1   MANATT, PHELPS & PHILLIPS, LLP
    RONALD S. KATZ (Bar No. CA 085713)
2   E-mail: rkatz@manatt.com
    RYAN S. HILBERT (California Bar No. 210549)
3   E-mail: rhilbert@manatt.com
    NOEL S. COHEN (California Bar No. 219645)
4   E-mail: ncohen@manatt.com
    1001 Page Mill Road, Building 2
5   Palo Alto, CA 94304-1006
    Telephone: (650) 812-1300
6   Facsimile: (650) 213-0260

7   McKOOL SMITH, P.C.
    LEWIS T. LECLAIR (Bar No. CA 077136)
8   E-mail: lleclair@mckoolsmith
    300 Crescent Court, Suite 1500
9   Dallas, TX 75201
    Telephone: (214) 978-4000
10  Facsimile: (214) 978-4044

11  Attorneys for Plaintiffs

12

13                      UNITED STATES DISTRICT COURT

14                    NORTHERN DISTRICT OF CALIFORNIA

15                        SAN FRANCISCO DIVISION

16

17  BERNARD PAUL PARRISH, HERBERT       CIVIL ACTION NO. C07 0943 WHA
    ANTHONY ADDERLEY, and WALTER
18  ROBERTS III, on behalf of themselves and
    all others similarly situated,        SECOND AMENDED COMPLAINT FOR
19                                         BREACH OF CONTRACT, UNJUST
                    Plaintiffs,            ENRICHMENT, BREACH OF FIDUCIARY
20                                         DUTY, VIOLATION OF CALIFORNIA
                                           BUSINESS & PROFESSIONS CODE § 17200,
21                                         AND AN ACCOUNTING

22  NATIONAL FOOTBALL LEAGUE
    PLAYERS ASSOCIATION, a Virginia
23  corporation, and NATIONAL FOOTBALL    CLASS ACTION
    LEAGUE PLAYERS INCORPORATED
24  d/b/a PLAYERS INC, a Virginia          JURY TRIAL DEMANDED
    corporation,
25
                    Defendants.
26

27

28

MANATT, PHELPS &
  PHILLIPS, LLP
ATTORNEYS AT LAW
   PALO ALTO

20183490.1

SECOND AMENDED CLASS ACTION
COMPLAINT CASE NO. C07 0943 WHA

Dockets.Justia.com

1      Plaintiffs Bernard Parrish, Herbert Adderley and Walter Roberts III, by and through their

2  undersigned attorneys, bring this complaint on behalf of themselves and other similarly situated

3  retired NFL players against National Football League Players, Inc. ("PLAYERS INC"), and its

4  parent labor union, the National Football League Players Association (the "NFLPA" or the

5  "Players Union"), as follows:

## I.    INTRODUCTION

7      This is a class action lawsuit brought by three classes of retired NFL football players

8  against the NFLPA and PLAYERS INC. Plaintiffs allege that the Defendants have unfairly

9  competed and wrongfully interfered with the marketing of the images of all retired NFL players

10  and further breached their duties to those retired players who have signed a Group Licensing

11  Agreement ("GLA"). Plaintiffs seek relief on behalf of the Classes for breach of contract, unjust

12  enrichment, breach of fiduciary duty, violations of the California Business & Professions Code

13  § 17200, and Plaintiffs seek an accounting.

## II.    JURISDICTION AND VENUE

15    1.    The Court has subject matter jurisdiction under 28 U.S.C. § 1332 (diversity

16  jurisdiction) because one or more Class members is a citizen of a state different from Defendants,

17  there are more than 100 class members, and, on information and belief, the aggregate amount in

18  controversy exceeds the jurisdictional amount of $5 million.

19    2.    Venue in this Court is proper under 28 U.S.C. § 1391 because a substantial part of

20  the events or omissions giving rise to the claims occurred in this district.

## III.    INTRADISTRICT ASSIGNMENT

22    3.    Pursuant to Local Civil Rule 3-2, assignment of this action to the San Francisco

23  division of this Court is proper because a substantial part of the events or omissions giving rise to

24  the claims herein occurred in San Mateo County.

## IV.    PARTIES

### A.    PLAINTIFFS

27    4.    Plaintiff BERNARD PAUL PARRISH, a resident of Florida, is a former defensive

28  back who starred with the Cleveland Browns from 1959 through 1966. Parrish graduated with a

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
PALO ALTO

20183490.1                                    2                    SECOND AMENDED CLASS ACTION
COMPLAINT CASE NO. C07 0943 WHA

1  degree in Building Construction from the University of Florida, School of Architecture and fine

2  Arts. He was the CEO and President of a commercial construction company for over 20 years that

3  employed over 3,000 tradesmen, laborers and engineers (both union and non-union), building

4  hotels, medical and office buildings, and housing for officer and enlisted men on AFB's in eight

5  states. Prior to entering the NFL, Parrish was a baseball All-American at the University of Florida

6  (where he is also a member of the school's Hall of Fame) and played one year of professional

7  baseball. As a pro football player, Parrish played in two Pro Bowl games. In 1964, Parrish led the

8  Browns to an NFL World Championship, beating Johnny Unitas and Coach Don Shula's heavily-

9  favored Colts 27-0. Parrish has been an advocate for retired players for many years. He is the

10  author of a best selling book, *They Call It A Game*. He is a competitor and/or potential competitor

11  to Defendants for the marketing of his image. Parrish has signed a number of Group Licensing

12  Agreements (GLAs) with the NFLPA.

13      5.    Plaintiff HERBERT ANTHONY ADDERLEY, a resident of New Jersey, is a

14  former NFL cornerback who starred for the Green Bay Packers and the Dallas Cowboys from 1961

15  through 1972. Adderley played in five Pro Bowl games during the 1960's. He also played in

16  seven NFL championship games, including four of the first six Super Bowl games. Adderley is

17  one of only two players in pro football history to play on six World Championship teams.

18  Adderley's 60-yard interception return for a clinching touchdown for the Packers in Super Bowl II

19  was the first touchdown scored by a defensive player in Super Bowl history. He was enshrined in

20  the Pro Football Hall of Fame in 1980. In 1999, Adderley was ranked number 45 on *The Sporting*

21  *News'* list of the 100 Greatest Football Players. Adderley has signed a number of GLAs with the

22  NFLPA. He is a competitor and/or potential competitor to Defendants for the marketing of his

23  image.

24      6.    Plaintiff WALTER ROBERTS III, a resident of Northern California since 1979, is a

25  former wide receiver and kick returner who starred in the NFL from 1964 to 1970. A former

26  California state and national long-jump champion in 1960, Roberts went on to play with the

27  Cleveland Browns from 1964 to 1966 and was a member of the Cleveland Browns team that

28  defeated Johnny Unitas and Coach Don Shula's heavily-favored Colts 27-0 in the 1964 World

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
PALO ALTO

20183490.1                                    3                    SECOND AMENDED CLASS ACTION
                                                                   COMPLAINT CASE NO. C07 0943 WHA

1   Championship. Roberts also led the league in kickoff returns that same year. Following his stint

2   with the Browns, Roberts played with the New Orleans Saints during their inaugural season in

3   1967 and helped the Saints win their first game in franchise history by scoring three touchdowns in

4   a 31-24 victory over the Philadelphia Eagles. Roberts also played for Coach Vince Lombardi and

5   the Washington Redskins in 1969 and 1970. Following his career in professional football, Roberts

6   co-owned a building supplies company called JR Builders Specialties, Inc. He is a competitor

7   and/or potential competitor to Defendants for the marketing of his image, and still receives many

8   requests for autographs for trading cards bearing his image.

