

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BERNARD PAUL PARRISH, HERBERT ANTHONY ADDERLEY, and WALTER ROBERTS III, | No. C 07-00943 WHA |
| Plaintiffs, | |
| v. | **ORDER GRANTING MOTIONS TO DISMISS** |
| NATIONAL FOOTBALL LEAGUE PLAYERS ASSOCIATION, a Virginia corporation, and NATIONAL FOOTBALL LEAGUE PLAYERS INCORPORATED d/b/a PLAYERS, INC., a Virginia corporation, | |
| Defendants. | |

## INTRODUCTION

In this putative class action, defendants have filed motions to dismiss all of plaintiffs' claims. Plaintiffs allege claims for violations of California's unfair competition law, breach of contract, breach of fiduciary duty, unjust enrichment and restitution, and accounting. Defendants have shown that plaintiffs failed to plead injury in fact, so they lack standing to pursue claims under California's unfair competition law. Plaintiffs have failed to allege the terms of the contract on which they base their claims for breach of contract, and what terms within those contracts defendants allegedly breached. Plaintiffs have also not pleaded a claim for breach of fiduciary duty, and have failed to plead facts to support their claim for unjust enrichment. Because plaintiffs' other claims fail, so too does their claim for an accounting.

Dockets.Justia.com

United States District Court
For the Northern District of California

1   Accordingly, defendants' motions to dismiss are **GRANTED**.  Plaintiffs will be allowed to file a

2   motion for leave to file a third amended complaint.

3                                      **STATEMENT**

4          Plaintiffs Bernard Paul Parrish, Herbert Anthony Adderley, and Walter Roberts III are

5   retired professional football players (Second Amd. Compl. ¶¶ 4–6).  Parrish resides in Florida,

6   Adderley resides in New Jersey, and Roberts resides in California (*ibid.*).  Plaintiffs purport to

7   bring this action on behalf of a class of retired National Football League players.

8          Defendant National Football League Players Association is a Virginia corporation that

9   acts as a union for NFL players (*id.* at ¶ 7).  Allegedly, nearly all active NFL players give the

10  NFLPA the right to market their names and images pursuant to the NFLPA's collective

11  bargaining agreement (*id.* at ¶ 9).  National Football League Players Incorporated, doing

12  business as Players Inc., is a subsidiary of the NFLPA that is responsible for marketing and

13  licensing (*id.* at ¶ 8).  Players Inc. purports to market active and retired players by licensing

14  their images for purposes such as trading cards, video games, television and radio

15  programming, personal appearances, autograph signings, internet sites, and events (*ibid.*).  The

16  NFLPA owns approximately 79% of Players Inc. (*id.* at ¶ 10, Exh. A).

17         Retired NFL players, such as plaintiffs, are given the opportunity to join the NFLPA by

18  paying annual dues (*id.* at ¶ 9).  The complaint contains no allegation that plaintiffs paid dues to

19  the NFLPA within the statute of limitations.  Later-filed declarations show that Adderley and

20  Parrish did pay dues (Collins Decl. ¶¶ 2–3).  The NFLPA allegedly promotes a "Retired Players

21  Group Licensing Program" in which the NFLPA offers third parties the right to license the

22  images, likenesses, and names of retired players in groups of six or more (*ibid.*).  Plaintiffs

23  allege that the number of retired players represented by NFLPA is not known (*id.* at ¶ 12).

24         Allegedly, to participate in the NFLPA's Retired Players Group Licensing Program,

25  retired players are given the opportunity to sign group licensing agreements, or GLAs, with the

26  NFLPA (*id.* at ¶ 17).  These agreements are then assigned to Players Inc., however, plaintiffs

27  allege that some retired NFL players have signed GLAs directly with Players Inc. (*ibid.*).

28  Parrish and Adderley allege that they have signed a number of GLAs with the NFLPA (*id.* at

**United States District Court**
For the Northern District of California

2

¶¶ 4–5).  Plaintiffs do not specifically identify when Parrish or Adderley signed GLAs, although a GLA signed by Parrish in 1998 is attached to the complaint as an example agreement (*id*. at ¶ 16, Exh. D).  Parrish alleges that he "has copies of the GLAs he signed in 1997 and 1998 and believes, and therefore alleges, that he signed GLAs in recent years" (Compl. ¶ 54).  Nowhere in the complaint does Roberts allege that he ever signed a GLA.

Plaintiffs plead that defendants have unfairly competed and wrongfully interfered with retired players' licensing opportunities.  They allege that the NFLPA and Players Inc. dominate the market for licensing the names and likenesses of current and former NFL players, and that the NFLPA's licensing agreements, including one with Topps for trading cards, require exclusive dealing with the NFLPA (*id*. at ¶ 30).  Plaintiffs allege that the NFLPA has another exclusive licensing deal with Electronic Arts, producer of a professional football-themed videogame (*id*. at ¶ 32).  Defendants allegedly held themselves out as the only avenue for licensing the names and images of retired NFL players (*id*. at ¶ 35).

Only 358 out of 3,500 retired players received payments from Players Inc. in 2005 (*id*. at ¶ 20).  Plaintiffs allege that a substantial portion of the revenue received from licensing the names, likenesses and images of retired NFL players was diverted from the players themselves (*id*. at ¶ 21).  Defendants have revealed very little information to plaintiffs about their licensing practices and the fate of any revenue that defendants receive (*id*. at ¶ 27).  A change in government-mandated labor reporting practices has made defendants release more information about licensing starting in 2005 (*ibid*.).  Plaintiffs also allege that Players Inc. has diverted licensing revenue to the NFLPA, and that defendants have not distributed revenue from licensing in an equitable manner (*ibid*.).

                    *                    *                    *

This action was filed on February 14, 2007, by plaintiffs Parrish and Adderley against Players Inc.  Defendant NFLPA was not originally a party to this action.  A first amended complaint was filed on February 23, 2007, adding Roberts as a plaintiff.  Players Inc. answered on April 2, 2007.  Thereafter, Players Inc. filed a motion to transfer venue, a motion for judgment on the pleadings, and a motion for sanctions against plaintiffs.  At the same time,

United States District Court

For the Northern District of California

3

1    plaintiffs filed a motion to appoint interim class counsel.  An order dated June 4, 2007, denied

2    defendant's motion for judgment on the pleadings without prejudice, denied defendant's motion

3    to transfer venue, and denied defendant's motion for sanctions.  Plaintiffs' motion to appoint

4    interim counsel was also denied.  Plaintiffs were given leave to amend their complaint, but were

5    counseled to plead their best case and take nothing for granted in their amended pleading.

