

ORIGINAL TRANSCRIPT

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

BERNARD PAUL PARRISH, HERBERT
ANTHONY ADDERLEY, and WALTER
ROBERTS III, on behalf of
themselves and all others
similarly situated,

               Plaintiffs,

vs.                           CIVIL ACTION NO.  C07 0943 WHA

NATIONAL FOOTBALL LEAGUE PLAYERS
ASSOCIATION, a Virginia
corporation, and NATIONAL
FOOTBALL LEAGUE PLAYERS
INCORPORATED d/b/a PLAYERS INC,
a Virginia corporation.

               Defendants.

VIDEOTAPED DEPOSITION OF DOUG ALLEN
LOS ANGELES, CALIFORNIA
SEPTEMBER 7, 2007

Reported by Terrie C. Barker, CSR No. 12000

Doug Allen                                    September 7, 2007

58

1   players who were members of the NFLPA.

2       Q.    So you, as the president of Players Inc.

3   believed it was accurate to say that Players Inc.

4   represented all of retired members of the NFLPA?

5       A.    Yes.

6       Q.    And represented them for the purposes --

7            MR. FEHER:   Wait.   Objection to form on the

8   prior question.

9   BY MR. LeCLAIR:

10      Q.    And represented them for purposes of group

11  licensing?

12           MR. FEHER:   Same objection.

13           THE WITNESS:   For the purpose of providing

14  access to them for a number of opportunities.   Group

15  licensing was part of it, but not all of it.

16  BY MR. LeCLAIR:

17      Q.    Is it correct that Players Inc. did not have

18  3,000 retired players who had signed GLAs, Group

19  Licensing Authorizations?

20      A.    During what period of time?

21      Q.    Between 2003 -- at any one time did --

22      A.    I don't know that that's accurate.   They may

23  well have.   I don't recall without researching the

24  record.

25      Q.    You mentioned that there were -- in your

Doug Allen                                    September 7, 2007

59

1    answer, there were three ways that retired players

2    could be represented.  One was signing a GLA;

3    correct?

4         A.    I think I was describing the circumstances

5    under which Players Inc. had access to those players

6    and could provide that access to the marketplace.  I

7    think those were the words I used.

8         Q.    Which you defined as representing them;

9    correct?

10        A.    Right.

11            MR. FEHER:  Objection.

12   BY MR. LeCLAIR:

13        Q.    And the three ways that you mentioned were:

14   signing a GLA.  That's one way; correct?

15        A.    Um-hmm.

16        Q.    Is that --

17        A.    Yes.

18        Q.    The second way would be being a member -- a

19   retired member of the NFLPA; correct?

20            MR. FEHER:  Objection to form.

21            THE WITNESS:  Because we had access to those

22   players and knew where they were and how to reach

23   them and contact them, yes.

24   BY MR. LeCLAIR:

25        Q.    And the third way would be that the player



Doug Allen                                        September 7, 2007

76

1      A.   No.  I think this was more in the nature of

2  explaining things and education.

3      Q.   What is a contract advisor?

4      A.   It's a person who represents an active NFL

5  player who is negotiating with an NFL club for that

6  player's services -- for a contract for that player's

7  services under the authority of the NFLPA and the

8  collective bargaining agreement.

9      Q.   Is that any different than a player's agent?

10     A.   Well, you could be a player's agent and not

11  be a contract advisor -- but not be an NFLPA contract

12  advisor.  It depends on whether you want to represent

13  players in negotiations with NFL teams.

14     Q.   All right.  Let's look at the first

15  paragraph of your memo.  You state, "The NFL and

16  Players Inc. have been working for five years under a

17  productive agreement which provides for Players Inc.

18  to exclusively license NFL sponsors for player group

19  licensing rights and for Players Inc. to be the

20  exclusive source of player participation in such

21  sponsors' programs."

22          Was that accurate?

23          MR. FEHER:  Objection to form.

24          THE WITNESS:  Yes.

25          MR. LeCLAIR:  I don't normally do this, but

Doug Allen                                    September 7, 2007

77

1    help me out.  What's your objection?  Can you explain

2    your objection so I can cure it?

3            MR. FEHER:  Well, you've asked, so I

4    wouldn't have otherwise said this.  But this and a

5    number of your other questions aren't clear in terms

6    of distinguishing between retired players and active

7    players.  This quote refers to players, and so unless

8    the questions are cleared up in terms of whether it

9    applies to active or retired, whenever it just talks

10   about players, I'm going to need to object to form so

11   that the question isn't misused later on in reference

12   to retired players as opposed to potentially just

13   active.

