IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BERNARD PAUL PARRISH, HERBERT ANTHONY ADDERLEY, and WALTER ROBERTS III, <br><br> Plaintiffs, <br><br> v. <br><br> NATIONAL FOOTBALL LEAGUE PLAYERS ASSOCIATION, a Virginia corporation, and NATIONAL FOOTBALL LEAGUE PLAYERS INCORPORATED d/b/a PLAYERS, INC., a Virginia corporation, <br><br> Defendants. <br> ———————————————————/ | No. C 07-00943 WHA <br><br> **ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR LEAVE TO FILE AN AMENDED COMPLAINT** |

## INTRODUCTION

In this putative class action, plaintiffs move for leave to file an amended complaint. Pursuant to a prior order, defendants' motion to dismiss for failure to state a claim was granted, and plaintiffs' complaint was dismissed. Plaintiffs were given leave to file a motion for leave to file an amended complaint. In their proposed pleading, plaintiffs have successfully alleged the existence of a contract between Adderley and defendants, that defendants breached the contract, and that Adderley was damaged as a result. Turning to plaintiffs' breach of fiduciary duty claim, plaintiffs have alleged that there were fiduciary relationships between defendants and Adderley and Parrish. Plaintiffs' allegations of fiduciary duty based on a confidential relationship again fail. Accordingly, plaintiffs' motion for leave to file an amended complaint

is **GRANTED IN PART AND DENIED IN PART**. The stay of discovery is lifted as of the date of this order.

## STATEMENT

Plaintiffs Bernard Paul Parrish, Herbert Anthony Adderley, and Walter Roberts III are retired National Football League players. In this action they purport to represent the class of former NFL players. Defendant National Football League Players Association is a Virginia corporation that acts as the labor union for players in the NFL (Third Amd. Compl. ¶ 7). Defendant Players Inc. is a corporation 79% owned by the NFLPA that allegedly handles group licensing for the current and former NFL players (*id*. at ¶ 10). The relevant facts of this action are recounted more fully in prior orders. In short, plaintiffs allege that they have not received revenues owed to them by defendants from the licensing of their names, images, and biographies, and that defendants have failed to pursue licensing opportunities on their behalf in breach of contract or in breach of fiduciary duties.

Parrish and Adderley first filed this action on February 14, 2007, alleging claims of breach of fiduciary duty, unjust enrichment, and accounting. They filed an amended complaint on February 23, adding Roberts as a plaintiff. Players Inc. answered on April 2, 2007. Thereafter, Players Inc. filed a motion to transfer venue, a motion for judgment on the pleadings, and a motion for sanctions against plaintiffs. At the same time, plaintiffs filed a motion to appoint interim class counsel. An order dated June 4, 2007, denied defendant's motion for judgment on the pleadings without prejudice, denied defendant's motion to transfer venue, and denied defendant's motion for sanctions. Plaintiffs' motion to appoint interim counsel was also denied. Plaintiffs were given leave to amend their complaint but were counseled to plead their best case and take nothing for granted in their amended pleading.

Plaintiffs filed their amended complaint on June 21, 2007, adding NFLPA as a defendant. The complaint alleged claims for: (1) breach of contract; (2) breach of fiduciary duty; (3) unjust enrichment and restitution; (4) unfair competition under California Business and Professions Code § 17200; and (5) accounting. Both defendants filed motions to dismiss on July 6, 2007. An order dated September 6, 2007, granted defendants' motions to dismiss on all

1 claims, but gave plaintiffs an opportunity to file a motion for leave to file yet another amended
2 complaint.

3 Plaintiffs filed this motion on September 27, 2007, along with their proposed amended
4 pleading. Plaintiffs amended the allegations of each of their claims, except for their unfair
5 competition law claim. That claim was realleged to preserve it for the purpose of appeal. The
6 proposed pleading also does not include a claim for unjust enrichment, it only alleges claims for
7 breach of fiduciary duty and breach of contract. A full round of briefing followed plaintiffs'
8 motion.

**ANALYSIS**

10 Leave to amend a complaint shall be freely given when justice so requires under
11 Rule 15(a). This standard is applied liberally. Rule 15(a) does not apply, however, when a
12 district court has established a deadline for amended pleadings under Rule 16(b). *See Johnson*
13 *v. Mammoth Recreations, Inc.*, 975 F.2d 604, 607–608 (9th Cir. 1992). Once the district court
14 has entered a scheduling order, the liberal policy favoring amendments no longer applies.
15 Subsequent amendments are not allowed without a request to first modify the scheduling order.
16 At that point, any modification must be based on a showing of good cause. *Coleman v. Quaker*
17 *Oats Co.*, 232 F.3d 1271, 1294 (9th Cir. 2000). "Leave to amend need not be granted when an
18 amendment would be futile." *In re Vantive Corp. Sec. Litig.*, 283 F.3d 1079, 1097 (9th Cir.
19 2002).

