| | |
|---|---|
| 1 | MANATT, PHELPS & PHILLIPS, LLP |
| | RONALD S. KATZ (Bar No. CA 085713) |
| 2 | E-mail: rkatz@manatt.com |
| | RYAN S. HILBERT (California Bar No. 210549) |
| 3 | E-mail: rhilbert@manatt.com |
| | NOEL S. COHEN (California Bar No. 219645) |
| 4 | E-mail: ncohen@manatt.com |
| | 1001 Page Mill Road, Building 2 |
| 5 | Palo Alto, CA 94304-1006 |
| | Telephone: (650) 812-1300 |
| 6 | Facsimile: (650) 213-0260 |
| 7 | McKOOL SMITH, P.C. |
| | LEWIS T. LECLAIR (Bar No. CA 077136) |
| 8 | E-mail: lleclair@mckoolsmith.com |
| | JILL ADLER NAYLOR (Bar No. CA 150783) |
| 9 | E-mail: jadler@mckoolsmith.com |
| | 300 Crescent Court, Suite 1500 |
| 10 | Dallas, TX 75201 |
| | Telephone: (214) 978-4000 |
| 11 | Facsimile: (214) 978-4044 |
| 12 | Attorneys for Plaintiffs |

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| BERNARD PAUL PARRISH, and HERBERT ANTHONY ADDERLEY, on behalf of themselves and all others similarly situated, <br><br> Plaintiffs <br><br> vs. <br><br> NATIONAL FOOTBALL LEAGUE PLAYERS ASSOCIATION, a Virginia corporation, and NATIONAL FOOTBALL LEAGUE PLAYERS INCORPORATED d/b/a PLAYERS INC, a Virginia corporation, <br><br> Defendants. | CIVIL ACTION NO. C07 0943 WHA <br><br> **DECLARATION OF MARVIN MILLER IN SUPPORT OF MOTION FOR CLASS CERTIFICATION** <br><br> Date: April 24, 2008 <br> Time: 8:00 a.m. <br> Place: Courtroom 9, 19th Floor <br> Judge: Hon. William H. Alsup |

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
PALO ALTO

4249v1

I, Marvin Miller, declare as follows:

1. I have sufficient knowledge of the facts stated herein to make this declaration and, if called upon to do so, I could and would testify competently thereto. I make this declaration in support of the Motion for Class Certification of Plaintiffs Herbert Adderley and Bernard Parrish in this matter.

2. I was the Executive Director of the Major League Baseball Players Association ("MLBPA") from 1966 to 1983.

3. After earning my B.S. degree in economics, I worked for a number of public agencies, New York City and Federal. During WWII, I was employed as an economist for the War Production Board and War Manpower Commission, and as a labor management disputes hearing officer for the National War Labor Board. In the post-War period, I was a Commissioner of Conciliation for the U.S. Conciliation Service of the Labor Department and then an organizer/economist/negotiator for the IAM-AFL and the UAW-CIO, and in 1950, associate director of research for the United Steelworkers of America–CIO (later AFL-CIO). I remained with the Steelworkers Union for more than 16 years, becoming chief economist, assistant to the president and a member of the Union's top negotiating team.

4. I was elected the Executive Director of the Major League Baseball Players Association in 1966. The Association had been created by the owners, rather than the players. It was weak, ineffectual and totally dominated and controlled by the baseball club owners and their appointed officials. In 1968, I led a committee of players that negotiated the first collective bargaining agreement in the history of professional sports. That agreement involved recognition of the newly-created union as the major league baseball players' sole collective bargaining representative; led to large increases in the minimum salary and all expense allowances (which had been, for the most part, at sub-standard levels for two decades); and established a grievance procedure, a safety and health committee, and the right of a player to select his own agent (who, for the first time, would assist him in his individual salary talks with his employing club). That first agreement also established the first steps leading to the reform of a system which permitted club owners to treat players as property throughout their entire careers. In 1970, I helped players

49v1

negotiate the right to arbitration to resolve grievances. That breakthrough led five years later to Andy Messersmith and Dave McNally successfully challenging the "reserve clause" before arbitrator Peter Seitz, thereby opening the door to free agency.

