IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BERNARD PAUL PARRISH, HERBERT ANTHONY ADDERLEY, and WALTER ROBERTS III,<br><br>　　　　Plaintiffs,<br><br>　v.<br><br>NATIONAL FOOTBALL LEAGUE PLAYERS ASSOCIATION and NATIONAL FOOTBALL LEAGUE PLAYERS INCORPORATED d/b/a PLAYERS INC,<br><br>　　　　Defendant.<br>　　　　　　　　　　　　　　　　　　／ | No. C 07-00943 WHA<br><br>**ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFFS' MOTION FOR CLASS CERTIFICATION** |

## INTRODUCTION

In this action for breach of contract and breach of fiduciary duty, plaintiffs move for class certification of two classes: (1) all retired National Football Players who signed licensing agreements with defendants and (2) all retired NFL players who joined the National Football League Players Association. For the reasons stated below, certification of the former class is **GRANTED** and certification for the latter class is **DENIED**.[1]

## STATEMENT

Plaintiffs Bernard Paul Parrish and Herbert Anthony Adderley are retired National Football League players. Parrish resides in Florida and Adderley resides in New Jersey (Third

---

[1] Defendants also move to strike the declaration of Marvin Miller in support of plaintiffs' motion for class certification. As this order does not rely on Miller's declaration, defendants' motion need not be addressed.

Amd. Compl. ¶ 4–5). They purport to bring this action on behalf of all retired NFL football players.

Defendant NFLPA is a Virginia corporation that acts as the labor union for players in the NFL. Allegedly, nearly all *active* NFL players give the NFLPA the right to market their names and images pursuant to the NFLPA's collective bargaining agreement (*id*. at ¶ 7). National Football League Players Incorporated, doing business as Players Inc., is a subsidiary of the NFLPA that is responsible for marketing and licensing (*id*. at ¶ 10). Players Inc. purports to market active and retired players by licensing their images for purposes such as trading cards, video games, television and radio programming, personal appearances, autograph signings, internet sites, and events (*ibid*.). The NFLPA owns approximately 79% of Players Inc. (*id*. at ¶ 10, Exh. A).

Allegedly, the NFLPA solicits *retired* NFL players to join a "Retired Players Group licensing Program," in which the NFLPA offers third parties the right to license the images, likeness, and names of retired players in groups of six or more (*id*. at ¶ 13). To participate in the program, former NFL players are given the opportunity to sign group licensing agreements, or GLAs, with the NFLPA. Adderley signed at least two such agreements (*ibid.*, Exhbs. B and C). Adderley's GLA stated in its entirety (Naylor Exh. N) (with italics used for passages of intent):

> The undersigned hereby authorizes the National Football League Players Association ("NFLPA") and its licensing affiliates the non-exclusive right to use his name signature, facsimile, voice, picture, photograph, likeness and/or biographical information (collectively "image") in the NFLPA Retired Player Group Licensing Program.
>
> *Group licensing programs are defined as programs in which a licensee utilized a total of six (6) or more present or former NFL players* images in conjunction with or on products that are sold at retail or used as promotional or premium items.
>
> *The undersigned player retains the right to grant the use of his image to another entity for use in a group of five (5) or less present or former players* in conjunction with or on products sold at retail or used as promotional or premium items.

2

> If the undersigned player's inclusion in a particular NFLPA
> program will conflict with an individual exclusive
> endorsement agreement, and the player provides the
> NFLPA with timely notice of that conflict, the NFLPA
> agrees to exclude the player from that particular program.
>
> *It is further understood that the moneys generated by such
> licensing of retired player group rights will be divided
> between the player and an escrow account for all eligible
> NFLPA members who have signed a group licensing
> authorization form.* Any group licensing contract entered
> into with an individual company by the NFLPA shall
> exclude players who are committed by contract
> individually for the competitive products or services.

The NFLPA then grants the rights it receives from the GLAs to Players Inc., who in turn licenses the rights to third parties.

The GLA is a masterpiece of obfuscation and raises more questions than it answers, like what "escrow account" is the one referenced? How are retired players payments to be determined? When are licensing distributions actually made? Which retired players are entitled to a distribution? Even though many have signed up, very few have received anything under the GLAs, it now appears.

