# Dewey & LeBoeuf

Dewey & LeBoeuf LLP
1301 Avenue of the Americas
New York, NY 10019-6092

tel +1 212 259 8070
fax +1 212 259 6333
dfeher@dl.com

June 10, 2008

**VIA ELECTRONIC FILING**

The Honorable William H. Alsup
United States District Court, Northern District of California
450 Golden Gate Avenue
San Francisco, CA 94102

    Re:    <u>Parrish v. National Football League Players Association</u>, No. C07-0943 WHA

Dear Judge Alsup:

        Defendants National Football League Players Association ("NFLPA") and National Football League Players Incorporated d/b/a Players Inc ("Players Inc") submit this letter brief in response to Plaintiffs' June 4 letter brief requesting that this Court issue an order compelling Defendants to produce Gene Upshaw's employment contracts and "[d]ocuments sufficient to show all monies received by Gene Upshaw in connection with his employment by Defendants." Plaintiffs have asserted that they need these documents not only purportedly in connection with the relief requested in their complaint, but also so they can somehow seek some type of order from this Court to reduce Mr. Upshaw's salary. The requested documents have absolutely no relevance to any proper purpose in this case. Plaintiffs once again are trying to turn this action into a political circus attacking Mr. Upshaw, instead of focusing on the licensing claims which are before this Court.

        A party seeking a non-party employee's sensitive personal data, as here, must demonstrate a "compelling need" for such documents. <u>Nat'l Union Fire Ins. Co. v. Electric Transit Inc.</u>, No. C 04-3435, 2006 U.S. Dist. LEXIS 38440, *10 (N.D. Cal. June 1, 2006). Plaintiffs have made no showing of need in their motion, let alone one of compelling need, and the existence of a confidentiality order in this action does not make the requested documents any less irrelevant. Each of the reasons Plaintiffs give to support their motion is meritless.

        <u>First</u>, Plaintiffs assert that they are entitled "to determine, for example, whether and what percentage of Mr. Upshaw's compensation is dependent or tied to revenues derived from player licensing," "how much of the money they should have received went into the pockets of Mr. Upshaw," and "whether Mr. Upshaw's efforts on behalf of retired players, or lack thereof, are somehow tied to the amount of his compensation or to the terms of his employment." 6/4/08 Letter Br. at 2. However, even if Mr. Upshaw's compensation was tied to revenues derived from player licensing (and it is <u>not</u>), any such connection would be irrelevant to

NEW YORK | LONDON MULTINATIONAL PARTNERSHIP | WASHINGTON, DC
ALBANY | ALMATY | AUSTIN | BEIJING | BOSTON | BRUSSELS | CHARLOTTE | CHICAGO | DUBAI
EAST PALO ALTO | FRANKFURT | HARTFORD | HONG KONG | HOUSTON | JACKSONVILLE | JOHANNESBURG (PTY) LTD.
LOS ANGELES | MILAN | MOSCOW | PARIS MULTINATIONAL PARTNERSHIP | RIYADH AFFILIATED OFFICE | ROME | SAN FRANCISCO | WARSAW

Dockets.Justia.com

Plaintiffs' claims unless Mr. Upshaw's compensation was specifically linked to retired player or active player licensing in particular. Plaintiffs' claims are not that Defendants or Mr. Upshaw did not generate enough total licensing revenue, but rather that <u>retired</u> players did not receive all of the money they allegedly should have gotten, and that the money the retired players should have received went to active players. Thus, unless Mr. Upshaw's employment contracts provide that he would receive more compensation if the retired players received less licensing revenue, Mr. Upshaw's employment contracts are irrelevant to Plaintiffs' claims. In fact, counsel can represent to the Court that Mr. Upshaw's employment contracts do not refer to retired or active player licensing at all, and his compensation is not in any way tied to such licensing revenue.

Mr. Upshaw's compensation is thus no different than any of the other expenditures made by the NFLPA and Players Inc. Plaintiffs extensively questioned the 30(b)(6) witness of Defendants on accounting-related matters, Mr. Glenn Eyrich, a partner at the independent accounting firm that prepares the certified financial statements of Defendants. As Mr. Eyrich testified, "[t]he compensation paid to Mr. Upshaw as a result of employment contracts that stipulate certain amounts of money to be paid from the fund of Players, Inc. and NFLPA [is] <u>not</u> traceable to any one revenue source." Eyrich Depo Tr. at 191:9-192:9 (emphasis added) (attached hereto as Exhibit A). And, Plaintiffs had every opportunity to ask Mr. Upshaw at his deposition whether his compensation is tied to retired player licensing, but did not do so. Plaintiffs know full well that Mr. Upshaw's employment contracts are not relevant to their claims in this action, and that they are seeking those contracts to harass Mr. Upshaw.

<u>Second</u>, Plaintiffs assert that Mr. Upshaw's employment contracts are "relevant to conclusions made by Plaintiffs' sports economics expert, Daniel A. Rascher, Ph.D.," that Mr. Upshaw is paid too much in comparison to executive directors of the MLB and NBA sports unions, and that they do not understand why his compensation significantly increased in 2007. 6/4/08 Letter Br. at 3. Plaintiffs know that Mr. Upshaw is the Executive Director of the NFLPA and that, as such, his compensation is affected by his performance as head of that union, which duties have absolutely nothing to do with the claims in this case, anything else relating to the licensing business, or the very different union businesses of MLB and the NBA. It would be equally irrelevant for Plaintiffs to seek information about the recent move of Players Inc and the NFLPA to new offices, and to compare the cost of those new offices to the commercial real estate costs of other sports unions in other cities. Plaintiffs are either entitled to a greater share of the players' licensing revenue or they are not – it makes no difference to their claims how the revenues were subsequently spent, and how Mr. Upshaw's compensation compares to his performance as head of the NFLPA and Players Inc, and the performance of other people heading sports unions.

Plaintiffs are thus seeking Mr. Upshaw's employment contracts as part of a diversion that has nothing to do with the merits of Plaintiffs' claims. They are trying to engender an extensive debate on union related issues that Plaintiffs may ardently desire to discuss, as they have repeatedly shown, but which are not proper subjects for this case and are not relevant to the claims they have asserted. Simply put, Plaintiffs are attempting to use this Court to gain a platform to publicly criticize Mr. Upshaw's performance as Executive Director of the NFLPA,

and to attack Mr. Upshaw politically, all of which has nothing to do with the class claims in this case.[1]

Indeed, Plaintiffs basically admit that their target for requesting Mr. Upshaw's employment agreements is not their licensing claims, but Mr. Upshaw personally: "Eventually Plaintiffs intend to show that a percentage of Mr. Upshaw's salary should be re-allocated to those retired players whose rights were or should have been licensed to third parties." Id. This ultra vires request for an order reducing Mr. Upshaw's salary -- which would involve a debate about Mr. Upshaw's performance as Executive Director of the NFLPA -- is made despite this Court's repeated admonishments to Plaintiffs not to pursue political aims disconnected from the class claims that the Court has certified. The outrageousness of Plaintiffs' position -- seeking an order to financially punish Mr. Upshaw personally, even though he is not even a party to this action -- demonstrates why this Court must send a clear signal to Plaintiffs that this case cannot be used for purposes far a field of their asserted claims.

For all of the above reasons, Defendants respectfully submit that Plaintiffs' motion seeking Mr. Upshaw's employment contracts has no basis whatsoever, and should be denied.[2]

Respectfully submitted,

David G. Feher

---

[1] As Plaintiffs know well, Mr. Upshaw's tenure as Executive Director of the NFLPA has resulted in unprecedented gains for both retired and NFL players, especially in the most recent extension of the Collective Bargaining Agreement in the NFL, which occurred in March 2006. For example, before Mr. Upshaw became Executive Director of the NFLPA, NFL players had no free agency, and were subject to restrictions in their employment that tied them to one team for their entire careers, the equivalent of employment bondage, such that their salaries were severely suppressed. This is a matter of public record, since the NFL's restrictions were found to be a violation of the antitrust laws in a trial that the NFLPA supported under the leadership of Mr. Upshaw. See, e.g., Reggie White v. NFL, 836 F. Supp. 1458, 1499 (D. Minn. 1993) (Doty, J.). Mr. Upshaw's stewardship of the NFLPA during a time when the players first gained free agency -- which is not the case with the executive directors of the other sports unions Dr. Rascher referenced -- is one of the reasons Mr. Upshaw's performance has been recognized in his employment contracts. And, that performance has continued to be superlative over time, as the CBA in the NFL was renegotiated and extended several times, much to the benefit of active and retired NFL players, most recently in March 2006 (immediately before Mr. Upshaw's recent increase in salary, about which Plaintiffs complain). Indeed, as Dr. Rascher knows or should know, the 'salary cap' in the NFL has increased from around $34 million per club in 1994 to $85 million per club in 2005 (the year before the most recent extension), $102 million in 2006 (a major increase as a result of the 2006 CBA extension), and a minimum of $123 million per club in 2009, a stellar result for NFL players.

[2] The total amount of Mr. Upshaw's annual compensation is publicly available in the "LM-2" forms the NFLPA is required to file under federal labor law. However, federal labor law does not require that all of the terms of those contracts be disclosed, and there are strong policy reasons against public disclosure of all of the terms of a union head's contract. For example, the disclosure of such specific terms could cause mischief if they become known to NFL owners – the adversaries of the NFLPA in collective bargaining – and Plaintiffs apparently hope to use these contracts in open court at trial.