1  MANATT, PHELPS & PHILLIPS, LLP
   RONALD S. KATZ (Bar No. CA 085713)
2  E-mail: rkatz@manatt.com
   RYAN S. HILBERT (California Bar No. 210549)
3  E-mail: rhilbert@manatt.com
   NOEL S. COHEN (California Bar No. 219645)
4  E-mail: ncohen@manatt.com
   1001 Page Mill Road, Building 2
5  Palo Alto, CA 94304-1006
   Telephone: (650) 812-1300
6  Facsimile: (650) 213-0260

7  MCKOOL SMITH, P.C.
   LEWIS T. LECLAIR (Bar No. CA 077136)
8  E-mail: lleclair@mckoolsmith.com
   JILL ADLER NAYLOR (Bar No. CA 150783)
9  E-mail: jnaylor@mckoolsmith.com
   300 Crescent Court
10 Dallas, TX 75201
   Telephone: (214) 978-4984
11 Facsimile: (214) 978-4044

12 *Attorneys for Plaintiffs*

                    UNITED STATES DISTRICT COURT
13
                         NORTHERN DISTRICT
14
                      SAN FRANCISCO DIVISION
15

16

17 BERNARD PAUL PARRISH, HERBERT         CIVIL ACTION NO. C07 0943 WHA
   ANTHONY ADDERLEY, and WALTER
18 ROBERTS III, on behalf of themselves and   **PLAINTIFFS' OPPOSITION TO**
   all others similarly situated,            **DEFENDANTS' MOTION FOR SUMMARY**
19                                           **JUDGMENT**

20              Plaintiffs,                   Judge:    Honorable William H. Alsup
                                             Date:     July 24, 2008
21 NATIONAL FOOTBALL LEAGUE                  Time:     8:00 a.m.
   PLAYERS ASSOCIATION, a Virginia          Place:    Courtroom 9, 19th Floor
22 corporation, and NATIONAL FOOTBALL
   LEAGUE PLAYERS INCORPORATED
23 d/b/a PLAYERS INC, a Virginia            **PUBLIC VERSION**
   corporation,
24
25              Defendants.

26

27

28

MANATT, PHELPS &
  PHILLIPS, LLP
ATTORNEYS AT LAW
  LOS ANGELES

Dockets.Justia.com

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION .................................................................................. 2

II.   KEY FACTS THAT MANDATE A TRIAL ................................................ 5

     A.   The Parties ........................................................................................ 5

     B.   Defendants' Retired Player Group Licensing Program ......................... 6

     C.   PI's Third-Party Licenses Include Retired Player Rights On Their Face .............. 9

     D.   PI Generates Significant Guaranteed Revenues in Connection with Its Third-Party License Agreements ...................................................... 11

     E.   Defendants Have Failed to Share Licensing Revenues with Retired Players ....... 12

     F.   Alternatively, Defendants Breached Their Fiduciary Duties To The GLA Class By Failing To Include Its Members in the Licensing Agreements ............. 14

III. ARGUMENT AND AUTHORITY ............................................................ 16

     A.   Summary Judgment Standard ............................................................ 16

     B.   Defendants Cannot Escape Liability for Their Breach of the GLA ...................... 16

         1.   The Plain Language of the GLA Sets Out Defendants' Obligations ........ 16

             a.   The Failure to Share Revenue Pursuant to the Retired Player GLAs ................................................................................ 17

             b.   The Failure to Share Revenues from ▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮ .......................................................................... 19

             c.   The Failure to Pay From, or Alternatively, to Create the Promised Escrow Account ....................................................... 20

             d.   The Irrelevance of the Individually Negotiated "Ad Hoc" Agreements ........................................................................... 21

         2.   The Third-Party Licensing Agreements .................................................. 24

         3.   Damages ................................................................................................. 29

     C.   The Breach of Fiduciary Duty Claims ................................................ 30

         1.   Defendants Owed Plaintiffs Fiduciary Duties Arising Out Of The GLAs ...................................................................................................... 30

             a.   The Agency Relationship ............................................................ 30

             b.   A Fiduciary Relationship Can Exist Absent an Agency Relationship ............................................................................... 33

         2.   Defendants Breached Their Fiduciary Duties to Plaintiffs ...................... 35

             a.   Defendants Failed to Pay the Class, and Failed to Disclose Material Facts ............................................................................. 35

             b.   Defendants Failed to Adequately Represent Plaintiffs and Had Improper Conflicts of Interest ............................................. 36

             c.   Damages .................................................................................... 38

IV. CONCLUSION ....................................................................................... 40

# TABLE OF AUTHORITIES

**Page**

## CASES

*A.S. Johnson Co. v. Atl. Masonry Co.,*
693 A.2d 1117 (D.C. 1997)...................................................................... 27

*Acordia of Va. Ins. Agency, Inc. v. Genito Glenn, L.P.,*
560 S.E. 2d 246 (Va. 2002)............................................................... 31, 32

*Affordable Elegance Travel, Inc. v. Worldspan, L.P.,*
774 A.2d 320 (D.C. 2001)............................................................... 17, 27

*Allen Realty Corp. v Holbert,*
318 S.E.2d 592 (Va. 1984)............................................................... 30, 31

*Ames v. Yellow Cab of D.C., Inc.,*
2006 WL 2711546 (D.D.C.) ...................................................................... 33

*Aronoff v. Lenkin Co.,*
618 A.2d 669 (D.C. 1992)...................................................................... 38

*Bangkok Crafts Corp. v. Capitolo di San Pietro in Vaticona,*
No. 03 Civ. 0015, 2004 U.S. Dist. LEXIS 25235, *7 ...................................... 33

*Bolling Fed. Credit Union v. Cumis Ins. Soc'y, Inc.,*
475 A.2d 382 (D.C. 1984)............................................................... 17, 26

*Brotherhood of Locomotive Firemen & Enginemen v. Graham,*
175 F.2d 802 (D.C. Cir. 1948)................................................................. 38

*Brown v. Coates,*
253 F.2d 36 (D.C. Cir. 1958) .................................................................. 32

*C&E Servs. v. Biggs,*
498 F.Supp.2d 242 (D.D.C. 2007 ........................................................... 38

*Church of Scientology, Int'l v. Eli Lilly & Co.,*
848 F.Supp. 1018 (D.D.C. 1994) ....................................................... 31, 33

*DNM, Inc. v. S. H. Clark & Sons Roofing, Inc.,*
No. 911233, 1992 Va. LEXIS 102 (Va. April 17, 1992) .................................. 33

*Ellipso, Inc. v. Mann,*
541 F.Supp.2d 365 (D.D.C. 2008) ........................................................... 36

*Graham v. Brotherhood of Locomotive Firemen & Enginemen,*
338 U.S. 232 (1949)............................................................................. 38

*Graham v. S. Railway Co.,*
74 F.Supp. 663 (D.D.C. 1947) ................................................................ 38

*Hammett v. Minar,*
53 F.2d 144 (D.C. 1931) ....................................................................... 34

*Heyman Cohen & Sons, Inc. v. M. Lurie Woolen Co.,*
133 N.E. 370 (N.Y. 1921) ...................................................................... 27

*In re Estate of Corriea,*
719 A.2d 1234 (D.C. 1998)..................................................................... 39

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
PALO ALTO

*In re Leisure Corp.,*
2007 WL 607696 (N.D. Cal)................................................................. 28

*Int'l Brotherhood of Teamsters v. Wirtz,*
346 F.2d 827 (D.C. Cir. 1965)............................................................. 33

*Int'l Underwriters, Inc. v. Boyle,*
365 A.2d 779 (D.C. 1976).................................................................. 36

*Jackson v. Loews Washington Cinemas, Inc.,*
944 A.2d 1088 (D.C. 2008)................................................................ 33

*Jenkins v. Strauss,*
931 A.2d 1026 (D.C. 2007)........................................................... 31, 38

*Judah v. Burton Reiner and Morris Mgmt., Inc.,*
744 A.2d 1037 (D.C. 2000)......................................................... 32, 33

*Keith v. Berry,*
64 A.2d 300 (D.C. 1949).................................................................. 38

*Martin & Martin, Inc. v. Bradley Enters., Inc.,*
504 S.E.2d 849 (Va. 1998)......................................................... 17, 26

*McClung v. Smith,*
870 F.Supp. 1384 (E.D. Va. 1994)..................................................... 31

*Messer v. Re/Max Props., Inc.,*
No. 66597, 1985 Va. Cir. LEXIS 150 (Va. Cir. Ct. Mar. 11, 1985)........ 38

*Murphy v. Holiday Inns, Inc.,*
216 Va. 490 (Va. 1975)................................................................... 33

*Nellis v. Air Line Pilots Assoc.,*
144 F.R.D. 68 (E.D. Va. 1992) .......................................................... 33

*Owen v. Shelton,*
277 S.E.2d 189 (Va. 1981)............................................................... 39

*Parco Merged Media Corp. v. Multispectral Solutions, Inc.,*
2006 U.S. Dist. LEXIS 29453 (E.D. Va. Apr. 21, 2006) ...................... 17

*PGI, Inc. v. Rathe Productions, Inc.,*
576 S.E.2d 438 (Va. 2003)............................................................... 36

*Reid v. Boyle,*
527 S.E.2d 137 (Va. 2000)............................................................... 27

*Retail Clerks Int'l Ass'n v. NLRB,*
510 F.2d 802 (D.C. Cir. 1975)........................................................... 27

*Rolinksi v. Lewis,*
828 A.2d 739 (D.C. 2003)................................................................ 31

*Schmidt v. Bishop,*
779 F.Supp. 321 (S.D.N.Y. 1991)...................................................... 31

*Shafford v. Otto Sales Co.,*
119 Cal. App. 2d 849 (1953)............................................................ 28

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
PALO ALTO

*Sheldon v. Metro-Goldwyn Pictures Corp.,*
   309 U.S. 390 (1940) ............................................................................................ 39

*Smith v. Jenkins,*
   452 A.2d 333 (D.C. 1982) ................................................................................. 31

*Stevenson v. Johnson,*
   No. 90-CL-1, 1993 Va. Cir. LEXIS 744 (Va. Cir. Ct. Oct. 12, 1993) ................ 33

*ViChip Corp. v. Lee,*
   438 F.Supp.2d 1087 (N.D. Cal. 2006) ............................................................... 28

*Wagman v. Lee,*
   457 A.2d 401 (D.C. 1983) ................................................................................. 33

*Wells v. Whitaker,*
   207 Va. 616 (Va. 1966) ..................................................................................... 33

*Yelen v. Banks,*
   146 A.2d 569 (D.C. 1958) ................................................................................. 37

**STATUTES**

Fed. R. Civ. P. 56(c) ................................................................................................ 16

**OTHER AUTHORITIES**

Restatement (Third) of Agency § 3.16 ...................................................................... 38

Restatement (Third) of Agency § 3:14 ...................................................................... 38

Restatement (Third) of Agency § 8.01 ...................................................................... 35

Restatement (Third) of Agency § 8.02 cmt. b (2006) ............................................... 40

Restatement (Third) of Agency § 8.08 (2006) .......................................................... 37

Restatement (Third) of Agency § 8:03 ...................................................................... 38

Manatt, Phelps &
Phillips, LLP
Attorneys At Law
Palo Alto

# I.    **INTRODUCTION**

The evidence developed in discovery, as well as facts which are publicly available, clearly demonstrate that the breach of contract and breach of fiduciary duty claims certified by this Court for class treatment must be tried and Defendants' Motion should be denied in its entirety.

Contrary to Defendants' untoward accusations in their Motion that class counsel has "repeatedly misled the Court," made "brazen" claims, and offered "fanciful" arguments supported by "not a shred"[1] of evidence, the class of retired NFL players who signed GLAs at the urging of their union leadership (Gene Upshaw, Doug Allen and other NFLPA executives) has in fact been mistreated for years by the very representatives in whom they reposed trust to protect the financial interests they had in their licensing rights. As detailed herein, and revealed in the voluminous evidence submitted herewith, there is no question that these Defendants licensed NFL players' rights in a manner that earned the union and active voting members tens of millions of dollars, but which also triggered contractual obligations to class members that were never satisfied. The GLA class was illegally frozen out of licensing revenues to which they were entitled and wrongfully excluded from other lucrative opportunities. Defendants in this case, having for years publicly and privately promised that they represented all active AND retired players' licensing interests, have been caught with their hands in the proverbial cookie jar and are seeking, by this Motion, further to take advantage of the purposefully vague contract language they drafted, to skirt their obligations and to continue their scheme of profiting off the reputations and rights of the men who (perhaps naively) believed that their union and its appointed representative (PLAYERS INC, hereafter "PI") would protect their rights.

The evidence against these Defendants on the certified claims is, in fact, overwhelming. Defendants wrote these contracts, one of which, the Group Licensing Authorization ("GLA"), has been described by the Court as a "masterpiece of obfuscation."

---

[1]    Ironically, after this case was filed, the NFLPA found it necessary to shred tons of documents, although it had not done that in years past. *See* January 24, 2008 *Charlotte Observer* article, attached as Exhibit A to the Declaration of Ryan Hilbert filed herewith ("Hilbert Decl.").

Defendants heavily solicited Plaintiffs to sign these GLAs because Defendants recognized, as the NFLPA wrote in one such solicitation, that retired players "built the game and the union."[2] Despite having promised in the GLA to share licensing revenue for retired players "between the player and an escrow account for all eligible NFLPA members who have signed a group licensing authorization," Defendants attempt to disavow these words. According to Defendants, there was no escrow account and no sharing, despite tens of millions of dollars of revenue from group licensing.

Similarly, Defendants have authored licenses with language stating that the NFLPA ██████████████████████████████████████████████████ ██████████████████████████████████████████[3] But Defendants now contend that this significant contract language involves licensing that has *nothing to do* with retired player rights, thus again attempting both to ignore the plain meaning of the contractual language and to render the contractual language meaningless.

Defendants trumpet the testimony of their licensees ████████████ ████████████████████████████████████████████ regarding the purported meaning of the license agreement. Such testimony, however, cannot change the unambiguous language of the contracts.

More importantly, discovery has shown that Defendants conspired with ███████ ████████████████████████████, to undermine the license rights of the very retired players Defendants purported to represent. ██████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████:

[2]    *See*, 2003 Letter from Doug Allen to NFLPA Members (Hilbert Decl., Exhibit B).
[3]    *See. e.g.* 2004 TOPPS Agreement, § 1(A) (Hilbert Decl. Ex. U); 2007 TOPPS Agreement, § 1(A)) (Hilbert Decl. Ex. V).
[4]    *See, e.g.*, 2004 and 2005 EA Agreement, ¶ 10(A) (Hilbert Decl., Exs. C and D) ████████ ████████████████████████████████████████████



This crass betrayal of retirees demonstrates both a breach of contract and a breach of fiduciary duty to the retired player class. The evidence shows that Defendants, rather than working to promote and maximize the returns to the retired players they purported to represent, were in fact working with their licensees to protect the interests <u>of the licensees</u> (and of themselves) at the expense of the retired players.

The hidden attempt by Defendants to undermine payments to retired players was neither isolated nor accidental. Defendants' treatment of group licensing revenue confirms their callous disregard of the interests of retired players. The NFLPA expended considerable effort from 2001 to 2005 in signing up nearly 2100 retired players to participate in the Group Licensing Authorization program. As the GLA retired player agent, the NFLPA, along with its marketing and licensing arm, PI, represented to the marketplace that only they could deliver the group licensing rights of these retired players to third parties.

Even though Defendants concede in their opening brief ("Brief") that they did indeed license retired player group rights, they claim that the retired players are not entitled to any

---

[5] "HOF" stands for "Hall of Fame." All of the players inducted are retired.

[6] 

(Hilbert Decl. Ex. G) (emphasis added).

group proceeds.

As the Executive Director of the NFLPA has admitted: "I don't work for them [retirees]. They don't hire me and they can't fire me. They can complain about me all day long . . . But the active players have the vote. That's who pays my salary."[7]

Defendants denigrate all retired players with their convenient, *ex post facto*, undocumented rationalization (Brief at 4:23) that,

This rationalization is irrelevant and untrue. It is irrelevant because, as the equal share group licensing for active players illustrates, the program applies to both superstars and third-stringers. It is untrue because, like the active players, the retired players have been used by licensees in independently negotiated *ad hoc* agreements.

The plain fact of the matter is that, because Defendants are unable to represent adequately all of the competing interests they purported to represent, they chose to create a system that this Court has described as leaving Plaintiffs "at the complete mercy and whim of the NFLPA."[8] For these reasons, which will be detailed below, Plaintiffs respectfully request that Defendants' Motion for Summary Judgment be denied.

## II. KEY FACTS THAT MANDATE A TRIAL

### A. The Parties

Herbert Adderley is a Hall of Fame NFL cornerback who played for the Green Bay Packers and the Dallas Cowboys for more than 10 years. Mr. Adderley represents the GLA Class, which consists of retired NFL players who signed GLAs with the NFLPA that were

---

[7] *See* January 15, 2006 *Charlotte Observer* Article (Hilbert Decl. Ex. FFF).
[8] Order Granting in Part and Denying in Part Plaintiffs' Motion for Class Certification ("Class Certification Order") at 7 (April 29, 2008) (Rec. Doc. 275).

effective between February 14, 2003 and February 14, 2007 containing the same operative language as Adderley's GLA.[9]

The National Football League Players Association ("NFLPA") is a Virginia corporation that acts as the labor union for professional football players in the National Football League. National Football League Players Incorporated ("PI") is the licensing and marketing subsidiary of the NFLPA.

## B.    Defendants' Retired Player Group Licensing Program

As a threshold matter, Defendants have created considerable confusion about the scope of the programs they operate in which they license to third parties the rights to use the "images" of both active and retired players. In particular, Defendants use a very expansive definition of "group licensing" that sweeps in a considerable number of individual negotiations for both active and retired players. Defendants define a "group licensing program" as any program or license "in which a licensee utilizes a total of six (6) or more *present or former* NFL player images in conjunction with or on products that are sold at retail or used as promotional or premium items."[10] The purpose for this expansive definition is obvious -- Defendants want to be the sole source of player licenses -- and by combining and treating individual licensing as "group licensing" the broad definition insures that licensees must go through Defendants for player licensing. In practice, however, Defendants make a very clear distinction between what they refer to as "collective licensing," which is characterized by a single license for the rights to a significant number of players without specified payments to any specific player (

), and individual *ad hoc* negotiations for the rights and/or services of one or more specific players for specified payments to each player.[11] Defendants' collective licensing

---

[9]    Stipulation and Order Revising Class Definition and Class Notice (June 9, 2008) (Rec. Doc. 289).

[10]    Adderley GLAs, ¶ 2 (emphasis added) (Hilbert Decl. Ex. H). It is undisputed that this is the only definition of group licensing in this case. Defendants' attempts to narrow this definition only to retired players (Brief at 17-18) patently ignores that fact by ignoring that the phrase "such licensing" in the penultimate paragraph of the GLA refers to "Group licensing" in the second paragraph of the GLA, which includes "six (6) or more present or former NFL player images." Defendants' interpretation that "such licensing" refers only to retired players is not only tortured, but also any ambiguity must be construed against the NFLPA as the sole drafter of the document.

[11]    Deposition of Howard Skall ("Skall Depo.") 56:16-57:3

programs are governed by the terms of "group licensing agreements" or "group licensing authorizations" (hereafter "GLAs").[12] This case is not about individually negotiated "*ad hoc*" agreements, of which there are many for both active and retired players. It is about collective group licensing for which the Defendants paid all active players an "equal share" royalty, but arbitrarily excluded retired players from the same royalty pool.

The NFLPA promoted a "Retired Players Group Licensing Program," through which it actively encouraged retired players to enter into GLAs which granted the NFLPA the "right to use [the player's] name, signature, facsimile, voice, picture, photograph, likeness and/or biographical information (collectively 'image') in the NFLPA Retired Group Licensing Program."[13]

[black redaction]

[16] The 2004-

[black redaction]

(Hilbert Decl. Ex. I). *See also* footnotes 81 and 82.

---

[12]     In contrast, Defendants "*ad hoc*" agreements are negotiated individually with each participating player. Brief 8:1-3; Skall Depo. 56:19-57:3 (Hilbert Decl. Ex. I); Deposition of Doug Allen ("D. Allen Depo. 165:20-166:7") (Hilbert Decl. Ex. J). Individually negotiated *ad hoc* agreements are separate from and not governed by GLAs, and contrary to Defendants' misleading and self-serving interpretation, a licensing venture requiring six or more individually negotiated *ad hoc* agreements does not constitute "collective" group licensing. (*See* Brief 8:10-19) Defendants concede that Plaintiffs are not asserting any claim with respect to individually negotiated *ad hoc* agreements. (Brief 8:9, n.23).

[13]     Adderley GLAs ¶ 1 (Hilbert Decl. Ex. H); *see also* Brief 4:17-20; Skall Depo. 35:6-9 ([black redaction]) (Hilbert Decl. Ex. I); Deposition of Gene Upshaw ("Upshaw Depo.") 20:18-24 ([black redaction]) (Hilbert Decl. Ex. K); Deposition of Glenn Eyrich ("Eyrich Depo.") 46:4-9 (Hilbert Decl. Ex. L).

[14]     D. Allen Depo. 214:21-215:9 (Hilbert Decl. Ex. J).

[15]     Skall Depo. 85:3-21; 156:13-157:9 ([black redaction]). (Hilbert Decl. Ex. I)

[16]     Deposition of Joe Nahra ("Nahra Depo.") 17:8-19 (Hilbert Decl. Ex. M); *See* Canton Presentation (Ex. 49 to D. Allen Depo.) (Hilbert Decl. Ex. N); D. Allen Depo. 274:7-275-6 ([black redaction]) (Hilbert Decl. Ex. J); D. Allen Depo.

2006 Directory of Retired Players published by the NFLPA confirmed that the drive to "sign up" more retired players would lead to better opportunities for retired players.[17] The GLAs permitted Defendants to use the retired players' image in collective group licensing. "When a player signs a [NFL]PA Group Licensing Assignment (GLA) or assigns his group licensing rights to the [NFL]PA, he gives [NFL]PA the exclusive right to market the retired player's name, number, likeness, voice, facsimile signature, photograph, picture and/or biographical information (collectively 'image') in the NFLPA Retired Player Group Licensing Program."[18]

Ultimately, representing both active and retired players is valuable to Defendants because it eliminates competition both when the NFLPA solicits the players and when the NFLPA negotiates with licensees. Defendants are able to provide licensees with "one-stop shopping", which in turn reduces the amount a licensee ███ has to spend negotiating player contracts, and allows Defendants to receive more from licensees (and, incidentally, to pay players less). ███████████████████████████████████████████

███████████,20

Defendants convinced over 2000 retired players to execute GLAs.[21] The incentive for a retired player to enter into the GLA was the promise of a share of royalties:

> [T]he moneys generated by such licensing of retired player group rights will be divided between the player and an escrow account for

278:2-20 (Hilbert Decl. Ex. J); Patricia Allen Performance Summary (Ex. 114 to Upshaw Depo.) ("Helped secure more than 70 GLAs at the Retired Players Convention.") (Hilbert Decl. Ex. O); Skall Depo. 38:2-8; 40:17-41:3 (Hilbert Decl. Ex. I).

[17] The Directory states: "PLAYERS INC, the for-profit licensing company of the NFL Players Association, is constantly working to develop retired players programs. The NFLPA Retired Players Department has obtained Group Licensing Assignment agreements (GLAs) from the more than 2,900 retired NFL players, and is in the process of building up our list so that PLAYERS INC can provide opportunities to retirees." (Hilbert Decl. Ex. P).

[18] PLAYERS INC Website (Ex. 3 to D. Allen Depo.) (Hilbert Decl. Ex. Q); *see also* Upshaw Depo. 20:25-21:11 (group licensing "is the use of our players in six or more.") (Hilbert Decl. Ex. K); Eyrich Depo. 46:4-9 (████████████████████████████████████ ██████) (Hilbert Decl. Ex. L); Adderley GLAs (Hilbert Decl. Ex. H).

[19] ████████████████████████████████████████████

[20] D. Allen Depo. 188:16-20 (Hilbert Decl. Ex. J).

[21] May 23, 2008 Expert Report of Phillip Rowley ("Rowley Report"), Ex. 7 (Hilbert Decl. Ex. S).

8

all eligible NFLPA members who have signed a group licensing authorization form.[22]

After soliciting and acquiring the GLAs, the NFLPA sublicensed these rights to PI pursuant to a March 1, 2000 agreement (the "2000 NFLPA-PI Agreement").[23]

## C. PI's Third-Party Licenses Include Retired Player Rights On Their Face

PI licensed the collective group rights of both active and retired NFL players to third parties for considerable profit. More specifically, PI has licensed the group rights of both active and retired players to dozens of licensees

[22]    Adderley GLAs ¶ 5 (Hilbert Decl. Ex. H).

[23]    2000 NFLPA–PI Agreement, § 1(A) (Hilbert Decl. Ex. T).

[24]    ████████████████████████ (Hilbert Decl. Ex. U); ████████ ████████████ (Hilbert Decl. Ex. V).

[25]    ████████████████████████ (Hilbert Decl. Ex. D).



Virtually identical language appears in numerous other license agreements.[28]

        In an effort to lock up the market, at the request of Defendants, the License

Agreements also ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

---

[26]     *Id.; see also* D. Allen Depo. 205:25-206:7 (Hilbert Decl. Ex. J).

[27]     ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ (Hilbert Decl. Ex. D); D. Allen Depo. 208:11-208:22 (Hilbert Decl. Ex. J).

[28]     Other license agreements entered into by PI during the class period containing retired player group licensing rights include, but are not limited to ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆.

[29]     *See e.g.* ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ (Hilbert Decl. Ex. D)



**D.** **PI Generates Significant Guaranteed Revenues in Connection with Its Third-Party License Agreements**

---

[30] D. Allen Depo 216:16-217:6; 213:9-20 (Hilbert Decl. Ex. J).

[31] *Id.*, 214:3-215:10.

[32] 2005 EA Agreement, § 6(C) (Hilbert Decl. Ex. D).

(Hilbert Decl., Ex. MMM).

[33] 2007 TOPPS Agreement § 6(B) (Hilbert Decl. Ex. V) (

**E.     Defendants Have Failed to Share Licensing Revenues with Retired Players**

The Adderley GLA provides, in critical part, that Defendants will establish an escrow account and that each player will share in the licensing revenue of group rights:

> [T]he moneys generated by such licensing of retired player group rights will be divided between the player and an escrow account for all eligible NFLPA members who have signed a group licensing authorization form.[34]

Although Defendants did create an escrow account (from which they paid an "equal share" royalty to active players), Defendants failed to pay retired players any portion of the license revenues pursuant to the terms of their GLAs.[35]



[36]

However, members of the GLA Class have not received their "equal share" of the revenues,

).

_____ (Hilbert Decl. Ex. U).

[34]     Adderley GLAs ¶ 5 (Hilbert Decl. Ex. H).
[35]

(Hilbert Decl. Ex. K).
[36]     D. Allen Depo. 121:13-16 (Hilbert Decl. Ex. J).
[37]     *Id.* 121:23-122:15; 124:12-23.

Defendants failed to pay to Adderley and the GLA Class any of the ████ revenues generated under ████████████ and the myriad other agreements which license both active and retired player rights.[39]

In addition to paying only to active players monies that should have been shared with the retired players, Defendants used retired player monies to line their own pockets.

[38]    Nahra Depo. 69:19-72:21(Hilbert Decl. Ex. M); *see also* Eyrich Depo. 69:21-24 (████████████████████████) (Hilbert Decl. Ex. L).

[39]    Eyrich Depo. 69:21-24

[40]    2000 NFLPA-PI Agreement, ¶ 4  (Hilbert Decl. Ex. T)
[41]    Rascher Report at 10-13 (Hilbert Decl. Ex. R).
[42]    Eyrich Depo. 127:3-129:2  (Hilbert Decl. Ex. L).
[43]    February 28, 2006 Amendment to 2000 NFLPA-PI Agreement (Hilbert Decl. Ex. OO).
[44]    

(Hilbert Decl. Ex. K).
[45]    *Compare* Eyrich Depo. 92:12-94:25 (████████████████████████



In short, instead of complying with the express terms of the GLAs signed by Adderley and other retired members of the NFLPA, PI has, with the concurrence of or at the direction of the NFLPA, diverted millions of dollars to PI and the NFLPA.

**F.      Alternatively, Defendants Breached Their Fiduciary Duties To The GLA Class By Failing To Include Its Members in the Licensing Agreements.**

Defendants' explanation for not paying the retired players is that the retired players' group rights were not included in the third-party license agreements. Even if this were true (which, on the face of the license agreements, it is not), any alleged non-inclusion stems from Defendants' failure to promote the interests of the retired players, despite their obligation to do so. Defendants were careful to negotiate for inclusion of all active players who signed the group authorization in collective group licenses, but took no such care for retired players.

_____) (Hilbert Decl. Ex. L) _with_ June 26, 2008 Expert Reply Report of Daniel A. Rascher ("Rascher Reply Report") at fn. 81 (Hilbert Decl. Ex. NNN).

[46]      Eyrich Depo. 108:4-14 (Hilbert Decl. Ex. L)

[47]      Upshaw Depo. 98:20-98:24 and 99:13-15 (Hilbert Decl. Ex. K).



Although Defendants claim that the retired players simply had no value, this is disproved both by Defendants' substantial multi-year efforts to solicit them to sign GLAs, and the third-party licensees' proven use of retired players in individually negotiated *ad hoc* agreements.[50]

The evidence demonstrates that Defendants were faithless representatives of retired players, in fact working against the interests of retired players and in favor of the licensees.



---

[48]    Deposition of Warren Friss ("Friss Depo.") 19:25-20:7 (Hilbert Decl. Ex. QQ).
[49]    *Id.*, 77:8-14.
[50]    Although the Defendants claim that the retired player usage was simply licensee cherry-picking via the use of multiple *ad hoc* agreements, in fact this proves both their value and use to the third-party licensees. Furthermore, the third-party licensees also cherry-picked amongst the active players for individually negotiated *ad hoc* agreements.
[51]



## III.     ARGUMENT AND AUTHORITY

### A.     Summary Judgment Standard

Summary judgment is proper only when the "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law" Fed. R. Civ. P. 56(c). Defendants' own admissions regarding both causes of action at the least raise questions of fact.

### B.     Defendants Cannot Escape Liability for Their Breach of the GLA.

The evidence Defendants offer in support of their interpretation of the GLAs and license agreements both contradicts the plain language of those agreements and raises additional factual questions.[54] In light of Defendants' strained interpretation of these agreements, which must be construed against them, summary judgment is inappropriate.

#### 1.     The Plain Language of the GLA Sets Out Defendants' Obligations

Although the GLA is "a masterpiece of obfuscation [that] raises more questions than it answers,"[55] the Court must give effect to the clear and unambiguous language on the face

---

[52]     November 1, 2007 email from Andy Feffer to Paul Cairns (EA) (emphasis added) (Ex. 523 to Nahra Depo.) (Hilbert Decl. Ex. F).

[53]     Nahra Depo. 224:3-18 (Hilbert Decl. Ex. M).

[54]     Defendants claim that both the GLA and the License Agreements are ambiguous. Brief 18:9-11 and 3:1-3. On the other hand, Defendants argue that the license agreements are clear and should be determined as a matter of law. Brief 18:22-20:19.

[55]     Class Certification Order at 3 (April 29, 2008) (Rec. Doc. 275).

1   of the GLA. *See Parco Merged Media Corp. v. Multispectral Solutions, Inc.*, 2006 U.S. Dist.

2   LEXIS 29453, at *16 (E.D. Va. Apr. 21, 2006) (construing Virginia contract law); *Bolling Fed.*

3   *Credit Union v. Cumis Ins. Soc'y, Inc.*, 475 A.2d 382, 385 (D.C. 1984). Should the Court find

4   any ambiguity within these words, the GLA must be construed against Defendants. *Martin &*

5   *Martin, Inc. v. Bradley Enters., Inc.*, 504 S.E.2d 849, 851 (Va. 1998) (contract is construed

6   against the drafter); *Affordable Elegance Travel, Inc. v. Worldspan, L.P.*, 774 A.2d 320, 328

7   (D.C. 2001) (same).

8           **a.**      **The Failure to Share Revenue Pursuant to the Retired Player GLAs**

9           It is undisputed that the NFLPA solicited the retired players to sign the GLAs

10  because they were beneficial to Defendants.[56] It is also undisputed that the plain language of the

11  GLAs defines the group licensing programs as "programs in which a licensee utilizes a total of

12  six (6) or more *present or former* NFL player images in conjunction with or on products that are

13  sold at retail or used as promotional or premium items."[57] Thus, any collective group license

14  negotiated by Defendants for six or more active or retired players constituted group licensing

15  under the terms of the GLA. The GLA also states that each player will share in the resulting

16  licensing revenue:

17          [T]he moneys generated by such licensing of retired player group
            rights will be divided between the player and an escrow account for
18          all eligible NFLPA members who have signed a group licensing
            authorization form.[58]
19

20  Thus, the GLAs signed by Mr. Adderley and other members of the GLA Class promised a share

21  of the revenue PI received from third-party licensees.[59] Defendants admit that the retired players

---

[56]     D. Allen Depo. 214:21-215:9 (Hilbert Decl. Ex. J); Rascher Report at 13-14 (Hilbert Decl. Ex. R).

[57]     Adderley GLAs, ¶ 2 (emphasis added) (Hilbert Decl. Ex. H). *See also* Upshaw Depo. 35:23-36:4 (Hilbert Decl. Ex. K):



[58]     Adderley GLAs, ¶ 5.

[59]     *Id.*

were not paid for collective group licensing rights.[60] By Defendants' own admissions, and a plain reading of the GLA, they have breached the GLAs.

All payments that Defendants have claimed to be GLA payments were actually made pursuant to individually negotiated *ad hoc* agreements.

[Text redacted]

[66]

[60] D. Allen Depo. 208:23-209:17 (Hilbert Decl. Ex. J).

[61] Defendants' Supplemental Responses and Objections to Defendants' Fourth Set of Interrogatories dated February 27, 2008. (Hilbert Decl. Ex. III).

[62] Rowley Report at Ex. 7 (Hilbert Decl. Ex. S).

[63] [Text redacted] (Hilbert Decl. ¶ 69).

[64] [Text redacted] (Hilbert Decl. ¶ 69).

[65] *See* Feb. 8, 2008 letter from David Greenspan to Ryan Hilbert at 3 (Hilbert Decl. Ex. JJJ).

[66] (Hilbert Decl. ¶ 69).

**b.     The Failure to Share Revenues from the** ████████████

Defendants also seek to dismiss in a footnote Plaintiffs' claims that they are entitled to an equal share of those retired player rights that were licensed as part of ████████████████████████████████████████

████████████████████████████████████████ [68]

████████████████████████████████████████

████████████████████████████████████████ This definition is consistent with the definition used by Defendants to describe their standard group licensing program, which Defendants have conceded includes retired player rights.[70]

████████████████████████████████████████

---

[67] ████████████

[68]     August 19, 2004 NFL and PLAYERS INC Information Worksheet (Ex. 145 to Skall Depo.) (Hilbert Decl. Ex. TT).

[69]     *See* 2006 CBA (Hilbert Decl. Ex. UU).

████████████████████████████████████████

[70]     *See, e.g.,* GLAs (PI000150-170) (Hilbert Decl. Ex. VV); *see also* PI website (stating that the group licensing program is one in which "a licensee or partner utilizes a total of six (6) or more NFL players" without specifying whether such players are active or retired) (Hilbert Decl. Ex. Q); Upshaw Tr. 20:18-21:11 (stating that the term "group licensing" in the GLAs simply means six or more players) (Hilbert Decl. Ex. K).

[71]     (Hilbert Decl. Ex. OOO) (consisting, collectively, of Defendants' responses, which have



**c.** **The Failure to Pay From, or Alternatively, to Create the Promised Escrow Account**

The distribution scheme and the establishment of the promised escrow account under the GLA raises additional fact questions. As the Court has noted:

> The GLA did not describe how the money would be divided or whether everyone who signed a GLA was entitled to any licensing

---

not been amended and communications exchanged by the parties on this issue).

[72] Skall Depo. 98:16-24 ( ⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛ ) (Hilbert Decl. Ex. I).

[73] *Id.* 86:6-25 (acknowledging that NFL sponsors were interested in using retired players).

[74] *See, e.g.,* ⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛

[75] Declaration of Andrew Feffer (October 9, 2007) ( ⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛ )(Hilbert Decl. Ex. YY); *see also* Skall Depo. 95:24-96:20 ( ⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛ ) (Hilbert Decl. Ex. I). Defendants have not produced any agreement under which PI and the NFLPA have memorialized this arrangement, with the possible exception of a pair of letter agreements that do not specifically mention retired players.

distribution even if their image or likeness was not used. It is even unclear what "escrow account" the GLA referred to or whether the escrow account was ever even created by defendants.[76]

Although the GLA does not specifically address how sharing of revenue is to be done,[77] the NFLPA has a well-established protocol for sharing of revenue from collective group licensing on an "equal share" basis. There is only one fund containing the proceeds of licensing revenue, from which the NFLPA pays active players equal shares.[78] Retired NFL players could have shared in this equal share distribution ███████████████.

Defendants' construction of the GLA is nonsensical. For all their argument that a journeyman should be paid less than a star (Brief 6:22-7:11; 34:2-35:3), by their own admission they paid each active player (regardless of fame) the same amount of royalty for the third-party licenses, as noted by the Court: "Significantly, the group licensing revenue for *active* NFL players were distributed *equally* among the players despite the varying celebrity among such players."[79] Defendants offer no reason why this division would be any different for the retired players. Indeed, as the Court noted, there is no system to distribute these monies except "mercy and whim."[80] A reasonable jury may conclude that Defendants did not need a system because they never intended to distribute monies to retirees.

### d. The Irrelevance of the Individually Negotiated "*Ad Hoc*" Agreements

Defendants attempt to mislead the Court by pointing to payments made to retired players under individually negotiated *ad hoc* license agreements – which Defendants concede are

---

[76]    Class Certification Order at 6 (April 29, 2008) (Rec. Doc. 275).

[77]    *See id.* at 7 (GLA leaves Plaintiffs at the "complete mercy and whim of the NFLPA").

[78]    Furthermore, to share unequally in a lump sum payment would constitute a breach of fiduciary duty.   An agent cannot favor one principal over another.   *See* discussion *infra*. ████████████████████████████████████████████████████████████████r.
Rascher Reply Report at fn. 94 (Hilbert Decl. Ex. NNN); *see also* Hilbert Decl. ¶ 71. ¶

[79]    Class Certification Order at 6-7; *see also* D. Allen Depo. 120:18 – 121:22 (Hilbert Decl. Ex. J).

████████ 2000 NFLPA-PI Agreement ¶ 4 (Hilbert Decl. Ex. T). ████████
                                                                  D. Allen Depo.
120-121 (Hilbert Decl. Ex. J).

[80]    Class Certification Order at 7 (April 29, 2008) (Rec. Doc. 275).

not in dispute in this case.[81]

[black redaction]

[81] The Court has noted that Defendants' efforts to license the "individual rights" of retired players are not the subject of the instant lawsuit:

> It turns out, the Joe Montanas of the world exploit their celebrity through separate "*ad hoc*" agreements with defendants and others, leaving the question how everyone including the lesser lights are to be compensated under the GLAs.[84]

[black redaction]

Defendants' citation of Mr. Adderley's testimony in this regard is

---

[81] Compare Brief 1:16-17; 2:20-23; 24:9-13 (erroneous conflation of *ad hoc* agreements with group licensing agreements) with Brief 8:9 fn. 23 (conceding *ad hoc* agreements are not at issue).

[82] Skall Depo. 56:19-57:3 (Hilbert Decl. Ex. I); PI website at 2 (Ex. 3 to D. Allen Depo.) ([redacted]) (Hilbert Decl. Ex. Q); 2005 EA Agreement § 2(B) [redacted] ) (Hilbert Decl. Ex. D).

[83] PI website at 2 (Ex. 3 to D. Allen Depo.) (Hilbert Decl. Ex. Q).

[84] Class Certification Order at 6.

[85] Brief 12:19-13:3 (citing deposition testimony of Warren Friss and Adam Zucker); PI website at 2 (Ex. 3 to D. Allen Depo.) (Hilbert Decl. Ex. Q).

1   unavailing. (Brief at 9:18-20; 18:5-11). First, Mr. Adderley at the time of his deposition was

2   prohibited by provisions inserted in the protective order (at Defendants' insistence) from seeing

3   documents produced by defendants, including ███████████████████████████

4   █████[86]  Secondly, Mr. Adderley, as class representative, has limited responsibilities, as

5   noted by the Court:

6       "...Adderley's testimony only shows that he was confused and
        probably thrown off by the rigor of a deposition. In light of his age
7       and unfamiliarity with the legal process, Adderley's responses are
        not alarming. It would be unfair to deny someone in Adderley's
8       position access to our courts merely because he is unable to
        articulately respond to questions from attorneys."
9

10  It is also undisputed that the active players have each received a portion of the promised shared

11  escrow ██████████████████[87]



[86]    (Hilbert Decl., ¶ 70).
[87]    See Upshaw Depo, 48:17-25; 95:1-96:16 (Hilbert Decl. Ex. K); D. Allen Depo., 121:10-
16 (Hilbert Decl. Ex. J).
[88]    April 25, 2006 Agreement Between EA, PI and The Pro Football Hall of Fame,
¶ 2(A)(i-iii) (Hilbert Decl. Ex. KKK).



2.      **The Third-Party Licensing Agreements**

Defendants' third-party license agreements expose additional factual issues.  For example, PI's license agreement with ████████████ stated:

---

[89]     Id.

[90]

[91]     *See* EA Sports Webpage (Hilbert Decl. Ex. AAA); *see also* Plaintiffs' Motion for Leave to File a Third Amended Complaint, filed on September 27, 2007 at Docket No. 139.

[92]     ████████████ Friss Depo. 19:25-20:17; 34:9-14 (Hilbert Decl. Ex. QQ); *see also* Deposition of Joel Linzner ("Linzner Depo.") 40:5-41:14, 49:1-55:11 (Hilbert Decl. Ex. QQQ).

[93]     2007 Topps Agreement § 1(A) (Hilbert Decl. Ex. V).

Other third-party license agreements entered into by the NFLPA contain similar language.

---

94    Class Certification Order at 6.

95    D. Allen Depo. 205:25-206: 7 (Hilbert Decl. Ex. J).

96    D. Allen Depo. 206:18-208:9 (Hilbert Decl. Ex. J).

[BLACK REDACTION BLOCK]

[98]

Summary judgment cannot result from Defendants' or their licensees' litigation-driven "understanding"[99] of these contracts that is contrary to the plain wording of the agreements, [BLACK REDACTION]

[BLACK REDACTION] Further, Defendants' own "understanding" of these contracts conflicts with itself. [BLACK REDACTION]

If the document is facially unambiguous, its plain language should be relied upon as providing the best objective manifestation of the parties' intent. *Bolling Fed. Credit Union v. Cumis Ins. Soc'y, Inc.*, 475 A.2d 382, 385 (D.C. 1984); *Martin & Martin, Inc. v. Bradley Enters., Inc.*, 504 S.E.2d 849, 851 (Va. 1998). This is especially true where the agreement states that all understandings and agreements between the parties are merged in the agreement and that no party had made representations or warranties that were not expressly set forth in the agreement [BLACK REDACTION].[101] *See Martin & Martin*, 504 S.E.2d at 851.

The plain language of the Adderley GLA and the PI license agreements is sufficient to support Plaintiffs' claim for breach of contract. [BLACK REDACTION]

---

[97]    *Id.* 207:13-23.

[98]    *See* 2005 EA Agreement § 6(C) ([BLACK REDACTION]) (Hilbert Decl. Ex. D).

[99]    *See* Brief 1:20-2:10; 10:13-22; 12:2-14:11; 20:20-23:15.

[100]    *See, e.g.,* [BLACK REDACTION] (Hilbert Decl., Exs. C and D).

[101]    *See e.g.,* [BLACK REDACTION] (Hilbert Decl., Ex. C).

Defendants state that the Class's interpretation of the third-party License Agreements would lead to "absurd" results. (Brief at 23-25.) But what would be absurd (and legally impermissible) is to interpret the License Agreements such that the GLA becomes meaningless. *Cf. A.S. Johnson Co. v. Atl. Masonry Co.*, 693 A.2d 1117, 1122-23 (D.C. 1997) (rejecting interpretation that would render part of an agreement meaningless); *Retail Clerks Int'l Ass'n v. NLRB*, 510 F.2d 802, 806 n.15 (D.C. Cir. 1975) ("It is a settled rule of contract interpretation that contract language should not be interpreted to render the contract promise illusory or meaningless."). Indefiniteness "must reach the point where construction becomes futile" for a court to declare the contract "meaningless" and to "justify the conclusion that in reality it accomplished nothing." *Heyman Cohen & Sons, Inc. v. M. Lurie Woolen Co.*, 133 N.E. 370, 371 (N.Y. 1921) (Cardozo, J.). This is especially true if, as here, it is a transparent attempt to avoid liability. *Reid v. Boyle*, 527 S.E.2d 137, 143 (Va. 2000) ("The law does not favor declaring contracts void for indefiniteness and uncertainty, and leans against a construction which has that tendency. While courts cannot make contracts for the parties, neither will they permit parties to be released from the obligations which they have assumed if this can be ascertained with reasonable certainty from language used, in the light of all the surrounding circumstances."). "The defendant, then, is bound, unless its promise is to be ignored as meaningless. Rejection on that ground is at best a last resort." *Heyman*, 133 N.E. at 371.

Nor are Plaintiffs "strangers" to the third-party license agreements, with no right to interpretation, as posited by Defendants.[102] Defendants negotiated these third-party licenses on

---

[102] None of Defendants' cases cited in Footnote 61 of their Brief support their assertions. Brief at 21 n. 61. For example, in four of their cases, the "understanding" offered by the "stranger" was contrary to the plain language of the contract – the exact opposite of what is proffered by defendants in this matter. *See Reliance Std. Life Ins. Co. v. Matula*, 2007 U.S. Dist. LEXIS 24523, *25 (E.D. Wis. Mar. 30, 2007) (whether an insured is covered by a life insurance policy that is part of an employee welfare benefit plan governed by ERISA cannot be changed by understanding of third party that is contrary to all the evidence); *Williams Tile & Marble Co., Inc. v. Ra-Lin & Associates, Inc.*, 426 S.E.2d 598, 600 (Ga.App. 1992) (party cannot offer evidence of stranger to contradict clear and unambiguous terms of a contract); *Combs v. Hunt*, 125 S.E. 661, 640 (Va. 1925) (the injured party cannot convert another's indemnity insurance policy to a liability insurance policy, contrary to the express terms of the insurance contract); *Matshushita*

behalf of the class members, and those licenses directly affected the Plaintiffs' economic interests.[103] In this situation, the Court should interpret these third-party agreements to evaluate the parties' arguments, following courts in previous cases. For example, in *Shafford v. Otto Sales Co.*, 119 Cal. App. 2d 849, 859-60 (1953), the Court allowed a non-party to a contract to submit evidence as to the meaning of that contract, noting that "mere words, and the ingenuity of contractual expression dreamed up by ingenious businessmen or their lawyers cannot be used to prevent a showing of the real nature of the transaction." *Shafford*, 119 Cal. App. 2d at 860. *See also ViChip Corp. v. Lee*, 438 F.Supp.2d 1087, 1097-98 (N.D. Cal. 2006) (entity with a direct economic interest or involvement in the relationship embodied among the parties to the agreement is not a stranger to the contract); *In re Leisure Corp.*, 2007 WL 607696, *13 (N.D. Cal) (Prochnow was not a stranger to the relationship between Leisure Corporation and Law Finance Group because the Factoring Agreement explicitly required Prochnow to adjust his appellate lien rights in the pending judgment to those of Law Finance Group.)

Furthermore, Defendants' position that all of their contracts were sloppy in including retired player rights █████████████████████████████████ undermines Defendants' position. (Brief at 23:21-24:8).

████████████████████████████████████████████████████████████████

*Elec. Corp v. Loral Corp.*, 1994 WL 497955, *2 (Fed. Cir. Sept. 23, 1994) (summary judgment granted where the plain and unambiguous meaning of the written agreement, consistent with other evidence, showed there was simply no genuine issue to be resolved). Defendants' fifth case is simply inapposite. *Waddy v. Sears, Roebuck & Co.*, 1994 WL 392483, *11 (N.D. Cal. July 8, 1994) (summary judgment holding that "the understandings of other employees as to the nature of their employments, however, are irrelevant to the question of whether Tucker himself had an implied for-cause employment contract").

[103] Of course, the existence of an agency is a fact question as discussed *infra*.

[104] ████████████████████████████████████████████████████████████

[105] STAT's website states: "STATS offers historical data for sports leagues across the globe.



[107]

### 3. Damages

The GLA Class is not seeking active player money, as contended by Defendants at Brief 14:11-16:16.

---

Historical packages include player and team statistics, leaderboards, schedules, standings, awards, draft information, injuries and transactional data. With deep, rich historical content dating back to 1876 – STATS provides an unparalleled package of historical statistics for Major League Baseball, National Football League, National Basketball Association, and the National Hockey League. In addition, we offer the most in-depth historical databases for college sports, cricket, international football/soccer leagues, golf and tennis." (Hilbert Decl. Ex. CCC).

[106]    *See* http://www.whatifsports.com/nfl/ (Hilbert Decl. Ex. DDD).

[107]    ██████████████████████████████████ (Hilbert Decl., Ex. EEE).

[108]    Brief 15:2-15; 25:14-29:8.

[109]    2000 NFLPA-PI Agreement ¶ 4(B) (Hilbert Decl. Ex. T).

[110]    *Id.*; see also *see* D. Allen Depo. 123:5-124:23 (Hilbert Decl. Ex. J).

[111]    *See id.* 123:5-124:23.



But the only money paid to Adderley was from individually negotiated *ad hoc* agreements, which are not at issue.

## C. The Breach of Fiduciary Duty Claims

The breach of fiduciary duty claims also present numerous factual inquiries, such as whether an agency relationship existed, whether a fiduciary relationship existed, and what obligations were breached by Defendants to Plaintiffs. Plaintiffs have presented evidence to satisfy each element of their claim.

### 1. Defendants Owed Plaintiffs Fiduciary Duties Arising Out Of The GLAs.

#### a. The Agency Relationship

The existence of a fiduciary relationship is a question of fact. *Allen Realty Corp. v Holbert*, 318 S.E.2d 592, 595 (Va. 1984) (Allen's amended motion for judgment was sufficient to

[112] 2000 NFLPA-PI Agreement ¶ 4(A) (Hilbert Decl. Ex. T).
[113] Brief at 15:9-11(citing deposition testimony of D. Allen).
[114] *See* D. Allen 108:11-111:16 (Hilbert Decl. Ex. J).

raise a question of fact as to whether Holbert occupied a fiduciary relationship to Allen and breached his fiduciary duty. Allen alleged that Rawlings was employed to act through Holbert to assist in Allen's liquidation, which involved the sale of Allen's real estate, and that Allen relied on Holbert to inform it of any outstanding offers before the liquidation.) Fiduciary relationships are created when "special confidence has been reposed in one who in equity and good conscience is bound to act in good faith and with due regard for the interests of the one reposing the confidence." *See Allen Realty*, 318 S.E.2d 592, 595; *Church of Scientology, Int'l v. Eli Lilly & Co.*, 848 F.Supp. 1018, 1028 (D.D.C. 1994) (whether there exists a fiduciary relationship is a fact-intensive question, involving a searching inquiry into the nature of the relationship, the promises made, the type of services or advice given and the legitimate expectations of the parties). The *Scientology* Court opined that relationships founded on trust and confidence result in fiduciary duties:

> Broadly stated, a fiduciary relationship is one founded upon trust or confidence reposed by one person in the integrity and fidelity of another. It is said that the relationship exists in all cases in which influence has been acquired and betrayed. The rule embraces both technical fiduciary relations and those informal relations which exist whenever one man trusts in, and relies upon, another. . . .

*Church of Scientology*, 848 F.Supp. at 1028 (quoting *Schmidt v. Bishop*, 779 F.Supp. 321, 325 (S.D.N.Y. 1991)).

An agency relationship is a fiduciary relationship. *See McClung v. Smith*, 870 F.Supp. 1384, 1399 (E.D. Va. 1994) ("Agency is a fiduciary relationship created by express or implied agreement of the parties"); *Jenkins v. Strauss*, 931 A.2d 1026, 1033 (D.C. 2007). Under either D.C. or Virginia law, an agency relationship is created "when one person authorizes another to act on his behalf subject to his control, and the other consents to do so." *Smith v. Jenkins*, 452 A.2d 333, 335 (D.C. 1982), *overruled on other grounds by Rolinksi v. Lewis*, 828 A.2d 739 (D.C. 2003); *see also Acordia of Va. Ins. Agency, Inc. v. Genito Glenn, L.P.*, 560 S.E. 2d 246, 249 (Va. 2002) (defining "agency" as "a fiduciary relationship resulting from one person's manifestation of consent to another person that the other shall act on his behalf and subject to his control, and the other person's manifestation of consent so to.").

The existence of an agency relationship is a question of fact. *Smith*, 452 A.2d at 335; *Acordia*, 560 S.E.2d at 250. In determining whether an agency relationship exists, the jury is entitled to look at any contracts between the putative principal and agent, the context of their relationship, and their course of dealing. *See Judah v. Reiner*, 744 A.2d 1037, 1040 (D.C. 2000) ("In deciding [whether there is an agency relationship], courts will look both to the terms of any contract that may exist and to the actual course of dealings between the parties."); *Acordia*, 560 S.E.2d at 250 ("[A]gency may be inferred from the conduct of the parties and from the surrounding facts and circumstances.").

Defendants argue that there was no agency relationship. Yet Defendants admit that they "represented" retired players, and held themselves out as representing the retired players.[115] Defendants cannot gain the benefit of that representation and disavow the resulting agency obligations. *Cf. Brown v. Coates*, 253 F.2d 36, 38 (D.C. Cir. 1958) (finding that appellees had a right to rely on the competence, honesty, and good faith of a real estate broker, in part because appellees engaged the broker "in his expert and publicly proclaimed capacity for the purpose of effectuating this not uncomplicated sale and purchase of properties.").

Moreover, the record evidence establishes the existence of a principal/agent relationship sufficient to impose fiduciary duties on the part of Defendants. The GLAs allow individuals to provide notice of conflicting endorsement agreements, which allow for termination of Defendants' representation.[116] Adderley and other retired players retained control over Defendants' ability to license all personal appearances and additional services that might be requested.[117] And, of course, Plaintiffs each were able to terminate their representation by Defendants at any time. Defendants do not contest that the retired player class authorized Defendants, through the GLAs, to act on the retired players' behalf, or that Defendants consented

---

[115] PI Website at 2 (Ex. 5 to D. Allen Depo) ("PLAYERS INC . . . represents . . . over 3,000 retired players . . .") (Hilbert Decl. Ex. GGG); NFLPA's Responses and Objections to Plaintiffs' First Set of Requests for Admissions at Requests 10 - 12 (Hilbert Decl. Ex. LLL).

[116] *See, e.g.*, Adderley GLA (stating that if (1) inclusion in any program conflicts with an endorsement agreement and (2) the player provides notice to the NFLPA, the NFLPA will exclude the player from that particular program) (Hilbert Decl. Ex. H).

[117] *Id.* ¶ 4 (Hilbert Decl. Ex. H).

to do so.[118] Thus, the indicia of control that are the hallmark of the principal/agent relationship are present in this case.[119] At minimum, based on the GLAs, Defendants' statements regarding representation of the retired players, and the context of group licensing, there are disputed factual issues whether Defendants were acting as Plaintiffs' agents under the GLAs.

### b. A Fiduciary Relationship Can Exist Absent an Agency Relationship

Courts have found that fiduciary relationships can exist in numerous situations. *See Church of Scientology*, 848 F.Supp. at 1028 (church/public relations firm); *Wagman v. Lee*, 457 A.2d 401, 404-405 (D.C. 1983) (escrow agent/depositor); *Stevenson v. Johnson*, 32 Va. Cir. 157, 159 (Va. Cir. Ct. 1993) (clinical psychologist/client, denying summary judgment and noting that "[e]ven though a fiduciary duty usually arises in the context of the management of money, it is not always so. A fiduciary duty is a duty to act for someone else's benefit, while subordinating one's personal interests to those of the other person."). Federal courts in Virginia and D.C. recognize that unions owe fiduciary duties to their members. *See Nellis v. Air Line Pilots Ass'n*, 144 F.R.D. 68, 71 (E.D. Va. 1992); *Int'l Brotherhood of Teamsters v. Wirtz*, 346 F.2d 827, 832 (D.C. Cir. 1965).

Here, based on the nature and context of the parties' relationship and Defendants' representations designed to induce class members to sign the GLAs, at minimum questions of fact exist concerning whether Defendants were fiduciaries of the class members for the purposes of group licensing. The GLAs state that the NFLPA was authorized to act on behalf of the class

---

[118]    PI Website at 2 (Ex. 5 to D. Allen Depo) ("PLAYERS INC . . . represents . . . over 3,000 retired players . . .") (Hilbert Decl. Ex. GGG); NFLPA's Responses and Objections to Plaintiffs' First Set of Requests for Admissions at Requests 10 - 12 (Hilbert Decl. Ex. LLL); NFLPA's and PI's Responses and Objections to Plaintiffs' Third Set of Requests for Admissions at Requests 19 (Hilbert Decl. Ex. PPP).

[119]    Defendants' cases examine the concept of "control" in apposite situations. With few exceptions, each is a respondeat superior case, examining the day-to-day control of an individual to determine if he or she operated as an employee or independent contractor in an effort to establish vicarious liability. *See Judah v. Reiner*, 744 A.2d 1037, 1040 (D.C. 2000) (respondeat superior); *Wells v. Whitaker*, 207 Va. 616, 624 (Va. 1966) (respondeat superior); *Ames v. Yellow Cab of D.C., Inc.*, 2006 WL 2711546 (D.D.C.) (respondeat superior); *Murphy v. Holiday Inns, Inc.*, 216 Va. 490, 493 (Va. 1975) (franchisor/franchisee); *Jackson v. Loews Washington Cinemas, Inc.*, 944 A.2d 1088 (D.C. 2008) (common enterprise); *DNM, Inc. v. S. H. Clark & Sons Roofing, Inc.*, No. 911233, 1992 Va. LEXIS 102 (Va. April 17, 1992) (respondeat superior); *Bangkok Crafts Corp. v. Capitolo di San Pietro in Vaticona*, No. 03 Civ. 0015, 2004 U.S. Dist. LEXIS 25235, *7 (third party liability under apparent authority doctrine).

members for the purpose of licensing the class members' images for group licensing programs. Defendants held themselves out as representing these retired players.[120]  For group licensing on this scale, a jury could infer that each of the 2,100 represented retired players could not possibly maintain full power or knowledge over licensing of the entire group.

      Additionally, Defendants engaged in conduct designed to impede Plaintiffs' ability to monitor third-party license negotiations.

      At a minimum, given these circumstances and the power that was invested in Defendants through the GLAs, a factual question arises as to the fiduciary nature of the relationship.  *Hammett v. Ruby Lee Minar, Inc.*, 53 F.2d 144, 146 (D.C. 1931)

---

[120]    PI Website at 2 (Ex. 5 to D. Allen Depo) ("PLAYERS INC . . . represents . . . over 3,000 retired players . . .") (Hilbert Decl. Ex. GGG); NFLPA's Responses and Objections to Plaintiffs' First Set of Requests for Admissions at Requests 10 - 12 (Hilbert Decl. Ex. LLL); NFLPA's and PI's Responses and Objections to Plaintiffs' Third Set of Requests for Admissions at Requests 19 (Hilbert Decl. Ex. PPP).

[121]    *See e.g.* 2005 EA Agreement § 13 (Hilbert Decl. Ex. D).

[122]    RFA 2 ("                                                                          ) (Hilbert Decl. Ex. LLL).  *See also*, Deposition of Adam Zucker (TOPPS 30(b)(6) deponent) 14:16-23; 16:9-22; 66:16-69:19; 71:6-73:21; 96:20-23 (Hilbert Decl. Ex. HHH).

[123]

("Courts of equity have carefully refrained from defining the particular instances of fiduciary relations in such a manner that other and perhaps new instances might be excluded. It is settled by an overwhelming weight of authority that the principle extends to every possible case in which a fiduciary relation exists as a fact, in which there is confidence reposed on one side and the resulting superiority and influence on the other.").

### 2. Defendants Breached Their Fiduciary Duties to Plaintiffs

#### a. Defendants Failed to Pay the Class, and Failed to Disclose Material Facts

Defendants claim that there is "no evidence" to support a breach of fiduciary duty (Brief at 32-34). On the contrary, Defendants repeatedly breached their fiduciary duties to the GLA Class by (i) ███████████████████████████████████████ ████████, (ii) failing to accurately report group licensing revenues to members of the GLA Class,[124] (iii) failing to distribute revenues to the members of the GLA Class that should have been distributed, (iv) failing to distribute to retired players their equal share of the fund from which the active players were paid, (v) ███████████████████████████████ ███████████████████████████████, (vi) ███████████████████████████████████████████, and (vii) placing themselves in a position of conflict of interest and acting adversely to the interest of retired NFL players who signed a GLA.

Restatement (Third) of Agency § 8.01 states that an agent has a fiduciary duty to act loyally for the principal's benefit in all matters connected with the agency relationship, and must act in accordance with the express and implied terms of any contract between the agent and the principal. In this matter, the principal's instruction was to divide the royalties amongst the players, both active and retired.[125] Rather than follow this instruction, however, Defendants

---

[124] ███████████████████████████████████████████████ ███████████████████████████████████████ 2000 NFLPA-PI Agreement ¶ 4 (Hilbert Decl. Ex. T). ██████████ *See* D. Allen Depo. 123:5-124:23 (Hilbert Decl. Ex. J).

[125] *See* Adderley GLAs ¶ 4 (Hilbert Decl. Ex. H).

breached their fiduciary duties to the Class by

[REDACTED]

[126]

Finally, the failure to inform Plaintiffs of each of the above ([REDACTED]

[REDACTED].) is each a separate breach of the duty of loyalty and duty of care. *Ellipso, Inc. v. Mann*, 541 F.Supp.2d 365, 374 (D.D.C. 2008) (noting that an agent owes a "duty to disclose . . . all matters coming to the agent's notice or knowledge concerning the subject of the agency, which it is material for the principal to know for his protection or guidance"); *cf. PGI, Inc. v. Rathe Prod's, Inc.*, 576 S.E.2d 438, 444 (Va. 2003) ("in breach of its duty of loyalty, duty of care, and obligation of good faith and fair dealing, partner Rathe did not inform PGI that it had received the $250,000 in settlement from the Smithsonian"); *Int'l Underwriters, Inc. v. Boyle*, 365 A.2d 779, 783 (D.C. 1976) (finding duty to disclose "any knowledge . . . relevant to his agency relationship").

**b.  Defendants Failed to Adequately Represent Plaintiffs and Had Improper Conflicts of Interest**

Additionally, Plaintiffs still maintain a claim for breach of fiduciary duty for the failure to adequately represent them and breaches of the duty of loyalty. The evidence shows that Defendants made little effort to market the retired player rights. [REDACTED]

[REDACTED] This issue is a classic factual dispute with contravening evidence, [REDACTED]

[REDACTED] Defendants' argument for summary judgment on the conflicting evidence is

---

[126]     *See* Page 16 *supra*.

1    frivolous.

2          Defendants have produced scant evidence of any of their vague attempts at

3    promotion.

13         [130] Again, issues of

14    fact prevent summary judgment.

15          "An agent is bound to use reasonable care and skill in the performance of his

16    agency, to use reasonable efforts to accomplish the purpose of his agency, and to disclose to his

17    principal all relevant information coming to his knowledge." *Yelen v. Banks*, 146 A.2d 569, 571

18    (D.C. 1958); Restatement (Third) of Agency § 8.08 (2006). In this case, the Class will show that

19    Defendants failed in this regard because of a conflict of interest. An agent breaches its fiduciary

20    duty by serving the interests of one principal less well than the interests of other principals:

> No one is compelled or required to undertake an agency, but one
> who voluntarily assumes the task owes the duty of acting in the
> utmost good faith toward his principal. An agent is a fiduciary. If
> the principal is a group of individuals, this obligation extends to
> each member of the group. The agent is bound to represent the
> interest of each member of the group fairly and with equal zeal. He

---

[127]

[128]   Upshaw Depo. 99:7-15 (Hilbert Decl. Ex. K).

[129]   Friss Depo. 77:8-14 (Hilbert Decl. Ex. QQ).                 Friss Depo. 19:25-20:17;
34:9-14 (Hilbert Decl. Ex. QQ).

[130]   Linzner Depo. 40:5-41:14, 49:1-55:11 (Hilbert Decl. Ex. QQQ).

> may not neglect some of the members, prefer some as against
> others, or discriminate among them. He may not advance the
> interests of some to the prejudice of others.

*Graham v. S. Railway Co.*, 74 F.Supp. 663, 664 (D.D.C. 1947).[131] *See also Keith v. Berry*, 64 A.2d 300, 303 (D.C. 1949) ("An agent employed by both parties to a transaction . . . has same duty to act with fairness to each that an agent has in dealing with his principal on his own account."); *Aronoff v. Lenkin Co.*, 618 A.2d 669, 687 (D.C. 1992) (holding that a settlement agent owes duty to deal fairly with each party to transaction.); *Jenkins v. Strauss*, 931 A.2d 1026, 1034 (D.C. 2007) (finding that an agent's acts with respect to dual representation violated fiduciary duties, "including negotiating the most favorable terms possible."); *Messer v. Re/Max Props., Inc.*, 15 Va. Cir. 15, 15 (Va. Cir. Ct. 1985) ("[A] fiduciary cannot serve two masters.").[132]

### c. Damages

███████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████

---

[131]   The D.C. Circuit reversed the District Court on grounds of improper venue, but the District Court's injunction was ultimately upheld by the Supreme Court. *Compare Brotherhood of Locomotive Firemen & Enginemen v. Graham*, 175 F.2d 802, 807 (D.C. Cir. 1948) ("the motion of the appellant . . . for dismissal of the instant suit for lack of proper venue should have been granted and therefore that the order issuing the preliminary injunction should not have been entered.") *with Graham v. Brotherhood of Locomotive Firemen & Enginemen*, 338 U.S. 232, 240 (1949) (reversing the D.C. Circuit, and reinstating the order of the District Court).

[132]   *See also* Restatement (Third) of Agency § 3.16 (An agent who acts on behalf of more than one principal in the same matter or transaction owes duties to all principals. When there is no substantial conflict among the principals' interests or their instructions to the agent, the agent may fulfill duties owed to all principals. However, by serving the interests of one principal, an agent may serve the interests of others less well when the principals' interests or their instructions to the agent diverge.) Restatement (Third) of Agency § 3:14 (An agent who represents principals whose interests conflict may breach the fiduciary duties that the agent owes to principals on whose behalves the agent undertakes to act.) Restatement (Third) of Agency § 8:03 (As a fiduciary, an agent has a duty to the principal to act loyally in the principal's interest in all matters in connection with the agency relationship. . . . When an agent deals with the principal on the agent's own account, the agent's own interests are irreconcilably in tension with the principal's interests because the interest of each is furthered by action—negotiating a higher or a lower price, for example—that is incompatible with the interests of the other. If an agent acts on behalf of the principal in a transaction with the agent, the agent's duty to act loyally in the principal's interest conflicts with the agent's self-interest. Even if the agent's divided loyalty does not result in demonstrable harm to the principal, the agent has breached the agent's duty of undivided loyalty. Likewise, an agent who acts on behalf of more than one principal in a transaction between or among the principals has breached the agent's duty of loyalty to each principal through undertaking service to multiple principals that divides the agent's loyalty.). The Restatement , has been relied on by D.C. and Virginia courts determining various questions relating to agency. *See, e.g., C&E Servs. v. Biggs*, 498 F.Supp.2d 242, 264 n.12 (D.D.C. 2007); *Feddeman & Co. v. Langan Assocs., P.C.*, 530 S.E.2d 668, 672 (Va. 2000). Restatement (Third) of Agency

But this ignores the equal share royalty to superstar or journeyman, active or retired, from the only escrow fund that exists, the equal share fund.

[134]

The Class's theories of damages are well founded. Either Defendants failed to share the license revenue with retired players                    OR Defendants failed to license the Class and should have done so.

[136]

Furthermore, Defendants fail to acknowledge that if they are found to have breached their fiduciary duties to the Class, no proof of specified damages is necessary for this Court to require disgorgement of profits for a breach of loyalty. *In re Estate of Corriea*, 719 A.2d 1234, 1241 (D.C. 1998) *citing Sheldon v. Metro-Goldwyn Pictures Corp.*, 309 U.S. 390, 399 (1940) (the fact that Avianca was not able to quantify the damages it suffered from the Twin Otter transaction does not disqualify the profits ordered disgorged as just compensation for the wrong. . . . Disgorgement of the net profits rectified that wrong in a manner that "conform[ed] . . . to [its] dimensions."); *Owen v. Shelton*, 277 S.E.2d 189, 192 (Va. 1981) ("The price of a violation of the duty to disclose is forfeiture of the broker's right to compensation.").

---

[133]     *See e.g.* D. Allen Depo. 121:13-16 ("                    ") (Hilbert Decl. Ex. J).
[134]     *See* Clay Walker Email (                    (Hilbert Decl. Ex. G) (emphasis added).
[135]     Rowley Report at 4-7.
[136]     *Id.*

39

| | |
|---|---|
| 1 | This rule illustrates the high regard the law holds for the fiduciary relationship, |
| 2 | founded as it is upon one person's trust in the integrity and fidelity of another. The purpose of the |
| 3 | rule is more prophylactic than remedial; it is applied, not to compensate the principal for an |
| 4 | injury, but rather to discipline the fiduciary in the conduct of the office entrusted to him. *Id.*; |
| 5 | Restatement (Third) Of Agency § 8.02 cmt. b (2006) (To establish that the agent is subject to |
| 6 | liability, it is not necessary that the principal show that the agent's acquisition of a material |
| 7 | benefit harmed the principal. The benefit realized by the agent can often be calculated more |
| 8 | readily than any harm suffered by the principal.) |

### IV. CONCLUSION

A masterpiece of obfuscation does not lend itself to summary judgment on a contract claim. Nor does documentary evidence of betrayal support summary judgment for Defendants on a fiduciary duty claim. Therefore, for all the reasons stated above, Plaintiffs respectfully request that Defendants' Motion for Summary Judgment be DENIED.

Respectfully submitted,

Dated: July 1, 2008                    MANATT, PHELPS & PHILLIPS, LLP

By:    /s/ Ronald S. Katz            .
          Ronald S. Katz (SBN 085713)
          Ryan S. Hilbert (SBN 210549)
          Noel S. Cohen (SBN 219645)
1001 Page Mill Road, Building 2
Palo Alto, CA 94304-1006
Telephone: (650) 812-1300
Facsimile: (650) 213-0260

MCKOOL SMITH, P.C.
Lewis T. LeClair (SBN 077136)
Jill Adler Naylor (SBN 150783)
300 Crescent Court
Dallas, TX 75201
Telephone: (214) 978-4984
Facsimile: (214) 978-4044

*Attorneys for Plaintiffs*