PAGES 1 – 58

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE WILLIAM H. ALSUP

BERNARD PAUL PARRISH, HERBERT,      )
ANTHONY ADDERLEY, WALTER ROBERTS,   )
III,                                )
                                    )
            PLAINTIFFS              )
                                    )
  VS.                               ) NO. C 07-00943 WHA
                                    )
NATIONAL FOOTBALL LEAGUE PLAYERS    )
ASSOCIATION AND NATIONAL FOOTBALL   )
LEAGUE PLAYERS INCORPORATED DBA     )
PLAYERS INC.,                       )
                                    ) SAN FRANCISCO, CALIFORNIA
            DEFENDANTS              ) THURSDAY
                                    ) JULY 24, 2008
_____)

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

**FOR PLAINTIFFS**          MANATT, PHELPS & PHILLIPS, LLP
                            1001 PAGE MILL ROAD, BUILDING TWO
                            PALO ALTO, CALIFORNIA  94304
                     BY:    **RONALD STANLEY KATZ, ESQUIRE**
                            **RYAN HILBERT, ESQUIRE**


**FOR DEFENDANTS**          DEWEY & LEBOEUF, LLP
                            1301 AVENUE OF THE AMERICAS
                            NEW YORK, NEW YORK  10019
                     BY:    **JEFFREY L. KESSLER, ESQUIRE**
                            **DAVID GREENSPAN, ESQUIRE**


*REPORTED BY:*  JOAN MARIE COLUMBINI, CSR 5435, RPR
                OFFICIAL COURT REPORTER, U.S. DISTRICT COURT

1          **PROCEEDINGS; THURSDAY, JULY 24, 2008**

2

3          **THE COURT:**  OKAY.  WE ARE GOING TO BERNARD PARRISH

4    VERSUS NATIONAL FOOTBALL LEAGUE PLAYERS ASSOCIATION.

5          **THE CLERK:**  COUNSEL, PLEASE STATE YOUR APPEARANCES.

6          **MR. KATZ:**  RONALD KATZ FOR THE PLAINTIFFS, YOUR

7    HONOR.  WITH ME IS MY CO-COUNSEL FROM DALLAS LEWIS LECLAIR,

8    RYAN HILBERT, LAURA FRANCO.

9              IN THE GALLERY, YOUR HONOR, WE HAVE TWO ASSOCIATES,

10   TWO SUMMER ASSOCIATES, ONE FROM OUR OFFICE, PILAR OLLOA

11   (PHONETIC) WHO GOES TO HASTINGS LAW SCHOOL AND ONE FROM

12   MR. LECLAIR'S OFFICE, J.R. JOHNSON FROM DALLAS.  WE ALSO HAVE A

13   RETIRED FOOTBALL PLAYER IN THE GALLERY BENJAMIN LYNCH, PLAYED

14   FOR, AMONG OTHER TEAMS, THE 49ERS.

15         **THE COURT:**  WHERE IS HE?

16         **MR. KATZ:**  HE'S HARD TO MISS, YOUR HONOR.

17         **THE COURT:**  WHY DON'T YOU COME UP HERE AND SIT IN

18   THE FRONT ROW SO I CAN HAVE AN EVER PRESENT REMINDER OF A CLASS

19   MEMBER?

20         **MR. KATZ:**  ACTUALLY, HE'S NOT A CLASS MEMBER.  HE IS

21   A SUPPORTER OF THE CLASS.

22         **THE COURT:**  STILL SIT UP THERE.  THANK YOU.  AND MR.

23   KESSLER.

24         **MR. KESSLER:**  GOOD AFTERNOON, YOUR HONOR.  JEFFREY

25   KESSLER FOR THE DEFENDANTS.  I AM HERE WITH MY COLLEAGUES DAVID

GREENSPAN AND JASON CLARK.  I ALSO HAVE AT COUNSEL TABLE THE

GENERAL COUNSEL OF THE NFLPA MR. RICHARD BERTHELSEN.  AND WE

HAVE SEATED IN THE AUDIENCE GENE UPSHAW, WHO IS ALSO A RETIRED

NFL PLAYER AND THE EXECUTIVE DIRECTOR OF THE NATIONAL FOOTBALL

PLAYERS ASSOCIATION.

        **THE COURT:**  WELCOME.  WELL, WE HAVE A LOT OF

CELEBRITIES HERE TODAY.  SO LET'S GET STARTED.

        **MR. KESSLER:**  YOUR HONOR, MAY I APPROACH?

        **THE COURT:**  IT'S YOUR MOTION, MR. KESSLER.  GO

AHEAD.

        **MR. KESSLER:**  THANK YOU, YOUR HONOR.  GOOD

AFTERNOON.

        WE ARE NOW, YOUR HONOR, AT THE POINT OF SUMMARY

JUDGMENT FROM A LEGAL STANDPOINT, I BELIEVE THIS IS THE DAY OF

RECKONING.

        YOU HAVE BEEN EXTRAORDINARILY GENEROUS, I THINK, IN

THIS CASE IN GIVING PLAINTIFFS NUMEROUS OPPORTUNITIES TO TRY TO

STATE THEIR CASE TO TRY TO COME FORWARD WITH EVIDENCE.  WE

BELIEVE THEY HAVE FAILED, AS WE SAID IN OUR PAPERS.  I KNOW YOU

READ THOSE PAPERS.  WHAT I'M GOING TO TRY TO DO IS TO HIGHLIGHT

THE FUNDAMENTAL REASONS WHY WE BELIEVE THAT SUMMARY JUDGMENT

IS, IN FACT, APPROPRIATE AT THIS STAGE OF THE CASE.  AND THERE

REALLY ARE FIVE ESSENTIAL POINTS HERE, YOUR HONOR, ALL OF WHICH

I BELIEVE THE EVIDENCE IS COMPLETELY ONE SIDED SO THAT THEY

ARE, IN EFFECT, UNDISPUTED.

1      WE'RE GOING TO HEAR ARGUMENT FROM COUNSEL FOR

2  PLAINTIFFS ABOUT WHY THEY WOULD LIKE TO DISPUTE THEM,

3  ALLEGATIONS, BUT I DO NOT BELIEVE THERE IS ANY EVIDENCE THAT

4  COULD ACTUALLY RAISE A GENUINE ISSUE ON ANY ONE OF THESE

5  POINTS.

6      THE FIRST POINT, YOUR HONOR, IS THAT THE GROUP

7  LICENSING AGREEMENTS THAT WERE SIGNED BY MR. ADDERLEY AND THE

8  CLASS MEMBERS, ON THEIR FACE, IF ONE THING ABOUT THEM IS

9  CLEAR -- AND I KNOW YOUR HONOR HAS OBSERVED THAT THERE ARE

10 PARTS OF THESE AGREEMENTS THAT ARE FAR FROM CLEAR -- BUT ONE

11 THING THAT IS CLEAR IS THAT THEY ONLY PROVIDE A CONTRACTUAL

12 RIGHT TO RECEIVE MONEY FROM THE GENERATION OF RETIRED PLAYER

13 LICENSING, NOT FROM ACTIVE PLAYER LICENSING.

14     AND THAT, YOUR HONOR, IS CLEAR IN GREENSPAN

15 DECLARATION EXHIBIT 5, WHICH CONTAINS THE GLA'S THAT WERE

16 SIGNED BY MR. ADDERLEY, AND THEY'RE ALL THE SAME FOR THIS

17 PURPOSE.

18     THE LANGUAGE IS UNCLEAR.  IT SAYS:

19     "IT IS FURTHER UNDERSTOOD THAT THE MONIES

20     GENERATED BY SUCH LICENSING OF RETIRED PLAYER GROUP

21     RIGHTS WILL BE DIVIDED," AND THEN IT GOES ON.

22     SO IT HAS TO BE MONEY GENERATED BY SUCH LICENSING OF

23 RETIRED PLAYER GROUP RIGHTS.  IF THERE ARE NO RETIRED PLAYER

24 RIGHTS INVOLVED, IF THE MONEY INVOLVED IS ONLY ACTIVE PLAYERS,

25 THERE IS NO CONTRACTUAL RIGHT TO THAT MONEY.  THAT IS ONE THING

1  THAT IS CRYSTAL CLEAR FROM THIS CONTRACTUAL ARRANGEMENT.

2          AND, SECONDARILY, YOUR HONOR, IF THERE WAS ANY DOUBT

3  ABOUT THIS, IS THAT THE ONLY PARTIES TO THIS AGREEMENT WHO'VE

4  TESTIFIED, BOTH THE PLAYERS ASSOCIATION AND MR. ADDERLEY HAVE

5  AGREED WITH THIS POINT.

6          I'M NOW GOING TO GREENSPAN DECLARATION EXHIBIT 4

7  WHICH IS MR. ADDERLEY'S TESTIMONY, AND AGAIN HE WAS ASKED VERY

8  SIMPLY:

9          "AT THE TIME YOU READ THE GROUP LICENSING

10         AGREEMENT IN 2001, IT'S YOUR SWORN TESTIMONY THAT YOU

11         THOUGHT THIS REFERRED TO THE LICENSING OF ACTIVE

12         PLAYER RIGHTS?"

13         AND HIS VERY CLEAR ANSWER WAS "NO."

14         THEN HE WAS ASKED:

15         "AND WHAT YOU THOUGHT YOU WERE AGREEING TO GET

16         WAS THAT, IF YOUR RIGHTS WERE LICENSED AND USED, YOU

17         WOULD GET SOME MONEY, CORRECT?

18         "CORRECT.

19         "AND THAT WAS YOUR UNDERSTANDING OF THIS

20         AGREEMENT?

21         "YES."

22         SO WHAT MR. ADDERLEY BELIEVED AND WHAT THE CONTRACT

23 SAID WAS THAT, IF RETIRED PLAYER RIGHTS WERE BEING LICENSED,

24 THEN HE WOULD GET PAID.  THIS BECOMES CRITICAL, YOUR HONOR,

25 BECAUSE ONCE IT'S UNEQUIVOCAL, IT'S THE ONLY EVIDENCE WE HAVE,

1  THE ONLY EVIDENCE WE HAVE THAT IT HAS TO BE RETIRED PLAYER

2  RIGHTS.  AND, BY THE WAY, YOUR HONOR, NOTHING ELSE MAKES SENSE,

3  BECAUSE YOU CAN IMAGINE, THERE ARE 1,000 RETIRED PLAYERS OUT

4  THERE; WHAT SENSE WOULD IT MAKE TO SAY ANY RETIRED PLAYER WHO

5  SIGNS A PIECE OF PAPER COULD GET A SHARE OF ACTIVE PLAYER

6  LICENSING MONEY?  THAT WOULD DESTROY THE ENTIRE ACTIVE PLAYER

7  LICENSING PROGRAM.

8       SO NOT ONLY IS THE LANGUAGE CLEAR, THE TESTIMONY

9  UNEQUIVOCAL, BUT, ALSO, IT MAKES NO SENSE WHAT THEY'RE SAYING.

10  SO THAT FIRST POINT, WE BELIEVE, IS UNDISPUTED.

11       ONCE THAT IS REALIZED, YOU COME -- YES.

12       **THE COURT:**  YOUR FIRST POINT IS THAT NEVER WAS A

13  SINGLE PENNY GENERATED FROM THE LICENSING OF RETIRED PLAYERS;

14  IS THAT IT?  GROUP --

15       **MR. KESSLER:**  I WILL GET TO THAT POINT, YOUR HONOR.

16  MY FIRST POINT IS ALL THEY COULD BE ENTITLED TO IS RETIRED

17  PLAYER MONEY.

18       MY POINT ON YOUR SECOND QUESTION JUST RAISED, WHICH

19  IS ACTUALLY MY THIRD POINT -- MY THIRD POINT IS WHENEVER

20  RETIRED PLAYER MONEY WAS GENERATED, IT WAS GIVEN TO THE RETIRED

21  PLAYERS, SO THAT THERE'S NOTHING DUE.  THAT'S REALLY THE POINT,

22  YOUR HONOR, NOT THAT THERE WAS NEVER ANY MONEY FROM RETIRED

23  PLAYER LICENSING.  THAT'S NOT THE MONEY THEY SEEK.

24       IT IS ABSOLUTELY UNDISPUTED, UNDISPUTED, YOUR HONOR,

25  THAT THERE WAS SOME RETIRED PLAYER MONEY, MOSTLY FOR THE STAR

1 RETIRED PLAYERS, THE JOE MONTANAS, THE PEOPLE LIKE THAT, SOME

2 OF WHOM SIGNED GLA'S AND SOME OF WHOM DID NOT SIGN GLA'S.  IT

3 WAS, BY THE WAY, YOUR HONOR, GROUP LICENSING, BECAUSE IT

4 INVOLVED SIX OR MORE PLAYERS.

5           BUT THERE IS NO DISPUTE HERE.  THEY DO NOT CLAIM

6 THAT ANY TIME THERE WAS MONEY GENERATED FOR THOSE RETIRED

7 PLAYER DEALS, WHAT THEY CALL THE AD HOC DEALS, ALL THAT MONEY

8 WENT TO THE RETIRED PLAYERS.  THEY DON'T SEEK IT.  THEY DON'T

9 COMPLAIN ABOUT IT.  SO THIS IS THE OPPOSITE OF THE CASE YOU

10 WOULD EXPECT.

11           THE CASE I THINK YOUR HONOR REALLY THOUGHT THIS WAS

12 ABOUT IN THE BEGINNING WAS THAT WE WERE USING RETIRED PLAYER

13 IMAGES, LICENSING IT, GETTING MONEY, AND SOMEHOW NOT GIVING THE

14 MONEY TO THE RETIRED PLAYERS, GIVING IT TO THE ACTIVE PLAYERS.

15 THERE'S NOT A SHRED OF EVIDENCE TO THAT, AND THEY DON'T CONTEND

16 THAT ANYMORE.  THEY AGREE, THEY HAVE NO COMPLAINT AGAINST ANY

17 OF THE AD HOC DEALS OR ANY OF THAT.

18           NOW, THEY DO DISAGREE THAT'S GROUP LICENSING.  THEY

19 GO, OH, NO, THAT'S NOT GROUP LICENSING BECAUSE THAT'S

20 INDIVIDUAL.  BUT IT'S SIX OR MORE PLAYERS, YOUR HONOR.  IF IT'S

21 SIX OR MORE PLAYERS, THAT IS GROUP LICENSING.  NOW, YOUR HONOR

22 COULD SAY, IF IT'S GROUP LICENSING, SAYS WHY DIDN'T IT GO

23 THROUGH THE GLA'S, WHY THESE ADDITIONAL DEALS?

24           AND IT'S VERY SIMPLE, YOUR HONOR.  THE LICENSEES

25 DIDN'T WANT MOST OF THE GLA PLAYERS.  THAT WAS UNFORTUNATE, BUT

1  IT WAS TRUE.  AS YOUR HONOR SAID, IF THEY DON'T WANT YOU, THE

2  MARKETPLACE DECIDES, DOESN'T MEAN YOU ARE ENTITLED TO ANYTHING.

3           SO THE LICENSEES WOULD SAY GIVE ME THESE 18 PLAYERS

4  FOR SOMETHING.  OKAY, WE LOOK AT IT.  OUT OF THOSE EIGHTEEN,

5  SIX OR SEVEN NEVER SIGNED GLA'S, LIKE A JOE MONTANA NEVER

6  SIGNED A GLA, SO WE HAVE TO GO GET AN INDIVIDUAL AGREEMENT.  SO

7  FOR THE REST WE WOULD ALSO GET INDIVIDUAL AGREEMENTS SO THEY

8  WOULD ALL BE TREATED THE SAME WAY.

9           WE COULD HAVE USED THEIR GROUP LICENSING

10 AUTHORIZATIONS FOR THEM, BUT WE DIDN'T DO THAT BECAUSE THIS

11 GAVE THEM MORE MONEY.  WHAT THEY GOT, JUST LIKE JOE MONTANA GOT

12 A HUNDRED PERCENT OF HIS MONEY, HERB ADDERLEY GOT A HUNDRED

13 PERCENT OF HIS MONEY IF HE BE SELECTED FOR ONE OF THESE DEALS.

14 SO HE GOT MORE MONEY THAN HE WOULD HAVE GOTTEN HAD WE PAID HIM

15 AND SAID, WE ARE GOING TO DO IT UNDER THE GROUP LICENSING

16 AGREEMENT, BECAUSE THAT'S GOING TO BE DIVIDED SOME WAY.

17           SO THIS WAS GROUP LICENSING, BUT HE ALWAYS GOT THE

18 MONEY.  SO THERE IS NO MONEY THAT NEVER WENT TO THE RETIRED

19 PLAYERS.  IT ALWAYS WENT TO THE RETIRED PLAYERS.  THE ONLY

20 MONEY THAT'S LEFT -- THIS WAS GOING TO BE MY SECOND POINT.

21 I'LL NOW MAKE IT MY THIRD -- IS THAT THE MONEY THAT THEY'RE

22 SEEKING IS CLEARLY UNDISPUTABLY, FROM THE RECORD, ACTIVE PLAYER

23 MONEY.

24           HOW DO WE KNOW THAT?  WELL, WE KNOW THAT FROM FIVE

25 OR SIX DIFFERENT SOURCES, ALL OF WHICH ARE THE SAME.  THE ONLY

1  THING WE HAVE CONTRARY TO THAT IS MR. KATZ'S ARGUMENT, WHICH IS

2  NOT ENOUGH, AND HIS CLAIM THAT ALL THE WITNESSES ARE LYING.

3       AND AS YOUR HONOR KNOWS, UNDER THE NINTH CIRCUIT

4  LAW, THE CASES *FAROUT PRODUCTS VERSUS OSAKA* (PHONETIC) -- MAYBE

5  FAROUT PRODUCTS IS A GOOD NAME FOR THAT CASE BECAUSE IT IS FAR

6  OUT TO TAKE THIS POSITION. YOU CAN'T SAY THEY'RE ALL LYING

7  AND, THEREFORE, HAVE A GENUINE ISSUE OF FACT. THAT DOESN'T CUT

8  IT AS A PLAINTIFF. THAT'S WHAT HIS POSITION IS.

9       SO HOW DO WE KNOW THIS? FIRST OF ALL, THE MONEY

10 THEY'RE SEEKING, THE SO-CALLED GLR POOL -- IT'S NOT REALLY A

11 POOL; IT'S A BUNCH OF ACCOUNTS THAT'S DISTRIBUTED TO THE ACTIVE

12 PLAYERS, EVERY ONE OF THOSE LICENSEES WHO HAVE TESTIFIED --

13 EVERY SINGLE ONE, THERE'S NO CONTRARY TESTIMONY -- HAS SAID

14 THAT MONEY WAS FOR ACTIVE PLAYER RIGHTS ONLY; THAT'S WHAT THEY

15 WERE BARGAINING FOR; THAT'S WHAT THEY WERE GETTING.

16      SO BOTH PARTIES TO THE AGREEMENT, ALL THE LICENSEES

17 AND PLAYERS, INC., AND THE NFLPA ALL SAY IT'S ONLY ACTIVE

18 PLAYER MONEY.

19      WHAT THE CASE LAW SAYS -- AND THEY REALLY CANNOT

20 DISTINGUISH THAT CASE LAW ON A BRIEF -- WHEN YOU HAVE TWO

21 PARTIES TO AGREEMENT OR ALL THE PARTIES TO AGREEMENT WHO AGREE

22 THIS IS WHAT SOMETHING MEANS IN THE LANGUAGE, IT SAYS A THIRD

23 PARTY DOESN'T COME IN AND SAY, NO, IT MEANS, I THINK, SOMETHING

24 ELSE. THEY HAVE NO BASIS FOR IT.

25      SO JUST ON THE TESTIMONY ALONE THIS SHOULD BE

1  SUMMARY JUDGMENT.  BUT THAT'S NOT ENOUGH.  BECAUSE YOU CAN GO

2  AND LOOK AT THE LANGUAGE ITSELF, AND IF YOU LOOK ACTUALLY AT

3  THE LANGUAGE OF ONE OF THESE AGREEMENTS -- MR. KATZ IS GOING TO

4  SAY IT'S CLEAR, IT MENTIONS RETIRED PLAYERS, IT MUST BE

5  CONVEYING RETIRED PLAYERS' RIGHTS.  BUT LET'S SEE WHAT THE

6  LANGUAGE ACTUALLY SAYS.  HE RARELY DISCUSSES THE ACTUAL WORDS.

7        **THE COURT:**  DO YOU HAVE ANOTHER COPY THAT I CAN --

8        **MR. KESSLER:**  YES, THIS IS, YOUR HONOR -- IT'S

9  GREENSPAN EXHIBITS -- I THOUGHT I WROTE THIS DOWN.  EXCUSE ME,

10 YOUR HONOR.  THE EA AGREEMENT, I THINK IS -- MAYBE WE CAN HAND

11 ONE UP TO THE COURT.

12       **THE COURT:**  I'LL FIND IT.

13       **MR. KESSLER:**  WHICH GREENSPAN EXHIBIT IS IT, DAVID?

14       **MR. GREENSPAN:**  I DON'T KNOW.  I HAVE AN EXTRA COPY.

15       **THE COURT:**  OKAY.

16       **MR. KESSLER:**  READING FROM THE EA ONE, BUT IT'S ALL

17 THE SAME.  IT'S THE SAME LANGUAGE.  WHAT IT SAYS IS AS FOLLOWS,

18 THERE'S A GRANTING LANGUAGE IN PARAGRAPH TWO, AND THE GRANTING

19 LANGUAGE SAYS:

20       "PLAYERS INC. HEREBY GRANTS TO LICENSEE, AND

21     LICENSEE HEREBY ACCEPTS THE EXCLUSIVE RIGHT LICENSE,"

22     ET CETERA, TO WHAT?  TO WHAT?  OKAY?

23       "... TO THE NAMES, LIKENESSES, PICTURES,

24     PHOTOGRAPHS, VOICES, FACSIMILE SIGNATURES, OR

25     BIOGRAPHICAL INFORMATION -- "

1           AND THIS IS THE KEY LANGUAGE:

2           "OF THE NFL PLAYERS REFERENCED IN PARAGRAPH 1A

3       ABOVE."

4           "THE NFL PLAYERS REFERENCED IN 1A ABOVE."

5           NOW, WHEN MR. LINZNER OF EA WAS ASKED ABOUT THAT, HE

6   SAYS, WHAT DOES THAT MEAN?  IT MEANS THE ACTIVE PLAYERS, THOSE

7   ARE THE NFL PLAYERS REPRESENTED IN 1(A) ABOVE.  IT DOESN'T SAY

8   THE RETIRED PLAYERS WHO ARE NOT IN THE NFL.  THAT'S HOW

9   EVERYONE UNDERSTOOD IT.

10          IF YOU LOOK TO 1(A) ABOVE, THERE ARE TWO SENTENCES.

11  THE FIRST SENTENCE IS WHAT'S BEING GRANTED.  IT SAYS:

12          "THE NFLPA HAS BEEN DULY APPOINTED AND IS ACTING

13      ON BEHALF OF THE FOOTBALL PLAYERS OF THE NATIONAL

14      FOOTBALL LEAGUE."

15          I WANT TO EMPHASIZE THAT, THE FOOTBALL PLAYERS OF

16  THE NATIONAL FOOTBALL LEAGUE.  THAT'S THE NFL PLAYERS BEING

17  REFERRED TO, THE FOOTBALL PLAYERS OF THE NATIONAL FOOTBALL

18  LEAGUE.  IT'S UNDISPUTED THOSE PLAYERS ARE ONLY ACTIVE PLAYERS

19  IN THE FIRST SENTENCE.  WHY?  BECAUSE IT REFERS TO THE

20  COLLECTIVE BARGAINING AGREEMENT AND THE ACTIVE PLAYER GLA,

21  WHICH IS ACTUALLY ATTACHED TO THAT.  SO WE KNOW THAT MEANS THE

22  ACTIVE PLAYERS.

23          NOW, THE SECOND SENTENCE SAYS, WHICH THEY POINT TO:

24      "LICENSEE ACKNOWLEDGES THAT PLAYERS, INC. ALSO ON

25      OCCASION -- " NOT HAS.

1    " —— ALSO ON OCCASION SECURES AUTHORIZATION FOR

2    INCLUSION IN PLAYERS, INC. LICENSING PROGRAMS FROM

3    PLAYERS, INCLUDING, BUT NOT LIMITED TO RETIRED

4    PLAYERS."

5        THAT'S WHAT THEY FOCUS ON.

6    " —— WHO HAVE NOT ENTERED INTO SUCH GROUP

7    LICENSING AUTHORIZATION BUT WHO, NEVERTHELESS,

8    AUTHORIZE PLAYERS, INC. TO REPRESENT SUCH PLAYERS FOR

9    DESIGNATED PLAYERS, INC. LICENSE PROGRAMS."

10        NOW WE BELIEVE THAT CLEAR IS REFERRING TO THE

11   INDIVIDUAL AGREEMENTS THAT WE GET FROM TIME TO TIME FOR RETIRED

12   PLAYERS.  BUT IF THIS WAS EVEN CLOSE TO AMBIGUOUS, THEN IT'S

13   RESOLVED BY THE TESTIMONY OF THE LICENSEES.

14        SO YOUR HONOR DOESN'T HAVE TO FIND THAT IT'S CRYSTAL

15   CLEAR HERE.  ALL YOUR HONOR HAS TO SAY IS THAT IT'S AT LEAST

16   AMBIGUOUS.  AND IF IT'S AMBIGUOUS, WHAT THE CASE LAW SAYS IS

17   THAT IT'S RESOLVED CONCLUSIVELY AS A MATTER OF LAW BY THE FACT

18   THAT EA, TOPPS, UPPER DECK, FAT HEAD, STATS, EVERY ONE OF THESE

19   LICENSEES SAYING, WE ONLY BOUGHT ACTIVE PLAYER RIGHTS.

20        THE OTHER THING THAT'S SIGNIFICANT, YOUR HONOR,

21   THERE IS ANOTHER PART OF THIS AGREEMENT CALLED "APPROVALS,"

22   PARAGRAPH 12 IN ALL THESE AGREEMENTS.  PARAGRAPH 12 SAYS, WE

23   HAVE A LIST OF ALL THE PLAYERS WE'RE LICENSING ON OUR WEBSITE,

24   COME LOOK AT IT SO YOU KNOW WHO YOU'RE GETTING.  GUESS WHAT?

25   IT'S UNDISPUTED, THE ONLY PLAYERS ON THOSE WEBSITES IS ACTIVE

1  PLAYERS.  THERE ARE NO RETIRED PLAYERS ON THAT WEBSITE OR THAT

2  LIST.

3          SO IF YOU'RE READING THE AGREEMENT AS A WHOLE

4  CONSISTENT WITH THIS, IT HAS TO BE THAT THIS IS ALL ACTIVE

5  PLAYER MONEY.

6          NOW, IF THERE WAS ANY DOUBT ABOUT THAT, WE ALSO

7  COULD LOOK AT, DOES THIS MAKE ANY SENSE, BECAUSE THE CASE LAW

8  SAYS YOU WOULDN'T READ THIS AGREEMENT IN A WAY THAT MAKES NO

9  SENSE.

10          SO, FIRST OF ALL, WHAT MAKES NO SENSE?  ONE THING

11  IS, MANY OF THE AGREEMENTS THEY CHALLENGE ARE OUR FANTASY

12  FOOTBALL GAMES.  FANTASY FOOTBALL GAMES, YOUR HONOR -- THOSE

13  ARE THE PRODUCTS -- ARE PRODUCTS OF TODAY'S ACTIVE PLAYERS THAT

14  PEOPLE PARTICIPATE IN.  THEY MAKE UP TEAMS, AND, AS THE SEASON

15  GOES ON, THEY LOOK AT THE STATISTICS, AND THEY GET PRIZES, OR

16  THEY HAVE CONTESTS WITH EACH OTHER.  YOU CAN'T HAVE RETIRED

17  PLAYERS IN THAT.  THEY DON'T PLAY.  SO THERE'S NO FANTASY

18  ELEMENT TO THEM.

19          THEY COME BACK AND SAY, WELL, WE LOOKED AT STATS

20  WEBSITE, AND THEY HAVE SOME RETIRED PLAYER STATISTICS.  NOT IN

21  THEIR FANTASY GAME PRODUCT.  THEY DO OTHER WEBSITE PRODUCTS,

22  HAVE NOTHING TO DO WITH US.  WE ONLY LICENSE A FANTASY GAME

23  PRODUCT.  MAKES NO SENSE.

24          WE LICENSE DRAFT PICKS FOR ROOKIES.  HOW CAN YOU

25  HAVE RETIRED PLAYERS WHEN WE ARE LICENSING ONLY TO BE USED THE

1 RIGHTS IN DRAFT PICKS?  SO, AGAIN, NONE OF THIS MAKES ANY

2 SENSE.

3          THIRD POINT IS WHEN SOMEONE LIKE AN EA WANTED TO USE

4 THE RETIRED PLAYERS, A SMALL GROUP, OR UPPER DECK, WHAT DID

5 THEY DO?  AND THIS IS UNDISPUTED.  THEY PAID THE RETIRED

6 PLAYERS MONEY AND ENTERED INTO THESE SEPARATE AGREEMENTS.

7          IF THEY ALREADY HAD THE RIGHTS, AS MR. KATZ

8 CONTENDS, TO THESE RETIRED PLAYERS THROUGH THIS LANGUAGE, WHY

9 WERE THEY PAID TWICE?  WHAT SENSE WOULD IT MAKE TO PAY TWICE?

10 MR. KATZ SAID THEY DIDN'T KNOW THEY HAD THE RIGHTS TO RETIRED

11 PLAYERS.  IF THEY DIDN'T KNOW AND IF THE PLAYERS, INC. DIDN'T

12 LICENSE IT TO THEM, WHO KNOWS?  MR. KATZ KNOWS BECAUSE HE SAYS

13 SO?  IT DOESN'T CREATE A GENUINE ISSUE OF FACT.

14          SO, FINALLY, TO SHOW YOU HOW ABSURD THEIR ARGUMENTS

15 GO, THEY EVEN TAKE AGREEMENTS THAT DON'T MENTION THE WORD

16 RETIRED PLAYERS.  THEY HAVE AGREEMENTS LIKE THE NFL SPONSORSHIP

17 AGREEMENT THAT SAYS NOTHING ABOUT RETIRED PLAYERS.  THEY HAVE

18 OTHER LICENSES THAT DON'T EVEN USE THIS LANGUAGE THAT MENTIONS

19 RETIRED PLAYERS.

20          THEY JUST WANT ALL THE ACTIVE PLAYERS' MONEY, AND

21 THEY COME UP WITH THIS HUGE CLAIM BASED ON ABSOLUTELY NO

22 CONNECTION AT ALL.

23          AND, SO, AGAIN, YOUR HONOR, WE SAY YOU ADD THESE

24 THREE THINGS TOGETHER THAT:  FIRST, THEY ONLY -- THEY'RE ONLY

25 ENTITLED TO RETIRED PLAYER MONEY; SECOND, THAT WHENEVER THERE

1   WAS RETIRED PLAYER MONEY IT WAS PAID TO THEM; AND, THIRD, THAT

2   ALL THE MONEY THEY'RE SEEKING, THEY'RE ENTIRE DAMAGE CLAIM FOR

3   MR. ROWLEY IS SOLELY BASED ON GETTING A SHARE OF THE ACTIVE

4   PLAYER MONEY.  THAT'S A HUNDRED PERCENT.  THEN IT CAN'T BE A

5   BREACH OF CONTRACT CLAIM HERE.  NOTHING AT ALL WAS BREACHED.

6         I'D ALSO NOTE, YOUR HONOR, THAT THEY SAY THEY CLAIM

7   THIS ACTIVE PLAYER MONEY IS THE, QUOTE, ESCROW FUND.  THERE'S

8   NO EVIDENCE OF THAT.  THAT'S JUST WHAT MR. KATZ SAYS.  THERE'S

9   NO ESCROW AGREEMENT.  THERE'S NO ESCROW AGENT.  THERE'S NO

10   ATTRIBUTES OF A ESCROW FUND.  THERE'S NO SEPARATE FUND SET UP.

11   HE'S JUST, YOUR HONOR, MAKING THAT UP.

12         HE COULD SAY IT A HUNDRED TIMES, BUT THERE'S NO

13   EVIDENCE OF IT.  ASK HIM WHERE THE EVIDENCE IS WHEN HE GETS UP,

14   THAT THAT'S THE ESCROW FUND.  THERE'S NO REFERENCE TO IT.  ALL

15   IT IS IS A BUNCH OF BANK ACCOUNTS WHERE THE LICENSING MONEY

16   GOES IN AND THEY FIGURE OUT HOW TO DIVIDE IT UP TO THE ACTIVE

17   PLAYERS.  THERE'S NO ESCROW FUND CREATED.

18         YOUR HONOR CAN SAY, WHY ISN'T THERE AN ESCROW FUND;

19   THERE HAS TO BE AN ESCROW FUND?  THE REASON IS BECAUSE ALL THE

20   RETIRED PLAYER MONEY WAS PAID OUT TO THE RETIRED PLAYERS, SO

21   THERE'S NOTHING TO PUT INTO A FUND.

22         THERE CAN BE NO INJURY CLAIM, AND THERE IS NONE,

23   JUST FROM NOT HAVING A FUND.  THE QUESTION IS, WAS THERE ANY

24   MONEY?  AND THEY HAVE NO EVIDENCE THAT THERE'S A SINGLE DOLLAR

25   OF MONEY THAT WASN'T PAID OUT.  IN FACT, IF ANYTHING, THE

1 RETIRED PLAYERS -- BECAUSE, FRANKLY, THE ACTIVE PLAYERS FELT

2 BADLY FOR THE RETIRED PLAYERS, THEY GOT PAID OUT A HIGHER

3 PERCENTAGE THAN THE ACTIVE PLAYERS.

4 　　　　　THE RETIRED PLAYERS GOT PAID ALMOST $30 MILLION,

5 THOSE WHOSE RIGHTS WE USED, OVER THIS PERIOD, ALMOST $30

6 MILLION.  OKAY?  AND IT WAS PAID OUT ABOUT 97 PERCENT.  THIS

7 WAS UNDISPUTED.  THREE PERCENT WAS KEPT, A TINY AMOUNT FOR SOME

8 ADMINISTRATIVE COSTS AND THINGS LIKE THAT.

9 　　　　　THE ACTIVE PLAYERS GET A MUCH SMALLER PERCENT

10 BECAUSE THAT'S WHAT THE ACTIVE PLAYERS VOTED TO TAKE FOR

11 THEMSELVES.

12 　　　　　THIS IS, AGAIN, A CLASSIC EXAMPLE OF NO GOOD DEED

13 GOES UNPUNISHED.  THE NFLPA IS THE ONLY UNION OF ALL THE SPORTS

14 UNIONS WHO HAVE TRIED TO DO SOMETHING FOR THE RETIRED PLAYERS,

15 AND WHAT THEY GET BACK IN TURN IS A CASE LIKE THIS THAT MAKES

16 ABSOLUTELY NO SENSE.

17 　　　　　THAT BRINGS ME, YOUR HONOR -- AND I WANT TO BE

18 CLEAR, FINALLY, ON THE NO BREACH.  WE ARE NOT CLAIMING, AS

19 MR. KATZ HAS SAID, THAT WE HAVE DISCRETION, SO OUR CLAIM IS

20 THERE'S RETIRED PLAYER MONEY, BUT THEY'RE NOT ELIGIBLE FOR IT.

21 THAT'S NOT THE FACTS.

22 　　　　　THERE IS NO RETIRED PLAYER MONEY.  IF THERE WAS

23 RETIRED PLAYER MONEY, WE AGREE THEY WOULD BE ENTITLED TO GET

24 THAT RETIRED PLAYER MONEY.  WE NEVER MADE ANY OTHER CLAIM.  HIS

25 PROBLEM IS HE CAN'T FIND ANY EVIDENCE OF RETIRED PLAYER MONEY

1 THAT HASN'T BEEN PAID.

2 THAT BRINGS ME TO BREACH OF FIDUCIARY DUTY, YOUR

3 HONOR, TWO POINTS -- THREE POINTS THERE.

4 ONE IS ALL THE REASONS WE JUST WENT THROUGH SHOWING

5 THERE'S NO BREACH, BECAUSE IF IT IS ALL ACTIVE PLAYER MONEY, IT

6 CAN'T BE A BREACH OF DUTY TO NOT GIVE TO THE RETIRED PLAYERS

7 MONEY THAT BELONGS TO SOMEBODY ELSE.  THAT -- NO VIEW OF BREACH

8 OF DUTY WOULD BE YOUR DUTY IS TO GIVE YOU SOMEBODY ELSE'S

9 MONEY.  IT MAKES NO SENSE.

10 BUT MORE FUNDAMENTALLY, THERE'S NO DUTY.

11 WHEN YOUR HONOR ALLOWED THE BREACH OF FIDUCIARY DUTY

12 CASE TO GO FORWARD, YOU WERE APPLYING CALIFORNIA LAW, AND YOU

13 ALLOWED IT UNDER CERTAIN THEORIES.  NOW YOUR HONOR HAS RULED

14 IT'S GOT TO BE VIRGINIA OR D.C. LAW.

15 THE CONSEQUENCE OF THAT AND THE CONSEQUENCE OF YOUR

16 CLASS CERTIFICATION DECISION IS THEY'RE ONLY LEFT WITH ONE MORE

17 THEORY OF BREACH OF FIDUCIARY DUTY.  THAT'S EXPRESS AGENCY.

18 UNDER BOTH D.C. AND VIRGINIA LAW, WE CITED THE CASES ON PAGE 30

19 TO 31 OF OUR MOTION, WHICH IS THE *MURPHY* CASE, THE *AMES* CASE,

20 SEVERAL OTHER CASES, UNDER BOTH OF THOSE YOU MUST HAVE CONTROL

21 OVER THE DAY-TO-DAY ACTIVITIES OF THE AGENT FOR THERE TO BE A

22 FIDUCIARY DUTY.

23 IT IS NOT ENOUGH TO HAVE THE SUPPOSED RIGHT TO

24 TERMINATE.  AND, BY THE WAY, UNDER THE GLA THEY HAVE NO RIGHT

25 TO TERMINATE.  IT'S A THREE-YEAR CONTRACT.  IT'S FOR A TERM.

1    IT'S FOR A SPECIFIC TERM.  EVEN IF THEY COULD TERMINATE, THAT'S

2    NOT SUFFICIENT CONTROL.  IT'S NOT ENOUGH THAT THEY'RE A

3    LICENSING AGENT.  THE *MURPHY* CASE IS RIGHT ON POINT, AS IS THE

4    *AMES* CASE.  THIS ISN'T ENOUGH.

5            SO THEY CAN'T RAISE ANY GENUINE ISSUE OF FACT ON

6    CONTROL, AND, THEREFORE, THERE COULD BE NO DUTY UNDER BREACH OF

7    FIDUCIARY DUTY CLAIM.

8            NOW, FINALLY, YOUR HONOR, TWO MORE POINTS ON BREACH

9    OF FIDUCIARY DUTY.

10           YOU MAY HEAR CLAIMS ABOUT THE $8 MILLION THAT THEY

11   SAY IMPROPERLY WE ALLOCATED THE 40 PERCENT THAT WAS KEPT FOR

12   THE NFLPA, THAT THAT'S TOO MUCH, AND THAT'S A BREACH OF DUTY.

13           WHAT THE UNDISPUTED FACTS SHOW IS THE FOLLOWING:

14   SINCE THIS WAS ALL ACTIVE PLAYER MONEY -- THAT'S ALL WE ARE

15   TALKING ABOUT -- THE ACTIVE PLAYER BOARD OF PLAYER

16   REPRESENTATIVES, ELECTED BY THE ACTIVE PLAYERS, MET EACH YEAR

17   IN HAWAII AT THEIR MEETING, AND THEY VOTED WHAT THE PERCENTAGE

18   SPLIT SHOULD BE BETWEEN THE NFLPA, THE PLAYERS, THE ACTIVE

19   PLAYERS, AND PLAYERS, INC., BECAUSE THEY'RE USING THIS MONEY TO

20   SUPPORT THEIR UNION.  THERE'S NOTHING WRONG WITH THE ACTIVE

21   PLAYERS TAKING THEIR OWN MONEY AND DECIDING HOW MUCH OF THAT

22   SHOULD GO TO THEIR UNION AND HOW MUCH OF IT SHOULD GO TO THEM.

23   HOW COULD THAT BE A BREACH OF FIDUCIARY DUTY?

24           IF THIS WAS RETIRED PLAYER MONEY, AGAIN, I COULD

25   UNDERSTAND THEIR COMPLAINT, BUT IT'S THE SAME ACTIVE PLAYER

1   MONEY.  THERE'S NO EVIDENCE THAT ANY RETIRED PLAYER MONEY WAS

2   DIVERTED FOR ANY PURPOSE AT ALL.  SO THE 40 PERCENT CLAIM THAT

3   THAT'S TOO HIGH A PERCENTAGE, THE CLAIM ABOUT $8 MILLION, ALL

4   OF THIS WAS THE ACTIVE PLAYERS THEMSELVES DECIDING THIS IS HOW

5   THEY WANTED TO DIVIDE UP THEIR MONEY.  CAN'T BE A BREACH OF

6   FIDUCIARY DUTY.

7           THEY ALSO RAISE -- TO SHOW YOU WHERE THEY ARE, YOUR

8   HONOR, IN DESPERATION -- NOW IN THEIR BRIEF THE HALL OF FAME

9   AGREEMENT.  WE MAY HEAR ABOUT THAT IN MR. KATZ'S ARGUMENT.

10          THE HALL OF FAME AGREEMENT IS ONE OF THESE AD HOC

11  DEALS.  THEY SAY THROUGHOUT THEY ARE NOT CLAIMING ANYTHING

12  WRONG FROM THE AD HOC DEALS; THEY ARE NOT SEEKING ANY DAMAGES

13  FROM THE AD HOC DEALS.  NOTHING.  THEIR DAMAGE STUDY BY

14  MR. ROWLEY ATTRIBUTES NO INJURY TO THE AD HOC DEALS.  HOW COULD

15  THEY NOW COME IN IN THEIR OPPOSITION AND SAY, OH, HERE'S AN

16  E-MAIL ABOUT AN AD HOC DEAL INVOLVING THE HALL OF FAME THAT

17  MUST SHOW THERE'S A BREACH OF DUTY?

18          IT MAKES ABSOLUTELY NO SENSE, YOUR HONOR.  THAT DEAL

19  ONLY INVOLVES 17 CLASS MEMBERS, 17.  IF YOU WERE LOOKING AT

20  EACH AD HOC DEAL, YOU COULDN'T CERTIFY A CLASS.  YET THEIR

21  CLAIM IS THAT PARTICULAR DEAL SHOULD HAVE BEEN MORE MONEY.

22  THAT'S NOT THEIR CLAIM IN THIS CASE.  THEY'RE JUST DESPERATE TO

23  THROW ANYTHING IN THE RECORD, NO MATTER WHAT ITS RELEVANCE IS

24  HERE.

25          THERE MAY BE DISPUTED ISSUES ABOUT THAT DEAL, BUT

1  THEY'RE NOT MATERIAL TO THIS MOTION, BECAUSE THE AD HOC DEALS

2  ARE NOT PART OF THIS CASE, THEY ARE NOT PART OF THIS MOTION,

3  THEY DON'T INVOLVE A CLASSWIDE ISSUE.  FINALLY, THEY SAY, WELL,

4  YOU DIDN'T MARKET ENOUGH.  WELL, THAT'S OKAY TO SAY IT.

5  WHERE'S THEIR EVIDENCE?  THEY HAVE NO EVIDENCE WE DIDN'T MARKET

6  ENOUGH.

7          FOR THE GROUPS OF PLAYERS WHO WERE WANTED WE

8  GENERATED ALMOST $30 MILLION.  THAT'S ALL THE EVIDENCE.  ALL

9  THE EVIDENCE WE PUT IN, OUR PEOPLE TALKING ABOUT HOW THEY TRIED

10 TO MARKET THE RETIRED PLAYERS.  THEY HAVE NO EVIDENCE TO THE

11 CONTRARY.  THEY JUST SAY, WE DON'T THINK IT'S ENOUGH.  THAT'S

12 NOT EVIDENCE.  WHERE'S THE WITNESS?  WHERE'S THE TESTIMONY?

13 WHERE'S THE DOCUMENT?  THEY DON'T HAVE THAT TO FIGHT OFF

14 SUMMARY JUDGMENT.

15          AND THEN IN THE END, THEY HAVE NO EVIDENCE OF

16 INJURY.  EVEN IF YOU THOUGHT THAT, WELL, MAYBE THERE'S A

17 GENUINE ISSUE, WE DIDN'T MARKET ENOUGH.  WHAT WOULD BE THE

18 EVIDENCE OF INJURY?  IT WOULD BE DIFFERENT FOR EVERY PLAYER.

19 IF YOU DON'T MARKET JOE MONTANA, IT IS DIFFERENT IF YOU DON'T

20 MARKET ME.  IT WOULD BE A DIFFERENT INJURY CALCULATION.

21          THE ONLY INJURY CALCULATION THEY PUT IN IS THE EQUAL

22 SHARE OF THE ACTIVE PLAYER MONEY.  HOW COULD YOU POSSIBLY LINK

23 THAT TO ANY INDIVIDUAL BREACH CLAIM ABOUT MARKETING EFFORT OR

24 SOMETHING LIKE THAT?  YOU CAN'T.  AND THEY -- IT'S AN ELEMENT

25 OF PROOF OF LIABILITY AND BREACH OF FIDUCIARY DUTY.  THERE MUST

1  BE INDIVIDUAL INJURY IN SOME WAY.

2           I KNOW YOUR HONOR IN YOUR CLASS RULING SAID, WE'LL

3  GET TO THAT ISSUE LATER, IT MAY OR MAY NOT WORK.  IT CLEARLY

4  CAN'T WORK HERE TO SATISFY THEIR INJURY ELEMENT.

5           THEIR EXPERT, MR. ROWLEY, IN HIS REPORT SAID, AND WE

6  QUOTED THIS IN OUR PAPERS, HE'S ASSUMING CAUSATION.  WELL, IT'S

7  ALL NICE, THEY HAVE A DAMAGE EXPERT WHO ASSUMES CAUSATION.

8  THEY HAVE NO EVIDENCE OF CAUSATION, AND THEY CAN'T, BECAUSE THE

9  SAD REALITY IS FOR MOST OF THE CLASS MEMBERS, NO ONE WANTS

10 THEIR RIGHTS, THEY'RE NOT IN DEMAND, THEY GENERATED NO MONEY,

11 AND, THEREFORE, THEY GOT NO MONEY.

12          FOR THOSE CLASS MEMBERS WHOSE RIGHTS WERE IN DEMAND,

13 THEY GOT THEIR MONEY.  IT WENT THROUGH THE AD HOC DEALS IN

14 GROUP LICENSING, AND THEY GOT EVERY NICKEL, AND THEY DON'T

15 CLAIM THEY WERE DENIED A NICKEL, INCLUDING MR. ADDERLEY, WHO

16 GOT THOUSANDS OF DOLLARS AS A RESULT OF HIS RIGHTS.

17          YOUR HONOR, WE BELIEVE -- AND I APOLOGIZE FOR TAKING

18 THIS MUCH TIME, BECAUSE I KNOW YOU SAID WE WERE PRESSED FOR

19 TIME -- IS WE BELIEVE IT'S TIME TO BRING THIS MATTER TO AN END.

20 YOU'VE GIVEN EVERY POSSIBLE CHANCE.  SUMMARY JUDGMENT REQUIRES

21 THEM, YOUR HONOR, TO COME FORWARD WITH EVIDENCE, NOT

22 ALLEGATIONS.

23          THEY COULD GET ONE LAST CHANCE NOW, YOUR HONOR,

24 BEFORE YOU.  WHAT I WOULD PLEASE ASK, IF MR. KATZ MAKES A

25 CLAIM, ASK HIM TO SHOW YOU THE DOCUMENT OR THE TESTIMONY AND

1  LOOK AT IT.  AND I AM WILLING TO STATE THAT IT WILL NOT SUPPORT

2  THE CLAIM HE'S MAKING, NOTHING HE'S IDENTIFIED IN HIS BRIEFS OR

3  OPPOSITION TO SUMMARY JUDGMENT.

4          DOES YOUR HONOR HAVE ANY QUESTIONS?

5      **THE COURT:**  I HAVE ONE.  IT'S A DIFFERENT QUESTION.

6  BUT ON THE CLASS NOTICE, WHERE DOES THAT STAND?

7      **MR. KESSLER:**  THE CLASS NOTICE?

8      **THE COURT:**  HAS THAT GONE OUT, AND HAS THE OPT-OUT

9  PERIOD PASSED?

10     **MR. KESSLER:**  HAS THE OPT-OUT PERIOD PASSED?

11     **MR. KATZ:**  THE OPT-OUT PERIOD PASSES ON AUGUST 15,

12 YOUR HONOR.

13     **THE COURT:**  BUT THE NOTICE HAS GONE OUT?

14     **MR. KESSLER:**  THE NOTICE HAS GONE OUT, YOUR HONOR.

15     **THE COURT:**  THANK YOU.

16     **MR. KESSLER:**  THANK YOU, YOUR HONOR.

17     **THE COURT:**  ALL RIGHT.  LET'S HEAR FROM MR. KATZ.

18         I WOULD LIKE TO ASK YOU, MR. KATZ, TO CITE TO

19 SPECIFIC EVIDENCE THAT YOU -- IF WE WERE TO HAVE A TRIAL, LAY

20 OUT THE EVIDENCE THAT YOU HAVE NOW.  THIS IS THE TIME -- THIS

21 IS WHAT JUDGE ORRICK USED TO CALL SHOW TIME.  IT IS YOUR BURDEN

22 TO TELL US WHAT THE EVIDENCE IS THAT I THINK WARRANTS

23 CONTINUING THE CASE.

24     **MR. KATZ:**  BUT I TAKE IT YOUR HONOR'S NORMAL

25 PROCEDURE IS YOU DON'T WANT ME TO REPEAT WHAT'S IN OUR PAPERS,

1  I PRESUME.

2          **THE COURT:**  I DON'T.  I'VE HEARD A LOT FROM

3  MR. KESSLER WHICH WAS IN HIS BRIEF.  I AM INTERESTED IN HEARING

4  EVIDENCE.

5          **MR. KATZ:**  SURE.

6          **THE COURT:**  SO YOU EVEN -- IF THAT MEANS REPEATING,

7  I'D LIKE TO HEAR THE ESSENCE OF THE CASE YOU ARE GOING TO BE

8  MAKING AT TRIAL.

9          **MR. KATZ:**  I'LL RESPOND TO EVERY POINT HE MADE, YOUR

10  HONOR.

11          ALTHOUGH IT'S DIFFICULT TO LITIGATE A MASTERPIECE OF

12  OBFUSCATION, AND, QUITE FRANKLY, DEFENDANT'S DISCOVERY TACTICS

13  IMPEDED US, I AM IN A POSITION TODAY, RIGHT NOW, TO CRACK THIS

14  CASE WIDE OPEN.  TO DO THAT I WOULD LIKE TO FOCUS ON THE

15  BIGGEST CONTRACT, ELECTRONICS ARTS, 45 PERCENT OF THE DAMAGES

16  HERE.

17          WE START WITH THE GLA.  YOUR HONOR IS WELL FAMILIAR

18  WITH THAT AND WHAT IT SAYS IS THAT -- IT DEFINES, GIVES THE

19  ONLY DEFINITION OF A GROUP LICENSING AGREEMENT.  SIX OR MORE

20  PRESENT OR FORMER NFL PLAYER IMAGES IN CONJUNCTION WITH OR ON

21  PRODUCTS THAT ARE SOLD AT RETAIL OR USED AS PROMOTIONAL OR

22  PREMIUM ITEMS.  YOU COULD HAVE SIX ACTIVE, YOU COULD HAVE SIX

23  RETIRED, YOU COULD HAVE THREE ACTIVE, THREE RETIRED.  ANYTHING

24  TRIGGERS IT.

25          THEY DRAFTED THAT LANGUAGE.  IT MUST BE CONSTRUED

1    AGAINST THEM.  THAT'S THE ONLY DEFINITION OF GROUP LICENSING.

2           THEN WE GO TO THE PAYMENT PART OF THE GLA, WHICH

3    SAYS:

4           "IT IS FURTHER UNDERSTOOD THAT THE MONIES

5        GENERATED BY SUCH LICENSING -- "

6           THERE'S ONLY ONE KIND OF LICENSING, AND THAT'S THE

7    SIX OR MORE PRESENT OR FORMER.

8           " -- SUCH LICENSING OF RETIRED PLAYER GROUP

9        RIGHTS WILL BE DIVIDED BETWEEN THE PLAYER AND AN

10       ESCROW ACCOUNT FOR ALL ELIGIBLE NFLPA MEMBERS WHO

11       HAVE SIGNED A GROUP LICENSING AUTHORIZATION FORM."

12          NOW, THE PARTIES DIFFER IN HOW THAT LANGUAGE IS

13   INTERPRETED.  WE SAY SUCH LICENSING CAN ONLY REFER TO SIX OR

14   MORE, PRESENT OR FORMER, BECAUSE THAT'S THE ONLY KIND THERE IS,

15   AND THEY FOCUS ON THE RETIRED PLAYERS.  WE SHOULD WIN THAT ONE

16   WAY OR THE OTHER.  I THINK WE'RE RIGHT.  BUT IF WE'RE NOT,

17   AMBIGUITY IS CONSTRUED AGAINST THEM.

18          LET'S TAKE IT THEIR WAY.  LET'S TAKE IT THEIR WAY.

19   LET'S SAY IT'S JUST SIX OR MORE RETIRED PLAYERS, AND, AGAIN,

20   FOCUSING ON EA.  IT IS UNDISPUTED, YOUR HONOR, THAT IN THE EA

21   GAME, THEY USE SIX OR MORE RETIRED PLAYERS.  IN FACT, THEY USE

22   148 RETIRED PLAYERS FROM THE HALL OF FAME.  I HAVE THE SCREEN

23   SHOTS.  THERE'S MR. ADDERLEY.  THERE'S MR. BELITNIKOV.  THERE'S

24   MR. HENDRICKS, LOFTON.  THERE'S 148 OF THEM.  SINGLETARY.

25   THERE IS NO DOUBT THERE IS -- THERE'S MORE THAN SIX.  OKAY?  SO

1    THAT TRIGGERS IT.

2             ONCE YOU HAVE SIX OR MORE RETIRED PLAYERS, THAT

3    AGREEMENT, EVEN BY THEIR INTERPRETATION, WHICH I THINK IS

4    ABSURD, BUT EVEN BY THEIR INTERPRETATION, IT'S TRIGGERED, AND

5    ALL THAT MONEY, THEREFORE, MUST GO INTO AN ESCROW FUND THAT

6    WILL BE DIVIDED BETWEEN THE PLAYER -- BE DIVIDED BETWEEN THE

7    PLAYER ESCROW ACCOUNT FOR ALL ELIGIBLE NFLPA MEMBERS.

8             HE SAYS THEY DIDN'T CREATE AN ESCROW FUND.  THERE IS

9    AN ESCROW FUND.  THERE IS ONLY ONE ESCROW FUND.  MR. EYRICH

10   TESTIFIED TO IT.  HE'S THEIR 30(B)(6) WITNESS.  HE'S THEIR

11   ACCOUNTANT.  THERE IS ONLY ONE ESCROW FUND, AND THAT IS THE

12   EQUAL SHARE FUND.  THAT IS IT.

13            SO I'M NOT MAKING A WILD GUESS, BUT IT'S VERY ODD,

14   VERY, VERY ODD THAT HIS DEFENSE IS, YEAH, WE BREACHED, WE JUST

15   DIDN'T CREATE AN ESCROW FUND.  THAT'S NOT A DEFENSE; THAT'S A

16   BREACH.  THAT'S A BREACH.

17            **THE COURT:**  MAY I ASK YOU A QUESTION?  THERE'S

18   PROBABLY A SIMPLE ANSWER.  NFLPA MEMBERS CAN BE ACTIVE AS WELL

19   AS RETIRED; IS THAT CORRECT?

20            **MR. KATZ:**  CORRECT.  YES, YOUR HONOR.  BUT ONLY THE

21   ACTIVES HAVE VOTES.

22            **THE COURT:**  ONLY WHAT?

23            **MR. KATZ:**  ONLY THE ACTIVE PLAYERS HAVE VOTES.

24            **THE COURT:**  ALL RIGHT.  BUT YOU CAN STILL BE A

25   MEMBER AND BE RETIRED; IS THAT CORRECT?

1     **MR. KATZ:** YOU CAN BE A MEMBER AND BE RETIRED, YES.

2     **THE COURT:** ALL RIGHT. OKAY.

3     **MR. KATZ:** BUT YOU ARE NOT ELIGIBLE. BEHIND OUR

4  BACKS THEY DEFINED ELIGIBILITY. I WILL GET TO THAT LATER. LET

5  ME FINISH THAT POINT, BECAUSE I'M ALMOST FINISHED WITH IT.

6     **THE COURT:** I WANT TO MAKE SURE I GOT THIS. YOU'RE

7  SAYING THAT EA CAME OUT WITH A GAME CALLED HALL OF FAME.

8     **MR. KATZ:** THERE'S ONLY ONE GAME. MADDEN 2008,

9  MADDEN 2007. AND PART OF THAT GAME IS THE VINTAGE GAMES. IF

10 YOU WANT TO BE THE '84 49ERS, YOU CAN BE THE '84 49ERS. IF YOU

11 WANT TO PLAY THE AFC ALLSTARS AGAINST THE NFC ALLSTARS, YOU CAN

12 DO IT. THERE'S NO QUESTION. THERE'S 148 RETIRED PLAYERS IN

13 THAT GAME. THEY ARE HALL OF FAMERS.

14     **THE COURT:** SO YOUR POSITION IS THAT THAT WOULD THEN

15 BE A GROUP LICENSE PROGRAM?

16     **MR. KATZ:** ABSOLUTELY.

17     **THE COURT:** BECAUSE LICENSEE, MEANING EA, UTILIZED A

18 TOTAL OF SIX OR MORE PRESENT OR FORMER NFL PLAYER IMAGES IN

19 CONJUNCTION WITH OR ON PRODUCTS THAT ARE SOLD AT RETAIL OR USED

20 AS A PROMOTIONAL OR PREMIUM ITEM. YOU ARE SAYING THAT ONE

21 PARTICULAR GAME THERE -- WHAT'S IT CALLED AGAIN?

22     **MR. KATZ:** THIS IS ONE OF THE VINTAGE GAMES. THIS

23 IS MADDEN 2007, YOUR HONOR.

24     **THE COURT:** ANYWAY, THAT GAME HAS 148 RETIRED

25 PLAYERS?

1    **MR. KATZ:** THAT'S MORE THAN SIX. I MEAN, MY

2  POSITION WOULD BE EVEN MORE THAN SIX ACTIVE PLAYERS TRIGGERS IT

3  BECAUSE IT SAYS SIX OR MORE FORMER OR PRESENT PLAYERS.

4         BUT PUT THAT ASIDE. LET'S FOCUS ON THEIR

5  INTERPRETATION. THERE IS SIX OR MORE RETIRED PLAYERS IN THERE.

6  THERE'S NO DOUBT ABOUT IT.

7      **THE COURT:** WHAT HAPPENED THEN TO THE LICENSING

8  MONEY FROM THAT PARTICULAR PROGRAM WITH THE 143 RETIRED

9  PLAYERS?

10        **MR. KATZ:** I CAN TELL YOU ONE THING THAT DIDN'T

11  HAPPEN WITH IT. WE DIDN'T GET ANY. OH, THE 148, THEY GOT AD

12  HOC. THEY WERE PAID ON AN AD HOC BASIS. BUT THAT DOESN'T MEAN

13  THEY'RE NOT PART OF THIS GAME. THEY ARE PART OF THE GAME.

14        FOR THE PURPOSE OF TRIGGERING ALL YOU HAVE TO HAVE

15  IS SIX OR MORE, USING THEIR DEFINITION AGAIN, SIX OR MORE

16  RETIRED PLAYERS. THERE'S SIX OR MORE RETIRED PLAYERS IN THAT

17  GAME. BUT THE POOL MONEY, THE SHARED MONEY, WE DIDN'T GET ANY

18  OF IT. WE DID GET AD HOC. MR. ADDERLEY GOT AD HOC FOR THAT.

19        **THE COURT:** HOW MANY, 143?

20        **MR. KATZ:** ONE HUNDRED FORTY-EIGHT.

21        **THE COURT:** EACH OF THOSE SIGNED AN AD HOC

22  AGREEMENT?

23        **MR. KATZ:** YES.

24        **THE COURT:** AND EACH OF THEM GOT PAID UNDER THAT AD

25  HOC AGREEMENT?

1    **MR. KATZ:**  RIGHT, BECAUSE YOU GET SPECIAL PAY IF YOU

2  ARE HIGHLIGHTED.

3         **THE COURT:**  IF THEY GOT PAID UNDER THE AD HOC

4  AGREEMENT, WHAT IS THE ARGUMENT FOR THEM GETTING PAID AGAIN

5  UNDER THE GROUP LICENSING?

6         **MR. KATZ:**  THEY ARE NOT GETTING PAID AGAIN, YOUR

7  HONOR.  THEY'RE SHARED, AND THEN YOU GET PAID EXTRA IF YOU'RE

8  HIGHLIGHTED.  THEY'RE HIGHLIGHTED IN THIS GAME.

9         TAKE THE ACTIVE PLAYERS.  THEY SHARE -- THERE'S A

10  FUND WHERE THEY SHARE, WHETHER THEY'RE TOM BRADY OR THE THIRD

11  STRING GUARD, AND THEY HAVE AD HOCS, JOE MONTANA OR -- NOT JOE

12  MONTANA -- TOM BRADY CAN GO OUT AND GET ALL THE MONEY THAT HE

13  CAN GET OUT OF THE MARKET, AND HE GETS PAID TWICE.  HE'S NOT

14  GETTING PAID TWICE.  ONE IS FOR THE GROUP WHERE EVERYBODY IS

15  THE SAME, AND THE OTHER IS HE'S HIGHLIGHTED.

16         THIS YEAR BRETT FARVE, WHO MAY OR MAY NOT BE A

17  RETIRED PLAYER, IS GOING TO BE ON THE COVER OF MADDEN, AS I

18  UNDERSTAND.  HE'S GOING TO GET A SPECIAL PAYMENT FOR THAT, BUT

19  HE'S ALSO GOING TO GET HIS EQUAL SHARE IF HE'S AN ACTIVE

20  PLAYER.

21         **THE COURT:**  WAIT.  JUST STICK WITH THIS ONE GAME FOR

22  A MINUTE.  WAS THERE ANY LICENSING MONEY PAID BY EA FOR THE 148

23  GAME ABOVE AND BEYOND THE MONEY PAID FOR THE AD HOC LICENSE?

24         **MR. KATZ:**  NO, IT'S NOT JUST THE 148 PLAYERS.

25  THAT'S WHAT I'M GETTING TO NEXT.  THERE'S A LOT MORE THAN 148.

1  THAT'S MY NEXT POINT.

2          **THE COURT:**  NO, NO.  DON'T LEAVE THIS POINT UNTIL I

3  UNDERSTAND IT.

4          **MR. KATZ:**  NO.  OF COURSE.

5          **THE COURT:**  BUT IT DOES SOUND LIKE A HUNDRED PERCENT

6  OF THE LICENSING MONEY THAT WAS GENERATED THROUGH THE EA GAME

7  WITH 148, ONE HUNDRED PERCENT OF THAT WENT TO THE RETIRED

8  PLAYERS.

9          **MR. KATZ:**  NO, THAT'S INCORRECT, YOUR HONOR.

10          **THE COURT:**  UNDER THE AD HOC AGREEMENTS?  WHAT AM I

11  MISSING?  LET ME EXPLAIN MY CONFUSION, AND YOU TELL ME WHY I'M

12  WRONG.

13          THE 148 SIGNED AD HOC AGREEMENTS.  EA PAID SOME

14  LICENSING MONEY.  THE NFLPA THEN -- BY THE WAY, WERE THESE AD

15  HOC AGREEMENTS WITH EA OR WERE THEY AD HOC AGREEMENTS WITH THE

16  NFLPA?

17          **MR. KATZ:**  I BELIEVE THAT EA MAKES AN AGREEMENT WITH

18  THE NFLPA WHO MAKES AN AGREEMENT WITH THE HALL OF FAME.  IT'S

19  SORT OF A THREE-WAY AGREEMENT.

20          **THE COURT:**  SO, IN ANY EVENT, PURSUANT TO THE --

21  WHAT YOU'RE SAYING, I THOUGHT YOU WERE SAYING, IS THAT A

22  HUNDRED PERCENT OF THE MONEY THAT WAS PAID FOR THE USE OF THEIR

23  IMAGES WENT BACK TO THESE INDIVIDUALS, BUT NOW YOU'RE SAYING,

24  NO, THAT'S NOT TRUE.

25          **MR. KATZ:**  MAY I SHOW YOUR HONOR WHAT HAS BEEN

1 MARKED AS EXHIBIT Q TO THE HILBERT DECLARATION, WHICH IS FROM

2 THE NFL -- DEFENDANT'S WEBSITE.

3          **THE COURT:**  ALL RIGHT.  I WANT THIS TO BE ON THIS

4 POINT.

5          **MR. KATZ:**  IT IS ON THIS POINT, YOUR HONOR.

6          **THE COURT:**  SO I CAN UNDERSTAND --

7          **MR. KATZ:**  I'M GOING TO JUST MARK --

8          **THE COURT:**  -- THIS ISSUE BETTER, LET'S STICK WITH

9 THE 148 UNTIL I GET TO THE BOTTOM OF IT.

10          **MR. KATZ:**  I'M GOING TO MARK THE LANGUAGE.  I'LL

11 HAND UP THE ONE PAGE AND MAKE IT EASY.

12          **MR. KESSLER:**  THIS IS Q TO HILBERT?

13          **MR. KATZ:**  YES.  I MARKED THE LANGUAGE THAT I WANTED

14 YOUR HONOR TO --

15          **THE COURT:**  I'LL READ IT OUT LOUD.

16          "ANY PLAYERS WHO ARE SINGLED OUT TO PROMOTE

17      LICENSED PRODUCTS ARE PAID ADDITIONAL FEES FOR BEING

18      HIGHLIGHTED ON PRODUCT PACKAGING, POINT OF SALE,

19      PRINT ADS OR OTHER COLLATERAL MATERIAL FOR

20      AUTOGRAPHS, APPEARANCES, PRODUCT ENDORSEMENTS, ET

21      CETERA."

22          **MR. KATZ:**  RIGHT.  SO WHAT THAT MEANS, LET ME PUT IT

23 IN THE CONTEXT OF THE ACTIVE, BECAUSE THEY KEEP SAYING

24 EVERYTHING IS ABSURD, NOTHING MAKES SENSE, IT'S THE EXACT SAME

25 THING THEY DO FOR THE ACTIVES, YOUR HONOR.  WHAT THEY DO FOR

1   THE ACTIVES IS, IF YOU'RE PART OF THE GROUP, YOU GET AN EQUAL

2   SHARE, NO MATTER IF YOU ARE THE BEST OR THE WORST, BUT THEN YOU

3   ALSO GET EXTRA IF YOU ARE HIGHLIGHTED.  YOU GET EXTRA IF YOU

4   ARE HIGHLIGHTED.

5           SO MR. ADDERLEY, JUST LIKE TOM BRADY, SHOULD HAVE

6   GOTTEN HIS EQUAL SHARE, AND HE GETS EXTRA BECAUSE HE'S

7   HIGHLIGHTED, AND THERE'S A BUNCH OF OTHER NAMELESS, FACELESS

8   PEOPLE I'M GOING TO TELL YOU ABOUT RIGHT NOW.  OKAY?

9           **THE COURT:**  DID MR. ADDERLEY GET HIS INDIVIDUAL

10  SHARE?

11          **MR. KATZ:**  HE GOT HIS INDIVIDUAL SHARE.  HE GOT HIS

12  INDIVIDUAL SHARE, BUT HE DID NOT GET HIS EQUAL SHARE.

13          **THE COURT:**  AND TRACE THROUGH FOR ME THE FUND OF

14  MONEY AND WHERE IT WAS OR SHOULD HAVE BEEN THAT WOULD HAVE BEEN

15  THE FUND OF MONEY HE WAS SUPPOSED TO GET AN EQUAL SHARE OF.

16          **MR. KATZ:**  WELL, THE FUND OF MONEY COMES FROM THE

17  GLA.  IT SHOULD BE AN ESCROW ACCOUNT.  THEY SAY, WE ARE GOING

18  TO DIVIDE IT BETWEEN THE PLAYER AND AN ESCROW ACCOUNT.

19          **THE COURT:**  START -- GO BACK TO THE EA, AND THE

20  MONEY -- LET'S FOLLOW THE MONEY FROM EA BACKWARDS SO I CAN SEE

21  WHERE THE MONEY WENT ASTRAY, IF IT DID.

22          **MR. KATZ:**  THE MONEY GOES TO -- 40 PERCENT OF IT

23  GOES TO THE NFLPA.  TWENTY-THREE PERCENT OF IT GOES TO PLAYERS,

24  INC., THE OTHER DEFENDANT.  AND THE REMAINDER IS SPLIT UP AMONG

25  THE PLAYERS FROM AN ESCROW FUND THAT IS EQUAL SHARE.  THAT'S

1  WHAT WE SHOULD HAVE BEEN SHARING.  THAT'S THE ONLY ESCROW FUND.

2          YOUR HONOR EXPRESSED CONFUSION IN YOUR CLASS

3  CERTIFICATION ORDER ABOUT, YOU KNOW, LIKE, WHERE IS THIS ESCROW

4  FUND, WHAT ARE THEY TALKING ABOUT, WE ARE NOT EVEN SURE AN

5  ESCROW FUND WAS CREATED.

6          **THE COURT:**  I WISH YOU HAD A DIAGRAM.  DO YOU HAVE A

7  DIAGRAM SOMEPLACE THAT WOULD DRAW THE FLOW OF THE MONEY SO I

8  CAN SEE WHERE THESE ACCOUNTS ARE.  JUST FIND A -- YOU CAN USE

9  THAT ONE OVER THERE.

10          **MR. KATZ:**  SURE.

11          **THE COURT:**  WE ARE IN A TRIAL, SO YOU'LL NEED TO

12  KEEP THOSE PAGES INTACT, BUT USE A DIFFERENT -- I WANT TO

13  UNDERSTAND ONE EXAMPLE, JUST ONE EXAMPLE, AND WE'LL STICK WITH

14  THE 148, OF HOW THERE'S MONEY OUT THERE THAT SHOULD HAVE GONE

15  TO THE RETIREDS BUT DIDN'T.

16          I THINK THERE'S A MAGIC MARKER THERE.

17          **MR. KATZ:**  YOU HAVE TO UNDERSTAND TWO THINGS.

18  THERE'S SHARED AGREEMENTS, SHARED MONEY, AND THERE'S SIDE

19  DEALS.  OKAY.  SO THIS CASE IS NOT ABOUT THE SIDE DEALS.  IT'S

20  NOT ABOUT THEM.  IT'S ABOUT THE EQUAL SHARE.

21          SO YOU HAVE A LICENSEE, EA.  AND THEY GET MONEY, AND

22  THEY GET LOTS OF MONEY.  THEY'RE PAYING THE NFLPA $300,000,000,

23  $400,000,000, SO YOU CAN IMAGINE.  THAT'S $3 OR $400,000,000

24  FOR THE CONTRACT.  YOU CAN IMAGINE HOW MUCH THEY'RE MAKING.

25          EA MONEY COMES, AND PA, THE UNION, GETS 40 PERCENT.

1 THE PI GETS 23 PERCENT.  AND THEN THERE'S AN ESCROW FUND, AND

2 THE PLAYERS GET SHARES FROM THAT.  PLAYERS.

3        **THE COURT:**  WHICH PLAYERS, ACTIVE OR WHAT?

4        **MR. KATZ:**  PARDON?

5        **THE COURT:**  ACTIVE OR --

6        **MR. KATZ:**  YEAH, THIS IS THE WAY -- IT'S SUPPOSED TO

7 WORK THIS WAY FOR BOTH.  BUT THIS IS -- LET'S JUST TAKE ACTIVE,

8 BECAUSE WE KNOW IT WORKS THIS WAY FOR ACTIVE.

9        **THE COURT:**  ALL RIGHT.  SHOW ME HOW IT WORKS FOR THE

10 ACTIVE.

11        **MR. KATZ:**  ALL RIGHT.  THIS IS IT.  OKAY?  IT'S

12 SIMPLE.

13        **THE COURT:**  HOW MUCH IS GOING INTO THAT ESCROW

14 THERE?

15        **MR. KATZ:**  FROM EA?

16        **THE COURT:**  YES.

17        **MR. KATZ:**  IT IS A MINIMUM GUARANTEED PAYMENT OF, I

18 THINK, 25, $30 MILLION A YEAR, REGARDLESS OF WHETHER YOUR IMAGE

19 IS USED.  A LOT OF MONEY.

20        **THE COURT:**  IS THAT MONEY BEING PAID OUT TO THE

21 ACTIVE PLAYERS?

22        **MR. KATZ:**  OH, YEAH.  OF COURSE, PA AND PI TAKE THE

23 LION'S SHARE OF IT.

24        **THE COURT:**  BUT WHATEVER IS LEFT OVER, IT LOOKS LIKE

25 TWO-THIRDS, ONE-THIRD IS LEFT OVER.

1          **MR. KATZ:**  THIRTY-SEVEN PERCENT, RIGHT.  THEY SPLIT

2   THAT.

3          **THE COURT:**  THAT GOES TO ESCROW?

4          **MR. KATZ:**  THAT'S AN EQUAL SHARE.  IT GOES TO

5   ESCROW.  THAT'S WHAT HAPPENS.

6          YOU KNOW, YOU SAY, IS TOM BRADY GETTING PAID --

7   BRETT FARVE, LET'S TAKE BRETT FARVE.  HE'S GOING TO BE ON THE

8   COVER THIS YEAR.  IS HE GETTING PAID TWICE?  HE GETS HIS EQUAL

9   SHARE, AND HE GETS PAID BECAUSE HE'S SINGLED OUT, WHAT I JUST

10  SHOWED YOUR HONOR.  THAT'S NOT GETTING PAID TWICE.

11         MR. ADDERLEY GOT PAID FOR BEING HIGHLIGHTED, BUT HE

12  DIDN'T GET HIS EQUAL SHARE.  NOW LET'S TALK ABOUT THE ESCROW

13  FUND.  OKAY?  THEY -- I DIDN'T MAKE UP ESCROW ACCOUNT.  IT'S IN

14  THEIR AGREEMENT.  THEY SAID THE MONIES WILL BE DIVIDED BETWEEN

15  THE PLAYER AND AN ESCROW ACCOUNT.

16         SO THE GAME WE ARE GOING TO PLAY IS, WHERE IS THE

17  ESCROW ACCOUNT?  WHERE IS IT?  OKAY.  HE SAYS THEY NEVER

18  CREATED IT BECAUSE THEY PAID OUT ALL THE MONEY.  THAT'S NOT

19  TRUE EITHER.  I'LL GET TO THAT EVIDENCE IN A MOMENT.

20         THERE'S ONLY ONE ESCROW ACCOUNT.  THIS IS THE ONLY

21  ESCROW ACCOUNT IN THE WORLD.  SO WHEN HE SAYS, WE HAVE NO

22  EVIDENCE THAT THIS IS THE ESCROW ACCOUNT, I SAY WE HAVE

23  OVERWHELMING EVIDENCE THAT THERE'S -- THAT THIS IS THE ESCROW

24  ACCOUNT, BECAUSE IT'S THE ONLY ESCROW ACCOUNT.

25         NOW, WHAT HAS TO HAPPEN, THIS HAS TO BE TRIGGERED.

1  THIS AGREEMENT HAS TO BE TRIGGERED.  HOW IS IT TRIGGERED?  IT'S

2  TRIGGERED IF THERE'S SIX OR MORE ACTIVE OR PRESENT -- PRESENT

3  OR FORMER MEMBERS.  OKAY?

4          AND THEY SAY, OH, THAT DOESN'T MEAN WHAT IT SAYS; IT

5  DOESN'T MEAN PRESENT OR FORMER, IT JUST MEANS FORMER.  OKAY.

6  FINE.  IT JUST MEANS FORMER?  WE GOT THE FORMER.  WE GOT 148

7  FORMER PEOPLE.

8          SO ONCE THAT'S IN THERE, THEN THE AGREEMENT IS

9  TRIGGERED.  NO PAYMENTS WERE MADE.  NO EQUAL SHARE PAYMENTS

10 WERE MADE TO ANY RETIREE.  THERE'S A BREACH.

11         **THE COURT:**  ALL RIGHT.  HERE ON THE 148, WAS MONEY

12 PAID FROM EA FOR THE 148 INTO THE E, INTO THE E BOX?

13         **MR. KATZ:**  I DON'T BELIEVE, NO, THEY DID NOT PAY IT

14 INTO THE E BOX.

15         **THE COURT:**  WHERE DID THE MONEY THEN GO?

16         **MR. KATZ:**  IT WENT -- I'M NOT SURE WHETHER IT WENT

17 TO PI AND THEN WENT TO HALL OF FAME AND THEN WENT TO THE

18 PLAYERS, OR -- IT DIDN'T GO INTO THE ESCROW FUND, I KNOW THAT

19 FOR SURE.  BUT THERE'S SOME COMBINATION OF, YOU KNOW, MONEY

20 FLOWING TO PI AND TO THE HALL OF FAME.

21         **THE COURT:**  THEN DID IT GO TO RETIRED PLAYERS?

22         **MR. KATZ:**  RETIRED PLAYERS GOT THAT MONEY.

23         **THE COURT:**  SO IF THE RETIRED PLAYERS EVENTUALLY GOT

24 IT ANYWAY, WHAT'S THE PROBLEM?

25         **MR. KATZ:**  THEY DIDN'T GET THEIR EQUAL SHARE.  THEY

1 DIDN'T GET THEIR EQUAL SHARE.  THAT'S A DIFFERENT --

2          **THE COURT:**  WHAT DO YOU MEAN THEY DIDN'T -- IF

3 INSTEAD OF GOING INTO --

4          **MR. KATZ:**  THEY DIDN'T GET THEIR SHARE OF THIS.

5          **THE COURT:**  THAT MONEY GOT DIVERTED TO THEM GOING

6 THROUGH THE HALL OF FAME.

7          **MR. KATZ:**  WE HAVE BRETT FARVE OVER HERE.  HE'S ON

8 THE COVER THIS YEAR.  LET'S SAY HE'S AN ACTIVE PLAYER.  OKAY?

9 HE'S GOING TO GET MONEY.  HE'S GETTING MONEY BECAUSE HE'S

10 SINGLED OUT.

11          HE ALSO GETS HIS EQUAL SHARE.  DOESN'T MEAN HE'S

12 BEING PAID TWICE.  IT JUST MEANS THAT HE'S GETTING PAID EXTRA

13 FOR BEING SINGLED OUT, BUT THEY ARE NOT PAYING RETIRED PEOPLE.

14 THEY ARE NOT TREATING THEM THE SAME.  IT'S NOT -- IT'S THE

15 SAME -- THE AGREEMENT IS TRIGGERED, BUT WE DON'T GET ANY

16 PAYMENT.  WE DON'T GET OUR EQUAL SHARE PAYMENT.

17          THERE'S NO REASON ON EARTH WHY WE WOULDN'T GET BOTH.

18 WHY WOULDN'T YOU GET EXTRA IF YOU WERE SINGLED OUT?  IF YOU GO

19 AND PLAY THIS GAME, YOU'LL SEE A CLIP OF MR. ADDERLEY, YOU'LL

20 SEE A PICTURE OF MR. ADDERLEY.  HE'S SINGLED OUT.

21          YOUR HONOR, MAY I PLEASE GO THE NEXT POINT?  WE CAN

22 COME BACK HERE, BUT I THINK IT WILL HELP YOU.

23          **THE COURT:**  ALL RIGHT.  GO AHEAD.

24          **MR. KATZ:**  SO THERE'S A BREACH.  THEY DIDN'T PAY.

25          BUT, YOUR HONOR, SOMETHING MUCH MORE INSIDIOUS WAS

1 GOING ON, AND THAT IS -- AND I HAVE GOT A SMOKING GUN DOCUMENT

2 TO PROVE IT.  I WOULDN'T SAY THAT LIGHTLY TO YOUR HONOR.

3        IT IS CLEAR THAT DEFENDANTS ACTUALLY CONSPIRED WITH

4 EA TO ALTER FORMER PLAYERS' IMAGES AND NUMBERS SO THAT AN

5 ARGUMENT COULD LATER BE MANUFACTURED BY DEFENDANTS THAT EA DID

6 NOT ACTUALLY LICENSE OR USE GLA RETIRED PLAYER IMAGES.

7        AND I WOULD DIRECT YOUR HONOR TO EXHIBIT MMM OF THE

8 HILBERT DECLARATION.

9        **THE COURT:**  YOU ARE GOING TO HAVE TO HAND THAT UP

10 BECAUSE I DON'T KNOW IF I HAVE THAT HERE.

11        **MR. KATZ:**  ALL RIGHT.

12        **THE COURT:**  ALL RIGHT.

13        **MR. KATZ:**  SO IN THESE VINTAGE GAMES, AS I SAY, IF

14 YOU ARE A FOOTBALL FAN -- I DON'T KNOW WHETHER YOUR HONOR IS OR

15 NOT.

16        **THE COURT:**  PROBABLY NOT AS MUCH AS YOU ARE.

17        **MR. KATZ:**  I KNOW YOUR HONOR IS FROM MISSISSIPPI.

18 YOU'RE PROBABLY A BIGGER FOOTBALL FAN --

19        **THE COURT:**  IN THOSE DAYS I WAS A BIG FOOTBALL FAN,

20 BUT MY TEAM NEVER GOT VERY FAR.

21        **MR. KATZ:**  JOHNNY VAUGHT, I REMEMBER JOHNNY VAUGHT.

22 WASN'T HE OLE MISS?

23        **THE COURT:**  HE WAS OLE MISS, YES.  BRETT FARVE, OF

24 COURSE, IS FROM MISSISSIPPI.

25        **MR. KATZ:**  RIGHT.

1          **THE COURT:**  I THINK THE QUARTERBACK FOR THE INDIANA

2 COLTS, WHAT'S HIS NAME?

3          **MR. KATZ:**  PEYTON MANNING.

4          **THE COURT:**  HE IS FROM MISSISSIPPI.  A NUMBER OF

5 FAMOUS QUARTERBACKS FROM MY HOME STATE.

6          **MR. KATZ:**  I'M QUITE SURE -- I'M FROM MISSOURI, SO

7 WE DON'T HAVE FAMOUS QUARTERBACKS.

8          **THE COURT:**  I WAS A PRETTY GOOD RECEIVER MYSELF.

9          **MR. KATZ:**  MY MOTHER WOULDN'T LET ME PLAY, SO I WAS

10 IN A SLIGHTLY DIFFERENT POSITION.

11          BUT, IN ANY EVENT, SO WE HAVE THESE GAMES AND IF

12 YOUR HONOR IS A FAN -- YOUR HONOR MIGHT BE A 49ER FAN OR YOU

13 MIGHT BE A RAIDER FAN.  I DON'T KNOW.

14          **THE COURT:**  BACK IN THE EARLY '80S I WAS A 49ER FAN.

15          **MR. KATZ:**  SO YOU MIGHT WANT TO BE THE '84 49ERS.

16 THAT WAS A GREAT TEAM.

17          **THE COURT:**  IT WAS.

18          **MR. KATZ:**  SO WHAT HAPPENED, IF YOU LOOK AT

19 EXHIBIT MMM AND YOU'RE PLAYING THIS GAME -- THE FIRST ONE IS

20 BRENT JONES.  YOUR HONOR PROBABLY REMEMBERS BRENT JONES WHO WAS

21 A GREAT TIGHT END.  OKAY?

22          **THE COURT:**  YES.

23          **MR. KATZ:**  SO THE FIRST ONE IS BRENT JONES, AND THE

24 SECOND DOCUMENT THERE IS ACTUALLY -- IT'S NOT FROM THE GAME.

25 IT'S JUST -- IT'S A REFERENCE DOCUMENT THAT TELLS YOU ABOUT

1 BRENT JONES, BECAUSE THE GAME DOESN'T TELL YOU ANYTHING ABOUT

2 BRENT JONES.  HE'S FACELESS.  HE'S NAMELESS.  DOESN'T HAVE THE

3 RIGHT NUMBER.

4          BUT WE MADE UP A GRAPHIC, YOUR HONOR, THAT ACTUALLY

5 MAKES IT A LITTLE BIT EASIER FOR YOU TO READ.  MAY I HAND THAT

6 UP?  YOU CAN SEE THAT IF YOU COMPARE THE STATISTICS ON THE

7 SECOND PAGE, WHICH ARE THE REAL STATISTICS, WITH THIS NAMELESS,

8 FACELESS PERSON THAT THEY'VE STRIPPED OF HIS IDENTITY, THEN IT

9 TURNS OUT TO BE BRENT JONES.  HE'S GOT THE SAME HEIGHT.  HE'S

10 GOT THE SAME WEIGHT.  HE PLAYS THE SAME POSITION, HE'S BEEN IN

11 THE LEAGUE THE SAME NUMBER OF YEARS.

12          EVERYTHING IS THE SAME FOR ALL THESE VINTAGE TEAMS,

13 THE TEAMS YOU WOULD WANT TO BE.  THE RAIDERS, THEIR

14 CHAMPIONSHIP TEAMS, THE COWBOYS.

15          **THE COURT:**  I DON'T GET IT.  WHAT YOU HANDED UP TO

16 ME, THE FIRST ONE SAYS BRENT JONES.  THE SECOND ONE SAYS KEENA

17 TURNER.

18          **MR. KATZ:**  THAT'S ANOTHER EXAMPLE.

19          **THE COURT:**  I DO NOT SEE WHERE YOU SAY IT WAS

20 MATERIALLY ALTERED.

21          **MR. KATZ:**  LOOK AT MMM, YOUR HONOR.  YOU'RE NOT

22 LOOKING --

23          **THE COURT:**  I'M LOOKING AT MMM, THE FIRST PAGE.

24          **MR. KATZ:**  MMM, THE FIRST PAGE SAYS TE 89.

25          **THE COURT:**  YEAH.

1          **MR. KATZ:** SO --

2          **THE COURT:** SO?

3          **MR. KATZ:** AND IT GIVES STATISTICS, AND IT'S THE

4  STATISTICS WE'VE SHOWN YOU THERE, THE ACTUAL STATISTICS ARE ON

5  THE SECOND PAGE OF THE DOCUMENT.  IT'S BRENT JONES, BUT THEY

6  JUST STRIP HIM.

7          **THE COURT:** YOU ARE SAYING THIS PAGE RIGHT HERE?

8          **MR. KATZ:** YES.  THAT'S NOT FROM THE GAME.

9          **THE COURT:** THAT'S NOT FROM THE GAME?  THAT'S WHAT?

10         **MR. KATZ:** THAT'S A REFERENCE WORK ON PRO FOOTBALL.

11 THERE'S A LOT OF REFERENCE WORKS OUT THERE ON PRO FOOTBALL.

12         **THE COURT:** YOU ARE SAYING THE PEOPLE PLAYING THE

13 GAME JUST GET THIS PAGE THAT HAS 89 TE WITH NO NAME ON IT?

14         **MR. KATZ:** RIGHT.  SO IT'S THE WRONG NUMBER.

15 EVERYTHING ELSE IS THE SAME, THE WEIGHT, THE HEIGHT,

16 EVERYTHING, BECAUSE IF YOU WANTED TO PLAY -- FIRST OF ALL, YOU

17 KNOW WHO PLAYED TIGHT END ON THE '84 49ERS.

18         **THE COURT:** BUT IT DOESN'T EVEN SAY 49ERS ON HERE,

19 DOES IT?  WHERE DOES IT SAY 49ERS?

20         **MR. KATZ:** THIS IS '92 49ERS.  IT SAYS TEAM -- I'M

21 SORRY.  THIS WAS '92, YOUR HONOR, RATHER THAN '84.

22         **THE COURT:** WHERE DO YOU SEE '92 EVEN?

23         **MR. KATZ:** IT'S RIGHT HERE, YOUR HONOR (INDICATING).

24         **THE COURT:** I SEE '94.  IS THAT IT?  OH, OH, I SEE

25 IT.  THAT BOX.  NINETY-TWO 49ERS.

1          **MR. KATZ:**  SO ANYBODY WOULD KNOW THAT'S BRENT JONES.

2  THAT'S JUST A RIPOFF.  OKAY?

3          SO WHY DID EA DO THIS?  THEY DID IT BECAUSE THEY

4  WERE TOLD TO DO IT BY THE DEFENDANTS, AND THAT'S THE SMOKING

5  GUN, YOUR HONOR.  I HAVE IT HERE.  I'LL HAND IT UP.

6          **MR. KESSLER:**  IS THIS DOCUMENT IN YOUR OPPOSITION TO

7  SUMMARY JUDGMENT?

8          **MR. KATZ:**  NO, IT'S NOT.  IT'S PART OF YOUR

9  DISCOVERY DOCUMENTS.  WE DID NOT FIND THIS DOCUMENT UNTIL THE

10  LAST FEW DAYS.  THIS WAS PART OF THEIR SO-CALLED ROLLING

11  PRODUCTION WHICH TOOK TEN MONTHS TO ROLL.

12          **MR. KESSLER:**  HOW MANY MONTHS HAVE YOU HAD THIS?

13          **MR. KATZ:**  I THINK IT WAS PRODUCED IN APRIL OF THIS

14  YEAR, I BELIEVE.  BUT BECAUSE IT WAS PRODUCED IN THE TENTH

15  MONTH, AS YOU PROBABLY CALCULATED, WE JUST DIDN'T HAVE MUCH

16  TIME TO DEAL WITH IT.

17          **MR. KESSLER:**  YOUR HONOR, I WOULD ALSO NOTE THIS IS

18  OUTSIDE OF THE LIMITATIONS PERIOD, WHERE WE HAVE A STIPULATION

19  WITH COUNSEL, WHICH HE INSISTED UPON, THAT NO EVIDENCE COULD BE

20  USED OUTSIDE OF THE LIMITATIONS PERIOD.  SO NOT ONLY IS THIS

21  NOT IN HIS PAPERS AND PRESENTED HERE, BUT IT'S SOMETHING THAT'S

22  NEVER BEEN IN THE CASE AND WE HAVE A STIPULATION CAN'T BE USED

23  AT TRIAL.  SO IT CANNOT BE CONSIDERED ON SUMMARY JUDGMENT.

24          **MR. KATZ:**  WE HAVE NO SUCH STIPULATION, YOUR HONOR.

25  I WOULD CHALLENGE HIM TO PRODUCE SUCH A STIPULATION.  WE HAVE

1   NONE.  THIS IS SOMETHING, IT'S TRUE, IT HAPPENED IN 2001, BUT

2   YOU CAN SEE IT'S STILL HAVING AN EFFECT.  THEY'RE STILL DOING

3   THIS.  THEY'RE USING ALL THOSE PLAYERS, HUNDREDS OF PLAYERS,

4   HUNDREDS OF RETIRED PLAYERS THEY'RE USING, BEYOND THE 148, AND

5   THEY'RE JUST RIPPING THEM OFF.  BECAUSE EVERYBODY KNOWS IT'S

6   BRENT JONES.  AND THEY DID IT WITH MALICE AFORETHOUGHT.

7          **THE COURT:**  WHO IS LASHON LAWSON (PHONETIC)?

8          **MR. KATZ:**  I BELIEVE SHE IS A MARKETING PERSON, BUT

9   THE COPIES, IF YOU NOTICED, THE CCS WERE SENT TO MR. DOUG

10  ALLEN, WHO IS THE NUMBER TWO PERSON, AND TO JOEL LINZNER, WHO

11  IS TOP PERSON ON THIS ACCOUNT FOR ELECTRONIC ARTS.

12         THIS IS COLD-BLOODED RIPPING OFF OF RETIRED PLAYERS.

13         **THE COURT:**  ALL RIGHT.  WHAT ELSE?

14         **MR. KATZ:**  ALSO, IN TERMS OF THE PAYMENTS, YOUR

15  HONOR, MR. KESSLER HAS CONTRADICTED HIMSELF IN WHAT HE HAS SAID

16  TO THE COURT, WHAT HE SAID AT THE CLASS CERTIFICATION HEARING,

17  QUOTE -- THE COURT SAYS:

18         "ALL RIGHT.  BUT YOU'RE TELLING ME THAT NO

19      MONEY'S EVER BEEN PAID OUT UNDER THIS?

20         "MR. KESSLER:  NO, IT'S BEEN DONE TWICE, YOUR

21      HONOR.  THERE'S A PHOTOFILE PROGRAM WHICH WAS PAID

22      ACCORDING TO HOW THE IMAGE WAS USED.  IT'S NOT A LOT

23      OF MONEY, BUT... "

24         AND THEN WHAT THEY SAY ON THEIR BRIEF, FOOTNOTE 79

25  OF THEIR OPENING BRIEF, MR. NAHRA, ONE OF THE IN-HOUSE LAWYERS

1  SAYS, "THIS ESCROW ACCOUNT LANGUAGE -- " THE ESCROW ACCOUNT

2  LANGUAGE WAS REMOVED BECAUSE IT DIDN'T MAKE ANY SENSE TO HAVE

3  IT ANY LONGER BECAUSE IN APPROXIMATELY TEN YEARS OF LICENSING

4  EFFORTS WE WERE NOT ABLE TO GENERATE ANY MONEY FOR AN ESCROW

5  ACCOUNT, SO THERE WAS NEVER ONE SET UP.

6       SO WAS MONEY GENERATED?  WAS MONEY NOT GENERATED?  I

7  TAKE THE POSITION, YOUR HONOR, ZERO, ZERO DOLLARS WERE PAID

8  OVER THE YEARS, ZERO.  AND WHERE IS THE MISSING ESCROW ACCOUNT?

9  IT'S NOT AS IF THEY SAID IT ONCE; YOU KNOW, WE'RE GOING TO

10  CREATE AN ESCROW ACCOUNT, AND THEN THEY SORT OF FORGOT ABOUT

11  IT.

12       EVERY YEAR THEY SAID IT, YOUR HONOR.  EVERY YEAR, WE

13  ARE GOING TO CREATE AN ESCROW AND THE MONIES WILL BE DIVIDED.

14  WHY COULDN'T THEY WAKE UP AND SAY, WELL, GUESS WHAT, THERE'S NO

15  ESCROW ACCOUNT?  BECAUSE THERE WAS AN ESCROW ACCOUNT.  THERE'S

16  ONLY ONE ESCROW ACCOUNT IN THIS CASE, AND IF THAT'S NOT

17  UNDISPUTED, IT'S AT LEAST AN ISSUE OF FACT.

18       THERE IS NOTHING MR. KESSLER SAID THAT IS NOT AN

19  ISSUE OF FACT, AND I WROTE DOWN EVERYTHING HE SAID.  I'M

20  PREPARED TO GO THROUGH THOSE NOW, YOUR HONOR, IF YOU WISH.  I

21  DON'T WANT TO BURDEN THE COURT'S TIME.

22      **THE COURT:**  THE THING IS I HAVE OTHER ITEMS --

23      **MR. KATZ:**  I UNDERSTAND.

24      **THE COURT:**  WE'VE GONE ON A LONG TIME.  I WANT TO

25  GIVE MR. KESSLER -- WHY DON'T YOU TAKE A MOMENT AND MAKE

1 WHATEVER LAST POINT YOU WOULD LIKE TO LEAVE ME WITH, AND THEN

2 WE'LL HEAR FROM MR. KESSLER?

3     **MR. KATZ:** LET ME JUST SEE WHAT I THINK THE MOST

4 OUTRAGEOUS THING HE SAID -- IT'S HARD TO CHOOSE.

5     WELL, HERE'S ONE. IT'S JUST A LITTLE MORE LIGHT

6 HEARTED THAN THE OTHERS, BUT FOOTBALL IS A LIGHT-HEARTED

7 PURSUIT, SO WHY NOT.

8     MR. KESSLER IS A GREAT ONE FOR SAYING, THIS IS AN

9 ABSOLUTE, I MEAN THERE'S NO ONE ELSE COULD BELIEVE THIS, AND IF

10 MR. KATZ BELIEVED THIS, HE'S JUST AN IDIOT, MAKE HIM GIVE YOU

11 THE EVIDENCE. AS IF I DON'T KNOW I HAVE TO GIVE YOU EVIDENCE.

12 I HEARD THAT. I HAVE TO BRING EVIDENCE HERE. OUR PAPERS ARE

13 FULL OF IT. THEY'VE GOT MORE EVIDENCE THAN YOU CAN SHAKE A

14 STICK AT.

15     BUT AN EXAMPLE IS, HE SAID, THIS COULDN'T MEAN THE

16 GLA'S. HE SAID I'M CALLING EVERYBODY A LIAR. I'M NOT CALLING

17 THEM A LIAR. THEY SIGNED AN AGREEMENT THAT SAID RETIRED

18 PLAYERS WERE COVERED. IT SAYS RETIRED PLAYERS. IT SAYS THOSE

19 WORDS.

20     NOW THEY'RE TRYING TO SAY SOMETHING DIFFERENT.

21 WELL, MAYBE IF I WAS MAKING TENS OF MILLIONS OF DOLLARS, MAYBE

22 I WOULD SAY SOMETHING DIFFERENT, TOO. I DON'T KNOW.

23     **THE COURT:** THEY SIGNED THE EA AGREEMENT?

24     **MR. KATZ:** YEAH, THE EA LICENSE SAYS RETIRED

25 PLAYERS. THERE'S NO QUESTION ABOUT IT.

1          SO HE SAYS THAT'S ONLY FOR DESIGNATED PROGRAMS, AND

2     "DESIGNATED" MEANS FOR SURE NOT GL -- I MEAN, IT'S NOT A TERM

3     OF ART.  IT'S NOT A DEFINED TERM.

4          SO I WENT BACK TO THE COLLEGE EDITION OF THE

5     WEBSTER'S NEW WORLD DICTIONARY -- WHICH IS ACTUALLY WHAT GOT ME

6     THROUGH COLLEGE, WE DIDN'T HAVE SPELL CHECKING AT THAT TIME --

7     AND I LOOKED UP "DESIGNATED" JUST TO FIGURE OUT WHETHER SOMEHOW

8     THE GLA COULD MEET THIS HIGH THRESHOLD OF BEING DESIGNATED,

9     BECAUSE IT'S SO HARD TO BE A DESIGNATED PROGRAM.  I MEAN, IT'S

10    PRACTICALLY IMPOSSIBLE, RIGHT?

11          HERE'S WHAT IT SAYS.  IT SAYS:

12         "DESIGNATED:  TO POINT OUT, MARK OUT, INDICATE,

13       SPECIFY, TO NAME."

14          WELL, THE GLA PROGRAM WAS POINTED OUT, IT WAS MARKED

15    OUT, IT WAS INDICATED, AND IT WAS NAMED.  IT'S CALLED THE GLA

16    PROGRAM.  SO HOW CAN IT BE THAT HE IS SAYING WITHOUT A DOUBT

17    THAT EXCLUDES THE GLA PROGRAM?  THAT'S HIS MODE OF ARGUMENT.

18    FINE.  LET HIM TRY IT.  LET HIM TELL IT TO THE JURY.  HE SHOULD

19    HAVE TO TELL IT TO THE JURY.  BUT IT DOESN'T PROVE ANYTHING

20    UNDISPUTEDLY, AND, AS I MENTIONED BEFORE, THEY WROTE THIS

21    CONTRACT.  IT'S THEIR BOILERPLATE.  IT HAS TO BE CONSTRUED

22    AGAINST THEM, AND THERE'S NO QUESTION THAT THEY BREACHED.

23          **THE COURT:**  IS THIS A JURY CASE IF IT DOES GO TO

24    TRIAL?

25          **MR. KATZ:**  IT IS A JURY CASE.

1          **THE COURT:**  THAT'S WHY?  BECAUSE IT'S WHAT?  WHAT IS

2   THE LEGAL -- IS IT FIDUCIARY DUTY, IS THAT THE BREACH OF

3   FIDUCIARY DUTY, IS THAT -- I WANT TO --

4          **MR. KATZ:**  WE HAVE A RIGHT TO A JURY TRIAL ON A

5   CONTRACT CLAIM AND ON THE BREACH OF FIDUCIARY DUTY CLAIM, I

6   BELIEVE, YOUR HONOR.

7          **THE COURT:**  ALL RIGHT.  OKAY, MR. KESSLER, I CAN

8   GIVE YOU LIKE FIVE MINUTES.

9          **MR. KESSLER:**  I'M GOING INCREDIBLY EFFICIENT, YOUR

10  HONOR.  MY MODE OF ARGUMENT IS ALL ABOUT EVIDENCE, NOT ABOUT

11  THE DICTIONARY.

12         **THE COURT:**  WAIT.  I WANT TO GIVE MR. KATZ THE

13  CHANCE TO SIT DOWN.

14         **MR. KATZ:**  HE CAN'T LIVE WITH THE DICTIONARY, YOUR

15  HONOR.

16         **THE COURT:**  PLEASE, PLEASE.  JUST HAVE A SEAT.  ALL

17  RIGHT.

18         **MR. KESSLER:**  YOUR HONOR, EVERYTHING MR. KATZ SAID

19  IS AN ILLUSTRATION WHY SUMMARY JUDGMENT IS APPROPRIATE IN THIS

20  CASE.  HE MAKES THINGS UP.  LET'S START FIRST WITH HIS

21  STATEMENT THAT MR. EYRICH, WHO WAS THE ACCOUNTANT OF THE

22  PLAYERS ASSOCIATION, TESTIFIED THERE WAS AN ESCROW FUND.  I'M

23  READING FROM MR. EYRICH'S DEPOSITION.  HE HAS NO CITATION.  I

24  HAVE A CITATION AND A QUOTE.  HERE IS THE QUESTION:

25         "OKAY.  ARE YOU AWARE --  "

1        I'M READING, SO YOU KNOW, ON PAGE -- IF I CAN FIND A

2   PAGE NUMBER HERE, SORRY, YOUR HONOR -- PAGE 61.  OKAY?  FROM

3   LINE -- FROM LINE SIX.

4        "OKAY.  ARE YOU AWARE OF ANY ESCROW ACCOUNT BEING

5        CREATED?"

6             THIS WAS A QUESTION THAT THEY ASKED.

7        "ANSWER:  NO, NOT THAT I AM AWARE OF.

8        "QUESTION:  AND DIRECTING YOUR ATTENTION THEN TO

9        EXHIBIT 90, ARE THOSE INDIVIDUALS THAT RECEIVED MONEY

10       PURSUANT TO A GLA, MONEY FROM EA?  ARE YOU AWARE OF

11       ANY ESCROW ACCOUNT BEING CREATED WITH RESPECT TO

12       THOSE MONIES?

13       "I AM NOT AWARE OF ANY ESCROW ACCOUNT."

14            THAT'S THE ONLY SWORN TESTIMONY FROM AN OUTSIDE

15   ACCOUNTANT, NOT AN EMPLOYEE, A CPA, WHO WE HAVE NO REASON TO

16   THINK WAS PERJURING HIMSELF.  IT'S THE ONLY EVIDENCE IN THE

17   CASE, AND HE COMES IN AND SAYS HE TESTIFIED TO THE OPPOSITE.  I

18   DEFY HIM TO FIND A CITATION TO THE OPPOSITE OF THIS.

19            HE TELLS YOU ABOUT THE HALL OF FAME.  YOUR HONOR,

20   FRANKLY, HE LIED TO YOU ABOUT THIS.  HERE'S THE EVIDENCE:  HE

21   SAID THESE PAYMENTS TO THE PLAYERS WERE BECAUSE THEY WERE

22   HIGHLIGHTED.  YOU REMEMBER HIM TELLING YOU THAT, BECAUSE THEY

23   WERE HIGHLIGHTED?  FALSE.

24            THE UNDISPUTED EVIDENCE IS THEY WERE PAID MONEY,

25   $2,000 A PIECE, NOT CHUMP CHANGE, $2,000 A PIECE BECAUSE JUST

TO BE INCLUDED IN THE HALL OF FAME GAME.  NOW, WHY?  BECAUSE EA

ALREADY WAS PAYING ITS RIGHTS TO PLAYERS, INC., 25 MILLION A

YEAR, AS HE SAID, 25 MILLION A YEAR, BUT THAT DIDN'T INCLUDE

ANY RETIRED PLAYER RIGHTS.

SO WHAT THEY HAD TO DO IS THEY NOW SAID, I WANT SOME

RETIRED PLAYERS FOR HALL OF FAME, I'M GOING TO PAY THEM EXTRA.

WHY PAY THEM EXTRA?  TWO THOUSAND DOLLARS A PLAYER.  A HUNDRED

PERCENT WENT THERE.  NOW, HOW DO I KNOW THIS?  I'M READING

NOW -- I ONLY HAVE ONE COPY, YOUR HONOR.  I WILL HAND IT TO THE

COURT AFTER I READ IT -- A DOCUMENT THAT HAS THE BATES STAMP

NUMBER PL 126889 AND PL 1138786.

THIS WAS THE DOCUMENT SENT TO PEOPLE LIKE

MR. ADDERLEY TO GET THEM TO JOIN THE HALL OF FAME GAME, AND

HERE'S WHAT IT SAID:

"THIS CONTRACT IS A NONEXCLUSIVE FOR FOUR YEARS

AND COULD GENERATE OVER 1.34 MILLION FOR OUR

MEMBERS."

IT'S COMING FROM THE HALL OF FAME.

"AND UP TO 200,000 FOR THE PRO FOOTBALL HALL OF

FAME ASSISTANCE FUND.  THE PROPOSAL WOULD BE AN

ANNUAL PAYMENT OF 2,000 A YEAR FOR A FOUR-YEAR

PERIOD, OR A TOTAL OF 8,000 OVER THE TERM OF THE

AGREEMENT."

EACH PLAYER GOT $8,000 FOR DOING THIS.

"HIS NAME, LIKENESS MAY BE USED ONLY IN

1     CONNECTION WITH THE HALL OF FAME MODE."

2           THAT MEANS WHEN YOU SWITCH TO PLAYING A HALL OF FAME

3 GAME.

4        "AND MAY NOT BE FEATURED, HIGHLIGHTED IN ANY

5        ADVERTISING, MARKETING OR PROMOTIONAL MATERIALS

6        WITHOUT YOUR FURTHER CONSENT AND ADDITIONAL PAYMENTS

7        TO YOU."

8           HE MADE THIS UP.  I'M SORRY, YOUR HONOR.  I DON'T

9 USUALLY GET ANGRY AT CO-COUNSEL.  HE MADE IT UP.  THIS HAS

10 NOTHING TO DO WITH HIGHLIGHTING.  THIS IS A PERFECT EXAMPLE OF

11 ADDITIONAL MONEY BEING PAID BY EA OUTSIDE OF THE ACTIVE PLAYER

12 MONEY FOR RETIRED PLAYERS THAT WENT A HUNDRED PERCENT TO THE

13 RETIRED PLAYERS, INCLUDING MR. ADDERLEY, AND HE HAS THE GALL TO

14 COME UP HERE AND REPRESENT AS AN OFFICER OF THE COURT THAT THIS

15 WAS A HIGHLIGHTING PAYMENT.  THAT'S ABSURD, YOUR HONOR, AND,

16 FRANKLY, IT IS INSULTING TO THIS COURT.

17           I'M GOING TO HAND UP THE DOCUMENT TO THE COURT FOR

18 THE COURT TO INSPECT.  THIS WAS THE DOCUMENT, YOUR HONOR.

19           I ALSO WOULD HAND UP, YOUR HONOR -- THIS IS THE

20 DOCUMENT THAT SHOWS ALL THE MONEY BEING PAID FOR THIS -- THIS

21 IS EXHIBIT 23 TO THE GREENSPAN DECLARATION -- ALL THE $2,000

22 PAYMENTS IN A PARTICULAR YEAR BEING PAID OUT TO THE RETIRED

23 PLAYERS.  PLAYERS, INC. KEPT NONE OF IT, NOT A PENNY OF IT.

24           SO -- AND I FINALLY SAY OF GLA MEMBERS, CLASS

25 MEMBERS THERE ARE 17 MEMBERS IN THAT DEAL, 17.  THE OTHER 140,

WHATEVER IT WAS, 130 SOMETHING, NEVER SIGNED GLA'S.  THAT'S WHY

WE HAVE TO DO THIS THROUGH SEPARATE ARRANGEMENTS, BECAUSE WHEN

EA CAME TO US AND SAID, WE WANT A HALL OF FAME DEAL, THEY

DIDN'T SAY, WE WANT ALL YOUR GLA PEOPLE, WE'LL PAY FOR THAT.

THEY SAID, WE WOULD LIKE THESE MEMBERS IN THE HALL OF FAME,

PEOPLE IN THE HALL OF FAME.  WE HAD 17 HALL OF FAMERS SIGN

GLA'S.  THAT'S ALL.

            SO THIS ISN'T EVEN A CLASS ISSUE.  THIS IS WHAT HE'S

SAYING IS HIS CRITICAL EVIDENCE OF HIS CASE.  IT IS SHOCKING,

YOUR HONOR.

            NOW, HE THEN GOES ON WITH SOMETHING EVEN MORE

SHOCKING.  HE COMES IN AND HE SAYS, OH, BUT WHAT ABOUT THESE

SCREEN SHOTS, AND IT'S A CONSPIRACY.  HE SAYS IT'S A CONSPIRACY

TO MY CLIENT.

            WELL, LET'S PUT ASIDE THE FACT THAT THIS DOCUMENT

WAS NEVER CITED TO HIM UNTIL TODAY AND THAT IT'S OUTSIDE THE

LIMITATIONS PERIOD AND COULD NOT AFFECT ONE CLASS MEMBER.  SO

HIS BEST EVIDENCE CAN'T AFFECT ONE CLASS MEMBER AND IS OUTSIDE

ZERO OF THE LIMITATIONS PERIOD.  LET'S START WITH THAT.

            BUT LET'S LOOK AT WHAT IT IS.  WHAT THIS IS AT BEST

IS PLAYERS ASSOCIATION SAYING, WE DON'T REPRESENT ALL THE

RETIRED PLAYERS, BECAUSE BACK IN 2001 THERE WAS ANOTHER PROGRAM

OF PUTTING IN SOME RETIRED PLAYERS, AND THE PLAYERS WE WERE

ABLE TO GET -- JUST LIKE WITH THIS OTHER DEAL, THEY EACH GOT

PAID A HUNDRED PERCENT OF THE MONEY TO THE RETIRED PLAYERS.

1          EA SAID THEY WANTED SOME OTHER PLAYERS.  WE SAID, WE

2    HAVE NO RIGHTS TO THEM; THEREFORE, WHAT DO YOU HAVE TO DO?  YOU

3    HAVE TO ALTER THEIR IDENTITY SO IT CAN'T BE RECOGNIZED.

4    THERE'S NOTHING CONSPIRATORIAL ABOUT THAT.  THAT'S TELLING EA

5    WE HAVE NO RIGHTS TO GIVE YOU FOR THEM, SO YOU HAVE TO MAKE

6    THEM -- THEY CHANGE THEIR UNIFORM NUMBERS.  THEY LEFT OUT THEIR

7    NAMES.  THEY DID NOTHING TO EXPLOIT THEIR RIGHTS.

8          AND IF THERE'S A PROBLEM WITH THAT, WHICH I WOULD

9    SUGGEST THERE'S NOT LEGALLY, IT'S A PROBLEM BETWEEN SOME

10   RETIRED PLAYER AND EA.  IT'S NOT A PROBLEM WITH MY CLIENT.  MY

11   CLIENT GOT ASKED, DO YOU HAVE THE RIGHTS, BACK IN 2001, AND,

12   APPARENTLY, SAID, WE DON'T HAVE THE RIGHTS, WE HAVEN'T LICENSED

13   YOU THE RIGHTS, YOU CAN'T USE THOSE PEOPLE, YOU HAVE TO CHANGE

14   IT.  AND WHAT HAPPENS IS THEY CHANGE THEIR UNIFORM NUMBER, THEY

15   TAKE OUT THEIR NAME, THEY TAKE OUT ALL IDENTIFYING INFORMATION.

16          **THE COURT:**  DID THEY CHANGE THE IDENTITIES AND SO

17   FORTH OF PEOPLE WHO WERE UNDER GLA?

18          **MR. KESSLER:**  IF WE HAD THE RIGHTS, WE ACTUALLY GOT

19   ADDITIONAL MONEY, ADDITIONAL MONEY, NOT THE GENERAL PAYMENT.

20   BACK IN 2001 -- THIS ISN'T IN THE RECORD, YOUR HONOR, BECAUSE

21   IT'S PRELIMITATIONS PERIOD, SO I HAVE TO REPRESENT TO YOU AS AN

22   OFFICER OF THE COURT, PRELIMITATIONS PERIOD THERE WAS ANOTHER

23   EA GAME, AND THERE WAS MONEY PAID A HUNDRED PERCENT TO THE

24   RETIRED PLAYERS WHOSE NAMES AND LIKENESSES WERE USED WHO WE GOT

25   MONEY FOR.  THAT'S WHAT HAPPENED HERE, YOUR HONOR.

1    SO FOR HIM TO COME IN AND SAY THIS IS EVIDENCE, THIS

2  IS THEIR BEST EVIDENCE -- PRESUMABLY, YOUR HONOR, HE GOT UP AND

3  GAVE YOU HIS BEST EVIDENCE, HIS BEST SHOT.  HIS BEST SHOT

4  DOESN'T INVOLVE THE CLASS, IS OUTSIDE OF THE LIMITATIONS

5  PERIOD, SHOWS NO WRONGFUL CONDUCT BY MY CLIENT.

6    AND THERE WAS A SUPREME COURT DECISION RECENTLY,

7  YOUR HONOR, WHICH RULED THAT JUST MENTIONING THE NAME EVEN OF A

8  PERSON IS NOT A PROTECTABLE LICENSING INTEREST IN THIS CONTEXT.

9  SO THIS IDEA THAT THIS IS SOME CONSPIRACY, HE SAID, SMOKING

10  GUN, IS SHOCKING.

11    THE FLOW OF MONEY, AS YOUR HONOR SAID, IS THAT

12  25 MILLION WENT TO PA, PI, AND NOT AN ESCROW FUND, TO THE

13  PLAYERS, NOT AN ESCROW FUND, BECAUSE IT WAS ALL ACTIVE PLAYER

14  MONEY.

15    WHEN THEY NEEDED RETIRED PLAYERS, THEY MADE A

16  SEPARATE DEAL, AND THEY PAID THOSE RETIRED PLAYERS A HUNDRED

17  PERCENT.  THERE'S NO EVIDENCE THAT THERE IS ANY MONEY HERE FOR

18  THE RETIRED PLAYERS, AND THERE'S NO MONIES IN ESCROW FUND.

19    HE SAID, HOW DO YOU KNOW IT'S AN ESCROW FUND?  THE

20  ACCOUNTANT SAID IT.  THE ACCOUNTANT SAID IT WASN'T AN ESCROW

21  FUND.  ALL IT IS IS A BANK ACCOUNT.  IT'S LIKE POINTING TO MY

22  BANK ACCOUNT, OR YOUR BANK ACCOUNT, OR THE COURT REPORTER'S

23  BANK ACCOUNT SAYING, YOU HAVE A BANK ACCOUNT WITH MONEY IN IT,

24  IT MUST BE AN ESCROW FUND.

25    HE HAS NO EVIDENCE.  THERE IS NO ESCROW AGREEMENT

1  EVIDENCE.  WHERE IS HIS EVIDENCE?  THERE'S NOTHING THERE.

2             FINALLY, YOUR HONOR, HE COMES IN AND HE GOES, WELL,

3  THEY SIGNED SOMETHING WITH RETIRED PLAYERS.  AT BEST, AGAIN,

4  IT'S AMBIGUOUS.  WHAT DID THEY SAY?  WELL, MY UNDERSTANDING --

5  THIS IS MR. LINZNER OF EA -- OF WHAT NFL PLAYERS REFERRED TO ON

6  THE LAST LINE OF PAGE ONE OF THE 2005 EA AGREEMENT, THAT'S

7  WHAT'S AT ISSUE, WAS ACTIVE NFL PLAYERS.

8             AND HE SAID TO MR. KATZ, NOW, YOU, YOU MAY NOT LIKE

9  THAT UNDERSTANDING, BUT I'M TELLING YOU, SIR, THAT'S MY

10 UNDERSTANDING OF WHAT IT MEANT.  THAT'S WHAT EVERYBODY

11 UNDERSTAND MEANT, AND IT'S THE ONLY THING THAT MADE SENSE.

12             FINALLY, HIS LAST CLAIM IS THAT THE GLA REFERS TO

13 GROUP LICENSING.  HE SAYS, OH, IT SAYS ACTIVE OR RETIRED

14 PLAYERS.  YEAH, THAT'S TRUE.  THAT'S THE DEFINITION OF GROUP

15 LICENSING.  BUT THE MONEY IS ONLY FOR THE LICENSING -- AND I'M

16 READING THIS, HE KEEPS IGNORING THIS -- OF RETIRED PLAYER GROUP

17 RIGHTS.

18             SO THE FACT THAT WHEN RETIRED PLAYERS ARE IN A GROUP

19 LICENSE, IT'S RETIRED PLAYER MONEY.  THE FACT THAT GROUP

20 LICENSING COULD INVOLVE A COMBINATION OF RETIRED AND ACTIVE

21 PLAYERS DOESN'T MEAN THAT RETIRED PLAYER LICENSING -- RETIRED

22 PLAYER GROUP RIGHTS IS THE WORD -- REFERS TO GROUP LICENSING

23 THAT HAS NO ACTIVE -- NO RETIRED PLAYERS IN IT AT ALL.

24             IT COULD BE A COMBINATION, BUT IT HAS TO BE RETIRED

25 PLAYER GROUP RIGHTS, AND IT'S -- THE ONLY EVIDENCE WE HAVE IS

1 THIS LANGUAGE AND THE TESTIMONY OF MR. ADDERLEY, THE ONLY

2 RETIRED PLAYER WHO THEY PRODUCED TO TESTIFY WHO SAID HIS

3 UNDERSTANDING -- HIS UNDERSTANDING WAS IT'S ONLY RETIRED PLAYER

4 RIGHTS, NOT ACTIVE PLAYER RIGHTS.  OUR UNDERSTANDING WAS THAT.

5         THE ONLY OTHER EVIDENCE YOU HAVE IS MR. KATZ AND HIS

6 DICTIONARY, AND HIS DICTIONARY DOES NOT CHANGE THE FACT THAT

7 "DESIGNATED PROGRAM" HERE, CLEARLY IN CONTEXT, WAS TALKING

8 ABOUT INDIVIDUAL PROGRAMS.  NOTHING ELSE MADE ANY SENSE.

9         YOUR HONOR, I THINK AT THAT, YOU HAVE BEEN VERY

10 GRACIOUS WITH YOUR TIME.  UNLESS YOU HAVE A QUESTION, I'M

11 WILLING TO REST.

12         **MR. KATZ:**  MAY I MAKE TWO BRIEF POINTS, YOUR HONOR?

13         **THE COURT:**  ALL RIGHT, MR. KATZ.  WHAT DO YOU HAVE

14 TO SAY?

15         **MR. KATZ:**  FIRST POINT IS THEY DID ALTER THE

16 IDENTITIES OF PEOPLE IN THE CLASS.

17         SECOND POINT IS --

18         **THE COURT:**  DO YOU KNOW OF ANY OF THEM?

19         **MR. KATZ:**  I BELIEVE MR. JONES IS ONE.  WE CAN SEND

20 YOU A LIST.

21         **THE COURT:**  YOU ARE SAYING BRENT JONES IS A MEMBER

22 OF THE CLASS?

23         **MR. KATZ:**  I BELIEVE -- I DON'T WANT TO REPRESENT

24 THAT TO YOUR HONOR.  I DON'T HAVE THE LIST WITH ME.  I DO KNOW

25 I'VE CONSULTED WITH CO-COUNSEL.

1          **THE COURT:**  I WOULD LIKE -- I MEAN, YOU MADE A

2    PRETTY SERIOUS ALLEGATION, AND MR. KESSLER COMES BACK AND SAYS

3    THIS WAS A LONG TIME AGO, IT HAD NOTHING TO DO WITH THIS

4    LAWSUIT, AND IT WAS SIMPLY BECAUSE THEY DIDN'T HAVE THE RIGHT

5    TO BRENT JONES.

6          **MR. KATZ:**  I BELIEVE --

7          **THE COURT:**  SO SEND ME A LETTER.  I WOULD LIKE BOTH

8    OF YOU TO SEND ME A LETTER ON THIS POINT.

9          **MR. KATZ:**  BUT TO SAY IT HAS NOTHING TO DO WITH THE

10   LAWSUIT WHEN THEY ARE DOING THIS NOW --

11         **THE COURT:**  YOUR LAWSUIT IS MORE RECENT THAN 2001.

12         **MR. KATZ:**  BUT THEY ARE STILL DOING THE SAME THING,

13   YOUR HONOR.  THEY ARE STRIPPING THE IDENTITIES.

14         **THE COURT:**  IF THEY STARTED DOING IT BACK THEN,

15   BEFORE THE LAWSUIT WAS ON THE HORIZON, THAT SUGGESTS THEY WERE

16   DOING IT FOR SOME OTHER REASON, SINISTER OR NOT, I DON'T KNOW,

17   BUT IT WASN'T ABOUT THIS LAWSUIT.  YOU MADE IT SOUND LIKE THEY

18   WERE DESTROYING EVIDENCE IN THIS CASE.

19         **MR. KATZ:**  I DIDN'T SAY THEY WERE DESTROYING IT.

20         **THE COURT:**  I KNOW YOU DIDN'T, BUT MANUFACTURING OR

21   SOMEHOW --

22         **MR. KATZ:**  WHAT I'M SAYING WAS THEY DIDN'T KNOW WHEN

23   THEY WERE GOING TO GET CAUGHT.  IT HAPPENED THEY GOT CAUGHT TWO

24   YEARS LATER.

25         **THE COURT:**  WELL, THAT --

1    **MR. KATZ:**  IT'S BEEN GOING ON EVER SINCE, YOUR

2  HONOR.

3        **THE COURT:**  WHEN DO THEY NOT DISTORT THE IMAGE?

4  WHEN DO THEY LEAVE THE IMAGE IN PLACE?  IS IT -- IF IT TURNS

5  OUT IT'S FOR THE PEOPLE THAT ARE -- IF IT'S JUST FOR THOSE

6  PEOPLE THEY DIDN'T HAVE GLA'S ON, THAT SUPPORTS MR. KESSLER.

7        **MR. KATZ:**  IT'S NOT JUST FOR THE PEOPLE --

8        **THE COURT:**  YOU SAY THAT.

9        **MR. KATZ:**  I AM GOING TO SEND YOUR HONOR A LETTER.

10       **THE COURT:**  I WOULD LIKE FOR YOU TO DO THAT.  AND

11  I'D LIKE TO KNOW THE ANSWER TO THAT.  CAN YOU DO THAT BY

12  MONDAY?

13       **MR. KATZ:**  YES, YOUR HONOR.

14       **THE COURT:**  ALL RIGHT.

15       **MR. KATZ:**  THE SECOND POINT IS SIMPLY THAT WHEN

16  MR. ADDERLEY -- FIRST OF ALL, AS YOUR HONOR NOTED IN YOUR CLASS

17  CERTIFICATION ORDER, MR. ADDERLEY IS AN ELDERLY PERSON.  HE'S A

18  FRAIL PERSON.  HE'S NOT USED TO THE LEGAL PROCESS.

19       AND, MOREOVER, YOUR HONOR, HE WAS NOT PERMITTED AT

20  THEIR INSISTENCE TO SEE ANY OF THESE DOCUMENTS AT THE TIME THAT

21  HE TESTIFIED, INCLUDING DOCUMENTS THAT SAY THAT PLAYERS WILL BE

22  PAID WITHOUT REGARD TO WHETHER THEIR IMAGE IS USED.  SO TO CITE

23  MR. ADDERLEY FOR LEGAL CONCLUSIONS REGARDING DOCUMENTS THAT HE

24  WAS NOT PERMITTED TO SEE BY PLAINTIFFS -- BY DEFENDANTS IS JUST

25  NOT RIGHT.

1          **MR. KATZ:**  YOUR HONOR, IF I MAY ON THAT POINT?

2          I CITED MR. ADDERLEY'S UNDERSTANDING OF THE GLA

3   WHICH HE SIGNED, ALWAYS HAD ACCESS TO, AND WHAT HIS

4   UNDERSTANDING IS WHAT HE SIGNED.  THAT HAS NOTHING TO DO WITH

5   WHAT WAS IN THE EA AGREEMENT.  THE ISSUE OF BREACH OF CONTRACT

6   IS, DID HE THINK HE WAS TO GET PAID IF THE ONLY ACTIVE PLAYER

7   RIGHTS WERE USED, AND HE SAID, NO, MY UNDERSTANDING OF WHAT I

8   WAS DOING, IT HAD TO DO WITH LICENSING HIS RIGHTS.  AND THAT,

9   MR. ADDERLEY -- I INVITE YOUR HONOR TO READ THAT TRANSCRIPT.

10  THERE NO BADGERING OF THAT.  I ASKED HIM THAT THE VERY FIRST

11  TIME, ONE QUESTION, AND HE WILLINGLY TESTIFIED TO THAT.

12          YOUR HONOR, I'M JUST SAYING IF HE IS GOING TO PUT IN

13  A PAPER, I ASSUME, WOULD YOU HONOR GIVE US TWO DAYS OR SO TO BE

14  ABLE TO ISSUE A RESPONSE?

15          **THE COURT:**  ALL RIGHT.

16          **MR. KATZ:**  YOUR HONOR, MAY WE HAVE UNTIL WEDNESDAY?

17  IT'S A LIST OF 2100 PEOPLE.

18          **THE COURT:**  GO AHEAD.  WEDNESDAY AT NOON AND FRIDAY

19  AT NOON.

20          **MR. KATZ:**  WE MADE RECORD OF, YOUR HONOR, OF THE

21  BADGERING.  IT'S PART THE CLASS CERTIFICATION -- PART OF OUR

22  PAPERS IN THE CLASS CERTIFICATION.  IT WAS ALL BADGERING ALL

23  THE TIME.

24          **THE COURT:**  ALL RIGHT.  LISTEN, IT'S UNDER

25  SUBMISSION.  AND I NEED TO GIVE THE COURT REPORTER A SHORT

1   BREAK.  THE REMAINING CALENDAR WILL RESUME IN A FEW MINUTES.

2             **MR. KESSLER:**  THANK YOU, YOUR HONOR, FOR YOUR TIME.

3   WE APPRECIATE IT.

4             (PROCEEDINGS ADJOURNED.)

1

2

3                    **<u>CERTIFICATE OF REPORTER</u>**

4          I, JOAN MARIE COLUMBINI, OFFICIAL REPORTER FOR THE

5    UNITED STATES COURT, NORTHERN DISTRICT OF CALIFORNIA, HEREBY

6    CERTIFY THAT THE FOREGOING PROCEEDINGS IN C 07-0943 WHA,

7    PARRISH V. NFL, WERE REPORTED BY ME, A CERTIFIED SHORTHAND

8    REPORTER, AND WERE THEREAFTER TRANSCRIBED UNDER MY DIRECTION

9    INTO TYPEWRITING; THAT THE FOREGOING IS A FULL, COMPLETE AND

10   TRUE RECORD OF SAID PROCEEDINGS AS BOUND BY ME AT THE TIME OF

11   FILING.

12          THE VALIDITY OF THE REPORTER'S CERTIFICATION OF SAID

13   TRANSCRIPT MAY BE VOID UPON DISASSEMBLY AND/OR REMOVAL FROM THE

14   COURT FILE.

15

16                    S/B JOAN MARIE COLUMBINI

17              JOAN MARIE COLUMBINI, CSR 5435, RPR

18                   MONDAY, JULY 28, 2008

19

20

21

22

23

24

25