IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

BERNARD PAUL PARRISH, HERBERT ANTHONY ADDERLEY, and WALTER ROBERTS III, on behalf of themselves and all others similarly situated,

    Plaintiffs,

  v.

NATIONAL FOOTBALL LEAGUE PLAYERS ASSOCIATION, a Virginia corporation, and NATIONAL FOOTBALL LEAGUE PLAYERS INCORPORATED d/b/a PLAYERS INC., a Virginia corporation,

    Defendants.

No. C 07-00943 WHA

**ORDER DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

## INTRODUCTION

In this certified class action for breach of contract and breach of fiduciary duty, defendants move for summary judgment. For the reasons stated below, defendants' motion is **DENIED**.

## STATEMENT

The circumstances of this case have been set forth in previous orders and need not be repeated in detail here. In brief, plaintiff Herbert Anthony Adderley is a retired National Football League player who brings this action on behalf of all retired NFL players who signed Group Licensing Agreements, or GLAs, with the National Football League Players Association.

The NFLPA is a Virginia corporation that acts as the labor union for players in the NFL. National Football League Players Incorporated, doing business as Players Inc., is a subsidiary of the NFLPA that is responsible for marketing and licensing.

The NFLPA solicits retired NFL players to join a "Retired Players Group Licensing Program," in which the NFLPA offers third parties the right to license the images, likenesses, and names of groups of six or more present or former players. To participate in the program, former NFL players sign GLAs with the NFLPA. Adderley signed at least two such agreements. Adderley's GLA stated in its entirety (with italics used for passages of interest):

> The undersigned hereby authorizes the National Football League Players Association ("NFLPA") and its licensing affiliates the non-exclusive right to use his name signature, facsimile, voice, picture, photograph, likeness and/or biographical information (collectively "image") in the NFLPA Retired Player Group Licensing Program.
>
> *Group licensing programs are defined as programs in which a licensee utilized a total of six (6) or more present or former NFL players* images in conjunction with or on products that are sold at retail or used as promotional or premium items.
>
> *The undersigned player retains the right to grant the use of his image to another entity for use in a group of five (5) or less present or former players* in conjunction with or on products sold at retail or used as promotional or premium items.
>
> If the undersigned player's inclusion in a particular NFLPA program will conflict with an individual exclusive endorsement agreement, and the player provides the NFLPA with timely notice of that conflict, the NFLPA agrees to exclude the player from that particular program.
>
> *It is further understood that the moneys generated by such licensing of retired player group rights will be divided between the player and an escrow account for all eligible NFLPA members who have signed a group licensing authorization form.* Any group licensing contract entered into with an individual company by the NFLPA shall exclude players who are committed by contract individually for the competitive products or services.

The NFLPA then grants the rights it receives from the GLAs to Players Inc., which in turn licenses those rights to third parties. As stated in the prior order, the GLA is a masterpiece of obfuscation and raises more questions than it answers. Defendants' motion for summary judgment does not adequately answer those questions.

Many retired NFL players signed GLAs, but they have allegedly received no revenue from the licensing of their names, images, and biographies under those GLAs. Plaintiffs allege that the NFLPA breached a fiduciary duty owed to its retired members by withholding information about benefits to which those members might have been entitled and by failing to pursue licensing opportunities on their behalf even though the NFLPA held itself out to represent its members in such a capacity.

On April 29, 2008, a class of players was certified, with Adderley as the class representative. The parties subsequently stipulated to the following class definition:

> All retired NFL players who executed a group licensing authorization form ("GLA") with the NFLPA that was in effect at any time between February 14, 2003 and February 14, 2007 and which contains the following language: "[T]he moneys generated by such licensing of retired player group rights will be divided between the player and an escrow account for all eligible NFLPA members who have signed a group licensing authorization form."

Only plaintiffs' breach-of-contract and breach-of-fiduciary-duty claims were certified, and the latter claim only insofar as it arose out of the GLAs between the NFLPA and retired players. Certification of this class was granted on the condition that plaintiffs file a statement agreeing that the law of either Virginia or the District of Columbia would apply to all certified claims, which they did, and the class was so notified. The opt-out period passes on August 15, 2008. Certification of plaintiffs' second proposed class, consisting of all retired NFL players who joined the NFLPA, was denied because Bernard Parrish was determined to be an inadequate class representative.

Defendants now move for summary judgment with respect to both of plaintiffs' remaining claims, on the ground that there is no evidence to support the allegations that the GLA class members were not adequately compensated for the licensing of their rights.

## ANALYSIS

Summary judgment is granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A district court must determine, viewing the evidence in

3

the light most favorable to the nonmoving party, whether there is any genuine issue of material fact. *Giles v. General Motors Acceptance Corp.*, 494 F.3d 865, 873 (9th Cir. 2007). A genuine issue of fact is one that could reasonably be resolved, based on the factual record, in favor of either party. A dispute is "material" only if it could affect the outcome of the suit under the governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986).[1]

The moving party "has both the initial burden of production and the ultimate burden of persuasion on a motion for summary judgment." *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos., Inc.*, 210 F.3d 1099, 1102 (9th Cir. 2000). When the moving party meets its initial burden, the burden then shifts to the party opposing summary judgment to "go beyond the pleadings and by [its] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Celotex Corp. v. Catrett*, 477 U. S. 317, 324 (1986).

As the certification order made clear, despite the varying celebrity of the retired players, the class as a whole has a common interest in determining what, if any, rights they have under the GLAs they signed. Thousands of players who signed GLAs have yet to receive a penny from defendants. The $30 million in revenues that defendants paid out to *certain* retired players under *ad hoc* licensing deals is not at issue here. Rather, what is at issue is the collective group licensing that defendants engaged in, for which defendants paid *active* players an "equal share" royalty but paid class members nothing. The retired players have a common interest in establishing whether the GLAs entitled them to something. Though this case is festooned with factual issues, three examples will suffice.

*First*, consider the GLA. That document plainly defines a group licensing program as one "in which a licensee utilized a total of six (6) or more *present or former* NFL players [sic] images in conjunction with or on products that are sold at retail or used as promotional or premium items." Defendants argue that this language, when read in conjunction with the GLA provision governing the distribution of revenue, means that six or more *retired* players' images must be used in order for the GLA to be implicated. Assuming arguendo that defendants are

---

[1] Unless otherwise stated, all internal citations are omitted from quoted authorities in this order.

4

correct, a reasonable jury could find that defendants entered into a group licensing program and that the GLA was thus triggered whenever defendants licensed the rights of six or more retired players who had signed GLAs.

*Second*, consider the language of one of the third-party licensing agreements that defendants entered into during the relevant limitations period and that may have implicated plaintiffs' GLA rights. It is undisputed that in March 2005, defendants entered into a contract with Electronic Arts, Inc. ("EA"), pursuant to which EA agreed to pay defendants a minimum of $25 million annually. Defendants argue that the EA agreement and defendants' similar agreements with other third parties did not include retired player rights. The plain wording of that contract, however, indicates otherwise — or so a jury could reasonably conclude. The following is the relevant language from the 2005 EA agreement (emphasis added):

> PLAYERS INC represents that . . . the NFLPA has been duly appointed and is acting on behalf of the football players of the National Football League who have entered into a Group Licensing Authorization, either in the form attached hereto as Attachment "A" or through the assignment contained in Paragraph 4(b) of the NFL Player Contract, which have been assigned to PLAYERS INC . . . Licensee acknowledges that PLAYERS INC also on occasion secures authorization for inclusion in PLAYERS INC licensing programs from players, *including but not limited to retired players*, who have not entered into such Group Licensing Authorization, but who, nevertheless, authorize PLAYERS INC to represent such players for designated PLAYERS INC licensed programs.

Defendants and plaintiffs agree that the retired players do not qualify as "players . . . who have entered into a Group Licensing Authorization, either in the form attached hereto as Attachment 'A' or through the assignment contained in Paragraph 4(b) of the NFL Player Contract." The sentence italicized above, however, does refer to retired players. That sentence can be read as including in the licensing agreement the rights of any players, including retired players, who did not sign the specific GLA attached as Exhibit A ("such Group Licensing Authorization") but who did sign a different GLA with defendants. Indeed, as Doug Allen of the NFLPA testified during his deposition (Allen Dep. 205:25–206:7) (objection omitted):

> Q: The last sentence [of the EA agreement] which talks about authorization for inclusion in Players Inc. Licensing program from players including but not limited to retired players, does that reference retired players who signed

> GLAs different than the standard form attached to the —
> to this license agreement?
>
> A: (Mr. Allen): I believe so.

A reasonable jury could thus interpret the EA agreement on its face as including the rights of retired players who had signed GLAs. This interpretation is further supported by paragraph 13 of the agreement, in which defendants ensured that EA would not go outside of the agreement to secure the rights of any players, including retired players (emphasis added):

> "Non-interference." Except as otherwise provided for herein, licensee agrees and acknowledges that it shall not secure or seek to secure directly from any player who is under contract to an NFL club, is seeking to become under contract to an NFL club, *or at any time in the past was under contract to an NFL club*, or from such player's agent, permission or authorization for the use of such player's name, facsimile signature, image, likeness (without including limitation, number), photograph or biography in conjunction with the licensed products herein.

The EA agreement is not the only agreement that appears, through its plain wording, to have licensed retired players' rights. For example, defendants, in their 2004 and 2007 agreements with the Topps Company, made the following representation (emphasis added):

> NFLPA represents that the NFLPA has been duly appointed and is acting on behalf of the active *and retired football players* . . . who have entered into a Group Licensing Assignment.

Defendants' arguments that this was merely "boilerplate" language and that the third-party licensees never understood their contracts to include retired player rights do not suffice. Defendants bear the burden of persuasion at this stage, and their claims are directly in conflict with the plain language of the contracts as a reasonable jury could read them. Summary judgment will not be granted based on *ipse dixit* interpretations of the contract.

*Third*, consider the provision governing revenue in the GLA, which reads as follows:

> It is further understood that the moneys generated by such licensing of retired player group rights will be divided between the player and an escrow account for all eligible NFLPA members who have signed a group licensing authorization form.

A reasonable jury could interpret this language as requiring that, whenever retired players' images were licensed in groups of six or more and those retired players had signed GLAs, the money generated by that licensing had to be divided between the player and an escrow account.

That is not, however, what happened. Instead of paying the retired players under the GLAs, EA engaged in *ad hoc* licensing deals with the retired players whose identities it wanted to use in the game, including players who had signed GLAs.

If defendants planned to have companies like EA obtain all retired player rights through *ad hoc* agreements, it is unclear why they worked so hard to recruit retired players to sign GLAs in the first place. It remains a genuine issue of material fact whether defendants had a duty, created by the plain wording of the GLA, to ensure that retired players' rights were licensed primarily through the GLAs rather than through *ad hoc* agreements and that retired players, like active players, shared in a pool of money generated by those group licensing deals.[2]

The factual issues laid out above, if proven at trial, would implicate both a breach of contract and a breach of fiduciary duty. If the GLA was triggered anytime defendants obtained licensing deals for groups of six or more retired players who had signed GLAs, and defendants did indeed obtain such licensing deals but failed to pay the retired players as per the GLA's instructions, the GLA was breached — or so a reasonable jury could find. Defendants argue that they were not in a fiduciary relationship with plaintiffs, but that is a question of fact to be determined by the jury based on the jury's interpretation of the agency relationship that did or did not exist between plaintiffs and defendants as dictated by the terms of the GLA.

\*        \*        \*

The foregoing is sufficient to deny summary judgment, but it is worthwhile to pause over a new dispute that has arisen. At oral argument, plaintiffs' counsel submitted a "smoking gun." That document is a purported letter from an employee of Players Inc. to an employee of EA. Arguably, the letter provides evidence that EA, on the advice of defendants, scrambled the identities of a number of retired players whose likenesses it used in the Madden NFL game, rather than paying for those players' rights, *even though those players had signed GLAs*. Defendants have objected to the admissibility of this document. While the document holds

---

[2] As stated in the order granting class certification, under the agreement governing the licensing arrangement for *active* NFL players (the NFLPA/Players Inc. agreement), active players equally split sixty percent of all gross licensing revenue (Naylor Decl. Exh. K). This equal-share royalty scheme was confirmed by Doug Allen, who negotiated the NFLPA/Players Inc. agreement (Allen Dep. 120–121).

7

some promise for plaintiffs, it is not admissible in the form submitted and thus has not been relied on in this order. Without sponsoring testimony from the author, recipient, or another qualified custodian, there is no foundation for the letter. Counsel cannot simply hand documents up, call them "smoking guns," and expect them to sail into evidence — now or at trial.

Defendants contend that the use of the "smoking gun" is barred by an alleged stipulation between the parties. The alleged stipulation, however, turns out to be *not* a formal filing approved by both sides but merely an email sent by one side purporting to confirm an agreement to which the other side did not reply, despite a request to "[p]lease confirm that this is your understanding as well" (Hilbert Decl. Exh. A). Moreover, the email stated that defendants would make a reasonable and good faith effort to create a list of documents supposedly precluded from use — but defendants apparently never did so. It is unfair for defendants to try to hold plaintiffs to the alleged stipulation when defendants did not bind themselves to it until it became convenient for them to do so. Whatever other effect the email might have on discovery issues, it will not be enforced for the purposes of trial or summary judgment.

To be enforceable by a court, a "stipulation" should be finalized, adopted by both sides, and free of "ifs" and "buts." A less formal arrangement is often honored privately among counsel but if it falls apart, the only sanction is the reputation of counsel. If counsel do not trust each other, they should make agreements suitable for enforcement by the judge rather than serving up a hodge-podge of emails and expecting the judge to divine an intent.

In short, and as stated in the order granting class certification, the retired players have a common interest in determining what their GLA rights were during the period in question. There continues to exist a genuine issue of material fact as to whether the GLAs guaranteed retired players something more than empty promises.

**CONCLUSION**

For all of the above-stated reasons, defendants' motion for summary judgment is **DENIED**.

**IT IS SO ORDERED.**

Dated: August 6, 2008.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE