MANATT, PHELPS & PHILLIPS, LLP
RONALD S. KATZ (Bar No. CA 085713)
E-mail: rkatz@manatt.com
RYAN S. HILBERT (California Bar No. 210549)
E-mail: rhilbert@manatt.com
NOEL S. COHEN (California Bar No. 219645)
E-mail: ncohen@manatt.com
1001 Page Mill Road, Building 2
Palo Alto, CA 94304-1006
Telephone: (650) 812-1300
Facsimile: (650) 213-0260

MCKOOL SMITH, P.C.
LEWIS T. LECLAIR (Bar No. CA 077136)
E-mail: lleclair@mckoolsmith.com
JILL ADLER NAYLOR (Bar No. CA 150783)
E-mail: jnaylor@mckoolsmith.com
300 Crescent Court
Dallas, TX 75201
Telephone: (214) 978-4984
Facsimile: (214) 978-4044

*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT

SAN FRANCISCO DIVISION

| | |
|---|---|
| BERNARD PAUL PARRISH, HERBERT ANTHONY ADDERLEY, and WALTER ROBERTS III, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>NATIONAL FOOTBALL LEAGUE PLAYERS ASSOCIATION, a Virginia corporation, and NATIONAL FOOTBALL LEAGUE PLAYERS INCORPORATED d/b/a PLAYERS INC, a Virginia corporation,<br><br>Defendants. | CIVIL ACTION NO. C07 0943 WHA<br><br>**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**<br><br>Judge: Honorable William H. Alsup<br>Date: July 24, 2008<br>Time: 8:00 a.m.<br>Place: Courtroom 9, 19th Floor |

**TABLE OF CONTENTS**

| | | | Page |
|---|---|---|---|
| I. | INTRODUCTION | | 2 |
| II. | KEY FACTS THAT MANDATE A TRIAL | | 5 |
| | A. | The Parties | 5 |
| | B. | Defendants' Retired Player Group Licensing Program | 6 |
| | C. | PI's Third-Party Licenses Include Retired Player Rights On Their Face | 9 |
| | D. | PI Generates Significant Guaranteed Revenues in Connection with Its Third-Party License Agreements | 11 |
| | E. | Defendants Have Failed to Share Licensing Revenues with Retired Players | 12 |
| | F. | Alternatively, Defendants Breached Their Fiduciary Duties To The GLA Class By Failing To Include Its Members in the Licensing Agreements | 14 |
| III. | ARGUMENT AND AUTHORITY | | 16 |
| | A. | Summary Judgment Standard | 16 |
| | B. | Defendants Cannot Escape Liability for Their Breach of the GLA. | 16 |
| | | 1. The Plain Language of the GLA Sets Out Defendants' Obligations | 16 |
| | |     a. The Failure to Share Revenue Pursuant to the Retired Player GLAs | 17 |
| | |     b. The Failure to Share Revenues from the NFL Sponsorship Agreement | 19 |
| | |     c. The Failure to Pay From, or Alternatively, to Create the Promised Escrow Account | 20 |
| | |     d. The Irrelevance of the Individually Negotiated "Ad Hoc" Agreements | 21 |
| | | 2. The Third-Party Licensing Agreements | 24 |
| | | 3. Damages | 29 |
| | C. | The Breach of Fiduciary Duty Claims | 30 |
| | | 1. Defendants Owed Plaintiffs Fiduciary Duties Arising Out Of The GLAs | 30 |
| | |     a. The Agency Relationship | 30 |
| | |     b. A Fiduciary Relationship Can Exist Absent an Agency Relationship | 33 |
| | | 2. Defendants Breached Their Fiduciary Duties to Plaintiffs | 35 |
| | |     a. Defendants Failed to Pay the Class, and Failed to Disclose Material Facts | 35 |
| | |     b. Defendants Failed to Adequately Represent Plaintiffs and Had Improper Conflicts of Interest | 36 |
| | |     c. Damages | 38 |
| IV. | CONCLUSION | | 40 |

# TABLE OF AUTHORITIES

## CASES

*A.S. Johnson Co. v. Atl. Masonry Co.,*
693 A.2d 1117 (D.C. 1997)................................................................................27

*Acordia of Va. Ins. Agency, Inc. v. Genito Glenn, L.P.,*
560 S.E. 2d 246 (Va. 2002).........................................................................31, 32

*Affordable Elegance Travel, Inc. v. Worldspan, L.P.,*
774 A.2d 320 (D.C. 2001)..........................................................................17, 27

*Allen Realty Corp. v Holbert,*
318 S.E.2d 592 (Va. 1984).........................................................................30, 31

*Ames v. Yellow Cab of D.C., Inc.,*
2006 WL 2711546 (D.D.C.) ............................................................................33

*Aronoff v. Lenkin Co.,*
618 A.2d 669 (D.C. 1992).................................................................................38

*Bangkok Crafts Corp. v. Capitolo di San Pietro in Vaticona,*
No. 03 Civ. 0015, 2004 U.S. Dist. LEXIS 25235, *7 ......................................33

*Bolling Fed. Credit Union v. Cumis Ins. Soc'y, Inc.,*
475 A.2d 382 (D.C. 1984).........................................................................17, 26

*Brotherhood of Locomotive Firemen & Enginemen v. Graham,*
175 F.2d 802 (D.C. Cir. 1948) .........................................................................38

*Brown v. Coates,*
253 F.2d 36 (D.C. Cir. 1958) ...........................................................................32

*C&E Servs. v. Biggs,*
498 F.Supp.2d 242 (D.D.C. 2007 .....................................................................38

*Church of Scientology, Int'l v. Eli Lilly & Co.,*
848 F.Supp. 1018 (D.D.C. 1994) ................................................................31, 33

*DNM, Inc. v. S. H. Clark & Sons Roofing, Inc.,*
No. 911233, 1992 Va. LEXIS 102 (Va. April 17, 1992) ...................................33

*Ellipso, Inc. v. Mann,*
541 F.Supp.2d 365 (D.D.C. 2008) ...................................................................36

*Graham v. Brotherhood of Locomotive Firemen & Enginemen,*
338 U.S. 232 (1949) ..........................................................................................38

*Graham v. S. Railway Co.,*
74 F.Supp. 663 (D.D.C. 1947) ..........................................................................38

*Hammett v. Minar,*
53 F.2d 144 (D.C. 1931) ...................................................................................34

*Heyman Cohen & Sons, Inc. v. M. Lurie Woolen Co.,*
133 N.E. 370 (N.Y. 1921).................................................................................27

*In re Estate of Corriea,*
719 A.2d 1234 (D.C. 1998)...............................................................................39

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
PALO ALTO

3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

*In re Leisure Corp.,*
  2007 WL 607696 (N.D. Cal)................................................................................................ 28

*Int'l Brotherhood of Teamsters v. Wirtz,*
  346 F.2d 827 (D.C. Cir. 1965) ........................................................................................... 33

*Int'l Underwriters, Inc. v. Boyle,*
  365 A.2d 779 (D.C. 1976).................................................................................................. 36

*Jackson v. Loews Washington Cinemas, Inc.,*
  944 A.2d 1088 (D.C. 2008)................................................................................................ 33

*Jenkins v. Strauss,*
  931 A.2d 1026 (D.C. 2007)........................................................................................... 31, 38

*Judah v. Burton Reiner and Morris Mgmt., Inc.,*
  744 A.2d 1037 (D.C. 2000)........................................................................................... 32, 33

*Keith v. Berry,*
  64 A.2d 300 (D.C. 1949).................................................................................................... 38

*Martin & Martin, Inc. v. Bradley Enters., Inc.,*
  504 S.E.2d 849 (Va. 1998)........................................................................................... 17, 26

*McClung v. Smith,*
  870 F.Supp. 1384 (E.D. Va. 1994) .................................................................................... 31

*Messer v. Re/Max Props., Inc.,*
  No. 66597, 1985 Va. Cir. LEXIS 150 (Va. Cir. Ct. Mar. 11, 1985)..................................... 38

*Murphy v. Holiday Inns, Inc.,*
  216 Va. 490 (Va. 1975)...................................................................................................... 33

*Nellis v. Air Line Pilots Assoc.,*
  144 F.R.D. 68 (E.D. Va. 1992) .......................................................................................... 33

*Owen v. Shelton,*
  277 S.E.2d 189 (Va. 1981)................................................................................................. 39

*Parco Merged Media Corp. v. Multispectral Solutions, Inc.,*
  2006 U.S. Dist. LEXIS 29453 (E.D. Va. Apr. 21, 2006) .................................................... 17

*PGI, Inc. v. Rathe Productions, Inc.,*
  576 S.E.2d 438 (Va. 2003)................................................................................................. 36

*Reid v. Boyle,*
  527 S.E.2d 137 (Va. 2000)................................................................................................. 27

*Retail Clerks Int'l Ass'n v. NLRB,*
  510 F.2d 802 (D.C. Cir. 1975)........................................................................................... 27

*Rolinksi v. Lewis,*
  828 A.2d 739 (D.C. 2003).................................................................................................. 31

*Schmidt v. Bishop,*
  779 F.Supp. 321 (S.D.N.Y. 1991)...................................................................................... 31

*Shafford v. Otto Sales Co.,*
  119 Cal. App. 2d 849 (1953).............................................................................................. 28

*Sheldon v. Metro-Goldwyn Pictures Corp.*,
309 U.S. 390 (1940)........................................................................................ 39

*Smith v. Jenkins*,
452 A.2d 333 (D.C. 1982).............................................................................. 31

*Stevenson v. Johnson*,
No. 90-CL-1, 1993 Va. Cir. LEXIS 744 (Va. Cir. Ct. Oct. 12, 1993)................... 33

*ViChip Corp. v. Lee*,
438 F.Supp.2d 1087 (N.D. Cal. 2006) ............................................................ 28

*Wagman v. Lee*,
457 A.2d 401 (D.C. 1983).............................................................................. 33

*Wells v. Whitaker*,
207 Va. 616 (Va. 1966).................................................................................. 33

*Yelen v. Banks*,
146 A.2d 569 (D.C. 1958).............................................................................. 37

**STATUTES**

Fed. R. Civ. P. 56(c)......................................................................................... 16

**OTHER AUTHORITIES**

Restatement (Third) of Agency § 3.16.............................................................. 38

Restatement (Third) of Agency § 3:14.............................................................. 38

Restatement (Third) of Agency § 8.01.............................................................. 35

Restatement (Third) of Agency § 8.02 cmt. b (2006)........................................ 40

Restatement (Third) of Agency § 8.08 (2006).................................................. 37

Restatement (Third) of Agency § 8:03 ............................................................ 38

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# I.    INTRODUCTION

The evidence developed in discovery, as well as facts which are publicly available, clearly demonstrate that the breach of contract and breach of fiduciary duty claims certified by this Court for class treatment must be tried and Defendants' Motion should be denied in its entirety.

Contrary to Defendants' untoward accusations in their Motion that class counsel has "repeatedly misled the Court," made "brazen" claims, and offered "fanciful" arguments supported by "not a shred"[1] of evidence, the class of retired NFL players who signed GLAs at the urging of their union leadership (Gene Upshaw, Doug Allen and other NFLPA executives) has in fact been mistreated for years by the very representatives in whom they reposed trust to protect the financial interests they had in their licensing rights. As detailed herein, and revealed in the voluminous evidence submitted herewith, there is no question that these Defendants licensed NFL players' rights in a manner that earned the union and active voting members tens of millions of dollars, but which also triggered contractual obligations to class members that were never satisfied. The GLA class was illegally frozen out of licensing revenues to which they were entitled and wrongfully excluded from other lucrative opportunities. Defendants in this case, having for years publicly and privately promised that they represented all active AND retired players' licensing interests, have been caught with their hands in the proverbial cookie jar and are seeking, by this Motion, further to take advantage of the purposefully vague contract language they drafted, to skirt their obligations and to continue their scheme of profiting off the reputations and rights of the men who (perhaps naively) believed that their union and its appointed representative (PLAYERS INC, hereafter "PI") would protect their rights.

The evidence against these Defendants on the certified claims is, in fact, overwhelming. Defendants wrote these contracts, one of which, the Group Licensing Authorization ("GLA"), has been described by the Court as a "masterpiece of obfuscation."

---

[1]    Ironically, after this case was filed, the NFLPA found it necessary to shred tons of documents, although it had not done that in years past. *See* January 24, 2008 *Charlotte Observer* article, attached as Exhibit A to the Declaration of Ryan Hilbert filed herewith ("Hilbert Decl.").

1  Defendants heavily solicited Plaintiffs to sign these GLAs because Defendants recognized, as the
2  NFLPA wrote in one such solicitation, that retired players "built the game and the union."[2]
3  Despite having promised in the GLA to share licensing revenue for retired players "between the
4  player and an escrow account for all eligible NFLPA members who have signed a group licensing
5  authorization," Defendants attempt to disavow these words. According to Defendants, there was
6  no escrow account and no sharing, despite tens of millions of dollars of revenue from group
7  licensing.

8  Similarly, Defendants have authored licenses with language stating that the
9  NFLPA "act[s] on behalf of the active and retired football players of the National Football
10  League who have entered into a Group Licensing Assignment."[3] But Defendants now contend
11  that this significant contract language involves licensing that has *nothing to do* with retired player
12  rights, thus again attempting both to ignore the plain meaning of the contractual language and to
13  render the contractual language meaningless.

14  Defendants trumpet the testimony of their licensees (who are contractually
15  required to support PI regarding the rights conveyed under the license[4]) regarding the purported
16  meaning of the license agreement. Such testimony, however, cannot change the unambiguous
17  language of the contracts.

18  More importantly, discovery has shown that Defendants conspired with their most
19  lucrative licensee, Electronic Arts ("EA"), to undermine the license rights of the very retired
20  players Defendants purported to represent. When a substantial competitor to EA began to emerge
21  for use of retired players, EA and Defendants rushed to enter into a contract locking up the most
22  valuable retired players' rights in exchange for payments that were admittedly below market.
23  PI's Senior Vice-President, Clay Walker, admitted as much in the following email:

24

25  [2]  *See*, 2003 Letter from Doug Allen to NFLPA Members (Hilbert Decl., Exhibit B).
   [3]  *See. e.g.* 2004 TOPPS Agreement, § 1(A) (Hilbert Decl. Ex. U); 2007 TOPPS Agreement,
26  § 1(A)) (Hilbert Decl. Ex. V).
   [4]  *See, e.g.*, 2004 and 2005 EA Agreement, ¶ 10(A) (Hilbert Decl., Exs. C and D) ("Licensee
27  agrees that it will not . . . attack the rights of PLAYERS INC in and to . . . any of the rights
   - licensed hereunder as specified in Paragraph 2 of this Agreement, or in any way attack the
28  validity of this Agreement.").

> [T]ake Two [the EA competitor] went after retired players to create
> and [sic] "NFL" style videogame after we gave the exclusive to EA.
> I was able to forge this deal with [the Pro Football Hall of Fame]
> that provides them with $400K per year (*which is significantly
> below market rate*) in exchange for the HOF[5] player rights. EA
> owes me a huge favor because that threat was enough to persuade
> Take Two to back off its plans, leaving EA as the only professional
> football videogame manufacturer out there.[6] (Emphasis added).

This crass betrayal of retirees demonstrates both a breach of contract and a breach of fiduciary duty to the retired player class. The evidence shows that Defendants, rather than working to promote and maximize the returns to the retired players they purported to represent, were in fact working with their licensees to protect the interests of the licensees (and of themselves) at the expense of the retired players.

The hidden attempt by Defendants to undermine payments to retired players was neither isolated nor accidental. Defendants' treatment of group licensing revenue confirms their callous disregard of the interests of retired players. The NFLPA expended considerable effort from 2001 to 2005 in signing up nearly 2100 retired players to participate in the Group Licensing Authorization program. As the GLA retired player agent, the NFLPA, along with its marketing and licensing arm, PI, represented to the marketplace that only they could deliver the group licensing rights of these retired players to third parties.

Even though Defendants concede in their opening brief ("Brief") that they did indeed license retired player group rights, they claim that the retired players are not entitled to any

---

[5]     "HOF" stands for "Hall of Fame." All of the players inducted are retired.

[6]     February 20, 2007 email from Clay Walker to Joe Nahra (Hilbert Decl. Ex. E). *See also* November 1, 2007 email from Andy Feffer to Joe Nahra (Hilbert Decl. Ex. F) (reiterating the value of retired players rights). A February 22, 2006 email from Walker to Nahra is even more damning:

> We definitely aren't going to require you to pay an additional price unless
> you choose to add players that didn't sign off on the original deal. You
> have the existing HOF players that responded to our letter for several
> years with no increase in cost. The per player price for most of these guys
> was tens of thousands of dollars less than what they were guaranteed by
> Take Two Interactive *so it's a real coup that we were able to pull this off
> so cheaply.* You have to remember that EA's total cost is only $200,000
> per year. *We know that Take Two offered six figure deals to several
> former NFL players so the total cost is millions below market prices.* That
> being said, we'll continue to go after the new inductees for the same price
> per player (around $2,500) and I think we'll be successful.

(Hilbert Decl. Ex. G) (emphasis added).

group proceeds. According to Defendants, the reason for this lack of entitlement is that, although the NFLPA promised the retired players that it would share proceeds with "all eligible NFLPA members," the NFLPA then set up secret criteria for eligibility that required a member to have signed a GLA <u>and</u> to be on a current roster of an NFL team. In short, the NFLPA decided to share royalties only with the active players who vote for the leadership of the NFLPA and not the retired players who have no vote. As the Executive Director of the NFLPA has admitted: "I don't work for them [retirees]. They don't hire me and they can't fire me. They can complain about me all day long . . . But the active players have the vote. That's who pays my salary."[7]

Defendants denigrate all retired players with their convenient, *ex post facto*, undocumented rationalization (Brief at 4:23) that, although they "hope[d]" that they could market the retired players via the GLA, most retired players were simply unmarketable. This rationalization is irrelevant and untrue. It is irrelevant because, as the equal share group licensing for active players illustrates, the program applies to both superstars and third-stringers. It is untrue because, like the active players, the retired players have been used by licensees in independently negotiated *ad hoc* agreements.

The plain fact of the matter is that, because Defendants are unable to represent adequately all of the competing interests they purported to represent, they chose to create a system that this Court has described as leaving Plaintiffs "at the complete mercy and whim of the NFLPA."[8] For these reasons, which will be detailed below, Plaintiffs respectfully request that Defendants' Motion for Summary Judgment be denied.

## II.    <u>KEY FACTS THAT MANDATE A TRIAL</u>

### A.    The Parties

Herbert Adderley is a Hall of Fame NFL cornerback who played for the Green Bay Packers and the Dallas Cowboys for more than 10 years. Mr. Adderley represents the GLA Class, which consists of retired NFL players who signed GLAs with the NFLPA that were

---

[7]    *See* January 15, 2006 *Charlotte Observer* Article (Hilbert Decl. Ex. FFF).

[8]    Order Granting in Part and Denying in Part Plaintiffs' Motion for Class Certification ("Class Certification Order") at 7 (April 29, 2008) (Rec. Doc. 275).

effective between February 14, 2003 and February 14, 2007 containing the same operative language as Adderley's GLA.[9]

The National Football League Players Association ("NFLPA") is a Virginia corporation that acts as the labor union for professional football players in the National Football League. National Football League Players Incorporated ("PI") is the licensing and marketing subsidiary of the NFLPA.

**B.    Defendants' Retired Player Group Licensing Program**

As a threshold matter, Defendants have created considerable confusion about the scope of the programs they operate in which they license to third parties the rights to use the "images" of both active and retired players. In particular, Defendants use a very expansive definition of "group licensing" that sweeps in a considerable number of individual negotiations for both active and retired players. Defendants define a "group licensing program" as any program or license "in which a licensee utilizes a total of six (6) or more *present or former* NFL player images in conjunction with or on products that are sold at retail or used as promotional or premium items."[10] The purpose for this expansive definition is obvious -- Defendants want to be the sole source of player licenses -- and by combining and treating individual licensing as "group licensing" the broad definition insures that licensees must go through Defendants for player licensing. In practice, however, Defendants make a very clear distinction between what they refer to as "collective licensing," which is characterized by a single license for the rights to a significant number of players without specified payments to any specific player (frequently with guaranteed revenue), and individual *ad hoc* negotiations for the rights and/or services of one or more specific players for specified payments to each player.[11] Defendants' collective licensing

---

[9]    Stipulation and Order Revising Class Definition and Class Notice (June 9, 2008) (Rec. Doc. 289).

[10]    Adderley GLAs, ¶ 2 (emphasis added) (Hilbert Decl. Ex. H). It is undisputed that this is the only definition of group licensing in this case. Defendants' attempts to narrow this definition only to retired players (Brief at 17-18) patently ignores that fact by ignoring that the phrase "such licensing" in the penultimate paragraph of the GLA refers to "Group licensing" in the second paragraph of the GLA, which includes "six (6) or more present or former NFL player images." Defendants' interpretation that "such licensing" refers only to retired players is not only tortured, but also any ambiguity must be construed against the NFLPA as the sole drafter of the document.

[11]    Deposition of Howard Skall ("Skall Depo.") 56:16-57:3 ("I would use the term [*ad hoc*]

programs are governed by the terms of "group licensing agreements" or "group licensing authorizations" (hereafter "GLAs").[12] This case is not about individually negotiated *"ad hoc"* agreements, of which there are many for both active and retired players. It is about collective group licensing for which the Defendants paid all active players an "equal share" royalty, but arbitrarily excluded retired players from the same royalty pool.

The NFLPA promoted a "Retired Players Group Licensing Program," through which it actively encouraged retired players to enter into GLAs which granted the NFLPA the "right to use [the player's] name, signature, facsimile, voice, picture, photograph, likeness and/or biographical information (collectively 'image') in the NFLPA Retired Group Licensing Program."[13] Defendants created this program so that they could provide a "critical mass" of retired players to prospective licensees.[14] More specifically, Defendants wanted to be known in the marketplace as the "one-stop" shop for *all* NFL player rights, active and retired.[15] To further this end, Defendants solicited retired players to sign GLAs at retired player meetings and conventions, and sent retired players a GLA as part of the NFLPA's membership kit.[16] The 2004-

where we would do agreements with players which again, were not pursuant to any group licensing rights, but pursuant to a company coming to us and wanting to involve a player in a way that was beyond the group licensing rights.") (Hilbert Decl. Ex. I). *See also* footnotes 81 and 82.

[12] In contrast, Defendants *"ad hoc"* agreements are negotiated individually with each participating player. Brief 8:1-3; Skall Depo. 56:19-57:3 (Hilbert Decl. Ex. I); Deposition of Doug Allen ("D. Allen Depo. 165:20-166:7") (Hilbert Decl. Ex. J). Individually negotiated *ad hoc* agreements are separate from and not governed by GLAs, and contrary to Defendants' misleading and self-serving interpretation, a licensing venture requiring six or more individually negotiated *ad hoc* agreements does not constitute "collective" group licensing. (*See* Brief 8:10-19) Defendants concede that Plaintiffs are not asserting any claim with respect to individually negotiated *ad hoc* agreements. (Brief 8:9, n.23).

[13] Adderley GLAs ¶ 1 (Hilbert Decl. Ex. H); *see also* Brief 4:17-20; Skall Depo. 35:6-9 ("A GLA is a document that gives Players, Inc. group licensing rights.") (Hilbert Decl. Ex. I); Deposition of Gene Upshaw ("Upshaw Depo.") 20:18-24 ("A GLA is a licensing agreement or assignment that the retired players grant us the right to represent them in group licensing.") (Hilbert Decl. Ex. K); Deposition of Glenn Eyrich ("Eyrich Depo.") 46:4-9 (Hilbert Decl. Ex. L).

[14] D. Allen Depo. 214:21-215:9 (Hilbert Decl. Ex. J).

[15] Skall Depo. 85:3-21; 156:13-157:9 ("As I stated earlier, PLAYERS INC, as part of our sell, is, we often talked about the access we had to active and retired players, and the fact that through PLAYERS INC, as opposed to the largest agency out there which may represent 100 to 150 players, you could have access to 1800 active players and thousands of retired players. I believe we used the term 3,000 loosely as a number we had access to."). (Hilbert Decl. Ex. I)

[16] Deposition of Joe Nahra ("Nahra Depo.") 17:8-19 (Hilbert Decl. Ex. M); *See* Canton Presentation (Ex. 49 to D. Allen Depo.) (Hilbert Decl. Ex. N); D. Allen Depo. 274:7-275-6 ("This wasn't the only time I made this kind of presentation") (Hilbert Decl. Ex. J); D. Allen Depo.

1  2006 Directory of Retired Players published by the NFLPA confirmed that the drive to "sign up"
2  more retired players would lead to better opportunities for retired players.[17] The GLAs permitted
3  Defendants to use the retired players' image in collective group licensing. "When a player signs a
4  [NFL]PA Group Licensing Assignment (GLA) or assigns his group licensing rights to the
5  [NFL]PA, he gives [NFL]PA the exclusive right to market the retired player's name, number,
6  likeness, voice, facsimile signature, photograph, picture and/or biographical information
7  (collectively 'image') in the NFLPA Retired Player Group Licensing Program."[18]

8       Ultimately, representing both active and retired players is valuable to Defendants
9  because it eliminates competition both when the NFLPA solicits the players and when the
10  NFLPA negotiates with licensees. Defendants are able to provide licensees with "one-stop
11  shopping", which in turn reduces the amount a licensee like EA has to spend negotiating player
12  contracts, and allows Defendants to receive more from licensees (and, incidentally, to pay players
13  less).[19] As a result, it is unsurprising that PI "was always interested in having more players
14  participate [in its GLA program.]"[20]

15       Defendants convinced over 2000 retired players to execute GLAs.[21] The incentive
16  for a retired player to enter into the GLA was the promise of a share of royalties:

17            [T]he moneys generated by such licensing of retired player group
              rights will be divided between the player and an escrow account for
18

19  278:2-20 (Hilbert Decl. Ex. J); Patricia Allen Performance Summary (Ex. 114 to Upshaw Depo.)
    ("Helped secure more than 70 GLAs at the Retired Players Convention.") (Hilbert Decl. Ex. O);
20  Skall Depo. 38:2-8; 40:17-41:3 (Hilbert Decl. Ex. I).
    [17]  The Directory states: "PLAYERS INC, the for-profit licensing company of the NFL
21  Players Association, is constantly working to develop retired players programs. The NFLPA
    Retired Players Department has obtained Group Licensing Assignment agreements (GLAs) from
22  the more than 2,900 retired NFL players, and is in the process of building up our list so that
    PLAYERS INC can provide opportunities to retirees." (Hilbert Decl. Ex. P).
23  [18]  PLAYERS INC Website (Ex. 3 to D. Allen Depo.) (Hilbert Decl. Ex. Q); *see also*
    Upshaw Depo. 20:25-21:11 (group licensing "is the use of our players in six or more.") (Hilbert
24  Decl. Ex. K); Eyrich Depo. 46:4-9 ("a group licensing authorization is an authorization signed by
    players to allow Players, Inc. to use their name, likeness, facsimile, signature, in groups of over
25  six.") (Hilbert Decl. Ex. L); Adderley GLAs (Hilbert Decl. Ex. H).
    [19]  May 23, 2008 Expert Report of Daniel A. Rascher ("Rascher Report") at 13-14 (Hilbert
26  Decl. Ex. R).
    [20]  D. Allen Depo. 188:16-20 (Hilbert Decl. Ex. J).
27  [21]  May 23, 2008 Expert Report of Phillip Rowley ("Rowley Report"), Ex. 7 (Hilbert Decl.
28  Ex. S).

all eligible NFLPA members who have signed a group licensing authorization form.[22]

After soliciting and acquiring the GLAs, the NFLPA sublicensed these rights to PI pursuant to a March 1, 2000 agreement (the "2000 NFLPA-PI Agreement").[23]

## C. PI's Third-Party Licenses Include Retired Player Rights On Their Face

PI licensed the collective group rights of both active and retired NFL players to third parties for considerable profit. More specifically, PI has licensed the group rights of both active and retired players to dozens of licensees including the TOPPS Company Inc. ("TOPPS") and EA. The express terms of these agreements include a collective license to both active and retired player rights. For example, PI's 2004 and 2007 agreements with TOPPS contain an unequivocal representation that PI is acting on behalf of both active and retired players:

> NFLPA represents that the NFLPA has been duly appointed and is acting on behalf of the active *and retired football players* . . . who have entered into a Group Licensing Assignment . . .[24]

PI's agreements with EA also contain explicit language that includes retired players who have signed GLAs. Specifically, in Section 1(A) of PI's March 1, 2005 Agreement with EA ("2005 EA Agreement"), PI represents that it has acquired group licensing rights for certain active and retired players:

> PLAYERS INC represents that . . . the NFLPA has been duly appointed and is acting on behalf of the football players of the National Football League who have entered into a Group Licensing Authorization, either in the form attached hereto as Attachment "A" or through the assignment contained in Paragraph 4(b) of the NFL Player Contract, which have been assigned to PLAYERS INC . . . Licensee acknowledges that PLAYERS INC also on occasion secures authorization for inclusion in PLAYERS INC licensing programs from players, *including but not limited to retired players,* who have not entered into such Group Licensing Authorization, but who, nevertheless, authorize PLAYERS INC to represent such players for designated PLAYERS INC licensed programs.[25]

---

[22] Adderley GLAs ¶ 5 (Hilbert Decl. Ex. H).

[23] 2000 NFLPA–PI Agreement, § 1(A) (Hilbert Decl. Ex. T).

[24] 2004 TOPPS Agreement, § 1(A) (emphasis added) (Hilbert Decl. Ex. U); 2007 TOPPS Agreement, § 1(A) (emphasis added) (Hilbert Decl. Ex. V).

[25] 2005 EA Agreement, § 1(A) (emphasis added) (Hilbert Decl. Ex. D).

On its face, the second sentence of Paragraph 1(A) includes those retired players, like Mr. Adderley, who did not sign "such Group Licensing Authorization" (*i.e.*, the specific GLA form attached as Exhibit A to the 2005 EA Agreement designed for active NFL players), but who instead signed a GLA with slightly different language.[26]

In both the TOPPS and the 2005 EA Agreement, PI granted a license to the retired players referenced in Paragraph 1(A):

> Upon the terms and conditions hereinafter set forth, ***PLAYERS INC hereby grants to Licensee*** and Licensee hereby accepts the exclusive right, license and privilege of utilizing . . . ***the NFL players referenced in Paragraph 1(A) above***, for products(s) in the form of video and computer football simulation, arcade-style, and manager games.[27]

Virtually identical language appears in numerous other license agreements.[28]

In an effort to lock up the market, at the request of Defendants, the License Agreements also blocked third parties from making independent agreements with the retired players. Paragraph 13 provided:

> "Non-interference." Except as otherwise provided for herein, licensee agrees and acknowledges that it shall not secure or seek to secure directly from any player who is under contract to an NFL club, is seeking to become under contract to an NFL club, ***or at any time in the past was under contract to an NFL club***, or from such player's agent, permission or authorization for the use of such player's name, facsimile signature, image, likeness (without including limitation, number), photograph or biography in conjunction with the licensed products herein.[29]

The exclusivity of this arrangement was confirmed by Allen:

---

[26] *Id.; see also* D. Allen Depo. 205:25-206:7 (Hilbert Decl. Ex. J).

[27] 2005 EA Agreement, § 2(A)) (emphasis added) (Hilbert Decl. Ex. D); D. Allen Depo. 208:11-208:22 (Hilbert Decl. Ex. J).

[28] Other license agreements entered into by PI during the class period containing retired player group licensing rights include, but are not limited to those with Activa Consumer Promotions Inc. (Hilbert Decl. Ex. W), Airplay (Hilbert Decl. Ex. X), Atari (Hilbert Decl. Ex. Y), Fanball Interactive, LLC d/b/a Fanball.com (Hilbert Decl. Ex. Z), Flipp Sports (Hilbert Decl. Ex. AA), Fox Sports Interactive Media, LLC (Hilbert Decl. Ex. BB), Gamewear, Inc. (Hilbert Decl. Ex. CC), Jamdat Mobile Inc. (Hilbert Decl. Ex. DD), K2 Licensing and Promotions (Hilbert Decl. Ex. EE), Little Earth Productions, Inc. (Hilbert Decl. Ex. FF), MBI, Incorporated (Hilbert Decl. Ex. GG), The Merrick Mint (Hilbert Decl. Ex. HH), Motion Imaging Inc. (Hilbert Decl. Ex. II), MVP Pics USA, LLC (Hilbert Decl. Ex. JJ), National Direct (Hilbert Decl. Ex. KK), and USAOPOLY, Inc. (Hilbert Decl. Ex. LL).

[29] *See e.g.* 2005 EA Agreement, § 13 (emphasis added) (Hilbert Decl. Ex. D)

Q. ...Do you understand whether this language, in fact, prevents EA from entering into an agreement with Herb Adderley directly related to the licensed products?

A. With respect to the licensed products contained in this agreement, yes.[30]

Being the exclusive provider of player group licensing rights was beneficial for Defendants:

I can say that it was important so that we could provide a reliable delivery of a critical mass of players to licensees and that there wouldn't be confusion about who was going to be involved and on what basis they were going to be involved.[31]

This confirms that Defendants sought to eliminate competition both when the NFLPA solicits the players and when the NFLPA negotiates with licensees.

**D.  PI Generates Significant Guaranteed Revenues in Connection with Its Third-Party License Agreements**

PI's agreements with licensees such as TOPPS, EA and numerous other licensees generate guaranteed minimum revenues for PI that are paid regardless of which player images, if any, its licensees actually use. Such payments do not relate to any specific player and make no distinction between active and retired players.

For example, the 2005 EA Agreement obligates EA to make annual minimum payments of $25 million to PI, regardless of whether EA actually uses any of the licensed rights, and regardless of which player images are used in EA's products.[32] Likewise, in its 2007 Agreement with PI, TOPPS agreed to make guaranteed minimum payments to PI of between $2,000,000 and $2,500,000 per year, regardless of whether TOPPS used any player likenesses whatsoever.[33]

---

[30]  D. Allen Depo 216:16-217:6; 213:9-20 (Hilbert Decl. Ex. J).

[31]  *Id.*, 214:3-215:10.

[32]  2005 EA Agreement, § 6(C) (Hilbert Decl. Ex. D). Notwithstanding this provision, EA has used an unfair practice to get around paying retirees while unmistakably cloning them for its vintage games (*e.g.*, 1964 Cleveland Browns vs. 1967 Green Bay Packers). In these games, the players are described by height, weight, years in the league, etc., but their names and images are not used. (Hilbert Decl., Ex. MMM).

[33]  2007 TOPPS Agreement § 6(B) (Hilbert Decl. Ex. V) ("Such guaranteed minimum royalty payments shall be made by Licensee as specified hereinabove whether or not Licensee uses the rights licensed hereunder, and no part of such guaranteed minimum payments shall be

**E.     Defendants Have Failed to Share Licensing Revenues with Retired Players**

The Adderley GLA provides, in critical part, that Defendants will establish an escrow account and that each player will share in the licensing revenue of group rights:

> [T]he moneys generated by such licensing of retired player group rights will be divided between the player and an escrow account for all eligible NFLPA members who have signed a group licensing authorization form.[34]

Although Defendants did create an escrow account (from which they paid an "equal share" royalty to active players), Defendants failed to pay retired players any portion of the license revenues pursuant to the terms of their GLAs.[35]

Pursuant to the terms of the 1994 and 2000 Agreements between PI and the NFLPA, PI distributes a percentage of its "gross licensing revenues" to players "who meet [certain] eligibility requirements." PI distributes the revenues that it generates in connection with its collective group licensing program in "equal shares" to every "eligible player," whether famous or unknown.[36]

However, members of the GLA Class have not received their "equal share" of the revenues, because Defendants unilaterally determined that the retired players were not "eligible." While Doug Allen (the former President of PI and the Assistant Executive Director of the NFLPA) conceded that the NFLPA's board of representatives could have included retired players in the eligibility requirements, Defendants elected to include only active players.[37] Joseph Nahra, Defendants' in-house attorney, explained that "it was the intent of the NFLPA to have discretion

---

repayable to Licensee."). *See also* 2004 EA Agreement (guarantees $500,000 per year) (Hilbert Decl. Ex. C); 2004 Upper Deck Agreement (guarantees $1,600,000 per year) (Hilbert Decl. Ex. MM); 2004 TOPPS Agreement (guarantees $1,600,000 per year) (Hilbert Decl. Ex. U).

[34]     Adderley GLAs ¶ 5 (Hilbert Decl. Ex. H).

[35]     The NFLPA claims that it never created an escrow account for retired players. D. Allen Depo. 148:16-149:10 (Hilbert Decl. Ex. J); Upshaw Depo. 23:3-5 (Hilbert Decl. Ex. K); Deposition of Richard Berthelsen ("Berthelsen Depo.") 48:12-14 (Hilbert Decl. Ex. NN). But if that were true, it would also be a breach of contract, as well as a breach of duty as the NFLPA did not inform any retired players that the NFLPA would not create an escrow account for them. Upshaw Depo. 40:19-22 (Hilbert Decl. Ex. K).

[36]     D. Allen Depo. 121:13-16 (Hilbert Decl. Ex. J).

[37]     *Id.* 121:23-122:15; 124:12-23.

for group licensing deals as to who the eligible recipients would be."[38] Hiding behind this "discretion," Defendants failed to pay to Adderley and the GLA Class any of the guaranteed licensing revenues generated under the EA Agreement, the TOPPS Agreement and the myriad other agreements which license both active and retired player rights.[39]

In addition to paying only to active players monies that should have been shared with the retired players, Defendants used retired player monies to line their own pockets. In the 2000 NFLPA-PI Agreement, Defendants agreed to keep 64% of all group licensing revenue per year (which later rose to 69%), a portion of which should have gone to retired players.[40] This award, which is well over any acceptable agency commission,[41] was signed off by Gene Upshaw and Doug Allen, the two highest-ranking officers in both organizations, without any independent appraisal.[42] To make matters worse, in a February 28, 2006 amendment to the 2000 NFLPA-PI Agreement,[43] Defendants agreed, unilaterally and without notice to retired players, that $8 million of gross licensing revenue should be "reallocated" to Defendants.[44] Defendants' 30(b)(6) witness on damages cited as justification for this re-allocation the increase of the NBPA's logo around this time, a comparison that was recently deemed "irrelevant and meaningless" by Defendants' own expert in this matter.[45] More significantly, even though Defendants stated that they would

---

[38] Nahra Depo. 69:19-72:21(Hilbert Decl. Ex. M); *see also* Eyrich Depo. 69:21-24 ("[r]etired players are not included in the equal share pool.") (Hilbert Decl. Ex. L).

[39] Eyrich Depo. 69:21-24 ("[r]etired players are not included in the equal share pool."). However, simply defining the retired players as ineligible does not achieve Defendants' goal of not paying them. Rather, the GLA promises to divide the money between (1) the retired player and (2) an escrow account for all "eligible," *i.e.* active, players. Thus, even if the retired player is not "eligible," under the terms of the GLA, the retired player is still entitled to receive his "division" of any moneys generated, before any such money is allocated to the escrow account.

[40] 2000 NFLPA-PI Agreement, ¶ 4 (Hilbert Decl. Ex. T)

[41] Rascher Report at 10-13 (Hilbert Decl. Ex. R).

[42] Eyrich Depo. 127:3-129:2 (Hilbert Decl. Ex. L).

[43] February 28, 2006 Amendment to 2000 NFLPA-PI Agreement (Hilbert Decl. Ex. OO).

[44] The 1994 NFLPA-PI Agreement expressly prohibits amendment to the royalty allocation between the NFLPA, PI and "eligible players" without the sign-off of an independent auditor. 1994 NFLPA-PI Agreement, § 5(b)) (Hilbert Decl. Ex. PP). Defendants apparently recognized this requirement because the eighth "whereas clause" in the February 28, 2006 amendment concedes that "further adjustment [to the allocation] may be necessary after completion of an independent, third party evaluation ...." However, it is undisputed that no independent evaluation has ever been done to determine the arm's-length value of the $8 million reallocation. Upshaw Depo. 86:5-87:5; 94:18-25 (Hilbert Decl. Ex. K).

[45] *Compare* Eyrich Depo. 92:12-94:25 (stating the "primary support for that 7 million dollars

1    subsequently conduct an independent third-party appraisal to assess the appropriateness of their

2    decision, Defendants have conceded that no such appraisal occurred.[46]

3         In short, instead of complying with the express terms of the GLAs signed by

4    Adderley and other retired members of the NFLPA, PI has, with the concurrence of or at the

5    direction of the NFLPA, diverted millions of dollars to PI and the NFLPA.

6    **F.    Alternatively, Defendants Breached Their Fiduciary Duties To The GLA Class By
         Failing To Include Its Members in the Licensing Agreements.**

7

8         Defendants' explanation for not paying the retired players is that the retired

9    players' group rights were not included in the third-party license agreements. Even if this were

10   true (which, on the face of the license agreements, it is not), any alleged non-inclusion stems from

11   Defendants' failure to promote the interests of the retired players, despite their obligation to do

12   so. Defendants were careful to negotiate for inclusion of all active players who signed the group

13   authorization in collective group licenses, but took no such care for retired players.   Gene

14   Upshaw, the Executive Director of the NFLPA, confirmed that Defendants made no effort to

15   license the rights of retired players:

16        Q.    But you don't make any affirmative efforts to sell them
             [licensees] the images of retired players as a group or individually?
17

18        A.    I don't run any licensee's company.  That's up to them.

                              *  *  *
19

20        Q.    But do you make efforts to sell [retired player images] prior
             to [a licensee] making a request?
21        A.    Not really.[47]

22        Mr. Upshaw's statements regarding Defendants' failure to represent retired players

23   are confirmed by the testimony of PI's third-party licensees. For example, Warren Friss, TOPPS'

24   30(b)(6) witness, testified that he was not even aware that the NFLPA had solicited and received

25   _____

26   was a peer review of [the NBA Players Association's] logo use revenue.") (Hilbert Decl. Ex. L)
     *with* June 26, 2008 Expert Reply Report of Daniel A. Rascher ("Rascher Reply Report") at fn. 81
27   (Hilbert Decl. Ex. NNN).
     [46]    Eyrich Depo. 108:4-14 (Hilbert Decl. Ex. L)
28   [47]    Upshaw Depo. 98:20-98:24 and 99:13-15 (Hilbert Decl. Ex. K).

GLAs from retired players that authorized PI to represent them.[48] Mr. Friss further testified that he would have taken a license to the group rights of retired players had they had been offered to him:

> Q. In fact, if in 2004 and 2007 Players, Inc had said, we've already got all of these [retired player] rights, you would have been happy to get them granted in the license agreement; wouldn't you?
>
> A. Yes.[49]

If retired player rights were not included in the license agreements with third parties (contrary to the express language of those agreements), not only did Defendants fail to negotiate for inclusion of retired players, Defendants did not bother to inform prospective licensees like TOPPS of the identity of the retired players that had already granted their collective group rights to the NFLPA.

Although Defendants claim that the retired players simply had no value, this is disproved both by Defendants' substantial multi-year efforts to solicit them to sign GLAs, and the third-party licensees' proven use of retired players in individually negotiated *ad hoc* agreements.[50]

The evidence demonstrates that Defendants were faithless representatives of retired players, in fact working against the interests of retired players and in favor of the licensees. For example, an internal email from NFLPA Executive Clay Walker, confirms that PI negotiated a deal with EA on behalf of retired Hall of Fame players which was "significantly below market rate:"

> I was able to forge this deal with the HOF that provides them with 400K per year (*which is significantly below market rate*) in exchange for the HOF player rights. EA owes me a huge favor because that threat was enough to persuade Take Two to back off its plans, leaving EA as the only professional football videogame manufacturer out there."[51]

---

[48] Deposition of Warren Friss ("Friss Depo.") 19:25-20:7 (Hilbert Decl. Ex. QQ).

[49] *Id.*, 77:8-14.

[50] Although the Defendants claim that the retired player usage was simply licensee cherry-picking via the use of multiple *ad hoc* agreements, in fact this proves both their value and use to the third-party licensees. Furthermore, the third-party licensees also cherry-picked amongst the active players for individually negotiated *ad hoc* agreements.

[51] February 20, 2007 email from Clay Walker to Joe Nahra (Ex. 521 to Nahra Depo.) (Hilbert Decl. Ex. E).

An email from Andrew Feffer, Executive Vice President and Chief Operating Officer of the NFLPA, confirms that EA should have paid more than double the price for the rights that it obtained pursuant to the agreement:

> I can tell you that Clay and Joe's negotiation of these discounted terms was a significant contribution to EA as *you more than likely would have paid in excess of $1 million for these rights without their involvement and assistance.*[52]

Instead of negotiating the best possible deal for the retired players which it purported to represent, PI was doing favors for EA by reducing compensation to retired players, and driving a competitive licensee out of the market. Indeed Joseph Nahra, PI's in-house attorney, candidly admitted: "[w]e are not trying to drive up the price on our licensees."[53]

## III.    ARGUMENT AND AUTHORITY

### A.    Summary Judgment Standard

Summary judgment is proper only when the "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law" Fed. R. Civ. P. 56(c). Defendants' own admissions regarding both causes of action at the least raise questions of fact.

### B.    Defendants Cannot Escape Liability for Their Breach of the GLA.

The evidence Defendants offer in support of their interpretation of the GLAs and license agreements both contradicts the plain language of those agreements and raises additional factual questions.[54] In light of Defendants' strained interpretation of these agreements, which must be construed against them, summary judgment is inappropriate.

#### 1.    The Plain Language of the GLA Sets Out Defendants' Obligations

Although the GLA is "a masterpiece of obfuscation [that] raises more questions than it answers,"[55] the Court must give effect to the clear and unambiguous language on the face

---

[52]    November 1, 2007 email from Andy Feffer to Paul Cairns (EA) (emphasis added) (Ex. 523 to Nahra Depo.) (Hilbert Decl. Ex. F).

[53]    Nahra Depo. 224:3-18 (Hilbert Decl. Ex. M).

[54]    Defendants claim that both the GLA and the License Agreements are ambiguous. Brief 18:9-11 and 3:1-3. On the other hand, Defendants argue that the license agreements are clear and should be determined as a matter of law. Brief 18:22-20:19.

[55]    Class Certification Order at 3 (April 29, 2008) (Rec. Doc. 275).

of the GLA. *See Parco Merged Media Corp. v. Multispectral Solutions, Inc.*, 2006 U.S. Dist. LEXIS 29453, at *16 (E.D. Va. Apr. 21, 2006) (construing Virginia contract law); *Bolling Fed. Credit Union v. Cumis Ins. Soc'y, Inc.*, 475 A.2d 382, 385 (D.C. 1984). Should the Court find any ambiguity within these words, the GLA must be construed against Defendants. *Martin & Martin, Inc. v. Bradley Enters., Inc.*, 504 S.E.2d 849, 851 (Va. 1998) (contract is construed against the drafter); *Affordable Elegance Travel, Inc. v. Worldspan, L.P.*, 774 A.2d 320, 328 (D.C. 2001) (same).

### a. The Failure to Share Revenue Pursuant to the Retired Player GLAs

It is undisputed that the NFLPA solicited the retired players to sign the GLAs because they were beneficial to Defendants.[56] It is also undisputed that the plain language of the GLAs defines the group licensing programs as "programs in which a licensee utilizes a total of six (6) or more *present or former* NFL player images in conjunction with or on products that are sold at retail or used as promotional or premium items."[57] Thus, any collective group license negotiated by Defendants for six or more active or retired players constituted group licensing under the terms of the GLA. The GLA also states that each player will share in the resulting licensing revenue:

> [T]he moneys generated by such licensing of retired player group rights will be divided between the player and an escrow account for all eligible NFLPA members who have signed a group licensing authorization form.[58]

Thus, the GLAs signed by Mr. Adderley and other members of the GLA Class promised a share of the revenue PI received from third-party licensees.[59] Defendants admit that the retired players

---

[56] D. Allen Depo. 214:21-215:9 (Hilbert Decl. Ex. J); Rascher Report at 13-14 (Hilbert Decl. Ex. R).

[57] Adderley GLAs, ¶ 2 (emphasis added) (Hilbert Decl. Ex. H). *See also* Upshaw Depo. 35:23-36:4 (Hilbert Decl. Ex. K):

Q . . . . the GLA clearly states that the rights granted are for "programs in which a licensee utilizes a total of six or more present or former NFL player images . . ." Is that consistent with your thinking?

A. Yes.

[58] Adderley GLAs, ¶ 5.

[59] *Id.*

were not paid for collective group licensing rights.[60] By Defendants' own admissions, and a plain reading of the GLA, they have breached the GLAs.

All payments that Defendants have claimed to be GLA payments were actually made pursuant to individually negotiated *ad hoc* agreements. During discovery, Defendants identified only four isolated instances during the entire four-year statute of limitations period in which they claim retired players were paid pursuant to a GLA.[61] Even if true, this number is staggeringly low considering that Defendants had in their possession the rights to license approximately 2,100 retired players.[62]

But a careful review of even these isolated instances indicates that Defendants' assertion is inaccurate. Even though Defendants claim that in June 2003 they paid 136 (of the approximately 2100) retired players $750 each in connection with an agreement with Electronic Arts, there are at the very least issues of material fact concerning these payments, starting with the fact that at least some of the 136 did not execute a GLA at all.[63] Similarly, even though Defendants also claim that 159 retired players earned as little as 8 cents each for the use of their images in connection with an agreement with Photo File, not all of these players had GLAs in effect,[64] and Defendants have conceded that not everyone whose image was used received compensation.[65] With respect to the other two instances, Footlocker and Exclusive Pro Sports, most of the individuals Defendants have identified as receiving monies in connection with these agreements did *not* have GLAs in effect.[66]

---

[60]    D. Allen Depo. 208:23-209:17 (Hilbert Decl. Ex. J).

[61]    Defendants' Supplemental Responses and Objections to Defendants' Fourth Set of Interrogatories dated February 27, 2008. (Hilbert Decl. Ex. III).

[62]    Rowley Report at Ex. 7 (Hilbert Decl. Ex. S).

[63]    Among the seven players who appear to have received $750 in connection with the agreement with EA, but for whom Defendants have not produced signed GLAs, are Rodney Hamilton, Marion Motley and Pat Swillig. (Hilbert Decl. ¶ 69).

[64]    Among the players whom Defendants claim to have paid in connection with an agreement with Photo File, but for whom Defendants have not produced signed GLAs, are John Elway, Reggie White and Steve Young. (Hilbert Decl. ¶ 69).

[65]    *See* Feb. 8, 2008 letter from David Greenspan to Ryan Hilbert at 3 (Hilbert Decl. Ex. JJJ).

[66]    (Hilbert Decl. ¶ 69).

### b. The Failure to Share Revenues from the NFL Sponsorship Agreement

Defendants also seek to dismiss in a footnote Plaintiffs' claims that they are entitled to an equal share of those retired player rights that were licensed as part of the NFL Sponsorship and Internet Agreement (the "NFL Agreement").[67] This NFL Agreement purports to give the NFL the right to convey to its sponsors the right to utilize those NFL player group licensing rights owned by PI in exchange for a guaranteed minimum royalty to PI.[68]

Paragraph 1 of the NFL Agreement describes the license grant to the NFL as follows (in relevant part): "In exchange for the Annual Sponsorship Payment as set forth below . . . NFL Properties shall acquire Group Player Licensing Rights (as defined in the CBA) and the exclusive use of PI's name and logo, for all corporate sponsorships/endorsements . . . ." When one looks to the CBA, the term "Group Player Licensing" is "defined as the use of a total of six or more NFL players' names, signatures facsimiles, voices, pictures, photographs, likenesses and/or biographical information on [designated products]."[69] This definition is consistent with the definition used by Defendants to describe their standard group licensing program, which Defendants have conceded includes retired player rights.[70]

Nowhere in the NFL Agreement does it expressly state that retired players are *not* to be included. Moreover, when Plaintiffs requested relevant discovery related to this NFL Agreement, including documents related to the negotiation, drafting or execution of the NFL Agreement, Defendants objected and refused to provide such documents.[71] The absence of such

---

[67] Brief fn. 66. *See* NFL Sponsorship and Internet Agreement (Hilbert Decl. Ex. RR). It was amended on July 28, 2006 to extend the term through the 2012. *Id.*

[68] August 19, 2004 NFL and PLAYERS INC Information Worksheet (Ex. 145 to Skall Depo.) (Hilbert Decl. Ex. TT).

[69] *See* 2006 CBA (Hilbert Decl. Ex. UU). At one point, Defendants attempted to argue that retired player rights could not have been licensed in the NFL Sponsorship and Internet Agreement because that Agreement was the product of CBA negotiations, which can only be done on behalf of active players. But the relevant language in the Agreement makes clear that it is only relying on a definition available in the CBA, not on the CBA itself. Moreover, as explained in the text, Defendants have conceded that they have paid retired players in connection with this Agreement.

[70] *See, e.g.,* GLAs (PI000150-170) (Hilbert Decl. Ex. VV); *see also* PI website (stating that the group licensing program is one in which "a licensee or partner utilizes a total of six (6) or more NFL players" without specifying whether such players are active or retired) (Hilbert Decl. Ex. Q); Upshaw Tr. 20:18-21:11 (stating that the term "group licensing" in the GLAs simply means six or more players) (Hilbert Decl. Ex. K).

[71] (Hilbert Decl. Ex. OOO) (consisting, collectively, of Defendants' responses, which have

19

documentation raises genuine issues of fact as to, among other things, whether the parties contemplated or discussed retired player rights at the time the NFL Agreement was executed. Defendants cannot state that the standard definition of group licensing in the NFL Agreement does *not* apply to retired players when they have refused to give Plaintiffs responsive documents and the evidence is to the contrary.[72]

Defendants' actions with respect to the NFL Agreement confirm that they intended it to cover retired players. Howard Skall, PI's former Vice President for Marketing, stated that numerous retired NFL players were used by NFL sponsors in accordance with the NFL Agreement.[73] Defendants themselves have promoted these uses in their Annual Reports.[74] Significantly, Defendants also have conceded that they have paid retired players in connection with this NFL Agreement, even though they now argue such players were not included.[75]

### c. The Failure to Pay From, or Alternatively, to Create the Promised Escrow Account

The distribution scheme and the establishment of the promised escrow account under the GLA raises additional fact questions. As the Court has noted:

> The GLA did not describe how the money would be divided or whether everyone who signed a GLA was entitled to any licensing

not been amended and communications exchanged by the parties on this issue).

[72] Skall Depo. 98:16-24 (admitting that he could not recall the general terms of the NFL Sponsorship and Internet Agreement despite offering his interpretation of what such terms meant earlier in the deposition) (Hilbert Decl. Ex. I).

[73] *Id.* 86:6-25 (acknowledging that NFL sponsors were interested in using retired players).

[74] *See, e.g.,* Annual Report dated March 12, 2005 (PI140504-568) (Hilbert Decl. Ex. WW) (noting that NFL sponsors Ameriquest (PI140522), IBM (PI140525) and Levitra (PI140522) used retired players); Annual Report dated March 12, 2006 (PI140583-684) (Hilbert Decl. Ex. XX) (noting that NFL sponsors Cadillac (PI140605), Coors (PI140605-6), GMC/Hummer (PI140607), IBM (PI140608) and Samsung (PI140609) used retired players, with certain of these programs, including IBM and Samsung, even focusing on retired players).

[75] Declaration of Andrew Feffer (October 9, 2007) ("In his October 9, 2007 Declaration, Andrew Feffer, current Executive Vice President and Chief Operating Officer of PI, swore: "Retired players who provide such services to NFL sponsors are paid under the Active Usage Credit, *i.e.,* from the 25% or more of the Annual Sponsorship Payment that would otherwise have gone to active players.")(Hilbert Decl. Ex. YY); *see also* Skall Depo. 95:24-96:20 (acknowledging that retired players were paid pursuant to a provision in the NFL Sponsorship and Internet Agreement) (Hilbert Decl. Ex. I). Defendants have not produced any agreement under which PI and the NFLPA have memorialized this arrangement, with the possible exception of a pair of letter agreements that do not specifically mention retired players.

distribution even if their image or likeness was not used. It is even unclear what "escrow account" the GLA referred to or whether the escrow account was ever even created by defendants.[76]

Although the GLA does not specifically address how sharing of revenue is to be done,[77] the NFLPA has a well-established protocol for sharing of revenue from collective group licensing on an "equal share" basis. There is only one fund containing the proceeds of licensing revenue, from which the NFLPA pays active players equal shares.[78] Retired NFL players could have shared in this equal share distribution, as Doug Allen conceded.

Defendants' construction of the GLA is nonsensical. For all their argument that a journeyman should be paid less than a star (Brief 6:22-7:11; 34:2-35:3), by their own admission they paid each active player (regardless of fame) the same amount of royalty for the third-party licenses, as noted by the Court: "Significantly, the group licensing revenue for *active* NFL players were distributed *equally* among the players despite the varying celebrity among such players."[79] Defendants offer no reason why this division would be any different for the retired players. Indeed, as the Court noted, there is no system to distribute these monies except "mercy and whim."[80] A reasonable jury may conclude that Defendants did not need a system because they never intended to distribute monies to retirees.

**d.    The Irrelevance of the Individually Negotiated "*Ad Hoc*" Agreements**

Defendants attempt to mislead the Court by pointing to payments made to retired players under individually negotiated *ad hoc* license agreements – which Defendants concede are

---

[76]    Class Certification Order at 6 (April 29, 2008) (Rec. Doc. 275).

[77]    *See id.* at 7 (GLA leaves Plaintiffs at the "complete mercy and whim of the NFLPA").

[78]    Furthermore, to share unequally in a lump sum payment would constitute a breach of fiduciary duty. An agent cannot favor one principal over another. *See* discussion *infra*. Defendants claim that practice squad players get $1,000 rather than an equal share, but there are no such payments reflected in the LM-2s submitted by the NFLPA to the Department of Labor. Rascher Reply Report at fn. 94 (Hilbert Decl. Ex. NNN); *see also* Hilbert Decl. ¶ 71. ¶

[79]    Class Certification Order at 6-7; *see also* D. Allen Depo. 120:18 – 121:22 (Hilbert Decl. Ex. J). Under the agreement governing the licensing arrangement for active NFL players, the 2000 NFLPA-PI Agreement, active players equally split sixty percent of all gross licensing revenue. 2000 NFLPA-PI Agreement ¶ 4 (Hilbert Decl. Ex. T). This equal-share royalty scheme was confirmed by Doug Allen, who negotiated the 2000 NFLPA-PI Agreement. D. Allen Depo. 120-121 (Hilbert Decl. Ex. J).

[80]    Class Certification Order at 7 (April 29, 2008) (Rec. Doc. 275).

not in dispute in this case.[81]  As Howard Skall of PI admitted, individually negotiated *ad hoc* agreements are used when a company wanted to "involve a player in a way that was beyond the group licensing rights."[82]  Such individual deals ensure that star players "are paid additional fees for being highlighted on product packaging . . . for autographs, appearances, product endorsements and commercials."[83]  The Court has noted that Defendants' efforts to license the "individual rights" of retired players are not the subject of the instant lawsuit:

> It turns out, the Joe Montanas of the world exploit their celebrity through separate "*ad hoc*" agreements with defendants and others, leaving the question how everyone including the lesser lights are to be compensated under the GLAs.[84]

Defendants also argue that the licensees would not need to enter into individually negotiated *ad hoc* licensing agreements if they had already acquired retired players' rights via the GLAs. (Brief 10:7-13:3.)  Defendants' argument ignores that this is precisely how active players collect money: both from equal GLA shares and from individually negotiated *ad hoc* agreements. Moreover, Defendants' third-party testimony shows that additional payments made to retired players were made at least in part for specific services such as signing a specific number of cards or being featured on the packaging of a product.[85]

Payment for an individually negotiated use of a player image is independent from and in addition to the granting of group rights in third-party licenses such as the EA agreement, as well as the minimum guaranteed payments that are paid under those licenses *without regard to any use of the rights*.  Defendants' citation of Mr. Adderley's testimony in this regard is

---

[81]    Compare Brief 1:16-17; 2:20-23; 24:9-13 (erroneous conflation of *ad hoc* agreements with group licensing agreements) with Brief 8:9 fn. 23 (conceding *ad hoc* agreements are not at issue).

[82]    Skall Depo. 56:19-57:3 (Hilbert Decl. Ex. I); PI website at 2 (Ex. 3 to D. Allen Depo.) ("Any players who are singled out to promote licensed products are paid additional fees for being highlighted on product packaging . . . for autographs, appearances, product endorsements and commercials.") (Hilbert Decl. Ex. Q); 2005 EA Agreement § 2(B)  ("In the event Licensee is interested in securing an individual player's personal endorsement, Licensee . . . acknowledges that such endorsement will require . . . separate payment to [PI].") (Hilbert Decl. Ex. D).

[83]    PI website at 2 (Ex. 3 to D. Allen Depo.) (Hilbert Decl. Ex. Q).

[84]    Class Certification Order at 6.

[85]    Brief 12:19-13:3 (citing deposition testimony of Warren Friss and Adam Zucker); PI website at 2 (Ex. 3 to D. Allen Depo.) (Hilbert Decl. Ex. Q).

unavailing. (Brief at 9:18-20; 18:5-11). First, Mr. Adderley at the time of his deposition was prohibited by provisions inserted in the protective order (at Defendants' insistence) from seeing documents produced by defendants, including the standard PI license that provides for payment without use.[86] Secondly, Mr. Adderley, as class representative, has limited responsibilities, as noted by the Court:

> "...Adderley's testimony only shows that he was confused and probably thrown off by the rigor of a deposition. In light of his age and unfamiliarity with the legal process, Adderley's responses are not alarming. It would be unfair to deny someone in Adderley's position access to our courts merely because he is unable to articulately respond to questions from attorneys."

It is also undisputed that the active players have each received a portion of the promised shared escrow, whether their image is used or not.[87]

Defendants incorrectly claim that they could not have licensed retired player group rights to EA based on EA's separate agreement with the Hall of Fame ("HOF"). As an initial matter, documents submitted by Defendants show that EA paid Defendants $400,000 for the rights granted by the HOF, and that Defendants then paid the HOF $400,000 for those rights; the documents do not show that Defendants distributed any money from the HOF agreement to the players themselves. Moreover, the rights granted by the HOF to EA are much broader than EA would have received pursuant to a GLA, and include use of the HOF's well-known trademarks (Paragraph 2(A)(i)); ". . . pictures owned by the HOF, photographs owned by the HOF, facsimile signatures and/or biographical information" of those players who are enshrined in the HOF (Paragraph 2(A)(ii)); and rights of coaches who are in the HOF.[88] With respect to the player rights alone, such rights are more akin to the type of rights a licensee would receive under an individually negotiated *ad hoc* agreement. For example, under EA's agreement with the HOF, EA has the right to highlight specific players while the program loads, and to view Hall of Fame-

---

[86] (Hilbert Decl., ¶ 70).
[87] See Upshaw Depo, 48:17-25; 95:1-96:16 (Hilbert Decl. Ex. K); D. Allen Depo., 121:10-16 (Hilbert Decl. Ex. J).
[88] April 25, 2006 Agreement Between EA, PI and The Pro Football Hall of Fame, ¶ 2(A)(i-iii) (Hilbert Decl. Ex. KKK).

1    licensed historical footage of these players in their playing days.[89]

2        Defendants also cite several examples from EA's NFL Street 2 game in support of

3 their argument.[90] These are the same examples Defendants raised in connection with their

4 Opposition to Plaintiffs' Motion for Leave to File a Third Amended Complaint. As Plaintiffs

5 informed the Court and Defendants at that time, these examples do not support Defendants'

6 argument because the nature of the rights granted by Anthony Munoz and Mean Joe Greene –

7 which, among other things, allow these players to be featured on the Internet to promote the game

8 – are much individual in nature than EA would have received pursuant to the standard GLA, and

9 thus had to have been and were individually negotiated in an *ad hoc* agreement.[91] The Court

10 should disregard these examples now, as it did before.[92]

11      **2.**     **The Third-Party Licensing Agreements**

12        Defendants' third-party license agreements expose additional factual issues. For

13 example, PI's license agreement with the TOPPS Company stated:

14          NFLPA represents that the NFLPA has been duly appointed and *is*
         *acting on behalf of the active and retired football players* of the

15          National Football League (hereinafter "NFL") who have entered
         into a Group Licensing Assignment.[93]

16

---

[89]    Id.

[90]    Defendants also claim that they could not have licensed retired player rights to RC2 for "rookie trading cards" because retired players obviously are not rookies. (Brief at 24.) Defendants' claim would make sense if their license agreements with RC2 were limited solely to rookies. However, Defendants do not dispute that they licensed all 1,800 active players to RC2, even though only a handful of these players are rookies for any given year. This at least the least raises issues of fact, along with the term of the license agreement (3 years, which go beyond rookie status). Indeed, there is no prohibition on a card company from re-issuing a rookie card of a veteran or of a retired player, particularly as such cards have enhanced value in the marketplace. Just as Defendants licensed surplus active player rights to RC2 because they could, so too did they license retired player rights as well. The bald fact that Defendants cannot avoid is that these contracts expressly include retired players on their face. If Defendants want to take the position that this is sloppiness, that too is an issue of fact.

[91]    *See* EA Sports Webpage (Hilbert Decl. Ex. AAA); *see also* Plaintiffs' Motion for Leave to File a Third Amended Complaint, filed on September 27, 2007 at Docket No. 139.

[92]    Defendants claim (Brief at 11:19-23) that some or all of the retired player "ad hoc" agreements included language containing a grant of rights clause. What Defendants fail to point out is that the reason that Licensees thought that they needed a grant of rights clause is that the NFLPA and PI failed to inform the licensees of the existence of and the specific names of the retired players for whom that had already obtained rights from a signed GLA. Friss Depo. 19:25-20:17; 34:9-14 (Hilbert Decl. Ex. QQ); *see also* Deposition of Joel Linzner ("Linzner Depo.") 40:5-41:14, 49:1-55:11 (Hilbert Decl. Ex. QQQ).

[93]    2007 Topps Agreement § 1(A) (Hilbert Decl. Ex. V).

As this Court asked with regard to this agreement: "How, exactly, was the NFLPA acting on behalf of retired football players?"[94]

Other third-party license agreements entered into by the NFLPA contain similar language. Defendants did not distinguish between active and retired players in defining their group licensing programs. Allen testified that players who signed a GLA are covered by the language of paragraph 1(A) and 2(A):

> Q. The last sentence [of Paragraph 1(A)] which talks about authorization for inclusion in PLAYERS INC. licensing program from PLAYERS INC including but not limited to retired players, does that reference retired players who signed GLAs different than the standard form attached to the -- to this license agreement?
>
> * * *
>
> A. I believe so.[95]
>
> Q. Paragraph 2(A) states, "Upon the terms and conditions hereinafter set forth, PLAYERS INC. hereby grants to licensee and licensee hereby accepts the exclusive right, license, and privilege of utilizing the trademarks and names of PLAYERS INC. which may be amended from time to time by PLAYERS INC. and the names, likenesses (including, without limitation, numbers), pictures, photographs, voices, facsimile signatures and/or biographical information (hereinafter 'identity') of the NFL players referenced in paragraph 1(A) above.
>
> Do you see that language?
>
> A. Yes.
>
> * * *
>
> BY MR. LeCLAIR: Well, specifically, isn't it a fact that this grant of license licenses those retired players who have entered into Group Licensing Authorizations with the NFLPA and PLAYERS INC.?
>
> * * *
>
> THE WITNESS: I think paragraph 1(A) says what it says and speaks for itself. It is true that paragraph 2(A) references NFL players referenced in paragraph 1(A) above.[96]

As Allen made clear throughout his testimony, the reference to "such" group licensing

---

[94] Class Certification Order at 6.

[95] D. Allen Depo. 205:25-206: 7 (Hilbert Decl. Ex. J).

[96] D. Allen Depo. 206:18-208:9 (Hilbert Decl. Ex. J).

1   authorizations is a reference to the specific form of GLA attached as Exhibit A.[97]  Retired players

2   who signed the annual GLAs did in fact "authorize PLAYERS INC. to represent such player[s]

3   for designated PLAYERS INC. license programs" and were covered by the second sentence of

4   Paragraph 1(A).   It is further undisputed that the $25 million guaranteed minimum royalty

5   payments were paid regardless of whether the images were used.[98]

6           Summary judgment cannot result from Defendants' or their licensees' litigation-

7   driven "understanding"[99] of these contracts that is contrary to the plain wording of the

8   agreements, particularly where the licensees have a contractual obligation not to "attack the rights

9   of PLAYERS INC in and to . . . any of the rights licensed hereunder as specified in Paragraph 2

10  of this Agreement, or in any way attack the validity of this Agreement."[100]  Further, Defendants'

11  own "understanding" of these contracts conflicts with itself.   (*See* Doug Allen testimony

12  excerpted in the paragraphs immediately above.)

13          If the document is facially unambiguous, its plain language should be relied upon

14  as providing the best objective manifestation of the parties' intent.  *Bolling Fed. Credit Union v.*

15  *Cumis Ins. Soc'y, Inc.*, 475 A.2d 382, 385 (D.C. 1984); *Martin & Martin, Inc. v. Bradley Enters.,*

16  *Inc.*, 504 S.E.2d 849, 851 (Va. 1998).  This is especially true where the agreement states that all

17  understandings and agreements between the parties are merged in the agreement and that no party

18  had made representations or warranties that were not expressly set forth in the agreement, as

19  exists in these License Agreements.[101]  *See Martin & Martin*, 504 S.E.2d at 851.

20          The plain language of the Adderley GLA and the PI license agreements is

21  sufficient to support Plaintiffs' claim for breach of contract.    At most, Defendants'

22  "understandings," which are contrary to the plain language of the agreements and to their own

23  witness' (Allen's) understanding, create issues of fact.  They do not "conclusively resolve . . . any

---

24  [97]   *Id.* 207:13-23.

25  [98]   *See* 2005 EA Agreement § 6(C) (providing that such payment "shall be made by Licensee
    as specified herein whether or not Licensee uses the rights licensed hereunder.") (Hilbert Decl.
26  Ex. D).

    [99]   *See* Brief 1:20-2:10; 10:13-22; 12:2-14:11; 20:20-23:15.

27  [100]  *See, e.g.*, 2004 and 2005 EA Agreement, ¶ 10(A) (Hilbert Decl., Exs. C and D).

28  [101]  *See e.g.*, 2004 EA Agreement § 18 (Hilbert Decl., Ex. C).

ambiguity in the language of the GLAs or the license agreements" as argued at page 3 of the Brief.

Defendants state that the Class's interpretation of the third-party License Agreements would lead to "absurd" results. (Brief at 23-25.) But what would be absurd (and legally impermissible) is to interpret the License Agreements such that the GLA becomes meaningless. *Cf. A.S. Johnson Co. v. Atl. Masonry Co.*, 693 A.2d 1117, 1122-23 (D.C. 1997) (rejecting interpretation that would render part of an agreement meaningless); *Retail Clerks Int'l Ass'n v. NLRB*, 510 F.2d 802, 806 n.15 (D.C. Cir. 1975) ("It is a settled rule of contract interpretation that contract language should not be interpreted to render the contract promise illusory or meaningless."). Indefiniteness "must reach the point where construction becomes futile" for a court to declare the contract "meaningless" and to "justify the conclusion that in reality it accomplished nothing." *Heyman Cohen & Sons, Inc. v. M. Lurie Woolen Co.*, 133 N.E. 370, 371 (N.Y. 1921) (Cardozo, J.). This is especially true if, as here, it is a transparent attempt to avoid liability. *Reid v. Boyle*, 527 S.E.2d 137, 143 (Va. 2000) ("The law does not favor declaring contracts void for indefiniteness and uncertainty, and leans against a construction which has that tendency. While courts cannot make contracts for the parties, neither will they permit parties to be released from the obligations which they have assumed if this can be ascertained with reasonable certainty from language used, in the light of all the surrounding circumstances."). "The defendant, then, is bound, unless its promise is to be ignored as meaningless. Rejection on that ground is at best a last resort." *Heyman*, 133 N.E. at 371.

Nor are Plaintiffs "strangers" to the third-party license agreements, with no right to interpretation, as posited by Defendants.[102] Defendants negotiated these third-party licenses on

---

[102]  None of Defendants' cases cited in Footnote 61 of their Brief support their assertions. Brief at 21 n. 61. For example, in four of their cases, the "understanding" offered by the "stranger" was contrary to the plain language of the contract – the exact opposite of what is proffered by defendants in this matter. *See Reliance Std. Life Ins. Co. v. Matula*, 2007 U.S. Dist. LEXIS 24523, *25 (E.D. Wis. Mar. 30, 2007) (whether an insured is covered by a life insurance policy that is part of an employee welfare benefit plan governed by ERISA cannot be changed by understanding of third party that is contrary to all the evidence); *Williams Tile & Marble Co., Inc. v. Ra-Lin & Associates, Inc.*, 426 S.E.2d 598, 600 (Ga.App. 1992) (party cannot offer evidence of stranger to contradict clear and unambiguous terms of a contract); *Combs v. Hunt*, 125 S.E. 661, 640 (Va. 1925) (the injured party cannot convert another's indemnity insurance policy to a liability insurance policy, contrary to the express terms of the insurance contract); *Matshushita*

behalf of the class members, and those licenses directly affected the Plaintiffs' economic interests.[103] In this situation, the Court should interpret these third-party agreements to evaluate the parties' arguments, following courts in previous cases. For example, in *Shafford v. Otto Sales Co.*, 119 Cal. App. 2d 849, 859-60 (1953), the Court allowed a non-party to a contract to submit evidence as to the meaning of that contract, noting that "mere words, and the ingenuity of contractual expression dreamed up by ingenious businessmen or their lawyers cannot be used to prevent a showing of the real nature of the transaction." *Shafford*, 119 Cal. App. 2d at 860. *See also ViChip Corp. v. Lee*, 438 F.Supp.2d 1087, 1097-98 (N.D. Cal. 2006) (entity with a direct economic interest or involvement in the relationship embodied among the parties to the agreement is not a stranger to the contract); *In re Leisure Corp.*, 2007 WL 607696, *13 (N.D. Cal) (Prochnow was not a stranger to the relationship between Leisure Corporation and Law Finance Group because the Factoring Agreement explicitly required Prochnow to adjust his appellate lien rights in the pending judgment to those of Law Finance Group.)

Furthermore, Defendants' position that all of their contracts were sloppy in including retired player rights (using the Fantasy Football agreement as an example) undermines Defendants' position. (Brief at 23:21-24:8). Contrary to Defendants' assertions, retired players are being used by Fantasy Football licensees. For example, one "fantasy sports" licensee specifically identified by Defendants is STATS LLC.[104] However, according to STAT's own website (biz.stats.com/historicaldata.asp), STATS offers an in-depth historical database consisting of retired NFL player data, including player statistics, awards, draft information, injuries and transactional data."[105] Similarly, What if Sports, a division of PI "fantasy sports"

*Elec. Corp v. Loral Corp.*, 1994 WL 497955, *2 (Fed. Cir. Sept. 23, 1994) (summary judgment granted where the plain and unambiguous meaning of the written agreement, consistent with other evidence, showed there was simply no genuine issue to be resolved). Defendants' fifth case is simply inapposite. *Waddy v. Sears, Roebuck & Co.*, 1994 WL 392483, *11 (N.D. Cal. July 8, 1994) (summary judgment holding that "the understandings of other employees as to the nature of their employments, however, are irrelevant to the question of whether Tucker himself had an implied for-cause employment contract").

[103] Of course, the existence of an agency is a fact question as discussed *infra*.

[104] Defendants even submit a declaration from STATS's Executive Vice President of Sales & Marketing, Steve Byrd, who states under oath that he did not negotiate for retired player rights. Ex. 31 to the Greenspan Declaration.

[105] STAT's website states: "STATS offers historical data for sports leagues across the globe.

1    licensee Fox Sports Interactive, allows users to choose teams consisting of retired players and

2    then pit those teams against one another in simulation "fantasy" games.[106]

3            Examples like these raise issues of fact as to whether and how companies like

4    STATS and Fox Sports Interactive acquired retired player rights notwithstanding Defendants'

5    representations to the contrary. Indeed, Defendants themselves have conceded that retired players

6    have value in the fantasy sports industry by negotiating agreements for retired players like

7    Antonio Freeman, Kevin Greene, Ray Childress and Bruce Matthews to appear at a Fantasy

8    Sports convention in August 2006.[107]

9        **3.    Damages**

10           The GLA Class is not seeking active player money, as contended by Defendants at

11   Brief 14:11-16:16. The 2000 NFLPA-PI Agreement exclusion, upon which Defendants rely to

12   prove their point that the Class is seeking active player money,[108] actually supports Plaintiffs'

13   claim. Section 4(B) of that agreement provides that gross licensing revenues will be distributed

14   to players, but it specifically excludes retired players and "amounts received by retired players

15   pursuant to Group Licensing Assignments or Group Licensing Rights."[109]  This exclusion

16   provides one of the bases of Plaintiff's claims -- that Defendants promised Plaintiffs certain

17   monies by participation in a GLA, that that money would be held for them in a fund, and that that

18   very fund then excluded their participation.[110]  Doug Allen actually confirmed that retired players

19   who signed GLAs met the requirements of 4(B), *but for* the NFLPA Board's determination to

20   exclude them.[111]  This does not prove Defendants' position – rather, it shows that Defendants

---

21   Historical packages include player and team statistics, leaderboards, schedules, standings, awards, draft information, injuries and transactional data. With deep, rich historical content dating back

22   to 1876 – STATS provides an unparalleled package of historical statistics for Major League Baseball, National Football League, National Basketball Association, and the National Hockey

23   League. In addition, we offer the most in-depth historical databases for college sports, cricket, international football/soccer leagues, golf and tennis." (Hilbert Decl. Ex. CCC).

24   [106]    *See* http://www.whatifsports.com/nfl/ (Hilbert Decl. Ex. DDD).

25   [107]    Antonio Freeman (PI004199), Kevin Greene (PI004201), Ray Childress (PI004203), Bruce Matthews (PI004205) (Hilbert Decl., Ex. EEE).

26   [108]    Brief 15:2-15; 25:14-29:8.

     [109]    2000 NFLPA-PI Agreement ¶ 4(B) (Hilbert Decl. Ex. T).

27   [110]    *Id.*; see also *see* D. Allen Depo. 123:5-124:23 (Hilbert Decl. Ex. J).

28   [111]    *See id.* 123:5-124:23.

were consistent in denying Plaintiffs their share of the monies.

Furthermore, the NFLPA-PI exclusion is only an exclusion for income received by retired players, not retired player licensing income that was admittedly not paid to the retired players.[112] Although Allen stated that the reason retired player licensing money is excluded "because it would have been counting the money twice,"[113] he was referring to amounts paid directly to retired players through an individually negotiated *ad hoc* agreement – which is not at issue here.[114] If Allen didn't think that the EA guaranteed minimum was ever due to retired players and therefore never paid, the retired players' share of that minimum could not constitute a portion of a purportedly improper double payment.

Defendants also claim that the $8 million reallocation could not possibly be shared with retired players because by the same exclusion, the reallocation was to be shared only with active players. (Brief at 15:14-16:4.) Again, this is a circular argument. Defendants' decision to reallocate the money is the reason that it was not paid to the retired players. Likewise, Defendants claim that Adderley's money was not put in an escrow account because it was paid to him directly. But the only money paid to Adderley was from individually negotiated *ad hoc* agreements, which are not at issue.

## C.    The Breach of Fiduciary Duty Claims

The breach of fiduciary duty claims also present numerous factual inquiries, such as whether an agency relationship existed, whether a fiduciary relationship existed, and what obligations were breached by Defendants to Plaintiffs. Plaintiffs have presented evidence to satisfy each element of their claim.

### 1.    Defendants Owed Plaintiffs Fiduciary Duties Arising Out Of The GLAs.

#### a.    The Agency Relationship

The existence of a fiduciary relationship is a question of fact. *Allen Realty Corp. v Holbert*, 318 S.E.2d 592, 595 (Va. 1984) (Allen's amended motion for judgment was sufficient to

---

[112]    2000 NFLPA-PI Agreement ¶ 4(A) (Hilbert Decl. Ex. T).
[113]    Brief at 15:9-11(citing deposition testimony of D. Allen).
[114]    *See* D. Allen 108:11-111:16 (Hilbert Decl. Ex. J).

raise a question of fact as to whether Holbert occupied a fiduciary relationship to Allen and breached his fiduciary duty. Allen alleged that Rawlings was employed to act through Holbert to assist in Allen's liquidation, which involved the sale of Allen's real estate, and that Allen relied on Holbert to inform it of any outstanding offers before the liquidation.) Fiduciary relationships are created when "special confidence has been reposed in one who in equity and good conscience is bound to act in good faith and with due regard for the interests of the one reposing the confidence." *See Allen Realty*, 318 S.E.2d 592, 595; *Church of Scientology, Int'l v. Eli Lilly & Co.*, 848 F.Supp. 1018, 1028 (D.D.C. 1994) (whether there exists a fiduciary relationship is a fact-intensive question, involving a searching inquiry into the nature of the relationship, the promises made, the type of services or advice given and the legitimate expectations of the parties). The *Scientology* Court opined that relationships founded on trust and confidence result in fiduciary duties:

> Broadly stated, a fiduciary relationship is one founded upon trust or confidence reposed by one person in the integrity and fidelity of another. It is said that the relationship exists in all cases in which influence has been acquired and betrayed. The rule embraces both technical fiduciary relations and those informal relations which exist whenever one man trusts in, and relies upon, another. . . .

*Church of Scientology*, 848 F.Supp. at 1028 (quoting *Schmidt v. Bishop*, 779 F.Supp. 321, 325 (S.D.N.Y. 1991)).

An agency relationship is a fiduciary relationship. *See McClung v. Smith*, 870 F.Supp. 1384, 1399 (E.D. Va. 1994) ("Agency is a fiduciary relationship created by express or implied agreement of the parties"); *Jenkins v. Strauss*, 931 A.2d 1026, 1033 (D.C. 2007). Under either D.C. or Virginia law, an agency relationship is created "when one person authorizes another to act on his behalf subject to his control, and the other consents to do so." *Smith v. Jenkins*, 452 A.2d 333, 335 (D.C. 1982), *overruled on other grounds by Rolinksi v. Lewis*, 828 A.2d 739 (D.C. 2003); *see also Acordia of Va. Ins. Agency, Inc. v. Genito Glenn, L.P.*, 560 S.E. 2d 246, 249 (Va. 2002) (defining "agency" as "a fiduciary relationship resulting from one person's manifestation of consent to another person that the other shall act on his behalf and subject to his control, and the other person's manifestation of consent so to.").

1  　The existence of an agency relationship is a question of fact. *Smith*, 452 A.2d at

2  335; *Acordia*, 560 S.E.2d at 250. In determining whether an agency relationship exists, the jury is

3  entitled to look at any contracts between the putative principal and agent, the context of their

4  relationship, and their course of dealing. *See Judah v. Reiner*, 744 A.2d 1037, 1040 (D.C. 2000)

5  ("In deciding [whether there is an agency relationship], courts will look both to the terms of any

6  contract that may exist and to the actual course of dealings between the parties."); *Acordia*, 560

7  S.E.2d at 250 ("[A]gency may be inferred from the conduct of the parties and from the

8  surrounding facts and circumstances.").

9  　Defendants argue that there was no agency relationship. Yet Defendants admit

10  that they "represented" retired players, and held themselves out as representing the retired

11  players.[115] Defendants cannot gain the benefit of that representation and disavow the resulting

12  agency obligations. *Cf. Brown v. Coates*, 253 F.2d 36, 38 (D.C. Cir. 1958) (finding that appellees

13  had a right to rely on the competence, honesty, and good faith of a real estate broker, in part

14  because appellees engaged the broker "in his expert and publicly proclaimed capacity for the

15  purpose of effectuating this not uncomplicated sale and purchase of properties.").

16  　Moreover, the record evidence establishes the existence of a principal/agent

17  relationship sufficient to impose fiduciary duties on the part of Defendants. The GLAs allow

18  individuals to provide notice of conflicting endorsement agreements, which allow for termination

19  of Defendants' representation.[116]　Adderley and other retired players retained control over

20  Defendants' ability to license all personal appearances and additional services that might be

21  requested.[117]　And, of course, Plaintiffs each were able to terminate their representation by

22  Defendants at any time. Defendants do not contest that the retired player class authorized

23  Defendants, through the GLAs, to act on the retired players' behalf, or that Defendants consented

24

---

25  [115]　PI Website at 2 (Ex. 5 to D. Allen Depo) ("PLAYERS INC . . . represents . . . over 3,000 retired players . . .") (Hilbert Decl. Ex. GGG); NFLPA's Responses and Objections to Plaintiffs' First Set of Requests for Admissions at Requests 10 - 12 (Hilbert Decl. Ex. LLL).

26  [116]　*See, e.g.*, Adderley GLA (stating that if (1) inclusion in any program conflicts with an

27  endorsement agreement and (2) the player provides notice to the NFLPA, the NFLPA will exclude the player from that particular program) (Hilbert Decl. Ex. H).

28  [117]　*Id.* ¶ 4 (Hilbert Decl. Ex. H).

1    to do so.[118] Thus, the indicia of control that are the hallmark of the principal/agent relationship

2    are present in this case.[119] At minimum, based on the GLAs, Defendants' statements regarding

3    representation of the retired players, and the context of group licensing, there are disputed factual

4    issues whether Defendants were acting as Plaintiffs' agents under the GLAs.

5    **b. A Fiduciary Relationship Can Exist Absent an Agency Relationship**

6    Courts have found that fiduciary relationships can exist in numerous situations.

7    *See Church of Scientology*, 848 F.Supp. at 1028 (church/public relations firm); *Wagman v. Lee*,

8    457 A.2d 401, 404-405 (D.C. 1983) (escrow agent/depositor); *Stevenson v. Johnson*, 32 Va. Cir.

9    157, 159 (Va. Cir. Ct. 1993) (clinical psychologist/client, denying summary judgment and noting

10    that "[e]ven though a fiduciary duty usually arises in the context of the management of money, it

11    is not always so. A fiduciary duty is a duty to act for someone else's benefit, while subordinating

12    one's personal interests to those of the other person."). Federal courts in Virginia and D.C.

13    recognize that unions owe fiduciary duties to their members. *See Nellis v. Air Line Pilots Ass'n*,

14    144 F.R.D. 68, 71 (E.D. Va. 1992); *Int'l Brotherhood of Teamsters v. Wirtz*, 346 F.2d 827, 832

15    (D.C. Cir. 1965).

16    Here, based on the nature and context of the parties' relationship and Defendants'

17    representations designed to induce class members to sign the GLAs, at minimum questions of fact

18    exist concerning whether Defendants were fiduciaries of the class members for the purposes of

19    group licensing. The GLAs state that the NFLPA was authorized to act on behalf of the class

20    [118] PI Website at 2 (Ex. 5 to D. Allen Depo) ("PLAYERS INC . . . represents . . . over 3,000

21    retired players . . .") (Hilbert Decl. Ex. GGG); NFLPA's Responses and Objections to Plaintiffs'
First Set of Requests for Admissions at Requests 10 - 12 (Hilbert Decl. Ex. LLL); NFLPA's and

22    PI's Responses and Objections to Plaintiffs' Third Set of Requests for Admissions at Requests 19
(Hilbert Decl. Ex. PPP).

23    [119] Defendants' cases examine the concept of "control" in apposite situations. With few
exceptions, each is a respondeat superior case, examining the day-to-day control of an individual

24    to determine if he or she operated as an employee or independent contractor in an effort to
establish vicarious liability. *See Judah v. Reiner*, 744 A.2d 1037, 1040 (D.C. 2000) (respondeat

25    superior); *Wells v. Whitaker*, 207 Va. 616, 624 (Va. 1966) (respondeat superior); *Ames v. Yellow
Cab of D.C., Inc.*, 2006 WL 2711546 (D.D.C.) (respondeat superior); *Murphy v. Holiday Inns,*

26    *Inc.*, 216 Va. 490, 493 (Va. 1975) (franchisor/franchisee); *Jackson v. Loews Washington
Cinemas, Inc.*, 944 A.2d 1088 (D.C. 2008) (common enterprise); *DNM, Inc. v. S. H. Clark & Sons*

27    *Roofing, Inc.*, No. 911233, 1992 Va. LEXIS 102 (Va. April 17, 1992) (respondeat superior);
*Bangkok Crafts Corp. v. Capitolo di San Pietro in Vaticona*, No. 03 Civ. 0015, 2004 U.S. Dist.

28    LEXIS 25235, *7 (third party liability under apparent authority doctrine).

members for the purpose of licensing the class members' images for group licensing programs. Defendants held themselves out as representing these retired players.[120] For group licensing on this scale, a jury could infer that each of the 2,100 represented retired players could not possibly maintain full power or knowledge over licensing of the entire group.

Additionally, Defendants engaged in conduct designed to impede Plaintiffs' ability to monitor third-party license negotiations. Defendants completely blocked the group licensing market through its licensee contracts, which included non-interference provisions precluding the licensees from seeking to license retired players directly.[121] These provisions effectively prevented the retired players from selling their own images to PI licensees, and made PI the only entity with the power to license the retired players' images in a group setting. Defendants also discouraged third parties from contacting retired players by aggressively protecting its license rights.[122] In effect, for group licensing, the GLAs were exclusive.[123] Inasmuch as each individual retired player could not effectively monitor the license agreement negotiations between PI and licensees like EA -- or prevent Defendants from cutting off the licensee's direct access to the players -- the retired players were required to have some level of trust in Defendants, which supports a finding of a fiduciary duty. At a minimum, given these circumstances and the power that was invested in Defendants through the GLAs, a factual question arises as to the fiduciary nature of the relationship. *Hammett v. Ruby Lee Minar, Inc.*, 53 F.2d 144, 146 (D.C. 1931)

---

[120] PI Website at 2 (Ex. 5 to D. Allen Depo) ("PLAYERS INC . . . represents . . . over 3,000 retired players . . .") (Hilbert Decl. Ex. GGG); NFLPA's Responses and Objections to Plaintiffs' First Set of Requests for Admissions at Requests 10 - 12 (Hilbert Decl. Ex. LLL); NFLPA's and PI's Responses and Objections to Plaintiffs' Third Set of Requests for Admissions at Requests 19 (Hilbert Decl. Ex. PPP).

[121] *See e.g.* 2005 EA Agreement § 13 (Hilbert Decl. Ex. D).

[122] RFA 2 ("PLAYERS INC admits that during the limitations period it has claimed that third-party licensees of PLAYERS INC could secure retired NFL player group licensing rights only through PLAYERS INC if such rights were going to be used in conjunction with PLAYERS INC licensed products.") (Hilbert Decl. Ex. LLL). *See also*, Deposition of Adam Zucker (TOPPS 30(b)(6) deponent) 14:16-23; 16:9-22; 66:16-69:19; 71:6-73:21; 96:20-23 (Hilbert Decl. Ex. HHH).

[123] Approximately half of the members of the GLA Class had a GLA that expressly stated that it was "exclusive" during the statute of limitations. While the GLAs of the other half of the Class purported to be "non-exclusive", they are all effectively exclusive for group licensing, as explained above and (*see also* second paragraph of GLA). Thus, Plaintiffs dispute Defendants' characterization of this issue at Brief 4:17-20.

("Courts of equity have carefully refrained from defining the particular instances of fiduciary relations in such a manner that other and perhaps new instances might be excluded. It is settled by an overwhelming weight of authority that the principle extends to every possible case in which a fiduciary relation exists as a fact, in which there is confidence reposed on one side and the resulting superiority and influence on the other.").

### 2. Defendants Breached Their Fiduciary Duties to Plaintiffs

#### a. Defendants Failed to Pay the Class, and Failed to Disclose Material Facts

Defendants claim that there is "no evidence" to support a breach of fiduciary duty (Brief at 32-34). On the contrary, Defendants repeatedly breached their fiduciary duties to the GLA Class by (i) defining "eligibility" in such a way as to deprive the retired players of their shared escrow, (ii) failing to accurately report group licensing revenues to members of the GLA Class,[124] (iii) failing to distribute revenues to the members of the GLA Class that should have been distributed, (iv) failing to distribute to retired players their equal share of the fund from which the active players were paid, (v) misappropriating funds totaling eight million dollars or more that should have been paid, in part, to the Class, (vi) misappropriating 64-69% of the funds for themselves, and (vii) placing themselves in a position of conflict of interest and acting adversely to the interest of retired NFL players who signed a GLA.

Restatement (Third) of Agency § 8.01 states that an agent has a fiduciary duty to act loyally for the principal's benefit in all matters connected with the agency relationship, and must act in accordance with the express and implied terms of any contract between the agent and the principal. In this matter, the principal's instruction was to divide the royalties amongst the players, both active and retired.[125] Rather than follow this instruction, however, Defendants

---

[124] Defendants accomplished their scheme through their self-created 2000 NFLPA-PLAYERS INC. Agreement. Section 4(A) provides that gross licensing revenues would be distributed to players, but specifically excludes retired players and "amounts received by retired players pursuant to Group Licensing Assignments or Group Licensing Rights." 2000 NFLPA-PI Agreement ¶ 4 (Hilbert Decl. Ex. T). Allen confirmed that retired players who signed GLAs met the requirements of 4(B), *but for* the NFLPA Board's determination to exclude them. *See* D. Allen Depo. 123:5-124:23 (Hilbert Decl. Ex. J).

[125] *See* Adderley GLAs ¶ 4 (Hilbert Decl. Ex. H).

breached their fiduciary duties to the Class by re-allocating a portion of retired player money to themselves as part of the $8 million reallocation, and by keeping for themselves the overly-generous 64-69% "commission" that was made, in part, of monies that should have gone to retired players. Also, rather than act in the interest of the retired players, Defendants gave priority to the interests of the licensees.[126]

Finally, the failure to inform Plaintiffs of each of the above (the definition of "eligibility", the License Agreements, the escrow money, the amount of commissions, etc.) is each a separate breach of the duty of loyalty and duty of care. *Ellipso, Inc. v. Mann*, 541 F.Supp.2d 365, 374 (D.D.C. 2008) (noting that an agent owes a "duty to disclose . . . all matters coming to the agent's notice or knowledge concerning the subject of the agency, which it is material for the principal to know for his protection or guidance"); *cf. PGI, Inc. v. Rathe Prod's, Inc.*, 576 S.E.2d 438, 444 (Va. 2003) ("in breach of its duty of loyalty, duty of care, and obligation of good faith and fair dealing, partner Rathe did not inform PGI that it had received the $250,000 in settlement from the Smithsonian"); *Int'l Underwriters, Inc. v. Boyle*, 365 A.2d 779, 783 (D.C. 1976) (finding duty to disclose "any knowledge . . . relevant to his agency relationship").

### b. Defendants Failed to Adequately Represent Plaintiffs and Had Improper Conflicts of Interest

Additionally, Plaintiffs still maintain a claim for breach of fiduciary duty for the failure to adequately represent them and breaches of the duty of loyalty. The evidence shows that Defendants made little effort to market the retired player rights. Although Defendants present certain deposition testimony regarding their putative efforts to market retired players, such evidence does nothing more than raises a factual dispute about Defendants' efforts to market the rights of retired players. This issue is a classic factual dispute with contravening evidence, including the e-mails from NFLPA Executive Clay Walker and the testimony of others referenced above and below. Defendants' argument for summary judgment on the conflicting evidence is

---

[126]    *See* Page 16 *supra.*

1   frivolous.

2   Defendants have produced scant evidence of any of their vague attempts at
3   promotion. Instead, they claim that they took a "try and see" attitude towards the retired players
4   (Brief at 32, n. 93 (Berthelsen testimony)) and "hope[d]" that the licensees wanted the retired
5   players. (Brief at 33, n. 94 (Nahra testimony)) Defendants' reliance on the testimony of
6   Castillion (from Fathead) and their expert Noll is not helpful to them. Castillion simply speaks to
7   Fathead's requests which are not probative of Defendants' efforts[127] (nor probative of other
8   companies). (Brief at 6:17-18.) And their expert Noll is simply reporting usage—not efforts
9   (Brief at 6:21-22). None of this testimony indicates that Defendants actively promoted retired
10  player group licensing. Moreover, the testimony is contradicted by Upshaw, who stated that he
11  makes no effort to sell retired player rights,[128] by TOPPS' representative, who testified that he
12  would have taken a license to the group rights of retired players if offered to him,[129] and by EA's
13  representative, who testified that he was unaware retirees had signed GLAs.[130] Again, issues of
14  fact prevent summary judgment.

15  "An agent is bound to use reasonable care and skill in the performance of his
16  agency, to use reasonable efforts to accomplish the purpose of his agency, and to disclose to his
17  principal all relevant information coming to his knowledge." *Yelen v. Banks*, 146 A.2d 569, 571
18  (D.C. 1958); Restatement (Third) of Agency § 8.08 (2006). In this case, the Class will show that
19  Defendants failed in this regard because of a conflict of interest. An agent breaches its fiduciary
20  duty by serving the interests of one principal less well than the interests of other principals:

21              No one is compelled or required to undertake an agency, but one
22              who voluntarily assumes the task owes the duty of acting in the
            utmost good faith toward his principal. An agent is a fiduciary. If
23              the principal is a group of individuals, this obligation extends to
            each member of the group. The agent is bound to represent the
24              interest of each member of the group fairly and with equal zeal. He

---

127   Furthermore, to the extent that Castillion testifies as to PI's "understandings" that is mere
25  speculation.
      128   Upshaw Depo. 99:7-15 (Hilbert Decl. Ex. K).
26    129   Friss Depo. 77:8-14 (Hilbert Decl. Ex. QQ). Friss was also unaware that the Defendants
      had authorization to use the images of thousands of retired players. Friss Depo. 19:25-20:17;
27  34:9-14 (Hilbert Decl. Ex. QQ).
      130   Linzner Depo. 40:5-41:14, 49:1-55:11 (Hilbert Decl. Ex. QQQ).

> may not neglect some of the members, prefer some as against others, or discriminate among them. He may not advance the interests of some to the prejudice of others.

*Graham v. S. Railway Co.*, 74 F.Supp. 663, 664 (D.D.C. 1947).[131]  *See also Keith v. Berry*, 64 A.2d 300, 303 (D.C. 1949) ("An agent employed by both parties to a transaction . . . has same duty to act with fairness to each that an agent has in dealing with his principal on his own account."); *Aronoff v. Lenkin Co.*, 618 A.2d 669, 687 (D.C. 1992) (holding that a settlement agent owes duty to deal fairly with each party to transaction.); *Jenkins v. Strauss*, 931 A.2d 1026, 1034 (D.C. 2007) (finding that an agent's acts with respect to dual representation violated fiduciary duties, "including negotiating the most favorable terms possible."); *Messer v. Re/Max Props., Inc.*, 15 Va. Cir. 15, 15 (Va. Cir. Ct. 1985) ("[A] fiduciary cannot serve two masters.").[132]

### c.    Damages

Finally, Defendants argue (Brief 3:15-18) that even if they are guilty of breaches

---

[131]    The D.C. Circuit reversed the District Court on grounds of improper venue, but the District Court's injunction was ultimately upheld by the Supreme Court. *Compare Brotherhood of Locomotive Firemen & Enginemen v. Graham*, 175 F.2d 802, 807 (D.C. Cir. 1948) ("the motion of the appellant . . . for dismissal of the instant suit for lack of proper venue should have been granted and therefore that the order issuing the preliminary injunction should not have been entered.") *with Graham v. Brotherhood of Locomotive Firemen & Enginemen*, 338 U.S. 232, 240 (1949) (reversing the D.C. Circuit, and reinstating the order of the District Court).

[132]    *See also* Restatement (Third) of Agency § 3.16 (An agent who acts on behalf of more than one principal in the same matter or transaction owes duties to all principals. When there is no substantial conflict among the principals' interests or their instructions to the agent, the agent may fulfill duties owed to all principals. However, by serving the interests of one principal, an agent may serve the interests of others less well when the principals' interests or their instructions to the agent diverge.) Restatement (Third) of Agency § 3:14 (An agent who represents principals whose interests conflict may breach the fiduciary duties that the agent owes to principals on whose behalves the agent undertakes to act.) Restatement (Third) of Agency § 8:03 (As a fiduciary, an agent has a duty to the principal to act loyally in the principal's interest in all matters in connection with the agency relationship. . . .  When an agent deals with the principal on the agent's own account, the agent's own interests are irreconcilably in tension with the principal's interests because the interest of each is furthered by action—negotiating a higher or a lower price, for example—that is incompatible with the interests of the other. If an agent acts on behalf of the principal in a transaction with the agent, the agent's duty to act loyally in the principal's interest conflicts with the agent's self-interest. Even if the agent's divided loyalty does not result in demonstrable harm to the principal, the agent has breached the agent's duty of undivided loyalty. Likewise, an agent who acts on behalf of more than one principal in a transaction between or among the principals has breached the agent's duty of loyalty to each principal through undertaking service to multiple principals that divides the agent's loyalty.). The Restatement , has been relied on by D.C. and Virginia courts determining various questions relating to agency. *See, e.g., C&E Servs. v. Biggs*, 498 F.Supp.2d 242, 264 n.12 (D.D.C. 2007); *Feddeman & Co. v. Langan Assocs., P.C.*, 530 S.E.2d 668, 672 (Va. 2000). Restatement (Third) of Agency

of fiduciary duty, the Class has not been harmed because "the market value of group licensing rights for most GLA class members was zero." But this ignores the equal share royalty to superstar or journeyman, active or retired, from the only escrow fund that exists, the equal share fund. Nor is the equal share "arbitrary" (Brief 3:23-27), but instead is well supported by the evidence as discussed *supra*.[133] Furthermore, the evidence shows that the retired players were marketable.[134]

The Class's theories of damages are well founded. Either Defendants failed to share the license revenue with retired players by the secret "eligibility" criteria OR Defendants failed to license the Class and should have done so. If it is the latter, the damages for breach of fiduciary duty include all the royalties generated from those third-party licenses that include the retired players in their express terms; alternatively, those damages include all the royalties generated by all the licenses that <u>could have</u> included retired players, whether they currently include the express term "retired players" or not.[135] Additionally, under either theory, the damages amounts include those "commissions" or surpluses wrongfully taken by Defendants.[136]

Furthermore, Defendants fail to acknowledge that if they are found to have breached their fiduciary duties to the Class, no proof of specified damages is necessary for this Court to require disgorgement of profits for a breach of loyalty. *In re Estate of Corriea*, 719 A.2d 1234, 1241 (D.C. 1998) *citing Sheldon v. Metro-Goldwyn Pictures Corp.*, 309 U.S. 390, 399 (1940) (the fact that Avianca was not able to quantify the damages it suffered from the Twin Otter transaction does not disqualify the profits ordered disgorged as just compensation for the wrong. . . . Disgorgement of the net profits rectified that wrong in a manner that "conform[ed] . . . to [its] dimensions."); *Owen v. Shelton*, 277 S.E.2d 189, 192 (Va. 1981) ("The price of a violation of the duty to disclose is forfeiture of the broker's right to compensation.").

---

[133] *See e.g.* D. Allen Depo. 121:13-16 ("Every player who met the eligibility requirements received the identical royalty") (Hilbert Decl. Ex. J).

[134] *See* Clay Walker Email ("We know that Take Two offered six figure deals to several former NFL players so the total cost is millions below market prices." (Hilbert Decl. Ex. G) (emphasis added).

[135] Rowley Report at 4-7.

[136] *Id.*

1  This rule illustrates the high regard the law holds for the fiduciary relationship,

2  founded as it is upon one person's trust in the integrity and fidelity of another. The purpose of the

3  rule is more prophylactic than remedial; it is applied, not to compensate the principal for an

4  injury, but rather to discipline the fiduciary in the conduct of the office entrusted to him. *Id.*;

5  Restatement (Third) Of Agency § 8.02 cmt. b (2006) (To establish that the agent is subject to

6  liability, it is not necessary that the principal show that the agent's acquisition of a material

7  benefit harmed the principal. The benefit realized by the agent can often be calculated more

8  readily than any harm suffered by the principal.)

9  ## IV.    CONCLUSION

10  A masterpiece of obfuscation does not lend itself to summary judgment on a

11  contract claim. Nor does documentary evidence of betrayal support summary judgment for

12  Defendants on a fiduciary duty claim. Therefore, for all the reasons stated above, Plaintiffs

13  respectfully request that Defendants' Motion for Summary Judgment be DENIED.

Respectfully submitted,

Dated: July 1, 2008                     MANATT, PHELPS & PHILLIPS, LLP

By:____/s/ Ronald S. Katz_____.
        Ronald S. Katz (SBN 085713)
        Ryan S. Hilbert (SBN 210549)
        Noel S. Cohen (SBN 219645)
        1001 Page Mill Road, Building 2
        Palo Alto, CA 94304-1006
        Telephone: (650) 812-1300
        Facsimile: (650) 213-0260

        MCKOOL SMITH, P.C.
        Lewis T. LeClair (SBN 077136)
        Jill Adler Naylor (SBN 150783)
        300 Crescent Court
        Dallas, TX 75201
        Telephone: (214) 978-4984
        Facsimile: (214) 978-4044

        *Attorneys for Plaintiffs*