Todd Padnos (Bar No. 208202)
*tpadnos@dl.com*
DEWEY & LEBOEUF LLP
One Embarcadero Center, Suite 400
San Francisco, CA 94111
Tel: (415) 951-1100; Fax: (415) 951-1180

Jeffrey L. Kessler (*pro hac vice*)
*jkessler@dl.com*
David G. Feher (*pro hac vice*)
*dfeher@dl.com*
David Greenspan (*pro hac vice*)
*dgreenspan@dl.com*
DEWEY & LEBOEUF LLP
1301 Avenue of the Americas
New York, NY 10019
Tel: (212) 259-8000; Fax: (212) 259-6333

Kenneth L. Steinthal (*pro hac vice*)
*kenneth.steinthal@weil.com*
WEIL, GOTSHAL & MANGES LLP
201 Redwood Shores Parkway
Redwood Shores, CA 94065
Tel: (650) 802-3000; Fax: (650) 802-3100

Bruce S. Meyer (*pro hac vice*)
*bruce.meyer@weil.com*
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, NY 10153
Tel: (212) 310-8000; Fax: (212) 310-8007

Attorneys for Defendants National Football League Players Association
and National Football League Players Incorporated d/b/a Players Inc

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| BERNARD PAUL PARRISH, HERBERT ANTHONY ADDERLEY, WALTER ROBERTS III, | Case No. C 07 0943 WHA |
|         Plaintiffs, | **DEFENDANTS' REPLY BRIEF IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT** |
|         v. | Judge: Honorable William H. Alsup |
| NATIONAL FOOTBALL LEAGUE PLAYERS ASSOCIATION and NATIONAL FOOTBALL LEAGUE PLAYERS INCORPORATED d/b/a/ PLAYERS INC, | Date: July 24, 2008<br>Time: 8:00 a.m.<br>Place: Courtroom 9, 19th Floor |
|         Defendants. | |

Dewey & LeBoeuf LLP
One Embarcadero Center, Suite 400
San Francisco, CA 94111

Defs.' Reply Br. in Support of Their Mot. for Summary Judgment     Civ. Action No. C07 0943 WHA

# TABLE OF CONTENTS

Page(s)

TABLE OF AUTHORITIES .................................................................................................. ii

PRELIMINARY STATEMENT ........................................................................................... 1

ARGUMENT ........................................................................................................................ 2

I.     SUMMARY JUDGMENT SHOULD BE GRANTED AGAINST THE GLA CLASS'S BREACH OF CONTRACT CLAIM.................................................... 2

    A.    Plaintiffs Do Not Dispute That Defendants Generated And Paid Over $30 Million In Licensing Revenues To Retired Players ................................ 2

    B.    The Adderley GLA Is Expressly Limited To "Moneys Generated By Such Licensing Of Retired" – Not Active – "Player Group Rights" ............................. 4

    C.    The Revenues Generated By The EA, Topps, And Other License Agreements At Issue Were Generated Solely By Active Player Group Licensing.................................................................................................. 6

        1.    The Four Corners of the License Agreements Establish That Only Active Player Rights Were Licensed ......................................... 6

        2.    The Extrinsic Evidence Also Establishes That Only Active Player Rights Were Licensed .................................................................. 7

    D.    Plaintiffs Are Even Seeking Revenues From License Agreements That, On Their Face, Do Not Mention Retired Players ......................................... 9

    E.    There Is No Triable Issue Of Fact As To Breach Of Contract Or Damages ........ 10

II.    SUMMARY JUDGMENT SHOULD ALSO BE GRANTED AGAINST THE GLA CLASS'S BREACH OF FIDUCIARY DUTY CLAIM ......................................... 13

    A.    There Is No Evidence That The GLAs Gave Rise To A Fiduciary Duty ............. 13

    B.    There Is No Evidence To Support A Claim That Defendants Breached Any Alleged Fiduciary Duty .................................................................... 16

    C.    There Is No Triable Issue Of Fact With Respect To Injury Or Damages............. 19

CONCLUSION.................................................................................................................... 20

Dewey & LeBoeuf LLP
One Embarcadero Center, Suite 400
San Francisco, CA 94111

**CASES**

Ames v. Yellow Cab of D.C., Inc.,
  No. 00-3116 (RWR)(DAR), 2006 WL 2711546 (D.D.C. Sept. 21, 2006) ............................... 14

Bangkok Crafts Corp. v. Capitolo di San Pietro in Vaticano,
  No. 03 Civ. 0015 (RWS), 2004 U.S. Dist. LEXIS 25235 (S.D.N.Y. Sept 13, 2004).............. 15

Black v. Nat'l Football League Players Ass'n,
  87 F. Supp. 2d 1 (D.D.C. 2000) .......................................................................................... 10

Copenhaver v. Rogers,
  238 Va. 361 (1989) .............................................................................................................. 8

Day v. Avery,
  548 F.2d 1018 (D.C. Cir. 1976) .......................................................................................... 19

Far Out Prods., Inc. v. Oskar,
  247 F.3d 986 (9th Cir. 2001) ......................................................................................... 8, 17

Ft. Lincoln Civic Ass'n, Inc. v. Ft. Lincoln New Town Corp.,
  944 A.2d 1055 (D.C. 2008) .................................................................................................. 8

Hager v. Gibson,
  109 F.3d 201 (4th Cir. 1997) .............................................................................................. 19

German Alliance Ins. Co. v. Home Water Supply Co.,
  226 U.S. 220 (1912) ............................................................................................................. 8

Jackson v. Loews Wash. Cinemas, Inc.,
  944 A.2d 1088 (D.C. 2008) .......................................................................................... 14, 15

In re Leisure Corp.,
  No. C-03-03012 RMW, 2007 WL 607696 (N.D. Cal. Feb 23, 2007) ................................... 8

Mackey v. Pioneer Nat'l Bank.,
  867 F.2d 520 (9th Cir. 1989) .............................................................................................. 10

Murphy v. Holiday Inns, Inc.,
  216 Va. 490 (1975) ....................................................................................................... 14, 15

Nellis v. Air Line Pilots Ass'n,
  144 F.R.D. 68 (E.D. Va. 1992) ........................................................................................... 15

Pfingston v. Ronan Eng'g Co.,
  284 F.3d 999 (9th Cir. 2002) .............................................................................................. 10

Vaca v. Sipes,
  386 U.S. 171 (1967) ............................................................................................................ 15

ViChip Corp. v. Lee,
  438 F. Supp. 2d 1087 (N.D. Cal. 2006) ............................................................................... 8

Wells v. Whitaker,
  207 Va. 616 (1966) ............................................................................................................. 14

Dewey & LeBoeuf LLP
One Embarcadero Center, Suite 400
San Francisco, CA 94111

**OTHER AUTHORITIES**                                                                   **Page(s)**

29 C.F.R. § 403.8(b)(1) ............................................................................................. 13

**Dewey & LeBoeuf LLP**
**One Embarcadero Center, Suite 400**
**San Francisco, CA 94111**

Dewey & LeBoeuf LLP
One Embarcadero Center, Suite 400
San Francisco, CA 94111

## PRELIMINARY STATEMENT

Plaintiffs' Opposition Brief is saturated with rhetoric, unsupported lawyer's arguments, and unfounded accusations about the integrity of Defendants and their officers – but it is fatally deficient when it comes to probative and admissible <u>evidence</u> to support the GLA Class's breach of contract and fiduciary duty claims. Far from satisfying their burden in opposing summary judgment, Plaintiffs' Opposition simply confirms the absence of evidence to contest the <u>undisputed</u> facts that:

(i)     Every GLA Class member was fully paid whenever his rights were utilized by Defendants or their licensees, and such payments, including royalties for numerous "ad hoc" programs involving six or more retired players – <u>i.e.</u>, "group licensing" – have totaled more than $30 million for retired players since 2003 (Point I.A);

(ii)    The Adderley GLA does not provide for the GLA Class to recover money generated by active player licensing, much less provide for an "equal share" of the active player gross licensing revenue ("GLR") pool (Points I.B, D);

(iii)   EA, Topps, Upper Deck, Fathead, and other parties to the license agreements whose revenues Plaintiffs are seeking have unanimously confirmed that those revenues were paid solely for the rights of <u>active</u> players (Point I.C);

(iv)    Plaintiffs never had the type of "day-to-day" control over Defendants' licensing operations to create a fiduciary duty arising out of the GLA – the <u>only</u> fiduciary duty theory that the Court permitted the GLA Class to pursue (Point II.A);

(v)     There is no evidence to support Plaintiffs' brand new claim – which contradicts the essential premise of their other claims – that Defendants breached their purported fiduciary duties because they did not license, but "should have" licensed, the GLA Class's rights to EA, Topps and other third party licensees (Point II.B); and

(vi)    Plaintiffs have not even tried to prove fact of injury or damages for individual class members, even though they do not dispute that the economic values of the licensing rights of the individual class members are widely variable, with most GLA Class members' rights having no value at all (Point II.C).

In effect, Plaintiffs are trying to go to trial on the basis of nothing more than unsupported allegations and attorney conjecture that all of the witnesses who testified under oath, including numerous third parties, were lying. This strategy is insufficient as a matter of law, and does not come close to meeting Plaintiffs' burden to come forward with <u>evidence</u> raising at least

Dewey & LeBoeuf LLP
One Embarcadero Center, Suite 400
San Francisco, CA 94111

a genuine issue of material fact in support of their claims.

Confronted with this complete absence of proof, Plaintiffs continue their "smoke-and-mirrors" pattern of changing their factual and legal theories on the fly, and ignoring their irreconcilable contradictions and lack of evidence in favor of bold new pronouncements to the Court. For example, because 18 months of fact discovery did not yield a shred of evidence that Defendants licensed GLA Class members' rights pursuant to the EA, Topps, and other license agreements at issue, Plaintiffs now feature at the outset of their Opposition a few e-mails that they use to attack a license agreement between EA and the Hall of Fame (the "EA-HOF Agreement") that Players Inc helped secure to benefit HOF retired players. Opp'n at 3-4. But later in their Opposition, Plaintiffs admit that the EA-HOF Agreement is one of the very "ad hoc" deals that Plaintiffs have declared to be "irrelevant," "not in dispute in this case," and not covered by their claims. Id. at 21-24. Similarly, since Plaintiffs have no support for their "direct agency" fiduciary duty theory, they try to resuscitate the non-GLA based theories of fiduciary duty that the Court has either stricken or declined to certify for class treatment. Id. at 30-35.

Summary judgment is the time when the factual record is closed and Plaintiffs must stop shifting. This Court afforded Plaintiffs the opportunity to plead five different complaints, and every possible chance to discover evidence to support their claims. But at this juncture, when allegations and rhetoric must give way to evidence, Plaintiffs cannot meet their burden for one simple reason: the undisputed facts establish that the legal rights of the GLA Class were never violated by Defendants, and that this entire case is nothing more than an unabashed grab for active player money, and an unfounded political attack upon Gene Upshaw and the NFLPA, which has no place before this Court.

## ARGUMENT

### I. SUMMARY JUDGMENT SHOULD BE GRANTED AGAINST THE GLA CLASS'S BREACH OF CONTRACT CLAIM

#### A. Plaintiffs Do Not Dispute That Defendants Generated And Paid Over $30 Million In Licensing Revenues To Retired Players

Despite Adderley's testimony that he filed this lawsuit because he believed that he was not properly paid pursuant to "ad hoc" agreements to license the images of various retired

players to Reebok,[1] Plaintiffs have disavowed "any claims based on an 'ad hoc' agreement."[2] This is not surprising, since Plaintiffs have no response to the undisputed evidence that Defendants have generated over $30 million in retired player licensing revenues pursuant to such agreements, paying out almost 99% of that money to the retired players whose rights were licensed. Mot. at 7-9. Nor do Plaintiffs dispute that Defendants lost money generating these licensing opportunities for retired players, since the minimal administrative fees kept by Players Inc were not nearly enough to cover the costs of, among other things, the staff who worked on the retired player deals. Id. at 7 n.22.

Although both parties agree that ad hoc agreements are not the subject of the GLA Class's claims (Opp'n at 21-24), the undisputed evidence that retired players were fully compensated under these deals – most of which involved six or more players and thus constituted "group licensing" – confirms the fundamental point that when retired players' group licensing rights were utilized, they were paid. Plaintiffs' Opposition tries to obfuscate this undisputed fact with unsupported rhetoric that the GLA Class has been "mistreated for years," and by asking the Court to ignore the over $30 million that Defendants generated for retired players. Specifically, Plaintiffs argue that "[t]his case is not about individually negotiated 'ad hoc' agreements, … [i]t is about collective group licensing …." Opp'n at 7. But the Adderley GLA expressly defines "group licensing" as "programs in which a licensee utilizes a total of six (6) or more present or former players," and Plaintiffs do not dispute that most ad hoc deals arranged by Players Inc involved "a licensee utiliz[ing] six (6) or more present or former players" in connection with the same program. E.g., Mot. at 8, 11; Adderley GLAs (Greenspan Decl. Ex. 5).

Plaintiffs point out that "third-party licensees' proven use of retired players in

---

[1] E.g., Adderley Depo. 77:13-78:5 (attached as Exhibit 1 to the Declaration of David Greenspan in Further Support of Defendants' Motion for Summary Judgment ("2d Greenspan Decl.") filed concurrently herewith). The Declaration of David Greenspan in Support of Defendants' Motion for Summary Judgment (which was submitted with Defendants' opening brief (the "Motion")) is hereinafter referred to as "Greenspan Decl."

[2] Pls.' Mot. For Leave To File TAC at 4 n.1 (Nov. 27, 2007) (Rec. Doc. 190); see also Opp'n at 21 (section entitled "The Irrelevance of the Individually Negotiated 'Ad Hoc' Agreements").

individually negotiated ad hoc agreements" shows that the rights of at least some GLA Class members had value. Opp'n at 15. This is true. But <u>the undisputed facts establish that the GLA Class members whose group licensing rights had value and were used were fully paid for their rights</u> (Mot. at 7-9), and Plaintiffs offer no evidence that the remaining GLA Class members' rights – which were never utilized or desired by any licensee – had any economic value.

**B. The Adderley GLA Is Expressly Limited To "Moneys Generated By Such Licensing Of Retired" – Not Active – "Player Group Rights"**

Although Plaintiffs seize upon the Court's observation that the Adderley GLA is not a model of clarity, the plain language of the GLA is unambiguous as to the most fundamental issue in this case: that the <u>only</u> moneys that were to be "divided between the player and an escrow account" were "moneys generated by such licensing of <u>retired</u> player group rights." Adderley GLAs (emphasis added) (Greenspan Decl. Ex. 5). Thus, the GLA Class has no contractual entitlement to revenues generated by <u>active</u> player licensing. This conclusion is established, as a matter of law, by the plain language of the GLA (quoted above), and also by Adderley's sworn admissions:

> Q: Sir, do you believe, as a retired player, you're entitled to any money that's generated by the licensing of active players?
> A: No.
>
>            *       *       *
>
> Q: And what you thought you were agreeing to get [in the GLA] was that if <u>your</u> rights were <u>licensed and used</u>, you would get some money; correct?
> A: Correct.[3]

Even the TAC alleges only that "the Adderley GLAs provide that moneys generated by licensing of <u>retired</u> player rights" are to be divided, and the Court itself has observed that "[t]he GLA did not describe how the money would be divided or whether everyone who signed a GLA was entitled to any licensing distribution even if their image or likeness was not used."[4]

Faced with an undisputed evidentiary record establishing that 99% of the money generated by the licensing of retired player rights was, in fact, paid to the retired players whose

---

[3] Adderley Depo. 96:13-18, 92:7-17 (emphases added), 89:13-90:7 (Greenspan Decl. Ex. 4); <u>see also</u> Opp'n at 29 ("The GLA Class is not seeking active player money …."). 
[4] TAC ¶ 29 (emphasis added); Opp'n at 20-21 (quoting Class Certification Order at 6).

---

Dewey & LeBoeuf LLP
One Embarcadero Center, Suite 400
San Francisco, CA 94111

rights were licensed, Plaintiffs advance the unsupported argument that the Adderley GLA entitles the GLA Class to money generated solely by <u>active</u> player licensing.  See, <u>e.g.</u>, Opp'n at 6-7.  Specifically, Plaintiffs argue that "the phrase 'such licensing' in the penultimate paragraph of the GLA refers to 'Group licensing' in the second paragraph of the GLA, which includes 'six (6) or more <u>present</u> <u>or</u> former NFL player images.'"  <u>Id.</u> 6 n.10.  But the fact that the Adderley GLA defines "group licensing" as programs utilizing six or more active or retired players is entirely distinct from the question of what group licensing revenues were to "be divided between the player and an escrow account."[5]  The answer to the latter question, as established as a matter of law by the plain language of the GLA and by Adderley's sworn admissions, is that the <u>only</u> revenues to be so divided were "the moneys generated by such licensing of <u>retired</u> player group rights."  Adderley GLAs (emphasis added) (Greenspan Decl. Ex. 5)  Indeed, no other interpretation of the GLA would be reasonable, since it would be absurd to think that Defendants would simply give any retired player who signed a GLA a contractual right to share in active player licensing money that he played no role in generating.[6]

There is similarly no merit to Plaintiffs' repeated attempts to mislead the Court into believing that the reason that the GLA Class was not paid an equal share of the revenues under the 2005 EA and other license agreements at issue was because Defendants construe the GLA as giving them "discretion" to not distribute revenues generated by retired player licensing.  Opp'n at 12-13.  In fact, it has <u>never</u> been Defendants' position that if the GLA Class's rights were licensed under the EA or any other license agreements, Defendants could have chosen not to share the resulting retired player licensing revenues with the GLA Class.  Rather, the only reason why Defendants did not share the EA, Topps, and other licensing revenues at issue with the GLA Class was because, as the undisputed evidence establishes, not one penny of that active

---

[5] Put another way, "such licensing" does not, as Plaintiffs contend, refer back to the definition of "[g]roup licensing" set forth three paragraphs above in the Adderley GLA, but instead refers to the remainder of the sentence in which those words appear:  "such licensing <u>of *retired* player group rights."  <u>Compare</u> Opp'n at 6 n.10 <u>with</u> Adderley GLAs (emphasis added).

[6] As the NFLPA's General Counsel explained, "It would be unfair to the retired players to give active players a share of [retired player money].  And that's true on the flip side."  Berthelsen Depo. 75:19-76:4 (Greenspan Decl. Ex. 37).

---

player licensing money was in any way attributable to retired player licensing.

### C. The Revenues Generated By The EA, Topps, And Other License Agreements At Issue Were Generated Solely By <u>Active</u> Player Group Licensing

#### 1. The Four Corners of the License Agreements Establish That Only Active Player Rights Were Licensed

Eighteen months of fact discovery has yielded no evidence of EA, Topps, or any other licensee ever once using the rights of any of the thousands of GLA Class members without making a separate payment for the use of such rights. As a result, Plaintiffs must rest their breach of contract claim entirely upon a distortion of the boilerplate reference to "retired players" that appears in virtually all (96) of Defendants' license agreements during the class period (including the 2004/2005 EA and 2004/2007 Topps Agreements). <u>See</u> Opp'n at 9-10, n.28.[7]

As set forth in Defendants' Motion (pp. 18-20), this boilerplate "retired player" reference does not convey any retired player rights; rather, it merely informs licensees that Players Inc may, "on occasion," acquire retired player rights for inclusion in "designated" programs, <u>e.g.</u>, ad hoc licensing programs. The essential premise of Plaintiffs' argument is that the boilerplate reference "to retired players, who have not entered into [active player GLAs], but who, nevertheless, authorize Players Inc to represent such players for designated Players Inc licensed programs," is a reference to retired players who signed the Adderley GLA. Opp'n at 9. But it would make no sense for this language about "designated" programs to refer to the <u>non</u>-program specific Adderley GLA. Nor would it make any sense for Defendants to so inaptly describe the Adderley GLA when they could have just appended it to the license agreements and incorporated it by reference, as they did with the active player GLA form, if, in fact, these license agreements were intended to convey retired player rights under the Adderly GLA.[8]

---

[7] <u>See also</u> Rowley Report, Ex. 8 (listing the 96 license agreements) (Greenspan Decl. Ex. 20).

[8] <u>E.g.</u>, Mot. at 19 (quoting 2005 EA Agreement ¶ 1A ("The NFLPA has been duly appointed and is acting on behalf of the football players who have entered into a Group Licensing Authorization, <u>either in the form attached hereto as Attachment "A" or through the assignment contained in Paragraph 4(b) of the NFL Player Contract</u>….")). Plaintiffs also highlight a provision that appears in the 2007 Topps Agreement, stating that "the NFLPA … is acting on behalf of the active and retired players of the [NFL]," and recite the question posed by the Court in its Class Certification Order: "How, exactly, was the NFLPA acting on behalf of retired football players?" Opp'n at 24-25. The answer is provided by the boilerplate "retired player"

---

Defs.' Reply Br. in Support of Their Mot. for Summary Judgment    Civ. Action No. C07 0943 WHA

-6-

Dewey & LeBoeuf LLP
One Embarcadero Center, Suite 400
San Francisco, CA 94111

Dewey & LeBoeuf LLP
One Embarcadero Center, Suite 400
San Francisco, CA 94111

Moreover, while even Plaintiffs agree that contracts must be interpreted as a whole, their forty-page Opposition makes no mention of the "Approvals" provision that appears in virtually all of Defendants' license agreements (including the EA and Topps Agreements). This provision further confirms that such agreements did not license retired player rights:

> The list of players for whom Players Inc has group licensing authorization (the "Player Agreement Report") is available to the Licensee via the Internet at www.nflplayers.com/licensee. . . . <u>In addition</u>, Players Inc <u>may</u> secure authorization from players <u>not listed</u> on the Player Agreement Report, <u>including but not limited to retired players</u>.

Mot. at 20 (emphases added). The "Approvals" provision expressly refers licensees to a website that lists the <u>active</u> players whose images had been licensed, but does "not list[] … retired players" who signed the Adderley GLA.[9]

## 2. The Extrinsic Evidence Also Establishes That Only Active Player Rights Were Licensed

Plaintiffs also have no response to – and thus again urge the Court to ignore – the <u>unanimous</u> sworn testimony of seven different licensees who have all attested that their companies' license agreements with Defendants (all of which all contain the boilerplate "retired player" reference) coveyed only <u>active</u> players' rights (<u>see</u> Mot. at 10-14, 20-23):

> "[T]his license agreement and the fees that [EA] agreed to pay in this license agreement were to secure the rights of <u>active</u> NFL players."[10]

> \*       \*       \*

> "[Topps] did not get [retired player] rights from the license agreement; we had to do a separate agreement and make a separate payment for these rights."[11]

> \*       \*       \*

> "[A]ll money [Upper Deck] paid under the 2004 License Agreement was paid for the rights of active players only."[12]

> \*       \*       \*

> "[A]ll money paid by Fathead pursuant to the 2005 License Agreement was paid for the rights to active players only…. To the limited extent that Fathead has

---

reference, which states that the NFLPA acts on behalf of retired players who, "on occasion," "authorize NFLPA to represent such players for <u>designated</u> licensed programs."

[9] <u>See also</u> Nahra Depo. 279:8-14 ("[T]he report that they go to on the website … contains a list of active players. Just active players."), 272:22-274:9, 277:18-280:1; Linzner 30(b)(6) Depo. 142:20-143:8 (Greenspan Decl. Exs. 6, 2).

[10] Linzner 30(b)(6) Depo. 71:23-73:25 (Greenspan Decl. Ex. 2).

[11] Friss 30(b)(6) Depo. 74:8-21 (Greenspan Decl. Ex. 3).

[12] Decl. of Adam Sullins ("Sullins Decl.") ¶¶ 3, 6 (June 12, 2008) (Greenspan Decl. Ex. 28).

sought to acquire the rights of retired players for use in Fathead's products, Fathead has entered into separate agreements, and paid additional money, to acquire those retired players' rights."[13]

Given the undisputed, mutual contractual understanding of the only parties to the license agreements (<u>i.e.</u>, Defendants and their licensees), the contrary "interpretation" of Plaintiffs (who are strangers to the agreements), is legally precluded.  <u>See</u> Mot. at 20-23. Plaintiffs do not challenge this settled principle of law.  Instead, they argue that they are not strangers to the license agreements because "those licenses directly affected the Plaintiffs' economic interests."  Opp'n at 27-28.  But whether active player license agreements could somehow "affect" retired players' "economic interests" (they could not), Plaintiffs have no legal standing to challenge the interpretation of the only parties to the license agreements.  Nor have they met their burden to show that the GLA Class was an <u>intended</u>, third-party beneficiary of the license agreements – the only type of third party with standing to sue for breach of contract.[14]

Faced with this legal barrier to advancing their conflicting contractual interpretation, as well as with the complete absence of proof, Plaintiffs next argue that the Court should disregard the licensees' unequivocal testimony because they are all lying.  Opp'n at 3, 26.[15]  But it is black letter law that such unsupported credibility challenges cannot create a genuine issue of material fact in opposition to a summary judgment motion.[16]

---

[13] Castillon Decl. ¶¶ 3-4; 5 (same re: 2007 Fathead Agreement); <u>see also</u> Brenner Decl. ¶ 3 (same re: 2004 MBI Agreement); Finch Decl. ¶¶ 3-4 (same re: 2005 Todd McFarlane Agreement); Byrd Decl. ¶¶ 3,5 (same re: 2006/2007 STATS Agreements) (Greenspan Decl. Exs. 11, 29, 31).

[14] <u>Copenhaver v. Rogers</u>, 238 Va. 361, 367 (1989); <u>Ft. Lincoln Civic Ass'n, Inc. v. Ft. Lincoln New Town Corp.</u>, 944 A.2d 1055, 1064 (D.C. 2008); <u>see also</u> <u>German Alliance Ins. Co. v. Home Water Supply Co.</u>, 226 U.S. 220, 230 (1912) (holding that "an indirect interest in the performance of the undertakings" is insufficient).  The case law that Plaintiffs cite in "support" of their argument that they are "not strangers" to the third party license agreements do not deal with third-party beneficiaries, but with the unrelated issue of whether defendants were strangers to a business relationship in tortious interference claims (<u>not</u> breach of contract).  <u>See</u> Opp'n at 28 (citing <u>In re Leisure Corp.</u>, No. C-03-03012 RMW, 2007 WL 607696, *13 (N.D. Cal. Feb. 23, 2007) and <u>ViChip Corp. v. Lee</u>, 438 F. Supp. 2d 1087, 1097-98 (N.D. Cal. 2006)).

[15] Plaintiffs' credibility challenge to the licensees rests upon a provision in the respective license agreements stating that "Licensee agrees that it will not … attack the rights of Players Inc" or "the validity of this Agreement."  Opp'n at 3 n.4 (quoting 2005 EA Agreement).  But the licensees' sworn testimony about the scope of their agreements as not covering retired players has nothing to do with "the rights <u>of Players Inc</u>" or the "validity" of those agreements.  Nor, in any event, would this provision be contractually enforceable if, as Plaintiffs frivolously contend, it compelled the licensees to perjure themselves.

[16] <u>See</u> <u>Far Out Prods., Inc. v. Oskar</u>, 247 F.3d 986, 997 (9th Cir. 2001).

---

Defs.' Reply Br. in Support of Their Mot. for Summary Judgment          Civ. Action No. C07 0943 WHA

-8-

Dewey & LeBoeuf LLP
One Embarcadero Center, Suite 400
San Francisco, CA 94111

In addition, Plaintiffs' Opposition offers no cogent response to the commercially absurd consequences that would result from treating the boilerplate "retired player" reference as a grant of rights to the entire GLA Class. See Mot. at 23-25. For example, Plaintiffs do not deny that their "interpretation" would mean that dozens of licensees would have acquired the rights to thousands of GLA Class members, but would never have used those rights except when they paid for them a second time, through separate ad hoc agreements.[17] Nor do Plaintiffs have any credible explanation as to why retired player rights would have been licensed to products in 21 fantasy football agreements and two "draft pick" trading card agreements, which, by definition, only can use active player rights.[18]

### D. Plaintiffs Are Even Seeking Revenues From License Agreements That, On Their Face, Do Not Mention Retired Players

The fact that Plaintiffs' claims depend upon a legally invalid attempt to recover active players' money is underscored by their claim for revenues under license agreements that do not even mention retired players. Most prominently, Plaintiffs seek revenues under the NFL Sponsorship and Internet Agreement between NFL Properties, Inc. and Players Inc (the "Sponsorship Agreement"). Defendants did indeed "dismiss in a footnote" (Opp'n at 19-20) Plaintiffs' claim for revenues under that agreement – precisely where that claim belongs.

---

[17] Plaintiffs only explanation for this is another new argument – that Defendants did not disclose to licensees which retired players' rights were being licensed, and thus the licensees mistakenly paid for the rights a second time through ad hoc agreements. Opp'n at 24 n.92. But it is just as commercially unreasonable for Plaintiffs to argue for an interpretation of the agreements in which sophisticated companies like EA and Topps would have spent millions of dollars to acquire retired player rights without asking whose rights they were acquiring.

[18] Plaintiffs contend that one of Players Inc's fantasy football licensees (STATS) uses retired player statistics on its website. See Opp'n at 28-29. But the website that Plaintiffs cite says nothing about retired players on its "Fantasy Sports" page. Rather, the retired player statistics appear in the "Historical Data" portion of the website. Since Players Inc's contract with STATS licenses only a "fantasy football game" product, STATS's use of publicly available statistics about retired players in connection with a "historical data" product is irrelevant to the question of whether retired player rights were included in the fantasy football license at issue. 2007 STATS Agreement ¶ 2(A) (2d Greenspan Decl. Ex. 2); see also Byrd Decl. ¶ 5 (Greenspan Decl. Ex. 31) ("the 2007 License Agreement included the rights of active players only for use in a STATS fantasy football product"). Further, Plaintiffs' only response to Defendants' point that the RC2 "rookie trading card" agreements could not possibly include retired players is to concede that "Defendants' claim would make sense if their license agreements with RC2 were limited solely to rookies." Opp'n at 24 n.90. Since the RC2 licensed product is specifically limited to "draft pick trading cards," however, rookie active players are the only active players whose rights can be used. See 2004 and 2006 RC2 Brands Agreements ¶¶ 2(A) (Greenspan Decl. Exs 44).

---

Dewey & LeBoeuf LLP
One Embarcadero Center, Suite 400
San Francisco, CA 94111

Dewey & LeBoeuf LLP
One Embarcadero Center, Suite 400
San Francisco, CA 94111

The illogic of Plaintiffs' argument that the Sponsorship Agreement licensed retired player rights even though it does not mention "retired players" speaks for itself – Plaintiffs rest their claims on the absurd proposition that "[n]owhere in the NFL Agreement does it expressly state that retired players are <u>not</u> to be included."[19] <u>Id.</u> Contrary to Plaintiffs' contorted argument, the reference in paragraph 1 of the Sponsorship Agreement to "Group Player Licensing Rights (as defined in the [NFL Collective Bargaining Agreement])" serves only to confirm that the Sponsorship Agreement does not convey retired player rights. Indeed, only <u>active</u> players can be parties to the NFL CBA,[20] and "Group Player Licensing Rights" is defined in the Sponsorship Agreement by reference to the terms of the standard Player Contract appended to the CBA, which only can be signed by <u>active</u> NFL players.[21]

Plaintiffs' state law claims for revenues under the Sponsorship Agreement also have a fatal legal flaw. Under Plaintiffs' argument, they "depend on construction and application of terms in a collective bargaining agreement," (the NFL CBA), and are thus preempted by the Labor-Management Relations Act. <u>Black v. Nat'l Football League Players Ass'n</u>, 87 F. Supp. 2d 1, 4 (D.D.C. 2000) (preempting state law claims dependent on analysis of the NFL CBA).[22]

**E.      There Is No Triable Issue Of Fact As To Breach of Contract Or Damages**

It is undisputed that the <u>only</u> money that the GLA Class is trying to recover is an "equal share" of the <u>active player</u> royalties generated by the 2004/2005 EA, 2004/2007 Topps, NFL Sponsorship, and other license agreements discussed above. Accordingly, there is no

---

[19] Opp'n at 19; <u>but see</u> NFL Sponsorship Agreement ¶ 14 (stating that a portion of the annual sponsorship payment will be paid "to active NFL players.") (2d Greenspan Decl. Ex. 3).

[20] NFL Collective Bargaining Agreement ("CBA"), Preamble (2d Greenspan Decl. Ex. 4); <u>see also</u> Upshaw Depo. 142:8-144:18 (testifying that the NFL Sponsorship Agreement covers active players only) (2d Greenspan Decl. Ex. 5).

[21] <u>See</u> CBA, Appendix C ¶ 4(b) (2d Greenspan Decl. Ex. 4).

[22] Plaintiffs falsely claim that Defendants refused to produce requested evidence relating to the Sponsorship Agreement. Opp'n at 19. Tellingly, Plaintiffs have not brought a motion to compel or a Rule 56(f) motion on the subject. Their complaints are thus not only specious, but untimely and moot. <u>See</u> <u>Pfingston v. Ronan Eng'g Co.</u>, 284 F.3d 999, 1005 (9th Cir. 2002); <u>Mackey v. Pioneer Nat'l Bank</u>, 867 F.2d 520, 524 (9th Cir. 1989). In fact, Defendants agreed to produce, <u>inter alia</u>, all documents regarding "Plaintiffs' allegation 'that retired player rights are included in the NFL Sponsorship and Internet Agreement.'" May 28, 2008 Ltr. from J. Clark to L. LeClair at 2 (2d Greenspan Decl. Ex. 6). Because the Sponsorship Agreement does not include any such retired player rights, there are, unsurprisingly, no responsive documents.

---

genuine issue of material fact to support Plaintiffs' claim that Defendants breached the GLA by failing to distribute "moneys generated by such licensing of <u>retired</u> player group rights." Adderley GLAs (emphasis added) (Greenspan Decl. Ex. 5).

Nor can Plaintiffs defeat summary judgment by arguing, without any evidentiary support, that more money should have been paid to class members through the GLAs, as opposed to through the ad hoc group license deals. As a threshold matter, Plaintiffs have specifically disavowed any claim relating to the group licensing money paid to retired players through ad hoc deals.[23] Moreover, the undisputed evidence shows that GLA Class members benefited from Defendants offering them the opportunity to negotiate ad hoc deals along with retired players who had not signed GLAs, since licensees "were only interested in particular players at particular prices, and that's why [Players Inc] had to do ad hoc agreements, because the high profile players they were interested in were not going to participate in a program … unless they knew how much money they were getting."[24]

Plaintiffs do not allege a breach of the Adderley GLA based upon the non-existence of an "escrow account." Instead, Plaintiffs continue to argue – without evidentiary support – that the GLR pool is the "escrow" account referred to in the Adderley GLA.[25] Moreover, the GLA Class does not cite evidence of any material injury or damages to class members based on the absence of an escrow account. Nor could it, since "all of the money secured for retired player licensing was distributed to the players who were involved in those license programs. There was no other money to escrow." Mot. at 26-27 (quoting Doug Allen).

In fact, the only damages that Plaintiffs seek are "equal shares" of the GLR pool – active player revenues to which the GLA Class is not contractually entitled. Plaintiffs' unfounded accusations about Defendants using revenues from the GLR pool "to line their own

---

[23] E.g., Pls.' Mot. For Leave To File TAC at 4 n.1 (Nov. 27, 2007) (Rec. Doc. 190).

[24] Nahra 30(b)(6) Depo. 208:21-209:19, 67:19-68:15; D. Allen Depo. 148:16-149:10 ("We wouldn't have been able to get the players to [sign GLAs] in the first place if they weren't getting paid.") (Greenspan Decl. Exs. 6 & 8); see also Mot. at 8-9.

[25] Class Hearing Tr. 8:12-17 (Class Counsel: "We say [the escrow account] was created. We say it's an equal share fund.") (Greenspan Decl. Ex. 13).

Dewey & LeBoeuf LLP
One Embarcadero Center, Suite 400
San Francisco, CA 94111

pockets" (Opp'n at 13) are legally irrelevant for the same reason – they are complaints about how active players chose to allocate their own money.  For example, Plaintiffs claim that the GLA Class is entitled to "equal shares" of the $8 million reallocation of the GLR pool between the NFLPA and Players Inc, and to an "equal share" of the portion of the GLR pool retained by Defendants.  Id. at 13-14.  But the undisputed evidence establishes that all of the revenue in the GLR pool (including the $8 million reallocation and the 40% retained by the NFLPA for union operations) is exclusively active players' money, allocated by the NFLPA Board of Player Representatives, which is elected by the active players.  See Mot. at 14-16, 25-29.[26]

In addition to the undisputed fact that the Adderley GLA does not provide a contractual right to revenues generated solely by active player licensing, it also says nothing about an "equal share" distribution of any revenues.  As the Court has noted, the Adderley GLA does "not describe how the money would be divided."  Opp'n at 20-21 (quoting Class Certification Order).  Moreover, although a so-called "equal share" distribution of the GLR pool makes sense for active players for large group programs, like trading cards and video games, because licensees do not know in advance which active players will be most desirable from season to season, this rationale for an "equal share" distribution does not apply to retired players, whose careers are over, and whose marketability, or lack thereof, is fixed.[27]

---

[26] For example, as testified to by Players Inc's Rule 30(b)(6) witness on these subjects, "the retired Players have … designated deals that are not part of the gross licensing equal share pool," "[t]he equal share pool is referred to as the active player licensing pool," and "the NFLPA receiv[es] 40 percent of the active player gross licensing share."  Eyrich 30(b)(6) Depo. 50:24-51:2, 11:22-25, 50:8-16 (Greenspan Decl. Ex. 34) (emphases added).  Plaintiffs' references to Mr. Allen's testimony misleadingly suggest that he considered it a valid possibility that the active players "could" have shared their money with retired players.  Mr. Allen, however, actually testified that: "That's a little bit like saying I'd have hair if I wasn't bald, but I am."  D. Allen Depo. 123:11-12 (2d Greenspan Decl. Ex. 12).

[27] As the NFLPA's General Counsel explained, "equal shares" make sense for active players because "[s]ome guys get hurt; other guys go on to play better than they're expected to; others play worse than they're expected to.  But they're all active players.  They're all going to be playing in the upcoming season.  And who's actually used [by the licensee] becomes a function of a lot of variables that nobody can anticipate when the license is first granted."  Berthelsen Depo. 78:6-79:6 (2d Greenspan Decl. Ex. 7).  With retired players, however, their marketability is known and fixed at the time of the license.  Moreover, "[y]ou can make a great case that the stars and people that make more money should pay more in union dues.  But the balance that's been struck by the players over time is that what differences there are among them by the stars being part of the group licensing, that's kind of their way of paying everybody back for what they don't pay extra in dues."  Id. at 80:10-14.  The GLA Class, however, is not a class of dues

Defs.' Reply Br. in Support of Their Mot. for Summary Judgment        Civ. Action No. C07 0943 WHA
-12-

Dewey & LeBoeuf LLP
One Embarcadero Center, Suite 400
San Francisco, CA 94111

Dewey & LeBoeuf LLP
One Embarcadero Center, Suite 400
San Francisco, CA 94111

1    Further, Plaintiffs continue to ignore the undisputed evidence that there is no

2  practice of uniformly distributing the GLR pool in "equal shares" to active players.  In fact,

3  "practice squad" players receive only a $1,000 share, and active players who did not meet the

4  eligibility requirements receive no share, even though they have signed the active player GLA

5  form.  See Mot. at 14-15.  Interpreting the Adderley GLA as giving the class a contractual right

6  to receive "equal" shares of the GLR pool, as Plaintiffs advocate, would have the illogical and

7  unreasonable consequences that retired players would consume the majority of active player

8  GLR pool revenues (since retired players greatly outnumber active players), and practice squad

9  players who received $1,000 shares during their playing careers would suddenly earn full,

10  "equal" shares in retirement.[28]

11    Lastly, Defendants note that Plaintiffs' "everything but the kitchen sink" strategy

12  for opposing summary judgment includes a reincarnation of their Section 17200 Unfair

13  Competition claim and related allegations about purported "exclusivity" that the Court dismissed

14  last year.[29]  These unfounded arguments, which were not permitted to be asserted in the TAC,

15  are irrelevant to Defendants' Motion.

16  **II.    SUMMARY JUDGMENT SHOULD ALSO BE GRANTED AGAINST THE GLA
       CLASS'S BREACH OF FIDUCIARY DUTY CLAIM**

17    **A.    There Is No Evidence That The GLAs Gave Rise To A Fiduciary Duty**

18    The TAC alleges two different fiduciary duty theories:  (i) an "express" or

19  "direct" agency theory (fiduciary duty arising out of the GLA); and (ii) an "agency by estoppel"

20  theory (fiduciary duty arising out of Defendants' alleged "representation" of all retired players ).

21  See TAC ¶¶ 45, 46-50.  In its Class Certification Order, the Court held, in no uncertain terms,

22

23  paying active players, and thus this rationale does not apply to them either.

24  [28] Because Plaintiffs' damages "expert" failed to account for the fact that active, practice squad
    players receive $1,000 instead of "equal shares," Plaintiffs attempt to dispute that practice squad

25  players received $1,000 shares, purportedly because "there are no such payments reflected in the
    LM-2s submitted by the NFLPA to the Department of Labor." Opp'n at 21 n.78.  What Plaintiffs

26  have chosen to ignore, however, is that LM-2s need only identify disbursements or receipts "in
    the amount of $5000 or more."  29 C.F.R. § 403.8(b)(1) (emphasis added).

27  [29] Compare, e.g., Opp'n at 10, 11 (arguments about "an effort to lock up the market," "the
    exclusivity of this arrangement," and "Defendants [seeking] to eliminate competition") with

28  Order Granting Motions to Dismiss at 7-14 (Sept. 9, 2007) (Rec. Doc. 133).

1   that the GLA Class's breach of fiduciary duty claim was certified "only insofar as [it] arises out

2   of the GLAs between the NFLPA and retired players," and Plaintiffs have since conceded that

3   "there is no longer an 'agency by estoppel' claim at issue" in this case. See Mot. at 29 n.89.[30]

4   Accordingly, the only fiduciary duty theory that Plaintiffs may pursue is an "express" or "direct"

5   agency relationship purportedly arising out of the GLA.

6          As set forth in Defendants' Motion, both Virginia and D.C. law provide that "the

7   critical test" in determining whether such an agency relationship exists "is the nature and extent

8   of the control agreed upon."[31]  Specifically, the level of control necessary to establish a direct

9   agency relationship is "control over the day-to-day operations of the alleged [agent]" and the

10  "right to control the methods or details of doing the work."[32]  Plaintiffs, however, have come

11  forward with no evidence to show that the GLA Class had the requisite "day-to-day" control

12  over, or the "right to control the methods or details of," Defendants' licensing operations.

13         Instead, Plaintiffs simply repeat their factually unsupported and legally

14  insufficient allegations that Plaintiffs were able to terminate the GLA.  See Opp'n at 32-33.  But

15  the GLA provision stating that a player may opt out of a "particular program" if his participation

16  would "conflict with an individual exclusive endorsement agreement" is clearly not the same as a

17  right to terminate the GLA.  See Adderley GLA (Greenspan Decl. Ex. 5).[33]  Moreover, even if

18  GLA Class members did have a contractual right to terminate the GLA (they did not), such a

19  right would not come close to evidencing the level of control over an alleged agent necessary to

20  create a fiduciary relationship under Virginia or D.C. law.  See Mot. at 30-32.[34]

21

22  [30] Class Cert. Order at 14 & 10 (Apr. 29, 2008) (Rec. Doc. 275); Pls' Opp'n to Pet. for
    Permission to Appeal Under Fed. R. Civ. P. 23(f) at 10 (Greenspan Decl. Ex. 47).

23  [31] Jackson v. Loews Wash. Cinemas, Inc., 944 A.2d 1088, 1097 (D.C. 2008); Murphy v. Holiday
    Inns, Inc., 216 Va. 490, 493 (1975).

24  [32] Ames v. Yellow Cab of D.C., Inc., No. 00-3116 (RWR)(DAR), 2006 WL 2711546, *5
    (D.D.C. Sept. 21, 2006) (applying D.C. law); Wells v. Whitaker, 207 Va. 616, 624 (1966).

25
    [33] See also Adderley Depo. 97:8-99:2 (testifying that the only "control" he had over Players Inc
26  was "to ask" to be excluded from a particular program if there was a conflict); Mot. at 30-31.

27  [34] Plaintiffs attempt to distinguish the numerous cases cited by Defendants on the basis that most
    of the cases involved the doctrine of respondeat superior. See Opp'n at 33, n.119. But there are
28  many decisions from Virginia, D.C., and elsewhere requiring the same level of control over a
    purported agent to establish a fiduciary duty, as is required in the respondeat superior cases. See,

Dewey & LeBoeuf LLP
One Embarcadero Center, Suite 400
San Francisco, CA 94111

Apparently recognizing that they cannot raise a genuine issue of material fact in support of an agency relationship arising out of the GLA, Plaintiffs improperly revert to arguing the existence of a fiduciary relationship based upon "sources" other than the GLA, such as statements on Players Inc's website. Opp'n at 32, 33, 34 ("Defendants cannot gain the benefit of that representation and disavow the resulting agency obligations"). But, as set forth above, this "agency by estoppel" theory did not survive class certification. <u>Supra</u>, n.30 and accompanying text. Similarly, Plaintiffs try to resuscitate their fiduciary duty claim by rehashing unsupported allegations that the allegedly "exclusive" effect of the GLA creates a "confidential," fiduciary relationship. Opp'n at 34-35. The Court, however, has already dismissed Plaintiffs' allegations about "exclusivity" and any claimed "confidential" relationship.[35]

Finally, Plaintiffs make the brand new claim that "[f]ederal courts in Virginia and D.C. recognize that unions owe fiduciary duties to their members." Opp'n at 33. This theory is utterly disingenuous since it was the putative Parrish ("Retired Member") class – not the GLA Class – whose claims were based upon alleged membership in the NFLPA. TAC ¶¶ 108-113. Further, even if the GLA Class (which consists of many members who are not NFLPA members) had asserted a fiduciary duty based on alleged "union membership,"[36] such allegations would fail to state a claim because: (i) retired players are not part of the NFLPA collective bargaining unit; and (ii) duty of fair representation claims against a union must be brought under Section 9 of the National Labor Relations Act, which preempts state law claims for breach of fiduciary duty.[37]

---

e.g., <u>Murphy</u>, 216 Va. at 495; <u>Jackson</u>, 944 A.2d at 1097-98; <u>see also</u> <u>Bangkok Crafts Corp. v. Capitolo di San Pietro in Vaticano</u>, No. 03 Civ. 0015 (RWS), 2004 U.S. Dist. LEXIS 25235, *17-20 (S.D.N.Y. Sept. 13, 2004) ("A standard license agreement such as the one at issue here, in and of itself, does not provide the type of direct and day-to-day control necessary to establish an actual agency relationship between the licensor and the licensee.") (citing <u>Murphy</u>, 216 Va. at 495).

[35] Order Granting in Part and Denying in Part Pls' Mot. for Leave to File an Amended Complaint at 10 (Nov. 14, 2007) (Rec. Dec. 176) ("Adderley has pleaded a fiduciary relationship based on contract, but has failed to plead fiduciary duty based on a confidential relationship").

[36] <u>See</u> Opp'n at 33 (citing <u>Nellis v. Air Line Pilots Ass'n</u>, 144 F.R.D. 68, 71 (E.D. Va. 1992) ("The 'duty of fair representation is . . . akin to the duty owed by other fiduciaries to their beneficiaries.'")).

[37] <u>E.g.</u>, <u>Vaca v. Sipes</u>, 386 U.S. 171, 177 (1967) (a union's duty of fair representation arises from Section 9 of the NLRA, and alleged breaches of that duty are governed by federal labor law).

---

**B.** **There is No Evidence to Support a Claim That Defendants Breached Any Alleged Fiduciary Duty**

The breach of fiduciary duty allegations in the TAC are premised on Defendants allegedly "licensing rights of retired players to licensees such as EA in exchange for . . . payments totaling millions of dollars per year" and the exclusion of "retired players from the 'equal share royalty' paid to active players from such funds." TAC ¶¶ 51-52. But because there is not a shred of evidence that the GLA Class members' rights were ever licensed to companies like EA without full compensation being paid to the players whose rights were licensed, Plaintiffs' breach of fiduciary duty claim now appears to be premised on the exact opposite contention: that "Defendants Breached Their Fiduciary Duties To The GLA Class By Failing To Include Its Members in the Licensing Agreements." E.g., Opp'n at 14 (emphasis added), 39 (Defendants "should have" licensed the GLA Class).

Specifically, Plaintiffs argue that Defendants breached their duties by purportedly "fail[ing] to promote the interests of the retired players" because a Topps representative testified "that he would have taken a license to the group rights of retired players." Opp'n at 15 (emphasis added). Plaintiffs are careful to state that Topps would have "taken" – not paid for – a license to the GLA Class's rights, because there is no evidence that Topps (or any other licensee) would have paid any additional money to acquire the collective rights of the GLA Class.[38] And, since even Adderley admits that the GLA Class is entitled only to money generated by the licensing of their rights, there is no theory – based on a fiduciary duty or otherwise – by which the GLA Class would be entitled to an "equal" or any other share of the Topps revenues unless such revenues had been generated, at least in part, by the conveyance of retired player rights.

Plaintiffs also argue that Defendants breached their purported fiduciary duties by failing to make adequate efforts to market the GLA Class. See Opp'n at 14, 36-37. The only evidence they cite in support of this contention, however, is a single, out of context quote from Gene Upshaw about his personal "efforts to sell [retired player images] prior to [a licensee]

---

[38] Even Plaintiffs' citation of the Topps's representative's testimony is misleading. Immediately after testifying that he would have "taken" a license to retired players in the 2004 or 2007 Topps Agreement, Mr. Friss confirmed that Topps had not sought to acquire any retired player rights in these agreements. Friss 30(b)(6) Depo. 77:8-25 (Greenspan Decl. Ex. 3).

1   making a request." Id. at 14.  Plaintiffs ignore the fact that Mr. Upshaw specifically testified

2   about his efforts to market retired player rights to EA and other companies.[39]  More importantly,

3   Plaintiffs' only response to the testimony of Players Inc's former President, Chief Operating

4   Officer, Vice President of Player Marketing, and Staff Counsel about Defendants' substantial

5   efforts to promote retired players (e.g., Mot. at 5-6) are ad hominem insinuations that all of these

6   witnesses were lying.  See Opp'n at 37.  This is legally insufficient to defeat summary

7   judgment.[40]  Further, it is impossible to reconcile Plaintiffs' claim that "Defendants made no

8   effort to license the rights of retired players" (Opp'n at 14) with the undisputed fact that that

9   Defendants generated over $30 million for retired players through ad hoc licensing.

10          Equally disingenuous is Plaintiffs' claim that "EA's representative … was

11  unaware retirees had signed GLAs."  Opp'n at 37.  In truth, EA's Linzner testified that Players

12  Inc did try to generate opportunities for retired players, but that EA was not interested in

13  obtaining retired player rights other than on an ad hoc basis:

14          Q:  Is it correct to say that you and Mr. Walker were negotiating about the rights
                of current and retired football players?
15          A:  No.  The proposal [EA] made was for active NFL players.  What Clay told me
                is that he also represented retired players, as I've testified here, and they were
16              looking for opportunities for those retired players as well."[41]

17          Even more irrelevant, is Plaintiffs' new claim that several emails written by Clay

18  Walker, a former Players Inc employee who wrote most of the emails at issue after he had left

19  Players Inc, support a claim that Players Inc did not properly represent retired players in

20  connection with the license agreement between EA and HOF (where Players Inc served as an

21  intermediary – not as a licensor or licensee).  Opp'n at 3-4.  Incredibly, Plaintiffs try to use these

22  e-mails to stave off summary judgment despite the fact that Plaintiffs concede that the EA-HOF

23  agreement is one of the ad hoc license agreements with retired players that is "not in dispute in

24

---

25  [39] Upshaw Depo. 151:3-153:16 ("I've had discussions with several licensees about the retired
        players and how they would be helpful and beneficial in certain programs," with the "most recent
26      example [being] the EA contract that we just executed not long ago, and I offered retired players
        in that area. But there was, there was really no interest.") (Greenspan Decl. Ex. 10).

27  [40] See Far Out Prods., 247 F.3d at 997.

28  [41] Linzner 30(b)(6) Depo. 113:4-12 (Greenspan Decl. Ex. 2); see also 40:21-41:3, 49:5-12 (2d
        Greenspan Decl. Ex. 8).

---

Dewey & LeBoeuf LLP
One Embarcadero Center, Suite 400
San Francisco, CA 94111

1    this case." Opp'n at 21-24 (section entitled "The Irrelevance of the Individually Negotiated 'Ad

2    Hoc' Agreements," also discussing the EA-HOF deal). In addition to the fact that Plaintiffs have

3    not "alleged any claims based on an 'ad hoc' agreement,"[42] ad hoc agreements, which involved

4    only small subsets of class members and non-class members, do not present class-wide issues of

5    fact, and claims relating to ad hoc agreements were not certified for class treatment. For

6    example, only 17 class members (out of 2,109) who had GLAs in effect were involved in the

7    EA-HOF Agreement.[43] Further, Plaintiffs have not offered any proof of injury or damages with

8    respect to the allegedly "below market" EA-HOF deal. See generally Rowley Report

9    (Greenspan Decl. Ex. 20).[44]

10              Finally, Plaintiffs have failed to raise a genuine issue of material fact in support of

11   any of their other breach of fiduciary duty claims. For example, the Opposition repeats the

12   argument that Defendants "fail[ed] to accurately report group licensing revenues" to class

13   members. Opp'n at 35. But this claim is based upon the false premise that Defendants had a

14   duty to report active player licensing revenues to retired players. See Mot. at 33-34. Similarly,

15   Plaintiffs persist in claiming that Defendants breached a purported duty to "distribute to retired

16   players their equal share of the fund from which the active players were paid" and that

17   Defendants misappropriated 64%-69% of funds that should have partly been paid to them, along

18   with the $8 million reallocation. Opp'n at 35 (emphasis added). A closely related claim is that

19   Defendants improperly defined the eligibility requirements for the GLR pool to exclude retired

20

21

---

22   [42] Pls.' Mot. For Leave To File TAC at 4 n.1 (Nov. 27, 2007) (Rec. Doc. 190).

23   [43] Compare Rowley Report, Ex. 7 with 2006 EA-HOF Agreement, Ex. A (together showing that
     only 17 GLA Class members had GLAs in effect at the time the EA-HOF Agreement was
24   entered into) (Greenspan Decl. Exs. 20 & 22)

25   [44] In a related allegation, Plaintiffs quote the testimony of NFLPA Staff Counsel Joe Nahra as
     stating that "[w]e are not trying to drive up the price on our licensees." Opp'n at 16. But Mr.
26   Nahra was testifying about ad hoc agreements, and how Players Inc serves as an intermediary to
     the negotiations between the retired players and the licensees in ad hoc deals, which are not part
27   of Plaintiffs' claims in this case. Nahra 30(b)(6) Depo. 222:25-225:16 (2d Greenspan Decl. Ex.
     9). The full text of Plaintiffs' selective quotation is as follows: "I want that player to get as
28   much money as he can, but I am not part of the negotiation. It is between the player and the
     licensee. We are not trying to drive up the price on our licensees." Id.

---

Defs.' Reply Br. in Support of Their Mot. for Summary Judgment        Civ. Action No. C07 0943 WHA

Dewey & LeBoeuf LLP
One Embarcadero Center, Suite 400
San Francisco, CA 94111

1   players.  Id.  All of these claims are just different iterations of Plaintiffs' claim for active player

2   licensing revenues.  Mot. at 14-17, 32-33.

3         **C.**     **There Is No Triable Issue Of Fact With Respect To Injury Or Damages**

4             Summary judgment should also be granted against Plaintiffs' breach of fiduciary

5   duty claim for the additional reason that Plaintiffs have failed to raise any genuine issue of

6   material fact in support of a claim of injury or damages to individual GLA Class members.  See

7   Mot. at 34-35.[45]  Plaintiffs continue to stand by their unsupported "equal share" damages theory,

8   but they have not presented any evidence that each of the thousands of GLA Class members –

9   the vast majority of whom have no economic value in their licensing rights[46] – has been injured.

10   Instead, Plaintiffs' damages "expert" just assumes his conclusion by "defin[ing] causation as the

11   fact that the retired players did not receive any payments from the [GLR pool]," and Plaintiffs'

12   other expert concedes that he has "not submitted an opinion as to the common impact to the class

13   or the fact or amount of damages in this case."[47]  There is simply no evidentiary support for a

14   theory of injury and damages based on "equal shares" of the GLR pool, since there is no

15   evidence that any revenues from the rights of GLA Class members were included in this pool,

16   and even Plaintiffs have conceded that the value of each retired player's licensing rights varies

17   from one class member to another.  See Mot. at 6-7.

18             Plaintiffs seem to have finally recognized this fatal evidentiary gap in their

19   damages claim, because they improperly offer yet another new theory for the first time on

20   summary judgment: that "no proof of specified damages is necessary for this Court to require

21   disgorgement of profits" for breach of fiduciary duty.  Opp'n at 39.  Plaintiffs, however,

22   submitted their initial and rebuttal expert damages reports weeks ago, and there has been no

23   damages evidence presented that even discusses the issue of profits disgorgement, or how such

24

---

25  [45] See, e.g., Hager v. Gibson, 109 F.3d 201, 212 (4th Cir. 1997) (affirming summary judgment where supposed breach of fiduciary duty "caused no injury"(applying Virginia law)); Day v.

26  Avery, 548 F.2d 1018, 1029 n.56 (D.C. Cir. 1976) (same under D.C. law).

27  [46] See Noll Decl. ¶¶ 4-12 (Greenspan Decl. Ex. 12).

28  [47] Rebuttal Report of Philip Y. Rowley at 2 (June 27, 2008); Expert Reply Report of Daniel A. Rascher at 6 (June 26, 2008) (2d Greenspan Decl. Exs. 10 & 11).

---

profits would be calculated. Instead, the only remedy that Plaintiffs have been seeking for their breach of fiduciary duty claim is an award of damages in the form of an "equal share" of Defendants' licensing revenues:

> The damages for breach of fiduciary duty include <u>all the royalties</u> generated from those third-party licenses that include the retired players in their express terms [or,] alternatively, those damages include <u>all the royalties</u> generated by all the licenses that could have included retired players….

Opp'n at 39 (emphases added). There has thus been no evidence presented for Plaintiffs to seek any profits disgorgement in this case.

Finally, Plaintiffs have not offered any evidence to raise a genuine issue of material fact in support of their claim that "equal shares" of the GLR pool correlate to injury or damages suffered by GLA Class members as a result of Defendants' alleged fiduciary breaches. For example, even if it could somehow be proven that Defendants had failed adequately to promote the licensing right of GLA Class members, Plaintiffs have offered no evidence to explain how a GLA class member whose licensing rights have no value would suffer any injury at all. <u>See</u> Mot. at 34-35. Nor have Plaintiffs shown how Defendants could "profit" from the rights of such a GLA Class member with no economic value. The appropriate measure of injury for such a claim would be the amount of revenues that adequate marketing would have generated for such a GLA class member in the "but for" world – not an arbitrary, "equal shares" division of active player revenues that had nothing to do with any retired player rights. There is simply no evidence presented of injury or damages to individual GLA Class members from any alleged breach of fiduciary duty in this case.

## CONCLUSION

For all of the foregoing reasons, Defendants' Motion should be granted. It is time to bring this baseless litigation, which has no evidentiary support, to an end.

Date: July 10, 2008                                    DEWEY & LEBOEUF LLP


                                                BY:  __/s/ Jeffrey Kessler____
                                                        Jeffrey L. Kessler
                                                        *Attorneys for Defendants*