# Dewey & LeBoeuf

Dewey & LeBoeuf LLP
1301 Avenue of the Americas
New York, NY 10019-6092

tel   +1 212 259 8050
fax   +1 212 259 7013
jkessler@dl.com

August 1, 2008

The Honorable William Alsup
United States District Court,
Northern District of California
450 Golden Gate Avenue
San Francisco, CA  94102

>    Re:    *Parrish v. National Football League Players Association, et al.*
>           **Case No. C07-0943 WHA**

Dear Judge Alsup,

    Defendants NFLPA and Players Inc hereby respond to class counsel's July 30, 2008 Letter Brief, including those topics addressed by class counsel that are outside the scope of the Court's narrow request for additional briefing.

    At the hearing on Defendants' Motion for Summary Judgment ("Motion"), the Court instructed Plaintiffs to cite the "specific evidence" that "warrants continuing the case," i.e., "the essence of the case you are going to be making at trial."  Hearing Tr. at 22:17-23:18.  Predictably, class counsel responded not with evidence, but with brand new "allegations" – this time, of an "insidious," "cold-blooded" "conspiracy" between Defendants and EA to disguise the licensing of GLA Class members' rights.  Id. at 36:24-37:6, 42:12.  As class counsel's Letter Brief makes clear, however, Plaintiffs' only purported "evidence" of this newly alleged conspiracy is an innocuous, inadmissible, pre-statute of limitations letter (the "2001 Letter") in which Players Inc simply asks EA not to use in its 2002 Madden NFL video game the names and images of active or retired players whose rights EA had not acquired.  There are no other documents, and no testimony, to raise any issue of fact in support of Defendants' alleged participation in class counsel's eleventh hour, fantastical conspiracy theory – notwithstanding the fact this entirely fictional conspiracy purportedly transpired throughout the statute of limitations period, and supposedly "continues to this day."  Ltr. Br. at 5.  As set forth below, the 2001 Letter is no "smoking gun."  It is just more "smoke-and-mirrors"[1] being used in one final attempt to obscure the indisputable fact that whenever GLA Class members' rights were licensed by Defendants, they were fully paid.

### I. CLASS COUNSEL'S MISREPRESENTATION OF THE "DEFENSE PREMISES"

    Class counsel fundamentally misrepresents what they characterize as Defendants' "basic defense premises."  Ltr. Br. at 1.  Defendants have never asserted that "licensees such as [EA] never wanted to license and therefore never actually did license" the rights of GLA Class members.  Id.  Rather, Defendants have demonstrated that the undisputed facts are that licensees such as EA never

---

[1] Order Granting Motions to Dismiss at 4 (Sept. 6, 2007) (Rec. Doc. 133) ("Plaintiffs' smoke-and-mirrors approach to pleading is unconvincing").

wanted to pay for a license to the rights of all (or even most) GLA Class members, since the identity rights of most GLA Class members have little or no economic value. See Mot. at 5-9; Defs.' Reply Br. in Support of Mot. for Summary Judgment ("Reply") at 2-4. Indeed, there can be no genuine dispute that EA and other licensees "were only interested in particular [retired] players at particular prices," and that Defendants paid nearly 99% of the revenues generated from such "ad hoc" retired player group licensing deals – over $30 million during the statute of limitations – to the retired players, including GLA Class members, whose rights were licensed. Id.

## II. WHEN RETIRED PLAYERS WERE LICENSED TO EA, THEY WERE ALWAYS FULLY PAID, AND THERE IS NO EVIDENCE OF THE ALLEGED "CONSPIRACY" BETWEEN DEFENDANTS AND EA

Because class counsel's Letter Brief so thoroughly confuses and conflates the various and separate active and retired player license agreements between EA and Players Inc, Defendants will address in order each of the documents put at issue in class counsel's Letter Brief, beginning with the 2000 EA Agreement and the 2001 Letter, and concluding with EA's inclusion of various nameless, faceless images in its 2007 Madden NFL video game.

### A. The 2000 EA Agreement and Addendum

In January 2000, EA and Players Inc entered into a license agreement for active NFL players (the "2000 EA Agreement"). See 2000 EA Agreement (Ex. 1 to Decl. of Jeffrey Kessler filed concurrently herewith ("Kessler Decl.")). In July of that same year, Players Inc and EA amended the 2000 EA Agreement through an Addendum that provided that the "Grant of License" in the 2000 EA Agreement would be expanded to include "the names, likenesses, pictures, photographs, voices, facsimile signatures and/or biographical images" of specific, designated retired players that were identified in an attachment to the Addendum. See Addendum (Kessler Decl., Ex. 2); 2000 EA Agreement ¶ 2A. The Addendum further provided that EA would pay an incremental fee of $150,000 per year – for a term of three years – for the use of these specifically requested and designated retired players in EA's video games (i.e., the 2000-2002 Madden NFL video games). Id.[2] Plaintiffs do not dispute that all of this money was distributed to the designated retired players whose rights were licensed to EA through the Addendum.

### B. The 2001 Letter

Contrary to the wild claims by class counsel about the 2001 Letter sent by Players Inc to EA, its wholly lawful and innocuous purpose is stated on the face of the document: to provide an "explanation of the approved use of retired players for [EA's] upcoming video games," i.e., "Madden 2002." 2001 Ltr. (Ex. A to Decl. of Laura Franco in Support of Pls.' July 30, 2008 Letter Brief ("Franco Decl.")). The proper and lawful explanation from Players Inc to EA provided in the 2001

---

[2] See also Joel Linzner 30(b)(6) Depo. Tr. ("Linzner Depo.") at 50:1-52:6 (EA executive testifying that "[w]e had given [Players Inc] a list of the people we were interested in. They could get some of those retired players. Some of them they couldn't get. And there was an agreement about an amount of money that we would pay incremental to our license fees that we were paying for the active NFL players [through the 2000 EA Agreement], at that point in time, to secure the rights of the retired NFL players.") (Kessler Decl., Ex. 3).

Letter could not be clearer – EA was <u>not</u> permitted to utilize the identity rights of any retired or active players who had not been licensed pursuant to the Addendum:

> The Addendum that was signed last July was a three year Agreement that granted Electronic Arts the right to use the images and identities of the players listed in Attachments A and B…. For **all** retired players that are <u>not</u> listed in either Attachment A or B, <u>their identity must be altered so that it cannot be recognized</u>. Hence, any and all players <u>not</u> listed in Attachment A or B <u>cannot be represented in Madden 2002</u> with the number the player actually wore, and **must** be scrambled.
>
> Along those same lines, the only active players that can be included in the licensed product, are those players who have given their licensing rights to Players Inc. Substituting a players [sic] name with their jersey number is not acceptable. If a player has not given his rights to Players Inc, his identity, as defined above, cannot be used within the game."[3]

According to class counsel, the 2001 Letter exposes a "conspiracy" between EA and Defendants "to alter former players' images and numbers so that an argument could later be manufactured by Defendants that EA did not actually license or use GLA retired player images." Hearing Tr. at 36:25-37:6; Ltr. Br. at 3. But class counsel's brazen allegation that the 2001 Letter was intended to disguise the licensing of GLA Class members is pure fantasy, unsupported by any evidence. The actual text of the 2001 Letter makes clear that Players Inc was merely asking EA <u>not</u> to use the identity rights of retired players who had <u>not</u> been licensed pursuant to the Addendum, or active players whose rights had <u>not</u> been acquired by Players Inc (and thus <u>not</u> licensed to EA). And there is <u>no</u> other "evidence" to support class counsel's newly-hatched theory that EA and Defendants were conspiring in 2001, or at any other time.[4]

Moreover, class counsel does not dispute that, in 2001, the <u>only</u> retired players being licensed to EA were the specific retired players designated by the Addendum, and that all of those retired players were fully paid for their rights. Thus, at the time the 2001 Letter was written, there would have been no possible motive by Players Inc to "disguise" any purportedly "licensed" GLA Class members, since it is undisputed that they were all identified and paid. It was not until the 2004/2005 EA Agreements, discussed below, that Plaintiffs first accuse Defendants (albeit without any evidentiary support) of licensing to EA the rights to the entire GLA Class and not paying the GLA Class members for such purported licensing of their rights.

---

[3] 2001 Ltr. (bolded text in original, underlined text added) (Franco Decl., Ex. A).

[4] Plaintiffs accuse me of misrepresenting to the Court that the 2001 Letter was "merely telling EA not to exploit the rights that Defendants did not possess." <u>See</u> Ltr. Br. at 4. But I did not state, after quickly reviewing the 2001 Letter, which had just been handed to me, that the only reason that EA was told that it could not use the identity rights of retired players not listed in the Addendum was because Defendants did not have GLA rights to those players. In fact, as I said, and as the 2001 Letter states, EA was told that it could not use any retired player rights who had not been <u>licensed</u>: "My client got asked, do you have the rights, back in 2001, and, apparently, said, we don't have the rights, <u>we haven't licensed you the rights</u>, you can't use those people, you have to change it." Hearing Tr. 51:8-15.

### C. The 2004 and 2005 EA Agreements and the Hall of Fame Agreement

After the 2000 EA Agreement expired, Players Inc entered into new license agreements with EA (the "2004" and "2005 EA Agreements"). Although the record evidence indisputably establishes that the 2004/2005 EA Agreements covered <u>active</u> players only (<u>see</u> Mot. at 10-15, 18-25 and Reply at 6-9), Plaintiffs allege that these license agreements included the rights of all GLA Class members. <u>E.g.</u>, Ltr. Br. at 3; Hearing Tr. at 23:14-16; TAC ¶¶ 20, 29.

But the indisputable fact that the 2005 EA Agreement did not license any retired player rights explains why, in 2006, when EA was interested in using the identity rights of Hall of Fame retired players (including certain GLA Class members) in its Madden NFL video games, EA entered into a <u>separate</u> agreement, and paid <u>additional</u> money to acquire a license to such selected retired player rights. <u>See</u> Mot. at 10-11.[5] Specifically, EA acquired approximately 150 designated retired players' identity rights from the Pro Football Hall of Fame ("HOF," and the "2006 EA-HOF Agreement"). <u>See</u> Linzner Depo. at 169:16-170:11; 2006 EA-HOF Agreement (Kessler Decl., Exs. 3, 4). Players Inc helped to facilitate this deal, and though class counsel's Letter Brief tries to confuse the point, it is undisputed, as the Court noted during the summary judgment hearing, that all of these HOF retired players, including GLA Class Members, were fully paid for the use of their rights under the 2006 EA-HOF Agreement. <u>See</u> Mot. at 11 n.31; Hearing Tr. at 27:24-30:9.

Because it would make no sense for EA to have paid twice for the identity rights of the HOF GLA Class Members if it had already acquired their rights (along with the rest of the GLA Class rights) through the 2005 EA Agreement,[6] class counsel once again argues in its Letter Brief that the 2006 EA-HOF Agreement is merely for "highlighting" rights of the designated HOF retired players. Ltr. Br. at 1-2; Hearing Tr. at 27:21-28:8. But this argument simply ignores the undisputed record evidence – which I handed up to the Court at the summary judgment hearing – establishing that the 2006 EA-HOF Agreement conveyed the retired players' "name/likeness" rights <u>only</u>; "highlighting" rights were expressly <u>not</u> included:

> The proposal for [HOF retired player] Doak Walker would be an annual payment of $2,000 a year for a four year period or a total of $8,000 over the term of the agreement. His name/likeness may be used <u>only</u> in connection with the Hall of Fame mode <u>and may not be featured/highlighted in any advertising, marketing, or promotional materials without your further consent and additional payments to you.</u>[7]

---

[5] <u>See also</u> Linzner Depo. at 169:21-170:11 (testifying that EA wanted to <u>add</u> a retired player feature to its video game) (Kessler Decl., Ex. 3); Mot. at 10 (quoting Linzner's testimony that "when [EA] agreed to pay the very substantial licenses fees we did [in the 2005 EA Agreement], it was for active players, and [] if we wanted to secure retired NFL players for our games, we would pay additional fees, which, in fact, we have done for many years in several different products.").

[6] EA's Linzner attested to the self-evident point that "EA would not have paid these additional monies if EA had already received, under [the 2005 EA Agreement] with Players Inc, group licensing rights for retired players who had previously signed the standard form GLA." Mot. at 11 (quoting Linzner's October 5, 2007 declaration).

[7] Oct. 27, 2005 Ltr. from President of HOF (Kessler Decl., Ex. 5); <u>see also</u> 2006 EA-HOF Agreement ¶¶ 2A, 2B, 9C, 9D (requiring modified or separate agreements for highlighting) (Kessler Decl., Ex. 4).

Plaintiffs have no response at all to this letter (or to the 2006 EA-HOF Agreement itself), so they turn a blind eye, and continue to argue in their Letter Brief – without citation to any evidence – that "[t]he payments for such special use are additional (just as they are for famous active players) and do not substitute for the equal share payment from the royalty pool." Ltr. Br. at 2. But the undisputed facts establish that the reason that active players received "equal shares" of the revenues under the 2004/2005 EA Agreements (in addition to extra payments if they were highlighted), is because active players were actually licensed under the 2004/2005 EA Agreements, and the revenues received from those EA agreements were solely active player licensing money. As EA's Linzner testified without contradiction, retired players were not licensed under those agreements. See, e.g., Mot. at 1-2, 10-12. That is why retired players did not share in the revenues from the 2004/2005 EA Agreements, and that is why their identity rights were licensed through separate agreements for different licensing money that was paid – virtually 100% of it – directly to the retired players whose rights were desired and then licensed.[8]

Class counsel's Letter Brief also misleads the Court by arguing that the reason that retired players do not share in the GLR (so-called "equal share") pool is because "Defendants have defined eligibility to include active players and exclude retired players." Ltr. Br. at 4. There is not a shred of evidence to support this claim. As Defendants have demonstrated, "the only reason why Defendants did not share the EA, Topps, and other licensing revenues at issue with the GLA Class was because, as the undisputed evidence establishes, not one penny of that active player licensing money was in any way attributable to retired player licensing." Reply at 5-6 (emphasis added).

### D. EA's Inclusion of Nameless, Faceless Images in the 2007 Madden NFL Video Game

As a threshold matter, Plaintiffs' complaints about EA's inclusion in the 2007 Madden NFL game of nameless, faceless, figures, whose heights and weights may correspond to the heights and weights of various retired NFL players (both-GLA Class and non-GLA Class members ), refute – rather than support – the GLA Class claims. What the GLA Class has alleged in this case is that Defendants licensed all of their identity rights through the 2004/2005 EA Agreements (and through 90-plus other license agreements that contain the same, boilerplate reference to "retired players"). See Mot. at 18-25. EA's use of anonymous avatars in its "historic mode" simply underscores the fact, as Mr. Linzner testified, that EA did not acquire a license to use the identity rights to any retired players through the 2004/2005 EA Agreements, because if EA had paid millions of dollars to acquire such retired player identity rights, then surely it would have used them. Instead, as class counsel's Letter Brief confirms, the only retired players whose names, numbers, and faces appear in the 2007 Madden NFL video games are those designated retired players who were licensed – and fully compensated – through the 2006 EA-HOF and other "ad hoc" agreements entered into by EA with those specific retired players. See Ltr. Br. at 2-3; Pls.' Opp'n to Defs.' Mot. for Summary Judgment

---

[8] The same is true with respect to all of the other license agreements at issue. See Mot. at 10-15, 18-23. For example, the two Topps representatives testified that retired player "ad hoc" agreements are not merely "highlight" agreements, because they include "grant of rights" provisions since retired player rights are not included in the main, active player license agreements with the NFLPA (i.e., the 2004 and 2007 Topps Agreements whose revenues Plaintiffs are seeking). See Zucker 30(b)(6) Depo. at 77:19-80:14; Friss 30(b)(6) Depo. Tr. 69:24-72:2 (Kessler Decl., Exs. 6 and 7); see also Mot. at 12-13.

at 11 n.32 ("In these games, the [scrambled players] are described by height, weight, years in the league, etc., <u>but their names and images are not used</u>.") (emphasis added).[9]

While class counsel argues that this behavior by EA in the 2007 Madden NFL video game somehow evidences a conspiracy between Defendants and EA to conceal the fact that GLA Class members were actually licensed to EA, there is no evidence at all to support this fantasy. As described above, the 2001 Letter provides no support for this claim. Moreover, there is not a single piece of evidence cited by Plaintiffs during the statute of limitations period that even class counsel's wild imagination could connect to the fictional conspiracy between Defendants and EA that supposedly transpired for over seven years, and "continues to this day." Ltr. Br. at 5.

Further, if the use of nameless and faceless images, without any identity elements, was, as class counsel contends, designed to disguise the licensing of GLA Class member rights by EA, then the nameless and faceless images would relate only to GLA Class members. But there is no correlation whatsoever between the nameless and faceless images in the 2007 Madden NFL video game and the members of the GLA Class. For example, class counsel purports to "identify" five "scrambled" GLA Class members in the "historic mode" 1984 San Francisco 49ers team, (<u>see</u> Ltr. Br., Ex. B), but the 2007 Madden NFL video game includes a total of <u>53</u> players on that team – meaning that Plaintiffs do not even claim that 48 out of the 53 nameless and faceless players signed GLAs. <u>See</u> Kessler Decl., Ex. 8. In addition, even for the 612 GLA Class members whose images are allegedly represented by nameless, faceless, abstract figures, class counsel fails to disclose to the Court that only a few of them actually had GLAs that were still in effect at the time GLA Class members were allegedly licensed to EA for use in the Madden NFL 2007 video game. For example, the last GLA signed by Brent Jones – the example repeatedly used by class counsel at the hearing and in the Letter Brief – expired <u>in 2005, well before the Madden NFL 2007 video game was released</u>. Rebuttal Report of Philip Y. Rowley, Ex. 3 (June 26, 2008) (list of GLA Class members and the years that they had GLAs in effect) ("Rowley Rebuttal Report") (Kessler Decl., Ex. 9).[10]

And on top of the fact that there is no <u>evidence</u> of class counsel's fanciful conspiracy claims, it is economically and otherwise illogical to believe that EA would have paid tens of millions of dollars, year after year, for a license to the rights of all GLA Class members, while at the same time agreeing, year after year, <u>not</u> to use those identity rights. This irrational and economically illogical conspiracy claim, without any supporting evidence, cannot stave off summary judgment in this case. <u>See</u> <u>Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587-88 (1986); <u>Vernon v. S. Cal. Edison Co.</u>, 955 F.2d 1361, 1371 (9th Cir. 1992).

---

[9] Plaintiffs do not cite any authority for a claim that EA's use of a player's height and weight, years of service, and position – without any name, face, number, or other identifying information – would violate any player's intellectual property rights. <u>See</u> <u>Polsby v. Spruill</u>, No. Civ. 96-1641 (TFH), 1997 WL 680550, at *5 (D.D.C. Aug. 1, 1997) (Defendants' "use" of plaintiff's "name or likeness" is a necessary element for the torts of misappropriation and infringement of the right to publicity); <u>PTS Corp. v. Buckman</u>, 263 Va. 613, 619 (Va. 2002) (a person's right of publicity is violated only where his "name, portrait, or picture is used" without his consent).

[10] In fact, the GLAs of 11 out of the 16 class members identified in Exhibit MMM to the Hilbert Declaration, which class counsel handed up to the Court at the hearing, expired in 2005 or earlier. <u>Compare</u> Hilbert Decl., Ex. MMM <u>with</u> Rowley Rebuttal Report (Kessler Decl., Ex. 9).

### III. THE 2001 LETTER CANNOT BE PART OF THE SUMMARY JUDGMENT OR TRIAL RECORD, AND ITS SUBMISSION IS IMPROPER

Finally, not only does the 2001 Letter offer no evidentiary support for class counsel's incredible allegations of a "cold-blooded" conspiracy that "continues to this day," the 2001 Letter is also inadmissible in this case, and Plaintiffs' submission of it is patently improper.

As I stated at the hearing, the parties entered into a stipulation precluding each side from relying (with limited exceptions not applicable here) on pre-statute of limitations documents such as the 2001 Letter. Class counsel told the Court that there was "no such stipulation," and "challenge[d]" Defendants "to produce such a stipulation." Hearing Tr. at 41:17-42:1. The stipulation, memorialized in an email written by Mr. Katz's associate, and copying Mr. Katz himself, is attached to my declaration, and states as follows:

> I believe the parties have an agreement as well. As we understand it, <u>the parties agree that they are each precluded from using any pre-statute of limitations documents produced by Defendants</u>, except for (1) responsive agreements that are still in effect during the statute of limitations period; and (2) those pre-SOL documents that are responsive to Plaintiffs' Document Request Nos. 24, 33, 34 and 36 [which relate to the NFLPA-PI Agreements and the NFL Sponsorship Agreement].

Kessler Decl., Ex. 10 (emphasis added). Class counsel may not renege on their binding agreement not to utilize pre-statute of limitations documents because they no longer deem it helpful to their case, and the 2001 Letter may not be considered on summary judgment. See, e.g., Block v. City of Los Angeles, 253 F.3d 410, 419 n.2 (9th Cir. 2001) (striking declaration submitted in attempt to defeat summary judgment because the declaration contradicted a prior stipulation); CDN Inc. v. Kapes, 197 F.3d 1256, 1258-59 (9th Cir. 1999); see also Orr v. Bank of America, NT & SA, 285 F.3d 764, 773 (9th Cir. 2002) ("A trial court can only consider admissible evidence in ruling on a motion for summary judgment.").

Moreover, class counsel's pretense for not citing the 2001 Letter prior to the summary judgment hearing is equally disingenuous. Specifically, class counsel stated that that they had not found the 2001 Letter "until the last few days," and then accused Defendants of producing the 2001 Letter delinquently, "as you probably calculated," so that Plaintiffs "[wouldn't] have much time to deal with it." Hearing Tr. at 41:6-11. In fact, the 2001 Letter was produced to Plaintiffs <u>on March 28, 2008</u>, two months before the close of fact discovery, and three months before Plaintiffs filed their Opposition to Defendants' Motion for Summary Judgment. See Kessler Decl., Ex. 11 (March 28, 2008 Ltr. to Mr. Hilbert enclosing the disc that contained the 2001 Letter).[11] Furthermore, co-

---

[11] For all of class counsel's rhetoric about Defendants' purported discovery abuses, Plaintiffs have filed only three motions to compel in this entire case – two of which were denied, and the third withdrawn. See August 29, 2007 Proposed and Granted Orders and August 17, 2007 Hearing Tr. 5:21-6:3 (denying motion to compel production of pre-statute of limitation documents and stating that class counsel "ought to at least cast a legitimate argument") (Kessler Decl., Exs. 12-14); June 11, 2008 Hearing Tr. at 11:14-18 (denying motion to compel production of Gene Upshaw's employment contracts and stating that "I would advise you to come up with a better theory") (Kessler Decl., Ex. 15).

Plaintiff Bernard Parrish has been publicly complaining about EA's inclusion of such "scrambled images" since prior to the commencement of this case (although, tellingly, there are no complaint allegations about it).  See, e.g., Parrish Depo. Tr. at 197:13-200:18 (testifying about his and Adderley's perceived use of their identities in the 2007 Madden NFL video game); Nov. 7, 2006 Email from Parrish (CLASS003725); Alan Schwarz, "Upshaw Maintains Royalties Were Distributed Properly," N.Y. Times, Feb. 16, 2007, at CLASS003006 (Kessler Decl., Exs. 16-18).

      In sum, a single, innocuous, inadmissible letter, which does nothing to support class counsel's new fantastic conspiracy allegations, cannot stave off summary judgment in this case. When challenged by the Court to cite their best evidence warranting a trial, class counsel, once again, came forward with wild allegations, but no probative evidence capable of raising a genuine issue of material fact in support of the GLA Class's breach of contract or breach of fiduciary duty claims. There is nothing in this record to justify subjecting the parties, the Court, a jury and third party witnesses to multiples weeks of trial for a case that has absolutely no evidentiary support.[12]

                                                      Respectfully submitted,

                                                      /s/ Jeffrey L. Kessler
                                                      Jeffrey L. Kessler
                                                      Counsel for Defendants

cc:      Ronald S. Katz, Esq.

---

[12] In response to Mr. Katz's statement at the oral argument – that "[t]here is an escrow fund.  There is only one escrow fund.  Mr. Eyrich testified to it.  He's their 30(b)(6) witness.  He's their accountant" – I read Mr. Eyrich's actual deposition testimony into the record.  See Hearing Tr. 46:18-47:18.  That testimony is attached to my declaration as Exhibit 19 (e.g., "MR: KATZ:  Again, I ask you are you aware of any such escrow account being create?  MR: EYRICH: No.").