Parrish et al v. National Football League Players Incorporated Doc. 386

Todd Padnos (Bar No. 208202)
*tpadnos@dl.com*
DEWEY & LEBOEUF LLP
One Embarcadero Center, Suite 400
San Francisco, CA 94111
Tel: (415) 951-1100; Fax: (415) 951-1180

Jeffrey L. Kessler (*pro hac vice*)
*jkessler@dl.com*
David G. Feher (*pro hac vice*)
*dfeher@dl.com*
David Greenspan (*pro hac vice*)
*dgreenspan@dl.com*
DEWEY & LEBOEUF LLP
1301 Avenue of the Americas
New York, NY 10019
Tel: (212) 259-8000; Fax: (212) 259-6333

Kenneth L. Steinthal (*pro hac vice*)
*kenneth.steinthal@weil.com*
WEIL, GOTSHAL & MANGES LLP
201 Redwood Shores Parkway
Redwood Shores, CA 94065
Tel: (650) 802-3000; Fax: (650) 802-3100

Bruce S. Meyer (*pro hac vice*)
*bruce.meyer@weil.com*
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, NY 10153
Tel: (212) 310-8000; Fax: (212) 310-8007

Attorneys for Defendants National Football League Players Association and National Football League Players Incorporated d/b/a Players Inc

**Dewey & LeBoeuf LLP**
**One Embarcadero Center, Suite 400**
**San Francisco, CA 94111**

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

BERNARD PAUL PARRISH, HERBERT ANTHONY ADDERLEY, WALTER ROBERTS III,

Plaintiffs,

v.

NATIONAL FOOTBALL LEAGUE PLAYERS ASSOCIATION and NATIONAL FOOTBALL LEAGUE PLAYERS INCORPORATED d/b/a/ PLAYERS INC,

Defendants.

Case No. C 07 0943 WHA

**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Dockets.Justia.com

**TO PLAINTIFFS AND THEIR ATTORNEYS OF RECORD:**

PLEASE TAKE NOTICE that on Thursday, July 24, 2008 at 8:00 a.m., or as soon thereafter as the matter may be heard in the above-referenced Court, Defendants National Football League Players Association ("NFLPA") and National Football League Players Incorporated d/b/a Players Inc ("Players Inc") (collectively, "Defendants"), will and hereby do move, pursuant to Fed. R. Civ. P. 56, for summary judgment as to all causes of action alleged against them by Plaintiff Herbert Anthony Adderley and the class he represents, which was certified by this Court in its Order dated April 29, 2008.

This Motion is based on the accompanying Memorandum of Points and Authorities, the accompanying declarations, the pleadings in this matter, and on such further evidence and argument as may be presented at the hearing on this Motion.

Date: June 13, 2008

DEWEY & LEBOEUF LLP

BY: /S/Jeffrey L. Kessler
Jeffrey L. Kessler
*Attorneys for Defendants*

**Dewey & LeBoeuf LLP**
**One Embarcadero Center, Suite 400**
**San Francisco, CA 94111**

## TABLE OF CONTENTS

**Page(s)**

TABLE OF AUTHORITIES ..... iii

PRELIMINARY STATEMENT ..... 1

STATEMENT OF UNDISPUTED FACTS ..... 4

A. The Parties ..... 4

B. Defendants' Retired Player Group Licensing Program ..... 4

1. The Retired Player GLAs ..... 4

2. Despite the Efforts of Defendants, Licensees Were Not Interested in Acquiring the Group License Rights of Most Retired Players Who Signed GLAs ..... 5

3. When Licensees Did Choose to License Retired Player Rights, Players Inc Distributed Virtually 100% of the Money to the Retired Players Whose Rights Were Licensed ..... 7

C. The GLA Class Is Improperly Seeking to Recover Licensing Revenues That Are Exclusively Attributable to Active Player Licensing ..... 9

1. The 2004/2005 EA Agreements Did Not Convey Retired Player Rights ..... 10

2. The 2004/2007 Topps Agreements Did Not Convey Retired Player Rights ..... 12

3. Plaintiffs Have No Evidence That Any of the Other License Agreements at Issue Conveyed Retired Player Rights ..... 13

D. The GLA Class Is Seeking "Equal Shares" of <u>Active</u> Player Money ..... 14

E. All of the Other Revenues That the GLA Class Is Trying To Recover Are Also <u>Active</u> Player Licensing Revenues ..... 15

1. The $8 Million Reallocation of Active Player Licensing Money ..... 15

2. The Portion of the GLR Pool Retained by Defendants for Union Operations was also 100% <u>Active</u> Player Money ..... 16

ARGUMENT ..... 16

I. SUMMARY JUDGMENT SHOULD BE GRANTED AGAINST THE GLA CLASS'S BREACH OF CONTRACT CLAIM ..... 17

A. The GLA Class Is Not Contractually Entitled to Active Player Licensing Revenues ..... 17

B. The EA, Topps and Other Licensing Revenues Sought By Plaintiffs Do Not Involve Retired Player Rights and Thus Cannot Be the Basis of Any Claim of Breach ..... 18

1. It Is Clear from the Face of the License Agreements at Issue That They Do Not License Retired Players' Rights ..... 18

Dewey & LeBoeuf LLP
One Embarcadero Center, Suite 400
San Francisco, CA 94111

2. The Undisputed Extrinsic Evidence Further Establishes That the License Agreements at Issue Conveyed Only Active Players Rights....... 20

3. Plaintiffs' Contractual "Interpretation" Must Also Be Rejected Because It Is Commercially Unreasonable and Absurd ........................... 23

C. The GLA Class Is Not Contractually Entitled To Any Share Of The GLR Pool ........................................................................................................ 25

1. The "Equal Shares" Claim ........................................................................ 25

2. The GLA Class Is Not Contractually Entitled to any Other Money from the GLR Pool........................................................................................ 28

II. SUMMARY JUDGMENT SHOULD ALSO BE GRANTED AGAINST THE GLA CLASS'S BREACH OF FIDUCIARY DUTY CLAIM ......................................... 29

A. The Adderley GLA Does Not Create a Fiduciary Duty ...................................... 29

B. There Is No Evidence to Raise a Genuine Issue That Defendants Breached Any Alleged Fiduciary Duty..................................................................... 32

C. There Is No Evidence to Raise Any Genuine Issue of Fact of Injury in Support of a Breach of Fiduciary Duty Claim ..................................................... 34

CONCLUSION.......................................................................................................... 35

Dewey & LeBoeuf LLP
One Embarcadero Center, Suite 400
San Francisco, CA 94111

## TABLE OF AUTHORITIES

**CASES** **Page(s)**

Ames v. Yellow Cab of D.C., Inc., No. 00-3116, 2006 WL 2711546 (D.D.C. Sept. 21, 2006) ........ 30

Bangkok Crafts Corp. v. Capitolo di San Pietro in Vaticano, No. 03 Civ. 0015, 2004 U.S. Dist. LEXIS 25235 (S.D.N.Y. Sept. 13, 2004) ........ 31

Barcamerica Int'l USA Trust v. Tyfield Importers, Inc., 521 289 F.3d 589 (9th Cir. 2002) ........ 23

Beal Sav. Bank v. Sommer, 8 N.Y.3d 318 (2007) ........ 19

Bell Atl. Corp. v. AT&T Corp., 339 F.3d 294 (5th Cir. 2003) ........ 34

Bembery v. District of Columbia, 758 A.2d 518 (D.C. 2000) ........ 17

Burns v. Eby & Walker, Inc., 226 Va. 218 (1983) ........ 21

C.B.C. Distribution and Marketing, Inc. v. Major League Baseball Advanced Media, 505 F.3d 818 (8th Cir. 2007) ........ 24

Capital City Mortg. Corp. v. Habana Village Art & Folklore, Inc., 747 A.2d 564 (D.C. 2000) ........ 21

Carstensen v. Chrisland Corp., 247 Va. 433 (1994) ........ 29

Caudill v. Wise Rambler, 210 Va. 11 (1969) ........ 17

City of Vernon v. S. Cal. Edison Co., 955 F.2d 1361 (9th Cir. 1992) ........ 17

Combs v. Hunt, 140 Va. 627 (1924) ........ 21, 28

Copenhaver v. Rogers, 238 Va. 361 (1989) ........ 28

Corley v. Entergy Corp., 220 F.R.D 478 (E.D. Tex. 2004) ........ 34

Day v. Avery, 548 F.2d 1018 (D.C. Cir. 1976) ........ 34

DNM, Inc. v. S.H. Clark & Sons Roofing, Inc., No. 911233, 1992 Va. LEXIS 102 (Va. April 17, 1992) ........ 31

Farmland Indus., Inc. v. Grain Bd. of Iraq, 904 F.2d 732 (D.C. Cir. 1990) ........ 21

Ford v. Sturgis, 14 F.2d 253 (D.C. 1926) ........ 28

Dewey & LeBoeuf LLP
One Embarcadero Center, Suite 400
San Francisco, CA 94111

Fourth Ocean Putnam Corp. v. Interstate Wrecking Co., 66 N.Y.2d 38 (1985)....28

Ft. Lincoln Civic Assoc., Inc. v. Ft. Lincoln New Town Corp., 944 A.2d 1055 (D.C. 2008) ....19, 28

Garcia v. Llerena, 599 A.2d 1138 (D.C. 1991)....35

Georgiades v. Biggs, 197 Va. 630 (1956)....21

Greenfield v. Philles Records, Inc., 98 N.Y.2d 562 (2002)....21

Hager v. Gibson, 109 F.3d 201 (4th Cir. 1997) ....34

In re Lipper Holdings, LLC, 1 A.D.3d 170 (N.Y. 1st Dep't 2003) ....23

Jackson v. Loews Washington Cinemas, Inc., 944 A.2d 1088 (D.C. 2008)....30

Judah v. Reiner, 744 A.2d 1037 (D.C. 2000) ....30

Matsushita Elec. Corp. v. Loral Corp., No. 93-1435, 1994 WL 497955 (Fed. Cir. Sept. 23, 1994) ....21

Miller & Long Co., Inc. v. John J. Kirlin, Inc., 908 A.2d 1158 (D.C. 2006) ....23

Murphy v. Holiday Inns, Inc., 216 Va. 490 (1975) .... 31

Orebaugh v. Antonious, 190 Va. 829 (1950)....35

Paul v. Judicial Watch, Inc., 543 F. Supp. 2d 1 (D.D.C. 2008)....29

Reliance Standard Life Ins. Co. v. Matula, No. 05-C-0788, 2007 U.S. Dist. LEXIS 24523 (E.D. Wis. Mar. 30, 2007)....21

Sanchez v. Medicorp Health Sys., 270 Va. 299 (2005)....30

Transit Cas. Co. v. Hartman's, Inc., 218 Va. 703 (1978) ....23

Waddy v. Sears, Roebuck & Co., No. C-92-2903, 1994 WL 392483 (N.D. Cal. July 8, 1994) ....21

Waikoloa Ltd. P'ship v. Arkwright, 268 Va. 40 (2004) ....19

Wells v. Whitaker, 207 Va. 616 (1966)....30

Williams Tile & Marble Co., Inc. v. Ra-Lin & Assocs., 426 S.E.2d 598 (Ga. Ct. App. 1992)....21

Dewey & LeBoeuf LLP
One Embarcadero Center, Suite 400
San Francisco, CA 94111

Wilson v. Good Humor Corp., 757 F.2d 1293 (D.C. Cir. 1985) .....30

Wing Ming Props. (U.S.A.) Ltd. v. Mott Operating Corp., 148 Misc.2d 680 (N.Y. Sup. Ct. 1990) .....21

Dewey & LeBoeuf LLP
One Embarcadero Center, Suite 400
San Francisco, CA 94111

Pursuant to Fed. R. Civ. P. 56, Defendants National Football League Players Association ("NFLPA") and National Football League Players Incorporated ("Players Inc") (collectively, "Defendants") hereby submit this Motion for Summary Judgment against Plaintiff Herbert Adderley and the GLA Class.

## PRELIMINARY STATEMENT

Summary judgment should be granted against both claims of the GLA Class – breach of contract and breach of fiduciary duty – because there is not a shred of evidence in the record to support Plaintiffs' claim that the GLA Class members have not been properly compensated for the licensing of their rights. From the beginning of this case, class counsel has repeatedly misled the Court by making brazen claims that Defendants have licensed the rights of retired player GLA Class members to third party licensees, such as Electronic Arts, Inc. ("EA"), without compensating those class members. Indeed, this is the sine qua non of all the GLA class claims, and the basis upon which the Court permitted the Third Amended Complaint to be filed.[1] Now that discovery has been completed, however, the record establishes that there is no evidence to raise even a genuine issue of material fact in support of the GLA Class claims.

To the contrary, the undisputed evidence establishes that all GLA Class members were paid when their rights were licensed, and that the third party license agreements whose revenues are sought by Plaintiffs were not intended to, and did not, license the rights of any retired players. Rather, the EA and other license agreements at issue, and all of the licensing revenues generated under those agreements, were 100% attributable to licensing the rights of active players. As testified to by the EA executive who negotiated EA's license agreements with Players Inc:

> "My understanding was that this license agreement and the fees that [EA] agreed to pay in this license agreement were to secure the rights of active NFL players and that Players Inc represented retired players, which, if we wanted to purchase

[1] See Third Amended Compl. ("TAC") ¶¶ 20-28, 51-55 (attached as Exhibit 1 to the Declaration of David Greenspan filed concurrently herewith); see Order Granting in Part and Denying in Part Pls.' Mot. for Leave to File an Am. Compl. at 4-7 (Nov. 14, 2007) (Rec. Doc. 176).

Dewey & LeBoeuf LLP
One Embarcadero Center, Suite 400
San Francisco, CA 94111

those rights separately, Players Inc would work on our behalf to do so."[2] Similarly, with respect to the NFLPA's license agreement with the Topps Company (which class counsel handed up to the Court at the class certification hearing), the undisputed facts, as attested to by Topps's Rule 30(b)(6) witness, establish that, contrary to what class counsel told the Court, this Topps license agreement also only conveys the rights of active players:

> Q: And is it your understanding today that under the 2007 license agreement Topps still needs to enter into individually negotiated deals with retired players or through Players, Inc. with respect to a particular retired player in order to obtain the rights to such a retired player?
>
> A: Yes. It's my understanding that we did not get those rights from the license agreement; that we had to do a separate agreement and make a separate payment for these rights.[3]

The record evidence is thus consistent; every licensee that has provided testimony or declarations has confirmed the testimony of Defendants' witnesses that the license agreements that are the basis for the GLA Class's claims do not, in fact, convey any retired players' rights. This is fatal to Plaintiffs' claims because it cannot be seriously disputed that the GLA Class has no contractual or other legal entitlement to revenues generated by active player licensing.

Indeed, Adderley admitted at his deposition that the retired player GLA – though not, as this Court has noted, a model of clarity – provides that the only moneys to be "divided" between retired players are "moneys generated by such licensing of retired player group rights," and that he understood that he would only get paid when his rights were used.[4] It is also undisputed that the GLA says nothing about retired players participating in any "equal share" pool.[5] Most significantly, Plaintiffs do not dispute that when Defendants licensed the rights of retired players, primarily through "ad hoc" deals (which included group licensing), Defendants paid over 98% of that more than $30 million in revenues to those retired players whose rights had been licensed.

---

[2] Joel Linzner 30(b)(6) Depo. Tr. ("Linzner 30(b)(6) Depo.") 71:23-73:25 (Greenspan Decl. Ex. 2).

[3] Warren Friss 30(b)(6) Depo. Tr. ("Friss 30(b)(6) Depo.") 74:8-21 (Greenspan Decl. Ex. 3) (emphasis added).

[4] Herbert Adderley Depo. Tr. ("Adderley Depo.") 89:13-90:1, 92:8-17, 101:3-9, 96:13-18 (Greenspan Decl. Ex. 4); Adderley GLAs (Greenspan Decl., Ex. 5) (emphasis added).

[5] See Adderley Depo. 255:4-257:11 ("'Equally' is not in here.") (Greenspan Decl. Ex. 4).

Dewey & LeBoeuf LLP
One Embarcadero Center, Suite 400
San Francisco, CA 94111

In contrast to this undisputed record evidence (which conclusively resolves, by undisputed extrinsic evidence, any ambiguity in the language of the GLAs or the license agreements), all that Plaintiffs offer to "support" the GLA Class's claims are the fanciful arguments of class counsel. There is simply no record evidence to raise any genuine issue of material fact in support of Plaintiffs' claims that there were any retired player licensing revenues that were not properly distributed to the GLA Class. Rather, the undisputed evidence establishes that all of the additional licensing revenues sought by the GLA Class – including an "equal share" of revenues in the active player royalty pool – are revenues solely attributable to the licensing of active player rights. As a result, Plaintiffs' breach of contract and breach of fiduciary duty claims must be dismissed on summary judgment.

There are additional, independent defects requiring summary judgment against Plaintiffs' breach of fiduciary duty claim. First, now that the Court has ruled that the law of Virginia or Washington, D.C. will apply, it is clear that Defendants had no fiduciary duty to Plaintiffs. Second, as this Court knows, an essential element of any claim of breach of fiduciary duty is proof of injury to each GLA Class member. Yet, Plaintiffs have offered no evidence to raise a genuine issue of material fact that each GLA class member suffered any such injury. To the contrary, the undisputed facts establish that the market value of group licensing rights for most GLA class members was zero because they are virtually unknown to today's fans. As a result, these class members would not suffer any fact of injury even if their rights had been licensed without compensation. Plaintiffs have tried to overcome this failure of proof by directing their paid accounting expert to apply an "equal shares" formula as a purported means for proving injury and damages, and even to include revenues from contracts that make no mention of retired players. But there is no legal or factual basis for using such an arbitrary formula as a substitute for individual proof of injury, particularly where, as here, the GLA says nothing about "equal shares," and it is undisputed that the economic values of the rights of individual retired players are widely disparate, with most GLA Class members' licensing rights having no value at all.

Dewey & LeBoeuf LLP
One Embarcadero Center, Suite 400
San Francisco, CA 94111

## STATEMENT OF UNDISPUTED FACTS

### A. The Parties

Defendant Players Inc, a Virginia corporation, is a for-profit licensing, sponsorship, marketing, and content development company that negotiates and facilitates licensing and marketing opportunities for active and some retired NFL players. TAC ¶¶ 10, 11. Defendant NFLPA is the union that represents all active NFL players. See id. The NFLPA also owns 79% of Players Inc. Id.

Plaintiff Adderley is a retired NFL player who signed two Group Licensing Authorizations ("GLAs") with the NFLPA that were effective, in relevant part, from February 14, 2003 to December 31, 2005. TAC ¶ 18; Adderley GLAs (Greenspan Decl. Ex. 4). The GLA Class consists of "[a]ll retired NFL players who signed GLAs with the NFLPA that were in effect between February 14, 2003 and February 14, 2007" and that contain the same operative paragraph as the Adderley GLA. Stipulation and Order Revising Class Definition and Class Notice (June 9, 2008) (Rec. Doc. 289).

### B. Defendants' Retired Player Group Licensing Program

#### 1. The Retired Player GLAs

Through GLAs signed by players in the GLA Class, retired players assigned to the NFLPA the "non-exclusive" right to use their names, images and other attributes in group licensing ("defined as programs in which a licensee utilizes a total of six (6) or more present or former NFL player images").[6] E.g., Adderley GLAs. Pursuant to certain agreements between the NFLPA and Players Inc, the NFLPA assigned the retired players' GLAs to Players Inc, and Players Inc tried to find group licensing opportunities for retired players with third party licensees. TAC ¶¶ 13, 14. Defendants' hope was that some licensees would want to acquire the collective rights to most, if not all, retired players who had signed GLAs. See Nahra 30(b)(6)

---

[6] Although the issue of "non-exclusivity" is not material to this Motion, Defendants note the undisputed testimony of their Rule 30(b)(6) witness that the GLAs are both expressly and operationally "non-exclusive," i.e., retired players could assign both their individual and group licensing rights to entities other than Defendants. See Deposition of NFLPA Staff Counsel Joe Nahra ("Nahra 30(b)(6) Depo." or "Nahra Depo.," as context requires) 19:8-18, 156:11-14; Adderley Depo. 95:1-14, 96:20-97:1, 97:12-15 (Greenspan Decl. Exs. 6, 4).

Dewey & LeBoeuf LLP
One Embarcadero Center, Suite 400
San Francisco, CA 94111

Depo. 122:9-123:24 (Greenspan Decl. Ex. 6).

**2. Despite the Efforts of Defendants, Licensees Were Not Interested in Acquiring the Group License Rights of Most Retired Players Who Signed GLAs**

There can be no genuine dispute that Defendants encouraged their licensees to acquire the rights to retired players:

> "[W]e're constantly promoting using retired players. [The licensees] didn't always do it. But to the extent they were interested we work with them. Our staff members worked with them to develop the retired player programs."[7]
>
> * * *
>
> "[O]ne of the most important things I did was emphasize to the Players Inc staff how important it was to promote retired players as an integral part of our approach to the marketplace."[8]
>
> * * *
>
> Q: Do you know if anyone at Players Inc ever went to a licensee and asked if they wanted to license retired player rights?
> A: Yeah. The staff did that all the time."[9]
>
> * * *
>
> "Players Inc would work with any and all retired players that a company we do business with wanted to use. Again, it was our interest to increase opportunities for all players, including retired players."[10]
>
> * * *
>
> "[W]henever I have contact with licensees or sponsors, or whatever, I always remind them that we also have this group of players besides our active players, and that applies to any of our players, both active and retired."[11]

It is also undisputed that it was the third party licensees – not Defendants – that determined which, if any, retired players' rights would be acquired:

> "[W]e do not control, and we have no way of controlling who the licensee feels they can include in a licensed product and generate revenue. We are not in the trading card business. We are not in the video game business. We leave it to the licensees who are the experts in those businesses to decide what players they want to use. What we want to do is make it as easy as possible and to encourage them to use as many players as possible, but we cannot control what they decide to

---

[7] Deposition transcript of former Chief Operating Officer of Players Inc Pat Allen ("P. Allen Depo.") 89:12-90:11 (Greenspan Decl. Ex. 7).

[8] Deposition transcript of former President of Players Inc and Assistant Executive Director of the NFLPA Doug Allen ("D. Allen Depo.") 181:16-183:22 (Greenspan Decl. Ex. 8).

[9] P. Allen Depo. 49:3-6.

[10] Deposition transcript of former Vice President, Player Marketing of Players Inc Howard Skall ("Skall Depo.") 159:8-16 (Greenspan Decl. Ex. 9).

[11] Deposition transcript of Chairman of Players Inc and Executive Director of the NFLPA Gene Upshaw ("Upshaw Depo.") 136:20-137:3 (Greenspan Decl. Ex. 10).

Dewey & LeBoeuf LLP
One Embarcadero Center, Suite 400
San Francisco, CA 94111

do."[12]

*     *     *

"Players Inc made known to the marketplace that it had access to a large number of retired NFL players that were available for use in licensing and of their name and image and in opportunities to provide services like autographs or appearances. The marketplace determined which players it wanted to make use of, not Players Inc or the NFLPA."[13]

Critically, the undisputed record evidence also establishes that most licensees either had no interest in acquiring retired player group licensing rights, or had an interest only in acquiring the rights of a small number of retired players for specific programs:

"I know there was a hope that licensees would be willing to pay money to get retired player rights in general without regard to who those particular players were but that never happened. Despite our efforts that never happened. There were no licensees that were willing to pay either a guarantee or some sort of flat fee for just getting whatever retired players they got. It was always where the licensees were only interested in obtaining rights to particular retired players."[14]

*     *     *

"[T]he companies that we discussed this with were only interested in particular players at particular prices…."[15]

*     *     *

"I've had discussions with several licensees about the retired players and how they would be helpful and beneficial in certain programs. Yes, I've done that... [T]he most recent example would be the EA contract that we just executed not long ago, and I offered retired players in that area. But there was, there was really no interest."[16]

*     *     *

"The only retired players whose rights Fathead has sought to acquire are 'superstar' retired players such as Joe Montana, John Elway, and Dan Marino."[17]

The reason that most licensees had little or no interest in large groups of retired players was because of the undisputed fact that the rights of the vast majority of retired players have no economic value. For example, 1,730 of the 2,109 of the members of the GLA Class (approximately 82%) were never asked for or used by any Players Inc licensee.[18] Adderley himself testified to the undisputed fact that the rights of superstar retired players like Joe

[12] Nahra Depo. 268:18-269:13 (Greenspan Decl. Ex. 6).
[13] D. Allen Depo. 156:2-8 (Greenspan Decl. Ex. 8).
[14] Nahra 30(b)(6) Depo. 67:19-68:15 (Greenspan Decl. Ex. 6).
[15] Nahra 30(b)(6) Depo. 208:21-209:19.
[16] Upshaw Depo. 151:3-153:16 (Greenspan Decl. Ex. 10).
[17] Decl. of Linda Castillon ("Castillon Decl.") ¶ 4 (June 7, 2008) (Greenspan Decl. Ex. 11).
[18] Decl. of Professor Roger Noll ¶ 7 (June 12, 2008) (Greenspan Decl. Ex. 12).

Dewey & LeBoeuf LLP
One Embarcadero Center, Suite 400
San Francisco, CA 94111

Montana are highly valued, but the rights of journeymen retired players are not:

> Q: And in fact, it's true, isn't it, that every player in the NFL, retired player, would have a different value of rights for their name and image based on what their careers were like and how famous they were or not; right?
> A: Yes.
> Q: And do you agree that the values could be very, very different comparing, for example, Joe Montana to that guy who only played one year on special teams, it could be a huge difference in value, right?
> A: Yes.[19]

Class counsel has also conceded this point:

> "Your Honor made a comment on it when the case was in a different posture earlier on. 'Well, isn't it true that Joe Montana's image is worth more than the third string center on that team?' And that's true. We acknowledge that."
>
> * * *
>
> "If you're Joe Montana you get one thing. A lesser player would get another thing. He probably wouldn't be used."[20]

**3. When Licensees Did Choose to License Retired Player Rights, Players Inc Distributed Virtually 100% of the Money to the Retired Players Whose Rights Were Licensed**

It is undisputed that, from February 2003 to August 2007, Defendants generated at least $30 million in revenues through retired player licensing, while keeping just over $400,000 in administrative fees before paying out the rest of the money to those retired players whose rights were licensed.[21] Thus, Defendants retained just 1.35% of the revenues they generated from retired player licensing – a vastly lower percentage than the up to 40% that Plaintiffs' own "expert" opines would have been within the typical range. See Expert Report of Daniel A. Rascher ("Rascher Report") at 12-13 (May 23, 2008) (Greenspan Decl. Ex. 16).[22]

---

[19] Adderley Depo. 83:3-84:1 (Greenspan Decl. Ex. 4).

[20] Tr. of Proceedings on Pls.' Mot. for Class Certification ("Class Hearing Tr.") 8:3-9, 11:20-22 (Apr. 24, 2008) (emphasis added) (Greenspan Decl. Ex. 13); May 31, 2007 Hearing Tr. 43:25-45:13 ("COURT: People decide that in the marketplace. If they are famous, they get more money. If they are not famous, they don't get much. They get nothing.") (Greenspan Decl. Ex. 14).

[21] See Decl. of Executive Vice President and Chief Operating Officer of Players Inc Andrew Feffer ("Feffer Decl.") ¶ 2 (Greenspan Decl. Ex. 15).

[22] It is also undisputed that the $400,000 Defendants retained from retired player licensing over a four year period did not come close to covering Defendants' costs for running the program. For example, the ten-person staff in Players Inc's Player Marketing Department, the staff of Players Inc's Trading Cards & Collectibles, Apparel, and Multimedia Departments, the NFLPA Retired Players Department, and members of Defendants' executive staff all worked to promote the use of retired players' rights. See Skall Depo. 21:11-22:9, 38:9-16. (Greenspan Decl. Ex. 9).

Dewey & LeBoeuf LLP
One Embarcadero Center, Suite 400
San Francisco, CA 94111

Most of this retired player licensing income was generated through "ad hoc" agreements, which are licensing agreements between retired players and Players Inc whereby retired players license their rights to Players Inc for use in designated programs. Although class counsel told the Court at the recent class certification hearing that he did not know whether the $30 million paid to retired players from ad hoc agreements was generated and paid by Players Inc, (Class Hearing Tr. 10:18-11:5) (Greenspan Decl. Ex. 13), the undisputed record evidence establishes that it was, in fact, Defendants who generated this substantial amount of money for retired players, including many GLA Class members. See Feffer Decl. ¶ 2. Indeed, the GLA Class has disavowed any legal complaint with respect to the distribution of this money.[23]

There can also be no genuine dispute that – contrary to class counsel's unsupported representations, (Class Hearing Tr. 10:3-9) – much of this $30 million in ad hoc licensing revenues constituted "group" licensing of retired player rights, not "individual" licensing. To give just one example, in March 2005, Defendants licensed the rights of 30 retired players – including Joe Montana and Adderley – to Upper Deck.[24] It is undisputed that Defendants generated approximately $301,175 through this group licensing program and passed every penny of it through to Montana, Adderley, and the other retired players whose group rights were licensed.[25] The fact that ad hoc agreements, rather than GLAs, were used to license and compensate retired players for this program does not change the indisputable fact that the program involved six or more players and thus constituted group licensing.

The reason that GLAs were not used for such group licensing programs, involving limited numbers of retired players selected by the licensees, is that, as Plaintiffs' list of GLA Class members shows, many of the retired players who participated in this (and other) ad hoc

[23] See, e.g., Mot. for Leave to File TAC at 4 n.1 ("Plaintiffs are not claiming that Defendants failed to pay Mr. Adderley pursuant to an 'ad hoc' agreement, nor have they based any claims upon an 'ad hoc' agreement.") (Rec. Doc. 190).

[24] See Adderley "ad hoc" agreement (paying Adderley $6,800); Montana "ad hoc" agreement (paying Montana $40,000) (Greenspan Decl. Ex. 17) (also including the other 28 retired players' "ad hoc" agreements in connection with this Upper Deck program); see also Expert Report of Roger G. Noll at 49-50 (June 12, 2008) (Greenspan Decl. Ex. 18).

[25] Excerpts of Player Marketing Reports (Greenspan Decl. Ex. 19).

Dewey & LeBoeuf LLP
One Embarcadero Center, Suite 400
San Francisco, CA 94111

group licensing programs did not sign GLAs.[26] Ad hoc license agreements were thus typically used for these group license programs, in which licensees would designate a small number of retired players for inclusion, including some who had signed, and some who had never signed, GLAs. If ad hoc agreements were not made available to the retired players who also signed GLAs, many of them would not have signed GLAs in the first place:

> "We wouldn't have been able to get the players to [sign GLAs] in the first place if they weren't getting paid. We learned that lesson. And all of the money secured for retired player licensing was distributed to the players who were involved in those license programs."[27]
>
> * * *
>
> "[T]he companies that we discussed this with were only interested in particular players at particular prices, and that's why we had to do ad hoc agreements, because the high profile players they were interested in were not going to participate in a program, and we can use Reebok as an example, unless they knew how much money they were getting and we had to memorialize that dollar amount in an agreement, and those are the ad hoc agreements."[28]

**C. The GLA Class Is Improperly Seeking to Recover Licensing Revenues That Are Exclusively Attributable to Active Player Licensing**

Adderley concedes that the GLA he and other class members signed does not permit retired players to recover money that is generated by licensing <u>active</u> players' rights:

> Q: Sir, do you believe, as a retired player, you're entitled to any money that's generated by the licensing of active players?
> A: No.
>
> * * *
>
> Q: And what you thought you were agreeing to get [in the Adderley GLA] was that if <u>your</u> rights were <u>licensed and used</u>, you would get some money; correct?
> A: Correct.

Adderley Depo. 96:13-18, 92:7-17 (emphases added), 89:13-90:7 (same) (Greenspan Decl. Ex. 4); <u>see also</u> Adderley GLAs (stating that the revenues to "be divided between the player and an escrow account" are "the moneys generated by such licensing of <u>retired</u> <u>player</u> group rights.") (emphasis added) (Greenspan Decl. Ex. 5).

---

[26] <u>See</u> Report of Philip Y. Rowley ("Rowley Report"), Ex. 7 (May 23, 2008) (list of GLA Class members that does not include, e.g., Joe Montana, Troy Aikman, Joe Theismann, Bo Jackson or Marcus Allen – all of whom participated in the Upper Deck program) (Greenspan Decl. Ex. 20).

[27] D. Allen Depo. 148:16-149:10 (Greenspan Decl. Ex. 8).

[28] Nahra 30(b)(6) Depo. 208:21-209:19 (Greenspan Decl. Ex. 6).

Dewey & LeBoeuf LLP
One Embarcadero Center, Suite 400
San Francisco, CA 94111

Despite Adderley's admission, the undisputed evidence establishes that all of the revenues that the GLA Class are trying to recover are 100% attributable to the licensing of active players' rights. Specifically, the GLA Class is seeking an "equal share" of the licensing revenues distributed to active players as a result of 96 license agreements that Defendants entered into with third parties such as EA, Topps, and Upper Deck. TAC ¶¶ 20, 28. There can be no genuine dispute, however, that all of these agreements only conveyed active player rights.

**1. The 2004/2005 EA Agreements Did Not Convey Retired Player Rights**

EA is Defendants' largest licensee by far,[29] and Plaintiffs contend that Players Inc's 2004 and 2005 agreements with EA (the "2004 and 2005 EA Agreements") constitute the "best" examples of Defendants licensing the rights of retired players in the GLA Class without compensating them. TAC ¶ 20. But the undisputed evidence establishes that the 2004/2005 EA Agreements did not license the rights of retired players, and that the revenues paid by EA were only for active player rights. As testified by the EA executive who negotiated those agreements:

> A: Well, the issue as I understood it, is whether or not I'd understood that our license agreements with Players Inc had included, as part of the grant, the rights to retired players, and I told him that I'd always understood that our licenses with Players Inc were on behalf of active NFL players and that, if we had wanted to license retired players, as we had done several times in the past, we signed separate agreements and paid additional license fees.
>
> Q: Okay. So, this is your position with respect to all of the agreements that you knew about between EA and PI; is that correct?
>
> A: At least since – since I joined EA, yes.
>
> * * *
>
> "I thought NFL players, at the time I did this and when we agreed to pay the very substantial license fees we did, it was for active players, and that if we wanted to secure retired NFL players for our games, we would pay additional fees, which, in fact, we have done for many years in several different products."[30]

It is further undisputed that while the 2004 and 2005 EA Agreements were in effect, EA paid additional sums of money, and entered into separate ad hoc group licensing

[29] See Rascher Report, Ex. 4 (asserting that revenues from EA comprised more than 60% of Defendants' total gross licensing income in Defendants' 2007 fiscal year) (Greenspan Decl. Ex. 16).

[30] Linzner 30(b)(6) Depo. 35:1-14, 73:2-25, 75:7-13, 102:4-25, 113:4-25, 139:8-13; see also Decl. of Joel Linzner ("Linzner Decl.") ¶¶ 2, 5 (Oct. 5, 2007) (Greenspan Decl. Exs. 2, 21). See also Nahra Depo. 278:24-279:14 (testifying that EA agreements were for "grant of active player rights" and "[retired] players were not part of this license agreement") (Greenspan Decl. Ex. 6).

Dewey & LeBoeuf LLP
One Embarcadero Center, Suite 400
San Francisco, CA 94111

deals, to acquire the group licensing rights to specified GLA Class members and other retired players. One example of this was EA's agreement with the Pro Football Hall of Fame ("HOF"), whereby EA paid $400,000 (through Players Inc) to acquire the group licensing rights of 148 specified retired players. 2006 EA-HOF Agreement ¶ 9A, Ex. A (Greenspan Decl. Ex. 22).[31] Some of these 148 retired players – including Adderley himself – had signed GLAs, but EA nevertheless entered into a separate, designated retired players deal with HOF. See id. It cannot be genuinely disputed, as Mr. Linzner attested, that "EA would not have paid these additional monies if EA had already received, under its main licensing agreement with Players Inc, group licensing rights for retired players who had previously signed the standard form GLA."[32]

Another undisputed example of EA paying additional money to acquire the group rights of GLA Class members occurred in June 2004, when EA agreed to pay $5,000 and $2,500 respectively for the right to use Joe Greene and Randall Cunningham, and at least nine other retired players in the "NFL Street 2" video game.[33] Greene and Cunningham are GLA Class members, and Plaintiffs have no evidence to explain why EA would have paid $7,500 to acquire their group licensing rights (a second time) if Players Inc had previously licensed to EA the group rights to GLA Class members. The text of the Greene ad hoc agreement further confirms that, in fact, EA did not already have any retired player rights, but instead had previously acquired only active player rights in the 2004 EA Agreement:

> [Greene] agrees that Players Inc shall grant [EA] the right, but not the obligation, to use [Greene's] name, likeness, image, and biographical information ("Identity") in their "NFL Street 2" video game. [Greene] agrees that Players Inc shall also grant [EA] the right to market [Greene's] in-game image under the same guidelines that are granted to [EA] for group licensing active player rights through the License Agreement with Players Inc.

---

[31] See PI051532-PI051542 (documents evidencing the $400,000 "pass through" from EA to Players Inc to HOF) (Greenspan Decl. Ex. 23).

[32] Linzner Decl. ¶ 7 (Greenspan Decl. Ex. 21).

[33] See Letter Agreements between certain GLA Class members (including Greene and Cunningham) and Players Inc, and corresponding Letter Agreements between Players Inc and EA (Greenspan Decl. Ex. 24).

Dewey & LeBoeuf LLP
One Embarcadero Center, Suite 400
San Francisco, CA 94111

E.g., Greene-PI Agreement ¶ 2 (at PI009619) (emphasis added) (Greenspan Decl. Ex. 24).[34]

**2. The 2004/2007 Topps Agreements Did Not Convey Retired Player Rights**

The undisputed evidence relating to the NFLPA's 2004 and 2007 agreements with Topps (the "2004 and 2007 Topps Agreements") establishes that those agreements also were not intended to, and did not, license any retired player rights. As Topps's 30(b)(6) witness testified:

> Q: Was it Topps' intention to acquire the group licensing rights of retired players under the 2004 license agreement?
> A: No.
> Q: Was it Topps' intention to acquire the group licensing rights of retired players under the 2007 license agreement?
> A: No.[35]

It is further undisputed that during the term of the 2004 and 2007 Topps Agreements, Topps, like EA, entered into separate ad hoc deals, and paid additional money, to acquire the rights of retired players (including some GLA Class members):

> Q: And is it your understanding today that under the 2007 license agreement Topps still needs to enter into individually negotiated deals with retired players or through Players, Inc. with respect to a particular retired player in order to obtain the rights to such a retired player?
> A: Yes. It's my understanding that we did not get those rights from the license agreement; that we had to do a separate agreement and make a separate payment for these rights.
> Q: Is it Topps' understanding that Topps needs to pay additional money beyond what's provided for in the 2007 license agreement in order to attain the rights of retired players?
> A: Yes.[36]
>
> * * *
>
> "It's my understanding and it always has been that we cannot make a trading card unless we obtain the rights individually from that retired player which we have to do through NFLPA. <u>We have never published a picture of a retired player</u>

---

[34] The NFLPA explained why video game companies are generally uninterested in retired players' rights in the <u>Touchback</u> retired player newsletter: "The NFLPA and Players Inc have worked hard to secure licensing agreements for games using retired players' names and images, but the video-game companies' response has been restrained. They are most interested in obtaining the rights of active players because they maintain that new rosters each year permit them to change the game annually, creating a new product." (Greenspan Decl. Ex. 25).

[35] Friss 30(b)(6) Depo. 77:18-25, 72:3-73:4 (further testifying as to Topps's understanding that under the 2004 Topps Agreement, the only rights acquired, and the only moneys paid, were for active NFL players) (Greenspan Decl. Ex. 3); <u>see also</u> Decl. of Warren Friss ¶¶ 2, 4-6 (Oct. 10, 2007) (Greenspan Decl. Ex. 26).

[36] Friss 30(b)(6) Depo. 73:23-75:3.

Dewey & LeBoeuf LLP
One Embarcadero Center, Suite 400
San Francisco, CA 94111

Dewey & LeBoeuf LLP
One Embarcadero Center, Suite 400
San Francisco, CA 94111

> without doing that."[37]
>
> * * *
>
> "It was my understanding that if we wanted to feature retired players, we would have to go and secure those rights separately."[38]

**3. Plaintiffs Have No Evidence That Any of the Other License Agreements at Issue Conveyed Retired Player Rights**

Plaintiffs allege that the GLA Class members' rights were licensed in 96 license agreements containing the same language as that in the 2004 and 2005 EA and 2004 and 2007 Topps Agreements.[39] But Plaintiffs once again have no evidence that the rights of any GLA Class members were licensed pursuant to any of these agreements. To the contrary, the undisputed evidence shows that these other agreements – just like the 2004/2005 EA and 2004/2007 Topps Agreements – licensed active players only.

For example, with respect to the NFLPA's 2004 and 2007 trading card agreements with Upper Deck (the "2004 and 2007 Upper Deck Agreements"), Upper Deck's General Counsel has attested that these agreements "includ[ed] the rights of active NFL players only, and all money [Upper Deck] paid under the [2004 and 2007 Agreements] was paid for the rights of active NFL players only."[40] The undisputed evidence also shows that during the term of the 2004 and 2007 Upper Deck Agreements, Upper Deck entered into separate ad hoc agreements, and paid additional money, to acquire the group licensing rights of a number of GLA Class members. See p. 8, supra (discussing 30-player ad hoc deal involving Adderley).

Declarations from other licensees who have agreements containing the boilerplate "retired player" language further reflect the undisputed fact that none of these agreements conveyed retired player rights, and that to the extent such rights were desired by licensees, they were acquired through separate ad hoc agreements:

> "Fathead's and Players Inc's mutual understanding that the 2005 License

---

[37] Friss 30(b)(6) Depo. 71:2-72:2 (emphasis added) (Greenspan Decl. Ex. 3).

[38] Adam Zucker 30(b)(6) Depo. Tr. ("Zucker 30(b)(6) Depo.") 58:8-14 (Greenspan Decl. Ex. 27).

[39] See TAC ¶¶ 20-28; Pls.' Mot. for Class Certification, at 6 n.3, 8-9 (Mar. 14, 2008) (Rec. Doc. 217); Rowley Report, Ex. 8 (identifying the 96 license agreements containing this language) (Greenspan Decl. Ex. 20).

[40] Decl. of Adam Sullins ("Sullins Decl.") ¶¶ 3, 6 (June 12, 2008) (Greenspan Decl. Ex. 28).

Agreement included only active players was discussed orally and is also reflected in the language of the 2005 License Agreement . To the limited extent that Fathead has sought to acquire the rights of retired players for use in Fathead's products, Fathead has entered into separate agreements, and paid additional money, to acquire those retired players' rights."[41]

*    *    *

"At the time MBI entered into the 2004 License Agreement, it intended to acquire the rights of active players only, and all money MBI paid under the 2004 License Agreement was paid for the rights of said players."[42]

*    *    *

"The 2005 License Agreement was not intended to, and did not, include the rights of any retired players. Rather, the 2005 License Agreement includes the rights of active players only, and all money paid by Todd McFarlane pursuant to the 2005 License Agreement was paid for the rights to active players only."[43]

*    *    *

"All revenues paid by STATS pursuant to the 2007 License Agreement were paid for the rights of active players only. The fantasy games licensed pursuant to the 2007 License Agreement did not involve any retired players."[44]

**D. The GLA Class Is Seeking "Equal Shares" of <u>Active</u> Player Money**

It similarly cannot be disputed that the GLA Class's "equal shares" claim is an attempt to obtain "equal shares" of the <u>active</u> player licensing revenues generated by EA, Topps, Upper Deck, and all of the other active player license agreements at issue. <u>See, e.g.</u>, Rascher Report, Ex. 4 (calculating that in Defendants' 2007 fiscal year, EA, Topps, and Upper Deck comprised approximately 75% of the revenues being sought by the GLA Class) (Greenspan Decl. Ex. 16). Pursuant to the 2000 NFLPA-PI Agreement, a fixed percentage of these "gross licensing revenues" ("GLR") is distributed from a pool (the "GLR pool") to active players "who meet [certain] eligibility requirements," such as being on a team's roster on the first or last day of a particular season.[45] Based upon these criteria, some active players received a full share (the so-called "equal share") of the GLR pool, other active players with the status of "practice squad" received a lesser share of the GLR pool, and active players who did not meet the criteria received

---

[41] Castillon Decl. ¶¶ 3-4 (Greenspan Decl. Ex. 11).

[42] Decl. of Jason Brenner ("Brenner Decl.") ¶ 3 (June 10, 2008) (Greenspan Decl. Ex. 29).

[43] Decl. of Christine Finch ("Finch Decl.") ¶ 3 (June 6, 2008) (Greenspan Decl. Ex. 30).

[44] Decl. of Steve Byrd ("Byrd Decl.") ¶ 5 (June 6, 2008) (Greenspan Decl. Ex. 31).

[45] 2000 NFLPA-PI Agreement §§ 4(B), (D) (Greenspan Decl. Ex. 32); TAC ¶¶ 29-35; <u>see also</u> Rowley Report § IV.C (Greenspan Decl. Ex. 20); "Equal Share Licensing Royalty Distribution Criteria" Memoranda dated 2002 – 2006 (Greenspan Decl. Ex. 33).

Dewey & LeBoeuf LLP
One Embarcadero Center, Suite 400
San Francisco, CA 94111

no share of the GLR pool (despite having a GLA in effect).

Plaintiffs contend that each GLA Class member should have received an "equal share" of the GLR pool for each year that he had a retired player GLA in effect. See TAC ¶¶ 32-34.[46] But, as set forth above, the undisputed evidence establishes that the EA and other licensing revenues that go into the GLR pool are 100% attributable to active player licensing. See also Glenn Eyrich 30(b)(6) Depo. Tr. ("Eyrich 30(b)(6) Depo.") 11:22-25 (Greenspan Decl. Ex. 34). Stated in the alternative, the undisputed evidence establishes that there is no retired player money in the GLR pool, and that virtually all retired players' money has been paid directly to the retired players whose rights were licensed. See, e.g., D. Allen Depo. 108:11-111:16 ("[I]t would have been counting the money twice to have included it [in the GLR pool] if it was already paid out to retired players.") (Greenspan Decl. Ex. 8); 2000 NFLPA-PI Agreement § 4(A)(v) (defining GLR as all licensing revenues "exclud[ing] … amounts received by retired players ….") (emphasis added) (Greenspan Decl. Ex. 32).

### E. All of the Other Revenues That the GLA Class Is Trying To Recover Are Also Active Player Licensing Revenues

#### 1. The $8 Million Reallocation of Active Player Licensing Money

The 1994 and 2000 agreements between the NFLPA and Players Inc (the "1994 and 2000 NFLPA-PI Agreements") provided for the division of the GLR pool between active players, Players Inc and the NFLPA. The 1994 and 2000 NFLPA-PI Agreements permit changes to that allocation, subject to the approval of the NFLPA's Board of Player Representatives.[47] In February 2006, such an amendment was passed (the "2006 Amendment"), providing for $8 million to be taken out of the GLR pool each year, and then reallocated between the NFLPA and Players Inc. See TAC ¶ 38; 2006 Amendment (Greenspan Decl. Ex. 36). Since it is undisputed that this $8 million was taken out of the GLR pool,[48] there can be no genuine dispute

---

[46] See also Rowley Report § IV.C (Greenspan Decl. Ex. 20).

[47] See 2000 NFLPA-PI Agreement §§ 4(C), 14; 1994 NFLPA-PI Agreement § 5(B) (Greenspan Decl. Exs. 32, 35).

[48] E.g., Pls.' Mot. for Class Certification at 12 ("in a February 2006 agreement, Defendants diverted to themselves in a 40%-60% split at least $8 million from the GLRD account") (emphasis added) (Rec. Doc. 217).

Dewey & LeBoeuf LLP
One Embarcadero Center, Suite 400
San Francisco, CA 94111

Dewey & LeBoeuf LLP
One Embarcadero Center, Suite 400
San Francisco, CA 94111

that this reallocation only was comprised of active player licensing revenues, as those are the only revenues in the GLR pool. See, e.g., Eyrich 30(b)(6) Depo. 89:12-20 ("one hundred percent of [the $8 million reallocation] was taken from the equal share pool which went to active players") (Greenspan Decl. Ex. 34).[49]

### 2. The Portion of the GLR Pool Retained by Defendants for Union Operations Was Also 100% Active Player Money

The 1994 and 2000 NFLPA-PI Agreements provide that in each fiscal year, the NFLPA receives approximately 40% of the GLR pool, Players Inc receives approximately 23% of the GLR pool, and approximately 37% is paid to active players who meet the eligibility criteria discussed above.[50] Plaintiffs claim that Defendants retain too high of a percentage of the GLR pool, and that some portion of the NFLPA's and Players Inc's share of the GLR pool should instead be distributed in "equal shares" to the GLA Class. See TAC ¶ 37; Rowley Report § IV.E (Greenspan Decl. Ex. 20). But, as set forth above, the undisputed evidence establishes that all of the money in the GLR pool is active player licensing revenues, and thus Plaintiffs' claim for the approximately 40 percent of the GLR pool retained by the NFLPA is another baseless attempt to claim a share of active player licensing revenues.[51]

## ARGUMENT

"Summary judgment is appropriate if the nonmoving party bears the ultimate burden of proof at trial as to an element essential to its case, and fails to make a showing

---

[49] See also Deposition transcript of NFLPA General Counsel Richard Berthelsen ("Berthelsen Depo.") 33:13-19 ("[W]hat we've talked about as far as the 8 million and the allocations that you've asked me about, there we are talking about active player licensing or marketing money.") (Greenspan Decl. Ex. 37); 2006 Amendment (stating that the $8 million constitutes "'gross licensing revenue' as defined [in the 2000 NFLPA-PI Agreement]," i.e., excluding retired player revenues) (Greenspan Decl. Ex. 36).

[50] See 1994 NFLPA-PI Agreement §§ 4-5 (Greenspan Decl. Ex. 35); 2000 NFLPA-PI Agreement § 4 (Greenspan Decl. Ex. 32). This division of the active player licensing revenues was supported by an independent evaluation conducted by Duff & Phelps Capital Markets Co. in an opinion letter dated January 13, 1995. See Duff & Phelps Report at 6-8 (Greenspan Decl. Ex. 38). Each year, Defendants financial statements – including the distribution of the GLR pool – is submitted to and approved by the Board of Player Representatives, which is comprised of active players elected by their teammates. E.g., Fiscal Year 2007 Annual Financial Report at 1-2 (Greenspan Decl. Ex. 39).

[51] See Eyrich 30(b)(6) Depo. 50:8-16, 50:24-51:2, 11:22-25 (Greenspan Decl. Ex. 34).

sufficient to establish a genuine dispute of fact with respect to the existence of that element."[52] Thus, if the Court finds that Plaintiffs have not carried their burden on even a single element of their breach of contract, breach of fiduciary duty, or accounting causes of action, that cause of action must be dismissed in its entirety.

## I. SUMMARY JUDGMENT SHOULD BE GRANTED AGAINST THE GLA CLASS'S BREACH OF CONTRACT CLAIM

The essential elements of a claim for breach of contract are (1) a legal obligation of a defendant to a plaintiff, (2) a violation or breach of that obligation, and (3) a consequential injury or damage to the plaintiff. Caudill v. Wise Rambler, 210 Va. 11, 13 (1969); see also Bembery v. District of Columbia, 758 A.2d 518, 520 (D.C. 2000).[53] Because Plaintiffs are seeking to recover money that the undisputed evidence establishes does not involve the use of retired player rights and is solely attributable to active player licensing, Plaintiffs' breach of contract claim fails as to all three elements.

### A. The GLA Class Is Not Contractually Entitled to Active Player Licensing Revenues

The GLA Class's breach of contract claim is based upon Defendants' alleged breach of, and the GLA Class's alleged injuries arising out of, the following provision in the Adderley GLA:

> "It is further understood that the moneys generated by such licensing of retired player group rights will be divided between the player and an escrow account for all eligible NFLPA members who have signed a group licensing authorization form."

E.g., TAC ¶ 19, 29 (quoting Adderley GLA) (emphasis added).

Although, as the Court has recognized, the Adderley GLA is not a model of clarity, several points are undisputed. First, the GLA language provides that the only moneys to "be divided between the player and an escrow account" are "moneys generated by such licensing

---

52 City of Vernon v. S. Cal. Edison Co., 955 F.2d 1361, 1365 (9th Cir. 1992).

53 The Court ruled in its Order Granting in Part and Denying in Part Plaintiffs' Motion for Class Certification ("Class Cert. Order") that the "certified claims will be governed by Virginia or District of Columbia law, which to be decided later." Class Cert. Order at 8 (Rec. Doc. 275). Accordingly, Defendants cite to both Virginia and D.C. law for the purposes of this Motion. As the EA and other license agreements have a New York choice of law clause, Defendants also cite to New York law where appropriate.

Dewey & LeBoeuf LLP
One Embarcadero Center, Suite 400
San Francisco, CA 94111

of retired player group rights." Id. (emphasis added). Adderley himself has thus admitted that retired players are not "entitled to any money that's generated by the licensing of active players."[54] And, even the TAC characterizes the Adderley GLAs as "provid[ing] that moneys generated by licensing of retired player rights" should be divided among the GLA Class. TAC ¶ 29 (emphasis added). Second, Adderley and Defendants agree that the GLA only provides for retired players to be paid when their rights are used. See Adderley Depo. 89:13-90:1, 92:8-17 (testifying that he understood the GLA to mean "that if [his] rights were licensed and used, [he] would get some money" and that he "never thought that [he] should get something if nobody used [his] image") (Greenspan Decl. Ex. 4). This agreement between Adderley and Defendants about the intended meaning of the GLA conclusively resolves any ambiguity in the contractual language. Simply put, there is no basis in the GLA for a claim to be made against any active player licensing revenues.

**B. The EA, Topps and Other Licensing Revenues Sought By Plaintiffs Do Not Involve Retired Player Rights and Thus Cannot Be the Basis of Any Claim of Breach**

The GLA Class alleges that Defendants "breached the terms of the Adderley GLA(s) by failing to share the revenues they received from such licenses – including the guaranteed minimum royalties under the EA Agreements, and other licensing royalties – with retirees." TAC ¶ 29. The undisputed evidence establishes, however, that all of the revenues generated by the license agreements put at issue by Plaintiffs are solely attributable to active (not retired) player licensing, to which the GLA Class has no contractual entitlement by the express terms of the GLA.

**1. It Is Clear From the Face of the License Agreements at Issue That They Do Not License Retired Players' Rights**

Plaintiffs' claim that Defendants licensed the GLA Class members' rights without compensating them rests entirely on a boilerplate "retired player" reference that appears in 96 license agreements Plaintiffs have identified. But, it is clear from the face of these agreements,

[54] Adderley Depo. 96:13-18 (Greenspan Decl. Ex. 4).

Dewey & LeBoeuf LLP
One Embarcadero Center, Suite 400
San Francisco, CA 94111

Dewey & LeBoeuf LLP
One Embarcadero Center, Suite 400
San Francisco, CA 94111

as a matter of law, that retired player rights were <u>not</u> being licensed.[55] The boilerplate reference to retired players that Plaintiffs rely upon is the following:

> Players Inc represents that it is a licensing affiliate of the [NFLPA]; that the NFLPA has been duly appointed and is acting on behalf of the football players of the National Football League who have entered into a [GLA], either in the form attached hereto as Attachment "A" or through the assignment contained in Paragraph 4(b) of the NFL Player Contract, which have been assigned to Players Inc; and that in such capacity Players Inc has the right to negotiate this contract and the right to grant rights and licenses described herein.[56] <u>Licensee acknowledges</u> that Players Inc also <u>on occasion</u> secures authorization for inclusion in Players Inc licensing programs from players, including but not limited to retired players, who have not entered into such Group Licensing Authorization, but who, nevertheless, authorize Players Inc to represent such players for <u>designated</u> Players Inc licensed programs.
>
> * * *
>
> Upon the terms and conditions hereinafter set forth, Players Inc hereby grants to Licensee and Licensee hereby accepts the…right, license and privilege of utilizing the…names, likenesses…, pictures, photographs, voices, facsimile signatures and/or biographical information…of the NFL players referenced in Paragraph 1(A) above…

TAC ¶¶ 25, 26 (quoting 2005 EA Agreement, ¶¶ 1A, 2A) (emphasis added) (emphases in original omitted). Plaintiffs argue that, because the second paragraph grants the rights to "the NFL players referenced in [the first paragraph]," and because that first paragraph includes the words "retired players," this means that retired players' rights are being licensed pursuant to the 2005 EA Agreement (as well as the other license agreements Plaintiffs have identified with the same language).

But this is not what the plain language states. Whereas in the first sentence of Paragraph 1(A), "Players Inc represents" that it is authorized to act on behalf of all active players who assigned their group licensing rights to the NFLPA, in the second sentence of Paragraph 1(A), it is the "<u>Licensee</u> acknowledg[ing]" that Players Inc "<u>on occasion</u>" secures retired players'

---

[55] <u>See, e.g.</u>, <u>Ft. Lincoln Civic Ass'n, Inc. v. Ft. Lincoln New Town Corp.</u>, 944 A.2d 1055, 1064 (D.C. 2008) ("Where the language [of the contract] in question is unambiguous, its interpretation is a question of law for the court."); <u>accord</u> <u>Beal Sav. Bank v. Sommer</u>, 8 N.Y.3d 318, 324 (2007) (same); <u>Waikoloa Ltd. P'ship v. Arkwright</u>, 268 Va. 40, 46-47 (2004) (same).

[56] Plaintiffs concede that this first sentence refers only to active players, who are the only players who would "have entered into a [GLA]…in the form attached hereto as Attachment A," which Plaintiffs state was "designed for active players," or had an "assignment" through an NFL Player Contract. TAC ¶¶ 22, 21 (quoting 2005 EA Agreement ¶ 1(A)).

rights for inclusion in certain "designated" licensing programs, e.g., "ad hoc" deals. Id. (emphasis added). This provision does not even contain a reference to the fact that Players Inc also obtains the rights to certain retired players pursuant to non-program specific GLAs. Moreover, when viewed in the overall context of this language, it is clear that the reference in the second paragraph, which grants certain group licensing rights to "the NFL Players referenced in" the first paragraph, only grants rights to the active NFL players mentioned in the first sentence of the first paragraph.

The plain language of the "Approvals" paragraph further confirms that the GLA Class members' rights were not being licensed in the 2005 EA agreement, or any of the other agreements with the same language:

> The list of players for whom Players Inc has group licensing authorization (the "Player Agreement Report") is available to the Licensee via the Internet at www.nflplayers.com/licensee. . . . In addition, Players Inc may secure authorization from players not listed on the Player Agreement Report, including but not limited to retired players.

2005 EA Agreement ¶ 12 (emphases added) (Greenspan Decl. Ex. 40). The language of this provision refers licensees to a website containing the names of active players whose images were licensed under the agreement so that licensees would know whose images they could use in licensed products.[57] Contracts must be interpreted as a whole, and, as the language makes clear, retired players were not listed on the "Approvals" website because they were not part of the license grant.[58]

**2. The Undisputed Extrinsic Evidence Further Establishes That the License Agreements at Issue Conveyed Only Active Players Rights**

If the Court was to determine that the language of the EA and other license

[57] The list of active players whose images licensees acquired pursuant to their license agreements with Defendants used to be provided as an "Attachment B" that was hundreds of pages long. For example, a 2001 Upper Deck license agreement has an Attachment B, which included only players who were active at the time that agreement was effective. See 2001 Upper Deck Agreement at Attachment B (Greenspan Decl. Ex. 41). The website is now used as a more convenient and efficient way of informing licensees which active players' images they have acquired, and what teams those active players currently play for. See Linzner 30(b)(6) Depo. 142:20-143:8; Nahra Depo. 272:22-274:9 (Greenspan Decl. Exs. 2, 6).

[58] See Nahra Depo. 279:8-14 ("[T]he report that they go to on the website which used to be Attachment B contains a list of active players. Just active players.") (Greenspan Decl. Ex. 6).

Dewey & LeBoeuf LLP
One Embarcadero Center, Suite 400
San Francisco, CA 94111

agreements at issue was ambiguous as to whether it licensed retired players' rights, then extrinsic evidence should be considered.[59] "[I]f that evidence demonstrates that only one view is reasonable – notwithstanding the facial ambiguity – the Court must decide the contract interpretation question as a matter of law."[60] Moreover, where, as here, all of the parties to the agreements (Defendants and their licensees) share the same contractual interpretation, a contrary interpretation advanced by strangers to that contract (Plaintiffs) is irrelevant as a matter of law.[61]

In this case, as set forth in detail at pp. 9-14, <u>supra</u>, the undisputed extrinsic evidence confirms that the license agreements at issue were not intended to, and did not, convey retired players' rights. For example, NFLPA Staff Counsel Joe Nahra explained the meaning of the boilerplate "retired player" reference as follows:

> "Doug Allen wanted to include that phrase ["including, but not limited to retired players"] as a way of signaling to our licensees that it's possible to secure retired player rights from Players Inc because we do occasionally obtain those rights. The whole sentence is aimed at securing rights for players who have not entered into a GLA who are not part of the description. Right. It is for letting the licensee know that there are occasions when we get rights from other players and if they are interested in using other players that are not identified on the list that's on the website, then they can inquire as to us whether we can get those rights if they want to include those rights, but if you will look in paragraph 12, that additional

---

[59] <u>See</u> <u>Greenfield v. Philles Records, Inc.</u>, 98 N.Y.2d 562, 569 (2002); <u>Capital City Mortg. Corp. v. Habana Village Art & Folklore, Inc.</u>, 747 A.2d 564, 567 (D.C. 2000); <u>Georgiades v. Biggs</u>, 197 Va. 630, 633-34 (1956).

[60] <u>Farmland Indus., Inc. v. Grain Bd. of Iraq</u>, 904 F.2d 732, 736 (D.C. Cir. 1990) (applying D.C. law); <u>accord</u> <u>Burns v. Eby & Walker, Inc.</u>, 226 Va. 218, 221-22 (1983); <u>Wing Ming Props. (U.S.A.) Ltd. v. Mott Operating Corp.</u>, 148 Misc.2d 680, 684 (N.Y. Sup. Ct. 1990).

[61] <u>See, e.g.</u>, <u>Reliance Standard Life Ins. Co. v. Matula</u>, No. 05-C-0788, 2007 U.S. Dist. LEXIS 24523, *25 (E.D. Wis. Mar. 30, 2007) ("[D]efendants are trying to tell a party to an agreement [plaintiff] that that party's interpretation of its own agreement is wrong. As strangers to the Agreement, the . . . defendants are not in an authoritative position regarding what the Agreement means and how the parties to the Agreement interpret it."); <u>Waddy v. Sears, Roebuck & Co.</u>, No. C-92-2903-VRW, 1994 WL 392483, *11 (N.D. Cal. July 8, 1994) ("Tucker's employment contract is defined by the understanding and intent of Sears and Tucker, not third parties to the contract."); <u>Williams Tile & Marble Co., Inc. v. Ra-Lin & Assocs.</u>, 426 S.E.2d 598, 600 (Ga. Ct. App. 1992) (the "interpretation of a contractual provision by a stranger to the contract obviously has no probative relevance whatsoever"); <u>Combs v. Hunt</u>, 140 Va. 627, 640 (1924) ("[W]e know of no principle of law or public policy which forbids [the] operation [of an agreement] exactly as stipulated by the parties, with which, as already stated, a stranger to the contract has absolutely no concern."); <u>Matsushita Elec. Corp. v. Loral Corp.</u>, No. 93-1435, 1994 WL 497955, *2 (Fed. Cir. Sept. 23, 1994) (rejecting a third party's interpretation of a license agreement where the original contracting parties both understood the contract to have a different meaning) (unpublished opinion).

Dewey & LeBoeuf LLP
One Embarcadero Center, Suite 400
San Francisco, CA 94111

use of players may require additional payment …. These players were not part of this license agreement, but if they wanted to inquire about using retired players they could do that."[62]

The Rule 30(b)(6) designees from EA and Topps, the only licensees that Plaintiffs deposed, testified to the exact same understanding of this language:

Q: [W]hat was your understanding, when you signed this agreement, of [the boilerplate retired player reference] that I just read to you, saying that the – that it was included, but not limited to retired players?
A: My understanding was that this license agreement and the fees that [EA] agreed to pay in this license agreement were to secure the rights of active NFL players and that Players Inc represented retired players, which, if we wanted to purchase those rights separately, Players Inc would work on our behalf to do so.[63]

* * *

"Well, my understanding of what NFL players referred to on the last line of page 1 of [the 2005 EA Agreement] was active NFL players… Now, you – you may not – you know you may not like that understanding, but I'm telling you, sir, that's my understanding of what it meant."[64]

* * *

Q: Did you have occasion to read that language in paragraph 2-A of the [2004 Topps Agreement]?
A: Yes.
Q: And when it says that it is granting a license to the "NFL Players referenced in paragraph 1-A above," what did you understand that phrase to include…if you had any understanding?
A: Active players.[65]

Indeed, the evidence is undisputed that licensees such as Topps did not intend to acquire retired players' rights through their license agreements with Defendants:

Q: Was it Topps' intention to acquire the group licensing rights of retired players under the 2004 license agreement?
A: No.

---

[62] Nahra 30(b)(6) Depo. 277:18-280:1 (Greenspan Decl. Ex. 6). Nahra also explained in his deposition that the language was changed to its current formulation because there was no longer any need to attach a list of active players for whom Players Inc had rights, as had been the prior practice and contractual language, because the list of active players became available on the website, and was not intended to make any substantive change adding retired players. <u>See</u> <u>id.</u> at 273:15-274:9.

[63] Linzner 30(b)(6) Depo. 71:18-72:4 (Greenspan Decl. Ex. 2).

[64] <u>Id</u>. at 73:2-25, 75:7-13; <u>see also</u> Berthelsen Depo. 60:8-60:13 ("Counsel, you always seem to sneak that retired player part into your question. The deal with EA Sports was for active players for the video game. If there was anything about retired players, that was a separate matter and retired players were separately compensated.") (Greenspan Decl. Ex. 37).

[65] Zucker Depo. 34:16-35:4 (Greenspan Decl. Ex. 27).

Dewey & LeBoeuf LLP
One Embarcadero Center, Suite 400
San Francisco, CA 94111

Q: Was it Topps' intention to acquire the group licensing rights of retired players under the 2007 license agreement?
A: No.

Friss 30(b)(6) Depo. 77:18-25 (Greenspan Decl. Ex. 3); see also Linzner 30(b)(6) Depo. 35:1-14, 70:20-72:4 (same for 2004/2005 EA Agreements); Castillon Decl. ¶¶ 3-5 (same for 2005/2007 Fathead Agreements); Sullins Decl. ¶¶ 3, 6 (same for 2004/2007 Upper Deck Agreements); Brenner Decl. ¶ 3 (same with respect to 2004 MBI agreement); Finch Decl. ¶ 3 (same for 2005 Todd McFarlane Agreement); Byrd Decl. ¶¶ 3, 5 (same for 2006/2007 STATS agreements) (Greenspan Decl. Exs. 2, 11, 28, 29, 30, 31).

In the face of this undisputed evidence about the mutual understanding of all of the parties to the license agreements, Plaintiffs offer only the unsupported interpretation of class counsel. The arguments of counsel, however, are insufficient to meet the plaintiffs' burden of proof in opposition to a summary judgment motion. Barcamerica Int'l USA Trust v. Tyfield Importers, Inc., 289 F.3d 589, 593 n.4 (9th Cir. 2002) ("The arguments and statements of counsel are not evidence and do not create issues of material fact capable of defeating an otherwise valid motion for summary judgment.") (quotation omitted).[66]

**3. Plaintiffs' Contractual "Interpretation" Must Also Be Rejected Because It Is Commercially Unreasonable and Absurd**

It is black letter law that courts should decline to interpret contracts in a manner that would lead to results that are absurd, commercially unreasonable, or contrary to the reasonable expectations of the parties.[67] But that is exactly what would follow if Plaintiffs' "interpretation" of the EA and other license agreements at issue was sustained.

For example, if the Court were to adopt Plaintiffs' position that the boilerplate

[66] In a recent Interrogatory response, and in their "expert's" damages report, Plaintiffs indicated that the GLA Class may also be seeking to recover revenues paid under the agreements that do not include even the boilerplate "retired player" reference, i.e., the remainder of the license agreements that go into the GLR pool. Pls.' Resps. and Objs. to Defs.' Third Set of Interrogs. at Resp. No. 9 (May 19, 2008); Rowley Report § IV.C (Greenspan Decl. Exs. 42, 20). Since these agreements, such as the NFL Sponsorship Agreement, do not even mention retired players, the Court should conclude, as a matter of law, that they too do not license retired players' rights.

[67] Miller & Long Co., Inc. v. John J. Kirlin, Inc., 908 A.2d 1158, 1160-61 (D.C. 2006); In re Lipper Holdings, LLC, 1 A.D.3d 170, 171 (N.Y. 1st Dep't 2003); Transit Cas. Co. v. Hartman's, Inc., 218 Va. 703, 708 (1978).

Dewey & LeBoeuf LLP
One Embarcadero Center, Suite 400
San Francisco, CA 94111

"retired player" language had the effect of licensing retired players' rights, it would have the absurd consequence that retired players were licensed in 21 agreements for fantasy football products.[68] As the Court may know, fantasy football is based upon the real-time statistics of active players, and thus "you cannot have fantasy football for retired players." Linzner 30(b)(6) Depo. 191:17-193:2 (Greenspan Decl. Ex. 2).[69] Plaintiffs' contractual "interpretation" of Defendants' license agreements would also have the absurd result that retired players were licensed in two agreements covering "draft pick trading cards," i.e., rookie trading cards, since those agreements also included the boilerplate "retired player" language.[70]

Another illustration of the absurdity of Plaintiffs' contractual interpretation is that it would mean that dozens of licensees paid twice to acquire the rights of certain GLA Class members (i.e., once through the license agreements allegedly including all GLA Class members' rights, and a second time through "ad hoc" deals to acquire the group license rights of specified retired players, including many GLA Class members). The undisputed testimony as to the economic absurdity of this interpretation speaks for itself:

> "EA would not have paid these additional monies if EA had already received, under its main licensing agreement with Players Inc, group licensing rights for retired players who had previously signed the standard form GLA."
>
> * * *
>
> "Whenever [Upper Deck] has sought to acquire the rights of retired players for use in [Upper Deck's] products, [Upper Deck] has entered into separate agreements, and paid additional money, to acquire those retired players' rights. This type of separate agreement for a specific retired NFL player occurred, for example, on March 10, 2005 and July 8, 2005, when [Upper Deck] agreed to pay additional money to acquire the rights of Herbert Adderley…. If [Upper Deck] had already acquired Mr. Adderley's rights pursuant to the 2004 License

---

[68] See Rowley Report, Ex. 8 (identifying fantasy agreements with All Sport Entertainment, AOL, Sporting News, CDM Fantasy Sports, Fantasy Sports Championships, ESPN, Excalibur, F&W Publications, Fanball, Fox Sports Interactive Media, Fox Interactive Media, Head2Head, PayDay Sports, Pro Trade, Sportsline.com, Stats, Vulcan Sports and Yahoo) (Greenspan Decl. Ex. 20); see also Excerpts from Fantasy License Agreements (Greenspan Decl. Ex. 43).

[69] See also C.B.C. Distribution & Marketing, Inc. v. Major League Baseball Advanced Media, 505 F.3d 818, 820-21 (8th Cir. 2007) ("[F]antasy baseball products incorporate the names along with performance and biographical data of actual major league baseball players…. A participant's success, and his or her team's success, depends on the actual performance of fantasy team's players on their respective actual teams during the course of the major league baseball season.") (emphases added).

[70] See 2004 and 2006 RC2 Brands Agreements ¶¶ 1(A), 2(A) & Rowley Report, Ex. 8 (identifying both RC2 Brands Agreements) (Greenspan Decl. Exs. 44, 20).

Dewey & LeBoeuf LLP
One Embarcadero Center, Suite 400
San Francisco, CA 94111

> Agreement, [Upper Deck] would not have paid this additional money to acquire Mr. Adderley's rights."

Linzner Decl. ¶ 7; Sullins Decl. ¶¶ 4-5 (Greenspan Decl. Exs. 21, 28); see also Adderley Depo. 150:15-22 (admitting that "if Upper Deck already had the rights to [Adderley's] image, in 2005, they would have no reason to pay [him] more money to get those rights again") (Greenspan Decl. Ex. 4).[71]

Yet another absurd consequence of the contractual interpretation advanced by Plaintiffs is the absence of any evidence that the licensees ever used any of the retired players' rights that they supposedly acquired, especially when there is no evidence the licensees ever knew the identities of the retired players who signed GLAs but who were never requested for an ad hoc deal. Under Plaintiffs' contractual "interpretation," thousands of GLA Class members' rights would have been licensed to dozens of licensees, pursuant to almost 100 agreements, and yet not one of these licensees ever used a single GLA Class member's rights without paying a second time for such rights through an ad hoc agreement.[72]

### C. The GLA Class Is Not Contractually Entitled to Any Share of the GLR Pool

#### 1. The "Equal Shares" Claim

The GLA Class alleges that, "[p]ursuant to the [2000 NFLPA-PI Agreement]," "royalties under the EA 2004 Agreement and EA 2005 Agreement" and the other licensing agreements at issue "should have been distributed on an 'equal share' basis to all retired players who had executed GLAs." TAC ¶ 34. As set forth above, however, the undisputed evidence establishes that those revenues are 100% attributable to active player licensing, and thus the

---

[71] Plaintiffs have tried to argue that some of the "ad hoc" agreements were merely autograph deals, but the undisputed testimony of the licensees establishes that this was not the case: "With retired players it's not strictly an autograph deal. It's a rights and autograph deal and when negotiating those respective deals for rights and autographs on retired players, to feature that respective player in an ad, [Topps] would have had to specifically secured ad rights." Zucker 30(b)(6) Depo. 64:17-23 (Greenspan Decl. Ex. 27); see also Friss 30(b)(6) Depo. 69:24-70:25 (testifying that whereas Topps retired player "ad hoc" deals have "grants of rights," active player "ad hoc" deals do not) (Greenspan Decl. Ex. 3).

[72] Plaintiffs also argue that some of the license agreements – such as the 2005 EA Agreement – included "guarantees" requiring that the revenues be paid regardless of whether all of the licensed rights are used. See TAC ¶ 27. But just because EA agreed to guarantee certain royalties, even if it did not use all of the active player rights licensed under the 2005 Agreement, does not explain why EA (or any other licensee) would pay millions of dollars per year for retired players rights that it never asked for or intended to use.

Dewey & LeBoeuf LLP
One Embarcadero Center, Suite 400
San Francisco, CA 94111

GLA Class has no contractual entitlement to an "equal" – or any other – share of this money.

Plaintiffs' related allegation that the 2000 NFLPA-PI Agreement "arbitrarily, capriciously and in violation of the GLA excluded retired players from the 'equal share' royalty" fails for the same reason. TAC ¶ 96. There is nothing "arbitrary" about excluding retired players from an equal share of the GLR pool, since the language of the GLA says nothing about such an equal share, see Adderley Depo. 255:4-257:11 ("'Equally' is not in here.") (Greenspan Decl. Ex. 4), and the undisputed evidence establishes that the GLR pool does not include any retired player licensing revenues. Among other things, the 2000 NFLPA-PI Agreement expressly provides that retired player licensing revenues (such as the roughly $30 million paid to retired players between February, 2003 and August, 2007) were excluded from the GLR pool:

> (A) Gross licensing revenue shall exclude any revenues derived from …
>
> (v) amounts received by retired players pursuant to Group Licensing Assignments or Group Licensing Rights.

2000 NFLPA-PI Agreement § 4(A)(v) (Greenspan Decl. Ex. 32).

Moreover, since even Plaintiffs do not dispute that the over $30 million generated by retired player licensing through ad hoc agreements was paid directly to the retired players whose rights were licensed, the GLR pool could not possibly contain retired player money:

> "[I]t would have been counting the money twice to have included it [in the GLR pool] if it was already paid out to retired players."[73]
>
> * * *
>
> "[T]he retired Players have … designated deals that are not part of the gross licensing equal share pool."[74]

Contrary to what class counsel told the Court,[75] the undisputed evidence establishes that the GLR pool is not the "escrow account" referenced in Adderley's GLA:

> "And all of the money secured for retired player licensing was distributed to the players who were involved in those license programs. There was no other money to escrow. There was no other money to divide."[76]

---

[73] D. Allen Depo. 108:11-111:16 (Greenspan Decl. Ex. 8).

[74] Eyrich 30(b)(6) Depo. 50:21-51:2 (Greenspan Decl. Ex. 34).

[75] Class Hearing Tr. 8:12-17 (Class Counsel: "We say [the escrow account] was created. We say it's an equal share fund.") (Greenspan Decl. Ex. 13).

[76] D. Allen Depo. 148:16-149:10 (Greenspan Decl. Ex. 8); see also P. Allen Depo. 82:5-7 (Greenspan Decl. Ex. 7).

Dewey & LeBoeuf LLP
One Embarcadero Center, Suite 400
San Francisco, CA 94111

* * *

> "The reason it [the referenced escrow in the retired player GLA] wasn't created, because we passed the money straight to the players. There was no money to set up an escrow account."[77]

* * *

> Q: To your knowledge was such an escrow account ever created?
> A: It was not.
> Q: Do you know why it wasn't created?
> A: Because the efforts to generate the money for the retired players were unsuccessful.[78]

* * *

> "There was never any money created or generated that wasn't attributable to specific retired player image use and no escrow account was ever created because there was no money to go into an escrow account, because all of the money generated was for specific use of individual retired players and in, I will say, most, if not all, instances was paid directly to those specific retired players."[79]

Indeed, it is undisputed that the Adderley GLA does not mention anything about "equal shares" of any royalty pool. See Adderley Depo. 255:4-257:11 ("'Equally' is not in here.").[80]

Further, Plaintiffs have absolutely no basis to claim, as they have done in their expert reports, an equal share of revenues generated by license agreements for active player rights that make no mention at all of retired players. As noted above, the GLA is expressly limited to revenue generated by retired player licensing. Plaintiffs' claims for an equal share of all revenue from deals that have nothing to do with retired players and make no mention of retired players, shows that Plaintiffs' claims are unfounded and political.

---

[77] Upshaw Depo. 40:11-18 (Greenspan Decl. Ex. 10).

[78] Berthelsen Depo. 50:5-50:18 (Greenspan Decl. Ex. 37).

[79] Nahra 30(b)(6) Depo 76:7-77:12 (Greenspan Decl. Ex. 6). As Mr. Nahra further explained, this is why, several years ago, Defendants removed the "escrow" language from the GLA: "[T]he escrow account [language] was removed because it didn't make sense to have it any longer because in approximately 10 years of licensing efforts, we were not able to generate any money for an escrow account so there was never one set up." Id. 141:4-11.

[80] Defendants note that Plaintiffs' breach of contract claim is not based on the absence of any escrow account (to the contrary, Plaintiffs make the unsupported claim that the GLR pool is the escrow account). See, e.g., Class Hearing Tr. 8:10-17 (Greenspan Decl. Ex. 13); Pls.' Mot. for Class Cert. at 7, 10 (Rec. Doc. 217). Nor, in any event, could Plaintiffs claim any material breach or injury from Defendants' failure to set up an escrow account that would have had no money in it. Indeed, the only retired player money that could have gone into such an escrow account would have been the group licensing revenues generated through "ad hoc" agreements – but Plaintiffs have disavowed any complaint about the distribution of such revenues. See, e.g., Pls.' Resps. and Objs. to Defs.' First Set of Interrogs. at Resp. No. 9 (Feb. 4, 2008) (stating that Plaintiffs do not contend that any money generated by ad hoc agreements should have been divided among the class members) (Greenspan Decl. Ex. 45).

Dewey & LeBoeuf LLP
One Embarcadero Center, Suite 400
San Francisco, CA 94111

Finally, there is no legal basis for the GLA Class to claim a breach of the 1994 or 2000 NFLPA-PI Agreements. As non-parties to those agreements, it is black letter law that GLA Class members have no standing to sue for any purported breach.[81] The only situation in which non-parties have standing to sue over a contract is if they are third-party beneficiaries to that contract.[82] Plaintiffs, however, have not alleged, and cannot allege, that the GLA Class members are third-party beneficiaries to the NFLPA-PI Agreements. Third-party beneficiaries "must show that the parties to a contract 'clearly and definitely intended' to confer a benefit upon [them]."[83] There is not a shred of evidence to indicate that this was the case.

**2. The GLA Class Is Not Contractually Entitled to Any Other Money from the GLR Pool**

Plaintiffs also allege that Defendants "have misappropriated funds totaling eight million dollars ($8,000,000) or more that should have been paid, in part, to Adderley and the GLA Class under the terms of the GLA." TAC ¶¶ 96(c), 36, 38. But it is undisputed that the $8 million in reallocated funds were taken from the GLR pool (with the approval of the NFLPA Board of Player Representatives). See TAC ¶ 38; Pls.' Mot. for Class Cert. at 12 (Rec. Doc. 217); Rowley Report, Ex. 3D (Greenspan Decl. Ex. 20); Eyrich 30(b)(6) Depo. 89:12-20 (Greenspan Decl. Ex. 34).[84] Accordingly, just as with the royalties paid to active players from the GLR pool, the undisputed evidence establishes that the $8 million in reallocated funds was comprised solely of active player licensing money.[85]

---

[81] See, e.g., Combs v. Hunt, 140 Va. 627, 640 (1924); Ford v. Sturgis, 14 F.2d 253, 255 (D.C. 1926) ("[I]f we hold that the plaintiff can sue in such case, there is no point at which such actions will stop. The only safe rule is to confine the right to recover to those who enter into the contract; for if we go one step beyond that, there is no reason why we should not go fifty.").

[82] See Ft. Lincoln Civic Assoc., 944 A.2d at 1064.

[83] Copenhaver v. Rogers, 238 Va. 361, 367 (1989) ("The essence of a third-party beneficiary's claim is that others have agreed between themselves to bestow a benefit upon a third party but one of the parties to the agreement fails to uphold his portion of the bargain.") (citation omitted); see also Ft. Lincoln Civic Assoc., 944 A.2d at 1064-65; Fourth Ocean Putnam Corp. v. Interstate Wrecking Co., 66 N.Y.2d 38, 44-45 (1985).

[84] Indeed, the 2006 Amendment defines the $8 million as "'gross licensing revenues,' as defined in Section 4(A) of the [2000 NFLPA-PI Agreement]," which expressly excludes revenues paid to retired players. See 2006 Amendment to the NFLPA-PI Agreement; 2000 NFLPA-PI Agreement §4(A) (Greenspan Decl. Exs. 36, 32).

[85] Although the reasons underlying the $8 million reallocation are irrelevant since it is purely active player money, Defendants note the undisputed fact that this reallocation was approved by

Dewey & LeBoeuf LLP
One Embarcadero Center, Suite 400
San Francisco, CA 94111

The GLA Class's claim that the "forty percent (40%) of gross licensing revenues" retained by the NFLPA should have been paid in equal shares to GLA Class members also fails. Again, there is no dispute that the 40% retained by the NFLPA comes out of the GLR pool, see, e.g., Rowley Report § IV.E, Exs. 3E.1-12, and there can thus be no genuine dispute that this money consisted only of the active player licensing revenues that comprise the GLR pool. See, e.g., Eyrich 30(b)(6) Depo. 50:8-51:2 ("[T]he NFLPA receiv[es] 40 percent of the active player gross licensing share.").[86] Summary judgment must thus be granted against all of Plaintiffs' breach of contract claims.

## II. SUMMARY JUDGMENT SHOULD ALSO BE GRANTED AGAINST THE GLA CLASS'S BREACH OF FIDUCIARY DUTY CLAIM

The elements of a breach of fiduciary duty claim are (1) the existence of a fiduciary duty, (2) breach, and (3) damages.[87] Plaintiffs have failed to establish a genuine issue of material fact with respect to each of these elements.

### A. The Adderley GLA Does Not Create a Fiduciary Duty

Last year, class counsel told the Court, in no uncertain terms, that "Plaintiffs have not alleged a relationship with PLAYERS INC based upon the GLA," and that "[t]he GLA … is not alleged to be the basis of the fiduciary relationship."[88] Now, however, such an "express agency" based upon the GLA is the only theory upon which Plaintiffs allege a fiduciary duty.[89]

---

the active players whose rights generated the money, that the reallocation was based upon the increased value of the NFL Players name and logo, and that the value ascribed to the NFL Players name and logo was based upon "a peer review of another sports organization's logo use revenue." Eyrich 30(b)(6) Depo. 92:10-17, 85:23-86:19; Players Inc's Resps. and Objs. to Pls.' Third Set of Interrogs. at Resp. No. 10(a) (Jan. 22, 2008) (Greenspan Decl. Exs. 34, 42).

[86] Further underscoring that this allocation has nothing to do with retired players is the undisputed fact that the division of GLR between players, Players Inc, and the NFLPA "was all based on a model that included only active players" and "preceded any involvement [in Defendants' licensing program] by retired players by a great number of years …." Berthelsen Depo. 77:17-78:5 (Greenspan Decl. Ex. 37).

[87] See Carstensen v. Chrisland Corp., 247 Va. 433, 444 (1994); Paul v. Judicial Watch, Inc., 543 F. Supp. 2d 1, 5-6 (D.D.C. 2008) (applying D.C. law).

[88] See Pls.' Opp'n to Defs.' Mot. for J. on the Pleadings at 1, 13 (May 10, 2007) (Rec. Doc. 55).

[89] Although the TAC also avers a fiduciary relationship based upon an "agency by estoppel" theory, TAC ¶46, since the Court determined that California law does not apply, Plaintiffs have conceded that "there is no longer an 'agency by estoppel' claim at issue." Pls.' Opp'n to Defs.' Pet. for Permission to Appeal at 10 (May 21, 2008) (Greenspan Decl., Ex. 47). Even if an agency by estoppel claim were still at issue, it would fail as a matter of law because Virginia and

Dewey & LeBoeuf LLP
One Embarcadero Center, Suite 400
San Francisco, CA 94111

Dewey & LeBoeuf LLP
One Embarcadero Center, Suite 400
San Francisco, CA 94111

As to Plaintiffs' "express agency" theory, the TAC alleges that the GLAs create a fiduciary relationship between the GLA Class and Defendants because the class members "retained control over Players Inc's conduct by having the ability to approve all personal appearance and additional services that might be requested by a licensee" and because they "ha[d] the ability to withdraw their participation in Defendants' Group Licensing Program, and to terminate the relationship." TAC ¶ 45. While these complaint allegations may have arguably stated a basis for a fiduciary duty under California law, they do not support the existence of a fiduciary duty under Virginia or D.C. law, and are, in any event, unsupported by the record evidence.[90]

Unlike the mere power to terminate the alleged agency relationship claimed by Plaintiffs, under Virginia and D.C. law, "the critical test is the nature and extent of the control agreed upon." Murphy v. Holiday Inns, Inc., 216 Va. 490, 493 (1975).[91] "[T]he determinative [factor] is usually whether the [principal] has the right to control and direct the [agent] in the performance of his work and the manner in which the work is to be done." Judah v. Reiner, 744 A.2d 1037, 1040 (D.C. 2000) (internal quotation omitted) (emphasis added). See also Wells v. Whitaker, 207 Va. 616, 624 (1966). Specifically, the level of control necessary to establish an agency relationship under Virginia or D.C. law is "control over the day-to-day operations of the alleged [agent]" and the "right to control the methods or details of doing the work." Ames v. Yellow Cab of D.C., Inc., No. 00-3116 (RWR)(DAR), 2006 WL 2711546, *5 (D.D.C. Sept. 21, 2006) (applying D.C. law); Wells, 207 Va. at 624.

Plaintiffs cannot point to anything in the Adderley GLA or in the record evidence

---

the District of Columbia only recognize agency by estoppel when it is used to estop the principal from denying the existence of an agency relationship to a third party, and not to estop a purported agent from denying the existence of the relationship to the purported principal. Sanchez v. Medicorp Health Sys., 270 Va. 299, 304 (2005); Wilson v. Good Humor Corp., 757 F.2d 1293, 1302 (D.C. Cir. 1985) (applying D.C. law).

[90] Plaintiffs argued the exact opposite of these complaint allegations when they were advancing their now-dismissed theory of fiduciary duty based upon a confidential relationship: "when they go to sell these rights to licensees, player video games being the single biggest money, biggest deal, it's all controlled by Players, Inc." May 31, 2007 Hearing Tr. 42:16-24 (emphasis added) (Greenspan Decl. Ex. 14).

[91] See also Jackson v. Loews Wash. Cinemas, Inc., 944 A.2d 1088, 1097 (D.C. 2008).

that would establish their control over the "day-to-day operations" or "the methods or details" of Defendants' licensing business. Indeed, the TAC does not even allege such control. Moreover, Adderley testified that the only "control" he had over Players Inc was the ability "to ask" Players Inc to keep him out of a promotion:

> A: If there was some type of conflict … or if they use me in some type of promotion that I didn't agree to, that I would have the authority to ask them not to use it….
> Q: So, apart from that, did you have any ability to control Players, Inc['s] use of your GLA rights?
> A. No.

Adderley Depo. 97:18-99:2 (Greenspan Decl. Ex. 4).

The record evidence thus falls far short of raising a genuine issue that any class member had the ability to control the "day-to-day operations" of Players Inc. Further, the record is devoid of any evidence with respect to the purported ability of Plaintiffs to control, at any level of activity, the NFLPA. See Murphy, 216 Va. at 495 (hotel franchise agreement providing purported principal with control over use of its intellectual property insufficient to create agency relationship as it still had "no power to control daily maintenance of the premises ….[,] [purported agent's] current business expenditures, fix customer rates, […] demand a share of the profits ….[, and] was given no power to hire or fire [purported agent's] employees, determine employee wages or working conditions, set standards for employee skills or productivity, supervise employee work routine, or discipline employees"); Ames, 2006 U.S. WL 2711546, *5-7 (no agency relationship created by agreement licensing purported principal's "name, logo and optional services," even though the agreement stated it could be terminated by either party at any time, and purported principal retained the right to ban purported agent from using its dispatch system).[92] Because there is no evidence to raise a genuine issue of material fact in support of the

---

[92] See also DNM, Inc. v. S.H. Clark & Sons Roofing, Inc., No. 911233, 1992 Va. LEXIS 102, *5-6 (Va. April 17, 1992) (memorandum opinion) (holding that even a contract that "establishes an on-site representative of the owner who retains authority to approve the construction budget, and . . . reject trade contracts" does not provide enough control to establish agency); Bangkok Crafts Corp. v. Capitolo di San Pietro in Vaticano, No. 03 Civ. 0015 (RWS), 2004 U.S. Dist. LEXIS 25235, *19-20 (S.D.N.Y. Sept. 13, 2004) (License provisions allowing licensor "to protect the goodwill associated with its name and marks . . . are clearly insufficient to create an agency relationship") (citing Murphy, 216 Va. at 495).

Dewey & LeBoeuf LLP
One Embarcadero Center, Suite 400
San Francisco, CA 94111

existence of a fiduciary duty, any claim of a breach of that purported duty cannot survive summary judgment.

**B. There Is No Evidence to Raise a Genuine Issue That Defendants Breached Any Alleged Fiduciary Duty**

Even if Defendants had any fiduciary obligations arising out of the GLA, the undisputed evidence establishes that there has been no breach of any such duty. The alleged breaches of Defendants' purported fiduciary duty are identical to Defendants' purported contractual breaches (e.g., failing to "distribute[] revenues to the members of the GLA Class that should have been distributed and were owed to them;" "arbitrarily, capriciously and wrongfully exclud[ing] retired players from the 'equal share' royalty;" and "misappropriat[ing] funds totaling eight million dollars … or more"). TAC ¶ 54. But, as discussed above (pp. 9-16, supra), the undisputed evidence establishes that all of these monies were active player licensing revenues to which the GLA Class members have no legal entitlement.

There was thus no breach of any fiduciary duty, nor anything arbitrary or capricious, in not distributing to retired players revenues generated by active players.[93] Indeed, Adderley himself has admitted that retired players are not entitled to active player licensing money, and that he only expected to be paid when Players Inc utilized his rights. See Adderley Depo. 89:13-90:1, 96:13-18 (testifying that he believes that "as a retired player, [he is not] entitled to any money that's generated by the licensing of active players" and that he "never thought that [he] should get something if nobody used [his] image"). The purported premise of Plaintiffs' breach of fiduciary duty claim is that "Players Inc licensed the rights of retired players to licensees such as EA" without compensation. TAC ¶¶ 51-54 (emphasis added). Since the undisputed evidence establishes that retired players rights were not included in such licenses (pp. 9-16, supra), it follows that the breach of fiduciary duty claim must fail.

---

[93] As the NFLPA's General Counsel explained: "[Y]ou want the people who generate the money to benefit from it…. It would be unfair to the retired players to give active players a share of [retired player money]. And that's true on the flip side." Berthelsen Depo. 75:19-76:4, 76:5-17 (further testifying that the active player group licensing program "is a viable ongoing program and has been for decades," whereas the retired player program "was a try and see which did not succeed. It wouldn't make any sense to combine the two.") (Greenspan Decl. Ex. 37).

Dewey & LeBoeuf LLP
One Embarcadero Center, Suite 400
San Francisco, CA 94111

Plaintiffs alternatively allege that Defendants breached their fiduciary duty by failing to represent the GLA Class members' best interests in pursuing licensing opportunities. See generally TAC ¶¶ 40-55. The undisputed evidence, however, shows that Defendants did attempt to promote the GLA Class members, including the lower profile retired players, but that there was simply no market for the group rights of most of these individuals.[94] Even so, the undisputed facts show that Defendants still managed to generate over $30 million for retired players by licensing designated groups of retired player rights, while retaining less than two percent of that money in administrative fees.[95] This is not a record upon which to base a breach of fiduciary duty claim.

The final variation of Defendants' breach of fiduciary duty claim is an alleged failure to "accurately report … revenues to members of the GLA Class." TAC ¶ 54. The fundamental problem with this claim is that the "pertinent and critical information" about revenues that Defendants allegedly "kept secret from" Adderley and the GLA Class is information about active player licensing revenues to which GLA Class members have no legal entitlement. Id. ¶ 53. Nevertheless, the undisputed evidence shows that Defendants have not "kept secret" from retired players any of the information at issue. For example, a 2004 issue of the Touchback retired player newsletter explained:

> Players Inc also receives a royalty for the inclusion of active players based on the wholesale price of games. This royalty is split: 40% goes to the NFLPA to offset its operating expenses, 23% goes to Players Inc to offset its operating expenses and 37% is divided equally among more than 2000 eligible active players each year.

"Group Licensing Essential," Touchback (June 2004) (Greenspan Decl. Ex. 25) (emphasis added) (also explaining why video game companies are mostly interested in active – not retired – players, stating that the "select" retired players whose rights were licensed were "mostly Hall of

---

[94] See generally pp. 5-7, supra; Nahra 30(b)(6) Depo. 67:19-68:15 ("[T]here was a hope that licensees would be willing to pay money to get retired player rights in general without regard to who those particular players were but that never happened. Despite our efforts that never happened."); D. Allen Depo. 181:16-183:22 ("[O]ne of the most important things I did was emphasize to the Players Inc staff how important it was to promote retired players as an integral part of our approach to the marketplace.") (Greenspan Decl. Ex. 8).

[95] See Feffer Decl. ¶ 2 (Greenspan Decl. Ex. 15).

Dewey & LeBoeuf LLP
One Embarcadero Center, Suite 400
San Francisco, CA 94111

Fame members or members of Super Bowl teams").[96]

**C. There Is No Evidence to Raise Any Genuine Issue of Fact of Injury in Support of a Breach of Fiduciary Duty Claim**

Even if Plaintiffs could demonstrate a genuine issue of material fact in support of Defendants' alleged breach of fiduciary duty (they cannot), the claim would still fail because Plaintiffs have not come forward with any evidence to raise a genuine issue of material fact to show individual injury or damages for each of the GLA Class members.[97] The undisputed evidence and admissions by Adderley and class counsel demonstrate that the licensing rights of most GLA Class members had no economic value because they are virtually unknown to the public.[98] Injury and damages could not result from licensing economically worthless rights and, in any event, Plaintiffs simply have no evidence to raise a genuine issue on the element of injury as to individual class members. See Noll Decl. ¶¶ 4-12 (Greenspan Decl. Ex. 12).

Nor can Plaintiffs' "equal shares" formula provide a legally valid substitute for the requirement to establish individualized injury and damages as a result of a purported contractual breach.[99] As a threshold matter, the Adderley GLA says nothing about "equal shares," and as the Court correctly noted at the class certification hearing, "for retired players there is no such [equal share] regime." Class Hearing Tr. 8:22-23 (Greenspan Decl. Ex. 13). Moreover, given the undisputed evidence and concessions of class counsel that the economic value of the GLA Class members' rights are widely disparate, with most GLA Class members'

---

[96] Adderley's allegations about a lack of information are especially disingenuous because he attached to his complaint a letter that he received in Fall 2003 which stated that "40% of Players Inc's operating revenues is paid to the NFLPA as a royalty for the active player name and image rights secured by the NFLPA and licensed to Players Inc." TAC ¶ 57, Ex. L (emphasis added).

[97] See, e.g., Hager v. Gibson, 109 F.3d 201, 212 (4th Cir. 1997) (affirming summary judgment because where supposed fiduciary "caused no injury to the corporate debtor nor personal gain to himself, [his actions] could not give rise to liability for breach of any fiduciary duty") (applying Virginia law); Day v. Avery, 548 F.2d 1018, 1029 n.56 (D.C. Cir. 1976) (affirming summary judgment because "the breach of fiduciary relationship is not actionable unless injury accrues to the beneficiary or the fiduciary profits thereby") (applying D.C. law).

[98] See pp. 5-7, supra.

[99] See, e.g., Bell Atl. Corp. v. AT&T Corp., 339 F.3d 294, 306 (5th Cir. 2003) ("[P]laintiffs' proposed damages formula . . . attempts to project a measure of damages, for all the class members, that in no way accounts for the vast differences among those class members."); Corley v. Entergy Corp., 220 F.R.D 478, 485 (E.D. Tex. 2004) (rejecting average dollar-per-foot measure of trespass damages because "some parcels of land are more valuable than others").

Dewey & LeBoeuf LLP
One Embarcadero Center, Suite 400
San Francisco, CA 94111

rights having <u>no</u> economic value, injury may not be economically presumed. <u>See</u> Noll Decl. ¶¶ 4-12. As this Court has previously noted, why should an unknown retired player whose licensing rights have no value have a claim to any payment at all?[100]

Further, there is no evidence to establish that even one penny of the $25 million in minimum guarantees paid by EA or, for that matter, any other licensee was attributable to the retired player rights of any GLA Class member. <u>See</u> pp. 9-16, <u>supra</u>. The total absence of evidence as to fact of injury for individual GLA Class members by itself requires summary judgment against the breach of fiduciary duty claim.[101]

## CONCLUSION

For all of the foregoing reasons, summary judgment should be granted against all of the claims of the GLA Class.[102] For too long, class counsel has been misleading the Court with misrepresentations about the evidence. Now, however, fact discovery is closed, and actual evidence – not just class counsel's argument – is before the Court. That evidence leaves no doubt that the GLA Class cannot prevail as a matter of law, and thus summary judgment should be granted.

Date: June 13, 2008

DEWEY & LEBOEUF LLP

BY: __/s/ Jeffrey Kessler_____
Jeffrey L. Kessler
*Attorneys for Defendants*

---

[100] May 31, 2007 Hearing Tr. 43:25-45:13 ("COURT: People decide that in the marketplace. If they are famous, they get more money. If they are not famous, they don't get much. They get nothing."); Class Hearing Tr. 8:6-9, 9:7-13, 11:20-22 (Class Counsel: "A lesser player would get another thing. He probably wouldn't be used."); Adderley Depo. 83:3-84:1 (Greenspan Decl. Exs. 14, 13, 4).

[101] This evidentiary failure also means that Plaintiffs cannot recover anything more than "nominal damages" on their breach of contract claim. <u>See, e.g.</u>, <u>Garcia v. Llerena</u>, 599 A.2d 1138, 1142 (D.C. 1991); <u>Orebaugh v. Antonious</u>, 190 Va. 829, 834 (1950).

[102] Because the Court should grant summary judgment against the GLA Class's breach of contract and breach of fiduciary duty claims, Plaintiffs' derivative relief claim for an accounting must also be dismissed. <u>See, e.g.</u>, May 31, 2007 Hearing Tr. 30:9-11 ("[T]here's no primary cause of action, there's no claim for an accounting.") (Greenspan Decl. Ex. 14).

Dewey & LeBoeuf LLP
One Embarcadero Center, Suite 400
San Francisco, CA 94111