MANATT, PHELPS & PHILLIPS, LLP
RONALD S. KATZ (Bar No. CA 085713)
E-mail: rkatz@manatt.com
RYAN S. HILBERT (California Bar No. 210549)
E-mail: rhilbert@manatt.com
NOEL S. COHEN (California Bar No. 219645)
E-mail: ncohen@manatt.com
1001 Page Mill Road, Building 2
Palo Alto, CA 94304-1006
Telephone: (650) 812-1300
Facsimile: (650) 213-0260

McKOOL SMITH, P.C.
LEWIS T. LECLAIR (Bar No. CA 077136)
E-mail: lleclair@mckoolsmith
300 Crescent Court, Suite 1500
Dallas, TX 75201
Telephone: (214) 978-4000
Facsimile: (214) 978-4044

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

| | |
|---|---|
| BERNARD PAUL PARRISH, HERBERT ANTHONY ADDERLEY, and WALTER ROBERTS, III on behalf of themselves and all others similarly situated,<br><br>Plaintiffs<br><br>vs.<br><br>NATIONAL FOOTBALL LEAGUE PLAYERS ASSOCIATION, a Virginia corporation, and NATIONAL FOOTBALL LEAGUE PLAYERS INCORPORATED d/b/a PLAYERS INC, a Virginia corporation,<br><br>Defendants. | CIVIL ACTION NO. C07 0943 WHA<br><br>DECLARATION OF ANTHONY M. GARZA IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION IN LIMINE NO. 2 TO EXCLUDE EVIDENCE ABOUT PLAINTIFFS' COMPLAINTS RELATING TO RETIRED PLAYER PENSION AND DISABILITY BENEFITS, COLLECTIVE BARGAINING, AND OTHER ISSUES. |

DECLARATION OF ANTHONY M. GARZA IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION IN LIMINE NO. 2 TO EXCLUDE EVIDENCE ABOUT PLAINTIFFS' COMPLAINTS RELATING TO RETIRED PLAYER PENSION AND DISABILITY BENEFITS, COLLECTIVE BARGAINING, AND OTHER ISSUES. – Page 1
Civil Action No. C07 0943 WHA

Dallas 266895v1

I, Anthony M. Garza, declare as follows:

1. I am an attorney with McKool Smith, P.C., counsel for Plaintiff Herbert Anthony Adderley and the GLA Class in this matter. I have personal knowledge of the matters stated herein.

2. Attached hereto as Exhibit A is a true and correct copy of an article entitled "Ex-Players Say NFL Neglects Retirees; Hall of Famers, League, Union Leader Fall Short in Providing Benefits," from the Charlotte Observer, dated January 15, 2006, and marked as Exhibit 117.

3. Attached hereto as Exhibit B is a true and correct copy of an excerpt from the transcript of Mr. Joseph H. Nahra's deposition, taken pursuant to Rule 30(b)(6), dated April 16, 2008.

4. Attached hereto as Exhibit C is a true and correct copy of an excerpt from the transcript of Mr. Gene Upshaw's deposition, dated February 13, 2008.

5. Attached hereto as Exhibit D is a true and correct copy of an excerpt from Dr. Roger G. Noll's expert report, dated June 12, 2008.

I declare under penalty of perjury and the laws of the United States that the foregoing is true and correct and that this declaration was executed on October 6, 2008, in Dallas, Texas.



Anthony M. Garza

DECLARATION OF ANTHONY M. GARZA IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION IN LIMINE NO. 2 TO EXCLUDE EVIDENCE ABOUT PLAINTIFFS' COMPLAINTS RELATING TO RETIRED PLAYER PENSION AND DISABILITY BENEFITS, COLLECTIVE BARGAINING, AND OTHER ISSUES. – Page 2
Civil Action No. C07 0943 WHA

Dallas 266895v1

McKool Smith
A Professional Corporation • Attorneys
Dallas, Texas



Copyright 2006 The Charlotte Observer
All Rights Reserved
Charlotte Observer (North Carolina)

January 15, 2006 Sunday ONE-THREE EDITION

SECTION: SPORTS: Pg. 1C

LENGTH: 2433 words

HEADLINE: EX-PLAYERS SAY NFL NEGLECTS RETIREES;
HALL OF FAMERS: LEAGUE, UNION LEADER FALL SHORT IN PROVIDING BENEFITS

BYLINE: CHARLES CHANDLER, CCHANDLER@CHARLOTTEOBSERVER.COM

BODY:

Gene Upshaw earned induction into the Pro Football Hall of Fame by playing guard for the Oakland Raiders. Now he's at the center position of a rift in the sport's most prestigious fraternity.

Thirteen Hall of Famers interviewed by The Observer expressed concern that the NFL and the league players association, headed by Upshaw, don't do enough to help former players, especially pioneers of the game suffering crippling health and financial difficulties.

"It's the deep, dark secret nobody wants to talk about," said Howie Long, a former Raiders defensive lineman who's now a studio analyst for Fox Sports.

Long, Joe Montana, John Elway, Ronnie Lott, Marcus Allen, Joe DeLamielleure, Randy White and Deacon Jones were among the Hall of Famers who expressed varying degrees of dissatisfaction with the NFL's pension and healthcare benefits. They said they were speaking on behalf of all retirees, not just themselves.

"When I went to the Hall of Fame in 2000 and was inducted, it was a travesty the kind of carnage I saw out of these guys who were in their 50s and 60s, who had defined and in many ways laid the foundation for the NFL being what it is today," Long said.

"Many of them could barely rub two nickels together to get to Canton. Many of them couldn't afford to have their knee replaced or had fallen through whatever imaginary net there is from an economic standpoint. Not enough is being done."

Long said it's the dual responsibility of the league and the players association to fix the problem.

Other Hall of Famers say they feel neglected and abandoned by Upshaw.

"We figure all we have to do is go to my man," said former Baltimore Colts running back Lenny Moore. "He's the head of the NFL Players Association. He's the guy who ought to pry the door open for us."

Said ex-Houston Oilers defensive end Elvin Bethea: "The union doesn't care about us. You're a forgotten child."

Upshaw said he does care and is proud of pension improvements made under his leadership, such as more than tripling monthly pension payments to retirees who played before 1959. He also said those benefits are now protected by law, but previously were not.

"For these guys to say what they get is peanuts, they're being ungrateful," said Upshaw, noting that current players agreed to fund higher payments to their predecessors.

Upshaw and NFL spokesman Greg Aiello said the league pays out nearly $5 million per month in retirement benefits, including $1 million in disability.



EXHIBIT
Upshaw
117
2-13-08
PENGAD 800-631-6989

CLASS 003000

EX-PLAYERS SAY NFL NEGLECTS RETIREES;HALL OF FAMERS: LEAGUE, UNION LEADER FALL SHORT IN PROVIDING BENEFITS Charlotte Observer (North Carolina) January 15, 2006 Sunday ONE-THREE EDITION

Upshaw, 60, who has been executive director of the NFLPA since 1987, said he stands by his record and rejects the suggestion he's supposed to be the retirees' representative.

"The bottom line is I don't work for them," he said. "They don't hire me and they can't fire me. They can complain about me all day long. They can have their opinion. But the active players have the vote. That's who pays my salary.

"They (retirees) say they don't have anybody in the (bargaining) room. Well, they don't and they never will. I'm the only one in that room. They're not in the bargaining unit. They don't even have a vote."

Montana, who quarterbacked the 49ers to four Super Bowl titles, said he has nothing against Upshaw personally, but believes the NFLPA needs new leadership.

"The NFL is the worst represented league, on the players' side, in pro sports," Montana said.

*

Regret of taking early pension

The NFL is a gargantuan business and marketing success. It is estimated to make more than $24 billion over the next eight years from its network, cable and satellite TV contracts.

The average NFL franchise is worth nearly $819 million, according to a September report in Forbes magazine.

Team values are skyrocketing. The Carolina Panthers cost owner Jerry Richardson $209 million when he was awarded an expansion franchise in 1993. Forbes estimated the team's current worth at $878 million.

Long said it wouldn't take much out of the "big pie" to address retirees' financial needs, but he acknowledged getting the coffers open wouldn't be easy.

Said Elway, who led the Denver Broncos to two Super Bowl titles: "There is plenty of money. All of it should not go to the players of today. We need to take care of the pioneers who came before us and made it possible for us to make all the money we do today."

For former players like Joe Perry, 78, even a few extra dollars would help. Perry, who was the first running back in NFL history to rush for 1,000 yards in consecutive seasons, said his monthly pension payment is $1,640 and that he and wife Donna need much of it to pay for health insurance.

"We pay something like $300 to $350 a month just for pills," Donna Perry said.

Perry was one of the pre-1959 players whose pension benefits increased dramatically over the past 13 years. However, he's not impressed.

"They do absolutely zero as far as I'm concerned," he said.

Former Cleveland Browns running back Leroy Kelly said he is suffering the consequences of taking his pension early at age 45 instead of waiting until 55.

Kelly, now 63, said he was receiving about $800 a month for his 10 seasons in the league, but that his benefit fell to $112 when he started drawing Social Security payments.

"There are about 40 of the (Hall of Fame) guys, maybe more, who signed up for the early pension," Kelly said. "It's really terrible."

Upshaw said former players used to have an option to get a higher initial sum in exchange for the Social Security offset, but that it has been closed for their protection.

Ex-Bills and Browns guard Joe DeLamielleure, 54, took his pension early because of a family financial crisis. He said he receives $992 per month as a 13-year veteran, but would have gotten $2,200 monthly if he had waited until next year.

"Some guys can't afford to wait until they're 55," said DeLamielleure, who lives in Charlotte. "I really want this point to be made: If this were a struggling league, we shouldn't be compensated, but it's not a struggling league.

"Football is a great game, but it's a bad business for former players."

CLASS 003001



Exhibit B

1          UNITED STATES DISTRICT COURT
          NORTHERN DISTRICT OF CALIFORNIA
2               SAN FRANCISCO
3   PAUL PARRISH and
    HERBERT ANTHONY ADDERLEY,
4   on behalf of themselves
    and all others similarly
5   situated,
6         Plaintiffs
7    vs.
8   NATIONAL FOOTBALL LEAGUE,      CASE NO. 07-0943
    PLAYERS INCORPORATED, d/b/a
9   PLAYERS, INC., a Virginia
    Corporation,
10
          Defendant
11  ~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~
12
13  .          VIDEOTAPED DEPOSITION OF
14
15               JOSEPH H. NAHRA
16
17               April 16, 2008
18                 9:00 a.m.
19
20          Manatt, Phelps & Phillips
21             One Metro Center
22      Suite 1100, 700 12th Street, NW
23             Washington, D.C.
24
25       Reported By: T. S. Hubbard, Jr.

Page 66

1   talking to Doug Allen, and from talking to Gene
2   Upshaw, and from talking to Clay Walker that
3   there was a hope to be able to generate, through
4   retired player group licensing, revenue, and
5   obviously this language is intended to address
6   that revenue.  So that's all I can say.
7   BY MR. LeCLAIR:
8       Q.  Well, in fact the retired player group
9   licensing program did generate revenue, didn't
10  it?
11      A.  It generated revenue for these specific
12  retired players that were used whose images were
13  used on an individual -- Well, it generated
14  revenue for the specific individual retired
15  players whose images were used.
16      Q.  Well, is that revenue not covered by
17  this first sentence of paragraph 5 to your
18  understanding?
19          MR. FEHER:  Objection to form.
20          THE WITNESS:  Revenue generated for
21  specific use of specific retired players was
22  revenue generated through our group licensing
23  program.
24  BY MR. LeCLAIR:
25      Q.  But it is your understanding that that

Page 67

1   specific revenue was not intended to be covered
2   by this language, the first sentence of
3   paragraph 5?
4           MR. FEHER:  Objection to form.
5           THE WITNESS:  My understanding is that
6   money generated from specific individual retired
7   players was intended to be covered by this form.
8   BY MR. LeCLAIR:
9       Q.  But the NFLPA didn't do that, right?
10      A.  It didn't do what?
11      Q.  It didn't divide the money or create an
12  escrow account.
13          MR. FEHER:  Objection to form.
14          THE WITNESS:  An escrow account was not
15  created.  The money from specific individual
16  retired players was paid to those specific
17  individual retired players.
18  BY MR. LeCLAIR:
19      Q.  Is it your understanding, Mr. Nahra,
20  that there was some different kind of revenue
21  that was expected to be obtained that would have
22  been treated in the manner set forth in the
23  first sentence of paragraph 5?
24          MR. FEHER:  Objection.  You can answer.
25          THE WITNESS:  You mean different than

Page 68

1   specific money for specific retired players?
2   BY MR. LeCLAIR:
3       Q.  Correct.
4       A.  Well, I think there was -- I know there
5   was a hope that licensees would be willing to
6   pay money to get retired player rights in
7   general without regard to who those particular
8   players were but that never happened.
9           Despite our efforts that never
10  happened.  There were no licensees that were
11  willing to pay either a guarantee or some sort
12  of flat fee for just getting whatever retired
13  players they got.  It was always where the
14  licensees were only interested in obtaining
15  rights to particular retired players.
16      Q.  Did the NFLPA ever seek to grant rights
17  to retired players who had in fact signed GLAs?
18  All such players?
19      A.  I'm not sure.
20      Q.  Did the NFLPA or Players, Inc. to your
21  knowledge ever even tell people who they even
22  had GLAs from?
23          MR. FEHER:  Objection to the form.
24  This is starting to go pretty far beyond the
25  drafting process, Lew.

Page 69

1           MR. LeCLAIR:  Are you instructing him
2   not to answer?
3           MR. FEHER:  I think for this portion of
4   the deposition since it is 30(b)(6), yes, for
5   that purpose.
6   BY MR. LeCLAIR:
7       Q.  Was it your understanding, Mr. Nahra,
8   that if license rights were granted to retired
9   players who signed GLAs, that that money would be
10  divided between the player and an escrow account
11  for eligible NFLPA members?
12      A.  I don't understand the question.  It
13  doesn't make sense.  But --
14          MR. FEHER:  Objection.
15          THE WITNESS:  We don't grant license
16  rights to retired players.  We grant rights to
17  companies.
18  BY MR. LeCLAIR:
19      Q.  Fair enough.  My question is:  If
20  rights were granted a licensee for all retired
21  players who had signed a GLA without regard to
22  specific use, was that money to be put into an
23  escrow account and divided among all eligible
24  NFLPA members?
25          MR. FEHER:  Objection to form.

Page 294
1           CERTIFICATE
2    STATE OF                    :
3    COUNTY/CITY OF              :
4    ☐☐Before me, this day, personally appeared,
5    JOSEPH H. NAHRA, who, being duly sworn,
6    states that the foregoing transcript of his/her Deposition,
7    taken in the matter, on the date, and at the time and
8    place set out on the title page hereof, constitutes a true
9    and accurate transcript of said deposition.
10   _____
11          JOSEPH H. NAHRA
12
13   ☐SUBSCRIBED and SWORN to before me this
14   _____day of_____, 20___ in the
15   jurisdiction aforesaid.
16
17   _____   _____
18   My Commission Expires   Notary Public
19
20   *If no changes need to be made on the following two pages,
21   place a check here _____, and return only this signed page.*
22
23
24
25

Page 296
1    Deposition of JOSEPH H. NAHRA
2    Page No._____Line No._____Change to:_____
3    _____
4    Reason for change:_____
5    Page No._____Line No._____Change to:_____
6    _____
7    Reason for change:_____
8    Page No._____Line No._____Change to:_____
9    _____
10   Reason for change:_____
11   Page No._____Line No._____Change to:_____
12   _____
13   Reason for change:_____
14   Page No._____Line No._____Change to:_____
15   _____
16   Reason for change:_____
17   Page No._____Line No._____Change to:_____
18   _____
19   Reason for change:_____
20
21   SIGNATURE:_____DATE:_____
22        JOSEPH H. NAHRA
23
24
25

Page 295
1         DEPOSITION ERRATA SHEET
2    RE:      Paulson Reporting & Litigation Services.
3    File No.   7532
4    Case Caption:  PAUL PARRISH, et al.
5    vs.  NATIONAL FOOTBALL LEAGUE, et al.
6    Deponent:  JOSEPH H. NAHRA
7    Deposition Date: April 16, 2008
8    To the Reporter:
9    I have read the entire transcript of my Deposition taken
10   in the captioned matter or the same has been read to me.
11   I request that the following changes be entered upon the
12   record for the reasons indicated.  I have signed my name to
13   the Errata Sheet and the appropriate Certificate and
14   authorize you to attach both to the original transcript.
15
16   Page No._____Line No._____Change to:_____
17   _____
18   Reason for change:_____
19   Page No._____Line No._____Change to:_____
20   _____
21   Reason for change:_____
22   Page No._____Line No._____Change to:_____
23   _____
24   Reason for change:_____
25

# Exhibit C

1     IN THE DISTRICT COURT OF THE UNITED STATES
               NORTHERN DISTRICT

2          (SAN FRANCISCO DIVISION)

3   BERNARD PAUL PARRISH, HERBERT
    ANTHONY ADDERLEY, and WALTER

4   ROBERTS, III, on behalf of
    themselves and all others

5   similarly situated,

6        Plaintiffs,       Civil Action

7   v.                      C07 0943 WHA

8   NATIONAL FOOTBALL LEAGUE
    PLAYERS ASSOCIATION, a

9   Virginia Corporation, and
    NATIONAL FOOTBALL LEAGUE

10  PLAYERS INCORPORATED, d/b/a
    PLAYERS, INC., a Virginia

11  Corporation,

12       Defendants

13  ~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

14      CONFIDENTIAL VIDEOTAPED DEPOSITION OF

15             GENE UPSHAW

16        Wednesday, February 13, 2008,

17             9:05 a.m.

18        Manatt,Phelps & Phillips, LLP,

19       One Metro Center,Suite 1100

20     700 12th Street, N.W., Washington,D.C.

21

22

23

24  Reported By:

25  Susan E. Smith, RPR, Notary Public

Page 58

1    Q. Okay, fine. So directing your
2  attention to the second page of Exhibit 117,
3  it quotes you as follows. Well, in the first
4  paragraph it says: Upshaw, sixty, who has
5  been executive director of the NFLPA since
6  1987, says he stands by his record and rejects
7  a suggestion he's supposed to be the retirees'
8  representative. "The bottom line is I don't
9  work for them," he said. "They don't hire me
10  and they can't fire me. They can complain
11  about me all day long. They can have their
12  opinion, but the active players have the vote.
13  That's who pays my salary."
14    Did you say those words?
15    A. I said those words directed at one
16  individual, Joe DeLamielleure.
17    Q. Then it continues quoting you in
18  the next paragraph, it says: "They (retirees)
19  say they don't have anybody in the
20  (bargaining) room. Well, they don't and they
21  never will. I'm the only one in that room.
22  They're not in the bargaining unit. They
23  don't even have a vote."
24    Did you say those words, sir?
25    A. Once again, those words are

Page 59

1  directed to one individual, Joe DeLamielleure.
2    Q. Did you say those words?
3    A. Yes.
4    Q. Okay.
5    MR. KATZ: Have the reporter mark as
6  the next exhibit.
7    (Whereupon, Upshaw Deposition Exhibit
8  No. 119, marked.)
9    Q. Is this a memorandum, sir, that
10  you sent out in the regular course of your
11  business on or around January 20, 2006?
12    A. Yes.
13    Q. And is it referring to the
14  Charlotte Observer article which is Exhibit
15  117?
16    A. Yes.
17    MR. KESSLER: Are you representing
18  this as the complete document?
19    MR. KATZ: I'm not representing
20  anything. I'm just asking questions.
21    Q. Is this the complete document,
22  sir?
23    A. I'm not sure. I can't tell by
24  this.
25    Q. Directing your attention to the

Page 60

1  first paragraph, it says: Much has been made
2  -- well, the re line is: The Truth about
3  Retiree Benefits. What were you referring to
4  there, sir, when you say retiree benefits? To
5  what benefits were you referring?
6    A. I was referring to the benefits
7  that are in reference to the ones that are
8  listed here on this page, and several others,
9  but that was what I put here.
10    Q. The six bullet points?
11    A. Yes.
12    Q. These comments were made in
13  response to several retired players' criticism
14  of me and the NFLPA.
15    To which retired players are you
16  referring there, sir?
17    A. The retired players that were
18  mentioned in the Charlotte Observer article.
19    Q. So Joe Montana is one of them; is
20  that right?
21    A. I received calls, I received
22  e-mails at one point, I can't remember, from
23  several players that were mentioned in the
24  article who felt the same way as I did, Howie
25  Long in particular, who pointed out, and so

Page 61

1  did Marcus Allen, that he knew that his quotes
2  and comments were taken out of context, the
3  same way as mine were taken out of context in
4  this article. That was later. So when you
5  say those players and you mentioned Joe
6  Montana, they were quoted in the article.
7    Q. Right. So you're referring to the
8  people who were mentioned in the article, the
9  retired players who were mentioned in the
10  article?
11    A. Yes.
12    Q. And that includes Howie Long,
13  right?
14    A. Yes.
15    Q. And Joe Montana, right?
16    A. The people that are included in
17  the article.
18    Q. Which includes Joe Montana; isn't
19  that right?
20    A. Yes.
21    Q. And John Elway, isn't that right?
22  You have to answer audibly.
23    A. Yes, they're in the article, all
24  of the names that are there.
25    Q. All right. And in fact, you've

**Page 166**

```
1        CERTIFICATE OF DEPONENT
2
3         I, GENE UPSHAW, deponent herein, do
4    hereby certify and declare the within and foregoing
5    transcription to be my deposition in said action; that
6    I have read, corrected, and do hereby affix my
7    signature to said deposition.
8
9
10        _____
11            GENE UPSHAW
12
13
14        Subscribed and sworn to before me this
15    day of _____, 20__.
16
17
18        _____
19            Notary Public
20
21
22
23
24
25
```

**Page 167**

```
1    STATE OF MARYLAND  ) ss
2    COUNTY OF BALTIMORE)
3
4         I, Susan Smith, RPR, a Notary Public
5    of the State of Maryland, do hereby certify
6    that the within named, GENE UPSHAW personally
7    appeared before me at the time and place
8    herein set out, and after having been duly
9    sworn by me, was interrogated by counsel.
10        I further certify that the
11   examination was recorded stenographically by
12   me, and this transcript is a true record of
13   the proceedings.
14        I further certify that the
     stipulations contained herein were entered
15   into by counsel in my presence.
16        I further certify that I am not of
     counsel to any of the parties, nor an employee
17   of counsel, nor related to any of the parties,
     nor in anyway interested in the outcome of
18   this action.
19        As witness my hand and notarial seal
     this 14th day of February, 2008.
20
21   My commission expires
22   November 1, 2010    _____
23                        Susan E. Smith
24                        Notary Public
25
```

**Page 168**

```
1        DEPOSITION ERRATA SHEET
2    RE:      Paulson Reporting & Litigation Services
3    File No.   7532
4    Case Caption: BERNARD PAUL PARRISH, et al.
5    Vs:  NATIONAL FOOTBALL LEAGUE PLAYERS ASSOCIATION
6    Deponent: GENE UPSHAW
7    Deposition Date: February 13, 2008
8    To the Reporter:
9    I have read the entire transcript of my Deposition taken
10   in the captioned matter or the same has been read to me.
11   I request that the following changes be entered upon the
12   record for the reasons indicated.  I have signed my name to
13   the Errata Sheet and the appropriate Certificate and
14   authorize you to attach both to the original transcript.
15
16   Page No._____Line No._____Change to:_____
17   _____
18   Reason for change:_____
19   Page No._____Line No._____Change to:_____
20   _____
21   Reason for change:_____
22   Page No._____Line No._____Change to:_____
23   _____
24   Reason for change:_____
25
```

**Page 169**

```
1    Deposition of GENE UPSHAW
2    Page No._____Line No._____Change to:_____
3    _____
4    Reason for change:_____
5    Page No._____Line No._____Change to:_____
6    _____
7    Reason for change:_____
8    Page No._____Line No._____Change to:_____
9    _____
10   Reason for change:_____
11   Page No._____Line No._____Change to:_____
12   _____
13   Reason for change:_____
14   Page No._____Line No._____Change to:_____
15   _____
16   Reason for change:_____
17   Page No._____Line No._____Change to:_____
18   _____
19   Reason for change:_____
20
21   SIGNATURE:_____DATE:_____
22        GENE UPSHAW
23
24
25
```

# Exhibit D

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| BERNARD PAUL PARRISH, *et al.*, | |
| Plaintiffs, | |
| v. | Civil Action No. C07 0943 WHA |
| NATIONAL FOOTBALL LEAGUE PLAYERS ASSOCIATION, *et al.*, | |
| Defendants | |

### *Expert Report of Roger G. Noll*

My name is Roger G. Noll, and I reside in Palo Alto, California. My education includes a B. S. with honors in mathematics from the California Institute of Technology and a Ph. D. in economics from Harvard University. I am Professor *Emeritus* of Economics at Stanford University, a Senior Fellow in the Stanford Institute for Economic Policy Research (SIEPR), and Co-Director of the SIEPR Program in Regulatory Policy.

My primary area of scholarship is the field of industrial organization, which includes the economics of antitrust, regulation, and specific industries. I have taught these subjects at both the undergraduate and graduate level. I am the author, co-author or editor of thirteen books, and the author or co-author of over 300 articles. Much of my research for the past forty years has focused on the economics of sports. My *curriculum*

licensing monies kept by the NFLPA/NFLPI? How does it compare with other professional sports unions or third-party licensing entities? How does the percentage kept by the NFLPA/NFLPI compare to what is customary in sports licensing?"

Dr. Rascher's answer begins by referencing his estimate in response to Question #2 that the players receive only between 31 and 36 percent of revenues. As shown above, this estimate is incorrect, under-estimating the fraction of licensing revenues that are disbursed to players by roughly half.

Dr. Rascher then presents several examples of licensing activities by organizations that use outside licensing agencies. According to Dr. Rascher, outside entities receive between 10 to 40 percent of gross licensing revenues. If this were a relevant measure, then the NFLPA/NFLPI would fall within the normal range as cited by Dr. Rascher. The answer then cites examples of organizations that use outside licensing: colleges and smaller leagues. Of course, these entities do not share revenues with players, and they are not unions. Dr. Rascher also reports that the U. S. Olympic Committee puts back 82.7 percent of its licensing income into training programs, grants, and other services. Again, this comparison attributes expenditures on behalf of athletes (training and services) as equivalent to direct payments (in the case of the USOC, grants); however, Dr. Rascher makes no similar provision for the NFLPA/NFLPI, which uses part of its share of the licensing revenues to deliver services to its members. Dr. Rascher errs by comparing only NFLPA/NFLPI disbursements to USOC disbursements plus services.

Dr. Rascher then offers an economic analysis of licensing. Dr. Rascher asserts that the cost of licensing agreements has strong economies of scale because the cost of negotiating a group license does not depend on the size of the group. Dr. Rascher does