Todd Padnos (Bar No. 208202)
*tpadnos@dl.com*
DEWEY & LEBOEUF LLP
One Embarcadero Center, Suite 400
San Francisco, CA 94111
Tel: (415) 951-1100; Fax: (415) 951-1180

Jeffrey L. Kessler (*pro hac vice*)
*jkessler@dl.com*
David G. Feher (*pro hac vice*)
*dfeher@dl.com*
David Greenspan (*pro hac vice*)
*dgreenspan@dl.com*
DEWEY & LEBOEUF LLP
1301 Avenue of the Americas
New York, NY 10019
Tel: (212) 259-8000; Fax: (212) 259-6333

Kenneth L. Steinthal (*pro hac vice*)
*kenneth.steinthal@weil.com*
WEIL, GOTSHAL & MANGES LLP
201 Redwood Shores Parkway
Redwood Shores, CA 94065
Tel: (650) 802-3000; Fax: (650) 802-3100

Bruce S. Meyer (*pro hac vice*)
*bruce.meyer@weil.com*
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, NY 10153
Tel: (212) 310-8000; Fax: (212) 310-8007

Attorneys for Defendants National Football League Players Association
and National Football League Players Incorporated d/b/a Players Inc

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| BERNARD PAUL PARRISH, HERBERT ANTHONY ADDERLEY, WALTER ROBERTS III,<br><br>Plaintiffs,<br><br>v.<br><br>NATIONAL FOOTBALL LEAGUE PLAYERS ASSOCIATION and NATIONAL FOOTBALL LEAGUE PLAYERS INCORPORATED d/b/a/ PLAYERS INC,<br><br>Defendants. | Case No. C 07 0943 WHA<br><br>**DEFENDANTS' MOTION IN LIMINE NO. 4 TO EXCLUDE THE TESTIMONY OF DANIEL A. RASCHER**<br><br>**FILED UNDER SEAL** |

**TO PLAINTIFFS AND THEIR ATTORNEYS OF RECORD:**

PLEASE TAKE NOTICE that on September 1, 2008, or as soon thereafter as the matter may be heard in the above-referenced Court, Defendants National Football League Players Association ("NFLPA") and National Football League Players Incorporated d/b/a Players Inc ("Players Inc") (collectively, "Defendants"), will and hereby do move to exclude the testimony of Daniel A. Rascher.

This Motion is based on the accompanying Memorandum of Points and Authorities, the accompanying declarations, the pleadings in this matter, and on such further evidence and argument as may be presented at the hearing on this Motion.

Date: August 19, 2008　　　　　　　　　　　　　　DEWEY & LEBOEUF LLP

　　　　　　　　　　　　　　　　　　　　　　　　BY: __/s/Jeffrey L. Kessler_____
　　　　　　　　　　　　　　　　　　　　　　　　　　　Jeffrey L. Kessler
　　　　　　　　　　　　　　　　　　　　　　　　　*Attorneys for Defendants*

## MEMORANDUM OF POINTS AND AUTHORITIES

Plaintiffs' economic expert, Daniel A. Rascher, seeks to offer testimony on matters for which he has conducted no economic analysis. His testimony predominately consists of repeating what he has read in third-party books, articles and websites and ipse dixit assertions about such information. Moreover, what little "analysis" he has done is not based on reliable assumptions and will thus mislead and prejudice the jury.

Pursuant to Fed. R. Evid. 702 and Daubert v. Merrell Dow. Pharms., Inc. and its progeny, expert testimony must be reliable and based on record facts. 509 U.S. 579, 589-592 (1993); Guidoz-Brault v. Mo. Pac. R.R. Co., 254 F.3d 825, 829 (9th Cir. 2001). When expert "testimony is not based on 'pre-litigation research' or if the expert's research has not been subjected to peer review, then the expert must explain precisely how he went about reaching his conclusion and point to some objective source . . . to show that he has followed the scientific method." Carnegie Mellon Univ. v. Hoffman-LaRoche, Inc., 55 F. Supp. 2d 1024, 1030 (N.D. Cal. 1999) (citing Daubert v. Merrell Dow Pharms., Inc., 43 F.3d 1311, 1318-1319 (9th Cir. 1995). Dr. Rascher's proposed testimony does not satisfy these requirements.

### A. Dr. Rascher's Opinion That The Value Of The Defendants' NFL Player Licensing Business Is Built Upon The Contributions Of Retired Players Is Not Based Upon Any Economic Analysis

Dr. Rascher's first opinion is that: "The retired NFL players did help to make the game what it is today… As a result, the value that the [Defendants are] able to develop with [their] licensing rights is built upon the contributions of past players." Expert Reply Report of Daniel A. Rascher ("Reply Rpt."). at 4 (Declaration of Jason Clark In Support of Def.'s Mot. In Limine No. 4 ("Clark Decl."), Ex. 1). Dr. Rascher has not conducted any economic analysis to support this opinion. See Expert Report of Daniel A. Rascher ("Rpt.") at 4-5 (Clark Decl. Ex. 2); Reply Rpt. at 6-15. He simply cites a series of unrelated articles regarding brand equity, and news stories, websites, television schedules and emails, which he asserts "demonstrate[] the continued popularity of the NFL's past." Rpt. at 5; Reply Rpt. at 14. Repeating statements from

articles without any independent economic study does not meet accepted standards of economic analysis. See Expert Report of Roger G. Noll ("Noll Rpt.") at 19 (Clark Decl. Ex. 3).[1]

Dr. Rascher cites various articles regarding brand equity and makes the entirely conclusory assertion that "the development of customer loyalty and brand value is partially based on historical teams and players." Rpt. at 5 n.2; see also Reply Rpt. at 10-12. The articles that Dr. Rascher cites discuss the impact of "history" on the brand equity of teams, leagues, service marks and non-sport entities – but not players or the value of their licensing rights. See Rpt. at 5; Reply Rpt. at 10-12; see also Noll Rpt. at 25-37. Dr. Rascher conceded that all of the articles he relied upon do not address the brand equity of NFL player licensing. See Deposition of Daniel A. Rascher, Ph.D., ("Depo. Tr.") 19:22-22:11 (Clark Decl. Ex. 4). Indeed, Dr. Rascher acknowledged that he has not studied whether retired NFL players contributed to the value of active player licensing rights. Depo. Tr. 23:4-22, 101:4-13.

Dr. Rascher asserts that the ability to use certain retired players in the Madden video game "indicates that there is value to EA in having retired players in the game." Rpt. at 5; Depo. Tr. 30:17-31:5. Similarly, he relies upon websites selling DVDs of "early Super Bowl highlights," the "popularity of retro jerseys," and other anecdotal evidence as support for his "brand equity" opinions. See Rpt. at 5; Reply Rpt. at 14; Depo. Tr. 42:2-25.[2] However, Dr.

---

[1] See Lust v. Merrell Dow Pharms., Inc., 89 F.3d 594, 596 (9th Cir. 1996) (expert testimony which merely interpreted the work of others was not admissible); Colony Holdings, Inc. v. Texaco Ref. & Mktg., Inc., No. SACV00217DOC(MLGX), 2001 WL 1398403, at *3 (C.D. Cal. Oct. 29, 2001) (excluding expert testimony which "contain[ed] no mention of a specific scientific theory or technique used nor . . . reference to a body of scientific knowledge or principles that was drawn upon in the evaluation"); Carnegie Mellon, 55 F. Supp. 2d at 1034 ("the manner in which [the expert] reaches his 'explained interpretation' of the data is not scientific . . . ."); Jones v. U.S., 933 F. Supp. 894, 898 (N.D. Cal. 1996) (articles upon which experts based their opinions showed "at most, that there is anecdotal support for the [experts'] hypothesis").

[2] At his deposition, for the first time, Dr. Rascher disclosed a regression analysis, based upon data that he has had for 10 years. Depo. Ex. 631 (Clark Decl. Ex. 5); Depo. Tr. at 6:16-7:16. This analysis was conducted after he did both of his expert reports. Depo. Tr. 7:17-8:1. This regression must be excluded because of its late disclosure. See Fed. R. Civ. P. 26(a)(2)(B)(i)-(iii); Fed. R. Civ. P. 37(c)(1); Olson v. Montana Rail Link, Inc., 227 F.R.D. 550, 552 (D. Mont. 2005). Moreover, this regression must be excluded because it does not provide a reliable basis for Dr. Rascher's opinions about player licensing. To the contrary, Dr. Rascher conceded that the data he analyzed in the regression is of team merchandise sales, and he does not know whether the data includes any player merchandise sales. Depo. Tr. 6:22-7:16, 13:21-14:8, 30:13-

Defendants' Motion In Limine No. 4 to Exclude the     Civ. Action No. C07 0943 WHA
Testimony of Daniel A. Rascher

Rascher admits that he did not perform any economic analysis relating to the sales of the Madden game or the other products he cites in his report. See Depo. Tr. 34:12-17, 38:12-23, 39:13-40:5, 112:20-113:10. He also concedes that he did not study the alleged economic contribution to Defendants' licensing business of any GLA class members. See Depo. Tr. 25:11-26:22, 188:13-190:23.

In sum, Dr. Rascher's "opinions" about the contribution of retired players to Defendants' brand equity are both irrelevant and ipse dixit. If permitted, Dr. Rascher would testify that everyone involved with the NFL, including unknown players, coaches, trainers, ticket-takers and front office employees, helped build the game and thus "contributed" to Defendants' licensing business. Depo. Tr. 26:15-28:11. Such an irrelevant lay "opinion" – applying no economic expertise – does not satisfy the requirements of Fed. R. Evid. 702.

**B.    Dr. Rascher's Opinion That The Share Of The GLR Pool Retained By Defendants Exceeds A "Customary" Amount Is Not Based On Reliable Information Or Economic Analysis**

One of Dr. Rascher's assignments was to review the GLR pool to compare the percentage of licensing revenues retained by Defendants with the percentages retained by other organizations. Depo. Tr. 62:12-66:8, 199:11-25. Because Dr. Rascher was unable to disaggregate the GLR pool revenue from other financial data in the NFLPA's LM-2s, he concluded that he could not use the LM-2s for his assignment. Depo. Tr. 113:18-114:7; Reply Rpt. at 16, 21. However, Dr. Rascher's ipse dixit "opinion" – which does not involve any economic analysis – that the NFLPA's LM-2s "do not accurately reflect the amount of shared group licensing revenues that have actually been received by the [Defendants] or that have actually been paid to players," Reply Rpt. at 4, has no foundation, is irrelevant, and can only serve to prejudice the jury with inflammatory accusations.

Based solely upon the Defendants' GLR spreadsheets, Dr. Rascher opines that the Defendants retained approximately 64% to 69% of group licensing revenues from 2003-2007, and that this retention exceeded what he states is the "customary" range of 10% to 40%. Reply

---

16. Dr. Rascher also testified that the data is from the period 1989 through 1996, which has nothing to do with the relevant time period in this case. Depo. Tr. at 6:22-7:9, 9:7-11.

-3-

Rpt. at 5-6, 31; Rpt. at 10. This "opinion" by Dr. Rascher has no relevance to this case. Either the retired players are, or are not, entitled to a portion of the GLR pool, but how the GLR pool was divided among the Defendants and active players has no bearing on this issue.

More fundamentally, Dr. Rascher's testimony regarding the "customary" percentage of retained licensing revenue is not based on any accepted economic methodology. To begin with, as Dr. Noll explains, only using financial information from the GLR spreadsheets, as opposed to the audited financial statements that were produced by Defendants, is contrary to accepted economic practice when conducting a financial analysis. Noll Rpt. at 9. Indeed, Dr. Rascher conceded that he has no rationale for not using the information in Defendants' audited financial statements other than the direction of Plaintiffs' counsel. Depo. Tr. 136:23-137:19 ("the rationale was that's what I was asked to look at."). The lack of any independent basis for not using the most reliable financial data available is underscored by Dr. Rascher's inability to answer whether he should have also included in his analysis the group licensing revenues that are shared by participants in ad hoc deals, and included in the audited financial statements, but not included on the spreadsheets for the GLR pool. Depo. Tr. 198:8-22 ("I would have to think about that. I was only asked to look at what's in the equal share pool… I'd have to analyze that. I mean, I have to think about that."). Dr. Rascher's unquestioning adherence to the directions of Plaintiffs' counsel was a biased methodology which does not satisfy <u>Daubert's</u> reliability test.[3]

Equally egregious, Dr. Rascher's opinion that the "customary" percentage of licensing revenues retained by a sports union, like the NLFPA, is within a range of 10% to 40% is not based on any reliable economic analysis. See Reply Rpt. at 6, Rpt. at 4, 10. Not only is

---

[3] See Diviero v. Uniroyal Goodrich Tire Co., 114 F.3d 851, 853 (9th Cir. 1997) (excluding expert opinion because of "his inability satisfactorily to explain the reasoning behind his opinions"); See In re Prempro Prods. Liab. Litig., 554 F. Supp. 2d 871, 887 (E.D. Ark. 2008) (excluding expert testimony that "tracked Plaintiffs' legal arguments, and there was very little significant analysis"); Astro Tech., Inc. v. Alliant Techsystems, Inc., No. H-03-0745, 2005 WL 6061803, at *8 (S.D. Tex. Sept. 28, 2005) (excluding expert opinion where "[r]ather than conduct and report the results of critical, independent analysis, it appears that [the expert] relied heavily . . . on the representations of" plaintiffs' president and counsel); Rowe Entm't, Inc. v. The William Morris Agency, No. 98 CIV, 8272(RPP), 2003 WL 22124991, at *3 (S.D.N.Y. Sept. 15, 2003) (expert's analysis "was further compromised by his reliance, not on his own independent study and analysis . . . but on Plaintiffs' information").

Defendants' Motion In Limine No. 4 to Exclude the  Civ. Action No. C07 0943 WHA
Testimony of Daniel A. Rascher

this too broad a range to characterize as "customary," but Dr. Rascher seeks to compare the percentage of licensing revenues retained by the Defendants to the percentages retained by <u>non-comparable entities</u>.

For example, Dr. Rascher's analysis compares Defendants' retention of licensing revenues to license commission rates for non-union entities and licensing agents who do not even engage in group licensing. Rpt. at 10-11; Depo. Tr. 137:20-138:10. This is clearly not comparable because the only part of Defendants' licensing business included in Dr. Rascher's comparison is the group licensing revenue in the GLR pool that is shared with the union. Dr. Rascher admitted that he is aware that sports unions, like the NFLPA, retain a percentage of group licensing revenues to support their collective bargaining activities, Depo. Tr. 61:16-62:8, but he did not consider whether the higher percentage of licensing revenues retained by the NFLPA in comparison to non-union entities is a result of the active players' decision to support union activities. Depo. Tr. 62:12-64:2.

Dr. Rascher thus provides no explanation for why what is purportedly a "customary" percentage retained by non-union licensing entities would be "customary" for a sports union, like the NFLPA. He merely compared the percentages he was directed to compare by Plaintiffs' counsel without any analysis of whether the non-union entities were comparable. See Depo. Tr. 66:19-68:18, 140:1-141:5.[4]

The <u>only</u> sports union to which Dr. Rascher compares the Defendants' retention of licensing revenue is the MLBPA – he has abandoned his earlier comparison with the NBPA. See Reply Rpt. at 30 n.101; Depo. Tr. 84:1-85:18, 87:9-88:11. In view of the fact that Dr. Rascher is now utilizing only <u>one</u> sports union for his comparison, he has no basis to testify that what he found at that <u>single</u> sports union is "customary."[5]

---

[4] See Domingo v. T.K., M.D., 289 F.3d 600, 606 (9th Cir. 2002) ("while studies involving similar but not identical situations may be helpful, an expert must set forth the steps used to reach the conclusion that the research is applicable"); Boucher v. U.S. Suzuki Motor Corp., 73 F.3d 18, 21 (2d Cir. 1996) ("expert testimony should be excluded if it is . . . in essence an 'apples and oranges comparison'").

[5] See U.S. Info. Sys., Inc. v. Int'l Bhd. of Elec. Workers Local Union No. 3, AFL-CIO, 313 F. Supp. 2d 213, 233 (S.D.N.Y. 2004) (excluding opinion because of lack of evidence that data was

Defendants' Motion In Limine No. 4 to Exclude the     Civ. Action No. C07 0943 WHA
Testimony of Daniel A. Rascher

Furthermore, while Dr. Rascher states that the <u>average</u> share of licensing revenue retained by the MLBPA during 2003-2007 was about 38%, the actual shares that the MLBPA retained has, according to Dr. Rascher ranged from approximately 45% in 2003, to 47% in 2004, to 85% in 2005, and to 99.6% in 2006. Reply Rpt. Ex. 3. Then, according to Dr. Rascher, in 2007, the MLBPA paid players 165.2% of its licensing revenues. <u>Id.</u> Under this analysis, the MLBPA – the <u>only</u> sports union being used as a comparison – <u>never</u> retained a percentage of licensing revenues in any single year within the 10% to 40% range that Dr. Rascher opines is "customary."

In addition, as Dr. Rascher conceded, the MLBPA's collective bargaining situation was not comparable to that of the NFLPA. Labor peace was achieved by the MLBPA during the period Dr. Rascher studied, so more licensing revenue could be distributed to the players in 2007. Depo. Tr. 79:2-12. By contrast, as Dr. Rascher acknowledged, the NFLPA's labor situation in 2007 was unstable. Depo. Tr. 79:17-21. Dr. Rascher has not considered what plans the NFLPA might have for further distribution of its licensing revenues when its labor situation becomes stabilized, as it was for the MLBPA in 2007. Depo. Tr. 80:9-83:9. In short, Dr. Rascher has no reliable basis for his comparability "opinion."

## C. Dr. Rascher's Opinion That The "Custom" Is For Group Licensing Revenues To Be Shared Equally Is Not Based On Any Economic Analysis

Dr. Rascher also proposes to testify that "the custom, across several sports, is that shared licensing revenue pools are generally shared equally." Reply Rpt. at 28. However, Dr. Rascher has not conducted any economic analysis to support this "opinion." Instead, he simply repeats the hearsay he has read in a "Primer for Journalists," news articles, and other media sources which he has made no effort to verify. <u>See</u> Rpt. at 9; Reply Rpt. at 26; Depo. Tr. 104:8-22, 116:4-117:15, 120:23-121:23, 146:16-149:25. Such unverified factual assertions – which involve <u>no</u> expert analysis – are not a proper basis for expert opinion.[6]

---

representative); <u>Rowe Entm't, Inc. v. The William Morris Agency, Inc.</u>, 2003 WL 22124991, at *1 (excluding opinion because sample studied was not representative).

[6] <u>See</u> <u>Guidroz-Brault</u>, 254 F.3d at 830; <u>Rowe</u>, 2003 WL 22124991, at *9; <u>Supply and Bldg. Co. v. Estee Lauder Int'l, Inc.</u>, No. 95 CIV 8136(RCC), 2001 WL 1602976, at *5 (S.D.N.Y. Dec. 14, 2001).

-6-

In addition, Dr. Rascher has conceded that "[t]here would be more than one reasonable way to take a pool of money and divide it up, depending… on the circumstances." Depo. Tr. 162:25-163:24. Thus, Dr. Rascher's <u>ipse dixit</u> assertion that it is "customary" to use "equal shares" to divide group licensing revenue is not helpful to a jury, as he acknowledges that there are many other reasonable ways to divide up a pool of group licensing revenues.

**D.    Dr. Rascher's Opinion That Defendants Have Leverage Akin To Market Power Is Not Based on Any Economic Analysis**

Finally, Dr. Rascher offers the opinion that "The fact that the [Defendants] represent[] both the active and retired players for group licensing provides the union with leverage, akin to 'market power,' in its negotiations with players and licensees." Rpt. at 4. In his Reply Report, however, Dr. Rascher concedes that "My opinion is not that the [Defendants have] 'market power' in a strict antitrust sense. . . . [M]y opinion is that for those set of licensees who sign the standard license agreement . . . the [Defendants] then [have] exclusivity, and the resulting leverage, over the retired players' rights." Reply Rpt. at 32-33.

Dr. Rascher admits that he has not undertaken any economic analysis to determine whether Defendants have market power. Depo. Tr. 169:17-170:20. Dr. Rascher also has not studied whether there is a "principal-agent" problem within the NFLPA to give it "leverage" over its members, a field of union study in which he does not claim any expertise. Depo. Tr. 215:16-217:20; Reply Rpt. at 34-35. In sum, Dr. Rascher has not applied any expert analysis to determine whether Defendants have leverage or market power.[7] Moreover, the issues of "market power" and "exclusivity" have no relevance to whether GLA class members are contractually entitled to an equal share of the GLR pool. A mini-trial on these issues would thus only serve to confuse the jury by raising complex issues that are irrelevant to this case.

## CONCLUSION

For all of the foregoing reasons, Defendants respectfully request that the Court grant this Motion to exclude the testimony of Dr. Rascher.

---

[7] See <u>Hynix Semiconductor Inc. v. Rambus Inc.</u>, No. CV-00-20905 RMW, 2008 WL 73689, at *13 (N.D. Cal. Jan. 5, 2008) (expert had "conducted no economic analysis to explain why any assumed conduct should be deemed anticompetitive")

-7-

Defendants' Motion In Limine No. 4 to Exclude the          Civ. Action No. C07 0943 WHA
Testimony of Daniel A. Rascher

| | | |
|---|---|---|
| Date: August 19, 2008 | | DEWEY & LEBOEUF LLP |
| | BY: | /s/ Jeffrey L. Kessler |
| | | Jeffrey L. Kessler |
| | | *Attorneys for Defendants* |