MANATT, PHELPS & PHILLIPS, LLP
RONALD S. KATZ (Bar No. CA 085713)
E-mail: rkatz@manatt.com
RYAN S. HILBERT (California Bar No. 210549)
E-mail: rhilbert@manatt.com
NOEL S. COHEN (California Bar No. 219645)
E-mail: ncohen@manatt.com
1001 Page Mill Road, Building 2
Palo Alto, CA 94304-1006
Telephone: (650) 812-1300
Facsimile: (650) 213-0260

McKOOL SMITH, P.C.
LEWIS T. LECLAIR (Bar No. CA 077136)
E-mail: lleclair@mckoolsmith.com
JILL ADLER (Bar No. CA 150783)
E-mail: jadler@mckoolsmith.com
300 Crescent Court, Suite 1500
Dallas, TX 75201
Telephone: (214) 978-4000
Facsimile: (214) 978-4044

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| BERNARD PAUL PARRISH, HERBERT ANTHONY ADDERLEY, and WALTER ROBERTS, III on behalf of themselves and all others similarly situated,<br><br>Plaintiffs<br><br>vs.<br><br>NATIONAL FOOTBALL LEAGUE PLAYERS ASSOCIATION, a Virginia corporation, and NATIONAL FOOTBALL LEAGUE PLAYERS INCORPORATED d/b/a PLAYERS INC, a Virginia corporation,<br><br>Defendants. | CIVIL ACTION NO. C07 0943 WHA<br><br>**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION IN LIMINE NO. 4 TO EXCLUDE THE TESTIMONY OF DANIEL A. RASCHER**<br><br>Judge: Honorable William H. Alsup<br>Date: October 15, 2008 |

MANATT, PHELPS & PHILLIPS, LLP
ATTORNEYS AT LAW
PALO ALTO

OPPOSITION TO MIL #4 DR. RASCHER
CASE NO. C:07-0943 WHA

dockets.Justia.com

# TABLE OF CONTENTS

| | | Page |
|---|---|---|
| I. | INTRODUCTION | 1 |
| II. | DR. RASCHER'S REPORTS AND OPINIONS MEET THE STANDARDS FOR ADMISSIBILITY | 1 |
| | A. Dr. Rascher's Opinions Concerning the Value of Retired Players Are Based on an Analysis of Credible Sources. | 2 |
| | B. Dr. Rascher's Opinions and Testimony on the Share of the GLR Pool Improperly Retained by Defendants is Reliable and Admissible Because, Among Other Reasons, it is Based on Defendants' Own Documents | 6 |
| | C. Dr. Rascher's Opinion on the Equal Sharing of GLR is Based on Reliable and Admissible Evidence, Including Defendants' Own Practices | 11 |
| | D. Defendants Misstate Dr. Rascher's Testimony Concerning Defendants' "Market Power", Which is Based on Reliable and Admissible Documentation | 12 |
| III. | CONCLUSION | 14 |

MANATT, PHELPS & PHILLIPS, LLP
ATTORNEYS AT LAW
PALO ALTO

i

OPPOSITION TO DEFENDANTS'
MOTION IN LIMINE NO. 5
C07 0943 WHA

# TABLE OF AUTHORITIES

## CASES

*Boucher v. U.S. Suzuki Motor Corp.*,
   73 F.3d 18 (2d Cir. 1996)......................................................................................9

*Caridad v. Metro-North Commuter R.R.*,
   191 F.3d 283 (2d Cir. 1999)....................................................................................6

*Carnegie Mellon Univ. v. Hoffmann-LaRoche, Inc.*,
   55 F. Supp. 2d 1024 (N.D. Cal 1999) ....................................................................2

*Clark v. Heidrick*,
   150 F.3d 912 (8th Cir. 1998)..................................................................................2

*Colony Holdings, Inc. v. Texaco Ref. & Mktg.*,
   No. 00-CV-217, 2001 U.S. Dist. LEXIS 26217 at *10 (C.D. Cal. Oct. 29, 2001) ........................................................................................................................2

*Daubert v. Merrell Dow Pharms.*,
   509 U.S. 579 (1993) ................................................................... 1, 2, 3, 4, 6, 12

*Domingo v. T.K., M.D.*,
   289 F.3d 600 (9th Cir. 2002)..................................................................................9

*Dukes v. Wal-Mart. Inc.*,
   222 F.R.D. 189 (N.D. Cal. 2004) ............................................................... 4, 6, 12

*In re Live Concert Antitrust Litig.*,
   247 F.R.D. 98 (C.D. Cal. 2007) .............................................................................6

*Jones v. United States*,
   933 F. Supp. 894 (N.D. Cal. 1996) ........................................................................2

*Kennedy v. Collagen Corp.*,
   161 F.3d 1226 (9th Cir. 1998)................................................................................3

*Kumho Tire Co. v. Carmichael*,
   526 U.S. 137 (1999) ...............................................................................................1

*Living Designs, Inc. v. E.I. DuPont de Nemours and Co.*,
   431 F.3d 353 (9th Cir. 2005)..................................................................................1

*Lust v. Merrell Dow Pharms.*,
   89 F.3d 594 (9th Cir. 1996)....................................................................................2

*Mitchell v. United States*,
   141 F.3d 8 (1st Cir. 1998) ......................................................................................2

*Rowe Entm't, Inc. v. William Morris Agency, Inc.*,
   No. 98-CV-8272, 2003 U.S. Dist. LEXIS 15976, *5-8 (S.D.N.Y. Sept. 15, 2003) ....................................................................................................................10

*Skidmore v. Precision Printing & Packaging*,
   188 F.3d 606 (5th Cir. 1999)..................................................................................1

*Stevens v. Cessna Aircraft Co.*,
   634 F. Supp. 137 (E.D. Pa. 1986), aff'd 806 F. 2d 254 (3d Cir. 1986) ........... 11, 12

*U.S. Info. Sys. v. IBEW Local Union No. 3*,
   313 F. Supp. 2d 213 (S.D.N.Y. 2004)..................................................................10

*U.S. v. Hankey*,
   203 F.3d 1160 (9th Cir. 2000)................................................................................1

MANATT, PHELPS & PHILLIPS, LLP
ATTORNEYS AT LAW
PALO ALTO

ii

OPPOSITION TO DEFENDANTS'
MOTION IN LIMINE NO. 5
C07 0943 WHA

Page

*United States v. Floyd,*
  281 F. 3d 1346 (11th Cir. 2002) .................................................................................. 11, 12

*Wattel v. Browne,*
  No. 02-CV-2256, 2006 WL 1211186 (D. Ariz. May 3, 2006) ................................................. 2

**RULES**

F.R.C.P. 37(c)(1) .................................................................................................................. 4

Federal Rule 702 .................................................................................................................. 2

Federal Rule 703 .................................................................................................................. 2

Manatt, Phelps &
Phillips, LLP
Attorneys At Law
Palo Alto

iii

OPPOSITION TO DEFENDANTS'
MOTION IN LIMINE NO. 5
C07 0943 WHA

I.  **INTRODUCTION**

Defendants do not argue that Dr. Rascher, a well-known sports economist with a Ph.D. in Economics from the University of California at Berkeley, is in any way unqualified to render expert opinion testimony in this matter. Nor, with few unsupported exceptions, do Defendants claim that Dr. Rascher's opinions have absolutely no relevance to this lawsuit. Instead, Defendants ask this Court to disregard Dr. Rascher's well-founded opinions on the ground that they allegedly lack "economic analysis." But the economic analyses Defendants claim Dr. Rascher should have undertaken are not required under *Daubert* and the Federal Rules of Evidence, and the analyses he did perform are specifically allowed under *Daubert*.

Dr. Rascher's testimony is the type of reliable and relevant evidence that will assist the jury to determine key issues in this case. For this reason and the reasons explained in more detail below, Defendants' Motion should be denied.

II. **DR. RASCHER'S REPORTS AND OPINIONS MEET THE STANDARDS FOR ADMISSIBILITY.**

This Court should admit expert testimony if it ensures that the expert's testimony is "relevant" and "reliable." *Daubert v. Merrell Dow Pharms.*, 509 U.S. 579, 592 (1993); *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 158 (1999). The *Daubert* inquiry is a flexible one, and must be tied to the facts of the particular case. *U.S. v. Hankey*, 203 F.3d 1160, 1168 (9th Cir. 2000) (quoting *Skidmore v. Precision Printing & Packaging*, 188 F.3d 606, 618 (5th Cir. 1999) ("Whether Daubert's suggested indicia of reliability apply to any given testimony depends on the nature of the issue at hand, the witness's particular expertise, and the subject of the testimony. It is a fact-specific inquiry."); *Living Designs, Inc. v. E.I. DuPont de Nemours and Co.*, 431 F.3d 353, 369 n.14 (9th Cir. 2005) (holding that some expert testimony admissible based on the knowledge and experience of the expert, rather than adherence to a particular methodology or theory).

Trial courts have broad latitude in determining for any particular case how to test an expert's reliability. *Kumho Tire*, 526 U.S. at 150 (stressing that the district court must have "considerable leeway" in both "how to determine reliability" and "its ultimate conclusion"). The

ultimate credibility determination and the testimony's accorded weight are in the jury's province. *See Mitchell v. United States*, 141 F.3d 8, 16-17 (1st Cir. 1998); *Clark v. Heidrick*, 150 F.3d 912, 914 (8th Cir. 1998) ("doubts . . . should generally be resolved in favor of admissibility"), *see also Wattel v. Browne*, No. 02-CV-2256, 2006 WL 1211186 (D. Ariz. May 3, 2006) ("Federal Rule 702 provides for the liberal admission of expert testimony regarding factual matters. Expert testimony is admissible when it will assist the tier (sic) of fact in understanding the evidence or determining a disputed issue of fact.").

Dr. Rascher's reports and testimony satisfy Federal Rules of Evidence 702 and 703, as well as the standards set forth in *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579 (1993), and its progeny.

### A. Dr. Rascher's Opinions Concerning the Value of Retired Players Are Based on an Analysis of Credible Sources.

Defendants argue that Dr. Rascher's opinions concerning the value of retired players must be disregarded for several reasons. None of these reasons is availing.

Defendants first suggest that Dr. Rascher's opinions are invalid because they are not based on "economic analysis," but instead that Dr. Rascher has developed an opinion that relies on facts presented in a series of materials related to brand value, as well as news stories, websites, and other documents.[1] Contrary to Defendants' suggestion, the materials on which Dr. Rascher relied for his opinions are of the type on which economists commonly rely to demonstrate economic

---

[1] Defendants cite a number of cases in support of their assertion. Each of these cases is distinguishable. In *Lust v. Merrell Dow Pharms.*, for example, the expert in question did not identify a single objective source in support of his opinions, nor did he offer any explanation as to how he reached his conclusions. *Lust*, 89 F.3d 594, 596-98 (9th Cir. 1996) (also pointing out that the conclusions reached by the expert were shared by no other experts). Similarly, in *Colony Holdings, Inc. v. Texaco Ref. & Mktg.*, the expert was a geology expert, for whom rigorous scientific methodology is appropriate. *Colony Holdings*, No. 00-CV-217, 2001 U.S. Dist. LEXIS 26217 at *10 (C.D. Cal. Oct. 29, 2001). Despite this heightened standard, the expert did virtually no work. *Id.* Indeed, the expert's complete explication of his evaluation process in that case was: "After a review and analysis of the information provided, I have developed the following opinions." *Id.* These cases are a far cry from the detailed and supported analysis conducted by Dr. Rascher. In *Carnegie Mellon Univ. v. Hoffmann-LaRoche, Inc.*, the expert at issue was unable to explain his methodology, and there was no evidence that his method was "practiced by even a minority of scientists in this field." *Carnegie Mellon*, 55 F. Supp. 2d 1024, (N.D. Cal 1999). In this case, Defendants have provided no evidence that Dr. Rascher's methodology is outside his field, nor could they. Lastly, in *Jones v. United States*, the expert sought to rely on certain publications to support an opinion that was directly contradicted by those same publications. *Jones*, 933 F. Supp. 894, 897-99 (N.D. Cal. 1996). That is hardly the situation here.

value. Indeed, it is the piecing together of such individual data points into a coherent whole that is economic analysis. Such materials – which include numerous peer-reviewed publications,[2] information concerning transactions in the marketplace, and Defendants' own admissions – are also of the type courts consider to be reliable as well. *See* Deposition Transcript of Dr. Daniel A. Rascher ("Rascher Tr.") at 28:12-31:5 (Declaration of Ryan S. Hilbert in Support of Plaintiffs' Opposition to Motion In Limine No. 4 ("Hilbert Decl.") Exh. A) (discussing the materials on which Dr. Rascher relied); *Kennedy v. Collagen Corp.*, 161 F.3d 1226, 1228 (9th Cir. 1998) (determining that the testimony of plaintiffs' expert was admissible under *Daubert* because the expert had "relied upon a wide variety of objective, verifiable evidence", including "peer-reviewed articles").

Defendants also suggest that the Court disregard Dr. Rascher's findings at this preliminary stage because Dr. Rascher allegedly failed to focus on several areas, including specific players rather than teams, the economic contribution of individual GLA class members, and whether retired players contributed to active player licensing. Regarding Dr. Rascher's analysis of the impact of history on team licensing, Defendants conveniently omit that portion of Dr. Rascher's testimony in which he explains that the value of a vintage team is derived, in part, from the retired players who played on that team. Rascher Tr. at 20:15-21:3; *see also* Expert Reply Report of Dr. Daniel A. Rascher ("Reply Report") at 4 (Declaration of Jason Clark in Support of Defendants' Motion In Limine No. 4 ("Clark Decl.") Exh. 1) ("The affinity of fans for today's players and teams is based, in part, on the shared history that fans have with past teams and, importantly, past players."). Though Defendants argue that Dr. Rascher should have valued retired players specifically, such information does not make the methodology employed by Dr. Rascher any less reliable. The economic connection between the game's past and current team licensing value is clearly relevant; as Dr. Rascher testified, even though the EA game uses player licensing,

---

[2] It is ironic Defendants would challenge Dr. Rascher's reliance on peer-reviewed publications. As pointed out in Dr. Rascher's Reply Report, Defendants' expert, Roger Noll, has repeatedly drawn conclusions from exactly these types of materials, which is a conventional mode of academic research. Reply Report at 13. *See Kennedy v. Collagen Corp.*, 161 F.3d 1226, 1229 (9th Cir. 1998) (citation omitted) (noting that other circuits have allowed experts to testify to opinions that are based on methods reasonably relied on by experts in their field).

consumers play the game as teams. Rascher Tr. 20:15-21:3. At most, it is an alternate methodology one can but need not use to reach the same conclusion. *Daubert*, 509 U.S. at 595 (the inquiry is a flexible one, and its "focus, of course, must be solely on principles and methodology, not on the conclusions that they generate").

Dr. Rascher's analysis of this economic evidence – looking at the valuations made by Defendants outside the context of litigation (which Defendants disparage as "emails"), demonstrating the marketability of highlights from games played more than forty years ago (which Defendants disparage as "websites" but which are in fact e-commerce sites like barnesandnoble.com, or television network sites like the NFL Network), and relying on the sport management literature (which is directly germane to questions of sports marketability and valuation) – is exactly how economists analyze qualitative, empirical data. Reply Report at 9-15 (discussing the materials on which Dr. Rascher relied for his conclusions, including evidence presented by Defendants' expert, Dr. Noll).[3] Dr. Rascher then added to this an econometric analysis, based on data used in his own published academic work.[4] Even in the absence of this quantitative work, the directional conclusions Dr. Rascher reached through qualitative analysis is still fully "economic."

Defendants claim that "Dr. Rascher conceded that all of the articles he relied upon do not address the brand equity of NFL player licensing." Motion at 2. This is untrue. When one reviews that section of Dr. Rascher's testimony cited by Defendants in support of this statement,

---

[3] Among the materials on which Dr. Rascher relied was a declaration from Defendants' Chief Financial Officer, Andrew Feffer. Expert Report of Dr. Daniel A. Rascher at 5 (Clark Decl. Exh 2); Reply Report at 7-8. "It is reasonable and customary for experts to rely on the statements of others, including the declarations of others." *Dukes v. Wal-Mart. Inc.*, 222 F.R.D. 189, 197 (N.D. Cal. 2004).

[4] Defendants seek to dismiss in a footnote a regression analysis Dr. Rascher prepared based on data he had previously used in his academic work. This report was created after Dr. Rascher's Reply Report based on additional review of the case issues, and was disclosed to Defendants at the start of Dr. Rascher's deposition. Defendants do not claim that they have suffered any prejudice by the timing of this production. nor have they sought to strike the report under F.R.C.P. 37(c)(1) despite having over a month in which to do so. Nor could Defendants claim prejudice considering that Defendants' counsel asked numerous questions about the report and its underlying sources during Dr. Rascher's deposition. *See* Rascher Tr. at 5:16-13:25. Moreover, this analysis, which was created after Dr. Rascher's Reply Report, does not present a new opinion but merely further supports Dr. Rascher's point that the past performance of NFL teams (and hence the players on those teams) influences the sale of licensed merchandise many years later. *Dukes v. Wal-Mart. Inc.*, 222 F.R.D. 189, 199 (N.D. Cal. 2004) (denying to strike evidence provided by expert because receiving party could not show lack of justification for delay or prejudice).

Rascher Tr. at 19:22-22:11, it is clear Defendants deliberately misstate Dr. Rascher's position. For example, it was *Defendants' counsel* who *represented* to Dr. Rascher the statement on which Defendants now rely:

> <u>I'm simply asking you to confirm what I think is an undeniable fact, since I read every single article you cited, I will represent to you. Okay?</u> And I just want you to confirm that every single article that you cite or relied upon, including this one, Underwood – but it's all of them – it says they deal with the issue of brand affinity or brand development of teams or – or nonsports [sic] entities or service marks, but they don't deal directly with discussing brand affinity of particular players or groups of players, other than the fact that teams are on players – I mean players are on teams."

Rascher Tr. at 21:5-21:17 (emphasis added). Even though Defendants' counsel repeatedly tried to get Dr. Rascher to agree with this conclusion, Dr. Rascher did not and could not. Rascher Tr. at 19:22-22:11.

As to the second area – the economic contribution of GLA class members – this issue, as explained in Dr. Rascher's Reply Report, requires an element of circular logic. According to Defendants' expert, Dr. Noll, the fact that Defendants did not pay GLA Class members pursuant to a GLA indicates that those players lack value. "But if Plaintiffs are correct that it is only because the alleged misconduct of Defendants that most of the class members have not received a (shared) payment, then Dr. Noll's conclusion is only true because of Defendants' alleged misconduct." Reply Report at 8. Dr. Rascher further showed that Dr. Noll's own analysis of class members' *ad hoc* deals further demonstrated the aggregate value of retired player licensing. Reply Report at 7-8. In any event, simply because Dr. Rascher did not address the specific subset of retired players suggested by Defendants does not make his opinions on the positive economic value of retired players as a whole any less reliable.

With respect to the third area – active player rights – Defendants claim that Dr. Rascher did not consider whether retired player rights contributed to the value of active player licensing rights. However, this was not the question posed to him, nor is it relevant to the issue at hand. Instead, Dr. Rascher considered whether retired players, in the aggregate, have value. This is relevant to the questions a trier of fact will need to decide, for example, with respect to why the NFLPA repeatedly sought out retirees to sign GLAs. As above, simply because Dr. Rascher did not address the issue Defendants would have liked him to address does not make Dr. Rascher's

opinions or testimony any less relevant or reliable.[5] If Defendants wish to argue that their expert's evidence is stronger than Dr. Rascher's, a trial is the appropriate venue for that contrast; a *Daubert* hearing should not be turned into a "battle of the experts." *Dukes v. Wal-Mart. Inc.*, 222 F.R.D. 189, 191-92 (N.D. Cal. 2004) ("[C]ourts should avoid resolving 'the battle of the experts.'"); *Caridad v. Metro-North Commuter R.R.*, 191 F.3d 283, 292-93 (2d Cir. 1999) (district court may not weigh conflicting expert evidence or engage in "statistical dueling" of experts); *see also In re Live Concert Antitrust Litig.*, 247 F.R.D. 98 (C.D. Cal. 2007) ("Where both plaintiffs and defendants have proffered expert testimony, the court must avoid resolving a 'battle of the experts' in a motion for class certification.") (citation omitted).

### B. Dr. Rascher's Opinions and Testimony on the Share of the GLR Pool Improperly Retained by Defendants is Reliable and Admissible Because, Among Other Reasons, it is Based on Defendants' Own Documents.

Defendants challenge Dr. Rascher's opinions concerning Defendants' retention of 64% to 69% of shared gross licensing revenues from 2003 to 2007. This challenge also is baseless, first and foremost because Dr. Rascher's calculation is correct, which Defendants do not (and cannot) dispute.

Defendants claim that Dr. Rascher's opinions on this issue are irrelevant because "[e]ither the retired players are, or are not, entitled to a portion of the GLR pool, but how the GLR pool was divided among the Defendants has no bearing on this issue." Motion at 4. On the contrary, one purpose of Dr. Rascher's testimony is to assist the trier of fact by showing that Defendants underfunded the GLR pool by retaining a far greater percentage of licensing revenues than is customary in the industry. This showing is directly relevant to Plaintiffs' claim that Defendants breached their fiduciary duty by improperly withholding funds that should have gone to retired players.

---

[5] Defendants also challenge Dr. Rascher's reliance on the inclusion of retired players in the Madden video games as evidence of the value of retired player rights, by implying that he should have instead analyzed Madden game sales data. Motion at 3. However, Dr. Rascher's reference to the Madden game found economic evidence in the fact that EA had invested time and money to include retired players' statistics (even if not their names and numbers) in the game, and analyzed this evidence as showing that EA felt consumers valued retired players. It also worth pointing out that Defendants' own expert, Dr. Noll, did not even know "which, if any, vintage teams are on Madden games." Deposition Transcript of Roger Noll ("Noll Tr.") at 71:15- 71:25 (Hilbert Decl. Exh. B).

6  OPPOSITION TO MIL #4 DR. RASCHER
CASE NO. C:07-0943 WHA

Incredibly, Defendants also challenge Dr. Rascher's statement that the LM-2s "do not accurately reflect the amount of shared group licensing revenues that have actually been received by the [Defendants] or that have actually been paid to players." Motion at 3. Defendants challenge this statement so that they can incorporate by reference one of Dr. Rascher's other discrete findings without having to address it expressly.[6] Defendants' challenge is completely baseless and is undermined by the statements of Defendants' own expert. *See* Expert Report of Roger G. Noll ("Noll Report") at 40 (Clark Decl. Exh. 3) (noting that Defendants' spreadsheets "report lower disbursements from licensing revenues and a lower share of payments to players from total revenues than is reported on Form LM-2" because "the documents do not report the same revenues and disbursements.") Dr. Rascher and Dr. Noll do not disagree that the spreadsheets and LM-2's differ, nor why they differ. Indeed, Dr. Rascher clarified in his Reply Report that he was not challenging the LM-2's for their purpose, but were inapt for the question of determining shared licensing issues. Reply Report at 15.[7] Why Defendants seek to challenge this joint conclusion of both Dr. Rascher and Dr. Noll (i.e., that the two sources cover different revenues and different disbursement values) is unclear.

Even more incredibly, Defendants challenge Dr. Rascher's opinions and testimony on the ground that they are based on the GLR spreadsheets Defendants produced in native format, instead of the audited financial statements Defendants produced. Defendants attempt to fault Dr. Rascher for not considering the *ad hoc* revenues included in the audited financial documents but not in the GLR spreadsheets, even though it was appropriate for Dr. Rascher to exclude such revenues because they are treated separately by Defendants themselves when determining GLR. Reply Report at 26-27. More importantly, Defendants fail to state that, as the below chart shows,

---

[6] One of the findings in Dr. Rascher's reports is that "[t]he NFLPA/NFLPI LM-2 documents submitted annually to the United States Department of Labor do not accurately reflect the licensing revenues that have actually been received by the NFLPA/NFLPI or that have actually been paid to players." Rascher Report at 3, 5-8; Reply Report at 4, 15-26. Defendants do not attack this conclusion directly but, as mentioned in the text, seek to attack it by reference.

[7] Dr. Rascher stated: "My opinion is not, as Dr. Noll characterizes it, 'that the form LM-2 submissions by the NFLPA are not accurate' but rather that the LM-2's do not provide an accurate means of determining (a) the total licensing revenue received by NFLPA/NFLPI pursuant to GLAs, or (b) (most importantly) the percentage of those shared revenues that are disbursed to players." Reply Report at 15.

the audited financial documents Defendants claim Dr. Rascher *should* have relied on provide the same numbers that Dr. Rascher *actually* relied on when calculating the percentage of GLR retained by Defendants.[8]

| Player Share of GLR | | | | | |
|---|---|---|---|---|---|
| | 2003 | 2004 | 2005 | 2006 | 2007 |
| As Reported by Dr. Rascher | 36% | 36% | 36% | 31% | 32% |
| As per Audited Financials[9] | 36% | 36% | 36% | 31% | 32% |

Thus, Defendants (erroneously) attack Dr. Rascher's calculations on relevance grounds, and (erroneously) seek to impeach his (Defendant-produced) source. What Defendants do not do is argue that Dr. Rascher's calculations are incorrect. As shown above, whether one uses the Defendants own spreadsheets, or the Defendants' preferred audited financials, Defendants kept 64% to 69% of the shared revenues, just as Dr. Rascher testified.[10] Defendants may prefer a jury to look at the LM-2's, which commingle shared and *ad hoc* revenues, but this is not a reason to exclude Dr. Rascher's accurate testimony that, for the purpose of looking at the equal shared pool, that LM-2 figure is off point.

Defendants also attack Dr. Rascher's opinion that the customary percentage of licensing revenue retained by a sports union is within the range of 10% to 40% on the ground that this range is too broad. However, simply because there is variation among the licensors does not mean that this range is any less reliable. Dr. Rascher has researched the subject and presented the factual evidence. Expert Report of Dr. Daniel A. Rascher ("Rascher Report") at 10-13 (Clark Decl. Exh. 2); Reply Report at 28-31. His conclusion was that even though there is a fairly large range of values, the percentage retained by Defendants is far outside this range. *Id.*

---

[8] Defendants cite a number of cases to suggest that Dr. Rascher's methodology is biased because it was done at the direction of counsel. Even if these cases stood for the proposition for which they are being offered – and Plaintiffs do not concede that they do – Defendants' suggestion that Dr. Rascher only looked at materials directed by counsel is patently false. Reply Report at 19-21 (discussing sources Dr. Rascher chose to look at on his own in order to substantiate his opinions). In addition, it completely ignores the fact that the materials Dr. Rascher looked at provided the exact same information as the materials Defendants suggest he should have reviewed.
[9] See PI096261, PI096199, PI096135, PI096071, and PI096010.
[10] Dr. Rascher's primary source, the NFLPA/NFLPI spreadsheets, has the added advantage, over the audited financials of providing much greater disaggregation. Reply Report at 16.

OPPOSITION TO MIL #4 DR. RASCHER
CASE NO. C:07-0943 WHA

Like Dr. Noll, Defendants try to discredit Dr. Rascher's analysis on the ground that it includes comparisons to license commission rates for non-union entities in addition to commission rates for union entities. Motion at 5. But also like Dr. Noll, Defendants "present[] no evidence as to why a licensing agency would charge more (or less) to an entity because they share revenues with players or because they are a union."[11] Reply Report at 29. In an arm's length transaction, the identity of customer, whether it is a union or a university or some other entity, will have little or no impact on the price charged, as opposed to the more relevant questions of bargaining position and the value of the product licensed. *Id.* Indeed, Dr. Rascher has expressly stated that he sees "no reason why the distinctions between the NFL players' deals and those made on behalf of colleges, smaller leagues, or even individual athletes would result in substantially higher fees for the NFL players because of how, or with whom, the NFLPA/NFLPI chooses to divide the receipts." *Id.*

Defendants claim that Dr. Rascher "merely compared the percentages he was directed to compare by Plaintiffs' counsel without any analysis of whether the non-union entities were comparable." Motion at 5. This is patently false and unsupported by the deposition testimony cited by Defendants. On the contrary, Dr. Rascher states that "[m]y analysis was to look at what was paid out directly to the players and then look at what was customary in different aspects of sports." Rascher Tr. at 63:25-64:2. It was Defendants' counsel who made the baseless allegation concerning Plaintiffs' counsel, not Dr. Rascher.[12] And as stated above, in his analysis, Dr.

---

[11] Defendants suggest for the first time in their moving papers that the amounts retained by the NFLPA could be higher because of "the active players' decision to support union activities." Motion at 5. Defendants offer no evidence to support this claim, however, and certainly not enough to call into question the reliability of Dr. Rascher's opinion that the amounts retained by Defendants are well above the industry standard.

[12] Defendants cite two cases to support the proposition that Dr. Rascher did not consider comparable data. Neither is applicable. In *Domingo v. T.K., M.D.*, the expert testimony excluded sought to link animal studies to human patients without adequate explanation for the connection. *Domingo*, 289 F.3d 600 (9th Cir. 2002). In this case, Dr. Rascher has expressly considered and addressed why it is appropriate to consider comparable sports entities in his analysis. In *Boucher v. U.S. Suzuki Motor Corp.*, testimony on lost earnings was excluded because the expert assumed plaintiff would work 40 hours/week, 52 weeks/year with regular pay increases, directly contradicting the record evidence which showed that plaintiff had a sporadic employment history with fluctuating levels of income and long periods of unemployment. *Boucher*, 73 F.3d 18 (2d Cir. 1996). Interestingly, Defendants include a quote from *Boucher* in which the Court mentions an "apples to oranges" comparison. This quote is disingenuous in that Dr. Rascher repeatedly characterized his comparisons as "apples to apples", despite Defendants' counsel's repeated attempts to get Dr. Rascher to say the contrary. Rascher Tr. at 65:14-68:18.

Rascher specifically considered, and rejected the theory that somehow the licensing fees charged by a neutral third-party should differ solely because the licensor in question is, or is not, a union. Reply Report at 29.

Defendants also seek to discredit Dr. Rascher's opinions on the ground that he only considered one other sports union – the MLBPA.[13][14] Defendants rely on *U.S. Info. Sys. v. IBEW Local Union No. 3* to support the proposition that this sample size is too small. But Defendants misstate Dr. Rascher's study. Contrary to Defendants' argument, Dr. Rascher was not attempting a statistical sampling exercise, but rather was estimating a range by looking at a variety of comparable transactions, including one union. Indeed, as the *IBEW* Court stated "[a]s long as a sample is representative – that is, it was not selected in a biased manner – sample size will not skew the results of the analysis." *IBEW*, 313 F. Supp. 2d 213, 232 (S.D.N.Y. 2004). Moreover, "small sample size goes to the weight rather than to the reliability (and admissibility) of a study." *Id.*

With respect to the MLBPA, Defendants then seek to discredit this comparison by disaggregating the amount of license revenue retained by the MLBPA on year-by-year basis. Motion at 6. At the same time, they seek to fault Dr. Rascher for not taking into account the respective union's fluctuating collective bargaining situations and the need to build up "war chests" in periods of labor instability. Motion at 6. This latter point is a red herring.

According to Defendants' expert, Dr. Noll, the funds used to build "war chests" come from dues, not from licensing revenue. Deposition Transcript of Roger Noll ("Noll Tr.") at 200:3-200:9 (Hilbert Decl. Exh. B) ("And what [the sports unions] use the dues for is to maintain emergency funds.") As a result, even if the NFLPA were to refund the entirety of the "war chest" tomorrow, the calculations performed by Dr. Rascher related to the percentage of equally-shared

---

[13] Defendants erroneously state that Dr. Rascher has abandoned his comparison with the NBPA. This is not true. Dr. Rascher still believes the NBPA is a valid comparable for other aspects of his opinion, including "for the fact that it shares its group licensing revenues equally among all participants." Reply Report at 30, n.101.
[14] The other cases on which Defendants rely, *Rowe Entm't, Inc. v. William Morris Agency, Inc.*, also favor Plaintiffs. In that case, the issue was not the adequacy of the sample size, but rather whether the sample culled by counsel for use by the expert was biased. *Rowe*, No. 98-CV-8272, 2003 U.S. Dist. LEXIS 15976, *5-8 (S.D.N.Y. Sept. 15, 2003). In this case, Defendants do not allege that the samples Dr. Rascher reviewed were provided by Plaintiffs' counsel, nor could they.

1  *licensing* revenues given to players would be unchanged. Reply Report at 22-23. Moreover,
2  even if one were to take this issue into consideration, common sense suggests that Dr. Rascher's
3  decision to present his findings as an *average* from 2003 to 2007 is a far superior method to the
4  inaccurate and unpredictable per-year calculation suggested by Defendants. Given the delay
5  between receipt and disbursement of revenues, if Dr. Rascher had relied on a single year, in the
6  face of such variation, clearly Defendants would have cause to question its accuracy. Instead,
7  Defendants rely on unreliable annual data to attempt to falsely impeach Dr. Rascher's appropriate
8  use of an average.

      **C.    Dr. Rascher's Opinion on the Equal Sharing of GLR is Based on Reliable and Admissible Evidence, Including Defendants' Own Practices.**

Defendants challenge Dr. Rascher's opinion that "the custom, across several sports, is that shared licensing revenue pools are generally shared equally." Motion at 6. Defendants do not directly attack the resources on which Dr. Rascher relied for his opinions, including his reliance on his interview with former long-time MLBPA head Marvin Miller. *See, e.g., United States v. Floyd*, 281 F. 3d 1346, 1349 (11th Cir. 2002) (expert properly relied on information obtained in discussions with a technical advisor); *Stevens v. Cessna Aircraft Co.*, 634 F. Supp. 137, 142-43 (E.D. Pa. 1986), aff'd 806 F. 2d 254 (3d Cir. 1986) (expert could reasonably rely on statements regarding decedent made by those interviewed by expert). Nor could they legitimately challenge Dr. Rascher's conclusion because Defendants themselves provide equal-share royalties to the active players in their licensing programs.

Defendants also do not attack the accuracy of those facts supported by Dr. Rascher's citations. For example, although they challenge the citation supporting Dr. Rascher's assertion that MLB Properties shares revenues among all MLB teams, they do not challenge the underlying factual statement. Motion at 6.

Instead, the crux of Defendants' argument is that Dr. Rascher failed to verify the otherwise authoritative materials on which he relied for his conclusions.[15] Defendants offer no

---

[15] As an example of the type of baseless challenges made by Defendants, they challenge Dr. Rascher's citation to a work by Dennis Howard, the Dean of the Lundquist College of Business at University of Oregon and a leading

support for the absurd argument that Dr. Rascher was obligated to confirm the underlying sources used in the credible sources on which he relied. Nor do they present any evidence that the facts themselves are in doubt.

Defendants also complain that Dr. Rascher's opinion concerning equal share royalties is invalid because there are numerous other ways in which such funds could be distributed. Nonetheless, *Daubert* makes clear that expert testimony is admissible where there are good grounds for the expert's conclusion, even if there may be grounds for an alternate conclusion. *Daubert*, 509 U.S. at 595 (the inquiry is a flexible one, and its "focus, of course, must be solely on principles and methodology, not on the conclusions that they generate"). This is especially the case where, as here, the opinions posited by Dr. Rascher are directly supported by the actions of Defendants' themselves.

### D. Defendants Misstate Dr. Rascher's Testimony Concerning Defendants' "Market Power", Which is Based on Reliable and Admissible Documentation.

Defendants claim that Dr. Rascher did not undertake an economic analysis to determine Defendant's market power. Motion at 7. At the same time, Defendants acknowledge that Dr. Rascher was not assessing market power "in a strict antitrust sense." Motion at 7. Had Dr. Rascher purported to make a determination of market power in the context of an antitrust claim, Defendants' allegations might make sense.[16] Under the current briefing, however, Defendants completely ignore the directional/qualitative analysis Dr. Rascher did conduct, which does not require cross-elasticities and formal market definitions. Rascher Report at 13-15.[17] Indeed, as

---

authority on sports finance, questioning the reliability of that book's citation to work by Brandon Grusd. However, Grusd's work is a published article in the *Virginia Journal of Sports and the Law*, and is clearly an appropriate source on which an expert can rely. As another example, Defendants' question Dr. Rascher's reliance on information provided to him by former long-time MLBPA head Marvin Miller both orally and in writing in the form of a declaration filed under oath. Such materials are clearly of the type on which an expert can rely. *See, e.g., United States v. Floyd*, 281 F. 3d 1346, 1349 (11th Cir. 2002) (interviews); *Stevens v. Cesna Aircraft Co.*, 634 F. Supp. 137, 142-43 (E.D. Pa. 1986), aff'd 806 F. 2d 254 (3rd Cir. 1986) (interviews); *Dukes v. Wal-Mart. Inc.*, 222 F.R.D. 189, 197 (N.D. Cal. 2004) (declarations).

[16] Defendants' reliance on *Hynix Semiconductor Inc. v. Rambus Inc.* is misplaced. Unlike here, that case involved allegations of monopolization under Section 2 of the Sherman Act and thus only considered "market share" in the strict antitrust context.

[17] Dr. Noll previously questioned Dr. Rascher's determination of market power by dismissing Dr. Rascher's opinions concerning Defendants' ability to be a "one-stop shop" for NFL player rights, active and retired. Dr. Noll also questioned Dr. Rascher's opinion that Defendants have increased leverage as a result of their purported

Dr. Rascher attests, negotiating leverage can exist in a situation in which, as here, an organization may or may not have broad market power *per se*, but can still exercise leverage by virtue of exclusivity over the rights being licensed. Rascher Report at 13-15. Dr. Rascher was not assessing "market power" but rather negotiating leverage "akin" to market power. Reply Report at 5. Defendants' expert, Dr. Noll, acknowledges this, which he calls an "announcement effect." Noll Tr. at 62:16-23 ("In a business sense, the existence of GLAs for a significant number of retired players may well have been important in terms of its announcement effect in the sense that it – the presence of having 2,000 plus retired players having signed GLAs means that a license – a licensee knows that if it wants to deal with retired players, it can call NFLPI and start a negotiation about obtaining those rights.").

Defendants also challenge Dr. Rascher's opinion because he is not an expert on whether there exists a "principal-agent" problem within the NFLPA to give it leverage over its members. Motion at 7. Dr. Rascher raised this point solely in response to Dr. Noll's conclusory statement that the NFLPA was immune to malfeasance against its members simply by virtue of having a representative structure. Noll Report at 55-56. As Dr. Rascher explained in his Reply Report, Dr. Noll's claim is naïve in the face of extensive economic evidence that principal-agent problems often exist even within democratic institutions.[18] Reply Report at 34-36. Indeed, Dr. Noll has noted in his own prior publications that purportedly democratic institutions (like the NFLPA) "can suffer from the problem of not having the agents carry out the will of the principals." Reply *Id.*

Lastly, Defendants challenge Dr. Rascher's opinion on the ground that it is irrelevant to Plaintiffs' claim for breach of contract. Even assuming *arguendo* this was true, because Dr. Rascher's opinion also contemplates that Defendants improperly used their "leverage" to provide

---

exclusivity over all player rights, including as a result of the "non-interference" clause Defendants require in license agreements with third parties. Defendants appear to have abandoned their criticisms of Dr. Rascher's report on these grounds.

[18] Dr. Rascher does not intend to testify affirmatively that the NFLPA has such problems, but rather that Dr. Noll did not consider these questions when forming his opinion, and should have done so. This is valid rebuttal testimony, and will allow a trier of fact to determine how much weight should be given to Dr. Noll's blanket statement.

OPPOSITION TO MIL #4 DR. RASCHER
CASE NO. C:07-0943 WHA

a lower share of group licensing revenue to their retired player members and to prevent those players from pursuing opportunities in the marketplace, it is still relevant to and reliable in support of Plaintiffs' claim for breach of fiduciary duty.

### III. CONCLUSION

For the reasons given above, Defendants' Motion to exclude the testimony of Dr. Daniel A. Rascher should be denied.

Dated: October 6, 2008

Respectfully submitted,

MANATT, PHELPS & PHILLIPS, LLP

By: /s/ Ryan S. Hilbert
Ronald S. Katz (SBN 085713)
Ryan S. Hilbert (SBN 210549)
Noel S. Cohen (SBN 219645)
1001 Page Mill Road, Building 2
Palo Alto, CA 94304-1006
Telephone: (650) 812-1300
Facsimile: (650) 213-0260

MCKOOL SMITH, P.C.
Lewis T. LeClair (SBN 077136)
Jill Adler Naylor (SBN 150783)
300 Crescent Court
Dallas, TX 75201
Telephone: (214) 978-4984
Facsimile: (214) 978-4044

*Attorneys for Plaintiffs*