1  MANATT, PHELPS & PHILLIPS, LLP
   RONALD S. KATZ (Bar No. CA 085713)
2  E-mail: rkatz@manatt.com
   RYAN S. HILBERT (California Bar No. 210549)
3  E-mail: rhilbert@manatt.com
   NOEL S. COHEN (California Bar No. 219645)
4  E-mail: ncohen@manatt.com
   1001 Page Mill Road, Building 2
5  Palo Alto, CA 94304-1006
   Telephone: (650) 812-1300
6  Facsimile: (650) 213-0260

7  McKOOL SMITH, P.C.
   LEWIS T. LECLAIR (Bar No. CA 077136)
8  E-mail: lleclair@mckoolsmith.com
   JILL ADLER (Bar No. CA 150783)
9  E-mail: jadler@mckoolsmith.com
   300 Crescent Court, Suite 1500
10 Dallas, TX 75201
   Telephone: (214) 978-4000
11 Facsimile: (214) 978-4044

12 Attorneys for Plaintiffs

13                UNITED STATES DISTRICT COURT

14               NORTHERN DISTRICT OF CALIFORNIA

15                  SAN FRANCISCO DIVISION

16                                      CIVIL ACTION NO. C07 0943 WHA

17 BERNARD PAUL PARRISH, HERBERT
   ANTHONY ADDERLEY, and WALTER
18 ROBERTS, III on behalf of themselves and
   all others similarly situated,            **DECLARATION OF RYAN S. HILBERT**
19                                           **IN SUPPORT OF PLAINTIFFS' OPPOSITION**
                                             **TO DEFENDANTS' MOTION IN LIMINE**
20                Plaintiffs                 **NO. 4 TO EXCLUDE THE TESTIMONY OF**
                                             **DANIEL A. RASCHER**
21 vs.                                       Judge:   Honorable William H. Alsup
                                             Date:    October 15, 2008
22
23 NATIONAL FOOTBALL LEAGUE
   PLAYERS ASSOCIATION, a Virginia
24 corporation, and NATIONAL FOOTBALL
   LEAGUE PLAYERS INCORPORATED
25 d/b/a PLAYERS INC, a Virginia
   corporation,
26
27                Defendants.
28

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
PALO ALTO

20204741.1

DECLARATION OF RYAN S. HILBERT
RE MOTION IN LIMINE NO. 4
CASE NO. C07 0943 WHA

1      I, Ryan S. Hilbert, declare as follows:

2      1.      I am an associate with Manatt, Phelps & Phillips, LLP, attorneys of record for

3 Plaintiff Herbert Anthony Adderley and the GLA Class in the above-captioned matter. The facts

4 below are true and correct and within my own personal knowledge. If called on to testify to

5 them, I could and would competently do so.

6      2.      Attached hereto as Exhibit A is a true and correct copy of excerpts from the

7 Deposition of Daniel A. Rascher, Ph.D., taken on July 25, 2008.

8      3.      Attached hereto as Exhibit B is a true and correct copy of excerpts from the

9 Deposition of Roger G. Noll, taken on July 9, 2008.

10      I declare under penalty of perjury and the laws of the United States that the

11 foregoing is true and correct and that this declaration was executed on October 6, 2008.

12

13                                 /s/ Ryan S. Hilbert
                                 Ryan S. Hilbert

14

15

16

17

18

19

20

21

22

23

24

25

26

27                                          DECLARATION OF RYAN S. HILBERT
20204741.1               2                      RE MOTION IN LIMINE NO. 4

28                                            CASE NO. C07 0943 WHA

**Exhibit A**
to the
**Declaration of Ryan S. Hilbert In Support of Plaintiff's Opposition to Defendants' Motion In Limine No. 4 To Exclude The Testimony Of Daniel A. Rascher**

1          IN THE UNITED STATES DISTRICT COURT

2        FOR THE NORTHERN DISTRICT OF CALIFORNIA

3              SAN FRANCISCO DIVISION

4

5 BERNARD PAUL PARRISH, HERBERT )
  ANTHONY ADDERLEY, and WALTER  )
6 ROBERTS, III, on behalf of    )
  themselves and all others     )
7 similarly situated,           )
                                )
8          Plaintiffs,          )
                                )
9      vs.                      )  No. C07-0943-WHA
                                )
10 NATIONAL FOOTBALL LEAGUE     )
   PLAYERS ASSOCIATION, a       )
11 Virginia corporation and     )
   NATIONAL FOOTBALL PLAYERS,   )
12 INC., d/b/a PLAYERS, INC.,   )
   a Virginia,                  )
13                              )
           Defendants.          )
14                              )
_____ )

15
16
17      DEPOSITION OF DANIEL A. RASCHER, Ph.D.,
18           San Francisco, California
19           Friday, July 25, 2008
20
21
22
23 Reported by:
   Rebecca Romano,
24 CSR No. 12546
   Job No. 204032
25

COPY

1    San Francisco, California, Friday, July 25, 2008

2             10:01 A.M. - 4:14 P.M.

3

4             DANIEL A. RASCHER, Ph.D.,

5 having been first duly sworn, was examined and testified

6 as follows:

7

8                 EXAMINATION

9 BY MR. KESSLER:

10    Q    Mr. Rascher, you want to state your name and

11 address for the record, please.

12    A    My name is Daniel A. Rascher.  And my address

13 is 5847 Heron Drive -- that's H-E-R-O-N Drive.  That's

14 in Oakland, California 94618.

15    Q    Okay.  My name is Jeffrey Kessler.  We just

16 met.  I'm representing the defendants in this case.

17         Is it correct that you prefer to be called

18 Dr.?

19    A    Yes.

20    Q    Okay.  Dr. Rascher, is it correct that you

21 have been deposed before?

22    A    Yes, I have.

23    Q    So I assume you're generally familiar with

24 deposition procedures?

25    A    It's been a while, but -- but yes.

1    Q    And you understand you're under oath?

2    A    Yes.

3    Q    I'm going to ask you a series of questions.

4 If you don't understand any of those questions, please

5 let me know and I will try to make them clear to you.

6 Otherwise, I'm going to assume that the question was

7 understandable.

8          Okay?

9    A    All right.  I will do my best.

10    Q    Okay.  And if at any time you require a break

11 of any kind, just let me know.  And when we get to a

12 convenient point in the questioning, I will try to give

13 you such a break.

14          Okay?

15    A    Okay.

16          MR. KESSLER:  I'm going to mark as Exhibit 631

17 a copy of what appears to be some regression results

18 that was just handed to me by your counsel before we

19 commenced the deposition this morning.

20          (Rascher Exhibit No. 631 was marked for

21 identification.)

22    Q    (By Mr. Kessler)  Dr. Rascher, could you tell

23 me what this exhibit is?

24    A    This is an analysis that looks at -- it takes

25 NFL licensing rankings.  So, for instance, if a team for

1 a particular year sold the most licensed products, then

2 they get a ranking of 1. The team that sold the second

3 most gets a ranking of 2, and so forth.

4 And I'm -- I'm regressing that against the --

5 so that -- so the time period is 1989 through 1996, NFL

6 data. So I'm averaging those over those -- over that

7 time period. And then I'm regressing that against the

8 handful of variables that you can see on the left-hand

9 side there.

10 And those are the -- the average number of

11 wins for those teams during that time period, the total

12 number of Super Bowl wins preceding the time period.

13 Not during the time period, but preceding the time

14 period. And then the 1990 population of each of the

15 cities or the -- I should be more clear, the -- the

16 MSAs, metropolitan statistical areas.

17 Q When did you perform this analysis?

18 A About a couple of weeks ago. Maybe about a

19 week ago, kinda. I was playing around with it.

20 I hadn't -- I hadn't -- I'd forgotten I had

21 this data. And I hadn't thought about it until

22 recently.

23 Q Okay. I take it that this analysis was

24 completed after you did both your original report and

25 your supplemental report?

1    A    Yes.

2    Q    Okay.  And yet you are purporting to now rely

3 upon this some way in this case?

4    A    I mean, yes.  I mean, I didn't need it for my

5 analysis, but when it -- it came to me -- I was just

6 thinking about some research I was working on, and so

7 forth.  And it came to me that I had this data, and so I

8 went and looked at it.  And I just started -- you know,

9 I started reviewing it.

10         MR. KESSLER:  For the record, we are going to

11 object to any admission of any testimony based on this

12 as being untimely.

13         But I will ask you questions about this,

14 nonetheless, in the event that the court would not agree

15 with that position; although, I believe it will.

16         MR. KATZ:  And I will note for the record -- I

17 didn't mean to interrupt you.  If you're not finished --

18         MR. KESSLER:  Go ahead.

19         MR. KATZ:  I would note for the record that

20 defendants produced some additional materials at the

21 beginning of Dr. Jizmagian's deposition.  Mr. O'Kelly

22 produced additional materials --

23         MR. KESSLER:  Yeah, but it was not material --

24         MR. KATZ:  May I finish?

25         MR. KESSLER:  Yes.

1              MR. KATZ:  -- that Dr. Jizmagian had provided.

2              MR. KESSLER:  It was not material that was not

3 fully disclosed in his report.  And that's a fundamental

4 difference.  But we can debate that at another time.

5              MR. KATZ:  Absolutely.

6      Q    (By Mr. Kessler)  Let me just ask now.

7           This covers the period, you said, 1984 to '95?

8      A    No.  What did I say?  1989 through 1996.

9      Q    Okay.  So this has nothing to do with the

10 class period in this matter.

11     A    That's true.

12     Q    Okay.  In fact, this ends seven years before

13 the class period.

14     A    Okay.

15     Q    Okay.  And to --

16              MR. KATZ:  Well, do you know what the class

17 period is?

18              THE DEPONENT:  I mean, I -- I don't know the

19 beginning of the class period.  So you didn't ask me a

20 question; you made a statement.

21     Q    (By Mr. Kessler)  Do you know when the class

22 period is in this case?

23     A    I don't know when the beginning of the class

24 period is.

25     Q    Okay.  Let me -- okay.

1                What basis do you have to conclude that

2 anything you found in this study ending in 1996 would

3 apply for the period 2003 going forward?

4        A     It's an analysis actually somewhat similar to

5 what Dr. Noll had produced.  Or not -- I shouldn't say

6 "produced."

7                But he did an analysis back in the -- in the

8 '70s, which I think was very applicable to this -- to

9 what my analysis is and to what my opinion is, and I'm

10 just finding his analysis here.

11       Q     That's not my question, Dr. Rascher.  I'm not

12 asking you about Dr. Noll's analysis in the '70s.

13               I'm asking you, what's the basis for your

14 conclusion that this study that ended in '96 would have

15 any applicability for the period from 2003 forward?

16       A     Well, what it shows is that events that

17 occurred in the past in the NFL, teams winning Super

18 Bowls, all the way into the future affects the -- the

19 sale of licensed merchandise.

20       Q     Okay.  From where do you get the data on sales

21 of licensed merchandise?

22       A     I think we have a cite in here.

23               Team Licensing Business is where the data

24 originally came from.

25       Q     What is Team Licensing Business?

1      A      It's a magazine -- or, I should say, it was a

2 magazine that used to produce this information.

3      Q      **Is it no longer in existence?**

4      A      No longer in existence.

5      Q      **Do you know where that magazine got the**

6 **information from?**

7      A      That, I do not know.

8      Q      **Do you have any way to verify the reliability**

9 **of that information?**

10      A      I have seen other -- well, I have seen -- I've

11 seen it mentioned in many -- in the press. I have seen

12 researchers use it in -- in publications.

13           But in terms of originally knowing where they

14 got the information from, I mean, I recall that -- I

15 believe they -- they got it from NFL Properties. And --

16 and I think one of the requirements would be that NFL

17 Properties says, Well, you can't put how much money is

18 being sold by -- you know, how much licensed merchandise

19 is being sold under each team's name, but you can rank

20 them.

21           And, again, that's my recollection of this

22 data. I originally, you know, gathered this data or I

23 had an RA gather this data ten years ago.

24      Q      **Since tens years ago, have you done anything**

25 **to verify the reliability of this data yourself?**

1     A     No.   As -- again, my -- my response is that

2 people use this data.  And because it doesn't -- there

3 isn't current versions of it, you don't -- you don't see

4 it mentioned as much currently.

5          But back when they were publishing it, it

6 was -- it was discussed, you know, as I said, in the --

7 in the press.  And, you know, people have published

8 peer-review articles based on this data, and so forth.

9     Q     **Is it your position as an economist and it's**

10 **your practice to use data if -- simply because other**

11 **people used it, without independently verifying its**

12 **reliability?**

13     A     I wouldn't say that's a practice.  I would say

14 that -- that if it came out published in a magazine --

15 in your research, you state where you got it from.

16          I mean, NFL Properties could give them data

17 that's incorrect for some unknown reason, and so I think

18 that's true with any data.

19     Q     **So your answer to my question is yes, as long**

20 **as someone has published it, you feel it's okay to use**

21 **it without independently verifying its reliability?**

22          MR. KATZ:  Object.

23          THE DEPONENT:  You always try to verify its

24 reliability.  But if you can't, then you state the basis

25 for -- for why you're using it.

1      Q      (By Mr. Kessler)  You know counsel has

2 subpoena power in this case?

3           MR. KATZ:  Object.

4      Q      (By Mr. Kessler)  Are you aware of the fact

5 that people have subpoena power in a lawsuit?

6      A      Right.

7           MR. KATZ:  Object.

8      Q      (By Mr. Kessler)  Did you ever ask counsel in

9 this case for plaintiffs to issue a subpoena to NFL

10 Properties to get any of this type of data?

11      A      No, I did not.  As I said, I -- I had only --

12 this only came to me in -- in the last few weeks.

13      Q      Okay.  Now, this data doesn't show anything

14 about -- about what fact this contributes to the

15 popularity of player licensing, licensing a player

16 images, as opposed to the sale of team merchandise; is

s/b 'licensing a player's images' per errata.

17 that correct?

18           MR. KATZ:  Object.

19           THE DEPONENT:  The -- it talks about -- you

20 mean in the terms of the average -- the licensing data?

21      Q      (By Mr. Kessler)  Okay.  The licensing data is

22 the sale of team merchandise, correct?

23      A      I believe that's what it is, but --

24      Q      Okay.

25      A      But I don't know if the team merchandise -- I

1        ‚So not only to differentiate a team, brand but

*s/b 'serve not only to differentiate' per errata.*

2 may also elevate a fan's sense of obligation to the

3 team.

4     Q    Okay. Is this one of my questions you don't

5 understand?

6         I'm asking you --

7         MR. KATZ: Object.

8     Q   (By Mr. Kessler) -- Dr. Rascher, to confirm

9 exactly what you just read; that every single one of the

10 studies that you relied upon, including this one, has to

11 do with a fan's obligation or affinity with a team brand

12 or obligation to team, without specifically talking

13 about players.

14         I'm correct, am I not?

15         MR. KATZ: Object.

16         THE DEPONENT: You mean, this -- this talks

17 about players.

18         MR. KATZ: You have to pause for a second.

19         THE DEPONENT: Sorry.

20         MR. KATZ: Object.

21         You can answer.

22     Q   (By Mr. Kessler) Other than the fact that

23 players are on a team -- which I understand that. Okay?

24 Putting that aside -- okay? -- show me where, in this

25 study, this study talks about how past history or past

1 players affects a fan's identification with or loyalty

2 to players in their player licensing.

3         Is there anything in this study that does

4 that?

5         MR. KATZ: Object.

6         THE DEPONENT: I think that your premise is

7 incorrect.

8   Q  (By Mr. Kessler) You don't get to argue with

9 my premise, just answer my question.

10         Okay. Is there some reason you won't answer

11 my question, sir?

12   A  I'm --

13         MR. KATZ: Object. He answered your

14 question.

15         THE DEPONENT: I'm -- my analysis -- I mean,

16 it's -- I just didn't think it's relevant to -- to --

17 you don't have to look at the -- player licensing goes

18 in groups.

19         For instance, on the EA sports game, the

20 players go in there and they form a group, which is a

21 team. And so fans are -- are -- are playing the game

22 and they're playing -- pitting one team against the

23 other.

24         And so the -- even -- you know, even if there

25 are -- there are player licensing; you know, the fans

1 are buying that so they can play one team against the

2 other and see highlights of particular players, and

3 things like that.

4     Q    (By Mr. Kessler)  Okay.  I'm not asking what

5 you think is relevant or not.  Okay?  I'm simply asking

6 you to confirm what I think is an undeniable fact, since

7 I read every single article you cited, I will represent

8 to you.  Okay?

9             And I just want you to confirm that every

10 single article that you cite or relied upon, including

11 this one, Underwood -- but it's all of them -- it says

12 they deal with the issue of brand affinity or brand

13 development of teams or -- or nonsports entities or

14 service marks, but they don't deal directly with

15 discussing brand affinity of particular players or

16 groups of players, other than the fact that teams are on

17 players -- I mean players are on teams.

18     A    Right.

19     Q    Is that true?

20             MR. KATZ:  Object.

21             THE DEPONENT:  I mean, I would have to look at

22 each article.

23             And the reason I say that is when I -- when I

24 analyzed them, I wasn't looking for whether a fan is

25 trying to remember a particular player from the past and

1 then buy a licensed merchandise currently from that --

2 you know, based on that memory of the particular player.

3 It's the -- you know, sports is about the experience.

4        And so my analysis was to -- was to look at

5 that retired players from the past matter.  In fact,

6 did -- did the retired NFL players help to make the game

7 what it is today?

8        That -- you know, that was the question that

9 was put forth to me.

10        Did retired players from the past help to make

11 the game what it is today?

12    Q    (By Mr. Kessler)  Okay.  So you did not

13 examine the issue of whether retired players in the past

14 helped to enhance the value of active player licensing

15 today, right?

16        You didn't look at that question.

17        MR. KATZ:  Object.

18        THE DEPONENT:  Can you explain that further,

19 "active player licensing."

20    Q    (By Mr. Kessler)  Okay.  You understand that

21 most of the business of Players, Inc., is to license

22 active players.

23        You understand that?

24    A    Yes.

25    Q    Okay.  And you understand that's where most of

1          MR. KATZ:  Object.

2     Q    (By Mr. Kessler)  Under that analysis,

3 everybody has helped build the game, correct?

4          MR. KATZ:  Object.

5          THE DEPONENT:  I mean, everyone -- yeah.  I

6 mean, I would say that -- that -- yeah.  I mean,

7 certainly, I imagine a ticket-taker would -- you know,

8 there's a push now in sports to really focus on customer

9 service.  And so those ticket-takers are going to really

10 impact whether you have somebody come back the next

11 season, for instance.

12     Q    (By Mr. Kessler)  Now, in offering this

13 opinion about who build the game, what area of expertise

s/b 'opinion about who builds the game' per errata.

14 are you applying?

15     A    I mean, the -- the economics of -- of the

16 sports industry.  And I'm -- as I -- you know, I'm --

17 I'm doing a number of things.  I'm -- I'm looking at

18 peer-reviewed published literature, and I'm looking at

19 transactions in the marketplace.

20          You know, I'm even -- I'm even taking the

21 NFLPA's own words, which are -- Doug Allen wrote that

22 the retired players built the game.  I mean, he says,

23 "The retired players built the game and the union.  We

24 live every day by the NFLPA's motto, past, present and

25 future."

1 what do these agents charge.

2            And then if you look at baseball, the baseball

3 union -- I wanted to look at the group licensing to make

4 it apples to apples, and so you look at what the

5 baseball union -- you know, and they have to run their

6 union, too.  And then you look at what the football

7 union does.

8     Q    (By Mr. Kessler)  Okay.  As I said in my

9 preface to this whole line of questions, I'm putting

10 aside now the comparisons you did with baseball and

11 basketball, which are also sports unions.  Okay?

12     A    Right.

13     Q    So put that aside for the moment.

14          Would you agree with me that all of your other

15 comparisons of licensing agents, which are listed in

16 your report on page 10 and 11 -- okay? -- that -- on,

17 you know, 10 and 11, would you agree with me that it's

18 not an apples-to-apples comparison when looking at a

19 sports union's licensing activities versus a non-sports

20 union because there's this additional factor that the

21 union is not a mere agent, licensing agent, but also

22 performs union functions for the principals, which the

23 principals may choose to support by deciding to devote

24 licensing revenue to that union?

25          MR. KATZ:  Object.

1            THE DEPONENT:  So the question that was put

2 forth to me was, you know, can you compare that

3 percentage of what happens with NFLPA/PI with other

4 professional sports unions or other third licensing,

5 entities.           *s/b 'third party licensing per errata.*

6            And so these are not unions.  You know,

7 each -- CLC does their work for college athletic

8 departments, and so forth.

9      Q    (By Mr. Kessler)  Well, let me ask it this

10 way.

11           MR. KATZ:  He's not finished, Mr. Kessler.

12     Q    (By Mr. Kessler)  Finish, if you have

13 something else to say.

14     A    In my analysis of -- you know, of published

15 research, again showing -- you know, shows what -- what

16 it shows, which are, you know, 20 percent licensing

17 management fee, as high as 35 percent, you know, 15

18 percent University of Kentucky, and so forth.

19     Q    You agree with me, when you're doing

20 comparisons as an economist, you should try to look at

21 things that are apples-to-apples comparisons, correct?

22     A    Correct.

23     Q    Okay.  And I guess my question is:  Have you

24 made -- not what -- not what did counsel ask you to do.

25 Okay?

1          I'm asking you:  Have you made any expert

2 conclusion that non-sports unions are an

3 apples-to-apples comparison to unions for the purposes

4 of looking at how they distribute their licensing

5 revenue?

6          MR. KATZ:  Object.

7          THE DEPONENT:  So it's -- it's not, you know,

8 most -- anytime you do an analysis evaluation on

9 anything like that, you're -- you're looking for

10 comparables, as you said.

11          Some comparables are more comparable than

12 others, but it's really a kind of shades-of-gray issue.

13          And so instead of just looking at baseball,

14 for instance, I -- I decided it was important to go out

15 there and look at all of these other situations where

16 they sell licensing rights and they -- and they charge a

17 fee for them.

18          And so, you know, to your point, you certainly

19 want to have as many -- you know, your comparables to be

20 as close as possible, but it's really shades of gray.

21     Q    (By Mr. Kessler)  Does that mean you do think

22 of apples to apples?

23          I just want to know --

24     A    Which does?

25     Q    -- one way or the other which -- I'll go

1 through each one separately, if you want.

2          Do you think the Collegiate Licensing Company

3 is an apples-to-apples comparison with the NFLPA with

4 respect to how they use licensing, how they distribute

5 licensing money?

6          Is that an apples-to-apples comparison in your

7 professional opinion?

8          MR. KATZ:  Object.

9          THE DEPONENT:  How they distribute it to

10 their --

11    Q    (By Mr. Kessler)  To their principals, because

12 one is players and the other is schools.

13         MR. KATZ:  Objection.

14         THE DEPONENT:  You know, they -- it's -- I

15 would -- I believe that it is a comparable.  Apples to

16 apples, again, you know, it's -- people have different

17 meanings when they say that.  But it's not exactly the

18 same.  It is not a union, I agree with you.

19    Q    (By Mr. Kessler)  Well, let me ask you this:

20 Would there be anything wrong economically, from your

21 standpoint, in the principals in a union, the players,

22 deciding to give a greater percentage of the revenues to

23 their licensing agent, the union, because they want to

24 support the union activities than a college wants to

25 give to Collegiate Licensing Company because all it is

1 is an agent?

2      Would there be anything economically wrong

3 with that?

4      MR. KATZ:  Object.

5      THE DEPONENT:  No.  In -- in this case,

6 there's -- again, my -- this wasn't part of what I set

7 out to study, but I kept coming across this, was that

8 you have these set of retired players who are members of

9 the union who may be adversely affected by the decisions

10 by the active players in terms of how they decide to

11 distribute their licensing revenues.

12   Q   (By Mr. Kessler)  You haven't studied at all

13 whether the money at issue in this case is active player

14 money or retired player money, right?

15      That's not an issue that you have been asked

16 to examine?

17      MR. KATZ:  Object.

18      THE DEPONENT:  Well, I -- no.  I mean, one

19 thing I looked at was how much money of the group of

20 the -- of the pooled licensing revenues is distributed

21 to PA, to PI and to -- and to the players.  No, but

22 that's active money.

23   Q   (By Mr. Kessler)  Okay.  It's active money,

24 yes.

25      My question is:  You haven't examined -- for

1

2

3

4          I, the undersigned, a Certified Shorthand

5 Reporter of the State of California, do hereby

6 certify:

7          That the foregoing proceedings were taken

8 before me at the time and place herein set forth; that

9 any witnesses in the foregoing proceedings, prior to

10 testifying, were placed under oath; that a verbatim

11 record of the proceedings was made by me using machine

12 shorthand which was thereafter transcribed under my

13 direction; further, that the foregoing is an accurate

14 transcription thereof.

15          I further certify that I am neither

16 financially interested in the action nor a relative or

17 employee of any attorney of any of the parties.

18          IN WITNESS WHEREOF, I have this date

19 subscribed my name.

20

21 Dated:  July 28, 2008

22

23

24                    _____

                      REBECCA L. ROMANO

25                    CSR No. 12546

**Exhibit B**
**to the**
**Declaration of Ryan S. Hilbert In Support of**
**Plaintiff's Opposition to Defendants' Motion In**
**Limine No. 4 To Exclude The Testimony Of**
**Daniel A. Rascher**

1        UNITED STATES DISTRICT COURT

2        NORTHERN DISTRICT OF CALIFORNIA

3        SAN FRANCISCO DIVISION

4        --oOo--

5  BERNARD PAUL PARRISH, HERBERT
    ANTHONY ADDERLY, WALTER
6  ROBERTS, III,

7        Plaintiffs,

8      vs.            Case No. C 070943 WHA

9  NATIONAL FOOTBALL LEAGUE
    PLAYERS ASSOCIATION AND
10  NATIONAL FOOTBALL LEAGUE
     PLAYERS INCORPORATED D/B/A
11  PLAYERS, INCORPORATED,

12       Defendants.
    _____/
13

14

15

16    VIDEO DEPOSITION OF ROGER G. NOLL, Ph.D.

17       Wednesday, July 9, 2008

18

19

20  REPORTED BY:

21  DEBRA J. SKAGGS, CSR 7857

22

23        DE SOUZA & ASSOCIATES
       Certified Shorthand Reporters
24    One Waters Park Drive, Suite 180
      San Mateo, California  94403
25        (650) 341-2671

1    not make reference to it, so I don't -- I can't answer a

2    question whether the players who had signed a GLA in

3    some legal sense were different from the ones who

4    hadn't.  All I can observe is what the actual agreements

5    were and there they were.  They had differences among

6    players in how much they were going to get paid.

7            MR. KATZ:  Q.  Right.  And let me say I'm

8    not asking you about any legal questions.  No

9    questions I ask you will be asking for legal

10   expertise because you don't -- there is no

11   foundation for that.

12           My question, in a business sense, is did the

13   GLA -- the GLA was irrelevant to this TMP transaction.

14   Whether someone had signed it or not was irrelevant.

15           MR. FEHER:  Objection to form.

16           THE WITNESS:  In a business sense, the

17   existence of GLAs for a significant number of retired

18   players may well have been important in terms of its

19   announcement effect in the sense that it -- the presence

20   of having 2,000 plus retired players having signed GLAs

21   means that a license -- a licensee knows that if it

22   wants to deal with retired players, it can call NFLPI

23   and start a negotiation about obtaining those rights.

24           Now, once it does that, if the players that

25   they want the license include some people who haven't

1    That the -- there may well be, but I don't believe it
2    accounts for a significant fraction of the -- most of
3    the revenue, as I understand it, to retired players that
4    comes from EA comes from the ability to put in stars of
5    the past into an existing team.  I think that's where
6    most of the revenue comes from.  That's my memory
7    sitting here.

8          But, again, I didn't -- the reason I'm
9    answering this question the way I did is I'm trying to
10   be responsive to a question that you put that is not
11   part of my report.  And when you say have I seen things?
12   Yes, I've seen them.  But they're not part of my report
13   and so I didn't attempt to memorize them in preparation
14   for the deposition.

15         MR. KATZ:  Q.  Right.  So my question is,
16   simply.  Do you know, as you sit here now, whether
17   the Madden games have vintage teams like the
18   '88 - 49ers or the '68 Packers?

19   A.       I do not know for certain which, if any,
20   vintage teams are on Madden games.

21         What I was referring to was licensing income
22   as opposed to the characteristics of Madden NFL
23   Football.  All right.  There is nothing in my report
24   that I studied that has anything to do with what Madden
25   NFL Football does.

```
 1            I, DEBRA J. SKAGGS, CSR No. 7857, a Certified

 2   Shorthand Reporter, do hereby certify:

 3            That ROGER G. NOLL, Ph.D., the witness in the

 4   foregoing deposition was by me duly sworn to tell the

 5   truth, the whole truth, and nothing but the truth in the

 6   within-entitled cause;

 7            That said deposition was reported by me and

 8   transcribed as herein set forth;

 9            That, if signed, the deposition was read by or

10   to said witness, corrected in every particular desired,

11   and was thereafter subscribed by said witness;

12            That, if unsigned, the deposition was retained

13   by me at the offices of DE SOUZA & ASSOCIATES, One

14   Waters Park Drive, Suite 180, San Mateo, California

15   94403 and was available for reading, correcting and

16   signing by said witness.

17            I further certify that I am not interested in

18   the outcome of said action, nor connected with, nor

19   related to any of the parties in said action or to their

20   respective counsel.

21                    IN WITNESS WHEREOF I have hereunto

22                    set my hand this _____14th____ day of

23                    _____July_____, 2008.

24                    _____
                      DEBRA J. SKAGGS, CSR NO. 7857

25

                                                  213
```