1   MANATT, PHELPS & PHILLIPS, LLP
    RONALD S. KATZ (Bar No. CA 085713)
2   E-mail: rkatz@manatt.com
    RYAN S. HILBERT (California Bar No. 210549)
3   E-mail: rhilbert@manatt.com
    NOEL S. COHEN (California Bar No. 219645)
4   E-mail: ncohen@manatt.com
    1001 Page Mill Road, Building 2
5   Palo Alto, CA 94304-1006
    Telephone: (650) 812-1300
6   Facsimile: (650) 213-0260

7   McKOOL SMITH, P.C.
    LEWIS T. LECLAIR (Bar No. CA 077136)
8   E-mail: lleclair@mckoolsmith.com
    JILL ADLER NAYLOR (Bar No. CA 150783)
9   E-mail: jadler@mckoolsmith.com
    300 Crescent Court, Suite 1500
10  Dallas, TX 75201
    Telephone: (214) 978-4000
11  Facsimile: (214) 978-4044

12  Attorneys for Plaintiffs

13

14              UNITED STATES DISTRICT COURT

15              NORTHERN DISTRICT OF CALIFORNIA

16                  SAN FRANCISCO DIVISION

17

18  BERNARD PAUL PARRISH, HERBERT          CIVIL ACTION NO. C07 0943 WHA
    ANTHONY ADDERLEY, and Walter
19  Roberts III, on behalf of themselves and all
    others similarly situated,
20                                          **DECLARATION OF RYAN S. HILBERT IN
                                            SUPPORT OF PLAINTIFFS' OPPOSITION
21                    Plaintiffs            TO DEFENDANTS' MOTION IN LIMINE
                                            NO. 5 TO EXCLUDE THE TESTIMONY OF
22  vs.                                     PHILIP Y. ROWLEY**

23  NATIONAL FOOTBALL LEAGUE                Judge:   Honorable William H. Alsup
    PLAYERS ASSOCIATION, a Virginia         Date:    October 15, 2008
24  corporation, and NATIONAL FOOTBALL
    LEAGUE PLAYERS INCORPORATED
25  d/b/a PLAYERS INC, a Virginia
    corporation,
26
                      Defendants.
27

28

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
PALO ALTO

20206038.1

4249v1

DECLARATION OF RYAN S. HILBERT
RE MOTION IN LIMINE NO. 5
CASE NO. C07 0943 WHA

Dockets.Justia.com

1     I, Ryan S. Hilbert, declare as follows:

2     1.     I am an associate with Manatt, Phelps & Phillips, LLP, attorneys of record for

3  Plaintiff Herbert Anthony Adderley and the GLA Class in the above-captioned matter. The facts

4  below are true and correct and within my own personal knowledge. If called on to testify to

5  them, I could and would competently do so.

6     2.     Attached hereto as Exhibit A is a true and correct copy of excerpts from the

7  Deposition of Philip Y. Rowley, taken on July 22, 2008.

8     3.     Attached hereto as Exhibit B is a true and correct copy of excerpts from the

9  Deposition of G. Stephen Jizmagian, taken on July 8, 2008.

10     I declare under penalty of perjury and the laws of the United States that the foregoing is

11  true and correct and that this declaration was executed on October 6, 2008.

_____
/s/ Ryan S. Hilbert
Ryan S. Hilbert

20206038.1

49v1

DECLARATION OF RYAN S. HILBERT
RE MOTION IN LIMINE NO. 5
CASE NO. C07 0943 WHA

**Exhibit A**
to the
**Declaration of Ryan S. Hilbert In Support of Plaintiff's Opposition to Defendants' Motion In Limine No. 5 To Exclude The Testimony Of Philip Y. Rowley**

```
1       IN THE UNITED STATES DISTRICT COURT
2     FOR THE NORTHERN DISTRICT OF CALIFORNIA
3            SAN FRANCISCO DIVISION
4
5 BERNARD PAUL PARRISH, HERBERT )
  ANTHONY ADDERLEY, and WALTER )
6 ROBERTS, III, on behalf of   )
  themselves and all others    )
7 similarly situated,          )
                               )
8           Plaintiffs,        )
                               )
9     vs.                      )  No. C07-0943-WHA
                               )
10 NATIONAL FOOTBALL LEAGUE.   )
   PLAYERS ASSOCIATION, a      )
11 Virginia corporation and    )
   NATIONAL FOOTBALL PLAYERS,  )
12 INC., d/b/a PLAYERS, INC.,  )
   a Virginia                  )
13                             )
            Defendants.        )
14                             )
   _____ )
15
16
17      DEPOSITION OF PHILIP Y. ROWLEY,
18         San Francisco, California
19          Tuesday, July 22, 2008
20
21
22
23 Reported by:
   Rebecca Romano,
24 CSR No. 12546
   Job No. 81049/204031
25
```

COPY

1   Q   (By Mr. Kessler)  In your assignment paragraph, it

2   says, "I have been asked to analyze and to reachopinions

3   as to potential damages in this matter."

4        What do you mean by the word "potential"?

5   A   Well, I think as -- as the dialogue has

6   progressed in the last couple of months, there's a

7   variety of liability decisions that need to be

8   determined.  And so depending upon that, there could be

9   different damage scenarios.

10   Q   Well, are you offering an opinion that the

11  damages you calculated were, in fact, incurred by the

12  class here, or are you offering an opinion that they

13  were potentially incurred by the class here?

14        MR. KATZ:  Object.

15        THE DEPONENT:  What my opinion is, is that if

16  the trier of fact determines certain liabilities, I

17  provided a construct as to what I believe the damages

18  were that were suffered by the plaintiffs.

19   Q   (By Mr. Kessler)  Okay.  So your view is that

20  for each possible liability outcome, you're rendering an

21  opinion as to what the damages would be for that

22  liability outcome; is that fair?

23        MR. KATZ:  Object.

24        THE DEPONENT:  In my words, I -- I've offered

25  damage models or constructs that the trier of fact could

1 use in applying the damages.

2     Q   (By Mr. Kessler)  Okay.  Would you offer an

3 opinion to the trier of fact as to which estimate is a

4 better estimate of the damages suffered by the class?

5         MR. KATZ:  Object.

6         THE DEPONENT:  As a general proposition?

7     Q   (By Mr. Kessler)  Yes.

8     A   No.

9     Q   Okay.  So in your expert opinion, are they all

10 equally good estimates?

11         MR. KATZ:  Object.

12         THE DEPONENT:  Again, it depends upon the

13 specific determination of liability on the relevant

14 issues.  If you defined this is the liability, I believe

15 I can apply a specific model.

16     Q   (By Mr. Kessler)  Okay.  Well, if the jury

17 just finds breach of contract -- and that's all we

18 know -- the judge gets a verdict that says breach of

19 contract, which, in your expert opinion, is the best

20 estimate of damages if it's just a finding of breach of

21 contract?

22         MR. KATZ:  Object.

23         THE DEPONENT:  Not being a lawyer, I would

24 have anticipated that the jury instructions would have

25 looked to one of the key issues being, "Does breach of

1 contract mean only those contracts or agreements that

2 have specific language referencing retired players

3 versus all contracts," because that goes to groups

4 larger than six, which I understand from plaintiffs'

5 counsel is one of -- is one of their arguments.

6      So for me to, first off, give a model, I would

7 need to understand, is that -- is that the breach of

8 contract.

9    Q  (By Mr. Kessler)  Do you have any opinion as

10 to what the contract means in this case?

11      MR. KATZ:  Object.

12    Q  (By Mr. Kessler)  I'm referring to the group

13 licensing authorization signed by retired players.

14    A  As it means from a -- from a legal standpoint?

15    Q  Are you offering any expert opinion on that

16 issue?

17    A  On that language?

18    Q  Yes.

19    A  Either the Group 6 or the retired in escrow?

20      Not to the meaning.  I take into account in my

21 damage constructs what an application might be of an

22 escrow account, as an example.  But to the language, I'm

23 not offering an opinion as to what that specifically

24 means.

25    Q  Do your models distinguish between the amount

1           THE DEPONENT:  Well, to the extent that I have

2 built three constructs with percentages, based on

3 percentages that were provided by another expert, I have

4 provided some type of a model that could be used by the

5 trier of fact if it's deemed as a breach.

6           But I have not been asked and nor did I study

7 specifically the reasonableness of the percentages

8 independently from what I gathered from Dr. Rasher.

9     Q     (By Mr. Kessler)  Dr. Rasher came up with

10 these comparables and percentages, correct?

11          MR. KATZ:  Object.

12          THE DEPONENT:  The 10 percent, the 25 and the

13 40?

14    Q     (By Mr. Kessler)  Yes.

15    A     Yes.

16    Q     You haven't done anything to independently

17 verify the reasonableness of those comparables, have

18 you?

19          MR. KATZ:  Object.

20          THE DEPONENT:  That's not true.

21    Q     (By Mr. Kessler)  You have verified them?

22    A     I have had at least two discussions with

23 Dr. Rasher as to how he -- how he came up with those and

24 what he's basing it upon.

25    Q     Okay.  And based on those discussions, you are

1    Q    Okay.  That's -- that's the full sum and

2 substance of your expert opinion on that particular

3 subject, correct?

4    A    Correct.

5    Q    Okay.  Now --

6         MR. KATZ:  Please note my objection to the

7 last question.

8    Q    (By Mr. Kessler)  Now, in terms of what you

9 did as opposed to what Dr. Rasher did --

10   A    Yes.

11   Q    -- in this analysis of the 10, 25 and 40

12 percent, other than performing arithmetic, what else did

13 you do in that particular analysis -- and rely upon

14 Dr. Rasher for the comparisons?

15        MR. KATZ:  Object.

16        THE DEPONENT:  Well, a significant amount of

17 work.  And anyone who spent time with the NFLPA, PI

18 licensing program recognizes that the documentation and

19 the detail is -- is not clean.

20        And so there was quite a bit of work that went

21 into -- to determine the appropriate shared revenue

22 pool, the adjustments that are made, when those

23 adjustments are made, the number of active players, the

24 number of retired players; if you look to some of the

25 theories here on liability, which contracts or

1 agreements are appropriate in which years.

2        So quite a bit of work went into constructing

3 the damage models.

4    Q    (By Mr. Kessler)  Did you make any judgment as

5 to which contracts and agreements were appropriate?

6        MR. KATZ:  Object.

7        THE DEPONENT:  I was directed by counsel that

8 those agreements that had certain language that

9 referenced retired players should be considered a subset

10 of all agreements.

11    Q    (By Mr. Kessler)  Okay.  Other than counsel

12 directing you on that, did you form any expert judgment

13 as to whether those agreements should be included in

14 your damage analysis?

15        MR. KATZ:  Object.

16        THE DEPONENT:  To the extent that they are

17 included or portions of them are included in the equal

18 share pool, yes.

19    Q    (By Mr. Kessler)  Okay.  On what basis do you

20 believe the language of those contracts support

21 including them?

22        MR. KATZ:  Object.

23    Q    (By Mr. Kessler)  If you have an expert

24 opinion about that.

25    A    Yeah -- no.  Counsel, are you talking about

1    Q    (By Mr. Kessler)  Are my questions unclear to

2 you?

3    A    I -- I asked for clarification.

4    Q    I'll ask it again.  Okay.

5         Is counsel the one who decided these different

6 cuts of your damage analysis in terms of do one subset

7 with just the retired player language, one subset

8 including the NFL sponsorship agreement and the retired

9 player language, another subset having all the GLR

10 contracts in them?

11        Did counsel decide that or did you decide

12 that?

13        MR. KATZ:  Object.

14        THE DEPONENT:  Ultimately, I would say it was

15 a combination.  And the reason for that is when I

16 initially was engaged, my assumption was there would be

17 a licensing pool that I would be able to access.  I

18 would see here were the shares that were allocated to

19 certain players.  And I didn't know at that time if

20 retired players had received any or not.

21        I would then find the number of active and

22 retired players, and I would come up with an adjusted

23 share.

24        Once I got into the engagement, some of the

25 things that I noted is that there were different

1 agreements; there are extensions.

2          This language later became one of the key

3 points turning on:  Are those the specific agreements

4 that should be discussed.

5          I then had to go back into the data and find

6 the various agreements and pull them.

7          You can't see that in just the financial

8 records.  It's simply listed as an entity and the amount

9 of the payments in the journal entries.  You have to go

10 back and find the agreements, which I was able to do.

11          Also noted that some of the agreements -- part

12 of them went into the revenue sharing fund, part of them

13 went into the premium appearances or ad hoc or side

14 deals, as Dr. Noll calls them.

15          That exercise took a significant amount of

16 work.  And I do rely on my expertise as a damage analyst

17 to go in and construct a model and to isolate it.

18     Q    (By Mr. Kessler)  When you say your expertise

19 as a damage analyst, what area of expertise is that?

20          Is that accounting?  Is that economics?

21          What body of expertise are you talking about

22 as a damage analyst?

23          MR. KATZ:  Object.

24          THE DEPONENT:  I think to some extent it

25 combines those types of disciplines.  And as you are

Philip Y. Rowley

1 looking to but-for worlds along with lost profits, what

2 are incremental costs, it combines those types of

3 disciplines.  And that's what I have testified on in

4 several occasions.

5      Q    (By Mr. Kessler)  Have you constructed a

6 but-for world here in your damage analysis?

7      A    I believe the correct --

8           MR. KATZ:  I'm going to object.  Sorry.

9           THE DEPONENT:  There's -- under the certain

10 parameters of what I was attempted (sic) to solve for as

11 it relates to the breach of contract and the certain

12 issues and the breach of fiduciary duty, I have built

13 what should be the but-for world, which would reflect

14 what the retired players would have received but for the

15 actions that are alleged.

16      Q    (By Mr. Kessler)  How did you eliminate the

17 possibility that in your but-for world, that if the

18 retired players were going to be participating in the

19 GLR pool, that their individual ad hoc monies would not

20 also go in that pool?

21           How do you know?

22           MR. KATZ:  Object.

23           THE DEPONENT:  That isn't what was practiced

24 or performed.  I have looked to just specifically the

25 equal share pool as a surrogate for the escrow fund that

1 was supposed to have been established.

2          The appearance monies, premium monies, ad hoc

3 monies, et cetera, are a completely separate -- separate

4 fund.

5     Q    (By Mr. Kessler)  Okay.  But in the actual

6 world, retired players didn't share in the GLR pool at

7 all, correct?

8          MR. KATZ:  Object.

9     Q    (By Mr. Kessler)  In the real world.

10    A    In -- in each of the years, it was active

11 players who -- who received monies out of that pool,

12 along with a small amount for practice squad players.

13    Q    So in the real world, retired players did not

14 share in the GLR pool, correct?

15         MR. KATZ:  Object.

16         THE DEPONENT:  Yes.

17    Q    (By Mr. Kessler)  Now, in the but-for world,

18 you're assuming retired players do share in the GLR

19 pool, correct?

20         MR. KATZ:  Object.

21         THE DEPONENT:  I'm assuming that they would

22 have shared in some type of an escrow fund.  And the

23 best measure or proxy that I have for that is the GLR

24 fund.

25    Q    (By Mr. Kessler)  Okay.  And if in your

1            THE DEPONENT:  Two -- two comments.

2            First off, I applied the pool exactly how

3 NFLPA/PI also utilized it during the relevant time

4 period.

5            The second goes to I haven't seen a formal

6 policy document or how that type of definition or

7 delineation was actually being done.  And so I have

8 simply assumed that what was actually practiced is the

9 best measure.

10            So I don't have that the Hall of Fame

11 agreement, as an example -- why that went into ad hoc

12 versus it went into the general licensing revenues.

13     **Q     (By Mr. Kessler)  So other than the fact that**

14 **that was done in the past, do you have any other basis**

15 **for that assumption?**

16            MR. KATZ:  Object.

17            THE DEPONENT:  I can see different agreements.

18 The NFL sponsorship agreement, as an example, has

19 language where there are minimums that do go into the

20 general licensing revenue, but there also is a holdback,

21 roughly 25 percent, on the sponsorship agreement that

22 must go to specific people, so -- specific players.

23            So there can be designations throughout this.

24            I don't know if a -- if you would go back and

25 redo history and put those monies into that fund.  I've

1    A    An assumption that the -- an escrow account --

2 my understanding is an escrow account was not

3 established but that if I looked to the actual actions

4 and administration by NFLPA/PI, that the reasonable

5 proxy for what that escrow would have looked like --

6 account would have looked like is the equal share fund,

7 the gross licensing revenues.

8    Q    **What's the basis for that assumption?**

9    A    That assumption is that as I look to what is

10 a -- an account that has gross licensing revenues -- has

11 what I think are group licensing revenues that are

12 distributed on an equal share basis, that is the most

13 relevant account for our purposes.

14    Q    **What's the basis for assuming that's the most**

15 **relevant account?**

16    A    Really, my opinion that it would -- that would

17 look like what an escrow account that should have been

18 established, that's what would -- would be included.

19    Q    **What expertise are you applying in giving an**

20 **opinion that if an escrow account were established, it**

21 **would look like that account?   What area of expertise?**

22          **Is that an economic conclusion?**

23          MR. KATZ:  Object.

24          THE DEPONENT:  It's a -- really a conclusion

25 at looking at how did the defendants actually behave

1    Q    (By Mr. Kessler)  Right.  So as an expert, why

2 would, in your view -- do you have an expert opinion

3 that the escrow fund would more look like the GLR pool,

4 okay, than it would look like either the ad hoc

5 agreement arrangements or the premium license agreement

6 arrangements for active players?

7          What expertise do you apply in making that

8 judgment?

9          MR. KATZ:  Object.

10          THE DEPONENT:  Part of it is some of the

11 guidance from counsel around language of being divided

12 between a player and an escrow account and then for all

13 eligible NFLPA members who have signed a group licensing

14 authorization.

15          And so as I look to where would I find a -- a

16 surrogate for something where a group of eligible

17 players have signed a GLA and how did they administer

18 that program, that's the most likely.

19    Q    (By Mr. Kessler)  Okay.  Well, let's look at

20 that.

21          What did counsel advise you about the meaning

22 of divided between the player and an escrow account?

23          Let's start with that.

24          MR. KATZ:  Object.

25          THE DEPONENT:  Open to interpretation and that

1 the model.

2    Q    (By Mr. Kessler)  Right.  So you were told by

3 counsel to make that assumption, and you made that

4 assumption in that model, correct?

5    A    Yes.

6    Q    Okay.  Now, going back to 630.  We were going

7 through the assumptions that you made.

8         You refer in the top of the next page --

9 actually, I can do this a little bit better.  Let me go

10 to page 3.

11         You talk here about the damages for breach of

12 fiduciary duty?

13    A    Yes.

14    Q    And you say that you've been advised that

15 "damages for breach of fiduciary duty under applicable

16 law should be a reasonable connection to the defendants'

17 wrongful acts, or that the damages are the natural and

18 probable consequences of the wrongful act."

19         I assume you've been advised about that by

20 counsel; is that correct?

21    A.    Yes.

22    Q    Okay.  Now, looking at the different possible

23 breaches here, one of the breaches that's mentioned here

24 is that -- is -- under No. 2, is failing to accurately

25 report group licensing revenues to members of the GLA

1 **class.**

2      **Do you see that?**

3    A    Yes.

4    **Q    If that is the only breach, how does your**

5 **damage model in any way represent the damages that will**

6 **be suffered by that particular alleged breach?  Failure**

7 **to report.**

8    A    First off, Counselor, if -- if plaintiffs are

9 able to show that somehow, had members of the class had

10 that information, they would have behaved differently, I

11 could see how an equal share program would be the

12 appropriate measure of damages.

13      In other words, I get a report.  I receive

14 zero.  I don't get a report that tells me what efforts

15 are being made, what's planned in the future, I just get

16 zero.

17      It could be that that would have stimulated

18 activity if someone was to say, "I don't understand

19 what's going on.  Explain the program to me."  And

20 ultimately, then, there would have been an equal -- an

21 equal share determined based on the language.

22      I see that somewhat -- in the reporting, as

23 somewhat of a supplemental to the others, but I would --

24 I would leave that to the trier of fact.

25      I isolated that's -- that's how I would see

1 someone applying it.

2      Q     Okay.  Let me understand this.

3            Isn't it true that every retired player who

4 received nothing would know that they received nothing?

5            MR. KATZ:  Object.

6            THE DEPONENT:  By -- by receiving no

7 documentation, they would know they received nothing.

8      Q     (By Mr. Kessler)  Right.  Okay.

9            So it wouldn't make any difference whether

10 they got a piece of paper saying they received nothing

11 or they received nothing.

12            They'd have the same information, right?

13            MR. KATZ:  Object.

14            THE DEPONENT:  I -- I disagree with that, at

15 least as a blanket statement for all -- for all the

16 members of the class.

17      Q     (By Mr. Kessler)  Okay.  Have you seen any

18 evidence out of all these retired -- you know, most of

19 the members of the GLA class did not receive any --

20 well, strike that.

21            Do you know of any retired player who received

22 nothing, who took any actions to indicate that he

23 expected to receive something?

24            MR. KATZ:  Object.

25            THE DEPONENT:  Counselor, I think there were

1 **Fame agreement.**

2     A    I have not.

3          MR. KATZ:  Object.

4          You have to pause for a moment.

5     **Q**    **(By Mr. Kessler)  Let's look back at 630, on**

6 **page --**

7     A    I guess, Counselor, if I may amend my answer

8 there.

9     **Q**    **Go ahead.**

10    A    As it relates to the breach of fiduciary duty,

11 if there was some type of -- part of the -- part of the

12 claims is placing themselves in a position of conflict

13 of interest, acting adversely to the interests of

14 retired NFL players.

15         If there was some type of a -- that that's an

16 example.  I guess the fact that I have then gone to the

17 equal share pool could be considered a damages.  But I

18 haven't -- I haven't made that exact nexus, which I

19 thought was your question.

20     **Q**    **Okay.  Well, let me ask you that, then.**

21         **Why is placing themselves in a position of**

22 **conflict of interest and acting adversely to the**

23 **interests of retired NFL players who signed the GLA at**

24 **all related to your damage calculations based on retired**

25 **players getting an equal share of the GLR pool?**

1          MR. KATZ:  Object.

2          THE DEPONENT:  Legally, my understanding would

3 be if they -- if they put themselves in this position

4 and intentionally or unintentionally -- no,

5 intentionally didn't -- didn't represent the retired

6 players appropriately, a measure would be that they

7 would have had access to the equal share --

8     Q     (By Mr. Kessler)  Well, why is --

9     A     -- pool.

10    Q     **Why is there a connection between having a**

11 **conflict of interest and having access to the GLR pool?**

12          **How do you draw that conclusion?**

13          MR. KATZ:  Object.

14          THE DEPONENT:  I draw that -- that plaintiffs

15 are attempting to argue is that there should have been,

16 for the group licensing programs, an account that was

17 established -- escrow account that was established that

18 was going to be for all eligible NFLPA members divided

19 between the player in an escrow account.  That's -- that

20 is this language.

21          When I look and see what actually happened,

22 what type of an account would have been available, I

23 look to the GLR, the equal share account as that's --

24 that is the best proxy for what should have been

25 available.

1 sign up and get some free money.

2          MR. KATZ:  Object.

3          THE DEPONENT:  So the -- the question that is

4 posed isn't relevant to my analysis in that I simply

5 looked at potential class members who are both retired

6 players and who signed the GLAs that have the specific

7 language.  There are other retired players who signed

8 different GLAs, which --

9     Q    (By Mr. Kessler)  Okay.

10    A    -- have not been included.  You can see, at a

11 later point in time, it doesn't have the language.

12         So the hypothetical isn't necessary for my

13 analysis.

14    Q    Okay.  Wait --

15    A    The class, as I understand it, are only those

16 players who had signed the relevant GLAs, and that's all

17 that's included in my analysis.

18    Q    Maybe you are not understanding my question.

19         Okay.  In a but-for world you are trying to

20 create for damages purposes, the world that would have

21 existed had defendants complied with the law as

22 plaintiffs are interpreting it, correct?

23         MR. KATZ:  Object.

24         THE DEPONENT:  In a general sense, yes.

25    Q    (By Mr. Kessler)  Okay.  Have you done any

1          THE DEPONENT:  It's an interesting analysis.

2 I wasn't asked to do that and I didn't do that.

3     Q    (By Mr. Kessler)  Well, do you agree it would

4 be relevant to them?

5          MR. KATZ:  Object.

6          THE DEPONENT:  I think there's a whole series

7 of analyses, including liability points, around this

8 class as to why others didn't sign up or who did sign up

9 and who stopped signing up, and so to simply assume that

10 there now would be 13,000, I don't have -- I don't have

11 basis for that.

12    Q    (By Mr. Kessler)  Okay.  I'm not asking you to

13 assume 13,000.

14          Did you assume that any new class -- any new

15 retired players would sign up in your analysis?

16    A    Not for purposes --

17          MR. KATZ:  Object.  Object.

18          THE DEPONENT:  Not for purposes of the damage

19 analysis.

20    Q    (By Mr. Kessler)  Okay.  Now, I would like to

21 direct your attention to the next paragraph.

22          In the last sentence you said, "I have defined

23 causation as the fact that the retired players did not

24 receive any payments from the general licensing pool

25 (further definition below.)"

1          I don't see any tiering within the active

2 players for any type of other -- any type of other

3 matrix, one.

4          Two, I really looked to the -- this

5 establishment of an escrow account; that is, the only

6 escrow account that I can see that was established.

7          And I then looked at how it was administered

8 and make the assumption that had you included those

9 retired players into that account, they would have been

10 treated equally.

11     Q     (By Mr. Kessler)  Okay.  Are you familiar with

12 the concept of an escrow account from your studying in

13 accounting courses?

14     A     I'm familiar with escrow accounts from a

15 variety of --

16     Q     Okay.

17     A     -- sources.

18     Q     From all of your sources, is there requirement

19 you are aware of in general where an escrow account

20 should be -- has to necessarily be equally divided

21 between its beneficiaries?

22          MR. KATZ:  Object.

23          THE DEPONENT:  They will be -- escrow accounts

24 can be set up individually and -- and how payments are

25 designated and what are the commitments or covenants

1       MR. KATZ:  Object.

2       THE DEPONENT:  That's my understanding, yes.

3    Q    (By Mr. Kessler)  Okay.  Retired players are

4 not on the active roster of an NFL team, correct?

5    A    That would certainly be my general

6 understanding, but the whole Brett Favre, I'm trying to

7 understand if he's even on a roster.

8       My general understanding is I would agree with

9 you, Counselor.  There might be some exceptions of which

10 I'm not fully aware.

11   Q    All right.  Let's assume I'm right.  Let me

12 represent to you -- okay? -- that retired players are

13 not on an active roster and the practice squad players

14 are not.

15      What is your expert basis for concluding that

16 if retired players were included in the GLR pool, they

17 would not be more similarly treated to practice squad

18 players, who, like them, are not on an active NFL roster

19 as opposed to the active NFL roster players?

20      MR. KATZ:  Object.

21      THE DEPONENT:  It's -- it's an assumption that

22 goes to eligibility and the eligibility requirements and

23 the signing of a -- of a GLA.

24   Q    (By Mr. Kessler)  Do you have any basis for

25 that assumption to distinguish one from the another?

1          MR. KATZ:  Object.

2          THE DEPONENT:  The reason for my pause, I'm

3 trying to go back and remember the definition of a -- of

4 a retired player, what that means.  I think we talked

5 about that earlier and the participation in the -- in

6 the escrow account.

7          I guess I would go back to, Counselor, I see

8 how the escrow account -- the -- the shared account was

9 administered, and my assumption is that the retired

10 players would have similar type of eligibility

11 requirements.

12          Now, not that they were on a squad but that

13 they were officially a retired player and that they had

14 signed GLAs and, therefore, would be similarly

15 positioned to active players for purposes of the

16 administration of the equal share form.

17     **Q    Is there anything else you can articulate as**

18 **the basis for that assumption, other than what you've**

19 **already testified to?**

20          MR. KATZ:  Object.

21          THE DEPONENT:  Not at this time.

22     **Q    (By Mr. Kessler)  By the way, you mentioned**

23 **other sports' unions.  Other sports' unions don't**

24 **distribute any money to retired players, do they?**

25          MR. KATZ:  Object.

1          MR. KATZ:  Object.

2          THE DEPONENT:  As I sit here right now, no,

3 but I will endeavor to research it.

4     Q    (By Mr. Kessler)  Okay.  Do you know that

5 Stats also just publishes statistics apart from fantasy

6 football?

7          MR. KATZ:  Object.

8     Q    (By Mr. Kessler)  Do you know that one way or

9 the other?

10    A    No.

11    Q    Do you know how it got the name Stats?

12         MR. KATZ:  Object.

13         THE DEPONENT:  Statistics.

14    Q    (By Mr. Kessler)  Let me ask you this:  In

15 your list of breaches of fiduciary duties on the No. 4

16 on page 3, you have listed "failing to create an escrow

17 account for the retired players."

18          Is your understanding that plaintiffs are

19 claiming here that one of the breaches of fiduciary duty

20 is that the defendants failed to create an escrow

21 account for the retired players?

22    A    This is my understanding, yes.

23    Q    Okay.

24    A    Did they?

25    Q    Looking at the next thing you say,

1 "alternatively, failing to distribute to retired players

2 equal share of the fund from which the active players

3 were paid."

4          Do you understand that plaintiffs are arguing

5 in the alternative that either there was a breach by

6 failing to create an escrow account or there was a

7 breach by failing to distribute an equal share of the

8 fund from which the active players are paid; is that

9 your understanding?

10          MR. KATZ:  Object.

11          THE DEPONENT:  Yes, Counselor, either there

12 was -- there was not a escrow account that was

13 established or if the equal share fund is the escrow

14 account, that the retired players didn't receive their

15 distribution from that.

16     Q    (By Mr. Kessler)  If the breach was failing to

17 establish an escrow account --

18          MR. KATZ:  Object.

19     Q    (By Mr. Kessler)  Okay.  So that one.

20          Okay.  And there's no reference in the GLA to

21 how the escrow account money would be shared and what

22 proportion.

23          It says, how would an equal share damages

24 theory be a measure of the damages in that case?

25          MR. KATZ:  Object.

1          THE DEPONENT:  We would look to an escrow

2 account that was established.  There is an account and

3 look to how that was administered.

4     Q    (By Mr. Kessler)  **What makes the GLR pool an**

5 **escrow account?**

6     A    Based on my definition, there are moneys --

7 these are licensing royalties, minimum fees, et

8 cetera -- that are being collected with a purpose down

9 the road for some type of distribution, and so there

10 isn't one check comes in and there's immediately an

11 overall distribution.  But it's an account to hold

12 moneys with a specific designation and that ultimately

13 those moneys are distributed.

14    Q    **So in your definition of escrow account,**

15 **anytime moneys are brought in and their purpose is to**

16 **distribute, that's an escrow account; that is all that**

17 **is required?**

18          MR. KATZ:  Object.

19          THE DEPONENT:  That's -- that's not what I

20 said, Counselor.

21    Q    (By Mr. Kessler)  **I thought that's what you**

22 **said.**

23          **What else about the -- what else about the GLR**

24 **pool makes it an escrow account, other than the fact you**

25 **said that moneys came in and they were being held to be**

1    that looks anything like the escrow

2    documents you recall when you were

3    involved in the distribution of the

4    insurance company funds?")

5        THE DEPONENT:  Any -- any document, obviously,

6  there are eligibility requirements that I have seen that

7  are related to the distribution of the GLR fund.

8        I have seen accounting documents that walk

9  through the charges or adjustments made to the fund, as

10 well as the number that goes forward into the accrual

11 for that fund.  I have also seen the journal entries for

12 the moneys that come into that fund.

13    **Q    (By Mr. Kessler)  And those are similar to the**

14 **escrow documents, that was my question, to the ones in**

15 **the insurance company that you were involved with?**

16        MR. KATZ:  Object.

17        THE DEPONENT:  In a general -- in a general

18 sense of moneys coming into funds, how those are being

19 done.  There were -- there were in financial

20 institutions.  There were construction loans, as an

21 example, where there were moneys set aside with a

22 specific purpose.  In a general sense, yes.

23    **Q    (By Mr. Kessler)  What was the name of the**

24 **insurance company who was involved?**

25    A    Investors Equity Life.  And then I can provide

1 distributor who alleged that he didn't receive most

2 favored nation pricing and what that did to the demise

3 of his business.

4    **Q    Which side were you on there?**

5    A    Defendant there.

6    **Q    Defendant there.**

7          **Okay.  Have you ever had your testimony**

8 **excluded by order of a trial court, either on Daubert**

9 **grounds or any other grounds?**

10    A    No.  Not -- not that I'm aware of, no.

11    **Q    Take a look at footnote 6 on page 4.**

12    A    Yeah, the supplemental?

13    **Q    No, no, back on the initial report.**

14    A    The initial report?

15    **Q    Yes.**

16    A    Okay.

17    **Q    So this is 629.**

18    A    Yes.

19          I'm sorry.  Footnote?

20    **Q    Footnote 6.**

21    A    Yes.

22    **Q    It says, "For the purpose of this calculation,**

23 **I assume that if a retired player had signed a GLA as in**

24 **the end of one calendar year, they would be eligible for**

25 **the player pool for that fiscal year."**

1          MR. KATZ:  Object.

2     Q    (By Mr. Kessler)  By that I mean, there would

3 have to be some way to know which retired players who

4 signed GLAs shared in which year's pool.

5          You'd have to have some standards for that,

6 right?

7          MR. KATZ:  Object.

8          THE DEPONENT:  And the -- the standard being

9 that you had signed a GLA during that fiscal year?

10    Q    (By Mr. Kessler)  Well, you --

11    A    That's my assumption.

12    Q    Your assumption, that's the standard.  But you

13 don't know if that would be the standard, or someone

14 would say you have to sign in the end of November.

15          MR. KATZ:  Object.

16          THE DEPONENT:  Yeah, I don't -- I don't know

17 if -- if that's something they would have considered.

18    Q    (By Mr. Kessler)  Now, on page 4 again of this

19 report, it says, "I initially relied upon the GLA

20 calculations made by the NFLPA, as well as the NFLPA/PI

21 financial statements to determine" --

22          MR. KATZ:  I'm sorry.  Where are you reading

23 from?

24          MR. KESSLER:  It says, "To this end" -- this

25 is on top of 4, first full paragraph.

1     Q     (By Mr. Kessler)  It says you have initially

2  relied upon the GLR calculations made by the NFLPA/PI,

3  as well as the NFLPA/PI financial statements to

4  determine the royalty pools.

5          Do you see that?

6     A     Yes.

7     Q     Now, those are just numbers that are listed on

8  those statements, correct?

9          You just literally lifted them off to start

10 out with that adjustment, correct?

11         MR. KATZ:  Object to form.

12         THE DEPONENT:  The -- yeah, the first step was

13 to understand exactly how PA/PI were doing the

14 calculations or the actual administration of the -- of

15 the equal share pool.  There's quite a bit that goes on

16 after that in order to construct a model.  But

17 initially, that's -- that's what I did.

18         And I also went back to the financial

19 statements to get an understanding of the accrual versus

20 some of the other payments, yeah.

21    Q     (By Mr. Kessler)  I know you read a lot of

22 documents to get an understanding.  Now I want to focus

23 on the actual physical steps of putting together your

24 calculations.

25    A     Yes.

1    Q    Okay?

2    A    Yes.

3    Q    Step 1 was to take the GLR calculations.    And

4 those are simply lifting the numbers that are stated on

5 an NFLPA/PI document, correct?

6    A    For the model that contemplates all general

7 licensing revenues that were in the equal share pool,

8 yes.

9    Q    So that model, you just lift the number that's

10 there on the papers.

11         MR. KATZ:  Object.

12         THE DEPONENT:  Ultimately.  I mean, you

13 attempt to gain an understanding.  We tried to -- well,

14 we had a deposition of Eyrich, attempting to understand

15 what are the various adjustments that are made and

16 reconciling those amounts.

17    Q    (By Mr. Kessler)  I understand you got an

18 understanding.  But I'm saying, the steps you took

19 for -- for the model that uses the whole pool number,

20 you just took the whole pool number from the documents

21 with no adjustments, right?

22    A    Outside of the adjustments that are made

23 within the calculation.

24    Q    You don't make those adjustments, somebody

25 else made those adjustments in NFLPA.

1          MR. KATZ:  Object.

2          THE DEPONENT:  That's correct, to get the

3 initial overall pool number.

4     Q    (By Mr. Kessler)  Okay.  Stop there.

5          **Then when you were, for example, taking out**

6 **the NFL sponsorship number, which was in the pool,**

7 **correct?**

8     A    (Deponent nods head.)

9     Q    **What you did for that was you looked at the**

10 **NFL sponsorship number in the PA/PI documents and just**

11 **subtracted each year.  You just took out the total for**

12 **the NFL sponsorship agreement from the total GLR pool.**

13          **You did simple arithmetic, right?**

14          MR. KATZ:  Excuse me.  Can you read that

15 back.

16          (Record read as follows:

17          "QUESTION:  What you did for that

18          was you looked at the NFL sponsorship

19          number in the PA/PI documents and just

20          subtracted each year.  You just took out

21          the total for the NFL sponsorship

22          agreement from the total GLR pool.

23          You did simple arithmetic, right?")

24          MR. KATZ:  Object.

25          THE DEPONENT:  No.  I wouldn't -- I wouldn't

1 characterize it that way.

2          There are -- there's an adjustment

3 specifically made to the NFL sponsorship and Internet

4 agreement.

5          Now, it's supposed to be 25 percent.  As you

6 go through the documents, it's not clear how that number

7 is calculated.  Part of that is because there are

8 minimums associated with the Internet aspect versus

9 minimums associated with the sponsorship.

10          So went through and verified that those

11 calculations were correct and then pull -- because you

12 already have some money being pulled out.  And then

13 pulled out separately the amounts attributable to the

14 NFL sponsorship and Internet.

15     Q    (By Mr. Kessler)  Okay.  Those numbers, those

16 calculations you described appeared in the PA documents,

17 correct?

18          You didn't have to invent those numbers.  They

19 were just in the PA documents.

20     A    Yes.

21     Q    So what you did is you copied the PA number

22 for the NFL sponsorship agreement amount that was in the

23 pool and you subtracted it, correct?

24          MR. KATZ:  Object.

25          THE DEPONENT:  Really, it's more of a -- it's

1 an isolation because that's one of the aspects that's in

2 question as far as it relates to the liability issues --

3    Q   (By Mr. Kessler)  Okay.

4    A   -- so it was isolated.

5    Q  Right.  But when you wanted to create the

6 variation that didn't include it, all I'm saying is --

7 I'm not trying to be complicated; I just want to

8 understand it.

9         You took the total GLR pool number that PA

10 reported and you subtracted the sponsorship agreement

11 number that PA reported and you came to a sum.  And that

12 was now your calculation of the pool without the NFL

13 sponsorship agreement, right?

14    A   Yes.

15    Q  Okay.  And when you wanted to get down to the

16 agreements that only had the language that counsel

17 identified for you -- okay? -- did you take a list of

18 those agreements and then calculate the revenues for

19 each of those agreements and add them up?  Or did you

20 take the agreements that didn't have that language, add

21 them up and subtract them from the total?

22         I assume it's one way or the other.  Which did

23 you do?

24    A   Yeah, the --

25         MR. KATZ:  Object.

1          THE DEPONENT:  The practical application was

2  to run through concordance on all of the agreements the

3  relevant language and then find and pull all those.

4  Then we also had counsel verify that those were

5  appropriate.

6          You then go back into -- because you won't

7  find that in the summary documents to which we're

8  referring.  You go back into the support behind the

9  calculations of the GLR equal share pool, and you can

10  find for each of the contracts -- that's one of my

11  exhibits -- the amounts that were included, and then you

12  add those -- add those total.

13      Q    Let me understand this.

14          You went through all the agreements looking

15  for the language that counsel identified and came up

16  with a list of agreements.

17          That was the first step.

18      A    Yes.

19      Q    Then you showed it to counsel and said, "Did

20  we find the right group?  Do you have any comments about

21  it?"

22      A    Yes.

23      Q    Then you had your final list of agreements,

24  and you went to the NFLPA listing of -- backup data that

25  showed the amounts generated by each agreement,

1 correct?

2    A    In the respective years, yes.

3    Q    And then you -- you extracted that amount for

4 each agreement and added that all up.

5    A    Yes.

6    Q    And that's how you came with your subset of

7 player pool A, your total amount.

8    A    For the relevant revenues.

9    Q    Yes.

10    A    Yes.

11    Q    And then to determine the number of active

12 players in each year, you went through the NFLPA

13 documents and -- this is for active players -- and

14 simply counted up the number of active players who were

15 distributed to each year, right?

16    A    Yes.

17    Q    Okay.  And to get the number of -- of retired

18 players you were going to count, you looked through all

19 the GLA forms -- okay? -- and you counted up each year

20 the number of retired players who had GLAs during the

21 particular -- in effect, during the particular year you

22 were looking at, correct?

23    A    Yes.

24    Q    Okay.  And then you divided the player royalty

25 pools you calculated by the total combined number of

1 **active and retired players who you calculated.**

2     A     Yes. Now, there is a step that we have

3 missed.

4     **Q     Okay. What's the step that we missed?**

5     A    When you got your gross revenues that are

6 relevant, you then have to go back through and in the --

7 in the analysis and you have to take out the 40 percent

8 of those revenues that would go to NFLPA.

9     **Q     Okay.**

10     A     And then you also take out the percentage that

11 would go to NFLPI. So you --

12     **Q     Right.**

13     A     -- replicate what the model would look like.

14          Now, in the early years, as you can see in the

15 analysis, you're not getting over the $35,000,000

16 threshold where the different percentage kicks in for

17 NFLPA versus kicking in for NFLPI.

18          But that's an important step. You're not just

19 taking the gross revenues and -- and then dividing them.

20 You're actually doing the calculation as if these were

21 the only revenues within the account.

22     **Q     Do you know what percentage of your damages**

23 **calculations is accounted for by the EA agreement?**

24     A     May I -- may I --

25     **Q     Sure.**

1    **What was the basis of that assumption?**

2    A    That if you had your -- if you had signed the

3 GLA and it ran through December 31st, 2002, that would

4 be part of the 2003 distribution.

5    Q    **Well, what if they -- if a retired player**

6 **signed the GLA in November -- okay?**

7    A    Yeah.

8    Q    **-- what is the basis for your assumption that**

9 **retired player would get a whole equal share for that**

10 **past year, even though their rights would not have been**

11 **available for most of the NFL season?**

12    A    I -- I looked to just how the current fund is

13 administered; where someone who's simply on the first --

14 you know, the first game the first day of the roster and

15 then may not play -- might be on injured reserve -- was

16 still eligible.  I -- I took that as an assumption.

17    Q    **But you agree with me, you don't know what**

18 **criteria would actually be applied to retired players if**

19 **they were included in the GLR pool.**

20         MR. KATZ:  Object.

21         THE DEPONENT:  No.  That's the substance of

22 the litigation.  Yeah, I don't know exactly how they

23 would have applied the -- the program.

24    Q    **(By Mr. Kessler)  And you agree with me, there**

25 **would have to be criteria.**

1 term.  If --

2    Q    (By Mr. Kessler)  The amount of damages.

3         MR. KATZ:  Well, let him finish.

4         THE DEPONENT:  If the amount of money would be

5 the same that would be allocated to each of those

6 players, yes, that's what the model cares for.  Someone

7 who is destitute, getting an additional $3,000, that

8 means a lot more than someone who has several million

9 dollars, if you're defining injury.

10   Q    (By Mr. Kessler)  What I hear you saying is

11 that plaintiffs' counsel told you the theory of

12 plaintiffs is that the breach was not giving an equal

13 share; therefore, the damages is an equal share.  Okay.

14        What I'm now asking you is something a little

15 bit different, which is that one of the breaches of

16 fiduciary duty alleges conflict of interest, for

17 example.

18        You're aware of that, right?

19   A    Yes.

20   Q    Okay.  Taking out plaintiffs' counsel's theory

21 that the only actionable injury was failure to

22 participate in the GLR share, is it your opinion, as a

23 damage expert, that for a conflict of interest, in

24 general, every class member would suffer an identical

25 injury, an identical amount of injury?

1          MR. KATZ:  Object.

2          THE DEPONENT:  In assessing the potential

3 damages, I have not looked to the premium appearances,

4 ad hoc, side deals, any of those monies which an

5 individual active player or retired player can pursue

6 and can be assisted by NFLPI.

7          What I attempted to do was to construct a

8 model that would look at an escrow account for all

9 eligible NFL members divided between the player who've

10 signed the GLA.

11          In that instance, as I have looked to how a

12 like-type account, if not the account, has been

13 administered, it was on a equal share basis.  Therefore,

14 the retired players, regardless of their status in the

15 league, would receive an equal amount of these monies.

16   Q    (By Mr. Kessler)  Okay.  I'm really not trying

17 to trick you.  I just want to understand and get a

18 yes-or-no answer.

19          So I understand your position is, which is --

20 you're entitled to have your position -- is that the

21 only possible damages in this case would be that

22 everybody suffered the exact amount of injury.

23          That's your expert opinion.

24          MR. KATZ:  Object.

25          THE DEPONENT:  Based on how the current

1 account, the GLR equal share account, was established

2 and administered, that's the most reasonable way to

3 measure the damages.

4    Q    **(By Mr. Kessler)   Okay.   What would be other**

5 **ways to measure it?**

6         MR. KATZ:   Object.

7         THE DEPONENT:   Well, Counselor, you offered a

8 hypothetical that potentially the NFLPA/PI would have

9 had some type of a policy where, similar to practice

10 squad players, retired players only get a certain

11 amount.

12         I haven't seen any language to that effect or

13 documentation to that effect.   That's an example that

14 you threw out; there would be some type of sliding

15 scale.

16    Q    **(By Mr. Kessler)   Any other examples --**

17         MR. KATZ:   Jeff, are we going to take our

18 break?

19         MR. KESSLER:   I thought it was to give you a

20 different answer.   He's the one --

21         MR. KATZ:   Well, you can ask questions before

22 the break, after the break.   I just need a two-minute

23 break.

24         MR. KESSLER:   All right.   Let's take a

25 two-minute break.

1     A     No.  I had -- I had reviewed it -- I had

2 reviewed it --

3     Q     **Okay.**

4     A     -- previously.  I didn't -- I didn't

5 appreciate that it was important to highlight it.

6     Q     **In terms of the documents that you reviewed,**

7 **which I was going to ask you about, so I might as well**

8 **turn to that now, who decided which depositions you**

9 **would review?**

10     A     To a great extent, it was my manager.  It was

11 Susie Gerard. ⌐ s/b 'Suzie Girard' per errata.

12            I also was in -- I had attended Eyrich's

13 deposition, and I attended Linzner's deposition, so I

14 wanted those -- obviously, this report was done before I

15 did the -- reviewed the depositions of Jizmagian and

16 Noll.

17     Q     **Are those the only additional depositions you**

18 **reviewed between your initial report and your**

19 **supplemental report?**

20     A     In fact, I wrote the supplemental report

21 before I read those depositions.  I read Upshaw -- not

22 Upshaw -- Jizmagian and Noll last week.

23            Yeah, the supplemental report was actually

24 written before I read those depositions.

25     Q     **Okay.  All right.  So the only depositions you**

1 read before both the original report and the

2 supplemental report are the four depositions listed

3 here.

4      A      Was there -- Counselor, I apologize.  I don't

5 think it was a deposition.

6           As I'm going through the list, there may have

7 been a declaration by another individual.

8      Q      Well, you listed two declarations, Doug Allen

9 and Joel Linzner.

10      A      Yeah.

11      Q      Did you review someone else's declaration?

12      A      I want to say I read the Tops declaration.

13 Fleece (sic)?  No.

14           What's his name?

15      Q      You read -- there were several Tops.  You read

16 one of the Tops declarations typically --

17      A      That's the only thing that's jumping out at me

18 that before -- I thought it was -- it was quite brief.

19      Q      Okay.  Did you read these whole -- the

20 entirety of the four depositions listed -- Upshaw,

21 Eyrich, Allen and Linzner -- or just excerpts?

22      A      Eyrich, Upshaw and Linzner, yes.  Allen, I

23 kind of sped read.  But one of my staff did read it in

24 its entirety.

25      Q      Take a look at number -- I don't know how to

1

2

3

4          I, the undersigned, a Certified Shorthand

5 Reporter of the State of California, do hereby

6 certify:

7          That the foregoing proceedings were taken

8 before me at the time and place herein set forth; that

9 any witnesses in the foregoing proceedings, prior to

10 testifying, were placed under oath; that a verbatim

11 record of the proceedings was made by me using machine

12 shorthand which was thereafter transcribed under my

13 direction; further, that the foregoing is an accurate

14 transcription thereof.

15          I further certify that I am neither

16 financially interested in the action nor a relative or

17 employee of any attorney of any of the parties.

18          IN WITNESS WHEREOF, I have this date

19 subscribed my name.

20

21 Dated:   July 23, 2008

22

23

24

                    REBECCA L. ROMANO

25                   CSR No. 12546

**Exhibit B**
**to the**
**Declaration of Ryan S. Hilbert In Support of**
**Plaintiff's Opposition to Defendants' Motion In**
**Limine No. 5 To Exclude The Testimony Of**
**Philip Y. Rowley**

1          UNITED STATES DISTRICT COURT

2          NORTHERN DISTRICT OF CALIFORNIA

3            SAN FRANCISCO DIVISION

4

5    BERNARD PAUL PARRISH, HERBERT
     ANTHONY ADDERLEY, WALTER ROBERTS III,
6

7          Plaintiffs,

8          vs.                        Case No. C 07 0943 WHA

9    NATIONAL FOOTBALL LEAGUE PLAYERS
     ASSOCIATION and NATIONAL FOOTBALL
     LEAGUE PLAYERS INCORPORATED d/b/a
10   PLAYERS INC.,

11         Defendants.
     _____/
12

13

14        DEPOSITION OF DR. G. STEPHEN JIZMAGIAN

15            Tuesday, July 8, 2008

16              Pages 1 - 142

17

18

        REPORTED BY:  THERESA WARD, C.S.R. 9587
19

20

21

22            DE SOUZA & ASSOCIATES
           Certified Shorthand Reporters
23         One Waters Park Drive, Suite 180
            San Mateo, California 94403
24              (650) 341-2671

25

                                                         1

1    document which told you that they made that decision before

2    it appeared in the auditor reports, other than the auditor

3    reports?  I understand you have testified to that.

4         A    Yeah.  I can't think of any, as I sit here.

5         Q    Okay.

6              MR. KATZ:  Want to just take a short break?  I'm

7    just about finished.

8              THE VIDEOGRAPHER:  This concludes tape 2 of

9    Volume I in the deposition of Dr. G. Stephen Jizmagian.

10             The time is 5:01 p.m.

11             (A break was taken.)

12             THE VIDEOGRAPHER:  This begins tape 3, Volume I

13   in the deposition of Dr. G. Stephen Jizmagian.

14             The date is 7/8/2008, and the time is 5:10 p.m.

15   We are now back on the record.

16   BY MR. KATZ:

17        Q    Dr. Jizmagian, did you find any mathematical

18   errors in Mr. Rowley's report?

19        A    I did not look for any, so not looking for any, I

20   didn't find any.

21             MR. KATZ:  Okay.  Fine.  I have got no further

22   questions.

23             MR. O'KELLY:  I have got a handful of questions.

24             EXAMINATION BY MR. O'KELLY:

25        Q    Dr. Jizmagian, you testified earlier that you

1              CERTIFICATION

2          I, THERESA WARD, duly authorized to administer

3    oaths pursuant to Section 2093(b) of the California Code of

4    Civil Procedure, do hereby certify that the witness in the

5    foregoing deposition was administered an oath to testify to

6    the truth in the within-entitled cause; that said

7    deposition was taken at the time and place therein stated;

8    that the testimony of said witness was reported by me and

9    thereafter transcribed by me into typewriting; that the

10   foregoing is a full, complete, and true record of said

11   testimony; and that the witness was given an opportunity to

12   read and correct said deposition and to subscribe the same.

13         Should the signture of the witness not be affixed

14   to the depostion, the witness shall not have availed

15   himself/herself of the opportunity to sign, or the

16   signature has been waived.

17         I further certify that I am not of counsel nor

18   attorney for any of the parties in the foregoing deposition

19   and caption named, nor in any way interested in the outcome

20   of the cause named in said caption.

21   DATED: _July 11_____, 200_

22

23                              Theresa Ward, C.S.R. 9587

24

25
                                                      142