Ronald S. Katz (Bar No. CA 085713)
rkatz@manatt.com
Ryan S. Hilbert (Bar No. CA 210549)
rhilbert@manatt.com
Noel S. Cohen (Bar No. CA 219645)
ncohen@manatt.com
MANATT, PHELPS & PHILLIPS, LLP
1001 Page Mill Road, Building 2
East Palo Alto, CA 94303-1006
Tel: (650) 812-1300; Fax: (650) 213-0260

Lewis T. LeClair (Bar No. CA 077136)
lleclair@mckoolsmith.com
Jill Adler (Bar No. CA 150783)
jadler@mckoolsmith.com
MCKOOL SMITH, P.C.
300 Crescent Court, Suite 1500
Dallas, TX 75201
Tel: (214) 978-4984; Fax: (214) 978-4044

*Attorneys for Plaintiffs.*

Todd Padnos (Bar No. 208202)
tpadnos@dl.com
DEWEY & LEBOEUF LLP
One Embarcadero Center, Suite 400
San Francisco, CA 94111
Tel.: (415) 951-1100; FAX: (415) 951-1180

Jeffrey L. Kessler (*pro hac vice*)
jkessler@dl.com
David G. Feher (*pro hac vice*)
dfeher@dl.com
David Greenspan (*pro hac vice*)
dgreenspan@dl.com
DEWEY & LEBOEUF LLP
1301 Avenue of the Americas
New York, NY 10019
Tel: (212) 259-8000; Fax: (212) 259-6333

Kenneth L. Steinthal (*pro hac vice*)
kenneth.steinthal@weil.com
WEIL, GOTSHAL & MANGES LLP
201 Redwood Shores Parkway
Redwood Shores, CA 94065
Tel: (650) 802-3000; Fax: (650) 802-3100

Bruce S. Meyer (*pro hac vice*)
bruce.meyer@weil.com
WEIL GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, NY 10153
Tel: (212) 310-8000; Fax: (212) 310-8007

*Attorneys for Defendants*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

JOINT FINAL PRE-TRIAL ORDER
CASE NO. C07 0943 WHA

266929.1

BERNARD PAUL PARRISH, HERBERT ANTHONY ADDERLEY, and WALTER ROBERTS III, on behalf of themselves and all others similarly situated,

Plaintiffs,

V.

NATIONAL FOOTBALL LEAGUE PLAYERS ASSOCIATION, a Virginia corporation, and NATIONAL FOOTBALL LEAGUE PLAYERS INCORPORATED d/b/a PLAYERS INC, a Virginia corporation,

Defendants.

CIVIL ACTION NO. C07 0943 WHA

**JOINT FINAL PRE-TRIAL ORDER**

## JOINT FINAL PRE-TRIAL ORDER

The parties hereby submit the following Joint Final Pre-Trial Order pursuant to the Court's Guidelines for Trial and Final Pretrial Conference in Civil Jury Cases and Federal Rule of Civil Procedure 26(A)(3).

I.  **CLAIMS AND DEFENSES**

**Plaintiffs' Claims**

Plaintiff Herbert Adderley is a Hall of Fame NFL cornerback who played for the Green Bay Packers and the Dallas Cowboys for more than 10 years. Mr. Adderley is the representative of a class consisting of retired NFL players who signed GLAs with the NFLPA that were effective between February 14, 2003 and February 14, 2007 containing the same operative language as Adderley's GLA (the "GLA Class"). There are approximately 2056 such retired players in the GLA Class (not including 13 opt outs). Defendant National Football League Players Association ("NFLPA") acts as the labor union for professional football players in the National Football League.

Defendant National Football League Players Incorporated ("PI") is the licensing and marketing subsidiary of the NFLPA.

Plaintiffs contend that the NFLPA promoted a Retired Player Group Licensing Program, through which it actively encouraged retired players to enter into Group Licensing Authorizations ("GLAS") which granted the NFLPA the right to use the player's name, signature, facsimile, voice, picture, photograph, likeness and/or biographical information in the Retired Group Licensing Program. The GLA defines a "group licensing program" as any program or license "in which a licensee utilizes a total of six (6) or more present or former NFL player images in conjunction with or on products that are sold at retail or used as promotional or premium items." This expansive definition effectively makes the Defendants the sole source of player licenses. Defendants convinced thousands of retired players to execute GLAs and the incentive for a retired player to enter into the GLA was the promise of a share of royalties:

> [T]he moneys generated by such licensing of retired player group rights will be divided between the player and an escrow account for all eligible NFLPA members who have signed a group licensing authorization form.

The GLA and the totality of the circumstances, including the relationship between the retired player and his union, the NFLPA, created a fiduciary relationship between the GLA Class members and the Defendants.

After soliciting and acquiring the GLAs, the NFLPA assigned these rights to PI. In turn, PI entered into profitable group licensing agreements with scores of third parties, such as Electronic Arts and Topps. The express and unambiguous terms of these third party agreements include a collective license to both active and retired player rights. The third party license agreements also precluded the licensees from making independent agreements with the retired players. Being the de facto exclusive provider of player group licensing rights was beneficial for Defendants and the Defendants sought to eliminate competition.

PI's agreements with the third party licensees generate millions of dollars guaranteed minimum revenues for PI every year that are paid regardless of which player images, if any, its licensees actually use. Such payments do not relate to any specific player and make no distinction between active and retired players.

The GLA provides that Defendants will establish an escrow account and that each player will share in the revenues generated by the licensing of collective group rights. In breach of their contractual and fiduciary obligations, the Defendants failed to create an escrow account from which the GLA Class members should have been paid. The Defendants did create an account from which they paid out an "equal share" of the royalties from collective group licensing, but only to active players. In breach of their contractual and fiduciary obligations, Defendants distributed the revenues that it generated in connection with its collective group licensing program in equal shares to every "eligible NFLPA member," whether famous or unknown. However, members of the GLA Class have not received their "equal share" of the revenues, because Defendants exercised their discretion to determine (secretly) that the retired players were not "eligible." Thus, in breach of their contractual and fiduciary obligations, Defendants failed to pay to Adderley and the GLA Class any of the guaranteed licensing revenues generated under the EA Agreement, the TOPPS Agreement and the myriad other agreements which license both active and retired player rights.

In addition to paying only to active players monies that should have been shared with the retired players, Defendants used retired player monies to line their own pockets, in breach of their contractual and fiduciary obligations. In the 2000 NFLPA-PI Agreement, Defendants agreed to keep 64% of all group licensing revenue per year (which later rose to 69%), a portion of which should have gone to retired players, in breach of their contractual and fiduciary obligations. This award, which is well over any acceptable agency commission, was signed off by Gene Upshaw and Doug Allen, the two highest-ranking officers in both organizations, without any independent appraisal, in breach of their contractual and fiduciary obligations. Further, in a February 28, 2006 amendment to the 2000 NFLPA-PI Agreement, Defendants agreed, unilaterally and without notice to retired

players, that $8 million of gross licensing revenue should be "reallocated" to the Defendants which was unjustified and in breach of their contractual and fiduciary obligations. Even though Defendants stated that they would subsequently conduct an independent third-party appraisal to assess the appropriateness of their decision, Defendants have conceded that no such appraisal occurred, in breach of their contractual and fiduciary obligations. Thus, instead of complying with the express terms of the GLAs signed by Adderley and other retired members of the NFLPA, PI has, with the concurrence of or at the direction of the NFLPA, diverted millions of dollars to PI and the NFLPA. Defendants have attempted to defend their conduct by asserting that the license agreements with third parties like EA were not intended to convey the right to retired players. If retired player rights were not included in the license agreements with third parties (contrary to the express language of those agreements), the Defendants' conduct is even more egregious and wrongful. If Defendants assertions are correct, not only did Defendants fail to negotiate vigorously for inclusion of retired players, in breach of their contractual and fiduciary obligations as agents of the GLA Class members, but Defendants did not even bother to inform prospective licensees like TOPPS of the identity of the retired players that had already granted their collective group rights to the NFLPA, in breach of their contractual and fiduciary obligations. If Defendants intended to include only specific retired players in specific promotions, they still could have included all retired players in the group license and shared revenues with them. Indeed, by failing to do so, Defendants placed themselves in a position of gross conflict and breached their fiduciary duty by failing to inform the retired players of the conflict.

Although Defendants claim that the retired players simply had no value, this is disproved both by Defendants' substantial multi-year efforts to solicit them to sign GLAs, and the third-party licensees' proven use of retired players. Furthermore, in many instances, the Defendants encouraged or allowed their licensees' to "scramble" the identities of retired players in their products in an effort to narrowly avoid actual "usage" and to avoid having to pay retired players license fees, in breach of their contractual and fiduciary obligations. The evidence will show that the most popular vintage

game in history, the EA Madden NFL videogame, allowed players to construct "vintage teams" and scrambled the identity of many class members[1]. In other cases, the Defendants negotiated for below market rates for retired player licenses, in breach of their contractual and fiduciary obligations. In any case and in further breach of their contractual and fiduciary obligations, the Defendants failed to report or disclose any information to the Class Members information regarding the licenses, fees, escrow account, or royalties of the collective group licensing.

Plaintiffs contend that each of the above actions constitute both a breach of the contractual obligations of the defendants under the GLA, including a breach of the covenant of good faith and fair dealing, and a breach of the fiduciary duties Defendants, including those duties imposed by agency, owed each Class Member, including the duty of loyalty, duty of care, and the duty to disclose. More specifically, plaintiffs contend that it is both a breach of the terms of the GLA and a breach of fiduciary duty owed by Defendants to them in: (i) failing to adequately market the retired players; (ii) failing to disclose their actions; (iii) defining "eligibility" in such a way as to deprive the retired players of their shared escrow, (iv) failing to establish an escrow account on behalf of the GLA Class (v) failing to accurately report group licensing revenues to members of the GLA Class, (vi) failing to distribute revenues to the members of the GLA Class that should have been distributed, (vii) failing to distribute to retired players their equal share of the fund from which the active players were paid, (viii) misappropriating funds totaling eight million dollars or more that should have been paid, in part, to the GLA Class, (ix) misappropriating 64-69% of the funds for themselves, (x) failing to include the retired players in the active players' group licenses; and (xi) placing themselves in a position of conflict of interest and acting adversely to the interest of retired NFL players who signed a GLA. Further, Plaintiffs contend that the Defendants acted with evil motive, actual malice, deliberate violence or oppression, or with intent to injure, or in willful disregard for the rights of the

---

[1] By letter to the Court dated July 30, 2008 in response to a question from the Court, Plaintiffs provided a list of 612 class members that had been "scrambled" by EA in the Madden 2007 PC video game. Further checking of the data shows that there some data errors and the correct number is actually 586 class members. Plaintiffs have tendered a new summary exhibit on the Exhibit List attached hereto as Exhibit "G" setting forth the correct numbers.

GLA Class members; and that the Defendants conduct was outrageous, grossly fraudulent, or reckless toward the GLA Class members.

### Defenses

### Defendants' Statement of Defenses

Defendants have not breached the Retired Player Group Licensing Authorizations ("Retired Player GLAs") signed by GLA Class members. Any revenue from the licensing of GLA Class members' retired player rights was paid to the GLA Class members whose retired player rights were licensed, with the agreement of those players. There was no retired player money generated to place in an escrow fund, and thus the decision not to set up an escrow account with no funds could not be a material breach of the Retired Player GLA. Plaintiffs are improperly seeking shares of revenues generated solely by active player licensing in the gross licensing revenue ("GLR") pool, to which Plaintiffs have no claim under the Retired Player GLA. All of the revenues from the license agreements with Electronic Arts, Inc. ("EA"), the Topps Company, and other licensees put at issue by Plaintiffs were solely attributable to active – not retired – player licensing. The accounts in which GLR pool moneys were held were not escrow accounts, and were not the "escrow account" referred to in the Retired Player GLA.

Additionally, Defendants were not in a fiduciary relationship with the GLA Class members, and Defendants have not engaged in any conduct that would amount to a breach of any fiduciary duty to the GLA Class members. With respect to Plaintiffs' claim that a fiduciary relationship exists between the parties, the Court certified the GLA Class's breach of fiduciary duty claim "only insofar as [it] arises out of the GLAs between the NFLPA and retired players." Accordingly, the only fiduciary duty theory that Plaintiffs may pursue is an "express" or "direct" agency relationship purportedly arising out of the Retired Player GLA. GLA Class members never had the required day-to-day control over Defendants' licensing operations for such a fiduciary relationship to arise. Although Plaintiffs continue to argue that a fiduciary relationship arose out of "the totality of the circumstances, including the relationship between the retired player and his union," such a theory

has been legally precluded by prior rulings of the Court and is, in any event, without any basis in fact or law.

There is also no merit to Plaintiffs' allegations about Defendants breaching any purported fiduciary duties. Whenever GLA Class members' rights were licensed, those retired players received the licensing revenues that were generated. Nor was it a breach of any fiduciary duty to the GLA Class to distribute active player licensing revenues in the GLR pool only to active players. Further, Plaintiffs have presented no evidence that Defendants failed to adequately market GLA Class members, or that third party licensees had any interest in paying to acquire the licensing rights of most GLA Class members. In fact, there is no evidence that any but a small minority of GLA Class members had licensing rights with any economic value at all. In addition, contrary to Plaintiffs' assertions, Defendants provided retired players with more than adequate information about Defendants' licensing activities.

Defendants did not breach any contractual or fiduciary duties by retaining a percentage of the GLR pool to fund their respective union and licensing operations. Any monies retained by Defendants out of the GLR pool (e.g., the percentage allocation between the NFLPA and Players Inc and the $8 million "reallocation") consisted only of active player licensing revenues to which GLA Class members have no contractual or other legal entitlement. Moreover, these allocations were approved by the NFLPA Board of Player Representatives who had legal authority to determine the division and use of these active player licensing revenues.

Plaintiffs' other factual allegations in support of their breach of contract and breach of fiduciary duty claims are also without merit. For example, Plaintiffs continue to make claims about Defendants' purported efforts to "eliminate competition," but the Court previously dismissed Plaintiffs' California Unfair Competition Law claims. Similarly baseless is Plaintiffs' claim that "Defendants negotiated for below market rates for retired player licenses." The only purported evidence Plaintiffs have come forward with to support this claim relates to an ad hoc license

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
LOS ANGELES

agreement between EA and the Pro Football Hall of Fame against which Plaintiffs have asserted no claim and seek no damages in this case.

Equally without merit is Plaintiffs' new argument that Defendants "encouraged or allowed their licensees to 'scramble' the identities of retired players in their products in an effort to narrowly avoid actual 'usage' and to avoid having to pay retired player license fees." This new claim is unsupported by any admissible evidence, flatly at odds with Plaintiffs' claim that EA and other licensees did pay license fees for the right to use GLA Class members' rights, and improperly seeks to penalize Defendants for a third party's (EA's) conduct (which Defendants do not, in any event, believe violated the intellectual property rights of any GLA Class members).

Finally, all of the GLA Class claims fail for the additional reason that Plaintiffs have no proof of any damages suffered by each of the individual GLA Class members, and thus could only be entitled to nominal damages at best, even if liability were proven. The economic value of the licensing rights of the members of the GLA Class varied widely (with most GLA Class members' licensing rights having no economic value at all), yet Plaintiffs base their damages claim solely on an equal share payment to all GLA Class members from the active player revenues in the GLR pool. Plaintiffs cannot prove that any of the licensing revenues in the GLR pool were due to GLA Class members. Plaintiffs' damages study also is based entirely on speculation and conjecture. Further, there is no basis in fact or law for Plaintiffs' claims for punitive damages, attorneys' fees, or any additional "class representative" damages for Mr. Adderley.

## II. RELIEF SOUGHT

Plaintiffs seek the following relief:

On their breach of contract claim:

1. A judgment that each of the Defendants have breached one of more of their obligations under the GLA;

2. For actual damages in an amount to be determined at trial;

3. For interest on all sums awarded as damages;

4. For an award of prejudgment interest and costs of suit to the extent permitted by law;

5. For attorneys' fees;

6. For additional compensation for Mr. Adderley as named Class Representative;

7. For such other and further relief as the Court deems just and proper.

On their breach of fiduciary duty claim:

1. A judgment that Defendants have breached their fiduciary duties by (i) failing to adequately market the retired players; and/or (ii) failing to disclose their actions; and/or (iii) defining "eligibility" in such a way as to deprive the retired players of their shared escrow, and/or (iv) failing to accurately report group licensing revenues to members of the GLA Class, and/or (v) failing to distribute revenues to the members of the GLA Class that should have been distributed, and/or (vi) failing to distribute to retired players their equal share of the fund from which the active players were paid, and/or (vii) failing to establish an escrow fund for the GLA Class, and/or (viii) failing to include the retired players in the active players' group licenses; and/ or (ix) misappropriating funds totaling eight million dollars or more that should have been paid, in part, to the GLA Class, and/or (x) misappropriating 64-69% of the funds for themselves, and/or (xi) placing themselves in a position of conflict of interest and acting adversely to the interest of retired NFL players who signed a GLA.

2. For actual damages in an amount to be determined at trial;

3. For disgorgement of all benefits unfairly derived by Defendants;

4. For punitive damages in an amount sufficient to deter Defendants;

5. For interest on all sums awarded as damages;

6. For an award of prejudgment interest and costs of suit to the extent permitted by law;

7. For attorneys' fees;

8. For additional compensation for Mr. Adderley as named Class Representative;

9. For such other and further relief as the Court deems just and proper.

III. STIPULATED FACTS

1. Herbert Adderley is a retired professional football player who played for more than 10 years in the National Football League ("NFL") for the Green Bay Packers and the Dallas Cowboys.

2. The National Football League Players Association ("NFLPA") is a nonprofit Virginia corporation. The NFLPA's headquarters are in Washington, D.C.

3. National Football League Players, Inc. ("Players Inc") is a Virginia corporation, owned 79% by the NFLPA and 21% by the Professional Athletes Foundation, that is engaged in, among other things, the business of licensing the rights of present and some former NFL players. Its headquarters are in Washington, D.C.

4. Plaintiff Adderley is the named representative of a class of all retired NFL players who executed a Retired Player Group Licensing Authorization (sometimes referred to as a "group licensing agreement") ("GLA") with the NFLPA that was in effect at any time between February 14, 2003 and February 14, 2007 and which contains the following language: "[T]he moneys generated by such licensing of retired player group rights will be divided between the player and an escrow account for all eligible NFLPA members who have signed a group licensing authorization form" (the "GLA Class").

5. The GLA Class consists of 2056 members, who are listed in Exhibit A attached hereto.[2]

6. The NFLPA sublicensed the rights acquired by the GLAs to Players Inc pursuant to a March 1, 2000 agreement (A true and correct copy of which is attached hereto as Exhibit B).

7. Plaintiff Adderley executed a GLA on May 1, 2001, which was effective from May 1, 2001 to December 31, 2003. (A true and correct copy of which is attached hereto as Exhibit C).

8. Plaintiff Adderley executed another GLA on November 22, 2002, which was effective from November 22, 2002 to December 31, 2005. (A true and correct copy of which is attached hereto as Exhibit D).

9. GLA Class member Walter Beach III executed a GLA on May 23, 2003, which was effective from May 23, 2003 to December 31, 2006. (A true and correct copy of which is attached hereto as Exhibit E).

10. GLA Class member Bruce Laird executed a GLA on April 19, 2000, which was effective from April 19, 2000 to December 31, 2003. (A true and correct copy of which is attached hereto as Exhibit F).

---

[2] Defendants reserve their right to correct the number of GLA Class members and/or the attached list of GLA Class members prior to trial should Defendants discover that this information – which was provided by Plaintiffs just prior to the parties' deadline for filing their Stipulated Facts – is inaccurate.

11. GLA Class member Laird executed a GLA on January 5, 2004, which was effective from January 5, 2004 to December 31, 2006. (A true and correct copy of which is attached hereto as Exhibit H).

12. GLA Class member Clifton McNeil executed a Retired Player GLA on June 21, 2002, which was effective from June 21, 2002 to December 31, 2005. (A true and correct copy of which is attached hereto as Exhibit I).

13. Plaintiffs do not seek to recover in this case any moneys paid to some GLA Class members under separate, so-called "ad hoc" license agreements.

14. Defendants entered into a license agreement with EA in 2005. (A true and correct copy of which is attached hereto as Exhibit J).

15. EA manufactures and sells a video game called EA Madden Football, a new version of which has been released annually for the past 20 years. The game simulates pro football play and is one of the top ten best-selling video games of all time.

16. Doug Allen was the Assistant Executive Director of the NFLPA from 1986 to 2006 and the President of Players Inc from 1994 to 2006.

17. Beginning in June 1983, Gene Upshaw was the Executive Director of the NFLPA. For all relevant times, he was also Chairman of Players Inc. Mr. Upshaw died on August 20, 2008.

18. Richard Berthelsen has served as General Counsel to the NFLPA since 1983, and also currently serves as Interim Executive Director of the NFLPA following the death of Gene Upshaw.

19. Patricia Allen was the Executive Vice-President & Chief Operating Officer of Players Inc from 1994 to 2006.

20. The 2004-2006 NFLPA Retired Members Directory states: "The NFLPA Retired Players Department has obtained Group Licensing Assignment agreements (GLAs) from more than 2,900 retired NFL players, and is in the process of building up our list so that PLAYERS INC can provide more opportunities to retirees."

21. LaShun Lawson was an employee of Players Inc and acted as the Assistant Vice President of Multimedia for Players Inc.

22. Trace Armstrong is a retired professional football player who played for 15 seasons in the NFL, for the Chicago Bears, Miami Dolphins, and Oakland Raiders. He was President of the NFLPA from 1995 to 2003.

## IV. FACTUAL ISSUES WHICH REMAIN TO BE TRIED

### A. Plaintiffs' Breach of Contract Claim

#### 1. Joint Factual Issues for Breach of Contract Claim

1. Whether Defendants engaged in conduct that breached the terms of the Retired Player GLAs entered into by the GLA Class members.

2. Whether the EA, Topps, and other license agreements at issue licensed the group licensing rights of GLA Class members.

3. Whether Defendants breached their contractual obligations to the GLA Class by allegedly failing to accurately report on any group licensing revenues owed to the GLA Class.

4. Whether Defendants breached their contractual obligations to the GLA Class by allegedly failing to adequately disclose material information regarding the group licensing program.

5. Whether Defendants breached their contractual obligations to the GLA Class by reallocating $8 million to the NFLPA and Players Inc in the calculation of the gross licensing revenue ("GLR") pool.

6. Whether Defendants breached their contractual obligations to the GLA Class by allegedly failing to adequately market the GLA Class to potential licensees.

7. How much damages, if any, have the GLA Class members suffered as a result of any breach of contract by Defendants.

#### 2. Plaintiffs' Additional Factual Issues for Breach of Contract Claim

1. Whether the GLA Class members were entitled to a share of the licensing revenues received by Defendants from third party licenses.

2. Whether Defendants engaged in conduct that violated the covenant of good faith and fair dealing implied in the retired player GLAs.

3. Whether Defendants breached their contractual obligations to the GLA Class by failing to distribute royalties received from the collective licensing of player image rights.

4. Whether Defendants breached their contractual obligations to the GLA Class by failing to tell them they were not "eligible" for a portion of an escrow account, despite the language of the GLA.

5. Whether Defendants breached their contractual obligations to the GLA Class by failing to create an escrow account as required by the GLA.

6. Whether Defendants breached their contractual obligations to the GLA Class by allocating 64% - 69% of the royalties received from collective group licensing for themselves.

7. Whether Defendants breached their contractual obligations to the GLA Class by allegedly defining "eligibility" to exclude retired players.

8. Whether Defendants breached their contractual obligations to the GLA Class by allegedly misappropriating funds to themselves.

**3. Defendants' Additional Factual Issues for Breach of Contract Claim**

1. Whether the revenues in the GLR pool were solely attributable to agreements that licensed only active player rights.

2. Whether the GLR pool uses an escrow account and, if it does, whether it is the escrow account referred to in the Retired Player GLA.

3. Whether the GLR pool contains any money attributable to the licensing of GLA Class members' group licensing rights.

4. Whether the Retired Player GLAs entitled GLA Class members to share in revenues generated solely by the licensing of active players' rights.

5. Whether Plaintiffs have proven injury and the amount of damages to each individual GLA Class member.

6. Whether the damages evidence submitted by Plaintiffs provides a reasonable measure of each GLA Class member's damages without resort to speculation or guesswork.

7. Whether Plaintiffs have proven an amount of damages caused by any breach of contract by Defendants in an amount greater than zero or a nominal amount.

**B.  Plaintiffs' Breach of Fiduciary Claim**

   **1.  Joint Factual Issues for Breach of Fiduciary Duty Claim**

   1. Whether the Retired Player GLAs created a fiduciary duty between Defendants and the GLA Class members.

   2. Whether Defendants engaged in conduct that breached any fiduciary duty that Defendants allegedly owed to the GLA Class members.

   3. Whether the EA, Topps, and other license agreements at issue licensed the group licensing rights of GLA Class members.

   4. Whether Defendants breached any fiduciary obligations to the GLA Class by allegedly misappropriating funds owed to the GLA Class.

   5. Whether Defendants breached any fiduciary obligations to the GLA Class by allegedly failing to accurately report on any group licensing revenues owed to the GLA Class.

   6. Whether Defendants breached any fiduciary obligations to the GLA Class by reallocating $8 million to the NFLPA and Players Inc in the calculation of the GLR pool.

   7. Whether Defendants breached any fiduciary obligations to the GLA Class by allegedly failing to adequately disclose material information regarding the group licensing program.

   8. Whether Defendants breached any fiduciary obligations to the GLA Class by allegedly placing themselves in a conflict of interest and acting adversely to the interests of the GLA Class members.

   9. Whether Defendants breached any fiduciary obligations to the GLA Class by allegedly failing to adequately market the GLA Class to potential licensees.

10. How much damages, if any, have the GLA Class members suffered as a result of any breach of fiduciary duty by Defendants.

**2. Plaintiffs' Additional Factual Issues for Breach of Fiduciary Duty Claim**

1. Whether Defendants were fiduciaries of the GLA Class.

2. Whether the facts show that an agency relationship was created between Plaintiffs and Defendants.

3. Whether the circumstances surrounding the execution and operation of the GLAs established a fiduciary relationship between Plaintiffs and Defendants.

4. Whether Defendants breached their fiduciary obligations to the GLA Class by failing to distribute royalties received from the collective licensing of player image rights.

5. Whether Defendants breached their fiduciary obligations to the GLA Class by failing to tell them they were not "eligible" for a portion of an escrow account, despite the language of the GLA.

6. Whether Defendants breached their fiduciary obligations to the GLA Class by failing to create an escrow account as required by the GLA.

7. The amount of benefits which the Defendants have unfairly derived from their breaches of fiduciary duties to Plaintiffs.

8. Whether Defendants breached their fiduciary obligations to the GLA Class by allocating 64% - 69% of the royalties received from collective group licensing for themselves.

9. Whether Defendants breached any fiduciary obligations to the GLA Class by allegedly defining "eligibility" to exclude retired players.

10. Whether Defendants breached their fiduciary obligations to the GLA Class by allegedly failing to include them in each of the active player group licenses.

11. Whether Defendants acted with actual malice toward the GLA Class members, or acted under circumstances amounting to a willful and wanton disregard of the GLA Class members' rights.

### 3. Defendants' Additional Factual Issues for Breach of Fiduciary Duty Claim

1. Whether the Retired Player GLAs entitled GLA Class members to share in revenues generated solely by the licensing of active players' rights.

2. Whether the allocation of the active player group licensing revenues in the GLR pool breached any fiduciary obligations to the GLA Class.

3. Whether the GLA Class Members had sufficient control over Defendants' day-to-day licensing operations to constitute a principal-agent relationship.

4. Whether the revenues in the GLR pool were solely attributable to agreements that licensed only active player rights.

5. Whether the GLR pool uses an escrow account and, if it does, whether it is the escrow account referred to in the Retired Player GLA.

6. Whether the GLR pool contains any money attributable to the licensing of GLA Class members' group licensing rights.

7. Whether Plaintiffs have proven injury and the amount of damages to each individual GLA Class member.

8. Whether the damages evidence submitted by Plaintiffs provides a reasonable measure of each GLA Class member's damages without resort to speculation or guesswork.

9. Whether Plaintiffs have proven an amount of damages caused by any breach of contract by Defendants in an amount greater than zero or a nominal amount.

## V. LEGAL ISSUES TO BE DETERMINED

Apart from pretrial legal questions (such as the parties' respective motions in limine and disputed proposed jury instructions), the parties believe that there are currently no legal issues to be determined by the Court.

## VI. JURY INSTRUCTIONS

Attached hereto as Exhibit K is the parties' proposed Joint Set of Instructions on Substantive Issues of Law.

Attached hereto as Exhibits L and M are the parties' proposed Special Verdict forms.

## VII. VOIR DIRE AND JURY QUESTIONNAIRE

Attached hereto as Exhibit N is the parties' proposed Joint Voir Dire Questions.

Attached hereto as Exhibit O is a proposed Jury Questionnaire prepared jointly by the parties, which they request that the Court approve and distribute prior to Voir Dire. The parties believe the use of a questionnaire in this case, which has received significant public attention and involves well-known defendants and professional athlete plaintiffs, will allow prospective jurors to accurately express their opinions and biases without impacting the opinions of others in the jury panel. This questionnaire has been designed to obtain the information the Court asks jurors to provide. The parties plan to quickly analyze the juror's responses and do not expect the questionnaire to extend the time spent on jury selection beyond that which would be anticipated for a trial with well-known litigants. To the contrary, the parties believe that their joint proposed Jury Questionnaire would be an efficient tool to mitigate the need for the extended voir dire that this case would otherwise require.

## VIII. WITNESS LIST

Attached hereto as Exhibit P is Plaintiffs' Witness List.

Attached hereto as Exhibit Q is Defendants' Witness List.

Pursuant to Federal Rule of Evidence 615, but subject to the exceptions therein, the parties request that the Court order the exclusion of witnesses from the courtroom until after such witness has completed his or her testimony. This request is made without waiver of the exceptions identified in Rule 615, such as an officer or employee designated as a representative of a party which is not a natural person.

IX. **JOINT TRIAL EXHIBIT LIST**

Attached hereto as Exhibit R is the parties' Joint Trial Exhibit List.

X. **DEFENDANTS' PROPOSAL FOR WITNESS SUMMARIES**

It has come to the Defendants' attention that, following the testimony of a trial witness, the Court sometimes invites counsel to offer to the jury a brief summary of the witness's testimony in order to put that witness's testimony into context and to provide clarification where necessary and appropriate. The Defendants believe that in this case such a procedure would be particularly helpful to the jury and therefore request that they be permitted to present such witness summaries after the conclusion of each witness's testimony. The Defendants understand any time used for witness summaries will be brief and will be deducted from the trial time allocated by the court to each party.

The Plaintiffs are opposed to witness summaries. They believe that the jury does not benefit from having the lawyers tell it what it just heard, that they are likely argumentative and disruptive to the flow of trial, and are inefficient and an unnecessary use of time.

Dated: _____          _____
                                        The Honorable William H. Alsup
                                        United States District Court Judge

266929.1

JOINT FINAL PRE-TRIAL ORDER
CASE NO. C07 0943 WHA

- 19 -