```
 1                                          Pages 1 - 175

 2                    UNITED STATES DISTRICT COURT

 3                  NORTHERN DISTRICT OF CALIFORNIA
             BEFORE THE HONORABLE WILLIAM H. ALSUP, JUDGE

 4   BERNARD PAUL PARRISH,          )
     HERBERT ANTHONY ADDERLEY,      )
 5   WALTER ROBERTS, III, ET AL.,   )
                                    )
 6               Plaintiffs,        )
          v.                        )   NO. C 07-00943 WHA
 7                                  )
     NATIONAL FOOTBALL LEAGUE       )
 8   PLAYERS ASSOCIATION and        )
     NATIONAL FOOTBALL LEAGUE       )
 9   PLAYERS INCORPORATED d/b/a     )
     PLAYERS INC.,                  )
10                                  )
                 Defendants.        )
11   _____)
                                        San Francisco, California
12                                      Wednesday, October 15, 2008

13                    TRANSCRIPT OF PROCEEDINGS

14   APPEARANCES:

15   For Plaintiffs:      Manatt, Phelps & Phillips
                          1001 Page Mill Road
16                        Building 2
                          Palo Alto, California 94304
17                  BY:   RONALD S. KATZ, ESQ.
                          RYAN S. HILBERT, ESQ.
18                        and
                          Manatt, Phelps & Phillips
19                        7 Times Square
                          New York City, New York 10036
20                  BY:   L. PETER PARCHER, ESQ.
                          and
21                        Manatt, Phelps & Phillips
                          11355 West Olympic Boulevard
22                        Los Angeles, California  90064
                    BY:   CHAD HUMMEL, ESQ.
23

24   (Appearances continued, next page)

25
```

1

2  **APPEARANCES, CONTINUED:**

3

  **Also for Plaintiffs:**
4                         McKool Smith
                        300 Crescent Court
5                         Suite 1500
                        Dallas, Texas  75201
6                 BY:   LEWIS T. LECLAIR, ESQ.
                        JILL ADLER NAYLOR, ATTORNEY
7                         ANTHONY GARZA, ESQ.
                        BRETT CHARHON, ESQ.

8

9  **For Defendants:**        Dewey & LeBoeuf
                        1301 Avenue of the Americas
10                        New York City, New York  10019-6092
                 BY:   JEFFREY L. KESSLER, ESQ.
11                        DAVID GREENSPAN, ESQ.
                        DAVID G. FEHER, ESQ.
12                        ROY TAUB, ESQ.
                        MOLLY DONOVAN, ATTORNEY
13                        JASON CLARK, ESQ.

14
   **Reported by:**           BELLE BALL, CSR 8785, RMR, CRR
15                        Official Reporter

16

17

18

19

20

21

22

23

24

25

1   **MONDAY, OCTOBER 15, 2008**                    **10:46 A.M.**

2                       **P R O C E E D I N G S**

3           THE CLERK:  Calling Civil Action No. C-07-943, it's

4   Bernard Parrish versus the NFL Players Inc.

5           Counsel, please state your appearances for the

6   Record.

7           MR. KATZ:  Ronald Katz for Plaintiffs, Your Honor.

8   Good morning.

9           THE COURT:  Okay.

10          MR. PARCHER:  Peter Parcher for the Plaintiffs, Your

11  Honor.

12          THE COURT:  Peter who?

13          MR. PARCHER:  Parcher.  P-A-R-C-H-E-R.

14          THE COURT:  Okay.

15          MR. LECLAIR:  Lew LeClair for the Plaintiffs, Your

16  Honor.

17          MR. HUMMEL:  Good morning, Your Honor.  Chad Hummel,

18  on behalf of the Plaintiffs.

19          MS. NAYLOR:  Jill Naylor for Plaintiffs.

20          THE COURT:  Your last name?

21          MS. NAYLOR:  Naylor, N-A-Y-L-O-R.

22          THE COURT:  All right.

23          MR. HILBERT:  Ryan Hilbert, for the Plaintiffs.

24          THE COURT:  Hilbert, thank you.

25          MR. KESSLER:  Good morning, Your Honor.  Jeffrey

1  Kessler for the Defendants.

2          THE COURT:  Okay.

3          MR. FEHER:  Good morning, Your Honor.  David Feher

4  for the Defendants.

5          THE COURT:  Thayer?

6          MR. FEHER:  Feher, F-E-H-E-R.

7          THE COURT:  All right.

8          MR. CLARK:  Good morning.  Jason Clark for the

9  Defendants.

10          THE COURT:  Okay.

11          MR. TAUB:  Roy Taub for the Defendants.  T-A-U-B,

12  Your Honor.

13          THE COURT:  T-A-U-B.  Got it okay.

14          MS. DONOVAN:  Good morning.  Molly Donovan for

15  Defendants.

16          THE COURT:  Okay.

17          MR. GREENSPAN:  David Greenspan for Defendants, Your

18  Honor.

19          THE COURT:  Each side has almost got eleven players

20  per side.  Not quite.  All right.  We're here for a final

21  pretrial conference.  The case goes to trial on Monday, after a

22  continuance.

23          I had a couple of preliminary questions.  Some of

24  your material referred to a trial brief, but I never found any

25  trial brief.  Was it called a trial brief?

1          MR. KATZ:  There's no trial briefs, Your Honor.

2          MR. KESSLER:  Your Honor, I'm not sure what the

3  reference is.  There is no --

4          THE COURT:  Well, it was in one of your motions in

5  limine, referred to a trial brief.  But, okay.  That's good,

6  because we wasted hours looking for it and couldn't find it.

7          MR. KESSLER:  Okay.

8          THE COURT:  Okay.  I'm going to give you -- there are

9  slight revisions to the guidelines for the jury trial that you

10  probably looked at.  And if you have been relying on the old

11  ones, you're fine so far, but there are some minor differences

12  that -- I would like to ask, Dawn, can you e-mail Kathy to

13  bring those?

14          THE CLERK:  Oh, sure.

15          THE COURT:  We will get them to you before this

16  hearing is over.  And one thing that you could do for me that

17  would be useful is you can give me notebook that is smaller

18  than this (Indicating), but it has all of the relevant

19  contracts of any type that anybody's going to refer to,

20  including with the third parties.  And you highlight the

21  language you think I should be focusing on.

22          For example, if there's one of these group licensing

23  things that refers to active players, maybe I should see that,

24  if it's going to be in evidence.  And you highlight the

25  language that you think is -- so I want you to do pink for

1  Plaintiff, and yellow for Defendant.

2         Then I'll look at that, and -- yes, sir.

3         MR. KESSLER:  Could I ask a question, Your Honor?

4  You mentioned the size of the book.  There are about 100

5  contracts that all have identical language.  Does Your Honor

6  really want --

7         THE COURT:  No, I want one.

8         MR. KESSLER:  You want one, as a sample.

9         THE COURT:  But if there's one for active and one for

10 retired, I want one of each of those, because at least the word

11 "retired" and "active" is different.  I just need one exemplar

12 so I can see -- okay.

13        First thing I guess we are going to -- do you have

14 schedule for this morning as I got a little less than an hour

15 now and then we will resume in the afternoon at about 1:00.  At

16 some point I've got to show the video to the jury.  But I may

17 be able to send in a DVD and let them look at it themselves, if

18 the lawyers will agree to that.  But, we have most of the

19 afternoon to continue with this.

20        I need to say to all of you, though, because this is

21 a courtroom now, this is not law and motion, this is trial.

22 This is not big-firmism practice.  So, you are going to get

23 very short opportunities to make your main points on the

24 motions in limine.  Maybe five minutes, and then we move on.

25        But this is no longer summary judgment time, this is

no longer motions to dismiss and arguments ad infinitum.  I

have a trial to run.  I'm going to run it.  I've read your

material myself.  I don't pretend to know every detail of it,

but I know the essence of it.  And I want to hear you out on

some things, and occasionally we will go longer than five

minutes.  But this is not an opportunity for extended argument.

There are going to be time limits on the trial, as

well.  So you are just going to have to adjust to the fact that

I've got a long line of people out there that want their case

tried.  So, we are going to get it done in about two weeks, two

and a half weeks, and then we move to the next case.  So, be

thinking how you can streamline your case.

All right.  First thing we will do is the Motion in

Limine No. 1 brought by the Defendants.

MR. LECLAIR:  Your Honor, if I could just say one

thing, I had a conference call with the Defendants.  We tried

to work out what we could, in advance.  And we did reach a

stipulation which I've not had time to actually get signed and

filed, but it has been blessed by both sides.

Would Your Honor like to receive that?  It's pretty

minor.

THE COURT:  On what?

MR. LECLAIR:  It agrees to the relief on, I think,

two or three of the portions of the motions.  So --

THE COURT:  I don't know what you are talking about.

1  I'm not going to let you file anything under seal, if that's

2  what you have in mind.

3        MR. LECLAIR:  Oh, no, Your Honor --

4        THE COURT:  This is a public proceeding.  This is not

5  a subsidiary of your law firm.  And if the public wants to come

6  in and find out how we decide things, we are.  So, nothing is

7  going to be under seal, and nothing -- no member of the public

8  is going to be excluded.

9        So, you had something to file under seal, the answer

10 is no.

11       MR. LECLAIR:  No, this is not under seal at all, Your

12 Honor.  This is a brief order -- if I could hand it up to Your

13 Honor -- that agrees to the relief on a couple of the motions

14 in limine.  And I just wanted to --

15       THE COURT:  All right, well, when we get to the point

16 where it matters, you let me know, because I've got my notes

17 organized by your motions in limine.  But I want to start with

18 the Defendants' motions in limine.  The motion under seal is

19 denied.

20       May we now go to the Motion in Limine No. 1, to

21 exclude evidence, how Defendants allegedly spent money, and so

22 forth.  This motion, we'll hear some argument on, unless you

23 have got a stipulation on it.

24       MR. KESSLER:  Your Honor, Mr. Kessler.  We have a

25 partial stipulation on this, Your Honor.  Plaintiffs have

agreed to the portion of this motion that has asked for a
preclusion of any discussion of salaries paid to individual
executives of the NFLPA or Players Inc., and has also agreed to
not reference to the salaries paid -- I'm sorry, to the
salaries earned by active players.  They've agreed that that
would be precluded.  And we have a stipulation on that aspect,
Your Honor.

The portion of the motion that's contested still has
to do with two issues.  One is how the monies are spent by the
players association, and by Players Inc.  That's the first
contested issue.

We believe, Your Honor, that either the retired
players in the class are entitled to this money, or they're
not.  If they're entitled to it, then they should get a jury
verdict, and it should be distributed to them.  But to go into
how the money was spent by the union, if it was not
distributed, or how it was spent by Players Inc. on expenses or
salaries or coffee mugs or given to other sources, then that is
really not a relevant issue.

This came up previously, Your Honor, you recall, in
Gene Upshaw's salary, when they had a whole argument that they
wanted to show that this was a diversion of expenses, that
Mr. Upshaw didn't deserve a salary.  Your Honor rejected all
that, and told them they should get a new theory, if that was
their theory of the case.  So, we believe generally how the

1 money was spent is not relevant.  That's the first contested

2 issue.

3           And then, the second issue is the general wealth of

4 the union.  What our assets are, how much money we have as a

5 union, or how much money Players Inc. has.

6           Your Honor, we understand that if we ever got to a

7 punitive damages phase, which we don't think we will ever get

8 to, that that is a factor to be considered.  But with respect

9 to the liability phase of this case, we don't think it's at all

10 appropriate to make this a case of poor retired players versus

11 rich ones.

12           THE COURT:  You are right on the punitive damages.

13 We're not going to get into the wealth, unless we have a

14 punitive damages --

15           MR. KESSLER:  That is our position.

16           THE COURT:  That would be a supplemental proceeding.

17 All right.  Well, that's the way it's going to be.

18           Mr. Katz, are you trying to argue with the way I run

19 my trials?  I don't -- we don't get into punitive damages until

20 the jury says "Yes, punitives should be awarded."

21           Then we bring them back, we have a supplemental

22 proceeding on the wealth of the individuals.

23           MR. KATZ:  Mr. LeClair is arguing this one.

24           THE COURT:  Mr. LeClair, what's wrong?  Are you

25 challenging the way the Court runs trial after trial?

1           MR. LECLAIR:  Of course not, Your Honor.

2           THE COURT:  Then, why -- why are you contesting this?

3           MR. LECLAIR:  We only have two issues, Your Honor.

4    One is, the use of the proceeds is relevant only in the sense

5    that we complain about --

6           THE COURT:  What about wealth?  The wealth issue

7    only.

8           MR. LECLAIR:  Well, the financial statements of the

9    Defendants, they put into evidence, Your Honor.  They're on

10   their exhibit list.  So, presumably the financial statements

11   come into evidence at the appropriate time.

12          THE COURT:  I don't know if they want them for

13   punitives or what.  Look.  This is easy.  We're not going to

14   waste time on it.  I'm going to tell you the answer.

15          Nothing about wealth can come in until the jury says

16   punitives are in order.  Then we will have a supplemental

17   proceeding.  Nothing about Upshaw's salary is going to come in.

18   You've already stipulated about the players and officials.

19          However, I disagree with this motion, in one

20   important respect.  And that is, you should be entitled to

21   trace the flow of the money.

22          MR. LECLAIR:  That's all we want, Your Honor.

23          THE COURT:  No, no.  Subject to Rule 403.  At some

24   point.  In other words, the money comes from the Electronic

25   Arts, and it goes to somebody, but it never manages to get to

1  the retired players.  It is important to understand that flow

2  of the money.  It is not important to understand how much

3  individual people got paid.  And at some point it may be

4  irrelevant to know under Rule 403 some of the details you are

5  trying to get into.

6          So, the basic ruling is you can put in evidence that

7  traces the flow of the money from the third-party licensees

8  back through the Defendants to the active players, retired

9  players, anyone else, within reason.  And Rule 403 will cut you

10  off at some point.  That's the ruling.

11          MR. LECLAIR:  Fair enough, Your Honor.  Thank you.

12          THE COURT:  Motion No. 2, on the Charlotte Observer.

13          MR. KESSLER:  Yes.  Very quickly, Your Honor, as you

14  know, there was a separate set of issues having nothing to do

15  with this case that would were embodied by Mr. Parrish and

16  others about disabilities, pension, collective bargaining,

17  et cetera.

18          We don't think any of those issues belong in this

19  case under Rule 403; be very confusing to the jury.  So we have

20  asked for ruling to -- to eliminate any testimony or evidence

21  complaining about disability or pensions or collective

22  bargaining.

23          The statement of Mr. Upshaw in the Charlotte Observer

24  was about that subject.  If Your Honor looks at that, it was a

25  meeting he had in which people were complaining about their

1  pensions, specifically, and in response to that, he made

2  comments that he didn't work for the retired players -- for the

3  active players because they were not in the bargaining room.

4  That was the specific context.

5          THE COURT:  Where can I find that statement again?

6          MR. KESSLER:  If you take a look, Your Honor, on the

7  Page 2 of our motion.  It's quoted in full.  And in

8  particular --

9          THE COURT:  I must be looking at the wrong motion in

10  limine.

11          MR. KESSLER:  I'm sorry, this is No. 2, Your Honor.

12          THE COURT:  Defendant's Motion No. 2.

13          MR. KESSLER:  I'm sorry, it's Plaintiffs' Opposition

14  No. 2, it's called, Your Honor.  I was looking at the wrong

15  brief, Your Honor.

16          In their opposition on Page 2, quotes it in full.

17          THE COURT:  All right.

18          MR. KESSLER:  And if you take a look at that, Your

19  Honor, you will see by the last paragraph -- and this in fact

20  was Mr. Upshaw's testimony as well --

21          THE COURT:  Did he admit in his deposition that he

22  said this?

23          MR. KESSLER:  He said he said it, and it had to do

24  with bargaining of pension benefits.  So what we are opposing,

25  Your Honor, is not the fact that he said this, but that since

1  this had to do with bargaining over pension benefits, they want

2  to make this a statement as if it had to do with licensing.

3       We would then have to get into it, and arguing -- and

4  Mr. Upshaw, of course, is not here, but it's there, that this

5  was in the context of who does collective bargaining, and what

6  the legal obligations are to active versus retired players.  An

7  issue that is only going to confuse the jury.

8       THE COURT:  All right.  Let's hear from Plaintiff.

9       MR. LECLAIR:  Your Honor, first of all, with respect

10  to Mr. Upshaw's statement, we think it is for the jury to

11  decide, based on to context of the statement we say he was

12  talking about his view of retirees, generally, in all contexts.

13  It's up to the jury to decide what he meant.  There certainly

14  is nothing in his statement that limits it that way, as far as

15  we are concerned.  But that's up to the jury to decide.

16       So we think that statement, where he says he doesn't

17  work for retired players, where he compares retired players to

18  dog food, those statements we think relate to marketing as much

19  as anything else, and therefore, we think the jury is entitled

20  to consider them.

21       With respect to pensions and disabilities generally,

22  we agree.  This case isn't about pensions and disabilities.

23  However, the Defendants are seeking to inject that very issue,

24  which you will find in response to our motions in limine.  They

25  want to inject those issues for their purposes, but don't want

1  us to respond to them.

2         And we, of course, don't agree with that.  But we

3  agree that pensions and disabilities are not at issue.

4         THE COURT:  Where can I find the more full version of

5  what he said?

6         MR. LECLAIR:  Your Honor, it is Exhibit A to our

7  response to the Motion No. 2, or to the -- it's Garza

8  declaration responding to Motion No. 2.  I can hand it up to

9  Your Honor, if you would like.

10         MR. KESSLER:  Your Honor, we also have a copy of the

11  entire article, if Your Honor would like to look --

12         THE COURT:  I've got it here.  It's hard to read,

13  it's that small print.  I think I got it.  Who is Joe De --

14         MR. LECLAIR:  Joe DeLamielleure is a retired player,

15  Your Honor.

16         MR. KESSLER:  It's all about the pension issue.

17         THE COURT:  Where is the thing about dog meat?

18         MR. LECLAIR:  That statement is a separate statement,

19  Your Honor.  It's not in this one.  That's in an interview that

20  Gene Upshaw gave right before the -- right after we filed the

21  case.

22         MR. KESSLER:  And we don't contest that statement,

23  Your Honor.  It's not the subject of this motion.

24         MR. LECLAIR:  And if I could direct Your Honor to the

25  particular language that I think is appropriate, at the top of

1  the second page of the article, Your Honor, it says, quote (As

2  read), "Upshaw, 60, who has been executive director of the

3  NFLPA since 1987, says he stands by his record and rejects the

4  suggestion he's supposed to be the retirees' representative.

5  'The bottom line is, I don't work for them.  They don't hire me

6  and they can't fire me.'"

7           Our point is, he is our representative.  That's our

8  point, under these contracts.  He wanted to be the retired

9  players' representative, but what he' saying is "I wasn't, and

10 I don't care about them."  And that's why it's relevant.

11          Now, they can argue to the jury --

12          THE COURT:  Isn't he talking here about the --

13 bargaining with the League, as opposed to retirees?  He's not

14 talking about licenses, here.

15          MR. LECLAIR:  Your Honor, he talks about lots of

16 things here.  The point is, he's talking about his

17 representation of retired players.  Generally.  That's what we

18 say this is about.  And that's our whole point, is, that's

19 exactly right.  It's not in Gene Upshaw's mind -- it was not in

20 his mind that retired players made any difference or that he

21 cared about them.  At the same time, his people were soliciting

22 these licenses.

23          And we say the jury is entitled to consider this

24 statement, and they can argue the context all they want.

25 That's our point.

1          THE COURT:  What is the proof, Mr. Kessler, that this

2    was in the context of bargaining with the League over salaries?

3          MR. KESSLER:  That's correct, Your Honor.

4          THE COURT:  What is the proof?  I can't just take

5    your word for that.

6          MR. KESSLER:  Okay, Your Honor.  The testimony is,

7    from Mr. Upshaw, who was deposed on this --

8          THE COURT:  Where is that in the record?

9          MR. KESSLER:  It's in the record, Your Honor.  I

10   don't know if it was submitted in connection with the motion.

11   But I don't think there goes any dispute about this, that there

12   was no reference to licensing at this entire meeting, there's

13   no contest in that, and that the subject of this meeting, as

14   Mr. Upshaw testified, were complaints about the pensions.

15          As Your Honor can see, yes, it's -- it was all about

16   the -- the pensions, and that's why he was talking about

17   they're not in the bargaining unit.  The bargaining unit is the

18   collective bargaining unit that bargains with the National

19   Football League to determine pensions.

20          And this came up, if Your Honor looks at the whole

21   article, it's specifically talking about -- if you look at the

22   prior page just before this -- about the pension improvements.

23   That was the entire subject of this.

24          And so, Mr. Upshaw was saying that he doesn't work

25   for the retired players in collective bargaining, which is

1 true, as a matter of labor law.  That's what he testi- -- in

2 his deposition.  We can submit, Your Honor, his deposition

3 testimony on this, which I think is uncontested.

4        THE COURT:  It's not in this motion here.  The motion

5 is denied.  This record doesn't support leaving this out,

6 Mr. Kessler.  This is going to come -- well, I'm not -- I'm not

7 saying it comes into evidence.  I'm just saying you haven't

8 given me sufficient grounds to exclude it.

9        MR. KESSLER:  Very good, Your Honor.  I will -- we

10 might make another submission.

11        THE COURT:  Maybe you can, maybe you can't.

12        MR. KESSLER:  Thank you, Your Honor.

13        THE COURT:  But right now, the record is not good

14 enough to grant that motion.

15        All right.  Motion -- I want to be clear on

16 something.  Sometimes when a motion in limine is denied, the

17 lawyers think that I've ruled something into evidence.  No.

18        I'm just saying that the ground asserted for keeping

19 it out -- means it's not good enough, but it doesn't mean it's

20 otherwise admissible.

21        Do you all understand that?

22        MR. KESSLER:  Yes, Your Honor.

23        THE COURT:  Sometimes lawyers goof up on that.

24        All right.  Motion in Limine 3, let's see what that

25 one's about.  It's called To Exclude Evidence Regarding

1  Complaints Relating to "Ad Hoc Agreements."

2          MR. KESSLER:  Yes, Your Honor.  In fact, we have a

3  stipulated fact now, in the pretrial order, that Plaintiffs are

4  not seeking any damages with regard to the ad hoc agreement.

5  Your Honor has pointed it out many times in your rulings.

6          And we note that the Hall of Fame agreement, which is

7  the subject of significant papering by the players, is one of

8  the ad hoc agreements.  There's no question about that.

9          So, this whole episode about claims that the Hall of

10 Fame agreement is below market, that was the claim here, Your

11 Honor might recall, is that this is one of the ad hoc

12 agreements, there's no damage claim about that agreement.

13         We are very concerned about juror confusion.  If they

14 think there's something wrong with that agreement, they may end

15 up awarding damages for that agreement.  And there's no claim

16 in this case about that.

17         THE COURT:  Is this the one where the scrambling took

18 place?

19         MR. KESSLER:  No, this is a different one, Your

20 Honor.  This was a Hall of Fame agreement between EA, the Hall

21 of Fame, and the union, in which retired players were paid

22 money.

23         This is the one, Your Honor might recall you asked

24 during summary judgment, weren't they paid that money, and

25 Mr. Katz said yes, they were.  Each of the retired players,

1  including Mr. Adderley, got that.  But it was an ad hoc

2  agreement, exactly the agreements they say they're not

3  complaining, exactly the money that Mr. Adderley is not

4  offering to give back.

5          And that, Your Honor, for them to come in and say

6  "Well, that was a below-market deal," and use that as evidence,

7  when that is not a complaint they have in this case, they're

8  not seeking damages, the jury is going to end up getting

9  confused.  And perhaps -- we will have to defend that, but

10 perhaps punishing us for that, even though there's not a claim,

11 and they've now stipulated.

12         THE COURT:  All right.  I understand your point.

13 Let's hear from the other side.

14         MR. LECLAIR:  Your Honor, I'm really not doing all

15 these; it just so happened the first three are mine.

16         This once very important to us, Your Honor.  And I do

17 want to take a moment to explain.

18         THE COURT:  You'd better have a good reason, because

19 right now I'm going to grant this motion.

20         MR. LECLAIR:  All right, Your Honor.  This is

21 critical to us.  What, here --

22         THE COURT:  I don't care how critical it is.  Why

23 should you be allowed to get off into smearing them, based on

24 some agreement you're not even -- you got a good case on the ad

25 hoc, maybe, but you gave that up.

1          MR. LECLAIR:  Your Honor, we are not seeking damages

2   for the ad hoc agreements.  But the ad hoc agreements are part

3   of the story, because the question is whether the Defendants in

4   fact marketed retired players.

5          Their whole defense to this case is retired players

6   essentially were not marketable.  That's their defense to the

7   case, is these retired players had no value in the marketplace.

8          What this e-mail shows --

9          THE COURT:  They bring that up, maybe you can get

10  this in.  But you are anticipating a defense.

11         MR. LECLAIR:  Well, Your Honor, they have said that

12  over and over.  They have said it in papers --

13         THE COURT:  Are you going to say that, Mr. Kessler?

14         MR. KESSLER:  Not the way he said it, Your Honor.

15  We're going to say we tried to market retired players.  And we

16  have no objection, Your Honor, to the fact that there were ad

17  hocs.

18         What we object to is them saying it was below market,

19  it was bad faith, it was something wrong with it, which sounds

20  like a damage claim.

21         That's the problem with the attack --

22         THE COURT:  Oh -- okay.  Go ahead, Mr. LeClair.

23         MR. LECLAIR:  What really happened, Your Honor, the

24  context of this is EA had a game, and Take Two is out there in

25  the marketplace, that was interested in signing up retired

1 players. And what this e-mail shows is that the vice-president

2 of marketing, the key guy at Players Inc. says "I went out" --

3 this is quoting from Exhibit 521, which is Exhibit -- it's the

4 Exhibit A to the declaration attached to our motion.

5 It says (As read), "For the Record, this came up

6 because Take Two went after retired players to create an NFL

7 style video game after we gave the exclusive to EA. I was able

8 to forge this deal with the HOF" -- Hall of Fame -- "that

9 provides them with 400K per year, which is significantly below

10 market rate in exchange for the HOF player rights. EA owes me

11 a huge favor because that threat was enough to persuade Take

12 Two to back off its plans, leaving EA as the only professional

13 football video game manufacturer out there."

14 What Players Inc. did was when somebody was trying to

15 market retired players, instead of assisting the retired

16 players, they went to EA and said "We'll go pick off, we'll

17 cherrypick the most valuable retired players, for an

18 under-market price," instead of just assigning the rights to

19 all the retired players they had gotten the rights for. So

20 they actually worked against the interests of all retired

21 players.

22 It's their conduct which is important to us, in which

23 they acted adversely to the interest of retired players.

24 Doesn't matter whether it was in an ad hoc -- if you exclude

25 the evidence of their conduct on ad hocs, you've wiped out all

1 evidence, because they never did anything about group

2 licensing.  There's not one piece of evidence showing that they

3 were marketing these group licenses.

4        The only evidence of their conduct is what they

5 actually did, which is this kind of evidence.  That's why it's

6 so critical to show what they really did, how they were working

7 against the interest of retired players.

8        THE COURT:  Go ahead, Mister --

9        MR. KESSLER:  Your Honor, that claim that was just

10 articulated -- which, of course, we disagree with factually --

11 is not in the case.  They disavowed it.

12        I wrote also note, Your Honor, that it involves 17

13 class members, out of 2,500, roughly, or 2,050, I think,

14 whatever the total number of the class is.  So it's not a class

15 claim.  It involves 17 members of the class who were in this --

16 who were in this deal.  They have no damage claim for it.

17        It's going to be hopelessly confusing.  Exactly what

18 Mr. LeClair is doing.  He's going to tell the jury that this

19 was bad faith, this was conduct that should -- you know, that

20 was wrongful, it shows that the union was bad.  And there's no

21 claim there for the case.  How are we going to make the jury

22 keep that compartmentalized?

23        THE COURT:  Are you going to make the argument,

24 directly or indirectly, to the jury, that the players' union

25 goes to some trouble to look out for the interests of the

1  retirees?

2          MR. KESSLER:  We are, Your Honor, in general going to

3  say we try to market retired players.  We are going to do that.

4  We -- I'm happy, Your Honor, not to discuss anything about

5  this -- this Hall of Fame agreement at all.  I'm happy for that

6  entire subject to be out.

7          I would never mention it, because it's so prejudicial

8  to confuse the jury, that their only evidence of a claim, Your

9  Honor, that they have a document for is an agreement that

10  they've chosen not to seek damages on, and it couldn't be

11  certified as a class claim.

12          How are we going to explain to the jury it's 17

13  members out of the whole class, and they're doing that?

14          THE COURT:  No, that's not the right test, whether

15  it's 17 or the entire class.  I am more sympa- -- look, here's

16  the ruling.  Right now I'm excluding this.  Except, I want to

17  make it very clear that I think there is a 50/50 likelihood,

18  Mr. Kessler, that you are going to open the door to this, by

19  making a line of argument that the Defendants have the best

20  interests of the retired players at heart, or something close

21  to that.

22          And if you do that, then I'm going turn to the other

23  side and say, "The door's open, you can put this in."  Maybe

24  it's on rebuttal; maybe it's later.  But if you start -- the

25  cross examination or whatever, or in your opening, if I hear

that type of argument, then -- then they got evidence that no,
you don't have the best interests of the retired players at
heart.  So, I'm going to let them use it at that point.

MR. KESSLER:  I understand --

THE COURT:  So if you -- and I'm not limiting it.  If
it becomes relevant enough that fairness requires that this be
put in to avoid a false impression to the jury, then I'm going
to let them put it in.

MR. KESSLER:  I appreciate that, Your Honor.  If that
were to happen, I might then at least ask for an instruction to
be made to the jury at that time that there was absolutely no
damage claim regarding this agreement, so that the jury does
not get confused on that subject.  If that were to happen.

THE COURT:  Well, if that were to happen, I would
probably give that kind of an instruction.

MR. KESSLER:  Thank Your Honor.

MR. LECLAIR:  Could I address that, Your Honor?

THE COURT:  No.  We'll address it later.  Why do you
want to address it now?

MR. LECLAIR:  Just, the only point I was going to
point out, Your Honor, is our damage claim is the failure to
license the group.  It's not that they didn't pay the more
amount to these retired Hall of Famers; it is they should have
licensed the group.  That was what they had the opportunity to
do.  That's our damage claim, and that's why this is relevant

1  to that, Your Honor.

2         THE COURT:  All right.  Now we turn to Motion No. 4,

3  which is several parts.  Let's take them one part at a time.

4  The first part is allowing Mr. Rascher -- is that his name,

5  Rascher?

6         MR. KESSLER:  That's correct, Your Honor.

7         THE COURT:  -- Rascher to testify concerning value of

8  current NFL licensing rights as effected by retired players.

9         MR. KESSLER:  Yes.  On this point, Your Honor, we

10 just make three quick points.

11        First, Dr. Rascher did not do any expert analysis of

12 this issue, at all.  All that he did is, as we have described

13 in the brief, is he cites a variety of articles that study a

14 different issue.

15        The issue of whether or not past performances of

16 teams is related to --

17        THE COURT:  Is this, is Rascher --

18        MR. KESSLER:  He's their expert.

19        THE COURT:  An expert in what, though?  Is he a

20 sports, football expert?

21        MR. KESSLER:  He's just an economist, Your Honor, who

22 studies various issues, including sports.  He has been on prior

23 sports cases.  We are not challenging his qualifications, Your

24 Honor.  This is purely a *Daubert* motion.  And the argument here

25 is he's done no economic analysis.

1            And he conceded at his deposition that never studied

2    the one possibly relevant issue, which is did retired players

3    contribute to the value of active player licensing today, to

4    the licensing business.

5            What he studied is -- he didn't study, he got a bunch

6    of articles that talk about the brand equity of teams.  So, the

7    brand equity of the Forty-Niners or the brand equity of the

8    San Francisco Giants can be contributed by the history of those

9    teams.  And he has some articles that discuss that, which he

10   cites, and does nothing more than mention those articles.

11           He also, after his reports were put in, came up with

12   a regression study that was never disclosed in any of his

13   reports.  The first time it was handed to us was at his

14   deposition, which he said he -- he did from some old data that

15   he had lying around from ten years ago.

16           But even that data did not study the only relevant

17   issue, which is NFL retired players, and this licensing

18   business.  It was data on other teams, other issues.

19           So, we don't think there's any expert basis to put

20   this in.  It's really just an *ipse dixit* -- a belief on this

21   issue.

22           THE COURT:  All right.  Let's hear from the

23   Plaintiff.

24           MR. KATZ:  Good morning, Your Honor.  Ronald Katz.

25           THE COURT:  Good morning.

1          MR. KATZ:  I share Your Honor's philosophy on motions

2     in limine, that they are brief.  This is not the time for

3     extended argument.  And they have made a full-fledged *Daubert*

4     motion here, about our expert.

5          We have proceeded to rebut every point that they made

6     in our papers.  We think that they disagree with the

7     conclusions, but there's no question that Dr. Rascher, a Ph.D.

8     economist who specializes in the sports industry, has done

9     economic analysis here.  They may not agree with the economic

10    analysis.

11         But we cite in our papers all of the things that he

12    looked at -- first of all, it's not a very extraordinary

13    proposition, previous players --

14         THE COURT:  Wait a minute.  Why isn't this just lay

15    opinion?  On this point, this one point?

16         MR. KATZ:  It's value.  It has to do with value --

17         THE COURT:  And then, just common sense?

18         MR. KATZ:  I agree.  It is common sense --

19         THE COURT:  -- argue this from the evidence, but why

20    do you need an expert to come up and articulate this?

21         MR. KATZ:  Well I think that it is supported also by

22    expert analysis.  You can study -- a lot of things are common

23    sense, if you can come up with an expert opinion on it, you

24    know.

25         THE COURT:  This is lay, a lay opinion, because you

1  need -- in other words, this is something within the ken of the

2  ordinary juror, this first point.  And --

3          MR. KATZ:  But it's also the subject of economic --

4  there have been peer-reviewed articles written about this.

5          THE COURT:  He didn't do any kind of analysis.  He

6  just read some articles, and decides -- says what seems

7  obvious, and what -- the ordinary sports person on the jury

8  would have their own opinions on it, and --

9          MR. KATZ:  Well, Your Honor, in terms of the

10  analysis, that's what economists do.  They go out and research

11  the field, and get peer-reviewed articles, and put those

12  together in a way that creates an opinion.

13          Now, that opinion may sometimes agree with what

14  common sense is.  But that does not mean that it is not an

15  expert opinion; it does not mean that there are not

16  peer-reviewed articles out there and other evidence which

17  experts consider.

18          And, he also included his econometric analysis as

19  well, which is not something that is -- I can assure Your

20  Honor, that's not common-sense.  It's very difficult.

21          THE COURT:  He did a mathematical projection of the

22  extent to which former players contribute to the brand battle?

23          MR. KATZ:  Yes, he did.  And that was --

24          THE COURT:  Mr. Kessler is saying that's not there.

25          MR. KATZ:  No, it was --

1              MR. KESSLER:  (Inaudible)

2              MR. KATZ:  It was produced after the reports.  It was

3   produced at his deposition.  And he was questioned on it, at

4   his deposition.

5              THE COURT:  That might -- if it's not in the report,

6   it doesn't count.

7              MR. KATZ:  Well, if that's Your Honor's rule, that's

8   Your Honor's rule.

9              THE COURT:  That's the rule.  It will be your burden

10  to seek leave to file a supplemental report.  You just can't

11  start throwing things in at the deposition, and say, "Hey,

12  count this as part of your report."

13             MR. KATZ:  You know, Your Honor, they produced things

14  at their expert's deposition, the same thing, and we --

15             THE COURT:  Listen, if you both agree that you are

16  going to throw Rule 26 out, I'm okay with that.  I'm okay,

17  because I hate to exclude possibly legitimate points just

18  because the rule is there.

19             But, the rule is there.  And, if I exclude it for

20  you, it's going to be excluded for Kessler.  So -- but that's

21  the default.  Now, if you both stipulate you're not going to

22  apply the rule, then I'm okay with that.  Then you can just

23  have trial by ambush.

24             But if it's not -- what I do when the expert is on

25  the stand is I get the report, and the first time an objection

1  is made that's outside the report, I ask you, "Where is it in

2  the report?"

3          If it's in the report, I overrule the objection.  If

4  it's not in the report, the objection is sustained.  And I

5  explain to the jury, there's a whole process; if it's not in

6  the report, it doesn't count.  I do that in all the trials.

7          And I've learned the hard way -- let me tell you,

8  I've learned the hard way that if you start going down the path

9  of "Oh, it was at the deposition," "Oh, we sent it to them at

10  such-and-such a point," then it just -- it requires almost an

11  evidentiary hearing to find out how much prejudice there was.

12  It takes up so much time to do that.

13          I make it very clear to the lawyers up front, I'm

14  going to apply Rule 26 and Rule 37.  So if you didn't follow

15  the rule, I'm sorry, but I have no pangs of conscience when I

16  exclude evidence any more, based on Rule 26.

17          MR. KATZ:  Even with without the econometric

18  analysis, Your Honor, this is the subject of expert study.

19  There are economic tomes written on this.  He researched those,

20  and he put together an opinion based on peer-reviewed

21  journals -- journal articles, and other evidence, including

22  admissions of the Defendants.

23          THE COURT:  Show me the -- can I -- I think I gave, I

24  guess -- do I have that -- show me, we have got to get it, in

25  the report, the most pertinent part of his testimony on this

1  first point.  So I can see how cogent it is.

2          MR. KATZ:  In his report, Your Honor?

3          THE COURT:  In his report.

4          MR. KATZ:  Do you want me to hand it up, Your Honor?

5          THE COURT:  Give it to the Clerk, and she will hand

6  it up to me.

7          (Request complied with by Mr. Katz)

8          THE COURT:  All right.  What do I look at?

9          MR. KATZ:  Well, the format of the report is that he

10 states the questions that he's answering.  So the part that I

11 handed you stay states the question, and states his conclusion.

12         Then a little bit later on, you'll see a coordinate

13 part where he gives the reasons for his conclusion.  And he

14 cites all of the articles and evidence that he reviewed, which

15 is -- that's economic analysis.

16         Then there would be a more meaty section a little bit

17 later on, Your Honor, where he gives his analysis.

18         THE COURT:  Where is that?

19         MR. KESSLER:  Well, I don't have the document in

20 front of me, but it parallels that -- you know, he --

21         THE COURT:  All right.  Let me look at that, as well,

22 then.  Please hand it back.

23         (Request complied with by Ms. Toland)

24         (Off-the-Record discussion)

25         THE COURT:  All right, I have the report now.  So if

 1   you can -- if you can tell me the page, I'll look at it on my

 2   own copy.

 3              MR. KATZ:  All right.  So, it's the section that I

 4   just showed Your Honor.

 5              THE COURT:  All right.

 6              MR. KATZ:  Which is footnoted, with the article.  And

 7   then he has a reply report, where he again --

 8              THE COURT:  Sorry.  Do I have the reply report up

 9   here?

10              MR. KATZ:  The reply report would be Page 6, Your

11   Honor.

12              THE COURT:  Page 6.  I'm confused on what I got up

13   here.  I don't think I got the reply report.

14              MR. KATZ:  Would you like me to and it up to Your

15   Honor?

16              THE COURT:  Would you please?

17              MR. KATZ:  Yeah.

18              (Request complied with by Mr. Katz)

19              (The Court examines document)

20              THE COURT:  I note here that he's saying that the --

21   Mr. Kessler's expert, himself, refers to the Hall of Fame

22   members.

23              MR. KATZ:  Yes, well --

24              THE COURT:  It's a different point.  I just want to

25   note that for further discussion.

1          MR. KESSLER:  Your Honor, obviously, our expert was

2   simply responding to his analysis.  If Your Honor excludes this

3   point, our expert will say nothing about this whole subject.

4          THE COURT:  All right.

5          MR. KATZ:  Mr. Kessler's expert does review

6   peer-reviewed articles.  And books.  He creates them.  And,

7   including some that were relied on by our expert.

8          THE COURT:  All right.  Look.  Let me go back to the

9   first page, 4 and 5, of the opening report.  I've read that

10  information.

11         What's so -- what's -- let's just -- even if it is

12  just common sense, what's so damaging to you about that,

13  Mr. Kessler?

14         MR. KESSLER:  This is, Your Honor, an issue of jury

15  time.  He cites reports.  What our expert did is went through

16  all the reports to -- all the articles he cited, to show that

17  none of them actually support what he was saying.

18         So I will spend time -- wasted time, I think --

19  having to debunk him on a point that the jury shouldn't have to

20  spend any time hearing, because it's no economic analysis in

21  the first place.

22         I agree with you, it's almost an irrelevant point in

23  the case, but once he puts it out there, I can't take a chance

24  that the jury might think it has some value that, "Oh, retired

25  players contributed, maybe they should get money."

1          THE COURT:  You'll have to take a chance within the

2    limits of the number of hours, the total time that you get.

3          MR. KESSLER:  That's correct, Your Honor.  I prefer

4    not to waste my time on points that could just be confusing to

5    the jury.

6          MR. KATZ:  Your Honor, this is precisely what the

7    adversarial system is about.  Our expert has one position,

8    their expert has another position.  And the jury chooses.

9          This was not *ipse dixit*.  He went out, looked at the

10   evidence, researched the literature, including articles by

11   their own expert, which contradict what their own expert says.

12         And the jury should be deciding that issue, Your

13   Honor.

14         MR. KESSLER:  And one point of note, Your Honor.

15   None of the articles discuss players, at all.  And I think

16   that's very important, Your Honor, because he is simply adding

17   in his *ipse dixit* that it has to do with players.

18         All the studies he looked at have to do with team

19   brand-building, not players.

20         THE COURT:  I'm going to rule that the information

21   that is at Pages 4 and 5, if the witness sticks to just that,

22   what's in the report, that's okay.  I honestly think that it is

23   as much lay opinion as it is expert opinion.

24         But, he's got to stick to what's literally in that

25   paragraph.

1          MR. KATZ:  And the reply brief -- his reply report --

2          THE COURT:  The reply brief is for the rebuttal case.

3    You don't get to get into that in your opening.  That is

4    another misconception.  That is for the -- you don't -- that is

5    not an invitation to jam all of that stuff into your case in

6    chief.  That has to wait until your rebuttal case.

7          MR. KATZ:  Okay.

8          THE COURT:  This is going to be one minute of

9    testimony in the direct case.  All right, so that is overruled,

10   to that extent.

11         Next we go to the share of the licensing revenue kept

12   by Defendants.  Look, I'm going to allow that in.  This is a

13   minor -- we are not even going to argue.  There is enough

14   relevance to the case to have already ruled on this basically

15   in the other motions in limine.  That is overruled.

16         No. 3, Customary Practices to Split Licensing

17   Revenues Equally.  That is going to be excluded.  Other sports

18   don't matter.  That's what -- maybe what happens in football

19   matters, but what happens in other sports is not -- we are not

20   going down that path.  Excluded.

21         No. 4, Defendants' Market Power, I'm going to allow

22   that evidence in, even though it -- it's only tangential, but I

23   feel that that is a legitimate point for the Plaintiff to make.

24         All right, that takes care of Motion in Limine No. 4.

25   Okay.  We now go to Motion in Limine No. 5.

1          MR. KESSLER:  Your Honor, this is the *Daubert* motion

2    to their damages study.  And, to be very succinct about this

3    from Mr. Rowley, what we believe a damages expert is required

4    to do under the law is to construct a but-for world, based on

5    assumptions, okay, and --

6          THE COURT:  Wait, let me back -- look.  All he's

7    doing is doing the mathematics.

8          MR. KESSLER:  That's correct.

9          THE COURT:  He's just doing the calculating.  Well,

10   what's wrong with that?  Believe me.  Sometimes juries can't

11   even do the calculator.

12         MR. KESSLER:  If all he's doing, that is fine.  I

13   don't think he can offer any opinion --

14         THE COURT:  He's not going to offer any opinions, is

15   he?  Is he going to get up there and say, "Oh, I've done the

16   math on this, and I've done the analysis, and I think the

17   damages in this case were X, Y, Z"?  No, he's not going to be

18   allowed to do that.

19         If all he did was crunch numbers, then he should get

20   up there and say "I didn't do any analysis, I don't have any --

21   everything is an assumption.  But if you crunch the numbers as

22   follows, here's the number you get."

23         MR. KESSLER:  Then I have no problem, Your Honor.

24         THE COURT:  That is what he's allowed to do.  Please

25   do not try to pass off somebody who is just a number-cruncher

1   as somebody who is giving substantive advice to the jury.

2          MR. KATZ:  He is taking assumptions, he does not

3   decide liability, Your Honor, so assuming that there's

4   liability, here's the number.

5          THE COURT:  No, he can't even do that.  All he is

6   doing is, "Here is a list of numbers that I added up."  Did he

7   do any analysis beyond that?

8          MR. KATZ:  Well, his whole analysis that there are

9   damages is based on a finding of liability by the jury.

10         THE COURT:  But, using what percentage?  What is the

11  methodology by which he even knows what number to put into the

12  machine?

13         MR. KATZ:  Well, the equal share, Your Honor.  Our

14  case is based on --

15         THE COURT:  How did he come to the equal share?

16         MR. KATZ:  That's an assumption of his.

17         THE COURT:  All right.  If he makes clear, that

18  part's okay.  But applying equal share, how did he come to a

19  number to put into the machine?

20         MR. KATZ:  Because there are various tranches of

21  potential damages.  Depending on what the jury decides.  There

22  could be just the licenses, could have to do with scrambling.

23  Could have to do with the NFL -- NFLPA agreement.  There are

24  various different points on the decision tree --

25         THE COURT:  How does equal share -- explain the

1  concept of how does that share translate to some concrete

2  number the jury can put their hands on?

3          MR. KATZ:  Well, because in order to --

4          THE COURT:  Equal share of what?  Equal share

5  vis-a-vis who?  I don't even know who we are talking about.

6  Equal share vis-a-vis who?

7          MR. KATZ:  We are talking about the GLA Agreement.

8  And the GLA  Agreement basically says -- defines a group

9  licensing agreement as when six or more present or former

10 players are used.  Okay?

11          So, there are some licenses that specifically mention

12 retired players.  There is the NFLPA PI agreement, there's

13 different percentages that can be used, depending on what is

14 customary in the industry.  All of these things are potential

15 findings by the jury.  So what he's telling the jury is if you

16 find this, here is the number associated with it.  If you find

17 that, here is the number associated with it.

18          THE COURT:  I don't see any problem with that.  What,

19 that's just helpful to the jury to speed through the

20 mathematics.

21          MR. KESSLER:  As long as Your Honor, he offers no

22 opinion because he has no basis, that this is an appropriate

23 measure of damages for this finding.  Or this is appropriate

24 for this.  's done no study.  I.

25          THE COURT:  I understand though that Mr. Katz is not

1  going to try to pass him off as some kind of substantive

2  expert.

3          MR. KESSLER:  Thank you.

4          THE COURT:  So, right?

5          MR. KATZ:  He is basing his work on assumption.  If

6  this, then this.  If that, then that.

7          THE COURT:  Why won't you answer my question?  Why is

8  it -- are you going to pass him off as a substantive expert,

9  other than a number cruncher?

10         MR. KATZ:  He -- well, when you say "other than a

11 number cruncher," he went through, literally, hundreds of

12 accounts.  It's very complicated.  You can't do what he did --

13 you can't do the arithmetic without being an expert.

14         THE COURT:  On what?  Expert on what?

15         MR. KATZ:  On analyzing financial documents.

16         THE COURT:  So, in other words, he is, then, bringing

17 analysis to bear.  Is that what you are saying?

18         MR. KATZ:  Well, I think we're saying the same thing

19 in slightly different ways.  There are -- Your Honor was

20 talking before about the flow of the money.

21         In any large organization, where large amounts of

22 money are flowing, it is a difficult task to track that.  You

23 can say it's just arithmetic or you can say it's just

24 accounting, but a juror could not do it; I could not do it.

25 It's difficult to do.

1          Once you parse through that, you come up with

2    arithmetic.  Here is what an equal share would be.  There were

3    1,800 people dealing, sharing equally, let's say.  If we win

4    the case, there will be 2,056 additional people sharing that

5    money.  So you have to find out what money's in the pot.  You

6    do that --

7          THE COURT:  How do we know what money's in the pot?

8          MR. KATZ:  Well, the jury is going to decide.  Do the

9    licenses fit in?  Does the EA license fit?  Does the Topp

10   license fit in?

11         THE COURT:  All right.  I feel like you are carefully

12   phrasing what you are telling me, and that I'm not

13   understanding it.

14         I had thought you said at first that he was nothing

15   but a numbers cruncher, that you gave him a list of columns of

16   numbers, and he got out the adding machine, and put them in,

17   and said, "Here."  I have no problem with him saying that.

18         But, if he is bringing his own analysis to bear to

19   tell us what numbers should be in the list to begin with, that

20   is a different issue.  And I need to understand if that's what

21   you're proposing him to do.

22         MR. KATZ:  Right.  He is looking at -- for example,

23   they have a license with EA.  EA pays $25 million a year.  So,

24   if the jury finds that the EA license is part of this, then

25   that goes into the equal share pool.

 1          THE COURT:  The 25 million.

 2          MR. KATZ:  Yes.  And then it's divided.  Instead of

 3 being divided by 1,800, it's divided by 1,800 plus, let's say

 4 2,100.  So, about 3,900.

 5          THE COURT:  1,800 comes from where?

 6          MR. KATZ:  1,800 is the active players.

 7          THE COURT:  And the 2,100, the retired players?

 8          MR. KATZ:  Yeah.  2,056 is the exact figure.

 9          THE COURT:  All right.  If it's as simple as that, I

10 don't have a problem with that.  But, you were saying things

11 like he had to go through hundreds of documents, and extract

12 something.

13          MR. KATZ:  It is as simple as that, but now, let's

14 define what that is.  What that is, is there's a hundred

15 contracts.  There's money flowing from those contracts.  And it

16 flows to different people in different years, because players

17 have signed contracts that cover different years.

18          It is a very complex arithmetic problem, is what it

19 is.

20          THE COURT:  And the contracts you are referring to

21 are contracts with the individual players?  Or are they

22 contracts between EA and the League?  I'm sorry, the

23 Defendants?

24          MR. KATZ:  Contracts between the -- Players Inc. --

25 between the Defendants, essentially, and the licensees.

1  There's about a hundred licensees.  So, it is complicated.

2  Ultimately it is arithmetic, but it is complicated.

3       As I say, I could not go through those accounts.  I

4  don't have sufficient expertise to go through those accounts.

5  I think you have to be an accountant to be able --

6       THE COURT:  So, the first step is that you are trying

7  to get the gross license revenue for player images paid by all

8  third-party licensees.

9       MR. KATZ:  That's correct.

10      THE COURT:  And the analysis that he's doing is going

11 through the various -- it would be more than contracts.  It

12 would be -- you might have to know some royalty rate, and apply

13 it, and --

14      MR. KESSLER:  Your Honor, I think I can help you with

15 this, because it hasn't been described accurately by Mr. Katz.

16 It really is quite simple.

17      There is something called the GLR pool, which is a

18 pool of money.  It's a fixed number.  There is no calculations

19 to be done.  That is the money that is distributed to the

20 active players each year.

21      What they did is they -- they instructed this expert,

22 take that fixed sum of money and break it up various ways.

23 First, break it up by those agreements that only mention

24 retired players.  So, how much of the fixed pool is that

25 amount?  Then, --

1        THE COURT:  Is the fixed pool in question?

2        MR. KESSLER:  No.  That money --

3        THE COURT:  What's wrong with letting him do the math

4 in different ways, and helping the jury --

5        MR. KESSLER:  As I said, Your Honor, I have no

6 problem -- not what he tries do in his report, and this is why

7 you're getting this dancing, he wants to say, "It is my expert

8 opinion that this amount of money is the appropriate damages

9 suffered by Plaintiffs if the jury finds breach of fiduciary

10 duty.  That this amount is the appropriate amount of damages

11 suffered by Plaintiffs," says, "if they find breach of

12 contract."  It's this --

13        THE COURT:  Where in his report?  Show me the report.

14        MR. KESSLER:  Okay.  And this is --

15        THE COURT:  I want to use my copy, here.  But I

16 keep -- show me where it is in all these tabs.

17        MR. KESSLER:  I will, Your Honor.

18        THE COURT:  Just tell me the tab number, please.

19        MR. KESSLER:  I will, Your Honor.  I apologize.

20        Do you know what tab this was?  On the experts?  And

21 I will do that.

22        MR. CLARK:  It is Exhibit 1, Your Honor, to the Clark

23 declaration.

24        THE COURT:  My Exhibit 1 is nothing.  All right.

25 I've got to run, I'm sorry.

```
 1            MR. KESSLER:  Okay.

 2            THE COURT:  I would have liked to have read this

 3  during the break, but since you can't find it --

 4            MR. KESSLER:  I have it now, Your Honor.

 5            THE COURT:  Let me have your copy.

 6            MR. KESSLER:  Please, Your Honor.

 7            THE COURT:  And I apologize.  I've got to meet

 8  somebody in five minutes.  And it'll just be a short meeting.

 9            But we will resume again in about an hour and ten

10  minutes?  Is that all right?

11            MR. KESSLER:  Thank you, Your Honor.

12            THE COURT:  All right.  See you then.

13            (Recess taken from 11:40 a.m. to 1:20 p.m.)

14            THE COURT:  All right, back on the Record.

15            On Motion No. 5 concerning Rowley, here's what I want

16  to do.  I'm going to deny this motion, because all that's going

17  on apparently is the witness will say, "Here are one set of

18  assumptions.  If you add -- if the jury finds that these are

19  correct, then once they add up all the numbers, here's the

20  total.  Here's another set of assumptions that if the jury

21  finds that, then you add up the numbers, you get a different

22  number.  And here's that number."  That would be okay.  If you

23  go beyond that, we will have an issue, and we will deal with it

24  then.

25            I -- I'm taking it on faith that Mr. Katz is being
```

1 honest with me, and totally candid.  If it turns out that's not

2 right, we will just knock it out in the presence of the jury.

3 So, motion denied.

4          The next motion is No. 6, somebody named Rhee.

5          MR. KESSLER:  Yes, Your Honor, we believe, Your

6 Honor, that Mr. Rhee is an effort frankly to avoid the

7 disclosure requirements of expert testimony and your own rules.

8 What Mr. Rhee does is he has prepared -- he works for the same

9 company as Mr. Rascher.

10          Mr. Rascher, in his first report, said nothing about

11 this issue of scrambled players.  In his second reply report,

12 which would only get it into rebuttal, he mentioned a handful

13 of scrambled players in a footnote in his reply report.  So

14 that might arguably be disclosed through rebuttal.

15          What they then did is have Mr. Rhee, who worked for

16 Mr. Rascher, do an entirely new analysis -- says, of the video

17 games, doing sampling, which is clearly an expert function.  He

18 was never disclosed as an expert, he's filed no expert report.

19          And then, Mr. Rascher filed an unauthorized

20 supplemental report, saying he intends to rely upon the work of

21 Mr. Rhee.  And the way they try to avoid all this is they go,

22 "Well, all Mr. Rhee is doing is testifying about a

23 compilation."

24          And there's no way, Your Honor that this is a

25 compilation, because what Mr. Rhee does is he's making sampling

judgments from a whole variety of materials.  It's classic

expert testimony.  It was never disclosed.  It can't be in the

case at this point.  It's a very simple argument.  It's just an

avoidance of the rules.

MR. HUMMEL:  Good afternoon, Your Honor.  My name is

Chad Hummel.  We haven't met before.  I'll be arguing Motions 6

and 7.

THE COURT:  All right.  Go ahead.

MR. HUMMEL:  Mr. Rhee, Your Honor, is neither an

expert nor really a fact witness.  He is merely someone that

examined voluminous records --

THE COURT:  Wait.  The rules require you to disclose

fact witnesses, and then later you've got to disclose experts.

You are saying there is a third category of a Never-Never Land,

that you don't have to disclose at all?

MR. HUMMEL:  No, Your Honor, he was disclosed timely.

He is a compiler of a summary exhibit, under Federal Rule 1006.

That is --

THE COURT:  Let me get the rule out, let's see where

that exception come from.

MR. HUMMEL:  If you look, Your Honor, at Federal Rule

of Evidence No. 1006.

THE COURT:  That that doesn't say anything about a

witness, in 1006.

MR. HUMMEL:  Your Honor the case law, actually, the

1  Ninth Circuit case law on this point is clear.  In order to get

2  a summary into evidence of voluminous records -- and here, the

3  voluminous records are the Madden games.  The Defendants have

4  stipulated that the Madden games come into evidence.  That's in

5  the Linzner stipulation that has been filed with the Court.

6  Those games are in.

7          The question is, in this case, is, did EA use retired

8  players in the game?  That's a question in the case.  That

9  might or might not trigger a payment obligation under the GLA.

10         What Mr. Rhee did is he looked at those games,

11  30-plus games, that are each listed in Exhibit C to the Cohen

12  Declaration.  And he said "Okay, how many of these vintage

13  teams" -- does Your Honor understand the vintage team concept?

14  I don't know if you are a football fan or not.  I happen to be.

15  Let's say --

16         THE COURT:  1983 was the last game I saw.

17         MR. HUMMEL:  All right.  Let's assume that you're a

18  video game player, and --

19         THE COURT:  I don't like video, either.

20         MR. HUMMEL:  All right.  Well, my kids do, and in

21  fact, the general public, to the tune of hundreds of millions

22  of dollars a year --

23         THE COURT:  A waste of money.  A waste of money.

24         MR. HUMMEL:  Not for my son.  He loves it.

25         THE COURT:  You are using bad analogies.

1          MR. HUMMEL:  All right.  Well, this is -- this is not

2     an analogy, Your Honor.  In this game, which is undisputed,

3     worth hundreds of millions of dollars a year, let's say that

4     you wanted to be the 1989 Forty-Niners, and play the 1985 Bears

5     in a video game.  Those teams unquestionably include retired

6     players.  They're in the Madden game.  That is a central issue

7     in this case.

8          What Mr. Rhee did -- and he is neither an expert

9     because is offering no opinions under Rule 702, and he is not a

10    fact witness because he has no knowledge of any of the facts

11    and circumstances of this case -- he looked at those games.

12    And he said, "Okay, how many of those vintage teams are in the

13    Madden game?"

14          And that is what he did with Exhibit D to the Cohen

15    Declaration, it shows -- it will be Trial Exhibit 1239.  It's a

16    compilation from voluminous records.

17          THE COURT:  Why can't you just put those all those

18    things into evidence and let the jury add them up?

19          MR. HUMMEL:  Because it would take literally weeks of

20    jury time to go through each game, each version of the game.

21    Your Honor --

22          THE COURT:  To do what?

23          MR. HUMMEL:  And find out how many NFL vintage teams

24    are in the game.  How many times EA actually utilized retired

25    players, although we'll talk about this in a minute.

1    THE COURT:  How would he be able to tell that?  How

2  did your expert -- or how did this witness decide if somebody

3  was or was not a scrambled player?

4    MR. HUMMEL:  This is not a scrambling issue at this

5  point, Your Honor.  It will be on the next motion, which I'll

6  also argue.

7    What he did here was he looked at each one of the

8  games.  So, EA has this game called Madden Football.  You may

9  not like it.  It's a game; it makes tons of money.  He looked

10 -- each one of those games exists on different platforms.

11 There's a Play Station, there's a PC version, there's a Wii,

12 Nintendo Wii makes a platform.  They have all these games,

13 across all platforms.  On each one of those games, there are

14 vintage team components.

15    So, for example, the 1985 Chicago Bears, the 1989

16 Minnesota Vikings.  The 1989 San Francisco Forty-Niners.  Those

17 are all retired players.  They're all in the game.  What he did

18 was he looked at all those games, on all those platforms.  And

19 he said here, in Exhibit 1239 -- I can hand it up to Your

20 Honor.

21    THE COURT:  Please hand it to the --

22    MR. HUMMEL:  Sure.

23    THE CLERK:  Thanks.

24    MR. HUMMEL:  He looked at each one of those 30 games.

25 And he said, "Okay, what historic teams are actually in the

1  game?"  And that is a classic summary, within the meaning of

2  1006.

3  What the Ninth Circuit has said about 1006 is are

4  there voluminous records that are summarized; is the underlying

5  evidence admissible?  Those are the Madden games.  Has there

6  been an ability to inspect by the other side?  And there

7  unquestionably has been.  We provided it.

8  And, can they cross-examine the compiler at trial?

9  In our opposition to the Motion in Limine, Your Honor, we cited

10  those criteria.  Those have all been met.

11  THE COURT:  Is any of this inaccurate?

12  MR. KESSLER:  Your Honor, there's no way to tell.  He

13  did a sampling technique.  Despite what was stated here, he

14  picked some players, using a methodology that's unknown.  And

15  it would have to be a proper sample; we have no way of knowing

16  if it's a proper sample.  He would look at one game and another

17  game, test a player here, test a player there.  And he's making

18  a judgment -- a judgment -- that based on his samples, that he

19  could say which players in which games -- none of which have

20  the players' names, none of which have the players' images,

21  none of which have the players' contracts, none of which have

22  the players' signatures he's offering his own opinion as to

23  this.

24  And the only purpose of this, Your Honor, is so that

25  Dr. Rascher could testify that -- something about this, in a

1  supplemental report, that was unauthorized, after his

2  deposition put in, saying he's got a lawyer, Dr. Rhee, who

3  works for him -- Mr. Rhee, who works for him.  It's classic

4  expert.  It's not a compilation.

5          A compilation would be going through the evidence and

6  just saying -- if he just said, "Here's how many games I found

7  that had vintage team," and include a number, that's different.

8          THE COURT:  All right.  I asked for a short answer.

9  You are giving a speech.

10          MR. HUMMEL:  Your Honor --

11          MR. KESSLER:  I'm sorry.

12          THE COURT:  How did he come to the conclusion that

13  the 1963 Bears were in this first line item?

14          MR. HUMMEL:  Because he looked at the game, and the

15  team is in the game.

16          THE COURT:  It says 1963?

17          MR. HUMMEL:  Yes, it does.  I can give you an

18  example.

19          THE COURT:  What is this business about a formula and

20  random sampling?

21          MR. HUMMEL:  There's no sampling.  I don't know what

22  Mr. Kessler's is talking about.  The exhibit that you have in

23  front of you, Your Honor, is an unquestionably accurate summary

24  of the vintage teams that are in the games that he examined.

25          MR. KESSLER:  Your Honor, I now realize he handed up

1  the wrong exhibit.

2            MR. HUMMEL:  No, I handed up --

3            MR. KESSLER:  The exhibit that's the basis we are

4  challenging, which I'll hand up, is 1240, which is when he's

5  testifying about the sample of the scrambled players, and all

6  that.

7            The exhibit he handed to you is probably a

8  compilation, for which they need no witness.  Because that

9  simply is a list of games.  So he handed to you the wrong

10  document, not even what we are challenging, Your Honor.

11            MR. HUMMEL:  No, no, no.  Your Honor, that's not

12  true.  They moved to exclude Mr. Rhee.  This is one of the

13  summaries that Mr. Rhee prepared.

14            We actually offered a stipulation to the Defendants

15  on the accuracy of this summary, and they refused.  Primarily

16  because of --

17            THE COURT:  Hand me up the other one.

18            MR. HUMMEL:  Sure.  That is Exhibit 1240.  It's

19  exhibit E to the -- and that's my only copy.  It's Exhibit E to

20  the Cohen Declaration.  I can describe to you how he did that

21  compilation.

22            THE COURT:  This says "scrambled."

23            MR. HUMMEL:  Yes.  And that I can explain, Your

24  Honor.

25            THE COURT:  Okay.

1          MR. HUMMEL:  So, what Mr. Rhee did there was -- and

2  let me use a very simple example.  Let me hand up something

3  else to you, Your Honor, so this is absolutely crystal-clear,

4  and there's no mistake.

5          Counsel?

6          These (Indicating) are screen shots from the actual

7  video game.  This is just an example of what Mr. Rhee did.  It

8  is not meant to reflect the totality of what he did.

9          He looked at the games.  He said, "Okay, I find in

10  this" -- this happens to be the 2007 PC platform version of the

11  Madden game.  This happens to be part of Exhibit 1263, Trial

12  Exhibit 1263.

13          And he said, "Okay, I find the '85 Bears."  There is

14  a team, the '85 Bears, and it's in the game.  That's reflected

15  on the first chart summary that is unquestionably accurate, and

16  apparently stipulated to.

17          The second team that he said was, "Let's look at the

18  San Francisco Forty-Niners from 1989."  That's the team that

19  one the Super Bowl with Joe Montana as the quarterback.  "And

20  then let's play the game."  All right, Your Honor?

21          The second page of what I handed you is the actual

22  game.  Now, that's my handwriting there.  I don't want to

23  mislead you or mislead anybody, that those identities are in

24  the game.  They're not.  That's the point of the scrambling.

25  And I'll get to that when we argue Motion in Limine No. 7.

1          But here's an example, where, assuming somebody who

2    liked football and liked games, and wanted to play a video game

3    with the San Francisco Forty-Niners from 1989 and the Chicago

4    Bears, the greatest defense of all time if you're a Bears fan,

5    1985 is there.  Those are unquestionably

6          THE COURT:  Where is the Refrigerator?

7          MR. HUMMEL:  The Refrigerator is actually right in

8    the middle.  William Perry.  He was actually the right

9    defensive tackle on that team.  His head is down, he's --

10         THE COURT:  And, Joe Montana was listed as No. 5.

11         MR. HUMMEL:  That's right.  He's not.  He wasn't

12   No. 5, was he?  His image was scrambled by EA.  And I'll talk

13   about why that was in a minute.

14         But, everybody knows that the 1989 Forty-Niners had

15   Joe Montana as the quarterback.  And there's another section of

16   the game called the player management section of the game,

17   where you go, and it lists how tall the quarterback was, how

18   much the quarterback weighed, how many years in the League,

19   that kind of data.

20         Guess what, Your Honor?  It matches up almost

21   perfectly to the real player.  If you went back and looked at

22   Joe Montana's height, weight, Joe Montana how many years in the

23   League, it would match.

24         So you know we're talking about Joe Mon- -- you know

25   we're talking about William "The Refrigerator" Perry.  You know

1  we're talking about Dan Hampton, who's the defensive end of the

2  Bears.  You know you're talking about Hall of Fame linebacker

3  Mike Singleterry.  That was the only middle linebacker for the

4  1985 Chicago Bears.  Period.

5          So the point is --

6          THE COURT:  How can they call these the '89

7  Forty-Niners, if Joe Montana is not in here?

8          MR. HUMMEL:  Joe Montana, Your Honor, is in there.

9  The only starting quarterback of the Forty-Niners was Joe

10  Montana.  And if you look at the way the game is programmed --

11  and we'll introduce evidence about this --

12          THE COURT:  The people who really are into this,

13  wouldn't that be a turnoff if they looked at it, and it's not

14  No. 16?

15          MR. HUMMEL:  Well, they took over the player

16  management function that understands -- well, they didn't have

17  the rights to Joe Montana for this game.  They didn't have his

18  personal rights.  We're not suing EA for violating Joe

19  Montana's rights.

20          But, let me tell you, Jim Brown did sue EA.  It's a

21  pending lawsuit.  For violating his rights.  That's not this

22  case.  This case is about what these Defendants did, in

23  marketing with EA.

24          THE COURT:  You are making a speech now.  Please --

25          MR. HUMMEL:  Well, I --

```
1              THE COURT:  I'm trying to figure out if this guy --
2              MR. HUMMEL:  Right.
3              THE COURT:  You are saying, it sounds to me like your
4  fellow did some judgment calls that this fellow -- was he
5  No. 5 -- was really Joe Montana.
6              MR. HUMMEL:  No, no, no, no, he did no judgment
7  calls, Your Honor.  What he did was -- this is what I wanted to
8  explain.  What he did was he looked at -- for example, take
9  Brent Jones.  Brent Jones was the tight end for the '89
10 forty-Niners.  And he's listed here, he's way out at the end.
11 Do you see that?
12             THE COURT:  I see.
13             MR. HUMMEL:  Okay.  Brent Jones, well-known
14 San Francisco Bay area football player.  And he said, "Okay" --
15 and by the way, Brent Jones is a GLA class member.  That's why
16 it's circled there.
17             So he said, "I know that Brent Jones has signed a
18 GLA.  I'm going to compare the statistics of Brent Jones listed
19 in the game with what his real statistics were, based on, for
20 example, a Topps card.  And if they match, that's a sampling of
21 a scrambled player who is a GLA class member.
22             There's no judgment being exercised; none.  Brent
23 Jones was the tight end for the Forty-Niners --
24             THE COURT:  Are you saying it's identical, it lines
25 up perfectly?
```

 1           MR. HUMMEL:  No.  It does not line up perfectly, in

 2    every case.  In some cases it does; in others it does not.  But

 3    it's off by a pound or two.  I mean, it is scrambled --

 4           THE COURT:  In other words, 295 pounds is 294?

 5           MR. HUMMEL:  Pretty much.  That happens.  But,

 6    there's no -- by the way, there's no dispute, Mr. Kessler won't

 7    dispute that Brent Jones was the tight end for the

 8    Forty-Niners.  And that his stats, if you compare the Topps

 9    card, the real data of Brent Jones with who's in this game,

10    that's not judgment.  That is, this is a match.  This is who

11    it's supposed to be.

12           And when we talk in a minute about what these

13    Defendants instructed EA to do, how to handle this, starting in

14    2001, you will see a pattern and practice, Your Honor, that

15    this is how it -- these are the GLA members who are in the

16    game.

17           This is not judgment or expert testimony at all.  But

18    he can describe on the stand exactly how he made the

19    compilation, and what the rule requires is that Mr. Kessler or

20    whoever else from his side talks when Mr. Rhee is on the stand,

21    can cross-examine.  And he can say, "Look.  This isn't a good

22    match."

23           So it's not in the summary.  The fact of the matter

24    is, all of this data has been made available to the Defendants

25    for weeks, if not months.  They've had it.  They could do their

own evaluation. They could look at every one of Mr. Rhee's
conclusions, and cross them until the cows come home. But they
can't, because it's an accurate summary. And they don't
contest the accuracy. All they say, Your Honor, is it wasn't
disclosed. And the answer is, he was exercising no judgment;
he just did the legwork. And the jury shouldn't use --

THE COURT: Counsel said something about a sampling
technique.

MR. HUMMEL: There's no sampling technique. He
specifically listed in the summary you have, GLA, players, that
-- those retired players who signed GLAs, who are in certain
retired teams. That's his work. It's not a sampling. It just
happens to be a fact.

THE COURT: It says "sample of scrambled." What does
that mean?

MR. HUMMEL: Right. It's not all of them. He didn't
look at every game on every platform. Like I said, Your Honor,
these video games are across multiple platforms. And a new
Madden game, a new Madden version, is released every single
year. This year happened to be the 20th versus of the game.

So, for 20 years, Madden has come out across multiple
platforms. He couldn't look at every single version of every
single game. He looked at enough to make the point that
significant numbers of GLA class members are utilized in the
game, --

1            THE COURT:  All right.

2            MR. KESSLER:  Your Honor?

3            MR. HUMMEL:  And Your Honor, if I just might close,

4    the -- the Rule 1006 requires no more than what we've done.

5    Period.  And the case law is very clear, as said in our

6    opposition.

7            THE COURT:  What is your best case that says that

8    Rule 1006 summary does not have to be disclosed?

9            MR. HUMMEL:  There's no case -- it does have to be

10   disclosed.  We did disclose.  I disclosed it exactly timely,

11   which is --

12           THE COURT:  Under Rule 26, you disclosed it?

13           MR. HUMMEL:  No, no.  It's not an expert report.

14           THE COURT:  How did you disclose it?  Under what

15   authority, and so forth?

16           MR. HUMMEL:  The Rule 1006 summary, Your Honor, is

17   disclosed as an exhibit in the case.  We timely disclosed it.

18   And we also timely disclosed all of this underlying information

19   that was utilized to compare the summary.

20           All the summary does, Your Honor, is it takes

21   admissible evidence, and it puts it in a form that's easily

22   comprehensible for the jury.  That's it.  And there's nothing

23   that is opinion about this, and there's nothing that is not

24   subject to cross-examination.

25           THE COURT:  Let me hear from the other side.

1   Mr. Kessler, what do you say?  First of all, show me one of

2   these that's not correct.

3              MR. KESSLER:  Okay.  If Your Honor looks at the

4   first, very first page on the sample, they claim he will

5   testify each of these players are in the game and are

6   scrambled.  We disagree with every single player about that.

7   We believe none of these players are in the game, and none of

8   them have been scrambled.

9              What this begins with is testimony by a witness that

10  in his judgment, even though Joe Montana, as Your Honor

11  observed, is the wrong number, it doesn't have his picture, it

12  doesn't have his name, he may have sampled him, found that his

13  weight was in -- I don't know, three pounds, four pounds, and

14  he's --

15             THE COURT:  How can you say that Joe Montana wasn't

16  on that team as the quarterback?

17             MR. KESSLER:  No, that's not the point, Your Honor.

18  Obviously it's the -- the team.  Nobody contends that just

19  using -- saying "I'm using a team" is using the name, image

20  rights of those players.

21             What they're contending in this case, what this

22  witness is trying to do is to say this is utilizing Joe

23  Montana's rights in some way.  It doesn't use any rights of Joe

24  Montana.  We don't believe that's Joe Montana.

25             They deliberately decided -- EA decided this, not my

1  client -- to not use any rights.

2  THE COURT:  How can it not be Joe Montana, if it's

3  the '89 Forty-Niners?

4  MR. KESSLER:  Your Honor, I can explain.

5  THE COURT:  John Madden -- what's his name, John

6  Madden is going to be putting out a game that has a

7  second-string quarterback?

8  MR. KESSLER:  Okay.  Here's -- here's the point.

9  Okay?  Montana was never a No. 5, right?

10  THE COURT:  Right.

11  MR. HUMMEL:  Right.

12  MR. KESSLER:  And Your Honor knows that.  It's the

13  difference between team rights and player rights.

14  When EA gets a license, EA licenses the rights to use

15  the Forty-Niners team name, to do anything they want with

16  Forty-Niners uniforms.  They get all that from the NFL.  They

17  have to separately get player rights if they want players.

18  If they don't want players, they're free to use team

19  rights, but they can't do anything to use the player's name,

20  the player's number, the player's picture, anything like that.

21  And it's not utilizing the player.

22  What -- but the point of this is, is -- and there's a

23  difference between --

24  THE COURT:  Wait a minute.  You are dodging the

25  issue.

1              MR. KESSLER:  I'm trying not to, Your Honor.

2              THE COURT:  Use this.  If we got out the statistics

3    for this guy, No. 5, and laid it alongside Joe Montana, how

4    close would it be?

5              MR. KESSLER:  I haven't checked Joe Montana.

6              MR. HUMMEL:  Can I help you?

7              MR. KESSLER:  What I'm telling you --

8              THE COURT:  You haven't checked it.

9              MR. KESSLER:  No.  What I'm telling you, Your Honor,

10   is -- let's first focus on the issue of this witness.  Rule

11   1006 says nothing about witnesses testifying.  All it says is

12   that if we wanted to cross-examine someone, we could have them.

13   We don't want them.

14             Okay.  Your Honor's quite right.  You can't avoid the

15   disclosure obligations by saying he's not an expert, he's not a

16   fact witness, he's some third category of being.  1006 simply

17   has to do with, when is the underlying document admissible?  We

18   will address that issue.

19             But the first issue is it's no way they get to put on

20   an expert to in effect -- or any witness to testify to the

21   jury, who's not been disclosed as fact or expert, and describe

22   how he's done this, or what judgments he made in doing this

23   sample, or why he calls this scrambled players.

24             They don't get to do that, and then have their expert

25   do a supplemental report relying upon it.  There should be no

1  issue about this testimony.  It's not allowed under the rules.

2         The second issue is, is this a -- does the document

3  come in?  Is it a proper compilation?  I have a separate

4  objection to that which I would make at trial, that this is not

5  a proper compilation (Indicating), because it makes judgments

6  by using the word "scrambled."

7         If it had simply said comparison of height and weight

8  of players from their cards versus these numbers or something,

9  if there was no judgments made, and if it wasn't a sample, if

10 they did it for all the players, or if they just said "It's not

11 a sample, we did it just for ten players," but they can't call

12 it a sample.  Because if an expert came up and said it was a

13 sample, Your Honor would apply the case law that says it has to

14 be a representative sample.

15        There's been no judgment that this is a

16 representative sample.  This was just Mr. Rhee saying "It's too

17 much work to do, so I'll do what I think is a good sample," but

18 I'm not saying they can't do that.  It should have been an

19 expert report.  It should have been disclosed.  It should have

20 been done by their expert.  They can't at the last moment in

21 the case avoid all their obligations and do this.  That's the

22 problem with Mr. Rhee's testimony.

23        I don't think Your Honor has to rule on the summaries

24 today.  We can address that at trial.  What we want to do at

25 the moment is exclude Mr. Rhee's testimony.  There's no basis

1  for it.

2          MR. HUMMEL:  Your Honor, could I respond, briefly,

3  just to make the point about the lack of exercise of expert

4  judgment?  I would like to hand up -- and I only have one copy

5  -- Counsel, will you take a look at this first?

6          This happens to be exactly what Mr. Rhee did, in his

7  analysis.  He looked at -- you can look at this, there's

8  another sample.  He looked at -- if I can hand that up?

9          Your Honor what he looked at, if you looked at the

10  right-hand part of the page, it says "player management," it

11  says "player management."  That's what's in the Madden game.

12  These are the statistics of that player.

13          You happen to have Mr. McNeil's up there, right?

14  Mr. McNeil is going to be a witness at trial.  Look at the

15  stats.  This is the '65 Browns, I think is the team that he's

16  on.  That's unquestionably a historic game.  Mr. McNeil

17  unquestionably signed a GLA.  He is on the '65 Browns.  Look at

18  his position.  It's identical.  Look at the number.  It's --

19  the height.  And the weight.  They are identical.  This is

20  Mr. McNeil.

21          Now, why were they scrambled, Your Honor?  That is

22  Motion in Limine No. 7.  It wasn't EA.  It wasn't EA.  It was

23  Players Inc.  It was the Defendant in this case, in violation

24  of their fiduciary duty, in breach of contract that said if

25  you're going to use these players in the game -- and guess

 1  what, Your Honor?  They did --they must be scrambled.  That's

 2  LaShun Lawson's words.  She is a representative of Players Inc.

 3  That letter was sent to EA.  That is a central issue in the

 4  case.

 5          And what Mr. Rhee did was he proves the point, that

 6  when me they used players that were not listed on Exhibits A or

 7  B of this letter in 2001, they scrambled them.  But guess what?

 8  It's the player.

 9          MR. KESSLER:  (Inaudible)

10          MR. HUMMEL:  It's the same height -- excuse me,

11  Mr. Kessler.  It's the same height, it's the same weight, it's

12  the same guy.

13          THE COURT:  But how do you know?  Looks like you are

14  using ESPN information.

15          MR. HUMMEL:  No, no.  Because, Your Honor, those --

16  those are self-authenticating records.  We will demonstrate

17  that at trial.  And Mr. Kessler has had ample opportunity to

18  inspect or to question, at all, the validity of that underlying

19  data.  Mr. McNeil was in fact that guy, with that height, that

20  weight, that position, on that team.

21          Same thing with Joe Montana.  We will go back and if

22  Your Honor wants to look at it, we will look at Joe Montana.

23  Same height, same weight, clearly the position.  This is a use

24  of historic teams by Madden in the game.

25          And what Mr. Rhee did, was he can tell the jury,

1   "Ladies and gentlemen, I've looked at this, and here is just a

2   sample of players where I've compared their actual statistics

3   with what is listed in the game."

4          And if Mr. Kessler -- can I -- can I just finish,

5   please?

6          If Mr. Kessler wants to cross-examine him -- excuse

7   me, can I have those back, please?

8          MR. KESSLER:  No.  I want to use them.

9          MR. HUMMEL:  Well, they're my exhibits.  I'm sorry.

10         MR. KESSLER:  Okay.  Take them.

11         MR. HUMMEL:  Thank you.

12         If Mr. Kessler would like to cross-examination that

13   Bruce Laird of the Buffalo Bills in -- or the 1977 Colts --

14         THE COURT:  Can I interrupt you for a minute?

15         MR. HUMMEL:  Sure.

16         THE COURT:  I'm going to defer this, and have an

17   evidentiary hearing.  I want to say that I've got a couple of

18   things that concern me.

19         This chart looks a lot like something that an expert

20   would come up with.  You are conveniently passing it off as a

21   summary of documents.  But, ordinarily I would think this is

22   something an expert would come up with.  That's just the way

23   the document looks.

24         MR. HUMMEL:  May I comment, Your Honor?

25         THE COURT:  No, no.

1          MR. HUMMEL:  Okay.

2          THE COURT:  Because I'm not going to make a ruling.

3          MR. HUMMEL:  All right.

4          THE COURT:  But, I don't think it's necessarily as

5   easy as you say.  So we are going to have an evidentiary

6   hearing.  It's going to be during the trial.

7          There will be no reference to this in the opening

8   statement.  There will be no reference to this chart.

9          MR. HUMMEL:  To that chart, fair.

10         THE COURT:  If you wind up not getting it into

11  evidence because you prepared your case the way you did, that's

12  tough.

13         MR. HUMMEL:  I understand, Your Honor.

14         THE COURT:  So, but I am going to set aside an hour

15  in the afternoon some day -- it will have to be after the trial

16  starts -- to have this guy come in and testify.  And if I think

17  that he should have been disclosed as an expert, it will -- I'm

18  not saying it's out, I'm just saying it's probably out.  You

19  would then have to justify it under Rule 37(c).

20         MR. HUMMEL:  I understand, Your Honor.  What I would

21  like to say, though, is that chart, he's applying no expertise.

22  There's no opinion being expressed about that chart.  It's just

23  a summary of data.  And, we'll address that at the hearing.

24         I understand your ruling.

25         THE COURT:  You can, I'll give you the chance to do

```
 1   that.  I'm going to give you, Mr. Kessler, a chance -- this is

 2   going to be an hour.  This is not a big-firm cross-examination

 3   that goes three days.

 4            MR. KESSLER:  Your Honor --

 5            THE COURT:  It's going to be right to the point.  But

 6   the issues that I'm concerned about that you should address are

 7   the method that he used to put this together, and the extent to

 8   which he used judgment, as opposed to it being a mechanical

 9   summary.

10            MR. HUMMEL:  I understand, Your Honor.

11            THE COURT:  All right.  So, that's postponed for the

12   time being.  All right.  Let's go to No. 7.

13            MR. KESSLER:  All right.  No. 7 is related to this,

14   somewhat.  This has to do with the whole scrambling issue.  And

15   Your Honor, this is first of all, in the first point, it's a

16   403 motion --

17            THE COURT:  By the way, the other one, I don't see

18   any problem with, the 1239.  That seems that you agree on that

19   one.

20            MR. KESSLER:  Not for him to testify about it, but as

21   to the exhibit, I think probably yes, Your Honor.  I'll take a

22   look at that again.  But I think the exhibit -- the piece of

23   paper, probably not a problem.  Has to do --

24            THE COURT:  Go ahead.  Scrambling.  What's the

25   problem with them trying to prove scrambling?
```

1          MR. KESSLER:  Okay.  Here's the issue, Your Honor.

2   They now concede in their opposition, if Your Honor looks at

3   their opposition memorandum on Page 3 and 4, they do not

4   contend that EA's scrambling is a violation of the players'

5   intellectual property rights, whatever they are calling

6   scrambling.  So, despite what you have just heard, they do not

7   contend that in this case.  This is their words (Indicating).

8          The problem is, and this is why you have the 403

9   issue, the jury, if they hear the type of testimony in the

10  argument that you just heard, they are going to believe that

11  what this is about is that it is somehow a violation of the

12  players' rights, and that the union or my client is somehow

13  responsible for that.

14         So, what we will have to do is have a trial about an

15  issue, again, that they do not have in this case, that they

16  don't -- that we will have to explain to the jury how EA is

17  totally allowed to do this, the union had no power to stop them

18  from doing this, of using images that are not the players,

19  themselves.

20         What the union did, and what they complain about, is

21  the union said, "If you don't pay for the retired players, you

22  can't use them."  That was protecting their rights, of the

23  retired players, not violating their rights.

24         And so, if there's no underlying claim that EA has

25  done anything wrong, the case law we cited your Honor, we can't

1  be held responsible, even if they say we're complicit in

2  something that did not violate any of these retired players'

3  rights.  And they can't say, "Well, you had a fiduciary duty."

4  There could be no fiduciary duty, as a matter of law, to stop

5  someone from doing something which they had the right to do.

6        We would have to argue all that to the jury.  Explain

7  intellectual property law.  Talk about when you can use rights

8  and when you can't use rights.  Almost have to have -- you

9  know, witnesses, EA, we testify how they got legal opinions

10  that they had the right to do what they did and it didn't

11  involve us.  None of that belongs before this jury.  So that's

12  the first basic problem with this.

13        The second problem with this is, none of this ever

14  appeared in their complaint.  In any of their three versions of

15  this complaint, none of this was ever --

16        THE COURT:  Because they only found out about it

17  whenever you made an eleventh-hour production.

18        MR. KESSLER:  Your Honor, "eleventh-hour" is an

19  interesting phrase.  They said "eve."  Two months before the

20  close of fact discovery.  Who months before.

21        THE COURT:  That's when they learned about it.  They

22  couldn't have put it in the complaint.

23        MR. KESSLER:  No, Your Honor, sorry.  That's the

24  document they cite.  I have testimony which we submitted with

25  this motion, that Mr. Adderley and Mr. Parrish, both of them,

1  discuss the fact Parrish that they thought their images were

2  being used -- you know, that by including this in EA, that --

3          THE COURT:  They didn't know.  What he didn't know

4  was that your client had sent a suggestion to EA saying "You

5  better scramble, we don't have the rights to these" -- in other

6  words, he didn't know about that e-mail.

7          MR. KESSLER:  Okay, but the e-mail, Your Honor,

8  wouldn't change this claim.  In other words, what the e-mail

9  says, Your Honor -- I just want to focus on this.

10          In 2000, EA licensed 143 retired players.  Paid for

11  them, all the money went to the retired players in an ad hoc

12  deal.  Okay.  That's undisputed.

13          THE COURT:  You don't want that in evidence.

14          MR. KESSLER:  No, no.  Just giving Your Honor the

15  background to the letter.  EA then said, "We want to use more

16  retired players."  They don't want to pay for them.

17          The letter says, "You are only authorized to use the

18  retired players who you have paid for.  Therefore you cannot

19  use anyone else, you have to scramble it, so that no one can

20  tell they're the players."  Which is what was protecting their

21  rights.  That's the only new fact --

22          THE COURT:  What, what the Defendant could have done

23  was say, "Ah, here's an opportunity for us to make good on our

24  obligation to the retired players.  Let's see if we can

25  negotiate a deal for the retired players."  That's what they

1  could have done.

2          MR. KESSLER:  That's what I'm trying to explain.

3  They did do that.  But the story was they already went to EA,

4  at that time, and said, "We want to sell you retired players.

5  Who do you want?"

6          EA said, "I want these 143."

7          They entered into that agreement.  They got that

8  money.  They gave all the money to the retired players.  That's

9  exactly what they did.

10          EA then said, "Well, do you think we could use some

11  other retired players without paying for them?"

12          And the client said, "No."  Says, "If you want them,

13  you have to include them and pay for them."

14          And EA didn't want to do it.  Those are the facts

15  that came out.  It's the opposite of what they said.

16          THE COURT:  Why is that so bad for the jury to hear?

17          MR. KESSLER:  Only because --

18          THE COURT:  The way you spin it, it makes it sound

19  like your people were great.

20          MR. KESSLER:  Your Honor, I don't have a problem with

21  those facts.  What I have a problem with, it has to do with

22  Mr. Rhee and their lawyers.  They are going to go up to the

23  jury, and they are going to say, "Look how everybody knows this

24  is Joe Montana.  Everyone knows this is Brent Jones.  They are

25  using all their images, and no one's getting paid for it."

1         And what the jury is going to think is that there's

2  something wrong with that.  "Hey, that must be illegal, they're

3  taking their rights.  Players Inc. should have stopped that

4  from happening.  They're bad, they didn't stop it, it breached

5  their duty."

6         But the relate is, it goes to the first point.  We

7  would have to explain, they didn't use any rights, Plaintiffs

8  said no rights were violated, we had no power to stop it, and

9  we are going make the jury -- Your Honor just went through a

10  patent trial.  You know how difficult these IP rights are.  Now

11  we are going to have to, on a supplementary issue, we'll have

12  to charge the jury as to whether or not EA had the rights do

13  this, and not to make a judgment about it?

14         Because as a matter of law -- and we cited the case

15  law in our brief, Your Honor -- that if there's no violation of

16  law with what EA did, we can't be responsible for it.  It can't

17  be part of a claim.  And under 403, we're going to have a whole

18  diversionary effort about this.

19         What this case is about -- and this may be is the

20  most important point.  Remember again, Your Honor, the only

21  damages they seek is this share of that GLR pool, okay?  That's

22  the whole damages.  There's nothing else.

23         There's no connection between that claim and anything

24  to have to do with player images being scrambled, which

25  players' images were scrambled, what's there.  This is going to

1  create havoc.

2           And what they try to do in this case, over and over

3  again, they can't prove up damages, they can't do any

4  connection.  And they just want to throw a mush to the jury,

5  that is indecipherable.  It's classic 403.

6           They admitted, as a matter of law, they admitted

7  these are not the images of the players.  That's what they said

8  in the brief.  If they are not the players of the images, how

9  did they get evidence saying these are the players, these are

10 the scrambled players?  And Your Honor, it's not my words.  I'm

11 reading what they said.  They do not contend EA scrambling is a

12 violation of any intellectual property rights.  They say that.

13 So, it's just -- it's so confusing, even to discuss it.  Think

14 about what it's going to do this to this poor jury.

15           We're going to be back here with Your Honor, with 12

16 sets of questions about does it violate EA's rights or not.  Is

17 that what we want in this case?  It makes no sense.

18           THE COURT:  That's the least of my problems.

19           MR. KESSLER:  I've said my piece, and I don't see how

20 that this is a problem diversionary effort in this case right

21 now.

22           THE COURT:  Let's hear from the -- Mr. Hummel.

23           MR. HUMMEL:  Thank you, Your Honor.  Plaintiffs in

24 this case did not sue EA.  There is no issue in this case about

25 whether --

1           THE COURT:  What is -- he draw a line from A to B.

2           MR. HUMMEL:  Sure.

3           THE COURT:  That connects up the scrambling with a

4    specific issue in this case.

5           MR. HUMMEL:  Absolutely, Your Honor.  Let me do it at

6    a 20000-foot level, if you don't mind.

7           THE COURT:  Fine.

8           MR. HUMMEL:  In an effort to avoid a speech, let me

9    lay it out.  The Plaintiffs' contention in this case, which is

10   disclosed in Paragraphs 51 and 52 of this complaint for that

11   matter, by the way, is the following.

12          The Defendants went out and signed all these retired

13   players up to GLAs.  The GLA will be an issue in the case.

14   Plaintiffs contend the Defendants licensed rights to third

15   parties, for money.  Right?  Money came in.

16          Licensed rights were then conferred, the rights were

17   conferred to these licensees.  In exchange for the conference

18   of license rights, money was paid.  Regardless of the actual

19   use by the licensees, active players got paid.  Retireds

20   didn't.  They got zero.  They didn't set up an escrow account,

21   they didn't pay anything to retired players pursuant to the GLA

22   over the years.  Nothing.

23          Their defense to this, as best I can understand it,

24   is the following.  No licensee ever wanted retired-player

25   rights.  Therefore, no licensee actually licensed

retired-player rights, notwithstanding the pretty clear

language of the license agreements which Your Honor will see,

which says the retired players' rights were in fact licensed,

and are covered.

        But because nobody wanted them, because no licensee

ever in fact licensed them, there was no money paid for them.

Therefore there was no escrow, and zero was paid.  That's their

defense.  Right?

        And to bolster that -- and I should say, Your Honor,

a lot of this case boils down a credibility contest about a man

who passed away in August, unfortunately, of pancreatic cancer,

unfortunately, Mr. Gene Upshaw.

        But Mr. Upshaw said in his deposition in this case,

and I'm quoting from his February 13, 2008 deposition, at Page

151 -- here's the questions.  And I would like Your Honor to

listen to this very carefully.

        (As read) Question:  "Have you personally ever made

any efforts to try to market retired players to potential

licensees?"

        Mr. Upshaw says, "Yes.  I've had discussions with

several licensees about the retired players and how they would

be helpful and beneficial in certain programs.  Yes, I've done

that."

        Question, "Can you give me some examples?"

        Answer:  "Well, the most recent example would be the

 1  EA contract" -- that's what we're talking about -- "that we

 2  just executed not long ago.  And I offered retired players in

 3  that area, but there was really no interest."

 4          "There was no interest in EA?"

 5          Answer:  "No."

 6          We now know --

 7          THE COURT:  Is that true?  Or how do you know whether

 8  that's not true?

 9          MR. HUMMEL:  Because we have documents.  We have an

10  e-mail, an internal EA e-mail, and we have a letter

11  (Indicating).

12          THE COURT:  Show me where I can find that in all

13  this --

14          MR. HUMMEL:  The e-mail, Your Honor, is Trial Exhibit

15  No. 1184.

16          MR. KESSLER:  It's not part of the submission, Your

17  Honor.

18          THE COURT:  It's not part of the submission?

19          MR. HUMMEL:  It's part of the submission, certainly,

20  in opposition to Motion in Limine No. 7.

21          THE COURT:  I've got that all right here.  If you

22  tell me which exhibit to look at, I'll look at it.

23          MR. HUMMEL:  Should be attached to the Cohen -- the

24  Noel Cohen declaration in opposition to --

25          THE COURT:  Yeah, I got that somewhere.  Where do I

1   look?

2           MR. HUMMEL:  Your Honor, while I'm looking at it,

3   I'll hand it up.

4           THE COURT:  No, no, I want to look at my copy.  Can't

5   you just tell me the tab number, for goodness sakes?

6           MR. HUMMEL:  Yes, I can.

7           All right.  It is Exhibit B.

8           THE COURT:  D as in Delta?

9           MR. HUMMEL:  B as in Boy.

10          THE COURT:  Okay, B as in Bravo.  All right.

11          MR. HUMMEL:  To the Cohen Declaration.

12          THE COURT:  May 31, 2001.  E-mail.  Looks like a

13  letter, really.

14          MR. HUMMEL:  What you have, Your Honor, is a

15  stipulation that was entered into between the parties regarding

16  these letters.  Exhibit B is the Jeremy Strausser May 31 letter

17  from LaShun Lawson.

18          Do you have that in front of you?

19          THE COURT:  Got it, yes.

20          MR. HUMMEL:  All right.  Page back --

21          THE COURT:  What does the stipulation say?

22          MR. HUMMEL:  The stipulation says -- it's

23  complicated.  It was negotiated between EA and the Defendants

24  and me.

25          What it says is, effectively, this was received by

1   EA, in the ordinary course of business, it was sent by LaShun

2   Lawson, who was a senior representative of Players Inc. at the

3   time.  And that she was acting in her official capacity.

4          In other words, it is authentic, non-hearsay, and a

5   statement by a party opponent.  It is coming into evidence in

6   this case.  That's the letter.

7          If you page back, Your Honor, you will see Exhibit B

8   to the stipulation of Linzner, the e-mail I was referencing.

9   The Linzner stip --

10          THE COURT:  I'm sorry, I --

11          MR. HUMMEL:  It's six pages back.

12          THE COURT:  I only have one page on my tab.  I got --

13   I got Exhibit B, Tab B to the opposition to your -- on this

14   Motion in Limine, and it's just got one document.

15          MR. HUMMEL:  The Tab B has one document.  The next

16   Tab is Exhibit C, is the Linzner stipulation.

17          THE COURT:  All right.

18          MR. HUMMEL:  Correct?

19          THE COURT:  Correct.

20          MR. HUMMEL:  All right.  That's the stipulation that

21   deals with the two letters.  Exhibit A to the Linzner stip is

22   the letter.  It's actually an unsigned version of the letter

23   that shows it was copied to Joel Linzner at EA and Doug Allen,

24   who is the former second-in-command of both Players Inc. and

25   the union.

1          The next page is the e-mail I'm referencing.

2          THE COURT:  Exhibit B.

3          MR. HUMMEL:  Exhibit B to the stipulation regarding

4    the testimony of Joel Linzner.

5          THE COURT:  Where is the stipulation on this?

6          MR. KESSLER:  There is no stipulation on this one,

7    Your Honor.  We actually object to this document.

8          MR. HUMMEL:  Your Honor, it's Paragraph 7 of the

9    Linzner stipulation.  Which is -- says (As read), "Defendants

10   agree to the authenticity of the document attached as Exhibit

11   B, evidencing an e-mail chain between and among EA personnel

12   and employees of the Defendants, spanning from June, 2005 to

13   August, 2005, and without waiving any other objections to,

14   Defendants may have as to the admissibility of that document,

15   and without waiving Plaintiff's right to seek to offer such

16   e-mail chain into evidence, the following is agreed:  The

17   portions of the e-mail that constitute statements by LaShun

18   Lawson are statements by an employee of a party within the

19   scope of her employment" -- In other words, they are admissions

20   by a party opponent -- "and that the portions of the e-mail

21   chain that constitute e-mail from EA personnel were

22   communications within scope of the person's duties with EA."

23          In other words, it's authentic, it's non-hearsay,

24   it's a statement by a party opponent.  And under the rule of

25   completeness, Your Honor, that e-mail chain comes in.

 1           MR. KESSLER:  Your Honor, that's incorrect.  Just on

 2  that point, the statements by the internal EA employees, which

 3  we had never seen, is not a party opponent statement.  EA is

 4  not a party opponent.  It is clear, classic hearsay.

 5           We object to this document.  There's no way they can

 6  get this document in, Your Honor.  Anyway, but Your Honor, none

 7  of this has anything to do --

 8           MR. HUMMEL:  Your Honor, I didn't interrupt

 9  Mr. Kessler.

10           (Counsel speaking simultaneously)

11           MR. KESSLER:  -- with the question Your Honor asked,

12  which is why -- this is a very interesting, you know, diatribe,

13  but Your Honor asked specifically, what does the issue of the

14  scrambling have to do with the claims in this case?  They have

15  nothing.

16           What the lawyers -- what he said is that they're

17  claiming that we gave the rights to EA, to the retired players,

18  and that the retired players should get paid, whether or not

19  their images are used.  We understand they have that claim.

20  That has nothing to do --

21           THE COURT:  Wait, wait, wait.  You're not being fair.

22  Mr. Hummel's got the floor right now.

23           MR. KESSLER:  Sorry, Your Honor.

24           THE COURT:  I -- you are making a speech.

25           MR. KESSLER:  Sorry.

1        THE COURT:  All right.  I want to stick with this

2   e-mail for just a second.

3        MR. HUMMEL:  Thank you, Your Honor.  If you would

4   turn to the --

5        THE COURT:  Show me what part of this is so hot for

6   you.

7        MR. HUMMEL:  Okay.  Second-to-last page.

8        THE COURT:  All right, second-to-last page, starts --

9   "Sounded like your initial" --

10       MR. KESSLER:

11       MR. HUMMEL:  Correct.  If you look down, Your Honor,

12  to the middle of that page, there is a e-mail from a Jeremy,

13  Jeremy Strausser at EA, written to LaShun Lawson.  This

14  document, by the way, was produced by EA in this case pursuant

15  to subpoena.  It is not, by the way, classic hearsay.  It also

16  falls under a business records exception, but we can talk about

17  admissibility later.

18       Let me focus on the point.  The point is, Jeremy

19  Strausser at EA is writing to Players Inc., one of the

20  Defendants, saying -- and this is in 2005 -- (As read) "We want

21  to use retired players in this game."

22       THE COURT:  Where does it say that?

23       MR. HUMMEL:  "We are designing a feature in Madden,"

24  it says, "where there will be a living record book with all the

25  preset NFL records by game, by season, by career."

1           Then if you look at the second paragraph, "What do

2   you think?  I know that Players Inc. doesn't want us to include

3   any retired players in the game, but in this case, given that

4   it is factual real-world information that is readily available,

5   our hope is that you will agree with us that this particular

6   feature is made much stronger by including the text display of

7   the record data."

8           EA comes to them and says, "We want to use retired

9   players info in the game."  What's more telling, Your Honor, is

10  this is right about the time that Mr. Upshaw is referring to,

11  in terms of the negotiation.

12          Now, move ahead to the very first page of the e-mail.

13  This is a Jeremy Strausser statement, internally at EA.

14          THE COURT:  Where are you now?

15          MR. HUMMEL:  First page of the exhibit.  Bates No.

16  153.

17          THE COURT:  All right.

18          MR. HUMMEL:  Jeremy Strausser writes internally --

19  again, business record produced by EA, stipulated as

20  authentic -- "They" -- meaning the Defendants, Players Inc. --

21  "said no to this, despite my attempts to convince them

22  otherwise.  They have taken a hard line on no retired players

23  in the game, in any form."

24          Mr. Upshaw said he tried.  And EA said no.  EA says

25  "We asked, and Players Inc. said no."

```
 1            THE COURT:  You shouldn't assume that that's
 2   necessarily a business record.
 3            MR. HUMMEL:  I understand that, Your Honor.
 4            THE COURT:  All right.  So, --
 5            MR. HUMMEL:  But --
 6            THE COURT:  Are you going to have Jeremy Strausser
 7   testify?
 8            MR. HUMMEL:  No, Your Honor.  If -- and we will
 9   submit a pocket brief on this, if you would like, Your Honor.
10   But given the rules about authenticity and the fact that this
11   is definitely a statement by EA within the course and scope of
12   its -- of the employment of Mr. Strausser, it is -- that is a
13   sufficient basis for admissibility.
14            THE COURT:  Well, what if he had said -- you want
15   this admitted not to prove up a transaction, but to prove up
16   the truth that the Defendants in this case have said no.
17            MR. HUMMEL:  No, Your Honor, not for truth.  It's
18   offered to prove Defendants' state of mind.  And that is that
19   they took the position, no retired players in the game.
20            Why?  The jury will be asked to decide that question.
21   We submit the reason was they didn't want to pay it.
22            THE COURT:  Where do you have an e-mail where the
23   Defendants said no?
24            MR. HUMMEL:  Where the Defendants said no?
25            THE COURT:  The Defendants said no.  You have an
```

1  e-mail where EA says the Defendants said no, but that's one

2  step -- that's an extra step.  That's a hearsay issue.

3          MR. HUMMEL:  Well, I submit it's not a hearsay issue,

4  and we can argue about that.

5          THE COURT:  Well, I'm the Judge.

6          MR. HUMMEL:  I understand.

7          THE COURT:  I understand what hearsay is.

8          MR. HUMMEL:  And I'm a lawyer.  And I can tell --

9          THE COURT:  You'd better get me a pocket brief that

10 bridges that gap, because you have a problem with this.

11         MR. HUMMEL:  Well, Your Honor, it's not hearsay on a

12 number of respects.  But we will get you a brief on that issue,

13 because the admissibility of this document is critical.  What

14 LaShun Lawson says --

15         THE COURT:  Why don't you bring in Strausser, who's

16 the guy, and let him be cross-examined?

17         MR. HUMMEL:  I would love to.  I understand he lives

18 in Florida.  We did not depose him in the case.  We will have

19 Mr. Linzner here under subpoena, and Mr. Linzner can testify as

20 to Mr. Strausser's position, and his authority to speak within

21 the context of the EA.

22         Now, what Ms. Lawson necessarily says -- or

23 absolutely says in the second page is, "We discussed it

24 internally, but there was no resolve.  Let me shoot another

25 e-mail.  Let's touch base tomorrow."

1          We do not have a statement in this e-mail from the

2     Defendant, other than the EA response to what the Defendant --

3     clearly told EA.  Because, guess what?  That scrambling

4     continued.

5          What happened here, Your Honor, is the Defendants had

6     our rights.  They could have said to EA, "Of course.  We've got

7     2000 retired players; you can have them all.  And by the way,

8     not for an additional penny.  Because your license already

9     covers that."

10         But they didn't do that.  They said no.  And in 2001,

11    they said, scramble them.  That's a classic issue for the jury.

12    It's a credibility contest about what Mr. Upshaw did, what he

13    said, and you can contrast the two.  The fact is, it's

14    undisputed.  No GLA member was paid.

15         The fact is that the EA license, in our view, clearly

16    conferred retired players rights.  And when EA went to the

17    Defendants and said, "We want to use retired players," they

18    said no.  And we submit the reason they said no is because they

19    didn't want to pay us.  Period.  And that's a jury issue, and

20    that's what this trial is about.  It's not irrelevant.  It's

21    centrally relevant to the case.

22         THE COURT:  Well -- coming back to the GLA for a

23    minute, was there ever a group licensing program that you

24    contend covered retired players?

25         MR. HUMMEL:  Yes.

1          THE COURT:  Give me just one example.

2          MR. HUMMEL:  EA.  The EA contract, Your Honor, dated

3   December 8, 2004 --

4          THE COURT:  All right.  Now, what was the name of the

5   game?

6          MR. HUMMEL:  What was the name of the game?

7          THE COURT:  Or whatever it was.

8          MR. HUMMEL:  It was a license between EA and Players

9   Inc., which had the rights to our retired players, that

10  conferred certain rights.  And there was not -- not for a

11  specific game.

12         THE COURT:  Did it refer to retired players?

13         MR. HUMMEL:  It does.

14         THE COURT:  Okay.  So that -- see if I got that one,

15  I.  Don't think I have that one in front of me.

16         MR. HUMMEL:  That's one of the ones we'll put in the

17  notebook and highlight for you.

18         THE COURT:  Do you have it right there?

19         MR. HUMMEL:  I do.

20         THE COURT:  Let me see that.  Please hand it to the

21  Court Reporter.

22         MR. HUMMEL:  I'm sorry.  It's, for the Record, Trial

23  Exhibit No. 28.

24         (The Court examines document)

25         THE COURT:  Where is the part about retired players

1  on this one?  This Exhibit 28?

2            (Off-the-Record discussion)

3            MR. HUMMEL:  So, Your Honor, just to walk you through

4  this, the representations made by Players Inc. in this license

5  are contained in Paragraph 1(a).

6            THE COURT:  All right.  I'm looking at that.  Where's

7  the part about retired players?

8            MR. HUMMEL:  It says (As read) "Licensee acknowledges

9  that Players Inc" -- it's in the fifth line from the bottom --

10  "that Players Inc. also on occasion secures authorization for

11  inclusion in Players Inc. licensing programs from players,

12  including but not limited to retired players who have not

13  entered into such group licensing authorization but who

14  nevertheless authorize Players Inc. to represent such players

15  for designated Players Inc. licensed programs."

16            In the grant of license, Your Honor, which is

17  Paragraph 2(a), also on the first page, Players Inc. confers to

18  EA the rights identified in Paragraph 1A.

19            THE COURT:  But this is referring to people who have

20  not entered into group licensing authorizations.

21            MR. HUMMEL:  Such group licensing authorizations.

22  And that is, Your Honor, attached, which is the active player

23  group licensing agreement.

24            What they're talking about in Paragraph 1(a) in terms

25  of retired players who haven't entered into Exhibit A

1  (Indicating), are the retired players that are our class.  They

2  had the rights.  They conferred them.

3          And by the way, Your Honor, if they didn't confer the

4  rights, and EA's asking for them, and they're saying no, that's

5  a breach of fiduciary duty.  That's this trial.

6          THE COURT:  Well, that paragraph says "Licensee

7  acknowledges that Players Inc. also on occasion secures

8  authorization for inclusion in Players Inc. licensing programs

9  from players, including but not limited to retired players."

10          MR. HUMMEL:  Right.

11          THE COURT:  Here's the language that I'm puzzled

12  over.  Says, "who have not entered into such group licensing

13  authorization but who nevertheless authorize Players Inc. to

14  represent such players for designated Players Inc. licensed

15  programs."

16          So, doesn't that sound like they're talking about

17  arrangements outside of the GLA?

18          MR. HUMMEL:  Yes.  But the GLA they're referring to

19  there is Exhibit A to this contract, which is the second to

20  last page.  And that's an active-player GLA.

21          THE COURT:  You are saying that what this sentence

22  was getting at were retired players who had GLAs, as versus

23  active players who had GLAs.

24          MR. HUMMEL:  Yes, yes.  That's what it means.  And it

25  clearly means that.  And Paragraph 2 clearly then grants the

1    license to those retired players.

2           Now, Your Honor, let's assume, hypothetically -- I

3    think it's plainly erroneous, but that Mr. Kessler's right.

4    And the jury's persuaded that this didn't confer the rights to

5    retired players.

6           They represented publicly for years that they

7    represented us.  They had guys signed GLAs, time and time

8    again.  They solicited them.  They got a benefit from them.

9    And then EA comes and says "We really want to use them," and

10   they don't tell EA -- and this will be the testimony of

11   Mr. Linzner at trial -- they don't tell EA that they have these

12   GLAs?

13          And EA's saying "We really want to use retired

14   players," but no, no, no.  And why?  Because it's hundreds of

15   millions of dollars that they didn't want to pay our clients.

16   That's the reason.  And that's the trial.

17          This agreement, we argue, confers the license rights.

18   The fact that we weren't paid is a breach of contract.  The

19   fact that they deliberately didn't tell key licensees like EA

20   that they had this bundle of 2,000-plus rights of GLA members,

21   that's a breach of fiduciary duty.  No matter which way you

22   slice it.

23          So, the scrambling evidence, Your Honor, is centrally

24   relevant to the case in the following way.  They say, nobody

25   wanted us.  The e-mail -- even, Your Honor, the part that you

1  would concede is not hearsay, disputes Mr. Upshaw's testimony.

2  Because EA's clearly going to them and saying, "We want you."

3          And by the way, the letter, the LaShun Lawson letter,

4  which is also not hearsay, concedes, "You are going to use

5  other players in the game."  But it says, "If you do, you have

6  to scramble them."  And our beef in this courtroom --

7          THE COURT:  But if you -- if there's nothing wrong

8  with scrambling, in other words, that the -- there was no

9  violation of their image rights by using the scrambling, how

10 does that tie in to a claim that the retired players should

11 have gotten a cut of the money paid under this license

12 agreement, Exhibit 28?

13         MR. HUMMEL:  With respect, Your Honor, that misses

14 the point entirely.  This is not a case about intellectual

15 property rights.  It's not.  This is a case about a breach of

16 fiduciary duty.  And the breach of the fiduciary duty --

17         THE COURT:  Explain that to me.  Explain how all ties

18 in.

19         MR. HUMMEL:  Sure.  I thought I had, but I'll try

20 again.

21         Your Honor knows that there are 2,050 or so class

22 members who signed GLAs, they have these rights of the retired

23 players.  Mr. Upshaw says nobody ever wanted them.  He actually

24 said, "You can't feed dog food to a dog that won't eat it."  Or

25 "You can't sell dog food for a dog that won't eat it."  He's

1  referring to retired players.

2       And then, we have EA, that comes to our Defendants

3  and says, "We want to use retired players in the game."  Now,

4  they have these rights.  They're sitting on them, though.

5  They're sitting on them.  They're not out there marketing them,

6  we think we'll prove at trial.  They haven't done a bona-fide

7  effort to market these guys.  But here you have the biggest

8  licensee in the world for retired-player rights, EA, coming up

9  and -- coming up and saying, "We want them."

10      And by saying "You can't have them," and not telling

11 them that they even have the rights, that, Your Honor, is a

12 breach of fiduciary duty.  That is acting contrary to the

13 interests of the people that you are representing.  Namely, the

14 retired players.

15      As a primary line, Your Honor, I will say this.  The

16 Madden game clearly contains six or more present and former

17 players.  We've shown today that it contains retired players in

18 the game.  When six or more retired players are actually in a

19 product, that triggers the GLA.  And when it triggers the GLA,

20 through the EA license (Indicating), our class is entitled to

21 that money as a breach of contract.

22      So, those are the two theories.  And they're not

23 necessarily, by any stretch of the imagination, alternative.

24 They are consistent.  Because we now know the story.  And the

25 documents reveal the story.  And the jury is entitled to see

1  that.

2          And the scrambling, Your Honor, it was a deliberate

3  effort by these Defendants (Indicating) to avoid the payment by

4  telling EA, "Scramble their images so people can't come back

5  and say you used them."  But it's clear that this was a

6  scrambled use.

7          This is not going to be an intellectual property

8  trial.  This is not going to be a case where we assert that EA

9  did something wrong.  We absolutely are asserting that these

10  Defendants (Indicating) did something wrong in telling EA -- by

11  the way, instructing EA to scramble the images, and then

12  telling them, despite the fact that they had these rights, that

13  "You may not use them."  That's our claim.

14          THE COURT:  All right.  Let me rephrase this.  You're

15  saying EA could have had two lawful ways to go.  It could

16  either use the actual images and names with the license, which

17  it could have acquired, or it could have scrambled and not get

18  the license, or not need a license, and that that was the

19  scenario facing the Defendant.  And the Defendant then said,

20  "Do the second.  Don't do the first."

21          MR. HUMMEL:  "Scramble."

22          THE COURT:  "Scramble, don't -- we don't want to give

23  you a license."

24          MR. HUMMEL:  They didn't say "We don't want to give

25  you a license."

1          THE COURT:  What?

2          MR. HUMMEL:  They didn't say "We don't want to give

3   you a license."

4          THE COURT:  What did they say?

5          MR. HUMMEL:  "Scramble."  That letter does nowhere

6   say "We're not going to give you a license."  That letter

7   nowhere says, "We've got over 2,000 of GLA-retired players that

8   we could license to you."  It simply says "Scramble."

9          THE COURT:  What you are saying that they should have

10  said is "Here is an opportunity for us to make some money for

11  the retired players, so let's do" -- what?  What is it they

12  should have done, in your view?

13         MR. HUMMEL:  They could have done many things.  One

14  of the things they could have done is to say, "EA, we have

15  2,051-plus GLA signatories.  And you get -- you have those

16  rights.  Don't scramble those images."  They could have said

17  that.

18         They could have said, "We have this retired player

19  program.  And for not a penny more, you get these rights.  Use

20  them.  Don't scramble them."

21         They could have said, in response to inquiries in

22  2005, "Can we use this in the game," instead of saying no and

23  taking a hard line, they could have said yes.  But they didn't.

24         THE COURT:  So under the agreements that were in

25  place, without changing a word of the written agreements, if

the scrambling had not taken place, and it was clear that the
class members were in the program, then your point is it would
have been clear that this was a GLA within the meaning of the
retired players, which would have meant that some money should
have gone to the retired players.

MR. HUMMEL:  This answer is it would have been
clearer, not clear, because in my mind, it's still clear that
this EA license confers retired players rights, and six or more
active or former players are in the game.  But, yes.  Yes.

Your Honor, in the most basic sense, this is a case
about a breach of trust.  Our guys placed our trust in their
union.  It's supposed to represent them.  And I can hear the
snickers in the background, but it's not funny to 2,100 retired
players who didn't get a penny out of this, and who are called
"worthless" and "dog food" by Mr. Upshaw, and --

THE COURT:  All right.  Look, save that for the jury,
please.  Come on.

MR. HUMMEL:  I will.  I will.

THE COURT:  You're just getting me off into meteoric
things that don't -- cause me to lose my train of thought.  All
right.

MR. HUMMEL:  But the point is, this is a case
fundamentally about a breach of contract, that is the hundred
or so license agreements that we contend specifically reference
and confer licensing rights.

1            And Your Honor, if I impress upon you one thing

2    that's important out of this, it is that there's a difference,

3    a fundamental difference, between the licensing of rights for

4    which there is unquestioned the minimum payment, and subsequent

5    use.  Subsequent use is not what triggered the payment

6    obligation.  It's the licensing of the rights.

7            So, when EA licenses the rights from the -- from

8    Players Inc., they get paid $25 million a year, minimum.  That

9    money got divided like this.  Sixty-four to 69 percent of those

10   funds -- in fact, probably on the first EA con -- 69 percent

11   went into these folks' -- the union's -- pockets.

12           THE COURT:  What do you mean, "these folks"?  Active

13   players?

14           MR. HUMMEL:  The Defendants.  No.  The union, and

15   Players Inc.  They took 65 percent off the top.  The rest went

16   to the active players.  Zero went to the retired players.

17   Zero.

18           THE COURT:  From EA.

19           MR. HUMMEL:  From EA.  But for everybody.  The gross

20   licensing revenues -- and Mr. Kessler won't dispute this.  His

21   own witnesses have said it.  They get a dollar in the door,

22   from any licensing source; they keep 69 cents.  The goes to the

23   actives, and it's divided on an equal-share basis.

24           The retireds got zero.  Despite the fact that they

25   had these rights, they could have conferred them, the licenses

1  are clear that they do in fact confer them, and they didn't get

2  a penny.  That's the case.

3          Your Honor, this has not been -- this, as interpreted

4  by the Defendants, the GLAs were an empty promise.  As

5  interpreted in the real world by a jury, they're not.  The

6  retired players are entitled to their equal share of these

7  licensing revenues.  That's the case.

8          THE COURT:  All right.  Mr. Kessler, what do you say

9  in response?

10          MR. KESSLER:  Your Honor, so much of what's said is

11  irrelevant.

12          THE COURT:  Now -- let me ask you just a direct

13  question.

14          MR. KESSLER:  Yes.

15          THE COURT:  All right.  Let's say that EA had used

16  the retired players' actual images.

17          MR. KESSLER:  Yes.

18          THE COURT:  No scrambling had taken place.

19          MR. KESSLER:  Yes.

20          THE COURT:  Would you agree then that the EA license

21  agreement would have -- that that would have covered that?

22          MR. KESSLER:  Of course not.  Your Honor, --

23          THE COURT:  How can you say "of course not"?

24          MR. KESSLER:  He so profoundly has misrepresented the

25  facts, and confused three different things.  If you'll bear

1  with me for a few minutes, he has totally confused the Court

2  and confused this Record.  And none -- almost none of this has

3  to do with the motion that we made.

4         But let me, please, put some context in this.  He has

5  three mutually inconsistent theories.  His first theory, his

6  first theory is that the EA license agreement already conveys

7  retired-player rights, including active players and retired

8  players.  And therefore, whether or not they're used, the money

9  that was received from EA was in part for retired-player

10  rights, and therefore they should get the money.  That is

11  profoundly wrong.  None of the parties agree.  Mr. Linzner from

12  EA will say that's absolutely wrong.

13         But, putting that aside, that theory has nothing to

14  do with scrambling.  Because, under that theory, it says, if

15  they were -- rights were included, the agreement he argued to

16  you -- which by the way, Your Honor's quite right when it says

17  other than the GLA, that was referring to the ad hoc

18  agreements.  Nothing to do with the GLAs.  But that's an issue

19  for the jury.  We agree, it has nothing do with scrambling.

20         So his first theory, that the rights were given to

21  EA, okay, has nothing do with scrambling.  So we don't get

22  scrambling under Theory 1.

23         Theory No. 2, okay, Theory No. 2 is EA didn't get any

24  rights to the retired players.  Okay.  And, they were

25  scrambling the issues, let's say because we told them to

1  scramble.  Okay, let's assume what he's saying.  We told them

2  to scramble, but they have no license to them.  And, he's

3  saying, "Well, that's a breach of fiduciary duty."

4         If EA had the legal rights to use that, as he agrees

5  they have the legal right to use this without their name,

6  there's nothing we can do to stop them, he can't hold us

7  responsible to it.

8         Theory 3 --

9         (Off-Record discussion)

10         THE COURT:  Well, but wait, if -- I can't hear.

11         MR. HUMMEL:  Sorry, Your Honor?

12         THE COURT:  If you need to you talk, I'll just wait

13  until you're done.  But I can't hear mister --

14         MR. HUMMEL:  I apologize, Your Honor.

15         THE COURT:  You should apologize to your Counsel,

16  here.

17         MR. HUMMEL:  I apologize.

18         THE COURT:  You asked him not to snicker, and here

19  you were holding a loud conference in the background.

20         MR. HUMMEL:  I apologize.

21         THE COURT:  I tell you both, if you don't behave in

22  front of the jury, you're going to get reprimanded in front of

23  the jury.  If there's any snickering, any coughing, hacking,

24  shuffling of papers, anything that distracts this jury, you're

25  going to regret it, on both sides.

1          MR. HUMMEL:  I understand, Your Honor.  And I

2    apologize.

3          THE COURT:  You're going to be on your best behavior

4    in front of the jury.

5          MR. KESSLER:  Understood, your Honor.

6          THE COURT:  All right.  Let's go to Scenario 2.

7          MR. KESSLER:  Yes.

8          THE COURT:  You are assuming that EA does not have --

9    of this prong, does not have any rights to the retired players

10   here (Indicating).

11         MR. KESSLER:  Yes.

12         THE COURT:  But, without any question, this GLA with

13   the retired players is sitting there, and your client could

14   have negotiated with EA, to give them rights in exchange for

15   more money.

16         MR. KESSLER:  Of course, Your Honor.  And the

17   evidence will show -- the evidence will show, not the

18   statements of Counsel, you will hear testimony from EA -- that

19   Players Inc. said to them, "We have these retired players.

20   Would you like to take all these GLAs?"

21         They said no.  Just as Mister --

22         THE COURT:  How about the ones that they did want?

23         MR. KESSLER:  Okay.  Here's what they did.  The ones

24   they wanted to pay for -- let's get to that.  The ones they

25   wanted to pay for, which would be additional money, they did

1  that through the Hall of Fame agreement, okay.

2          Or they did that back in 2000, when they designated

3  143 people they wanted, they said "We'll pay for those and no

4  others, because those are the only ones we want to pay for.  We

5  don't want any more than that."  So, that's what they did, and

6  we delivered all that money to them.

7          What Your Honor's confused by, and this is very

8  clever of Counsel, over and over again, what the exchange is

9  being referred to here, and that's why you don't allow hearsay

10 in, because you can take it out of context and twist it, what

11 this refers to, if you look at all the e-mails, is they wanted

12 to use playing statistics.  Statistics of the players.  How

13 many touchdowns, that kind of thing.  Not their names.  Not

14 their images.  They didn't want to pay for anything.

15         So what they said to Players Inc., "We think, our

16 lawyers tell us, we can use this public information without

17 having to pay you anything.  What do you think about that,

18 Players Inc.?"

19         And Players Inc., protecting the retired players,

20 said "No way.  You can't use public information about these

21 players, because those are rights you have to pay for.  And

22 then we'll give it to the retired players."

23         So it's the opposite, again, of what he said.  And

24 that's why you don't take in hearsay out of context.  Because

25 if that witness was here, testifying, Mr. Strausser, who they

1 could have deposed, that's what he would have to testify to,

2 under oath. It's all about playing statistics. He didn't ask,

3 "Can we get additional players".

4         And further, if they already had the rights to

5 players, they wouldn't ask for them, they would have just used

6 it. But they didn't have the rights. It actually shows how

7 his first theory is wrong.

8         But again, the most important point of this motion --

9 I don't want to argue the whole case, even though that's what

10 he's doing -- for this motion the issue is, does any of this

11 have to do, where "scrambling" in this context could possibly

12 be something that we would be liable for, for EA scrambling?

13 And the answer is no. Under Theory 1, scrambling is

14 irrelevant, because they are licensed. Under Theory 2, it

15 doesn't matter, because they had the legal right to use the

16 images, so there was nothing we could do to stop them.

17         And even under Theory 3, this would have nothing to

18 do with scrambling. Let's say he had evidence that EA said "We

19 want a license," and "We won't give you a license." If you had

20 that evidence, that evidence would be relevant. It wouldn't

21 exist, but it would be relevant. It has nothing do with

22 scrambling. Nothing to do with scrambling, even under that

23 theory which he says is a breach of fiduciary duty.

24         All that scrambling is going to do -- and it's

25 exactly what he wants to do. He wants to make this jury think

that it's improperly using the rights of the players, it has to

do with Mr. Rhee, the scrambled -- here's Mr. Brett (Phonetic),

Mr. Brett should be paid, and somehow we're responsible for

that.  And it's a case that as a matter of law can't stand, and

there's no way that this is the case they have for the jury.

It's throw everything up against the wall and inflame the jury.

He has yet -- you asked him a very simple question,

before he went on for about 30 minutes.  You said, "Tell me

what the scrambling has to do with your claims in this case."

He has yet to do it.  He has yet to do it.

THE COURT:  No, but his theory was something like

this.  It was that even though it was lawful for EA to do the

scrambling, that that was a lawful option, that EA in fact

wanted to actually use the real images, and -- but if they had

used the real images, then that would have made it absolutely

clear that some money had to go to the retired players.

MR. KESSLER:  If he --

THE COURT:  And, and therefore, that's how it ties in

to the theory.

MR. KESSLER:  None of that has to do with scrambling.

If he had somebody to testify to say that EA wanted a license

to retired players, which is what Your Honor is saying, they

wanted -- said "We'll pay more money for retired players," and

the players association said "No, we're not going to give you a

license to retired players"?  That would be entirely different.

He has nothing about that.

What he showed you, an e-mail, if you look at the context of it -- and that's why I said it's the hearsay of this, it's all about the historic playing statistics. If you take a look at Exhibit C, I think it was -- was it Exhibit C? No, which one was it? It was -- sorry, Your Honor.

It's the -- okay, where they wanted to put in, there will be a living record book, with all the preset NFL records by game, by season, and by career. And as you progress, you can see how they did this.

And what happened is they wanted to include this feature, without paying anything for retired-player rights. Because the $25 million payment he referred to, Mr. Linzner will testify to, from EA, he only got active-player rights.

So they said, "Since this is historic information, can we do this without paying for it?" And what the response was, "No. You can't. Because you haven't paid for the retired players." There are retired players in the game, he's right. The retired players in the game are the Hall of Fame mode, for which they separately licensed through an ad hoc deal, and paid.

And it's very interesting that he gets up in the last -- the fourth theory he gave, Your Honor, was well, that makes it a group license. So they're entitled to the money because the Hall of Fame agreement was entered into, and that's

why there are retired players in the game.  That's the claim

they disclaimed.

          That's asking again, saying that the ad hoc license

for Hall of Fame -- to go back to the issue Your Honor ruled

on, that's how those players got in the game -- then the ad hoc

license somehow is something that gives them a claim under the

group license agreement.  They have disclaimed that four times.

But, they do this over and over again.  They keep conflating

all their different theories together, hopelessly confusing the

issues.  If we can barely keep it straight, imagine the poor

jury.  This case should be very simple.

          They state, on Page 4 of their brief -- and this is

their theory -- that (As read) "The agreements for third-party

licensees generate millions of dollars, guarantee minimum

revenues for every year that are paid, regardless of which

player images, if any, its licensees actually use."  And they

say that includes retired players.  That's their theory of this

case, which the jury should have.

          This scrambling thing is a total diversion.  It's

going to create hopeless juror confusion.  We are going to be

back, going through again, explaining, well, EA had the right

to this, there's no evidence that any rights were used by

players.

          The key issue is, do these agreements include retired

players or not.  If they don't, there's no claim in this case,

Your Honor. To put in another claim, he wants his cake and eat

it too. You heard him say it. "Well, if they include the

retired players we win, and if they didn't include retired

players, we win, too, because if they don't include retired

players, they should have included retired players." That's

his claim. None of those theories have to do with scrambling.

None of them has to do with scrambling. They have admitted in

their arguments that use is irrelevant. That's their claim.

Your Honor, I just -- this is going to hopelessly

complicate this case, and it's going to inflame and confuse

this jury.

MR. HUMMEL: Thank you for being patient with me,

Your Honor. I do apologize for interrupting.

Mr. Kessler just said that EA only wanted stats. And

he says that that's what the e-mail says. Which, it does say.

It also says "They've taken a hard line, no retired players in

the game."

Let's look at the concept of whether EA only wanted

stats (Indicating). There's not a stat on that page. That's

historic teams, retired players. EA wanted retired players.

And the Defendants told them to scramble them. That's one.

No. 2, Mr. Kessler said, "Well, when EA wanted

retired players, they went to the Hall of Fame, and they signed

the Hall of Fame deal." That's his response to EA not wanting

the GLA members.

1          Well, we now know what happened there.  Players Inc.

2    sold out the retired players in the Hall of Fame deal.  Your

3    Honor already looked at that e-mail.  That opens the door to

4    that coming in.  That argument, right there.

5          Because the fact is, these Defendants did not have

6    retired players in mind.  They said they represented them, they

7    signed them up, and they, in effect, put the GLA -- after

8    benefiting from it, and we can talk about why they benefited

9    they put it in the drawer.

10         The third point, Your Honor, is actually very

11   important.  And that is the EA contract, itself.  And without

12   relitigating this, Your Honor, I will remind you that in your

13   summary judgment order in the case, you actually wrote the

14   following (As read): "Defendants argue that the EA agreement

15   and Defendants' similar agreements with other third parties did

16   not include retired-player rights.  The plain wording of that

17   contract, however, indicates otherwise" -- we agree -- "or so a

18   jury could reasonably conclude."

19              THE COURT:  Well --

20              MR. HUMMEL:  You are right, Your Honor.

21              THE COURT:  You goofed that up.  That was all one

22   sentence.

23              MR. HUMMEL:  Right.

24              THE COURT:  So, it's --

25              MR. HUMMEL:  I could have said "dash."

1          THE COURT:  "Otherwise" or at least "so a

2  reasonable" -- so all that's saying is that I'm not saying that

3  I disagree.  I'm saying that a jury could disagree.

4          MR. HUMMEL:  I understand.  And Your Honor, what you

5  said here is, I think, the fundamental point here.  This is a

6  jury trial.

7          The jury should decide whether EA wanted players, or

8  didn't.  The jury should decide whether the Defendants acted in

9  retired players' best interests when they were talking to EA.

10  The jury should decide whether, in fact, the Defendants

11  instructed EA to scramble players' rights to avoid payment.

12          The jury should decide these issues, Your Honor.

13          THE COURT:  No, please.  I don't know where you get

14  this -- it's like a political speech.  You know.

15          MR. HUMMEL:  It's debate night.

16          THE COURT:  It is, but -- now, I'm going to tell you

17  the answer.  First, I'm going to start with the -- the easy

18  part.

19          I don't want there to be any reference to this

20  e-mail, until the Court clears it.  Because I think part of

21  this is likely to be hearsay.  And you'd better be clear on

22  what is a business record.

23          MR. HUMMEL:  I will, Your Honor.

24          THE COURT:  Merely because something is found in

25  somebody's files doesn't mean that it's a business record.

1          MR. HUMMEL:  I understand.

2          THE COURT:  Merely because it was sent from A to B

3  doesn't mean that it's a business record.

4          Now, proving up a transaction is one time that all

5  that matters is what was actually said, not whether it was

6  true.  Like "I will sell you this for $100."  "Great, I

7  accept."  That is proving up the transaction, and that is never

8  hearsay.

9          So, for example, in this case, if you could prove

10  through competent testimony -- you have got to have firsthand

11  testimony -- "I overheard EA ask for retired players' images,

12  and I heard the NFLPA say no," that's actually firsthand

13  knowledge.  Even though it sounds like hearsay, it's not

14  hearsay at all, because it's only trying to prove up the

15  transaction, as in the sense of a contract, or in that case,

16  the failure to make a contract.

17          But, when you want to have Mr. Strausser say in an

18  e-mail, "They said no.  Despite my attempts to convince them

19  otherwise, they have taken a hard line on" -- that sounds very

20  much like hearsay to me.

21          And so, to just use this old saw about Oh, "it's for

22  state of mind" is not going to work with me.  So you -- you can

23  put in a brief on this.  But it may be that this is going to be

24  redacted out before it goes to the jury.  So, please, no

25  references to this e-mail until -- until I clear it.

1        Now, the other, the letter from LaShun Lawson, that

2   is a party admission, and there is a foundation, been

3   stipulated to.  That one is no problem.

4        MR. KESSLER:  That one, Your Honor, is only subject

5   to the whole motion as to whether scrambling comes in.

6        THE COURT:  I'm going to come to that now.

7        MR. KESSLER:  Yes.

8        THE COURT:  I think that motion has to be denied,

9   because -- here is the reason.  I'm not saying that you're

10  wrong, Mr. Kessler, on what is the ultimate determination of

11  what these contracts mean.  You may, in the end, win that part.

12       What I am saying, though, is that the -- the

13  scrambling is enough of an integral part of the overall res

14  gestae of the case, or just the fact pattern of the case.

15  We're going to hear it, and then I will give appropriate lawful

16  instructions to the jury that tell them the legal significance.

17  I don't think that anything here is so inflammatory, like a

18  dead body, or gory scenes or anything -- it's not that

19  inflammatory.

20       It's -- it's really just slightly more interesting

21  than the rest of the detail.  So, it's not inflammatory.  We'll

22  let the jury hear it.  And then I'll give them perfect

23  instructions, which will -- the scales will fall from their

24  eyes, and they will see the truth.

25       MR. KESSLER:  Your Honor, I understand the Court's

1  ruling.  What we will do is, since we didn't address that,

2  obviously, in our proposed instructions, we will suggest a

3  curative instruction, to make it clear to the jury that the use

4  of the rights was not unlawful by EA, and they had to --

5          THE COURT:  Go ahead and do that.  Now, I have a

6  question for all of you, while I'm changing subjects here.

7          And that is, since I spent two hours looking for the

8  trial brief -- and I think it was Mr. Katz referred to in his

9  memorandum, but maybe it was someone else -- and couldn't find

10 it, I would like to have a trial brief on how much of this does

11 the Judge decide, and how much does the jury decide.  That

12 would be fine, if you wanted me to let the jury decide

13 everything, with just proper instructions.

14         But if somebody's going to take a counter view and

15 say "No, no, it's for you, Judge to decide X," you had better

16 surface that now, or otherwise the whole thing is going to be

17 tried by consent to the jury.

18         MR. KESSLER:  Your Honor, I believe that in the

19 pretrial order, both parties have agreed that there's nothing

20 for the Court to decide, other than these in limine motions.

21 In other words, there are obviously legal issues --

22         THE COURT:  So what am I going to do?  Give the jury

23 proper instructions on how to construe a contract?

24         MR. KESSLER:  I think, Your Honor, that's correct.

25 Your Honor, you have to do it, with respect to that.

1              THE COURT:  All right.  Fine.  Yes?

2              MS. NAYLOR:  May I, Your Honor?  Jill Naylor for the

3    Plaintiffs.

4              It's true, as he represents the pretrial order.  But

5    part of the motion in limine, at least for Plaintiffs No. 4, is

6    whether or not these licensee agreements are ambiguous.

7    Because unless the Court has made that determination, the

8    Defendants cannot parade through all the third-party licensees

9    on what was meant by the language and what their intentions

10   were when they signed it, and so on and so forth.

11             THE COURT:  Well, we'll come to that later.  But

12   otherwise, is that the only exception that you can think of?

13             MS. NAYLOR:  Yes.

14             THE COURT:  Okay.  Now -- how's my Court Reporter

15   holding up?

16             THE REPORTER:  Fine.

17             THE COURT:  Sometimes these lawyers talk pretty fast,

18   and I know it's hard for you hard for you to keep the pace,

19   but you're doing a great job.

20             All right.  We're going to now turn to -- how come

21   you did ten motions in limine?  Didn't you read my thing?  No

22   more than five or six.  And then you did ten.

23             MR. KATZ:  I think you strongly suggested no more

24   than five, Your Honor, but --

25             THE COURT:  Well, next time I guess I'll do an order.

1  But, really, I don't mind you bringing motions in limine during

2  the trial, as the trial is under way.  We hear those almost

3  every morning, anyway.  So by the time the trial is over, I'll

4  probably decide 30 motions in limine.

5          But in my experience, only four to five motions in

6  limine are ever really ripe to decide before the case starts.

7          MR. KATZ:  If I may say, Your Honor, I'm responsible

8  for 1, 3, 5 and 8.  They're really all the same subject.

9          THE COURT:  All right.  Very well.  Just, help me out

10  on this.  You can't imagine how much work this is.  And I don't

11  mind the work, but I've got hundreds of other cases going.

12          Okay.  I'm looking at a letter about Mr. Doug Allen.

13  Here's the answer.  He's going to appear on October 22nd.  In

14  the morning -- and you better get him on and off, because

15  that's the last day of testimony that we -- I want him here on

16  October 22.

17          Plaintiff has a right to present their trial, and I

18  don't care how busy he is, he's going to be here.  So, make

19  sure Mr. Doug Allen is here -- that is a Wednesday, I think,

20  right?

21          MR. KESSLER:  Your Honor --

22          MR. KATZ:  Yes.

23          MR. KESSLER:  We understand, Your Honor.  We will do

24  that.

25          THE COURT:  All right.  Great.  Next is Plaintiff's

1  Motion in Limine No. 1 regarding Bernard Parrish.  Is he --

2  who's the -- isn't Adderley our class rep here?

3          MR. KATZ:  Yes, Your Honor.  Your Honor decided that

4  Mr. Parrish was an inadequate class representative, and

5  subsequently his claim was dismissed with prejudice.

6          THE COURT:  All right.  So, you're not even going to

7  surface Mr. Parrish in this case.

8          MR. KATZ:  No, no.  We think he should not be

9  mentioned.  We -- we lost him.

10          THE COURT:  All right.  So, now, let me ask you then,

11  Mr. Kessler, you went to a great deal of trouble to succeed in

12  excluding Mr. Parrish as a class representative.

13          MR. KESSLER:  Yes, Your Honor.

14          THE COURT:  And now you want to drag him back into

15  the case, to tarnish the class claims.

16          MR. KESSLER:  Well, no, Your Honor, I wouldn't put it

17  that way.

18          THE COURT:  That's the way I'm putting.  You just

19  want to dirty them up with all those Nazi statements that he

20  made.

21          MR. KESSLER:  Well, Your Honor, he dirtied himself up

22  with those statements.  I --

23          THE COURT:  No.  The answer is, it's out.  Out,

24  unless they open the door.  That motion is granted.

25          MR. KESSLER:  Okay.  Very good, Your Honor.

1          THE COURT:  All right.  No. 2, to grant -- to exclude

2    argument that Plaintiff sued -- should have sued EA at least --

3    all right.  I'm going to exclude any argument that there's a

4    missing chair here.

5          No, that's not what I mean to say.  I misspoke.  What

6    argument -- what argument do you want to make about they should

7    have sued EA?

8          MR. KESSLER:  Your Honor, that's not the way I would

9    put it.

10          THE COURT:  How do you want --

11          MR. KESSLER:  The argument I want to make is that --

12    is that many of their witnesses will know that this practice of

13    using what's called avatars -- this is only if the scrambling

14    comes in.  Of course, I don't want it in, but Your Honor ruled

15    it in.  Since it's in, it's been existing for years and years

16    prior to this whole situation, and that no one has ever

17    complained about it, no one has ever said there's anything

18    wrong with it.  This, again, goes to this whole issue of that.

19          For them to come in now and suddenly say, "Oh,

20    there's something wrong with using this" -- we expect their

21    witnesses, for example, because we deposed them, to say they

22    think it's a gross invasion of their rights.  The individual

23    player witnesses they have.

24          THE COURT:  All right, okay.  Why can't -- why can't

25    Mr. Kessler make that argument?  What's wrong with that?

1          MR. HUMMEL:  Because it's not an issue in the case.

2          THE COURT:  All right.

3          MR. HUMMEL:  We're not contending --

4          THE COURT:  Look.  There are a lot of things --

5    everybody says it's not an issue, they say that the -- the

6    scrambling is not an issue in the case, and yet, you say it is.

7    Look.  I just -- there's not going to be -- the only way -- I'm

8    denying this motion.  I'm denying this motion.  I'm denying

9    this motion.

10         But if it gets out of hand, I'm going to have to stop

11   it.  All right?  So, I don't think this is going to be a big

12   problem.  This motion is denied.

13         MR. HUMMEL:  Thank you.

14         THE COURT:  No. 3 is to exclude evidence and argument

15   regarding Adderley, purported fiduciary relationship Adderley

16   with the -- with the RFPJ, which is a different outfit that's

17   in the business of suing the League.  No?

18         MR. KESSLER:  I believe, Your Honor --

19         THE COURT:  Suing the union.

20         MR. KESSLER:  Yes.  Yes, Your Honor.

21         MR. KATZ:  It's a defunct organization, Your Honor.

22   It's never sued anybody.  But this brings up the issue of --

23   there are other issues, as Your Honor has noted, mainly

24   disability and pension, that retired players take issue with

25   Defendants on.

1    This case is not about those.  And it's not about the

2  Retired Players for Justice.  It has nothing to do with this

3  case, and it should not be mentioned in this case.

4    Mr. Parrish is --

5    THE COURT:  But Adderley is a witness, and he's got a

6  bias.

7    MR. KATZ:  What is his bias?  Because he --

8    THE COURT:  Because he -- he hates -- he hates the

9  Defendants.  Or so the jury could conclude.

10    MR. KATZ:  He thinks that they have acted incorrectly

11  on other issues.  He doesn't have to check his ideas when he

12  comes to the door here.

13    He -- yes, he will testify that he thinks they did a

14  poor job on pensions, and a poor job on disability.  But I

15  think Your Honor ruled before, you don't want those issues in

16  the case.  And we don't want those issues in the case, either.

17    THE COURT:  All right.  Here's the answer.  The

18  answer is, you win on one point, and that is we're going to

19  exclude misuse of Parrish $5,000 solicited -- during --

20  something, about the $5,000 and the misuse.  That ought not to

21  come in.

22    But, the fact that he is the president of the RPFPJ

23  and the purpose of that is to sue or get even with the union,

24  that just goes to his bias, and it would be wrong to exclude

25  that.  So that motion is granted in part, and denied in part.

 1          MR. KATZ:  But may I ask your Honor a question, just

 2   a practical question?

 3          THE COURT:  Sure.  All right.

 4          MR. KATZ:  And that is, when they bring that up, as

 5   they are now permitted to do, then am I permitted to ask

 6   Mr. Adderley, "Well, do you think -- what's your problem with

 7   the pension?  What's your problem?"

 8          THE COURT:  If they want to open that door, they can

 9   do that.  You can respond --

10          MR. KATZ:  Because he's got lots of them.

11          THE COURT:  Within reason.  At some point, 403's got

12   to say all right, you've had enough on that.  But if

13   Mr. Kessler makes a calculated judgment that he wants to open

14   that door, you can then come in and say, "Yeah, let's talk

15   about how bad they are."

16          MR. KATZ:  That's a great deal, Your Honor.  Thank

17   you very much.

18          THE COURT:  So then, Mr. Kessler may decide it's not

19   worth the candle.  But, that would only be fair, because then

20   he can explain why he's biased.

21          MR. KATZ:  Thank you.

22          THE COURT:  All right?  No. 4, exclusion of parol

23   evidence regarding intent of parties to third-party licensing

24   agreements.  This is one, Ms. Naylor, right?

25          MS. NAYLOR:  Yes, Your Honor.

1          THE COURT:  Okay.  Come up here and tell me why that

2    should be excluded.

3          MR. KATZ:

4          MS. NAYLOR:  We believe under the law, without a

5    finding of ambiguity, the Defendants are not entitled to

6    interpret the language for the jury.  The jury can read the

7    contracts, and the jury can determine whether or not retired

8    players were intended to be included.

9          The D.C. law, as well as all the other 50 states, as

10   far as I know, follows objective law contracts.  Which means

11   that the written language --

12         THE COURT:  Objective, objective?

13         MS. NAYLOR:  Objective law of contracts.

14         THE COURT:  That's a different point.  Isn't this the

15   answer?  I'm not going to let anybody get up and tell what they

16   thought the contract meant.  Because that's not the law.  The

17   law is, how would a reasonable person in these circumstances --

18   and then you may have to go outside the contract to determine

19   what the circumstances are, how would they understand -- a

20   reasonable person, how would they understand what this clause

21   meant.  All right?

22         Then, that's -- if the jury is going to decide that,

23   great.  Now, maybe I have to -- maybe it could be that at the

24   end of the case, after hearing all of the evidence, I say,

25   look, there is no way that a jury could conclude that this

phrase means anything other than X.  It's not ambiguous.  Even

though they have heard the evidence, I'm taking that issue away

from them, and I'll tell them it's not ambiguous, they don't

get to decide.  What's wrong with that?  Why can't I wait here,

do that at the end, rather than give you a grand-slam home run

right off the top?

MS. NAYLOR:  Well, our concern, and the Defendants

have represented that they intend to put on a lot of evidence,

and take up some time talking about what was intended.  What

they intended, and what the third-party licensees intended when

they signed the licensee agreement.

THE COURT:  That's not going to be allowed, is it?

MR. KESSLER:  Your Honor, can I please address that?

THE COURT:  No.  Wait 'til your turn.

MS. NAYLOR:  Thank you, Your Honor.

MR. KESSLER:  Okay.

THE COURT:  We're not getting into subjective intent.

MS. NAYLOR:  Thank you.

THE COURT:  What do you have to say to all that?

MR. KESSLER:  Your Honor, I believe -- I say this in

all due respect.  If you made that argument, you would not only

devastate our case, but it would make this whole trial

reversible error.  And I don't say that --

THE COURT:  Look, that's -- it's okay.  You can

threaten me all you want.  You can take me to the Second

1  Circuit, if you want.  I've been reversed.  And nobody can

2  threaten me with telling me it's reversible error.

3          MR. KESSLER:  I'm saying this only, frankly, from my

4  heart, about how profoundly wrong the law is here.

5          THE COURT:  Well, give me your proffer.

6          MR. KESSLER:  Yes.

7          THE COURT:  Give me an example of some piece of

8  evidence you think ought to come in.

9          MR. KESSLER:  Yes, yes.  Let me first state the legal

10  standard, which is the unequivocal legal standard of the

11  District of Columbia, which now applies, doesn't matter if it's

12  Virginia, it's the same, okay, which is that unless -- there

13  are two possibilities with the contract.  Either it's so clear

14  that the Court decides, as a matter of law, that it's

15  unambiguous, and then the Court decides that.  That's the law.

16          There's no way Your Honor could decide that from

17  these EA agreements.  In fact, as Your Honor just corrected

18  Counsel, what you said in your summary judgment opinion, it was

19  one sentence, not two sentences, a reasonable jury could find

20  either way on that.

21          Once Your Honor says that, so it's not a decision for

22  the Court, the unequivocal law is that one of the key factors

23  that we could brief -- we did in our brief it's already briefed

24  in the brief -- one of the key factors is, then, what was the

25  contemporaneous understanding of the negotiators to the

1  contract as to what they understood the ambiguous terms to

2  mean.

3           That is the -- in fact, the courts say this is the

4  most relevant evidence, it's parol evidence, it's absolutely

5  allowed, as a matter of law, case after case, in the District

6  of Columbia's --

7           THE COURT:  At the end of the day, isn't it for the

8  jury to determine what an objective person in those

9  circumstances --

10          MR. KESSLER:  No.  What the jury must decide is

11 taking into account the language of the agreement, which is

12 ambiguous, the testimony of parties to the contract as to what

13 they understood, all other relevant circumstances you could

14 testify about.  Course of performance is something that's

15 frequently looked at, history of negotiations, other

16 circumstances.

17          How does the jury construe this?  If you look at our

18 proposed instruction of this --

19          THE COURT:  You're not answering my question.  Give

20 me some proffer of proof of what somebody is going to testify,

21 "Here is what I intend" --

22          MR. KESSLER:  Yes.  I gave you a specific example.

23 Mr. Linzner, who is the negotiator for EA, will testify that

24 his understanding of the very words that Counsel read to you

25 earlier in court about what the grants of right was, when it

1  referred to NFL players in the first circumstances, he will

2  explain how in his understanding at the time, that was only

3  referring to active player rights.

4          And therefore, whenever he needed a retired player

5  that he wanted, he would have to go out and pay additional

6  money.  And he entered into agreements to do that.  And that

7  was their whole history of understanding of performance of that

8  unambiguous language.

9          THE COURT:  You are going beyond mere subjective

10 intent.  You're pointing to a course of performance.

11         MR. KESSLER:  Course of performance, and his personal

12 understanding as the negotiator.  Not as a third party, looking

13 at the contract, doing it -- and this only comes in --

14         THE COURT:  Is he saying that during the

15 negotiations, that point was discussed?

16         MR. KESSLER:  He will say during the negotiations

17 were -- the only rights that were ever discussed were active

18 player rights.  And that that was the clear understanding of

19 the parties, and in fact, --

20         THE COURT:  Wait, parse it for a second.

21         MR. KESSLER:  Okay.

22         THE COURT:  It would be okay, it is okay for when you

23 have a vague or ambiguous contract that needs construction, --

24         MR. KESSLER:  Yes.

25         THE COURT:  -- it's okay for the parties, in addition

to putting into evidence the written document, to put in the

conversation that took place.

        Unless there's a merger clause.  Is there a merger

clause here?

        MS. NAYLOR:  There is a merger clause in all the

agreements, Your Honor.

        MR. KESSLER:  The merger clause, Your Honor -- again,

we briefed this -- only applies to prevent the parties from

saying there was some other agreement that's different from the

agreement in the contract.

        MS. NAYLOR:  (Inaudible)

        MR. KESSLER:  It does not bar prole evidence to give

the parties understanding of ambiguous terms.  It's a very

different distinction.

        THE COURT:  Let me help myself out here with a

simpler example.  Let's say you have a situation where there is

a one-page written agreement that has a phrase that needs

construction.  And each side comes in, and they testify to the

words that were actually exchanged between the -- in other

words, proving up the transaction.  The words -- not -- not

what was in somebody's mind, but what was said.

        In other words, "We -- we talked 14 times, and every

time we talked about active players."

        Question, "Did you ever talk about retired players?"

        "No.  That was never discussed."

1        That is completely objective information.  That part,

2   there's no question that -- unless -- except for the merger

3   clause, that that would be admissible.  I don't know about the

4   merger clause.  We will have to go there.

5        What bothers me, though, is your idea that somebody

6   can come in and say, over and apart from what was -- the words

7   that were actually exchanged, and the course of conduct which

8   are proveable facts, that you can then say, "In addition, my

9   unspoken, subjective intent was always X."  That's the part

10  that bothers me the most.

11        MR. KESSLER:  Your Honor --

12        THE COURT:  To take your example, you could go

13  further and say, "After this contract, we treated" -- treated,

14  that's conduct -- "this contract as if it only covered active,

15  and that's why we went to -- did separate ad hoc agreements on

16  retireds each time."  That would be a course of conduct.  That

17  would be objective information.

18        But saying what was subjectively in his mind, and it

19  went unspoken, that's the -- I'm troubled over that.

20        MR. KESSLER:  Your Honor, I would like to brief this

21  again if you're troubled by it, because there are cases that --

22        THE COURT:  Where's the brief?  You know, I can't --

23  I'm going to be honest.  You lawyers gave me about three feet

24  of material.  And I looked diligently for your trial brief that

25  Mr. Katz said was somewhere in here, and I never found it.

1           MR. KESSLER:  I have my copy --

2           THE COURT:  But I did not find the thing that you're

3    talking about.

4           MR. KESSLER:  Your Honor, in fact, the case law that

5    I would like to show you says not only is it admissible, but

6    that generally -- and we briefed this in our jury trial

7    instructions.

8           Can you give me those cases, please, on the jury

9    trial instructions?

10          Because that's -- is that generally what happens is

11   where there's an ambiguous phrase, if both parties come

12   together and agree to the meeting, that this is what we agreed,

13   because they are both parties to a contract, it's not a dispute

14   between them.

15          They could testify as -- ambiguous thing.  I'm

16   reading, Your Honor, now, from the case law.  Okay?  This is

17   what the case law says.

18          That's not what I'm looking for.

19          MS. NAYLOR:  Your Honor, may I interrupt?

20          MR. KESSLER:  Please.  I'm -- I think I still have

21   the podium.

22          This is not the case I was looking for.  This is on

23   the third parties.  We will get to it.  It's in the jury

24   instructions.

25          THE COURT:  Well, just tell me where I can find it.

1          MR. KESSLER:  Okay.  If someone will hand me the jury

2    instruction brief, please.

3          THE COURT:  What, again, is the part that you are

4    trying to exclude?

5          MR. KESSLER:  They would like to exclude the

6    following.  I'll give you an example, Your Honor.  This was the

7    testimony of Mr. Linzner, about the very clause that's

8    ambiguous, the very clause.

9          THE COURT:  All right.  Read it to me.

10          MR. KESSLER:  (As read) "Well, my understanding of

11    what 'NFL players' referred to" -- that was the lower "NFL

12    players" -- "referred to on the last line of Page 1 of the

13    agreement, that Players Inc., was active NFL players.  Now you

14    may not -- you know, you may not like that understanding, but

15    I'm telling you, sir, that's my understanding of what it

16    meant."

17          And then he --

18          THE COURT:  His present understanding or --

19          MR. KESSLER:  His understanding at the time, he will

20    testify.

21          THE COURT:  That's not what he said there, though.

22          MR. KESSLER:  Well, this is just an excerpt from --

23          THE COURT:  From his deposition.

24          MR. KESSLER:  Yeah.  But I'm saying, on the stand.

25    I'm not going to use his deposition.  He's going to be a live

1  witness.  He will testify his understanding at the time, his

2  understanding subsequently, his understanding today, has

3  been -- it only refers to active players.  And that's why he

4  pays extra money for others.

5          And by the way, that's why, with this whole issue of

6  scrambling, if it was -- now that Your Honor ruled it in, he

7  will testify the reason why he uses avatars is because he knows

8  he has no rights under this language to retired players.

9          THE COURT:  All right.  Look.  You wanted to say

10  something, Ms. Naylor.  What is it?

11          MS. NAYLOR:  All of this is -- first of all, what he

12  is talking about is the subjective intention of Mr. Linzner,

13  which is exactly what the prole evidence rule excludes.  The

14  best evidence of intention is what is in the written agreement.

15          We would like to present the written agreement to the

16  jury, and let them decide whether or not retired players were

17  included.  They want to get up and say "Well, maybe that's what

18  the contract says, but it's not what we meant."

19          THE COURT:  Well, what's wrong -- I mean, if both

20  sides to this licensing agreement come in and say, "No, wait,

21  that's not what we meant," and that's both sides, then what's

22  wrong with -- it's their agreement.  Why can't they construe it

23  the way they want?

24          MS. NAYLOR:  It affects our economic interests.  And

25  it's not what it says.  It says --

1          THE COURT:  You're a party to the agreement.

2          MS. NAYLOR:  It says repeatedly that the retired

3   players are included, in the grant of license, and in other

4   parts of that agreement.

5          THE COURT:  That's for the jury to decide that, isn't

6   it?

7          MS. NAYLOR:  Yes.

8          THE COURT:  To say that they are included?  It's

9   already subject to the interpretation, that -- Mr. Kessler's

10  interpretation.

11         MR. KESSLER:  Your Honor, I think this is

12  dispositive.  This is the D.C. -- under D.C. law, standard jury

13  instructions by the D.C. Bar Association, on this issue, as to

14  what the jury should consider.  And I'm reading exactly.

15         First it says what Your Honor said, what are factors,

16  what a reasonable person in the position of the parties would

17  have believed was the meaning of the words.  That's part of it,

18  Your Honor.

19         Then the next point, No. 3 of the D.C. Standard

20  Instructions, Section 1113, "The circumstances that existed at

21  the time the contract was made, including the apparent purpose

22  of the parties in entering into the contract, the history of

23  negotiations leading up to the contract, and" -- here's the key

24  -- "and the statements by parties about their understanding of

25  the language of the contract."

1          That's the D.C. sta- --

2          THE COURT:  At the time the deal went down, though.

3          MR. KESSLER:  Well, at the time -- that's what the

4   testimony will be.  At the time the deal went down, this was

5   our understanding of what the language meant.  As long as it's

6   ambiguous, that is the most probative evidence, with all these

7   other things.

8          THE COURT:  The thing is what you just read -- I'm

9   not going to decide this point now.  But what you just read,

10  let me give you an alternative interpretation of that.

11  Statements of the parties at the time would be part of the

12  transaction.

13          In other words, if -- let's say there was -- they

14  were negotiating the language, and it said "license."  And

15  somebody said, "Oh, wait, that's possibly ambiguous.  Let's

16  make sure we agree.  That just refers to active."

17          And both sides say "Yes, of course.  We are just

18  talking about active."  Then that's part of the transaction.

19  That would be admissible, because that's an objective

20  historical --

21          MR. KESSLER:  I agree with that, Your Honor.  But --

22          THE COURT:  But if they're talking about statements

23  made in depositions about what they intended way back then, I'm

24  not sure that's admissible.

25          MR. KESSLER:  Your Honor, I do believe it is.  And

1 that's why they talk about two different phrases.  They talk

2 about the negotiations of the contract, and then they

3 separately say "and the statements of the parties about their

4 understanding of the language of the contract separate from the

5 negotiations."  They contest it doesn't have to have been that

6 this is what we said at the negotiation.

7             They can say, "When I signed this ambiguous term,

8 this was my understanding."  In fact, Your Honor, in most

9 contractual disputes, there's a dispute between two parties to

10 a contract.  What happens is one side, when it's ambiguous,

11 says "This was my understanding."  The other side says "This

12 was my understanding.  It was different."  It doesn't resolve

13 anything, it's just two different things.

14             Here, and that's why the law is so clear about this,

15 is that if both parties understood the ambiguous term to mean

16 exactly the same thing, and have operated that way subsequently

17 for all these years, to have a lawyer come in and argue to the

18 jury, well, why don't you interpret it this way, contrary to

19 the understanding of the parties for the last ten years,

20 however long this has been there, the jury has to hear all of

21 that, and then the jury decides.

22             I agree, Your Honor, it's for the jury to decide.

23 But you can't take away the most relevant evidence.  And again,

24 I will call your attention -- I apologize for not having it all

25 organized here, but if you look at the jury instructions on

1  this, I think you will see it is very clear in the D.C.

2  Circuit, this is how they approach it.

3          THE COURT:  All right.  Here's the answer.  The

4  answer is I am not going to decide all of this now.  I am

5  troubled over -- I agree with the instruction that you read, at

6  least with the loss that I would put on there.  Where I think

7  we may part company -- but I'll let you brief it -- is if

8  somebody is silent on a point throughout the transaction and

9  the subsequent course of history, and the first time that they

10 utter a word on the issue is in a deposition, and then they say

11 "Oh, yeah, here's what I meant," I question whether that is

12 admissible.  Even under the language that you gave me.  And --

13 because it's not a statement at the time.

14          The statements at the time are often put in evidence,

15 they help to explain an ambiguous term.  But subsequent

16 conduct, the actual negotiations that led up to the deal, all

17 of those are objective historical facts.

18          And, I thought I heard a reasonable objective test

19 coming out of -- when you said the apparent purpose -- apparent

20 purpose, not purpose --

21          MR. KESSLER:  That is --

22          THE COURT:  Apparent purpose, what appeared to be the

23 purpose.

24          MR. KESSLER:  What I agree, Your Honor, is that there

25 are many different factors.  The apparent purpose is fine.  The

 1   evidence -- I believe Your Honor will see this comes in -- I'll

 2   give Your Honor a perfect example, on this scrambling point.

 3          When they asked EA, "Why did you scramble" -- which

 4   they'll probably ask that question now, Your Honor let it in --

 5   EA is going to say "Because we didn't have the rights to the

 6   retired players; we didn't want to pay for those rights, it

 7   wasn't part of our license agreement, so all we were willing to

 8   do was to not use the images."  That's what they were going to

 9   say.  We weren't going to pay for them, we didn't have the

10   rights.  They will be giving their understanding.

11          THE COURT:  Well, of course.  Listen, that's a

12   different point.  If, if the -- if the Plaintiffs ask the

13   question why, and the answer comes back "Because we thought we

14   didn't have the rights," of course that's admissible.

15          MR. KESSLER:  Right.

16          THE COURT:  But, look.  Let's leave it, you are going

17   to give me a brief and some prole evidence, and -- you know,

18   it's complicated because we are dealing with a third party.

19   Kind of a common-sense approach here is that two parties come

20   in, even during litigation, and say "Here's what it means,"

21   some third party to come in and say "Wait a minute, you're us

22   out of our rights."

23          MR. KESSLER:  And that's what the case law assistant.

24          THE COURT:  I can be a buttinski in lots of

25   government contracts, and come in, and ask a the jury to say,

1    you know, "Give the poor federal judges a raise," or something,

2    I don't know if the -- I don't know that that argument -- we're

3    not going decide this now.  And for the time being, I'm going

4    to let everything in.  But eventually we'll have to come to

5    grips on this.

6          This falls under the category that in somebody says

7    it, I can just cure it in a jury instruction.  This is not

8    inflammatory stuff.

9          MR. KESSLER:  Thank Your Honor.

10          MS. NAYLOR:  Your Honor, may I add, they were sitting

11    across the table with EA as our agent.  They were acting as our

12    agent.  They represented us.  That's another reason that we get

13    to tell you what the contract means.

14          THE COURT:  All right.  But I'm not going to -- I've

15    given you some guidelines, but I haven't made a ruling on this.

16          MS. NAYLOR:  Thank you.

17          THE COURT:  All right.  Next is --

18          (Off-the-Record discussion)

19          THE COURT:  All right, we'll take a ten-minute break.

20          (Recess taken from 3:10 to 3:27 p.m.)

21          THE COURT:  Please have a seat.  Thank you.

22          We're up to No. 5, Argument Re: Dismissed Causes of

23    Action and uncertified Class.  I am inclined to grant that.

24          So, let me hear from the other side as to why I

25    should not grant it.  This is your motion, right?

1              MR. KATZ:  Yes.  So, --

2              THE COURT:  Let me -- I agree with you so far.  But

3    let me hear from Mr. Kessler why he wants to inject the issues.

4    And you managed to throw them out of the case, now you want to

5    bring them back in.

6              MR. KESSLER:  Your Honor, it all goes to just one

7    issue, which is the fact that the interpretation of the GLA,

8    for example, has constantly shifted in this case.  Including by

9    the witnesses, because at various times, the witnesses were

10   testifying at different times for them on parts of this case.

11   I think to the credibility of their testimony before the jury,

12   if they have new theories today, in court, about what these

13   agreements mean or don't mean or what their rights are or not,

14   that are different, because earlier in the case they had

15   different theories they were --

16             THE COURT:  Who had the theories?  The witnesses,

17   themselves?  Or the lawyers in court?

18             MR. KESSLER:  Well, the witnesses themselves.  So for

19   example, Mister -- Mr. Adderley, okay, who's the main Plaintiff

20   witness here, he testified when I deposed him, that when he

21   first brought this case, his case, his understanding was that

22   they were using his rights in a Reebok program, okay, which

23   turned out not to be the case, and that he should have been

24   paid for it.  And that's why he brought the case.  It had

25   nothing to do with his GLA or any complaint about anything else

1  in terms of that.

2          And then later on, he found out there was no basis

3  for that claim, so now suddenly he has testimony with a whole

4  new view of the world.  I think it just goes to his credibility

5  and his testimony.  That's what it is, is the changing

6  testimony.

7          THE COURT:  Where can I see the actual testimony?

8          MR. KESSLER:  Actually, it comes up in the -- there's

9  an Adderley motion -- this is related to that, but it's not in

10  this brief, it's in the Adderley briefs, which is --

11          THE COURT:  I'm just asking a simple question.  Where

12  can I find the testimony that you want to have in evidence, so

13  I can look at it and see how good it is?

14          MR. KESSLER:  Okay.  In our opposition to No. 6,

15  which is coming up, for example.

16          THE COURT:  I got that.

17          MR. KESSLER:  One piece which is quoted on this,

18  which I'll see if we have it quoted, I hope we do --

19          THE COURT:  I'm afraid, the way this is organized, I

20  don't have any opposition to No. 6.

21          MR. KESSLER:  I'll see if I can find it, Your Honor.

22          THE COURT:  Was it combined with something else?

23          MR. KESSLER:  I'll find it somewhere, Your Honor.

24          THE COURT:  I see the declaration of Garza.  Is that

25  it?

1          MR. KESSLER:  It may be attached there as well.

2          THE COURT:  Well, I got Garza here.  I see some

3    deposition testimony --

4          MR. KESSLER:  No, but the whole thing is probably

5    attached --

6          THE COURT:  -- of Adderley, so --

7          MR. KESSLER:  I need the whole --

8          (Off-the-Record discussion)

9          MR. KESSLER:  Exhibit 1 to the Greenspan declaration.

10         THE COURT:  Well, it seems to me I got the -- I got

11   the Adderley deposition here.  What page number do I look at?

12         MR. KESSLER:  Okay, on Page 77.

13         THE COURT:  Right there.  Go ahead.

14         MR. KESSLER:  So, for example, it says (As read),

15   "Okay," on Line 13, "What did you think when your lawsuit was

16   first filed, first filed, what claim did you think you were

17   asserting, sir?"

18         "I was thinking that this referred to the agreement

19   that I signed with player's name with Reebok, that I didn't get

20   paid for, I couldn't get any acknowledgement from, in the

21   beginning."

22         "That's what you thought this was about?"

23         "Yeah."  And then he goes on, this lawsuit.

24         And then it goes on, there's more testimony.  The

25   point was, he had no complaint about his GLA at all when this

1  lawsuit was filed.

2          Now, later on, he now says he has complaints about

3  other things.  And I think that just goes, Your Honor, to

4  credibility, as to what the named Plaintiffs' claims are.

5          THE COURT:  Did you ever put the group license

6  agreement in front of him and get his interpretation?

7          MR. KESSLER:  I did, Your Honor.  That's in another

8  portion of his deposition.  I did that as well.  I said, "What

9  was your understanding of the agreement?"  They want to exclude

10  that also.

11          Can we have the rest of that?  That should also be in

12  this -- this thing --

13          THE COURT:  First, let me rule on -- I've read

14  what -- the thing you want to have in evidence, that you

15  pointed me to, that is about when his lawsuit was first filed,

16  what claim -- and something about Reebok.

17          MR. KESSLER:  Yes.

18          THE COURT:  No, we're not going into that.  That's

19  too far afield.  So that's out, just as -- under Rule 403.  But

20  if you have something more directly on point that you have --

21          MR. KESSLER:  Yes, I do, Your Honor.

22          THE COURT:  -- that you have the witness saying

23  "Here's what I understood it to mean," --

24          MR. KESSLER:  Yes.

25          THE COURT:  -- maybe that should come in.

1          MR. KESSLER:  Yes, Your Honor.  I do have that.

2          THE COURT:  Where is that?

3          MR. KATZ:  Your Honor, that's the next Motion in

4   Limine.

5          THE COURT:  Is that No. 7?

6          MR. KATZ:  No, --

7          MR. KESSLER:  No. 6.

8          MR. KATZ:  No. 6.  May I present our motion?

9          THE COURT:  All right.  Well, so we haven't gotten to

10  that one yet.  All right.

11         So, on No. 5, I'm going to grant that.  I'm going to

12  grant No. 5, subject to this.  If you come up with some nugget

13  that you feel that the circumstances just clearly cry out for

14  being allowed into evidence, despite the general ruling out of

15  evidence of the dismissed claims in the case, then bring it to

16  my attention, and maybe I'll make an exception.  But as a

17  general proposition, No. 5 is granted.

18         All right.  Let's go to No. 6.

19         MR. KESSLER:  Do you want me to address that?  Or do

20  you want him to address that first, Your Honor?  It's his

21  motion.

22         THE COURT:  Yeah.  Let's see, No. 6, Legal

23  Conclusions Made by Herb Adderley.

24         MR. KATZ:  Right.  This motion is for the relatively

25  unextraordinary proposition that the legal conclusions of a lay

witness are not relevant.  He was asked a number of legal

conclusions.

The testimony from all the players -- there'll be

four of them, Your Honor -- will be uniform.  They did not

retain counsel when they got this agreement.  They read it.

They don't have legal training.  And basically, they just

signed it, and the words meant what the words meant.

It is not appropriate evidence -- there's no

foundation for Mr. Adderley to give his unexpressed

understanding of the agreement at the time that he signed it.

There was no negotiation of this agreement.  It was drafted by

Defendants.  And, it was -- it was just something he signed and

put aside.

He did not have -- to the point that Mr. Kessler was

just making, he did not even have his GLA when we started this

lawsuit.  Your Honor permitted us to do some discovery.  And we

got his GLA through discovery.  He did not have it in his

possession at the beginning of this lawsuit.

But I don't know of any theory which would permit

Mr. Adderley's legal conclusions to come in.  Your Honor, --

THE COURT:  Look, this -- this -- legal conclusions

are one thing.  But, in determining what the rights are of

various parties, it's okay for the jury to hear what the

historical facts of how the agreement was signed, and the

circumstances.

1          MR. KATZ:  I don't have any problem with that, Your

2    Honor.

3          THE COURT:  Just one second.

4          (Off-the-Record discussion)

5          THE COURT:  But, and it would be okay for Counsel to

6    put Mr. Adderley on the stand, and say, "At the time that you

7    signed this, what were your expectations of what would happen?

8    And what" -- In other words, you're trying a to make a large

9    point here, in this case, that these players have been cheated.

10          Well, if they didn't even know they were being

11    cheated until the lawyer came along and constructed an

12    argument, based about what -- I think it's kind of a hollow

13    point.  You're trying to protect these people from ever being

14    cross-examined.

15          The more I think -- Mr. Katz, this is not right, this

16    motion.  We are going to deny this motion.

17          MR. KATZ:  Thank you, Your Honor.

18          THE COURT:  All right.  Next motion is No. 7.

19    Something to do with Document Request 31.  Here is my tentative

20    ruling:

21          Defendant may not introduce into evidence any

22    document that was within the scope of Document Request 31 which

23    went to PI, and 33 that went to NFLPA, unless it was timely

24    produced in discovery.  Still, even if it was -- even if it

25    was, still have to be otherwise admissible.  Now,

1 otherwise-admissible testimony is not excluded by this ruling.

2 This only goes to documents.

3          Now, that's my tentative ruling.  I want to let

4 everybody argue with me on that.  Does anybody want to argue?

5          MR. HILBERT:  I was going to be the fresh face now,

6 Your Honor, but now I think we are fine with the tentative.

7          THE COURT:  Fine.  Do you want to argue with me,

8 Mr. Kessler?

9          MR. KESSLER:  Your Honor, I just want to understand

10 the ruling.  If that says -- we only have one document we

11 intend to use, which was talking -- produced to them, which is

12 the sponsorship agreement, itself.  Everything else is

13 testimony.  I think I'm fine, Your Honor, because we do want

14 the testimony.

15          THE COURT:  All right.  The wrong that occurred here

16 was stonewalling on documents, to put a little theatrical flair

17 on it, but it had nothing to do with testimony.  So I'm not --

18 I'm not going to exclude any testimony, but I won't exclude

19 documents which should have been produced.

20          MR. KESSLER:  We only have one document --

21          THE COURT:  What is that?

22          MR. KESSLER:  We produced it.  The NFL sponsorship

23 and Internet agreement that's at issue.  The Internet

24 agreement, the very agreement at issue, it's the text of that

25 agreement.  And that was produced without any dispute from the

1  very beginning.

2          THE COURT:  Are you saying the Plaintiffs,

3  themselves, want that document in evidence?

4          MR. KESSLER:  They probably do, yeah.

5          THE COURT:  Well, if there's only one document that

6  deals with this -- in other words, why did you bring this

7  motion?  You were trying to get rid of the testimony, too?

8          MR. HILBERT:  Well, the problem with this motion,

9  Your Honor, the problem with the issue was that we -- we have

10 an allegation that there's a grant of retired-player rights,

11 license rights, in the document that Mr. Kessler is referring

12 to.  We tried to get some discovery concerning the drafting,

13 the negotiation, the execution of that agreement, to try to

14 ferret out some of this -- you know, contemporaneous statements

15 that might have been made at the time that the contract was

16 being entered into.  And they wouldn't give us that

17 information.  So we want to preclude them from trying --

18         THE COURT:  But there's only one document.

19         MR. HILBERT:  That was the problem.  They wouldn't

20 give us the information that we would need to ferret out if

21 there were additional documents --

22         THE COURT:  You don't even know if there is any

23 information.

24         MR. HILBERT:  And that's the problem.  Because we

25 don't know that there's any information --

1           THE COURT:  You're just speculating that there may

2    have been information there that you didn't get, and therefore,

3    you don't want to hear testimony about that.

4           MR. HILBERT:  The problem is that they could bring

5    someone in to testify, on what the parties intended or stated

6    to one another, or maybe even put in a document --

7           THE COURT:  That's a separate problem.  Again, that

8    is a different issue, about subjective intents.  But I'm saying

9    that you have based this motion on a discovery violation.

10          MR. HILBERT:  Right.

11          THE COURT:  The discovery violation related to

12   documents.  Yes, it's true, maybe a document might have been

13   usable, maybe, we don't know.  We don't know what was not

14   produced.  Might have been usable in other discovery.  But

15   that's speculation, and I'm not going to exclude testimony

16   based upon that, and Rhee.

17          Usually the way these motions come up, it's much

18   stronger.  The way it would come up in a good context for you

19   would be that they stonewalled on it, the last day of discovery

20   you went to EA or somebody else, and they produced their

21   versions of the same documents.  It's clear that they had them

22   in their files all along, and were stonewalling you, and

23   refusing -- and so, then you say, "If we had had all these

24   documents, look at all the good we could have done in the

25   deposition."  That's a strong case for knocking out testimony.

1           But, but you don't have that here.  You're

2    speculating that had they produced more, you might have found

3    some nugget that would have helped you on cross-examination.

4    And that's just too speculative.  So, that's the ruling.

5           All right.

6           MR. HILBERT:  Thank you, Your Honor.

7           THE COURT:  No. 8, Contingent Fee.

8           MR. KATZ:  Right.  I think we have --

9           THE COURT:  I'm not going to let contingent fee

10   information in.

11          MR. KESSLER:  We stipulate to this, Your Honor.

12   There's no problem.

13          THE COURT:  All right.  This is granted.

14          MR. KATZ:  I think we have an agreement on that, Your

15   Honor.  There are three documents.  This in a way relates back

16   to the Motion about the RPFPJ that Your Honor ruled on.

17          They have included three documents, Nos. 160, 307 and

18   321, which include my name and Mr. LeClair's name on them,

19   because at one point -- as I say, this organization is now

20   defunct.  At one point, we were listed as outside litigation

21   counsel for this organization.  So I think it has a 403

22   problem.

23          THE COURT:  Why can't we redact out the name of

24   Mr. Katz?  Why does the jury need to know that he had something

25   to do with this outfit?

1          MR. KESSLER:  We can redact out the name of Mr. Katz

2   and we can redact -- (Inaudible) about contingency fee.  We

3   will, Your Honor, use Retired Players for Justice documents, as

4   Your Honor has permitted us to do, but we'll redact it out.

5          THE COURT:  What is wrong with that, Mr. Katz?

6          MR. KATZ:  Well, if I may just state what I would

7   like redacted out, Your Honor.

8          THE COURT:  All right.

9          MR. KATZ:  In Exhibit No. 160, which is a draft --

10  this actually never saw the light of day -- it lists me and

11  Mr. LeClair as outside general counsel.  That is false.  We

12  never were.  We never had that title.  This is a draft.

13         With respect to the Exhibit 307, it's a press

14  release, headline, "Manatt and McKool Smith Help Retired

15  Professional Football Players Kick Off Class Action Lawsuit.

16         THE COURT:  We don't want any references to trial

17  counsel.

18         MR. KESSLER:  (Inaudible)

19         THE COURT:  Take all that out.

20         MR. KATZ:  I'm just putting on the Record, so it's

21  explicit.  And then in the third one, it has my picture in it,

22  and my name.

23         THE COURT:  All right.  The picture, take that out.

24         MR. KATZ:  Mr. LeClair's name, as outside litigation

25  counsel.

1           MR. KESSLER:  Yeah.  We are happy to redact out all

2    reference to Mr. Katz and Mr. LeClair.

3           THE COURT:  All right.  Good.  That's done.

4           MR. KATZ:  Thank you, Your Honor.

5           THE COURT:  Next we come to No. 9.  I'm going to

6    exclude all reference to that, the Justin versus PI lawsuit.

7    Is anybody going to want to argue with me, and have a good

8    reason why anything in that case ought to come in?

9           MR. KESSLER:  We stipulated to that, Your Honor, with

10   one exception, which is that if they open the door by arguing

11   that we were never responsive to retired players complaints

12   that they weren't getting enough information, in fact, that

13   lawsuit resolved those complaints by giving out a lot of

14   information, but I don't think they could open that door.  If

15   they do, it will come in; if not, otherwise not.

16          THE COURT:  Is that door contingency in your

17   stipulation?

18          MR. KESSLER:  It says we reserve the right to raise

19   it if the open that door.

20          THE COURT:  All right.  We'll cross that bridge when

21   we get there.

22          No. 10, do we have a stipulation there?

23          MR. HUMMEL:  No, Your Honor.

24          MR. KESSLER:  Your Honor, here's the issue here.  The

25   issue is very simple.  We have offered in this motion that we

would not put in any, you know, homages to Mr. Upshaw, provided

that they would agree not to attack his character and behavior

as untrustworthy, because then in fact it does come in under

the Rules of Evidence.

And they would not stipulate that they wouldn't

attack his character.  In fact, we've heard earlier today that

they intend to attack his character.

THE COURT:  I've got a ruling for you.  Here we go.

No homages in opening nor at all until integrity or character

of Gene Upshaw is placed in issue by Plaintiff.  Then on a

case-by-case basis, the Court will consider counter evidence,

including homages to Gene Upshaw.

MR. KESSLER:  Your Honor, can I just ask a question?

If a narrow --

THE COURT:  I'm not agreeing, necessarily, that, you

know, speeches at a funeral warrant or come in under the Rules

of Evidence, but I'm not ruling it out, either.

MR. KESSLER:  Your Honor, just a question.  If in

their opening, if they attack Mr. Upshaw's character without

talking about specific things, I assume I can defend against it

if they open that --

THE COURT:  If they were to stand up and say that he

-- I don't know what he -- you know, whatever they want to say,

and then you can respond in like kind.  But just don't get into

"And by the way, at his funeral, here's what XYZ said about how

1  great he was."

2        MR. KESSLER:  Understood, Your Honor.

3        THE COURT:  Just say that -- if they say that he was

4  a bad man, and cheated the players, you would be entitled to

5  respond in kind, and say "No, the evidence is going to show he

6  was a good man, and looked out for the rights of the players."

7        MR. KESSLER:  Very good, Your Honor.

8        THE COURT:  You can respond in kind.

9        MR. KESSLER:  Very good, Your Honor.

10        THE COURT:  Do you have any problem with that,

11  Mr. Hummel?

12        MR. HUMMEL:  I don't in principle, Your Honor.  We

13  will see how it plays outs.  The one issue we would like a

14  preclusion order on is the following:  Every NFL player this

15  season is wearing a "GU" patch on their uniform.  We'd like

16  that excluded.  I think that's classic 403, unfair prejudice.

17        THE COURT:  Any problem with that?

18        MR. KESSLER:  Subject to Your Honor's rulings,

19  depending on how much they attack him, the fact that it may be

20  relevant -- I'm not saying it will be -- that the League,

21  itself, voted to honor Mr. Upshaw with this patch.  And I just

22  think we leave that open, Your Honor, see how bad their attacks

23  are.

24        THE COURT:  All right.  For the moment, it's out.

25  But it may come in.

1          I do want to make one thing clear.  Members of the

2    jury are going to see that on TV.  And no one ought to come to

3    me later and say, "Oh, by the way, they violated your

4    admonition, and they saw the 'GU' thing on the sleeve, and now

5    we need a new trial."  That, the answer to that is no way.

6          I don't even think that's terribly prejudicial.  But

7    since you're agreeing to it, that's the way it will be.  All

8    right.  That's all the motions in limine.

9          All right.  Here's the -- let's go over the other

10   parts that I need to cover with you.  How many jurors do you

11   think that we would like to have?

12          MR. KESSLER:  Your Honor, I would suggest again,

13   assuming it's a two-and-a-half-week trial, as Your Honor

14   suggested, that we probably should seat nine, if that makes

15   sense to Your Honor.

16          THE COURT:  Well, it's an odd number.

17          MR. PARCHER:  I'm content to do whatever Your Honor

18   wishes.

19          THE COURT:  Well, as between eight and ten, what do

20   you think?

21          MR. KESSLER:  I prefer ten, then, Your Honor.  I'm

22   just afraid of mistrial, you know, people who drop out.  So if

23   we go down, I would rather going up.

24          MR. PARCHER:  My own experience, such as it is, is

25   any opinions they have on those kind of subjects are usually

1  wrong, if I'm thinking --

2          THE COURT:  I'll tell what you the tradeoff really

3  is.  If this was in the summer, I would probably go with eight.

4  But now that we are into the flu season, I think ten is more

5  likely.  And believe me, if anybody on that jury starts coming

6  down with the flu, we get rid of them immediately.  Because

7  they infect the rest of the members of the jury.

8          MR. PARCHER:  And us.

9          THE COURT:  And us, too.

10          MR. KESSLER:  We don't count, Your Honor.  You do.

11          THE COURT:  I count, but you do, too.  And by the

12  way, if anybody out there gets sick, no hacking and coughing.

13  Just don't breathe.  Just don't breathe.  Breathe through your

14  skin.  Do whatever you've got to do, but don't give the rest of

15  us whatever you've got.

16          All right.  So, we are going to go with ten.  I think

17  that's a safer thing to do.  Given that we are now into

18  mid-October, trial will probably get into at least

19  November 10th  or so.

20          Now, you know that next week I have -- I take

21  Thursday and Friday off, right?  The following week, we will be

22  in session every day.

23          Dawn, check me on this, would you?

24          THE CLERK:  Uh-huh.

25          THE COURT:  That's the week of Halloween.  And then

1   the week after that, we can be in session every day.

2              MR. KESSLER:  That includes Election Day, Your Honor.

3              THE COURT:  November 4th, yeah.  Since they get to

4   take off in the afternoon, they will get to vote.

5              MR. KESSLER:  Very good.

6              THE COURT:  Now, I could change that.  This is, you

7   know, it may vary by one day here or there, but that's -- all

8   right.  So, that's the number of jurors.

9              Now, time limits.  I have carefully considered

10  everything.  I think 16 hours of evidence per side, and that

11  includes your cross-examination.  Thirty-two hours of evidence,

12  total, is ample for the jury to hear and decide this case.

13             That does not count opening statement.  That does not

14  count closing argument.  That does not count the time that we

15  spend before the jury comes in, on our motions-in-limine

16  practice.  But when the jury is here, and we have a witness on

17  the stand, it does count, whether you are asking questions or

18  not.

19             Anyone want to argue with me over that?

20             MR. KESSLER:  I guess, Your Honor, since we have most

21  of the witnesses, I do think 16 is a little tight.  I would

22  guess -- I would pose 20, if Your Honor would possibly consider

23  that?

24             I think it would be a little hard to get through

25  these issues, especially since Your Honor has allowed in now

1  the scrambling, and some of these other things, which

2  unfortunately are going to require jury time to cover.

3          THE COURT:  Twenty is too much, but we'll compromise

4  at 18.

5          MR. KESSLER:  Thank you, Your Honor.

6          THE COURT:  Eighteen hours per side.  Now, to be

7  clear on that, that -- without any doubt, the first time that

8  we could then be looking at a -- well, I don't think we will

9  even have a verdict by November 7th, because the time goes

10 slower than you might think.

11         All right.  On the documents and the projection, I

12 want you to have a screen over here (Indicating), that has a

13 projector that does not make noise.  You know, sometimes these

14 agencies will give you one that has a fan that's loud.  You

15 want one that probably corrects with converging verticals.

16         You need to, each side, have your own technical

17 person who can put the documents up on the screen.  Maybe even

18 practice it.  Some of the lawyers like to have an ELMO that

19 hooks in, as an alternative.  That's fine.  I want to give

20 you -- you should share the cost of the system.  And, it ought

21 to work.

22         Click, click, click.  This is like a stage

23 performance for the jury.  And, we need to be considerate of

24 their time.  And, always have that thing ready to go.

25         You have your technical people here right now?

1           MR. KESSLER:  We do, Your Honor.  Tomorrow --

2           THE COURT:  Here in the courtroom now?

3           MR. CHARHON:  We do not, Your Honor.

4           THE COURT:  Whenever you say "Give me Exhibit 32," it

5   ought to be on the screen in like one-tenth of a second.  It

6   shouldn't be a five-second delay.  Because, when you multiply a

7   five-second delay times 200 documents, it's -- the jury gets

8   tired of that.  And there really is no need for it.  You ought

9   to be able to go click, click, click.

10          All right.  Corporate representatives.  We have

11  corporate representatives -- we don't have any corporate

12  representatives on your side.  We've got Mr. Adderley.

13          MR. KATZ:  Mr. Adderley will be here, Your Honor.

14          THE COURT:  How about --

15          MR. KESSLER:  Richard Berthelsen will be the

16  corporate representative for Players Inc.  He's the interim

17  chairman of Players Inc.  And Joe Nahra will be the corporate

18  representative for the NFLPA.  He's a staff counsel at the

19  NFLPA.

20          THE COURT:  Okay, fine.  Motions in limine, I want

21  you to agree on a summary of the rulings that we made today,

22  and agree on whatever it was, and submit that.  So, you know --

23  I have my own records, I guess, but -- the law clerk does, but

24  please do that for me.

25          Now, with the exhibits, I've learned the hard way

1  that you have just got to use the originals with the witnesses.

2  The ones that literally have the stamp on it that belong to the

3  Deputy Clerk.  And those are the ones that go to the Ninth

4  Circuit.

5          If the lawyers start trying to use those notebooks

6  and so forth, you run into problems.  We find out after the

7  document is already in evidence, that the -- that it was a

8  mistaken document.  Something goofed up about it.  Then you get

9  into an argument over, well, it shouldn't come into evidence,

10 shouldn't -- so the safe way to do it is the old common-law

11 way.  And that is that the witness actually has it in front of

12 them.  And then if it sailed into evidence without objection,

13 that's your own fault.

14          That means you have to fish the exhibits that you

15 want out before you get the witness on stand.  We will be here

16 at 7:30 in the morning, you can get the five exhibits that you

17 want, get they ready, you.  Can even put them up there, have

18 them ready for the witness, if you want.  But please use the

19 original exhibits.

20          I gave you the updated guidelines.  It's very similar

21 to the old ones, but two paragraphs different.  One of them has

22 to do with videotaped depositions.  Do you have any of those in

23 this case?

24          MR. KESSLER:  We do, Your Honor.

25          THE COURT:  You had better take a look at that.  The

1  last trial they used a videotaped deposition.  It was the most

2  boring thing in the entire case.

3        Really, I think you're better off to do the -- one

4  lawyer stands here and one lawyer sits up there, and -- but,

5  you can do a video if you want.  Just, please, look at those

6  guidelines, to try to speed it up a little.

7        I need for you to agree on a one-page statement of

8  the case that I can read to the jury prior to voir dire.  You

9  need to give that to me the first day of trial.  We will -- you

10 need to be here at 7:30.  We start at 7:30.

11       The jury gets here at 7:45 on a typical day, and no

12 later than 8:00.  We drop whatever we are doing, we bring the

13 jury in, and we start with the evidence.  So, we do not have

14 long-winded law and motion.  We can get all of that done in 30

15 minutes.

16       The truth is, we often have two or three small items

17 that are done by 7:35 and at seven -- the jury happens to be

18 here, they like to get here early.  See, you're from New York,

19 aren't you, Mr. Kessler?

20       MR. KESSLER:  I am, Your Honor.

21       THE COURT:  In New York, people don't even wake up

22 until, like, 9:00 a.m.  Out here, people get to work early.

23 These jurors will be here.  They'll be here at 7:30.  Some of

24 them are here at 6:00.

25       MR. KESSLER:  As my associates can attest, at our law

1  firm, we are there.

2          THE COURT:  All right.  So, you're there.  Is that

3  true?

4          MS. GREEN:  Mr. Kessler's there.

5          THE COURT:  All right.  Well, okay.  That's good.

6  That's good, Mr. Kessler.  So you've seen the sun rise.

7          MR. KESSLER:  I'm usually in by 7:30, Your Honor.

8          MR. PARCHER:  I'm from Brooklyn, New York, Your

9  Honor.  And I was given two pieces of advice when I came here

10 to trial, to try the case.

11         THE COURT:  What's that?

12         MR. PARCHER:  The first was at all costs, get here on

13 time.  And is the second was not to argue with the Court.

14         THE COURT:  Well, you can argue with me.  A little

15 bit.

16         All right.  Is the -- next is length of the openings.

17 All right.  Let me get your input.  What do you want -- how

18 long do you want the openings to be?

19         The openings will be shorter than the closings.  I

20 like to give the lawyers more time for closings.  But, what do

21 you think you need for opening statements?

22         MR. PARCHER:  I would like an hour.  But I confess,

23 it's hard for people to understand my New York accent, too.

24         MR. KESSLER:  This might be the only issue that that

25 the two lawyers can agree upon.  I would prefer an hour also,

1 but it's obviously whatever the Court will give us.  There are,

2 again --

3          THE COURT:  Forty-five minutes each for the opening

4 statements.

5          MR. PARCHER:  Judge, could you consider -- we will

6 try to get it done in 45 minutes, but don't hold us to it if it

7 goes to an hour?  Because I really don't want to cut it --

8          THE COURT:  No, 45 minutes, I'm going to hold you to

9 it.  So, you've got to get it done in 45 minutes.

10          Okay.  Next we go to the -- when you -- deposition

11 read-ins, for impeachment.  Give me the deposition when you

12 start your examination.  That way, whenever you get to the

13 magic point of impeachment, you don't have to go back there,

14 look in a box, and ruin the great moment you were about to

15 impeach somebody with, because by then the jury will have

16 forgotten what the question was.

17          So if I already have it, you just say -- and this is

18 the way I like to do it, it's in the guidelines -- don't say

19 this.  Don't say, "In your deposition, didn't you say the light

20 was green?"Some of you are from Texas, aren't you?  Down in

21 Texas, anything goes.  You get away with that all the time.

22          But, the reason that that is not a good practice is

23 you put your spin on what they actually said.  It might have

24 been like, "Well, somebody told me the light was red," or

25 "green."  That's what they said in the deposition.  But you --

1  you transmogrify it to say "In your deposition, didn't you say

2  the light was green?"

3          Well, we all know that there's a big difference

4  between "Somebody told me" and -- but they might not remember

5  what they said in their deposition, so they may say "Yeah, I

6  guess I said that."  In fact, so you wind up getting them to

7  admit something that in truth be told, you kind of tricked

8  them.

9          So, I've learned the hard way.  Lawyers will do that;

10  they get carried away.  So you just -- the way to do it

11  properly is to say -- the witness is on the stand.  And you

12  say, "What color was the light?"

13          "The light was yellow."  Then you just, without

14  further ado, you just say "I want to read from Page 10, Lines 1

15  through 3, of the deposition."

16          I will pause about four seconds.  If I hear no

17  objection, I'll say "Proceed."

18          Then you say -- you read it directly.  You say,

19  "Question, 'What color was the light?'

20          "Answer, 'The light was red.'"

21          Now, I will have told the jury what a deposition is.

22  So it's -- the impeachment is obvious, it's clear.  Now, if

23  it's a party deposition, it doesn't even have to impeach.  You

24  can just read it any time you want.  But, you have to read it

25  exactly, because if it does say something like "Somebody told

1 me the light was green," as opposed to "The light was green,"

2 then the jury sees it's not so impeaching, after all, and you

3 haven't tricked anybody.

4          So, you've got to do it my way.

5          MR. KESSLER:  Question.

6          THE COURT:  Yes?

7          MR. KESSLER:  After doing it exactly your way, can

8 you then ask a followup question like, "Does that cause you to

9 refresh your recollection, or change your testimony," or

10 something like that?

11          THE COURT:  Yeah.  Typical things would be -- at

12 least when I used to practice, I would say, "Mr. Witness" --

13 this is after I've impeached them up and down, I would say,

14 "Mr. Witness, do you stand by that testimony today?"

15          What are they going to say?  Are they going to say,

16 "No, I said -- I lied in my deposition"?  You see, it's kind of

17 a great question.  But, you can do that.  You can even say, if

18 it's something very important, say "And you had the opportunity

19 to correct that deposition, didn't you?"

20          "Yes."

21          And, "Did you correct the deposition?"

22          "No."

23          MR. PARCHER:  How about --

24          THE COURT:  So it reinforces the strength of the --

25 so you can ask those kind of followup questions.  But what you

1  don't need to say is to indicate to the jury -- you know, "You

2  came there, you took an oath, you" -- I'm going to tell the

3  jury it's under oath and so forth.

4        Now, if the witness were to say something, "Oh, I

5  didn't know I was under oath," well, then, they would be in a

6  lot of trouble with me.  But in addition, you could impeach

7  them all up and down about how they took an oath at the outset,

8  and so forth.

9        MR. PARCHER:  Could you say, Judge -- I don't mean to

10 prolong this, but maybe it's just an old habit, but I do, "Do

11 you recall being asked this question and giving this answer?

12 And is it accurate?  And is it true?"  That kind of thing.

13 It's not -- I sort of favor a more theatrical approach.

14       THE COURT:  Well, the reason -- I will let you do

15 that once or twice.  But the fact is, you are reading it in.

16 To just repeat that they gave that answer to that question is

17 repeating what's already before the jury.

18       I've already told the jury that's the question that

19 was asked and the answer that was given.

20       MR. PARCHER:  But aside from the fact that --

21       THE COURT:  It's just argumentative to do that.

22       MR. PARCHER:  Well --

23       THE COURT:  In a rare case where a witness deserves

24 it, yes.  But usually, it's not worth taking the time to do

25 that.  If a witness is really -- if I think a witness is lying,

I'm going to let the lawyer have a lot of leeway with them. If

not, or just mistaken or whatever, we're going to move on to

something else.

All right. We'll probably get to the first witness

on the first day. Be ready with your witnesses.

I need to have just the top 20 documents for my trial

notebook, including the ones that you are going to mark up for

me.

I've already told you about no distractions. No

coughing, shuffling of papers, snickering. You ave to be

respectful to the other side whenever they have the floor, just

like they are going to be respectful to you.

If you are going to assert some discovery violation

in court, some morning you come to court and say, "Wait, wait,

they can't do that because they didn't do this in response to

Interrogatory No. 5," you've got to have it all there, chapter

and verse.

I will not take your word -- or your memory of what

happened on an interrogatory or whatever, because the memories

are just not good enough. You have got to show it to me. So

that means you have got to have a box with your discovery, in

court, ready to prove up whatever you say.

Stipulations, I hope you stipulate to a lot. But,

the -- the only way they get to the jury is by reading them to

the jury, right here in the trial. They don't go in as a

 1   separate document.  Unless I -- unless you both agreed to that.

 2   I guess I could allow it, then.

 3          But the reason for that is it shouldn't get any more

 4   stress in the evidence than -- if it goes in as a kind of

 5   formal stipulation it may take on a higher meaning than -- so

 6   ordinarily what you do, whenever the right timing for your case

 7   comes up, you read the stipulation.

 8          And if one side reads the stipulation in their case,

 9   and you decide you want to read it in yours because it helps

10   you, I would let you read it again.  That's the way the jury --

11   then I tell them, "That's proven evidence in the case.  That

12   stipulation is binding on you."

13          Now, did you see that thing I sent out about the

14   timeline?  Didn't I send out an order that you --

15          MR. KESSLER:  Yes, Your Honor, we are negotiating as

16   to what to put on --

17          THE COURT:  All right.  Good.  It will be somewhere

18   in the room, maybe back there -- I don't know, somewhere where

19   the jury can just look over, and at a glance, see where the

20   witness is talking about, and where -- how it fits in the

21   timeline.

22          MR. KESSLER:  May I ask a question, Your Honor?

23          THE COURT:  Sure.

24          MR. KESSLER:  Are you absolutely wedded to 12?  If

25   the parties settled on 13 or 14 items, is that a problem?

1          THE COURT:  All right, all right.  That'd be fine.

2  But if you have 20, then it will be so cluttered that they

3  won't -- it won't serve the purpose of an easy glance.  So, if

4  you have 13, okay.

5          MR. KESSLER:  It may make it easier to agree --

6          THE COURT:  13 is an unlucky number.

7          MR. KESSLER:  Let's say 14.

8          THE COURT:  That's an odd number.  I would rather

9  have 14.

10         MR. KESSLER:  Yeah.  See, that way, we don't have to

11 fight for who gets which entry in there.

12         THE COURT:  All right.  But if you put too much in

13 there, you overload the chart, and then it doesn't serve the

14 purpose of being at a quick glance, being able to see the basic

15 story so that they can fit the -- you know, I love this job,

16 but one of the challenges in this job is trying to help the

17 jury comprehend the evidence.  And, I think they generally do a

18 great job of it.

19         But I'll just put you on notice, every now and then

20 I'm going to *sua sponte* call on you, I'll say, "Mr. Kessler" --

21 you'll be asking a witness, and I will have no clue why you're

22 going into something.  I'll say, "Mr. Kessler, explain to the

23 jury in one minute or less why we are going into this."  And

24 then you state your piece.

25         And then I'll turn to Mr. Katz, and say, "You can

1  state for one minute whatever you want that's on the same

2  subject."  So then you explain what you think the jury ought to

3  be listening for in that witness.

4          I'll tell you, that helps the jury grasp whatever it

5  is that you -- get a better feel for what it is they should be

6  listening for, to see if the witness actually says it.

7          MR. KESSLER:  Does Your Honor do that during the

8  examination, or at the conclusion of the questions?  Or --

9          THE COURT:  Sometimes -- it just depends.  Sometimes,

10  right in middle of the examination.

11          MR. KESSLER:  Okay.

12          THE COURT:  Because if I think that it's all going

13  over the head of the jury, I don't want to waste the -- I want

14  the jury to understand why they're hearing it.  And so, I might

15  interrupt you, and ask you to explain that.

16          Often, I will, if we have a -- like, over a weekend,

17  I might start off the next week by saying "Take five minutes,

18  explain what you think has been proven so far, and what they

19  ought to be listening for in the next day or so."  And then

20  each side takes five minutes to -- it's amazing, how -- I think

21  those are very -- probably no more than ten minutes per side in

22  the entire trial, but they're very useful to give heads-up to

23  the jury.

24          MR. KESSLER:  Your Honor, I very much agree with

25  that.  Can I ask a question?

 1                THE COURT:  Sure.

 2                MR. KESSLER:  Consistent with your rules about

 3    encouraging young lawyers -- which we intend to do in this

 4    case, we are going to have a number of our associates do

 5    witnesses.

 6                THE COURT:  Great.

 7                MR. KESSLER:  Would it be all right that if you ask,

 8    for example, Mr. Katz or Mr. Parcher to do that summary, and we

 9    had to respond, that we could choose who would do the

10    one-minute response if we don't feel that it should be the

11    young lawyer who's doing the objecting and the cross

12    examinations?

13                THE COURT:  Well -- what is your name again?

14                MS. DONOVAN:  Molly Donovan.

15                THE COURT:  Are you a young lawyer?

16                MS. DONOVAN:  Yeah -- I believe so.

17                THE COURT:  All right.  So Ms. Donovan,, if you are

18    examining a witness, and I'm confused as to why we're -- I'm

19    going to require you to do the one minute.  I'm not going to

20    let Mr. Kessler explain it.

21                MR. KESSLER:  I would never do that, Your Honor.

22    What I was asking, I was asking if it was Mr. Parcher doing the

23    examining and Ms. Donovan was going to do the cross, and you

24    asked Mr. Don Parcher to do a summary of what he just asked,

25    could somebody else but Ms. Donovan do the response?

1          THE COURT:  I guess in that circumstance, it wouldn't

2   be too awkward.  But if she's already on the floor, then it

3   would not be cool for you to edge her out of the center stage.

4          MR. KESSLER:  Understood.

5          MR. PARCHER:  Mr. Kessler, I would let Ms. Donovan do

6   a lot more, and let him do a little bit less before --

7          MR. KESSLER:  They're going to be tired of me anyway.

8          THE COURT:  You talk more slowly, Ms. Donovan, than

9   Mr. Kessler.

10          MR. KESSLER:  I will be a lot more slowly when we get

11   before the jury, Your Honor.  I apologize, I go fast, I know.

12   It's a New York problem.

13          THE COURT:  Well, you need to -- I would urge you to

14   slow down a little, because it goes by so fast, it's hard to

15   grab some of those thoughts, and keep them --

16          MR. KESSLER:  Take a little less coffee, I'll try,

17   Your Honor.

18          THE COURT:  Yeah, maybe I'm going to have to insist

19   that you go to decaf.

20          MR. KESSLER:  You may be -- I think I'll take that

21   advice, Your Honor.

22          MR. PARCHER:  May I ask a collateral question, Your

23   Honor?

24          THE COURT:  Yes.

25          MR. PARCHER:  I apparently injured my hip playing

 1  basketball with my grandson.

 2          THE COURT:  Yeah?

 3          MR. PARCHER:  And from time to time, if I need to

 4  adjust, lean or something, I don't want the Court to think that

 5  I'm being disrespectful.

 6          THE COURT:  Oh, --

 7          MR. PARCHER:  I hope it won't happen, but about a

 8  minute ago it started to happen.

 9          THE COURT:  No, that's -- that's -- you know, I know

10  that I have a reputation for being, like, very strict and so

11  forth.

12          MR. PARCHER:  Uh-huh.

13          THE COURT:  The truth is, as long as the lawyers

14  behave, I like to give them a large amount of leeway in how

15  they conduct the trial.  But, you know, at some point I've got

16  to keep order, and to keep you -- each side from strangling

17  each other, I have to be tough.

18          MR. PARCHER:  Yes, sir.

19          THE COURT:  So, that's fine.  Of course you can do

20  that.

21          MR. PARCHER:  I'll try not to.  I'll be stretching my

22  leg before I get here.

23          THE COURT:  You can lean and -- of course you can do

24  that.  All right.  Have we covered everything you want to hear

25  about today?

1              MR. KESSLER:  I think, Your Honor, there's two other

2    subjects.

3              THE COURT:  Yeah?

4              MR. KESSLER:  One is that we both jointly submitted

5    proposed jury questionnaire.  I guess we would like to know

6    what Your Honor's view --

7              THE COURT:  I don't even think -- I don't like jury

8    questionnaires.

9              MR. KESSLER:  We had --

10             THE COURT:  I'll look at it, to see if there are

11   questions I'll ask for you.  At the end of the voir dire, I'll

12   give you each 15 minutes per side to ask questions that I

13   somehow overlooked.  And if you think I overlooked a question

14   on the questionnaire that's a good one, you can do that.

15             MR. KESSLER:  Our only concern about the

16   questionnaire is because this case obviously involves a lot of

17   public figures, and people may have views, so that the pool

18   won't be exposed to hearing other people express views possibly

19   in response to your questions, we thought some questionnaire

20   might actually make it more efficient.

21             THE COURT:  Give me an example of that.

22             MR. KESSLER:  Opinions about particular people like

23   Mr. Upshaw in the case and things like that might, you know, be

24   good in questionnaires.  There are some issues like that, where

25   if you start getting those opinions, it could affect people.

1          THE COURT:  Show me your questionnaire for a second.

2          MR. KESSLER:  We probably have too much in it.  You

3    know, I think it would be up to the Court, obviously, what you

4    think is helpful or not helpful.  And, this was jointly agreed

5    to.

6          (Off-the-Record discussion)

7          THE COURT:  Can I see your questionnaire?

8          MR. KESSLER:  Oh, I'm sorry.  I think there's

9    probably more than Your Honor wants.

10          (The Court examines document)

11          THE COURT:  This is way too long.  No, I -- I

12    can't -- we can't give this.  This is nine pages long.  So, if

13    something starts to go awry, and somebody's about to blurt out

14    some terrible inflammatory comment, then try to cut it off.

15    Honestly, I don't think it's that -- that bad.

16          MR. KESSLER:  Okay.  I understand that's Your Honor's

17    view.

18          THE COURT:  We are just going to try to pick a jury

19    in the normal way.

20          Okay.  What else can I do for you today?

21          MR. PARCHER:  Go back to the hotel and watch the

22    debate.

23          MR. KESSLER:  Your Honor, thank you for your time.

24    you really gave us a great portion of your schedule today.  We

25    appreciate that.

 1            THE COURT:  Well, you are going to get an even bigger

 2    proportion for several weeks.  That's my job.  Thank you,

 3    though.  And I'm happy you are all here.

 4            You probably just -- are you staying right on through

 5    then?  You are not going to go home, are you?  How about Texas?

 6    Anybody going back to Texas?

 7            MR. PARCHER:  If you are not working Thursday and

 8    Friday of next week, I might.

 9            THE COURT:  Thursday and Friday of next week I'm

10    definitely not going to be here.  So if you want to go home

11    over that time, that's fine with me.

12            Well, then --

13            MR. PARCHER:  Autumn in New York.

14            THE COURT:  We will see you all here.  Are you going

15    to have that many lawyers sitting at the table each day?  It's

16    up to you.  You can do it.

17            MR. KESSLER:  Your Honor, we -- again, we might,

18    because -- because all of our team members are going to do some

19    witnesses, we may want them to be up here as part of the team.

20            We are probably, for the technical --

21            THE COURT:  Where are you going to put your client

22    representative?

23            MR. KESSLER:  For the technical thing, we might set

24    up a table in the front pew, so that that can be controlled

25    from there.

1          THE COURT:  Where are you going to put your client

2   representative?

3          MR. KESSLER:  I don't know.  We'll have to think

4   about that.  Maybe he'll just sit on the front row of the pews,

5   not at table.  We'll see about that.  We may switch it off.

6          THE COURT:  You can switch it off, as you feel

7   appropriate.  All right.  So you got one, two, three -- this is

8   a case where no one can ever say you're too busy, because

9   you've got so many lawyers on this case.

10          That brief I was asking for, what was it about?  I

11   can't remember, but --

12          MR. KESSLER:  We asked for a brief --

13          THE COURT:  At the time, I thought it was important.

14          MR. KESSLER:  We asked for a brief about the

15   subjective intent of the parties.

16          THE COURT:  That's it.  I could really use that even

17   by tomorrow, but try to give it to me by Friday, if you --

18          MR. KESSLER:  Should we do a simultaneous exchange on

19   Friday?

20          THE COURT:  Friday at noon, how's that?

21          MR. KESSLER:  That's fine.

22          THE COURT:  Friday at noon?  Okay.  Well, I'm worn

23   out, and I've got to still deal with this other case for a bit.

24   So I'm going to bring it to a halt here, and see you again at

25   7:30 -- Monday morning will be the kickoff.

1          MR. KESSLER:  Understood, Your Honor.

2          THE COURT:  Bad metaphor.  All right.

3          MR. PARCHER:  Thank you, Your Honor.

4          MR. KESSLER:  Thank you.

5          THE COURT:    Thank you.  See you then.

6          (Conclusion of Proceedings)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**CERTIFICATE OF REPORTER**

       I, BELLE BALL, Official Reporter for the United States Court, Northern District of California, hereby certify that the foregoing proceedings in Case No. C 07-0943 WHA, Parrish, et al. v. NFLPA, et al., were reported by me, a certified shorthand reporter, and were thereafter transcribed under my direction into typewriting; that the foregoing is a true record of said proceedings as bound by me at the time of filing.

    The validity of the reporter's certification of said transcript may be void upon disassembly and/or removal from the court file.


          _____/s/ Belle Ball_____

          Belle Ball, CSR 8785, RMR, CRR

           Saturday, October 18, 2008