```
 1                                              Volume 1
                                          Pages 1 - 220
 2
                     UNITED STATES DISTRICT COURT
 3                  NORTHERN DISTRICT OF CALIFORNIA
            BEFORE THE HONORABLE WILLIAM H. ALSUP, JUDGE
 4
    BERNARD PAUL PARRISH,          )
 5  HERBERT ANTHONY ADDERLEY,      )
    WALTER ROBERTS, III, ET AL.,   )
 6                                 )
                    Plaintiffs,    )
 7                                 )
         v.                        )     NO. C 07-00943 WHA
 8                                 )
    NATIONAL FOOTBALL LEAGUE       )
 9  PLAYERS ASSOCIATION and        )
    NATIONAL FOOTBALL LEAGUE       )
10  PLAYERS INCORPORATED d/b/a     )
    PLAYERS INC.,                  )
11                                 )
                    Defendants.    )
12  _____)
                                         San Francisco, California
13                                       Monday, October 20, 2008
14               TRANSCRIPT OF JURY TRIAL PROCEEDINGS
15  APPEARANCES:
16  For Plaintiffs:        Manatt, Phelps & Phillips
                           1001 Page Mill Road
17                         Building 2
                           Palo Alto, California 94304
18                   BY:   RONALD S. KATZ, ESQ.
                           RYAN S. HILBERT, ESQ.
19                         and
                           Manatt, Phelps & Phillips
20                         7 Times Square
                           New York City, New York 10036
21                   BY:   L. PETER PARCHER, ESQ.
                           and
22                         Manatt, Phelps & Phillips
                           11355 West Olympic Boulevard
23                         Los Angeles, California  90064
                     BY:   CHAD HUMMEL, ESQ.
24
    (Appearances continued, next page)
25
```

```
 1  APPEARANCES, CONTINUED:

 2  Also for Plaintiffs:
                          McKool Smith
 3                        300 Crescent Court
                          Suite 1500
 4                        Dallas, Texas  75201
                     BY:  LEWIS T. LECLAIR, ESQ.
 5                        JILL ADLER NAYLOR, ATTORNEY
                          ANTHONY GARZA, ESQ.
 6                        BRETT CHARHON, ESQ.

 7
    For Defendants:       Dewey & LeBoeuf
 8                        1301 Avenue of the Americas
                          New York City, New York  10019-6092
 9                   BY:  JEFFREY L. KESSLER, ESQ.
                          DAVID GREENSPAN, ESQ.
10                        DAVID G. FEHER, ESQ.
                          ROY TAUB, ESQ.
11                        MOLLY DONOVAN, ATTORNEY
                          JASON CLARK, ESQ.
12
13  Reported by:          BELLE BALL, CSR 8785, RMR, CRR
                          Official Reporter
14

15

16

17

18

19

20

21

22

23

24

25
```

1  **October 20, 2008**                                  **7:30 o'clock A.M.**

2                          **P R O C E E D I N G S**

3          THE COURT:  All right.  These our jury members back

4  there?

5          THE CLERK:  No, Judge.

6          THE COURT:  Oh, okay.  We're here for the trial.

7  Let's have our appearances.

8          MR. KATZ:  Your Honor, Ronald Katz for the

9  Plaintiffs. And I would also like to introduce you to our

10  client, class representative, Mr. Herbert Adderley.

11          THE COURT:  All right.

12          MR. ADDERLY:  Good morning, sir.

13          THE COURT:  Welcome, Mr. Adderley.

14          MR. ADDERLY:  Thank you, sir.

15          THE COURT:  Okay.

16          MR. KESSLER:  Good morning, Your Honor.  Jeffrey

17  Kessler for the Defendants.  You met all of the Defendants at

18  the counsel table.  At the table we also have here this morning

19  Mr. Richard Berthelsen, who is our corporate representative,

20  the interim executive director of the NFLPA.

21          WE also have here Mr. Clark Gaines, who is a deputy

22  executive director of THE NFLPA, and Joe Barber, our other

23  corporate representative on behalf of the NFLPA, the staff

24  counsel.

25          Thank you.

1              THE COURT:  All right.

2              MR. PARCHER:  If the Court please I was never

3   formally introduced to you.  I'm Peter Parcher.

4              THE COURT:  Peter?

5              MR. PARCHER:  Parcher, P-a-r-c-h-e-r.  I'm one of the

6   lawyers for the Plaintiffs.

7              THE COURT:  Very good.

8              All right.  Are we going to have any football players

9   here in the courtroom?

10             MR. KATZ:  It's possible, Your Honor.  We have at

11  least one here that I know of.

12             THE COURT:  All right.  I just want to have a word of

13  caution -- and that is on both sides -- no smiling to the jury,

14  because they will be running into each other out there in the

15  hallway.

16             No talking, no smiling, no hand signals, no Nods, no

17  winking.  No communications whatever to the jury.

18             That goes for your people, too, Mr. Kessler.

19             MR. KESSLER:  Of course, Your Honor.

20             THE COURT:  All right?

21             MR. KATZ:  Yes, Your Honor.

22             THE COURT:  Thank you.

23             MR. KESSLER:  Your Honor, I must have introduced --

24  this is Mr. Bruce Meyer, who was not here for the pretrial

25  conference but will be part of our team.  I'm sorry.

 1            THE COURT:  What is your name?

 2            MR. MEYER:  It is Bruce Meyer, Your Honor.  I'm from

 3  Weil, Gotshal & Manges in New York.

 4            THE COURT:  All right.

 5            MR. KATZ:  And, Your Honor, Mr. Chad Hummel.  He has

 6  some housekeeping matters when that time arises.

 7            MR. HUMMEL:  Good morning, Your Honor.

 8            THE COURT:  Good morning.

 9            All right.  Let me go over a few things.  I received

10  a letter from both sides on statements made by Mr. Upshaw.

11            We will come to that in a moment.

12            I received a declaration from Jason Clark in support

13  of that, I guess.

14            I also received a brief from Plaintiffs on

15  admissibility of 1184.  I have forgotten what that issue is.

16  What is that issue?

17            MR. HUMMEL:  Your Honor, that is the issue of the

18  e-mail that we talked about last week at the pretrial

19  conference, with requests by the -- by EA, if you will recall,

20  to use retired players in the EA Madden game, and the question

21  of whether the document itself, the e-mail was hearsay.  And

22  you asked for letter brief or a brief regarding that issue.

23            MR. KESSLER:  We just got that brief this morning

24  before court, so we would like an opportunity to respond to it.

25            THE COURT:  Well, you can respond by the end of

 1   today.  And in the meantime, no reference to this in front of

 2   the jury, to that e-mail.

 3            MR. KESSLER:  That's correct, Your Honor.

 4            THE COURT:  All right.

 5            MR. HUMMEL:  Thank you.

 6            THE COURT:  "By the end of today," I mean 4:00 p.m.

 7            MR. KESSLER:  Very good, Your Honor.

 8            THE COURT:  California time.

 9            MR. KESSLER:  Thank you, Your Honor.  That helps.

10            THE COURT:  Lashonda, I hear some static coming off

11   of the sound system.  Is there a way to reduce that?

12            THE CLERK:  Yes, Judge.

13            THE COURT:  Okay.  What are your housekeeping

14   matters?

15            MR. HUMMEL:  Thank you, Your Honor.  Good morning.  I

16   have several things for the Court that are really, I think

17   pursuant to the Court's directive.

18            THE COURT:  Oh, wait.  Wait.  I'm sorry.  I forgot.

19   My court reporter informed me this morning that is she is

20   related by marriage to a class member.  Did she inform you of

21   that?

22            MR. HUMMEL:  She did.

23            MR. PARCHER:  She did.

24            MR. KESSLER:  She did, Your Honor.

25            THE COURT:  All right.  My proposal is that she

1  transcribe today, but we will get a different court reporter

2  going forward.  But, I want to know if you stipulate to that.

3           MR. PARCHER:  We're perfectly -- for us it is

4  perfectly acceptable that she remains on, but I guess

5  Mr. Kessler has an objection.

6           MR. KESSLER:  No.  We would stipulate as to what Your

7  Honor proposed.  We think it is appropriate today because no

8  arrangements have been made, and to replace her after that.

9           THE COURT:  All right.  We will make alternative

10 arrangements.  But for today our court reporter will go ahead.

11 All right?

12          MR. KESSLER:  Thank you, Your Honor.

13          THE COURT:  All right.  Thank you.

14          MR. KATZ:  Your Honor, also in terms of what you were

15 listing as having received since we were last here, there was

16 also some briefing on the parol evidence issue.

17          THE COURT:  You are right.  But, I have -- haven't

18 had a chance to read that yet, so you're not proposing to go

19 over that right now, are you?

20          MR. KATZ:  No.  I just wanted to make sure that that

21 was --

22          THE COURT:  I did get that, and I will read that.

23 All right.

24          MR. KESSLER:  I guess, Your Honor, the issue on that

25 is I was hoping to utilize some of that testimony in my

1  opening.  And so I was hoping Your Honor would reach that

2  issue, but if not, I guess I will not be able to do so.

3          THE COURT:  I don't think I'm going to get to it in

4  time.  I'm going to turn now to the October 17th letter brief

5  from Mr. Kessler about statements by Mr. Upshaw.

6          MR. KESSLER:  This is specifically, Your Honor,

7  regarding statement in the Charlotte Observer.  And, in fact,

8  it would not be the Charlotte Observer story itself which, of

9  course, is hearsay, but it would be Mr. Upshaw's deposition

10  testimony about those comments, which is -- which would

11  otherwise be admissible.

12          We believe, Your Honor, that the record we presented

13  shows that what Mr. Upshaw stated that he does not represent

14  the retired players in the bargaining room, which is the

15  context that's there.

16          And based on what he said about that at his

17  deposition, as well as subsequent documents that we submitted,

18  Your Honor, where he described how this had to do with

19  pensions, this had to do with disability complaints, it came in

20  the context of a dispute between the retired players and

21  Mr. Upshaw over those collective bargaining issues.

22          That to inject that statement here in order for us to

23  explain it to the jury, we are going to have to get into the

24  very collective bargaining disputes that Your Honor, we

25  believe, has already ruled can properly be excluded from this

1 case so that we don't get on a side trip with the jury about

2 those pension and disability issues.  Because if the statement

3 came in, others would have to testify that what Mr. Upshaw was

4 referring to was the fact that in bargaining we only represent

5 the active lawyers.

6            But as a matter of law, actually, as a matter of

7 labor law, says explain that issue.  And that this dispute had

8 to do with other items, and we think it is a distraction for

9 the jury, and we don't think it is appropriate for them.

10            They claim they want to argue to the jury it has to

11 do with licensing.  The problem with that is there's no

12 reference to licensing in the testimony about this.  There is

13 no reference to licensing in the article.

14            The article itself is hearsay, but it gives you

15 context.  There's no reference to licensing.

16            It's pure Plaintiff's *ipse dixit* that say:

17                 "Well, it must have to do with licensing."

18            And we, therefore, think absent any licensing

19 connection, it should not be admitted.

20            THE COURT:  All right.  What's your name?

21            MR. COHEN:  Noel Cohen.

22            THE COURT:  Go ahead, Mr. Cohen.

23            MR. COHEN:  Good morning, Your Honor.

24            During the in limine arguments, Your Honor asked:

25                 "What is the proof, Mr. Kessler, that the

 1 statement was in the context of bargaining with the League over

 2 salaries?"

 3         In their brief filed on Friday and in ours filed on

 4 Sunday, there still is no proof.  They have an argument, and it

 5 deals with collective bargaining.  Our argument is that it's

 6 not solely related to collective bargaining.  And our amount is

 7 consistent with Mr. Upshaw's testimony at his deposition.

 8         And they can argue what they think it means to the

 9 jury, and we can argue what we believe his statements meant to

10 the jury.  And it's much, much, much broader than collective

11 bargaining.  It's our case.  This is the way he treated retired

12 players.

13         THE COURT:  All right.  The ruling is:  Motion is

14 denied.  Here's the reason.  If Mr. Upshaw had been more

15 precise in his statement, so that it was clear that it was

16 relating to collective bargaining, probably this motion would

17 be granted.

18         But -- and probably on just the jury argument alone,

19 Mr. Kessler has the better argument.  I think most likely that

20 Mr. Upshaw spoke too loose language, and probably what he meant

21 was "collective bargaining," but he didn't say it that way.

22         And it left room to make the argument that he was

23 including anything and everything having to do with retired

24 players, including licensing.  So, there's enough of an

25 argument that this comment relates to his attitude toward

 1  licensing that a jury will be allowed to hear it.

 2          The Court's going to add this, though.  We are not

 3  going to let this degenerate into a trial where the Plaintiffs

 4  try to confuse the jury with the difference between retirement

 5  benefits and collective bargaining versus these licensing

 6  rights.

 7          I know there is a much broader debate going on

 8  between the two sides, but this case involves licensing.  So,

 9  if you start going down that path I'm going to interject and

10  just tell the jury that's not the issue in the case.

11          MR. KATZ:  May I respond, Your Honor?

12          THE COURT:  Yes.

13          MR. KATZ:  We agree with Your Honor.  And, in fact,

14  that's why we made our motion about the organization of Retired

15  Players for Justice.  And if Your Honor will recall last

16  Thursday basically what you said was that if they bring that

17  up, which that organization does have to do with these issues,

18  that we may comment on these issues up to a certain point.

19          So I just wanted to -- that's our understanding of

20  the Court's ruling at this time.  We have no intention of doing

21  that.

22          THE COURT:  Well, all right.  Fair enough.

23          MR. KESSLER:  Your Honor, if I may, just two things.

24  I do think Your Honor indicated that if we -- if we go too far

25  to open the door that we opened, I don't agree with Mr. Katz

 1  that the mere fact we mentioned that organization opens the

 2  door, because Your Honor ruled we could mention that

 3  organization.  But I know Your Honor will decide that --

 4          THE COURT:  I will have to wait and see how, what

 5  impressions are left, and --

 6          MR. KESSLER:  Of course.

 7          THE COURT:  So forth.  I'm not going to give anyone

 8  the green light or red light yet.  I just know the general

 9  principle.

10          MR. KESSLER:  Your Honor, also, I assume that Your

11  Honor's ruling now, by Mr. Upshaw's statement relates to his

12  deposition testimony --

13          THE COURT:  Of course.  That newspaper article is

14  rank hearsay, and it will not come into evidence.

15          MR. KESSLER:  Very good, Your Honor.

16          THE COURT:  Unless he at the deposition read it, and

17  said:

18              "Yeah, I stand by everything in here," or "This

19  Is the statement that I made," that would be okay.

20          But, the article itself is just hearsay.  And without

21  proper foundation, it is not coming into evidence.

22          MR. KESSLER:  In that connection, Your Honor, when we

23  exchanged opening exhibits, Plaintiffs have proposed to have a

24  slide, which I'll hand up to Your Honor -- which is another --

25          THE COURT:  If it's the newspaper story, no.

1          MR. KESSLER:  -- quote from a New York Times story

2    (indicating).

3          THE COURT:  No, no newspaper stories.  No newspaper

4    stories, unless you can show me that the witness was shown the

5    newspaper story, said:

6               "I stand by every word of that."

7          MR. KESSLER:  And, Your Honor, this particular one,

8    which is the dog food quote, they never showed it to Mr. Upshaw

9    at his deposition.  He never adopted it in any way, so we

10   believe it cannot be in this case.

11         MR. PARCHER:  If the Court pleases, the question --

12         THE COURT:  No newspaper -- Mr. Parcher, no

13   newspapers.

14         MR. PARCHER:  I understand that, Your Honor.

15         THE COURT:  All right.  So what -- what are you

16   trying to tell me?

17         MR. PARCHER:  If the Court pleases, Request for

18   admission No. 19 in the interrogatories:

19               "Admit that Gene Upshaw has said in reference to

20   licensing the image of retired players, quote:  'We could have

21   the greatest dog food in the world, but if the dogs don't like

22   it, we can't sell it.'"

23         THE COURT:  All right.  You will have to --

24         MR. PARCHER:  Right.

25               "Request Number 19 is admitted."

1          THE COURT:  Show it to me in here.  Here, let me hand

2   you down one of the many filings that came in at this point.

3          MR. PARCHER:  May I hand this up?

4          THE COURT:  All right.

5          "Request to admit:  Gene Upshaw has said in reference

6   to licensing of images of the retired players:  'We could have

7   the greatest dog food in the world, but if the dogs don't like

8   it, we can't sell it.'

9          "Admitted."

10          What is wrong with that?

11          MR. KESSLER:  He can read the Request for Admission

12   under Your Honor's rules.  What he can't do is do something

13   like this that says:

14          "Upshaw quote from the New York Times," which

15   has an entire newspaper story.

16          THE COURT:  Correct.  That's right.

17          MR. KESSLER:  He could read a Request for Admission.

18          THE COURT:  Read the Request for Admission.  Don't

19   use the New York Times.

20          MR. PARCHER:  I understood that, Your Honor.  Perhaps

21   I misunderstood Mr. Kessler, but I don't think so.

22          THE COURT:  Thank you.  All right.

23          What other housekeeping matters do you have?

24          MR. HUMMEL:  Your Honor, three things.  One:  The

25   proposed joint statement of the case, which we have exchanged.

 1  I'll hand up to Your Honor.

 2          Number two:  The requested bench binder of key

 3  exhibits highlighted, as Your Honor instructed, which we have

 4  exchanged and negotiated with the other side.

 5          THE COURT:  Wonderful.  Thank you.

 6          MR. HUMMEL:  Number three is the Court's copy of --

 7  and I understand negotiated until the wee hours of the

 8  morning -- the packet of deposition reads that we will use in

 9  our case in chief.

10          The red tabs for the Court's convenience are

11  objections that do need to be ruled upon.  At some convenient

12  time, we can address that with the Court.

13          THE COURT:  All right.  I'll do that.  Give it to me

14  tomorrow.

15          MR. HUMMEL:  Thank you, Your Honor.  There will

16  probably be some reads tomorrow, probably not today.

17          MR. KESSLER:  Your Honor, I assume it can't be today

18  because under the Court's rulings you won't reach any of the

19  objections today, so --

20          THE COURT:  I doubt that I'm going to be able to --

21  I'll try at the first break to see how hard they are.  But I

22  can't guarantee that I'm going to get through it today.

23          MR. HUMMEL:  Your Honor, we don't have any plans to

24  read deposition testimony today.

25          THE COURT:  All right.  Wonderful.  Okay.

1            MR. KESSLER:  Your Honor, just a few more

2   housekeeping items, if I may.

3            First, we do have -- and I believe both sides may

4   have jury consultants assisting us.  And with Your Honor's

5   permission we would like to be able to have our consultant with

6   us, Mr. Dave Weinberg here, Your Honor, for our side with us at

7   table during jury selection.  And they are not referred to for

8   the jury, if that is acceptable to the Court.

9            THE COURT:  No problem.

10           MR. KESSLER:  Thank you.

11           THE COURT:  Both sides can do that.

12           MR. KESSLER:  Thank you, Your Honor.

13           Second, Your Honor, the issue of scrambling, which

14  Your Honor declined our in limine on that motion.  We had a 403

15  objection.  Can I ask Your Honor that we could have, just to

16  preserve the record, a continuing objection to the issue of

17  scrambling so we don't have to raise it at all during the trial

18  itself?  And just assume, since that in limine was denied, that

19  we have continuing objection to that subject, based on 403?

20           THE COURT:  Well, you can have a continuing objection

21  to the points that you raised in your Motion in Limine to the

22  extent that the testimony on other evidence relates to that.

23           But if it's something that is hard to see why your

24  Motion in Limine would relate to it, and then you have got to

25  bring that -- you have got to clarify it for me at the time.

1          But, as a general principle, I think you're okay

2   without objecting each time.

3          MR. KESSLER:  Thank you, Your Honor.

4          And in that connection, during the conference that we

5   had with Your Honor, you mentioned that we might be able to

6   request in connection with the scrambling issue the first time

7   it's raised, a direction from the Court to the jury that the

8   Plaintiffs are not claiming the scrambling violates any

9   intellectual property rights of the class members.

10          Mr. McNeil might testify today on that subject.

11   That's their first witness.  And if the subject comes up, we

12   would request that direction at that time, if Your Honor is

13   inclined to give it.

14          MR. PARCHER:  If the Court pleases, in principle I

15   don't have any objection to that.  But there is a confusion as

16   to what Mr. Kessler says.  The intellectual property law is not

17   what the issue is that is here in the case.  It's whether or

18   not by all -- by directing Electronic Arts to scramble, in

19   effect, either the contract was breached or fiduciary

20   obligations were breached because they are supposed to be doing

21   for us what was good for us and not -- and not --

22          THE COURT:  Are you backing off of what you admitted

23   last week?

24          MR. PARCHER:  Not at all.

25          THE COURT:  You said last week that Electronic Arts

1  did not violate anybody's intellectual property rights.

2          MR. PARCHER:  It's not Electronic Arts that violated

3  anybody's rights.

4          THE COURT:  Who was it?

5          MR. PARCHER:  As Your Honor said at the conference

6  the other day it's the Defendants that violated --

7          THE COURT:  No.  Nobody violated any of the --

8          MR. PARCHER:  Intellectual property.

9          THE COURT:  -- intellectual property rights --

10         MR. PARCHER:  That's correct.

11         THE COURT:  -- by using the scrambling.  But rather

12 the -- your argument is that instead of doing the scrambling,

13 they should have affirmatively negotiated to use the retired

14 players.

15         MR. PARCHER:  Or that it was in the contract already,

16 either -- either way.  And as Your Honor pointed out at the

17 conference, our argument is that either the contract was

18 breached -- the contract was breached or the fiduciary

19 obligation was breached.  It's not an intellectual property

20 question.

21         THE COURT:  Well, but, no.  You're trying to get me

22 to say nothing on this point to the jury.  And you're trying to

23 say it's not a question, whereas before you said that there was

24 no violation.

25         MR. PARCHER:  No, Your Honor.  I'm not trying to get

1  you to say nothing.  I'm trying for not too much to be said.

2              THE COURT:  There's no violation of intellectual

3  properties rights.

4              MR. PARCHER:  That's correct.

5              THE COURT:  And the question is, rather, whether or

6  not it was already in the contract, or it should have been in

7  the contract.

8              MR. PARCHER:  That's correct.  Or they should have

9  directed -- or they should have given it to them, anyway, once

10 they raised the point.

11             MR. KESSLER:  Well, Your Honor --

12             MR. PARCHER:  In other words -- excuse me,

13 Mr. Kessler.

14             All I'm saying, if the Court pleases, that I'm not

15 objecting in principle to the portion of the instruction that

16 Mr. Kessler is asking for.  I'm saying there's more to it once

17 you give an instruction.

18             THE COURT:  All right.  When we get there if I don't

19 say it right, you can correct me.

20             All right.  Go ahead.

21             MR. PARCHER:  Thank you.

22             MR. KESSLER:  Your Honor, just two more points.  One

23 is that Your Honor asked us to submit a proposed order on the

24 in limines.

25             Regrettably, we've had a dispute with the Plaintiffs

1  as to how to do this.

2          THE COURT:  I thought you did do that.

3          MR. KESSLER:  We submitted a summary, and Your Honor

4  asked that it be turned into a proposed order.  We had agreed

5  on the summary.  But when we got to doing it as a proposed

6  order, the summary explained certain differences between the

7  sides.  For example --

8          THE COURT:  It's not one of these things where I got

9  two versions?

10          MR. KESSLER:  Right.  So what we did, Your Honor, is

11  we prepared a proposed order that most of them are agreed to,

12  and it states where the disagreement is.  And you could adopt

13  either one for the two or three items.  So --

14          THE COURT:  Let me have the order.

15          MR. KESSLER:  So, for example, Your Honor, on in

16  limine No. 2 of ours, Plaintiffs' view is that we believe --

17  no, let me rephrase that.

18          We believe Your Honor ruled in discussion with the

19  Plaintiffs' counsel that they couldn't use complaints about

20  collective bargaining benefits, disability, pensions.

21  Plaintiff's view is:  "Well, Your Honor never really ruled on

22  that.  There was just a discussion about it."

23          And we believe what happened is Your Honor said to

24  counsel: "You are not going to raise that, are you?"

25          And they said: "No."

1            And we think that was the he equivalent of a ruling.

2   And they say:  "Well, there was no ruling on it," so they want

3   to still be free to raise those type issues.  So it's those

4   type of --

5            THE COURT:  The collective bargaining retirement

6   benefits, they're not part of this case.  This case is about

7   licensing.

8            MR. KESSLER:  That's our proposed order.

9            THE COURT:  Wait, wait, wait.  Now, there will be

10  some limited number of times when it's probably impossible to

11  explain an item of evidence, just like the Gene Upshaw comment,

12  without veering off into aspects of that other issue.

13           And to some limited extent it's okay, as long as we

14  make it clear to the jury that that's for a different judge, a

15  different court.  That's for -- or that's for some other time

16  and place.  It's not for this jury.  What's for this jury is

17  the issue of licensing.

18           So I don't think I can say that you cannot use the

19  word "pensions" and "retirement" and "collective bargaining."

20           I think that I might be going too far.  What I can

21  say is that if the principal reason something is relevant as to

22  that set of issues, then it's out of the case.

23           Or, I can alternatively say that if it is related to

24  these issues, but only tangentally -- by "these," I mean

25  licensing issues -- but only tangentally, and it has much more

1  prejudicial value than probative value, it's still going to be

2  out of the case.

3              So that's the best I can say.

4              MR. KESSLER:  I understand, Your Honor.  Actually,

5  our proposed order was simply not to exclude the entire

6  subject, but to exclude anything where the Plaintiffs are

7  complaining that their pensions are not good enough, their

8  disability benefits are not good enough, why they don't think

9  they're good enough.  It has to do with complaint issues.

10             THE COURT:  None of that should be mentioned in this

11  case.

12             MR. HILBERT:  If I can respond quickly, Your Honor.

13  Ryan Hilbert for the Plaintiffs.

14             We agree with everything that you said, just as we

15  agreed on Wednesday.  The problem with the proposed is order

16  that the proposed order that Defendants wanted us to adopt went

17  beyond what Your Honor ruled on Wednesday.

18             There were discussions between the parties that were

19  not included expressly in your order.  We didn't think that

20  those should have gone in the order.  There were discrete

21  moments within the transcript in which you said:  "Here is my

22  ruling.  Motion denied."

23             To  the extent you had a further ruling, you

24  explained it at that point.

25             To try to incorporate the parties' colloquy as

 1 something that Your Honor ordered we thought went beyond what

 2 Your Honor had ordered that day.

 3         Another example, Your Honor, is in their

 4 interpretation of the proposed order they think that you made a

 5 legal determination that their third-party contracts with

 6 licensees are ambiguous.

 7         Our recollection is that there was a lot of

 8 discussion about it; that Your Honor could not have been more

 9 clear that he was not ruling on that motion; and that he

10 ordered the parties to submit additional briefing, which they

11 did on Friday.

12         Their order goes one step beyond and asks you to

13 incorporate those arguments in your order.  What we propose --

14 and I've got a copy here.  Unfortunately, I have one copy.

15         What we propose is something that's neutral, that's

16 simple, that only reflects what Your Honor clearly ordered in

17 the transcript.

18         THE COURT:  What Mr. Kessler just gave me, does that

19 include your version, too?

20         MR. HILBERT:  No, Your Honor, it doesn't.

21         THE COURT:  What is that you have right there?

22         MR. HILBERT:  This is our version that includes only

23 what the Plaintiffs proposed.

24         THE COURT:  What is this document?

25         MR. KESSLER:  We included their version.  We included

1  their version of the disputed words in the document I put up,

2  Your Honor.

3          THE COURT:  All right.  Well, if that's in there I

4  only need this one item, then.

5          I don't need for you to give it to me in a different

6  format if I've already got the information.

7          MR. HILBERT:  Our version only includes the

8  Plaintiffs' arguments.  The reason that we didn't like their

9  version is that it allowed you to revisit topics that we

10 thought had already been decided clearly on Wednesday and to

11 upon perhaps reconsideration to determine that:  "Yes, I think

12 that that should be part of my order, even though I may not

13 have done so on Wednesday," and that is check a box

14 acknowledging that point.

15         And that's why we didn't like the format that they

16 submitted it in.  If I can --

17         THE COURT:  All right.  Give me -- go ahead and hand

18 up to me whatever it is you got.

19         (Off-the-Record discussion.)

20         THE COURT:  All right. I'm not going to rule on this

21 right now.

22         All right.  All right.

23         MR. HILBERT:  Thank you, Your Honor.

24         MR. KESSLER:  Last item that I have, Your Honor, is

25 that Plaintiffs have told us that they would like tomorrow to

1  have Mr. Berthelsen, our corporate representative, who is

2  noticed in our case, testify live in their case.

3          We don't have any objection to that, Your Honor.  But

4  what we ask for is so that the jury would not be burdened with

5  hearing Mr. Berthelsen twice, that just as we've agreed with

6  Mr. Allen and Ms. Pat Allen, that our examination of

7  Mr. Berthelsen could exceed the scope of what they're going to

8  ask Mr. Berthelsen, because he was a critical witness in our

9  case.

10          Plaintiffs have now objected to that and want us to

11  limit our examination to just what they ask, and then call

12  Mr. Berthelsen a second time.  We don't think --

13          THE COURT:  But he's going to be here for the whole

14  trial.

15          MR. KESSLER:  Well, actually, because Mr. Berthelsen

16  must conduct team meetings, he's not going to be here every

17  single day.

18          THE COURT:  He's your corporate representative.

19          MR. KESSLER:  He is, Your Honor.  But because of the

20  fact that they're in the middle of their team meetings he may

21  miss a day or two.  But the issue really is from the jury's

22  standpoint, is it efficient to have him twice?

23          THE COURT:  No.  No.  The reason you don't -- look,

24  the Plaintiff has a right not to have their case interrupted by

25  you going off on to new points.

 1            If this was a third-party witness, I would agree with

 2    you.  It is not a third-party witness, though.

 3            This is a -- witness convenience is a de minimus

 4    point here.  Because he's your corporate representative, you

 5    can cross-examine within the -- the limits of the direct, but

 6    then you shouldn't be getting back into it again.

 7            No, look.  The answer is:  They can call and you will

 8    be limited to the four corners of the direct examination.

 9            MR. KESSLER:  Okay, Your Honor.  I understand.  We

10    will just call him a second time.

11            THE COURT:  All right.  Call him a second time.

12            Yes.

13            MR. KATZ:  Your Honor, one other point.  And that is

14    Mr. Adderley has a bad back, and from time to time he might

15    have to stretch.  And I wanted to know how Your Honor wanted us

16    to --

17            THE COURT:  Fine.  Just stand up and do that.

18            MR. KATZ:  All right, thank you.

19            THE COURT:  Now, but don't blame it on the football

20    league.  Don't say that he's, you know -- the Defendants have

21    put him in such a position that he's got a bad back and -- if

22    this is just a sympathy thing, don't do it.

23            MR. KATZ:  I'm just saying -- I didn't say that, Your

24    Honor.

25            THE COURT:  All right.  Well, then, if he has to

1  stand up and stretch every now and then, that's fine.  He can

2  do that.

3           MR. KATZ:  Thank you.

4           MR. LECLAIR:  Your Honor, Lew LeClair for the

5  Plaintiffs.  The only other question I had was when -- they

6  have some objections to the exhibits on our fist witness.  I

7  didn't know whether you wanted to take up now, later or when.

8           THE COURT:  We usually take it up at the time the

9  document is offered, unless there is a special need to take it

10 up in advance before the jury comes in.

11          MR. LECLAIR:  Fair enough, Your Honor.

12          THE COURT:  Kind of the old common law.  And we argue

13 the objections out right in front of the jury.  Somebody wins,

14 somebody loses.

15          A jury knows somebody has lost.  The lawyers think

16 that a jury holds it against them, but usually it's not true,

17 unless the jury detects a pattern of unreasonable objections.

18 Then, maybe they do.

19          But, the truth is juries don't mind.  They like to

20 see the fireworks.

21          All right.  What else?

22          MR. KESSLER:  Just Mr. Meyer also has a bad back,

23 Your Honor.  He may have to stretch.

24          MR. KATZ:  It doesn't come from the NFL.

25          MR. KESSLER:  My back is fine, Your Honor.

 1              THE COURT:  Well, he probably got that from the NFL,

 2   too.

 3              You can stand and stretch all you want.

 4              MR. MEYER:  Thank you, Your Honor.

 5              THE COURT:  Okay.  Are we ready to start jury

 6   selection?

 7              MR. KATZ:  Yes, Your Honor.

 8              THE COURT:  Now, Lashonda, call and have them come

 9   in.

10              I need to say to everyone in the courtroom, you

11   ignore the members of the prospective jury.  Do not talk to

12   them, make any signals, smiles, nothing.  This is a total --

13   this is not a political event.  This is a courtroom.  And,

14   please, we want to keep the jury as unbiased as possible.

15              It's going to be a few more minutes, so what we will

16   do is take a recess.  And be ready to go as soon as the jury

17   comes in and Lashonda was sworn them, the prospective veniremen

18   or venire person, she will come get me, and then we will get

19   started.  So it will be probably be about ten minutes.

20              We will take a short recess.

21              (Recess taken from 8:03 A.M. to 8:15 A.M.)

22              (The following proceedings were held in open court in

23              the presence of the Jury Venire)

24              THE COURT:  Good morning.  Good morning, everyone.

25   Please have a seat.

1          I want to welcome my prospective jurors.  How is

2    everybody today?

3          (Jury responded "Good.")

4          THE COURT:  Great.  We are here today to select a

5    jury.  So, I guess we need to -- have we already called,

6    Lashonda, the name of the case or not?

7          THE CLERK:  Not yet.

8          THE COURT:  All right.  Why don't you do that?  Call

9    the name of the case, and then we will have the lawyers

10   introduce themselves, make their appearance.

11         THE CLERK:  Calling civil action C-07-0943, Bernard

12   P. Parrish, et al versus National Football League,

13   Incorporated.

14         Counsel, please state your appearances for the

15   Record.

16         MR. PARCHER:  My name is Peter Parcher.  I'm one of

17   the lawyers for Plaintiffs.

18         THE COURT:  All right.  Say your name.  Spell your

19   name.  They didn't get it.  Say it again?

20         MR. PARCHER:  Peter Parcher, P-A-R-C-H-E-R.

21         THE COURT:  Okay.  Great.

22         MR. PARCHER:  Picked a --

23         THE COURT:  Anyone else from there you want to

24   introduce?

25         MR. KATZ:  Ronald Katz for the Plaintiffs, K-A-T-Z.

1              THE COURT:  Great.

2              MR. HUMMEL:  Good morning.  My name is Chad Hummel,

3    H-U-M-M-E-L. I represent the Plaintiffs.

4              MR. KESSLER:  Good morning.  My name is Jeffrey

5    Kessler, K-e-S-S-L-E-R, and I represent the Defendants in this

6    case.

7              THE COURT:  Say who the Defendants are.

8              MR. KESSLER:  Oh, the Defendants are the National

9    Football League Players Association, and it's licensee

10   Subsidiary, Players, Inc.

11             MR. MEYER:  Good morning, Your Honor.  My name is

12   Bruce Meyer, and I'm also an attorney for the Defendants in

13   this case.

14             MR. FEHER:  Good morning.  My name is David Feher.

15   I'm also an attorney for the Defendants.

16             MR. GREENSPAN:  Good morning.  My name is David

17   Greenspan, another attorney for the Defendants.

18             MS. DONOVAN:  Good morning.  Molly Donovan, attorney

19   for the Defendants.

20             THE COURT:  Okay.  Oops.

21             MR. CLARK:  Sorry, Your Honor.  Just one more.

22             My name is Jason Clark, C-L-A-R-K, attorney for the

23   Defendants, also.

24             THE COURT:  Sorry, Mr. Clark.

25             MR. CLARK:  No problem.

1            THE COURT:  I didn't mean to overlook you.  Okay.

2            Now, it's going to take a while for you to figure out

3  who is who, but let me kind of underscore the -- who the

4  players are in this case.

5            On this side of the room (Indicating) -- I'm pointing

6  to my right -- that's the table where the Plaintiffs are, or

7  are represented.

8            And the -- on the Plaintiffs' side are retired NFL

9  players.  "NFL" stand for National Football League.

10           And, Mr. Adderley, has he been introduced?  Do you

11  want to introduce Mr. Adderley?

12           MR. KATZ:  This is Herbert Adderley.  He is a former

13  National Football League player.

14           THE COURT:  Thank you, Mr. Adderley.

15

16           MR. ADDERLEY:  Thank you.

17           THE COURT:  So he is the representative.  This is

18  what's called a class action.  And Mr. Adderley is the

19  representative of the retired NFL players.

20           All right.  Now, who do we have over -- who is your

21  representative for the -- for the Defendants?

22           MR. KESSLER:  Your Honor, we have Richard Berthelsen,

23  who is the interim executive director of the National Football

24  League Players Association, and also the interim chairman of

25  Players, Inc.

 1            And also Mr. Joe Nahra, who is staff counsel for the

 2    NFLPA.  They are the two corporate representatives.

 3            THE COURT:  Great.  So welcome.  There are two

 4    Defendants, right?

 5            MR. KESSLER:  Yes, Your Honor.

 6            THE COURT:  One is National Football League Players

 7    Association, right?

 8            MR. KESSLER:  Yes, Your Honor.

 9            THE COURT:  And that is a union.  Right?

10            MR. KESSLER:  Correct.

11            THE COURT:  That's a labor union.  And then, there's

12    something called Players, Inc., correct?

13            MR. KESSLER:  Yes.  The full name is National

14    Football League Players, Incorporated.  We refer to it as

15    "Players Inc." to make it easy.

16            THE COURT:  So those are the two entities on the

17    defense side.

18            At the table over here on the right where I'm

19    pointing, that's the -- all of those lawyers represent the

20    Plaintiffs.

21            Over here at this table on my left, all of those

22    lawyers represent the Defendants.  So those of you who get to

23    sit on this case are going to come to know each of these people

24    by heart, as the case goes on.  But, you know, we've got to

25    start somewhere, and so that's a basic introduction.

1          Now, before I get started on the -- telling you what

2     this case is about, I -- I want to get rid of anybody who has

3     the flu or who is hacking and coughing, who has bronchitis.

4          It's better to get you out of here so you won't

5     infect anyone else.

6          Anybody got the flu, a bad cold, bronchitis?  Raise

7     your hand, and come forward.

8          All right, sir.  Come forward.

9          What is your name?

10    PROSPECTIVE JUROR BOVO:  Steve Bovo, B-O-V-O.

11    THE COURT:  I didn't hear you.

12    PROSPECTIVE JUROR BOVO:  Steve Bovo, B-O-V-O.

13    THE COURT:  B-O-V-O?

14    PROSPECTIVE JUROR BOVO:  Yes.

15    THE COURT:  What is your situation.

16    PROSPECTIVE JUROR BOVO:  I got the flu.  I came down

17    with it on Saturday.

18    THE COURT:  I'm going to excuse you unless there is

19    an objection.

20         Any objection?

21    MR. PARCHER:  No objection, Your Honor.

22    THE COURT:  No objection.  You are free to go.  Go

23    back to the jury room and tell them what happened.

24    PROSPECTIVE JUROR BOVO:  Thank you.

25    THE COURT:  Thank you, Mr. Bovo.  I hope you are

1  feeling better soon.

2          PROSPECTIVE JUROR BOVO:  Me, too.

3          THE COURT:  Yes, you got infected right away, right?

4  You are sitting by Mr. Bovo.

5          Okay.  Come forward.

6          PROSPECTIVE JUROR MAZID:   It's not the flu, Your

7  Honor.

8          THE COURT:  Well, I want to find out what it is.

9  Come up here and tell me.

10         What's your name?

11         PROSPECTIVE JUROR MAZID:  Sanjida Mazid.

12         THE COURT:  How do you say that last name?

13         PROSPECTIVE JUROR MAZID:  Mazid, M-A-Z-I-D.

14         THE COURT:  Mazid?

15         PROSPECTIVE JUROR MAZID:  Uh-huh.

16         THE COURT:  What is your situation?

17         PROSPECTIVE JUROR MAZID:  I have some health

18  situations.  I have a doctor's appointment tomorrow morning,

19  and I'm going through some tests.

20         THE COURT:  Well, are you infectious right now?

21         PROSPECTIVE JUROR MAZID:  No.  No.  No.

22         THE COURT:  Do you have the flu, cold, bronchitis or

23  anything like that?

24         PROSPECTIVE JUROR MAZID:  No.

25         THE COURT:  Okay.  Then I want to hold those kinds of

 1   problems until later.

 2            PROSPECTIVE JUROR MAZID:  Okay.

 3            THE COURT:  You might get excused, anyway.  But right

 4   now I'm trying to get rid of anybody who may be infectious and

 5   get our jury pool contaminated.

 6            Anyone else have the flu, a cold, bronchitis, bad

 7   cold, hacking and coughing?

 8            Yes, ma'am.  Come forward.

 9            You see, jury service is a service to your country.

10   You are making a sacrifice.  These lawyers here are getting

11   paid a lot of money to be here, but you're not.

12            And, you're making a sacrifice to your country to

13   serve on this jury.  And, I'm not going to expose you to

14   getting the flu as, well.  So we are going to get rid of

15   anybody with the flu.

16            Yes, ma'am.  What is your situation and your name?

17            PROSPECTIVE JUROR JACOBSON:  My name is Heather

18   Jacobson.  I think I'm at the tail end of a cold.  Everyone in

19   my household has been sick with cold and flu so -- I mean, I

20   feel okay.  I just wanted you to -- I'm blowing my nose all

21   day, but besides that I'm okay.

22            THE COURT:  You have been blowing your nose?

23            PROSPECTIVE JUROR JACOBSON:  Yes.

24            THE COURT:  Today?

25            PROSPECTIVE JUROR JACOBSON:  I just don't want to be

1    an interruption, but I feel fine.

2              THE COURT:  Is that handkerchief a prop?  That

3    Kleenex?

4              PROSPECTIVE JUROR JACOBSON:  No.

5              THE COURT:  You have come down with it and you are

6    getting over it?

7              PROSPECTIVE JUROR JACOBSON:  I'm getting over it,

8    yes.

9              THE COURT:  I'm going to excuse you.  What's your

10   name?

11             PROSPECTIVE JUROR JACOBSON:  Heather Jacobson.

12             THE COURT:  I'm going excuse Ms. Jacobson unless

13   there is an objection.

14             MR. KESSLER:  No objection, Your Honor.

15             MR. KATZ:  No objection.

16             MR. PARCHER:  No objection.

17             THE COURT:  Go back.  I know you are on the rebound,

18   but let's not take a chance.

19             Anybody else out there?

20             I see a hand.  Please come forward.

21             Okay.  And your name?

22             PROSPECTIVE JUROR HUANG:  My name is Judy Huang.

23             THE COURT:  What is your last name?

24             PROSPECTIVE JUROR HUANG:  Judy Huang.

25             THE COURT:  And was your situation?  Wong.

1          PROSPECTIVE JUROR HUANG:  English is my second

2    language.  I'm might not understand some special -- in the

3    Court, and some --

4          THE COURT:  Are you saying you are going to have a

5    hard time understanding the trial because your English is not

6    so good?

7          PROSPECTIVE JUROR HUANG:  Uh-huh, yes.  It's not good

8    enough I hear, yeah.

9          THE COURT:  You are a citizen, of course right?

10         PROSPECTIVE JUROR HUANG:  Yes.

11         THE COURT:  How long have you been a citizen?

12         PROSPECTIVE JUROR HUANG:  I think eight year, eight

13   year.

14         THE COURT:  Eight years?

15         PROSPECTIVE JUROR HUANG:  Yes.

16         THE COURT:  All right.  You didn't come forward on

17   account of the flu and all that, but I'm going to excuse

18   Mrs. Huang?  What's your last name?

19         PROSPECTIVE JUROR HUANG:  Huang, H-U-A-N-G.

20         THE COURT:  I'm going to excuse you unless there is

21   any objection.

22         Any objection?

23         MR. KESSLER:   No objection.

24         MR. PARCHER:  No objection.

25         THE COURT:  All right, thank you.  Go back to the

1    jury assembly room and tell them what happened.

2              PROSPECTIVE JUROR HUANG:  Okay.  Thank you.

3              THE COURT:  All right.  Thank you.

4              Anyone else?  I want to limit, though -- just raise

5    your hand if you feel like you have got a flu, a bad cold,

6    bronchitis, hacking and coughing.

7              Anyone out there who's a heavy smoker, who hacks and

8    coughs?  Whether you are sick or not, I want you to raise your

9    hand.

10             Sometimes -- all right.  No one's raising your hand.

11             See, I'm looking out for you already.  I'm making

12   sure that if you stay on this jury, you are going to stay

13   healthy.

14             All right.  Now, let's turn to a different subject.

15   I'm going to tell you what this case is about.  This is a class

16   action lawsuit.

17             A class action -- now, this is a civil case.  This is

18   not a criminal case.  So, this is one side sues the other one

19   for money.

20             This is not a case where somebody goes to prison.

21   All right.  A class action is a form of a lawsuit where the

22   class representatives seek to bring a claim on behalf of a

23   large group of people who are similarly situated.

24             All right.  Now, Mr. Herb Adderley, who you met, is

25   the representative of the class, a class of retired NFL

1  players, who, like Mr. Adderley, signed something called a

2  Retired Player Group Licensing Authorization Form.

3          Now, that's very important in this case, this word.

4  So I'm going to -- this phrase, I'm going to repeat it.

5  Retired Player Group Licensing Authorization Form, which I'll

6  refer to as Retired Player GLA.

7          Now, I'm just giving you an overview of what this

8  case is about, for purposes of helping you understand whether

9  or not you might have some biases involved.

10          So, later on when the evidence actually starts, you

11  will have to learn all of this in great detail, those of you

12  who serve on the jury.

13          All right.  Now, the Retired Player GLAs signed by

14  the members of the class were in effect during the periods of

15  February, 2004 to February, 2007.

16          Now, there are two Defendants in the case.  The first

17  is the National Football League Players Association, which is a

18  labor union.   Sometimes we will call that the "NFLPA," Players

19  Association.

20          The second is Players, Inc., which is a subsidiary of

21  the NFLPA.  And that's engaged in the licensing business.

22          As you will learn, this case concerns licensing,

23  licensing of images.

24          Okay.  Mr. Adderley and the class of players he

25  represents allege that Defendants breached the GLAs, which the

1  retired players signed, but from which they claim they received

2  no payments.

3         Further, Plaintiffs allege that Defendants executed

4  several licensing agreements from which the GLA class should

5  have been compensated.  Now, what they're talking about here

6  are licensing agreements with other people, like a company

7  called Electronic Arts.  Some of you might have heard of that.

8         So that statement is not too clear.  Let me reread

9  that.

10        Plaintiffs further allege that Defendants executed

11  several licensing agreements, not with Mr. Adderley, but with

12  other people, from which the GLA class allegedly should have

13  been compensated.

14        Plaintiffs allege that Defendants' failure to

15  compensate the GLA class is a breach of contract.  Plaintiffs

16  also allege that Defendants breached fiduciary duties they owed

17  to the class, by, among other things, failing adequately to

18  report information, failing to represent the interests of those

19  retired players who signed GLAs, and failing to pay those

20  retired players when their rights were licensed.

21        So those are the allegations.  Now, here's what the

22  Defendants say.  The NFLPA and Players Inc. deny all claims

23  against them.  The NFLPA and Players Inc. contend first that

24  Mr. Adderley and the class members he represents received all

25  money due them.

 1          And, too, all of the money that Adderley and the GLA

 2   class are claiming in this action is money that was paid in

 3   exchange for the group licensing rights of active players, not

 4   retired players.

 5          Maybe I misread that.  Let me repeat it.

 6          The Defendants say that all of the money that

 7   Adderley and the GLA class are claiming in this action is money

 8   that was paid in exchange for the group licensing rights of

 9   active players, not retired players.

10          I think -- that's not very clear, but I think what

11   they're trying to say is that the Plaintiffs, who are retired

12   players, the Defendants allege, are going after money in this

13   case that belongs to the active players, according to the

14   defense.

15          Now, that's what the jury is going to have to sort

16   out.  I'm not saying who's right or wrong on that.  That's for

17   the jury.

18          All right.  Defendants contend that neither Adderley

19   nor GLA class members have a legal right to the money generated

20   by the group licensing rights of active NFL players.

21          The NFLPA and Players Inc. further deny that they

22   breached any fiduciary obligations to Adderley or any class

23   member.

24          All right.  So that's kind of what this case is

25   about.

 1            How long will it take?  Well, without getting into

 2     details, there are time limits on both sides.  This is to --

 3     this is to encourage the lawyers to get right to the point, and

 4     to not consume undue amounts of the jury's time.

 5            But all that having been said, I will tell you how

 6     long I think this case is going to go.  This week, we will be

 7     in session Monday, Tuesday, Wednesday.  Then, the following

 8     week, all five days.

 9            And then, the following week, all five of those days.

10     And it's my expectation that by the end of the week of

11     November -- that ends on November 7th, I believe, yes, that the

12     case, our closing arguments will be made.

13            But, I think the jury should be able to be here

14     through the 14th of November to deliberate in case I'm off on

15     my estimates.  And I would say that while I don't think we are

16     going to be here the week of November 17th, I think the case

17     will be over by then.  Just in case, you need to be able to

18     have that time set aside.

19            So that the -- the time period that you would be

20     committed to, but not necessarily run up to, is November 21,

21     which is the Friday before Thanksgiving.

22            Again, though, it's my expectation that the arguments

23     to you will commence on, on or before November 7th, which is a

24     Friday.  And that the case will be decided by you by the

25     14th of November, with the cushion week of November 17th, just

1   in case I'm wrong.

2            It looks like the 11th is Armistice Day.  Armistice

3   Day.  So, that's a court holiday.  We won't be in session on

4   that day.

5            Now, I'm going to ask when you come forward -- I

6   think all of you have been cleared for hardship for that time

7   period, if I understand the procedure correctly.  But I'll give

8   you another chance to raise some issue of hardship if your name

9   is called, and you come forward.

10           Now, let's turn to what we are going to do this

11  morning.  What we are going to try to do is select the jury and

12  have the opening statements today and get this case underway.

13           We need to get ten jurors.  And there's a procedure

14  for doing this.  And rather than me try to explain it in

15  advance, it's better just for you to see how it works in

16  practice and for us to just jump in and get going on it.

17           But, the key is:  What are we trying to do here?

18  We're not trying to necessarily get people who watch football

19  every Sunday afternoon and can't be pulled away.  No, that --

20  what we are trying to get are 12 people -- not 12, ten -- 12

21  jurors who can be fair and will pay attention to the evidence

22  and will apply the law as I will give it to you at the end of

23  the case, and lay the law alongside the facts and decide what

24  the facts are, and then make a ruling.

25           You have got to be fair and impartial.  That's the

1  essence of our system.  So, that's what we are trying to do

2  today.  And along the way we are going to ask you some

3  questions to find out about any potential biases or life

4  experiences that might create a bias.

5          And, you know, we want to know about that.  It might

6  not necessarily disqualify you, but it could be that when the

7  lawyers go to use their peremptory challenges, which are

8  challenges they can make without regard to specific cause, that

9  they might decide they would rather have someone else on the

10 jury than someone with a potential bias.

11         So, we will be asking you some questions, not -- not

12 to pry too much, but we have to pry a little bit, in order to

13 determine if there's a basis for any -- for any bias.

14         Now, remember, when you are called forward, you are

15 under oath.  You must be completely truthful.  And I know that

16 you will be in all the answers that you give.

17         We are going to call forward at this time 16 names.

18 And I'll tell you where to sit as your name is called.

19         So let's start with the first person.

20         THE CLERK:  Gabrielle Denise Timlin,  T-I-M-L-I-N.

21         THE COURT:  All right.  Gabriel Timlin, correct?

22         PROSPECTIVE JUROR TIMLIN:  Yes.

23         THE COURT:  All right.  How are you today?

24         PROSPECTIVE JUROR TIMLIN:  Doing very well.  Thank

25 you.

 1            THE COURT:  Please sit in the first cushioned chair,

 2   the regular chair.  And we will fill those other two chairs up

 3   last.

 4            So, Ms. Timlin, you are in seat No. 1.

 5            No, no, no.  The first -- the regular chair.

 6            Right there.  Okay.  Welcome.  Next?

 7            THE CLERK:  Nancy Jean Smith, S-M-I-T-H.

 8            THE COURT:  Okay.  Ms. Smith, how are you today?

 9            PROSPECTIVE JUROR SMITH:  Very good.  Thank you.

10            THE COURT:  Welcome.  Have a seat next to Ms. Timlin.

11            Next?

12            THE CLERK:  Charles Burchard McEachron,

13   M-C-E-A-C-H-R-O-N.

14            THE COURT:  Okay.  Good morning.  How are you today?

15            PROSPECTIVE  MCEACHRON:  Very well.  How are you?

16            THE COURT:  Good.  Please have a seat next to Mrs.

17   Smith.

18            Next?

19            THE CLERK:  Danny Chui, C-H-U-I.

20            THE COURT:  Good morning, sir.

21            PROSPECTIVE JUROR CHUI:  Good morning.

22            THE COURT:  Please have a seat next to Mister -- how

23   do you say your name, Mc --

24            PROSPECTIVE  MCEACHRON:  McEachron.

25            THE COURT:  McEachron I got it.  Okay.

1              All right, next?

2              THE CLERK:  James Allen Brown, B-R-O-W-N.

3              THE COURT:  Okay.  Where is he?

4              Here we go.  Mr. Brown.

5              All right.  Next?

6              THE CLERK:  Douglas Arthur Clark Neville,

7     N-E-V-I-L-L-E.

8              THE COURT:  Mr. Neville, how are you?

9              PROSPECTIVE JUROR NEVILLE:  Good, thank you.

10             THE COURT:  Thank you.  Please have that next seat.

11             Next?

12             THE CLERK:  Athanasios Foufoulas, F-O-U-F-O-U-L-A-S.

13             THE COURT:  How do you say your name?

14             PROSPECTIVE JUROR FOUFOULAS:  Foufoulas.

15             THE COURT:  Foufoulas.  All right.  Please have that

16    last seat there.

17             Then, next?

18             THE CLERK:  Andrea Appell, A-P-P-E-L-L.

19             THE COURT:  Okay.  Ms. Appell, are we saying that

20    right?

21             PROSPECTIVE JUROR FOUFOULAS:  Yes.

22             THE COURT:  Okay, welcome.  Please have the seat

23    behind Ms. Timlin.

24             THE CLERK:  Jano Koely Porter, P-O-R-T-E-R.

25             THE COURT:  Ms. Porter, how are you?

1           PROSPECTIVE JUROR PORTER:  Fine.

2           THE COURT:  Great.  Have that next seat, please.

3           All right.  And, continue.

4           THE CLERK:  Andrea Casotto, C-A-S-O-T-T-O.

5           THE COURT:  All right.  Good morning.  Casotto, is

6   that the way you say it?

7           PROSPECTIVE JUROR CASOTTO:  About right.

8           THE COURT:  Okay, thank you.  Have that next seat.

9           All right.  Who's next?

10          THE CLERK:  Jodie Akemi Yoshioka, Y-O-S-H-I-O-K-A.

11          THE COURT:  Good morning.

12          Okay, the next?

13          THE CLERK:  Ofelia Schwartzler,

14  S-C-H-W-A-R-T-Z-L-E-R.

15          THE COURT:  Good morning.

16          Next.

17          THE CLERK:  Jessie Rae, Kainz, K-A-I-N-Z.

18          THE COURT:  All right.  Good morning to you.

19          PROSPECTIVE JUROR KAINZ:  Good morning.

20          THE CLERK:  Beatrice D. Kahoonei, K-A-H-O-O-N-E-I.

21          THE COURT:  Good morning.  Please have that last seat

22  in the corner.

23          Next?

24          THE CLERK:  Barbara C. Dunlap, D-U-N-L-A-P.

25          THE COURT:  Okay.  Ms. Dunlap, if you will come sit

1  down here in this temporary chair.

2          When we actually pick the jury we will not need this

3  many seats, but temporarily I need to ask you to sit there, if

4  you don't mind.

5          Thank you, Ms. Dunlap.

6          Next?

7          THE CLERK:  Pamela N. Curtiss-Horton,

8  C-U-R-T-I-S-S-H-O-R-T-O-N.

9          THE COURT:  Good morning.

10         PROSPECTIVE JUROR CURTISS-HORTON:  Good morning.

11         THE COURT:  The last seat up there is yours, if you

12 can find a way to get there.  I think you have to go around the

13 bailiff's box.

14         Are we saying that right, Curtiss-Horton?

15         PROSPECTIVE JUROR CURTISS-HORTON:  Yes.

16         THE COURT:  Okay.  Now, the rest of you back there

17 please pay close attention, because there's a good chance some

18 of you will be called forward.  And it will speed things up if

19 I can ask you a shorthand question when you do come forward,

20 whether or not you listened to all the questions and heard

21 everything and was there anything that rung a bell with you.

22 And then, you can just tell us.  So if there's a question that

23 comes up that you feel like you have got to respond on,

24 remember that, and I'll ask you -- ask you to tell us what it

25 was.

 1              So, all right.  So, first of all, I need to ask if

 2    there's anyone who would have a hardship sitting on the jury,

 3    if need be, all the way up to November 21.

 4              If so, raise your hand.

 5              Okay.  All right.  I'm going to -- let's take the

 6    microphone over to Ms. Dunlap.  We will start with you,

 7    Ms. Dunlap.

 8              So, just make sure it's on.

 9              Your name is Ms. Dunlap?

10              PROSPECTIVE JUROR DUNLAP:  Yes.

11              THE COURT:  Okay.  What is your hardship?

12              By the way, if any of these hardship problems are so

13    sensitive that they require a more private hearing, I'll wait

14    to hear your issue until the courtroom is more clear.

15              I can't do that right now, though.  So, if you would

16    like that, I am happy to try to accommodate you at least to

17    that extent.

18              So, Ms. Dunlap, do you have a hardship issue you want

19    to bring up now?

20              PROSPECTIVE JUROR DUNLAP:  Yes.  It just came up,

21    care for minor children.

22              THE COURT:  I'm sorry.  You need to speak into the

23    mic.

24              PROSPECTIVE JUROR DUNLAP:  Okay.  Is that better?

25              THE COURT:  That's much better.

1          PROSPECTIVE JUROR DUNLAP:  Okay.  It just came up.  I

2     have to care for minor children Mondays Wednesdays and Fridays.

3          THE COURT:  These are your children?

4          PROSPECTIVE JUROR DUNLAP:  My grandchildren.

5          THE COURT:  Now, you will be in session here through

6     1:00.  Our hours will be 7:45 in the morning until 1:00 in the

7     afternoon.  Then, you get to go home.  You can do whatever you

8     would like to do then --

9          PROSPECTIVE JUROR DUNLAP:  Yeah.

10         THE COURT:  -- until you start deliberating.  At the

11    time you start deliberating, usually the juries stay here all

12    day.  But at least for the first three weeks you would be free

13    at 1:00.  So, can you work with that?

14         PROSPECTIVE JUROR DUNLAP:  That works every day but

15    Friday.

16         THE COURT:  What happens on Friday?

17         PROSPECTIVE JUROR DUNLAP:  That starts -- it starts

18    3:00 to 7:00 in the afternoon, except on Friday it's like noon

19    to 7:00.

20         THE COURT:  Can you get that adjusted so that --

21         PROSPECTIVE JUROR DUNLAP:  No, I'm sort of the go-to

22    person.

23         THE COURT:  These are your grandchildren?

24         PROSPECTIVE JUROR DUNLAP:  Uh-huh.

25         THE COURT:  Do your own children have any other

 1  alternatives so that you can accommodate and serve --

 2          PROSPECTIVE JUROR DUNLAP:  No.

 3          THE COURT:  -- here in your United States District

 4  Court?

 5          PROSPECTIVE JUROR DUNLAP:  No.  Sorry.

 6          THE COURT:  These are not your children.  I'm not

 7  sure this is a valid request, Ms. Dunlap.  I'm going to think

 8  about it.

 9          PROSPECTIVE JUROR DUNLAP:  Okay.

10          THE COURT:  But, they -- they knew you were on -- why

11  couldn't they have made some other arrangements?

12          PROSPECTIVE JUROR DUNLAP:  This just came up in the

13  last couple weeks.

14          THE COURT:  But what do you mean it just came up?

15  What is the problem that they could not have made alternative

16  arrangements?

17          PROSPECTIVE JUROR DUNLAP:  Both of their parents

18  work, and they just split up.  And, there isn't anybody else to

19  take care of them.

20          THE COURT:  All right.  I'll think about it.

21          Who else raised their hand?

22          Ms. Timlin.

23          PROSPECTIVE JUROR TIMLIN:  A possible medical

24  problem.  Only possible.  May I talk with you in private about

25  that?

1                THE COURT:  All right.  We will come back to you.

2    Not at this moment, but later.

3                PROSPECTIVE JUROR TIMLIN:  Of course.

4                THE COURT:  All right.  Who else raised their hand on

5    the front row?

6                Pass it all the way down to Mr. Neville.

7                PROSPECTIVE JUROR NEVILLE:  It's not so much a

8    hardship.  I do have vacation plans November 9th.

9                THE COURT:  Well, one day?

10               PROSPECTIVE JUROR NEVILLE:  No, it's for a week

11   starting November 9th.

12               THE COURT:  Do you already have prepaid tickets to go

13   someplace?

14               PROSPECTIVE JUROR NEVILLE:  Yes.

15               THE COURT:  They are prepaid?

16               PROSPECTIVE JUROR NEVILLE:  Well, I go standby on an

17   airline, but I do have a prepaid hotel.

18               THE COURT:  Can you get your money back?

19               PROSPECTIVE JUROR NEVILLE:  Oh, probably.

20               THE COURT:  Prepaid airplane tickets that you can't

21   get your money back on, I would let you out on that.  But

22   hotel, you can usually get back.

23               Tell me how important this vacation is.

24               PROSPECTIVE JUROR NEVILLE:  Oh, I would like to go,

25   of course.  And my wife has the time off, So it's up to you.

1              THE COURT:  Well, it sounds like I should deny this

2     request.  But, I -- if this was your 40th anniversary, and, you

3     know, your wife and you were counting on this -- you're not old

4     enough to have a 40th anniversary yet.  But let's say it's your

5     25th anniversary, or your 20th, I would probably say:  "Okay.

6     I'll excuse you."

7              But just another vacation, I don't know.

8              PROSPECTIVE JUROR NEVILLE:  It's just another

9     vacation.

10             THE COURT:  All right.  I'm going to deny that

11    request, Mr. Neville.  But, I -- I'm reading between the lines

12    that you can live with serving on this jury, and do your

13    vacation later.  All right?

14             PROSPECTIVE JUROR NEVILLE:  Yes, I would just have to

15    do it alone.

16             THE COURT:  Let's go to Mr. Foufoulas.  Did you have

17    a -- what was your -- what is your --

18             PROSPECTIVE JUROR FOUFOULAS:  I'm scheduled to be

19    outside the country next week.  I'm tending to family issues

20    abroad.

21             THE COURT:  You have prepaid airplane tickets to do

22    that?

23             PROSPECTIVE JUROR FOUFOULAS:  Correct.

24             THE COURT:  They are already paid for?

25             PROSPECTIVE JUROR FOUFOULAS:  Correct.

 1              THE COURT:  What country are you going to?

 2              PROSPECTIVE JUROR FOUFOULAS:  Greece.

 3              THE COURT:  How long has this been -- how long have

 4  you had these plans already made up?

 5              PROSPECTIVE JUROR FOUFOULAS:  I booked it in July.

 6              THE COURT:  Didn't you tell the jury administrator

 7  that a long time ago?

 8              PROSPECTIVE JUROR FOUFOULAS:  I wasn't aware of the

 9  duration of the proceedings.  So I was hoping if the

10  proceedings were shorter, I should be able to be here, before

11  my trip.

12              THE COURT:  But you are going next week.

13              PROSPECTIVE JUROR FOUFOULAS:  Correct.  I'm leaving

14  on Friday.

15              THE COURT:  You thought we would have a four-day

16  trial?

17              PROSPECTIVE JUROR FOUFOULAS:  I wasn't aware, Your

18  Honor.

19              THE COURT:  So you have already paid and you have

20  not -- are they non-refundable tickets?

21              PROSPECTIVE JUROR FOUFOULAS:  Correct.  When I say

22  I'm attending to family issues, my father has some health

23  issues that I need to be there for.

24              THE COURT:  And he's in Greece?

25              PROSPECTIVE JUROR FOUFOULAS:  Correct.

 1              THE COURT:  All right.  I'm going to excuse you,

 2   Mr. Foufoulas.  Go back to the jury -- is there an objection?

 3              MR. PARCHER:  No objection.

 4              MR. KESSLER:  No objection.

 5              THE COURT:  All right.  You are excused.

 6              PROSPECTIVE JUROR FOUFOULAS:  Thank you.

 7              THE COURT:  Go back to jury assembly room.  Please

 8   tell them what happened.  Let's call another name to replace

 9   Mr. Foufoulas.

10              THE CLERK:  Kent Michael Doan, D-O-A-N.

11              THE COURT:  Okay.  Mr. Doan, how are you?

12              PROSPECTIVE JUROR DOAN:  Hanging in there.

13              THE COURT:  Great.  Any hardship issue you want to

14   raise?

15              PROSPECTIVE JUROR DOAN:  Start my job today.

16              THE COURT:  What?

17              PROSPECTIVE JUROR DOAN:  I'm starting my job today.

18   At least it's supposed to.  So that starts at 12:00.

19              THE COURT:  You speak into the mic.

20              PROSPECTIVE JUROR DOAN:  Where's the mic?

21              THE COURT:  Are you raising a hardship issue?

22

23              PROSPECTIVE JUROR DOAN:  No, I just -- my first day

24   on the job, so I won't have a job if I stay here.

25              MR. KESSLER:  Sounds like hardship, Your Honor.

1          THE COURT:  Wait a minute.  Are you going to lose

2    your job if you serve on this jury?

3          PROSPECTIVE JUROR DOAN:  Yes.  I teach part-time,

4    in -- my course at the college I teach at starts my first day

5    today, at 12:00.  And it goes for eleven weeks until, what is

6    it, January.  So I won't be able to teach it.

7          So, I won't be able to teach any of the classes I

8    teach.

9          THE COURT:  Well, what -- you can't teach them in the

10   afternoon?

11         PROSPECTIVE JUROR DOAN:  No, they've already

12   scheduled it.  I teach 12:00 to 2:00, and then I teach on, what

13   is it, Tuesdays and Thursdays from 8:00 to 10:00.

14         THE COURT:  Are you a full-time employee?

15         PROSPECTIVE JUROR DOAN:  No, I'm part-time.

16         THE COURT:  You know, if you were full-time, and they

17   tried to fire you because you were on a jury, the U.S. Marshal

18   would be paying them a visit.

19         PROSPECTIVE JUROR DOAN:  I realize that, but I'm not,

20   I'm part-time.

21         THE COURT:  Any objection to excusing Mr. Doan?

22         MR. KESSLER:  No objection.

23         THE COURT:  All right.  Go back to the jury assembly

24   room and tell them what happened.

25         Let's replace Mr. Doan.

1          THE CLERK:  Alexander Oliver Ranada, R-A-N-A-D-A.

2          THE COURT:  Okay, Mr. Ranada.  How are you?  Please

3    have a seat.

4          Do you have any hardship issues?

5          PROSPECTIVE JUROR RANADA:  No.

6          THE COURT:  Thanks.  Great.  On the second row,

7    anybody have a hardship issue?

8          Okay Ms. Kahoonei?

9          PROSPECTIVE JUROR KAHOONEI:  I just lost my husband

10   seven months ago, so I'm the sole supporter.  And I have a son

11   that still lives at home.

12         THE COURT:  You're a sole supporter?

13         PROSPECTIVE JUROR KAHOONEI:  Yes.  I just live on one

14   income, just my income.

15         THE COURT:  I understand.  But if you serve on the

16   jury you won't get paid?  Or what is your job?

17         PROSPECTIVE JUROR KAHOONEI:  I just started a job,

18   that's not a problem.  But I don't have any vacation accrued.

19   I just started two months ago, and they only pay for three

20   days.

21         THE COURT:  They only pay for three days of jury

22   service?

23         PROSPECTIVE JUROR KAHOONEI:  Yes.

24         THE COURT:  So, are you saying that you won't be able

25   to pay the rent, or you won't be able to buy groceries?  I'm

1    not quite -- I'm sorry about your husband.

2              PROSPECTIVE JUROR KAHOONEI:  I won't be able to pay

3    for my mortgage.

4              THE COURT:  What?

5              PROSPECTIVE JUROR KAHOONEI:  I won't be able to pay

6    for my mortgage.

7              THE COURT:  You won't be able to pay for your

8    mortgage if you serve on this jury.

9              PROSPECTIVE JUROR KAHOONEI:  Yes, through the 20th.

10             THE COURT:  All right.  I'm going to take that at

11   face value and excuse Ms. Kahoonei unless there's an objection.

12             Any objection?

13             MR. PARCHER:  No objection.

14             THE COURT:  Okay, thank you.

15             Go back to the jury assembly room and tell them what

16   happened.

17             All right.  Lets replace Ms. Kahoonei.

18             THE CLERK:  Stephen Douglas Simoni, S-I-M-O-N-I.

19             THE COURT:  Okay.  Welcome, sir.  How are you?

20             PROSPECTIVE JUROR SIMONI:  Good.

21             THE COURT:  Any hardship?

22             PROSPECTIVE JUROR SIMONI:  Yes.

23             THE COURT:  Please tell us what it is.

24             PROSPECTIVE JUROR SIMONI:  I'm a general contractor

25   currently in the middle of a house half tore up and with the

1  kitchen being the biggest portion of the project, and need to

2  have this thing finished by Thanksgiving.

3           THE COURT:  You need to have the trial finished by

4  Thanksgiving?

5           PROSPECTIVE JUROR SIMONI:  No, I need to be on the

6  job.  And my mind is not going to be here.  It's where I need

7  to be on the job, so --

8           THE COURT:  Can you do the work after you get out of

9  court?

10          PROSPECTIVE JUROR SIMONI:  No.  You do it when the

11  customers -- this is a -- half a house is tore up.  We just got

12  it rocked.  It's painted.  No cabinets.

13          THE COURT:  Have you ever served on a jury?

14          PROSPECTIVE JUROR SIMONI:  Never.

15          I've sent in excuses, and it's always --

16          THE COURT:  Let me ask you this.  We need people from

17  all walks of life to serve their country by serving on this

18  jury, by serving on a jury.  So when are you ever going to

19  serve?  Aren't you always going to have this excuse?  You have

20  got some house to build?  When are you ever going to do your

21  jury service?

22          PROSPECTIVE JUROR SIMONI:  Well, when I retire

23  there's plenty of time for that.  Right now this is not the

24  economy to be playing around with -- you are bidding them to

25  get them, and there's not a lot of money in these projects

 1  right now.

 2          THE COURT:  Well, it's not a good enough answer to

 3  say you are going to wait until you retire to do your jury

 4  service.  I'm going to let you go this time Mr. Simoni, on

 5  account of you got this house that's -- but, I want to tell

 6  you, I don't think it's right.  All these other people are

 7  making room for this trial.  But you're not.

 8          You want the benefits of the society, but you don't

 9  want to do your obligation as a juror.  I'm going to excuse Mr.

10  Simoni unless there's an objection.

11          Any objection?

12          MR. KESSLER:  No objection.

13          THE COURT:  All right.  You are excused, sir.

14          Let's replace Mr. Simoni.

15          THE CLERK:  Robin Matthew Thomas, T-H-O-M-A-S.

16          THE COURT:  All right.  How are you?

17          PROSPECTIVE JUROR THOMAS:  Pretty good.

18          THE COURT:  Any excuses? Any hardship?

19          PROSPECTIVE JUROR THOMAS:  Yes, sir.

20          THE COURT:  All right.  Let's hear it.

21          PROSPECTIVE JUROR THOMAS:  First of all, I would say

22  it would be an honor --

23          THE COURT:  Please speak into the mic.  It is

24  probably on.

25          PROSPECTIVE JUROR THOMAS:  Can you hear me now?

1              THE COURT:  Yes.  That's much better.

2              PROSPECTIVE JUROR THOMAS:  At this present time, Your

3    Honor, I'm going through a pretty bad divorce.  It's getting

4    ready to go to court.  I'm paying 74 -- 74 percent of my wages

5    right now for three kids and an ex-wife.  And I get two weeks

6    for jury pay.

7              If it goes beyond that, I won't be able to pay for my

8    apartment.  As it is right now I'm working overtime so I can

9    subsidize the income.

10             THE COURT:  Have you ever served on a jury?

11             PROSPECTIVE JUROR THOMAS:  No, sir.  I went to Contra

12   Costa County one time, but was not elected.

13             THE COURT:  Well, can you take some of your vacation

14   time?  You get two weeks from your employer.  Why can't you

15   take the rest in vacation time?

16             PROSPECTIVE JUROR THOMAS:  I could probably do that.

17             THE COURT:  Well, tell me how much of a hardship that

18   is on you.  How much of a hardship is it?

19             PROSPECTIVE JUROR THOMAS:  Well, at this point, when

20   I see my kids on the weekend I don't even have enough money to

21   take them to Burger King.  What I do is I buy lunchmeat and

22   stuff and we have sandwiches every weekend.  Based on the

23   Dissomaster, basically, what I figured out is I'm living off of

24   about $13 a day.

25             THE COURT:  Well, how will not serving on this jury

 1   help you?

 2            PROSPECTIVE JUROR THOMAS:  Well, if I go beyond the

 3   two weeks, then based on $40 a day and travel, there would be

 4   absolutely no way that I can continue to afford my apartment.

 5   As it is right now, with the amount of money that I've already

 6   paid for the last month, I was basically about $800 in the

 7   hole.

 8            THE COURT:  All right.  I'm going to excuse

 9   Mr. Thomas unless there's an objection.  Any objection?

10            MR. KESSLER:  No objection.

11            MR. PARCHER:  No objection.

12            THE COURT:  Thank you, Mr. Thomas.  Go back to the

13   jury room and tell them what happened.

14            Let's replace Mr. Thomas.

15            THE CLERK:  Amy Jean Holm, H-O-L-M.

16            THE COURT:  Ms. Holm, how are you?

17            PROSPECTIVE JUROR HOLM:  Good.

18            THE COURT:  Any hardship issue?

19            PROSPECTIVE JUROR HOLM:  No.

20            THE COURT:  Great.  Anyone else on the back row raise

21   a hardship issue?

22            Ms. Kainz?

23            PROSPECTIVE JUROR KAINZ:  It's Kainz.

24            THE COURT:  Kainz.  I have to be out of my residence.

25   I have to move.  I have to move on the 1st.  1st of November?

1          PROSPECTIVE JUROR KAINZ:  Yes.

2          THE COURT:  Why can't you do that and still serve?

3          PROSPECTIVE JUROR KAINZ:  I would consider it a

4  hardship to have to try to move out of my place, all that

5  entails, into another place and drive all the way here from

6  Healdsburg every day.

7          THE COURT:  Well, is it a -- how extensive is the

8  move?  Is it an apartment?

9          PROSPECTIVE JUROR KAINZ:  Yes.

10          THE COURT:  Are you moving yourself or do you have a

11  mover?

12          PROSPECTIVE JUROR KAINZ:  No, I'm moving myself.

13          THE COURT:  Any other hardship?

14          PROSPECTIVE JUROR KAINZ:  No.

15          THE COURT:  Well, I'm going to take that under

16  advisement.  I'm not sure that that is quite good enough.  I'm

17  sympathetic, but let's see who else raised their hand.

18          Ms. Yoshioka.

19          PROSPECTIVE JUROR YOSHIOKA:  My company will only pay

20  for three days of jury service.

21          THE COURT:  Well, that's why it's called a

22  "sacrifice."

23          PROSPECTIVE JUROR YOSHIOKA:  Well, true.  And I know

24  that we do get a payment, but I live in San Francisco, so --

25          THE COURT:  Are they going to kick you out of your

1  house or your apartment on account of serving on this jury?

2          PROSPECTIVE JUROR YOSHIOKA:  I don't -- well, just to

3  make rent.

4          THE COURT:  You can make rent, can't you?

5          PROSPECTIVE JUROR YOSHIOKA:  With not working for

6  three weeks, no.

7          THE COURT:  What is your job?

8          PROSPECTIVE JUROR YOSHIOKA:  I work at a media

9  company.

10          THE COURT:  And, do you have vacation accrued?

11          PROSPECTIVE JUROR YOSHIOKA:  I have some.

12          THE COURT:  So, you're saying that if you serve on

13  the jury they're not going to pay you?

14          PROSPECTIVE JUROR YOSHIOKA:  Right.

15          THE COURT:  All right.  So, you don't get paid.  You

16  have money in the bank?  Can you fall back on that?

17          PROSPECTIVE JUROR YOSHIOKA:  Sort of.  I mean, not --

18  not to live, you know.

19          THE COURT:  Are you single, married, children?

20          PROSPECTIVE JUROR YOSHIOKA:  Single.

21          THE COURT:  Say it again?

22          PROSPECTIVE JUROR YOSHIOKA:  Single.

23          THE COURT:  Do you have any children to support?

24          PROSPECTIVE JUROR YOSHIOKA:  No.

25          THE COURT:  Do you have any roommates that would help

 1 | with the rent?

 2 |         PROSPECTIVE JUROR YOSHIOKA:  No.

 3 |         THE COURT:  Well, I'm not hearing you say that you

 4 | would be unable to -- that they are going to kick you out

 5 | because you won't be able to pay the rent.

 6 |         Now, if it's that severe I would say okay.  We can't

 7 | put you in that position.  But most people have some money they

 8 | can fall back on, and they will still be able to put food on

 9 | the table and pay their rent if they do their jury service.

10 |         So, seems like it's going to be a sacrifice, but you

11 | could do it.  But you tell me.  Tell me why it's harsher than

12 | that.

13 |         PROSPECTIVE JUROR YOSHIOKA:  It would be tough

14 | probably to make rent without having three weeks of work.

15 |         THE COURT:  All right.  Let me think about it.

16 |         Okay.  Who else raised their hand?

17 |         PROSPECTIVE JUROR RANADA:  My name is Alexander

18 | Ranada.  I'm the founder and CEO of a very small software

19 | company in Silicon Valley.  We are trying to compete on the

20 | world market with our product.  And, while I would be happy to

21 | serve, I did not expect the duration of the proceedings to be

22 | in the weeks.  I think that it would be serious, put our

23 | company in serious danger if I'm not able to contribute with

24 | the support, customer, the development, the problem-fixing.

25 |         We have customers in Korea, Israel, and it requires

 1  support very early in the morning and sometimes very late at

 2  night.

 3              THE COURT:  How many people work for your company?

 4              PROSPECTIVE JUROR RANADA:  We used to be six.  We

 5  lost two to downsizing, and one changed job so we're down to

 6  four.

 7              THE COURT:  Why can't you work on this between 1:00

 8  and 7:45 in the mornings?

 9              PROSPECTIVE JUROR RANADA:  I certainly can.  It's

10  just, I normally work a lot longer than that in order to keep

11  the company viable.

12              THE COURT:  Is there some specific problem that you

13  see on the horizon during the next three or four weeks that --

14              PROSPECTIVE JUROR RANADA:  We are trying to get out

15  of a hole.  We just won Toshiba on the East Coast, Toshiba

16  America, and they are about to deploy the software so they will

17  require support.

18              In truth, there is nothing special happening in the

19  next three weeks.  Just a constant struggle to keep the company

20  afloat.

21              THE COURT:  Well, I am sympathetic to that, but I

22  feel like you are going to have this problem no matter when you

23  get called for jury service.  And it is a sacrifice.  The

24  hardship that you're raising is a generalized hardship on your

25  company.  So I'm afraid I'm going to deny your request.

1          PROSPECTIVE JUROR RANADA:  Okay.

2          THE COURT:  Thank you.

3          Anyone else on the back row have a hardship issue?

4          Ms. Porter?

5          PROSPECTIVE JUROR PORTER:  Yeah, my case, I taking

6   care of my grandchildren.  There's a baby, six months old.  And

7   my daughter, she will depend on me because she works and her

8   husband work.  And my job is taking care of her children Monday

9   through Friday.

10          THE COURT:  What time would you normally be taking

11  them?

12          PROSPECTIVE JUROR PORTER:  From 7:00 to 5:30, 7:00 in

13  the morning to 5:30.

14          THE COURT:  Why didn't you tell that to the jury

15  assembly people ahead of time?  Why is this just now coming up

16  now?

17          PROSPECTIVE JUROR PORTER:  Excuse me.  I didn't --

18          THE COURT:  Why didn't you tell this to the jury

19  assembly people a long time ago when you got the request for

20  jury service?

21          PROSPECTIVE JUROR PORTER:  Hmm, so I -- I didn't know

22  so that I have tell anything about that.

23          THE COURT:  All right.  Let me think about it.

24          Who else over there raised their -- Ms. Appell.  What

25  is your situation?

1          PROSPECTIVE JUROR APPELL:  Good morning, Your Honor.

2          THE COURT:  Good morning.

3          PROSPECTIVE JUROR APPELL:  First, I have a relative

4   that is a retired NFL player, so I'm not sure I can be fair and

5   impartial.

6          Second, logistically, I have an eleven-month-old that

7   requires my care.

8          THE COURT:  You have the eleven-month-old?

9          PROSPECTIVE JUROR APPELL:  Yes, my child.

10         THE COURT:  Is there anyone who can look after the

11  11-month old in your absence?

12         PROSPECTIVE JUROR APPELL:  Sure.  My husband, though

13  he travels frequently, he can help.  But if the travel comes up

14  that's when we are going to be stuck.

15         THE COURT:  Couldn't you just say to him, he's going

16  to have to do it?

17         PROSPECTIVE JUROR APPELL:  You know, business, I have

18  no control over his business demands.  I'm sorry, Your Honor.

19         THE COURT:  Well, but his children ought to come

20  first.  He can just say to the business, "tough."

21         PROSPECTIVE JUROR APPELL:  Certainly, that's true.

22  However, the fallback is usually, you know, a provider or me, I

23  generally work from my home office.

24         THE COURT:  Let me go back to the NFL player.  You

25  have a cousin who is a what now?

1          PROSPECTIVE JUROR APPELL:  No.  I have a relative by

2    marriage.

3          THE COURT:  Just a relative?

4          PROSPECTIVE JUROR APPELL:  By marriage.  My husband's

5    sister is married to a former NFL player.

6          THE COURT:  Your husband's sister is married to a

7    former NFL player?

8          PROSPECTIVE JUROR APPELL:  Yes, a retired player.

9          THE COURT:  Who is that?

10          PROSPECTIVE JUROR APPELL:  Robert Awalt.

11          THE COURT:  Is that one of our class members?

12          MR. KATZ:  We would have to check, Your Honor.

13          THE COURT:  Well, we don't know whether he's in the

14    class or not.

15          MR. KATZ:  Can we ask for the spelling.

16          THE COURT:  How do you spell the last name?

17          PROSPECTIVE JUROR APPELL:  A, as in apple, W-A, as in

18    apple, L-T, as in Tom.  Robert.

19          THE COURT:  Let me think about that problem.

20          Anyone else that I haven't spoken to that wants to

21    assert a hardship issue?

22          MR. KATZ:  Your Honor, he is a class member.

23          THE COURT: He is?  All right.

24          I think I got to excuse you, Ms. Appell, because you

25    are related by marriage to a member of the class.  That

 1  wouldn't be cool to leave you on, so we are going to have the

 2  replace you.

 3          PROSPECTIVE JUROR APPELL:  Thank you, Your Honor.

 4          THE COURT:  All right.  Any objection?

 5          MR. KESSLER:  No objection.

 6          THE COURT:  Thank you, Ms. Appell.  We will ask you

 7  to serve some other time.

 8          Thank you.

 9          PROSPECTIVE JUROR APPELL:  Thank you.

10          THE COURT:  Go back to the jury assembly room and

11  tell them what happened.

12          Okay.  Let's replace Ms. Appell.

13          Just leave the mic there with Ms. Curtiss-Horton.

14          THE CLERK:  Sanjida Shahnaz Mazid, M-A-Z-I-D.

15          THE COURT:  Okay.  Why don't you see if you can

16  squeeze in to that spot somehow.

17          Ms. Mazid, right?

18          PROSPECTIVE JUROR MAZID:  Yes.

19          THE COURT:  Remind me what your issue was.

20          PROSPECTIVE JUROR MAZID:  I would be happy to serve

21  as a juror.  However, the time is not right for me.  I'm very

22  overwhelmed at this time.  I'm going to make a religious

23  pilgrimage, so I'm leaving the country for a month.  I'm

24  leaving on the 28th of November.  So this time is very

25  precious.

1          So, the health issue, as I mentioned to you, that is

2   also part of what I'm dealing with.

3          THE COURT:  What is the health issue?

4          PROSPECTIVE JUROR MAZID:  Oh, I'm just losing weight,

5   and the doctor is looking into it, what's happening.  And, I'll

6   be -- actually, I'm a Muslim, and I'm going to Mecca for Hajj,

7   so it is, as it is, strenuous.  So I want to make sure that I

8   stay healthy.

9          THE COURT:  Well, we would be done with the trial, at

10  least by a week before you would be leaving.

11         PROSPECTIVE JUROR MAZID:  But this time, and I need

12  time for preparation.

13         THE COURT:  You couldn't do --

14         PROSPECTIVE JUROR MAZID:  Spiritual preparation and

15  also, you know, travel needs need to be taken care of.

16         THE COURT:  But you would be -- you would be ending

17  most days at 1:00.  Why couldn't you take care of those items

18  in the afternoons?

19         PROSPECTIVE JUROR MAZID:  Your Honor, it's going to

20  be very difficult for me to pay full attention to the case.

21  That's my worry, that I will not be able to serve as a good

22  juror.  My mind will be occupied with, you know, all the other

23  things that I need to take care of at this time, both

24  spiritually and family-wise.

25         THE COURT:  All right.  Anyone else raise a hardship

 1    issue?

 2           Here's what we are going to do.  I need to come back

 3    to you, Ms. Timlin.  But, you want wanted to speak more

 4    privately, so we are going to take a recess at this time,

 5    except for Ms. Timlin and the lawyers.

 6           And, then we will have a more private conversation.

 7           It will just be a 15-minute recess.

 8           When you are done, please just come back to the

 9    courtroom and have your seat where you are.  And, likewise, all

10    of you, I need to give you an admonition.  This room is full of

11    people who have an interest in case.

12           Under no circumstances should you be talking to any

13    of them or smiling at them or doing anything.

14           This -- our job here is to get a jury who will be

15    completely immune from any of the influences of any of the

16    people in this courtroom, except what they are supposed to be

17    influenced by, which is the evidence and the law.

18           So, if anyone tries to approach you in the hallway,

19    or say anything to you, in any way, I want to know about it.

20    You tell me.

21           So, remember that admonition.  We will see you back

22    here in 15 minutes.

23           And, Ms. Timlin, will you please stay back?

24           Wait a minute, Ms. Schwartzler.

25           PROSPECTIVE JUROR SCHWARTZLER:  Yes.  I didn't know

1  about if my English will be good enough.

2          THE COURT:  I'll come to that later.  Not yet.

3          PROSPECTIVE JUROR SCHWARTZLER:  Okay.

4          (A pause in the proceedings)

5          THE COURT:  All right.  Is this still too many people

6  or would you like to come to the sidebar and talk with me?

7          PROSPECTIVE JUROR TIMLIN:  May I talk to you?

8          THE COURT:  All right.  So, let's go to sidebar, and

9  one lawyer from each side, and the court reporter.

10          (Sidebar discussion held on the Record:)

11          THE COURT:  We're now at the sidebar.  Go ahead.

12          PROSPECTIVE JUROR TIMLIN:  It's only a possibility.

13  I'm being treated for intractable migraines, rather successful.

14  They are very debilitating.  Now, it is entirely possible that

15  I could serve on the jury.  It is a strong medication I'm on.

16  It doesn't affect my ability to operate at all.  Last year the

17  longest migraine I had was three months, which is why I'm being

18  treated.  Usually, it's rather successful, but I did want to

19  mention it in the event that there is a highly debilitating

20  migraine.

21          THE COURT:  When is the last time you had a migraine?

22          PROSPECTIVE JUROR TIMLIN:  Last month, I believe.

23          THE COURT:  You mean, September?

24          PROSPECTIVE JUROR TIMLIN:  I do mean September.

25          THE COURT:  Yeah.

 1              PROSPECTIVE JUROR TIMLIN:  And so I have been treated

 2    successfully.

 3              THE COURT:  How long did it last that time?

 4              PROSPECTIVE JUROR TIMLIN:  It only lasted one day.

 5              THE COURT:  And is there medicine that you can take

 6    that will --

 7              PROSPECTIVE JUROR TIMLIN:  Yes.

 8              THE COURT:  That will -- okay.  Well, does that have

 9    any affect on your ability to think clearly?

10              PROSPECTIVE JUROR TIMLIN:  It has in the past.

11    Again, it is entirely possible that I could be able to serve

12    for the entire length, but I did want you to have the

13    information.

14              THE COURT:  All right.  So what do you think the odds

15    are, given the time frame that we are talking about, that you

16    would be able to go through without any issue?

17              PROSPECTIVE JUROR TIMLIN:  It's possible I'll have

18    none.

19              THE COURT:  So you think better than 50/50?

20              PROSPECTIVE JUROR TIMLIN:  Yes, I do.

21              THE COURT:  All right.  Well, unless the lawyers have

22    an issue I'm inclined that you -- we thank you for the

23    information, and you should serve if selected.

24              PROSPECTIVE JUROR TIMLIN:  I should not?

25              THE COURT:  You should.

 1                MR. KESSLER:  One question, Your Honor, if I may.

 2                If you get a migraine, would that take you out of

 3    that day of service, I assume?

 4                PROSPECTIVE JUROR TIMLIN:  It may.

 5                MR. KESSLER:  It could.

 6                PROSPECTIVE JUROR TIMLIN:  It may.  If the pain

 7    reliever that I take is effective, it may not.

 8                MR. KESSLER:  Okay.

 9                THE COURT:  Any questions?

10                MR. PARCHER:  No.

11                THE COURT:  All right.  Hearing none, any more?

12                MR. KESSLER:  No, that was all I had.

13                THE COURT:  All right.  Okay.  I'm -- I don't

14    think -- I think we should look on the bright side.

15                PROSPECTIVE JUROR TIMLIN:  Of course.

16                THE COURT:  And, go forward and not excuse you.

17                PROSPECTIVE JUROR TIMLIN:  Of course.

18                THE COURT:  All right.  Good.

19                PROSPECTIVE JUROR TIMLIN:  May I be excused

20    momentarily?

21                THE COURT:  Yes, you may take 15 minutes.

22                PROSPECTIVE JUROR TIMLIN:  Thank you.

23                THE COURT:  The rest of us will take 15 minutes, but

24    before we do that I want to talk to the lawyers a minute.

25                (Proceedings held in open court, outside

1              the presence and hearing of the jury venire)

2              THE COURT:  All right.  Are there any prospective

3    jurors still in the courtroom?

4              Looks like none are.  All right.

5              I have, I guess, four people who are in play.

6              Ms. Kainz is the lady who's moving out on the 1st.

7              Ms. Yoshioka will miss three weeks of work.

8              Ms. Porter has child care 7:00 to 5:30.

9              Ms. Mazid is making preparations to go to Mecca.

10             I'm inclined to excuse all four.

11             MR. KESSLER:  I would agree, Your Honor.  I think

12   that for the variety of reasons they are going to be too

13   distracted to pay attention adequately for this case.

14             MR. PARCHER:  I feel the same way, Your Honor.

15             THE COURT:  All right.  Are you a juror?  Is that a

16   juror?

17             THE CLERK:  Yes, that's a juror, Judge.

18             THE COURT:  Would you mind staying outside until I'm

19   finished?

20             THE PROSPECTIVE JUROR:  Excuse me.

21             THE COURT:  Thank you.

22             (Off-the-Record discussion)

23             THE COURT:  I'm confused.  You lawyers look at your

24   notes.  Was it Ms. Kainz who had the moving issue?

25             MR. PARCHER:  Yes.

1          THE COURT:  That's what I thought.  All right.  All

2   of us agree that we will excuse those four?

3          MR. PARCHER:  Just one thing, Your Honor.  I wasn't

4   sure of the procedure when he were up at the sidebar.  I just

5   wanted to suggest -- I didn't know if you wanted me to say this

6   in front of the prospective juror.  I have a concern that we're

7   playing a little bit of Russian Roulette given her

8   circumstance.  And I wonder if that isn't a cause to reconsider

9   whether she ought to sit.

10         I have an open mind about it, but -- if it happens

11  we're all going to have a problem.

12         THE COURT:  She seems to me to be a very responsible

13  person.

14         MR. PARCHER:  Absolutely.

15         THE COURT:  Except for this issue of migraines.

16         MR. PARCHER:  Absolutely.

17         THE COURT:  Is that somebody, a member of the jury

18  back there?  Who is that back in the corner?

19         MR. PARCHER:  That is a paralegal.

20         THE COURT:  And she's got an issue that may or may or

21  may not come up, but she thinks it won't come up.  She is a

22  very responsible person, and the ideal person to serve on a

23  jury.

24         MR. PARCHER:  Agreed.

25         THE COURT:  And we got -- we will have ten.  If we

 1   lose her, then we dismiss her.  In other words, I would have --

 2   if it was going to be a one-day miss I might keep her and take

 3   a day off, but if it was going to be two days we would probably

 4   dismiss her.  And I might even, depending on how -- it's so

 5   hard to tell you in advance, but I just think the balancing of

 6   all of the considerations, the fact that she might have a

 7   migraine headache attack for an otherwise excellent candidate

 8   to serve on the jury is not a good enough reason, so that's

 9   overruled.

10            MR. KESSLER:  I would agree, Your Honor.

11            THE COURT:  All right.  So, I'm going to excuse the

12   other four.  Sounds like you all agree they ought to be

13   excused.

14            MR. PARCHER:  Yes, sir.

15            THE COURT:  All right.  I hope we don't run out of

16   jurors here.  Thank you.  We will take a few minutes ourselves.

17            MR. PARCHER:  Thank you, Your Honor.

18            (Recess taken from 9:23 A.M.to 9:45 A.M.)

19            (The following proceedings were held in open court in

20            the presence of the Jury Venire)

21            THE COURT:  Let's go back to work.

22            Ms. Mazid, Ms. Porter, Ms. Yoshioka and Ms. Kainz, we

23   are going to excuse all four of you.  Please go back to the

24   jury assembly room and tell them what happened.

25            All right.  We will try to use you on some other case

 1    in the future.

 2              All right.  We will now replace them in the order

 3    that I just called them.  Let's replace Ms. Mazid first.

 4              THE CLERK:  Carmella Munoz Haywood, H-A-Y-W-O-O-D.

 5              THE COURT:  How are you today?

 6              PROSPECTIVE JUROR HAYWOOD:  Fine, thank you.

 7              THE COURT:  Could you come sit on the chair over

 8    there farthest from where you are?

 9              Thank you.

10              Next is?

11              THE CLERK:  Gary Walker Kittams, K-I-T-T-A-M-S.

12              THE COURT:  All right.  Mr. Kittams, if you will sit

13    next to Mrs. Haywood.

14              All right.  And who's next?

15              THE CLERK:  Jeffrey Moreno Collins, C-O-L-L-I-N-S.

16              THE COURT:  Mr. Collins, please have a seat, right

17    there in the very middle.

18              Okay. Then, finally?

19              THE CLERK:  Natalie Louie Hart, H-A-R-T.

20              THE COURT:  Ms. Hart, how are you today?

21              Very good.  Please take that second to the last

22    chair.

23              All right.  Welcome to all of you.  Any of you four

24    have a hardship issue that you wish to raise?

25              Okay.  Let's hand the mic to Mr. Collins.

1          Mr. Collins, tell us your full name, though.

2          PROSPECTIVE JUROR COLLINS:  Your Honor, my full name?

3  Jeffrey Moreno Collins.

4          THE COURT:  All right.  What is your hardship issue?

5          PROSPECTIVE JUROR COLLINS:  Not so much a hardship as

6  I had a previously planned trip for my team at work with

7  tickets paid for to Boston for the 27th and 28th.  So, I didn't

8  think because of the two-week window, I'm on the last day of

9  my two-week call period, that it was going to reach out that

10 long.  So --

11         THE COURT:  Did you pay for the tickets or your

12 company pay?

13         PROSPECTIVE JUROR COLLINS:  My company paid for the

14 tickets.

15         THE COURT:  And what is the nature of this trip?

16         PROSPECTIVE JUROR COLLINS:  It is a business trip for

17 an off-site meeting in Boston for my team at work.

18         THE COURT:  Well, it sounds like the kind of thing

19 that is important, but can give way to jury service, don't you

20 think?

21         PROSPECTIVE JUROR COLLINS:  So, I want to serve on

22 the jury.  In this case, it is a particularly important

23 meeting, and it would be a bit of a hardship for everyone

24 involved who made time to commit to these dates.

25         There are several people who would have to change the

 1  dates to do this.

 2          THE COURT:  I'm not -- you are not being very clear.

 3  Why is your presence at the meeting necessary?

 4          PROSPECTIVE JUROR COLLINS:  My presence at the

 5  meeting is necessary because it's a team meeting, and I'm a

 6  member of that team.  And we scheduled the meeting so that all

 7  of us could be there at the same time in Boston.

 8          THE COURT:  How many people are on the team?

 9          PROSPECTIVE JUROR COLLINS:  That would be six people.

10          THE COURT:  How big a deal is it to change it to

11  later?

12          PROSPECTIVE JUROR COLLINS:  Unfortunately, I didn't

13  even know this would come up, so I -- I haven't even had a

14  chance to try to talk to anyone about it.  But this would be

15  fairly painful, just because of the nature of it being six

16  people.  And for the three weeks that we're, you know, going to

17  be here, that would have been the best time to do it, so we

18  would have to find another time do it.  So -- so it's

19  difficult.

20          THE COURT:  I want to ask those of you sitting in the

21  back of the courtroom, prospective jurors, raise your hand if

22  you are going -- if you get called forward, if there's some

23  issue about hardship.

24          Raise your hand.  Okay.

25          (Jurors raised hands.)

 1            THE COURT:  Okay, thank you.  I'm not sure that's a

 2   good enough reason, Mr. Collins, to get out of jury service.

 3            What is the name of your company?

 4            PROSPECTIVE JUROR COLLINS:  Intuit Corporation.

 5            THE COURT:  That is a huge company.

 6            PROSPECTIVE JUROR COLLINS:  Huge by some standards,

 7   sure.

 8            THE COURT:  They're not going to go under if they --

 9   if you don't make a meeting in Boston.  Really.  There's always

10   going to be some business meeting.

11            PROSPECTIVE JUROR COLLINS:  They're not going to go

12   under, Your Honor, that's true.

13            THE COURT:  So I'm going to deny that request, even

14   though I do believe you're probably critical to the company,

15   and to your team and all that.  But, you know, companies like

16   Intuit, every -- they got smart people there.  All of them are

17   committed to something.

18            And there's always going to be something like this.

19   So, I'm going deny that.

20            Anybody else want to raise a hardship issue?  This is

21   the last call for hardship issues.

22            Okay.  All right.  Are you okay with that,

23   Mr. Collins?  You are not going to harbor some grudge against

24   me, are you?

25            PROSPECTIVE JUROR COLLINS:  I'm not going to harbor a

 1  grudge, Your Honor.

 2          THE COURT:  Let's see how this goes.  Take the mic

 3  down the Ms. Dunlap.

 4          Ms. Dunlap, did we -- did you have some hardship

 5  issue?

 6          PROSPECTIVE JUROR DUNLAP:  My grandchildren, yes.

 7          THE COURT:  I didn't rule on your issue, did I?

 8          PROSPECTIVE JUROR DUNLAP:  No, you took it under

 9  advisement or something.

10          THE COURT:  I'm sorry.  This was because your kids

11  are splitting -- your own children are splitting up.

12          PROSPECTIVE JUROR DUNLAP:  Right.

13          THE COURT:  So you have been selected to be the --

14          PROSPECTIVE JUROR DUNLAP:  Unfortunately.

15          THE COURT:  All right.  I'm going to excuse

16  Ms. Dunlap unless there is an objection.  Any objection?

17          MR. KESSLER:  No objection.

18          THE COURT:  All right.  I didn't have you circled

19  here, but now that -- okay.  So you are excused.

20          PROSPECTIVE JUROR DUNLAP:  Thank you.

21          THE COURT:  Go back to the jury assembly room and

22  tell them what happened, Ms. Dunlap.

23          All right.  Let's call name to replace Ms. Dunlap.

24          THE CLERK:  Lisa Ann De Souza, D-E S-O-U-Z-A.

25          THE COURT:  Ms. De Souza, how are you?

1        PROSPECTIVE JUROR DE SOUZA:  Dandy. How are you?

2        THE COURT:  Say it again?

3        PROSPECTIVE JUROR DE SOUZA:  Dandy.

4        THE COURT:  Dandy?

5        PROSPECTIVE JUROR DE SOUZA:  Yeah.

6        THE COURT:  That's great.

7        So you have no hardship issue.

8        PROSPECTIVE JUROR DE SOUZA:  No.

9        THE COURT:  That's good.  Okay.  All right.

10       Then, you get to start off.

11       Ms. De Souza, can you see that chart up there?

12       PROSPECTIVE JUROR DE SOUZA:  Yep.

13       THE COURT:  You have got speak into the mic, though.

14

15       PROSPECTIVE JUROR DE SOUZA:  Oh, yes.

16       THE COURT:  Because if you don't, we won't be able to

17  all hear you.

18       Now, give full and complete answers to all 12 points

19  there, but then I -- then, I will -- I might interrupt every

20  now and then.  But basically what I'm hoping is that you will

21  just be able to go down that chart and tell us everything that

22  is relevant about you, okay?

23       PROSPECTIVE JUROR DE SOUZA:  Okay.

24       THE COURT:  Go ahead.  You go first.

25       PROSPECTIVE JUROR DE SOUZA:  My name is Lisa De

 1    Souza.  I live in Pacifica, California.

 2              I have a nursing degree, but don't use it.

 3              I'm an executive assistant at an architecture firm.

 4              I'm in no organizations.

 5              I like photography.

 6              Married 21 years.

 7              My spouse is a driver at a linen company.

 8              I have a 13-year-old child who is a student.

 9              I did jury duty this earlier this year.  I don't know

10    if that's a bad thing.  I wasn't picked.

11              THE COURT:  Well, no.  That's a good thing.

12              PROSPECTIVE JUROR DE SOUZA:  Yeah.  I have never been

13    in the military.

14              And I've never been a party or witness in court.

15              THE COURT:  Great.  Thank you.

16              Ms. Timlin?

17              PROSPECTIVE JUROR TIMLIN:  Of course.  My name is

18    Gabriel Timlin.  I live in Fremont.

19              I have a Bachelors of Science in biochemistry.

20              I woke at BD Biosciences in San Jose.

21              I'm not a member of any organizations, clubs or

22    unions.

23              My hobbies are music.

24              I study classical voice, and I compose songs.

25              I was in three operas and choruses this summer.

1              I have --

2              THE COURT:  Say that again?  You were what?

3              PROSPECTIVE JUROR TIMLIN:  I was in a chorus and

4    three different operas this summer.

5              THE COURT:  Okay.

6              PROSPECTIVE JUROR TIMLIN:  I am single.

7              I have no children.

8              Per prior jury service, I was summoned earlier this

9    year for the County of Alameda, but was excused prior to ever

10   reaching the courtroom.

11             I have never been in military or law enforcement.

12             And I have not been a party or witness in court.

13             THE COURT:  Thank you.

14             Ms. Smith?

15             PROSPECTIVE JUROR SMITH:  My name is Nancy Smith, and

16   I live in Santa Rosa.  I have a Bachelor of Science in nursing.

17   I'm a registered nurse and work for Kaiser-Permanente.

18             I'm a member of the union, California Nurses

19   Association, and Wound Ostomy Continence Nurses.

20             THE COURT:  Say that last one again.

21             PROSPECTIVE JUROR SMITH:  Wound Ostomy and Continence

22   Nurses.

23             THE COURT:  Okay.

24             PROSPECTIVE JUROR SMITH:  My hobbies are like hiking,

25   gardening, reading.

1              I'm divorced.

2              I have two children, a 29-year-old son, who is a

3   graphic designer, and a 22-year-old daughter, who is a media

4   planner.

5              I've been called to jury service before, but never

6   chosen.

7              I've never been in military or law enforcement.

8              And I've never been a party or a witness in court.

9              THE COURT:  Thank you.

10             Mr. McEachron.

11             PROSPECTIVE JUROR MCEACHRON:  My name is Charlie

12  McEachron.  I live in San Francisco.

13             I have a Bachelor in science and finance.

14             I'm a real estate developer.

15             Don't belong to any organizations or unions.

16             I'm an ice hockey player, and an avid hiker.

17             I'm married, have an 11-month-old daughter.

18             I have been called for jury service but never

19  selected.

20             Never been in military or law enforcement.

21             Never been a party or a witness in court.

22             THE COURT:  Great.

23             Mr. Chui?

24             PROSPECTIVE JUROR CHUI:  Yes.  My name is Danny Chui.

25             I live in San Mateo County.

1          I have two years of college, and I just retired from

2  Postal Service, four months ago.

3          I never been in any organization.

4          My hobby is martial arts and golf.

5          And I'm married.  I have one wife and one child.  He

6  is 27 years old.

7          And I never been any crime, and I never been in

8  military and law enforcement.

9          And I never been -- I -- I never be in a party or

10 witness in court.

11         THE COURT:  Were you a member of the postal union?

12         PROSPECTIVE JUROR CHUI:  I'm not -- I'm -- I was in

13 postal union, yes.

14         THE COURT:  All right.  Thank you.

15         MR. PARCHER:  Please, I didn't hear the hobby.

16         Can you repeat that?

17         THE COURT:  What is your hobby?

18         PROSPECTIVE JUROR CHUI:  My hobby is martial art and

19 golf.

20         THE COURT:  Good hobbies.  Okay.

21         Mr. Brown?

22         MR. BROWN:  My name is James Brown.  I live in

23 Oakland.

24         I have an engineering degree.

25         I work for the Port of Oakland.  I'm a contract

 1  engineer for them.

 2          I belong to a union, Local 39 here in San Francisco.

 3          My hobbies are just normal hobbies:  Golf and

 4  whatever else.

 5          So, I'm married for 21 years.  My spouse is a

 6  paralegal.

 7          THE COURT:  Where is she a paralegal?

 8          PROSPECTIVE JUROR BROWN:  She's a temporary paralegal

 9  now.  She worked for Flynn Delich & Wise, which is -- I don't

10  know where it is, but she works in Walnut Creek right now.

11          THE COURT:  And, what kind of -- does she do

12  litigation paralegal work?

13          PROSPECTIVE JUROR BROWN:  She was doing stuff for --

14  how well I know my wife after 21 years.

15          She was doing stuff for people who were having

16  trouble with finances, getting their cases in court and stuff.

17          THE COURT:  All right.  Fair enough.  Okay.  Keep

18  going.

19          PROSPECTIVE JUROR BROWN:  I don't know too much about

20  it.

21          No children.

22          I'm not -- I have never had any criminal record or

23  military.  Never been in that.

24          And, I've just got my normal call-up, and they

25  refused me, so --

1          THE COURT:  I'm sorry.  I didn't know that last.

2   Normal call-up what?

3          PROSPECTIVE JUROR BROWN:  It's hard for me to read.

4   It's kind of blurry.  Last one, 12, says:

5          "Ever been a witness or party in court?"

6          THE COURT:  Have you ever been a party in a court

7   case or party in a court case?

8          PROSPECTIVE JUROR BROWN:  No, I just have jury duty

9   is what I meant.

10          THE COURT:  All right.  Fair enough.  That's good.

11          All right.  Right there.  Thank you.

12          Next, Mr. Neville?

13          PROSPECTIVE JUROR NEVILLE:  Yes.  My name is Douglas

14   Neville.

15          I live in Napa.

16          I've done a little bit of college.

17          I work for Silverado Resort as multimedia manager.

18          No clubs, unions or organizations.

19          Hobbies: skiing, outdoor activities, music.

20          I'm married.  My spouse works for Bank of America as

21   a personal banker.

22          No children.  No jury service except for being almost

23   selected.

24          And then, no military.

25          And I have been a witness twice.  And that's it.

 1            THE COURT:  Tell us the witness incidents.

 2            PROSPECTIVE JUROR NEVILLE:  There's two different

 3  incidents.

 4            THE COURT:  Go ahead.

 5            PROSPECTIVE JUROR NEVILLE:  At one point I was --

 6  this was down in Los Angeles, and I was carjacked.  And they

 7  caught the person, and I had to go to court and explain what

 8  happened, of course.

 9            And the other was a car stereo was stolen out of my

10  car at one point.

11            THE COURT:  So you were a witness in that case, too?

12            PROSPECTIVE JUROR NEVILLE:  Yes.  It was my vehicle

13  that --

14            THE COURT:  All right.  Mr. Ranada.

15            PROSPECTIVE JUROR RANADA:  My name is Alex Ranada.

16  I'm from Pittsburg.

17            I'm married.  12 years education.  Postal Service

18  worker.  Hard --

19            THE COURT:  Are you still working for the Postal

20  Service?

21            PROSPECTIVE JUROR RANADA:  Yes, sir.

22            THE COURT:  All right.

23            PROSPECTIVE JUROR RANADA:  I'm a member of the Postal

24  Carrier Union.

25            No kids.

 1              I had jury service, but civil, civil jury.

 2              I was in the military.

 3              And --

 4              THE COURT:  You have got to speak into the mic.  We

 5  can't hear you.

 6              Have you -- can you see the chart okay?

 7              PROSPECTIVE JUROR RANADA:  Yes.

 8              THE COURT:  You have sunglasses on.  Do you have an

 9  eye problem?

10              PROSPECTIVE JUROR RANADA:  Yeah, I'm -- I'm kind

11  of -- the lights.

12              THE COURT:  The lights bother you?

13              PROSPECTIVE JUROR RANADA:  Yes.

14              THE COURT:  What happens with the lights?  Gives you

15  a headache or something?

16              PROSPECTIVE JUROR RANADA:  Kind of hurts my eyes.

17              THE COURT:  Can you read that far away?  Can you read

18  the chart from that distance.

19              PROSPECTIVE JUROR RANADA:  Please, the man's head is

20  blocking the No. 12 there.

21              THE COURT:  Okay, can we -- can you read the rest of

22  it?

23              PROSPECTIVE JUROR RANADA:  Yes, sir.  I answered most

24  of it.

25              THE COURT:  All right.  Well, now, did you have prior

1   jury service?

2              PROSPECTIVE JUROR RANADA:  Prior jury service, yes.

3   It was a civil.

4              THE COURT:  Civil case.  Did you reach a verdict?

5              PROSPECTIVE JUROR RANADA:  Yes.

6              THE COURT:  You did.  All right.  Just the one time

7   you had that jury service?

8              PROSPECTIVE JUROR RANADA:  I think about twice in the

9   past.  It's been a while.

10             THE COURT:  Okay.  And you were in the military?

11             PROSPECTIVE JUROR RANADA:  Yes.

12             THE COURT:  What were you in the military?

13             PROSPECTIVE JUROR RANADA:  I was in the Navy.

14             THE COURT:  All right.  And ever a party or a witness

15  in court?

16             PROSPECTIVE JUROR RANADA:  No, sir.

17             THE COURT:  Okay.  Thank you.  If you will hand the

18  mic back to Ms. Holm.

19             Ms. Holm, can you see the chart okay?

20             PROSPECTIVE JUROR HOLM:  Yes.

21             THE COURT:  Okay. Go ahead.

22             PROSPECTIVE JUROR HOLM:  My name is Amy Holm, and I'm

23  from Clayton.

24             I recently graduated with a Bachelor of Science in

25  nursing, but don't have a job yet.

1              I like to go boating and water skiing.

2              I'm single and have no kids.

3              I was called for jury service, but I wasn't selected.

4              And I've never been in the military or a witness in

5    court.

6              THE COURT:  Thank you.

7              Ms. Hart.

8              PROSPECTIVE JUROR HART:  My name is Natalie Hart.

9              I live in Livermore.

10             I have a Bachelor of Science in biological sciences.

11   I'm a quality manager for Genentech, a biotech company.

12             I don't belong to any unions or organizations.

13             Hobbies are dance and cooking.

14             I'm married.  I have two children, a 10-year-old and

15   a three-year-old.

16             My husband works for Washington Mutual.

17             And my prior jury service, I've only been called for

18   jury duty, but haven't been selected.

19             I don't have -- I've not been in the military or law

20   enforcement, and I've not been a party or a witness in court.

21             THE COURT:  Great.  Thank you.

22             Ms. Schwartzler?

23             PROSPECTIVE JUROR SCHWARTZLER:  Yes.  My name is

24   Ofelia Schwartzler.

25             I live in Alameda, California.

1            I did some college.

2            I work for Sorry Bakery (phonetic) for 18 years.

3            I belong to a union, 18 -- 1788.

4            I like to cook.  I like to decorate my house.

5            I'm married.  My husband is a driver, a truck driver.

6            I have two children.  26, she's designer.  And 21,

7   she's a social worker.  She is going to be a social worker.

8            I have been called to be -- to serve as a juror --

9   juror, but I never been selected.

10           I never -- never a criminal or any of those things.

11           I never been in the military or law enforcement.  I

12  never been a party or witness of any court.

13           THE COURT:  Thank you.

14           Mr. Collins, again.

15           PROSPECTIVE JUROR COLLINS:  My name is Jeffrey

16  Collins.  I live in San Mateo.

17           I have a bachelor's degree in computer science, and I

18  work at Intuit Corporation.

19           And, I'm not really a part of any clubs, although I

20  coach my kids' soccer teams.  I guess that's part of a club.

21           For hobbies, I'm a basketball player.  And actually,

22  I'm NFL Sunday ticket subscriber, and really into watching the

23  NFL, Been a fan of the Chargers, an out-of-market team since

24  the '70's.

25           I'm married, I have two daughters, and I have a

 1  22-year-old stepson.  My daughters are ten and eight.

 2            My wife is a chef.

 3            And I have never been -- I have been called, but I've

 4  never served on a jury.

 5            I'm not in the military or law enforcement.

 6            And I've never been a party or witness in court.

 7            THE COURT:  Thank you.

 8            Mr. Casotto.

 9            PROSPECTIVE JUROR CASOTTO:  My name is Andrea

10  Casotto.

11            I live in Fremont.

12            I have a Ph.D. from U. C. Berkeley in electrical

13  engineering.  And for the past 13 years I have been building

14  this small company in Silicon Valley.

15            I don't belong to any organization.

16            My hobbies is my family.  I'm married.  I have three

17  kids.  They are nine, 7 and 7.

18            My wife is a professor of linguistics at the

19  University of Padua in Italy.

20            And I was called once for jury service, but was not

21  selected.

22            I was not in the military.  And law enforcement, my

23  father was a judge -- probably that doesn't count -- in Italy.

24            And, I have never been party or witness in court.

25            THE COURT:  I'm sorry.  You say your wife is a

 1  professor in Italy?

 2           PROSPECTIVE JUROR CASOTTO:  Yes, Your Honor.

 3           THE COURT:  That is a long commute.

 4           PROSPECTIVE JUROR CASOTTO:  It's a very long commute,

 5  yeah.  It is a 21st-century relationship.  She's here, this --

 6  she's been --

 7           THE COURT:  All right.  Thank you.

 8           Next is Mr. Kittams.

 9           PROSPECTIVE JUROR KITTAMS:  Gary Kittams, yes.

10           I'm a city resident in Fremont.

11           Bachelor's in Naval Technology School.  I have been

12  with the VA in Palo Alto for 18 years.

13           No organizations.

14           Hobbies:  Piano, skiing and gardening.

15           I'm single, but I have been with my partner ten

16  years.

17           She's a nurse manager at the nursing home, VA nursing

18  home in Menlo Park.

19           I have a 19-year-old, who is a second-year student at

20  U.C. Davis.

21           And she has a 19-year-old who's second-year at Lewis

22  and Clark in Portland and a 17-year-old who is a senior in high

23  school.

24           Never served on a jury, gone to many summons.

25           No military, law enforcement background, and never a

 1   party or witness in court.

 2            THE COURT:  What do you do for the VA?

 3            PROSPECTIVE JUROR KITTAMS:  I'm a lead technologist

 4   at a satellite lab.  I'm a medical technologist.

 5            THE COURT:  Thank you.

 6            Now, we go to Ms. Haywood.

 7            PROSPECTIVE JUROR HAYWOOD:  My name is Carmella

 8   Haywood.  I reside in Oakland, California.

 9            I am close to receiving my bachelor's in biological

10   sciences.

11            I am currently a senior project manager for a health

12   care technology company, called Cardinal Health, Incorporated.

13            I do not belong to any organizations, clubs or

14   unions.

15            My hobbies are sports -- pretty much all kinds -- and

16   music.

17            I am married.  My husband is an executive for a

18   technology company that's based in Barcelona.

19            But he lives here and he travels to Barcelona once a

20   month.

21            No children, unless you consider a dog a child.

22            No prior jury service.  I have never been involved in

23   military or law enforcement and have never been a party or a

24   witness in court.

25            THE COURT:  Great.

1              And Ms. Curtiss-Horton?

2              PROSPECTIVE JUROR CURTISS-HORTON:  Pamela

3    Curtiss-Horton.  I live in Richmond.  I have a master's in

4    education.

5              I teach in Oakland for the Oakland Unified School

6    District.

7              I belong to the Oakland Education Association.

8              My hobbies are singing, dancing, exercising.

9              I'm married.  My husband is a material handler.

10             My children, I have a 20-year-old daughter,

11   17-year-old son, both students.

12             Called many times for jury service, never selected.

13             Never in the military or law enforcement.

14             I have been a witness in a few juvenile court cases

15   for students that have been in my schools.

16             And I was a character witness for a nephew in a

17   criminal case.

18             THE COURT:  Which school do you teach at in Oakland?

19             PROSPECTIVE JUROR CURTISS-HORTON:  I teach at Bella

20   Vista Elementary School.

21             THE COURT:  Where is that?

22             PROSPECTIVE JUROR CURTISS-HORTON:  East 28th and

23   Tenth Avenue near Park Boulevard.

24             THE COURT:  Okay.  So how long have you been an

25   Oakland schoolteacher?

 1            PROSPECTIVE JUROR CURTISS-HORTON:  30 years.

 2            THE COURT:  Okay.  Thank you.

 3            Well, so that means we've gotten down the basic

 4    information.

 5            Now, let me go back over something.  Our schedule is

 6    every member of the jury must be here at 7:45 in the morning.

 7    And, then we would adjourn at 1:00.

 8            We would have a couple of breaks in there, of course.

 9            No lunch break, though, because then you could get

10    lunch on your own after we adjourn each day.

11            So, is there anyone here who just cannot get out of

12    bed in the morning?  Because you have got to be here at 7:45.

13    This is not like school where you can look at somebody else's

14    notes and catch up.

15            If you are not here, we have to sit here in stony

16    silence, twiddling our thumbs until you arrive, because every

17    member of the jury must hear every item of evidence, all of the

18    evidence.

19            So I'm going to ask you:  Is there somebody here who

20    just cannot get out of bed early enough in the morning or you

21    have some substantial reason to believe that you're going to be

22    prone to being late?

23            If so, raise your hand.

24            Ms. Timlin?

25            PROSPECTIVE JUROR TIMLIN:  I'm not a morning person,

 1  but I will make it here, if necessary, if I'm called.

 2           THE COURT:  All right.  Good.

 3           Anyone else?  You don't have to be a morning person

 4  to serve on the jury, but it does help.  But, you don't have to

 5  be.

 6           Like my son, I know that he could serve on the jury

 7  if he was required to, but it would not be his first choice to

 8  be here that early.

 9           All right.  We are going to -- ordinarily I would ask

10  you about the -- does anyone personally know any football

11  player, professional football player, either active or retired?

12           Ms. Haywood, let's get the microphone to you.  Do you

13  have -- who is it you personally know?

14           PROSPECTIVE JUROR HAYWOOD:  My husband.  He formerly

15  played in the NFL.

16           THE COURT:  He did?  What's his name?

17           PROSPECTIVE JUROR HAYWOOD:  Robert Haywood.  He

18  played for the Eagles and the Philadelphia Stars, between '83

19  and '85.

20           THE COURT:  Is he one of our class members?

21           MR. KATZ:  We're checking, Your Honor.

22           THE COURT:  All right.  Okay.  We are going to check

23  on that.

24           Anyone else?

25           MR. KATZ:  He is not, Your Honor.

1          THE COURT:  Well, probably what that means is he

2   didn't sign one of these contracts that are at issue here.

3   But, what do you -- do you have any feelings about the NFL and

4   the retired football players and so forth?

5          PROSPECTIVE JUROR HAYWOOD:  No, not particularly.

6          THE COURT:  Does he work?  What does he do now?

7          PROSPECTIVE JUROR HAYWOOD:  He's a vice-president of

8   marketing for a technology company.  His background is in

9   consumer packaged goods.

10          THE COURT:  All right.  Well, is there anything about

11   the fact pattern in this case -- did you listen when I

12   described the case?

13          PROSPECTIVE JUROR HAYWOOD:  Yes, I have.

14          THE COURT:  Do you think you could be fair and

15   impartial or is there something about your relationship, being

16   married to somebody who is a former football player, do you

17   think that that would cause you to be biased one way or the

18   other?

19          PROSPECTIVE JUROR HAYWOOD:  No, Your Honor.  I

20   believe I can be as fair and impartial in any -- any proceeding

21   like this.  My feelings set aside, I would listen to evidence.

22          THE COURT:  All right.  We will leave it at that for

23   the moment.

24          Anyone else know any retired football players, active

25   football players?  Football owners?  Members of the union?

 1  Football -- okay.

 2          None of you know any -- okay.  I want to get the

 3  Plaintiffs to read off the witnesses you are going to hear, and

 4  then the Defendants.

 5          Now, you are going to hear a long list of people.  I

 6  don't think they're really going to call everyone, because we

 7  have time limits here.

 8          But out of caution you are going to hear a longer

 9  list than necessary.  And just in case, if you know any of

10  these people, I want you to tell me in a moment.

11          Mister -- are you ready to go over there, Mr. Hummel?

12  You got the list?

13          Mister -- Mr. Kessler, do you have your list ready?

14          MR. KESSLER:  I have the list, Your Honor.

15          THE COURT:  All right.  You go first, then.

16          Mr. Kessler is going to read off the defense names.

17          MR. KESSLER:  Just the defense names, Your Honor,

18  because I have the whole list.

19          For the defense names, both parties, Mr. Joel

20  Linzner.

21          THE COURT:  Come up closer to the jury box.  I'm

22  afraid they are not hearing you.

23          MR. KESSLER:  Yes, Your Honor.

24          Mr. Joel Linzner.

25          Mr. Doug Allen.

 1            Ms. Pat Allen.

 2            Mr. Eugene Upshaw, deceased.

 3            Mr. Joseph Nahra.

 4            Mr. Warren Friss.

 5            Mr. Glenn Eyrich.

 6            Mr. Richard Berthelsen.

 7            Mr. Howard Skall.

 8            Mr. Trace Armstrong.

 9            Ms. Linda Castillon.

10            Mr. Dan Goich.

11            Ms. Christine Finch.

12            Mr. Steven Jizmagian.

13            Mr. Willie Lanier.

14            Mr. Roger Noll.

15            Mr. Adam Sullins.

16            Mr. Tim Brown.

17            Mr. Steven Saxon.

18            I believe that is the list of all of the witnesses

19  who are even defense witnesses or who have been called by both

20  sides.

21            All right.  Anybody know any of those names or think

22  you might know?

23            If so, raise your hand.

24            Okay.  No one is raising their hand.

25            You know, I need to do a precautionary thing.

1        Those of you who are prospective members of the jury,

2   I notice that that side of the room is filling up with other

3   people.  Would those of you who are prospective members of the

4   jury come forward to the first and second rows.  And then --

5   and then, if you're not a prospective member of the jury, would

6   you go somewhere else in the courtroom?

7        So I want to keep, keep those prospective members of

8   the jury completely free from any bias.

9        Okay.  Anyone else?

10        How about -- well, I meant the front row here, but

11   okay.

12        And that next row back there, are you prospective

13   members of the jury, too?

14        (Jury panel indicated affirmatively.)

15        THE COURT:  Okay, great.  All right.

16        Any prospective members of the jury behind the first

17   two rows?

18        All right.  Thank you.

19        Okay.  Going back to that list now, nobody on the

20   jury?  How about any of you back there that haven't been called

21   forward?

22        Any of you recognize those names?

23        **UNIDENTIFIED PROSPECTIVE JUROR:**  Christine Finch, I

24   believe.

25        THE COURT:  If you get called forward, remind me

1   about that.  All right.

2           How about any of sitting here at counsel table?

3           Do you know any of these lawyers either by reputation

4   or personally?  Maybe one of your neighbors, for example.

5           No?  Anybody?

6           Remind us of the names of the law firms that are

7   involved here.  So, I want to ask if anyone knows the law

8   firms.  All right?

9           MR. PARCHER:  The Plaintiff's law firm is Manatt

10  Phelps and McKool Smith.

11          McKool Smith is from Dallas, and Manatt Phelps is

12  from California and in New York.

13          THE COURT:  Anyone know those names?

14          Okay.  All right.  How about on the defense side?

15          MR. KESSLER:  The Defendant's law firms are Dewey &

16  LeBoeuf, and Weil, Gotshal & Manges.

17          THE COURT:  Okay.  Any of those firms ring a bell?

18          Okay.  Let's say, for example, that one of you in the

19  software business it turned out that one of these law firms

20  represented your company, it might be an issue.

21          So -- but if you don't know about it, you don't know

22  about it, I guess.

23          All right.

24          MR. KESSLER:  Your Honor, I don't think you got the

25  Plaintiff's witnesses.

1          MR. HUMMEL:  Your Honor, we have an additional list

2  of witnesses.

3          THE COURT:  I thought you read off everyone.

4          MR. KESSLER:  Just ours.

5          THE COURT:  I'm sorry.  Mr. Hummel, go ahead.

6          MR. HUMMEL:  Thank you, Your Honor.

7          Good morning, ladies and gentlemen.

8          The witnesses that the Plaintiffs expect to call

9  during their case is:  Herbert Adderley.

10          Clifton McNeil.

11          Walter Beach.

12          Bruce Laird.

13          Joel Linzner.

14          Daniel Rascher.

15          Phillip Rowley.

16          Doug Allen and Pat Allen.

17          Peter Rhee.

18          Eugene Upshaw, again.

19          Joe Nahra.

20          Warren Friss.

21          Glenn Eyrich.

22          Adam Zucker.

23          And Mr. Richard Berthelsen.

24          THE COURT:  Anyone know any of those names?

25          All right.  Thank you.

 1              How about my prospective jurors back there?  Any of

 2    those names ring a bell?

 3              UNIDENTIFIED PROSPECTIVE JUROR:  Your Honor, does it

 4    include not knowing personally, but recognizing a name?

 5              THE COURT:  No, no.  If you -- that would be later.

 6    I'm sure you, you know -- some of those names you surely have

 7    recognized, but right now I'm just interested in whether you

 8    know any of them.

 9              All right.

10              (Off-the-Record discussion)

11              THE COURT:  Okay.  How many of you have -- I want you

12    to just raise your hand if you have been to a professional

13    football game in the last year of any type.

14              Just raise your hand.  Keep your hands up high enough

15    as to that.  I'm going to let the professional football game --

16    okay.  All right.

17              So we have got one, two -- six of you.  Keep your

18    hands up so the lawyers can make a note of it.

19              All right.  How many -- put your hand down.

20              How many of you have been to more than one game in

21    the last year?  More than one game?

22              Okay.  We have got two of you.  Three.

23              All right.  And how many of you have been to more

24    than two games?  If so raise your hand.  Two games.

25              All right.

 1             So Ms. Hart, I want to ask you a question.  Are you a

 2   big football fan?  You have got to have the microphone.

 3             PROSPECTIVE JUROR HART:  Yes, my husband and I are

 4   season ticket holders to the Raiders.

 5             THE COURT:  To the Raiders.  All right.

 6             And how long have you been season ticket holders?

 7             PROSPECTIVE JUROR HART:  Since they returned from Los

 8   Angeles.

 9             THE COURT:  Oh, a long time.  Do you get -- do you go

10   out to those -- do you go out to those tailgate parties and --

11   at the Coliseum?

12             PROSPECTIVE JUROR HART:  We -- we used to, yes.

13             THE COURT:  All right.  Now, did you recognize any of

14   the names of the -- like Gene Upshaw?  Do you remember him?

15             PROSPECTIVE JUROR HART:  Yes, and Tim Brown.

16             THE COURT:  Okay, so you -- this case involves Gene

17   Upshaw.  It involves football players.  But at the end of the

18   day, what the jury has got to decide is whether -- what rights,

19   if any, of the retired football players, concerning licensing

20   agreements, were violated.  If any.

21             And, it does not involve bigger issues that have to

22   do with health benefits or pensions or anything like that.

23             We're dealing with a contract called "the GLA," the

24   group licensing agreement.

25             So in deciding that issue, can you be fair and

1  impartial, or do you think that you will be biased one way or

2  the other in this case?

3           PROSPECTIVE JUROR HART:  I believe I can be

4  impartial.

5           THE COURT:  Well, are you sympathetic to the players?

6  If you had to choose between the union on the one side and the

7  players on the other, not knowing anything else, do you think

8  you would be biased in favor of the players?

9           PROSPECTIVE JUROR HART:  I -- I'm not sure.  I don't

10 know.

11          THE COURT:  Okay.  Now -- all right.  So, how many

12 games do you think you've seen?  Probably a hundred, right?

13 Maybe?

14          PROSPECTIVE JUROR HART:  Maybe a little less than a

15 hundred.

16          THE COURT:  All right.  Okay.  How about any of the

17 rest of you?  Feel that you would have a bias one way or the

18 other in this case, either for the players or against the

19 players, or for the union or against the union?

20          Any of you think you might have a bias even before

21 you hear any of the evidence?

22          Okay.  Ms. -- Ms. Haywood.  I'm sorry,

23 Ms. Curtiss-Horton.  Let's send down the mic to you.

24          PROSPECTIVE JUROR COLLINS:  I also have one, as well.

25          THE COURT:  All right.  Mr. Collins, you go first.

1              PROSPECTIVE JUROR COLLINS:  Before I send down the

2    mic.

3              So I don't know if I can answer whether I actual have

4    a bias or not.  But two things are kind of interesting here.

5              One is that my brother worked as a game tester at

6    V.C. Entertainment at the time when EA got an exclusive license

7    to player names and information and pretty much put him out of

8    business.

9              THE COURT:  I didn't understand.  He worked for who?

10             PROSPECTIVE JUROR COLLINS:  Another game company that

11   competes with EA, when NFL and EA signed an exclusive agreement

12   for licensing the player information.  And it made it hard for

13   V. C. Entertainment to compete.  So at that point he left that

14   job because they were having trouble financially.

15             And so it was just an interesting side note and

16   something that's come up in the conversation before is NFL

17   licensing.

18             I'm also an out-of-market fan, so I get the Sunday

19   ticket, which is another exclusive.  And there's no competition

20   there, as well.  So just two interesting side notes.

21             I'm not sure if that qualified.  I'm not sure if I am

22   being pushed as far as a bias some way or other, but there are

23   definitely things that are top of mind for me.

24             THE COURT:  You are very good to bring them up, but

25   we all have life experiences.  And they don't necessarily mean

1  that they will affect the outcome of -- in other words, a lot

2  of people can be fair and square, and they can put that to one

3  side.  And so, you -- you know yourself, the best, though, is

4  of those circumstances in your case going to cause you to be

5  biased one way or the other?

6           PROSPECTIVE JUROR COLLINS:  So I don't feel like I'm

7  going to be biased one way or the other.

8           THE COURT:  All right.  Good for you to bring them

9  up.

10          How long ago did your brother leave that company?

11          PROSPECTIVE JUROR COLLINS:  I guess that's -- hard to

12 remember, exactly.  But i think it is about four years ago now.

13          THE COURT:  All right.  Good.  Thank you.

14          Now, going down to Ms. Curtiss-Horton, please.

15          PROSPECTIVE JUROR CURTISS-HORTON:  I always hate to

16 admit any biases, but I do have a bias in terms of the older

17 professional players in that I feel that they have gotten a raw

18 deal.  And so that's what came up for me.

19          But I can set that aside and listen to the facts.

20 But, immediately it came up, that -- that bias did come up for

21 me.

22          THE COURT:  How did you learn about this?

23          PROSPECTIVE JUROR CURTISS-HORTON:  Oh, my dad was an

24 avid sports fan, and he would always talk about how underpaid

25 the older players were in terms -- you know, compared to now.

1  And how contractually they were -- were not given a fair deal.

2          THE COURT:  All right.

3          Now, I got to tell you something.  I know that

4  there's a controversy out there just along the lines that

5  you've mentioned.  That has almost nothing to do with this

6  case.

7          This case involves a contract called the "GLA," the

8  group licensing agreement.

9          And either the players can prove that they got rights

10 under that agreement or they can't.  But this does not -- even

11 if you think or your dad thought that the retired players got a

12 raw deal by the union, you know, low-paid contracts a long time

13 ago, that is zero to do with this issue, which has to do with:

14 What is the meaning of this license agreement, and whether it

15 was violated.

16         So, can you keep those all straight and decide this

17 case fair and square on the issues that are actually for the

18 jury as opposed to those broader issues that bothered your dad?

19         PROSPECTIVE JUROR CURTISS-HORTON:  Yeah.

20         THE COURT:  All right, thank you.

21         Anyone else?

22         Okay.  Ms. Timlin.

23         PROSPECTIVE JUROR TIMLIN:  I have no bias, but you

24 may be interested in this information.  My mother is retired

25 from Superior Court, Santa Clara County.  She was an -- she was

 1   a judicial secretary.  She is retired at this time.

 2          THE COURT:  Okay?  And how would that affect your

 3   ability to be fair?

 4          PROSPECTIVE JUROR TIMLIN:  It wouldn't affect it at

 5   all, but I suppose that you might want that information.

 6          THE COURT:  Well, okay.  Anything else?

 7          All right.

 8          PROSPECTIVE JUROR RANADA:  One more.

 9          THE COURT:  Oh, I didn't see your hand, Mr. Ranada.

10          Let's go all the way down to you.

11          PROSPECTIVE JUROR RANADA:  First of all, my belief is

12   that the Defendant wouldn't be here if they hadn't done

13   anything wrong.

14          THE COURT:  Say that again?

15          PROSPECTIVE JUROR RANADA:  The Defendant wouldn't be

16   here if they hadn't done anything wrong.  That's the way --

17   that's what I believe.  And also --

18          THE COURT:  Where did you get that idea?

19          PROSPECTIVE JUROR RANADA:  You know, I -- I pretty

20   much -- right now, I pretty much decided which -- which side

21   I'm going to be on.

22          THE COURT:  Which side is that?

23          PROSPECTIVE JUROR RANADA:  I'm a union supporter,

24   so --

25          THE COURT:  Without hearing any of the evidence you

 1  have already made up your mind?

 2            PROSPECTIVE JUROR RANADA:  Yes, sir.

 3            THE COURT:  I'm going to excuse Mr. Ranada, unless

 4  there is some objection.

 5            MR. KESSLER:  No objection.

 6            PROSPECTIVE JUROR RANADA:  Thank you.

 7            THE COURT:  Any objection?

 8            MR. PARCHER:  Yeah, in the interest of fairness I

 9  won't object to that.

10            THE COURT:  You won't object.  All right.

11            Well, Mr. Ranada, that's not the right attitude to

12  have.  We can't have -- well, thank you for bringing it up.

13  You're right.  You're right to bring it up now rather than

14  later on.  So you did the right thing to bring it up.  But we

15  can't have somebody on the jury --

16            PROSPECTIVE JUROR RANADA:  That's the way I look at

17  it, you know --

18            THE COURT:  We don't need to know.  I don't want you

19  to infect anybody else with your views.

20            Okay, Mr. Ranada, you are excused.  Please go back to

21  the jury assembly room.

22            PROSPECTIVE JUROR RANADA:  Yes, sir.

23            THE COURT:  Hand the mic to Mr. Neville.

24            You know, I think we have an even longer case, a big

25  antitrust case that's going to go for eight months.  And maybe

1 | they can use you on that case.

2 | All right.  Let's replace Mr. Ranada.

3 | THE CLERK:  Debra Jean Martin, M-A-R-T-I-N.

4 | THE COURT:  All right, Ms. Martin.  How are you

5 | today?

6 | PROSPECTIVE JUROR MARTIN:  Fine.  Thank you.

7 | THE COURT:  Any hardship issue?

8 | PROSPECTIVE JUROR MARTIN:  No.

9 | THE COURT:  Great.  Can you see the chart okay?

10 | PROSPECTIVE JUROR MARTIN:  Yes.

11 | THE COURT:  Mr. Kessler, would you tilt the chart

12 | slightly more towards Ms. Martin?

13 | MR. KESSLER:  Is that okay?

14 | PROSPECTIVE JUROR MARTIN:  That is fine.

15 | THE COURT:  You know what I would recommend?  She's

16 | not going to -- well, all right.  Can you see it well enough?

17 | PROSPECTIVE JUROR MARTIN:  Yeah, that's fine.

18 | THE COURT:  Go right ahead.

19 | PROSPECTIVE JUROR MARTIN:  My name's Debra Martin.  I

20 | live in San Leandro.  I have a master's in library and

21 | information science, I'm a librarian, a law librarian.  And I

22 | work for Bank of America legal department.

23 | I'm a member of the American Association of Law

24 | Libraries and some local history -- historic groups.

25 | I'm interested in architectural history.

 1            I lost my husband about seven months ago.  I have two

 2    stepdaughters in their thirties.

 3            One works for an insurance company and another does

 4    marketing for the California Chamber of Commerce.

 5            I have been on a jury one time, and it was at a

 6    criminal trial.  And we did reach a verdict.

 7            No military or law enforcement, never been a party or

 8    a witness in court.

 9            THE COURT:  All right.  Well done.  Thank you.

10            Any of the questions that I asked ring a bell with

11    you?  Like know any of the lawyers?

12            How about you work in the legal department.  Have you

13    ever heard of any of these law firms?

14            PROSPECTIVE JUROR MARTIN:  I've heard of the firms,

15    yes.

16            THE COURT:  Do any of them work for B of A that you

17    know of.

18            PROSPECTIVE JUROR MARTIN:  Not that I know of.

19            THE COURT:  What do you for the legal department?

20            PROSPECTIVE JUROR MARTIN:  I'm the librarian.  I take

21    care of the library, and I do a lot of research online.

22            THE COURT:  So, do you do -- you are not a lawyer,

23    though?

24            PROSPECTIVE JUROR MARTIN:  No, no.

25            THE COURT:  So, somebody -- you know in this case you

 1  would not be allowed to go do any homework.  You couldn't go

 2  online and look up licensing agreements.

 3            PROSPECTIVE JUROR MARTIN:  I know.

 4            THE COURT:  You couldn't ask anyone in the B of A

 5  legal department what they think.  You know, you couldn't do

 6  any of that.

 7            PROSPECTIVE JUROR MARTIN:  I know.

 8            THE COURT:  So, do you know any of these lawyers

 9  individually?

10            PROSPECTIVE JUROR MARTIN:  No.

11            THE COURT:  Never heard of them?

12            PROSPECTIVE JUROR MARTIN:  No.

13            THE COURT:  All right.  Well, I'm sure they are

14  crestfallen.

15            PROSPECTIVE JUROR MARTIN:  Sorry.

16            THE COURT:  Did you know any of the names of these

17  football players that were mentioned earlier?

18            PROSPECTIVE JUROR MARTIN:  Just heard of some names,

19  that's all.  Like Gene Upshaw.

20            THE COURT:  Have you ever been to a football game?

21            PROSPECTIVE JUROR MARTIN:  I've been to one

22  exhibition game, Niner's game.

23            THE COURT:  How long ago was that?

24            PROSPECTIVE JUROR MARTIN:  Probably 15 years ago.

25            THE COURT:  Glory days.  All right.

 1              So, good.  Any other questions that we asked a while

 2   ago that ring a bell with you?

 3              PROSPECTIVE JUROR MARTIN:  No.

 4              THE COURT:  Anything that would cause you to be

 5   biased in this case?

 6              PROSPECTIVE JUROR MARTIN:  No.

 7              THE COURT:  All right.  Okay.  How many of you have

 8   ever played the Madden Football Game, the video game called

 9   "Madden Football Game"?

10              Raise your hand.

11              Raise it high.  You can't just raise it like that.

12   You raise it high.

13              Okay.  Ms. De Souza.  Let's give you the mic, though.

14              PROSPECTIVE JUROR DE SOUZA:  I don't play it well.

15              THE COURT:  All right.

16              PROSPECTIVE JUROR DE SOUZA:  My son is 13.  He has

17   it, and he makes me sit there and do whatever it is.  I just

18   push the buttons.

19              THE COURT:  He wants somebody to play against.

20              PROSPECTIVE JUROR DE SOUZA:  Yeah.

21              THE COURT:  So how many times do you think you have

22   played the Madden Football Game?

23              PROSPECTIVE JUROR DE SOUZA:  Oh, on what day?  I -- a

24   couple of times a day.

25              THE COURT:  Many times.  All right.  Many times.

 1  Okay.

 2          Now, this case is going to involve the Madden

 3  Football Game.  All right?  So  is that going to cause you to

 4  be biased one way or the other?

 5          PROSPECTIVE JUROR DE SOUZA:  No.

 6          THE COURT:  No?

 7          PROSPECTIVE JUROR DE SOUZA:  No.  I barely pay

 8  attention when I'm doing it, so -- it's sort of one of those --

 9          THE COURT:  Have you ever tried to figure out who the

10  players are that you're manipulating on the screen?

11          PROSPECTIVE JUROR DE SOUZA:  No.

12          THE COURT:  Okay.  All right.

13          Anyone else?  Anybody back there who have ever played

14  that game?  Raise your hand.

15          Okay.  We have got one player back there.  If you

16  come forward I'll ask you a question about that, too.

17          Okay.  Are there any other games that -- other than

18  the Madden Football Game that we are going to hear about in

19  this case?

20          How about the -- how about football cards?  Are we

21  going to hear about that?

22          MR. HUMMEL:  (Nods head).

23          THE COURT:  How about football cards?  You know, the

24  player cards?  Any of you ever collect those things?

25          Mr. Collins, did you ever collect those?

1

2          PROSPECTIVE JUROR COLLINS:  Never did.

3          THE COURT:  Never did?  Okay.

4          PROSPECTIVE JUROR COLLINS:  Never did.

5          THE COURT:  How about you, Ms. De Souza?  No?

6          How about your son, does he collect them?

7          PROSPECTIVE JUROR DE SOUZA:  Just baseball.

8          THE COURT:  Baseball.  Okay.

9          Any of you have, other than --  raise your hand if

10 you have any law training?  Any law training?

11         PROSPECTIVE JUROR MARTIN:  (Juror indicates.)

12         THE COURT:  You do.  Ms. Martin, other than what you

13 have told us is there any more to tell?

14         PROSPECTIVE JUROR MARTIN:  No.

15         THE COURT:  Any of you have accounting training?

16         Okay, Mr. McEachron.  What is your accounting

17 training?

18         MR. KESSLER:  I have an undergrad in finance and took

19 numerous accounting courses.  I don't have a CPA.  That's the

20 extent of my training in accounting.

21         THE COURT:  Okay.  And in your job, do you use it?

22         PROSPECTIVE JUROR MCEACHRON:  Just -- I'm a real

23 estate developer, and I use a lot of financial analysis, so I

24 use --

25         THE COURT:  You are good with numbers.  You can read

 1  a financial statement.

 2          PROSPECTIVE JUROR MCEACHRON:  Yes.

 3          THE COURT:  Good.  That's a very handy skill to have.

 4          Okay, let's see.  I need to ask -- I asked you if you

 5  had gone to football games, but how about watching TV?  On

 6  Sundays and Monday night football, how many of you -- raise

 7  your hand if you think you are a regular football season

 8  television watcher.  Raise your hand if you think you are.

 9          Okay.  Raise it a little higher so all the lawyers

10  can -- okay.  One, two, three, four is basically it.

11          All right.  Now, Mr. Brown, I think -- do you have

12  the ESPN magazine there?  What magazine is it?  I saw -- you

13  left it there a while ago and --

14          PROSPECTIVE JUROR BROWN:  (Indicating).

15          THE COURT:  Okay.  Is that one of your favorite

16  magazines to read?

17          PROSPECTIVE JUROR BROWN:  No.  I got it out of your

18  room over there.

19          THE COURT:  So, you were desperate.  So, you don't

20  normally subscribe to that, then?

21          PROSPECTIVE JUROR BROWN:  No, sir.

22          THE COURT:  How about how many of you subscribe to a

23  sports magazine?  Raise your hand?  One, two.  Okay.

24          Mr. Collins, which ones do you subscribe to?

25          PROSPECTIVE JUROR COLLINS:  Right now it's ESPN, and

1   then previously it's been Sports Illustrated.

2              THE COURT:  But not now?

3              PROSPECTIVE JUROR COLLINS:  Not now.

4              THE COURT:  And then, Mr. Kittams?

5              PROSPECTIVE JUROR KITTAMS:  Kittams.

6              THE COURT:  Kittams.

7              PROSPECTIVE JUROR KITTAMS:   Powder Magazine, Skiing

8   Magazine, skiing magazines.

9              THE COURT:  Okay.  Skiing magazines.  Good.

10             How many of you have some connection to professional

11  football that we've not touched on?  If you have one, raise

12  your hand?

13             Mr. Kittams.

14             PROSPECTIVE JUROR KITTAMS:  Kittens with an M.

15             THE COURT:  Oh, Kittams, okay.  Kittams okay.  Got

16  it.  Okay.

17             PROSPECTIVE JUROR KITTAMS:  My son's mother is the

18  office manager for Bruce Moorstein, which is a general surgeon

19  in Oakland.  And he's historically shared office space with

20  Dr. Bob Albo, who was the team physician for Raiders and

21  Warriors, has been team physician for those two teams.

22             THE COURT:  Who, who -- who is your connection?

23             PROSPECTIVE JUROR KITTAMS:  Her employer is Dr. Bruce

24  Moorstein.

25             THE COURT:  And her, though, is who?  Your wife?

 1              PROSPECTIVE JUROR KITTAMS:  My ex, my son's mother.

 2              THE COURT:  Oh, your son's mother.  All right.

 3              Well, will that have an affect on your ability to be

 4    fair and impartial?

 5              PROSPECTIVE JUROR KITTAMS:  It probably would,

 6    because I've heard a lot of stories.  I have been thinking

 7    about it, and it's -- there's a bias there, I -- I don't know

 8    if I can -- if I can do it.

 9              THE COURT:  Well, what is your bias?  Who do you

10    think you are biased in favor of?

11              PROSPECTIVE JUROR KITTAMS:  Definitely against the

12    owners, definitely for the players.  But the owners aren't

13    involved here.

14              THE COURT:  That seems pretty attenuated to me, that

15    you would have acquired a bias in that indirect a fashion.

16              So, you are saying that you heard stories over the

17    years about what, injuries?

18              PROSPECTIVE JUROR KITTAMS:  Well, yes, yes.

19              THE COURT:  About football injuries.

20              PROSPECTIVE JUROR KITTAMS:  Yes.  Well, and

21    basketball, too.  But mostly football.

22              THE COURT:  So you are telling us, though, that you

23    have a bias in favor of the players and against the -- it's not

24    the League here, it's the union.

25              Do you understand?

1          PROSPECTIVE JUROR KITTAMS:  Yes.

2          THE COURT:  So you think you are biased?

3          PROSPECTIVE JUROR KITTAMS:  Yes.

4          THE COURT:  I'm going to excuse Mr. Kittams unless

5   there is an objection.

6          MR. KESSLER:  No.

7          MR. PARCHER:  I wonder if the Court could inquire

8   whether this witness could follow your instructions and keep an

9   open mind and set his bias aside.

10         THE COURT:  Let me ask that question.

11         Can you set aside your bias an decide this case fair

12  and square on the law and the facts?

13         PROSPECTIVE JUROR KITTAMS:  I don't know.  I don't

14  know.  They're all injured.  They're all -- they're all

15  handicapped.

16         THE COURT:  That's not a good enough answer.  I'm

17  going to excuse this witness on account of his statement that

18  he's biased and doesn't know whether he can set that bias

19  aside.

20         Well, maybe we can use that on that eight-month

21  antitrust case.  I hope so, because I know you would be an

22  excellent juror.  And I think I'm going to call down there and

23  say to make a special point to get you on that case.  All

24  right.

25         PROSPECTIVE JUROR KITTAMS:  I've given the system

 1  many days of my life.

 2          THE COURT:  And I thank you for that.

 3          Mr. Kittams, thank you.  Go back to the jury room and

 4  tell them what happened.

 5          One of you lucky ones out there will be called

 6  forward.

 7          THE CLERK:  Kelly Sue Irby, I-R-B-Y.

 8          THE COURT:  Kelly --

 9          THE CLERK:  Irby.

10          THE COURT:  Kelly Sue Irby.

11          PROSPECTIVE JUROR IRBY:  Yes.

12          THE COURT:  Ms. Irby, how are you?

13          PROSPECTIVE JUROR IRBY:  Just fine.

14          THE COURT:  That's the way we want you to be.

15          Ms. De Souza was dandy.

16          All right.  Okay.  Any hardship issue?

17          PROSPECTIVE JUROR IRBY:  I'm getting married on

18  Saturday, so --

19          THE COURT:  Congratulations.

20          PROSPECTIVE JUROR IRBY:  -- it may be a hardship.

21          THE COURT:  It's going to be a short honeymoon, then.

22          PROSPECTIVE JUROR IRBY:  I can prove it (Indicating).

23          So, and also, until Friday, I worked for the law firm

24  of Heller Ehrmann who dissolved their law firm and shut the

25  doors.

1          THE COURT:  Are you a lawyer?

2          PROSPECTIVE JUROR IRBY:  I am, but I'm not a

3    practicing attorney.  I'm a litigation supervisor.  So I do the

4    scheduling for the litigation cases.  And now I'm working

5    contract starting tomorrow at the law firm of Morrison &

6    Foerster.

7          THE COURT:  Well, let's go back to your marriage

8    thing.  Do you have plans for traveling?

9          PROSPECTIVE JUROR IRBY:  We are driving up to

10   Vancouver, Washington.  Or Vancouver.

11         THE COURT:  And you will be leaving when and

12   returning when?

13         PROSPECTIVE JUROR IRBY:  We will be leaving on Sunday

14   and coming back on November 4th.

15         THE COURT:  Well, I know you could not have

16   constructed all this just to get out of jury service, so I'm

17   going to --

18         PROSPECTIVE JUROR IRBY:  No, and I actually did put

19   this on the form, and for what reason they still called me.

20         THE COURT:  Well, we will excuse you unless there is

21   any objection.

22         MR. KESSLER:  No objection.

23         THE COURT:  Thank you, Ms. Irby.  Congratulations,

24   again.

25         PROSPECTIVE JUROR IRBY:  Oh, thank you.

1           THE COURT:  Have a great trip up to Oregon.

2           THE CLERK:  Laura Yamane, Y-A-M-A-N-E.

3           THE COURT:  Okay.  How are you?

4           PROSPECTIVE JUROR YAMANE:  Fine, thank you.

5           THE COURT:  Great.  I'm sorry you have to squeeze

6   through there.  If you are selected, though, it will be a lot

7   easier.  It will be down to ten.

8           Ms. Yamane, am I saying that right?

9           PROSPECTIVE JUROR YAMANE:  Yamane.

10          THE COURT:  Yamane.

11          PROSPECTIVE JUROR YAMANE:  Yes.

12          THE COURT:  Okay.  Tell me if you have any hardship

13  issue.

14          PROSPECTIVE JUROR YAMANE:  None.  Thank you.

15          THE COURT:  Wonderful.  Can you see the chart?

16          PROSPECTIVE JUROR YAMANE:  I can.

17          THE COURT:  Would you give us that information?

18          PROSPECTIVE JUROR YAMANE:  My name is Laura Yamane.

19  I'm a resident of San Carlos.  Junior college education.

20          I'm a registered dental assistant and lab -- dental

21  lab owner.

22          No organizations, clubs, unions.

23          Scrapbooking, gardening, spectator sports.

24          I have been married for 17 years.  My spouse is a

25  financial analyst.

1                    I have children, 12 and 9.

2                    I have been called to jury service but never had to

3  serve.

4                    Never in the military or law enforcement.

5                    And never been a party or witness in a court.

6            THE COURT:  Great.  Okay.

7                    Your husband is a financial analyst for who?

8            PROSPECTIVE JUROR YAMANE:  Yes, Avis Budget.

9            THE COURT:  Now, do you know any of the lawyers or

10 witnesses?  Those names ring a bell?

11           PROSPECTIVE JUROR YAMANE:  No.

12           THE COURT:  No?

13           PROSPECTIVE JUROR YAMANE:  No.

14           THE COURT:  All right.  And how about any of the --

15 you said you were sports.  Do you go to football games?

16           PROSPECTIVE JUROR YAMANE:  I have been to a few 49er

17 games.

18           THE COURT:  All right.  When is the most recent one?

19           PROSPECTIVE JUROR YAMANE:  Just probably last year,

20 so it hasn't been too recent.

21           THE COURT:  How about --

22           PROSPECTIVE JUROR YAMANE:  It's mostly spectator at

23 my kids' sports.  My son is -- he's in football pools and

24 everything like that.  Xbox, Madden.

25                    But I don't play, so --

 1           THE COURT:  But he has the Madden game?

 2           PROSPECTIVE JUROR YAMANE:  He does.

 3           THE COURT:  All right.  So do you have any connection

 4  with professional football or professional sports of any type?

 5           PROSPECTIVE JUROR YAMANE:  No.  I was in a mother's

 6  club with Pat Tillman's cousin, so -- but other than that.

 7           THE COURT:  All right.  Do you think you have any

 8  possible bias one way or the other in this case?

 9           PROSPECTIVE JUROR YAMANE:  No biases.

10           THE COURT:  I'm sorry?

11           PROSPECTIVE JUROR YAMANE:  No biases.

12           THE COURT:  And can you be fair and impartial in

13  deciding this case?

14           PROSPECTIVE JUROR YAMANE:  Yes.

15           THE COURT:  Okay.  Great.  All right.  Any of those

16  other questions that I asked ring a bell with you?

17           PROSPECTIVE JUROR YAMANE:  (Witness shakes head).

18           THE COURT:  Any sports magazines, for example, that

19  you subscribe to?

20           PROSPECTIVE JUROR YAMANE:  Sports illustrated.  My

21  son has Kids Sports Illustrated.

22           THE COURT:  Any law or accounting training yourself?

23           PROSPECTIVE JUROR YAMANE:  No, no.

24           THE COURT:  Okay.  Different question now for the

25  entire group.

 1            Any of you ever acted -- had a role in any kind of

 2    collective bargaining negotiations?  Like being a union rep or

 3    somehow having input into collective bargaining?

 4            Ms. Schwartzler?

 5            PROSPECTIVE JUROR SCHWARTZLER:  Yes, every three

 6    years my contract expire, and I been three times, to negotiate

 7    my -- the new contract.

 8            THE COURT:  And what is your role in negotiating the

 9    contract?

10            PROSPECTIVE JUROR SCHWARTZLER:  I am on the side with

11    the union to negotiate the best contract that we can against

12    the company.

13            THE COURT:  And your -- and your job is what, again?

14            PROSPECTIVE JUROR SCHWARTZLER:  I work for a bakery,

15    Sorry Bakery in Oakland.

16            THE COURT:  So you are, in a way, affiliated with a

17    union?  You are a union member, too, right?

18            PROSPECTIVE JUROR SCHWARTZLER:  Yes.

19            THE COURT:  Now, the Defendant in this case is a

20    labor union.  Do you understand that?

21            PROSPECTIVE JUROR SCHWARTZLER:  Yes.

22            THE COURT:  Are you going to be biased in this case

23    in favor of the union?

24            PROSPECTIVE JUROR SCHWARTZLER:  I have some kind of a

25    feeling for -- when you dismissed the other guy, but I put

 1  myself in the situation that I can be neutral, too, you know.

 2  I can -- I can be on both sides.

 3          THE COURT:  So you can -- you can set aside your --

 4  the fact that you've had an experience with the union, and be

 5  fair and impartial in this case, correct?

 6          PROSPECTIVE JUROR SCHWARTZLER:  Yes.

 7          THE COURT:  All right.  Good.  Okay.

 8          Mr. Brown, you raised your hand.

 9          PROSPECTIVE JUROR BROWN:  My experience with

10  collective bargaining is about the same as hers.  We go to a

11  big renegotiation every so many years, just renegotiate.

12          THE COURT:  Can you -- does that -- do you think that

13  would cause you to be biased in some way, one way or the other

14  in this case?

15          PROSPECTIVE JUROR BROWN:  No, not a problem.

16          THE COURT:  All right.  Very good.

17          Ms. Timlin, let's have the microphone go down to you.

18          PROSPECTIVE JUROR TIMLIN:  I'm sorry.  I was unable

19  to get to the last question.  My ex-boss, mentor and one of my

20  closest friends does something with the Forty-Niners, with a

21  note pad on the field.  And I really am not familiar enough

22  with the game to know what that is.

23          So I don't foresee any bias.  At one point last year

24  I did audition to sing for the national anthem and was one of

25  the finalists in the Greg Kihn competition,  but was not

 1  chosen.

 2          Those are my experiences.  But I see absolutely no

 3  bias whatsoever.

 4          THE COURT:  So it was good to tell us about, but you

 5  are telling us you don't think that would bias you one way or

 6  the other, right?

 7          PROSPECTIVE JUROR TIMLIN:  No.

 8          THE COURT:  Great.  Anyone else?

 9          Okay.  Any of you ever been involved in licensing

10  rights, licensing rights to use somebody else's name or image?

11  If so, raise your hand.

12          PROSPECTIVE JUROR HAYWOOD:  Your Honor, personally

13  involved or --

14          THE COURT:  Yeah.

15          PROSPECTIVE JUROR HAYWOOD:  I know someone that --

16          THE COURT:  Tell us what you are referring to.

17          PROSPECTIVE JUROR HAYWOOD:  Haywood, Carmella

18  Haywood.

19          Well, my husband was the vice-president, I believe,

20  for Upper Deck Authenticated.  And I'm not the collector, when

21  you asked that question, but he definitely has.  And it's all

22  sitting in our closet.  Cards, you know, pictures, Jerseys,

23  that sort of thing.

24          And, again, he did run that -- that division of Upper

25  Deck.  He has told me of --

1          THE COURT:  I don't even know what Upper Deck is.

2   What is it?

3          PROSPECTIVE JUROR HAYWOOD:  It's trading card and

4   licensing of images of sports.

5          THE COURT:  I see.

6          PROSPECTIVE JUROR HAYWOOD:  So he's told me stories,

7   but I have not been directly involved in any persons that he

8   has worked with, or was part of their organization.

9          THE COURT:  What, do you think that causes you to be

10  biased in this case?

11         PROSPECTIVE JUROR HAYWOOD:  No, I don't believe it

12  would.

13         THE COURT:  All right.

14         Now, Mr. Casotto.

15         PROSPECTIVE JUROR CASOTTO:  Yes.  With my company we

16  are trying to do licensing agreements with our partners, but I

17  don't know if it's relevant to this case.  We license our

18  software or OEM agreements.

19         THE COURT:  Now, at the end of this case you are

20  going to have to decide what the contract means and what it

21  covers.  And I will tell you the guidelines for deciding that.

22  And, it -- so you would not be applying what you think you

23  would apply the rules under your licensing agreements.  You

24  would have to apply the rules that I give you.

25         Do you think you can keep that straight and do it the

 1  right way?

 2            PROSPECTIVE JUROR CASOTTO:  I believe so.

 3            THE COURT:  All right.  Thank you.  Okay.  Any of you

 4  have either strong negative or strong positive views about

 5  labor unions?  If you do, raise your hand.

 6            All right.  Here we go.  Ms. Curtiss-Horton?

 7            PROSPECTIVE JUROR CURTISS-HORTON:  Strong positive

 8  views towards labor unions.

 9            THE COURT:  Okay.  Now, that's okay.  You know, no

10  problem.  But will that cause you to be biased in favor of the

11  labor union in this case, or can you set that aside and be fair

12  and impartial to both sides?

13            PROSPECTIVE JUROR CURTISS-HORTON:  I can set it

14  aside.

15            THE COURT:  Good.  Anyone else?  Ms. Smith.

16            PROSPECTIVE JUROR SMITH:  Yes.  I have strong

17  positive views on labor unions.  I belong to one, and I believe

18  that I would not have the benefits that I have now without my

19  union.

20            THE COURT:  All right.

21            Now, in this case, we haven't even heard the evidence

22  yet.  So -- but, you would have to put that general view of

23  yours aside, and decide this case fair and square on the facts

24  and the record that we hear in this case.

25            Can you do that?

1          PROSPECTIVE JUROR SMITH:  Yes, I think I can.

2          THE COURT:  If you got down to a 50/50 and were

3     really close and so forth, would you say in your mind:

4               "Well, I like labor unions, so I'm just going to

5     vote information the labor union"?

6

7          PROSPECTIVE JUROR SMITH:  No, I would not do that.

8          THE COURT:  That's good.  Anyone else?

9          Mr. Casotto.

10         PROSPECTIVE JUROR CASOTTO:  Yeah.  I also have a

11    political opinion that stronger unions would benefit this

12    country.  So, I don't know if that's going -- it is not going

13    to affect my judgment in this case.

14         THE COURT:  But, all right?  So you like labor

15    unions, right?

16         PROSPECTIVE JUROR CASOTTO:  I do like labor unions.

17         THE COURT:  That's no problem.  But you got to put

18    your like for unions aside, and decide this case fair and

19    square on the record.  Can you do that?

20         PROSPECTIVE JUROR CASOTTO:  I believe so.

21         THE COURT:  Good.

22         Mr. Collins?

23         PROSPECTIVE JUROR COLLINS:  So, I also like labor

24    unions, but my dad has spent his whole career doing battle with

25    them because he's a managing partner at Sheppard Mullin Richter

 1  & Hampton, and he is often fighting the labor unions because of

 2  wrongful firing and the various things he defends companies

 3  against.

 4          I don't think it biases me because I actually think

 5  labor unions are good.  But I can imagine that over the years I

 6  have built up the ability to mistrust the tactics of a labor

 7  union in a legal proceeding.  So it's just something that I'm

 8  trying to think through.

 9          THE COURT:  Well, you -- I'm going to tell you that

10  whether labor unions have done some kind of a trick before or

11  management has done some kind of a trick in some other case has

12  nothing to do with -- at the end of the day we are going to

13  have a set of contracts.  We are going to have some testimony.

14  And you as a juror would have to decide who's proven -- if they

15  got the burden of proof -- have they proven what they need to

16  prove?

17          And you would have to put out of your mind what your

18  dad did and general politics about labor unions.  Can you do

19  that?

20          PROSPECTIVE JUROR COLLINS:  I don't believe I'm

21  biased by it.

22          THE COURT:  All right, thank you.

23          Anyone else?

24          No one's raising their hand.  Okay.  Good.

25          I'm going to ask you a slightly unfair -- it's not

1    unfair, really.  It's a good question.  But probably one you

2    are not ready for.  I'm going to ask you why you think you

3    would be a good juror.

4            Now, you might think you would not be a good juror,

5    and that's okay.  You can say:

6                 "I don't think I would be a good juror, and here

7    is the reason."

8            But if you think you would be a good juror or a bad

9    juror or just so-so, or whatever, I want you to tell us the

10   reasons why you think you would be a good juror.

11           And, don't just repeat what the person said

12   immediately before.

13           Who's got the microphone?

14           Okay.  Let's pass it down to Ms. Holm.  You get to go

15   first, Ms. Holm.

16           PROSPECTIVE JUROR HOLM:  I really don't know what

17   kind of juror I would be.  I think I would be good, but I don't

18   know.

19           THE COURT:  All right.  Let's go to Ms. Hart.

20           Before you -- I want to tell you what a juror has to

21   do.  So hand the mic back to Ms. Holm, please.

22           Here's what a juror has to do.  Some of you have

23   never served on a jury, so maybe this will help you.

24           It's not like TV.  We -- you know, I take an oath to

25   uphold the law, as the Judge.  I try my best to do that.

 1              I got a credential, you know, a little thing saying

 2    that I'm an officer of the Court.

 3              A jury is the same thing.  You take an oath to uphold

 4    the law.  It's limited to one case, but you will be the United

 5    States of America, speaking on behalf of this country to decide

 6    this case.

 7              So you take an oath to uphold the law, pay close

 8    attention to the facts.  Then, at the end of the -- all the

 9    evidence, after paying close attention, you go into the jury

10    room and you have to reach a unanimous verdict, meaning

11    everybody agrees.

12              And you lay the facts that have been proven or not

13    proven alongside what is required to be proven, and you make a

14    decision:  Has the party with the burden of proof carried their

15    burden of proof?  If so, they win.

16              If not, they lose.

17              So, you have to apply the -- you decide the facts.

18    In other words, if one side said the light was red and the

19    other side said it was green, the jury decides that in our

20    system.

21              The Judge tells you what the law is so you will know

22    what it means, what the significance of the light being red or

23    green is.

24              But you, the jury, are told are delegated by your

25    country, the important responsibility to decide a case.  In

 1  this case, it's this particular case.

 2          So you get a credential.  You get a badge, just like

 3  I get a little badge.  You take the oath to uphold the law,

 4  just like I do.  You are the judge for this case.

 5          Now, with that in mind, I want you to -- Ms. Holm,

 6  you tell me why you would be a good juror or not a good juror.

 7

 8          PROSPECTIVE JUROR HOLM:  I think I would be good.

 9  I'm good at looking at the facts and not being swayed by other

10  emotional parts.  So I think I would be good at looking at the

11  facts and deciding my verdict.

12          THE COURT:  All right.

13          Okay.  Ms. Hart, your turn.

14          PROSPECTIVE JUROR HART:  Again, I think I would be a

15  good juror.  I'm not positive, but the case is interesting.

16  And, again, looking at all of the facts and the evidence

17  presented, I think I would be able to present an unbiased

18  decision.

19          THE COURT:  All right.

20          Ms. Schwartzler?

21          PROSPECTIVE JUROR SCHWARTZLER:  I think I would be a

22  very good juror because I am a very fair person, I like the

23  truth, and I like face the reality.  And in this special

24  occasion I want to learn from this experience.

25          THE COURT:  Mr. Collins?

1          PROSPECTIVE JUROR COLLINS:  I think I would be a good

2     juror.  I have to make fairly objective decisions without a lot

3     of emotion pretty much every day at work as a software

4     architect.  So I think I can make an unbiased judgment.

5          THE COURT:  Thank you.

6          Mr. Casotto?

7          PROSPECTIVE JUROR CASOTTO:  Yeah.  I would like to be

8     a good juror.  My father was a judge, so instilled in me the

9     value of justice.  I'm not sure that reality is always red and

10    green or black and white.  There is a lot of gray in-between.

11    And I believe I can apply my own good judgment, in any case.

12         THE COURT:  All right.  Ms. Yamane.

13         PROSPECTIVE JUROR YAMANE:  I think I would be a good

14    juror.  I'm a good listener, and I think I could be fair and

15    unbiased.

16         THE COURT:  Ms. Haywood?

17         PROSPECTIVE JUROR HAYWOOD:  I feel like I can be a

18    good juror.  Personally and professionally, I always employ

19    objectivity.  I'm a good listener.  And I always have to look

20    at, you know, evidence or what's real or the facts for a client

21    or even for my company, in what I do.  And so I do feel that I

22    could be objective.

23         THE COURT:  Okay.  Ms. Curtiss-Horton?

24         PROSPECTIVE JUROR CURTISS-HORTON:  I think I can be a

25    good juror.  I'm a very fair, calm, reasonable person.

 1          My only question -- I've always questioned this with

 2    myself -- is I do tend to take the position of the underdog.

 3    And so, I have to set that aside, whatever I think the underdog

 4    is, and really look at it in terms of the legalities of it.

 5          And I'm sure I can do that.  But sometimes I just

 6    question that a little bit.

 7          I've always wanted to be a juror, and I think I'm up

 8    to the task.  But, there's that little question that I have.

 9          THE COURT:  Okay.  Ms. De Souza?

10          PROSPECTIVE JUROR DE SOUZA:  I think I would be a

11    good juror.  I've been told I'm a very fair person, and I've

12    always wanted to do this.

13          THE COURT:  All right.

14          Ms. Timlin?

15          PROSPECTIVE JUROR TIMLIN:  I think I would be a good

16    juror for two reasons.  One of them is the fact that I am

17    completely unfamiliar with what is going on here.  I don't

18    follow football.  So it's something that's a little new to me.

19          And, two, as a scientist my job is to look at the

20    data without making a judgment prior to seeing what the facts

21    are, and making a judgment based on the data, based on the

22    facts.

23          THE COURT:  Okay.

24          Ms. Smith?

25          PROSPECTIVE JUROR SMITH:  I think I would make a good

1   juror.  I'm a rational, critical thinker.  I'm used to working

2   with teams of people, and I know absolutely nothing about

3   football.  I've never seen a football game on TV or out in real

4   life ever, in my whole life.

5               PROSPECTIVE JUROR MCEACHRON:  I think I would be a

6   good juror.  I tend to in any sort of debate or argument,

7   listen to all the facts before forming an opinion.

8               I'm a good listener, fairly analytical, so I can

9   separate facts from emotion and make a decision.

10              THE COURT:  Okay.

11              Mr. Chui.

12              PROSPECTIVE JUROR CHUI:  I think I will be a good

13  juror, because I'm a fair person.  So I would do my job well.

14              THE COURT:  Okay.

15              PROSPECTIVE JUROR BROWN:  Waldo, right?  I'll be a

16  good juror, I guess.  Yep.

17              THE COURT:  Well, why?  What is it about you that

18  would make you a good juror?

19              PROSPECTIVE JUROR BROWN:  You know, it's just being

20  fair.  Most of us are going to be fair, right?  Better for --

21  well, for me sitting here in this area, cooped up, kind of.  So

22  I'll put up with that, and I'll give you a fair and

23  impartial judgment out of it.

24              THE COURT:  Okay, all right.

25              Mr. Neville?

 1              PROSPECTIVE JUROR NEVILLE:  Yes.  I think I would be

 2      a good juror, as well, just because I'm pretty fair, impartial.

 3      The only thing my mind sometimes goes different directions, so

 4      that would be one thing I would have to work on, just paying

 5      attention, holding in the information to make a fair judgment.

 6              PROSPECTIVE JUROR MARTIN:  I think I would be fair,

 7      or be a good juror.  I'm very logical thinking.  That's the

 8      librarian in me.  I organize thoughts, listen to all sides.

 9              THE COURT:  All right.  I want you to -- now, you

10      would be given a note pad, steno pad, and you could take all

11      the notes you want.  But you don't have to take notes.

12              I want you to raise your hand if you think you would

13      take notes, even though you are not required to, that you would

14      take notes if you were selected as a juror.

15              Raise your hand if you think you would.

16              (All jurors indicate by raising hand, except Mr.

17      Chui.)

18              THE COURT:  All right.  Okay.  And, raise your hand

19      if you think you would not.

20              (Mr. Chui indicates by raising hand.)

21              THE COURT:  Okay, one.  All right.

22              Now, how many of you -- there will be a lot of

23      documents in this case, and they're going to be put on the

24      screen for you to see.

25              Do any of you have any trouble seeing or following a

 1  lot of documents?  Some people are good at it.  Some people are

 2  not good at it.

 3           If you think you would have trouble following a lot

 4  of documents, I want you to raise your hand.

 5           Mr. Brown?

 6           PROSPECTIVE JUROR BROWN:  I'll be all right if I

 7  bring my glasses.

 8           THE COURT:  Okay.  No, but not today.  You would have

 9  to bring your glasses, yes.

10           Anyone else?  Okay.

11           How about, do any of you have trouble with the

12  English language?  We are going to have -- as I say, there are

13  going to be documents.  They will be in English.

14           Any of you have trouble with English in written form?

15           Ms. Schwartzler?

16           PROSPECTIVE JUROR SCHWARTZLER:  Yes.

17           THE COURT:  What is your issue there?

18           PROSPECTIVE JUROR SCHWARTZLER:  Well, I can

19  understand, I would say, 90 percent.  When I'm reading I can

20  understand a lot.  But I don't know if I'm fit or not, you

21  know, I'm not --

22           THE COURT:  What is your -- is English your first

23  language or second language?

24           PROSPECTIVE JUROR SCHWARTZLER:  Second language.

25           THE COURT:  What is your first language?

 1             PROSPECTIVE JUROR SCHWARTZLER:  Spanish.

 2             THE COURT:  And how long have you been fluent in

 3   English?

 4             PROSPECTIVE JUROR SCHWARTZLER:  Well, if you call me

 5   "fluent," thank you.  Ten years.

 6             THE COURT:  Ten years.

 7             PROSPECTIVE JUROR SCHWARTZLER:  Yeah.

 8             THE COURT:  All right.  Do you, do you read documents

 9   in your work?

10             PROSPECTIVE JUROR SCHWARTZLER:  I read books.

11             THE COURT:  And they are in English?

12             PROSPECTIVE JUROR SCHWARTZLER:  Yes.

13             THE COURT:  Okay.  Have you been able to follow and

14   understand everything in the courtroom so far?

15             MR. SCHWARTZ:  Yes.

16             THE COURT:  All right.  I think you are okay, but it

17   would be important for you to be able to follow the testimony

18   and follow the documents on the screen.

19             PROSPECTIVE JUROR SCHWARTZLER:  I think I will.

20             THE COURT:  All right.  Good.  Anyone else?

21             Mr. Collins?

22             PROSPECTIVE JUROR COLLINS:  Just a question.

23             Given that we are going to be following a lot of

24   documents, and there are a lot of us, or ten of us, I guess, is

25   going to be the result, are there going to be summarizations

1  that we can have at the same time, or is it all relying on us

2  taking the right notes throughout the right content?

3           THE COURT:  There will be very few summarizations, if

4  any.  There will be an opening statement by both sides.  Now

5  that's not evidence.  That's just an opening statement.

6           But after that, the evidence just starts coming in

7  one question at a time, one document at a time.  And, I can

8  tell you from prior experience, sometimes the jury has no clue

9  why they're seeing a document on the screen.

10          And it may be not clear until the very end at the

11 closing arguments.

12          Now, we have excellent lawyers in this case.  I think

13 they will bend over backwards to find ways to make it

14 comprehensible to the jury, but I can't guarantee it.

15          So, that's why I'm asking the question.  Some people

16 are good at seeing documents and just kind of naturally -- a

17 bunch of e-mails, you see documents, contracts, letters,

18 schedules of numbers, things like that.

19          We are going see, I'm going to guess, 50 to a hundred

20 of those in this case.

21          You can take notes, but you can only rely on your own

22 notes.  You can't rely on somebody else's notes.

23          All right.  Some people -- a different question:

24 Some people don't like to sit in judgment on others.  They feel

25 uncomfortable doing that.

1          It may be that you would have to decide who was

2  telling the truth, for example, on a certain -- or maybe

3  somebody was mistaken.  You might even have to decide if

4  somebody was lying or not.

5          Is there anyone here who has trouble sitting in

6  judgment on other people?  If so, raise your hand.

7          All right.  No one's raising -- no one is raising

8  their hand.

9          Any of you ever heard of Gene Upshaw?  If you have,

10 raise your hand?

11         Okay.  Mr. Upshaw, until recently, was the head of

12 the union in this case.  And he died just a month ago,

13 unexpectedly.  And, it's a sad thing that he is not here, but

14 the fact is that we have to decide this case fair and square,

15 with or without him.

16         You will be hearing from his testimony that he gave

17 prior to his death in this very case.  But, you cannot have

18 sympathy one way or the other on account of his untimely

19 passing.

20         So I need to ask, is there anyone here who thinks

21 that those circumstances would cause them to be unable to be

22 fair and square in this case?

23         If so, raise your hands.

24         Would any of you -- all right.  Any of you ever

25 brought a lawsuit in court?  If so, raise your hand.  Any of

1  your family -- immediate family members ever bring a lawsuit in

2  court?

3           If so, raise your hand.

4           Okay.  We need -- who has the microphone?  The

5  microphone first to Mrs. Schwartzler.

6           What's the lawsuit that you are thinking of?

7           PROSPECTIVE JUROR SCHWARTZLER:  You talking about

8  anybody in my family?

9           THE COURT:  Yeah, I am.

10          PROSPECTIVE JUROR SCHWARTZLER:  Okay.  My husband.

11          THE COURT:  What did he do?

12          PROSPECTIVE JUROR SCHWARTZLER:  Well, they -- my

13  husband and his sister, they were involved on inheritance deal

14  that -- that wasn't --

15          THE COURT:  So it was a family inheritance problem?

16          PROSPECTIVE JUROR SCHWARTZLER:  Yes.

17          THE COURT:  Did that work out to your satisfaction?

18          PROSPECTIVE JUROR SCHWARTZLER:  Yes.

19          THE COURT:  How long ago was that?

20          PROSPECTIVE JUROR SCHWARTZLER:  Two years ago.

21          THE COURT:  Okay.  Mr. Casotto, did you ever bring a

22  lawsuit or someone in your family?

23          PROSPECTIVE JUROR CASOTTO:  There is a case currently

24  open in Italy.  It is inheritance.  It involves my wife and her

25  brother.

1            THE COURT:  All right.  Okay.  Is that still pending?

2            PROSPECTIVE JUROR CASOTTO:  Yes, it is.

3            THE COURT:  Okay.  Then, Ms. -- who else raised their

4    hand?  Ms. Curtiss-Horton.

5            PROSPECTIVE JUROR CURTISS-HORTON:  I don't know.  It

6    wasn't really a lawsuit, but we were overcharged by attorneys

7    in San Diego, and so we went to the bar association to get back

8    money.  And we were successful in that.

9            THE COURT:  And the "we" being who?

10           PROSPECTIVE JUROR CURTISS-HORTON:  My husband and

11   myself.

12           THE COURT:  How long ago was that?

13           PROSPECTIVE JUROR CURTISS-HORTON:  It was last year.

14           THE COURT:  Is there anything about that, that you

15   think could sway you one way or the other in this case?

16           PROSPECTIVE JUROR CURTISS-HORTON:  No, because those

17   attorneys aren't here, so --

18           THE COURT:  All right.  Okay.

19           And Mr. Chui?  Let's go back to you.

20           PROSPECTIVE JUROR CHUI:  My wife being involved in a

21   traffic -- a traffic accident lawsuit.  It was about 15 years

22   ago.

23           THE COURT:  And she was the plaintiff?

24           PROSPECTIVE JUROR CHUI:  Yes.

25           THE COURT:  Okay.  And did that case come out to your

1  satisfaction okay?

2          PROSPECTIVE JUROR CHUI:  Yes.  We won the case.

3          THE COURT:  Okay, very good.

4          Now, any of you ever been sued?  Have you or your --

5  you know, any of you ever been sued?

6          Mr. Brown?  Mr. Brown, what have you been sued for?

7          PROSPECTIVE JUROR BROWN:  Traffic accident.  Many,

8  many, many, many years ago.

9          THE COURT:  Anything about that case that will cause

10 you to be biased in this case?

11         PROSPECTIVE JUROR BROWN:  No.

12         THE COURT:  Anyone else?  He's indicating no.

13         Anyone else?  Okay.  No one else has been sued.

14         All right.  Okay.  I might have a few more questions.

15 I do have just one basic question.

16         And that is, again, your job on behalf of your

17 country, if you are selected, would be to decide this case.

18 It's important that every case get decided fair and square by

19 an impartial jury.

20         And what the jury has to do is listen carefully to

21 the evidence.  And then, not go out and do any homework, not go

22 out and talk to anyone about the case, but decide the case

23 fairly and squarely based on what you hear in court and

24 according to the instructions of law that I give you.

25         I want you to raise your hand if you think you can do

1    that fairly and squarely, impartially.

2              Please raise your hand.

3              If the answer is yes, raise your hand.

4              (All jurors indicated.)

5              THE COURT:  If you don't think you can do that, raise

6    your hand.

7                  All right.  Is there -- now, another thing is I

8    will give you what is called "the admonition," which means you

9    can't go and talk to your family members about this case.

10   Can't go talk to anybody else about this case, or let anybody

11   talk to you about it.

12             And some people think:

13             "Oh, the Judge is just kidding. He doesn't really

14   mean that."

15             I do mean that.  If I find out you have done such a

16   thing we have to hold an entire -- suspend the trial and hold

17   an evidentiary hearing to find out if the jury has been

18   tainted.  And if I find out you have been talking about the

19   case among yourselves, same thing.

20             All right.  Can all of you follow that admonition?

21   No talking about the case to anybody, including yourselves,

22   until deliberations?  Then, it's your duty to talk about the

23   case.

24             Can all of you do that?

25             Ms. Timlin, can you do that?

 1              PROSPECTIVE JUROR TIMLIN:  Yes.

 2              THE COURT:  Anyone think you cannot do that?  Raise

 3 your hand if you cannot do that.

 4              And I'm serious.  I do mean it.

 5              Last trial I had I was walking back there, and I

 6 heard some guy in the jury in there talking about what had just

 7 happened in court.

 8              And I said:

 9                  "You are not supposed to be talking about that."

10              And he said:

11                  "Oh, I didn't think that was talking about the

12 case."

13              And I said:

14                  "Yeah, that's talking about the case."

15              You can't talk about the case during -- until it's

16 time to, which is at deliberations.

17              You have got to keep an open mind.  Sometimes the

18 last thing you hear is the most important thing you hear.

19              You have got to be fair to both sides until this case

20 goes to you for decision.

21              Can you all do that?  Anyone here think you can't do

22 that?

23              Okay.  I'm going to -- I'm going to let the lawyers

24 now ask a few questions.  Not many.

25              Each side has up to 15 minutes to follow up with any

1  points that you would like to bring.

2          Mr. Parcher, you may go first.

3          MR. PARCHER:  Thank you, Your Honor.

4          Good morning, everybody.

5          I have very few questions.  One is a question about

6  Gene Upshaw, the head of the union who just recently passed

7  away.

8          I need to ask you, if it turns out that in this case,

9  there's criticism by one side or another -- perhaps our side --

10  of Mr. Upshaw, of Mr. Upshaw's professional conduct, vis-a-vis

11  our clients in this case, is the fact that he passed away, or

12  any other fact, would it preclude you from keeping an open

13  mind?

14          I mean, if you feel the way -- if you feel the way we

15  do, you can -- you can accept it.  And if you don't feel the

16  way we do, of course you are free to reject it.

17          But is there anything about the fact that Mr. Upshaw

18  is deceased -- he will be speaking, to some degree, through

19  the depositions that were taken.  But he obviously won't be

20  here.

21          Is there anything about that that would make it

22  difficult for you to call it the way you see it?

23          Assuming by everybody's shake of the head that --

24  everybody's okay with that.

25          THE COURT:  Let me ask -- I think this is an

 1  important point.  And, Counsel is being respectful to someone

 2  who has just passed away.  But I know from this case, let me

 3  ask the question, if I may.  It may be a little bit more

 4  pointedly.

 5          MR. PARCHER:  Please.

 6          THE COURT:  In this case, the Plaintiffs attacked

 7  Mr. Upshaw, because he was the head of the union, and they were

 8  saying he should have been doing more on these licensing

 9  agreements for the players, these retired players.

10          So, it's not like there may be.  There is going to

11  be.

12          You are going to be attacking him, right?

13          MR. PARCHER:  Yes, sir.  I was trying to be

14  understated.

15          THE COURT:  I know you were.  But I'm going to be

16  blunt.  I'm going to be blunt.

17          MR. PARCHER:  Yes, sir.

18          THE COURT:  Now, in those circumstances, if he was

19  here to defend himself, everybody would say "Fine.  It's a fair

20  fight."

21          There are people who say:

22              "Oh, no.  Now, he's dead, and he can't defend

23  himself now that he's passed away."

24          So that you would take offense from that be, maybe.

25  Some people would.

1          But I'm telling you you have got to put that out of

2   your mind if you are going to serve on this jury because

3   there's no way around it.  He's passed on, he's passed on.

4   That's history.

5          We are going decide this case based on his conduct,

6   fair and square whether it was good or bad.  You have got to

7   put aside the fact that he's no longer here to defend himself,

8   or at least the idea that it's unfair to attack him now that

9   he's dead.

10         Now, does anybody here think that it is unfair to

11  attack him now that he's dead?  If so, raise your hand.

12         Okay.  Nobody's raising their hand.

13         All right.  Go ahead.

14         MR. PARCHER:  Thank you.  The second question is a

15  more general question.

16         At the end of the -- at the end of the case, both

17  sides close, and then you receive your instructions, obviously,

18  from His Honor.  But if the class, which is my clients, if the

19  class proves that these Defendants breached the contract --

20         THE COURT:  Wait a minute.  Wait a minute.  Is this

21  one of these you are asking them to commit which way they are

22  going to vote questions?

23         MR. PARCHER:  Absolutely not.

24         THE COURT:  All right.  Better not be, Mr. Parcher.

25  Go ahead.

1              MR. PARCHER:  I have no intentions of doing that.

2              THE COURT:  All right, thank you.

3              MR. PARCHER:  If the class proves that these

4    Defendants breached the contract and breached their fiduciary

5    duties, if -- if they don't, then all bets off.  But if they

6    do, is there any reason that you would resist, any of you, or

7    be uncomfortable in awarding substantial damages?

8              That's if we have proved our case.  If we haven't

9    proved our case, then, obviously you move for the Defendant.

10             But if we do, is there anything that would make you

11   feel uncomfortable awarding substantial damages if we can prove

12   it?

13             PROSPECTIVE JUROR SMITH:  Can I ask a question?

14             MR. PARCHER:  Sure.

15             PROSPECTIVE JUROR SMITH:  What are "substantial

16   damages"?

17             MR. PARCHER:  It will be for you to decide.  It will

18   be for me to ask and you to decide.

19             THE COURT:  What is the dollar amount, ballpark?

20             MR. PARCHER:  It will be in many millions.

21             THE COURT:  All right.  The question is a fair

22   question that Counsel is asking, and I was anticipating a

23   different question.   And so I was unfair to Mr. Parcher.

24             But it is a fair question.  The Plaintiff has the

25   burden to prove they have got a case, first.  But if they do

1  prove that, assume that they prove that for the sake of

2  argument.  There are people out there who will just say:

3            "Oh I'm never going to vote for a lot of money,

4  that's just -- you know, that's what's wrong with the court

5  system."

6            They will say:

7            "Too many -- MacDonald's gets a hot coffee, and

8  they get 50 million."

9            So, there are people who feel that they would not

10  award a lot of money as damages.  So if you -- that is what

11  Mr. Parcher -- if you have some view on that, he wants to know

12  if you have got a view along those lines.

13            Go ahead.

14            Mr. Casotto?

15            PROSPECTIVE JUROR CASOTTO:  Yes.  You brought up the

16  case of the millions of dollars awarded for the hot coffee, and

17  I've heard about that.  And I'm outraged about that.  I said,

18  you know, there is a -- a number at which point something would

19  sound outrageous.  So I don't know what your question really

20  is.

21            MR. PARCHER:  May I respond?  No.  No.  I'm being

22  too -- I'm being too general.

23            Look.  If we don't prove our case to your

24  satisfaction, I'm not asking for anything.  If we prove our

25  case to your satisfaction, and if part of that proof, it turns

1  out that we are entitled to substantial damages, if it does

2  turn that way, I'm not talking about a cup of coffee here,

3  believe me, right?

4         If it turns out that way, I want to make sure, if you

5  don't mind, that nobody is going to be uncomfortable.  If we

6  are entitled to it, you will give it to us.  If we are not

7  entitled to it, then you don't give it to us.  But you call it

8  right down the middle.

9         PROSPECTIVE JUROR CASOTTO:  I'm okay with that.

10        THE COURT:  All right.  Anybody else?

11        No one's raising their hand.

12        MR. PARCHER:  That's my 15 minutes of fame.

13        THE COURT:  All right.  You did it in eight minutes.

14 You did good.

15        Mr. Kessler?

16        MR. KESSLER:  Good morning.  Let me first ask, the

17 Judge asked you some questions about whether any of you were

18 union members or involved.  Are any of your family members

19 involved in union activities?  Could you please --

20        THE COURT:  You need the mic to Ms. De Souza.

21        MR. KESSLER:  Ms. De Souza?

22        PROSPECTIVE JUROR DE SOUZA:  My husband's in the

23 union, but I don't know what number it is.  It's the truck

24 drivers' association.

25        MR. KESSLER:  Is he an officer or -- involved in

1  bargaining or just a member?

2          PROSPECTIVE JUROR DE SOUZA:  Just once, but that was

3  six years ago.

4          MR. KESSLER:  Thank you.

5          Anybody else?

6          PROSPECTIVE JUROR TIMLIN:  My grandmother is a

7  retired postal worker.  She never spoke of any unions

8  whatsoever, but I'm assuming she was in one.

9          MR. KESSLER:  Thank you, Ms. Timlin.

10          Yes, Ms. Curtiss-Horton?

11          PROSPECTIVE JUROR CURTISS-HORTON:  I'm in the

12  teachers' union, and I have been involved in a number of

13  strikes, unfortunately, in Oakland.

14          MR. KESSLER:  You bid on the strike as a member?

15          PROSPECTIVE JUROR CURTISS-HORTON:  Yeah, picket

16  captain and all that stuff,.

17          PROSPECTIVE JUROR SCHWARTZLER:  My husband is a

18  member of a union and --

19          THE COURT:  Wait.  We need a mic.  Repeat that,

20  please.

21          PROSPECTIVE JUROR SCHWARTZLER:  My husband is a

22  member of a union, and we both being involved in a strike

23  before.  We work for the same place.

24          MR. KESSLER:  Has anyone ever had any complaints with

25  their union in any way?

1          PROSPECTIVE JUROR SCHWARTZLER:  Regular complaints

2     like --

3          MR. KESSLER:  Like some problem with your union.

4          PROSPECTIVE JUROR SCHWARTZLER:  Normally, in my place

5     always a little bit of complaints, as I don't think so.  I

6     don't do that.  The union don't do what they are supposed to do

7     for the employees.

8          But most of the time it get fixed with some time.

9          MR. KESSLER:  Mr. Chui?

10         PROSPECTIVE JUROR CHUI:  Yes, I was a member of

11    American Postal Worker Union, but I retired.

12         MR. KESSLER:  Okay, thank you.

13         My next question is:  Has anyone on the jury ever had

14    any type of contractual disputes with anyone, as to what a

15    contract meant?

16         Yes, please, Ms. Curtiss-Horton?

17         PROSPECTIVE JUROR CURTISS-HORTON:  Just with the

18    attorneys.  We had a contractual dispute, and it was found in

19    our favor.

20         MR. KESSLER:  You resolved it to your satisfaction?

21         PROSPECTIVE JUROR CURTISS-HORTON:  Yes.

22         MR. KESSLER:  That was a fee dispute with an

23    attorney?

24         PROSPECTIVE JUROR CURTISS-HORTON:  Yes.

25         MR. KESSLER:  Anyone else?

1              You were asked about your interests in sports.  Does

2    anybody play any fantasy sports games, fantasy baseball or

3    fantasy football?

4              Ms. Yamane?

5              PROSPECTIVE JUROR YAMANE:  My son does, but I don't

6    myself, so --

7              MR. KESSLER:  Okay.

8              PROSPECTIVE JUROR COLLINS:  Yeah.  I've played

9    fantasy football several times in the past.

10              MR. KESSLER:  When is the last time you played,

11    please?

12              PROSPECTIVE JUROR COLLINS:  Four or five years.

13              MR. KESSLER:  Okay.  And let me read off some names

14    of the witnesses again, just to make sure that you haven't

15    heard of these players.

16              Has anyone ever heard of Walter Beach, as an NFL

17    player?

18              Has anyone ever heard of Bruce Laird as an NFL

19    player?

20              What do you know about Mr. Laird?

21              PROSPECTIVE JUROR COLLINS:  You know, I was focusing

22    on that name, and I can't remember any other details.  But I

23    have heard of the name.

24              MR. KESSLER:  You know he is a player.

25              How about Mr. Clifton McNeil?  Does anyone remember

 1   him?

 2           Mr. Willie Lanier?

 3           Mr. Herb Adderley, who is in court, has anyone ever

 4   heard of him before as an NFL player?

 5           And, finally, Mr. Dan Goich?

 6           Thank you.

 7           Now, I'm going to ask the opposite of the question

 8   Mr.Parcher asked, which is that if the evidence convinces you

 9   that there is no claim in this case, and Plaintiffs have not

10   proven their case, is there anyone on the jury who would have

11   trouble awarding nothing to the Plaintiffs, even though you

12   might feel sympathy to them as individuals?

13           Would anyone have trouble awarding a zero in this

14   case?

15           I would like to ask, I guess, Ms. Horton, if I can.

16   You expressed some specific sympathy on -- at least I thought a

17   little bit of doubt about your sympathy for older NFL players

18   and many issues.

19           If you found that they had no merit to their

20   licensing dispute in this particular case, would you have any

21   trouble awarding them nothing, putting aside your sympathies?

22           PROSPECTIVE JUROR CURTISS-HORTON:  No.

23           MR. KESSLER:  Let me ask you, if I can, Ms. Haywood,

24   a followup question.

25           Is your husband, the former NFL player, does he have

1  friends in his former teammates?

2          PROSPECTIVE JUROR HAYWOOD:  You mean, that he

3  currently has associations with, interactions with?

4          MR. KESSLER:  Yeah, is he still in touch with his

5  former teammates at all?

6          PROSPECTIVE JUROR HAYWOOD:  No, no.

7          MR. KESSLER:  He doesn't go to NFL player alumni

8  meetings ever or anything like that?

9          PROSPECTIVE JUROR HAYWOOD:  No.

10          MR. KESSLER:  Okay.  He is still working at Upper

11  Deck?

12          PROSPECTIVE JUROR HAYWOOD:  No, he is not.

13          MR. KESSLER:  When did he last work at Upper Deck?

14          PROSPECTIVE JUROR HAYWOOD:  '97, I believe, '98, '98

15  at the latest.

16          MR. KESSLER:  In his job at Upper Deck did he deal

17  with a lot of former NFL players?

18          PROSPECTIVE JUROR HAYWOOD:  A lot of contact with

19  them.

20          MR. KESSLER:  And he was sort of a liaison from Upper

21  Deck to various NFL players?

22          PROSPECTIVE JUROR HAYWOOD:  Yes.

23          MR. KESSLER:  If it turned out that NFL players who

24  were his former teammates or that he worked with at Upper Deck

25  were members of this case, is that something that might

1    influence your thinking about this case in any way?

2              PROSPECTIVE JUROR HAYWOOD:  It would not.

3              MR. KESSLER:  There may be testimony from

4    representatives of Upper Deck in this case.  Did your husband

5    leave on good terms with Upper Deck?

6              PROSPECTIVE JUROR HAYWOOD:  Yes, he did.

7              MR. KESSLER:  Does he have very positive feelings or

8    negative feelings or any feelings about Upper Deck that you

9    know of?

10             PROSPECTIVE JUROR HAYWOOD:  He's always spoke in a

11   positive light with them, his experience in the company.

12             MR. KESSLER:  Would that make you more or less likely

13   to believe their testimony from somebody from Upper Deck if

14   they testified in this case?

15             PROSPECTIVE JUROR HAYWOOD:  No.  I would listen to

16   the evidence as presented.

17             MR. KESSLER:  Mr. Collins, if I may, you expressed

18   some information about someone who lost their job as a result

19   of EA getting the NFL exclusive.

20             Does that affect your feelings about EA as a company

21   in any way?

22             PROSPECTIVE JUROR COLLINS:  He didn't lose his job.

23             The company reached financial difficulties.  He just

24   thought he needed to leave.  But -- so as far as EA, yeah, it

25   does create a bit of a bias on the fairness, just in terms of

1  competitive practice, that licensing agreement.  But I also

2  have other biases around EA because I know a lot of people in

3  the gaming industry, and it has a particular reputation.

4          MR. KESSLER:  It has an adverse reputation to you?

5          PROSPECTIVE JUROR COLLINS:  EA's had reputation of

6  working employees a lot of hours.  And so, that would be much

7  more of my perception of EA than this particular licensing

8  agreement, although they're similar.

9          MR. KESSLER:  You also mentioned you had feelings

10 about the exclusive NFL license that EA had.  That is also

11 something in this case.  You have particular feelings about

12 that license agreement?

13         PROSPECTIVE JUROR COLLINS:  Mainly based on my prior

14 experience with my brother, and whether that's a -- given that

15 the NFL is what it is, and the -- the great way it's managed

16 itself and such popularity, an exclusive like -- an exclusive

17 like that is very difficult to compete against, and so it was a

18 very frustrating experience for all of us.

19         MR. KESSLER:  That is something you would have

20 negative feelings about?

21         PROSPECTIVE JUROR COLLINS:  Yeah, just in terms of

22 how that happened.

23         MR. KESSLER:  I just have one final question.  Is

24 there anything that I haven't asked someone where they feel

25 would prevent them from giving a full, fair and unbiased

1   verdict in this case?

2          I know the Judge asked you a similar question.

3   Anything else that none of us have asked you?

4          Thank you very much for your time.

5          THE COURT:  Mr. Collins, on the EA thing, EA is going

6   to be a factor in this case.  There are contracts between the

7   union and the -- well, I guess Players Inc., and the EA, that

8   will be laid before the jury and fit into the overall picture

9   of this case.

10         So, if that -- if your views towards EA are going to

11  color how you assess that evidence, that cause you to be tilted

12  one way or the other, we need to know about that now.  What do

13  you think?

14         PROSPECTIVE JUROR COLLINS:  So, I believe that EA and

15  all the people who negotiated a deal with the NFL offer it

16  within the law, and so from an objective and rational

17  standpoint I don't see anything that should bias me.  So I'm

18  trying not to let any kind of that emotion of that past

19  experience factor into this.

20         I don't think I'm particularly biased.  I just was

21  answering the question that I had --

22         THE COURT:  Fair enough.  But I need to hear you say

23  whether or not you can set aside what your preexisting views

24  were about EA, and decide this case based on what you hear from

25  the witness stand and in the courtroom, and leave outside the

1  courtroom your prior knowledge of EA.

2          PROSPECTIVE JUROR COLLINS:  I understand the

3  question.

4          THE COURT:  Can you do that?

5          PROSPECTIVE JUROR COLLINS:  Yes, I can do that.

6          THE COURT:  Can you fair to both sides?

7          PROSPECTIVE JUROR COLLINS:  I feel I can be fair to

8  both sides.

9          THE COURT:  Without tilting one way or the other?

10          PROSPECTIVE JUROR COLLINS:  Yes.

11          THE COURT:  Mr. Parcher, do you have any further

12  questions?

13          MR. PARCHER:  No.  You just covered what I would have

14  asked.

15          THE COURT:  All right.  Anything more?

16          MR. KESSLER:  No, Your Honor.

17          THE COURT:  Okay.  Well, let me ask one or two

18  questions.  Do any of have you any kind of special disability

19  other than anything you have already brought up?  Any kind of

20  special disability that would make it hard for you to sit in a

21  case like this?

22          If so, raise your hand.  And, again, I can talk with

23  you at the sidebar if need be.

24          All right.  No special disabilities.

25          Okay.  Again, your job, if you are selected, is to be

1  here every day at 7:45.  Stay until 1:00.  Listen carefully to

2  the evidence as it comes in.  Pay close attention.  Don't talk

3  about the case until it goes to you for decision.

4          But when it goes for decision, then it's your duty to

5  talk about it and follow the law as I give it to you.  And,

6  then make a decision, an impartial decision.

7          All right.  Is there anybody here who has something

8  that you feel like you should disclose in the interest of full

9  disclosure that might affect your ability to do that?

10          If so, raise your hand.  This is about the last time

11  I'm going to ask it.  Anyone?

12          No one is raising their hand.

13          I want to put it a different way.  In cases in the

14  past we have gone through and we have selected the jury.  And

15  then, the next morning, somebody comes in and says:

16              "Oh, I should have told you this.  I forgot, you

17  know, I wasn't thinking."

18          It's too late.  You're on the jury then.  And it

19  creates -- it might create a long delay while we get that

20  sorted out.

21          But, the time and place to raise any problems is now.

22  Not later.  Once you are sworn in as a member of the jury you

23  are in for the duration.  You must be here every day.

24          You are the one who would be delegated to decide this

25  case.  Anything you want to raise, raise your hand if there's

 1  something.  If you even think there's a long shot that the

 2  lawyers would be interested in it, I want you to raise your

 3  hand.

 4          There will be no autographs.  Zero.  You might see

 5  some famous football player come in here.  No autographs.  No

 6  handshakes with somebody famous.

 7          You are going to be the jury.  You have to be

 8  impartial.  You can't be doing anything like that.

 9          Anything you want to raise, this is the -- having

10  heard all these questions, I'm going to give you one last

11  chance.  Is there anything else that you feel you should raise

12  as to why you should not sit on this jury and render a fair

13  verdict?

14          If so, raise your hand.

15          Any of you think you are coming down with the flu?

16          That's important, you know.  Somebody on the jury

17  gets the flu, then everybody else gets sick, and we have a

18  problem.

19          Yes, Ms. Timlin?

20          PROSPECTIVE JUROR TIMLIN:  I'm assuming court cases

21  for six hours straight do have a break or two here and there.

22          THE COURT:  Yes.  We would normally go about an hour

23  and a half, roughly, break 15 minutes.  Go another hour and a

24  half, roughly, break 15 minutes.

25          Then, we push on to 1:00.  Yes.

1              And if somebody needed a facility break because they

2    just couldn't wait any longer, they raise their hand and we

3    take a break anyway.

4              The jury's convenience always comes first.  So, that

5    would -- that's not a problem.  But we do not have a lunch

6    break.

7              Sometimes, if the juries deliberate all day -- and

8    they often do -- then they want to have lunch brought in.  Or

9    they go down to the lunch room.  That's okay.

10             But in the normal -- until deliberations start, it is

11   usually we stop right at 1:00.  Okay.

12             Okay.  Any questions that the lawyers think I have

13   overlooked that you want me as to ask?

14             MR. PARCHER:  No, thank you.

15             MR. KESSLER:  No, Your Honor.

16             THE COURT:  May we pass this panel for cause?

17             MR. KESSLER:  Your Honor, I have one --

18             THE COURT:  You have an issue you want to raise,

19   Mr. Parcher?  Do you have any issues that you wish to raise.

20             MR. PARCHER:  No, but I would like to hear what

21   counsel has to say.

22             THE COURT:  All right.  I'm going to -- you need to

23   bear with me one moment.

24             Let's have a sidebar.

25             (The following proceedings were held at sidebar.)

 1              THE COURT:  All right.  What is the issue?

 2              MR. KESSLER:  Yes, Your Honor.  I guess, we do have a

 3    concern.  We do have a concern and challenge for cause.

 4              Ms. Haywood, we think as being married to an NFL

 5    player, her husband worked at Upper Deck, who is to be a

 6    witness in this case.  He obviously knows his teammates could

 7    be class members.  People he dealt with at Upper Deck could be

 8    class members.

 9              It's a long trial.  I think there's just some

10    significant possibility of that fact infecting this case, Your

11    Honor, and we think that's a problem.

12              MR. PARCHER:  You are asking to challenge No. 8 for

13    cause?

14              MR. KESSLER:  It is Ms. Haywood.  I don't think it's

15    No. 8.

16              MR. HUMMEL:  She is 8.

17              MR. KESSLER:  And the second one would be

18    Mr. Collins.

19              THE COURT:  Let's hear from -- what is Mister --

20    Mr. Parcher, what do you say on Ms. Haywood?

21              MR. PARCHER:  I'm not going to object if that's what

22    he wants to do.  Whether he's right or not is a debatable

23    question.  But if he wants to -- if he wants to challenge him

24    for cause, I'm not going to object to that.

25              THE COURT:  Let me hear the other one.

1          MR. KESSLER:  And the other one was Mr. Collins.

2   Again, I'm very concerned that he brought up the -- on his own.

3   I know that he testified that he thought he could put it aside,

4   but the fact that the exclusive license that he's complaining

5   about is the very license that's going to be testified here --

6   and as Your Honor knows, Mr. Linzner's testimony is one of the

7   most critical issues in this case.  That if he has feelings and

8   he will be testifying about that very exclusive license, which

9   he has some adverse feelings about, I think could influence

10  him.  And that's my other challenge for cause, Your Honor.

11         MR. PARCHER:  I have a very strong negative reaction

12  to that application.  Absolutely not.  Your Honor was very

13  clear, said it better than I could have said it.  You

14  questioned him very, very closely as to whether or not --

15         THE COURT:  All right.  That motion is denied on

16  account of the record is convincing to me that he will be fair

17  and impartial and that grounds for his exclusion have not been

18  made.  But as to the other, the other person, since there's no

19  objection to the motion, I feel like I should grant it.

20         So, we will have to excuse her and then select

21  another replacement.

22         MR. KESSLER:  Thank you, Your Honor.

23         THE COURT:  All right.

24         (The following proceedings were held in open court.)

25         THE COURT:  All right.  Ms. Haywood, in light of your

1  husband being a former player, it's enough of a problem that I

2  believe you can put that to one side.  I really do.  I think

3  you would be an excellent juror.

4         But both sides have agreed that you may be excused

5  from this case on account of that relationship.

6         And I regret that, because I think you would be a

7  superb juror.  And I hope that there is some case other than

8  the eight-month long antitrust case that we can use you on.

9         So would you mind going back to the jury assembly

10 room and telling them what happened?

11        All right.  And good luck to you and your husband.

12        PROSPECTIVE JUROR HAYWOOD:  Thank you.

13        THE COURT:  Okay.  Let's call a name as a replacement

14 to Ms. Haywood.

15        THE CLERK:  Amalia Santillano, S-A-N-T-I-L-L-A-N-O.

16        THE COURT:  How are you today?

17        PROSPECTIVE JUROR SANTILLANO:  Good.  How about you?

18        THE COURT:  Okay.  Okay.  Santillano?  How do you say

19 your last name?

20        PROSPECTIVE JUROR SANTILLANO:  Santillano.

21        THE COURT:  Santillano, all right.  Do you have any

22 hardship issue?

23        PROSPECTIVE JUROR SANTILLANO:  Yes, a five-year-old

24 and a seven-year-old.

25        THE COURT:  You what?

1             PROSPECTIVE JUROR SANTILLANO:  Kindergartener and a

2    second-grader, two girls.

3             THE COURT:  And, what do they do?  Where are they

4    now?

5             PROSPECTIVE JUROR SANTILLANO:  One is in

6    kindergarten.  The other is in second grade this moment in

7    school.

8             THE COURT:  Why would there be a hardship on you

9    serving on the jury?

10            PROSPECTIVE JUROR SANTILLANO:  Because I pick one up

11   at 11:55 and the other at 2:00 from their schools.

12            THE COURT:  Do you have a job normally?

13            PROSPECTIVE JUROR SANTILLANO:  Yes, I have a job,

14   too.

15            THE COURT:  What is your job?

16            PROSPECTIVE JUROR SANTILLANO:  I'm in the preschool,

17   assistant teacher for a preschool.

18            THE COURT:  Well, then, when you are working, how do

19   you deal with the children?

20            PROSPECTIVE JUROR SANTILLANO:  Well, I get two lunch

21   breaks to go pick them up.

22            THE COURT:  Where do they stay after lunch?

23            PROSPECTIVE JUROR SANTILLANO:  They stay with me

24   basically, at my work.

25            THE COURT:  All right.  I'm going to excuse this

 1  juror, unless there's an objection.

 2              MR. KESSLER:  Okay.

 3              THE COURT:  All right.  Thank you.  Go back to the

 4  jury assembly room.  Tell them what happened.

 5              Lashonda, is our microphone working okay?

 6              THE CLERK:  They turned it off, Judge.

 7              THE COURT:  What?

 8              THE CLERK:  It was turned off.  It's on now.

 9              THE COURT:  All right.  Let's call another name,

10  please.

11              THE CLERK:  Nicholas James Casper, C-A-S-P-E-R.

12              THE COURT:  Mr. Casper, how are you?

13              PROSPECTIVE JUROR CASPER:  Good.  How are you, Your

14  Honor?

15              THE COURT:  Great.  Come forward and have the obvious

16  seat.

17              Okay, Mr. Casper.  Take the microphone, please.  Any

18  hardship issue?

19              PROSPECTIVE JUROR CASPER:  No, Your Honor.

20              THE COURT:  All right.  Can you read the -- give us

21  the biographical information.

22              PROSPECTIVE JUROR CASPER:  Sure.  My name is Nicholas

23  Casper.  I live in San Francisco.

24              I have a Bachelor of Arts from UCLA, and a juris

25  doctor from the University of San Francisco.

1             I'm an attorney in Walnut Creek.  I work Plaintiffs'

2   side civil litigation firm in Walnut Creek.  And I've actually

3   been in your courtroom before.

4             THE COURT:  Really?

5             PROSPECTIVE JUROR CASPER:  Yes, Your Honor.

6             THE COURT:  Did you win or lose?

7             PROSPECTIVE JUROR CASPER:  We lost, Your Honor.

8             THE COURT:  There we go.

9             PROSPECTIVE JUROR CASPER:  Let's see.

10            No organizations except for some legal organizations

11  such as the Consumer Attorneys of Kaoik (phonetic).  And I

12  think there's a public justice and the Contra Costa Bar

13  Association, as well as the California Bar.

14            Hobbies:  Skiing, tennis, sports watching.

15            I'm single.  I have no children.

16            I have never been selected to serve on a jury before.

17            No military or law enforcement experience.  And I've

18  never been a party or witness in court.

19            THE COURT:  Do you know any of the firms involved in

20  this case?

21            PROSPECTIVE JUROR CASPER:  I do not, Your Honor.

22            THE COURT:  Do you know any of the lawyers?

23            PROSPECTIVE JUROR CASPER:  I do not, Your Honor.

24            THE COURT:  Do you know any of the witnesses,

25  recognize the names of any of the witnesses?

 1            PROSPECTIVE JUROR CASPER:  Besides a couple of the

 2    players, and Gene Upshaw.

 3            THE COURT:  All right.  How big a football fan are

 4    you?

 5            PROSPECTIVE JUROR CASPER:  A pretty big fan, Your

 6    Honor.

 7            THE COURT:  Describe your --

 8            PROSPECTIVE JUROR CASPER:  I'm a big Forty-Niners

 9    fan, life-long.  I go to games, maybe one or two a year.  And

10    then, I also follow the League, in general, and usually will

11    watch a game or two on a Sunday and usually the Monday night

12    game, as well.

13            THE COURT:  Do you know anything about the issues

14    between the football union and the retired players?

15            PROSPECTIVE JUROR CASPER:  Not in this matter.  I'm

16    familiar with the more public dispute involving the pensions.

17            THE COURT:  Have you drawn any bias one way or the

18    other, any conclusions one way or the other on that issue?

19            PROSPECTIVE JUROR CASPER:  I'm sympathetic in that

20    matter towards the retired players.  I'm not familiar enough

21    with that dispute to really say that I've decided the issue.  I

22    don't think I'm biased.  I'm sympathetic to the players.

23            THE COURT:  Now, in this case we would be dealing

24    with the -- these GLAs, these licensing agreements and what

25    rights flowed out of them, and that's it.

 1          We're not dealing with pensions, and we're not

 2   dealing with whether the football players got enough money back

 3   in the seventies and eighties.  We are dealing with this one

 4   agreement.

 5          And now, can you be totally fair and square to both

 6   sides on that case on that set of issues?

 7          PROSPECTIVE JUROR CASPER:  I understand the

 8   distinction between those two disputes, and I could be fair and

 9   impartial in this case.

10          THE COURT:  Now, you say you are on a plaintiff-side

11   law firm.

12          PROSPECTIVE JUROR CASPER:  That's correct,

13   Your Honor.

14          THE COURT:  Okay.  Well, there's nothing wrong with

15   that.  Half the world is on the plaintiff side and half is on

16   the defense side.  But sometimes one side or the other has a

17   bias built in, just from their years of work.  How would you

18   rate yourself on that?

19          PROSPECTIVE JUROR CASPER:  You know, I'm obviously

20   philosophically inclined to -- with the Plaintiffs' bar more

21   than the defense.  I would say, it's not half and half.  It

22   sometimes seems ten to one on the defense side.

23          But, I think I could still be impartial in any given

24   matter.  But, of course, I am more sympathetic to the

25   Plaintiffs' bar.

1           THE COURT:  All right.  But, that being said, you

2    know what your duty here would be.  You would have to size up

3    the evidence at the trial, and lay it alongside the burdens of

4    proof.  And if the Plaintiff has proven the case, based on the

5    evidence at trial, then the Plaintiff ought to win.

6           On the other hand, if the Plaintiff falls short, the

7    Plaintiff ought to lose.  Do you understand that?  Do you

8    understand that basic concept?

9           PROSPECTIVE JUROR CASPER:  I do, Your Honor.

10           THE COURT:  Can you apply that concept in this case,

11    impartially, and be fair to both sides?

12           PROSPECTIVE JUROR CASPER:  I believe I could, Your

13    Honor.

14           THE COURT:  All right.  Anything that you feel you

15    ought to raise in light of all the other questions that were

16    asked?

17           PROSPECTIVE JUROR CASPER:  The only thing that comes

18    to mind is one of my childhood friends and good friends is a

19    current NFL player.

20           THE COURT:  Who is that?

21           PROSPECTIVE JUROR CASPER:  His name is Drew Bennett.

22    He plays for the St. Louis Rams, as a receiver.  He played for

23    about six years with the Titans previously.

24           THE COURT:  How would that affect your ability to be

25    fair and impartial?

 1              PROSPECTIVE JUROR CASPER:  I don't think it will, one

 2    way or the other.  And it sounds like the dispute in the

 3    current case involves retired players, anyway.  But I don't

 4    think it would color my perception of the case.

 5              THE COURT:  Well, you are going to hear about -- you

 6    are going to hear about -- Ms. De Souza, you are hacking and

 7    coughing.

 8              PROSPECTIVE JUROR DE SOUZA:  I just am thirsty.

 9              THE COURT:  Are you sick?

10              PROSPECTIVE JUROR DE SOUZA:  Oh, no.  No.

11              THE COURT:  Really, if you are ill I'll get you some

12    cough drops but --

13              PROSPECTIVE JUROR DE SOUZA:  Oh, no.

14              THE COURT:  So, will that affect -- Mr. Casper, will

15    that affect your ability to be fair and impartial?

16              PROSPECTIVE JUROR CASPER:  I don't believe so, Your

17    Honor.

18              THE COURT:  Anything else?

19              PROSPECTIVE JUROR CASPER:  Nothing else comes to

20    mind.

21              THE COURT:  Schedule okay?

22              PROSPECTIVE JUROR CASPER:  You know, I have

23    appearances on the calendar.  I have -- I do a lot of the law

24    and motion for the office, and I have -- I'm opposing a summary

25    judgment motion later this month, so it would be --

 1          THE COURT:  You might not be able to.  If you are on

 2    the jury you have got to come here.

 3          MR. KESSLER:

 4          PROSPECTIVE JUROR CASPER:  I understand, Your Honor.

 5    We would be out of here at 1:00.  I would just have to shift my

 6    schedule to work afternoons and evenings, and probably late

 7    evenings.

 8          It would be a burden.  I can't say that it would be

 9    physically impossible for me to balance my work schedule with

10    my jury duty.  But, it would be very difficult.

11          THE COURT:  Well, will you do it?  If you are

12    selected, you would have to do it.

13          PROSPECTIVE JUROR CASPER:  I understand, Your Honor.

14    I'm --

15          THE COURT:  All right.

16          PROSPECTIVE JUROR CASPER:  I'm hoping I'll be used up

17    in a peremptory.

18          THE COURT:  Well, you might be.  But I'm telling you,

19    if you are selected, you are going to serve.

20          PROSPECTIVE JUROR CASPER:  I understand, Your Honor.

21    And, my employers, I think, would understand just as well as

22    anyone that, you know, jury duty is a very important civic

23    duty.  And I believe I could get my schedule worked out to

24    fulfill my jury duty.

25          THE COURT:  All right.  Thank you.

1          Now, you being a lawyer, there are two questions I've

2     got to ask you.  One, you got to forget everything you ever

3     learned about law.  And I give you the law at the end of the

4     case.

5          You know how that works.  You have to follow the law

6     as I give it to you, not what you think the law is.

7          And I'll say we have some issues of what state law to

8     apply here.  It wouldn't necessarily be -- in fact, I can tell

9     you it's not California law.

10          You're probably familiar with California law.  Forget

11     California law.  It doesn't apply here.

12          So, I'm going to tell you what the law is, and you

13     have got to follow the law that I give to you, not -- not

14     something that your notions of what the law should be.  Do you

15     understand that?

16          PROSPECTIVE JUROR CASPER:  I do, Your Honor.

17          THE COURT:  All right.  And, the second thing is, you

18     wouldn't -- you would not be allowed to try to exert an undue

19     influence on the jury by saying:

20               "Well, I'm a lawyer, I know how this works."

21          No.  You would just be one other person on the jury.

22     Do you understand?

23          PROSPECTIVE JUROR CASPER:  I do, Your Honor.

24          THE COURT:  Not first among equals.  You would just

25     be regular old equal with everybody else.

1           PROSPECTIVE JUROR CASPER:  I'm just a regular old

2    Nick.

3           THE COURT:  That's right.  That's good.  That's good.

4    All right.

5           Anyone want to ask regular old Nick some questions?

6           MR. PARCHER:  No, thank you, Your Honor.

7           MR. KESSLER:  No questions.

8           THE COURT:  All right.  Can we now pass the -- well,

9    let me ask you, is there anything that you -- you have heard

10   all these questions.

11          I want to give you one last opportunity to say

12   anything you would like that may -- it may bear on your ability

13   to be fair and impartial.

14          PROSPECTIVE JUROR CASPER:  Other than what we've

15   previously discussed, I don't -- nothing comes to mind.

16          THE COURT:  All right.  Since we have had this little

17   delay, anything else on -- any other member of the panel have

18   anything you want to raise?  If so, raise your hand.

19          No one is raising their hand.

20          Can we pass this panel for cause?

21          MR. KESSLER:  I have a cause issue.

22          THE COURT:  You have a cause issue?

23          MR. KESSLER:  I have a cause issue, yes, Your Honor.

24          THE COURT:  All right.  Let's go to the sidebar

25   again.

1          (Sidebar discussion as follows:)

2          MR. KESSLER:  Your Honor, it's my belief, based on

3    this witness -- this last juror's -- new juror's statements,

4    that he has a clear bias as a Plaintiff's lawyer.

5          He's made disparaging remarks about defense counsel,

6    ten to one defense lawyers, and I think he knows that he's

7    going to force us to use a peremptory.  He raised it.  He has

8    no desire, intention to want to serve on this jury.

9          I believe he could have law and motion practice

10   issues that are going to come up if he were to remain on the

11   case.  And on top of it all he has a very good friend who is a

12   current NFL player.

13         You know, which adds a further element if there was

14   any doubt about this.  I just don't see why -- there are a

15   number of jurors remaining, obviously a large number -- that we

16   would have him in this pool.  I object, Your Honor, based on

17   that.

18         THE COURT:  What do you say?

19         MR. PARCHER:  Seems that Mr. Kessler has this concern

20   that anybody who ever played football doesn't like his clients

21   very much.

22         I don't see what that's got to do it with it.  As far

23   as this fellow being a trial lawyer, I think he knows his duty

24   around his responsibility, as well as anybody in this

25   courtroom.  And that is to call it down the middle.  So, I

1    don't see a scintilla of a basis for a challenge for cause

2    here.

3            MR. KESSLER:  I would note, Your Honor, if I was in a

4    jury and someone asked me to identify who I was, I would say I

5    was a "trial lawyer."

6            I wouldn't call myself a "Plaintiffs' lawyer" or a

7    "defense lawyer."

8            He has a clear affiliation in terms of his

9    orientation.

10           MR. PARCHER:  May I respond?

11           THE COURT:  Go ahead.

12           MR. PARCHER:  You are not a plaintiff or a

13   defendant's trial lawyer.  I'm a trial lawyer.  He's --

14           THE COURT:  All right.  The motion is denied.  This

15   is -- he, in my mind, while he works on the plaintiff side, he

16   stated that he can be fair and impartial and lay the evidence

17   alongside the burdens of proof that are required in the case

18   and call it fair and square.

19           And I am sure that he will.  So, the motion is

20   denied.

21           MR. KESSLER:  Understood, Your Honor.  Thank you.

22           THE COURT:  Are there any others for cause?

23           MR. KESSLER:  None from us, Your Honor.

24           THE COURT:  Do you have any motions for cause?

25           MR. PARCHER:  Not for substantive reasons.

 1           THE COURT:  All motions for cause are either ruled on

 2     or the rest have been passed for cause.

 3           So what I'll do, I'll exclude the jury, and we will

 4     take a break.  And then, you are going to exercise your

 5     peremptories in their absence.  Tell me what they are, and I'll

 6     call forward the people who were selected to serve.

 7           Everyone okay with that?

 8           MR. KESSLER:  Yes, Your Honor.

 9           MR. PARCHER:  Yes, Your Honor.

10           THE COURT:  All right.  Thank you.

11           MR. PARCHER:  Thank you.

12           (The following proceedings were had in open court.)

13           THE COURT:  Okay.  We've reached a milestone in the

14     case, our first milestone.  And that is that the Court has

15     deemed that all 16 of you would make excellent jurors.

16           Now, we only need ten of you.  And there is a

17     procedure whereby the lawyers meet with their clients and try

18     to decide, reading the tea leaves, which way is the best way to

19     go, who among you would be the best jurors.  And I need to give

20     them a few moments to make that decision.

21           So this would be a good time for a break.  But the --

22     we have passed a hurdle where we can say with almost certainty

23     that the final ten will come from this group of 16.

24           And, that once you are selected, you are in for the

25     duration.

1            Now, for the rest of you who haven't been called

2    forward, I need to ask you to come back, anyway, after the

3    break because sometimes things come up, and I might need you.

4    But in all honesty I think it's unlikely.  But I do need to ask

5    you to come back until we swear in the jury.

6            So, what we are going to do this time is a little

7    different drill.  I want you to take with you all of your

8    belongings, your newspapers, magazines, purses and so forth,

9    take -- this time we are going to take like a 20-minute break.

10           And then, when you come back, sit in the courtroom.

11   And all of you members of the public I'm going to ask you to

12   squeeze in over there so we make plenty of room for the

13   prospective jurors, at least the first three rows.  And then, I

14   will call forward the final ten of you to serve.

15           So I'm going to ask you now to remember my admonition

16   and don't talk with each other or anyone else about this case.

17           We will see you back in 20 minutes, but stay out in

18   the hallway and don't come in until we're ready for you.

19           Thank you very much.

20           (Jury excused)

21           (The following proceedings were held in open court

22           outside of the presence of the jury:)

23           THE COURT:  All right.  Everyone be seated.  Let me

24   ask those people back there, are all members of the -- are

25   all -- don't leave yet.  Did I see someone talking to

1   Mr. Casper?

2              Did I see one of you back there talking to Mr.

3   Casper?

4              MS. KNUDSON:  That is me, Your Honor.

5              THE COURT:  Please come forward.

6              MS. KNUDSON:  Okay.

7              THE COURT:  Who are you?

8              MS. KNUDSON:  My name is Kelly Knudson. I'm an

9   assistant --

10             THE COURT:  Come up here.

11             Are all the members of the jury gone now?

12             All right.

13             MS. KNUDSON:  Kelly Knudson, and I'm an associate at

14  Manatt Phelps.  But I'm not involved in this case at all.

15             THE COURT:  But you were talking to Mr. Casper?

16             MS. KNUDSON:  He said -- he just said "hello" to me.

17  He was a law school classmate of mine.  I haven't seen him or

18  talked to him since I graduated.

19             MR. KESSLER:  Your Honor, I'm going to renew my

20  motion.

21             THE COURT:  All right.  He is stricken from the jury.

22             You should not have done that.

23             MS. KNUDSON:  I apologize, Your Honor.  I simply said

24  "hello."

25             THE COURT:  It doesn't matter.  Didn't you hear the

 1  speech that I gave this morning?

 2          MS. KNUDSON:  I did.  I apologize, Your Honor.

 3          THE COURT:  All right.  He's going to be stricken.

 4          Mr. Katz, this is unacceptable --

 5          MS. KNUDSON:  It's completely my fault.

 6          THE COURT:  -- that somebody in your firm would do

 7  that after I made that speech.

 8          MR. KATZ:  I apologize.

 9          THE COURT:  I saw with my own eyes a conversation

10  going on out there.  He should have known better himself.

11          MR. KATZ:  I apologize.

12          THE COURT:  I'm not going to let him stay on the jury

13  after what's transpired here.

14          All right.  You are forgiven.

15          MS. KNUDSON:  Sorry, Your Honor.

16          THE COURT:  But, you know, this -- I stand up here

17  and I sit up here and I make these admonitions, and the lawyers

18  think:

19              "Oh, he doesn't really mean it."

20          We going to have a fair trial in this case.

21          MR. KATZ:  We apologize to the Court, Your Honor.

22          MS. KNUDSON:  I'm sorry.

23          THE COURT:  Your apologize is accepted.  When the

24  jury comes back, we have got the resume now.  We can't pass for

25  cause.  We have got to replace Mr. Casper.

1          All right.  The jury -- I want to say for the record

2   that I saw with my own eyes as Mr. Casper was leaving, he had a

3   conversation with this young lady who is an attorney with the

4   Plaintiff's law firm in this case, in direct violation of what

5   I told him and told the members of the audience out there.

6   Should not have happened.

7          All right.  We will resume at that point in 20

8   minutes.

9          (Recess taken from 11:51 a.m. to 12:11 p.m.)

10          (The following proceedings were held in open court in

11          the presence of the Jury Venire)

12          THE COURT:  Well, we have to take back what I said,

13   we've not reached a milestone.  Mr. Casper, on your way out I

14   saw you talking to a member of the Plaintiffs' law firm in this

15   case.

16          PROSPECTIVE JUROR CASPER:  Your Honor?

17          THE COURT:  You don't need to -- I've gone into it

18   with the lawyers.  After my admonition not to talk to -- I

19   can't imagine that you would have done what you did.

20          PROSPECTIVE JUROR CASPER:  Your Honor, I didn't speak

21   to --

22          THE COURT:  No, you did.  I saw it myself.

23          PROSPECTIVE JUROR CASPER:  I was not aware that they

24   were involved in this litigation, whatsoever.  This was a girl

25   I went to law school with.

 1          THE COURT:  It doesn't matter.  They talked to you.

 2  I'm sure it was all innocent.  And I'm going to tell everyone

 3  else to disregard it.  But now that it's happened, I'm going to

 4  excuse you from serving on this jury.

 5          That was at least, at minimum, a member of the public

 6  that was sitting out there.  And I told everybody that was a

 7  prospective juror, ignore those people.  And you, being a

 8  lawyer, you should have known better than to do that.  But,

 9  it's happened and I'm going to write it off to an honest

10  mistake by both sides.  But it would not be fair to allow to

11  you serve on the jury after -- after what's happened.

12          PROSPECTIVE JUROR CASPER:  I absolutely apologize,

13  Your Honor.  It was an innocent mistake.  I should have known

14  better.

15          THE COURT:  I know it was, I accept your apology, but

16  it still would not be the right thing to do.  So I'll ask you

17  to go back to the jury assembly room.  I'm excusing you for

18  cause.  Thank you, Mr. Casper.

19          PROSPECTIVE JUROR CASPER:  Okay.  Thank you,

20  Your Honor.

21               (Prospective Juror Casper excused)

22          THE COURT:  Let's call somebody to replace him.

23          THE CLERK:  Lana Lim Ma, M-A.

24          THE COURT:  Good afternoon, Ms. Ma.  How are you

25  today?

 1            PROSPECTIVE JUROR MA:  I'm doing good, thank you.

 2            THE COURT:  All right.  Do you have a hardship issue

 3    you wish to raise?

 4            PROSPECTIVE JUROR MA:  No, Your Honor.

 5            THE COURT:  All right.  Can you see that chart well

 6    enough to --

 7            PROSPECTIVE JUROR MA:  Yes.

 8            THE COURT:  Please give us the information.

 9            PROSPECTIVE JUROR MA:  My name is Lana Ma, I live in

10    Oakland.  I have two years of college, education.  I work for

11    Social Security Administration.  I don't belong to any

12    organization, clubs, unions.  My hobbies are reading, cooking.

13    I'm married.  My husband is auto mechanic.

14            I have three children.  My son is 25 years old.  My

15    daughter is 23.  And my youngest one is 19 years old.  My son

16    is unemployed right now.  My two daughters, in school.

17            I have been called for many times for jury service.

18    I served, I remember, it's a civil case.  Was long time ago.

19    There was a verdict reached.  I am never in the military or law

20    enforcement.

21            I was a possible witness in a lawsuit, many years

22    ago.  This involved a criminal case.  It was more than 30 years

23    ago.  But I was never called to serve as a witness.  During the

24    entire time of the case, I was outside of the courtroom.

25            THE COURT:  All right.  Good.  Do you know any of the

 1  lawyers, any of the, of the witnesses?

 2              PROSPECTIVE JUROR MA:  No, I don't.

 3              THE COURT:  All right.  Did you hear all the names as

 4  they were read out?

 5              PROSPECTIVE JUROR MA:  Yes.

 6              THE COURT:  Are you a football fan?

 7              PROSPECTIVE JUROR MA:  No, I'm not.

 8              THE COURT:  Do you know anything about football?

 9              PROSPECTIVE JUROR MA:  Yes, I watch on television

10  once in a while when my husband has the TV on.

11              THE COURT:  Is he a football fan?

12              PROSPECTIVE JUROR MA:  No, he's not but he watches

13  football.

14              THE COURT:  Nothing wrong with that.  Okay.  Any of

15  the other questions I asked raise an issue with you?

16              PROSPECTIVE JUROR MA:  No.

17              THE COURT:  Can you be a fair and impartial juror?

18              PROSPECTIVE JUROR MA:  I can.

19              THE COURT:  Do you think you favor the retired

20  players over the union, or vice-versa, in this case?

21              PROSPECTIVE JUROR MA:  No.  I -- I believe everybody

22  have their own side of the story.  Their point of view.  And,

23  what I understand, I will apply the facts and the laws, and

24  make a sound decision.

25              THE COURT:  All right.  Okay.  Any possible point of

1  bias that you feel -- well, any possible point of bias that you

2  think of that maybe we ought to know about, even if it's not

3  disqualifying?

4           PROSPECTIVE JUROR MA:  No.

5           THE COURT:  Can you be here every day at 7:45?

6           PROSPECTIVE JUROR MA:  Oh, yes.  My best time of the

7  day is in the morning.

8           THE COURT:  Good.  All right.  Any questions that

9  anyone wants to ask Ms. Ma?

10          MR. PARCHER:  If I may Your Honor, I would just like

11 to ask the two that I asked previously.

12          THE COURT:  Go ahead.

13          MR. PARCHER:  Good afternoon.  The first, did you

14 hear the questions that I asked when I stood up before when you

15 were out on the bench?

16          PROSPECTIVE JUROR MA:  Yes.

17          MR. PARCHER:  So the first was about Mr. Upshaw, who

18 has passed away.  And if there's criticism -- and there will be

19 some criticism of Mr. Upshaw in this case -- is there anything

20 about the fact that he's deceased that would cause you to say,

21 "I can't listen to this, one way or the other, or be fair about

22 it one way or the other"?

23          PROSPECTIVE JUROR MA:  I heard of the name Upshaw but

24 I never -- I mean, you know, because through our years, my

25 husband did mention some of the football players' names so

1  this -- it sound familiar to me, but other that, I don't know

2  anything about football, so no, I have no problem if a person's

3  deceased, no longer living, and would make an issue or any

4  special consideration to the case.

5           MR. PARCHER:  Even though he's not going to be here,

6  to be questioned, or to respond to questions?

7           PROSPECTIVE JUROR MA:  No.

8           MR. PARCHER:  That's okay with you?

9           PROSPECTIVE JUROR MA:  Yes.

10          MR. PARCHER:  And the second is, if my clients are, I

11 call it the class.  If the class proves its case -- and only if

12 it proves its case.  I'm not asking for an advantage here of

13 any kind.  If the class doesn't prove its case, I understand

14 that the verdict goes against us and goes for the Defendants.

15          But if the class approves its case, both the contract

16 case and the fiduciary duty case, is there any reason that you

17 would resist or be uncomfortable with awarding substantial

18 damages, if we demonstrated that we were entitled to it?

19          PROSPECTIVE JUROR MA:  I have no problem with that.

20          MR. PARCHER:  Thank you.

21          MR. KESSLER:  Very quickly, good morning.  Just a few

22 questions.  Has any member of your family ever been involved in

23 any type of union issue or union dispute, that you recall?

24          PROSPECTIVE JUROR MA:  No.  Not I recall.  I don't

25 think so.

1          MR. KESSLER:  Have you or any member of your family

2   ever been involved in any type of contractual dispute of any

3   kind?

4          PROSPECTIVE JUROR MA:  No, I don't think so.

5          MR. KESSLER:  And then finally, I'll ask the opposite

6   of Mr. Parcher's question.  If you find that Plaintiffs have

7   not proven their case, do you have any trouble awarding them

8   nothing, even though you might feel some sympathy to the

9   underdog or to a retired player or something like that?

10          PROSPECTIVE JUROR MA:  I have no problem with that,

11   either.

12          MR. KESSLER:  Thank you.

13          THE COURT:  Anything more that you thought of that

14   you want to tell us?

15          PROSPECTIVE JUROR MA:  No.

16          THE COURT:  So if you are selected, now, you will be

17   here every day, right?

18          PROSPECTIVE JUROR MA:  I believe so, yes.

19          THE COURT:  Do you have the flu or bronchitis or

20   anything?

21          PROSPECTIVE JUROR MA:  No.  I'm healthy.

22          THE COURT:  Good.

23          PROSPECTIVE JUROR MA:  I want to believe that I'm

24   healthy.

25          THE COURT:  Anyone else come down with bronchitis

 1   over the break?

 2            All right.  May we pass the panel for cause?

 3            MR. KESSLER:  I have nothing further, your Honor.

 4            THE COURT:  Mr. Parcher?

 5            MR. PARCHER:  I just have one, just one more

 6   question.  May I?

 7            THE COURT:  All right.

 8            MR. PARCHER:  Thank you.  I should have thought of it

 9   before, but I didn't.

10            THE COURT:  Please go ahead.

11            MR. PARCHER:  Also there's a committee of sort --

12   there is -- hi.  There is going to be some interpretation of

13   contracts, the language of contracts.  Not the law, but your

14   conclusions about what a contract may or may not mean.  Do you

15   have any -- any problems with reading the language?

16            PROSPECTIVE JUROR MA:  If it's not like -- okay, my

17   work involved to read a lot of laws and regulations of the

18   Social Security, so I don't think I would have a problem with

19   it.

20            MR. PARCHER:  Neither do I.

21            PROSPECTIVE JUROR MA:  Okay.

22            MR. PARCHER:  Thank you.

23            THE COURT:  Okay.  Can we pass the panel for cause?

24            MR. HUMMEL:  (Nods head)

25            THE COURT:  Can you give me your peremptory

1  challenges now, or do you need a minute?

2          MR. KESSLER:  We're in, Your Honor.

3          MR. PARCHER:  I could use a few minutes.

4          THE COURT:  Well, all right.  What we are going to

5  do, then, and I apologize for this, but because of the snafu

6  with Mr. Casper, we had to go kind of back, but we have now

7  reached the milestone again.

8          So, the 16 of you are the final pool, and I'm going

9  to give the lawyers just a few moments, so they can think

10 through -- I could just ask you to sit here, but how long do

11 you need?

12         MR. PARCHER:  I don't think any more than ten.  I

13 don't think any more than ten.

14         THE COURT:  All right.  Let's do this.  I would --

15 rather have you just sit here, let's do the same drill again.

16 You can take a ten-minute break.  Please be outside in ten

17 minutes.  And when you come back in, sit in the back of the

18 courtroom.

19         Remember my admonition.  No talking to anybody.  I'm

20 going to have to insist on that.  It's important.  So we will

21 see you back here in ten minutes.  Please -- And the other

22 prospective members of the jury who have not been selected, I

23 need to ask you to come back in ten minutes as well, because

24 you never know, I might need you.  Thank you.

25         (Prospective jury panel excused from the courtroom)

1          (The following proceedings were held in open court

2          outside of the presence of the jury:)

3          THE COURT:  Okay have a seat.  I'll come back in ten

4   minutes and we'll decide, see who you have decided on.

5          MR. PARCHER:  Thank you.

6          (Recess taken from 12:20 to 12:31 p.m.)

7          (The following proceedings were held in open court

8          outside of the presence of the jury:)

9          THE COURT:  All right.  Let's get back to work.

10  Everyone have a seat, please.

11          Would the lawyers please hand up to me, the three

12  strikes on each side.

13          (Request complied with by Counsel)

14          THE COURT:  All right.  Who's list is this

15  (Indicating)?  Is that yours?

16          MR. PARCHER:  I can't see that well, Your Honor, but

17  just by the question I feel it's probably me.

18          THE COURT:  All right.  Plaintiffs' is Casotto,

19  stricken; McEachron, stricken; and Timlin stricken.

20          Then the Defendant strikes are James Brown, Jeffrey

21  Collins, Pamela Curtiss-Horton.

22          So that means the final ten will be DeSouza, Smith,

23  Chui, Neville, Martin, Ma, Yamane, Schwartzler, Hart and Holm.

24          Have I done that right?

25          MR. HUMMEL:  Yes, Your Honor.

 1          THE COURT:  All right.  Let's bring in our -- let's

 2   bring in the venire.

 3          (The following proceedings were held in open court in

 4          the presence of the jury:)

 5          THE COURT:  Welcome back, everyone.  Please have a

 6   seat.  We've reached another milestone, and we now know the

 7   final ten.  I'm going call you forward.

 8          I want to say first that all 16 of you, and I'm sure

 9   the other two or three back there, would have made excellent

10   jurors.  But the truth is we can -- we only need ten.  And so,

11   we should impose only to the minimum extent, and ten is the

12   number that we need.  So, the lawyers have winnowed down 16 to

13   ten, and so now we're ready to go forward.  I'll call the names

14   of the ten of you who will be serving.

15          Ms. DeSouza, please come forward and this time, sit

16   in the regular jury box, if you wouldn't mind.  We are going to

17   move those chairs.

18          Mrs. Smith.  Looks like you're going to get the same

19   seat you were in a while ago.  Welcome to jury.

20          Mr. Chui, where are you?  You are going to be next.

21   Please sit by Mrs. Smith.  Mr. Neville, you will be next.

22   Ms. Martin, all right.  So, that's our front row.

23          Ms. Ma, where are you?  You get to come sit back,

24   behind Ms. DeSouza.  Ms. Yamane, Ms. Schwartzler, Ms. Hart.

25   Ms. Holm.

1              All right.  Counsel, have I done that correctly?

2              MR. KESSLER:  Yes, Your Honor.

3              THE COURT:  All right.  Okay, both sides are

4    indicating yes.

5              Okay.  You will be the final jury selected to decide,

6    on behalf of your country, this case.  So, just like I take an

7    oath to decide cases and follow the law, that's what you are

8    going to be doing.  And, your country has delegated to you the

9    responsibility to decide this case.

10             So, please stand at this time.  The clerk will swear

11   you in.  Raise your right hand.

12             (Jury sworn in)

13             THE CLERK:  Thank you.

14             THE COURT:  All right.  What I'm going to do now is

15   ask you to go into the jury room in a moment, to go through

16   this door, and Lashonda will take you back there and we will --

17   it's a very brief session.

18             You get your badge, which you need to get in, in the

19   morning.  Just kind of like the credential that I have that

20   proves that I have a right to be in the building and so forth.

21   A note pad to take notes with if you wish.  Some of the ground

22   rules on parking and reimbursement and things like that, that

23   are of daily importance to you.

24             And, so I think in light of the hour, what I'm going

25   to do is, I had hoped that we could get to the opening

1  statements today, but I was wrong.  This is not the first time

2  you will find that I was wrong about something in this case,

3  but, you know, I was wrong.  So, we will let you go, as soon as

4  you're done with your orientation.  And then, we will start

5  fresh in the morning with the opening statements, I think is --

6  is the best way to go.

7          Now, remember, we need all ten of you here.  We can't

8  start until everyone is ready to go.  So, you need to be on

9  time.  At least by 7:45.  The last jury that I had was amazing,

10 they were always here by 7:30.  Even though I never asked them

11 to be.  And one morning we got started with the evidence at

12 7:33, which is a record for me.

13         And, if you got here, and the lawyers had nothing to

14 bring up with me, we -- so if you were all here and ready to go

15 at 7:30 and the witness was ready, we could beat the record.

16 But I'm not asking to you do that.  7:45 is perfectly fine.

17         We will always start by 8:00.  Because, one thing I

18 commit to you, because I know that sacrifice you are making,

19 you -- we will run and efficient trial.  And when you're here

20 and ready to hear evidence, you are going to be hearing

21 evidence.  The lawyers will not be calling for sidebars and

22 hearings out of the presence of the jury, except in the most

23 extreme of cases.  So, you will be listening to evidence the

24 entire time you're here.

25         So, that's, that's where we are.  Any questions

1  before I excuse you to go into the jury room, and you're all

2  set and ready to go and -- what was that word you said,

3  "dandy"?  You're all in that mode now?  Excellent.  I want to

4  congratulate you, and welcome you to the courtroom, and thank

5  you for your service in advance.

6          So at this time, Lashonda, would you mind escorting

7  our jurors into the jury room?

8          THE CLERK:  Okay.

9          THE COURT:  Remember that admonition, now, remember

10 that admonition.  Don't talk to anybody, don't do any Internet

11 research or anything.

12          (Jury excused)

13          (The following proceedings were held in open court

14          outside of the presence of the jury:)

15          THE COURT:  You know, everybody have a seat.  I -- do

16 you lawyers mind if I step in there in a moment -- I should

17 have said this on the Record, but I think I should tell them

18 not to read any newspaper stories about this case.

19          And, do you mind if I step in there and say that, or

20 do you want me to bring them back out and do it on the Record?

21          MR. PARCHER:  No.  You could tell them not to catch a

22 cold, too.

23          MR. KESSLER:  Not at all, Your Honor.  In fact, there

24 was a story today, and there was something in the legal thing,

25 and I know that there are TV cameras downstairs.  So, you might

 1  also tell them not to watch anything that may happen on

 2  television.

 3              THE COURT:  Hang on, then.  I made a mistake.  Just a

 4  second.

 5              (A pause in the proceedings)

 6              (The jury re-entered the courtroom )

 7              (The following proceedings were held in open court in

 8              the presence of the jury:)

 9              THE COURT:  Okay everyone, we are going to move those

10  chairs, and eventually it will be very easy to go in and out.

11  I'm sorry we haven't arranged things.

12              Have a seat, please.  I made a mistake.  There's

13  something I should have mentioned to you.  There has already

14  been one newspaper story about this case.  I'm assuming no one

15  saw that, or else you would have told me about it.

16              Has anyone read any newspaper stories about this

17  case?

18              (No indication from the Jury)

19              THE COURT:  All right.  If you see one, don't read

20  it.  If you hear something on the radio about this case, don't

21  listen to it.  Don't go on the Internet, doing any homework

22  about this case or anything having to do with group license

23  agreements or the NFL.  You know, sometimes people say "I'll go

24  on the Internet and I'll find out all about it."  No.  No, no.

25  Do not do it.

1          The great thing about the trial is you make these

2    lawyers do all the work.  And they will present the evidence

3    here in court that you need decide this case from.  You cannot

4    go and do any Internet research or any kind of research of any

5    type.  And if there's stories in the news about this case,

6    please ignore them.

7          Don't talk to your loved ones about this case.  Don't

8    talk to anybody about this case.  Including among yourselves,

9    until it's your duty to do it.  And then it'll be your duty to

10   talk, talk, talk at the end.  I can't tell you how important

11   this is, to abide by this admonition.

12          Now, there may be news cameras downstairs.  Somebody

13   out here was telling me there are news cameras downstairs.

14   When the case is over, and you have reached a verdict, you can

15   hold a press conference on the sidewalk out front.

16   Individually or as a group.  It's up to you.  But now you

17   cannot do that.

18          If some newspaper person comes up to you and wants

19   you to say something, you tell me.  You ignore them, and you

20   come tell me.  And they will be looking at a U.S. Marshal, for

21   trying to jury-tamper.  Anybody out there in the press who

22   hears me, you had better behave yourself.

23          So, ignore any members of the press, anybody.

24          Now, these lawyers, if you see them in the hallway,

25   or somebody associated with them, out of respect for you,they

 1  know that they're supposed to ignore you.  So, they are not

 2  being rude.  They are doing their job, as lawyers and

 3  professionals, to respect the important job you have.

 4          Now, that's what I forgot to say, is I don't want you

 5  to -- mainly I don't want you to try to -- I don't want you to

 6  listen to any news stories about this case, if there are any.

 7          Anything else that you want me to admonish the jury

 8  about before -- because they're not going to come back in here

 9  today.  Anything more?

10          MR. KESSLER:  No, Your Honor.

11          MR. PARCHER:  No, thank you, Your Honor.

12          THE COURT:  Okay.  Everybody think they got that now?

13  I'm sorry that I had to bring you back in here.  I goofed up.

14  I should have thought of that, myself.

15          Okay.  Now, Lashonda will continue on, and then you

16  will be free to go, and we will see you back here tomorrow at

17  7:45.

18          (Jury excused)

19          (The following proceedings were held in open court

20          outside of the presence of the jury:)

21          THE COURT:  Everyone be seated.  Now, the rest of you

22  who were prospective jurors, I want to thank you very much, for

23  your willingness to serve.

24          You know, time and time again, I see the good people

25  of our district come in here, and work hard, they listen to the

1   evidence, they decide cases.  And, it's because of the jurors

2   that the -- that the judicial system has the high reputation

3   that it has, in this country.  It's always ranked at the top.

4   Way ahead of the President, way ahead of Congress, way ahead of

5   newspapers and labor unions.

6            And it's because good people like you come in here

7   ready to do their duty and make a sacrifice.  Thank you for

8   your willingness to do that.  This time, we don't need you.

9   But, there will be a time in the future when we have to call on

10  you.

11           So at this time, with the thanks of your District

12  Court, you are excused.  And just go back to the jury assembly

13  room, and tell them that you were not needed, and good luck to

14  all of you.

15           Please, now, don't try to talk to any members of our

16  jury.  You know that that wouldn't be proper.  But you are

17  perfectly free now to talk to -- you can talk to lawyers, you

18  can talk to anybody, if you want, at this stage.  Because you

19  are turned back into ordinary civilians.  But you are not

20  obligated to.

21           You are just -- you are back -- you're no longer

22  bound by any of my admonitions.  Thank you very much.

23           (The remainder of the Jury Venire is excused)

24           THE COURT:  All right.  Counsel, anything that we

25  need to go over today before we get -- Mister -- Mr. Kessler,

1  would you mind moving that (Indicating)?

2          MR. CLARK:  Certainly, Your Honor.

3          THE COURT:  So that I can see everybody at your side?

4  Anything you lawyers want to go over today, or can we just move

5  forward and see you back here in the morning at 7:30?

6          MR. KESSLER:  Nothing from us, Your Honor, other than

7  to remind you you do have that other motion pending on -- on

8  the -- the in limine of Plaintiffs, regarding the testimony

9  about the meaning of the license agreements.

10         And that is, there was supplemental briefings

11 submitted to Your Honor --

12         THE COURT:  I tried to read all that.  I'll have to

13 see what I can -- all right.

14         MR. HUMMEL:  Yes, Your Honor.  Briefly, now, with the

15 schedule pushing witnesses into tomorrow, it is likely we will

16 need to read some depositions tomorrow.  I handed you the

17 packet with the tab.

18         THE COURT:  You know, one of these -- can you just

19 stay right there?  I started looking at those.  And, I would

20 like to take like a five-minute break.  Belle, can we do a

21 five-minute break?

22         THE COURT REPORTER:  (Nods head)

23         THE COURT:  Actually, I don't even need that much

24 time.  But I had some questions about some of these

25 depositions, and I -- so, if you will bear with me, I'll be

 1  back in a few moments.

 2          MR. HUMMEL:  Yes, Your Honor.

 3          THE COURT:  All right.  We will take just a moment

 4  break.

 5          (Recess taken from 12:48 to 12:50 p.m.)

 6          THE COURT:  On the deposition of Glenn Eyrich, I made

 7  the ruling, and I'll hand this down to somebody.  Who would

 8  like to come get this?

 9          MR. HUMMEL:  I would, Your Honor.

10          THE COURT:  But on one of these depositions, there

11  were lot of objections, and not necessarily the objections that

12  I would have raised, but the -- looking at one, Warren Friss.

13          MR. HUMMEL:  Yes, Your Honor.

14          THE COURT:  And the form of the questions, in my

15  view, is totally improper.  First, they quote from a

16  declaration.  Right off the bat, that is an out-of-court

17  statement.  So the -- the question is infected with hearsay, to

18  begin with.  And then, there's some -- then it's followed by a

19  whole series of leading questions.  So to my view, virtually

20  none of this is admissible.

21          And, and I -- if you -- if this is going to be -- if

22  you have got the same problem that you want to stipulate, okay.

23  But, but the other thing is I couldn't tell -- it's lined out,

24  it says "Objection to form" and so forth, but I couldn't tell

25  whether you were reasserting these objections or not.

1          So, I want you -- I'm going to hand this one back.

2    And you have got to clarify what -- write in it, what is the

3    objection that is being made.

4          MR. HUMMEL:  We will, Your Honor.  And --

5          THE COURT:  Because I couldn't tell what objection I

6    was ruling on.  But let me just say to you lawyers something.

7    You can't go into a court -- let's say you had a witness on the

8    stand and you had a completely inadmissible document, and then

9    you read out loud from the completely inadmissible document,

10   and then you said some question about it.

11         Well, now you have laid before the jury inadmissible

12   testimony.

13         MR. KESSLER:  Your Honor, if I could refer to that

14   specific subject, Mr. Friss.  What had happened is Mr. Friss

15   himself filed a declaration.  Of course, the declaration

16   itself, we understand, is not admissible evidence.

17         THE COURT:  Correct.

18         MR. KESSLER:  What was done at the deposition, which

19   I believe is proper, is that he then testified to the exact

20   words, "Is the following statement you made in your deposition

21   correct?"

22         THE COURT:  That's leading.  That's just leading.

23         MR. KESSLER:  Well -- it wasn't --

24         THE COURT:  Then they object to the form, then that's

25   a proper objection.

1          MR. KESSLER:  But there wasn't an objection on that

2    ground, Your Honor.  As you know, Your Honor, form objections

3    have to be made at the time of deposition.  And also --

4          THE COURT:  There were a lot of them made, and that I

5    saw there.  So I want you to be real clear on what objection it

6    is that you are asserting here.

7          MR. HUMMEL:  We will, Your Honor.

8          THE COURT:  So you have to hand that back to me.

9    But, you know, if you give somebody -- it's like giving them a

10   script, for goodness sakes.  If you give somebody a script and

11   say, "Okay, I'm asking you this question, do you agree with

12   that?"

13         "Oh, yeah, yeah, I agree.  You wrote it out for me

14   here.  I know it must be true, Mr. Kessler."

15         MR. KESSLER:  But it was his own declaration, Your

16   Honor.  It wasn't somebody else's.

17         THE COURT:  Written by who?

18         MR. KESSLER:  By him.  In other words --

19         THE COURT:  Written by your law firm, probably.

20         MR. KESSLER:  Your Honor, it was his sworn

21   declaration submitted, and what was simply done --

22         THE COURT:  That's not the way you do testimony.  You

23   know, that would be -- imagine if he was up on the stand, and

24   you said, "By the way, Mr. Witness, just in case you can't

25   remember what you are supposed to say, here's your

 1  declaration."

 2          That's not the way -- you don't proceed like that.

 3          MR. KESSLER:  I --

 4          THE COURT:  So I'm going to give you a chance over

 5  here to make clear what your objections are.  And I'm telling

 6  you that's the way I feel about it.  If -- if you ask the wrong

 7  questions it's your own -- wrong questions, I'm sorry.  But you

 8  have to bring the guy out here live, if these get sustained.

 9          But that one is the one I had the most questions

10  about.  I haven't gotten to Zucker yet.

11          MR. HUMMEL:  Your Honor, if I might?

12          THE COURT:  Nor to Linzner.

13          MR. HUMMEL:  The most important one, Your Honor, from

14  our perspective for tomorrow is Mr. Upshaw's.  We intend to

15  play --

16          THE COURT:  I don't even have that one.

17          MR. HUMMEL:  Should have been in the packet.

18          THE COURT:  It was not.

19          MR. HUMMEL:  Well, I have one, a copy --

20          THE COURT:  Let me just be -- I had four.

21          MR. HUMMEL:  And there are five.  I have

22  Mr. Upshaw's, Your Honor.  I will give that to you.

23          THE COURT:  I hope I didn't -- give it to me, because

24  I hope I didn't --

25          MR. HUMMEL:  I will.

 1          THE COURT:  Does it have all the --

 2          MR. HUMMEL:  It's my last copy.

 3          THE COURT:  There's only one objection.

 4          MR. HUMMEL:  That's only one objection.

 5          THE COURT:   Well, I can rule on that right now.

 6          Question, "Looking now at Exhibit 117, the Charlotte

 7  Observer," --

 8          (The Court examines document)

 9          THE COURT:  Well, why isn't this admissible?  This

10  is -- this is, he's saying, he's admitting that "I made the

11  statements that are in the Charlotte Observer article," the

12  ones at least that -- but the article, itself, will not come

13  into evidence.  But, the -- the -- his testimony that he made

14  the statements, since these are party admissions --

15          MR. KESSLER:  Your Honor, as long as the article,

16  itself, will not be shown and displayed to the jury -- and you

17  already overruled, I guess this morning, this is that same

18  statement that we believe relates to collective bargaining and

19  that's why we objected to this.  So your ruling --

20          THE COURT:  Well, that objection I've overruled.  117

21  is not going to come into evidence.

22          MR. KESSLER:  Okay.

23          THE COURT:  That's the Charlotte Observer article.

24          Mr. Hummel, do you understand this?

25          MR. HUMMEL:  Yes, Your Honor.

 1          THE COURT:  You cannot show that to the jury, but you

 2   can, since this is adverse testimony and their party admission,

 3   he's admitting that he made those statements, that's fine.  You

 4   can read that deposition testimony to him.

 5          MR. HUMMEL:  And with Mr. Upshaw, Your Honor, we do

 6   intend to play the video.  It's been cut, so I think that will

 7   be smoother.

 8          THE COURT:  All right.  Okay, I'm giving you back

 9   Upshaw.

10          MR. HUMMEL:  Thank you, Your Honor.

11          THE COURT:  Did you come up with the timeline that I

12   wanted you to have for the jury?

13          MR. KESSLER:  We have, Your Honor, yes.

14          THE COURT:  Let's see that.

15          MR. KESSLER:  We can display that, if you would like.

16   Your Honor, I would know you instructed us, and we'll confer

17   again on the deposition of Mr. Friss, but I would also note

18   that Mr. Friss was a third-party witness with separate counsel,

19   he was not our witness.

20          So, again, the idea of leading, I think, which may

21   have been inappropriate if he was our witness, will be a little

22   bit different in showing this third party.

23          THE COURT:  Whose witness was he?

24          MR. KESSLER:  He was known -- they took his

25   deposition.  He -- just a third party.  And what happened is he

 1  did submit a declaration in the case, previously, but he's not

 2  a party witness.  He's a representative of Topps Baseball

 3  Company.

 4          And what we did is we showed him his prior

 5  declaration in the case, very similar to showing the article in

 6  the Charlotte Observer.  I understand he's not an adverse

 7  party, but he is a third party.

 8          And he was simply asked, "Did you make these

 9  statements and do you -- and are they correct?"  And he

10  answered.

11          THE COURT:  Well wait a minute.  Who noticed and took

12  his deposition?

13          MR. KESSLER:  It was the other side, Your Honor

14  (Indicating).

15          THE COURT:  But is he somebody affiliated with you?

16          MR. KESSLER:  He is not --

17          THE COURT:  Where did that declaration come from?

18          MR. KESSLER:  We did secure a declaration for him in

19  support of our summary judgment motion previously, and I

20  believe that's -- or maybe in support of our -- in support of

21  our opposition to the motion to amend the complaint.  He had

22  done, we had secured it but we asked you secured it for him as

23  a third party and he was represented by separate counsel at the

24  deposition.  We were in no way his counsel.

25          MR. HUMMEL:  Your Honor, it's -- he is in no way an

 1  adverse witness to him.  The questions are leading, they're

 2  also classic hearsay.  Because what they do is they read the

 3  declaration to him, and then they say, "Do you agree with

 4  that?"

 5          Well, the declaration is an out-of-court statement.

 6  So, there, on two levels at least -- and we'll go through the

 7  objections and give them to you clearly tomorrow morning, but

 8  on two levels at least, that's inadmissible.

 9          THE COURT:  All right.  I'm going to withhold ruling

10  until I get it back.

11          I like your timeline.  I think that's good.  And, you

12  need to figure out a way to have that in a place where the jury

13  can glance over at it and see it.

14          One possibility is at the end of the jury box down

15  there, probably need a pair of easels.  I only have the one

16  easel, but you're free to use that one.  Or, maybe back in that

17  corner by the thermostat, although that's a long way for the

18  jury to look.  I can barely make out the wording from here.

19          MR. KESSLER:  Your Honor, one possibility -- well,

20  that won't work.  I was going to suggest putting it on the

21  side, but that would cut off people's being able to see

22  through.

23          THE COURT:  I think you need to have it high enough

24  on an easel, maybe at the end of the jury box.  But you lawyers

25  can figure that out.

 1          All right.  Now, the other thing, is, in the last

 2   trial they managed to get the screen about three feet higher.

 3   Two feet higher, anyway.  And, so you are going find that when

 4   Mr. Hummel is standing at the lectern, somebody on the jury

 5   won't be able to see the documents because of the -- that's why

 6   they had it up a little bit higher.

 7          Now I'll go with whatever you're able to do, but if

 8   you can get a better screen that is higher up -- now, somebody

 9   said well how about putting it on that table?  I don't think

10   that's the way we had it, but it seems a little -- kind of

11   dangerous to put it on that table.

12          MR. HUMMEL:  Your Honor?

13          THE COURT:  Yes.

14          MR. HUMMEL:  I have not appeared in your courtroom

15   before, but in a number of other federal courtrooms, at least

16   in Los Angeles, they have monitors or a monitor that's close to

17   the jury box.  You don't do that.

18          THE COURT:  I don't like that.  You know why?  You

19   lawyers will -- ought to understand this.  As an advocate, you

20   want the jury to be looking at you.  You don't want them

21   looking at some TV screen that's -- you want them looking right

22   at you when you are pointing to the thing on the screen.

23          I believe so strongly this, I have told the rest of

24   the Court I do not want to waste the taxpayers' money with a

25   bunch of monitors and all that out there.  I want everyone in

1  the courtroom looking at the same place on the screen.  And

2  believe me, they pay much more attention to you.  So the

3  advocates in you ought to say that's a bad idea.

4          That's like LAX airport, you know how they used to

5  have all the little TVs, everybody looking at their own TV.

6  No.  That's not good advocacy.  I want the advocates to have

7  the advantage of everyone looking at what the advocate is

8  pointing to at the same time.

9          MR. HUMMEL:  Your Honor, could I --

10         THE COURT:  That is not a good idea.  It's a better

11 idea to get a screen that works for this courtroom.

12         MR. HUMMEL:  We'll do that.  Could I inquire, too, I

13 know that in federal court, we typically stay at the podium.

14 Are we free to walk over and point to things on the screen?

15         THE COURT:  Yeah, you are.

16         MR. HUMMEL:  All right.

17         THE COURT:  I do like it if you ask permission to

18 approach the witness or the jury box.  But other than that, you

19 are free to walk around all you want.  You want the witness to

20 walk over there, I think it's good.  Keeps the interest up, of

21 the members of the jury.

22         MR. HUMMEL:  Appreciate that, Your Honor.

23         THE COURT:  What more can I do for you today?

24         MR. KESSLER:  I think that's it for the moment, Your

25 Honor.  And we will confer further on this issue of Mr. Friss's

1   deposition.

2          THE COURT:  All right.  Great.  Now, see you at 7:30

3   in the morning.  And we will have 45 minutes per side on the

4   opening statements.  And then we will be off and running.

5          Who is your first witness going to be?

6          MR. HUMMEL:  First witness will be Clifton McNeil,

7   Your Honor.

8          THE COURT:  Great.  Okay.  See you then.

9          MR. HUMMEL:  Thank you, Your Honor.

10          MR. KESSLER:  Thank you, Your Honor.

11          (At 1:03 p.m., the proceedings were adjourned, to

12          recommence Tuesday, October 21, 2008, at 7:30 a.m.)

13

14

15

16

17

18

19

20

21

22

23

24

25

## CERTIFICATE OF REPORTER

I, BELLE BALL, Official Reporter for the United States Court, Northern District of California, hereby certify that the foregoing proceedings in C 07-00943 WHA, Parrish, et al. v. NFLPA, et al., were reported by me, a certified shorthand reporter, and were thereafter transcribed under my direction into typewriting; that the foregoing is a full, complete and true record of said proceedings as bound by me at the time of filing.

The validity of the reporter's certification of said transcript may be void upon disassembly and/or removal from the court file.


_____/S/ Belle Ball_____

Belle Ball, CSR 8785, CRR, RMR

Monday, October 20, 2008