KEKER & VAN NEST, LLP
ROBERT A. VAN NEST - #84065
R. JAMES SLAUGHTER - #192813
710 Sansome Street
San Francisco, CA 94111-1704
Telephone: (415) 391-5400
Facsimile: (415) 397-7188

Attorneys for Third Party
ELECTRONIC ARTS INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| BERNARD PAUL PARRISH, HERBERT ANTHONY ADDERLEY, and WALTER ROBERTS III, on behalf of themselves and all others similarly situated,<br><br>               Plaintiffs,<br><br>v.<br><br>NATIONAL FOOTBALL LEAGUE PLAYERS ASSOCIATION, a Virginia corporation, and NATIONAL FOOTBALL LEAGUE PLAYERS INCORPORATED d/b/a/ PLAYERS INC., a Virginia corporation,<br><br>               Defendants. | Case No. C07 0943 WHA<br><br>**DECLARATION OF JACOB J. SCHATZ IN SUPPORT OF ELECTRONIC ARTS, INC.'S NOTICE OF MOTION AND MOTION FOR ADMINISTRATIVE RELIEF TO FILE DOCUMENT UNDER SEAL**<br><br>Date: October 22, 2008<br>Time: 7:30 a.m.<br>Dept: Courtroom 9, 19th Floor<br>Judge: Honorable William H. Alsup |

1    I, Jacob J. Schatz, declare as follows:

2        1.    I am Vice President, Legal Affairs for Electronic Arts Inc. ("EA"), a non-party to

3    this action. I have personal knowledge of the facts set forth herein and would and could

4    competently testify to their truth under oath if called upon to do so.

5        2.    I am the in-house counsel responsible for managing litigation, including

6    responding to subpoenas. Earlier this year, Plaintiffs subpoenaed EA for documents. In

7    response to the subpoena, EA produced numerous documents in this matter, among them EA's

8    current license agreement with NFLPA, dated March 1, 2006. Bates No. EA000057-EA000076

9    ("2006 License Agreement"). The 2006 License Agreement is EA's current license agreement

10   with the NFLPA. Paragraph 6 of the 2006 License Agreement includes EA's royalty rates and

11   guaranteed minimum payments, which are extremely sensitive and confidential business

12   information. EA never shares publicly, including with any of its other licensors the royalty rates

13   and guaranteed minimum payments contained in a license agreement with another licensor. The

14   public disclosure of such information would severely harm EA in its negotiations with other

15   parties. Because of the sensitivity of the agreement, EA designated the document highly

16   confidential pursuant to the terms of the protective order in place in this litigation and expected

17   that it would be kept and used on an attorneys' eyes only basis.

18       3.    This morning, October 21, 2008, I learned from a press report that the Court had

19   told the parties that evidence would not be submitted or kept under seal. After confirming the

20   general accuracy of the press report, I sent an email to counsel for plaintiffs and counsel for

21   defendants. A true and correct copy of that email is attached as Exhibit A. In that email, I

22   informed the parties that EA's current license agreement with the National Football League

23   Players Association (Trial Exhibit 80; Bates No. EA 000057-EA000076) contains extremely

24   sensitive and confidential business information, specifically the royalty rates and guaranteed

25   minimum payments, the public disclosure of which would severely harm EA. As a result, I

26   informed the parties that EA intended to ask the Court to keep confidential just the financial

27   terms described in Paragraph 6 of the 2006 NFLPA License Agreement.

28       4.    In addition, I asked Plaintiffs' and Defendants' counsel to inform me of when

1

they intended to first use this document and whether they would stipulate to keeping the financial information under seal. As of the time I am signing this declaration at approximately 3:30 p.m., I have not heard back from either plaintiffs' or defendants' counsel.

5. Attached hereto as Exhibit B is a redacted version of the 2006 License Agreement. The redacted version redacts only those portions of Paragraph 6 of the 2006 License Agreement that describe EA's royalty rates and guaranteed minimum payments.

I declare under penalty of perjury under the laws of the State of California and the United States of America that the foregoing is true and correct, and that this Declaration was executed on October 21, 2008, in Redwood City, California.

JACOB J. SCHATZ

429225.01

# Exhibit A

## R. James Slaughter

| | |
|---|---|
| **From:** | Schatz, Jacob [JSchatz@ea.com] |
| **Sent:** | Tuesday, October 21, 2008 12:55 PM |
| **To:** | lleclair@mckoolsmith.com; jnaylor@MckoolSmith.com; RKatz@manatt.com; Kessler, Jeffrey; Feher, David; Greenspan, David |
| **Cc:** | R. James Slaughter |
| **Subject:** | Parrish v. NFLPA -- URGENT |

**Importance:** High

Counsel for Plaintiffs and Counsel for Defendants,

I need your prompt response to a very straightforward concern. Please get back to me by 2:00 pm today.

I understand Judge Alsup has said he does not want to keep any evidence under seal at trial. EA's current license agreement with the NFLPA, dated effective March 1, 2006 (Exhibit 80; Bates No. EA000057 – EA000076) has not been publicly disclosed, and it contains extremely sensitive and confidential business information, specifically the royalty rates and guaranteed minimum payments. The public disclosure in court of this financial information would severely harm EA. As a result, EA intends to ask the court to keep confidential just the financial terms described in Paragraph 6 of this 2006 License Agreement.

1. When do you intend to first use this document at trial?

2. Will you stipulate to keeping this very limited financial information under seal?

Again, please advise ASAP.

Thanks.

Jake

# Exhibit B

## LICENSE AGREEMENT

This Agreement is made and entered into this _12th_ day of January, 2006, by and between Electronic Arts Inc., a Delaware corporation, with offices at 209 Redwood Shores Parkway, Redwood City, CA 94065 and Electronic Arts C.V. ("EACV"), a Netherlands limited partnership, whose address is Suite 203, 2nd Floor, Lauriston House, Lower Collymore Rock, Bridgetown, Barbados (hereinafter "Licensee"), and NATIONAL FOOTBALL LEAGUE PLAYERS INCORPORATED, a corporation with offices at 2021 L Street, N.W., Washington, D.C. 20036 (hereinafter "PLAYERS INC" or "Licensor"). This Agreement shall be effective as of March 1, 2006. By mutual agreement of the parties, this Agreement shall supersede the license agreement between Licensee and PLAYERS INC dated December 8, 2004 (the "Original License Agreement"), except with respect to any licensed products commercially released by Licensee prior to the Effective Date pursuant to the Original License Agreement, which licensed products shall continue to be governed by the terms and conditions of the Original License Agreement.

## 1. REPRESENTATIONS.

(A) PLAYERS INC represents that it is a licensing affiliate of the National Football League Players Association ("NFLPA") and the National Football League Coaches Association ("NFLCA"); that the NFLPA has been duly appointed and is acting on behalf of the football players of the National Football League who have entered into a Group Licensing Assignment, either in the form attached hereto as Attachment "A" or through the assignment contained in Paragraph 4(b) of the NFL Player Contract, which have been assigned to PLAYERS INC; that the NFLCA has been duly appointed and is acting on behalf of the assistant coaches of the National Football League who have entered into a Group Licensing Agreement in the form attached hereto as Attachment "A-2", which has been assigned to PLAYERS INC; and that in such capacity PLAYERS INC has the right to negotiate this contract and the right to grant rights and licenses described herein. Licensee acknowledges that PLAYERS INC also on occasion secures authorization for inclusion in PLAYERS INC licensing programs from players, including but not limited to retired players, who have not entered into such Group Licensing Authorization, but who, nevertheless, authorize PLAYERS INC to represent such players for designated PLAYERS INC licensed programs.

(B) PLAYERS INC makes no representation that it has the authority to grant, nor does it grant herein, the right to utilize any symbols, insignias, logos, or other identifying names or marks of the National Football League (hereinafter "NFL") and/or any of its member clubs. Accordingly, it is understood by the parties hereto that if likenesses of players are to be used by Licensee in conjunction with any symbols, insignia, or logos of the NFL, or any of its member clubs, in the exercise of the License granted hereunder, it will be the responsibility of Licensee to obtain such permission as may be necessary for the use of such material from the NFL or the club(s) in question. Licensor retains all rights not expressly and exclusively granted to Licensee hereunder.

EXECUTION

Parrish, et al. v. Players Inc., et al.
EA000057
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

## 2.   GRANT OF LICENSE.

(A)    Upon the terms and conditions hereinafter set forth, PLAYERS INC hereby grants to Licensee and Licensee hereby accepts the exclusive right, license and privilege of utilizing the trademarks and names of PLAYERS INC which may be amended from time to time by PLAYERS INC and the names, likenesses (including, without limitation, numbers), pictures, photographs, voices, facsimile signatures and/or biographical information (hereinafter "identity") of the NFL players and assistant coaches referenced in Paragraph 1(A) above, for product(s) in the form of video and computer football simulation, arcade-style, and manager games for: current and successor game console platforms developed by Sony, Nintendo, and Microsoft; personal computers and Apple computers; Nokia N-Gage and its cartridge-based successors; arcade units; Pocket PC and Palm products and other handhelds using a Palm or similar operating system; Linux computers and handheld systems and personal gaming devices Game Boy, Game Boy Advanced, PlayStation Portable, and Nintendo DS and their successors; and any new platforms that may emerge to compete with any of the foregoing during the term of this Agreement (collectively, hereinafter referred to as "the licensed product(s)" and which shall include all features and functionality that enable or enhance gameplay through player/network connectivity but shall not include interactive television).   The definition of licensed product(s) includes fantasy football games only to the extent that such fantasy football games are an element of the licensed product(s), but not as a stand-alone product.  Licensed product(s) shall also include products in the form of "wireless football games" and other related applications (e.g., games, ringtones, wallpaper, and animated images).   Notwithstanding the foregoing, with regard to wireless football games and youth-oriented games (Atari's "Backyard Football" title by way of example), this grant of license shall be non-exclusive except that for the Seventh License Period the license shall be exclusive for wireless football games.  In the event Licensee, at any time during the Term (as defined below), does not produce licensed product(s) for the most current version per License Period of any console platform for which Licensee has exclusive rights, Licensee's rights for such platform(s) shall immediately become non-exclusive.   The specific manner in which the rights licensed hereunder are to be used on the licensed product(s) in question shall require the prior written approval of PLAYERS INC as provided in Section 12 below.

(B)    The rights, licenses and privileges granted by PLAYERS INC hereunder shall not constitute or be used by Licensee as a testimonial or an endorsement of any product, service, or event by all or any of the players, or by PLAYERS INC.  In the event Licensee is interested in securing an individual player's personal endorsement, Licensee further agrees and acknowledges that such endorsement will require the personal approval of the individual player and approval of PLAYERS INC and a separate payment to PLAYERS INC.  Licensee may contact any player or player's agent solely for the purposes of promoting Licensee's products or services and/or to indicate Licensee's interest in securing a player's endorsement and/or services related to any licensed product; provided, however, that all negotiations for such endorsement and/or services shall be conducted solely with PLAYERS INC and any contract for player's endorsement and/or services will be entered by Licensee with PLAYERS INC.  Consistent with past practice, all contact with such player and/or his agent to facilitate player's services or other player performance

EXECUTION                                                    2

Parrish, et al. v. Players Inc., et al.
EA000058
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

under such contract shall be made by PLAYERS INC. Licensee further agrees and acknowledges that any player who is committed individually by contract for products or services competitive with those of Licensee may be required to cease from further inclusion in this Agreement; provided, however, that the use of such player for such products and services shall be on an individual basis and shall not be combined with the use of five or more other NFL players.

(C)   During the term of this Agreement, Licensee shall have the right to continue to manufacture, market, distribute and sell those licensed products previously released by Licensee pursuant to the terms and conditions of the respective governing agreements under which such licensed products were originally released (including, without limitation, the royalty payment terms of such agreements).

3.   RETAIL LICENSE ONLY. The Grant of License set forth in Paragraph 2 of this Agreement applies only to the development, manufacture, publishing, promotion and distribution of licensed product(s) intended for retail sale (including without limitation, sales directly to consumers over the Internet), and shall not permit the use of licensed product(s) as "premium items" to be included with non-licensed product(s), services or events to promote the sale of such non-licensed product(s), services or events; provided, however, that Licensee shall be permitted to promote the sale of licensed product(s), subject to prior written approval by PLAYERS INC and in a manner consistent with the provisions of the Agreement. Any such promotion using the licensed product(s) herein as premium items shall require a separate agreement between PLAYERS INC and Licensee or other sponsor of the promotion, with separate terms and conditions, and nothing contained herein shall obligate either PLAYERS INC or Licensee to enter into such an agreement.

4.   TERRITORY AND DISTRIBUTION. Licensee shall have the right to utilize the rights granted hereunder for distribution of the licensed product(s) in the following territory: Worldwide.

5.   TERM.

(A)   The term of this Agreement shall extend from March 1, 2006 to February 28, 2013 unless terminated in accordance with the provisions hereof. The period of time from March 1, 2006 through February 28, 2007 shall be referred to as the Original License Period. The period of time from March 1, 2007 through February 29, 2008 shall be referred to as the Second License Period. The period of time from March 1, 2008 through February 28, 2009 shall be referred to as the Third License Period. The period of time from March 1, 2009 through February 28, 2010 shall be referred to as the Fourth License Period. The period of time from March 1, 2010 through February 28, 2011 shall be referred to as the Fifth License Period. The period of time from March 1, 2011 through February 29, 2012 shall be referred to as the Sixth License Period. The period of time from March 1, 2012 through February 28, 2013 shall be referred to as the Seventh License Period.

(B)   Licensee acknowledges and agrees that Licensee has and shall have no right to extend or renew this Agreement beyond the term and renewal options, if any, stated herein. No conduct by either Licensor or Licensee (including without limitation, any approvals granted

EXECUTION                                     3

Parrish, et al. v. Players Inc., et al.
EA000059
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

pursuant to Paragraph 12 hereof) shall create, imply or infer a new license agreement or an extension of the stated term and renewal options, if any, of this Agreement, unless same is specifically set forth in a written agreement signed by both Licensor and Licensee. Licensee's agreement that this Agreement is subject to the term and renewal options, if any, stated herein, in all events whatsoever, is a material inducement for Licensor to enter into this Agreement. Notwithstanding the forgoing, Licensee shall have a limited right of first negotiation to extend or renew this Agreement. Licensee shall have such right only through the Fifth License Period. If no agreement for extension or renewal is reached by the end of the Fifth License Period, PLAYERS INC shall be free to negotiate with third parties for the rights set forth above to take effect at the end of the Term.

8.    ROYALTY PAYMENT.

    (A)    Licensee agrees to pay PLAYERS INC a guaranteed minimum royalty of _____ for its use of the rights licensed hereunder for the Original License Period, a guaranteed minimum royalty of (_____) for the Second License Period, a guaranteed minimum royalty of _____ for the Third License Period, a guaranteed minimum royalty of _____ for the Fourth License Period, a guaranteed minimum royalty of _____ or the Fifth License Period, a guaranteed minimum royalty of _____, for the Sixth License Period, and a guaranteed minimum royalty of _____0 for the Seventh License Period. Such amounts include any amounts due with respect to Licensee's use of the assistant coach rights licensed hereunder. Recoupable advances against such guaranteed minimum royalties shall be paid as follows:

EXECUTION                                                    -4-

Parrish, et al. v. Players Inc., et al.
EA000060
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

(B)    [Intentionally omitted.]

(C)    Such advances, flat fees, and guaranteed minimum royalty payments shall be made by Licensee as specified herein whether or not Licensee uses the rights licensed hereunder, and no part of such payments shall be repayable to Licensee.

(D)    (i)    Licensee shall also pay to PLAYERS INC (A) an amount equal to _____ of the Gross Sales as defined below of the licensed product(s) covered by this Agreement, unless otherwise provided herein, less the recoupable advance payments specified above for the applicable License Period, and (B) an amount equal to _____ of any Subscription Revenue as defined below. In the event that any licensed product(s) under this Agreement are not licensed by NFL Properties (or its successors or assigns) during a License Period, then Licensee shall pay to PLAYERS INC an amount equal to _____ of the Gross Sales as defined below of such licensed product(s), instead of the _____ first set forth above, less the recoupable advance payments specified above for the applicable License Period.

(ii)    With respect to wireless football games, Gross Sales shall be calculated based on the revenues charged by Licensee on its first sale, whether to the consumer directly, to the retailer, or to the wholesaler, respectively, in an arms length transaction and shall exclude any revenues rightly paid to or retained by wireless carriers.

(iii)    With respect to all licensed product(s), Licensee shall also pay to PLAYERS INC an amount equal to _____ all net revenue from promotional events, sponsorship, advertising, and substantially similar revenue in connection with the licensed product(s). For purposes of this Paragraph 6(C)(iii) only, "net revenue" shall mean gross revenue less commissions paid by Licensee to third parties in connection with the sale of such promotions, sponsorships, advertising, etc., and actual costs incurred by Licensee in connection with events.

(iv)    All royalties payable pursuant to this Paragraph 6(D) shall be equal to a percentage of Gross Sales or Subscription Revenues of licensed products, as applicable, and shall be calculated on a quarterly basis for calendar quarters ending the last day of each May,

EXECUTION                                                            5

Parrish, et al. v. Players Inc., et al.
EA000061
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

August, November and February of each License Period. All such royalties accrued within a License Period shall be applied to the recoupment of the advances paid in accordance with Paragraph 6(A) above for such applicable License Period (but shall not be applied to recoup or otherwise offset the advance payments for any prior or subsequent License Period), and once the applicable advances have been recouped, all excess royalties shall be due as of the last day of each May, August, November, and February of this Agreement and must be paid no later than thirty (30) days following such due dates. "Gross Sales" shall be calculated based on the actual price(s) charged by Licensee on its first sale, whether to the consumer directly, to the retailer, or to the wholesaler, respectively, in an arms length transaction. Licensee shall transact no sale, the effect of which is to reduce the royalty paid by Licensee to PLAYERS INC; provided, however, that Licensee shall be permitted to provide arms length discounts, allowances and returns which are normal and customary. Gross Sales shall exclude only such normal and customary discounts, allowances and returns.

(v)   "Subscription Revenue" means subscription fees collected from subscribers in return for the right to access premium content offered specifically for the licensed products, minus any commissions or affiliate bounty paid by Licensee to any third party for the purpose of acquiring such subscribers. Such subscription fees may, in Licensee's discretion, be structured as periodic payments, one-time payments, usage-based fees or feature-based fees.

(vi)   Licensee represents and warrants that it shall publish a minimum of two (2) royalty bearing titles each License Period.

(E)   To the extent permitted under Licensee's privacy policy and applicable law, and to the extent Licensee obtains such information, in addition to the royalty payments specified herein and as additional consideration hereunder, Licensee also shall provide to Players Inc by electronic transmission on a quarterly basis, the names, postal addresses, telephone numbers and email addresses of all users of the licensed products. PLAYERS INC shall utilize such user database in accordance with Licensee's privacy policy and applicable law. In addition, PLAYERS INC will take reasonable steps to assure that third parties to whom PLAYER INC transfers any personal information will provide sufficient protection of that information.

7.   PERIODIC STATEMENTS.

(A)   Licensee shall furnish to PLAYERS INC, in a form approved by PLAYERS INC, no later than thirty (30) days following the last day of each May, August, November, and February of this Agreement, a complete and accurate statement certified to be accurate by an authorized representative of Licensee, showing the quantity, description and gross purchase price, of the licensed product(s) distributed by Licensee during the preceding quarterly reporting period described in Paragraph 6(D) herein, and sufficient information to show the calculation of any Subscription Revenues and all other revenues received by Licensee with respect to the licensed products during such quarterly reporting period. Once in every twelve-month period, Licensee shall furnish PLAYERS INC with a detailed statement certified by an officer of Licensee, showing the number of gross sales of the licensed product(s) covered by this Agreement.

EXECUTION

6

Parrish, et al. v. Players Inc., et al.
EA000062
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

(B)   Such statements shall be furnished to PLAYERS INC whether or not any of the licensed product(s) have been purchased during the reporting period for which such statement is due.  The receipt or acceptance by PLAYERS INC of any statement or of any royalty paid hereunder (or the cashing of any royalty check paid hereunder) shall not preclude PLAYERS INC from questioning the correctness thereof at any time, and in the event any inconsistencies or mistakes are discovered in connection therewith, they shall immediately be rectified and the appropriate payment made by the appropriate party.

## 8.   BOOKS AND RECORDS.

(A)   For a period of two (2) years following the termination or expiration of this Agreement, Licensee shall maintain accurate books and records for itself and any subsidiary or affiliated entity with respect to its sale of licensed product(s) under this Agreement.  Said books and records shall be subject to inspection and audit by PLAYERS INC or its duly authorized representative no more than once per calendar year and at reasonable times upon reasonable notice from PLAYERS INC to Licensee.  PLAYERS INC's duly authorized representative must be an internationally recognized chartered or certified accounting firm with offices in the United States, retained by PLAYERS INC on other than a contingent fee basis.  Such accounting firm must hold such books and records in strict confidence except as necessary to report to PLAYERS INC and Licensee on the accuracy of Licensee's statements.  Each statement issued under this Agreement shall be deemed correct and conclusive unless (i) within forty-eight (48) months after the date of the issuance of the statement PLAYERS INC notifies Licensee in writing of any error disclosed in such statement or by an inspection by such accounting firm or (ii) PLAYERS INC or such accounting firm discovers at a later date that Licensee has engaged in fraud or misrepresentation with regard to such statement.  In addition and similarly, Licensee shall use commercially reasonable efforts to cause any entity from which it contracts for services or production or product to cause its books and records to be available for audit and inspection by PLAYERS INC to the extent necessary to confirm the audit of Licensee.  Licensee shall not interfere with such inspections and audits in any way.

(B)   The cost of such inspections and audits shall be paid by Licensee if the result of such inspections and audits indicates a difference of 3% or more (net of any overpayment in the same period), when compared to the statement certified to be accurate by an officer of Licensee, as required by Paragraph 7 (A) of this Agreement, for the twelve month period covered by such statement, or the cost of such inspections and audits as the result of an inspection or audit performed by PLAYERS INC as specified in Paragraph 8(A) above shall be paid by PLAYERS INC if such difference is less than 3% (net of any overpayment in the same period).

(C)   In the event any inconsistencies or mistakes are discovered as a result of such inspections and audits, they shall immediately be rectified and the appropriate payment made by the appropriate party.

9.   PAYMENT, INTEREST AND NOTICES.  All transactions under this Agreement, including without limitation all payment of royalties and all other payments, and all notices, reports, statements, approvals and other communications, shall be with or made payable in the name of

EXECUTION                                                     7.

Parrish, et al. v. Players Inc., et al.
EA000063
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

NATIONAL FOOTBALL LEAGUE PLAYERS INCORPORATED, 2021 L Street, N.W., Washington, D.C. 20036, or its assignee where applicable. With regard to all recoupable advance and actual royalty payments only, such payments shall be made by wire transfer in accordance with Attachment "B" hereto. All other payments shall be made directly to PLAYERS INC at the address above. In addition to all other rights contained in this Agreement, PLAYERS INC shall be entitled to collect and Licensee shall pay daily interest at the rate of one and one-half percent (1 1/2%) monthly, or the maximum interest permitted by law if less, on all payments not timely made by Licensee. All correspondence, notices, approvals and other communications to Licensee shall be with Joel Linzner, EVP Business and Legal Affairs.

## 10. INDEMNIFICATION.

(A)    Licensee agrees that it will not during the term of this Agreement, or thereafter, attack the rights of PLAYERS INC in and to the trademarks or names owned by or licensed to PLAYERS INC or any of the rights licensed hereunder as specified in Paragraph 2 of this Agreement, or in any way attack the validity of this Agreement.

(B)    Licensee further agrees to assist PLAYERS INC to the extent necessary in the procurement of any protection or to protect any of the rights conveyed hereunder, and PLAYERS INC, if it so desires, may commence or prosecute at its own expense any claims or suits in its own name or in the name of Licensee or join Licensee as a party thereto. Licensee shall notify PLAYERS INC in writing of any infringement by others of the rights covered by this Agreement which may come to Licensee's attention, and PLAYERS INC shall have the sole right to determine whether or not any action shall be taken on account of any such infringement. Licensee shall not institute any suit or take any action on account of any such infringement without first obtaining the written consent of PLAYERS INC to do so and PLAYERS INC shall reasonably consider any such request; provided, however, that Licensee shall have the right to take action without PLAYERS INC's prior consent with respect to any infringement of Licensee's intellectual property rights in the licensed product(s).

(C)    Licensee for its own acts hereby indemnifies PLAYERS INC and undertakes to defend PLAYERS INC from and against any and all claims, suits, losses, damages, and expenses (including reasonable attorney's fees and expenses) arising out of the manufacture, marketing, sale, distribution, or use of the licensed product(s) which are the subject of this Agreement. Licensee agrees to obtain, at its own expense, general liability insurance, providing adequate protection for Licensee and PLAYERS INC against any such claims or suits in amounts not less than Three Million Dollars ($3,000,000.00). Within thirty (30) days from the date hereof, Licensee shall submit to PLAYERS INC a fully paid policy or certificate of insurance naming PLAYERS INC as an additional insured party, requiring that insurer will not terminate or materially modify such without written notice to PLAYERS INC at least twenty (20) days in advance thereof.

(D)    PLAYERS INC hereby indemnifies Licensee and undertakes to defend Licensee against, and hold Licensee harmless from any liabilities, losses, damages, and expenses (including reasonable attorney's fees and expenses) resulting from claims made or suits brought

EXECUTION                                                         8

Parrish, et al. v. Players Inc., et al.
EA000064
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

against Licensee challenging the ownership by PLAYERS INC of the rights licensed in Paragraph 2 strictly as authorized in this Agreement.

## 11. COPYRIGHT AND TRADEMARK NOTICES.

(A) Consistent with the practice established by the parties through express approval by PLAYERS INC at the time this Agreement was entered into, Licensee shall prominently place or cause to be placed Licensor's "PLAYERS INC (and design)" trademark (hereinafter "Licensor's Trademark") on the licensed products and on packaging, wrapping, advertising (both print and media regardless of medium, e.g., broadcast, Internet, etc.), and any other material, including trade show booths and exhibits, sales catalogues, and other sales/marketing materials in connection with such licensed product(s) that are publicly distributed or relating to such licensed product(s).

(B) Licensor's Trademark appearing on the licensed product(s) and on all materials in connection with the licensed product(s) distributed or relating to such licensed product(s), shall appear precisely according to the specifications set forth in Appendix B attached hereto, which may be amended from time to time by Licensor, without variation, with the letter "R" enclosed within a circle. Further, Licensee shall provide to Licensor the date of the first use of such licensed product(s) bearing Licensor's Trademark in intrastate and interstate commerce.

(C) Additionally, Licensee shall imprint or cause to be imprinted the following text on any such licensed product(s) and/or materials therefor:

"Officially Licensed Product of
PLAYERS INC"

and

"Information about your favorite players at NFLPLAYERS.COM"

The specific text imprinted shall be subject to Licensor's sole discretion and changed with reasonable notice to Licensee.

(D) For any licensed product, Licensee shall also place Licensor's Trademark and a PLAYERS INC "content box" on all product pages of Licensee's website that utilizes the rights licensed hereunder. "Content box" shall be defined as editorial, sweepstakes or other promotional content designed and developed by PLAYERS INC. The size of such "content box" shall not exceed 120 x 60 pixels. The logo and "content box" on each page shall contain the PLAYERS INC URL as follows: NFLPLAYERS.COM and shall serve as a hyperlink to the PLAYERS INC website at www.nflplayers.com. In the event that PLAYERS INC requests that Licensee include in such "content box" any text, graphics or content other than the Licensor's Trademarks, PLAYERS INC hereby agrees to indemnify Licensee and undertakes to defend Licensee against, and hold Licensee harmless from any liabilities, losses, damages, and expenses (including reasonable attorney's fees and expenses) resulting from claims made or

EXECUTION 9

Parrish, et al. v. Players Inc., et al.
EA000065
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

suits brought against Licensee based upon the use by Licensee of such text, graphics or other content on Licensee's website(s).

12.  APPROVALS.

(A)   The list of players for whom PLAYERS INC has group licensing authorization (the "Player Agreement Report") is available to Licensee via the Internet at www.nflplayers.com/licensee with Licensee's "user name" and "password." In addition, PLAYERS INC may secure authorization from players not listed on the Player Agreement Report, including but not limited to retired players. Notwithstanding the foregoing:

(i)    Upon execution of this Agreement, and thereafter annually by March 1 of each calendar year covered by this Agreement, Licensee shall submit to PLAYERS INC a proposed list of players' names for inclusion in the licensed product(s) for the upcoming football season.  Licensee shall cross-reference its player list against the current Player Agreement Report.  After cross-referencing the lists, Licensee must submit its proposed final player list to PLAYERS INC for approval.  With regard to jersey numbers for active players, it is Licensee's sole responsibility to cross-reference its player list against player rosters posted on www.nfl.com.  If applicable, jersey numbers for retired players must be submitted to PLAYERS INC for approval.

(ii)    Upon execution of this Agreement, and thereafter annually by March 1 of each calendar year covered by this Agreement, Licensee shall submit to PLAYERS INC a proposed list of assistant coaches' names for inclusion in the licensed product(s) for the upcoming football season;

(ii)    PLAYERS INC shall respond to such submissions in writing to Licensee, signifying approval or disapproval in the case of each player's name so requested.

(iii)    Licensee may submit requests in writing to PLAYERS INC for additions, deletions, or substitutions of players' and/or assistant coaches' names and PLAYERS INC shall respond to such requests within ten (10) business days.  Any such request by Licensee for such approval that is received by PLAYERS INC and not responded to within ten (10) business days shall be deemed approved.

(iv)    If PLAYERS INC removes any player name from the Player Agreement Report (or later disapproves an already approved assistant coach name) after the later of March 1 or a specific product Beta date of any year, PLAYERS INC acknowledges that Licensee will not have the ability to remove such player's name and likeness from its licensed products for the applicable football season.  Therefore, the use of such player's name in such case shall not constitute a breach of this Agreement, and PLAYERS INC agrees that the indemnity in Paragraph 10(D) above shall apply to resulting claims or suits brought against Licensee.

EXECUTION                                                   16

Parrish, et al. v. Players Inc., et al.
EA000066
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

(B)   Licensee agrees to furnish PLAYERS INC free of cost for its written approval as to quality and style, samples of each of the licensed product(s), together with their packaging, hangtags, and wrapping material, before their manufacture, sale or distribution, whichever occurs first, and no licensed product(s) shall be manufactured, sold or distributed by Licensee without such prior written approval of such artwork and such sample licensed product(s). PLAYERS INC shall respond to requests for such approval from Licensee within ten (10) business days. Any request by Licensee for such approval that is received by PLAYERS INC and not responded to within ten (10) business days shall be deemed approved. Any material submitted by Licensee for approval that is disapproved by PLAYERS INC within the ten (10) business day period shall be resubmitted to PLAYERS INC with changes and PLAYERS INC shall respond in writing as to approval or disapproval as soon as practicable. Subsequent to final approval, forty (40) production samples of licensed product(s) will be sent to PLAYERS INC to insure quality control, and should PLAYERS INC require additional samples for any reason, PLAYERS INC may purchase such at Licensee's cost. In recognition of the success of the "Madden" franchise, PLAYERS INC agrees that it will support the continuing use of the "Madden" name in connection with the licensed product currently titled "Madden NFL [XX]".

(C)   Licensee may choose to use player names and/or likenesses to promote licensed product(s) on or in radio or television commercials, any material pertaining to packaging, hangtags, wrapping material, print ads, flyers, point-of-purchase displays, press releases, catalogues, trade show booths and exhibits, sales catalogues and other sales/marketing materials, or any other written material or medium, including but not limited to electronic or interactive use; provided, however, that such use shall require the prior written approval of PLAYERS INC and may require additional payment to PLAYERS INC separate from and in addition to any guarantees or royalty payments contained in this Agreement. The amount of such payment, if any at PLAYERS INC's sole discretion, shall be subject to mutual agreement by PLAYERS INC and Licensee. Licensee may contact any player or player's agent solely for the purposes of promoting Licensee's products or services and/or to indicate Licensee's interest in securing a player's endorsement and/or services related to any licensed product; provided, however, that all negotiations for such endorsement and/or services shall be conducted solely with PLAYERS INC and any contract for player's endorsement and/or services will be entered by Licensee with PLAYERS INC. Consistent with past practice, all contact with such player and/or his agent to facilitate player's services or other player performance under such contract shall be made by PLAYERS INC. Licensee agrees to furnish PLAYERS INC all scripts and story boards for proposed commercials for any medium in connection with the promotion of the licensed product(s), and the content of such scripts and story boards shall require the prior written approval of PLAYERS INC before any commercials shall be made or shall be contracted for by Licensee.

(D)   In the event Licensee wishes to secure an individual player or players to make appearances to promote licensed product(s) or to autograph licensed product(s), the selection of such player and the separate fee to PLAYERS INC for such player services shall be subject to mutual agreement between Licensee and PLAYERS INC. Licensee may contact any player or player's agent solely for the purposes of promoting Licensee's products or services and/or to indicate Licensee's interest in securing a player's endorsement and/or services related to any licensed product; provided, however, that all negotiations for such endorsement and/or services

EXECUTION                  11

Parrish, et al. v. Players Inc., et al.
EA000067
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

shall be conducted solely with PLAYERS INC and any contract for player's endorsement and/or services will be entered by Licensee with PLAYERS INC. Consistent with past practice, all contact with such player and/or his agent to facilitate player's services or other player performance under such contract shall be made by PLAYERS INC. Once the player has made the appearance or performed the autograph service, any payment due for such services shall be made immediately to PLAYERS INC. Any such payments shall be separate from and in addition to any royalties paid by Licensee under this Agreement. Once the selection of such player and such separate fee have been agreed upon by Licensee and PLAYERS INC, in the event of cancellation of such appearance or autographing (other than by player or PLAYERS INC), Licensee shall nevertheless be obligated to make such fee payment to PLAYERS INC immediately upon such cancellation.

13. NON-INTERFERENCE. Except as otherwise provided for herein, Licensee agrees and acknowledges that it shall not secure or seek to secure, directly from any player or assistant coach who is under contract to an NFL club, is seeking to become under contract to an NFL club, or at any time in the past was under contract to an NFL club, or from such player's or coach's agent, permission or authorization for the use of such player's or coach's name, facsimile signature, image, likeness (including, without limitation, number), photograph or biography in conjunction with the licensed product(s) herein.

14. GOODWILL.

(A)   Licensee recognizes the great value of the goodwill associated with the rights licensed in Paragraph 2 of this Agreement and acknowledges that such goodwill belongs exclusively to PLAYERS INC and that said trademarks, names and rights licensed in Paragraph 2 of this Agreement have acquired secondary meaning in the mind of the public.

(B)   Licensee agrees that all elements (including all material of any nature utilizing in any way the rights licensed hereunder, including but not by way of limitation, all packages, cartons, point of sale material, newspaper and magazine advertisements) of the licensed product(s) shall be of high standard and of such style, appearance and quality as to be adequate and suited to the best advantage and to the protection and enhancements of such rights; that the marketing of the licensed product(s) will be conducted in accordance with all applicable federal, state and local laws and any other governmental or quasi-governmental laws or regulations of the United States, Canada or any other country in which the licensed products are marketed or distributed by Licensee; and that the licensed product(s) and their exploitation shall be of high standard and to the best advantage and that the same in no manner reflect adversely upon the good name of PLAYERS INC.

15. SPECIFIC UNDERTAKINGS OF LICENSEE.

(A)   Licensee agrees that every use of the rights licensed hereunder by Licensee shall inure to the benefit of PLAYERS INC and that Licensee shall not at any time acquire any title or interest in such rights by virtue of any use Licensee may make of such rights hereunder.

EXECUTION                                                      12

Parrish, et al. v. Players Inc., et al.
EA000068
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

(B) All rights relating to the rights licensed hereunder are specifically reserved by PLAYERS INC except for the License herein granted to Licensee to use the rights as specifically and expressly provided in this Agreement.

(C) Upon expiration or termination of this Agreement, all rights granted hereunder shall immediately revert to PLAYERS INC, and Licensee will refrain from further use of such rights or any further reference thereto, direct or indirect, except as provided in Paragraph 16(E) below. Licensee acknowledges that its failure to cease the use of such rights at the termination or expiration of this Agreement will result in immediate and irreparable damage to Licensor, and/or individual National Football League player(s), and to the rights of any subsequent licensee(s).

(D) During the Term of this Agreement, Licensee agrees to spend the following total amounts on activities which stimulate and promote the market for licensed product(s) through player appearances, highlighting, autographing, or endorsements, and/or PLAYERS INC branded programs, properties, or events (herein after "marketing payments"), subject to prior written approval by PLAYERS INC of such activities:

> $1,400,000 during the Original License Period, and
>
> $1,500,000 during the Second License Period, and
>
> $1,600,000 during the Third License Period, and
>
> $1,700,000 during the Fourth License Period, and
>
> $1,800,000 during the Fifth License Period, and
>
> $1,900,000 during the Sixth License Period, and
>
> $2,000,000 during the Seventh License Period

Licensee shall provide documentation that such approved expenditures have been made. The expenditure documentation shall be provided on a quarterly basis and shall be certified by an authorized representative of Licensee. Such documentation shall be subject to inspection and audit by PLAYERS INC on the same basis as Licensee's books and records.

Notwithstanding the foregoing, the parties agree that Licensee will make an annual marketing payment of:

(i) $350,000 for the Original, Second, Third, and Fourth License Periods; $385,000 for the Fifth License Period; $423,500 for the Sixth License Period; $465,850 for the Seventh License Period for title sponsorship of PLAYERS INC's "Helmets Off" or substantially similar television programming subject to PLAYERS INC's prior written approval, and

EXECUTION 13

Parrish, et al. v. Players Inc., et al.
EA000069
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

(ii) $183,750 for presenting sponsorship of PLAYERS INC's Rookie Premier event and related television programming subject to PLAYERS INC's prior written approval. At PLAYERS INC's sole discretion, the $183,750 set forth above may be increased by up to five percent (5%) per License Period.

Such marketing payments set forth in (i) and (ii) above shall offset the amounts listed in the first paragraph of this Section 15(D) on a dollar for dollar basis for the appropriate License Period. In addition, for purposes of clarity, marketing payments made to support the NFL Players Gridiron Gala, the Aspen Grassroots Celebrity Downhill, or other charitable events, if approved by PLAYERS INC, shall count toward such offset. In the event that any previously approved activity is no longer available or practicable for Licensee's marketing payments at PLAYERS INC's sole discretion, PLAYERS INC agrees to negotiate in good faith for an alternative activity.

(E)    In addition to the amounts set forth above in 15(D), Licensee agrees to donate $100,000 during each License Period to the NFL Player Charities Foundation.

16.  TERMINATION BY PLAYERS INC

(A)    In the event Licensee does not commence in good faith to cause the manufacture, distribution, and sale of licensed product(s), in substantial quantities on or before October 31 of the Original License Period or any applicable subsequent License Period, PLAYERS INC, in addition to all other remedies available to it shall have the option to terminate the License granted hereunder upon written notice of such termination to Licensee.

(B)    In the event Licensee files a petition in bankruptcy or is adjudicated as bankrupt, or if a petition in bankruptcy is filed against Licensee or if Licensee becomes insolvent, or makes an assignment for the benefit of its creditors or an arrangement pursuant to any bankruptcy laws, or if Licensee discontinues its business, or if a receiver is appointed for it or its business, all rights granted hereunder, without notice, shall terminate automatically upon the occurrence of any such event.  In the event of such termination, neither Licensee nor its receivers, representatives, trustees, agents, administrators, successors, and/or assigns shall have any right to sell, exploit or in any way deal with the rights granted hereunder or with any licensed product(s), or any carton, container, packaging or wrapping material, advertising, promotional or display material pertaining to any licensed product(s).

(C)    If Licensee shall violate any of its other material obligations under the terms of this Agreement, PLAYERS INC shall have the right to terminate this Agreement upon fifteen (15) days' notice in writing, and such notice of termination shall become effective unless Licensee shall completely remedy the violation within the fifteen (15) day period and shall provide reasonable proof to PLAYERS INC that such violation has been remedied.  If this Agreement is terminated under this paragraph, all royalties theretofore accrued shall become due and payable immediately to PLAYERS INC, and PLAYERS INC shall not be obligated to reimburse Licensee for any royalties and/or advances paid by Licensee to PLAYERS INC.

EXECUTION                     14

Parrish, et al. v. Players Inc., et al.
EA000070
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

(D).   Failure to resort to any remedies referred to herein shall not be construed as a waiver of any other rights and remedies to which PLAYERS INC is entitled under this Agreement or otherwise.

(E).   Upon termination of this Agreement, Licensee shall have one hundred twenty (120) days to dispose of and liquidate all inventory. Any remaining licensed product(s) in Licensee's inventory shall not be available to consumers after this one hundred twenty (120) day period expires. Such disposition shall conform to this Agreement in all respects. PLAYERS INC shall have right to conduct a physical inventory at the time of termination if it so elects.

(F).   The rights, obligations, terms and conditions set forth herein which otherwise would have arisen during the first four license periods may be terminated by either party at any time during the first four license periods of this Agreement upon thirty (30) days written notice in the event Licensee does not have the rights to use the trademarks of the NFL and its member clubs in connection with the licensed product(s) for any reason whatsoever; provided that, in such event, all rights, obligations, terms and conditions set forth in this Agreement shall again be of full force and effect upon the earlier of either (i) the time in which Licensee re-secures the right to utilize the trademarks of the NFL and its member clubs or (ii) the commencement of the Fifth License Period, and remain in full force and effect (except with respect to such terminated rights, obligations, terms and conditions specific to the affected period and subject to the remaining terms and conditions hereof) through and including the Seventh License Period. If the terms and conditions of this Agreement are terminated under this Paragraph 16(F), all royalties theretofore accrued shall become due and payable immediately to PLAYERS INC, and PLAYERS INC shall be obligated to reimburse Licensee for any royalties and/or advances paid by Licensee to PLAYERS INC but not accrued.

(G).   This Agreement is contingent upon the approval of Licensee's Board of Directors and, therefore Licensee may terminate this Agreement upon written notice received by PLAYERS INC no later than February 28, 2006 in the sole event that Licensee's Board of Directors does not approve this Agreement prior to such date. The parties agree that, in the event of such a termination of this Agreement by Licensee, the Original License Agreement shall remain in full force and effect.

17.  PARTNERSHIP.  Nothing herein contained shall be construed to place PLAYERS INC and Licensee in the relationship of partners or joint venturers, and Licensee shall have no power to obligate or bind PLAYERS INC in any manner whatsoever.

18.  WAIVER AND/OR MODIFICATION.  None of the terms of this Agreement shall be waived or modified except by an express agreement in writing signed by both parties. There are no representations, promises, warranties, covenants or undertakings other than those contained in this Agreement, which represents the entire understanding of the parties. No written waiver shall excuse the performance of an act other than those specified therein. The failure of either party hereto to enforce, or delay by either party in enforcing any of its rights under this Agreement shall not be deemed a continuing waiver or modification thereof and either party may, within the time provided by applicable law, commence appropriate legal proceedings(s) to enforce any or all of such rights.

EXECUTION                                  15.

Parrish, et al. v. Players Inc., et al.
EA000071
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

19. NON-ASSIGNABILITY. This Agreement and all rights and duties hereunder are personal to Licensee and shall not, without written consent of PLAYERS INC, be assigned, mortgaged, sublicensed or otherwise encumbered by Licensee or by operation of law to any other person, or entity. Upon any such attempted unapproved assignment, mortgage, license, sublicense or other encumbrance this Agreement shall terminate and all rights granted to Licensee hereunder shall immediately revert to PLAYERS INC. In addition, PLAYERS INC may terminate this Agreement, at its sole discretion, in the event that Licensee is merged, consolidated, transfers all or substantially all of its assets, or implements or suffers any material change in executive management or control, or upon any transfer of more than fifty percent (50%) of its voting control. If, in its sole discretion, PLAYERS INC shall exercise such termination, all rights granted to Licensee hereunder shall immediately revert to PLAYERS INC, subject to Paragraph 16(E) above.

20. SETTLEMENT AGREEMENT. Notwithstanding anything herein to the contrary, this Agreement and PLAYERS INC's obligations hereunder shall be subject to the terms and conditions set forth in paragraph 21 of the Settlement Agreement between National Football League Players Association and National Football League Properties, Inc. et al dated May 6, 1993 and substantially similar extensions thereof.

21. CONSTRUCTION. This Agreement shall be governed by, and shall be construed in accordance with the laws of the State of New York of the United States of America. The parties consent to jurisdiction under the State of New York and designate the courts of the State of New York as the venue for any dispute arising out of, under or relating to this Agreement.

[signature page to follow]

EXECUTION

16

Parrish, et al. v. Players Inc., et al.
EA000072
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

IN WITNESS WHEREOF, the parties hereto have signed this Agreement as of the day and date written first above.

The Foregoing is Acknowledged:

NATIONAL FOOTBALL LEAGUE                ELECTRONIC ARTS INC.
PLAYERS INCORPORATED

By: _____            By: _____

Title: _Chairman_____           Title: _C.E.O._____

Date: _1/12/06_____            Date: _1/12/2006_____

                                        ELECTRONIC ARTS C.V.
                                        By its General Partner,
                                        Electronic Arts US Co.

                                        By: _____

                                        Title: _C.E.O._____

                                        Date: _1-12-2006_____

Parrish, et al. v. Players Inc., et al.
EA000073
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

## ATTACHMENT A

**TEAM:** _____

### NFL PLAYERS ASSOCIATION
### GROUP LICENSING ASSIGNMENT

The undersigned player, a member of the National Football League Players Association ("NFLPA"), hereby assigns to the NFLPA and its licensing affiliates, if any, the exclusive right to use and to grant to persons, firms or corporations (collectively "licensees") the right to use his name, signature facsimile, voice, picture, photograph, likeness and/or biographical information (collectively "image") in group licensing programs. Group licensing programs are defined as those licensing programs in which a licensee utilizes a total of six (6) or more NFL player images in conjunction with or on products that are sold at retail or used as promotional or premium items. The undersigned player retains the right to grant permission to a licensee to utilize his image if that licensee is not concurrently utilizing the images of five (5) or more other NFL players in conjunction with or on products that are sold at retail or are used as promotional or premium items. If the undersigned player's inclusion in a particular NFLPA program is precluded by an individual exclusive endorsement agreement, and the undersigned player provides the NFLPA with timely notice of that preclusion, the NFLPA agrees to exclude the undersigned player from that particular program.

In consideration for this assignment of right, the NFLPA agrees to use the revenues it receives from group licensing programs to support the objectives as set forth in the By-laws of the NFLPA. The NFLPA further agrees to use its best efforts to promote the use of NFL player image in group licensing programs, to provide group licensing opportunities to all NFL players and to ensure that no entity engages in a group licensing program without first obtaining a license from the NFLPA. The NFLPA makes no representations regarding group licensing other than those expressed herein. This agreement shall be construed under New York law.

This assignment shall expire on December 31, 2007 and may not be revoked or terminated by the undersigned player until such date.

Dated: _____

_____
Player's Signature

Agreed to by the NFLPA:

_____
Player's Name (PLEASE PRINT)

_____
Name

_____
Title

EXECUTION                                    18

Parrish, et al. v. Players Inc., et al.
EA000074
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

ATTACHMENT A-2

### NATIONAL FOOTBALL LEAGUE COACHES ASSOCIATION
### GROUP LICENSING AGREEMENT



The undersigned coach, a member of the National Football League Coaches Association ("NFLCA"), hereby assigns to the NFLCA and its licensing affiliates, if any, the exclusive right to use and to grant, to the extent legally permitted, to persons, firms or corporations (collectively "licensees") the right to use his name, signature facsimile, voice, picture, photograph, likeness and/or biographical information (collectively "image") in group licensing programs. Group licensing programs are defined as those licensing programs in which a licensee utilizes a total of three (3) or more NFL coach images in conjunction with or on products that are sold at retail or used as promotional or premium items. The undersigned coach retains the right to grant permission to a licensee to utilize his image if that licensee is not concurrently utilizing the images of three (3) or more other NFL coaches in conjunction with or on products (including, but not limited to, trading cards, clothing, video games, computer games, collectibles, internet sites, fantasy games, etc.) that are sold at retail or are used as promotional or premium items. If the undersigned coach's inclusion in all NFLCA group licensing programs or a particular NFLCA program is precluded by either his employment agreement with an NFL Club or an individual exclusive endorsement agreement, and the undersigned coach provides the NFLCA with a timely notice of that preclusion, the NFLCA agrees to exclude the undersigned coach from all NFLCA group licensing programs or that particular program as applicable.

In consideration for this assignment of right, the NFLCA agrees to use the revenues it receives from group licensing programs to support the objectives as set forth in the By-laws of the NFLCA. The NFLCA further agrees to use its best efforts to promote the use of NFL coach images in group licensing programs, to provide group licensing opportunities to all NFL coaches and to ensure that no entity engages in a group licensing program without first obtaining a license from the NFLCA. The NFLCA makes no representations regarding group licensing other than those expressed herein. This Agreement shall be construed under New York law.

This Agreement shall expire on December 31, 2010, and may not be revoked or terminated by the undersigned coach until such date. However, this Agreement may terminate prior to December 31, 2010, if, and only if, the undersigned coach is not employed as an Assistant Coach in the National Football League for at least ninety (90) consecutive days during the term of this Agreement and notifies the NFLCA in writing of such change in employment after such ninety (90) day period has passed. This Agreement shall terminate upon NFLCA's receipt of such written notification.

Agreed to by the NFLCA:                          Agreed to by Coach:

Name: _____

Title:  Executive Director                        Coach's Name (PLEASE PRINT)

Date:  12/5/05

                                                  Date: _____

EXECUTION                                         19

Parrish, et al. v. Players Inc., et al.
EA000075
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

## ATTACHMENT B

### Wire Transfer Instructions

Please wire <u>only</u> advance payments and actual royalty payments to the following:

SUNTRUST BANK
1445 NEW YORK AVE., N.W.
WASHINGTON, D.C. 20005
Account Name: National Football League Players Association and National Football
League Players Inc
ABA/ Routing # : 061000104
Account #: 0000707221706

Tax Id # 52-1169809

EXECUTION                                                                          20

Parrish, et al. v. Players Inc., et al.
EA000076
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY