Volume 2

Pages 221 - 453

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE WILLIAM H. ALSUP

BERNARD PAUL PARRISH, HERBERT      )
ANTHONY ADDERLEY, WALTER ROBERTS   )
III,                               )
                                   )
            Plaintiffs,            )
                                   )
  VS.                              )   No. C 07-0943 WHA
                                   )
NATIONAL FOOTBALL LEAGUE PLAYERS   )
ASSOCIATION and NATIONAL FOOTBALL  )
LEAGUE PLAYERS INCORPORATED d/b/a  )
PLAYERS INC,                       )
                                   )   San Francisco, California
            Defendants.            )   Tuesday
_____)   October 21, 2008

## TRANSCRIPT OF PROCEEDINGS

**APPEARANCES**:

**For Plaintiffs:**          MANATT, PHELPS & PHILLIPS
                             1001 Page Mill Road
                             Building 2
                             Palo Alto, California 94304
                   **BY:  RONALD S. KATZ, ESQ.**
                             and
                             MANATT, PHELPS & PHILLIPS
                             7 Times Square
                             New York City, New York 10036
                   **BY:  L. PETER PARCHER, ESQ.**
                             and
                             MANATT, PHELPS & PHILLIPS
                             11355 West Olympic Boulevard
                             Los Angeles, California  90064
                   **BY:  CHAD HUMMEL, ESQ.**


(Appearances continued on next page)

Dockets.Justia.com

**APPEARANCES CONTINUED:**

**Also for Plaintiffs:**     MCKOOL SMITH
                             300 Crescent Court
                             Suite 1500
                             Dallas, Texas  75201
                     BY:  **LEWIS T. LECLAIR, ESQ.**
                          **JILL ADLER NAYLOR, ESQ.**


**For Defendants:**          DEWEY & LEBOEUF
                             1301 Avenue of the Americas
                             New York City, New York  10019-6092
                     BY:  **JEFFREY L. KESSLER, ESQ.**
                          **DAVID GREENSPAN, ESQ.**
                          **DAVID G. FEHER, ESQ.**
                          **ROY TAUB, ESQ.**
                          **MOLLY DONOVAN, ESQ.**
                          **JASON CLARK, ESQ.**


**Reported By:**     *Katherine Powell Sullivan, CSR # 5812*
                     *Official Reporter - U.S. District Court*

<u>P R O C E E D I N G S</u>

**OCTOBER 21, 2008**                                          **7:30 A.M.**


            (The following proceedings were held in open court,

            outside the presence of the jury.)

      **THE COURT:**  All right.  First item of business.  Did

you get that notice I sent out yesterday?

      **MR. KESSLER:**  Yes, we did, Your Honor.

      **THE COURT:**  All right.  First deal with --

      **MR. KESSLER:**  Your Honor, from defendants' standpoint

we believe the stipulation is actually crystal clear that for

the purposes of this case the District of Columbia laws govern

for all purposes.

            In fact, the "ALL" in the stipulation is in all

capital letters to emphasize that point.  What I would note,

Your Honor, is that even if New York law did govern and we have

here the New York cases --

      **THE COURT:**  Both sides agree with that, that you've

stipulated to apply D.C. law?

      **MR. LECLAIR:**  We do, Your Honor.  Actually,

Ms. Naylor was going to argue this, but I think I know enough

since she's not here -- she'll be back in a moment -- to tell

you our position, which is that our position is that we did

stipulate to D.C. law.

            We don't think there are significant differences at

1    all between New York and D.C. law.  However, when you apply

2    D.C. law you apply D.C. conflicts of law, which if there is a

3    selection of another law which bears a reasonable relationship,

4    you use that, whatever the parties selected.

5            **THE COURT:**  Well, when you briefed this point you

6    didn't bring any of that up, did you?

7            **MR. LECLAIR:**  We did not, Your Honor.  In fact, when

8    you noted it we have to actually give credit to Your Honor.  We

9    think that that's a good point.  And we think that actually --

10   and the only difference is that there's probably more cases --

11   the law is the same, but there are probably more cases under

12   New York law.

13           **THE COURT:**  All right.  You briefed this in your

14   memorandum that I have right here.  And you refer to D.C. law,

15   D.C. law.  D.C. law.  You start off with:

16               "The D.C. -- District of Columbia follows the

17   objective law of contracts."

18               Now, this is all about the third-party contracts.

19               Now, I -- are you trying to sneak New York law into

20   this or not?

21           **MS. NAYLOR:**  Your Honor, may I?  Jill Naylor.

22           **THE COURT:**  I want to hear what you have to say.

23           **MS. NAYLOR:**  We believe the evidence, the clerk or

24   Your Honor, whoever caught it, we simply didn't --

25           **THE COURT:**  No.  I just happened to read the -- I

1  read every single contract yesterday.  Several of them refer to

2  New York law.

3          **MS. NAYLOR:**  We believe that the result is the same.

4  They both follow the objective interpretation of contracts.  We

5  don't think the outcome is any different under D.C. law or

6  New York law.

7          The New York cases have some clearer language.  But

8  aside from that, it's the same results.

9          **THE COURT:**  All right.  We've argued this point.

10 That's the only point I wanted to ask you about.  We've

11 already --

12         **MR. KESSLER:**  Your Honor, just before you rule, I

13 would just note that if New York law were applicable -- and we

14 did not brief it -- in fact, New York law makes it very clear

15 that where the contract is ambiguous that subjective intent

16 that's contemporaneous is admissible.

17         We have cases for that in case Your Honor were

18 interested in that.  That's the only point I'd raise.

19         **MS. NAYLOR:**  Your Honor, may I respond to that?  What

20 Mr. Kessler just said is contemporaneously expressed subjective

21 intent may be admissible.  That's different than the evidence

22 they're trying to get into the trial, which is intention that

23 was expressed at a deposition after litigation.

24         They've produced no evidence to this court of a

25 contemporaneously expressed intention under these contracts.

 1    It's the same under either D.C. law or New York law to look at

 2    extrinsic evidence where a contract is ambiguous to figure out

 3    what a reasonable person would have believed the contract to

 4    intended.  It is an objective standard.

 5          The subjective intent is only available, even under

 6    D.C. law, even under the jury instructions that Mr. Kessler is

 7    relying upon and his cases if that intent was made at the time

 8    or during the contract, not later in litigation.

 9          That would obliterate the rule of contracts if people

10    could come into law later under litigation and say:

11          "Even though that's what I said, it's not what I

12    meant."

13          **MR. KESSLER:**  And, Your Honor, again, I think you're

14    ready to rule, but the statement of New York law is not

15    correct.  I'm reading, for example, from the leading New York

16    case, which is the International Business Insurance case.  And

17    it says:

18          "At least with respect to a negotiated

19    agreement, a party's subjective understanding, while not

20    controlling, may shed light on the state of those negotiations

21    that could bear on that party's objective actions."

22          And this was unexpressed subjective intent.  So we

23    believe New York law is the same.

24          **THE COURT:**  I have a different question.

25          Ms. Naylor, right?  Ms. Naylor, on the -- focusing

1  now on Exhibit -- I guess it's 28.  And it's a license

2  agreement that is effective March 1, 2005, with

3  Electronic Arts.  It begins:

4            "This agreement is made and entered into this

5  8th day of December, 2004."

6       Do you know the agreement I'm referring to?

7       **MS. NAYLOR:**  Yes, Your Honor.

8       **THE COURT:**  All right.  Now, look under paragraph 1A.

9  It says:

10            "Players Inc represents that it is a licensing

11 affiliate," et cetera.

12      And it has this clause that:

13            "The NFLPA has been duly appointed and is Acting

14 on behalf of the football players of the National Football

15 League who have entered into a group licensing authorization,

16 either in the form attached hereto as Exhibit A, or through the

17 assignment contained in paragraph 4B of the NFL player

18 contract."

19      Stop there.  There's a second sentence later on in

20 the paragraph which has significance, too, but I want to focus

21 just on that sentence and the reference to attachment A.  All

22 right?

23      Now, unlike many of these other things that you gave

24 me yesterday, this one does have attachment A.  Many of them

25 are missing the attachment A.  But this one does have

1    attachment A.

2              And it's entitled:

3                   "NFL Players Association Group Licensing

4    Assignment."

5              And it has a Bates number.  Looks like "PI," and a

6    bunch of zeroes, and then "70."

7              Do you see the agreement?

8              **MS. NAYLOR:**  I do, Your Honor.

9              **THE COURT:**  And just as an aside, it says:

10                  "It shall be construed under New York law."

11             So, then, in addition, the -- the -- so does the

12   Electronic Arts agreement.

13             Anyhow, that's not my question now.  My question is:

14   As I -- you are contending that that attachment A is for active

15   players.

16             **MS. NAYLOR:**  That's correct.

17             **THE COURT:**  So in your view, the first sentence

18   refers to active players.

19             **MS. NAYLOR:**  That's correct.

20             **THE COURT:**  So then, the -- in order for this to

21   cover retired players under the GLA, you have to rely on the

22   second sentence, correct?

23             **MS. NAYLOR:**  That's correct, Your Honor.

24             **THE COURT:**  All right.  So then, the second sentence

25   says:

1              "Licensee acknowledges that Players Inc also on

2  occasion secures authorization for inclusion in Players Inc

3  licensing programs for players, including, but not limited to,

4  retired players, who have not entered into such group licensing

5  authorization, but who nevertheless authorize Players Inc to

6  represent such players designated Player Inc licensed

7  programs."

8              So your view of that is that the group licensing

9  authorization phrase "Such group licensing authorization" means

10 that the form -- since, in your view, attachment A applies only

11 to active players, the phrase "Such group licensing

12 authorization" would not exclude the possibility of group

13 licensing authorization for retired players.

14         **MS. NAYLOR:**  Your Honor, we --

15         **THE COURT:**  If you want to rephrase it in your own

16 words -- I didn't do a very good job -- so you can say it

17 yourself.

18         **MS. NAYLOR:**  Just so I want to be clear that I'm

19 understanding you.  The "Such group licensing authorization" is

20 referring back to the GLA in the first sentence.

21         **THE COURT:**  I think that's your argument, isn't it?

22         **MS. NAYLOR:**  Yes.

23         **THE COURT:**  All right.  And -- all right.  Okay.

24         Now, Mr. Kessler --

25         **MR. KESSLER:**  Yes.

1            **THE COURT:**  -- do you agree that attachment A is only

2    for retired players?  I mean, only for active players?

3            **MR. KESSLER:**  Absolutely, Your Honor.  And in the

4    second sentence, it's very -- we believe the correct

5    interpretation is, and everyone's understanding and by conduct,

6    is the second sentence referred solely to ad hoc agreements

7    which could be entered into by either retired or active

8    players.

9            Now, how do I know that?  Because the second sentence

10   does three important things.  First of all, it says "On

11   occasion."

12           Second of all, it says "For designated programs."

13           There is no retired group licensing authorization

14   that is for designated programs.

15           The only retired player group licensing authorization

16   that's in evidence is for all programs, has no "designated

17   program," and it's not "on occasion."

18           Second of all, there are active players who also on

19   occasion sign ad hoc programs.

20           Mr. LaVar Arrington, for example, refused to sign an

21   active player GLA.  He also struck out the language of 4B in

22   his NFL player contract that you asked for.

23           So the only way Mr. Arrington would ever be included

24   would be in an ad hoc program.

25           What the second sentence refers to is the ad hoc

1  programs.  And what we believe -- and, again, we understand

2  Your Honor believes this is ambiguous, and that's why we should

3  get our parol evidence -- is that a grant of license at the

4  very bottom of the page, where it says it's licensing the

5  rights of the NFL players referenced above.

6           NFL players are the players in the NFL.  It doesn't

7  say "of the retired players."  It doesn't say "of the past or

8  present players."

9           It says "of the NFL players," which corresponds in

10  the first sentence to "the football players of the National

11  Football League."

12           And, in fact, what Mr. Linzner testified to, which we

13  believe is admissible, is that he understood that the word "NFL

14  players" in the bottom of this referred to the players, the

15  football players in the National Football League in the first

16  sentence.

17           **THE COURT:**  You go way beyond what I asked.

18           **MR. KESSLER:**  I'm sorry, Your Honor.

19           **THE COURT:**  So all right.  Now, 4B, as referenced in

20  the first sentence -- I'm assuming, but no one bothered to give

21  it to me -- what does it provide?

22           **MR. KESSLER:**  Your Honor, here it is.  It is the NFL

23  active player contract attached to the collective bargaining

24  agreement.  4B is an active player licensing authorization of

25  that NFL player contract.  It only can be an active player.

1              **THE COURT:**  Do you agree that that's what it is,

2    Ms. Naylor?

3              **MS. NAYLOR:**  Yes.  We think that Exhibit A and the 4B

4    of the NFL player contract apply to active players, and that we

5    are included in the second sentence that talks about the other

6    program, the other GLAs.

7              I would like to respond to his points.  He's raised

8    some unreasonable interpretation of that second sentence.

9              And I would also like to point out the grant of

10   license is for the NFL players referenced in paragraph 1A

11   above, which includes retired players.  And he's trying to make

12   1A -- he's trying to define "retired players" to mean not

13   retired players.

14             That's just an unreasonable interpretation.  It

15   doesn't create an ambiguity in this case.  And his evidence is

16   the testimony during this lawsuit of the subjective intent of

17   the defendants and the third-party licensees.

18             **MR. KESSLER:**  Actually, Your Honor, what the issue is

19   she's trying to define "NFL players" to include retired

20   players.  That's the ambiguity.  That's the key issue.

21             **MS. NAYLOR:**  It's defined in the grant of licenses:

22                  "The NFL players referenced in paragraph 1A

23   above."

24             **THE COURT:**  The Court is ready to rule.  And I want

25   to say that I have considered quite a lot of material that has

 1   been submitted in repeated cascades of memoranda and briefs and

 2   argument on two occasions now.

 3              The issue is whether the -- the extent to which we

 4   allow any parol testimony to explain what Exhibit 28 and others

 5   that are somewhat similar form to it, what the intent was.

 6              Now, I want to first of all say I read every one of

 7   these contracts yesterday in the booklet that was given to me

 8   by the plaintiffs.

 9              I don't know why, but quite a number of them the

10   attachment A just wasn't there.  Just wasn't there.

11              And so -- but I did find one that it did have it, and

12   that's the one I've been referring to.

13              So I think I, nonetheless, understand the issue.  I'm

14   going to go ahead and rule now.

15              As a sideshow here, in the event the Ninth Circuit

16   ever reads this, it ought to be clear that these agreements --

17   these are now the third-party agreements.  They are not the

18   GLAs themselves.  These are the license agreement between the

19   defendants and EA.  They refer to being construed by New York

20   law.

21              Now, the parties in this case, however, have

22   stipulated -- and I'm going to hold them to it -- that this

23   contract is going to be construed by D.C. law.

24              And if you go back and look at the briefs, I'm not

25   going to let them wiggle out of it now, because they briefed it

 1   based on D.C. law.

 2              I raised myself yesterday when I read these:  Why

 3   does D.C. law govern if they said New York law would govern?

 4              Well, I don't know why you stipulated to it, but you

 5   did, and you're stuck with it.  We're not going to go deviating

 6   into New York law.  So just don't go there.

 7              Now, I want to turn to the merits of this.  It takes

 8   a bit of effort to put your finger on what the right issue here

 9   is.

10              Both sides, I finally figured out, agreed that the

11   first paragraph that we referred to here that refers to

12   attachment A, both sides agree that that is referring only to

13   active players.

14              Now, conceivably you could have had an argument that

15   the reference to GLAs were to retired or active, and that the

16   attachment was kind of a general exemplar, and maybe try to

17   shoehorn the retired GLA in under attachment A.

18              But the plaintiffs have given up that argument, so

19   they agree that paragraph 1A, first sentence, only covers

20   active.

21              So then, the question becomes:  Well, how about the

22   next sentence?

23              The Court finds that that sentence is ambiguous and

24   is susceptible to two possible readings.  These alternatively

25   have been placed on the record.  Let's focus on a few points.

1          It says:

2               "Licensee acknowledges that Players Inc also on

3     occasion secures authorization for inclusion in Players Inc

4     licensing programs for players, including but not limited to

5     retired players, who have not entered into such group licensing

6     authorizations."

7          Now, if the first sentence already picks up all the

8     actives, why are we referring to the actives again?  Because it

9     says:

10               "Including, but not limited to retired players."

11          So that to my mind is referring something to do with

12     retired and active players.

13          So if the active players are referred to in that

14     second sentence, we know that they've already entered into the

15     group licensing authority, either as attachment A or in the

16     paragraph 4B.

17          So what is this referring to?  Well, one possibility

18     is that it's referring to ad hoc programs, maybe.

19          Another possibility is what plaintiffs say, which is

20     that this is referring to -- the second sentence is referring

21     to retired players who have not entered into a group licensing

22     authorization used with active players.

23          And they, instead, entered into a group licensing

24     authorization used for retired players.

25          So, without expressing at this point any views on

1  which version I think, without hearing any further evidence

2  would be correct, the Court is of the view that this agreement

3  is susceptible to ambiguity on those critical sentences.

4           Now, in addition I have read the rest of this.

5  There's some paragraphs later on, paragraph 12, paragraph 13,

6  that possibly bear on this issue.  But it's not conclusive

7  enough to say that it's unambiguous.

8           So without any question, the correct answer is

9  that -- is that some parol evidence is certainly authorized to

10 come in.

11          Now, we turn to how much parol evidence can come in?

12 For the most part, there's not any disagreement on some aspects

13 of the evidence that can come in.  I think we are all familiar

14 with the basic rules of construction that things like course of

15 dealing, course of conduct, the practical construction of the

16 parties, usually is given great weight in the way in which an

17 ambiguity is resolved.

18          For example, if there is a landlord-tenant agreement,

19 and there's an ambiguity in it, but for two years the parties

20 acted as if whatever ambiguous clause that covered or did not

21 covered something, then at the end of that time period the

22 parties have given a practical construction to the ambiguity.

23 And why should a court rule any differently?

24          So that's one area that without any question the

25 parties should be allowed to put in a course of dealing.

 1          Another clear-cut item would be expressed

 2  communications at the time.  For example, if during the

 3  negotiations one of the parties said:

 4               "Well, we don't need that clause because this

 5  doesn't cover that, anyway."

 6          And if that were said during the negotiations that

 7  might help explain how a particular clause did or did not get

 8  in there.

 9          That would be part of the expressed intentions of the

10  parties.

11          Now, the part that is most in controversy is

12  unexpressed subjective intentions at the time.

13          Now, the law in the District of Columbia to which

14  both sides have stipulated governs this issue seems to go

15  further toward allowing subjective intentions at the time, even

16  if unexpressed, to be admitted into evidence, despite the fact

17  that the traditional law that I'm more familiar with here in

18  California would normally bar that, because of the objective

19  theory of contracts.

20          That is that the contracts are to be construed

21  according to the objective events.  And the objective events

22  would, of course, include the expressed intentions of the

23  parties and the course of conduct of the parties and the course

24  of dealing after the contract was entered into.

25          But what the law in the District of Columbia seems to

 1  allow is that the parties to the contract can testify to what

 2  their subjective intents were at the time.

 3          It may be, for example -- only as an example --

 4  helpful to know the subjective intent to help explain why

 5  something was drafted as it was or why a party acted as they

 6  did.

 7          In this case, the proffer is by defendants to the

 8  effect that they would not have entered into these ad hoc

 9  agreements, or other agreements on retired players, if they had

10  known all along that they had already tapped into that treasure

11  trove of licenses.

12          So the Court is going to allow subjective testimony

13  that speaks to the time in question.  What will not be allowed

14  will be answers phrased or questions phrased in the present

15  tense.

16          So if you asked somebody in a deposition:

17          "What does this mean?"  And they say:

18          "It means active players," that is inadmissible.

19          The proper question is:

20          "At the time you signed the agreement, did you have

21  an understanding of whether it covered active versus retired

22  players?

23          **"ANSWER:**  Yes.

24          "What was your understanding then?

25          "It covered only active players."

1          Even though it was subjective and unexpressed, the

2    Court is going to allow that line of questions.  But the

3    foundational requirements are that they actually thought about

4    it at the time, that they had a subjective intent at the time,

5    and that they can remember that they had that subjective intent

6    at the time.

7          Now, in reading some of the Linzner materials, you

8    came very close to violating that rule.  So some of these --

9    however, for the most part I think what Linzner said is okay.

10   I've got to find it.

11         Just a moment.

12         All right.  I have the -- now, so that is the main

13   ruling on the main issue.

14         Now, I'm turning to a related issue, the deposition

15   of Joe Linzner.

16         The only objection that was made by plaintiffs is the

17   parol evidence rule.  That objection is overruled.  Other

18   objections might have been made to somewhat argumentative

19   answers on a few occasions.  But no objection along those lines

20   was made, so I don't have to deal with it.  Those are now

21   waived.

22         So the -- this witness, by the way, is somebody who

23   negotiated the contracts.  He's not somebody coming along after

24   the fact and giving an idle opinion.  He was somebody who could

25   have had a subjective intent at the time.  And that's what he

 1   says, that he actually -- at various places he says that his

 2   intent at the time was active players only.

 3          So the depositions of Linzner will be allowed, and

 4   the objections that are given to me are all overruled.

 5          I'm going to hand this to LaShonda to give to the --

 6   oh, I'm sorry, to Dawn.  I thought you weren't going to be here

 7   today.

 8          **THE CLERK:**  No, just yesterday.

 9          **THE COURT:**  And then, she will give that to the

10   parties.

11          All right.  That's the answer for you on that one.

12          While we're on the subject of depositions, I'm giving

13   you back Mr. Zucker.  That objection is overruled.

14          Now, one thing I will say is that at the time I

15   instruct the jury on how to interpret the contract, the Court

16   may have -- at that point I will have heard all the evidence.

17   And the Court may, as I'm entitled to do, comment on the

18   evidence.

19          For example, if I think one side or the other is

20   trying to pull the wool over -- using technical language or

21   whatever, to pull the wool over the eyes of the jury I'm going

22   to do what I haven't done in nine years, I'm going to comment

23   on the evidence.

24          But we'll see.  I am not to that point yet, so we'll

25   just have to wait and see.

1          All right.  Now, I'm going to turn to a different

2   subject.  I'm going to turn to the issue of -- issue of the

3   Exhibit 1184.

4          The Court heard argument on this once in connection

5   with the motions in limine at the final pretrial conference.

6          The Court is not entirely satisfied with the

7   materials and wanted more information, so supplemental briefing

8   was allowed.

9          The Court has now read that and is prepared to make a

10  ruling on the extent to which 1184 will be admitted into

11  evidence.

12         I did read both sides' submissions.  So I'm just

13  going to go ahead and rule, unless there's some burning thing

14  that you have to say.

15         **MR. HUMMEL:**  I have nothing burning.

16         **THE COURT:**  All right.  Here we are.

17         This is, again, in connection with Exhibit 1184.  The

18  issue is whether part of an e-mail chain, as set forth in trial

19  Exhibit 1184, is admissible.

20         Exhibit 1184 covers a series of e-mails involving

21  Jeremy Strausser at Electronic Arts and the so-called

22  scrambling issue.

23         The main objection is to the -- to certain e-mails in

24  the afternoon of August 8th, 2005.

25         As to the earlier e-mails, up to 11:52 a.m. from

1  LaShun Lawson of Players Inc, all of them were either from

2  Ms. Lawson or were to her on the same subject.

3          Since she is a defendant employee working within the

4  scope of her employment and authorized to speak for the

5  defendant on those issues, the -- those particular e-mails by

6  her would be party admissions and sail into evidence.

7          As to the ones that were directly on the same

8  subjects, to and from her, to and from her -- I'm not talking

9  about the controversial part of it -- those would be at least

10  admissible to prove up the transaction to which she was

11  responding.

12          So the Court will allow all of the e-mail chain up to

13  11:52 a.m. in evidence.

14          Now, as for the e-mail mainly in controversy, it is

15  from Electronic Arts' Jeremy Strausser and sent in-house at

16  Electronic Arts to other people at Electronic Arts.

17          Now, Electronic Arts is not a party in this case.

18  And that particular e-mail is not a party admission.  And I

19  want to stress, again, never sent to any defendant.

20          Now, I want to read to you what it says for the

21  record.

22          This particular one is from Jeremy Strausser to

23  Jeffrey Luhr, L-U-H-R, and someone named Ryan Ferwerda,

24  F-E-R-W-E-R-D-A, dated August 8, 2005, 2:58 p.m.

25          "Subject:  NFL record book in Madden question."

1              Mr. Strausser purportedly says:

2                   "They" -- which I take to mean Players Inc --

3    "They said 'no' to this despite my attempts to convince them

4    otherwise.  They" -- again, subject to interpretation, but I

5    suspect it means Players Inc -- "They have taken a hard line on

6    no retired players in the game in any form."

7              All right.  This is not a party admission and is not

8    admissible.  There are two levels of hearsay involved.  This

9    ruling assumes, however, that one level would involve a party

10   admission.

11             But the second level is the hearsay of the e-mail

12   itself.  The e-mail would be offered to prove the truth of the

13   statements I just read into the record.  Namely, that

14   defendants said "no" to the proposal.  And more than that, said

15   "no," despite attempts to convince them otherwise.

16             And even more than that, said "no" and have taken a

17   hard line -- or "had taken a hard line on no retired players in

18   the game in any form."

19             Since this statement is offered for the truth and,

20   indeed, it would have no relevance whatsoever otherwise, it is

21   hearsay.

22             So now we need to turn to section 8036, records of

23   regularly conducted activity.  That's an exception to the

24   hearsay rule.  Does it apply?

25             The answer is no.  Or at least it hasn't been shown

1    to apply.

2          All right.  It is true that electronically-stored

3    information can qualify under 8036.  That's not the issue, and

4    That's not the problem.

5          Even treating the e-mail as a memorandum within the

6    meaning of 8036, it has not been shown that it was the regular

7    practice of EA and Strausser to make such a memorandum to

8    record the results of telephone calls in circumstances like the

9    telephone call, assuming it took place, between Ms. Lawson and

10   Mr. Strausser.

11         In this connection, it is interesting that an earlier

12   e-mail in the very same chain -- are you done over there?  Are

13   you ready to listen?

14         **MR. LECLAIR:**  Sorry, Your Honor.

15         **THE COURT:**  Thank you.

16         In this connection an earlier e-mail from LaShun

17   Lawson to Mr. Strausser, asked him to give a call to discuss

18   something.  But there is no contemporaneous e-mail from him or

19   memorandum summarizing the call.

20         This circumstance indicates that it was not the

21   regular practice to make such a record of any such telephone

22   calls.

23         Indeed, a month later in the same e-mail chain

24   Mr. Strausser wrote back to Lawson an e-mail and referred to

25   the telephone call a month earlier and said that she had said

1  that she wanted to discuss the matter internally.  But that

2  e-mail a month later was not a contemporaneous recording.

3          Now, beyond all of the foregoing, Rule 8036 requires

4  that the business records exception be proven up by the

5  testimony of a custodian or other qualified witness.  No such

6  testimony is here offered.

7          I want to be clear on that.  You have no deposition

8  of Mr. Strausser.  You have no deposition of somebody from

9  Electronic Arts vouching for any such practice within the

10 company.

11         Plaintiffs chose not to depose Mr. Strausser or to

12 bring him here to trial.  I don't know why.  I asked about that

13 earlier and was not given to my mind a satisfactory answer.

14         But I am not here to question the strategic choices

15 made by counsel.

16         The fact is the foundation has not been shown for

17 8036.  As to 8031, which involves present sense impressions, it

18 has not been shown that the declarant made the statement

19 immediately after or while perceiving an event.  In other

20 words, it's not a present sense impression.  The closest part

21 of this that would even come close, but is not good enough, is

22 the part where he says:

23             "They said 'no.'"

24         But that's not really the part that counsel wants in

25 evidence.  The part counsel wants in evidence is the part

 1  about:

 2              "They have taken a hard line despite my attempts

 3  to convince them otherwise," and so forth.

 4         And even if by a stretch you could say the "no" part

 5  was within some short time period after the telephone call, the

 6  rest of that they have taken a hard line on "no retired

 7  players," that -- that is not limited in time to something that

 8  happened immediately preceding.

 9         So, therefore, for all those reasons, the -- the --

10  that aspect of the Strausser e-mail that says "They said 'no,'"

11  and so forth, is absolutely excluded, unless for some reason

12  the door gets opened by or you find some other way to get it --

13  lay the foundation to get it into evidence.

14         But right now it's excluded.  You have not laid the

15  sufficient foundation.

16         Now, what that also means is the other two on that

17  same page, precise is the 4:09 p.m. and the 1:44 p.m., also

18  dated August 8, those are all in-house at Electronic Arts.  And

19  those are not going to have any meaning without the one in

20  question, so those will be excluded, as well.

21         All right.  That's the ruling on that.

22         Now, can you give me the -- so I can rule on it in

23  due course, I have received another memorandum.  This time a

24  letter about the Friss deposition, but I never got it back.

25         **MR. HUMMEL:**  Your Honor, I have it here.  Pursuant to

1  what we said yesterday, we've gone through it.

2          This is your copy.  What we did was we tabbed in red

3  what you've ruled on.  The blue ones are the new objections

4  that you haven't ruled on yet.

5          **THE COURT:**  All right.  Well, I may revise some of my

6  rulings, anyway.

7          **MR. HUMMEL:**  I understand.

8          **THE COURT:**  Now that I understand what you're doing

9  and I have the benefit of that letter.

10         All right.  I have now gone over everything on my

11  plate.  I'm ready to bring the jury in and hear the opening

12  arguments.

13         **MR. KESSLER:**  Your Honor, two very short subjects.

14         One is that we anticipate when they call Mr. McNeil

15  today, who is their first witness, because they have given us

16  the documents pursuant to the Court's order, that they are

17  going to try to put into evidence versions of the Madden EA

18  game from what's called the 2003 game that was created in 2002

19  for the 2003 season.

20         We believe that particular game, which was prior to

21  the three-year statute of limitations that now applies, and it

22  could not involve any of the rights here is the wrong games for

23  them to be utilizing.

24         They should be utilizing games in the '04, the '05,

25  the '06, the '07.

 1          The reason they have chosen the '03 game is unlike

 2   the games during the statute of limitations, some of the

 3   numbers on the players' uniforms, the retired players, they

 4   argue, are the same, while they concede they are all different

 5   during the statute of limitations period.

 6          It's going to be very confusing to the jury to use

 7   any of the games pre statute of limitations period.  And we,

 8   therefore, think they should only be able to use the games that

 9   are during the period, which are the only things that can be at

10   issue in this case.

11          **MR. HUMMEL:**  Thank you, Your Honor.

12          Your Honor has just ruled that course of conduct

13   evidence to interpret a contract is relevant.

14          These EA contracts date back prior to 2003 game.

15   Therefore, Your Honor -- and continue through.

16          So how EA actually acted under the contract --

17          **THE COURT:**  All right.  I'm going to rule.  I think

18   you're probably right.

19          **MR. HUMMEL:**  Thank you.

20          **THE COURT:**  You can go into it on cross-examination.

21          **MR. KESSLER:**  Very good, Your Honor.  One last point.

22   I'm sorry, but this is for the jury.

23          There was regrettably a news story today on the local

24   ABC television network.  And what we're concerned with, there

25   were two very disturbing things in that news story.

1          One is from somewhere the news story primarily

2     focused on the EA Hall of Fame evidence that Your Honor

3     excluded, and said that's what the case is about, and described

4     it in some detail.

5          I don't know where they got that from, Your Honor,

6     but I'm concerned about evidence you specifically excluded

7     beforehand going into the other side.

8          There also was a reference to plaintiff seeking

9     $250 million in punitive damages, which I assume they had to

10    get from the plaintiffs' side, because they haven't even made a

11    demand in this case with respect to that.

12         So I am both concerned about the information that

13    might be coming --

14         **THE COURT:**  Have any of the lawyers on either side

15    been talking to members of the press?

16         **MR. KESSLER:**  Your Honor, I was asked coming out, and

17    I said:

18              "We believe the case has no merit.  It's

19    inappropriate to comment on anything else."

20         That was my comment.  But something is coming out the

21    other side.

22         **THE COURT:**  How about on your side, Mr. Katz?

23         **MR. KATZ:**  Yesterday afternoon, Your Honor, when we

24    came out of the court, there was TV crew there.  And I believe

25    that both sides spoke to them.

 1          THE COURT:  Well, how about from now on let's not
 2  talk to the press?
 3          MR. KATZ:  That's fine, Your Honor.
 4          THE COURT:  On both sides.  That includes all of the
 5  retired players.  That includes -- nobody ought to be -- no one
 6  that you can control ought to be talking -- every class member
 7  should not be talking to the press.
 8          MR. KATZ:  Your Honor, I have advised them of this.
 9  We have no problem with this.  But there's a lot of information
10  out there.  The press is very interested in this case.
11          The particular information that Mr. Kessler is
12  referring to, I don't know where the press got it.
13          MR. KESSLER:  Your Honor, they didn't get it from
14  defendants.  And we will adhere to your instructions.
15          THE COURT:  In the future -- this is a direct order.
16  No more talking to the press.
17          If you want your lawsuit, fine.  If we have to
18  declare a mistrial, we're not going to try this case for a long
19  time.
20          You have a day in court ahead of a lot of other
21  people that are out there in the hallway waiting for their day
22  in court.
23          You want to try the case in the press, fine.  Then,
24  I'll dismiss the jury, and you can go talk to the press all day
25  long.  Do whatever you want.

 1          But if you want your day in court, let's have a fair

 2  trial and not try to infect this jury with press releases.

 3          **MR. KATZ:**  There was no press release, Your Honor.

 4          **THE COURT:**  No talking.  Zero from now on.

 5          I didn't have any gag order in place, so I guess it's

 6  okay.  But from now on, no talking to the press by the class

 7  representatives, by the lawyers.

 8          **MR. KATZ:**  Mr. Kessler has sent out several press

 9  releases.

10          **THE COURT:**  Mr. Kessler, please stop it.

11          **MR. KESSLER:**  Your Honor, I am not going to be

12  talking to the press at all.

13          **MR. KATZ:**  He has sent out several press releases.

14          **THE COURT:**  No more press releases.

15          **MR. KESSLER:**  Your Honor, that is not correct.

16          **MR. KATZ:**  It is correct.

17          **MR. KESSLER:**  Okay.  Your Honor --

18          **MR. KATZ:**  I can show them to you.

19          **MR. PARCHER:**  Excuse me.

20          **THE COURT:**  It's all history now.

21          **MR. KESSLER:**  Thank you.

22          **THE COURT:**  Don't do it again.

23          Yes, sir.

24          **MR. PARCHER:**  If I may, Your Honor.  I don't mean to

25  double team here.  We don't control the class members who are

1  not here.  We can tell them that, but, I mean, I don't know

2  where this information came from.

3          **THE COURT:**  Why don't you tell them that the Court --

4          **MR. PARCHER:**  We will.  We will.

5          **THE COURT:**  -- says if this infects the jury there's

6  going to be a mistrial, and this case will have to stand in

7  line again, and it's 18 months away.

8          **MR. PARCHER:**  Absolutely.  Absolutely.  But I need

9  to --

10         **THE COURT:**  You have to do a lot more -- I know you

11 can control them.  If you can't control them, you have a lot of

12 influence with them.  You're their lawyer.

13         **MR. PARCHER:**  Excuse me, Your Honor.  I agree with

14 you.

15         What I'm concerned about is there seems to be an

16 imbalance in your impression as to what occurred here.  I've

17 been reading the press assiduously, and Mr. Kessler has been

18 working this press from the beginning of the case until this

19 very moment.

20         He's been telling them --

21         **THE COURT:**  Not anymore.

22         **MR. PARCHER:**  -- "No good deed goes unpunished.  They

23 want something for nothing."

24         **THE COURT:**  Not anymore.  It's going to come to a

25 stop.

1              **MR. PARCHER:** That's good. I just want an even -- I

2      want an even impression before this court as this case goes

3      forward.

4              I understand a gag order. I haven't spoken to the

5      press at all. Didn't intend to.

6              **THE COURT:** There are a lot of lawyers over there.

7              **MR. PARCHER:** Okay. I understand that.

8              **THE COURT:** Where did "250 million" come from?

9              **MR. PARCHER:** I have no idea in the world. None,

10     zero. As an officer of this court, that's what I tell Your

11     Honor.

12             But I will say this, right? Mr. Kessler has been

13     working this press assiduously from the beginning of this case

14     until a moment ago.

15             **THE COURT:** Mr. Kessler, if you've been doing that

16     you are ordered to stop, and everyone on your side is ordered

17     to stop.

18             **MR. KESSLER:** Your Honor, there is nobody on this

19     side who will speak to the press. And Mr. Parcher should be in

20     the case for more than five minutes before making those

21     comments.

22             **THE COURT:** And, moreover, no more press releases,

23     too.

24             All right. Let's bring in our jury.

25             **THE CLERK:** Okay.

1          (Thereupon, the jury returned to the courtroom.)

2          **THE COURT:**  Welcome back.  Please have a seat.

3          Thank you for being on time.  I'm sorry we're running

4   a little later.  I promised you we always start by

5   8:00 o'clock, and here I violated my own rule.

6          Let me ask you a question:  Have any of you seen any

7   press stories about this case?

8          (Jurors shake heads negatively.)

9          **THE COURT:**  All right.  So if you happen to be in a

10  room and some TV is droning on about this case, turn it off or

11  walk out of the room.  Don't pay any attention to it.  Please

12  don't even put us in a position where we have to hold an

13  evidentiary hearing to find out what you heard.

14         So I'm going to -- I know you'll all do the right

15  thing and keep yourselves as pure as possible for deciding this

16  case.

17         All right.  Now, we're going to have the opening

18  statements in a minute, but since we're starting off I have to

19  give you some instructions here.  And it won't be long.  It

20  will be five minutes worth of kind of do's and don'ts and

21  pointers on what to look for and what not to look for.

22         What is your main job?  Your main job is to decide

23  the case.  And another main job you have is to decide what the

24  facts are.

25         If one of these sides says:  "Well, this is what we

1  did," and the other side says:  "No, you didn't do that,"

2  you've got to decide.  It may be important to your decision

3  who's telling the truth, or whether somebody is just innocently

4  mistaken or whatever.

5          You are the one that decides the facts.  If somebody

6  says:  "The light was green," and the other one says:  "The

7  light was red," that's for you, not for me.

8          My job, though, is to tell you what the law is.  And

9  that's hard enough.  I'm glad that that's all I have to do.

10  But I have to figure out what the law is.  And I will tell you

11  at the right time when you need to know it what the law is.

12          And then, what you wind up doing is you lay the facts

13  alongside the law in the jury room when you deliberate.

14          And you see the party with the burden of proof has

15  proved what they've got to prove.  That's kind of what it comes

16  down to.  Okay.  So that's your job.

17          Now, nothing that I'm ever going to say is trying to

18  indicate to you which way you ought to come out on your

19  ultimate verdict.  That's for you to decide.

20          Okay.  The evidence from which you will decide what

21  facts are -- remember, you decide the facts.  But where do you

22  get those facts?  This is real important.  You get them from

23  the witnesses who are under oath.  They take an oath to tell

24  the truth.

25          They will be sitting in this chair (indicating), and

1    we always put the chair closest to the -- see how close you are

2    to the witness?  It's not over here.  You wouldn't be able to

3    see them very well.

4            We want you to see them as close as anybody in the

5    courtroom to see if you think from their demeanor you think

6    they are telling the truth.

7            So witnesses go there.  They take an oath, and

8    they're sworn to tell the truth.  So that's evidence.

9            You're also going to have documents that will be

10   admitted into evidence.  There will be contracts.  There will

11   be -- all kinds of material will be put into evidence for you

12   to also assess as we go along.

13           So those will be the two main things.

14           There will be some stipulations now and then,

15   stipulations by the lawyers that a certain fact is true, or

16   whatever.

17           Let me tell you what is not evidence.  This is

18   probably just as important -- in fact, more important -- than

19   what I just told you.

20           Now, we have some excellent lawyers to present this

21   case.  But what they say is never, never evidence.

22           They are, for example, going to give you an opening

23   statement in a minutes.  That's what they hope to prove or what

24   they expect the evidence is going to be, but that's not the

25   same thing as the evidence.

 1          Even more than that, you will be hearing the lawyers

 2   a lot more than anybody else, a lot more than me and more than

 3   the witnesses.  And they will be standing there asking these

 4   questions back and forth.

 5          Question, answer, question, answer.

 6          And sometimes the jury gets confused over what --

 7   confused as to what the lawyers said in the question with what

 8   the answer actually was.

 9          Let me give you a classic example.  It happens all

10   the time.  The lawyer might say:

11              "Well, isn't it true the light was red?"

12          And the witness says:

13              "I don't remember."

14          Now, then you get back in the jury room and you start

15   thinking in deliberations:

16              "You know, somebody out there said the light was

17   red."

18          And then, you say:

19              "Yeah, the light was red."

20          There's no evidence of that.  It's just the lawyer

21   talking.

22          Now, if the witness says:

23              "Yeah, the light was red," or says "Yes," then,

24   of course, that means the witness is saying the light was red.

25   That's okay.

1        I'm telling you in every trial -- these are excellent

2   lawyers.  They are not going to try to trick you.  I'm not

3   suggesting that at all.  What I'm trying to say is in doing

4   their job they're going to be asking question after question

5   after question, planting ideas before you because they expect

6   what the witness is going to admit or deny, I don't know

7   exactly.  But they will be acting in good faith.

8        But you must always distinguish between what the

9   lawyers say in their questions versus what the witness actually

10  admits to or says in their answer.

11       I will remind you about this from time to time.  But

12  in my judgment this is like one of the top two things the jury

13  needs to keep straight as they go through a trial.

14       All right.  Of course this applies to both sides, not

15  just to one side.

16       Now, occasionally I will tell you that you should

17  disregard something that you heard because I accidentally let

18  it into evidence, and I know you will be able to do that when

19  that occurs.

20       Anything that happens outside this courtroom is not

21  evidence.  If by accident you saw something on the Internet

22  about this case, that would not be evidence that you could

23  consider.  In fact, you would have to tell me about it, anyway.

24       The great thing about a trial is you sit back.  These

25  lawyers will do all the work for you.  And then, you take good

1  notes and think carefully about what you're hearing, and then

2  decide at the end what the evidence means and whether somebody

3  has proven their case or not.

4           You don't have to go out and do homework.  The

5  homework is all done by the lawyers.  And they bring that in

6  here for you to evaluate.  So that's important.

7           All right.  Now, this is a civil case.  It's not a

8  criminal case.  And the burden of proof in a civil case is

9  what's called "preponderance of the evidence."  That basically

10 means more likely than not.

11          There may be some other standards.  Do we have a

12 clear and convincing standard in this case?

13          **MR. KESSLER:**  I don't think so, Your Honor.

14          **THE COURT:**  This is a 51 percent versus 49 percent

15 issue.  It's as not proof beyond a reasonable doubt.  You might

16 have heard about that, and that applies in criminal cases.  But

17 in this kind of a case it's only:  Which side's case is more

18 likely to be true?

19          I'm not going to get into it now, but there are

20 certain issues on which the plaintiff has the burden of proof

21 and certain defenses on which the defense would have the burden

22 of proof.  I'll sort all that out for you at the end.  But it's

23 probably enough for you to know at this stage that there's some

24 issues on which each side has the burden of proof.  At the end

25 you need to keep straight who has the burden of proof.

1        All right.  I want -- I said this before.  I'll say

2   it again.  You cannot discuss this case with anyone.  You can't

3   do any homework about it.  You can't permit anybody to come and

4   talk with you about it.  In fact, even among yourselves you

5   should not talk about the case.

6        And I'm going to include in this when you go back in

7   there don't even talk about the lawyers.  Talk about something

8   else.

9        If this weren't a sports case I would say you could

10  talk about sports.  Baseball would be okay, but not football.

11       You must keep an open mind.  You know, there are

12  always two sides to every story.  And sometimes the most

13  important thing you hear is the first thing you hear, and

14  sometimes the most important thing you hear is the last thing

15  you hear.

16       So you need to keep an open mind until all the

17  evidence is before you.  Then, make up your mind.  Then,

18  deliberate and talk with each other, and make up your mind.

19       I encourage you to take notes, but you're not

20  required to.  That's up to you.  But these notes are for your

21  own personal use.  They are not like group notes.  These should

22  just be for your own personal notes.

23       One thing that I want to point out, the lawyers were

24  good enough to create this timeline.  It's a little hard to see

25  at that distance, but this is something that they both agree is

1    correct.

2              And as the trial goes on -- it's on a couple of

3    easels across the room -- you will be able to glance over there

4    and have that chronology in place.

5              I'm not sure whether we're going to take it into the

6    jury room or not.  Maybe we can arrange for something, but you

7    shouldn't count on that at this point.

8              But that timeline is -- the lawyers have prepared it

9    to kind of help you get into the case and keep a time frame

10   before you.

11             It is important to point out what's going -- you're

12   going to have at the end.

13             You know, we have this excellent court reporter here

14   making a transcript, ultimately.  That's for appeal.  You won't

15   have any transcript.  Many jurors think there's going to be a

16   transcript of the evidence in the jury room.

17             I'm sorry to say there won't be.  So it will be your

18   notes and your memory of what happened.

19             If you wanted a readback I could help you do that,

20   but it usually takes about an hour to find what it is that you

21   wanted to have read back.  So it's not a very easy thing to do.

22   So keep that in mind.

23             Basically, when you're deliberating at the end you're

24   going to have your memory, you're going to have your notes,

25   you're going to have a copy of my instructions that I will give

1  you at the end of the case.  And you'll have boxes of documents

2  that the lawyers put into evidence.  That's it.

3          Then, your job will be to sort through that and

4  decide the case.

5          Of course, you would also have the verdict form in

6  there.

7          If you want during the evidence -- let's say you had

8  a burning note, a question in mind that you want to have the

9  witness answer.  Then, you write it out on a piece of paper.

10 Put your name on there.  Give it to Dawn.  She'll give it to

11 me.

12         I will share it with the lawyers, and the lawyers

13 will try to work it into their examination.

14         If you were to ask some question like:  "Well, is

15 there insurance in this case?" that would be a totally improper

16 question.  We don't consider things like that.

17         You've got to decide the case on the merits, not on

18 whether somebody has got insurance or not.  That would be an

19 improper question, and I would not allow that one.

20         But in my experience I find the jurors come up with

21 some pretty good questions now and then.  In fact, most all of

22 them are good questions.  So it's up to you.

23         You can sit there through the entire trial and never

24 ask a single question, and that's okay.  But if you want to,

25 don't be hesitant.  Just write it out, give it to Dawn, and

1    we'll deal with it as best we can.

2          Okay.  I told you there were going to be time limits

3    on this trial.  I won't tell you exactly what they are, but I

4    have given you an estimate of when I think the case is going to

5    end.

6          So the reason for the time limits is to encourage the

7    lawyers to get right to the points and so forth.

8          You know, in a trial we have opening statements.  And

9    these are very helpful.  This is the opportunity for the

10   lawyers to tell you what they think they're going to prove and

11   what the evidence is going to show at the end of the case.

12         Now, remember what I told you:  What the lawyers say

13   is never evidence.  So what the lawyers say is never evidence.

14   The only time is when it's a stipulation.  That is evidence.

15   But that's because both sides agree.

16         But you're going to hear the opening statements in

17   just a moment.  None of that is evidence.  Zero.  I'm going to

18   remind you about this a lot.

19         But, nonetheless, in my experience these opening

20   statements are very helpful for you to get a framework in minds

21   of what the lawyers expect you're going to be hearing so it

22   will make more sense to you when it comes in.

23         Each side gets to have a 45-minute opening statement.

24   And then, after that, we're going to get -- we'll probably take

25   a little break and get right down to hearing evidence from

1  witnesses.

2          So at this time, the plaintiff may give the opening

3  statement on behalf of the class.

4          **MR. PARCHER:**  Thank you, Your Honor.

5          **THE COURT:**  Mr. Parcher, proceed.

6          **MR. PARCHER:**  If Your Honor pleases, and ladies and

7  gentlemen of the jury, Mr. Kessler and his team.

8          As you know, I'm Peter Parcher.  I introduced myself

9  to you.

10         **THE COURT:**  A little louder, please.  It's hard to

11  hear you.

12         **MR. PARCHER:**  As you know, I'm Peter Parcher, and

13  I'm one of the lawyers representing the plaintiffs in this

14  case.

15         The Court has told you that what I'm about to say is

16  not evidence in this case.  And, of course, that's absolutely

17  correct.

18         It is what I expect the evidence will show.  And

19  then, Mr. Kessler will get his turn to tell you what he expects

20  the evidence will show.

21         This is what I'll say to you.  If the evidence does

22  show what I expect it to show, then I would hope there will be

23  a verdict in my clients' favor.

24         If it doesn't, it's perfectly acceptable if you reach

25  the conclusion that I haven't delivered on what I'd expect to

1    show, just stick it to our side here.

2            This is an even-handed battle.  Somebody is going to

3    win here, and somebody is going to lose.

4            This is what I expect the evidence to show.  I expect

5    the evidence to show that the defendants have engaged in

6    conflicts of interest, deceitful behavior, double-talking,

7    double-dealing, breaches of trust, and have been very unfair

8    and unreasonable and conducted themselves improperly towards

9    their NFLPA members, who are my clients, and the retired

10   players that signed what's called "the group licensing

11   agreement."

12           There's no way to fudge that.

13           This isn't an accident or mistake case, I don't think

14   the evidence is going to show.  Somebody conducted themselves

15   unfairly here.

16           Now, the union is the National Football League

17   Players Association.  I would like to put on the chart -- I'm

18   not too good at this, but I would like to put on the chart the

19   Constitution of the union.

20           (Document displayed.)

21           Can you all see that?  You can see here that what the

22   union is telling its members is that they're paying homage to

23   their predecessors, my clients, retired football players, for

24   their courage, sacrifice and vision.

25           And then, they make a series of pledges and they

1  confirm their willingness.  I will respectfully suggest that

2  what that evidence shows is that what they're telling our

3  clients is:

4              "We're on your side.  We're your union.  We

5  respect you for what you've done, for what you've brought to

6  this, and you can trust us.  We're yours."

7          I would like to put on the board the Web site that

8  the NFLPA puts out.

9          (Document displayed.)

10         This is for everybody to see on the Internet.  I feel

11 like I'm blocking you, and I don't quite know where --

12         **JUROR MS. SMITH:**  A little bit.

13         **MR. PARCHER:**  It's a little herkey-jerky, but, you

14 know, I'm a little herky-jerky.  Sorry about that.

15         And you will see here that what anybody who reads it

16 is being told is Players Inc, which is the licensing -- the

17 Court has said Players Inc is the licensing arm of the union,

18 the NFLPA.

19         It is the licensing arm.  But the evidence will show

20 its mandate is also to be the marketing arm.

21         The evidence is going to show that there's a

22 responsibility on the part of the NFLPA and the union, not only

23 to get licenses if they can for the retired athletes that

24 signed the group licensing authorizations, but to market it.

25 To market it.

1          Some of you, I understand, are in the marketing or

2     media business or have some contact with it.  But everybody

3     ought to understand what that means.  You don't just sit on

4     your hands, the evidence will show, and say:

5               "Do you want these fellows or don't you want

6     these fellows?" if you're aggressively helping them.  Which it

7     says:  We represent over 3,000 retired players, and we've been

8     aggressive in our efforts to expand player marketing

9     opportunities.

10         So what they say to my clients -- eventually you'll

11    see the evidence will show -- if you sign these GLAs, not only

12    are we yours, not only do we have your back, not only are we

13    going to attack you from behind, which the evidence will show

14    is what they did here when we get the Madden game, but we're

15    going to aggressively expand player marketing opportunities.

16         And the evidence is going to show they did nothing,

17    nothing.

18         There's a letter here that Doug Allen -- he is going

19    to be here tomorrow.  As you all know, Gene Upshaw has passed

20    away.  Doug Allen is the number two man or was the number two

21    man in the union, and he was also the president of Players Inc.

22         Let me just be clear about that.

23         The chairman -- excuse me -- the president of the

24    union, the NFLPA at the time, the relevant time, was Gene

25    Upshaw, the man who passed away.  His number two man, his right

1   arm, his executive assistant, was Doug Allen.

2          Players Inc, which the NFLPA formed to do the

3   marketing and the licensing of the ballplayers, because it's a

4   for-profit company, by coincidence/not so coincidence, has as

5   its chairman Gene Upshaw, and has as its president Doug Allen.

6          So this is a letter from Doug Allen to the NFLPA

7   members re GLAs.

8          You'll see the whole thing.  I've got my 45 minutes,

9   so I need to focus on what I need to focus on.

10          (Document displayed.)

11          "Retired players deserve this kind of support

12   from the active players because you built the game in the

13   union.  We live every day by the NFLPA's motto:  'Past, Present

14   and Future.'"

15          So I think the evidence will show that beyond all

16   doubt, beyond all doubt, not just by a preponderance of the

17   evidence, just not 51-49, but what the union was saying to the

18   ballplayers, the retired ballplayers, is:

19          "We are all for one, we are one for all, past

20   present and future, and you can trust us.  Sign the GLAs."

21          All right.  Who is the NFLPA?  I just told you that

22   the NFLPA had Gene Upshaw as its executive director, Doug Allen

23   as its assistant executive director.  And Players Inc had Gene

24   Upshaw as its chairman and Doug Allen as its president.

25          So what happened here?  Quite surprisingly, from our

1   point of view, Doug Allen and Gene Upshaw had a conversation

2   with Doug Allen and Gene Upshaw.

3            And Doug Allen and Gene Upshaw, talking to Doug Allen

4   and Gene Upshaw entered into an agreement signed by Doug Allen

5   and Gene Upshaw.  And that's called the agreement or the

6   license agreement between the Players Association and Players

7   Inc.

8            And by that document what you'll see in the course of

9   the trial the Players Association says:

10           "We'll get the licenses from the ballplayers in

11  the GLAs.  We'll assign them to you and you, Players Inc, go

12  out and market and license these fellows."

13           So Doug Allen and Gene Upshaw, talking to Doug Allen

14  and Gene Upshaw, enter into an agreement.  And the agreement

15  says in pertinent part that the royalties -- excuse me -- the

16  percentage of the gross.  "Gross" meaning, you know, the money

17  that is going to come in from the licensing.

18           And, by the way, hundreds of millions of dollars come

19  in from the licensing, and our clients get zero.

20           Our group license retired players got zero -- not a

21  dollar and a quarter, zero -- of the hundreds of millions of

22  dollars.

23           What it says is that the players will get 37 percent

24  of the group licensing.

25           Now, look.  The evidence is going to show this:  That

1 Players Inc was the agent for the ballplayers.  In the history

2 of the world, could you imagine if we're dealing with

3 fairness -- and "fairness" is a big word in this courtroom.

4 "Fairness" is a big word in this country.  "Fairness" is a big

5 word in this court.

6          In the interest of fairness, can you imagine an

7 agent, if they're dealing fairly with athletes, saying:

8              "We're your agent.  We'll take -- we'll take

9 63 percent of the money when we get your name and likeness

10 licensed someplace.  And we'll give you 37 percent."

11          Wouldn't you think it would be at least the reverse?

12 Wouldn't you think that maybe the agent would say:

13              "I'll take 10 percent or 15 percent?

14 20 percent?"

15          Allen and Upshaw talking to Allen and Upshaw said

16 they're going to take 63 percent and give the players

17 37 percent.

18          And, apparently, by the players, they didn't mean

19 retired players, because the only players who got their

20 37 percent, the only players who got the 37 percent are the

21 active ballplayers.

22          And this is a union.  Union -- I'm not a language

23 scholar, but you don't have to be a Harvard lawyer -- which I'm

24 not, I'm a Brooklyn, New York.  You don't have to be a Harvard

25 lawyer, the evidence will show, to understand that "union"

1  means together.  Together, not separate.  We're in it together.

2          Those of you who are in unions I'm sure understand

3  what I mean.  Those of you who are not, I'm sure, understand

4  what I mean.

5          The evidence will show that what Mr. Kessler's side

6  is going to present -- and it's going to be right through his

7  case -- that this union was separate.  That this union was not

8  all for one and one for all.  That this union was -- and never

9  told anybody.  Never told anybody, which is worse.  That this

10 union, while they were saying "We've got your back, trust us"

11 was, in effect, saying "This is the actives.  This is theirs.

12 This is the retired.  This is theirs" (indicating).  Zero.

13         You know, before our clients signed the GLAs, which

14 is what -- I'm calling group license authorizations "GLAs."

15 It's a habit, but I hope you understand what I'm talking about.

16         Before they signed the GLAs they were heavily

17 solicited by the representatives of the union, the

18 representatives of Players Inc, one in the same.  Same in one.

19         So, for example, Doug Allen, the same Doug Allen has

20 his letter.  And if you read the first and the second

21 paragraph -- we'll just go through the last paragraph there,

22 the paragraph 3.

23             "Help us market retired NFL players and show

24 your support for the NFLPA and Players Inc by signing and

25 returning the enclosed GLA today."

1          And the top one says:

2                "In 1994, the NFLPA created a separate marketing

3    and licensing subsidiary, Players Inc.  Since then, Players Inc

4    has marketed NFL players, active and retired, in a variety of

5    ways."

6                So what's he telling them?

7                "Active and retired.  You're together.  Do your

8    patriotic duty and sign your GLA, and we'll do everything we

9    can to license and market you.  And you'll be in this venture

10   together."

11         That's not what happened here.  That's not what

12   happened here.

13         Now, I want to say something else.  One of the

14   things -- I don't know if the evidence will show that

15   Mr. Kessler or his witnesses will say it here in the courtroom,

16   but one of the themes of this case by the other side has been

17   that these retired ballplayers, nobody wanted them, nobody

18   cared about them, and they're here asking for something for

19   nothing.

20         Now, leaving aside from the fact that they're a

21   union, that they're a -- supposed to be in a togetherness

22   situation, leaving aside that fact, the evidence will show that

23   that's a blatant falsehood.

24         The union and Players Inc got an enormous benefit by

25   the retired players signing the group licensing authorization.

1          There's testimony by Doug Allen in what's called "a

2    deposition" -- I hope everybody knows what a deposition is.  We

3    lawyers, we are asking questions forever of people under oath

4    in conference rooms and stuff until we finally get to have ten

5    people look us in the eye and say:

6                    "This is the way we call it."

7          And you've all agreed you're going to call it the way

8    you see it.

9          So Allen testifies, and he says:

10                    "It's been our experience in the past that the

11   confusion made it more difficult for competitors to secure a

12   reliable, critical mass.  It was procompetitive to be a

13   reliable provider of a critical mass."

14          Now, that's a marketing man's word.  That's a

15   licensing man's words.

16          What it means translated into Brooklynese, what it

17   means translated into Brooklynese is the more people, the more

18   players we get to sign with us, the more important we're going

19   to be.

20          Remember, the union is not in the licensing business

21   when it starts off.

22          You're all Californians.  William Morris is in the

23   licensing business.  Creative Arts is in the licensing

24   business.  Creative Talent Management is in the licensing

25   business.

1          By the way, the evidence will show that those kind of

2    companies that were in the talent agent business would be 10,

3    15 percent people, not 67 percent people, which I believe the

4    evidence will persuade you was just outrageous.  Just

5    outrageous, and certainly was never told to my clients, our

6    clients, the class.

7          But critical mass means if we've got all of you

8    signed, then when a licensee wants to figure out where to go,

9    where should we go if we're Reebok or Electronic Arts or Topps

10   Cards, or whatever it is, where should we go to find out if we

11   can get a group of ballplayers, you know, to be on a

12   commercial, to be on a poster, to be on something advertising

13   our product?

14         Well, where you go is to the company, to the agency

15   that's got the critical mass, that's got the most players.

16         So once Players Inc, or the union, persuades all the

17   guys to trust them and sign up, they become the only game in

18   town.  They become a monopoly.

19         So much so that you'll see the evidence will show

20   when they started to issue the licenses they put into their

21   licenses to the third parties:

22              "Don't you dare interfere with the men that we've

23   signed up," meaning don't even approach them.

24         They became so strong that they could right it up,

25   and:

1                    "Don't go near us."

2              And they needed the retired players to do that.  And

3    you are going to see, if I don't run out of time -- and I may.

4    I talk too much, okay.  But I'm speaking my heart here, you

5    know?

6              Sooner or later they say:

7                    "We don't -- we don't -- we represent them, but

8    nobody wants them.  They're worthless."

9              As they were saying that -- I don't know if I could

10   take it out of context or not, and get up and hold the board,

11   the touchback, the document.

12             As they're saying to the players:

13                   "You're not wanted," they continue to solicit

14   them to sign GLAs.  Why do they continue to solicit them to

15   sign GLAs if they're worthless?

16             You have to go back one, please.

17             (Document displayed.)

18             Okay.  He's telling them there -- I don't know if you

19   can all see it.  Can you?

20             I know I'm blocking somebody, and I'm not even sure

21   where I'm supposed to be standing here.  Very sorry about that.

22             They are most interested in obtaining the licensing

23   rights of active players.

24             He's telling them -- this is late in the game:

25                   "You're not really wanted, guys."

1          Go down to the next paragraph, please.

2          (Document displayed.)

3          In the very next paragraph after he says:

4          "You're not really wanted," "To take advantage of

5   these opportunities it is essential that all retired members

6   sign current group licensing authorizations."

7          This is a 204 or 205 document.

8          So the point I'm trying to make is:  There's an

9   enormous benefit to this union.  They want to argue something

10  for nothing.  This is what I want to argue:  That the evidence

11  will show we got nothing for something.  Not something for

12  nothing.  We got nothing for something.  That's what the

13  evidence is going to show there.

14         And they got themselves a monopoly.  They got an

15  expert.  His name is Noll, Roger Noll.  The evidence will show

16  that Roger Noll explains -- if we can get it on the board.

17              (Document displayed.)

18         That Roger Noll explains that:  If we can get a

19  significant number of retired players, we may well have been

20  important in terms of its announcement, in effect, in the

21  essence -- in the presence of having 2,000 plus retired players

22  having signed GLAs means that a licensee knows that if it wants

23  to deal with retired players, it can call us.

24         So everybody acknowledges that we are giving them

25  something.

1          Now, let's take a look at the GLA, if we can.

2          (Document displayed.)

3          The GLA is going to be for you to interpret.  There's

4   no question in the world Judge Alsup is going to tell you the

5   law -- whatever Judge Alsup says goes.  I think we all agree

6   with that, you were hearing in voir dire.

7          But at the end of the day I suspect what this GLA

8   means is going to be up to you.  Is going to be up to you.  And

9   I pray that you'll bring your own common sense, your own sense

10  of fairness, your own knowledge of right or wrong in the

11  English language into the jury room when you're deciding what

12  the GLA says.

13         The reason I say it that way is you're going to find

14  that no representative of Mr. Kessler's clients ever walked up

15  to any retired player and said:

16              "This is which it means.  It doesn't mean what

17  it says.  It means something different."

18         And if you ever heard double talk, you know, if you

19  ever heard double talk -- they have that word in San Francisco.

20  They have that word in the outlying counties, double talk,

21  doubling dealing.  You know, talking out of the side of your

22  mouth.  Selling you the Brooklyn Bridge.

23         Wait until you hear their explanation for what the

24  GLA means, and why it doesn't mean what it says.  But the GLA

25  very clearly says:  One, sign this, the evidence will show, and

 1  I'll give you the right -- I'll sign this, and I'll give you

 2  the right to use my name, signature, so on and so forth in the

 3  NFLPA retired group licensing program.  That's it.  I'm giving

 4  you a license.

 5          Now, look at the next paragraph:

 6              "Group licensing programs are defined as

 7  programs in which a licensee utilizes a total of six or more

 8  present or former NFL players' images, six or more current,

 9  present or former."

10          Now, that isn't saying to you that what this will

11  mean is if any combination of present or former, all six, all

12  six current ballplayers, all six retired ballplayers, some

13  combination of the two, people that signed the GLA who are

14  retired, people that didn't sign the GLA that are active or

15  back and forth, whatever.

16          As long as you've got six or more present or former

17  NFL players' images in conjunction with or on products that are

18  sold at retail I believe it is respectfully clear beyond all

19  doubt that means that everybody who signed the GLA is going to

20  get paid.

21          They are going to say it doesn't mean that.  Let's

22  hear their explanation.  And remember I'm saying the evidence

23  is going to show that you'll be sitting in that jury room

24  saying:

25              "If I ever heard double talk, if I ever -- if I

1    ever heard double talk I'm hearing it now."

2              The next paragraph of the GLA says -- excuse me.  I

3    get a little -- whatever the word is.

4              (Document displayed.)

5              My apologies.  Okay.

6              Now, let's talk about what happened.  Let's talk

7    about what happened here.

8              Oh, one thing I need to say to you, the -- you're

9    going to hear a lot from Mr. Kessler about ad hocs.  I don't

10   know if any of you ever heard that word before.  I didn't hear

11   it before I got into this case.

12             Ad hocs are star football players, retired.  Some of

13   you don't know football.  Some of you do know football.

14             Joe Montana.  If you were from New York I would say

15   Joe Namath, you know?  Whatever the names may be, these men are

16   in an extremely fortunate position.  They have their own

17   agents.  The union is not their agent.

18             The union maybe charges them a 1 percent or 1 and a

19   half percent administration fee, not 60 percent that they're

20   charging the regular guys to get involved in being able to deal

21   with licenses.

22             Those ad hoc agreements are not GLAs.  They are going

23   to try to bring this into the case.  The reality is is that

24   GLAs are the group licensing agreements.  And the group

25   licensing agreements are what it is that we're talking about.

1              So they'll come in and tell you that the evidence

2    will show they did a lot for the retired players.  They got

3    them $30 billion.

4              Listen carefully and find out who they got the

5    $30 million for.  Did they get it for a group of retired

6    players?  No.

7              They got it for the stars who had their own agents.

8    They got it for Joe Montana.  They got it for Joe Namath.  They

9    got it for Archie Manning.

10             I don't know if the names mean anything, honestly.

11   So I'm not a big football guy myself.  I'm a baseball -- I'm a

12   basketball guy, except the New York Nicks aren't doing too

13   well, so I don't talk about it too loud.

14             I think you're following what I'm saying.

15             Now, as a practical -- as a practical matter, I'm

16   looking for -- I'm looking for an exhibit that I don't seem

17   to -- I don't seem to have.  And that's -- when I say have, I

18   mean I talk with my hands, so I'm knocked the papers over.

19             Would you put on the board the second -- the next

20   paragraph of the group licensing agreement, please?

21             (Document displayed.)

22             Right.  That's it.  Thank you.

23             As a practical matter -- that's it.

24             As a practical matter, the GLA said in one paragraph

25   six or more current or retired players, and you'll get your

1    money.  And this tells how the money will come.

2             It will be -- it will be -- the monies generated for

3    the licensing will be divided between the player -- that's the

4    fellows who signed the GLA, presumably, unless they are going

5    to say something differently -- and an escrow account for all

6    eligible NFLPA members.

7             Well, ask them if they ever formed an escrow account.

8             From the very first minute of the very first second

9    of the very first GLA to the present time they've never formed

10   an escrow account.  Why didn't they form an escrow account?

11   That's for you to decide.

12            I would suggest the evidence -- the evidence would

13   suggest they say because there is no money there, which I'll

14   show you there was.  But I would suggest the evidence will show

15   they never intended, they never intended -- our guys are like

16   the forgotten tribe or something like that.

17            You know, you go on television, and you tell

18   everybody:

19                "We're taking care of these retired players,"

20   you know?  You go to conventions.  You go to the different

21   things.

22            But the reality is they never intended.  As a matter

23   of fact, I'm not even sure that under the charter our players

24   would be called "eligible players."

25            You may very well find out that the definition of

 1  "eligible" for you to decide is you've got to be an active

 2  player.

 3          This is -- this is -- this is -- I don't know what

 4  you call it.  I don't know if you have it in the streets of

 5  San Francisco, where they have like Three-card Monte, where

 6  you've got to find -- you've got to find the pea under the

 7  shell and stuff like that.  That's what it is these guys did

 8  here.

 9          And they all went to bed at night thinking they stood

10  for what was good and right in America.

11          All right.  You know, eventually what happened here

12  is they signed a license with a company called Electronic Arts.

13  The only reason I get into Electronic Arts -- I don't know how

14  I'm doing for time, but I have it in the back of my mind that

15  any minute now the Judge --

16          **THE COURT:**  You have more than 15 minutes to go.  17

17  minutes.

18          **MR. PARCHER:**  That's good.  I need every second,

19  apparently.  I'm doing my best.  I am.

20          **THE COURT:**  I'll remind you.

21          **MR. PARCHER:**  Thank you.  I'm sure you will, Your

22  Honor.

23          Okay.  The Electronic Arts is the biggest of all the

24  licensees.  There's 96, a hundred others.  I don't know what

25  the number is.  You'll hear about all of them.  But

1  Electronic Arts, amongst other things, is the video game maker.

2  And I think one of the jurors or maybe more than one of the

3  jurors -- one of the jurors is saying they played it, but they

4  don't play the Madden game well.

5         One of the jurors were saying:

6             "I have no idea what Madden is," but their

7  children play it.  And a couple of them were saying:

8             "What in God's name is the Madden game?"

9         Well, these are all video games that the

10 Electronic Arts Company has.  And grownups pretend they don't

11 like to play them.  They pretend it.  The kids love to play it.

12        And then, the mother or the father is playing it with

13 the daughter or the son or with the niece or with the nephew,

14 you know?  And guys like me are playing it with their

15 grandsons, you know?

16        And tons of money come in.  Tons of money come in.

17 And of those tons of money, guess how much of those tons of

18 money go to the retired ballplayers?  Zero.  Zero.

19        Guess how much of those tons of money go to the

20 active ballplayers, the guys that are playing today?

21 37 percent.

22        Although you'll see, if I ever get to it, that it

23 ends up being only 31 percent, because these defendants, the

24 evidence will show, had the nerve at one point in time, talking

25 to themselves, Upshaw and Allen talking to Allen and Upshaw,

1  they had the nerve to take another $8 million off the top in

2  2006.

3           Wasn't enough that they would take the 37 percent.

4  My math may not be right, but I think -- experts will say --

5  you don't have to be an expert.  You just have to know how to

6  add or something.

7           But I think you'll see that that comes down finally

8  to the players got 31 percent.

9           So the players got either 37 percent or 31 percent,

10  the active players.

11           The retired players got zero.  And I represent 2,067

12  retired players.

13           If you want to remember any numbers -- and you don't

14  have to, and if you want to take any notes, and you don't have

15  to -- remember these numbers:  2,067 men got zero.

16           And the defendants got somewhere between 61 and

17  69 percent, talking to each other.  Talking to each other.

18           And the actives got somewhere between 37 and

19  31 percent.

20           Now, go back to the GLA, if we can, please.

21           (Document displayed.)

22           Well, nobody can really see it, so I'll just have to

23  say it.  I promise you I'm saying it accurately.  But if for

24  any reason you find out I'm not, hold it against me.  It's not

25  just that part, it's the whole thing.

1          Here's what I want to tell you about the GLA on the

2    left, the one that you can't read, if you want to be able to

3    read, of which this is part of, one:  There's no negotiation

4    through the GLA.

5          2100 men, approximately, signed a GLA.  They never

6    negotiated.  It was drawn by these fellows.  Drawn by these

7    fellows.  Mr. Kessler didn't draw it, but during the years in

8    question he was one of the lawyers.

9          I don't know whether he went to Harvard or Yale or

10   Columbia or what, but he knows how to draw a contract.  They

11   know how to draw a contract.  They had a whole bunch of

12   lawyers.

13         The players are retired guys.  I'm not asking you for

14   an edge.  I'm not asking you for any benefit.  You know, but

15   they're guys that trusted the union.  You give me this piece of

16   paper.  You say I'm going to market you aggressively.  You say

17   six or more current or former guys gets licensed, you'll be in.

18         They signed a piece of paper.  Not one of them comes

19   to the table with a lawyer and says:

20              "Well, let's negotiate that clause.  Let's see

21   what that clause means.  This looks a little technical to me."

22         No.  2100 people signed what the men they trusted

23   suggest that they sign.  And they wait and see if they get any

24   money.  And they never, ever do.

25         And until they form a band of a class -- this is a

1  class action -- you know, four people are going to testify,

2  four ballplayers are going to testify.  Herb, who's the

3  representative of the class, a very fine retired player, and

4  three others.  I hope you'll like all of them.  You can't bring

5  2100 people to testify.

6          But what they had in common is they trusted their

7  union.  They didn't negotiate.  They signed with a lawyer, and

8  they never got paid a penny.

9          So eventually the union comes along and says:

10              "Nobody is interested in you."

11          I showed you that before.

12          At the same token, they say:

13              "You got to keep signing the licenses" so they

14  can get their critical mass, so that they can be this monopoly.

15          And what they do is they enter into an agreement with

16  Electronic Arts.  It's only said by way of example.

17              (Document displayed.).

18          The Electronic Arts agreement, Judge Alsup has

19  already ruled -- I hope I'm not stepping on a toe when I say

20  that -- but it's not necessarily a monument of clarity.  I

21  personally believe the evidence will show that it's clear that

22  it includes retired players.

23          Counsel is going to say the evidence will show that

24  it doesn't include retired players.

25          I'm here to say to you in this opening the evidence

1  will show it makes no difference.  It either did because it

2  should have, and I think it does.  I'm not going to go bother

3  to go over the various language for you right now only because

4  of the time factor.  That's only the reason I'm not, you know.

5        But if it doesn't, for any reason on earth, if

6  including, but not limited to retired players who have not

7  entered into such GLAs -- the GLAs they've got up there are a

8  different kind of GLA, which is why they say it's for active

9  ballplayers.  If for any reason it doesn't, well, for God's

10  sakes it should have.  They had a duty to.

11        Electronic Arts, the times in question, paid anywhere

12  from $500,000 to $25 million, $25 million each year upfront

13  just to get an exclusive license.

14        It didn't matter who they used.  It didn't matter

15  what they did.  Maybe more money if it went beyond the

16  $25 million worth of royalties.  But for the $25 million they

17  could have used Checkers the Cocker Spaniel, or something like

18  that.

19        It made no difference.  They got paid whether --

20  they, the union, got paid whether it was used or not.

21        They want to say it only applied to actives, meaning

22  current ballplayers, and ad hocs, meaning the Joe Montanas.

23        The only Oakland guy I know was Kenny Stabler, so

24  I'll use that name, the quarterback here from Alabama.  You

25  know?

1          They want to say it didn't include GLAs.

2          Well, why didn't it?  Let's just give them the

3    benefit of the doubt, which I don't.  Why didn't it?  Why

4    didn't it include retired GLAs?

5          Other than they thought they were worthless, and they

6    had no power.  The evidence is going to show in this case that

7    eventually Gene Upshaw compared them to dog food, compared them

8    to dog food.  Yes.  Yes.

9          At some point said:

10          "We don't represent them because they don't vote.

11    They don't vote."

12          In other words, in order for Upshaw and Allen to

13    continue being Upshaw and Allen of the Players Association and

14    Players Inc, they have to be elected into office.

15          You can please the current ballplayers and get

16    elected into office.  You cannot please the retired football

17    players and get elected into office.

18          So 37 percent comes in -- and I forgot to say this

19    before I get to the -- 37 percent comes in.  Never mind that

20    that doesn't go the way it should go, the agent gets less and

21    the ballplayers get more.

22          When the actives get the money, you would think that

23    it's only the actives, according to the way they want to try

24    this case, by separating everybody, not being a union, you

25    would think that it's only those actives whose names and

1  likenesses are used.

2          No.  Every active ballplayer who signed a GLA, which

3  is just about all of them -- I think that Web site said 1800 --

4  every single ballplayer who signed that GLA gets paid.

5          If he was the 45th guy on the team and didn't get a

6  chance to carry a water bucket, if his name and likeness was

7  never used for any purpose whatsoever, he gets paid.

8          Why does he get paid?  The retireds don't get paid,

9  they say, if they don't use their names and likenesses, which

10  is not what the contract said.  It's not what the GLA said.

11  But he wants to say something for nothing.

12          Why did he give these active guys, who aren't

13  American heroes, why did he give them something for nothing?

14  Why?  The answer is -- he said it himself, Gene Upshaw, I think

15  it was:

16              "They don't vote."

17          They're not dog food.  They don't -- yes, that's the

18  word.  You'll see it in the case.

19          And if you don't see it in the case, hold it against

20  me.

21          But if you do see it in the case, hold it against

22  them.  Hold it against them if that's what they said.

23          All right.  Now, there's a Madden game up there.  I

24  think somebody is giving me a hint to talk about Madden before

25  my time is up.

1          **THE COURT:**  Six minutes.

2          **MR. PARCHER:**  I got six minutes to talk about Madden.

3          Look, the Madden game, as best as I can explain it to

4   you -- and there are people who will be able to explain it a

5   lot better than me -- the Madden game has 147 vintage teams.

6          When I say the word "vintage," that's a word of art.

7   Teams of retired ballplayers.

8          Whatever the -- whatever the teams were that won the

9   Super Bowls or played the great games or whatever the case may

10  be, has 147 of them.

11         I think -- if I give you the wrong number, I'm not an

12  expert.  That 32 current teams, got it?  32 current teams.  147

13  teams of retired players.

14         I don't know how many -- I don't know how many

15  1,000 -- don't know how many thousand you get out of that.  All

16  right?

17         So assume that Mr. Kessler is correct, which I do not

18  believe the evidence will show, but assume that Mr. Kessler is

19  correct that the Electronic Arts agreement didn't include

20  retired players as part of the license.

21         Okay.  Let me ask you this:  Since it happens to be a

22  game that has 147 retired -- 147 of the old teams on it, and

23  only 32 of the current teams on it, why doesn't it include it?

24         You're my representative.  You're not my enemy.

25  You're not my adversary.  You're not the guy I've got to watch

1  my back on.  You're not the guy that I've got to parcel out

2  every word and hire the best lawyer in America to represent me.

3  I'm a retired player talking to my union.

4          If it's not in there, which I suggest that it is, why

5  didn't you say to these guys:

6              "Put it in there, for God's sakes.  Put it in

7  there."

8          And if you don't want to pay anything for it, we'll

9  give it to you.  And they will say:

10              "You can't take it from the active ballplayers.

11 You can't take it from active ballplayers."

12         How about you could take it from your 63 to

13 69 percent?  Would that be an incredible hardship?  Would the

14 evidence show that if they took some of the 63 and 69 percent

15 for doing what top agencies would have done for 10, 15,

16 20 percent, that somehow they would have gone broke; that the

17 world would fall to an end?

18         You would think they would have said to them:

19              "No.  Come on now.  You got the retired players

20 that you wanted.  You want those 147 vintage games?  We've got

21 2100 guys signed up.  You can have it.  Here's their GLAs."

22         Guess what they did?

23         Put up -- let's show them the letter, please.

24         (Document displayed.)

25         This is a letter -- this is a letter that the

1  executive at Players Inc or the Players Association -- they are

2  interchangeable -- they are all the same:  Allen-Upshaw,

3  Upshaw-Allen.

4          This is a letter that a woman by the name of LaShun

5  Davis [sic] writes to Electronic Arts.

6                  "For all retired players that are not listed

7  in either attachment A or B, their identity must be altered so

8  that it cannot be recognized."

9          Now, that's called "scrambling."  So what do they do?

10         Go back to Madden, if you will.  To the game, I mean.

11  Sorry.

12         (Document displayed.)

13         What do they do?  Look, some of you don't know

14  football at all.  Some of you probably don't even like football

15  at all, which some of you mentioned there were.  Some of you

16  could care less.

17         This is not a football game.  This is not a game.

18  This is about fairness.  This is about justice.  This is the

19  evidence showing who's stabbing who in the back and who really

20  deserves to stand up tall and say "We did our best."

21         I don't care whether you know football or you don't

22  know football.  This is Joe Montana.  It's the '89

23  San Francisco Giants.  Don't take my word for it.  Ask anybody

24  in the entire world, including send a note out and ask the

25  defendants that.  Ask the defendants that.  Who are these men?

1  Every single one of them have a name.  The name doesn't have to

2  mean anything to you.

3          All you need to know is that they can't be anybody

4  else but the guys who lined up to play for the San Francisco

5  49ers in 1989.  It can't be.

6          EA advertises its game, the Madden game, as an

7  authentic game.  If it's an authentic game, you can only put on

8  there the very men who played that game.  That's what a vintage

9  game is.

10          You can't switch and say:

11              "I'll take somebody from another team.  I'll

12  take a current player, and I'll put them on the '89 -- on the

13  '89 San Francisco team."

14          You can't do that.  It's beyond all doubt that these

15  are whoever they were.

16          And guess what?  All of them are retired.  One or two

17  of them may be lucky and be ad hocs, but the vast majority of

18  them they are playing linebacker.  They are blocking for

19  Montana.  They're hiking him the ball.  They're out on the wide

20  receivership trying to catch the ball.

21          Not going to go into what may or may not happen to

22  them when they're playing football.  That's not allowed.

23          But the fact of the matter is, they are as much a

24  part of the union as anybody else is.  There are no

25  second-class citizens here.

1          Nobody asked how much money you make and how popular

2   you are before they put you on the jury.  Nobody does anything.

3   They just say:

4               "Can you be fair?  Can you listen to the

5   evidence?"

6          It is their union, for God's sakes.  And this is who

7   they are.  And what does this LaShun, working for Doug Allen

8   and Gene Upshaw, what does she write?

9          What she writes is:

10              "Scramble them.  Take their names off.  Take

11  their likenesses off.  Don't let them be recognizable, because

12  you don't have the rights."

13         Why don't you have the rights, Doug Allen?  Why don't

14  you give it to them?

15         The answer is:  Because then you got to give them

16  some money.  Then you have to face the fact that you didn't

17  deal right with them.

18         Then you've got to tell them you didn't open up an

19  escrow account.  Then they're liable to get a lawyer and find

20  out that 63 percent or 69 percent is outrageous for the person

21  whom you trusted to pay, whom you trusted to pay.

22         Look, my time is going to be up any second now, and I

23  have two hours more that I respect -- I'm just kidding.

24         **THE COURT:**  Take a minute.

25         **MR. PARCHER:**  Thank you.

1          THE COURT:  One minute and bring it to a close, but

2    you are over your time.

3          MR. PARCHER:  Yes, sir.  Yes, sir.  Take a minute to

4    think about it or a minute to do it?

5          THE COURT:  A minute to do it.

6          MR. PARCHER:  To do it.

7          (Laughter.)

8          THE COURT:  I don't think you need a minute to think

9    about it.

10          Continue on.

11          MR. PARCHER:  Judge Alsup has told you.  I say "we."

12    It's not "we."  I wasn't there.  It's 2,100 ballplayers, you

13    know?

14          They've got to prove their case 51-49.  That's good.

15    I think they're going to prove their case 90-10.  I think

16    that's what the evidence will show.  But it doesn't have to.

17    It's 51-49.

18          The evidence is going to show this is not only a

19    breach of contract case, it's a breach of the GLA.  It's a

20    breach of a fiduciary obligation.

21          I can't define it for you.  Only Judge Alsup can and

22    will.  But it's about trust.

23          It's not an ordinary transaction where you bump into

24    a salesman in the treat and sign a piece of paper and he takes

25    advantage of you.  It's about trust.

1          And you're going to find out, the evidence will show,

2     that the men they trusted, which include lots of lawyers and

3     lots of marketing people, did nothing.

4          They didn't spend one penny to market these guys.

5     Not one.  Not one whatever a media person would do to create a

6     video.

7          At best what they did, some of them will testify they

8     asked the licensees.  A lot of them will say:

9               "We asked the licensee, but it was up to the

10    licensee.  It wasn't up to us.  If they didn't want it, they

11    wouldn't."

12          They never tried.

13          Finally, what turns out to be the biggest of all the

14    money earners, they didn't have to try.  The licensee has

15    players who indisputably are the retired guys.  And what do

16    they do?  Scramble them.  Take their names off.

17          The evidence is going to show, as I said, there's a

18    conflict of interest here.  There's double-dealing.  There's

19    double talk.  There's duplicity.  With this Madden, there's a

20    stab in the back.

21          The evidence is going to show the contract was

22    breached; that the fiduciary obligation was breached deeply and

23    meaningfully.  I would say despicably, the evidence will show.

24          And for that our clients, if I can demonstrate it, I

25    ask all of you, for that I contend that our clients are

1  entitled to substantial damages.  The case will be over.  We

2  will sum up.  And I'll remind you of that.

3          I talk too long, too fast, I probably blocked the

4  screen, and God knows what else.  But that's what I believe the

5  evidence will show.  It's not evidence.  If it doesn't show it,

6  you'll remember that I said it, I'm sure.

7          But if it does show it, then please, please, please,

8  be fair about this.  I'm sure you will.

9          Thank you.

10         **THE COURT:**  Thank you, Mr. Parcher.

11         We're going to have to take a 15-minute recess at

12  this time.

13         I want you to remember the admonition.  Your first

14  impulse would be to go back in the jury room and talk about

15  what you just heard.  But, no, you can't do that.  You have to

16  talk about something else, so for all the reasons I've

17  previously stated.

18         When we come back, we'll hear the opening statements

19  for the other side.

20         All right.  Please remember the admonition.

21         **THE CLERK:**  All rise.

22         (Thereupon, the jury left the courtroom.)

23         **THE COURT:**  Anything the lawyers need the Court for?

24         **MR. PARCHER:**  Sorry.  I didn't hear Your Honor.

25         **THE COURT:**  Anything you need me for?  Otherwise, I'm

1  going to take a break.

2          **MR. KESSLER:**  Your Honor, just for future reference

3  counsel made reference in opening arguments to an alleged role

4  that counsel played as previous counsel for the union.

5          There's going to be no evidence about any role of

6  counsel in this case.  I don't think that should be permitted

7  in the rest of this case, Your Honor.  I can represent to you

8  that I had no involvement in the GLAs in any of that.

9          And for him to suggest that I did was completely

10 inappropriate, Your Honor.  It puts me in play, and that's not

11 right.

12         **THE COURT:**  What to you say to that, Mr. Parcher?

13         **MR. PARCHER:**  I say that Mr. Kessler -- I don't know

14 the full details.  I know he was at Weil Gotshal's and he's at

15 the Dewey firm now, having separted from my friend Jim Quinn,

16 but he's been a lawyer working with the now general counsel and

17 executive head of the company since Upshaw has died, for at

18 least, what, ten years?

19         **MR. KESSLER:**  Excuse me.

20         **MR. PARCHER:**  Excuse me.  You made the statement.  I

21 want to answer the Judge.

22         **THE COURT:**  Are you going to have evidence to that

23 effect?

24         **MR. PARCHER:**  I don't want to put this man on the

25 stand.  He's trying the case.  But he can't deny that.  Is he

1  going to say that he never, in all his years with the NFLPA,

2  ever saw the GLA?

3           **MR. KESSLER:**  No, Your Honor --

4           **MR. PARCHER:**  Is that what he is going to say, that

5  he sat by indifferently while retired guys went down?  I think

6  it's --

7           **THE COURT:**  Mr. Parcher, I'm going to order you not

8  to do that again.  You misbehaved by bringing in trial counsel

9  and waved your hand at him three or four times trying to make

10 it out like he's the bad guy in the case.

11          That was improper conduct.  Improper.

12          **MR. PARCHER:**  Your Honor, I respectfully --

13          **THE COURT:**  In ten years of being a trial judge and

14 25 years as a trial lawyer I never saw anyone do that until

15 today.

16          **MR. PARCHER:**  I respect Your Honor.

17          **THE COURT:**  I'm going to tell the jury to disregard

18 it.

19          **MR. PARCHER:**  Okay.  I'll respect Your Honor.  Your

20 Honor will rule as you rule.  I respectfully disagree with all

21 my heart and soul.

22          **THE COURT:**  Don't do it again.

23          **MR. PARCHER:**  I won't do it again.  Your Honor

24 ordered me not to.

25          **THE COURT:**  I don't care about your heart and soul.

1  You had the longest -- that was all closing argument,

2  Mr. Parcher.  There wasn't a single part of that that was

3  opening statement.  Maybe a little bit.  I let you get away

4  with it, because no objection was made.

5          But you get to make just as wide-ranging opening

6  statement that has argument in it, to be fair.

7          **MR. PARCHER:**  I just want to say to the Court --

8          **THE COURT:**  You stepped over the line, sir.

9          **MR. PARCHER:**  I just want to say to the Court --

10         **THE COURT:**  You should not have brought counsel into

11 this.  Now you made it look like the defense counsel on the

12 other side is the bad guy, and trying to throw dirt on this

13 advocate.

14         **MR. PARCHER:**  Look, I'm an officer of the Court, Your

15 Honor.

16         **THE COURT:**  You are, and you misbehaved.  I'm telling

17 you.

18         **MR. PARCHER:**  I'm respectfully saying that if I

19 misbehaved it is not a conscience, intentional act on my part.

20         **THE COURT:**  You did it three times.

21         **MR. PARCHER:**  That doesn't mean that I did it because

22 I believed I was misbehaving.

23         I believe that he had an obligation.  I accept your

24 order.

25         **THE COURT:**  All right.

1          **MR. PARCHER:**  I accept it a 100 percent.

2     110 percent.

3          **THE COURT:**  Don't do it again.

4          **MR. PARCHER:**  I won't.  Not even close.  But I don't

5     want you to think I was in bad faith here.  I wasn't.

6          **THE COURT:**  What I think, I may think you were in bad

7     faith, but there's nothing I can do about it now, sir.

8          **MR. PARCHER:**  But your impression of me is quite

9     important to me.

10         **THE COURT:**  Well, then, why did you keep waving your

11    hand at counsel and say he drafted this and never once told --

12         **MR. PARCHER:**  I didn't say he drafted it.  Look at

13    the record.

14         **THE COURT:**  You go back and look at.

15         **MR. KESSLER:**  He implied that.

16         **MR. PARCHER:**  I never said he drafted it.  What I

17    said is he was there during those years, as were all -- some of

18    those other lawyers.

19         **THE COURT:**  All right.  I'm going to say something to

20    the jury to try to mitigate the damage that you've done.

21         **MR. PARCHER:**  Good.  I'm sorry Your Honor feels --

22         **THE COURT:**  More like that, Mr. Parcher, next time

23    I'm going to interrupt you right in the middle.  And you may

24    regret the way I explain it to the jury.

25         **MR. PARCHER:**  I understand.  I understand that

 1  perfectly.

 2            **THE COURT:**   15 minutes.

 3            (Recess taken from 9:21 to 9:35 a.m.)

 4            (Thereupon, the jury returned to the courtroom.)

 5            **THE COURT:**   All right.  Welcome back.

 6            Please have a seat.

 7            And I need to make a short reminder, statement to

 8  you.  Remember, I told you that nothing the lawyers ever say is

 9  evidence.  So that's true for both of the opening statements,

10  the one you just heard and the one you're about to hear.

11            Also, Mr. Parcher left the impression in his opening

12  that Mr. Kessler drafted the GLA and was somehow involved in

13  presenting them to the retired players.

14            There is no evidence in this case about that, and

15  there's not going to be any evidence in this case about that.

16  And that is not an issue in the case.

17            The role of trial counsel is not an issue in this

18  case.  So just put that thought out of your mind and disregard

19  the comment that was made by Mr. Parcher.

20            At this time, we'll hear the opening statement by

21  Mr. Kessler.

22            **MR. KESSLER:**  Thank you, Your Honor.

23            Good morning, ladies and gentlemen.

24            Different lawyers, I guess, have a different view of

25  what a lawsuit is about and what an opening argument is about.

1          I'm not going to shout at anybody.  I'm not going to

2    call anybody names.  I'm not going to do that.  I am going to

3    tell you about the evidence in this case.

4          **THE COURT:**  Speak a little louder.  It's hard for the

5    court reporter to hear you.

6          **MR. KESSLER:**  I'm sorry.  I'm sorry.

7          I'm going to tell you about the evidence in this

8    case.  I guess I'll have to shout a little bit so the court

9    reporter can hear it.

10          You heard almost nothing about the evidence in this

11   case so far.  So let's talk about that.

12          If we could put up, please, first, slide D50, please,

13   Lauren?

14          (Document displayed.)

15          There are three critical points in this case which

16   the evidence is going to overwhelmingly establish.  Any one of

17   these points completely defeats the plaintiffs' claims.

18          They didn't talk about any of these points.  Or if

19   they did, they didn't show you any evidence about them.  I'm

20   going to talk about the evidence.

21          What are those three points?  First of all, the first

22   point, the money that they're seeking is active player money,

23   not retired player money.

24          What the evidence will show is retired player

25   licensing was kept here (indicating), and the retired players

1  got that money.  And the active players did their licensing and

2  got their money here (indicating).

3            All of the money they seek is active player money.

4  It just doesn't make any sense.  That's the first critical

5  point.

6            And if you find that, then there's no claim because

7  they're not seeking money that belongs to them under the GLA.

8            Second point, if we could put that up, Lauren,

9  please.

10           (Document displayed.)

11           When retired player rights were licensed, and they

12  were, did you get the impression that retired players never got

13  any money, from the opening on the other side?

14           What the evidence is going to show is that

15  Mr. Adderley, for example, who I have great respect for as a

16  former player, he received $13,000 as a result of licensing his

17  rights.  That's what the evidence is going to show.

18           The class received over -- almost $7 million during

19  this period of time.  So when their rights were licensed, they

20  got their money.  Very, very simple.  It's not a complicated

21  case.

22           That's what the evidence is going to show.

23           The third point -- and this is an important point,

24  also -- there are many class members who didn't receive any

25  money.  Okay.  So not everybody received money.  But why was

1  that?

2          The reason why they didn't receive money is because

3  the licensees, the EAs, the Topps, the others, didn't ask for

4  their rights.

5          Now, that's unfortunate, but there's nothing that the

6  union could do about that.  There's nothing that Players Inc

7  could do.  We might all love to get money for licensing their

8  rights.  I would like to get money for some of the licensed

9  rights.  No one wants my rights.  I'm not in marketplace

10 demand.

11         And the reality here is even for retired football

12 players, many of them are not known today anymore.  And many of

13 these class members only played in the NFL only a game or two,

14 or some of them signed contracts and didn't play any game.

15 They were just in training camp.  So there is no demand for

16 their rights.

17         Again, we would all like to get money, especially in

18 these times.  But they have no claim to that if the marketplace

19 won't demand their rights.

20         So those are the three critical points that the

21 evidence is going to show in this case.  You heard the judge

22 talk about the burden of proof.

23         On these issues you'll find out plaintiffs have the

24 burden on these issues.  That's what the judge will tell you at

25 the end, not me.  And you should listen to the judge's

1    instructions about that.

2             But there's going to be no evidence to overcome these

3    critical facts.

4             You know, I remember as a little boy -- I also happen

5    to be a New Yorker, if you haven't noticed it.  So you are

6    subjected to two New Yorkers here.  I apologize for that.

7             But my grandmother used to tell me when I was a

8    little boy:

9                  "No good deed goes unpunished."

10            That's what this case is.  You saw the references to,

11   "Past, Present and Future."  The NFLPA tried to do things for

12   its retired players.  It's true.

13            Mr. Upshaw, who's been attacked, Mr. Upshaw is not

14   with us, has been attacked, is a former NFL player.

15            Mr. Allen who has been attacked, is a former NFL

16   player.  They believe what was written there:  "Past, Present

17   and Future."

18            So they went out and they tried to find some

19   licensing for retired players, to help them out.

20            By the way, the evidence will show the basketball

21   players' union doesn't do retired player licensing.  The

22   baseball players' union doesn't do retired player licensing.

23            Only the football players' union, led by Mr. Upshaw

24   and Mr. Allen at the time, said:

25                  "Let's try to find some opportunities for these

1   guys."

2           So what happened to them for that good deed in

3   generating $7 million for the class -- and by the way,

4   $30 million for retired players altogether -- this lawsuit.

5   That's their punishment.

6           Talk about fairness.  That's not right.

7           What I want to talk mostly about is the evidence.  I

8   don't want you hearing just my argument here.  Just give me --

9   if you bear with me for one second, there's one thing I have to

10  do before I do the evidence.

11          I have to introduce you to the people who will be

12  helping me here today, presenting this.  But you need to know

13  them.

14          First of all, David Feher, seated right there, and

15  Bruce Meyer, and Jason Clark and Molly Donovan and David

16  Greenspan, these are all lawyers who will be helping me present

17  the evidence to you.  So I want you to know who they are, and

18  you will see them.

19          The most important person is Lauren Kaplan, who is

20  responsible for everything you see on the screen.  She's a

21  great paralegal in our law firm and is going to law school next

22  year.  We're very proud of Lauren's contribution in this case.

23          I also want to introduce you to the representatives

24  of our client.  You may remember this from voir dire, but I

25  think just to see them again, Mr. Berthelsen, Richard

1  Berthelsen, who is the acting executive director of the NFLPA,

2  and also is the acting chairman of Players Inc.

3          When Mr. Upshaw tragically passed away a little more

4  than a month ago, Mr. Berthelsen, who is the long-time general

5  counsel, assumed that role.

6          We also have Mr. Joe Nahra, who is staff counsel, the

7  NFLPA.  He's here to represent the union.

8          And, finally, we have Mr. Clark Gaines, who's not an

9  official representative, but he's our deputy executive

10  director, and he is -- may be here, as well, and I thought you

11  should know who he is.

12          Now, let me talk about the evidence in this case

13  because that's what's most important, is the evidence, I think

14  you will agree.

15          My first point on the evidence, if we go to slide

16  D21, is:  Are retired player GLA class members entitled to

17  active players' money?

18          (Document displayed.)

19          The first most important point -- I'm going to talk

20  about the evidence on that point -- if they're not entitled to

21  it, we win the case.  So that's something you're going to have

22  to decide.

23          So let's look at the retired player authorization

24  form, if we can, which is trial Exhibit 110.

25          This is the form -- and, by the way, I'm not going to

1    do these little call-ups that were done.

2            I'm going to show you the language of the actual

3    evidence you're going to see.  And I want to talk about that.

4            (Document displayed.)

5            Let's look first, if we can, at the top of this.

6    This is the retired player group licensing authorization form.

7    It's very important.

8            It's a retired player program.  Different from active

9    player licensing.  The evidence is going to show it's

10   different, two different things.

11           Now, I would like to go to the bottom paragraph for a

12   second.  And you were shown this paragraph.  But there was no

13   discussion.  There was no reading of the actual key words.

14           This is the -- this is the paragraph that says when

15   do you get paid?  That's important.

16           And what it said is:

17               "Further understood that the monies generated by

18   such licensing" -- and these are the words that counsel didn't

19   mention.  Licensing of what?  Licensing of retired player group

20   rights.

21           Well, what did that mean?  What do people understand?

22   What the evidence will show is those are retired player rights.

23           You can't have a claim under this if it was just

24   active players licensing.  That's what they're claiming.

25   They're claiming if it's just active player money, the retired

1  players should somehow get that.  No.

2          What this was authorizing is retired player group

3  rights.  That's the critical issue here.

4          Now, if you go back up, they pointed to the second

5  paragraph, if we can look at that.

6          (Document displayed.)

7          Now, the second paragraph, which doesn't tell you

8  when you get paid, simply notes that the programs have to have

9  six or more players.  And it could be retired and present and

10 former together.  You can combine them.

11         Well, so what?  You still have to have a retired

12 player in the licensing in order for it to be retired player

13 money.  Nothing else would make any sense.

14         And, in fact, these forms have been in existence for

15 many, many years.  And you're going to hear testimony from four

16 players who played this, we'll call.

17         One of them is Mr. Adderley, seated here.  By the

18 way, you heard there is more than 2,000 people who signed these

19 forms.

20         Only four players are going to be called in by

21 plaintiffs' counsel to try to support this claim.

22         And what do those four players say?

23         Well, let's take a look at what Mr. Adderley says,

24 first.

25         D44.

1            (Document displayed.)

2            Mr. Adderley was deposed in this case, as you heard

3    about the depositions.  And what did he say?

4            We said:

5            "Sir, do you believe, as a retired player, you're

6    entitled to any money that's generated by the licensing of

7    active players?

8            "No."

9            That's the evidence.  Mr. Adderley was candid.  I

10   respect his candor with respect to that.  That was honest,

11   truthful testimony.

12           "And, what you thought you were agreeing to get was

13   that if your rights were licensed and used, you would get some

14   money; correct?

15           **"ANSWER:**  Correct.

16           "And that was your understanding of this agreement?

17           "Yes."

18           That's our case.  That's their class representative.

19           If it's not retired player rights being used, they

20   don't have any claim to it.

21           Mr. Adderley was a truth-teller about that issue.

22           Now, I don't know what he's going to testify to when

23   he comes here.  I assume he's going to testify the same way,

24   because he's a truth-teller.

25           Now, they have three other players who have surfaced

1   very recently who are going to come in and tell you:

2              "Oh, no.  We thought -- when we signed this, we

3   thought that we would get active player.  Even if it was just

4   2,000 active players and no retired players, that money should

5   come to us."

6          You're going to hear that from Mr. Bruce Laird.

7   You're going to hear that from Mr. Beach.  And you're going to

8   hear that from Mr. McNeil, who is going to testify this

9   morning.

10         And as the judge said, you have to judge the

11  credibility of that testimony.

12         Now, what might you think of the incredibility of

13  that testimony?  Well, first of all we asked them at their

14  depositions:

15             "Okay.  You signed these agreements."

16         If you look back at the schedule, they signed them

17  back in 2000.  Mr. Laird in 2000.  Mr. McNeil in 2002.

18  Mr. Adderley in 2002.  And I think that's Mr. Beach in 2003.

19         We asked them:

20             "Okay.  You went through all these years.  Did

21  you ever tell anybody that you weren't getting any money for

22  active player licensing?

23             "Oh, no, we didn't tell anybody about that.

24             "Did you ever say anything to the union?

25             "Oh, no, we never said anything to the union

1    about that.

2                    "Did you ever tell another retired player about

3    it?

4                    "No."

5            When's the first time we hear about this?  The first

6    time we hear about this is a year after this lawsuit is filed,

7    when they show up as witnesses.

8            How credible is that?  They're coming here saying

9    they were entitled to tens of thousands of dollars from active

10   player licensing, and that they never received it, and they

11   never asked for it?

12           They never raised a question?  In fact, some of them,

13   like Mr. Laird, he signed again.  He signed in 2004, and he

14   signed in 2000.  He kept doing it.  And he never once raised

15   this.

16           How credible is this?  What sense does this make?

17   And the language doesn't support it.

18           Now, interestingly is the testimony of Mr. Laird

19   because at his deposition I asked Mr. Laird -- and he'll be

20   here to testify perhaps today -- I asked him:

21                   "Why didn't you, if you believed that active

22   player licensing was covered, why did you keep signing this,

23   and why did you never complain?"

24           And he kept sort of hemming and hawing and trying to

25   explain.  And he said:

1           "Oh, I trusted the union."

2           Of course, that made no sense.  Why did it make no

3    sense?  Because he said:

4           "I knew there were trading cards with active

5    players.  I knew there was apparel in active players, and I

6    knew I got no money, but I thought I was entitled to it."

7           Wouldn't you raise a question?  Wouldn't you ask?

8           So finally, finally, I kept saying:  Why was it?  He

9    came up with the strangest explanation of all.  And I want to

10   show you that, because it totally negates their claims, and it

11   just shows you how incredible this all is.

12           When I asked Mr. Laird, finally, why did he never

13   complain, he said:

14           "Well, because we're not entitled to any money of

15   baseball cards or apparel or video games or anything that's a

16   new program.

17           "So your understanding when you signed this, it

18   would have nothing to do with Topps, nothing to do with Upper

19   Deck, nothing to do with other trading cards, right?

20           "Yeah.

21           "So it would have to be a new category that had

22   never been dealt with?"

23           2000 is when he signed this.

24           "Yes."

25           He ends up saying that none of what they are seeking

1  he was seeking.  None of what was there, the whole thing fell

2  apart.

3              Well, why did it fall apart this way?  Because what

4  your instinct in jurors are going to tell you is when you're

5  scrambling around trying to explain something that doesn't

6  really quite make sense, you get yourself tied up in knots.

7              Okay.  That's what happened to Mr. Laird, okay?

8  Mr. Laird basically says he has no claim against us.

9              Now, Mr. Adderley is the truth-teller.  He said they

10 were never entitled to active player money.

11             So I believe you're going to find that there's no

12 claim here about that.

13             And just to show you D1, if I can, to go back to

14 this.

15             (Document displayed.)

16             D1 compares the retired player form here.  Look at

17 the active player form.  It's totally different.  I will come

18 back to this.

19             You'll see it's attachment A.  It's called "The NFL

20 Players Association Group Licensing Assignment."

21             It has nothing to do with the retired players.

22             You heard the reference to the escrow fund -- and

23 I'll come back to that.  There is no reference to any escrow

24 account in this one.

25             This was active player money, separate program.

1          Now, I also want to note very briefly, you heard

2   claims about conflict of interest, Mr. Allen and Mr. Upshaw

3   making these decisions.

4          What will the evidence show?  What will the evidence

5   show?

6          What the evidence is going to show -- and you'll hear

7   Mr. Allen testify tomorrow -- Mr. Allen will testify and

8   explain, as will Mr. Berthelsen, who they may call later

9   tomorrow or later next week -- maybe today, actually.  They

10  will explain that the money they are seeking was the active

11  player money, as I described, something we call "the GLR pool,"

12  the pool that was divided up among the active players.

13         And that 37 percent number that they told you about,

14  it's true.  It was 37 percent.  Who decided that?  Did you get

15  the impression that Mr. Upshaw decided that or Mr. Allen

16  decided that, or it was some big secret?

17         No.

18         What the evidence will show, like many unions, the

19  members of the union, the active players who were in the

20  bargaining union -- and, by the way, as a matter of labor law

21  only the current players can be in the bargaining union.  It's

22  just a matter of labor law.

23         So they get to vote and run their union.  And the

24  current players elect player representatives.  Each team.  It's

25  democratic.

1              And the players representatives meet once a year.

2   And what did they decide?  They decided 37 percent was a good

3   number.

4              What did they do with the rest of it?  They decided

5   to give it to their union.  Why?  To support their union.  To

6   fund their union.

7              Some of you may be union members and pay dues.  They

8   get their dues back because they use the licensing money to run

9   the union.

10             That was a decision.  You heard counsel say:

11                  "Oh, what kind of licensing agent would take

12  this big a percentage?"

13             It wasn't a licensing agent.  It was the union.  And

14  the members of the union voted to say this is the fair

15  percentage.  Everybody knew about it.

16             In fact, the retired players knew about it.  I'll

17  show you that, too, in a document that he showed you a little

18  piece of, but not quite the whole document.  That letter from

19  Mr. Allen talks about this, that touchback he showed you to

20  retired players talks about all this.  There's no secret about

21  all this.

22             So that's how this was done.

23             Now, the second point that they argue -- and they

24  argue in the alternative.  You heard counsel say:

25                  "It doesn't matter which way the facts are, we

1    win."

2              Well, there's no such thing as an alternative

3    reality, okay?  There are only facts.  Okay?

4              The facts you're going to find, okay?  The facts

5    you're going to find is that, one, as I said, they're not

6    entitled to active player money.

7              Their alternative argument is:  Well, maybe the

8    agreements, the EA agreement, the others, really licensed

9    retired player rights, so it was retired player money.

10             That's their alternative reality.  That's what they

11   argue.

12             And they put up the thing quickly and they ran around

13   with that language.  I don't think you could follow it very

14   much because they don't spend time with the evidence.

15             Let me tell you what the evidence is going to show.

16   First of all, on this language EA will come in and testify.

17   You're going to see from Mr. Eric Linzner, okay?  You might see

18   him in video, and you might see him live, both.  That's up to

19   plaintiffs.

20             Okay?  And what will EA say were the rights they got?

21   Were they retired player rights, or were they active player

22   rights?  Or were they both?  What were they?

23             If we could take a look, please.

24             (Document displayed.)

25             This is the testimony you're going to see.  This,

1    again, was a deposition so we know already.

2          And he was asked, and this was the answer:

3           "My understanding that this license

4    agreement" -- that he'll testify this is his understanding at

5    the time he negotiated a deal.

6          This is the negotiator.  So it's not his

7    understanding later.  It's his understanding at the time.

8           "My understanding was that this license

9    agreement and the fees that EA agreed to pay in this license

10   agreement were to secure the rights of active NFL players, and

11   that Players Inc represented retired players, which, if we

12   wanted to purchase those rights separately, Players Inc would

13   work on our behalf to do so."

14         And that was how it worked.  They didn't want -- let

15   me make this very clear.  It's not because NFLPA didn't want to

16   license them the right to retired players.  We told them in the

17   agreement:

18          "We can get you retired players."

19         What EA said is:

20          "We don't want to pay for all those retired

21   players, most of whom don't have any value.  What I'll pay for

22   is the few retired players who I think have some value to me."

23         And, by the way, EA did enter into some agreements,

24   okay, to license some retired players.  But the ones they

25   wanted.

1            And guess what happened to that retired player money?

2    Remember I told you point two?  It all went to the retired

3    players.

4            You heard criticism that such a big percentage was

5    saved.  For retired players, 1 percent was taken out.  Not

6    40 percent.  Not 60 percent.

7            The evidence will show for retired players 1 percent

8    on whole was taken out, and the rest was given to the retired

9    players.

10           For the active players, the active players voted:

11               "This is my union.  I'm giving more to the

12   union."

13           What's wrong with that?

14           Now, it would be wrong, it would be unfair to take

15   retired player money and use it to fund the union.  You would

16   never do that.  It would be wrong to take retired player money

17   and give it to active players.

18           But it was just as wrong for them to claim take the

19   active player money and give it to the retired players to mix

20   it up, or to say there's something wrong.  The NFLPA and

21   Players Inc keep all this money because the active players

22   decided to give it to them instead of keeping their dues.

23           What's wrong with that?

24           By the way, Mr. Adderley, who earned his $13,000,

25   he's not suggesting he give back his money and share it with

1    the active players.  Nor should he.

2              The class members who got the $7 million aren't

3    saying:

4              "Let's give that $7 million back to the active

5    players and share that money."  Nor should they.

6              That's retired player money.  That's where it

7    belongs.  Active player money was different.

8              So we know what EA -- I want to go to the second

9    testimony.  He said:

10             "Well, my understanding of what" -- focus on

11   that word "NFL players" means, because that's the language of

12   the contract.  You didn't hear much about this, but I want to

13   go to this.

14             "Well, my understanding of what 'NFL players'

15   referred to on the last line of page 1 of the 2005 EA

16   agreement" -- that's the one he flashed up for you -- "was

17   active NFL players."

18             So focus on that.  That's the negotiator of the

19   contract.  Now, let's look at that contract, if we can.

20             If you look at the contract, the language Mr. Linzner

21   was talking about is on the bottom of the first page.  As he

22   said, it's called "the grant of license."

23             The grant of license is when he tells you what

24   license do you get, right?

25             And what it says is:

1                    "Upon the terms and conditions hereinafter set

2       forth above" -- set forth -- "Players Inc hereby grants to

3       licensee and licensee hereby accepts the exclusive right,

4       license and privilege of utilizing the trademarks and names of

5       Players Inc" -- that's not so important to you, but then this

6       is important -- "and the names, likenesses, including without

7       limitation, numbers, pictures, photographs, voices, facsimile

8       signatures and/or biographical information" -- of who? -- "of

9       the NFL players referenced in paragraph 1(a) above."

10              And what Mr. Linzner is saying is when you look in

11      that paragraph 1(a), who are the NFL players referenced above?

12      It's the active players.  That's what the evidence is going to

13      show.

14              And you'll hear a lot about this from the witnesses,

15      but this is the actual language.  This is what the agreement

16      provides.

17              And by the way, all the license agreements at issue

18      have similar language, have similar language to this.  So this

19      is what this case is about.

20              The evidence will show -- and we're going to have

21      other licensees here.  You're going to hear evidence from other

22      licensees.  Every licensee who testifies, every single one,

23      whether by video or live, will testify that they only got the

24      rights to active players through these licenses.  And when they

25      needed retired players -- they didn't want everybody.  They

1  wanted small groups.  And they did that separately, in a

2  separate license.  And that money went to the retired players.

3           That is what the evidence will show.  You will hear

4  from the licensees themselves about that.

5           Now, you also heard a claim here that there's no

6  escrow account.

7                "Where's the escrow account?  Where's the escrow

8  account?"

9           Well, there was no escrow account created, but why?

10 Think about what an escrow account is.  And I think you all

11 certainly have bank accounts.  You are familiar with an

12 account.

13          What's the first most important thing you would do to

14 have a bank account?

15          Well, you would want to have some money for the

16 account, right?  You wouldn't open up an account when there's

17 no money.

18          What happened here?  What happened here is that none

19 of the licensees wanted all the retired players.  The only

20 retired players they wanted were small groups of players, 10,

21 12, 18, some of whom, as I'm going to discuss, signed these

22 GLAs, and some who didn't.

23          Joe Montana you heard about?  He never signed a group

24 licensing authorization.  So when they wanted Joe Montana, we

25 had to put together a group of players in what we called

 1  "ad hoc licensing."

 2          Ad hoc licensing generated money.  And who got that

 3  money?  Retired players, Mr. Adderley.

 4          Again, so all the money went to Mr. Adderley, went to

 5  the GLA class members or the other retired players.  There was

 6  no money left to put into an escrow account.

 7          And by the way, plaintiffs don't claim there's

 8  anything wrong about that.  They don't say that money should

 9  have gone in an escrow account.  There's no claim about that in

10  this case saying:

11          "Oh, no.  Mr. Adderley should give back his

12  money."

13          That's not their claim.

14          They got all the money.  So the first reason -- if we

15  can on the escrow account, if we can go to that.

16          (Document displayed.)

17          You need money to be set up.  The money wasn't there,

18  so it wasn't set up.

19          What's the second reason?  The second reason was

20  there was no licensing demand for most GLA class members.  And

21  you'll hear testimony about that.  That's why there was no

22  money.

23          Had we gotten -- let me explain the difference

24  between active and retired player licensing.  This is

25  important.

1          The evidence will show -- not me -- that in active

2    players and trading cards, for example, the licensees want all

3    the active players.  Why?

4          Because they don't know which active player will play

5    in the game, who will get hurt, who will not be a star, who

6    will not be a star.  They are active.  It changes every day.

7    They are active players.

8          We had hoped we could sell retired players that way.

9    Take all of our retired players, like you take all of their

10   active players.  Video games the same thing.  They pay for all

11   the active players.  They want the names of all the players.

12   They didn't want that.

13         Why?  Because retired players, they're not active.

14   They're retired.  Therefore, they know many, many of them have

15   no value at all.  Some of them have value.

16         Why should they pay for everyone?  Is that our fault?

17   We would love if they would pay for that.  We would give them

18   the money, as we do for all the retired player licensing.

19         If we could get more, we would give it to them.  But

20   that's what the marketplace demanded, so there was no money for

21   the escrow account.

22         The next item was that all the licensing money was

23   paid to the GLA class members.  We gave them all the money,

24   kept 1 percent.  1 percent administrative fee.  There was no

25   money for the escrow account.

1              Nothing wrong with that.

2              Now, finally -- and one last line on D18.

3              (Document displayed.)

4              The plaintiffs' claims make no sense, their claim

5  that the license agreement secretly included retired players.

6  Why?

7              First of all, they would have to pay twice.  Why do I

8  say that?  Well EA, for example, when they wanted more retired

9  players they paid again in a separate license.  If they had the

10 rights, why would they pay twice?

11             Upper Deck, which is a trading card company, the

12 evidence will show when they wanted Mr. Adderley -- by the way,

13 who is a Hall of Fame player.  He was a great player in his

14 time.  Mr. Adderley, they wanted him, they paid him again.  If

15 they had his rights, why would they pay again?

16             I mean, Upper Deck, EA, Topps, they're not stupid

17 companies.  They're not stupid.

18             Their claims make no sense.

19             As jurors, your common sense to the evidence, the

20 testimony and the facts, that's what you're going to use to

21 decide this case.

22             Next point.  Retired players under their theory would

23 get money from agreements where you can never use a retired

24 player.

25             For example, there's something called "fantasy

1  football" today.  I don't know if any of you know, and maybe

2  some your kids play it.

3          Fantasy football are games where you use today's

4  active players, and every week you watch how they're doing, and

5  you sort of pick your own teams.  And it's an exciting thing.

6  You compete.

7          Retired players can't be in a fantasy football game.

8  How can they be in it if they don't play?  They have no

9  statistics anymore.

10          Yet, under their theory, under their twisted

11  interpretation of the language, you would have retired players

12  getting money for fantasy games.

13          Rookie cards.  Rookies are every year's rookies.  How

14  could these retired players -- they were rookies 15 years ago,

15  20 years ago.  It makes no sense.

16          And the third point is that they would get money --

17  they even claim money for licenses that don't mention retired

18  players; that only say "active."

19          They say:

20              "We're entitled to it.  Give us the money.

21  Where's the money?"  It makes no sense.  It's not the retired

22  players' money.

23          Now, I now want to talk a bit more about the ad hocs,

24  which are important, as I mentioned.

25          $7 million went to the retired players in the class.

1   You heard counsel say:

2                   "Zero.  They got zero."

3               No.  They got $7 million.  $7 million.  What's wrong

4   with that?

5               And, by the way, $30 million went to all retired

6   players during this time because, as I told you, Joe Montanas

7   didn't sign GLAs.  But I want you to look at that.

8               If you would put up D5.

9               (Document displayed.)

10              This shows the top ten retired players in the ad hoc

11  deals.  This is who the licensees requested.

12              Now, what is significant?  The only one who signed

13  the GLA is Mr. Archie Manning.  He got 775,000 during this

14  time.  Mr. Montana got 1.6.

15              None of the top ten signed GLA deals.  Why is that

16  significant?  When the licensee said they wanted those players,

17  we didn't even have retired player GLAs.  So we had to do

18  ad hoc licensing.  But we didn't discriminate.  We didn't keep

19  Mr. Adderley out of that, if they wanted him.

20              So we would include GLA members in the ad hoc deals,

21  even though they only asked for specific players, many of whom

22  didn't sign retired player GLAs.  It only makes sense.

23              If you look at the next slide, D6, you'll see the

24  demand varied.  Some players had great value.  Others had

25  little value.

1            So, for example, Mr. Adderley, who was a Hall of Fame

2    player, he earned 13,000.

3            Mr. Willie Lanier, who is one of the witnesses we are

4    going to call -- and we are going to have some retired players

5    come in to give you what their understanding was.  Mr. Lanier

6    earned 26,000.  Okay.

7            But the point is, that fades in comparison to the

8    others.  It's who decides that?  Does the PA decide that?  The

9    Players Association?  Does the Players Inc decide that?  No.

10            Does Mr. Upshaw decide that?  No.

11            The marketplace decides that.

12            That's the reality.

13            If we go to the next slide -- and this is probably

14    the most important, this is the zero issue.

15            Most of these GLA players there was no economic value

16    to their rights.  Licensees didn't want them.

17            Now, the first one on the list -- this is just a

18    sample -- happens to be Mr. Doug Allen, the person you heard,

19    you know, he was making decisions.  He's a retired player.

20            Now, Doug Allen -- I don't want to embarrass him --

21    he barely played in the NFL.  Okay?  He played, I think, one

22    season or less.

23            He's not known as an NFL player.  So no one wants his

24    rights.  He is a GLA signer, but he didn't get any money for

25    it, because it wasn't demanded.

1           Mr. Beach, Mr. Laird, and Mr. McNeil, there was no

2    demand for their rights.  I'm not being in any way

3    disrespectful of them.  That's just the marketplace demand.

4    Some of them could be good players, and they just fade.  That's

5    how life is, you know, unfortunately.  That's how it goes.

6           Mr. Goich we're going to call as our witness.  He'll

7    tell you he never expected to get anything.  You know, he hoped

8    maybe something would come of it.  But he wasn't shocked when

9    no one wanted his rights.  He didn't have any value.

10           That is virtually the whole class.  Most of the

11    class.  Out of the class members, over 300 did get demand, but

12    the rest didn't get demand.  That's just how it worked out by

13    the marketplace.

14           Now, what I would say, also with respect to this

15    issue, many of these players played one or two games.  They

16    didn't play a game at all.  Yet, what their argument is --

17    think about this argument.  I would love to have this deal.

18           They're saying for signing your name to a piece of

19    paper which you got in the mail, I guess putting a postage

20    stamp in and sending it back, what you are going to get out of

21    that -- it's almost like a great Lotto ticket, except you know

22    you are going to win -- what you are going to get out of that,

23    as they claim, is tens of thousands of active player money for

24    just signing your name as a retired player, even if you never

25    played a game in the NFL, even if you played two games in the

1   NFL, regardless of who you are.  Just sign up here.

2              Why would we have to urge people to do that?  Why

3   wouldn't everybody just do it?

4              They talk about how we urged people to sign it.  Why

5   don't the notices that they showed you say:

6                  "Hey, sign here.  You'll get thousands of dollars

7   of active player money."

8              Don't you think -- there were 13,000 retired players.

9   We got 2,000.  You don't think everybody would sign for that?

10  Wouldn't you sign for that?

11             Who wouldn't love that kind of a deal?  Does it make

12  any sense?  For doing nothing.  For signing your name.

13             And, by the way, as you saw that these were

14  non-exclusive deals.  They could have licensed themselves.  No

15  one stopped them from licensing themselves.

16             They could have done all of this.

17             **THE COURT:**  You have about maybe six minutes to go.

18             **MR. KESSLER:**  That's what I thought, Your Honor.

19  Thank you.

20             So let me just talk about two more issues.  They make

21  a claim for breach of fiduciary duty.  You heard a lot of

22  attacks on people personally.

23             You heard attacks upon Mr. Upshaw.  Mr. Upshaw is not

24  here to defend himself.  So those of us who are here, we have

25  to defend Mr. Upshaw, okay?

1          Mr. Upshaw was a Hall of Fame player, the evidence

2    will show, who was dedicated to retired players, who came up

3    with the idea of retired player program because he wanted to

4    help retired players.

5          Actually, he was a great player in the Bay Area.  If

6    you are an Oakland Raiders fan, you might have heard of him, or

7    even just if you live in the Bay Area.

8          These attacks are unprincipled, and the evidence

9    won't support that.  They won't support them.

10          You heard about the percentages.  That was active

11    player money, and the active players decided.

12          Moreover, what counsel didn't tell you, there was an

13    outside consultant called Duff & Phelps.  Duff & Phelps.  Duff

14    & Phelps was an advisory group who said that 37 percent was the

15    correct number, who said that the splits were justified.  You

16    didn't hear that.

17          And the Internal Revenue Service, you will hear

18    evidence, audited this to make sure:  Well, are these splits

19    fair?  And it passed the IRS.  And, believe me, if you can pass

20    the IRS, you're okay, okay?

21          That's what they're claiming, is a breach of

22    fiduciary duty.  That's what he said was despicable.  All

23    right?

24          I don't think there was any basis for that kind of

25    language or for that kind of a claim about Mr. Upshaw or about

1    this union.

2            You heard about the $8 million.  What the evidence

3    will show is the $8 million came solely from active player

4    money.  And the active players agreed at the board of player

5    reps to do that.  Why?  Because it was more appropriate to give

6    more money to the union, at that point, to support the union

7    and because of the trademark value of the union.  There's

8    nothing mysterious, and there was nothing hidden, and it was

9    known.

10           One of the claims you heard is -- if we could put up

11   the Doug Allen exhibit, please.

12               (Document displayed.)

13           You saw it very -- maybe several times counsel put

14   this letter up, and showed you squibs of this letter, okay?

15   And he told also told you no one knew anything about how the

16   split was done in the 37 percent.  It was in secret.  Didn't

17   you all get the impression that's what he was telling you?

18           What would have happened if he showed you the rest of

19   the letter?

20           Let's look at this middle paragraph.  This is from

21   Doug Allen to the retired players, as he said.  He told them

22   the following, Mr. Allen:

23               "Hundreds of retired NFL players have received

24   payments from Players Inc for these activities."

25               Those are the ad hoc deals.  Remember, hundreds, not

1  thousands.

2            "But every retired player has benefited from

3  Players Inc creation."

4        How?

5        Now, he didn't say because you get active player

6  money.  He didn't say that, because it wasn't true.

7        What he said was:

8            "Because 40 percent of Players Inc operating

9  revenue is paid to the NFLPA, the union, as a royalty."

10       This was fully disclosed, okay?  For what?  As a

11 royalty for the active player names and image rights.  Not for

12 retired players.  That's 40 percent of the active player money.

13       This allows the NFL to provide extensive services and

14 benefits to retired players in return for modest retired player

15 dues of $50 a year.

16       For example, the NFLPA retired players department and

17 benefits department serves almost 4,000 NFLPA retired player

18 members, at an annual cost to the NFLPA of 1.5 million.

19       Retired player dues offset less than 200,000 of that

20 amount.  The 1.3 million difference in the cost of retired

21 player representation by the PA is paid for by active player

22 licensing.

23       It was in that context that Mr. Allen correctly and

24 properly told the retired players:

25            "We live every day by the NFLPA's motto:  Past,

1    present and future."

2              Now, counsel didn't show you that part of the

3    evidence.

4              Now, what I would like to do is talk a minute about

5    the scrambling, in the few minutes I have left.

6              This EA scrambling issue makes no sense.  First of

7    all, again, they have alternative universes.  You heard that's

8    the alternative universe.

9              One claim they have is that the EA agreements did not

10   cover retired player rights and should have covered it because

11   they don't use retired players.  They use scrambled images.

12             Well, the first part of that is true.  That's the

13   truth.  EA agreements don't give retired player rights so they

14   have to scramble the images.  They don't use any names.  No

15   names.

16             They don't use any pictures, okay?  And since 2004,

17   they don't even use any numbers.  Okay?

18             They're going to show you later in the case probably

19   a 2003 game.  One year they used numbers.  They were stopped by

20   the Players Association.

21             Why were they stopped?  Because they wouldn't pay for

22   the retired players.  Not because -- why wouldn't the NFLPA

23   want to sell more retired player rights?  They would sell them,

24   and they'd give the money to retired players.  That was what

25   they wanted to do.

1          But EA said:

2              "I paid a lot for active players."

3          In fact, they paid $25 million a year.  That's a lot

4    of money.  But that was for the active players.  They said:

5              "I'm not going to pay any more.  No Mas."

6          Okay?  They wouldn't pay any more.

7          So, instead, EA said:

8              "Well, could we use the retired players anyway?"

9          And the Players Association said:

10              "No, you can't use them anyway.  If you don't

11   pay for it, you can't do it."

12          That's what we should be doing for the retired

13   players.

14          The letter they showed you, if we could take a look

15   at the letter that was shown to you, by LaShun Jackson, look

16   what it actually says.

17          You heard that this was evidence of bad faith,

18   duplicity, double talking.  Well, let's look at the actual

19   language, if we can, in the first paragraph.

20              "The following is a detailed explanation of the

21   approved use of retired players for the upcoming video game per

22   our discussion."

23          At the time this letter was written, which was 2001,

24   EA had an ad hoc license for some retired players.  Not all,

25   some.

1          There was a list of them.  That list was in the

2    attachment.  The addendum that was signed last July was a

3    three-year agreement that granted Electronic Arts the right to

4    use the images and identities of players listed in attachment A

5    and B."

6          Those were the only retired players EA would pay for.

7    So what the union said:

8               "For all retired players that are not listed in

9    either attachment A or B, their identity must be altered so

10   that it cannot be recognized."

11         Of course.  Of course.  If you don't pay for the

12   ones, if they're not on the list, you can't use their identity.

13   What's wrong with that?

14         They're going to come in, and Mr. McNeil is going to

15   say:

16              "Well, I know that was me.  I was on that team."

17         And he was on that team, but EA doesn't use his name,

18   doesn't use his image.  And EA has the legal right to do that.

19         And there's no claim in this case, and the Court will

20   instruct you at the end, they don't claim there was something

21   wrong in using the retired -- in using those figures that they

22   showed you without the name and image, because the law says if

23   they use your name and image they have to pay for it.

24         If they don't, they don't.

25         What could the union have done?  Do you get that

1  impression when you listen to the other side of the argument

2  that they're not claiming there's anything wrong with that?

3  They don't.  They don't.

4          What they claim is that we should have forced the EA

5  somehow to pay additional money for the retired players and use

6  the names.

7          Well, we didn't have that power over EA or anyone

8  else.

9          This does nothing to prove their claim.  In fact, if

10 you look at the next paragraph of this, this wasn't as retired

11 players.  It was active players.

12         The second paragraph says:

13             "Along those same lines, the only active players

14 that can be included in the licensed product are those players

15 who have given their licensing rights to Players Inc."

16         There are a handful of players that don't.  Say you

17 can't use them.  And what do they say about that?

18             "Substituting a player's name with their Jersey

19 number is not acceptable."

20         So they said the same thing for active players.  You

21 heard counsel say this was some conspiracy to deceive the

22 retired players?  No.

23         This was ordinarily protecting those rights.

24         So, again, this doesn't make any sense at all.

25         **THE COURT:**  Mr. Kessler, your time is up, so take one

1    minute to wind up.

2              **MR. KESSLER:**  Thank you, Your Honor.

3              What I would ask you again, ladies and gentlemen,

4    again, don't listen to me.  Don't listen to counsel for either

5    side.  Look at the evidence.

6              You're going to see witness after witness say that

7    these agreements only involved active player rights.

8              You're going to see evidence that it was understood

9    that the license for the retired players was they would get

10   money for retired player licensing, not for active player

11   licensing, the only thing that makes sense.

12             You're going to see unequivocal evidence that

13   Mr. Adderley and the rest of the players got $7 million.  Not

14   zero.  And that the money went to them.

15             This is not a case where there should be shouting or

16   pounding or name calling.

17             Please, just look at the evidence.  Look at the

18   facts.  And that's how you should decide this case.

19             Thank you so much for your time today.

20             **MR. KATZ:**  Your Honor, may we approach?

21             **THE COURT:**  What is it about?

22             **MR. KATZ:**  It's an objection, Your Honor.

23             **THE COURT:**  Can't you make it in the presence of the

24   jury?

25             **MR. KATZ:**  If you would like me to.

 1              **THE COURT:**  Is it going to inflame the jury in some

 2    way?

 3              Go ahead.  Make your objection.

 4              **MR. KATZ:**  Can I make it at sidebar?

 5              **THE COURT:**  You tell me.  I don't like sidebars,

 6    because it wastes the jury's time.  But if it is essential to

 7    have a sidebar, we will.  That means, I will take your word for

 8    it.

 9              **MR. KATZ:**  The objection has to do Mr. Kessler's use

10    of the first person plural to refer to the defendant.  He kept

11    saying:

12                   "We.  We had hoped we could sell, we" --

13              **THE COURT:**  All right.  I'm going to say to all of

14    you:  Don't do that again.

15              **MR. KESSLER:**  Your Honor --

16              **THE COURT:**  Mr. Kessler, you are not -- I went to

17    some trouble to explain you were not the one who drafted these

18    documents, or at least there's not going to be evidence to that

19    effect.  And then, you turn around and use the word "we."

20              **MR. KESSLER:**  Your Honor --

21              **THE COURT:**  You are not -- no lawyer is going to

22    vouch for -- you are not on any team.  You are an advocate.

23              Mr. Katz, you are an advocate.  You are not the

24    class, and you are not the defendant.

25              So when you say "we," it introduces a level of you

1  vouching for the credibility of witnesses and putting your own

2  credibility on the line, which is exactly the problem that I

3  was trying to avoid.

4          **MR. KESSLER:**  Your Honor, I deeply apologize for

5  that.  I will not use "we" again.  I'm sorry.

6          **THE COURT:**  All right.  Is that good enough?

7          **MR. KATZ:**  Thank you, Your Honor.

8          **THE COURT:**  Now, do you understand what I'm trying to

9  get at?

10          You can have a seat, Mr. Kessler.

11          **MR. KESSLER:**  Thank you.

12          **THE COURT:**  You can see that these are excellent

13  lawyers.  Both sides have given an A plus opening statements.

14  But they are just the lawyers.  They are not the real

15  parties-in-interest.

16          And as officers of the court, they have the duty to

17  remember where their advocacy line stops and the real

18  party-in-interest starts.

19          So I don't think any harm has been done by anything

20  that we've heard today, but it's my job to help keep the

21  lawyers in line, so that's what I'm going to do.

22          Okay.  You all exhausted yet, or can we get started

23  with the witnesses?

24          Anybody need a facilities break?

25          Great.  We're going to go ahead, then, with the

1   witnesses.

2          First witness, please.

3          **MR. LECLAIR:**  Your Honor, we call Clifton McNeil.

4          **THE COURT:**  All right.  Let's hear from Mr. McNeil.

5          **MR. KATZ:**  Your Honor, we would move that witnesses

6   be precluded from the courtroom.

7          **THE COURT:**  All right.  If there are any witnesses in

8   the courtroom who are not representatives, corporate

9   representatives, then you've got to step outside.

10         If you are a representative, even though you're going

11  to be a witness, you may stay.

12         Counsel, there are a number of people out there.  I

13  don't know who all the witnesses are.  I need your help to

14  decide if there's someone specific that you want to step out.

15         **MR. KATZ:**  The only witness in the courtroom would be

16  Mr. Laird, and I think he's left.

17         I think we're okay, Your Honor.

18         **THE COURT:**  All right.  Very good.

19         Now, before we get started, Dawn, would you swear in

20  our witness?

21         **THE CLERK:**  Yes.

22         (Thereupon, the witness was sworn.)

23

24

25

1          **THE WITNESS:**  I do.

2          **THE CLERK:**  Okay.  Thank you.

3          **THE COURT:**  All right.  Mr. McNeil, is that your

4     name?

5          **THE WITNESS:**  Clifton.

6          **THE COURT:**  Please have a seat.

7          **THE WITNESS:**  Thank you.

8          **THE COURT:**  And may we take your photograph?

9          This is going to be used under the court's GLA

10    because we are going to show it at the end of the case because

11    it will remind the jury who everybody was, if the lawyers want

12    to do that.

13          But that's the only way we'll use this, so thank you

14    very much.

15          So the jury will understand, at the end of the case

16    your memory may not be so good about individual witnesses, but

17    if we let the lawyers see the pictures they can show it to you,

18    then we can help refresh your memory.

19          If this doesn't work we'll get another camera and

20    come back to it.

21          (Photograph taken.)

22          **THE CLERK:**  Okay.  Thank you.

23          **THE COURT:**  Great.

24          **MR. KATZ:**  Your Honor, I can't see the witness very

25    well.  Is it okay if I sit over there?

1              **THE COURT:**  Sure.  Go ahead.

2              Mr. LeClair, remind the jury who you are.

3              **MR. LECLAIR:**  All right, your Honor.  I'm Lew

4  LeClair.  I'm one of the lawyers for the plaintiff in the case,

5  the class in the case.

6              **THE COURT:**  Great.  Go right ahead.

7                        **CLIFTON MCNEIL,**

8  called as a witness for the Plaintiffs herein, having been

9  first duly sworn, was examined and testified as follows:

10                      **DIRECT EXAMINATION**

11  BY MR. LECLAIR::

12  Q.   Would you state your name, sir.

13  A.   Clifton McNeil.

14  Q.   Mr. McNeil, where were you born?

15  A.   Mobile, Alabama.

16              **THE COURT:**  Now, let me stop you, because you –– it

17  would be better if you lean forward and let the mic catch your

18  voice.

19              I want to make sure everybody on the jury can hear

20  you okay.

21              If anyone over there cannot hear at any time or

22  cannot see, raise your hand and let me know, and we will make

23  an adjustment.

24              All right.  Go ahead, Mr. LeClair.

25  BY MR. LECLAIR:

1  Q.   You're from Mobile and I'm from Dallas.  We've had the

2  Brooklyn lawyers, but now it's the two southerners.

3         Are you a required professional football player?

4  A.   Yes, I am.

5  Q.   And is your family in the courtroom?  Is your wife in the

6  courtroom?

7  A.   My wife is in the courtroom, Ruby.

8         MR. LECLAIR:  Would she stand up, please?

9         Thank you.

10 BY MR. LECLAIR:

11 Q.   And how long have you been married, sir?

12 A.   Will be 44 years in December on the 28th.

13 Q.   And did you grow up in Mobile, Alabama?

14 A.   Yes, I did.

15 Q.   Did you go to high school there?

16 A.   Yes, I did.

17 Q.   Were you an athlete in high school?

18 A.   Yes, I was.

19 Q.   What sports did you play?

20 A.   Football, basketball, baseball and ran track.

21 Q.   Were you able to go to college on an athletic scholarship?

22 A.   Yes, I was.

23 Q.   Where did you go?

24 A.   I went to Grambling State University.  It used to be

25 Grambling College, when I attended.

1  Q.   And where is that, sir?

2  A.   That's in Louisiana.

3  Q.   While you were at -- you'll need to lean forward, if you

4  can, Mr. McNeil.  You're a little soft-spoken.  We want the

5  jury to hear you.

6         When you went to Grambling, did you play multiple

7  sports?

8  A.   Yes, I did.

9  Q.   Which sports did you play?

10  A.   I participated in football, baseball, and I also ran

11  track.

12  Q.   What was your favorite of those at the time?

13  A.   When I first began, I went there on a baseball

14  scholarship.  So I started off thinking that, like most

15  Mobilians, like Henry Aaron and some of the others, that I

16  would be a Major League Baseball player.

17         I had a lot of scholarship offers when I was leaving

18  high school.  So I chose Grambling because I wanted to be a

19  Major League Baseball Player.  So when I first started,

20  baseball was my favorite sport.

21  Q.   While you were in college, did you receive any special

22  recognition, all-American of any kind?

23  A.   I made academic all-American in both baseball and

24  football.

25  Q.   Now, you indicated you had planned to be a professional

1  baseball player.  Did something happen to change your plans,

2  sir?

3  **A.**    Yes.  I was drafted by the Cleveland Browns during my

4  junior year in college.  And my parents got -- were both ill

5  during my senior year.  And prior to the end of the baseball

6  season, we needed money for the family, so the Cleveland Browns

7  offered me a signing bonus if I were to sign a football

8  contract.

9          So I opted out to sign the football contract so that

10 I could support the family financially.

11 **Q.**    How old are you, sir?

12 **A.**    Beg your pardon?

13 **Q.**    How old are you?

14 **A.**    68.

15 **Q.**    All right, sir.  And so when you -- when you first were

16 drafted, what year was that?

17 **A.**    1963.

18 **Q.**    All right, sir.

19          And did you finish out college before you started

20 playing pro ball?

21 **A.**    Yes, I did.

22 **Q.**    And was it unusual or not unusual for you to be drafted

23 after your junior year at that time as opposed to after your

24 senior year?

25 **A.**    Back in those days they had what they call "future draft

1  choice."  And during that period of time, a future draft choice

2  was usually someone who maybe got set back in his class for

3  whatever reasons might be.  That didn't happen to me.

4          I believe that what happened, the Cleveland Browns

5  were so sure that I was going to play major league baseball as

6  they were scouting me that they just took a chance to draft me

7  during my junior year rather than waiting for my senior year in

8  the event I chose to play football instead of baseball.

9  **Q.**  In 1963, did you then start playing professional football

10 with the Cleveland Browns?

11 **A.**  Yes.  After I graduated I played football with the

12 Cleveland Browns.  That was my rookie year.

13 **Q.**  What position did you play, Mr. McNeil?

14 **A.**  I played wide receiver.

15 **Q.**  Were you known for anything in particular?

16 **A.**  I could run pretty fast, catch the ball.

17 **Q.**  All right, sir.  Speed was what you were known for?

18 **A.**  That was one of them.

19 **Q.**  How long did you play in the NFL?

20 **A.**  11 years.

21 **Q.**  Did you play for the Cleveland Browns all of that time or

22 just for part of that time?

23 **A.**  I played for the Cleveland Browns for my first five years

24 in the National Football League.

25 **Q.**  So you played there from the 1963 through the 1967

1  seasons?

2  **A.**    That's correct.

3  **Q.**    Did you happen to win any championships while you were the

4  Cleveland Browns?

5  **A.**    Yes.  We won the 1964 world championship.  That was prior

6  to the Super Bowl.  It used to be world championship from the

7  top two teams in football.

8  **Q.**    So this goes a long way back because there wasn't even a

9  Super Bowl back in 1965.

10  **A.**    No, it wasn't.

11  **Q.**    All right, sir.

12         Now, after you played for five years with the

13  Cleveland Browns, what happened next?

14  **A.**    I was traded to the San Francisco 49ers, and I played with

15  them.

16  **Q.**    And did you play -- how many seasons with the

17  San Francisco 49ers?

18  **A.**    Two years.  I played the '68 and '69 seasons with the

19  49ers.

20  **Q.**    Let me ask you, Mr. McNeil, was this something where you

21  decided you wanted to move to San Francisco, and so you picked

22  up and moved, or was it somebody else's decision?

23  **A.**    It was is someone else's decision.  Let me kind of clarify

24  what happened.

25         As a player, we didn't have a right to determine to

1  what team we would be traded or if we would be traded.  That

2  was left to the discretion of the owners.

3          So the owners, along with their head coaches, made

4  that decision.  And I guess based upon what a team's needs was

5  or the player's desirability in another position determined

6  whether he would be traded.

7  **Q.**   So you -- you were traded, and I guess they just called

8  you one day and said "You're traded"?

9  **A.**   That's what happened.  Towards the end of the exhibition

10  season for '68, right before the regular season started, I was

11  traded to the San Francisco 49ers from the Cleveland Browns.

12  **Q.**   Did you continue to play wide receiver while you were with

13  the San Francisco 49ers?

14  **A.**   Yes, I did.

15  **Q.**   And I guess maybe some of the jury has heard about a term

16  called "a no-trade contract," which may be a modern thing.  Did

17  that even exist back in the '60s when you were playing, sir?

18          **MR. MEYER:**  Your Honor, I'll object to the relevance.

19          **THE COURT:**  What's the relevance?

20          **MR. LECLAIR:**  It's just background, Your Honor.  I

21  will just move on.

22          **THE COURT:**  Move on.

23          **MR. LECLAIR:**  All right, sir.

24  **BY MR. LECLAIR:**

25  **Q.**   While you were with the San Francisco 49ers, did you --

1   did you get any special recognition while playing for the

2   49ers?

3   **A.**   Yes.  I led the league in pass receiving, made consensus

4   All Pro.  And so -- and I made the Pro Bowl team.

5   **Q.**   All right, sir.

6            Now, what happened after the 1969 season?

7   **A.**   After '68 season I could tell you.  I was traded -- I had

8   a contract dispute that may or may not be relative, but I was

9   later traded to -- in 1970, to the New York Giants football

10  team.

11  **Q.**   And how long did you play for the Giants?

12  **A.**   I played for them '70 and '71.

13  **Q.**   Did you end up living in the Bay Area after you retired

14  from football?

15  **A.**   Yes, I did.

16  **Q.**   For how long?

17  **A.**   It was a long time.  I left the Bay Area in 1988, and I

18  moved to Mobile, Alabama.

19  **Q.**   I want to ask you, Mr. McNeil, about the union and your

20  participation in it.

21           Were you a member of the NFLPA during your time as a

22  player?

23  **A.**   Yes, I was.

24  **Q.**   And did you ever serve in any leadership position with the

25  union?

1  **A.**    Yes, I did.

2  **Q.**    What role?

3  **A.**    In the role as player representative.  I played -- I was a

4  player representative twice during my career in the National

5  Football League.

6  **Q.**    Did you think that the union served an important role for

7  players while you were a player?

8  **A.**    When I was a player, when I first got started, coming from

9  my southern background I didn't really understand, like I think

10 many of the players, the true value of the union.  But I later

11 came to depend upon the union quite a bit.  Because, as you

12 know, football is a short-term career.

13         The average life span or career span of a football

14 player was less than four years even then.  And now it's not

15 much more than that.

16         So the union was really our lifeline that allowed us

17 to have a continuum once our careers were over.  But it was

18 also a collective bargaining agreement that was happening.

19 That was the connection between the owners and the players,

20 whereby we were able to exercise some rights to improved

21 benefits.

22         So I looked upon the union as something that was

23 very, very, very important.  It was the thing that gave the

24 players voices.  And we became someone more than identities as

25 just people who were participating on the football field.

1          Because of the short-term career we ended up being

2    concerned about injuries and other things that would happen.

3    So the player union who was negotiating for our behalf became

4    very, very important to all of the active players, but in

5    particular to me.

6    **Q.**   All right, sir.  I want to turn to your career after

7    football.  How old were you when you retired from professional

8    football?

9    **A.**   I was either 32 or 33.  I don't remember exactly how old I

10   was.

11   **Q.**   And did you just stop working at that point or did you end

12   up taking another job?

13   **A.**   I was working all along.  Most of the football players,

14   because we understood that we had short-term careers, always

15   found something extra to do.  Because what we had to do had to

16   develop a career within a career.

17          So, yes, I did mostly working with people.  I

18   remember in Cleveland I worked with kids who were having

19   problems in Huff area.

20          I worked for the State of Cleveland in the

21   penitentiary system.  I did a lot of speaking engagements.  I

22   took those kind of jobs.

23          Then, after I moved to -- went back to California, I

24   worked in sales and things that were centered around people.

25   **Q.**   All right, sir.  So you -- you worked in sales and

1  marketing after you retired from football?

2  **A.**   Yes, I did.

3  **Q.**   And did you continue to work continuously then until you

4  moved back to Mobile?

5  **A.**   Yes, and even after moving back to Mobile I worked.  I

6  also went into ministries.  That's the main reason I left from

7  California and went back to Mobile because I was going into

8  ministry.

9         And after I got back home, Mobile being a home,

10 people knowing me there, my brother had to start a ministry, I

11 went there to give him support.  So I had to get started all

12 over again in my hometown.

13 **Q.**   All right, sir.  When you got back to Mobile -- and this

14 would have been 1990 or so?

15 **A.**   1988, I think.

16 **Q.**   All right, sir.  And what employment, if any, did you have

17 in Mobile?

18 **A.**   I worked with is JTPA.  That was the job program that the

19 government had that helped young people who were in high school

20 and contemplating going to college, get some work and some

21 experience, job experience and earn extra monies during the --

22 in-between school sessions.

23        Also people who were in college when they came back

24 home they could get some job experience and earn some extra

25 money.  So I worked there for about -- did that kind of work

1  for eight years.

2          And I went into other fields of sales.

3  **Q.**   Did you become a teacher at some point?

4  **A.**   Yes, I did.  I became a teacher.  And I've been a teacher

5  now for at least ten years, the last ten years.  I'm currently

6  working now as a teacher in a middle school.

7  **Q.**   And what grade pupils do you teach?

8  **A.**   Teach 8th grade math and science.

9  **Q.**   All right, sir.

10         And you mentioned you went into ministry.  Are you

11  also an associate pastor somewhere?

12  **A.**   Yes, I am.  I've been associate pastor from the second

13  year I went back to Mobile.

14  **Q.**   Okay.  Mr. McNeil, I want to talk about the marketing of

15  your image or rights.

16         While you were a player back in the '60s and early

17  '70s, did you make any effort to market your own image at that

18  time?

19  **A.**   No, I didn't.

20  **Q.**   Why not?

21  **A.**   Well, I felt that I, like many of the other professional

22  football players, were so involved with our short-term career

23  that we spent most of our time promoting what our next job was

24  going to do.

25         I had opportunities after I led the league and after

1  I had made all pro the second time there were people who had

2  approached me to market my career.  But I was so involved with

3  my family, two natural children, four nephews that I raised as

4  my sons, starting when they were 7 through 9, until I just got

5  more involved with developing the career beyond football than I

6  was trying to develop a -- or market myself as a football

7  player.

8  **Q.**   All right.  Let's talk about after football.  After you

9  retired did you have opportunities to market yourself as a

10 player having been a player?

11 **A.**   I had opportunity, but I didn't take it.

12 **Q.**   And why not?

13 **A.**   Because, again, I was more oriented towards making a

14 living for my family than I was -- the things that I guess I

15 had a zeal for, a passion for was dealing with, working with

16 people.  So I spent most of my time working with people rather

17 than try and market myself.

18 **Q.**   So have you -- have you earned any significant amount of

19 money from endorsements or marketing, licensing income related

20 to being a football player at any time during your career?

21 **A.**   No.  The most monies I made was doing speaking engagements

22 when I spoke from all over the country to people who wanted me

23 to speak to groups.

24 **Q.**   But do people still recognize you as a football player in

25 your hometown?

1  **A.**   Yes, they do.

2  **Q.**   We'll show in a minute some cards.  Did you have football

3  cards that were -- that were produced that had your -- your

4  name and picture and so forth on them?

5  **A.**   Yes.  In fact, as far as I'm concerned those football

6  pictures have been produced for as long as I can remember.  And

7  ever since I've been retired I've still been signing a lot of

8  baseball cards.

9          In fact, last week I had at least five or ten cards.

10 That normally happens.  People send me letters and cards, and I

11 sign those cards, and I send them back to them.

12 **Q.**   So you receive in the mail, you actually receive cards

13 with letters in the mail that people want you to autograph and

14 sent back to them?

15 **A.**   Yes, I do.

16 **Q.**   And how often do you say that happens?

17 **A.**   I get at least five, ten or more each week, weekly.

18 **Q.**   And do you charge when you do that?

19 **A.**   No, I don't.

20 **Q.**   You just sign it and send it back?

21 **A.**   I just sign them and send them back.

22 **Q.**   I want to ask you now, Mr. McNeil, about this GLA

23 contract.  And I think you have in front of you -- should be

24 the top document -- Exhibit 1223.

25 **A.**   I have it.

1  **Q.**   And I believe this is the one signed by you; is that

2  correct, sir?

3  **A.**   That's correct is.

4           **MR. LECLAIR:**  Your Honor, I would like to move the

5  admission of Exhibit 1223.

6           **MR. MEYER:**  No objection, Your Honor.

7           **THE COURT:**  Received.

8           (Trial Exhibit 1223 was received into evidence.)

9           **MR. LECLAIR:**  All right.  We'll put that up on the

10  screen for the jury.

11          (Document displayed.)

12  **BY MR. LECLAIR:**

13  **Q.**   Mr. McNeil, I want to get a little background to this.

14  This is a document that's signed by you.  It shows to be signed

15  on June 21, 2002; is that correct?

16  **A.**   That's correct.

17  **Q.**   Now, do you remember, Mr. McNeil, did you ever sign one of

18  these before 2002?

19  **A.**   It just seemed to me like I had signed more than one, but

20  I just can't recall exactly when.  But I know I signed this one

21  because it's right before me.

22  **Q.**   And if you did sign one before, you've been unable to find

23  a company of it; is that right, sir?

24  **A.**   Correct.

25  **Q.**   And how did you happen to receive this particular one-page

1  Exhibit 1223?  How did you get it?

2  **A.**    It came in the mail.

3  **Q.**    And who sent it to you?

4  **A.**    Players Association.

5  **Q.**    And do you occasionally still receive mail from the

6  Players Association?

7  **A.**    I only get like an annual report now days.

8  **Q.**    Have you remained a retired member of the union, the

9  Players Association?

10  **A.**    I had.  For some reason I didn't receive my last request

11  for them to send me the form I needed to sign.

12  **Q.**    But you did stay a retired member for a considerable

13  period of time after you stopped playing football?

14  **A.**    Yes, I did.

15  **Q.**    All right.  And when you got this letter agreement in the

16  mail, Mr. McNeil, did you -- did you go hire a lawyer to look

17  at it for you?

18  **A.**    No, I didn't.

19  **Q.**    Why not?

20  **A.**    Well, truth of the matter is, I relied upon the Players

21  Association, because it had come from them.  I figured that

22  they had all the lawyers that needed to look at it to look at

23  it.

24          So I just felt like if I were to sign it that the

25  clauses in here would be -- I would be protected, that they had

1  looked at it, and that this was something I didn't have to go

2  to an extra person to end up incurring additional expenses for.

3  **Q.**  Did anybody from the Players Association ever call you and

4  explain any of the terms in this letter agreement?

5  **A.**  No.

6  **Q.**  I take it -- I think this is clear, but I just want to be

7  sure.  Did you write any of the words in this letter agreement,

8  Exhibit 1223?

9  **A.**  No, I didn't.

10  **Q.**  Did you ask to change any of the words in this letter

11  agreement?

12  **A.**  No, I didn't.

13  **Q.**  Now, did you sign and return it back to the NFLPA?

14  **A.**  Yes, I did.

15  **Q.**  Why did you -- why did you sign it and send it back,

16  Mr. McNeil?

17  **A.**  Well, the main reason is I felt like there could be an

18  opportunity for me to get additional income, as a former

19  player.

20      And the reason why I signed it -- let me tell you why

21  I signed it.  I signed it because some time ago when I was an

22  active player, unlike what has been expressed earlier, National

23  Football League Properties had rights to the players, when I

24  was actively involved, and when I was a player representative.

25      So marketing rights basically went to the National

1  Football League properties.  We as players and union members

2  who made requests to try to find out how much monies, revenues

3  that were generated by the National Football League through the

4  National Football League Properties, their marketing arm, we

5  never had an opportunity, and they never disclosed anything to

6  us.  So that never was part of our bargaining during our

7  collective bargaining sessions.

8         But my understanding was at some point in time that

9  the players were given the right that they had not previously

10 had, since the owners didn't want to share with us in National

11 Football League properties, I felt like this was an opportunity

12 where we could get a chance to possibly make monies off of

13 group marketing, where before the owners had all of the

14 exclusive rights to it.

15 **Q.**   That was a long answer, and I want to make sure we're

16 clear on what you're saying, Mr. McNeil.

17        Back when you played, tell us your understanding of

18 who had the rights over the players and their -- their sort of

19 images, if you will?

20 **A.**   The owners.

21        **MR. MEYER:**  Object to the relevance, Your Honor.

22        **MR. LECLAIR:**  Well, Your Honor, I do think this is

23 relevant because it's going to explain some of the confusion

24 about why he didn't complain and what was going on in his mind.

25 I think it sets the stage for what he understood.

1          **THE COURT:**  Go ahead.  Overruled.

2    **BY MR. LECLAIR:**

3    **Q.**   So back in the '60s, what was your understanding of who

4    had the rights over players images and so forth?

5    **A.**   In the '60s and '70s during the time I played, and I was

6    also at the end of my career a player representative, the

7    owners had the rights through the National Football League

8    Properties in our base contract.

9    **Q.**   And you mentioned an entity called "NFL Properties."  Is

10   that the entity of the owners?

11   **A.**   Yes, it is.

12   **Q.**   All right, sir.  And at some point you had -- did you have

13   an understanding one way or another as to whether some

14   agreement had been reached between the owners and the union?

15   **A.**   My understanding then was the owners did bypass the union

16   when they got ready to deal with marketing, and they just --

17   they used it as though it was chattel property.

18          (Reporter interrupts.)

19   **A.**   Chattel,  C-H-A-T-T-E-L.  Chattel property, in which they

20   had the right to use our images, et cetera, for marketing

21   purposes as they saw fit.  And, basically, the union could do

22   nothing about it.

23   **Q.**   All right, sir.

24          **MR. MEYER:**  Your Honor, I move to strike that last

25   part about what the union did or didn't do.

1          **THE WITNESS:**  That's my understanding, sir.

2          **MR. LECLAIR:**  Hold on, Mr. McNeil.

3          **THE COURT:**  This is still on the background?

4          **MR. LECLAIR:**  Yes, it is, Your Honor.

5          **THE COURT:**  Overruled, but let's move on.  You spent

6    enough time with this.

7    **BY MR. LECLAIR:**

8    **Q.**   Now, when you signed this Exhibit 1223, Mr. McNeil, did

9    you feel you were conferring any benefit on the union by doing

10   that?

11   **A.**   Well, when I signed this I just thought it was an

12   opportunity for me to make additional monies.  And that the

13   union had now, because that's the only reason why I went into

14   my explaining it earlier, I felt that the union had rights that

15   were given to them that they previously hadn't had.  And this

16   was the first opportunity for players to start receiving some

17   benefits that previously they didn't because the owners had all

18   the rights to it in the National Football League Properties.

19          So I signed it thinking that this was going to be an

20   opportunity for me as a retired player to begin making monies

21   from marketing.

22   **Q.**   Let me ask you a little different question, Mr. McNeil,

23   which is:  What were you giving to them?  What were you giving

24   to them, as you understood it?

25   **A.**   I was giving them the right to my image and my likeness as

1  far as marketing me along with other group members.

2  Q.   And tell me what you expected to happen after you signed

3  this agreement, Mr. McNeil.  Did you think you were going to do

4  something, or did you think the union was going to do

5  something?

6  A.   I felt that the union was going to market the rights to

7  six or more players to a third party, and that there would be

8  revenue or income generated, and I would get an opportunity to

9  earn some monies.

10 Q.   I want to direct your attention now -- if we could bring

11 up the second paragraph.

12          (Document displayed.)

13          There's a definition here, Mr. McNeil, of group

14 licensing programs which are defined, as quote:

15               "Programs in which a licensee utilizes a total

16 of six or more present or former NFL player images in

17 conjunction with or on products that are sold at retail or used

18 as promotional or premium items."  Period, closed quote.

19          Tell me just your understanding of what was going to

20 happen and what you were participating in.

21 A.   Well, I felt like this was going to be an opportunity for

22 me, as a retired player, for people who wanted to use my rights

23 that had been previously used along with some of the other

24 current players who were playing, that, a third party could use

25 us as he saw fit.  And I trusted that the union would enter

1    into a contract.  From my understanding of the way I read it,

2    that I would be compensated as a member of a group in this GLA

3    program.

4    **Q.**    There's been some discussion about differences between

5    actives and retireds.  And I want to ask you, Mr. McNeil, to

6    tell us whether you thought you were talking about something

7    separate for retireds or something that was a group involving

8    both actives and retireds?

9    **A.**    I thought this was a group license that involved both.  I

10   did not know exactly what the active players had to sign.  I

11   didn't know exactly -- but I did know that as a retired player

12   this is what was sent to me.

13            My understanding, my perception of what was going on

14   at that time was that the players' union, after they talked to

15   their legal arm, had sent this to me and other retired players

16   so that we could enjoy a benefit.

17            And it seemed to me like they engaged in a contract

18   with active players, too, because this seemed like a group

19   contract that involved both active and inactive.  And they

20   could use us as they saw fit.

21   **Q.**    Did you have an expectation one way or another as to

22   whether the union was going to actively market your rights?

23   **A.**    Sure.  I thought that they were going to actively market

24   the rights of whomever was chosen or desired by a third party.

25   **Q.**    Has anybody from the NFLPA ever told you that there is a

1  different definition of group licensing different from what is

2  set forth in the words of Exhibit 1223?

3  **A.**   No.

4  **Q.**   Have you ever discussed with anyone there being any

5  different definition of group licensing other than that

6  definition that's on the board from Exhibit 1223?

7  **A.**   No.  This is all I had at my disposal.

8  **Q.**   Now, with respect to the use of different people, did you

9  think that you would be included in every single license that

10  was being granted or not?

11  **A.**   Well, let me explain it.  I understood that any members of

12  the group, either active or retired players that are third

13  party, would desire to use for whatever marketing purposes, be

14  it card, be it pictures or whatever, didn't make me any

15  difference, movies or whatever, I felt that if I was a member

16  of the group then I would be one who would participate in the

17  sharing of the revenues.

18          But it was left to the option of those.

19          Now, my perception is that 2000 or however many -- I

20  had no idea at that time -- but however many retired players

21  was left to the disposal of the players' union to use as they

22  see fit, and the third party could choose whomever they wanted,

23  any group, as long as it was six or more.

24          So in my mind what I fathomed was -- take, for

25  example, the baseball cards.  I know that my baseball cards

 1  have been out there forever.  Okay?  I also knew by this time

 2  that there were Madden games and other things that were being

 3  sold.

 4          So what I felt is that now all the sudden I have a

 5  chance to participate with both active players and former

 6  players, because they were using teams, not just individuals.

 7          This ad hoc, as some people have spoken about

 8  earlier.  And this is what my perception was, because this is

 9  why I thought the players' union would have me to sign a

10  group -- this GLA.

11  **Q.**   All right, sir.  I want to highlight now the fifth

12  paragraph of this Exhibit 1223.

13          (Document displayed.)

14          The language of that, Mr. McNeil says, quote:

15          "It is further understood that the monies

16  generated by such licensing of retired player group rights will

17  be divided between the player and an escrow account for all

18  eligible NFLPA members who have signed a group licensing

19  authorization form."  Period, closed quote.

20          I want to first focus on that language "such

21  licensing of retired player group rights."  And tell us your

22  understanding and your perception at the time as to what that

23  meant.

24  **A.**    This is what it meant to me, and it still means this to

25  me today.  It meant that they were talking about retired

1 players who would be able to enjoy some of the benefits from a

2 third party whenever income was generated, along with eligible

3 National Football League Players Association members.

4         So I'm thinking they are still covering both retired

5 players, as well as active players just in that form that I had

6 read.  And I --

7 Q.  Let me just -- excuse me.  I didn't mean to interrupt you,

8 sir.

9         Let me take a specific example.  If an end-user used

10 a hundred actives and a hundred retireds, but didn't

11 specifically pick you, tell us whether you perceived that you

12 would participate or not participate?

13 A.  Well, I felt that this was a group contract.  That's why

14 it's not an ad hoc contract or an individual contract.  And I

15 felt that all the members of the group, like in the Players

16 Association, whenever they give benefits, they give benefits to

17 everybody, not just one or two members of it.

18         This is the group.  The Players Association to me is

19 a group.

20         And my perception was that as long as I'm a member of

21 the group and income is generated wasn't going to an individual

22 in the group, but it was going to be monies that was going to

23 be put collectively into a group and divided accordingly.

24 Q.  Did anybody ever call up and tell you that that

25 understanding was wrong or tell you some different

1  understanding?

2  **A.**    Nobody ever contacted me again.

3  **Q.**    I want to ask you about these individual agreements.  I

4  think they've been referred to as ad hoc agreements.

5          Did you ever sign any individual agreement?

6  **A.**    No.  I came close to signing an individual agreement with

7  a third party directly myself, without having to go through the

8  players' union.  I had that right as an individual.

9  **Q.**    But you never signed one?

10  **A.**    No, I didn't.

11  **Q.**    All right, sir.

12          And are you trying to claim here in this any amount

13  of the ad hoc money that was paid where somebody contracted to

14  pay Jim Brown, who was one of your teammates, right?

15  **A.**    That's correct.

16  **Q.**    If he had an individual contract to get paid a hundred

17  thousand dollars by somebody for him, are you trying to get

18  that?

19  **A.**    No.  My understanding is that if a third party during the

20  years, sometime between 2002 and the end of 2005, I don't know

21  exactly how -- I didn't even go into how the union was going to

22  market us.  I just trusted that they would market us so that we

23  could benefit.

24          And I felt that the reason they got me involved in it

25  and retired players was that we had a market value.  Because I

1  had seen myself on cards.  I had also seen myself represented

2  in the Madden game.

3          In fact, people had come to me and said -- asked me

4  when I had played.  They said that they had played me.  I

5  caught touchdowns and whatever.

6          So I had seen that.  I never had gotten paid, so I

7  felt like this was my first opportunity to finally get some

8  money.

9  **Q.**  Now, did you have anything to do with when the union was

10  out negotiating with a third party, as to whether they were

11  doing a group license, an individual ad hoc agreement?  Did you

12  have anything to do with that?

13  **A.**  No, I didn't.

14  **Q.**  Was that Players Inc and the union that did all of that?

15  **A.**  I didn't even know about Players Inc.  I didn't know

16  exactly how the players' union did it.

17          All I my knew this was an agreement that the Players

18  Association had sent me.  I didn't know how it had come --

19  another organization other than -- I didn't know about that

20  they had organized them through the Players Inc.  I didn't

21  know, for example, that EA had engaged into a contract with

22  somebody other than this.

23          But if that's the way that the players' union chose

24  to market themselves as a profit-making entity instead of a

25  nonprofit-making entity, that was left up to them.  I trusted

1  that the union was going to look out for my benefit.

2  **Q.**    And I want to look back -- go back to 1223 one second.

3              (Document displayed.)

4              The reference in the fifth paragraph to the money

5  that's going to be divided, sir, did you understand -- tell me

6  whether your understanding of such retired player group rights,

7  the licensing of such retired player group rights referred to

8  the second paragraph definition of group licensing or some

9  other definition.

10             **MR. MEYER:**  Objection.  Leading, Your Honor.

11             **MR. LECLAIR:**  I don't think it's leading, Your Honor.

12             **THE COURT:**  It's borderline.  Overruled.

13             Go ahead and answer.

14             **THE WITNESS:**  That's -- that's the only reference

15  that I had at that point that I could refer back to.  So I

16  connected those two together because I thought it was -- it was

17  my perception, still is my perception that the Players

18  Association wanted to make sure that they had retired as well

19  as active players covered under the licensing agreement, so

20  that if a third party wanted to use us they had the freedom to

21  do so with the ones who had signed.

22  **BY MR. LECLAIR:**

23  **Q.**    But if the group was used, whether active or retired, did

24  you think you were sharing in the money?

25  **A.**    If there was a third party who paid under the group

1  licensing during this period of time when the players' union

2  was under contract, it could use either/or.  I felt like I

3  would be compensated.

4  **Q.**   All right, sir.  Now, I want to ask you about you signed

5  this in 2002.  And it extended for three years, did it not,

6  sir, through the end of 2005?

7  **A.**   Correct.

8  **Q.**   And from the time you signed it, until recently, did you

9  ever complain to the union about the fact that you hadn't

10 received what you felt you should receive?

11 **A.**   No, I didn't.

12 **Q.**   Tell us why you didn't.

13 **A.**   Because I felt that apparently the union did not make any

14 monies at all marketing retired players or the active players

15 that we were talking about.  And if -- what my connection at

16 that time I still think about National Football League

17 properties.  That's the reason why I brought it up earlier.

18 Because the owners were the ones.

19          And then, I started remembering at some point in time

20 seemed to me like the owners had given the players' union the

21 right to market themselves rather than them just marketing.

22 **Q.**   Did you -- had you seen any of the agreements that the

23 players' union has entered into with any of the third-party

24 licensees?

25 **A.**   No.

1   Q.   Did you know the terms of any of those agreements?

2   A.   No.  The only thing I was familiar with was the one that

3   they had sent me in the mail.

4   Q.   Can you tell us of any report you received that explained

5   in detail what the terms were of the license agreements by the

6   union?

7   A.   Nothing.

8   Q.   Is that the reason you didn't follow up with the union?

9           MR. MEYER:  Objection.  Leading, Your Honor.

10          THE WITNESS:  I did not --

11          MR. LECLAIR:  Fair enough.  I'll withdraw it.

12  BY MR. LECLAIR:

13  Q.   Did you believe that if you were owed the money the union

14  would pay it or not pay it?

15  A.   I believed that if I were owed the monies that the union

16  would pay.  So I assumed that they didn't make any money.

17  Q.   Did you think you had to call them up and beg for the

18  money?

19  A.   No.  My assumption was that they didn't make -- apparently

20  they didn't make any money, because I never received a penny

21  from it.

22  Q.   All right, sir.  I want to now show you -- I think in

23  front of you you should have Exhibit 1321.  Can you see if you

24  can find that, sir?

25  A.   Sure.

1              **MR. LECLAIR:**  Hold on, please.

2              **THE COURT:**  We'll do one more document, and then it's

3    time for a break, unless you are close to finishing.

4              **MR. LECLAIR:**  I'm not, Your Honor.

5              **THE COURT:**  Let's do one more document, and then

6    we'll take a 15-minute break.

7              **THE WITNESS:**  1321.  I have it.

8    **BY MR. LECLAIR:**

9    **Q.**  And just tell us what these are, Mr. McNeil.  It's four

10   pages.  And tell us what it is.

11   **A.**  Well, the first page is the first page of a card that has

12   a picture of me as a San Francisco 49er.  And it was the year

13   after I had led the league in pass receiving, because it has

14   the previous year of what my statistics was as a receiver.

15             And the second page is a picture of me after I was

16   traded to the New York Giants.

17   **Q.**  Let me stop you there, Mr. McNeil, because I want to get

18   it in evidence.

19             Are all those pages pictures of trading cards of you?

20   **A.**  Yes, they are.

21             **MR. LECLAIR:**  All right.  I'll move the admission of

22   Exhibit 1321, Your Honor.

23             **MR. MEYER:**  Just object, Your Honor, that it's prior

24   to the statute of limitations, all of these cards.

25             **THE COURT:**  Overruled.

1          Received.

2          (Trial Exhibit 1321 was received into evidence.)

3  **BY MR. LECLAIR:**

4  **Q.**   And now, Mr. McNeil, the first page of this, tell us what

5  this is.  Just briefly, what is this card?  What year is it?

6  **A.**   This is a card of me in a Cleveland Browns uniform that

7  says "San Francisco 49ers."  And it's the year for 1969,

8  because it's the year after I had led the league in pass

9  receiving, and it gave those statistics.

10  **Q.**   All right, sir.

11          And I note up at the top, right under your name in

12  small print we see your -- it looks like your height, weight

13  and age and years pro.  Do you see that, sir?

14  **A.**   Yes.  It has my height, age, year -- years of pro and the

15  college that I had graduated from.

16  **Q.**   All right.  We'll come back to that later.

17          Let's go to the next page.  And tell us what this is,

18  sir?

19  **A.**   It's a picture of me in a San Francisco 49ers uniform.  It

20  says "New York Giants."  And it shows the year after I had

21  played for 1969.  That was getting ready to go into 1970.  And

22  it also gave what my statistics and lifetime -- what that

23  year's statistic was, as well as my lifetime stats were at that

24  time.

25  **Q.**   It's hard to read, but under your name it says, I believe,

1   sir:

2               "The Cinderella man of the 1968 season."

3          Do you see that language?

4   **A.**   Yes, I do.

5   **Q.**   Tell us what that reference was, sir.

6   **A.**   That was in reference to the fact that when I played for

7   the Cleveland Browns my first five years I basically was a

8   substitute who felt like he had a chance to play and should

9   have been starting.  Finally got an opportunity to play, and it

10  was like Cinderella going from rags to riches.

11          And they referred to me as the Cinderella man because

12  of the success I had when finally given the opportunity to

13  start.

14  **Q.**   All right.  Next, let's look at the next page.  And just

15  tell us what this one is, sir.

16  **A.**   This is a picture of me when I was playing with the

17  New York Giants, giving vital statistics, again.  Wrong birth

18  date, but that's okay.

19          And it has my statistics at the end.  It said that I

20  was a salesman working with an automobile company.

21  **Q.**   Okay.  And let's see.  Is there one more?  Oh, there is

22  one more.

23  **A.**   Yes.

24  **Q.**   Let's go to the next page.

25          And can you tell us what that one is, sir?

1  **A.**   This is a picture of me when I played with the New York

2  Giants.  And it was -- it's a card that they had.

3  **Q.**   And are these the kinds of cards that you still receive in

4  the mail every week?

5  **A.**   Yes, it is.

6  **Q.**   All right, sir.

7              **MR. LECLAIR:**  At this point we can take a break, Your

8  Honor.

9              **THE COURT:**  All right.  We're going to take a

10  15-minute break.

11              I want to set your mind at ease, though, ladies and

12  gentlemen of the jury, that you heard the lawyers refer to

13  1,321 exhibits so far.

14              And it went through your mind, I'm sure:  "Are we

15  going to have that many exhibits in the case?  Because if so,

16  that would take a long time, wouldn't it?"  The answer is no.

17  It's just the way that these have been numbered.

18              My guess is that maybe a hundred will be introduced

19  into evidence on both sides -- or, I mean, 50 per side.  So I

20  think you should not worry about that.  Sometimes jurors worry.

21  It's just the way these are numbered to keep track with the way

22  they were numbered in the various depositions.

23              So with that, I'm going to let you go back.  Remember

24  the admonition.  We'll see you back in 15 minutes.

25              (Thereupon, the jury was excused from the courtroom.)

1           THE COURT:  All right.  Mr. McNeil, you may take a

2   15-minute break, too.  See you back here in 15 minutes.

3           All right.  Everyone have a seat.  And let's make

4   sure that we have the same ground rule here.

5           While somebody is on cross-examination or under

6   examination, no talking to the witnesses, including your own

7   client.

8           Both sides, anyone going to fight me on that?  Okay.

9           If you've got a client who's on the ropes and they

10  are getting clobbered on cross-examination, you just got to sit

11  back and let it happen, even during breaks.  Okay?

12          MR. KATZ:  Your Honor, I would ask you to supplement

13  that rule and say the witnesses can't talk to anybody during

14  the break.

15          THE COURT:  Well, they can talk to their family

16  members and things like that.  But they can't talk to any

17  member of the legal team or the client.  Even the client.

18  Surely they can talk to their family members.  That's okay.

19          MR. KATZ:  I think it's a small price to pay.

20          THE COURT:  They can't be surreptitiously getting

21  help through the -- but I'm not going to go so far as to say,

22  for example, that Mr. McNeil can't talk to his wife.  That

23  wouldn't be proper.

24          Maybe it would be, but in an extreme case.  I don't

25  think it's warranted.  I'm just saying to the lawyers:  Do not

1  try to directly or indirectly fix up the way some witness is

2  getting clobbered while they're still subject to examination.

3          **MR. KESSLER:**  Your Honor, I just have a question.

4  Just like to know the Court's preference.  If it's during your

5  own examination, such as you are in the middle of your direct,

6  and there's a break, are you still prohibited from talking to

7  the witness while it's on your own examination?  Whatever the

8  Court wants.

9          Most courts would say when it goes to the other side,

10 but its it's up to, Your Honor, of course.

11         **THE COURT:**  Yes.  Yes, what you say is true.

12         What do you lawyers want to do?  We ought to have the

13 same ground rule.

14         **MR. KESSLER:**  I prefer, Your Honor, and I have no

15 objection, for example, to counsel talking to Mr. McNeil now if

16 he wants to, because he's still on his examination.  But that's

17 just how I always have mostly done it.

18         **THE COURT:**  I understand.  Let's have the same ground

19 rule.

20         **MR. PARCHER:**  No.  If Your Honor pleases, I think the

21 rule ought to be that once you start, lawyers shouldn't be

22 taking to the client.

23         **THE COURT:**  Even on direct?  Even for your own

24 witness?

25         **MR. PARCHER:**  I think the preparation -- trial

1   preparation is over, and we're in the game.

2           **THE COURT:**  Including when a witness goes overnight?

3   So they can't go to dinner and talk about anything overnight?

4           In other words, let's say Mr. McNeil goes to the next

5   morning?

6           **MR. PARCHER:**  How about a -- that's an agreed point.

7           **THE COURT:**  What?

8           **MR. PARCHER:**  That's an agreed point.

9           I think the rule of reason --

10          **THE COURT:**  There's no such thing as the rule of

11  reason with so many lawyers.

12          **MR. PARCHER:**  What does Your Honor think?

13          **THE COURT:**  Well, look.  I would -- what I'm going to

14  say then is this.  The rule applies, unless somebody wants me

15  to rule -- has a very good reason, of while your own witness is

16  on direct examination you can have a conference with the

17  witness, but the other side is entitled to inquire about it.

18          Maybe it would be protected by attorney/client.  Who

19  knows?

20          But once it starts on cross-examination then no one,

21  over dinner, over drinks, over nothing, can talk to that

22  witness while they're on cross-examination.  Because the

23  cross-examination is the most important part.

24          Now, if it's a witness where it's an adverse witness

25  and you're calling -- like you're calling Mr. --

1          **MR. PARCHER:**  Allen.

2          **THE COURT:**  -- Allen, then that is cross-examination.

3  So when that happens, Mr. Kessler, you have to take your lumps

4  and can't during recesses or during over dinner or recesses,

5  you can't try to fix up and throw lifelines and so forth.  He

6  just has to tough it out until the examination is over.

7          Now, if you don't do your -- you know, he may be

8  recalled.  So once the examination, the first examination is

9  done, then all bets are off.  You can go back to talking to

10 him.  And then, you call him in your case and so forth.

11         But while he's on examination, effectively

12 cross-examination, he is to be unapproached by lawyers or any

13 legal team or anyone indirectly for the legal team.

14         So is that clear?  So on direct examination with your

15 own client, while the direct examination is still going on,

16 it's okay to have a conference.

17         But not on cross-examination, or what is effectively

18 cross-examination.

19         Is that clear enough?

20         **MR. PARCHER:**  Yes, sir.

21         **MR. KESSLER:**  Absolutely, Your Honor.

22         **THE COURT:**  All right.  Let's follow that rule.

23         All right.  See you back here in a few minutes.

24         (Recess taken from 11:19 to 11:37 a.m.)

25         (The following proceedings were held in open court,

 1              outside the presence of the jury.)

 2          **THE COURT:**  Is there an issue?

 3          **MR. PARCHER:**  Can I make a brief application?  I can

 4  save it.

 5              I was thinking, or perhaps I wasn't thinking and was

 6  rethinking Your Honor's ruling.  And it just struck me -- and I

 7  just offer it to Your Honor for consideration -- if I'm

 8  cross-examining Doug Allen, it seems to me, as I think about it

 9  now, inherently unfair, I complete my cross-examination, and at

10  that point Mr. Kessler has the ability to go outside.  And

11  since he's putting Doug Allen on, correct, it's an unusual

12  situation, it goes backwards, that now he's speaking to Doug

13  Allen.  And inevitably he's covering directly or indirectly

14  what it is that went on in cross-examination.

15              So there's something about that that I would

16  respectfully ask Your Honor to consider or to reconsider.  Just

17  doesn't -- it just doesn't feel right.

18          **THE COURT:**  Well, what do you do back in Brooklyn?

19          (Laughter)

20          **MR. PARCHER:**  Well, you know, I never thought about

21  it.  But I will tell you this about California.  When I got out

22  in the hall, Chad Hummel grabbed me -- he's California, you

23  know -- and he said:

24              "What in the world are you doing suggesting that

25  that's okay?  It's inherently unfair."

1              And as he said it I said:

2                   "Oh, my God, I made a mistake."

3              So all I can tell you about what I do back in

4    Brooklyn, I admit it.  And with Your Honor's prior ruling, when

5    I'm wrong I admit it, too.

6              **THE COURT:**  What's wrong with -- because,

7    effectively, it's like on redirect.

8              **MR. PARCHER:**  Yes.

9              **THE COURT:**  In other words, on cross or on redirect,

10   no talking to the witness.  What's wrong with that?

11             **MR. KESSLER:**  I just want to understand the rules.

12   And I'll comply with any rule that's there.

13             Here is the issue:  We have an agreement that we can

14   cover on our examination of Mr. Allen materials that are beyond

15   the scope of his examination, so he doesn't come back twice.

16             It seems to me that if there are areas that he

17   doesn't touch upon at all, okay, and I'm going to put him on

18   for the first time in those areas where we agreed by

19   stipulation I could, there should be no problem -- I will wait

20   until his examination is finished.

21             But let's say his examination goes on for quite some

22   time, and then there's a break.  If it's still a new area for

23   the first time on direct, then I think -- otherwise, I never

24   get a direct --

25             **THE COURT:**  I'm going to stick with what I said

1  earlier.  It's during the period of actual cross-examination.

2          Mr. Parcher, you have a decent point.  But it's just

3  too hard to tell where the direct examination ends and where

4  the redirect starts.  So I'm not going to revise what I said,

5  even though it's not perfect.

6          **MR. PARCHER:**  Without being argumentative, can I

7  respond?  If the answer is no, I'll accept it.

8          **THE COURT:**  The answer is no.

9          **MR. HUMMEL:**  Your Honor, one more thing.  It has to

10  do with timing of a witness.

11          We have a witness here from Baltimore, Bruce Laird.

12  He flew out just to testify in this trial.  It's now 20 to

13  12:00.  We cannot get him on and off today.  But Mr. Allen is

14  only available tomorrow, and that was the Court's orders.

15          **THE COURT:**  Wait a minute.  You wrote me a letter and

16  said, by God, make Mr. Allen come here.  And I enforced that.

17          **MR. HUMMEL:**  Today.

18          **THE COURT:**  Now you're blaming.

19          **MR. HUMMEL:**  No, today.  You ruled on the 22nd.

20          **THE COURT:**  I said I wanted him here on Wednesday.

21          **MR. HUMMEL:**  Right.  And we asked for today.

22          So now the issue is this.  We have a witness here

23  who's from Baltimore.  I am only asking this in front of

24  counsel now, which is, if Allen can stay over until Thursday

25  morning, I'm confident --

1            THE COURT:  I'm not going to be here Thursday

2    morning.

3            MR. HUMMEL:  Fair enough.

4            THE COURT:  Remember.

5            MR. HUMMEL:  We have a witness scheduling problem.

6    We'll deal with it, Your Honor.  Thank you.

7            THE COURT:  Let's bring back our jury and continue

8    on.

9            MR. MEYER:  Your Honor, in the interest of not having

10   to disrupt to do this in front of the jury, I'm just

11   anticipating something that's going to come up, I think, very

12   shortly in Mr. McNeil's examination, which is that they're

13   going to show him some of the so-called scrambled images from

14   the Madden game.

15           And so we would request that when they do that -- I

16   understand we have a continuing objection to that subject, but

17   we would request that when they do that, that at that time it

18   would be appropriate for Your Honor to give the instruction on

19   scrambling that we previously discussed.

20           THE COURT:  Well, if I think it's appropriate I will,

21   all right.  I probably will, but I have to see if it fits.

22           MR. KATZ:  Your Honor, may I say something about

23   scrambling?

24           THE COURT:  Yes.

25           MR. KATZ:  I think it's important to distinguish

1  between the fact that it's absolutely true we have not sued

2  anyone for violating anyone's intellectual property rights with

3  respect to scrambling.  There's simply no allegation.

4          For Mr. Kessler to say as he did that you're going to

5  instruct them this is legal --

6          **THE COURT:**  It's legal for EA to do it.

7          **MR. KATZ:**  I don't think it is, actually.

8          **THE COURT:**  You conceded in your brief that it is.

9          **MR. KATZ:**  We said we did not allege it.

10         **MR. KESSLER:**  No, Your Honor.  Their brief clearly

11 said --

12         **THE COURT:**  Give me the brief.  Give me the brief and

13 I'll prepare that language.

14         **MR. KESSLER:**  Plaintiffs do not contend that EA's

15 scramble is a violation of the class members' intellectual

16 property rights.

17         **MR. KATZ:**  We do not contend.  That's exactly what I

18 said.

19         **THE COURT:**  Well, if it starts to make a suggestion

20 that there was something illegal about it, then I might have to

21 go beyond this.  But for the time being, this is what I'm going

22 to use.

23         **MR. KATZ:**  Thank you.

24         **THE COURT:**  All right.  Is this a fair statement?  I

25 want to get something maybe to say to the jury that's clear.

1              Will both of you agree with this?  That the class

2    members have never gotten any money out of the GLA.  Is that

3    true?

4              **MR. LECLAIR:**  Absolutely true.

5              **MR. KESSLER:**  Your Honor, unfortunately, there is an

6    exception to everything.  There was a Photo File program which

7    is a few dollars that were paid directly to GLA class members

8    just for having a GLA.

9              **THE COURT:**  That was or was not?

10             **MR. KESSLER:**  That was paid.  That was paid.

11             There was a -- that was for using photographs of

12   people that came up in a mass, and they were paid that money.

13   And there were -- there was an old EA program, the one that's

14   referred to in that letter going back to the -- to the 2000, I

15   guess, period, in terms of that.  But it extended into the

16   period where some -- that was some large group of class members

17   were given money under the GLA.

18             So there actually are two programs of very small

19   amounts of money that were generated.

20             **MR. KATZ:**  That's utterly false, Your Honor.  Those

21   monies were paid regardless whether you signed the GLA.  The

22   GLA had nothing to do with it.

23             **MR. KESSLER:**  Actually, Your Honor, that's not

24   correct.  Some members had GLAs that were paid by the GLAs.

25   Others --

 1              **THE COURT:**  Fine.  I'll deal with it in a different

 2   way.

 3              **MR. KESSLER:**  Thank you.

 4              **THE COURT:**  Please bring back our jury.

 5              **THE CLERK:**  Okay, Judge.

 6              **THE COURT:**  Tomorrow we will break at 12:30.  12:30

 7   we have a break tomorrow.

 8              (Thereupon, the jury returned to the courtroom.)

 9              **THE COURT:**  All right.  Welcome back, everybody.

10   Thank you for being patient.  Please have a seat.

11              And you may continue, Mr. LeClair.

12              **MR. LECLAIR:**  Thank you, Your Honor.

13   **BY MR. LECLAIR:**

14   **Q.**   Mr. McNeil, I want to turn now to the Madden game, to

15   Exhibit 1245, which is the bigger, thicker -- should be the

16   game, the first game.

17   **A.**   1245-1 and 2?

18   **Q.**   No, 1245 itself.  I think it's still under here.  No, I

19   think you should just -- right there.  See if that's not it.

20   **A.**   That's it.

21   **Q.**   Okay.  Go ahead and take that out, if you would, sir.

22              Is that 1245, or is that 1263?

23   **A.**   1245.

24   **Q.**   Okay.  And is that the 2003 Madden game?

25   **A.**   Yes, I believe so.

1  Q.   All right, sir.

2         **MR. LECLAIR:**  Your Honor, I'm going to move the

3  admission of Exhibit 1245.

4         **MR. MEYER:**  I think we previously made objections

5  which have been overruled, Your Honor.

6         **THE COURT:**  All right.  Received.  1245.

7         (Trial Exhibit 1245 was received into evidence.)

8  **BY MR. LECLAIR:**

9  Q.   Mr. McNeil, you're not a regular video game player; are

10  you, sir?

11  A.   No, I'm not.

12  Q.   And I take it -- until recently, had you ever even played

13  the Madden game?

14  A.   No, I hadn't.

15  Q.   But had anyone talked to you about the Madden game?

16  A.   Yes.  I had been talked about -- I had been exposed to the

17  Madden game for ages.  I have grandchildren.  And I'm a

18  football coach.  And many times the kids come stay overnight.

19  That would be their main course of entertainment.

20  Q.   All right, sir.  At my request have you actually played

21  the Madden game, 1245?

22  A.   Yes, I did.

23  Q.   And I want to show the jury some photographs from --

24  obviously, the game is a computer game.  It's interactive, and

25  so forth.  But we've taken a couple of photographs.  And the

1  first one is Exhibit 1245-1.  If you could take a look at that.

2  **A.**   Yes.

3  **Q.**   Is that a photograph that you actually saw from the game?

4  **A.**   Yes, it is.

5         **MR. LECLAIR:**  Your Honor, I'll move the admission of

6  Exhibit 1245-1.

7         **MR. MEYER:**  No objection, Your Honor.

8         **THE COURT:**  Received.

9         (Trial Exhibit 1245-1 was received into evidence.)

10        (Document displayed.)

11 **BY MR. LECLAIR:**

12 **Q.**   Mr. McNeil, this exhibit is from the 2003 Madden game.

13 And it appears to show a Team Select.  And at the top we have

14 the 65 Browns, and at the bottom we have the 89 49ers.  My

15 first question, sir, the 65 Browns, is that a team on which you

16 played?

17 **A.**   Yes, it is.

18 **Q.**   Did you at some point learn that this team was actually in

19 the Madden football game?

20 **A.**   Yes, I did.

21 **Q.**   And is it correct that the 65 Browns had a record of 11

22 and 3?

23 **A.**   That's correct, to my memory.  Best of my memory.

24 **Q.**   And when did you become aware that you could actually play

25 what are called vintage teams in the Madden game?  Did you

1  become aware of that?

2  **A.**    I became aware of it a long time ago, but I became more

3  familiar with it here recently.  Long time ago I learned

4  through my grandchildren and through my own son, who will come

5  to the house and play sometimes, and through some of the other

6  football players that would come over and play.

7  **Q.**   All right.  Now, I want to -- if you would pull out

8  Exhibit 1263, which is also a game which is right in front of

9  you, sir.  It's the thicker game right in front of you.

10         Now, is that the Madden 2007 PC game?

11  **A.**   Yes, it is.

12         **MR. LECLAIR:**  All right.  I'll move the admission of

13  Exhibit 1263.

14         **MR. MEYER:**  No objection, Your Honor.

15         **THE COURT:**  Received.

16         (Trial Exhibit 1263 was received into evidence.)

17  **BY MR. LECLAIR:**

18  **Q.**   If you would look at Exhibit 1302, which is a thinner, one

19  of the -- sorry we got so much stuff there, Mr. McNeil.  Do the

20  best you can to sort through it.

21  **A.**   I have it.

22  **Q.**   All right.  And Exhibit 1302, I think, are -- they are

23  slides from the Madden game.

24         **MR. LECLAIR:**  So if we could pull up Exhibit 1302.

25         (Document displayed.)

1  **BY MR. LECLAIR:**

2  **Q.**   Okay.  Now, this is also from the 2003 Madden game,

3  Mr. McNeil.  And this is a particular page that selects where

4  you -- it's called "Player Management."  And do you see there

5  that there is reference to a position of, quote, WR?

6          Do you see that?

7  **A.**   Yes, I do.

8  **Q.**   And do you know what that stands for?

9  **A.**   Yes.  That's wide receiver number 85.

10  **Q.**   Okay.  And when you played for the Cleveland Browns in

11  1965, what was your number?

12  **A.**   Number 85.

13  **Q.**   And how tall were you?

14  **A.**   6' 2.

15  **Q.**   And what did you weigh?

16  **A.**   185.

17  **Q.**   And how old were you?

18  **A.**   25.

19  **Q.**   And, in fact, do you remember those cards that we looked

20  at a while ago, Exhibit 1302, do you remember that card that

21  had your height/weight?

22  **A.**   It was the same as this.

23  **Q.**   It was exactly the same as this?

24  **A.**   Exactly the same.

25  **Q.**   All right, sir.

1          Now, let's turn back to Exhibit 13 --

2          **THE COURT:**  Is that 1302?

3          **MR. LECLAIR:**  This is 1302, Your Honor.

4          **THE COURT:**  You have not moved that into evidence.

5          **MR. LECLAIR:**  I apologize, Your Honor.  I thought I

6   had.  Move the admission of 1302, Your Honor.

7          **THE COURT:**  Any objection?

8          **MR. MEYER:**  No objection, Your Honor.

9          **THE COURT:**  Received.

10          (Trial Exhibit 1302 was received into evidence.)

11   **BY MR. LECLAIR:**

12   **Q.**   Turn to the fourth page.

13          **MR. LECLAIR:**  If we could bring up on the screen the

14   fourth page of Exhibit 1302.

15          (Document displayed.)

16   **BY MR. LECLAIR:**

17   **Q.**   This is actually, Mr. McNeil, another player management

18   screen from Exhibit 1263, the 2007 game.  And I believe, if you

19   look at this, you're going to find similar information.  We're

20   trying to make it a little bit bigger so the jury can see it.

21   There you go.

22          There is -- it's hard to see, but it's highlighted.

23   There is another wide receiver in the 2007 game from this

24   Cleveland Browns team.  And do you see there that you've got a

25   number 89?

1  **A.**    Yes, I do.

2  **Q.**    Now, that was not your correct number, sir; is that right?

3  **A.**    Correct.  85 was correct number.

4  **Q.**    But you also see there that you have a height of 6' 2,

5  weight 185, age 25, and years pro 2.  Is that all correct

6  information for you as a member of the Cleveland Browns in

7  1965?

8  **A.**    Yes, that's my statistical data.

9  **Q.**    All right, sir.  Now, let's look at another slide, 1245-2,

10  if you could find that among your information, which is another

11  photograph from the 2003 Madden game.

12  **A.**    I have it.

13  **Q.**    And I'll ask you, sir, is this a photographer that you --

14  where you actually looked at the game and saw what appears on

15  this photograph?

16  **A.**    Yes, I did.

17         **MR. LECLAIR:**  I'll move the admission of Exhibit

18  1245-2.

19         **MR. MEYER:**  No objection, Your Honor, other than, of

20  course, all of this is subject to the continuing objection.

21         **THE COURT:**  All right.  1242?

22         **MR. LECLAIR:**  1245-2.

23         **THE COURT:**  Dash 2.

24         **MR. LECLAIR:**  Because it's all part of 1245, which is

25  the game itself.

1          **THE COURT:**  I got it.  Thank you.  Go ahead.

2          (Trial Exhibit 1245-2 was received into evidence.)

3  **BY MR. LECLAIR:**

4  **Q.**   Mr. McNeil, I want to stop here because not everybody on

5  the jury is very familiar with football.

6          We have now here a picture from the 2003 Madden game,

7  up on the screen.  Do you see up at the top there it says

8  "65CLE"?

9  **A.**   Yes.

10  **Q.**   And do you understand that to be a reference to the '65

11  Cleveland Browns?

12  **A.**   Yes, I do.

13  **Q.**   And then there's also a reference to "89SF."  Tell us what

14  you understand that to be.

15  **A.**   That's the 89 San Francisco 49ers.

16  **Q.**   Okay.  Now, back to the big picture.  In football,

17  Mr. McNeil, is there an offense and a defense?

18  **A.**   Yes, it is.

19  **Q.**   And what is the offense trying to do?

20  **A.**   Offense is the team trying to move the ball.  The defense

21  is the team trying to stop it.

22  **Q.**   In this particular picture, Mr. McNeil, is the team in

23  white representing the Cleveland Browns on offense or defense?

24  **A.**   On offense.

25  **Q.**   And the team in red representing the San Francisco 49ers

1  from 1989, are they on offense or defense?

2  **A.**    They are on defense.

3  **Q.**    Okay.  And you see a number of players, including one that

4  is out to the right.  And it's hard to read the number.  It's

5  number 85.  Do you see that, sir?

6  **A.**    Yes, I do.

7  **Q.**    And is that player in a position of -- that -- tell us

8  whether that player is in a position of a wide receiver or some

9  other position.

10  **A.**    That's one of the positions that I would have played with

11  the Cleveland Browns.  It's a flanker position.  Considered a

12  flanker position, which is wide receiver now.  The "F" stands

13  for flanker.

14  **Q.**    All right, sir.  When you played wide receiver for the

15  Cleveland Browns -- let's go pack to the big picture -- did you

16  typically line up right next to the other players, or out wide

17  as shown in this picture?

18  **A.**    Out wide as shown in this picture.

19  **Q.**    All right.

20          **THE COURT:**  May I ask just a question?

21          **MR. LECLAIR:**  Yes.

22          **THE COURT:**  Are those letters on there something that

23  the lawyers put on, or does that appear in the actual game?

24          **MR. LECLAIR:**  My understanding is it appears in the

25  actual game.  But my expert would have to -- yes, I'm told that

1  appears in the actual game, Your Honor.

2          **MR. MEYER:** Your Honor, I would object. I don't

3  believe the numbers underneath appear in the actual game.

4          **THE COURT:** The number 14 and the number 85?

5          **MR. MEYER:** Yes.

6          **MR. LECLAIR:** My expert -- I shouldn't say that, Your

7  Honor. But I'm told that that is actually in the game. But

8  we'll verify. And if it's incorrect, we'll advise everyone

9  that's a fact.

10          **THE COURT:** All right. Well, then remember what I

11  said. Unless it's under oath, it's not evidence. But there is

12  an issue of whether or not those "D" "F" and the numbers were

13  added after the fact. But, it probably has no relevance.

14          All right. Go ahead.

15  **BY MR. LECLAIR:**

16  **Q.** And how does a team score in football, Mr. McNeil, while

17  on offense? What do you do?

18  **A.** You either run for a score, pass for a score, you kick a

19  field goal or you can score on defense with a safety.

20          Those are the ways that come to mind right away.

21  **Q.** Is there a player on the field known as the quarterback?

22  **A.** Yes, it is.

23  **Q.** And in this particular picture, is the quarterback -- tell

24  us where the quarterback is on offense.

25  **A.** The quarterback is the persons third from the left side,

1  right where the "F" is right under, for fullback.  He's the

2  person in front of the number 47, fullback.

3  Q.  When you played wide receiver, were you attempting to

4  catch passes from the quarterback?

5  A.  Yes, I was.

6  Q.  And that's how you -- the year that you led the league,

7  that was in the number of pass receptions?

8  A.  Yes, that was number of pass receptions.

9  Q.  So who was throwing you the ball in 1965?

10  A.  Frank Ryan, quarterback for -- number 14, quarterback for

11  the Cleveland Browns.

12  Q.  All right, sir.

13         And the team on red here, the defensive team, once

14  the ball is snapped from the center to the quarterback, what do

15  they do?

16  A.  They try to prevent you from advancing the ball.

17  Q.  Okay.  And did someone -- does someone on defense line up

18  opposite you as a wide receiver and attempt to block you from

19  catching the ball?

20  A.  Yes.  That's the defensive back.  Usually that's the

21  defensive back.

22  Q.  And, for example, do you know what position Mr. Adderley

23  played?

24  A.  He played at that position of cornerback.

25  Q.  So if you and Mr. Adderley had played each other, you

1  would have been the pass receiver running down the field to

2  catch the ball, and he would have been the defensive back

3  trying to defend the pass?

4  **A.**    Correct.

5  **Q.**    All right, sir.

6          Now, prior to recently, in connection with this case,

7  Mr. McNeil, did the NFLPA ever send you any information about

8  this game or what was being done in the game?

9  **A.**    No, they didn't.  They never sent me any information

10 whatsoever concerning the game.

11 **Q.**    As you look at that picture, Exhibit 1245-2, Mr. McNeil,

12 tell the jury which of the players on that field are active NFL

13 players.

14 **A.**    None of those players are active.  Those are people who

15 played in 1965.

16 **Q.**    None of them are active players?

17 **A.**    No.  Nobody's active now, unless you got a 40-year plus

18 player.  40 plus -- be in their 60's now.

19 **Q.**    Okay.  All right.  Let's shift off this.  I want to go to

20 Exhibit 1263-1.

21         **MR. LECLAIR:**  I haven't moved it into evidence.  Take

22 it off the screen, please.

23 **BY MR. LECLAIR:**

24 **Q.**    Is this a shot, a photograph of something that you saw in

25 the 2007 Madden game?

1    **A.**   Yes, it is.

2              **MR. LECLAIR:**  I'll move the admission of Exhibit

3    1263-1, Your Honor.

4              **MR. MEYER:**  No objection, Your Honor.

5              **THE COURT:**  Received.

6              (Trial exhibit 1263-1 was received into evidence.)

7    **BY MR. LECLAIR:**

8    **Q.**   And you'll see, Mr. McNeil, again, that in the 2007 Madden

9    game we have the ability -- this is called "team select."

10             And, again, do you see that you've got the Browns,

11   the 1965 Browns?

12   **A.**   Yes.

13   **Q.**   And then, you've got the 1989 49ers?

14   **A.**   That's correct.

15   **Q.**   And prior to recently, were you aware, one way or the

16   other, as to whether in the 2007 Madden game you could play two

17   vintage teams of, say, the 65 Browns against the 1989

18   San Francisco 49ers?

19   **A.**   I was aware of it because my kids had made me aware of it.

20   But I just never played it myself, until recently.

21   **Q.**   Did you -- did anyone, including your kids or grandkids,

22   ever complain to you about your performance in the game?

23   **A.**   They told me I had scored, because they have the ability

24   to manipulate what happens in the game.

25   **Q.**   All right, sir.

1           Now, let's go to 1263-2.

2           **MR. LECLAIR:**  And don't put it on the screen.  I'm

3    sorry.  I'm looking up there.

4           **THE COURT:**  Any objection to 1263-2?

5           **MR. MEYER:**  No, Your Honor.

6           **THE COURT:**  Received.

7           (Trial exhibit 1263-2 was received into evidence.)

8    **BY MR. LECLAIR:**

9    **Q.**  And, again, Mr. McNeil, this is a picture from the 2007

10   Madden game.  And as you can see, up at the top, is that the

11   Cleveland Browns' logo up in the top left?

12   **A.**  It's the Cleveland Browns' logo.

13   **Q.**  Is that the San Francisco logo?

14   **A.**  Yes, it is.

15   **Q.**  And which team is in white?

16   **A.**  Team in white is the Cleveland Browns again.

17   **Q.**  And there is a number 89 out on the right-hand side, which

18   from the previous exhibits you remember is the six two,

19   185-pound wide receiver.  But you didn't play -- you were

20   number 85, instead of number 89?

21   **A.**  Yes.

22   **Q.**  That's one difference between the 2003 and the 2007 game?

23   **A.**  The number on the uniform.

24   **Q.**  Did anyone from the -- I'm sorry.  One more question about

25   this.

1          Point out to me all the active NFL players on the

2   field in this game.

3   **A.**    Well, it's difficult to relate to an active NFL player

4   after they've changed all the numbers because nobody played

5   during that time.

6   **Q.**    Okay.

7   **A.**    So it would be nobody.

8   **Q.**    Is there anybody who currently plays in the NFL who's

9   pictured on this, this screen?

10  **A.**    Not that I know of.

11  **Q.**    All right.  Did -- did anybody back in 2003, did anybody

12  from the NFLPA come to you and tell you that EA wanted to use

13  any information of yours in the Madden football game?

14  **A.**    No.  No one did.

15  **Q.**    Did anybody from the NFLPA ask you whether you would be

16  willing to be in the Madden football game?

17  **A.**    No, but I think it was covered under my contract.

18  **Q.**    And so do you know any reason why they didn't give them

19  the ability to use everything about you in the Madden football

20  game?

21  **A.**    No.  I have no idea.

22          **MR. MEYER:**  Your Honor, just for the record I'm going

23  to renew the request for the instruction we discussed before.

24          **THE COURT:**  I'm going to -- I'm waiting for the right

25  opportunity.

1          I will advise the jury, but not -- I don't want to

2    interrupt yet.

3    **BY MR. LECLAIR:**

4    **Q.**   Did -- were you ever told by anybody from the NFLPA that

5    they had granted a license to Electronic Arts to use both

6    current NFL players and some retired NFL players?

7    **A.**   No, they never contacted me again after I signed that

8    agreement.

9    **Q.**   Were you ever advised that there had been a license that

10   included six or more such players?

11   **A.**   No.

12   **Q.**   Let me ask you what you would have preferred, Mr. McNeil.

13   Would you have rather had a faceless person with your height,

14   weight, years in the league, or would you rather have had

15   everything about you in the game?

16   **A.**   Since it was supposed to be a depiction of a player in my

17   position, my statistical data, I see no reason why they

18   should -- why they changed it.

19          I would preferred being myself, because that's the

20   only person that played with the Cleveland Browns at that time

21   that wore number 85 that was six feet two, weighed 185 and was

22   25 years old and played the position I played.

23   **Q.**   Did anybody from the NFLPA call you up and say:

24          "We're not going to let them use your full image

25   because we don't want to share the money with you"?

 1              **MR. MEYER:**  Objection, Your Honor.

 2              **THE WITNESS:**  No.

 3              **THE COURT:**  What's the objection?

 4              **MR. MEYER:**  There's no foundation for that.

 5              **THE COURT:**  Sustained.

 6              Disregard the -- that's argumentative.  Lacks

 7    foundation.  Assumes facts not yet in evidence.

 8              The jury will disregard that last question and

 9    answer.

10    **BY MR. LECLAIR:**

11    **Q.**   Do you -- you mentioned you've never seen the license

12    agreements between the NFLPA Players Inc and any of the

13    third-party licensees, right?

14    **A.**   No, I haven't.

15    **Q.**   So you don't know what's in the license agreements between

16    EA and the NFLPA; is that right, sir?

17    **A.**   That's right.  I depended upon the NFLPA to protect my

18    interests.

19    **Q.**   And as you sit here today you don't know what amount of

20    money was paid for any group license related to the Madden

21    football game right, sir?

22    **A.**   Absolutely.

23    **Q.**   So what is it you're asking this jury to do?

24    **A.**   Main thing I want the jury to determine, because I'm

25    trying to discover what the absolute facts are, I would like

1  the jury to be able to determine if my rights, if my images, or

2  my likeness was used, and if there was a contract that was

3  consummated under the period of time that I played and was

4  under contract under a group, like with the cards or with

5  Madden game, if there was some depiction where I was involved

6  or some retired players were involved that played during the

7  era when I played, along with the -- the example what we used,

8  the 89 team, that would have been more current than the 65

9  team, of course.

10        That if by any reason that during that time there had

11 been some kind of contract or agreement between the Players

12 Association and the active players and the retired players at

13 that time whereby monies were exchanged that I should have been

14 compensated.

15        That's what I'm trying to discover.  If there were

16 actual monies that was exchanged, I don't care what pocket it

17 went to.  It doesn't make any difference.  I just want to know

18 the truth.

19        I want to know if -- if the Players Association whom

20 I trusted in, put my trust in, when I was an active player, I

21 looked out for the benefit of the player.  Otherwise, no reason

22 to have a union.  It seemed like there should be no reason why

23 you would ask me to sign a contract.

24        **THE COURT:**  This has turned into an argumentative

25 speech.

1            THE WITNESS:  Okay.  Well, that's what I --

2            THE COURT:  All right.

3            Next question.

4 BY MR. LECLAIR:

5 Q.   All right.  And are you willing to accept the jury's

6 determination of what you're owed here, sir?

7            MR. MEYER:  Objection.

8            THE COURT:  Of course.

9            What kind of question is that?

10           MR. LECLAIR:  All right.

11           THE COURT:  Are you finished, Mr. LeClair?

12           MR. LECLAIR:  Pass the witness, Your Honor.

13           THE COURT:  All right.  I'm going to give an

14 instruction to the jury.

15           THE WITNESS:  Okay.

16           THE COURT:  Now, you've heard about this thing called

17 scrambling.  That's where they -- that's what the lawyers are

18 going to call it, scrambling in the Madden game where you

19 remember that letter that the person from -- person wrote

20 saying you can't use their real names and numbers on the

21 jerseys for the retired players.

22           This involves, I believe, the Madden game.

23           All right.  Now, you're going to hear a fair amount

24 about this in the case.  And one thing that the lawyers want me

25 to emphasize to you is that there is no contention in this

1    case, no contention, that EA -- that stands for

2    Electronic Arts.  They're the people who put out the came.

3    That Electronic Arts' scrambling of these players' identities

4    was somehow a violation of the class members' intellectual

5    property rights.

6           That is not the claim that's being made by the

7    plaintiffs in this case.  And the lawyers have asked me

8    specifically to make that clear to you.

9           All right.  Now, what is at issue, among a few other

10   things, is this agreement called the "Retired Player Group

11   Licensing Authorization Form" that you've already seen just a

12   moment earlier.

13          Several hundred, I think 2,000, 1800, something like

14   that class members signed that.

15          Now, in this case both sides agree with this.  The

16   retired players either got nothing or got very little out of

17   those agreements.  You've heard something about "ad hoc

18   agreements."

19          Some retired players got paid pursuant to ad hoc

20   agreements.  But the ad hoc agreements are not these retired

21   player group licensing, the group thing, the group licensing

22   agreement.

23          So one of the key things that you've got to decide in

24   this case is:  Have the plaintiffs proven a violation of this

25   group licensing agreement?

1              Have I stated the issue more or less right?

2              **MR. PARCHER:**  Respectfully, Your Honor, I think

3  there's a little more to it.

4              **THE COURT:**  Well, you have the fiduciary duty claim,

5  too.

6              **MR. PARCHER:**  Yes.

7              **THE COURT:**  All right.  All right.  On the contract

8  part, have I stated it right?

9              **MR. PARCHER:**  Yes.

10             **MR. KESSLER:**  Your Honor, only to make it clear that

11  many of the ad hocs involved group license rights because they

12  involved six or more players.

13             **THE COURT:**  Well, all right.  You can say that if you

14  want, but what -- I feel that is going over the head of the

15  jury right now -- and they're not grasping this -- is that the

16  main issue you've got to decide is this group license agreement

17  and does the defendant owe more money on this or not?  That's

18  the main issue.

19             Now, there --

20             **MR. PARCHER:**  From the union.

21             **THE COURT:**  From the union and Players Inc.

22             **MR. PARCHER:**  Right.

23             **THE COURT:**  The second issue concerns the fiduciary

24  duty claim, that the -- and this is, again, something you're

25  going to have to decide is:  Did the union have -- breach any

 1 fiduciary duty to -- in connection with the -- the image rights

 2 of the retired players?

 3          It may be more specific than that at the end of the

 4 day, but that's -- those are the two issues.

 5          Now, I want to circle back to how I started here.  I

 6 don't want you to get confused.  The lawyers don't want you to

 7 get confused.  They've asked me to make this clear to you, that

 8 this scrambling by EA, Electronic Arts, in the Madden game, is

 9 not alleged to be a violation of anybody's rights in this case.

10          Rather, the alleged violation flows out of this

11 agreement, the group licensing agreement, if there was a

12 violation.  And that's for you to determine.

13          All right.  I just wanted to -- I hope that helps

14 some.

15          Mr. Parcher?

16          **MR. PARCHER:**  I don't know whether Your Honor wants

17 me to say it out loud.

18          **THE COURT:**  What, you have an objection to what I

19 said?

20          **MR. PARCHER:**  Well, I think there's a little

21 confusion and more to it on the fiduciary point.  Our fiduciary

22 point is that if for any reason the EA agreement didn't

23 include -- didn't include the group, the class, that the union

24 breached its fiduciary obligation by not turning it over.

25          **THE COURT:**  I meant to include that argument in

1   your --

2           **MR. PARCHER:**  Either way -- either way.  Either it's

3   in or it should have been in, and they could have put it in

4   easily, and taken it out of their 63 or 69 percent.

5           **THE COURT:**  All right.  Mr. Parcher can phrase his

6   argument as he wishes.  That's an issue you're going to have to

7   decide.

8           **MR. PARCHER:**  Thank you.

9           **THE COURT:**  As to whether or not that -- you sustain

10  that contention.

11          If you want two sentences to respond, as well.

12          **MR. KESSLER:**  Yes.

13          **THE COURT:**  Two sentences.

14          **MR. KESSLER:**  Yes.  In response to Mr. Parcher, what

15  the evidence is going to show is that EA had no desire to pay

16  anything for the rights of the entire group of GLA retired

17  players.

18          **THE COURT:**  That's your contention.

19          **MR. KESSLER:**  That's the only reason why.  And we

20  contend it would not be a breach of duty.

21          **THE COURT:**  No more.  No more.

22          **MR. PARCHER:**  Judge, please.

23          **THE COURT:**  Mr. Parcher, no.  No more now.  The jury

24  has the basic contentions in mind, and that's all I wanted them

25  to -- it sounded possibly like this witness was suggesting that

1  the scrambling somehow violated his intellectual property

2  rights.

3          And whether it did or it did not is not an issue in

4  this case.  The plaintiffs have asked me specifically to make

5  clear to you that the plaintiffs do not contend that

6  Electronic Arts' scrambling is a violation of the class

7  members' intellectual property rights.

8          So put that idea out of your mind, because that's an

9  easy thing to get confused on.

10          Electronic Arts isn't even a defendant in this case.

11  So how could we holds them liable for anything?

12          The question is whether or not these defendants, who

13  are here, did something wrong.  That's what you've got to

14  decide.

15          Okay.  Cross-examination.

16          **MR. MEYER:**  Thank you, Your Honor.

17                        **CROSS EXAMINATION**

18  **BY MR. MEYER:**

19  **Q.**   Good afternoon, Mr. Adderley.  My name is Bruce Meyer.

20          **THE COURT:**  No.  Mr. McNeil.

21  **BY MR. MEYER:**

22  **Q.**   Mr. McNeil, I apologize.

23          I'm one of the lawyers for the defense in this case.

24          Let me ask you a question, sir.  First of all, you

25  became a plaintiff in this case fairly recently; isn't that

1   right?

2   **A.**     Correct.

3   **Q.**     And you gave a deposition on October 3rd, 2008, I believe?

4   **A.**     I don't remember the exact date.

5   **Q.**     But I think you said it was only a few weeks before that

6   that you were approached by the plaintiffs' lawyers in this

7   case about becoming a witness in the case?

8   **A.**     Correct.

9   **Q.**     So you didn't go to retain lawyers in connection with the

10  case.  The lawyers actually came to you, correct?

11  **A.**     Yes.  I didn't know that the case was even --

12  **Q.**     Okay.  Now, I want to ask you about -- a little bit --

13           **THE COURT:**  There's nothing wrong with that.

14           **MR. MEYER:**  Excuse me, Your Honor?

15           **THE COURT:**  There's nothing wrong with the lawyers

16  coming to them and asking them to participate in this class

17  action.

18           **MR. MEYER:**  It goes --

19           **THE COURT:**  I do not want the lawyers on each side

20  trying to smear the other set of lawyers.

21           **MR. MEYER:**  Your Honor, it was not my intention.  I

22  can explain.

23           **THE COURT:**  Then move to something new and disregard

24  that line of questions about the lawyers came -- do not go

25  there, Counsel.

1          **MR. MEYER:**  Yes, Your Honor.

2    **BY MR. MEYER:**

3    Q.   Mr. McNeil, my point is, you never complained to the union

4    or anybody else about the things that you're testifying about

5    today, until a few weeks before your deposition in October;

6    isn't that right?

7    A.   Until I learned that there's a strong possibility that I

8    should have been included in something I was precluded from.

9    Q.   And that was sometime in the fall of this year; is that

10   correct?

11   A.   Yes.

12   Q.   Now, I just want to ask you about your career.  I think

13   you said your career ended in the 1970s; is that correct?

14   A.   Yes, I did.

15   Q.   I'm sorry.  I missed the year.  What was it, '73?

16   A.   '3.

17   Q.   And you were a good player, I think you said you made the

18   Pro Bowl one year, correct?

19   A.   I did.

20   Q.   You weren't a Hall of Fame player like Mr. Adderley, for

21   example, right?

22   A.   No, but I did lead the league.  Since the inception of the

23   league there's only been a few people led the National Football

24   League.

25   Q.   I'm not trying to denigrate your skills.  They're

1  impressive.  You led the league in receptions.  You made the

2  Pro Bowl.  You weren't a Hall of Fame player, correct?

3  **A.**    Correct.

4  **Q.**    With all due respect.

5          Do you consider yourself today to be a famous

6  athlete?

7  **A.**    Sure.

8  **Q.**    And do you typically get recognized when you're out on the

9  street?

10 **A.**    At home, of course.

11 **Q.**    When you say "at home," where do you mean?  Where is home?

12 **A.**    Mobile, Alabama.

13 **Q.**    Other than in Mobile, Alabama when you go out in the

14 street do you typically get recognized?

15 **A.**    I stay in -- mostly I stay in Mobile.  But if you mean

16 here in San Francisco, some people recognized me a few moments

17 ago.

18 **Q.**    A few months ago?

19 **A.**    A few moments ago.

20 **Q.**    Would you typically be recognized in places where you

21 didn't play?

22 **A.**    Maybe by people who were football fans.

23 **Q.**    And even in cities where you did play -- well, let me show

24 you, something, sir.

25          **MR. MEYER:**  I apologize, Your Honor.  I should have

1    handed this up at the beginning.

2            May I approach the witness and give him a copy of his

3    deposition?

4            **THE COURT:**  Of course.

5            **MR. MEYER:**  Your Honor, it is my understanding you

6    already have a copy.  Is that correct?

7            **THE COURT:**  I should have it here if you need to read

8    from it.  Are you going to do that?

9            **MR. MEYER:**  I believe so, Your Honor.

10           **THE COURT:**  Page and line.

11           **MR. MEYER:**  Page 15 of the deposition that was taken

12   on October 3rd, 2008, which is the oral deposition of Clifton

13   McNeil.

14           **THE COURT:**  What is the line number?

15           **MR. MEYER:**  Page 15, and line 8, Your Honor.

16           **THE COURT:**  Through what?

17           **MR. MEYER:**  Through line 25.

18           **THE COURT:**  All right.  Before you do that I want to

19   explain to the jury what a deposition is.

20           Before the case comes up for trial, the lawyers can

21   do investigation.  And one of the tools that the court allows

22   is to go and take somebody's deposition.

23           So usually that means that the witness comes to a

24   lawyer's office.  They're placed under oath to tell the truth,

25   and a court reporter like the one we have here takes down all

1   the questions and the answers, and then it's prepared into a

2   booklet like this.

3           The witness is given an opportunity to make any

4   corrections, although the original testimony can still be used.

5   And then, when the case comes up for trial, subject to certain

6   rules I don't need to go into now, the testimony can be read in

7   for you to consider as the jury.

8           And when it is read in it counts just as much as

9   evidence as anything else in the case.  Of course, it's up to

10  you to decide how much weight to give it.

11          With that background, any objection to reading that

12  passage?

13          **MR. LECLAIR:**  No objection, Your Honor.

14          **THE COURT:**  Please read it.  And say "question" and

15  read it, and say "answer" and read it, so we will all know

16  where the breaks are.

17          Go ahead.

18          **MR. MEYER:**  Thank you, Your Honor.

19          **"QUESTION:**  In terms of today's generation of

20          football fans -- and we'll talk about the

21          kids, people in their 20s, 30s, 40s, people

22          like that -- do they have do they ever

23          recognize you?

24          **"ANSWER:**  In my hometown, of course.

25          **"QUESTION:**  Outside of your hometown?

1          "**ANSWER:**  The places that I played, if I go

2          visit there, I'm recognized right away.

3          Cleveland, when I went to Cleveland not too

4          long ago when we wents to my anniversary,

5          well everybody recognized me from the moment

6          I stepped off the plane.

7          "**QUESTION:**  So you know in your hometown in

8          places like --

9          "**ANSWER:**  In places that I played.

10         "**QUESTION:**  You might be recognized?

11         "**ANSWER:**  I would be recognized, I think, in

12         every place I played.

13         "**QUESTION:**  But, for example, Dallas, a place

14         where you haven't played, you wouldn't be

15         recognized, of course?

16         "**ANSWER:**  No."

17  **BY MR. MEYER:**

18  **Q.**   Now, Mr. Adderley, as an active player when were you

19  actually playing in the NFL --

20  **A.**   McNeil.

21  **Q.**   I apologize for that.

22  **A.**   That's okay.

23  **Q.**   In the -- as an active player, when you were, as we said,

24  a fine player, did you ever make any money from licensing of

25  your name or your image?

1   **A.**    No.

2   **Q.**    And did you ever make any effort to generate any money

3   from licensing your name or your image as an active player?

4   **A.**    No, I didn't.

5   **Q.**    As a retired player, have you ever been approached by

6   anyone about licensing your name or your image?

7   **A.**    Yes, I have.

8   **Q.**    And for what type of application?

9   **A.**    Number of applications.  I can recall there have been

10  people who wanted me to write a book about what happened to me

11  during my career.

12          Even when I was actively playing there were people

13  who wanted to film highlights of my film, have training

14  pictures that they would send out to colleges and things like

15  that.  And I said no.

16  **Q.**    And when was that, sir?

17  **A.**    Shortly after the '68 season after I led the league, in

18  New York when I played for the Washington Redskins, made All

19  Pro again, I was approached by people who wanted me to write a

20  book.  And I said no.

21  **Q.**    I'm sorry.  Was that when you were active or retired?

22  **A.**    Both when I was active and after I was retired there were

23  people who wanted me to write a book.

24  **Q.**    When was the last time after your career ended when

25  somebody approached you about writing a book?

1   A.    I don't remember the exact date, but it was shortly after

2   I had retired.  And I had come back to the Bay Area that

3   someone wanted me to write a book.

4   Q.    Is it fair to say, sir, that was in the mid '70s?

5   A.    Yeah.

6   Q.    Now, what other occasions have there been as a retired

7   player when anyone has approached you about using your name or

8   image in any licensing?

9   A.    There were people who wanted me to go to card shows and

10  participate in card shows.

11          THE COURT:  What kind of shows?

12          THE WITNESS:  Card.  You know, the cards that they

13  have.

14          THE COURT:  Player cards.

15          THE WITNESS:  Player cards.  I've been approached a

16  number of times to do that.

17  BY MR. MEYER:

18  Q.    And that's a show where you would sit and autograph some

19  trading cards?

20  A.    Correct.

21  Q.    When is the last time that happened?

22  A.    I don't remember exactly.  It's been a long time ago.

23  Q.    And other than the book and the autograph shows you just

24  testified about, have there been any other instances as a

25  retired player where anyone has approached you about a desire

1  to use your name or image in licensing?

2  **A.**   No, not that I can recall right now.

3  **Q.**   Now, did you understand that the GLA that you testified

4  about was non-exclusive?

5  **A.**   I didn't go into the non-exclusive, exclusive.  All I know

6  is that it was a group agreement, licensing agreement that I

7  signed.  I didn't go into an account of that.  I just felt

8  there was an opportunity for me to earn some monies with active

9  players and retired players.

10 **Q.**   We'll get to that, sir.  But on the issue of whether it

11 was exclusive or non-exclusive, is it your testimony that you

12 didn't have an understanding one way or the another?

13 **A.**   I didn't put any weight to it.  I know it says

14 "non-exclusive," but I did not put any weight to it.

15 **Q.**   So you recall that the GLA you signed said that the rights

16 you were giving to the NFLPA were non-exclusive; is that right?

17 **A.**   Yes, I do.

18 **Q.**   That would mean you can still give your rights to another

19 company, separate and apart from the NFLPA, correct?

20 **A.**   I think that was the case for every player.

21 **Q.**   Whether or not it was the case for every player, I'm

22 asking for your understanding of your GLA.

23        You understood that even though you signed the GLA,

24 you still had the right to try to go out yourself and generate

25 revenue from licensing your name and your image, right?

1  **A.**    Yes.

2  **Q.**    Did you ever try to do that?

3  **A.**    I just explained to you that I didn't.

4  **Q.**    You did not?

5  **A.**    That's right.  That's what I told you.

6  **Q.**    And you didn't -- and so that's also true -- excuse me.

7  Let me withdraw that.

8          Your GLA expired in 2005, is that your understanding?

9  **A.**    Yes.

10 **Q.**    And since 2005, have you ever tried to license your name

11 or image?

12 **A.**    No.  I didn't do it before, then or after then.

13 **Q.**    Now, Mr. McNeil, you testified about your GLA.  And that

14 was Trial Exhibit 1223 in evidence.  And you signed that in

15 2002, correct?

16 **A.**    Correct.

17 **Q.**    And we'll put that up on the screen.

18          And I believe you said you received that in the mail;

19 is that right?

20 **A.**    That's correct.

21 **Q.**    And did anyone from the NFLPA call you or come to your

22 house or anything about trying to get you to sign that

23 agreement?

24 **A.**    No, they didn't.

25 **Q.**    Did you talk to anybody before signing it at the NFLPA or

1  Players Inc about your understanding of what that agreement

2  meant?

3  **A.**   No, I didn't.

4  **Q.**   Did you rely on any representations by anyone from the

5  NFLPA or Players Inc about what the agreement meant before you

6  signed it?

7  **A.**   No, I didn't.

8           **MR. LECLAIR:**  Objection, form, Your Honor.

9  Ambiguous.

10          **THE COURT:**  I'm sorry.  What's the ambiguity?

11          **MR. LECLAIR:**  Whether he's talking about what's in

12  the agreement or something apart from the agreement.  I can't

13  tell from the question, Your Honor.

14          **THE COURT:**  No.  As I see the question it's a fine

15  question.  Overruled.

16          Next question.

17 **BY MR. MEYER:**

18 **Q.**   Sir, when you were in the courtroom did you see that your

19 counsel put up a letter from Doug Allen from 2003; do you

20 recall that?

21 **A.**   Yes, I saw he done it, but I didn't pay too much attention

22 to it.

23 **Q.**   And you didn't receive a copy of that letter prior to

24 signing the GLA, right?

25 **A.**   No, I didn't.

1   Q.   Now, let me ask about your understanding of the GLA.  Did

2   you --

3   A.   Excuse me.

4   Q.   Do you recall --

5   A.   Excuse me.

6   Q.   I apologize.

7   A.   May I look at it, since you're referring to it?

8   Q.   Absolutely.  It's up on the screen, and you should still

9   have it in front you.

10  A.   I need reference to it.

11           THE COURT:  Give him the official exhibit.

12           MR. MEYER:  It should still be up there.

13           THE COURT:  Help him find it.

14           THE WITNESS:  What is it?

15           THE COURT:  Help the witness find it.

16           THE WITNESS:  I think it's one of the early ones.

17  BY MR. MEYER:

18  Q.   It was the first one.

19  A.   Okay.  Thank you.

20           THE COURT:  What is that Exhibit number?

21           MR. MEYER:  Trial Exhibit 1223, Your Honor.

22           THE COURT:  Mr. McNeil, do you have that now in front

23  of you?

24           THE WITNESS:  Yes, I do.

25           THE COURT:  Please consult that as you wish.

1          **THE WITNESS:**  Excuse me.  Do I need is this anymore?

2          **THE COURT:**  You might.  Leave it it anywhere over

3   there, if it helps you.

4          All right.  What's the question?

5   **BY MR. MEYER:**

6   **Q.**   Sir, you see -- I believe your counsel showed it to you --

7   in the last paragraph, there's language that says:

8               "It is further understood that the monies

9   generated by such licensing of retired player group rights will

10  be divided between the player and an escrow account for all

11  eligible NFLPA members who have signed a group licensing

12  authorization form."

13         Do you recall at the time you signed this in June of

14  2002 seeing the language that says that the monies generated by

15  licensing of retired player group rights would be divided?

16  **A.**   Yes.  I recall it.  I recall it -- yes, I recall reading

17  that, yes, I do.

18  **Q.**   And is it your testimony that your understanding of that

19  was that you would also be entitled to monies generated by

20  active player group rights licensing?

21  **A.**   Yes.  My understanding was that that particular thing,

22  because if you were to continue it -- I'm talking about the way

23  I read it -- it says in an escrow account for all eligible

24  NFLPA members, as well as that retireds group who have signed.

25  So I connected the two of them together.

1  Q.   What was your understanding about what money would be put

2  into the escrow account?

3  A.   Monies that would be divided between the people that was

4  earned between the eligible NFL players, as well as the members

5  of our group, retired group.

6  Q.   Sir, isn't it true that the GLA that you signed made clear

7  that what was going to be divided in the escrow account was

8  monies generated from licensing of retired player group rights?

9  A.   No.  I tell you what -- you asked what I --

10 Q.   I'm not trying to argue with you.  I'm just asking.

11 A.   When I read it, I continued reading the whole sentence.

12 And the sentence said:  "In escrow account for all eligible NFL

13 players" -- because it continued -- "will be divided between

14 the players and the escrow account for all eligible NFL players

15 who have signed group licensing authorization forms."

16        It didn't say the same one that I signed.  It said "a

17 group licensing authorization form."

18 Q.   Right.

19 A.   So that to me meant active players as well as retired

20 players.

21 Q.   And if there's no money in the escrow account, then

22 there's nothing to be divided, right?

23 A.   If there's no money in the escrow account there's no money

24 to be divided.

25 Q.   Okay.

1  **A.**   But who was supposed to put the money in the escrow

2  account?  To me, it was the players --

3  **Q.**   Let me ask you a question, sir, about your understanding

4  of that language.  If there's a licensing program, let's say

5  trading cards, that involves a hundred active player and not

6  one single retired player, is it your understanding that that

7  constitutes monies generated by licensing of retired player

8  group rights?

9  **A.**   No.  What my understanding was as I read this reference

10 that you're talking about, because previously, in I think

11 paragraph 2, it was talking about it could be either/or.

12 Either active players or retired players.  It could be either.

13         So I connected all of it when I read it.  My

14 understanding was that that was a continuum of what I had read

15 in paragraph number 2.

16         So my understanding was, and still is, that the

17 monies that they were talking about generating was going to be

18 between retired players and -- because of the language that was

19 in the contract.

20 **Q.**   Sir, I'm sorry.

21 **A.**   Between the two, active players as well as retired

22 players.

23 **Q.**   My question was:  Is it your understanding that if there's

24 a licensing program, let's say trading cards, that involved a

25 hundred, hundred active players and zero retired players, that

1  that was retired -- that was money generated by the licensing

2  of retired player group rights?

3  **A.**   My understanding is that those people signed an agreement,

4  a licensing agreement at the time because it didn't spell

5  out -- it just said "image," and my picture is an image.  And

6  active player pictures is an image.  So my understanding is

7  that if there are 100 people who were active during that period

8  of time who earned any income, and they were part of the

9  licensing group, that they we were all eligible for it, because

10 it did not say anything different in my -- in what I had

11 received from the players' union.

12 **Q.**   Have you ever seen any of the GLAs or any contracts signed

13 by the active players for licensing?

14 **A.**   No, they didn't have those when I as playing.

15 **Q.**   Have you ever compared or had an opportunity to compare

16 your group licensing authorization to those of active players

17 to see whether they would constitute, as you said, part of the

18 same group?

19 **A.**   No.

20 **Q.**   Do you know, for example -- you do recall that the

21 agreement you signed at the top is called "a retired player

22 group licensing authorization form."  You recall -- do you

23 recall seeing that at the time you signed it?

24 **A.**   Yes, I do.

25 **Q.**   Do you know whether that's at the top of the GLA that the

1   active players signed?

2   **A.**    No, but I would imagine that it would -- would say for all

3   eligible NFL players who would sign a group licensing

4   authorization form.  It didn't have to be the same one to me.

5   **Q.**    Let me ask you this way.  Is it your claim in this court

6   to your understanding that if, let's say, a million dollars --

7   I'm picking a number out of nowhere -- a million dollars were

8   received by the NFLPA or Players Inc for a set of trading cards

9   that used a hundred active players and no retired players -- I

10  just want to understand clearly -- is it your testimony that

11  you are entitled to a share of that money?

12  **A.**    During that period of time when I was under that group

13  licensing agreement that the players' union sent to me, my

14  understanding would be yes.

15  **Q.**    And regardless of whether they used your individual image

16  or name, correct?

17  **A.**    Correct.  Because that's not what -- it's not saying it

18  had to use my individual.  It's a group licensing agreement.

19  **Q.**    And if a commercial was shown that used the images of Bret

20  Favre, Tom Brady, Payton Manning, Eli Manning, Donovan McNabb

21  and Terrell Owens, Clifton McNeil is entitled to a share of

22  that money?

23  **A.**    If they were members of this group licensing agreement, I

24  would be entitled to it.  But if they were that ad hoc group

25  you told me they would be members of, none of players would.

1   None of the active players would be eligible for it, either,

2   because that group you just named would be ad hoc players.

3   **Q.**   I just named six players, six or more players.  Is it your

4   understanding that that would not be a group license --

5   **A.**   Six or more players who were not under the group licensing

6   agreement.  My contention is that if they were members of an

7   eligible National Football League members who were members of

8   the group -- who -- who signed the group licensing form, I

9   don't care if it was on the retired form or if it was under

10  active NFL players form.  That's my understanding.

11  **Q.**   How do you determine whether or not a certain group of

12  players is part of the group, if you haven't seen the -- the

13  contracts that they've signed?

14  **A.**   The only way I could determine that would be by the

15  National -- trusting the players' union.  Because they are the

16  one who had both parties sign whatever kind of group licensing

17  agreement we had.

18          I was not a party to what they signed.

19  **Q.**   Were you aware that Mr. Adderley received some significant

20  sum of money in return for a licensee using his rights?

21  **A.**   I heard about it today.

22  **Q.**   Okay.  Do you know whether or not that -- and

23  Mr. Adderley, you consider him to be part of your group; isn't

24  that right?

25  **A.**   Correct.

1  Q.   So do you expect, as part of your claim in this case, that

2  Mr. Adderley is going to give you a share of that money that he

3  got?

4  A.   I expected the players' union to give me --

5  Q.   That's not my question, sir.

6  A.   Excuse me.  You asked me the question.  Let me answer to

7  the best of my ability, sir.

8  Q.   Appreciate that.

9  A.   Okay.  Now, my understanding, first of all, unless you

10  clear it up for me, is that he signed what will be possibly an

11  ad hoc agreement, separate and apart from the group licensing

12  agreement that we're talking about.

13         The ad hoc that you were talking about where people

14  go out and get Hall of Famers, I'm aware that they get Hall of

15  Famers, players, to sign separate agreements from the group

16  agreement.  That's why a lot of them don't sign the group

17  agreement.

18         What I'm talking about, people who are members here,

19  my question -- I can't ask you a question.  I can answer the

20  question.

21         But the best way for me to answer your question is

22  for me to understand this:  Did the players' union pay him

23  separate and apart?  Did the players' union engage in that

24  contract that was signed between him and the third party?  Was

25  it directly between him and the third party?

1    If -- I would have been eligible to some of it, if it

2  was the players' union who made the deal without Mr. Adderley

3  making the deal for himself with a third party.  And he

4  added -- and the players' union received the monies, then I

5  would have expected to be put in that escrow account and all of

6  us get part of it.

7  **Q.**   Okay.

8  **A.**   But that's one individual.  That's not six.  There's a

9  whole group of them.  So if all those people got paid, I expect

10 to get paid, too, if it was during that period of time.

11 **Q.**   And you don't know whether Mr. Adderley's payments

12 involved six or more players or not, do you?

13 **A.**   No, I don't.

14 **Q.**   Let me ask you about when you signed the retired player

15 group licensing authorization form, did you -- did you have to

16 pay any money or give up anything in return for whatever

17 opportunities you got from this agreement?

18 **A.**   No.  I had already paid my dues.

19 **Q.**   Okay.  And the dues you're referring to were dues to the

20 NFL --

21 **A.**   When I played as an active player at the time.

22 **Q.**   But in order to get whatever benefits you got from this,

23 all you had to do was sign it and send it back, right?

24 **A.**   I had to be a member of the group.

25 **Q.**   And so the only thing that it cost you really was a stamp;

1    is that a fair statement?

2    **A.**    And my career.  They're not just getting anybody off the

3    street.  They're getting people who played in the National

4    Football League.  That's why you have a group licensing.

5    **Q.**    I'm just asking a very simple question:  All it cost you

6    to become a part of this was a stamp that it cost to send it

7    back to the NFLPA; isn't that right?

8    **A.**    And my career.  I'm answering it the same way I answered

9    it before.

10   **Q.**    And the fact that you were a member of the -- that you

11   played in the NFL?

12   **A.**    Right.  Otherwise, I wouldn't be a member of the group

13   licensing.

14   **Q.**    By the way, if you were entitled to money, would you care

15   whether or not it came from an escrow account or whether it

16   came directly from Players Inc or some other source?

17   **A.**    I was not the person who put the contract together.

18   They're the ones who put the contract together.  So my

19   understanding was I trusted the way that they wanted to do it

20   in order to do whatever the accounting practices were for the

21   Internal Revenue department or whatever.  All I wanted to do

22   was get paid.

23   **Q.**    So you didn't care where the money came from, whether or

24   not it came from an escrow account, correct?

25   **A.**    No.  But they specified it would be put into an escrow

1    account.

2    **Q.**    Okay.  And I think -- you have no control over the

3    defendants' licensing operations, right?

4             **MR. LECLAIR:**  Objection, form, Your Honor.  I think

5    that calls for a legal conclusion.

6             **THE WITNESS:**  No, I don't have any control to my

7    knowledge.  I don't have any control.

8             **THE COURT:**  Overruled.  In light of what both sides

9    have asked here, that's a fair question.

10            Go ahead.

11            **THE WITNESS:**  No, I don't have control.

12   **BY MR. MEYER:**

13   **Q.**    And do you have any knowledge of NFLPA or Players Inc's

14   licensing activities?

15   **A.**    Let me make sure I understand the question.

16   **Q.**    Let me withdraw it and be more specific.

17            Do you know what NFLPA or Players Inc did in order

18   to try to market your rights?  Let me say "retired player group

19   licensing rights."  Do you have any idea?

20   **A.**    Here's what I assume.

21   **Q.**    Sir, with all due respect, I'm not asking about

22   assumptions.  I'm asking about factual knowledge.

23   **A.**    It's the only way I can answer you.

24   **Q.**    You can say you don't know if you don't know.  I don't

25   want to argue with you.

1       Do you have factual knowledge about what the NFLPA or

2  Players Inc did in order to generate group licensing revenues

3  for retired players?

4  **A.**   Yes.

5  **Q.**   Okay.  What factual knowledge do you have on that subject?

6  **A.**   Actual knowledge is somebody paid EA or somebody to have

7  the licensing right to have the Madden trading cards or

8  whatever.

9       And whenever the players had the right, the players'

10 union -- this is my way of thinking -- when the players' union

11 had the right to market us rather than National Football League

12 properties, then I assumed that's where the rights were, in the

13 players' union.

14 **Q.**   I'm focusing specifically on attempts of licensees in

15 licensing rights of retired players.

16      Do you have any factual knowledge about the efforts

17 made by the NFLPA or Players Inc to do that with respect

18 specifically to retired players?

19 **A.**   When you ask it that way I don't know how to answer.  I

20 don't know.

21 **Q.**   Do you have any factual knowledge about what efforts the

22 NFLPA or Players Inc may have made to try and do that?

23 **A.**   No.  I'm learning.

24 **Q.**   You mentioned, again, as you did on direct, your

25 understanding that there was a time when the players didn't

1  have the licensing rights, and the NFL had those rights; is

2  that right?

3  **A.**    That's right.

4  **Q.**    Okay.  And you signed the GLA in 2002, correct?

5  **A.**    Correct.

6  **Q.**    Isn't it true, sir, that it was years, in fact, decades

7  before that when the players got the rights to do player

8  licensing separate and apart from the NFL?

9  **A.**    To my knowledge, it was.  I don't know exactly when it

10  happened.

11  **Q.**    Okay.  Now, you signed the agreement in 2002.  And the

12  term of the agreement was until 2005; is that your

13  understanding?

14  **A.**    That's what the contract said.

15  **Q.**    Correct.  And between 2002 and 2005, is it your testimony

16  that you thought the NFLPA and Players Inc were making no money

17  from licensing either retired or active players?

18  **A.**    I just assumed that they must have because they didn't pay

19  me anything.

20  **Q.**    Isn't it a fact, sir, you assumed active players were

21  being paid during that time frame?

22  **A.**    I didn't think about it.

23  **Q.**    Let me read from your deposition at page 81.  And I'd like

24  to read from line 1 to line 18.

25           **THE COURT:**  Any objection?

1        **MR. LECLAIR:**  No objection, Your Honor.

2        **THE COURT:**  All right.  Go ahead.

3        **MR. MEYER:**  Okay.

4        "QUESTION:  But you knew active players

5        were --

6        "ANSWER:  Right.

7        "QUESTION:  -- being paid?

8        "ANSWER:  Right.  I assumed because I never

9        saw a check for an active player, but I

10        assumed that active players were being paid.

11        "QUESTION:  And you knew that they --

12        "ANSWER:  And I don't know if they did or

13        didn't.  I don't know what the Players

14        Association did.

15        "QUESTION:  And you knew the NFLPA was making

16        money off of licensing active players?

17        "ANSWER:  Right.

18        "QUESTION:  To end users?

19        "ANSWER:  Right.

20        "QUESTION:  And you knew that you weren't

21        receiving any of that money?

22        "ANSWER:  Right."

23  BY MR. MEYER:

24  Q.   Now, you never complained -- I think we established

25  earlier you never complained until you became involved in this

1  case, correct?

2  **A.**    Correct.

3  **Q.**    And throughout the term of 2002-2005, is it -- have I

4  refreshed your recollection that, in fact, you did know that

5  active players -- that the NFLPA was making money or receiving

6  money from active player licensing?

7  **A.**    But I also said, if you read further on down, as I recall

8  during my deposition I explained to them the reasons why I

9  didn't immediately respond, and respond to it, was because I

10 was still under the assumption that some of the retired players

11 was under the National Football League players -- or owners.

12 And I didn't think that this was a deal that the players' union

13 had negotiated with the active players.

14         I didn't see them connected.

15         **MR. MEYER:**  I would like to read another portion of

16 the deposition on page 76, line 16 through -- excuse me, Your

17 Honor.  I apologize.

18         Line 16 through 22.

19         **THE COURT:**  Any objection?

20         **MR. PARCHER:**  No objection, Your Honor.

21         **THE COURT:**  Go ahead.

22         **MR. MEYER:**  Okay.

23         "**QUESTION:**  And you knew -- you had known for

24         many years, you believe, that the NFLPA was,

25         in fact, making money off of licensing active

 1              player rights?

 2              **"ANSWER:**  Active players and inactive players

 3              as I see it.  But I knew that they -- the

 4              answer to that question is yes.  I know that

 5              the Players Association was making money with

 6              the active players, at least the active

 7              players."

 8  **BY MR. MEYER:**

 9  **Q.**   And you knew that during the 2002 through 2005 time

10  period, correct?

11  **A.**   Correct.  But since you brought that up, you notice I said

12  both active and inactive players.

13  **Q.**   Right.  Now, focusing on active, you knew during 2002

14  through 2005, the period when your GLA was in effect, that, in

15  fact, the NFLPA was getting money for active player licensing,

16  correct?

17  **A.**   Correct.

18  **Q.**   And that's the same money that you claim that you are

19  entitled to, correct?

20  **A.**   No.  I'm learning that that's --

21              See this is what -- during the time the deposition

22  was taken he was asking me these questions.  Hadn't developed

23  all the way through, or it wasn't in my line of reasoning that

24  I could connect the two together.

25              I know -- because to me that was a question that was

1   a general question.  I think everybody, if someone were to ask

2   somebody a question if you think the active players are making

3   endorsements, marketing, I think anybody would say yes.  That's

4   why I answered it that way.

5           But I also included inactive players, as well.

6   **Q.**   I understand.  That's not what I'm asking you, sir.

7   **A.**   When I was answering about the inactive players and the

8   people making money, I connected to the players' union having

9   possibly earned monies from the GLA that I signed with active

10  players or inactive players.

11          And I just felt that they never made a deal with

12  anybody, since I never got paid.

13          **THE COURT:**  Just a second.

14          **THE WITNESS:**  I'm --

15          **THE COURT:**  Wait.  I feel like you two are talking

16  past each other.

17          You ask a clear-cut question, and then you just say

18  "yes" or "no," or "I don't remember."  Or if it cries out for

19  something else, I'd let you say something else.  But on

20  cross-examination counsel is entitled to get a yes or a no, to

21  almost everything.

22          **THE WITNESS:**  Okay.

23          **THE COURT:**  Or "I don't remember."  That's the way

24  cross-examination is supposed to work.

25          Ask your question.  And if I think it deserves a

 1  "yes," "no," or "I don't know" answer, I'm going to require

 2  that.

 3  **BY MR. MEYER:**

 4  **Q.**   Didn't you know during the 2002 through 2005 period that

 5  the NFLPA was receiving money from licensing active player

 6  rights?

 7  **A.**   No.

 8          **THE COURT:**  You can say "yes" or "no" or "I don't

 9  remember."

10          He says "no."  Okay.  Good.

11          Move on.

12  **BY MR. MEYER:**

13  **Q.**   And you knew that there were trading cards that were being

14  made, football cards, right?

15  **A.**   Yes.

16  **Q.**   You knew that Madden games were coming out every year,

17  right?

18  **A.**   Yes.

19  **Q.**   And you never asked anybody:

20          "Where's my share of that money," right?

21  **A.**   Right.  Because --

22  **Q.**   I didn't ask "because," with all due respect, sir.

23          **THE COURT:**  "Because" is on redirect.

24          **THE WITNESS:**  Okay.

25          **THE COURT:**  Counsel is entitled to get his little

1   bullet points --

2              **THE WITNESS:**  Okay.

3              **THE COURT:**  -- nailed down and not -- not

4   explanatory.  This one doesn't require an explanation.

5              **THE WITNESS:**  Okay.

6              **THE COURT:**  How much more do you have, Counsel?

7              **MR. MEYER:**  Not very much, Your Honor.  I think we

8   will be able to finish by 1:00 o'clock.

9              **THE COURT:**  We've got seven minutes, so let's hurry.

10             **MR. MEYER:**  I'll do my best.

11  **BY MR. MEYER:**

12  **Q.**   You never made any complaints to the NFLPA about not

13  getting any payments?

14  **A.**   Correct.

15  **Q.**   Right?

16             Now, did I hear you say on direct that you asked for

17  the ability to sign another GLA?  Perhaps I misheard, sir.

18  **A.**   I thought that I had signed more than one GLA at some

19  point in time.  But I just couldn't remember when.

20  **Q.**   I thought -- again, perhaps I misheard.  I thought you

21  said that you requested to be sent another GLA.

22  **A.**   No.

23  **Q.**   Okay.

24  **A.**   Oh, I requested -- not a GLA.  I requested when it was

25  time for me to pay my dues I requested that they send me

1   another form so I could fill it out and send it to them.

2   **Q.**   Another GLA form?

3   **A.**   No.  Membership dues.

4   **Q.**   A different form?

5   **A.**   (Nods head).

6   **Q.**   Okay.

7         Let me ask you briefly about the Madden game.  You

8   played the Madden game at the request of your attorneys; is

9   that right?

10  **A.**   Yes.

11  **Q.**   Okay.  And in all of the material that you've seen on the

12  Madden game, have you seen any use of your name?

13  **A.**   No.

14  **Q.**   Have you seen any use of your picture?

15  **A.**   Not that last time, but the time before I saw it.

16  **Q.**   I'm sorry, sir?

17  **A.**   What I thought was my picture.  Previously I thought I had

18  seen something that was my picture, number 85, in the earlier

19  game that I had seen.

20  **Q.**   I'm not talking about the number, sir.  I'm talking about

21  the your picture, picture of your face?

22  **A.**   Didn't see anybody's picture in the Madden game.

23  **Q.**   The only time you saw your number was in the 2003 game; is

24  that right?

25  **A.**   Yes.

1  Q.   After 2003, you didn't even see your number, right?

2  A.   No.

3  Q.   Do you have any idea whether the NFLPA got paid by EA any

4  extra money for using your name -- I'm sorry -- for using your

5  height or your weight in the Madden game?

6  A.   I don't know.

7  Q.   Let me just ask you one final question, sir.

8       Are you aware of -- I've been asking you about the

9  Madden game.  Now, I want to ask you, are you aware of any

10 example, any example you can think of where a licensee of the

11 NFLPA or the or Players Inc used your name or your picture

12 without your being compensated?

13 A.   It's my belief that they have.

14 Q.   Tell us the details.

15 A.   When we look at the 1965 game that we were talking about.

16 Q.   Sir, I'm asking about your name or your picture.  Do you

17 understand that?  Let me clarify, if it's needed.

18       The picture of your face.  Are you aware of any

19 example anywhere, whether it be Madden or anything else, where

20 a licensee of the NFLPA used your name or likeness of your face

21 without your being compensated?

22 A.   Not my face, but my likeness.

23 Q.   Are you referring to the number?

24 A.   Yeah, number 85, 6' 2, 185.

25 Q.   Let my ask the question again.  Are you aware of any

1  example where a licensee of the NFLPA used your name or a

2  likeness or picture of your face without you being compensated?

3  **A.**   Not my face.

4         **MR. MEYER:**  I have nothing further, Your Honor.

5  Thank you.

6         **THE COURT:**  Any redirect?

7         **MR. LECLAIR:**  I will be very brief, Your Honor.  I

8  know you want to break for lunch.  I just have two questions.

9         **THE COURT:**  We're going to break for the day.

10        **MR. LECLAIR:**  Break for the day.  I apologize, Your

11 Honor.

12                   **REDIRECT EXAMINATION**

13 **BY MR. LECLAIR:**

14 **Q.**   Mr. McNeil, I want to follow up on a couple of things.

15 With respect to whether you complained and what you knew, did

16 you know prior to this litigation whether the NFLPA had signed

17 a group licensing contract that -- that fits within the

18 definition of the GLA?

19        **MR. MEYER:**  Objection, Your Honor.  Lack of

20 foundation.

21        **THE COURT:**  No.  That's what we're trying to find out

22 is whether there is any foundation.  That's a proper question.

23        Please answer it.

24        **THE WITNESS:**  I had to assume that there was no way

25 that the players' union could enter into an engagement with

1   someone when it seemed to me, because 65 and when they were

2   marketing, that apparently they could have.

3   **BY MR. LECLAIR:**

4   Q.   But before this lawsuit, did you know one way or the

5   other --

6   A.   No, I didn't.

7   Q.   -- whether they had?

8        Did you know whether the agreements that they had

9   done for active players were ad hocs versus group licenses?

10  A.   No, I didn't.

11  Q.   Is that the reason -- part of the reason you didn't

12  complain?

13        **MR. MEYER:**  Objection.  Leading, Your Honor.

14        **MR. LECLAIR:**  This is redirect, Your Honor.

15        **THE COURT:**  Well, I know.  But it's still leading.

16        Sustained.

17        Ask it a different way.

18  **BY MR. LECLAIR:**

19  Q.   Tell us why you didn't complain.

20  A.   I didn't complain because there is no way I thought that

21  the players' union had entered into an agreement with a third

22  party to receive compensation and never paid us.  That's why.

23        I just never connected the two.  I didn't complain

24  because, although I knew that there was monies that were being

25  earned, my old way of thinking I just connected that to the old

1  players National Football League Owners' Association.

2  **Q.**   One final question, Mr. McNeil.

3         After you signed the group licensing authorization,

4  counsel asked you, you know:

5              "Did you do anything?"

6         Who did you expect was going to market you after you

7  signed this contract, you or them?

8  **A.**   Them.

9         **MR. LECLAIR:**  That's all I have.

10        **THE WITNESS:**  That was the contract.

11        **THE COURT:**  Can we excuse the witness now.

12        **MR. MEYER:**  Just one question?

13        **THE COURT:**  One question.

14        All right.

15                    **RECROSS—EXAMINATION**

16  BY MR. MEYER:

17  **Q.**  Since your GLA expired in 2005, have you done anything to

18  market yourself?

19  **A.**   I told you no.

20        **MR. MEYER:**  Okay.

21        **THE COURT:**  All right.  We need to take your picture

22  because it didn't come outright a while ago.  So bear with us

23  for one more try.

24        Is that a new battery?

25        **THE CLERK:**  It is a new battery.  Okay.

1          **THE COURT:**  Did that work?

2          **THE CLERK:**  The background setting, it's not

3  cooperating.

4          **THE COURT:**  Maybe we won't have pictures of anybody.

5  We might have to resort to your 1967 card.

6          (Laughter.)

7          **THE WITNESS:**  Maybe I broke the camera.

8          **THE COURT:**  You didn't break it.  It's the

9  government.  It's just us.  We've got something wrong.

10          All right.  Mr. McNeil, can we excuse you without

11  recall?

12          **MR. MEYER:**  Yes, Your Honor.

13          **MR. LECLAIR:**  That's fine, Your Honor.

14          **THE COURT:**  All right.  You're going to go back to

15  Mobile, Alabama?

16          **THE WITNESS:**  Yes, I am.

17          **THE COURT:**  Good for you.

18          Have a safe trip home.

19          **THE WITNESS:**  Thank you.

20          **THE COURT:**  Hope you have a safe trip home.  You are

21  excused.

22          Now, we are at 1:00 o'clock.  This is the magic time

23  for us to break.  And I want you to please remember the

24  admonition.

25          Don't talk to anyone about the case.  Don't let

1  anyone try to talk to you about it.  Keep an open mind.  You

2  don't -- don't do any Internet research or any any other kind

3  of research.

4          We'll see you back here tomorrow morning at 7:45 in

5  the morning.

6          Now, tomorrow we are going to break at 12:30.  And

7  then, there's no court on Thursday or Friday this week, so

8  we'll have a somewhat shorter day tomorrow.  But we'll get in a

9  a good day's worth of evidence.  All right?

10         See you tomorrow.

11         **THE CLERK:**  All rise.

12         (Jury excused.)

13         (The following proceedings were held in open court,

14         outside the presence of the jury.)

15         **THE COURT:**  Anything that the lawyers need the Court

16  for?

17         **MR. KESSLER:**  Just a housekeeping question, Your

18  Honor.

19         **THE COURT:**  Everyone have a seat.  What's that?

20         **MR. KESSLER:**  How can we check with your staff in

21  terms to make sure we're monitoring the time correctly?

22         **THE COURT:**  I do it myself.  I've got to write that

23  down.

24         Well, the way it works is I'll tell you from time to

25  time.  I'm not going to add it up every day, but every couple

1    of days I will tell you where you stand.

2              **MR. KESSLER:**  That's fine, Your Honor.  We'll inquire

3    if we get behind.  Thank you.

4              **THE COURT:**  Listen, something -- do you have

5    something, Mr. Hummel?

6              **MR. HUMMEL:**  I did, Your Honor.

7              **THE COURT:**  What do you have?

8              **MR. HUMMEL:**  In the motions in limine Your Honor said

9    or decided it wanted to have a hearing on the Peter Rhee issue

10   who prepared the summaries.

11             **THE COURT:**  All right.

12             **MR. HUMMEL:**  I was wondering when we might set that.

13             **THE COURT:**  Dawn, that's -- I've been wondering

14   myself.  It's going to have to be Monday or Tuesday next week.

15   Can you see -- we need about 45 minutes to an hour after court.

16             **THE CLERK:**  We've got a full Monday.  Tuesday --

17   well, Tuesday afternoon maybe you could do it after criminal

18   calendar at 3:00 o'clock.

19             **THE COURT:**  All right.  Let's shoot for 3:00 o'clock

20   on Tuesday.

21             **MR. HUMMEL:**  Thank you, Your Honor.  I just wanted to

22   remind the Court.

23             **THE COURT:**  Listen, I want to have a word to the wise

24   for all you lawyers.  This is based on something I observed

25   here.  And I'm just going to -- maybe I misinterpreted what

1  happened.

2          But when a witness is on the stand, lawyers should

3  not -- when a question is asked, do not nod yes.  Do not shake

4  your head no.  Even if it's done completely innocently, the

5  witness may pick up on it and think that you're trying to

6  signal how to answer the question.

7          And, certainly, if the jury sees it they're going to

8  think that.

9          So I -- I'm not going to go any further than this,

10 but I don't want to see it again.  No nodding of any type.  No

11 hand signals.  No smiles.  No high fives, which I did see.

12          **MR. PARCHER:**  I did that.

13          **THE COURT:**  You did that, too.  Mr. Parcher, you've

14 got to be careful here.

15          **MR. PARCHER:**  Yes, sir.

16          **THE COURT:**  As poker faced --

17          **MR. PARCHER:**  Yes, sir.

18          **THE COURT:**  Ail of you.  As poker faced as you can.

19 I promise you the jury will see that and think you are trying

20 to signal the witness.

21          So let's not -- both sides, totally professional on

22 this.  If the witness is on the stand -- that witness didn't

23 need any help.

24          He had his opinions ready to go.  So you didn't need

25 to offer any assistance.

1          All right.  That's all I'm going to say on that

2    subject.  All right.

3          We will see you tomorrow.

4          **MR. LECLAIR:**  Your Honor, would you give us the time?

5          **THE COURT:**  What?

6          **MR. LECLAIR:**  I want to track the time daily.

7          **THE COURT:**  So far I've got -- I can't add it up.

8          **MR. LECLAIR:**  Okay.

9          **THE COURT:**  You've gotten, looks like, an hour and 17

10   minutes for the plaintiff and 42 for the defense.

11         **MR. LECLAIR:**  Thank you, Your Honor.

12         (Thereupon, this trial was continued until Wednesday,

13   October 22, 2008 at 7:30 o'clock a.m.)

14                         -   -   -   -

15

16                   **CERTIFICATE OF REPORTER**

17        I certify that the foregoing is a correct transcript

18   from the record of proceedings in the above-entitled matter.

19

20   DATE:   Tuesday, October 21, 2008

21

             s/b Katherine Powell Sullivan
22        _____

23        Katherine Powell Sullivan, CSR #5812, RPR, CRR
                     U.S. Court Reporter
24

25

```
 1                        I N D E X

 2   OPENING STATEMENT BY MR. PARCHER     PAGE 264

 3   OPENING STATEMENT BY MR. KESSLER     PAGE 302

 4

 5   PLAINTIFF WITNESSES:

 6   CLIFTON MCNEIL

 7   DIRECT EXAMINATION BY MR. LECLAIR     PAGE 344

 8   CROSS-EXAMINATION BY MR. MEYER        PAGE 412

 9   REDIRECT EXAMINATION BY MR. LECLAIR   PAGE 444

10   RECROSS-EXAMINATION BY MR. MEYER      PAGE 446

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1           E X H I B I T S

2  TRIAL EXHIBITS INTO EVIDENCE

3  1223    PAGE 358

4  1321    PAGE 375

5  1245    PAGE 389

6  1241-1 PAGE 390

7  1263    PAGE 391

8  1302    PAGE 393

9  1245-2 PAGE 395

10  1263-1 PAGE 400

11  1263-2 PAGE 401

12

13

14

15

16

17

18

19

20

21

22

23

24

25