Volume 3

Pages 454 - 629

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE WILLIAM H. ALSUP

BERNARD PAUL PARRISH, HERBERT      )
ANTHONY ADDERLEY, WALTER ROBERTS   )
III,                               )
                                   )
           Plaintiffs,             )
                                   )
  VS.                              )  No. C 07-0943 WHA
                                   )
NATIONAL FOOTBALL LEAGUE PLAYERS   )
ASSOCIATION and NATIONAL FOOTBALL  )
LEAGUE PLAYERS INCORPORATED d/b/a  )
PLAYERS INC,                       )
                                   )  San Francisco, California
           Defendants.             )
_____)  Wednesday
                                      October 22, 2008


**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

**For Plaintiffs:**          MANATT, PHELPS & PHILLIPS
                             1001 Page Mill Road
                             Building 2
                             Palo Alto, California 94304
                        BY:  **RONALD S. KATZ, ESQ.**
                             **RYAN S. HILBERT, ESQ.**


                             MANATT, PHELPS & PHILLIPS
                             7 Times Square
                             New York City, New York 10036
                        BY:  **L. PETER PARCHER, ESQ.**


                             MANATT, PHELPS & PHILLIPS
                             11355 West Olympic Boulevard
                             Los Angeles, California  90064
                        BY:  **CHAD HUMMEL, ESQ.**

(Appearances continued on next page)

Katherine Powell Sullivan, CSR, RPR,CRR
Official Reporter - U.S. District Court
(415) 794-6659

**APPEARANCES CONTINUED:**

**Also for Plaintiffs:**    MCKOOL SMITH
                                    300 Crescent Court
                                    Suite 1500
                                    Dallas, Texas  75201
            BY:   **LEWIS T. LECLAIR, ESQ.**
                    **JILL ADLER NAYLOR, ESQ.**
                    **ANTHONY GARZA, ESQ.**
                    **BRETT CHARHON, ESQ.**

**For Defendants:**        DEWEY & LEBOEUF
                                      1301 Avenue of the Americas
                                    New York City, New York  10019-6092
            BY:   **JEFFREY L. KESSLER, ESQ.**
                    **DAVID GREENSPAN, ESQ.**
                    **DAVID G. FEHER, ESQ.**
                    **ROY TAUB, ESQ.**
                    **MOLLY DONOVAN, ESQ.**
                    **JASON CLARK, ESQ.**

                                    WEIL, GOTSHAL & MANGES LLP
                                    767 Fifth Avenue
                                    New York, New York 10153-0119
            BY:   **BRUCE S. MEYER, ESQ.**

**Also Present:**        KEKER & VAN NEST LLP
                                    710 Sansome Street
                                    San Francisco, California 94111-1704
            BY:  **R. JAMES SLAUGHTER, ESQ.**

**Reported By:**     *Katherine Powell Sullivan, CSR #5812*
                      *Official Reporter - U.S. District Court*

**P R O C E E D I N G S`**

2   **OCTOBER 22, 2008**                                    **7:34 A.M.**

3

4              (The following proceedings were held in open court,

5              outside the presence of the jury.)

6         **THE COURT:**  All right.  I want you to know on the

7   Friss, I completely misunderstood the procedural context in

8   which this was coming up.

9         I thought this was something you were giving me that

10  the defense was propounding and was going to be read in as a

11  defense witness.  And now I understand that the plaintiff is

12  the proponent of this witness.

13        So I'm not going to rule right now because I'm still

14  sorting this out, but -- just a minute.  In the future, when

15  you give me these -- there was nothing on here that tells me

16  who was the proponent of the witness and whose objections I was

17  ruling on.  I completely misunderstood the context.

18        Then I began to suspect that I had misled myself, and

19  I sent out that order yesterday to get this clarified.  I now

20  have a better understanding.  In fact, you, Mr. Hummel, are the

21  proponent of this witness.

22        **MR. HUMMEL:**  Under the rules, Your Honor, we

23  designated certain testimony from Mr. Friss.

24        **THE COURT:**  You are the proponent at trial.

25        **MR. HUMMEL:**  We would call him as our witness if he

1 were here.

2          **THE COURT:**  Yes, that's right.  You are the

3 proponent.

4          **MR. HUMMEL:**  Correct.

5          **THE COURT:**  They are entitled to lead the witness.

6          **MR. HUMMEL:**  No, Your Honor, not if he is an adverse

7 witness, respectfully.

8          **THE COURT:**  He is a third party.

9          **MR. HUMMEL:**  Correct.

10          **THE COURT:**  He is a third party, and you are calling

11 him.

12          **MR. HUMMEL:**  Right.

13          **THE COURT:**  If this guy was called live at trial,

14 Mr. -- Kebble?

15          **MR. KESSLER:**  Kessler.

16          **MR. HUMMEL:**  Kessler, Your Honor.

17          **THE COURT:**  -- would be allowed to lead all day long.

18          **MR. HUMMEL:**  I disagree, Your Honor.

19          **THE COURT:**  You're wrong.  Now, just sit down.  I'm

20 not going to entertain anymore argument.

21          I read the brief on it.  I feel like I'm misled.  I

22 misled myself.  But you are the proponent of the witness.  If

23 you call this guy live at trial you're saying he can't lead?

24          **MR. HUMMEL:**  Correct.

25          **THE COURT:**  You're wrong.

1           **MR. HUMMEL:**  Your Honor --

2           **THE COURT:**  He's a first party.

3           **MR. HUMMEL:**  May I --

4           **THE COURT:**  Yes, he went and got a declaration from

5    the guy.

6           **MR. HUMMEL:**  Right.

7           **THE COURT:**  Yes, he may have written it.

8           **MR. HUMMEL:**  Yes.

9           **THE COURT:**  That happens all the time.  People go and

10   get statements from third parties all the time so they can

11   impeach them at trial.

12          **MR. HUMMEL:**  Of course.  So they could impeach him at

13   trial.  What you wouldn't allow him to do at trial is to say:

14              "Mr. Friss, let me read you paragraph 1 of your

15   declaration."

16          **THE COURT:**  You did not object on that ground,

17   unfortunately.

18          **MR. HUMMEL:**  We did.

19          **THE COURT:**  No, you didn't.  You objected to it as

20   leading, but that's -- he can lead.  He can lead, but he

21   cannot -- the proper objection would have been:  It assumes

22   facts not in evidence.  No one bothered -- I read that.  No one

23   bothered to bring that up.

24          **MR. HUMMEL:**  Your Honor, it's hearsay, as well.  And

25   that objection is correct as to form, because the declaration

1  is an out-of-court statement by the witness.

2          **THE COURT:**  The declaration is not going to come in.

3          **MR. HUMMEL:**  So then why --

4          **THE COURT:**  The declaration itself won't come in, but

5  the parts that were read in the question -- that would have

6  been a proper objection, but it was not made, and you waived

7  it.

8          **MR. HUMMEL:**  Your Honor, we objected as to form --

9          **THE COURT:**  No.

10          **MR. HUMMEL:**  -- which is --

11          **THE COURT:**  No.  You objected, comma, leading.  I

12  read it.  I've got it right here.  Do you want to see it in?

13          **MR. HUMMEL:**  No.  There are times when it was

14  "Objection, leading," that's correct.

15          **THE COURT:**  You said:

16               "Object to the form, leading."

17          **MR. HUMMEL:**  That's correct.

18          **THE COURT:**  "Objection, leading.  Objection, leading.

19  Objection, leading."

20          **MR. HUMMEL:**  And, Your Honor --

21          **THE COURT:**  Never:  "Objection, assumes facts not in

22  evidence."

23               If you had said that, you would have given the lawyer

24  a chance to fix it.  It's a very common mistake for young

25  lawyers who never tried a case to make.  I'm not trying

1   to excuse what Mr. -- is Mr. Greenspan here today?

2          **MR. GREENSPAN:**  I'm the --

3          **THE COURT:**  Are you the guy who did this?

4          **MR. GREENSPAN:**  The leading question.

5          **THE COURT:**  Probably never tried a case.  You should

6   have -- you should have -- you would have known not to proceed

7   in this manner.

8          But you didn't put him on notice that he was making a

9   mistake.  You said it's leading.  Yeah, it was leading.  But

10  now that you are the proponent, he can lead.

11         **MR. HUMMEL:**  Your Honor, we'll preserve this.

12         **THE COURT:**  All right.  That point is preserved for

13  appeal.

14         **MR. HUMMEL:**  Thank you, Your Honor.

15         **THE COURT:**  But there is a different problem.  There

16  is a different problem here, and that's why I'm not ready to

17  completely rule on this.

18         Get this.  I've already ruled on this.  But I've got

19  to sort through it.  It's not so easy.  He puts it in the

20  present tense.

21         "It is Topps' understanding that" -- I've already

22  ruled the present tense doesn't matter.  That's just an

23  opinion.  What matters is the intent back at the time they were

24  doing the deal.

25         All right.  So then I write in the margin:

1          "Today's understanding not relevant so I've

2   already ruled that out.

3          Except, then I get to the next page, and then he

4   says:

5          "Well, was this your understanding at the time?"

6          He says:

7          "Yes."

8          So he kind of fixes it up.

9          **MR. HUMMEL:**  Your Honor --

10         **THE COURT:**  I'm not finished going through this.  Not

11  all of this is going to come in, but some of it is going to

12  come in, contrary to what I said the other day because I had

13  totally misunderstood the procedural context.

14         **MR. HUMMEL:**  Your Honor, and to be clear, we

15  obviously reserve the right.  If you rule that they can put in

16  what, in my mind, is obviously leading hearsay testimony, we

17  may not choose to read Friss affirmatively in our case.  In

18  which case they would have to.

19         **THE COURT:**  Then it would be a much different

20  problem, wouldn't it?

21         **MR. HUMMEL:**  Correct.  That's right.

22         **THE COURT:**  Well, then, I wish you had told me that

23  and saved me a lot of pain and suffering overnight.

24         **MR. HUMMEL:**  Your Honor, to me it was very clear that

25  that testimony --

1          **THE COURT:**  Fair enough.  Fair enough.  I think --

2    listen.  These are not easy evidentiary problems.  And you had

3    a definite good faith basis to make these objections.

4          **MR. HUMMEL:**  Yes, Your Honor.

5          **THE COURT:**  There's no doubt about it.

6          **MR. HUMMEL:**  Thank you.

7          **THE COURT:**  But now that I understand the context and

8    that you're the proponent of the witness, which I didn't

9    understand until the thing got submitted last night -- I'm

10   looking at these different colored things.  No one bothered to

11   tell me whose objections they are.

12          Now that I figured it out and went through and did

13   the Rosetta Stone code that you gave me last night, I

14   understand that you're the proponent of the witness.

15          **MR. HUMMEL:**  And we may not be, Your Honor.

16          **THE COURT:**  If you decide not to call him --

17          **MR. HUMMEL:**  Right.

18          **THE COURT:**  -- that is a different problem.

19          And you're going to be in trouble, Mr. Greenspan,

20   because of all these leading questions.  If you're the

21   proponent then --

22          **MR. GREENSPAN:**  No, Your Honor.  The deposition

23   itself, which plaintiff subpoenaed, they were the ones that

24   marked the declaration --

25          **THE COURT:**  Please, no.  I'm telling you,

1  Mr. Greenspan, depositions are one thing.  At trial I've got to

2  treat it as:  Who is the proponent of the witness here?  I

3  don't look to see who took the deposition.  It's only in a rare

4  case that might have something to do with it.

5        But the principal thing is if -- I have to just say

6  if this guy was called as a witness live here at trial, would

7  these kind of questions be allowed on cross-examination?

8        Now, if you are the proponent of the witness, there

9  is no way I would allow you to lead like this.

10       **MR. GREENSPAN:**  Even then, Your Honor, I will note

11  there are many questions in there that we believe are either

12  not leading or were not objected to for form at the deposition.

13       **THE COURT:**  That would be a good point, except the

14  one I'm looking at right now were objected to precisely on that

15  ground.

16       **MR. KESSLER:**  Your Honor, I think if we end up as a

17  proponent of the witness we will then redesignate those

18  portions we think are consistent with Your Honor's rulings.

19       We do think there are portions that will not be

20  subject to what Your Honor is saying, because either they did

21  not make the objection or the questions were not leading.  And

22  we will go through that if we become the proponents.

23       **THE COURT:**  When Mr. Greenspan took over there are a

24  couple of questions that are not leading.  But 80 to 90 percent

25  of them are.  It's like he doesn't know how to ask a nonleading

1 question.  He's afraid of the answer or something.

2          So you -- look.  I'm not going to fix it up for

3 somebody.  I'm not finished with this yet.  I will try to get

4 it done by, maybe -- I don't know, sometime today.

5          **MR. KESSLER:**  Thank you.

6          **THE COURT:**  That's going to be the ground rule.

7          I want to go back and emphasize that the

8 understanding today of what any of these -- that's just an

9 opinion.  What matters is what the -- I already said this.

10 It's the objective test.

11          But because you're applying D.C. law and it does seem

12 to allow some subjective intent, I think the only subjective

13 intent that matters is what they thought at the time.  And in

14 the contract and any subsequent actions like some other

15 contract was entered into because they thought it meant -- the

16 other contract meant X.

17          **MR. HUMMEL:**  Your Honor?

18          **THE COURT:**  Okay.  We can allow that.  But we're not

19 going to allow present-day opinions.  And by "present day," I

20 mean when they ask him at the deposition:

21               "What do you think this means?" and they say:

22               "It means X," that's inadmissible.

23          All right.

24          **MR. HUMMEL:**  Your Honor, I'd like to save the Court

25 some time.  If you're inclined to let them lead if we were the

1  proponent, we will not call him in our case.  So we will

2  redesignate.  I want to save the Court time and not have you do

3  it, then.

4         **THE COURT:**  You are not going to call Warren Friss?

5         **MR. HUMMEL:**  We will not call him in our affirmative

6  case, if that's Your Honor's inclination.

7         **THE COURT:**  That's my inclination for sure.

8         **MR. HUMMEL:**  All right, Your Honor.  Then, we will

9  take that back and redesignate.  We don't want to waste the

10  Court's time on this.

11         **THE COURT:**  Well, I have got a lot of preliminary

12  notes on there now.  I can't give it back to you.

13         **MR. HUMMEL:**  Okay.

14         **THE COURT:**  Unless you really have to have it, and

15  then I'll have to --

16         **MR. HUMMEL:**  We don't have to have it, but I'm giving

17  notice to the other side.  And Mr. Kessler indicated he would

18  designate him.

19         **MR. KESSLER:**  We would redesignate, Your Honor,

20  obviously.

21         **THE COURT:**  Since this guy is your friend, why don't

22  you just call him as a witness in the case?

23         **MR. KESSLER:**  He's not our friend.  He's a third

24  party.

25         **THE COURT:**  You wrote the declaration.  Come on.  You

1  could get this guy out here.

2       **MR. KESSLER:**  As Your Honor knows, you can approach a

3  third party.  You can get them to agree to submit a

4  declaration.  They are a licensee of the company.  He's on the

5  East Coast, and I don't know whether we can call him or not.

6       **THE COURT:**  He has a contract with you that he's

7  supposed to help cooperate.

8       **MR. KESSLER:**  I don't believe that kind of provision,

9  Your Honor, would require him to come to a litigation.

10       In any event, since they have --

11       **THE COURT:**  It's your problem.  Next time you better

12  teach your associates not to ask leading questions if they ever

13  want to get it in evidence at trial.

14       **MR. KESSLER:**  We will go through the deposition

15  again, and if we decide to designate it in our case we will not

16  designate the ones that are leading.  We will designate the

17  other portions.

18       **THE COURT:**  It's been withdrawn from the plaintiff.

19  If you want to try your best to get some of that into evidence,

20  more power to you.

21       **MR. KESSLER:**  We will look at that, Your Honor.

22       **MR. HUMMEL:**  Thank you, Your Honor.  I apologize for

23  the confusion.

24       **THE COURT:**  Anything you want to bring up this

25  morning?

1          **MR. KESSLER:**  Your Honor, I think EA is here and

2    filed a motion with the Court.

3          **THE COURT:**  I read your motion.  Who is this?

4    Slaughter.

5          **MR. SLAUGHTER:**  Yes, Your Honor.  James Slaughter

6    from Keker & Van Nest.

7          **THE COURT:**  You have an uphill battle here, but I'll

8    hear what you have to say.

9          **MR. SLAUGHTER:**  Your Honor, we seek only to have very

10   minimal portions of this document redacted and kept

11   confidential.

12          EA is a third party to this action.  They produced

13   documents pursuant to a subpoena.  The document was produced on

14   a highly-confidential basis.  They were expected to be

15   maintained on an attorneys' eyes only basis.  And as far as we

16   understand, throughout the course of this litigation they have

17   been maintained on an attorneys' eyes only basis.  They have

18   not been publicly disclosed.

19          We learned only yesterday, for the first time, that

20   the document might come into evidence unredacted and unsealed.

21   We don't seek to have the entire document sealed, as I

22   mentioned, Your Honor, but just solely the price terms, which

23   are EA's, you know, most confidential trade secret.  This is

24   what they do with -- this is how they negotiate with their

25   third parties.

1      **THE COURT:**  They are a public company, aren't they?

2  How could the amount of money they get be a trade secret?

3      **MR. SLAUGHTER:**  The amount of money that they

4  negotiate with one licensor is going to directly affect how

5  they negotiate with other licensors.  This is their business

6  practice.

7      If the other licensors know what EA is willing to

8  pay, that directly affects their business practices, Your

9  Honor.  This is the exact kind of confidential financial

10  information that is normally kept secret.

11      And we're not -- as I mentioned, we're not asking the

12  entire document be kept secret, just those portions of the

13  document that relate to the pricing information.

14      I understand that the defendants support the request.

15  The plaintiffs do not; take the position with respect to the

16  request.  And so we would request, Your Honor, that just those

17  portions of paragraph 6 of the Exhibit 80 be redacted relating

18  to the price.

19      **THE COURT:**  The Court is now going to rule.  This

20  motion is denied.  I'm going to explain why it's denied.

21      The courts of the United States belong to the people

22  of the United States.

23      The Ninth Circuit, in a decision called Kamakana vs.

24  City and County of Honolulu -- which you did cite in your

25  memorandum, but you didn't cite it for the proper and most

1  pertinent proposition -- the Ninth Circuit has said when a case

2  goes to trial and/or on summary judgment, the public -- not

3  these parties -- the public has an additional interest in

4  knowing the operations and the workings of its federal courts.

5       And if somebody's case gets thrown out or not thrown

6  out, the public has a right to come in and see why so they can

7  look over the shoulder of the judge and see if the judge or the

8  jury is doing the right thing.

9       Now, so the Ninth Circuit specifically modified the

10  good cause test that you rely on, and imposed a compelling

11  reasons standard.

12       Your memorandum doesn't even mention the compelling

13  reasons standard.  Doesn't even mention it.  It relies on good

14  cause.  Yeah, it's true for discovery purposes that would have

15  been enough to keep it under seal.

16       But for purposes of a trial and the ability of the

17  public to come in here and see how we operate, there is a much

18  higher standard, which you ignored in your memorandum.

19  Ignored.  And, therefore, your motion is denied.

20       So the Court is sympathetic to the idea that you've

21  got some information there you don't want the competitors to

22  know about but, you know, that happens all the time in cases.

23  It happens all the time.

24       In order to get to the bottom and the truth and to

25  allow these parties to have their day in court, something has

1  got to give now and then.

2          And what's got to give in your case is that you

3  happened to do a deal with one of these parties.  Your company,

4  I mean, not you.  And your company is now stuck with the fact

5  that they are embroiled in somebody else's litigation and all

6  of this is going to be public.

7          Now, I don't see anything so -- I see that it's of

8  some passing interest, how much has been paid in this case by

9  your company.  But it's not like the recipe of Coca-Cola.

10          **MR. SLAUGHTER:**  It may not -- sorry, Your Honor.

11          **THE COURT:**  I'm making my ruling now.

12          **MR. SLAUGHTER:**  Fair enough, Your Honor.  Appreciate

13  it.

14          **THE COURT:**  The ruling has been made.  The motion is

15  denied.

16          The public, as far as I'm concerned, as soon as this

17  comes into evidence they can come look at it, now that you've

18  drawn so much attention to it.

19          Thank you.

20          All right.  Any more issues you want to bring up?

21          **MR. KESSLER:**  Nothing from us, Your Honor.

22          **THE COURT:**  Do we have our next witness ready to go?

23          **MR. KESSLER:**  Is he in the courtroom?  I believe

24  they're calling Mr. Doug Allen.

25          **THE COURT:**  All right.  Let's have our jury come in.

1          **THE CLERK:**  We are missing one juror.

2          **THE COURT:**  Everyone have a seat.  I guess we'll take

3 a few moments.  Come get me.  Come get me as soon as they are

4 ready, Dawn.

5          (Proceedings in recess from 7:51 to 8:46 a.m.)

6          **THE COURT:**  Our jurors are all here now.

7          Are we set to go out here?  Are we all set out here?

8 Are we ready?

9          **MR. KESSLER:**  Yes, we are, Your Honor.

10          **MR. PARCHER:**  Yes.

11          **THE COURT:**  Let's bring in the jury.

12          **MR. KATZ:**  Your Honor, if need be, may I move over

13 there again?

14          **THE COURT:**  Of course.

15          **MR. KATZ:**  I'll just wait until they come in.

16          **THE COURT:**  You can do that.

17          (Thereupon, the jury returned to the courtroom.)

18          **THE COURT:**  Okay.  Have a seat.  I know all of you

19 tried very hard to get here on time.  If it wasn't for that

20 terrible accident over there, everybody would have been here

21 even earlier than normal.  So thank you for that continued

22 attention to your job in this case.

23          You will remember yesterday we had Mr. McNeil as a

24 witness.  He is finished now.  And the plaintiff is ready to

25 call their next witness.  So please proceed.

1          MR. PARCHER:  We called Doug Allen to the witness

2    stand, Your Honor.

3          THE COURT:  All right.  Mr. Doug Allen.  Let's bring

4    him forward.

5          Does the camera work?

6          THE CLERK:  I think so.  I tried to change the

7    setting.

8          THE COURT:  Mr. Allen, please raise your right hand

9    and the clerk will swear you in.

10          (Thereupon, the witness was sworn.)

11          THE WITNESS:  I do.

12          THE CLERK:  Okay.  Thank you.

13          THE COURT:  We're going to try and see if our camera

14    works today.  And we need to take your picture for the closing

15    arguments.

16          THE CLERK:  Yes, it worked.

17          THE COURT:  Good.  Thank you.

18          Go ahead, Mr. Parcher.

19          MR. PARCHER:  Thank you, Your Honor.

20                    **DOUGLAS ALLEN**,

21    called as a witness for the Plaintiff herein, having been first

22    duly sworn, was examined and testified as follows:

23                    **DIRECT EXAMINATION**

24    BY MR. PARCHER:

25    Q.   Good morning, Mr. Allen.

1   **A.**   Good morning.

2   **Q.**   I'm Peter Parcher.  We haven't officially met before.  I

3   shook your hand a moment ago.

4   **A.**   Yes.

5   **Q.**   I am one of the lawyers for the plaintiffs, and I'm going

6   to be questioning you this morning.

7   **A.**   All right.

8   **Q.**   Nice to meet you.

9   **A.**   Nice to meet you.

10          **THE COURT:**  Keep your voice up or lean forward.  You

11  can adjust that mic.  It's important that it catch your voice

12  so the jury can hear everything you say.

13          **THE WITNESS:**  Yes, sir.

14  **BY MR. PARCHER:**

15  **Q.**   So as I understand it, Mr. Allen, you're now an executive

16  with the Screen Actors Guild?

17  **A.**   That's correct, I am.

18  **Q.**   What is your position?

19  **A.**   I am the national executive director and the chief

20  negotiator for the Screen Actors Guild.

21  **Q.**   How long have you been with the Guild?

22  **A.**   A little less than two years.

23  **Q.**   And they're located in Hollywood?

24  **A.**   In Los Angeles.

25  **Q.**   Forgive me.  I'm a New Yorker.  Los Angeles?

1  **A.**    That's right.

2  **Q.**    There's a difference, right?  Hollywood is just a part of

3  Los Angeles?

4  **A.**    An important part.

5  **Q.**    And as a director of the Screen Actors Guild I would

6  imagine, am I correct, that you have occasion to come in

7  contact with actors and actresses, directors and so forth?

8  **A.**    I do on a daily basis, yes.

9  **Q.**    On a daily basis.  And how about their agents, do you have

10 occasion to come into contact with the agents of the actors and

11 actresses, directors and whatnot?

12 **A.**    On occasion.  Less often than my membership, but, yes.

13 **Q.**    But you have a working familiarity, don't you, with the

14 agencies that represent talent?

15          **MR. KESSLER:**  Your Honor, I'm going to object as to

16 relevance, what --

17          **THE COURT:**  Where's the relevance, Mr. Parcher?

18          **MR. PARCHER:**  The relevance is I'm going to ask the

19 witness if he knows the percentage that these talent agencies

20 customarily charge their talent.

21          **THE COURT:**  Sustained.  Not relevant.

22          **MR. PARCHER:**  Yes, sir.

23 **BY MR. PARCHER:**

24 **Q.**    You -- prior to being with the Screen Actors Guild, I

25 gather you spent quite a few years with the defendants

1  employed, correct?

2  **A.**   I was with the NFL Players Association for 25 years.

3  **Q.**   When you say you were with the Players Association, what

4  was your capacity?

5  **A.**   Well, I had different titles and responsibilities during

6  the years.  But when I left I was the assistant executive

7  director.

8  **Q.**   And you had been there for several years?

9  **A.**   About 20.

10 **Q.**   Our relevant period in this case, although there are

11 occasions to go earlier and later, but our relevant period is,

12 I think, 2004 to 2007.  You certainly were the executive person

13 at that time, correct?

14 **A.**   Yes.  I had that job title and responsibility during that

15 time.  I did.

16 **Q.**   Well, you actually had a second job title during those

17 years, didn't you?

18 **A.**   I did.

19 **Q.**   And would you tell Judge Alsup and the jury what that

20 title was?

21 **A.**   I was the president of NFL Players Incorporated, which was

22 known as Players Inc.

23 **Q.**   Now, at the time -- would it be fair to say that your

24 executive position with the union, the NFLPA, made you the

25 number two man in the organization?

1  A.    Uhm, I was certainly described that way by some.

2  Q.    Well, the president of the union was a Mr. Upshaw,

3  correct?

4  A.    No, no.  The -- he was the executive director of the

5  union.

6  Q.    Oh, I've got it --

7  A.    The president was always an active player.

8  Q.    Okay.  I guess I'm saying the wrong titles.  I'm not doing

9  that deliberately.

10  A.    No problem.

11  Q.    No, but I just want to tell you I probably should know

12  better, but I don't.

13         So -- but for all practical purposes, Mr. Upshaw was

14  the number one man on a day-to-day basis with the union,

15  correct?

16  A.    That's correct.

17  Q.    And you were the number two man?

18  A.    Uhm, I was certainly described that way by some.  I'm not

19  trying to be difficult, but there were other people who had

20  responsibilities that were at the same level as mine.

21  Q.    Okay.  So you're saying you were number two along with

22  others, is that it?  There were a bunch of number twos?

23  A.    No, I'm thinking of our general counsel who was at the

24  same level I was at.

25  Q.    But as far as an executive position as distinguished from

1  a legal position, you were the number two, weren't you?

2  **A.**   Yes, I was.

3  **Q.**   Right.  And as the president of Players Inc -- withdrawn.

4         Mr. Upshaw was the chairman of Players Inc?

5  **A.**   That's correct.

6  **Q.**   And you were the president?

7  **A.**   I was.

8  **Q.**   So could we say number one and two there, as well?

9  **A.**   Certainly.

10 **Q.**   All right.  Now, I'd ask you to take a look at -- the

11 exhibits should all be before you.  I hope they are.  I hope

12 they're organized properly.

13        I would ask you to take a look at Trial Exhibit 125.

14 I'll tell you what it is.  It's the agreement between Players

15 Inc and the NFLPA, dated 9th of May, 1994.

16        Have you got it there, sir?

17 **A.**   I do.

18 **Q.**   Would you take a look at -- I think it would be the last

19 page.  I just want to make sure that it's -- see the signature

20 page?

21 **A.**   Yes, I do.

22 **Q.**   Okay.  I'll get it in evidence first.  That's your

23 signature under "National Football League Players Inc?"  That's

24 you, Douglas F. Allen?

25 **A.**   That's correct.

1   Q.   And the signature above, do you recognize that on behalf

2   of the National Football League Players Association by Eugene

3   T. Upshaw, Jr., Executive Director.  Do you recognize that

4   signature?

5   A.   Yes, I do.

6          MR. PARCHER:  I'll move this trial exhibit into

7   evidence, Your Honor.

8          MR. KESSLER:  No objection.

9          THE COURT:  And the number again?

10         MR. PARCHER:  It's trial Exhibit 125.

11         THE COURT:  Very well.

12         Received.

13         MR. PARCHER:  Thank you.

14         (Trial Exhibit 125 was received into evidence.)

15  BY MR. PARCHER:

16  Q.   I'll turn your attention to page 6 of this exhibit.

17         MR. PARCHER:  Put that up on the board.

18         (Document displayed.)

19  BY MR. PARCHER:

20  Q.   It says in paragraph 5 (a) that there will be a royalty in

21  the amount of 37 percent of gross licensing revenues.  Do you

22  see that there?

23  A.   I do, yes.

24  Q.   And that was the money that was going to go to the --

25  monies derived from licenses, that's the percentage of that

1  money that was going to go to the players; is that correct?

2  **A.**   To the active players, that's correct.

3  **Q.**   Okay.  Now, did -- and none of this money was ever

4  intended, this 37 percent, none of that percentage was ever

5  intended to be paid over to retired players; is that -- excuse

6  me.  I'm asking you a question.  I shouldn't say, Is that what

7  you're saying?

8          Is that your position?

9  **A.**   Could you repeat the question, please?

10 **Q.**   Well, you've got 37 percent here.  I gather it's

11 indisputable that that's the money that was supposed to go to

12 the active ballplayers who were in the union, right?

13 **A.**   That's correct.

14 **Q.**   Okay.  Now, was any of that 37 percent ever intended, from

15 the first minute or the first second that this document was

16 negotiated, was it ever intended to go to the retired players?

17 **A.**   No, sir, it wasn't.

18 **Q.**   Okay.  So there's nothing in this exhibit, the agreement

19 between the players' union and Players Inc, that suggested in

20 any manner, shape or form that the retired players were going

21 to get anything for licensing their names and likenesses under

22 group licenses, correct?

23 **A.**   I haven't reviewed the document.

24 **Q.**   You can review it, sir.  This is a document that you

25 signed, correct, sir?

1  **A.**    I'm sorry.  Would you repeat?

2  **Q.**    This is a document you signed?

3  **A.**    That's correct.

4  **Q.**    This is a document you had a strong hand in developing,

5  along with Mr. Upshaw, correct?

6  **A.**    That's correct.

7  **Q.**    In fact, the truth is it's you and Mr. Upshaw who decided

8  what would be in this document in the first instance, wasn't

9  it?

10          I'm not talking about the legal language, but the

11  substance?

12  **A.**    Well, this was done -- this document was prepared in close

13  consultation with our tax counsel.

14  **Q.**    Leaving aside tax counsel, the terms of this agreement

15  between the Players Association and Players Inc were decided

16  upon in the first instance by Gene Upshaw and Doug Allen,

17  correct?

18  **A.**    They were based on --

19  **Q.**    Could you say "yes" or "no"?

20  **A.**    Well, it's hard for me to answer that question without an

21  explanation.  I'd like to try to do that, if that's all right.

22  **Q.**    I'll say this to you, sir.  If you'll say "yes" or "no" --

23          **MR. PARCHER:**  If I may do this, Your Honor.

24  **BY MR. PARCHER:**

25  **Q.**    If you'll say "yes" or "no" for me, and an explanation is

1  required beyond that, your counsel has already said that he's

2  going to take quite a bit of time in asking you questions.  And

3  you can explain it then.

4          **THE COURT:**  No, not -- that's not the right ground

5  rule.

6          Can you answer the question "yes" or "no"?

7          **THE WITNESS:**  Could you please repeat the question?

8          **MR. PARCHER:**  Would you mind reading it back?

9          **THE COURT:**  Here's the ground rule.  This is

10  effectively cross-examination because you are on opposite

11  sides.

12          Mr. Parcher is entitled to get a "yes," or a "no" or

13  an "I don't remember," unless you just can't answer one of

14  those at all without putting in some short explanation.

15          If you've got to have an explanation, I'll let you

16  make one, unless I think you're abusing the privilege of doing

17  that.

18          So let's hear the question, and you tell me if you

19  think you can answer it, "yes", "no" or "I don't recall."

20          **THE WITNESS:**  Yes, Your Honor.

21          **THE COURT:**  Do you want to repeat it so the court

22  reporter doesn't have to go back?

23          **MR. PARCHER:**  Oh, sure.

24          Pardon me.  You got it?

25          (The question was read by the reporter as follows:)

1          **"QUESTION:**  Leaving aside tax counsel, the

2          terms of this agreement between the Players

3          Association and Players Inc were decided upon

4          in the first instance by Gene Upshaw and Doug

5          Allen, correct?"

6          **THE WITNESS:**  Yes.

7  **BY MR. PARCHER:**

8  **Q.**   Thank you.

9          So Gene -- excuse me -- Gene Upshaw and Doug Allen

10  decided that at least in this agreement there would be no money

11  or no percentage of money set aside for retired football

12  players that signed group licensing authorizations, correct?

13          Yes or no, sir?

14  **A.**   Yes.

15  **Q.**   Now, I'd ask you to take a look at Trial Exhibit No. 132.

16  That's the -- if I'm correct, I'm led to believe that's the

17  constitution of the National Football League Players

18  Association.

19          Looks like you've got a blurred copy there because

20  you're holding it horizontally and mine is vertical.

21  **A.**   The first page is horizontal.

22          **MR. PARCHER:**  Could I, Your Honor?

23          **THE COURT:**  Go ahead.  Straighten it up, please.

24  **BY MR. PARCHER:**

25  **Q.**   Maybe I'm on the second page and don't realize it.  I will

1  point it out to you.  If you don't mind, I'm just coming up to

2  show you where I'm at.  This is the page I'm going to refer to,

3  okay (indicating)?

4  A.    Yes, sir.

5  Q.    Would you agree that it was the -- was this the

6  Constitution?  Do you recognize it?  I'll represent to you that

7  it's my belief that it is, if we can save some time.

8  A.    Yes.

9            THE COURT:  Look.  Don't testify.

10            MR. PARCHER:  No, sir.

11            THE COURT:  Your belief doesn't matter.  What matters

12  is what this witness says under oath.

13            MR. PARCHER:  Yes, sir.

14            THE COURT:  All right.  Let's do it the right way.

15  You find the right page and answer the question.

16            MR. PARCHER:  Sorry, Your Honor.  I was just trying

17  to move it along.

18            THE COURT:  I know you are.

19            MR. PARCHER:  I'm not going to do it again.

20            THE COURT:  You start going down that path, pretty

21  soon you lawyers from both sides will be laying all kinds of,

22  quote, beliefs before the jury, and they'll think that's

23  evidence.

24            MR. PARCHER:  Yes, sir.  Yes, sir.

25            THE WITNESS:  It appears to me to be, but I will

1  point out that it's dated March, 2007, which is after I left

2  the NFLPA.

3  **BY MR. PARCHER:**

4  **Q.**   Yes, but you were with the union for well over 20 years,

5  correct?

6  **A.**   I was.

7  **Q.**   Okay.  Take a look at the page that I asked you to look

8  at.  That's the Constitution of your union, isn't it?

9  **A.**   Are you talking about the second page?

10  **Q.**   That's correct.

11  **A.**   Yes.

12        **MR. PARCHER:**  I'll move this 132 into evidence, Your

13  Honor.

14        **MR. KESSLER:**  No objection.

15        **THE COURT:**  132 is received.

16        (Trial Exhibit 132 was received into evidence.)

17  **BY MR. PARCHER:**

18  **Q.**   Okay.  It says there:

19             "We, the National Football League Players

20  Association, pay homage to our predecessors for their courage,

21  sacrifice and vision."

22        Would you agree that the "predecessors" are the

23  retired football players?

24  **A.**   I would, yes.

25  **Q.**   Do you believe -- did you believe at the time you were

1  part of the organization, the number two man, that the union

2  had a responsibility to pay homage to their retired players for

3  their courage, sacrifice and vision?

4  **A.**   Yes, sir, I did.

5  **Q.**   Matter of fact, you're a retired player yourself, right?

6  **A.**   I am.

7  **Q.**   Still are retired.  I'm not trying to take it away from

8  you.  You're still a retired player.

9          Then it says, to go on, that:

10             "The union pledges to preserve and enhance the

11 democratic involvement of our members, confirm our willingness

12 to do whatever is necessary for the benefit of our members."

13         Did you subscribe to that at the time you were part

14 of the organization?

15 **A.**   Yes, sir, I do.

16 **Q.**   So you believe you have a duty to do whatever is necessary

17 for the benefit of the retired players, correct?

18         **MR. KESSLER:**  Objection, Your Honor, to the form of

19 the question, "duty."

20         **THE COURT:**  No, the witness can -- no, that's a

21 proper question.  Overruled.

22         Please answer.

23         **THE WITNESS:**  I'm sorry.  Could you repeat it.

24 **BY MR. PARCHER:**

25 **Q.**   Yes.  I'm asking if you believe -- believed at the time

1  you were there that you had a duty to see that the union

2  conducted itself, and you particularly conducted yourself to do

3  whatever was necessary for the betterment of the retired

4  players?

5          THE COURT:  Just a second.  This case is not a

6  Section 301 labor case, sir.  So why are we going into the

7  union constitution?

8          MR. PARCHER:  Because the union had a duty, in my

9  respectful opinion, Your Honor, to use its best efforts, as I

10  believe Your Honor has already told the jury.  The union had a

11  duty to do what was right for the these players.

12          THE COURT:  I never said -- when did I say that?

13  You're telling me I said that?

14          MR. PARCHER:  Yes, sir.

15          THE COURT:  I don't remember.  If I said that, it

16  must have been in a different context.  This case is about the

17  GLA.

18          MR. PARCHER:  No.

19          THE COURT:  Only the GLA.  All these other documents

20  might have something to do with how that GLA gets constructed.

21          MR. PARCHER:  I'm sorry, Your Honor.

22          THE COURT:  But you cannot be trying to win this case

23  based on some theory that the constitution of the union imposed

24  a duty that -- unless it somehow gets read into the GLA.

25          MR. PARCHER:  Yes, I --

1          **THE COURT:**  But the --

2          **MR. KESSLER:**  Your Honor --

3          **MR. PARCHER:**  Excuse me, please.  I would like to

4   respond to that.

5          **THE COURT:**  Go ahead, Mr. Parcher.  What do you say

6   to that?

7          **MR. PARCHER:**  Well, I'm respectfully disagreeing.

8   Perhaps it's my fault because I'm making it look left when it's

9   center right.

10         There are two prongs to this case.  One is breach of

11  contract, and the other is breach of fiduciary obligation.

12         **THE COURT:**  Only as it relates to the GLA.

13         **MR. PARCHER:**  Right.  I'm saying there is a duty.  It

14  began -- it began with the constitution in the union.  It goes

15  through several other documents that I'm about to introduce

16  that clearly demonstrate that these men who spoke for this

17  union had a duty to do the right thing by these guys.

18         **THE COURT:**  All right.  I'm going to instruct the

19  jury.

20         I'm going to let you pursue this line of questioning,

21  but before this case ever started we had a lot of motions.  And

22  the Court has already ruled that this case you've got to decide

23  is two issues, and they both are related to the GLA.

24         This case is not about a broad-ranging duty of

25  fairness by the union to its members.  That would be a

1  different kind of a lawsuit.

2           This case is about the GLA that the class members

3  signed.  And that's what hooks them all together, is this GLA.

4           The Court has previously said there are two issues

5  for you to decide:  The meaning of the GLA and whether it was

6  violated by the defendants, and secondly, whether or not the

7  defendants violated any fiduciary duty as it relates to the

8  GLA.

9           **MR. PARCHER:**  Okay.

10          **THE COURT:**  Not as it might have related to the union

11 constitution.

12          **MR. PARCHER:**  I accept that entirely.

13          **THE COURT:**  All right.  Well, then, I'm going to let

14 you pursue this line of questions based on the union

15 constitution.

16          **MR. PARCHER:**  Right, right.

17          **THE COURT:**  But at some point you've got to connect

18 it to the GLA.

19          **MR. PARCHER:**  Right.  Well, I'm just --

20          **THE COURT:**  Fine.

21          **MR. PARCHER:**  I've just begun.

22          **THE COURT:**  All right.  You're talking about duties

23 and so forth.

24          **MR. PARCHER:**  I am talking about duties.

25          **MR. KESSLER:**  Your Honor, again, just to add an

1   objection to this line, the evidence will show most of the

2   class members are not members of the union.  They didn't join.

3   So I don't see how he can connect this to the constitution.

4   That's part of my objection.

5           **THE COURT:**  I'm going to let him give it a try.

6           But I need to remind the jury, at the end of the day

7   the fiduciary duties that count have to be related to the GLA.

8   Otherwise, it's not in this case.

9           So, Mr. Parcher, you can have some flexibility to try

10  to connect up the union constitution to the GLA in some manner.

11  I'll give you that flexibility.

12          **MR. PARCHER:**  I appreciate that, Your Honor.

13          **THE COURT:**  That's an important distinction for all

14  to keep in mind.

15          Thank you.

16          **MR. PARCHER:**  I've heard you clearly, Your Honor.

17          **THE COURT:**  Go ahead.

18  **BY MR. PARCHER:**

19  **Q.**   Is there a question before you?  I think --

20          **THE COURT:**  Please ask a fresh question.

21  **BY MR. PARCHER:**

22  **Q.**   I can't ask you the exact question again without having it

23  read back.  I'll just rephrase it.

24          **THE COURT:**  Rephrase it.

25          **MR. PARCHER:**  No, I'm saying I'm going to do that.

1   BY MR. PARCHER:

2   Q.   Do you believe that it was the duty of your union to do

3   whatever was necessary for the benefit -- betterment of retired

4   players who were a member of the union?

5   A.   Yes, I do.

6   Q.   Thank you.

7            I'll call your attention to Trial Exhibit 5, not yet

8   in evidence.  Do you have it there, sir?

9   A.   Yes, I do.

10  Q.   Now, that -- if I understand it correctly, this is a

11  replica of a Web site that NFLPlayers.com put out to provide

12  information to the retired players; is that right?

13  A.   Yes.

14  Q.   And do you recognize this as one -- as one -- as one -- as

15  a piece -- as a part of the Web site?  You can look through it

16  if you want.

17  A.   Yes, this is -- this is a -- a screen shot from the

18  NFLPlayers.com Web site.

19           MR. PARCHER:  Move Trial Exhibit 5 be placed in

20  evidence.

21           MR. KESSLER:  Your Honor, can we get a foundation for

22  what period of time this was?  The Web site obviously changes

23  daily.  I don't know what this is being offered for.

24           THE COURT:  All right.  Please lay a foundation for

25  the time period.

1              Does the witness know the time period?

2              **MR. PARCHER:**  Thank you, Your Honor.

3              **THE COURT:**  Tell us what time period the

4    Exhibit No. 5 was operative, roughly.

5              **THE WITNESS:**  No, I don't.

6    **BY MR. PARCHER:**

7    **Q.**  Well, if you -- I'm sorry to say neither do I.  It's not

8    on the document itself, is it?

9    **A.**  I --

10   **Q.**  I don't see it, if it is.

11   **A.**  I didn't see it, no.

12             **THE COURT:**  Well, does it look like one that was

13   probably there whenever -- the time period of this lawsuit,

14   which is, what, 2002 to 2005, something like that?

15             **THE WITNESS:**  Uhm --

16   **BY MR. PARCHER:**

17   **Q.**  Let me go further.  Look at page 2.

18             **MR. PARCHER:**  Do you mind, Your Honor?

19             **THE WITNESS:**  There is a -- there's a date on the

20   bottom of the second page.

21   **BY MR. PARCHER:**

22   **Q.**  Yes.  I don't see it.  Tell us where it is.

23   **A.**  "Copyright 2006, Players Inc."

24             **MR. PARCHER:**  Thank you.

25             **THE COURT:**  That's close enough.  What is this

1  exhibit, number 5?

2        **MR. PARCHER:**  Trial Exhibit No. 5, Your Honor.

3        **THE COURT:**  Received.

4        (Trial Exhibit 5 was received into evidence.)

5  BY MR. PARCHER:

6  Q.   Turn to the second page of trial Exhibit No. 5.  Turn to

7  the first paragraph of the second page.

8        (Document displayed.)

9        **MR. PARCHER:**  Could you move it up so we can see

10 the -- just the top line, too, the head thing.  See "What is

11 Players Inc?"  If you move it up just a little.  That's it.

12 Thank you.

13 BY MR. PARCHER:

14 Q.   It says that Players Inc -- I'm not reading it verbatim,

15 I'm summarizing it.  It says that Players Incorporated,

16 officially known as Players Inc, is the for-profit licensing

17 and marketing subsidiary of the NFL Players Association.

18        That's correct, isn't it?

19 A.   Yes.

20 Q.   Formed in 1994.  Its message is to take the helmets off

21 the players and market them as personalities as well as

22 professional athletes.  Is that the mission?

23 A.   Uhm, yes.

24 Q.   So anybody who was retired, that was asked to sign a GLA

25 and signed the GLA, would have a right to believe that what

1  Players Inc was going to do for them is take the helmets off

2  the players and market them as personalities as well as

3  professional athletes, correct?

4  A.   Well --

5  Q.   Yes or no, sir?

6  A.   Yes.

7  Q.   Then it goes on to say:

8              "Players Inc, which represents more than 1800

9  active players" -- and that number was more or less the same

10  throughout the years, right, a little more, a little less, but

11  a vast majority of the active players, right?

12  A.   That's correct.

13  Q.   And over 3,000 retired players.  -- "has been aggressive

14  in its efforts to expand player marketing opportunities,"

15  right?

16  A.   Right.

17  Q.   So any retired player who was being asked to sign a group

18  licensing authorization by the union would have a right to

19  believe from this that Players Inc had been aggressive on

20  behalf of retired players to expand their marketing

21  opportunities, right?

22  A.   That's correct.

23  Q.   Okay.  And then, if you'll turn to trial Exhibit No. 5 --

24  excuse me.  I'm giving you the same exhibit twice.  My mistake.

25  Trial Exhibit 23.  That's a letter of yours, sir.

1          Do you recognize your signature at the bottom?

2   **A.**   Yes, I do.

3   **Q.**   Is this a letter that you sent out to union members?

4   **A.**   Uhm, that's correct.

5          **MR. PARCHER:**  I move this entry into evidence, Your

6   Honor.

7          **THE COURT:**  The number again?

8          **MR. PARCHER:**  23.

9          **MR. KESSLER:**  No objection.

10         **THE COURT:**  Received.

11         (Trial Exhibit 23 was received into evidence.)

12         **MR. PARCHER:**  Thank you.

13  **BY MR. PARCHER:**

14  **Q.**   Take a look at the first paragraph, first.  1990 --

15         "Dear NFLPA member:  In 1994, the NFLPA created a

16  separate marketing and licensing subsidiary, Players Inc."

17         That's true, isn't it?

18  **A.**   Yes, it is.

19  **Q.**   "Since then, Players Inc has marketed NFL players, active

20  and retired, in a variety of ways."

21         Do you see that, sir?

22  **A.**   I do.

23  **Q.**   In terms of -- withdrawn.

24         Take a look at the next to last -- well it's actually

25  three from the last paragraph, the one that begins "Help us."

1        Do you see where it says there:

2        "Help us market retired players and show your support

3   for NFLPA and Players Inc by signing and returning the enclosed

4   GLA today."

5        So you were soliciting the retireds to sign this

6   group licensing authorization, weren't you?

7   **A.**   Yes.  We were asking them to sign the GLA.

8   **Q.**   Right.  And you -- and when I say "you," you collectively,

9   you, you the union, or you Players Inc, solicited the retired

10  players to sign GLAs often and in many different ways.  That's

11  true, isn't it?

12  **A.**   Yes, it is.

13  **Q.**   So a retired player who got this letter in the mail, and

14  enclosed in a packet was a group licensing authorization, he

15  would be entitled to believe that you were asking him to sign a

16  group licensing authorization because Players Inc was an

17  organization that had marketed NFL players active and retired

18  in a variety of ways.

19  **A.**   I'm sorry.  Could you repeat that?  I -- I lost the

20  question --

21  **Q.**   The flow?

22  **A.**   -- while I was looking at the document.  I apologize.

23  **Q.**   You don't have to apologize.  My wife tells me all the

24  time:  What did you say?

25        What I'm saying is -- what I'm saying is, one:  You

1  solicited the retired ballplayers to sign the GLA in this

2  letter, right?

3  **A.**   We asked retired players to sign this, in this letter.

4  **Q.**   So excuse me.  So the answer is "yes"?

5  **A.**   Yes.

6  **Q.**   Thank you.

7         And beyond that, before you asked them, before you

8  made your pitch for them to fill out the GLAs that you

9  enclosed -- you enclosed the GLA in the letter you sent, right?

10 **A.**   That's right.

11 **Q.**   So before you got to the point where you said "would you

12 please sign, you retired fellows, would you please sign a group

13 licensing authorization," you said to them in the first

14 paragraph, since 1994 Players Inc -- that's not the word but

15 you say since then:

16          "Players Inc has marketed NFL players, active

17 and retired, in a variety of ways," right?

18 **A.**   Right.

19 **Q.**   So you're telling these retired fellows in this letter and

20 in other solicitations, both before and after, you're telling

21 them:  Sign up, because Players Inc is in the business of

22 marketing retired players, right?  And you've done it in a

23 variety of ways.

24 **A.**   Correct.

25 **Q.**   Now, correct me if I'm wrong.  The truth is that with a

1  very minor exception involving photos of some kind that I don't

2  understand, so I can't even ask the question properly, but with

3  a very minor exception Players Inc has never received a license

4  from any organization, from the beginning of Players Inc until

5  the time that you left, never received a license, according to

6  your side, from any licensee that included a group licensing of

7  retired players, correct?

8         **MR. KESSLER:**  Objection.  No foundation in the

9  evidence for that, Your Honor.

10         **THE COURT:**  Overruled.

11         Please answer.

12         **THE WITNESS:**  I'm sorry.  With the objection I lost

13  the substance of the question.

14  **BY MR. PARCHER:**

15  **Q.**   Very simple, sir.  You've been with the organization

16  before you left to help out the actors and actresses, you --

17  you -- your career was the union and Players Inc, right?

18  **A.**   That's correct.

19  **Q.**   And as part of your responsibilities, number two man in

20  both organizations, you were out there encouraging, soliciting,

21  persuading, cajoling the retired players to sign group

22  licensing authorizations, right?

23  **A.**   Yes.

24  **Q.**   And in doing so, you were suggesting to them, amongst

25  other things -- I'm not saying that's all you were suggesting,

1  but amongst other things you were suggesting to them that since

2  1994, Players Inc marketed retired players in a variety of

3  ways, right?

4  **A.**    Correct.

5  **Q.**    Now, I'm saying to you, since 1994 and up to the time that

6  you left, isn't it true that never once did Players Inc, the

7  union, or anybody connected with Players Inc or the union, get

8  a license from any third party that including group licensing

9  of retired players, according to your position?

10          Yes or no?

11 **A.**    No.

12 **Q.**    "No," meaning they never did?

13 **A.**    That's correct.

14 **Q.**    Thank you.

15          Now, is there a reason, in 2006 -- you -- you weren't

16 intending to deceive any of the retired players when you were

17 encouraging them to sign GLAs, were you?

18 **A.**    Absolutely not.

19 **Q.**    And, by the way, I've handed you a -- you know, one

20 letter.  But the fact is, from the inception of Players Inc

21 until the time you left, there was constant solicitation of the

22 retired persons, right, to sign GLAs?

23 **A.**    We asked retired players to sign the retired players' GLA

24 on a regular basis, yes.

25 **Q.**    And is there a reason that you didn't say to them up to a

1  point in time we've never been able -- you sign, but don't --

2  don't think you're going to get a share of any money.  Never

3  mind what the contract says.  Don't think you're going to get a

4  share of any money because we don't seem to be able to get you

5  into the license business?

6          Did you have a reason you didn't tell them that?

7  **A.**   We did tell them that.

8  **Q.**   When did you tell them that?

9  **A.**   At the retired players conventions and chapter meetings on

10  a regular basis.

11  **Q.**   Yes?  Show me one single document.  I have one.  I don't

12  want to be disingenuous.  I have a Touchback document.  That's

13  your newsletter?

14  **A.**   That's the retired players newsletter of the NFL Players

15  Association, yes.

16  **Q.**   Right, right.  I have a Touchback letter which I'm going

17  to get to later.

18          But you're saying on a regular basis you would go to

19  the retired guys and say, "I can't seem to get you a license"?

20  **A.**   We would explain to them that we were attempting to

21  collect a sufficient number of retired players together who had

22  signed the retired players' GLA and offer those players to

23  licensees.

24          We had not been able to convince the licensees to use

25  the players on that basis.  They used retired players in other

1  ways on an ad hoc basis, but they weren't interested in

2  securing the rights to all of the players, including players

3  like me, who had very short careers or didn't have any real

4  celebrity.

5  Q.   Mr. Allen, most respectfully, sir, I'm going to ask you to

6  respect my process and answer my question.  Just answer my

7  question.

8  A.   I'm sorry, I really was trying to do that.

9  Q.   Well, okay.

10         THE COURT:  All right.

11  BY MR. PARCHER:

12  Q.   We all have our own impressions of what you were trying to

13  do.

14         THE COURT:  Be that as it may, ask a fresh question

15  and try to answer "yes", "no," "I don't recall," if it calls

16  for a "yes" "no" or "I don't recall."

17         Go ahead.

18  BY MR. PARCHER:

19  Q.   Show me one single document of correspondence, memoranda,

20  minutes of a convention where you sat with retired players and

21  said, "We've been unsuccessful," other than the one document I

22  happen to have in my possession.

23  A.   I personally did that myself.

24  Q.   So we have to take your word for the fact that every time

25  you went to a convention you sat with the retired ballplayers.

1           Did you sit with one or two?  Or did you get them all

2    together, make a speech?  What did you do?

3    **A.**    I mean, in my report to the entire convention, which would

4    be hundreds of retired NFL players, I described the Players Inc

5    programs and made that point to them whenever I was talking to

6    them, that we were trying to collect that group together and we

7    were going -- we were doing so diligently and continuing to try

8    to get the marketplace interested in -- in the collection of a

9    large number of retired players.

10          But we hadn't succeeded in getting someone to take

11   all of the players.  They were taking the players they wanted

12   at the top of the celebrity pyramid and not further down with

13   retired players like me.

14   **Q.**    My question to you is:  Did you get the fellows together

15   in a group, or did you speak to them one-on-one?  How did you

16   convey this information to them?

17   **A.**    In my case, I was reporting to the convention from -- as

18   the president of Players Inc and the assistant executive

19   director of the NFLPA.

20   **Q.**    So you made a speech to everybody in the room, right?

21   **A.**    I described how it was working and made that point.

22   **Q.**    Could you answer my question?  Did you make a speech to

23   the room?

24   **A.**    I did.

25   **Q.**    And the speech would say, amongst other things:

1          "We've been trying like heck, but we can't get

2    the job done"?

3    **A.**    Essentially, yes.

4    **Q.**    Essentially.  And this was repeated to them over and over

5    and over and over again so that none of them could have any

6    false hope, right?

7    **A.**    It was explained to them on a regular basis, year in and

8    year out.

9    **Q.**    Then, how it is it -- would you consider yourself, sir, in

10   addition to being an administrator, a super salesman?

11   **A.**    Not particularly, no.

12   **Q.**    You would not?

13   **A.**    No.

14   **Q.**    So how do you think -- I don't know what the facts are,

15   but how do you think you were able to -- from 1994 to 2007 you

16   never got these fellows one license?

17            **MR. KESSLER:**  Objection, Your Honor, to the form of

18   that question.

19            **MR. PARCHER:**  I haven't asked a question yet.

20            **THE COURT:**  What about --

21            **MR. KESSLER:**  It's a completely argumentative

22   question.  It wasn't asking for any fact.

23            **MR. PARCHER:**  I'm sorry.  That is a fact, Judge.

24   It's not so, and I didn't finish my question.

25            **THE COURT:**  All right.  Ask it without things like

1  your lead-in, how do you think, "I don't know what the facts

2  are," and so forth.  Just ask a normal question.

3              **MR. PARCHER:**  I thought I was, Judge.

4              **THE COURT:**  Well, you had a preparatory comment.  It

5  wasn't a question.

6              **MR. PARCHER:**  Yes, sir.

7              **THE COURT:**  Try again.

8  **BY MR. PARCHER:**

9  **Q.**   I'm trying to reframe it in my mind.

10              How many times, from 1994 -- I'm not asking you for

11  the exact number, just your best approximation.  How many times

12  did you tell these retired players that you were having no

13  luck; in effect, nobody was interested, from the beginning of

14  your job doing it until the time you walked out the door?

15  Would you say hundreds of times?

16  **A.**   Uhm, no.

17  **Q.**   Dozens of times?

18  **A.**   Yes.

19  **Q.**   Many dozens of times?

20  **A.**   Yes.

21  **Q.**   Pick a number.  I'm not holding you to it.

22  **A.**   It would be a guess.

23  **Q.**   Well, I'm not asking you to guess.

24  **A.**   Many dozens of times is a reasonable estimate.

25  **Q.**   40, 50, 60 times?

1  **A.**    Probably more than that.

2  **Q.**    Probably more than that, right?

3          And, nevertheless, sir, you were successful year in

4  and year out in persuading these players to continue signing

5  GLAs, right?

6  **A.**    Uhm, some of them.  I mean, it varied from player to

7  player.

8  **Q.**    But each year you'd keep asking?

9  **A.**    That's correct.

10 **Q.**    You had this sense of optimism, did you, that because of

11 your efforts it was all going to change one day, and they

12 better get on the gravy train?

13 **A.**    I don't remember ever using the phrase "gravy train."

14          I was certainly optimistic and energetic in trying to

15 provide an opportunity for the GLAs to be marketed as a group.

16 **Q.**    Okay.

17 **A.**    As an entire group as opposed to ad hoc.

18 **Q.**    I'm questioning you about your optimism, sir.  Year one,

19 1994, you're unsuccessful, right?

20 **A.**    Uhm, yes.

21 **Q.**    You're optimistic, right?

22          Year two, you're unsuccessful, right?

23 **A.**    Right.

24 **Q.**    You're optimistic, right?

25 **A.**    Yes.

1  Q.   I don't want to make this a tortuous exercise, sir.  So

2  we'll just say years three, four, five, six, seven, eight,

3  nine, 10, 11, 12, 13, 14, and how many it takes to go from 1994

4  to the time you left, each and every year you were

5  unsuccessful, and each and every year you were optimistic.  Is

6  that what your testimony is to this court and jury?

7  A.   Yes.

8  Q.   Yes or no?

9  A.   Yes.

10  Q.   Yes.

11         And for that reason it didn't bother you at all to

12  continue soliciting these retired players to sign GLAs, is that

13  your testimony, yes, or not?

14  A.   I'm sorry.  Could you repeat the question?

15  Q.   And for that reason, because you had this sense of

16  optimism, despite all these years of lack of success, it didn't

17  bother you at all to continue to ask these fellows to sign

18  GLAs.

19  A.   We were --

20  Q.   Could you just say "yes" or "no"?

21  A.   I'm sorry.  Repeat the question.

22  Q.   Yes, sir.

23         **MR. PARCHER:**  Your Honor doesn't want me to ask the

24  reporter?

25         **THE COURT:**  If the reporter can find it quickly, go

1  ahead.

2           Go ahead, Katherine.

3           (The question was read by the reporter as follows:)

4           **"QUESTION:**  And for that reason, because you

5           had this sense of optimism, despite all these

6           years of lack of success, it didn't bother

7           you at all to continue to ask these fellows

8           to sign GLAs?"

9           **THE WITNESS:**  No.

10 BY MR. PARCHER:

11 **Q.**   "No," meaning you're agreeing it didn't bother you?

12 **A.**   That's correct.

13 **Q.**   All right.  Now, isn't it a fact, sir, that there was a

14 significant benefit -- withdrawn.

15           Players Inc is a for-profit company, right?

16 **A.**   That's correct.

17 **Q.**   And it was formed or caused to be formed by you and

18 Mr. Upshaw to be the licensing and marketing arm for the union,

19 right?

20 **A.**   It was -- it was formed by the NFL Players Association

21 Board of Players Reps, or by an act of them, but, yes.

22 **Q.**   Well, wait a minute.  Wait a minute.  I understand the

23 distinction, but for all practical purposes this was Upshaw and

24 Allen's brainchild, wasn't it?

25 **A.**   There were many people involved in that.  It wasn't just

1  Gene Upshaw and me.

2  **Q.**   No, but you're not disclaiming --

3  **A.**   Not at all.

4  **Q.**   -- a significant role in this process, are you?

5  **A.**   No, no, no.

6  **Q.**   And you're not disclaiming on Mr. Upshaw's behalf a

7  significant role in this process, are you?

8  **A.**   Not at all.

9  **Q.**   You two fellows were the straw that stirred the drink,

10 right?

11 **A.**   We were certainly among the straws.  There were many

12 people involved in the formation and implementation of Players

13 Inc.

14 **Q.**   You were just a worker amongst workers, right?

15 **A.**   No, I wasn't suggesting that.  I just didn't want to take

16 all of the credit.

17 **Q.**   Yeah.  Well, okay.

18        There was a significant benefit to Players Inc and

19 the union in getting a large number of retired players to sign

20 GLAs, wasn't there?

21 **A.**   There was a hope that it would provide a productive

22 result, certainly.

23 **Q.**   I'm not asking you that, sir.  Perhaps it's my question.

24 Perhaps it's my question.  Let me try to rephrase it.

25        There was a significant benefit -- leave aside the

1  players.  So far you would agree the players that signed the

2  GLAs haven't gotten any money as a result directly from revenue

3  from a licensee, right?

4  **A.**    There are players that have --

5  **Q.**    No, from group licenses?

6  **A.**    I'm trying to answer the question.  There were players who

7  received money from licensees who also signed GLAs.

8  **Q.**    Now, going back to -- I'm going to question you about ad

9  hocs.  I promise you before you go back to Los Angeles to

10  resume your duties, I'm going to question you about ad hocs.

11  Right now I'm not questioning you about ad hocs.

12  **A.**    Okay.

13  **Q.**    Just so the jury understands, when you say "players who

14  happen to sign group licenses who also receive individual

15  money," when they receive that individual money you call them

16  "ad hocs," right?

17  **A.**    That's correct.

18  **Q.**    And when they receive that individual money, you didn't

19  commission 30 percent of it, did you?

20  **A.**    No.

21  **Q.**    Matter of fact, you took maybe a 1 percent administration

22  fee or 1.5 percent administration fee, correct?

23  **A.**    It was something in that neighborhood.

24  **Q.**    And that money, the ad hoc money, the monies received by

25  individuals because some licensee wanted their individual

1  license, that wasn't shared with anybody, was it?

2  **A.**    Sorry.  Say that again.

3  **Q.**    The money that was received by an individual ad hoc.

4  **A.**    Right.

5  **Q.**    As a result of licensing his name or likenesses to a

6  licensee was not shared with anybody, was it?

7  **A.**    No.

8  **Q.**    It didn't go to the union and the union kept 63 percent or

9  the union and Players Inc kept 63 percent, correct?

10 **A.**    Yes.  It all went to the players involved.

11 **Q.**    37 percent didn't go to the active players?

12 **A.**    No.

13 **Q.**    Right?  But nothing, of course, went to the retireds,

14 right?

15 **A.**    If they were retired players receiving the money, they got

16 the money.

17 **Q.**    I'm talking about the groups.

18          **THE COURT:**  Well, just a second.  Mr. Parcher --

19          **MR. PARCHER:**  Yes, sir.

20          **THE COURT:**  Sometimes I think you just don't say -- I

21 mean, you say it without referring to the groups or whatever.

22          **MR. PARCHER:**  Yeah.

23          **THE COURT:**  And then, the witnesses --

24          **MR. PARCHER:**  Get confused.

25          **THE COURT:**  No.  The witness is answering the

1  question as you yourself have phrased it, and then you blame

2  him --

3          **MR. PARCHER:**  Right.

4          **THE COURT:**  -- because you didn't put the word

5  "group" in there.

6          **MR. PARCHER:**  Okay.

7          **THE COURT:**  So when he's answering a question, don't

8  interrupt him.  Let him finish his answer.

9          **MR. PARCHER:**  Yes, sir.

10         **MR. KESSLER:**  Your Honor, I also have an objection to

11 Mr. Parcher throwing in the word "groups" as opposed to

12 referring to the retired player group licensing authorization

13 or the ad hocs, because the ad hocs could also be groups.  And

14 it's creating a very confusing record on that issue.

15         I think he should either have the retired player

16 group licensing authorization or the ad hocs, but not use the

17 word "groups."  It's not clear what he's referring to.

18         **THE COURT:**  Just -- I am not going to rule on that

19 point until I hear the particular questions.  But conceivably

20 there are circumstances where it would matter whether it was an

21 ad hoc group versus a GLA group.

22         In other words, a group under the GLA versus a group

23 under the ad hoc, possibly.  I don't know.  I guess that's the

24 distinction counsel is making.

25         **MR. PARCHER:**  Yes, sir.

 1          **THE COURT:**  Conceivably, that can make a difference,

 2    and be aware of that possibility.

 3          **MR. KESSLER:**  Thank you, Your Honor.

 4    **BY MR. PARCHER:**

 5    **Q.**   I'll start afresh, sir, and certainly accept the Court's

 6    admonition that probably I think I'm asking you question A, and

 7    I'm phrasing it so it sounds like question Z.  And then, I'm

 8    saying:  "Why don't you answer question A?"

 9          If I'm doing that I can only tell you I'm not doing

10    it on purpose.  Doesn't mean I'm not doing it.  I'm not doing

11    it on purpose.  I want your honest answers, and I assure you my

12    questions are all in good faith.

13    **A.**   Thank you.

14    **Q.**   Thank you.

15          When an individual athlete, retired football player,

16    receives an ad hoc license, none of that money is shared with

17    Players Inc, correct?

18    **A.**   Yes.

19    **Q.**   None of that money is shared with the union, correct?

20    **A.**   Yes.

21    **Q.**   None of that money is shared with the retired players who

22    signed group licensing authorizations, correct?

23    **A.**   That's right.

24    **Q.**   And that wouldn't matter whether the ad hoc was an active

25    player or a retired player.  It wouldn't be part of the group

1 | licensing arrangements, right?

2 | **A.**   Well, it would -- essentially, that's correct, yes.

3 | **Q.**   Right.  And, quite often, the retired players who are

4 | fortunate enough to be ad hocs have their own agents, don't

5 | they?

6 | **A.**   Some do.  Some don't.

7 | **Q.**   In which case they don't have to pay an agent commission,

8 | do they?

9 | **A.**   I -- it depends on what their arrangement with the agent

10 | is.

11 | **Q.**   If they don't have an agent.

12 | **A.**   That's right.  They wouldn't be paying commissions to an

13 | agent.

14 | **Q.**   And as a key executive of the Screen Actors Guild, it

15 | wouldn't surprise you if they did have an agent they paid a

16 | commission?

17 | **A.**   I miss the connection with the Screen Actors Guild.

18 | **Q.**   Well, you have a real familiarity with talent as a result

19 | of your position in the Screen Actors Guild.

20 |          **MR. KESSLER:**  Your Honor, I have my objection.

21 |          **THE COURT:**  Sustained.

22 |          Look.  We're not going to get into Hollywood and

23 | Screen Actors Guild.

24 |          **MR. PARCHER:**  Okay.  Well, could I --

25 |          **THE COURT:**  We've got enough on our plate to deal

 1  with the football.

 2          MR. PARCHER:  I'm almost positive Your Honor --

 3          THE COURT:  Let's stick with football.

 4          MR. PARCHER:  I'm almost positive Your Honor is going

 5  to say "no," but could I have a sidebar for a minute?

 6          THE COURT:  Not now, no.  This witness will be on the

 7  stand for a while.

 8          MR. PARCHER:  Yes, sir.

 9          THE COURT:  Whenever the jury takes their break we

10  will take it up then.

11          MR. PARCHER:  Certainly isn't significant that I do

12  it now.

13          Thank you.  I appreciate that.

14  BY MR. PARCHER:

15  Q.   I'd like -- isn't it true that there is a significant

16  benefit to the union and to Players Inc, in having retired --

17  withdrawn.

18          Isn't it true that there's a significant benefit to

19  the union and Players Inc in having a large number of retired

20  players sign group licensing authorizations?  Yes or no?

21  A.   I can't answer that "yes" or "no."  I don't believe so.  I

22  need to be able to give you a short explanation.

23          MR. PARCHER:  Before you do, Your Honor obviously is

24  going to rule.

25          THE COURT:  Go ahead.  Give your explanation.

1          **THE WITNESS:**  It was certainly our hope that that

2    would be the case.  We were not able to accomplish that.

3    Although, we were -- were persistent and diligent in trying to.

4    **BY MR. PARCHER:**

5    **Q.**   Wait a minute.  I'm talking about a benefit to the union

6    and Players Inc.  I am not talking about or asking you about

7    benefit to group -- to retired players who signed a group

8    licensing authorization.

9          Isn't it true that the more players retired that you

10   signed, the greater critical mass that you were able to have

11   when you went out to speak to potential licensees?

12   **A.**   If they were the right players.

13   **Q.**   Wait a minute.  You continued year in and year out to tell

14   the retired players it was important that they sign GLAs,

15   right?

16   **A.**   Yes.

17   **Q.**   That the union needed them to sign GLAs, right?

18   **A.**   Yes.

19   **Q.**   Did you ever say -- did you ever say that the reason it

20   was important was so that you could have a critical mass?

21   **A.**   Yes.

22   **Q.**   And that's the truth, isn't it?

23   **A.**   Yes.

24   **Q.**   Now, let's talk about what we mean by -- "we" meaning you,

25   right?  And, also, your expert -- if you know this.  I don't

 1  know.  You might have been a long way at sea [sic] by that

 2  time.

 3           THE COURT:  He is not with the company anymore.

 4           MR. PARCHER:  Well, he may know this, though.

 5           THE COURT:  I think talking about experts is

 6  premature.  Stick with what he knows.

 7           MR. PARCHER:  He may know they had an expert, Your

 8  Honor.

 9           THE COURT:  All right.  You can lay a foundation and

10  see if he does.

11           MR. PARCHER:  Thank you.

12  BY MR. PARCHER:

13  Q.   You know that the defendants hired an expert in this case,

14  don't you?

15  A.   No, I don't.  I have no knowledge of that.

16  Q.   Then I can't ask you a question.  Should have listened to

17  the Court.

18           THE COURT:  All right.

19  BY MR. PARCHER:

20  Q.   Do you know a Roger Noll?

21  A.   I know who Roger Noll is.

22  Q.   What do you know about him?

23  A.   He's an economist.

24  Q.   Do you know whether or not he expressed any opinion about

25  the benefit of the union signing up large numbers of retired

 1  players?

 2  **A.**    I have no idea.

 3  **Q.**    If he did, would you respect his opinion?  Is he a man

 4  whose opinion you respect?

 5          **MR. KESSLER:**  Your Honor, I object.  He has no

 6  foundation at all.  He doesn't know anything about this

 7  subject.

 8          **MR. PARCHER:**  Well, how do we know that?

 9          **THE COURT:**  Sustained.  Sustained.  We're not going

10  to --

11  **BY MR. PARCHER:**

12  **Q.**    Have you ever hired Roger Noll?

13  **A.**    Have I?  No.

14  **Q.**    "You," being the union.

15  **A.**    I think the answer to that question is yes, in a

16  litigation in the, uhm, the -- that occurred in the late '80s

17  and early '90s.

18  **Q.**    So when you were with the union you hired him as an

19  expert.

20  **A.**    I didn't.

21  **Q.**    Well, who did?

22  **A.**    I -- well, I wasn't involved in that at all.  That was

23  done by, uhm, our general counsel and litigation counsel.

24  **Q.**    Well, do you respect the views of -- do you think your

25  litigation counsel was hiring somebody who didn't know what he

1   was doing?

2   **A.**    I didn't participate in that.

3   **Q.**    I'm asking you for your thought process.  You're the

4   number two man in the company.  You have a general counsel,

5   right?

6           **THE COURT:**  This is argumentative.  You're asking

7   him -- this is just an argument, Mr. Parcher.  The Court is

8   going to sustain its own objection.

9           **MR. PARCHER:**  Yes, sir.

10          **THE COURT:**  Move to something more directly relevant

11  to the GLA.

12          **MR. PARCHER:**  I'll respectfully -- well, yes, sir.

13  Yes, sir.

14  **BY MR. PARCHER:**

15  **Q.**    So let's talk about a critical mass.  At one time didn't

16  you say that one of the good things about having all the -- you

17  know, so many people sign up was that the Players Inc, the

18  NFLPA would become one-stop shopping?

19  **A.**    That was certainly our hope.

20  **Q.**    Well, to a large degree you became one-stop shopping,

21  didn't you?

22  **A.**    In what respect?  I'm not sure I understand --

23  **Q.**    In being able to go over to licensees like Electronic Arts

24  and tell them, in effect, you're the only game in town.  You

25  got loads and loads of ballplayers.  And if they want to

1 license ballplayers, they ought to come to you.  That respect.

2 **A.**   Well, we certainly hoped that we would have -- with

3 respect -- you're asking me about retired players?  I'm not

4 clear.

5 **Q.**   Well, it's retireds and active.  But retired players were

6 a big part of your critical mass, right?

7          **THE COURT:**  Look.  This is a fair question.  And you

8 should give an answer to this.

9          Counsel is asking this:  Wasn't there a benefit to

10 Players Inc to be able to hold yourself out to people like

11 Electronic Arts, that you had a large number of people signed

12 up for licenses to use their name and images?

13          **THE WITNESS:**  No.

14          **THE COURT:**  Okay.

15          There's your answer.  Now, move on.

16          **MR. PARCHER:**  I need that question and answer read

17 back, please, Your Honor.

18          **THE COURT:**  Okay.  Maybe I didn't understand what you

19 were getting at.

20          **MR. PARCHER:**  Maybe you did.

21          **THE COURT:**  Read it back.  This is a relevant point,

22 and we're going to make sure that the questions and the answers

23 are fairly put and fairly answered.

24          Go ahead.  Read it back.

25          (The reporter read as follows:)

1        "**THE COURT:** Counsel is asking this: Wasn't

2        there a benefit to Players Inc to be able to

3        hold yourself out to people like Electronic

4        Arts that you had a large number of people

5        signed up for licenses to use their name and

6        images?

7        "**THE WITNESS:** No."

8  **BY MR. PARCHER:**

9  **Q.** Are you telling this court and this jury that it wasn't

10 important to be able to announce to prospective licensees that

11 you had many, many ballplayers signed -- signed up with you?

12 **A.** They knew who we had, and they knew who we didn't have.

13 And the problem was we didn't have the ones they -- in every

14 instance the ones they wanted. We had the ones they didn't

15 want.

16 **Q.** I don't know what you're talking about. Are you talking

17 about ad hocs? What are you talking about?

18 **A.** I'm talking about the group of players who signed the

19 GLAs.

20 **Q.** That's not what Judge Alsup -- forgive me if I misstate

21 what I think the Court asked.

22        That's not what Judge Alsup asked you. Judge Alsup

23 asked you, isn't it true, isn't it true that with -- using EA

24 as an example -- doesn't have to be EA.

25        That with respect to prospective licensees it was

1  important to you fellows to be able to say you had a lot of

2  ballplayers to offer them if they wanted a license.

3          **MR. KESSLER:**  Your Honor, objection.  Could we get

4  retired or active combinations?

5          **MR. PARCHER:**  It doesn't matter to me, and I don't

6  have to do that.

7          **THE COURT:**  All right.  You can answer the question

8  as phrased, but if it makes a difference in terms of retired

9  versus active you can give that by way of explanation.

10          Please give an answer.

11          **THE WITNESS:**  It does make a difference if we could

12  hold out to a company like EA that we had essentially every

13  active player.  We could not make that representation about

14  retired players.

15          We had -- some of them signed the GLAs.  We had some

16  of them that we could convince to be involved in designated

17  programs, and we had some that we couldn't.

18          So it was not -- EA knew what the -- what the lay of

19  the land was and what our ability to deliver them was.

20          So it was -- we were interested in working with them

21  to get the retired players that they wanted, but we were not

22  able to say to them, essentially, that we have the same

23  capacity with retired players that we did with active players.

24  BY MR. PARCHER:

25  Q.   So it was no benefit to you whatsoever to be able to say

1  you've got over 2,000 men that have retired that have signed

2  GLAs, as well as 1800 active players; is that what you're

3  telling this court?

4  A.    They were --

5  Q.    Yes or no?  Yes or no?  I'm entitled to that, sir.

6          THE COURT:  Well, I'm going to let him say "yes" or

7  "no," but you can add an explanation.  So do your best.

8          THE WITNESS:  Uhm, it was a benefit with respect to

9  active players.  It was -- it was not a benefit with respect to

10  retired players, because we didn't have everybody that they

11  wanted.  And we had some that they didn't want.

12  BY MR. PARCHER:

13  Q.    You -- you are the optimist, right?

14  A.    Yes, I am, actually.

15  Q.    Yes.  And you're the guy that believes that despite the

16  fact of years and years of failure people are going to want

17  retired players, right?  That's why you keep asking them to

18  sign GLAs, right?  Yes or no?

19  A.    Yes.

20  Q.    Right.  And so being an optimist you still say it's that

21  important to be able to tell the prospective licensee that

22  you've got lots of them?  It's not a part of your pitch at all?

23  You don't even mention them?  Yes or no?

24  A.    We mentioned our access.

25  Q.    Your what?

1  **A.**    Our access.

2  **Q.**    Right.  And that would include over 2,000 retired players,

3  right?

4  **A.**    To the extent they -- the players they wanted had signed

5  those GLAs.

6  **Q.**    No --

7  **A.**    Excuse me.  I'm not finished.

8           To the extent that those players they wanted had

9  signed the group licensing authorization forms.

10 **Q.**    Is there such a thing -- withdrawn.

11          Did you ever make this statement --

12          **MR. KESSLER:**  Your Honor, could I have an objection

13 to counsel's behavior?  He's making facial gestures and

14 movements in response to the witness's testimony.  I don't

15 think it's appropriate.

16          **MR. PARCHER:**  If Your Honor pleases, I need to

17 respond to that before Your Honor rules.  May I?  It's only

18 fair.

19          Thank you.  I appreciate that.

20          I watched Counsel open to the jury in a

21 supplicant-kind-of-way explaining himself to them with certain

22 types of gestures and mannerisms.  I sit there and watch it and

23 I say not a word.

24          I talk a certain way.  I don't mean it

25 disrespectfully.  And for him to do it, for him to do that is

1   very inappropriate.

2        Some people sit straight ahead stone faced.  Some

3   people do what he does, and some people do what I do.  That's

4   called "America."

5        I've got a license to practice law.  I'm doing my

6   duty here like everybody else in this courtroom.

7        Sorry, I have said more than --

8        **THE COURT:**  Wait.  Look, the only thing -- your

9   gestures so far are okay.

10       **MR. PARCHER:**  Thank you.

11       **THE COURT:**  But your -- you make speeches ahead of

12  your questions.  That's not proper.  And I urge you to stick to

13  questions and not -- not make comments.

14       **MR. PARCHER:**  I'm doing the best --

15       **THE COURT:**  It's not your job to make commentary as

16  we go along.

17       **MR. PARCHER:**  Yes, sir.

18       **THE COURT:**  Do your best to stick to asking

19  questions.  I don't think your facial expressions have gotten

20  out-of-hand.  But even if they have, it's not going to mislead

21  the jury.

22       **MR. PARCHER:**  My wife and Aunt Frances would both

23  appreciate that comment, Your Honor.

24       I'll order that portion of the transcript and send it

25  home this evening.

1          **THE COURT:**  Very well.  Go ahead.

2          **MR. PARCHER:**  Thank you.

3    **BY MR. PARCHER:**

4    **Q.**   Did you ever make this statement, sir:

5          "It had been our experience in the past that

6          the confusion made it more difficult for

7          competitors to secure a reliable critical

8          mass of players, and in our view was better

9          for the marketplace.  It was procompetitive

10          to be a reliable provider of a critical mass

11          of those players because there were very few

12          places that could be accomplished

13          efficiently, reliably and the benefit of the

14          players involved"?

15   **A.**   I believe so, yes.

16   **Q.**   And was that true?

17   **A.**   Yes.

18   **Q.**   Do you have such a thing -- I may not have the right

19   title, and I want to give it to you.  I'll tell you the trial

20   exhibit.  That will help.  It's Trial Exhibit No. 12.

21   **A.**   Yes, I do.

22   **Q.**   This is a -- you got it there?

23   **A.**   I think so.

24   **Q.**   Take your time.

25   **A.**   Yes.

1  Q.   At the top it would appear to be a memorandum that was

2  sent out to National Football League Players Association

3  contract advisors attending a 2006 seminar, correct?

4  A.   Yes.

5  Q.   Now, do you recognize that document?  This is one of the

6  things you sent out, right?

7  A.   Yes.

8           MR. PARCHER:  Move its admission, Your Honor.

9           MR. KESSLER:  No objection.

10          MR. PARCHER:  This is trial Exhibit 12.

11          THE COURT:  Received.

12          (Trial Exhibit 12 was admitted into evidence.)

13          MR. PARCHER:  Thank you.

14  BY MR. PARCHER:

15  Q.   Take a look at page 6.  Well, first of all, who were the

16  contract advisors?  Tell the Court and the jury that.

17          Who were you writing this to?  Who are you talking to

18  here?

19  A.   The NFLPA contract advisors were agents that represented

20  the players and were registered with the union in their

21  negotiations with NFL teams for their player contracts.

22  Q.   So you're talking to the agents now, the guys that you're

23  hoping will help you persuade licensees to want a license from

24  you fellows, right?

25  A.   I didn't understand that question.  I'm sorry.

1  **Q.**   You're talking in this document, Trial Exhibit 12, you're

2  referencing men and women whom you're hoping are in one way or

3  another going to be helpful to you in getting third parties to

4  want to ask for licenses from Players Inc and the union?

5  **A.**   Well, the -- the purpose -- if I could explain.

6  **Q.**   I don't want an explanation.  You can tell one of the

7  tensions we're having is I want an answer to my question, if

8  you can give it.

9          Judge Alsup has told you if you can't apparently the

10  Court is willing to give you some latitude.

11          **THE COURT:**  All right.  That question, though, I

12  didn't understand the question.

13          So the fourth thing you can say is you don't

14  understand the question, or "please rephrase it" or something,

15  if it's true that you really can't understand it.

16          I don't understand that question.

17  **BY MR. PARCHER:**

18  **Q.**   Do you understand my question?

19  **A.**   I don't understand the question.  If you would repeat it,

20  it would help.

21  **Q.**   Yes.  You sent Trial Exhibit 12 to a group of contract

22  advisors attending the 2006 seminar, right?

23  **A.**   Yes.

24  **Q.**   And these group of contract advisors, for the most part,

25  were players' agents?

1  A.    Yes.

2  Q.    And you were addressing them for what purpose?

3  A.    To explain the NFL sponsorship agreement and its effect on

4  club sponsorships and agent obligations.

5  Q.    One of the things you said here on page 6 of this exhibit,

6  if you'll take a look at it, starts with the word -- it's

7  paragraph Roman numeral II, "Value."

8          MR. PARCHER:  If we could get it up on the board

9  there.

10          (Document displayed.)

11  Q.    "The agreement between the NFL and Players Inc is a

12  valuable asset for sponsors interested in utilizing NFL

13  players."

14          Now, weren't you, in effect, selling them on a

15  thought that what you offered there was something valuable that

16  they ought to be listening to?

17          Yes or no, sir?

18  A.    I'm sorry, I was -- I was familiarizing myself with the

19  document, and I apologize for that, because I wanted to make

20  sure I was refreshing my recollection about what it says.

21  Q.    If you don't -- if you don't mind, obviously, if you want

22  to read the document I'm sure that the Court would say take

23  your time and read the whole document.

24          But I'm not questioning you about the whole document.

25  I'm questioning you right now about paragraph 2 on page 6 of

 1 | this Trial Exhibit 12.

 2 |          Do you see it?  I could point it out to you if you're

 3 | not clear?

 4 |          **MR. PARCHER:**  May I, Your Honor?

 5 |          **THE COURT:**  Go ahead.

 6 | **BY MR. PARCHER:**

 7 | **Q.**   Here.  This is what I'm reading to you.

 8 | **A.**   Okay.

 9 | **Q.**   Got it?

10 | **A.**   I was looking up here.  This was part of my confusion.

11 | "Value" is here as well as there.

12 | **Q.**   I'm not --

13 | **A.**   Thank you.

14 | **Q.**   I'm an adversary, so I don't want to say I'm trying to be

15 | helpful, but I am trying to be helpful to a certain extent,

16 | anyway.

17 |          Okay.  You're with me now, right?

18 | **A.**   I see what part of the document you're talking about.

19 | Could you repeat the question?

20 | **Q.**   Sure.  I'll go again.

21 |          In this paragraph Roman numeral II on page 6 of Trial

22 | Exhibit 12, it starts with the heading or the word:

23 |               "Value.  The agreement between the NFL and

24 | Players Inc is a valuable asset for sponsors interested in

25 | utilizing NFL players."

1            Do you see that?

2  **A.**    Yes, I do.

3  **Q.**    And now I'm asking you -- I don't know how I phrased it

4  before, but the substance of my question to you is:  By saying

5  that to them you're, in effect, pitching them.  You're, in

6  effect, telling them:

7            "We got something of value.  We've got something

8  of value here by the fact that we've got, you know, players

9  that are signed to us."

10           Right?

11 **A.**    Pitching whom?

12 **Q.**    These men and women that are attending the seminar.

13 **A.**    If you'll -- if I could explain, if you'll note at the top

14 of the page it says:

15           "Agreed upon language which both the NFL and

16 Players Inc used to explain the sponsorship agreement to NFL

17 sponsors."

18        We were educating the player contract advisors, the

19 active player contract advisors on how the -- the terms of that

20 agreement would be explained to NFL sponsors so they would

21 understand it.

22 **Q.**    Okay.  But you're telling them here that it's okay to tell

23 people you're a good organization.  You do -- you've got a good

24 thing going here, and for them to understand that as they go

25 out to do their jobs, right?

1  A.   Well, the "value" referred to is the agreement between the

2  NFL and Players Inc.  The agreement between the NFL and Players

3  Inc is a valuable asset for sponsors interested in utilizing

4  NFL players.

5  Q.   Okay.  Mr. Allen, I don't want to fence with you.

6       The agreement -- we've already established this.  The

7  agreement between Players Inc and a professional association --

8  it's a trial exhibit, I could refer you back to it -- is an

9  agreement by which the union --

10      MR. KESSLER:  Your Honor, I object.  He's confusing

11 the agreements.  This is between the National Football League

12 and Players Inc not between the NFLPA and Players Inc.  He's

13 completely confusing the record on this.

14      It had nothing to do with the earlier testimony.

15      MR. PARCHER:  Okay.  I think that's a valid -- I

16 think that's valid.

17      THE COURT:  Why don't you correct that point and move

18 on to something --

19      MR. PARCHER:  Yes.  Thank you.  Sorry about that.

20 Right.

21 BY MR. PARCHER:

22 Q.   The second line of that paragraph 2 says:

23           "Sponsors can take advantage of one-stop

24 shopping that is quick and convenient, without additional

25 agency fees."

1          Now, aren't you telling them by that sentence:

2              "'One-stop shopping' means we've got enough

3    players signed up that whoever the licensee is, prospective

4    licensee, doesn't have to go anywhere else," right?  That's

5    what you're telling them?

6    **A.**    Active players.

7    **Q.**    Where does it say "active players" here?

8    **A.**    The agreement between the NFL and Players Inc deals with

9    active players.

10   **Q.**    Where does it say "active players" where you tell people

11   in a complete -- sir --

12              **MR. KESSLER:**  Your Honor, now I object.

13              **MR. PARCHER:**  Excuse me.

14              **MR. KESSLER:**  It says it on the next paragraph.

15   There is no foundation for his question.  The next to the last

16   paragraph says "active."

17          He shouldn't be asking that question, Your Honor.

18   It's misleading, Your Honor.  I object.

19              **MR. PARCHER:**  I respectfully disagree.  I don't want

20   to get into a --

21              **THE COURT:**  Well, do this.  If it does say "active"

22   in the next paragraph, point that out to the witness, and then

23   ask him, if you believe that the statement does not pertain to

24   active or --

25              **MR. PARCHER:**  Right.  There's a third paragraph.  We

1  can put it up for you to see.  Make it easy for you, Your

2  Honor.

3           Is it possible to put both the paragraph that I'm

4  talking about and the following paragraph for the Court to see?

5  That's the paragraph I'm reading.

6           We'll put it more clearly.  I'm reading the second

7  sentence of that paragraph.  There's another paragraph below.

8           I'll read it to you, Judge.  It will be easier for

9  you.

10          THE COURT:  I don't see which one you're talking

11  about.

12          MR. PARCHER:  Okay.  Okay.  So, here, I'll read it to

13  you.

14          THE COURT:  He's blowing it up now.  All right.

15  Let's see.

16          (Document displayed.)

17          MR. PARCHER:  Right.  That's a paragraph that follows

18  my paragraph.

19          THE COURT:  All right.  So now everyone sees that

20  paragraph.

21          MR. PARCHER:  Refers to active.

22          THE COURT:  Go back and put the -- so I want to make

23  sure the witness -- I want you to see this paragraph that

24  follows.

25          Are you seeing that one?

1          **THE WITNESS:**  Yes, sir.

2          **THE COURT:**  All right.  Now, go back to the paragraph

3    you were asking about.

4          **MR. PARCHER:**  Thank you.

5          **THE COURT:**  And let's see --

6          **MR. PARCHER:**  Right.

7          (Document displayed.)

8          **THE COURT:**  All right.  And your question is?

9          **MR. PARCHER:**  On the second sentence of the first

10   paragraph, the value -- I shouldn't say the first paragraph.

11         The paragraph that has Roman numeral II, that begins

12   with the word "Value."  I'm questioning this witness about the

13   second --

14         **THE COURT:**  The issue is whether "NFL players," as

15   used in that sentence, refers to active players only.

16         **MR. PARCHER:**  No.  The issue is:  Would you say in

17   the second sentence, "sponsors can take advantage of one-stop

18   shopping," et cetera, that that necessarily refers to active

19   players rather than all the players that he's got signed up?

20         **THE COURT:**  All right.  That's a fair question.  Go

21   ahead and ask the question.

22   **BY MR. PARCHER:**

23   **Q.**   It doesn't say that there, does it, sir?  Yes or no?

24         That you surely can answer "yes" or "no" by just

25   looking at the board.  No, it does not, right?

1  **A.**   No.

2  **Q.**   Now, is it your position -- how many people attend these

3  conventions?  I'm not holding you to a precise number.  On

4  average.

5  **A.**   300, 400, 500.  This isn't a convention.  It's an annual

6  required meeting of the registered contract advisors.

7  **Q.**   Okay.  Forgive me for saying "a convention."

8            So you get three, four, five hundred people that are

9  in the licensing business in a room.  And is it your position

10  to Judge Alsup and this jury that you don't at all make

11  reference to retired players in that room when you're pitching

12  these guys?

13            Yes or no?

14  **A.**   Yes, we make reference in those discussions to retired

15  players.

16  **Q.**   But not in this document.  Here you're only talking about

17  to them about actives when you say "one-stop shopping."

18            Is that your testimony?

19  **A.**   That's correct.

20  **Q.**   Show me one place in this document -- take your time.

21  Show me one place in this document where you refer to retired

22  players who have signed group licensing authorization.

23            Show me one place in this document that goes to four,

24  five hundred people that are in the business, that are in the

25  licensing business, when you made a reference to it.

1          You should say it's not there.

2  **A.**   This document is a description of --

3  **Q.**   Could you just show me where it is?  It's very simple.  If

4  you go through the document and look at a paragraph --

5          **THE COURT:**  The document is the one we have on the

6  screen?

7          **MR. PARCHER:**  Well, that's a part of it.  I'll hand

8  it up so you know what I'm talking about.

9          **THE COURT:**  What is the exhibit number?

10          **MR. PARCHER:**  The exhibit is Trial Exhibit No. 12.

11          **THE COURT:**  All right.

12          **MR. PARCHER:**  It's an eight-page document entitled

13  "Memoranda," and it's directed to these three, four, five

14  hundred persons who were called "NFLPA contract advisors"

15  attending the 2006 seminar.

16          **THE COURT:**  Okay.  And the question is:  Where in the

17  document is there a reference to the retired players' GLA?

18          **MR. PARCHER:**  Yes.

19          **THE COURT:**  All right.  All right.  Stop.

20          **MR. PARCHER:**  Yes, sir.  Yes, sir.  Yes, sir.

21          **THE COURT:**  Take your time and see if you can find

22  any such reference.

23          **MR. KATZ:**  Your Honor, it's a little bit cold in the

24  courtroom.  I don't know if Your Honor can adjust that or not.

25  I see a lot of people with their hands in their pockets.

 1           THE COURT:  That's their problem.

 2           The -- how about my jury?  Any members of the jury

 3   cold?

 4           (Jurors shaking heads negatively.)

 5           MR. KATZ:  It's just me, Your Honor.  Sorry.

 6           THE COURT:  You're sitting too far away from the heat

 7   that's being generated.

 8           (Laughter)

 9           THE COURT:  I like it to be a little on the cold side

10   because, otherwise, people get drowsy.  We also are saving

11   energy.

12           MR. PARCHER:  Jimmy Carter used to insist -- probably

13   before Your Honor was born -- that it be 68 degrees in every

14   courtroom.  And if you didn't like it, you had to bring a

15   sweater with you.

16           THE COURT:  I was in the Justice Department when

17   Jimmy Carter was president, and believe me, we all wore

18   cardigan sweaters.

19           MR. PARCHER:  I do.

20           THE COURT:  We kept the temperature at 65.

21           MR. PARCHER:  65?

22           THE COURT:  That's what he wanted.

23           MR. PARCHER:  I thought it was 68.

24           THE COURT:  No, 68 was the normal.  65 was -- this is

25   coming out of your time, so let's move on.

1          **MR. PARCHER:**  I was a public defender representing

2    poor people accused of serious crimes when you were prosecuting

3    them, Your Honor.

4          **THE COURT:**  Those were the days.  Okay.

5          **MR. PARCHER:**  Yes, they were.

6          **THE COURT:**  Would you proceed with your next

7    question.

8    **BY MR. PARCHER:**

9    **Q.**   Well, I'm waiting for an answer to this question.

10   **A.**   I don't believe there is any reference.

11   **Q.**   Thank you, sir.

12         **MR. PARCHER:**  Now, I'd like to put -- I'm sure

13   there's no objection.  I want to put the GLA up on the board.

14   I was going to put the Adderley one up, Trial Exhibit 110.

15         **THE COURT:**  Any objection?

16         **MR. KESSLER:**  No objection.

17         **THE COURT:**  Received.

18         (Trial Exhibit 110 was received into evidence.)

19         **MR. PARCHER:**  I misplaced my document.

20         **THE COURT:**  We're going to take about ten more

21   minutes, and then take a recess for the jury unless someone

22   needs it sooner.

23         **MR. PARCHER:**  I got it.

24         **THE COURT:**  All right.  Take about -- let's go about

25   ten more minutes before we recess.

1              All right.  Go ahead.

2              **MR. PARCHER:**  Yes, sir.

3  **BY MR. PARCHER:**

4  **Q.**   This is -- do you have the right document before you,

5  Mr. Allen?

6              I can help you out.

7  **A.**   This right?

8  **Q.**   Still hit the jump shot.

9              Trial Exhibit 110.  That's it.

10             Now, this -- I've selected this document, just so you

11 know.  Take a look at this for a minute.  This is the group

12 licensing authorization form that was in effect during the

13 period that we're talking about here, correct?

14             I happen to be giving you Mr. Adderley's, but there's

15 no magic to the fact I'm giving you his.

16 **A.**   It's the Retired Players Group Licensing Authorization

17 Form.

18 **Q.**   Right.  It changes later on.  I think it's 2005, right?

19 You made a change in the retired players authorization.

20 **A.**   Changed in what respect?

21 **Q.**   Okay.  I'll show it to you.  It's out of context.  But I'm

22 just trying to establish that it's not just this document we're

23 talking about.  We're talking generally about the group

24 licensing authorization form, okay?

25 **A.**   All right.

1  **Q.**   Fine.  Thank you.

2          Now, the second paragraph -- well, let me just go

3  back a step.  Do you have a general impression -- I don't

4  expect you to know two-thousand-some-odd people.

5          You understand that we're here representing 2,067

6  people who are members of the class?  If you don't, tell me.

7  I'm just telling you that.  I hope it's not going to be a

8  problem.

9          Okay.  I understand that you probably don't know all

10 2,067 of these men personally.  That's a fair assumption,

11 right?

12 **A.**   Yes.

13 **Q.**   Okay.  But as a generalization, is it fair to say that you

14 don't picture the vast, vast majority of these men as Harvard

15 Ph.D.s or Rhodes scholars?

16 **A.**   I wouldn't characterize them one way or the other.  Some

17 of them are successful businessmen, very successful lawyers,

18 doctors, dentists.  And some of them aren't.  I mean, it's a

19 diverse group.

20 **Q.**   Uhm.  But for the most part -- but for the most part --

21 well, let me just say it this way.  This GLA was prepared --

22 when I say "you," sometimes I mean "you," and sometimes I mean

23 "you" the number two person.  You know, the editorial --

24 editorial you.  You know, the defendants.

25         You prepared this document, correct?

1  **A.**   You mean me, personally?

2  **Q.**   No.  I just got through saying that.

3  **A.**   I wasn't sure which one you were ending with.  I'm sorry.

4  Me personally or collectively?

5  **Q.**   Well, did you personally prepare the GLA that got sent out

6  to all the retired players?

7  **A.**   I -- you mean, did I actually -- you mean, you're talking

8  about the drafting of it?

9  **Q.**   Well, did you have input into the language?

10 **A.**   Yes.

11 **Q.**   Of course you did.  You're the number two guy there,

12 right?

13 **A.**   Yes.

14 **Q.**   Right.  So you understood by the first paragraph -- I

15 guess we'll start with that -- wait, wait.  Withdrawn.

16        Am I correct in saying that none of the GLAs that you

17 sent out were negotiated by a retired player before they

18 signed?

19 **A.**   That's correct.

20 **Q.**   To the best of your knowledge, none of the retired players

21 were represented by counsel prior to your -- prior to your

22 receiving their signature which you solicited in the mail,

23 correct?

24 **A.**   Correct.

25 **Q.**   To the best of your knowledge, as the union person, you

1  never told any of these players:

2             "Watch yourself.  You better get a lawyer here.

3  There may be some technical language as a linebacker, you may

4  not be all that familiar with," did you?

5  **A.**   Did I say that?  No.

6  **Q.**   You never told them:

7             "It might be a good idea to get lawyered up

8  before you sign this, because this language may not be a

9  monument of clarity," did you?

10 **A.**   I didn't believe the last part of that sentence, and I

11 didn't use -- I didn't say the first part to the players.

12 **Q.**   Okay.  So now going to the second paragraph.

13          (Document displayed.)

14          Would you agree with this statement?  That language:

15             "Group licensing programs are defined as

16 programs in which a licensee utilizes a total of six or more

17 present or former NFL player images in conjunction with, or on

18 products that are sold at retail or used as promotional or

19 premium items."

20          Would you agree that that sentence is perfectly

21 clear?

22 **A.**   I think it's clear, yes.

23 **Q.**   Do you see any ambiguity in that sentence?

24 **A.**   No.

25 **Q.**   So that if six or more present or former NFL player images

1   are licensed in conjunction with or on products sold at retail

2   then it's part of the group licensing program, correct?

3   **A.**   Programs defined that way are group licensing programs.

4   **Q.**   Yes, sir.

5           I'd like to turn your attention to the one, two,

6   three, four, fifth paragraph.

7           Just tell you, I was chastised by one of my

8   colleagues.  Sometimes I call this the "group licensing

9   agreement."  It's interchangeable with me, "group licensing

10  authorization, group licensing agreement."

11          I'm referring to the same document.

12          **MR. KESSLER:**  Well, Your Honor, I just note the

13  documents are different.  So he may refer to the words the

14  same, but there's one document that has this name, and there's

15  another document, as Your Honor knows, involving active players

16  that has a different name.

17          So if counsel is going to confuse them --

18          **MR. PARCHER:**  I'll withdraw what I said.  I'll

19  withdraw what I said.

20          **THE COURT:**  You got in trouble making a speech.  See,

21  you were making a speech, a preparatory speech, talking about

22  your colleagues were chastising you.  And it was not a pending

23  question, and so then it just invited a speech by Mr. Kessler.

24  So --

25          **MR. PARCHER:**  Since I'm not a masochist --

1          **THE COURT:**  -- if you hadn't made the speech in the

2    first place, we would be to question number 14 by now.

3          **MR. PARCHER:**  Since I'm not a masochist, I will try

4    not to do that again, because I'm feeling the -- I'm feeling

5    the wounds.

6          **THE COURT:**  Just stick with this agreement and ask --

7    these are legitimate questions to ask.  So stick with your --

8          **MR. PARCHER:**  Yes, sir.

9          **THE COURT:**  -- agreement on the screen, and let's

10   continue on.

11   **BY MR. PARCHER:**

12   **Q.**   Okay.  We're down to -- you see there, Mr. Allen:

13                "It is further understood"?

14   **A.**   Are you talking about the last -- the next to the last

15   paragraph?

16   **Q.**   Yes.

17   **A.**   Right here.  I see it.

18   **Q.**   It's up there on the board, just so you can double-check.

19   I'll make sure.

20   **A.**   Right here.

21          **MR. PARCHER:**  I should ask, Your Honor.  I'm

22   approaching the witness for a minute.

23          Yeah, that's it.

24          **THE WITNESS:**  Thank you.

25

 1  **BY MR. PARCHER:**

 2  **Q.**   "It is further understood that the monies generated by

 3  such licensing of retired player group rights will be divided

 4  between the player and an escrow account."

 5        And then it goes on.  I will get to the rest of the

 6  sentence.  I'm cutting you off just for question purposes.

 7        Would you agree that from the first minute of the

 8  first day that the first retired person signed a GLA, down to

 9  the day that you left, that you never did establish an escrow

10  account?

11  **A.**   That's correct.

12  **Q.**   Now, to continue on with the sentence:

13              "Will be divided between the player."

14        "The player," presumably, is the person who signs the

15  GLA, right?

16  **A.**   Yes.

17  **Q.**   And "an escrow account for all eligible NFLPA members,"

18  those are the active fellows, right?

19  **A.**   No.

20  **Q.**   Wait a minute.  Is there a retired player -- withdrawn.

21        What document of the union's -- I have just forgotten

22  the name.  That's why I'm asking.  I'm going to ask you

23  questions about it.  I know what it says, but I don't remember

24  the name of the document.

25        What document of the union establishes who is an

1  eligible NFLPA member who has signed a group licensing

2  authorization form?  What's it called?  I think it's the

3  bylaws, but I don't want to mislead you.

4  A.    I'm not sure I recall.

5  Q.    Okay.  Put it this way.  Am I correct in saying that --

6  give me just a second.

7         MR. PARCHER:  Can you, Your Honor?

8  BY MR. PARCHER:

9  Q.    Am I correct in saying that there's nothing that you know

10 of that would have prevented the NFLPA from establishing

11 eligibility requirements that included the retired players?

12 A.    I think that's correct.

13 Q.    Didn't you ever say that exact thing?

14 A.    It --

15        MR. KESSLER:  Your Honor, he answered the question.

16 He said --

17        MR. PARCHER:  Okay.  Withdrawn.  Withdrawn.

18 BY MR. PARCHER:

19 Q.    Didn't you ever say that the NFLPA board of reps, in their

20 consideration of that issue, determined that wasn't

21 appropriate?  Meaning that it wasn't appropriate to make

22 retired players eligible.

23        MR. KESSLER:  Your Honor, I now have an objection

24 because he's -- he's reading testimony about the active player

25 pool fund.

1              MR. PARCHER:  This is not fair, Judge.

2              MR. KESSLER:  And he is mixing it now into this

3    subject, Your Honor.  There's no foundation for that.  It's

4    inappropriate.

5              MR. PARCHER:  May I be heard, Judge?

6              THE COURT:  It's time for our break, anyway.  So

7    we'll let you go on with your break.

8              15 minutes.  Please remember the admonition.

9              THE CLERK:  All rise.

10             (Thereupon, the jury left the courtroom.)

11             THE COURT:  All right.  The witness can step down.

12   We don't need the witness, do we?

13             MR. KESSLER:  Not right now, Your Honor.

14             THE COURT:  You can take your 15-minute break, as

15   well.

16             THE WITNESS:  Thank you, Your Honor.

17             THE COURT:  Thank you, Mr. Allen.

18             Everyone else be seated.

19             The procedure that I like to use when depositions are

20   involved for impeachment is, as I said at the pretrial

21   conference, "do not do this," which lawyers abuse all the time.

22             They will say:

23                  "In your deposition didn't you say the light was

24   green?"

25             And, in fact, in the deposition the question was

1  asked and they said:

2              "Well, somebody told me the light was green,"

3  which is different.

4         And if I let lawyers get away with that, they take

5  liberties, and they will not quote it exactly verbatim.

6         So the way you should do it is you just ask the

7  witness the question:

8              "Was the light green or red or yellow?"

9         And they say:

10              "The light was yellow."

11         And then, you can then read question and exact line

12  and so forth from the deposition in which they said something

13  to the contrary.

14         That way we will get the full context.  If it said

15  "active" versus whatever, then that will be clear instead of

16  doing a memory test where you say:

17              "Didn't you say -- have you ever made the

18  following statement?"

19         And then, you read something, and we don't know

20  whether it's exact or not.

21         So that's the procedure that's going to be used.  I'm

22  going to ask you to do it my way, Mr. Parcher.  The way you're

23  doing it is in violation of my ground rules.

24         So, please, everyone has got to do this.  I've

25  learned the hard way if I let the lawyers get away with asking

1  those kind of questions they take words out, they slip words

2  in, they paraphrase, and pretty soon it's just tricking the

3  witness.

4          **MR. PARCHER:**  Right.

5          **THE COURT:**  So that's the way we're going to handle

6  that.  So if it turns out that it's true that the context makes

7  a distinction between active and retired that will come out

8  when you read the excerpt in.

9          **MR. PARCHER:**  Sure.  Obviously, I respect that

10  completely.  No buts.  And I follow the Court's admonition.  I

11  just want to say at that moment in time -- it may be confusing

12  the way I do things -- I wasn't impeaching this witness.  I was

13  trying to get him to confirm that that's his position.  He

14  hadn't -- he hadn't said "that's not my position."

15          **THE COURT:**  You just should ask him.  It would be

16  perfectly permissible for you to say, "do you agree that"?  And

17  then say A, B, C, whatever you want to lard in there.  If he

18  says "No, I don't agree with that," you can read what he said

19  in the deposition.

20          What I don't like is whenever you are communicating

21  to the jury, the way you're doing it is that you're reading

22  from something.

23          **MR. PARCHER:**  Right.

24          **THE COURT:**  And that leaves the impression with the

25  jury that you're reading from the deposition.  That may or may

 1  not be what he actually said in the deposition.

 2          **MR. PARCHER:**  Your Honor --

 3          **THE COURT:**  That's the part that is borderline.

 4          **MR. PARCHER:**  I assure you, Your Honor, I'm not

 5  arguing with the Court.  I hope it doesn't sound like I am.  I

 6  respect that completely.

 7          What's happening is I'm trying to -- when I say

 8  "didn't you say, don't you agree," whatever it is that you want

 9  me to do, I'm trying -- I'm literally doing it in reverse.  I'm

10  trying to get it right.  That's why I'm looking at the

11  document.

12          **THE COURT:**  Well, you can --

13          **MR. PARCHER:**  See what I mean?

14          **THE COURT:**  If you -- you can just -- instead of

15  saying "haven't you previously said," the way to do it is --

16  because if it's coming out of the deposition that's not the way

17  to do it.  The way to do it is:

18              "Do you agree with the statement?"

19          And then, you can read the statement.

20          **MR. PARCHER:**  Thank you.  I got it.  Sorry about

21  that.

22          **MR. KESSLER:**  Your Honor?

23          **THE COURT:**  Yes.

24          **MR. KESSLER:**  I had an additional objection, which is

25  that it does refer to deposition testimony in which a specific

1 document was placed before the witness, not the retired player

2 GLA, the active player pool eligibility criteria.

3        And so he was being questioned at his deposition

4 about those criteria. And what counsel has now done -- and I

5 don't think there's a foundation for this -- is that he's

6 asking the witness questions as if those statements about the

7 active player, which is a document that says "eligibility

8 criteria for the pool of active player money," has something to

9 do with this retired player form. And that's what I was

10 objecting to. He has to have an foundation for the question.

11     **MR. PARCHER:** First of all, I want to point out for

12 the record how my adversary is gesturing, just so we have that

13 clear.

14     **THE COURT:** Is what?

15     **MR. PARCHER:** So my Aunt Frances gets both sides of

16 the story here. That's not what I'm doing.

17     And you'll hear -- Your Honor will hear it when I do

18 it.

19     **THE COURT:** It is okay for -- the reason that

20 Mr. Kessler is wrong is that if the question by the person at

21 the podium is, "Do you agree with the statement XYZ?" that

22 question does not invoke any deposition. That question does

23 not necessarily mean that he's reading from the wrong contract.

24     The witness can protect himself and say either "yes"

25 or "no." And then --

1        **MR. KESSLER:**  Of course, Your Honor.

2        **THE COURT:**  -- if it turns out he has to resort to

3   the deposition to impeach, it will then become clear because

4   we're going to read literally the questions and answers what

5   was the underlying impeachment material.

6            And if it turns out that Mr. Parcher was trying to

7   pull a fast one, it will then become clear to the jury.

8        **MR. KESSLER:**  Very good, Your Honor.  Thank you.

9        **MR. PARCHER:**  I want to say what counsel is saying is

10  so disingenuous.  It's already established in this depo and in

11  this thing he is referring to active players as the ones that

12  are eligible.  And this question says:

13            "But if you wanted to, you also could have made

14  retired players?"

15            Okay.  That's it.

16       **THE COURT:**  All right.  You had something you wanted

17  to do at a sidebar.  Is that moot now, or do you need to go

18  into it?

19       **MR. PARCHER:**  I don't remember.

20       **THE COURT:**  I think it had something to do with

21  Hollywood.

22       **MR. PARCHER:**  Oh, everybody is saying hold my fire to

23  another moment.

24       **THE COURT:**  I'm going to treat that as moot until you

25  bring it up later.

 1          **MR. PARCHER:**  Not moot.  Just holding --

 2          **THE COURT:**  Well, I'm not going to have a sidebar

 3 while the jury is here.

 4          **MR. PARCHER:**  No, no, no.

 5          **THE COURT:**  This is it.  Withdrawn for now.

 6          We'll take 15 minutes or so.

 7          **MR. PARCHER:**  Thanks for reminding me.

 8          **THE COURT:**  Here is the Glenn Eyrich transcript that

 9 somebody asked me -- would you hand that to counsel?

10          I've ruled on those objections.

11          (Recess taken from 10:30 to 10:48 a.m.)

12          (The following proceedings were held in open court,

13          outside the presence of the jury.)

14          **THE COURT:**  All right.  Be seated, please.

15          What is the issue?

16          **MR. HUMMEL:**  Your Honor, I have a short issue.  We

17 have a concern, very quickly, about paragraph 29 of your

18 standing order, which is regarding speaking objections.  We

19 have a strong view that Mr. Kessler has been making repeated

20 speaking objections, and we object to that.

21          **THE COURT:**  Mr. Kessler, what do you say?

22          **MR. KESSLER:**  Your Honor, I think my objections, when

23 they were speaking, were designed either because we had

24 speeches by counsel that I was responding to or, Your Honor,

25 since you don't want to have sidebars I have had to state the

1    basis for the objection.

2         I think I have to speak that way so Your Honor knows

3    the basis for the objection.

4         **THE COURT:**  Well, the way to do it is to just say the

5    technical legal objection.  You can say "Hearsay."  You can say

6    something else.

7         But there was one time whenever I thought it was like

8    deposition conduct when were you throwing the witness a life

9    preserver, and you didn't need to do it.  So just make the

10   legal objections.

11        Sometimes I will understand what you are getting at.

12   Other times I will ask you to elaborate.  If I ask you to

13   elaborate, then it's fine.  You can --

14        **MR. KESSLER:**  Very good, Your Honor.

15        **MR. PARCHER:**  I have a short one, too, Your Honor.

16        **THE COURT:**  Yes.

17        **MR. PARCHER:**  In the -- I understand that in this

18   convention that we were talking about, with the 500 agents,

19   that the union has a rule that if you want to be part of that

20   organization you can't charge a commission of more than -- I

21   think it's 3 percent, but I don't know the exact number.  I

22   don't want to say that number.  And I want to -- I want to get

23   him to acknowledge that, that the union itself is keeping the

24   agents --

25        **THE COURT:**  What agents?

1          **MR. PARCHER:**  Why?

2          **THE COURT:**  What agents?

3          **MR. PARCHER:**  The agents that attend the convention

4    all have to -- I'm using the number 3 percent.  I could be

5    getting misinformation, so I don't want to represent --

6          **THE COURT:**  How does that help?  I don't understand

7    the relevance of that.

8          **MR. PARCHER:**  Because these guys have charged

9    37 percent.  It's outrageous.  63 percent.

10          **THE COURT:**  Now --

11          **MR. PARCHER:**  I'm representing to this court that in

12    the history of the world Colonel Parker charged Elvis Presley

13    50 percent, and it was outrageous.  They charge 10 percent.

14    They charge 15 percent.  They don't charge -- and you're going

15    to see before the case is over with they went up to 69 percent.

16          **MR. KESSLER:**  Your Honor, the problem we have -- and

17    this is a perfect example -- Mr. Parker -- Parcher has no

18    understanding of the facts or evidence in this case.

19          The contract advisors he's referring to --

20          **MR. PARCHER:**  Excuse me.  The witness is here.  Could

21    we ask him to step outside maybe?

22          **THE COURT:**  Well, no, because I'm going to give you

23    the ruling.  You can ask whatever questions that you want so

24    long as you have a good faith basis to ask them.

25          **MR. PARCHER:**  Thank you.

1          **THE COURT:**  And if the witness knows the answer he

2    has got to admit it.  But then, if there's something that's

3    misrepresented and there's confusion you just have to bring it

4    up on your turn.

5          **MR. KESSLER:**  Your Honor, can I make a 403 objection

6    and have the witness leave?  I don't want to in any way put

7    anything in the witness's head, but I think you should rule on

8    this before he comes back.

9          **THE COURT:**  All right.  The witness will step

10   outside.

11         Okay.  What is your 403?

12         **MR. KESSLER:**  Okay.  The contract advisors he's

13   referring to and the 3 percent fee he's referring to has

14   nothing to do with licensing.  It is the fee -- they are the

15   advisors who negotiate NFL salaries with NFL teams.

16         They have nothing to do with licensing at all.

17   That's why they're here.

18         So he wants to conflate and confuse the jury with

19   salary percentages that the union sets.  It has nothing to do

20   with licensing.

21         **THE COURT:**  Is that true.

22         **MR. PARCHER:**  I have no idea.  What I do know --

23         **THE COURT:**  Then, if you don't know, then I'm going

24   to sustain the objection.

25         **MR. PARCHER:**  Please, Your Honor.  That's not right.

1      **THE COURT:**  Well, you better know something about it,

2   because if it's salaries, that's not licensing.

3           **MR. PARCHER:**  That's not right.

4           **THE COURT:**  Tell me why it's wrong.

5           **MR. PARCHER:**  Yes, sir.  The -- an agent -- an

6   agent -- I don't care if he's a man in the moon or a woman in

7   Mars agent, an agent charges -- and I'm very familiar with this

8   subject, which is not important to Your Honor, but I'm telling

9   you that I'm very familiar with this subject.

10          They charge 10 percent.  Maybe they charge

11  15 percent.  I'm talking about the best agents in the country

12  charge 10 or 15 percent.

13          Maybe you'll get it up in a rare instance where

14  there's a special thing between an agent and a particular

15  person, you'll get it up to 25 percent.

16          The idea of taking a 63 percent commission for

17  anything, if you're an agent, is completely, completely

18  inappropriate.

19          And to take that from men whom you're supposed to be

20  representing because you're their union, you're their Players

21  Inc, you're the ones -- he says it right in his document --

22          **THE COURT:**  But they're taking it only from the

23  actives.

24          **MR. KESSLER:**  Correct, Your Honor.

25          **MR. PARCHER:**  Wait a minute.

1          **THE COURT:**  What has that got to do with the

2   retireds?

3          **MR. PARCHER:**  Wait a minute.  He says that they're

4   taking it only from the actives.  That contract, PAPI, doesn't

5   say he's taking it only from the actives.

6          If I was representing a retired person, I would

7   think -- I would think that they're taking 63 percent from me.

8   It's as if -- what are you saying?  That they anticipated

9   before the contract began that they would never be able to do a

10  group licensing?

11         It's a whole construct on their part.  That's not so.

12  It has everything to do with that.

13         **MR. KESSLER:**  Your Honor, the specific issue that you

14  just ruled upon is whether or not the salary agent fees have

15  anything to do with licensing.  Your Honor correctly ruled no.

16  And I believe --

17         **THE COURT:**  I'm going to stand by my ruling.  I don't

18  think it has anything to do with licensing.  So bring back the

19  witness.

20         Let's not get into that.

21         **MR. PARCHER:**  I'll just ask if it does have anything

22  to do with it, Judge.  We haven't established it yet.

23         **THE COURT:**  Why?

24         **MR. PARCHER:**  I don't know that.

25         **THE COURT:**  I've ruled it out.

1    **MR. PARCHER:**  No, you haven't ruled it out.  What

2  you've ruled out is asking the percentage if it turns out that

3  it has nothing to do with licensing.  You haven't ruled out

4  that if it does -- if these do guys licenses, too, you haven't

5  ruled it out.

6         **THE COURT:**  What is your offer of proof that it has

7  something to do with --

8         **MR. PARCHER:**  I have no proof.

9         **MR. KESSLER:**  Your Honor, I'm representing as an

10  officer of the Court the 3 percent only applies to salary

11  licensing.  In fact, agents who do marketing deals of players

12  have no regulation.

13         As an officer of the Court Mr. Parcher has to have a

14  good faith basis for his question.  He can't just make it up.

15         **THE COURT:**  Are you bringing Mr. Allen back in your

16  case?

17         **MR. KESSLER:**  No, Your Honor.  In my direct

18  examination, which will be today, though, as we agreed we could

19  do it at one time.  So he's going to have a long direct --

20         **THE COURT:**  At the rate this is going we are not

21  going to finish by 12:30.

22         **MR. KESSLER:**  I think so.

23         **THE COURT:**  I'm sustaining the 403 objection.  The

24  Court is going to find that this is so far afield of the

25  issues -- it has some tangential relevance, yes.  But under

1   Rule 403 the probative value of the 3 percent for people who

2   are agents on salaried issues is so far afield of the issues

3   we've got for this jury it's going to confuse them, and it is

4   just not fair to get into it.

5             **MR. HUMMEL:**  Your Honor --

6             **MR. PARCHER:**  I can't tell you how strongly I

7   disagree.

8             **THE COURT:**  You disagree with my ruling?  All right.

9   Great.  That is why we have the Ninth Circuit.

10            **MR. PARCHER:**  No, I'm not interested in the Ninth

11  Circuit.  I want to win the case here.

12            **THE COURT:**  In ever trial a judge makes a hundred

13  mistakes.  At least one of them you can probably get me

14  reversed on.  I'm doing the best I can.  So accept my ruling,

15  and let's move on.

16            **MR. PARCHER:**  I do accept it, but I'm not interested

17  in the Ninth Circuit.

18            **MR. HUMMEL:**  Your Honor, I'm going to come to the

19  help of my partner, Peter Parcher.

20            **THE COURT:**  No, you're not.  You're going to sit

21  down.

22            **MR. HUMMEL:**  Your Honor, may I --

23            **THE COURT:**  You can make a supplemental ruling later

24  and file an exception to whatever you want.

25            But I'm getting irritated.  You lawyers never accept

1    my rulings.

2            **MR. HUMMEL:**  Your Honor, the document that

3    Mr. Parcher was talking about is a licensing document.  And

4    I'll show it to Mr. Kessler.  It's Exhibit 12.

5            He just said it has to do with player salaries, and

6    I'm reading from it.

7            It says:

8                "The NFL and Players Inc, the licensing and

9    marketing subsidiary of the National Football League Players

10   Association, have entered into an agreement that allows the NFL

11   to convey to sponsors the exclusive right to utilize the group

12   licensing rights of NFL players as assigned by Players Inc."

13           It's not a salary document.  And I apologize for

14   doing that to Your Honor, but I'm looking at Exhibit 12.  It's

15   on page 6, and I would be happy to hand it to you.

16           **THE COURT:**  Show me.

17           **MR. HUMMEL:**  I will.

18           **MR. KESSLER:**  Your Honor, Mr. Hummel, okay, in all

19   due respect, is not addressing the issue.  The 3 percent

20   license fee, it's not a license fee.  It's an agent commission.

21   It's not a license fee.

22           The agent commission has to do with salaries.  That

23   3 percent agent commission is not referenced anywhere in this

24   document.

25           This was a meeting of the agents for active players

1   to explain to them how they were going to use active players in

2   sponsorship agreements for which, by the way, the agents charge

3   no money.

4           In other words, he's conflating the rule, which is a

5   rule of certified contract advisors, that for salary

6   negotiations, if you negotiate an active player's salary it's

7   3 percent.

8           It has nothing to do with what Mr. Hummel said.  And

9   I'm shocked he would come in and try to mislead the court by

10  talking about this document.

11          **MR. PARCHER:**  I withdraw the application, because I'm

12  irritating the Court, and I don't mean to do that.  And the

13  Court is thinking I'm not obeying a ruling.  I withdraw it.  I

14  can live without it, regardless of my professional opinion.

15          **THE COURT:**  Thank you.  All right.  Let's now move --

16          **MR. PARCHER:**  And if I've annoyed you, I'm sorry.

17  That's all I can say.

18          **MR. KATZ:**  Your Honor, can I address the Court for a

19  moment on a related subject?

20          **THE COURT:**  No.  If it's on this subject, the answer

21  is no.  I've made a rule ruling, and we're going to move on.

22          **MR. KATZ:**  No, I'm not trying to question the ruling.

23          **THE COURT:**  What do you have to say?  We've got a

24  room full of lawyers here.  We've got more lawyers in the

25  courtroom than jurors.

1          And you lawyers are not being respectful of the

2     jury's time.  Go ahead.  We'll hear what you have to say.

3          **MR. KATZ:**  Your Honor has said several times this

4     morning, most recently a few moments ago, that the 63 percent

5     comes out of the active players.

6          That is not our contention.

7          Our contention is that the escrow account is either

8     the monies that were supposed to go in there and didn't go in

9     there are the monies in the escrow account for the active

10    players, which is the only escrow account.  63 percent was

11    taken from those monies.  Those monies were ours to share.

12         So it's -- it is -- that's our contention.

13         **THE COURT:**  All right.  All right.  So, of course,

14    you can make that contention.

15         **MR. KATZ:**  Right.

16         **THE COURT:**  And I misunderstood your contention.

17         **MR. KATZ:**  Right.  That's all I wanted, Your Honor.

18    I think it will save us time as we go forward.  I'm

19    respectful --

20         **THE COURT:**  That's a fair point to have made.

21         **MR. KATZ:**  Thank you.

22         **THE COURT:**  I'm not accepting it.  I'm not denying

23    it.  That's going to be for others to decide.

24         **MR. KATZ:**  We're going to be hearing from Mr. Kessler

25    on this point.

1          **THE COURT:**  They're entitled to make the argument.

2          **MR. KESSLER:**  They are, Your Honor, except in opening

3     argument Mr. Parcher told the jury there was no escrow account.

4     Mr. Katz just said their contention is there's an escrow

5     account.  They can't have both contentions.

6          **MR. KATZ:**  In Mr. Kessler's special world I can't

7     have both those contentions.

8          **THE COURT:**  All right.

9          **MR. KATZ:**  Fortunately, it doesn't correlate with the

10    real world.

11         **THE COURT:**  Good.  You made your point.  Let's bring

12    back our witness and bring back our jury.

13         You used 96 minutes on this witness alone so far.

14    And in my judgment, a lot of the time was wasted.  So don't

15    come back asking for more time later, Mr. Parcher.  I would get

16    right to your points and move to your next witness.

17         I'm going to say to the witness say "yes," "no," "I

18    don't recall" or "I don't understand the question."  And limit

19    your explanations to half a sentence so we can move this along.

20         **THE WITNESS:**  Yes, Your Honor.

21         (The following proceedings were held in open court,

22         in the presence of the jury.)

23         **THE COURT:**  Okay.  Welcome back.  Please have a seat.

24         Mr. Parcher, please continue.

25         **MR. PARCHER:**  Thank you, Your Honor.

1          **THE WITNESS:**  Excuse me.  Which document -- are you

2    going back to the documents?

3          **THE COURT:**  He's going to tell you.

4          Just ask a question, and then Mr. Parcher will make

5    it clear what document he's on.

6    **BY MR. PARCHER:**

7    **Q.**  Am I correct in suggesting that it's your position that

8    under the union charter or regulations the eligible NFLPA

9    members who would sign a group licensing authorization form is

10   referring to active players not retired players?

11   **A.**  I'm not sure what documents you're referring to.

12   **Q.**  Oh, I'm sorry.  We've got to go back then.

13          Trial Exhibit --

14          **MR. PARCHER:**  May I approach, Your Honor?

15          **THE COURT:**  Please.  Mr. Adderley is 110, I think.

16   **BY MR. PARCHER:**

17   **Q.**  It's Trial Exhibit 110.

18   **A.**  All right.

19   **Q.**  Mr. Adderley.  It's the GLA.

20   **A.**  Okay.

21   **Q.**  And that's what's up on the board.  You know that, right?

22   **A.**  Yes.

23          **THE COURT:**  In fairness to the witness, you didn't

24   say that.  And on the cold record being transcribed we would

25   not know what was being referred to.

1          **MR. PARCHER:**  Yes, sir.

2          **THE COURT:**  And if this was referred to in the

3  closing arguments, it wouldn't be clear, either.

4          So the witness had a point.

5          **MR. PARCHER:**  Yes, sir.

6          **THE COURT:**  Let's be clear on what document we're

7  referring to.

8          **MR. PARCHER:**  I agree with the witness, Your Honor.

9  **BY MR. PARCHER:**

10  **Q.**   We're talking to Trial Exhibit 110.  And in the fifth

11  paragraph, where it refers to "will be divided between the

12  player" that's the signatory, as you said, right?

13  **A.**   Yes.  I'm sorry.

14  **Q.**   "An escrow account for all eligible NFLPA members who have

15  signed a group licensing authorization form."

16          Do you see it up there?

17  **A.**   Yes, I do.

18  **Q.**   Now, I believe -- correct me, if I'm wrong -- you don't

19  need the document to respond to this.  I believe that it's your

20  position that the persons referred to as "eligible NFLPA

21  members who signed a group licensing authorization form" in

22  Trial Exhibit 110 are the active players.

23          Your lawyer has argued that, and I believe that's

24  your position, right?

25          **MR. KESSLER:**  Objection.  No foundation.

```
 1            THE COURT:  Sustained.

 2            MR. KESSLER:  Thank you.

 3            MR. PARCHER:

 4   Q.   Is it your position --

 5            THE COURT:  Mr. Parcher, please don't mix it up with

 6   what the lawyers -- just ask this witness -- ask him what he

 7   thinks it means.  You're trying to say that the lawyer has

 8   argued some point.

 9            How is this witness going to know?  You're making a

10   speech again.

11            MR. PARCHER:  I believe he said it.  I believe he

12   said it, Your Honor.

13            THE COURT:  I'm asking you to stick to -- stick to

14   asking the question.

15   BY MR. PARCHER:

16   Q.   Is it true that by "eligible NFLPA member" you mean to

17   refer to active players?

18   A.   No, it's not true.

19   Q.   Who are you referring to?

20   A.   This document refers to retired players and the monies

21   generated by such licensing of retired player group rights.

22   Q.   So the retired players -- your position is that the

23   retired players are all -- are eligible and can be eligible

24   NFLPA members who have signed a group licensing authorization?

25   A.   That refers to the escrow account.
```

1  **Q.**   Do you -- do you -- are you saying that a retired football

2  player who signed a group licensing authorization form can be

3  eligible under your union's rules and regulations?  Is that

4  your testimony?

5          **MR. KESSLER:**  Objection, Your Honor, as, again,

6  eligible in this document?  Is that the question?  I just want

7  a clear record.

8          **MR. PARCHER:**  I'm just asking the witness -- not to

9  make any speaking objections.  Make his objections.  Let the

10 Court rule.

11         **THE COURT:**  It was a speaking objection.  That was

12 not a legal objection.

13         The objection is overruled.

14         Is the question -- he said "eligible" as used up

15 there means "retired."

16         And I lost track, Mr. Parcher, what your follow-up

17 question was.  But it's fair for you to have a follow-up

18 question, so please ask it again.

19 **BY MR. PARCHER:**

20 **Q.**   Can a retired player, who signed a group licensing

21 authorization, be an eligible player, as that word is used in

22 the union rules and regulations?

23         Yes or no, sir?

24 **A.**   Yes.

25         **MR. PARCHER:**  I forgot how you told me to do it.

1  BY MR. PARCHER:

2  Q.   At some point --

3         THE COURT:  Just say:

4            "Do you agree with this statement?"

5  BY MR. PARCHER:

6  Q.   Do you agree with this statement that paragraph 4(b) and

7  4(d) of the union rules and regulations would have excluded

8  retired players who didn't meet the eligibility requirements

9  established by the NFLPA board of player reps?

10        MR. KESSLER:  Your Honor, objection.  Misstates facts

11 in evidence.  He's referring to the wrong documents.  I can

12 explain, Your Honor.

13        THE COURT:  If that's -- no.  Please.  You don't get

14 a chance to explain.  This witness can protect himself, and if

15 he thinks not that's not a correct statement, then he can say

16 so.

17        So it's a fair question.

18        THE WITNESS:  I don't know what document you're

19 referring to.

20 BY MR. PARCHER:

21 Q.   Okay.  Leave aside documents.  Let's not look at

22 documents.  Turn it over, or don't look at it, if you don't

23 mind.  Right?

24 A.   Okay.

25 Q.   The union has eligibility requirements, correct?

1  **A.**   For?

2  **Q.**   Well, let's go back then.  Let's go back then, if you

3  will, to the very first exhibit -- I have to get the number

4  out -- which is the PAPI agreement.

5         Have you got it?  I have to give you the number, I'm

6  sure.

7  **A.**   What number?

8  **Q.**   Here it is.  It's Trial Exhibit 125.  That exhibit --

9  **A.**   Excuse me.  I don't have it yet.

10  **Q.**   All right.  Sorry.

11  **A.**   I do now.

12         **MR. PARCHER:**  Bear with me a moment, Your Honor.

13         Sorry, Judge.

14  **BY MR. PARCHER:**

15  **Q.**   The agreement we're talking about now, sir, is the license

16  agreement between the NFLPA and Players Inc, that establishes

17  the right of Players Inc to do the licensing and marketing of

18  the players that the union gets to sign general license

19  authorizations, correct?

20  **A.**   Uhm --

21  **Q.**   That's what the document does?

22  **A.**   Yes.

23  **Q.**   Yes.  And if you turn your attention to page 7 of that

24  trial exhibit, subdivision C, do you see it there, page 7 down

25  at the bottom?

1  A.   Yes, I do.

2         MR. PARCHER:  If we can blow it up a little bit.

3         (Document displayed.)

4  BY MR. PARCHER:

5  Q.   "Licensor and the licensee shall establish eligibility

6  requirements, as mutually agreed to in writing from time to

7  time, upon which licenses shall make royalty payments to

8  players.  Initial eligibility requirements are set forth in

9  attachment D."

10        Do you know what attachment D is?

11  A.   I don't recall without seeing the document.

12  Q.   Is there any rule or regulation, in other words in the

13  charter, the bylaws and regulations that talks about

14  eligibility requirements?  Never mind what it references.  That

15  talks about eligibility requirements that's promulgated by the

16  union?

17  A.   Yes.

18  Q.   What is that?  Would you please tell His Honor and our

19  jury that.

20  A.   The board of player representatives of the NFLPA

21  decided -- and it's reflected in minutes from the meeting at

22  which they first decided to establish eligibility provisions

23  for players to -- to get the royalty payments from Players Inc.

24        And those rules were established by the board of

25  player reps and in writing in the minutes of the meeting.

1  Q.   And those eligibility requirements talk about players that

2  are going to receive monies from Players Inc.  That's the

3  37 percent, right?

4  A.   That's correct.

5  Q.   Those players, you say, only refer to active players,

6  right?

7  A.   That's correct.

8  Q.   So that the eligibility requirements or rules promulgated

9  by the union exclude retired players that have signed the GLAs

10  in the rules?

11  A.   That's right.

12  Q.   Okay.  Now, am I right in saying that there's nothing that

13  would have prevented the NFLPA from establishing eligibility

14  requirements that included the retired players?  Do you agree

15  with that?

16  A.   Yes, I do.

17  Q.   So they could have done it if they wanted to, but they

18  chose not to, right?

19  A.   That's right.

20  Q.   Thank you.

21       Now, I would like to turn to Trial Exhibit 28, which

22  is the -- oh, before -- I'm sorry.  Before I turn -- I was

23  going to return to Electronic Arts, but I'll get there in a

24  minute.

25       You never told the retired players, whether it was in

1  the group licensing or any other way, that they weren't

2  eligible under the rules promulgated by the union?  You never

3  told them that?

4  **A.**   Actually I did, often.

5  **Q.**   You did?  Where did you do that?

6  **A.**   When I described the circumstances of the involvement of

7  retired players with Players Inc at the retired players'

8  conventions that I attended and reported to the players at, and

9  at retired players' chapter meetings.

10 **Q.**   So you would tell thousands of retired players over the

11 years "you're not eligible, but sign this GLA anyway"?  Is that

12 what your testimony is?

13       Yes or no.

14 **A.**   Uhm, that's correct.

15 **Q.**   Do you have any correspondence, memoranda or other

16 document that happens to memorialize the fact that you did this

17 at all the conventions or meetings or whatever it is that

18 you're referring to?

19 **A.**   Uhm, I have no idea without checking the files.

20 **Q.**   Well, I can tell you, sir, that all relevant information,

21 I believe, was subpoenaed by the law firms representing the

22 plaintiffs.  And I, in good faith, have no knowledge of any

23 such document.  Do you?

24       **MR. KESSLER:**  Your Honor, I object.

25       **THE COURT:**  Is this a speech?

1              **MR. PARCHER:**  I don't mean it to be a speech.

2              **THE COURT:**  But, look --

3              **MR. PARCHER:**  Yes, sir.  I'll move on.

4              **THE COURT:**  You understand the problem.  You're not

5    under oath.  You're not a witness.

6              **MR. PARCHER:**  Yes, sir.

7              **THE COURT:**  What was produced in this case we're

8    not -- if we're going to get into that we're going to get into

9    it through proper witnesses.

10             **MR. PARCHER:**  Yes, sir.

11             **THE COURT:**  So lets --

12             **MR. PARCHER:**  Yes, sir.  I stand corrected.

13   BY MR. PARCHER:

14   **Q.**   As you sit here today, you know of no such document,

15   correct?

16   **A.**   I don't know whether there is or isn't.

17   **Q.**   Okay.  But as you sit here today you can't tell Judge

18   Alsup or anybody on the jury about such a document.  You don't

19   know if it exists or not?

20             **MR. KESSLER:**  Objection.  Argumentative.

21             **THE COURT:**  No, that's a fair point.

22             **THE WITNESS:**  No, I don't recall.

23   BY MR. PARCHER:

24   **Q.**   Wouldn't that be a pretty important point to tell these

25   retired fellows, your hopes and dreams for revenue from

1  royalties are in the GLA, but you're not eligible?  Would that

2  be something important that you'd remember?

3          **MR. KESSLER:**  Objection.  Compound and argumentative.

4          **THE COURT:**  Overruled.

5          **THE WITNESS:**  Yes.

6  **BY MR. PARCHER:**

7  **Q.**  But you still say you don't recall, right?

8  **A.**  I said I can't recall a specific document in which I could

9  point you to that that was stated.

10 **Q.**  Okay.

11 **A.**  I don't know whether there is or isn't.

12         **MR. PARCHER:**  Okay.  Turn our attention to the

13 Electronic Arts agreement, which is Exhibit 28.  I don't mean

14 to be presumptuous, but I assume I can just move that into

15 evidence?

16         **MR. KESSLER:**  Could you tell me what it is?

17         **MR. PARCHER:**  I said the Electronic Arts license

18 agreement.

19         **MR. KESSLER:**  No objection.

20         **MR. PARCHER:**  Which is Trial Exhibit 28.

21         (Trial Exhibit 28 was admitted into evidence.)

22 **BY MR. PARCHER:**

23 **Q.**  Turn to page 15.  Have you got it in front of you?

24 **A.**  Yes, I do.

25 **Q.**  Turn to page 15 for a minute.

1          That's your signature on page 15, signed as president

2    for National Football League Players Incorporated?

3    **A.**   Yes, it is.

4    **Q.**   And if you recognize it, the signature for Electronic Arts

5    is -- I can't read his --

6    **A.**   Joel Linzner.

7    **Q.**   Joel Linzner, who was what, the head of what?

8    **A.**   Senior vice president of business affairs.

9    **Q.**   At Electronic Arts --

10   **A.**   That's right.

11   **Q.**   -- during this time?

12   **A.**   Yes.

13   **Q.**   Now, look at the -- at the top of -- if you just don't

14   mind interchanging for a minute, go back to Trial Exhibit 110,

15   the GLA, retired players GLA.

16         **MR. PARCHER:**  Can we go back for just a minute?

17   **BY MR. PARCHER:**

18   **Q.**   You pointed this out yourself, didn't you?

19             Way up at the top so everybody can see it.

20             That document is headed "retired player group

21   licensing authorization form," correct?

22   **A.**   That's right.

23   **Q.**   Now, turn back your attention to the Trial Exhibit 28.  Do

24   you see anywhere in the heading of Trial Exhibit 28 where it

25   says this is an active player GLA licensing agreement?

1  **A.**   Do I see --

2  **Q.**   At the top?

3  **A.**   In the first paragraph?

4  **Q.**   No.  Excuse me.  We'll get to the first paragraph in a

5  minute.  I'm asking you to look at the heading.  This says

6  "licensing agreement."

7          It does not say "active player group licensing

8  agreement."

9          You agree with that, right?  Obviously, it speaks for

10 itself.

11 **A.**   Says "license agreement," I agree.

12 **Q.**   You didn't bother to reference the fact, so there would be

13 no ambiguity that this is only applying to actives or actives

14 and ad hocs, as you would say, correct?

15 **A.**   It is --

16 **Q.**   Just say "yes" or "no."

17 **A.**   I was just trying to understand the question.

18 **Q.**   The question is:  You didn't find it necessary to avoid

19 any ambiguity -- withdrawn.

20          In the retired players group licensing authorization

21 you found it necessary -- you're one of the persons who had a

22 lot of input into the document, right?

23          Correct?

24 **A.**   Yes.

25 **Q.**   You found it necessary -- I don't have the exact words,

1  it's set up on the screen -- to label it "retired group players

2  authorization agreement," or whatever the words were, but to

3  make it clear what you were referring to, right?

4  **A.**   Yes.

5  **Q.**   Okay.  You didn't find it necessary to do that in this

6  licensing agreement in the headnotes."  Just --

7  **A.**   That's correct.

8  **Q.**   Thank you.

9        Now, if you turn your attention to paragraph 1(a).

10 And I might add 1(b), both.  If you can do it.  If not, I'll

11 break it down into two questions.

12        Would you agree that paragraphs 1(a) and 1(b) are,

13 for all practical purposes, boilerplate language that the union

14 or that Players Inc asserts into the license.

15        These are not negotiated clauses, 1(a) and 1(b), 1(a)

16 and 2, correct?

17        If that's not a clear question, I'll ask it again.

18 Sounds like I muddled it up.

19 **A.**   I'm a little confused.

20 **Q.**   I'm sorry.  I'm sure -- I'm sure that I somehow garbled it

21 in the process.  I'll break it down.  I'm trying to do too much

22 at once.

23        Let's just go to 1(a) for just a minute, all right?

24 **A.**   Okay.

25 **Q.**   The language of 1(a) you -- "you" being Players Inc, "you"

1  being the union -- you're the author of that language, correct?

2  **A.**   That's correct.

3  **Q.**   This isn't language that Electronic Arts had any input

4  into.  This is just what you're saying to them, right?

5  **A.**   That's correct --

6  **Q.**   Thank you.

7  **A.**   -- in this paragraph.

8  **Q.**   Now, I'm referring to paragraph 1(a).

9         Okay.  Now, your answer would be the same

10 presumably -- correct me if I'm wrong -- about paragraph 2, the

11 so-called -- if we can get that up here for a minute,

12 underneath it.

13         (Document displayed.)

14         If we could get paragraph 2.  That's the same thing.

15 It's not a negotiated clause.  It's something that the union

16 writes into the license.

17 **A.**   That's not correct.

18 **Q.**   This is negotiated?

19 **A.**   Yes.

20 **Q.**   What part of the language was negotiated by

21 Electronic Arts?

22 **A.**   Well, among the things are the description of the -- for

23 example, are the description of what games are covered as

24 described herein --

25 **Q.**   Okay.

1  **A.**    -- by the license.

2  **Q.**   Okay.  I'll take it back.  I'll try to keep it -- I'll

3  make the question narrower.  I appreciate it, sir.  I wasn't

4  turning over to the other page.  For some reason I'm fixated on

5  the paragraph that begins paragraph 2.

6              You're quite correct.  It goes on.

7              My apologies.  Just give me just one minute, okay?

8              Okay.  Let's just go this far, all right?

9              I'm on 2 now, the granted license, subdivision (a).

10              "Upon the terms and conditions hereinafter set

11  forth, Players Inc hereby grants the licensee and licensee

12  hereby accepts the exclusive right, license and privilege of

13  utilizing the trademarks and names of Players Inc, which may be

14  amended from time to time by Players Inc and the names,

15  likenesses, including without limitation, numbers, pictures,

16  photographs, voices, facsimiles, signatures and/or biographical

17  information (hereinafter identified) of the NFL players

18  referenced in paragraph 1(a) above."

19              That's just strictly your language, right?

20  **A.**   Yes.

21  **Q.**   Okay.  Thank you.

22              Now, let's turn to attachment A.  Have you got it

23  there?  It's at the very, very back.  Here, I'll help you.

24              **MR. PARCHER:**  May I, Your Honor?

25              **THE COURT:**  Go ahead.

1          **THE WITNESS:**  I've got it.  It's right here.

2          **MR. PARCHER:**  Got it?

3          Can we put that on the board, please?

4          Thank you.

5          (Document displayed.)

6   **BY MR. PARCHER:**

7   **Q.**   This document -- it's your position, is it not, that this

8   document is strictly for active player -- strictly -- strictly

9   a form of an active player group licensing authorization; am I

10  correct about that?

11  **A.**   Yes, you are.

12  **Q.**   And I need to ask you a question before I get to my point.

13          When a dollar comes in to Players Inc from a

14  licensee, because of the utilization of six or more active or

15  retired players, but we'll limit it for a moment just to

16  actives.  We'll just limit it for the moment.

17          Players Inc takes the dollar, keeps a certain portion

18  of it.  Gives a certain portion over to the union.  And the

19  balance, for most of your tenure, 37 percent gets divided

20  equally amongst the players, right?

21  **A.**   Right.

22  **Q.**   Now, amongst those players, how many -- how many players?

23  1800 players?  I'm not holding you to the number.

24          Okay.  Go ahead.  Say what you wanted to say.

25  **A.**   I'm sorry.  I was starting to answer before you finished

1    the question.

2    **Q.**    Yeah.  And I said "1800."  And it might be a little more

3    or a little less.  I should have said I got that from other

4    documents.  But I'm sure it's a fluid --

5            **MR. KESSLER:**  Your Honor, I object.  I don't know

6    what this is.  It's not a question.

7            **THE COURT:**  Let's just ask a fresh question.

8            **MR. PARCHER:**  Whatever it is, it's not a joke.

9            **THE COURT:**  Well, you did get off into talking about

10   1800.  It was going on and on.  So let's just ask a fresh

11   question.

12           **MR. PARCHER:**  Yes, sir.  Yes, sir, I will.

13   **BY MR. PARCHER:**

14   **Q.**    Amongst the active players who signed group licensing

15   agreement, there are a number of active players whose names and

16   likenesses are never used by a particular licensee, correct?

17   **A.**    By a particular licensee, yes, that's correct.

18   **Q.**    So that there are times, whether it's the fellow who never

19   got into a game, or for whatever the reason is, there are a

20   number of men whose names and likenesses were not used in any

21   particular license.  That's true, right?

22   **A.**    That's right.

23   **Q.**    Right.  Nevertheless, when the union distributes the

24   37 percent, it distributes that 37 percent equally to every one

25   of the players, including the players who are actives whose

1  names and likenesses were never used, correct?

2  **A.**    Yes.

3  **Q.**    Now, would you agree that the decision to do that --

4  withdrawn.

5         Would you agree -- agree that there is no reference

6  in this attachment A, part of Trial Exhibit 28, to sharing the

7  money equally -- share and share alike -- between actives,

8  whether they're used or not used?

9         Yes or no?

10  **A.**    In which document?  I was confused.

11  **Q.**    Oh, attachment A.

12  **A.**    Attachment A?

13  **Q.**    Wait a minute.  I'm calling it "attachment A."  We're

14  clear what we're talking about.  We're talking about an active

15  group player license authorization.  You understand that,

16  right, sir?

17  **A.**    Yes.

18  **Q.**    And attachment A is simply -- it's not clear on the board

19  up there but attachment A, if we can make it so everybody can

20  see it -- there you go.

21         Attachment A is simply an example of a group license

22  authorization form that's for actives, right?

23  **A.**    That's right.

24  **Q.**    Right.  And I'm saying to you, would you agree with me,

25  that nowhere in this document does it say that when money comes

1  in from licensing it will be shared not only with the active

2  players whose names and licenses are used, but with the active

3  players whose names and likenesses are not used?

4          It doesn't appear there?

5  **A.**   That's correct.

6  **Q.**   So this is a decision -- whether it's correct or

7  incorrect, arbitrary or not -- this is a decision that's made

8  unilaterally by the -- by the union and Players Inc in

9  determining what it wants to do with the money.

10          Yes or no?

11 **A.**   The decision is made by the NFL Players Association board

12 of player representatives, the governing body.

13 **Q.**   Yes, but it's not an obligation.  It's decision on your

14 part.  And you and Mr. Upshaw -- correct me if I'm wrong,

15 you're the engines of these organizations, right?  You are the

16 leaders.  You're the trusted servants.

17          **MR. KESSLER:**  I would object to the compound form of

18 that question.

19          **MR. PARCHER:**  Yes.

20 **BY MR. PARCHER:**

21 **Q.**   You're the leaders, are you not?

22 **A.**   Is the question whether we are the leaders?

23 **Q.**   Yes.

24 **A.**   Yes, that was true.

25 **Q.**   Thank you.

1          You're also the trusted servants, if I might say, the

2    person that everybody looks to, correct?

3    **A.**   Sure.

4    **Q.**   If they're part of it.

5    **A.**   Sure.

6    **Q.**   These men, whether they're actives or retireds, they don't

7    show up with lawyers, do they, and start negotiating with you

8    with respect to that -- with respect to whether all the actives

9    get it or just the actives whose names and likenesses were

10   actually used?

11   **A.**   The decision of the governing body.  They have advice of

12   counsel, and they make -- they make many decisions.

13   **Q.**   The "advice of counsel" is the union's counsel, right?

14   **A.**   Yes.

15   **Q.**   And the advice of counsel is after consultation with you

16   and, of course, at the time, Mr. Upshaw, correct?

17   **A.**   Certainly.

18   **Q.**   And yet, you make the unilateral decision, notwithstanding

19   Trial Exhibit 110, the retired players GLA, that not one penny

20   of that money will be shared with them, because their name or

21   likeness wasn't used.  Am I correct?

22          **MR. KESSLER:**  I object, Your Honor.  It's pure

23   argument.  It's not even a question.

24          **THE COURT:**  Overruled.

25          Please answer.

 1          **THE WITNESS:**  I'm sorry.  It was at the end of the

 2   question, and I couldn't get the whole question.  I apologize

 3   for that.

 4   **BY MR. PARCHER:**

 5   **Q.**   You don't have to apologize.  You don't have to.  It could

 6   just as easily be me as you.  Believe me.  I've gotten that

 7   message.

 8          **MR. PARCHER:**  Would you mind reading it back so that

 9   I don't garble it up?

10          (The question was read by the reporter as follows:)

11          **"QUESTION:**  And yet, you make the unilateral

12          decision, notwithstanding Trial Exhibit 110,

13          the retired players GLA, that not one penny

14          of that money will be shared with them,

15          because their name or likeness wasn't used.

16          Am I correct?"

17   **BY MR. PARCHER:**

18   **Q.**   Yes or no, sir?

19   **A.**   If you mean by "you," you don't mean me, you mean the

20   board of player reps.

21   **Q.**   The what?

22   **A.**   The board of player reps.  The governing body of the

23   National Football League Players Association, the board of

24   directors.

25   **Q.**   You keep -- I want to ask you something about that.  I

1  meant the union and Players Inc.  But I want to ask you a

2  question about that.

3          This is -- several times during the course of this

4  cross-examination you've sought to distance yourself from the

5  decision of the board of player representatives, have you not?

6  **A.**    No.

7  **Q.**    These board of player representatives are advised by you,

8  are they not?

9  **A.**    Sure.

10 **Q.**    And they're advised by your -- "your" being the union's --

11 lawyer; are they not?

12 **A.**    Yes.

13 **Q.**    So they're not men who show up with the best trial lawyer

14 from San Francisco and say, okay, this is what you want to do;

15 let's have a discussion.  They're relying on you -- "you" being

16 you and Mr. Upshaw and your general counsel, correct?

17 **A.**    Certainly.

18 **Q.**    Thank you.

19         Now, this attachment A, the active group licensing

20 authorization, not only does it say that the money that comes

21 in should be shared equally with the actives, but it also --

22 whether they're used or not -- but it doesn't say "don't share

23 it with the retireds," either, does it?

24 **A.**    No.

25 **Q.**    So regardless of fame or fortune, interest or lack of

1  interest, whoever you are if you're an active you get a

2  share -- you get a share of the revenue, right?

3  **A.**   If you meet the eligibility rules.

4  **Q.**   Well, the eligibility requirement -- we could go back and

5  look at it, but I don't want to take the time -- is not a very

6  big hurdle for most of the -- most of the men are eligible if

7  they've been playing for the team for a period of time, right?

8  **A.**   I just meant it doesn't cover every single active player.

9  **Q.**   Okay.  But 98 percent of them, 99 percent of them?

10  **A.**   I would have to do the math.  I don't know.

11  **Q.**   The vast majority of them?

12  **A.**   That's fair.

13  **Q.**   Right.  Okay.  Now, can I just ask you something?

14  **A.**   Sure.

15  **Q.**   Did it ever occur to you that you might have a conflict of

16  interest representing the retireds in trying to get them

17  licenses and the actives in trying to get them licenses, from

18  time to time?  Did that ever occur to you?

19  **A.**   No.  I don't believe that's the case.

20  **Q.**   So you walk up to somebody and you say:

21          "I'm desperate.  I'm desperate for you to take

22  some of these retireds.  Come on, you know.  I've been giving

23  you exclusive licenses for years.  I want you to take some of

24  these retireds so that they can make some dough, too."

25          Immediately, if you say that to them, if they put

1   them in you're taking money away from the actives, aren't you?

2   **A.**    Uhm, I'm not understanding the question.

3   **Q.**    Electronic Arts, it doesn't have to be Electronic Arts.

4   Could be anybody.  I don't know why I'm focused on

5   Electronic Arts, you know.

6           A licensee, you go up to the licensee and you say:

7               "Take a license.  I got a ton of guys, 1800 or

8   so actives, 2,000 or so retireds."

9           And they say to you:

10              "Ah, we prefer the actives to the retireds,"

11  right?

12  **A.**    Yes.

13          **MR. KESSLER:**  Your Honor, I would object to

14  hypothetical questions as opposed to facts that actually

15  happened.  He's not an expert witness.

16          **THE COURT:**  Well, this is going to your argument

17  about conflict of interest.

18          **MR. PARCHER:**  Yes, sir.

19          **THE COURT:**  Well, but the witness said he hadn't

20  considered any.  So why isn't this just argument?

21          **MR. PARCHER:**  Because I believe, sir, under

22  cross-examination I'm entitled to probe the credibility of that

23  answer and whether it's credible at the end of the day that he

24  never considered it.  Or, more importantly, whether he has one

25  or not, i.e., a conflict.

1           Could I have just a little more latitude, please?

2           **THE COURT:**  All right.  Go ahead.

3           **MR. PARCHER:**  Thank you.

4    **BY MR. PARCHER:**

5    **Q.**   I know according to your position -- understand, it's not

6    ours -- but according to your position no money ever came in

7    for the retired players on a group licensing situation, right?

8    **A.**   You mean, other than ad hoc?

9    **Q.**   Ad hoc is not what we're talking about.

10   **A.**   I'm only asking, sir.

11          That's correct.

12   **Q.**   Right.  But if it had, then it would have to be divided

13   between the retireds and the actives, right?

14   **A.**   No.

15   **Q.**   They keep it all to themselves?

16   **A.**   It would be divided among the retired players.

17   **Q.**   Not a penny would go to the actives?

18   **A.**   No.

19   **Q.**   Let's go back to Trial Exhibit 110.  Let's go back to -- I

20   think it's paragraph 5.  It's not numbered, but I think it's

21   the fifth paragraph.

22          (Document displayed.)

23          That paragraph says:

24              "It is further understood that the monies

25   generated by such licensing of retired player group rights will

1   be divided between the player, and an escrow account for all

2   eligible NFLPA members who have signed the group licensing

3   authorization form."

4           We've established that no retired player is an

5   eligible player under the rules and regulations.

6           **MR. KESSLER:**  Objection, Your Honor.  Misstates the

7   testimony of this witness today.

8           **THE COURT:**  Well, I think that's correct.  I think --

9   I'm not sure that that's correct.  So let's ask the witness

10  again.  Maybe it is correct.

11          Let's ask him if eligible NFLPA members, as used in

12  that agreement, refer to retired active or both.

13          **THE WITNESS:**  Uhm, eligible NFLPA members referred to

14  in this document refers to retired players only.

15  **BY MR. PARCHER:**

16  **Q.**   Where does it say that?  You -- excuse me.  Withdrawn.

17          You're coming to this court and you're saying that's

18  what it was.  Did you -- where does it say that in there so we

19  can read it in plain English language, without a Ph.D. from

20  Berkeley?  Where could we see that?

21  **A.**   At the top, where it says, "Retired Player Group Licensing

22  Authorization Form."  This is about retired players.

23  **Q.**   So when you use the word "eligible" here, you mean it

24  completely differently than the word "eligible" when you made

25  your rules and regulations as directed by the licensing

1  agreement between Players Association and Players Inc; is that

2  what you're telling this court and this jury?

3  **A.**   Yes, because --

4  **Q.**   I don't need to hear the "because."

5          That's what you're telling this jury, that when you

6  were directed under the agreement that you and Mr. Upshaw

7  negotiated with you and Mr. Upshaw, to form eligibility

8  requirements, and you excluded the retired players, you were

9  not meaning for anybody reading this group licensing

10  authorization to think that an eligible NFLPA member who signed

11  a group licensing authorization form would be sharing -- would

12  be sharing in this; is that what you're saying?

13  **A.**   Yes, sir, it is.

14  **Q.**   In other words, "eligible" means this on the left,

15  "eligible" means that on the right.  Is that what your position

16  is?

17  **A.**   I'm not -- I don't understand the context of that

18  question.

19  **Q.**   Well, the context of the question is:  Isn't that a little

20  bit of -- trying to pick my word carefully here.

21          **THE COURT:**  Mr. Parcher, he's acknowledged that he

22  has two different meanings in the two different contexts, or

23  the two contexts, whether they are different on not.  But to

24  say "the left" and "the right," that's just gilding the lily in

25  argument, so --

1          **MR. PARCHER:**  Okay.

2          **THE COURT:**  That is --

3          **MR. PARCHER:**  When I say "okay" I don't mean any

4   disrespect.

5          **THE COURT:**  You can stick with this, but please don't

6   use those kind of argumentative questions.

7          **MR. PARCHER:**  Yes, sir.  Yes, Your Honor.

8   **BY MR. PARCHER:**

9   **Q.**  So let me understand something.  According to your -- by

10  the way, you never sat down with the retired players and

11  explained the meaning of this document to them, did you, line

12  by line, word by word, thought by thought?

13  **A.**  Uhm, not in that way.

14  **Q.**  And you never told the players, the retired players in

15  this document, what percentage of monies they would be getting

16  other than in this paragraph, right, where you don't refer to

17  percentages?

18  **A.**  Because there wasn't any money.  That's correct.

19  **Q.**  No.  You didn't know there wasn't going to be any money

20  when you drew paragraph 5 up, did you?

21  **A.**  Well --

22  **Q.**  Did you?

23  **A.**  No.

24  **Q.**  As a matter of fact, from 1994 to 2007, every single year

25  of your life you thought there was going to be money because

1  you kept chasing these guys down saying, "Please keep signing

2  these GLAs, it's important," right?

3  **A.**    We -- we encouraged players to sign them on a regular

4  basis.

5  **Q.**    Yes, sir.

6          So a dollar comes in from whomever, it doesn't

7  matter, a licensing dollar, gross revenue of a dollar comes in.

8  Three active players -- excuse me -- five active players, and,

9  he should be so lucky, one retired player are the group that

10  was licensed.

11         What happens to the dollar?

12  **A.**    In the case you just described, that would be -- that

13  would be shared by all of the players.  And it wouldn't be

14  retained by Players Inc.

15  **Q.**    In other words, the Players Inc would take no commissions

16  at all, right?

17  **A.**    If it's a 35 or fewer program, the royalties would be paid

18  directly to the players.

19  **Q.**    Make it 36, 38.  I don't know the technical rules of the

20  company.  Make it some number that doesn't have some technical

21  rule that makes the answer to my question different.

22  **A.**    Okay.

23  **Q.**    40 guys.  I don't know the number, please.  40 guys and

24  one retired.  What happens to the money?

25  **A.**    Those would be ad hoc arrangements, and the retired player

1  would keep the money that was paid to the retired player.

2  **Q.**    Excuse me.  Not an ad hoc agent, so then we'll say three

3  retired players.

4  **A.**    Those retired players would keep all of the money paid to

5  them.

6  **Q.**    Because you say they would be ad hocs, they wouldn't be

7  part of a group?

8  **A.**    That's right.

9  **Q.**    So that -- go back to the second paragraph, please.

10             (Document displayed.)

11             So that notwithstanding the fact that group licensing

12  programs are defined as programs in which a licensee utilizes a

13  total of six or more present or former NFL player images in

14  conjunction, so on and so forth, you say that in a situation

15  where the actives and the retireds are combined, they're ad

16  hocs?  Is that your position.

17  **A.**    The retireds, yes.

18  **Q.**    Okay.  When I say "okay," sir, I mean, I hear what you

19  say.

20             Now, do you take the position that you -- and "you"

21  is the defendants -- used your best efforts, did everything you

22  could to market and license the retired players who signed

23  GLAs?

24  **A.**    Yes.

25  **Q.**    Uh-huh.  As we sit here today, can you show the Court and

1  the jury one single marketing plan, one single written

2  marketing plan to market retired players?  Just say can you?

3  **A.**    Yes.

4  **Q.**    Okay.  Tell us about it.

5  **A.**    There were, uhm, any number of presentations made to

6  licensees about retired players.

7  **Q.**    Excuse me.  I didn't ask you that.  I'm being very clear.

8  You're a marketing and licensing person, aren't you?

9  **A.**    Yes.

10 **Q.**    That's your expertise.

11 **A.**    Yes.

12 **Q.**    Am I correct?  Am I saying it right?  I don't want to be

13 too much.  I don't want to be too little here.

14 **A.**    That's part of my experience, yes.

15 **Q.**    Right.  Well, it's a considerable part of your experience,

16 no?

17 **A.**    Yes.

18 **Q.**    It's an important part of your experience, no?

19 **A.**    Right.

20 **Q.**    Right.  You know what a marketing plan is, don't you?

21         I understand you take the position that when you saw

22 a licensee you asked him to take retireds.  That's your

23 position, right?

24 **A.**    Yes.

25 **Q.**    Now, you come back in the first year, everybody said "no."

1  Not to gild the lily, for 16 years they said "no."

2          Did you ever prepare a marketing plan:

3              "Okay, guys."

4          How many people are in the marketing department when

5  you were there?  I'm not holding you to the exact number.  You

6  don't have to --

7  **A.**    Six, seven.

8  **Q.**    Seven?

9  **A.**    Six.

10 **Q.**    Six or seven.  It's okay.  It's okay.  A number of people,

11 right?

12 **A.**    Yes.

13 **Q.**    Did you ever come back and say:  "Let's have a marketing

14 plan"?

15         They're saying "no."  They're saying "no."

16         Maybe if they had a video of Herb Adderley doing

17 something great, maybe if they saw Clifton playing wide

18 receiver, and so on down the line -- I'm singling them out

19 because they're here testifying.

20             "Let's get a marketing plan going."

21         Withdrawn.

22         Let's just take an assumption.

23     **MR. KESSLER:**  Your Honor, I would move to strike.  He

24 made a speech, and then he withdrew it.

25     **MR. PARCHER:**  Then, let's stick with it.  Let's stick

 1  with it.

 2          THE COURT:  Go ahead.

 3  BY MR. PARCHER:

 4  Q.   You know what a marketing plan is, right?

 5  A.   I do.

 6  Q.   Okay.  You produced a marketing plan for anyone in the 16

 7  years, one that says:

 8              "We're in trouble.  Let's try this.  Let's do

 9  that.  Let's pitch it this way.  Let's make a video.  Let's

10  something"?

11  A.   We made a video.

12  Q.   Excuse me.  Can you produce a marketing plan?

13  A.   The marketing retired players was built into the fabric of

14  everything we did as a company, including --

15  Q.   Excuse me.

16  A.   I'm not finished with my answer.

17          MR. PARCHER:  I move to strike.  I move to strike.

18  The witness can't just arbitrarily --

19          THE COURT:  You are -- he's sitting up there right

20  now.  He didn't bring a briefcase.  He didn't bring a pile of

21  documents.  It's unfair to ask him can he produce a marketing

22  plan.

23          So you can ask him can he describe one?  Was one ever

24  written up?  Those would be fair questions.

25          But to ask him to produce something cold like this.

1   You didn't subpoena this from him, and he doesn't even work at

2   the company anymore.  I think that's an unfair question.

3         You have a fair point you're trying to get at, so you

4   should go about it with less ambiguous questions, like:

5           "Can you describe any marketing plan that was

6   directed toward the GLA for retired players?"

7         That would be a very fair question.

8        **MR. PARCHER:**  I would like to call upon this court to

9   direct this witness -- apparently, we're not going to be

10   finished today.  I don't say it arbitrarily, but apparently

11   we're not.

12        **THE COURT:**  He doesn't work for the company.

13        **MR. PARCHER:**  But he's under Your Honor's aegis right

14   now, and I assure you --

15   **BY MR. PARCHER:**

16   **Q.**  How many hours did you spend, if at all, with Mr. Kessler

17   last night?

18        **MR. KESSLER:**  Your Honor, I would object.

19        **THE COURT:**  That's fair.  That's fair.  Goes to bias.

20   That's a legitimate question.

21        Please answer.

22        **THE WITNESS:**  Maybe four.

23   **BY MR. PARCHER:**

24   **Q.**  Maybe four?

25   **A.**  (Nods head.)

1  Q.   Did he twist your arm to do it?

2           MR. KESSLER:   Your Honor, I object to that question.

3           THE WITNESS:   Did he twist my arm to do what?

4  BY MR. PARCHER:

5  Q.   To meet with him for four hours.  You got a lot of

6  valuable time with the Screen Actors Guild and all.

7           Did you have to be pressed to spend four hours with

8  counsel?

9  A.   Uhm, that's probably a fair description.

10 Q.   You were pressed?

11 A.   Yes.

12 Q.   Right.  I'm asking you --

13 A.   In terms of my time.  My time is particularly tight right

14 now, so that the amount of time that was allocated was a

15 significant issue for me.

16 Q.   Yes.  I understand that.  I respect that.

17          The point that I'm trying to make is, you're capable,

18 if you wish, even though you're not with the company anymore,

19 of getting somebody in the company to give you the courtesy of

20 allowing you to receive the marketing plans that you say were

21 prepared and bring them with you next time you're -- next time

22 you come to court.

23          Can you do that?

24 A.   Uhm, I have no idea.  I don't work there anymore.

25 Q.   Wait a minute.  I know you don't work there anymore.

1          **MR. KESSLER:**  Your Honor, I object to this line.

2          **MR. PARCHER:**  Withdrawn.

3  **BY MR. PARCHER:**

4  **Q.**   That was Judge Alsup's point.  I'm making a different

5  point.  You don't have enemies there, do you?

6  **A.**   I have no idea.

7  **Q.**   Really?

8  **A.**   How can I answer that?

9          **THE COURT:**  This is not a legitimate line of

10  questions.  This witness does not work for the company anymore.

11          What counsel wants me to do is order him to go back

12  to the company -- where is the company located?

13          **MR. KESSLER:**  In Washington, D.C.

14          **THE COURT:**  Washington, D.C.  Go there, go through

15  old files and see if he can find marketing plans.

16          **MR. PARCHER:**  No.

17          **THE COURT:**  They may or may not exist.  What Counsel

18  is trying to show is that they never existed and they can't

19  produce them.

20          I don't know if that's true or not, but as a

21  concession to the shortness of life --

22          (Laughter)

23          **THE COURT:**  -- litigation has got to come to end at

24  some pont, and there's no way the Court is going to order this

25  witness to do that.

1          **MR. PARCHER:**  Okay.

2          **THE COURT:**  This is out of line, Counsel.

3          **MR. PARCHER:**  I'm sorry.  I didn't hear that.

4          **THE COURT:**  This is out of line.

5          **MR. PARCHER:**  Line.

6          **THE COURT:**  Stick to something -- we're taking up the

7   time of ten people here.

8          **MR. PARCHER:**  I believe that I'm doing that in good

9   faith here to make my point.

10         **THE COURT:**  You're going to get me upset.  I am

11  sorry.  I apologize to you.  Stick to something this witness

12  can answer as opposed to would he go back to Washington,

13  D.C. --

14         **MR. PARCHER:**  No, no.

15         **THE COURT:**  -- when he's employed by somebody else,

16  and start sifting through old documents.

17         **MR. PARCHER:**  Right.  Most respectfully -- I know

18  Your Honor is annoyed at me.  Most respectfully, I'm not asking

19  him to go back to Washington, D.C.

20         I'm asking him, by the sake of Mr. Kessler, to pick

21  up the telephone.

22         **THE COURT:**  The answer is no.  The answer is no.  And

23  the jury is going it disregard this whole line.

24         That is way out of line.

25         **MR. PARCHER:**  Okay.

 1          **THE COURT:**  We're not going to ask this witness to go

 2     do that.  He's here to give his testimony under oath at your

 3     request.  I ordered him to be here.

 4          **MR. PARCHER:**  Yes, sir.

 5          **THE COURT:**  For you.

 6          **MR. PARCHER:**  Yes, sir.

 7          **THE COURT:**  So just take advantage of the answer that

 8     he can give under oath from personal knowledge.

 9          **MR. PARCHER:**  Okay.

10          **THE COURT:**  I'm going to bring this to an end if you

11     don't hurry up and start asking questions.

12          **MR. PARCHER:**  Yes, sir.

13          **THE COURT:**  All right.  Come to your next question.

14          **MR. PARCHER:**  Yes, sir.

15     BY MR. PARCHER:

16     **Q.**  I'd like to read to you a series of questions and answers

17     that were put to Mr. Upshaw under oath in his deposition some

18     time ago.  It was several months ago.  I don't remember when it

19     was.

20          **MR. KESSLER:**  Your Honor, I object.  I don't think

21     this is appropriate use of deposition.

22          **THE COURT:**  It's appropriate.  It was a party

23     admission -- party deposition.  It can be used for any purpose.

24          Read it exactly.  Give us page and line.

25          **MR. PARCHER:**  Okay.  This is page 99, line 7.

1            **THE COURT:**  Any objection?

2            **MR. PARCHER:**  I'm just going to read the deposition

3    page, Your Honor.

4            Does Your Honor have his own copy?

5            **THE COURT:**  No.  You didn't give it to me yet.  If

6    you think I need it, you should give it to me.

7            **MR. PARCHER:**  I just think you should know what we're

8    talking about.  I assume Your Honor wants it.

9            **THE COURT:**  If there's an objection, I've got to rule

10   on it.  So far there's no objection.

11           **THE CLERK:**  Thanks.

12           **THE COURT:**  All right.  Page 99?

13           **MR. PARCHER:**  Yes, sir.

14           **THE COURT:**  What's the line number?

15           **MR. PARCHER:**  Line 7.

16           **THE COURT:**  Through?  Line 15, is that what you want

17   to read?

18           **MR. PARCHER:**  Yes.  I would actually like to start --

19   you have the whole transcript.  Is that it, Judge?

20           **THE COURT:**  I do.

21           **MR. PARCHER:**  I would like to start on page 98, line

22   10.  I'm not going to read everything.  Some of it.  It's the

23   Upshaw deposition.

24           **THE COURT:**  All right.  The Court is going to allow

25   you to do this.

1          Is there an objection?

2          **MR. KESSLER:**  There is going to be errata, Your

3  Honor.  There was a correction to this, Your Honor.  If he

4  reads line 15, he should read the corrected version.

5          **MR. PARCHER:**  Mr. Kessler, I intend to read the

6  original answer and then the corrected version.

7          **THE COURT:**  All right.  Read both, and I'll explain.

8          Remember I told you about depositions?  Well,

9  Mr. Upshaw was also deposed on February of this year, and he

10  gave the following answers and testimony in part.  Then, he had

11  the opportunity to do a correction, and he did.  But both can

12  be laid before the jury to assess the testimony.

13          Then, presumably this is going to be foundation for

14  some subsequent question with this witness.  But this is okay.

15  You can do this.

16          Go ahead.

17  **BY MR. PARCHER:**

18  **Q.**   I'm asking you whether you -- going to ask you whether you

19  believe these answers are accurate and conform to your

20  understanding of the situation.  Just bear with me and you'll

21  see what I mean.

22          **MR. KESSLER:**  Well, Your Honor, I might have an

23  objection to that question, because I think this is -- we don't

24  know the witness has a foundation to know.  There's a lot he

25  proposes to read.

 1          **MR. PARCHER:**  Okay.  I will find out.  I'll read it

 2    first.

 3          **THE COURT:**  This is a short enough segment that this

 4    is a fair question.  I read it myself.  If the witness doesn't

 5    believe -- it's up to him to decide and up to the jury to

 6    evaluate the witness's answer on that.

 7          **MR. PARCHER:**  Yes, sir.

 8          **THE COURT:**  I want you to read it exactly, warts and

 9    all.  Any mistakes in this transcript they stick in the

10    transcript.

11          **MR. PARCHER:**  Of course.

12          **THE COURT:**  Go ahead.

13          **MR. PARCHER:**  Right.  So this is on page 98, line 10.

14          **"QUESTION:**  Okay.

15          It's by our side questioning Mr. Upshaw.

16          **"QUESTION:**  Okay.  And do you make efforts to

17          get the licensees to designate retired

18          players?

19          **"ANSWER:**  It's up to the licensee.  It's

20          their business.  They determine what's best

21          for their business.  We have no input

22          whatsoever in telling them who they should

23          use and who they should not use.  They have

24          their own company.  We just facilitate as

25          much as we possibly can to help.

1          **"QUESTION:** But you don't make any

2          affirmative efforts to sell them the images

3          of retired players as a group or

4          individually?

5          **"ANSWER:** I don't run any licensees' company.

6          That's up to them."

7  **BY MR. PARCHER:**

8  **Q.** Was Mr. Upshaw accurate in his statement in his

9  deposition, yes or no?

10 **A.** I couldn't understand the word you said before "that's up

11 to them," the last part.

12 **Q.** Oh?

13 **A.** You were pretty close to the microphone.

14 **Q.** Wait a minute.

15          **THE COURT:** I'll read it.

16          **"ANSWER:** I don't run any licenses" --

17          **MR. PARCHER:** "Licensees."

18          **THE COURT:** -- "licensees' company. That's up to

19 them."

20          That was the answer given by Mr. Upshaw.

21          Now, was any part of that in the errata?

22          **MR. KESSLER:** No.

23          **MR. PARCHER:** No.

24          **THE COURT:** The question is: Do you agree with

25 what -- the testimony given by Mr. Upshaw as read just now?

1          THE WITNESS:  Yes.

2          MR. PARCHER:  Now, on page 99, if Your Honor pleases,

3    line 7:

4          "QUESTION:  And do you make any efforts with

5          respect to selling the images of retired

6          players to companies that request -- that

7          make requests for NFL player services?

8          "ANSWER:  If they're making a request it's

9          pretty much sold.

10         "QUESTION:  Right.  But do you make efforts

11         to sell that prior to them making a request?"

12         Now, here is a correction.  First, I'm going to read

13   you what Mr. Upshaw said at the deposition.  And then, sometime

14   later -- it's not dated, but sometime later these corrections

15   were made.

16         They certainly weren't made at the deposition.  I'm

17   reading it again.

18         This is from line 11 -- line 33.

19         "QUESTION:  Right.  But do you make efforts

20         to sell that prior to them making a request?

21         "ANSWER:  Not really."

22         Then, time went by.  The deposition was sent to

23   counsel, made available to Mr. Upshaw --

24         THE COURT:  Just read the errata.

25         MR. PARCHER:  And then the errata said -- crossing

1   out "not really," it said:

2           "If they make a request there is no need to

3           make an effort, so no, not really."

4   **BY MR. PARCHER::**

5   **Q.**  Do you agree with that?

6   **A.**  As --

7           **THE COURT:**  Well, is your question does he agree with

8   everything or just that last part?

9           **MR. PARCHER:**  Everything there was said there.

10          **THE COURT:**  All right.  Well --

11          **MR. KESSLER:**  I think it would be helpful, Your

12  Honor, if the witness had a copy of the deposition, and maybe

13  questions to be directed to specific lines.  There's a lot of

14  material being put in here.

15          **THE COURT:**  Well, I'm going to let you reread it,

16  just this passage.  And then, if the witness thinks -- the

17  witness can read my copy.

18          **MR. PARCHER:**  I'm sure we have an extra copy for,

19  Your Honor.  That doesn't feel right.

20          **MR. KESSLER:**  Your Honor, I can hand up my copy.

21          **THE COURT:**  I know what it says.

22          Go ahead.  Read it again.

23          **MR. PARCHER:**  Just this last --

24          **THE COURT:**  No, the whole last, second segment, about

25  half a page.

 1              **MR. PARCHER:**  Okay.  I'm sorry.  I'm just asking

 2     where you're asking me to read.

 3              **THE COURT:**  It was the second set of questions and

 4     answers.

 5              **MR. PARCHER:**  Yeah.  I think it's just -- you want to

 6     go --

 7              **MR. HUMMEL:**  Line 7.

 8              **THE COURT:**  To the top of page 9.

 9              **MR. PARCHER:**  Oh, sure.  Thanks.  So we're on 99,

10     line 7:

11              **"QUESTION:**  And do you make any efforts with

12              respect to selling images of retired players

13              to companies that request -- that make

14              requests for NFL player services?

15              **"ANSWER:**  If they make a request it's pretty

16              much sold.

17              **"QUESTION:**  Right.  But do you make efforts

18              to sell that prior to them making requests?

19              **"ANSWER:**  Not really."

20     BY MR. PARCHER::

21     Q.   Do you see that?

22     A.   Yes.

23     Q.   Okay.  Stop there.

24              Did you agree with that?

25     A.   No.

1    **Q.**   Then, after the deposition it gets sent to the lawyers, it

2    changes -- by the way, is that Mr. Upshaw's handwriting, do you

3    know?

4    **A.**   Where?

5            **MR. KESSLER:**  Objection, Your Honor.  This was done

6    by counsel on both sides.  He knows that Mr. Upshaw has nothing

7    to do with doing that.

8            **MR. PARCHER:**  I know no such thing.  Maybe someone

9    else --

10           **THE WITNESS:**  There is no --

11           **THE COURT:**  Did Mr. Upshaw sign it?  Did he sign it?

12           **MR. KESSLER:**  Yes, Your Honor, he signed it.

13           **THE COURT:**  If he signed it, I'm going to sustain the

14   objection, then.  It doesn't matter who wrote it.  What matters

15   is did he sign it.

16           **MR. PARCHER:**  Okay.  I just want to check --

17           **THE WITNESS:**  There's no handwriting on my copy.

18           **MR. PARCHER:**  I don't have any -- are you

19   representing -- may I ask, inquire?

20           **THE COURT:**  No.

21           **MR. PARCHER:**  Is that a representation that he signed

22   it?  Because I don't have it on mine.

23           **MR. KESSLER:**  Yes, there's a representation of

24   signing the errata (indicating).

25           **THE COURT:**  All right.  Then forget about whose

1   handwriting it is.

2           **MR. PARCHER:**  Fine.  That's okay.  Yes, sir, right.

3           And then, the answer is changed to read:

4           **"QUESTION:**  If they make a request, there is

5           no need to make an effort, so not really."

6   BY MR. PARCHER:

7   **Q.**   Do you agree with that?

8   **A.**   Not entirely.

9   **Q.**   Now --

10          **THE COURT:**  Now, we're not going to do this.  I

11  thought you had just a short segment.

12          **MR. PARCHER:**  That's it.

13          **THE COURT:**  We're not going to go through his

14  deposition.

15          **MR. PARCHER:**  That's it.

16          **THE COURT:**  And flyspeck it to see how much of it

17  this witness agrees with.

18          Are you done with the deposition?

19          **MR. PARCHER:**  Yes.

20          **THE COURT:**  All right.

21          New question.

22          **MR. PARCHER:**  Just bear with me one minute, Your

23  Honor.  I just said "yes," and I want to make sure I meant it.

24  Okay.

25

1  **BY MR. PARCHER:**

2  **Q.**   Now, am I correct in saying that your position and

3  Mr. Upshaw's position with the union and Players Inc depends

4  upon the support of the players, right?

5  **A.**   Yes.

6  **Q.**   In other words, these are my words, but you work for them?

7  **A.**   Well, we certainly worked on their behalf.  I reported to

8  Mr. Upshaw.

9  **Q.**   Right.

10  **A.**   He reported to the governing body of the union board of

11  player reps.

12  **Q.**   Now, the active players who signed GLAs they get to vote,

13  right?

14  **A.**   That's correct.

15  **Q.**   And if the active players were to vote that they didn't

16  want you or Mr. Upshaw to run their organization anymore, you

17  would be out, right?

18  **A.**   That's correct.

19  **Q.**   The retired players have no vote, right?

20  **A.**   That's correct.

21  **Q.**   And so whether they like what you're doing or not like

22  what you're doing, whether they think you're fair or unfair,

23  whether they think you're helping them or hurting them, they've

24  got no say.  You're there, right?

25  **A.**   They don't vote on that.

1   **Q.**   They have no say.

2   **A.**   No, that's not correct.

3   **Q.**   They can speak, but they can't vote.  They can't decide.

4   Let's put it that way.

5   **A.**   That is correct.

6   **Q.**   Do you think that once you got these retired players to

7   sign the GLA, and got yourself your critical mass, did you

8   think that it was okay to just take it and put it in the

9   drawer, the GLA, forget about it?

10  **A.**   We didn't get the critical mass.  We never achieved that.

11  That was the point.

12  **Q.**   Once you got them to sign it, did you think it was okay to

13  just stick it in the drawer?

14  **A.**   I don't know what you mean by that.

15  **Q.**   You don't know what I mean by sticking it in the drawer?

16  Take it, put it in the drawer, never look at it again.  Okay.

17  I got it.  That's done.  Next.

18  **A.**   I don't know what that means, and that's not what

19  happened.

20         **MR. PARCHER:**  May I read from page 155 of

21  Mr. Allen's deposition?

22         **THE COURT:**  Why are you doing this?

23         **MR. PARCHER:**  Stick it in the drawer.

24         **THE COURT:**  Let me see the deposition, please.

25         **MR. PARCHER:**  I'll hand it up to you.  Here.  Yes.

1          THE COURT:  May I borrow this back?

2          Just a moment.

3          155 --

4          MR. PARCHER:  Lines 11 through 16.

5          MR. KESSLER:  Your Honor, it's not proper

6    impeachment.

7          MR. PARCHER:  I said "Mr. Allen's deposition."

8          THE COURT:  155 what?

9          MR. PARCHER:  You've got Mr. Allen's deposition,

10   right, Your Honor?

11         THE COURT:  No.  I've got Gene Upshaw's.

12         MR. PARCHER:  No, no.  It was Mr. Allen's.

13         THE COURT:  Oh, I thought you were referring to

14   Upshaw.

15         MR. PARCHER:  My apologies.

16         THE COURT:  I got.  All right.  155.  What's the line

17   again?

18         MR. PARCHER:  Lines 11 through 16.

19         MR. KESSLER:  Objection, Your Honor.  This is not

20   proper impeachment.  He's not a party witness.

21         THE COURT:  When his deposition was taken was he --

22         MR. KESSLER:  No, Your Honor, he was already long

23   gone from the players' union.

24         THE COURT:  All right.  I agree with the defense.

25   This is not proper impeachment.

1           So, objection sustained.  Plus, it's a highly

2   argumentative question.  I'm looking at 155.

3           **MR. PARCHER:**  Yes, you've got the right page.

4           **THE COURT:**  11 through 16.

5           **MR. PARCHER:**  Yes.

6           **THE COURT:**  Objection sustained.

7           **MR. PARCHER:**  Yes, sir.

8   **BY MR. PARCHER:**

9   **Q.**   There's a magazine called Touchback.  Could you tell the

10  Court and the jury what it is.

11  **A.**   Touchback is a newsletter that the National Football

12  League Players Association sends out for retired players.  It's

13  also distributed to active players and to the leadership of the

14  board of player representatives.  But it's primarily intended

15  for retired players.

16  **Q.**   I just want to go back.  Before I do this I want to go

17  back to a statement that you made before.  You said:  We tried

18  for the critical mass, but we didn't quite get it.

19          Words to that effect.  I'm not quoting.  I don't

20  have --

21  **A.**   We didn't get the critical mass.

22  **Q.**   You didn't get the critical mass.

23          Is it your testimony that there were other

24  significant competitors with respect to the group licensing of

25  active or retired players?  Group licensing.

1   A.    I don't know what you mean by "competitors."

2   Q.    You don't know what I mean by the word "competitors"?

3   A.    In that context.  I'm trying to understand.

4   Q.    I'm older than you, but it's like Gimbels and Macy's.  I

5   don't know if that makes any sense to anybody.

6           Competitors.  Senator Obama and Senator McCain are

7   competitors.

8   A.    You mean was there another NFL players' union that was --

9   Q.    Anybody.  Was there any competitor out there that was

10  cutting into your territory with respect to GLAs, group

11  licensing authorizations, from either retired players or active

12  players?

13  A.    There were people who were getting name and image rights

14  from -- from retired players.

15  Q.    I didn't ask you that.  I said "group licensing

16  authorizations."  Did you have any competitors?

17          Withdrawn, before you answer that.

18          That's what you were selling to licensees, wasn't it?

19  "We are a one-stop-shop.  We have the most players."  Isn't

20  that what you were selling?  "Come to us for your license."

21  A.    We --

22  Q.    Yes or no?

23  A.    Uhm, we did not claim to represent every player.

24  Q.    Excuse me, sir.  I'm not asking you that.  I didn't

25  suggest that you claim to represent every player.

1        I'm asking you specifically whether it's true that

2   part of what you were selling to prospective licensees is that

3   you had had a great many retired and active player group

4   licensing authorizations so they ought to come to you, not look

5   elsewhere to make a deal?

6        That was what you did, wasn't it?

7   **A.**   Yes.

8   **Q.**   And you were quite successful in that, weren't you?

9   **A.**   Not for retired players.

10  **Q.**   But you were quite successful in getting the licensees to

11  come to you, prospective licensees to come to you?

12  **A.**   Yes.

13  **Q.**   There wasn't a lot of competition out there for group --

14  for group -- for group -- not saying the word right.

15       There wasn't a lot of competition out there for

16  players who were signing group licenses, was there?  You were

17  the only game in town, weren't you, for groups?

18  **A.**   I believe the Hall of Fame got rights from players, as

19  well.

20  **Q.**   Weren't you the big cheese?

21  **A.**   I'm just trying to answer the question.

22  **Q.**   No, no.  You know more than that, don't you, sir?

23  **A.**   Sorry?

24  **Q.**   You know more than that, don't you, sir?

25       Wasn't your organization by far the most significant

1  organization in getting football players to sign group

2  licensing authorizations?

3          **MR. KESSLER:**  Objecting to preparatory comments by

4  counsel to his questions.

5          **THE COURT:**  That's sustained.  But please answer the

6  question as framed.

7          **THE WITNESS:**  Uhm -- uhm, yes.  We were significant

8  in that respect.

9  **BY MR. PARCHER:**

10 **Q.**   I would like you to take a look at Trial Exhibit 2046.

11 It's one of the Touchbacks, to help you know what I'm shooting

12 for here.

13 **A.**   I have it.

14 **Q.**   This is one of the publications that you -- "you" being

15 the editorial you -- caused to send out to retired players; am

16 I correct?

17 **A.**   Yes.

18         **MR. PARCHER:**  I would move its admission, Your Honor.

19 It's Trial Exhibit 2046.

20         **MR. KESSLER:**  No objection.

21         **THE COURT:**  All right.  2046 received.

22         (Trial Exhibit 2046 was admitted into evidence.)

23 **BY MR. PARCHER:**

24 **Q.**   Have you got it there in front of you, sir?

25 **A.**   Yes.

1  Q.   Okay.  You see here in --

2           MR. PARCHER:  Put up the second paragraph, if you

3  don't mind.

4           (Document displayed.)

5  BY MR. PARCHER:

6  Q.   Do you see the heading there, "group licensing essential"?

7  A.   Yes.

8  Q.   So this is a June 2004 exhibit, sir.

9           In 2004 -- let's see, now.  You started when, 1994,

10  right?

11  A.   Started.

12  Q.   Players Inc?

13  A.   Players Inc, that's right.

14  Q.   Right.  So for ten years, year in and year out, you're

15  striking out when it comes to group licensing of retired

16  players, right?

17  A.   If by that you mean the GLAs and having that be the basis

18  for a license agreement, yes.

19  Q.   You don't know what I mean by "striking out"?

20           Oh, that's baseball.

21           Okay.  I'll withdraw it.  I'll withdraw it.

22           After all those years of failure, you're writing to

23  the retired players and you're telling them group licensing is

24  essential; are you not?

25  A.   That's correct.

1  Q.  Now, you're not going to say that when you say "group

2  licensing essential" when you're writing to retired players

3  that you're referring to active players here, are you?

4  A.  I haven't read this in a while, so I would want to read it

5  to get the context.

6  Q.  Wait.  Okay.

7  A.  It's four years old.

8        THE COURT:  Let's let the witness take a look at it

9  so he can answer the questions.

10        MR. PARCHER:  Yes, sir.

11        THE WITNESS:  Okay.

12        THE COURT:  What's the question?

13  BY MR. PARCHER:

14  Q.  I just want to set the predicate, Mr. Allen.  This is --

15  just to be clear, this Touchback is being sent out to the

16  retired players, right?

17  A.  That's correct.

18  Q.  In fact, that's who the publication is for.  The jury

19  won't be able to read it, or the judge.  But right at the top

20  it says:

21        "Publication for retired NFL players," right?

22  A.  That's right.

23  Q.  Okay.  Now --

24        MR. PARCHER:  You can take that off.  Publication is

25  off.  Okay.

1                    (Document displayed.)

2    BY MR. PARCHER:

3    Q.    Now, do you see right at the top of the lead article, the

4    first article on the first page of this communication to

5    retireds, you're saying group licensing is essential, are you

6    not?

7    A.    Yes.

8    Q.    And I'm asking you to confirm for Judge Alsup and the

9    jury, that there when you're referring to the essentialness,

10   the significance, the importance of group licensing, you're

11   referring to retired player group licensing authorizations,

12   aren't you?

13   A.    Yes.

14   Q.    Now, if you go down aways, you tell -- I would say in the

15   second paragraph.  In June of 2004, we have a Touchback where

16   you tell the retired players that you've worked hard -- I'm

17   paraphrasing now.  I'm not reading it literally, although I

18   can, if you want me to.

19           You've worked hard to secure licensing for games

20   using retired players' names and images, but the response has

21   been restrained.  Meaning to say you're not doing well with it,

22   right?

23   A.    It means that the response by the companies has been

24   restrained.

25   Q.    Now, if you have been telling them that every time you see

1   them for convention after convention after convention after

2   convention, or if I'm not using the right word when I say

3   "convention," whatever the gatherings are, do you know?

4   Chapters or whatever the word is, why is it so necessary to

5   remind them of that again, that you're trying, but you're not

6   doing so good?

7   **A.**   Because we didn't give up.  We were -- we were -- we were

8   hoping to take advantage of achieving that critical mass, and

9   hoping that the marketplace would respond to that critical

10  mass.

11          But that hadn't happened and didn't happen in the

12  time that I was there.

13  **Q.**   So, in other words, if you've got more retired players

14  that nobody wanted for your critical mass, you would do better

15  for them?

16  **A.**   Well, we were --

17  **Q.**   For another thousand or two retireds that nobody wanted

18  signed up with you --

19  **A.**   If we had --

20  **Q.**   Excuse me.  Let me finish this question.  Your contention

21  for this court and this jury is you would do better for them?

22  You would have a better shot at it if you had another 2,000

23  guys that nobody cared about?

24  **A.**   Well, it's not just asking the retired guys who nobody

25  cares about.  It's asking everybody who's a retired player to

1  sign.  Saying that every single member, and that that includes

2  players that companies do care about.

3  **Q.**  Yes.  And those players are the Joe Montanas, the Joe

4  Namaths of the world, right?

5  **A.**  That's two of them.

6  **Q.**  Pardon me?

7  **A.**  That is two of them, yes.

8  **Q.**  You say "two of them."  I mean, they're the stars.

9  They're the famous ones.  They are the well-known ones.

10  **A.**  Sometimes.  I mean, sometimes those players have signed

11  GLAs, and sometimes they have not.

12  **Q.**  I understand.  But that's who you're referring to.  Not

13  the ordinary Joe who signs the GLA hoping to be getting part of

14  a group licensing deal.  Right?

15          **MR. KESSLER:**  I object to that question.  I'm not

16  sure what the question is referring to.

17          **THE COURT:**  I've lost a little bit of track myself.

18          What I think I hear the witness saying, or maybe what

19  yours, is that the celebrities -- not very many celebrity

20  retired players have signed GLAs; is that correct?

21          **THE WITNESS:**  That's a fair statement.

22          **THE COURT:**  Is that the point that you were trying to

23  make?

24          **MR. PARCHER:**  I was working up to it, but that's the

25  point.

1          **THE COURT:**  We need to take a break now.  If you have

2   a key point you need to make --

3          **MR. PARCHER:**  No, no.

4          **THE COURT:**  As I said, we're going to stop at 12:30

5   today.  I actually have to be at a meeting at 12:30, and I need

6   to dash there.  But we're going to not be in session tomorrow,

7   nor on Friday.  Remember, we have the rest of the week off.

8   But we will resume on Monday morning.  And I ask you to please

9   be here at 7:45.

10         Everyone is doing a great job being here on time.

11   You should not be doing any homework about the case.  You

12   should not be talking with anyone about the case or letting --

13   or reading any news stories about the case or listening to any

14   news stories.  I've gone through all that.  I don't think I

15   need to repeat it.

16         One thing, though, I would like to say is, you know,

17   I have to make objections -- not objections.  I have to rule on

18   objections.  I did make one objection, and I sustained it.  So

19   I was lucky on that one.

20         (Laughter)

21         But I don't want you to think that I'm in any way

22   indicating to you how this case should come out.  These are

23   excellent lawyers.  They have strong views about the case.

24   They get carried away sometimes.  And my job is to kind of be

25   like the referee on the football field and make sure it's a

1  fair fight.  So you know that I'm not trying to suggest

2  anything about the strength or weaknesses of the cases if I

3  call a penalty on one of these lawyers.  So remember that.  I

4  know you will.  It's the only other way this system could

5  possibly work.  Keep all that in mind.

6          Anything more the lawyers want me to admonish the

7  jury about before we let them go for the weekend?

8          **MR. KESSLER:**  Yes, Your Honor.  Maybe a reminder

9  about the press, television or newspapers.

10         **THE COURT:**  I did say that.  But, again, please, that

11 would be very problematic if anybody were to listen to a TV

12 show or radio show or listen -- or read something or -- don't

13 talk to the press, of course.  Do you all understand all that?

14         (Jurors respond affirmatively.)

15         **THE COURT:**  I know you do.

16         See you back here on Monday now, Monday, 7:45 a.m.

17         **THE CLERK:**  All rise.

18         (Jury excused.  The following proceedings were held

19         in open court, outside the presence of the jury.)

20         **THE COURT:**  All right.  Mr. Allen, you need to be

21 back here on Monday, as well.  All right.  Sorry we didn't

22 finish you today, but what can I say?

23         **THE WITNESS:**  Are you asking me or telling me?

24         (Laughter)

25         **THE COURT:**  I'm telling you.

1        THE WITNESS:  Then, I don't know why you're waiting

2    for an answer.

3        THE COURT:  I'm just waiting for you to say "I

4    understand."

5        THE WITNESS:  I understand.

6        THE COURT:  All right.  See you then.

7        MR. KESSLER:  Your Honor, I would just like some

8    clear guidance.

9        Obviously, the witness is on cross-examination.  No

10   one will discuss with him.  And the witness should understand

11   he should discuss with no one any issue in this case or

12   anything about his testimony, or anything else.  But I also

13   assume it's all right, Your Honor, that the witness -- like,

14   for example, we can ride in the car with him and have a social

15   conversation.  As long as it has nothing to do with this case,

16   we don't have to shun him for the weekend or the day.

17       I assume that's correct, Your Honor?

18       THE COURT:  All right.  As long as you're honest and

19   you have no discussions about this case or the facts involved

20   in this case, that would be okay.

21       MR. KESSLER:  Absolutely not, Your Honor.

22       MR. KATZ:  Your Honor, I think the witness should be

23   sequestered from his lawyers.  We have no way of knowing what

24   is being said.

25       THE COURT:  You can --

1          **MR. PARCHER:**  I don't mean to interrupt.  I have a

2    lot of disagreements with Mr. Kessler, but his good faith is

3    not one of them.

4          **MR. KESSLER:**  Thank you, Mr. Parcher.

5          **MR. PARCHER:**  He's been instructed by you he's not

6    going to talk.  He says he's not going to talk.  I got it.  I

7    think we can live with that comfortably.  I hope everybody

8    would do the same for me.

9          **THE COURT:**  You can have a drink, but you have to

10   stay sober enough that you don't talk about this case.

11         (Laughter)

12         **THE WITNESS:**  I understand.

13         **MR. PARCHER:**  And don't talk about me, either.

14         **THE COURT:**  All right.  I've got to run.  You are

15   free to go right now.

16         **THE WITNESS:**  Thank you.

17         **THE COURT:**  Anything, very quickly, before we break

18   for the day?

19         **MR. KESSLER:**  Nothing, Your Honor.  Have a good four

20   days off.

21         **THE COURT:**  That's what I'm going to do.  It's work,

22   but it will be somewhat fun.

23         All right.  See you here, then, 7:30 on Monday

24   morning.  Let me give you your time.  The plaintiffs have

25   used -- I'll just give you the numbers:  45, 32, 96, 60 and 22.

1  Whatever that adds up to.

2          **MR. KESSLER:**  60 and 22, Your Honor, six-oh?

3          **THE COURT:**  45, 32, 96, 60, plus 22.  That's what I

4  have written down for time lapsed on the plaintiffs.  And 42

5  minutes for the defendants.

6          **MR. PARCHER:**  Excuse me, Judge.  What's the fourth

7  number you're saying?  Six-zero?

8          **THE COURT:**  I'll start all over.  45, 32, 96, 60.

9          **MR. HUMMEL:**  Thank you.

10         **THE COURT:**  Plus 22.

11         **MR. HUMMEL:**  Thank you, Your Honor.

12         **THE COURT:**  See you on Monday.

13         **MR. PARCHER:**  Have a nice weekend, Judge.

14         **THE COURT:**  Thank you.

15         (Thereupon, this trial was continued until Monday,

16  October 27, 2008 at 7:30 o'clock a.m.)

17                          -   -   -   -

18                 **CERTIFICATE OF REPORTER**

19         I certify that the foregoing is a correct transcript

20  from the record of proceedings in the above-entitled matter.

21  DATE:   Wednesday, October 22, 2008

22
                    s/b Katherine Powell Sullivan
23         _____

24      Katherine Powell Sullivan, CSR #5812, RPR, CRR
                    U.S. Court Reporter
25

629

I N D E X

**PLAINTIFF WITNESS**

**DOUG ALLEN**

DIRECT EXAMINATION BY MR. PARCHER    PAGE 472


**EXHIBITS**

125  PAGE 478

132  PAGE 484

5    PAGE 492

23   PAGE 494

12   PAGE 525

110  PAGE 537

28   PAGE 574

2046 PAGE 618

*Katherine Powell Sullivan, CSR, RPR,CRR*
*Official Reporter - U.S. District Court*
*(415) 794-6659*