Volume 4

Pages 630 - 870

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE WILLIAM H. ALSUP

BERNARD PAUL PARRISH, HERBERT      )
ANTHONY ADDERLEY, WALTER ROBERTS   )
III,                               )
                                   )
          Plaintiffs,              )
                                   )
  VS.                              )  No. C 07-0943 WHA
                                   )
NATIONAL FOOTBALL LEAGUE PLAYERS   )
ASSOCIATION and NATIONAL FOOTBALL  )
LEAGUE PLAYERS INCORPORATED d/b/a  )
PLAYERS INC,                       )
                                   )  San Francisco, California
          Defendants.             )  Monday
_____)  October 27, 2008

### TRANSCRIPT OF PROCEEDINGS

**APPEARANCES**:

**For Plaintiffs:**          MANATT, PHELPS & PHILLIPS
                             1001 Page Mill Road, Building 2
                             Palo Alto, California 94304
                   BY:   **RONALD S. KATZ, ESQ.**
                         **RYAN S. HILBERT, ESQ.**


                             MANATT, PHELPS & PHILLIPS
                             7 Times Square
                             New York City, New York 10036
                   BY:   **L. PETER PARCHER, ESQ.**


                             MANATT, PHELPS & PHILLIPS
                             11355 West Olympic Boulevard
                             Los Angeles, California  90064
                   BY:   **CHAD HUMMEL, ESQ.**

(Appearances continued on next page)

Dockets.Justia.com

**APPEARANCES CONTINUED:**

**Also for Plaintiffs:**    MCKOOL SMITH
                       300 Crescent Court
                       Suite 1500
                       Dallas, Texas  75201
             BY:  **LEWIS T. LECLAIR, ESQ.**
                   **JILL ADLER NAYLOR, ESQ.**
                   **ANTHONY GARZA, ESQ.**
                   **BRETT CHARHON, ESQ.**

**For Defendants:**      DEWEY & LEBOEUF
                       1301 Avenue of the Americas
                       New York City, New York  10019-6092
             BY:  **JEFFREY L. KESSLER, ESQ.**
                   **DAVID GREENSPAN, ESQ.**
                   **DAVID G. FEHER, ESQ.**
                   **ROY TAUB, ESQ.**
                   **MOLLY DONOVAN, ESQ.**
                   **JASON CLARK, ESQ.**

                       WEIL, GOTSHAL & MANGES LLP
                       767 Fifth Avenue
                       New York, New York 10153-0119
             BY:  **BRUCE S. MEYER, ESQ.**

**Reported By:**       *Katherine Powell Sullivan, CSR # 5812*
                       *Official Reporter - U.S. District Court*

<u>**P R O C E E D I N G S**</u>

**OCTOBER 27, 2008**                                    **7:30 A.M.**


                (The following proceedings were held in open court,

                outside the presence of the jury.)

        **THE COURT:**  Okay.  I have a preliminary question for

you.  On the document that Electronic Arts is in the Ninth

Circuit over, if any of you have been following that -- it's

Trial Exhibit 80, I believe -- do the plaintiffs intend to

introduce that into evidence?

        **MR. HUMMEL:**  Your Honor, at this time we do intend to

introduce it with Mr. Linzner on Wednesday.  However, I think

we have consulted with our team, and at this point we're

prepared to go with a redacted portion of that consistent with

the Ninth Circuit's order.

        **THE COURT:**  The Ninth Circuit hasn't issued any

order.  All they did was issue a stay.

        **MR. HUMMEL:**  Right.

        **THE COURT:**  But the entire bugaboo has been -- my

assumption, which sounds like maybe I was wrong, is that you

wanted the jury to see that paragraph.  And if that's true,

then my view of the law is the public gets to see it.

        But if you're prepared to redact it and not introduce

it into evidence, then the whole issue becomes moot.

        **MR. HUMMEL:**  I actually reached out to EA last week,

1   Your Honor.  I think it was on Thursday.  And they sent me a

2   version that would be acceptable to them.  I need to consult,

3   but I believe it would be acceptable.

4           In any event, it won't come in until Wednesday.

5           **THE COURT:**  Well, if we're going to avoid making the

6   Ninth Circuit do work on this, we ought to get this resolved

7   today so we can advise the Ninth Circuit that it's moot.

8           So would you give this your attention and see if you

9   can't get it worked out?  But let's be clear on what that

10  means.  That means the jury would never see the redacted

11  material.

12          **MR. HUMMEL:**  No.  That, Your Honor, we're not

13  prepared to do.  What we are prepared to do is have the jury

14  see the unredacted version and have any display in open court

15  be the redacted version.

16          **THE COURT:**  Wait a minute.  All right.  I'm glad you

17  clarified that, because you said you wanted to introduce into

18  evidence the redacted version.

19          **MR. HUMMEL:**  The publish publicly, correct.

20          **THE COURT:**  All right.  Let's be real clear.

21          **MR. HUMMEL:**  Okay.  Fair enough.

22          **THE COURT:**  This is so collusive.  Of course the

23  parties -- you don't care what the public -- except for your

24  press releases that you regularly give out, you don't care what

25  the public learns.

1           But the Ninth Circuit has said very clearly that the

2   parties cannot cover up the court records and keep them a

3   secret from the public because the public has a right to look

4   over our shoulder and see the federal system at work.

5           So the bugaboo here is that while the parties -- the

6   parties are perfectly prepared to let the jury see more than

7   the public, and the counsel are.

8           The Ninth Circuit has in previous cases -- the

9   Kamakana case being the most pertinent one -- has said that

10  that can only be done if there are compelling circumstances.

11  Not just good cause, compelling circumstances.

12          So I'm glad we had this conversation because it has

13  reaffirmed my belief that you did want the jury to see the

14  paragraph in question.

15          **MR. HUMMEL:**  The paragraph in question are the

16  financial details of the license deal.

17          **THE COURT:**  You want them to see that.

18          **MR. HUMMEL:**  Yes.  Absolutely.

19          **THE COURT:**  That's what I assumed.

20          **MR. HUMMEL:**  Right.

21          **THE COURT:**  But Electronic Arts wants to conceal that

22  from the public.

23          **MR. HUMMEL:**  Correct.

24          **THE COURT:**  And as I read the Ninth Circuit law to

25  this date, even though you're prepared to conceal it from the

 1  public so that the public cannot see the basis for the jury's

 2  decision, the Ninth Circuit has said that's bogus in the past.

 3          Now, perhaps this will be an occasion for the Ninth

 4  Circuit to say:  "No, we didn't really mean that."

 5          All right.  I think someone needs to make more clear

 6  to the Ninth Circuit -- see, you don't have -- you don't care.

 7          **MR. HUMMEL:**  Correct.

 8          **THE COURT:**  But it could be that the Ninth Circuit

 9  was on the verge of issuing an order that prevented you from

10  using that paragraph even with the jury.  Do you understand

11  that?

12          **MR. HUMMEL:**  Yes, Your Honor.

13          **THE COURT:**  Because they may be under the

14  misapprehension that you're perfectly prepared to redact that

15  from the jury's view.

16          Now, you're making it clear to me that that's not

17  what you want.

18          **MR. HUMMEL:**  That's correct.

19          **THE COURT:**  All right.

20          **MR. HUMMEL:**  We will take care of that today, Your

21  Honor.

22          **THE COURT:**  Well, I think somebody ought to say to

23  the Ninth Circuit, the plaintiff wants this -- is this

24  important to you?  Do you care?  How much do you care that the

25  jury sees that paragraph?

1          **MR. HUMMEL:**  The amount of royalties is important to

2 us, Your Honor, yes.

3          **THE COURT:**  Well, that's what I assumed.

4          **MR. HUMMEL:**  Yes.

5          **THE COURT:**  To your theory, anyway.

6          But I think the -- your friend Electronic Arts is

7 telling the Ninth Circuit it's not important; that it's just

8 some sort -- all that matters to the jury is the gross amount

9 that was paid and not the details of paragraph 6.

10          So don't come complaining to me if it turns out the

11 Ninth Circuit sweeps broader in a mandate order than you would

12 like.

13          All right.  Thank you for that clarification.  Now,

14 telling me doesn't tell the Ninth Circuit.

15          **MR. HUMMEL:**  I understand.

16          **THE COURT:**  But at least you've informed me on this

17 point.

18          All right.  Now, we're going to change topics.

19 Anything that the lawyers want to bring up today?

20          **MR. HUMMEL:**  Yes, Your Honor.  We have two matters we

21 would like to raise before the jury comes in.

22          The first has to do with some exhibits that are --

23 that the defendants notified the plaintiffs over the extended

24 break they intend to use with Mr. Allen on their effective

25 direct examination once Mr. Parcher is done.

```
 1              These exhibits were clearly called for in discovery
 2    requests pursuant to paragraph 16 of your standing order.
 3    Because they were not produced in response to those discovery
 4    requests they should not be allowed in evidence.  I can go into
 5    detail, if you like.
 6              THE COURT:  Of course you've got to go into detail.
 7              Hand up the first exhibit that you care about, and
 8    keeping in mind as soon as all the jurors are here we are going
 9    to go ahead whether we have resolved this or not.
10              MR. HUMMEL:  I will hand them all up, Your Honor.
11    They are Trial Exhibit numbers 2258 through 2264.
12              THE COURT:  I'm just going to look at them on the top
13    then.  2259, is that it?
14              MR. HUMMEL:  That's one of them, Your Honor.
15              THE COURT:  All right.  So explain to me why this --
16    give me the exact document request.  Hand it up to me.
17              MR. HUMMEL:  The exact document request number was --
18    there are two, actually.  Document request number 1, which is:
19                   "Documents that summarize or describe the
20    identities and/or number of retired NFL players that the NFL
21    represents or -- NFLPA represents or has represented or
22    purported to represent and the years each was represented by
23    the NFLPA."
24              The second document request is document number 4.
25              THE COURT:  It's hard for me to follow.  Do you have
```

1  a copy that I can --

2            **MR. HUMMEL:**  I have one that I can hand up to you,

3  Your Honor.

4            **THE COURT:**  You keep a copy and let me see --

5            **MR. HUMMEL:**  The one I would like the Court to focus

6  on is actually document number 4.  It's highlighted for Your

7  Honor.

8            **THE COURT:**  All right.  Document request No. 4:

9            "All documents that refer to or constitute

10  representations made by the NFLPA as to its or Players Inc's

11  licensing or representation of retired NFL players."

12            And the response to that was:

13            "NFL objects to this on the ground

14  'representation' is vague and ambiguous, calls for a legal

15  conclusion, and is overly broad.  Subject to and without waiver

16  of the foregoing objections, the NFLPA will produce any

17  documents that summarize, describe or refer to communications

18  referring to the group licensing program for retired players,

19  licensing or appearance opportunities available to retired

20  players, licensees of the NFLPA and/or Players Inc, licensed

21  retired players rights, terms of the licensing programs for

22  retired NFL players, the performance revenues or finances of

23  the group licensing program for retired NFL players.  The NFLPA

24  will not produce documents relating solely to administrative

25  matters."

1          All right.  I've focused on that.  So explain to me

2    now why this first document would have fallen within request

3    No. 4.

4          **MR. HUMMEL:**  Each of those documents, Your Honor,

5    that I handed you, including the first one, are, in fact,

6    representations made by the NFLPA to, we presume, third-party

7    licensees regarding their representation of retired players.

8          It is squarely within the ambit of document request

9    No. 4.

10          I assume that Mr. Kessler will say with Mr. Allen

11    that these are marketing materials.  In fact, they are

12    marketing materials for both active and retired players.

13          But clearly they fall within No. 4.  They should have

14    been produced.  They were not.  And this is in effect now by

15    labeling them trial exhibits a violation of your standing

16    order.

17          **THE COURT:**  What do you say to that, Mr. Kessler?

18    Just focus on Exhibit 2259 at the moment.

19          **MR. KESSLER:**  Yes, Your Honor.  First of all, Your

20    Honor, this objection was waived by plaintiffs because under

21    Your Honor's standing order we exchanged exhibit lists.  And

22    they have to state, as Your Honor knows, all objections to the

23    admissibility of documents.  This was on the list.

24          The only objections they stated to the admissibility

25    of these particular documents was authentication, which we will

do with the witness, and internal hearsay to the extent that it
has internal hearsay.

So having not raised this issue of nonproduction we
believe it was waived there.

But putting aside the waiver issue, although I think
that under Your Honor's rules is dispositive on this, more
importantly these documents are not representations by Players
Inc, you know, as to its licensing or representation of retired
players.

What these are is brochures on -- given to licensees
about players. It's not representations about anything in any
stretch of the word.

Okay. And it was not responsive. They easily could
have asked for a request that said: "Give us marketing
materials. Give us brochures. Give us materials you give to
licensees." Anything about that.

There is no request. So they're now trying to
pigeonhole it here. And what's particularly egregious, Your
Honor, is Mr. Parcher, you'll recall, when he questioned
Mr. Allen started shouting at the witness:

"Can you produce any document? Can you direct
Mr. Kessler," or whatever he said now, "to go to his office
over the weekend and get these documents?"

And he had the documents all the time. They were on
our exhibit list. So he's now created -- he's overstated his

1  hand with the jury, strongly suggested to them that there are

2  no marketing documents or brochures or anything like that.

3         The jury thinks there's nothing there.  And now they

4  want to come in and say:  "Well, it's true we've had them on

5  your exhibit list the whole time."

6         So Mr. Parcher had no basis to ask those questions

7  under the rules of having a good faith basis for the question.

8  And now he wants to keep the material out, even though they

9  never asked for it.  But we did produce it on our exhibit list.

10         **MR. HUMMEL:**  Your Honor --

11         **THE COURT:**  What do you say to all that?

12         **MR. HUMMEL:**  Well, I have a lot to say.

13         Number one, we went, actually, back yesterday and

14  checked the transcript of what Mr. Parcher said that

15  Mr. Kessler obviously didn't read.  What he said was:

16              "Do you have marketing plans for retired

17  players?"

18         These are not marketing plans for retired players.

19  They are marketing plans that include both actives and

20  retireds.  They do not specifically call out retired players.

21  Mr. Kessler actually has his facts wrong.

22         As to waiver, Your Honor, I never -- and, by the way,

23  I never in a million years thought we would have to object on a

24  specific document that was not disclosed, because it violated

25  your standing order.

1          Your standing order, paragraph 16, is very clear:

2               "Anything that wasn't produced pursuant to a

3    document request is out."

4          These documents were not produced.  Mr. Kessler knows

5    that.

6          **THE COURT:**  But don't I have another ground rule that

7    says you have to identify your documents at trial ahead of

8    time, then give the other side a chance to state its objections

9    to those documents?

10         **MR. HUMMEL:**  Yes.  And the objections are specific as

11   to hearsay, as to no foundation, as to those kinds of things.

12         But as to whether they were disclosed in discovery,

13   Your Honor, we assumed that paragraph 16 trumped.

14         **THE COURT:**  But wait a minute.  You mean, you can

15   just lie back in the weeds and spring this on Mr. Kessler the

16   morning he's going to introduce it into evidence?

17         **MR. HUMMEL:**  No, Your Honor.  There's no lying back

18   in the weeds.  They disclosed what documents they are going to

19   use with Mr. Allen over the weekend.

20         **THE COURT:**  But they put it as a trial exhibit.

21   That's what I'm -- maybe Mr. Kessler is wrong, but did he

22   disclose -- was this disclosed as a trial exhibit up front?

23         **MR. HUMMEL:**  Yes, with the exhibit list.  Yes.

24         **THE COURT:**  Correct.  Well, then -- so you've known

25   about this for weeks.

1              **MR. HUMMEL:**  Weeks.

2              **THE COURT:**  And today is the first time you're

3    raising this objection.

4              **MR. HUMMEL:**  Today is the first time after we learned

5    that they were going to use it with Mr. Allen, that, yes, these

6    were not disclosed pursuant to a discovery request.  That's

7    correct.

8              I don't believe that's laying in the weeds, Your

9    Honor.

10             **THE COURT:**  But why didn't you assert that discovery

11   violation in the -- in your response to their trial exhibit

12   list?

13             **MR. HUMMEL:**  My response is only that I assumed that

14   paragraph 16 of your discovery order trumped everything else.

15   That if there is a trial exhibit identified that was not

16   produced in discovery that was directly responsive they can't

17   introduce it, period.

18             And if that's not a satisfactory explanation for Your

19   Honor, that is the explanation.

20             **THE COURT:**  I don't think I ever meant that that -- I

21   don't think that's what I meant.

22             The purpose of identifying your objections to the

23   trial exhibits is so that we can meet and confer ahead of time

24   and sort it out ahead of time and not wait until the witness is

25   on the stand, and then raise that for the first time.

1    **MR. KESSLER:**  Your Honor's order is actually crystal

2  clear in this.  You specify in your order the only objections

3  that don't have to be stated, which are 403 objections.  You're

4  very clear saying all objections are --

5    **THE COURT:**  Give me the ground rule.

6    **MR. KESSLER:**  -- 403.

7    **THE COURT:**  I don't remember it, per se.

8    **MR. HUMMEL:**  I'll show you paragraph 16, Your Honor.

9    **THE COURT:**  I think our witness ought not be in the

10  courtroom.

11    **MR. KESSLER:**  Your Honor, I'll hand up your standing

12  order.

13    **THE COURT:**  Mr. Allen ought to step outside.

14    Which one do you want me to look at?

15    **MR. KESSLER:**  Which order is it?  Which rule?  I

16  believe it may be 26, Your Honor.

17    **MR. HUMMEL:**  Your Honor, I handed you paragraph 16 of

18  your standing order.

19    **THE COURT:**  I've got it right here.

20    **MR. HUMMEL:**  I highlighted it for you, Your Honor.

21    **THE COURT:**  You did.

22    Well, paragraph 22.  All right.  Look.  These

23  guidelines for trial and final pretrial conference, paragraph

24  22, says:

25    "As stated, FRCP 2683 disclosures regarding

1  proposed exhibits must be made at least 30 calendar days before

2  trial.  And any objections thereto must be made within 14

3  calendar days thereafter or waived unless excused for good

4  cause."

5          So -- then further on down -- all right.  So let's

6  look at --

7          **MR. HUMMEL:**  Your Honor, my argument would be good

8  cause exists based on paragraph 16 of your standing order.

9          **THE COURT:**  Well, just a minute.

10         Well, the Federal Rule of Civil Procedure 26 is

11  really what is at stake here.  It's not my guideline.  But Rule

12  26 says that:

13              "After the trial exhibit list is served, then

14  any objection, together with the grounds therefore, that may be

15  made to the admissibility of materials identified under Rule

16  2683(c).  Objections not so disclosed, other than objections

17  under 402 and 403, are waived unless excused by the Court for

18  good cause."

19         And C is the trial exhibit list.

20         So then the question becomes whether or not the

21  failure to produce it in discovery constitutes good cause in

22  this case.

23         So is it conceded that this objection was not made in

24  your written objections under Rule 26?

25         **MR. HUMMEL:**  Is it conceded that we did not object on

1  the exhibit list to these exhibits because they had not been

2  produced previously pursuant to a document request?  Yes.

3       **THE COURT:**  All right.  So then the issue is:  Is

4  there good cause to allow a late objection?

5       You know, it is true that Mr. Parcher went on and on.

6  I mean, he made a grandstand show out of poor Mr. Allen had to

7  go back to the company and file through the documents, that he

8  didn't have a single exhibit.

9       Now, it's true this is not a marketing plan, per se.

10 But it does refer to 3500 retired NFL players that Players Inc

11 represents.

12      **MR. KESSLER:**  And, in fact, Your Honor, each of the

13 documents that are at issue have individual retired player

14 names even mentioned or pictures of them, et cetera.

15      So it's the opposite of what Mr. Parcher suggested.

16 And that's why we think it would be particularly inappropriate

17 to exclude that.

18      **THE COURT:**  The argument is made that my standing

19 ground rule on discovery, which --

20      **MR. HUMMEL:**  Your Honor?

21      **THE COURT:**  Yes.

22      **MR. HUMMEL:**  I'm sorry.  I would also like to cite

23 the Court to Rule 37 of the Federal Rules, which does have an

24 absolute bar to introducing documents that were not disclosed

25 and not supplemented.

1          "If a party fails to provide information or

2   identify a witness as required the party is not allowed to use

3   that information or witness to supply evidence on a motion, at

4   a hearing or at trial."

5          And I understand the rule about objecting to on the

6   exhibit list.  We didn't do it.

7          As to the grandstanding show, let me make one point.

8   Mr. Parcher asked the following question -- and I'm reading

9   from the transcript.  He says:

10          "As we sit here today can you show the Court and

11  the jury one single marketing plan, one single written

12  marketing plan to market retired players?"

13         It had nothing to do with active players.

14         And then Your Honor actually clarified the question

15  on page 598, line 5 through 6.  You actually said:

16          "Mr. Parcher, in there you have a good

17  question.  You have a fair point you are trying to get at.  So

18  you should go about it with less ambiguous questions, like,

19  quote:

20          'Can you describe any marketing plan that was

21  directed toward the GLA for retired players?'"

22         That was Mr. Parcher's question.  To the extent you

23  want to characterize it as a grandstand, we weren't talking

24  about active player marketing, which is what these are.  And

25  these weren't provided in discovery, and we asked for them.

1           **MR. KESSLER:**  Your Honor, he went on --

2           **THE COURT:**  Are any of these photographs retired

3  players?

4           **MR. KESSLER:**  Yes, Your Honor.  I have to look at

5  each page, but I will represent to the Court that each of those

6  documents have either the names or pictures of more than one

7  retired player in those things.

8           **THE COURT:**  All right.  Look.  This is easy.  All

9  right.  The Court is now going to rule on this.  All of these

10 exhibits are in the same category.

11          Mr. Parcher, now you're trying to put a narrow spin

12 on what he was asking.  But the clear import of his questioning

13 was that the NFLPA locked up all these players with these GLAs,

14 and then put them in a drawer or something.  He said put them

15 under a bushel basket, or I forgot how he phrased it.

16          **MR. KESSLER:**  Put them in a drawer.

17          **THE COURT:**  Just put them in a drawer and forgot

18 about them, and did nothing to promote these retired players.

19          Now, these documents that are going to be offered

20 refer to -- can be construed as attempts to promote the retired

21 and active players.

22          And Counsel is representing that there's some

23 photographs of retired players in here.  It's not a marketing

24 plan, per se, but it is marketing.

25          So this is fairly in response to Mr. Parcher's broad

1   statement.  It's true that I tried to get him to narrow it, but

2   that was after he had laid a monumental claim before the jury.

3         I'm not going to hear any more argument on this,

4   Mr. Parcher.  Motion denied.  All of these exhibits can be

5   received.

6         **MR. HUMMEL:**  Thank you, Your Honor.  We have one more

7   issue to raise, and that has to do with ad hoc agreements,

8   which is the subject of a motion in limine.  And Mr. LeClair is

9   addressing that.

10        Thank you.

11        **THE COURT:**  Very well.  Let me hand this back to the

12   clerk.

13        Okay.  Go ahead.

14        **MR. LECLAIR:**  Your Honor, I believe this will be real

15   quick.  As Your Honor knows, you have already excluded

16   testimony and documents related to ad hoc agreements.  The

17   defendants have --

18        **THE COURT:**  I couldn't possibly have ruled that

19   broadly.

20        **MR. LECLAIR:**  No, I'm not saying you ruled

21   everything.  I'm saying you have actually excluded certain

22   testimony and certain documents related to ad hoc agreements.

23        The defendants have now indicated an intention to use

24   this document, which is, in fact, a summary of all ad hoc

25   payments made to retired members of the class.  It's not money

1  we are claiming.  It's not at issue in the case.  It is

2  completely irrelevant and prejudicial under Rule 402 and 403.

3          **THE COURT:**  Show me the ruling that you're referring

4  to, the ruling that I made.  Where is my summary of all the

5  rulings?

6          **MR. KESSLER:**  Your Honor, it is our motion, not

7  plaintiffs'.

8          **THE COURT:**  That won't matter.

9          **MR. KESSLER:**  And the motion -- no, I'm reading to

10  you what Your Honor wrote.  I'm sorry.

11          **THE COURT:**  You can't win a motion and say:

12              "Well, we withdraw it now."

13          **MR. KESSLER:**  No.  Absolutely not, Your Honor.

14          Defendants' motion in limine 3:

15              "Granted.  Plaintiffs" -- it was only directed to

16  plaintiffs.  "Plaintiffs may not introduce evidence relating to

17  plaintiffs' complaints about ad hoc license agreements,

18  including, but not limited to, such evidence relating to the

19  license agreement between Electronic Arts, the Pro Football

20  Hall of Fame and Players Inc."

21          All we're doing, Your Honor, as you know, the jury

22  needs to understand what ad hocs are and how the money flowed,

23  which is something that Your Honor has spoken about the jury

24  needs to know.

25              This is simply a compilation exhibit that summarizes

1  the payments that were made to the retired player class

2  members.  That's all.

3        Because this is on a huge computer database known as

4  "the Raider database."  There is no way for the jury to extract

5  this information.  So we simply did a compilation that lists

6  each class member, how much they have been paid and under what

7  license.  And that's all.

8        It's simply to let the jury know how this retired

9  player money flowed.  It has nothing to do with any other

10  issue, and it certainly is not covered by the in limine order,

11  which has to do with their complaints about this money that

12  they are seeking that somehow this had to do with that whole EA

13  Hall of Fame agreement Your Honor will recall that you

14  excluded.

15        **THE COURT:**  I don't remember excluding -- did I

16  exclude the EA Hall of Fame?

17        **MR. KESSLER:**  Yes, Your Honor.  You granted the

18  motion saying --

19        **THE COURT:**  It says "complaints."

20        **MR. KESSLER:**  Not the -- not the agreement.  I'm

21  sorry.  The complaints that it was below market, that it would

22  confuse the jury because there's no damages claimed regarding

23  that particular agreement.

24        And that -- you know, and you did, in fact, grant

25  that motion finding it under 403 to be unduly prejudicial.

 1          And you also, at the same time, made it clear that ad

 2   hocs could be referred to as long as we don't, in effect, go

 3   in, for example, on the EA Hall of Fame agreement and say like:

 4               "Oh, look at how this is evidence of our good

 5   faith on this agreement," because you said that could open up

 6   the door.

 7          We have no intention of doing that, Your Honor.  We

 8   do not want to open that door because we do think it's

 9   confusing.

10          **MR. LECLAIR:**  Your Honor, they have actually already

11   opened the door.  The whole purpose of this exhibit is to say:

12               "Look, we did what we were supposed to do.  We

13   did great for the retired players.  We got them $7 million."

14          We're not claiming this money as to the claim that

15   this is the flow of the money.  This is not the money at issue

16   in the case.  This is the unshared money.  Our claim is about

17   the shared money.

18          What they want to do is say:

19               "Oh, look.  Okay.  We didn't give you any shared

20   money.  We didn't give you one penny under the GLA.  But, look,

21   we did give you this other money, so we did good.  Everything

22   is wonderful.  And we were great for the retired players."

23          At the same time they are blocking us from showing

24   what they were really doing, which was they didn't have the

25   interest of the retired players at heart at all.

1          **THE COURT:**  How were they blocking you?

2          **MR. LECLAIR:**  Because they won't let us show -- and

3   Your Honor has excluded the very evidence of what they were

4   doing on the EA Hall of Fame, which is one of the very payments

5   they have on that summary.  And what the evidence shows is they

6   didn't care about the retired players.  They got them an

7   under-market payment because they wanted to keep a competitor

8   out of the market.

9          They wanted to keep Take 2 out of the market.  So

10  they and EA got together and said:

11              "Let's go get these retired players to block

12  Take 2."

13          What they want to do is use this as a sword and a

14  shield.  They want to put the evidence in and say:

15              "We were great for retired players.  We got

16  them a lot of money."

17          It's confusing to the jury, because it's not the

18  money we're claiming at all.  We're claiming the shared money.

19  They know what's shared, and they know what's unshared.

20  They're putting in an exhibit of the very thing that's not at

21  issue in the case:  The unshared money, which they know what it

22  is, and we know what it is.

23          We're claiming the shared money.  The flow of money

24  that Mr. Kessler was talking about is the flow of money on the

25  shared money.  There's no dispute as to what that is.  The

1  parties don't disagree about it.

2        **THE COURT:**  Didn't you yourself refer to ad hoc

3  agreements?  You yourself, and Mr. Parcher in his opening

4  statement?

5        **MR. LECLAIR:**  We referred to ad hoc agreements.

6  We've always said, Your Honor, they're entitled to say there's

7  such a thing as ad hocs, and we admit there are ad hoc

8  agreements for famous players.

9        What's not appropriate is to put before the jury an

10  exhibit that says:

11              "Here's $7 million.  And, gee, this is really

12  what plaintiffs are claiming."

13        It's not what we're claiming at all.  What we're

14  claiming is the hundred million dollars that was shared money

15  that they did not share.

16        **MR. KESSLER:**  Your Honor --

17        **MR. LECLAIR:**  That's what's at issue in the case.

18        **MR. KESSLER:**  Your Honor, first of all, Mr. LeClair

19  just made a misstatement.  The EA Hall of Fame payments are not

20  in this list.

21        Why?  Because the Hall of Fame received that money

22  and entered into deals with the players for that.  That wasn't

23  even a Players Inc arrangement.

24        So that particular one that he has so many complaints

25  he would like to get to the jury about, even though he admits

1 it's not at issue, was a Hall of Fame arrangement.  It's not in

2 this exhibit.

3          So this exhibit does not include that.  That was just

4 wrong.

5          What Mr. Parcher has done, though, in his opening and

6 his questions, is that the jury now knows there were ad hoc

7 agreements.  In fact, he made statements it only goes to the

8 superstars.

9          This shows, by the way, various class members got

10 those payments.  And we have a claim of fiduciary duty here

11 that Mr. Parcher again said to Mr. Allen:

12               "You made no efforts in marketing.  You put it

13 in the drawer."

14          We're entitled to respond to that by saying:

15               "We made great efforts in marketing."

16          But what the licensees did was they came back and

17 said:

18               "We only want certain players."

19          And so we facilitated $7 million in ad hoc payments

20 for the class.

21          That negates their claim that we somehow didn't

22 fulfill our fiduciary duties to the class.  If we didn't get

23 that money for them they could have had some claim about that.

24          The jury needs to understand this.  Plus, Your Honor

25 knows in the license agreement -- Your Honor pointed this out

1  during our in limine motions -- we have a paragraph of the

2  agreement which they rely upon to say that retired player

3  rights were given to EA and other licensees where we believe it

4  is referring to these very ad hoc agreements.

5        So the jury needs to understand what the ad hoc

6  agreements are so they could evaluate what the meaning is of

7  the EA license and as to how these all worked together.

8        The fact that the licensees had to make these ad hocs

9  because they didn't have retired player rights is a very

10 important course-of-dealing argument we're going to allow.

11       So be believe that the issue clearly is relevant.  It

12 doesn't open the door to the EA Hall of Fame.  And a

13 compilation is clearly the only appropriate way to give it to

14 the jury because, Your Honor, this is the entire database, is

15 this box, an entire box of maybe 20,000 pages of paper, which

16 we have here.  We made it available to them to inspect.

17       **THE COURT:**  When did you do that?

18       **MR. KESSLER:**  Oh, way before the time exhibits were

19 exchanged, right?

20       **MR. GREENSPAN:**  Correct.

21       **MR. KESSLER:**  In fact, I think the Raider database

22 was earlier.  They had that way before August, Your Honor, in

23 terms -- and there is no dispute this is accurate, by the way.

24 They've had the database.  They never raised any concern this

25 does anything other than take the data off of the computerized

1  database and list it.  That's all it does.

2        **MR. LECLAIR:**  Our objection, Your Honor, is not about

3  that issue.  It is about the relevance and 403 effect of this

4  evidence, which is they are trying to say to the jury:

5              "We did great for the retired players.  We got

6  them $7 million," which is confusing because it's not our

7  claim.  They know what --

8        **THE COURT:**  But there are two ways to read that GLA

9  and the EA agreement and so forth.  And you're presupposing

10 your version is correct.

11        You both are going to have to get the jury to agree

12 with your version.  And so one of the surrounding circumstances

13 is the fact that these ad hoc agreements existed.

14        And so why isn't that -- why isn't it fair for the

15 jury to understand more rather than understand less?

16        **MR. LECLAIR:**  Your Honor, this goes to the whole

17 effect of what the defendants did.

18        They -- they defined the world, Your Honor.  There's

19 no question that if this was group licensing as defined under

20 the GLA it's supposed to go into an escrow account and be

21 shared.

22        They didn't do that.  They treated it as ad hoc

23 individual agreements.  So, therefore, they can't now come in

24 and say:

25              "Oh, no, it really is group -- it really is, and

1  it's what we did under the GLA."

2          **THE COURT:**  Is that your argument, Mr. Kessler?

3          **MR. KESSLER:**  No.  In fact, Your Honor, it is, in

4  fact, a group deal.  We believe we had the right to do it this

5  way.

6          And we thought, Your Honor, based on what their

7  witnesses said, as Your Honor knows, that they were going to

8  make a claim that because it's group licensing it should have

9  been in the escrow fund.

10          Now, they've made the choice to waive that claim, as

11  Your Honor has noted many times, and it would have raised class

12  issues internally and conflicts within the class.  So I guess

13  that's why they chose not to pursue that claim.

14          I'm not going to revisit that issue.  But they

15  can't -- because they chose not to do that they can't prevent

16  us from telling the jury they should not be able to --

17          **THE COURT:**  You yourself have said that under the GLA

18  very little, maybe zero, has ever gone to the class members.

19          **MR. KESSLER:**  Pursuant to the escrow arrangements.

20          Our position is, Your Honor, that these ad hoc

21  deals -- let me make it very clear -- are group licensing

22  because they involve six or more retired players.

23          In fact, they involve six or more sometimes retired

24  and active players together.  So it clearly meets the

25  definition of "group licensing."

1          That is our position from day one.  And that we think

2     it's appropriate to not have used that through the escrow fund

3     for the reasons we argued to the jury at the very beginning,

4     because the licensees didn't want the whole group of 2,000

5     players.

6          They would want 10, 13, 12 at a time.  They would

7     want some who had GLAs, some who didn't have GLAs.  So the only

8     way to deliver this money was to give all of it to the retired

9     players.  The jury needs to understand that.

10         You're right.  The jury will either accept our

11    explanation that that's appropriate under the GLA and that's

12    appropriate of our good faith, or they won't do it.

13         Now, Mr. LeClair is saying, well, if we're right,

14    that's a violation of the GLA because it should have gone to

15    the escrow fund, but he doesn't want to make that claim.

16         **THE COURT:**  Why -- how do you get around the fact

17    that if you're going to contend that $7 million was paid under

18    the group licensing forms, how do you get around the fact that

19    there never was any escrow?

20         **MR. KESSLER:**  Because our belief -- again, that's a

21    claim they're not making in the case.  They could have made

22    that claim that you just made.

23         **THE COURT:**  I always hate it when the lawyers hoist

24    the other side on their own petard.

25         **MR. KESSLER:**  No.  No.

1          **THE COURT:**  You've got the affirmative problem --

2          **MR. KESSLER:**  Okay.

3          **THE COURT:**  -- that your own agreement said there was

4   going to be an escrow, and there never was an escrow.  That

5   alone is enough to raise a big issue.

6          **MR. KESSLER:**  It can certainly raise an issue.  We

7   believe the jury will understand the following:  That because

8   the licensees didn't want the whole group of players, because

9   they would want, let's say, 15 players, 10 of whom had no GLAs

10  and five of whom had a GLA -- so Joe Montana never signed the

11  GLA -- that we had to do their ad hoc license agreements, which

12  gave all the money to the players.  And those who signed the

13  GLA, like Mr. Adderley, agreed to it, thereby waiving any

14  rights he had under the GLA.

15         Mr. Adderley, for example, made it very clear in his

16  testimony he doesn't think that money should have gone into an

17  escrow fund.  So we think our position is well supported.

18  That's something they can argue to the jury.  Although they can

19  argue it, they won't argue it because they waived it in this

20  case.

21         That's not my problem they waived it.  We're prepared

22  to defend why there's no escrow account.

23         **THE COURT:**  Are you saying this Exhibit 2056

24  represents ad hoc agreements?

25         **MR. KESSLER:**  It represents every payment made to

1  players through either ad hoc agreements, and it also has that

2  Photo File one, which is the only one we paid out under the GLA

3  under that period of time.  So that's it.

4       It's all the payments made to any class members for

5  their licensing rights.  That's what it lists, how that was

6  done.

7       It does not have the Hall of Fame agreement because

8  we did not make those payments.  The Hall of Fame made those

9  payments.  So that's not even an issue in this exhibit.

10       We have no intention of discussing that Hall of Fame

11  agreement ever in this case.

12       **THE COURT:**  Can you tell from Exhibit 2056 which

13  agreement, whether it was ad hoc or GLA?  How do you tell that?

14       **MR. LECLAIR:**  It's all ad hoc, Your Honor.  They

15  title it.  It's all ad hoc.  That's what the title is.

16       **THE COURT:**  Where is the ad hoc?

17       **MR. LECLAIR:**  Very top of the document, Your Honor.

18       **THE COURT:**  "Royalty from ad hoc agreements."

19       **MR. KESSLER:**  Yes.

20       **MR. LECLAIR:**  That's the whole vice of this, Your

21  Honor.  What they want to do is they admit they didn't treat

22  this as group licensing.  We didn't complain with that.  We

23  said:

24            "We accept your world.  We want you to talk

25  about the group licensing."

1          They didn't treat it as group licensing.  Now, they

2   want to come into court and say:

3               "Oh, look.  Here's all these agreements.  We did

4   all this wonderful group licensing for you."

5          But it's not even at issue.  They decided the world.

6   They said it's not group licensing because they said -- you

7   know, what they did, Your Honor?  They treated 35 or fewer as

8   ad hoc.

9          Mr. Allen's already testified to that.  They treated

10  it as ad hoc.  And we said:

11              "Okay.  We accept your world.  We'll accept that

12  you treated 35 or fewer as ad hoc, and we're not going to

13  complain about it."

14          **MR. KESSLER:**  Your Honor --

15          **MR. LECLAIR:**   But what's not fair -- excuse me.  Let

16  me finish.

17           What's not fair, Your Honor, is they can't now come

18  in and say:

19              "Oh, all this under 35 is actually group

20  licensing, and we did wonderful for you guys."

21          **THE COURT:**  Why wouldn't you be down on your knees

22  praying that they would do such a thing so you could expose

23  them as frauds if they are going to take such an argument?

24          Look.  This is easy.  I am going to allow this in.

25  And here's why.  Both sides want the jury to decide, and both

sides on different occasions -- you for the GLA, and you for

the EA agreement -- are requesting and have been allowed to put

in intent, subjective intent at the time, in addition to all of

the surrounding circumstances.

Now, the surrounding circumstances do include the

overall financial arrangements between the NFLPA and players,

as well as retired players.  And for that matter we veered off

into the active players.

So -- and ad hoc agreements were mentioned by both

sides in their opening statements.  So it is part of the case

and part of the surrounding circumstances for the jury to

understand these ad hoc agreements and what light they shed on

what the parties reasonably expected out of these GLA

agreements.

Now, Mr. LeClair, you are right.  At the end of the

day whatever rights they got under the GLA should not be

forfeited just because of some other money they got paid.  In

other words, if there was a violation of the GLA there ought to

be a recovery.

But the problem is in order to understand the GLA in

the first place you need to understand the -- the jury needs to

understand the surrounding circumstances at the time these GLAs

were entered into.

And one of the surrounding circumstances is this

alternative way in which some money was gotten, royalty money,

1   was gotten under these ad hoc agreements.

2          So you lawyers are excellent lawyers.  I think you're

3   able to make these points reasonably clear to the jury.  I

4   don't think there's going to be any misuse or confusion.  These

5   are matters of argument.

6          So the objection to 2056 is denied.

7          **MR. LECLAIR:**  Your Honor, then we should be permitted

8   to ask Mr. Allen about the Hall of Fame agreement, because if

9   they're going to put in these ad hoc agreements and say, "We

10  did good on behalf of retired players.  We did the best we

11  could.  We got this money for them," which is the very purpose

12  of putting this in, we should be able to show fairly they

13  weren't working in the best interests of retired players.

14          If the ad hoc agreements come in, the surrounding

15  circumstances of the ad hoc agreements must come in.

16          **THE COURT:**  Here's what we will do on that.  Maybe

17  you're right.  Maybe you're not.  We'll hear further argument

18  on this.  And we will only get to that on redirect, anyway, or

19  effectively the recross.

20          I don't want you to get into the Hall of Fame until

21  after the witness is tendered to Mr. Kessler, and then

22  depending on how Exhibit 2056 is used -- you're going to use

23  this with him?

24          **MR. KESSLER:**  I will, Your Honor.

25          **THE COURT:**  Then maybe that opens the door to the

1    Hall of Fame.  I want to hear your proffer on that.

2            So I'm not saying no to that, and I'm not saying yes

3    to it yet.  But it's now time to bring in our jury.

4            **MR. KESSLER:**  Your Honor, one 30-second issue.  We

5    can do it at the next break, if Your Honor prefers.

6            **THE COURT:**  Let's do it at the next break.

7            **MR. LECLAIR:**  I was just going to hand up a

8    deposition, one final deposition, Your Honor.

9            Thank you.

10           **THE COURT:**  Can we now resume with the witness?  Are

11   we ready to go with the witness?

12           Let's bring in our jury.

13           Welcome back.  Please have a seat.  I'll remind you

14   you're still under oath.

15           **THE WITNESS:**  Thank you.

16           **THE COURT:**  How much longer on direct?

17           **MR. PARCHER:**  No more than half an hour.  If I can do

18   less, I'll do it.  I'll give it a shot.

19           (Thereupon, the Jury returned to the courtroom.)

20           **THE COURT:**  Welcome back, and have a seat.  Hope you

21   all had a great, long time off.  And just to refresh your

22   memory, we have on the stand Mr. Doug Allen.  And he was on

23   examination by Mr. Parcher.

24           Mr. Parcher says he has about half an hour more of

25   questions for Mr. Allen.  And then it will be turned over to

1  Mr. Kessler for questions.

2          And you will remember that Mr. Allen used to be a

3  high-ranking official at the NFLPA, as well as Players Inc.  So

4  I hope that helps put your mind back to where we were a few

5  days ago.

6          And Mr. Parcher, with that I will allow you to

7  continue on.

8          **MR. PARCHER:**  Thank you very much, Your Honor.

9          (Thereupon, **Mr. Doug Allen** resumed the stand and was

10  examined further on Direct Examination by Mr. Parcher as

11  follows:)

12                    <u>**DIRECT EXAMINATION RESUMED**</u>

13  **BY MR. PARCHER:**

14  **Q.**   Good morning, Mr. Allen.

15  **A.**   Good morning, Mr. Parcher.

16          **MR. PARCHER:**  What I would like to put on the screen

17  is Exhibit 125, please.

18          (Document displayed.)

19          **MR. PARCHER:**  And we'll turn it to page -- to

20  paragraph 5(a).

21  **BY MR. PARCHER::**

22  **Q.**   Mr. Allen, you recall, I'm sure, this is the agreement

23  between the NFLPA, Players Association and Players Inc.  You

24  understand what we're looking up at up there, right?

25  **A.**   Yes, I do.

1   Q.   And paragraph 5(a) is the paragraph that talks about

2   37 percent going to the players, correct?

3   A.   That's correct.

4   Q.   And I believe you said on Wednesday that's the active

5   players?

6   A.   That's right.

7          **MR. PARCHER:**  Now, let's take a look at Exhibit 91,

8   please.  Withdrawn.  You can't put that on the board yet.

9          Sorry, Your Honor.

10  **BY MR. PARCHER::**

11  Q.   Would you mind taking a look, Mr. Allen, at Exhibit 91?

12  Do you have it there, or do you need me to help you along a

13  little bit?

14  A.   I've got it.

15  Q.   If you could take a look at page 2.  Do you see the

16  signature there by Doug Allen, president?

17  A.   I do.

18         **MR. PARCHER:**  I move 91 into evidence, Your Honor,

19  please.

20         **THE COURT:**  Any objection?

21         **MR. KESSLER:**  No objection, Your Honor.

22         **THE COURT:**  91 is received.

23         (Trial Exhibit 91 received in evidence.)

24         **MR. PARCHER:**  Thank you.  We'll put it on the board,

25  please.

1          Put it up so the jury can see, if you can.

2          (Document displayed.)

3   **BY MR. PARCHER:**

4   **Q.**   All set, Mr. Allen?

5   **A.**   Yes.  Thank you.

6   **Q.**   Now, 91, up on the screen, is an amendment to the NFLPA

7   Players Inc licensing agreement, correct?

8   **A.**   That's correct.

9          **MR. KESSLER:**  Your Honor, objection.  It's referring

10  to a different agreement than the '94 agreement he just

11  referred to, if you look at the first line.

12         **THE COURT:**  Mr. Parcher, do you need to reframe your

13  question?

14         **MR. PARCHER:**  I don't think so, but I'll -- I'll

15  bring that out if it will make it easier.

16         **THE COURT:**  Overruled.  Please make it clear.

17         **MR. PARCHER:**  It will make it easier.

18  **BY MR. PARCHER:**

19  **Q.**   The first PA/PI agreement, which I just showed on the

20  screen a moment ago, was the 1994 agreement, correct?

21  **A.**   That's correct.

22  **Q.**   And that contained the 37 percent in paragraph 5(a),

23  correct?

24  **A.**   Yes.

25  **Q.**   That 37 percent never changed up until 2006?  We'll talk

 1  about whether it changed at all in 2006.  But that 37 percent

 2  never changed in the 2000 agreement, did it?  Remained the

 3  same?  Up to this point.

 4  **A.**   Yes.

 5  **Q.**   Okay.  Thank you.

 6           Now, so let me say it in a different way.  The fact

 7  that the union, PA and PI shared 63 percent remained the same

 8  from '94 until the document that I'm going to question you

 9  about in 2006, right?

10  **A.**   Uhm, I -- that sounds right.  I'm not -- you know, I'm

11  trying to remember the circumstances and the dates.  But I

12  think so.

13  **Q.**   You have no reason as you sit here today to think that

14  you, that Players Inc and Players Association ever took less

15  than 63 percent, do you, as their share?

16  **A.**   I'm sorry.  I'm trying to be precise, and I'm not -- I

17  didn't get the whole question.

18  **Q.**   As you sit on the witness stand today you have no reason

19  to think that between 1994 and 2006, Players Inc and the

20  Players Association ever revised their share so that they took

21  less than 63 percent, do you?

22  **A.**   Well, there was --

23  **Q.**   Could you just say "yes" or "no"?

24  **A.**   I really can't without explaining it.

25           **THE COURT:**  All right.  Go ahead and explain.

1          **THE WITNESS:**  There was a modification in the

2     arrangement as a result of advice from tax counsel that had

3     some of the money that would have in the past gone through

4     Players Inc, and then to -- from licensees, and then to the

5     Players Association as a result of the licensing agreement

6     after a certain point went directly -- some of that money went

7     directly to the Players Association.  I won't get into all the

8     reasons.

9     **BY MR. PARCHER:**

10    **Q.**    Players Association meaning the union?

11    **A.**    Yes.

12    **Q.**    Right.

13    **A.**    But the essential division that was arrived at as a result

14    of the valuation remained the same.

15    **Q.**    Okay.  I'm just trying to establish, sir, that basically

16    63 percent to the defendants and 37 percent to the active

17    players was written in in 1994, and it continued up to 2006,

18    correct?

19    **A.**    That's correct.

20    **Q.**    Thank you.

21          Now, turning to this amendment.  In this -- well,

22    first, you signed this agreement on behalf of Players Inc,

23    right?

24    **A.**    That's correct.

25    **Q.**    And there's a second signature there.

1          **MR. PARCHER:**  If we can look at the signature page

2     for just a moment.

3               (Document displayed.)

4     **BY MR. PARCHER:**

5     **Q.**   Do you recognize that as Gene Upshaw's signature?

6     **A.**   I do.

7     **Q.**   So that Gene Upshaw and you negotiated with Gene Upshaw

8     and you to make this amendment, right?

9     **A.**   These changes were made as a result of advice from tax

10    counsel.  And I executed the agreement on behalf of Players

11    Inc, and Mr. Upshaw executed the agreement on behalf of the

12    Players Association.

13    **Q.**   I would ask you, sir, just to answer "yes" or "no" if you

14    can answer "yes" or "no," please.

15              The fact is that you and Upshaw who were the 1 and 2

16    in the union and 1 and 2 in Players Inc are the persons who

17    signed and negotiated -- and agreed upon this agreement, right?

18              **MR. KESSLER:**  Compound, Your Honor.

19              **THE WITNESS:**  We each signed this agreement --

20              **THE COURT:**  Overruled.

21              Go ahead and answer, please.

22              **THE WITNESS:**  We each signed this agreement, yes.

23    **BY MR. PARCHER:**

24    **Q.**   Now, if you'll turn, if you will, to paragraph 2(e) on

25    this agreement, on the second page.

1            **MR. PARCHER:**  If we can blow it up a little bit,

2    please, so the jury can see it.

3            (Document displayed.)

4    **BY MR. PARCHER:**

5    **Q.**   The fact is that the purpose of this agreement, this

6    amendment, sir, was to allocate an additional $8 million to the

7    NFLPA and PI, Players Inc, correct?

8            Yes or no, please.

9    **A.**   I want to make sure I'm familiar with it before answering

10   the question.

11           Could you repeat the question for me?

12   **Q.**   Yes.  The fact is we're looking at 2(e).  It says:

13           "Notwithstanding the other provisions in this

14   Section 4, $8 million of the amount described in Section 4A

15   shall be paid out of the licensing revenue depository account

16   established" -- I can't read whether that word is "to" or

17   "for" -- "to disburse amounts payable to the NFLPA and Players

18   Inc, with the depository account paying 60 percent of such

19   amount to the NFLPA and 40 percent of such amount to Players

20   Inc."

21           You see that, right?

22   **A.**   Yes.

23   **Q.**   Would you agree, sir, is this a correct statement:  Is the

24   purpose of this amendment or a purpose of this amendment was to

25   allocate an additional $8 million above and beyond the

1  63 percent to the NFLPA and PI, correct?

2  **A.**   Yes.

3  **Q.**   So that this amendment entitled you to keep an additional

4  $8 million over and above the 63 percent, right?  Yes or no,

5  please.

6  **A.**   Yes.

7  **Q.**   Now I'll turn your attention, if I can, back to Exhibit

8  28 --

9          **MR. PARCHER:**  Which is already in evidence, Your

10  Honor.  That's the EA license agreement.

11          **THE COURT:**  Which one?

12          **MR. PARCHER:**  28.  Two-eight.

13          **THE COURT:**  Two-eight.  All right.

14          Go ahead.

15          **MR. PARCHER:**  Right.

16          **THE COURT:**  No, 28 I don't have in evidence.

17          **MR. PARCHER:**  No?

18          **THE COURT:**  Do you have it in evidence, Dawn?

19          **THE CLERK:**  I do, on October 22nd.

20          **THE COURT:**  All right.

21          **MR. PARCHER:**  Did we do it --

22          **THE COURT:**  Sorry.  My clerk said it is in evidence.

23  I was mistaken.

24          Go ahead.

25          **MR. PARCHER:**  Now, I'm questioning my own memory

1  here.  I thought we did it on Wednesday.

2           **THE COURT:**  It's in.  Go ahead.

3           **MR. PARCHER:**  Thank you.

4           So let's go up a little bit, if we can, to the

5  introductory paragraph.  Go up more.  That's right.

6           (Document displayed.)

7  **BY MR. PARCHER:**

8  **Q.**  Now, you see there the last sentence of the introductory

9  paragraph:

10           "This agreement shall be effective as of

11  March 1, 2005"?

12  **A.**  Yes, I do.

13  **Q.**  So that's when this license agreement actually took

14  effect, right?

15  **A.**  Yes.

16  **Q.**  Just to be clear for -- I'm sure the Court understands,

17  but just to be clear for the jury, by "the license agreement"

18  we're talking about the license between Electronic Arts and

19  Players Inc, related to name and likeness images?

20  **A.**  Are you asking me if --

21  **Q.**  No, I'm just trying to establish so that everybody knows

22  what document we're talking about.

23  **A.**  The license agreement's between Electronic Arts and

24  National Football League Players Incorporated.

25  **Q.**  Now, turn -- on your exhibit, turn -- just go down the

1  page.  Still on page 1, up to section 1(a).

2  **A.**   All right.

3  **Q.**   Let's get that on the board.

4         Have you had a chance to look at it, sir?

5  **A.**   Yes.

6  **Q.**   Is it correct that the second sentence of 1(a), which

7  references, quote:

8              "Players, including, but not limited to, retired

9  players who have not entered into such group licensing

10  authorization, but who nevertheless authorized PI to represent

11  such players."

12         Do you see that there, that sentence?

13  **A.**   I couldn't find where you were beginning to read.  I'm

14  sorry.

15  **Q.**   Oh, my.

16  **A.**   I'm looking at the document, not up at the --

17  **Q.**   Okay.  So what can I do?

18  **A.**   I got it.  I got it.

19  **Q.**   Shall I say it again?

20  **A.**   Yes, please.  Thank you.

21  **Q.**   Okay.  Fine.

22         Isn't it correct that the second sentence of this

23  paragraph 1(a), which is up on the screen, which references:

24              "Players, including, but not limited to retired

25  players, who have entered into such group licensing

1  authorization, but who nevertheless authorized PI to represent

2  such players."

3           Isn't it correct that that sentence includes retired

4  players who signed GLAs that are different than the standard

5  form or the form attached to the EA agreement as Exhibit A?

6  Yes or no?

7           **MR. KESSLER:**  Objection, Your Honor.  That question

8  is compound, confusing and self-contradictory internally in the

9  question.

10          **THE COURT:**  Overruled.

11          Please answer.

12 **BY MR. PARCHER:**

13 **Q.**  Yes or no, sir?  Doesn't that include retired players who

14 signed GLAs different than the standard or the referenced form

15 attached to the Electronic Arts agreement as Exhibit A?  Or

16 attachment A, I should say.

17 **A.**  I believe the answer is yes, but I'm a little confused by

18 the question.

19          **THE COURT:**  Well, this is important enough that I

20 want the witness to explain anything that he wishes to explain

21 in that answer.  So, please, take your time and give any

22 explanation that you would like.

23          **THE WITNESS:**  The Players Inc on occasion secures

24 authorization from players who -- who -- including retired

25 players, who have not entered into the group licensing

1   authorizations referred to above which are either attachment A

2   or contained in paragraph 4(b) of the NFL player contract, but

3   who despite that fact have authorized Players Inc to represent

4   them for designated license programs.

5   **BY MR. PARCHER:**

6   **Q.**   So are you acknowledging, sir, that that sentence includes

7   retired players who signed GLAs different than the standard

8   form or the form attached to the EA agreement as attachment A

9   or Exhibit A?

10          Are you acknowledging that, yes or no?

11          **MR. KESSLER:**  Objection to the form of that question.

12          **THE COURT:**  Overruled.

13          Please answer.

14          **THE WITNESS:**  Yes, with respect to what it asks about

15  in this -- or what it refers to in this sentence, yes.

16  **BY MR. PARCHER:**

17  **Q.**   Well, I don't know.  I can't tell whether you're

18  qualifying your answer or you're not qualifying your answer.

19          Yes or no, does that sentence include retired players

20  who signed GLAs different than the standard form attached to

21  the EA agreement as attachment A?

22  **A.**   Well, yes, because retired players do not sign attachment

23  A or paragraph 4(b).

24  **Q.**   So it does include retired players who signed group

25  licensing agreements, not attachment A.  It does include those

1  players, right?

2  **A.**    It could.

3  **Q.**    Does it or doesn't it?  Not it could or would or it

4  should.  Doesn't it or doesn't it, sir?

5  **A.**    It depends.

6  **Q.**    Okay.

7           **MR. PARCHER:**  I would ask to play a video from the

8  deposition, Your Honor.  May I?

9           **THE COURT:**  Fine.

10          **MR. PARCHER:**  Thank you.  I'm just asking.

11          **THE COURT:**  What's the page and line?

12          **MR. PARCHER:**  It's page 205, line 25, to page 206 to

13 line 7.

14          **THE COURT:**  Any objection?

15          **MR. KESSLER:**  Not to playing that.

16          **THE COURT:**  Go ahead.  Play the --

17          (Videotaped deposition played in open court as

18          follows:)

19          "**QUESTION:**  The last sentence which talks

20          about authorization for inclusion in Players

21          Inc licensing program for players including

22          but not limited to retired players, does that

23          reference retired players who signed GLAs

24          different than the standard form attached to

25          the -- to this license agreement?

1              **"ANSWER:** I believe so."

2  **BY MR. PARCHER:**

3  **Q.** Turning now, sir, to paragraph 2(a) of this same document,

4  Exhibit 28, the EA agreement.

5              Have you got it there, sir?

6  **A.** Yes, I do.

7  **Q.** Is it correct, Mr. Allen, that the grant of a license in

8  paragraph 2(a) includes the grant of the retired players who

9  have given authorization to Players Inc to represent such

10 players for designated -- for designated Players Inc license

11 programs?

12 **A.** No.

13             **MR. PARCHER:** Okay. I'd ask to read a deposition

14 into evidence, Your Honor.

15             **THE COURT:** Go ahead.

16             **MR. PARCHER:** Thank you.

17             I'm referring now to page 208, lines 11 through 22.

18             **THE COURT:** Are you going to read it or play it?

19             **MR. PARCHER:** Read it.

20             **THE COURT:** All right.

21             Any objection?

22             **MR. KESSLER:** I'd like to read it, Your Honor, first.

23             It's not impeachment, Your Honor.

24             **THE COURT:** Was the --

25             **MR. KESSLER:** The testimony is consistent.  The

1  witness is just reading the language of the GLA in the answer.

2          **THE COURT:**  Why isn't that correct?

3          **MR. PARCHER:**  Because he just said "no" in response

4  to the question and --

5          **MR. KESSLER:**  It's --

6          **MR. PARCHER:**  Excuse me, Mr. Kessler.  You had your

7  turn.

8          Because the witness just said "no" in response to the

9  precise question that's going to be put to him in his

10  deposition.  In the deposition he references the language and

11  never quibbles with it.  He never argues with it.  He never

12  says "no."  He never says it doesn't mean that.

13         **MR. KESSLER:**  Your Honor, it's not the precise

14  question that he asked.  It's a different question, the

15  transcript will reflect.  The witness answered that question,

16  and this question is not impeachment of it.

17         **THE COURT:**  Well, whether it is or not, it will be

18  for the jury to decide.

19         Please go ahead.  Overruled.

20         **MR. PARCHER:**  "Question," the last sentence --

21         **THE COURT:**  What page are you on?

22         **MR. PARCHER:**  Just bear with me a second, Your Honor.

23         It's page 208/11, starting with 11.  Goes down to 22.

24         **THE COURT:**  Read it exactly.

25         **MR. PARCHER:**  Right, right.  I was reading the wrong

1  words.

2          "**QUESTION:**  And I'm asking you your

3          understanding as the president of Players Inc

4          and the signatory of this agreement, isn't it

5          a fact that the grant of license includes the

6          grant of the retired players who have given

7          authorization to Players Inc to represent

8          such players for designated Players Inc

9          license programs?

10         "**ANSWER:**  'It includes retired players who

11         have not entered into such'" -- quote:  'It

12         includes retired players who have not entered

13         into such group licensing authorizations but

14         who nevertheless authorized Players Inc to

15         represent such players for designated Players

16         Inc license programs,'" period, end quote.

17         **MR. KESSLER:**  Your Honor, it's a quotation, just for

18  the record, of the license language that was read.  I just want

19  the jury to understand that since he didn't display it.

20         **MR. PARCHER:**  Your Honor, please, may I just say

21  something?

22         **THE COURT:**  Is this a quote from the GLA?

23         **MR. PARCHER:**  This is.  Yes, it is.

24         **THE COURT:**  Why shouldn't that be made clear?

25         **MR. PARCHER:**  He can make -- counsel can make it

1  clear all he wants.  I -- on Wednesday, I don't want to make a

2  big deal of this, but listened to a lot of speaking objections.

3  Finally, we spoke up and said:  "Please don't do that."  And

4  Your Honor said:  "Don't do that."

5          Now, we are getting a speaking objection.  Counsel

6  has already said he's going to have two hours of direct

7  examination.  He can bring out anything he wants.

8          I just object to the way he interrupts my flow to

9  make his point.

10         **THE COURT:**  But this -- some of what you say may be

11 legitimate.  But in this case I think it is a fair point to

12 bring to the jury's attention that this answer has quotations

13 marks around it, which is unusual.  And apparently that's

14 because the witness was reading the answer in its entirety, was

15 reading the language of the document.

16         **MR. PARCHER:**  That's correct.  And, indeed, Your

17 Honor -- sorry to interrupt.  Didn't mean to.

18         **THE COURT:**  Let's just make that clear to the jury.

19         **MR. PARCHER:**  Indeed, Your Honor.  I thought I did

20 make myself very clear because I started to go, and then I

21 stopped and I read "quote" and I read "end quote" into the

22 record to the witness.

23         **THE COURT:**  You did.  But I'm positive the jury has

24 no idea what it means if it's in quotes.

25         **MR. PARCHER:**  Okay.  Fair enough.

1           **THE COURT:**  All we're doing is letting them know.

2  You did do that, and I thank you for the attempt to clarify it.

3           All right.  Let's move on.

4           **MR. PARCHER:**  Thank you.  Thank you.

5           **THE COURT:**  No speaking objections.

6           **MR. PARCHER:**  Thank you, Your Honor.

7           **THE COURT:**  I agree with that.  No speaking

8  objections.

9           **MR. PARCHER:**  Thank you, Your Honor.

10          What is a speaking objection?  Well, a regular

11 objection is "hearsay, ambiguous, compound, lacks -- states

12 facts not in evidence."

13          Those are the objections that lawyers are supposed to

14 make.  Every now and then a lawyer stands up and makes a speech

15 like they're in Congress or something.

16          And there are reasons why we don't allow that,

17 because -- I won't go into all the reasons.  But speaking

18 objections are frowned upon.  And if it continues I'll get into

19 more reasons why they're frowned upon.

20          This applies to both sides.  No speaking objections

21 whenever your witness is on the stand.

22          **MR. PARCHER:**  Haven't made one yet.

23          **THE COURT:**  We'll see when they get on the stand.

24          **MR. PARCHER:**  Right.

25          **THE COURT:**  All right.  Go ahead.

1          **MR. PARCHER:**  Yes, sir.  We'll turn to another topic

2   now.

3   **BY MR. PARCHER:**

4   **Q.**   Back to the Electronic Arts agreement, Exhibit 28 that we

5   referenced before.  I'd ask you to turn your attention --

6          **MR. PARCHER:**  I would ask to put on the screen, too,

7   to paragraph 6(a) of Exhibit 28, which is on page 3.

8          (Document displayed.)

9   **BY MR. PARCHER:**

10  **Q.**   The reason I pause, sir, is I'm trying to give you an

11  opportunity to read it.

12  **A.**   Appreciate that.

13  **Q.**   I didn't want to ask you a question and you didn't have a

14  chance to read it.  Just give me a nod when you're ready to go

15  to bat.

16          Only on 6(a), sir.

17  **A.**   Okay.

18  **Q.**   Okay.  Is it correct that the $25 million royalty amount

19  referenced under this license agreement was by far the largest

20  amount of royalty paid by any licensee to PI up to that time?

21  **A.**   Yes.

22  **Q.**   Is it correct that it was many, many millions of dollars

23  more than had ever been paid to PI up to that time?

24  **A.**   Do you mean by an individual licensee?

25  **Q.**   Of course by an individual licensee.

1  **A.**    Yes.

2  **Q.**    Right.  Now, turn to paragraph 6 (c), if you will.  Same

3  document.

4  **A.**    All right.

5  **Q.**    Is it correct that all of the $25 million is guaranteed

6  and paid -- excuse me -- is guaranteed and paid by

7  Electronic Arts no matter what use they make of the players, or

8  whether they use any players at all?

9          Yes or no, sir?

10 **A.**    Yes.

11 **Q.**    Speak up a little.

12 **A.**    I'm sorry.

13 **Q.**    Louder.

14 **A.**    Yes.  Yes.

15 **Q.**    "Yes" is the answer.

16          Now, it's further correct that when the $25 million

17 goes to Players Inc, since you contend this is an active player

18 document, the money goes to all active players, even those

19 players if their names and likenesses weren't used, right?

20          **THE COURT:**  Can you rephrase that?

21          **MR. PARCHER:**  Yes.

22          **THE COURT:**  It had a false start, and I just didn't

23 get it.

24          **MR. PARCHER:**  Right.

25          **THE COURT:**  Please ask again.

1  BY MR. PARCHER::

2  Q.   Right.  Okay.  When that $25 --

3         MR. PARCHER:  In fact, I'll withdraw that.  I don't

4  need to go into that.

5  BY MR. PARCHER::

6  Q.   Let's turn to another document, which is Exhibit 506.

7  A.   All right.

8         (Document displayed.)

9  BY MR. PARCHER:

10 Q.   Do you have that there in front of you, sir?

11 A.   Yes, I do.

12 Q.   Now, that's a revised retired player group licensing

13 agreement, isn't it?

14 A.   I don't know what you mean by "revised."

15 Q.   Well, the language --

16        MR. PARCHER:  Well, let's just withdraw that.

17 BY MR. PARCHER::

18 Q.   This -- this document, Exhibit -- let me just say it

19 right.

20        Am I correct in saying that shortly after the EA

21 agreement became effective on March 1st, 2005, Players Inc

22 began to work on changing the language -- language of the

23 retired players GLA?

24 A.   I don't recall the dates, and they weren't connected to

25 each other.  I don't recall -- this document was revised over

1  time.  I don't recall the dates with any specificity as to when

2  that happened.

3           But it was not done with reference to any particular

4  license agreement.

5  **Q.**  I would appreciate you just answering my question.  The

6  answer is you don't know whether shortly after March 1st, 2005

7  you, you and your organization, began working on a revised

8  group licensing agreement for your players?

9           Is that your testimony, yes or no?

10 **A.**  I don't recall when that happened with any specificity.

11 **Q.**  All right.  Who is Corinne Beavers?

12 **A.**  She's an employee of the NFL Players Association.

13 **Q.**  I would ask you to turn to Exhibit 54, sir.  Have you got

14 it in front of you?

15          Go ahead.  Take your time.

16          Are you ready?

17 **A.**  Yes.

18          **MR. PARCHER:**  Before I move to introduce 54 into

19 evidence, let me just orient -- say to the Court and jury,

20 focusing on the jury, to where I'm at in my questioning.

21 **BY MR. PARCHER:**

22 **Q.**  The $25 million payment which became effective on

23 March 1st, 2005, from EA to Players Inc, that was a huge

24 increase from anything you had gotten from them before, right?

25 Huge.

1   **A.**   It was a significant increase, yes.

2   **Q.**   You want to use the word "significant"?  You won't give me

3   "huge"?  Yes or no, sir?

4   **A.**   I don't remember what it was, and what it went to

5   precisely.

6   **Q.**   But it was quite a lot of money, right?

7   **A.**   Yes.

8   **Q.**   Now, Exhibit 54 is a letter from Corinne Beavers to you,

9   is it not?

10  **A.**   I think it was an e-mail, but, yes.

11  **Q.**   Well, right.  It's correspondence between she --

12  **A.**   That's right.

13  **Q.**   -- your employee and you.

14          **MR. PARCHER:**  I will move its admission, Your Honor.

15  It's 54.

16          **THE COURT:**  Any objection?

17          **MR. KESSLER:**  No, Your Honor.

18          **THE COURT:**  54 is received.

19          Thank you.

20          (Trial Exhibit 54 received in evidence.)

21          **MR. PARCHER:**  I would like to put that up on the

22  board.  Blow it up a little more.  Thank you.

23          (Document displayed.)

24  **BY MR. PARCHER:**

25  **Q.**   This is Corinne to you.

1              "Hi, Doug."

2         That's you, right?

3  **A.**   Yes.

4  **Q.**   "Have you had a chance to look at/revise the retired

5  players GLA?  I want to have the new one ready to use at

6  convention.  There are 113 guys attending that we need to get

7  to sign (82 with expired GLAs and 31 who have never had one).

8  Muneer is going to sit at registration with us and have them

9  sign.  Thanks."

10         Do you see that?

11 **A.**   I do.

12 **Q.**   Does that refresh your recollection that certainly by May

13 of 2005, a month and a half or so after receiving $25 million

14 from Electronic Arts, you began work on revising the retired

15 players GLA, yes or no?

16 **A.**   Yes.

17 **Q.**   And the fact is you did begin work on revising the retired

18 players GLA shortly after the 25 million bucks became

19 effective, right?  I'm saying "bucks."  I should say "dollars."

20         Yes or no.

21 **A.**   Yes.

22 **Q.**   Now, let's take a look at 506, again, please.  That is the

23 retired players' revised GLA.

24         You began using that revised -- I'm sorry.  Wait

25 until it's on the board.  I'm not paying close attention.

1          **MR. PARCHER:**  Exhibit number?

2          Exhibit number is 506?

3          **THE CLERK:**  506 is not in evidence.

4          **MR. PARCHER:**  It's not in?  Oh, my.  Oh, my.

5  **BY MR. PARCHER::**

6  **Q.**   Take a look at 506.

7          **THE COURT:**  You asked him about it, but never moved

8  it in.

9          **MR. PARCHER:**  My mistake.

10          **THE COURT:**  Any objection to 506?

11          **MR. KESSLER:**  No objection.

12          **MR. PARCHER:**  Thank you.  Sorry about that.

13          Ahead of myself.

14          (Trial Exhibit 506 received in evidence.)

15          (Document displayed.)

16  **BY MR. PARCHER:**

17  **Q.**   You began using this new or revised player, retired

18  players GLA form.  Players Inc began using it in 2005, correct?

19  **A.**   I -- I don't know exactly when that happened.

20  **Q.**   Well, you know that Corinne is telling you to take a look

21  at it -- this is Exhibit 54 -- in -- in May because she wants

22  to get it ready for a convention, right?

23  **A.**   I have no idea whether that happened or not, whether there

24  was a change that was made for that convention or not.

25  **Q.**   As you sit here today, do you have any reason to doubt

1  that in 2005, a few months after you, Players Inc, received

2  $25 million, the huge increase, you put into operation a

3  revised retired player GLA?

4  **A.**   I don't remember when that happened with any specificity.

5  **Q.**   You think it might not have happened in 2005?

6  **A.**   I don't remember.

7  **Q.**   You have no indication at all?

8  **A.**   I don't remember when that happened.

9  **Q.**   Turning your attention to the document itself.  We'll go

10 to the second paragraph, please.

11           "In consideration for this assignment."  What

12 you changed in the language, first, you removed all the

13 language about the creation of the escrow account.  It doesn't

14 exist there anymore, does it?

15 **A.**   There's no language about an escrow account.

16 **Q.**   You removed it, didn't you?

17 **A.**   Not me personally, but the -- the group of us that were

18 working on this, yes.

19 **Q.**   Well, wait a minute.  In the group of you that were

20 working on it, you were the number one guy, weren't you?

21 **A.**   Uhm, I don't argue with you about that.  Yes.

22 **Q.**   Right.  So you're not distancing yourself from the removal

23 of the escrow account.  You were amongst the significant people

24 that said:

25           "Let's get the escrow account out of here.  Now

1  we've got 25 million bucks.  Now let's get the escrow account

2  out of here and give them -- 'them' the retired fellows -- a

3  revised GLA"?

4          **MR. KESSLER:**  Objection compound.

5          **THE WITNESS:**  No, that's not at all what happened.

6          **THE COURT:**  It is a argumentative, but the witness

7  has said:  No, it didn't happen that way.

8          Overruled.  Go ahead.

9          **MR. PARCHER:**  Yes, sir.

10          **THE COURT:**  Go ahead.

11  **BY MR. PARCHER:**

12  **Q.**   In any event, that's what occurred.  A few months after

13  the $25 million you -- "Players Inc," we'll say.  I know you're

14  not comfortable saying "you" -- Players Inc removed the escrow

15  account.  You can explain it at some other point, but the

16  answer is "yes," isn't it?

17  **A.**   This document is an NFL Players Association document.

18  **Q.**   Okay.  NFLPA removed the escrow account, correct?

19  **A.**   That language came out of this agreement.

20  **Q.**   Thank you.

21  **A.**   That's correct.

22  **Q.**   Secondly --

23          **MR. PARCHER:**  Can we put -- is it possible to put up

24  on the board 110, which is already in evidence -- that's the

25  old GLA, Your Honor -- at the same time as we have 506 up

1   there.

2               (Document displayed.)

3               If you can highlight paragraph 5 of the old GLA.

4           **THE WITNESS:**  Do you have that, that I could look at

5   here?

6   **BY MR. PARCHER:**

7   **Q.**   I'm sorry?

8   **A.**   Do you have it, that I could look at?  It's hard for me to

9   see.

10              **THE COURT:**  Do you have a copy of the --

11              **MR. PARCHER:**  Of the old GLA, I do.

12              **THE COURT:**  I prefer you use the actual court copy.

13              **MR. PARCHER:**  I'll give him mine.  Your Honor has it.

14              **THE COURT:**  This time you can do it.  But I like it

15  whenever the witness works with the original exhibits.  But go

16  ahead.

17              **MR. PARCHER:**  I thought those were on there from

18  Wednesday.  I didn't agree that they get taken.

19              It's in evidence, Judge.  It's not a new document.

20              **THE WITNESS:**  I have it.  I just didn't know --

21              **MR. PARCHER:**  We questioned him about it on --

22              **THE COURT:**  Let's have him read the -- work off of

23  the exhibit.

24              **MR. PARCHER:**  Yes, sir.  Yes, sir.

25              **THE WITNESS:**  Thank you.

1          **THE COURT:**  All right.  We have them on the screen

2   side by side.  And your question is going to be about the

3   paragraph you've highlighted.

4          **MR. PARCHER:**  That's correct.

5          **THE COURT:**  "It is further understood."

6   **BY MR. PARCHER:**

7   **Q.**   Are you with me?  Are you ready to go, Mr. Allen?

8   **A.**   Yes.

9   **Q.**   Now, we've established that the escrow account referred to

10  in what we'll call "the old GLA," has been removed.

11          Now I'm questioning you about -- about another

12  change.  You removed the language about dividing the money

13  between the player and eligible NFLPA members who have signed a

14  group licensing authorization form, correct?  That's removed.

15          You don't find that in the new -- in the new revised

16  GLA.

17  **A.**   That's correct.

18  **Q.**   Thank you.

19          In the second paragraph --

20          **MR. PARCHER:**  You can take off the old one now,

21  please.  Take off 110.

22  **BY MR. PARCHER:**

23  **Q.**   In the second paragraph of the new GLA, Exhibit 506, do

24  you see the language that:

25          "The NFLPA agrees to use its best efforts to

1  promote the use of NFL player images in group licensing

2  programs, to provide group licensing opportunities to all NFL

3  players," et cetera?

4          Do you see that?

5  **A.**   I do.

6  **Q.**   The reference to "NFL players" in this paragraph of the

7  new GLA includes retired players, right?

8  **A.**   I was reading it carefully.  Now, I've lost the question.

9  I apologize.

10 **Q.**   The reference to "NFL players," I think it's not

11 rhetorical, but -- okay.  I don't want to make a speech.

12         The reference to "NFL players" in paragraph 2 of the

13 new GLA includes retired players, correct?

14 **A.**   Yes.

15 **Q.**   Thank you.

16         Now, you put into the new GLA "best efforts."

17         You see that, right?

18 **A.**   I see the words "best efforts."

19 **Q.**   Right.  But the truth is, is it not, that Players Inc

20 always made its best efforts to promote the retired players,

21 correct?  You always did your best?

22 **A.**   Uhm, yes.

23 **Q.**   All right.  Next topic.

24         **MR. PARCHER:**  Almost done, Judge.

25         **THE COURT:**  Before you leave this, though, I want to

1  ask a question that may be clarifying.  This is for counsel.

2          In our lawsuit, is it the old GLA or the new GLA that

3  the class is trying to enforce?

4          **MR. PARCHER:**  I believe the answer is both.

5          **MR. KESSLER:**  Your Honor, that's --

6          **MR. PARCHER:**  I'm wrong?  No, that's wrong.  It's the

7  old one.  It's the old one.

8          **MR. KESSLER:**  The class was certified --

9          **MR. PARCHER:**  It's the old one.  We're not wrong.

10         (Counsel speaking simultaneously, which was not

11         reportable.)

12         (Reporter interrupts.)

13         **MR. PARCHER:**  I'm sorry.

14         **MR. KESSLER:**  I'm sorry.

15         I said it's only the old GLA that is the subject of

16  this lawsuit.  There's no claim at all concerning this new GLA.

17         **THE COURT:**  Do you agree with that?

18         **MR. KATZ:**  That's correct.

19         **THE COURT:**  Mr. Katz agrees with that.  All right.

20         So now you might be over there wondering well, then,

21  why are we getting into the new GLA?  And the reason is

22  sometimes is helpful to get into -- because you're going -- in

23  this case you're going to get to see a lot of what are known in

24  the law as the surrounding circumstances.

25         So the new GLA is a circumstance that you can

1  consider even though it's not the specific document that is

2  being sued on in this case.  That's point number 1.

3          All right.  Point number 2 that I want you to be

4  aware of is you have seen references to the EA agreement,

5  right?

6          When you go into the jury room to decide this case

7  you're going to have to decide:  What does the EA agreement

8  mean and require, and who does it cover?

9          And you're also going to have to decide the meaning

10 of the GLA in some respects.  And maybe even some other

11 third-party license agreements before this is all over.

12         So you -- I want you to be -- you've heard this

13 before, but let's reminds you.  It's a new week.  At the end of

14 the day the contract interpretation of both the GLA, the old

15 one, and the EA agreement, and maybe some other license

16 agreements we haven't heard about, is going to be for you to

17 figure out how they fit together and how they -- what their

18 meanings are, and what rights and obligations they create and

19 who they cover and so forth.

20         So as you hear the evidence, I want you to be

21 thinking:  At the end of the trial you're going to have to make

22 those decisions.

23         So that's my heads-up to you as we start a new week.

24         All right, Mr. Parcher, you're just about done,

25 right?

1          **MR. PARCHER:**  I'm more than on the final turn.

2          **THE COURT:**  You go ahead.  Finish up, and then we're

3   going to have our break.

4          **MR. PARCHER:**  Thank you.  I'll be as quick as I can,

5   Judge.

6   **BY MR. PARCHER:**

7   **Q.**   Tell the Court and the jury who's LaShun Lawson?

8   **A.**   LaShun Lawson was a Players Inc employee.

9          **MR. PARCHER:**  I move -- I move into evidence Exhibit

10  1320, which has been the subject of quite a bit of discussion

11  here.  It's a letter from LaShun.

12         **THE COURT:**  Any objection?

13         **MR. KESSLER:**  Which exhibit, please?

14         **MR. PARCHER:**  1320.

15         **MR. KESSLER:**  The correct exhibit, Your Honor, is

16  1183.  I do not understand this.

17         **MR. PARCHER:**  No.

18         **MR. KESSLER:**  Maybe I'm wrong.

19         **THE COURT:**  He is entitled to move in whatever number

20  he wants to move in.

21         **MR. PARCHER:**  A rare event, Your Honor.

22         **MR. KESSLER:**  It's correct, Your Honor.  No

23  objection.

24         **MR. PARCHER:**  A rare event, Your Honor.  I want to

25  say it, okay?

 1            **THE COURT:**  1320 is received.

 2            **MR. KESSLER:**  Thank you, Your Honor.

 3            (Trial Exhibit 1320 received in evidence.)

 4            **MR. PARCHER:**  That is correct.  All right.

 5            (Document displayed.)

 6   **BY MR. PARCHER:**

 7   **Q.**   So take a look at 1320, if you will.  Let's get to the

 8   last sentence of paragraph 1, if we can.

 9   **A.**   Can I read it?  It's short.

10   **Q.**   Sure.  I'm just trying to get myself set here so we don't

11   waste anybody's time.

12            **MR. PARCHER:**  Judge, I said I would be done in a

13   minute.  It is true.  But I just want to go back for 30

14   seconds, not three hours, 30 seconds.

15   **BY MR. PARCHER:**

16   **Q.**   I'm going to take you back to someplace else for just a

17   minute, Mr. Allen.  Is that okay?

18   **A.**   I'm sorry.  I was reading.

19   **Q.**   I know.  It's all on me.  All on me.  Just go back to the

20   EA, the new GLA for a minute.

21            When you changed the retired players GLA, did you

22   inform retired players that you had just signed a new

23   Electronic Arts agreement with a $25 million guarantee?  Yes or

24   no?

25   **A.**   We certainly -- I can't answer that "yes" or "no."  I

1  don't recall the precise time of the circumstances in which we

2  informed them.

3  Q.   Let's just see, quickly.  You didn't put it into the GLA

4  that you just received?

5  A.   No.

6  Q.   The $25 million.  You didn't write a letter when you

7  enclosed the GLA to the retired players that you had just

8  received $25 million?

9  A.   No.

10  Q.   Let's go back to where we were.  I'm sorry about that

11  question.  I forgot to ask you the question.

12          In the last sentence --

13          **MR. PARCHER:**  Can you get it up a little better so

14  the jury can see it?

15          (Document displayed.)

16  **BY MR. PARCHER:**

17  Q.   I'm on paragraph 1 of the last sentence:

18          "Hence, any and all players not listed in

19  attachment A or B cannot be represented in Madden 2002 with the

20  number that the player actually wore, and must be scrambled."

21          Do you see that?

22  A.   I do.

23  Q.   So in the last paragraph, amongst other things, Players

24  Inc told Electronic Arts that the images of the retired

25  football players, unless they were on Exhibit A and Exhibit B,

1  must be scrambled, correct?

2          Yes or no?

3  **A.**   One more time.  Could you repeat the question?

4  **Q.**   Do you want me to repeat the question?

5  **A.**   Please.

6  **Q.**   It is correct that in the last sentence of -- in the last

7  sentence of paragraph 1, amongst other things, Players Inc told

8  Electronic Arts that the images of retired football players,

9  those not on A or B, must be scrambled, correct?  Says so right

10 there.

11 **A.**   With respect to those players in the clause that talks

12 about -- well, that precedes that.

13 **Q.**   Excuse me.  Is the answer "yes" or "no"?

14 **A.**   With that explanation, the answer is "yes."

15 **Q.**   The retired players who signed retired player GLAs, if

16 their names weren't on attachment A and weren't on attachment

17 or Exhibit B, their names and likenesses must be scrambled,

18 right?

19 **A.**   I don't believe that there were any players that would --

20 **Q.**   Excuse me?

21 **A.**   I don't believe that -- that a player who had done that

22 would be in that circumstance.  I think that's logically

23 inconsistent.

24 **Q.**   Just could you just answer my question?

25          **THE COURT:**  Well, what's unclear even to me and maybe

 1  to the jury is what is attachment A and what is attachment B?

 2          **MR. PARCHER:**  Attachment A, according --

 3          **THE COURT:**  Let's get the witness to explain.

 4          Do you know what it is?

 5          **MR. PARCHER:**  It has already been asked and answered

 6  on Wednesday.

 7          **THE COURT:**  I don't remember it being asked and

 8  answered.  What is A and what is B?  He has already answered

 9  that?

10          **MR. PARCHER:**  Yes, sir.

11          **THE COURT:**  I don't remember that.

12          **MR. PARCHER:**  We have to go back.  I have to take

13  time to do it.

14          **THE COURT:**  That was done on Wednesday?

15          **MR. PARCHER:**  Yeah.  I could just say what it is.

16  **BY MR. PARCHER:**

17  **Q.**  You do agree Exhibit A --

18          **MR. PARCHER:**  I'll shoot it in, yes?

19          **THE COURT:**  Go ahead.

20          **MR. PARCHER:**  Thank you.

21  **BY MR. PARCHER:**

22  **Q.**  Exhibit A is what you claim is all the active players.

23  That's attachment A.  It's the form of an active players group

24  licensing agreement?

25          **MR. KESSLER:**  Your Honor, objection.  Counsel is

1  confusing the agreement of EA in 2005 with this agreement from

2  2000.  They are completely different attachments.

3        **MR. PARCHER:**  If your Honor pleases.

4        **MR. KESSLER:**  Completely different.  He should show

5  the attachments, and the witness can answer the question.

6        **MR. PARCHER:**  If your Honor pleases.

7        **MR. KESSLER:**  Misstates facts in evidence.

8        **MR. PARCHER:**  If your Honor pleases.  I will ado

9  whatever Your Honor directs me, obviously.

10        Not only is he mischaracterizing improperly what I'm

11  doing, but he's doing a speaking objection three minutes after

12  you said "no speaking objections."

13        **THE COURT:**  No, this time it's okay, because he's

14  getting at the point I was asking about.

15        It says, "The addendum that was signed last July was

16  a 3-year agreement."  And then, it refers to attachments A and

17  B, I guess, to that agreement.

18        Now, I don't remember that agreement.  Is that --

19  which agreement is that?

20        **MR. PARCHER:**  That agreement --

21        **THE COURT:**  Is that the EA agreement that you

22  referred to earlier?

23        **MR. PARCHER:**  No.  The agreement I referred to

24  earlier is a 2004 agreement.  There was a whole series of EA

25  agreements.

1                 THE COURT:  Which one is that referring, to a July

2    agreement last July?  Which one was that?

3                 MR. PARCHER:  Would have been either 2002 or before.

4                 MR. KESSLER:  No, Your Honor.  It's 2000.

5                 MR. PARCHER:  I said "2002 or before."  That includes

6    2000.

7                 THE COURT:  Pull that out, and let's see what the

8    attachments A and B of that are.

9                 MR. PARCHER:  Okay.  Well, I don't have it handy.  It

10   will take a minute to do that.

11                THE COURT:  Here's what we're going to do, to give

12   you a chance.

13                We're going to take our break a moment early, and

14   give you a chance to sort that out.

15                This is -- I know both sides have placed some

16   importance on this particular letter.

17                MR. PARCHER:  Yes, sir.

18                THE COURT:  So let's be clear what attachment A and

19   attachment B are.

20                MR. PARCHER:  Yes, sir.

21                THE COURT:  So let's do our homework in the meantime

22   and have it all teed up and ready to go when we come back.

23                We'll take a 15-minute recess.

24                Please remember the admonition.

25                (Jury in recess.)

1          (The following proceedings were held in open court,

2          outside the presence of the jury.)

3          THE COURT:  All right.  Anything you need me for?

4          MR. KESSLER:  Your Honor, I just had an issue.  We

5   have a witness, Steven Byrd, who is the executive vice

6   president of STATS, Inc., who we have disclosed and intend to

7   call in our case.

8          Because of the way in which the schedule was playing

9   out, it appears now that because of Mr. Byrd's vacation he

10  cannot be here next Monday, Tuesday, Wednesday, Thursday.

11         And I'm concerned that my case will neither start

12  before Friday, when he also can't be here, and it will end

13  before his vacation ends.

14         So what I've suggested, Your Honor, is either that we

15  be permitted to take a trial deposition of him, because he's

16  available this week.  We could do it in one afternoon.  And it

17  won't take more than one hour.  We have -- we're going to have

18  about a half hour of very important direct with him, and they

19  can have cross-examination.  Or we call him out of order during

20  their case, before Thursday of this week.

21         Plaintiffs have refused both alternatives, and I

22  would like the Court's permission to do either one.

23         THE COURT:  I'm going to allow you at least the

24  deposition, and I prefer the jury hear it live.  I don't know

25  why the plaintiffs --

1              Is it true you won't agree to this?

2         **MR. HUMMEL:**  Yes, Your Honor.

3         **THE COURT:**  Why won't you agree to this?

4         **MR. HUMMEL:**  Because the time for depositions is

5    over.  If they needed to preserve his testimony --

6         **THE COURT:**  Then it's going to interrupt your case.

7    You can call him out of turn on a day convenient to you.

8    That's unreasonable, Mr. Hummel.

9              You're going to have the same problem and need some

10   courtesy from them.  This happens in all trials, and we're

11   going to allow it.

12             How many more instances do you have?

13        **MR. KESSLER:**  This is the only one we have, Your

14   Honor.

15        **THE COURT:**  All right.  You work out when it's least

16   disruptive to the plaintiffs' case, and you can call him this

17   week.

18        **MR. HUMMEL:**  Thank you, Your Honor.

19        **MR. KESSLER:**  Very good, Your Honor.  Thank you.

20        **MR. KATZ:**  Your Honor, I wanted to clarify one small

21   point.

22        **THE COURT:**  Sure.

23        **MR. KATZ:**  Your Honor mentioned very early on today

24   about plaintiffs regularly issuing press releases.  We issued

25   one press release in February 2007, Your Honor.  That was it.

1    **THE COURT:** I stand corrected. Thank you.

2    (Recess taken from 9:09 to 9:27 a.m.)

3    **THE COURT:** Okay. Please be seated.

4    **MR. PARCHER:** Can I say an administerial thing,

5 Judge?

6    **THE COURT:** Sure.

7    **MR. PARCHER:** Nothing of any great drama. So the

8 2000 -- yes?

9    **THE COURT:** Go ahead.

10    **MR. PARCHER:** The 2000 EA is not -- was never on any

11 exhibit list, so nobody has a copy of a 2000 EA. This is what

12 you were asking for right at the break.

13    Nobody has Exhibit A. But -- 2000 EA. But I'm told

14 that what Exhibit A is, by Mr. Kessler, and our side seems to

15 agree, is substantially all of the active players.

16    In other words, if there was 1800, there's either

17 1800 or 1790, or something like that. You know, it's an active

18 player list.

19    And Exhibit B, which is called an "addendum," I do

20 have here. This is -- it's Exhibit 24. I'm telling Your Honor

21 this so it's not herky-jerky when we begin.

22    **THE COURT:** Exhibit B is --

23    **MR. PARCHER:** Well, there is no Exhibit A and B.

24 Start with that.

25    **THE COURT:** All right. There's no attachment. Do

1    you have attachment B?

2              **MR. PARCHER:**  The second attachment.

3              **THE COURT:**  B.

4              **MR. PARCHER:**  It's not called "B."  It's called

5    "addendum."  But that's what it is.

6              **MR. KESSLER:**  Your Honor, if I could maybe add some

7    clarity here.

8              We do have the 2000 EA agreement.  That, in fact, is

9    an exhibit.

10             With respect to the attachments, neither side had

11   marked attachment A as an exhibit to it.  We agree it's a

12   list -- it's the long list of individual names of active

13   players.  But no one had marked attachment A with respect to

14   that.

15             Attachment B is actually in the form of an addendum

16   that was done listing the retired players.  So it's not called

17   "B," but it was an addendum, and we agree with that.

18             **MR. PARCHER:**  Excuse me.  I'll hand this up, if Your

19   Honor wants to read it.  But saying it is a list of retired

20   players is a total distortion of reality.

21             I haven't counted the number, but it lists

22   approximately 100 players and does not list approximately 2,000

23   players, assuming it was 2100 back at that time, or more.

24             So it's not a list of retired players.  It's a

25   list of -- I don't want to use the word "handful."  I haven't

1  counted the number.  Take a look and you'll see what I mean in

2  one second.

3          **MR. KESSLER:**  Your Honor, it's a list of the retired

4  players that EA agreed to pay for a license.

5          **MR. PARCHER:**  That's a different point.

6          **THE COURT:**  Look.  This is -- is there a stipulation

7  on this of any type?

8          **MR. KESSLER:**  No, there's not, Your Honor.

9          **THE COURT:**  Then, you have to do it the traditional

10 way.  I allow you latitude, but the Rules of Evidence

11 ultimately cover here.

12         If you don't have attachment A or if you don't have

13 attachment B, you've got to go with what the witness can

14 remember.  But I am not -- I'm not here to force some version

15 of facts down the throats of one side or the other.

16         **MR. KESSLER:**  We can -- we'll discuss it with

17 plaintiffs after court, and see if we can agree to a stip or

18 not.

19         **THE COURT:**  Now is the time.  We've got the witness

20 here.

21         **MR. PARCHER:**  Your Honor, before we go forward, it's

22 not the biggest point in the world.  But counsel is saying that

23 Exhibit A is a list of all the active players.  He's

24 acknowledging that.

25         **MR. KESSLER:**  No, Your Honor, I'm not.

1           **MR. PARCHER:**  You're not acknowledging it?

2           **MR. KESSLER:**  No, I'm not acknowledging that.  Let me

3   be very clear what I'm saying, instead of counsel stating it,

4   because there seems to be a difference.

5           What I understand attachment A to be is a list of all

6   the active players who were licensed under the agreement.

7   That's not all active players because there are some active

8   players who never gave their rights to the union.

9           And so it would be less than all the active players.

10  It would be those who were licensed.

11          Exhibit B -- which was never done as B, it was done

12  as an addendum -- is a list of those specific retired players

13  who were licensed by EA under this specific agreement because

14  they identified those players they wanted.  Those rights were

15  secured.  They were put on.  It was an ad hoc addition.  And

16  they were paid that money.

17          So both of those are only the list -- they're two

18  separate things.  But they're the list of players who were

19  licensed under the agreement.

20          **THE COURT:**  Look, I will give permission to amend the

21  trial exhibit list to put in Attachments A and B.  If you have

22  them here in the courtroom, and you can do that, great.

23          **MR. PARCHER:**  I have B.

24          **THE COURT:**  I don't know why I'm getting all this

25  explanation other than, look, I can't -- I can't glide over the

Rules of Evidence.  Either you get it out of the mouth of this
witness or you put it into an exhibit or whatever.  But I can't
force some version of the facts down the throat of the jury
when you two can't even agree on it.

**MR. PARCHER:**  Would you give me just one minute?

**THE COURT:**  All right.

**MR. PARCHER:**  Maybe I can get through it.  Maybe I
can't.

Okay.  I'm not going to -- can I report to the Court
or just hold my own counsel here?

What we're going to try to do -- try to move it
along, right -- is I'm not going to refer to Exhibit A at this
point in time.  Although, I don't think it's a controversial
document.  We'll do it with Berthelsen.

Exhibit B or the addendum, as it's now correctly
called, I'll put in through this witness, if I can, and then
I'll go on to my one or two questions.

**THE COURT:**  All right.  Do it the best you can, and
I'll rule on the evidentiary rulings the best I can.

**MR. PARCHER:**  Okay.  Thank you.

**THE COURT:**  Let's bring the jury back.

**THE CLERK:**  Okay.

(Thereupon, the jury returned to the courtroom.)

**THE COURT:**  Welcome back.  Have a seat.

Mr. Parcher, please continue.

1          MR. PARCHER:  Thank you, Your Honor.

2   BY MR. PARCHER:

3   Q.   Do you have Exhibit 24 in your portfolio there, sir?

4   A.   Yes, I do.

5   Q.   Okay.  Do you recognize Exhibit 24?  I called it

6   inadvertently "Exhibit B."  But do you recognize it as the

7   addendum or the second attachment to the 2000 EA agreement

8   between EA and Players Inc?

9          THE COURT:  Mr. Allen, can you answer the question?

10         THE WITNESS:  I'm struggling with -- I believe the

11  answer is "yes," but I'm struggling with why it's effective in

12  '98.  I'm trying to recall that.

13  BY MR. PARCHER:

14  Q.   I'm sorry.  I didn't hear that sentence.

15         THE COURT:  Please repeat what you just said.

16         THE WITNESS:  I said I was struggling with the

17  March 1, '98 date.  But -- and you were asking me whether this

18  was an addendum to the 2000 Electronic Arts agreement with

19  Players Inc?  Is that correct?

20  BY MR. PARCHER:

21  Q.   Yeah.

22  A.   Uhm --

23  Q.   If you don't know, you don't know.

24         THE COURT:  Do you know the answer?

25         THE WITNESS:  Uhm, I don't -- I believe the answer to

1  that question is "yes," but I'm struggling with why the

2  effective date is March 1, 1998, because that would appear to

3  be consistent with an agreement that was arrived at or it was

4  pending.

5  **BY MR. PARCHER:**

6  **Q.**   So let's move to --

7  **A.**   So I think the answer to that question is "yes," but I

8  don't know why --

9          **THE COURT:**  With that exception, does it look like

10  the addendum?

11          **THE WITNESS:**  Yes.

12          **THE COURT:**  Go ahead.

13          **MR. PARCHER:**  Let's put it up on the screen, please.

14          We won't even bother to do that.

15          **THE COURT:**  It's not in evidence yet.

16          **MR. PARCHER:**  Oh, move it into evidence, please.

17          **THE COURT:**  24 is received unless there's an

18  objection.

19          **MR. KESSLER:**  No objection.

20          **THE COURT:**  Received.

21          (Trial Exhibit 24 received in evidence.)

22  **BY MR. PARCHER:**

23  **Q.**   Now, this -- this -- I'm calling it "addendum," I called

24  it "Exhibit B" before, but I mean the same thing.

25          This document, this document is a list -- I didn't

1  count the number -- but it's a list of approximately a hundred

2  or so, more or less, retired -- retired players whom this

3  letter is not directing to be scrambled, right?

4  **A.**   Uhm --

5           **MR. KESSLER:**  Objection.

6           **THE WITNESS:**  Can I get the letter in front of me?

7  Is that all right?

8  **BY MR. PARCHER:**

9  **Q.**   Do what?

10 **A.**   Can I get the letter in front of me?  I don't have it.  I

11 was looking at Exhibit 24.

12 **Q.**   Sure.

13          **THE COURT:**  Let's break that question down, first.

14 The first part is:  This addendum, Exhibit 24, concerns retired

15 players; is that true?

16          **THE WITNESS:**  That's correct.

17          **THE COURT:**  And as to those players, this letter from

18 Ms. Lawson was saying that they did not have to scramble their

19 names and identities, correct?

20          **THE WITNESS:**  That's right.

21 **BY MR. PARCHER::**

22 **Q.**   Without holding you or me to the number, because I did it

23 very quickly during the break, more or less there's

24 approximately a hundred names on there.  Do you see it?

25          I'm not quibbling about the number.

 1  A.   I haven't counted it.  I haven't counted them, but I don't

 2  have any reason to believe it's not in that neighborhood.

 3  Q.   Right.  Right.  But you'll agree that at the time that

 4  LaShun wrote this letter -- LaShun Lawson wrote this letter --

 5  there were approximately 2,000 or so, more or less, retired

 6  players that had signed GLAs, right?

 7          MR. KESSLER:  Objection, Your Honor.  This is

 8  pre-statute period, so we don't know --

 9          THE COURT:  It doesn't matter.  It's background.

10  Overruled.

11          MR. KESSLER:  Okay.

12          THE COURT:  Were there roughly that 2,000 retired

13  players at that time frame?

14          THE WITNESS:  Don't remember the precise number, but

15  that sounds about right.

16  BY MR. PARCHER:

17  Q.   Right.  Right.  And with respect to those players that are

18  not on the addendum or B, LaShun Lawson was telling

19  Electronic Arts -- or put it this way, PI was telling

20  Electronic Arts:  Scramble those players' names and likenesses.

21          "The names must be scrambled."  Those are the last

22  three words of the last sentence of this exhibit, correct?

23  A.   The -- the number of the player has to be scrambled,

24  according to this letter.

25  Q.   Well, how about the name and likeness:

1              "And must be scrambled"?

2  **A.**   No, it says --

3  **Q.**   Not?

4  **A.**   I'm just reading from it.  It says the number that the

5  player actually wore.

6  **Q.**   "Hence, any and all players not listed in Attachment A or

7  B cannot be represented in Madden 2002 with the number that the

8  player actually wore, comma, and must be scrambled."

9              Are you saying that LaShun Lawson isn't telling

10  Electronic Arts or PI isn't telling Electronic Arts to scramble

11  the names and likenesses to those retired players who signed

12  GLA that are not on Exhibit B or the addendum; is that your

13  testimony?

14  **A.**   Scrambling refers to not using the player's number because

15  that would be identified by the consumer with that player.  And

16  using another number that would represent another player.

17  **Q.**   So it would be all right for them to use the person's name

18  and likeness.  They could put on the jersey --

19  **A.**   No.  They wouldn't do that anyway.

20  **Q.**   Excuse me.  I didn't ask you whether they would do it

21  anyway.  I'm asking you to answer my question.

22              So are you saying to this Court and jury that LaShun

23  Lawson isn't telling them:

24              "Scramble the names and likenesses of these

25  people"?

1          Yes or no, sir?

2    **A.**   I believe that what she's telling them is not to use their

3    identities.

4    **Q.**   Which includes a person's name and likeness.  If you see

5    my face, then you haven't scrambled my identity, have you?

6          Yes or no, sir?

7    **A.**   Yes.  Well, assuming that -- that the face you're talking

8    about is recognizable as you.  If it's someone else's face, as

9    is -- as was typically the case in these games in this period,

10   it -- it -- the -- the face of the player was not, uhm -- was

11   not the same as the player -- was not like a photograph, in

12   other words.

13   **Q.**   From the time that LaShun, more or less, not identical,

14   but from the time LaShun Lawson wrote this letter until the

15   present time, a retired player who signed a GLA, his name and

16   likeness -- never mind just his number -- has never appeared in

17   the Madden games; isn't that correct?

18   **A.**   That -- I --

19   **Q.**   Yes or no?

20   **A.**   I'm -- I'm trying to follow the question, Mr. Parcher.

21   And I'm -- I'm listening carefully.  But I'm getting confused.

22          Could you repeat the question?

23   **Q.**   Yes.  From the time, more or less -- I'm not saying the

24   exact moment -- but more or less from the time that LaShun

25   Lawson wrote this letter, to the present time, a retired GLA

1  who was on a vintage team, his name and likeness has been

2  obliterated.  It's not shown, correct?

3  **A.**   I think that's correct.  But without going back and

4  reviewing the games I couldn't be -- I couldn't remember.

5           **MR. PARCHER:**  I have no further questions of this

6  witness.

7           **THE COURT:**  All right.  Let's go to Mr. Kessler.

8           **MR. KESSLER:**  Thank you, Your Honor.  It will just

9  take me one minute to get set up here.

10                    <u>**CROSS EXAMINATION**</u>

11  **BY MR. KESSLER:**

12  **Q.**   Good morning, Mr. Allen.

13  **A.**   Good morning.

14  **Q.**   Mr. Allen, we're going to cover some of the same subjects

15  that Mr. Parcher has covered with you, but I'm going to try to

16  do them in some overall order.  So let's start at the

17  beginning, if we can.

18           Mr. Allen, have you ever been a football player?

19  **A.**   Yes, I have.

20  **Q.**   Would you explain to the jury, please, your career as a

21  college football player, first?

22  **A.**   I was a linebacker for Penn State University and played

23  from '69 to '73.  And, uhm -- the '73 season was my last year

24  on the team.

25  **Q.**   When you finished your career at -- what college was it?

1    I'm sorry, maybe you stated it.

2    **A.**    Pennsylvania State University.

3    **Q.**    How were your teams those years?

4    **A.**    Pretty good.

5    **Q.**    Okay.

6    **A.**    We lost five games the three seasons that I played.

7    **Q.**    When you finished your time as a college football player,

8    did you graduate from college?

9    **A.**    Yes, I did.

10   **Q.**    And were you then drafted by any National Football League

11   team?

12   **A.**    Yes.  I was drafted by the Buffalo Bills in the second

13   round of the 1974 draft.

14   **Q.**    And how many years did you play in the NFL?

15   **A.**    Two seasons.

16   **Q.**    Okay.  And what happened after those two seasons?

17   **A.**    I -- in -- in preseason in my third season I, uhm, retired

18   from the National Football League and took another job.

19   **Q.**    So are you a retired NFL player?

20   **A.**    I am, indeed.

21   **Q.**    And how would you describe your accomplishments during

22   your career when you were an NFL player those two years?

23   **A.**    Limited.  Uhm, I started much of the time I was there.  I

24   was the rookie of the year my rookie season for the Buffalo

25   Bills, but I was not somebody who was an All Pro or a

1  particularly well-regarded player.  I certainly wasn't

2  somebody -- I was a journeyman player.

3  **Q.**  Mr. Allen, are you familiar from your career as to the --

4  what the average career is of an NFL player?

5  **A.**  I am.

6  **Q.**  Tell the jury, typically, what's an average career like?

7  **A.**  It's a little more than three years.  Typically, it's

8  about three years.

9  **Q.**  Okay.  Are there players who sign NFL player contracts who

10  never make a team?

11  **A.**  Uhm, certainly.  There are lots of players who sign and

12  try out and don't make the team.

13  **Q.**  Are there NFL players who make a team who play one year?

14  **A.**  Yes, there are.  Quite a few, actually.

15  **Q.**  Are there NFL players who play less than one year their

16  entire career?

17  **A.**  Sure.  They might make the team for a while and then be

18  cut and not play that season.

19  **Q.**  Now, from the standpoint of signing a retired player group

20  licensing authorization, are all those different kinds of

21  players allowed to sign retired player GLAs?

22  **A.**  Absolutely.

23  **Q.**  So if a player signed an NFL player contract and never

24  played a game, could he have signed one?

25  **A.**  Yes.  And did.

1  **Q.**   And somebody like you could have signed one?

2  **A.**   I did, yes.

3  **Q.**   In fact, did you sign one?  You did?

4  **A.**   Yes.

5  **Q.**   Now, after you left the NFL what did you do next with your

6  life, your career?

7  **A.**   Uhm, I -- when I retired from the NFL, I went to work for

8  the AFLCIO using my college degree, and was the regional

9  director for their committee on political education.

10          I covered New York and New Jersey for the AFLCIO.

11 **Q.**   How many years did you work -- well, first, tell the jury.

12 I'm sure many of them know this, but just in case one doesn't,

13 what is the AFLCIO?

14 **A.**   It's the American Federation of Labor and Congress and

15 Industrial Organizations.  It's the federation of labor unions

16 at the national level.  It's an organization of the national

17 labor unions.

18 **Q.**   How long were you with the AFLCIO?

19 **A.**   About six or seven years.

20 **Q.**   Following those six or seven years, what was your next

21 position?

22 **A.**   I joined the staff of the NFL Players Association as

23 assistant to the executive director.

24 **Q.**   And what year was that?

25 **A.**   That was in 1982.

1  Q.    Okay.  And when you joined the NFLPA in 1982, was there

2  already player licensing activities going on at the union?

3  A.    Yes.

4  Q.    And in 1982 -- well, I'll come back to that.  Let me keep

5  going with your career.

6        What were your first responsibilities in your job?

7  A.    Primarily it was to communicate with players on the teams

8  in the locker room, to go to team meetings to make sure the

9  players knew what was happening and to get their input and to

10 deal with the issues that were going on on that team.  That

11 position has evolved over time and continues to this day.

12        I mean, there are people who do that at the union to

13 this day.

14 Q.    When did Mr. Upshaw become the executive director of the

15 NFLPA?  Which year, do you recall?

16 A.    In the summer of 1983, I think.

17 Q.    So the year after you joined?

18 A.    Yes.

19 Q.    And how many years did you stay at the NFL Players

20 Association, from 1982 until when?

21 A.    January of 2007.  So 25 years.

22 Q.    And during the time you were at the NFL Players

23 Association for that 25-year period, what other position did

24 you hold at the Players Association?

25 A.    Well, at the Players Association I was -- there was a --

1  there was a 3-year period during which I, with a lot of other

2  people at the NFLPA, organized the USFL Players Association,

3  and I served as its executive director for three years.

4           When I came back to the staff of the NFLPA, I came

5  back as assistant executive director, and I had that position

6  for about 20 years.

7  **Q.**   Okay.  And in that 20-year period of time, just briefly

8  describe to the jury what were your responsibilities as the

9  assistant executive director at the National Football League

10 Players Association?

11 **A.**   I had a number of departments in the organization that

12 reported directly to me.  I got involved in the membership

13 services area in the pension end in dealing with the pension

14 plan and retirement benefits part of the association,

15 negotiating that and administering that with staff that

16 reported to me.

17          I was responsible for the drug and alcohol program

18 that the union jointly administered with the league.  And the

19 communications department reported to me as some examples of --

20 I was also part of the team that negotiated the collective

21 bargaining agreements.  And I particularly concentrated in that

22 area on licensing and pension and the benefits.

23 **Q.**   Again, could you briefly explain to the jury -- again,

24 many of them may know this -- what is the NFLPA?

25 **A.**   The National Football League Players Association is the

1  union that represents the players in the National Football

2  League and negotiates a collective bargaining agreement that

3  covers the bargaining unit for wages, hours and working

4  conditions.

5          So minimum compensation and the terms and conditions

6  of employment are negotiated in that agreement.

7          And then, the union is responsible for administering

8  and enforcing that agreement as part of its responsibilities.

9  And it's governed by a board of directors of active players who

10 are elected by their teammates to be the board of directors.

11 **Q.**  Now, you mentioned earlier that when you arrived at the

12 NFLPA in 1982, it already was engaged in some player licensing,

13 correct?

14 **A.**  Yes.

15 **Q.**  Now, was that active player licensing?

16 **A.**  Yes.

17 **Q.**  With respect to the active player licensing back in 1982,

18 in that period of time, the revenues that were generated from

19 that licensing, where did it go?

20 **A.**  It went to the operation of the union.

21 **Q.**  100 percent?

22 **A.**  A hundred percent.

23 **Q.**  Now, why -- who decided that a hundred -- 100 percent of

24 the active player licensing money in those days would go to run

25 the union?  Who decided that?

1  **A.**    The Board of Player Representatives.

2  **Q.**    Okay.  Explain to the jury, please, what is the Board of

3  Player Representatives?

4  **A.**    The Board of Player Representatives is a group of players

5  who are elected by their teammates, active players who are

6  elected by their teammates.  Generally, there's a player

7  representative and an alternative player representative.  And

8  the alternate represents the team when the player

9  representative is unavailable.

10         And that is the governing body of the union.  It's

11  the board of directors.  Each team elects its representatives,

12  and then they sit together as a board of directors and hold

13  meetings and make decisions that -- that determine the policy

14  and the finances and the -- the collective bargaining proposals

15  that the union is going to advance, for example.

16  **Q.**    So each team elects a player representative to the board

17  of player reps?

18  **A.**    Yes.

19  **Q.**    Does the board of player reps have authority to hire and

20  fire the executive director?

21  **A.**    It does, yes.

22  **Q.**    So the executive director, like Mr. Upshaw, who does he --

23  who did he work for when he was at the union?

24  **A.**    He was accountable to the Board of Player Representatives.

25  They were responsible.  Under the constitution, they had the

1  authority to hire and fire the executive director.

2  **Q.**   Now, at the time, why did the Board of Player

3  Representatives use all the active player licensing money to

4  run the union?  Why not give it to the players, the active

5  players?

6         **MR. PARCHER:**  Object to that, Your Honor.  That would

7  necessitate some discussion between the players'

8  representatives and this witness.  The best evidence rule

9  applies.  There has been no production of minutes and, also,

10 there has been no foundation.

11        **THE COURT:**  Well, the witness can state why -- what

12 the board said after he came on to the -- to the NFLPA.  But he

13 cannot purport to say what happened before that.  He wasn't

14 even present.

15        **MR. KESSLER:**  I wouldn't ask that.  Your Honor, let

16 me ask this.

17 **BY MR. KESSLER::**

18 **Q.**   Did you attend --

19        **MR. PARCHER:**  Best evidence.

20        **THE COURT:**  Wait.  Mr. Parcher, what?  The best

21 evidence is overruled.

22        **MR. PARCHER:**  Okay.  How about hearsay?

23        **THE COURT:**  You don't have to have the best evidence.

24 You can have alternate evidence.  There are many ways to skin a

25 cat.

1          **MR. PARCHER:**  The alternative would be hearsay, would

2     it not, Your Honor?

3          **THE COURT:**  No, it wouldn't necessarily be hearsay,

4     if the board stated the reason.  If the question is phrased in

5     terms of the stated reason if he was present and heard it

6     stated that would be admissible.

7     **BY MR. KESSLER:**

8     **Q.**    Did you attend the annual meeting of the board of player

9     reps every year from 1982 until you left the Players

10    Association in 2006?

11    **A.**    Well, I attended meetings when I was a player rep, while I

12    was playing.  But I also attended meetings when I was on the

13    staff.  As part of my responsibilities, I attended every player

14    representative meeting.

15    **Q.**    So you attended every -- let's break it up.  You attended

16    every player rep meeting while you were a staff member?

17    **A.**    Yes.

18    **Q.**    And you also attended some player rep meetings earlier,

19    when you were a player rep?

20    **A.**    Yes.  I was the alternate player representative for the

21    Buffalo Bills while I played.

22    **Q.**    At those meetings, did the board of player reps indicate

23    why they were -- did he discuss why they were giving the money

24    to the union as opposed to giving it to active players?

25          **THE COURT:**  Well, to be more precise, did they state

1  a reason?  Did not did they indicate, but did they state a

2  reason?

3            **THE WITNESS:**  Yes.

4  **BY MR. KESSLER:**

5  **Q.**   What was that reason?

6  **A.**   That the amount of money was best spent on union

7  operations that would benefit the greatest number of players

8  given the amount of licensing that there was and the -- and the

9  resource that was available to help keep dues down.

10 **Q.**   Now, this money that was devoted to run the union a

11 hundred percent, was any of that retired player money?

12 **A.**   No.

13 **Q.**   Now, Mr. Allen, did there come a time when Players Inc was

14 created?

15 **A.**   Yes.

16 **Q.**   Okay.  Could you describe to the jury the circumstances

17 that led to the creation of Players Inc and when that occurred?

18 **A.**   Well, the -- the union and the league got into a number of

19 collective bargaining battles and litigation battles.  And it

20 was clear that licensing was the way that the union was funding

21 the -- its -- its resources in dealing with those battles with

22 the league on behalf of the players.

23            And one of the things that the league tried to do

24 was -- was pull active players away from the -- the licensing

25 program by saying:

1              "We can do all sorts of things for you.  We can

2    put you on the television.  We can give you appearances and

3    endorsements.  And the union, which is doing licensing, can't

4    do any of that."

5              So players came to us and said:

6              "Why can't we do that?"

7              And the answer was:

8               "Our tax counsel told us as a not-for-profit

9    there were certain things we could do."

10             We could license, for instance, trading cards and get

11   royalties for doing that.  But all those other things players

12   wanted us to do we couldn't do as a not-for-profit tax exempt

13   union.

14             And if we were going to do those things we had to

15   create a separate entity.  And on the advice of tax counsel we

16   structured -- after doing evaluation that would tell us what

17   the appropriate relationship between that company and the union

18   should be, we created Players Inc so that it could do the kinds

19   of things the players said they wanted us to do for them.

20             **MR. KESSLER:**  Your Honor, may I approach the witness

21   and give him an exhibit?  Thank you.

22   **BY MR. KESSLER:**

23   Q.   I have handed you, Mr. Allen, a copy of Trial Exhibit

24   2047.

25             **MR. KESSLER:**  Is this already in evidence?

1          **MR. GREENSPAN:**  I don't believe so.

2          **MR. KESSLER:**  No?  Okay.

3  **BY MR. KESSLER:**

4  **Q.**   Do you recognize what Exhibit 2047 is, Mr. Allen?

5  **A.**   It's an active player GLA.

6          **MR. KESSLER:**  Your Honor, I would move Trial Exhibit

7  2047 into evidence.

8          **MR. PARCHER:**  No objection.

9          **THE COURT:**  Received.

10          (Trial Exhibit 2047 received in evidence.)

11          **MR. KESSLER:**  Could we display it, please?

12          (Document displayed.)

13          **MR. KESSLER:**  If we could start out by looking at --

14  to my pointer.  Sorry.

15          If we could start by blowing up, Lauren, Attachment

16  A, all the way through the first paragraph.

17  **BY MR. KESSLER:**

18  **Q.**   Do you know why it's listed as attachment A, this exhibit?

19  Do you know what this was an attachment to?

20  **A.**   It was typically an attachment to a license agreement

21  between either the NFLPA or Players Inc and the licensee.

22  **Q.**   So in an agreement like the EA agreement that was shown to

23  you during your examination, when it would refer to the players

24  who signed an attachment A, did that have anything to do with

25  this document?

1  **A.**    Uhm, yes.  This was the document that was referred to.

2  **Q.**    Okay.  And this document, Attachment A, NFL Players

3  Association Group Licensing Assignment, is this the GLA that

4  was signed by active players or retired players?

5  **A.**    This is the GLA that was signed by active players.

6  **Q.**    Okay.  So would retired players sign this after they left

7  the NFL?

8  **A.**    No.

9  **Q.**    Okay.  Let me -- by the way, if you look at the second

10  line here it says there is an exclusive right.  Do you see that

11  in the second line?

12  **A.**    Yes, I do.

13  **Q.**    Was the active player GLA exclusive?

14  **A.**    Yes.

15  **Q.**    Now, did you use the same or a different form for retired

16  player licensing?

17  **A.**    It was a different form.

18  **Q.**    With respect to active player -- well, let me ask you a

19  question now -- I'll withdraw it -- about retired player

20  licensing.

21          Was retired player licensing money ever used to fund

22  the operations of the union the way the active player money was

23  used?

24  **A.**    No, it never was.

25  **Q.**    Okay.  So do you have an understanding of why the union

1  started retired player licensing?

2  **A.**    Yes.

3  **Q.**    Why did the union start retired player licensing?

4  **A.**    For a number of reasons.  One was to -- to try to create,

5  based on the active player model, opportunities for retired

6  players to be involved in group licensing and to be involved in

7  endorsements or making appearances or participating in events

8  or being on television programs, so that there would be -- we

9  could try to provide the opportunity for retired players to

10 earn some money.

11             And we could also give them exposure to the

12 marketplace and try to develop the kind of program for them

13 that we had developed for active players.

14 **Q.**    Now, was Mr. Upshaw a retired player?

15 **A.**    Yes.

16 **Q.**    Hall of Fame player?

17 **A.**    He was a little more famous than I was.

18 **Q.**    Was Mr. Upshaw involved in the decision to start retired

19 player licensing?

20 **A.**    Very much involved.

21 **Q.**    Now, other than attachment A, do you recall there was

22 another way that active players could sign up for GLA rights?

23 **A.**    Yes.

24             **MR. KESSLER:**  Your Honor, if I may I approach.

25

1  **BY MR. KESSLER:**

2  **Q.**   Mr. Allen, I've handed you a copy of Trial Exhibit 1281.

3  Do you recognize what this is?

4  **A.**   It's a form NFL player contract.

5  **Q.**   Okay.  And when you say "form," does that have any

6  relationship to the contracts used in the NFL?

7  **A.**   Yes.  This is by agreement between the union and the

8  league, the form of the player contract between the player and

9  the team that provided for his playing services.

10 **Q.**   Well, would anybody but an active player ever sign this

11 contract?

12 **A.**   No.  By definition, this is for somebody who is actively

13 employed by an NFL team and playing for them.

14 **Q.**   So it couldn't be a retired player?

15 **A.**   No.

16 **Q.**   Okay.

17        **MR. KESSLER:**  Your Honor, I would move into evidence

18 Trial Exhibit 1281.

19        **MR. PARCHER:**  No objection.

20        **THE COURT:**  All right.  Received.

21        (Trial Exhibit 1281 received in evidence.)

22        (Document displayed.)

23 **BY MR. KESSLER:**

24 **Q.**   Mr. Allen, I direct your attention to paragraph 4(b) of

25 this agreement, if you can.

1             Are you familiar with 4(b)?

2   **A.**   Just make sure I look at it.

3             **MR. KESSLER:**  Lauren, maybe we can put the next page

4   so you can display both sections together, if it's possible to

5   do that.  I don't know if it's possible.

6             Both the start of B and the completion.

7             (Document displayed.)

8   **BY MR. KESSLER:**

9   **Q.**   Mr. Allen, are you familiar with 4(b)?

10  **A.**   No, I'm just finishing reading it.

11  **Q.**   Please.

12  **A.**   Yes, I am.

13  **Q.**   Okay.  Could you explain what 4(b) is of the NFL player

14  contract that says:

15             "Player hereby assigns to the NFLPA and its

16  licensing affiliates, if any, the exclusive right to use and to

17  grant to persons, firms, or corporations, collectively

18  licensees, the right to use his name, signature, facsimile,

19  voice, picture, photograph, likeness and/or biographical

20  information in group licensing programs."

21             What is this paragraph?

22  **A.**   This is a mechanism as a matter of convenience and within

23  the player contract the player can provide his rights -- it's

24  an alternative way to provide his rights to the GLA, but it

25  accomplishes essentially the same thing.  It provides the union

1  with active player group licensing rights.

2  Q.   And this, again, this was only active players?

3  A.   Yes.

4  Q.   So just to conclude on active player licensing, there are

5  two ways an active player could assign its rights, its group

6  licensing rights:  One through the attachment A form and one

7  through the paragraph 4(b) of the NFL player contract; is that

8  correct?

9  A.   Yes.

10  Q.   Now, with respect to retired players you testified it was

11  different.  If you could look at Trial Exhibit 110.  I think

12  it's before you in the stack that Mr. Parcher covered.

13            (Document displayed.)

14            What is Trial Exhibit 110?

15  A.   Get it out, first.  It is a retired player group licensing

16  authorization form.

17            **MR. KESSLER:**  Could we blow up, Lauren, please, just

18  the top and title through the first paragraph?  If we can do

19  that.

20            (Document displayed.)

21  **BY MR. KESSLER:**

22  Q.   Now, would any active players ever sign this retired

23  player group licensing form?

24  A.   No.

25  Q.   And let me ask you a question about that.  Are you

1  familiar with accounts of monies at the union and Players Inc

2  referred to as the "gross licensing revenue pool"?

3  **A.**    Yes.

4  **Q.**    Was that sometimes referred to as the "GLR pool"?

5  **A.**    Yes.

6  **Q.**    And did that pool have any money from retired player

7  licensing in it?

8  **A.**    No.

9  **Q.**    Okay.  Explain to the jury what type of money went into

10  this GLR pool.

11  **A.**    It was money that was generated by licensing active

12  players and paid by licensees to Players Inc under a license

13  agreement between the NFLPA and Players Inc.

14  **Q.**    Now, we heard Mr. Parcher ask you questions about the

15  63 percent that went to the union and Players Inc.  Do you

16  recall that?

17  **A.**    Yes.

18  **Q.**    Well, first, let's break that down.  What percentage went

19  to Players Inc, the licensing agent?

20  **A.**    23 percent.

21  **Q.**    Okay.  So the licensing agent didn't get 63 percent, did

22  it?

23  **A.**    No.

24  **Q.**    Okay.  What was the number it got?  How much did it get?

25  **A.**    23 percent.

1  **Q.**   Okay.  And was that 23 percent of what?

2  **A.**   It was 23 percent of the, uhm, the gross licensing revenue

3  as defined in the agreement between Players Inc and the NFLPA.

4  **Q.**   Was that the money in the GLR pool?

5  **A.**   Yes.

6  **Q.**   And was that active player money or retired player money?

7  **A.**   It was all active player money.

8  **Q.**   Okay.  And the union, what percentage of the active player

9  GLR pool did the union get?

10  **A.**   40 percent.

11  **Q.**   Now, what I asked you earlier about originally the union

12  got a hundred percent of that money, correct?

13  **A.**   That's right.

14  **Q.**   Okay.  So when the decision -- well, who made the decision

15  to reduce the 100 percent of the active player money given to

16  the union down to 40 percent?

17  **A.**   The Board of Player Representatives, the governing body of

18  the union.

19  **Q.**   Did you attend that meeting when that was decided?

20  **A.**   Yes.

21  **Q.**   Okay.  And it was also -- was it also decided at that time

22  to give 37 percent to the active players?

23  **A.**   Yes.

24  **Q.**   Okay.  And who made that decision?

25  **A.**   The governing body of the union, the Board of Player

1   Representatives.

2   **Q.**   Okay.   The decision wasn't made by you and Mr. Upshaw in

3   some secret back room?

4   **A.**   No.  We didn't have the authority to do that without

5   the -- uhm, the -- uhm, decision of the board of directors.

6   **Q.**   Was this presented to the board of directors at a player

7   rep meeting?

8   **A.**   Yes.

9   **Q.**   Was it voted on by the members the at a board of player

10  reps meeting?

11  **A.**   Yes.

12  **Q.**   Now, with respect to this retired player group licensing

13  form, it says:

14              "Retired Player Group Licensing Authorization

15  Form."

16          And it talks about:

17              "The undersigned hereby authorizes the National

18  Football League Players Association, NFLPA, and its licensing

19  affiliates the non-exclusive right to use his name, signature,"

20  et cetera, "in the NFLPA retired player group licensing

21  program."

22          Do you see that?

23  **A.**   Yes.

24  **Q.**   Now, previously we looked at the active player licensing

25  was ex-exclusive, correct?

1  **A.**    Yes.

2  **Q.**    Why were the non- -- why were the retired players only

3  asked here to give up non-exclusive rights?

4  **A.**    Because it was our experience that the really well-known

5  retired players either were unwilling to sign a GLA at all or

6  were unwilling to sign one that was exclusive.

7  **Q.**    Now, since this was non-exclusive did signing this form

8  prevent a retired player from signing group licensing with

9  anybody else?

10         **MR. PARCHER:**  Objection.

11         **THE COURT:**  What's the objection?

12         **MR. PARCHER:**  Calls far a legal conclusion.

13         **THE COURT:**  Well, but so many of these questions

14  about what the contract meant are going to be decided by the

15  jury.  However, you can -- the ground rule is you can get into

16  the -- what he -- his thought process was at the time.

17         But as the question is phrased, it's just -- it does

18  call for a legal conclusion.

19         **MR. KESSLER:**  Very good, Your Honor.  I'll rephrase.

20         **THE COURT:**  I'll let you pursue this, but you've got

21  to use the ground rules we agreed upon earlier.

22         **MR. KESSLER:**  Very good, Your Honor.

23  **BY MR. KESSLER:**

24  **Q.**    During the time this retired player GLA was in effect, did

25  you have an understanding as to how it was applied and

1  implemented during that period?

2  **A.**    Yes.

3  **Q.**    And the way in which it was applied and implemented, did

4  it prevent retired players from signing up for group licensing

5  with anybody else?

6  **A.**    No.

7  **Q.**    Did it prevent them from marketing themselves

8  individually?

9  **A.**    No.

10 **Q.**    Okay.  Did it cost the retired players anything to sign

11 this form?

12 **A.**    No.

13 **Q.**    Okay.  Did they have to be a member of the union to sign

14 this form?

15 **A.**    No.

16 **Q.**    Okay.  Were there retired players who signed GLAs who were

17 not even members of the NFLPA?

18 **A.**    Yes.

19 **Q.**    Did it have any cost at all to them that you could think

20 of?

21 **A.**    No.

22 **Q.**    Did they have to do anything but sign their name?

23 **A.**    No.

24 **Q.**    Now, let's take a look, if we can, at the bottom

25 paragraph.

1              There's a reference here to:

2                   "It is further understood that the monies

3    generated by such licensing of retired player group rights will

4    be divided between the player and an escrow account."

5              I want to stop there for a moment.

6              Did you have an understanding of this form for the

7    years it was in effect?

8    **A.**    Yes.

9    **Q.**    Did you know how it was implemented?

10   **A.**    Yes.

11   **Q.**    Okay.  Mr. Allen, under this form were retired players

12   going to receive any money from active player licensing?

13   **A.**    No.

14   **Q.**    What type of money would the retired players receive under

15   this form?

16   **A.**    Uhm, money that would have been generated by a license

17   that was the result of providing all of the retired player

18   group licensing authorization form players to sign one in

19   return for payment, for the right to use any or all of them.

20            **MR. PARCHER:**  If Your Honor pleases, I'm objecting

21   only to make it clear this witness is saying today that that

22   was his state of mind then.

23            Other than that, there's no evidence whatsoever that

24   that was the case.

25            **MR. KESSLER:**  Your Honor, we're getting --

1          **THE COURT:**  We're here today because --

2          **MR. PARCHER:**  I just wanted to be clear.

3          (Counsel and the Court speaking simultaneously, which

4          was not reportable.)

5          **THE COURT:**  I have previously said that the lawyers

6   can ask questions of all the witnesses who were involved in the

7   negotiations and administration of various contracts, what

8   their actual subjective understanding was back at the time in

9   question.

10          As long as the questions are addressed to that time

11  period, it's okay.

12          **MR. PARCHER:**  My point is, Your Honor --

13          **MR. KESSLER:**  Your Honor, I think we are now in a

14  speaking objection.  I think you've ruled.

15          **THE COURT:**  Let's hear.  What is your point?

16          **MR. PARCHER:**  That since we all know no money came

17  in, it's difficult to understand --

18          **MR. KESSLER:**  Your Honor -- this is argument, Your

19  Honor.

20          **MR. PARCHER:**  Well, I don't --

21          **THE COURT:**  Sounds like a speaking objection to me.

22          **MR. PARCHER:**  I didn't even get a chance to --

23          **THE COURT:**  Be that as it may, regardless of whether

24  money came in, the people who were involved with the program

25  back at the time are entitled to state, if it's true, of

1    course, what their understanding was at the time.

2              **MR. PARCHER:**  Thank you.  Okay.

3              **THE COURT:**  So that objection is overruled.

4              **MR. KESSLER:**  Thank you, Your Honor.

5    **BY MR. KESSLER:**

6    **Q.**   Mr. Allen, the word "retired player group rights," did you

7    have an understanding of what that meant at the time?

8    **A.**   Yes.

9    **Q.**   Did that include any active player group rights?

10   **A.**   No.

11   **Q.**   Now, Mr. Allen, you got asked questions, you recall, by

12   counsel, and you spoke about retired player conventions.  Do

13   you recall that?

14   **A.**   Yes.

15   **Q.**   We're going to do a little bit on this, but just right now

16   explain to the jury:  What are the retired player conventions?

17   **A.**   That was a meeting that's been held for a number of years

18   annually to which all retired player members of the NFLPA are

19   invited.  And each chapter typically sends a contingent to --

20   there's about 35 chapters around the country sends a contingent

21   to one place for a meeting to talk about issues important to

22   retired players, and hear presentations about things the union

23   is involved in and the things that Players Inc's involved in.

24              There's an opportunity for players to ask questions,

25   to make comments in both large groups and small groups.  And it

1   happens on an annual basis.

2   **Q.**   And I think you testified under Mr. Parcher's questions

3   that you made presentations at those retired player conventions

4   about the retired player licensing program, correct?

5   **A.**   Yes.  I did it as well as other people.

6   **Q.**   Okay.  And so sometimes you made the presentation.

7   Sometimes someone on your staff did?

8   **A.**   Under my direction, but yes.

9   **Q.**   By the way, I didn't ask this, but did you have a position

10  at Players Inc, also?

11  **A.**   Yes.

12  **Q.**   What was your position at Players Inc?

13  **A.**   I served as the president of Players Inc.

14  **Q.**   Okay.  And were you the first president when it was

15  created?

16  **A.**   Yes.

17  **Q.**   And did you serve in that position until you left in 2006?

18  **A.**   Yes, I did.

19  **Q.**   Okay.  And during these presentations to the retired

20  players at their conventions, was the program for retired

21  players explained?

22  **A.**   Yes.

23  **Q.**   Okay.  And were the retired players told at these

24  conventions whether or not they would receive money from

25  retired player licensing or active player licensing?  Was that

1  all explained to them?

2  **A.**    Very carefully.

3  **Q.**    Prior to this lawsuit, had you ever heard, for the entire

4  time that you were the president of Players Inc, did you ever

5  hear even one retired player suggest to you that they thought

6  they would get active player licensing money because they

7  signed a retired player GLA?

8  **A.**    No.  They understood that -- that -- that the active

9  players' money was to be divided among active players.

10           **MR. PARCHER:**  Objection.

11           **THE COURT:**  All right.  The witness is purporting to

12  tell us what other people understood.  That's inadmissible.

13  That's sustained, and the jury will disregard that.

14           But the "yes" part of the answer -- no, I mean the

15  "no" part of the answer will stand.

16  **BY MR. KESSLER:**

17  **Q.**    Okay.  Just to make it clear to the jury, just answer that

18  part of the question.  Okay?

19           Did any retired player ever, during the 20 years you

20  were president -- you were at the NFLPA and during all the

21  years you were president of Players Inc, did any retired player

22  ever say to you that he thought he was entitled to active

23  player licensing money, some share, because he signed the

24  retired player GLA?

25  **A.**    No.

1  **Q.**   Now, Mr. Allen, there's also a discussion here about the

2  money that was generated, will be divided between the player

3  and an escrow account.  Okay.

4          And I'm going to come back to that later in our

5  examination.  Just briefly now, because the jury may have some

6  questions about this, was there an escrow account ever created?

7  **A.**   No.

8  **Q.**   Why not?

9  **A.**   Uhm, the simple answer to that is there was no money

10 generated to create it with.

11 **Q.**   Well, couldn't you just create an empty account and have

12 no money in it?

13 **A.**   Didn't seem to be a lot of point to that.  The -- the

14 reason the escrow account was not created is because we didn't

15 have a license agreement that paid for the rights that would

16 have been divided among all of the retired players who signed

17 GLAs because we couldn't convince somebody to take all of those

18 players and pay for them, because too many of them were players

19 like me that didn't have a market value in that -- in that

20 context.

21         The licensees wanted particular well-known players,

22 and they wanted to choose which ones.  They weren't interested

23 in paying something to get everybody.

24 **Q.**   Well, Mr. Allen, you were an NFL player.  Are you saying

25 that no one has ever asked to license your name and image on a

1  product or a T-shirt or a trading card since you've retired or

2  anything like that?

3  **A.**   Regrettably, no.

4  **Q.**   Were you surprised by that?

5  **A.**   Uhm, no.

6  **Q.**   Why not?

7  **A.**   Because I realized that there was a big difference between

8  me and Joe Namath or Jim Brown, people that are icons of the

9  sport, and have an enduring iconic legacy.  I wasn't one of

10  those players.  I was a journeyman player who after I left

11  people forgot about.  My family knew I played.  My friends knew

12  I played.

13        But I was not somebody you would recognize on the

14  street or whose name you would remember.

15  **Q.**   Now, you signed one of these retired player GLAs, correct?

16  **A.**   I did.

17  **Q.**   Did you ever get any money from an escrow account under

18  this retired player GLA?

19  **A.**   No.

20  **Q.**   Now, Mr. Allen, you got asked questions by plaintiffs'

21  counsel about the eligibility requirements for all eligible

22  NFLPA members.  Do you see that?

23  **A.**   Yes.

24  **Q.**   And I want to ask you about this so that the jury can

25  understand this.

1              For the GLR pool, again to remind the jury, what

2   money was in that pool, active or retired player money?

3   **A.**    Active player only.

4   **Q.**    Okay.  For the GLR pool, were there eligibility criteria

5   set as to which active players would receive that money?

6   **A.**    Yes.

7   **Q.**    Okay.  Now, did those eligibility criteria for the GLR

8   pool have anything to do with what would be the eligibility

9   criteria for the escrow account if one was set up?

10  **A.**    No.  Absolutely not.  They were completely separate

11  activities.

12  **Q.**    They were completely separate, but they both used the word

13  "eligible"?

14  **A.**    But that was with reference to the retired player group

15  licensing, not with respect to -- not with respect to active

16  player licensing.

17  **Q.**    So for this retired player group licensing, and the escrow

18  account, if there had been money put in it, would there be new

19  eligibility requirements?

20  **A.**    Yes.

21  **Q.**    Okay.  And who would share in this money if it was

22  generated?  Would it be active players or retired players or

23  both?

24  **A.**    It would be only retired players who would share this

25  money.

1  Q.   Okay.  Is there any doubt about this in your mind?

2           THE COURT:  Wait.  That's a present day -- please.

3           MR. KESSLER:  Please, Your Honor, I'm sorry.

4  Withdraw.

5           THE COURT:  If he didn't have all these thoughts back

6  at the time he shouldn't be talking about it.

7           MR. KESSLER:  Yes.

8           THE COURT:  He has got to be testifying about the way

9  he thought of it back at the time these deals were being

10 entered into, not coming in and explaining how it's been put

11 together now.  I'm not saying -- we have got just a very clear

12 line that we need to adhere to.

13          So rephrase that question.

14          And I need to caution the witness:  If this wasn't in

15 your mind back at the time as to how you understood that it

16 worked, then the answer is you don't remember or you don't

17 recall.  Or "I didn't have any such view."

18          So when you are telling us how you thought it worked,

19 it's important that you actually did have those thoughts back

20 then.

21          THE WITNESS:  I understand.

22          THE COURT:  Keep that in mind.

23          MR. KESSLER:  I apologize, Your Honor.

24          THE WITNESS:  I understand, Your Honor.  Thank you.

25

**BY MR. KESSLER:**

Q.   Mr. Allen, so we are very, very clear --

        **MR. PARCHER:**  Your Honor, just to clarify it, that

it's important that here in 2008 he say what his memory -- that

he has a memory today of what was in his mind then, and we'll

see whether any evidence comes out of that.

        **THE COURT:**  We're not going to go through that drill

with every single question.

        But you can only testify to what was in your mind and

your intention and understanding back at the time in question.

And, of course, that presupposes you can even remember that far

back on that particular point.

        So that's the ground rule.

**BY MR. KESSLER:**

Q.   Let's be very clear.  We'll focus for a moment on the

period between 2004 and 2006, when you left, since that's the

period that's at issue here.

        During that period of time, 2004-2006, did you have

an understanding about what retired player group rights meant?

A.   Yes.

Q.   And did that include any active players in your

understanding then?

A.   Absolutely not.

Q.   Did you have an understanding back between 2004 and 2006

as to what "eligibility requirements" meant?

**A.**    You mean, on this -- on this form here (indicating)?

**Q.**    Did you understand both what they meant for the GLR pool

at that time and what it meant for this form?

**A.**    Yes, I did.

**Q.**    And were they the same or different?

**A.**    Different.

**Q.**    Okay.  In your understanding then, how were they

different?

**A.**    The -- well, to start with, the retired players, there

wasn't -- those eligibility rules were, uhm, to be established

if there was an escrow account.  There was not an escrow

account because there was no money to fund it with.

         So it was not an issue that was decided with any --

with any degree of detail.

         For the active players, because there was a

considerable amount of money generated by active player

licensing that went into the pool that was divided up the way

we talked about earlier, it was necessary for the board of

player reps because there was some money to be divided by the

active players to determine what those eligibility rules would

be.  So they determined some time ago that the money would be

divided equally.

         The portion of it that was to be distributed to

players on an equal share basis would be divided among players

essentially who were either on the last game roster of a season

1  or the first game roster of the following season.

2         So that the rookies could get picked up and be

3  eligible for money.  Because if they made the team they were

4  part of the group that was being licensed.

5  **Q.**  Mr. Allen, we'll come back to explain the criteria to the

6  jury a little bit later.

7         I just want to get clear now, at that time did you

8  have an understanding, would the eligibility criteria for the

9  GLR pool involving active players apply under the retired

10  player GLA?

11  **A.**  No.  They were two different things.

12  **Q.**  Finally, I would just like to show the second paragraph of

13  the retired player GLA.  Mr. Parcher asked you about this

14  reference to the fact that "group licensing programs are

15  defined as programs in which a licensee utilizes a total of six

16  or more present or former NFL player images."

17         Do you see that?

18  **A.**  Yes.

19  **Q.**  I would like you to tell the jury:  Did you have an

20  understanding of what this portion of the form meant at the

21  time it was implemented in 2004 to 2006?

22  **A.**  Yes.

23  **Q.**  Did this paragraph indicate to you, in your understanding

24  in any way, that active player licensing would be included in

25  this form and paid to retired players?

1  **A.**    No.

2  **Q.**    Why not?

3  **A.**    Because this was a form that dealt with retired player

4  group licensing.  And there were circumstances where companies

5  would use active player rights and would use some retired

6  players that they got rights to on an ad hoc basis for the same

7  products.

8           But they were dealt with -- they were dealt with

9  completely differently.

10 **Q.**    So under this paragraph could you combine former and

11 current players?

12 **A.**    Who?

13 **Q.**    Could a licensee in a group license program combine

14 retired and active players?

15 **A.**    Uhm, yes.

16 **Q.**    Okay.  Now, does this paragraph tell you anything about

17 how and when retired players will get paid?

18 **A.**    No.

19 **Q.**    Which paragraph does that?

20          **MR. PARCHER:**  That assumes a set of facts that's not

21 in evidence, Your Honor.  The question would be "if any."

22          **THE WITNESS:**  On this form --

23          **THE COURT:**  Well, that's a good point.  The "if any"

24 should have been in there.

25          Go ahead and answer.

1           THE WITNESS:  Could you repeat the question, please?

2   BY MR. KESSLER:

3   Q.   Which paragraph tells you how monies would be paid, if

4   any, in this form?

5   A.   I don't think -- I don't think --

6   Q.   Let me rephrase the question.

7           Which is the paragraph in the GLA that talks about

8   payment?

9   A.   The next to the last paragraph.

10  Q.   Okay.  That would be the -- if we could show that one.

11  "It is further understood" paragraph?

12  A.   Yes.

13  Q.   And in the "further understood" paragraph, which

14  references retired player group rights, is this any mention of

15  active player group rights in that payment paragraph?

16  A.   Absolutely none.

17          THE COURT:  Before you leave that, may I ask a

18  question?

19          MR. KESSLER:  Please.

20          THE COURT:  After you finished.

21          MR. KESSLER:  I'm finished with this document.

22          THE COURT:  Leave those two paragraphs up there.  I

23  have a question.

24          (Document displayed.)

25          Now, it may pertain to both of these paragraphs.  I'm

1  asking for your intent back at the time, if you had one.  So it

2  may be the answer is you don't know.

3          But the first question is, let's say you had a

4  situation where you had six retired NFL players, and you -- a

5  company like the football card manufacturing company licensed

6  those, their images, for whatever reason.

7          Let's just say they had six of your people that you

8  had signed up for GLAs.

9          Would that have been -- what did you understand that

10 would have triggered by way of rights under this agreement?

11         **THE WITNESS:**  Uhm, I think, if I understood your

12 question correctly, the answer is it wouldn't have triggered

13 rights under this agreement because the trading card companies

14 didn't utilize this mechanism for the grant of rights.

15         There was a negotiation with each player as to what

16 their willingness to participate in the program was and how

17 much they were going to get paid to participate.  Otherwise,

18 they weren't going to participate.

19         It was individually -- in other words, it was

20 individually negotiated with each player because that was

21 the -- the players that they wanted were only willing to do it

22 on that basis.

23         **THE COURT:**  Well, I'm --

24         **THE WITNESS:**  And the licensee was not willing to pay

25 to have access to the broad group.  They weren't interested in

1   the broad group.  They were only interested in the really

2   well-known players who -- who would negotiate separate terms

3   that would define what they would have to do, what was

4   provided, and how much they would get paid.

5           **THE COURT:**  Well, I meant to make this a hypothetical

6   as to how you understood back at the time that it would have

7   worked.

8           So if a -- if you -- if a licensee like the baseball

9   card company had come to you at Players Inc and said:

10           "We want to use the following six people on

11  cards," and it just happened that you had a GLA from each of

12  those, and they were all retired, so it was not the entire

13  group of 2000.  It was just six people.  Would that -- did you

14  have any understanding one way or the other back then as to

15  whether or not that would have triggered any rights under the

16  GLA?

17          **THE WITNESS:**  No, for the reasons I just stated, that

18  the -- the card companies were not interested in that kind of a

19  grant of rights.  They wanted the right to pick and choose

20  which players that they got and to pick and choose what the

21  terms of that player's involvement would be.

22          So they weren't interested in doing retired players

23  on a group basis where -- where everybody would be treated

24  exactly the same way and they would pay an amount of money that

25  would not involve that kind of negotiation.

1           **THE COURT:**  But, the example that I'm giving you is

2   one where the company has already picked out -- they have

3   picked, and they've already chosen, and they come to the

4   Players Inc and asked for the rights to a group.  And the group

5   is six.  And it just happens to be that in every case you have

6   a signed GLA.  And you're saying that the GLA would not be

7   triggered by that?

8           **THE WITNESS:**  No, because the -- the other players

9   would have -- it would have been treating them differently than

10  we treated the other players they were securing the rights to.

11  And they weren't interested in -- in licensing players that

12  way.  They wanted the right to say "yes" or "no" to each one,

13  and not be committed to using a particular number or a

14  particular group.

15          **THE COURT:**  Well --

16          **THE WITNESS:**  They didn't want to pick -- they didn't

17  want to choose from among the group.  They wanted to deal with

18  the list of specific players one at a time.

19          **THE COURT:**  All right.  Let me ask a last question,

20  then.

21          When you were entering into these GLA agreements back

22  at the time in question, how did you envision at the time that

23  any monies would ever come to the retired GLA players pursuant

24  to this agreement?

25          **THE WITNESS:**  We were hoping that we could convince

1    somebody to do that.  But --

2              **THE COURT:**  Do what?

3              **THE WITNESS:**  To pay a -- an amount of money that

4    would be in return for the right to use all of the players that

5    we had signed to retired players group licensing authorization

6    forms.  But nobody was willing to do it that way.

7              We kept trying to find different mechanisms to

8    accomplish that, unsuccessfully.  In the meantime, we provided

9    a lot of opportunities for players to be involved in television

10   and special events, to attend hospitality events, to -- and to

11   be involved in individually-negotiated agreements with trading

12   card companies, et cetera.

13             So we were able to put a lot of players into

14   circumstances where they could make money.  But we couldn't

15   convince anyone to pay for the large group, of which I was

16   part, because they weren't interested in players like me.  We

17   didn't have enough marketplace value.

18             And they took a very different view of the broad

19   group of active players.  They had a reason why they wanted all

20   of the active players that did not apply to retired players.

21             **THE COURT:**  But just so I can -- and so it's clear to

22   the Court and jury, you're saying that it was your

23   understanding back then that GLA rights for retired players

24   would only arise in the event that a third-party licensee like

25   Electronic Arts agreed to license the entire stable of several

 1   thousand retired player images?

 2           Is that what you understood?

 3           **THE WITNESS:**  That they would -- they would pay a

 4   single price for the right to -- not knowing who they were

 5   going to be from -- you know, as time changed, to pick from

 6   that pool and be -- and that be the -- the universe of players

 7   that they had to select from.

 8           They weren't willing to pay us to do that, given the

 9   quality and the mix of players that were in that group.

10           They wanted the right to say:

11            "We'll tell you which players we're interested in

12   and if you can get them to agree, that's fine.  But we're

13   not" --

14           **THE COURT:**  Mr. Allen, I'm asking:  Did you

15   understand then that it was all or nothing, that the -- that

16   the GLA kicked in only if the third-party licensee agreed to

17   license on a blanket basis the entire group of retired GLA

18   people you had on GLAs?  Is that your --

19           **THE WITNESS:**  I'm confused.

20           **THE COURT:**  I think you can say "yes" or "no" to

21   that.

22           **THE WITNESS:**  Can you repeat the question?

23           **THE COURT:**  I will.

24           Are you saying it was your view back at the time,

25   that the GLA would only kick in for retired players in the

1  event that a third party like EA agreed to license the entire

2  stable of retired players who had signed up under the GLA?

3           **THE WITNESS:**  Yes.

4           **THE COURT:**  All right.

5  **BY MR. KESSLER:**

6  Q.   Mr. Allen, if I could follow up on that.  First of all,

7  the programs you just testified about in response to the

8  Judge's question, in which EA or trading card companies wanted

9  small groups of individual retired players, is that what we've

10 been referring to as "ad hoc licensing"?

11 **A.**   Yes.

12 Q.   Now, was ad hoc licensing explained to the retired players

13 at the retired player conventions?

14 **A.**   Absolutely.

15 Q.   Was information given out about that ad hoc licensing

16 program?

17 **A.**   Yes.

18 Q.   Again, during the period of time that you were there, were

19 the retired players told that in these small groups ad hoc

20 licenses were used, not the retired player GLAs?

21 **A.**   Yes.

22 Q.   Now, Mr. Allen, let me ask you about active player

23 licensing, because you said -- withdrawn.

24           You said you had a hope that you'd convince the

25 licensees to license the whole stable of retired players.

1           In active player licensing were you able to convince

2    the licensees to license the whole stable of active player

3    licenses?

4    **A.**    Yes.

5    **Q.**    Is that true in the EA agreement?

6    **A.**    Yes.

7    **Q.**    Is that true in the trading card agreements?

8    **A.**    Yes.

9    **Q.**    Is that true in most of the active player agreements that

10   went into the GLR pool?

11   **A.**    Yes.

12   **Q.**    Now, why were licensees willing to license all -- why did

13   they want to license -- withdraw it.

14           Did licensees tell you they wanted all the active

15   players?

16   **A.**    Yes.

17   **Q.**    Why?

18   **A.**    Because they needed to be in a position to -- to -- to use

19   any active player who became famous.  And it wasn't always

20   clear who that was going to be.  A first round pick might get

21   hurt and not play.

22           An undrafted rookie who barely makes the team and is

23   the third-string running back might get to play, if the first

24   two are injured, and all of a sudden -- and this happens fairly

25   routinely -- becomes a productive player.  Might even go to the

1    pro bowl.  The team might win and be in the playoffs or go to

2    the Super Bowl.

3           They don't have that undrafted -- if we don't have

4    that undrafted rookie and they don't have access to all of the

5    players they could possibly want to use, then they -- that's --

6    that is the basis upon which they pay the royalties.  So

7    they're sure that if somebody becomes a very popular and

8    well-known player in a hurry -- and it happens very fast --

9    that they have access.

10          The other side of that is a player who may have been

11   famous at one point and then becomes a backup and doesn't play.

12   And people sort of forget about them.  And then, there's an

13   injury.  They get a chance to go in.  All of a sudden they're

14   productive again.

15          This year in Tampa Bay a player like Jeff Garcia, the

16   quarterback, would be a good example.

17          So they have to be able -- they don't want to have to

18   wait and see if we can go get somebody, because they need to

19   know -- because typically the products rejuvenate every year

20   with the new rosters.

21          Every year there's a new roster of players.  So for

22   trading cards or video games that's the core. That's the basis

23   upon which they build a product, is the ability to put the new

24   players in and the players that are producing and famous now in

25   the product and make sure they don't have to worry about

1  whether we have to go ask somebody and get them.

2          **THE COURT:**  All right.  Now, the -- that was a very

3  long answer.  And it's okay to have two or three sentence

4  answer.  But I think we've got -- you've got to try to limit

5  your answers to shorter, more concise, because there's a

6  tendency to veer off into other subjects.

7          So keep that in minds as you frame your questions,

8  Mr. Kessler.

9          **MR. KESSLER:**  I will, Your Honor.  I'm also trying

10 not to be leading.  So --

11         **THE WITNESS:**  Yes, Your Honor.

12         **MR. KESSLER:**  But I'll try to direct him to specific

13 pieces.

14         **THE COURT:**  You can try harder to be nonleading.

15         **MR. KATZ:**  Thank you.  Okay.

16         **THE COURT:**  Because many of your questions are

17 leading and there's been no objection.

18         **MR. KESSLER:**  Okay.

19 **BY MR. KESSLER:**

20 **Q.**   Mr. Allen, could you make that same argument that you

21 testified about, that the -- for active players, that the

22 licensees would need them because they get the whole group.

23 They don't know who would be playing.  Could you make that

24 argument for retired players?

25 **A.**   No.

1  **Q.**   Why not?

2  **A.**   Because retired players like me are as famous or

3  non-famous as they are going to get.  And the players that have

4  great careers, like Jim Brown or Joe Namath, or take your pick,

5  they are as famous as they are going to get.

6          It's not a question of whether somebody is going to

7  pop up and all of a sudden be a really well-known player.  They

8  either are or they aren't.

9          There's not that uncertainty.  They know that I'm not

10 marketable.  They know that Jim Brown is.  They want Jim Brown.

11 They don't want me.  That doesn't change.

12 **Q.**   Now, Mr. Allen, for the active players, did you have all

13 or almost all the active players?

14 **A.**   Yes.

15 **Q.**   Do you recall about what percentage of the league signed

16 GLAs when you were there from, let's say, 2004 to 2006?

17 **A.**   Essentially all.

18 **Q.**   Were there always like maybe one or two who didn't sign?

19 **A.**   There were sometimes -- it took a while to get the rookies

20 signed up.  It might take a little bit of time to do that.  But

21 with a couple of exceptions, in terms of established players,

22 essentially all.

23 **Q.**   Occasionally, one wouldn't sign, like Mr. LaVar Arrington,

24 remember?

25 **A.**   Yes, I do.  There was occasionally one who refused to

1  sign.  But it was very rare.

2  **Q.**   Now, for the retired players, were you able to convince

3  most of the star retired players to sign the retired player

4  GLA?

5  **A.**   No.

6  **Q.**   You mentioned Joe Namath.  Did Joe Namath sign the retired

7  player GLA?

8  **A.**   No.

9  **Q.**   You mentioned Jim Brown.  Did Jim Brown sign the retired

10  player GLA?

11  **A.**   No.

12  **Q.**   You mentioned, I think, Joe Montana at one point.

13         Did Joe Montana sign the retired player GLA?

14  **A.**   No.

15  **Q.**   Did the failure or the unwillingness of the star retired

16  players to sign the retired player GLA have any impact on your

17  ability to convince licensees whether to license the whole

18  group?

19  **A.**   Yes.

20  **Q.**   What was the impact?

21  **A.**   They weren't interested in a group that didn't include the

22  high-profile celebrity players that they knew would be

23  marketable in their products.

24  **Q.**   Would you have liked to have gotten those star players to

25  sign the retired player GLAs?

1   **A.**   Sure.

2   **Q.**   Did you try to do that?

3   **A.**   Yes.

4            **MR. KESSLER:**  Now, I would like to now approach the

5   witness, Your Honor, if I may.

6            **THE COURT:**  Go ahead.

7   **BY MR. KESSLER:**

8   **Q.**   Let me show you a trial exhibit that's been marked as

9   1164-1.  Okay?

10           And you'll see this is five different retired player

11  GLAs.  Do you see that, Mr. Allen?

12  **A.**   I'm sorry.  I was looking at it.  Could you repeat the

13  question?

14  **Q.**   Yes.  You'll see that that exhibit on the first page has a

15  retired player GLA with some handwriting on it?

16  **A.**   Yes.

17  **Q.**   The second page is a letter from an attorney attaching

18  another retired player GLA with some handwriting on it.  Do you

19  see that?

20  **A.**   I do.

21  **Q.**   The third and fourth page are also retired player GLAs

22  with some handwriting on it.

23  **A.**   Yes.

24  **Q.**   Okay.  Mr. Allen, during the course of your signing up

25  retired players for GLAs, did players sometimes change the

1    provisions of the retired player GLA before signing it?

2    **A.**    Yes.

3    **Q.**    Okay.  Did they sometimes have lawyers send you letters

4    about the retired player GLA?

5    **A.**    Yes.

6    **Q.**    Okay.  So when Mr. Parcher asked you or suggested in his

7    questions that players never tried to negotiate or never

8    negotiated this, was that true of all retired players?

9    **A.**    No.

10            **MR. KESSLER:**  Your Honor, I would like to move into

11   evidence Trial Exhibit 1164-1.

12            **THE COURT:**  Any objection?

13            **MR. KESSLER:**  No objection whatsoever.

14            **THE COURT:**  1164-1.

15            (Trial Exhibit 1164-1 received in evidence.)

16            (Document displayed.)

17   **BY MR. KESSLER:**

18   **Q.**    If you look at the first page of this, at the handwriting

19   on the form it says:

20                "I am declining the offer in all forms, parts

21   and phases.  Lynn Swann of Swann, Inc."

22            Do you know who Mr. Lynn Swann is?

23   **A.**    Yes.

24   **Q.**    Who is Mr. Lynn Swann?

25   **A.**    He was a wide receiver for the Pittsburgh Steelers during

1  the years when they won four Super Bowls.

2  **Q.**   And did Mr. Lynn Swann, after he received the retired

3  player authorization form, did he decline?  Do you remember if

4  he declined to sign it?

5  **A.**   I do.  And he did.

6  **Q.**   Okay.  Take a look at the second page of this exhibit.

7  This is a letter, if you'll see, from a Mr. Morrall, which

8  says:

9            "Dear Sirs:  Please find enclosed my client's

10  authorization form to participate in the non-exclusive

11  licensing program for the NFL retired player group licensing

12  program.  Please allow my language, initialed by Mr. Morrall,

13  to reflect that he may participate in other licensing projects.

14  Please contact me if this is not the case."

15            Do you see that?

16  **A.**   Yes.

17  **Q.**   And then, there's a form attached.  If you go to the next

18  page, and you'll see there's a bunch of handwriting.

19            **MR. KESSLER:**   If we could blow that up, too, the

20  signature, if we can.

21            (Document displayed.)

22            Just do that.  Get it all on.

23  **BY MR. KESSLER::**

24  **Q.**   Was this handwriting added by Mr. Earl Morrall's attorney

25  to the retired player form?

1  **A.**    Uhm, I don't know.

2  **Q.**    Okay.  You don't know one way or the other.  Okay.

3          Would you tell the jury who Earl Morrall was?

4  **A.**   He was a very well-known quarterback for the Miami

5  Dolphins, who took the Dolphins to the Super Bowl, as I recall.

6  And he played a long time.

7  **Q.**   And let me direct your attention to the next document, if

8  I can.  And you'll see there's handwriting on this form, as

9  well, added.

10          (Document displayed.)

11          It says:

12              "Will exclude any alcohol or nicotine products."

13          Do you see that?

14  **A.**    Yes.

15  **Q.**   And do you recall some players would say:

16              "Okay, I'll sign the form, but I want some

17  products excluded"?

18  **A.**    Yes.

19  **Q.**    Okay.  And this would be one of them?

20  **A.**    Yes.

21  **Q.**   And for the last one, if we can, you'll see this was an

22  older form that had the word "exclusive."

23          Was there a time when the retired player group

24  licensing form had exclusive rights?

25  **A.**    Yes.

1  Q.   And was that changed?

2  A.   Yes, it was.

3  Q.   Was it changed to non-exclusive?  I think you testified to

4  that.

5  A.   Yes.  We changed "exclusive" to "non-exclusive."

6  Q.   Now, this is a form where someone wrote:

7            "I cut the word 'exclusive' since I do some

8  things on my own."

9            Do you see that?

10 A.   I do.

11 Q.   So when you had the exclusive form did some retired

12 players say:

13            "I'm going to take that out"?

14 A.   It did.

15 Q.   Did that affect your decision as to whether to change the

16 form?

17 A.   Yes, the number of players that objected to signing it

18 because it was exclusive led us to change the language to

19 non-exclusive.

20 Q.   Now, I would like, Mr. Allen, to turn to a new subject.

21            Which is you were asked some questions about Trial

22 Exhibit 125, which is the agreement between the Players

23 Association and Players Inc, dated the 9th day of May, 1994.  I

24 just want to go through that date.

25            We're going to refer to this as the "1994 agreement,"

1  Mr. Allen?

2  **A.**    All right.

3  **Q.**    Because later there's a 2000 agreement that I want to

4  refer to, also.

5  **A.**    All right.

6  **Q.**    Now, you got asked by counsel:

7              "Is this the agreement that set the division of

8  23 percent to Players Inc, 40 percent to the union and

9  37 percent to the players?"

10         Do you recall?

11  **A.**    Let me look at it, and I'll tell you.

12  **Q.**    Sure.  I can direct your attention to the paragraph if

13  that will help you.

14  **A.**    Yes, it is.

15  **Q.**    Okay.  And you testified earlier that that was decided

16  ultimately by the Board of Player Representatives, correct?

17  **A.**    Yes.

18  **Q.**    Now, take a look, if you can, on page 5 of this agreement.

19  Actually, go back paragraph 4 on page 4.  This comes under the

20  subject of royalties.

21         Do you see that?

22  **A.**    I do.

23  **Q.**    Now, look at page 5.  And there's a definition here of the

24  term "gross licensing revenues."

25  **A.**    Yes.

1   **Q.**   Now, these are the revenues that were being divided up,

2   37/23/40; is that correct?

3   **A.**   Yes.

4   **Q.**   Was any of this retired player money?

5   **A.**   No.

6   **Q.**   What money was it?

7   **A.**   Active player money.

8   **Q.**   Now, there's also a reference here, Counsel showed you, on

9   page 7.  If you look at the bottom, on page 7C, this is in

10  section 5(c), to setting eligibility requirements.  Do you see

11  that?

12  **A.**   Yes.

13  **Q.**   Now, were these the eligibility requirements for the

14  active player money or the retired player money, or both?  What

15  were they?

16  **A.**   Active player only.

17  **Q.**   Have anything at all to do with retired players?

18  **A.**   No.

19  **Q.**   Okay.

20          **MR. KESSLER:**  Your Honor, I would like to approach

21  the witness, please.

22          **THE COURT:**  Go ahead.

23  **BY MR. KESSLER:**

24  **Q.**   I'm going to show you, Mr. Allen, a copy of Exhibit 93.

25          Do you recognize what Trial Exhibit 93 is?

1          Yes, Trial Exhibit 93?

2   **A.**    Yes, I do.

3   **Q.**    What is 93, first?  Just describe it generally.

4   **A.**    It's the opinion from Duff & Phelps relating to the

5   valuation of the rights that were being dealt with in the

6   license agreement between the NFLPA and Players Inc after

7   Players Inc's inception in 1994.

8   **Q.**    What is -- or what was Duff & Phelps in '94, '95?  What

9   was that group?

10  **A.**    They were a company that did independent valuations for

11  businesses so that there would be an opportunity to have an

12  arm's-length valuation placed on the terms of a business

13  transaction.

14          **MR. KESSLER:**  Okay.  Your Honor, I move into evidence

15  Exhibit 93.

16          **MR. PARCHER:**  No objection.

17          **THE COURT:**  Received.

18          (Trial Exhibit 93 received in evidence.)

19  **BY MR. KESSLER:**

20  **Q.**    So we can look here on Duff & Phelps' stationery.  It

21  says:

22          "Dear Doug:  Enclosed is our signed opinion

23  relating to our analysis of licensing operations.  It has been

24  a pleasure working with you on this engagement."

25          Do you see that?  Who was Mr. Cooper?

1  A.   He was the lead partner who was responsible for the team

2  that did this valuation for Duff & Phelps.

3  Q.   Now, in this report did Duff & Phelps review the

4  37 percent of the GLR pool that was going to active players?

5  A.   Yes.

6  Q.   And did they give an opinion on that?

7  A.   Yes.

8  Q.   What opinion did they give?

9  A.   That it was a reasonable and appropriate percentage based

10 on marketplace conditions.

11 Q.   Okay.

12 A.   And the value of the -- the terms that were being

13 exchanged.

14 Q.   Did they review the 40 percent that was being given to the

15 NFLPA?

16 A.   Yes.

17 Q.   And what opinion did they give on that?

18 A.   It was appropriate, given the nature of their relationship

19 that it was a reasonable and defensible -- an appropriate

20 percentage.

21 Q.   Did they review the 23 percent that was given to Players

22 Inc?

23 A.   Yes.

24 Q.   And what opinion did they have on that?

25 A.   Based on what Players Inc was going to be doing and was

1  doing, it was -- it was an appropriate amount of money to

2  retain in Players Inc for the -- to cover the cost of doing

3  what Players Inc was going to be doing.

4  **Q.**   Was the Duff & Phelps' opinions made available to the

5  board of -- active board of player reps when they considered

6  this issue?

7  **A.**   Yes.

8  **Q.**   And did the board of player reps then take any action on

9  these percentages?

10 **A.**   Yes.

11 **Q.**   What did the board of -- active board of player reps do?

12 **A.**   They adopted them.

13 **Q.**   Now, subsequently, Mr. Allen, did the Internal Revenue

14 Service ever look at these percentage splits?

15 **A.**   Yes.

16         **MR. PARCHER:**  Objection.

17         **THE COURT:**  Sorry?  Was there an objection?

18         **MR. PARCHER:**  Yes, sir.

19         **THE COURT:**  Sustained.  We're not going to get --

20 you're trying to say the Internal Revenue somehow blessed the

21 percentage split?

22         **MR. KESSLER:**  Your Honor, I will make a proffer that

23 they reviewed the arm's-length nature of the transactions which

24 is something they put in issue for tax reasons, and concluded

25 they were arm's-length.

1          **THE COURT:**  Not going to be allowed.  We're not going

2     to get into whether the Internal Revenue Service did their job

3     or didn't do their job right.

4              Please disregard that, ladies and gentlemen.

5          **MR. KESSLER:**  Very good, Your Honor.

6     **BY MR. KESSLER::**

7     **Q.**   Mr. Allen, let me move on to the 2000 agreement.

8          **MR. KESSLER:**  Your Honor, if I may approach.

9          **THE COURT:**  Go ahead.

10    **BY MR. KESSLER:**

11    **Q.**   I'm going to show you Exhibit 95.

12             Mr. Allen, do you recognize Trial Exhibit 95?

13    **A.**   Yes.

14    **Q.**   Okay.  And tell the jury what Trial Exhibit 95 is.

15    **A.**   It's a -- an agreement between the National Football

16    League Players Association and Players Inc.

17    **Q.**   Now, did this agreement also have to do with the

18    percentages that were divided up between the Players

19    Association, Players Inc and the players out of the GLR pool?

20    **A.**   Yes.

21         **MR. KESSLER:**  Your Honor, I would move into evidence

22    Trial Exhibit 95.

23         **MR. PARCHER:**  No objection.

24         **THE COURT:**  Received.

25

 1              (Trial Exhibit 95 received in evidence.)

 2   **BY MR. KESSLER:**

 3   **Q.**   If you take a look, Mr. Allen, first, on page 3 of this,

 4   4(a).

 5              **MR. KESSLER:**  Just the bottom, if we can, please,

 6   Lauren, just the (a) part.

 7   **BY MR. KESSLER:**

 8   **Q.**   It says:

 9              "Gross licensing revenue shall exclude any

10   revenues derived from the following."

11              Do you see that?

12   **A.**   I do.

13   **Q.**   Was this identifying what revenues were subject to the

14   division between -- of the 40 percent, the 23 percent and the

15   37 percent?

16   **A.**   Uhm, no.  It was identifying those that weren't.

17   **Q.**   Okay.  I'm sorry.  Thank you.

18              This was saying what's not included?

19   **A.**   Correct.

20   **Q.**   So it says "shall exclude those revenues"?

21   **A.**   Right.

22   **Q.**   And one of the things that excluded, if you look at number

23   5, it says:

24              "Amounts received by retired players pursuant to

25   group licensing assignments or group licensing rights."

1            Mr. Allen, was any of the retired player money that

2    was generated, whether it was through an ad hoc license

3    agreement or whether, if you ever were successful, if you ever

4    achieved the full license under the GLAs, was any of that money

5    going to be in the GLR pool under your understanding at the

6    time?

7            **MR. PARCHER:**  Objection, Your Honor.  Assumes a set

8    of facts not in evidence here.  The evidence is that not one

9    single penny of group licensing money was ever put in.  So he's

10   saying:

11            "If it was, what would you do?"

12            The fact is that it wasn't.  Never was.

13           **MR. KESSLER:**  Your Honor, I'm asking --

14           **MR. PARCHER:**  Under his definition --

15           **THE COURT:**  That's a speaking objection.  That's a

16   speaking objection.

17           **MR. PARCHER:**  Yes, sir.

18           **THE COURT:**  Overruled.

19           **MR. KESSLER:**  Thank you.

20   **BY MR. KESSLER:**

21   **Q.**   Mr. Allen, should I repeat the question?

22   **A.**   Please.

23   **Q.**   I'm focusing on the GLR pool.  In the GLR pool, the gross

24   licensing revenue pool, in your understanding, was any kind of

25   retired player money going to be in that pool?

1   **A.**   No.

2   **Q.**   Was there any ad hoc money in that pool?

3   **A.**   No.

4   **Q.**   If there was any money generated from the mass licensing

5   of GLA signees, would it have gone into that pool?

6   **A.**   You mean, retired or active?

7   **Q.**   Retired only.

8   **A.**   No.

9   **Q.**   Okay.  Was that something that was explained to retired

10  players at conventions?

11  **A.**   Yes.

12  **Q.**   Now, Mr. Allen, do you recall in 2000 why this agreement

13  was necessary, why this 2000 agreement was necessary?

14  **A.**   I think so.

15  **Q.**   Could you explain to the jury why?

16  **A.**   Well, the -- there was a recommendation from our outside

17  counsel, particularly our tax counsel, that -- that we change

18  the structure of the relationship between Players Inc and the

19  NFLPA so that some of the money that was generated would be

20  subject to a license agreement between the union and a licensee

21  and go directly to the union.

22          And it would be the most passive licenses, the

23  licenses for which there was not much more than the providing

24  of rights and then the payment of royalties.

25          And the trading card companies were the best examples

1  of that.  So with the trading card companies it was established

2  that there would be a license directly between the trading card

3  company and the NFLPA for the player rights.  And that the

4  Players Inc would service that with a service agreement

5  separately.

6          That was a model that was based on -- my

7  understanding at the time was that was a model that was based

8  on -- and the reason it was recommended to us was because it

9  had been successfully done by the AARP, because the AARP had a

10  for-profit insurance affiliate.  And this is the way they had

11  structured it in accordance with a dispute they'd had with the

12  IRS.  That's how they had resolved it.

13  **Q.**  Mr. Allen, this change in structure having passive

14  agreements going to the NFLPA and sort of changing the way you

15  got there, did it change the 40/23/37 split?

16  **A.**  Not essentially.  It just meant that you had to put the

17  two things together.  You had to put the money going into the

18  NFLPA together with the money going to the -- through Players

19  Inc, and you ended up with the same result.  But instead of

20  having it go all through Players Inc, some of it went directly

21  to the union.

22          It didn't change the essential split, but it did --

23  because the money wasn't coming to Players Inc, so the formula

24  between Players Inc and the PA had to be different.  But then

25  when you added back in the money that was going in the PA, you

1 ended up essentially with the same result.  PA got what it got.

2 Players got what they got.  And Players Inc got what it got.

3        And it was consistent with the Duff & Phelps

4 valuation.  And the way it had originally been set up, it was

5 just two streams instead of one.

6 **Q.**   Was this presented at the Board of Player Representatives'

7 annual meeting?

8 **A.**   Yes.

9 **Q.**   And the did the Board of Player Representatives approve

10 this?

11 **A.**   Yes.

12 **Q.**   And you mentioned tax counsel.  Was that Mr. Steve Saxon?

13 **A.**   Yes.

14 **Q.**   Now, I would next like you to take a look at Trial Exhibit

15 2046.  I believe you should have that in front of you.

16        This was shown to you by counsel in your examination.

17 **A.**   I don't have it yet.  There's a lot of them here.

18        **MR. KESSLER:**  Can I approach, Your Honor, and help

19 the witness find it?

20        **THE COURT:**  Go ahead.

21 **BY MR. KESSLER:**

22 **Q.**   Here it is.

23 **A.**   Sorry.

24 **Q.**   It's okay.  It's a big state.

25        **THE COURT:**  It's not in evidence.

1          **MR. KESSLER:**  It's already in evidence, Your Honor.

2          **THE CLERK:**  Which number?

3          **MR. KESSLER:**  2046 was moved into evidence earlier by

4    plaintiffs.

5          **MR. PARCHER:**  Just a second, Mr. Kessler, so I can

6    get a copy of.

7          **THE COURT:**  True.  2046 is in evidence.

8    **BY MR. KESSLER:**

9    **Q.**  Now, Mr. Allen, do you recognize what 2046 was?  What is

10   TouchBack?

11   **A.**  TouchBack was a newsletter that was produced by the NFL

12   Players Association for retired players, although active

13   players and others got it, as well.

14   **Q.**  Now, was this sent out -- who was this sent out to on your

15   mailing list?

16   **A.**  Well, its primarily audience was retired players who were

17   members of the NFLPA.

18   **Q.**  If you take a look at the top here.

19         **MR. KESSLER:**  You if you could blow that up, Lauren.

20   No.  No.  The little heading in the box there.

21         See that?  Yes.

22         (Document displayed.)

23   **BY MR. KESSLER:**

24   **Q.**  This was a publication for retired NFL players, correct?

25   **A.**  That's right.

1  **Q.**   And did you sometimes use this publication to discuss

2  group licensing?

3  **A.**   Yes.

4  **Q.**   Okay.  Now, there's a reference to -- you mentioned the

5  retired Players Association.  What is that?

6  **A.**   It's a -- it's not a separate entity.  It's a way to think

7  about the retired player membership of the NFLPA.

8  **Q.**   Okay.  Are there some retired player members?

9  **A.**   Yes.

10  **Q.**   Are they in the same category or different category from

11  active members?

12  **A.**   They're a different category.

13  **Q.**   Do you recall what retired player dues are?

14  **A.**   Uhm, I -- I think I'm right on this.  Well, when I was

15  there they went -- for a long time they were $50 a year, and

16  then they went to a hundred dollars.

17  **Q.**   And do you know if their other $50 was rebated back out of

18  the hundred?

19  **A.**   Some of the dues money was rebated to chapters so that the

20  chapters would have funds to operate at a local level based on

21  the number of players that were members who were part of their

22  geographic chapter area.  So some of it was.

23  **Q.**   The active players, did they just pay $50 in dues?

24  **A.**   No.

25  **Q.**   Do you recall what they paid during that period of time?

1   **A.**   $10,000 a year.

2   **Q.**   Okay.  Now, if you could take a look at -- this is the

3   same article Mr. Parcher showed you, the group licensing

4   essential article.

5          And let me show you the other page of this article

6   which he didn't cover with you.

7          And if you take a look at page -- the last page of

8   this, you'll see --

9          **MR. KESSLER:**  If we can blow this up, Lauren.  This

10  whole box, just the box.

11          (Document displayed.)

12  **BY MR. KESSLER:**

13  **Q.**   It states that -- let me get this list.  It says:

14          "Players Inc also receives a royalty for the

15  inclusion of active players based on the wholesale price of

16  games."

17  **A.**   Mr. Kessler, I'm not sure where you are.

18  **Q.**   Can you find it in yours, Mr. Allen?

19  **A.**   I've got it.

20  **Q.**   And it says:

21          "The royalty is split.  40 percent goes to the

22  NFLPA to offset its operating expenses.  23 percent goes to

23  Players Inc to offset its operating expenses.  And 37 percent

24  is divided equally among more than 2,000 eligible active

25  players each year.

1              Do you see that?

2    **A.**    Yes.

3    **Q.**    So were the retired players told in their publication that

4    this split of royalties for the inclusion in these video games

5    only went to active players?

6    **A.**    Yes, they were.

7    **Q.**    And it then says:

8              "Hundreds of retired players benefited directly

9    from the fees paid by Players Inc for using their names and

10   images in video games."

11             Did that refer to ad hoc agreements?

12   **A.**    Yes, it did.

13   **Q.**    And then, it says:

14             "But all retired players benefit from the

15   royalties paid by Players Inc to the NFLPA.  For example, the

16   NFLPA's retired players department and benefits department

17   combined cost the NFLPA approximately 1.5 million per year, but

18   total dues paid by retired players equal only about $175,000

19   annually.  The NFLPA's representation of retired players is

20   funded mostly by royalties from Players Inc's licensing program

21   involving current players.  This representation has delivered

22   amazing gains in player pensions, especially over the past 10

23   years."

24             Mr. Allen, my question here is:  Is this information

25   you gave to retired players?

1   **A.**    Yes.

2   **Q.**    And did you tell retired players this was a reason that it

3   was good to support the union?

4   **A.**    Yes.

5   **Q.**    And did you tell them this was a reason it was a good idea

6   to sign retired player GLAs?

7   **A.**    We absolutely did.

8   **Q.**    Now, I would like you to take a look next at Trial Exhibit

9   91 that should be before you.  Do you see it, Mr. Allen?

10  **A.**    Hold on a second.

11  **Q.**    It was the amendment.

12          Counsel showed you this document this morning.

13          **MR. KESSLER:**  If you, Lauren, could blow up the top

14  of it.  Not just that, but through the "whereas" clause.

15          **THE WITNESS:**  Wait a minute, Mr. Kessler.

16  **BY MR. KESSLER:**

17  **Q.**    Don't have it?

18  **A.**    Took me a while to find it.  Sorry.

19  **Q.**    I'm sorry.  I got you out of order.

20  **A.**    I got it now.

21  **Q.**    Okay.

22  **A.**    Yes.

23  **Q.**    This was the amendment Counsel asked you about this

24  morning.  And this is an amendment in this first paragraph to

25  the agreement that was entered into 2000, the 2000 agreement,

1  correct?

2  **A.**    Yes.

3  **Q.**    This wasn't the '94 agreement that counsel for

4  plaintiffs -- this was not an amendment to the '94 agreement

5  counsel was talking about?

6  **A.**    Yeah.  This was an amendment to the 2000 agreement.

7  **Q.**    And this is the agreement that spoke about on the second

8  page, if you take a look, about taking $8 million and moving

9  it?  If you look at the last paragraph here, this E:

10              "Notwithstanding the other provisions of this

11  section, $8 million of the amount described in 4(a) shall be

12  paid out of the licensing revenue depository account

13  established to disburse amounts payable to the NFLPA and

14  Players Inc with the depository account paying 60 percent of

15  such amount to the NFLPA and 40 percent to Players Inc,"

16  correct?

17  **A.**    Yes.

18  **Q.**    Do you see that?  I'm going to ask you questions.

19  **A.**    Yes.

20  **Q.**    Now, prior to this amendment, the NFLPA received

21  40 percent of the amount in those accounts, correct?

22  **A.**    Yes.

23  **Q.**    And Players Inc received 23 percent of the amounts in

24  those accounts, correct?

25  **A.**    Correct.

1  Q.   So am I correct that by moving the $8 million out 60/40,

2  the only difference is increasing the NFLPA's share of this

3  $8 million from 40 to 60, and the Players Inc's share from 23

4  to 40, correct?

5  A.   Yes.

6  Q.   And the total reduction of the GLR pool wasn't $8 million

7  in terms of the players' share, it was about 2.8 million,

8  correct?

9  A.   Yes.

10  Q.   And why was this change made?

11  A.   In accordance with the agreement, it was made to reflect

12  changing market conditions.  With respect to the amount of

13  money that was being generated by virtue of an NFL sponsorship

14  agreement.  And because of the increased value of the logo that

15  had been utilized in -- in thousands of ways, on television

16  commercials and on product packaging, the Players Inc logo, NFL

17  players, the value of that logo, which is owned by the NFL

18  Players Association and not by Players Inc.  And that value

19  didn't really exist when the company was created because all of

20  those commercials and all of that exposure hadn't happened.

21       By the time you get a few years later and you've had

22  all that exposure, that logo had value.  And this helped

23  recognize those changing market conditions.

24  Q.   You said you got advice on this from tax counsel?

25  A.   Yes.

1   Q.   Now, was this change disclosed to the active board of

2   player reps?

3   A.   Absolutely.

4   Q.   And was it approved by the active board of player reps?

5   A.   Yes, it was.

6   Q.   And, Mr. Allen, the money that was moved, was this any

7   retired player money?

8   A.   Not a dollar.

9   Q.   So it was all active player money?

10  A.   Yes.

11          THE COURT:  All right.  Are we going to a new topic?

12          MR. KESSLER:  We are, Your Honor.

13          THE COURT:  Time for a 15-minute break.  Please

14  remember the admonition.

15          THE CLERK:  All rise.

16          (Jury in recess.)

17          (The following proceedings were held in open court,

18          outside the presence of the jury.)

19          THE COURT:  Mr. Allen, you can step down, too.  15

20  minute break.

21          Anything the lawyers need me for?

22          MR. KESSLER:  Not at this moment, Your Honor.

23          THE COURT:  Thank you.  We'll take 15 minutes.

24          (Recess taken from 11:17 to 11:35 a.m.)

25          MR. LECLAIR:  Judge, I have one question before the

1    jury comes in.

2          Could we get an instruction that Mr. Allen was not in

3    the class, since he said he signed the GLA?  He's excluded from

4    the class.  I don't want there to be confusion about that

5    issue.

6          **THE COURT:**  What do you mean he's excluded?

7          **MR. LECLAIR:**  By the definition.

8          **MR. KESSLER:**  He signed the GLA, but they proposed a

9    definition not to include anybody who was an employee of the

10   union at the time.

11         **THE COURT:**  You both agree to this?

12         **MR. KESSLER:**  He's not a class member --

13         **THE COURT:**  All right.

14         **MR. KESSLER:**  -- because of that fact.

15         **THE COURT:**  All right.  I'll tell the jury that he's

16   not a class member.

17         **MR. KESSLER:**  But I would appreciate that you would

18   tell them the only reason he's not is because plaintiffs

19   proposed to exclude employees.  In other words, it was just

20   their proposed definition.  He otherwise would be.

21         **THE COURT:**  Let's bring in our jury.

22         **THE CLERK:**  Okay.

23         (Thereupon, the Jury returned to the courtroom.)

24         **THE COURT:**  Welcome back.  Have a seat, everyone.

25         The lawyers have asked me to clarify one thing.  And

1  that is, our witness, Mr. Allen, even though he's a retired

2  former football player, he is -- by the way we define the class

3  in this case, it excludes former employees who worked for the

4  NFLPA.  Because then they would be on both sides of the

5  problem.

6         So he is not a member of the class.  He is a retired

7  football player, but he is not a member of the class.  The

8  lawyers both wanted me to explain that to you.

9         Go ahead, Mr. Kessler.

10 **BY MR. KESSLER:**

11 **Q.**  Mr. Allen, even though you're not a class member, did you

12 sign the same retired player form as the class members?

13 **A.**  Yes.

14 **Q.**  Mr. Allen, I took the opportunity at the break to place

15 before you a few exhibits we're going to go through.

16        If you look at Trial Exhibit 2247, should be on top.

17 **A.**  Yes.

18 **Q.**  Okay.

19        **MR. KESSLER:**  Your Honor, I would move 2247 into

20 evidence.

21        **THE COURT:**  Any objection?

22        **MR. KESSLER:**  It's the minutes from the board of

23 players meeting.

24        **THE COURT:**  Any objection?

25        **MR. PARCHER:**  I'm not familiar with it, Your Honor.

1          THE COURT:  All right.  Hearing no objection, it's

2    received.

3          Was notice given of 2247?

4          MR. KESSLER:  I don't believe there's any objection

5    to it, Your Honor, even on their list.  But I don't know.

6          THE COURT:  Any objection to 2247?

7          MR. PARCHER:  I think -- first of all, I think it's

8    hearsay.

9          THE COURT:  All right.

10          MR. PARCHER:  And, secondly, authentication,

11   accuracy, completeness of statement.

12          THE COURT:  It's not in evidence.  You'll have to lay

13   the foundation for 2247.

14   BY MR. KESSLER:

15   Q.   Mr. Allen, do you recognize this exhibit?

16   A.   I do.

17   Q.   Could you explain to the jury what this exhibit is.

18   A.   It's a copy of minutes of the NFLPA Board of Player

19   Directors' meeting March 18 through the 20th, 1991, in Hawaii.

20   Q.   Did you attend this meeting?

21   A.   I did.

22   Q.   Do you remember this resolution being voted upon and

23   adopted?

24   A.   Yes, I do.

25          MR. KESSLER:  Your Honor, I move its admission.

1          **THE COURT:**  May I see it?

2          Are these minutes adopted by the board?

3          **THE WITNESS:**  Yes.

4          **THE COURT:**  All right.  The objection is overruled.

5          The purpose of this minutes is to set forth a

6   resolution.  That's like proving up what a contract is.  It's

7   not hearsay at all.  These are minutes of the -- minutes that

8   set forth what the resolution was that was adopted by the

9   board.

10          The objection is overruled.  Exhibit 2247 is in

11  evidence.

12          (Trial Exhibit 2247 received in evidence.)

13          (Document displayed.)

14  **BY MR. KESSLER:**

15  **Q.**   Mr. Allen, this was at the March 18 to 20, 1991 meeting of

16  the Board of Player Directors' meeting; is that correct?

17  **A.**   That's correct.

18  **Q.**   And you attended that meeting?

19  **A.**   Yes, I did.

20  **Q.**   If we could look down now at the resolution, please.  It

21  says:

22          "The board then discussed who should be regarded

23  as a participating player in the group licensing program."

24          Let me stop there.  You were present for that

25  discussion?

1  **A.**    I was.

2  **Q.**    Okay.  And this resolution involved active player

3  licensing or retired player licensing?

4  **A.**    Active player licensing.

5  **Q.**    It says:

6              "After extensive discussion Dave Duerson moved

7  that such a participating player should be eligible if he was

8  on the injured reserve or active list of a club at the end of

9  the 1989 season or was on the regular season roster at the

10  beginning of the 1990 season.  He expanded this motion to also

11  include any player who signed the group licensing authorization

12  and was on the developmental squad at the end of the 1989

13  season, and also any practice squad player who signed a group

14  licensing authorization and was on the practice squad roster at

15  the beginning of the 1990 season."

16          Then it says:

17              "The motion was seconded by Gary Reasons and

18  after extensive discussion was passed unanimously."

19          Did that vote take place, Mr. Allen?

20  **A.**    Yes.

21  **Q.**    Did this set the eligibility criteria for the GLR pool?

22  **A.**    Yes.

23  **Q.**    Okay.  And it says:

24              "When further questions were raised after the

25  vote, Dave Duerson amended his motion to empower the executive

1  committee, the NFLPA executive committee, to make the final

2  decision on qualifying participants within the general

3  parameters of the motion as passed."

4          Who is the NFLPA executive committee?

5  **A.**    The NFLPA executive committee is a group of ten players

6  who are elected by the Board of Player Representatives to act

7  in their stead in between board meetings, with delegated

8  authority from the board.

9  **Q.**    And so those are active players, elected from the player

10  board meeting?

11  **A.**    Yes.

12  **Q.**    Okay.  And, Mr. Allen, I would now like you to take a look

13  together at Exhibit 96A, 96B, 96C, and 96D.  Those four, if we

14  can.

15          **MR. KESSLER:**  I'm sorry, Your Honor.  I read you the

16  wrong things.  The official numbers are 1307, 1308, 1309 and

17  1310.  They were renumbered pursuant to Your Honor's rules.  So

18  it's 1307 through 1310.

19          **THE COURT:**  Any objection?  Oh, wait.  Haven't moved

20  them yet.  I jumped ahead.  Go ahead.  Just showing --

21          **MR. PARCHER:**  No objection.

22          **THE COURT:**  Just showing them to the witness, right?

23          **MR. PARCHER:**  No objection.

24          **THE COURT:**  All right.  All four are received.

25          (Trial Exhibits 1307, 1308, 1309 and 1310 received in

1              evidence.)

2  **BY MR. KESSLER:**

3  **Q.**   Mr. Allen, if you could describe to the jury -- we're not

4  going to go through each one individually, but what are these

5  documents?

6  **A.**   These are the protocols that govern the -- the royalty

7  eligibility rules for payment during various seasons.

8  **Q.**   Okay.

9              **MR. KESSLER:**   Could we put up 1307, so we go through

10  one of them.   If we could just do it from equal share through

11  the first through number 4, if we can.

12              (Document displayed.)

13  **BY MR. KESSLER:**

14  **Q.**   This is the rules for the 2003 season; is that correct?

15  **A.**   Yes.

16  **Q.**   Now, again, to be very clear, did these rules have

17  anything at all to do with retired player money?

18  **A.**   Nothing whatsoever.

19  **Q.**   Okay.   Whose money was involved here?

20  **A.**   Active player.

21  **Q.**   And it says:

22              "In order for a player to be considered eligible

23  he must have appeared on the last game roster of the 2002

24  season and/or must have appeared on the first game roster of

25  the 2003 season.   Provided the player meets these roster

1  requirements, his status must have been" -- and then it says --

2  "A, IR, PS, PUP/FI."

3          What is all that about?

4  **A.**   Those are categories of active players:  Active, injured

5  reserved, physical unable to perform, football injury, and

6  practice squad.

7  **Q.**   Those are different categories of active players that the

8  NFL characterizes?

9  **A.**   Yes.

10  **Q.**   None of them are retired players?

11  **A.**   No.

12  **Q.**   And then it says:

13          "And he must have signed the GLA effective

14  during the 2003 season or have agreed to participate in a

15  licensing program for the 2003 season, or was used in a

16  licensing product for the 2003 season."

17          Do you see that?

18  **A.**   Yes.

19  **Q.**   Now, Mr. Allen, is it true that under these -- under these

20  criteria, if an active player signed the GLA but was not on the

21  roster, the last game or the first game, he would get nothing?

22  **A.**   That's right.

23  **Q.**   Okay.  So the mere fact that an active player signed the

24  GLA didn't give him any share of the pool, did it?

25  **A.**   No, it did not.

1  Q.   And did practice squad players get -- what is the practice

2  squad?  Tell the jury.

3  A.   The practice squad is a group of players who practice but

4  do not play.  And they -- they are employed under different

5  contracts.  And if they become a player who plays, they have to

6  change their contract and become an active roster player.

7        But they're -- they're available to participate in

8  practice for a -- for an amount of money that's below the

9  minimum that an active player would get.

10 Q.   If you take a look now at the note.

11        MR. KESSLER:  If we can go down to the paragraph that

12 begins, "Note."  If we can blow that up, Lauren.  Next to last

13 paragraph, "Note."

14        (Document displayed.)

15 BY MR. KESSLER:

16 Q.   It says:

17        "Players who meet the above criteria with only

18 the status of PS receive a reduced amount of 1,000."

19        What is "PS"?

20 A.   Practice squad, the group I just described.

21 Q.   So they would not get an equal share, just a thousand?

22 A.   That's correct.

23 Q.   Okay.  Now, was any retired player money given to any of

24 these players, to any active players under this criteria?

25 A.   No, none.

1   **Q.**   Now, by the way, Mr. Allen, on your examination by

2   plaintiffs' counsel you got asked some questions about this and

3   you referred to programs involving active players of 35 or

4   less?

5   **A.**   Yes.

6   **Q.**   Okay.  In active player group licensing, if it involves 35

7   or less active players, does that money go into the GLR pool?

8   **A.**   No.

9   **Q.**   Okay.  Where does the money for the smaller, active player

10  programs go?

11  **A.**   It's divided among the players who participate, whatever

12  the -- whatever the proceeds are from the royalties.

13  **Q.**   So it doesn't go into the GLR pool for these equal shares?

14  **A.**   No.

15  **Q.**   It goes just to the players whose rights are used?

16  **A.**   Yes.

17  **Q.**   How would you compare that, if at all, to the retired

18  player ad hoc licensing program?

19  **A.**   It's very similar.  It's essentially the same arrangement.

20  **Q.**   Could you explain that to the jury?

21  **A.**   Well, the player is paid based on the -- the royalty of

22  the particular item that he is associated with.  It usually

23  involves one player per team.  And there are only 32 teams.

24          So it's generally a product that is limited in terms

25  of the players that are involved.  And they typically are the

1  most well-known players.

2          And at that level, with a number as small as it is,

3  it was decided a long time ago by the board of player reps that

4  that would be the appropriate way to divide up the money.

5  **Q.**  Now, was -- were these decisions by the active players to

6  divide up the active player money in the GLR pool, were they

7  kept secret from the retired players in any way?

8  **A.**  No.

9  **Q.**  Did you discuss them at your conventions with retired

10 players?

11 **A.**  Uhm, yes.  And many of the retired players were also

12 active players who became retired players, so they were

13 familiar with how this process worked once they become -- they

14 became retired players.

15         So we not only explained it to the retired players,

16 but every year there would be retiring players who would join

17 their group who would have understood exactly how it worked

18 from the active side.  So it was not a circumstance where

19 people were confused.

20 **Q.**  So in this case the period we're looking at is 2004 to

21 2007.  In 2004, would some of the retired players that year

22 have been active players the previous year?

23 **A.**  Yes.

24 **Q.**  And would that also be true in 2005 or 2006, there's a new

25 group of retired players every year?

1   **A.**    Every year.

2   **Q.**    Okay.  And they would previously have been active players?

3   **A.**    Yes.

4   **Q.**    And they would have -- would they have known how the

5   active player licensing money was being distributed?

6   **A.**    Sure.

7   **Q.**    Let me show you next -- it should be up there -- Trial

8   Exhibit 23.  It was previously shown to you by plaintiffs'

9   counsel.

10  **A.**    Yes.

11  **Q.**    Do you recall --

12          **MR. KESSLER:**  Go to the top, please.

13          (Document displayed.)

14  **BY MR. KESSLER:**

15  **Q.**    -- that this was a letter, I believe, was identified that

16  you sent out to retired players in the fall of 19 -- in the

17  fall of 2003; is that correct?

18  **A.**    2003.

19  **Q.**    2003.  Okay.  And take a look at the second paragraph of

20  this letter.

21          Was this letter sent to all the retired players on

22  your mailing list?

23  **A.**    Yes.

24  **Q.**    Okay.  And in this letter you wrote:

25                  "Hundreds of retired players have received

1  payments from Players Inc for these activities."

2           What activities were you referring to here?

3           You can read the previous paragraph, if you need to

4  look at that.

5  **A.**   The -- the activities referred to are, uhm, being included

6  in products, personal appearances, autograph signings,

7  inclusion on the Internet site and participation in events.

8  **Q.**   And was it true that hundreds of retired players

9  participated in those ad hoc programs and benefited personally

10 from that?

11 **A.**   Yes.

12 **Q.**   Okay.  And then, it says:

13          "But every retired NFL player has benefited

14 from Players Inc's creation.  How?  Because 40 percent of

15 Players Inc's operating revenue is paid to the NFLPA as a

16 royalty for the active player name and image rights secured by

17 the NFLPA and licensed to Players Inc."

18          And this information was given to all the retired

19 players who received this, right?

20 **A.**   Yes.

21 **Q.**   Then, it says:

22          "This allows the NFLPA to provide extensive

23 services and benefits to retired players in return for modest

24 player dues of $50 per year."

25          And, Mr. Allen, you got asked about this phrase:

1              "We live every day by the NFLPA's motto:  Past,

2  Present and Future."

3          Do you see that?

4  **A.**    Yes, I do.

5  **Q.**    In your experience in the more than 25 years you were at

6  the NFLPA and Players Inc, did the union and Players Inc live

7  by that model?

8  **A.**    Absolutely.  Every day.

9          One of the -- one of the axioms of being in this

10 league is that you're going to -- the one thing you know is if

11 you're an active player you're going to be a retired player.

12 And there's a continuum.

13         And we have a real rich and great tradition in our

14 union of -- of looking out for each other and not forgetting

15 where we came from and making sure that the rookies learn that

16 lesson when they come into this league; that they didn't fall

17 out of the sky.  That there are some giants that went before

18 them, and we have a responsibility to them.  And that's one of

19 the reasons we had a retired players licensing program.

20 **Q.**    Mr. Allen, did the retired players ever attend the active

21 player meetings, the annual meetings at which these votes took

22 place?

23 **A.**    Yes.

24 **Q.**    Please explain to the jury who was invited and who

25 attended.

1  **A.**     The retired player chapters would at the convention elect

2  a steering committee of experienced retired players who were

3  active in retired players' affairs with the association.

4         And the Players Association, active players would

5  invite representatives of that steering committee, usually

6  three or four, to come to every player rep meeting, the board

7  of player reps' annual meeting, and participate fully.

8         They got to go to every meeting.  They were there for

9  ever discussion, the breakout sessions, as well as the general

10 sessions.

11        And so they were full participants in the meeting.

12 So they got all of the information and the documents that were

13 distributed.  And the reports on licensing and the reports on

14 our finances were part of what they were there to -- to

15 observe.

16 **Q.**     So these representatives of the retired players who

17 elected as their steering committee, did they have full access

18 to any votes that took place dividing up the active player

19 money?

20 **A.**     Yes.  They didn't vote themselves, but they were there and

21 observing and participating in the discussion and aware of all

22 of the votes that took place.

23 **Q.**     Could they ask any questions they had?

24 **A.**     Yes.  They had complete access to the floor.

25 **Q.**     Was the ad hoc licensing for retired players discussed at

1  those meetings?

2  **A.**    Absolutely.

3  **Q.**    Were reports generated of which retired players got ad hoc

4  payments?

5  **A.**    Yes.

6  **Q.**    And was that made available to those retired player

7  representatives?

8  **A.**    Yes.

9  **Q.**    If they had any questions, could they have asked?

10  **A.**    Yes.

11  **Q.**    Now, Mr. Allen, you got asked some questions from

12  plaintiffs' counsel -- withdrawn.

13          During opening it was suggested that Players Inc and

14  NFLPA made zero efforts to promote or market retired players.

15  Was that true?

16  **A.**    No.

17  **Q.**    Okay.  Did you personally make efforts to promote and

18  market retired players?

19  **A.**    Yes.

20  **Q.**    Did your staff ever make such efforts?

21  **A.**    Yes.  And I made it a point to make sure they did.

22  **Q.**    Okay.  Were any documents produced to promote active and

23  retired players?

24  **A.**    Yes.

25  **Q.**    Okay.  All right.  Mr. Allen, I would like to --

1              **MR. KESSLER:**  Your Honor, if I may approach.

2    **BY MR. KESSLER:**

3    **Q.**   -- give you a copy of Trial Exhibit 2262 and 2259.

4              I ask you to first look at Trial Exhibit 2262.  And

5    if you could identify what this is.

6    **A.**   It is a advertising supplement about Players Inc and --

7    and its activities that was in the Sports Business Journal.

8    **Q.**   Did Players Inc pay to have this put into the Sports

9    Business Journal?

10   **A.**   Yes.

11   **Q.**   Okay.  What is the audience of the Sports Business

12   Journal?  If you could explain that, what that is to the jury.

13   They probably have not read that publication.

14             **MR. PARCHER:**  Your Honor, can I interrupt just a

15   minute?  In this document and several of the others it would be

16   nice if counsel would tell us what the date is on the

17   documents.  There is no date on the documents themselves.

18             **THE COURT:**  Counsel, you should let the witness

19   testify.

20             **MR. KESSLER:**  Yes.

21             **MR. PARCHER:**  Yes.

22   **BY MR. KESSLER:**

23   **Q.**   Take a look at the top left-hand corner of the very first

24   page, Mr. Allen.

25   **A.**   Yes.

1   **Q.**   Is there a date on it?

2   **A.**   There is.

3   **Q.**   What is the date?  Please tell the jury.

4   **A.**   September 1 through 7, 2003.

5   **Q.**   Thank you.  Okay.

6          Now, I think my question pending was:  What was the

7   Sports Business Journal that you put this materials in?

8   **A.**   It was a trade publication that most people in the

9   business of sports read.  Agents, everybody associated --

10  Players' Associations, players and club executives and league

11  executives all -- it was essentially the business Bible of

12  sports.

13  **Q.**   Would licensees and possible licensees read that

14  publication?

15  **A.**   Absolutely.

16  **Q.**   Okay.  And in this -- what was the purpose of having a

17  supplement like this?

18  **A.**   To promote Players Inc and everything that it was doing

19  and was involved in.

20  **Q.**   Okay.

21          **MR. KESSLER:**  Your Honor, I move Trial Exhibit 2262

22  into evidence.

23          **MR. PARCHER:**  We've already had that argument earlier

24  in the day.  Your Honor knows our reasoning.

25          **THE COURT:**  You have no further objection, so 2262 is

1  received in evidence.

2              (Trial Exhibit 2262 received in evidence.)

3              (Document displayed.)

4          **MR. KESSLER:**  Your Honor, I would like to ask you --

5  I'm sorry.

6  **BY MR. KESSLER:**

7  **Q.**   Mr. Allen, I would like to ask you to look at the second

8  page of the supplement.

9  **A.**   Yes.

10 **Q.**   If you look at this box.

11         **MR. KESSLER:**  If we could blow that up, please,

12 Lauren.

13 **BY MR. KESSLER:**

14 **Q.**   On the very first page after you open this it refers to

15 two players who are quoted:  Mr. Emmitt Smith of the Arizona

16 Cardinals, and Mr. Sterling Sharpe, former Greenbay Packer,

17 current ESPN broadcaster.

18         Was he an active or retired player?

19 **A.**   Retired.

20 **Q.**   And was it your practice to include retired players in

21 promotional things like this?

22 **A.**   Yes.

23 **Q.**   Okay.  Was this done routinely and regularly by you?

24 **A.**   Regularly.

25 **Q.**   Okay.  And is Mr. Sharpe in this picture?

1    A.    Yes, he is.

2    Q.    Take a look, if you can, Mr. Allen --

3    A.    He's the one on the left.

4    Q.    Thank you.  This one here (indicating)?

5    A.    Yes.

6    Q.    Okay.  If you take a look at the page 8(a) of this on the

7    bottom.  See if you can find the right one.  They are not

8    terribly well-numbered.

9              It's that one.  Yes.

10             You can look up here and see which one I'm talking

11   about.

12   A.    Yes.

13   Q.    It has this nice picture.

14   A.    Yes.

15   Q.    Take a look at the right-hand side.

16             **MR. KESSLER:**  If you can blow that up.

17             (Document displayed.)

18   **BY MR. KESSLER:**

19   Q.    This talks about the 989 Sports NFL QuarterBack Challenge.

20   Was this a program run by Players Inc?

21   A.    Yes.

22   Q.    And did it involve all -- well, did it involve any retired

23   players?

24   A.    Uhm --

25   Q.    Take a look at the second paragraph.

1   **A.**   Typically it did.  Yes.

2   **Q.**   I'll direct your attention, for example, where it says:

3               "Former players Bobby Brister, Boomer Esiason,

4   Jim Kelly and Warren Moon."

5               Were they active or retired players at this time?

6   **A.**   Retired.

7   **Q.**   If you take a look at page 12A of this exhibit.

8               That's not 12A.  It has the -- that's it.

9               (Document displayed.)

10              Could you identify for the jury who's featured in

11  this photograph on the right-hand side?

12  **A.**   Former Dallas Cowboy player, retired player Darrell

13  Johnston.

14  **Q.**   And was he a retired player?

15  **A.**   Yes.

16  **Q.**   And what is was Players Inc Radio?

17  **A.**   It was an interview show that Players Inc produced and got

18  aired on the radio.  And he was a host of that show.

19  **Q.**   Okay.  I would now like you, Mr. Allen, if you can, to

20  turn attention to the next exhibit I handed to you, which was

21  Trial Exhibit 2259.

22  **A.**   Yes.

23  **Q.**   Do you recognize this exhibit?

24  **A.**   Yes.

25  **Q.**   What is this, please?

 1   **A.**    It is marketing material from Players Inc.

 2   **Q.**    Now, who would you give this marketing material to as a

 3   normal business practice?

 4   **A.**    Uhm, it would go out to players, the licensees, sponsors,

 5   prospective licensees and prospective sponsors, the National

 6   Football League, the press.  It would be widely circulated.

 7            **MR. KESSLER:**  Your Honor, I move into evidence Trial

 8   Exhibit 2259.

 9            **MR. PARCHER:**  No new objection, Your Honor.

10            **THE COURT:**  All right.  Received.

11            Thank you.

12            (Trial Exhibit 2259 received in evidence.)

13            (Document displayed.)

14   **BY MR. KESSLER:**

15   **Q.**    And this one was prepared or circulated in September of

16   '06.  Is that what this top date indicates?

17   **A.**    And I don't remember whether I mentioned this or not, but

18   this went out to every player, as well.

19   **Q.**    Okay.

20   **A.**    I'm sorry.

21   **Q.**    Okay.  Was this -- it says "09/06."  Does that mean it was

22   the September '06 edition of this?

23   **A.**    Yes.

24   **Q.**    And did you have editions periodically of this?

25   **A.**    Yes.

1    Q.   And did the editions typically include just active

2    players, or were there also retired players in them?

3    A.   There were also retired players on a regular basis.

4    Q.   Uhm, by the way, what is this logo that's on the top here?

5    A.   That's a form of the Players Inc logo that has existed

6    from the inception of Players Inc.

7    Q.   Is that one of the logos you're referring to that gained

8    value so, therefore, required the $8 million reallocation?

9    A.   Yes.

10   Q.   And was this logo seen in television advertising?

11   A.   Regularly.

12   Q.   Mr. Allen, going back to the page, if we can, the

13   left-hand paragraph.  On the very first page it talks about the

14   following:

15            "Among the players taking their helmets off for

16   the shoot were Steven Jackson, Anthony Munoz, Hall of Fame,

17   Donovan McNabb," et cetera.

18            Were any of these retired players?

19   A.   Yes.  Anthony Munoz.

20   Q.   Okay.

21   A.   That's him in the upper right-hand corner.

22   Q.   Right there (indicating)?

23   A.   Yes.

24   Q.   Okay.  Taking a look, Mr. Allen, at the next page of this

25   exhibit, there's a reference --

```
 1              MR. KESSLER:  If we could blow up the bottom segment,
 2    Lauren.
 3              (Document displayed.)
 4    BY MR. KESSLER:
 5    Q.   In number 4 there's a reference to Archie Manning, Hall of
 6    Fame.  Okay?  There's a reference in number 8 to Herman Moore,
 7    retired.
 8              There's a reference in number 11 to --
 9              MR. KESSLER:  If you can go to the other side of
10    this.
11              (Document displayed.)
12    BY MR. KESSLER:
13    Q.   Number 11, Brian Mitchell retired, and Gary Clark,
14    retired.
15              Were these retired NFL players who were mentioned and
16    featured?
17    A.   Yes.
18    Q.   And, finally, looking at the last page of this document,
19    is there's a reference --
20              MR. KESSLER:  If we can blow up this part right here
21    (indicating).
22              (Document displayed.)
23    BY MR. KESSLER:
24    Q.   -- to Joe Searles, Dan Upperco, Walter Beach, and James
25    Chambers.
```

1          Were these retired players?

2   **A.**   Yes.

3   **Q.**   Now, is this the same Walter Beach who's going to be

4   testifying in this case?

5   **A.**   I believe so.

6   **Q.**   Okay.  So Mr. Beach was a player who you included in your

7   promotional materials; is that correct?

8   **A.**   Yes.

9   **Q.**   Mr. Allen, I'm finished with this document now.

10          **MR. KESSLER:**  I'd now like to, Your Honor, approach

11   and hand the witness three more documents.

12          **THE COURT:**  All right.  Go ahead.

13   **BY MR. KESSLER:**

14   **Q.**   Take a look, first, Mr. Allen, at Trial Exhibit 2307.  And

15   do you recognize what this document is?

16   **A.**   Yes.

17   **Q.**   Explain to the jury what these monthly reports were.

18   **A.**   They were monthly activity reports by someone senior in

19   Players Inc -- in this case from me to the chairman -- about

20   what was going on in terms of the company's activities.

21   **Q.**   Were you required by Mr. Upshaw to produce these on a

22   monthly basis during some period of time?

23   **A.**   Yes.

24   **Q.**   And were they routinely part of your business records?

25   **A.**   Yes.

1  Q.   Did you regularly use and rely upon them in your business?

2  A.   Yes.

3         MR. KESSLER:  Your Honor, I would move into evidence

4  Trial Exhibit 2307.

5         MR. PARCHER:  I'll object Your Honor.  These are all

6  about ad hocs and are all hearsay.

7         THE COURT:  2307?

8         MR. KESSLER:  Your Honor, I believe it's a business

9  record.

10        THE COURT:  Let me see the document.

11        Which is the part that's relevant?

12       MR. KESSLER:  Your Honor, we're going to point out

13  different references to retired players.  So apparel, on the

14  first page, we're going to talk about that.  And then I have

15  some other references.

16        Each month there are references to retired player

17  efforts.

18        THE COURT:  What was the purpose of this memorandum?

19        MR. KESSLER:  Mr. Allen, the judge said you should

20  address that.

21        THE WITNESS:  I'm sorry, Your Honor.

22        THE COURT:  What was the purpose of the memorandum?

23        THE WITNESS:  It was to memorialize the activity of

24  the organization as a way to create a business record that we

25  could all, uhm, keep track of.  And it was also directed from

1  the chairman of the company to be something that we do on a

2  regular basis.

3          **THE COURT:**  Who prepared this memorandum?

4          **THE WITNESS:**  I did.

5          **THE COURT:**  And did you prepare one like this every

6  month?

7          **THE WITNESS:**  Uhm, for several months.  There were

8  periods of time when someone else in the company did it.  In

9  this period of time I was doing it.  I was always -- it was

10 always something that I was -- that I received and was aware of

11 and could comment on, but it was not always prepared by me and

12 from me.

13         There was a period of time when it was on a regular

14 monthly basis.

15         **THE COURT:**  All right.  The objection is overruled.

16 The business records exception would cover that document.

17         So what's the Exhibit number?

18         **MR. KESSLER:**  This is Trial Exhibit 2307, Your Honor.

19         **THE COURT:**  All right.  That's received.

20         (Trial Exhibit 2307 received in evidence.)

21 **BY MR. KESSLER:**

22 **Q.**   You'll see, Mr. Allen, the first paragraph says -- so the

23 jury can see who it's from, this particular report was prepared

24 from you to Mr. Upshaw, correct?

25 **A.**    That's correct.

1  Q.   Now, I believe some months this was prepared by Pat Allen;

2  is that correct?

3  A.   That's correct.

4  Q.   And did Ms. Allen report to you at Players Inc?

5  A.   Yes.

6  Q.   So did she prepare those reports also under your

7  supervision?

8  A.   Yes.

9  Q.   Okay.  If you take a look at the first category,

10  "apparel," it says:

11              "Continued to sign retired players for Reebok

12  and Fathead."

13         Could you explain to the jury what that referred to?

14  A.   It was referring in the case of Reebok to jerseys of

15  retired players and to Fathead for wall decals that stick on

16  the wall for retired players.

17  Q.   Was this an ad hoc licensing program?

18  A.   Yes, it was.

19  Q.   Okay.  Who selected which retired players would be

20  included in the Reebok and Fathead programs?

21  A.   In Reebok's case, Reebok did.  And n the Fathead company

22  case, Fathead.

23  Q.   Were Fathead and Reebok willing to license all of the 2000

24  GLA players?

25  A.   No.

1   Q.   What were they willing to do?

2   A.   They were willing to give us a list of players.  That if

3   we could get the player to agree to participate, they would --

4   they would provide them compensation.  And they were done on a

5   one off basis.

6   Q.   Now, when Fathead or Reebok would ask for the list of

7   players, would you have all those players signed to retired

8   player GLAs?

9   A.   No.

10  Q.   So what would you do?

11  A.   We would talk to the players.  Or if they were well-known

12  enough, sometimes their marketing representatives or agents,

13  and -- and their marketing representatives or agents and ask

14  them to participate, and then work out an agreement with them.

15  Q.   If they didn't have a marketing representative would you

16  do it with them directly?

17  A.   Yes.

18  Q.   Now, when money was generated from these type of programs

19  for the retired players, was any of the money used to fund the

20  union?

21  A.   No.

22  Q.   Did Players Inc charge 23 percent, the way they charged

23  23 percent for the active player money?

24  A.   No.

25  Q.   Do you recall what you charged for these types of

1  programs?

2  **A.**    Usually, it would be nothing or a de minimus amount.

3  There were occasionally -- there were some times occasionally

4  when it might be a little bit more than that.  But,

5  collectively, because it was so often we didn't take anything

6  out.  It was a very small amount of money.

7  **Q.**    Collectively did you take less than 1 percent?

8  **A.**    Yes.

9  **Q.**    Okay.  So for active player money in the GLR pool Players

10 Inc took a 23 percent administrative fee, correct?

11 **A.**    Yes.

12 **Q.**    And the active players voted to put 40 percent to fund the

13 union, correct?

14 **A.**    Right.

15 **Q.**    For this retired player money, how much did Players Inc

16 take out of it?

17 **A.**    Sometimes nothing.  Overall, about 1 percent.

18 **Q.**    Was any of it given to fund the union?

19 **A.**    No.

20         **MR. PARCHER:**  If Your Honor pleases, I object to the

21 characterization of "retired player money."

22         These are ad hocs.  This is not part of the group

23 licensing of retired player agreements, which is the focus of

24 this case.

25         He's mixing apples and oranges as if he is equating

1  the same, and treating it as if he's asking one question.

2          **MR. KESSLER:**  Your Honor, he's -- it's argumentative.

3          And I believe it's appropriate questions here.  I'm

4  happy to talk to what this money is.

5          **THE COURT:**  Let me explain to the jury.  The

6  objection is overruled.  But you are hearing -- the heart of

7  this case is the GLA.  I've told you that several times.

8          Both sides have gone into things that go beyond the

9  GLA, surrounding circumstances.  Right now we're talking about

10  ad hoc agreements.

11          Those ad hoc agreements are not the GLA.  But it's a

12  surrounding circumstance, so you can get a better feel for

13  the -- you, the jury, can get a better feel for the overall

14  structure into which this GLA fits.

15          Then, later it's going to be up to you to decide what

16  weight you give this business to the ad hocs.  So there's a

17  point there that Mr. Parcher is making.  There's some validity

18  to it.

19          But, on the other hand, you've heard a lot from both

20  sides that are way off of the GLA.

21          This is off the GLA.  Maybe even way off.  But I'm

22  going to allow it in, anyway, for you to evaluate in deciding

23  whether or not the GLA has been violated.

24          All right.  Go ahead.

25

**BY MR. KESSLER:**

Q.    Mr. Allen, these programs, these ad hoc programs that were

done for retired players, did they frequently involve six or

more retired and active players?

A.    Yes.

Q.    Okay.  So it was six or more group licensing in those

programs?

A.    Yes.

Q.    Now, when you were making efforts to promote group

licensing for retired players, would you have liked to have

gotten the licensees to license all the retired players?

A.    Yes.

Q.    And to do that under your retired player GLA?

A.    Yes.

Q.    Were you able to do that?

A.    No.

Q.    Why not?

A.    Because for the reasons that I explained earlier, they

didn't have the same view of the collective of retired players.

They -- there were particular players they wanted, and they

didn't have the uncertainty that somebody that they didn't

think they wanted, like me -- they knew they didn't want me --

would somehow later on become someone they did want.

        Once I was out of the calculus there was no reason

for them to negotiate with us to bring me back in, or any

1  player like me who played a couple of years and wasn't

2  well-known.

3          They wanted particular players.  And sometimes very

4  particular.  I mean, it wasn't just someone who was well-known,

5  but someone who was a superstar.

6          So they knew what they wanted from their own market

7  research, and they weren't interested in the collective, the

8  way they were with active players, because then it was more

9  about having the replenished group that's on a team roster

10 every year to make sure they're current.

11         They didn't have that issue with retired players.

12 **Q.**  Mr. Allen, let me direct your attention next to Trial

13 Exhibit 2291, which should be in front of you.

14         Do you recognize this exhibit?

15 **A.**  Yes.

16 **Q.**  And was this another one of those monthly reports

17 prepared?

18 **A.**  Yes.

19 **Q.**  And was this one prepared by Pat Allen?

20 **A.**  Yes, it was.

21 **Q.**  Was she working under your supervision?

22 **A.**  Yes.

23         **MR. KESSLER:**  Your Honor, I move in Trial Exhibit

24 2291.

25         **MR. PARCHER:**  Same objection, except that this is the

 1  wife of the witness.

 2          **THE COURT:**  2291?

 3          **MR. KESSLER:**  Yes, Your Honor.

 4          **MR. PARCHER:**  Yes, sir.

 5          **THE COURT:**  All right.  Let's see that one.

 6          Well, was this prepared under the same protocol that

 7  you described earlier?

 8          **THE WITNESS:**  Yes, Your Honor.

 9          **THE COURT:**  Objection is overruled.  2291 is

10  received.

11          (Trial Exhibit 2291 received in evidence.)

12  **BY MR. KESSLER:**

13  **Q.**  Mr. Allen, since it was raised by plaintiffs' counsel was

14  Pat Allen someone who you married after you met her at Players

15  Inc?

16  **A.**  Yes, she was and she is.

17  **Q.**  She might object to my asking if she worked under your

18  direction, but I hope I didn't get you in any trouble on that

19  issue.

20  **A.**  No.  No, we resolved that a long time ago.

21  **Q.**  Okay.  So --

22          **THE COURT:**  If so, you got yourself in trouble.  You

23  didn't get the witness in trouble.

24          **MR. KESSLER:**  That's true, Your Honor.

25          **THE COURT:**  You're the one that framed the question.

1          **MR. KESSLER:**  You're right, Your Honor.  It's my

2   fault.

3          **THE COURT:**  She can blame you.

4   **BY MR. KESSLER:**

5   **Q.**   Let's look at "Apparel" in this category.  It says here: "

6              "Had a conference call with Reebok and Player

7   Marketing about new retired player deals and the transition of

8   Mitchell & Ness into our program."

9              Do you know what that referred to?

10  **A.**   Yes.

11  **Q.**   What did that refer to?

12  **A.**   Mitchell & Ness made what were called throwback jerseys.

13  They were stylized jerseys of retired players that were modeled

14  on the actual jerseys those players wore with their name and

15  number, so that people would identify them with those old time

16  jerseys.

17              They were being -- they were being subsumed into the

18  Reebok program.  So there was a transition going on, where

19  Mitchell & Ness jerseys would now become Reebok jerseys.

20  **Q.**   And if you turn your attention to page 2 of this document,

21  there's a reference under "player marketing" -- we can do that.

22              (Document displayed.)

23              It talks about, under number 4:

24              "Worked with 16W to get the four legends:  Moon,

25  Esiason, Cunningham, and Kelly for QVC."

1              Do you see that?

2  **A.**    No.

3  **Q.**    Sorry.  Under "Player Marketing," the fourth bullet,

4  Mr. Allen?

5  **A.**    Yes.

6  **Q.**    Do you know what that refers to?

7  **A.**    Yes.  That is talking about working with a marketing

8  company that represented quarterbacks to get them to

9  participate in a QuarterBack Challenge.

10 **Q.**    Were those retired player quarterbacks?

11 **A.**    Yes.  All four of them.

12 **Q.**    Finally, on the last page of this document, under "Trading

13 Card and Collectibles," it says in the third bullet:

14            "Began clearing retired players for McFarlane

15 products."

16            What did that refer to?

17 **A.**    McFarlane is a company that makes figurines, lifelike

18 representations of players in uniform in various poses.  They

19 also do superhero figurines, as well, and figurines in other

20 sports.

21            This was getting retired players to agree to be in

22 that product line.

23 **Q.**    Mr. Allen, I would now like --

24            **MR. KESSLER:**  If I may approach, Your Honor.

25

1   **BY MR. KESSLER::**

2   **Q.**    -- hand you a copy of Exhibits 2295 and 2056?

3           **MR. KESSLER:**  May I approach, Your Honor?

4           **THE COURT:**  Go ahead.

5   **BY MR. KESSLER:**

6   **Q.**  First, Mr. Allen, I'm going to ask you:  Do you know what

7   the Raider database was?

8   **A.**    Yes.

9   **Q.**    Tell the jury what the Raider database was.

10  **A.**    It was the -- the -- the customized database that the NFL

11  Players Association and Players Inc had created to keep track

12  of players and money, among other things.

13          It was the database that we used at the NFLPA and

14  Players Inc.

15  **Q.**    Okay.  Take a look at Trial Exhibit 23 -- I'm sorry, 2226.

16  It may be renumbered 2395.  Sorry, 2395.

17  **A.**    2395.

18  **Q.**  Do you recognize this?  This is a printout from part of

19  the Raider database.

20  **A.**    This is a report that uses Raider as the database from

21  which the information is derived.

22  **Q.**    Okay.  So let's --

23          **MR. KESSLER:**  Your Honor, I move this piece of the

24  Raider database into evidence.  I think Your Honor has already

25  ruled on this.

1              THE COURT:  2395?  This doesn't have 2395.

2              MR. KESSLER:  The judge's copy doesn't say -- it

3    originally --

4              THE COURT:  2393.

5              MR. KESSLER:  Well, is it 2393 or 95?  I'm sorry,

6    Lauren?

7              MS. CAPLAN:  It is, Your Honor.  It was an exhibit

8    that was created after --

9              MR. KESSLER:  Which is the correct number?

10             MS. CAPLAN:  2395.

11             MR. KESSLER:  2395, Your Honor, is the correct

12   number.

13             MR. PARCHER:  I think you've ruled on that.

14             MR. KESSLER:  I think it was already decided, but the

15   Court needs to see it.

16             This, Your Honor, is a piece of the Raider database.

17             THE COURT:  This doesn't look like the thing I saw

18   this morning.

19             MR. KESSLER:  No, Your Honor.  That's going to come

20   next.  This is an actual printout for one player, to explain it

21   to the jury.

22             THE COURT:  Well --

23             MR. PARCHER:  Since we are not going to object to it

24   any further.  You already --

25             THE COURT:  I was only ruling on the summary and the

1  general theory of possible relevance.  But if you're not

2  objecting on hearsay or other grounds --

3          **MR. PARCHER:**  Well, if you say you haven't focused on

4  his point yet, well, then please continue.

5          **THE COURT:**  I'm assuming that the business records

6  foundation could ultimately be laid for this document.  I don't

7  know that for certain.  But I didn't rule on that this morning.

8          **MR. KESSLER:**  Your Honor, I'm happy to lay it, if you

9  like.  But I don't think there is any contest that this is a

10 business record.

11         **THE COURT:**  All the other objections I made this

12 morning I'm going to overrule for the reasons I stated.  If you

13 want to speed things up and let this sail in.  Otherwise, fine.

14 I did not rule on the hearsay problem.

15         **MR. PARCHER:**  On the representation that it's a

16 business record --

17         **THE COURT:**  2395.

18         **MR. PARCHER:**  -- apply over my old objections.

19         **THE COURT:**  Thank you for your cooperation.

20         2395 is received.

21         (Trial Exhibit 2395 received in evidence.)

22         **MR. KESSLER:**  Thank you, Mr. Parcher.  I appreciate

23 it.

24         **MR. PARCHER:**  You're welcome, Mr. Kessler.

25

1   **BY MR. KESSLER:**

2   Q.   Taking a look at the top of this, this says, "Player Herb

3   Adderley."

4           Would that be the same Herb Adderley who is the

5   plaintiff in this case?

6   A.   Yes.

7   Q.   Okay.  Is this a report that you maintain on the database

8   that you can just cull out for any particular player?

9   A.   Yes.

10  Q.   What does this show regarding Mr. Adderley when it says

11  "player amount"?

12  A.   I'm sorry.  Where are you?

13  Q.   It says "player amount."

14  A.   $6,800.

15  Q.   Okay.  Thank you.

16          Is that money Mr. Adderley received?

17  A.   Yes.

18  Q.   Okay.  Now, let me direct your attention to 2056.

19          **MR. KESSLER:**  Your Honor, this is the document we did

20  discuss.  And I would move in as the compilation of all the

21  data in the Raider database for retired players who are class

22  members.

23          **THE COURT:**  Well, you've got to have testimony to

24  back that up.

25          **MR. KESSLER:**  Okay.

1  **BY MR. KESSLER:**

2  **Q.**    Mr. Allen, does the Raider database maintain information

3  on the payments made to all retired players?

4  **A.**    Yes.

5  **Q.**    Okay.  And looking through this exhibit, do you recognize

6  this as the type of information that is maintained in that

7  Raider database?

8  **A.**    Yes.

9  **Q.**    And is the Raider database something that was used as a

10  business record by the NFLPA and Players Inc?

11  **A.**    Yes.

12  **Q.**    Was it maintained in the ordinary course of business?

13  **A.**    Yes.

14           **MR. KESSLER:**  Your Honor, I move in the exhibit.

15           **THE COURT:**  Any objection?

16           **MR. PARCHER:**  I would like to know whether the

17  witness supervised the preparation of this document.

18           **THE COURT:**  That's a good question.

19           **MR. KESSLER:**  Your Honor, he did not.  And the rule

20  on 1006 doesn't require that the witness be the one who

21  supervised it, because counsel had a chance to check its

22  accuracy, which is what 1006 requires.

23           And they had no objection to its accuracy.

24           **THE COURT:**  It doesn't say one way or the other.  But

25  I'm not -- if you don't have anyone's say-so but yours, then

1  it's a compilation.

2        **MR. KESSLER:**  Your Honor, what the case law requires,

3  I believe -- and we can discuss it now -- is that you make the

4  underlying records available to the opposing counsel, which we

5  did.

6        Then, they can check the accuracy and raise any

7  problems with accuracy.  They found it to be completely

8  accurate.

9        **THE COURT:**  I will let you bring in whoever it is

10  that actually did the compilation.  And if it shows that they

11  went about this in a reasonable manner.  The rule doesn't say

12  what you're telling me now.

13        Maybe there's case law that does, but I don't have

14  that in front of me.

15        **MR. KESSLER:**  Your Honor, I will present you with

16  case law later which shows if they would like to call that

17  person they're free to do so, but that we don't have to call

18  the person.

19        It's more that we can identify who it is, and they

20  can call the person if, necessary.

21        **THE COURT:**  Doesn't sound quite like the normal

22  procedure.

23        **MR. KESSLER:**  I believe for compilations that is, in

24  fact, how it is, Your Honor.

25        **THE COURT:**  Well, I can't just take your word for

1   that.

2              **MR. KESSLER:**  Okay.

3              **THE COURT:**  So I don't say you're wrong.  Right now

4   you don't have -- you ought to have either this -- if this

5   witness didn't do it -- on your representation you will be able

6   to do that, I will let you connect up -- go ahead and ask

7   your -- without it coming into evidence you can ask the

8   substantive questions were you going to ask about this.

9              **MR. KESSLER:**  Thank you.

10  **BY MR. KESSLER:**

11  **Q.**   Mr. Allen, did the union maintain a record of how much was

12  paid to the retired players through various licensing

13  agreements?

14  **A.**   Yes.

15  **Q.**   Okay.  And would that include both retired players who

16  signed GLAs and those who did not sign GLAs?

17  **A.**   Yes.

18  **Q.**   Okay.  And Mr. Allen, do you know, was the amount paid to

19  retired players who signed GLAs in the millions of dollars?

20  **A.**   In the tens of millions of dollars over time.

21  **Q.**   If I were to focus on the period of 2000 --

22  **A.**   I might have misheard that.  Could you --

23  **Q.**   Let me say it again.

24              First, to all retired players, whether they signed

25  GLAs or not, would it be in the tens of millions of dollars?

1   **A.**    Yes.

2   **Q.**    Okay.  Focusing just on those who signed GLAs and focusing

3   on the period 2004 to 2007, would GLA class members in this

4   case have received millions of dollars through the ad hoc

5   licensing agreements?

6   **A.**    Absolutely.

7   **Q.**    And do you know if it was a little bit more than

8   $7 million?

9   **A.**    I do.

10  **Q.**    What's your information on that?

11  **A.**    Uhm, I -- I've seen the documentation of that.  And I

12  have -- I have a general knowledge of what was generated during

13  that period of time.

14  **Q.**    And how much was it?

15  **A.**    Around $7 million.

16  **Q.**    Okay.

17          **MR. KESSLER:**  Your Honor, I'll hold this subsequently

18  and not move to admit it now.  I take it Your Honor would

19  prefer that.

20          **THE COURT:**  We can sort it out later through a

21  different witness.

22          All right.  Go ahead.

23  **BY MR. KESSLER:**

24  **Q.**    Okay.  Mr. Allen, you were asked a question by Mr. Parcher

25  about the changes that were made in the retired player group

1  licensing authorization form, the removal of the escrow

2  language.  Do you recall that?

3  **A.**  Yes.

4  **Q.**  Did those changes have anything at all to do with the EA

5  agreement?

6  **A.**  No.

7  **Q.**  Did it have anything to do with the $25 million paid per

8  year by EA?

9  **A.**  Absolutely not.

10  **Q.**  That $25 million per year for EA, was that active player

11  money or retired player money?

12  **A.**  Active player money.

13  **Q.**  I'd now like to show you, Mr. Allen, I believe we have up

14  there Exhibit 29, which is the EA, one of the EA agreements.

15  **A.**  Mr. Kessler, it's going to take me a second to find it.

16  **Q.**  Okay.  I'm sorry.

17  **A.**  2029.

18  **Q.**  Wait.  I have one.  I have one.

19  **A.**  I'm getting a pretty big pile here.

20      Thank you.

21  **Q.**  Actually, this is not the one Mr. Parcher showed you.  The

22  one he showed you was 28.  So let me make sure you have both of

23  them, because I believe the language is the same.

24  **A.**  Let's put that aside.

25  **Q.**  28 and 29 (indicating).

1  **A.**   That's yours.

2  **Q.**   That's mine.

3         Do you recognize --

4  **A.**   Mr. Kessler, hold on just a minute.

5  **Q.**   Okay.

6  **A.**   I'm afraid these are going to fall over.  Is that all

7  right?  Thank you.

8  **Q.**   Look at Exhibit 29 first, which is the one Mr. Parcher

9  didn't show you.  Do you recognize that?

10  **A.**   Yes.

11  **Q.**   Okay.  And what is Exhibit 29, please?

12  **A.**   It's an agreement between Players Inc and Electronic Arts,

13  effective as of March 1, '04, dated 31, January, '05.

14         **MR. KESSLER:**  Your Honor, I move into evidence

15  Exhibit 29.

16         **THE COURT:**  Any objection?

17         **MR. PARCHER:**  No.

18         **THE COURT:**  Is this subject to the Ninth Circuit

19  thing?  I thought that was 80.  I just want to be clear.

20         **MR. GREENSPAN:**  No.

21         **MR. KESSLER:**  This one is not.  This one is not.

22         **THE COURT:**  All right.  29 is received.

23         (Trial Exhibit 29 received in evidence.)

24  **BY MR. KESSLER:**

25  **Q.**   And this agreement was entered into:

1              "Shall be effective on March 1, 2004"; is that

2    correct?

3    **A.**    That's correct.

4    **Q.**    Now, I would also like you to look at -- do you know, the

5    next agreement, Exhibit 28, that Mr. Parcher showed you, did

6    they have the same grant of rights in both agreements, both EA

7    agreements?

8    **A.**    Yes.

9    **Q.**    Okay.  And it's true, isn't it, that this same grant of

10   license language appears in many of Players Inc's license

11   agreements?

12   **A.**    That's correct.

13   **Q.**    This was sort of a format you utilized; is that correct?

14   **A.**    Correct.

15   **Q.**    And at the time that this licensing format --

16           **MR. PARCHER:**  Objection.  This is all leading.

17           **THE COURT:**  These are very leading questions.

18           **MR. PARCHER:**  You know, I --

19           **THE COURT:**  Sustained.

20           **MR. PARCHER:**  I've held my fire in the interest of

21   time and all that, but there's moments.

22           **THE COURT:**  It's okay to lead on something that's

23   preliminary.  But when you get to anything that's substantive,

24   you must is ask a "how, what, who" question.

25           **MR. KESSLER:**  I apologize, Your Honor.

1          **THE COURT:**  Instead of just a question where all the

2    witness has to do is say:  "Yes, yes, yes."

3          **MR. KESSLER:**  I'm trying to move it along, Your

4    Honor.

5          **THE COURT:**  It's okay to lead on preliminary matters.

6    **BY MR. KESSLER:**

7    **Q.**   Mr. Allen, so I asked a question there.  Okay.  Was this

8    language used in more than one agreement?

9    **A.**   Yes.

10   **Q.**   Who developed this language?

11   **A.**   It developed over time in negotiations with licensees, and

12   was typical of the language that Players Inc had in its

13   agreements with licensees.

14   **Q.**   Okay.  And the language I'm referring to is the

15   representation language in Section 1(a) and (b), just so the

16   jury is clear.

17          And then, the granting language that appears right

18   below it.  That's the language you're referring to?

19   **A.**   Yes.

20   **Q.**   Okay.  Mr. Allen, during the time all these license

21   agreements were in effect with this language, did you have an

22   understanding at the time as to whether or not this language

23   granted retired player rights?

24   **A.**   Yes, I did.

25   **Q.**   And what was your understanding at the time?

1   **A.**   That they did not, that the payments made under this

2   license was for active player rights.

3   **Q.**   Okay.  And was that sometimes discussed in the

4   negotiations with licensees?

5   **A.**   Yes.

6   **Q.**   Okay.  And in any of these agreements where the license

7   had this language that's been shown in the EA agreement, were

8   the licensees able to use retired player rights without having

9   some new agreements?

10          **MR. PARCHER:**  Is the question --

11          **THE COURT:**  As phrased it calls for a legal

12  conclusion.

13  **BY MR. KESSLER:**

14  **Q.**   Okay.  What was your understanding at the time that you

15  negotiated each of these agreements?  Did the licensees have

16  the right to use retired players without entering into a new

17  agreement?

18  **A.**   Uhm, no.

19  **Q.**   Okay.

20  **A.**   They would, uhm, tell us if they wanted to use somebody,

21  and we would see if we could get them.

22  **Q.**   Okay.  Now, Mr. Allen, during the time you negotiated

23  these agreements -- take EA, for example -- in your

24  negotiations with EA for the Exhibit 28 and 29, was EA willing

25  to pay additional money to get the rights to all of your

1  retired players?

2  **A.**    No.

3  **Q.**    The money that EA did pay, the $25 million, whose rights

4  were those for, in your understanding in the negotiations?

5  **A.**    They were only for active player rights.  They did not

6  involve retired players.

7  **Q.**    Now, if EA had gotten retired player rights, if they had

8  gotten that, hypothetically, as plaintiffs contend, would EA

9  have then been authorized to use the name and picture of the

10 retired players who had been licensed?

11 **A.**    If there had been a license that gave them rights to all

12 the players collectively?

13 **Q.**    Yes.

14 **A.**    Yes.

15 **Q.**    But did they ever do that?

16 **A.**    No.

17 **Q.**    Now, let me direct your attention to the actual language.

18 Take a look at the granting language.

19              (Document displayed.)

20              It says:

21                  "Upon the terms and conditions hereinafter set

22 forth, Players Inc hereby grants to licensee and licensee

23 hereby accepts the non-exclusive right, license and privilege

24 of utilizing the trademarks and names of Players Inc, which may

25 be amended from time to time by Players Inc, and the names,

1  likenesses (including without elimination) numbers, pictures,

2  photographs, voices, facsimile signatures and/or biographical

3  information (hereinafter identity) of the NFL players

4  referenced in paragraph 1(a) above."

5           Now, Mr. Allen, I want to focus your attention on the

6  words "the NFL players," okay?

7           At the time you personally negotiated these

8  agreements, did you have an understanding of what was referred

9  to by "the NFL players" referenced in paragraph 1(a) above.

10  **A.**   Yes.

11  **Q.**   Would you please tell your jury that understanding?

12  **A.**   It was referring to the active players who had provided

13  the active player GLA, or had signed the same rights to the

14  NFLPA in paragraph 4(b) of the NFL player contract.

15  **Q.**   Let me direct your attention to now the representation

16  paragraph 1(a) above.  Is there anything in that language that

17  you understood described what you just testified to the jury?

18  **A.**   I missed the question, Mr. Kessler.

19  **Q.**   I'm now going to paragraph 1(a) above.

20  **A.**   Right.

21  **Q.**   You just testified what you thought "the NFL players"

22  referred to?

23  **A.**   Yes.

24  **Q.**   Is there any language in paragraph 1(a) above which you

25  believe reflected your understanding?

1   **A.**    Yes.

2   **Q.**    What language is that?

3   **A.**    The first sentence.

4   **Q.**    Could you explain to the jury how that reflects your

5   understanding?

6   **A.**    Because it says that Players Inc is the licensing

7   affiliate of the NFLPA, and that the NFLPA has been duly

8   appointed and acts on behalf of football players in the

9   National Football League who have entered into a group

10  licensing authorization, either in the form attached hereto as

11  attachment A, which is the active player group licensing

12  assignment, or to the assignment contained in paragraph 4(b) of

13  the NFL player contract, which has been assigned to Players

14  Inc.

15          And since those are the only two ways to do this, it

16  follows that active players are the only ones involved.

17  **Q.**   And it then goes on to say:

18              "And in such capacity" -- the capacity just

19  described -- "Players Inc has the right to negotiate this

20  contract and the right to grant rights and licenses described

21  herein."

22  **A.**    Right.

23  **Q.**    Now, looking at the players who signed attachment A in

24  paragraph 4(b), could that be any retired players?

25              **MR. PARCHER:**  I assume the question --

1          **MR. KESSLER:**  I --

2          **MR. PARCHER:**  It's not a law professor up there or a

3  disinterested --

4          (Counsel speaking simultaneously, which was not

5          reportable.)

6          **MR. KESSLER:**  I don't need a speaking objection, Your

7  Honor.

8          **THE COURT:**  Sustained.  Please re-ask it.

9  **BY MR. KESSLER:**

10 **Q.**   Mr. Allen, at the time you negotiated this language, okay,

11 in your understanding at the time, was attachment A, at

12 paragraph 4(b), a retired player form?

13 **A.**   No.

14 **Q.**   What was it?

15 **A.**   It was two -- it was the two ways that active players

16 could provide their group licensing rights through the GLA as

17 active players to the NFLPA, and then through the NFLPA to

18 Players Inc.

19 **Q.**   And, in fact, was that active player form attached to the

20 agreement as attachment A?

21 **A.**   Yes.

22 **Q.**   Is that the same exhibit that you discussed at the

23 beginning of our testimony?

24 **A.**   Yes.

25 **Q.**   Okay.  Now, it's been contended that this license also

1  grants rights in the second sentence of paragraph 1(a), which

2  reads:

3              "Licensee acknowledges that Players Inc also on

4  occasion secures authorization for inclusion in Players Inc

5  from players, including but not limited to retired players, who

6  have not entered into such group licensing authorization, but

7  who nevertheless authorized Players Inc to represent such

8  players for designated Players Inc license programs."

9           Now, Mr. Allen, at the time you negotiated this

10 language did you have an understanding of what this referred

11 to?

12 **A.**   Yes, I did.

13 **Q.**   What did this refer to in your understanding at the time?

14 **A.**   This was alerting the licensee to the fact that Players

15 Inc could ask players to participate in certain programs if

16 they hadn't signed -- hadn't entered into such group licensing

17 authorization, either attachment A or paragraph 4(b), which

18 were active player authorizations.

19           If they hadn't done that, then this was an

20 acknowledgment that we could go out and ask them and try to get

21 them, and that the licensee was -- was acknowledging that we

22 were involved in that activity.  And we would try, if they gave

23 us a request, to see if we could get the player to agree.

24 **Q.**   Did this have anything to do with ad hoc license

25 agreements?

1    **A.**    Yes.  This was essentially a description of the fact that

2    we would try to secure ad hoc agreements if they were

3    interested in particular players.

4    **Q.**    Now, when you do an ad hoc license agreement for retired

5    players, is that for designated programs?

6    **A.**    Yes.

7    **Q.**    When you do a retired player GLA, is there anything to

8    make that just for designated programs?

9    **A.**    No.

10   **Q.**    Mr. Allen, I would like to show you next Trial Exhibit

11   2094.

12             **MR. KESSLER:**  If I may approach, Your Honor.

13             **THE COURT:**  Go ahead.

14   **BY MR. KESSLER:**

15   **Q.**    Mr. Allen, do you recognize what this document is?

16   **A.**    Give me a second, Mr. Kessler.

17   **Q.**    Please.

18   **A.**    Okay.

19   **Q.**    Do you recognize this?

20   **A.**    Yes, I do.

21   **Q.**    What is this?  Please tell the jury.

22   **A.**    This is a contract between Electronic Arts and Players Inc

23   with regard to a retired player named Joe Greene.

24             **MR. KESSLER:**  Your Honor, I would like to move into

25   evidence Trial Exhibit 2094.

1          **MR. PARCHER:**  No objection.

2          **THE COURT:**  Received.

3          (Trial Exhibit 2094 received in evidence.)

4          **MR. KESSLER:**  If you could plea, Lauren, show the

5   top, who this is to and from.

6               Further down, thanks.

7          (Document displayed.)

8   **BY MR. KESSLER:**

9   **Q.**   This is to Mr. Joel Linzner.  Who is Mr. Joel Linzner?

10  **A.**   It's been a while, but I think his title is Senior Vice

11  President of Business Affairs for EA.

12  **Q.**   Is he the person you negotiated with the EA license

13  agreements that are at issue here?

14  **A.**   Yes.

15  **Q.**   Now, this is in June 14, 2004.  This would have been

16  during the period -- was this during the period of time when

17  Exhibit 29 was in effect?

18  **A.**   I don't remember.

19  **Q.**   Without going back, was it during the period of time when

20  one of the two EA agreements was in effect?

21  **A.**   Yes.

22  **Q.**   Now, let's take a look at grant of rights, if we can.

23               Now, who was this agreement between?

24  **A.**   This agreement was between Electronic Arts and Players

25  Inc.

1  Q.   And was Mr. Greene also a party to this?

2  A.   I don't think he was.

3  Q.   Describe how it would work.  How would you secure

4  Mr. Greene's rights for this?

5  A.   We would get the rights from Joe Greene to license EA in

6  this manner.  So first, Joe Greene would agree to this.  And

7  then, we would provide these rights through this mechanism to

8  EA.

9  Q.   Now, it says here:

10            "Grant of rights.  Players Inc grants company

11 the right, but not the obligation, to use player's name,

12 likeness, image and biographical information in company's video

13 game with a current working title 'NFL Street 2,' or the same

14 or substantially similar video game if the company changes the

15 title of its NFL Street 2 video game."

16            Now, if Players Inc had already granted the retired

17 player rights to Mr. Greene through its license agreement,

18 would it have to do it again here?

19 A.   No.

20 Q.   Did EA pay additional money for Mr. Greene's rights here?

21 A.   Yes.

22 Q.   And who was that money eventually given to?

23 A.   Joe Greene.

24 Q.   The player himself?

25 A.   Yes.

1    Q.   It then says:

2              "Company shall also have the right to market

3    player's in-game image under the same guidelines that are

4    granted to company for group licensing active player rights

5    through the license agreement with Players Inc."

6         Do you see that?

7    A.   Yes.

8    Q.   What license agreement is that referring to?

9    A.   The one we were just looking at.

10   Q.   Exhibits 28 or 29?

11   A.   Yes.

12   Q.   Okay.  And that's being referred to by EA as the licensing

13   for active player rights agreements?

14   A.   Yes.

15   Q.   Mr. Allen, let me show you next a copy of Trial Exhibit --

16             MR. PARCHER:  Could we repeat that question, Judge?

17   I missed it.

18             Sorry to do that to you.

19             THE COURT:  What do you want?

20             MR. PARCHER:  I just missed the question.  I missed

21   the question and heard the answer.

22             Could he just repeat it?

23             THE COURT:  The question was:

24             "And that's being referring to by EA as the

25             licensing for active player rights

 1              agreements?

 2              **"ANSWER:**  Yes."

 3              **MR. PARCHER:**  This is a PA license, not an EA

 4    license.

 5              **THE COURT:**  EA, what does that mean?

 6              **MR. PARCHER:**  NFLPA.  NFLPA, one of the defendants.

 7    He said it as if it's EA.  Oh, I'm speaking --

 8              **THE COURT:**  Cross-examination.  The witness has

 9    answered in the way that he has.  If you think that's

10    inaccurate, you can take it up whenever you examine again.

11              **MR. PARCHER:**  Yes, sir.

12    **BY MR. KESSLER:**

13    **Q.**   Mr. Allen, was Electronic Arts a party to this license

14    agreement?

15    **A.**   To the one that is 2094?

16    **Q.**   Yes.

17    **A.**   Yes, they were.

18    **Q.**   Was it signed by Mr. Linzner of Electronic Arts?

19    **A.**   This isn't a signed copy, but it is -- it is typical of

20    the memorialization of these agreements.

21    **Q.**   Okay.  I would now like to hand you --

22              **MR. KESSLER:**  If I may approach, Your Honor.  Exhibit

23    2089 and, also, 2092 I'm going to hand to the witness.

24              **THE COURT:**  Go ahead.

25

1  **BY MR. KESSLER:**

2  **Q.**   First, before you look at that, Mr. Allen, okay?  Did you

3  have a license agreement with the Upper Deck Company?

4  **A.**   Yes.

5  **Q.**   And did the Upper Deck license agreement use similar

6  language to the EA agreements?

7  **A.**   In many respects, yes.

8  **Q.**   What products does Upper Deck make, in case the jury

9  doesn't know?

10 **A.**   They make trading cards.  They come in packs and have

11 players' pictures on them.

12 **Q.**   Did you negotiate those agreements with Upper Deck?

13 **A.**   Yes, I did.

14 **Q.**   Did you have an understanding at the time you negotiated

15 the Upper Deck agreements, did they include -- did they grant

16 active player rights, retired player rights or both?

17 **A.**   Active player rights only.

18 **Q.**   No retired player rights?

19 **A.**   No.

20 **Q.**   Okay.  Let me direct your attention now to Trial Exhibit

21 2089.  Do you recognize what this is, Mr. Allen?

22 **A.**   Yes.

23 **Q.**   What is this?

24 **A.**   It is a -- it's -- when I said that Players Inc had an

25 agreement with Joe Greene, this was the one between Players Inc

 1  and the company that reflected that.  This is an example of an

 2  agreement between Players Inc and the player.

 3  **Q.**   Which player was this agreement with?

 4  **A.**   Herb Adderley.

 5  **Q.**   Is that the same Mr. Adderley who's a plaintiff in this

 6  case?

 7  **A.**   Yes.

 8           **MR. KESSLER:**  Your Honor, I move into evidence Trial

 9  Exhibit 2089.

10           **MR. PARCHER:**  What's the number, 2089?

11           **MR. KESSLER:**  Yes.

12           **THE COURT:**  Any objection?

13           **MR. PARCHER:**  I haven't seen it, but I can't imagine

14  that we would.

15           **THE COURT:**  Received.

16           (Trial Exhibit 2089 received in evidence.)

17           (Document displayed.)

18  **BY MR. KESSLER:**

19  **Q.**   If you take a look at the top of this, this is dated

20  August 15, 2005 to Mr. Herb Adderley.

21           And it says:

22           "Dear Herb:  Thank you for agreeing to

23  participate in the Players Inc player marketing program.  The

24  purpose of this letter agreement is to set forth the

25  understanding which has been reached between you, Herb

ALLEN - CROSS / KESSLER

1  Adderley, player and National Football League Players

2  Incorporated," it says, "with regard to the Upper Deck Company.

3  Our understanding is set forth in the following numbered

4  paragraphs."

5          First, Mr. Allen, I would ask you to -- at the time

6  this was entered into, August 15, 2005, was there a license

7  with Upper Deck more generally between Players Inc and Upper

8  Deck?

9  A.    Yes.

10 Q.    And did that grant any player rights?

11 A.    Yes.

12 Q.    Did it grant any retired player rights?

13 A.    No.

14 Q.    What kind of rights did it grant?

15 A.    Active player rights.

16 Q.    Taking a look at the grant of rights, it says:

17          "Player agrees that Players Inc shall grant

18 company the right, but not the obligation, to produce trading

19 cards bearing player's name, likeness, image and biographical

20 information to insert into its 2005 football products.  The

21 rights shall be granted on a non-exclusive basis by Players

22 Inc, which engages player on an independent contractor basis."

23          Do you see that?

24 A.    Yes.

25 Q.    Now, if Mr. Adderley's rights had already been granted to

1 Upper Deck in your license agreement, would there be any reason

2 to enter into this agreement?

3 **A.**   No, none.

4           **MR. PARCHER:**  Same objection.

5 **BY MR. KESSLER:**

6 **Q.**   Now, did Mr. Adderley agree to this license agreement?

7 **A.**   Yes.

8 **Q.**   Take a look under "Compensation."

9           It says:

10           "As consideration for the grant of rights and

11 services, Players Inc shall pay player $3,820, 400 [sic] per

12 autograph.  Payment for each shipment of cards will be made to

13 player within two weeks after signed cards are received by

14 company."

15           Who got this company in this agreement, ultimately?

16 **A.**   Herb Adderley.

17 **Q.**   Take a look at next Trial Exhibit 2092.

18           One thing before we go from this one, the date on

19 this is August 15, 2005, okay?

20 **A.**   Yes.

21 **Q.**   I now want to direct your attention to 2092, trial

22 exhibit.

23           **MR. KESSLER:**  Don't put it up yet.

24 **BY MR. KESSLER::**

25 **Q.**   Do you recognize this as an ad hoc agreement?

1   **A.**    Which one?

2   **Q.**    2000 -- 2092, now.

3   **A.**    2092.

4   **Q.**    It's with Mr. Vernand, Morency or Morency.  Do you see

5   that, "care of Robert Bailey"?

6   **A.**    Yes.

7   **Q.**    Mr. Allen, do you recognize this as being another ad hoc

8   license?

9   **A.**    Yes.

10  **Q.**    Now, Mr. Allen, this one is with an active player; is that

11  correct?

12  **A.**    Yes.

13          **MR. KESSLER:**  Your Honor, I move into evidence Trial

14  Exhibit 2092.

15          **MR. PARCHER:**  No objection.

16          **THE COURT:**  2092 is received.

17          (Trial Exhibit 2092 received in evidence.)

18  **BY MR. KESSLER:**

19  **Q.**    And if you look, it has the same date as Mr. Adderley's

20  ad hoc license, correct?

21  **A.**    Correct.

22  **Q.**    Now, in this one for the active player, is there any grant

23  of rights provision you see?

24  **A.**    No, none.

25  **Q.**    Okay.  Now, why would it be, in your understanding at the

1   time in 2005, would the retired player, Mr. Adderley, have a

2   grant of rights provision while the active player, Mr. Morency

3   did not have a grant of rights provision?

4   **A.**   Because Mr. Morency's rights had already been provided by

5   virtue of the license agreement between Players Inc and --

6   and -- or the NFLPA and the Upper Deck Company.

7          Those rights were already provided.  So it wasn't

8   necessary to deal with the grant of rights.  This -- what's

9   dealt with in here is the particular services that are provided

10  by the player.

11  **Q.**   What services was Mr. Morency providing that he wasn't --

12  that he was being compensated for, as opposed to granting his

13  rights?

14  **A.**   He was being compensated for signing a certain number of

15  trading cards or stickers or other products that were made by

16  Upper Deck.

17  **Q.**   Okay.

18          Mr. Allen, during the period of time between 2004 and

19  2005 -- we're finished with that exhibit -- did you negotiate

20  the Topps license agreements?

21  **A.**   Yes.

22  **Q.**   Did you have an understanding at the time as to whether

23  those license agreements granted any active player rights?

24  **A.**   Yes.

25  **Q.**   Okay.  Did it grant active or retired player rights?

1  **A.**    Active player only.

2  **Q.**    Did it grant any retired player rights at all?

3  **A.**    No.

4  **Q.**    Let me show you next --

5              **THE COURT:**  You have about two more minutes, and then

6  we're going to break for the day.

7              **MR. KESSLER:**  I'll do one more exhibit, Your Honor.

8              **MR. PARCHER:**  Has he offered that into evidence?

9              **MR. KESSLER:**  Which one?  Oh, I didn't offer that?

10 I'm sorry.  I thought I already did.

11             **MR. PARCHER:**  Topps.

12             **MR. KESSLER:**  No, I'm not going to take the time.

13             **THE COURT:**  What's the number?  2092 is in evidence.

14             **MR. KESSLER:**  That is in evidence.  The one I showed

15 Your Honor is in evidence.

16             **MR. PARCHER:**  If Your Honor pleases, Counsel is

17 questioning about Topps, and now he's not putting it in

18 evidence.

19             **MR. KESSLER:**  I have no objection to it being put in

20 evidence.  I just don't want to waste the witness's time.  It's

21 the same language.  I don't want to go through it right now.

22 But plaintiffs' counsel can do it.  I'll move the Topps

23 agreement into evidence.

24             **MR. PARCHER:**  If you stipulate to the same language,

25 it's okay.

1          **MR. KESSLER:**  No.

2          **THE COURT:**  Just move it in.  What is the exhibit?

3          **MR. KESSLER:**  The Topps license agreement -- I don't

4    know if I even have that here.

5          Does anybody have the Topps license agreement?

6          **THE COURT:**  Let's not guess at it.  Sorry.  I thought

7    you had it right there.  Let's move on.

8          **MR. KESSLER:**  Oh, Trial Exhibit 36.  It's the Topps

9    license agreement, Your Honor.

10          **THE COURT:**  All right.

11          **MR. KESSLER:**  36 and, also, 394 are two different

12    Topps license exhibits.

13          **THE COURT:**  All right.  Both are received.

14          **MR. KESSLER:**  Thank you.

15          **THE COURT:**  36 and 294 [sic].

16          (Trial Exhibit 36 received in evidence.)

17          **MR. KESSLER:**  Maybe, Your Honor -- I don't want to go

18    over my time.  Maybe we should stop at this point.

19          **THE COURT:**  294.  There is no 294 in here.  It jumps

20    from --

21          **MR. KESSLER:**  394, Your Honor.

22          **THE COURT:**  394.  394.  Just a minute.

23          **MR. KESSLER:**  Your Honor, should I try to use the

24    last five minutes?

25          **THE COURT:**  No.  We don't even have that much.  394

1    is received.

2              (Trial Exhibit 394 received in evidence.)

3         **THE COURT:**  Mr. Allen, the magic hour is here.  It's

4    time to say to you please come back tomorrow at 7:30 a.m.

5    We'll try to finish you up tomorrow.

6         I know this is a burden on you, but you -- both sides

7    have a lot of questions to ask you.

8         **MR. KESSLER:**  I apologize to Mr. Allen.  I know he

9    has a very busy schedule.

10        **THE COURT:**  All right.  Can't do anything about it.

11   Okay.  We'll see all of our jurors back -- oh, you wanted to

12   know whether or not you could take home your notepads and read

13   them at home.  It's okay with me if it's okay with the lawyers.

14        Is it okay with everyone?  Okay with that?

15        **MR. KESSLER:**  I have no objection, Your Honor.

16        **MR. PARCHER:**  I think the jurors should do what they

17   would like to do.

18        **THE COURT:**  All right.  You can take them home, but

19   don't share them with anyone.  Don't say to your loved one,

20   "Hey, look at the doodle I made in court today."  Don't read

21   anything to others.  You can read it silently to yourself and

22   refresh your memory.  That would be okay.  Then, of course,

23   remember to bring your notepad back.

24        All right.  Again, remember my admonition.  No

25   talking with anyone about the case.  We'll see you back here --

 1   and no listening to the news reports and the like.

 2          We'll see you back here tomorrow at 7:45.

 3          **THE CLERK:**  All rise.

 4          (Jury excused.)

 5          (The following proceedings were held in open court,

 6          outside the presence of the jury.)

 7          **THE COURT:**  Be seated everyone.  All right.  Anything

 8   you need me for before we break for the day?

 9          Mr. Allen, you can step down.  We don't need to

10   detain you today.

11          **MR. HUMMEL:**  Your Honor --

12          **THE COURT:**  When did I say I would hold that

13   evidentiary hearing?

14          **MR. HUMMEL:**  Tomorrow afternoon at 3 o'clock, I

15   believe.

16          **THE COURT:**  3 o'clock tomorrow afternoon?

17          **MR. HUMMEL:**  Right.

18          **THE COURT:**  All right.

19          **MR. HUMMEL:**  We'll have Mr. Rhee here.

20          **THE COURT:**  Who?

21          **MR. HUMMEL:**  Mr. Rhee.  He is the witness on that.

22          **THE COURT:**  All right.  I don't even remember the

23   issue anymore.  I'm sure you'll refresh my memory.

24          What else do we need to do today?

25          **MR. HUMMEL:**  Your Honor, I was going to say, though,

1  we both now have compilations and maybe we could handle both

2  compilations at the same time, if that witness would be

3  available.

4          We just have the issue of the compilation of the

5  ad hoc money.  If you don't want to, we can have the Rhee

6  hearing tomorrow.

7          **MR. KESSLER:**  I think, Your Honor, it's entirely

8  different.  They want to present the witness that we think was

9  undisclosed, and present expert testimony.

10          We're just offering the compilation.  And we will

11  provide Your Honor with authority that we don't have to offer

12  any witness.  They're free to call one.  But you precisely

13  don't get --

14          **THE COURT:**  This boggles my mind that some lawyer can

15  stand up and say, "Here's a compilation and we don't have to

16  have a witness for it."

17          **MR. KESSLER:**  The reason is, Your Honor, the

18  following:

19          First, the underlying documents must be admissible.

20  So the Raider database, there's no dispute, is admissible, the

21  entire 20,000-page database.

22          Second, because the other side gets to check it, and

23  if they find any inaccuracy in the summary, they could object

24  or call to Your Honor's attention, and it must be corrected.

25          **THE COURT:**  That puts the burden on the other side.

1   And, normally, the burden is on the proponent.

2           **MR. KESSLER:**  That's just the way 1006 is done.

3           **THE COURT:**  Get me the case law that says that.

4           **MR. KESSLER:**  I will, Your Honor.

5           **THE COURT:**  I'm surprised to hear that.  If that's

6   true, then why shouldn't I just let their thing sail in, and

7   you have to show problems with it?

8           **MR. KESSLER:**  The difference in their compilation, to

9   remind Your Honor, is, first of all, they want witness

10  testimony which we believe was undisclosed in expert.

11          More profoundly, theirs is not simply taking data out

12  of an underlying exhibit and summarizing it.  What theirs does

13  is it makes judgments.  Five percent difference in height and

14  weight is something that this witness decided to classify as

15  constituting a scrambled player.

16          In other words, there were expert judgments that have

17  nothing to do with summarizing the material in there.  But what

18  1006 allows, and the case law is clear on this as well, is

19  simply to summarize pieces of information in the underlying

20  admissible documents.

21          It's to make it easy for the jury because the jury

22  can't go into the database and print it out.

23          It is not to avoid having an expert say 5 percent is

24  the relevant test.  Or if you do a sample, to say this is the

25  proper sampling technique.

 1          THE COURT:  All right.  I'm going to do this one step

 2   at a time.  Your witness was -- what was his name?

 3          MR. HUMMEL:  Mr. Rhee, Peter Rhee, R-H-E-E.

 4          THE COURT:  All right.  Let's have him here at

 5   3 o'clock tomorrow, and we'll do the evidentiary hearing on

 6   him.

 7          I'm not saying whether or not you need to have an

 8   evidentiary hearing or prove up your -- I will have to read

 9   your authority that you can place the burden on the other side

10   to object to your -- show flaws in your compilations.

11          MR. KESSLER:  Very good, Your Honor.  We will.

12          I would say that if they were flaws, they would get

13   resolved by the Court.  In other words, they don't have to show

14   it in the hearing.  It's part of the admissibility

15   determination.  They said:  These are wrong data.  They would

16   show that it would have to be corrected before it went to the

17   jury.  We agree with that.

18          But what they don't need is a witness to describe

19   that, "I physically went through the database and took this

20   information out," because they have the database.  They can

21   check it themselves.

22          THE COURT:  There's a difference between the Ninth

23   Circuit saying that a judge could dispense with a witness

24   versus must dispense with a witness.

25          MR. KESSLER:  Understood.

1          **THE COURT:**  I don't know what authority you've got.

2          All right.  So what's next?

3          **MR. HUMMEL:**  Your Honor, I'll simply comment with one

4  sentence.  And that is that the law of this Circuit -- and I've

5  been through many trials in the Ninth Circuit -- when you offer

6  a 1006 summary, you put on the witness who actually supervised

7  or performed the summary.  That's my understanding.  It's

8  invariably been the case.

9          **THE COURT:**  That would be my normal view.

10          **MR. HUMMEL:**  Right.

11          **THE COURT:**  I may be wrong.

12          **MR. HUMMEL:**  So, Your Honor, we've actually cited

13  cases to that effect in our motion in limine number 6

14  opposition.

15          Two -- actually one issue, Your Honor.  We now have a

16  bit of a witness logjam.  I just want to alert the Court to

17  that.

18          We've been, I think, very cooperative in providing,

19  on an ongoing basis with Mr. Kessler, our sort of rolling idea

20  of what witnesses are going next.  And we have that idea.

21          We have two sort of immovable objects tomorrow, and

22  now we have a third, which is Mr. Allen.

23          We have a witness who is now coming from Baltimore

24  for the second time, to testify tomorrow.  He is our client,

25  Mr. Laird.  He's flying across the country.  We thought we

1 would get him on last week.  He needs to go on and off,

2 tomorrow because he has employment in Baltimore.

3          Pat Allen is employed in Los Angeles.  Or I guess she

4 is not employed.  She lives in Los Angeles and is flying up.

5 We told them we would put her on tomorrow.

6          I would respectfully request, Your Honor, that we

7 finish Mr. Allen and then be allowed to put on Mr. Laird next.

8          I don't know.  I haven't had a chance to talk with

9 Mr. Kessler about when --

10          **THE COURT:**  What's wrong with that?

11          **MR. KESSLER:**  As long as Ms. Allen goes tomorrow.

12 Because what happened, Your Honor, while they have given us

13 information, they've changed Ms. Allen's -- the time she would

14 come -- she's a third party -- three or four different times

15 just in the last week.  I finally said to them:  She must know,

16 to plan her life, which day.

17          And they said they would call her -- and I have this

18 in an exchange, Your Honor.  They said, "We will call her

19 Tuesday or we won't call her at all."

20          And I told that to Ms. Allen, and she relied on it.

21 So she's already -- I expect her to be here --

22          **THE COURT:**  Well, look.  You've had a very long

23 cross-examination of this witness.  How much longer do you

24 need?

25          **MR. KESSLER:**  I need, with this witness, probably

1    about 15, 20 minutes, and I'm done.

2            **THE COURT:**  How much do you have on redirect?

3            **MR. HUMMEL:**  You know, Your Honor, we haven't had a

4    chance to confer.  I don't know.  I expect it to be short.  I

5    did -- I personally told Mr. Kessler we would get Ms. Allen on

6    tomorrow.  And that was the agreement.

7            Things change in a trial.  This witness went much

8    longer.  All I'm saying to Mr. Kessler is, we have a witness

9    flying out from Baltimore for the second time.

10           **THE COURT:**  I can't do anything about it.  We're

11   going to stop at 1 o'clock.  I have a criminal calendar

12   tomorrow afternoon.  I have no choice in the matter.

13           Both sides here have been beating to death items with

14   argumentative questions, preparatory comments, speaking

15   objections.  So you are wasting time on your own.  Both sides

16   are guilty.

17           So what can I do?  What do you want me to do, say one

18   person is not going to be called?

19           **MR. HUMMEL:**  I'm advising the Court, Your Honor, that

20   we have to put on Mr. Laird tomorrow.  He's coming from

21   Baltimore.

22           We will make every effort we possibly can to get

23   Ms. Allen on and off tomorrow.

24           **MR. KESSLER:**  And our view would be, Your Honor,

25   simply, if she gets off or on tomorrow --

1          **THE COURT:**  Here's the answer:  How much do you have

2     on redirect on Mr. Allen?

3          **MR. PARCHER:**  It's not an answerable question until

4     we talk it out.  I can say assure you we are going to try to do

5     it as quickly as we can.

6          **THE COURT:**  How about 15 minutes?

7          **MR. PARCHER:**  No, Your Honor.  Then that put in --

8     may be the smart thing to do, which of course the answer will

9     become yes.

10          But they have put in two and a half hours worth of

11     what he put in, of his understanding or whatever, we may --

12          **THE COURT:**  You had him on the stand for more than

13     two and a half hours.

14          **MR. PARCHER:**  Of course.  He is the key witness in

15     the case.

16          **THE COURT:**  Well, then is --

17          **MR. PARCHER:**  He's the man.  He's their spokesman.

18          **THE COURT:**  I think, yeah.  But I would say 15

19     minutes more for Mr. Kessler and 30 minutes for you ought to be

20     enough.

21          **MR. PARCHER:**  I would hope so.  I'm going to sure

22     try.

23          **THE COURT:**  Let me say this.  After that -- I'm

24     thinking about this -- I'm going to say to the jury, "This has

25     gone on too long.  We've got other witnesses.  Mr. Allen is

1  going to have to come back."  Or we strike all of his

2  testimony.

3         So -- but if you have these other witnesses who have

4  just got to go on, then we'll put them on.  Interrupt Allen

5  and -- but this -- let me tell you both something.

6         You've all lived with this for a while, but this jury

7  is sitting here thinking:  "My God, all those witnesses they

8  read out to us and we're only on the second witness.  This is

9  terrible."  They're going to start tuning out any day.

10         **MR. PARCHER:**  I agree with you.

11         **THE COURT:**  You lawyers better get down to the

12  business of putting this case -- the background is all clear

13  now -- bang bang bang, one point after another, sit down, move

14  to the next witness.

15         **MR. PARCHER:**  I agree.

16         **THE COURT:**  Pretend that you're a prosecutor for the

17  United States Attorney's Office.

18         **MR. KESSLER:**  I can tell your Honor, we have very

19  little examination of Ms. Allen planned.  So if they -- if they

20  can --

21         **THE COURT:**  I'm not going to hold them to Tuesday or

22  nothing.  I don't care how much -- she could be having a trip

23  to Paris planned.  If they want her in the case, she's going to

24  come.  So you are relieved from that agreement.  You can call

25  her on Wednesday, Thursday or Friday.  I don't care.

1          Look.  This is too important.  We're not going to
2     hold them to that agreement.
3          MR. KESSLER:  I agree.  But in all due respect, it's
4     her 60th birthday party.  She has 50 people invited in
5     Washington, D.C., the next day.  So I would suggest the
6     following, because we don't mind this.  If she can't testify
7     tomorrow, we'll bring her back next week in our case and they
8     can call her in our case.
9          Just like you were accommodating us, they --
10         THE COURT:  Then the Rule 50 gets --
11         (Counsel and the Court speaking simultaneously, which
12         was not reportable.)
13         MR. KESSLER:  But she can't do it after tomorrow.
14         (Reporter interrupts.)
15         MR. KESSLER:  So that what we'll do is, if you can't
16    do it tomorrow, okay, you'll tell us whether we should send her
17    home now.
18         MR. HUMMEL:  No, we want her here tomorrow.
19         MR. KESSLER:  If you can't do it tomorrow, she'll
20    come back the following week.  As long as she can go to her
21    60th birthday party with 50 people, I think that's fair.
22         MR. HUMMEL:  Of course.  That's fine.
23         THE COURT:  When is the party?
24         MR. FEHER:  I just know she's flying out immediately
25    on the 4 o'clock plane.

1          **MR. DOUG ALLEN:**  I'm not invited, Your Honor.  I

2  think the party is Thursday.

3          **MR. KESSLER:**  Thursday.

4          **MR. DOUG ALLEN:**  I'm not positive about that.  I'm --

5  my schedule is so tight, I can't go.

6          **THE COURT:**  She can go to the party.  And if we don't

7  get her testimony, we'll bring her back next week.

8          But that goofs up the Rule 50 because at the end of

9  the case we haven't heard all the plaintiffs' case yet.

10          **MR. KESSLER:**  We understand, Your Honor.

11          **THE COURT:**  Anything more today?

12          **MR. HUMMEL:**  No, Your Honor.

13          **THE COURT:**  See you at 7:30.

14          **MR. HUMMEL:**  Thank you very much, Your Honor.

15          (Thereupon, this trial was continued until Tuesday,

16  October 28, 2008 at 7:30 o'clock a.m.)

17                      -   -   -   -

18                    **CERTIFICATE OF REPORTER**

19          I certify that the foregoing is a correct transcript

20  from the record of proceedings in the above-entitled matter.

21  DATE:   Monday, October 27, 2008

22

                    s/b Katherine Powell Sullivan

23          _____

24          Katherine Powell Sullivan, CSR #5812, RPR, CRR
                         U.S. Court Reporter

25

1                                    **I N D E X**

2    **PLAINTIFF WITNESSES**

3    DOUG ALLEN (RESUMED)

4    DIRECT EXAMINATION (RESUMED) BY MR. PARCHER    PAGE 666

5    CROSS EXAMINATION BY MR. KESSLER              PAGE 718

6

7

8    **EXHIBITS INTO EVIDENCE**

9    91      PAGE 667

10   54      PAGE 688

11   506     PAGE 690

12   1320    PAGE 699

13   24      PAGE 713

14   2047    PAGE 730

15   1281    PAGE 733

16   1164-1  PAGE 769

17   93      PAGE 773

18   95      PAGE 777

19   2247    PAGE 793

20   1307    PAGE 795

21   1308    PAGE 795

22   1309    PAGE 795

23   1310    PAGE 795

24   2262    PAGE 808

25          (Exhibits continued on next page.)

**EXHIBITS INTO EVIDENCE** (continued)

2259    PAGE 811

2307    PAGE 816

2291    PAGE 823

2395    PAGE 828

29      PAGE 835

2094    PAGE 845

2089    PAGE 850

2092    PAGE 853

36      PAGE 856

394     PAGE 857