Volume 5

Pages 871 - 1112

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE WILLIAM H. ALSUP

BERNARD PAUL PARRISH, HERBERT          )
ANTHONY ADDERLEY, WALTER ROBERTS       )
III,                                   )
                                       )
          Plaintiffs,                  )
                                       )
  VS.                                  )  No. C 07-0943 WHA
                                       )
NATIONAL FOOTBALL LEAGUE PLAYERS       )
ASSOCIATION and NATIONAL FOOTBALL      )
LEAGUE PLAYERS INCORPORATED d/b/a      )
PLAYERS INC,                           )
                                       )  San Francisco, California
          Defendants.                  )  Tuesday
_____)  October 28, 2008

## TRANSCRIPT OF PROCEEDINGS

**APPEARANCES:**

**For Plaintiffs:**         MANATT, PHELPS & PHILLIPS
                            1001 Page Mill Road, Building 2
                            Palo Alto, California 94304
                      BY:   **RONALD S. KATZ, ESQ.**
                            **RYAN S. HILBERT, ESQ.**


                            MANATT, PHELPS & PHILLIPS
                            7 Times Square
                            New York City, New York 10036
                      BY:   **L. PETER PARCHER, ESQ.**


                            MANATT, PHELPS & PHILLIPS
                            11355 West Olympic Boulevard
                            Los Angeles, California  90064
                      BY:   **CHAD HUMMEL, ESQ.**

(Appearances continued on next page)

Dockets.Justia.com

**APPEARANCES CONTINUED:**

**Also for Plaintiffs:**  MCKOOL SMITH
300 Crescent Court
Suite 1500
Dallas, Texas  75201
BY: **LEWIS T. LECLAIR, ESQ.**
**JILL ADLER NAYLOR, ESQ.**
**ANTHONY GARZA, ESQ.**
**BRETT CHARHON, ESQ.**

**For Defendants:**  DEWEY & LEBOEUF
1301 Avenue of the Americas
New York City, New York  10019-6092
BY: **JEFFREY L. KESSLER, ESQ.**
**DAVID GREENSPAN, ESQ.**
**DAVID G. FEHER, ESQ.**
**ROY TAUB, ESQ.**
**MOLLY DONOVAN, ESQ.**
**JASON CLARK, ESQ.**

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153-0119
BY: **BRUCE S. MEYER, ESQ.**

**Reported By:**  *Katherine Powell Sullivan, CSR # 5812*
*Official Reporter - U.S. District Court*

**P R O C E E D I N G S**

**OCTOBER 28, 2008**                                                7:30 **A.M.**


            (The following proceedings were held in open court,

            outside the presence of the jury.)

      **THE COURT:**  Good morning.

      All right.  What can I do for you this morning before

the jury comes in?

      **MR. KESSLER:**  Your Honor, to give you a happy report,

we worked something out.

      **THE COURT:**  I don't believe it.  My heart.

      **MR. KESSLER:**  We've agreed, Your Honor, that Mr. Rhee

will not testify, so we do not need any hearing about that.

      We've also agreed to stipulate to the admissibility

of a revised compilation that Mr. Rhee was involved in, that

plaintiffs have prepared.  And we've agreed on what that will

say.

      **THE COURT:**  This is on the scattered -- not

scattered.  What's the --

      **MR. HUMMEL:**  Scrambled.

      **THE COURT:**  Players.

      **MR. KESSLER:**  What is the new trial exhibit number?

      **MR. HUMMEL:**  What was it?  1240.

      **MR. KESSLER:**  1240.  So the new version of 1240 will

be stipulated to on admissibility.  And plaintiffs, in turn,

1  have agreed that they will stipulate to the admissibility of

2  the compilation we discussed yesterday, 2056.  So we do not

3  have to get to the issue that Your Honor wanted briefed as to

4  whether or not we had to produce a witness.  And there will be

5  no witness necessary for either compilation.

6      **THE COURT:**  Well, I congratulate both sides.

7      Is all that true?

8      **MR. HUMMEL:**  That's true.

9      **MR. KESSLER:**  Your Honor, I guess I should move in

10  1256 when the jury is back.  Then, I will do that.

11      **THE COURT:**  All right.  Possibly Dawn took it, my

12  list.  Oh.

13      **MR. HUMMEL:**  So what that means for the Court's

14  calendar is there is no hearing this afternoon.

15      **THE COURT:**  That's wonderful news.  Thank you.

16      Okay.  Anything else?

17      **MR. KATZ:**  One other small point, Your Honor.  And

18  that is Your Honor ordered yesterday that Mr. Byrd will appear

19  out of order on Thursday.  And I wanted to confirm with Your

20  Honor that we may question him beyond the scope of his direct.

21      **THE COURT:**  Well, sure.  Why not?

22      **MR. KESSLER:**  Well, Your Honor, they didn't list him

23  as a witness.  So I think -- I don't --

24      **THE COURT:**  Well, look.  Once he's here --

25      **MR. KESSLER:**  In other words, he was never a witness

1 in their case.  They don't have him under subpoena.  So he

2 never was going to be here in their case.  He would have come

3 in our case, and they would have been limited by the normal

4 rule to whatever we raised they could certainly cover in their

5 cross.  But not new subjects, I believe.

6       **THE COURT:**  What is the subject you want to get into?

7       **MR. KATZ:**  Well, I don't know, Your Honor.  But if

8 the problem is he hasn't been subpoenaed we will subpoena him

9 for our rebuttal case.

10       **THE COURT:**  I would let them bring him back in

11 rebuttal.

12       **MR. KESSLER:**  It's fine.

13       **THE COURT:**  All right.  Within reason.  Just a rule

14 of reason, you can go beyond the scope of the direct.  But I

15 can't give you a blank check without knowing what subject you

16 want to get into.

17       But within reason you can go beyond the scope of the

18 direct.

19       **MR. KATZ:**  Again, I don't -- I'm not in the game -- I

20 think given what Your Honor is ruling, as a belt and suspenders

21 thing, I will probably subpoena him, too, just to make sure.

22       **THE COURT:**  Fine.  Go ahead.  We'll just have to see

23 how it plays out.

24       Okay.  What else?

25       **MR. HUMMEL:**  Your Honor, I should inform the Court we

1 had our oral argument with the Ninth Circuit yesterday about

2 the EA exhibit.  They took it under submission.  I advised the

3 Court that we intended to call the EA witness, Mr. Linzner,

4 tomorrow morning, first thing.

5           If there is no ruling, the stay remains in effect, is

6 my understanding.  So I just wanted to advise the Court that we

7 argued.  Mr. Kessler and I both appeared telephonically for the

8 hearing.

9           **THE COURT:**  All right.  Thank you.

10           I have a suggestion.  I would like for you to get

11 me -- you did exactly what I said, but the words are so small

12 on chronology that I'm afraid it's not serving its purpose.

13           So either we got to put it a lot closer -- then that

14 would block the view of the people in the seating area -- or we

15 need a little, small handout.

16           I would like for you to get a handout, one for each

17 juror, so that they can have that as a ready reference point.

18 Can you do that?

19           **MR. KESSLER:**  We can do that.

20           **MR. HUMMEL:**  We'll do that, Your Honor.

21           **MR. KESSLER:**  By tomorrow is no problem.

22           **THE COURT:**  Thank you.

23           Now, I'll raise this as an idea, and that is to let

24 each side give the jury one document to have in the jury box

25 with them.  In other words, maybe the player GLA.  So then they

1  could be looking at it.  Because that's the document they need

2  to construe.

3          What do you think?  Each side could pick out one

4  document.

5          Of course, in the jury room they're going to get all

6  the documents, but I'm talking about during -- as the trial is

7  underway.  Kind of like a witness -- a jury notebook, but

8  limited in -- I don't generally like notebooks, because they

9  have too much information.

10          **MR. HUMMEL:**  I think it's an excellent idea, Your

11  Honor.  We'll think about it, confer with the other side.  And

12  maybe there are a couple of documents they could have in a

13  small pamphlet that the sides could agree on.

14          **THE COURT:**  I'm only talking about two.

15          **MR. HUMMEL:**  Right.

16          **THE COURT:**  Talking about each side gets to pick one

17  document.

18          **MR. HUMMEL:**  All right.

19          **THE COURT:**  Think about it, and let me know tomorrow.

20          **MR. KESSLER:**  That's fine, Your Honor.  We'll confer

21  with counsel about that.

22          **THE COURT:**  All right.  What else would you like to

23  go over this morning?

24          **MR. KESSLER:**  I think that's all we have, Your Honor,

25  this morning.

1      **MR. HUMMEL:**  Ready.

2      **THE COURT:**  All right.  Let me see if the jury is

3  present.  If they are, we will get started now.

4      (Pause.)

5      (Discussion held off the record.)

6      (Thereupon, the jury entered the courtroom.)

7      **THE COURT:**  Welcome back, and have a seat.

8      I will give you a couple of heads-up items here.

9  We're going to try to get a copy of that chronology that's over

10  there, that timeline.  We're going to try to get you a little

11  handout version so you can have it in your lap and be able to

12  consult it.

13      I think it's a little small and hard to read.  So the

14  lawyers did exactly what I wanted, but the print's too small.

15  You have to have superpowers to be able to focus in on that.

16      And we're going to make it easier for you.  So that

17  will come tomorrow, just as a heads-up.

18      Now, the other thing is our witness is back now and

19  we will -- I don't want you to get discouraged over how long

20  this witness is on the stand.  Some witnesses are longer and

21  others are shorter.  And I promise you the lawyers are under

22  strict time limits.  And when the time comes, the iron curtain

23  comes down, and the stop talking ceases.  And then, you go

24  decide the case.

25      So they are spending their time and allocating their

1  time as they think it's most important for your

2  decision-making.  So bear with us on this.  It's -- the lawyers

3  know the case much better than I do, and they will use the time

4  accordingly.

5          So I'm sure we are going to start getting after, soon

6  today, to other witnesses.

7          Okay.  Now, where were we?  We were, Mr. Kessler, you

8  still are taking the witness, right?

9          **MR. KESSLER:**  Yes, I am, Your Honor.

10          **THE COURT:**  All right.  Go right ahead.

11          **MR. KESSLER:**  Thank you.

12          Your Honor, just before I start I would move into

13  evidence, as we discussed before the jury came in, Trial

14  Exhibit 2056, to which there is no longer any objection.

15          **THE COURT:**  1056 [sic] received.

16          (Trial Exhibit 2056 received in evidence.)

17          **MR. KESSLER:**  Thank you, Your Honor.

18          (Thereupon, **Mr. Doug Allen** resumed the stand and was

19  examined further on Cross Examination by Mr. Kessler as

20  follows:)

21                    <u>**CROSS EXAMINATION RESUMED**</u>

22  **BY MR. KESSLER:**

23  **Q.**   Good morning, Mr. Allen.

24  **A.**   Good morning.

25  **Q.**   We just have a little bit more to go together.

1          Mr. Allen, when we broke yesterday we were discussing

2    the Topps license agreements.

3          **MR. KESSLER:**  And I believe, Your Honor, we moved

4    into evidence Trial Exhibit 36 and 394.

5          **THE COURT:**  36, yes.  394, yes.

6          **MR. KESSLER:**  Very good, Your Honor.

7          May I approach the witness?

8          **THE COURT:**  Please.

9    **BY MR. KESSLER:**

10   **Q.**  I would like you to take a look, Mr. Allen, at Trial

11   Exhibit 36.

12   **A.**  All right.

13         **MR. KESSLER:**  If we can display that, please.

14         (Document displayed.)

15   **BY MR. KESSLER:**

16   **Q.**  Is this the Topps agreement?

17   **A.**  This is a license agreement between The Topps Company and

18   the National Football League Players Association.

19   **Q.**  Okay.  Were you the lead negotiator for Players Inc or the

20   National Football League Players Association --

21   **A.**  Yes.

22   **Q.**  -- with respect to the Topps agreements?

23   **A.**  Yes, I was.

24   **Q.**  And at the time that you negotiated the Topps agreements,

25   did you have an understanding of what its terms meant?

1  **A.**    Yes.

2  **Q.**    Tell the jury what kind of products Topps makes, in case

3  they don't know.

4  **A.**    They make primarily player trading cards, which are --

5  come in a pack and are collectable and have pictures of players

6  and biographical information about their careers on the cards.

7  **Q.**    Now, at the time you entered into the Topps agreements,

8  both of them that were entered into during this period, did you

9  have an understanding as to whether or not active player rights

10  were granted in the agreement, retired player rights or both?

11  **A.**    Just active player rights.

12  **Q.**    There were no retired player rights granted?

13  **A.**    That's correct.

14  **Q.**    Mr. Allen, let me show you some language in the Topps

15  agreement.  First, if we can look at B.

16          It discusses -- I'm sorry.  Not B.  A.  I'm sorry.

17  1(a), "Representations."  It says here that the:

18              "NFLPA represents that the NFLPA has been duly

19  appointed and is acting on behalf of the active and retired

20  football players of the National Football League who have

21  entered into a group licensing assignment, either in the form

22  attached hereto as attachment A, or through the assignment

23  contained in paragraph 4(b) of the NFL player contract, and

24  that in such capacity NFLPA has the right to grant rights and

25  licenses described herein."

1        Do you see that?

2    **A.**   Yes, I do.

3    **Q.**   Now, that language is a little bit different from the

4    language in the EA agreement and some of the other agreements

5    we discussed; is that correct?

6    **A.**   Yes, it is.

7    **Q.**   Now, my question is:  There is a reference to retired

8    football players in this language.  What was your understanding

9    at the time of when a retired football player could sign a

10   group licensing assignment in the form attached hereto as

11   attachment A or paragraph 4(b)?

12   **A.**   Because attachment A is something only an active player

13   could sign, and obviously paragraph 4(b) of the player contract

14   would be with the club for playing services is something only

15   an active player could sign, this was referring to a player who

16   retired while those rights were still in effect, but had signed

17   them as an active player.

18   **Q.**   So this would all be active player GLAs, attachment A and

19   paragraph 4(b) of the NFL player contract?

20   **A.**   That's correct.

21   **Q.**   And explain to the jury again, because this is a little

22   bit confusing, even to me, how could -- let me ask it this way.

23   Once a player retires, can that player ever sign attachment A

24   or paragraph 4(b) of the NFL player contract?

25   **A.**   No.  That's only for a player who's actively playing at

1    the time that they sign.

2    **Q.**   So how would a retired player ever have signed an active

3    player GLA?

4    **A.**   Well, they are for a period of time.  And if in the

5    meantime that player retired, those rights would continue.  The

6    document itself has a time limit on it, and those rights would

7    continue.  But the player would be effectively retired.

8              It might be a player who retires in mid-season.  It

9    might be a player who makes the team, and then retires.  It

10   might be a player who retires at the end of the season before

11   the playoffs.

12             There's a lot of circumstances where a player could,

13   as an active player, suddenly retire.  Sometimes it's an injury

14   that ends his career.  Sometimes he just makes the decision not

15   to play anymore.

16   **Q.**   What was the typical length of an active player GLA?

17   **A.**   Three years.

18   **Q.**   Just to be clear:  Were any rights granted in the Topps

19   agreement under retired player GLAs?

20   **A.**   No.

21             **MR. PARCHER:**  Excuse me.  Objection, Your Honor.

22   Today he could say --

23             **THE COURT:**  Sustained.

24   **BY MR. KESSLER:**

25   **Q.**   I'm sorry.

1      **MR. PARCHER:** Way back then is for the jury to

2   determine.

3   **BY MR. KESSLER:**

4   **Q.** At the time of the Topps agreements. Let's go in 2004,

5   2005, 2006.

6   **A.** Okay.

7   **Q.** Did you have an understanding of what the Topps agreements

8   made?

9   **A.** Yes.

10  **Q.** Meant. Sorry.

11      At that time did those agreements in your

12  understanding convey any retired player rights under the

13  retired player GLA?

14  **A.** No, none.

15  **Q.** Let me ask you next to take a look at -- it should be in

16  front of you, Trial Exhibit 2125.

17      **MR. KESSLER:** Don't put it up yet.

18  **BY MR. KESSLER::**

19  **Q.** Do you recognize what this is?

20  **A.** Uhm, yes.

21  **Q.** And please tell the jury, what is this document?

22  **A.** It is a -- an agreement between a player, retired player,

23  Roger Craig, and the National Football League Players

24  Incorporated or Players Inc, with regards to the Topps Company.

25  **Q.** Okay.

1           **MR. KESSLER:**  Your Honor, I move into evidence Trial

2    Exhibit 2125.

3           **MR. PARCHER:**  No objection.

4           **THE COURT:**  Give me the number again.  2125.

5           **MR. KESSLER:**  2125.

6           **THE COURT:**  Very well.  Received.

7           (Trial Exhibit 2125 received in evidence.)

8           **MR. KESSLER:**  And let's, if you can, blow up the top

9    of this.

10          Thank you, Lauren.

11          (Document displayed.)

12   **BY MR. KESSLER:**

13   **Q.**   This is to Mr. Roger Craig.  And it's "Re:  The Topps

14   Company."

15          And it says:

16          "Dear Roger:  Thank you for agreeing to

17   participate in the Players Inc player marketing program.  The

18   purpose of this letter agreement is to set forth the

19   understanding which has been reached between you, Roger Craig,

20   the National Football League Players Incorporated with regard

21   to the Topps Company."

22          Was Mr. Craig a retired player?

23   **A.**   Yes.

24   **Q.**   Okay.  Let's take a look now, if we can, at the grant of

25   rights.  It says:

1          "Grant of rights.  Player agrees that Players Inc

2   shall grant company the right, but not the obligation, to

3   produce trading cards bearing player's name, likeness, image

4   and biographical information to insert into its 2004 and 2005

5   football products."

6          Then, it says:

7          "The rights shall be granted on a non-exclusive

8   basis."

9          If the Topps agreement conveyed retired player rights

10  as plaintiffs contend, would there be any reason for Topps to

11  enter into these types of ad hoc agreements for retired

12  players?

13         **MR. PARCHER:**  Excuse me, Your Honor.  I'm going to

14  object.  It's a confusing and misleading question.  This

15  document --

16         **MR. KESSLER:**  Your Honor --

17         **MR. PARCHER:**  This document is a document between the

18  union and the player.  This is not a document between the

19  player and -- and The Topps Company.  And the question suggests

20  otherwise.

21         **MR. KESSLER:**  Your Honor, I've gone through the

22  language of the agreement.  And I said it's between the player

23  and NFLPA.

24         **THE COURT:**  The jury understands the context.  The

25  objection is overruled.

1          Please ask the question again.

2              **MR. KESSLER:**  Thank you.

3  **BY MR. KESSLER:**

4  **Q.**   Mr. Allen, would there be any reason to enter into a

5  separate ad hoc license agreement with the retired player,

6  granting rights if the rights had already been granted to

7  Topps?

8  **A.**   No.

9              **MR. PARCHER:**  Objection.  Speculation.

10             **THE COURT:**  It's an argumentative question, but both

11  sides have made -- asked questions sort of this type, so I'm

12  going to allow it.

13             Overruled.

14             **MR. KESSLER:**  Thank you, Your Honor.

15  **BY MR. KESSLER:**

16  **Q.**   Take a look now on compensation.  It says:

17             "As consideration for the grant of rights and

18  services, Players Inc shall pay player $5,000, $20 per

19  autograph."

20             Was that money given to the retired player?

21  **A.**   You mean, to Roger Craig?

22  **Q.**   Yes.

23  **A.**   Yes.  All of it.

24  **Q.**   Now, did Topps pay this additional money to get the rights

25  of Roger Craig to Players Inc?

1   **A.**   Yes.

2   **Q.**   Okay.  So Players Inc didn't pay this --

3          **MR. KESSLER:**  Withdrawn.

4   **BY MR. KESSLER::**

5   **Q.**   Why would Topps pay additional money for retired players

6   if it already had the rights, as plaintiffs contend?

7          **MR. PARCHER:**  Objection.

8          **THE COURT:**  That is argumentative.

9          **MR. KESSLER:**  Okay.

10         **THE COURT:**  Sustained.

11  **BY MR. KESSLER:**

12  **Q.**   Did you discuss with Topps in the negotiations paying this

13  additional money for retired player rights?

14  **A.**   Yes.

15  **Q.**   Okay.  And was Topps willing to do so?

16  **A.**   For particular players that they chose, yes.

17  **Q.**   Was Topps ever willing to take a license to the whole mass

18  group of retired player GLAs?

19         **MR. PARCHER:**  Objection.  That assumes a set of facts

20  not in evidence, which is that Mr. Allen brought the subject

21  up.

22         **THE COURT:**  As phrased, the objection is sustained.

23  **BY MR. KESSLER:**

24  **Q.**   Were there discussions about Topps possibly taking the

25  whole mass of rights?

1   **A.**   Yes.

2   **Q.**   Were they willing to do so in those discussions?

3   **A.**   No.

4   **Q.**   I'm now going to turn to another subject, Mr. Allen.

5           **MR. KESSLER:**  Your Honor, may I approach?

6           **THE COURT:**  Go ahead.

7   **BY MR. KESSLER:**

8   **Q.**   Mr. Allen, could you please look at the exhibit I have

9   just given you, which is Trial Exhibit 1100?

10          Mr. Allen, do you recognize this agreement?

11  **A.**   Yes.

12  **Q.**   And what is this agreement?

13  **A.**   It is a license agreement between RC2 brands, Inc. and the

14  National Football League Players Incorporated or Players Inc.

15          **MR. KESSLER:**  Okay.  Your Honor, I move into evidence

16  Trial Exhibit 1109.

17          **MR. PARCHER:**  No objection, Your Honor.

18          **THE COURT:**  1109 is received.

19          **MR. HUMMEL:**  1100?

20          **MR. KESSLER:**  I'm sorry.  1100.  Sorry.  Misspoke.

21          **THE COURT:**  1100 is received.  Not 1109.

22          (Trial Exhibit 1100 received in evidence.)

23  **BY MR. KESSLER:**

24  **Q.**   Now, this agreement, if you look at number 1, contains the

25  same -- does it contain the same language as the EA agreement

1  language that we reviewed, this language here (indicating)?

2  **A.**    Let me read it first, please.

3         Yes.

4  **Q.**    Now, explain to the jury what type of products were being

5  licensed in this agreement.

6  **A.**    Draft pick trading cards and inserted memorabilia.

7  **Q.**    Explain to the jury what is a draft pick trading card

8  product?

9  **A.**    That's a card of a player who is selected to be on an NFL

10  team out of college.  Each team gets to select a college player

11  in turn, and there are rounds of the draft.  So each team picks

12  in order.  It's determined by how they finish the season, picks

13  the college player it wants.  So they go through a first round,

14  second round and third round.

15         So when I said I was the second round pick of the

16  Buffalo Bills in '74, that meant they had been through the

17  first round, came back and got to choose again.  So I was the

18  second player they picked, as an example.

19         This is a license for trading cards of those college

20  players while they're draft picks and before they have played

21  their first season.

22  **Q.**    Are these commonly referred to as "rookie cards"?

23  **A.**    Yes.

24  **Q.**    Now, when you have a rookie card product, is it just the

25  rookies that year?

**A.**   Yes.

**Q.**   So it wouldn't show rookies from previous years, or would it?

**A.**   Uhm, no.

**Q.**   Okay.  Now, did you have an understanding, a contemporaneous understanding in this agreement as to whether any retired player rights were granted in this rookie card deal?

**A.**   Yes, I did.

**Q.**   Were there any?

**A.**   No.

**Q.**   Mr. Allen, you are familiar with rookie card products; is that correct?

**A.**   Yes.

**Q.**   Has any rookie card product in history ever used a retired player for any reason?

**A.**   No, because it would be -- they would be mutually exclusive.  By definition, if you're a drafted rookie you haven't played yet.  You're not a retired player.  You haven't even made the team yet.

**Q.**   You're familiar with fantasy football products?

**A.**   Yes.

**Q.**   Did Players Inc license a number of fantasy football products?

**A.**   Yes.

1  **Q.**   Okay.  Was one of them STATS?

2  **A.**   I believe so, yes.

3  **Q.**   Could you explain to the jury what a fantasy football card

4  product is?

5  **A.**   Well, they weren't card products.

6  **Q.**   I'm sorry.  What a fantasy football product is.

7  **A.**   The football fans in a fantasy game choose the players

8  they want to assemble from various teams to be on their fantasy

9  team.  So they pick the wide receiver they think will be the

10 best.  They pick the quarterback they think will do best.

11        They can come from two different teams, so it really

12 becomes your fantasy team.  That's another way for people to

13 enjoy professional football.  And it's been a very popular

14 enterprise.

15        And the rights to use the player's name and image in

16 those fantasy games has been licensed by Players Inc, the

17 NFLPA, to various companies that make their software or their

18 fantasy game product available to consumers and to fans.

19        **MR. KESSLER:**  Your Honor, and I apologize.  We're

20 having trouble finding the court copy of Trial Exhibit 1109,

21 which is the STATS agreement.  But I would like to hand up

22 another copy to the witness now if that's all right.

23        **THE COURT:**  You can use a copy.

24        **MR. KESSLER:**  Thank you, Your Honor.

25

1   **BY MR. KESSLER:**

2   **Q.**   Do you recognize what is Trial Exhibit 1109?

3   **A.**   Yes.

4   **Q.**   What is it?

5   **A.**   It's a license agreement between STATS LLC, limited

6   liability corporation, and National Football League Players

7   Incorporated, or Players Inc.

8   **Q.**   Is this a fantasy football license as you've just

9   described to the jury?

10  **A.**   Yes.  It's a license agreement for fantasy football game

11  distributed over the Internet.

12          **MR. KESSLER:**  Your Honor, I would move into evidence

13  Trial Exhibit 1109.

14          **MR. PARCHER:**  No objection, Your Honor.

15          **THE COURT:**   Thank you.

16          Received.

17          (Trial Exhibit 1109 received in evidence.)

18  **BY MR. KESSLER:**

19  **Q.**   And, Mr. Allen, I'm now displaying the STATS fantasy

20  football license.  Does this also have the same language as

21  appears in the EA agreement?

22          **MR. PARCHER:**  I'm sorry.  I didn't hear that last

23  question, Your Honor.

24          Do you mind repeating it?

25

1  **BY MR. KESSLER:**

2  **Q.**   Does this have the same language as appears in the EA

3  agreement?

4  **A.**   Yes, it does.

5  **Q.**   Okay.  Now, did you have a contemporaneous understanding

6  of the STATS fantasy football license as to whether or not it

7  granted any rights to retired players as opposed to active

8  players?

9  **A.**   Yes.

10  **Q.**   And what was your contemporaneous understanding?

11  **A.**   It granted rights to active players, not retired players.

12  **Q.**   Based on your -- well, let me understand.  In fantasy

13  football, do the players look at the results of an NFL game

14  every week and see how the statistics change for the players?

15  **A.**   If you are participating in a fantasy game, and you had

16  your fantasy team, the way you -- the way you competed against

17  people who had other fantasy teams was how well your players

18  did week-to-week during the season.

19         So, by definition, all of your players have to be

20  active players, because it's a competition through the season.

21  It's another way to enjoy the football season.  You assemble

22  your players, and then how they do delivers points to your

23  fantasy team.  And they're from all different teams.

24         So if the quarterback does very well that week, you

25  get points.  If your running back gets hurt and doesn't play,

1  you lose points.  And you're competing with other people who

2  have assembled other players on their fantasy team.

3          But, by definition, all of the players you are using

4  to do that with are active players who are playing during the

5  season, not retired players.  It wouldn't do you any good to

6  have a fantasy team with players, say, from my era, because

7  everything they have done has been done.

8          We can't compete.  There can't be any uncertainty as

9  to how they will do next week, and there can't be any

10  competition.

11          That's why fantasy only involves active players.

12  **Q.**   So based on your knowledge of fantasy football products,

13  do fantasy football products have any use at all for retired

14  players?

15  **A.**   No.

16  **Q.**   Okay.  I would now like to turn to another subject which

17  is the NFL sponsorship agreement.

18          **MR. KESSLER:**  Your Honor, if I may approach.

19          **THE COURT:**  All right.

20  **BY MR. KESSLER:**

21  **Q.**   Mr. Allen, take a look at Exhibit 99 first, and tell me if

22  you recognize what that is.

23  **A.**   Yes, I do.

24  **Q.**   What is this document?

25  **A.**   It's a sponsorship agreement between NFL Properties, which

1  is a subsidiary company of the National Football League, and

2  Players Inc.

3          **MR. KESSLER:**  Your Honor, I move into evidence Trial

4  Exhibit 99.

5          **MR. PARCHER:**  No objection.

6          **THE COURT:**  Thank you.

7          Received.

8          (Trial Exhibit 99 received in evidence.)

9          **MR. KESSLER:**  If we could display that, please.

10         (Document displayed.)

11  **BY MR. KESSLER:**

12  **Q.**  Now, first, let's make clear who this agreement is

13  between.  This is an agreement between NFL Properties first; is

14  that correct?

15  **A.**  Yes.

16  **Q.**  And NFL Properties is a licensing company of the National

17  Football League; is that right?

18  **A.**  It -- yes.  It represents the teams, the ownership of the

19  teams in the league.

20  **Q.**  So if I could divide the world up, that represents the

21  owners, correct?

22  **A.**  Correct.

23  **Q.**  You represent the players, correct?

24  **A.**  That's right.  That's right.

25  **Q.**  And the other party to this agreement was Players Inc,

1    correct?

2    **A.**    Uhm, that's correct.

3    **Q.**    Let's take a look at the first page of this document, if

4    we can.

5          And in the very first page under "sponsorship terms,"

6    it says:

7                "In exchange for the annual sponsorship payment

8    as set forth below, NFL Properties shall acquire group player

9    licensing rights as defined in the CBA and the exclusive use of

10   Players Inc's name and logo, for all corporate

11   sponsorships/endorsements, including official designations

12   using the Players Inc name and logo, and the agreement of

13   Players Inc not to grant any Players Inc or NFL players

14   corporate sponsorships/endorsements, including official

15   designations using either such terms."

16         Then it says:

17                "For the 2000, 2001, 2002 and 2003 NFL seasons."

18         This agreement was subsequently extended; is that

19   correct?

20   **A.**    That's correct.

21   **Q.**    So it covered the period going through the time you were

22   there in 2006?

23   **A.**    That's right.

24   **Q.**    Now, the group player licensing rights say:

25                "As are defined in the CBA."

1              Do you see that, Mr. Allen?

2    **A.**    Yes.

3    **Q.**    What is the CBA?

4    **A.**    The CBA is the collective bargaining agreement, which is

5    the agreement between the union, the NFL Players Association

6    and National Football League that governs all of the wages,

7    hours and working conditions and terms of employment for NFL

8    players.

9    **Q.**    Okay.  The group player licensing rights defined in the

10   CBA, is that defining rights for active players, retired

11   players, or both?

12   **A.**    Just active players.

13   **Q.**    Okay.  Is that a reference to 4(b) of the NFL player

14   contract?

15   **A.**    Yes.

16   **Q.**    So did the sponsorship agreement grant any retired player

17   rights to the NFL Properties?

18   **A.**    None.

19   **Q.**    What type of player rights did it grant?

20   **A.**    Active player rights.

21   **Q.**    Now, Mr. Allen, let me direct your attention also to page

22   7 of this document, number 14.  It has on the bottom --

23            **MR. KESSLER:**  It's the next page, please.  Thank you.

24            Start at 14.

25            (Document displayed.)

1  **BY MR. KESSLER::**

2  **Q.**   It says:

3           "During each year of the agreement, on behalf

4  of NFL sponsors, Players Inc will pay at least 25 percent of

5  the annual sponsorship payment, the active usage credit

6  directly to active NFL players."

7           Was there any agreement to pay any money to retired

8  NFL players under this agreement?

9  **A.**   No.

10  **Q.**   Now, Mr. Allen, with respect to the fantasy football

11  license we discussed, the draft rookie contract, rookie card

12  contract we discussed, the NFL sponsorship money we discussed,

13  did that all go into the GLR pool?

14  **A.**   Yes.

15  **Q.**   Okay.  And, again, to remind the jury, that group

16  licensing revenue pool was that active player money or retired

17  player money?

18  **A.**   All of it was active player money.

19  **Q.**   Okay.  Now, I'd like to take a look at a document that

20  plaintiffs' counsel showed you, which is Exhibit 12.  It's

21  already in evidence.

22           (Document displayed.)

23           **MR. KESSLER:**  We can blow this up and remind the jury

24  about this document.

25

1  BY MR. KESSLER:

2  Q.    You recall plaintiffs' counsel asked you about this

3  meeting with NFLPA contract advisors, which was about the NFL

4  sponsorship agreement and its effect on club sponsorships and

5  agent obligations, as we just discussed.

6         First of all, the NFLPA contract advisors, could you

7  explain to the jury who are the NFLPA contract advisors?

8  A.    NFLPA contract advisors are agents who represent the

9  players in negotiating their player contract with the club.  So

10  if I'm hiring someone to be a defensive end, that player's

11  agent would negotiate with someone from the club on the terms

12  of that contract, how much that player would get paid and how

13  long the contract would be for.

14         And the union, the NFL Players Association, regulates

15  those agents.  They are essentially extensions of the union.

16  And they're called "NFLPA contract advisors."

17         But they represent the player in their negotiations

18  with the club to be an active player.

19  Q.    Okay.  So, first of all, there may have been some

20  confusion about this.  Do NFLPA contract advisors represent

21  licensees?

22  A.    No.  They represent players.

23  Q.    Okay.  And do they represent active players?

24  A.    The reason they are at that seminar is because they are

25  certified by the union to represent active players in

1  negotiations with the NFL teams.

2  **Q.**   Is this a required seminar that active player agents have

3  to attend?

4  **A.**   It is.

5  **Q.**   And, again, so the jury can have some context in case

6  they've seen it, is this somebody like Jerry Maguire,

7  essentially?

8  **A.**   That's a fictionalized portrayal, but, yes.

9  **Q.**   Now, when you were talking to these active player agents

10  about the NFL sponsorship agreement, why were you talking to

11  them?  What was the purpose of this meeting?

12  **A.**   It was to show them how we were describing this

13  sponsorship agreement and its effect on the NFL, the teams and

14  Players Inc with respect to how players would be utilized in

15  sponsorships in -- in the programs of sponsors of the NFL,

16  companies that had paid to be sponsors of the NFL.

17          And, for example, to make sure they understood the

18  protocols that would govern that 25 percent that Players Inc

19  was required to spend on player services as part of this

20  agreement.

21  **Q.**   Take a look at page -- it's 667, page 7 of the document.

22  It's 662 on the bottom.  If we could look at category A.

23          It says:

24              "The use of NFL players that is free for

25  sponsors."

1          And then it says:

2               "Premiums:  There will be no charge for sponsors

3     for use of active NFL players depicted equally in prominence."

4          Do you see that?

5          Okay.  Did this have --

6     **A.**   I'm not finding it.  I'm looking at two places at once.

7     I'm sorry.

8     **Q.**   Category A.  Do you see the reference to the "use of

9     active NFL players"?

10    **A.**   I do.

11    **Q.**   Was this entire meeting and discussion about active NFL

12    players, retired players, or both?

13    **A.**   It was about active players.

14              **MR. PARCHER:**  I'm going to object.

15          Could you repeat the question, please?

16    **BY MR. KESSLER:**

17    **Q.**   What type of players was this meeting about?

18    **A.**   Active players.

19    **Q.**   Thank you.

20          I'm now going to turn -- oh, one question.  Despite

21    the fact that the agreement was about granting active player

22    rights to the NFL sponsorship agreement, were you able

23    sometimes to find some sponsorship payments for retired

24    players?

25    **A.**   Yes.

1  **Q.**    Explain to the jury how that worked.

2  **A.**    Uhm, there were, uhm, circumstances where a particular

3  sponsor wanted to use -- and we encouraged them to use retired

4  players.

5        If they were an NFL sponsor they -- the league worked

6  out with us a circumstance where the money that was paid by the

7  sponsor through Players Inc to the retired player would count

8  against this usage credit.  That helped the sponsor, it helped

9  the league, and it helped Players Inc.  And it provided an

10  opportunity for a retired player to do something and be

11  compensated for it.

12        So on an ad hoc basis we worked that out.

13  **Q.**   I would now like to turn to my final subject of the

14  questions that I have for you, Mr. Allen.

15        **MR. KESSLER:**  If I may approach, Your Honor.

16        **THE COURT:**  Go ahead.

17  **BY MR. KESSLER:**

18  **Q.**   The final subject I'm going to ask you about, Mr. Allen,

19  is this issue of so-called scrambling of images by EA.

20        First of all, just to remind the jury of your

21  testimony yesterday --

22        **MR. PARCHER:**  If Your Honor pleases, I would

23  appreciate if Mr. Kessler would ask a question, and we would

24  get an answer.

25        **THE COURT:**  I agree with that, but both sides need to

1   do this.  No speeches.

2           **MR. KESSLER:**  Okay.

3   **BY MR. KESSLER:**

4   **Q.**  Did you have a contemporaneous understanding of what the

5   EA grant -- what the grant of rights were to EA under its

6   license agreements?

7           **MR. PARCHER:**  Objection.  Asked and answered already.

8           **MR. KESSLER:**  Your Honor, what I'm trying to do --

9           **THE COURT:**  It's preliminary to a line of questions.

10  Overruled.

11          Go ahead.

12          **MR. KESSLER:**  Thank you.

13          **THE WITNESS:**  Could you repeat the question?

14  **BY MR. KESSLER:**

15  **Q.**  Yes.  Did you have a contemporaneous understanding of what

16  player rights were granted to EA in its license agreements?

17  **A.**  Yes.

18  **Q.**  And was it -- what type of player rights were granted?

19  **A.**  Active player rights.

20  **Q.**  Were any retired player rights granted?

21  **A.**  No.

22  **Q.**  Now, were there times in history when EA negotiated to get

23  some retired player rights?

24  **A.**  Certainly.

25  **Q.**  Okay.  I would like you to take a look at Trial Exhibit

1    2062.  And I'll ask you if you recognize what this document is.

2    Make sure you're looking at 2062.

3              No, you're looking at the wrong one, Mr. Allen.  It

4    should be labeled on the folder.

5    **A.**   Okay.  Yes.

6    **Q.**   Do you recognize what Trial Exhibit 2062 is?

7              **MR. PARCHER:**  Just a second, Mr. Kessler.

8              **MR. KESSLER:**  Let's wait for Mr. Parcher.  Yes.

9              **THE WITNESS:**  I do.

10   **BY MR. KESSLER:**

11   **Q.**   And what is Trial Exhibit 2062?

12   **A.**   It's a license agreement between Electronic Arts

13   Incorporated and the National Football League Players

14   Incorporated or Players Inc.

15             **MR. KESSLER:**  Your Honor, I move into evidence 2062.

16             **THE COURT:**  2062.  Any objection?

17             Hearing none, received.

18             (Trial Exhibit 2062 received in evidence.)

19   **BY MR. KESSLER:**

20   **Q.**   Now --

21             **MR. PARCHER:**  Your Honor, just give me a moment.  I

22   didn't mean not to respond.  I was looking at the document.

23             **THE COURT:**  Let's take it off the screen for a

24   moment.

25             **MR. PARCHER:**  Just a second.

1          **THE COURT:**  Go ahead.  Take your time.

2          **MR. PARCHER:**  I have no objection.

3          **THE COURT:**  Thank you.  2062 received.

4    **BY MR. KESSLER:**

5    **Q.**  Take a look at the top of this exhibit.  It says:

6               "This is an agreement made and entered into this

7    20th day of January, 2000, by and between Electronic Arts."

8          And then, it's with the National Football League

9    Players Incorporated.

10         And this agreement was effective as of March 1, 1998?

11   Do you see that, Mr. Allen?

12   **A.**  Yes, I do.

13   **Q.**  By the way, was that a practice that sometimes happened

14   where you would enter into an agreement in one year, 2000, and

15   you would make it retroactively effective to an earlier time?

16   **A.**  Yes.  We had a continuing relationship with some

17   companies, and it would take a while sometimes to finish the

18   negotiations and sign the agreement.  But it would be

19   retroactive so that all of the periods of time would be covered

20   by it.

21   **Q.**  Okay.  Now, this older agreement from this period had a

22   grant of license, if you look, which had a specific list

23   attached.

24         It says:

25               "Upon the terms and conditions hereinafter set

1  forth above Players Inc hereby grants to licensee and licensee

2  accepts the non-exclusive right, license and privilege of

3  utilizing the trademarks and names of Players Inc."

4        And then, it says:

5              "The identity of the NFL players listed in

6  attachment B."

7        Do you see that?

8  **A.**   I do.

9  **Q.**   An older period of time, was it sometimes typical to just

10 list the players that were going to be licensed?

11 **A.**   Yes.

12 **Q.**   Now, did there come a time when EA wanted to license

13 specific retired players with respect to this period of time?

14       **MR. PARCHER:**  Objection.  Speculation.

15       **THE COURT:**  Well, you can answer with respect to

16 whether they asked to do so.  Whether they wanted to do so is

17 an inference.

18       With that caveat, go ahead and answer.

19 **BY MR. KESSLER:**

20 **Q.**   Going back to this period of time in 2002, 2001, 2002,

21 going in that period right now, did you have any discussions

22 with EA as to whether it wanted to use any retired players?

23 **A.**   Yes.

24 **Q.**   What do you recall about those discussions?

25 **A.**   Well, we were encouraging them to use retired players.

1  And they ultimately agreed to use certain players that they

2  selected as players that they thought were appropriate to be in

3  their game.

4  **Q.**   Were they -- did you try to encourage them to use more

5  retired players?

6  **A.**   Yes.

7  **Q.**   Okay.  Were they willing to use more?

8  **A.**   No.

9  **Q.**   What did EA say they were willing to do?

10 **A.**   They were willing to pay a certain amount of money to --

11 to Players Inc and select a certain limited number of players

12 in return for that money.

13 **Q.**   Okay.  Take a look now at Trial Exhibit 24, already in

14 evidence.  It should be in front of you.  It's another folder.

15         **MR. KESSLER:**  If we could blow up, Lauren, the whole

16 beginning of that, through "the payments."

17         (Document displayed.)

18 **BY MR. KESSLER:**

19 **Q.**   Is this an addendum to the license agreement that we just

20 have been looking at, the 2000 agreement that was effective in

21 1998?

22 **A.**   Yes.

23 **Q.**   Okay.  And it says that here:

24         "The following paragraphs of the license

25 agreement between Electronic Arts and Players Inc effective

1  March 1, 1998 shall be amended and added to only as follows."

2          And then, it says:

3              "Identity, as defined in paragraph 2, also shall

4  apply to retired NFL players listed in attachment C hereto."

5          Now, what is this referring to?

6  **A.**   This is a grant of license for certain retired players who

7  were listed in a document that's referred to in this first

8  page.

9          **MR. KESSLER:**  If we could look, Lauren, at the next

10  paragraph, "Royalty Payment."

11          (Document displayed.)

12  **BY MR. KESSLER:**

13  **Q.**   It says:

14              "For the additional rights granted by this

15  addendum, separate from and in addition to the other guarantees

16  and payments specified in such paragraph 6, licensee shall pay

17  to Players Inc the following amounts on the dates listed."

18          And then, it has:

19              "150,000, 150, 150,000."

20          Do you see that, sir?

21  **A.**   I do.

22  **Q.**   Now, did you have a contemporaneous understanding as to

23  why was EA paying additional money for these retired player

24  rights?

25  **A.**   Because the -- the agreement referred to didn't provide

1  retired player rights.  In order to get them there had to be

2  another agreement which dealt with them.

3  **Q.**  Take a look now at the first page of the attachment.

4       Is this then a list of the retired players who were

5  granted under this addendum?

6  **A.**  Yes, it is.

7  **Q.**  Okay.  Finally, Mr. Allen, I would like you to take a look

8  at Trial Exhibit 1320.  It should already be in evidence.

9  Maybe I didn't put that in front of you.

10      It should be in your stack.

11 **A.**  Yes, it is.

12 **Q.**  Thank you.

13      Now, this was a document you were shown during your

14 examination by plaintiffs' counsel.  Let's just remind the jury

15 what this is.

16      This was the May 31st, 2001 letter to Jeremy

17 Strausser of Electronic Arts.  And if we could show who it's

18 from on the bottom.  This was from LaShun Lawson.

19      Remind the jury who is LaShun Lawson?

20 **A.**  She was assistant vice president for multimedia for

21 Players Inc.

22 **Q.**  And did she ultimately report to you at this time in May

23 of 2001?

24 **A.**  Well, ultimately.  Not as a direct report, but, yes.

25 **Q.**  As an indirect report?

1  **A.**   Yes.

2  **Q.**   Okay.  Let me focus your attention now on the language.

3  It says:

4           "The following is a detailed explanation of the

5  approved use of retired players for the upcoming video games

6  per our discussion.  The addendum that was signed last July was

7  a three year agreement that granted Electronic Arts the right

8  to use the names [sic] and identities of the players listed in

9  attachments A and B (both documents were sent with the

10  addendum)."

11           Now, that reference to attachments A and B, was that

12  a reference to Exhibit 24, Trial Exhibit 24, the list of

13  players, retired players we looked at?

14  **A.**   Yes.

15  **Q.**   It says:

16           "For all retired players that are not listed in

17  either attachments A or B, their identity must be altered so

18  that it cannot be recognized."

19           Now, did you have a contemporaneous understanding

20  when this was going on why EA had to alter the identity of

21  retired players who were not listed in the addendum?

22           **MR. PARCHER:**  Excuse me, Your Honor.  I just want a

23  clarification of the question:  Do you have an understanding of

24  why EA needed it?

25           I assume it was his opinion, is what he thinks was on

1   his mind.

2           **THE COURT:**  The question was in terms of

3   contemporaneous understanding back then.

4           **MR. KESSLER:**  Yes.

5           **MR. PARCHER:**  His understanding -- his understanding

6   of his thinking back then.

7           **MR. KESSLER:**  Players Inc's thinking.

8   **BY MR. KESSLER:**

9   **Q.**   Did you have a contemporaneous understanding of what

10  Players Inc was telling EA this?

11          **MR. PARCHER:**  That wasn't the question.  It was why

12  EA --

13          **THE COURT:**  Well, that's true.

14          **MR. KESSLER:**  Okay.

15          **THE COURT:**  Why don't you rephrase the question in

16  terms of why it was that the defendant was making this

17  statement back at the time.

18  **BY MR. KESSLER:**

19  **Q.**   Did you have a contemporaneous understanding of why

20  Players Inc was making this statement to EA at that time?

21  **A.**   Yes.

22  **Q.**   Why was Players Inc doing that?

23  **A.**   It was pointing out that there were only certain retired

24  players who were licensed by Players Inc for utilization in the

25  EA game, and that the identities -- we weren't providing them

1   with permission to use the identities of retired players that

2   weren't included in that grant of rights.

3   **Q.**   In the last sentence it says:

4               "Hence, any and all players not listed in

5   attachments A or B cannot be represented in Madden 2002 with

6   the number that the player actually wore."

7               Was it Players Inc's position at that time that

8   unless you pay for the retired player you shouldn't use their

9   number?

10  **A.**   That's correct.

11  **Q.**   Now, would Players Inc -- did you have an understanding at

12  that time, if EA had been willing to pay for more retired

13  players, would Players Inc have granted those rights?

14              **MR. PARCHER:**  Objection.

15              **THE WITNESS:**  Sure.

16              **THE COURT:**  Wait.

17              What's the objection?

18              **MR. PARCHER:**  He's just speculating as to what EA

19  would or would not -- EA would or wouldn't have done.

20              I don't want to make a speaking objection here.  I

21  have to save it for my time.  But -- okay.  I'm going to let it

22  go at that, because I'll be speaking if I --

23              **THE COURT:**  Well, it is, and I'm going to give a word

24  of caution.

25              This is a speculative answer:  If this, then would

1  you have done that?

2         You can see how that calls for a degree of

3  speculation.

4         Ordinarily, I would sustain the objection.  The

5  problem is that both sides have injected some degree of

6  speculation about what would have happened if this had

7  happened.  So I'm going to allow you to hear it, but with that

8  word of caution that there's a degree of speculation.  And here

9  we are in litigation.  So you should take into account the

10  caveat.

11         Go ahead.

12  **BY MR. KESSLER:**

13  **Q.**   Mr. Allen, if EA had asked you for additional retired

14  player rights at that time, would Players Inc have granted

15  those rights?

16  **A.**   Sure.

17  **Q.**   Did you make it clear at that time to EA that you would

18  try to give them any retired rights they were willing to pay

19  for?

20  **A.**   Yes.

21  **Q.**   Now, looking at the bottom paragraph, it says:

22              "Along those same lines, the only active

23  players that can be included in the licensed product are those

24  who have given their licensing rights to Players Inc.

25  Substituting a player's name with their Jersey number is not

1  acceptable.  If a player has not given his rights to Players

2  Inc, his identity as defined above cannot be used within the

3  game."

4          Now, was it correct that at this time there were a

5  few active players who had not given you rights?

6  **A.**    There was one that I can think of.

7  **Q.**    Who was the one you can think of?

8  **A.**    The linebacker for the Washington Redskins named LaVar

9  Arrington.

10  **Q.**    Okay.  And so in this -- it was Players Inc's position at

11  the time, according -- do you remember, was it Players Inc's

12  position at the time, to EA, that they'd have to scramble

13  Mr. Arrington because they -- you didn't have the rights there

14  either to give?

15  **A.**    Yes.  They couldn't -- they couldn't show LaVar Arrington,

16  as I recall, on the -- in the game.

17  **Q.**    So how would you summarize what Players Inc's position was

18  back at this time about why images should be altered or

19  scrambled?

20  **A.**    So that they wouldn't be utilizing the identities of

21  players that they didn't have the rights to use.  In this case

22  the -- they did have the rights to use players that we had

23  provided them the right to use, but for those that they didn't

24  have those rights they shouldn't use their identities.

25  **Q.**    Now, Mr. Allen, when money was paid under the addendum,

1   the $150,000 a year for the retired player rights, what did you

2   do with that money?

3   **A.**   We paid it out to that list of players who were utilized

4   in the game.

5   **Q.**   So the retired players got all that money?

6   **A.**   All of it.

7   **Q.**   None of it -- was any of it given to the active players?

8   **A.**   No.

9   **Q.**   Was any of it put into the GLR pool?

10  **A.**   No.

11  **Q.**   Now, Mr. Allen, since this time in 2002 -- I think this

12  letter was -- 2001, May of 2001, has Players Inc had any

13  control over whether or not EA would choose to put scrambled

14  images of players in their classic games?

15  **A.**   I'm not sure I understand the question.

16  **Q.**   Okay.  There's been claims in this case that in 2002, '3,

17  '4, '5, '6, that there are classic games in the EA video games

18  in which the players -- there's no name, there's no image.

19  It's scrambled.  Were you aware of that?

20  **A.**   Yes.

21  **Q.**   Are you familiar with those game products, generally?

22  **A.**   Generally.

23  **Q.**   Okay.  Who decides whether to include those classic games

24  with those scrambled images?  Is it Players Inc or EA?

25  **A.**   EA.

1   **Q.**   Does Players Inc, in your -- did Players Inc, in the

2   period 2002 to 2006, have any ability to stop EA from having

3   games with scrambled images and no names and no likenesses?

4   **A.**   No.

5           **MR. PARCHER:**  Objection.

6           **THE COURT:**  Wait a minute.

7           Well, what's the objection?

8           **MR. PARCHER:**  It calls for a legal conclusion.

9           **MR. KESSLER:**  Your Honor has actually already

10  instructed the jury that there's no claim about that.  I'm just

11  confirming with the witness that it was their understanding

12  they had no legal right with respect to these --

13          **THE COURT:**  You can ask him if he thought they had

14  any legal right, but the way the question was phrased was:  Did

15  they have any ability?

16  **BY MR. KESSLER:**

17  **Q.**   Was it your understanding at the time, did you have any

18  legal right to stop EA from including classic games that had --

19  that had players, but no names, no pictures, no images, no

20  number?

21          **THE COURT:**  No.  Why don't you instead -- you're

22  asking him for a legal conclusion.

23          Why don't you ask him whether or not he ever

24  considered any such thing?

25          **MR. KESSLER:**  Okay.

1            THE COURT:  I think that would be a better question.

2    BY MR. KESSLER:

3    Q.   Did you ever consider whether you had any such legal

4    claim?

5    A.   Did we ever consider that?  Yes.

6    Q.   And did you conclude that you had any legal claim to

7    assert?

8    A.   We concluded that we did not.

9            MR. KESSLER:  Thank you, Mr. Allen.

10           Your Honor, I have no further questions for the

11   witness at this time.

12           THE COURT:  One thing you said wasn't clear on this.

13           Can you put that document that we just had up on the

14   screen?

15           (Document displayed.)

16           This thing you referred to as the "addendum," what is

17   this exhibit number?

18           MR. KESSLER:  This one, Your Honor, is 1320.  1320.

19           THE COURT:  All right.  You referred to these

20   attachments A and B, and I got confused on which -- were

21   retired players in any way involved in either A or B?

22           THE WITNESS:  Yes.

23           THE COURT:  And how were they involved, and how many

24   were involved?

25           THE WITNESS:  I think that was -- I believe that that

1    was listing retired players who were the subject of the

2    addendum.

3              THE COURT:  Are A and B in evidence?

4              MR. KESSLER:  No, Your Honor.  These are attachments

5    not to the agreement.  Your Honor may be confusing this with

6    attachment A to the license agreements.

7              THE COURT:  Well, how is the jury supposed to figure

8    out, is it five retired players, 5,000 retired players?

9              MR. KESSLER:  Your Honor, we put in Trial Exhibit 24.

10   I'll ask the witness again, lists the players.  That's what I

11   think --

12             THE COURT:  24?

13             MR. KESSLER:  Yeah.

14             Could we put up 24, and I'll ask the witness?

15             (Document displayed.)

16   BY MR. KESSLER:

17   Q.   Mr. Allen, let's show each of the pages, if we can.

18   A.   Wait a minute.

19             MR. KESSLER:  This is the first page of the list.

20   The whole list, Lauren.  That's fine.

21             And then, show the next page.  And then, the next

22   page, please.  And then the next page.

23             (Document pages displayed.)

24             Thank you.

25

1    **BY MR. KESSLER:**

2    **Q.**   Mr. Allen, is this the list of the retired players you

3    understood were granted in the addendum?

4    **A.**   Yes.

5    **Q.**   Is this the list of retired players that was referred to

6    as attachments A and B in the Trial Exhibit 1320 as you

7    understand it?

8    **A.**   Yes.

9            **THE COURT:**  Have you counted up the number on there?

10           **MR. KESSLER:**  I have not counted, Your Honor.

11   It's --

12           **THE COURT:**  Anybody counted it?  It looks like about

13   a hundred players.

14           **MR. KESSLER:**  It's a little more than a hundred, Your

15   Honor.

16           **THE COURT:**  Okay.  And I have one other question for

17   the witness.

18           Was -- these hundred retired players on that

19   particular addendum, was that one of these so-called "ad hoc"

20   deals?

21           **THE WITNESS:**  Yes.

22   **BY MR. KESSLER:**

23   **Q.**   And were those players paid all that money?

24   **A.**   Yes.

25   **Q.**   And I should also ask you, Mr. Allen, looking at this

1  list, did many of these players not sign retired player GLAs?

2  **A.**   Yes.

3         **THE COURT:**  All right.  I think I understand it now.

4         Okay.

5         **MR. KESSLER:**  Thank you, Your Honor.

6         **THE COURT:**  Mr. Parcher, your turn.

7         **MR. PARCHER:**  Thank you.

8         I would like to put that exhibit back up, if it's not

9  inconvenient.

10         (Document displayed.)

11                    <u>**REDIRECT EXAMINATION**</u>

12  **BY MR. PARCHER:**

13  **Q.**   Good morning, Mr. Allen.

14  **A.**   Good morning.

15  **Q.**   Let me understand something now.  EA has a game called the

16  Madden game, correct?

17  **A.**   Yes.

18  **Q.**   The Madden game has approximately 147 vintage teams on it,

19  correct?

20  **A.**   I don't know the exact number, but --

21  **Q.**   Well, more or less.  It has well over a hundred vintage

22  teams.

23         **THE COURT:**  He didn't ask for the exact number.  He

24  asked for an approximate number.

25         Is that about right?

1    **THE WITNESS:**  That sounds right to me.

2  **BY MR. PARCHER:**

3  **Q.**   At some point in time, EA is in the process of using the

4  names and likenesses of the players, of the actual players,

5  retired players, who are on those vintage teams, and LaShun

6  intervenes, correct?

7  **A.**   Uhm --

8  **Q.**   Yes or no, sir?

9  **A.**   One more time.

10    **THE COURT:**  Why don't you break it into two parts?

11  **BY MR. PARCHER:**

12  **Q.**   At some point in time, Electronic Arts is apparently in

13  the process of beginning to use or wanting to use the names and

14  likenesses of the retired players who are members of the

15  vintage teams, correct?

16  **A.**   Yes.

17  **Q.**   Many of those people signed group licensing retired

18  agreements, correct?

19  **A.**   Some, yes.

20  **Q.**   Quite a few, yes?

21  **A.**   I don't remember what the percentage was.

22  **Q.**   No idea at all?

23  **A.**   No.

24  **Q.**   Right.  No recollection today about what your recollection

25  was then as it's been in the consistent case with Mr. Kessler,

1  where you remember today what was on your mind then?

2          **MR. KESSLER:**  Objection, Your Honor, to the form --

3          **THE COURT:**  It's a fair question.  Overruled.

4          Please answer.

5          **THE WITNESS:**  Uhm, I -- my answers to Mr. Kessler

6  were based on my understanding at the time.  I just meant

7  that -- certainly there were some that were and some that

8  weren't.  I just don't remember, and I don't think I ever

9  testified to a precise number.

10  **BY MR. PARCHER:**

11  **Q.**   But this particular one you don't remember, correct?  As

12  you sit here today, you don't remember?

13  **A.**   I don't remember.

14          **MR. KESSLER:**  Objection.

15          **THE WITNESS:**  "This particular one" I don't remember

16  what?  I didn't understand the question.

17          **THE COURT:**  He's asking this:  Of the 147 teams -- is

18  that what you said, roughly?

19          **MR. PARCHER:**  Yeah.

20          **THE COURT:**  Roughly 147 teams with all retired

21  players, can you give us any rough estimate of how many of

22  those people would have had retired GLAs?

23          **MR. PARCHER:**  Right.

24          **THE WITNESS:**  No.  I would be speculating.  Some.

25

1  **BY MR. PARCHER:**

2  **Q.**   Well, you had approximately 2,000 some-odd, at that point

3  in time, GLA retireds, right?  Approximately?

4  **A.**   That's right.

5  **Q.**   Right.  And considering that there are 147 vintage teams

6  with approximately how many players per team?

7  **A.**   Be about 50.

8  **Q.**   So 50 players times 147, whatever the number is.  I'm

9  not the best mathematician in the world.

10        **THE COURT:**  Would be about 7,000.

11 **BY MR. PARCHER:**

12 **Q.**   About 7,000 players, would there be a pretty reasonable

13 chance that quite a few of the 2,000 some odd were amongst

14 those 7,000 players?

15 **A.**   Some, but I don't know how many.

16 **Q.**   Okay.  Fine.

17        Now, and you have -- "you," meaning PI and NFLPA,

18 whichever, right -- you have an option at that point in time as

19 to how could conduct yourself given this situation where there

20 may be a usage of the names and likenesses of the retired

21 players who signed GLAs in this Madden game, correct?  You have

22 options as to what to do?

23 **A.**   I guess.  I'm not sure what you mean by "options."

24 **Q.**   Well, you could -- you could -- you could take a

25 particular course of conduct, like LaShun's letter, or you

1  might have had other things that you might have considered

2  doing?

3          **THE COURT:**  You've got to be more specific with that.

4  Other things.  Why don't you suggest other things.

5  **BY MR. PARCHER:**

6  **Q.**   Yes.  You could have said to Electronic Arts, have you

7  not:

8                  "I'm delighted that you want to use the names

9  and likenesses of my retired players, finally.  I'll make it

10 part of your license for the $25 million you're giving me."

11                 You could have said that, right?

12         **MR. KESSLER:**  Objection, Your Honor.  This is at a

13 time that had nothing to do with that $25 million, seven years

14 later.

15 **BY MR. PARCHER:**

16 **Q.**   For whatever amount of money they were paying, you could

17 have said to them:

18                 "Rather than scrambling the identities of my

19 players, since I'm trying every way I can to get them some

20 royalties, I'll make them part of the license."

21                 You could have said that, couldn't you?

22 **A.**   I don't --

23 **Q.**   Yes or no?

24 **A.**   No.

25 **Q.**   You couldn't have said that to them?

1  A.    No.  There wasn't -- there wouldn't have been any money to

2  pay for that.

3  Q.    Excuse me.  Excuse me.

4         If the retired -- if Electronic Arts wanted to use

5  the names and likenesses of retired players in their vintage

6  games, and you had not stopped them, then you would have had to

7  taken the share of your 63 percent and given some of that

8  63 percent to the retired players, wouldn't you?

9  A.    No.

10 Q.    And the reason for that is that's not how you interpret

11 the GLA, right?  The way you interpret the GLA is it would have

12 to be all 2,062 players, or else no retired player is entitled

13 to group licensing money, correct?

14 A.    Could you repeat that question?

15 Q.    Yes.

16         MR. PARCHER:  Please read it back.

17         (The question was read by the reporter as follows:)

18         "QUESTION:  And the reason for that is that's

19         not how you interpret the GLA, right?  The

20         way you interpret the GLA is it would have to

21         be all 2,062 players, or else no retired

22         player is entitled to group licensing money,

23         correct?"

24 BY MR. PARCHER:

25 Q.    Yes or no, sir?

1  **A.**    I don't think I can answer that question "yes" or "no."

2  **Q.**    Okay.

3           **THE COURT:**  Before you leave this subject, I have a

4  related question.  And it may be one that's on the mind of the

5  jury.  And since you asked so many questions that are

6  argumentative, I -- let me try a less argumentative question.

7           I think this is a fair question to ask you.  And it

8  goes like this:  Rather than telling EA that they had to

9  scramble the identities, did you consider offering EA a license

10 to at least those retired players for whom you had the GLA?

11          **THE WITNESS:**  Yes.

12          **THE COURT:**  And did you do that?

13          **THE WITNESS:**  Yes.

14          **THE COURT:**  Is that in writing?

15          **THE WITNESS:**  It was in the discussions about what

16 the arrangement was going to be.

17          **THE COURT:**  Was it in writing?

18          **THE WITNESS:**  I don't believe so.

19          **THE COURT:**  Is there any document anywhere that backs

20 up what you just said?

21          **THE WITNESS:**  I -- without searching the files, I

22 don't know.  But I remember having those discussions.

23          **THE COURT:**  All right.  Fair enough.

24          **MR. PARCHER:**  I would add an addendum to Your Honor's

25 question, if I --

1    **THE COURT:**  Fine.  Go ahead.

2  **BY MR. PARCHER:**

3  **Q.**   If I may.  Did you consider for the license fee that was

4  already being paid, rather than scrambling the identities of

5  the retired players, just adding them to your EA license?  No

6  extra money charged to EA.  Did you consider that?  Yes or no?

7  **A.**   Uhm, sure.

8  **Q.**   And you rejected that as an option?

9  **A.**   Because I didn't think I had the authority to spend the

10  active player money on retired players under the agreements we

11  had and the rules.

12  **Q.**   Excuse me.  You're telling the Court and the jury that you

13  used your best efforts on behalf of these retired players,

14  correct?

15  **A.**   Yes.

16  **Q.**   And you're telling the Court and the jury that you didn't

17  feel you had any conflict between your best efforts for retired

18  players and protecting the active players, correct?  Yes or no?

19  You said that, didn't you?

20  **A.**   Yes.

21  **Q.**   Right.  And you're telling this Court and this jury that

22  you, meaning the defendants, have 63 -- at least 63 percent of

23  the money, at least 63 percent of the money that you defendants

24  retained after you give the active players 37 percent, aren't

25  you?

1  **A.**   Of the active player money.

2  **Q.**   You're giving them 37 percent, and you're keeping

3  63 percent amongst yourselves, correct?

4  **A.**   The union --

5  **Q.**   Please, could you just say "yes" or "no"?

6  **A.**   I'm explaining.

7  **Q.**   I don't think it requires an explanation, with all

8  respect, sir.

9  **A.**   Some of the money went to the union, some of the money

10  went to the marketing company.

11  **Q.**   But you still had quite a bit of a percentage from the

12  63 percent that you retained, didn't you?

13  **A.**   I don't know what -- I have explained that 40 percent of

14  the -- of the active player money went to the union, and

15  37 percent went to the players, and 23 percent was retained by

16  the company.

17  **Q.**   Thank you, sir.

18        Now, of that 63 percent did it ever occur to you that

19  if you were doing your best for these retired players, that you

20  could have allowed Electronic Arts to put out their video game

21  without scrambling their names and paid them their share of the

22  money?  Not from the 37 percent of the actives, but from the

23  63 percent that you retained.  Yes or no?

24  **A.**   The -- the percentages were a function of an agreement

25  that was approved by the board of player reps.  I didn't have

1  the authority to pick and choose how I would apply those

2  percentages.

3  Q.   I'm not talking about applying percentages.  You had the

4  ability.  When a dollar came in from Electronic Arts, you had

5  the ability to take some of that money, if their names weren't

6  scrambled, and give it to these retired players, didn't you?

7  A.   I didn't have that ability.

8  Q.   You didn't?  What precluded you from doing that?

9  A.   The board of player reps that had -- the agreement had

10  described the terms, the valuation had described the

11  percentages, and the board of player reps had authorized

12  certain things to happen.  And I was bound to abide by that

13  authorization.

14  Q.   Did you ever say to yourself:

15             "These poor, retired players, since 19-" --

16        MR. KESSLER:  Your Honor, this is argumentative.

17  It's not any questions anymore on facts.

18        THE COURT:  Sustained.  Sustained.

19  BY MR. PARCHER:

20  Q.   Did you ever say to yourself:

21             "These retired players have never received one

22  single penny."

23        MR. KESSLER:  It's asked and answered and

24  argumentative, Your Honor.

25        MR. PARCHER:  Excuse me.  I'm sorry, Your Honor.

1  This got opened way up on direct examination.

2          **THE COURT:**  The argument is sustained.  I mean, the

3  objection is sustained on this line of questions.  This is

4  degenerating into just -- just final jury argument.

5          It's okay to have a jury argument.  I encourage it.

6  But it should come at the end of the case.

7          **MR. PARCHER:**  Yes, sir.

8  **BY MR. PARCHER:**

9  **Q.**   You -- you suggest that the writing -- LaShun's writing of

10  this letter represented your best efforts to help the retired

11  players to receive monies under their GLAs.  Is that your

12  position?

13  **A.**   Yes.

14  **Q.**   Okay.  I'd like to show you Trial Exhibit 53.

15          **MR. HUMMEL:**  May I approach, Your Honor?

16          **THE COURT:**  Go ahead.

17          **MR. HUMMEL:**  Thank you.

18          **THE WITNESS:**  Thank you.

19          (Document displayed.)

20  **BY MR. PARCHER:**

21  **Q.**   Are you looking at it, Mr. Allen?

22  **A.**   Uhm, yes.

23  **Q.**   This is a letter from Corinne Beavers, who you identified

24  the other day as working for the defendants, to -- to you and

25  other people, correct?

1  **A.**    Yes.

2              **MR. PARCHER:**  I'll move its admission, Your Honor.

3              **MR. KESSLER:**  No objection.

4              **THE COURT:**  53 is received.

5              (Trial Exhibit 53 received in evidence.)

6  **BY MR. PARCHER:**

7  **Q.**   Yesterday you testified, sir, about the revenues in the

8  GLRD, the group licensing revenue depository account.  Do you

9  remember that testimony?

10 **A.**   I do.

11 **Q.**   Please look at Exhibit 95 to the 2000 agreement between

12 the NFLPA and Players Inc.

13 **A.**    We're not looking at 53.  I had that in front of me.  I'm

14 sorry.  What exhibit do you want me to look at?

15             **MR. PARCHER:**  Oh.  It's 95.

16             **THE COURT:**  Okay.

17             **MR. PARCHER:**  Just moving the blackboard, Your Honor.

18 Is that all right?  Thank you.

19             **MR. HUMMEL:**  I can speed this up, Your Honor, if I

20 may approach with 95.

21             **THE WITNESS:**  Sure.

22             **THE COURT:**  Fine.  Go right ahead.

23             **MR. HUMMEL:**  Thank you, Your Honor.

24             **MR. KATZ:**  Your Honor, where would you like to place

25 this?

1          **THE COURT:**  What are you doing?

2          **MR. KATZ:**  He's going to be writing on it.

3          **THE COURT:**  Who is, the witness or --

4      **MR. PARCHER:**  Me.

5      **MR. KATZ:**  Mr. Parcher.

6          **THE COURT:**  Well, where do you want it to be?  Where

7  would you like it?

8          **MR. PARCHER:**  I would have been happy with it right

9  back there.

10          **THE COURT:**  You put it wherever you think the jury --

11  it's seen and convenient for you.

12          **MR. PARCHER:**  I'm not much of an artist.  My wife is,

13  but I'm not much of an artist.

14          **MR. KATZ:**  Is that okay?

15          **THE COURT:**  That's fine.  You've got to write big

16  enough so the jury can see whatever you put on it.

17          **MR. PARCHER:**  I'll do the best I can.  I'm not trying

18  to be Picasso, just trying to sketch a little something on

19  there.

20  **BY MR. PARCHER:**

21  **Q.**    Okay.  Please direct your attention to paragraph 4(a)v.

22  It's highlighted up there.

23          (Document displayed.)

24          Number v is what we're referring to.  So it's (a),

25  and then down to v.  Do you see it?

1  **A.**    Yes.

2  **Q.**    You're with me, right?

3  **A.**    Yes.

4  **Q.**    Right.  Which discusses the fact that excluded from gross

5  licensing revenue is amounts received by retired players

6  pursuant to group licensing assignment or group licensing

7  rights.  Do you see that?

8  **A.**    I do.

9  **Q.**    That clause in the first instance is something that was

10  negotiated between the Players Association and Players Inc,

11  correct?

12          **THE COURT:**  I'm confused.  Maybe the jury is.  What

13  document are we even looking at?

14          **MR. PARCHER:**  We're looking -- we're looking --

15          **THE COURT:**  What exhibit number is it?

16          **MR. PARCHER:**  We're looking at Exhibit 95.

17          **THE COURT:**  95.  And what does the front page look

18  like?

19          **MR. PARCHER:**  I just pulled that page, so I'll have

20  to -- I believe it's the 2000 -- it's the 2000 PA/PI agreement.

21          **THE COURT:**  So this is between the Players

22  Association and --

23          **MR. PARCHER:**  Players Inc.

24          **THE COURT:**  Oh, I see.  Players Inc.

25          **MR. PARCHER:**  Right.

1          THE COURT:  All right.  In 2000.  All right.  So then

2     go to the --

3          MR. PARCHER:  Back to --

4          THE COURT:  Back to where you were.

5          MR. PARCHER:  Back to 4 -- back to the paragraph.

6     BY MR. PARCHER:

7     Q.   Now, that provision, "Excluding amounts received by

8     retired players pursuant to group licensing assignments of

9     group licensing rights" is something that was negotiated or

10    decided upon, in the first instance, by you and Mr. Upshaw to

11    put that clause in there, right?

12    A.   On advice of tax counsel, yes.

13    Q.   The tax counsel advised you to cut the retired players out

14    completely; is that what your position is, and you went along

15    with it?

16    A.   It was--

17    Q.   Yes or no, sir?

18    A.   The answer to that is yes.

19    Q.   So you and Mr. Upshaw, and your tax counsel, whoever he or

20    she may be, decided amongst yourselves to just remove any --

21    any monies at all that were received by retired players, to not

22    put it into the pool, right?  That was your decision?  "Your"

23    being the three of you.

24    A.   Well, there were others involved in that decision, but

25    yes.

1  **Q.**   But initially it was the three of you?

2  **A.**   Yes.

3  **Q.**   And then, you went up to your board, and with your advice

4  and the advice of your counsel, who was also their counsel,

5  they went along with it, right?

6  **A.**   They authorized this agreement.

7  **Q.**   I understand.  Based on the recommendation of the head of

8  the union and the number two person in the union, and the

9  general counsel of the union, correct?

10 **A.**   Well, I wasn't referring to the general counsel when I

11 said "tax counsel."  But, yes.

12 **Q.**   But also the general counsel's part of the thing?

13 **A.**   Yes.

14 **Q.**   Your lawyer, your lawyer is also the players' lawyer?

15 **A.**   I don't have a lawyer.

16 **Q.**   Your company's lawyer at the time, is also the players'

17 lawyer?

18 **A.**   Yes.

19 **Q.**   I mean, they're not bringing -- they're not bringing in

20 independent counsel of their own.  They're relying on the

21 union's lawyer for advice, correct?

22 **A.**   The "they" in that sentence?

23 **Q.**   Is the so-called persons who ratified what you and

24 Mr. Upshaw and your tax counsel decide.

25 **A.**   You mean, the Board of Player Representatives?

1    Q.    Yes.

2    A.    The Board of Player Representatives had access to outside

3    as well as in-house counsel.

4    Q.    Excuse me.  But they take the advice of the inside counsel

5    in this situation, right?  They didn't go and hire somebody and

6    say "what should we do," did they?

7    A.    Actually, they heard presentations from outside counsel

8    about these matters.

9    Q.    Are you saying that outside counsel advised the players to

10   accept this paragraph v here?  Is that your testimony?

11   A.    No.  I'm saying this agreement was subject to advice by

12   outside counsel given to the board of player reps.

13   Q.    Now, please tell the jury -- oh.  Am I correct in saying

14   that this exclusion wasn't negotiated with or agreed to by

15   retired players who had signed GLAs?

16   A.    No, it wasn't.

17   Q.    And would you -- would you tell the jury again, so that

18   everybody is clear, what is "gross licensing revenue"?

19   A.    It is the -- it is the money that is related to the

20   license or sublicense of the license rights pursuant to the

21   terms of this agreement.  And this particular section is the

22   things that are excluded from gross licensing revenues.

23   Q.    Okay.  And please tell the jury, again, what is the GLRD,

24   or gross licensing revenue depository?

25   A.    I'm not sure what you're referring to.

1  **Q.**   Just tell them what it is.

2  **A.**   I don't recall.

3  **Q.**   What a GLRD is?

4  **A.**   I know what gross licensing revenue is.  I don't recall

5  what the gross licensing revenue depository was, without

6  refreshing my recollection.

7  **Q.**   Well, I'll refresh your recollection.  I'm assuming that

8  when you use the words "gross licensing revenue depository"

9  what you're talking about is the money that comes in from the

10 gross licensing revenue pool.

11 **A.**   If you're looking at a document --

12        **MR. KESSLER:**  Your Honor, now we're getting into

13 Counsel testifying.  The witness doesn't know what it is.

14        **THE COURT:**  The witness has never used the term

15 "depository."

16        **MR. KESSLER:**  Yes.

17        **THE COURT:**  You're the one using it.  Maybe you have

18 got some document somewhere, where the witness used it.

19        **MR. PARCHER:**  Well --

20        **THE COURT:**  I -- Mr. Kessler is right on this.

21        **MR. PARCHER:**  I don't think this is a controversial

22 question.

23        **THE COURT:**  Well, if you've got a document where

24 depository --

25        **MR. PARCHER:**  Leave out the word "depository."  Fine.

1  That's fine with me.  Let me cross it out of my little

2  artist...

3  **BY MR. PARCHER:**

4  **Q.**   When a dollar comes in from a company such as

5  Electronic Arts, Mr. Allen -- sorry to be standing so far away

6  from you.  Don't really know where to put this.

7           When a dollar comes in, 37 percent goes to the

8  actives, and 63 percent is kept by PA, NFLPA, and PI, correct?

9  **A.**   No.

10 **Q.**   No?

11 **A.**   No.

12 **Q.**   What happens?

13 **A.**   23 percent is kept by Players Inc, and 40 percent is kept

14 by the Players Association separately.

15 **Q.**   Okay.  All I'm saying, I'm combining the two for purposes

16 of my question.  The combination of PA and PI is 63 percent,

17 right?

18 **A.**   That's correct.

19 **Q.**   That's all I'm saying about that.  I'm not quibbling here.

20          Now, when the 37 percent is distributed to the active

21 players -- if everybody can read my writing.  "Active."

22          When the 37 percent is distributed to the active

23 players, the active players share and share that 37 percent.

24 Regardless of whether their names or likenesses were used on a

25 particular license, they get their share, right?

1   **A.**   Correct.

2   **Q.**   And the retireds, my clients, get zero, correct?

3   **A.**   Get zero from what?

4   **Q.**   My retireds --

5   **A.**   You mean, out of the gross licensing --

6   **Q.**   -- out of the gross licensing agreements.

7   **A.**   Do you mean out of gross licensing revenues?

8   **Q.**   Yes.  Correct.

9   **A.**   That's right.

10  **Q.**   Now, suppose, just suppose -- I know you don't agree with

11  this -- but just suppose that the jury were to decide that the

12  Electronic Arts agreements granted the rights to retired --

13  granted the rights to retired players.  Just assume that.  I

14  know you don't agree with that.  But just assume that that's

15  what the jury concluded.  They didn't agree with you, they came

16  to a different conclusion.

17          Then, it's true that a share of the money of the

18  gross licensing revenue would be due to the retired players,

19  correct?

20          **MR. KESSLER:**  Your Honor, inadmissible question for a

21  fact witness.  It's argument, closing argument or expert

22  testimony.

23          **MR. PARCHER:**  This is a question from my 8-year-old

24  grandson, not for a tax expert.

25          **THE COURT:**  I don't know about your 8-year-old

1  grandson.

2          **MR. PARCHER:**  Ti Diego is his name.

3          **THE COURT:**  Given that both sides -- Mr. Kessler, you

4  asked questions of this character.  I'm going to let the same

5  kind of questions, hypothetical questions be -- within reason,

6  be allowed.

7          So the jury has got to understand this is a

8  hypothetical situation.  But in order to illustrate the point

9  that Mr. Parcher is trying to make I'm going to allow the

10 question.

11         **MR. PARCHER:**  Thank you so much, Your Honor.

12         **THE COURT:**  All right.  What is the question?

13 **BY MR. PARCHER:**

14 **Q.**  Hypothetically -- since it is a jury question, I

15 believe -- hypothetically, the jury has concluded, Mr. Allen,

16 that when EA sends over its $25 million it's for active and

17 retired -- and such retired players that have signed the group

18 licensing agreement.

19         Then you would agree that when the money goes over to

20 the GLR, it's not fair any longer, it's not right any longer

21 for the retireds to get nothing, because it turns out they were

22 part of that license, right?

23 **A.**  Are you asking me whether that would be fair?  I am not --

24 I'm trying to understand the question.  There was a -- there

25 was a preface to that, and I'm trying to understand the precise

1  nature of the question.

2           **THE COURT:**  Okay.  Fairness doesn't matter.

3           What matters -- well, I don't know.  Fairness matters

4  in some abstract sense.  But we're talking about whatever the

5  contract provides.

6           **MR. PARCHER:**  Right.

7  **BY MR. PARCHER:**

8  **Q.**  It would be required of you -- what would happen in your

9  understanding, your understanding, if it turned out that when

10 EA paid $25 million, that the retired players who signed the

11 group licensing agreement were part of that license, they would

12 be entitled to a part of the $25 million, wouldn't they?  Yes

13 or no?

14 **A.**  No.

15 **Q.**  In other words, if the retired players -- your

16 understanding is that if the retired players were actually --

17 who signed group licenses were actually licensed to

18 Electronic Arts, nevertheless they would be entitled to nothing

19 of the $25 million?  Just yes or no.

20 **A.**  I don't know.

21 **Q.**  It's entirely possible that they might be entitled to

22 nothing?  Yes or no?

23 **A.**  I don't know.

24 **Q.**  Well, "don't know" means that it's possible that they

25 would have been entitled to nothing.

**A.**    No, it means I don't know.

**Q.**    Okay.

Did it ever enter into your consideration that if you said to Electronic Arts, when they wanted to use the names and likenesses of the retired players who had signed the vintage games, did it ever occur to you that you could have said -- that you could have said to them:

"Take it as part -- don't scramble their names and likenesses. We're not going to tell you to do that. Just put it in, and we'll then give the retired players a share of the $25 million"?

Did that ever enter into your consideration? Yes or no?

**A.**    Sure.

**Q.**    And you rejected it?

**A.**    I didn't reject it. I didn't have the authority to agree to that. It wasn't the arrangement that had been authorized by the active board of player reps.

**Q.**    And you never went to them and said:

"This isn't right, fellows. At this moment in time EA actually really does want to use these retired players. They've got vintage games. And unless we're going to remove their identity, unless we are going to take Herb Adderley and all the others, all 2100 of them out of existence, like they didn't play and they don't exist" --

1     **THE COURT:**  Mr. Parcher, this is a jury speech.

2   Please.

3     **MR. PARCHER:**  Yes.

4     **THE COURT:**  Save that for the closing argument.

5     **MR. PARCHER:**  Yes, sir.

6   **BY MR. PARCHER:**

7   **Q.**   In any event, it didn't enter into your consideration to

8   talk to whoever was in charge of you, along with Mr. Upshaw and

9   your general counsel, and say to them:

10     "The right thing to do here would be to put --

11   would be not to scramble these names," correct?

12   **A.**   We discussed that.

13   **Q.**   And -- in writing?

14   **A.**   I don't know.  I mean, I had the conversations with -- at

15   board of player rep meetings with players.

16   **Q.**   Right.  But you don't have any writing to that effect, do

17   you?

18   **A.**   I have no idea.

19   **Q.**   Okay.  And it's rejected.  It was rejected, right?

20   **A.**   That did not happen.

21   **Q.**   Okay.  And it's nevertheless your position, one, that you

22   did your best for the retireds?

23   **A.**   That's right.

24   **Q.**   And, two, that you had no conflict between the actives and

25   the retireds?

1  **A.**    That's true.

2  **Q.**    Okay.  Let's turn to the Duff & Phelps exhibit, if we may,

3  Exhibit 93.

4  **A.**    93?

5  **Q.**    Before we get to that -- oh, sorry.  Go ahead an pull it.

6  I want to ask you this, sir:  Did you ever favor the interests

7  of the licensees over the interests of the players that you

8  represented?  Yes or no?

9  **A.**    No.

10  **Q.**    Okay.  Let's go to 93, if you will.

11         93, page 6.  Let's establish what it is we're talking

12  about.

13         This is what you called, when your lawyer was

14  questioning you, the independent appraisal, where an

15  independent body of accountants said good for the 63/37 split,

16  right?

17  **A.**    No.

18  **Q.**    That's not what the Duff & Phelps report is?

19  **A.**    No, it doesn't say that.  It says 37 percent to the active

20  players, 23 percent to the for-profit entity, Players Inc, and

21  40 percent to the NFL Players Association.

22  **Q.**    I don't understand something.  I use the number 63 between

23  you and PA and PI.  That is 40/23, isn't it?  63 percent --

24  **A.**    Yes.

25  **Q.**    -- to PA/PI?

1  A.   The math, that is correct.  You asked me if it was in the

2  Duff & Phelps report.  I was just pointing out that the Duff &

3  Phelps report analyzed a split between active player share,

4  union retention, and company retention.

5  Q.   I'd like to highlight the language of -- this is in the

6  section on page 6, called "player royalties."  And it's the

7  one, two, three, four, five, six, seven, eighth --

8  A.   I'm not there yet.  Give me one second, please.

9       Thank you.

10 Q.   It's going to get highlighted up there.  Begins with "This

11 judgment."

12      Do you see that?  Just read the sentence for a

13 minute.  Take your time.

14      MR. PARCHER:  Keep going.  Down to the word

15 "Payments," right.

16      (Document displayed.)

17      THE WITNESS:  Okay.

18 BY MR. PARCHER:

19 Q.   Now, first of all, let me understand something.  These

20 independent accountants, Duff & Phelps, were hired by Players

21 Inc and the NFLPA, right?

22 A.   That's correct.

23 Q.   They weren't hired by some independent blue ribbon panel

24 who selected them for their objectivity, right?

25 A.   They were not hired by a blue ribbon panel.

Q.   Right.  They were hired by the defendants, right, who

had -- who had determined amongst themselves that 63 percent

would be kept by them, 37 percent would be given to the

players.  And now you were hiring somebody to see if they would

say "good" for what you had decided or not, right?

        Yes or no, sir?

A.   No, that's not exactly how it worked.

Q.   No?  You weren't -- you weren't hiring them to examine the

decision that you and Mr. Upshaw had made?  Isn't that why you

called it a so-called "independent third party"?

A.   We -- we asked them to advise us on the appropriate split.

Q.   But you had already determined 37 percent, first, and then

you went out and got the independent advisors, correct?

A.   I believe that we -- we suggested to them that we had --

that we had arrived at a tentative conclusion, but we were

interested in knowing from them both whether they had an

alternative suggestion and whether they thought the tentative

conclusion that we had drawn was appropriate.

Q.   Do you have a writing where that's what you said to them?

A.   No.  I was there when I said that to them.

Q.   Right.  But you don't have a writing, just in case

somebody were to say, "Gee" --

A.   I have no idea.  This was 13, 14 years ago.

Q.   Okay.  But one thing, you have no idea what the situation

was 13 or 14 years ago?

1  **A.**    I'm sorry?

2  **Q.**    You have no idea what the situation was 13 or 14 years

3  ago?

4  **A.**    Sure I do.  You asked me if there was a piece of paper

5  that said that on it.  And I said without searching -- I meant

6  without searching the file, I don't know.

7  **Q.**    Okay.  In any event, the independent Duff & Phelps knew

8  when you hired them that 37 percent was your tentative number,

9  subject to their approval, right?

10 **A.**    That's essentially correct.

11 **Q.**    Yes.  And Duff & Phelps was paid a substantial amount of

12 money for their opinion?

13 **A.**    They were paid their fee.

14 **Q.**    I understand.  Was that substantial or was it a dollar and

15 a quarter or something like that?

16 **A.**    It was -- they are an independent firm with a very -- at

17 the time, with a very established relationship.

18 **Q.**    Excuse me, sir?

19 **A.**    Established reputation.  And they were paid what the

20 marketplace value for that work was.

21 **Q.**    Which was a substantial fee?

22 **A.**    I don't remember the amount.

23 **Q.**    Okay.  But it was substantial.  Don't you?  You remember

24 that.

25 **A.**    If you would tell me what you mean by "substantial."  It

1    was a significant number.

2    **Q.**    Whatever you mean by "substantial."  Was it substantial?

3              **THE COURT:**  No.  No.  Move to a new topic.

4              **MR. PARCHER:**  Yes, sir.

5              **THE COURT:**  We are wasting the time of the jury.

6              **MR. PARCHER:**  I'm --

7              **THE COURT:**  Let's bring it to a close.

8              **MR. PARCHER:**  Here we go.  Here we go.

9    **BY MR. PARCHER::**

10   **Q.**    Now, the Duff & Phelps said:

11              "This judgment balances the business need to pay

12   players sufficient amounts to motivate their continued granting

13   of group licensing rights to the NFLPA and indirectly to

14   Players Inc, with the desire not to make excessive payments."

15             So aren't they saying to you:

16             Looking at that 37 percent, we think that you're

17   paying them no more than you have to so that they -- so that

18   they'll continue to be motivated to sign GLRs, and you don't

19   need to pay them one penny more.  These guys will do it for

20   37 percent.  You don't have to give them 40, 50, 60, 70, 80 or

21   90.

22             Isn't that what Duff & Phelps, the independent

23   accountants that you hired and paid, isn't that what they say

24   in that sentence?

25   **A.**    I wouldn't put it that way.

1    **Q.**   No?   Okay.

2              **THE COURT:**   We're going to need to take a break, and

3    I would like to finish this witness before the break.

4              **MR. PARCHER:**   I think I can.   I think I can.   Give me

5    a moment.

6              **THE COURT:**   The court reporter needs a break.   She's

7    telling me she needs a break, so please bring it to a close.

8              **MR. PARCHER:**   Okay.   Give me just a moment.

9              **THE COURT:**   Are you going to have any redirect?

10             **MR. KESSLER:**   One minute, Your Honor.   I will stay to

11   my minute.

12             **MR. PARCHER:**   I guess we need to take break, Your

13   Honor.

14             **THE COURT:**   All right.   15-minute recess.   Please

15   remember the admonition.

16             **THE CLERK:**   All rise.

17             (Thereupon, the jury left the courtroom.)

18             **THE COURT:**   The witness can take a 15-minute break.

19             Anything the lawyers need me for?

20             **MR. KESSLER:**   No, Your Honor.

21             **MR. PARCHER:**   No, Your Honor.

22             (Recess taken from 9:18 to 9:37 a.m.)

23             **THE COURT:**   Thank you.   Be seated, please.

24             Mr. Parcher.

25             **MR. PARCHER:**   Yes, Your Honor.   Two or three

1   questions.  I know it's hard to believe.  Two or three

2   questions, and I'm done.

3          **THE COURT:**  I'll do this.  I'll go one, two, three.

4   See if you can really do it.

5          **MR. PARCHER:**  Okay.  Okay.  My wife is in the

6   courtroom, so I'll give it my best shot.

7          **THE COURT:**  Where is she?

8          **MR. PARCHER:**  Joycie.

9          **THE COURT:**  Ms. Parcher, how are you?

10         **MR. PARCHER:**  It's her birthday.  It's her birthday,

11  so...

12  **BY MR. PARCHER:**

13  **Q.**   Mr. Allen, very briefly, sir.  Turn your attention to the

14  two -- I'm calling them "brochures" now; is that right, the two

15  brochures?

16  **A.**   Sure.

17  **Q.**   If you have a better word.  I don't mean to be limiting.

18  One is 2262 and one is 2259.

19  **A.**   20 --

20  **Q.**   2262?

21  **A.**   I've got a lot of them.

22  **Q.**   I'll just show you.

23         **MR. PARCHER:**  May I approach, Your Honor?

24         **THE WITNESS:**  That might be quicker.

25         **MR. PARCHER:**  Thanks.

1    BY MR. PARCHER:

2    Q.   You have these in there, don't you?

3    A.   Somewhere.

4            MR. PARCHER:  Oh, my.

5            MR. HUMMEL:  I have an extra set, Your Honor.  May I,

6    to save time?

7            THE COURT:  Sure.

8            MR. HUMMEL:  2262.

9            THE COURT:  These are in evidence already?

10           MR. PARCHER:  Yes, they are.  Mr. Kessler put them

11   in, Your Honor.

12   BY MR. PARCHER:

13   Q.   Ready?

14   A.   Yes.

15   Q.   Now, neither of these documents mentioned that you were

16   trying to license the rights of all 2,062 players as part of

17   the same package, correct?

18   A.   Without reading them, I don't -- I don't know.  But that

19   sounds correct.

20   Q.   Yes.  And it's also true that none of these documents

21   addresses retired players only, correct?

22   A.   Uhm, that's correct.

23           MR. PARCHER:  I have no further questions of this

24   witness.  Two.

25           THE COURT:  You did what you said you were going to

1  do.  Thank you.

2          **MR. PARCHER:**  Yes, sir.  I am a man of my word, sir.

3          (Laughter)

4          **THE COURT:**  Thank you.  Go ahead.

5          **MR. KESSLER:**  Your Honor, let's see if I can do that.

6                        <u>**RECROSS EXAMINATION**</u>

7  **BY MR. KESSLER:**

8  **Q.**  This chart over here, the 63 percent, the 37 percent --

9  sorry.  Withdrawn.

10          This chart, the 40 percent to the union, the

11 23 percent to PI, which Mr. Parcher aggregates as 63 percent,

12 and the 37 percent to the active players, that circle, is any

13 of that money retired player money?

14 **A.**  No.

15 **Q.**  What money is that?

16 **A.**  That's the active player licensing money.

17 **Q.**  Okay.  Mr. Parcher put up an exhibit that said that

18 retired player money was excluded from this circle.  Do you

19 recall that from the GLR pool?

20 **A.**  Yes.

21 **Q.**  Now, where did any retired player money go?

22 **A.**  To the retired players.

23 **Q.**  If -- when it goes to the retired players, does any of

24 this go to the Players Association?

25 **A.**  No.

1  **Q.**   Does any of it go to the active players?

2  **A.**   No.

3  **Q.**   So is it better or worse for the retired players to stay

4  out of the GLR pool for their money?

5        **MR. PARCHER:**  Objection.

6        **THE WITNESS:**  Well --

7        **THE COURT:**  Overruled.

8        **THE WITNESS:**  It's better because they get all of it.

9  **BY MR. KESSLER:**

10 **Q.**   They get all of it if it's out of the GLR pool?

11 **A.**   Right.

12 **Q.**   And that's what the agreement did?

13 **A.**   Correct.

14 **Q.**   Now, you also got asked a question about the ESPN and the

15 $25 million payment.  First of all, the $25 million payment

16 was --

17       **MR. GREENSPAN:**   EA.

18 **BY MR. KESSLER:**

19 **Q.**   The EA payment --

20       **THE COURT:**  You said "ESPN."

21       **THE WITNESS:**  You said "ESPN."

22       **MR. KESSLER:**  Excuse me.

23       **THE COURT:**  Start all over.  I think you misspoke,

24 and it's kind of confusing.

25       Start all over with a fresh question.

1              **MR. KESSLER:**  Sorry.  I apologize.  Trying to go too

2  quickly.

3  **BY MR. KESSLER:**

4  **Q.**   The EA license agreements, there is a minimum royalty

5  payment in 2006-2007, that period of time, of $25 million per

6  year, correct?

7  **A.**   Yes.

8  **Q.**   Was that agreed to for active player rights, retired

9  player rights or both?

10  **A.**   Just active player rights.

11  **Q.**   Did you discuss with EA whether they would be willing to

12  pay any additional money for all the retired player rights?

13  **A.**   Yes.

14  **Q.**   Were they willing to do that?

15  **A.**   Absolutely not.

16  **Q.**   Mr. Parcher suggested you could give away the rights of

17  the retired players for free to EA just by saying:

18              "Don't pay me anymore.  Include them in the 25."

19              Mr. Allen, if you gave away retired player rights for

20  free to a licensee, would you have any money to give to the

21  retired players?

22  **A.**   No.

23  **Q.**   Mr. Allen, if you gave away the retired player rights to

24  EA for free, would any licensee in the future ever pay for

25  something you gave away for free?

1  **A.**    No.

2  **Q.**    Thank you, Mr. Allen.  I have no further questions.

3          **MR. PARCHER:**  At the risk of an historic first, I

4  have no questions of this witness.

5          **THE COURT:**  Thank you.  Just one second.

6          Before the witness is excused, I want to make sure I

7  didn't goof up on a document.  I said 1056 was received in

8  evidence, but Dawn is asking whether or not it was supposed to

9  be a different number.

10         **MR. KESSLER:**  Your Honor, I don't know which one of

11  us goofed up, so I'll take responsibility.  But it was 2056.

12  2056.

13         **THE COURT:**  2056?

14         **MR. KESSLER:**  Yes, not 1056.  That's the compilation.

15         **THE COURT:**  2056.  All right.  I allowed in 1056, so

16  that's out.  Back to not being admitted.  And 2056 is the one

17  that's received.

18         **MR. KESSLER:**  Thank you, Your Honor.

19         **THE COURT:**  All right.  May the witness be excused

20  and discharged, not subject to recall?

21         **MR. PARCHER:**  Yes, sir.

22         **MR. KESSLER:**  Yes, Your Honor.

23         **THE COURT:**  All right.  You're free to go.  You are

24  not subject to recall.

25         Thank you, Mr. Allen.

1          **THE WITNESS:**  Thank you, Your Honor.

2          **THE COURT:**  Next witness.

3          **MR. HUMMEL:**  Your Honor, plaintiffs call Bruce Laird.

4          **THE COURT:**  Bruce Laird.

5          Does our camera work?

6          **THE CLERK:**  Yes, it should be working.

7          **THE COURT:**  Do what?

8          **THE CLERK:**  It should be working.

9          **THE COURT:**  All right.

10         Are you Mr. Laird?

11         **THE WITNESS:**  Yes.

12         **THE COURT:**  Please come forward.  If you would stand

13    there and raise your right hand, we'll swear you in now.

14         (Thereupon, the witness was sworn.)

15         **THE WITNESS:**  I do.

16         **THE CLERK:**  Thank you.  Can you please be seated on

17    the witness stand.

18         **THE COURT:**  Make yourself comfortable.  And we need

19    to take your photograph so they can be displayed during the

20    closing arguments so the jury can remember who was who.

21         Did it work?

22         **THE CLERK:**  Yeah, a little blurry just because I

23    moved.  Let me try it one more time, to make sure.

24         **THE WITNESS:**  Do you want to get my good side?

25         **THE CLERK:**  Sure.  Thank you.  Okay.  Perfect.

1    **THE COURT:**  Adjust the mic so it catches your voice

2  and make sure everyone on the jury can hear you loud and clear.

3    **THE WITNESS:**  Okay.

4    **THE COURT:**  All right.  Go ahead, Mr. Hummel.

5    **MR. HUMMEL:**  Thank you, Your Honor.

6    Good morning, ladies and gentlemen.  My name is Chad

7  Hummel.  I will be one of the lawyers, as you know,

8  representing the plaintiffs.

9                    **BRUCE LAIRD**,

10  called as a witness for the Plaintiff herein, having been first

11  duly sworn, was examined and testified as follows:

12                    **DIRECT EXAMINATION**

13  **BY MR. HUMMEL::**

14  **Q.**   Good morning, Mr. Laird.

15  **A.**   Good morning.

16  **Q.**   Would you please state your full name for the record.

17  **A.**   Bruce Allen Laird.

18  **Q.**   Mr. Laird, where do you currently reside?

19  **A.**   Baltimore, Maryland.

20  **Q.**   You flew here from Baltimore, did you?

21  **A.**   Yes.

22  **Q.**   How are you currently employed?

23  **A.**   I'm employed by Advanced Medical Management.  One of their

24  divisions is called Multispecialty Healthcare.  I represent

25  doctors, chiropractors, and a surgery center, along with an MRI

1  facility, locally in the Baltimore area.

2  **Q.**   Mr. Laird, are you a former NFL player?

3  **A.**   Yes, I am.

4  **Q.**   You're retired?

5  **A.**   Yes, I am.

6  **Q.**   What years did you play in the NFL?

7  **A.**   1972 to '81, as a Baltimore Colt; 1982 to '83 as a San

8  Diego Charger; and then, I went on to play in the USFL -- not

9  with the NFL, but the USFL -- in '83 and '84.

10 **Q.**   So the Colts and the Chargers in the NFL; is that right?

11 **A.**   Yes, sir.

12 **Q.**   What position did you play?

13 **A.**   I played strong safety.

14 **Q.**   Is strong safety an offense or defensive position?

15 **A.**   It's a defensive position.

16 **Q.**   Could you briefly describe for the jury what the strong

17 safety's responsibilities are in the game?

18 **A.**   Yes.  Strong safety more than likely always goes to the

19 strength of the formation.  So if there's a tight end and two

20 wide receivers and two backs in the game, I would line up on

21 the side of the tight end.

22         If there was two wide receivers, and they were on the

23 same side, I would probably go to the two wide receivers' side,

24 which is considered the strength of the formation.

25         My job typically had -- I had to take care of run

1  support first, and then play pass.  So I was a little bit of a

2  tweener between the running game and the passing game.

3          And also in our system the strong safety called out

4  defenses to our group in the backfield and our linebackers.

5          So I was like a team captain.

6  **Q.**   And would you -- would you characterize that position as a

7  defensive back?

8  **A.**   Yes.

9  **Q.**   So Mr. Adderley here was a cornerback.  He's also a

10  defensive back, but a different position, right?

11  **A.**   Yes, he was.

12  **Q.**   His job generally was what, generally, as a cornerback?

13  **A.**   Those gentlemen were told to clamp down the wide

14  receivers.

15          In Herb's situation, he would probably be put on the

16  best receiver that team had, and his job was to make sure he

17  didn't hurt us.

18  **Q.**   All right.  Now, when were you playing for the Baltimore

19  Colts from 1972 to 1982 -- nine years with the same team,

20  right?

21  **A.**   Ten.

22  **Q.**   Ten years.  Ten seasons.

23          Did you have a number?

24  **A.**   Yes.

25  **Q.**   What was your number?

**A.**   Number 40, for all ten years.

**Q.**   Was there a particular Baltimore Colts team that had more success than others?

**A.**   1975, 1976 and 1977.  We were division champions.

**Q.**   Focus on the 1977 team.  Did that have any particular fame in the Baltimore area, the 1977 Colts team?

**A.**   Yes, it did.  I think we had one of our finest years.  I think we finished 11 and 3.  There were 14 games in that season.  And we hosted the first division playoffs in Baltimore at Memorial Stadium in 1977, to the Oakland Raiders.

**Q.**   And did you win that game?

**A.**   No, unfortunately we did not.

**Q.**   Did you have a good game?

**A.**   Had a heck of a game.

**Q.**   But as they used to say, if you don't win the game, it doesn't matter, right?

**A.**   No.

**Q.**   Okay.  So --

**A.**   I still look at the film, and it still doesn't change.  We still lost the game.

**Q.**   And you played in that game the Oakland Raiders, which is a local team here, right?

**A.**   Yes.

**Q.**   They had a famous quarterback on that team, right?

**A.**   Ken Stabler.

1  **Q.**   Did you make an interception in that game?

2  **A.**   Yes, I did.

3  **Q.**   Now, coming into the pros, you came in out of college,

4  right?

5  **A.**   Yes, sir.

6  **Q.**   Where did you go to college?

7  **A.**   American International College.

8  **Q.**   And they have a football team?

9  **A.**   I get asked that a lot.  Yes, they did.

10 **Q.**   Were you drafted out of college?

11 **A.**   Yes, I was.

12 **Q.**   And how does the draft work, generally, for the ladies and

13 gentlemen of the jury?

14 **A.**   From what I understood, that was the only way you could

15 get into the league, unless you become a free agent.  Teams,

16 because of the way they finished in the league, have a draft

17 choice schedule.  And then, you're picked.

18        It will go like the worst team, which could be

19 Cincinnati Bengals this year.  If they finish the way they're

20 playing, they'll probably get their first pick in the draft.

21 And then it goes each team after that.

22        I was the sixth-round pick, approximately 168th

23 player taken.

24 **Q.**   168th player out of college that year, which was 1970 --

25 **A.**   '72.

1    Q.    '72.

2          All right.  And were you ever selected as an All Pro?

3    A.    Yes, I was.

4    Q.    What does that mean?

5    A.    That means that by your peers and the coaching staff at

6    that time -- it's changed now -- but your peers, which is all

7    professional football players, usually by position, and their

8    coaching staff will pick players that they deem are the best of

9    the best.

10   Q.    So let me ask you this:  Did the Colts over the years have

11   a special relationship with the City of Baltimore?

12   A.    Oh, incredible.

13   Q.    Can you describe that for the jury?

14   A.    Uhm, it would be like grandparents and fathers and sons

15   going to games.  There would be talk about you could never get

16   a ticket to a Colt game unless someone had passed away and

17   given it to you.  We probably had the largest sellouts for

18   years and years over 12 years of sellout game in, game out.

19         The love affair with the Baltimore Colts started in

20   1958, which is the greatest game ever played.  Started in that

21   year and continued in '59, and right on through up until

22   probably the mid '70s.

23   Q.    And when you first joined the Colts, they had a pretty

24   famous quarterback on the team, right?

25   A.    Yes, sir.

1   Q.   Who was that?

2   A.   John Unitas.

3   Q.   And John Unitas is now, unfortunately, deceased.  But can

4   you describe what Mr. Unitas meant to the City of Baltimore?

5   A.   Uhm, icon.  Almost, you know, he was idolized there.  He

6   played --

7          MR. KESSLER:  Your Honor, I just have an objection to

8   relevance.  Mr. Unitas is not a class member.  I don't

9   understand how this connects to anything.

10          MR. HUMMEL:  He has made an issue of famous players

11   versus nonfamous players, Your Honor.

12          THE COURT:  All right.  Overruled.

13          Please go ahead.

14          THE WITNESS:  And he made his home in the Baltimore

15   area and stayed there and raised his family, went to church.

16   You know, had everything.  Was part of the Baltimore community.

17   BY MR. HUMMEL:

18   Q.   Mr. Unitas was a very famous player in Baltimore, right?

19   A.   No doubt.

20   Q.   And throughout the entire NFL, right?

21   A.   Absolutely.

22   Q.   In fact, he transcended the NFL, didn't he?

23   A.   Absolutely.

24   Q.   So on the same team when you came in and Mr. Unitas was

25   this quarterback, were there third-string tackles?

1  **A.**   Yes, sir.

2  **Q.**   Were there guys who just weren't known?

3  **A.**   Yes, sir.

4  **Q.**   And, I mean, not known even in Baltimore, maybe?

5  **A.**   Probably not.

6  **Q.**   And during the time that you were an active player, did

7  you understand that licensing revenues were divided among

8  players?

9  **A.**   I wasn't really sure about the licensing revenues.  I did

10  have an understanding that when we signed on as union members

11  we gave the union the right to use our images for the trading

12  card situation.

13  **Q.**   Right.  And when those funds were divided at the time, if

14  they were -- were they divided at the time?

15  **A.**   I'm not really sure.

16  **Q.**   Okay.

17  **A.**   I would assume they were.

18  **Q.**   Okay.

19  **A.**   But I don't know in what detail.

20  **Q.**   Did the third string tackle on a group license get paid

21  the same as a Johnny Unitas?

22  **A.**   I wouldn't know, because I don't know where those funds

23  went.

24  **Q.**   Okay.  The league or the union didn't tell you how those

25  were divided?

1    **A.**    Not really.

2    **Q.**    Okay.  So you -- you were a member of the union when you

3    were an active player, right?

4    **A.**    Yes, I was.

5    **Q.**    And are you currently a member of the NFLPA?

6    **A.**    Yes, I am.

7    **Q.**    All right.  How is it that a retired player is a member of

8    the NFLPA?

9    **A.**    They started a division in 1984 for retired players, and

10   have a retired players class.  I think there's five members of

11   the union have full-time jobs dealing with retired players'

12   issues.

13   **Q.**    And you're one of those players who over the years has

14   dealt with retired player issues since you've been retired?

15   **A.**    Yes, I have.

16   **Q.**    And do you pay dues to be a member?

17   **A.**    Yes, we do.

18   **Q.**    Are you what's called a card-carrying member of the NFLPA?

19   **A.**    Yes, I am.

20   **Q.**    Is there, in fact, a card?

21   **A.**    Yes, there is.

22   **Q.**    Do you have it?

23   **A.**    Yeah.  Keep it with me all the time.  I get 10 percent off

24   on Hertz.

25            (Laughter)

1          Here it is.

2   **BY MR. HUMMEL:**

3   **Q.**   What's it say?

4   **A.**   Excuse me.  I have to use these cheaters every once in a

5   while now that I've gotten a little older.

6          "National Football League Players Association member.

7   Bruce Laird.  Expiration date."

8          Nice card.

9   **Q.**   Does it say anything on the bottom?

10  **A.**   "Past, Present and Future."  I expire 4/2/09.

11  **Q.**   What does that mean to you, sir, "Past, Present and

12  Future"?

13  **A.**   Well, it means that the union is going to take care of

14  everything from the past, great history of our game; to the

15  present, the active players; and for the future of the game and

16  the players.

17  **Q.**   All right.  So put the card aside for a minute, sir, and

18  let me ask you about the time that you were an active player.

19          Did you have any special role with the -- within the

20  union as an active player?

21  **A.**   Well, my time as an active player, myself and my family

22  went through two strikes.  We went on strike in 1974.  And we

23  also went on strike in 1982.  Both of those times I put my

24  career and family on the line in not getting paid to strike for

25  what our union believed.

1          And so I was very much a part of the union in my

2    playing days.

3    **Q.**   Did you have a special role in representing the Colts with

4    the union at any point?

5    **A.**   In 1981, I was elected player representative for the

6    Baltimore Colts.

7    **Q.**   What is a player representative?

8    **A.**   It's called the board of active player reps.  There's 32

9    of them, so each team has one.  And at the time we didn't have

10   32 teams.  We were 28.  And it was 28 player reps and an

11   alternate player rep, another gentleman that was voted in.  And

12   in my years that probably wasn't a very good position to have.

13          It's a lot different in the '70s and '80 than it is

14   now.  Player reps sometimes didn't have a long stay at the team

15   you were with at the time.

16   **Q.**   When -- your job was to act as effectively an interface

17   between the union and the team; is that right?

18          **MR. KESSLER:**  Objection.  Leading, Your Honor.

19          **THE COURT:**  Well, that is leading, but that sounds

20   preliminary enough.

21          So try not to lead.  But you can lead on preliminary

22   matters, but not on anything that's of importance to the case.

23          **MR. HUMMEL:**  Thank you, Your Honor.

24          **THE WITNESS:**  Uhm, I would say I was their

25   representative.  In other words, I would get input from our

1   players, and then be the conduit between our players and what

2   they're looking for and what the union wants to do or how they

3   want to present it, and so on and so forth.

4   **BY MR. HUMMEL:**

5   **Q.**   And when you were a player rep, did you go to any

6   meetings?

7   **A.**   Yes, I did.

8   **Q.**   Could you describe what those meetings were?

9   **A.**   Player rep meetings for the board of player reps were held

10  at a very nice location.  We always went to Hawaii.  We went

11  out there for five to seven days.  Can't remember quite -- I

12  think it was five -- yeah, five or seven days.

13         I attended as a player rep.  I was only a player rep

14  for two years.  I attended two of those meetings in Maui or one

15  of the islands, in 1981 and 1982.

16  **Q.**   And at those meetings, can you describe, generally

17  speaking, what happened?

18  **A.**   Uhm, those meetings were a combination of work and

19  enjoyment.  We worked from 8:00 in the morning until 12:00.

20  And then, after that it was either golf, tennis, pool, or

21  cocktail parties, dinners.

22  **Q.**   And when you say you "worked," what was the work that was

23  done?

24  **A.**   Well, the work was we would sit in the meetings, and the

25  union would present certain -- certain agenda items.

1          Obviously, in 1981 we were very -- it was very

2    stressful because we were thinking about going on strike.  So

3    we were talking about strike issues, mostly.  You know:  "Can

4    we stay together?  What should be our issue?"

5          Our issue in 1982, ladies and gentlemen, was

6    percentage of the gross revenues, which was unheard of.  In

7    fact, it was called socialism back then.  But right now that's

8    what the league has done.  The league presents 60 percent of

9    their gross revenues to active players.

10          In '82 we struck on that.  For the most part we also

11   wanted free agency, some other items.  But that was the part

12   that we were dealing with in 1981 and '82.

13          **MR. KESSLER:**  Your Honor, I am going to have to

14   continue.  Relevance, the jury's time, talking about strikes in

15   '82.

16          **THE COURT:**  What's the relevance?

17          **MR. HUMMEL:**  I'll tie it up in one question, Your

18   Honor.

19          **THE COURT:**  All right.  Overruled.

20          **MR. HUMMEL:**  Thank you.

21          **THE COURT:**  Go ahead.

22   **BY MR. HUMMEL:**

23   **Q.**   Did you consider yourself a union man?

24   **A.**   Absolutely.

25   **Q.**   What does that mean to you, to be a union man?

1   **A.**    Part of the brotherhood.  Part of the group.  It wasn't

2   just the stars.  I mean, you know, the union represented all

3   football players.  All of us.

4   **Q.**    Did you have any power vis-a-vis the league or the owners

5   if you didn't band together?

6   **A.**    Not much.  Again, it was a different era, a different

7   time.  It was very difficult to fight the monopoly of the NFL

8   owners.

9   **Q.**    All right.  And at some point, sir, you retired, right?

10  **A.**    Yes, sir, I did.

11  **Q.**    Okay.  And what was the reason you retired?

12  **A.**    Age.

13  **Q.**    Okay.  Look, if you would, please, at Exhibit 1224.

14  There's a stack in front of you, and the labels are on the

15  Manila folder.

16  **A.**    1224?

17  **Q.**    1224.

18  **A.**    Okay.

19  **Q.**    Do you recognize that document, Mr. Laird?

20  **A.**    Yes.

21  **Q.**    Is your signature on the document?

22  **A.**    Yes, it is.

23  **Q.**    Can you tell the ladies and gentlemen of the jury what it

24  is?

25  **A.**    It is an NFL Players Association retired players group

1  licensing form.

2          **MR. HUMMEL:**  Your Honor, move 1224.

3          **MR. KESSLER:**  No objection.

4          **THE COURT:**  Received.

5          (Trial Exhibit 1224 received in evidence.)

6          **MR. HUMMEL:**  Could I have 1224 displayed, please?

7          (Document displayed.)

8  **BY MR. HUMMEL:**

9  **Q.**   Mr. Laird, 1224 is a contract that you received from the

10 league; is that right?

11 **A.**   Yes, it is.

12 **Q.**   Can you describe how you received it?

13 **A.**   Uhm, got it through the mail.

14 **Q.**   Was there any letter with it, do you recall?

15 **A.**   I do not recall if there was a letter with it.  But I -- I

16 get a lot of TouchBacks.  They're our weekly -- or not

17 weekly -- monthly or quarterly newspapers about retired players

18 and other things going on.

19 **Q.**   You decided to sign this form, right?

20 **A.**   Yes.

21 **Q.**   Can I ask you why?

22 **A.**   Well, it looked like it was a contract between the NFLPA

23 and retired and active players that there was some group

24 licensing agreements that could be had.  We would share in the

25 revenues.

1  Q.   What did you think you were providing to the NFLPA when

2  you signed this?

3  A.   I was providing my image and who I am as a football

4  player.

5  Q.   Was there anything of value, other than that, that you

6  understood you were giving them?

7  A.   Oh, absolutely.

8  Q.   What's that?

9  A.   Well, my heart and soul as a player, and the fact that I

10 was giving them the right to be my agent.

11 Q.   What does the retired player group licensing authorization

12 mean to you?

13 A.   Just exactly as it states, group licensing authorization.

14 Q.   Did you have any understanding that other retired players

15 would be signing this, as well?

16 A.   Oh, absolutely.

17 Q.   How did you form that understanding?

18 A.   Well, because we had talked about it occasionally, and we

19 gathered together as retired players in Baltimore, so --

20 Q.   Did you have any understanding, one way or the other,

21 about whether having a number of retired players sign these

22 forms conferred a benefit on the union?

23 A.   I would just assume it would.  Just like anything, power

24 in numbers.

25 Q.   At the time, what -- did you think that at the time, power

1   in numbers?

2   **A.**    Probably not right away, no.

3   **Q.**    Okay.  Did you -- did you come to understand at some

4   point, as you were in the program, that there was power in

5   numbers for these group licensing forms signed in the

6   thousands?

7   **A.**    Oh, absolutely.

8           **MR. KESSLER:**  Objection, Your Honor.  It's leading,

9   and he said he didn't have any understanding at the time.

10          **THE COURT:**  It is leading.  Please don't lead the

11  witness on important matters.

12          Both sides have done a lot of leading.  Mr. Kessler

13  has done the same thing.

14          And you on the jury can take into account -- if all

15  the lawyer is doing is asking a question and expecting the

16  witness to say "yes, yes, yes, yes," then take that into

17  account in evaluating the strength of the testimony.

18          This goes to both sides.  The ground rule here is

19  it's okay to speed things along and lead unless you get up to

20  the important parts.  Then, you should say:  "What happened

21  next?"

22          Let's hear from the witness as opposed to the lawyer

23  testifying.

24          **MR. HUMMEL:**  Fair enough, Your Honor, appreciate it.

25          **THE COURT:**  Both sides need to learn this and move

1  the right way.

2          **MR. KESSLER:**  Your Honor, if I may, maybe you should

3  explain to the jury leading on cross and direct, because they

4  may be confused about that.

5          **THE COURT:**  All right.  That's a fair point.  I know.

6  I am going to make that point.

7          Please have a seat, Mr. Parcher.

8          Whenever the witness is friendly to the lawyer, like

9  in this case Mr. Laird is called by this side.  He's a member

10  of the class.  He's affiliated with the lawyer who's asking the

11  questions.  That's when you're not supposed to lead, because

12  there's too big a risk that the lawyer will just tell --

13  basically lead the witness into saying whatever the lawyer

14  wants.  That's why we have a rule against leading.

15          Whenever it's on cross-examination, though, there is

16  no such -- there is no such friendship involved or identity or

17  affiliation.  And, in fact, we encourage the lawyers to ask

18  leading questions so that they can zero in on the point that

19  they're trying to make and see if the witness will admit it.

20          Now, a little further wrinkle I've got to give is

21  when Mr. Parcher was asking questions of Mr. Allen, he was

22  adverse to Mr. Allen, so it's perfectly okay for him to lead

23  then.  It was not okay for Mr. Kessler to lead that witness

24  except on preliminary matters.

25          But so few objections were ever made on this point.

1    But I'm tell you on the jury that if you hear a bunch of

2    leading questions you ought to step back and ask yourself:

3    Who's really testifying here?  Is it the witness or is it the

4    lawyer?

5              A leading question is one that suggests the answer.

6    So I'm urging the lawyers -- there's a lot more leading going

7    on in this trial than most trials.

8              I want you to try -- this witness right here is a

9    very able person.  He doesn't need to be led.  He can testify

10   without the benefit of leading.

11             It's okay to lead on preliminary matters, even when

12   it's your witness.

13             All right.  Go ahead.

14             **MR. HUMMEL:**  Thank you, Your Honor.

15   **BY MR. HUMMEL:**

16   **Q.**   Mr. Laird, did you have an understanding of what "group"

17   meant in this document?

18   **A.**   Yes.

19   **Q.**   What was your understanding?

20   **A.**   Six or more, present or former.

21             **MR. HUMMEL:**  And if you could highlight that second

22   paragraph, please.

23             **THE COURT:**  I would blow it up so the jury can see it

24   better.  There we go.

25             (Document displayed.)

1  **BY MR. HUMMEL:**

2  **Q.**   Your understanding was as set forth in the contract?

3  **A.**   Yes, sir.

4  **Q.**   Now, after you retired did you ever attend any retired

5  player conventions?

6  **A.**   Yes, I did.

7  **Q.**   Can you describe what a retired player convention is?

8  **A.**   Retired players convention, again, started after 1984.

9  The union would gather retired players at certain locations,

10 usually one part of the country one year, one part the other

11 year.  Some nice places, very nice resorts.  And they would

12 talk about some of, you know, the retired players' issues.

13         I went to one in June of 2004, in Las Vegas, Nevada.

14 And I went there for the sole purpose of John Mackey.

15 **Q.**   At these retired player conventions, did Doug Allen ever

16 speak?

17 **A.**   Yes.

18 **Q.**   At any time in these retired player conventions did Doug

19 Allen ever inform retired players that the GLA would only kick

20 in if a third-party licensee agreed to license on a blanket

21 basis the entire group?

22         **MR. KESSLER:**  Your Honor, objection.  Lack of

23 foundation.  The witness only attended one convention.  He can

24 only answer to that one convention.

25         **MR. HUMMEL:**  That's a speaking objection, Your Honor.

1          THE COURT:  Just a second.  Would you give this to

2     Mr. Katz, please?

3          Mr. Katz, are you feeling all right?

4          MR. KATZ:  No, it's just an allergy, Your Honor.

5     Nothing contagious.

6          THE COURT:  You are coughing, and I want you to be

7     comfortable and not distract our jury.

8          MR. KATZ:  Sorry.

9          THE COURT:  All right.  The objection is overruled.

10         The witness can answer within the scope of whatever

11    he was.  He went to one meeting, and maybe he remembers

12    everything.  Maybe he remembers part of it.  Whatever he -- but

13    the -- it's a fair question, since Mr. Allen testified on this

14    very point.

15         So let's hear what this witness has to say on that.

16         MR. HUMMEL:  Just to refresh the jury's recollection,

17    I'll repeat the question, Your Honor.

18         THE COURT:  Fine.  Go ahead.

19    BY MR. HUMMEL:

20    Q.   Did Mr. Allen, at any of these conventions you attended,

21    ever say to you that this GLA would only kick in if a

22    third-party licensee agreed to license on a blanket basis the

23    entire group?

24    A.   No.

25    Q.   Did you ever hear that from any source within the union,

1   Mr. Upshaw, Mr. Allen, any other union representative, that

2   this GLA would only kick in if a third-party licensee agreed to

3   license on a blanket basis the entire group?

4   **A.**    No.

5   **Q.**    Did you have frequent interaction outside of the

6   convention context with union representatives?

7   **A.**    Yes.

8   **Q.**    Who?

9   **A.**    From Doug Allen down to D. Becker, down to some of the

10  staff.  I was the either president or vice president of the

11  retired players chapter in Baltimore from 1987 until present.

12  **Q.**    And in all of those interactions, 20 some years of

13  interactions, did anyone ever tell you that?

14  **A.**    No.

15  **Q.**    Did you understand what you were signing?

16  **A.**    Yes.

17  **Q.**    Did you have an expectation one way or the other if you

18  would be paid?

19  **A.**    Well, I was hoping if a deal ever got struck and there was

20  monies, that we would be paid.

21  **Q.**    Did you have an understanding when you signed this

22  agreement of what the phrase "present or former NFL player

23  images" meant?

24  **A.**    Yes.

25  **Q.**    What was your understanding?

**A.**    Active or retired players, present or former.

**Q.**    So did you have an understanding when you signed this agreement about what would trigger an obligation for the union to pay?

**A.**    If they struck some type of deal for active or former players to license us, then we would get paid.

**Q.**    Did you draft this document?

**A.**    No, sir.

**Q.**    Did you negotiate it?

**A.**    No, sir.

**Q.**    Did anyone from the union ever instruct you or advise you you better hire a lawyer?

**A.**    No, sir.

**Q.**    When you signed this document, did you send it back in?

**A.**    Yes, sir.

**Q.**    Did you retain any control at all?

**A.**    No.  Well, what does "control" mean?

**Q.**    Do you have an understanding of the word "control"?

**A.**    In what context?

**Q.**    Well, when you sent this letter back in, did you retain any control over what the union could or couldn't do?

**A.**    Oh, no.

**Q.**    Did you have a mind-set about what the union was going to do on your behalf under this agreement?

**A.**    I assumed they're acting as an agent for active and

1  retired players, and they were going to try to get deals for

2  us, and we would get paid.

3  **Q.**   What do you mean by the word "agent"?

4  **A.**   Well, usually when we do things as even active or retired

5  players, sometimes you have agents that work on your behalf to

6  get you either speaking engagements, motivational speaking or

7  other things.  And the agent takes a percentage of the -- of

8  the monies, and you get paid the rest.

9  **Q.**   And is that how you thought of the NFLPA in connection

10 with this deal?

11 **A.**   Yes.

12 **Q.**   They would be acting on your behalf?

13 **A.**   Yes.

14 **Q.**   In connection with what, specifically?

15 **A.**   I have no idea.

16 **Q.**   Well, was it in connection with something other than

17 licenses?

18         **MR. KESSLER:**  Objection, leading.

19         **THE WITNESS:**  I'm not sure.

20 **BY MR. HUMMEL:**

21 **Q.**   Okay.

22         **THE COURT:**  Well, the witness doesn't know, so

23 overruled.

24         Go ahead.

25

1  **BY MR. HUMMEL:**

2  **Q.**   Did you have an understanding of whether you had any --

3  retained any veto rights?

4  **A.**   No.

5  **Q.**   Now, did you ever come to learn in your interaction in the

6  retired player events that you attended, that -- did you ever

7  hear the phrase "ad hoc agreement"?

8  **A.**   Not really.

9  **Q.**   Did you ever understand that famous players could strike

10 separate deals?

11 **A.**   Oh, absolutely.

12 **Q.**   All right.

13 **A.**   I didn't know that's what's called "an ad hoc."

14 **Q.**   What did you call it?

15 **A.**   They had a deal.

16 **Q.**   Okay.  And can you explain how that worked?  What's your

17 understanding of how that worked?

18 **A.**   Well, I live in -- I live in Baltimore, Maryland.  And

19 I've had the pleasure to play with three Hall of Famers.  And

20 all of those guys have separate deals.

21       They could have a deal with a car company.  They

22 could have a deal with other entities.  They could have a deal

23 with Budweiser Beer, Coors Beer.  You know, they are all

24 separate deals.  We all have our own separate entities.

25 **Q.**   Is that group licensing in your understanding within the

1   meaning of this GLA?

2   **A.**    No.

3   **Q.**    Okay.  Now, when you attended these retired player

4   conventions, did you have interaction with Gene Upshaw?

5   **A.**    Gene spoke.  I also attended a chapter presidents' meeting

6   in October, 2005, where both Gene Upshaw and Doug Allen spoke.

7         And he would kind of give the address to the union,

8   so to speak.  And usually at those things he would address some

9   retired players' issues a little bit.

10  **Q.**    Did Mr. Allen have any special role in connection with

11  retired player programs?

12  **A.**    It was my understanding that Mr. Allen ran retired players

13  for Mr. Upshaw.

14  **Q.**    So at these retired player conventions did Mr. Allen play

15  a special role?

16  **A.**    Yes.  After -- after Mr. Upshaw's address to the union or,

17  you know, introduction speech, however you want to call it,

18  Doug Allen ran the meeting, and Gene Upshaw left.

19  **Q.**    And then, Doug Allen would do what?

20  **A.**    Conduct the rest of the meeting.

21  **Q.**    With respect to what topics?

22  **A.**    Anything and everything.  Mostly, you know, if we're there

23  it's retired players' issues.

24  **Q.**    Did Mr. Allen after these speeches ever make himself

25  available for questions?

1  **A.**    Yes, you could ask him questions.

2  **Q.**    And how generally did Mr. Allen react to questions that

3  were asked of him?

4  **A.**    He didn't like them.

5  **Q.**    Why?

6  **A.**    He didn't like when I asked him questions.

7  **Q.**    How did he respond?

8  **A.**    Like:  "Why are you asking me this?  Don't you know that

9  the union is working for you?  And that Gene Upshaw is a

10  retired player, and we have many retired players at the union

11  that work for you?  Why do you keep asking me these questions?"

12 **Q.**    How did you react to this?

13 **A.**    I kept asking him questions.  I wanted him to answer.

14 **Q.**    Did you over the course of time at these retired player

15 conventions discuss Mr. Allen with other retired players?

16 **A.**    Oh, many times.

17 **Q.**    Okay.  And in those discussions --

18          **MR. KESSLER:**  Your Honor, this is going to be

19 hearsay.

20          **MR. HUMMEL:**  It's 608, Your Honor.

21          **THE COURT:**  608?

22          **MR. HUMMEL:**  This is foundational for a 608 question.

23          **THE COURT:**  Let me see.

24          Well, before we go down this path I'm going to have

25 to do this out of the presence of the jury.  And I don't want

1  to interrupt the jury, so can you move on to something else and

2  we'll save this until the break?

3           MR. HUMMEL:  I will, Your Honor.

4  BY MR. HUMMEL:

5  Q.  So we were talking about Mr. Allen's comments to the

6  retired players at these conventions.

7  A.  Yes.

8  Q.  Okay.  Did he, at these conventions, ever explain group

9  licensing programs for retired players?

10 A.  Not in great detail.  He would mention there was group

11 licensing agreements.

12 Q.  Did he ever at these conventions tell retired players over

13 and over again that:

14           "You're not eligible, but sign this GLA,

15 anyway"?

16           MR. KESSLER:  Objection, Your Honor.  I don't know

17 which conventions we're talking about.

18           MR. HUMMEL:  That's a speaking objection, Your Honor.

19 At any of the ones he attended.

20           THE COURT:  Overruled.

21           Please answer.

22           THE WITNESS:  No.

23 BY MR. HUMMEL:

24 Q.  Did you ever hear from any source that the union --

25 union's position was:

1          "You, Mr.-Retired-Player-who-signed-a-GLA, are

2   not eligible, but sign the GLA anyway"?

3   **A.**   No.

4   **Q.**   Would that have made any sense to you?

5   **A.**   No.

6   **Q.**   In any of the conventions that you attended, where you

7   spoke with Doug Allen, did he ever say words to the effect:

8          "Never mind what the contract says, don't think

9   you're going to get any share of the money, because we don't

10  seem to be able to get you into the license business"?

11  **A.**   No.

12  **Q.**   He never said anything like that?

13  **A.**   No.

14  **Q.**   Did he ever say why he wanted retired players to sign the

15  GLAs?

16  **A.**   No.  He didn't like to answer questions.  No.

17  **Q.**   Did you ever ask?

18  **A.**   No.

19  **Q.**   Did you ever inquire as to why all these thousands of

20  players are signing GLAs?

21  **A.**   We didn't really know if there was an issue until after

22  2004.

23  **Q.**   And what happened after 2004?

24  **A.**   There were some things that came out regarding retired

25  players in the union.

1   **Q.**   What?

2   **A.**   There was a memo written by Gene Upshaw to retired

3   players, telling us:  We are not union members; you have no

4   vote; you cannot hire; you cannot fire; and you have no legal

5   stance in this matter.

6           **MR. KESSLER:**  Your Honor, I don't believe what he's

7   testifying to -- first of all, I believe what he is testifying

8   to is precluded by your in limine rulings, and I don't think it

9   has anything to do with licensing in this case, Your Honor.

10          **MR. HUMMEL:**  Your Honor, he put in the TouchBack

11  exhibit and highlighted it and read it to the jury yesterday,

12  which is on this issue.

13          **MR. KESSLER:**  No, Your Honor.

14          **MR. HUMMEL:**  You did highlight it.

15          **MR. KESSLER:**  The TouchBack exhibit?

16          **MR. HUMMEL:**  Yes.

17          **MR. KESSLER:**  That's not contained in the TouchBack

18  exhibit.

19          **THE COURT:**  Look, we're not going to get off into

20  collective bargaining.  The objection is sustained.

21          **MR. HUMMEL:**  Fair enough, Your Honor.

22          **MR. KESSLER:**  Thank you, Your Honor.

23  BY MR. HUMMEL:

24  **Q.**   Did Mr. Allen, at a retired player convention, ever

25  explain to you that licensing was coming in for active players

1  only and that you would have no entitlement to a GLR pool?

2  **A.**    No.

3  **Q.**    Let me mark as next in order or have you look at Exhibit

4  1225.

5           Do you recognize 1225, sir?

6  **A.**    Yes.

7  **Q.**    Is your signature on it?

8  **A.**    Yes.

9  **Q.**    And is it another retired player group licensing

10 authorization form?

11 **A.**    Yes, it is.

12           **MR. HUMMEL:**  Your Honor, move 1225.

13           **MR. KESSLER:**  No objection.

14           **THE COURT:**  Received.

15           (Trial Exhibit 1225 received in evidence.)

16           **MR. HUMMEL:**  Can I display 1225, please?

17           (Document displayed.)

18 **BY MR. HUMMEL:**

19 **Q.**    Is this another form that you received?

20 **A.**    Yes, it is.

21 **Q.**    And why did you sign it?

22 **A.**    Because I thought I would still have a shot at licensing

23 monies if it came to fruition.

24 **Q.**    Did you have an understanding of what the phrase "group

25 licensing" meant here?

1   **A.**    Yes, I did.

2   **Q.**    If the NFLPA used your image in a way that was offensive

3   to you, did you think you had any rights under this agreement?

4   **A.**    Probably.

5   **Q.**    Okay.  What did you have an understanding?

6   **A.**    Well, if I didn't like the sponsor maybe I would have

7   something to say about it.

8   **Q.**    Did you think if they had done something that was

9   offensive to you, you could quit the program?

10  **A.**    I assumed I could.

11  **Q.**    Did you understand at this point when you signed this

12  agreement -- by the way, what's the date of it?

13  **A.**    This is January, 2004.

14  **Q.**    And it was effective through what date?

15  **A.**    I'm not sure.

16  **Q.**    If you look right above your signature.

17  **A.**    Oh, to December, 2006.  I'm sorry, yeah.

18  **Q.**    Okay.  As of this date, January 5, 2004, had you learned

19  whether or not other retired players had signed this?

20  **A.**    Yes.

21  **Q.**    Did you ever learn how many signed it?

22  **A.**    Not the actual number, no.

23  **Q.**    Did you have an understanding, was it ten or 50 or more?

24  **A.**    It was in the hundreds.

25  **Q.**    In the hundreds.  That was your understanding?

**A.**    Yes, sir.

**Q.**    Did you have any -- and just as in the last agreement, how did you view the NFLPA's role vis-a-vis you and the group in connection with licensing programs?  How did you think about it?

        Do you understand the question?

**A.**    No.

**Q.**    All right.  So you signed this document, right?  And you're giving them what?

**A.**    The right to act as my agent.  I'm giving them my image as a professional football player.

**Q.**    And did you think they were going to do anything with that right?

**A.**    I assumed so.  Why would they ask me to sign something?

**Q.**    All right.  And what did you expect them to do?

**A.**    I expected them to market retired and active players in the group licensing agreement.

**Q.**    As your what?

**A.**    As my representative, my agent, whatever you want to call them.

**Q.**    Now, did Mr. Allen, at any of these retired player conventions, ever report to the retired players on royalties that were being received by the union?

**A.**    No.

**Q.**    From licensing programs?

**A.**   Not that I'm aware of.  He may have mentioned a broad figure.

**Q.**   Did he ever, prior to the time that this lawsuit was filed, show you, or to your knowledge any other retired player, any license agreements that the NFLPA entered into for licensing rights?

      **MR. KESSLER:**  Objection to the form of the question.

      **THE COURT:**  What?

      **MR. KESSLER:**  Objection, Your Honor, to the form of the question.  Both leading and lack of foundation "for other players."

      **MR. HUMMEL:**  It's not leading, Your Honor.  I'm not suggesting the answer.

      **THE COURT:**  Well, it comes close to suggesting an answer, but it sounds preliminary enough.  I'll overrule the objection.

      **THE WITNESS:**  The question again, please?

      **MR. HUMMEL:**  Could I ask to have it read back, Your Honor?

      (The question was read by the reporter as follows:)

      "**QUESTION:**  Did he ever, prior to the time

      that this lawsuit was filed, show you, or to

      your knowledge any other retired player, any

      license agreements that the NFLPA entered

      into for licensing rights?"

1          **THE WITNESS:**  I had no idea what a license agreement

2    was, or the numbers, no.

3    **BY MR. HUMMEL:**

4    **Q.**    Did Mr. Allen or any other union representative, to your

5    knowledge, ever report to the retired players whether or not a

6    license agreement had been entered into that included six or

7    more present or former NFL players?

8    **A.**    No.

9    **Q.**    Now, outside of the convention context --

10   **A.**    Yes.

11   **Q.**    -- did you have separate discussions involving retired

12   player rights, with Mr. Upshaw, Mr. Allen or any other

13   representative of the union?

14   **A.**    Regarding rights?

15   **Q.**    Yes.

16   **A.**    No.

17   **Q.**    So what you learned about licensing rights, how did you

18   learn it?

19   **A.**    I basically learned it about when this trial was coming

20   up.

21   **Q.**    Okay.  Did you ever discuss licenses with any

22   representative of the union?

23   **A.**    The only thing I got into was in October of -- October of

24   2005 at a chapter presidents' meeting that was held in

25   Baltimore, Maryland.

1           This is a meeting where all chapter presidents or

2   officers of each chapter -- I believe there's 31 or 32 around

3   the country -- they are called NFLPA retired chapters -- where

4   those things were discussed.  Mr. Allen was running the

5   meeting, and I asked him about retired players' revenues and

6   licensing.

7   **Q.**   What was the response?

8   **A.**   He responded that -- I believe it was 375 retired players

9   received in excess of $7 million.  But he did not specify that

10  it came under GLAs or what I now know is ad hocs.

11          Obviously, now that I understand this about ad hocs,

12  he was referring to the ad hoc agreement.

13  **Q.**   He wasn't referring, in your understanding, to the group

14  licensing?

15  **A.**   We thought he was.

16  **Q.**   But he wasn't, right?

17  **A.**   But he wasn't, no.

18          **MR. HUMMEL:**  Your Honor, permission to read Request

19  for Admission No. 19, and the response.

20          **THE COURT:**  Any objection?

21          **MR. KESSLER:**  I'm sorry.  I don't know what he's

22  referring to.

23          **MR. HUMMEL:**  The defendants' response to Request for

24  Admission No. 19.

25          **THE COURT:**  Show it to counsel so he can see what

1   you're going to read.

2           **MR. KESSLER:**  No objection.

3           **THE COURT:**  All right.  Before you read it, I need to

4   tell the jury what a request for admission is.

5           Remember I told you about depositions?  Before the

6   trial the lawyers can take depositions.  Another thing that

7   lawyers can do is to send out questions and ask the other side

8   to admit them.  So they might say:  "Please admit that ABC is

9   true."  And the other side can either say "admit" or "deny."

10  It's like "yes" or "no."  And then those are under oath.

11          In this case now we are going to hear one of those

12  that was sent out by Mr. Hummel's side to Mr. Kessler's side.

13          And I assume the answer is, it was admitted, right?

14          **MR. HUMMEL:**  Correct.

15          **THE COURT:**  All right.  So read the exact Request for

16  Admission, and then read the exact admission.

17          **MR. HUMMEL:**  "Request for Admission No. 19:  Admit

18  that Gene Upshaw has said in reference to licensing of images

19  of the retired players, quote, 'We could have the greatest dog

20  food in the world, but if the dogs don't like it, we can't sell

21  it.'

22          "Response to request for admission number 19:

23  Request No. 19 is admitted."

24          **THE COURT:**  All right.  So that's now evidence in the

25  case.  Even though you heard that from a lawyer, I will tell

1    you this is an exception.  It is evidence because it was deemed

2    admitted by the other side.  It's like a stipulation.

3              Okay.  Next question.

4    **BY MR. HUMMEL:**

5    **Q.**   Mr. Laird, I would like you to look at Trial Exhibit No.

6    2370.

7    **A.**   23?

8    **Q.**   2370.

9    **A.**   Okay.

10   **Q.**   Do you have it handy?

11   **A.**   I don't have it here, I don't think, unless I'm missing

12   it.

13             **THE COURT:**  Mr. Hummel, please help the witness find

14   it.

15             **MR. HUMMEL:**  I will, Your Honor.

16             Thank you.  Handing the witness exhibit --

17             **THE WITNESS:**  Oh, here it is.

18             **MR. HUMMEL:**  Got it?

19             **THE WITNESS:**  Yes, sir.

20             **MR. HUMMEL:**  Thank you, Your Honor.

21   **BY MR. HUMMEL:**

22   **Q.**   Do you recognize Exhibit 2370, sir?

23   **A.**   Yes.

24   **Q.**   Is this a document you had in your files?

25   **A.**   Yes, it is.

1    Q.    What is it?

2    A.    It's the NFLPA's constitution.

3              MR. HUMMEL:  Move Exhibit 2370, Your Honor.

4              MR. KESSLER:  Your Honor, my objection here is based

5    on 403 and Your Honor's prior ruling that there's no claims

6    here based on rights as members in a union.

7              As Your Honor knows, that claim is not in this case.

8    You already instructed the jury.

9              Therefore, this is about retired player membership.

10   It has no relevance in this case, Your Honor.

11             THE COURT:  What is the relevance?

12             MR. HUMMEL:   Your Honor, the issue goes to trust,

13   why he signed the GLA.

14             MR. KESSLER:  Your Honor, I don't believe that's

15   relevant.  It's exactly your 403 ruling.

16             MR. HUMMEL:  No, it's not.

17             MR. KESSLER:  Exactly.

18             MR. HUMMEL:  No, it's not, Your Honor.  This is the

19   reason he signed the GLA was he was a union man, trusted his

20   union, had the Constitution in his files.  I would like to ask

21   him about it, Your Honor.  Won't take more than a minute.

22             MR. KESSLER:  I object for the reasons stated and

23   your prior rulings under 403.

24             THE COURT:  I don't remember the prior ruling very

25   well, Mr. Kessler, so I'm going to allow this in evidence.

1          But I'm going to say to the jury, this case is about

2     a contract and what it means.  It's called "the GLA."  This is

3     not a generalized grievance against the union.

4          I don't know where Counsel is going with this, but I

5     caution you not to try and turn -- I'm talking to the jury

6     now -- not to try to turn this into:  Is the union good for

7     members or bad for members?

8          At the end of the day you've got to construe that

9     contract of what rights that were there.  If the rights weren't

10    there, then it doesn't matter how much trust there was, the

11    plaintiffs lose.  If.

12         On the other hand, if the contract rights were there,

13    it could be the other way.  So what matters is the contract

14    rights.  It doesn't matter whether this was a good, bad or

15    indifferent union in terms of representing the players in their

16    collective bargaining.

17         So I am giving counsel some latitude on this, but

18    there is a risk of confusion to you, the members of the jury.

19         Now, Mr. Hummel, I think you -- I'm going to let you

20    do this, but I think it's important to stick to the GLA and

21    what it meant, not why he signed it, but what he -- what a

22    reasonable interpretation of the words on the paper would mean.

23         **MR. HUMMEL:**  I understand, Your Honor.

24         **THE COURT:**  All right.  So that's what you got to

25    decide, ladies and gentlemen.  Again, what the words on the

1    paper mean.

2    **BY MR. HUMMEL:**

3    **Q.**   Mr. Laird, you kept this document in your files?

4    **A.**   Yes.

5    **Q.**   Why?

6    **A.**   It was some paperwork that I had had, and I had wanted to

7    keep it just in case I had some issues.

8    **Q.**   All right.  Did you think, sir, when you signed the GLA,

9    that your union would not say what it meant?

10          **MR. KESSLER:**  Objection, Your Honor.

11          **THE WITNESS:**  Of course not.

12   **BY MR. HUMMEL:**

13   **Q.**   Now, in the constitution that you kept in your files, and

14   in your general dealings with your union over the years as an

15   active player, did you trust your union?

16   **A.**   Yes.

17   **Q.**   I'd like you to look, sir, at Defendants' Exhibit 2392.

18          Do you have 2392 in front of you?

19   **A.**   I have a letter --

20   **Q.**   Do you have it, 2392?

21   **A.**   Yes.

22   **Q.**   Do you have it?

23   **A.**   Sitting right on top.

24   **Q.**   Can you tell me, Mr. Laird, what 2392 is?

25   **A.**   It's a football card of me.

1   **Q.**   Okay.

2           **MR. HUMMEL:**  Your Honor, move Exhibit 2392.

3           **MR. KESSLER:**  No objection.

4           **THE COURT:**  2392.

5           **MR. HUMMEL:**  2392.

6           **THE COURT:**  Received.

7           (Trial Exhibit 2392 received in evidence.)

8           **MR. HUMMEL:**  Can we blow that up?

9   **BY MR. HUMMEL:**

10  **Q.**   Now, Mr. Laird, that's you, right?

11  **A.**   Yes.

12  **Q.**   That's number 40 for the Baltimore Colts, right?

13  **A.**   Yes.

14  **Q.**   And it says you're a safety.  Is that what the "S" means

15  down below?

16  **A.**   Yes.

17  **Q.**   If you look in the upper right-hand corner, there is a

18  word?

19  **A.**   Yes.

20  **Q.**   What is that?

21  **A.**   "Topps."

22  **Q.**   Is that a company?

23  **A.**   I believe so.

24  **Q.**   When you were an active player had you entered into an

25  agreement under your understanding with that company?

1  **A.**    I believe the union did.

2  **Q.**    On your behalf?

3  **A.**    My assumption would be yes.

4  **Q.**    Okay.  And so you understood at that time when were you an

5  active player, did you not, that the union was acting on your

6  behalf?

7  **A.**    Yes.

8              **MR. KESSLER:**  Objection.  Leading, Your Honor.

9              **MR. HUMMEL:**  I apologize.  It's preparatory.

10             **THE COURT:**  Of course.  You're leading like crazy.

11             **MR. HUMMEL:**  All right.

12             **THE COURT:**  Can't you ask a nonleading question?

13             **MR. HUMMEL:**  Yes, I can, Your Honor.  I will.

14             **THE COURT:**  Try to do your best to ask nonleading

15  questions.

16             **MR. HUMMEL:**  I will, Your Honor.

17  **BY MR. HUMMEL:**

18  **Q.**    What did you understand Topps to be?

19  **A.**    Trading card company, I guess.  Card company.  Like

20  bubblegum, you know.

21  **Q.**    And could you look at the next -- at the back of the card?

22  **A.**    Yeah.

23  **Q.**    What's listed on the back of the card?

24  **A.**    It's my name, my position.  I guess I was card number 326.

25  Talked about my height, six one; weight, 194; the esteemed

1    university that I went to, American International College;

2    drafted in the sixth round, 1972.  When I was born, and my

3    hometown, and my stats.

4    **Q.**   On the left-hand column it says "year."  What does that

5    represent?

6    **A.**   That was the -- probably the year of this card, if you're

7    referring to the very bottom, '78, '79, '80.

8    **Q.**   All the teams listed there next to the team Colts, what

9    does that mean?

10   **A.**   Those are my years of service.

11   **Q.**   And then it has other statistics, including interceptions,

12   kickoffs and punts, right?

13   **A.**   Yes.

14   **Q.**   All right.

15          **THE COURT:**  You said, but I don't remember, can we

16   tell what year this card was printed?

17   **BY MR. HUMMEL:**

18   **Q.**   Can you tell, Mr. Laird?

19          **THE COURT:**  Maybe you know.

20          **THE WITNESS:**  Judge, it's hard sometimes.  It may

21   have been my picture from the prior year, that goes on the card

22   that has the following year.

23          I can tell you from a rookie card and some other

24   cards, but I'm going to assume this is 1980.  This is my

25   picture in 1980.

1          **MR. KESSLER:** Your Honor, actually, there is an NFLPA

2   copyright date on the bottom left, next to the NFLPA logo. I

3   think it says "1981," if I can read it from here.

4          **THE COURT:** I can't read it, but I'll take your word

5   for it.

6          Is that true, Counsel?

7          **MR. HUMMEL:** Yes.

8          **THE COURT:** Do you see that?

9          **THE WITNESS:** So my assumption, Your Honor, would be

10  my 1980 picture.

11         **THE COURT:** Okay.

12         **THE WITNESS:** So I was in uniform in 1980.

13  **BY MR. HUMMEL:**

14  **Q.** Were those statistics on the card accurate?

15  **A.** Yes. Thank God I got out of kickoffs and punts.

16  **Q.** Why do you say that?

17  **A.** It's a tough business.

18         You notice, Judge, I didn't do any of that.

19         **THE COURT:** All right.

20  **BY MR. HUMMEL:**

21  **Q.** Did there come a time, sir, when you understood that your

22  number, height and weight was being used in any product?

23         **MR. KESSLER:** Objection. Leading.

24         **THE COURT:** This is preliminary. Overruled.

25         Please answer.

1           **THE WITNESS:**  Yes.

2   **BY MR. HUMMEL:**

3   **Q.**   Can you describe for the jury and His Honor how you came

4   to learn that?

5   **A.**   I have three sons.  And one of my -- my middle son's

6   buddies was playing the John Madden game and said:

7               "Your old man was on a game."

8   **Q.**   Okay.  When did that occur?

9   **A.**   I have no idea.  I mean, a year ago, two years ago.

10  Something -- something like that.  Months ago.

11  **Q.**   What do you recall precisely that was said?

12  **A.**   He just said that you can --

13          **MR. KESSLER:**  Objection, Your Honor.  It's hearsay.

14          **THE COURT:**  What?

15          **MR. KESSLER:**  It's hearsay.

16          **MR. HUMMEL:**  Goes to state of mind, Your Honor.

17          **THE COURT:**  TSA?

18          **MR. KESSLER:**  Hearsay, Your Honor.

19          **THE COURT:**  Oh, hearsay.

20          **MR. KESSLER:**  I'm sorry.  He just asked:  What did he

21  say?

22          **THE COURT:**  Well, true.  But it sounds like a

23  spontaneous utterance.  Overruled.

24          Please answer.

25          (Laughter)

1           **THE WITNESS:**  He just said he was playing the John

2    Madden game, and the 1977 Colts were on there:  "And I was

3    playing the Colts versus some other team and saw your, quote,

4    'old man' on the Madden game."

5    **BY MR. HUMMEL:**

6    **Q.**   Look, if you would, sir, at Trial Exhibit No. 1301.

7    **A.**   Is that the screen saver?  1301?

8    **Q.**   1301.

9    **A.**   There has to be a better way.

10          **THE COURT:**  Would you help the witness find --

11          **MR. HUMMEL:**  I will, Your Honor.  Handing the witness

12   1301.

13   **BY MR. HUMMEL:**

14   **Q.**   Now, Mr. Laird, did you, after this lawsuit was filed,

15   look at the Madden games?

16   **A.**   No.  I don't play video games.

17   **Q.**   Were you shown the Madden games in connection with this

18   lawsuit?

19   **A.**   Yes.

20   **Q.**   All right.  And did you go through and find the player

21   management function in the Madden games?

22   **A.**   I was shown it, yes.

23   **Q.**   Right.  And Exhibit 1301, do you recognize what these are?

24   **A.**   Yes.

25   **Q.**   What are they?

1   **A.**   Called screen savers, or something, for the game.

2   **Q.**   All right.

3           **MR. HUMMEL:**  Your Honor, move Exhibit 1301.

4           **MR. KESSLER:**  No objection.

5           **THE COURT:**  Received.

6           (Trial Exhibit 1301 received in evidence.)

7   **BY MR. HUMMEL:**

8   **Q.**   Exhibit 1301, Mr. Laird, I'll show the first page of this.

9   This is from the 2003 Madden game.

10          **MR. HUMMEL:**  I'll represent to the Court, which is in

11  evidence by stipulation.

12  **BY MR. HUMMEL::**

13  **Q.**   Mr. Laird, do you see a number on here, associated with

14  you?

15  **A.**   Yes, I do.

16  **Q.**   What number is that?

17  **A.**   40, strong safety.

18  **Q.**   Was that your playing number?

19  **A.**   Yes, sir, it was.

20  **Q.**   Do you see your name on this document anywhere?

21  **A.**   No.

22  **Q.**   Do you see your position listed here?

23  **A.**   Yes.

24  **Q.**   Do you see your height?

25  **A.**   Yes.

1    **Q.**   Do you see your weight?

2    **A.**   Yes.

3    **Q.**   Are they matches of when you played for the 1977 Colts?

4    **A.**   Yes.  Salary was about right, too.

5    **Q.**   Now, I'd ask you to look at Exhibit No. 1245-3, if that's

6    up there.

7    **A.**   Yes.

8    **Q.**   Do you have that in front of you, sir?

9    **A.**   Yes, I do.

10   **Q.**   And do you recognize this as a screen shot from the Madden

11   game?

12   **A.**   Yes.

13   **Q.**   Were you shown this in the context of this case?

14   **A.**   I don't think I was shown this one, with the 49ers on it.

15   **Q.**   Would you look at the second page of Exhibit 1245?  It's

16   actually 1245-4.

17   **A.**   Yes.

18   **Q.**   Now, this is a screen shot from the Madden game that you

19   were shown in this case, right?

20   **A.**   Yes.

21   **Q.**   Okay.

22           **MR. HUMMEL:**  Your Honor, it's part of an exhibit in

23   evidence, 1245, the Madden game.  Permission to display.

24           **THE COURT:**  It's in evidence?  Fine.  Go ahead.

25           **MR. HUMMEL:**  Thank you, Your Honor.

1          1245-4, please.

2          (Document displayed)

3  **BY MR. HUMMEL:**

4  **Q.**    Is this a screen shot in the Madden game?

5  **A.**    Yes.

6  **Q.**    What team is that?

7  **A.**    Uhm, '77, it would be the Baltimore Colts versus the

8  San Francisco 49ers.

9  **Q.**    Do you see a player represented in that -- in that game

10 that wears your number?

11 **A.**    Yes, I do.

12 **Q.**    What position is he playing there on the field?

13 **A.**    Uhm, if the ball is correct and that quarterback is under

14 the center, he's at the tight end position on the strong side

15 of the formation, opposite number -- from 79 over to the left.

16 I don't know his number.  85, it could have been.

17 **Q.**    Wait.  Do you see the position there that number 40 is

18 playing?

19 **A.**    Yes.

20 **Q.**    Offense or defense?

21 **A.**    Defense.

22 **Q.**    What position on defense?

23 **A.**    That would be the strong safety position.

24 **Q.**    So that -- and you can tell by looking at this screen shot

25 where that player -- what position that player is, right?

**A.**   Yes, I can.

**Q.**   Was there any other player on the Baltimore Colts with the number 40 who played strong safety in 1977, other than you?

**A.**   No, not for ten years.

**Q.**   And did you -- do you know your guys on defense?  Do you know who they were?

**A.**   Absolutely.

**Q.**   All right.  So you could go through this game, could you not, and identify the players?

**A.**   Yes, I could.

**Q.**   What position is this guy up here on the -- on the left side in the white?

         **THE COURT:**  Use the pointer, please, the 1842 technology.

         **MR. HUMMEL:**  It's perfect for me, actually.

         **THE COURT:**  Never fails.

         (Laughter.)

**BY MR. HUMMEL::**

**Q.**   This guy, what position is he playing?

**A.**   He's left defensive end.  That's Fred Cook, number 72.

**Q.**   He had a name, uhm?

**A.**   Yes, sir, Fred Cook.

**Q.**   All right.  And how about this guy?  What position is this guy playing?

**A.**   Right now he's a strong backer, but he's in an over

1    position.  That's Tom Macleod.

2    **Q.**    Who was that on the Colts, Tom Macleod?

3    **A.**    Number 52.

4    **Q.**    He had name?

5    **A.**    Tom Macleod.

6    **Q.**    And you could go through and identify every person on this

7    defense, right?

8    **A.**    Yes.  The one next to Fred Cook was Joe Orman, because he

9    was a defensive tackle from Syracuse.

10   **Q.**    Your name doesn't appear on your jersey there, does it?

11   **A.**    No, it does not.

12   **Q.**    Did you ever give the NFLPA permission to instruct EA to

13   scramble your name?

14   **A.**    No, sir.

15           **MR. HUMMEL:**  Your Honor, I need a sidebar on the

16   issue of 608.  That's all I have left.

17           **THE COURT:**  What I would recommend we do is go ahead

18   with the cross-examination, and then after cross-examination

19   you can reopen to get back into this.  That way we won't have

20   to have two breaks.

21           **MR. HUMMEL:**  I will, Your Honor.

22           Nothing further.

23           **THE COURT:**  Thank you.

24           So you're done except for that?

25           **MR. KESSLER:**  Would you like your instrument?

1          **MR. HUMMEL:**  It's not mine.

2          **MR. KESSLER:**  The Court's.

3          **THE COURT:**  Give it back to Dawn.

4          **THE CLERK:**  Thank you.

5          **THE COURT:**  Thank you.

6          Is everyone okay over there on the jury?  Going like

7   20 more minutes, then we'll take a break.  Because if anyone

8   needs a break, of course we'll take it.

9          All right.  No one raised their hand.

10         Let's go, Mr. Kessler.

11         **MR. KESSLER:**  Your Honor already has a deposition

12  transcript for this witness, I believe?

13         I would like to approach the witness so he can have

14  his deposition up with him.

15         **THE COURT:**  Fine.  Either way.

16                        <u>**CROSS EXAMINATION**</u>

17  **BY MR. KESSLER:**

18  **Q.**   Good morning, Mr. Laird.

19  **A.**   Good morning.  Actually, good afternoon.

20  **Q.**   Well, almost.  We met before.  I'm Jeffrey Kessler.  I

21  represent the defendants.

22         Mr. Laird, you testified on your counsel's question

23  that the union didn't tell you how player licensing was divided

24  up when you were an active player.

25         Do you recall telling that to the jury?

1  **A.**    Yes.

2  **Q.**    And were you being truthful to the jury when you made

3  those statements?

4  **A.**    Yes, I was.

5  **Q.**    Now, Mr. Laird, you were a player representative in 1981

6  and 1982, correct?

7  **A.**    1981 and '82.

8  **Q.**    Okay.  And you attended -- as a member of the board of

9  active player representatives, you attended meetings in Hawaii.

10 And at that meetings the licensing program was discussed,

11 correct?

12 **A.**    Probably was.

13 **Q.**    And at those meetings that you attended, okay, you were

14 told in no uncertain terms that what was recommended --

15          **MR. HUMMEL:**  Objection, hearsay, Your Honor.

16          **THE COURT:**  Sorry, what?

17          **MR. HUMMEL:**  Hearsay.

18          **THE COURT:**  Overruled.  The reason it's overruled is

19 you went into these meetings and what was or was not said.

20 And, also, what was or was not said, even though it's an

21 out-of-court unsworn statement, the witness can testify to it

22 from his firsthand knowledge.  And it's proving up the nature

23 of the transaction.

24          **MR. KESSLER:**  Okay.

25          **THE COURT:**  So it's not hearsay at all.  Overruled.

1          Please answer.

2          **MR. KESSLER:**  Thank you, Your Honor.

3    **BY MR. KESSLER:**

4    **Q.**   You were told in no uncertain terms that the licensing

5    money was going 100 percent to the union to support for a

6    possible strike, for other possible union activities, correct?

7    **A.**   Could be.

8    **Q.**   Not "could be," sir.  That's what you were told.  Do you

9    remember that now?

10   **A.**   Could be.

11   **Q.**   Let me read to you from your deposition, sir.

12          **THE COURT:**  Page and line, please.

13          **MR. KESSLER:**  It's going to be the transcript, Your

14   Honor.  I believe it's 131 to 132.

15          Actually, it starts at 130, Your Honor.

16          **THE COURT:**  Mine skips from 129 to 141, for some

17   reason.

18          **MR. KESSLER:**  I'm sorry, Your Honor.  Could we please

19   hand up another copy?

20          David, could you do that, please?

21          **THE CLERK:**  Here, Counsel.  Thank you.

22          **THE COURT:**  131?

23          **MR. KESSLER:**  Yes.  I'm going to start on page 130,

24   Your Honor, line 20.  I'm going to read through most of the

25   next page as well.  Starting on line -- there's a series of

1   questions.

2          **MR. HUMMEL:**  Your Honor, I object.  It's not

3   impeaching.  It's not inconsistent.

4          **MR. KESSLER:**  It is, Your Honor.

5          **THE COURT:**  Just one second.  130 what?

6          **MR. KESSLER:**  I'm reading from line 12 on 130, and

7   all the way through line 8 on 131.  And in particular, Your

8   Honor, I would call your attention to lines 4 to 8, when he

9   says:  "I do remember this."

10         **MR. HUMMEL:**  It's a different question, Your Honor,

11  than what he asked.  It's not impeaching.

12         **THE COURT:**  Well, but he's a class member, so I think

13  he's a party to the case.  So the Court is going to allow you

14  to read this.

15         I'm not necessarily saying this impeaches anything.

16  I don't see the phrase "in no uncertain terms" anywhere.

17         **MR. KESSLER:**  Your Honor --

18         **THE COURT:**  Is that just you embellishing?

19         **MR. KESSLER:**  Your Honor, this was a follow-up

20  question, not the "no uncertain terms" question.  This was a

21  question I asked him about whether he knew that the money was

22  being used for union activities like the strike and operations

23  at that time.

24         That's what I'm reading about, Your Honor.

25         **THE COURT:**  All right.  Go ahead and read it.

1         **MR. KESSLER:**  Okay.

2         "**QUESTION:**  You don't believe any of the

3         NFLPA's licenses ever used your image on any

4         trading card since you retired?

5         "**ANSWER:**  Correct.

6         "**QUESTION:**  Now, look at page 2, the back.

7         You will see in the left 'National Football

8         League Players Association'?

9         "**ANSWER:**  Yeah.

10        "**QUESTION:**  Is that what used to be the Fat

11        football logo?  Does that refresh your

12        recollection that your trading cards were

13        licensed under an NFLPA licensing program?

14        "**ANSWER:**  Yeah.

15        "**QUESTION:**  And do you recall that you, as an

16        active player representative, voted what to

17        do with that money?

18        "**ANSWER:**  I do remember this because we

19        needed money.  We needed money forever,

20        forever-and-a-day when I was playing from the

21        first strike in 1974 to 1982, but I don't

22        remember the rest of it."

23  BY MR. KESSLER:

24  **Q.**   Mr. Laird --

25  **A.**   Okay.

1    Q.   -- do you now recall that -- do you now remember that when

2    you were an active player rep --

3              **MR. HUMMEL:**  Your Honor?  Your Honor?  In interest of

4    fairness, under the rule of completeness, I'd ask that he read

5    lines 9 through 14, as well.

6              **MR. KESSLER:**  I would be happy to do that.

7              **THE COURT:**  All right.  Go ahead.

8              **MR. KESSLER:**   (Reading)

9              **"QUESTION:**  "When you were an active player

10             rep, did you vote to give any of this

11             licensing money to retired players?

12             **"ANSWER:**  I don't think it ever came up.  I

13             don't think it was voted one way or the

14             other, active or retired."

15   **BY MR. KESSLER:**

16   Q.   Mr. Laird, does that now refresh -- let me ask it a

17   different way.

18             Do you now have a refreshed recollection that you

19   knew when you were an active player rep what was decided was to

20   give all the licensing money to the union for its operations?

21   **A.**   The only licensing I was aware of was football cards.

22   **Q.**   Yes.

23   **A.**   And as union members we sign off our rights to the

24   football cards.

25   **Q.**   And was all that money given 100 percent to union

1   operations?

2   **A.**   I have no idea.

3   **Q.**   Okay.  Is it --

4   **A.**   My assumption would be probably yes.

5   **Q.**   Probably yes?

6   **A.**   That's an assumption.  I have no idea where the money

7   went.

8           **MR. HUMMEL:**  Motion to strike, Your Honor.  It's

9   speculation.

10          **THE COURT:**  He says he doesn't have any idea so the

11  jury can evaluate that.

12          Go ahead.

13  **BY MR. KESSLER:**

14  **Q.**   Now, when you were a union rep, you had power to make

15  resolutions, proposals, correct?

16  **A.**   Yes.

17  **Q.**   In fact, sometimes you made resolutions and proposals as a

18  player rep, correct?

19  **A.**   I believe I did.

20  **Q.**   Yes.  Did you ever propose, as an active player rep back

21  when you were an active player rep, to take the licensing money

22  for the active players and give any part of it to retired

23  players?

24          **MR. HUMMEL:**  Objection.  Relevance.

25          **THE WITNESS:**  Retired players were never an issue.

1    **THE COURT:**  Wait.  It may or may not have much

2    relevance, but Mr. Parcher drew his diagram over there.  I can

3    still see it as an ever-present reminder.  And the question

4    pending is relevant to the diagram.

5    **THE WITNESS:**  I'll answer -- the union never

6    mentioned retired players.

7    **BY MR. KESSLER:**

8    **Q.**   Sir, you never made such a proposal, correct?

9    **A.**   My -- me, personally?

10   **Q.**   Yes.

11   **A.**   No.

12   **Q.**   And it's also true that no active player ever proposed,

13   when you were on the board, to give the active player money to

14   the retired players, correct?

15   **A.**   What do you mean by "active player money"?

16   **Q.**   Money from active player licensing of trading cards.

17   **A.**   No.

18   **Q.**   And, in fact, the reason that you recall that that was

19   done is because the union needed the money to carry on the

20   fight it was having with the owners, correct?

21   **A.**   Yes.

22   **Q.**   Okay.  Now, sir, it's equally true, is it not, that in

23   2005 and '6, the NFLPA was having a fight with the NFL owners;

24   is that correct?

25   **A.**   No, it's not.  2005 and '6?

1  **Q.**   You didn't know that in 2005 and '6 there were collective

2  bargaining negotiations going on with the owners?

3  **A.**   No.  The last CBA in my recollection was signed in 2002.

4  **Q.**   Okay.  Sir, you -- okay.  So you didn't know that in 2006

5  there was a major extension of the collective bargaining

6  agreements?

7              **THE COURT:**  Wait a minute.

8              **MR. HUMMEL:**  Is he testifying, Your Honor?

9              **THE COURT:**  Ladies and gentlemen, did I tell you the

10  first thing -- please, these lawyers are not under oath.  And

11  it's so dangerous to hear questions like that because then

12  you'll go back there and think that somebody out here testified

13  to that effect.

14              Please don't ask questions like that when you know

15  the witness --

16              **MR. KESSLER:**  I'll ask it differently, Your Honor.

17  **BY MR. KESSLER:**

18  **Q.**   If the union was negotiating for a new collective

19  bargaining agreement in 2006, just as you were in 1981-'82, do

20  you think then it would be proper for the board of player reps

21  to use their money for union operations from licensing, just

22  like you decided to do in '81-'82?

23              **MR. HUMMEL:**  Objection, Your Honor.

24              **THE COURT:**  I'll allow the question.

25              Please answer.

1          **THE WITNESS:**  For their licensing?

2    **BY MR. KESSLER:**

3    **Q.**   Yes.

4    **A.**   Yes.

5    **Q.**   Thank you.

6          Now, Mr. Laird, you also testified that when you

7    signed the retired player group licensing authorization, you

8    had an expectation that you would be paid money if six or more

9    active players were used; is that true?

10   **A.**   Former or active.

11   **Q.**   It could have been all active, right?

12   **A.**   Yes.

13   **Q.**   Okay.  Now, you first signed your group licensing

14   authorization as a retired player in 2000, correct?

15   **A.**   Yes, I believe so.

16   **Q.**   And you signed another one again in 2003, correct?

17   **A.**   No.  2004.

18   **Q.**   2004.  Thank you, sir.

19          From 2000 to 2004, you didn't receive any money from

20   licensing under your group player -- under your GLA, correct?

21   **A.**   No, I did not receive any funds.

22   **Q.**   Okay.  But you knew during that time from 2000 to 2004

23   that the union was licensing active players, right?  You knew

24   that?

25   **A.**   Sure.

1    **Q.**   Okay.  You knew there were trading cards with active

2    players, right?

3    **A.**   There has been trading cards ever since I have been in the

4    league.

5    **Q.**   Right.  And you knew there was apparel with active

6    players' names?

7    **A.**   That's from the league.

8    **Q.**   You didn't know --

9    **A.**   Apparel is from the league, sir.

10   **Q.**   How about jersey names?  Did you know there were jersey

11   names?

12   **A.**   It's from the league.

13   **Q.**   You didn't know the union licenses active player names on

14   jerseys?

15   **A.**   No, sir.  I thought it was the league through Reebok.

16   **Q.**   Okay.  You knew there were trading cards, at least.  We'll

17   start with that, right?

18   **A.**   That I can tell you.

19   **Q.**   You knew there were video games out there, correct?

20   **A.**   I heard of video games.

21   **Q.**   And you knew -- you didn't just hear of it.  You knew

22   there was a Madden game that had NFL players, right?

23   **A.**   Yeah, I heard about it, right.

24   **Q.**   Okay.  And despite the fact that you knew there was this

25   active player licensing and you knew that you didn't receive

1    any money, okay, you signed another retired player GLA in 2004,

2    correct?

3    **A.**    Yes.

4    **Q.**    And it's also true that you never once asked anyone in the

5    union:

6                 "Where's the money I should get from active

7    player licensing" during that period, right?

8    **A.**    I don't care about active player licensing.  You keep

9    asking me about active player licensing.

10   **Q.**    You don't care about it.  Did you know in this -- in this

11   case, aren't you seeking money if it's just active player

12   licensing?

13                 **MR. HUMMEL:**  Objection, Your Honor?

14                 **THE WITNESS:**  If they signed the GLA, yes, sir.

15                 **MR. HUMMEL:**  Objection, Your Honor.  There is no

16   foundation he knows what the allegations are.

17                 **THE COURT:**  Well, that's true.  The witness can't be

18   expected to know what the lawyers are contending for or not

19   contending for.  You can ask what this witness is contending

20   for or what he understood at the time.

21                 You can't try to get him to read the mind of the

22   lawyers.

23                 **MR. KESSLER:**  Okay.

24   **BY MR. KESSLER:**

25   **Q.**    Sir, are you telling the jury that you think you should

1  get paid money under your retired player GLA if it's just

2  active player licensing, more than six active players?

3  **A.**   Yes.

4  **Q.**   Okay.  So my question then is:  If that were true --

5  withdrawn.

6          My question is:  The entire time from 2000 until

7  after this lawsuit was filed, you never once complained to any

8  union official:

9               "Why am I not receiving money from active player

10  licensing," correct?

11 **A.**   Correct.

12 **Q.**   And you never once -- you, sir, were president of the

13 Baltimore chapter of the retired players association?

14 **A.**   Correct.

15 **Q.**   You never once told any other retired player that:

16               "We should be getting money from active player

17  licensing," correct?

18 **A.**   From active player licensing?

19 **Q.**   Yes.

20 **A.**   Correct.

21 **Q.**   You never once told anyone in the universe for that entire

22  period of time from 2007 -- excuse me.  You never once told

23  anybody in the universe from 2000 until after this lawsuit was

24  filed, anybody, that you were owed money from active player

25  licensing, correct?

1  **A.**    Correct.

2  **Q.**    Okay.  Now, it's also true, is it not, sir, that at the

3  time you signed your retired player GLA, your expectation is

4  that you would never receive any licensing money from trading

5  cards?

6  **A.**    Probably so.  Probably so.

7  **Q.**    Not "probably so."  That was your memory at that time,

8  correct?

9  **A.**    Probably so then, yes.

10 **Q.**    Yes, correct?

11 **A.**    Correct, yes.

12 **Q.**    In fact, your expectation was you would not receive any

13 money from any product category that existed in 2000.

14 **A.**    I didn't even -- why would I think that?

15        **MR. KESSLER:**  Your Honor, I would like to read in

16 deposition testimony.

17        **THE COURT:**  Page and line, please.

18        **MR. KESSLER:**  I would first -- first like to look at

19 page -- start out first with page 156, lines 21 to 24.  This

20 was actually a question by counsel for plaintiffs.

21        "**QUESTION:**  And you testified that a few

22        moments ago that the GLA would only apply to

23        new programs going forward?

24        "**ANSWER:**  That was my belief."

25        Then, I would like to read --

1          MR. HUMMEL:  Your Honor, under the rule of

2    completeness, again, I would like you to continue on with the

3    question and the next answer.

4          THE COURT:  Fine.  Read the next question and answer.

5          MR. KESSLER:  Question from his counsel:

6          "Is that belief based on anything.

7          "ANSWER:  Yes, my belief based on that we

8          never signed -- I believe we did when we were

9          active, as being NFLPA members, active

10         players, we signed something to allow them to

11         use our images for the Topps cards."

12         Okay.  Going on now, Your Honor --

13         MR. HUMMEL:  Your Honor, there is one more question

14   and one more answer.

15         MR. KESSLER:  I think, Your Honor, he should come

16   back at this point.  I read the next question and answer.

17         THE COURT:  Go ahead and read the next question and

18   answer.

19         MR. KESSLER:  Okay.

20         "I'm asking you" -- this was his counsel --

21         "whether there is anything in these

22         agreements, 1224 and 1225, which leads you to

23         believe that it had to be new programs?

24         "ANSWER:  Not really."

25         Now going on, Your Honor, line 19.  Now, I'm

1   questioning.

2           **MR. HUMMEL:**  What page?

3           **MR. KESSLER:**  Same page.

4           "Both those were your beliefs at the time you

5           signed the GLAs, right?

6           "**ANSWER:**  Regarding Topp cards?

7           "**QUESTION:**  Regarding Topps.  And it was also

8           your belief that it would have to be new

9           programs previously in existence" --

10          **THE COURT:**  No, "not previously in existence."

11          **MR. KESSLER:**  Sorry, Your Honor.

12          "**QUESTION:**  "And it was also your belief that

13          it would have to be new programs not

14          previously in existence at the time you

15          signed the GLA.  That was your belief?

16          "**ANSWER:**  Yes."

17  BY MR. KESSLER:

18  Q.   Now, Mr. Laird, it was your belief at the time you signed

19  your GLA that you would not receive any money from any program

20  unless it was a new program not previously in existence?

21  That's true, isn't it?

22  A.   About Topps cards, yes.

23  Q.   Okay.  It is also true for any other program not

24  previously in existence, isn't that true?

25  A.   Not really.  I only knew of one program.  As a player from

1   1982 to 19 -- 1972 to 1983 there was only one program that

2   active players knew about.  Okay.  And that's the trading

3   cards.  There was no other thing in existence.

4           The only recollection I can have, the only thing I

5   can talk to you about, Mr. Kessler, is the Topps trading cards.

6           I have no idea about what other programs there are

7   out there.

8   **Q.**   You don't recall that you also believed that, for example,

9   about Upper Deck?

10  **A.**   Topps, Upper Deck, what's the difference?

11  **Q.**   They are two different trading card companies.

12  **A.**   Well, they're trading cards, sir.  I'm referring, again,

13  to trading cards.  That's all I know about, is trading cards.

14  **Q.**   So let's start with that.  You agree with me that your

15  expectation when you signed the GLA is you would never receive

16  anything for any trading card license?

17  **A.**   I've retired.  Are they going to run new trading cards for

18  retired players, sir?

19          **MR. KESSLER:**  Your Honor, could I --

20          **THE WITNESS:**  That's the only thing that could make

21  me think that --

22          **MR. KESSLER:**  Your Honor --

23          **THE WITNESS:**  -- Topps ---

24          **MR. KESSLER:**  -- can I get a "yes" or "no" answer,

25  please?

1    **THE WITNESS:**  Judge --

2    (Laughter)

3    **THE COURT:**  Ask the question again.

4    **MR. KESSLER:**  Okay.

5  **BY MR. KESSLER::**

6  **Q.**   At the time you signed your GLAs -- yes or no, sir,

7  please, yes or no -- it was your belief you would never get any

8  licensing money for any trading card, whether it was Topps,

9  Upper Deck or any other trading card company.

10  **A.**   I was retired.

11    **MR. KESSLER:**  Your Honor?

12    **THE WITNESS:**  I was retired.

13    **THE COURT:**  Wait.  I think you can answer "yes" or

14  "no" to that.

15    **THE WITNESS:**  No.  I'm retired.  If they do retired

16  trading cards.  I want to know:  Is there a retired trading

17  card program?

18    **THE COURT:**  Can you answer the question "yes" or

19  "no"?

20    **THE WITNESS:**  No.

21  **BY MR. KESSLER:**

22  **Q.**   That was not your belief?

23  **A.**   State the question again.  Now you got me confused.

24  **Q.**   I'm not trying to confuse you, sir.

25  **A.**   Yes, you are.

1           (Laughter)

2    **Q.**   No, I'm not.

3    **A.**   Yes, you are.

4           **THE COURT:**  Let's not start arguing.

5    **BY MR. KESSLER:**

6    **Q.**   Sir, at the time you signed the GLA, it was your belief at

7    that time that you would never receive any licensing money from

8    trading cards, whether it was Topps, Upper Deck or any other

9    company?

10   **A.**   Yes.

11   **Q.**   Thank you.

12   **A.**   Thank you.

13   **Q.**   And it was also true if that you didn't believe you would

14   receive it from any other program, correct?

15   **A.**   No.

16   **Q.**   I direct your attention now to a different portion of your

17   transcript, page 154.

18           **THE COURT:**  Go ahead.  Page and line.

19           **MR. KESSLER:**  Okay.  Starting at -- let me just see.

20   Maybe it's -- okay.  Let's go -- sorry, Your Honor.  Wrong cite

21   here.

22           Oh.  Yes.  Your Honor, starting at page 154, from 23,

23   going to line 8 on page 155.

24           **"QUESTION:**  So your understanding when you

25           signed this, it would have nothing to do with

1      Topps, nothing to do with Upper Deck, nothing

2      to do with other trading cards, right?

3      **"ANSWER:**  Yeah.

4      **"QUESTION:**  So it would have to be a new

5      category that had never dealt with prior to

6      2000?

7      **"ANSWER:**  Yes."

8      **THE WITNESS:**  Have to be a new category with Topps.

9  I've already said not Topps, not Upper Deck.  You keep asking

10  me about trading cards.

11      I retired 25 years ago, sir.

12  **BY MR. KESSLER:**

13  **Q.**   When I -- your deposition took place on September 24th,

14  2008?

15  **A.**   I believe so.

16  **Q.**   Not 25 years ago, right?

17  **A.**   You're asking me about trading cards.

18  **Q.**   Okay.  And your questions --

19  **A.**   I continue to ask me --

20  **Q.**   Let me ask you, sir, do you not remember what you thought

21  when you signed your GLA in 2004?

22  **A.**   I just testified it was not about Topps or Upper Deck

23  trading cards.

24  **Q.**   Now, is it also true, Mr. Laird, that from when you

25  retired in '82 -- was it '82 or '83?

1  **A.**   '86.

2  **Q.**   You retired in '86?

3  **A.**   Yes, sir.

4  **Q.**   Okay.

5  **A.**   From professional football.

6  **Q.**   I apologize.

7        When you retired in '86, from that moment until 2000,

8  when you first signed a retired player GLA, you never had one

9  license entered into for your name or likeness on any product

10 or merchandise, correct?

11 **A.**   No.

12 **Q.**   Okay.  And so prior to signing a retired player GLA, you

13 had no licensing deals?

14 **A.**   No.

15 **Q.**   Okay.  And is it also true that since you stopped signing

16 retired player GLAs after your second one expired, that you've

17 had no licensing deals, correct?

18 **A.**   Correct.

19 **Q.**   Okay.  And to your knowledge, no one has ever used your

20 name or likeness in any product since you've been a retired

21 player?

22 **A.**   To my knowledge.

23 **Q.**   Yes.  Now, you mentioned Mr. Unitas.  You'd agree with me

24 Mr. Unitas was -- unfortunately, he's not with us anymore --

25 but he was a much more famous and well-known NFL player than

1  you, correct?

2  **A.**   Uhm, yeah --

3  **Q.**   Okay.

4  **A.**   -- though, not Baltimore.

5         (Laughter)

6  **Q.**   Okay.  I'm sure you would agree that the licensing rights

7  of Mr. Unitas, or someone like him, you would expect to be a

8  lot more valuable than the licensing rights for you?

9  **A.**   What's the agreement?

10 **Q.**   No.  I'm sorry, sir.  My question is -- I'll rephrase it.

11 I don't want to single you out.  You or Mr. Allen.  You know

12 Mr. Allen.

13 **A.**   Who?

14 **Q.**   Doug Allen.

15 **A.**   Yes.

16 **Q.**   You know he was a retired player, right?

17 **A.**   Yes.

18 **Q.**   His rights aren't worth very much, are they, as a retired

19 player?

20 **A.**   Yes.

21 **Q.**   So for people like you and Mr. Allen --

22 **A.**   Excuse me?

23 **Q.**   I said for individuals like you and Mr. Allen, who are

24 retired players whose rights are not worth very much --

25 **A.**   I take objection to that.  My rights are worth a darn lot.

1       Are you comparing me to Mr. Allen?

2       **MR. KESSLER:**  Your Honor, he is making a speech. I

3  direct the witness --

4       **THE COURT:**  He never admitted that his rights weren't

5  worth much.  That's you talking.

6       **MR. KESSLER:**  Okay.

7       **THE COURT:**  That's for the jury to decide.  You drew

8  the comparison with Mr. Allen, not the witness.

9  **BY MR. KESSLER:**

10 **Q.**  Do you agree your rights are worth less than Mr. Unitas'

11 rights?

12 **A.**  Monetarily, yes.

13 **Q.**  Okay.  So you understand my questions are now about money,

14 okay?  For players -- strike that.

15      Do you agree with me that there are many, many

16 retired players whose licensing rights are worth nothing?

17 **A.**  I wouldn't say "nothing."

18 **Q.**  How about a retired player who never played one game?

19 Would you agree that that person's rights are worth nothing?

20 **A.**  I wouldn't say "nothing," sir.  I'd say we would have a

21 hard time getting a deal.  Are you saying "nothing"?  He's not

22 worth nothing?

23 **Q.**  Well, if they never played one game, do you think someone

24 would want to put them in a football card or product if they

25 never played one game?

1    **A.**    They would be probably in a football card.

2    **Q.**    You think so?  As a retired player?

3    **A.**    There is no retired player football cards, sir, unless you

4    know something I don't.  I don't believe there was ever a

5    retired football program.

6            Is there a retired football program?

7    **Q.**    I'd like you -- sir, I know you're trying your best as a

8    witness, but could you please try to answer my questions?

9    **A.**    I'm sorry.

10   **Q.**    Please.  My question is, take a video game.  Do you think

11   any individual game company would want to use a retired player

12   image of a player who never played a game?

13   **A.**    Well, there's 11 of us.  So if it's a football team, yeah,

14   maybe they wouldn't.

15   **Q.**    He never was on a roster.

16   **A.**    Probably not.

17   **Q.**    Okay.  I'm talking --

18   **A.**    Probably not.

19   **Q.**    You know there are retired players who signed GLAs who

20   never made a roster, never?

21   **A.**    No.

22   **Q.**    Did you know that?

23   **A.**    No.

24   **Q.**    You didn't know that?

25   **A.**    No, sir.

**Q.**   Did you know there were retired players who made a roster

for two or three games, signed the GLA, but were never on the

team again?  Did you know that?

**A.**   Sir, I'll help you with -- I don't know other than five or

six of the retired players that signed GLAs.  The union never

gave us a list of who signed GLAs.

**Q.**   You never asked for that list, did you?

**A.**   No.

**Q.**   Now --

          **THE COURT:**  We are going to have to take our break.

I think we've reached the magic point.  And I need to spend at

least five extra minutes with the lawyers.

          So it will be a 20-minute break this time.  Please

remember the admonition.

          **THE CLERK:**  All rise.

          (The following proceedings were held in open court,

          outside the presence of the jury.)

          **THE COURT:**  All right.  Everyone be seated, including

our witness.

          Mr. Hummel, please come up.  The jury is not present.

Ask the questions.  I want to hear your line of questions and

the answers under oath before -- under 608.

          **MR. HUMMEL:**  I'll do my best to approximate it.  I

don't have them scripted, so let me just ask him the questions.

          **THE COURT:**  I don't need an offer of proof.  We've

1  got the witness right here.  Let's see what he would say.

2  **VOIR DIRE EXAMINATION**

3  **BY MR. HUMMEL:**

4  **Q.**   Mr. Laird, you attended these retired player gatherings,

5  correct?

6  **A.**   Yes.

7  **Q.**   And at those retired player gatherings, Doug Allen was

8  present, as well?

9  **A.**   Yes.

10  **Q.**   And you had communications with other retired players

11  about Doug Allen, correct?

12  **A.**   Yes.

13  **Q.**   And you had conversations with other retired players about

14  Doug Allen and statements that he made, correct?

15  **A.**   Yes.

16  **Q.**   Did you through those conversations form an opinion about

17  the reputation that Mr. Allen had for credibility with respect

18  to retired player license programs?

19  **A.**   Yes.

20  **Q.**   What was that opinion?

21  **A.**   That Doug Allen was just going to do whatever Doug Allen

22  is going to do.

23  **Q.**   No.  The precise question is:  Did you form an opinion --

24  did Doug Allen have a reputation among retired players for

25  being truthful or untruthful?

**A.** Mostly untruthful.

      **MR. HUMMEL:** That's the line of questions, Your Honor. And it's plainly allowed under rule 608.

      **MR. KESSLER:** Your Honor, I don't think there's any basis for that under 608 with respect to this. 608 generally applies where they can cite a specific history of: This was a statement made. We discovered it was untruthful. Therefore, that person has a reputation for untruthfulness.

      This is innuendo by unnamed players that's they're just casting aspersions on the witness.

      **MR. HUMMEL:** Actually, Your Honor, Mr. Kessler is exactly wrong. 404(b) would preclude specific instances of prior bad conduct.

      608 allows testimony on a foundation where he talked to retired players of a reputation for truthfulness or untruthfulness.

      And then he's free in his case, at that point when that door is opened, to call a witness to testify as to the, quote, truthful character of Doug Allen.

      That's how it works, in my opinion.

      **MR. KESSLER:** Your Honor, this is a sideshow. He has to have more than a foundation. I don't believe this witness could even identify the names of the players who stated this.

      **MR. HUMMEL:** That would be the subject of cross, Your Honor. That goes to weight, not admissibility.

1    **THE COURT:**  The Court is going to exclude this under

2  608, because of 403 considerations.

3    The foundation for what the witness testified to may

4  be -- is thin.  It may be enough to be sustained under 608(a).

5    But this is very weak character evidence.  And if it

6  does not warrant the time that this is going to consume.

7    So there's plenty of ways to attack Mr. Allen without

8  asking this witness to go out on a limb and so forth.  So that

9  would only invite -- it would just wind up being a donnybrook,

10 and too much time would be consumed under it.

11    Under 403, this line of questions is going to be

12 excluded.

13    **MR. HUMMEL:**  Okay, Your Honor.

14    **THE COURT:**  We will take our break.

15    **MR. KATZ:**  Your Honor, can we just make it clear that

16 no one is to speak to Mr. Allen, for everybody in the

17 courtroom.

18    **MR. HUMMEL:**  Mr. Laird?

19    **MR. KATZ:**  Mr. Laird.  Excuse me.

20    **THE COURT:**  Well, he's on examination.

21    **MR. KATZ:**  Right.  Just so everyone hears, Your

22 Honor.

23    **THE COURT:**  So you should not be talking to the

24 lawyers.  I wouldn't expect that you would, but the ground rule

25 here is when the witness is on the stand during breaks you

1    don't go and talk to the lawyers, all right?

2           **MR. PARCHER:**  Your Honor, just a very brief point.

3           **THE COURT:**  Yeah.

4           **MR. PARCHER:**  Thank you.

5           I believe inadvertently, but I don't want to be

6    presumptuous, when the-retired-players-don't-vote subject came

7    up, Your Honor said:  We're not going to get into collective

8    bargaining here.

9           Where Your Honor previously had ruled, I think it was

10   when I was -- when I was on --

11          **THE COURT:**  Yes.

12          **MR. PARCHER:**  That that was going to be for the jury

13   to decide whether he was referring to collective bargaining,

14   whether his remarks were limited -- Upshaw's remarks were

15   limited to collective bargaining, or whether they went beyond

16   that.

17          And I don't think -- I could be wrong, but I don't

18   think Your Honor was intending to change that expression when

19   you said what you said.

20          **THE COURT:**  I don't know what you're talking about.

21          **MR. PARCHER:**  Okay.

22          **THE COURT:**  What you just said is so vague and

23   ambiguous, I don't have a clue.

24          **MR. PARCHER:**  I'll say it again.  I'll say it again,

25   and I'll make it clear.

1          Pardon me?  I don't think we need to.

2          **THE COURT:**  What are you getting at?

3          **MR. PARCHER:**  I'll make it clearer, Your Honor.

4   There was a quote of Gene Upshaw's --

5          **THE COURT:**  Right.

6          **MR. PARCHER:**  -- about retireds, that he wasn't -- he

7   doesn't represent them, and they don't vote.

8          There was a whole colloquy before Your Honor where

9   Mr. --

10         **THE COURT:**  I do remember that, yes.

11         **MR. PARCHER:**  -- where Mr. Kessler was claiming that

12  those remarks were limited to collective bargaining.

13         Your Honor took a look at it at that time and said:

14  No, that's going to be -- at least this is my recollection.  I

15  don't have a transcript -- that's going to be for the jury to

16  decide.  I'm not going to decide whether he was limiting his

17  remarks or whether it went beyond that.

18         Today, when the subject of retireds don't vote came

19  up through Mr. -- through Mr. Hummel, Your Honor said:

20  We're not going to get into anything about collective

21  bargaining.

22         And I don't think Your Honor was focused on the

23  information that I'm giving you now, when --

24         **THE COURT:**  What information?

25         **MR. PARCHER:**  That Your Honor had already said you're

1  not going to make that decision; that you're going to leave it
2  up to a jury.
3       THE COURT:  What I have been trying to say is this
4  generalized grievance that the union has done a poor job -- do
5  you need a cough drop?
6       THE WITNESS:  Yes, sir.  Thank you.
7       You got the good ones?
8       THE COURT:  This is all I've got.
9       THE WITNESS:  Thank you, sir.
10      THE COURT:  I hope that helps some.
11      Those of you who follow this sport can realize that
12  there is a general controversy between the retired players and
13  the union over pension benefits and retirement and health
14  benefits.
15      And maybe the union has done a crummy job on now,
16  past and future, but that's a different issue.
17      MR. PARCHER:  Correct.  Agreed.
18      THE COURT:  And our issue here is this GLA, just the
19  GLA.  And so I've been trying to focus on the GLA and allow
20  just enough other evidence from these other transactions to
21  shed some light on the extrinsic circumstances surrounding the
22  GLA.
23      MR. PARCHER:  Right.
24      THE COURT:  Both sides have been given a fair amount
25  of latitude on that.  And I'm not sure what you're getting at

1  here.  I don't know what motion you're making or whether you're

2  just making another speech.

3          **MR. PARCHER:**  I'm not making a speech, Your Honor.

4          **THE COURT:**  What is it you're asking me to do?

5          **MR. PARCHER:**  I'm respectfully calling to Your

6  Honor's attention that perhaps inadvertently you suggested that

7  the-retired-players-don't-vote remark was limited to the

8  context of collective bargaining.

9          That's what Your Honor said.  Whereas, a few days ago

10 Your Honor had said:  I'm not going to decide that.  That will

11 be for a jury to determine.

12         **THE COURT:**  They don't vote.

13         **MR. PARCHER:**  They don't vote, but was that remark

14 limited to a collective bargaining type of speech or was that

15 a -- a statement that related to the retired players generally?

16         **THE COURT:**  What did I rule when this motion in

17 limine came up?  Did I exclude the comment or not?

18         **MR. PARCHER:**  I don't believe you did.  I believe you

19 said:  I'm not going to decide that.  I'm going to leave it.

20         I don't know whether there was a motion in limine or

21 not.

22         **MR. HUMMEL:**  I have the order, Your Honor.

23         **MR. KESSLER:**  Your Honor --

24         **MR. PARCHER:**  I don't know why I'm not being clear.

25 Maybe somebody can say it better than I can.

1     **THE COURT:**  You know, I'm sorry. I hope I'm not -- I

2  hope the Appellate Court will read this transcript and ask

3  themselves what is it that Mr. Parcher is specifically asking

4  me to do?

5     I haven't got a clue.  Are you asking to put

6  something in evidence?

7     **MR. PARCHER:**  No.  I'm asking Your Honor to

8  reconsider a remark that I believe you spontaneously made that

9  seemed to link the Upshaw comment about not -- retireds don't

10 vote, to collective bargaining and, therefore put it out of the

11 case rather than leaving it to their consideration.

12    **MR. KESSLER:**  Your Honor --

13    **MR. PARCHER:**  Excuse me, please.  Let me finish.

14    **THE COURT:**  I'm not going to say anything more on

15 this subject to the jury now.

16    If you want to propose a jury instruction that I

17 could give either soon or later, I will be happy to consider

18 it.

19    **MR. PARCHER:**  Okay.  Thank you.

20    **THE COURT:**  Please put it in writing and give my your

21 points and authorities so I can understand the context.

22    But I am confused as to what you're getting at.

23    **MR. PARCHER:**  Okay.  It has to be me, then.  I'll try

24 to be clearer in writing.

25    **THE COURT:**  Take 15 minutes.

1     (Recess taken from 11:24 to 11:39 a.m.)

2          **MR. KESSLER:**  Your Honor, one quick preliminary

3   subject.

4          **THE COURT:**  All right.

5          **MR. KESSLER:**  Pat Allen is here, Your Honor, and you

6   recall she will either testify today or next week.

7          What I told Mr. LeClair if we start her at noon,

8   okay, which we might do, I have about 10 or 15 more minutes --

9   I don't know what they're going to do -- then we should try to

10  get her on.

11         But if it ends up being later than noon, then since

12  she cannot complete tomorrow, she would have to come back next

13  week.  And they should go to their next witness, Mr. Beach, who

14  is in the courtroom, so there isn't that interruption for the

15  jury and that period of time.

16         And the witness, she won't come back then, as Your

17  Honor ruled yesterday.

18         **THE COURT:**  Whose witness is she?

19         **MR. LECLAIR:**  She's our witness.

20         **MR. KESSLER:**  She's their witness.

21         **THE COURT:**  What do you want me to do?

22         **MR. LECLAIR:**  Our request is, we've requested to call

23  her, and that we call her whenever she comes up.  If she

24  finishes, she finishes.  If she doesn't, we'll accommodate her

25  request to go to her birthday party, and she'll come back next

```
 1  week to finish.
 2          THE COURT:  When are we going to finish with the
 3  witness on the stand?
 4          MR. KESSLER:  Oh, no.  We're going to finish this
 5  witness now.  I have about 10 or 15 more minutes with him and
 6  I'm done.  This may not be an issue.
 7          It depends on how long they go on redirect with
 8  Mr. Laird.
 9          THE COURT:  Well, look.  I would rather not interrupt
10  her testimony.  So if we can't -- in your judgment we can't get
11  her on and off, then skip her for now and go to the next
12  witness so that we don't have the long hiatus.
13          MR. KESSLER:  Thank you, Your Honor.
14          THE COURT:  All right.  Okay.
15          Before we bring in the jury, the court reporter has
16  told me, Mr. Kessler, she's having trouble with you because you
17  interrupt the witness.
18          So you are speaking over -- you're not the only one
19  who has done this -- but right now you're the one that's
20  causing the trouble.  So you have to stop.
21          MR. KESSLER:  I will, Your Honor.  I think in this
22  particular witness he's both interrupting me and I may be
23  interrupting him.  So it may be both sides.  But I understand
24  the problem, and I will be careful.
25          MR. LECLAIR:  Your Honor, because of some logistical
```

1   issues we have, we did not think we would get to Beach.  Would

2   it be all right, instead of calling Beach, who we are not ready

3   to call from an exhibit standpoint, could we read the

4   deposition of Mr. Eyrich to finish out the day?

5            That's because we just did not expect --

6            **MR. KESSLER:**  I have no objection to that.

7            **THE COURT:**  If you're ready to go, do that.

8            **MR. LECLAIR:**  We'll be ready.

9            **THE COURT:**  Somebody is hacking and coughing.

10           **MR. KATZ:**  It's just me, Your Honor.  It's just an

11  allergy.  It's nothing contagious.

12           **THE COURT:**  I know, but germs are going everywhere.

13  Be mindful.  The rest of us are trying to keep well.

14           **MR. KATZ:**  Yes, Your Honor.

15           **THE COURT:**  Let's bring in our jury, and continue on.

16  Where is our witness?

17           **THE WITNESS:**  Right here, Your Honor.

18           **THE COURT:**  Bring in our jury.  You lawyers must know

19  that anytime there is a videotape deposition even for

20  impeachment the court reporter does not take it down.  You know

21  that.  That's the ground rule.

22           So if you want a record of it, you've got to somehow

23  agree to put in the record what it was or give us the page and

24  line number at the time so that there will be a record of it.

25           **THE CLERK:**  All rise.

1          **THE COURT:**  Usually, the lawyers can agree on it.

2    It's not a problem.

3          Please, come right in.

4          (Thereupon, the jury enters the courtroom.)

5          **THE COURT:**  Welcome back.  Have a seat.

6          I'm going to ask the witness and lawyers on both

7    sides to try not to step on each other's questions and answers,

8    so we get clear-cut questions, no interruption, clear-cut

9    answer, no interruption.  And that way it will be easier for us

10   all to follow, including the court reporter.

11         Please go ahead, Mr. Kessler.

12                    **RECROSS EXAMINATION (RESUMED)**

13   **BY MR. KESSLER:**

14   **Q.**   Mr. Laird, you were asked some questions by counsel for

15   plaintiffs about retired player conventions.  Do you recall

16   that?

17   **A.**   Yes.

18   **Q.**   And I believe you testified you only attended one retired

19   player convention since you've been a retired player, correct?

20   **A.**   I believe so, yes.

21   **Q.**   So you have no idea it what Mr. Allen may or may not have

22   said about retired player licensing at all of the retired

23   player conventions that you did not attend?

24   **A.**   Not me personally, no.

25   **Q.**   Okay.  And it's also true, isn't it, that other people

1  speak about retired player licensing at retired player

2  conventions besides Mr. Allen from the union?  Did you know

3  that?

4  **A.**   I think Mr. Allen does most of it.

5  **Q.**   Well, you've only attended one convention, sir, so how do

6  you know what happens at the other conventions?

7  **A.**   I talk to the other chapter presidents.

8  **Q.**   Okay.  Is it your understanding Mr. Allen is the one who

9  ordinarily speaks?

10 **A.**   Most of the time, yes.

11 **Q.**   And you have no idea from any personal knowledge what he

12 has said at those other conventions?

13 **A.**   Personally, no.

14 **Q.**   Now, you also testified, Mr. Laird, that you did attend a

15 meeting of chapter presidents of the retired players

16 association in Baltimore in 2004.  Is that correct, or --

17 **A.**   I believe it's 2005.  I believe the date was October.

18 **Q.**   Was it 2006, actually?

19 **A.**   It could have been.

20 **Q.**   2006?  Okay.

21 **A.**   Could have been.

22 **Q.**   Let me show you a document that may refresh your

23 recollection.

24       **MR. KESSLER:**  Do we have Trial Exhibit 2362?  Is it

25 in my stack here somewhere?  It's not up here.  I don't think

1    we've handed it up.

2              Thank you.  Okay.

3              May I approach the witness, Your Honor?

4              **THE COURT:**  Please.

5    **BY MR. KESSLER:**

6    **Q.**   And do you recall this e-mail exchange between you and

7    Mr. Allen?

8    **A.**   Yes.

9    **Q.**   And this e-mail exchange was in October of 2006, correct?

10   **A.**   Yes.

11   **Q.**   Now, does that refresh your recollection that the meeting

12   of the chapter presidents you attended in Baltimore was in

13   October of 2006?

14   **A.**   Yes, not 2005.

15   **Q.**   Okay.  Now, you told the jury on the questioning from your

16   counsel that when Mr. Allen gave you a list of more than 300

17   retired players who received about $7 million in revenues, that

18   you assumed that was group licensing revenue under the GLAs you

19   signed, the retired player GLAs, and not ad hoc agreements,

20   correct?  That's what you told the jury?

21   **A.**   I don't recall that.

22   **Q.**   Okay.  Well, let me clarify this.  When Mr. Allen showed

23   you a list of more than 300 players --

24   **A.**   He never showed me a list, sir.

25   **Q.**   When he sent to you the list --

1  **A.**   He never sent me a list of the names.

2  **Q.**   You don't recall that in Baltimore Mr. Allen either

3  displayed or showed the list of the 857 payments to 358 retired

4  players totaling $7,061,000?

5  **A.**   No, sir, there was never a list presented.

6  **Q.**   Did he tell you that there were 857 payments to 358

7  retired players, totaling 7,061,000?

8  **A.**   Now you have it right.

9  **Q.**   Okay.  I just want to understand.  When I was sitting

10 down, I thought I heard you tell the jury that you did not

11 think those were ad hoc licenses.  You assumed it must be

12 retired player group licensing.

13         Wasn't that what you told the jury?

14 **A.**   I don't I spoke about this to the jury.  The only thing I

15 mentioned is that Doug Allen spoke about giving certain amount

16 of players' money, retired players.

17 **Q.**   Okay.  If you don't -- you may not recall exactly what you

18 said.

19 **A.**   Right.

20 **Q.**   I know it's hard to be there.  So let me just ask you now.

21 When Mr. Allen told you at this meeting that there were -- in

22 2006, that there were payments to 358 retired players in one

23 year, in one year, totaling 7,061,150, did you understand that

24 to be ad hoc licensing?

25 **A.**   I never knew what ad hoc was at the time.

1  **Q.**   Did you think it was group licensing?

2  **A.**   I thought it was licensing.

3  **Q.**   Well, in terms of your retired player GLA, you testified a

4  lot about what you thought was group licensing.  Do you recall

5  that?

6  **A.**   Yes, sir.

7  **Q.**   Did you think this was group licensing at the time?

8  **A.**   Yes.

9  **Q.**   Okay.  So you just told the jury you thought that was

10  group licensing, correct?

11  **A.**   Probably, yeah.

12  **Q.**   Okay.  And what Mr. Allen told you is that that money was

13  given out to the individual 358 players, correct?

14          **MR. HUMMEL:**  Objection, Your Honor.  Misstates the

15  document which he has not put in evidence.

16          **THE COURT:**  Well, the -- whether it misstates it or

17  not is -- this is not -- his question is not anchored in any

18  document.  So if the information is not correct, the witness

19  can say so.

20          Overruled.  Please answer.

21  **BY MR. KESSLER:**

22  **Q.**   Okay.  Mr. Allen told you the payments were made to

23  individual retired players, 358, correct?

24  **A.**   Yes.

25  **Q.**   And you knew you were not one of those 358 players because

1  you didn't get any payment, right?

2  **A.**    Correct.

3  **Q.**    And when you heard this information at the convention, you

4  didn't tell anyone from the union, Mr. Allen or any retired

5  player:

6              "Wait a minute.  This is group licensing as I

7  understand it.  Where's my payment?  Where's my -- where's my

8  check?"

9          You didn't say that, did you?

10 **A.**    No.  I assumed I was not part of the 358 players.

11 **Q.**    In other words, you thought the only players who should

12 get paid were those players whose rights were used, correct?

13 **A.**    I assumed I was not part of the 358 players, yes.

14 **Q.**    But what you mean by that is your understanding in 2006 is

15 that if your rights were used, so you would be one of the 358,

16 you would get money?

17 **A.**    Yes.

18 **Q.**    And if your rights weren't used, you didn't get money

19 because they didn't use your rights.  That was your

20 understanding, correct?

21 **A.**    Yes.

22 **Q.**    And you never told Mr. Allen that there was something

23 wrong with that, correct?

24 **A.**    No.  I didn't get around to it.

25 **Q.**    You also -- not that you didn't get around to it.  You

1  didn't believe there was anything wrong with it.

2  **A.**   No, I didn't get around to it.

3  **Q.**   Well, you did communicate to Mr. Allen --

4           **MR. KESSLER:**  I would like to move into evidence,

5  Your Honor, this exchange between Mr. Allen and Mr. Laird,

6  Trial Exhibit 2362.

7           **THE COURT:**  Any objection?

8           **MR. HUMMEL:**  2362?  No objection.

9           **THE COURT:**  Thank you.  Received.

10          (Trial Exhibit 2362 received in evidence.)

11          (Document displayed.)

12 **BY MR. KESSLER:**

13 **Q.**   This is a series of e-mails.  Like these e-mails work, we

14 have to start at the second page first, and work our way up the

15 chain, if you will.

16          So let's go, first, to the bottom of the chain.  And

17 the first e-mail is from you, sent to Qiana Thomas and other

18 people at the NFL Players Association, correct?

19 **A.**   Yes.

20 **Q.**   You said:

21               "Qiana, as a member of the NFL" -- I think you

22 meant NFLPA.  Not the R, right?  That's just a typo?

23 **A.**   No, it's an R.

24 **Q.**   Oh, I'm sorry.  Retired.  You are correct, sir.  I

25 apologize.

1          You said:

2                "As a member of the NFL Retired Players

3    Association ..."

4          That was different, in your mind, from the NFLPA,

5    correct?

6    **A.**    It's a subsidiary.

7    **Q.**    I'm sorry?

8    **A.**    Subsidiary.  Subsidiary.

9    **Q.**    I see.  Okay.

10               "As a member of the NFLRPA, I am requesting the

11   information that Doug Allen said was available to us at the

12   chapter meeting, the names and amounts of money that Players

13   Inc has given to the retired players.  Second request."

14         Then, let's look on the next page, if we can.  It

15   says:

16               "Bruce:  I will call and discuss" -- let's see

17   who it's from, first so we can say.

18         This is from Doug Allen, correct, to you?  Right?

19   **A.**    Yes.

20   **Q.**    And he said:

21               "Bruce:  I will call you and discuss any

22   questions you have.  But, as I said at the Baltimore meeting,

23   the specifics of individual deals are often confidential and

24   the list is not for publication or circulation.  I would be

25   glad to give you the range of payments overall and how many

1  opportunities particular players had when we speak if you are

2  interested.  Any progress with Andre?"

3          And that seems to be another issue.

4          Mr. Allen was telling you, was he not, that these

5  were individual deals, correct?

6  **A.**  No.

7  **Q.**  Okay.

8  **A.**  You can assume he was telling me that, but he doesn't say

9  it.

10 **Q.**  Well, when he said in the second line:

11         "The specifics of individual deals," you didn't

12 understand an individual meant "individual"?

13 **A.**  No, not really.

14 **Q.**  Okay.  Looking at the next -- the next one, your response,

15 saying:

16         "That is exactly" -- I'm sorry.  I may have left

17 one out.  Did I leave one out in the middle?  Okay.

18         (Document displayed.)

19         Is there some -- okay.

20         "Thanks."  This is your response.  "It would be

21 nice to know which guys out of the 3500 that the NFLPA said are

22 part of the Players Inc program take part in programs and the

23 total of monies that is given to retired guys."

24         Now, Mr. Laird, when you wrote this you clearly

25 understood that the players who were being paid were those who

1   were getting deals and not everybody who signed the GLA, right;

2   you understood that?

3   **A.**    No, it's not correct.  It's not correct.

4          I asked him, out of what they put on the Web site,

5   out of the 3500 players they said are part of Players Inc's

6   programs.  Part of Players Inc programs.  I was absolutely

7   specifying "part of Players Inc programs."  Those were my

8   words.

9   **Q.**   Okay.

10  **A.**   And Doug Allen's response to me was:

11             "Here's the list.  I'm not going to give you the

12  names.  There's 358 players, 857 guys."

13         And he told me in a conversation that I had with him,

14  just to clarify for you, that the amounts were from 500 to

15  $250,000.

16  **Q.**   Let's look to the next response from Mr. Allen.  It says:

17             "That is exactly what we gave you in Baltimore.

18  That was the total list of retired players paid last year and

19  the total amount paid.  857 payments to 358 players totaling

20  7,061,150.  It was the second line on the list we passed out."

21         Now, he passed out a list at the meeting, right?

22  **A.**   As my first e-mail said, I didn't stay long enough at the

23  meeting.  I may have missed the list.

24  **Q.**   Okay.  What you're now telling the jury is not that there

25  wasn't a list provided, but perhaps you left early and wasn't

1 there when he passed out the list of the players.

2 **A.**   That could have been.  But we've never -- I was never

3 given a list.  I asked for the list.

4 **Q.**   Okay.  Well, if you were at the meeting and stayed for the

5 whole meeting you would have gotten whatever was passed out,

6 right?

7 **A.**   Possibly.

8 **Q.**   Okay.  And Mr. Laird, if you thought there should have

9 been money paid not to 358 players, but should have been paid

10 to all 2,000 players who signed retired player GLAs, you didn't

11 say anything about that, did you, to Mr. Allen, in these

12 e-mails?

13 **A.**   I wasn't thinking about the GLAs, sir, at the time.  This

14 was in 2006.  I was asking about retired players' benefits --

15 **Q.**   Okay.

16 **A.**   -- out of the Players Inc program.

17 **Q.**   You know --

18 **A.**   So I'm supposed to get back and say:

19           "Oh, I remember I signed a GLA, and I'm supposed

20 to get paid" to my union?

21 **Q.**   Sir, you signed the GLA, I believe, once in April 19,

22 2000, and then again July 5th, 2004.  Are you saying that the

23 retired player GLA was so unimportant to you, you didn't even

24 remember you signed it when you were discussing licensing with

25 Mr. Allen?  Is that your testimony?

1   **A.**   Of course I remember signing it.  It wasn't -- it wasn't

2   on my mind about the exact wording of the GLA.

3   **Q.**   Okay.  Mr. Laird, let me move on to another subject.

4          It's correct, isn't it, you've testified you got the

5   GLA in the mail.  You signed it, put a stamp on it and sent it

6   in, correct?

7   **A.**   Or it could have been a self-addressed envelope back to

8   them.

9   **Q.**   So it may not even have cost you a stamp, right?

10  **A.**   Could have been.

11  **Q.**   And you didn't have to -- you didn't have to pay anything

12  to sign the GLA, right?

13  **A.**   No.

14  **Q.**   The GLA you signed, the second one in 2004, was

15  non-exclusive, right?

16  **A.**   I don't know.  You'd have to show it to me.

17  **Q.**   You don't recall?

18  **A.**   No.

19          **MR. KESSLER:**  Could we put up the second retired

20  player GLA?

21          This is Trial Exhibit 12 -- what is it, 25?

22  **BY MR. KESSLER::**

23  **Q.**   And if you look at the first line, you'll see it says

24  "non-exclusive."

25          (Document displayed.)

1          Does that refresh your recollection, sir?

2   **A.**   Yes, I see "non-exclusive."

3   **Q.**   So by signing this and maybe putting it in a

4   self-addressed envelope, you didn't -- you were still free to

5   do a deal with anyone else you wanted to do a deal with,

6   correct?

7   **A.**   Sure.

8   **Q.**   You didn't give up anything by signing this, except that

9   if an opportunity was found for you, then the Players

10  Association would give you that, and you benefited from it,

11  right?

12  **A.**   I gave up my rights to them, yes.

13  **Q.**   Right.  You gave up your rights, but you didn't give it up

14  exclusively.  You gave them the right to find any opportunities

15  they could find for you, right?

16  **A.**   Correct.

17  **Q.**   And if they found no opportunities for you, you weren't

18  expecting anything, right?

19  **A.**   Not if they didn't find anything, no.

20  **Q.**   I would now like to move on to -- you mentioned that

21  you -- you used the word "agent."  You thought of the NFLPA as

22  your agent.  Do you remember that testimony?

23  **A.**   Yes.

24  **Q.**   Now, when were you an active player did you have an agent?

25  **A.**   Yes.

1  **Q.**   Okay.  And when you had an agent, you signed an agency

2  agreement, right?

3  **A.**   Yes.

4  **Q.**   And that said they were going to be your agent, right?

5  **A.**   In some words to that effect.  I can't remember --

6  **Q.**   Right.  The retired player GLAs you signed said nothing

7  about the NFLPA being your agent, correct?

8  **A.**   Not in words.

9  **Q.**   Well, not in words or in any other substance, if you look

10 at the paper, right?  There was no reference to agent?

11 **A.**   Not in words.

12 **Q.**   Okay.  Was there something else other than words in the

13 authorization form that told you it was an agent?

14 **A.**   I was giving them my rights to use my image in my playing

15 days for licensing.  So that to me is what agents do.

16 **Q.**   That's the only basis of your testimony to the jury you

17 thought this was an agency?

18 **A.**   Yeah.

19 **Q.**   But you also testified to the jury you had absolutely no

20 control over what they did with those rights, correct?

21 **A.**   No.

22 **Q.**   You had no control over the licensing business of Players

23 Inc?

24 **A.**   I've never even seen a licensing agreement with Players

25 Inc.

1  Q.   So you had no control, yes?

2  A.   Yes.

3  Q.   Thank you.  All right.

4        Now, you also mentioned that -- that you -- I guess

5  your son had a conversation with someone else who said:

6             "I saw your dad in the Madden game."

7        Do you recall that?

8  A.   Yes.

9  Q.   Who was the conversation with?  I just couldn't hear --

10 A.   One of my son's friends.

11 Q.   One of your son's friends.  And this conversation took

12 place in what year?

13 A.   I don't know.  It was a while ago.

14 Q.   Okay.  Was it -- was it in the last two or three years?

15 A.   Probably so.

16 Q.   Okay.  It was after -- later than 2003, correct?

17 A.   I would assume so, yes.

18 Q.   Okay.  Now, your counsel showed you a version of the

19 Madden game in 2003 that had your number.  You said that was

20 your number, 40, I think it was, right?

21 A.   Yes.

22 Q.   Okay.  Now, you know, sir, that after 2003 your number

23 never appears.  It's a different number, right?

24 A.   I was told that, yes.

25 Q.   Okay.  So the only year your number ever appeared was

1  2003, correct?

2  **A.**   To the best of my knowledge.

3  **Q.**   Did you know that this case is about 2004 to 2007?

4  **A.**   Not really.

5  **Q.**   Okay.  So during 2004 to 2007, Madden never used even your

6  number, correct?

7  **A.**   I don't know.  I guess not.

8  **Q.**   Okay.  And they didn't use your name and they didn't use

9  your image, correct?

10 **A.**   Well, they used my image when they used:  Six-one, 198,

11 six years in the league, and 27 years old.

12 **Q.**   They didn't use your picture or your name?

13 **A.**   That's correct.

14 **Q.**   They didn't use your number after 2003?

15 **A.**   Correct.

16 **Q.**   Okay.  Now, are you saying that your son's friend knew

17 what your weight was when you played football or your height?

18 **A.**   No.

19 **Q.**   Okay.  So he couldn't have gotten any information from

20 that, right?

21 **A.**   Right.

22 **Q.**   Okay.  And it didn't have your number, correct?

23 **A.**   I don't know what game he was playing, sir.

24 **Q.**   If it was after '03, he didn't have your number, correct?

25 **A.**   I don't know what game he was playing.

1  | Q.  So is it your testimony simply that just because you were

2  | on that team, you know you were on that team, right?

3  | A.  Everybody knows I'm on that team.

4  | Q.  Okay.  Well, do you think young -- well, do you think --

5  | do you know who buys video games today?

6  | A.  Probably young people.

7  | Q.  Yeah.  Do you think all the young people remember, with

8  | all due respect, sir, who was on your team in different

9  | positions, especially if it wasn't a superstar like Mr. Unitas?

10 |         MR. HUMMEL:  Objection.  Speculation, Your Honor.

11 |         THE WITNESS:  In and around Baltimore.

12 |         THE COURT:  Isn't it just argument?

13 |         MR. KESSLER:  Okay, Your Honor.

14 |         THE COURT:  Save that for closing argument.

15 |         MR. KESSLER:  Okay.  Very good.

16 | BY MR. KESSLER:

17 | Q.  Now, you speak a lot to retired players, sir, because

18 | you're a chapter president, correct?

19 | A.  Correct.

20 | Q.  And it's true, isn't it, that you never heard one retired

21 | player say that they expected to get paid under a GLA if their

22 | rights were not licensed and used?

23 |         You never heard that.

24 |         MR. HUMMEL:  Objection.  Compound, Your Honor.

25 |         THE WITNESS:  I don't recall.  I'm not understanding.

1          **THE COURT:**  Wait.  I think it's -- I'm going to

2    overrule the objection.

3          If you understand the question, please answer.

4          **THE WITNESS:**  Could you restate the question again?

5    **BY MR. KESSLER:**

6    **Q.**  When you talked to retired players about licensing -- you

7    did that sometimes, correct?

8    **A.**  Very limitedly.

9    **Q.**  Okay.  But at the times you did, did any retired player

10   ever say to you:

11         "I should get paid even if they don't use my

12   rights"?

13   **A.**  No.

14   **Q.**  Did any retired player say to you:

15         "I should get paid" -- this is before this

16   lawsuit now, my question.  Did any retired player before this

17   lawsuit ever say to you:

18         "I should get paid out of active licensing"?

19   **A.**  No.  GLAs weren't even brought up.

20         **MR. KESSLER:**  Now, can you put up the retired player

21   GLA again for just one moment.

22         1225, I think.

23         (Document displayed.)

24   **BY MR. KESSLER:**

25   **Q.**  It's correct, isn't it, that you didn't have a clue as to

1 how you would receive money under this retired player GLA when

2 you signed it; is that correct?

3 **A.**   Correct.

4 **Q.**   Not a clue at all?

5 **A.**   Not a clue.

6         **MR. KESSLER:**  Thank you.  I have no further

7 questions.

8         **THE COURT:**  All right.  Redirect.

9         **MR. HUMMEL:**  Thank you, Your Honor.

10        Could I have Exhibit 1225 on the board, please.

11        (Document displayed.)

12                  **<u>REDIRECT EXAMINATION</u>**

13 **BY MR. HUMMEL:**

14 **Q.**   Mr. Laird, calling your attention to the third to last

15 paragraph of Exhibit 1225 -- I'm sorry, the next one.  Starts:

16            "If the undersigned player's inclusion."

17        Did you read that when you signed this agreement,

18 sir?

19 **A.**   I'm sure I did.

20        **MR. HUMMEL:**  It's not a paragraph that's been focused

21 on very much, Your Honor, so I would like to read it into the

22 record.

23        **THE COURT:**  Go ahead.

24        **MR. HUMMEL:**  "If the undersigned player's inclusion

25 in a particular NFLPA program will conflict with an individual

1  exclusive endorsement agreement, and the player provides the

2  NFLPA with timely notice of that conflict, the NFLPA agrees to

3  exclude the player from that particular program."

4  **BY MR. HUMMEL:**

5  **Q.**   What did you understand that paragraph to mean?

6  **A.**   That if I had a conflict with a particular situation,

7  i.e., I'm sure, sponsorship or program or marketing, that all

8  I'd have to do was give timely notice to the NFLPA, and they'll

9  exclude me from this particular GLA, or this particular

10 program, whatever that program is.

11 **Q.**   So Mr. Kessler asked you a question where he said -- he

12 said, his words -- "absolutely no control."

13         Did this paragraph, in your mind, give you any

14 control?

15         **MR. KESSLER:**  Objection, Your Honor.  This is

16 leading.

17         **THE WITNESS:**  Yeah --

18         **THE COURT:**  It is leading.  Please ask it a different

19 way.

20 **BY MR. HUMMEL:**

21 **Q.**   What did this paragraph mean to you in terms of control

22 you had or didn't have?

23 **A.**   It meant if I had some conflicts I could give them writing

24 and be excluded from the program.

25 **Q.**   One more question.

1      **MR. HUMMEL:** If you could call up the second

2 paragraph there. That one.

3          (Document displayed.)

4 **BY MR. HUMMEL:**

5 **Q.** Mr. Kessler asked you about conversations you had with

6 retired players and representatives of the union. I just want

7 to ask you one more time: Did anyone ever tell you that "six

8 or more present or former" didn't really mean that?

9 **A.** No.

10 **Q.** Now, Mr. Kessler seems to think it's important that you

11 didn't complain.

12        **MR. KESSLER:** Your Honor, I move --

13 **BY MR. HUMMEL:**

14 **Q.** Why didn't you complain?

15        **MR. KESSLER:** I move to strike. He's arguing

16 about --

17        **THE COURT:** Sustained.

18        **MR. HUMMEL:** Fair enough.

19 **BY MR. HUMMEL:**

20 **Q.** Why didn't you complain when you didn't receive money?

21 **A.** Because I trusted the union would do a program, and if we

22 had a program we would get paid. I don't need the money.

23 **Q.** And Mr. Laird, Mr. Kessler asked you about some testimony

24 you gave in your deposition, which was under oath, right?

25 **A.** Right.

1          **MR. HUMMEL:**  I apologize for leading.  That's a

2   preparatory question.

3          **THE COURT:**  That's all right.  It's preliminary.

4   **BY MR. HUMMEL:**

5   **Q.**   And you were sworn to tell the truth in your deposition,

6   right?

7   **A.**   Yes.

8   **Q.**   And did you intend to tell the truth in your deposition?

9   **A.**   Absolutely.

10  **Q.**   Now, when you were talking about Topps and Upper Deck and

11  he was asking you questions in your deposition about that, what

12  was in your mind?

13  **A.**   When I was an active player that's all I knew about was

14  Topps or Upper Deck.  So I was referring to them as an active

15  player.

16  **Q.**   Did you know anything about other licenses that the NFLPA

17  either did or didn't enter into for retired players?

18  **A.**   We were never told a thing about that.

19  **Q.**   All right.  So now let's go to Exhibit 2362, and put this

20  on the board.  It's the e-mail exchange between you and

21  Mr. Allen.

22          While you're getting it out, Mr. Laird, did you have

23  a sense of whether or not Mr. Allen was agitated with you for

24  sending these e-mails?

25          **MR. KESSLER:**  Objection, Your Honor.

1    **THE COURT:**  Calls for speculation.  Sustained.

2    **BY MR. HUMMEL:**

3    **Q.**  Well, you wrote to him in the first line --

4          **MR. HUMMEL:**  If you could just --

5          **THE WITNESS:**  The same one.

6    **BY MR. HUMMEL:**

7    **Q.**  No, first line at the very top.

8          "Doug," you wrote this, right?

9    **A.**  Yes.

10   **Q.**  "You're cute when you're mad."

11   **A.**  Yes.

12   **Q.**  What did you mean by that?

13   **A.**  Well, because Doug gets very aggravated and very intense

14   and very argumentative and absolutely downright ornery when you

15   ask him questions.

16   **Q.**  So now let's go to the second page of the exhibit, which

17   is actually your first e-mail, your initial inquiry.  Who is

18   Qiana?

19   **A.**  She is works for the NFLPA.

20   **Q.**  And what were you intending to ask?  This is an e-mail you

21   wrote, right?

22   **A.**  Yes.

23   **Q.**  What were you intending to ask?  What did you want to

24   know?

25   **A.**  I wanted to know about the -- the retired players' monies

1  that were generated by Players Inc to retired players.

2  **Q.**   Did you, in your mind, have any distinction between

3  "ad hoc" and "group" when you wrote this?

4  **A.**   Sir, I didn't even know what an ad hoc agreement was until

5  two months or six weeks before this trial.

6  **Q.**   Fair enough.  So now let's go to the next e-mail,

7  Mr. Allen's response to you, which is on the next page.  It's

8  actually on the first page of the exhibit at the bottom.

9              **MR. HUMMEL:**  No, very bottom.

10             (Document displayed.)

11             And this, just for the record, is dated October 25,

12  2006.

13  **BY MR. HUMMEL::**

14  **Q.**   Mr. Allen writes to you the following:

15             "I will call you and discuss any questions you

16  have, but as I said at the Baltimore meeting, the specifics of

17  individual deals are often confidential, and the list is not

18  for publication or circulation."

19             You asked for information.  How did you interpret

20  this response?

21  **A.**   That I couldn't get the list of the names or the amounts,

22  because it wasn't for publication or circulation.

23  **Q.**   Did you ever get the list from Mr. Allen?

24  **A.**   No, sir, I did not.

25  **Q.**   Look, if you would, at the next e-mail in the chain, right

1  there.  You responded to him, right?

2  **A.**    Yes.

3  **Q.**    And you said:

4              "Thanks.  It would be nice to know which guys

5  out of the 3500 that the NFLPA said are part of the Players Inc

6  program take part in programs and the total of monies that is

7  given to retired players," [sic] right?

8  **A.**    Yeah.

9  **Q.**    Where did you get that number, 3500?

10 **A.**    Came from the NFLPA's publication and Web site.

11 **Q.**    They were holding out that number?

12 **A.**    Yes.

13 **Q.**    And were you drawing a distinction here about ad hocs

14 versus the group?

15 **A.**    Sir, at the time of this e-mail I wasn't even, you know,

16 thinking about the -- those things.  I just wanted to know what

17 was going on with retired players.

18 **Q.**    Did Mr. Allen respond to this e-mail?  I guess he did.

19 It's in the next one up, right?

20 **A.**    Yeah.  Says:  What don't you understand, or something.

21 **Q.**    He writes to you:

22              "857 payments to 358 players totaling

23 $7 million."

24              Did you know if those were ad hoc deals or group

25 licensing money?

1   **A.**   No idea what it was.

2   **Q.**   Did you know what licenses were involved in those

3   payments?

4   **A.**   No, sir.

5   **Q.**   Did he ever show you those licenses?

6   **A.**   No, sir.

7   **Q.**   Did he ever give you an accounting for how that was

8   calculated?

9   **A.**   No, sir.

10  **Q.**   In --

11          **MR. HUMMEL:**  I'm done with this exhibit.

12  **BY MR. HUMMEL:**

13  **Q.**   In the Madden game, when your son's friend came up to you

14  and said, "Your dad's in the game," was there any other strong

15  safety for the 1977 Baltimore Colts other than you?

16  **A.**   No, sir.  I played all 15 games.  Started and completed

17  every one.

18  **Q.**   Including the playoff game, right?

19  **A.**   Yes.

20          **MR. HUMMEL:**  Your Honor, I have nothing further.

21          **MR. KESSLER:**  Very briefly, Your Honor.

22                    <u>**RECROSS EXAMINATION**</u>

23  **BY MR. KESSLER:**

24  **Q.**   Going back to Exhibit 2362, that your counsel just took

25  you through.

1    In this exhibit, sir, Mr. Allen was telling you that

2 he gave out the list of the players in Baltimore, and it turns

3 out you left the meeting early so maybe you didn't get it,

4 correct?

5 **A.**   It could be.

6 **Q.**   Yes?

7 **A.**   I don't know if he ever gave it out.

8 **Q.**   After you got this did you ever talk to other people at

9 the meeting and ask to see the list, if maybe they got it?

10 **A.**   No, I did not.

11 **Q.**   What you did know, sir, is that you were not one of the

12 358 players who got any money because you would know if you got

13 money, right?

14 **A.**   Right.

15 **Q.**   And you never wrote back to Mr. Allen, when you were

16 telling him he was cute when he was angry, you never wrote back

17 and said:

18    "By the way, where's the money I should be

19 getting under my retired player GLA?"

20    Never said that, right?

21 **A.**   I never asked for any money, no.

22 **Q.**   Okay.  In fact, Mr. Laird, there's no discussion in any of

23 this e-mail asking at all about payment from active player

24 licensing.  The subject is not there at all?

25 **A.**   No.

1          MR. KESSLER:  I'm fine.  Thank you, Mr. Laird.  We're

2    finished.

3          THE COURT:  All right.  May the witness be excused?

4          MR. HUMMEL:  Yes, Your Honor.

5          THE COURT:  May the witness be excused and discharged

6    not subject to recall?

7          MR. HUMMEL:  Yes, Your Honor.

8          THE COURT:  Mr. Kessler, may the witness be excused

9    not subject --

10          MR. KESSLER:  Oh, yes, Your Honor.  I'm sorry, yes.

11          THE COURT:  All right.  Mr. Bruce Laird, number 40.

12          THE WITNESS:  Or 37, 62, 48.  Whatever you want to

13    call me, sir.

14          THE COURT:  Thank you, sir.  You're free to go.

15    Thank you for coming.

16          All right.  Time for the next witness.

17          MS. NAYLOR:  Your Honor, we call Walter Beach.

18          THE COURT:  Is this by deposition?

19          MS. NAYLOR:  No, Your Honor.

20          MR. LECLAIR:  Your Honor, I'm sorry.  I confused you

21    by saying that, but we got the exhibits straight so we are able

22    to call Mr. Beach now.

23          THE COURT:  That's fine.  Walter Beach.

24          You must be Mr. Walter Beach.

25          THE WITNESS:  Yes, sir.

1          **THE COURT:**  Welcome.  Please raise your right hand.

2    We will swear you in.

3          (Thereupon, the witness was sworn.)

4          **THE WITNESS:**  Yes.

5          **THE CLERK:**  Thank you.  Be seated.

6          **THE COURT:**  May we take your picture for closing

7    arguments?  Have a seat.  We try to take pictures so the jury

8    can be reminded of who was who.

9          **THE WITNESS:**  Okay.

10         **THE CLERK:**  Thank you.

11                        **WALTER BEACH,III,**

12   called as a witness for the Plaintiff herein, having been first

13   duly sworn, was examined and testified as follows:

14                        **DIRECT EXAMINATION**

15   **BY MS. NAYLOR:**

16   **Q.**   Good morning.

17   **A.**   Good morning.

18         **MS. NAYLOR:**  And, ladies and gentlemen, my name is

19   Jill Naylor.  And I'm here with the plaintiffs.

20         **THE COURT:**  Ms. Naylor, I'm going to ask you to pull

21   that microphone so it gets your voice better.

22         I'll say the same thing to the witness.  It's

23   important that the jury hear every word.

24         All right.  Go ahead.

25

1    **BY MS. NAYLOR:**

2    **Q.**    Mr. Beach, could you please state your name.

3    **A.**    Walter Beach, III.

4    **Q.**    And are you a retired NFL football player?

5    **A.**    Yes.

6    **Q.**    And, sir, are you married?

7    **A.**    Yes.

8    **Q.**    Is your wife here with you today?

9    **A.**    Yes, she is.

10              **MS. NAYLOR:**  Can we ask her to stand?

11              **THE COURT:**  Welcome to the court.

12              **MRS. BEACH:**  Thank you.

13              **THE COURT:**  All right.

14   **BY MS. NAYLOR:**

15   **Q.**    Mr. Beach, do you have children and grandchildren?

16   **A.**    Five children, four grandchildren, and three

17   great-grandchildren.

18   **Q.**    Where were you born?

19   **A.**    In Pontiac, Michigan.

20   **Q.**    And where do you currently reside?

21   **A.**    Macungie, Pennsylvania.

22   **Q.**    Could you tell us a little about your football career?

23   When did you start playing professional football?

24   **A.**    Started playing professional football in 1960.

25   **Q.**    Okay.  And who did you play for in 1960?

**A.**   Uhm, the Boston Patriots in the American Football League,
and then the Cleveland Browns in the National Football League.

**Q.**   Okay.  Were you drafted out of college?

**A.**   Yes.

**Q.**   And where did you go to college?

**A.**   Central Michigan University.

**Q.**   Okay.  And you mentioned that in 1960 you started with the
Boston Patriots?

**A.**   Uhm, yes.

**Q.**   Is that an AFL team?

**A.**   At that particular time.  I was drafted by the -- the
Oakland Raiders in the American Football League.  I was drafted
by the New York Giants in the National Football League.  And I
was drafted by the Hamilton Tiger-Cats in the Canadian Football
League.

**Q.**   Okay.  But you began with which team?

**A.**   Uhm, I began with the New York Giants.  I was released by
the New York Giants.  And then, I went to the Boston Patriots.

**Q.**   Okay.  And the Boston Patriots are an AFL team or an NFL
team?

**A.**   They were an AFL team at that time.

**Q.**   What position did you play with the Boston Patriots?

**A.**   At that time I was an offensive running back.

**Q.**   Okay.  And what year did you begin playing with the
Cleveland Browns?

1  **A.**   In 1963.

2  **Q.**   Okay.  And with the Cleveland Browns, what position did

3  you play with them?

4  **A.**   I was a defensive cornerback.

5  **Q.**   Okay.  Was that also called a halfback at that time?

6  **A.**   Uhm, yes.  Halfback, defensive cornerbacks.  I think the

7  terms were synonymous or interchangeable.

8  **Q.**   Okay.  And was that your position all four years with the

9  Cleveland Browns?

10  **A.**   That's correct.

11  **Q.**   What was your number with the Cleveland Browns?

12  **A.**   49.

13  **Q.**   And how much salary did you earn as a pro football player?

14  **A.**   Well, as a professional football player I never made over

15  $30,000 a year.  And it's kind of different in today's -- by

16  today's standards.  But -- and that's about it.

17  **Q.**   And for the 1963 to '66, when you were with the Cleveland

18  Browns, was that a typical salary for a football player?

19          **MR. KESSLER:**  Your Honor, I don't think this is

20  relevant, what active players were making then.

21          **THE COURT:**  What's the relevance?

22          **MS. NAYLOR:**  It's background information, Your Honor.

23          **THE COURT:**  Sustained.

24  **BY MS. NAYLOR:**

25  **Q.**   In the off season when you played football, did you have a

1  job?

2  **A.**    Yes.  In off season I was a school teacher.  I was a

3  fourth grade school teacher in Pontiac, Michigan, Bagley

4  Elementary School, the same elementary school that I attended.

5  **Q.**    And when you were with the Cleveland Browns, did you win

6  any championships?

7  **A.**    Uhm, in 1964 we were the world champions.  And in 1965 we

8  lost the championship game to Herb Adderley, Greenbay Packers.

9  **Q.**    And for those of us who don't know a lot about football is

10 the world championship the same as the Super Bowl?

11 **A.**    Yes.  It would probably be the same.

12 **Q.**    Okay.  Were you known for any particular football skills

13 when you played with the Browns?

14 **A.**    Well, I -- the skills were it was a skill position.

15 Defensive cornerback is probably a skilled position.

16 **Q.**    What year did you retire from football?

17 **A.**    1966.

18 **Q.**    And can you tell the jury a little about your career since

19 then?

20 **A.**    Uhm, after -- after retiring from the National Football

21 League I was a -- the youth coordinator for the City of

22 Cleveland.  Carl B. Stokes was the mayor, and I was the youth

23 coordinator.

24          After that, my next employment situation was in New

25 York City.  I was an assistant principal at an alternative

1  school, alternative education.

2        From that I was the director of -- executive director

3  of the Greater YMCA of New York as the -- as a trainer and

4  diagnostic program.

5        From that particular place I went to -- I have a --

6  I've had a lot of different employments.

7        I was at the Department of Corrections.  I was the

8  training director for the Department of Corrections for New

9  York City.

10        From that I was the chief of recreation for the

11  Borough of Brooklyn in New York.  And after that, I'm presently

12  the executive director for Amer-I-Can of New York, the eastern

13  region.

14  Q.   I think you mentioned you were the director of an

15  alternative school.  Can you tell us what that is?

16  A.   Yeah.  They call it ACE, an Alternative Concept in

17  Education.

18        That's basically individuals in the public school

19  system who are having difficulty in making adjustments into the

20  traditional school.  They get those individuals, and they send

21  them to a specific class, and we try to make some -- some

22  adjustments happen, make some adjustments about their attitudes

23  toward school and toward education.

24  Q.   You mentioned you're currently with Amer-I-Can?

25  A.   Yeah, the Amer-I-Can Foundation for Social Change is an

1  organization that was created by Jim Brown.  And Jim Brown is

2  the national director.  And I'm the eastern executive director

3  on the eastern coast.

4  **Q.**   And have you gone to school during this time?

5  **A.**   Well, uhm, my -- my education is basically I graduated

6  from Central Michigan High School in Pontiac, Michigan.  And

7  from there I went into the Air Force.  And in the Air Force I

8  was a cryptographer and a clerk typist.

9          Got out of the military, went to Central Michigan

10 University.  And while I was playing football, I took a couple

11 of courses at John Marshall Law School.

12         From there, I went to Yale Law School, where I

13 attended Yale Law School for two years.  And I'm presently in

14 the theological seminary.

15 **Q.**   And you say you went to law school for a couple of years.

16 Are you a lawyer?

17 **A.**   No.  No, I'm not a lawyer.

18 **Q.**   Okay.  When you played football, Mr. Beach, were you a

19 member of the union?

20 **A.**   Yes.

21 **Q.**   And have you maintained that membership over the years?

22 **A.**   I believe so, most of the -- most of the time.  I get that

23 information.  My wife usually handles it and sends the checks

24 out, take care of it.

25 **Q.**   In your opinion, what role does the union serve?

1  **A.**   Well, the union --

2          **MR. KESSLER:**  Object to the question.  I don't think

3  it's relevant.

4          **THE COURT:**  Too overbroad.  Sustained.

5  **BY MS. NAYLOR:**

6  **Q.**   Why have you maintained your membership in the union, sir?

7  **A.**   Well, the union has -- is a benefit.  It supports and help

8  the players that belong to the union.  And I've never been

9  anything but pleased for what they were trying to do, most of

10  the time, because I don't think any particular union has

11  members that accept or think that everything they do is

12  correct.

13  **Q.**   Let's talk for a minute about the GLA.  You have some

14  documents in front of you there.  And can you pull out Exhibit

15  640?

16  **A.**   640?

17  **Q.**   Yes.

18  **A.**   Don't see no 640.

19          **THE COURT:**  Counsel, would you help the witness,

20  please.

21          **THE WITNESS:**  Okay.  Here's 640.  I'm sorry.  Yes, I

22  have it.

23  **BY MS. NAYLOR:**

24  **Q.**   Can you identify this document for the Court?

25  **A.**   Yes.  It's the NFL Players Association Retired Player

1  Group Licensing Authorization Form.

2  **Q.**   Is that your signature on there?

3  **A.**   Yes, it is.

4          **MS. NAYLOR:**  Your Honor, I move to admit this

5  exhibit.

6          **MR. KESSLER:**  No objection, Your Honor.

7          **THE COURT:**  What was the number, again?

8          **MS. NAYLOR:**  640.

9          **THE COURT:**  Very well.  That's received.

10         (Trial Exhibit 640 received in evidence.)

11         (Document displayed.)

12 **BY MS. NAYLOR:**

13 **Q.**   Mr. Beach, do you remember when you first received this

14 document?

15 **A.**   What I say, yes, sometime before December 26, 1996.

16 **Q.**   Do you remember how you received it?

17 **A.**   Through the mail.

18         **MR. KESSLER:**  Oh, Your Honor, they put in a version

19 with the witness's Social Security number.  I don't think he

20 wants that in evidence, Your Honor.

21         We should agree to redact that.  In fact, I think

22 California law would also require that.

23         **THE COURT:**  Let's take the Social Security number off

24 the screen.

25         Do we have a version that we can put up that doesn't

1  have that?  Can we just use the Elmo for this?

2          **MS. NAYLOR:**  Or just a piece of tape.  I can redact

3  it.

4          **MR. KESSLER:**  I just want to protect the witness.

5          **MS. NAYLOR:**  Thank you.  Thank you.

6          **THE COURT:**  Let's move the --

7          **MR. KESSLER:**  Then, you can put it right on the Elmo

8  over there.  It should display it.

9          **MS. NAYLOR:**  I'm going to need another copy.

10          (Discussion held off the record.)

11          **THE COURT:**  You can zoom in or zoom out.

12          **MS. NAYLOR:**  I need some technical assistance.

13          **THE COURT:**  Or you can do it as it is.  It's pretty

14  good.

15          **MR. KESSLER:**  I think just zoom out and get the whole

16  document, if she wants that.

17          Right.  There you go.

18          **MS. NAYLOR:**  Thank you.

19          **THE COURT:**  Go ahead.

20          **MS. NAYLOR:**  Thank you.

21  **BY MS. NAYLOR:**

22  **Q.**  Mr. Beach, what did you understand Exhibit 640 to be?

23  **A.**  Uhm, my understanding that it was a contract with the NFL

24  Players Association that the union had sent to me.

25  **Q.**  What did you think this accomplished?

**A.**   Well, I thought that what it was saying that I was to

provide my -- my image to a group licensing program as defined

in paragraph 2.  And that for participating in this particular

program, the -- the union would provide marketing on behalf of

the group of six or more, and then receive particular

compensations and put it in an escrow account.  And that escrow

account would divide the monies between the players.

**Q.**   Before you received this in the mail from the union, had

you tried to market your own image?

**A.**   No.

**Q.**   Why not?

**A.**   Uhm, I was just not interested in marketing my image, you

know, as an ex-football player.  I played football.  I

appreciated it.  And then, I was moving on in my life to do

some other things.

**Q.**   Did you still get requests for autographs?

**A.**   Constantly get requests from time to time when people -- I

meet them or see them or get cards or pictures to sign, and I

send them back.

**Q.**   Is that current today or --

**A.**   No, that's been -- that's been current -- it's current

today.  I get cards and pictures in the mail.  And from the

Cleveland Browns' office they forward it to me, I sign them and

send them back to wherever they should be.

**Q.**   Do you charge for that?

1    **A.**    Of course not.

2    **Q.**    And do people still recognize you as a retired player?

3    **A.**    Uhm, I believe so.  Yesterday I came into the courtroom,

4    and a gentleman asked me where was my Super Bowl ring.  That

5    was just yesterday.

6              I'm still recognized by people who are interested in

7    the game.

8    **Q.**    So you believe that your image as a retired player has

9    value?

10   **A.**    Of course.

11   **Q.**    And you talked about on Exhibit 40 -- I think you pointed

12   us to the second paragraph.

13   **A.**    Yes, the second paragraph in the -- the second paragraph

14   is a group licensing program.  And it defines the fact that six

15   or more present or former NFL players are part of this here --

16   this agreement.

17   **Q.**    What does that mean to you, that language?

18   **A.**    That language means the group -- that if there's any six

19   or more present or -- present or former players' images in

20   conjunction with -- or the products that are sold at retail or

21   used as promotion and premium items, that I was part of that

22   group.

23   **Q.**    Did you negotiate this contract with the union?

24   **A.**    No.

25   **Q.**    Those aren't your words?

1  **A.**    No.  No, it's not my words.

2  **Q.**    What -- what did you understand that you were giving to

3  the union of value in exchange for this agreement?

4  **A.**    Uhm, my image.  My image as a professional football player

5  was what they were requesting.  And that's what I was

6  providing.

7  **Q.**    And what was the significance of this back to you, if any,

8  that this was a group agreement?

9  **A.**    Well, the fact that it was -- what was significant to me

10 was that it meant that any group of six or more individual

11 football players would -- I would benefit.  And I was delighted

12 to participate in this particular agreement.

13 **Q.**    Did anyone ever tell you there was a different definition

14 of "group licensing," other than what is up here, the "six or

15 more present or former NFL players"?

16 **A.**    No, no.

17 **Q.**    Did you believe that active players were a part of this

18 agreement?

19 **A.**    Of course.  It says "six or more present."

20          "Present" means active to me.  Present.

21 **Q.**    Did anyone ever tell you that active players were not a

22 part of the definition of "group licensing" under paragraph 2?

23 **A.**    No.

24 **Q.**    Did you believe you were automatically entitled to receive

25 money just because you signed this contract?

**A.**   No, not just because I signed the contract.  I was

automatic -- I believe that I was automatically to receive

money with reference to the group licensing agreement.  Not

just because I signed it.  But if I signed it, and it was used,

I thought I was entitled to monies.

**Q.**   Did you expect the union to make an affirmative effort to

market you as a part of this group?

          **MR. KESSLER:**  Your Honor, leading.

          **THE COURT:**  Sustained.  It's leading.

**BY MS. NAYLOR:**

**Q.**   What did you expect from the union, if anything?

**A.**   Well, my -- my belief was that these particular documents,

the GLA, would probably be collected by the union, and then the

union would take those and market it through -- through a third

party.

**Q.**   And if the union was able to sell a group license of six

or more present or active players, but they didn't use your

image, in particular, did you think you were entitled to share

in the money?

**A.**   Yes.

**Q.**   And what led you to believe that?

**A.**   Because it says it's a collective -- it's a group

licensing agreement.  It doesn't mean me, per se.  There's

nothing in that that says that.  It says I must be part -- I

could be part of the group or any six current or former players

1  would be part of this collective agreement.

2  Q.    How did you think the union was going to divide the money?

3  A.    Well, I didn't know in specifics how they were going to

4  divide the money.  But in the contract it says monies that's

5  generated would be divided between the players.  And -- oh, I

6  can look up there, sure.

7         Between the players such monies would be -- it would

8  just be divided, and then an escrow account would be

9  established.  And then, all eligible NFL players, members who

10 have signed that licensing group agreement would benefit from

11 it.

12        That was my understanding of it.

13 Q.    Okay.  You've just read from paragraph --

14 A.    I think it's paragraph 5.

15 Q.    -- 5 of the agreement?

16 A.    Uh-huh.  That's correct.

17 Q.    Okay.  Did you have questions about this agreement?

18 A.    Yes, I did.

19 Q.    Is that what is written on the bottom left-hand corner

20 there of Exhibit 640?  Is that your handwriting?

21 A.    Yes, it is.

22 Q.    Can we look at these one at a time?

23 A.    Yes.

24 Q.    Can you read for the jury what the first question is that

25 you sent to the union?

**A.**   The first question is:

                "I'm getting paid at what rate?"

**Q.**   And what did you mean by that question?

**A.**   Well, I wanted to know what would be the rate of pay once the union had had a successful negotiation with a third party.

**Q.**   And what is the second question that you wrote there?

**A.**   The second question is: "When?"

        And at what time after -- when we would he get the monies.  That was basically it.  That was my concern.

**Q.**   What is your third question?

**A.**   "What method of accounting to the players?"

        I wanted to know what they were going to do to let those members who had signed this, what was going to be the accounting or how they was going to make us aware of what was going on.

**Q.**   Your fourth question to the union?

**A.**   Next one is:  "What course of action, if not paid?"

**Q.**   And it looks like you have a comment here at the bottom?

**A.**   Yeah, the comment at the bottom was "would better clarify agreement."

        I just thought it would be better if the agreement was clarified and not so vague and convoluted.

**Q.**   So that we're understanding, did you write these questions on the agreement, and then sign it and return it?

**A.**   That's correct, uh-huh.

1  **Q.**   Did you hear back from the union --

2  **A.**   No.

3  **Q.**   -- on your questions?

4  **A.**   No.

5  **Q.**   Did you ever receive any licensing money from this

6  agreement?

7  **A.**   No.

8  **Q.**   Why would you sign an agreement where you had so many

9  questions?

10         **MR. KESSLER:**  Your Honor, could I get just a

11  direction that this particular agreement being displayed is not

12  the one that's inside the statute of limitations or the period?

13  And Counsel is asking questions about the older agreement, as

14  opposed to the one he signed ten years later.

15         I think that could be confusing to the jury.

16         **MS. NAYLOR:**  Your Honor, we're going to follow up

17  with the current agreement, which is identical except for one

18  word.

19         **MR. KESSLER:**  And the questions, Your Honor, were

20  about payments under this agreement.  It's not an issue in the

21  case.

22         **THE COURT:**  What was your question, Ms. Naylor?

23         **MS. NAYLOR:**  The last question I don't even --

24         **THE COURT:**  Something about "why would you do"

25  something?

1          **MS. NAYLOR:**  "Why would you" -- can you read it back?

2     I'm sorry.

3               (The reporter read the pending question as follows:)

4               "**QUESTION:**  Why would you sign an agreement

5               where you had so many questions?"

6          **THE COURT:**  All right.  The Court will overrule the

7     objection, and the jury is clear-cut on what the timeline is.

8               Go ahead and answer the question.

9          **THE WITNESS:**  Okay.  The reason that I had -- I had

10    some questions.  And I thought that by returning it with the

11    questions I would get some clarity.  But by signing it

12    immediately and sending it on I had no reason not to.  I

13    trusted the union.  I had faith in them.  They sent the

14    document out.

15              And I thought the document was sent to me so that I

16    could benefit from whatever -- from whatever efforts they were

17    going to put forward.

18    **BY MS. NAYLOR:**

19    **Q.**   And did there come a time when you signed a second GLA?

20    **A.**   Yes.

21    **Q.**   Can you turn to Exhibit 639, please?

22    **A.**   All right.  639, yes.

23    **Q.**   Can you identify that document, please?

24    **A.**   It's "retired players group licensing authorization form."

25    **Q.**   And is that your signature on that document?

1  **A.**   Yes, it is.

2          **MS. NAYLOR:**  Your Honor, we move to admit 639,

3  please.

4          **MR. KESSLER:**  No objection, Your Honor.

5          **THE COURT:**  Thank you.  Received.

6          (Trial Exhibit 639 received in evidence.)

7          (Document displayed.)

8          **MS. NAYLOR:**  This one is redacted.

9  **BY MS. NAYLOR:**

10  **Q.**   What date did you sign this, Mr. Beach?

11  **A.**   5/23/03.

12  **Q.**   And can you see above your signature there what date it

13  expires?

14  **A.**   Yes.  It expires December 31st, 2006.

15  **Q.**   Did you -- how did you receive this second GLA?

16  **A.**   Through the mail, same way that I did the first.

17  **Q.**   And did you find the terms of the second GLA to be nearly

18  identical to the first one we just discussed?

19  **A.**   Uhm, it is identical, with the exception in the first

20  paragraph.  The first paragraph where it talks about

21  "non-exclusive rights."

22          In the former document it was an exclusive rights.

23  **Q.**   Did that have any significance to you?

24  **A.**   No, in theory it had no significance to me.  I didn't

25  intend to market myself personally, anyway, so it didn't matter

1  whether there was an exclusive right or non-exclusive right.

2  **Q.**   And just like the first GLA we talked about, the first

3  paragraph authorizes the NFLPA to license your image.  Is that

4  correct?

5  **A.**   That's correct.

6  **Q.**   And the second GLA contains the same definition as the

7  first GLA, doesn't it, a group licensing programs?

8          **MR. KESSLER:**  Your Honor, we're leading now.

9          **THE COURT:**  It is.  But I guess this is preliminary,

10  so overruled.

11          Try not to lead on anything of importance.

12          **MS. NAYLOR:**  Thank you, Your Honor.

13  **BY MS. NAYLOR:**

14  **Q.**   Just like the first one, can you read the second paragraph

15  to us, please?

16  **A.**   "Group licensing programs are defined as programs in which

17  the licensee utilizes a total of six or more present or former

18  NFL player images in conjunction with or on the products that

19  are sold at retail or used as promotional or premium items."

20  **Q.**   So from 1996, when you signed the first one, to 2006 when

21  the second one expired, that definition never changed, did it?

22  **A.**   That's correct.

23  **Q.**   And does this second GLA contain the same language

24  regarding how royalties would be divided?

25  **A.**   On paragraph 5?  Yes.  In paragraph 5.

1        "It is further understood that the monies

2   generated by such a licensing of retired player group rights

3   will be divided between the players and an escrow account for

4   all group license contracts entered into."

5        I'm sorry.

6   Q.   I don't think you read that exactly right.

7   A.   I dropped down a line.  Let me start from the beginning.

8        "It is further understood that the monies

9   generated by such licensing of retired player group rights will

10  be divided between the players and an escrow account for all

11  eligible NFLPA members who have signed the group's licensing

12  authorization form."

13  Q.   So from 1996 to 2006, that paragraph, the language never

14  changed?

15  A.   That's correct.

16  Q.   Did you ever receive any licensing money from the union in

17  connection with this second GLA?

18  A.   No.

19  Q.   Did you ever receive an accounting from the union?

20  A.   No.

21  Q.   Mr. Beach, after you signed the GLA, what control, if any,

22  did you have over the union's ability to license your rights to

23  third parties?

24  A.   Well, the control that -- that I think that we all had is

25  that in -- and I think it's the third paragraph -- I'm sorry,

1    fourth paragraph:

2              "If the undersigned players' inclusion in a

3    particular NFL player program will conflict with an

4    individual's exclusive endorsement agreements and the players

5    provides the NFLPA with a timely notice of that conflict," if

6    there was something that conflicts with it, if they were -- I

7    had given my image, and they were probably -- if they used my

8    image for something in reference to alcohol or something that I

9    didn't -- that would be in conflict with my personal, then I

10   would have the opportunity to say that I wouldn't want to

11   participate.

12   **Q.**    Did you believe you had the right to revoke this GLA, as

13   well?

14   **A.**    That's correct.

15   **Q.**    Did you ever complain to the union that they hadn't sent

16   you a check or any reports or accounting on the GLAs?

17   **A.**    No.

18   **Q.**    Why not?

19   **A.**    Uhm, as I -- as I said earlier, I -- when I left football,

20   I left football.  I was fortunate and blessed.  I was glad to

21   receive the GLAs.  And as I received the GLAs, I sent it back.

22   But I didn't -- I didn't have a lot of contact with the -- with

23   the league or to that nature.  So I was about doing other

24   things.

25   **Q.**    Did anything under the GLA that you're aware of obligate

1  you to call the union and ask for your money?

2  **A.**    No.  There's no specific requirement for me to perform

3  anything in this particular GLA document.

4  **Q.**    Did you believe that if the union owed you money it would

5  pay you?

6  **A.**    I did.  Of course I did.

7  **Q.**    Have you heard the term "ad hoc agreement"?

8  **A.**    Yes, I've heard the term "ad hoc agreement."

9  **Q.**    What is your understanding of that term?

10  **A.**    My understanding of the term "ad hoc agreement" is that if

11  individuals, what they consider to be marqueed or premium

12  players have specific contracts with a third party, the union

13  would support that.

14          Ad hoc had nothing to do with me, per se, because I

15  was never involved in any aspect of marketing myself.

16  **Q.**    So do you understand that some retired players are more

17  famous than you?

18  **A.**    My dear friend Jim Brown is more famous than I am.

19  **Q.**    And are you aware that certain retired players have signed

20  the individual or ad hoc agreements?

21  **A.**    I've -- I've -- I've witnessed that.

22  **Q.**    Are you claiming any of their money under those

23  agreements?

24  **A.**    Of course not, no.

25  **Q.**    Do you think they should share it with you?

1  **A.**    No.

2  **Q.**    Have you seen any license agreement other than the GLA?

3  **A.**    No, I haven't.

4  **Q.**    I want to talk to you a minute about the Madden games,

5  which you'll find in front of you.

6          **THE COURT:**  You have about eight minutes to go.

7          **MS. NAYLOR:**  I see that.

8          **THE COURT:**  Be aware of the time.

9          **MS. NAYLOR:**  Thank you.  Exhibit 1245 is already

10 admitted into evidence, Your Honor.  It's the 2003 Madden game.

11 **BY MS. NAYLOR:**

12 **Q.**    Mr. Beach, are you familiar with the Madden football video

13 games?

14 **A.**    Yes.

15 **Q.**    And how are you familiar with them?

16 **A.**    Uhm, my -- my first involvement with the -- with the

17 Madden games was my nephew called me from Chicago, and my wife

18 answered the phone.  And she said that her -- our nephew wanted

19 to talk to me about he was playing the Madden games.

20          And BJ asked me did I play professional football with

21 the '65 Cleveland Browns.  And I said I did.

22          And he said:

23              "Well, I see a picture of you on the '65 Browns."

24          I said:  "A picture?"

25          And he said:  "Well, it's something like that kind of

1    look like you.  I don't know if it's a picture or not."

2            And he asked me some questions.  And he asked me was

3    the information on the card, the Madden games, the screen, was

4    me.  That's what he said.

5            And I told him I thought that it was me.  Although, I

6    hadn't seen it at that time.  I hadn't seen a Madden game.

7    **Q.**   Have you had occasion since then to see a Madden game?

8    **A.**   I've had occasion to see the Madden games as it was shown

9    to me by -- by the attorneys.

10   **Q.**   Can you turn to the exhibit 1245-1?

11   **A.**   Yes, I got it.

12   **Q.**   Do you recognize that as a screen shot of the Madden game?

13   **A.**   Yes.  It says "Team Select shot of the Madden games."

14           **THE COURT:**  You have on the screen something

15   different than the witness is looking at.  Is that in evidence?

16           **MS. NAYLOR:**  It's part of the Madden game that's in

17   evidence, Your Honor.

18           **THE COURT:**  Okay.

19   **BY MS. NAYLOR:**

20   **Q.**   Could you tell the jury what they're looking at here?

21   **A.**   It says "Team Select."  And it's an image of the '65

22   Browns, and the '89 49ers.

23   **Q.**   And you were on the '65 Browns; isn't that correct?

24   **A.**   Yes, that's correct.

25   **Q.**   And could you go to 1245-7?

1   **A.**    1245-7.  Yes.

2   **Q.**    Can you tell the jury what we're looking at here?

3   **A.**    It's a depth chart, and it's still the depth chart of the

4   Cleveland Browns, the 1965 Cleveland Browns.

5   **Q.**    Is a depth chart a football term?

6   **A.**    Yes.

7   **Q.**    And what does it mean?

8   **A.**    Basically it means they have what they consider maybe two

9   or three teams.  The first team is the starters.  And the

10  second team and third team.  So depth chart just means which

11  team you're on.

12  **Q.**    And is this a depth chart for the cornerback position of

13  the '65 Browns?

14  **A.**    Yes, it is.

15  **Q.**    Is that the position you played for the '65 Browns?

16  **A.**    That's correct.

17  **Q.**    And was your officially reported height at that time six

18  feet?

19  **A.**    Correct.

20  **Q.**    And is that what we see up here in the Madden game?

21  **A.**    Yes.

22  **Q.**    And was your officially reported weight at that time 185?

23  **A.**    Yes.

24  **Q.**    Is that what we see up here on the Madden game?

25  **A.**    That's correct.

1  **Q.**   And was your age at that time 30?

2  **A.**   That's correct.

3  **Q.**   And you were two years pro?

4  **A.**   That's correct.

5          **MS. NAYLOR:**  Could you also highlight the position up

6  there?

7          Thank you.

8  **BY MS. NAYLOR:**

9  **Q.**   I want to take a look at your football card, quickly,

10 which is Exhibit -- I'm sorry, Exhibit 644.  And if you could

11 identify this for the Court.

12 **A.**   Yes.  This is -- this is a playing card that -- that I'm

13 still receiving today.  We get -- I get in the mail playing

14 cards.  I sign them, send them back.

15         **MS. NAYLOR:**  Your Honor, I move to admit Exhibit 644.

16         **MR. KESSLER:**  No objection.

17         **THE COURT:**  Received.

18         (Trial Exhibit 644 received in evidence.)

19         (Document displayed.)

20         **MS. NAYLOR:**  I wonder if we could enlarge that.

21 Thank you.

22         (Document displayed.)

23 **BY MS. NAYLOR:**

24 **Q.**   Is that you there in the picture?

25 **A.**   Yes.

1  **Q.**   And can you tell us, on the playing card, what your

2  reported height is?

3  **A.**   The reported height is six feet.

4  **Q.**   Get this a little bigger.

5       And if you go to the top, this is when you were with

6  the Cleveland Browns, correct?

7  **A.**   That's correct.

8  **Q.**   And the position says "halfback"?

9  **A.**   Well, that's the defensive cornerback.  Halfback.  They're

10 interchangeable.  The term is interchangeable.

11 **Q.**   Okay.

12 **A.**   On offense they say halfback.  On defense they say

13 cornerback.

14 **Q.**   And your weight on this card?

15 **A.**   185 pounds.

16 **Q.**   And your age?

17 **A.**   Reported 30.

18       **MS. NAYLOR:**  So if we can pull up the comparison

19 chart.

20       (Document displayed.)

21 **BY MS. NAYLOR:**

22 **Q.**   This the depth chart that we had admitted into evidence a

23 few minutes ago that you described, and your playing card; is

24 that correct?

25 **A.**   That's correct.

1  Q.   And the team on both is the '65 Browns.  Your position is

2  the halfback or cornerback --

3  A.   Cornerback, that's correct.

4  Q.   -- position.  And the height is six feet and six feet.

5  And the weight is 185 and 185; is that correct?

6  A.   That's correct.

7  Q.   Can you turn to Exhibit 1245-8 and 1245-9.

8  A.   Yes.

9  Q.   And can you describe what these are?

10 A.   1245 -- 1245-8 is a picture of a Madden screen game that

11 would show the team closest at the bottom, the San Francisco

12 49ers.  And the defensive team would be the Cleveland Browns on

13 the other side.

14 Q.   Which -- where is the cornerback position?

15 A.   To the extreme left where it says number "33."

16 Q.   Was that your number?

17 A.   No, that was not my number.

18 Q.   Can we go to Exhibit 1245-9.

19 A.   Okay.  1240-9.  Yes.

20 Q.   And can you describe what we're seeing here?

21 A.   That would be just the reverse of what we saw in the

22 earlier picture.  That would be the right cornerback.  That

23 would have been me in 1965 with the Cleveland Browns.

24 Q.   Okay.  They didn't use your number here.  How do you know

25 it's you?

1  **A.**   Well, in 1965 the right cornerback had to be me.  I mean,

2  I don't know -- they can use any number they want.  They can

3  use any picture they want.  But that's me.

4  **Q.**   You're the only --

5  **A.**   If that's what they're trying to say, the 1964 Cleveland

6  Browns was.  I was the right cornerback.  They can use a

7  picture, a number.  They can use a gorilla, if they want to.  I

8  was the one who was actually playing.

9          **MS. NAYLOR:**  And can we turn to Exhibit 1263, which

10  is the Madden 2007 game, which has already been admitted, Your

11  Honor.

12          **THE COURT:**  This will be the last exhibit because

13  we're at 1 o'clock.

14          **THE WITNESS:**  Which number is that?

15  **BY MS. NAYLOR:**

16  **Q.**   1263.

17  **A.**   1263.

18  **Q.**   1263-1.

19  **A.**   Yes.

20          (Document displayed.)

21  **Q.**   Can you describe what this screen shot is?

22  **A.**   It's an -- under Madden game it just says it's a video

23  screen shot of the Browns '65 team and the 49ers team.

24  **Q.**   And you were on that team, the '65 Browns, correct?

25  **A.**   That's correct.  I was on the '65 Browns.

1  Q.   And on 1263-7?

2  A.   Yes, 12 -- right.

3  Q.   Is that the cornerback position of the '65 Browns in that

4  game?

5  A.   Yeah.  That's what this is representing, the cornerback.

6  Q.   Is that your officially reported height, the six feet?

7  A.   That's correct.

8  Q.   And your age at 30?

9  A.   That's correct.

10  Q.   Your weight 185?

11  A.   That's the official.

12  Q.   Your years pro, two?

13  A.   Two, right.

14  Q.   Did you receive any money from these Madden games, sir?

15  A.   No.

16  Q.   Did anybody call you from the union and ask if you would

17  have been willing to be in this game?

18  A.   No.

19  Q.   Would you have been willing to be in this game?

20  A.   Of course.

21  Q.   And do you believe they should have scrambled your

22  identity?

23  A.   No.

24          **MR. KESSLER:**  Objection, Your Honor.

25          **THE COURT:**  Why is that relevant?  I've already told

1  the jury there is no claim in this case by the class that EA

2  violated anybody's rights by scrambling.  There are other

3  claims in this case, but that's not it.

4          So why is that relevant?

5          **MS. NAYLOR:**  Well, the relevance is that he just

6  testified that he would be willing to be part of this game.

7          **MR. KESSLER:**  That wasn't the question she was

8  asking, Your Honor.

9          **THE COURT:**  Well, we're not going to allow that

10  question and answer.

11          We need to keep straight what is an issue in the case

12  and what's not an issue.  Scrambling isn't part of this case.

13  But scrambling is -- no one is contending in this case that the

14  players' rights were violated by scrambling their identities

15  and numbers and so forth.

16          **MS. NAYLOR:**  I think I can rephrase.

17          **THE COURT:**  That's not the issue in the case.  I

18  don't want the jury to get confused over what the issue is in

19  the case.  I'll let you ask a new question.

20  **BY MS. NAYLOR:**

21  Q.   Do you think the union should have permitted your identity

22  to be scrambled when they had your GLA?

23          **MR. KESSLER:**  Your Honor, I think it's the same kind

24  of an issue.

25          **THE COURT:**  Well, the -- you can ask a somewhat

1   different question.  You can ask:  What, if anything, do you

2   think the union should have done with respect to the Madden

3   game?

4           That I will allow you to ask.

5           **MS. NAYLOR:**  Thank you, Your Honor.

6   **BY MS. NAYLOR:**

7   **Q.**   What, if anything, do you think the union should have done

8   with respect to the Madden game?

9   **A.**   I think the union should have put my image on the Madden

10  game, if they were definitely dealing with the 1965 Cleveland

11  Browns on the right corner.

12          **MS. NAYLOR:**  Okay.  Thank you, Your Honor.

13          **THE COURT:**  Are you done with your entire

14  examination, or have you got more tomorrow?

15          **MS. NAYLOR:**  I'm done.

16          **THE COURT:**  All right.  So we'll start with the

17  cross-examination -- yes.

18          **MS. NAYLOR:**  Can we clarify for the jury what the

19  issue is with the scrambling and fiduciary duty claims that we

20  have?

21          **MR. KESSLER:**  Your Honor, I think that's appropriate

22  for the final instructions in this case.

23          **THE COURT:**  We don't need to do that now.  We're

24  going to take our break.  Please remember the admonition.

25  We'll see you back here tomorrow morning.

1              **THE CLERK:**  All rise.

2              (Thereupon, the jury was excused.)

3              **THE COURT:**  Okay.  Mr. Beach, we must ask you to come

4    back in the morning, 7:30.  Can you do that?

5              **THE WITNESS:**  Yes, sir.

6              **THE COURT:**  Great.  We'll see you back here.  You're

7    free to go now.  The lawyers want me to say you're not supposed

8    to talk to either side because you're on examination now.

9              **THE WITNESS:**  Okay.

10             **THE COURT:**  All right.  They can -- they can help you

11   with hotel arrangements and where to go to dinner and that kind

12   of thing, but they're not supposed to talk to you about the

13   case.

14             **THE WITNESS:**  That's correct.

15             **THE COURT:**  All right.  Thank you.

16             Anything you want me for?

17             **MR. HUMMEL:**  Yes, Your Honor.

18             **THE COURT:**  Go ahead.

19             **MR. HUMMEL:**  Actually, we just told the jury that

20   Mr. Beach would be tendered for cross tomorrow morning.  We

21   have a stipulation among the parties, I believe, that

22   Mr. Linzner from EA, a third party, is to testify first

23   thing --

24             **THE COURT:**  Well, then, Mr. Beach, don't leave yet.

25   You may not need to be here.

1          MR. KESSLER:  He needs to be here, Your Honor.

2          MR. HUMMEL:  He does.

3          MR. KESSLER:  I think -- if they want to accommodate

4   Mr. Linzner and put him on first --

5          THE COURT:  Oh, you mean you're going to do Mr. Beach

6   later?

7          MR. HUMMEL:  Your Honor, it's not that we are

8   accommodating -- there is a three -- a tripartide stipulation

9   that Mr. Linzner will come tomorrow morning and testify.

10         MR. KESSLER:  There is no problem with that.  I don't

11  recall if the stip said he would interrupt a witness testimony.

12         MR. HUMMEL:  It does not.

13         MR. KESSLER:  Yeah.  So my understanding is we should

14  finish Mr. -- you know, in other words --

15         THE COURT:  What are you asking me to do?

16         MR. HUMMEL:  I'm asking you to allow us to call

17  Mr. Linzner out of order because of what I understood was an

18  agreement between the parties that he would be called --

19         THE COURT:  Why is Mr. Linzner so important?

20         MR. HUMMEL:  He's not to us, Your Honor.  In fact,

21  he's affiliated with them.

22         THE COURT:  Let's finish Mr. Beach, and then call

23  Mr. Linzner.

24         MR. HUMMEL:  That's fine, Your Honor.

25         THE COURT:  What's wrong with that?

1    **MR. KESSLER:** I have no problem with that. I won't

2  be that long with Mr. Beach. I think we should finish with

3  him.

4        **THE COURT:** Let's finish Mr. Beach, unless Mr.

5  Linzner is saying: "I just got to get on an airplane and fly

6  to Japan."

7        **MR. KESSLER:** No, Mr. Linzner simply said tomorrow is

8  his only day, and that was the agreement. We'll get him in

9  easily tomorrow.

10        **THE COURT:** We'll finish Beach, then we'll go to

11  Linzner.

12        **MR. HUMMEL:** Thank you, Your Honor.

13        **MR. KESSLER:** Thank you, Your Honor.

14        **THE COURT:** I may be off by a few numbers, but I have

15  plaintiff has used 466 minutes, and the defendants have used

16  327 minutes.

17        You'll have to do the math to figure out how many

18  hours that translates --

19        **MR. KESSLER:** Challenging us with the math, Your

20  Honor, but thank you.

21        **THE COURT:** All right. So see you in the morning,

22  7:30.

23        **MR. HUMMEL:** Thank you, Your Honor.

24        **MR. KESSLER:** Thank you, Your Honor.

25        **THE COURT:** I will have criminal calendar in about 45

1  minutes in here, so I will need your tables.  But you can leave

2  everything else.

3          **MR. KESSLER:**  Okay.  Thank you.

4          **MR. KATZ:**  Thank you.

5          (Thereupon, this trial was continued until Wednesday,

6  October 29, 2008 at 7:30 o'clock a.m.)

7

8

9                          -   -   -   -

10                    <u>**CERTIFICATE OF REPORTER**</u>

11          I certify that the foregoing is a correct transcript

12  from the record of proceedings in the above-entitled matter.

13  DATE:   Tuesday, October 28, 2008.

14

15                  s/b Katherine Powell Sullivan

16

17          _____

18

19          Katherine Powell Sullivan, CSR #5812, RPR, CRR
                        U.S. Court Reporter
20

21

22

23

24

25

# I N D E X

**PLAINTIFFS' WITNESSES**                              **PAGE**   **VOL.**

ALLEN, DOUG
Cross Examination Resumed by Mr. Kessler        879      5
Redirect Examination by Mr. Parcher             921      5
Recross Examination by Mr. Kessler              953      5


LAIRD, BRUCE
Direct Examination by Mr. Hummel                958      5
Cross Examination by Mr. Kessler                1010     5
Voir Dire Examination by Mr. Hummel             1035     5
Redirect Examination by Mr. Hummel              1064     5
Recross Examination by Mr. Kessler              1071     5


BEACH, III, WALTER
Direct Examination by Ms. Naylor                1074     5

# E X H I B I T S

| TRIAL EXHIBITS | IDEN | VOL. | EVID | VOL. |
|---|---|---|---|---|
| 2056 | | | 879 | 5 |
| 2125 | | | 885 | 5 |
| 1100 | | | 889 | 5 |
| 1109 | | | 893 | 5 |
| 99 | | | 896 | 5 |
| 2062 | | | 905 | 5 |
| 53 | | | 932 | 5 |
| 1224 | | | 972 | 5 |
| 1225 | | | 988 | 5 |
| 2392 | | | 999 | 5 |
| 1301 | | | 1005 | 5 |
| 2362 | | | 1052 | 5 |
| 640 | | | 1082 | 5 |
| 639 | | | 1092 | 5 |
| 644 | | | 1100 | 5 |