

**manatt**
manatt | phelps | phillips

**Ronald S. Katz**
Manatt, Phelps & Phillips, LLP
Direct Dial: (650) 812-1346, Ext. 1346
E-mail: rkatz@manatt.com

October 29, 2008

Client-Matter: 29749-060

**VIA ELECTRONIC FILING**

The Honorable William Alsup
United States District Court, Northern District of California
450 Golden Gate Avenue
San Francisco, CA 94102

RE: *Bernard Paul Parrish, et al. v. National Football League Players Association and Players Inc.,* Cause No. C07-0943 WHA

Dear Judge Alsup:

Plaintiffs submit this letter brief to address the admissibility of certain emails relating to the Electronic Arts/Players Inc/Hall of Fame Agreement (the "HOF Agreement") that were previously addressed by the Court in connection with Defendants' Motion in Limine Number 3. As the Court suggested during the argument on the motion in limine, it was entirely possible that Defendants would open the door to the admission of these emails. In fact, Defendants have squarely placed the money paid to class members pursuant to "ad hoc" agreements in this case in issue and Plaintiffs are entitled to respond. Plaintiffs are now entitled to introduce these emails, based on the arguments made by Mr. Kessler in his opening statement and the testimony of Doug Allen, in order to show the bias of Electronic Arts representative Mr. Linzner who will testify on Wednesday, and also to show Defendants' breach of their fiduciary duties toward Plaintiffs.

**I. The Emails Show a Cozy Relationship between Defendants and EA.**

As background, the four Trial Exhibits at issue consist of email chains that include internal and external communications from employees of Defendants and employees of Electronic Arts ("EA").[1] *See* Trial Exs. 521, 522, 1011, and 1034 (collectively attached as Exhibit A). Some exchanges show the favorable licensing pricing that EA received from Players Inc for the use of retired player rights:

---

[1] One participant in the email chains, Clay Walker, appears to be an employee in some of the exchanges (particularly, the ones at Trial Exs. 1011 and 1034), but does not appear to be an employee in another exchange (Trial Ex. 521). Even so, in Trial Exhibit 21, Mr. Walker appears to be acting at the behest of Players Inc. *See* Trial Ex. 521 at 1 (including an email from Joe Nahra to Clay Walker, instructing Mr. Walker to "please put your PI hat back on and provide some insight here?").

1001 Page Mill Road, Building 2, Palo Alto, California 94304-1006 Telephone: 650.812.1300 Fax: 650.213.0260
Albany | Los Angeles | New York | Orange County | Palo Alto | Sacramento | San Francisco | Washington, D.C.



> I can tell you that Clay and Joe's negotiation of these discounted terms was a significant contribution to EA as you more than likely would have paid in excess of $1M for these rights would their involvement and assistance.

Trial Ex. 522 at PI121593.[2]  Other exchanges show how, through the HOF Agreement, Defendants helped EA fend off a potential competitor in the video game market, Take Two:

> For the record, [the HOF Agreement] came up because Take Two went after retired players to create and [sic] "NFL" style videogame after we gave the exclusive to EA. I was able to forge this deal with the HOF that provides them with $400k per year (which is significantly below market rate) in exchange for the HOF player rights. EA owes me a huge favor because that threat was enough to persuade Take Two to back off its plans, leaving EA as the only professional football videogame manufacturer out there.

Trial Ex. 521 at PI126892.

These emails show that, through Defendants' efforts, (1) EA received substantially discounted rights to use certain retired players, and (2) Take Two declined to create a competing video game. In this particular situation, Defendants placed EA's interest in cheaply obtaining retired player image rights and maintaining its video game monopoly over the interest of retired players in maximizing the value they receive from licensing.

**II. Counsel for Defendants Opened the Door by Claiming that the Defendants acted in the Interest of Retired Players.**

One of Defendants' central themes in their opening statement was Defendants' attention to the interests of retired players:

> Page 306
>  9 "No good deed goes unpunished."
> 10 That's what this case is. You saw the references to,
> 11 "Past, Present and Future." **The NFLPA tried to do things for**
> 12 **its retired players. It's true.**
> 13 Mr. Upshaw, who's been attacked, Mr. Upshaw is not
> 14 with us, has been attacked, is a former NFL player.
> 15 Mr. Allen who has been attacked, is a former NFL

---

[2] *See also* Trial Ex. 1011 at EA235 ("You have the existing HOF players that responded to our letter for several years with no increase in cost. The per player price for most of these guys was tens of thousands of dollars less than what they were guaranteed by Take Two Interactive so it's a real coup that we were able to pull this off so cheaply); Trial Ex. 1034 at PI113599 (same).



Honorable William Alsup
October 29, 2008
Page 3

> 16 player. **They believe what was written there: "Past, Present**
> 17 **and Future."**
> 18 **So they went out and they tried to find some**
> 19 **licensing for retired players, to help them out.**
> ****
> Page 332
> 1 Mr. Upshaw was a Hall of Fame player, the evidence
> 2 will show, who was dedicated to retired players, who came up
> 3 with the idea of retired player program **because he wanted to**
> 4 **help retired players.**

*See also* Tr. 306:23-307:5, 325:8-12 (Ex. B, attached).

Defendants elicited testimony during Doug Allen's examination concerning Defendants' continuing "responsibility" toward retired players:

> Page 802
> 25 And, Mr. Allen, you got asked about this phrase:
> Page 803
> 1 "We live every day by the NFLPA's motto: Past,
> 2 Present and Future."
> 3 Do you see that?
> 4 A. Yes, I do.
> 5 Q. In your experience in the more than 25 years you were at
> 6 the NFLPA and Players Inc, did the union and Players Inc live
> 7 by that model?
> 8 A. Absolutely. Every day.
> 9 One of the -- one of the axioms of being in this
> 10 league is that you're going to -- the one thing you know is if
> 11 you're an active player you're going to be a retired player.
> 12 And there's a continuum.
> 13 And we have a real rich and great tradition in our
> 14 union of -- of looking out for each other and not forgetting
> 15 where we came from and making sure that the rookies learn that
> 16 lesson when they come into this league; that they didn't fall
> 17 out of the sky. **That there are some giants that went before**
> 18 **them, and we have a responsibility to them.** And that's one of
> 19 the reasons we had a retired players licensing program.

*See also* Tr. 785:8-786:7 (Ex. B, attached).



Honorable William Alsup
October 29, 2008
Page 4

Finally, Defendants elicited testimony in the same examination about Defendants' $7 million in payments to retired players via "ad hoc" agreements:

>Page 832
>11 Q. Mr. Allen, did the union maintain a record of how much was
>12 paid to the retired players through various licensing
>13 agreements?
>14 A. Yes.
>15 Q. Okay. And would that include both retired players who
>16 signed GLAs and those who did not sign GLAs?
>17 A. Yes.
>****
>24 First, to all retired players, whether they signed
>25 GLAs or not, would it be in the tens of millions of dollars?
>Page 833
> 1 A. Yes.
> 2 Q. Okay. Focusing just on those who signed GLAs and focusing
> 3 on the period 2004 to 2007, would GLA class members in this
> 4 case have received millions of dollars through the ad hoc
> 5 licensing agreements?
> 6 A. Absolutely.
> 7 Q. And do you know if it was a little bit more than
> 8 $7 million?
> 9 A. I do.
>10 Q. What's your information on that?
>11 A. Uhm, I -- I've seen the documentation of that. And I
>12 have -- I have a general knowledge of what was generated during
>13 that period of time.
>14 Q. And how much was it?
>15 A. Around $7 million.

Defendants are justifying their actions in this case in ignoring the language of the GLA by arguing a beneficent motive: that Defendants look out for the interests of retired players and have served their interests by entering into the "ad hoc" agreements. The emails between and Defendants and EA regarding the HOF agreement rebut this argument, by showing that Defendants do not *always* look out for retired players; rather, Defendants are beholden to multiple masters, and will favor a large licensee, such as EA, over retired players licensors as Defendants see fit. Plaintiffs are entitled to introduce trial exhibits 521, 522, 1011, and 1034 to rebut Defendants' opening argument and testimony.



### III. The Jury Deserves to Understand the Relationship between EA and Defendants in Evaluating Joel Linzner's Credibility.

Joel Linzner, an employee of EA, is on the parties' witness lists. As shown by the emails above, through the HOF Agreement, Defendants cut EA a sweetheart deal, and, as a result, "EA owes [Defendants] a huge favor." *See* Trial Ex. 521 at PI126892. The jury deserves to understand the favors Defendants provided EA in evaluating whether Joel Linzner's testimony is biased toward Defendants, intentionally or unintentionally.

As Defendants recognize in their motion in limine briefing, evidence of bias: "is highly relevant to [the witness's] motives and credibility and will help the jury understand whether [his] testimony about key issues in this case . . . is believable."[3] *See* Defs.' Opp'n to Pls.' Mots. in Limine Nos. 1, 3, and 5 (Second part of Dkt. No. 437) (attached as Ex. C). Plaintiffs intend to introduce the email exchanges relating to the HOF Agreement to establish this bias.

                                      Respectfully submitted,

                                      /s/ Ronald S. Katz
                                      Ronald S. Katz
                                      Counsel for Plaintiffs

---

[3] Defendants included the following string cite for this proposition: *United States v. Abel*, 469 U.S. 45, 52 (1984) ("Proof of bias is almost always relevant because the jury, as finder of fact and weigher of credibility, has historically been entitled to assess all evidence which might bear on the accuracy and truth of a witness' testimony."; *United States v. Hankey*, 203 F.3d 1160, 1171 (9th Cir. 2000) ("Evidence is relevant . . . if it has a mere tendency to impeach a witness' credibility by showing of bias or coercion."); *Lewy v. S. Pac. Transp. Co.*, 799 F.2d 1281, 1298 (9th Cir. 1986) ("[Plaintiff] was entitled to introduce evidence of [witness'] bias both by cross-examining her and through presentation of extrinsic evidence . . .").