Dewey & LeBoeuf LLP
1301 Avenue of the Americas
New York, NY 10019-6092

tel   +1 212 259 8050
fax  +1 212 259 7013
jkessler@dl.com

# DEWEY & LEBOEUF

October 29, 2008

The Honorable William Alsup
United States District Court,
Northern District of California
450 Golden Gate Avenue
San Francisco, CA 94102

Re:   *Parrish v. National Football League Players Association, et al.*
      Case No. C07-0943 WHA

Dear Judge Alsup,

     Defendants respectfully submit this response to Plaintiffs' letter brief, dated October 29, 2008, regarding the admissibility of emails regarding Plaintiffs' complaints about an ad hoc licensing agreement, effective March 1, 2006, between Electronic Arts ("EA"), the Pro Football Hall of Fame ("HOF"), and Players Inc. This topic was previously addressed in Defendants' Motion in Limine No. 3 To Exclude Evidence Regarding Plaintiffs' Complaints Relating to 'Ad Hoc' Agreements, Dkt. No. 415, which the Court <u>granted</u>:

> Plaintiffs may not introduce evidence relating to Plaintiffs' complaints about ad hoc license agreements, including but not limited to such evidence relating to the license agreement between Electronic Arts, Inc. ("EA"), the Pro Football Hall of Fame, and Players Inc.

Order Summarizing Rulings Made by the Court at the Pretrial Conference Held on October 15, 2008 (Dkt. No. 494-2) at 2.

     As demonstrated in Defendants' MIL No. 3, Plaintiffs do not have any claim, and do not seek any damages, based upon the EA-HOF ad hoc agreement. Indeed, Plaintiffs have stipulated that they "do not seek to recover in this case any moneys paid to some GLA Class members under separate, so called 'ad-hoc' license agreements." Amended Stipulated Facts at 13, Rec. Doc. 482, October 18, 2008; Defs.' MIL No. 3 at 1. Moreover, the EA-HOF ad hoc agreement involved only 17 class members who had GLAs in effect at the time, and does not present any class-wide issues (much less claims). <u>See</u> Defs.' MIL No. 3 at 3. Introducing the irrelevant EA-HOF emails at issue will only serve to confuse the jury and unduly prejudice the Defendants.

     The fact that the EA-HOF ad hoc agreement has nothing to do with this case is further confirmed by Plaintiffs' own Letter Brief, which offers only two reasons as to why the emails should be admitted (neither of which have anything to do with the GLA Class's claims): (i)

Defendants' purportedly "opened the door"; and (ii) the EA-HOF emails are purportedly relevant to Mr. Linzner's credibility.

Contrary to Plaintiffs' assertions, Defendants have not opened the door to Plaintiffs' complaints about ad hoc licensing, much less to Plaintiffs' irrelevant and prejudicial complaints about the EA-HOF Agreement. Indeed, none of the transcript excerpts quoted in Plaintiffs' Letter Brief even mentions the EA-HOF ad hoc agreement, and most of the quoted statements do not relate to ad hoc license agreements at all. See Letter Br. at 2-4. More fundamentally, all of the quoted excerpts from Defendants' opening statement and Mr. Allen's testimony are merely responsive to accusations levied by Plaintiffs.

For instance, class counsel, in his opening statement, repeatedly stated – in absolute terms – that Defendants have done "nothing" for GLA Class members, and paid "nothing" to GLA Class members:

> Page 267
> [PLAINTIFFS' OPENING STATEMENT]
> 16 And the evidence is going to show they did nothing,
> 17 nothing.
>
> Page 269
> [PLAINTIFFS' OPENING STATEMENT]
> 18 And, by the way, hundreds of millions of dollars come
> 19 in from the licensing, and our clients get zero.
> 20 Our group license retired players got zero -- not a
> 21 dollar and a quarter, zero -- of the hundreds of millions of
> 22 dollars.
>
> Page 283
> [PLAINTIFFS' OPENING STATEMENT]
> 16 And tons of money come in. Tons of money come in.
> 17 And of those tons of money, guess how much of those tons of
> 18 money go to the retired ballplayers? Zero. Zero.

Defendants were entitled to respond to these patently false assertions by reference to the ad hoc license agreements. Even in responding to such attacks, however, Defendants have been extremely careful not to raise the 2006 EA-HOF ad hoc license agreement for any purpose. Notably, the compilation of licensing payments made to GLA Class members (i.e., the roughly $7 million), does not include any payments made to GLA Class members pursuant to the EA-HOF ad hoc agreement.

In fact, it was class counsel itself which first raised the ad hoc license agreements in Plaintiffs' opening statement:

Page 279
[PLAINTIFFS' OPENING STATEMENT]
8 Oh, one thing I need to say to you, the – you're
9 going to hear a lot from Mr. Kessler about ad hocs. I don't
10 know if any of you ever heard that word before. I didn't hear
11 it before I got into this case.
12 Ad hocs are star football players, retired. Some of
13 you don't know football. Some of you do know football.
14 Joe Montana. If you were from New York I would say
15 Joe Namath, you know? Whatever the names may be, these men are
16 in an extremely fortunate position. They have their own
17 agents. The union is not their agent.
***
22 Those ad hoc agreements are not GLAs. They are going
23 to try to bring this into the case. The reality is is that
24 GLAs are the group licensing agreements. And the group
25 licensing agreements are what it is that we're talking about.

Plaintiffs further raised the issue of ad hoc license agreements during their own questioning of Mr. Allen:

Page 508
[PLAINTIFFS' EXAMINATION]
13 Q. Just so the jury understands, when you say "players who
14 happen to sign group licenses who also receive individual
15 money," when they receive that individual money you call them
16 "ad hocs," right?
17 A. That's correct.
18 Q. And when they receive that individual money, you didn't
19 commission 30 percent of it, did you?
20 A. No.
21 Q. Matter of fact, you took maybe a 1 percent administration
22 fee or 1.5 percent administration fee, correct?
23 A. It was something in that neighborhood.

Page 511
[PLAINTIFFS' EXAMINATION]
15 When an individual athlete, retired football player,
16 receives an ad hoc license, none of that money is shared with
17 Players Inc, correct?
18 A. Yes.
19 Q. None of that money is shared with the union, correct?
20 A. Yes.
21 Q. None of that money is shared with the retired players who

>   22 signed group licensing authorizations, correct?
>   23 A. That's right.

With respect to the excerpts in Plaintiffs' Letter Brief about how Defendants did, in fact, care for retired players, these statements have <u>nothing</u> to do with <u>any</u> ad hoc license agreements and, in any event, were again directly responsive to the ad hominem attacks in class counsel's opening statement:

>   Page 271
>   [PLAINTIFFS' OPENING STATEMENT]
>   5 The evidence will show that what Mr. Kessler's side
>   6 is going to present -- and it's going to be right through his
>   7 case -- that this union was separate. That this union was not
>   8 all for one and one for all.
>
>   Page 292
>   [PLAINTIFFS' OPENING STATEMENT]
>   17 This is not a football game. This is not a game.
>   18 This is about fairness. This is about justice. This is the
>   19 evidence showing who's stabbing who in the back and who really
>   20 deserves to stand up tall and say "We did our best."
>
>   Page 265
>   [PLAINTIFFS' OPENING STATEMENT]
>   4 I expect
>   5 the evidence to show that the defendants have engaged in
>   6 conflicts of interest, deceitful behavior, double-talking,
>   7 double-dealing, breaches of trust, and have been very unfair
>   8 and unreasonable and conducted themselves improperly towards
>   9 their NFLPA members, who are my clients, and the retired
>   10 players that signed what's called "the group licensing
>   11 agreement."

Defendants should certainly be permitted to respond to such accusations by merely stating, as Mr. Allen did, that Defendants did indeed believe in the NFLPA's motto of "Past, Present and Future." But more fundamental to the question now before the Court, such statements have <u>nothing</u> to do with the EA-HOF ad hoc agreement (or, for that matter, any other ad hoc agreement). Moreover, much of the testimony from Mr. Allen that Plaintiffs are now complaining about was directly responsive to questions first asked by <u>Plaintiffs'</u> counsel. For example, Mr. Parcher asked Mr. Allen:

>   Page 484
>   [PLAINTIFFS' EXAMINATION]
>   18 Q. Okay. It says there:

> 19 "We, the National Football League Players
> 20 Association, pay homage to our predecessors for their courage,
> 21 sacrifice and vision."
> 22 Would you agree that the "predecessors" are the
> 23 retired football players?
> 24 A. I would, yes.
> 25 Q. Do you believe -- did you believe at the time you were
> Page 485
> 1 part of the organization, the number two man, that the union
> 2 had a responsibility to pay homage to their retired players for
> 3 their courage, sacrifice and vision?
> 4 A. Yes, sir, I did.
>
> Page 540
> [PLAINTIFFS' EXAMINATION]
> 25 Q. To the best of your knowledge, as the union person, you
> Page 541
> 1 never told any of these players:
> 2 "Watch yourself. You better get a lawyer here.
> 3 There may be some technical language as a linebacker, you may
> 4 not be all that familiar with," did you?
> 5 A. Did I say that? No.
> 6 Q. You never told them:
> 7 "It might be a good idea to get lawyered up
> 8 before you sign this, because this language may not be a
> 9 monument of clarity," did you?
> 10 A. I didn't believe the last part of that sentence, and I
> 11 didn't use -- I didn't say the first part to the players.
>
> Page 587
> [PLAINTIFFS' EXAMINATION]
> 15 Q. Did it ever occur to you that you might have a conflict of
> 16 interest representing the retireds in trying to get them
> 17 licenses and the actives in trying to get them licenses, from
> 18 time to time? Did that ever occur to you?
> 19 A. No. I don't believe that's the case.

Plaintiffs also advance the argument that the emails relating to the EA-HOF ad hoc agreement are somehow relevant to establishing a supposed "cozy" relationship between Defendants and EA, and to otherwise impugn Mr. Linzner's credibility. As a threshold matter, Mr. Linzner has now been subject to hours of cross-examination by class counsel, and the jury has ample evidence before it with which to assess Mr. Linzner's credibility without the need to introduce highly inflammatory emails regarding an irrelevant ad hoc license agreement upon which Plaintiffs base no claim. Moreover, the notion that Mr. Linzner would commit perjury as

a "favor" for a $400,000 purported "sweetheart" deal for the rights of a group of retired players defies reason, and cannot possibly justify introduction of the emails at issue. It would be particularly prejudicial to allow Plaintiffs to introduce such evidence to attack Mr. Linzner's credibility <u>after</u> Mr. Linzner has already been released from his subpoena, not subject to recall, and left with no opportunity to defend these after-the-fact charges.

In sum, since the Court made its ruling, there has been no change in the fundamental and undisputed fact that Plaintiffs assert no claim or damages based upon any ad hoc license agreement (including the EA-HOF Agreement), and thus there is no basis for the Court to now modify its Order and permit Plaintiffs to confuse the jury with complaints about an ad hoc license agreement regarding the Hall of Fame for which Plaintiffs seek no damages and assert no claim.

Respectfully submitted,

/s/ Jeffrey L. Kessler
Jeffrey L. Kessler
Counsel for Defendants


cc: Ronald S. Katz, Esq.