VOLUME 6

PAGES 1113 - 1362

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE WILLIAM H. ALSUP

BERNARD PAUL PARRISH, HERBERT          )
ANTHONY ADDERLEY, WALTER ROBERTS       )
III,                                   )
                                       )
          PLAINTIFFS,                  )
                                       )
  VS.                                  )  NO. C 07-0943 WHA
                                       )
NATIONAL FOOTBALL LEAGUE PLAYERS       )
ASSOCIATION AND NATIONAL FOOTBALL      )
LEAGUE PLAYERS INCORPORATED D/B/A      )
PLAYERS INC,                           )
                                       )  SAN FRANCISCO, CALIFORNIA
          DEFENDANTS.                  )  WEDNESDAY
_____)  OCTOBER 29, 2008

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

**FOR PLAINTIFFS:**          MANATT, PHELPS & PHILLIPS
                             1001 PAGE MILL ROAD, BUILDING 2
                             PALO ALTO, CALIFORNIA 94304
                        BY:  **RONALD S. KATZ, ESQ.**
                             **RYAN S. HILBERT, ESQ.**

                             MANATT, PHELPS & PHILLIPS
                             7 TIMES SQUARE
                             NEW YORK CITY, NEW YORK 10036
                        BY:  **L. PETER PARCHER, ESQ.**

                             MANATT, PHELPS & PHILLIPS
                             11355 WEST OLYMPIC BOULEVARD
                             LOS ANGELES, CALIFORNIA  90064
                        BY:  **CHAD HUMMEL, ESQ.**

(APPEARANCES CONTINUED ON NEXT PAGE)

```
APPEARANCES CONTINUED:

ALSO FOR PLAINTIFFS:     MCKOOL SMITH
                         300 CRESCENT COURT
                         SUITE 1500
                         DALLAS, TEXAS  75201
                    BY:  LEWIS T. LECLAIR, ESQ.
                         JILL ADLER NAYLOR, ESQ.
                         ANTHONY GARZA, ESQ.
                         BRETT CHARHON, ESQ.


FOR DEFENDANTS:          DEWEY & LEBOEUF
                         1301 AVENUE OF THE AMERICAS
                         NEW YORK CITY, NEW YORK  10019-6092
                    BY:  JEFFREY L. KESSLER, ESQ.
                         DAVID GREENSPAN, ESQ.
                         DAVID G. FEHER, ESQ.
                         ROY TAUB, ESQ.
                         MOLLY DONOVAN, ESQ.
                         JASON CLARK, ESQ.


                         WEIL, GOTSHAL & MANGES LLP
                         767 FIFTH AVENUE
                         NEW YORK, NEW YORK 10153-0119
                    BY:  BRUCE S. MEYER, ESQ.




REPORTED BY:     KATHERINE POWELL SULLIVAN, CSR #5812
                 OFFICIAL REPORTER - U.S. DISTRICT COURT
```

### P R O C E E D I N G S

OCTOBER 29, 2008                                    7:30 A.M.


          (THE FOLLOWING PROCEEDINGS WERE HELD IN OPEN COURT,

          OUTSIDE THE PRESENCE OF THE JURY.)

     **THE COURT:**  GOOD MORNING.  PLEASE BE SEATED.

     ANY ISSUES FOR ME THIS MORNING?

     **MR. KESSLER:**  JUST SOME HOUSEKEEPING.

     **THE COURT:**  GO AHEAD.

     **MR. KESSLER:**  YOUR HONOR ASKED US TO PREPARE JURY

HANDOUTS OF THE CHARTS.  WE'VE DONE THAT.  I DON'T KNOW HOW

YOUR HONOR WANTS TO GIVE IT TO THE JURY, BUT WE HAVE THAT.

     **THE COURT:**  HAVE BOTH SIDES LOOKED AT IT?

     **MR. KESSLER:**  YES, I THINK YOU'VE LOOKED AT THESE.

THESE ARE JUST --

     **THE COURT:**  DAWN, PUT THESE ON THE JURORS' CHAIRS

AND --

     **MR. KESSLER:**  AND WE'VE --

     (SIMULTANEOUS COLLOQUY; NOT REPORTABLE.)

     **THE COURT:**  YOU'VE GOT TO LET -- THE COURT REPORTER

CAN'T DO TWO THINGS AT ONCE, MR. KESSLER.  YOU HAVE TO WAIT

UNTIL I FINISH.

     DAWN, WOULD YOU PLEASE PUT ON THE CHAIR THE TIMELINE

MR. KESSLER HAS.

     **THE CLERK:**  ALL RIGHT.

1        **MR. KESSLER:**  AND WE ALSO WITH THAT EACH HAVE

2   SELECTED ONE DOCUMENT.  WHY DON'T WE ALSO HAND THAT TO DAWN,

3   AND SHE CAN PUT THAT DOWN AT THE SAME TIME?

4        **THE COURT:**  THAT'S FINE.  LET ME SAY THIS TO THE

5   LAWYERS:  HAVE THE LAWYERS LOOKED AT THE DOCUMENTS, EACH AND

6   EVERY COPY, TO MAKE SURE ITS IT'S OKAY?  HAVE BOTH SIDES LOOKED

7   AT EVERY SINGLE DOCUMENT?

8        **MR. KESSLER:**  WE'VE TRUSTED EACH OTHER, YOUR HONOR --

9        **THE COURT:**  THAT'S A MISTAKE.

10       **MR. KESSLER:**  -- BUT IF YOU WANT US TO, WE WILL.

11       **THE COURT:**  DON'T TRUST.  VERIFY.

12       **MR. KESSLER:**  OKAY.

13       **THE COURT:**  LET ME TELL YOU WHY.

14       WE DID THIS IN ONE OTHER CASE.  IT TURNED OUT THAT

15  ONE OF THE LAWYERS' LEGAL ASSISTANTS HAD GOOFED UP.  AND THE

16  LAWYERS THEN WANTED TO SUBSTITUTE, AND THE ANSWER WAS NO,

17  BECAUSE BY THAT POINT THE JURORS HAD MADE NOTES ON IT.

18       AND, IN FACT, I THINK IT HAD A STRAY PAGE THAT DIDN'T

19  BELONG THERE.  AND ONE SIDE THOUGHT THEY HAD BEEN BAMBOOZLED BY

20  THE OTHER SIDE.  PROBABLY THEY WERE.

21       BUT I WOULD NOT LET THEM CHANGE IT, BECAUSE I'M

22  TELLING YOU NOW WHATEVER YOU -- YOU'VE GOT TO MAKE SURE THAT

23  YOU AGREE IT'S GOING INTO THE JURY BOX.  FROM THAT POINT ON YOU

24  WILL NEVER SEE IT AGAIN.

25       **MR. KESSLER:**  OKAY.  WE WILL CHECK WITH EACH OTHER

1  NOW BEFORE HANDING IT TO DAWN.

2         **THE COURT:**  FINE.

3         **MR. KESSLER:**  FINALLY, YOUR HONOR, SINCE WE ARE

4  GETTING, YOUR HONOR, CLOSE TO OUR CASE WE HAVE BEEN INFORMED BY

5  PLAINTIFFS WE MIGHT BE ABLE TO START ON FRIDAY.  IT'S UNCLEAR.

6  WE HAVE DESIGNATIONS FOR ONE WITNESS, MR. ADAM ZUCKER.

7         YOUR HONOR, HAS ACTUALLY ALREADY SEEN ZUCKER BECAUSE

8  HE WAS ORIGINALLY PROPOSED AS TO BE READ OR PLAYED BY

9  PLAINTIFFS.

10        THEY'VE DECIDED NOT TO READ OR PLAY HIM, SO WE'RE NOW

11 PROPOSING TO --

12        **THE COURT:**  IS HE THE ONE WHO HAD THE ALL THE LEADING

13 QUESTIONS?

14        **MR. KESSLER:**  NO, THAT WAS MR. FRISS.  THAT WAS

15 MR. FRISS.

16        **THE COURT:**  OKAY.  HAND IT UP TO DAWN, AND I'LL GET

17 AT IT.

18        **MR. KESSLER:**  WE MADE IT CLEAR AS TO EACH DESIGNATION

19 WHICH PARTY IT IS.  AND WHAT I'D ALSO CALL YOUR HONOR'S

20 ATTENTION TO, JUST BECAUSE IT'S A BIT UNUSUAL, MOST OF THE

21 OBJECTIONS IN THIS DEPOSITION ARE BY PLAINTIFFS TO THEIR OWN

22 QUESTIONS.  AND WE DON'T THINK ANY OF THAT IS APPROPRIATE TO

23 THE FORM OF THEIR OWN QUESTIONS.

24        BUT YOUR HONOR WILL SEE THAT WITH RESPECT TO THAT.

25        **THE COURT:**  ALL RIGHT.  IT MIGHT MAKE A DIFFERENCE.

1  I'LL HAVE TO LOOK AT EACH QUESTION IN EACH CONTEXT.

2         ALL RIGHT.

3         **MR. KATZ:**  YOUR HONOR, I HAVE A POINT.

4         **THE COURT:**  SURE.  GO AHEAD.

5         **MR. KATZ:**  YOUR HONOR, WILL RECALL DURING THE MOTIONS

6  IN LIMINE THAT YOU MADE A MOTION -- WE WERE TALKING ABOUT THIS

7  ORGANIZATION OF RETIRED PLAYERS FOR JUSTICE, AND YOU SAID IF

8  THEY BROUGHT IT UP, IF THEY OPENED THE DOOR WITH RESPECT TO

9  PENSIONS AND DISABILITIES THAT WE COULD TALK ABOUT THAT.

10         WHAT HAPPENED THE OTHER DAY IS THAT THEY SUBMITTED

11  AND WAS ADMITTED THE TOUCHBACK MAGAZINE, WHICH IS EXHIBIT 2046.

12         ACTUALLY, MR. KESSLER READ THIS PORTION TO THE JURY,

13  WHICH I WILL NOW READ TO YOUR HONOR.  AND THIS IS THE DOCUMENT

14  THAT THEY'RE GIVING TO THE JURY.

15         IT SAYS, AMONG OTHER THINGS:

16         "THE NFLPA'S REPRESENTATION OF RETIRED PLAYERS

17  IS FUNDED MOSTLY BY ROYALTIES FROM PLAYERS INC LICENSING

18  PROGRAMS INVOLVING CURRENT PLAYERS.  THIS REPRESENTATION HAS

19  DELIVERED AMAZING GAINS IN PLAYER PENSIONS, ESPECIALLY OVER THE

20  PAST TEN YEARS.  DURING THE LAST COLLECTIVE BARGAINING

21  AGREEMENT EXTENSION, FOR EXAMPLE, ALL PLAYER BENEFIT CREDITS

22  PRIOR TO 1977 INCREASED TO A MINIMUM OF $200 PER MONTH."

23         I DO, THEREFORE, SEEK LEAVE OF THE COURT TO QUESTION

24  MR. ADDERLEY ABOUT HIS PENSION SINCE THEY HAVE OPENED THE DOOR

25  ON THAT.

1          **MR. KESSLER:**  YOUR HONOR, THE ACTUAL RECORD IS AS

2    FOLLOWS:  PLAINTIFFS PUT THAT DOCUMENT INTO EVIDENCE WITH

3    MR. ALLEN.  THEY ALSO USED THAT DOCUMENT IN THEIR OPENING WITH

4    THE JURY.  I DID NOT READ TO THE JURY -- WHEN I QUESTIONED

5    MR. ALLEN ABOUT IT AFTER THEY PUT THE DOCUMENT INTO EVIDENCE, I

6    DID NOT MOVE IT IN.  THEY MOVED IT INTO EVIDENCE.

7          I DID NOT READ TO MR. ALLEN THE PORTION HE JUST NOTED

8    ABOUT GAINS IN PENSIONS.  I READ TO HIM THE PART THAT ACTIVE

9    PLAYER LICENSING IS USED TO SUPPORT RETIRED PLAYER DEPARTMENT,

10   WHICH IT IS, BECAUSE THEY'VE SOMEHOW MADE THE ARGUMENT THAT

11   THERE'S SOMETHING WRONG AS TO HOW ACTIVE PLAYER LICENSING IS

12   DONE.

13         **THE COURT:**  WHY DO YOU WANT THAT DOCUMENT TO BE THE

14   ONE DOCUMENT YOU GIVE TO THE JURY?

15         **MR. KESSLER:**  BECAUSE, YOUR HONOR, THEY ON THEIR

16   FIDUCIARY DUTY CLAIM, OKAY, THEY MAKE A BIG ARGUMENT THAT THE

17   RETIRED PLAYERS DID NOT KNOW HOW THE REVENUE WAS SPLIT OF

18   23 PERCENT, 40 PERCENT, 37 PERCENT WITH RESPECT TO THE GLR

19   POOL.

20         THEY ALSO MAKE A BIG ARGUMENT THAT THE RETIRED

21   PLAYERS DID NOT KNOW THAT EVEN THOUGH THEY ALL SIGNED GLR'S,

22   THAT INDIVIDUAL RETIRED PLAYERS IN GROUPS WERE RECEIVING THAT

23   MONEY.  HUNDREDS OF PLAYERS WERE RECEIVING IT, BUT IT WAS NOT

24   GOING TO ALL THE RETIRED PLAYERS.

25         THEY ALSO ARGUE THAT THE RETIRED PLAYERS DIDN'T KNOW

1  THAT THE EA AGREEMENT DID NOT COVER THEIR RIGHTS.

2           ALL OF THAT INFORMATION IS CONTAINED IN THIS ISSUE OF

3  TOUCHBACK, WHICH WAS GIVEN TO ALL THE RETIRED PLAYERS.  SO IT'S

4  A CRITICAL PART OF SHOWING TO US -- IT'S A DOCUMENT THAT SHOWS

5  ALL THIS INFORMATION WAS GIVEN TO THE RETIRED PLAYERS.  WE DO

6  NOT MENTION THE TWO SENTENCES THAT MR. -- AND, IN FACT, IF YOUR

7  HONOR WANTS US TO REDACT OUT THOSE SENTENCES ABOUT GAINS IN

8  PENSIONS, I'M HAPPY TO REDACT THEM OUT.  I NEVER READ THEM IN,

9  AND I HAVE NO INTEREST IN REFERRING TO THEM.

10          **MR. KATZ:**  MAY I RESPOND, YOUR HONOR?

11          **THE COURT:**  GO AHEAD.

12          **MR. KATZ:**  MR. KESSLER DID READ THEM IN, CONTRARY TO

13  WHAT HE JUST SAID, ON PAGE 785 OF THE TRANSCRIPT FROM

14  OCTOBER 27TH, HE QUOTES THE LANGUAGE THAT I JUST READ.

15          I'LL SHOW THAT TO MR. KESSLER.

16          WE DID NOT USE THAT PORTION OF THE DOCUMENT, AND IT'S

17  TOO LATE NOW.  IT'S IN.

18          **MR. KESSLER:**  I READ ONE OF THE SENTENCES HE READ,

19  NOT THE OTHERS.

20          BUT IN ANY EVENT, YOUR HONOR, I GUESS I DIDN'T RECALL

21  THAT ONE SENTENCE.  I'M HAPPY TO HAVE THAT ONE PART REDACTED

22  OUT.

23          **MR. KATZ:**  IT'S TOO LATE, YOUR HONOR.

24          **MR. KESSLER:**  THAT ONE SENTENCE --

25          **THE COURT:**  IT'S IN EVIDENCE.  IT'S IN EVIDENCE

1   ALREADY.  I DON'T SEE -- BUT MAYBE I SHOULDN'T DRAW SPECIAL

2   ATTENTION TO IT.  WHAT IS THE OTHER DOCUMENT THAT THE OTHER

3   SIDE WANTS TO PUT INTO THE --

4            **MR. KESSLER:**  THE RETIRED PLAYER GLA.

5            **MR. HUMMEL:**  THE GLA.

6            **MR. KATZ:**  THE GLA, WHICH IS WHAT THIS CASE IS ALL

7   ABOUT.

8            **THE COURT:**  THAT DOCUMENT SHOULD DEFINITELY BE PART

9   OF IT.  BUT, LOOK, I'M GOING TO HOLD OFF ON LETTING ANYTHING

10  EXCEPT THE TIMELINE GO INTO THE JURY BOX, UNTIL I CAN SORT THIS

11  PROBLEM OUT.

12           WHEN IS MR. ADDERLEY GOING TO TESTIFY?

13           **MR. KATZ:**  THIS MORNING, YOUR HONOR.  HE'S THE THIRD

14  WITNESS SCHEDULED THIS MORNING, PROBABLY AFTER THE FIRST BREAK,

15  BEFORE THE SECOND BREAK.

16           **THE COURT:**  WHAT WAS THE SENTENCE -- HAND UP WHAT IT

17  WAS THAT MR. KESSLER QUOTED.

18           **MR. KESSLER:**  I'LL HAND IT UP, YOUR HONOR.

19           **THE COURT:**  GIVE IT TO DAWN.

20           **MR. KATZ:**  AND IT WAS ON THE BOARD.  AND HE

21  HIGHLIGHTED IT.  AND HE HIGHLIGHTED IT.

22           **MR. KESSLER:**  AND, YOUR HONOR, I NOTE THEY PUT THE

23  DOCUMENT INTO EVIDENCE.  WE DID NOT.  SO THE DOCUMENT WAS IN

24  EVIDENCE BY THEM.

25           **THE COURT:**  WHO DESIGNATED THE DOCUMENT?

1    **MR. KESSLER:** THEY -- THEY -- THEY USED IT IN THEIR

2 OPENING ARGUMENT AS PLAINTIFFS, AND THEY MOVED IT INTO

3 EVIDENCE.

4        **THE COURT:** WHO PUT IT ON THEIR EXHIBIT LIST?

5        **MR. KESSLER:** WE BOTH DID, YOUR HONOR.

6        **MR. KATZ:** I DON'T KNOW IF THAT'S TRUE, YOUR HONOR.

7        **MR. HUMMEL:** THAT'S TRUE.

8        **MR. KESSLER:** I'M VERY SURE IT'S TRUE.

9        **MR. KATZ:** YOU WERE VERY SURE YOU DIDN'T READ IT IN,

10 BUT YOU WERE WRONG.

11        **MR. KESSLER:** BUT I JUST TOLD I WAS SURE ABOUT THIS.

12        **MR. KATZ:** YOU'RE SURE ABOUT EVERYTHING.  THAT'S YOUR

13 PROBLEM.

14        **THE COURT:** WAIT.  WAIT.  WAIT.  PLEASE.  PLEASE.

15 PLEASE.  PLEASE.

16        MR. KATZ, WHAT WAS THE SENTENCE?

17        **MR. KATZ:** "AMAZING INCREASES IN THE PENSIONS."

18        MR. ADDERLEY'S WENT FROM $120 A MONTH TO $175 A

19 MONTH.  THAT WAS HIS AMAZING INCREASE.

20        **THE COURT:** HERE IS WHAT I'M GOING TO ALLOW.  ONE

21 QUESTION.  AND HERE'S THE FORMAT OF THE QUESTION.

22        AND THIS IS TO MR. ADDERLEY.  AND THIS IS BECAUSE YOU

23 DID READ IT, MR. KESSLER.

24        YOU CAN QUOTE THE WAY -- THE FORM OF THE QUESTION

25 WILL BE AS FOLLOWS.

1        YOU CAN SAY:  MR. KESSLER PUT UP ON THE SCREEN AND

2   READ FROM THE -- WHAT WAS IT CALLED?

3        **MR. KESSLER:**  TOUCHBACK.

4        **THE COURT:**  -- TOUCHBACK, THIS SENTENCE.  THE LAST

5   TWO SENTENCES IN THE QUOTE THAT STARTS WITH THE:

6             "THE NFLPA'S REPRESENTATION OF VARIOUS -- OF

7   RETIRED PLAYERS IS FUNDED MOSTLY BY ROYALTIES," ET CETERA.

8   "THIS REPRESENTATION HAS DELIVERED AMAZING GAINS IN PLAYER

9   PENSIONS, ESPECIALLY OVER THE PAST TEN YEARS."

10            YOU CAN QUOTE THAT.  AND THEN, YOU CAN SAY:

11            "MR. ADDERLEY, HAVE YOU HAD AMAZING GAINS IN

12  YOUR PENSIONS OVER THE LAST TWO YEARS?"

13            AND HE WILL HAVE TO GIVE WHATEVER IS THE TRUTHFUL

14  ANSWER, AND THEN MOVE ON TO SOMETHING ELSE.

15       **MR. KESSLER:**  YOUR HONOR --

16       **MR. KATZ:**  IF THAT'S THE CASE, YOUR HONOR, I THINK WE

17  WOULD WANT TO REDACT IT.

18       **THE COURT:**  WHY?

19       **MR. KATZ:**  IT'S TOO LIMITING, YOUR HONOR, BECAUSE THE

20  TRUTH OF THE MATTER IS HIS PENSION IS RIDICULOUS.

21       **THE COURT:**  WELL, THEN, HE CAN SAY:

22            "IT'S RIDICULOUS."

23       **MR. KATZ:**  NO, YOU SAID HE CAN'T.

24       **THE COURT:**  LISTEN TO WHAT I SAID.  YOU CAN SAY:

25            "READ THIS ABOUT THE AMAZING GAINS."

1    AND THEN SAY:

2         "MR. ADDERLEY, HAVE YOU HAD AMAZING GAINS --

3   WHAT IS YOUR PENSION, AND HAVE YOU HAD AMAZING GAINS?"

4   PRESUMABLY HE IS GOING TO SAY:

5         "MY PENSION IS TERRIBLE, AND I HAVE NOT HAD

6   AMAZING GAINS."

7         **MR. KATZ:**  WELL, CAN HE SAY WHAT HIS PENSION IS?

8         **THE COURT:**  YES, HE CAN SAY WHAT HIS PENSION IS.

9         **MR. KATZ:**  AS LONG AS HE CAN SAY WHAT HIS PENSION IS

10  AND THAT HE DOESN'T THINK IT'S AN AMAZING --

11        **THE COURT:**  I THINK THAT'S A FAIR RESPONSE TO WHAT

12  MR. KESSLER READ TO THE JURY.

13        **MR. KESSLER:**  YOUR HONOR --

14        **THE COURT:**  YES.

15        **MR. KESSLER:**  -- IF I MAY.  THE PROBLEM I HAVE WITH

16  THAT IS THAT THE REASON MR. ADDERLEY'S PENSION IS THE WAY IT

17  IS -- AND IT'S EXACTLY WHAT WE WANTED TO KEEP FROM THE JURY --

18  IS MR. ADDERLEY MADE AN ELECTION TO TAKE HIS PENSION EARLY, AND

19  HE VOLUNTARILY REDUCED THE AMOUNT OF HIS PENSION BY AN ENORMOUS

20  AMOUNT OF MONEY, CONTRARY TO UNION ADVICE.

21        SO WHAT THE JURY WOULD HEAR --

22        **THE COURT:**  THEN, YOU CAN BRING THAT UP.

23        **MR. KESSLER:**  THANK YOU, YOUR HONOR.

24        **THE COURT:**  ON CROSS-EXAMINATION.

25        **MR. KESSLER:**  THANK YOU, YOUR HONOR.

1       **THE COURT:** I MAY, IF I FEEL IT'S WARRANTED -- I WANT

2 TO PUT YOU BOTH ON NOTICE I MAY TELL THE JURY WHEN THIS COMES

3 OUT THAT IN THE COURT'S JUDGMENT THIS IS IRRELEVANT, BECAUSE I

4 DO THINK IT'S IRRELEVANT.

5       **MR. KATZ:** YOUR HONOR, WE DID NOT BRING IT UP.

6       **THE COURT:** I KNOW YOU DIDN'T. BUT SINCE IT WAS

7 BROUGHT UP I THINK YOU'VE GOT REASONABLE LATITUDE, PUT YOUR

8 POINT OF VIEW IN ON SOMETHING THAT IS IRRELEVANT.

9       BUT THE OTHER SIDE READ THIS TO THE JURY, SO I THINK

10 FAIRNESS REQUIRES THAT YOU GET TO SAY WHAT I SAID YOU COULD

11 SAY.

12       BUT THIS HAS SUCH A RISK OF CONFUSING THE JURY ON THE

13 GLA ISSUE. IT DOESN'T MATTER IF HE GETS ZERO PENSION. ZERO.

14 THE ISSUES HERE CONCERN THE GLA, THE FIDUCIARY DUTY AND THE --

15 ONLY AS IT PERTAINS TO THE GLA AND THE BREACH OF CONTRACT.

16       **MR. KATZ:** I AGREE, YOUR HONOR. THAT'S WHY I DID NOT

17 BRING THIS UP.

18       **THE COURT:** THANK YOU FOR BEING A GOOD CITIZEN.

19       (LAUGHTER)

20       I'M GIVING YOU SOME LATITUDE.

21       **MR. KATZ:** I GET IT. I GET IT, YOUR HONOR.

22       **THE COURT:** BUT PLEASE DON'T ABUSE IT NOW.

23       AND THE WAY TO TEE THIS UP --

24       **MR. KATZ:** THAT'S WHY I BROUGHT IT UP NOW, YOUR

25 HONOR.

1          **THE COURT:** -- IS YOU READ THOSE TWO SENTENCES.

2    HERE.  GIVE IT TO ME SO I CAN CIRCLE THE TWO SENTENCES.

3          **MR. KATZ:**  I BROUGHT IT UP NOW SO THERE WOULDN'T BE

4    ANY SURPRISES FOR YOUR HONOR.

5          **THE COURT:**  THANK YOU.  YOU DID RIGHT.  THANK YOU.

6          WHAT'S NEXT?

7          **MR. HUMMEL:**  YOUR HONOR, THE ONE DOCUMENT WE DID WANT

8    TO GO TO THE JURY WAS THE GLA.  I DON'T THINK THERE'S ANY

9    OBJECTION TO THAT.

10          **THE COURT:**  I WANT TO DO IT AT THE SAME TIME.

11          **MR. HUMMEL:**  I UNDERSTAND.

12          **THE COURT:**  SO LET'S -- DO YOU STILL WANT THE -- I'M

13   NOT GOING TO REDACT IT OUT.  SO I WILL LET YOU PUT IN THE --

14   PUT THAT --

15          **MR. KESSLER:**  TOUCHBACK.

16          **THE COURT:**  HERE'S WHAT I THINK WE SHOULD DO,

17   MR. KATZ.

18          TOUCHBACK CAN GO TO THE JURY BOX, BECAUSE IT'S

19   ALREADY IN EVIDENCE.  GLA GOES INTO THE JURY BOX.  AND YOU GET

20   TO ASK THE LINE OF QUESTIONS, ONE OR TWO QUESTIONS THAT I JUST

21   STATED.

22          **MR. KESSLER:**  AND I HAVE NO --

23          **THE COURT:**  EVERYONE OKAY WITH THAT?

24          **MR. KESSLER:**  YES, AND I THINK YOUR HONOR GIVING THE

25   INSTRUCTION IT'S TOTALLY IRRELEVANT IS TOTALLY APPROPRIATE.

1   **THE COURT:**  I'M NOT NECESSARILY GOING TO MAKE THAT.

2  THAT'S THE WAY I FEEL, BUT I HAVE TO SEE HOW IT COMES OUT

3  BEFORE I START INTERJECTING HERE.

4   **MR. KATZ:**  I'M PERFECTLY HAPPY WITH HIM

5  CROSS-EXAMINING TO HIS HEART'S CONTENT, BECAUSE THE REASON THIS

6  PENSION IS BAD IS THAT IT'S BAD.  IT'S THE WORST PENSION IN

7  HISTORY.

8   (LAUGHTER)

9   **THE COURT:**  BE AWARE THAT I HAVE TO GIVE REASONABLE

10  REDIRECT.  SO MR. KATZ CAN, WITHIN THE SCOPE OF HIS QUESTIONS,

11  HE CAN THEN --

12   **MR. KESSLER:**  SURE.

13   **MR. KATZ:**  LET HIM TAKE HIS BEST SHOT, YOUR HONOR.

14  THAT'S WHAT I SAY.

15   **MR. HUMMEL:**  I WANT TO HAND UP THE GLA AND THE

16  TOUCHBACK THING.

17   **THE COURT:**  BOTH SIDES LET IT GO IN TO THE JURY BOX.

18   **MR. KESSLER:**  THE JUDGE JUST ASKED US TO VERIFY.

19   **THE COURT:**  VERIFY, AND THEN IT WILL GO.  BUT CAN WE

20  AT LEAST PUT THE TIMELINE ON THE CHAIRS?

21   **MR. KESSLER:**  YES.  HERE'S THE TIMELINE.  THERE'S NO

22  DISPUTE ABOUT THAT.

23   **THE COURT:**  PUT THOSE OUT, DAWN.

24   **MR. HUMMEL:**  I CAN DO IT.

25   **THE COURT:**  MR. HUMMEL, THANK YOU.

1      **MS. NAYLOR:** YOUR HONOR, I HAVE SOME TRULY

2 HOUSEKEEPING MATTERS.

3          WE HAVE A REDACTED --

4      **THE COURT:** ARE YOU SUGGESTING THAT THESE LAWYERS

5 REALLY NEVER HAVE --

6      **MS. NAYLOR:** I'M SUGGESTING THAT, YOUR HONOR.

7      **THE COURT:** THEY ALWAYS CALL IT THAT, AND HOPE I

8 AGREE IMMEDIATELY.

9      **MS. NAYLOR:** WE HAVE A REDACTED GLA FOR WALTER BEACH

10 THAT CAME UP YESTERDAY.

11      **THE COURT:** ON THE SOCIAL SECURITY NUMBER?

12      **MS. NAYLOR:** YES, FOR TRIAL EXHIBIT 640.

13      **THE COURT:** EXCELLENT.  GOOD.

14      **MS. NAYLOR:** AND I WOULD ALSO LIKE TO MOVE INTO

15 EVIDENCE 1245-7, 1245-8, 1245-9, AND 1263-7, WHICH ARE ALREADY

16 ADMITTED AS PART OF THE GAME, BUT WE WANTED THEM ADMITTED

17 SEPARATELY.

18      **THE COURT:** I'M SORRY.  I WAS LOOKING AT THE

19 TIMELINE.  I HAVE TO GET MY LIST OUT.  12 WHAT?

20      **MS. NAYLOR:** 1245-7 -- THESE ARE ALL SCREEN SHOTS

21 FROM THE MADDEN GAME.

22      **THE COURT:** 12 --

23      **MS. NAYLOR:** 1245-7.

24      **THE COURT:** 1245-7.  WELL, I HAVE A NOTE HERE THAT

25 EVERY SINGLE PAGE IS IN.

1    **MS. NAYLOR:** THEY'RE IN AS A PART OF THE GAME, BUT WE

2  WOULD LIKE THEM ADMITTED SEPARATELY, AS WELL, FOR CONVENIENCE

3  OF THE JURY.

4    **THE COURT:** I MISUNDERSTOOD, BECAUSE I STOPPED

5  PUTTING DOWN ALL THE --

6    **MS. NAYLOR:** ALL THE DASHES?

7    **THE COURT:** -- ALL THE DASHES. BUT IF YOU TELL ME

8  THE ONES YOU WANT IN I WILL --

9    **MS. NAYLOR:** WE PUT IN SOME YESTERDAY. AND THESE ARE

10 ADDITIONAL.

11   **THE COURT:** GIVE IT TO ME AGAIN.

12   **MS. NAYLOR:** 1245-7.

13   **THE COURT:** 1245-7.

14   **MS. NAYLOR:** 1247-8.

15   **THE COURT:** 8. HERE ARE THE ONES I PUT DOWN BEFORE I

16 STOPPED MAKING NOTES ON 1245. DASH 1, DASH 2, DASH 4, DASH 8.

17   NOW, YOU'RE TELLING ME I --

18   **MS. NAYLOR:** DASH 7.

19   **THE COURT:** DASH 7. WHAT ELSE?

20   **MS. NAYLOR:** DASH 9.

21   **THE COURT:** DASH 9.

22   **MS. NAYLOR:** AND 1263-7.

23   **THE COURT:** WAIT. ARE YOU FINISHED WITH 1245?

24   **MS. NAYLOR:** YES.

25   **THE COURT:** ALL OF THOSE ARE RECEIVED.

1    **MR. LECLAIR:** YOUR HONOR, JUST SO THE RECORD IS

2 CLEAR -- I'M SORRY.  1245-1 AND 2 WERE ADMITTED ALREADY.  SO

3 THOSE ARE ALREADY IN EVIDENCE SEPARATELY.

4         **THE COURT:** I HAVE THEM IN EVIDENCE BUT --

5         **MS. NAYLOR:** AND 1263-7.

6         **THE COURT:** -- SINCE YOU TOLD ME THE WHOLE THING WAS

7 IN I STOPPED TAKING NOTES.

8         WHAT WAS THE OTHER ONE?  12 WHAT?

9         **MS. NAYLOR:** 1263-7.

10        **THE COURT:** JUST A MINUTE.  1263-7 IS ALSO IN.

11        WHAT ELSE?

12        (TRIAL EXHIBITS 1245-7, 1245-8, 1245-9, AND 1263-7

13        RECEIVED IN EVIDENCE.)

14        **MS. NAYLOR:** AND 2370.

15        **THE COURT:** WHAT?

16        **MS. NAYLOR:** 2370.

17        **THE COURT:** 2370.

18        **MR. KESSLER:** NO, YOUR HONOR.  WE OBJECTED TO THAT.

19 THAT WAS THE CONSTITUTION.  THAT'S NOT PART OF THIS, I DON'T

20 THINK.

21        **THE COURT:** THAT WAS NEVER MOVED INTO EVIDENCE.

22        **MR. KESSLER:** CORRECT, YOUR HONOR.

23        **MR. HUMMEL:** I DID NOT, YOUR HONOR, BUT A FOUNDATION

24 WAS LAID, AND I WOULD HAVE MOVED IT.  IT CAME FROM HIS FILES.

25 IT IS THE CONSTITUTION, AND YOU ALLOWED QUESTIONING ABOUT IT.

1  I WOULD HAVE MOVED IT IN.  I SIMPLY NEGLECTED TO DO SO.

2           **MR. KESSLER:**  YOUR HONOR, WE'D OBJECT UNDER 403.

3  THIS IS THE DOCUMENT THAT HE KEPT IN HIS FILES THAT HE WAS

4  ARGUING HAD SUCH TRUST IN THE UNION.  YOUR HONOR WAS FORCED TO

5  GIVE AN INSTRUCTION THAT THAT'S NOT THE ISSUE TO THE JURY

6  BECAUSE OF THE CONFUSION.  I DON'T THINK THIS DOCUMENT BELONGS

7  IN EVIDENCE.

8           **THE COURT:**  WHY IS THAT RELEVANT?

9           **MR. HUMMEL:**  BECAUSE IT'S ONE OF THE REASONS HE

10  SIGNED THE GLA, WHICH MR. KESSLER HAS PUT IN ISSUE IN THIS CASE

11  AS TO THESE PEOPLE DIDN'T BELIEVE THEY WERE GOING TO GET

12  ANYTHING OUT OF THIS GLA'S, AND THEY TRUSTED THE UNION.

13           IT'S A CENTRAL PIECE OF THE CASE, YOUR HONOR, AND

14  THAT'S BEEN THE UNION'S MANTRA FROM DAY ONE.

15           **THE COURT:**  WHAT IS IN THE CONSTITUTION THAT COULD

16  POSSIBLY CAUSE THEM TO TRUST THE UNION?

17           **MR. HUMMEL:**  IF YOU LOOK, YOUR HONOR, AT THE BATES

18  PAGE 1242:

19           "PAY HOMAGE TO OUR PREDECESSORS FOR THEIR

20  COURAGE, SACRIFICE AND VISION."

21           IT IS THE FABRIC OF THIS UNION THAT THEY SUPPORT THE

22  RETIRED PLAYERS.  AND THAT'S PART OF THE REASON MR. LAIRD

23  TESTIFIED HE SIGNED THE GLA.  IT'S PART OF THE REASON

24  MR. MCNEIL TESTIFIED HE SIGNED THE GLA.

25           IT IS A CENTERPIECE OF THIS CASE AS TO WHEN THEY

1  RECEIVED SOMETHING FROM THEIR UNION IN THE MAIL, THEY THOUGHT

2  THE UNION HAD THEIR BACK.

3          IN FACT, THE EVIDENCE HAS SHOWN, AND WILL CONTINUE TO

4  SHOW, THEY DIDN'T.  THIS IS FROM MR. LAIRD'S FILES, AND A

5  FOUNDATION WAS LAID, YOUR HONOR.

6          IT IS CENTRALLY RELEVANT TO THE REASON WHY THEY

7  SIGNED THE GLA AND THE UNDERSTANDING THEY HAD OF THE GLA WHEN

8  THEY SIGNED IT.

9          **MR. KESSLER:**  YOUR HONOR HAS ALREADY RULED ON TWO

10 THINGS.  ONE, THERE ARE ONLY TWO CLAIMS IN THIS CASE.  THE

11 BREACH OF CONTRACT, WHICH HAS NOTHING TO DO WITH THIS,

12 OBVIOUSLY, AS YOUR HONOR HAS NOTED MANY TIMES, EITHER BREACHED

13 OR DIDN'T BREACHED.  AND THE BREACH OF FIDUCIARY DUTY, WHICH

14 YOUR HONOR SPECIFICALLY RULED ONLY STEMS FROM THE GLA, NOT

15 THEIR RELATIONSHIP WITH THE UNION.

16         IN FACT, MANY OF THESE CLASS MEMBERS ARE NOT MEMBERS

17 OF THE UNION.  THEY HAVE THREE OF THEM WHO ARE.  MOST OF THEM

18 WERE NOT DUES-PAYING MEMBERS.

19         SO TO CONFUSE THE JURY ABOUT THIS ISSUE THAT SOMEHOW

20 THERE'S SOME DUTY ARISING OUT OF THE CONSTITUTION IS NOT AN

21 ISSUE IN THIS CASE.

22         SECOND OF ALL --

23         **THE COURT:**  HOW MANY MEMBERS OF THE CLASS WERE

24 MEMBERS OF THE UNION WHO SIGNED THE GLA?

25         **MR. KESSLER:**  I DON'T KNOW THE NUMBER, YOUR HONOR,

1  BUT IT'S FAR LESS THAN A HUNDRED PERCENT.

2         **THE COURT:**  IS IT MORE THAN HALF?

3         **MR. LECLAIR:**  YOUR HONOR, ACTUALLY, THE EVIDENCE ON

4  THIS IS GOING TO BE THAT THERE IS -- IN THEIR PUBLICLY-FILED

5  DOCUMENTS THEY DEFINE "RETIRED MEMBERS" AS PEOPLE WHO HAVE BEEN

6  IN THE NATIONAL FOOTBALL LEAGUE.

7         SO THE JURY IS GOING TO HAVE TO DECIDE EXACTLY WHAT

8  "MEMBERSHIP IN THE UNION" MEANS BECAUSE OF THE WAY THEY DEFINE

9  IT, NOT THE WAY WE --

10         **THE COURT:**  RIGHT NOW THIS IS EXCLUDED, BUT I'LL LET

11  YOU DO A BRIEF.

12         I WANT TO SAY SOMETHING TO THE PLAINTIFFS HERE.  YOU

13  HAVE SOME GOOD POINTS IN THIS CASE.  AND A LOT OF THEM ARE

14  GETTING BURIED IN DRIBBLE.  THAT GLA, THERE'S A LOT OF PROBLEMS

15  WITH THAT GLA.  BUT YOU ARE RUNNING AWAY FROM IT.  YOU ARE

16  RUNNING TO THE CONSTITUTION.  YOU'RE RUNNING TO THE 63 -- THAT

17  THING OVER THERE, THEIR PRESENT REMINDER, WHICH TO MY MIND HAS

18  NOTHING TO DO WITH THIS CASE.  IT'S CONFUSING THE JURY.

19         AND I DON'T SEE THIS BEING MUCH -- IF YOUR CASE COMES

20  DOWN TO "PAY HOMAGE TO OUR FORMER PLAYERS," YOU'RE GOING TO

21  LOSE.

22         **MR. HUMMEL:**  IT CERTAINLY DOESN'T COME DOWN TO THAT,

23  YOUR HONOR, BUT IT IS ABSOLUTELY IS A PART OF THE FABRIC OF

24  THIS CASE.

25         **THE COURT:**  WAS EVERY SINGLE MEMBER OF THE CLASS A

1  UNION MEMBER WHEN THEY SIGNED?  IF NOT, IT'S NOT A COMMON

2  ISSUE.  SO I'M NOT GOING TO RULE IT OUT PERMANENTLY.  I'M JUST

3  GOING TO SAY YOU'RE GOING TO HAVE TO BRIEF THIS.  I WANT GOOD

4  BRIEFING ON THIS.  AND I DON'T WANT PLATITUDES AND A JURY

5  ARGUMENT.

6          DON'T TELL ME IT'S CENTRAL TO THE CASE.

7          **MR. HUMMEL:**  I DIDN'T TELL YOU IT'S CENTRAL.  I

8  SAID --

9          **THE COURT:**  YOU SAID IT WAS CENTRAL TO YOUR CASE.  IF

10  THAT'S THE TRUTH, YOU MIGHT AS ROLL THIS CASE UP AND GO HOME

11  NOW.  YOUR CASE -- YOU'VE GOT STRONGER POINTS TO MAKE THAN

12  THAT.  BUT MOST OF THE TIME YOU'RE NOT MAKING THEM.

13          **MR. HUMMEL:**  I UNDERSTAND, YOUR HONOR.

14          **THE COURT:**  IF I WAS ON YOUR SIDE I WOULD BE SAYING:

15          "WHERE IS THE ESCROW?  AND WHAT WAS THE POINT OF

16  EVER ENTERING INTO THESE AGREEMENTS IF NOT ONE PENNY WAS EVER

17  GOING TO BE PAID UNDER THEM?"

18          **MR. HUMMEL:**  OH, WE INTEND TO SAY THAT.

19          **THE COURT:**  THAT'S A GOOD POINT TO MAKE.

20          **MR. HUMMEL:**  WE'LL MAKE IT.

21          **THE COURT:**  NOW, MR. KESSLER'S GOT SOME GOOD POINTS,

22  TOO, BUT YOU HAVEN'T MADE THAT POINT ABOUT ONE TIME IN THIS

23  WHOLE CASE.

24          I DON'T THINK THE JURY HAS GOTTEN THAT.

25          **MR. HUMMEL:**  ALL RIGHT, YOUR HONOR.

1       **THE COURT:**  I THINK YOU GUYS ARE -- THAT THING OVER

2   THERE WHICH LOOKS LIKE A JIGSAW PUZZLE, THAT THE GLR, WHATEVER

3   IT IS -- NOT -- THAT MR. PARCHER PUT UP THERE IS A MASTERPIECE

4   OF CONFUSION.

5       SO I FEEL THAT THIS CASE IS -- YOU'VE GOT TO TRY THE

6   CASE THE WAY YOU WANT TO WITHIN THE RULES OF REASON AND

7   EVIDENCE.  THAT'S YOUR -- BUT I'M SAYING TO THE NINTH CIRCUIT

8   WHEN THEY READ THIS TRANSCRIPT LATER, I DON'T SEE THE UNION

9   CONSTITUTION AS BEING A CENTERPIECE OF THIS CASE.

10      **MR. HUMMEL:**  I DIDN'T MEAN TO IMPLY IT WAS A

11  CENTERPIECE, YOUR HONOR.

12      **THE COURT:**  THIS IS NOT A 301 ACTION.  THIS IS

13  SOMETHING TO DO WITH A SINGLE CONTRACT THAT APPLIES TO ALL

14  MEMBERS OF THE CLASS.

15      SO -- BUT I'M NOT MAKING A FINAL RULING ON IT.  YOU

16  CAN BRIEF IT.

17      **MR. HUMMEL:**  I UNDERSTAND, YOUR HONOR.

18      **THE COURT:**  PLEASE GIVE ME YOUR BRIEFS ON THIS BY

19  TOMORROW WHEN WE ADJOURN.

20      **MR. HUMMEL:**  YOUR HONOR --

21      **THE COURT:**  YOU'VE GOT TONS OF LAWYERS ON BOTH SIDES.

22      YES.

23      **MR. HUMMEL:**  WE'LL DO OUR BEST.

24      I DO ACTUALLY HAVE SOME OTHER BUSINESS BEFORE WE

25  START, AND I KNOW YOU WANT TO START.

1    MR. KATZ, DO YOU WANT TO SAY SOMETHING?

2    **THE COURT:**  WHAT ELSE?

3    **MR. KATZ:**  I HAD JUST ONE POINT ON THAT.  IT CAME UP

4    AT THE END OF THE DAY AND HAS COME UP SEVERAL TIMES, YOUR

5    HONOR.

6        I JUST WANT TO STATE, FOR CLARITY, OUR POSITION ON

7    THE FIDUCIARY DUTY ISSUE, BECAUSE OFTEN WE FOCUS ON THE

8    CONTRACT.  THERE IS A FIDUCIARY DUTY CLAIM AND HOW THE

9    SCRAMBLING RELATES TO THAT.

10       THE -- IT IS ABSOLUTELY CORRECT THAT WE ARE -- WE

11   HAVE NOT CONTENDED THAT THEY HAVE VIOLATED THE INTELLECTUAL

12   PROPERTY RIGHTS OF THE PLAYERS BECAUSE OF THE SCRAMBLING.  OUR

13   CONTENTION IS THAT THEY HAVE VIOLATED THE FIDUCIARY DUTY

14   RIGHTS.

15       AND WE BELIEVE THAT AT SOME APPROPRIATE POINT WE

16   WOULD REQUEST YOUR HONOR TO MAKE AN INSTRUCTION TO THE JURY

17   WITH THOSE TWO SIDES IN IT.

18   **THE COURT:**  THAT'S A FAIR POINT.  I THINK WE SHOULD

19   FAIRLY PLACE THE ACTUAL CONTENTION BEFORE THE JURY.  YOU CAN

20   HAND UP SOME VERSION THAT YOU WOULD LIKE ME TO READ TO THE

21   JURY, AND I WOULD BE HAPPY TO ENTERTAIN IT.

22   **MR. KATZ:**  OKAY.  WE WILL DO THAT TOMORROW MORNING,

23   YOUR HONOR.

24   **THE COURT:**  YOU'VE GOT IT MAKE IT CLEAR IN THE FINAL

25   JURY INSTRUCTIONS, AS WELL.  I'M WORKING ON THOSE EVERY DAY.

1  I HAVE A DIFFERENT QUESTION THAT RELATES TO THIS

2  POINT.  AND I DON'T WANT TO SAY ANYTHING MORE THAN THIS:

3  WHEN MR. ALLEN WAS ON THE STAND, HE MADE VARIOUS

4  STATEMENTS, AND I WOULD LIKE FOR SOMEBODY TO COLLECT THEM FOR

5  ME BECAUSE THEY COULD RELATE TO A PRIOR RULING THAT I MADE.

6  HE SAID THAT HE HAD SPECIFICALLY PROPOSED TO THE --

7  TO THE PEOPLE THAT DID THE MADDEN GAME -- WHO WAS THAT, EA?

8  **MR. HUMMEL:**  YES.

9  **MR. KATZ:**  YES.

10  **THE COURT:**  THAT HE HAD SPECIFICALLY PROPOSED THAT

11  THE -- THAT EA LICENSE --

12  **MR. HUMMEL:**  YOUR HONOR, I THINK WE MIGHT HAVE A

13  WITNESS IN THE COURTROOM TO WHICH THIS RELATES, AND IT'S

14  IMPORTANT THAT THAT WITNESS BE EXCLUDED.

15  **THE COURT:**  WHO IS THAT?

16  **UNIDENTIFIED SPEAKER:**  NO, YOUR HONOR.  I AM AN

17  IN-HOUSE LAWYER WITH ELECTRONIC ARTS.

18  **MR. HUMMEL:**  I WOULD ASK THAT THAT IN-HOUSE LAWYER

19  BE EXCUSED, BECAUSE IT'S CRITICAL TO THE CROSS-EXAMINATION OF

20  MR. LINZNER.

21  **THE COURT:**  PLEASE STEP OUTSIDE.

22  **MR. KATZ:**  YOU WERE SAYING THAT MR. ALLEN TESTIFIED

23  THAT HE PROPOSED TO EA.

24  **THE COURT:**  OH, YEAH.  HE PROPOSED TO EA, AND THAT EA

25  SAID THAT THEY WERE NOT INTERESTED.

1    NOW, PLEASE, I THINK HE SAID IT TWICE, BUT I WOULD

2  LIKE TO HAVE THE EXACT CONTEXT.  AND I'D LIKE FOR THE LAWYERS

3  TO GIVE ME WHAT HE SAID ON THAT SUBJECT.

4        **MR. HUMMEL:**  WE WILL, YOUR HONOR.

5        **MR. KATZ:**  YES, YOUR HONOR.

6        **MR. KESSLER:**  OKAY.

7        **MR. KATZ:**  AND YOUR HONOR ASKED HIM WHETHER THERE WAS

8  ANY WRITING TO BACK IT UP, AND HE SAID "NO."

9        **THE COURT:**  YES, BUT I WOULD LIKE TO KNOW WHETHER HE

10  SAID THAT ON OCCASION OTHER THAN WHEN I ASKED THE QUESTION.

11        AND, BY THE WAY, WHEN YOU'RE MAKING YOUR JURY

12  ARGUMENTS, NOBODY CAN SAY:

13            "AND THE JUDGE ASKED THIS QUESTION."

14        DON'T DO THAT.  YOU CAN SAY HE WAS ASKED THE

15  QUESTION.  I DON'T WANT SOMEBODY PUTTING EXTRA WEIGHT ON THE

16  FACT THAT I ASKED THE QUESTION.

17        **MR. KESSLER:**  WELL, CERTAINLY, YOUR HONOR.

18        **THE COURT:**  ALL RIGHT.  SO, IN OTHER WORDS, IN YOUR

19  CLOSING ARGUMENTS, MR. PARCHER, DON'T SAY:

20            "AND THE JUDGE ASKED THIS," BECAUSE YOU'RE JUST

21  TRYING TO HIKE THE QUESTION UP BY THE FACT THAT THE JUDGE ASKED

22  IT.  YOU CAN SAY:

23            "HE WAS ASKED THE QUESTION, AND HERE'S THE

24  ANSWER HE GAVE."

25        I KNOW -- I KNOW MR. PARCHER, BUT IT'S NOT FAIR.

1          **MR. PARCHER:**  ONE THING'S FOR SURE.  YOU'RE IN

2    CHARGE.

3          **THE COURT:**  I DON'T WANT MY QUESTIONS TO GET ANY MORE

4    WEIGHT THAN THE QUESTIONS ASKED BY THE LAWYERS.

5          **MR. KESSLER:**  YOUR HONOR, IF THEY'RE GOING TO PROPOSE

6    AN INSTRUCTION ABOUT THE EA BREACH OF FIDUCIARY DUTY CLAIM,

7    OKAY, WHAT I WOULD REQUEST IS THEY ALSO EXPLAIN IN THAT

8    INSTRUCTION WHAT THEIR CLAIM IS.

9          BECAUSE THE REASON I'M STATING THAT IS NOT JUST STATE

10   THAT THEY CLAIM SCRAMBLING IS A BREACH OF FIDUCIARY DUTY,

11   BECAUSE WHAT THEY'VE DONE IS THEY'VE ARGUED EVERY POSSIBLE

12   VARIATION.

13         THEY'VE ARGUED COMMITTING THE SCRAMBLING IS A BREACH

14   OF FIDUCIARY DUTY.  THEY'VE ARGUED WE EITHER SHOULD HAVE JUST

15   GIVEN THE THEM THE RIGHTS -- IN OTHER WORDS, WE SHOULD HAVE

16   GIVEN THEM THE RIGHTS FOR FREE TO THE RETIRED PLAYERS; IT WAS A

17   BREACH OF FIDUCIARY DUTY NOT TO DO THAT.  OR THEY ALREADY HAD

18   THE RIGHTS, AND THAT WE WERE TELLING THEM TO SCRAMBLE.

19         I WOULD LIKE TO KNOW, WHAT IS THEIR CLAIM?

20         **THE COURT:**  THERE ARE THREE POSSIBLE VARIATIONS THAT

21   HAVE OCCURRED TO ME.  I DON'T KNOW WHICH ONE THE PLAINTIFFS

22   WILL -- ONE IS THAT THEY SHOULD HAVE AFFIRMATIVELY -- BY "THEY"

23   I MEAN -- BY "THEY" I MEAN DEFENDANTS SHOULD HAVE PROPOSED TO

24   EA, WHENEVER THEY WERE DOING THE MADDEN GAME, AFFIRMATIVELY

25   PROPOSED:

1    "HEY, WE NEED ALL THESE RETIRED PLAYERS.  WE GOT

2  THESE 2,000 PEOPLE SIGNED UP.  WHY DON'T WE MAKE ANOTHER DEAL

3  WITH YOU USING GLA'S?"

4          THAT WOULD BE ALTERNATIVE ONE.

5          ALTERNATIVE TWO WOULD BE DO AD HOCS, I GUESS, SO THAT

6  THE PARTICULAR PLAYERS -- YOU COULD DO AD HOCS.

7          ANOTHER ALTERNATIVE WOULD BE TO GIVE IT AWAY, TO JUST

8  DEEM IT AS IF IT WAS UNDER THE EXISTING AGREEMENTS.

9          AND ANOTHER ALTERNATIVE WOULD BE WHAT YOU'VE

10 CONTENDED FOR, SCRAMBLE, THEREBY PROTECT THE -- HOLD LEVERAGE

11 OVER THE EA.  YOU'RE GOING TO SCRAMBLE UNLESS YOU GET THESE

12 INDIVIDUAL RIGHTS, AND THERE WAS A FOURTH ONE YOU MENTIONED,

13 AND I LOST TRACK OF.

14         **MR. KESSLER:**  I DON'T KNOW WHAT THE CLAIM IS.

15         **THE COURT:**  IT MAY BE THEY'VE GOT MORE THAN ONE.

16 MAYBE THEY'RE NOT LOCKED INTO ONE.  I WON'T -- THIS COULD BE

17 SORTED OUT WHENEVER I SEE --

18         **MR. KESSLER:**  I WOULD JUST BE CONCERNED THAT YOUR

19 HONOR NOT DO ANYTHING TO THE JURY TO SUGGEST THAT THE COURT

20 THINKS ANY OF THOSE ARE VIABLE.  THAT WOULD BE MY CLAIM --

21         **THE COURT:**  I WILL MAKE IT VERY CLEAR THIS IS UP TO

22 THE JURY TO SORT OUT WHAT THESE VARIOUS DUTIES WERE.

23         **MR. KESSLER:**  OKAY.

24         **THE COURT:**  BUT WHAT BOTHERS ME IS MR. HUMMEL, AND

25 THE IDEA THAT YOU CAN WAIVE THE CONSTITUTION OF THE UNION

1  AROUND AND SAY:

2            "THIS IS WHERE THE FIDUCIARY DUTY COMES FROM."

3        **MR. KESSLER:**  RIGHT.  THE BROTHERHOOD CLAIM, YOUR

4  HONOR.

5        **THE COURT:**  I FEEL THAT THAT IS -- THAT SOUNDS SO

6  MUCH LIKE A 301-TYPE CASE THAT -- SO I'VE ALREADY SAID -- I'M

7  NOT MAKING A RULING.  I'M JUST SAYING I'M VERY CONCERNED ABOUT

8  THAT, AND YOU'RE GOING TO GET A CHANCE TO BRIEF IT.

9        THANK YOU.

10       OKAY.

11       **MR. HUMMEL:**  WE HAVE ONE MORE THING, YOUR HONOR.

12       **THE COURT:**  GO AHEAD.

13       **MR. HUMMEL:**  IT HAS TO DO WITH THE NINTH CIRCUIT.

14  DID YOUR HONOR SEE THE NINTH CIRCUIT'S OPINION?

15       **THE COURT:**  I WAS TOLD ABOUT IT.  I DID NOT READ IT.

16  HERE IS THE THING.  I'M GOING TO REDACT THE PUBLIC VERSION.

17  WE'LL PUT UNDER SEAL THE FULL VERSION.

18       **MR. HUMMEL:**  SO IN THE PUBLIC QUESTIONING ABOUT THE

19  DOCUMENT --

20       **THE COURT:**  I THINK WE'VE GOT TO CLEAR THE COURTROOM.

21  SEE, THIS IS WHAT YOU SHOULD HAVE BROUGHT TO THE -- SEE, I'M

22  NOT ABLE TO APPEAR IN FRONT OF THE NINTH CIRCUIT.  BUT WHEN

23  THIS COMES UP I'M GOING TO ASK EVERYBODY OUT THERE TO BE

24  EXCUSED.

25       **MR. HUMMEL:**  YOUR HONOR --

1          THE COURT:  AND WHEN IT'S ARGUED IN CLOSING ARGUMENT

2   THE SAME THING.

3          MR. HUMMEL:  OKAY, YOUR HONOR.  I UNDERSTAND.

4          THE COURT:  YOU SHOULD HAVE APPEARED AND MADE THIS

5   POINT.

6          MR. HUMMEL:  I DID.

7          THE COURT:  YOU SAID -- DID YOU SPECIFICALLY BRING UP

8   CLEARING THE COURTROOM?

9          MR. HUMMEL:  NO, WHAT I DID --

10         THE COURT:  WHY NOT?  THAT'S THE WHOLE THING THAT

11  BOTHERED ME FROM DAY ONE.

12         MR. HUMMEL:  YOUR HONOR, I RAISED IT WITH YOU, THE

13  COMPROMISE THAT THE --

14         THE COURT:  I'M NOT THE NINTH CIRCUIT.

15         MR. HUMMEL:  I RAISED IT WITH THE NINTH CIRCUIT.  I

16  RAISED EXACTLY --

17         THE COURT:  THEY DIDN'T ADDRESS IT, DID THEY?

18         MR. HUMMEL:  THEY DIDN'T ADDRESS CLEARING THE

19  COURTROOM, NO.

20         THE COURT:  BUT HOW ELSE CAN I DEAL WITH IT?  I'M

21  GOING -- I'M GOING TO NOW ERR ON THE SIDE OF DOING WHAT THE

22  NINTH CIRCUIT WANTS, EVEN THOUGH I THINK IT'S WRONG.

23         MR. HUMMEL:  I UNDERSTAND.

24         THE COURT:  I THINK THAT THEY MADE A MISTAKE.  BUT

25  THEY ARE APPELLATE JUDGES.  THEY ARE NOT DOWN HERE TRYING TO

1 TRY A CASE.  BUT I'M BOUND TO APPLY WHAT THEY WANT TO DO.

2        SO I'M GOING TO ERR ON THE SIDE.  EVERYONE WHO IS NOT

3 A PARTY TO THE CASE -- THE CLASS MEMBERS CAN STAY, BECAUSE I

4 GUESS THEY'RE PARTIES TO THE CASE.  BUT THE -- ANYBODY ELSE WHO

5 IS JUST A MEMBER OF THE PUBLIC, A THIRD PARTY, WHATEVER,

6 THEY'RE GOING TO HAVE TO BE EXCUSED.

7        **MR. HUMMEL:**  ALL RIGHT, YOUR HONOR.

8        **THE COURT:**  IF A MEMBER OF THE PRESS IS HERE, WE'RE

9 GOING TO HAVE TO SAY, BECAUSE YOU, THE PLAINTIFF, WANT TO USE A

10 DOCUMENT THE NINTH CIRCUIT WANTS, WE'RE GOING TO HAVE TO ASK

11 THEM TO LEAVE.

12        **MR. HUMMEL:**  CORRECT.

13        **THE COURT:**  MAYBE YOU CAN THINK OF A WAY TO -- THAT

14 MEANS ANYBODY WHO IS NOT A CLASS -- I DON'T KNOW WHO ALL THESE

15 PEOPLE ARE OVER HERE FOR THE DEFENDANT, BUT IF YOU'RE NOT A

16 CLASS -- IF YOU'RE NOT A CORPORATE REPRESENTATIVE YOU'RE GOING

17 TO BE EXCUSED.

18        **MR. KESSLER:**  YOUR HONOR, THEY ARE THE TWO

19 REPRESENTATIVES.

20        **THE COURT:**  THEY WILL GET TO STAY.

21        **MR. KESSLER:**  THE ONE QUESTION I WOULD ASK, I ASSUME

22 EA'S INSIDE COUNSEL CAN STAY BECAUSE THEY KNOW THE INFORMATION.

23        **THE COURT:**  IF EVERYONE WERE TO STIPULATE, INCLUDING

24 EA, I MIGHT AGREE TO THAT.  BUT THE PRESS IS GOING TO HAVE TO

25 GO.  ANY OTHER MEMBER OF THE PUBLIC IS GOING TO HAVE TO GO.

1    ANY COMPETITORS ARE GOING TO HAVE TO GO.  JUST

2  INTERESTED MEMBER OF THE PUBLIC, I THINK, IS GOING TO HAVE TO

3  BE EXCUSED.  AND WE WILL HAVE TO INTERRUPT THE PROCEEDINGS FOR

4  ME TO MAKE SURE THAT THAT'S THE CASE, BECAUSE I CAN'T TAKE THE

5  WORD OF THE LAWYERS.

6    WE DON'T -- I'LL HAVE TO ASK EACH MEMBER OUT THERE:

7    "ARE YOU -- WHAT IS YOUR BUSINESS FOR BEING HERE

8  TODAY?"

9    THAT'S GOING TO TAKE TIME OUT OF THE CLOSING

10  ARGUMENTS.

11    SO I URGE YOU TO THINK OF A WAY TO DEAL WITH THAT SO

12  YOU DON'T EVEN BRING IT UP IN THE CLOSING ARGUMENTS.

13    **MR. HUMMEL:**  WE WILL DO THAT, YOUR HONOR.

14    **THE COURT:**  AND IN QUESTIONING.

15    **MR. HUMMEL:**  THANK YOU.

16    **THE COURT:**  ALL RIGHT.

17    AND THE COURT REPORTER IS GOING TO HAVE TO SEAL THAT

18  PORTION OF THE TRANSCRIPT.

19    I GUESS WE'VE RUN OUT OF POINTS TO BRING UP.  WHO IS

20  OUR WITNESS?

21    **MS. NAYLOR:**  WALTER BEACH.

22    **THE COURT:**  LET'S BRING BACK MR. BEACH, AND LET'S

23  BRING IN THE JURY.

24    **MR. KESSLER:**  YOUR HONOR, I'M GOING TO GIVE MR. BEACH

25  A COPY OF HIS DEPOSITION TRANSCRIPT BECAUSE HE'LL NEED IT FOR

1    CROSS-EXAMINATION.

2              **THE COURT:**  FINE.

3              (THEREUPON, THE JURY RETURNED TO THE COURTROOM.)

4              **THE COURT:**  WELCOME BACK.  HAVE A SEAT.  HOW IS

5    EVERYBODY THIS MORNING?

6              GOOD?

7              (THEREUPON, THE JURORS RESPOND AFFIRMATIVELY.)

8              **THE COURT:**  WE HAVE A PRESENT FOR YOU.  THE ONE-PAGE

9    TIMELINE.  IT IS A COPY OF WHAT'S OVER THERE ON THE BOARD.  WE

10   WANTED TO MAKE SURE THAT YOU -- IT'S A LITTLE BIGGER THAN I HAD

11   THOUGHT.  MAYBE YOU WILL BE ABLE TO FOLD IT UP AND STICK IT IN

12   YOUR -- STICK IT IN YOUR STENO PADS.  THAT'S UP TO YOU.

13             WHETHER YOU WANT TO USE IT OR NOT, YOU JUST DECIDE.

14   IF IT'S NOT USEFUL TO YOU, YOU CAN TOSS IT OUT.

15             YOU CAN TAKE NOTES ON IT.  WE'RE NOT GOING TO ASK FOR

16   IT BACK.  YOU CAN DO WHATEVER YOU WANT WITH THIS.  JUST TREAT

17   IT AS PART OF YOUR NOTEPAD.  AND AT THE END OF THE CASE WE WILL

18   SHRED IT AND NOT LOOK AT ALL THE NOTES AND DOODLES THAT YOU

19   MADE ON THE PIECE OF PAPER.

20             I WANT TO EMPHASIZE AGAIN THE EVIDENCE IN THE CASE IS

21   WHAT THE WITNESSES SAY AND THE EXHIBITS SAY AND THE

22   STIPULATIONS, OF COURSE.

23             YOU HEAR MANY THINGS THAT THE LAWYERS SAY.  YOU HEAR

24   THEM MORE THAN ME ON BOTH SIDES.  NONE OF THAT IS EVIDENCE.

25   NONE OF IT.  ZERO.

1    AND I THINK ONE OF THE GREATEST DANGERS IN A TRIAL IS

2 THAT THESE LAWYERS, EVEN THOUGH THEY'RE ACTING IN PERFECTLY

3 GOOD FAITH BECAUSE THEY'VE GOT TO GET UP AND SAY THINGS, THEY

4 ARE DOING THEIR BEST.  ONE OF THE GREAT DANGERS IS YOU WILL

5 MISTAKE SOMETHING THEY SAY FOR EVIDENCE, AND IT'S NOT.  IT'S

6 NOT.

7    SO A LOT OF THE THINGS THAT THE LAWYERS SOMETIMES SAY

8 ARE HOTLY CONTESTED.  THEY'RE NOT STIPULATED TO.  AND IT WOULD

9 BE A MISTAKE FOR YOU TO THINK THAT BECAUSE A LAWYER SAYS IT, IT

10 MUST BE TRUE.

11    MAYBE THEY GOT A GOOD FAITH BASIS FOR WHAT THEY'RE

12 SAYING, BUT THERE'S ALSO A GOOD FAITH BASIS FOR THE OTHER VIEW.

13 THAT'S WHY WE'RE HAVING A TRIAL, FOR YOU TO SORT IT OUT.  BUT

14 THAT'S GOT TO BE BASED ON WHAT THE WITNESSES SAY UNDER OATH IN

15 CROSS-EXAMINATION.

16    OKAY.  AS WELL AS, OF COURSE, THE DOCUMENTS.

17    SO I JUST NEED TO REMIND YOU ABOUT THAT EVERY NOW AND

18 THEN, THAT AS YOU HEAR WHAT'S GOING ON HERE IN THE COURTROOM,

19 THAT YOU SAY TO YOURSELF:

20    "OH, THAT'S JUST THE LAWYER TALKING.  MAYBE IT'S

21 TRUE.  MAYBE IT'S NOT TRUE."

22    AND THEN REMEMBER, KEEP SEPARATE WHAT THE WITNESS IS

23 SAYING.

24    NOW, I FORGOT WHERE WE WERE.  HAVE WE FINISHED THE

25 DIRECT?

1          **MS. NAYLOR:**  YES, YOUR HONOR.

2          **THE COURT:**  NOW, THE DIRECT EXAMINATION HAS NOW BEEN

3  FINISHED OF MR. BEACH.  AND MR. BEACH IS NOW GOING TO BE

4  CROSS-EXAMINED BY WHO?

5          MR. KESSLER?

6          GO AHEAD, MR. KESSLER.

7          **MR. KESSLER:**  THANK YOU, YOUR HONOR.

8                 **WALTER BEACH, III**,

9  CALLED AS A WITNESS FOR THE PLAINTIFFS HEREIN, HAVING BEEN

10  PREVIOUSLY DULY SWORN, WAS EXAMINED AND TESTIFIED FURTHER AS

11  FOLLOWS:

12                 **CROSS EXAMINATION**

13  **BY MR. KESSLER:**

14  **Q.**  GOOD MORNING, MR. BEACH.

15  **A.**  GOOD MORNING.

16  **Q.**  MR. BEACH, I BELIEVE IT'S CORRECT THAT YOU ATTENDED THREE

17  YEARS OF LAW SCHOOL.

18  **A.**  THAT'S NOT CORRECT.

19  **Q.**  OKAY.  WELL, LET ME UNDERSTAND THEN --

20          **THE COURT:**  I THINK HE SAID TWO YEARS AT YALE LAW

21  SCHOOL, CORRECT?

22          **THE WITNESS:**  TWO YEARS.

23  **BY MR. KESSLER:**

24  **Q.**  YOU HAD TWO YEARS OF YALE LAW SCHOOL.

25  **A.**  THAT'S CORRECT.

1  Q.   BUT I THOUGHT YOU ALSO SAID YOU ATTENDED JOHN MARSHALL LAW

2  SCHOOL.

3  A.   YES, I SAID AT NIGHT, WHEN I WAS PLAYING PROFESSIONAL

4  FOOTBALL.  I WENT TO NIGHT SCHOOL WITH MR. MCNEIL AND JOHN

5  BROWN.  I THINK WE WENT THERE FOR MAYBE TWO COURSES.

6  Q.   OKAY.  SO FIRST YOU ATTENDED SOME NIGHT LAW SCHOOL AT JOHN

7  MARSHALL, AND THEN YOU ATTENDED TWO YEARS AT YALE LAW SCHOOL.

8  IS THAT FAIR?

9  A.   THAT'S CORRECT.

10 Q.   SO IS IT FAIR TO SAY YOU'VE HAD SOME GOOD LEGAL TRAINING?

11 I KNOW YOU'RE NOT A LAWYER, BUT YOU'VE HAD GOOD LEGAL TRAINING.

12 WOULD YOU AGREE WITH THAT?  CORRECT?

13 A.   PROVIDED AT BOTH THOSE INSTITUTIONS, CORRECT.

14 Q.   YES.  OKAY.  AND SO, GENERALLY SPEAKING, YOU WOULD HAVE

15 LEARNED IN LAW SCHOOL HOW TO LOOK AT CONTRACTS, HOW TO

16 UNDERSTAND CONTRACTS.  IS THAT FAIR?

17 A.   WELL, TO THE EXTENT THAT I UNDERSTOOD THIS CONTRACT, YES.

18 Q.   OKAY.

19 A.   I MEAN, IF IT COULD HAVE BEEN ANY COMPLICATED, I'M NOT

20 CERTAIN THAT I WOULD HAVE UNDERSTOOD THAT.

21 Q.   OKAY.  AND, IN FACT, I BELIEVE YOUR WIFE IS ALSO -- IS AN

22 ATTORNEY; IS THAT CORRECT?

23 A.   UHM, YES.  AND MY WIFE IS AN ATTORNEY.

24 Q.   AND DID YOU EVER CONFER WITH HER ABOUT THE RETIRED PLAYER

25 GLA THAT YOU SIGNED?

1  A.   LIKE I SAID, ON THE FIRST ONE --

2         MS. NAYLOR:  OBJECTION, YOUR HONOR.  I THINK THAT

3  THERE'S A PRIVILEGE THERE.

4         THE COURT:  WELL, WE CAN FIND OUT -- YOU CAN EITHER

5  SAY "YES" OR "NO" TO THAT.  DON'T TELL US WHAT WAS SAID YET.

6  LET'S FIND OUT IF YOU DID HAVE --

7         THE WITNESS:  YES.

8         THE COURT:  -- A CONVERSATION WITH YOUR WIFE ABOUT

9  THE MEANING OF THE GLA BEFORE YOU SIGNED IT.

10         AFTER YOU SIGNED IT IS NOT SO RELEVANT, BUT BEFORE

11  YOU SIGNED IT.

12         THE WITNESS:  YES.

13         MR. KESSLER:  I WON'T ASK THE CONTENT, YOUR HONOR.

14  BY MR. KESSLER:

15  Q.   YOU WOULD CLAIM A PRIVILEGE IF I ASKED WHAT YOU DISCUSSED

16  WITH YOUR WIFE?

17  A.   YES.

18  Q.   OKAY.  ALL RIGHT.  BUT YOU DID DISCUSS WITH YOUR WIFE, AN

19  ATTORNEY, THE GLA BEFORE YOU SIGNED IT?

20  A.   I'M NOT TRYING -- MY WIFE IS THE LOVE OF MY LIFE, THE

21  LIGHT OF MY LIFE, SO I'VE DISCUSSED EVERYTHING WITH HER.

22  Q.   SURE.  I UNDERSTAND THAT, SIR.

23         NOW, MR. BEACH -- AND I KNOW YOU ARE UP HERE

24  TESTIFYING, AND YOU'RE DOING YOUR BEST TO TELL THE TRUTH, SIR,

25  CORRECT?

1  **A.**   I TOOK AN OATH.  OF COURSE, I'M TELLING THE TRUTH.

2  **Q.**   I RESPECT THAT, SIR.

3         NOW, YESTERDAY YOU WERE ASKED THE FOLLOWING QUESTIONS

4  BY YOUR COUNSEL.  I'M ACTUALLY READING FROM THE EXACT WORDS IN

5  THE TRANSCRIPT.  THE QUESTION WAS:

6              "DO YOU STILL GET REQUESTS FOR AUTOGRAPHS?"

7          AND YOUR ANSWER WAS:

8              "CONSTANTLY GET REQUESTS FROM TIME TO TIME, WHEN

9  PEOPLE -- I MEET THEM OR SEE THEM OR GET CARDS OR PICTURES TO

10 SIGN, AND I SEND THEM BACK."

11         THEN, THE QUESTION FROM YOUR COUNSEL IS:

12              "IS THAT CURRENT TODAY OR -- NO, THAT'S BEEN --

13 THAT'S BEEN CURRENT.  IT'S CURRENT TODAY."

14         DO YOU RECALL TESTIFYING TO THAT YESTERDAY?

15 **A.**   YES.

16 **Q.**   I'D LIKE YOU, MR. BEACH, TO TAKE A LOOK AT YOUR DEPOSITION

17 THAT'S IN FRONT OF YOU.  AND SPECIFICALLY PAGE 62.  IF YOU CAN

18 LOOK AT THAT.

19 **A.**   RIGHT.

20 **Q.**   OKAY.  AND I'LL DIRECT YOUR ATTENTION, FIRST, TO LINE 10:

21         **"QUESTION:**  ON A REGULAR BASIS DO YOU HAVE

22         KIDS OR PEOPLE COME UP TO YOU FOR AUTOGRAPHS,

23         THINGS LIKE THAT?

24         **"ANSWER:**  NO.  NO.  NOT ON A REGULAR BASIS AT

25         ALL."

1          NOW, MR. BEACH, I WOULD ALSO LIKE TO DIRECT YOUR

2     ATTENTION TO THE LINE 2 OF THIS DEPOSITION.

3     **A.**    LINE 2?

4               **THE COURT:**  LINE 2 OR PAGE 2?

5               **MR. KESSLER:**  PAGE 62, LINE 2, SAME PAGE:

6               "NOTORIETY IN TERMS OF AFTER THE DEPOSITION

7     TODAY YOU AND BRETT, YOU WENT DOWNSTAIRS TO GET SOME COFFEE,

8     GET SOMETHING TO EAT.  THERE'S 50 PEOPLE IN THE RESTAURANT.

9     HOW MANY OF THESE PEOPLE ARE GOING TO RECOGNIZE YOU?

10              **"ANSWER:**  ZERO."

11    **BY MR. KESSLER::**

12    **Q.**   NOW, MR. BEACH --

13              **MS. NAYLOR:**  YOUR HONOR?  YOUR HONOR, I OBJECT.  THIS

14    IS NOT IMPEACHMENT.  IT'S NOT AT INCONSISTENT WITH HIS

15    TESTIMONY, WHICH WAS:

16              "DO PEOPLE REQUEST AUTOGRAPHS FROM YOU," WHICH HE

17    GETS IN THE MAIL.

18          AND MR. KESSLER IS TALKING ABOUT PEOPLE APPROACHING

19    HIM FOR AUTOGRAPHS.  IT'S APPLES AND ORANGES.

20              **MR. KESSLER:**  YOUR HONOR, THE FIRST TESTIMONY WAS

21    DIRECTLY INCONSISTENT, AND THE SECOND, I'M PERMITTED TO READ IN

22    AS --

23              **THE COURT:**  I'M NOT GOING TO DISTURB IT.  BUT IF

24    THERE HAD BEEN AN OBJECTION -- IF YOU HAD BEEN FASTER ON YOUR

25    FEET, I WOULD HAVE SUSTAINED IT.

1        SEE, THIS IS THE LAWYER TESTIFYING.  HE SAID:

2            "THERE'S 50 PEOPLE IN THE RESTAURANT."

3        THAT'S PART OF THE QUESTION.  THERE'S NO TESTIMONY

4   THAT THERE WAS 50 PEOPLE IN THE RESTAURANT.  THAT WAS JUST THE

5   LAWYER -- WHO WAS ASKING THESE QUESTIONS?  WAS THAT YOU,

6   MR. KESSLER?

7        **MR. KESSLER:**  NO, YOUR HONOR.

8        **THE COURT:**  WHOEVER ASKED THE QUESTION, HE JUST --

9   LOOK, FOR ALL I KNOW THERE WAS 20 PEOPLE.  THERE MIGHT HAVE

10  BEEN THREE PEOPLE.

11       SO HOW MANY OF THESE PEOPLE ARE GOING TO RECOGNIZE --

12  ALL RIGHT.  SO THE JURY -- THIS IS A GREAT EXAMPLE OF THE

13  LAWYER TESTIFYING.  YOU TAKE THAT INTO ACCOUNT IN EVALUATING

14  IT.

15       BUT ON THE POINT YOU'RE MAKING, THE COURT DISAGREES.

16  THIS IS CLOSE ENOUGH TO BEING INCONSISTENT WITH THE TESTIMONY

17  GIVEN ON DIRECT, THAT IT'S UP TO THE JURY TO EVALUATE WHETHER

18  OR NOT THIS -- THE EXTENT TO WHICH THIS IMPEACHES.

19       **MS. NAYLOR:**  THANK YOU, YOUR HONOR.

20  **BY MR. KESSLER:**

21  **Q.**   LET ME GO TO THE FIRST QUOTE THAT I READ, WHEN IT SAID:

22           "ON A REGULAR BASIS, DO YOU HAVE KIDS OR PEOPLE

23  COME UP TO YOU FOR AUTOGRAPHS, THINGS LIKE THAT?"

24       AND YOU SAID:  "NO."

25       THAT'S TRUE, ISN'T IT?  YOU DON'T HAVE PEOPLE

1 REGULARLY COME UP TO YOU FOR AUTOGRAPHS, CORRECT?

2 **A.**   THAT'S TRUE.

3 **Q.**   OKAY.  NOW, MR. BEACH, IT'S ALSO CORRECT, IS IT NOT, THAT

4 YOU BELIEVE THAT THE RIGHT -- THE VALUE OF A RETIRED PLAYER'S

5 IMAGE COULD VARY DEPENDING ON WHO THAT RETIRED PLAYER IS?

6 **A.**   I AGREE WITH THAT.

7 **Q.**   SO, FOR EXAMPLE, IF IT WAS STAR PLAYERS THEY MAY HAVE A

8 HIGHER VALUE TO THEIR RIGHTS THAN, LET'S SAY, A PLAYER WHO

9 PLAYED IN ONE GAME?

10 **A.**   I DON'T KNOW EXACTLY -- I'M NOT CERTAIN ABOUT WHAT YOU'RE

11 TRYING TO SAY.

12 **Q.**   OKAY.  I'LL REPHRASE IT.

13 **A.**   PLEASE.

14 **Q.**   I'LL REPHRASE IT.

15        WOULD YOU AGREE THAT A STAR RETIRED FOOTBALL PLAYER,

16 SOMEONE LIKE A JIM BROWN, I KNOW IS A FRIEND OF YOURS --

17 **A.**   RIGHT.

18 **Q.**   -- THAT HIS RIGHTS TO HIS NAME AND IMAGE WOULD BE WORTH A

19 LOT MORE MONEY THAN SOMEBODY ON THE TEAM WHO ONLY PLAYED TWO

20 GAMES AND THEN WAS CUT AND NEVER PLAYED IN THE NFL AGAIN.

21 THAT'S TRUE, ISN'T IT?

22 **A.**   I DON'T UNDERSTAND WHAT THAT'S GOT TO DO WITH THIS GLA.

23 IF JIM BROWN SIGNED THIS GLA, AND I SIGNED --

24 **Q.**   MR. BEACH, I DON'T WANT TO INTERRUPT YOU, BUT --

25 **A.**   I MEAN, I DON'T UNDERSTAND.

1  **Q.**   I WOULD JUST LIKE YOU, PLEASE -- I'M GOING TO TRY MY BEST

2  TO ASK MY QUESTIONS VERY CLEARLY, SIR.  IF YOU DON'T UNDERSTAND

3  THEM, PLEASE TELL ME YOU DON'T UNDERSTAND THEM.

4  **A.**   THAT'S WHAT I JUST SAID.  I DON'T UNDERSTAND.

5  **Q.**   BUT THE RELEVANCE OF THE QUESTION WILL BE DECIDED BY THE

6  JURY.  SO LET ME PLEASE ASK MY QUESTIONS.

7  **A.**   THE JURY WON'T DECIDE MY UNDERSTANDING.  I WAS JUST

8  RESPONDING TO YOU THAT I TOLD YOU I DIDN'T UNDERSTAND.

9  **Q.**   LET'S TRY AGAIN.

10  **A.**   YES.

11  **Q.**   LET'S TRY TO WORK WITH EACH OTHER.

12  **A.**   PLEASE.

13         **THE COURT:**  PLEASE DON'T TALK OVER EACH OTHER.  NO

14  ARGUMENTS.  THE COURT REPORTER CAN'T TAKE DOWN TWO PEOPLE AT

15  ONCE.

16         **THE WITNESS:**  I'M SORRY.

17         **THE COURT:**  ASK A QUESTION, AND THEN PAUSE, AND THEN

18  YOU CAN ANSWER.  AND THEN, YOU PAUSE AND ASK A QUESTION SO THAT

19  YOU DON'T TALK OVER EACH OTHER.

20  **BY MR. KESSLER:**

21  **Q.**   MR. BEACH, IS IT CORRECT THAT IT IS YOUR UNDERSTANDING

22  THAT A RETIRED PLAYER WHO WAS A STAR, LIKE JIM BROWN, WOULD

23  HAVE MUCH MORE VALUABLE RIGHTS IN HIS NAME AND IMAGE THAN A

24  RETIRED PLAYER WHO JUST PLAYED A FEW GAMES AND WAS CUT AND

25  NEVER PLAYED IN THE NFL AGAIN?

1          YES OR NO, IF YOU CAN, PLEASE?

2  **A.**   I CAN'T ANSWER THAT "YES" OR "NO."

3  **Q.**   THEN, ANSWER THE QUESTION AS BEST AS YOU CAN.

4  **A.**   JIM BROWN'S VALUE IS BASED ON HIS IDENTITY AND HIS IMAGE.

5  WALTER BEACH'S VALUE IS BASED ON MY VALUE THAT I HAVE TO MY

6  IMAGE.  NOW, WHAT FANS AND SPECTATORS VIEW HIS VALUE MORE THAN

7  ME THAT HAS NOTHING TO DO WITH IT.

8          BUT IF A JIM BROWN PLAYS ON A PROFESSIONAL FOOTBALL

9  TEAM WITH A WALTER BEACH, AND WE PART OF A TEAM THERE IS NO

10 VALUE THAT HE HAS THAT IS GREATER THAN MINE; OTHERWISE, I

11 WOULDN'T BE ON THE TEAM.

12          I WOULDN'T BE PLAYING FOOTBALL IF I DIDN'T HAVE A

13 VALUE TO THE FOOTBALL PLAYERS.

14          CLEVELAND BROWNS ASSIGNED A VALUE TO ME.  IT MAY NOT

15 BE THE SAME VALUE THAT THEY ASSIGNED TO JIM BROWN, BUT JIM

16 BROWN DON'T PLAY FOOTBALL BY HIMSELF.

17 **Q.**   MR. BEACH, MY QUESTION WAS ABOUT THE ECONOMIC VALUE OF THE

18 NAME.  BUT LET ME READ TO YOU FROM YOUR DEPOSITION AGAIN, PAGE

19 66, PLEASE.

20 **A.**   OKAY.

21          **THE COURT:**  WAIT, WAIT.  BEFORE YOU READ IT, ANY

22 OBJECTION?

23          WHAT IS THE PAGE IS LINE NUMBER?

24          **MR. KESSLER:**  66, YOUR HONOR, 8 TO 17.

25          **THE COURT:**  ALL RIGHT.  PAUSE AND SEE IF THERE'S AN

1    OBJECTION.

2              ANY OBJECTION?

3              HEARING NONE, GO AHEAD AND READ IT.

4              **MS. NAYLOR:**  YOUR HONOR?

5              **THE COURT:**  YOU HAVE TO BE FAST ON YOUR FEET.

6              **MS. NAYLOR:**  I'M SORRY.  IT'S A DIFFERENT QUESTION

7    THAN WHAT HE'S CURRENTLY ASKED.

8              **THE COURT:**  OVERRULED.

9              PLEASE READ IT.

10             **MR. KESSLER:**  LINE 8:

11             **"QUESTION:**  AND WE'RE GOING TO GO THROUGH THE

12             GLA AT LENGTH, BUT PUTTING THE GLA ASIDE, DO

13             YOU AGREE THAT JIM BROWN, THE NAME AND IMAGE

14             RIGHTS OF JIM BROWN, ARE MORE VALUABLE TO A

15             VIDEO GAME COMPANY OR A TRADING CARD COMPANY

16             THAN WALTER BEACH'S NAME AND IMAGE RIGHTS?

17             **"ANSWER:**  I WOULDN'T HAVE ANY PROBLEM

18             AGREEING TO THAT."

19             **THE WITNESS:**  AND I STILL STAND BY THAT.  I DON'T

20   HAVE ANY PROBLEM AGREEING TO THAT.

21   **BY MR. KESSLER:**

22   **Q.**   THAT WAS MY QUESTION, SIR.  THANK YOU.

23   **A.**   BUT THAT --

24             **MR. KESSLER:**  I DON'T HAVE ANOTHER QUESTION.

25             **THE COURT:**  DON'T ARGUE.  MAYBE THAT WASN'T.  THAT'S

1  UP TO THE JURY TO DECIDE IF YOU REWORDED THE QUESTION IN A

2  DIFFERENT WAY.  MAYBE IT WAS, MAYBE IT'S NOT.

3          LET'S NOT ARGUE ABOUT IT.  LET'S MOVE ON.

4  **BY MR. KESSLER:**

5  **Q.**   NOW, MR. BEACH, IT'S TRUE THAT YOU HAVE ATTENDED SOME

6  RETIRED PLAYER CONVENTIONS?

7  **A.**   THAT'S CORRECT.

8  **Q.**   OKAY.  AND AT THE RETIRED PLAYER CONVENTIONS, YOU KNOW

9  THERE ARE SOME BUSINESS MEETINGS FOR THE RETIRED PLAYERS; IS

10  THAT CORRECT?

11  **A.**   YES, THAT'S CORRECT.

12  **Q.**   AND THERE ARE ALSO SOME SOCIAL EVENTS, PARTIES AND OTHER

13  THINGS FOR THE PLAYERS, CORRECT?

14  **A.**   THOSE ARE THE ONES I ATTENDED, YES.

15  **Q.**   AND, MR. BEACH, IT'S CORRECT THAT THERE WERE LICENSING

16  MEETINGS AT THE RETIRED PLAYER CONVENTIONS, BUT YOU DON'T KNOW

17  WHAT HAPPENED AT THOSE MEETINGS BECAUSE BASICALLY YOU WOULD

18  ONLY GO TO THE PARTIES; IS THAT CORRECT?

19  **A.**   THAT'S CORRECT.

20  **Q.**   OKAY.  AND, IN FACT, WHEN YOU WENT TO THE RETIRED PLAYER

21  CONVENTION, EVEN THOUGH THERE WAS INFORMATION AVAILABLE ABOUT

22  THE GROUP LICENSING PROGRAM AT BUSINESS MEETINGS, YOU CHOSE TO

23  GO TO THE PARTIES, AND YOU THOUGHT THE CONVENTION WAS YOU WOULD

24  GO TO THE PARTIES AND YOUR WIFE WOULD GO SHOPPING, AND IT WAS A

25  GOOD TIME, RIGHT?

1    **A.**    THAT'S CORRECT.

2    **Q.**    OKAY.  AND WHEN YOU WERE AT THESE RETIRED PLAYER

3    CONVENTIONS, EVEN THOUGH YOU COULD HAVE GONE TO THE BUSINESS

4    MEETING AND ASKED QUESTIONS ABOUT YOUR RETIRED PLAYER

5    LICENSING, YOU JUST NEVER DID SO.

6            **MS. NAYLOR:**  OBJECTION, YOUR HONOR.  THERE'S NO

7    FOUNDATION FOR THAT.

8            **THE COURT:**  WELL, HE'S ASKING.  YOU CAN ASK THE

9    QUESTION IF IT'S TRUE; AGREE WITH IT, IF IT'S NOT TRUE, THEN

10   SAY "NO."

11           DO YOU WANT THE QUESTION BACK?

12           **THE WITNESS:**  PLEASE.

13   **BY MR. KESSLER:**

14   **Q.**    I'LL ASK IT AGAIN, SIR.

15   **A.**    UH-HUH.

16   **Q.**    AT THE RETIRED PLAYER CONVENTIONS YOU COULD HAVE GONE TO

17   THE BUSINESS MEETINGS ABOUT LICENSING AND ASKED QUESTIONS OF

18   THE UNION ABOUT YOUR GLA, BUT YOU NEVER DID SO.

19   **A.**    THAT'S CORRECT.

20           **MS. NAYLOR:**  OBJECTION.

21           **THE COURT:**  OVERRULED.

22           GO AHEAD.

23   **BY MR. KESSLER:**

24   **Q.**    AND, IN FACT, SIR, IN THE WHOLE HISTORY OF TIMES FROM WHEN

25   YOU FIRST SIGNED YOUR FIRST GLA, WHICH I BELIEVE WAS IN 1996;

1   IS THAT RIGHT?

2   **A.**    THAT'S CORRECT.

3   **Q.**    YOU NEVER ASKED ONE QUESTION ABOUT RETIRED PLAYER

4   LICENSING TO ANY UNION OFFICIAL AT ANY TIME.

5   **A.**    THAT'S NOT CORRECT.

6         **MS. NAYLOR:**  OBJECTION.  THAT MISCHARACTERIZES HIS

7   TESTIMONY.

8   **BY MR. KESSLER:**

9   **Q.**    I WOULD ASK YOU TO PLEASE LOOK --

10        **THE COURT:**  WAIT.  NO.  THE WITNESS -- I DON'T

11  UNDERSTAND THAT OBJECTION.  COUNSEL IS ENTITLED TO ASK LEADING

12  QUESTIONS.  AND IF THE WITNESS AGREES TO IT, THEN THAT IS

13  EVIDENCE THE JURY CAN CONSIDER.

14        AND IF THE WITNESS -- WHY DO YOU STAND UP AND SAY

15  THAT MISCHARACTERIZES HIS TESTIMONY?

16        **MS. NAYLOR:**  IT'S EXACTLY THE OPPOSITE OF THE

17  TESTIMONY.

18        **THE COURT:**  THEN, THE WITNESS CAN SAY THAT.  THAT'S

19  NOT -- THE QUESTION THAT MR. KESSLER WAS ASKED WAS NOT IN ANY

20  WAY MISCHARACTERIZING -- HE WASN'T ATTEMPTING TO CHARACTERIZE

21  ANY PRIOR TESTIMONY.

22        IT WAS SOMETHING LIKE:

23            "YOU NEVER ASKED ONE QUESTION ABOUT RETIRED

24  PLAYER LICENSING TO ANY UNION OFFICIAL AT ANY TIME."

25        AND IF THE WITNESS THINKS THAT'S NOT TRUE, HE CAN SAY

1  IT'S NOT TRUE.

2          **THE WITNESS:**  I THOUGHT THAT'S WHAT I SAID.  I SAID

3  THAT'S INCORRECT.

4  **BY MR. KESSLER:**

5  **Q.**  OKAY.  LET ME DIRECT YOUR ATTENTION, SIR, TO PAGE 89 OF

6  YOUR DEPOSITION.

7          **MR. KESSLER:**  AND I'D LIKE TO READ, YOUR HONOR, FROM

8  LINE 22 TO LINE 25.

9          **THE COURT:**  JUST A MINUTE.  ANY OBJECTION TO 89?  SAY

10  IT AGAIN.

11          **MR. KESSLER:**  ACTUALLY, I'LL READ FROM 18 TO 25.

12          **THE COURT:**  ANY OBJECTION?

13          **MS. NAYLOR:**  NO OBJECTION.

14          **THE COURT:**  ALL RIGHT.  GO AHEAD.

15          **MR. KESSLER:**  LINE 18:

16          **"QUESTION:**  DID YOU EVER ASK ANY QUESTIONS

17          ABOUT YOUR GLA OR ABOUT LICENSING AT THESE

18          CONVENTIONS?

19          **"ANSWER:**  NO.

20          **"QUESTION:**  AND YOU NEVER ASKED QUESTIONS

21          ABOUT YOUR GLA OR LICENSING TO THE NFLPA AT

22          ANY OTHER TIME?

23          **"ANSWER:**  NO."

24  **BY MR. KESSLER::**

25  **Q.**   THAT'S YOUR TESTIMONY, SIR, RIGHT?

1  A.    THAT'S CORRECT.

2  Q.    MR. BEACH, IT'S ALSO TRUE THAT YOU NEVER COMPLAINED TO

3  ANYONE AT THE UNION THAT YOU WEREN'T RECEIVING MONEY UNDER YOUR

4  RETIRED PLAYER GLA, CORRECT?

5  A.    THAT'S CORRECT.

6  Q.    YOU NEVER COMPLAINED SINCE 1999 TO ANY FRIEND ABOUT THAT,

7  CORRECT?

8  A.    THAT'S CORRECT.

9  Q.    YOU NEVER COMPLAINED ABOUT IT TO ANYBODY IN THE WORLD?

10 A.    THAT'S CORRECT.

11 Q.    OKAY.  AND YOU -- IT'S ALSO CORRECT THAT THE WHOLE ISSUE

12 OF RETIRED PLAYER LICENSING WAS NOT THAT SIGNIFICANT TO YOU?

13 A.    THAT'S CORRECT.

14 Q.    OKAY.  AND, MR. BEACH, IT'S ALSO TRUE YOU NEVER MADE ANY

15 EFFORTS TO MARKET YOURSELF SINCE YOUR RETIREMENT AS AN NFL

16 PLAYER, CORRECT?

17 A.    THAT'S CORRECT.

18 Q.    AND, IN FACT, YOU HAD NO DESIRE TO MARKET YOURSELF AS A

19 RETIRED PLAYER FOR ANY PURPOSE.  THAT IS CORRECT, ISN'T IT?

20 A.    THAT'S CORRECT.

21 Q.    AND IT'S ALSO CORRECT, SIR, AGAIN IN ALL DUE RESPECT, YOU

22 YOURSELF HAVE CHARACTERIZED YOURSELF, YOUR CAREER AS BASICALLY

23 BEING AN AVERAGE PLAYER, CORRECT?

24 A.    THAT'S CORRECT.

25 Q.    NOW, I WOULD LIKE TO ASK YOU NOW, SIR, ABOUT YOUR RETIRED

1  PLAYER GLA.

2          **MR. KESSLER:**  IF WE COULD PUT UP FIRST EXHIBIT 640,

3  WHICH IS ALREADY IN EVIDENCE.

4          (DOCUMENT DISPLAYED.)

5  **BY MR. KESSLER:**

6  **Q.**   YOU SHOULD HAVE THAT IN FRONT OF YOU, SIR.  YOU SHOULD SEE

7  IN ONE OF THOSE FOLDERS TRIAL EXHIBIT 640.

8          IF YOU HAVE TROUBLE WITH IT, I'LL FIND IT FOR YOU.

9  **A.**   I HAVE IT.

10 **Q.**   THANK YOU.

11         AND THIS WAS THE RETIRED PLAYER GLA REVIEWED BY YOUR

12 COUNSEL.

13         **MR. KESSLER:**  AND IF WE COULD SHOW FROM THE BOTTOM

14 DOWN.

15         THANK YOU, LAUREN.

16 **BY MR. KESSLER:**

17 **Q.**   THIS IS THE ONE THAT YOU SIGNED FIRST, IN DECEMBER 26,

18 1996; IS THAT CORRECT?

19 **A.**   THAT'S CORRECT.

20 **Q.**   AND THAT'S WHEN YOU WROTE DOWN THESE QUESTIONS ABOUT

21 GETTING PAID AT WHAT RATE, WHEN, WHAT METHOD OF ACCOUNTING, ET

22 CETERA, RIGHT?

23 **A.**   THAT'S RIGHT.

24 **Q.**   AND SINCE 1996, DID YOU EVER DO ANYTHING TO PURSUE THE

25 ANSWERS TO THESE QUESTIONS?

1  A.   UHM, I NEVER THOUGHT THAT THIS DOCUMENT REQUIRED ME TO DO

2  THAT.

3  Q.   OKAY.  SO THE ANSWER WOULD BE YOU NEVER DID THAT, SIR?

4  A.   THAT'S CORRECT.

5  Q.   AND DESPITE THE FACT THAT YOU HAD THESE QUESTIONS AND YOU

6  WERE A LAWYER --

7          **MR. KESSLER:**  SORRY.  WITHDRAWN.

8  **BY MR. KESSLER::**

9  Q.   YOU HAD LEGAL TRAINING, AND YOU HAD THESE QUESTIONS,

10  CORRECT?

11  A.   UHM, THE QUESTIONS -- I HAD THOSE QUESTIONS BRIEFLY, YES.

12  Q.   YES.  AND YET IN 2003 --

13          **MR. KESSLER:**  IS THAT RIGHT?  OKAY.  THE JURY NOW HAS

14  THAT IN FRONT OF THEM IN THEIR LITTLE CHARTS.

15  **BY MR. KESSLER:**

16  Q.   IN 2003, SEVEN YEARS LATER, YOU SIGNED ANOTHER RETIRED

17  PLAYER GLA, CORRECT?

18  A.   THAT'S CORRECT.

19  Q.   AND YOU STILL HAD THOSE QUESTIONS, BUT YOU HAD NO PROBLEM

20  SIGNING IT, RIGHT?

21  A.   I HAD NO PROBLEM SIGNING IT BECAUSE, AS I DEALT WITH THE

22  PARTICULAR DOCUMENT I THOUGHT THAT THE DOCUMENT SAID THAT THE

23  UNION WAS GOING TO TAKE CARE OF THAT ASPECT OF IT.  SO I JUST

24  TRUSTED, RELIED ON THEM.

25          WHEN I DIDN'T RECEIVE ANYTHING IT WASN'T THAT

1  IMPORTANT TO ME.  I DIDN'T PURSUE IT.

2  **Q.**   AND, IN FACT, SIR, IT DIDN'T COST YOU ANYTHING TO SIGN THE

3  DOCUMENT, RIGHT?

4  **A.**   WHAT DO YOU MEAN IT DIDN'T COST ME ANYTHING?

5  **Q.**   YOU DIDN'T PAY ANY MONEY?

6  **A.**   IT TOOK MY IDENTITY, RIGHT?

7  **Q.**   OKAY.

8  **A.**   MY LIFE, MY IDENTITY IS TIED UP.  I GIVE YOU MY IDENTITY

9  IN THE --

10 **Q.**   MR. BEACH?

11 **A.**   NO, NO, NO, NO, NO.

12 **Q.**   THE UNION NEVER USED YOUR IDENTITY WITHOUT PAYING YOU,

13 RIGHT?

14 **A.**   I NEVER GOT PAID.  I DON'T KNOW WHETHER THEY USED IT OR

15 NOT.

16 **Q.**   BUT YOU HAVE NO KNOWLEDGE THAT THEY EVER USED YOUR

17 IDENTITY ANYWHERE, DO YOU, SIR?

18 **A.**   WELL, IN RETROSPECT I DO.  I DIDN'T INITIALLY.

19 **Q.**   WELL --

20 **A.**   BUT I DO BELIEVE THAT MY IMAGE WAS USED IN THE MADDEN

21 GAMES.  MY IMAGE IS IN THE CARDS.  YOU TOOK MY IDENTITY, AND

22 YOU SAID I HAVE VALUE.

23 **Q.**   MR. BEACH, YOU'RE TALKING ABOUT THE MADDEN GAME.

24        OTHER THAN THE MADDEN GAME -- LET'S PUT THAT ASIDE

25 FOR ONE MOMENT -- YOU DON'T KNOW OF ANY PRODUCT SINCE YOU'VE

1  RETIRED THAT USES YOUR NAME OR IMAGE WITHOUT PAYING YOU, RIGHT?

2  **A.**   NO, NO.

3  **Q.**   YOU DON'T KNOW OF ANY?

4  **A.**   NO.

5  **Q.**   AND WITH RESPECT TO THE MADDEN GAME, THEY DON'T USE YOUR

6  NAME, DO THEY, SIR?

7  **A.**   I DIDN'T SAY MY NAME.

8  **Q.**   OKAY.  THEY DON'T USE A PICTURE OF YOUR FACE, DO THEY,

9  SIR?

10 **A.**   I DIDN'T SAY MY FACE.

11 **Q.**   IN FACT, SINCE 2004, THEY DON'T EVEN USE YOUR NUMBER, DO

12 THEY, SIR?

13 **A.**   THEY USE A MADDEN GAME THAT THEY USE A VINTAGE 1965

14 CLEVELAND BROWNS, AND THERE IS A CORNERBACK ON THE 1965.  THAT

15 WAS ME.  THAT WAS MY IMAGE.  AND THAT IS WHAT I THOUGHT I WAS

16 GIVING TO THE UNION SO THAT THEY WOULD MARKET.

17 **Q.**   MR. BEACH, AND YOU'VE HAD SOME LEGAL TRAINING.  YOU KNOW

18 THAT THERE'S NO LEGAL CLAIM TO STOP EA FROM JUST HAVING AN

19 IMAGE OF A PLAYER WITH NO NAME AND NO NUMBER.  YOU KNOW THAT,

20 DON'T YOU, SIR?

21 **A.**   I'M NOT DEALING WITH EA.  I'M DEALING WITH THE UNION AND

22 THE GLA.  I'M NOT DEALING WITH -- I'M NOT DEALING WITH NO

23 THIRD-PARTY PEOPLE.  I DON'T EVEN KNOW WHAT THEY DO WITH THE

24 THIRD-PARTY PEOPLE.

25        I DON'T KNOW IF THEY DO WHAT THEY SAY OR ANYTHING.

1   ALL I KNOW IS I GAVE THEM THE OPPORTUNITY TO USE THAT IMAGE IN

2   CONJUNCTION WITH SIX OTHER RETIRED OR CURRENT BALLPLAYERS.

3          THAT'S ALL I KNOW.

4   **Q.**   LET'S LOOK AT THE LANGUAGE OF THE GLA, IF WE CAN.

5          AND LOOK AT THE BOTTOM PARAGRAPH.

6   **A.**   RIGHT.

7   **Q.**   OKAY.  YOU WOULD AGREE WITH ME, SIR, THAT THIS IS THE

8   PARAGRAPH THAT TALKS ABOUT WHEN AND HOW RETIRED PLAYERS WHO

9   SIGN THIS WOULD GET PAID, RIGHT?

10  **A.**   THAT'S CORRECT.

11  **Q.**   OKAY.  THE OTHER PARAGRAPHS DON'T TALK ABOUT MONEY AT ALL,

12  RIGHT?

13  **A.**   THAT'S CORRECT.

14  **Q.**   OKAY.  SO LOOKING AT THE MONEY PARAGRAPH, IT SAYS:

15              "IT IS FURTHER UNDERSTOOD THAT THE MONIES

16  GENERATED BY SUCH LICENSING OF RETIRED PLAYER GROUP RIGHTS."

17         DO YOU SEE THAT, SIR?

18  **A.**   THAT'S CORRECT.

19  **Q.**   THERE'S NO REFERENCE IN THIS PARAGRAPH ANYWHERE TO THE

20  WORD "ACTIVE PLAYERS" OR "PRESENT PLAYERS" OR ANYTHING BUT

21  "RETIRED PLAYERS," RIGHT?

22  **A.**   THE FIFTH PARAGRAPH IS CAPTURED IN THE SECOND PARAGRAPH

23  WHEN THEY DEFINE IN THE GROUP LICENSE AGREEMENT WHO IT IS.

24  THAT INCLUDES THE CURRENT AND PAST PLAYERS.

25         **THE COURT:**  ALL RIGHT.  HELP THE JURY UNDERSTAND THE

1  TESTIMONY.

2          CAN YOU DO THAT SPLIT SCREEN THERE WHERE YOU PUT BOTH

3  PARAGRAPHS ON THE SCREEN?

4          **MR. KESSLER:**  SURE.  PUT THAT PARAGRAPH THERE.

5          (DOCUMENT DISPLAYED.)

6  **BY MR. KESSLER:**

7  **Q.**  NOW, WHAT I WOULD LIKE TO ASK YOU, SIR -- I'LL GET TO THE

8  OTHER PARAGRAPH, OKAY, IF YOU BEAR WITH ME.

9  **A.**  SURE.

10 **Q.**  IN THIS PARAGRAPH, THE MONEY PARAGRAPH, THERE'S NO

11 REFERENCE TO "PRESENT PLAYERS," CORRECT?  THERE'S NO WORD ABOUT

12 THAT.

13 **A.**  NO, I SEE NO WORD ABOUT "PRESENT PLAYERS" IN THAT

14 SENTENCE.

15 **Q.**  OKAY.  WHAT -- THE ONLY THING THAT'S REFERRED TO IN THE

16 MONEY PARAGRAPH IS THE MONIES GENERATED BY SUCH LICENSING OF

17 RETIRED PLAYER GROUP RIGHTS, RIGHT?  THAT'S ALL THAT'S IN THAT

18 PARAGRAPH.

19 **A.**  NO, THAT'S NOT ALL THAT'S IN THE PARAGRAPH.  THAT'S ALL

20 YOU HIGHLIGHTED.

21 **Q.**  OKAY.  WELL --

22 **A.**  YOU HAVE TO READ THE ENTIRE PARAGRAPH.

23 **Q.**  OKAY.  LOOK AT THE ENTIRE PARAGRAPH FROM "IT" UNTIL

24 "SERVICES."

25 **A.**  RIGHT.

1   Q.   IS THERE ANY WORD MENTIONING "ACTIVE PLAYERS"?

2   A.   ACTIVE PLAYERS?  IN MY INTERPRETATION OF THAT "ACTIVE

3   PLAYERS" WOULD BE THE ELIGIBLE NFLPA MEMBERS.

4   Q.   OKAY.  NOW, SIR, DO YOU HAVE ANY PERSONAL KNOWLEDGE OF

5   HOW -- WHAT THE ELIGIBLE MEMBERS WOULD BE UNDER THIS AGREEMENT?

6   ANY PERSONAL KNOWLEDGE?

7          HOW DO YOU KNOW WHO'S ELIGIBLE, SIR?  DO YOU HAVE ANY

8   PERSONAL KNOWLEDGE OF THAT?

9   A.   WELL, IF I READ THE SENTENCE AND THE PARAGRAPH THAT WOULD

10  TELL ME WHO WAS ELIGIBLE.

11  Q.   OKAY.  IT'S -- IT SAYS --

12  A.   IT'S OBVIOUS -- I'M SORRY.  IT'S OBVIOUS THAT IT'S NOT THE

13  RETIRED PLAYERS, BECAUSE YOU MENTIONED THE RETIRED PLAYERS.

14  Q.   OKAY.

15  A.   SO THE NEXT SENTENCE, WHEN IT SAYS:

16          "AN ESCROW ACCOUNT FOR ALL ELIGIBLE NFLPA

17  MEMBERS" WOULD, IN MY UNDERSTANDING, WOULD HAVE TO BE THE

18  ACTIVE PLAYERS.

19  Q.   OKAY.  WHAT I'M GOING TO ASK YOU, SIR, ABOUT YOUR PERSONAL

20  KNOWLEDGE, AT THE TIME THAT YOU SIGNED THIS, BACK IN 1996,

21  OKAY?  DID YOU HAVE ANY KNOWLEDGE OF WHAT THE ELIGIBILITY

22  REQUIREMENTS WERE UNDER THIS FORM?  ANY KNOWLEDGE AT ALL,

23  PERSONAL KNOWLEDGE?

24  A.   NO, I HAVE NO PERSONAL KNOWLEDGE ABOUT WHAT THE

25  ELIGIBILITY -- I JUST USED MY UNDERSTANDING OF WHAT THE

1    SENTENCE --

2    **Q.**   SIR, DID YOU BELIEVE WHEN YOU SIGNED THIS THAT THE PEOPLE

3    WHO WERE GOING TO GET THE MONEY WOULD JUST BE THE ACTIVE

4    PLAYERS?

5    **A.**   NO.

6    **Q.**   OKAY.  RIGHT.  YOU BELIEVED THE PEOPLE WHO WOULD GET THE

7    MONEY WOULD BE -- IT WOULD BE DIVIDED BETWEEN THE RETIRED

8    PLAYER, RIGHT?

9    **A.**   UH-HUH.

10   **Q.**   AND THE ELIGIBLE PLAYERS WHO WOULD BE THE RETIRED PLAYERS,

11   RIGHT?  THAT'S WHAT YOU THOUGHT?

12   **A.**   WOW.  I DON'T WANT TO BE -- YOU CAN'T TELL ME WHAT I

13   THOUGHT.

14   **Q.**   OKAY, SIR.  I'M NOT TRYING TO PUT WORDS IN YOUR MOUTH.

15   **A.**   NO, I KNOW THAT. NO, THAT'S NOT WHAT I THOUGHT.

16   **Q.**   OKAY.  I'M GOING TO ASK YOU.  LET ME ASK YOU:  DID YOU

17   THINK -- THAT'S OKAY.

18         SO WHEN YOU SIGNED THIS -- TELL ME IF I HAVE IT

19   RIGHT -- YOU THOUGHT YOU WERE AGREEING THAT THIS MONEY WOULD GO

20   TO THE ACTIVE PLAYERS?

21   **A.**   I THOUGHT IT WOULD BE DIVIDED BETWEEN THE CURRENT AND

22   FUTURE PLAYERS.  WHICH WOULD HAVE BEEN -- CURRENT WOULD HAVE

23   BEEN THE ACTIVE PLAYERS, THAT'S CORRECT.

24   **Q.**   OKAY.  SO YOU THOUGHT THE RETIRED PLAYERS WOULD GET SOME,

25   AND THE ACTIVE PLAYERS WOULD GET SOME?

1  **A.**   THAT'S CORRECT.

2  **Q.**   AND THAT'S HOW THE MONEY WOULD BE DIVIDED, YOU THOUGHT?

3  **A.**   WELL, I DIDN'T KNOW EXACTLY WHAT FORMULA WOULD BE USED TO

4  DIVIDE IT, BUT I THOUGHT THAT THAT'S -- THAT'S -- THAT WAS MY

5  INTERPRETATION OF IT.

6  **Q.**   OKAY.  AND THAT TALKS ABOUT HOW THE MONEY WILL BE DIVIDED

7  BETWEEN THE PLAYER AND AN ESCROW ACCOUNT FOR ALL ELIGIBLE NFLPA

8  MEMBERS, AND YOU THOUGHT THAT WOULD BE ACTIVE AND RETIRED,

9  RIGHT?

10  **A.**   THAT'S WHAT I THOUGHT.

11  **Q.**   OKAY.  BUT THE MONEY WE'RE TALKING ABOUT, THE MONEY THAT

12  WOULD BE DIVIDED, WOULD BE THE MONEY GENERATED BY LICENSING OF

13  RETIRED PLAYER GROUP RIGHTS, CORRECT?

14  **A.**   RETIRED PLAYER GROUP RIGHTS AS WELL AS A COMBINATION OF

15  CURRENT PLAYER GROUP RIGHTS.

16  **Q.**   OKAY.  WELL, THAT'S WHAT I WANT TO ASK YOU, SIR.

17          WHEN IT TALKS ABOUT THE MONEY GENERATED BY SUCH

18  LICENSING OF RETIRED PLAYER GROUP RIGHTS, IN THIS PARAGRAPH IT

19  DOESN'T REFER TO MONEY GENERATED BY COMBINING WITH ACTIVE

20  PLAYERS IN THIS PARAGRAPH, RIGHT?

21  **A.**   WELL, UHM, IF I READ THE PARAGRAPH, IT -- IT -- THE

22  ELIGIBLE NFLPA MEMBERS, WHICH I THOUGHT WERE THE ACTIVE

23  PLAYERS.

24          SO THE PARAGRAPH -- THE PARAGRAPH IS NOT AS IMPORTANT

25  AS THE SENTENCE.  THE SENTENCE SAYS:

1          "AND AN ESCROW ACCOUNT FOR ALL ELIGIBLE NFL

2    MEMBERS."  "AND" IS -- I WAS JUST A FOURTH-GRADE TEACHER.

3    "AND" IS A CONJUNCTION.  SO IN THE ASPECT OF IT COMBINES THE

4    ELIGIBLE PLAYERS AND THE RETIRED PLAYERS.  THAT'S JUST MY

5    UNDERSTANDING.

6    **Q.**   OKAY.  I UNDERSTAND THAT.

7          AND YOU REMEMBER, SITTING HERE TODAY, THAT WAS YOUR

8    UNDERSTANDING IN 1996, 12 YEARS AGO?

9    **A.**   I WAS JUST AS INTELLIGENT THEN AS I AM TODAY.

10   **Q.**   NO, THAT'S NOT MY QUESTION, SIR.

11   **A.**   THAT'S AN INSULT TO ME.

12   **Q.**   OKAY.

13   **A.**   THAT'S THE WAY I SAW IT THEN.

14   **Q.**   I JUST WANT TO BE SURE I UNDERSTAND MY QUESTION.

15   **A.**   I DID.

16   **Q.**   AS YOU'RE SITTING HERE TODAY, YOU HAVE A MEMORY OF WHAT

17   WAS IN YOUR MIND ABOUT THIS ISSUE 12 YEARS AGO?

18   **A.**   OF COURSE.

19   **Q.**   EVEN THOUGH YOU TESTIFIED THAT THIS WHOLE ISSUE WAS NOT

20   VERY SIGNIFICANT TO YOU, RIGHT?

21   **A.**   UHM, THAT'S CORRECT.

22   **Q.**   OKAY.  AND, IN FACT, YOU HAD NO DESIRE TO LICENSE YOUR

23   RIGHTS, YOU TESTIFIED, CORRECT?

24   **A.**   THAT'S RIGHT.

25   **Q.**   OKAY.  NOW, BUT ISN'T IT TRUE, SIR -- AND, AGAIN, I'M

1    CALLING, IN PART, ON YOUR LEGAL TRAINING -- THAT THE DIVIDED

2    PART TALKS ABOUT HOW THE MONEY IS DIVIDED.  IT'S THE FIRST PART

3    OF THE SENTENCE THAT TALKS ABOUT WHAT MONEY WOULD BE DIVIDED.

4    AND THAT FIRST PART ONLY TALKS ABOUT RETIRED PLAYER RIGHTS;

5    ISN'T THAT TRUE, THE LANGUAGE?

6    **A.**   THE SENTENCE SAYS THAT -- TO ME, THAT THE MEMBERS WHO ARE

7    ACTIVE, AND THE MEMBERS WHO ARE RETIRED ARE PART OF THAT

8    SENTENCE.  IT'S NOTHING THAT SEPARATES THAT AND EXCLUDES THE

9    RETIRED FROM THE ACTIVE.  NOT AS I UNDERSTAND THAT.

10   **Q.**   OKAY.  OKAY.

11            SO YOU THOUGHT, YOU'RE TELLING THE JURY, BACK IN

12   1996, THAT IF IT WAS JUST ACTIVE PLAYER TRADING CARDS, YOU

13   WOULD GET MONEY FOR THAT, SOME MONEY, RIGHT?  THAT'S YOUR

14   BELIEF?

15   **A.**   IF THEY -- ACCORDING TO THIS DOCUMENT, IF IT WERE JUST

16   ACTIVE PLAYERS IN THIS GLA, SIX OR MORE, I WOULD BE ENTITLED TO

17   COMPENSATION.

18   **Q.**   AND THAT WAS YOUR BELIEF STARTING 12 YEARS AGO IN 1996?

19   **A.**   YES, IT WAS.

20   **Q.**   AND YOU KNEW THERE WERE ACTIVE PLAYER TRADING CARDS EVERY

21   YEAR, RIGHT?

22   **A.**   THAT'S CORRECT.

23   **Q.**   YOU KNEW THERE WERE OTHER PRODUCTS LIKE VIDEO GAMES EVERY

24   YEAR WITH ACTIVE PLAYER NAMES, RIGHT?

25   **A.**   THAT'S CORRECT.

1  Q.   AND NOT ONCE, NOT ONCE IN THAT 12-YEAR PERIOD OF TIME DID

2  YOU EVER SAY TO ANYONE IN THE ENTIRE UNIVERSE:

3              "HOW COME I'M NOT GETTING A CHECK?"

4  A.   WELL, LET ME TELL YOU WHY.

5         THE COURT:  WAIT.

6  BY MR. KESSLER:

7  Q.   ANSWER "YES" OR "NO."

8         THE COURT:  FIRST, IS IT TRUE THAT YOU NEVER

9  COMPLAINED?

10         THE WITNESS:  YES.

11  BY MR. KESSLER:

12  Q.   THAT'S MY QUESTION, SIR.  LET ME NOW MOVE ON.

13         NOW, IT'S ALSO TRUE, SIR, YOU KNEW -- LET'S MOVE ON

14  TO YOUR NEXT GLA, IF WE CAN.  TRIAL EXHIBIT 639.

15         (DOCUMENT DISPLAYED.)

16         YOU KNEW -- SORRY.  LET'S JUST SHOW THE BOTTOM OF

17  THIS.

18         YOU SIGNED THE -- THE SECOND GLA ON MAY 23, 2003,

19  CORRECT?

20  A.   THAT'S CORRECT.

21  Q.   OKAY.  AND THE LANGUAGE OF THIS GLA, THIS BOTTOM

22  PARAGRAPH, IS THE SAME AS THE LANGUAGE YOU SIGNED -- YOU SIGNED

23  IN 1996, CORRECT?

24  A.   THAT'S CORRECT.

25  Q.   AND YOU HAD THE SAME UNDERSTANDING, CORRECT?

1  A.   THAT'S CORRECT.

2  Q.   TAKE A LOOK AT THE TOP PARAGRAPH, IF WE CAN.

3        THIS GLA SAYS IT'S NON-EXCLUSIVE.  DO YOU SEE THAT,

4  SIR?

5  A.   UH-HUH.

6  Q.   NOW, YOU KNEW WITH YOUR LEGAL TRAINING THAT MEANT THAT YOU

7  COULD DO WHATEVER YOU WANTED ON YOUR OWN IN LICENSING, EVEN

8  AFTER SIGNING THIS, RIGHT?

9  A.   RIGHT.

10  Q.   NOW, IT'S CORRECT, ISN'T IT, SIR, THAT WHEN YOU SIGNED

11  THIS GLA, YOU HAD NO IDEA HOW THE MONEY WOULD EVER BE DIVIDED?

12  A.   I NEVER HAD ANY IDEA.  I NEVER HAD COMMUNICATIONS WITH

13  ANYBODY IN REFERENCE TO THIS GLA.

14  Q.   BUT I'M SAYING WHEN YOU SIGNED THE GLA, YOU HAD NO IDEA

15  HOW THE MONEY WOULD BE DIVIDED?

16  A.   THAT'S CORRECT.

17  Q.   WASN'T IMPORTANT TO YOU.

18  A.   WAS WHAT IMPORTANT TO ME?

19  Q.   IT WAS NOT IMPORTANT TO YOU HOW THE MONEY WOULD BE

20  DIVIDED.  THAT WAS YOUR VIEW AT THE TIME, RIGHT?

21  A.   NO, IN REFERENCE TO THE GLA, IF THERE WAS MONIES IT WOULD

22  ALWAYS BE IMPORTANT TO ME HOW IT'S DIVIDED.

23  Q.   ISN'T IT TRUE, SIR, THAT YOU SAID YOU DIDN'T CARE HOW THE

24  MONEY WAS DIVIDED?

25  A.   I DON'T EVER RECALL SAYING THAT.

**Q.**   OKAY.

LET ME ASK YOU THIS:  IS IT TRUE THAT -- TWO SEPARATE
POINTS:  ONE, YOU DIDN'T KNOW HOW THE MONEY WOULD BE DIVIDED.
THAT'S FAIR.

**A.**   THAT'S RIGHT.

**Q.**   AND IT'S ALSO TRUE YOU DIDN'T CARE ANYTHING ABOUT WHETHER
THERE WOULD BE AN ESCROW ACCOUNT OR NOT.  YOU DIDN'T CARE.

**A.**   NO, I DIDN'T REALLY CARE WHETHER THERE WAS AN ESCROW
ACCOUNT OR NOT.  I DIDN'T KNOW WHAT -- I MEAN, ESCROW ACCOUNT
BY PUTTING -- I JUST THOUGHT THEY WOULD GET MONEY, AND PUT IT
IN AN ESCROW ACCOUNT.  IF THEY PUT IT IN ANOTHER ACCOUNT, IT
WOULDN'T MATTER TO ME.

**Q.**   DIDN'T MATTER TO YOU ONE WAY OR THE OTHER IF THERE WAS
SUCH AN ACCOUNT.

**A.**   THAT'S CORRECT.

**Q.**   OKAY.

NOW, IT'S ALSO TRUE, SIR, THAT YOUR UNDERSTANDING AT
THE TIME WAS IF THERE WAS NO MONEY GENERATED FROM THIS RETIRED
PLAYER GLA, THEN YOU WOULD GET NOTHING.

**A.**   OF COURSE.

**Q.**   OKAY.  YOU ALSO UNDERSTOOD, SIR, IF THERE WAS NO MONEY
GENERATED FROM THE SPECIFIC RIGHTS THAT YOU GRANTED, YOU WOULD
GET NOTHING.

**A.**   THAT'S CORRECT.

**Q.**   OKAY.  AND THE ONLY RIGHTS THAT YOU GRANTED WAS YOUR NAME

1  AND IMAGE.  YOU COULDN'T GRANT SOMEBODY ELSE'S RIGHTS, RIGHT?

2  **A.**   NO, THAT'S NOT CORRECT.

3  **Q.**   WELL, YOU COULD ONLY -- LET ME ASK IT THIS WAY:  YOU ONLY

4  COULD GRANT YOUR OWN RIGHTS.  YOU COULDN'T GRANT MR. JIM

5  BROWN'S RIGHTS, COULD YOU?

6  **A.**   IT'S A COLLECTIVE GRANTING.  IT SAYS "GROUP LICENSING." SO

7  I WASN'T THERE AS AN INDIVIDUAL.  I WAS PART OF A GROUP.

8  **Q.**   I UNDERSTAND THAT, SIR.  WHAT I'M ASKING IS -- THIS IS MY

9  QUESTION:  YOUR POWER TO GRANT RIGHTS, YOUR OWN INDIVIDUAL

10  POWER, SIR?

11  **A.**   YES.

12  **Q.**   YOU COULD ONLY SPEAK FOR YOURSELF AS TO WHAT YOU WOULD

13  GRANT, RIGHT?

14  **A.**   OF COURSE, RIGHT.

15  **Q.**   RIGHT.  OKAY.

16          NOW, I'D LIKE TO SHOW YOU, SIR, NEXT, A COPY OF TRIAL

17  EXHIBIT 2046.  IT SHOULD BE IN FRONT OF YOU.

18          AND DO YOU RECOGNIZE THIS, SIR, AS AN ISSUE OF THE

19  TOUCHBACK MAGAZINE WHICH WAS SENT OUT TO RETIRED PLAYERS?

20  **A.**   THIS WAS SHOWN TO ME IN A DEPOSITION.

21  **Q.**   YES.  BUT, SIR, YOU DID RECEIVE TOUCHBACK MAGAZINES,

22  CORRECT?

23  **A.**   YES, I RECEIVED TOUCHBACK MAGAZINES.  AND MY WIFE READS

24  THEM.  I DON'T READ THEM.

25  **Q.**   WELL, IN FACT, SIR, IT'S TRUE, ISN'T IT, WHAT YOU DID WITH

1  THE TOUCHBACK MAGAZINES IS YOU THREW THEM IN THE GARBAGE CAN,

2  RIGHT?

3  **A.**    AFTER SHE READ THEM AND HAD SOME DISCUSSION ABOUT THE --

4  THE EVENTS THAT -- OR PLAYERS THAT SHE WANTED TO KNOW THE NAME

5  OF, OR WHAT THEY DID.

6  **Q.**    SO IF THERE WAS INFORMATION HERE -- LET'S LOOK, FOR

7  EXAMPLE, IF WE CAN, ON PAGE -- THE LAST PAGE OF THIS DOCUMENT.

8  **A.**    UH-HUH.

9            **MR. KESSLER:**  IF WE CAN, PLEASE, LAUREN.

10           (DOCUMENT DISPLAYED.)

11 **BY MR. KESSLER:**

12 **Q.**    IF THERE WAS INFORMATION HERE ABOUT HOW HUNDREDS OF

13 RETIRED PLAYERS WERE GETTING LICENSING MONEY, EVEN THOUGH YOU

14 WERE NOT GETTING LICENSING MONEY, YOUR WIFE WOULD KNOW ABOUT

15 THAT BECAUSE SHE READ THE MAGAZINE, RIGHT?

16 **A.**    YOU'D HAVE TO ASK HER.

17 **Q.**    OKAY.  BUT --

18 **A.**    THE FIRST TIME THAT THIS WAS BROUGHT TO MY ATTENTION WAS

19 IN THE DEPOSITION.  AND AS IT WAS BROUGHT TO MY ATTENTION IN

20 THE DEPOSITION, I SAID THAT I HAD NOT SEEN THIS PARTICULAR

21 DOCUMENT BECAUSE I DON'T LOOK AT THE TOUCHDOWN (SIC) THINGS

22 PRECISELY, BECAUSE IT SAYS "A GREAT TIME HAD AT THE CONVENTION,

23 ANNUAL" -- AND THAT'S WHAT I GO THERE FOR.  THAT'S WHAT I DO.

24 AND I DON'T PAY THAT MUCH ATTENTION TO IT.

25 **Q.**    WHAT YOU SAID, SIR, IS YOU THROW THESE IN THE GARBAGE CAN

1  WITHOUT READING THEM, RIGHT?

2  **A.**   WELL, BASICALLY THAT.

3  **Q.**   OKAY.

4  **A.**   I MEAN, TO BE PRECISE, I MAY NOT HAVE GOTTEN ONE AND JUST

5  THREW IT IN THE GARBAGE CAN.  BUT BASICALLY, I DON'T PAY THAT

6  MUCH ATTENTION TO TOUCHBACK.

7  **Q.**   THAT'S FINE, SIR.  I UNDERSTAND THAT.  I'M SAYING ARE YOU

8  SUGGESTING THAT YOUR WIFE DID READ THEM SO SHE WOULD HAVE

9  RECEIVED THIS INFORMATION AND DISCUSSED IT WITH YOU?  I JUST

10  WANT TO KNOW YES OR NO?

11  **A.**   DID SHE -- DOES SHE KNOW ABOUT THIS INFORMATION?

12  **Q.**   YES.

13  **A.**   I DON'T KNOW.

14  **Q.**   OKAY.

15  **A.**   IT MAY NOT BE ONE OF THE TOUCHDOWNS (SIC) THAT SHE LOOKED

16  AT.

17  **Q.**   OKAY.

18  **A.**   BUT IF THAT'S THE WAY YOU'RE GOING TO COMMUNICATE TO ME

19  ABOUT MY LICENSE AGREEMENT, THROUGH A TOUCHDOWN (SIC), YOU GAVE

20  ME A GLA, AND NOW YOU SAY:

21              "I WILL TELL YOU WHAT YOUR SITUATION IS WHEN

22  YOU SEE THE TOUCHDOWN" (SIC).

23          THAT DON'T MAKE SENSE.

24  **Q.**   SIR, YOU SIGNED YOUR FIRST GLA IN 1996, CORRECT?

25  **A.**   THAT'S CORRECT.

1 **Q.** AND THEN, YOU SIGNED ANOTHER ONE IN 2003, CORRECT?

2 **A.** THAT'S CORRECT.

3 **Q.** AND THE WAY IN WHICH THE NFLPA COMMUNICATES WITH RETIRED

4 PLAYERS IS BY SENDING THEM PUBLICATIONS FOR RETIRED PLAYERS

5 LIKE TOUCHDOWN (SIC); THAT'S CORRECT, ISN'T IT?

6 **A.** I DON'T KNOW IF THEY SEND THAT TO ALL PLAYERS.

7 **Q.** WELL, YOU GOT IT.

8 **A.** I GOT IT, BUT I DIDN'T READ IT. SO IT WAS MY OBLIGATION

9 TO READ IT TO FIND OUT WHAT MY -- THIS GLA WAS -- HOW IT WAS

10 GOING TO IMPACT ME? I MUST READ ALL TOUCHDOWNS (SIC) TO

11 FOLLOW -- OR TOUCHBACKS TO FIND OUT HOW I'M GOING TO RECEIVE

12 SOME COMPENSATION?

13       AND THERE'S 2,000 INDIVIDUALS IN THIS CASE.

14 **Q.** THE REASON, SIR, YOU DIDN'T READ TOUCHBACK IS BECAUSE THE

15 WHOLE ISSUE OF LICENSING WAS NOT REAL SERIOUS TO YOU; IS THAT

16 TRUE?

17 **A.** THAT'S CORRECT.

18 **Q.** OKAY. NOW, IT'S ALSO TRUE, MR. BEACH, AT THE TIME YOU

19 SIGNED YOUR GLA, YOUR UNDERSTANDING WOULD BE YOU WOULD NOT GET

20 ANY ACTIVE PLAYER MONEY IF THE ACTIVE PLAYER SIGNED A DIFFERENT

21 KIND OF DOCUMENT, CORRECT?

22       THAT WAS YOUR UNDERSTANDING.

23 **A.** IF YOU COULD ASK ME A QUESTION. WHAT YOU'VE DONE AGAIN IS

24 TELL ME WHAT MY UNDERSTANDING IS. JUST ASK ME A QUESTION. I

25 WILL RESPOND TO IT. YOU DON'T KNOW WHAT MY UNDERSTANDING IS.

1  Q.   I'M REQUIRED TO ASK WHAT YOUR UNDERSTANDING IS.  SO PLEASE

2  BEAR WITH ME.  I APOLOGIZE, BUT THAT'S THE WAY THE COURT WOULD

3  LIKE US TO ASK THE QUESTIONS.

4        YOUR UNDERSTANDING, SIR, THAT'S IMPORTANT TO THIS

5  JURY.

6  A.   I'M SORRY.

7  Q.   SO IT'S TRUE, ISN'T IT, THAT YOUR UNDERSTANDING AT THE

8  TIME YOU SIGNED THE GLA WAS THAT IF THE ACTIVE PLAYERS DIDN'T

9  SIGN THIS TYPE OF A FORM WITH AN ESCROW ACCOUNT, BUT SIGNED

10 SOME OTHER KIND OF FORM, THAT YOU WOULD NOT BE ENTITLED -- NOT

11 BE ENTITLED -- TO ANY REVENUE GENERATED BY ACTIVE PLAYER

12 LICENSING?  THAT WAS YOUR UNDERSTANDING?

13 A.   THAT'S CORRECT.  THAT'S MY UNDERSTANDING.

14 Q.   AND YOU DON'T KNOW WHAT FORMS THE ACTIVE PLAYERS SIGNED,

15 RIGHT?

16 A.   I HAVE NO IDEA WHAT FORMS THE ACTIVE PLAYERS SIGNED,

17 BECAUSE OF THE FACT I BELONG TO A UNION.  AND I DIDN'T KNOW

18 THAT THE UNION HAD SEPARATED ACTIVE PLAYERS FROM RETIRED

19 PLAYERS, BECAUSE UNION -- THAT'S ANTITHETICAL TO "UNION."

20 Q.   NOW, MR. BEACH, IT'S ALSO TRUE THAT IT WAS YOUR

21 UNDERSTANDING WHEN YOU HAD YOUR GLA'S, THAT YOU HAD NO CONTROL

22 OVER DEFENDANTS' LICENSING OPERATIONS.

23        THAT'S TRUE, RIGHT?

24 A.   AGAIN, THAT'S NOT TRUE.

25 Q.   OKAY.  LET'S TAKE A LOOK, PLEASE, AT YOUR DEPOSITION

1    TRANSCRIPT, 113.

2              **MR. KESSLER:** LINES 3 TO 7, YOUR HONOR.

3              **MS. NAYLOR:** NO OBJECTION.

4              **THE COURT:** GO AHEAD.

5              **MR. KESSLER:** OKAY.

6              **"QUESTION:** MR. BEACH, DO YOU BELIEVE YOU

7         HAVE ANY CONTROL OVER DEFENDANTS' LICENSING

8         OPERATIONS?

9              **"ANSWER:** OH, NO. I DON'T HAVE ANY CONTROL

10        ABOUT THAT."

11             **THE WITNESS:** THAT'S CORRECT. THAT'S WHAT I SAID.

12   **BY MR. KESSLER:**

13   **Q.** I'M SORRY. I MISUNDERSTOOD YOU. THAT'S CORRECT TESTIMONY

14   THAT YOU DON'T HAVE CONTROL?

15   **A.** THAT'S CORRECT TESTIMONY. BUT WHAT IT DOESN'T DEAL WITH

16   IS I THOUGHT YOU WERE TALKING ABOUT OPERATIONS OF THE -- OF

17   THE -- THE UNION'S EVERYDAY OPERATION: FAX MACHINES, SENDING

18   OUT NOTICES.

19             THAT'S WHY I RESPONDED TO IT THAT WAY. THAT'S WHAT I

20   THOUGHT YOU WERE TALKING ABOUT. I DIDN'T KNOW YOU WAS TALKING

21   ABOUT THE ASPECT OF THE GLA IN TERMS OF HAVING ANY KIND OF

22   IMPACT. I DEFINITELY WOULD HAVE IMPACT ON THE GLA.

23   **Q.** WELL, SIR, YOU TESTIFIED ON YOUR COUNSEL'S EXAMINATION YOU

24   THOUGHT THERE WERE TWO THINGS YOU HAD -- YOU HAD THE RIGHT TO

25   DO, I BELIEVE. ONE THING YOU SAID IS YOU COULD REVOKE THE GLA,

1  CORRECT?

2          YOU TESTIFIED TO THAT?

3  **A.**   THAT'S WHAT I --

4  **Q.**   OKAY.  TAKE A LOOK AGAIN AT THE GLA.

5          **MR. KESSLER:**  IF WE COULD PUT THAT BACK UP, PLEASE.

6  LET'S GO TO TRIAL EXHIBIT -- WHAT IS IT, 630 --

7          **MR. GREENSPAN:**  639.

8          **MR. KESSLER:**  639.

9          (DOCUMENT DISPLAYED.)

10 **BY MR. KESSLER::**

11 **Q.**   AND, SIR, I'D ASK YOU, GIVEN YOUR LEGAL TRAINING, THERE'S

12 NOTHING HERE IN THE GLA THAT SAYS IT CAN BE REVOKED.  IT JUST

13 HAS A STATED TERM, IF YOU TAKE A LOOK AT THE BOTTOM, PLEASE --

14         **MR. KESSLER:**  LAUREN, WHERE STATED TERM IS, VERY

15 BOTTOM.

16         THANK YOU.

17         (DOCUMENT DISPLAYED.)

18 **BY MR. KESSLER::**

19 **Q.**   IT HAS A STATED TERM UNTIL DECEMBER 31ST, 2006.  THERE IS

20 NO LANGUAGE THAT SAYS YOU HAVE ANY RIGHT TO REVOKE BEFORE THAT,

21 DOES IT?

22 **A.**   THIS IS -- IN THE FOURTH PARAGRAPH IT SAYS:

23              "IF THE UNDERSIGNED PLAYER'S INCLUSION IN A

24 PARTICULAR NFLPA PROGRAM WILL CONFLICT WITH AN INDIVIDUAL'S

25 EXCLUSIVE ENDORSEMENT AGREEMENT, AND THE PLAYER PROVIDES THE

1  NFLPA WITH A TIMELY NOTICE OF THAT CONFLICT, THE NFLPA AGREES

2  TO EXCLUDE THE PLAYER FROM THAT PARTICULAR PROGRAM."

3  **Q.**   OKAY.

4  **A.**   SO THAT MEANS THAT IF YOU'RE GOING TO -- IF THERE IS

5  SOMETHING THAT I HAD A CONFLICT WITH, I COULD -- I WAS GOING TO

6  BE EXCLUDED FROM IT.  AGAIN, I'M CONFUSED.

7  **Q.**   I DON'T WANT TO CONFUSE YOU, SIR.  I'LL ASK YOU ABOUT THAT

8  PARAGRAPH.

9           **MR. KESSLER:**  LEAVE THAT PARAGRAPH UP, LAUREN,

10  BECAUSE I WANT TO ASK ABOUT IT.

11           (DOCUMENT DISPLAYED.)

12  **BY MR. KESSLER:**

13  **Q.**   IT SAYS -- BUT I WANT FIRST WANT TO ASK YOU:  THIS

14  PARAGRAPH DOESN'T GIVE YOU THE RIGHT TO REVOKE THE WHOLE

15  AGREEMENT, RIGHT?  IT SAYS YOU COULD BE EXCLUDED FROM A

16  PARTICULAR PROGRAM, RIGHT?

17  **A.**   THAT'S CORRECT.

18  **Q.**   OKAY.  SO I JUST WANT TO BE CLEAR FOR THE JURY.  YOU DON'T

19  THINK THERE'S ANYTHING THAT GIVES YOU THE RIGHT TO REVOKE THE

20  WHOLE AUTHORIZATION?

21  **A.**   NO, NO, NOT THE WHOLE --

22  **Q.**   OKAY.  OKAY.  NOW, LET'S FOCUS ON THIS.

23           IT SAYS:

24              "IF THE UNDERSIGNED PLAYER'S INCLUSION IN A

25  PARTICULAR NFLPA PROGRAM WILL CONFLICT WITH AN INDIVIDUAL

1  EXCLUSIVE ENDORSEMENT AGREEMENT."

2          NOW, SIR, YOU HAD NO ENDORSEMENT AGREEMENTS, RIGHT?

3  **A.**   I DIDN'T KNOW.  I -- I WAS COMPLETELY IN THE DARK.  IF

4  THERE ARE ANY AGREEMENTS, THE UNION -- I GAVE THE UNION THE

5  RIGHT TO USE MY IMAGE, AND I ASSUMED THE UNION WAS MY AGENT.

6  SO I DON'T KNOW WHAT THEY WERE DOING.  I HAVE NO IDEA.

7  **Q.**   SIR, I APPRECIATE YOUR TESTIMONY.  JUST PLEASE BEAR WITH

8  ME, AND TRY TO ANSWER MY QUESTION.

9          MY QUESTION, SIR, IS:  THIS IS TALKING ABOUT HERE

10  THAT IF THE UNDERSIGNED PLAYER'S INCLUSION IN A PARTICULAR

11  NFLPA PROGRAM -- THAT'S THE UNION, RIGHT?  NFLPA -- WILL

12  CONFLICT WITH AN INDIVIDUAL EXCLUSIVE ENDORSEMENT AGREEMENT,

13  AND THE PLAYER PROVIDES THE NFLPA WITH TIMELY NOTICE OF THAT

14  CONFLICT, THE NFLPA AGREES TO EXCLUDE THE PLAYER FROM THAT

15  PARTICULAR PROGRAM.

16          NOW, THAT MEANS, SIR, DOES IT NOT -- OR IT WAS YOUR

17  UNDERSTANDING, SIR, WITH YOUR LEGAL TRAINING -- THAT IF YOU HAD

18  AN INDIVIDUAL EXCLUSIVE ENDORSEMENT PROGRAM, LIKE YOU HAD AN

19  EXCLUSIVE DEAL WITH, ON YOUR OWN, WITH, LET'S SAY, A TOY

20  COMPANY TO MAKE A FIGURE OF YOU, AND THAT CONFLICTED WITH AN

21  NFLPA PROGRAM, AND YOU GAVE NOTICE, THEN YOU COULD BE EXCLUDED.

22  THAT WAS YOUR UNDERSTANDING, RIGHT?

23  **A.**   THAT WAS PART OF MY UNDERSTANDING.

24  **Q.**   RIGHT.  AND MY QUESTION WAS:  YOU HAD NO INDIVIDUAL

25  ENDORSEMENT AGREEMENTS THAT YOU EVER NEGOTIATED FOR YOURSELF.

1  NONE.

2  **A.**   I VIEWED THE --

3  **Q.**   SIR, I'M NOT ASKING YOU --

4          **THE COURT:**  HE'S ENTITLED TO GET A DIRECT ANSWER --

5          **THE WITNESS:**  I AM SORRY, SIR.

6          **THE COURT:**  -- TO THE QUESTION OF WHETHER OR NOT YOU

7  HAD ANY INDIVIDUAL ENDORSEMENT AGREEMENTS.

8          **THE WITNESS:**  NO, I HAD NO INDIVIDUAL ENDORSEMENT

9  AGREEMENT.

10  **BY MR. KESSLER:**

11  **Q.**   RIGHT.  SO YOU DIDN'T HAVE THEM EXCLUSIVE OR

12  NON-EXCLUSIVE.  YOU DIDN'T HAVE ANY, RIGHT?

13  **A.**   I DON'T KNOW.

14  **Q.**   NO, YOU KNOW WHAT AGREEMENTS YOU HAD INDIVIDUALLY.

15  **A.**   RIGHT.  I KNOW THAT.

16  **Q.**   AND YOU HAD NONE.

17  **A.**   I HAD NONE.

18  **Q.**   THANK YOU.  THAT WAS MY QUESTION, SIR.

19          NOW, FINALLY, SIR, I JUST WANT TO UNDERSTAND YOUR

20  POSITION WITH RESPECT TO EA, OKAY?

21          YOU KNOW IN THE EA GAME, AS WE DISCUSSED, THEY DON'T

22  USE YOUR NAME, AND THEY DON'T USE YOUR PICTURE, AND THEY DON'T

23  USE YOUR NUMBER SINCE 2003, CORRECT?  YOU KNOW THAT?

24  **A.**   YES.

25  **Q.**   OKAY.  IS IT YOUR BELIEF THAT THE NFLPA SHOULD HAVE GIVEN

1    AWAY YOUR NAME FOR FREE TO EA?

2    **A.**    NO.

3            **MR. KESSLER:**  THANK YOU, SIR.

4            I HAVE NO FURTHER QUESTIONS.

5            **THE COURT:**  ALL RIGHT.  WILL YOU FINISH THE REDIRECT

6    RIGHT NOW?

7            **MS. NAYLOR:**  YOUR HONOR, WE HAVE NO REDIRECT.

8            **THE COURT:**  THANK YOU.

9            **MS. NAYLOR:**  YOU'RE WELCOME.

10           **THE COURT:**  THEN, MAY THE WITNESS BE EXCUSED AND

11   DISCHARGED, NOT SUBJECT TO RECALL?

12           **MS. NAYLOR:**  YES.

13           **MR. KESSLER:**  NO, YOUR HONOR, NOT SUBJECT TO RECALL.

14           **THE COURT:**  ALL RIGHT.  MR. BEACH, YOU'RE FREE TO GO.

15   THANK YOU FOR COMING.

16           **THE WITNESS:**  THANK YOU.

17           **THE COURT:**  OKAY.  CAN WE GET STARTED ON OUR NEXT

18   WITNESS BEFORE WE TAKE A BREAK?  WE'RE GOING TO TAKE A BREAK IN

19   ABOUT 15 MINUTES.

20           **MR. HUMMEL:**  YES, YOUR HONOR.

21           **THE COURT:**  ALL RIGHT.  SO CAN WE ALL GO ANOTHER 15

22   MINUTES?

23           (JURY RESPONDED AFFIRMATIVELY.)

24           **THE COURT:**  EXCELLENT.  WE WILL START WITH OUR NEXT

25   WITNESS.

1    **MR. HUMMEL:** YOUR HONOR, PLAINTIFFS CALL JOEL

2  LINZNER.

3         **THE COURT:** JOEL LINZNER.

4         **MR. HUMMEL:** FROM EA SPORTS.

5         **THE COURT:** ALL RIGHT. ARE YOU MR. LINZNER?

6         **THE WITNESS:** I AM, SIR.

7         **THE COURT:** WELCOME. PLEASE RAISE YOUR RIGHT HAND.

8  IF YOU STAND THERE THE CLERK WILL SWEAR YOU IN.

9         (THEREUPON, THE WITNESS WAS SWORN.)

10        **THE WITNESS:** YES, MA'AM.

11        **THE CLERK:** OKAY. THANK YOU. PLEASE BE SEATED.

12        PLEASE SAY THE YOUR FULL NAME FOR THE RECORD.

13        CAN YOU PLEASE STATE YOUR NAME FOR THE RECORD?

14        **THE WITNESS:** MY NAME IS JOEL LAURENCE,

15  L-A-U-R-E-N-C-E, LINZNER, L-I-N-Z-N-E-R.

16        **THE COURT:** ALL RIGHT. WE WOULD LIKE TO TAKE YOUR

17  PICTURE TO BE USED IN THE CLOSING ARGUMENTS. IS THAT OKAY?

18        **THE WITNESS:** IF THAT'S STANDARD PROCEDURE, THEN

19  SURE.

20        **THE COURT:** WELL, THAT'S WHAT WE DO WITH EVERYONE

21  ELSE.

22        **THE WITNESS:** OKAY.

23        **THE CLERK:** YOU CAN BE SEATED.

24        **THE WITNESS:** BE SEATED?

25        **THE COURT:** THIS IS SO THE JURY CAN BE REMINDED WHO

1    THE WITNESSES WERE IN THE CLOSING ARGUMENTS.

2            **THE CLERK:**  OKAY.  GOOD.  THANK YOU.

3            **THE COURT:**  ALL RIGHT.  THANK YOU.  I'LL ASK YOU TO

4    SPEAK INTO THE MIC SO THAT YOUR VOICE GETS PICKED UP ENOUGH SO

5    THAT EVERYONE ON THE JURY CAN HEAR.

6            AND GO RIGHT AHEAD, MR. HUMMEL.

7            **MR. HUMMEL:**  THANK YOU VERY MUCH, YOUR HONOR.

8            **THE WITNESS:**  I'M SORRY.  MR. HUMMEL?

9                        <u>**JOEL LINZNER**</u>,

10   CALLED AS A WITNESS FOR THE PLAINTIFFS HEREIN, HAVING BEEN

11   FIRST DULY SWORN, WAS EXAMINED AND TESTIFIED AS FOLLOWS:

12                   <u>**DIRECT EXAMINATION**</u>

13   BY MR. HUMMEL:

14   **Q.**   CORRECT.  MY NAME IS CHAD HUMMEL.

15   **A.**   THANK YOU.

16   **Q.**   I REPRESENT THE PLAINTIFFS IN THIS CASE, MR. LINZNER.

17            YOU AND I HAVE NEVER MET BEFORE, HAVE WE?

18   **A.**   I DON'T RECALL MEETING YOU.

19   **Q.**   WE HAVE NEVER SPOKEN?

20   **A.**   NOT THAT I KNOW OF, NO.

21   **Q.**   WE HAVEN'T WORKED TOGETHER IN ANY WAY TO PREPARE YOUR

22   TESTIMONY FOR THIS CASE, CORRECT?

23   **A.**   NOT AT ALL.

24   **Q.**   ALL RIGHT.

25            **THE COURT:**  MR. LINZNER, MAY I ASK YOU TO MOVE THE

1  MIC?  IT'S NOT CATCHING YOUR VOICE WELL ENOUGH.

2           THANK YOU.

3  **BY MR. HUMMEL::**

4  **Q.**  MR. LINZNER, YOU WORK FOR WHAT COMPANY?

5  **A.**  ELECTRONIC ARTS, INC.

6  **Q.**  ELECTRONIC ARTS, INC.

7           IS THAT SOMETIMES KNOWN AS "EA"?

8  **A.**  YES, IT IS.

9  **Q.**  ALL RIGHT.  NOW, YOU'RE NOT APPEARING HERE TODAY

10 VOLUNTARILY; IS THAT RIGHT?

11 **A.**  WELL, I WAS SUBPOENAED, IF THAT'S WHAT YOU MEAN.

12 **Q.**  RIGHT.  WE'VE ISSUED A SUBPOENA FOR YOU TO COME AND

13 TESTIFY FOR THE JURY; IS THAT RIGHT?

14 **A.**  I BELIEVE I WAS SUBPOENAED BY THE PLAINTIFFS, YES.

15 **Q.**  AND A SUBPOENA IS, AS YOU UNDERSTAND IT -- YOU'RE A

16 LAWYER, RIGHT?

17 **A.**  I AM.

18 **Q.**  AND YOU GRADUATED FROM A LAW SCHOOL HERE IN THE BAY AREA?

19 **A.**  BEST LAW SCHOOL IN THE BAY AREA.

20 **Q.**  WHAT'S THAT ONE?

21 **A.**  UNIVERSITY OF CALIFORNIA AT BERKELEY.

22 **Q.**  THAT'S BOALT HALL?

23 **A.**  YES, SIR.

24 **Q.**  AND YOU PRACTICED LAW FOR A NUMBER OF YEARS AFTER YOU

25 GRADUATED, RIGHT?

1  **A.**   YES, I DID.

2  **Q.**   AND WERE YOU A LITIGATOR?

3  **A.**   I WAS.

4  **Q.**   DID YOU TRY CASES?

5  **A.**   I DID.

6  **Q.**   SO YOU UNDERSTAND THIS PROCESS PRETTY WELL.

7  **A.**   VERY WELL.

8  **Q.**   AND IN 1999, YOU LEFT THE PRACTICE OF LAW, RIGHT?

9  **A.**   I DID.

10  **Q.**   AND YOU JOINED WHAT COMPANY?

11  **A.**   ELECTRONIC ARTS, INC.

12  **Q.**   AND WHAT POSITION DID YOU ASSUME WHEN YOU JOINED -- IF I

13  SAY "EA" TODAY WILL YOU UNDERSTAND THAT WE'RE TALKING ABOUT THE

14  SAME COMPANY?

15  **A.**   YES.  I USUALLY REFER TO IT AS "EA" MYSELF.

16  **Q.**   OKAY.  LET'S CALL IT "EA", THEN, FOR SHORT.

17         YOU JOINED EA IN WHAT CAPACITY?

18  **A.**   I JOINED AS VICE PRESIDENT OF WORLDWIDE BUSINESS AFFAIRS.

19  **Q.**   ALL RIGHT.  BUSINESS AFFAIRS.  CAN YOU TELL THE LADIES AND

20  GENTLEMEN OF THE JURY AND THE COURT WHAT "BUSINESS AFFAIRS" IS?

21  **A.**   WELL, CERTAINLY.  IN DIFFERENT COMPANIES "BUSINESS

22  AFFAIRS" CAN MEAN DIFFERENT THINGS.  BUT AT EA AT THE TIME THAT

23  I JOINED, THE RESPONSIBILITY FOR BUSINESS AFFAIRS INCLUDED THE

24  LICENSING END OF ALL OF THE CONTENT WE USED FOR OUR GAMES.  SO,

25  FOR EXAMPLE, IF WE WANTED TO LICENSE IN THE JAMES BOND PROPERTY

1   TO MAKE JAMES BOND GAMES OR IF WE WANTED TO LICENSE IN MUSIC OR

2   IF WE WANTED TO LICENSE IN THE NFL OR PLAYERS INC RIGHTS, THAT

3   ALL FELL WITHIN THE AMBIT OF BUSINESS AFFAIRS, ALONG WITH SOME

4   OTHER RESPONSIBILITIES, WHICH I'M HAPPY TO GO INTO, IF YOU

5   LIKE.

6   **Q.**   NO.   YOUR JOB WAS ESSENTIALLY TO ACQUIRE CONTENT FOR USE

7   IN EA'S VIDEO GAMES; IS THAT RIGHT?

8   **A.**   THAT WAS ONE OF THE FUNCTIONS OF BUSINESS AFFAIRS WAS THE

9   LICENSING CONTENT FOR USE IN OUR GAMES, YES.

10  **Q.**   AND THAT'S WHAT WE'RE GOING TO BE TALKING ABOUT MOST OF

11  THE MORNING TODAY, ABOUT LICENSING, AND, IN PARTICULAR,

12  LICENSING RIGHTS FROM THE DEFENDANTS, PLAYERS INC AND THE

13  NFLPA, OKAY?

14  **A.**   OKAY.

15  **Q.**   NOW, ARE YOU AWARE, SIR, THAT PREVIOUSLY IN THIS CASE YOU

16  FILED A -- YOU SUBMITTED A DECLARATION?

17  **A.**   I THINK I SUBMITTED TWO, BUT, YES.

18  **Q.**   YOU SUBMITTED TWO.   OKAY.

19          AND WHO ASKED YOU FOR THOSE DECLARATIONS?

20  **A.**   THE DEFENDANTS.

21  **Q.**   THE DEFENDANTS DID.

22  **A.**   (NODS HEAD).

23  **Q.**   THE UNION AND PA DID.

24          NOW, DID THEY PAY YOU FOR THAT?

25  **A.**   NO.

1  Q.   YOU DID THAT VOLUNTARILY?

2  A.   WELL, THE ONE WAS AROUND A PROTECTIVE ORDER, WHICH WE

3  WANTED.

4  Q.   I UNDERSTAND.

5  A.   THERE WERE CERTAIN CONFIDENTIAL INFORMATION THAT HAD TO BE

6  COVERED WITHIN THE AMBIT OF THE COURT'S' PROTECTIVE ORDER.

7  Q.   FAIR ENOUGH.

8  A.   I SUBMITTED A DECLARATION ON THAT.  AND THEN, I SUBMITTED

9  ANOTHER DECLARATION THAT HAD SEVERAL DOCUMENTS ATTACHED.

10  Q.   AND THE PREVIOUS DECLARATION THAT YOU JUST REFERENCED WAS

11  SUBMITTED IN OCTOBER, 2007; IS THAT RIGHT?

12  A.   I DON'T REMEMBER THE DATES, SIR.

13         **MR. HUMMEL:**  YOUR HONOR, PERMISSION TO APPROACH TO

14  REFRESH RECOLLECTION.

15         **THE COURT:**  FINE.

16         **MR. HUMMEL:**  THANK YOU.

17  **BY MR. HUMMEL::**

18  Q.   I'VE JUST HANDED YOU, MR. LINZNER, A COPY OF YOUR

19  DECLARATION YOU SUBMITTED IN THE CASE.  CAN YOU LOOK ON THE

20  LAST PAGE AND SEE IF THAT REFRESHES YOUR RECOLLECTION AS TO

21  WHEN YOU SUBMITTED THAT DECLARATION?

22  A.   WELL, IT DOESN'T REFRESH MY RECOLLECTION, BUT I SEE THE

23  DATE.

24  Q.   COULD YOU READ THAT DATE FOR THE JURY, PLEASE?

25  A.   OCTOBER 5, 2007.

1  Q.   AND WHO APPROACHED YOU?  WHO APPROACHED YOU TO PROVIDE

2  THAT DECLARATION?

3  A.   WHO?  YOU MEAN, THE NAME OF THE INDIVIDUAL?

4  Q.   OR THE PARTY.  WAS IT THE PLAINTIFFS?

5  A.   NO.  I SAID IT WAS THE DEFENDANT.

6  Q.   RIGHT.  SO YOU COOPERATED WITH THE DEFENDANT IN PROVIDING

7  A DECLARATION VOLUNTARILY IN THIS CASE; IS THAT RIGHT?

8  A.   YES.

9  Q.   OKAY.  AND YOU CERTAINLY STAND BY, UNDER PENALTY OF

10 PERJURY, WHAT YOU WROTE IN THAT DECLARATION, RIGHT?

11 A.   DO YOU WANT ME TO READ IT THROUGH AGAIN SO THAT I --

12 CERTAINLY AT THE TIME I SIGNED IT I BELIEVED IT WAS TRUE.

13 Q.   OKAY.  FAIR ENOUGH.  THAT'S ALL I WANT TO KNOW.

14      NOW, DID YOU, IN CONNECTION WITH YOUR TESTIMONY HERE

15 TODAY, WORK WITH ANY OF THE DEFENDANTS' LAWYERS?

16 A.   NO, SIR.

17 Q.   NO?  OKAY.

18      YOU DIDN'T MEET WITH ANY OF THEM ABOUT THE CASE?

19 A.   NO, SIR.

20 Q.   HAVE YOU EVER MET WITH ANY OF THEM ABOUT THE CASE?

21 A.   I MET MR. FEHER AT MY DEPOSITION, BUT THAT'S THE ONLY

22 TIME, OTHER THAN GENE UPSHAW'S MEMORIAL, I THINK I'VE EVER SEEN

23 HIM.

24 Q.   JUST SO WE'RE CLEAR, WITH RESPECT TO YOUR DECLARATION, WHO

25 WROTE IT?

1 **A.** AS I RECALL THE DECLARATION, THERE WAS A DRAFT THAT CAME

2 IN. WE HAVE A LAWYER THAT WORKS AT EA WHO HAD WORKED ON IT, AS

3 WELL. SUBMITTED IT TO ME. I HAD A LOT OF CHANGES I WANTED TO

4 MAKE TO MAKE SURE IT WAS ACCURATE, BASED ON MY KNOWLEDGE AND

5 UNDERSTANDING. MADE THE CHANGES.

6 **Q.** FAIR ENOUGH.

7 **A.** AND FINALIZED IT.

8 **Q.** WHEN THAT DRAFT CAME IN -- THAT'S AN INITIAL VERSION OF A

9 DECLARATION -- WHERE DID IT COME FROM?

10 **A.** WELL, I GOT IT THROUGH MY IN-HOUSE COUNSEL.

11 **Q.** DO YOU KNOW WHERE YOUR IN-HOUSE COUNSEL GOT IT?

12 **A.** I COULD MAKE CERTAIN ASSUMPTIONS, BUT I AM NOT SURE YOU

13 WANT ME TO DO THAT.

14 **Q.** NO.

15        DO YOU KNOW WITH WHETHER YOUR IN-HOUSE COUNSEL GOT IT

16 FROM THE DEFENDANTS' COUNSEL?

17 **A.** NO.

18 **Q.** YOU DON'T KNOW. OKAY.

19        DO YOU KNOW IF YOUR IN-HOUSE COUNSEL WROTE IT?

20 **A.** WELL, IT'S THE FLIP SIDE OF THE SAME QUESTION.

21 **Q.** YOU DON'T --

22 **A.** I'M NOT SURE IF HE WROTE IT.

23 **Q.** ALL RIGHT. WHAT IS THE BUSINESS OF EA?

24 **A.** EA -- EXCUSE ME. IS THERE SOME --

25        **THE COURT:** PLEASE HELP YOURSELF TO SOME WATER.

1    THERE SHOULD BE PLENTY OF IT IN THE PITCHER.

2            **THE WITNESS:**  EA IS IN THE BUSINESS OF DEVELOPING,

3    PUBLISHING AND SELLING VIDEO GAMES, ONLINE GAMES AND

4    MERCHANDISING AROUND THOSE GAMES.

5    **BY MR. HUMMEL:**

6    **Q.**   IS ONE OF THOSE GAMES THE MADDEN GAME?

7    **A.**   MADDEN NFL GAME, YES.

8    **Q.**   MADDEN NFL GAME.  AND, IN FACT, THAT'S BEEN A VERY

9    SUCCESSFUL GAME FOR EA, CORRECT?

10   **A.**   YES, OVER 20 YEARS.

11   **Q.**   20 YEARS.  IN FACT, THE 2009 VERSION WAS THE 20TH

12   ANNIVERSARY EDITION, RIGHT?

13   **A.**   IT'S THE 20TH OF THE MADDEN NFL SERIES, THAT'S CORRECT.

14   **Q.**   RIGHT.  AND YOU CHOSE TO PUT ON THE COVER OF THAT A

15   RETIRED PLAYER AT THE TIME, RIGHT?

16   **A.**   UHM, WELL, BRETT FAVRE AT THE TIME WE DECIDED TO PUT HIM

17   ON THE COVER WAS NOT RETIRED, HAD NOT ANNOUNCED HIS RETIREMENT.

18           HE SUBSEQUENTLY ANNOUNCED HIS RETIREMENT.  WE THOUGHT

19   ABOUT REPLACING HIM TO HAVE AN ACTIVE PLAYER.  BUT THE

20   LOGISTICS OF MAKING THE PACKAGES ARE KIND OF COMPLICATED, AND

21   WE DECIDED TO STAY WITH BRETT FAVRE.  AND I THINK AS MOST

22   PEOPLE SUBSEQUENTLY KNOW, HE REVOKED HIS RETIREMENT AND IS

23   CURRENTLY AN ACTIVE PLAYER WITH THE NEW YORK JETS.

24   **Q.**   IS IT CORRECT THAT IN THE EA MADDEN GAME, EA STRIVES TO

25   PUT OUT AN AUTHENTIC FOOTBALL EXPERIENCE FOR VIDEO GAME

1  PLAYERS?

2  **A.**   YES.

3  **Q.**   AND, IN FACT, THE MADDEN GAME HAS BEEN SO SUCCESSFUL THAT

4  UPON THE RELEASE OF THE GAME THIS YEAR THERE WAS SOMETHING

5  CALLED "MADDEN PALOOZA," RIGHT?

6  **A.**   WELL, WE PUT ON SOMETHING LIKE MADDEN PALOOZA THIS YEAR.

7  WE PUT ON OTHER EVENTS IN PAST YEARS.  NOT BECAUSE THE GAME WAS

8  SO SUCCESSFUL, BUT TO TRY TO KEEP THE GAME SUCCESSFUL BY HAVING

9  A BIG PR LAUNCH EVENT SO THAT THE PUBLIC, AS A WHOLE,

10  CELEBRATES THE LAUNCH OF THE GAME AND LOOKS FORWARD TO ITS

11  RELEASE.

12  **Q.**   ISN'T IT ALSO TRUE THAT THERE AS BEEN AN ENTIRE TELEVISION

13  PROGRAM CREATED AROUND THE MADDEN GAME?

14  **A.**   ESPN HAS BEEN AIRING A SHOW CALLED "MADDEN CHALLENGE," I

15  THINK, FOR THE LAST THREE YEARS.

16  **Q.**   IS IT CALLED "MADDEN NATION" OR "MADDEN CHALLENGE"?

17  **A.**   MADDEN NATION.  I'M SORRY.

18  **Q.**   MADDEN NATION.

19  **A.**   MADDEN NATION, YES.  MADDEN CHALLENGE IS A SERIES OF

20  TOURNAMENTS THAT WE HOLD AT DIFFERENT CITIES AROUND THE

21  COUNTRY.

22  **Q.**   SO THERE'S A BIG COMING-OUT PARTY, A TELEVISION PROGRAM,

23  AND A SERIES OF EVENTS AROUND THE COUNTRY TO LAUNCH THE GAME?

24  **A.**   NO.  THERE'S -- TWO OF THOSE ARE RIGHT.  THERE'S A BIG

25  LAUNCH PARTY.

1    THE TELEVISION SHOW, MADDEN NATION, USUALLY FOLLOWS

2 THE LAUNCH BY SOME PERIOD OF TIME.  AND THE MADDEN CHALLENGE,

3 WHICH IS A SERIES OF TOURNAMENTS, LIVE TOURNAMENTS, FOLLOWS THE

4 LAUNCH BY WEEKS, IF NOT MONTHS.

5 **Q.**   AND THE MADDEN GAME OVER THE YEARS HAS BEEN A SIGNIFICANT

6 FINANCIAL SUCCESS FOR EA, CORRECT?

7 **A.**   IT HAS BEEN A SUCCESSFUL GAME, YES, SIR.

8 **Q.**   ALL RIGHT.  NOW, THERE ARE VARIOUS FEATURES IN THE MADDEN

9 GAME.  ONE OF THEM I'M GOING TO FOCUS ON THIS MORNING IS THE

10 VINTAGE OR HISTORIC TEAM FEATURE.

11    ARE YOU FAMILIAR WITH THAT?

12 **A.**   I THINK THEY HAVE THAT -- I'M NOT TERRIBLY FAMILIAR WITH

13 THE FEATURES IN ALL OF THE VARIOUS ITERATIONS OF THE MADDEN NFL

14 GAME.

15    I'VE BEEN AT EA SINCE '99, SO THERE WOULD HAVE BEEN

16 TEN ITERATIONS OF THAT GAME.  AND I AM NOT FAMILIAR WITH WHAT'S

17 IN EACH OF THOSE VERSIONS OF MADDEN NFL.

18 **Q.**   AND I'M NOT ASKING THAT.  WHAT I'M ASKING IS A SIMPLER

19 QUESTION, WHICH IS SORT OF 20,000-FOOT.

20    ARE YOU AWARE THAT THERE IS A FEATURE IN THE MADDEN

21 GAME THAT HAS HISTORIC TEAMS?

22 **A.**   WELL, I KNOW IN SOME VERSIONS OF MADDEN WE HAVE HAD

23 HISTORIC TEAMS.  I DON'T KNOW IF THAT'S IN EVERY VERSION OF

24 MADDEN.

25 **Q.**   OKAY.  AND CAN YOU DESCRIBE FOR THE JURY WHAT THE HISTORIC

1  TEAM FEATURE IS?

2  **A.**    NOT VERY WELL.  I KNOW -- AGAIN, IT'S DIFFERENT IN

3  DIFFERENT YEARS, MR. HUMMEL, SO I'M NOT SURE THAT ONE ANSWER

4  WILL -- YOU KNOW, WILL EXPLAIN THAT.

5         THE GAME GROWS AND CHANGES EVERY YEAR.  THAT'S WHY WE

6  GET -- ARE ABLE TO GET PEOPLE TO BUY IT EVERY YEAR.  THERE'S

7  DIFFERENT FEATURES IN IT FROM MADDEN '01, '02, '03 AND '04, ET

8  CETERA.

9         AND THEY DON'T HAVE THE SAME FEATURES IN EVERY YEAR.

10  AND EVEN WHEN THEY HAVE FEATURES THAT ARE COMPARABLE, THEY'RE

11  DIFFERENT.  SO I CAN'T -- I DON'T KNOW HOW TO ANSWER YOUR

12  QUESTION.

13  **Q.**    I'M ONLY FOCUSING ON THE HISTORIC GAME FEATURE.  ARE YOU

14  AWARE THAT THAT EXISTED IN SOME VERSIONS OF THE MADDEN GAME

15  OVER THE YEARS?

16  **A.**    YES, SIR.

17  **Q.**    AND IS THAT A FEATURE BY WHICH A GAME PLAYER COULD CHOOSE,

18  FOR EXAMPLE, TO BE THE 1989 49ERS, AND AN OPPONENT COULD BE THE

19  1985 BEARS OR THE 1965 BROWNS?

20  **A.**    AS FAR AS I'M AWARE THERE WERE SOME VERSIONS OF THE GAME

21  IN THE EARLY 21ST CENTURY, LIKE 2001 VERSION, 2002, WHERE THE

22  KIND OF FEATURE YOU DESCRIBED WAS AVAILABLE.

23  **Q.**    ALL RIGHT.  LET ME SHOW YOU WHAT --

24         **MR. HUMMEL:**  YOUR HONOR, I BELIEVE IS STIPULATED INTO

25  EVIDENCE AS EXHIBIT 1239.

1  BY MR. HUMMEL::

2

3  MR. HUMMEL:

4  Q.   YOU ACTUALLY HAVE A STACK IN FRONT OF YOU.

5  A.   1239?

6  Q.   1239.

7         MR. HUMMEL:  IF I COULD HAVE -- 1239, YOUR HONOR, I

8  BELIEVE WAS STIPULATED IN.

9         MR. FEHER:  NO OBJECTION.

10        THE COURT:  1239 IS RECEIVED.

11        (TRIAL EXHIBIT 1239 RECEIVED IN EVIDENCE)

12  MR. HUMMEL:

13  Q.   ALL RIGHT.  MR. LINZNER, I'M NOT ASKING YOU IF YOU'VE SEEN

14  THIS DOCUMENT BEFORE.  I TRUST YOU HAVE NOT.

15        BUT WE'VE ACTUALLY DONE A STUDY OF THE HISTORIC TEAMS

16  THAT APPEAR IN VARIOUS VERSIONS OF THE MADDEN GAME.

17        AND IF YOU COULD, FOR EXAMPLE, IN THE '03 MADDEN

18  GAME, THOSE ARE THE TEAMS AND THE YEARS THAT THEY APPEARED.

19        DO YOU HAVE ANY REASON TO DOUBT THAT THOSE HISTORIC

20  TEAMS APPEAR IN THAT VERSION?

21  A.   I DON'T KNOW ONE WAY OR ANOTHER WHETHER THESE TEAMS

22  APPEAR.

23  Q.   WHO AT EA IS IN CHARGE OF DECIDING WHAT HISTORIC TEAMS GO

24  IN THE GAME?

25  A.   WELL, IT'S ACTUALLY A TEAM DECISION.  THE TEAM THAT

1   BUILDS, DEVELOPS THE MADDEN NFL GAME IS BASED IN ORLANDO,

2   FLORIDA, A STUDIO THAT WE CALL TIBURON.  AND THEY HAVE BEEN

3   BUILDING THE MADDEN NFL GAME FOR THE ENTIRETY OF MY CAREER AT

4   EA.

5            AND THE IDENTITY OF MEMBERS OF THAT TEAM, THE

6   PRODUCERS, THE EXECUTIVE PRODUCER CHANGES OVER TIME.  AND EVERY

7   YEAR THE PEOPLE THAT MAKE THE GAME AND THE PEOPLE THAT MARKET

8   THE GAME DECIDE WHAT TO DO TO MAKE NEXT YEAR'S ITERATION OF THE

9   GAME DIFFERENT THAN THE PRIOR YEAR'S ITERATION OF THE GAME.

10           AND THOSE ARE THE PEOPLE WHO ARE BEST -- WOULD HAVE

11  BEEN BEST ABLE TO ANSWER QUESTIONS ABOUT WHETHER THE 1989 49ERS

12  WERE IN MADDEN NFL '03.

13           I'M SURE YOU HAD AN OPPORTUNITY TO DEPOSE THEM,

14  SUBPOENA THEM, IF IT WAS IMPORTANT.

15  **Q.**   AND ONE OF THOSE MEN IS JEREMY STRAUSSER; IS THAT RIGHT?

16  **A.**   JEREMY STRAUSSER IS A PRODUCER AT TIBURON AND HAS BEEN

17  WITH THE COMPANY AS FAR AS -- I THINK AS LONG AS I HAVE, AT

18  LEAST.

19  **Q.**   AND IS HE ONE OF THE PEOPLE THAT'S RESPONSIBLE FOR THIS

20  DECISION?

21  **A.**   WELL, AGAIN, OVER THE TEN YEARS HIS RESPONSIBILITIES HAVE

22  CHANGED.  THERE WOULD HAVE BEEN TIMES WHEN JEREMY WAS A

23  PRODUCER FOR THE MADDEN NFL GAME.  I THINK MOST RECENTLY HE

24  WORKED ON THE HEAD COACH GAME, HEAD COACH, NFL HEAD COACH.

25  **Q.**   SO TELL ME HOW THIS WORKS.  SO YOU'VE GOT A GUY IN FLORIDA

1   WHO'S DECIDING WHAT FEATURES HE WANTS IN A PARTICULAR YEAR FOR

2   THE GAME, RIGHT?

3   **A.**   WELL, NO, THAT'S NOT RIGHT.

4   **Q.**   OR A TEAM?

5   **A.**   THERE AS'S A TEAM.

6   **Q.**   A TEAM.   FINE.   THERE'S A TEAM IN FLORIDA THAT'S DECIDING

7   WHAT FEATURES THEY WANT IN A GAME FOR A PARTICULAR YEAR, RIGHT?

8   **A.**   YES.

9   **Q.**   AND THEN, THEY COME TO YOU AND THEY SAY:

10              "WE NEED TO GET -- WE NEED TO ACQUIRE THERIGHTS.

11  YOU, HEAD OF BUSINESS AFFAIRS, AS A LAWYER, GO GET US THE

12  RIGHTS TO USE THIS STUFF," RIGHT?

13          THAT'S HOW IT WORKS?

14  **A.**   WELL, IF THEY FEEL THEY NEED ADDITIONAL RIGHTS THEY COME

15  TO US AND ASK THE BUSINESS AFFAIRS GROUP TO GO OUT AND

16  NEGOTIATE FOR THE RIGHT TO USE WHATEVER ADDITIONAL PROPERTIES

17  THEY WANT FOR THAT YEAR'S ITERATION OF THE GAME.

18  **Q.**   OKAY.   SO IF YOU COULD TURN TO THE LAST PAGE OF THIS

19  EXHIBIT, NUMBER 1239, PLEASE?

20          **MR. HUMMEL:**   AND BLOW THAT UP.

21  **MR. HUMMEL:**

22  **Q.**   AGAIN, THIS IS A STUDY -- IT'S NOT IN DISPUTE IN THE

23  CASE -- THE HISTORIC NFL TEAMS FEATURED IN THE 2007 MADDEN

24  VERSION.

25          AND THIS HAPPENS TO BE FOR THE XBOX PLATFORM, ALL

1  RIGHT?  YOU HAVE NO REASON TO DISPUTE THIS.  AND IT'S AGREED BY

2  THE PARTIES, OKAY?

3          **THE COURT:**  LET'S MAKE SURE.  IS IT AGREED BY THE

4  PARTIES?

5          **MR. KESSLER:**  YOUR HONOR, WE STIPULATED TO THE

6  ADMISSIBILITY OF THIS EXHIBIT.  WHAT MR. HUMMEL SAYS ABOUT THE

7  EXHIBIT IS OBVIOUSLY NOT STIPULATED TO.  BUT THE EXHIBIT

8  ITSELF, WE AGREE, IS IN EVIDENCE.

9          **MR. HUMMEL:**  THE STIPULATION IS THAT IT'S AN ACCURATE

10 SUMMARY OF WHAT'S IN THE GAME, YOUR HONOR.  THAT'S WHY IT CAME

11 IN.

12         **THE COURT:**  READ ME THE SIGNED STIPULATION.

13         **MR. HUMMEL:**  THERE IS NO SIGNED STIPULATION, YOUR

14 HONOR.  WE HAD THIS DEBATE AT THE MOTION IN LIMINE STAGE.

15         **THE COURT:**  MR. KESSLER, STATE WHAT IT IS THAT IS THE

16 STIPULATION.

17         **MR. KESSLER:**  WE AGREED THIS COULD BE ADMITTED AS A

18 COMPILATION EXHIBIT WITHOUT OBJECTION TO US.  THAT WAS THE

19 AGREEMENT.

20         **THE COURT:**  WELL, FOR THE MOMENT, I WILL ADVISE THE

21 JURY THAT WHAT MR. HUMMEL HAS SAID IS NOT EVIDENCE.  THE ONLY

22 STIPULATION THAT I KNOW OF IS WHAT MR. KESSLER JUST SAID.

23         NOW, IF THERE'S MORE SOMEWHERE ON THE RECORD THAT I

24 DON'T REMEMBER, WE'LL DEAL WITH THAT LATER.  BUT THIS FALLS

25 INTO THE CATEGORY OF THE LAWYER TESTIFYING AGAIN.  I'M NOT

1    SAYING MR. HUMMEL HAS DONE ANYTHING WRONG.  BUT WE HAVE TO

2    SORT -- WE -- I CANNOT MAKE ANYONE STIPULATE TO ANYTHING THEY

3    DON'T WANT TO STIPULATE TO.

4            SO RIGHT NOW THIS IS A DOCUMENT THAT IS IN EVIDENCE,

5    AND YOU'RE ENTITLED TO CONSIDER IT.  BUT THERE HAS BEEN NO

6    TESTIMONY GIVEN TO YOU ABOUT THE MANNER OF ITS COMPILATION OR

7    WHO DID WHAT, OR WHETHER THE INFORMATION IN THERE IS ACCURATE.

8            IT IS TRUE THAT MR. KESSLER STIPULATED THAT THIS

9    COULD GO INTO EVIDENCE.

10           AND I ASK THE PLAINTIFFS' COUNSEL IF YOU THINK YOU

11   NEED TO BRING A WITNESS TO EXPLAIN WHAT IT -- HOW IT WAS

12   COMPILED, YOU'RE FREE TO DO THAT.

13           **MR. HUMMEL:**  WE MAY NOW DO THAT, YOUR HONOR.

14           **THE COURT:**  BUT I CANNOT REQUIRE SOMEBODY TO

15   STIPULATE TO SOMETHING THEY DON'T WANT TO STIPULATE TO.

16           **MR. HUMMEL:**  ALL RIGHT.

17   **MR. HUMMEL:**

18   **Q.**   NOW, MR. LINZNER --

19   **A.**   YES, SIR.

20   **Q.**   -- YOU'VE NEVER SEEN THIS BEFORE, RIGHT?

21   **A.**   CORRECT.

22   **Q.**   BUT IF YOU FOCUS ON THE UPPER RIGHT-HAND CORNER OF WHAT'S

23   UP ON THE CHART HERE WHERE IT SAYS --

24   **A.**   SAME AS WHAT'S HERE, RIGHT?

25   **Q.**   RIGHT.  YOU HAVE ONE TO LOOK AT THAT'S LIVE.  IT SAYS

1  "XBOX."  DO YOU SEE THAT?

2  **A.**   I DO.

3  **Q.**   IS THAT ONE OF THE PLATFORMS FOR WHICH EA MANUFACTURES

4  VIDEO GAMES?

5  **A.**   IN 2006, WHICH IS THE DATE THAT MADDEN NFL '07 WOULD HAVE

6  BEEN RELEASED.  XBOX WAS A PLATFORM WHICH WE WERE MAKING GAMES

7  FOR.

8  **Q.**   AND YOU MAKE GAMES FOR OTHER PLATFORMS LIKE PLAYSTATION,

9  RIGHT?

10 **A.**   WELL, WE -- IF YOU GO BACK IN THE 2000 TO 2005 TIME FRAME

11 WE MADE THEM FOR THE PLAYSTATION AND SUBSEQUENTLY THE

12 PLAYSTATION 2 AND NOW THE PLAYSTATION 3.

13 **Q.**   RIGHT.  AND ANOTHER PLATFORM IS A PC, RIGHT?

14 **A.**   PC IS A PERSONAL COMPUTER, AND IN THE PAST WE HAVE MADE

15 MADDEN NFL FOR THE PERSONAL COMPUTER.

16 **Q.**   AND THERE WAS ANOTHER IN THE PAST PLATFORM CALLED THE

17 "GAMECUBE," MADE BY NINTENDO, RIGHT?

18 **A.**   THAT'S CORRECT.

19 **Q.**   AND THERE WAS ANOTHER PLATFORM MORE RECENT CALLED "THE

20 WII," W-I-I?

21 **A.**   YES, THAT'S CORRECT.

22 **Q.**   AND THAT'S ALSO A NINTENDO PRODUCT?

23 **A.**   THAT IS A NINTENDO PLATFORM, YES, VERY SUCCESSFUL.

24 **Q.**   AND YOU MAKE MADDEN ALSO FOR SOMETHING CALLED THE "PSP,"

25 RIGHT?

1    **A.**   I DON'T KNOW IF WE DID THAT THIS YEAR, BUT WE HAVE DONE

2    THAT IN YEARS PAST, YES.

3    **Q.**   AND THE PSP IS MADE BY SONY, AND IT'S A PORTABLE PLATFORM,

4    RIGHT?

5    **A.**   "PSP" STANDS FOR "PLAYSTATION PORTABLE."

6    **Q.**   PORTABLE.  OKAY.  THANKS.

7           SO ALL OF THESE PLATFORMS OVER TIME HAVE BEEN

8    UTILIZED BY EA IN TERMS OF MAKING THE MADDEN GAME FOR THEM,

9    RIGHT?

10   **A.**   YEAH.  WE ARE -- TECHNICALLY, WE'RE THE LICENSEES OF SONY

11   OR NINTENDO OR MICROSOFT, AND WE LICENSE IN THEIR TECHNOLOGY

12   AND THEIR TRADEMARKS, JUST LIKE WE LICENSE IN THE RIGHTS OF THE

13   NFL AND PLAYERS INC, AND WE MAKE THE GAME THAT WE THEN PUBLISH

14   ON THE THEIR PARTICULAR PLATFORMS.

15   **Q.**   OKAY.  AND I THINK YOU SAID THAT A NEW EDITION OF MADDEN

16   COMES OUT EVERY YEAR FOR 20 YEARS; IS THAT RIGHT?

17   **A.**   WELL, CERTAINLY, THAT'S FOR THE LAST TEN YEARS.  I'M NOT

18   EXACTLY SURE THE SCHEDULE.  I THINK THERE WAS ONE YEAR IN THE

19   FIRST TEN YEARS WHERE WE WERE LATE.

20           SO IT WOULDN'T -- YOU KNOW, TECHNICALLY WHAT WOULD

21   HAVE HAPPENED WAS THERE WOULD HAVE BEEN TWO IN ONE CALENDAR

22   YEAR.

23   **Q.**   ALL RIGHT.  AND FOR EACH OF THOSE YEARS, THE MADDEN GAME

24   FEATURES THE ACTIVE -- THE THEN CURRENT NFL TEAMS, RIGHT?

25   THAT'S THE IDEA?

1  **A.**   YEAH.   EVERY YEAR OF THE MADDEN GAME WE UPDATE THE ROSTERS

2  TO REFLECT AS CLOSELY AS WE CAN THE ROSTERS OF EACH NFL TEAM AS

3  OF THE DATE WE LOCKED THE GAME.

4  **Q.**   RIGHT.

5  **A.**   WE LOCK THE GAME BEFORE THE SEASON STARTS, SO YOU CAN'T BE

6  SURE OF THE FINAL ROSTERS, BUT WE DO OUR BEST.

7  **Q.**   SO IF A PLAYER IS TRADED, FOR EXAMPLE, DURING THE SEASON,

8  THAT PLAYER WILL STILL SHOW UP ON HIS OLD TEAM IN THAT LOCKED

9  VERSION, RIGHT?

10  **A.**   AS IT'S WRITTEN ON THE CODE, YES.   I MEAN, THESE DAYS

11  BECAUSE A LOT OF THE GAMES CAN CONNECT ONLINE, YOU CAN ACTUALLY

12  SHOW THE PLAYER ON HIS NEW TEAM IN HIS NEW UNIFORM, IF THE

13  USER, THE CONSUMER OF THE GAME HAS CONNECTED TO THE PROPRIETARY

14  NETWORKS OF THE CONSOLE COMPANY.

15  **Q.**   AND THAT'S BECAUSE YOU WANT TO MAKE THE GAME AS AUTHENTIC

16  AS POSSIBLE FOR THE PLAYERS, RIGHT?

17  **A.**   FOR THE CONSUMER.

18  **Q.**   RIGHT.

19  **A.**   YES, WE TRY TO MAKE THE GAME AUTHENTIC.

20  **Q.**   NOW, FOR THOSE VERSIONS OF THE MADDEN GAME THAT HAD

21  HISTORIC TEAMS -- AND HERE'S ONE IN MADDEN '07 WHICH, AS YOU

22  SAID, WAS RELEASED IN '06 -- WAS IT THE GOAL OF EA TO MAKE

23  THOSE HISTORIC TEAMS AUTHENTIC?

24  **A.**   I DON'T KNOW.   I DIDN'T KNOW THAT WE HAD THESE -- THE

25  REPRESENTATION IS ALL THESE TEAMS FOR THESE DATES ARE IN MADDEN

1  NFL '07, AND I DON'T KNOW THAT.  I HAVE NEVER PLAYED MADDEN NFL

2  '07.

3  Q.   YOU NEVER PLAYED IT?

4  A.   NO.  I'M OF AN AGE WHERE VIDEO GAMES WEREN'T PART OF MY

5  ENTERTAINMENT PORTFOLIO, AND I NEVER REALLY LEARNED TO PLAY

6  THEM.  THEY ARE HARD TO PLAY.

7  Q.   DO YOU HAVE KIDS?

8  A.   I DO.

9  Q.   DO THE KIDS PLAY?

10 A.   MY SON USED TO PLAY WHEN HE WAS IN HIGH SCHOOL, BUT HE'S

11 25 NOW.  HE DOESN'T LIVE AT HOME.

12 Q.   IN YOUR VIEW, WOULD EA PUT OUT A PRODUCT FOR A FEATURE IN

13 THE MADDEN GAME THAT WAS DESIGNED TO BE INAUTHENTIC?

14 A.   DESIGNED TO BE -- YOU KNOW, WE TRY TO BE AUTHENTIC WITHIN

15 THE GRANT OF RIGHTS THAT WE RECEIVE.  NOW, WHEN WE SAY

16 "AUTHENTIC" NONE OF THESE THINGS -- THESE ARE VIRTUAL

17 EXPERIENCES.  THEY ARE NOT -- THEY'RE NOT REAL.  AND WE

18 SOMETIMES TWEAK THE GAME PLAY TO MAKE IT MORE FUN, IN ADDITION

19 TO TRY AND HAVE ALL OF THE REAL TEAMS AND LOGOS AND PLAYERS.

20 Q.   BUT YOU ARE --

21         MR. HUMMEL:  AND, YOUR HONOR, MAYBE THIS IS THE LAST

22 QUESTION BEFORE THE BREAK OR LAST TWO, AND THEN I'LL MOVE TO

23 ANOTHER TOPIC.

24 BY MR. HUMMEL:

25 Q.   YOU ARE AWARE THAT THE MADDEN GAME FROM TIME TO TIME IN

1  THE 2000'S HAD HISTORIC TEAMS, CORRECT?

2  **A.**   YES.

3  **Q.**   AND YOU ARE AWARE THAT THOSE HISTORIC TEAMS ATTEMPTED TO

4  SIMULATE FOOTBALL PLAY OF THOSE HISTORIC TEAMS IN A VIDEO GAME

5  CONCEPT, CORRECT?

6  **A.**   UHM, TO SOME DEGREE.  I MEAN, I KNOW AT LEAST THE TIME

7  WHEN I WAS JUST STARTING AT EA AND I WAS A LITTLE MORE FAMILIAR

8  WITH WHAT WE WERE -- IN DOING THE MADDEN NFL GAMES, BECAUSE

9  THAT WAS MY SOLE RESPONSIBILITY, UNLIKE TODAY.

10         YOU KNOW, I KNOW THAT WE, YOU KNOW, TRIED FOR SOME OF

11  THESE HISTORIC TEAMS -- AND YOU MENTIONED THE 49ERS IN 1989,

12  BECAUSE I'M A 49ERS FAN THAT RINGS TRUE TO ME -- THAT WE TRIED

13  TO LICENSE CERTAIN PLAYERS FROM THAT TEAM, EVEN THOUGH THEY ARE

14  NO LONGER ACTIVE IN THE NFL.

15         AND WE WERE SUCCESSFUL IN GETTING THE RIGHTS TO

16  CERTAIN PLAYERS.  LIKE, I HAPPEN TO JUST RECALL HARRIS BARTON,

17  BECAUSE I WAS ABLE TO MEET HARRIS BARTON AT ONE TIME, AND WAS

18  VERY IMPRESSED BY HIM.

19         BUT WE WEREN'T ABLE AND DIDN'T ATTEMPT TO LICENSE ALL

20  OF THE PLAYERS FROM THAT TEAM.  SO WE KNEW THAT, YOU KNOW, YOU

21  CAN'T -- YOU COULDN'T GET THE RIGHTS TO EVERYBODY, OR AT LEAST

22  WE DIDN'T THINK WE COULD GET THE RIGHTS TO EVERYBODY.  AND WE

23  TRIED TO GET THE RIGHTS TO PLAYERS THAT WERE SORT OF MORE

24  NOTEWORTHY.

25         **MR. HUMMEL:**  THIS IS A GOOD TIME FOR A BREAK, YOUR

1    HONOR.

2           **THE COURT:**  PLEASE REMEMBER THE ADMONITION.  WE'LL

3    TAKE A 15-MINUTE RECESS.

4           **THE WITNESS:**  15 MINUTES, YOUR HONOR?

5           **THE COURT:**  YES.

6           **THE CLERK:**  ALL RISE.

7           (THEREUPON, THE JURY LEFT THE COURTROOM.)

8           **THE COURT:**  ONE MOMENT, MR. LINZNER.

9           WOULD YOU MIND GETTING THE DOOR, MR. LINZNER?

10          WE HAVE A GROUND RULE THAT WHILE THE WITNESS IS ON

11   THE STAND THERE IS NO TALKING TO THE LAWYERS BY THE WITNESS.

12          **THE WITNESS:**  SURE.

13          **THE COURT:**  ALL RIGHT.  WE'LL SEE YOU BACK HERE IN 15

14   MINUTES.

15          **MR. HUMMEL:**  YOUR HONOR, COULD I RAISE ONE THING,

16   VERY BRIEFLY?  THE FOUNDATION -- AND WE WANT TO AVOID CALLING

17   MR. RHEE TO TESTIFY ABOUT THIS.  BUT BY STIPULATING TO THE

18   ADMISSIBILITY OF THE SUMMARY, THE DEFENDANTS ARE STIPULATING

19   UNDER THE CASE LAW IN WEINSTEIN'S EVIDENCE -- AND I CAN CITE

20   YOUR HONOR TO CHAPTER AND VERSE -- THAT THE SUMMARY ACCURATELY

21   REFLECTS THE UNDERLYING DOCUMENTS.

22          THERE IS NO DISPUTE ABOUT THAT.

23          FOR MR. KESSLER TO HAVE DONE THAT WAS UNFAIR, QUITE

24   HONESTLY.  AND IF I HAD KNOWN THAT THERE WAS -- WELL, YOU CAN

25   SHRUG ALL YOU WANT.  IT WAS UNFAIR.

1    **THE COURT:**  LOOK, I'M GOING TO LET YOU CALL MR. RHEE.

2 IS THAT HIS NAME?

3    **MR. HUMMEL:**  YES.

4    **THE COURT:**  YOU CAN CALL HIM AND GO THROUGH IT, IF

5 YOU WANT.  YOU'RE PROBABLY RIGHT.  BUT THIS WAS NOT PART OF THE

6 STIPULATION, AND I DO NOT GET INTO THE BUSINESS OF CONSTRUING

7 STIPULATIONS.  I'VE LEARNED THE HARD WAY YOU CAN'T DO THAT.

8    SO YOU SHOULD HAVE WORKED THIS OUT BETTER BEFOREHAND.

9    **MR. KESSLER:**  WHAT'S IRONIC, YOUR HONOR, IS WE MADE A

10 DIFFERENT AGREEMENT ABOUT THE OTHER COMPILATION, WHICH WAS THE

11 SUBJECT OF THE RHEE POSSIBLE TESTIMONY.

12    THEY NEVER EVEN ASKED FOR ANYTHING ON THIS ONE, OTHER

13 THAN THAT WE AGREE IT'S ADMISSIBLE, WHICH WE DID.

14    SO FOR HIM TO SAY IT'S UNFAIR -- AND, MR. HUMMEL, YOU

15 DIDN'T HAVE THE DISCUSSIONS WITH US.  SO IT'S UNFAIR FOR YOU TO

16 MISCHARACTERIZE WHAT WE DISCUSSED ABOUT THIS.

17    **THE COURT:**  YOU TWO DON'T GET INTO AN ARGUMENT.  IN

18 TRIAL, THE LAWYERS ARE NEVER SUPPOSED TO TALK TO EACH OTHER

19 WHILE THE TRIAL IS UNDERWAY.  NEVER.  YOU ONLY ADDRESS THE

20 COURT AND THE JURY.

21    **MR. KESSLER:**  I'M SORRY, YOUR HONOR.  I APOLOGIZE.

22    **THE COURT:**  BECAUSE, OTHERWISE, YOU GET INTO

23 FISTFIGHTS.

24    **MR. PARCHER:**  THAT'S RIGHT.  THAT'S RIGHT, YOUR

25 HONOR.

1          **MR. KESSLER:**  NEVER HAPPENED.

2          **THE COURT:**  OUTSIDE OF COURT YOU CAN BE CORDIAL AND

3    HAVE A DRINK AND STIPULATE AND HAVE A FISTFIGHT, IF YOU WANT.

4    BUT IN COURT -- SO THE SOLUTION IS --

5          **MR. HUMMEL:**  CAN I ASK --

6          **THE COURT:**  YOU MAY ASK ALL THE QUESTIONS YOU WANT

7    BECAUSE I HAVE NO DOUBT MR. RHEE WILL COME IN AND LAY THE

8    FOUNDATION.

9          **MR. HUMMEL:**  RIGHT.

10         **THE COURT:**  I'M NOT ASSUMING THAT IT'S ALL TRUE, BUT

11   YOU CAN CONNECT IT UP LATER.

12         YOUR WITNESS, YOUR FOUNDATIONAL WITNESS CAN BE

13   BROUGHT IN TO SOME SOLVE THIS PROBLEM.

14         **MR. HUMMEL:**  YOUR HONOR, MAY I ASK ON THE RECORD FOR

15   A STIPULATION THAT THE EXHIBIT I JUST SHOWED ACCURATELY

16   REFLECTS THE UNDERLYING DOCUMENTS?

17         **THE COURT:**  ALL RIGHT.

18         MR. KESSLER, WILL YOU SO STIPULATE?

19         **MR. KESSLER:**  HERE'S THE ISSUE.  I DON'T THINK I

20   COULD SO STIPULATE.  WE ARE NOT CHALLENGING THE ACCURACY OF IT,

21   SO WE'RE NOT OBJECTING TO ADMISSIBILITY.  BUT WE HAVEN'T

22   FRANKLY TAKEN THE TIME TO EXAMINE THESE HUNDREDS OF DIFFERENT

23   REFERENCES THEY MAKE TO -- IN OTHER WORDS, WE'RE NOT

24   CHALLENGING IT.  BUT WE CAN'T VERIFY IT, EITHER.  THAT'S -- AND

25   WE SHOULDN'T BE REQUIRED TO VERIFY IT, BECAUSE IT'S NOT

1212

IMPORTANT TO OUR CASE.  WE DON'T WANT TO DO THAT WORK TO VERIFY

IT.

SO WE AGREED NOT TO CHALLENGE ITS ADMISSIBILITY.  AND

I'M NOT OBJECTING TO FOUNDATION.  HE CAN ASK THE WITNESS

WHATEVER QUESTIONS HE WANTS.  BUT THIS WITNESS CAN'T PROVE UP

ITS ACCURACY, AND WE'RE NOT --

**THE COURT:**  I THINK IT WOULD ACTUALLY BE BETTER FOR

THE JURY TO UNDERSTAND WHAT THIS IS.  WHETHER YOU BRING IN THE

GUY WHO PREPARED IT -- AND YOU CAN DO IT IN FIVE MINUTES.  YOU

COULD HAVE HIM ON AND OFF THE STAND.

**MR. HUMMEL:**  I'LL DO IT, YOUR HONOR.

**THE COURT:**  I THINK THAT'S -- BECAUSE, OTHERWISE,

YOU'RE JUST THROWING THIS ON THE LAP OF THE JURY.  AND I TOLD

THEM SO MANY TIMES WHAT THE LAWYERS SAY IS NOT EVIDENCE.  IT'S

BETTER OFF IF THEY UNDERSTAND AT LEAST A FIVE-MINUTE DIRECT HOW

IT WAS PREPARED.

**MR. HUMMEL:**  OKAY.  THANK YOU, YOUR HONOR.

**THE COURT:**  THANK YOU.

TAKE 15 MINUTES.

(RECESS TAKEN FROM 9:30 TO 9:48 A.M.)

**THE COURT:**  DAWN, WE'RE ALL SET.  PLEASE BRING IN THE

JURY.

(THEREUPON, THE JURY RETURNED TO THE COURTROOM.)

**THE COURT:**  WELCOME BACK.  HAVE A SEAT.

MR. HUMMEL, YOU MAY CONTINUE.

1      **MR. HUMMEL:** YES. THANK YOU VERY MUCH, LADIES AND

2  GENTLEMEN OF THE JURY.

3           WOULD YOU GIVE ME THAT SCREEN SHOT, PLEASE?

4           (DOCUMENT DISPLAYED.)

5  **BY MR. HUMMEL:**

6  **Q.** MR. LINZNER, RIGHT BEFORE THE BREAK YOU TESTIFIED THAT YOU

7  WERE AWARE THAT FOR VERSIONS OF THE MADDEN GAME, YOU IN THE

8  BUSINESS AFFAIRS GROUP, ACQUIRED THE RIGHTS FOR ACTIVE PLAYERS,

9  CORRECT? ACTIVE NFL PLAYERS?

10 **A.** YES.

11 **Q.** AND YOU ACQUIRED THOSE ACTIVE RIGHTS AS A GROUP, CORRECT?

12 **A.** CORRECT. FOR ACTIVE NFL PLAYERS, THAT'S CORRECT.

13 **Q.** YOU ACQUIRED THOSE AS A GROUP, CORRECT?

14 **A.** YES. THAT WAS WHAT OUR LICENSE WAS.

15 **Q.** OKAY. AND FOR THE SAME VERSIONS OF THE GAME YOU ALSO

16 ACQUIRED THE RIGHTS TO RETIRED PLAYERS, CORRECT?

17 **A.** WELL, TO THE BEST OF MY KNOWLEDGE. FOR SOME VERSIONS OF

18 THE GAME, THAT'S CORRECT.

19 **Q.** THAT'S CORRECT. SO FOR THOSE VERSIONS OF THE GAME, THAT

20 WAS A PRODUCT THAT UTILIZED MORE THAN SIX PRESENT AND FORMER

21 PLAYERS, CORRECT?

22 **A.** WELL, THERE'S CERTAINLY MORE THAN SIX CURRENT PLAYERS.

23 **Q.** RIGHT.

24 **A.** AND IT'S HARD TO HAVE A TEAM WITH ONLY SIX PLAYERS. SO

25 YOU NEED MORE THAN SIX PLAYERS.

**Q.** RIGHT. SO MY QUESTION IS: IS THE MADDEN VIDEO GAME A PRODUCT THAT UTILIZED SIX OR MORE PRESENT OR FORMER PLAYERS WHERE YOU ACQUIRED THE RIGHTS TO THOSE RETIRED PLAYERS?

**A.** WELL, CERTAINLY, EVERY VERSION OF THE GAME USES MORE THAN SIX THEN CURRENT NFL PLAYERS.

**Q.** RIGHT.

**A.** I TOLD YOU BEFORE I'M NOT SURE IF RETIRED PLAYERS WERE IN EVERY VERSION OF THE GAME. SO -- BECAUSE I DON'T KNOW THAT, I CAN'T ANSWER WHETHER THERE'S MORE THAN SIX RETIRED PLAYERS IN THAT VERSION OF THE GAME.

**Q.** THAT'S NOT --

**A.** BUT TO FINISH THE THOUGHT, I'M AWARE THAT THERE ARE MORE THAN SIX RETIRED PLAYERS IN VARIOUS VERSIONS OF THE GAME.

**Q.** RIGHT. IN THOSE VERSIONS THAT HAVE MORE THAN SIX RETIRED PLAYERS, OKAY? THOSE ARE THE VERSIONS I'M TALKING ABOUT, WHERE YOU KNOW THAT HAPPENED.

**A.** YES, SIR.

**Q.** IS IT TRUE THAT FOR THOSE GAMES EA UTILIZED SIX OR MORE PRESENT OR FORMER PLAYERS?

**A.** I THINK I JUST ANSWERED THAT.

**Q.** YES OR NO?

**A.** IN EVERY GAME WE USED SIX OR MORE CURRENT PLAYERS.

**Q.** I UNDERSTAND THAT.

**A.** FOR THOSE GAMES WHICH I'M AWARE OF WHERE WE USED FORMER OR RETIRED PLAYERS, IN EVERY INSTANCE WHERE WE DID SO I BELIEVE WE

1    USED SIX OR MORE.

2    **Q.**   RIGHT.  SO MY QUESTION IS:  FOR THOSE INSTANCES, YES OR

3    NO, WHERE YOU USED SIX OR MORE RETIRED PLAYERS, DID YOU ALSO

4    USE SIX OR MORE PRESENT PLAYERS, SO THAT IN THOSE VERSIONS

5    THERE WERE SIX OR MORE PRESENT OR FORMER NFL PLAYERS?

6    **A.**   I THINK I'VE ANSWERED THAT.  IF YOU'RE ASKING -- BECAUSE

7    EVERY VERSION OF THE GAME HAD AT LEAST SIX CURRENT PLAYERS, FOR

8    THOSE VERSIONS OF THE GAME I'M AWARE ALSO HAD RETIRED PLAYERS

9    WITH SIX OR MORE, YES, THEY ALSO HAD SIX OR MORE CURRENT

10   PLAYERS, BECAUSE EVERY VERSION OF THE GAME HAS SIX OR MORE

11   CURRENT PLAYERS.

12   **Q.**   OKAY.  NOW, LET'S TALK ABOUT THE CONTRACTS, BECAUSE I

13   THINK YOU MENTIONED THE CONTRACTS.

14   **A.**   YES, SIR.

15   **Q.**   IS IT TRUE, SIR, THAT THE LEAGUE -- WELL, NOT THE

16   LEAGUE -- THE UNION, IN YOUR EXPERIENCE, WHEN YOU START

17   NEGOTIATING A CONTRACT, THEY SEND OVER CERTAIN FORM LANGUAGE?

18   **A.**   WELL, NO.  TYPICALLY, THEY DON'T SEND OVER LANGUAGE UNTIL

19   WE'VE AGREED ON THE TERMS OF THE LICENSE.

20   **Q.**   THE PROCESS DOESN'T START, SIR, WITH THEM SENDING OVER

21   FORM LANGUAGE FOR A LICENSE?

22   **A.**   NO.  TYPICALLY -- AGAIN, WE'VE HAD A SERIES OF LICENSES

23   WITH PLAYERS INC.  ALL OF THEM HAVE BEEN MORE OR LESS THE SAME

24   FORM.  SO WE'RE NOT STARTING FROM SCRATCH FOR EVERY TERM.

25           AND TYPICALLY WE'RE JUST NEGOTIATING OVER THE TERMS

1 THAT ARE CHANGING.  AND WE USE THE FORMER LICENSE AS A BASE,

2 AND WE UPDATE IT AS NECESSARY.

3 **Q.**  IS IT TRUE THAT THE LANGUAGE OF WHAT ULTIMATELY BECOMES

4 THE CONTRACT STARTS WITH PLAYERS INC?

5 **A.**  AS I SAID, THERE'S A SERIES OF LICENSES.  THE FORM OF THE

6 LICENSE COMES FROM PLAYERS INC.  THE FIRST LICENSE STARTED

7 BEFORE I ARRIVED AT EA.  WE USED THAT AS A BASE FOR THE LICENSE

8 AGREEMENT THAT I FIRST NEGOTIATED AND SIGNED.

9 **Q.**  I'D LIKE TO ASK YOU TO LOOK, PLEASE, AT EXHIBIT NO. 24.

10          **MR. HUMMEL:**  WHICH IS IN EVIDENCE, YOUR HONOR.

11          **THE WITNESS:**  YES, SIR.

12 BY MR. HUMMEL:

13 **Q.**  DO YOU RECOGNIZE THIS DOCUMENT, SIR?

14 **A.**  I DO.

15 **Q.**  AND WHAT IS IT?

16 **A.**  WELL, THIS WAS AN AMENDMENT OR ADDENDUM TO ONE OF OUR

17 LICENSE AGREEMENTS WHEREBY WE OBTAINED THE RIGHTS TO A NUMBER

18 OF RETIRED NFL PLAYERS, APPROXIMATELY 150 OR 200 OF THEM, OR

19 SO, FOR INCLUSION IN CERTAIN EDITIONS OF THE MADDEN NFL GAME IN

20 EXCHANGE FOR A PAYMENT OF $150,000 FOR EACH OF THE THREE YEARS

21 THE AGREEMENT WAS IN EFFECT.

22 **Q.**  AND IF YOU COULD GO TO THE SECOND PAGE OF THAT AGREEMENT,

23 PLEASE.

24 **A.**  YES, SIR.

25

Q.   THAT'S THE FIRST PAGE OF THE LIST OF THOSE PLAYERS?

A.   THE LAST NAME.  I THINK IT'S IN ALPHABETICAL ORDER.

Q.   THE REASON YOU ACQUIRED THE RIGHTS TO THESE PLAYERS WAS

THAT SO RETIRED PLAYERS COULD BE USED IN THE MADDEN FOOTBALL

GAME, RIGHT?

A.   WELL, THIS IS AN EXAMPLE OF WHAT YOU WERE ASKING ABOUT

PREVIOUSLY, WHERE THERE AS WAS A POINT IN TIME FOR THE MADDEN

NFL '01 GAME, I BELIEVE IT WAS, WHICH WOULD HAVE BEEN RELEASED

IN 2000, WHERE THE TEAM, THE STUDIO TEAM DOWN IN ORLANDO WANTED

TO INCLUDE A NEW FEATURE THAT WOULD HAVE HAD SOME OF THESE

HISTORIC TEAMS AND RETIRED PLAYERS?  AND THEY WANTED TO

ACTUALLY OBTAIN THE RIGHTS OF A SPECIFIC LIST OF RETIRED

PLAYERS TO INCLUDE IN THAT FEATURE.

        AND PLAYERS INC ACTED AS THE PROCUREMENT AGENT, AS IT

WERE, TO GO OUT AND GET THE RIGHTS TO THE PLAYERS THAT ARE

LISTED HERE ON THIS EXHIBIT.

        AND WE HAD GIVEN THEM A LIST OF NAMES OF WHO WE

WANTED.  WE GAVE THEM SORT OF A MINIMUM.  I FORGET HOW BIG THE

LIST WAS, BUT LET'S JUST ASSUME IT WAS LIKE 250 NAMES.

        WE SAID WE NEEDED AT LEAST 80 PERCENT OR SO OF THESE

PLAYERS TO MAKE THE FEATURE WORTHWHILE.  AND PLAYERS INC WAS

ABLE TO GET A SUFFICIENTLY HIGH PERCENTAGE AT THE VARIOUS

POSITIONS THAT WE WENT FORWARD WITH THE DEAL AND LICENSED THE

RETIRED PLAYERS THAT YOU SEE ATTACHED TO THIS DOCUMENT FOR THE

FEE THAT YOU SEE ON THE FIRST PAGE OF THE DOCUMENT.

1  Q.   COULD I ASK YOU TO LOOK, PLEASE, AT EXHIBIT NUMBER 65?

2  A.   YES, SIR.

3  Q.   IS EXHIBIT 65 A COPY OF A LICENSE BETWEEN EA AND PLAYERS

4  INC?

5  A.   UHM, I ASSUME THE BATES NUMBERS ON THE BOTTOM MEANS IT

6  CAME FROM OUR FILE?

7  Q.   CORRECT.

8  A.   YES, THAT'S MY SIGNATURE ON THE 13TH PAGE.

9       **MR. HUMMEL:**  MOVE EXHIBIT 65, YOUR HONOR.

10      **MR. FEHER:**  NO OBJECTION.

11      **THE COURT:**  65 IS RECEIVED.

12      (TRIAL EXHIBIT 65 RECEIVED IN EVIDENCE.)

13  **BY MR. HUMMEL:**

14  Q.   MR. LINZNER, ON THE VERY FIRST PAGE, FIRST PARAGRAPH, JUST

15  SO THERE'S NO CONFUSION HERE, THE AGREEMENT, IT SAYS, IS MADE

16  AND ENTERED INTO "THIS 31ST DAY OF JANUARY, 2005."

17      I THINK THAT'S A TYPO, BECAUSE AT THE BOTTOM IT SAYS:

18      "THE AGREEMENT SHALL BE EFFECTIVE AS OF MARCH 1,

19  2004"; IS THAT RIGHT?

20  A.   WELL, YOU SAID SEVERAL THINGS.  IT DOES SAY "THE 31ST OF

21  JANUARY."  IT DOES SAY THE EFFECTIVE DATE, BUT I DON'T THINK

22  THAT'S A TYPO NECESSARILY.

23  Q.   SO YOU THINK YOU ENTERED INTO AN AGREEMENT IN JANUARY 2005

24  THAT WAS EFFECTIVE MARCH 1, 2004?

25  A.   APPARENTLY.

1   Q.   OKAY.   NOW, WOULD YOU LOOK AT PARAGRAPH 6 OF THIS ON PAGE

2   3?  "ROYALTY PAYMENT."

3        DO YOU HAVE THAT IN FRONT OF YOU, SIR?

4   A.   YES, SIR.

5   Q.   AND IS THERE A GUARANTEED MINIMUM ROYALTY PAYMENT IN THIS

6   AGREEMENT?

7   A.   YES, SIR.

8   Q.   WHAT'S THE AMOUNT?

9   A.   DOES THAT COME INTO EVIDENCE, YOUR HONOR?  JUST STATING

10  THE AMOUNTS OF THE GUARANTEES?

11       MR. HUMMEL:  THIS IS NOT THE EXHIBIT THAT WAS THE

12  SUBJECT OF THE ORDER.

13       THE COURT:  IT WAS IN EXHIBIT NO. 80.

14       MR. HUMMEL:  80.

15       THE COURT:  IS THAT THE ONLY ONE -- AM I CORRECT

16  THAT'S THE ONLY ONE THAT WAS MOVED ON?

17       MR. HUMMEL:  CORRECT, YOUR HONOR.

18       THE COURT:  WHICH EXHIBIT ARE WE ON NOW?

19       MR. HUMMEL:  65.

20       THE COURT:  THEN, THE -- THAT'S ALREADY BEEN RECEIVED

21  IN EVIDENCE ALREADY, RIGHT?

22       MR. HUMMEL:  CORRECT.

23       THE COURT:  DIDN'T I JUST MOVE THIS --

24       MR. HUMMEL:  YES, YOU DID.

25       MR. FEHER:  IT'S FINE, YOUR HONOR.  IT'S FOR A PRIOR

1  TIME PERIOD.

2         **THE COURT:**  ALL RIGHT.  THIS IS ALL --

3         **THE WITNESS:**  GO AHEAD?

4         **THE COURT:**  THIS IS ALL SUBJECT TO PUBLIC TESTIMONY.

5         **THE WITNESS:**  OKAY.  PARAGRAPH 6, AS YOU CAN READ

6  THERE FOR YOURSELF, SAYS THE LICENSEE, WHICH IN THIS CASE IS

7  EA, AGREED TO PAY PLAYERS INC, WHICH IN THIS CASE IS THE

8  LICENSOR, A GUARANTEED MINIMUM ROYALTY OF $500.000 FOR THE

9  RIGHTS THAT WERE GRANTED.

10  **BY MR. HUMMEL:**

11  **Q.**   $500,000 GUARANTEED MINIMUM ROYALTY FOR AN AGREEMENT

12  EFFECTIVE MARCH 1, 2004, CORRECT?

13  **A.**   YES.

14  **Q.**   OKAY.  AND THEN, IF YOU LOOK BACK AT PAGE ONE OF THE

15  AGREEMENT --

16  **A.**   YES.

17  **Q.**   -- "GRANT OF LICENSE," THE FIRST SENTENCE READS:

18         "UPON THE TERMS AND CONDITIONS HEREINAFTER SET

19  FORTH, PLAYERS INC HEREBY GRANTS TO LICENSEE AND LICENSEE

20  HEREBY ACCEPTS THE NON-EXCLUSIVE RIGHT TO LICENSE."

21         THIS WAS A NON-EXCLUSIVE AGREEMENT, RIGHT?

22  **A.**   IT WAS A NON-EXCLUSIVE LICENSE, THAT'S CORRECT.

23  **Q.**   CAN YOU EXPLAIN TO THE JURY WHAT THAT MEANS, THE

24  "NON-EXCLUSIVE" PART OF THAT SENTENCE?

25  **A.**   AT THIS POINT IN TIME FOR THE PERIOD EFFECTIVE MARCH,

1 | 2004, PLAYERS INC WAS LICENSING THE RIGHTS OF NFL PLAYERS TO

2 | MULTIPLE VIDEO GAME COMPANIES.

3 |      SO EA WAS ONE OF THEM.  SONY WAS ONE OF THEM.  I

4 | BELIEVE, PERHAPS, MICROSOFT WAS ONE OF THEM AT THAT TIME.  SAGO

5 | WAS ONE OF THEM.  SO -- ATARI WAS ONE OF THEM -- THERE WERE

6 | MULTIPLE VIDEO GAME LICENSEES WHO WERE PROCURING THE RIGHTS FOR

7 | THE RIGHT TO USE THE PLAYERS.  AND, LIKEWISE, THE NFL ALSO

8 | GRANTED LICENSES TO THOSE VARIOUS COMPANIES ON A NON-EXCLUSIVE

9 | BASIS.

10 | **Q.**  NOW, COULD I ASK YOU TO LOOK AT EXHIBIT 67, PLEASE?

11 | **A.**  YES, SIR.

12 | **Q.**  IS THIS AN AGREEMENT THAT REPLACED EXHIBITS -- EXHIBIT 65?

13 | THIS IS EFFECTIVE MARCH 1, 2005, CORRECT?

14 | **A.**  WELL, IT WAS EFFECTIVE AFTER EXHIBIT 65 EXPIRED.

15 | **Q.**  CORRECT.  AND IF YOU LOOK AT PAGE 15 YOU'LL SEE YOUR

16 | SIGNATURE ON THIS AGREEMENT BETWEEN PLAYERS INC AND EA.

17 | **A.**  YES, IT'S MY SIGNATURE AND MY PRINTING.

18 |      **MR. HUMMEL:**  YOUR HONOR, MOVE 67.

19 |      **THE COURT:**  RECEIVED.

20 |      (TRIAL EXHIBIT 67 RECEIVED IN EVIDENCE.)

21 |      **MR. HUMMEL:**  THANK YOU.

22 | **BY MR. HUMMEL:**

23 | **Q.**  NOW, COULD YOU LOOK AT THE GRANT OF LICENSE UNDER

24 | PARAGRAPH 2 AT THE BOTTOM OF THIS EXHIBIT, SIR?

25 | **A.**  YES, SIR.

1  Q.  THERE'S A BIG DIFFERENCE BETWEEN THIS AGREEMENT AND THE
2  ONE BEFORE, IS THERE NOT?
3  A.  THERE'S -- THERE IS A BIG DIFFERENCE BETWEEN THIS
4  AGREEMENT AND THE ONE BEFORE THAT, YES.
5  Q.  AND WHAT'S THAT?
6  A.  A COUPLE BIG DIFFERENCES.
7  Q.  WHAT'S THE DIFFERENCE BETWEEN PARAGRAPH 2 OF THIS
8  AGREEMENT AND PARAGRAPH 2 OF THE PRIOR AGREEMENT, WHICH WAS ONE
9  YEAR BEFORE?
10 A.  WELL, THERE'S PROBABLY MORE THAN ONE DIFFERENCE.  BUT THE
11 PRIMARY DIFFERENCE --
12 Q.  JUST IN PARAGRAPH 2.
13 A.  EXCUSE ME?
14 Q.  JUST IN PARAGRAPH 2.
15 A.  AS I SAID, THERE MAY BE MULTIPLE DIFFERENCES IN PARAGRAPH
16 2, BUT I THINK THE ONE YOU ARE FOCUSING ON IN THE SECOND LINE
17 WAS THIS WAS AN EXCLUSIVE LICENSE FOR VARIOUS GENRES OF GAMES
18 ON THE ENUMERATED PLATFORMS.
19 Q.  AND THIS WAS AN EXCLUSIVE LICENSE AS OPPOSED TO THE PRIOR
20 ONE WHICH WAS NON-EXCLUSIVE, RIGHT?
21 A.  FOR CERTAIN GENRES, THAT'S CORRECT.
22 Q.  NOW, LET'S LOOK AT WHAT THAT WAS WORTH TO EA.  TURN ON
23 PAGE 3, PARAGRAPH 6.
24 A.  YES, I REMEMBER THIS.
25 Q.  THE MINIMUM ROYALTY GOES FROM $500,000 TO $25 MILLION,

1  CORRECT?

2  **A.**   THAT'S CORRECT.

3  **Q.**   AND THAT'S A GUARANTEED PAYMENT TO PLAYERS INC, REGARDLESS

4  OF WHETHER YOU ACTUALLY USED THE RIGHTS CONFERRED BY THIS

5  AGREEMENT, CORRECT?

6  **A.**   IF WE DIDN'T PUBLISH A GAME IN ANY GIVEN YEAR WE STILL HAD

7  TO PAY THE MINIMUM GUARANTEE, THAT'S CORRECT.

8  **Q.**   RIGHT.  SO EVEN IF AN ACTIVE PLAYER WASN'T USED PURSUANT

9  TO THIS LICENSE YOU STILL HAD TO PAY, RIGHT?

10  **A.**   AND A SINGLE ACTIVE PLAYER.

11  **Q.**   YOU HAD TO PAY THIS REGARDLESS OF WHAT YOU USED, RIGHT?

12  **A.**   WELL, NO, THAT'S NOT RIGHT.  THIS WAS THE MINIMUM

13  GUARANTEE PER YEAR, WHETHER WE PUBLISHED A GAME OR MULTIPLE

14  GAMES, BECAUSE IF YOU READ THROUGH THE LICENSE, SIR, YOU'LL SEE

15  IT CALLS FOR PUBLISHING MULTIPLE GAMES THAT WOULD UTILIZE THE

16  RIGHTS OF THE PLAYERS INC MEMBERS FOR EACH YEAR THAT THE

17  LICENSE IS IN EFFECT.

18          AND, YOU KNOW, WHAT THE MINIMUM GUARANTEE DOES IS

19  IT'S PROTECTION FOR THE LICENSOR THE OPPORTUNITY COST BY

20  GRANTING THE RIGHTS ON AN EXCLUSIVE BASIS TO ONE COMPANY. THEY

21  WANT TO MAKE SURE THAT THEY ARE GOING TO GET PAID EVEN IF THAT

22  COMPANY DOESN'T PUBLISH THE GAMES IT'S SUPPOSED TO.

23  **Q.**   ALL RIGHT.

24  **A.**   SO IT'S TYPICAL IN LICENSES LIKE THIS TO HAVE A MINIMUM

25  GUARANTEE THAT'S PAYABLE WHETHER YOU PUBLISH GAMES OR NOT.

1  Q.   THIS WAS PROTECTION TO PI?

2  A.   FOR THE LICENSORS, CORRECT.

3  Q.   WAS THERE ANYTHING IN THESE AGREEMENTS THAT REQUIRED YOU

4  TO USE ANY PARTICULAR PLAYER IMAGE?

5  A.   ANY PARTICULAR PLAYER?

6  Q.   YEAH.

7  A.   NO.

8  Q.   OKAY.  AND, IN FACT, EA PAID THESE MINIMUM AMOUNTS TO PI,

9  CORRECT?

10 A.   WE CERTAINLY DID.

11 Q.   DID?

12 A.   DID.  WE CERTAINLY DID.

13 Q.   ONCE YOU PAID THOSE MINIMUM AMOUNTS, $25 MILLION PER YEAR

14 GUARANTEED, DID YOU CARE HOW THE DEFENDANTS ALLOCATED THE MONEY

15 INTERNALLY?

16 A.   WE WERE NOT PARTY TO HOW THEY ALLOCATED THE MONEY THAT

17 THEY RECEIVED FROM US FOR THE INDIVIDUAL GAME RIGHTS.

18 Q.   I UNDERSTAND YOU WEREN'T PARTY TO IT.  DID YOU CARE?

19 A.   I'M NOT SURE I CARED.  I NEVER GAVE IT MUCH THOUGHT SO --

20 Q.   OKAY.  SO YOU DIDN'T CARE IF, FOR EXAMPLE, A PORTION OF IT

21 WENT TO PI, RIGHT?

22 A.   PI?

23        **MR. FEHER:**  YOUR HONOR, OBJECTION.  THIS IS ARGUMENT.

24 BY MR. HUMMEL:

25 Q.   PLAYERS INC.

1  **A.**   NO.   WE UNDERSTOOD THAT PLAYERS INC --

2          **THE COURT:**  OBJECTION'S OVERRULED.

3          GO AHEAD.  ANSWER THE QUESTION.

4          **THE WITNESS:**  I'M SORRY, YOUR HONOR.  WE UNDERSTOOD

5  THAT PLAYERS INC, LIKE ALL THE PLAYER ASSOCIATIONS WITH THE

6  DIFFERENT SPORTS OPERATE MORE OR LESS THE SAME WAY.

7          THEY RETAINED A CERTAIN PERCENTAGE OF THEIR LICENSING

8  MONIES FOR THE OPERATIONS OF THEIR LICENSING ARMS.  AND SOME OF

9  THE PLAYERS ASSOCIATIONS ACTUALLY RETAINED LARGE PORTIONS OF

10 THOSE FUNDS TO OPERATE AS SORT OF A STRIKE FUND IN CASE THEY

11 HAVE A LABOR PROBLEM.

12 **BY MR. HUMMEL:**

13 **Q.**   THAT'S NOT WHAT I'M ASKING.

14 **A.**   I THOUGHT THAT'S WHAT YOU WERE ASKING.

15 **Q.**   DID YOU, EA, CARE IF THEY DID THAT OR NOT?

16 **A.**   NO.

17 **Q.**   SO YOU THOUGHT YOU WERE PAYING MONEY TO ACQUIRE RIGHTS,

18 AND THAT'S WHAT YOU CARED ABOUT, RIGHT?

19 **A.**   WELL, I THOUGHT THAT WE WERE GUARANTEEING A CERTAIN AMOUNT

20 OF MONEY WHICH WAS VERY SIZABLE, PLUS A RUNNING ROYALTY IF THAT

21 GUARANTEE WAS RECOUPED TO SECURE THE RIGHTS OF ACTIVE NFL

22 PLAYERS TO USE IN SEVERAL NFL-BRANDED GAMES THAT WE WERE

23 DEVELOPING AND PUBLISHING ON AN ANNUAL BASIS.

24 **Q.**   OKAY.  AND YOU PAID -- YOU AGREED TO PAY THIS MINIMUM

25 ROYALTY OF $25 MILLION A YEAR FOR AN EXCLUSIVE THAT RAN THROUGH

1   WHAT PERIOD OF TIME?

2   A.   FIVE YEARS.

3   Q.   FIVE YEARS.  AND THEN, YOU RECENTLY OBTAINED AN EXTENSION

4   OF THAT FIVE-YEAR EXCLUSIVE, RIGHT?

5   A.   WELL, IF YOU SAY 2006 IS RECENT, YEAH.  I THINK IT WAS IN

6   2006 OR SO.

7   Q.   COULD YOU --

8   A.   IT WAS A COUPLE OF YEARS AGO.

9   Q.   COULD YOU LOOK AT EXHIBIT 80, PLEASE?

10          THE COURT:  80 IS THE ONE THAT WE HAVE THE ISSUE

11  WITH.

12          MR. HUMMEL:  I DON'T INTEND TO TOUCH ANY --

13          THE COURT:  ALL RIGHT.  SO IF YOU DO NOT GET INTO

14  PARAGRAPH -- WHAT IS IT, IS 6?

15          MR. HUMMEL:  6.

16          THE COURT:  6, WITHOUT RAISING IT WITH ME FIRST.

17  BY MR. HUMMEL:

18  Q.   IS THIS A SIMILAR LICENSE BETWEEN EA AND PLAYERS INC THAT

19  YOU SIGNED?

20  A.   EXHIBIT 6 IS AN EXTENSION OF EXHIBIT 67.

21  Q.   EXHIBIT 80.

22  A.   EXCUSE ME.  EXHIBIT 80.  I'M SORRY.  IS AN EXTENSION OF

23  TRIAL EXHIBIT 67, THAT WAS ENTERED INTO IN JANUARY 2006.

24  THAT'S WHAT I SAID.

25          MR. HUMMEL:  YOUR HONOR, I WOULD MOVE EXHIBIT 80.  WE

1  DON'T INTEND TO PUBLISH IT AT THIS TIME.

2          **THE COURT:**  ANY OBJECTION?

3          **MR. FEHER:**  NO, YOUR HONOR.  SO LONG AS IT'S SUBJECT

4  TO THE PRIOR RULINGS.

5          **THE COURT:**  ALL RIGHT.  THE EXHIBIT 80 IS RECEIVED.

6  ULTIMATELY THE JURY WILL SEE ALL OF EXHIBIT 80.  BUT WE HAVE

7  SOME PROTECTIVE GUIDELINES WE HAVE TO FOLLOW IF IT'S USED HERE

8  IN THE COURTROOM.

9          KEEP THOSE IN MIND, MR. HUMMEL.

10         **MR. HUMMEL:**  I WILL, YOUR HONOR.

11         (TRIAL EXHIBIT 80 RECEIVED IN EVIDENCE)

12 **BY MR. HUMMEL:**

13 **Q.**  DID EXHIBIT 80 EXTEND THE TERM OF THE EXCLUSIVE, YES OR

14 NO?

15 **A.**  EXHIBIT 80 DID EXTEND THE TERM OF THE EXCLUSIVE.

16 **Q.**  FOR HOW MANY YEARS?

17 **A.**  THREE YEARS, I BELIEVE.

18 **Q.**  SO YOU HAVE AN EXCLUSIVE NOW WITH PI THROUGH WHAT YEAR?

19 **A.**  MAY I REFER TO THE DOCUMENT?

20 **Q.**  YES.

21 **A.**  THROUGH FEBRUARY -- IT'S AN EXCLUSIVE FOR CERTAIN GENRES

22 OF INTERACTIVE GAMES.

23 **Q.**  OKAY.

24 **A.**  NOT FOR OTHERS.  BUT IT GOES THROUGH FEBRUARY 2013.

25 **Q.**  NOW, GOING BACK, IF YOU WOULD, TO EXHIBIT NO. -- I GUESS

1  IT'S 67 -- WHICH IS THE FIRST TIME YOU AGREED TO PAY A

2  $25 MILLION MINIMUM; IS THAT RIGHT?

3  **A.**   EXHIBIT 67 IS WHEN WE FIRST AGREED TO PAY THAT GUARANTEE,

4  YES.

5  **Q.**   OKAY.  NOW, WHEN YOU SIGNED THIS AGREEMENT, YOU HAD AN

6  UNDERSTANDING, DID YOU NOT, OF WHAT -- WHAT LICENSE RIGHTS WERE

7  BEING CONFERRED, CORRECT?

8  **A.**   I ABSOLUTELY DID, YES.

9  **Q.**   AND IT'S YOUR POSITION, IS IT NOT, THAT ACTIVE PLAYER

10  RIGHTS WERE BEING CONFERRED, RIGHT?

11  **A.**   ABSOLUTELY.  WE WERE GETTING THE RIGHTS TO THEN ACTIVE NFL

12  PLAYERS, WHICH WAS CHANGING ON AN ANNUAL BASIS.

13  **Q.**   OKAY.  SO NOTWITHSTANDING THE FACT THAT PARAGRAPH 1(A)

14  REFERENCES RETIRED PLAYERS, IT WAS YOUR UNDERSTANDING THAT

15  THOSE RIGHTS WERE NOT BEING CONFERRED BY THIS AGREEMENT; IS

16  THAT YOUR TESTIMONY?

17  **A.**   WELL, MY TESTIMONY IS THAT THE -- THE FOOTBALL PLAYERS

18  THAT WE WERE LICENSING UNDER EXHIBIT 67 WERE THEN ACTIVE NFL

19  PLAYERS THAT WOULD CHANGE ON AN ANNUAL BASIS AS NEW PLAYERS

20  CAME INTO THE LEAGUE AND OTHER PLAYERS LEFT THE LEAGUE.

21  **Q.**   MY QUESTION --

22  **A.**   AND I'LL FINISH.

23  **Q.**   SURE.

24  **A.**   AND THE FACT THAT THERE IS A REFERENCE TO RETIRED PLAYERS

25  IN THE SECOND SENTENCE OF PARAGRAPH 1(A) JUST REFERS TO THE

1   FACT THAT THERE ARE OTHER PROGRAMS THAT WE WOULD ENGAGE IN FROM

2   TIME TO TIME, SUCH AS EXHIBIT 24 THAT YOU SHOWED ME EARLIER.

3   **Q.**   RIGHT.

4   **A.**   THAT WE WOULD PAY ADDITIONAL MONEY FOR.

5   **Q.**   AND YOU DID THAT, RIGHT?

6   **A.**   WE DID THAT ON SEVERAL OCCASIONS.

7   **Q.**   AND WHEN YOU DID THAT FOR THOSE PRODUCTS, THOSE PRODUCTS

8   UTILIZED SIX OR MORE PRESENT OR FORMER NFL PLAYERS, CORRECT?

9   **A.**   I THINK THAT'S THE SAME QUESTION THAT WE JUST HAD THE

10  GO-ROUND.

11          EVERY PRODUCT HAD AT LEAST SIX NFL ACTIVE PLAYERS.

12  **Q.**   SURE.

13  **A.**   AND AS FAR AS I'M AWARE EVERY TIME WE USED FORMER NFL

14  PLAYERS WE USED AT LEAST SIX, BUT FREQUENTLY LICENSED THEM

15  INDIVIDUALLY, NOT AS A GROUP.

16  **Q.**   BUT YOU UNDERSTOOD THAT EXHIBIT 67 WAS A GROUP LICENSE,

17  RIGHT?

18  **A.**   FOR ACTIVE NFL PLAYERS.

19  **Q.**   YES OR NO, WAS IT A GROUP LICENSE?  JUST ANSWER THE

20  QUESTION.

21  **A.**   I JUST ANSWERED YOU.  FOR ACTIVE NFL PLAYERS IT WAS A

22  GROUP LICENSE FOR THOSE THAT WERE CURRENT PLAYERS IN THE NFL.

23  OTHERWISE -- YEAH --

24          **MR. HUMMEL:**  YOUR HONOR, I WOULD LIKE AN ADMONITION

25  ON THE YES OR NO, PLEASE.

1    **THE COURT:**  I THINK HE'S FAIRLY ANSWERED THE

2  QUESTION.

3    **MR. HUMMEL:**  FAIR ENOUGH.

4    **THE COURT:**  THE DIFFERENCE BETWEEN YOU IS MERE

5  ARGUMENT.

6    **MR. HUMMEL:**  OKAY.  FAIR ENOUGH.

7  **BY MR. HUMMEL:**

8  **Q.**  NOW, WITH RESPECT TO ACTIVE PLAYERS -- LET ME SHOW YOU --

9  LET ME JUST TAKE AN EXAMPLE.  EXHIBIT 1246.

10    **MR. HUMMEL:**  1246 IS ALREADY STIPULATED INTO

11  EVIDENCE, YOUR HONOR, SO I WOULD MOVE IT NOW.

12    **MR. FEHER:**  NO OBJECTION.

13    **THE COURT:**  RECEIVED.

14    (TRIAL EXHIBIT 1246 RECEIVED IN EVIDENCE.)

15    **MR. HUMMEL:**  COULD I PUT UP THE FRONT COVER OF

16  EXHIBIT 1246, PLEASE?

17    OKAY.  IT'S A BLACK AND WHITE COVER.  I APOLOGIZE.

18  **BY MR. HUMMEL:**

19  **Q.**  COULD YOU SHOW THE JURY WHAT IT IS?  THAT'S ACTUALLY THE

20  MADDEN GAME, RIGHT, IN THE PACKAGE IT COMES IN THE STORE?

21  **A.**  WELL, THIS IS THE -- THIS IS ONE VERSION OF MADDEN NFL

22  2004 FOR THE PLAYSTATION 2 AS RESOLD PROBABLY AT GAMESTOP ON A

23  USED BASIS FOR 99 CENTS.  IT DIDN'T SELL FOR THE 99 CENTS WHEN

24  WE OFFERED IT INITIALLY.

25  **Q.**  WE COULDN'T FIND IT WHEN WE WERE TRYING TO GET IT INTO

1  THIS TRIAL.  IT WASN'T A 99 CENT PRODUCT, RIGHT?  THIS IS A

2  RECENT --

3  **A.**  IT'S NOT A 99 CENT PRODUCT.

4  **Q.**  OKAY.  AND I'M NOT GOING TO GET INTO HOW MUCH IT COSTS.

5  IT DOESN'T MATTER TO ME.

6       ALL I WANT TO DO IS FOCUS ON THIS.  IF YOU LOOK ON

7  THE COVER OF THIS MADDEN GAME, THERE'S A -- THERE'S A THEN

8  ACTIVE -- ACTUALLY IS A THEN ACTIVE NFL PLAYER.  THAT'S MICHAEL

9  VIC, RIGHT?

10  **A.**  THIS IS MICHAEL VIC, AND AT THIS TIME HE WAS AN ACTIVE NFL

11  PLAYER.

12  **Q.**  RIGHT.  HE SUBSEQUENTLY HAD SOME TROUBLE WITH THE LAW, AND

13  HE'S IN CUSTODY, RIGHT?

14       **MR. FEHER:**  OBJECTION, YOUR HONOR.  THAT'S NOT

15  RELEVANT.

16       **MR. HUMMEL:**  YOU'RE RIGHT.  I'LL WITHDRAW IT.

17  **BY MR. HUMMEL:**

18  **Q.**  BUT HE IS NOT CURRENTLY AN ACTIVE NFL PLAYER?

19  **A.**  HE IS NOT CURRENTLY AN ACTIVE NFL PLAYER.

20  **Q.**  BUT AT THE TIME HE WAS, RIGHT?

21  **A.**  THAT'S CORRECT.

22  **Q.**  OKAY.  AND DID YOU HAVE TO OBTAIN A SEPARATE AGREEMENT

23  WITH MICHAEL VIC TO PUT HIM ON THE COVER?

24  **A.**  WE OBTAINED A SEPARATE AGREEMENT WITH MICHAEL VIC AND PAID

25  HIM INCREMENTAL AMOUNTS FOR TWO THINGS.

1  Q.   YES.

2  A.   TO BE ON COVER.

3  Q.   RIGHT.

4  A.   AND TO PERFORM SERVICES FOR US IN CONNECTION WITH THE

5  LAUNCH OF THE GAME, THE TV COMMERCIAL, ET CETERA.

6  Q.   RIGHT.  SO HERE YOU HAVE AN ACTIVE NFL PLAYER FOR WHOM YOU

7  HAD THE RIGHTS BECAUSE OF THE GROUP LICENSE, BUT YOU WENT OUT

8  AND YOU SIGNED A SEPARATE AGREEMENT WITH MICHAEL VIC SO THAT

9  YOU COULD PUT HIM ON THE COVER, RIGHT?

10  A.   NO, THAT'S NOT CORRECT.

11  Q.   OKAY.  WHAT HAPPENED?

12  A.   OUR GROUP LICENSE FOR ALL ACTIVE NFL PLAYERS REQUIRES US

13  TO USE THEM IN GROUPS OF SIX OR MORE.

14  Q.   OKAY.

15  A.   AND IT DOESN'T PERMIT US TO TAKE ONE PLAYER AND USE HIM AS

16  AN ENDORSER.  SO WE HAVE TO ENTER INTO A SEPARATE AGREEMENT AS

17  WE DID UNFORTUNATELY WITH MICHAEL VIC, WHO HAD SOME PROBLEMS

18  SUBSEQUENTLY.

19  Q.   RIGHT.

20  A.   TO BE THE ENDORSER OF THE GAME AND TO PERFORM SERVICES FOR

21  US.  BUT THAT'S SEPARATE FROM THE GROUP LICENSE THAT WE SIGNED

22  WITH PLAYERS INC TO HAVE ALL OF THE PLAYERS IN THE VIDEO GAME.

23  Q.   SO HE'S A HIGHLIGHTED PLAYER?

24  A.   IT'S FREQUENTLY CALLED A "HIGHLIGHT AGREEMENT," IF THAT'S

25  WHAT YOU'RE REFERRING TO, YES.

1  Q.   THAT'S WHAT I'M TALKING ABOUT.   OKAY.

2        AND HE GETS PAID ABOVE AND BEYOND WHAT HE WOULD GET

3  FOR THE GROUP LICENSE RIGHTS, CORRECT?

4  A.   THAT'S CORRECT.

5  Q.   OKAY.  SO HAVE YOU EVER HEARD THE PHRASE "AD HOC

6  AGREEMENT"?

7  A.   ONLY IN THE DEPOSITION.  MR. KATZ USED IT.

8  Q.   ALL RIGHT.  THIS IS MR. KATZ RIGHT HERE (INDICATING).  YOU

9  MET HIM BEFORE?

10 A.   YES.

11 Q.   ALL RIGHT.  SO THIS IS A SITUATION WHERE HE -- MR. VIC

12 SIGNED A SEPARATE AGREEMENT.  NOW, WAS THAT NEGOTIATED BY PI?

13 A.   THE -- PI.  THE HIGHLIGHT AGREEMENTS THAT WE HAVE ARE

14 OBTAINED WITH THE HELP OF PLAYERS INC.  BUT WE HAVE SOMEBODY ON

15 STAFF AT EA WHO WORKS FOR EA.

16 Q.   OKAY.

17 A.   WHO FREQUENTLY MAKES CONTACTS TO FIND A PLAYER AND HIS

18 AGENT WHO ARE INTERESTED IN BEING ON THE COVER AND IS WILLING

19 TO PERFORM THE PR SERVICES THAT WE WANT AND BE IN THE TV

20 COMMERCIALS AND IS FAMILIAR WITH THE GAME.

21 Q.   FAIR ENOUGH.  SO HERE'S MY QUESTION.  WHEN WE'RE TALKING

22 ABOUT EXHIBIT 67, WHICH IS THE GROUP LICENSE?

23 A.   YES, SIR.

24 Q.   YOU DON'T HAVE TO LOOK AT LOOK IT, BUT THE JURY KNOWS WHAT

25 IT IS.

1    YOU'RE PAYING GROUP MONEY, CORRECT?  IT'S MONEY FOR

2  THE RIGHTS TO A GROUP.

3  **A.**   WE PAID FOR THE RIGHTS TO USE ALL ACTIVE NFL PLAYERS AS A

4  GROUP --

5  **Q.**   AS A GROUP.

6  **A.**   -- IN OUR GAMES, YES.

7  **Q.**   AND WHEN YOU PAID MICHAEL VIC, THAT'S NOT SHARED MONEY,

8  RIGHT?  THAT'S NOT GROUP MONEY.

9  **A.**   THE MONEY THAT WE PAID TO MICHAEL VIC UNDER HIS HIGHLIGHT

10 AGREEMENT, TO THE BEST OF MY KNOWLEDGE, IS NOT SHARED WITH THE

11 OTHER 1400, 1500 ACTIVE PLAYERS.

12 **Q.**   SO YOU HAVE GROUP MONEY AND YOU HAVE -- WHICH I WILL CALL

13 SHARED MONEY.  AND YOU UNDERSTOOD THAT, RIGHT?

14 **A.**   THE WAY WE LOOK AT IT IS WE HAVE A GROUP LICENSE.

15 **Q.**   RIGHT.

16 **A.**   AND THEN, WE HAVE A HIGHLIGHT AGREEMENT, WHICH IS IN THE

17 NATURE OF AN ENDORSEMENT.

18 **Q.**   AND MONEY FROM EA FLOWS FROM BOTH, RIGHT?

19 **A.**   WE PAY FOR BOTH HIGHLIGHT PLAYERS, AS WELL AS THE GROUP

20 LICENSE.

21 **Q.**   FAIR ENOUGH.  AND THAT'S FOR ACTIVE PLAYERS, RIGHT?

22 MICHAEL VIC WAS ACTIVE AT THAT TIME?

23 **A.**   YEAH, THE HIGHLIGHT AGREEMENT -- WE HAVE ON OCCASION DONE

24 AGREEMENTS WITH FORMER PLAYERS WHO HAVE PERFORMED SERVICES FOR

25 US.

1  Q.   FOR EXAMPLE, LET'S ALSO THROW UP 1257, JUST TO MAKE THE

2  POINT.

3  A.   1257.

4       **MR. HUMMEL:**  WHICH IS IN EVIDENCE, YOUR HONOR.  AND I

5  WOULD LIKE TO SO MOVE IT IF IT'S NOT IT.

6       AGAIN, WE'VE GOT THE USED STICKER.  IGNORE THAT.

7       **THE WITNESS:**  THIS WAS DOLLAR 99.

8  BY MR. HUMMEL:

9  Q.   THIS WAS 4.99 USED.  BUT THIS IS THE MADDEN '06 GAME THAT

10 ALSO HAS AN ACTIVE PLAYER ON THE PLAYER, DONOVAN MCNABB, RIGHT?

11 A.   DONOVAN MCNABB WAS AND REMAINS AN ACTIVE NFL PLAYER.

12 Q.   AND THERE WAS A HIGHLIGHT AGREEMENT WITH DONOVAN MCNABB,

13 RIGHT?

14      **THE COURT:**  1257 IS NOT YET IN EVIDENCE.

15      **MR. HUMMEL:**  CAN I MOVE IT SO, YOUR HONOR?

16      **THE COURT:**  ANY OBJECTION?

17      **MR. FEHER:**  NO OBJECTION.

18      **THE COURT:**  RECEIVED.

19      (TRIAL EXHIBIT 1257 RECEIVED IN EVIDENCE.)

20 BY MR. HUMMEL:

21 Q.   ALL RIGHT.  DO YOU HAVE A HIGHLIGHT AGREEMENT WITH DONOVAN

22 MCNABB?

23 A.   WELL, WE DID FOR MADDEN NFL '06.

24 Q.   OKAY.

25 A.   HE WAS IN A TV COMMERCIAL.

1  **Q.** DID PLAYERS INC ASSIST YOU IN PROCURING THOSE RIGHTS FROM

2  MR. MCNABB?

3  **A.** THE PAPERWORK GOES THROUGH PLAYERS INC, AS I SAID.  WE

4  HAVE AN EMPLOYEE AT EA WHOSE JOB IT IS -- HIS TITLE IS DIRECTOR

5  OF ATHLETE RELATIONS, AND HE DOES A LOT OF THE WORK TO PROCURE

6  THE COVER ATHLETES.

7  **Q.** FOR THOSE TIMES THAT YOU PROCURED THE RIGHTS TO RETIRED

8  PLAYERS WHEN THEY WERE AT THAT TIME RETIRED, IS IT TRUE THAT EA

9  WANTED TO PRODUCE, MARKET AND SELL A GAME THAT FEATURED CURRENT

10  NFL PLAYERS AND RETIRED PLAYERS?

11  **A.** I'M SORRY, MA'AM.  COULD YOU READ THAT BACK.

12        (THE REPORTER READ THE PENDING QUESTION AS FOLLOWS:

13            **"QUESTION:** FOR THOSE TIMES THAT YOU PROCURED

14            THE RIGHTS TO RETIRED PLAYERS WHEN THEY WERE

15            AT THAT TIME RETIRED, IS IT TRUE THAT EA

16            WANTED TO PRODUCE, MARKET AND SELL A GAME

17            THAT FEATURED CURRENT NFL PLAYERS AND RETIRED

18            PLAYERS?")

19            **THE WITNESS:** YES, THAT'S CORRECT.

20  **BY MR. HUMMEL:**

21  **Q.** AND FOR THOSE TIMES THAT YOU WANTED TO ADD FEATURES AROUND

22  HISTORIC NFL TEAMS, YOU WORKED WITH PLAYERS INC TO SECURE THE

23  RIGHTS TO THE IDENTITIES OF RETIRED PLAYERS FOR THOSE FEATURES.

24  **A.** WELL, I -- I'M HESITATING BECAUSE I'M MORE FAMILIAR WITH

25  THE GAMES LIKE THE CONTRACT WE LOOKED AT, EXHIBIT 26.

1    I RECALL THAT WHEN WE WANTED TO USE SOME HISTORIC

2 TEAMS, WE WANTED SPECIFIC RETIRED PLAYERS TO POPULATE THOSE

3 TEAMS.  AND WE DID WORK WITH PLAYERS INC TO HELP US OBTAIN THE

4 RIGHTS TO THOSE RETIRED PLAYERS IN THOSE INSTANCES.

5 **Q.**   ALL RIGHT.  AND IN THOSE INSTANCES YOU PAID ADDITIONAL

6 FEES FOR THOSE RIGHTS?

7 **A.**   YES, SIR.

8 **Q.**   ALL RIGHT.  AND IS IT ALSO TRUE THAT AS A RESULT OF YOUR

9 DESIRE TO FEATURE RETIRED PLAYERS YOU ENTERED INTO A HALL OF

10 FAME AGREEMENT?

11         **MR. FEHER:**  OBJECTION, YOUR HONOR.

12         **MR. KESSLER:**  YOUR HONOR, THIS IS SUBJECT TO YOUR

13 PRECLUSION ORDER.

14         **THE COURT:**  IT IS, ISN'T IT?

15         **MR. HUMMEL:**  NO, YOUR HONOR, IT'S NOT.  THIS IS IN

16 HIS DECLARATION.  IT'S PART OF THE "USE OF PRESENT OR FORMER

17 PLAYERS IN A GAME."

18         I'M NOT TALKING ABOUT THAT PARTICULAR SET OF E-MAILS

19 THAT WE'VE ADDRESSED OR THE VALUE OF THAT DEAL OR WHY IT

20 HAPPENED.  BUT THIS GOES TO THE CENTERPIECE OF THE GLA.

21         **THE COURT:**  CAN WE GO TO SOMETHING ELSE, AND THEN

22 DEAL WITH THIS LATER?

23         HOW CLOSE TO THE END OF YOUR EXAMINATION ARE YOU?

24         **MR. HUMMEL:**  NOT SO CLOSE.

25         **THE COURT:**  WELL, THEN, WHY DON'T WE SKIP THIS FOR

1   NOW, AND THEN I'LL TAKE IT UP WHEN WE SEND THE JURY OUT FOR A

2   BREAK?

3            **MR. HUMMEL:**  OKAY.  CAN I ASK ONE QUESTION ON THIS

4   TOPIC?

5            **THE COURT:**  I DON'T KNOW WHAT THE QUESTION IS.

6   **BY MR. HUMMEL:**

7   **Q.**   COULD YOU LOOK AT EXHIBIT 1268?

8   **A.**   I'M GETTING LOST HERE.  IS THAT IN THIS STACK HERE?

9   **Q.**   I THINK IT IS.

10            **MR. HUMMEL:**  AGAIN, THERE IS NO OBJECTION TO THIS

11   EXHIBIT, YOUR HONOR.

12   **BY MR. HUMMEL:**

13   **Q.**   WHAT IS THAT GAME, SIR?

14   **A.**   THIS ONE HERE (INDICATING)?

15   **Q.**   NO, 1268.  I'M SORRY.  WHAT'S THAT IT SAYS?

16   **A.**   YEAH.

17   **Q.**   ALL RIGHT.  IF YOU WOULD LOOK AT THE BOARD, AND WE'LL GET

18   1268 IN FRONT OF YOU.  SOMETHING IS IN THE WRONG READ WELL

19   THERE.

20            THIS WAS A GAME THAT WAS MARKETED BY EA.  DO YOU

21   RECOGNIZE IT?

22   **A.**   I DO.

23   **Q.**   WHAT IS IT?

24   **A.**   THAT PARTICULAR COVER IS --

25            **MR. KESSLER:**  YOUR HONOR, IT'S NOT IN EVIDENCE.

1    **MR. HUMMEL:**  THERE'S NO OBJECTION.

2        **THE COURT:**  IS THERE ANY OBJECTION TO 1268?

3        **MR. KESSLER:**  WELL, WE HAVE AN OBJECTION, YOUR HONOR,

4  TO THE ORDER, TO THE ENTIRE SUBJECT THE HALL OF FAME EDITION.

5  THAT'S WHAT HE'S PUTTING IN.

6        **MR. HUMMEL:**  THAT HAS NOTHING TO DO WITH THE ORDER.

7        **THE COURT:**  WELL, I DON'T REMEMBER IT WELL ENOUGH, TO

8  BE HONEST.  SO LET'S TAKE IT DOWN UNTIL I CAN SORT IT OUT.

9        **MR. HUMMEL:**  THIS WAS A DOCUMENT THAT WAS STIPULATED

10 IN BY THE PLAINTIFFS -- BY THE DEFENDANTS.

11       **THE COURT:**  MAYBE.

12       **MR. HUMMEL:**  ALL RIGHT.

13       **THE COURT:**  I'M NOT SAYING YOU DID ANYTHING WRONG.

14       THE JURY SHOULD UNDERSTAND BEFORE THE TRIAL STARTS

15 EACH SIDE GIVES ME QUITE A NUMBER OF THINGS THEY WANT TO KEEP

16 OUT OF EVIDENCE.  BOTH SIDES DO IT.  AND SOME OF THOSE ARE

17 GRANTED.  ONE OF THESE HAD TO DO WITH THE HALL OF FAME.  I

18 REMEMBER THAT MUCH.  I DON'T REMEMBER THE DETAILS OF THE RULING

19 ANYMORE.

20       I HAVE TO GO BACK AND LOOK AT A LOT OF PAPERWORK TO

21 COME UP TO SPEED ON THAT AGAIN.  SO I NEED TO GET -- REFRESH MY

22 MEMORY ON -- OUT OF DOZENS OF MOTIONS, TO MAKE SURE I DON'T

23 CONTRADICT MYSELF.

24       I'M NOT SUGGESTING ANYBODY HAS DONE A THING WRONG

25 HERE.  PLEASE DON'T -- I JUST WANT TO BE MORE ORDERLY ABOUT IT

1    THAN I CAN DO ON THE FLY.

2            MR. KATZ, WHY ARE YOU RISING?

3            **MR. KATZ:**  I JUST WANTED TO INFORM YOUR HONOR THAT ON

4    THE OTHER SUBJECT RELATING TO THE MOTION IN LIMINE, THERE WAS

5    SOMETHING FILED THIS MORNING, JUST FOR YOUR HONOR'S

6    INFORMATION.

7            **THE COURT:**  I HAVEN'T SEEN THAT AT ALL.

8            SEE, OVERNIGHT THEY FILE PAPERS AND EXPECT ME TO HAVE

9    READ EVERYTHING BY THE TIME I GET TO WORK.  AND I TRY MY BEST,

10   BUT -- SEE HOW MANY LAWYERS THERE ARE OUT THERE?  THERE'S ONLY

11   ONE OF ME.

12           ALL RIGHT.  MR. HUMMEL, CAN YOU COVER SOMETHING ELSE?

13           **MR. HUMMEL:**  YES, YOUR HONOR.

14           **THE COURT:**  AND COME BACK TO THE HALL OF FAME AFTER

15   WE MAKE OUR RULING?

16           **MR. HUMMEL:**  I WILL.

17   **BY MR. HUMMEL:**

18   **Q.**   WITHOUT REFERENCE TO THE HALL OF FAME, IT IS TRUE THAT --

19   THAT EA WORKED WITH PI TO ACQUIRE THE RIGHTS OVER TIME TO

20   RETIRED PLAYERS; IS THAT RIGHT?

21   **A.**   FOR DIFFERENT VERSIONS OF THE GAME, WE HAVE IN THE PAST

22   WORKED WITH PLAYERS INC TO OBTAIN THE RIGHTS FOR FORMER NFL

23   PLAYERS TO PUT IN VARIOUS EDITIONS OF BOTH MADDEN NFL AND NFL

24   STREET.

25           **MR. HUMMEL:**  COULD I HAVE EXHIBIT 110 DISPLAYED, YOUR

1    HONOR?

2    BY MR. HUMMEL:

3    **Q.**   AND 110 SHOULD BE IN FRONT OF YOU, MR. LINZNER.

4    **A.**   I DON'T SEE IT.

5              (DOCUMENT DISPLAYED.)

6              IT GOES FROM 79 AND 80?

7              HERE IT IS.

8    **Q.**   DO YOU HAVE 110?

9    **A.**   YEAH, I DO.

10   **Q.**   HAVE YOU EVER SEEN THAT DOCUMENT BEFORE THIS LITIGATION

11   STARTED?

12   **A.**   I'M NOT SURE I'VE EVER SEEN THIS DOCUMENT BEFORE, PERIOD.

13   **Q.**   NEVER SEEN IT BEFORE?  IT'S A RETIRED PLAYER GROUP

14   LICENSING AUTHORIZATION FORM.  DID ANYONE FROM PI EVER SHOW YOU

15   A GLA?

16   **A.**   A GLA?

17   **Q.**   YES, SIR.

18   **A.**   THERE WAS A GLA ATTACHED TO OUR FORMS OF LICENSE.

19   **Q.**   CORRECT.  AND YOU UNDERSTOOD THAT TO BE A GLA THAT APPLIED

20   TO ACTIVE PLAYERS, RIGHT?

21   **A.**   THAT'S CORRECT.

22   **Q.**   DID ANYONE FROM PI -- NOW, LET ME ASK YOU THIS.  DID YOU

23   NEGOTIATE WITH DOUG ALLEN?

24   **A.**   I DID.

25   **Q.**   AND WITH ANYBODY ELSE FROM PI?

1   **A.**   YES, SIR.

2   **Q.**   CLAY WALKER?

3   **A.**   YES, SIR.

4   **Q.**   ANYBODY ELSE?

5   **A.**   GENE UPSHAW.

6   **Q.**   GENE UPSHAW. ALL RIGHT.

7   **A.**   LASHUN LAWSON SOMETIMES.

8   **Q.**   NOW, DID ANY OF THOSE PEOPLE EVER SHOW YOU A GLA?

9   **A.**   A GLA?

10   **Q.**   THIS RETIRED PLAYER GROUP LICENSING AUTHORIZATION FORM,

11 REGARDLESS OF WHETHER IT WAS SIGNED OR UNSIGNED.

12   **A.**   I DON'T RECALL SEEING THIS BEFORE.

13   **Q.**   DID THEY EVER GIVE YOU A LIST OF RETIRED NFL PLAYERS WHO

14 HAD SIGNED RETIRED PLAYER GROUP LICENSING AUTHORIZATION FORMS?

15   **A.**   NOT THAT I RECALL.

16   **Q.**   DID ANY OF THOSE INDIVIDUALS OFFER EA A LICENSE TO THOSE

17 RETIRED PLAYERS WHO HAD SIGNED GLA -- THAT IS RETIRED PLAYER

18 GROUP LICENSING AUTHORIZATION FORMS?

19   **A.**   I'M SORRY. COULD YOU REPEAT THAT, MA'AM?

20         **MR. HUMMEL:** COULD I HAVE THAT ONE READ BACK, PLEASE?

21

22         (THE REPORTER READ THE PENDING QUESTION AS FOLLOWS:

23         **"QUESTION:** DID ANY OF THOSE INDIVIDUALS

24         OFFER EA A LICENSE TO THOSE RETIRED PLAYERS

25         WHO HAD SIGNED GLA -- THAT IS RETIRED PLAYER

1    GROUP LICENSING AUTHORIZATION FORMS?")

2         **THE WITNESS:**  THAT'S NOT TYPICALLY THE WAY IT WORKS.

3    WE WOULD TYPICALLY TELL THEM WHICH PLAYERS WE WERE INTERESTED

4    IN, AND THEN THEY WOULD ENDEAVOR TO GET THE RIGHTS TO THE

5    PLAYERS WE WERE INTERESTED IN.

6    **BY MR. HUMMEL:**

7    **Q.**  I UNDERSTAND THAT.  I'M ASKING YOU A DIFFERENT QUESTION,

8    AND IT'S IMPORTANT ON THIS ONE THAT WE BE AS PRECISE AS

9    POSSIBLE.

10   **A.**  OKAY.

11   **Q.**  DID ANY OF THE INDIVIDUALS FROM PI THAT YOU REFERENCED,

12   INCLUDING DOUG ALLEN, EVER OFFER EA A LICENSE TO AT LEAST THOSE

13   RETIRED PLAYERS FOR WHOM THEY HAD OBTAINED A RETIRED GROUP

14   AUTHORIZATION FORM?

15   **A.**  EVERYBODY THAT OBTAINED A FORM?

16   **Q.**  YES.

17   **A.**  I DIDN'T KNOW -- I DIDN'T HAVE -- LIKE I SAID BEFORE, I

18   DON'T THINK I EVER GOT A LIST OF EVERYBODY THAT THEY HAD A

19   FORM.  SO I DON'T THINK THEY -- YOU KNOW, IF THEY WOULD HAVE

20   OFFERED IT THEY WOULD HAVE SUPPLIED ME WITH A LIST.

21   **Q.**  AND THEY NEVER DID THAT?

22   **A.**  I WASN'T REALLY INTERESTED IN THAT, THOUGH.

23   **Q.**  THAT'S NOT MY QUESTION.

24   **A.**  I DON'T RECALL THEM EVER GIVING ME THAT LIST OR OFFERING

25   ME THAT LIST.

1  **Q.**   DID THEY EVER SAY TO YOU THAT:

2               "WE HAVE 2100 RETIRED PLAYERS WHO HAVE SIGNED

3  RETIRED PLAYER GROUP LICENSING AUTHORIZATION FORMS, AND WE

4  WOULD LIKE YOU TO TAKE A LICENSE TO THOSE GUYS"?

5  **A.**   NO.

6  **Q.**   DID THEY EVER TRY TO MARKET THOSE TO YOU?

7  **A.**   YES.

8  **Q.**   WHAT DID THEY SAY?

9  **A.**   THEY SAID IF -- YOU KNOW, THEY'D ASK US IF WE WERE

10  INTERESTED IN USING FORMER NFL PLAYERS, RETIRED PLAYERS.  AND

11  ON THOSE OCCASIONS WHEN WE WERE INTERESTED, WHICH WE WERE ON

12  SEVERAL OCCASIONS, THEY HELPED US LICENSE THEM.  AND WE

13  NEGOTIATED A SEPARATE CHARGE FOR THAT.

14  **Q.**   OKAY.  BUT DID THEY EVER IN THOSE DISCUSSIONS REFERENCE A

15  LIST OF GLA MEMBERS THAT THEY HAD SIGNED UP?

16  **A.**   THEY HAD REFERENCED THAT THERE WERE CERTAIN PLAYERS THAT

17  THEY HAD SIGNED UP AND OTHER PLAYERS WHO DID NOT WANT TO WORK

18  WITH PLAYERS INC. --

19  **Q.**   DID THEY OFFER --

20  **A.**   -- AND --

21       **MR. FEHER:**  YOUR HONOR, THE WITNESS SHOULD BE ALLOWED

22  TO FINISH HIS ANSWER.

23       **THE COURT:**  PLEASE FINISH YOUR ANSWER.

24       **THE WITNESS:**  THANK YOU, SIR.

25       AND IN SOME OF THOSE INSTANCES WHERE THERE'S CERTAIN

1 HIGH-PROFILE PLAYERS THAT WE WANTED, THEY WOULD GO OUT AND TRY

2 AND CONVINCE THE AGENTS OR THE PLAYERS THEMSELVES TO ALLOW US

3 TO USE THE RIGHTS.

4        AND THEY MADE EFFORTS AT VARIOUS TIMES TO OBTAIN THE

5 RIGHTS OF THE PLAYERS WE TOLD THEM WE WANTED.  THEY WEREN'T

6 ALWAYS SUCCESSFUL, BUT THEY DID MAKE THE EFFORT.

7 **BY MR. HUMMEL:**

8 **Q.**  AGAIN, I'M ASKING YOU A VERY SPECIFIC QUESTION BECAUSE IT

9 RELATES TO TESTIMONY THAT WAS PREVIOUSLY GIVEN IN THIS CASE.

10 **A.**  OKAY.

11 **Q.**  DID MR. ALLEN EVER OFFER YOU A GROUP LICENSE FOR EVERY

12 PLAYER THAT SIGNED A RETIRED PLAYER GROUP LICENSING

13 AUTHORIZATION FORM?

14 **A.**  NOT THAT I RECALL.

15 **Q.**  BUT YOU UNDERSTOOD, DID YOU NOT, THAT CERTAIN NFL PLAYERS,

16 RETIRED NFL PLAYERS, HAD SIGNED GROUP LICENSING AUTHORIZATION

17 FORMS?

18 **A.**  WELL, I KNEW THAT PLAYERS INC HAD OBTAINED THE ABILITY TO

19 LICENSE US THE RIGHTS TO SOME RETIRED PLAYERS THROUGH ONE OF A

20 VARIETY OF MECHANISMS.  WHETHER IT WAS A GROUP LICENSING

21 AUTHORIZATION FORM OR THE SETTLEMENT OF THE OLD QUARTERBACK

22 CLUB LITIGATION OR INDIVIDUAL AGREEMENTS, IT DIDN'T REALLY

23 MATTER TO US.

24        YOU KNOW, THEY STOOD BEHIND THE RIGHTS THAT THEY

25 LICENSED TO US.  WE USED THOSE RIGHTS.  WE NEVER -- WITH ONE

1 SMALL EXCEPTION, WE NEVER REALLY HAD ANY ISSUES WITH THEM.  AND

2 THEY WERE ABLE TO LICENSE US ENOUGH OF THE RETIRED PLAYERS THAT

3 WE NEEDED TO DO THE FEATURES THAT WE HAD IN OUR GAMES.

4 **Q.**   IS IT TRUE THAT YOU UNDERSTOOD THAT, IN EFFECT, THE NFL

5 PI, PLAYERS INC, WAS ACTING AS A SORT OF AGENT FOR RETIRED

6 PLAYERS IN DEALING WITH YOU?

7 **A.**   YEAH, THEY WERE AN AGENT OR MIDDLEMAN TO -- BETWEEN THE

8 RETIRED PLAYERS AND US TO LICENSE THE RIGHTS OF THOSE RETIRED

9 PLAYERS.

10 **Q.**   IS IT TRUE THAT YOU UNDERSTOOD THAT THEY ACTED AS A SORT

11 OF AGENT TO GET MERCHANDISING OR LICENSING DEALS FOR RETIRED

12 PLAYERS?

13 **A.**   WELL, AT LEAST WITH RESPECT TO US THEY DID.  I DON'T KNOW

14 ABOUT OTHER ENTITIES.

15 **Q.**   WITH RESPECT TO YOU THAT'S HOW YOU UNDERSTOOD IT?

16 **A.**   THEY HAD A PROVISION IN THEIR AGREEMENT THAT IF WE WANTED

17 THE RIGHTS TO RETIRED PLAYERS OR UPCOMING PLAYERS, FOR THAT

18 MATTER, WE WOULD WORK THROUGH THEM TO DO THAT.

19 **Q.**   IS IT TRUE, SIR, THAT IN YOUR VIEW, IN FACT, THE NFLPA AND

20 PLAYERS INC NEVER EVEN TRIED TO GET EA TO ADD MORE RETIRED

21 PLAYERS IN A GAME?

22 **A.**   NO.

23 **Q.**   THAT'S NOT TRUE?

24 **A.**   NO.

25 **Q.**   IS IT TRUE, THOUGH, THAT EA SELECTS WHICH PLAYERS IT

1 WANTS?

2 **A.**   YES.

3 **Q.**   BUT -- AND IS IT TRUE THAT ONCE EA MAKES THAT SELECTION,

4 ISN'T IT TRUE THAT THE NFLPA AND PI NEVER ATTEMPTED -- NEVER

5 EVEN TRIED TO GET EA TO ADD MORE RETIRED PLAYERS IN THE GAME?

6 **A.**   TRY THAT AGAIN.

7 **Q.**   SURE.  SO YOU MAKE THE SELECTION.  THAT I UNDERSTAND.

8 **A.**   YES.

9 **Q.**   AND AFTER YOU, EA, MADE THE SELECTION, ISN'T IT TRUE THAT

10 YOU NEVER EVEN TRIED TO GET EA TO ADD MORE RETIRED PLAYERS FOR

11 THE GAME?

12 **A.**   YOU MEAN, THE PLAYERS INC NEVER TRIED?

13 **Q.**   YES, YES.

14 **A.**   I DON'T THINK THAT'S TRUE.

15          **MR. HUMMEL:**  OKAY.

16          YOUR HONOR, PERMISSION TO READ GENE UPSHAW'S

17 DEPOSITION, PAGE 29, LINES 9 THROUGH 17.

18          **THE COURT:**  DO I HAVE THAT UP HERE?

19          **MR. HUMMEL:**  YOU HAVE IT, YOUR HONOR.

20          **THE WITNESS:**  MAYBE I CAN HELP.  MOST OF THOSE

21 DECISIONS WOULD HAVE BEEN MADE DOWN AT THE TEAM.

22          **MR. HUMMEL:**  THERE'S NO QUESTION.

23          **THE WITNESS:**  IN OTHER WORDS --

24          **THE COURT:**  LET US DO THIS ONE STEP AT A TIME.

25          WHAT IS THE PAGE, AGAIN?  29.

1      **MR. HUMMEL:** PAGE 29, LINES 9 THROUGH 17. DEPOSITION

2  TESTIMONY OF GENE UPSHAW GIVEN FEBRUARY 13, 2008.

3      **THE COURT:** WELL, THIS IS PARTY -- PARTY TESTIMONY.

4  UNDER RULE 32 IT CAN BE USED. IT'S OKAY FOR YOU TO READ THIS.

5      ANY OBJECTION?

6      **MR. FEHER:** NO, YOUR HONOR.

7      **THE COURT:** ALL RIGHT. GO AHEAD.

8      **MR. HUMMEL:** THANK YOU, YOUR HONOR.

9      STARTING AT LINE 9:

10      **"QUESTION:** WHEN, FOR EXAMPLE, EA DESIGNATES

11      A GROUP, DO YOU NEGOTIATE WITH THEM ABOUT

12      WHAT INDIVIDUALS ARE GOING TO BE INCLUDED?

13      **"ANSWER:** NO. IT'S THEIR DESIGNATION. EA

14      DESIGNATES, NOT THE NFLPA, NOT PLAYERS INC.

15      WE DON'T PICK. WE DON'T PICK WHO THEY WANT.

16      **"QUESTION:** SO YOU DON'T TRY TO ADD MORE OR

17      ANYTHING LIKE THAT?

18      **"ANSWER:** IT'S THEIR COMPANY. NOT OURS."

19  **BY MR. HUMMEL:**

20  **Q.**  NOW, ISN'T IT TRUE, MR. LINZNER, THAT YOU'RE AWARE THAT

21  FROM TIME TO TIME EA REACHED OUT TO INCLUDE MORE RETIRED PLAYER

22  DATA IN A GAME THAN PLAYERS INC WOULD ALLOW YOU TO USE?

23  **A.**  I'M NOT SURE I UNDERSTAND YOUR QUESTION, SIR.

24  **Q.**  WELL, ISN'T IT TRUE THAT OVER THE YEARS YOU'RE AWARE OF

25  TIMES WHEN EA WANTED TO USE MORE RETIRED PLAYER INFORMATION IN

1  THE MADDEN GAME THAN YOU WOULD ALLOW -- THAN THEY WOULD ALLOW?

2  **A.**   I DON'T KNOW WHAT YOU'RE TALKING ABOUT.

3  **Q.**   YOU'RE NOT FOLLOWING?

4  **A.**   NOT AT ALL.

5  **Q.**   LET'S LOOK AT EXHIBIT 1320, WHICH IS IN EVIDENCE.

6         (DOCUMENT DISPLAYED.)

7  **A.**   1320.

8  **Q.**   I COULD JUST ASK YOU, SIR, YOU SAID YOU KNOW WHO JEREMY

9  STRAUSSER IS, RIGHT?

10 **A.**   STRAUSSER, YES.

11 **Q.**   STRAUSSER?  HE'S AN EMPLOYEE OF ELECTRONIC ARTS?

12 **A.**   JEREMY STRAUSSER IS AN EMPLOYEE OF ELECTRONIC ARTS.

13 **Q.**   AND HE WAS AS OF MAY 31, 2001?

14 **A.**   YES.  AS FAR AS I RECALL HE WAS, YES.

15 **Q.**   AND YOU KNOW WHO LASHUN, L-A-S-H-U-N, IS?

16 **A.**   I DO.

17 **Q.**   AT THE TIME WAS SHE AN EMPLOYEE AT PLAYERS INC?

18 **A.**   SHE WAS.

19 **Q.**   HAVE YOU EVER SEEN THIS LETTER BEFORE?

20 **A.**   I HAVE.

21 **Q.**   YOU HAVE.  ALL RIGHT.

22 **A.**   I JUST SAW IT IN CONNECTION WITH THIS TRIAL.

23 **Q.**   OKAY.  WERE YOU AWARE, AS OF MAY 31, 2001, THAT PI WAS

24 INSTRUCTING ELECTRONIC ARTS TO "SCRAMBLE" -- THAT'S

25 MS. LAWSON'S WORD IN THE FIRST PARAGRAPH -- RETIRED PLAYERS IN

1  THE GAME FOR WHOM YOU DID NOT HAVE RIGHTS PURSUANT TO

2  ATTACHMENTS A AND B?

3  **A.**   NO.   FOR ANY PLAYER FOR WHOM WE DID NOT HAVE THE RIGHTS WE

4  WEREN'T GOING TO EXERCISE THOSE RIGHTS.   SO WHAT WE TYPICALLY

5  DID, NOT JUST IN A FOOTBALL GAME, BUT IN OTHER GAMES, IF WE

6  DON'T HAVE THE RIGHTS TO A PLAYER WE DON'T USE THEIR NAMES, WE

7  DON'T USE THEIR IMAGE, WE DON'T USE THEY ARE PHOTOGRAPH, AND WE

8  DON'T USE THEIR DATE OF BIRTH, THAT KIND OF THING, THEIR

9  BIOGRAPHY.

10        SOMETIMES WE DON'T USE THE NUMBER, EITHER.   PLAYERS

11  INC WAS PARTICULARLY SENSITIVE ABOUT THE NUMBERS.   SO THEY

12  DIDN'T TELL US TO SCRAMBLE NAMES.

13        IT'S A QUESTION OF:   IF YOU DON'T HAVE THE RIGHTS,

14  YOU CAN'T EXERCISE --

15  **Q.**   WAIT A MINUTE.   MS. LAWSON IS TELLING YOU THEY MUST BE

16  SCRAMBLED, RIGHT?

17  **A.**   MS. LAWSON WAS CONFIRMING THAT THEY DIDN'T WANT US TO USE

18  THE NUMBERS, PRIMARILY.

19  **Q.**   DID SHE OR DID SHE NOT WRITE THEY MUST BE SCRAMBLED?   YES

20  OR NO?

21  **A.**   YOU CAN READ THE LETTER.   I'M TELLING YOU BECAUSE I

22  REMEMBER THIS.

23  **Q.**   OKAY.   YOU REMEMBER.   GOOD.

24  **A.**   I REMEMBER THIS.

25  **Q.**   GOOD.

1  A.   THAT IF WE DIDN'T HAVE THE RIGHTS TO PLAYERS, FOR RETIRED

2  PLAYERS, WE WEREN'T GOING TO USE THEIR IDENTITIES.

3  Q.   OKAY.  BUT YOU DID USE THEIR HEIGHTS, RIGHT?

4  A.   I DON'T KNOW IF WE USED THE HEIGHTS OF INDIVIDUAL PLAYERS

5  OR NOT, BUT THE IDENTITIES --

6  Q.   YOU DID USE THEIR WEIGHTS, RIGHT?

7  A.   DON'T KNOW.

8  Q.   YOU DID USE THE YEARS THEY WERE IN THE LEAGUE, RIGHT?

9  A.   DON'T KNOW THAT, EITHER.

10 Q.   YOU DID USE THEIR POSITIONS, RIGHT?

11 A.   WE DIDN'T USE THEIR NAMES.  WE DIDN'T USE THEIR IMAGES.

12 WE DIDN'T USE THEIR PHOTOGRAPHS.

13 Q.   NOW, THERE'S NO CONTENTION --

14      **MR. FEHER:**  YOUR HONOR --

15      **THE WITNESS:**  IN THIS INSTANCE WE MADE STEPS TO NOT

16 USE THE NUMBERS, EITHER, BECAUSE THAT WAS SOMETHING THAT WAS

17 SENSITIVE FOR PLAYERS INC.

18 **BY MR. HUMMEL:**

19 Q.   LET ME BE REALLY CLEAR.

20 A.   OKAY.

21 Q.   WE'RE NOT ALLEGING IN THIS CASE THAT EA VIOLATED ANY

22 INTELLECTUAL PROPERTY RIGHTS OF THESE PLAYERS.  WE'RE NOT.

23 A.   THAT'S WHAT WE TRY TO AVOID DOING.

24 Q.   THAT'S NOT THIS CASE, RIGHT?

25      **MR. HUMMEL:**  BUT NOW COULD I HAVE THE SCREEN SHOT ON

1   THE SCREEN, PLEASE?

2            (DOCUMENT DISPLAYED.)

3   **BY MR. HUMMEL  :**

4   **Q.**   THIS IS A SCREEN SHOT FROM THE MADDEN GAME WHERE THE 65

5   CLEVELAND BROWNS THAT ARE ON DEFENSE THERE ARE PLAYING YOUR 89

6   49ERS, RIGHT?

7   **A.**   OKAY.

8   **Q.**   OKAY.  WHO WAS THE QUARTERBACK OF THAT TEAM?

9   **A.**   I THINK IT WAS JOE MONTANA.

10  **Q.**   IT WAS JOE MONTANA, RIGHT?  AND IT DOESN'T EVEN USE --

11           **MR. HUMMEL:**  CAN YOU BLOW IT UP?

12           (DOCUMENT DISPLAYED.)

13  **BY MR. HUMMEL:**

14  **Q.**   WHAT WAS JOE MONTANA'S NUMBER?

15  **A.**   IN SAN FRANCISCO IT WAS 16.

16  **Q.**   RIGHT.  DOES THAT SAY "16" OR "19"?  YOU CAN'T REALLY READ

17  IT, CAN YOU?

18  **A.**   CAN'T REALLY READ IT.

19  **Q.**   ALL RIGHT.  YOU KNOW HE WAS THE QUARTERBACK, RIGHT?

20  **A.**   THAT'S RIGHT.

21  **Q.**   AND YOU SAY YOU KNOW HARRIS BARTON?

22  **A.**   I MET HARRIS BARTON.  I DON'T KNOW HARRIS BARTON.

23  **Q.**   WHAT POSITION DID HE PLAY?

24  **A.**   EITHER LEFT OR RIGHT TACKLE.  HE WAS A TACKLE.

25  **Q.**   DID YOU HAVE THE RIGHTS TO USE HARRIS BARTON IN THIS GAME?

**A.**   WHICH EDITION OF THE GAME IS THIS?

**Q.**   ANY EDITION?

**A.**   YEAH, HE WAS LISTED ON EXHIBIT 24, I THINK.  LOOKING AT EXHIBIT 24.

**Q.**   24?

**A.**   YEAH, FIFTH NAME.

**Q.**   HOW LONG DID THAT AGREEMENT LAST?

**A.**   THREE YEARS.

**Q.**   THREE YEARS.  SO AS OF 2003 YOU NO LONGER HAD HIS RIGHT, THE RIGHTS TO USE HIM, RIGHT?

**A.**   I THINK THIS COVERED 2003.

**Q.**   '5?  2005?

**A.**   NO, IT WOULD HAVE BEEN OVER BY 2005.

**Q.**   OKAY.  SO DO YOU KNOW WHETHER IN THE 2007 EDITION OF MADDEN 89 49ERS WERE A HISTORIC TEAM?

**A.**   I DON'T KNOW.

**Q.**   YOU DON'T KNOW.

         AND DID YOU HAVE THE RIGHTS TO USE EVERY SINGLE MEMBER OF THESE 49ERS ON THAT TEAM IN THAT EDITION?

**A.**   I'M SORRY.  REPEAT THAT?

**Q.**   DID YOU HAVE THE RIGHTS TO USE EVERY SINGLE --

**A.**   YOU SAID THIS WASN'T ABOUT -- YOU WEREN'T CLAIMING WE VIOLATED ANYBODY'S RIGHTS.

**Q.**   RIGHT.  I'M NOT.  LET ME PUT IT THIS WAY.  DID YOU ACQUIRE THE RIGHTS FROM THE DEFENDANTS TO USE EVERY SINGLE ONE OF THE

1  MEMBERS OF THAT 89 49ER TEAM?

2  **MR. FEHER:** OBJECTION TO FORM, YOUR HONOR.

3  THE QUESTION WHEN HE IS REFERRING TO THE "MEMBERS,"

4  IT'S COMPLETELY UNCLEAR WHAT HE'S REFERRING TO.

5  **THE WITNESS:** I CAN'T SEE --

6  **THE COURT:** I THINK WHAT HE'S ASKING IS, DID YOU GET

7  FOR THE REAL -- WHAT'S THE YEAR, '89?

8  **MR. HUMMEL:** YEAH, 89 49ERS.

9  **THE COURT:** FOR THE REAL 89 49ERS, WE COULD GO BACK

10  AND LOOK IN THE SPORTS BOOKS AND FIGURE OUT JOE MONTANA AND

11  ROGER CRAIG. HE'S ASKING: DID YOU HAVE THE RIGHTS TO USE

12  THEIR ACTUAL IMAGES? IS THAT YOUR QUESTION?

13  **MR. HUMMEL:** YES, SIR.

14  **THE COURT:** FOR THOSE ACTUAL PEOPLE.

15  **THE WITNESS:** AGAIN, I DON'T RECALL RIGHT NOW

16  WHETHER -- IF WE DID FOR ANY OF THEM. AND IF WE DIDN'T HAVE

17  THE RIGHTS, IT WAS OUR PRACTICE NOT TO USE THE NAMES OR IMAGES

18  OF THOSE PLAYERS.

19  **BY MR. HUMMEL:**

20  **Q.** I UNDERSTAND. AND TO BE CLEAR, THIS IS NOT A CASE AGAINST

21  EA. SO MY QUESTION IS THIS: DID THE DEFENDANTS, WHO KNEW

22  ABOUT THIS, COME TO YOU AND SAY:

23  "WE HAVE 2100 RETIRED GUYS UNDER LICENSE. WE'RE

24  GOING TO GIVE YOU THOSE 2100 GUYS UNDER LICENSE SO YOU CAN HAVE

25  AT LEAST SOME OF THEM IN THE GAME"?

1    DID THEY TO THAT?

2  **A.**   I THINK I TOLD YOU BEFORE THAT THEY DIDN'T COME TO US AND

3  SAY:

4        "HERE'S A LIST OF 2100 GUYS."

5  **Q.**   THEY DIDN'T DO THAT.

6        AND WHAT LASHUN LAWSON WROTE TO YOU WAS "SCRAMBLE,"

7  RIGHT?

8        WAS THAT YOUR WORD OR HERS?

9  **A.**   I THINK IT WAS USED BY US BEFORE SHE PUT IT IN HER LETTER.

10 **Q.**   WHAT DID "SCRAMBLE" MEAN?

11 **A.**   CHANGE THE NUMBER.

12 **Q.**   THAT'S ALL, CHANGE THE NUMBER?

13 **A.**   YEAH.

14 **Q.**   DIDN'T MEAN DON'T USE THEIR NAME?

15 **A.**   WE ALREADY KNEW WE WERE NOT GOING TO USE THEIR NAME.  WHAT

16 I TOLD YOU WAS THAT PLAYERS INC IS PARTICULARLY SENSITIVE ON

17 THE ISSUE OF PLAYER NUMBERS.  THE LEAGUE GRANTS US THE RIGHT TO

18 THE JERSEYS, INCLUDING THE NUMBERS.  BUT IT'S A LITTLE BIT OF

19 AN INTERMURAL BATTLE BETWEEN THE PLAYERS ASSOCIATION AND THE

20 LEAGUE WHO ACTUALLY HAS THE RIGHT THE NUMBERS.

21        AND DISCRETION BEING THE BETTER PART OF VALOR, AS THE

22 LICENSEE IN THE MIDDLE OF THE NFL AND THE PLAYERS ASSOCIATION,

23 WE CHOSE NEVER TO FIGHT THEM ABOUT THAT SAYING:

24        "WELL, WAIT A SECOND.  THE LEAGUE GIVES US THE

25 RIGHT TO THESE JERSEYS, AND PART OF THE JERSEY IS THE NUMBER."

1    AND WE JUST DECIDED NOT TO ARGUE WITH THEM OVER THAT.

2   **Q.**   OKAY.  AND ISN'T IT TRUE THAT LASHUN LAWSON WAS TELLING EA

3   IN 2001:

4                   "IF YOU DON'T HAVE THE RIGHTS, YOU HAVE TO

5   SCRAMBLE"?

6   **A.**   THE NUMBER.

7   **Q.**   SCRAMBLE.  IT DOESN'T SAY THE NUMBER.

8   **A.**   I'M TELLING YOU WHAT I UNDERSTOOD.  THEY DIDN'T WANT US TO

9   USE THE NUMBER OF THE PLAYER.

10  **Q.**   RIGHT.

11  **A.**   WE WEREN'T NECESSARILY CONCEDING THAT WE DIDN'T HAVE THE

12  RIGHT TO USE THE NUMBER FROM THE JERSEY THAT THE NFL GRANTED US

13  THE RIGHTS TO.  BUT I THINK FOR THE MOST PART WE WENT ALONG

14  WITH THEIR REQUEST NOT TO USE THE NUMBER OF JOE MONTANA AND

15  NUMBER 16.

16  **Q.**   AND YOU DID THAT, RIGHT?

17  **A.**   THAT WAS OUR PRACTICE.

18  **Q.**   OKAY.

19  **A.**   IF WE DID NOT HAVE THE RIGHTS TO JOE MONTANA.  SO IF WE

20  HAD LICENSED JOE'S RIGHTS WE WOULD USE HIS PHOTO AND HIS JERSEY

21  NUMBER AND HIS BIOGRAPHICAL INFORMATION, ET CETERA.

22  **Q.**   AND INSTEAD OF SAYING "IT MUST BE SCRAMBLED," THEY DIDN'T

23  COME TO YOU IN 2001, '2, '3, '4, '5, '6, '7, AND SAY:

24                   "WE HAVE THIS GROUP OF GUYS UNDER LICENSE.  TAKE

25  THEM"?

**A.**   FOR HOW MUCH EXTRA?

**Q.**   NO EXTRA.

**A.**   THEY NEVER OFFERED US THE LIST OF 2100 GUYS.  WE'VE SAID
THAT A COUPLE OF TIMES.

**Q.**   OKAY.  AND, IN FACT, IN -- LET ME GET THE DATE RIGHT --
2005, IN JUNE, JEREMY STRAUSSER REACHED OUT TO LASHUN LAWSON
AGAIN AND WANTED TO USE RETIRED PLAYER DATA IN THE MADDEN GAME
AGAIN, RIGHT?

**A.**   I'M NOT SURE.

**Q.**   LOOK AT EXHIBIT 1184.

         **MR. HUMMEL:**  YOUR HONOR, IN A REDACTED FORM THIS
DOCUMENT HAS BEEN ADMITTED.

         **THE WITNESS:**  HOLD ON A SECOND.

         **MR. HUMMEL:**  HASN'T BEEN ADMITTED YET, BUT I'LL OFFER
IT NOW.

         **MR. FEHER:**  MAY I HAVE A MOMENT, YOUR HONOR?

         **THE COURT:**  1184, IS THIS THE E-MAIL CHAIN THAT WE
DISCUSSED EARLIER?

         **MR. HUMMEL:**  YES, SIR.

         **THE COURT:**  DOES IT CONFORM TO THE COURT'S RULING?

         **MR. HUMMEL:**  YES, IT DOES.

         **THE COURT:**  IS THERE ANY OBJECTION?

         **MR. KESSLER:**  IF THEY'VE REDACTED THE MATERIAL THAT'S
NOT ADMISSIBLE, THEN IT'S FINE.

         **THE COURT:**  ALL RIGHT.  WITH THAT REPRESENTATION,

1   1184 IS RECEIVED.

2           (TRIAL EXHIBIT 1184 RECEIVED IN EVIDENCE.)

3   **BY MR. HUMMEL:**

4   **Q.**   DO YOU HAVE EXHIBIT 1184, SIR?

5   **A.**   YES, I'M READING IT.

6   **Q.**   YOU'RE NOT SHOWN AS A COPY ON THIS, BUT I WOULD LIKE TO

7   TURN TO THE SECOND TO LAST PAGE OF THE EXHIBIT.

8           **MR. FEHER:**   YOUR HONOR, JUST ONE QUESTION, PLEASE.  I

9   BELIEVE THIS DOCUMENT WASN'T LISTED BY THE PLAINTIFFS AS A

10  DOCUMENT TO BE USED IN THIS EXAMINATION.

11          **MR. HUMMEL:**   IT'S CROSS-EXAMINATION, YOUR HONOR.

12          **MR. FEHER:**   IT VIOLATES THE RULES.  UNDER THE RULES

13  THE PLAINTIFFS HAVE KNOWN THAT THIS WITNESS WAS GOING TO BE

14  HERE FOR THIS PURPOSE, AND ALL DOCUMENTS SHOULD HAVE BEEN

15  LISTED.  THIS IS A COMPLETE SURPRISE.

16          **THE COURT:**   WHY IS THIS CROSS-EXAMINATION?

17          **MR. HUMMEL:**   BECAUSE THIS IS AN 811 (C) WITNESS, YOUR

18  HONOR.

19          **THE COURT:**   HE'S NOT AFFILIATED WITH THE OTHER SIDE.

20          **MR. HUMMEL:**   THAT'S NOT THE WORD.  THE RULE IS HE'S

21  IDENTIFIED WITH.

22          **MR. FEHER:**   IF THAT'S THE POINT --

23          **THE COURT:**   THAT POINT IS WRONG, BUT I WILL ALLOW YOU

24  TO USE IT, ANYWAY.

25          **MR. HUMMEL:**   THANK YOU, YOUR HONOR.

BY MR. HUMMEL:

Q.   ALL RIGHT.  IF YOU LOOK AT THE JEREMY -- FROM JEREMY

STRAUSSER, THE FIRST E-MAIL IN THAT CHAIN, DATED --

            MR. HUMMEL:  BOTTOM OF THE PAGE.

            (DOCUMENT DISPLAYED.)

BY MR. HUMMEL:

Q.   NOW, YOU'RE NOT SHOWN AS A COPY OF THAT, SIR.

A.   CAN I READ THROUGH IT?

            THE COURT:  THE COURT IS GOING TO ALLOW YOU TO PURSUE

THIS, BUT ORDINARILY WE DON'T ALLOW YOU TO DISPLAY UP THERE

E-MAILS THAT THE WITNESS NEVER GOT.

            MR. HUMMEL:  I UNDERSTAND YOUR HONOR.

            THE COURT:  SO AT SOME POINT IT'S YOUR OBLIGATION TO

CONNECT HIM UP WITH HAVING PERSONAL KNOWLEDGE OF WHATEVER IT IS

YOU ARE SHOWING.  OTHERWISE, IT'S JUST AN OCCASION FOR

ARGUMENT.

            MR. FEHER:  YOUR HONOR, THIS HASN'T BEEN MOVED INTO

EVIDENCE.  AND I DO BELIEVE THERE IS HEARSAY IN THIS DOCUMENT

APART FROM THE EARLIER RULING.

            MR. HUMMEL:  WE'VE DEALT WITH THAT, YOUR HONOR.

            THE COURT:  WE HAVE DEALT WITH THAT COUNSEL.  IT'S

OVERRULED, AND WITH THE REDACTIONS IT'S IN EVIDENCE.

            MR. HUMMEL:  THANK YOU, YOUR HONOR.

            I WILL LINK THIS UP.

            THE COURT:  THE POINT I'M GETTING AT IS A DIFFERENT

1    ONE.  WE HAVE THIS WITNESS HERE TO GIVE US THE FACTUAL

2    INFORMATION HE CAN GIVE US.  SO I'M EXPECTING YOU TO CONNECT

3    HIM UP WITH THIS E-MAIL CHAIN SOMEHOW.

4            **MR. HUMMEL:**  I WILL, YOUR HONOR.  I'LL TRY.

5            **THE COURT:**  ALL RIGHT.

6    **BY MR. HUMMEL:**

7    **Q.**  MR. LINZNER.

8    **A.**  YES, SIR.

9    **Q.**  JEREMY STRAUSSER WAS AN EMPLOYEE IN 2005, OF EA, AND

10   LASHUN LAWSON WAS AN EMPLOYEE OF PLAYERS INC, RIGHT?

11   **A.**  IN 2005, YES.

12   **Q.**  OKAY.  WERE YOU AWARE OF THE FACT THAT THE -- IN THAT TIME

13   FRAME EA WAS DESIGNING A FEATURE IN MADDEN WHERE THERE WILL BE

14   A LIVING RECORD BOOK WITH ALL THE PRESET NFL RECORDS BY GAME,

15   SEASON AND CAREER?

16            WERE YOU AWARE OF THAT?

17   **A.**  I RECALL THAT THEY WERE THINKING OF INCLUDING THAT IN A

18   MADDEN GAME AT SOME POINT IN TIME.  I DON'T REMEMBER THE DATE,

19   BUT I DO RECALL THAT THERE WAS A CONSIDERATION GIVEN TO HAVING

20   A RECORD BOOK FEATURE.

21   **Q.**  AND DO YOU RECALL THAT EA REACHED OUT TO PLAYERS INC TO

22   GET THEIR VIEWS ON WHETHER THAT WOULD BE OKAY?

23   **A.**  WELL, YEAH, WE REACHED OUT TO PLAYERS INC TO CONFIRM THAT

24   THEY THOUGHT THAT WE DID NOT NEED A LICENSE FOR THIS PARTICULAR

25   FEATURE BECAUSE ALL WE WANTED TO INCLUDE WAS FACTUAL

1  INFORMATION, YOU KNOW, DAN MORENO THREW 49 TOUCHDOWN PASSES IN

2  1998, OR WHATEVER IT WAS.

3  **Q.**  RIGHT.  RIGHT.

4        AND SO MR. STRAUSSER WAS REACHING OUT HERE TO LASHUN

5  LAWSON, RIGHT?

6  **A.**  YES.  THAT'S WHAT IT APPEARS TO BE.

7  **Q.**  AND HE WROTE ON BEHALF OF EA, YOUR COMPANY, IN THE SECOND

8  PARAGRAPH:

9        "I KNOW THAT PLAYERS INC DOESN'T WANT US TO

10  INCLUDE ANY RETIRED PLAYERS IN THE GAME."

11        HOW DID HE KNOW THAT?

12        **MR. FEHER:**  OBJECTION, YOUR HONOR.  THERE IS NO

13  FOUNDATION.

14        **THE COURT:**  SUSTAINED.

15  **BY MR. HUMMEL:**

16  **Q.**  DID YOU KNOW THAT?

17  **A.**  THAT'S NOT CORRECT.

18  **Q.**  SO THAT'S AN INCORRECT STATEMENT IN THE E-MAIL?

19  **A.**  THAT'S CORRECT.

20  **Q.**  ALL RIGHT.

21  **A.**  IT'S CORRECT THAT IT'S AN INCORRECT STATEMENT.

22  **Q.**  OKAY.

23  **A.**  THEY -- WHAT THEY WANTED, THEY WANTED US TO INCLUDE

24  RETIRED PLAYERS IN THE GAME, BUT THEY WANTED US TO PAY EXTRA

25  FOR IT.  FOR THIS PARTICULAR FEATURE WE WERE OF THE OPINION

1  THAT BECAUSE IT WAS FACTUAL INFORMATION IT WAS SORT OF PUBLIC

2  DOMAIN INFORMATION.  WE DIDN'T NEED A SEPARATE LICENSE FROM DAN

3  MARINO IN THAT EXAMPLE I JUST GAVE TO INCLUDE FACTUAL

4  INFORMATION THAT HE HELD THE RECORD FOR MOST TOUCHDOWN PASSES.

5  **Q.**   THEY WANTED YOU TO PAY EXTRA FOR THAT INFORMATION, RIGHT?

6  **A.**   THEY THOUGHT THAT WE SHOULDN'T USE THE NAMES OR THE STATS

7  OF THOSE PLAYERS UNLESS WE SECURED SEPARATE LICENSES, AND WE

8  PAID SEPARATELY.

9  **Q.**   NOT TO BE REPETITIVE, BUT IN THE CONTEXT OF THIS DIALOGUE

10 THAT WAS OCCURRING IN 2005, ISN'T IT CORRECT THAT NO ONE FROM

11 PLAYERS INC EVER TOLD YOU OR MR. STRAUSSER, TO YOUR KNOWLEDGE:

12                 "WE'VE GOT 2100 RETIRED PLAYERS UNDER A GROUP

13 LICENSE, AND YOU COULD USE THEIR STATS"?

14 **A.**   WE ONLY WANTED THE STATS OF LIKE, AN EXAMPLE, DAN MARINO,

15 WHO HAD THE RECORD FOR THE MOST TOUCHDOWN PASSES.  BUT IT IS

16 BEING REPETITIVE.  I TOLD YOU THEY NEVER GAVE US A LIST OF 2100

17 PLAYERS THAT THEY REPRESENTED.

18 **Q.**   SO IN THIS CONTEXT WHEN YOU'RE REACHING OUT YET AGAIN THEY

19 SAID "NO," RIGHT, WITHOUT AN EXTRA FEE?

20 **A.**   WITHOUT AN EXTRA FEE.  IF WE WERE WILLING TO PAY FEES, YOU

21 KNOW, FOR THE DAN MARINO RECORD OR THE WALTER PAYTON RECORD OR,

22 YOU KNOW, LAWRENCE TAYLOR, AND THE SACK RECORD, WHATEVER IT MAY

23 BE, THEY WOULD HAVE ENDEAVORED TO TRY AND SECURE THE RIGHTS TO

24 THOSE PLAYERS FOR THE FEE THAT WE COULD NEGOTIATE.

25 **Q.**   BUT YOU DIDN'T KNOW WHETHER WITHIN THAT GROUP OF 2100 GUYS

WHO SIGNED RETIRED PLAYER GROUP AUTHORIZATION FORMS THERE MIGHT

HAVE BEEN SOME RIGHTS THAT YOU ACTUALLY WANTED TO USE, RIGHT?

**A.**   WE DIDN'T KNOW WHO -- I'VE TOLD YOU SEVERAL TIMES -- I'M

SURE THE JURY'S HEARD IT BY NOW -- THEY DID NOT GIVE US A LIST

OF 2100 PLAYERS.

WE TYPICALLY WOULD TELL THEM WHO WE WANTED, AND THEY

WOULD TRY AND GET THEM.

**MR. HUMMEL:**  ONE MOMENT, YOUR HONOR.

NOTHING FURTHER AT THIS TIME, YOUR HONOR.

**THE COURT:**  TAKE A BREAK SO I CAN DEAL WITH THE HALL

OF FAME ISSUE.  THIS TIME IT WILL BE 20 MINUTES.

**THE CLERK:**  ALL RISE.

(THEREUPON, THE JURY LEFT THE COURTROOM.)

**THE WITNESS:**  DO YOU NEED ME FOR THIS, YOUR HONOR?

**THE COURT:**  DO I NEED THE WITNESS FOR THIS?

**MR. KESSLER:**  I DON'T THINK SO, YOUR HONOR.

**MR. HUMMEL:**  NO, YOUR HONOR.

**THE COURT:**  WHY DON'T YOU STEP OUT AND TAKE YOUR

20-MINUTE BREAK, TOO?

THANK YOU, MR. LINZNER.

DO YOU STILL WANT TO GO INTO THE HALL OF FAME?

**MR. HUMMEL:**  YES, YOUR HONOR.

**THE COURT:**  ALL RIGHT.  WELL, THEN, HERE IS WHAT MY

NOTES FROM THE -- EVERYONE ELSE HAVE A SEAT.

DO YOU WANT MR. LINZNER HERE OR NOT?

1    **MR. HUMMEL:**  NOT.

2         **THE COURT:**  NOT.  ALL RIGHT.  YOU'LL NEED TO STEP

3    OUTSIDE, THEN.

4         **THE WITNESS:**  THANK YOU, YOUR HONOR.

5         **THE COURT:**  ON DEFENDANTS' MOTION IN LIMINE NUMBER 3,

6    THE STIPULATED LANGUAGE YOU GAVE ME IS THIS WAS GRANTED.

7         "PLAINTIFFS MAY NOT INTRODUCE EVIDENCE RELATING TO

8    PLAINTIFFS' COMPLAINTS ABOUT AD HOC AGREEMENTS, INCLUDING BUT

9    NOT LIMITED TO SUCH EVIDENCE RELATING TO THE LICENSE AGREEMENT

10   BETWEEN ELECTRONIC ARTS, THE PRO FOOTBALL HALL OF FAME AND

11   PLAYERS INC."

12        SO THIS WAS -- THIS WAS, IN MY MEMORY OF IT, GETTING

13   AT COMPLAINTS, NOT -- IT WAS NOT A BLANKET RULING THAT THE HALL

14   OF FAME WAS OUT OF THE CASE.

15        IT WAS EXCLUDING THE COMPLAINTS.  ISN'T THAT THE WAY

16   IT CAME DOWN?

17        **MR. KESSLER:**  YES, YOUR HONOR.  I BELIEVE THE PURPOSE

18   OF INTRODUCING THIS WITH THE WITNESS WAS TO COMPLAIN ABOUT THE

19   BEHAVIOR OF PLAYERS INC IN CONNECTION WITH THE LICENSING OF

20   THAT AGREEMENT.  THERE ARE SEVERAL DIFFERENT POSSIBLE

21   COMPLAINTS.

22        THEY HAVE ONE SET OF COMPLAINTS, YOUR HONOR KNOWS,

23   REGARDING THE PRICES THAT WERE PAID.  AND THAT'S DEFINITELY

24   COVERED BY THIS EXCLUSION.

25        AND THEN, THEY HAD OTHER COMPLAINTS, WHICH I THINK

1  THEY WERE TRYING TO ELICIT ABOUT:

2          "WELL, HOW DID -- WHAT DID THEY OFFER FOR YOU

3  FOR THIS GAME?"

4          THIS GAME, THE PROBLEM IS, YOUR HONOR, IS THAT IT WAS

5  AN AD HOC LICENSE.  THEY CONCEDE IT WAS AN AD HOC LICENSE.

6  THEY'RE CLAIMING NO INJURY OR DAMAGES FROM THE AD HOC LICENSE.

7          AND THE REASON YOUR HONOR EXCLUDED IT BECAUSE IT

8  WOULD CONFUSE THE JURY THAT THERE WAS, IN FACT, GOING TO BE

9  SOME CLAIM FOR THE BEHAVIOR REGARDING AN AD HOC LICENSE LIKE

10  THE HALL OF FAME GAME.

11          **THE COURT:**  LET'S SEE.  WHAT IS THE -- WHAT IS THE

12  PROFFER THAT THIS WITNESS, MR. LINZNER -- WHAT EVIDENCE DO YOU

13  EXPECT TO GET OUT OF HIM AND FOR WHAT PURPOSE ON THE SUBJECT OF

14  THE HALL OF FAME?

15          **MR. HUMMEL:**  WELL, YOUR HONOR, I WAS SIMPLY GOING TO

16  ESTABLISH THAT EA PUBLISHED A GAME, UTILIZED A GAME THAT HAD

17  SIX OR MORE RETIRED FORMER NFL PLAYERS.

18          THAT'S A PRODUCT THAT OUR CONTENTION IS FALLS WITHIN

19  THE DEFINITION OF THE GLA LICENSE.  AND THEY DID IT REPEATEDLY

20  WITH THE HISTORIC TEAMS AND WITH THE GROUP.

21          **MR. KESSLER:**  AND, YOUR HONOR, THEY'VE ALREADY

22  ESTABLISHED THROUGH MR. LINZNER THAT WHEN THEY DID DO AD HOC

23  AGREEMENTS FOR RETIRED PLAYERS, THAT THERE WERE RETIRED PLAYERS

24  AND ACTIVE PLAYERS IN THE GAME.

25          THIS EA HALL OF FAME GAME IS BEFORE THE STATUTE OF

1   LIMITATIONS PERIOD.  SO THEY'VE ALREADY ESTABLISHED THE

2   ARGUMENT HE MADE OR THAT HE WANTS TO MAKE THAT THERE WERE BOTH

3   RETIRED AND ACTIVE PLAYERS WHEN THEY LICENSED THE RETIRED

4   PLAYERS DURING THE LIMITATIONS PERIOD.  HE DOESN'T HAVE TO GO

5   INTO THE PRELIMITATIONS PERIOD TO DO THAT.

6        **MR. LECLAIR:**  YOUR HONOR, THAT'S JUST TOTALLY

7   INCORRECT.  I DON'T KNOW WHAT MR. KESSLER IS TALKING ABOUT.

8   IT'S ENTIRELY WITHIN THE STATUTE OF LIMITATIONS.

9        **MR. KESSLER:**  I'M SORRY.  I THOUGHT IT WAS THE OTHER

10  ONE.  I APOLOGIZE.  IT IS IN THE LIMITATIONS PERIOD.

11       I GUESS MY POINT THEN IS THEY HAVE ALREADY

12  ESTABLISHED THAT WITH RESPECT TO OTHER GAMES.  IF THAT'S THE

13  SOLE PURPOSE, HE'S ALREADY ESTABLISHED THAT.

14       IF THAT'S THE SOLE QUESTION, THEN I PROBABLY DON'T

15  HAVE SUCH AN OBJECTION.  MY PROBLEM IS I CERTAINLY DON'T WANT

16  TO OPEN THE DOOR TO ANYTHING ABOUT THEIR COMPLAINTS, ABOUT THE

17  BELOW MARKET -- ALLEGED BELOW MARKET PRICES OR ANY OF THOSE

18  OTHER THINGS WHICH IS NOT A SUBJECT OF THIS CASE.

19       **THE COURT:**  ARE YOU GOING TO GET INTO THAT?

20       **MR. HUMMEL:**  NOT WITH THIS WITNESS.

21       **MR. LECLAIR:**  NOT WITH THIS WITNESS.  BUT, YOUR

22  HONOR, WE DID FILE A BRIEF THIS MORNING AND WE DO HAVE A

23  WITNESS TOMORROW TO WHICH THAT EVIDENCE WILL APPLY.

24       SO WE WOULD LIKE TO HAVE THAT ISSUE RESOLVED.  BUT IT

25  DOESN'T HAVE TO BE RESOLVED FOR THIS WITNESS.

1    **THE COURT:** AGAIN, MR. HUMMEL, WHAT ARE THE POINTS

2 YOU WANT TO MAKE WITH MR. LINZNER ON THE HALL OF FAME?

3    **MR. HUMMEL:** THAT THIS WAS A GAME THAT EA

4 MANUFACTURED AND SOLD THAT UTILIZED SIX OR MORE PRESENT OR

5 FORMER PLAYERS. AND IT WAS PURSUANT TO A GROUP LICENSE.

6    **MR. KESSLER:** WELL, IT CERTAINLY WAS NOT PURSUANT TO

7 A GROUP LICENSE IF HE MEANS THE GROUP LICENSES THAT RETIRED

8 PLAYERS SIGNED.

9    **MR. HUMMEL:** IT DOESN'T SAY THAT. HE KEEPS WANTING

10 TO TRUMP OUR ARGUMENT OR DEFEND HIS CASE BASED ON LANGUAGE

11 THAT'S NOT IN THE GLA.

12    WE'RE ENTITLED TO PUT ON A CASE BASED ON THE LANGUAGE

13 OF THE GLA. THAT'S WHAT I'M DOING.

14    **THE COURT:** ALL RIGHT. YOU CAN ASK THE LINE OF

15 QUESTIONS THAT YOU SAID THAT YOU WANT --

16    **MR. HUMMEL:** THANK YOU, YOUR HONOR.

17    **THE COURT:** -- TO ASK.

18    **MR. KESSLER:** MY ONLY REMAINING OBJECTION IS HE

19 SHOULDN'T BE QUESTIONING THIS WITNESS ABOUT THE MEANING OF

20 GROUP LICENSE, BECAUSE HE'S TRYING TO INPUT THAT TO THE GLA.

21 AND THIS WITNESS HAS ALREADY TESTIFIED HE'S NEVER EVEN SEEN THE

22 GLA. SO HE COULD OFFER NO TESTIMONY ABOUT WHETHER IT'S A GROUP

23 LICENSE OR NOT WITH RESPECT TO THE GLA.

24    **THE COURT:** THIS WITNESS IS VERY CAPABLE OF DEFENDING

25 HIMSELF.

1    MR. HUMMEL:  QUITE.

2        THE COURT:  AND MAKING ALL PROPER DISTINCTIONS.

3    MR. KESSLER:  OKAY.

4        THE COURT:  AND I DON'T THINK THAT MR. HUMMEL, AS

5  GOOD A LAWYER AS HE IS, IS GOING TO PULL THE WOOL OVER THE EYES

6  OF MR. LINZNER.

7        SO THE LINE OF QUESTIONS IS GOING TO BE ALLOWED.  AND

8  I'LL HAVE TO DIG OUT -- MY LAW CLERK HAS ARRIVED.  THEY TELL ME

9  THAT THEY HAVE FILED SOME BRIEFS OVERNIGHT.  I DID NOT SEE

10 THOSE.

11       MR. KESSLER:  WE DIDN'T SEE IT, EITHER.

12       MR. HUMMEL:  IT WAS JUST FILED THIS MORNING.

13       MR. KATZ:  IT WAS THIS MORNING, YOUR HONOR.

14       MR. KESSLER:  AFTER WE GOT TO COURT.

15       THE COURT:  ANYWAY, WE NEED TO DIG THOSE OUT.  I

16 DON'T KNOW WHAT MR. LECLAIR IS TALKING ABOUT, BUT I'LL SEE IF I

17 CAN'T FIGURE IT OUT.  OKAY.

18       TAKE A 15-MINUTE BREAK.

19       MR. HUMMEL:  THANK YOU, YOUR HONOR.

20       (RECESS TAKEN FROM 10:55 TO 11:14 A.M.)

21       THE COURT:  BEFORE WE BRING IN THE JURY, MR. KESSLER,

22 WOULD YOU RESPOND TO THIS BY 5:00 P.M. TODAY, THIS LETTER DATED

23 OCTOBER 29TH?

24       MR. KESSLER:  YES, YOUR HONOR, WE WILL DO SO.

25       THE COURT:  ALL RIGHT.  WE'LL ARGUE THIS FIRST THING

1  IN THE MORNING.

2       ALL RIGHT.  BRING IN THE JURY.

3      **MR. KESSLER:**  THERE'S ONE BRIEF ISSUE BECAUSE WE WERE

4  HANDED TODAY IN COURT A DOCUMENT, TRIAL EXHIBIT 1164-2.  I

5  ASSUME THE REASON WE WERE HANDED THIS IS BECAUSE THAT

6  PLAINTIFFS WANTED TO TRY TO USE THIS PERHAPS FOR MR. ADDERLEY

7  BECAUSE IT WAS NOT USED FOR MR. LINZNER, BUT WE'RE NOT GOING TO

8  HAVE ANOTHER BREAK.

9       WE HAD NO PRIOR NOTICE OF THIS DOCUMENT UNDER THE

10  COURT'S RULES.  IT'S A GLA SIGNED BY MR. JOE GREENE, WHICH

11  MR. ADDERLEY, OF COURSE, NEVER HAD POSSESSION OF.  AND IT HAS

12  HANDWRITING ABOUT "HOF," WHICH I ASSUME IS THE HALL OF FAME.

13  AND MR. ADDERLEY WOULDN'T EVEN KNOW WHAT THAT HANDWRITING IS.

14  SO I DON'T THINK IT'S APPROPRIATE FOR THIS DOCUMENT TO BE

15  INTRODUCED WITH ANY WITNESS TODAY, BUT I DON'T KNOW WHAT

16  PURPOSE THEY GAVE IT TO ME.

17      **MR. KATZ:**  IT HAS NOTHING TO DO WITH MR. ADDERLEY'S

18  EXAMINATION, YOUR HONOR.

19      **MR. HUMMEL:**  IT MIGHT HAVE SOMETHING TO DO WITH

20  MR. LINZNER'S RECROSS.  AND WE GAVE THEM NOTICE TODAY.

21      **THE COURT:**  ALL RIGHT.

22      **MR. KESSLER:**  CAN I OBJECT, THEN, BECAUSE WE HAD NO

23  NOTICE OF THIS UNDER THE COURT'S RULES, OF THIS DOCUMENT?

24      **THE COURT:**  WELL, IF IT'S ON RECROSS --

25      **MR. HUMMEL:**  RIGHT.

1     **THE COURT:**  -- IT WOULD BE ANOTHER MATTER.

2     **MR. KESSLER:**  OKAY.

3     **THE COURT:**  WE HAVE TO WAIT AND SEE HOW THE

4  INTERVENING EXAMINATION GOES.

5     CAN WE NOW BRING BACK THE JURY?

6     **MR. HUMMEL:**  YOUR HONOR, WHILE WE'RE DOING THAT, I

7  JUST WANT TO INFORM YOU THE HARD COPY OF THE HALL OF FAME GAME

8  IS AT OUR OFFICE.  IT WAS INADVERTENTLY NOT PUT IN THE RIGHT

9  READ WELL.  SO IF I COULD DISPLAY THIS ON THE PODIUM?

10     **THE COURT:**  ALL RIGHT.

11     **MR. HUMMEL:**  THANK YOU, YOUR HONOR.

12     (THEREUPON, THE JURY RETURNED.)

13     **THE CLERK:**  ALL RISE.

14     **THE COURT:**  WELCOME BACK.  HAVE A SEAT.

15     MR. HUMMEL, YOU MAY CONTINUE.

16     **MR. HUMMEL:**  THANK YOU, YOUR HONOR.

17     LADIES AND GENTLEMEN, MR. LINZNER.

18     COULD I HAVE DISPLAYED EXHIBIT 1268, PLEASE?

19     (DOCUMENT DISPLAYED.)

20  **BY MR. HUMMEL:**

21  **Q.**   MR. LINZNER, THIS IS A PRODUCT THAT EA MARKETED, CORRECT?

22  **A.**   YES.  CAN I SEE THE HARD COPY?

23  **Q.**   OH, SURE.

24  **A.**   I CAN'T SEE THE YEAR.

25  **Q.**   SORRY.

1  A.   YES, SIR.

2  Q.   CAN YOU SEE THE YEAR ON THAT ONE?

3  A.   YEAH.  IT SAYS "MADDEN NFL '07." IT'S HARD TO SEE, BUT TO

4  THE RIGHT OF THE NFL SHIELD THERE'S NUMBERS THAT SAY "'07."

5  Q.   IT'S THE HALL OF FAME EDITION.  WHAT DOES THAT MEAN?

6  A.   JOHN MADDEN WHO OBVIOUSLY OUR GAME IS NAMED AFTER IS A

7  FAMOUS COACH FOR THE OAKLAND RAIDERS AND NOW A VERY FAMOUS

8  FOOTBALL ANNOUNCER.  HE WAS ADMITTED INTO THE NFL HALL OF FAME

9  IN 2006.

10       SO WE COMMEMORATED, CELEBRATED HIS ENTRY INTO THE

11  HALL OF FAME WITH A SPECIAL MADDEN NFL HALL OF FAME EDITION.

12  Q.   DID THAT EDITION ALSO CONTAIN HALL OF FAME TEAMS?

13  A.   I DON'T -- I -- HALL OF FAME?  THERE'S NO SUCH THING AS A

14  HALL OF FAME TEAM.

15  Q.   I UNDERSTAND.  BUT DID MADDEN -- DID EA IN THE MADDEN GAME

16  CREATE HALL OF FAME TEAMS THAT COULD PLAY AGAINST EACH OTHER?

17  A.   I DON'T KNOW.

18  Q.   YOU DON'T KNOW?

19  A.   NO.

20  Q.   DID YOU EVER ACQUIRE THE RIGHTS TO RETIRED PLAYERS FROM

21  THE HALL OF FAME?

22  A.   WE DID A DEAL WITH THE HALL OF FAME THAT INCLUDED THE

23  RIGHTS TO HALL OF FAME MEMBERS.

24  Q.   RIGHT.

25  A.   THAT CONSENTED TO IT.  AND WHO HADN'T LICENSED THEIR

1 RIGHTS OUT EXCLUSIVELY TO SOMEONE ELSE IN THE INTERIM.  I DON'T

2 THINK THEY WERE HALL OF FAME TEAMS.  THEY WERE PLAYERS THAT YOU

3 COULD USE IN THE GAME SOMEHOW.

4 **Q.**  WASN'T THERE IN THIS VERSION AN AFC ALL STAR TEAM MADE UP

5 OF HALL OF FAME PLAYERS VERSUS AN NFC ALL STAR TEAM?

6 **A.**  I DON'T KNOW.

7 **Q.**  YOU DON'T KNOW.  ALL RIGHT.

8      AND DID PLAYERS INC HAVE ANY ROLE IN NEGOTIATING YOUR

9 DEAL WITH THE HALL OF FAME?

10 **A.**  YES, THEY DID.

11 **Q.**  THEY DID.  ALL RIGHT.

12      AND THOSE WERE ALL RETIRED PLAYERS AT THE TIME,

13 CORRECT?

14 **A.**  WELL, BY DEFINITION, YOU CAN'T BE IN THE HALL OF FAME

15 UNLESS YOU'VE RETIRED.

16 **Q.**  SO THE ANSWER IS "YES"?

17 **A.**  YES.

18 **Q.**  SO ONE MORE EXHIBIT, NUMBER 1240.

19      **THE COURT:**  1268, YOU DIDN'T MOVE THAT INTO EVIDENCE.

20      **MR. HUMMEL:**  MAY I MOVE IT NOW?

21      **THE COURT:**  ANY OBJECTION TO 1268?

22      **MR. FEHER:**  NO, YOUR HONOR.

23      **THE COURT:**  RECEIVED.

24      (TRIAL EXHIBIT 1268 RECEIVED IN EVIDENCE)

25      **THE WITNESS:**  MR. HUMMEL?  YOU WANT THIS BACK?

1    **THE COURT:** ALL RIGHT. NOW, WHAT WAS THE OTHER ONE?

2    **MR. HUMMEL:** THIS ONE IS 1240.

3 **BY MR. HUMMEL:**

4 **Q.** ALL RIGHT, SO MR. LINZNER THIS IS NOT A DOCUMENT YOU'VE

5 EVER SEEN BEFORE, I TAKE IT, CORRECT?

6 **A.** I DON'T RECALL EVER SEEING THIS BEFORE.

7 **Q.** IT'S A COMPILATION THAT WAS PREPARED BY THE PLAINTIFFS IN

8 THIS CASE.

9    YOUR HONOR, I THINK THERE'S A STIPULATION THAT IT'S

10 ADMISSIBLE IN ITS CURRENT FORM?

11    **MR. KESSLER:** ABSOLUTELY.

12    **MR. FEHER:** YES, YOUR HONOR.

13    **THE COURT:** RECEIVED.

14    (TRIAL EXHIBIT 1240 RECEIVED IN EVIDENCE)

15    **MR. HUMMEL:** CAN WE DISPLAY THE FIRST PAGE OF THIS

16 SUMMARY, PLEASE.

17    THANK YOU, YOUR HONOR.

18    (DOCUMENT DISPLAYED.)

19 **BY MR. HUMMEL:**

20 **Q.** THIS IS A COMPILATION OF SAMPLES OF RETIRED NFL PLAYER

21 CLASS MEMBERS WHOM PLAINTIFFS CONTEND ARE IN CERTAIN VERSIONS

22 OF EA'S MADDEN VIDEO GAME.

23    MY QUESTION TO YOU IS THIS, SIR: DID YOU EVER IN

24 YOUR ROLE, OR TO YOUR KNOWLEDGE DID ANYONE IN EA EVER UNDERTAKE

25 TO DETERMINE WHICH RETIRED PLAYERS WHO HAD SIGNED GROUP

1  LICENSING AUTHORIZATION FORMS WITH THE DEFENDANTS WERE DEPICTED

2  IN SOME FASHION IN EA'S MADDEN GAME?

3  **A.**   I THINK I'VE TOLD YOU AT LEAST THREE OR FOUR TIMES I NEVER

4  GOT A LIST OF ALL THE RETIRED PLAYERS WHO HAD SIGNED GLA'S, OR

5  TO MY KNOWLEDGE ANYONE ELSE AT EA.  SO I DON'T KNOW HOW THAT

6  COULD HAVE BEEN DONE.

7            **MR. HUMMEL:**  NO FURTHER QUESTIONS, YOUR HONOR.

8            **THE COURT:**  ALL RIGHT.  CROSS-EXAMINATION.

9            **MR. FEHER:**  YES, YOUR HONOR.

10           GOOD MORNING.  MEMBERS OF THE JURY, YOU HAVEN'T MET

11  ME YET.  I'M DAVID FEHER.

12           **THE COURT:**  SAME YOUR NAME AGAIN.

13           **MR. FEHER:**  DAVID FEHER, F-E-H-E-R.

14           **THE COURT:**  F-E --

15           **MR. FEHER:**  H-E-R.

16           **THE COURT:**  THANK YOU.

17           ADJUST THE MIC SO WE WILL ALL HEAR YOU.  AND GO RIGHT

18  AHEAD.

19                    **<u>CROSS EXAMINATION</u>**

20  **BY MR. FEHER:**

21  **Q.**   GOOD MORNING, MR. LINZNER.

22  **A.**   GOOD MORNING, MR. FEHER.

23  **Q.**   APART FROM YOUR DEPOSITION AND BRIEFLY SEEING YOU AT

24  MR. UPSHAW'S MEMORIAL SERVICE, HAVE WE EVER MET?

25  **A.**   THOSE ARE THE ONLY TWO TIMES I THINK I HAVE EVER SEEN YOU.

1  **Q.** JUST GOING TO A FEW CLEANUP POINTS THAT MR. HUMMEL WENT

2  OVER, DID MR. ALLEN -- WELL, ACTUALLY LET ME LAY ONE PREDICATE.

3       FROM 1999 ON, IS IT FAIR TO SAY THAT YOU WERE THE

4  CHIEF NEGOTIATOR ON BEHALF OF EA WITH PLAYERS INC RELATING TO

5  THE LICENSING MATTERS?

6  **A.** CERTAINLY WITH THE MAIN LICENSE AGREEMENT WITH PLAYERS

7  INC, YES.

8  **Q.** AND DURING YOUR NEGOTIATIONS WITH PLAYERS INC, DID DOUG

9  ALLEN REPEATEDLY MAKE IT CLEAR TO YOU THAT IN ADDITION TO ANY

10 PLAYERS AS TO WHICH EA EXPRESSED INTEREST, THAT PLAYERS INC

11 ALSO HELD RIGHTS TO ADDITIONAL PLAYERS?

12       **MR. HUMMEL:** OBJECTION. LEADING, YOUR HONOR.

13       **MR. FEHER:** HE'S NOT MY WITNESS, YOUR HONOR. HE'S A

14 THIRD PARTY.

15       **THE COURT:** HE IS A THIRD-PARTY WITNESS. OBJECTION

16 OVERRULED.

17       NOW, THAT'S WITHOUT PREJUDICE -- IF I THINK THIS GETS

18 OUT OF HAND --

19       **MR. FEHER:** I UNDERSTAND.

20       **MR. CHARHON:** AND THERE'S TOO MUCH LEADING, I'M GOING

21 TO INTERVENE, ANYWAY. BUT FOR THE TIME BEING, OKAY.

22       **MR. FEHER:** I UNDERSTAND, YOUR HONOR.

23       **THE WITNESS:** I'VE LOST THE QUESTION.

24 **BY MR. FEHER:**

25 **Q.** THAT'S ALL RIGHT.

1          DID MR. ALLEN INDICATE TO YOU REPEATEDLY IN YOUR

2  NEGOTIATIONS THAT IN ADDITION TO THE PLAYERS THAT EA INDICATED

3  THAT THEY WERE INTERESTED IN, THAT PLAYERS INC ALSO HELD RIGHTS

4  TO ADDITIONAL PLAYERS?

5  **A.**   I MEAN, THE QUESTION IS HARD TO ANSWER BECAUSE YOU'RE

6  TIMING IT IN THE NEGOTIATIONS OVER THE LICENSE AS OPPOSED TO

7  OTHER TIMES WHEN THE LICENSE WAS IN EXISTENCE.

8  **Q.**   AT ANY TIME DURING THE PERIOD?

9  **A.**   SO IF WE'RE TALKING ABOUT ANYTIME DURING THE PERIOD, THERE

10  WERE SEVERAL OCCASIONS WHEN VARIOUS MEMBERS OF PLAYERS INC,

11  WHETHER IT WAS MR. ALLEN OR MR. WALKER OR MS. LAWSON, YOU KNOW,

12  TOLD ME PERSONALLY THAT THEY COULD PROCURE THE RIGHTS OR

13  ALREADY HAD THE RIGHTS OF CERTAIN PLAYERS IF WE WANTED TO USE

14  THEM IN OUR VIDEO GAMES.

15          AND THERE WAS A PROVISION IN SOME LATER VERSIONS OF

16  THE LICENSE AGREEMENT THAT REQUIRED US TO INITIALLY GO THROUGH

17  PLAYERS INC IF, IN FACT, WE WANTED TO LICENSE THE RIGHTS TO

18  RETIRED PLAYERS.

19  **Q.**   AND YOU UNDERSTOOD AT THE TIME THAT THOSE ADDITIONAL

20  PLAYERS, THAT PLAYERS INC HAD RIGHTS TO THOSE PLAYERS EITHER

21  THROUGH A GLA OR SOME OTHER AUTHORIZATION?

22          **MR. HUMMEL:**  OBJECTION, LEADING.

23          **THE COURT:**  HERE'S THE THING.  I'M GOING TO SAY TO

24  THE JURY:  ORDINARILY YOU CAN'T LEAD, EXCEPT ON

25  CROSS-EXAMINATION.  NOW, COUNSEL IS LEADING.  AND THIS IS

 1  CROSS-EXAMINATION.

 2         I'M GOING TO ALLOW HIM TO LEAD, BUT YOU SHOULD TAKE

 3  INTO ACCOUNT THE FACT THAT THESE ARE LEADING QUESTIONS.  AND

 4  YOU GIVE IT SUCH WEIGHT AS YOU THINK IT DESERVES GIVEN THE FACT

 5  THAT COUNSEL WILL NOT ASK A NONLEADING QUESTION.

 6         I URGE YOU TO ASK A NONLEADING QUESTION.  YOU HAVE

 7  THE RIGHT TO ASK A LEADING QUESTION ON CROSS, BUT WHEN ALL YOU

 8  WANT THE WITNESS TO DO IS SAY "YES, YES, YES," YOU ARE THE ONE

 9  THAT'S TESTIFYING, AND NOT THE WITNESS.

10         **MR. FEHER:**  YOUR HONOR, I WAS JUST TRYING TO DEAL

11  WITH A FEW CLEANUP QUESTIONS, INITIALLY.

12         **THE COURT:**  IT DIDN'T SOUND LIKE CLEANUP TO ME.  IT

13  SOUNDED LIKE THESE WERE IMPORTANT POINTS.  I URGE YOU NOT TO

14  LEAD THE WITNESS.

15         I WANT THE WITNESS TO BE THE ONE THAT'S TESTIFYING,

16  NOT THE LAWYERS.  NOW, MIND YOU BOTH SIDES HAVE DONE THIS.

17  BOTH SIDES HAVE DONE IT.

18         SO YOU TAKE INTO ACCOUNT MY ADMONITION.  IT'S GOING

19  TO MEAN A LOT MORE IF WE HEAR THE WITNESS SAY IT ON HIS OWN

20  THAN IF YOU SAY IT.

21         **MR. FEHER:**  I UNDERSTAND, YOUR HONOR.

22  **BY MR. FEHER:**

23  **Q.**  MR. LINZNER, CAN YOU JUST TELL US WHAT UNDERSTANDING YOU

24  HAD DURING THIS PERIOD OF TIME AS TO WHAT ADDITIONAL

25  AUTHORIZATIONS PLAYERS INC MAY HAVE HAD AS TO OTHER PLAYERS?

**A.**    WITH RESPECT TO RETIRED PLAYERS?

**Q.**    YES, RETIRED PLAYERS.

**A.**    THERE WAS -- WE UNDERSTOOD THAT SOME OF THEM HAD SIGNED, YOU KNOW, WHAT HAS BEEN CALLED "GLA'S," WHICH IS AN ACRONYM THAT CAN MEAN DIFFERENT THINGS AT DIFFERENT TIMES.  BUT BASICALLY THAT THERE WAS SOME WRITTEN MECHANISM WHEREBY RETIRED PLAYERS HAD CONVEYED THEIR RIGHTS, THEIR PUBLICITY RIGHTS TO PLAYERS INC TO RELICENSE TO COMPANIES LIKE EA.

AND WHETHER IT WAS A GLA, I RECALL THERE WAS A WHOLE GROUP OF PLAYERS WHO HAD BEEN A MEMBER OF WHAT WAS THEN CALLED "THE QUARTERBACK CLUB," WHICH WAS AN ENTITY THAT WAS SET UP BY SOME PLAYERS IN CONJUNCTION WITH NFL PROPERTIES THAT WAS EFFECTIVELY COMPETING WITH PLAYERS INC IN THE MERCHANDISING OF PLAYERS' RIGHTS.

AND IN LITIGATION BETWEEN THE NFL AND THE NFL PLAYERS ASSOCIATION WHETHER THAT WAS APPROPRIATE UNDER THE COLLECTIVE BARGAINING AGREEMENT THEY HAD -- I DON'T WANT TO GET TOO INVOLVED, BUT THERE WAS A SETTLEMENT IN THAT CASE.  AND AS PART OF THAT SETTLEMENT WE WERE ABLE TO LICENSE THROUGH PLAYERS INC THE RIGHTS TO MEMBERS OF THE QUARTERBACK CLUB.

SO THAT'S A SECOND WAY WE GOT RIGHTS TO RETIRED PLAYERS.

AS I UNDERSTAND IT, THERE WERE SOME AGREEMENTS THAT WERE JUST DONE ON AN AGREEMENT-BY-AGREEMENT BASIS THAT PLAYERS INC WOULD SUBMIT TO EITHER THE AGENT OR THE LAWYER OR THE

1  RETIRED PLAYER HIMSELF THE OPPORTUNITY, AND LET THEM DECIDE

2  WHETHER OR NOT THEY WANTED TO PARTICIPATE.

3  **Q.**   OKAY.

4  **A.**   SO THROUGH THOSE THREE DIFFERENT MECHANISMS WE COULD

5  PROCURE THE RIGHTS TO RETIRED PLAYERS.

6  **Q.**   DID YOU CARE ESPECIALLY ONE WAY OR THE OTHER AS TO WHAT

7  THE MECHANISM WAS?

8  **A.**   NOT AT ALL.  THE QUARTERBACK CLUB THING WAS KIND OF

9  INTERESTING POLITICALLY.  BUT OTHER THAN BEING INTERESTING IN

10 TERMS OF THE POLITICS BETWEEN THE LEAGUE AND THE PLAYERS

11 ASSOCIATION, THE ANSWER IS NO.

12 **Q.**   WHAT DISCUSSION DID YOU HAVE, IF ANY, WITH MR. ALLEN OR

13 OTHERS AT PLAYERS INC AS TO HOW THE PROCESS OF SELECTING

14 PLAYERS WHO WOULD BE LICENSED BY EA AS TO HOW THAT WOULD BE

15 RUN?

16 **A.**   WELL, AS I SAID DURING MY PREVIOUS TESTIMONY, WE HAVE A

17 TEAM DOWN AT ORLANDO.  THEIR JOB IS EVERY YEAR TO COME UP WITH

18 A NEW ITERATION OF THE GAME TO INCLUDE SOME NEW FEATURES OR

19 IMPROVE UPON PREVIOUS FEATURES SO PEOPLE WILL BUY THE GAME YET

20 AGAIN.

21         AND THEY COME UP -- THE TEAM IS RESPONSIBLE FOR

22 COMING UP WITH IDEAS ON WHAT FEATURES TO INCLUDE.  AND WHEN

23 THEY'VE WANTED TO USE RETIRED PLAYERS, WHETHER IT WAS IN MADDEN

24 OR IN NFL STREET OR COACHES IN THE HEAD COACH GAME, THEN THEY

25 COME UP WITH A LIST OF PLAYERS THAT THEY WOULD LIKE -- RETIRED

1  PLAYERS THAT THEY WOULD LIKE TO INCLUDE.  AND WE WOULD THEN SET

2  OUT TRYING TO ACQUIRE THE RIGHTS TO THOSE PLAYERS AND NEGOTIATE

3  THE AMOUNT WE WOULD PAY INCREMENTALLY FOR THOSE RETIRED PLAYER

4  RIGHTS.

5          AND, TYPICALLY, WE WOULD SET OUT WHO WE WERE

6  INTERESTED IN OBTAINING FOR THE GAMES AND, YOU KNOW, PLAYERS

7  INC WOULD TELL US THAT THEY WERE ABLE TO GET, YOU KNOW, CERTAIN

8  PERCENTAGE OF THEM.  IF THEY WEREN'T ABLE TO PROCURE THE RIGHTS

9  WE WOULD THEN MAKE OUR OWN EFFORT BY GOING TO THE AGENT OR THE

10 ATHLETE, OR SOMETIMES IT'S AN ESTATE, A LAWYER, AND TRY TO DO

11 WITH THAT OURSELVES.  AND --

12         **THE COURT:**  I HATE TO INTERRUPT, BUT THESE ARE

13 GETTING TO BE VERY LONG ANSWERS.  SO WE'RE VEERING OFF

14 GENERALLY RELATING TO THE TOPIC.

15         TRY TO LIMIT YOUR ANSWERS TO LIKE FIVE SENTENCES, AT

16 MOST.

17         **THE WITNESS:**  WILL DO, YOUR HONOR.

18         **THE COURT:**  ALL RIGHT.  AND THEN, THAT GIVES EVERYONE

19 A CHANCE TO KNOW WHERE WE ARE IN THE DISCUSSION, AND THEY CAN

20 MAKE OBJECTIONS IF THEY WANT.

21         FRESH QUESTION, PLEASE.

22 **BY MR. FEHER:**

23 **Q.**  MR. LINZNER, WAS EA EVER INTERESTED DURING THIS PERIOD OF

24 TIME IN ENTERING INTO A BLANKET LICENSE WITH PLAYERS INC

25 COVERING ALL PLAYERS FOR WHOM PLAYERS INC HAD AUTHORIZATION,

1  RETIRED PLAYERS?

2  **A.**   DO YOU MEAN A BLANKET LICENSE FOR RETIRED PLAYERS?  IS

3  THAT THE QUESTION?

4  **Q.**   BLANKET LICENSE, ALL RETIRED PLAYERS FOR WHOM PLAYERS INC

5  HAD AUTHORIZATION.

6  **A.**   I DON'T RECALL EVER INVESTIGATING THAT POSSIBILITY.

7  **Q.**   YOU NEVER EXPRESSED ANY INTEREST IN THAT TO PLAYERS INC?

8  **A.**   NO.

9  **Q.**   OKAY.  AND DO YOU HAVE ANY UNDERSTANDING -- DID YOU HAVE

10  ANY UNDERSTANDING DURING THIS PERIOD OF TIME AS TO WHETHER EA

11  WOULD EVER BE INTERESTED IN LICENSING RIGHTS WITH RESPECT TO

12  RETIRED PLAYERS ALONG THE LINES OF DOUG ALLEN WHO ONLY PLAYED A

13  COUPLE OF SEASONS IN THE NFL AND WHO WERE NOT MORE PROMINENT

14  THAN THAT?

15          WAS EA EVER INTERESTED IN THAT KIND OF LICENSE?

16  **A.**   I'M SORRY.  I DON'T UNDERSTAND THE QUESTION.

17          **THE COURT:**  YOU HAVE TO ASK QUESTIONS THAT ARE 12

18  WORDS OR LESS.  IF YOU ASK AN ENTIRE PARAGRAPH NO ONE CAN

19  FOLLOW YOU.

20          SIMPLE, STRAIGHTFORWARD.

21          **MR. FEHER:**  OKAY.

22          **THE COURT:**  SHORT.

23  **BY MR. FEHER:**

24  **Q.**   WAS EA EVER INTERESTED, DURING THIS PERIOD OF TIME, IN

25  LICENSING THE RIGHTS TO RETIRED PLAYERS WHO WERE NOT STARS?

1        **THE COURT:**  GOOD QUESTION.

2        THANK YOU.

3        **MR. FEHER:**  YOU'RE WELCOME, YOUR HONOR.

4        **THE WITNESS:**  AGAIN, THE TEAM DOWN IN ORLANDO WOULD

5   DECIDE WHICH PLAYERS THEY WERE INTERESTED IN LICENSING.  BUT

6   BASED ON MY DISCUSSIONS WITH THEM, AND MY UNDERSTANDING IS

7   TYPICALLY WE WANTED WELL-KNOWN PLAYERS WHO WOULD BE OF INTEREST

8   TO OUR CONSUMERS.

9   **BY MR. FEHER:**

10  **Q.**   OKAY.  THANK YOU, MR. LINZNER.

11       LET'S GO BACK TO THE BEGINNING A LITTLE BIT ON THIS.

12       ACTUALLY, I'D LIKE TO DIRECT YOUR ATTENTION TO --

13  THIS HASN'T BEEN ADMITTED INTO EVIDENCE YET.  IT'S TRIAL

14  EXHIBIT NO. 26.  IT'S A LICENSE AGREEMENT DATED JUNE 18, 2001.

15       HAVE YOU GOT THAT, MR. LINZNER?

16       **THE COURT:**  IS THERE ANY OBJECTION TO 26?

17       **MR. HUMMEL:**  NO, YOUR HONOR.

18       **THE COURT:**  RECEIVED.

19       (TRIAL EXHIBIT 26 RECEIVED IN EVIDENCE.)

20       **MR. FEHER:**  LET'S DISPLAY ACTUALLY THE FIRST AND

21  SECOND PAGE ON THE SCREEN, IF THAT'S OKAY.

22       (DOCUMENT DISPLAYED.)

23       **THE COURT:**  KEEP YOUR VOICE UP, NOW.

24       **MR. FEHER:**  OKAY.  THANK YOU.

25

1  **BY MR. FEHER:**

2  **Q.**    MR. LINZNER, COULD YOU JUST TELL US, BRIEFLY, AS TO WHAT

3  THIS DOCUMENT IS?

4  **A.**    WELL, THIS SEEMS TO BE ONE OF THE LICENSE AGREEMENTS THAT

5  EA ENTERED INTO WITH PLAYERS INC FOR THE RIGHT TO ACQUIRE THE

6  NFL PLAYERS ON SPECIFIED PLATFORMS FOR VIDEO GAMES.

7  **Q.**    JUST TO BE CLEAR AS TO THE TIME PERIOD --

8          **MR. FEHER:**  COULD YOU PLEASE BLOW UP THE TERM

9  PARAGRAPH 5, ON THE NEXT PAGE?

10         THERE YOU GO.

11         (DOCUMENT DISPLAYED.)

12  **BY MR. FEHER:**

13  **Q.**   NOW, MR. LINZNER, COULD YOU JUST LOOK AT THAT PARAGRAPH

14  AND TELL US WHAT TIME PERIOD YOU BELIEVE THIS LICENSE AGREEMENT

15  COVERED?

16  **A.**    WELL, IT STARTS MARCH 1, 2001.  AND WITH THE SORT OF

17  AUTOMATIC EXTENSION IF WE GAVE NOTICE IT WENT THROUGH

18  FEBRUARY 29, 2004.

19  **Q.**   LET'S GO BACK TO THE FIRST PAGE UNDER PARAGRAPH 2 AT THE

20  BOTTOM UNDER "GRANT OF LICENSE."

21  **A.**    YES, SIR.

22  **Q.**   DO YOU SEE THAT LANGUAGE?  I WOULD ACTUALLY LIKE TO READ

23  INTO THE RECORD BRIEFLY THE LANGUAGE AT THE TOP.

24         IT SAYS:

25              "UPON THE TERMS AND CONDITIONS HEREINAFTER SET

1   FORTH, PLAYERS INC HEREBY GRANTS TO LICENSEE AND LICENSEE

2   HEREBY ACCEPTS THE NON-EXCLUSIVE RIGHT, LICENSE AND PRIVILEGE

3   OF UTILIZING THE TRADEMARKS AND NAMES OF PLAYERS INC WHICH MAY

4   BE AMENDED FROM TIME TO TIME BY PLAYERS INC, AND THE NAMES

5   LIKENESSES, (INCLUDING WITHOUT LIMITATIONS), PICTURES,

6   PHOTOGRAPHS, VOICES, FACSIMILE SIGNATURES" --

7            **THE COURT:**  NOT SO FAST.  SLOW DOWN.  THE COURT

8   REPORTER HAS GOT TO GET IT.  THE JURY HAS GOT TO FOLLOW.  THIS

9   IS NOT DICTATION.  THIS IS A TRIAL.

10            PLEASE, YOU SHOULD SLOW DOWN WHEN YOU'RE READING

11   THINGS.  NEVER SPEED UP.

12            **MR. FEHER:**  OKAY.

13            **THE COURT:**  YOU'RE NOT THE FIRST ONE.  EVERYONE DOES

14   IT.

15            BUT YOU SLOW DOWN WHEN YOU WANT EVERYONE TO FOLLOW

16   IT.

17            ALL RIGHT.

18            **MR. FEHER:**  OKAY.

19            **THE COURT:**  ALL RIGHT.

20            **MR. FEHER:**  "FACSIMILE SIGNATURES, AND/OR

21   BIOGRAPHICAL INFORMATION (HEREINAFTER "IDENTITY") OF THE NFL

22   PLAYERS LISTED IN ATTACHMENT B."

23   **BY MR. FEHER:**

24   **Q.**   DO YOU SEE THAT LANGUAGE?

25   **A.**   I DO.

1  **Q.**   MR. LINZNER, DO YOU HAVE ANY UNDERSTANDING AS TO WHETHER

2  ANY OF THE PLAYERS FOR THIS LICENSE LISTED IN ATTACHMENT B WERE

3  RETIRED PLAYERS?

4        **MR. HUMMEL:**  OBJECTION, YOUR HONOR.  HE'S ASKING FOR

5  HIS PRESENT UNDERSTANDING.

6  **BY MR. FEHER:**

7  **Q.**   DID YOU HAVE ANY UNDERSTANDING DURING THE TIME THAT YOU

8  NEGOTIATED THIS CONTRACT AND IT WAS IN EFFECT AS TO WHETHER

9  THIS COVERED ACTIVE OR RETIRED PLAYERS?

10 **A.**   THE ANSWER TO THAT QUESTION IS THE -- MY UNDERSTANDING AT

11 THE TIME I NEGOTIATED AND SIGNED THIS LICENSE AGREEMENT WAS

12 THAT IT COVERED ACTIVE NFL PLAYERS AS THEY MAY CHANGE FROM YEAR

13 TO YEAR, SEASON TO SEASON.

14 **Q.**   ACTIVE ONLY?

15 **A.**   ACTIVE.

16 **Q.**   OKAY.  NOW, LET'S MOVE ON.

17       AFTER FEBRUARY 29TH, 2004, WHICH IS THE LAST POSSIBLE

18 DATE REFERENCED ON THIS DOCUMENT, DID THE CONTRACTUAL

19 RELATIONSHIP BETWEEN EA AND PLAYERS INC END?

20 **A.**   NO.

21 **Q.**   AND HOW DID IT CONTINUE CONTRACTUALLY AS OF THAT TIME

22 THROUGH THE REMAINDER OF 2004, TO THE BEST OF YOUR

23 RECOLLECTION?

24 **A.**   EVENTUALLY WE ENTERED INTO A NEW LICENSE.

25 **Q.**   DID THERE COME A TIME TOWARD THE END OF 2004, ON OR AROUND

1    DECEMBER, WHERE YOU ENTERED INTO NEGOTIATIONS ABOUT THE

2    SPECIFIC TERMS OF A FURTHER EXTENSION OF THESE ARRANGEMENTS?

3    **A.**    YES.

4    **Q.**    I WOULD ACTUALLY LIKE TO DIRECT YOUR ATTENTION TO TRIAL

5    EXHIBIT NO. 69.  IT'S NOT IN EVIDENCE YET.  IT'S A LETTER DATED

6    DECEMBER 7, 2004.

7    **A.**    YES.

8    **Q.**    MR. LINZNER, CAN YOU IDENTIFY THIS DOCUMENT?

9    **A.**    I BELIEVE THIS IS A -- ONE OF SEVERAL PROPOSALS WE SENT TO

10   PLAYERS INC THROUGH CLAY WALKER, AS I RECALL, THROUGH E-MAIL

11   THAT WAS PART OF THE NEGOTIATION PROCESS FOR THE LICENSE THAT

12   MR. HUMMEL SHOWED ME, THE EXCLUSIVE LICENSE.

13          **MR. FEHER:**  YOUR HONOR, I WOULD LIKE TO MOVE THIS

14   DOCUMENT INTO EVIDENCE.

15          **THE COURT:**  THE EXHIBIT NUMBER IS WHAT?

16          **MR. FEHER:**  IT'S 69.

17          **THE COURT:**  ANY OBJECTION?

18          **MR. HUMMEL:**  NO OBJECTION.

19          **THE COURT:**  RECEIVED.

20          (TRIAL EXHIBIT 69 RECEIVED IN EVIDENCE.)

21          **MR. FEHER:**  ACTUALLY, AT THE BEGINNING I WOULD LIKE

22   TO FOCUS ON THE VERY FIRST PARAGRAPH, LAUREN.  COULD YOU BLOW

23   THAT UP, PLEASE?

24          (DOCUMENT DISPLAYED.)

25

1 | **BY MR. FEHER:**

2 | **Q.** IS SAYS -- AND THIS IS A LETTER DATED DECEMBER 7, 2004:

3 | "DEAR CLAY: I AM CONFIRMING THE TERMS WE HAVE

4 | ORALLY AGREED UPON FOR ELECTRONIC ARTS TO ACQUIRE THE EXCLUSIVE

5 | RIGHTS TO USE THE LICENSED PROPERTY AS DEFINED BELOW IN

6 | CONNECTION WITH THE LICENSED USES AS DEFINED BELOW FOR FIVE

7 | YEARS, AS WELL AS CERTAIN NON-EXCLUSIVE RIGHTS."

8 | DOES THAT REFRESH YOUR RECOLLECTION, MR. LINZNER, AS

9 | TO WHAT THIS DOCUMENT WAS ABOUT?

10 | **A.** I DON'T NEED TO REFRESH MY RECOLLECTION. I REMEMBER THIS

11 | PERIOD QUITE WELL.

12 | **Q.** COULD YOU TELL US WHAT WAS GOING ON WITH RESPECT TO THIS

13 | PARTICULAR DOCUMENT FIRST?

14 | **A.** WELL, AS I SAID, THERE WERE A SERIES OF PROPOSALS THAT WE

15 | HAD MADE TO PLAYERS INC FOR EXCLUSIVE RIGHTS FOR CERTAIN GENRES

16 | OF VIDEO GAMES. AND THE QUESTION IS: WHAT WAS GOING ON AT

17 | THIS POINT IN TIME?

18 | **Q.** WHAT IS THIS DOCUMENT ABOUT IN CONNECTION WITH THE

19 | DISCUSSIONS THAT WERE GOING ON? I WOULD JUST LIKE YOU TO

20 | EXPLAIN TO THE JURY AS TO THE SIGNIFICANCE, IF ANY, OF THIS

21 | PARTICULAR LETTER THAT IS ADDRESSED TO MR. WALKER.

22 | **A.** ALL RIGHT. I'LL TRY TO KEEP IT TO FIVE SENTENCES OR LESS.

23 | THE NFL HAD DETERMINED THAT IT WANTED TO PROCEED IN

24 | THE VIDEO GAME BUSINESS ON AN EXCLUSIVE BASIS. THE PLAYERS

25 | ASSOCIATION, PLAYERS INC, WAS WILLING TO GO ALONG WITH THE SAME

1  DIRECTION AS THE NFL.

2          AND THERE WERE MULTIPLE BIDS FROM MULTIPLE COMPANIES

3  TO OBTAIN THOSE RIGHTS ON AN EXCLUSIVE BASIS.

4          THIS LETTER IS ONE IN THE SERIES THAT WE MADE TO

5  PLAYERS INC SO THAT WE COULD COMBINE THE RIGHTS OF NFL

6  PROPERTIES AND PLAYERS INC TO KEEP MAKING MADDEN NFL VIDEO

7  GAMES AND OTHER GAMES.

8  **Q.**   DID THIS LETTER CONFIRM THE TERMS THAT WERE ORALLY AGREED

9  UPON THAT DAY?

10 **A.**   THERE WERE A SERIES OF LETTERS.  BASICALLY, WE WERE IN

11 A -- AS I SAID, THEY KEPT RATCHETING UP THE NUMBER.  I THINK

12 THIS WAS THE LAST IN THE SERIES --

13 **Q.**   OKAY.

14 **A.**   -- WHEREBY THEY TOLD US IF WE AGREED TO PAY THIS AMOUNT IN

15 GUARANTEE, AND SOME OF THE OTHER TERMS, THEN THEY WOULD

16 COMPLETE THE LICENSE AND SIGN THE AGREEMENT MR. HUMMEL SHOWED

17 ME.

18          **MR. FEHER:**  LAUREN, COULD YOU GO BLOW UP THE

19 PARAGRAPH THAT SAYS "LICENSED PROPERTY."

20          LITTLE HIGHER.  THERE YOU GO.

21 **BY MR. FEHER:**

22 **Q.**   IT SAYS:

23          "LICENSED PROPERTY:  AS DESCRIBED IN PARAGRAPHS 1

24 (A) AND 2 (A) OF OUR CURRENT AGREEMENT, I.E. THE TRADEMARKS AND

25 NAMES OF PLAYERS INC, AS WELL AS THE NAMES, LIKENESSES,

1    PICTURES, PHOTOGRAPHS, VOICES, FACSIMILE SIGNATURES, AND

2    BIOGRAPHICAL INFORMATION OF THE NFL PLAYERS:  ONE, WHO HAVE

3    SIGNED THE GROUP LICENSING ASSIGNMENT FORM ASSIGNING THEIR

4    IMAGE OR IDENTITY RIGHTS TO PLAYERS INC; OR, TWO, WHO ASSIGN

5    THOSE RIGHTS TO PLAYERS INC IN THE STANDARD NFL PLAYERS

6    CONTRACT."

7            DO YOU SEE THAT LANGUAGE?

8    **A.**   I DO.

9    **Q.**   OKAY.  AND WHAT WAS YOUR UNDERSTANDING AT THE TIME THIS

10   DOCUMENT WAS AUTHORED AS TO WHAT THAT'S DESCRIBING IN TERMS OF

11   ACTIVE VERSUS RETIRED PLAYERS?

12   **A.**   WE WERE MAKING A PROPOSAL FOR ACTIVE NFL PLAYERS ON A

13   SEASON-BY-SEASON BASIS.

14   **Q.**   AND NO RETIRED PLAYERS?

15   **A.**   RETIRED PLAYERS, I DID NOT INTEND TO INCLUDE FORMER NFL

16   PLAYERS, RETIRED PLAYERS IN THE LICENSED PROPERTY.  I WROTE

17   THIS DOCUMENT MYSELF.

18           **MR. FEHER:**  OKAY.

19           LAUREN, CAN YOU ACTUALLY TAKE THE BLOWUP BACK?  AND

20   IF YOU CAN ACTUALLY GO BACK TO THE PRIOR EXHIBIT.

21           **THE WITNESS:**  TO 26?

22           **MR. FEHER:**  IT'S THE '01.

23           YES, 26.  CAN YOU JUST BLOW UP THE REPRESENTATION

24   PAGE?

25           WELL,  THE FIRST PARAGRAPH IS FINE.

1    MOVE THAT TO THE RIGHT, AND THEN BLOW UP IN THE

2   LETTER AGREEMENT THE LICENSED PRODUCT LANGUAGE.

3        (DOCUMENT DISPLAYED.)

4   **BY MR. FEHER:**

5   **Q.**   THE LICENSED PROPERTY LANGUAGE AT THE BOTTOM, THAT'S FROM

6   YOUR -- THE LETTER AGREEMENT WHEN YOU CLOSED THE DEAL ON THE

7   NEW ARRANGEMENT WITH $25 MILLION, CORRECT?  THE ONE AT THE

8   BOTTOM.

9   **A.**   FROM EXHIBIT 69?

10  **Q.**   YES.

11  **A.**   YES.

12  **Q.**   AND THE CONTRACT THAT'S ABOVE, THE LANGUAGE IN THE

13  CONTRACT ABOVE, THAT'S THE CONTRACT THAT WAS CURRENTLY IN

14  PLACE, EITHER FORMALLY OR INFORMALLY BETWEEN PLAYERS INC AND EA

15  AT THE TIME THAT WAS NEGOTIATED?

16  **A.**   WELL, IT WAS THE LAST SIGNED LICENSE AGREEMENT.

17  **Q.**   OKAY.  AND SO WHERE IT SAYS:

18        "AS DESCRIBED IN PARAGRAPHS 1 (A) AND 2 (A)" OF

19  THE LETTER THAT YOU SENT, YOU WERE REFERRING TO THE LANGUAGE UP

20  ABOVE, CORRECT?

21  **A.**   IN FACT, THAT'S WHERE I CRIBBED THIS FROM.

22  **Q.**   AND WHERE YOU CRIBBED IT FROM, YOU ONLY INCLUDED THE FIRST

23  SENTENCE OF PARAGRAPH 1 (A), CORRECT?  YOU DIDN'T INCLUDE

24  ANYTHING FROM THE SECOND SENTENCE.

25  **A.**   NO.  IT READS WHAT IT READS.  YEAH, IT'S WHAT I DID IS I

1  CRIBBED THE PORTION OF WHERE WE WERE GETTING THE IDENTITY

2  RIGHTS FROM THE NFL PLAYERS.

3  **Q.**   OKAY.  SO AT THE TIME YOU DID THIS DEAL, WHAT WAS YOUR

4  UNDERSTANDING AS TO WHETHER THE SECOND SENTENCE IN 1 (A) DID IN

5  TERMS OF CONVEYING OR NOT CONVEYING ANY KIND OF RIGHTS?

6  **A.**   AS I THINK I TOLD MR. HUMMEL, WHAT WE UNDERSTOOD IS THAT

7  ON OCCASION AS IT SAYS THERE IN THE SECOND SENTENCE IF WE

8  WANTED TO GO OUT AND SECURE RETIRED PLAYERS, THEN WE COULD WORK

9  WITH PLAYERS INC TO DO SO.  AND, ON OCCASION, WE DID SO.

10 **Q.**   OKAY.  THE SECOND SENTENCE WAS NOT INTENDED TO CONVEY ANY

11 RIGHTS, IN YOUR MIND, WHEN YOU NEGOTIATED THIS IN PARAGRAPH 1

12 (A)?

13 **A.**   I'M SORRY.  COULD YOU SAY THAT AGAIN?

14 **Q.**   I WAS JUST SAYING IN TERMS OF THE SECOND SENTENCE IN

15 PARAGRAPH 1 (A), WAS IT EVER INTENDED, IN YOUR MIND, AT THE

16 TIME ANY OF THESE NEGOTIATIONS OCCURRED, TO CONVEY ANY KIND OF

17 RETIRED PLAYER RIGHTS THROUGH THESE MAIN LICENSE AGREEMENTS?

18 **A.**   RETIRED PLAYERS?

19 **Q.**   YES.

20 **A.**   I'M SORRY.  I'M HAVING TROUBLE.

21 **Q.**   LET ME RESTATE IT SO IT'S CLEAR.

22       WAS THE SECOND SENTENCE EVER INTENDED BY YOU AS THE

23 CHIEF NEGOTIATOR OF EA, THE SECOND SENTENCE IN PARAGRAPH 1 (A),

24 TO CONVEY ANY PLAYER RIGHTS OF ANY KIND?

25 **A.**   1 (A) IS NOT A CONVEYANCE PARAGRAPH.  IT'S JUST THE

1  REPRESENTATION, RIGHT?  THE GRANT IS IN PARAGRAPH 2, RIGHT?

2  **Q.**    OKAY.

3  **A.**    BUT TO ANSWER YOUR QUESTION MORE DIRECTLY, WE DID NOT

4  INTEND THROUGH EXHIBIT 26 TO SECURE THE RIGHTS TO RETIRED

5  PLAYERS FOR THE AMOUNTS OF MONEY THAT IS REFLECTED IN EXHIBIT

6  26.  WE HAD THE ABILITY TO GO TO PLAYERS INC AND ASK THEM TO

7  HELP US GET RETIRED PLAYERS FOR FEATURES IN OUR GAME FOR

8  ADDITIONAL SUMS OF MONEY.

9  **Q.**    OKAY.  AND THAT WAS REFLECTED IN THE FINAL LANGUAGE WHEN

10 THE 2004 AGREEMENT WAS FORMALIZED?  MR. HUMMEL SHOWED IT TO

11 YOU.

12 **A.**    WHAT WAS REFLECTED?

13 **Q.**    THAT'S FINE.  I'LL STATE A DIFFERENT QUESTION.  I THINK

14 WE'VE ALREADY COVERED IT.

15        DURING YOUR TESTIMONY THROUGH MR. HUMMEL, HE MADE

16 REFERENCE TO A PRIOR CONTRACT THAT SPOKE OF $500,000 A YEAR IN

17 FIXED PAYMENTS FROM EA TO PLAYERS INC.

18        THIS WAS THE CONTRACT THAT COVERED THE PERIOD FROM

19 MARCH 1ST, 2004, THEREAFTER FOR A BRIEF PERIOD OF TIME.  DO YOU

20 RECALL THAT DISCUSSION?

21 **A.**    I REMEMBER HE SHOWED ME THE LICENSE AGREEMENT THAT WAS

22 DATED IN JANUARY THAT WAS EFFECTIVE MARCH OF THE PRIOR YEAR.

23        BUT IT'S NOT CORRECT THAT IT WAS A FIXED PAYMENT.

24 THAT WAS A MINIMUM GUARANTEE.

25 **Q.**    THAT ACTUALLY JUST LEADS ME TO THE BASIC QUESTION, WHICH

1  IS:  WHEN YOU ADD IN ROYALTIES THAT EA WAS PAYING, JUST

2  APPROXIMATELY HOW MUCH WAS EA PAYING UNDER THAT PRIOR CONTRACT

3  THAT WAS STILL A NON-EXCLUSIVE?

4  **A.**   WELL, IT WAS MILLIONS OF DOLLARS.  THAT WAS A FUNCTION

5  OF -- ROYALTIES ARE A FUNCTION OF NET REVENUE, WHICH IS HOW

6  MANY GAMES WE SELL.

7        AND IN DIFFERENT YEARS, THE -- YOU KNOW, THE MADDEN

8  NFL GAME WOULD SELL, FORTUNATELY FOR US, GENERALLY INCREASING

9  AMOUNTS OVER TIME. BUT WE ALSO INTRODUCED A GAME LIKE NFL

10 STREET OR NFL STREET 2, SO IN CERTAIN YEARS THERE WOULD BE

11 SPIKES, BECAUSE WE WOULD HAVE A SECOND GAME THAT WOULD GENERATE

12 EVEN MORE REVENUE THAT WOULD LEAD TO EVEN MORE ROYALTY.

13 **Q.**   IN TERMS OF THE NEW CONTRACT AT THE END OF 2004 AND THEN

14 FORMALIZED AT THE BEGINNING OF '05, WITH A $25 MILLION MINIMUM

15 GUARANTEE, WHY WAS EA WILLING AT THAT TIME TO ENTER INTO A NEW

16 CONTRACT WITH A MINIMUM GUARANTEE AT THAT LEVEL?

17 **A.**   WELL, THE BUSINESS WAS PROFITABLE FOR US.  IF THE QUESTION

18 IS:  WHY DID WE WANT TO PAY A 25 MILLION GUARANTEE?  THE ANSWER

19 IS:  WE DIDN'T.

20       BUT IT WAS EITHER BID -- BID FOR THE RIGHTS OR LOSE A

21 FRANCHISE THAT WAS YEAR-IN-YEAR-OUT OUR NUMBER ONE TITLE IN

22 NORTH AMERICA.

23       **MR. FEHER:**  JUST FOR THE RECORD, LET'S PUT UP,

24 LAUREN, IF YOU COULD 28, TRIAL EXHIBIT 28.

25       **THE WITNESS:**  28.

1          (DOCUMENT DISPLAYED.)

2    BY MR. FEHER:

3    Q.  COULD YOU JUST BRIEFLY TELL THE JURY WHAT THIS IS.  JUST

4    VERY BRIEFLY.

5    A.  APPEARS TO BE ANOTHER LICENSE AGREEMENT.

6    Q.  IS THIS THE FINAL SIGNED AGREEMENT ON THE $25 MILLION

7    CONTRACT YOU ENTERED INTO, MINIMUM?

8    A.  LET ME LOOK AT THIS A SECOND.

9          DIDN'T MR. HUMMEL SHOW ME THIS?

10   Q.  YES, HE DID.

11   A.  OKAY.  YES.  THAT'S MY SIGNATURE.  I RECALL DOING THIS IN

12   DECEMBER OF 2004.

13   Q.  JUST SO THE RECORD IS CLEAR, BECAUSE WE'VE LOOKED AT SOME

14   OTHER DOCUMENTS, DOES THIS CONTRACT IN ANY WAY, SHAPE OR FORM

15   COVER RETIRED PLAYERS IN ANY WAY?

16         MR. HUMMEL:  OBJECTION, YOUR HONOR.  THAT VIOLATES

17   THE ORDER REGARDING CONTEMPORANEOUS INTENT.

18         MR. FEHER:  I'LL REPHRASE IT.  THAT'S FAIR.

19   BY MR. FEHER:

20   Q.  AT THE TIME THIS WAS ENTERED INTO, DID YOU HAVE ANY

21   UNDERSTANDING AS TO WHETHER THIS AGREEMENT COVERED RETIRED

22   PLAYERS IN ANY WAY IN TERMS OF CONVEYING RETIRED PLAYER RIGHTS?

23   A.  MY INTENT WHEN I NEGOTIATED AND SIGNED THIS AGREEMENT WAS

24   THAT WE WERE LICENSING THE RIGHTS TO THEN ACTIVE NFL PLAYERS ON

25   A SEASON-BY-SEASON BASIS ON THE CONDITIONS AND FOR THE AMOUNTS

1    THAT ARE SET FORTH IN THE DOCUMENT.

2              IT COVERED ACTIVE PLAYERS AT ANY GIVEN YEAR, WHICH

3    WERE CHANGING FROM YEAR TO YEAR.

4    **Q.**   AT THE TIME YOU NEGOTIATED THIS, DID YOU CONSIDER ANY

5    PORTION AT ALL OF THE $25 MILLION MINIMUM GUARANTEE TO BE

6    ATTRIBUTABLE IN ANY WAY TO RETIRED PLAYERS?

7    **A.**   NO.

8    **Q.**   VERY BRIEFLY, IF YOU GO TO THE GRANT OF LICENSE PARAGRAPH

9    IN 2 (A).

10   **A.**   IN 28?

11   **Q.**   IN 2 (A), YES, THAT EXHIBIT.  AT THE VERY BOTTOM WHERE IT

12   REFERS TO "THE NFL PLAYERS REFERENCED IN PARAGRAPH 1 (A)

13   ABOVE," DO YOU SEE THAT LANGUAGE?

14   **A.**   ARE YOU TALKING ABOUT THE LAST LINE ON PAGE 1 WHERE IT

15   SAYS "NFL PLAYERS"?

16   **Q.**   YES, THAT PARTICULAR LANGUAGE.

17   **A.**   OKAY.  WHAT'S THE QUESTION?

18   **Q.**   DID YOU HAVE ANY UNDERSTANDING AT THE TIME THIS AGREEMENT

19   WAS NEGOTIATED AS TO WHAT THIS REFERRED TO, "THE NFL PLAYERS,"

20   IN TERMS OF ACTIVE VERSUS RETIRED?

21   **A.**   NFL PLAYERS ARE THE PLAYERS ACTIVELY PLAYING IN THE NFL.

22   AND THAT'S WHAT I UNDERSTOOD AT THE TIME, AND THAT'S WHAT THE

23   INTENDED LICENSE THROUGH EXHIBIT 28 WAS, WAS THE RIGHTS TO

24   ACTIVE NFL PLAYERS.

25   **Q.**   UHM --

1   **A.**   RETIRED PLAYERS, WE DID SEPARATE LICENSES.

2   **Q.**   DID YOU HAVE ANY KNOWLEDGE AT THE TIME THESE CONTRACTS

3   WERE NEGOTIATED AS TO WHETHER OR NOT THE AUTHORIZATIONS THAT

4   PLAYERS INC SIGNED WITH RETIRED PLAYERS, WHETHER THOSE WERE

5   EXCLUSIVE OR NON-EXCLUSIVE ARRANGEMENTS?

6   **A.**   I THINK FOR THE MOST PART WHEN WE HAD LICENSED RETIRED

7   PLAYERS THROUGH PLAYERS INC IN THE PAST WE HAD UNDERSTOOD IT

8   WAS NON-EXCLUSIVE.

9   **Q.**   OKAY.  AND WHEN YOU DID THE DEAL IN -- AT THE END OF

10  DECEMBER, 2004, FORMALIZED SHORTLY THEREAFTER, THE ONE WITH THE

11  $25 MILLION MINIMUM GUARANTEE, THAT WAS -- WAS THAT -- THAT WAS

12  AN EXCLUSIVE DEAL, CORRECT?  YOU ALREADY TESTIFIED AS TO THAT.

13  **A.**   WHAT I TESTIFIED WAS IT WAS EXCLUSIVE FOR CERTAIN GENRES

14  OF GAMES.

15  **Q.**   OKAY.  TO BE CLEAR.

16          DID YOU HAVE AT THE TIME THAT CONTRACT WAS NEGOTIATED

17  ANY UNDERSTANDING AS TO WHETHER OR NOT IT WOULD EVEN BE

18  CONCEIVABLY POSSIBLE TO COVER WITHIN THAT EXCLUSIVE CONTRACT

19  RETIRED PLAYER RIGHTS WHICH WOULD BE NON-EXCLUSIVE?

20          **THE COURT:**  I DON'T UNDERSTAND THAT QUESTION.

21          **MR. FEHER:**  I'M SORRY.  LET ME REPHRASE.

22  **BY MR. FEHER:**

23  **Q.**   YOU UNDERSTOOD AT THE TIME -- LET ME ACTUALLY GO BACK AND

24  SAY THIS DIFFERENTLY.

25          IN TERMS OF RETIRED PLAYER NFL RIGHTS, RETIRED PLAYER

1  RIGHTS THAT PLAYERS INC HAS, YOU UNDERSTAND THAT THOSE ARE

2  NON-EXCLUSIVE, CORRECT?

3  **A.**   I JUST TOLD YOU.

4  **Q.**   YES.

5  **A.**   IN MY EXPERIENCE WHEN WE HAD LICENSED RETIRED PLAYERS

6  THROUGH THE NFL, IT WAS MY UNDERSTANDING THAT IT WAS ON A

7  NON-EXCLUSIVE BASIS.

8  **Q.**   OKAY.  ISN'T IT A FACT THAT VARIOUS RETIRED PLAYERS HAVE

9  LICENSED THEIR RIGHTS TO OTHER GAMES THAT ARE IN COMPETITION

10  WITH EA?

11  **A.**   AS FAR AS I'M AWARE, YES.

12  **Q.**   DO YOU KNOW WHAT GAME OR GAMES THOSE ARE?

13  **A.**   WHAT POINT IN TIME?  THERE'S -- IF YOU GO BACK TO --

14  **Q.**   FROM THE TIME YOU HAVE HAD EXCLUSIVE ARRANGEMENTS WITH

15  PLAYERS INC.

16  **A.**   YES.  SINCE THE -- THE EXCLUSIVE LICENSE BECAME EFFECTIVE

17  MARCH 1ST OF 2005.

18  **Q.**   RIGHT.

19  **A.**   AND SUBSEQUENT TO THAT OTHER VIDEO GAME COMPANIES HAD MADE

20  VIDEO GAMES THAT INCLUDE THE RIGHTS TO RETIRED NFL PLAYERS IN

21  THEIR GAMES.

22  **Q.**   OKAY.  AND --

23  **A.**   I THINK THAT'S WHAT YOU'RE ASKING.

24  **Q.**   IT WAS.  IT WAS.

25  **A.**   OKAY.  THANK YOU.

1  Q.   AND THOSE GAMES ARE IN COMPETITION WITH YOU USING -- WELL,

2  ACTUALLY I'LL JUST DROP IT AND MOVE ON, BECAUSE I THINK THAT

3  INVOLVES SOME THINGS THAT YOU WOULDN'T NECESSARILY HAVE

4  PERSONAL KNOWLEDGE OF.

5           IF, AS PLAINTIFFS CONTEND, OKAY, RETIRED PLAYERS WERE

6  COVERED BY THE EXCLUSIVE CONTRACT THAT EA DID WITH PLAYERS INC,

7  BEGINNING ON THAT DATE IN MARCH 2005, WOULD, IN YOUR

8  UNDERSTANDING, THOSE RETIRED PLAYERS BE ABLE TO GO OUT AND SIGN

9  WITH OTHER COMPANIES, SUCH AS TAKE 2, AND IN COMPETITION WITH

10 EA?

11 A.   TAKE 2 IS ONE OF THE VIDEO GAME COMPANIES THAT DID MAKE A

12 VIDEO GAME AFTER MARCH 2005 THAT FEATURED RETIRED NFL PLAYERS.

13 AND THE ANSWER TO YOUR QUESTION IS:  IF ANY OF THE PLAYERS THEY

14 USED IN THAT GAME HAD BEEN ONE OF THE 2100 PLAYERS THAT

15 MR. HUMMEL REFERRED TO, AND THEY SOMEHOW HAD GRANTED EXCLUSIVE

16 RIGHTS THROUGH ONE OF THE CONTRACTS -- AND THIS IS GETTING

17 CONVOLUTED, BUT I THINK THE QUESTION WAS A LITTLE CONVOLUTED --

18 THEN THEY WOULDN'T HAVE BEEN ABLE TO LICENSE THEIR RIGHTS

19 SEPARATELY TO TAKE 2.

20 Q.   I APOLOGIZE.  IT'S THE CONTENTION OF THE PLAINTIFFS.

21 A.   IT'S NOT THAT HARD.  YEAH.

22 Q.   DOES EA SELL ANY FANTASY FOOTBALL GAMES?

23 A.   WE OFFER FANTASY FOOTBALL.  FANTASY FOOTBALL IS OFTEN

24 ADVERTISING-SUPPORTED AS OPPOSED TO SOLD.

25 Q.   OKAY.  AND DID YOU -- DID EA EVER ENTER INTO A FANTASY

1   FOOTBALL LICENSE WITH PLAYERS INC?

2   **A.**   WE HAVE HAD SEVERAL FANTASY FOOTBALL LICENSES --

3   **Q.**   OKAY.  I WOULD LIKE YOU TO LOOK AT TRIAL EXHIBIT NO. 79,

4   PLEASE.  IT'S NOT IN EVIDENCE YET.

5   **A.**   79?

6   **Q.**   YES.

7   **A.**   I HAVE IT.

8   **Q.**   OKAY.  COULD YOU JUST TELL US, BRIEFLY, WHAT THIS DOCUMENT

9   IS?  IDENTIFY IT.

10  **A.**   THIS IS ONE OF THE LICENSE AGREEMENTS THAT EA HAD WITH

11  PLAYERS INC, SIGNED BY ME, DATED AUGUST, 2005.

12          AND AS I LOOK DOWN IN PARAGRAPH 2, THIS IS FOR

13  FANTASY GAMES WHICH PLAYERS INC ALWAYS WANTED TO LICENSE

14  SEPARATELY FROM VIDEO GAMES.

15          **MR. FEHER:**  OKAY.  YOUR HONOR, I MOVE THIS INTO

16  EVIDENCE.

17          **MR. HUMMEL:**  NO OBJECTION.

18          **THE COURT:**  THE NUMBER IS WHAT?

19          **MR. FEHER:**  79, YOUR HONOR.

20          **THE COURT:**  RECEIVED.

21          (TRIAL EXHIBIT 79 RECEIVED IN EVIDENCE.)

22          **MR. FEHER:**  LAUREN, COULD YOU DISPLAY THE VERY FIRST

23  PARAGRAPH?  ACTUALLY, I APOLOGIZE, I MEAN THE REPRESENTATIONS

24  PARAGRAPH.

25          (DOCUMENT DISPLAYED.)

**BY MR. FEHER:**

Q.   NOW, MR. LINZNER, IS IT FAIR TO SAY THAT THIS IS THE EXACT REPRESENTATION LANGUAGE THAT IS IN THE MAIN CONTRACT WE'VE BEEN GOING OVER?

A.   NO.  I DON'T WANT TO COMPARE IT WORD FOR WORD, BUT I BELIEVE IT'S THE SAME LANGUAGE IN PARAGRAPH 1 (A) OF THIS AS WE'VE SEEN IN SOME OTHER AGREEMENTS.

Q.   OKAY.  AND THIS IS STRUCTURALLY IS BROKEN DOWN IN THE FIRST SENTENCE REFERRING TO THE ACTIVE PLAYER RIGHTS, AND THEN THE SECOND SENTENCE INCLUDING, AS YOU'VE ALREADY TESTIFIED, SOME MENTION OF RETIRED PLAYERS, CORRECT?

A.   YES.

Q.   NOW, CAN YOU JUST TELL ME, AT THE TIME YOU NEGOTIATED THIS AGREEMENT, AS TO WHETHER EA WAS ENTERING INTO -- LET ME REPHRASE THAT.

     AT THE TIME YOU NEGOTIATED THIS AGREEMENT, DID YOU HAVE ANY UNDERSTANDING AS TO WHETHER ANY RETIRED PLAYER RIGHTS WERE BEING GRANTED IN ANY WAY, SHAPE OR FORM UNDER THIS FANTASY FOOTBALL LICENSE?

A.   YES, I DO.

Q.   AND WHAT WAS YOUR UNDERSTANDING AT THAT TIME?

A.   WELL, MY UNDERSTANDING IS THAT THROUGH THE LICENSE AGREEMENT FOR FANTASY, WE WERE SECURING ONLY THE RIGHTS TO ACTIVE NFL PLAYERS BECAUSE RETIRED PLAYERS CANNOT PARTICIPATE IN FANTASY.

1           IN OTHER WORDS, FANTASY GAMES DEPEND UPON THE

2    REAL-LIFE RESULTS OF ACTIVE PLAYERS IN REAL-LIFE GAMES DURING

3    THE NFL SEASON.

4           I DON'T KNOW, YOUR HONOR, IF THE JURY WANTS TO KNOW

5    HOW FANTASY GAMES WORK.

6           **THE COURT:**  IF YOU KNOW HOW THEY WORK, TAKE A COUPLE

7    OF SENTENCES AND EXPLAIN IT.

8           **THE WITNESS:**  SURE.  SO FANTASY GAMES BASICALLY

9    CONSUMERS BECOME THE OWNERS OF THE TEAM.  AND THEY PLAY WITH

10   THEIR FRIENDS OR, YOU KNOW, THEY CAN ACTUALLY PLAY WITH

11   STRANGERS ONLINE.

12          WHAT THEY DO IS THEY DRAFT PLAYERS, GENERALLY SKILLED

13   PLAYERS.  YOU CAN DRAFT LIKE FRANK GORE, FROM THE 49ERS, OR YOU

14   CAN DRAFT PAYTON MANNING FROM THE INDIANAPOLIS COLTS AND YOU

15   DRAFT VARIOUS PLAYERS.   AND YOU GET POINTS DEPENDING UPON HOW

16   MANY YARDS THEY GET OR HOW MANY PASSES THEY COMPLETE OR HOW

17   MUCH TOUCHDOWNS THEY SCORE OR WHETHER THEY KICK FIELD GOALS OR

18   IF A DEFENSE INTERCEPTS PASSES.

19          BUT THE POINT IS THE SCORING IN A FANTASY LEAGUE

20   DEPENDS UPON THE PERFORMANCE OF REAL-LIFE PLAYERS IN REAL NFL

21   GAMES.  AND RETIRED PLAYERS ARE NEVER PART OF THE EQUATION

22   BECAUSE THEY DON'T PLAY REAL NFL GAMES ON A CURRENT BASIS.

23          SO WHEN WE DID EXHIBIT 79, WE WERE LICENSING THE

24   RIGHTS TO ACTIVE NFL PLAYERS, BECAUSE THAT'S THE ONLY THING --

25   ANYTHING ELSE WOULD BE NONSENSICAL FOR PURPOSES OF FANTASY.

BY MR. FEHER:

Q.    DID DOUG ALLEN AND OTHERS AT PLAYERS INC MAKE EFFORTS TO

PROMOTE RETIRED PLAYERS TO EA?

          MR. HUMMEL:  OBJECTION.  FOUNDATION.  SPECULATION.

BY MR. FEHER::

Q.    TO YOUR KNOWLEDGE.

          THE COURT:  WELL, THERE WAS ALREADY SOME QUESTION

ABOUT THIS ON THE OTHER EXAMINATION, SO WITHIN THE SCOPE OF

YOUR ACTUAL KNOWLEDGE YOU CAN GIVE FIRSTHAND TESTIMONY ON THIS

POINT.

          THE WITNESS:  DOUG ALLEN AND OTHER EXECUTIVES AT

PLAYERS INC FREQUENTLY ENCOURAGED US TO LICENSE THE RIGHTS TO

RETIRED NFL PLAYERS THROUGH THEM, IF, INDEED, WE WANTED SUCH

FEATURES IN OUR GAME.

BY MR. FEHER:

Q.    AND --

A.    GAMES, I SHOULD SAY.

Q.    DID THEY ENCOURAGE YOU TO USE PLAYERS THAT YOU INITIALLY

DIDN'T EXPRESS INTEREST IN?

A.    WELL, AND THAT WOULD HAVE BEEN HANDLED MORE AT A TEAM

LEVEL.  THERE WAS A TEAM DOWN IN ORLANDO WHO WOULD COME UP WITH

A LIST OF PLAYERS THAT IT WANTED FOR THE PARTICULAR GAME.

          AND, YOU KNOW, AT SOME LEVEL THE BACK AND FORTH OVER

WHO PLAYERS INC COULD ACQUIRE THE RIGHTS FOR AND WHO COULD BE

BETTER SUBSTITUTES IF WE HAD A CRITICAL MASS OF PLAYERS

1  SUFFICIENT TO HAVE THE FEATURE BE ATTRACTIVE, THAT WAS HANDLED

2  MORE AT THE TEAM LEVEL AND, YOU KNOW, THE PLAYERS INC LEVEL.

3          I WOULD NOT TYPICALLY GET INVOLVED AND SAY:

4             "WELL, OKAY, YOU CAN'T GET JOE MONTANA, BUT HOW

5  ABOUT STEVE YOUNG," FOR EXAMPLE.

6  **BY MR. FEHER:**

7  **Q.**   BUT DURING THIS WHOLE PERIOD DID YOU EVER HAVE ANY SENSE

8  THAT DOUG ALLEN AND OTHERS AT PLAYERS INC WEREN'T TRYING TO

9  PROMOTE RETIRED PLAYERS TO EA?

10 **A.**   NO.  IN FACT, THEY DID LICENSE US RETIRED PLAYERS ON MANY

11 OCCASIONS.

12 **Q.**   LET'S ACTUALLY TALK ABOUT THAT BRIEFLY.  HOW DID THAT WORK

13 STRUCTURALLY?  WHEN YOU LICENSED ADDITIONAL PLAYERS HOW WOULD

14 THAT WORK PROCESS-WISE?

15 **A.**   IT WORKED DIFFERENTLY IN DIFFERENT WAYS.  THE ONE EXHIBIT

16 MR. HUMMEL SHOWED ME WE ACTUALLY ENTERED INTO A GROUP LICENSING

17 AGREEMENT.  WHICH NUMBER WAS IT?  26 OR SOMETHING.  WHERE THERE

18 WAS ENUMERATED PLAYERS, WHICH HARRIS BARTON WAS ONE.  AND WE

19 PAID A SET AMOUNT, AND WE HAD THE RIGHTS TO USE THAT GROUP OF

20 PLAYERS.

21          WAS IT 24?

22 **Q.**   IT'S 24.

23 **A.**   AND THEN ON -- I RECALL THERE WAS A DIFFERENT KIND OF GAME

24 THAT WE HAD THAT'S CALLED "NFL STREET."  NFL STREET 2 IN

25 PARTICULAR.  NFL STREET IS NOT LIKE MADDEN.

1      IT'S AN ARCADE-STYLE GAME WHERE THERE'S NOT REAL

2   PHYSICS.  PEOPLE CAN JUMP REALLY HIGH.  THEY CAN DO THINGS THAT

3   AREN'T POSSIBLE IN THE REAL WORLD.

4      AND WE WANTED TO INCLUDE PLAYERS THAT HAD A LOT --

5   RETIRED PLAYERS THAT HAD A LOT OF PERSONALITY AND MIGHT BE

6   WELL-KNOWN TO OUR USER BASE.

7      SO WE LICENSED THROUGH PLAYERS INC RETIRED PLAYERS

8   LIKE WILLIAM PERRY, BO JACKSON, PLAYERS THAT HAD -- WERE

9   WELL-KNOWN AND HAD BIG PERSONALITIES.

10  **Q.**   OKAY.  AND WHEN YOU MADE THOSE ARRANGEMENTS FOR RETIRED

11  PLAYERS, TO YOUR RECOLLECTION WERE THERE SEPARATE GRANTS OF

12  RIGHTS TO COVER THOSE RETIRED PLAYERS?

13  **A.**   MY UNDERSTANDING BASED ON THE DOCUMENTS I'VE SEEN IS THAT

14  THERE WERE SEPARATE AUTHORIZATIONS TO USE THOSE RETIRED PLAYER

15  RIGHTS BOTH IN GAME AND/OR FOR MARKETING FOR, YOU KNOW, SET

16  AMOUNTS OF MONEY.

17  **Q.**   OKAY.  AND EA PAID ADDITIONAL AMOUNTS OF MONIES TO SECURE

18  THESE RIGHTS?

19  **A.**   WE DID.

20  **Q.**   OKAY.  IF EA ALREADY HAD THE RIGHTS TO RETIRED PLAYERS

21  THROUGH THE MAIN LICENSE AGREEMENTS AS PLAINTIFFS CONTEND,

22  WOULD YOU EVER HAVE PAID AN ADDITIONAL PENNY TO SECURE THOSE

23  ADDITIONAL RIGHTS?

24  **A.**   I DON'T KNOW ABOUT WHAT PLAINTIFFS CONTEND, BUT OBVIOUSLY

25  I WOULDN'T PAY EXTRA FOR RIGHTS THAT I ALREADY HAD.

1  Q.   JUST VERY BRIEFLY ON THE SCRAMBLING ISSUE.

2            AT ANY POINT IN TIME DID YOU HAVE AN UNDERSTANDING AS

3  TO WHETHER EA NEEDED THE LICENSE FROM ANYONE TO USE THE AVATARS

4  THAT WERE DISPLAYED IN THOSE GAMES?

5  A.   I DON'T KNOW WHAT YOU MEAN "AVATARS."  I KNOW WHAT AN

6  AVATAR IS.  THAT'S NOT WHAT WE USE IN OUR GAME.

7  A.   HOW WOULD YOU DESCRIBE WHAT YOU USE IN YOUR GAME?

8  A.   PLAYER MODELS.

9  Q.   PLAYER MODELS?  OKAY.  AND THOSE PLAYER MODELS --

10 A.   AVATARS ARE MORE OF AN ONLINE CONCEPT.

11 Q.   WERE THOSE PLAYER MODELS INTENDED SO THAT THEY WOULD NOT

12 BE RECOGNIZABLE AS ANY PARTICULAR PLAYER?

13 A.   AT WHAT POINT IN TIME?  THERE'S A POINT IN TIME WHEN NO

14 PLAYERS WERE RECOGNIZABLE.  THE TECHNOLOGY WAS SUCH, AND

15 DEPENDING ON THE PLATFORM IT WAS IMPOSSIBLE TO RECOGNIZE A

16 PLAYER.

17 Q.   RIGHT.

18 A.   THE PHOTOREALISM WASN'T GOOD ENOUGH.  IT WAS ONLY MORE

19 RECENTLY THAT YOU ACTUALLY CAN SEE ANYBODY, TIGER WOODS OR A

20 PLAYER AND SEE THAT, YEAH, THAT'S TIGER WOODS.

21 Q.   LET ME REPHRASE IT DIFFERENTLY.

22            WHEN, FOR EXAMPLE, YOU'D HAVE A PARTICULAR VINTAGE

23 TEAM, AND THERE WOULD BE A PLAYER LISTED, WITHOUT A PICTURE OF

24 THE ACTUAL PLAYER AND WITHOUT THE NAME OF THE ACTUAL PLAYER,

25 BUT THERE WOULD BE A HEIGHT AND A WEIGHT GIVEN FOR THOSE

1  PLAYERS, DID YOU EVER BELIEVE AT ANY TIME THAT YOU NEEDED A

2  LICENSE FROM ANYONE IN ORDER TO DISPLAY THOSE HEIGHTS AND

3  WEIGHTS?

4  **A.**   IT WAS OUR BELIEF THAT WE DID NOT NEED A LICENSE TO LIST A

5  HEIGHT OR A WEIGHT FROM WHATEVER SOURCE BOOK THAT WOULD BE.

6  THAT WASN'T A MISAPPROPRIATION OF A PLAYER IDENTITY AS

7  APPARENTLY MR. HUMMEL --

8  **Q.**   OKAY.  IN TERMS OF THE VINTAGE GAMES EA DOES --

9  **A.**   VINTAGE TEAMS?

10 **Q.**   VINTAGE TEAMS.  THE GAMES WITH VINTAGE TEAMS THAT USE THE

11 MARKS AND NAME OF THE CHICAGO BEARS OR THE SAN FRANCISCO 49ERS,

12 DO YOU PAY ANYONE FOR THE RIGHT TO USE ANY INTELLECTUAL

13 PROPERTY IN THOSE GAMES?

14 **A.**   YES.

15 **Q.**   WHO DO YOU PAY?

16 **A.**   NFL PROPERTIES.  THEY CONVEY TO US THE RIGHTS NOT ONLY THE

17 LOGOS AND UNIFORMS OF THE TEAMS CURRENTLY, BUT THE RIGHTS GOING

18 BACKWARD IN TIME THAT THEY STILL CONTROL.

19 **Q.**   AND SO WHEN YOU SAY "THE CHICAGO BEARS FROM 1985," AND

20 THEN USE THE TEAM UNIFORMS IN THE GAME, WAS IT YOUR

21 UNDERSTANDING THAT YOU COULD ONLY DO THAT BECAUSE YOU

22 SEPARATELY HAD A LICENSE WITH AND PAID MONEY TO THE NFL?

23 **A.**   NO.  IF I DIDN'T HAVE AN NFL LICENSE I WOULD NOT BE ABLE

24 TO DO THAT.

25 **Q.**   THEY WOULD COME AFTER YOU, RIGHT?

1  **A.**   WELL, YES, THEY WOULD.

2  **Q.**   OKAY.

3        **MR. FEHER:**  NOTHING FURTHER, YOUR HONOR, AT THIS

4  TIME.

5        **THE COURT:**  ALL RIGHT.  THANK YOU.

6        ANY FURTHER EXAMINATION, MR. HUMMEL?

7        **MR. HUMMEL:**  YES, YOUR HONOR.

8                   **REDIRECT EXAMINATION**

9  **BY MR. HUMMEL:**

10 **Q.**   MR. LINZNER, YOU'RE A LAWYER, RIGHT?

11 **A.**   I AM.

12 **Q.**   CAN YOU TELL THE LADIES AND GENTLEMEN WHY YOU HAVE YOUR

13 LAWYER IN THE COURTROOM?

14 **A.**   HE WORKS FOR ME IN MY LEGAL DEPARTMENT.

15        **MR. FEHER:**  OBJECTION, YOUR HONOR.  THAT'S AN

16 IMPROPER QUESTION.

17        **THE COURT:**  WHAT?

18        **MR. HUMMEL:**  WHY HE HAS A LAWYER IN THE COURTROOM.

19 GOES TO BIAS.

20        **THE COURT:**  WHY IS THAT RELEVANT?

21        **MR. HUMMEL:**  GOES TO BIAS, YOUR HONOR.

22        **THE WITNESS:**  BIAS?

23        **MR. FEHER:**  OBJECTION, YOUR HONOR.

24        **THE COURT:**  GO AHEAD AND ANSWER THE QUESTION.

25        **THE WITNESS:**  IS IT WHY DID I HAVE MY LAWYER HERE?

1    **THE COURT:** WHY IS A LAWYER HERE FOR EA?

2    **THE WITNESS:** HE'S INTERESTED IN MY TESTIMONY. I'M A

3 SENIOR EXECUTIVE AT THE COMPANY. IT'S TYPICALLY THAT WE -- IF

4 WE DO TESTIFY, JUST AS THE DEPOSITION, HE ATTENDED THE

5 DEPOSITION. IN FACT, HE REPRESENTED ME AT THE DEPOSITION.

6 **BY MR. HUMMEL:**

7 **Q.** IS HE REPRESENTING YOU HERE?

8 **A.** I DON'T THINK I NEED REPRESENTATION HERE.

9 **Q.** THAT'S NOT MY QUESTION. IS HE?

10 **A.** I HAVEN'T ASKED HIM TO REPRESENT ME, BUT I AM A SENIOR

11 EXECUTIVE OF THE COMPANY, AND HE IS A LAWYER FOR THE COMPANY,

12 SO I GUESS BY DEFINITION HE'S REPRESENTING ME.

13 **Q.** WITHOUT GETTING INTO WHAT HE SAID TO YOU, DID HE PREPARE

14 YOU FOR YOUR TESTIMONY TODAY?

15 **A.** WE REVIEWED A BUNCH OF DOCUMENTS SO THAT WE WOULDN'T WASTE

16 THE COURT OR THE JURY'S TIME.

17 **Q.** I UNDERSTAND.

18 **A.** HE GAVE ME A LIST -- NOT A LIST, A BOOKLET OF THE

19 DOCUMENTS WE HAD PRODUCED PURSUANT TO YOUR SUBPOENA AND THE --

20 SOME OF THE THINGS THAT HAD BEEN MARKED AS TRIAL EXHIBITS, SO I

21 WOULD BE MORE FAMILIAR WITH THEM AND NOT WASTE TIME READING

22 THROUGH THEM WHILE SITTING HERE.

23 **Q.** I APPRECIATE THAT.

24    DO YOU KNOW WHO PREPARED THAT BOOKLET OF DOCUMENTS

25 THAT YOUR LAWYER WOULD WORK THROUGH WITH YOU TO PREPARE FOR

1    YOUR TESTIMONY?

2              **MR. FEHER:**  OBJECTION.

3              **THE WITNESS:**  I BELIEVE HE DID.

4    **BY MR. HUMMEL:**

5    **Q.**  PARDON ME?

6    **A.**  I BELIEVE HE DID.

7    **Q.**  DO YOU KNOW IF THE DEFENDANTS' LAWYERS SENT DOCUMENTS FOR

8    HIM TO PREP YOU WITH?

9    **A.**  WE HAD TO GET THE TRIAL EXHIBITS FROM SOMEBODY.

10   **Q.**  SO YOU GOT THEM FROM WHOM?

11   **A.**  I GOT THEM FROM MY LAWYER, MR. SHOTS.

12   **Q.**  RIGHT.  AND MR. SHOTS GOT THEM FROM WHOM?

13   **A.**  I DON'T REALLY KNOW.

14   **Q.**  NOT FROM US, RIGHT?

15   **A.**  YOU TELL ME.

16   **Q.**  NOT FROM US.

17   **A.**  THAT'S INSULTING.

18   **Q.**  BUT YOU CONTEND --

19   **A.**  I AM INSULTED.

20   **Q.**  I'M SORRY YOU'RE INSULTED.

21   **A.**  RIGHT.

22   **Q.**  YOU PREPARED TO FOR YOUR TESTIMONY HERE TODAY, RIGHT?

23   **A.**  I REVIEWED THE EXHIBITS WHICH YOU SHOWED ME SO THAT I

24   WOULDN'T WASTE YOUR TIME OR THE JURY'S.  WOULD YOU RATHER I

25   WASTED THE TIME?

1  **Q.**  NO.

2  **A.**  THANK YOU.

3  **Q.**  NOW, LET'S TALK ABOUT YOUR PRODUCT.  YOU SAID YOU WANTED

4  TO HAVE AN AUTHENTIC VIDEO GAME FOOTBALL EXPERIENCE, RIGHT?

5  **A.**  MADDEN NFL.

6  **Q.**  MADDEN, YES.  IS THAT CORRECT?

7  **A.**  MADDEN NFL SEEKS TO BE A SIMULATION OF NFL FOOTBALL.

8  **Q.**  ALL RIGHT.  AND TO HAVE AN AUTHENTIC FOOTBALL VIDEO GAME

9  EXPERIENCE, YOU HAVE TO HAVE A WHOLE TEAM, RIGHT?

10  **A.**  A WHOLE TEAM?

11  **Q.**  TO PLAY A SIMULATED VIDEO GAME, YOU CAN'T HAVE A

12  QUARTERBACK, A FAMOUS QUARTERBACK AND FAMOUS RUNNING BACK.  YOU

13  HAVE TO HAVE A WHOLE TEAM, RIGHT?

14  **A.**  ACTUALLY, WHAT YOU NEED IS ALL 32 TEAMS IN THE NFL.

15  **Q.**  OKAY.  AND IF YOU WANT TO HAVE HISTORIC TEAMS YOU HAVE TO

16  HAVE ALL THE MEMBERS OF THOSE HISTORIC TEAMS TO PLAY IN THE

17  GAME?

18  **A.**  WELL, THAT'S NOT THE PART ABOUT BEING AUTHENTIC.  WHAT

19  MAKES MADDEN A YEAR-IN-YEAR-OUT TOP SELLER IS THAT IT PRESENTS

20  THE TEAMS OF THE NFL WITH CURRENT ROSTERS.  THEY UPDATE THE

21  UNIFORMS, NEW STADIUMS AND UPDATED STATS FOR THOSE ACTIVE

22  PLAYERS.

23  **Q.**  NOW, I'M ONLY ASKING YOU ABOUT HISTORIC TEAMS, WHICH

24  YOU'VE TESTIFIED ARE IN THE GAME, RIGHT?

25  **A.**  YES, SIR.

1  Q.   AS TO HISTORIC TEAMS, DID YOU WANT THEM TO BE AUTHENTIC,

2  YES OR NO?

3  A.   NO.

4  Q.   YOU DIDN'T CARE?

5  A.   NOT THAT WE DIDN'T CARE.  WE DIDN'T HAVE THE RIGHTS TO

6  MAKE THEM AUTHENTIC OR THE RESOURCES TO PUT THE EFFORT INTO

7  MAKING THOSE SIMULATIONS AS REALISTIC AS WE DO FOR THE 32

8  ACTIVE TEAMS.

9  Q.   SOMEBODY TOOK THE EFFORT, SIR, TO FIGURE OUT

10 MR. ADDERLEY'S HEIGHT AND WEIGHT, RIGHT?  AND THEY PUT IT IN

11 THE GAME, RIGHT?

12 A.   WELL, WHAT THEY -- I DON'T KNOW HOW THEY FIGURED IT OUT,

13 BUT THEY PROBABLY TOOK SOME SOURCE FROM SOMEWHERE OF PLAYERS,

14 RETIRED -- WHAT YOU CALL THE HISTORIC TEAMS OR CLASSIC TEAMS,

15 AND THEY JUST LISTED HEIGHTS AND WEIGHTS.

16 Q.   AND THEY TOOK MR. MCNEIL'S HEIGHT AND WEIGHT, CLIFTON

17 MCNEIL, WHO TESTIFIED IN THIS TRIAL, WHO WAS A GREAT WIDE

18 RECEIVER FOR THE CLEVELAND BROWNS.  THEY WENT -- YOUR GUYS WENT

19 AND LOOKED UP HIS HEIGHT AND WEIGHT AND HOW MANY YEARS HE WAS

20 IN THE LEAGUE, AND WHAT HIS POSITION WAS, AND THEY PUT IT IN

21 THE GAME, RIGHT?

22 A.   I DON'T KNOW IF THAT'S IN THE GAME.  I DON'T KNOW

23 MR. MCNEIL OR WHETHER HE'S INCLUDED IN THE GAME.

24 Q.   WHY WOULD THEY DO THAT IF THEY DIDN'T WANT IT TO BE

25 AUTHENTIC?

1    WHY WOULD THEY USE HERB ADDERLEY'S HEIGHT AND WEIGHT

2   (INDICATING), GREAT QUARTERBACK FOR THE GREENBAY PACKERS. WHY

3   WOULD THEY DO IT?

4        **MR. FEHER:**  OBJECTION, YOUR HONOR.  THIS IS PURE

5   CLOSING ARGUMENT.

6   **BY MR. HUMMEL:**

7   **Q.**   WHY WOULD THEY DO IT?

8        **THE COURT:**  ALL RIGHT.  GO AHEAD.

9        IF YOU CAN ANSWER, PLEASE ANSWER.

10       **THE WITNESS:**  I DON'T KNOW.

11  **BY MR. HUMMEL:**

12  **Q.**   REALLY?

13  **A.**   REALLY.

14       (LAUGHTER)

15  **Q.**   UHM.

16       NOW, LET'S TALK ABOUT THAT EXCLUSIVE LICENSE THAT

17  MR. FEHER WANTED TO TALK ABOUT.

18       YOU WANTED THAT EXCLUSIVE LICENSE, DID YOU NOT, TO

19  TAKE COMPETITION OUT OF THE MARKETPLACE?

20       YOU WANTED TO REMOVE TAKE 2 AS A COMPETITOR OF EA'S

21  IN MARKETING A PROFESSIONAL FOOTBALL SIMULATION GAME.  HE

22  TALKED ABOUT TAKE 2.  WHO IS TAKE 2?

23  **A.**   TAKE 2 IS ANOTHER VIDEO GAME PUBLISHER.

24  **Q.**   AND THEY HAD A PRO FOOTBALL GAME IN THE MARKETPLACE,

25  DIDN'T THEY, PRIOR TO THE TIME YOU ENTERED INTO THIS EXCLUSIVE

1  LICENSE?

2  **A.**    ACTUALLY, THEY DID NOT.

3  **Q.**    THEY HAD A GAME, DIDN'T THEY?  IT WAS CALLED "MADDEN" --

4  IT WAS NOT CALLED "MADDEN"; IT WAS CALLED 2K, CORRECT?

5  **A.**    THAT WAS BY SAGO.

6  **Q.**    BUT IT WAS 2K, RIGHT?

7  **A.**    THAT'S NOT TAKE 2.  IT WAS THE 2K BRAND THAT WAS OWNED BY

8  SAGO AT THE TIME.

9  **Q.**    WASN'T TAKE 2 INVOLVED?

10  **A.**    TAKE 2 STARTED TO GET INVOLVED WITH SAGO AS SAGO WAS

11  GETTING OUT OF THE SPORTS BUSINESS AROUND THAT PERIOD OF TIME.

12  **Q.**    AND THAT $25 MILLION THAT YOU PAID TO THESE GUYS, THE

13  DEFENDANTS IN THIS CASE, GAVE YOU AN EXCLUSIVE TO THE PLAYERS

14  SO THAT TAKE 2 COULDN'T USE THEM ANYMORE, RIGHT?

15  **A.**    WELL, ON CERTAIN GENRES OF GAMES WE BID AGAINST TAKE 2 FOR

16  AN EXCLUSIVE LICENSE, AND WE THOUGHT IT WAS MORE ADVANTAGEOUS

17  FOR OUR BUSINESS THAT WE ACQUIRE THE EXCLUSIVE LICENSE RATHER

18  THAN LET TAKE 2 TAKE THE EXCLUSIVE LICENSE.

19  **Q.**    WAS THE HALL OF FAME AN EXCLUSIVE LICENSE?

20  **A.**    WAS THE HALL OF FAME AN EXCLUSIVE LICENSE?

21  **Q.**    YEAH.  YOU LICENSED FROM THE HALL OF FAME ALL THE RIGHTS

22  TO THE HALL OF FAME RETIRED PLAYERS.  WAS THAT EXCLUSIVE?

23  **A.**    NO, NOT FOR THE RETIRED PLAYERS THAT ARE IN THE HALL OF

24  FAME.

25  **Q.**    FOR THE HALL OF FAME?

1   **A.**   WELL, FOR THE HALL OF FAME TRADEMARKS.

2   **Q.**   RIGHT.

3   **A.**   JUST THE HALL OF FAME TRADEMARKS, I BELIEVE WE

4   SUBSEQUENTLY ENTERED INTO AN EXCLUSIVE LICENSE FOR THE HALL OF

5   FAME TRADEMARKS BUT NOT AN EXCLUSIVE RIGHT FOR THE HALL OF FAME

6   PLAYERS, BECAUSE, IN FACT, MANY OF THOSE PLAYERS WERE IN OTHER

7   GAMES.

8   **Q.**   LET'S TALK ABOUT FANTASY FOOTBALL.

9   **A.**   OKAY.

10  **Q.**   MR. FEHER TALKED ABOUT A LICENSE FOR FANTASY FOOTBALL.

11  AND YOU DID LICENSE THE ACTIVE PLAYERS AS A GROUP FOR FANTASY

12  FOOTBALL PRODUCTS; IS THAT RIGHT?

13  **A.**   WE DID.

14  **Q.**   ALL RIGHT.  NOW, AND THAT WOULD BE ALL ACTIVE PLAYERS?

15  **A.**   YES.

16  **Q.**   IN A FANTASY GAME DO YOU DRAFT AN OFFENSIVE LINEMAN?

17  **A.**   GENERALLY NOT.

18  **Q.**   DO YOU DRAFT A DEFENSIVE LINEMAN?

19  **A.**   GENERALLY NOT.

20  **Q.**   SO YOU DRAFT THE SKILLED POSITION PLAYERS BECAUSE THOSE

21  ARE THE ONES THAT SCORE POINTS, RIGHT?

22  **A.**   IN A FANTASY GAME, THAT'S CORRECT.

23  **Q.**   RIGHT.  AND YOU PAID A LUMP SUM TO THE DEFENDANTS FOR THE

24  RIGHTS FOR ALL PLAYERS, RIGHT?

25  **A.**   WELL, IT WAS PART OF THE GROUP LICENSE APPROACH.

1   Q.   RIGHT.

2   A.   SO, YES.  SO WE GOT THE RIGHT FOR FANTASY TO ALL THE

3   PLAYERS, AND THEN THE DIFFERENT LEAGUES COULD DRAFT PLAYERS

4   HOWEVER THEIR RULES PROVIDED.

5   Q.   DID YOU KNOW HOW THOSE FUNDS WOULD BE DIVIDED AMONG THE

6   ACTIVE PLAYERS?

7   A.   NO.

8   Q.   WOULD AN OFFENSIVE LINEMAN WHO WOULD NEVER BE USED IN A

9   FANTASY GAME, WOULD HE GET A SHARE OF THAT MONEY, DO YOU KNOW?

10  A.   I DON'T KNOW.

11  Q.   YOU DON'T KNOW.  OKAY.  NOW, I THINK MR. FEHER SAID OR

12  ASKED YOU A QUESTION ABOUT WHETHER DOUG ALLEN PROMOTED RETIRED

13  PLAYERS TO YOU FROM TIME TO TIME, RIGHT?

14  A.   I RECALL THE QUESTION MR. FEHER ASKED, YES.

15  Q.   AND YOU SAID YES, HE DID PROMOTE RETIRED PLAYERS?

16  A.   THAT'S NOT EXACTLY WHAT I SAID.  I SAID MR. ALLEN AND

17  OTHERS AT PLAYERS INC UPON OCCASION OFFERED TO OBTAIN THE

18  RIGHTS TO RETIRED PLAYERS WHEN WE WERE INTERESTED IN PROCURING

19  THEM.

20  Q.   THAT'S FAIR ENOUGH.

21        DID HE ACTUALLY EVER PROMOTE SPECIFICALLY RETIRED

22  PLAYERS WHO HAD SIGNED GLA'S AS OPPOSED TO RETIRED PLAYERS,

23  GENERALLY?

24  A.   COULD YOU REPEAT THAT, PLEASE?

25  Q.   I CAN DO IT AGAIN.  LET ME MAKE IT CLEAR.

1      YOU NOW KNOW BECAUSE OF THIS CASE THERE'S A GROUP,

2   2100, REPRESENTED BY MR. ADDERLEY HERE WHO WAS A HALL OF FAME

3   CORNERBACK FOR THE GREENBAY PACKERS.

4   **A.**   I WAS A FAN OF MR. ADDERLEY.  HE WAS A GOOD PLAYER.

5   **Q.**   AND YOU UNDERSTAND THAT HE REPRESENTS A CLASS OF 2100

6   PEOPLE, FORMER PRO FOOTBALL PLAYERS, WHO ARE NOW RETIRED WHO

7   SIGNED GLA'S.

8      THE QUESTION THAT I HAVE FOR YOU IS:  DID MR. ALLEN,

9   OR ANYONE ELSE AT PLAYERS INC, AS OPPOSED TO MARKETING RETIRED

10  PLAYERS, MARKET TO YOU RETIRED PLAYERS LIKE MR. ADDERLEY AND

11  OTHERS WHO HAD SIGNED GLA'S?

12  **A.**   I THINK I ANSWERED THIS BEFORE WHEN YOU ASKED ME IF THEY

13  EVER SHOWED ME A LIST OF 2100 PLAYERS.  AND THINK I'VE SAID

14  SEVERAL TIMES THEY DID NOT.

15  **Q.**   OKAY.

16      **THE COURT:**  NO, HE IS ASKING YOU A DIFFERENT

17  QUESTION.  HE'S SAYING DID ANYONE -- DID MR. ALLEN OR ANYONE

18  OVER AT NFPLA ATTEMPT TO INTEREST YOU IN LICENSING PEOPLE WHO

19  HAD THE -- WHO HAD SIGNED GLA'S, WHETHER OR NOT THEY EVER GAVE

20  YOU A LIST?

21      **THE WITNESS:**  WELL, THEY -- THEY DID TELL ME -- TO

22  ANSWER YOUR HONOR'S QUESTION, THEY DID TELL ME, FOR EXAMPLE,

23  THAT FIRST EXHIBIT THAT MR. HUMMEL SHOWED ME THAT THEY HAD

24  OBTAINED THE RIGHTS TO SOME OF THESE PLAYERS WHO HAD ALREADY

25  SIGNED GLA'S, AND THEY WOULD GO OUT AND TRY AND GET MORE, WHICH

1  THEY DID.

2        AND THAT'S WHY WE -- THE LIST OF 150, 200 ATTACHED TO

3  THAT EXHIBIT 26 OR 8 --

4  **BY MR. HUMMEL:**

5  **Q.**  24.

6  **A.**  24.

7  **Q.**  RIGHT.

8  **A.**  THAT YOU SHOWED ME.  SO THEY DID TELL US THAT THEY HAD

9  SOME PLAYERS, RETIRED PLAYERS THAT HAD ALREADY SIGNED; THAT

10  THEY WOULD MAKE AN EFFORT TO GO OUT AND GET MORE.

11        AND AS FAR AS I KNOW THEY WERE SUCCESSFUL, IN PART

12  NOT IN WHOLE, FOR GETTING THE PLAYERS THAT WE HAD LISTED AS

13  WANTING FOR THOSE FEATURES.

14        **MR. HUMMEL:**  I'M SORRY, YOUR HONOR.  I WANT TO ASK

15  HIM A QUESTION.  IS THAT OKAY?

16        **THE COURT:**  GO AHEAD.  I'M -- YOU WERE NOT ASKING

17  ABOUT A LIST.  YOU WHY ASKING ABOUT THE GLA.

18        **MR. HUMMEL:**  RIGHT.

19        **THE COURT:**  WHICH IS NOT NECESSARILY THE SAME THING.

20  AND THAT POINT WAS GETTING CONFUSED.

21        SO GO AHEAD AND ASK MORE QUESTIONS.

22        **MR. HUMMEL:**  THANK YOU, YOUR HONOR.

23  **BY MR. HUMMEL:**

24  **Q.**  I'M NOT ASKING YOU ABOUT A LIST NOW.  I'M ASKING YOU ABOUT

25  WHETHER MR. ALLEN, OR ANYONE ELSE AT PLAYERS INC, EVER CAME TO

1  YOU AND SAID:

2          "WE'VE GOT THIS GROUP OF RETIRED PLAYERS WHO HAVE

3  SIGNED GLA'S.  TAKE THEM.  TAKE THE GUY SPECIFICALLY WHO SIGNED

4  THE GLA'S."

5  **A.**  NO, NOT IN THAT WAY.

6  **Q.**  OKAY.

7  **A.**  WHAT I SAID WAS THAT THEY TOLD US THAT THEY HAD SOME GUYS

8  WHO HAD SIGN GLA'S.  IF WE WANTED OTHERS FOR WHOM THEY DID NOT

9  HAVE AUTHORIZATION THEY WOULD TRY AND GO GET THEM.

10          AND, IN FACT --

11          **THE COURT:**  WAIT.  TRY AND GO GET THEM VIA OTHER

12  GLA'S?

13          **THE WITNESS:**  YES.

14          **THE COURT:**  I WANT TO JUST BE CLEAR ON THIS POINT,

15  BECAUSE YOU PHRASED THE QUESTION AS ALL OR NOTHING.

16          DID MR. ALLEN EVER SAY:

17          "WE'VE GOT THIS GROUP OF GUYS ON GLA'S, AND TRY

18  TO PROMOTE SOME OR ALL OF THEM THROUGH YOUR ORGANIZATION?"

19  THROUGH THE GLA.

20          **THE WITNESS:**  THE ANSWER TO YOUR HONOR'S QUESTION

21  WOULD BE "YES" ON SOME OF THEM.  WE DIDN'T WANT ALL OF THEM.

22  YOU'VE GOT TO UNDERSTAND, THERE'S LIKE 1400 PLAYERS EVERY YEAR

23  IN THE NFL.  YOU GO BACK DECADES.  YOU KNOW HOW MANY PEOPLE

24  WE'RE TALKING ABOUT, POTENTIALLY?

25          AND SOME OF THEM HAD SIGNED GLA'S WITH PLAYERS INC.

1  THIS IS WHAT I UNDERSTOOD, BASED ON WHAT THEY TOLD ME.

2        SOME OF THEM HAD SIGNED, BUT NOT ALL OF THEM HAD.  SO

3  IF WE SHOWED INTEREST IN, FOR EXAMPLE, WALTER PAYTON.  MAYBE HE

4  HADN'T SIGNED A GLA.  SO THEY WOULD GO TO MR. PAYTON'S ESTATE

5  OR HIS WIFE OR WHOEVER IS CONTROLLING HIS RIGHTS AT THIS POINT

6  IN TIME AFTER HE DIED, AND THEY WOULD SAY:

7        "DO YOU WANT TO PARTICIPATE?  SIGN THIS GLA OR

8  SOME OTHER AUTHORIZATION."

9        AND, YOU KNOW, WE EITHER COULD OR COULD NOT GET

10  MR. PAYTON IN THE GAME.

11        **THE COURT:**  YOU MAY ASK MORE QUESTIONS ON THIS.  I

12  THINK THE -- GO AHEAD.  PURSUE IT, IF YOU WANT.

13  **BY MR. HUMMEL:**

14  **Q.**   MR. LINZNER, YOU DIDN'T EVEN KNOW BACK WHEN YOUR

15  DEPOSITION WAS TAKEN -- IN FACT, UP UNTIL TODAY -- WHAT A GLA

16  WAS, RIGHT?

17  **A.**   WELL, NO, I DID.  I UNDERSTOOD IT WAS CALLED LIKE A

18  GENERAL LICENSING AGREEMENT.  BUT WHATEVER WORDS YOU WANT TO

19  USE FOR THE ACRONYM --

20  **Q.**   YES.

21  **A.**   -- I KNEW WHAT THE CONCEPT WAS.  AGAIN, EVEN IN THE

22  AGREEMENTS THEY HAVE TWO DIFFERENT DESCRIPTIONS OF THAT

23  ACRONYM, AS MR. KATZ SHOWED ME.  THAT, YOU KNOW, ONE TIME IT'S

24  DEFINED AS "GROUP LICENSING AUTHORIZATION."  ANOTHER TIME IT'S

25  DEFINED AS "GROUP LICENSING ASSIGNMENT."  AND WHETHER IT'S A

1   GENERAL LICENSING AGREEMENT, WHICH IS THE TERM I USED IN MY

2   DEPOSITION, I ALWAYS UNDERSTOOD IT WAS A MECHANISM BY WHICH WE

3   OBTAINED GROUP LICENSING RIGHTS TO NFL PLAYERS.

4   **Q.**   NOW, I'M GOING TO ASK YOU ONE FINAL SORT OF SERIES OF

5   QUESTIONS ON THIS TOPIC.

6          YOU'VE SAID THAT YOU WANTED AN AUTHENTIC GAME.  AND I

7   GUESS I ASKED IF YOU YOU WANTED THE HISTORIC TEAMS TO BE AS

8   AUTHENTIC AS POSSIBLE WITHIN THE GRANT OF LICENSES YOU THOUGHT

9   YOU HAD, OKAY?

10  **A.**   YES.

11  **Q.**   NOW, ASSUME FOR A MOMENT THAT, IN FACT, YOU COULD READ THE

12  LICENSE THAT YOU GOT, THAT YOU NEGOTIATED, AS CONVEYING THE

13  RIGHTS TO RETIRED PLAYERS WHO HAD SIGNED GLA'S.  THERE WOULD

14  HAVE BEEN NO HARM TO YOU, NO HARM TO EA, IF PI HAD SIMPLY

15  SAID --

16          **MR. FEHER:**  OBJECTION, YOUR HONOR --

17  **BY MR. HUMMEL:**

18  **Q.**   -- "WE CONVEYED THE RIGHTS," CORRECT?  YOU COULD HAVE USED

19  THEM FOR NO ADDITIONAL COST TO YOU?

20          **MR. FEHER:**  YOUR HONOR, THIS IS CLOSING ARGUMENT.

21          **MR. HUMMEL:**  IT'S A QUESTION.

22          **THE COURT:**  LET'S HEAR THE QUESTION.  I LOST TRACK OF

23  THE QUESTION.

24          BUT DON'T ANSWER UNTIL I HEAR THE OBJECTION.

25          **MR. HUMMEL:**  SURE.

1          **THE COURT:**  START OVER.

2          **MR. HUMMEL:**  SURE.

3  **BY MR. HUMMEL:**

4  Q.   THE QUESTION IS THIS:  ASSUME THAT THE LICENSE GRANT

5  ACTUALLY DOES, BY TECHNICAL LANGUAGE THAT YOU AND I AS LAWYERS

6  MIGHT UNDERSTAND, DOES CONVEY THE RIGHTS TO RETIRED PLAYERS

7  THAT SIGNED GLA'S --

8          **THE COURT:**  WHICH GRANT?

9          **MR. HUMMEL:**  THE GRANT OF LICENSE IN THE EA LICENSE

10  THAT WE'VE BEEN TALKING ABOUT, PARAGRAPHS 1 AND 2.

11  **BY MR. HUMMEL:**

12  Q.   JUST ASSUME THAT.

13          **THE COURT:**  FOR THE SAKE OF ARGUMENT.

14          **MR. HUMMEL:**  FOR THE SAKE OF ARGUMENT.

15          **THE COURT:**  HE'S TESTIFIED THE OPPOSITE.

16          **MR. HUMMEL:**  NO, HE HAS TESTIFIED AS TO WHAT HE

17  THOUGHT HE WAS GETTING.  BUT THAT'S FINE, YOUR HONOR.

18  **BY MR. HUMMEL:**

19  Q.   ASSUME FOR THE SAKE OF OF ARGUMENT, ASSUME YOU GOT IT.

20  COULD YOU HAVE USED 2100 RETIRED PLAYERS IN A HISTORIC GAME TO

21  MAKE THE GAME MORE AUTHENTIC IF YOU HAD THEIR NAMES,

22  LIKENESSES, JERSEY NUMBERS, ET CETERA?

23          COULD YOU HAVE USED MR. ADDERLEY'S IMAGE TO MAKE IT

24  MORE AUTHENTIC WHEN YOU WANT TO PLAY THE GREENBAY PACKERS IN A

25  HISTORIC GAME?

1  **A.**   WHEN?

2          MAY I ANSWER, YOUR HONOR.

3          **THE COURT:**  ANY OBJECTION?

4          **MR. FEHER:**  IT'S ARGUMENTATIVE, YOUR HONOR.

5          **THE COURT:**  NO, IT'S NOT.  I'M GOING TO ALLOW THE

6  QUESTION.

7          I'M CONFUSED, THOUGH, MYSELF.  ARE YOU TALKING ABOUT

8  THE HISTORICAL TEAMS OR ARE YOU TALKING ABOUT THE CURRENT

9  TEAMS?

10         **MR. HUMMEL:**  HISTORICAL TEAMS, YOUR HONOR.

11         **THE COURT:**  ALL RIGHT.  WELL, THEN, I TAKE BACK WHAT

12 I SAID EARLIER.  I MISUNDERSTOOD THE PURPORT OF YOUR QUESTION.

13 I DON'T REMEMBER WHAT THE WITNESS SAID.

14         I'M NOT SAYING HE TESTIFIED TO THE OPPOSITE.  IT'S UP

15 TO HIM TO TESTIFY.

16         IF YOU UNDERSTAND THE QUESTION, PLEASE ANSWER.

17         **THE WITNESS:**  THE WAY I UNDERSTAND THE QUESTION,

18 MR. HUMMEL IS ASKING ME IF I HAD GOTTEN THE RIGHTS, FOR

19 EXAMPLE, TO MR. ADDERLEY --

20 **BY MR. HUMMEL:**

21 **Q.**   YEAH.

22 **A.**   -- THROUGH -- ASSUMING CONTRARY TO WHAT I TESTIFIED THAT

23 MR. ADDERLEY'S RIGHTS WERE CONVEYED IN THE GENERAL LICENSING

24 AGREEMENT, COULD I HAVE USED HIS RIGHTS FOR NO ADDITIONAL

25 CHARGE?

1           AND THE ANSWER WOULD BE "YES," IF IT WAS CONVEYED IN

2    THAT --

3    Q.   YOU COULD HAVE USED IT, RIGHT, FOR NO ADDITIONAL CHARGE?

4    A.   I JUST SAID THAT.  ASSUMING THAT IT WAS PART OF THE

5    LICENSE AGREEMENT, CONTRARY TO WHAT I UNDERSTOOD AND INTENDED,

6    THEN, YES.  IF HE HAD GIVEN ME HIS RIGHTS, THEN WE WOULD BE

7    ABLE TO USE HIS RIGHTS.

8    Q.   AND THAT WOULD BE TRUE FOR THE 2100 RETIRED PLAYERS IN THE

9    CLASS, RIGHT?  YOU COULD HAVE USED THEM?

10           **MR. FEHER:**  YOUR HONOR --

11           **THE COURT:**  THE PHRASE "COULD HAVE USED" IS

12   AMBIGUOUS.  DOES THAT MEAN:

13           "SURE, IT WOULD HAVE BEEN FINE TO HAVE THEM.  WE

14   COULD HAVE PUT THEM TO USE"?  OR DOES IT MEAN LEGALLY HE COULD

15   HAVE USED IT?

16           **MR. HUMMEL:**  THE FIRST.  THE FIRST.

17   **BY MR. HUMMEL:**

18   Q.   IT WOULD HAVE BEEN FINE TO HAVE.  YOU COULD HAVE USED THEM

19   AS A BUSINESS.

20   A.   I UNDERSTOOD MORE LIKE THE JUDGE THAT LEGALLY YOU COULD

21   HAVE.

22   Q.   I'M PUTTING LAW ASIDE FOR THE TIME BEING.  COULD YOU AS A

23   BUSINESS HAVE IMAGINED USING MR. ADDERLEY TO MAKE THE GAME MORE

24   AUTHENTIC?

25   A.   IN FACT, WE DID USE MR. ADDERLEY, AND WE LICENSED HIS

1  RIGHTS SEPARATELY, AND WE PAID HIM SEPARATELY.

2  **Q.**   BUT I'M TALKING ABOUT THE GROUP LICENSE GRANT.

3  **A.**   WELL, AGAIN --

4          **THE COURT:**  I THINK THIS HAS GOTTEN TO BE TO THE

5  POINT OF ARGUMENT, AND I'M GOING TO SUSTAIN THE OBJECTION.

6          **MR. HUMMEL:**  ALL RIGHT, YOUR HONOR. I DON'T HAVE

7  ANYTHING FURTHER.

8          **THE COURT:**  ANYTHING MORE?

9          **MR. FEHER:**  YES.

10                  **RECROSS EXAMINATION**

11 **BY MR. FEHER:**

12 **Q.**   MR. LINZNER, AT THE TIME YOU DID ALL OF THESE NEGOTIATIONS

13 AND DEALS YOU UNDERSTOOD THAT IT WAS ACTIVE PLAYERS ONLY,

14 RIGHT?

15 **A.**   NO, THAT'S TOO -- I MEAN THERE WERE TIMES WE, NEGOTIATED

16 SPECIFICALLY FOR RETIRED PLAYERS.

17 **Q.**   OKAY.

18 **A.**   THAT WAS NOT ACTIVE PLAYERS ONLY.  BUT WE, WHEN WE WANTED

19 RETIRED PLAYERS, WE HAD SEPARATE DOCUMENTATION.  WE PAID

20 SEPARATE AMOUNTS OF MONEY.

21 **Q.**   LEAVING THE SEPARATE ASIDE IN TERMS OF THE MAIN LICENSE

22 AGREEMENTS, YOU UNDERSTOOD THE MAIN LICENSE AGREEMENTS ONLY

23 COVERED ACTIVE PLAYERS, CORRECT?

24 **A.**   I BELIEVE I TESTIFIED THAT EACH OF THE AGREEMENTS BOTH YOU

25 AND MR. HUMMEL SHOWED ME WHEN WE WERE LICENSING FOR 25 MILLION

1 OR A MILLION OR WHATEVER IT WAS, THOSE RIGHTS THAT WERE BEING

2 CONVEYED WERE FOR ACTIVE PLAYERS ON A YEAR-BY-YEAR BASIS.

3 **Q.**   AND ALL OF THE MONEY THAT YOU PAID TO PLAYERS INC UNDER

4 THOSE AGREEMENTS WERE PAID FOR ACTIVE PLAYERS ONLY, CORRECT?

5 **A.**   THE RIGHTS TO THE LICENSING, YES, THAT'S WHAT WE WERE

6 PAYING FOR.

7 **Q.**   IF HYPOTHETICALLY -- WELL, IN TERMS OF GETTING ADDITIONAL

8 RIGHTS FOR NO ADDITIONAL MONEY, IN YOUR EXPERIENCE AS A GENERAL

9 MATTER, DO YOU GET ADDITIONAL RIGHTS FOR NO ADDITIONAL MONEY?

10          DO YOU GET THINGS FOR FREE IN YOUR NEGOTIATIONS?

11 **A.**   MR. FEHER, IN OUR GAMES, FOR EXAMPLE, WE HAVE -- WE SHOW

12 THE WILSON FOOTBALL GRANT.  WILSON IS THE MAKE OF THE OFFICIAL

13 FOOTBALL IN THE NFL.

14          WE GIVE A CERTAIN AMOUNT OF EXPOSURE IN RETURN,

15 RATHER THAN PAYING FOR THAT LINE -- PAYING FOR THOSE RIGHTS.

16          SO WE DON'T PAY WILSON, BUT WE DO GIVE THEM CERTAIN

17 EXPOSURE IN THE GAME.  YOU CAN SEE SOME OF THE -- ON THE COVER

18 OF THE GAME YOU CAN SEE IT'S A WILSON FOOTBALL.

19 **Q.**   RIGHT.

20 **A.**   THEY LIKE THAT, GENERALLY.

21          SO JUST LIKE REEBOK, YOU CAN SEE THE REEBOK SYMBOL ON

22 THE COVER OF THE GAME.  WE DON'T PAY REEBOK SEPARATELY, BUT WE

23 DO GIVE THEM PROMOTIONAL BENEFITS.  IT'S KIND OF LIKE AN

24 IN-KIND EXCHANGE.

25 **Q.**   WOULD YOU HAVE PAID ADDITIONAL MONEY FOR THE RETIRED

1   PLAYERS YOU WEREN'T INTERESTED IN?

2   **A.**   IF THEY HAD NO VALUE TO US IN THE GAME FOR WHATEVER

3   REASON, THEN WE WOULDN'T HAVE PAID ADDITIONAL MONEY FOR THAT.

4   **Q.**   OKAY.

5   **A.**   WHEN WE HAVE BEEN INTERESTED IN RETIRED PLAYERS FOR THE

6   GAME, WE HAVE PAID THEM ADDITIONAL MONEY.

7   **Q.**   DID PLAYERS INC PROMOTE RETIRED PLAYERS, GENERALLY, TO EA?

8   **A.**   I DON'T -- THEY DID PROMOTE THE OPPORTUNITY ON SEVERAL

9   OCCASIONS TO LICENSE RETIRED PLAYERS FOR SPECIFIC GAMES.

10  **Q.**   OKAY.  IN TERMS OF THIS HEIGHT AND WEIGHT QUESTION, DO YOU

11  HAVE ANY REASON TO BELIEVE THAT ANY OF THE CONSUMERS OF YOUR

12  GAMES --

13          **THE COURT:**  MR. PARCHER, I THINK IN THE INTEREST OF

14  OF THE JURY BEING ABLE TO PAY ATTENTION, WHEN YOU'RE SITTING

15  THAT CLOSE TO THE JURY BOX, WHICH I PREFER YOU NOT DO, I DON'T

16  THINK IT'S APPROPRIATE FOR YOU TO BE HAVING CONVERSATIONS THAT

17  THE JURORS CAN HEAR.

18          **MR. PARCHER:**  SORRY ABOUT THAT.

19          **THE COURT:**  I WANT THE JURY TO DISREGARD ANYTHING YOU

20  MIGHT HAVE HEARD MR. HUMMEL SAY AND MR. PARCHER SAY.

21          GO AHEAD.

22  **BY MR. FEHER:**

23  **Q.**   MR. LINZNER, DO YOU HAVE ANY REASON TO BELIEVE THAT

24  CONSUMERS OF YOUR GAME EITHER CARE OR KNOW ABOUT THE HEIGHT AND

25  THE WEIGHT OF RETIRED PLAYERS SUCH AS MR. ADDERLEY?

1  **A.**   I DON'T KNOW.  I MEAN, I DON'T BELIEVE THEY WOULD CARE

2  ABOUT HEIGHT AND WEIGHT, BUT I'VE NEVER LOOKED AT THE QUESTION

3  AND STUDIED IT OR SEEN ANY INFORMATION ON IT.

4  **Q.**   HAS ANYONE AT YOUR COMPANY EVER TOLD YOU CONSUMERS CARE

5  ABOUT HEIGHT OR WEIGHT?

6  **A.**   NO.

7          **MR. FEHER:**  I THINK THAT'S IT, YOUR HONOR.

8          **THE COURT:**  ALL RIGHT.  ANYTHING MORE, MR. HUMMEL?

9          **MR. HUMMEL:**  NO, YOUR HONOR.

10         **THE COURT:**  ALL RIGHT.  IS THERE ANY NEED FOR US TO

11  RETAIN THIS WITNESS IN LIGHT OF THE OTHER ISSUE THAT YOU RAISED

12  WITH ME EARLIER ABOUT THE MOTION YOU WANT ME TO HEAR AT 7:30 IN

13  THE MORNING?

14         **MR. HUMMEL:**  YOUR HONOR, I THINK THAT ALTHOUGH

15  THERE'S A STIPULATION WE WOULD LIKE TO BE HEARD ON THAT SO

16  WE'LL TAKE IT OUTSIDE THE PRESENCE.

17         **THE COURT:**  ALL RIGHT.  WELL, I -- I'M ASKING BECAUSE

18  I NEED TO EITHER DISCHARGE THIS WITNESS FROM THE SUBPOENA OR

19  NOT.  DO YOU WANT TO DISCHARGE HIM FROM THE SUBPOENA OR NOT?

20         **MR. HUMMEL:**  MAY I HAVE A MOMENT, YOUR HONOR?

21         **THE COURT:**  YEAH.

22         **MR. HUMMEL:**  WE WILL DISCHARGE HIM, YOUR HONOR.

23         **THE COURT:**  ALL RIGHT.  DO YOU WANT TO RETAIN HIM?

24         **MR. KESSLER:**  NO, YOUR HONOR.

25         **MR. FEHER:**  NO, YOUR HONOR.

1    THE COURT: ALL RIGHT. MR. LINZNER, YOU'RE

2  DISCHARGED FROM THE SUBPOENA. YOU CAN GO TO A BUSINESS TRIP TO

3  SINGAPORE.

4    THE WITNESS: THANK YOU, YOUR HONOR.

5    THE COURT: IF THESE LAWYERS NEED YOU BACK IT'S THEIR

6  PROBLEM. YOU WILL NOT HAVE TO COME BACK. THANK YOU FOR YOUR

7  APPEARANCE.

8    THE WITNESS: THANK YOU, YOUR HONOR.

9    THE COURT: BE SURE TO LEAVE BEHIND ALL THE DOCUMENTS

10 THAT BELONG TO US AND TAKE WITH YOU ANYTHING THAT YOU BROUGHT.

11   THE WITNESS: THANK YOU.

12   THE COURT: THANK YOU.

13   ALL RIGHT. WE'RE NOW MOVING TO THE NEXT WITNESS.

14   MR. HUMMEL: YOUR HONOR, PLAINTIFFS CALL PETER RHEE.

15   THE COURT: WHO?

16   MR. HUMMEL: PETER RHEE.

17   THE COURT: ALL RIGHT. GO RIGHT AHEAD.

18   MR. KESSLER: YOUR HONOR, I KNOW YOU JUST ALLOWED

19 MR. RHEE TO TESTIFY. WE HAVE NO PROBLEM WITH THAT. BUT WE

20 ALSO HAD NO NOTICE HE WAS GOING TO BE ON TODAY.

21   THE COURT: WELL, IN LIGHT OF THE WAY THIS UNFOLDED,

22 I'M GOING TO ALLOW IT ANYWAY, BECAUSE OF THE SNAFU ON THE

23 SUPPOSED STIPULATION.

24   MR. KESSLER: OKAY.

25   THE COURT: SO YOU'VE GOT SEVEN LAWYERS OVER THERE.

1  YOU'LL JUST HAVE TO DEAL WITH IT.

2          ARE YOU MR. RHEE?

3          **THE WITNESS:**  YES, SIR.

4          **THE COURT:**  RAISE YOUR RIGHT HAND AND WE WILL SWEAR

5  YOU IN.

6          (THEREUPON, THE WITNESS WAS SWORN.)

7          **THE WITNESS:**  I DO.

8          **THE CLERK:**  OKAY.  THANK YOU.  WITNESS STAND.

9          **THE COURT:**  HAVE A SEAT AND STATE YOUR NAME.

10          CAN WE TAKE YOUR PICTURE SO THAT WE CAN PUT YOU UP ON

11  THE SCREEN DURING THE CLOSING ARGUMENTS?

12          **THE WITNESS:**  MY NAME IS PETER RHEE.

13          **THE COURT:**  GREAT.  WE'RE GOING TO TAKE YOUR PICTURE.

14          OKAY.  ALL RIGHT.  WE WILL REMEMBER THAT ONE.

15          GO AHEAD MR. HUMMEL.

16          **MR. HUMMEL:**  THANK YOU, YOUR HONOR.

17                          **PETER RHEE**,

18  CALLED AS A WITNESS FOR THE PLAINTIFFS HEREIN, HAVING BEEN

19  FIRST DULY SWORN, WAS EXAMINED AND TESTIFIED AS FOLLOWS:

20                    **DIRECT EXAMINATION**

21  BY MR. HUMMEL:

22  Q.   AND I THINK IT SHOULD BE UP THERE, BUT IF YOU COULD TRY TO

23  FIND EXHIBIT 1239.  WHICH I KNOW IT'S A BIG STACK.

24          (COUNSEL ASSISTS THE WITNESS.)

25          HAVE IT?

1   **A.**   YEAH.

2   **Q.**   GOOD.

3           DO YOU RECOGNIZE EXHIBIT 1239, SIR?

4   **A.**   YES, I DO.

5   **Q.**   IS IT A DOCUMENT THAT YOU PREPARED?

6   **A.**   YES.

7   **Q.**   CAN YOU TELL THE LADIES AND GENTLEMEN WHAT IT IS, PLEASE?

8   **A.**   IT IS A LIST OF VINTAGE TEAMS FOR THE MADDEN GAME, YEARS

9   '03 TO '07, FOR THREE DIFFERENT PLATFORMS OR CONSOLES:

10  PERSONAL COMPUTER, XBOX AND PLAYSTATION 2.  SO 15 DIFFERENT

11  GAMES.

12  **Q.**   DID YOU PERSONALLY PREPARE THIS EXHIBIT?

13  **A.**   MY TEAM AND I DID, YES.

14  **Q.**   YOU SUPERVISED THAT TEAM?

15  **A.**   YES.

16  **Q.**   AND DOES THIS DOCUMENT ACCURATELY REFLECT THE HISTORIC NFL

17  TEAMS FEATURED IN THESE VERSIONS OF THE MADDEN GAME?

18  **A.**   TO THE BEST OF MY KNOWLEDGE, YES.

19  **Q.**   THANK YOU.

20          NOW I WOULD LIKE YOU TO LOOK AT EXHIBIT 1240.

21          **THE COURT:**  HOLD THAT UP.  SHOW THEM HOW MANY PAGES

22  IT IS AND KIND OF WHAT ONE TYPICAL PAGE LOOKS LIKE.

23          **THE WITNESS:**  (INDICATING.)

24          **MR. HUMMEL:**  IT'S ON THE SCREEN TOO, YOUR HONOR.

25          **THE COURT:**  NEVER MIND.  IS THAT IN EVIDENCE?

1       **MR. HUMMEL:** YES.

2       **THE COURT:** IT'S IN EVIDENCE. ALL RIGHT.

3    BY MR. HUMMEL:

4    **Q.** NOW, MR. RHEE, I WOULD LIKE YOU TO LOOK AT EXHIBIT 1240.

5    DO YOU HAVE THAT IN FRONT OF YOU?

6    **A.** I DO NOT.

7    **Q.** I HAVE AN EXTRA COPY. DO YOU HAVE IT? DO YOU HAVE

8    EXHIBIT 1240 IN FRONT OF YOU?

9    **A.** YES.

10   **Q.** CAN YOU TELL THE LADIES AND GENTLEMEN OF THE JURY WHAT

11   EXHIBIT 1240 IS?

12   **A.** IT IS A LIST OF RETIRED PLAYERS ON THE MADDEN GAME FOR THE

13   DIFFERENT YEARS, '03 TO '07, AND THEIR STATISTICS.

14   **Q.** DID YOU PREPARE THIS SUMMARY?

15   **A.** YES.

16   **Q.** AND IF YOU LOOK, PLEASE, AT PAGE -- WELL, THERE ARE

17   ACTUALLY SEVERAL LISTS IN HERE, BUT I WANT TO FOCUS ON ONE,

18   WHICH IS THE LAST LARGE LIST.

19   **A.** YES. GOT IT.

20   **Q.** OKAY. AND IF YOU COULD TELL THE LADIES AND GENTLEMEN OF

21   THE JURY, THIS IS JUST THE 2007 PC VERSION OF EA'S MADDEN GAME,

22   CORRECT?

23   **A.** THAT IS CORRECT.

24   **Q.** AND WHAT IS DEPICTED, IF YOU CAN TELL THE LADIES AND

25   GENTLEMEN OF THE JURY, ON THIS CHART?

1  **A.**   THESE ARE ALL THE MATCHES OF RETIRED PLAYERS IN THE CLASS

2  LIST THAT SHOW UP ON THE MADDEN GAME, AND THEIR STATISTICS.

3  THEY ARE RIGHT NEXT TO EACH OTHER.

4  **Q.**   WHAT DID YOU DO TO PREPARE THIS SUMMARY?

5           AND LET ME NOTE FOR THE RECORD, AND THIS IS FAIR TO

6  MR. KESSLER BECAUSE THIS WAS HIS POINT, LET ME SHOW THE

7  FOOTNOTE, BEFORE WE GO INTO WHAT YOU ACTUALLY DID.

8           THESE SAMPLES ARE EXACT MATCHES ON HEIGHT -- BLOW

9  THAT UP -- POSITION, YEARS IN THE LEAGUE, AND WITHIN 5 PERCENT

10 OF RECORDED WEIGHT.

11          NOW, WITH THOSE PARAMETERS, COULD YOU DESCRIBE FOR

12 THE LADIES AND GENTLEMEN OF THE JURY WHAT YOU DID?

13 **A.**   SURE.  SO, FIRST OF ALL, WE NEEDED THE ROSTERS OF THE

14 VINTAGE TEAMS SHOWN ON THE MADDEN GAME.

15          ONCE YOU HAVE THE ROSTERS, YOU HAVE TO

16 CROSS-REFERENCE THE ROSTERS WITH WHOEVER IS ON THE GLA CLASS

17 LIST.  SO WE HAVE A SUBSET OF THAT, WHO SHOW UP ON THE VINTAGE

18 TEAMS.

19          THEN WE WENT INTO THE MADDEN GAME.  WE'VE LISTED THE

20 STATISTICS FOR THOSE PLAYERS.

21          THEN WE WENT INTO ESPN ENCYCLOPEDIA, WHICH IS A HUGE

22 BOOK WITH ALL THESE STATISTICS IN IT, WITH EVERY PLAYER THAT

23 PLAYED IN THE GAME.  AND WE PUT IT SIDE BY SIDE.  WE ENTERED

24 THESE STATISTICS RIGHT NEXT TO THEM.

25 **Q.**   SO ALL THESE PLAYERS, JUST TO BE CLEAR HERE, ARE GLA ARE

1    CLASS MEMBERS?

2              **MR. KESSLER:**  OBJECTION.  LEADING, YOUR HONOR.

3              **THE WITNESS:**  THAT'S CORRECT.

4              **THE COURT:**  IT IS LEADING, BUT THAT'S PRELIMINARY.

5    GO AHEAD.

6    **BY MR. HUMMEL:**

7    **Q.**   CAN YOU TELL THE LADIES AND GENTLEMEN OF THE JURY, FOR

8    THESE CLASS MEMBERS, JUST AGAIN, THERE'S A RED COLUMN WHEN THEY

9    LOOK AT IT IN THE JURY ROOM.  WHAT'S THAT?  WHAT ARE THOSE

10   STATISTICS?

11   **A.**   THOSE ARE THE MADDEN STATISTICS FOR THE '07 PC VERSION.

12   **Q.**   IN OTHER WORDS, THEY ARE LISTED IN THE GAME?

13   **A.**   YES.

14   **Q.**   EA PUT THEM IN THERE?

15   **A.**   YES.

16   **Q.**   OKAY.  AND THEN IN THE BLUE COLUMN, WHICH SAYS "ESPN

17   FOOTBALL ENCYCLOPEDIA," WHAT ARE THOSE STATISTICS?

18   **A.**   THOSE ARE STATISTICS MADE BY THE AUTHORS OF THE ESPN

19   SPORTS ENCYCLOPEDIA."

20   **Q.**   IN OTHER WORDS, THOSE ARE THE REAL STATISTICS FOR THE

21   PLAYER?

22   **A.**   YES.

23              **MR. HUMMEL:**  NOTHING FURTHER, YOUR HONOR.

24              **MR. KESSLER:**  A FEW BRIEF QUESTIONS, YOUR HONOR.

25              **THE COURT:**  ALL RIGHT.

1                    **CROSS EXAMINATION**

2    **BY MR. KESSLER:**

3    **Q.**   GOOD MORNING, MR. RHEE.  MY NAME IS JEFFREY KESSLER.

4    **A.**   GOOD MORNING.

5    **Q.**   MR. RHEE, I TAKE IT YOU'RE FAMILIAR WITH THE MADDEN GAME?

6    **A.**   YES.

7    **Q.**   DO YOU PLAY THE MADDEN GAME?

8    **A.**   YES.

9    **Q.**   DID YOU PURCHASE THE MADDEN GAME AS A CONSUMER?

10   **A.**   OF COURSE.

11   **Q.**   OKAY.  LET ME ASK YOU, FIRST, MR. RHEE, THE WEIGHT IS

12   WITHIN 5 PERCENT, RIGHT?

13   **A.**   YES.

14   **Q.**   5 PERCENT COULD BE A BIG RANGE FOR A 300-POUND FOOTBALL

15   PLAYER, RIGHT?

16   **A.**   YES.

17   **Q.**   OKAY.  SO HOW COULD YOU DETERMINE WHETHER IT'S THE CORRECT

18   WEIGHT OR NOT IF FOR A 300-POUND FOOTBALL PLAYER THAT COULD BE

19   A -- WHAT, A 15-POUND DIFFERENCE?

20          HOW DO YOU KNOW?  HOW DO YOU KNOW IT'S SUPPOSED TO BE

21   THAT PLAYER OR NOT, IF IT'S 15 POUNDS?

22   **A.**   THERE ARE OTHER CRITERIA, SUCH AS HEIGHT NEEDS TO BE

23   EXACT, YEARS PROFESSIONAL NEEDS TO BE EXACT.

24   **Q.**   OKAY.

25   **A.**   AND POSITION.

1    Q.   I'M JUST FOCUSING, SIR, JUST ON WEIGHT.

2         WOULD YOU AGREE WITH ME THAT IF IT'S A 15-POUND

3    DIFFERENCE, YOU HAVE NO IDEA WHETHER THAT WAS MEANT TO BE THE

4    WEIGHT OF THAT PLAYER OR NOT?  YOU HAVE NO IDEA?  JUST THAT.

5    A.   REPEAT THE QUESTION, PLEASE.

6    Q.   SURE.  IF YOU WERE JUST LOOKING AT THE WEIGHT, AND THERE'S

7    A 15-POUND DIFFERENCE FROM THE ACTUAL WEIGHT OF THE PLAYER, YOU

8    HAVE NO IDEA WHETHER IT WAS THAT PLAYER'S WEIGHT OR NOT.  IT

9    WASN'T HIS ACTUAL WEIGHT, IT WAS 15 POUNDS DIFFERENT.

10   A.   IF JUST LOOKING AT THE WEIGHT AND NOTHING ELSE, YES,

11   YOU'RE CORRECT.

12   Q.   OKAY.  IN FACT, I'VE BEEN ADVISED THAT IT COULD BE 30

13   POUNDS DIFFERENCE, RIGHT?

14   A.   YES.

15   Q.   MY MATH IS BAD.

16        SO YOU HAVE A 30-POUND DIFFERENCE IN THE PLAYER, AND

17   YOU'D SAY IT WAS THE SAME PLAYER JUST BASED ON WEIGHT, WITH

18   30 POUNDS DIFFERENCE?

19   A.   NO.

20   Q.   AND MY WIFE WOULD LIKE ME TO LOSE 30 POUNDS.  SHE THINKS

21   THAT'S A DIFFERENCE.  DO YOU THINK THAT'S A DIFFERENCE?

22        (SIMULTANEOUS SPEAKING BETWEEN COUNSEL AND THE

23   WITNESS; NOT REPORTABLE.)

24        **THE COURT:**  YOU DON'T WEIGH 300 POUNDS.

25        **MR. KESSLER:**  THAT'S TRUE, YOUR HONOR.  I HAVE A

1    DIFFERENT ISSUE.

2              **THE COURT:**  WHAT IS IT, 10 PERCENT -- IS IT 10 OR

3    5 PERCENT?

4              **MR. KESSLER:**  5 PERCENT.

5              **THE COURT:**  5 PERCENT TIMES 300 IS PLUS OR MINUS 15.

6              **MR. KESSLER:**  RIGHT, PLUS OR MINUS 15 IS 30 BECAUSE

7    IT COULD GO EITHER WAY.

8              **THE WITNESS:**  YEAH.

9    **BY MR. KESSLER:**

10   **Q.**   SO IT COULD HAVE BEEN 15 POUNDS HEAVIER OR 15 POUNDS

11   LIGHTER, AND YOU STILL SAY IT'S THE SAME WEIGHT?

12   **A.**   YES.

13   **Q.**   OKAY.  NOW, WITH RESPECT TO POSITION, THERE ARE ONLY THE

14   SAME POSITIONS ON A FOOTBALL TEAM.  SO NO MATTER WHAT PLAYER

15   WAS BEING REPRESENTED, THE POSITIONS ARE ALWAYS GOING TO BE

16   EXACTLY THE SAME, CORRECT, IN EVERY GAME IN THE HISTORY OF

17   FOOTBALL?

18   **A.**   YES.

19   **Q.**   OKAY.  SO THE FACT THAT IT'S THE POSITION TELLS YOU

20   NOTHING ABOUT WHETHER IT'S THE SAME PLAYER OR NOT, RIGHT?

21   **A.**   YES.

22   **Q.**   OKAY.  SO WE DISCUSSED HEIGHT.  WE DISCUSSED POSITION.

23   WEIGHT AND POSITION.

24             LET'S TALK ABOUT HEIGHT.

25   **A.**   SURE.

1  **Q.**   YOU SAID YOU PLAYED THE GAME.  DO YOU KNOW THE HEIGHTS OF

2  ANY -- AS A PLAYER, DO YOU KNOW THE HEIGHTS OF ANY VINTAGE TEAM

3  RETIRED PLAYERS?  CAN YOU GIVE ME ONE?

4  **A.**   SURE.  EMMITT SMITH, FIVE EIGHT, FIVE NINE.

5  **Q.**   OKAY.  COULD YOU GIVE ME A SECOND?

6  **A.**   UHM, YES.  JERRY RICE, SIX ONE.

7  **Q.**   OKAY.  WHAT YEAR WAS HE SIX ONE?  WAS HE ALWAYS LISTED AS

8  SIX ONE?

9  **A.**   I DON'T KNOW.

10       (LAUGHTER)

11       **THE COURT:**  THAT WAS THE YEAR AFTER THEY STRETCHED

12  HIM.

13       (LAUGHTER)

14  **BY MR. KESSLER:**

15  **Q.**   THE REASON I ASKED THAT QUESTION, MR. RHEE, IF YOU LOOKED

16  AT THE FOOTBALL ENCYCLOPEDIA YOU KNOW, ISN'T IT, THAT FOR

17  WHATEVER REASON NFL PLAYERS HAVE DIFFERENT HEIGHTS LISTED.

18  SAME PLAYER, DIFFERENT HEIGHTS DIFFERENT YEARS SOMETIMES, ON

19  THEIR TRADING CARDS AND OTHER FORMULA?

20  **A.**   THE HEIGHT IS USUALLY THE SAME FOR EVERY YEAR.

21  **Q.**   HAVE YOU CHECKED THAT?

22  **A.**   YES.  IF YOU LOOK AT ANY TRADING CARD YOU'LL HAVE THE

23  HEIGHT ON THERE, AND THEN EACH YEAR WHAT ARE THEIR RELEVANT

24  STATISTICS.

25  **Q.**   YOU BELIEVE THAT'S THE SAME.  YOU LOOKED AT TRADING CARDS,

1  AND HEIGHT IS ALWAYS THE SAME?

2  **A.**   YES.

3  **Q.**   DO YOU KNOW, IF I ASKED YOU, THERE ARE HUNDREDS OF VINTAGE

4  TEAMS AND THEY INVOLVED, YOU'LL AGREE WITH ME, HUNDREDS OF

5  PLAYERS, RIGHT?

6  **A.**   YES.

7  **Q.**   OKAY.  IS IT FAIR TO SAY THAT YOU, AS A CONSUMER, MIGHT

8  KNOW THE HEIGHTS OF TWO OR THREE RETIRED PLAYERS, AND NO MORE?

9  THAT'S FAIR, ISN'T IT?

10        YOU DON'T MEMORIZE HEIGHTS OF RETIRED PLAYERS, DO

11  YOU?

12  **A.**   NO, BECAUSE I'M NOT -- I GUESS -- I'M A BIGGER FAN OF

13  NATIONAL BASKETBALL ASSOCIATION.  IF YOU ASKED ME A RETIRED

14  PLAYER I WOULD PROBABLY KNOW THEIR HEIGHT.

15  **Q.**   DO YOU THINK YOU HAVE FRIENDS WHO HAVE MEMORIZED NOT

16  CURRENT PLAYERS BUT WHO HAVE MEMORIZED THE HEIGHTS OF RETIRED

17  PLAYERS FROM 20, 30, 40 YEARS AGO?  YOU THINK -- THAT'S WHAT

18  YOU THINK?

19  **A.**   YEAH.

20        **MR. KESSLER:**  OKAY.  I DON'T HAVE ANY FURTHER

21  QUESTIONS.

22        **MR. HUMMEL:**  NOTHING FURTHER, YOUR HONOR.

23        **THE COURT:**  ALL RIGHT.  MAY OUR WITNESS BE EXCUSED

24  AND DISCHARGED?

25        **MR. KESSLER:**  YES, HE MAY, YOUR HONOR.

1      **MR. HUMMEL:**  YES, YOUR HONOR.

2           **THE COURT:**  THANK YOU, MR. RHEE.  YOU'RE FREE TO GO.

3  WE HAVE 20 MINUTES.  LET'S TRY TO MAKE GOOD USE OF IT.  THE

4  NEXT WITNESS.

5           **MR. CHARHON:**  YOUR HONOR, THE PLAINTIFFS ARE GOING TO

6  CALL --

7           (REPORTER INTERRUPTS)

8           **MR. CHARHON:**  BRETT CHARHON.

9           WE'RE GOING TO CALL GLENN EYRICH BY DEPOSITION.  MY

10  COLLEAGUE AND I, ANTHONY GARZA, ARE GOING TO READ IT IN.

11           **THE COURT:**  IS THIS ONE I HAVE ALREADY GONE THROUGH,

12  AND SO FORTH?

13           **MR. CHARHON:**  YES, SIR.

14           **THE COURT:**  THAT'S FINE.  HOW LONG DO YOU THINK THIS

15  WILL TAKE?

16           **MR. CHARHON:**  APPROXIMATELY 45 MINUTES TO AN HOUR.

17           **THE COURT:**  WE'RE GOING TO GET A START ON IT AND NOT

18  FINISH IT, BUT THAT'S FINE.  YOU GO AHEAD AND HAVE A SEAT.

19           I TOLD YOU HOW DEPOSITIONS WORK.  AND SOMETIMES THE

20  WITNESS IS UNAVAILABLE OR THE LAWYERS JUST THINK IT'S BETTER TO

21  JUST READ THE TESTIMONY.

22           AND YOU'VE HEARD THE LAWYERS DO QUESTION/ANSWER,

23  QUESTION/ANSWER.  AND I LIKE IT THAT WAY WHEN IT'S SHORT.  BUT

24  ON A LONGER READ-IN IT'S BETTER, SO YOU CAN FOLLOW IT, TO HAVE

25  SOMEBODY PLAY THE ROLE OF THE WITNESS AND SOMEBODY PLAY THE

ROLE OF THE PERSON ASKING THE QUESTION.

      DID YOU ASK THE QUESTIONS AT THE ORIGINAL DEPOSITION?

      **MR. CHARHON:**  NO, I DID NOT.

      **THE COURT:**  WE'VE GOT SOMEBODY WHO WASN'T PRESENT AT THE CREATION ON EITHER SIDE.  BUT THAT DOESN'T MATTER.  WHAT YOU'RE ABOUT TO HEAR IS GOING TO BE THE Q&A, QUESTIONS AND ANSWERS, AS IT UNFOLDED AT THE DEPOSITION OF WHO NOW?

      **MR. CHARHON:**  GLENN EYRICH.

      **THE COURT:**  HOW DO YOU SPELL THAT?

      **MR. CHARHON:**  E-Y-R-I-C-H.

      **THE COURT:**  AND WHAT WAS THE DATE OF THE DEPOSITION?

      **MR. CHARHON:**  FEBRUARY 12TH, 2008.

      **THE COURT:**  AND WHO WERE THE LAWYERS ASKING QUESTIONS AT THE DEPOSITION?

      **MR. CHARHON:**  I THINK RON KATZ ASKED QUESTIONS ON BEHALF OF PLAINTIFFS.

      **THE COURT:**  ALL RIGHT.  AND THEN?  ANYONE ELSE?

      **MR. CHARHON:**  NOT ON BEHALF OF PLAINTIFFS, NO.

      **THE COURT:**  ARE YOU READING JUST THE PLAINTIFFS' SIDE, OR ARE YOU GOING TO READ EVERYTHING THAT'S BEEN DESIGNATED BY BOTH?  RIGHT?

      **MR. CHARHON:**  YES.  THERE HAVE BEEN COUNTERDESIGNATIONS BY THE DEFENDANTS.

      **THE COURT:**  YOU'RE GOING TO DO THE WHOLE THING?

      **MR. CHARHON:**  YES, SIR.

1    **THE COURT:** SO BOTH SIDES HAVE GOTTEN TOGETHER,

2  FIGURED OUT WHAT THEY WANT YOU TO HEAR. THEY'VE REVIEWED THIS

3  SO IT'S ORIGINAL SIZE. AND SO THEY'VE GOT IT VETTED AND READY

4  TO GO.

5    AND WILL YOU BE SHOWING THINGS ON THE SCREEN?

6    **MR. CHARHON:** A COUPLE OF DEPOSITION EXHIBITS, YES.

7  AND WITH THE COURT'S PERMISSION, I'M GOING TO MOVE MOST OF THEM

8  INTO EVIDENCE AT THE CONCLUSION OF THE DEPOSITION, IF THAT'S

9  OKAY.

10    **THE COURT:** I GUESS WE CAN LIVE WITH THAT NOW. AT

11  LEAST AFTER THE JURY LEAVES TODAY, WE CAN DEAL WITH IT.

12    SO JUST SIT BACK AND TREAT THIS AS YOU WOULD ANY

13  OTHER WITNESS TESTIMONY. AND IT COUNTS JUST AS MUCH AS ANY

14  OTHER EVIDENCE.

15    ALL RIGHT GO AHEAD, COUNSEL.

16    **MR. CHARHON:** JUST ONE MORE HOUSEKEEPING MATTER.

17  THIS WAS A 30B(6) DEPOSITION, YOUR HONOR.

18    **THE COURT:** ALL RIGHT.

19    **MR. CHARHON:** IF WE COULD EXPLAIN THE IMPORT TO THE

20  JURY.

21    **THE COURT:** I WILL DO THAT.

22    **MR. KESSLER:** YOUR HONOR, BEFORE YOU DO THAT, THERE

23  WERE CERTAIN SPECIFIC SUBJECTS HE WAS DESIGNATED FOR 30(B)(6).

24  THEY ALSO ASKED HIM QUESTIONS OUTSIDE OF HIS 30(B)(6) CAPACITY,

25  AND THEY'VE DESIGNATED SOME MATERIALS THAT HAVE NOTHING TO WITH

1  HIS 30B6) CAPACITY.  SO IT'S A LITTLE BIT COMPLICATED ON THAT

2  ISSUE.

3       **MR. CHARHON:**  I DON'T MIND HANDING UP THE TOPIC, IF

4  YOU WOULD LIKE TO READ IT TO THE JURY.

5       **THE COURT:**  YOU ARE MAKING IT SO COMPLICATED FOR THE

6  JURY.

7       WHO DID THIS WITNESS WORK FOR?  WHAT COMPANY?

8       **MR. FEHER:**  HE'S AN OUTSIDE ACCOUNTANT.

9       **THE COURT:**  OUTSIDE ACCOUNTANT FOR WHO?  WHO WAS HE A

10  30(B)(6) FOR?

11       **MR. KESSLER:**  HE WAS AN OUTSIDE ACCOUNTANT FOR THE

12  PLAYERS ASSOCIATION AND PLAYERS INC.

13       **THE COURT:**  SO THIS WAS A 30(B)(6) DIRECTED TO YOUR

14  SIDE?

15       **MR. KESSLER:**  CORRECT.

16       **THE COURT:**  AND THEN YOU DESIGNATED THIS OUTSIDE GUY?

17       **MR. KESSLER:**  YES.

18       **THE COURT:**  HE CAME IN AND TESTIFIED?

19       **MR. KESSLER:**  YES.

20       **THE COURT:**  AND -- ALL RIGHT.

21       **MR. KESSLER:**  AND FOR THE SUBJECTS LISTED.

22       **THE COURT:**  WELL, HERE'S THE WAY WE'RE GOING TO DEAL

23  WITH IT.  FIRST OF ALL, LET ME TELL YOU WHAT HAPPENED.  THIS IS

24  THE EASY PART.

25       YOU KNOW, I GAVE YOU ONE OF THE GROUND RULES FOR HOW

1  YOU GO ABOUT TAKING DISCOVERY BEFORE THE TRIAL.  ANOTHER THING

2  YOU CAN DO IS SAY:  WE WANT A DEPOSITION OF THE OTHER SIDE, BUT

3  WE DON'T KNOW EXACTLY WHO IT IS.  SO YOU, THE OTHER SIDE, PICK

4  WHO YOU WANT TO COME SPEAK ABOUT A PARTICULAR SUBJECT.

5          AND YOU'RE ENTITLED TO DO THAT.  THAT WAY YOU GET THE

6  BEST PERSON KNOWLEDGEABLE ON THAT SUBJECT.

7          AND THE TOPIC WAS SUPPOSED TO BE HOW YOU DETERMINE,

8  COLLECT, EXPEND, DISTRIBUTE, ACCOUNT FOR, AND AUDIT MONIES FROM

9  LICENSE AGREEMENTS, INCLUDING BUT NOT LIMITED TO THE ALLOCATION

10 OF FUNDS BETWEEN NFLPA AND PLAYERS INC, AND THE CALCULATION OF

11 THE EQUAL SHARE ROYALTY TO NFL PLAYERS.

12         SO THAT WAS THE TOPIC THEY WANTED A WITNESS ON.  AND

13 MR. --

14         **MR. CHARHON:**  EYRICH.

15         **THE COURT:**  HE GOT DESIGNATED BY THE DEFENDANTS AS

16 THE PERSON MOST KNOWLEDGEABLE ON THIS SUBJECT.

17         ALL RIGHT.  SO WHAT WE'RE GOING TO HAVE TO DO IS

18 THIS:  IF IT TURNS OUT THAT IT REALLY MAKES A BURNING

19 DIFFERENCE, I WILL TELL YOU AFTER THE FACT WHICH GENERAL

20 SUBJECTS -- WELL, I CAN JUST TELL YOU NOW.

21         IF A QUESTION WAS OUTSIDE THAT TOPIC, THEN IT'S --

22 IT'S NOT ABSOLUTELY BINDING -- IT'S NOT REALLY ABSOLUTELY

23 BINDING ANYWAY.  THIS WITNESS IS SPEAKING FOR THE NFLPA AND THE

24 PLAYERS INC.  SO -- BUT HE'S ONLY SPEAKING FOR THEM ON THE

25 SUBJECT OF THIS TOPIC.

1         IF THEY VEER WAY OFF OF THAT TOPIC, THEN HE'S JUST

2    SPEAKING IN HIS ROLE AS AN ORDINARY PERCIPIENT WITNESS, WHICH

3    YOU CAN STILL GIVE SOME WEIGHT TO.  BUT HE'S WEARING A

4    DIFFERENT HAT.  WHEN HE WEARS THAT HAT, HE'S WEARING A HAT AS

5    AN ORDINARY WITNESS.

6         BUT WHEN HE'S WEARING HIS HAT AS A 30(B)(6) WITNESS,

7    HE'S WEARING THE HAT OF SOMEBODY SPEAKING FOR THE NFLPA AND

8    PLAYERS INC.

9         ALL RIGHT.  I THINK I'VE EXPLAINED THAT UP.  PLEASE

10   GO RIGHT AHEAD.

11                      **GLENN EYRICH**,

12   CALLED AS A WITNESS FOR THE PLAINTIFFS HEREIN, TESTIFIED VIA

13   DEPOSITION READ IN OPEN COURT IN THE PRESENCE AND HEARING OF

14   THE JURY AS-FOLLOWS:

15                      **EXAMINATION**

16   **Q.**   GOOD MORNING SIR.

17   **A.**   GOOD MORNING.

18   **Q.**   WILL YOU PLEASE STATE YOUR NAME AND HOME ADDRESS FOR THE

19   RECORD.

20   **A.**   GLENN M. EYRICH.  210 HOLMARD, H-O-L-M-A-R-D, STREET,

21   GAITHERSBURG, MARYLAND.

22   **Q.**   AND CAN YOU GIVE US A BRIEF RESUME OF YOUR EMPLOYMENT

23   HISTORY.

24   **A.**   I WORKED FOR CALIBRE CPA GROUP AND THOMAS HAVEY, LLP FOR

25   THE LAST 13 YEARS, AS AN AUDIT PARTNER THE LAST FIVES YEARS,

1  AND BEEN WITH THEM FOR THE LAST 13.

2  **Q.**   DO YOU HAVE A CPA, SIR?

3  **A.**   YES.

4  **Q.**   DID THOMAS HAVEY ALSO -- WERE THEY ALSO THE AUDITORS FOR

5  THE NFLPA?

6  **A.**   YES.

7  **Q.**   AND DID YOU -- ARE YOU THE PERSON THAT'S BEEN DESIGNATED

8  BY THE NFLPA FOR THIS DEPOSITION?

9  **A.**   YES.

10  **Q.**   DID YOU SPEAK TO ANYONE ELSE IN THE COURSE OF YOUR

11  PREPARATION FOR THIS DEPOSITION?

12  **A.**   YES.

13  **Q.**   WITH WHOM DID YOU SPEAK?

14  **A.**   JOE NORA, ERIN DOUGLAS, DAVID LEVINE.  THAT'S IT.

15  **Q.**   AND WHO IS MR. NORA?

16  **A.**   HE'S IN-HOUSE COUNSEL FOR PLAYERS INC.

17  **Q.**   AND MR. DOUGLAS?

18  **A.**   ERIN DOUGLAS, FEMALE, IS THE CONTROLLER OF THE NFLPA.

19  **Q.**   AND DAVID LEVINE?

20  **A.**   HE'S AN ATTORNEY AT GROOM LAW GROUP.

21  **Q.**   YOU HAVE REFERRED, SO FAR IN YOUR TESTIMONY, TO SOMETHING

22  CALLED AN EQUAL SHARE POOL; IS THAT CORRECT?

23  **A.**   CORRECT.

24  **Q.**   CAN YOU TELL ME, WHAT IS THAT, PLEASE?

25  **A.**   EQUAL SHARE POOL IS REFERRED TO AS THE ACTIVE PLAYER

1  LICENSING POOL THAT IS ALLOCATED BETWEEN PLAYERS INC, THE

2  NFLPA, AND ACTIVE PLAYERS.

3  **Q.**   CAN YOU TELL US WHAT AN LM-2 IS?

4  **A.**   AN LM-2 IS THE REQUIRED DISCLOSURE TO THE DEPARTMENT OF

5  LABOR FOR ANY 501C5 LABOR ORGANIZATIONS, THE PRIMARY DEPARTMENT

6  OF LABOR FILING.

7  **Q.**   WHEN YOU SAY "PRIMARY ACTIVITIES" WHAT DO YOU MEAN?

8  **A.**   THE CORE MISSION OF THE ORGANIZATION OR THE PURPOSE OF THE

9  ORGANIZATION.

10  **Q.**   IN THE CASE OF THE NFLPA, THAT WOULD BE WHAT, REPRESENTING

11  FOOTBALL PLAYERS?

12  **A.**   THAT IS ONE OF THEIR PRIMARY MISSIONS.

13  **Q.**   SO DOES THE NFL PAY TAX, PAY INCOME TAXES?

14  **A.**   THEY DON'T PAY TAXES ON THEIR OPERATIONS.

15  **Q.**   DO THEY PAY ANY TAXES, ANY INCOME TAXES, AS FAR AS YOU

16  KNOW?

17  **A.**   NO INCOME TAXES.

18  **Q.**   IS IT CORRECT THAT YOU DO THE NFL PI AND PI ACCOUNT?

19  **A.**   YES.

20  **Q.**   WHEN I SAY PI, I MEAN PLAYERS INC.

21  **A.**   CORRECT.

22  **Q.**   ARE THOSE CONSOLIDATED FINANCIAL STATEMENTS?

23  **A.**   YES.

24  **Q.**   CAN YOU TELL US, FOR THE RECORD, WHAT THAT MEANS?

25  **A.**   CONSOLIDATED FINANCIAL STATEMENTS ARE -- ALL CLOSELY-HELD

1  ENTITIES ARE CONSOLIDATED INTO ONE FINANCIAL STATEMENT THAT WE

2  ISSUE AN OPINION ON THE CONSOLIDATED FINANCIAL STATEMENT SO ALL

3  ACTIVITIES OF THE ORGANIZATIONS ARE INCLUDED IN THE

4  CONSOLIDATION.

5  **Q.**   WHAT IF ANYTHING DO YOU DO TO DETERMINE THAT A LICENSEE IS

6  PAYING PI THE CORRECT AMOUNT?

7  **A.**   WE WOULD PERFORM AGREED-UPON PROCEDURES ON SITE AT THE

8  LICENSEE.

9  **Q.**   ARE YOU AWARE THAT -- YOU KNOW MR. GENE UPSHAW?

10  **A.**   YES.

11  **Q.**   AND ARE YOU AWARE THAT MR. UPSHAW IS -- HOLDS HIGH OFFICE

12  AT BOTH THE NFLPA AND PI?

13  **A.**   YES.

14  **Q.**   DO YOU KNOW MR. DOUG ALLEN?

15  **A.**   YES.

16  **Q.**   ARE YOU FAMILIAR WITH THE FACT THAT MR. ALLEN, WHEN HE

17  WORKED FOR THE NFLPA, HELD HIGH OFFICE AT BOTH THE NFLPA AND

18  PI?

19  **A.**   YES.

20  **Q.**   BESIDES LICENSING AGREEMENTS AND LICENSING, WHAT OTHER

21  DEALINGS DID THE NFLPA AND PI HAVE?

22  **A.**   THE NFLPA AND PLAYERS INC RESIDE IN THE SAME BUILDING.

23  THERE IS A LEASE AGREEMENT FOR PLAYERS INC, FOR THEIR LEASE

24  SPACE.  SO THERE IS COMMON DEALINGS ADMINISTRATIVELY BETWEEN

25  THE TWO.

1   **Q.**   OTHER THAN THAT, IS THERE ANY OTHER DEALINGS BETWEEN THE

2   NFLPA AND PI OTHER THAN LICENSING?

3   **A.**   THERE'S ALSO AN ADMINISTRATIVE AGREEMENT THAT PLAYERS INC

4   MAINTAIN CERTAIN LICENSING CONTRACTS FOR THE NFLPA.

5   **Q.**   CERTAIN LICENSING CONTRACTS, DID YOU SAY?

6   **A.**   CORRECT.

7   **Q.**   WITH RESPECT TO THE LICENSING PARTS, DO YOU TAKE INTO

8   ACCOUNT THE FACT THAT THERE ARE SOME INDIVIDUALS WHO ARE OR

9   HAVE BEEN IN BOTH -- OCCUPY HIGH OFFICE IN BOTH ORGANIZATIONS?

10  **A.**   I DON'T UNDERSTAND WHAT YOU MEAN BY "TAKE INTO ACCOUNT."

11  **Q.**   WELL, DO YOU UNDERSTAND THE CONCEPT OF CONFLICTS OF

12  INTEREST?

13  **A.**   YES.

14  **Q.**   AND DO YOU UNDERSTAND THE CONCEPT OF AN ARM'S LENGTH

15  TRANSACTION?

16  **A.**   YES.

17  **Q.**   WOULD YOU HAVE A CONCERN ABOUT AN ARM'S LENGTH TRANSACTION

18  WHERE TWO PEOPLE ARE DEALING WITH EACH OTHER AND THEY ARE BOTH

19  MEMBERS OF TWO ORGANIZATIONS THAT ARE MAKING THE TRANSACTION?

20  **A.**   YES.   THAT'S ALWAYS A CONSIDERATION.

21  **Q.**   WELL, YOU UNDERSTAND THAT MR. UPSHAW AND MR. ALLEN, FOR

22  EXAMPLE, HAVE SIGNED AGREEMENTS ON BEHALF OF PLAYERS INC AND

23  NFLPA RESPECTIVELY; IS THAT CORRECT?

24  **A.**   CORRECT.

25  **Q.**   HOW DO YOU DETERMINE THAT THOSE AGREEMENTS HAVE BEEN MADE

1  AT ARM'S LENGTH?

2  **A.**   WE DON'T MAKE THAT DETERMINATION.

3  **Q.**   HAVE YOU EVER ASKED FOR AN INDEPENDENT EVALUATION OF A

4  TRANSACTION, TO MAKE SURE THAT IT WAS AT ARM'S LENGTH?

5  **A.**   NO.

6  **Q.**   AND DO YOU NOT BELIEVE THAT THAT WAS NECESSARY?

7  **A.**   IT DEPENDS ON THE MATTER AT HAND, WHAT THE ISSUE IS.

8  **Q.**   WELL, YOU'VE NEVER DONE IT.  SO I TAKE IT YOU'VE NEVER

9  THOUGHT IT WAS NECESSARY.  IS THAT CORRECT?

10  **A.**   THAT'S CORRECT.

11  **Q.**   DO YOU RECOGNIZE THIS DOCUMENT, SIR?

12  **A.**   YES.

13  **Q.**   CAN YOU TELL US WHAT IT IS, PLEASE?

14  **A.**   IT'S WHAT'S CONSIDERED THE FINANCIAL STATEMENT PACKET,

15  THAT INCLUDES THE AUDITED FINANCIAL STATEMENTS, CHARTS AND

16  GRAPHS, AND THE NFLPA PLAYERS INC BUDGET.

17       **MR. CHARHON:**  THIS IS ONE OF THE EXHIBITS WE WOULD

18  LIKE TO ENTER INTO EVIDENCE AT THIS TIME, SO THAT THE JURY CAN

19  SEE IT ON THE SCREEN.  EXHIBIT 85.

20       **THE COURT:**  85 ANY OBJECTION?

21       **MR. KESSLER:**  WHICH TRIAL EXHIBIT?  I'M SORRY.

22       **MR. CHARHON:**  85.

23       **MR. KESSLER:**  NO OBJECTION.

24       **THE COURT:**  RECEIVED.  GO AHEAD AND PUT IT ON THE

25  SCREEN.

1       (TRIAL EXHIBIT 85 RECEIVED IN EVIDENCE.)

2       (DOCUMENT DISPLAYED.)

3   **BY MR. KESSLER:**

4   **Q.**   DIRECTING YOUR ATTENTION TO THE BOTTOM RIGHT-HAND CORNER

5   OF THESE PAGES IS SOMETHING WE CALL A BATES NUMBER.  SO IF YOU

6   LOOK AT THE BATES NUMBER THAT HAS THE -- THE PAGE WITH THE

7   BATES NUMBER THAT HAS THE LAST DIGITS 6031, AND THERE'S A

8   COLUMN, "UNDESIGNATED FUNDS."  CAN YOU TELL US WHAT

9   "UNDESIGNATED FUNDS" ARE, PLEASE?

10  **A.**   THOSE ARE CONSIDERED UNRESTRICTED, ON BOARD DESIGNATED

11  FUNDS AT THE CONSOLIDATED NFLPA PLAYERS INC. AND THE BUILDING

12  CORPORATION.

13  **Q.**   WHEN YOU SAY "UNRESTRICTED" WHAT DO YOU MEAN BY THAT, SIR?

14  **A.**   THEY'RE CONSIDERED UNRESTRICTED IN ACCOUNTING TERMS, FOR

15  NOT-FOR-PROFITS, MEANING THEY ARE NON-DONOR RESTRICTED.

16  **Q.**   I'M JUST TRYING TO UNDERSTAND WHAT THE MEANING OF

17  "UNRESTRICTED" MEANS.  UNRESTRICTED IN WHAT SENSE?

18  **A.**   IN ACCOUNTING, UNRESTRICTED FOR NOT-FOR-PROFITS MEANS

19  NON-DONOR RESTRICTED.  MEANING, EFFECTIVELY, IT CAN BE USED FOR

20  THE OPERATIONS OF THE ORGANIZATION AND IT'S NOT RESTRICTED IN

21  ANY MANNER.

22  **Q.**   BUT IS IT CORRECT TO SAY THAT THE PRIMARY BUSINESS OF

23  PLAYERS INC IS LICENSING?

24  **A.**   THAT IS CORRECT.

25  **Q.**   DO YOU HAVE AN UNDERSTANDING THAT -- DO YOU KNOW WHAT A

1  GROUP LICENSING AUTHORIZATION IS, GLA?

2  **A.**    YES.

3  **Q.**    TELL US WHAT YOUR UNDERSTANDING IS.

4  **A.**    A GROUP LICENSING AUTHORIZATION IS AN AUTHORIZATION SIGNED

5  BY PLAYERS TO ALLOW PLAYERS INC TO USE THEIR NAME, LIKENESS,

6  FACSIMILE, SIGNATURE, IN GROUPS OVER SIX.

7  **Q.**    DO YOU HAVE AN UNDERSTANDING THAT THE GROUP LICENSING

8  AUTHORIZATIONS ARE SIGNED WITH THE NFLPA?

9  **A.**    YES.

10  **Q.**    AND DO YOU HAVE AN UNDERSTANDING THAT THE NFLPA THEN

11  ASSIGNS THOSE GROUP LICENSING AUTHORIZATIONS TO PLAYERS INC?

12  **A.**    YES.

13  **Q.**    HAVE YOU EVER SEEN EXHIBIT 19, SIR?

14  **A.**    NO.

15  **Q.**    ISN'T IT CORRECT THAT LICENSING REVENUES FLOW FROM THE

16  LICENSEE LIKE TOPPS TO PLAYERS INC; ISN'T THAT RIGHT?

17  **A.**    CORRECT.

18  **Q.**    AND THEN ISN'T IT RIGHT THAT PLAYERS INC MAKES PAYMENTS OF

19  LICENSING REVENUES TO THE NFLPA; ISN'T THAT CORRECT?  MAKES

20  PAYMENTS OUT OF THOSE LICENSING REVENUES TO THE NFLPA; ISN'T

21  THAT CORRECT?

22  **A.**    PLAYERS INC DOES NOT PAY THE NFLPA FOR THE LICENSING

23  ROYALTIES.

24  **Q.**    WHAT DO THEY PAY THE NFLPA FOR?

25  **A.**    THE NFLPA, IN THEIR EARNING OF THEIR 40 PERCENT, RECEIVES

1   40 PERCENT OF THE GROSS LICENSING REVENUE DIRECTLY.

2   **Q.**   DIRECTLY FROM?

3   **A.**   FROM THE LICENSEES.

4   **Q.**   FROM THE LICENSEES.  AND THEN DO YOU -- IS THAT PART OF

5   YOUR WORK, PART OF YOUR AUDIT WORK, TO FOLLOW THAT FLOW OF

6   FUNDS?

7   **A.**   YES.

8   **Q.**   SO IF PI RECEIVES 60 PERCENT OF THAT FROM LET'S SAY TOPPS,

9   THEN THE NFLPA RECEIVES 40 PERCENT; IS THAT CORRECT?

10  **A.**   NO.

11  **Q.**   CAN YOU TELL ME HOW THAT WORKS?

12  **A.**   SURE.  THE GROSS LICENSING EQUAL SHARE POOL HAS THREE

13  COMPONENTS TO IT OF ALLOCATION.

14       THE FIRST IS THE NFLPA RECEIVING 40 PERCENT OF THE

15  ACTIVE PLAYER GROSS LICENSING SHARE.  THE PLAYERS, THE ELIGIBLE

16  PLAYERS, RECEIVING 37 PERCENT WITH THE GROSS LICENSING SHARE.

17  AND PLAYERS INC, FOR OPERATIONS, RECEIVES APPROXIMATELY

18  23 PERCENT OF THE GROSS LICENSING EQUAL SHARE POOL.

19  **Q.**   WHEN YOU SAY "THE PLAYERS," DO YOU MEAN THE ACTIVE

20  PLAYERS, THE RETIRED, OR BOTH?

21  **A.**   THE ACTIVE PLAYERS.

22  **Q.**   HOW DO RETIRED PLAYERS RECEIVE MONEY?

23  **A.**   IT'S MY UNDERSTANDING THAT THE RETIRED PLAYERS HAVE

24  CERTAIN DEALS, DESIGNATED DEALS, THAT ARE NOT PART OF THE GROSS

25  LICENSING EQUAL SHARE POOL.

1   **Q.** LET ME DIRECT YOUR ATTENTION TO EXHIBIT 19 AGAIN. WOULD

2   EXHIBIT 19 BE ONE OF THOSE DESIGNATED DEALS TO WHICH YOU ARE

3   REFERRING?

4   **A.** THE DESIGNATED DEALS THAT I'M REFERRING TO ARE SEPARATE

5   AND DISTINCT DEALS BETWEEN THE RETIRED PLAYERS AND THE ACTUAL

6   COMPANIES, THE LICENSING COMPANIES.

7   **Q.** WELL, ARE THERE ANY MONIES THAT GO TO THE PEOPLE WHO

8   SIGNED THESE GROUPS LICENSING AUTHORIZATIONS, THAT YOU KNOW OF,

9   THE RETIREES?

10  **A.** I DON'T KNOW.

11  **Q.** THAT'S NOT PART OF YOUR WORK IN THE AUDIT?

12  **A.** OUR WORK IS BASED ON A LOT OF FACTORS AS WE DO THE AUDIT,

13  SUCH AS MATERIALITY, SUCH AS THE FINANCIAL STATEMENT LINE

14  ITEMS. SO THIS SPECIFICALLY WOULD NOT BE PART OF OUR AUDIT

15  WORK.

16  **Q.** WELL, YOUR AUDIT WORK HAS TO DO WITH ANY MONIES THAT CAME

17  IN OR OUT OF THE NFLPA OR PI?

18  **A.** CORRECT.

19  **Q.** IF MONEY IS GOING TO RETIRED PLAYERS, WOULDN'T THAT BE

20  PART OF YOUR WORK?

21  **A.** AGAIN, IT DEPENDS ON MATERIALITY, THE SAMPLE SIZE. SO OUR

22  AUDIT AND OPINION THAT WE GIVE IN THE FINANCIAL STATEMENTS IS

23  BASED ON SAMPLES.

24  **Q.** HAVE YOU EVER SEEN EXHIBIT 87 BEFORE, SIR?

25  **A.** NO.

1  **Q.**   DOES THAT APPEAR TO REFER TO A DESIGNATED PROGRAM SUCH AS

2  YOU WERE DISCUSSING?

3  **A.**   YES.

4  **Q.**   SO WHERE DO YOU COME UP WITH THE NOMENCLATURE

5  "DESIGNATED"?

6  **A.**   IN WORKING WITH THE NFLPA AND PLAYERS INC OVER THE YEARS,

7  IT'S BEEN KNOWN THAT THE RETIRED PLAYERS HAD SEPARATE

8  DESIGNATED AGREEMENTS WITH LICENSEES.

9  **Q.**   AND HAS IT ALSO BEEN KNOWN THAT THERE WERE GROUP LICENSING

10  AUTHORIZATIONS WITH RETIRED PLAYERS?  DID YOU KNOW THAT?

11  **A.**   I WAS AWARE THERE WERE SOME RETIRED PLAYERS THAT SIGNED

12  GLA'S OVER THE YEARS.

13  **Q.**   AND WERE YOU AWARE THAT THEY RECEIVED PAYMENTS FOR SIGNING

14  THE GLA'S?

15  **A.**   NO.

16  **Q.**   ARE YOU AWARE THAT PAYMENTS FROM PHOTO FILE WERE MADE TO

17  RETIRED PLAYERS PURSUANT TO GLA'S?

18  **A.**   NO, I WAS NOT.

19  **Q.**   DIRECTING YOUR ATTENTION BACK TO EXHIBIT 19, WHICH IS THE

20  GLA, ONE OF THE GLA'S SIGNED BY MR. ADDERLEY, AND YOU'LL NOTICE

21  IN THE LAST -- SECOND TO LAST PARAGRAPH IT SAYS, "IT IS FURTHER

22  UNDERSTOOD THAT THE MONIES GENERATED BY SUCH LICENSING OF

23  RETIRED PLAYERS GROUP RIGHTS WILL BE DIVIDED BETWEEN THE PLAYER

24  AND ESCROW ACCOUNT FOR ALL ELIGIBLE NFLPA MEMBERS WHO HAVE

25  SIGNED A GROUP LICENSING AUTHORIZATION FORM"?

1        **THE COURT:**  SLOW DOWN A LITTLE BIT.  SLOW DOWN,

2   PLEASE.

3        **MR. CHARHON:**  SORRY ABOUT THAT.

4   **Q.**  ARE YOU AWARE OF THE CREATION OF ANY SUCH ESCROW ACCOUNT?

5   **A.**  NO, I'M NOT.

6   **Q.**  AND DIRECTING YOUR ATTENTION AGAIN TO EXHIBIT 87, WHICH IS

7   A LETTER TO MR. HUFF, YOU WILL NOTE IN THE SECOND PAGE OF THAT,

8   THE RETIRED PLAYER GROUP LICENSING AUTHORIZATION FORM, THE SAME

9   LANGUAGE APPEARS IN THE LICENSE.

10        THIS IS THE SECOND TO LAST PARAGRAPH OF THE SECOND

11   PAGE OF EXHIBIT 87.  IT SAYS:  "IT IS FURTHER UNDERSTOOD THAT

12   THE MONIES GENERATED BY SUCH LICENSING OF RETIRED PLAYER GROUP

13   RIGHTS WILL BE DIVIDED BY THE PRAYER IN AN ESCROW ACCOUNT FOR

14   ALL ELIGIBLE NFLPA MEMBERS WHO HAVE SIGNED A GROUP LICENSING

15   AUTHORIZATION."

16        AGAIN, I ASK YOU, ARE YOU AWARE OF SUCH ESCROW

17   ACCOUNT BEING CREATED?

18   **A.**  NO.

19   **Q.**  AND THEN WITH RESPECT TO EXHIBIT 88, THE MONIES FROM PHOTO

20   FILE TO RETIRED PLAYERS, WITH RESPECT TO THOSE MONIES ARE YOU

21   AWARE OF AN ESCROW ACCOUNT BEING CREATED?

22   **A.**  NO, NOT THAT I'M AWARE OF.

23   **Q.**  AND DIRECTING YOUR ATTENTION THEN TO EXHIBIT 2, TO EXHIBIT

24   1172.  ARE THOSE INDIVIDUALS THAT RECEIVE MONIES PURSUANT TO A

25   GLA, MONEY FROM EA, ARE YOU AWARE OF ANY ESCROW ACCOUNT BEING

1  CREATED WITH RESPECT TO THOSE MONIES?

2  **A.**   I'M NOT AWARE OF ANY ESCROW ACCOUNT.

3  **Q.**   MOVING BACK TO THE 2006 FINANCIAL STATEMENT, WHICH IS --

4  WHAT'S THE EXHIBIT NUMBER ON IT?

5  **A.**   85.

6  **Q.**   85.   THANK YOU.

7         IF WE LOOK IN THE CURRENT LIABILITY SECTION, WHICH IS

8  PAGE 6032, IT SAYS "ROYALTIES DUE TO PLAYERS" IS THE THIRD

9  TITLE.   DOES THAT REFER TO RETIRED PLAYERS, ACTIVE PLAYERS, OR

10  BOTH?

11  **A.**   IT WOULD REFER TO BOTH.

12  **Q.**   AND DO YOU KNOW WHAT THE BREAKDOWN IS?   IS THERE SOME

13  PLACE IN THIS DOCUMENT THAT WOULD SHOW THE BREAKDOWN?

14  **A.**   NO.

15  **Q.**   WHERE WOULD YOU GO TO FIND THAT?   WHERE WOULD YOU GO TO

16  FIND THAT OUT?

17  **A.**   THE NFLPA FINANCE DEPARTMENT.

18  **Q.**   AND WHAT DOCUMENTS WOULD YOU LOOK FOR?

19  **A.**   THERE WOULD BE A LISTING OF AMOUNTS DUE TO PLAYERS.

20  **Q.**   ACTIVE AND RETIRED PLAYERS?

21  **A.**   YES.

22  **Q.**   IF WE MOVE TO PAGE 6033, UNDER "REVENUE," IT SAYS

23  "ROYALTIES, LICENSING."   THERE'S A FIGURE OF $67 MILLION AND

24  CHANGE.   DO YOU SEE THAT?

25  **A.**   YES.

1  **Q.**   HOW DO YOU FIND -- HOW DO YOU DEFINE LICENSING IN THIS

2  CALCULATION?

3  **A.**   THE DEFINITION OF LICENSING RELATED TO THE FINANCIAL

4  STATEMENTS OR ANY AGREEMENT PLAYERS INC OR THE NFLPA HAVE THAT

5  GENERATES ROYALTIES OR LICENSING INCOME.

6  **Q.**   WOULD THIS INCLUDE BOTH ACTIVE AND RETIRED PLAYERS, THIS

7  67 MILLION?

8  **A.**   YES.

9  **Q.**   AND ON WHAT DOCUMENTS IF ANY DID YOU RELY TO VERIFY THIS

10 NUMBER OF 67 MILLION?

11 **A.**   ON OUR SAMPLING OF THE LICENSING AGREEMENTS.

12 **Q.**   SO THE AGREEMENTS FROM EA AND TOPPS, ET CETERA?

13 **A.**   YES.

14 **Q.**   THEN THERE'S A NUMBER FOR -- IF YOU LOOK UNDER EXPENSES --

15 PLAYER ROYALTIES AND APPEARANCES.

16       HOW -- AND I THINK THE NUMBER IS 54 MILLION AND

17 CHANGE.  HOW DID YOU DETERMINE THAT NUMBER, SIR?

18 **A.**   WELL, AGAIN, WE AUDIT THE NUMBER THAT'S DETERMINED BY THE

19 NFLPA.  THE TWO MAJOR COMPONENTS TO THAT IS THE EQUAL SHARE

20 POOL, THE ACTIVE PLAYER EQUAL SHARE POOL, AND ANY PREMIUM

21 PLAYER APPEARANCES THAT WERE PAID OUT IN THIS YEAR.

22       **THE COURT:**  ALL RIGHT.  HAVE WE REACHED A GOOD

23 BREAKING POINT?  IT'S TIME TO BREAK.

24       **MR. CHARHON:**  THIS IS AS GOOD AS ANY.

25       **THE COURT:**  ALL RIGHT.  THIS IS WHERE WE'RE GOING TO

1    LEAVE IT FOR TODAY.

2          I HAVE AN EVIDENTIARY HEARING THAT STARTS IN ONE

3    MINUTE ON ANOTHER CASE, SO I'M GOING TO HAVE TO ASK EVERYONE TO

4    CLEAR THE TABLES AND SO FORTH.

5          REMEMBER THE ADMONITION.  WE'LL SEE YOU ALL BACK HERE

6    TOMORROW AT 7:45.  ISN'T THAT THE RIGHT TIME?  7:45.

7          HAVE A GOOD EVENING EVERYBODY.  AND STAY IN GOOD

8    HEALTH NOW, AND WASH YOUR HANDS.

9          **THE CLERK:**  ALL RISE.

10         **MR. KESSLER:**  YOUR HONOR, I HAVE ONE 30-SECOND

11   REQUEST AFTER THE JURY LEAVES.

12         **THE COURT:**  ALL RIGHT.

13         (THEREUPON, THE JURY LEAVES THE COURTROOM.)

14         **MR. KESSLER:**  YOUR HONOR, THIS MORNING, BEFORE WE

15   BEGAN TRIAL, IN THE COURSE OF COLLOQUY YOUR HONOR MADE SOME

16   COMMENTS ABOUT YOUR HONOR'S VIEWS ABOUT THE GROUP LICENSING

17   AUTHORIZATION.

18         AND THE CONCERN WE HAVE IS THAT THERE IS SOME PRESS

19   PUBLICATIONS WHO ARE LITERALLY PUTTING OUT THE TRANSCRIPT EVERY

20   DAY.  AND I AM CONCERNED ABOUT SOME JUROR POSSIBLY BECOMING

21   AWARE OF THOSE COMMENTS, WHICH I THINK WOULD BE VERY

22   PREJUDICIAL.

23         I KNOW YOUR HONOR HAD NO INTENTION THEY EVER SHOULD

24   GET TO ANY JUROR.  AND SINCE THEY'RE NOT PART OF THE

25   EVIDENTIARY RECORD IN ANY WAY, I WAS WONDERING IF YOUR HONOR

1  WOULD CONSIDER EITHER EXCLUDING THOSE COMMENTS IN THE RECORD OR

2  REDACTING IT FROM THE PUBLIC RECORD, OR SOMETHING LIKE THAT.

3           YOUR HONOR MAY RECALL THE COMMENTS.  THEY WERE ABOUT

4  YOUR HONOR'S VIEWS OF WHAT COULD BE THE, QUOTE, PROBLEMS WITH

5  THE GLA LANGUAGE.  AND I THINK IF ANY JUROR GOT ANY WIND OF

6  THAT, THAT THAT WAS YOUR HONOR'S STATEMENT, IT COULD BE VERY

7  DAMAGING TO US.

8           **THE COURT:**  ALL RIGHT.  WHAT DOES THE OTHER SIDE SAY?

9           **MR. KATZ:**  THIS IS A PUBLIC -- AN OPEN COURTROOM.

10 PERIOD.

11          **THE COURT:**  WELL, IS THERE ANY MEMBER OF THE PRESS

12 HERE?  I THINK THE CASE FROM NIGERIA HAS SUPERSEDED THE

13 PUBLIC'S INTEREST IN THIS CASE.  I'M SORRY TO SAY.

14          **MR. KATZ:**  ALL THE PLAYERS ARE DOWN THERE, YOUR

15 HONOR.

16          **THE COURT:**  BUT IT IS A PUBLIC PROCEEDING.  I

17 CAN'T -- I'VE GOT TO BE ABLE TO RUN THE COURTROOM THE WAY I RUN

18 THE COURTROOM.  AND THAT IS GOING TO REQUIRE SOME FRANK

19 DISCUSSIONS WITH YOU LAWYERS ABOUT WHAT THE ISSUES IN THE CASE

20 ARE.  THERE ARE ALL KINDS OF THINGS WE'VE SAID THAT WE DON'T

21 WANT THE JURY TO KNOW ABOUT.

22          SO THAT MOTION IS DENIED, AND I'M GOING TO RELY ON

23 THE JURY TO BRING TO MY ATTENTION IF THEY SEE ANY SUCH THING,

24 WHICH THEY'VE BEEN TOLD NOT TO PAY ANY ATTENTION TO.

25          **MR. KESSLER:**  YOUR HONOR, MAYBE IT WOULD BE GOOD IF

1   YOU MADE A PUBLIC COMMENT NOW THAT I'M SURE YOUR HONOR DID NOT

2   INTEND TO EXPRESS ANY VIEW AS TO HOW THIS CASE SHOULD BE

3   DECIDED.

4          **THE COURT:**  THAT IS TRUE.  THAT IS UP TO THE JURY.

5          **MR. KESSLER:**  THANK YOU, YOUR HONOR.

6          **THE COURT:**  I'VE SAID THAT MANY TIMES, AND I STAND BY

7   THAT.  THE JURY IS GOING -- I'M GOING TO GIVE THEM PROPER

8   INSTRUCTIONS OF LAW.  BUT WHAT THEY DECIDE IS THEIR BUSINESS.

9          **MR. KESSLER:**  THANK YOU.

10         **THE COURT:**  ALL RIGHT.  SEE YOU TOMORROW.

11        (THEREUPON, THIS TRIAL WAS CONTINUED UNTIL THURSDAY,

12   OCTOBER 30, 2008 AT 7:30 O'CLOCK A.M.)

13

14                        - - - -

15               **CERTIFICATE OF REPORTER**

16        I CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT

17   FROM THE RECORD OF PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

18   DATE:  THURSDAY, OCTOBER 30, 2008.

19

20             S/B KATHERINE POWELL SULLIVAN

21            _____

22

23        KATHERINE POWELL SULLIVAN, CSR #5812, RPR, CRR
                   U.S. COURT REPORTER

24

25

1

<u>**I N D E X**</u>

2

**PLAINTIFFS' WITNESSES**                              <u>**PAGE**</u>   <u>**VOL.**</u>

3

**BEACH, III, WALTER**
Cross Examination by Mr. KESSLER              1147      6

4

**LINZNER, JOEL LAURENCE**

5
Direct Examination by Mr. Hummel             1188      6
Cross Examination by Mr. FEHER               1274      6

6
Redirect Examination by Mr. Hummel           1307      6
Recross Examination Resumed by Mr. feher     1324      6

7

**RHEE, PETER**

8
Direct Examination by Mr. HUMMEL             1329      6
Cross Examination by Mr. KESSLER             1334      6

9

**EYRICH, GLEN**

10
DEPOSITION EXCERPTS READ BY
MR. CHARON CHARHON AND MR. GARZA             1344      6

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# E X H I B I T S

| TRIAL EXHIBITS | IDEN | VOL. | EVID | VOL. |
|---|---|---|---|---|
| 1245-7 | | | 1130 | 6 |
| 1245-8 | | | 1130 | 6 |
| 1245-9 | | | 1130 | 6 |
| 1263-7 | | | 1130 | 6 |
| 1239 | | | 1199 | 6 |
| 65 | | | 1218 | 6 |
| 67 | | | 1221 | 6 |
| 80 | | | 1227 | 6 |
| 1246 | | | 1230 | 6 |
| 1257 | | | 1235 | 6 |
| 1184 | | | 1258 | 6 |
| 1268 | | | 1272 | 6 |
| 1240 | | | 1273 | 6 |
| 26 | | | 1282 | 6 |
| 69 | | | 1286 | 6 |
| 79 | | | 1299 | 6 |
| 85 | | | 1350 | 6 |