9   **B.    DEFENDANTS**

10   7.    Defendant NFLPA, formed in 1956, is a Virginia corporation that acts as the labor

11   union for professional football players in the National Football League. The NFLPA's principal

12   place of business is 2021 L Street, Washington, D.C. According to the NFLPA, "financial security

13   for players during and after their football career is a goal of the NFLPA."

14   According to the NFLPA's mission statement:

15   We, the National Football League Players Association, pay homage to our
    predecessors for their courage, sacrifice and vision; pledge to preserve and
16   enhance the democratic involvement of our members; and confirm our
    willingness to do whatever is necessary for the betterment of our
17   membership to preserve our gains and achieve those goals not yet attained.

18   8.    PLAYERS INC, formed in 1994, is the licensing and marketing subsidiary of the

19   NFLPA (see **Exhibit F**). PLAYERS INC is a Virginia corporation with its principal place of

20   business at 2021 L Street, Washington, D.C. It claims to market active and retired players through

21   licensed products such as trading cards and video games, television and radio programming,

22   personal appearances, autograph signings, an Internet site, and events such as the Super Bowl.

23   PLAYERS INC has already been served and filed and an Answer in this lawsuit. During 2006, on

24   information and belief, the following officers resigned from PLAYERS INC: its President, its

25   Executive Vice President, its Senior Vice President, and its Vice President. On its website as of

26   February 6, 2007, PLAYERS INC listed the following under the category "HISTORY":

27   April 1995  PLAYERS INC launches a Player Marketing department to
    generate marketing opportunities for NFL players and to support its
28   licensing departments.

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
PALO ALTO

20183490.1                    4                    SECOND AMENDED CLASS ACTION
COMPLAINT CASE NO. C07 0943 WHA

<u>June 1998</u>  PLAYERS INC signs MBNA to a five year, multi-million dollar sponsorship agreement. PLAYERS INC names MBNA the "Official Credit Card of the NFL Players," and MBNA uses the sponsorship to include NFL player images on affinity credit cards.

<u>June 1999</u>  PLAYERS INC signs Coors Brewing Company to a three year, multi-million dollar sponsorship agreement. Coors leverages the sponsorship by creating the "Coors Light NFL Players Starting Lineup" fantasy football promotion on its 12-packs in the fall.

<u>August 2000</u>  PLAYERS INC and the NFL enter into a historic internet and sponsorship partnership. NFLPlayers.com becomes part of the NFL Internet Network and NFL players are now made available to NFL sponsors exclusively through PLAYERS INC. As part of the partnership, PLAYERS INC and the NFL manage the NFL Auction on eBay and PLAYERS INC licenses NFL.com's fantasy football game.

<u>July 2001</u>   PLAYERS INC licenses Reebok exclusively to produce authentic and replica NFL player jerseys. Reebok breaks all previous PLAYERS INC licensed jersey sales records.

<u>February 2003</u>   More than 5 million PLAYERS Inc-licensed videogames are sold during the 2002 NFL season.

<u>March 2003</u>   Annual retail sales of PLAYERS INC licensed products reaches $700 million.

<u>August 2003</u>  PLAYERS INC launches its own fantasy football game, NFL Players Fantasy Football, on NFLPLAYERS.COM.

<u>November 2004</u>  PLAYERS INC signs a five year exclusive videogame license with Electronic Arts (EA), the world's largest videogame software manufacturer.

<u>March 2005</u>   Annual retail sales of PLAYERS INC licensed products reaches $750 million.

<u>August 2005</u>  Beat The NFL Players Fantasy Football is available only at NFLPLAYERS.COM giving fans the chance to test their skills against former NFL greats Ron Jaworski, Daryl Johnston, Ed McCaffrey, Fran Tarkenton, Thurman Thomas and Jack Youngblood.

<u>September 2005</u>   PLAYERS INC currently licenses more than 65 companies for retail and licensed products and does business with 21 NFL sponsors.

On its website on February 6, 2007, PLAYERS INC stated under the heading "What is GROUP LICENSING?":

Group licensing programs are defined as those programs in which a licensee utilizes a total of six (6) or more NFL players in conjunction with or on products that are sold at retail or used as promotional or premium

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
PALO ALTO

20183490.1                                      5                    SECOND AMENDED CLASS ACTION
                                                                     COMPLAINT CASE NO. C07 0943 WHA

1    items. The players may be depicted individually on a product as part of a
     series or collectively with other players.
2
     Some PLAYERS INC group licensing programs utilize as few as 6 players
3    and others as many as 1,800 league-wide. PLAYERS INC works with more
     than 60 licensees whose products include: Trading cards (500+ players),
4    Videogames (1,500+ players), Apparel (1,000+ players) and Collectibles
     (75+ players)."
5

6                    **V.    SUBSTANTIVE ALLEGATIONS**

7        9.    The NFLPA is the labor union representing active football players in the NFL.

8    Almost all active NFL players grant the right to market their names and images to the NFLPA

9    under the Collective Bargaining Agreement with the NFL (the "CBA"). The NFLPA also offers

10   membership to retired NFL players and charges them annual dues for membership. The NFLPA

11   promotes a "Retired Players Group Licensing Program," which solicits retired players to grant to

12   the NFLPA the right to market the retired player's name, number, likeness, voice, facsimile

13   signature, photograph, picture, and/or biographical information (collectively "image") as a part of a

14   group consisting of six or more players.

15       10.    PLAYERS INC is a for profit corporation owned by the NFLPA. According to a

16   Form 990 filed by Defendant NFLPA, PLAYERS INC is 79% owned by the NFLPA (see **Exhibit**

17   **A**). The NFLPA assigns the license agreements that it receives from retired players to PLAYERS

18   INC. As stated on PLAYERS INC's website on February 6, 2007, the licensing operates as

19   follows:

20       When a player signs an NFLPA Group Licensing Assignment (GLA) or assigns his
         group licensing rights to the NFLPA, he gives the NFLPA the exclusive right to use
21       his name, number, likeness, voice, facsimile signature, photograph, picture, and/or
         biographical information (collectively "image") in licensed programs involving six
22       or more players. The NFLPA has assigned, and will continue to assign, those rights
         to PLAYERS INC.
23

24       11.    On information and belief, PLAYERS INC receives revenues of over $100 million

25   per year based on sales of licensed products of over $700 million per year.

26       12.    On various occasions, PLAYERS INC has made inconsistent, misleading, and

27   ambiguous representations about the number of retired players that it purports to represent. For

28   example, PLAYERS INC's website as of February 6, 2007 (before the original complaint in this

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
PALO ALTO

20183490.1                    6            SECOND AMENDED CLASS ACTION
                                           COMPLAINT CASE NO. C07 0943 WHA

1  matter was filed) stated that PLAYERS INC represents "over 3000 retired players." Shortly after

2  this complaint was filed, however, the PLAYERS INC website was changed to say that PLAYERS

3  INC represents "many memorable retired NFL players." At present, Plaintiffs do not know the

4  exact number of retired players purportedly represented by PLAYERS INC.

5     13.    PLAYERS INC and the NFLPA have sought to become the exclusive representative

6  for active and retired players with respect to licensed products, such as trading cards and video

7  games, television and radio programming, personal appearances, autograph signings, an Internet

8  site, and events such as the Super Bowl. As a letter (**Exhibit B**) from the Chairman of PLAYERS

9  INC to a retired player states:

10     PLAYERS INC'S licensees such as EA Sports are permitted to secure retired NFL player
       rights only from PLAYERS INC, <u>not from any other source</u>, contrary to what others may
11     have told you. This offer will be your <u>only</u> opportunity to participate in NFL player video
       games and get paid.
12

13  **Exhibit B** (emphasis added). On information and belief, this same letter was sent to a number of

14  retired NFL players.

15     14.    Defendant NFLPA has confirmed its desire and intention to become the exclusive

16  group licensing representative for active and retired NFL players. For example, the NFLPA's

17  licensing agreement (effective March 1, 2007) with one of the major trading card companies, the

18  TOPPS Company, Inc. ("TOPPS"), attaches a sample GLA between the NFLPA and a retired

19  player that is entitled "Retired Player Group Licensing Authorization Form". This sample GLA

20  states that the NFLPA "agrees to use its best efforts to promote the use of NFL player images in

21  group licensing programs, to provide group licensing opportunities to all NFL players, and <u>to</u>

22  <u>ensure that no entity engages in a group licensing program without first obtaining a license from</u>

23  <u>the NFLPA</u>." (*See* Attachment A (page 14) to the TOPPS license agreement, which is attached

24  hereto as **Exhibit C**) (emphasis added).

25     15.    Furthermore, Paragraph 11 of Exhibit C emphasizes exclusivity, not just for group

26  licensing: "Licensee agrees and acknowledges that it shall not secure or seek to secure directly

27  from any player who . . . at any time was under contract to an NFL club, or from such player's

28

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
PALO ALTO

20183490.1

7

SECOND AMENDED CLASS ACTION
COMPLAINT CASE NO. C07 0943 WHA

agent, permission or authorization for the use of such player's name, facsimile, signature, image, likeness, photograph or biography in conjunction with the licensed product(s) herein."

### A.    THE NFLPA AND PLAYERS INC HAVE CONTRACTUAL OBLIGATIONS TO THOSE RETIRED PLAYERS WHO HAVE SIGNED A GLA.

16.    On information and belief, Adderley, Parrish and other members of the GLA Class (see Paragraphs 37-38 for a definition of the GLA Class) entered into one or more versions of Group Licensing Agreement(s) with PLAYERS INC and/or the NFLPA within the period of the statute of limitations. The GLA form signed by Plaintiff Parrish in 1998 is attached as an example of one such agreement (**Exhibit D**).

17.    According to PLAYERS INC's website, retired players sign a Group Licensing Agreement with the NFLPA. In turn, the NFLPA assigns (and will continue to assign) the rights under those Agreement(s) to PLAYERS INC. On information and belief, some NFL players may have also signed Group Licensing Agreement(s) directly with PLAYERS INC.

18.    A version of the Group Licensing Agreement, executed by members of the GLA Class including Parrish and Adderley (**Exhibit D**), provided, in relevant part, that " . . . the monies generated by such licensing of retired player group rights <u>will be divided among the player,</u> the Players Assistance Trust and, to the extent necessary, may be used to cover the cost of administering the Retired Player Group Licensing Program." (emphasis added).

19.    On information and belief, a 2007 version of the Group Licensing Agreement – attached as a "Sample GLA" to the NFLPA's Licensing Agreement with TOPPS (**Exhibit C**) – provides, in relevant part, that "the NFLPA agrees to ...<u>use its best efforts</u> to promote the use of NFL player image in group licensing programs, to provide group licensing opportunities to <u>all</u> NFL players . . . ." (emphasis added).

20.    Despite Defendants' obligations to Plaintiffs, an email from the then-president of PLAYERS INC (**Exhibit E**) states that only 358 of 3,500 retired players received payments in 2005. These payments amounted to a fraction of PLAYERS INC's NFL player licensing business. With respect to those retired NFL players who signed GLAs with the NFLPA that have in turn

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
PALO ALTO

20183490.1

8

SECOND AMENDED CLASS ACTION
COMPLAINT CASE NO. C07 0943 WHA

1   been assigned to PLAYERS INC, PLAYERS INC has and had an obligation to provide payment

2   regardless of whether a specific player's image is or was used (see **Exhibit D**), which was drafted

3   solely by PLAYERS INC); as PLAYERS INC's website as of February 6, 2007 (**Exhibit F**) stated:

> PLAYERS INC has become a fully integrated marketing company for
> active and retired NFL players. These activities generate guaranteed
> royalties to PLAYERS INC and the players in addition to providing
> financial support to the NFLPA. The organization is committed to meeting
> the needs of all NFL players in the National Football League by creating
> player marketing opportunities, increasing brand awareness and developing
> valuable business partnerships.

> PLAYERS INC has positioned itself in the marketplace as a
> "brand" and has adopted the slogan "PLAYERS INC MEANS NFL
> PLAYERS." The highly recognizable PLAYERS INC logo, which
> represents all players in the NFL, has become a valuable and recognizable
> icon that appears on all licensed products and is used in connection with all
> sponsorships, promotions and PLAYERS INC events and properties.

12  **Exhibit F** (emphasis added).

13      21.     Although it is to be expected that some better-known players will or may receive

14  additional payments, each represented player should have received some payment as a result of

15  signing a GLA.   PLAYERS INC's website as of February 6, 2007 states: "Any players who are

16  singled out to promote licensed products are paid additional fees for being highlighted on product

17  packaging, point of sale, print ads or other collateral material, for autographs, appearances, product

18  endorsements and commercials." (emphasis added).   Instead of providing payments to all retired

19  players who signed a GLA, PLAYERS INC has, on information and belief, diverted millions of

20  dollars from PLAYERS INC to the NFLPA in order to support the overhead, substantial salaries

21  and perquisites of NFLPA management and employees.   Plaintiffs have an ownership interest in

22  these funds.

23      **B.     THE NFLPA AND PLAYERS INC HAVE FIDUCIARY OBLIGATIONS TO
           THOSE RETIRED PLAYERS WHO HAVE SIGNED A GLA.**

24

25      22.     Furthermore, whether or not the GLAs created contractual obligations to retired

26  NFL players, as the representative of the retired players who have signed a GLA during the class

27  period, Defendants have created an agency relationship between themselves and the retired

28

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
PALO ALTO

20183490.1                                    9                    SECOND AMENDED CLASS ACTION
                                                                   COMPLAINT CASE NO. C07 0943 WHA

1    players, either by operation of law and/or as can be inferred or implied based on the conduct of the

2    parties and the circumstances of the case. Upon information and belief, Defendants have enjoyed

3    substantial benefits from these agency relationships, and Defendants should now be estopped from

4    disavowing their resulting obligations.

5         23.    As the agent of those retired players who have signed a GLA, Defendants have

6    assumed a confidential relationship with the retired players and are obligated to act with the

7    highest duty of loyalty and regard for the interests of the retired players. Those duties include

8    fiduciary obligations. Defendants owed and/or owe each represented player a fiduciary duty to

9    seek for that player licensing and marketing opportunities in a fair and equitable manner consistent

10    with the best interests of that player. Instead, Defendants have acted in an arbitrary, capricious and

11    inequitable manner, contrary to their fiduciary obligations. Those retired players who have signed

12    GLAs for any given year are all, as individuals, vulnerable to the size and economic power of

13    Defendants; their vulnerability empowers Defendants; this empowerment has been solicited and/or

14    accepted by Defendants; and Plaintiffs and the putative class they represent are unable to

15    effectively protect themselves from Defendants. Many retired players suffer from mental and

16    physical disabilities as a result of their NFL careers.  It would be unfair and contrary to law to

17    allow PLAYERS INC to reap the benefits of its purported representation – *i.e.*, obtaining sole and

18    exclusive right to negotiate with third parties like EA Sports – but then disavow that relationship

19    for purposes of avoiding the need to account for and/or fairly represent the retired players who

20    signed GLAs. Defendants should be estopped from adopting such a position.

21         24.    **Exhibit G** states that ". . . every retired player has benefited from PLAYERS INC's

22    creation... [b]ecause 40% of PLAYERS INC's operating revenue is paid to the NFLPA as a royalty

23    . . .This allows the NFLPA to provide extensive services and benefits to retired players . . ." But

24    the NFLPA does not provide "extensive" services and benefits to retired players, even to those

25    retired players who have chosen to pay the $100 annual fee to join the NFLPA's retired member

26    program. As a result, any purported benefits to the retired players have not been actualized[1].

27  [1]    In addition to poverty-level NFLPA pension payments (Plaintiff Adderley, for example,
receives only $176.85 per month), and the failure to disburse royalty payments from PLAYERS
28    INC to 90% of the retired players who signed GLAs, the situation regarding disability payments to

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
PALO ALTO

20183490.1                    10                    SECOND AMENDED CLASS ACTION
COMPLAINT CASE NO. C07 0943 WHA

25.     Defendants purport to have the sole and exclusive control over licensing contracts with vendors and yet provide no meaningful information to retired NFL players on such contracts. With respect to the vast sums of money that Defendants are able to obtain through their claim to represent retired NFL players who have signed GLAs, Defendants control all of the material information and accounting for funds due and owing to members of the GLA Class.

26.     More specifically, PLAYERS INC and the NFLPA have a continuing duty to GLA Class members (see Paragraphs 37-38) to serve the best interests of all retired NFL players who have signed GLAs, to maximize the collection of revenue, portions of which belong to members of the GLA Class; to accurately report such revenues and other material to members of the GLA Class; to accurately account for such monies; and to remit such monies to the members of the GLA Class in a timely fashion. By virtue of, among other things, PLAYERS INC's and/or the NFLPA's position of control and the lack of information in the possession of GLA Class members, Defendants stand in the position of fiduciary to Plaintiffs and thus must account for amounts due and owing to Plaintiffs.

27.     PLAYERS INC and/or the NFLPA have violated their fiduciary duties to the retired players who signed GLAs in several additional ways:

- Although Defendants have a complete monopoly on the basic information relevant to Plaintiffs (including, for example, sources of revenue, principles for division of monies, revenues, principles for division of opportunities, efforts to develop business, and other basic business facts), Defendants have revealed only sketchy and inadequate information to Plaintiffs in spite of numerous requests (see, for example, **Exhibit I**, regarding Adderley's unsuccessful attempts to get a response to his phone calls and written communications) dating as far back as 1994;

- Only in 2006, when the United States Department of Labor imposed new disclosure requirements on the NFLPA, were the Plaintiffs able to obtain any more than the

ailing retired players is very negative for the mentally and physically ailing retired players. Although professional football is an extremely violent game causing long-term injury, an extremely low percentage of retired players receive disability payments. *See*, for example, **Exhibit H**.

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
PALO ALTO

20183490.1                                    11                    SECOND AMENDED CLASS ACTION
COMPLAINT CASE NO. C07 0943 WHA

sketchiest information.     However, even the expanded Form LM-2 Labor Organization Annual Report, required by the United States Department of Labor and filed by the NFLPA in 2006, does not provide all the information that Plaintiffs need to determine that PLAYERS INC and the NFLPA are observing their fiduciary duties.  Before that document was filed, however, Plaintiffs did not discover (and, in the exercise of reasonable diligence, could not have discovered) that facts had been concealed;

- At or around the time of the NFLPA's filing of the 2006 LM-2 (which states that the NFLPA has 3,700 retired members, up from zero reported the year before), four of the top officers of PLAYERS INC announced their resignations.  The then-president of PLAYERS INC was quoted in the November 6-12, 2006 edition of SportsBusiness Journal on the increased Department of Labor reporting requirements as follows:  "It's a real problem.  We will have to deal with the consequences and we are not happy about it.";

- PLAYERS INC has not, on information and belief, made diligent efforts to generate revenue for members of the GLA Class; almost 90% of the GLA Class receive no money;

- PLAYERS INC has not, on information and belief, allocated opportunities to the members of the GLA Class in any fair or equitable manner;

- PLAYERS INC and/or the NFLPA has not, on information and belief, distributed revenues to the members of the GLA Class that should have been distributed, even to the small percentage of GLA Class members who have received some monies; and

- PLAYERS INC has distributed monies to the NFLPA that have not benefited GLA Class members and in contravention of their duties to the Class.

28.     As a result of the unlawful conduct complained of above, Plaintiffs seek an accounting of the funds received and distributed by PLAYERS INC in connection with its claimed representation of retired players who signed a GLA.  As an example of the need for an accounting,

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
PALO ALTO

20183490.1                                    12                    SECOND AMENDED CLASS ACTION
COMPLAINT CASE NO. C07 0943 WHA

1    the Total Income figure on Exhibit A of $4,868,249 is off, on information and belief, by at least a

2    factor of ten.    Plaintiffs also seek damages, in an amount to be proven at trial, which, on

3    information and belief, exceed the jurisdictional amount of $5 million.

**C.    THE NFLPA AND PLAYERS INC HAVE UNFAIRLY COMPETED AND WRONGFULLY INTERFERED WITH THE MARKETING OF THE IMAGES OF RETIRED NFL PLAYERS.**

6        29.    In addition to violating the rights of those retired NFL players who signed a GLA

7    with the NFLPA, the NFLPA and PLAYERS INC have engaged in predatory and unlawful

8    conduct in connection with the marketing of retired NFL player images and downstream markets

9    like videogames.    This conduct affects all retired players, regardless of whether or not they have

10   signed a GLA.

11       30.    Because the NFLPA dominates the market for NFL player marketing by virtue of its

12   representation of almost all current NFL players under the CBA and thousands of retired players

13   pursuant to GLAs, those potential licensees who seek to use the names and likenesses of current

14   and former NFL players are forced to deal with the NFLPA.    Through its assignment of the rights

15   of the NFLPA, PLAYERS INC carries the power of the NFLPA.    On information and belief, in an

16   abusive and unlawful exercise of its power, the NFLPA has agreed upon a clause in its licensing

17   agreements with one or more potential licensees that requires all such licensees to deal only with

18   the NFLPA and not with any retired NFL player directly.    In its license agreement with TOPPS

19   dated in 2004 and renewed in 2007, the NFLPA agreed with TOPPS upon the following clause:

> 11.    NON-INTERFERENCE.    Licensee agrees and acknowledges that it shall not secure or seek to secure, directly from any player who is under contract to an NFL club, is seeking to become under contract to an NFL club, or at any time was under contract to an NFL club, or from such player's agent, permission or authorization for the use of such player's name, facsimile, signature, image, likeness, photograph, or biography in conjunction with the licensed products herein.

**Exhibit C (page 8).**

25       31.    Counsel for PLAYERS INC admitted before this Court during the hearing on May

26   31, 2007 that PLAYERS INC has a number of exclusive dealing arrangements.

27

28

MANATT, PHELPS & PHILLIPS, LLP
ATTORNEYS AT LAW
PALO ALTO

20183490.1                                    13

SECOND AMENDED CLASS ACTION
COMPLAINT CASE NO. C07 0943 WHA

1    32.    PLAYERS INC also has an exclusive contract with Electronic Arts (sometimes

2    referred to as "EA"), which is headquartered in Redwood City, CA, and which, on information and

3    belief is the largest licensee of PLAYERS INC (paying PLAYERS INC over $30 million in 2005

4    alone). Electronic Arts stated in a press release in December, 2004, that it had signed a five-year

5    exclusive licensing agreement with PLAYERS INC, giving Electronic Arts exclusive rights to

6    NFL players. Gene Upshaw, Chairman of both the NFLPA and PLAYERS INC, was quoted in

7    that press release as follows:

8        This exclusive relationship will maximize the value of NFL players through
         EA's continued commitment to bring fans closer to the game.
9

10   The press release also describes the significant amount of commerce involved:

11       Madden NFL Football from the EA SPORTS(TM) brand has sold more
         than 42 million copies over the franchise's 15 year history. Madden NFL
12       2005, the most complete football game ever, is available for the
         PlayStation(R)2 computer entertainment system, Xbox(R) videogame
13       system from Microsoft, Nintendo GameCube(TM), Game Boy(R) Advance,
         the PlayStation(R) console and PC. . .
14
         Electronic Arts Inc. (EA), headquartered in Redwood City, California, is
15       the world's leading interactive entertainment software company. Founded
         in 1982, EA posted revenues of $2.96 billion for fiscal 2004.
16
                                    * * *
17
         The significant anticompetitive effects of the agreement between PLAYERS INC and EA
18
     have been extensively reported in the financial press, the general press, and the videogame press.
19
     For example:
20
     *The Wall Street Journal*, July 11, 2005
21
         In December [2004,] [EA] negotiated an exclusive right to make
22       videogames that use National Football League teams and players, knocking
         Take-Two [another videogame manufacturer] and everyone else out of that
23       game for five years. . .

24       EA agreed to unprecedented prices in nailing down these deals:  more than
         $400 million for the NFL rights. . .
25
         Madden football has . . . racked up some $1.5 billion in retail sales.
26
         EA held 63% of the overall U.S. market for sports videogames as of last
27       year, estimates Arcadia Investment Corp., a research firm in Portland, Ore.

28       Instead of licensing multiple publishers, [the NFL and the NFLPA]

Manatt, Phelps &
Phillips, LLP
Attorneys At Law
Palo Alto

20183490.1                                   14                    SECOND AMENDED CLASS ACTION
                                                                  COMPLAINT CASE NO. C07 0943 WHA

1    indicated early last year they would be willing to consider an exclusive
     deal. Using such a system in apparel licensing – with Reebok International
2    Ltd. holding sole rights – had led to higher profits, the league and players
     say.
3
     Annualized, the contract brings the NFL and players; union roughly twice
4    what they got in the past from multiple licensees, say people familiar with
     the matter.
5    EA's exclusive licenses have reduced the threat of price wars, since Take-
     Two and others, while they can still make football games, can no longer
6    depict NFL uniforms or stadiums or players.

7                                    * * *

8    *The Los Angeles Times*, August 24, 2006

9    <u>Madden NFL has field to itself</u>

10        Madden NFL is the only fully licensed NFL game on the market

11        And it has spawned a cottage industry of its own, such as the recent $19.95
          pay-per-view TV shows hyping the game's new features.
12
13        . . . EA effectively bought out the competition . . .
                                     * * *

14   *The Calgary Herald*, September 17, 2005

15   <u>Exclusive deals sack competition:  Gamers worry big money trumps choice</u>

16        Video game players fear a new corporate deal will kill ingenuity in their
          favorite football title, drive up prices and remove their freedom of choice.
17
          The deal [with PLAYERS INC and the NFL] effectively killed all of EA
18        Sports' competition in the genre.

19        Football games are the jewel in the sports genre and Madden has sold 40
          million units since 1989.
20
          Take Two [a videogame manufacturer] soon spoke out against these deals
21        in a release.

22        "We believe that the decisions of the (NFL) and Players Inc. to grant an
          exclusive license for videogames do a tremendous disservice to the
23        consumers and sports fans whose funds ultimately support the NFL, by
          limiting their choices, curbing creativity and almost certainly leading to
24        higher game prices,"

25        Gamers on chat sites and blogs claimed to be boycotting this year's Madden
          title because of what they viewed as predatory licensing. They complained
26        about the lack of purchase options and that EA would now rest on their
          laurels rather than continue to develop.
27
          "Madden was a disappointment this year," [Jon] Robinson [sports video
28        game editor for review site IGN] says. "EA would have added more in the

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
PALO ALTO

20183490.1                          15                SECOND AMENDED CLASS ACTION
                                                      COMPLAINT CASE NO. C07 0943 WHA

1    games if they knew there was a competitor on the market."

2    Still, Madden NFL '06, released last month, is enjoying great sales, moving
     1.7 million copies in its first week.

3

4                                    * * *

5    *The Arizona Daily Star,* August 30, 2006

6    'Madden 07' has video game all to itself

7    Thanks to an exclusive contract, "Madden NFL 07" is the only licensed
     NFL game out this year, so fans are at publisher Electronic Arts' mercy in
8    regard to the quality of the self-selling franchise.

9                                    * * *

10   *PlayStation Magazine,* March 1, 2005

11   NFL and EA Kill Competition

12   In short order, EA has garnered full control over the most profitable, best-
     selling wedge of the sports-videogame pie, ensuring that no one else will
13   get a slice.

14   In a genre based on competition, this makes Madden a sort of monopoly,
     effectively killing off the NFL 2K series, the biggest to EA's long-standing
15   and legendary franchise.

16   There's no question that this maneuver limits gamers' choices if they're
     looking for an NFL-aided experience
17
     Without impetus to outdo the competition, it stands to reason that the series
18   could very possible stagnate.

19   There's the question of higher game prices.   While nothing has been
     officially announced, industry insiders say the final cost of the NFL deal is
20   somewhere north of $300 million, a whopping sum that consumers will
     ultimately pay for.
21
     This is a bold and powerful move – one that borders on predatory licensing,
22   aimed solely to drive companies out of business. . .

23        33.    These unfair restrictions are unreasonable and are designed to, and do, exclude

24   competitors from the market and enhance the economic domination of the NFLPA and PLAYERS

25   INC.    PLAYERS INC's unfair conduct has restrained, or is likely to restrain, competition by

26   raising prices, by decreasing competition for the marketing or licensing of NFL player images, and

27   by depriving potential licensees, as well as retired NFL players, of free and open competition for

28   licensing and marketing opportunities.

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
PALO ALTO

20183490.1                              16              SECOND AMENDED CLASS ACTION
                                                        COMPLAINT CASE NO. C07 0943 WHA

34.    In addition, the NFLPA, by and through PLAYERS INC, has made false and misleading statements designed to attain a monopoly over retired NFL player marketing, to induce retired NFL players to become retired members of the NFLPA and/or to sign exclusive GLAs, and to suggest to retired NFL players that the NFLPA and PLAYERS INC are the exclusive representatives for retired NFL group marketing rights.  These false and misleading statements include claims that:

- The activities of PLAYERS INC benefit every retired player by paying " . . . 40% of [its] operating revenue to [Defendant] NFL Players Association as a royalty," thereby " . . . allow[ing] the NFLPA to provide extensive services and benefits to retired NFL players[2].";

- the GLAs are "non-exclusive", whereas the language of one or more of the forms of the GLAs purports to "exclusively" grant certain rights to the NFLPA,

- all retired players, including but not limited to those who signed a GLA, will effectively receive a guaranteed minimum payment; and

- PLAYERS INC represents specific numbers of retired NFL players, which numbers are inconsistent and not reconcilable.

Members of the public, including Plaintiffs, have been deceived, and/or are likely to be deceived, by Defendants' false and misleading statements and other acts of unfair competition.

35.    By purporting either to represent or to control access to the rights of all retired players, by making exclusive arrangements and by its advertising and other mass communications that disseminate this information in commerce, Defendants have either effectively cut off any avenues for retired NFL players to deal directly with licensees or sponsors such as TOPPS and Electronic Arts (which, according to PLAYERS INC's website as of February 6, 2007, is the world's largest video game software manufacturer), or alternatively, Defendants have disseminated false and misleading information to the public.

---

[2]    Despite PLAYERS INC's claim of substantial payments to the NFLPA benefiting retired players, few retired NFL players receive the "extensive services and benefits" promised.  Most retired NFL players continue to receive only poverty-level pension payments.

# VI.    CLASS ACTION ALLEGATIONS

36.    Plaintiffs bring this class action on behalf of themselves and all others similarly situated pursuant to Rule 23 of the Federal Rules of Civil Procedure.  This action is maintainable as a class action pursuant to Rule 23(a), (b) and (d).

## A.    THE GLA CLASS

37.    Plaintiffs Herb Adderley and Bernard Parrish bring claims of breach of contract, breach of fiduciary duty, or in the alternative, unjust enrichment on behalf of a nationwide class seeking damages and an accounting (the "GLA Class").

38.    The GLA Class is defined as all those retired NFL Players who at any time from 1997 to the present have sent an executed GLA to the NFLPA.  Excluded from the GLA Class are the NFLPA, PLAYERS INC, and their directors, officers and employees.

## B.    THE 17200 CLASS

39.    Plaintiffs Roberts, Parrish and Adderley also represent a class of retired NFL players nationwide who have been harmed by conduct violative of California Business and Professions Code 17200 that has occurred in California (the "17200 Class").

40.    The 17200 Class is defined as retired NFL players who have been harmed by conduct occurring in California that is violative of Business & Professions Code 17200.  Excluded from the 17200 Class are the NFLPA, PLAYERS INC, and their directors, officers and employees.

## C.    THE 17200 CALIFORNIA RESIDENT CLASS

41.    Plaintiff Walter Roberts, III brings claims for violation of the California unfair competition law on behalf of California residents who are retired NFL players (the "17200 California Resident Class").

42.    The 17200 California Resident Class is defined as all former NFL players who live in California and who have been harmed by violations of Business & Professions Code 17200 nationwide.  Excluded from the 17200 California Resident Class are the NFLPA, PLAYERS INC, and their directors, officers and employees.

43.    The above three Classes all meet the numerosity standard in Rule 23(a)(1) because, although the exact numbers are unknown to Plaintiffs, on information and belief each alleged class

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
PALO ALTO

20183490.1                18                SECOND AMENDED CLASS ACTION
COMPLAINT CASE NO. C07 0943 WHA

1 consists of at least hundreds of retired NFL players, who are geographically dispersed throughout

2 the United States, California and perhaps elsewhere. The joinder of each of these players is

3 impracticable. The disposition of their claims through this class action will provide substantial

4 benefits to both the parties and the Court.

5　　44.　　The size of the three Classes and the identities of their individual members are

6 ascertainable through Defendants' records.

7　　45.　　Members of these three Classes may be notified of the pendency of this action by

8 techniques and forms commonly used in class actions, such as by published notice, e-mail notice,

9 website notice, first class mail, or combinations thereof, or by other methods suitable to this class

10 and deemed necessary and/or appropriate by the Court.

11　　46.　　There is a well-defined community of interest and common questions of law and

12 fact affecting the members of the 17200 Class and the 17200 California Residents Class as

13 required by 23(a)(2). The questions of law and fact common to these two Classes predominate

14 over any questions affecting only individual members and include, but are not limited to, the

15 following:

16　　(a)　　Whether PLAYERS INC and/or the NFLPA have attempted to exclude retired NFL

17 players from direct dealings with licensees, and have thus unfairly competed in violation of

18 California law by the acts and omissions, among others described above;

19　　(b)　　Whether the unlawful conduct of Defendants has allowed them to collect license

20 fees and royalties and distribute them among themselves, while depressing amounts paid to retired

21 players;

22　　(c)　　Whether the conduct of PLAYERS INC and the NFLPA has injured Plaintiffs and

23 the two Classes they represent;

24　　(d)　　Whether PLAYERS INC and/or the NFLPA have violated the California unfair

25 competition laws;

26　　(e)　　Whether Plaintiffs and the two Classes are entitled to injunctive relief and/or

27 monetary relief as a result of the unlawful conduct of Defendants.

28

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
PALO ALTO

20183490.1

19

SECOND AMENDED CLASS ACTION
COMPLAINT CASE NO. C07 0943 WHA

47.    There is a well-defined community of interest and common questions of law and fact affecting the members of the GLA Class as required by 23(a)(2). The questions of law and fact common to the GLA Class predominate over any questions affecting only individual members and include, but are not limited to, the following:

(a)    Whether PLAYERS INC and/or the NFLPA have breached their fiduciary duties, contractual obligations and non-contractual obligations to each player member of the Class by the acts and omissions, among others described above;

(b)    Whether Plaintiffs and the Class are entitled to an accounting showing all revenue received by Defendant and whether and how that revenue was distributed to the NFLPA and among the members of the Class;

(c)    Whether PLAYERS INC and/or the NFLPA have been unjustly enriched at the expense of Plaintiffs and the Class; and

(d)    Whether Plaintiffs and the Class are entitled to damages, punitive damages, costs and attorneys' fees as a result of the unlawful conduct of Defendants

48.    Plaintiffs' claims are typical of the claims of the respective Classes that they represent as required by Rule 23(a)(3). The claims of Plaintiffs and members of their respective Classes are based on the same legal theories and arise from the same unlawful conduct.

49.    Plaintiffs are adequate representatives of their respective Classes pursuant to Rule 23(a)(4) because their interests do not conflict with the interests of the Class members they seek to represent, and, in fact, they are similarly situated with the members of their respective Classes. Plaintiffs will fairly and adequately represent and protect the interests of their respective Classes. Plaintiffs have retained counsel who are competent and experienced in the prosecution of class action litigation.

50.    This action is maintainable under Rule 23(b)(1)(A) because the prosecution of separate actions could create the risk of inconsistent adjudication, which could establish incompatible standards of conduct for the party opposing the three Classes. As an example, separate actions for breach of fiduciary duty by Defendant could result in different adjudications as to the scope or enforceability of that duty.

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
PALO ALTO

20183490.1                    20                    SECOND AMENDED CLASS ACTION
COMPLAINT CASE NO. C07 0943 WHA

51.    This action also is maintainable under Rule 23(b)(1)(B) because the prosecution of separate actions could create the risk of adjudication that could, as a practical matter, be dispositive of the interests of others.  As an example, separate actions for breach of the fiduciary duty by Defendant could result in an adjudication concerning the scope or enforceability of that duty that would be binding on those not a party to such actions.

52.    A class action is superior to all methods for the fair and efficient adjudication of this controversy pursuant to Rule 23(b)(3).  Although the aggregate damages which may be awarded to Plaintiffs and the three classes are likely to be large, the actual damages suffered by the individual damages could be small in comparison.  Accordingly, the expense and burden of individual litigation makes it economically infeasible and procedurally impracticable for each retired player member of the three classes to seek redress for the wrongs done to them.  Plaintiffs are unaware of any other litigation concerning this controversy already commenced by or against any member of the three classes.  Allowing these matters to proceed as a class actions presents fewer management difficulties, conserves the resources of the parties and the court system, and is the only method whereby Plaintiffs and their respective Classes can efficiently seek redress and obtain a uniform adjudication of their claims.  Plaintiffs do not anticipate difficulties with the management of this action.

## VII.    CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION

#### (Breach of Contract)

53.    Plaintiffs incorporate by reference paragraphs 1 through 52 above as though set forth fully herein.

54.    On information and belief, Adderley, Parrish and other GLA Class members entered into one or more versions of Group Licensing Agreement(s) with PLAYERS INC and/or the NFLPA within the period of the statute of limitations, which has been tolled by Defendants' conduct.  The GLA form signed by Plaintiff Parrish in 1998 is attached as an example of one such agreement (**Exhibit D**).  Parrish has copies of the GLAs he signed in 1997 and 1998 and believes, and therefore alleges, that he signed GLAs in recent years.

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
PALO ALTO

20183490.1                                    21                SECOND AMENDED CLASS ACTION
                                                              COMPLAINT CASE NO. C07 0943 WHA

55.    According to PLAYERS INC's website, retired players sign a Group Licensing Agreement with the NFLPA. In turn, the NFLPA assigns (and will continue to assign) the rights under those Agreement(s) to PLAYERS INC. On information and belief, some NFL players may have also signed Group Licensing Agreement(s) directly with PLAYERS INC.

56.    A version of the Group Licensing Agreement, executed by members of the GLA Class including Parrish and Adderley, provided, in relevant part, that " . . . the monies generated by such licensing of retired player group rights will be divided among the player, the Players Assistance Trust and, to the extent necessary, may be used to cover the cost of administering the Retired Player Group Licensing Program." (**Exhibit D**) (emphasis added).

57.    On information and belief, a 2007 version of the Group Licensing Agreement – attached as a "Sample GLA" to the NFLPA's Licensing Agreement with TOPPS – provides, in relevant part, that "the NFLPA agrees to . . . use its best efforts to promote the use of NFL player image in group licensing programs, to provide group licensing opportunities to all NFL players . . . ." (**Exhibit C**) (emphasis added).

58.    On information and belief, Adderley, Parrish and other GLA Class members performed any and all obligations required of them under the Group Licensing Agreement(s).

59.    On information and belief, PLAYERS INC and/or the NFLPA breached their various Group Licensing Agreement(s) with retired NFL players by the acts and omissions set forth above. More specifically, with regard to the 2007 version of the Agreement referenced above, Defendants failed to use their "best efforts" to promote opportunities for retired NFL players as described in that Agreement. With regard to the other version of the Agreement referenced above, Defendants failed to make royalty payments as promised to all players, and diverted funds from PLAYERS INC to the NFLPA in breach of the GLA.

60.    As a result of Defendants' breaches, Adderley, Parrish and other GLA Class members have suffered damages.

MANATT, PHELPS & PHILLIPS, LLP
ATTORNEYS AT LAW
PALO ALTO

20183490.1

22

SECOND AMENDED CLASS ACTION
COMPLAINT CASE NO. C07 0943 WHA

## SECOND CAUSE OF ACTION

### (Breach of Fiduciary Duty)

61.    Plaintiffs incorporate by reference paragraphs 1 through 60 above as though set forth fully herein.

62.    Defendants have a fiduciary duty to the retired players that at any time signed a GLA with the NFLPA, a representation that is believed to generate hundreds of millions of dollars for PLAYERS INC and/or the NFLPA.

63.    Defendants have breached that duty by, among other things, the acts and omissions described above.

64.    As a direct and proximate result of Defendants' breaches of fiduciary duty, each member of the GLA Class has suffered damages in an amount subject to proof that, collectively, exceeds the jurisdictional minimum of the Court.

65.    As a result of Defendants acts and or omissions, Plaintiffs and the GLA Class are entitled to recover actual damages, punitive damages and attorney's fees.

## THIRD CAUSE OF ACTION

### (Unjust Enrichment/Restitution)

66.    Plaintiffs incorporate by reference paragraphs 1 through 65 above as though set forth fully herein.

67.    Plaintiffs have alleged that PLAYERS INC and/or the NFLPA have breached a number of duties and obligations required of them under various GLAs entered into with retired NFL players.    To the extent that Defendants dispute that they have any such duties under the Group Licensing Agreement(s) – and/or claim they have not breached any terms of those Agreements – Plaintiffs allege that those Agreements would thus be considered illusory, null and void and/or voidable.

68.    Plaintiffs alternatively allege that PLAYERS INC and/or the NFLPA have unjustly retained the benefit of the purported assignment of rights under the Group Licensing Agreement(s), without paying Plaintiffs any fair compensation to Plaintiffs for this benefit.

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
PALO ALTO

20183490.1                    23                    SECOND AMENDED CLASS ACTION
COMPLAINT CASE NO. C07 0943 WHA

69.    Plaintiffs' status as former players in the NFL has provided significant value to PLAYERS INC which has benefited PLAYERS INC and/or the NFLPA, and in the event the Group Licensing Agreement(s) were considered illusory, it would be unjust to allow PLAYERS INC and/or the NFLPA to retain this benefit without providing restitution to Plaintiffs.

70.    PLAYERS INC and/or the NFLPA have retained the money or property of GLA Class members against the fundamental principles of justice or equity and good conscience, and Plaintiffs have been harmed by this conduct and are entitled to restitution or other relief deemed proper by this Court.

## FOURTH CAUSE OF ACTION

### (California Unfair Competition, Cal. Bus & Prof. Code § 17200)

71.    Plaintiffs incorporate by reference paragraphs 1 through 70 above as though set forth fully herein.

72.    Defendants engaged in fraudulent conduct as proscribed by Cal. Bus. & Prof. Code § 17200 by the acts and omissions described above, including by making claims that:

- The activities of PLAYERS INC benefit every retired player by paying " . . . 40% of [its] operating revenue to [Defendant] NFL Players Association as a royalty," thereby " . . . allow[ing] the NFLPA to provide extensive services and benefits to retired NFL players";

- the GLAs are "non-exclusive";

- all retired players, including but not limited to those who signed a GLA, will effectively receive a guaranteed minimum payment;

- PLAYERS INC represents specific numbers of retired NFL players; and

- dues payments to the NFLPA entitle retired players, among other things, to licensing opportunities that generate guaranteed minimum payments.

73.    Such statements were false, or were likely to mislead members of the public, including retired NFL players and potential licensees of NFL player rights, and were made for the purpose of improperly procuring NFLPA membership, NFL player rights and exclusive licensing

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
PALO ALTO

20183490.1

24

SECOND AMENDED CLASS ACTION
COMPLAINT CASE NO. C07 0943 WHA

1  agreements for such rights and/or to cut off any avenues for the retired NFL players and potential

2  licensees to deal with one another directly.

3        74.    In addition, Defendants engaged in practices that are unfair as proscribed by Cal.

4  Bus. & Prof. Code § 17200, by the acts and omissions described above, including:

5        •    unfairly dominating and controlling (or attempting to control) licensing and

6             marketing opportunities for NFL player rights;

7        •    by abuse of its power, entering into exclusive dealing arrangements with licensees,

8             whereby the licensees are precluded from procuring NFL player rights from anyone

9             other than Defendants; and

10       •    unreasonably restraining competition for the licensing or marketing of NFL player

11            rights and/or in downstream markets for products like videogames.

12       75.    Among other things, Defendants represented to the public, retired NFL players and

13  existing or potential licensees for NFL players rights that they were the sole and exclusive

14  representative of all NFL players with regard to commercial marketing and licensing opportunities.

15  By virtue of their economic dominance, Defendants also informed a number of retired NFL players

16  that the only opportunity to get paid for marketing or licensing opportunities was to enter into a

17  Group Licensing Agreement with PLAYERS INC and/or the NFLPA.

18       76.    Defendants' practices have excluded competition and at least threaten to give

19  Defendants the ability to control prices for licensing of NFL player rights and/or for any resulting

20  licensed items bearing NFL player images, such as videogames.  Defendants' practices have

21  effectively foreclosed Plaintiffs' ability to pursue these commercial opportunities on their own

22  behalf.  PLAYERS INC's practices have also increased PLAYERS INC's monopoly (and/or

23  threaten to create a monopoly) over marketing and licensing opportunities available to retired NFL

24  players and other downstream markets like videogames.

25       77.    These unfair practices threaten an incipient violation of federal and state antitrust

26  laws, and violate the spirit and policy of those laws.  By foreclosing competition for NFL players'

27  rights, Defendants' practices violate both the policy and spirit of the Sherman Act's prohibition on

28  unlawful restraints of trade, monopolization and attempted monopolization, and the Cartwright

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
PALO ALTO

20183490.1                           25                SECOND AMENDED CLASS ACTION
                                                      COMPLAINT CASE NO. C07 0943 WHA

1  Act's prohibition on contracts or combinations in restraint of trade and otherwise significantly

2  harm or threaten competition. These unfair practices are comparable to or the same as a violation

3  of the antitrust laws.

4      78.    Members of the public, including Plaintiffs, have been deceived, and are likely to be

5  deceived, by Defendants' false statements and acts of unfair competition.

6      79.    Plaintiffs, and each member of the two Section 17200 Classes, have suffered injury

7  in fact, and have lost money or property (including but not limited to dues payments to the

8  NFLPA) as a result of Defendants' unfair competition.

9      80.    As a result of Defendants' conduct, Plaintiffs have been harmed, and seek

10  injunctive relief, restitution, an accounting, a constructive trust, and any other relief this Court

11  deems appropriate.

12  **FIFTH CAUSE OF ACTION**

13  **(Accounting)**

14      81.    Plaintiffs incorporate by reference paragraphs 1 through 80 above as though set

15  forth fully herein.

16      82.    By virtue of the acts and omissions described above, Plaintiffs do not have adequate

17  information to determine what monies are attributable to them, and distributable to them, as a

18  result of Defendants' purported representation of them.

19      83.    The exact amount of money received and distributed by PLAYERS INC in

20  connection with the licensing and marketing of Plaintiffs and the GLA Class, including monies

21  distributed to the NFLPA, is unknown and cannot be ascertained without an accounting of the

22  funds.

23  **VIII.  PRAYER FOR RELIEF**

24      WHEREFORE, Plaintiffs, on behalf of themselves and all others similarly situated, pray as

25  follows:

26      a.    That the Court determines that this action may be maintained as a class action under

27          Rule 23 of the Federal Rules of Civil Procedure, and that Ronald S. Katz of

28          MANATT, PHELPS & PHILLIPS, LLP be appointed as lead class counsel.

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
PALO ALTO

20183490.1

26

SECOND AMENDED CLASS ACTION
COMPLAINT CASE NO. C07 0943 WHA

1    b.    That Plaintiffs and each and every member of the three Classes recover (i) damages

2    determined to have been sustained by each of them, including punitive damages,

3    (ii) injunctive relief, equitable relief (including but not limited to a constructive

4    trust), and restitution as provided by law, and (iii) that joint and several judgments

5    in favor of Plaintiffs and each and every member of the three Classes, respectively,

6    be entered against the Defendant.

7    c.    That an accounting by accountants of the Plaintiffs' choice be ordered by the Court

8    at the expense of the Defendant.

9    d.    That Plaintiffs and other members of the three classes recover their costs of this suit,

10    including reasonable attorneys' fees, as provided by law.

11    e.    That Plaintiffs and the other members of the three classes be granted such other,

12    further and different relief as the nature of the case may require or as may seem just

13    and proper to this Court.

14    Respectfully submitted,

15    Dated: June 21, 2007

16

17

18    _____

Ronald S. Katz (SBN 085713)

19    Ryan S. Hilbert (SBN 210549)

Noel S. Cohen (SBN 219645)

20    MANATT, PHELPS & PHILLIPS, LLP

1001 Page Mill Road, Building 2

21    Palo Alto, CA 94304-1006

Telephone:    (650) 812-1300

22    Facsimile:    (650) 213-0260

*Attorneys for Plaintiffs*

23

24    Lewis T. LeClair, Esq.

McKOOL SMITH, P.C.

25    300 Crescent Court

Suite 1500

26    Dallas, TX 75201

214-978-4984

27    214-978-4044 (fax)

28

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
PALO ALTO

20183490.1    27    SECOND AMENDED CLASS ACTION
COMPLAINT CASE NO. C07 0943 WHA

**OF COUNSEL**

Jill Adler
MCKOOL SMITH, P.C.
300 Crescent Court
Suite 1500
Dallas, Texas 75201
(214)978-4000
(214)978-4044 (fax)

Samuel A. Mutch Esq.
SAMUEL A. MUTCH, P.A.
2114 N.W. 40th Terrace, Suite A-1
Gainesville, FL 32605
Telephone:    (352) 378-5599
Facsimile:    (352) 378-3388

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
PALO ALTO

20183490.1

28

SECOND AMENDED CLASS ACTION
COMPLAINT CASE NO. C07 0943 WHA