6         Plaintiffs filed their amended complaint on June 21, 2007, adding NFLPA as a

7    defendant.  The complaint alleges claims of (1) breach of contract; (2) breach of fiduciary duty;

8    (3) unjust enrichment and restitution; (4) unfair competition under California Business and

9    Professions Code § 17200; and (5) accounting.  Both defendants filed motions to dismiss on

10   July 6, 2007.  A hearing on this motion was held on August 30, 2007.  Thereafter, parties were

11   asked to submit additional information regarding GLAs and dues paid to the NFLPA.

**ANALYSIS**

13        A motion to dismiss under Rule 12(b)(6) tests the legal sufficiency of the claims alleged

14   in the complaint.  "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not

15   need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his

16   'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of

17   the elements of a cause of action will not do."  *Bell Atlantic Corp. v. Twombly*, ___ U.S. ____,

18   127 S.Ct. 1955, 1964–65 (May 21, 2007).  "All allegations of material fact are taken as true and

19   construed in the light most favorable to plaintiff.  However, conclusory allegations of law and

20   unwarranted inferences are insufficient to defeat a motion to dismiss for failure to state a

21   claim."  *Epstein v. Wash. Energy Co.*, 83 F.3d 1136, 1140 (9th Cir. 1996).

22        It is worthwhile to note that there are major differences between what plaintiffs argued

23   in opposing these motions and what plaintiffs actually plead in the complaint.  Time and again

24   in the briefs and at the hearing, plaintiffs argued that they had alleged a key element.  On

25   examining the complaint, however, the actual allegations did not go nearly so far.  Sometimes

26   those key elements were absent altogether.  Plaintiffs' smoke-and-mirrors approach to pleading

27   is unconvincing.  The complaint itself controls, not any arguments made by counsel.

28

**United States District Court**
For the Northern District of California

**United States District Court**
For the Northern District of California

1      **1.      STATUTE OF LIMITATIONS.**

2          Defendants first argue that plaintiffs' claims are barred by the applicable statutes of

3   limitations.  The statute of limitations for plaintiffs' breach of contract, breach of fiduciary duty,

4   unjust enrichment, and Section 17200 claims is four years.  Cal. Code Civ. Proc. §§ 337, 339;

5   Cal. Bus. & Prof. Code § 17208.   The statute of limitations for a claim of unjust enrichment is

6   two years.  Cal. Code Civ. Proc. § 339.

7          **A.      Operation of the Statute of Limitations.**

8          To the extent that plaintiffs' claims rely on GLAs, defendants contend that none of the

9   plaintiffs signed GLAs within the four-year statute of limitations.  Roberts never alleges that he

10  even signed a GLA.  The last identified GLA signed by Parrish expired in 1998.  Plaintiffs

11  argue in response that they have alleged that Parrish and Adderley signed GLAs within the

12  statute of limitations, because Parrish and Adderley "believe" that they did so.  Moreover, they

13  note that Players Inc. has produced two GLAs signed by Adderley that were effective within the

14  statute of limitations (Hilbert Decl. Exhs. 3, 4).  Parrish's vague allegations that he believes he

15  signed GLAs at some point within the statute of limitations are simply insufficient.

16  Accordingly, Parrish has not pleaded that he signed a GLA within the statute of limitations.

17  Any claims by Parrish based on the GLAs are barred by the statute of limitations.  Adderley can

18  sustain a claim provided he amends his allegations to specify that he signed GLAs within the

19  statute of limitations.

20         As to the portions of the plaintiffs' claims not premised on signing GLAs, plaintiffs

21  contend that any claims based on payments due to them within the last four years are not barred

22  by the statute of limitations.  They also note that the agreement with Electronic Arts was signed

23  in 2004, and the agreement with Topps trading card company was signed on March 1, 2007.

24  Insofar as plaintiffs can plead claims that are not based on signing GLAs, these claims survive,

25  at least as to injuries accruing after February 14, 2005, for the unjust enrichment claim and after

26  February 14, 2003, for the other claims.

27

28

**B.    Discovery Rule and Equitable Estoppel.**

Plaintiffs next argue that their claims that predate the statute of limitations should not be barred because plaintiffs could not have known of their existence. Plaintiffs rely on the application of the discovery rule and the doctrine of equitable estoppel. They specifically concede in their opposition that fraudulent concealment does not apply to this action (Opp. at 41).

Generally, a claim accrues at the time the injury occurs. An exception to this is the discovery rule which postpones accrual of a claim until the plaintiff discovers or has reason to discover the injury. "A plaintiff has reason to discover a cause of action when he or she 'has reason to suspect a factual basis for its elements.' Under the discovery rule, suspicions of one or more of the elements of a cause of action, coupled with the knowledge of any remaining elements, will generally trigger the statute of limitations period." *Grisham v. Philip Morris U.S.A., Inc.*, 40 Cal. 4th 623, 634 (2007) (quoting *Fox v. Ethicon Endo-Surgery, Inc.*, 35 Cal. 4th 797, 806–07 (2005)). To rely on the discovery rule, a plaintiff must plead specific facts describing the time and manner of discovery and the inability to have discovered the claim earlier despite due diligence. *Id*. at 638.

Plaintiffs point out that until 2006, they had only the barest information regarding Players Inc.'s licensing practices. Adderley allegedly made requests for this information as far back as 1994 (Compl. ¶ 27). These requests were rebuffed until only recently (*id*. at ¶ 17). Plaintiffs claim that they were only able to get information from defendants in 2006 because of a change in Department of Labor disclosure regulations. They also argue, without pleading supporting facts, that they could not have gotten information about their claims despite exercising diligence.

Adderley's allegations that he inquired into defendants' licensing practices show that he at least had reason to suspect the existence of his claims as far back as 1994. He wrote several letters and emails to various officials asking about licensing practices for retired players and how any resulting revenues were split up (*id*. at ¶ 27, Exh. I). Moreover, plaintiffs have not pleaded facts that describe the time and manner of their discovery or their due diligence. They

attempt to rely on conclusory allegations that defendants had better information about their claims. They do not allege what triggered discovery of their claims, or why they could not have filed them earlier. Plaintiffs point to increased disclosure requirements starting in 2006, but fail to plead why those disclosures made them aware of their claims, or what information they received because of the disclosures. Plaintiffs also do not plead facts as to their diligence in pursuing their claims, or why they could not have discovered their claims at an earlier time. Accordingly, plaintiffs may not rely on the discovery rule to toll the statute of limitations.

Plaintiffs also point to equitable estoppel to toll their claims. "Equitable tolling may be applied if, despite all due diligence, a plaintiff is unable to obtain vital information bearing on the existence of his claim." *Santa Maria v. Pacific Bell*, 202 F.3d 1170, 1176 (9th Cir. 2000). As with the discovery rule, plaintiffs have not pleaded that they could not obtain vital information bearing on their claim. They only allege that better information was available as of 2006, even though Parrish inquired into defendants' licensing practices as far back as 1994. They do not plead facts that would lead to the conclusion that the information available in 2006 enabled them to plead their claims. Additionally, they do not plead diligence; plaintiffs offer no details as to how they pursued their claims or what information they lacked. Accordingly, equitable estoppel does not apply. The statute of limitations for plaintiffs' claims is not tolled.

### 2. SECTION 17200.

Under Section 17200, the plaintiff must assert an "unlawful, unfair or fraudulent business act or practice." *Cel-Tech Communications, Inc. v. Los Angeles Cellular Tel. Co.*, 20 Cal. 4th 163, 180 (1999). Thus, Section 17200 establishes three alternative theories for finding illegal conduct: (1) unlawful, (2) unfair and deceptive, or (3) fraudulent. *See ibid*. Since Section 17200 is written in the disjunctive, the plaintiff may allege only one of the three theories to properly plead a claim. For example, the plaintiff may allege unlawful business practices without alleging unfair or fraudulent business practices. Plaintiffs here base their claims on both the unlawful and fraudulent prongs of the statute. As to the unlawful prong, they allege that defendants' conduct was unlawful because it threatened an antitrust violation or violated the spirit and policy of the antitrust laws.

7

**A.    Injury In Fact.**

A Section 17200 claim may be brought by "any person who has suffered injury in fact and has lost money or property as a result of such unfair competition." Cal. Bus. & Prof. Code § 17204. Relief is limited to injunctive relief and restitution; damages are not available under the unfair competition law. *See Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134, 1444 (2003); *Dietz v. Comcast Corp.*, 2006 WL 3782902, *5 (N.D. Cal. Dec. 21, 2006) (Alsup, J.).

Plaintiffs allege that class members "have suffered injury in fact, and have lost money or property (including but not limited to dues payments to the NFLPA) as a result of Defendants' unfair competition" (Compl. ¶ 79). To summarize, they allege that they and class members have suffered two kinds of harm:  (1) lost dues; and (2) lost licensing opportunities.

There are a number of references to dues in plaintiffs' complaint. Specifically, they allege that "dues payments to the NFLPA entitle retired players, among other things, to licensing opportunities that generate guaranteed minimum payments" and that "the NFLPA does not provide 'extensive' services and benefits to retired players, even to those retired players who have chosen to pay the $100 annual fee to join the NFLPA's retired member program" (*id.* at ¶¶ 72, 24). Significantly absent from the complaint is any allegation that Parrish, Adderley, or Roberts ever paid dues to the NFLPA. Section 17200 makes clear that each individual plaintiff must establish injury in fact. *See Meyer v. Sprint Spectrum L.P.*, 59 Cal. Rptr. 3d 309, 313 (2007).

At the hearing on this motion, parties were asked to submit a declaration telling which, if any, of plaintiffs paid dues to the NFLPA during the statute of limitations. Defendants presented the declaration of Andre Collins, Director of the NFLPA, Retired Players Department. Collins declared that according to the NFLPA's records, Adderley paid dues in the amount of $50 in each of 2003, 2004, and 2005, and Parrish paid dues in the amount of $50 in 2005 (Collins Decl. ¶¶ 2–3). Although no such allegation ever appears in this version of the complaint, it appears that plaintiffs could amend consistent with their obligations under Rule

8

United States District Court

For the Northern District of California

11, at least as to Adderley and Parrish. They must do so to be able to plead lost dues as an injury.

Defendants still maintain that lost dues are not sufficient to show an injury in fact because plaintiffs cannot show a causal nexus to alleged violations of Section 17200. Plaintiffs allege that in contravention to its promises and policies, "the NFLPA does not provide 'extensive' services and benefits to retired players, even to those retired players who have chosen to pay the $100 annual fee to join the NFLPA's retired member program. As a result, any purported benefits to the retired players have not been actualized" (Compl. ¶ 24). Elsewhere in the complaint, plaintiffs allege that *some* retired players had seen the NFLPA's representations on its website and may have believed that paying dues would have entitled them to licensing opportunities or other benefits. Plaintiffs never allege that they themselves saw or relied on any such representations in paying dues. Plaintiffs also never allege that they expected to receive any benefits by paying dues. Perhaps these deficiencies could be remedied by repleading, however, as described below, plaintiffs must explain that any such amendments are in good faith and remedy the deficiencies in their complaint.

Turning to the lost licensing opportunities, defendants argue that plaintiffs have not pleaded any causal nexus between the licensing agreements and the alleged harms. Defendants point out that plaintiffs have only pleaded in cursory fashion that they are in competition with defendants to license their names, images, and likenesses — they have not pleaded that they actually attempted to enter into any license in competition with Players Inc. Moreover, all GLAs govern licensing for groups of six or more players. Plaintiffs' bare assertion that they are in competition with defendants and that they have suffered harm is simply not sufficient. Nor have they alleged that they were unable to license their names, images, or likenesses because of any deal that defendants had with any third-party licensee. Accordingly, plaintiffs have failed to plead injury in fact for their unfair competition claim. To the extent that plaintiffs' claims are based on unfair competition and antitrust violations, plaintiffs cannot maintain a claim under the "unfair" prong.

United States District Court

For the Northern District of California

1    Turning to plaintiffs' allegations that defendants engaged in fraudulent business

2    practices, plaintiffs identify the same two harms — lost dues and lost licensing opportunities.

3    As above, plaintiffs may not rely on lost dues because they never alleged that they paid dues.  If

4    plaintiffs can, in good faith, plead that they believed that paying dues would have actually

5    entitled them to receive licensing revenue, they be able to remedy this problem by repleading.

6    Plaintiffs allege that "[b]y purporting either to represent or to control access to the rights

7    of all retired players, by making exclusive arrangements and by its advertising . . . Defendants

8    have either effectively cut off any avenues for retired NFL players to deal directly with

9    licensees or sponsors such as TOPPS and Electronic Arts . . ." (Compl. ¶ 35).  According to

10   plaintiffs, defendants led retired players, including plaintiffs, to believe that defendants would

11   pursue licensing opportunities on their behalf.  The retired players then declined to pursue

12   licensing and marketing opportunities on their own.  Defendants failed to generate revenue from

13   licensing for the retired players or diverted the revenue for other purposes, so they suffered

14   injury in the form of lost revenue.  These allegations, if taken true, are sufficient to show that

15   plaintiffs could have suffered injury from defendants' fraudulent business practices.  Plaintiffs

16   have failed to plead that they suffered injury in fact from defendants' alleged unfair business

17   practices.  Plaintiffs have, however, successfully pleaded that they suffered injury in fact from

18   defendants' alleged fraudulent business practices.  This order now addresses the acts of unfair

19   competition alleged by plaintiffs.

20                **B.    Unfair Business Practices.**

21   Plaintiffs identify three ways in which defendants engaged in unfair business practices:

22   (1) unfairly dominating and controlling licensing opportunities for NFL player rights; (2) which

23   enabled defendants to enter into exclusive dealing arrangements with licensees that prevented

24   them from seeking rights from anywhere else; and (3) unreasonably restraining competition for

25   licensing or marketing NFL player rights in products (Compl. ¶ 74).  They plead that defendants

26   were able to exclude competition by holding themselves out as the only source for the rights to

27   images of current and former NFL players (*id*. at ¶ 76).  Such practices allegedly threaten an

28

10

incipient violation of the Sherman Act and California's Cartwright Act and violate the spirit and policy of the antitrust laws, at least according to plaintiffs (*id*. at ¶ 77).

The scope of Section 17200 is broad, and it borrows violations of other laws and treats them as independently actionable unfair practices. *Cel-Tech Communications, Inc. v. Los Angeles Cellular Tel. Co.*, 20 Cal. 4th 163, 180 (1999). Unfair business practices are defined under Section 17200 as follows:

> When a plaintiff who claims to have suffered injury from a direct competitor's "unfair" act or practice invokes section 17200, the word "unfair" in that section means conduct that threatens an incipient violation of an antitrust law, or violates the policy or spirit of one of those laws because its effects are comparable to or the same as violation of the law, or otherwise significantly threatens or harms competition.

*Id*. at 187. The *Cel-Tech* court held that it was appropriate to borrow standards from Section 5 of the Federal Trade Commission Act which prohibits unfair methods of competition and unfair or deceptive acts or practices. *Id*. at 186. The Federal Trade Commission Act can prohibit practices "which conflict with the basic policies of the Sherman and Clayton Acts even though such practices may not actually violate these laws." *FTC v. Brown Shoe Co.*, 384 U.S. 316, 321 (1966). Although Section 17200 is broad, unfair practices under California's unfair competition law must still at least threaten significant harm to competition because of a violation of a recognized policy of antitrust law. *See Cel-Tech*, 20 Cal. 4th at 186–87.

Plaintiffs have failed to plead sufficient facts to show an incipient antitrust violation or harm to competition because of defendants' actions. Plaintiffs' claim rests on the theory that the NFLPA and Players Inc. entered into exclusive deals with licensees, thereby foreclosing their opportunities to enter into direct licenses. Exclusive deals are not *per se* illegal and do not always pose a significant threat to competition. Because they can have economic benefits, they are judged by the rule of reason under both the Sherman Act and the Cartwright Act. *Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 18–19 (1984) (holding that an exclusive dealing arrangement between hospitals and anaesthesiologists was not *per se* illegal); *Redding v. St. Francis Med. Ctr.*, 208 Cal. App. 3d 98, 107 (1989) (holding that an exclusive deal between a surgeon and hospital was not sufficient, by itself, to form the basis of a Section 17200 claim).

11

The mere existence of an exclusive deal between the NFLPA and its licensees does not violate the antitrust laws or significantly threaten competition.

Plaintiffs and defendants differ over what plaintiffs must allege to show an incipient antitrust violation. Defendants contend that plaintiffs must establish a relevant product or geographic market, while plaintiffs argue that this is not necessary. It remains, however, that plaintiffs have made no allegations that, even if true, would show harm to competition in the market for licensing retired players' images. The complaint excerpts some popular press articles that argue that the exclusive license between the NFLPA and EA Sports spells the end of consumer choice in video games. Since only EA Sports has a license for NFL players' images, its "Madden" series of games is now the only licensed professional football-themed game. Predictions in news articles are not enough to plead a violation of antitrust law or policy. Moreover, the articles appear to be discussing the market for video games using *active* players. It is not clear how decreased competition in the market for video games featuring active players would cause harm to *these plaintiffs*. They argue at the hearing and in their opposition that this license has harmed them in some nebulous way, but they simply do not allege that they could have received anything from the license with EA Sports. Accordingly, plaintiffs have failed to plead that defendants engaged in unfair business practices.

### B.    Fraudulent Business Practices.

Defendants allegedly engaged in fraudulent business practices by making statements on their website and in promotional materials that Players Inc.'s activities benefitted all retired players by giving each of them a minimum payment, that the GLAs were not exclusive (*i.e.* that retired players were not foreclosed from pursuing licensing opportunities on their own), that Players Inc. represented a certain number of former NFL players, and that dues paid by former players to Players Inc. would entitle them to licensing opportunities (Compl. ¶ 72). Plaintiffs allege that these representations deceived the public and former players which cut off other licensing opportunities for retired players (*id*. at ¶ 73).

Section 17200 claims that are grounded in fraud must satisfy the particularity requirements of Rule 9(b). *Vess v. Ciba-Geigy Corp., USA*, 317 F.3d 1097, 1103 (9th Cir.

United States District Court
For the Northern District of California

12

2003) (applying Rule 9(b)'s pleading requirements for claims based in fraud to a Section 17200

claim).   Even if plaintiffs had alleged injury in fact, they fall short of satisfying Rule 9(b).

Plaintiffs allege that they did not pursue licensing opportunities on their own because

defendants led them to falsely believe that they were working to create licensing deals on their

behalf.   Plaintiffs identify statements defendants supposedly made regarding licensing.   *First*,

defendants "informed a number of retired NFL players that the only opportunity to get paid for

marketing or licensing opportunities was to enter into a Group Licensing Agreement with

PLAYERS INC and/or the NFLPA" (Compl. ¶ 75).   Appended to the complaint is a letter to

that effect with the date and recipient redacted (*id*. at Exh. B).   Plaintiffs never allege having

received that letter; they merely allege that *some* retired players received it.   If they never

received it, plaintiffs could never have relied on it.   Again, an allegation that some retired

players may have received the letter does nothing for these plaintiffs.

*Next*, NFLPA allegedly stated that they would provide services and benefits to retired

players.   Plaintiffs identify some statements on the NFLPA website that indicate that retired

players should receive benefits from licensing and other programs (Compl. Exh. F).   Here,

however, plaintiffs have not alleged that they ever saw or relied on defendants' representations.

At best, they have pleaded that some members of the putative class may have relied on

defendants' representations.   Plaintiffs have not alleged that they themselves, and not putative

class members, ever saw, heard or relied on defendants' statements, so they fall well short of

satisfying Rule 9(b).

Plaintiffs also seem to argue that members of the *public* were likely to be deceived.   *See,*
*e.g., Comm. on Children's Television, Inc. v. Gen. Foods Corp*., 35 Cal. 3d 197, 211 (1983).

Perhaps plaintiffs could prevail if they allege that defendants falsely stated that third parties

could only license plaintiffs' names and images from them, and from no other source.   Members

of the public, including potential licensees, could be deceived into believing that they could not

deal directly with retired players to license their images.   Such allegations do not appear in the

complaint.   Plaintiffs only allege that defendants made those statements; they stop far short of

alleging that any third party relied on them in negotiating a license (Compl ¶ 35).   Accordingly,

United States District Court

For the Northern District of California

13

plaintiffs have failed to plead with particularity that either they or members of the public were deceived. Defendants' motion to dismiss plaintiffs' Section 17200 must be **GRANTED**. This order need not reach defendants' arguments about preemption under federal labor law, choice of law under the GLAs, and Parrish and Adderley's standing as non-California residents. In asking leave to amend their complaint, however, plaintiffs should not take these issues for granted, particularly the issue of Parrish and Adderley's residency and standing to bring a Section 17200 claim.

### 3.    BREACH OF CONTRACT CLAIMS.

Plaintiffs argue that they have sufficiently alleged a claim for breach of contract "on behalf of the GLA class" (Opp. at 5–6). "A cause of action for damages for breach of contract is comprised of the following elements:  (1) the contract, (2) plaintiff's performance or excuse for nonperformance, (3) defendant's breach, and (4) the resulting damages to plaintiff." *Armstrong Petroleum Corp. v. Tri-Valley Oil & Gas Co.*, 116 Cal. App. 4th 1375, n.6 (2004) (citation omitted).

### A.    Existence of a Contract.

Defendants argue that plaintiffs have failed to plead the first element. "In an action based on a written contract, a plaintiff may plead the legal effect of the contract rather than its precise language." *Construction Protective Servs., Inc. v. TIG Specialty Ins. Co.*, 29 Cal. 4th 189, 198–99 (2002). To plead the legal effect of a contract, plaintiffs must "'allege the substance of its relevant terms.' This is more difficult [than pleading the precise language], for it requires a careful analysis of the instrument, comprehensiveness in statement, and avoidance of legal conclusions." *McKell v. Washington Mutual, Inc.*, 142 Cal. App. 4th 1457, 1489 (2006) (quoting 4 *Witkin Cal. Proc. Pleading* § 480 (4th ed., 1997)).

Defendants first argue that plaintiffs lack standing because they have not alleged that *they* signed GLAs within the limitations period. Defendants note that plaintiffs attempt to rely on allegations of the GLA class, or a class of retired players who signed GLAs within the applicable statute of limitations. A named plaintiff must *himself* plead that he has suffered injury in order to represent the class; he may not rely on the alleged injuries of others. *O'Shea*

14

*v. Littleton*, 414 U.S. 488, 494 (1974).  Plaintiffs cannot defeat this motion to dismiss by relying on class allegations.  They must each show that they have satisfied the pleading requirements for a breach of contract claim.

Turning to named plaintiffs' allegations, Roberts does not allege that he ever signed a GLA, thus he cannot maintain this claim.  Parrish alleges that he signed GLAs in 1997 and 1998.  A copy of the 1998 GLA signed by Parrish is appended to the complaint (Compl. Exh. D).  As described above, this is several years outside the statute of limitations period.  Parrish "believes, and therefore alleges that he signed GLAs in recent years" (Compl. ¶ 54).  Adderley alleges that the last GLA he signed expired in 2005, but he did not attach a copy of this agreement to the complaint.  Copies of any agreements actually signed by plaintiffs, or recitations of terms contained therein, are conspicuously absent from the complaint.

In opposing these motions to dismiss, plaintiffs referred to three different GLAs, none of which they allege to be the contract between themselves and the NFLPA.  *First*, plaintiffs attached a copy to the complaint of a GLA that Parrish signed in 1998, long outside the statute of limitations (Compl. Exh. D).  *Second*, plaintiffs attached to the complaint a copy of a licensing agreement between Topps and the NFLPA for trading cards (*id*. at Exh. C).  A proposed GLA specimen is attached to that agreement.  Plaintiffs, however, never alleged that any of them signed that particular form of agreement.  At most, they alleged that *some other* retired players *may* have signed that agreement.  That is not sufficient.  To sustain a claim for breach of contract, plaintiffs must plead that *they* signed the GLA.  *Third*, plaintiffs attached copies of two GLAs signed by Adderley (Hilbert Decl. Exhs. 3, 4).  One was dated November 22, 2002, and expired at the end of 2005, and the other was dated May 1, 2001, and expired at the end of 2003 (*ibid*.).  The complaint never specifically refers to these GLAs.  Both GLAs were in effect during the statute of limitations and could in theory form the basis of breach of contract claim, if plaintiffs should so amend.

In the alternative, plaintiffs argue that they have alleged the legal effect of the GLAs.  They allege that under the GLAs, *all* players who signed them, including plaintiffs, were entitled to payments from the licenses, regardless of whether any particular former player's

United States District Court

For the Northern District of California

name or likeness was actually used by a third party.  Plaintiffs do not say where the funds should come from or how the amounts should be calculated.  Likewise, at the hearing, plaintiffs' counsel maintained that the act of signing a GLA itself entitled plaintiffs to receive at least some licensing revenues, regardless of whether or not those particular players' images were ever used.  Plaintiffs' counsel pointed out at the hearing that the GLA specimen made part of the agreement between Topps and the NFLPA contains a "best efforts" clause.  It stated that the NFLPA will "use the revenues it receives from group licensing programs to support the objectives as set forth in the By-laws of the NFLPA . . . .  The NFLPA makes no representations regarding licensing other than those expressed herein" (Compl. Exh. C).  The by-laws of the NFLPA were not attached to the complaint or presented as an attachment.  This simply does not support the allegation that all players who signed GLAs were automatically entitled to at least some licensing revenues whether or not their images were used.  Plaintiffs also point to statements on the NFLPA's website that indicate that the NFLPA's goal was to help retired players through licensing efforts, and that if a particular player were singled out in a licensing deal, he would receive additional fees (Compl. ¶ 21).  These statements were not part of any contracts and plaintiffs cannot rely on them to allege the terms of any contract.

**B.    Defendants' Alleged Breach.**

Even if plaintiffs had pleaded the existence or legal effect of a contract, they have failed to allege what provision of the relevant GLAs was breached by defendants.  They first plead that each player who signed a GLA was entitled to royalty payments under the agreements, but they fail to identify the terms in the contract that would entitle them to such payments.  Looking at the GLA signed by Parrish in 1998, it stated that "monies generated by such licensing of retired player group rights will be divided among the player, the Players Assistance Trust, and, to the extent necessary, may be used to cover the cost of administering the Retired Player Group Licensing" (Compl. Exh. D).  Even if this contract had been signed within the statute of limitations, this does not support plaintiffs' allegation.  Likewise, the 2005 GLA signed by Adderley reads "the moneys generated by such licensing of retired player group rights will be divided between the player and an escrow account for all eligible NFLPA members who have

16

signed a group licensing authorization form" (Hilbert Decl. Exh. 4).  Again, this contract was

not pleaded in the complaint, and plaintiffs never allege entitlement to the escrowed funds under

the contract.

At the hearing on these motions, plaintiffs' counsel argued that defendants diverted

licensing revenues from plaintiffs for overhead and other expenses for the NFLPA.  When

asked where this allegation appears in the complaint, they pointed to paragraph 21.  It, however,

reads:

> Although it is to be expected that some better-known players will
> or may receive additional payments, each represented player
> should have received some payment as a result of signing a GLA.
> PLAYERS INC'S website as of February 6, 2007, states: "Any
> players who are singled out to promote licensed products are paid
> additional fees for being highlighted on product packaging, point
> of sale, print ads or other collateral material, for autographs,
> appearances, product endorsements and commercials." (emphasis
> added).  Instead of providing payments to all retired players who
> signed a GLA, PLAYERS INC has, on information and belief,
> diverted millions of dollars from PLAYERS INC to the NFLPA
> in order to support the overhead, substantial salaries and
> perquisites of NFLPA management and employees.  Plaintiffs
> have an ownership interest in these funds.

This paragraph of the complaint does allege that funds were diverted from "all retired players."

In quoting the NFLPA website, plaintiffs are begging the question:  what provision in the actual

contracts was violated?

Nor do any of the plaintiffs allege that the NFLPA failed to pay them licensing revenue

that they were personally owed under the contracts for the use of their names or images.  At

best, they allege that some funds were diverted from unknown persons and used for overhead at

the NFLPA.  This is insufficient to plead breach because plaintiffs never alleged that they

personally lost funds because a provision of the contract was breached.

Plaintiffs also argue that the 2007 GLA specimen appended to the Topps agreement

contained a "best efforts" clause.  It stated "[t]he NFLPA further agrees to use its best efforts to

promote the use of the NFL player image [sic] in group licensing programs, to provide group

licensing opportunities to all NFL players and to ensure that no entity engages in a group

licensing program without first obtaining a license from the NFLPA" (Compl. Exh. C).  None of

the plaintiffs alleged that they signed this agreement, however, it is merely attached to the

complaint by way of example. At best, plaintiffs allege that some unknown members of the putative class may have signed such a GLA. Neither the GLAs signed by Adderley or the GLAs signed by Parrish outside of the statute of limitations contains such a provision. Accordingly, plaintiffs have failed to plead the existence of a contract between themselves and the NFLPA, and have also failed to plead what provision defendants breached. Defendants' motion to dismiss the claims for breach of contract is **GRANTED**. Plaintiffs may be able to remedy some of these defects by repleading, but they must be able to demonstrate that they can do so in good faith.

### 4.    BREACH OF FIDUCIARY DUTY.

Plaintiffs allege that "[d]efendants have a fiduciary duty to the retired players that at any time signed a GLA with the NFLPA . . ." (Compl. ¶ 62). "The elements of a cause of action for breach of fiduciary duty are: (1) existence of a fiduciary duty; (2) breach of the fiduciary duty; and (3) damage proximately caused by the breach." *Slovensky v. Friedman*, 142 Cal. App. 4th 1518, 1534 (2006). "A fiduciary relationship is a recognized legal relationship such as a guardian and ward, trustee and beneficiary, agent and principal, or attorney and client." *Richelle L. v. Roman Catholic Archbishop*, 106 Cal. App. 4th 257, 271 (2003). "Before a person can be charged with a fiduciary obligation, he must either knowingly undertake to act on behalf and for the benefit of another, or enter into a relationship which imposes that undertaking as a matter of law." *Comm. on Children's Television v. Gen. Foods Corp.*, 35 Cal. 3d 197, 221 (1983).

Agency relationships may be inferred or implied from the conduct of parties and circumstances surrounding the events. *Michelson v. Hamada*, 29 Cal. App. 4th 1566, 1579–80 (1994). Under principles of agency by estoppel, "when one assumes to act as an agent for another, he may not, when challenged for these acts, deny his agency . . . ." *People v. Robertson*, 6 Cal. App. 514, 517 (1907). Mere contractual relationships, without more, do not give rise to fiduciary relationships. *Oakland Raiders v. Nat'l Football League*, 131 Cal. App. 4th 621, 633–34 (2005).

United States District Court

For the Northern District of California

### A.    Fiduciary Relationship.

Defendants argue that plaintiffs have not adequately alleged a fiduciary relationship. Plaintiffs contend that based on confidential relationships between parties *and* based on the GLAs, there was a fiduciary relationship.  As an initial matter, it is worth noting that plaintiffs plead that defendants had a fiduciary relationship with those retired players who signed GLAs. It appears that only Adderley can plead that he signed a GLA within the statute of limitations. Parrish and Roberts may not base their fiduciary duty claims on signing a GLA.

Plaintiffs first argue that a fiduciary duty arose out of a confidential relationship between plaintiffs and defendants.  Such a confidential relationship can occur where "(1) the vulnerability of one party to the other, (2) results in the empowerment of the stronger party by the weaker which (3) empowerment has been solicited or accepted by the stronger party and (4) prevents the weaker party from effectively protecting itself."  *Richelle L.*, 106 Cal. App. 4th at 272.  "The vulnerability that is the necessary predicate of a confidential relation . . . usually arises from advanced age, youth, lack of education, weakness of mind, grief, sickness, or some other incapacity."  *Id*. at 273.

Plaintiffs plead that "[t]hose retired players who have signed GLAs for any given year are all, as individuals, vulnerable to the size and economic power of Defendants" and alleged that many retired NFL players "suffer from mental or physical disabilities as a result of their careers" (Compl. ¶ 23).  Missing is any allegation that *plaintiffs* have suffered disability. Plaintiffs argue that defendants' mere economic power alone created a fiduciary duty.  In support, they cite *Beery v. State Bar,* 43 Cal. 3d 802, 813 (1987), for the proposition that the essence of a confidential relationship is that the parties do not deal with one another on equal terms because of the trust and confidence that one party reposed in the other.  Mere difference in economic power and size and access to information is not sufficient to show vulnerability to

United States District Court

For the Northern District of California

1    establish a fiduciary relationship.[*]  *See Wolf v. Superior Court*, 107 Cal. App. 4th 25, 30–32

2    (2003).

3            At the hearing on this motion, plaintiffs argued that the GLAs created a fiduciary

4    relationship between plaintiffs and defendants because the GLAs are exclusive and defendants

5    are obligated under the contracts to use their best efforts to promote licensing opportunities for

6    retired players.  In determining whether a contract could give rise to a fiduciary duty, mere

7    sharing of profits does not give rise to a fiduciary relationship.  *Wolf*, 107 Cal. App. 4th at

8    32–33.  In *Wolf*, an author granted rights to a company to develop his work into a movie on his

9    behalf, and the author and the company were to share the profits under the contract.  Even

10   though both parties stood to benefit from developing the work, the development deal was only a

11   contract that did not give rise to a fiduciary duty.  *Ibid*.  The presence of a "best efforts" clause

12   may give plaintiffs a better argument that the author had in *Wolf*, but again, plaintiffs did not

13   plead that any of them were a party to a contract containing such a term.  Accordingly, plaintiffs

14   have failed to plead that the GLA itself created a fiduciary relationship.

15                    **B.    Agency by Estoppel.**

16           Plaintiffs also argue that they have pleaded the existence of a fiduciary relationship

17   based on agency by estoppel.  Plaintiffs specifically disavow any argument that there was a

18   direct agency relationship, either from the contract or implied through representation.  Plaintiffs

19   admit that they cannot plead, either by implication or by contract, that they had the ability to

20   control the actions of defendants (Opp. at 13).  An implied agency relationship can arise when

21   one party holds itself out to be acting as the agent for another.  *See Carpenter Foundation v.*

22   *Oakes*, 26 Cal. App. 3d 784, 791–92 (1972).  The Restatement (Third) of Agency describes an

23   agency by estoppel relationship as follows:

---

24

25        [*]  In *Wolf*, the plaintiff attempted to argue that since the defendant was a much larger corporation and
     had exclusive control over the business records, those circumstances converted a distribution contract into a

26   fiduciary relationship.  The Court disagreed and held that the relationship was contractual and was the result of
     arms-length negotiations.  Furthermore, "[a]lthough we therefore agree that the burden of proving a plaintiff has

27   been paid contingent compensation in accord with the parties' agreement is property placed on a defendant in
     exclusive control of essential financial records (thereby imposing on the defendant the risk of any

28   incompleteness in such records), this determination regarding evidentiary burdens does not alter the contractual
     nature of the parties' relationship."  *Id*. at 35.

The agency-law doctrines of actual authority and apparent authority attribute the legal consequences of an actor's actions to a person when the person has made a manifestation of authority . . . thereby creating apparent authority . . . . Estoppel links the legal consequences of the actor's actions to the person estopped on different bases. These are the third party's justifiable and detrimental change in position and the third party's belief in the actor's relationship to the person estopped, which induced the change in position for which the person estopped is held responsible.

\*        \*        \*

Apparent authority is not present unless the third party's belief is traceable to the principal's own manifestations, which may include placing the agent in a position that leads third parties to believe that the agent has authority consistent with the position. Estoppel does not require as close a fit between affirmative acts of the principal and the third party's belief. Instead, it protects third parties who reasonably believe an actor to be authorized as an agent when the belief cannot be shown to follow directly or indirectly from the principal's own manifestations.

Restatement (Third) of Agency § 2.05, cmt. d (2006).

Plaintiffs allege that defendants sought to obtain the exclusive rights to negotiate with and enter into licensing agreements to license the names, images, and likenesses of retired players. Defendants "purport to have sole and exclusive control over licensing contracts with vendors" and defendants are allegedly the only source from which to obtain licenses from retired professional football players who have signed GLAs (Compl. ¶ 25). Essentially, the NFLPA and Players Inc. held themselves out to be agents of the players who signed GLAs for purposes of licensing and marketing.

Plaintiffs' allegations and arguments are weakened by the documents they append to their complaint. Plaintiffs allege that "[b]y purporting either to represent or to control access to the rights of all retired players . . . Defendants have either effectively cut off any avenues for retired NFL players to deal directly with licensees or sponsors such as TOPPS and Electronic Arts . . ." (Compl. ¶ 35). The GLAs themselves, however, make clear that retired players are granting the rights to the NFLPA only for the purpose of licenses for groups of six or more. The GLAs are silent on licensing for individual players. Still, assuming the pleaded facts to be true, plaintiffs have sufficiently alleged that there was an agency by estoppel relationship

United States District Court
For the Northern District of California

between Adderley and defendants.  Looking at the issues of breach and damages, however, Adderley has failed to plead that defendants breached the duty and that Adderley was damaged as a result.

### C.     Breach and Damages.

Detrimental reliance on some action taken by the defendant is required if estoppel is to apply.  *Robinson v. Fair Employment & Hous. Comm'n*, 2 Cal. 4th 226, 244–45 (1992).  As to breach and damages, plaintiffs allege that the NFLPA and Players Inc. failed to give plaintiffs information regarding licensing activities and revenues earned, failed to maximize revenues, and failed to remit revenues to some players who signed GLAs.  They do not, however, allege that Adderley's image was ever licensed without his permission or that he did not receive licensing royalties owed to him.  Nor do they allege that Adderley relied to his detriment on specific information released or withheld by the NFLPA or Players Inc.  They also do not allege that Adderley failed to pursue individual, non-group licensing opportunities on his own because he believed that Players Inc. was representing him.  Nor do they allege that *Adderley himself lost money* because defendants failed to pursue licensing opportunities on his behalf.  Plaintiffs make many allegations regarding what members of the putative class may have done or believed, but their claims are not before us at this time.  Accordingly, plaintiffs have failed to plead detrimental reliance.  Defendants' motion to dismiss plaintiffs' claim for breach of fiduciary duty is **GRANTED**, and this claim must be dismissed.

### 5.     UNJUST ENRICHMENT AND RESTITUTION.

A claim for unjust enrichment requires pleading "the receipt of a benefit and the unjust retention of the benefit at the expense of another."  *Lectrodryer v. Seoulbank*, 77 Cal. App. 4th 723, 726 (2000).  California courts appear to be split on whether unjust enrichment can be an independent claim or merely an equitable remedy.  "The phrase 'unjust enrichment' does not describe a theory of recovery, but an effect:  the result of a failure to make restitution under circumstances where it is equitable to do so."  *Melchoir v. New Line Productions, Inc.*, 106 Cal. App. 4th 779, 793 (2003) (quoting *Lauriedale Assocs. Ltd. v. Wilson*, 7 Cal. App. 4th 1439, 1448 (1992)).  Other California courts, however, have held that a plaintiff may state a claim for

United States District Court

For the Northern District of California

United States District Court

For the Northern District of California

1   unjust enrichment, particularly where their claim seeks restitution where other remedies are

2   inadequate.  *See Ghirardo v. Antonioli*, 14 Cal. 4th 39, 50 (1996).

3       Assuming that unjust enrichment is a claim that can stand on its own, plaintiffs still have

4   not pleaded that they conferred a benefit on defendants which they unjustly retained.  Plaintiffs

5   allege that defendants benefitted in some manner from plaintiffs' status as retired NFL players.

6   They do not, however, allege that defendants received anything from plaintiffs' status.

7   Defendants may have been able to generate licensing revenues for those players who signed

8   GLAs, but not for those players who never signed GLAs.  For those plaintiffs who signed

9   GLAs, plaintiffs granted defendants the rights to use their names, images, and likenesses in

10  group licenses of six or more players.  Specifically, they did not allege that the NFLPA licensed

11  plaintiffs' names, images, or likenesses without their permission.  Accordingly, defendants'

12  motion to dismiss is **GRANTED**.

13      **6.    ACCOUNTING.**

14      An accounting is available where the nature of the relationship requires an accounting, a

15  balance is due to the plaintiffs, and there is no other adequate remedy at law.  *See* 1 Cal. Jur. 3d

16  *Accounts & Accounting* § 77.  As with plaintiffs' claim for unjust enrichment, they have failed

17  to plead that a balance is due to them.  Additionally, plaintiffs fail to plead that there is no

18  adequate remedy at law.  Defendants' motion to dismiss plaintiffs' claim for an accounting is

19  **GRANTED**.

20                          **CONCLUSION**

21      The defense motion to dismiss is **GRANTED**.  In the prior order on defendants' motion

22  for judgment on the pleadings, plaintiffs expressed a desire to amend their complaint.  They

23  were given leave to do so, but were warned then that they should plead their best case and to

24  take nothing for granted.  In our current round of motion practice, it seems evident that Parrish

25  may not be able to plead that he signed a GLA during the statute of limitations period (O'Kelly

26  Decl. Exh. A).

27      On the other hand, it seems possible that at least some of the shortfalls could be cured by

28  amendment.  Leave to amend will be allowed but only via the following procedure.  Plaintiffs

United States District Court
For the Northern District of California

1    may file a motion for leave to file a third amended complaint no later than **SEPTEMBER 27,**

2    **2007**.  The motion should be accompanied by a copy of the proposed amended pleading and a

3    declaration that explains how the amended complaint is different from prior complaints and the

4    good-faith basis on which the amendments were made.  The motion itself should specifically

5    address why the amended pleading cures problems discussed in this order.  Defendants should

6    file an opposition to the motion for leave no later than **OCTOBER 11, 2007**.  Plaintiffs reply will

7    be due no later than **OCTOBER 18, 2007**.  The Court will then determine if a hearing on the

8    motion is necessary.  Please do not ask for extensions.

9          At the hearing on these motions to dismiss, defendants raised the issue of staying

10   discovery if their motions to dismiss were granted.  This order has granted their motions to

11   dismiss, and it is unclear at this time whether or not plaintiffs will be allowed to replead.

12   Accordingly, effective as to all discovery due beginning Monday, September 10, 2007,

13   discovery is **STAYED** pending further order.

15          **IT IS SO ORDERED.**

17   Dated:  September 6, 2007.

     _____
                            WILLIAM ALSUP
                            UNITED STATES DISTRICT JUDGE