14           MR. LeCLAIR:  Understood.  Fair enough.

15   BY MR. LeCLAIR:

16       Q.   Go ahead, Mr. Allen.  Do you recall the

17   question?

18       A.   No.

19       Q.   I read the first sentence into the record,

20   and I asked you if it was accurate.

21       A.   Yes, I believe it is.

22           MR. FEHER:  Same objection.

23   BY MR. LeCLAIR:

24       Q.   And when you refer to player participation,

25   are you referring to active players, retired players,



Doug Allen                                          September 7, 2007

                                    78

1    or both?

2        A.    It depends on the circumstances, but in this

3    memo, we were essentially referring to active players

4    because this was a seminar for active player contract

5    advisors.

6        Q.    Is it correct, Mr. Allen, that with respect

7    to the exclusivity provisions, you interpreted them

8    the same for retired players as you did for active

9    players?

10           MR. FEHER:  Objection to form.

11           THE WITNESS:  I think we've been over that.

12   And it depends on the circumstances.  And among the

13   differences is the fact that -- is the fact that the

14   GLAs for active and retired players are different.

15   BY MR. LeCLAIR:

16       Q.    Different how?

17       A.    For active players, for group licensing,

18   they're exclusive; for retired players, they're not.

19       Q.    Has that always been true?

20       A.    No.

21

22                          **REDACTED**

23

24

25



Doug Allen                                              September 7, 2007

108

**REDACTED**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25



Doug Allen                                          September 7, 2007

109

**REDACTED**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25



**P A U L S O N**

**REPORTING & LITIGATION SERVICES**
**WWW.PAULSONREPORTING.COM**

800.300.1214                                        619.239.4111

Doug Allen                                        September 7, 2007



110

**REDACTED**



Doug Allen                                          September 7, 2007



111

1
2
3
4           **REDACTED**
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25



Doug Allen                                    September 7, 2007

124

**REDACTED**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25



Doug Allen                                    September 7, 2007

133

1
2
3
4
5                              **REDACTED**
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25



Doug Allen                                    September 7, 2007

134

1

2

3

4

5

6

**REDACTED**

7

8

9

10

11

12

13

14

15

16

17

18

19

20          (Exhibit 16 marked)

21   BY MR. LeCLAIR:

22       Q.    All right.   I want to change subjects,

23   Mr. Allen, and ask you about the Group Licensing

24   Authorizations related to retired players.

25           Let me show you what I've marked as



Doug Allen                                        September 7, 2007

145

1    BY MR. LeCLAIR:

2         Q.   Was a retired player, as you understood it,

3    free to license his rights to anybody for anything at

4    any time after signing this Group Licensing

5    Authorization Form?

6              MR. FEHER:  Objection to form.

7              THE WITNESS:  Could you restate the

8    question?

9              MR. LeCLAIR:  Why don't you read it back.

10             (Record read)

11             THE WITNESS:  I think for the most part,

12   that was true.

13   BY MR. LeCLAIR:

14        Q.   And this did not in any way, as you

15   understood it, limit the ability of a player to

16   market his image or rights in a group licensing

17   context after signing this form?

18        A.   This document itself?  I'm sorry.  I'm

19   focused on more than one element in your question.

20   Could you repeat it?

21             MR. LeCLAIR:  Read it back, please.

22             (Record read)

23             THE WITNESS:  Certainly, to some extent.

24   For example, if we have the right to use him and we

25   put him in a program, he's not going to be able to



Doug Allen                                    September 7, 2007

146

1   license himself to that program.  We've got the right
2   to put him into the program, and he doesn't have --
3   that's why he's giving us the right to do this, so
4   that if we put him into a particular licensed program
5   he doesn't have an independent right to put himself
6   into that program as part of a group at the same time
7   that we have the right to put him.  That wouldn't
8   make any sense.
9        So, for example, that's one -- one way that
10  this would constrain his ability to use his name and
11  image.  Otherwise, this form doesn't have any
12  meaning.
13
14
15
16
17                  **REDACTED**
18
19
20
21
22
23
24
25

Doug Allen                                    September 7, 2007

147

**REDACTED**

5        MR. FEHER:  Pardon me just one second.  I

6    realized something relatively important, and I don't

7    want it to escape me.

8            This was produced by us to you, and it

9    wasn't designated as "confidential" because it's

10   Mr. Adderley's document.  I just noted it includes

11   Mr. Adderley's social security number.  And you may

12   want to designate it as "confidential" or "highly

13   confidential" down the road so that it's not

14   inadvertently produced in a public fashion with

15   Mr. Adderley's social security number out there.

16       MR. LeCLAIR:  I think we -- we certainly

17   will designate -- we don't need to designate the

18   whole document.  We'll designate the social security

19   number of Mr. Adderley as "highly confidential."

20       MR. FEHER:  I just noted that potential, you

21   know, item.  Whatever you want to do is fine, but

22   since I noticed it, I didn't want you to lose the

23   benefit of that.

24       MR. LeCLAIR:  Thank you for that.  We'll

25   similarly designate the social security number of



Doug Allen                                          September 7, 2007

148

1    Mr. Adderley on Exhibit 17 as "highly confidential."

2         MR. FEHER:  You should separately contact

3    the lawyers at my office who are dealing with

4    document production.  Because I'm sure they had no

5    intent.  It's just that they didn't want to make

6    designation decisions for you.

7    BY MR. LeCLAIR:

8         Q.   Mr. Allen, the next to the last paragraph

9    states, "It is further understood that the moneys

10   generated by such licensing of retired player group

11   rights will be divided between the player and an

12   escrow account for all eligible NFLPA members who

13   have signed a Group Licensing Authorization Form."

14        Do you see that language?

15        A.   I do.

16        Q.   When it refers to an escrow account for all

17   eligible NFLPA members who have signed a Group

18   Licensing Authorization Form, was there such an

19   account created?

20        A.   No, because all of the money was distributed

21   to the players who participated.

22        Q.   So you did not divide the money at all

23   between the player and an escrow account.  You didn't

24   even create an escrow account?

25        A.   There was no money to create it with.  We



P A U L S O N

REPORTING & LITIGATION SERVICES

800.300.1214        WWW.PAULSONREPORTING.COM        619.239.4111

Doug Allen                                          September 7, 2007

149

1    wouldn't have been able to get the players to do it

2    in the first place if they weren't getting paid.  We

3    learned that lesson.  And all of the money secured

4    for retired player licensing was distributed to the

5    players who were involved in those license programs.

6    There was no other money to escrow.  There was no

7    other money to divide.  And if we had -- if we had

8    discounted it and taken money out of it, we wouldn't

9    have gotten the players to participate in the first

10   place.

11            MR. FEHER:  Object to the form.

12   BY MR. LeCLAIR:

13       Q.  How long did this language stay in the

14   Retired Player GLA Form?

15       A.  I don't know.

16       Q.  I think it was in there probably about ten

17   years.  Does that make sense to you?

18       A.  I don't know.

19       Q.  Do you know why you didn't take it out?

20            MR. FEHER:  Objection to form.

21            THE WITNESS:  I think -- well, my opinion is

22   because we were hopeful that we would be able to

23   generate through group player licensing of retired

24   players a sufficient amount of money to do that, but

25   that was never the case.



Doug Allen                                          September 7, 2007

205

1
2
3
4
**REDACTED**
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25



Doug Allen                                    September 7, 2007

206

1

2

3

4

5                                **REDACTED**

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Doug Allen                                    September 7, 2007

207

1

2

3

4

5

6

7                        **REDACTED**

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



Doug Allen                                           September 7, 2007



208

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**REDACTED**



P A U L S O N
REPORTING & LITIGATION SERVICES
800.300.1214          WWW.PAULSONREPORTING.COM          619.239.4111

Doug Allen                                    September 7, 2007

294

REPORTER CERTIFICATION

1

2

3      I, Terrie C. Barker, Certified Shorthand

4  Reporter, in and for the State of California, do

5  hereby certify:

6

7      That the foregoing witness was by me duly sworn;

8  that the deposition was then taken before me at the

9  time and place herein set forth; that the testimony

10  and proceedings were reported stenographically by me

11  and later transcribed into typewriting under my

12  direction; that the foregoing is a true record of the

13  testimony and proceedings taken at that time.

14

15      IN WITNESS WHEREOF, I have subscribed my name

16  this 13th day of September, 2007.

17

18

19

20          /s/ Terrie C. Barker

21          Terrie C. Barker, CSR No. 12000

22

23

24

25

P A U L S O N

REPORTING & LITIGATION SERVICES

800.300.1214          WWW.PAULSONREPORTING.COM          619.239.4111