20 **1.    BREACH OF CONTRACT.**

21 "A cause of action for damages for breach of contract is comprised of the following
22 elements: (1) the contract, (2) plaintiff's performance or excuse for nonperformance,
23 (3) defendant's breach, and (4) the resulting damages to plaintiff." *Armstrong Petroleum*
24 *Corp. v. Tri-Valley Oil & Gas Co.*, 116 Cal. App. 4th 1375, n.6 (2004) (citation omitted). In the
25 prior order, defendants' motions to dismiss were granted because plaintiffs failed to plead the
26 existence of a contract, which provisions of the contract defendants' breached, and what
27 damages had resulted.

3

### A. Existence of a Contract.

The first problem identified by the order on defendants' motion to dismiss was that plaintiffs had not adequately pleaded the existence of a contract. Adderley had pled that he believed that he signed GLAs within the statute of limitations, but did not pled their terms or their legal effect. Parrish had pleaded that he signed a GLA at some point, but he did not replead this claim. Here, plaintiff has appended copies of group licensing agreements signed by Adderley. The first is dated May 1, 2001, and expired December 31, 2003, and the second is dated November 22, 2003, and expired December 31, 2005 (Compl. Exh. B, C). Accordingly, he has now pleaded the existence of a contract between Adderley and defendants.

### B. Breach.

The order on defendants' motions to dismiss also held that Adderley had not alleged which provisions of the contract defendants had breached. Adderley now alleges that defendants breached the provision of the GLA which states "it is further understood that the moneys generated by such licensing of retired player group rights will be divided between the player and an escrow account for all eligible NFLPA members who have signed a group licensing authorization form" (Compl. ¶¶ 19, 29). They allege, on information and belief, that Players Inc. and the NFLPA created an account, deposited licensing funds into it, but failed to distribute revenue owed to retired players such as Adderley (*id.* at ¶¶ 29–39).

As an example, Adderley alleges that under the GLA, he was entitled to licensing revenues regardless of whether his image was ever used under licenses in 2004 and 2005 between defendants and Electronic Arts (*id.* at Exh. F, G). He never received any money from these licenses. They allege that these agreements provided for payments for the names, images, and likenesses of retired players, regardless of whether they were actually used by EA. Plaintiff points to two sections in these agreements. First, the section under "Representations" stated (*id.* at Exh. F, ¶ 1(A)) (emphasis added):

> PLAYERS INC represents that it is a licensing affiliate of the National Football League Players Associated ("NFLPA"); that the NFLPA has been duly appointed and is acting on behalf of the football players of the National Football League who have entered into a Group Licensing Authorization, either in the form attached hereto as Attachment "A" or through the assignment contained in

4

> Paragraph 4(b) of the NFL Player Contract, which have been assigned to PLAYERS INC; and that in such capacity PLAYERS INC has the right to negotiate this contract and the right to grant rights and licenses described herein. Licensee acknowledges that PLAYERS INC also on occasion secures authorization for inclusion in PLAYERS INC licensing programs from players, *including but not limited to retired players*, who have not entered into such Group Licensing Authorization, but who, nevertheless, authorize PLAYERS INC to represent such players for designated PLAYERS INC licensed programs.

Later in the contract, in the section marked "Grant of License" the agreement stated (*id*. at ¶ 2(A)) (emphasis added):

> Upon the terms and conditions hereinafter set forth, PLAYERS INC hereby grants to Licensee and Licensee hereby accepts the non-exclusive right, license and privilege of utilizing the trademarks and names of PLAYERS INC which may be amended from time to time by PLAYERS INC and the names, likenesses (including, without limitation, numbers), pictures, photographs, voices, facsimile signatures and/or biographical information (hereinafter "identity") *of the NFL players referenced in Paragraph 1(A) above*, for product(s) . . . Provided, however, that the specific manner in which the rights licensed hereunder are to be used on the licensed product(s) in question shall require the prior written approval of PLAYERS INC as provided in Section 12 below.

Plaintiff also alleges that 60% of the licensing revenues should have been distributed in equal shares to all retired players who signed GLAs, as indicated by an agreement between Players Inc. and NFLPA.

Defendants argue that such amendments would be futile because plaintiff cannot have a good faith basis for making them. In particular, they contend that the language of the agreement with EA clearly stated that it does not grant the rights to retired players. The relevant language provided "[l]icensee acknowledges that Players Inc. also on occasion secures authorization for inclusion in Players Inc. licensing programs from players, including but not limited to retired players, who have not entered into such Group Licensing Authorization, but who, nevertheless, authorize Players Inc. to represent such players for designated Players Inc. licensed programs" (*id*. at ¶ 21). According to defendants, this means that retired players were included in the licensing programs *only if* they signed a different GLA from active players, and participated in specific, designated Players Inc. licensing programs outside of the 2004 and 2005 EA agreements.

5

The next paragraph, however, stated that the EA license grants the rights to "the NFL players referenced in Paragraph 1(A) above" (*id.* at ¶ 23). Taking plaintiff's allegations as true, this indicates that the rights to all active players and those retired players who signed another GLA pursuant to a different licensing program with Players Inc. were licensed under that agreement.

In support, defendants also cite to the declaration of Joel Linzner, executive vice president of business and legal affairs at EA, and Douglas Allen, former president of Players Inc.. Both declare that both Players Inc. and EA understood that the agreement only granted them rights to active players, not retired players (Linzner Decl. ¶¶ 2, 4, 5; Allen Decl. ¶¶ 11–12). Plaintiff notes that they have not yet had an opportunity to depose Linzner, and at any event, considering this information would risk turning this proceeding into summary judgment. This is true. Adderley also points out that Allen testified in his deposition that the last sentence of Paragraph 1(A) of the agreement does refer to retired players (LeClair Decl. Exh. A 205:25–206:7). Allen's testimony, however, does not foreclose defendants' interpretation of the agreement because it could still indicate that the language referred to retired players who were parties to different agreements. It may well turn out that defendants' interpretation of this agreement is the correct one, but for now, plaintiff has shown that retired player rights could be licensed pursuant to this agreement. In turn, Adderley could be owed some licensing revenue under this agreement.

Defendants also argue that because Adderley entered into a separate agreement to license the rights to his image, he cannot now claim that he was entitled to revenue from the EA agreement. Licensees already bought and paid for the rights to his image pursuant to other agreements, according to defendants. Plaintiff alleges that defendants have licensed retired players' rights granted to them under the retired players group licensing program to Upper Deck Company and the Topps Company (Compl. ¶ 28). Defendants assert that any revenue derived from these agreements has already been passed through to Adderley. Specifically, they point to other agreements signed by retired players, including Adderley (Greenspan Decl. Exh. B, ¶ 9A). The money was passed on to retired players whose images were used, according to defendants.

Plaintiff responds by pointing out that Allen confirmed in his deposition that the agreement specifically contemplated that the royalty payments were *in addition* to ad hoc agreements (LeClair Decl. Exh. A 209:18–210:11):

> Q: When you refer to "marketing dollars," what dollars are you referring to?
>
> A: I'm looking for it.
>
> Q: "Specific undertakings of the licensee," paragraph 15.
>
> A: Um-hmm. Some of that money was spent on a variety of activities that involved — also involved both active and retired players. And I can't tell you without researching it how much money retired players got from that.
>
> Q: These amounts in paragraph 15 are in addition to the amounts of paragraph 6; correct?
>
> A. That's correct.

Paragraph 6 of the EA license deals with licensing revenues. Whether or not Adderley was owed any money from this license pursuant to his GLA is another question of fact.

Adderley next alleges that he was denied royalty payments owed him pursuant to Paragraph 6(C) of the EA license, which states that EA would make minimum licensing payments regardless of whether or not it actually used the rights (Compl. Exh. G, 4). Since plaintiffs have pleaded that retired players could be entitled to licensing revenue under the EA agreement, Adderley has successfully pleaded that defendants breached the contract.

### B. Agreement Between NFLPA and Players Inc.

Next, Adderley alleges that he and other retired players were owed money pursuant to an agreement between Players Inc. and the NFLPA. Licensing revenue in the amount of eight million dollars was allegedly misallocated and not paid to retired players. According to plaintiff, this money should have been placed in an escrow account for distribution to retired players, including Adderley. Defendants argue that this cannot be so because the agreement itself states that "[g]ross licensing revenue shall exclude any revenues derived from . . . (v) amounts received by retired players pursuant to Group Licensing Assignments or Group Licensing Rights" (Compl. Exh. D, § 4(A)(v)). Defendants also argue that a letter attached to the complaint shows that this cannot be true. It explained that dues paid by NFLPA

7

Retired Players Associated members were not sufficient to cover the costs of services offered to retired players. Players Inc. ended up subsidizing those services "[b]ecause 40% of Player's Inc's operating revenue is paid to the NFLPA as a royalty for the active player name and image rights secured by the NFLPA and licensed to Players Inc." (Compl. Exh. L).

Plaintiffs argue that the agreement between the NFLPA and Players Inc. actually supports their position. It shows clearly that the agreement excluded revenue derived from retired player licenses from the escrow account. According to plaintiff, this was an arbitrary decision by the NFLPA and Players Inc. This argument is a pretty hard sell because this contract does not actually indicate that any revenues were owed to retired players. Plaintiff presents a better argument by pointing out that the agreement excludes income received by retired players, not income that was not paid to them in the first place. The evidence will show whether or not any such revenue actually existed. At least at the pleading stage, plaintiff has adequately alleged that defendants breached their contracts with Adderley.

**C.    Damages.**

The order on defendants' motions to dismiss held that plaintiff had failed to plead how he, personally, and not members of the as-yet uncertified class, had suffered damages from defendants' alleged breach. Adderley now pleads that he suffered damages as a result of defendants' failure to pay licensing royalties owed to them. As demonstrated above, Adderley pleads that he was entitled to licensing royalties under the agreements which he was never given. Accordingly, plaintiff's motion for leave to file an amended complaint for breach of contract is **GRANTED**.

**2.    BREACH OF FIDUCIARY DUTY.**

As before, plaintiffs present two different theories of fiduciary duty — one for Adderley based at least in part on his having signed a GLA, and one for the Parrish based on his membership in the NFLPA.

8

**A.     Adderley.**

The order on defendants' motions to dismiss identified a number of problems with Adderley's claims for breach of fiduciary duty claim. First, plaintiff had failed to plead the existence of a fiduciary relationship. Plaintiff also failed to plead breach and damages.

*(1)     Fiduciary Relationship.*

Adderley now pleads that there was a direct agency relationship based on his signing a GLA. As to a direct agency relationship, plaintiff pleads that "defendants had the ability to negotiate and ultimately execute licensing agreements on behalf of Adderley and the GLA class by virtue of the GLAs" (Compl. ¶ 45). Players Inc. allegedly controlled Adderley's access to personal appearance and licensing opportunities, while Adderley controlled the relationship with Players' Inc. through his ability to terminate the relationship. The prior order on defendants' motions to dismiss held that the GLAs could not, by themselves, create a fiduciary duty. Adderly now alleges that newly-discovered evidence, including Allen's testimony, confirms that retired players retained control over Players Inc.'s ability to license personal appearances and additional services.

Defendants argue that any attempt to argue that the GLAs gave rise to an exclusive relationship between Adderley and defendants is specious. They present Allen's testimony that the GLAs were not exclusive (Greenspan Decl. Exh. L, 145:1–12). They also point out that the GLAs specifically state that they only cover licensing for groups of six or more retired players. That is so, but it does not foreclose the possibility that defendants retained exclusive control over group rights. Adderley could have gone it alone to pursue licenses, but his group rights had to be licensed through Players Inc. Defendants also argue that this contention has no basis because *other* retired players pursued their own licensing opportunities for video games. Here, the question of whether Adderley was actually prevented from pursuing his own licensing opportunities is a question of fact that needs to be further developed in this action.

Adderley also attempts to plead a fiduciary relationship based on a confidential relationship. Such a confidential relationship can occur where "(1) the vulnerability of one party to the other, (2) results in the empowerment of the stronger party by the weaker which

9

1  (3) empowerment has been solicited or accepted by the stronger party and (4) prevents the
2  weaker party from effectively protecting itself." *Richelle L. v. Roman Catholic Archbishop*,
3  106 Cal. App. 4th 257, 272 (2003). "The vulnerability that is the necessary predicate of a
4  confidential relation . . . usually arises from advanced age, youth, lack of education, weakness
5  of mind, grief, sickness, or some other incapacity." *Id*. at 273.

6        The prior order faulted plaintiff for failing to plead facts indicative of the kind of
7  vulnerability necessary for such a relationship. Specifically, Adderley now pleads that he was
8  vulnerable to the NFLPA because they solicited his participation in licensing programs while at
9  the same time withholding information about licensing revenue. He also alleges now that he
10 receives only a minimal pension from the NFLPA and suffers from physical disabilities from
11 his career playing professional football (Compl. ¶ 51). The prior order held that mere difference
12 in economic power, even where the difference was great, did not create a confidential
13 relationship. Moreover, taking plaintiff's allegations regarding his physical disabilities as true,
14 it is not certain that his conditions are severe enough to render him vulnerable in this sense.
15 Accordingly, Adderley has pleaded a fiduciary relationship based on contract, but has failed to
16 plead a fiduciary duty based on a confidential relationship.

17       *(2)    **Breach and Damages.***

18       The prior order held that Adderley had successfully pleaded agency by estoppel
19 sufficient to give rise to a fiduciary duty. Adderley failed to allege detrimental reliance and
20 damages flowing therefrom. Now, plaintiff alleges that he relied to his detriment on defendants
21 to act in good faith and represent his best interests in pursuing group licensing opportunities
22 (Compl. ¶ 48). He also believed that defendants would pursue group licensing opportunities on
23 his behalf, so he did not do so. Even if he had pursued licensing opportunities on his own, he
24 would have been unlikely to succeed. Accordingly, Adderley has pleaded detrimental reliance.

25       The order on the motions to dismiss held that Adderley had failed to plead breach of
26 fiduciary duty and resulting damages. Adderley now alleges that defendants breached their
27 duties by failing to report revenues, failing to distribute revenues owed to him, excluding retired
28 players from receiving a share of the licensing revenue, misappropriating funds owed to him,

1  and acting adversely to his interests after he had signed a GLA (Compl. ¶¶ 52–56). As to
2  damages, he alleges that he did not receive licensing revenue, and that he was harmed by
3  defendants' misappropriating licensing revenue derived from licenses for retired players.
4  Taking these allegations as true, they are sufficient to show that defendants breached their
5  fiduciary duties to Adderley and that he was damaged as a result.

### B.    Parrish.

Since Parrish has never alleged that he signed a GLA within the statute of limitations, the prior order held that he could not base a claim for breach of fiduciary duty on GLAs. Parrish argues now that he has stated a claim based on agency by estoppel or a confidential relationship. The order also noted that even if Parrish had pleaded a fiduciary relationship, he had failed to allege how defendants breached any fiduciary duty, and how he suffered damages as a result.

#### *(1)    Fiduciary Relationship.*

Parrish now attempts to plead an agency-by-estoppel relationship based on his membership in the NFLPA. He alleges that the NFLPA solicited retired players to join. The NFLPA then held itself out to third parties as representing those players for licensing purposes (Compl. ¶¶ 62, 66). Parrish, by virtue of joining the NFLPA and paying dues, reasonably expected that the NFLPA would act in good faith on his behalf. He also alleges that the NFLPA did not inform him of benefits that he could have received by virtue of his membership in the NFLPA.

Parrish also attempts to plead that there was a confidential relationship between himself and NFLPA. He alleges that as a retired player, he was not allowed to vote in the NFLPA and that the NFLPA and Players Inc. failed to provide him with information regarding benefits to which he may have been entitled. He, in effect, argues that he was vulnerable to the NFLPA because he was a non-voting member and had no say in the direction of the organization. Still Parrish's allegations do not establish the kind of confidential relationship that would give rise to a fiduciary duty by itself.

11

### (2) *Breach and Damages.*

As with Adderley's claims, the order defendants' motions to dismiss held that even if he had alleged a fiduciary relationship, he did not identify how defendants breached a fiduciary duty and how he was damaged as a result. The order explained that Parrish could have had an agency-by-estoppel relationship.

Now, Parrish has added allegations that defendants withheld information about benefits to which he could have been entitled based on his membership in the NFLPA. Additionally, Parrish alleges that the NFLPA did not act in good faith toward him, and failed to pursue licensing opportunities on his behalf even though the NFLPA held itself out as representing him. He was damaged because he received little in exchange for his dues. Accordingly, Parrish has stated a claim for breach of fiduciary duty. Plaintiffs' motion for leave to amend their claim for breach of fiduciary duty is **GRANTED IN PART AND DENIED IN PART**.

### 3. ACCOUNTING.

The prior order on defendants' motions to dismiss held that plaintiffs could not plead a claim for an accounting. On the prior allegations, plaintiffs had not shown that they were entitled to a balance due. Here, plaintiffs have shown that defendants deprived them of licensing revenues and dues paid to the NFLPA. Accordingly, plaintiffs can seek an accounting by way of relief, assuming they prevail on the merits and equity warrants such relief.

### CONCLUSION

For all of the above-stated reasons, plaintiffs' motion for leave to file an amended complaint is **GRANTED IN PART AND DENIED IN PART**. Plaintiffs are ordered to file their complaint conforming to this order forthwith. The stay on discovery is lifted as of the date of this order. The fact-discovery cutoff is extended from May 9, 2008, to **MAY 23, 2008**.

**IT IS SO ORDERED.**

Dated: November 14, 2007.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE

12