5. As a result of my almost 17-year tenure as Executive Director of the MLBPA, all the conditions of the major league players' employment were or have been vastly improved:

- The pensions and health care plan became a matter of contract between the union and club owners and all the benefits provided therein were greatly expanded in each and every negotiation thereafter;

- The minimum salary of $6,000 a year and the average major league salary of $19,000 a year grew under the MLBPA's efforts to a minimum salary of over $400,000 a year and an average salary of $2,600,000 a year and the top salary of $100,000 expanded to over $25 million a year;

- Pension benefits, which typically were a few hundred dollars a month before the MLBPA, now range to $185,000 a year, a ceiling imposed by the U.S. Congress;

- Today's major league players have vastly improved per diem allowances, travel conditions, ballpark facilities, jointly selected impartial arbitrators to resolve grievances and other arbitrators to arbitrate salary differences; and

- The players have the right to change employers on their own initiative, a right that was non-existent before the union.

6. All of the improvements above, and much more, have been accomplished along with a tremendously increased economic well-being of the baseball franchise owners. The 20 clubs in existence when the union began in 1966 had a combined revenue of $50 million a year. Last year the industry, which has expanded by 50% in the interim, had revenues of more than $6 billion. The market's value of the major league franchises has grown similarly.

7. In 2000, "The Sporting News" ranked me fifth on its list of the "100 Most Powerful People in Sports for the 20th Century."

8. As the former head of a professional sports union, I have always believed, and continue to believe, that all members of a sports union must be treated equally because solidarity

49v1

is a pre-eminent union value.  Having a second category of non-voting retired members (as I understand the NFLPA has done) would have created untenable conflicts of interest for me as Executive Director of the MLBPA and for the MLBPA as a whole.  For that reason and others, retired players were not solicited to join nor permitted to join the MLBPA.  In my opinion, professional sports unions that include both active and retired players have a duty to treat all members equally and may not favor one group of members over another group of members.

9. The group licensing program of the MLBPA when I was its Executive Director provided for an equal share royalty to everyone who was invited to participate.  I managed the program in this way in order to promote the solidarity of the union and to avoid conflicts of interest.  Also, it was important that every player who played for the same period of time during a season share equally in the proceeds of group licensing, even if a particular player's image was not used.  In the event one player was more famous than another and thus more marketable, that player was free to negotiate his own agreement with a potential licensee.  I did not think that the MLBPA should intervene in this relationship because to do so would favor one player over another, which I am and have always been firmly against.

10. I understand that the NFLPA has solicited retired NFL players such as Plaintiff Herb Adderley to license their names and images as part of the NFLPA's group licensing program pursuant to a Group Licensing Authorization form ("GLA", see **Exhibit**).  In my opinion, this combination of active and retired players provides the benefit of greatly increased bargaining power to the NFLPA and to its licensing arm, Players Inc.  Even though, on its face, the definition of "group licensing program" in the GLA does not distinguish between active and retired player licensing, I understand that very few retired players, if any, have been paid pursuant to a GLA and that no retired player has received an equal share royalty.  In my opinion, once the NFLPA invited retired players to participate in its group licensing program alongside active players, it was incumbent upon the NFLPA to treat all of the participants in the group licensing program equally in terms of opportunities, information, revenues and any other aspect of group licensing.  I know of no principle of union organization that would permit these two groups of members to be treated differently.

49v1

| | |
|---|---|
| 1 | I declare under penalty of perjury and the laws of the United States that the foregoing is |
| 2 | true and correct and that this declaration was executed on March 13, 2008. |

                                                  /s/ Marvin Miller
                                                  Marvin Miller

*Filer's Attestation: Pursuant to General Order No. 45, Section X(B) regarding signatures, Ronald S. Katz hereby attests that concurrence in the filing of this document has been obtained.*

20198092.1

49v1