In other words, with rare exception, the retired NFL players who signed GLAs have received no revenue from the licensing of their names, images, and biographies. Plaintiffs further allege that the NFLPA breached a fiduciary duty owed to its retired-player members by withholding information about benefits to which such members could have been entitled to and by failing to pursue licensing opportunities on their behalf even though the NFLPA held itself out to represent its members in such a capacity.

Retired NFL players may also become members of the NFLPA by paying annual dues of fifty dollars. Parrish allegedly paid such membership fees as late as 2005 with his membership expiring in April 2006 (*id.* at ¶ 58).

Parrish and Adderley first filed this action on February 14, 2007. After extensive motion practice, Adderley's only remaining claims are for breach of contract and breach of fiduciary duty. Parrish' only claim is that the NFLPA breached a fiduciary duty.

Plaintiffs now move to certify two classes. Adderley purports to represent a class consisting of all retired NFL players who signed GLAs with defendants that were in effect

3

during the statute of limitations period (the GLA class). Parrish purports to represent a class consisting of all retired NFL players who became members of the NFLPA and whose membership was in effect during the statute of limitations period (the retired-member class). Both classes are alleged to have over 3000 members.

**ANALYSIS**

**1. LEGAL STANDARD FOR CLASS CERTIFICATION.**

In determining whether class certification is appropriate, "the question is not whether the plaintiff or plaintiffs have stated a cause of action or will prevail on the merits, but rather, whether the requirements of Rule 23 are met." *Eisen v Carlisle & Jacquelin*, 417 U.S. 156, 177–178 (1974). Although a district judge may not investigate the likelihood of prevailing on the merits, he or she is at liberty to consider evidence relating to the merits if such evidence also goes to the requirements of Rule 23. The party seeking class certification bears the burden of showing that each of the four requirements of Rule 23(a) and at least one of the requirements of Rule 23(b) are met. *See Hanon v. Data Products Corp.*, 976 F.2d 497, 508-509 (9th Cir. 1992).[2]

For a named plaintiff to obtain class certification, the district court must find: (1) numerosity of the class; (2) common questions of law or fact predominate; (3) the named plaintiff's claims and defenses are typical; and (4) the named plaintiff can adequately protect the interests of the class. In addition, in the instant case, plaintiffs seek to certify both classes under Rule 23(b)(3). Certification under Rule 23(b)(3) requires that a district court find "that questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy."

**2. THE GLA CLASS PROVISIONALLY MEETS THE REQUIREMENTS FOR CLASS CERTIFICATION.**

The GLA class is deserving of class certification, at least subject to the important proviso below. Despite the varying celebrity of retired players, the proposed class as a whole

---

[2] Unless otherwise stated, all internal citations are omitted from this order.

4

has a common interest in determining what, if any, rights they have under the GLAs. Only on two occasions has any distribution been made to any retired players and even then it was only to a tiny number. Retired players have a common interest in establishing an entitlement *to something* more than the whim of defendants. Accordingly, class certification for a GLA class is provisionally **GRANTED** as defined below.

### A. Rule 23(a)(1): Numerosity.

The numerosity requirement of Rule 23(a)(1) is satisfied when joinder of individual plaintiffs would be impracticable. While plaintiffs need not allege the exact number or identity of class members, mere speculation of the number of class members involved does not satisfy the requirement of Rule 23(a)(1). *See Ellis v. Costco Wholesale Corp.*, 240 F.R.D. 627, 637 (N.D. Cal. 2007). Defendants have produced over 3000 GLAs signed by various retired NFL football players during the statute of limitations period (Naylor Decl. Exh. Z). Defendants also seem to concede the GLA class meets the numerosity requirement. This order finds that plaintiffs have satisfied their burden required by Rule 23(a)(1).

### B. Rule 23(a)(2): Commonality and 23(b)(3): Predominance.

A class has sufficient commonality under Rule 23(a)(2) if "there are questions of law or fact which are common to the class." Rule 23(a)(2) does not require each member in a class to have identical factual and legal issues surrounding their claim. "The existence of shared legal issues with divergent factual predicates is sufficient" to meet the requirements of Rule 23(a)(2)." *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1019 (9th Cir. 1998)

The analysis under Rule 23(b)(3) "presumes that the existence of common issues of fact or law have been established pursuant to Rule 23(a)(2)." In contrast to the less stringent standard of Rule 23(a)(2), class certification under Rule 23(b)(3) is proper when common questions present a significant portion of the case and can be resolved for all members of the class in a single adjudication. *Hanlon*, 150 F.3d at 1019–22 (9th Cir. 1998).

Defendants contend that certification for the GLA class should be denied because: (1) individualized issues of fact regarding injury and damages predominate and (2) individualized legal issues will have to be applied on a member-by-member basis.

5

### *(1)* *Injury and Damages.*

The GLA defined the group licensing program as "programs in which a licensee utilizes a total of six (6) or more *present* or former NFL players images in conjunction with or on products that are sold at retail or used as promotional or premium items" (emphasis added). The provision in the GLA that Adderley alleges was breached stated (Naylor Decl. Exh. A):

> The money generated by such licensing of retired player group rights will be divided between the player and an escrow amount for all eligible NFLPA members who have signed a group licensing authorization form.

The GLA did not describe how the money would be divided or whether everyone who signed a GLA was entitled to any licensing distribution even if their image or likeness was not used. It is even unclear what "escrow account" the GLA referred to or whether the escrow account was ever even created by defendants. And, it turns out, the Joe Montanas of the world exploit their celebrity *through separate "ad hoc" agreements with defendants and others*, leaving the question how everyone including the lesser lights are to be compensated *under the GLAs*.

Again, only twice has any licensing revenue been distributed to retired NFL players pursuant to a GLA. Although the retired players who were a part of those distributions received varying amounts, defense counsel could give no explanation for how such revenues were divided — except at the "discretion" of defendants. Other than these two distributions, no retired NFL player has received any licensing revenue from a GLA. Thousands have signed up but without receiving a penny.

Defendants' licensing agreement with third parties layer on more need for clairification. For example, a license agreement with the Topps Company stated (Naylor Exh. N):

> NFLPA represents that the NFLPA has been duly appointed and is acting on behalf of the active and retired football players of the National Football League (hereinafter "NFL") who have entered into a Group Licensing Assignment.

Other licensing agreements entered into by the NFLPA contain similar language. How, exactly, has the NFLPA acting on behalf of retired football players? Significantly, the group licensing revenue for *active* NFL players were distributed *equally* among the players despite the varying

celebrity among such players.[3] This order need not validate or reach plaintiffs' theory that the same rule should apply to the GLAs.

Given that the GLAs have thus far proven to be an empty promise, all retired players have a common interest in determining their GLA rights. Under defendants' own depiction of the group-licensing program, retired NFL players are at the complete mercy and whim of the NFLPA. The retired players have a common interest in establishing that the GLAs mean more than that even if they may part company on the contingent issue of what formula should apply if they even succeed in debunking defendants' position.

### *(2)* *Nationwide Class Under California Law.*

Plaintiffs purport to bring breach of contract and breach of fiduciary duty claims on behalf of a nationwide class of retired NFL football players. Normally, variations in local law from state to state would create an obstacle to class. *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 821–22 (1985). Here, however, there is a solution.

*All conflict issues could be remedied if plaintiffs stipulated to applying defendants' own choice of law*. At the hearing, defense counsel stated that the law of Virginia or the law of the District of Columbia would apply. If plaintiffs acquiesce in this view then the multiplicity of different state laws would evaporate.

In this regard, plaintiffs have not shown that defendants have the necessary contacts to warrant application of California law to plaintiffs' claims. Significantly, both defendants are Virginia corporations with principal places of business in Washington, D.C. (TAC ¶¶ 7 and 10). The putative class members consists of retired NFL players presumably residing in all fifty states across the United States. *Adderley is a resident of New Jersey. He has no contact with California.* (Parrish is a resident of Florida.) These are fatal obstacles to class-wide application of California law.

---

[3] Under the agreement governing the licensing arrangement for active NFL players, the NFLPA/Players Inc. agreement, active players equally split sixty percent of all gross licensing revenue (Naylor Decl. Exh. K). This equal-share royalty scheme was confirmed by Doug Allen, who negotiated the NFLPA/Players Inc. agreement (Allen Dep. 120–121).

7

While the NFLPA has an office in San Francisco and derives substantial revenue from licensing agreements with California corporations, this is not enough. *First*, the NFLPA office in San Francisco is not even used by the NFLPA for its primary business. It is instead sub-leased to a third party (Berthelsen Decl. ¶¶ 2–3). *Second*, it is likely that defendants derive substantial revenue from many states across the nation. *Third*, in light of the wide varying residency of the proposed class members — including Adderley — it is difficult to see why California would be the proper choice. California is connected to this case only because counsel practices here. California law does not govern this dispute.

On the other hand, all GLA class members executed a GLA with similar if not identical language with the same Virginia-based corporation whose primary place of business is Washington, D.C. Defendants themselves have already advocated that Virginia law or District of Columbia law be applied to plaintiffs' claims. If plaintiffs agree to apply Virginia or District of Columbia law then this obstacle will evaporate. The class notice would clearly advise that either Virginia or District of Columbia law will apply, the precise law to be determined through litigation, and anyone who wishes to opt out may do so. Plaintiffs shall have until **MAY 8, 2008**, **AT NOON** to file a statement agreeing that the certified claims will be governed by Virginia or District of Columbia law, which to be decided later.

### C. Rule 23(a)(3): Typicality.

The typicality requirement of Rule 23(a)(3) is satisfied when "the claims or defenses of the representative parties are typical of the claims or defenses of the class." A plaintiff's claims are typical if they "are reasonably co-extensive with those of absent class members; they need not be substantially identical." *Hanlon*, 150 F.3d at 1020.

In the instant action, Adderley's claims are typical of the class. As his GLA contains similar or identical language to the rest of the GLAs signed by retired NFL players, Adderley's claims are identical to the proposed class members. Plaintiffs have sustained the burden required by Rule 23(a)(3).

### D. Rule 23(a)(4): Adequacy.

The last hurdle of Rule 23(a) is that "the representative parties will fairly and

adequately protect the interests of the class." Determining whether the representative parties adequately represent a class involves two inquiries: (1) does the named plaintiff and their counsel have any conflicts of interest with other class members and (2) will the named plaintiff and her counsel act vigorously on behalf of the class? *See Lerwill v. Inflight Motion Pictures, Inc.*, 582 F.2d 507, 512 (9th Cir. 1978). The adequacy inquiry under Rule 23(a)(4) serves to uncover conflicts of interest between named parties and the class they seek to represent. "[A] class representative must be part of the class and possess the same interest and suffer the same injury' as the class members." *East Tex. Motor Freight System, Inc. v. Rodriguez*, 431 U.S. 395, 403 (1977).

Defendants argue that certification for the GLA class should be denied because the class would have conflicting interests. In addition, defendants contend that Adderley is an inadequate representative.

Defendants assert that plaintiffs' equal-royalty theory of damages presents insurmountable conflicts of interest among class members. According to defendants, while players in low demand — *e.g.*, the special-teams player — would supports plaintiffs' proposed theory of damages, star athletes — *e.g.*, Joe Montana — would not. *Significantly, the overwhelming majority of putative class members have received nothing at all under the GLAs*. It is in the interest of each GLA class member to determine if they are entitled to anything at all beyond the whim and discretion of defendants.

It is also important to note that the GLAs only cover *group* licensing — *i.e.*, licensing of *six or more* players at once. Individual retired players (and groups of five or less) can still license their image and likeness independently under their *own "ad hoc" agreements*. For instance, Adderley received over $12,000 in licensing revenues from Players Inc. over roughly four years under *such ad hoc agreements* (Greenspan Decl. Exh. 36). During that same period, other more famed retired players such as Archie Manning, Roger Craig, and Randall Cunningham received $450,000, $190,000, and $175,000, respectively under their own ad hoc agreements (*id*. at Exhbs. 37–45). The star athletes of the class would thus still be able to

9

license their celebrity on an individual basis for whatever amount they choose. Such licensing would have no effect on the class. What is at stake here is the *group* license.

Defendants next contend that Adderley is an inadequate representative of the class. Defendants primarily rely on Adderley's own deposition testimony where he repeatedly gave conflicting and peculiar answers in response to questioning relating to this suit. Such evidence is unavailing. In *Surowitz v. Hilton Hotels Corp.*, 383 U.S. 363 (1966), the Supreme Court reversed the district court's decision to dismiss a derivative action because the plaintiff was not a proper party to a law suit. The plaintiff, Surowitz, was "a Polish immigrant with a very limited English vocabulary and practically no formal education." *Id*. at 368. After being subjected to an oral examination at the district court Surowitz (*Id*. at 366):

> showed in her answers to questions that she did not understand the complaint at all, that she could not explain the statements made in the complaint, that she had a very small degree of knowledge as to what the lawsuit was about, that she did not know any of the defendants by name, that she did not know the nature of their alleged misconduct, and in fact that in signing the verification she had merely relied on what her son-in-law had explained to her about the facts in the case.

The district court then dismissed the complaint and the court of appeals affirmed the dismissal. After finding that the complaint had been filed in good faith, the Supreme Court rejected the court of appeal's analysis because it "indicate[d] in several places that a woman like Mrs. Surowitz, who is uneducated generally and illiterate in economic matters, could never under any circumstances be a plaintiff in a derivative suit brought in the federal courts to protect her stock interests." *Id*. at 372.

Similarly, Adderley's testimony only shows that he was confused and probably thrown off by the rigor of a deposition. In light of his age and unfamiliarity with the legal process, Adderley's responses are not alarming. It would be unfair to deny someone in Adderley's position access to our courts merely because he is unable to articulately respond to questions from attorneys.

Therefore, this order provisionally certifies the contract claim and the fiduciary duty claim (but only insofar as it arises out of the contracts) for class treatment, the class to be

defined as "[a]ll retired NFL players who signed GLAs with the NFLPA that were in effect between February 14, 2003, and February 12, 2007."

### 3. THE RETIRED-MEMBER CLASS.

With respect to the retired-member class, Parrish is an inadequate representative. This is dispositive. Parrish purports to represent retired NFL football players who paid fifty dollar membership dues to the NFLPA. Plaintiffs allege the NFLPA beached their fiduciary duties owed to such members by failing to provide them with accurate and complete information about benefits to which they may have been entitled to.

"The district court must ensure that the representative plaintiff fulfills his fiduciary duty toward the absent class members." *Diaz v. Trust Territory of Pacific Islands*, 876 F.2d 1401, 1408 (9th Cir. 1989). A plaintiff's vindictiveness towards the defendants in a class action is one factor a district court may consider in determining whether a named plaintiff is an adequate representative of the class. *See Larson v. Dumke*, 900 F.2d 1363, 1367 (9th Cir. 1990). "The reason [a district court] consider[s] vindictiveness as a factor in evaluating adequacy of representation is to render ineligible individuals who possess animus that would preclude the possibility of a suitable settlement." *Kayes v. Pacific Lumber Co.*, 51 F.3d 1449, 1464 (9th Cir. 1995).

Parrish's conduct and behavior leading up to and during this litigation demonstrate that he would be unable to meet his fiduciary duty owed to the putative class. To start, Parrish has made or adopted numerous extreme remarks directed at Gene Upshaw, executive director of the NFLPA (Parrish Dep. 271–272):

> Q: Okay. Well, let me ask you this. It says in the next paragraph: 'Many tyrants with the untouchable label like Caesar, Napolean, Idi Amin, Hitler, Stalin, Milosevic, Saddam, have been touched and are gone.' Do you remember writing something like that about Mr. Upshaw?
>
> A: I don't — I don't remember. But, I wish I had if I didn't.
>
> Q: Okay. Sir, you would agree, it is your view that Mr. Upshaw should be compared to people like Caesar, Napoleon, Idi Amin, Hitler, Stalin, Milosevic, and Saddam, correct, that's your view?

11

A: In my opinion, yes. Absolutely, yes.

Parrish, a Caucasian, has also publicly made many racially charged comments on an internet blog regarding the NFLPA and Upshaw (an African American) (Greenspan Decl. Exh. 12):

> Upshaw has signed a deal . . . to sell Super Bowl tickets in a partnership with the BET, Black Entertainment Network. It is part of the Upshaw/Vincent/Condon campaign to marry the NFLPA to the gangster rap and hip hop industry, a marriage that sets up an unprecedented opportunity for money laundering from Washington, D.C./Baltimore drug rings, through gangster rap, hip hop industry contacts through the NFLPA and NFL players who are expected to throw around lots of cash. . . . I'm sure that Upshaw hip hop/gangsta rap fraternity will keep [Coach Bill Parcels] busy sorting through a quality pool of dog fighting, gun toting, dui driving, strip club shooting, ass showing team, that only gambles on dog fights and don't take steroids or HGH.

In a submission to the Department of Justice, Parrish stated (*id.* at Exh. 13):

> [NFLPA President Troy] Vincent's comments smack of reverse discrimination. Baseball's white Donald Fehr Exec Director makes $1 mil a year and negotiated 5.5% of total salaries for employer contributions while Upshaw negotiated only 2.2%. The white President Bush makes $398,000 a year. Gene Upshaw has never had a real job in his life . . . I'm white and Troy you can't do anything two or three times as well as I can. . . . The retired player retirement benefits issue is tainted with vindictive Upshaw and Vincent motives to get back at the white pioneer era players for how the white NFL management and owners treated blacks in the earlier days of the NFL.

These comments are particularly disturbing considering many of the putative class members that Parrish is seeking to represent are African American. This would be true even if Parrish were himself not white.

Parrish's views of the NFLPA demonstrate that he would be unwilling to make any settlement in this case, even if it were ultimately beneficial to any certified class. In an email to another retired NFL player, Parrish said (*id.* at Exh. 1):

> They know I'll never make a deal with them and any offer they attempt will be on the front page of the NY Times too. . . . I am going to finish this fight no matter how dirty it gets or what it takes or where it goes. I am not in it to make any deal. Upshaw is a rotten bastard and he is going down so is Condon and Vincent and Berthelson and those who took off and Goodell knows it and he will probably go too.

12

At his deposition, Parrish confirmed his position (Parrish Dep. 102):

> Q: And do you recall writing that you'd never make a deal with Upshaw and his cronies?
>
> A: Yes. Certainly, yes.
>
> Q: And do you recall saying that any offer they attempt will be on the front page of the New York Times, too?
>
> A: Yes. Yes, I think I wrote this.

Parrish's personal vendetta against Upshaw and the NFLPA would be a roadblock to any favorable settlement. It would seem to skew the litigation strategy pursued on behalf of any class. Any judgment would forever be in doubt by reason of unfit representation. Parrish is not fit to serve in a fiduciary capacity on behalf of all other retired players.

Parrish's previous track record representing retired NFL players raises another red flag. Parrish and Adderley co-founded the Retired Professional Football Players for Justice in an effort to represent retired NFL players. After soliciting roughly $5,500 from retired NFL players, the organization became inactive with all funds depleted (RPFPJ Dep. 73–75). The RPFPJ's Rule 30(b)(6) witness (Parrish's sister) could not identify how the funds were spent or whether they were spent in furtherance of the goals of the organization despite the fact that she was RPFPJ's secretary and treasurer (*id*. at 98–107). Significantly, Adderley testified that Parrish regularly signed his name on documents sent to retired NFL players in conjunction with the RPFPJ without Adderley's permission (Adderley Dep. 63–64):

> Q: And after you read it, did you call Mr. Parrish about putting your name on this?
>
> A: Yes.
>
> Q: What did you tell him?
>
> A: I emailed him and asked him to stop putting my name on documents without my permission, without me seeing it.
>
> Q: How many times did you have to ask Mr. Parrish that?
>
> A: At least three or four.

Adderley further testified that he really had no knowledge regarding the operations of the RPFPJ even though his signature regularly appeared on RPFPJ documents and he was a co-

president of the enterprise (*id*. at 278–280). Parrish's reckless management of the RPFPJ is hardly befitting of a class representative.

It rarely happens that certification is denied solely because its representative is inadequate, especially when counsel is able, as here. This, however, is such a rare case. Excellent counsel cannot overcome the shortfalls here. We must always remember that the class representative has the responsibility to control and manage the litigation. Counsel works for the class representative, not the other way around. Parrish's vindictive remarks aimed at defendants, the racial slurs in several of his statements, his stated unwillingness to ever settle this case, and his blemished track record of representing retired NFL players — all demonstrate that he cannot be trusted to fulfill his fiduciary duty to the proposed class.

## CONCLUSION

For all of the above-stated reasons, plaintiffs' motion for class certification is **GRANTED IN PART** and **DENIED IN PART**. The following class is hereby certified subject to the condition that plaintiffs file a statement acquiescing in the application of Virginia or District of Columbia law to all certified claims by **MAY 8, 2008, AT NOON**:

> All retired NFL players who signed GLAs with the NFLPA
> that were in effect between February 14, 2003, and
> February 14, 2007.

The claims being certified are only the breach of contract claim and breach of fiduciary duty claim but only insofar as the latter claim arises out of the GLAs between the NFLPA and retired players. All counsel shall propose a form of class notice by **MAY 15, 2008**. Also, counsel are required to submit a joint proposal for dissemination of notice. The above definition shall apply for all purposes, including settlement.

**IT IS SO ORDERED.**

Dated: April 29, 2008.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE