VOLUME 7

PAGES 1363 -

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE WILLIAM H. ALSUP

BERNARD PAUL PARRISH, HERBERT      )
ANTHONY ADDERLEY, WALTER ROBERTS   )
III,                               )
                                   )
          PLAINTIFFS,              )
                                   )
  VS.                              ) NO. C 07-0943 WHA
                                   )
NATIONAL FOOTBALL LEAGUE PLAYERS   )
ASSOCIATION AND NATIONAL FOOTBALL  )
LEAGUE PLAYERS INCORPORATED D/B/A  )
PLAYERS INC,                       )
                                   ) SAN FRANCISCO, CALIFORNIA
          DEFENDANTS.              ) THURSDAY
_____) OCTOBER 30, 2008

### TRANSCRIPT OF PROCEEDINGS

**APPEARANCES**:

**FOR PLAINTIFFS:**          MANATT, PHELPS & PHILLIPS
                             1001 PAGE MILL ROAD, BUILDING 2
                             PALO ALTO, CALIFORNIA 94304
                    BY:  **RONALD S. KATZ, ESQ.**
                         **RYAN S. HILBERT, ESQ.**


                             MANATT, PHELPS & PHILLIPS
                             7 TIMES SQUARE
                             NEW YORK CITY, NEW YORK 10036
                    BY:  **L. PETER PARCHER, ESQ.**


                             MANATT, PHELPS & PHILLIPS
                             11355 WEST OLYMPIC BOULEVARD
                             LOS ANGELES, CALIFORNIA  90064
                    BY:  **CHAD HUMMEL, ESQ.**

(APPEARANCES CONTINUED ON NEXT PAGE)

```
APPEARANCES CONTINUED:

ALSO FOR PLAINTIFFS:      MCKOOL SMITH
                          300 CRESCENT COURT
                          SUITE 1500
                          DALLAS, TEXAS  75201
                    BY:   LEWIS T. LECLAIR, ESQ.
                          JILL ADLER NAYLOR, ESQ.
                          ANTHONY GARZA, ESQ.
                          BRETT CHARHON, ESQ.


FOR DEFENDANTS:           DEWEY & LEBOEUF
                          1301 AVENUE OF THE AMERICAS
                          NEW YORK CITY, NEW YORK  10019-6092
                    BY:   JEFFREY L. KESSLER, ESQ.
                          DAVID GREENSPAN, ESQ.
                          DAVID G. FEHER, ESQ.
                          ROY TAUB, ESQ.
                          MOLLY DONOVAN, ESQ.
                          JASON CLARK, ESQ.


                          WEIL, GOTSHAL & MANGES LLP
                          767 FIFTH AVENUE
                          NEW YORK, NEW YORK 10153-0119
                    BY:   BRUCE S. MEYER, ESQ.




REPORTED BY:    KATHERINE POWELL SULLIVAN, CSR #5812
                OFFICIAL REPORTER - U.S. DISTRICT COURT
```

1    **P R O C E E D I N G S**

2  **OCTOBER 30, 2008**                                    **7:30 A.M.**

3         **THE COURT:**  GOOD MORNING.  ALL RIGHT.

4         LET'S GO TO WORK.  HAVE A SEAT.

5         HERE ARE THE DESIGNATIONS BACK ON THE WITNESS NAMED

6  ZUCKER, SO I DON'T HAVE TO COME AROUND HERE.

7         **MR. KESSLER:**  THANK YOU, YOUR HONOR.

8         **THE COURT:**  NEXT, I WANT TO GET TO THIS MOTION THAT

9  WAS MADE ON HALL OF FAME, UNLESS THERE'S SOMETHING ELSE THAT'S

10  URGENT THAT YOU NEED TO TAKE UP.

11         OKAY.  MR. LECLAIR, GO AHEAD.

12         **MR. LECLAIR:**  YOUR HONOR, WE BELIEVE THAT WE'RE NOW

13  ENTITLED TO GET THE HALL OF FAME E-MAILS IN THE CASE.  AND THE

14  REASON IS THE DEFENDANTS ARE TRYING THIS CASE BY SAYING "NO

15  GOOD DEED GOES UNPUNISHED."  AND THEY HAVE INJECTED INTO THE

16  CASE THE MONEY FROM AD HOC LICENSE AGREEMENTS OVER OUR

17  OBJECTION.

18         THEY HAVE SAID TO THE JURY:

19             "OKAY, WE DIDN'T CREATE AN ESCROW ACCOUNT.  THERE

20  WASN'T ANY GROUP LICENSING MONEY.  BUT DON'T WORRY ABOUT THAT

21  BECAUSE WE DID THE GOOD DEED FOR THE RETIRED PLAYERS BY GETTING

22  THEM 7 MILLION FOR THE CLASS AND 30 MILLION FOR RETIRED

23  PLAYERS, AND THAT'S ALL FROM AD HOC LICENSE AGREEMENTS."

24         **THE COURT:**  I THOUGHT IT WAS 7 MILLION.

25         **MR. LECLAIR:**  7 MILLION FOR THE CLASS.  30 MILLION

1   THEY ELICITED FROM DOUG ALLEN FOR RETIRED PLAYERS.

2          AND THAT WAS ALL OVER OUR OBJECTION.  WE ARE ENTITLED

3   TO REBUT THAT EVIDENCE.  AND WHAT WE ARE SHOWING IS THROUGH

4   THIS EVIDENCE THAT THEY SAY THEY HAVE NO CONFLICT OF INTEREST:

5              "WE USED BEST EFFORTS FOR RETIRED PLAYERS."

6          AND WE'RE ENTITLED TO SHOW THAT THEY DO HAVE A

7   CONFLICT OF INTEREST.  THIS IS EVIDENCE OF THEIR CONFLICT OF

8   INTEREST.  IT'S EVIDENCE THAT THEY DIDN'T ALWAYS ACT IN THE

9   BEST INTEREST OF RETIRED PLAYERS.

10          SO FOR THAT REASON, IT IS RELEVANT TO THE ISSUE THEY

11   HAVE INJECTED IN THE CASE, WHICH IS THEY SAY:

12              "WE GOT THEM A WHOLE BUNCH OF MONEY.  WE'RE GOOD

13   GUYS."

14          WE WANTED TO TRY THIS CASE ON THE GROUP MONEY.  THERE

15   WASN'T ANY.

16          THEY ARE INJECTING INTO THE CASE --

17          **THE COURT:**  I'M SORRY, WHAT? YOU WANTED TO TRY WHAT?

18          **MR. LECLAIR:**  THE CASE ON THE GROUP MONEY.

19          THEY HAD INJECTED INTO THE CASE THE MONEY FROM THE

20   INDIVIDUAL AGREEMENTS.

21          **THE COURT:**  PLEASE DON'T TRY TO FOOL ME ON THAT,

22   MR. LECLAIR.  IN THE OPENING STATEMENT, ALL I HEARD ABOUT WAS

23   THE CONSTITUTION AND THE MAGNA CARTA, AND THAT CAME FROM YOUR

24   SIDE.

25          SO IF ANYBODY INJECTED BROADER ISSUES INTO THE CASE,

1   IT WAS YOUR SIDE, THE MAGNA CARTA -- I'M SORRY, THE --

2          **MR. KESSLER:**  CONSTITUTION.

3          **THE COURT:**  -- CONSTITUTION.

4          SO YOU MAY HAVE -- YOU KNOW, THIS IS A PROBLEM.

5   SOMETIMES YOU HAVE SOME GOOD POINTS, BUT YOU SURROUND THEM WITH

6   A BUNCH OF BAD POINTS THAT YOU THINK I'M GOING TO FALL FOR.

7          I WANT YOU TO -- HERE, LET ME JUST ASK YOU SOME

8   QUESTIONS.  I'M NOT SAYING -- YOU'VE GOT SOME POINTS HERE THAT

9   DESERVE ATTENTION, BUT TO BLAME THEM FOR BRINGING UP BROADER

10  ISSUES IN THE CASE AFTER YOUR OPENING STATEMENT IS JUST NOT

11  FAIR.

12         **MR. LECLAIR:**  YOUR HONOR, I'M NOT BLAMING THEM.  I

13  APOLOGIZE, YOUR HONOR, IF I'M NOT BEING CLEAR.

14         I'M NOT BLAMING THEM FOR BRINGING UP BROADER ISSUES.

15  I AM SAYING ON THIS SPECIFIC ISSUE THEY HAVE INJECTED IT INTO

16  THE CASE, AND WE'RE ENTITLED TO REBUT IT.

17         **THE COURT:**  THEY NEVER MENTIONED THE HALL OF FAME.

18         **MR. LECLAIR:**  WHAT?

19         **THE COURT:**  THEY NEVER MENTIONED THE HALL OF FAME.

20         **MR. LECLAIR:**  YOUR HONOR, THEY CANNOT SAY:

21          "WE DID GOOD BY RETIRED PLAYERS BY GETTING THEM

22  7 MILLION AND $30 MILLION OF AD HOC MONEY," AND JUST LEAVE OUT

23  ONE DEAL AND SAY WE CAN'T TALK ABOUT THE DEAL WHERE WE HAVE

24  EVIDENCE THAT THEY DIDN'T DO GOOD FOR RETIRED PLAYERS.

25         THAT'S WHY IT'S RELEVANT.

1    **THE COURT:**  WELL, EXPLAIN -- FIRST OF ALL, EXPLAIN --

2  THESE E-MAILS ON THEIR FACE ARE WAY OUT OF -- WITHOUT CONTEXT.

3  I'M NOT THE SAYING OUT OF CONTEXT.

4    YOU'RE TRYING TO TAKE A LINE OR TWO OUT OF SOMEBODY'S

5  E-MAIL, AND IT IS NOT CLEAR FROM THIS OFFER OF PROOF -- IN FACT

6  VERY UNCLEAR.

7    SO TELL ME YOUR OFFER OF PROOF OF WHO THE WITNESSES

8  WOULD BE AND WHAT THEY WOULD ACTUALLY SAY WAS THE HALL OF FAME

9  DEAL, AND THEN BEFORE YOU EVEN GET INTO THESE, EXPLAIN THAT

10  PART TO ME.

11    **MR. LECLAIR:**  ALL RIGHT, YOUR HONOR.

12    **THE COURT:**  TELL ME THE WITNESS FIRST THAT I'M

13  LISTENING TO ON THE STAND, HYPOTHETICALLY.

14    **MR. LECLAIR:**  ALL RIGHT.  THE WITNESS, YOUR HONOR,

15  WOULD BE JOE NAHRA.

16    **THE COURT:**  WHO?

17    **MR. LECLAIR:**  JOE NAHRA.

18    **THE COURT:**  WHO IS HE?

19    **MR. LECLAIR:**  HE WAS COPIED ON THE E-MAILS.  HE WAS

20  THE DESIGNATED REPRESENTATIVE OF THE NATIONAL FOOTBALL LEAGUE

21  PLAYERS ASSOCIATION.

22    **THE COURT:**  IS HE HERE NOW?

23    **MR. LECLAIR:**  HE'S SITTING RIGHT THERE (INDICATING).

24    **THE COURT:**  IS HE A DESIGNATED -- SO HE'S ON THE

25  STAND.

1          **MR. LECLAIR:** HE'S ON THE STAND.  HE RECEIVED EVERY

2     SINGLE ONE OF THESE E-MAILS.  HE WAS THE PERSON WHO WAS SAID TO

3     HAVE BEEN INVOLVED IN FORGING AND NEGOTIATING THIS DEAL ON

4     BEHALF OF --

5          **THE COURT:** PLEASE, SIT DOWN.

6          **MR. LECLAIR:** AND IT IS -- THE HALL OF FAME DEAL WAS

7     AN AD HOC DEAL DONE, AND OUR EVIDENCE WILL SHOW IT WAS DONE

8     BECAUSE THEY -- TAKE 2 WAS OUT SIGNING UP RETIRED PLAYERS.  AND

9     EA AND THE DEFENDANTS DECIDED TO TRY TO KEEP TAKE 2 OUT OF THE

10    MARKET, THEY WOULD GO FORGE THIS DEAL WITH THE HALL OF FAME,

11    WHICH INCLUDES MR. ADDERLEY, WHO IS A MEMBER OF THE CLASS.

12          AND THE POINT IS IN THE AD HOC DEAL THE ONLY DEALS

13    THEY DID WERE AD HOC DEALS.  THEY NEVER DID, THEY ADMIT, A

14    GROUP DEAL.

15          AND IN THIS DEAL THEY DID IT BELOW MARKET.  AND THEY

16    DIDN'T CARE -- IT'S OBVIOUS THEY FAVORED THE INTEREST OF EA

17    OVER THE RETIRED PLAYERS.

18          THAT'S WHY IT'S ALSO RELEVANT TO THE CREDIBILITY OF

19    MR. LINZNER WHEN HE TESTIFIES ON THE STAND.  AND HE SAYS ALL

20    THE THINGS --

21          **THE COURT:** YOU RELEASED MR. LINZNER.  HE'S IN

22    SINGAPORE AS FAR AS WE KNOW BY NOW.

23          **MR. LECLAIR:** THAT'S FINE, YOUR HONOR.

24          **THE COURT:** IS IT FAIR TO IMPEACH HIM AFTER THE FACT?

25          **MR. LECLAIR:** YOUR HONOR, WE WANTED TO DO IT --

1          **THE COURT:**  WHY DIDN'T YOU BRING IT UP SOONER, THEN?

2          **MR. LECLAIR:**  YOUR HONOR --

3          **THE COURT:**  WHY DIDN'T YOU AT LEAST SAY:  "NO, WE

4    CAN'T RELEASE HIM, BECAUSE WE MAY NEED TO RECALL HIM TO LET

5    HIM, IN FAIRNESS, BE ABLE TO ADDRESS THIS"?

6          **MR. LECLAIR:**  YOUR HONOR, THEY CAN CALL HIM BACK.

7    YOUR HONOR, THIS IS A GUY WHO'S -- THE WHOLE POINT OF THIS

8    EVIDENCE IS THESE TWO ARE LINKED TOGETHER.  THEY ARE WORKING

9    FOR EACH OTHER.  THEY ARE NOT WORKING FOR THE RETIRED PLAYERS.

10         THAT'S THE POINT.  THAT'S WHY THE EVIDENCE IS

11   RELEVANT.  IF THEY WANTED TO KEEP MR. LINZNER HERE -- WE HAD

12   FILED THE MOTION -- THEY COULD HAVE SAID:  "WE NEED

13   MR. LINZNER."

14         **THE COURT:**  IS IT TRUE THAT -- I'M QUOTING NOW FROM

15   THE OPPOSING BRIEF HERE.  IT SAYS:

16         "PLAINTIFFS HAVE STIPULATED THAT" -- I'M

17   QUOTING.  THIS IS A QUOTE WITHIN A QUOTE:  "THEY DO NOT SEEK TO

18   RECOVER IN THIS CASE ANY MONIES PAID TO SOME GLA CLASS MEMBERS

19   UNDER SEPARATE SO-CALLED AD HOC LICENSE AGREEMENTS."

20         SO YOU'RE NOT TRYING TO RECOVER -- YOU'RE NOT TRYING

21   TO SAY, AS I READ THAT -- AND MAYBE I'M WRONG -- THAT -- YOU'RE

22   NOT TRYING TO RECOVER IN THIS CASE ANY MONIES THAT WERE PAID

23   UNDER THE HALL OF FAME AGREEMENT TO PLAYERS.

24         **MR. LECLAIR:**  WE'RE NOT TRYING TO RECOVER THE MONEY

25   BACK FROM THE PLAYERS, YOUR HONOR.  WE'RE TRYING TO RECOVER THE

1 GROUP MONEY.

2 BUT THE POINT IS TO REBUT THEIR CONTENTION THAT THEY

3 ACTED IN THE BEST INTEREST OF RETIRED PLAYERS.  EVEN YOUR HONOR

4 SAID WHEN WE ARGUED THIS MOTION IN LIMINE:

5 "I WANT TO MAKE IT VERY CLEAR THAT I THINK THERE

6 IS A 50/50 LIKELIHOOD, MR. KESSLER, THAT YOU ARE GOING TO OPEN

7 THE DOOR TO THIS BY MAKING A LINE OF ARGUMENTS THAT THE

8 DEFENDANTS HAVE THE BEST INTEREST OF RETIRED PLAYERS AT HEART,

9 OR SOMETHING CLOSE TO THAT."

10 I MEAN, THAT'S EXACTLY WHAT THEY'VE DONE, YOUR HONOR.

11 THEY HAVE SAID THAT.  AND THEY'VE SAID:  "WE DID GOOD."

12 IT'S NOT FAIR TO TIE OUR HANDS.  THEY INJECT ALL

13 THESE AD HOC AGREEMENTS, AND SAY:

14 "WE GOT ALL THIS MONEY FOR RETIRED PLAYERS.

15 DON'T WORRY THAT WE DIDN'T DO ANY GROUP MONEY.  WE GOT THEM ALL

16 THIS INDIVIDUAL MONEY."

17 AND THEN, THEY WANT TO KEEP US FROM SHOWING:

18 "WELL, YOU WEREN'T ACTING IN THE BEST INTEREST OF

19 RETIRED PLAYERS.  YOU, IN FACT, HAD A CONFLICT OF INTEREST.

20 YOU DENIED IT, BUT YOU DID.  YOU FAVORED EA OVER THE RETIRED

21 PLAYERS."

22 THAT'S WHY THE EVIDENCE IS --

23 **THE COURT:**  HOW MUCH MONEY WAS INVOLVED IN THIS HALL

24 OF FAME AGREEMENT?

25 **MR. LECLAIR:**  $400,000.

1    **THE COURT:**  AND WHO GOT THAT MONEY?

2    **MR. LECLAIR:**  THE VARIOUS HALL OF FAME PLAYERS GOT IT

3 THROUGH PLAYERS INC.

4    **MR. KESSLER:**  YOUR HONOR -- SORRY.

5    **THE COURT:**  AND 17 OF THOSE WERE CLASS MEMBERS?

6    **MR. LECLAIR:**  THAT'S CORRECT, YOUR HONOR.

7    **THE COURT:**  SO -- AND WERE THERE CLASS MEMBER

8 COMPLAINTS ABOUT THAT DEAL?

9    **MR. LECLAIR:**  YOUR HONOR, NOBODY KNEW THIS.  NOBODY

10 HAD ANY IDEA UNTIL --

11    **THE COURT:**  WHEN I EXCLUDED COMPLAINTS -- IT SAYS:

12    "PLAINTIFFS MAY NOT INTRODUCE EVIDENCE RELATED

13 TO PLAINTIFFS' COMPLAINTS."

14    WHAT COMPLAINTS WERE -- DID LETTERS OR E-MAILS COME

15 IN ABOUT THIS?  NOT COME INTO THE EVIDENCE, BUT COME IN TO

16 PLAYERS INC OR SOMEBODY AT THE UNION ABOUT THIS DEAL WHEN IT --

17    **MR. LECLAIR:**  NO, YOUR HONOR.  LET ME EXPLAIN.  WE

18 SAID FROM THE BEGINNING -- OUR APPROACH TO TRIAL WAS WE ARE NOT

19 COMPLAINING ABOUT THE AD HOC MONEY, BECAUSE WE DIDN'T WANT IT

20 INJECTED IN THE CASE.  WE THOUGHT IT WAS GOING TO CONFUSE THE

21 JURY TO HAVE THEM HEAR ABOUT ALL THESE INDIVIDUAL DEALS WHEN WE

22 THINK THE CASE IS ABOUT GROUP MONEY.

23    BUT THEY, INSTEAD, THROUGH OPENING STATEMENT AND

24 THROUGH MR. ALLEN, HAVE INJECTED IT ALL INTO THE CASE OVER OUR

25 OBJECTION AND HAVE SAID:

 1              "WE WANT TO TELL THE JURY WE GOT $30 MILLION FOR

 2     RETIRED PLAYERS, AND WE GOT $7 MILLION FOR THE CLASS."

 3              AND WHEN THEY SAY THAT TO THE JURY, TO TIE OUR HANDS

 4     AND NOT LET US SAY:

 5              "WAIT A MINUTE, ALL THESE INDIVIDUAL DEALS,

 6     HERE'S ONE WHERE YOU WEREN'T ACTING IN THE BEST INTERESTS OF

 7     RETIRED PLAYERS."

 8          **THE COURT:**  OKAY.  LET'S FOCUS ON THAT POINT FOR A

 9     SECOND.

10          TELL ME THE POINT OF CONFLICT OF INTEREST THAT YOU

11     THINK THE E-MAILS SHOW.

12          **MR. LECLAIR:**  ALL RIGHT, YOUR HONOR.  IT SAYS:

13              "WE GOT YOU" -- THIS IS THE STATEMENT OF PLAYERS

14     INC TO EA.  IT SAYS:

15              "WE GOT YOU THESE PLAYERS FOR SUBSTANTIALLY

16     UNDER MARKET VALUE."

17          AND ANOTHER E-MAIL SAYS:

18              "MILLIONS LESS."  OR -- OR  "WOULD HAVE COST YOU

19     A MILLION.  INSTEAD, YOU GOT IT FOR CHEAP."

20          **THE COURT:**  WAIT.  THESE ARE STATEMENTS BY PLAYERS

21     INC, OR THIS IS SOME -- SOMETHING FROM SOMEBODY ELSE?

22          **MR. LECLAIR:**  NO, THEY ARE TWO DIFFERENT SETS OF

23     STATEMENTS.  SOME OF THEM ARE DIRECTLY BY CLAY WALKER, WHO WAS

24     THE BUSINESS EXECUTIVE WHO DID THIS DEAL AT PI.

25          AND THEN, THERE'S STATEMENTS BY CLAY WALKER A YEAR

1  LATER THAT CONFIRM WHAT HE DID AFTER HE LEFT PLAYERS INC.  AND

2  THERE'S A CONFIRMING E-MAIL FROM ANDY FEFFER -- FEFFER, WHO

3  REPLACED MR. WALKER WHO CONFIRMS AND ADOPTS MR. WALKER --

4          **THE COURT:**  ALL THESE PEOPLE WORK FOR THE DEFENDANTS?

5          **MR. LECLAIR:**  ALL WORK FOR THE DEFENDANTS.

6  MR. WALKER'S ONE E-MAIL WAS AFTER HE LEFT, BUT THAT E-MAIL WAS

7  THEN ADOPTED BY THE EMPLOYEES OF PLAYERS INC.  SO THEY ARE --

8  THIS CLEARLY IS AN ADMISSION, YOUR HONOR.

9          I DON'T THINK THERE IS ANY ISSUE UNDER HEARSAY.

10         **THE COURT:**  ALL RIGHT.  SO LET'S ASSUME FOR THE SAKE

11  OF ARGUMENT THAT THIS GETS INTO EVIDENCE.  HOW DOES THAT

12  RELATE, THEN, TO YOUR FIDUCIARY -- IN OTHER WORDS, THEY WERE

13  NOT PURPORTING TO ACT UNDER THE GLA IN THAT DEAL.  SO HOW DOES

14  THAT RELATE TO A FIDUCIARY DUTY THAT PERTAINS TO THE GLA?

15         **MR. LECLAIR:**  BECAUSE OUR THEORY IS, YOUR HONOR, THAT

16  INSTEAD OF DOING WHAT THEY DID, THEY SHOULD HAVE LICENSED OUR

17  GLA PEOPLE TO EA.

18         **THE COURT:**  THERE'S ONLY 17 OF THEM.

19         **MR. LECLAIR:**  YOUR HONOR, NO.  OUR THEORY IS THEY

20  SHOULD HAVE GIVEN THEM THE GROUP.  WHAT WAS HAPPENING WAS --

21         **THE COURT:**  GIVE THEM WHAT?

22         **MR. LECLAIR:**  THAT THEY SHOULD HAVE LICENSED TO EA

23  THE GROUP, THE GROUP THAT THEY REPRESENTED.

24         **THE COURT:**  BUT THERE WAS ONLY 17.

25         **MR. LECLAIR:**  NO, YOUR HONOR.  THEY REPRESENTED 2,000

1  GLA SIGNERS.

2  **THE COURT:**  THEY ONLY WANTED THE HALL OF FAMERS.

3  **MR. LECLAIR:**  YOUR HONOR, THEY COULD HAVE LICENSED

4  ANYBODY THEY WANTED TO.  THAT'S OUR THEORY OF THE CASE.  THEY

5  COULD HAVE LICENSED THEM EVERYBODY.  THEY NEVER TRIED TO DO

6  THAT.  THEY DIDN'T TRY TO LICENSE THE GLA MEMBERS.

7  AND WHAT THEY SHOULD HAVE DONE WAS THAT.  AND THAT'S

8  NOT WHAT THEY DID.  SO OUR THEORY IS THEY BREACHED THEIR

9  FIDUCIARY DUTY.

10  WHAT THEY REALLY DID, YOUR HONOR, WAS THEY

11  CHERRY-PICKED THE BEST PLAYERS, THE MOST VALUABLE PLAYERS TO

12  TRY TO KEEP A COMPETITOR OUT OF THE MARKET.

13  **THE COURT:**  BUT THE THING THAT WAS ON THE TABLE IN

14  THAT INSTANCE WAS THE HALL OF FAME, RIGHT?  WASN'T IT -- WHAT

15  WAS IT CALLED, DOUBLE DECK OR --

16  **MR. LECLAIR:**  TAKE 2.

17  **THE COURT:**  TAKE 2.  TAKE 2 WAS OUT THERE TRYING TO

18  SIGN UP THE HALL OF FAME PLAYERS.

19  **MR. LECLAIR:**  NO, YOUR HONOR.  THAT'S NOT CORRECT.

20  THEY WERE SIGNING UP RETIRED PLAYERS, GENERALLY.

21  AND WHAT THESE DEFENDANTS DID IS THEY SAID:

22  "OH, WE'VE GOT AN EXCLUSIVE."

23  AND INSTEAD OF LICENSING THEIR GLA GROUP, THEY GO OUT

24  AND FORM A DEAL TO PICK OFF THE MOST VALUABLE PLAYERS UNDER

25  MARKET AND SAY:

1    "WE'RE GOING TO LICENSE THEM, AND THEN THAT WILL

2  KEEP TAKE 2 OUT OF THE MARKET OF SIGNING UP RETIRED PLAYERS."

3  THAT'S WHY IT'S A BREACH OF FIDUCIARY DUTY AND WHY IT'S A

4  CONFLICT OF INTEREST.

5    THEY'RE WORKING FOR THEIR INTERESTS AND EA'S

6  INTERESTS AND AGAINST THE INTERESTS OF THE RETIRED PLAYERS.

7  THEY ARE NOT DOING WHAT'S IN THE BEST INTEREST OF THE GLA

8  GROUP.  IT'S CREDIBILITY, YOUR HONOR, FOR DOUG ALLEN, WHO SAID

9  HE HAD NO CONFLICT OF INTEREST, FOR JOEL LINZNER, WHO SAID HE

10  HAD NO CONFLICT OF INTEREST.

11    I'M SORRY.  JOEL LINZNER, WHO SAID EVERYTHING THEY

12  WANTED HIM TO SAY ABOUT WHAT HAPPENED WITH EA.

13    THE JURY IS ENTITLED TO KNOW WHAT REALLY HAPPENED

14  HERE.

15    **THE COURT:**  THAT LAST KIND OF ARGUMENT IS WHAT GETS

16  ME GOING.  YOU COULD MAKE THAT ARGUMENT TO JUSTIFY ANYTHING:

17    "THE JURY'S ENTITLED TO KNOW WHAT REALLY

18  HAPPENED HERE."

19    WE HAVE TO KEEP THE CASE IN SOME KIND OF REASONABLE

20  BOUNDS.  I'M TRYING TO FIGURE OUT HOW THIS SCREWS IN WITH THE

21  GLA.  SO --

22    **MR. LECLAIR:**  ALL RIGHT.  I UNDERSTAND, YOUR HONOR.

23    **THE COURT:**  -- YOU GOT ME SO OFF TRACK WHEN YOU MADE

24  THAT CRAZY REMARK.  I WANT TO GIVE YOU ANOTHER CHANCE.

25    SAY IT AGAIN WITH LASER-LIKE PRECISION, IF THAT IS

1    POSSIBLE.

2          LASER-LIKE PRECISION TELL ME HOW THE HALL OF FAME

3    E-MAILS RELATE TO THE GLA FIDUCIARY CLAIM.

4          **MR. LECLAIR:**  ALL RIGHT, YOUR HONOR.

5          THEY SIGNED UP 2,000 RETIRED PLAYERS WITH THE GLA.

6    THEY BECOME THEIR REPRESENTATIVE.  WHAT HAPPENS IS THEY DO AN

7    EXCLUSIVE DEAL AND CLAIM IT DOESN'T INCLUDE RETIRED PLAYERS,

8    DOESN'T INCLUDE OUR GLA CLASS.

9          THEY AND EA REALIZE THAT ALL OF A SUDDEN SOMEBODY

10   ELSE IS SIGNING UP RETIRED PLAYERS FOR A COMPETING GAME.  THEY

11   DON'T WANT THAT BECAUSE IT IS COMPETITION THAT MAY HURT THEIR

12   REVENUES.

13         **THE COURT:**  "THEIR" BEING?

14         **MR. LECLAIR:**  THEIR BEING PI'S REVENUES AND EA'S

15   REVENUES.  THEY'RE SAYING:

16              "THIS IS NOT GOOD FOR US."

17         BUT INSTEAD OF SAYING:

18              "WHY DON'T YOU TAKE ALL OF OUR GLA SIGNED UP

19   THAT WE ALREADY HAVE, AND PUT THEM IN THE GROUP?"

20         INSTEAD, WHAT THEY DO IS THEY SAY:

21              "LET'S GO OUT AND FORGE A DEAL UNDER MARKET FOR

22   A FEW OF THE MOST MARKETABLE PLAYERS, AND THE EFFECT WILL BE

23   WE'LL GET TAKE 2 TO BACK OFF SIGNING UP RETIRED PLAYERS."

24         THAT'S WHY IT'S A BREACH OF FIDUCIARY DUTY.  THAT'S

25   WHY IT SHOWS A CONFLICT OF INTEREST.  THEY WERE FAVORING

1   THEMSELVES AND EA OVER THE RETIRED PLAYERS.  AND IT DOES RELATE

2   TO THE GLA, BECAUSE THE CHOICE THEY HAD WAS:

3             "DO WE GIVE EA OUR GLA GROUP?  OR DO WE INSTEAD

4   GO OFF AND PICK OFF THE MOST VALUABLE RETIRED PLAYERS?"

5             OUR THEORY OF THE CASE IS THEY SHOULD HAVE LICENSED

6   OUR GROUP.  AND THEY DIDN'T DO IT, AND THAT'S WHY WE THINK IT'S

7   A BREACH OF FIDUCIARY DUTY.

8             **THE COURT:**  ALL RIGHT.  THANK YOU.

9             LET'S HEAR FROM MR. KESSLER.

10            **MR. KESSLER:**  YOUR HONOR, THIS IS SO FAR AFIELD FROM

11  ANYTHING HAVING TO DO WITH THE GLA.

12            **THE COURT:**  NO, WAIT A MINUTE.  BUT YOU YOURSELF -- I

13  HEARD YOU ASK ALL THESE QUESTIONS OF MR. ALLEN.  YOU HAVE LEFT

14  THE IMPRESSION WITH THE JURY THAT YOUR DEFENDANTS ARE OUT THERE

15  LOOKING OUT FOR THE INTERESTS OF THE RETIRED PLAYERS, AND

16  7 MILLION, 30 MILLION, ALL THESE AD HOC DEALS.

17            AND HERE'S ONE INSTANCE WHERE IT CAN BE ARGUED, CAN

18  BE ARGUED, THAT YOU DID NOT HAVE THE BEST INTERESTS OF THE

19  RETIRED PLAYERS, YOU SOLD THEM OUT CHEAP IN ORDER TO KEEP

20  SOMEBODY OUT OF THE MARKET.

21            **MR. KESSLER:**  YOUR HONOR, LET ME EXPLAIN TO YOU THE

22  ACTUAL EVIDENCE AND FACTS ABOUT THE HALL OF FAME DEAL, BECAUSE

23  YOU DIDN'T GET AN ACCURATE PICTURE, I'M AFRAID.

24            THE HALL OF FAME LICENSE WAS BETWEEN THE HALL OF FAME

25  ITSELF, AN INSTITUTION, AND EA.  IT WAS NOT A PLAYERS INC-EA

1  LICENSE AT ALL TO BEGIN WITH.  THEREFORE --

2          **THE COURT:**  WHERE DOES ALL THOSE E-MAILS COME FROM

3  THAT SAY 400 --

4          **MR. KESSLER:**  YOUR HONOR, IF YOU LET ME EXPLAIN ALL

5  THE FACTS --

6          **THE COURT:**  ALL RIGHT.

7          **MR. KESSLER:**  -- I WILL.

8          **THE COURT:**  ALL RIGHT.  GO AHEAD.  I WILL BE QUIET

9  AND LISTEN.

10          **MR. KESSLER:**  OKAY.  OKAY.  SO IT WAS -- WHAT

11  HAPPENED IS, THE HALL OF FAME WANTED TO LICENSE ONLY HALL OF

12  FAME PLAYERS.  SO AS YOUR HONOR CORRECTLY SAID, IT COULDN'T

13  INVOLVE THE WHOLE GROUP OF RETIRED PLAYERS UNDER THE GLA.

14  COULD HAVE NOTHING TO DO WITH THAT, BECAUSE IT WAS ONLY MEMBERS

15  OF THE HALL OF FAME, A VERY SELECT GROUP.

16          **THE COURT:**  SO THE HALL OF FAME WAS GOING TO PUT OUT

17  A VIDEO GAME.

18          **MR. KESSLER:**  NO, THEY WERE TO LICENSE EA TO PUT OUT

19  A VIDEO GAME.  SO HALL OF FAME HAS RIGHTS, AND THEY GIVE RIGHTS

20  TO EA, OKAY?

21          EA MAKES THE VIDEO GAME.

22          NOW, WHAT HAPPENED IS SOME OF THE PLAYERS, 17 OF

23  THEM, OKAY, WERE GLA MEMBERS, JUST HAPPENED TO BE.  BUT THIS

24  HAD NOTHING TO DO WITH THE GLA.

25          WHAT HAPPENS IS PLAYERS INC WAS IN THE MIDDLE, IN

1 EFFECT, SAYING:

2     "WELL, THE HALL OF FAME CAN GIVE THE RIGHTS TO

3 ITS NAME, ITS LOGO, 'HALL OF FAME,'" WHICH IT DID.

4    AND, BY THE WAY, SOME OF THAT $400,000 WAS FOR THE

5 LOGO.  IT WASN'T EVEN FOR THE PLAYER RIGHTS.

6    AND HALL OF FAME HAD THE RIGHTS ITSELF TO SOME OF THE

7 HALL OF FAME PLAYERS SIGNED UP, BUT THEY DIDN'T HAVE ALL.

8    SO PLAYERS INC HELPED THE HALL OF FAME AND EA GET

9 SOME OF THE PLAYERS --

10   **THE COURT:**  HOW MANY?

11   **MR. KESSLER:**  -- SIGNED UP.  I DON'T KNOW HOW MANY.

12 THERE'S NO EVIDENCE AS TO HOW MANY THEY HELPED GET.  BUT SOME

13 NUMBER THEY HELPED FACILITATE GETTING.

14    HALL OF FAME HAD SOME.  THEY HAD SOME.  AND IT WAS

15 ALL DONE THROUGH AD HOCS, OKAY?

16    AND THEN, THOSE PLAYERS SIGNED THOSE AD HOCS AND GAVE

17 THE MONEY -- THEY GOT THE MONEY.  THE MONEY WAS PAID TO HALL OF

18 FAME, OKAY?  AND THEN, ULTIMATELY TO THE PLAYER, FOR THE

19 PLAYER'S SHARE, SO THE PLAYERS GOT THE MONEY.

20    NONE OF THIS HAD ANYTHING TO DO WITH THE GROUP

21 LICENSING AUTHORIZATION.

22   **THE COURT:**  HERE'S THE PART I DON'T UNDERSTAND, 17

23 WAS MORE THAN SIX.  SO WHY DIDN'T YOUR CLIENT SAY:

24     "WELL, WE'VE ALREADY GOT 17 OF THESE PEOPLE

25 SIGNED UP.  WE'LL JUST RELY ON THE GLA"?

1    **MR. KESSLER:** WELL, YOUR HONOR, AGAIN, THIS IS THE

2  CLAIM THAT'S NOT IN THE CASE.  AND THIS IS VERY, VERY

3  IMPORTANT.

4        THERE IS NO CLAIM IN THIS CASE, AS HAS BEEN SAID

5  REPEATEDLY -- AND AS YOUR HONOR RULED, BECAUSE OTHERWISE WE'D

6  HAVE TO DECERTIFY THE CLASS -- THERE'S NO CLAIM IN THIS CASE

7  THAT BECAUSE IT WAS 17, WHICH WOULD BE A GROUP, IT SHOULD HAVE

8  BEEN PURSUANT TO THE GLA AND GONE INTO AN ESCROW ACCOUNT

9  INSTEAD OF JUST DOING AD HOC DEALS.

10        IF THAT WAS A CLAIM IN THIS CASE, THERE COULD BE NO

11  CLASS.  AND YOUR HONOR HAS CHASTISED ME FOR SUGGESTING THERE

12  COULD BE THAT CLAIM IN THIS CASE.

13        SO WE CAN'T CONFUSE THAT.  THERE COULD BE NO CLAIM IN

14  THIS CASE THAT THERE WAS SOMETHING WRONG IN USING AD HOCS FOR

15  THOSE 17S INSTEAD OF PUTTING THAT MONEY INTO THE ESCROW ACCOUNT

16  AND SAYING IT'S A GROUP LICENSE DEAL.

17        THAT'S JUST NOT A CLAIM HERE.

18        **THE COURT:** WELL, IT LOOKS LIKE THEY STIPULATED TO

19  SOMETHING SLIGHTLY DIFFERENT.

20        **MR. KESSLER:** YES.

21        **THE COURT:** THEY DON'T SEEK TO RECOVER MONEY PAID

22  UNDER THOSE AGREEMENTS, BUT THEY'RE NOT SAYING THAT THEY --

23  YOU'RE SAYING THAT'S DIFFERENT FROM SAYING THERE'S NOTHING

24  WRONG WITH IT.

25        **MR. KESSLER:** NO, YOUR HONOR SAID THERE WAS NOTHING

1  WRONG WITH IT.

2          YOUR HONOR SAID IN --

3          **THE COURT:**  I DON'T REMEMBER SAYING THAT.

4          **MR. KESSLER:**  OKAY.  WELL, CAN WE GET THE COURT'S

5  RULING ON REJECTING THE DECERTIFICATION?

6          IN THE DECERTIFICATION WE ARGUED THAT WE THOUGHT YOUR

7  HONOR WAS SUGGESTING IN THE SUMMARY JUDGMENT OPINION, AS YOUR

8  HONOR FRANKLY SUGGESTED YESTERDAY, THAT THERE COULD BE SOME

9  CLAIM BASED ON IF THERE'S A GROUP OF PLAYERS, 17 PLAYERS, THAT

10  THAT SHOULD HAVE BEEN, INSTEAD OF PAYING THOSE PLAYERS A

11  HUNDRED PERCENT OF THE MONEY, THAT THAT SHOULD HAVE BEEN PUT

12  INTO AN ESCROW ACCOUNT.

13          AND WE POINTED OUT THAT CLAIM WOULD CREATE A CONFLICT

14  BETWEEN THE CLASS, BECAUSE THAT WOULD MEAN ALL THE PARTIES TO

15  THE AGREEMENT, MR. ADDERLEY, FOR EXAMPLE WITH US, WE BREACHED

16  THE AGREEMENT BY GIVING HIM ALL OF HIS MONEY; THAT MONEY SHOULD

17  HAVE GONE INTO AN ESCROW ACCOUNT.

18          AND BECAUSE OF THAT, THEY'VE REPEATEDLY DENIED THAT

19  CLAIM, NOT JUST IN THE STIPULATION, BUT THEY'VE REPEATEDLY

20  DENIED IT IN THEIR OWN -- WE HAVE INTERROGATORY ANSWERS,

21  REQUESTS TO ADMIT.  AND WHAT YOUR HONOR -- THIS IS THE

22  INTERROGATORY I ASKED.  WE ASKED:

23              "DO PLAINTIFFS CONTEND THAT THE MONEY RECEIVED

24  BY ADDERLEY FROM DEFENDANTS FOR LICENSING HIS IMAGE SHOULD HAVE

25  BEEN PROVIDED TO PROVIDE A SHARE OF THAT MONEY TO OTHER RETIRED

1    NFL PLAYERS WHO HAD SIGNED GLAS?"

2         AND THEIR ANSWER IS:

3              "TO THE EXTENT THAT DEFENDANTS ARE REFERRING TO

4    THE MONEY -- THE AMOUNTS OF MONEY PAID TO ADDERLEY PURSUANT TO

5    AD HOC AGREEMENTS, PLAINTIFFS DO NOT CONTEND, DO NOT CONTEND

6    THAT SUCH AMOUNTS SHOULD HAVE BEEN DIVIDED.  THE ACTIONS OF THE

7    DEFENDANTS MAKE CLEAR THAT SUCH AMOUNTS, THE AD HOC AMOUNTS,

8    ARE IN ADDITION TO AMOUNTS PAID FOR THE GRANTING OF RIGHTS

9    PURSUANT TO THE GLA AND REFLECT THE ADDITIONAL EFFORTS OF THE

10   INDIVIDUAL INVOLVED."

11        SO THEY MADE IT A HUNDRED PERCENT CLEAR -- AND

12   THEY'VE DONE THIS REPEATEDLY -- THEY'RE NOT ADVANCING ANY CLAIM

13   THAT THE AMOUNTS, FOR EXAMPLE, THOSE 17, SHOULD HAVE BEEN

14   DIVIDED INTO AN ESCROW ACCOUNT.

15        THAT'S PRECISELY THE PROBLEM.  AND THAT'S WHY YOUR

16   HONOR, I BELIEVE, GRANTED THE IN LIMINE.

17        WHAT THE JURY IS GOING TO THINK, EVEN AS YOUR HONOR

18   MIGHT THINK, MAYBE THERE'S A CLAIM ABOUT THAT.  BUT THEY WON'T

19   MAKE THAT CLAIM, AND IT'S NOBODY'S FAULT.  THEY HAVE JUST

20   CHOSEN NOT TO AS CLASS COUNSEL TO MAKE THAT CLAIM.

21        AND I BELIEVE IF THEY MADE IT THAT IT WOULD CREATE A

22   CONFLICT WITHIN THE CLASS, SO THEY COULDN'T DO THAT.

23        THEY MAYBE SHOULD HAVE ASKED FOR DIFFERENT CLASSES,

24   OR WHATEVER.  BUT THE POINT IS YOU CAN'T HAVE THAT CLAIM IN

25   THIS CASE.

1    AND THE JURY IS GOING TO THINK THAT'S A CLAIM.  AND

2  SO WE BELIEVE, YOUR HONOR --

3    **THE COURT:**  THAT PART WE COULD SOLVE WITH A

4  CAUTIONARY INSTRUCTION.

5    **MR. KESSLER:**  OKAY.  BUT, YOUR HONOR, THEN WE GO:

6  WHAT'S THE RELEVANCE OF THIS?  SINCE THIS HALL OF FAME --

7    **THE COURT:**  WELL, HERE'S THE RELEVANCE.  THE

8  RELEVANCE MAY BE -- AT LEAST IT'S TENDERED TO ME AS THE

9  ARGUMENT -- THAT THIS SHOWS THAT YOUR CLIENTS WERE WILLING TO

10  SELL OUT THE RETIRED PLAYERS IN ORDER TO KEEP SOMEBODY OUT OF

11  THE MARKET AND DO A FAVOR TO EA AND DID NOT REALLY HAVE THE

12  BEST INTERESTS OF RETIRED PEOPLE AT HEART, AND THAT THEY SHOULD

13  HAVE OFFERED THE ENTIRE GROUP OF GLA'S.

14    NOW, YOU KNOW, IT'S A STRETCH TO SAY --

15    **MR. KESSLER:**  OKAY.

16    **THE COURT:**  -- THAT'S THEIR ARGUMENT.  IT'S A STRETCH

17  TO SAY --

18    **MR. KESSLER:**  BUT, YOUR HONOR, LET'S GO INTO WHAT

19  THEY DID.  THE E-MAILS COME FROM MR. CLAY WALKER.  THEY CHOSE

20  TO NEVER DEPOSE MR. CLAY WALKER.

21    **THE COURT:**  THEY GOT SOMEBODY HERE --

22    **MR. KESSLER:**  NO.  NO, THEY DON'T.  I WANTED TO GET

23  TO THAT.  MR. NAHRA WAS NOT INVOLVED IN ANY OF THE DISCUSSIONS

24  ABOUT THE NEGOTIATIONS FOR THE MONEY.  SO ALL THEY COULD DO FOR

25  HIM -- THIS IS VERY IMPORTANT, YOUR HONOR -- IS, YES, HE WAS

THE LAWYER WHO WAS NEGOTIATING THE LANGUAGE OF THE EA

AGREEMENT.

HE HAD NOTHING TO DO WITH THE ISSUE OF HOW MUCH MONEY

WAS PAID OR ANYTHING.  SO HE'S A CC ON AN E-MAIL, BUT HE COULD

OFFER NOTHING SUBSTANTIVELY ABOUT THOSE NEGOTIATIONS WITH EA OR

THE HALL OF FAME.

SO WHAT WE'RE GOING TO HAVE IS JUST LAWYERS' ARGUMENT

ABOUT A STATEMENT FROM A WITNESS WHO'S NOT HERE, WHERE THEY'RE

GOING TO ARGUE:

"OH, YES.  THIS IS WHAT'S GOING TO MEAN."

THEY HAVE NO WITNESS.  AND MR. FEFFER, THEY SAY,

ADOPTED THIS.  THEY DIDN'T CHOOSE TO DEPOSE MR. FEFFER.  SO

THEY DIDN'T RAISE THIS ISSUE BEFORE TO ASK ANYONE FROM EA ABOUT

THIS.

SO WHAT WE'RE GOING TO GET TO THE JURY IS THESE THREE

E-MAIL SNIPPETS, NO CONTEXT, NO ARGUMENT, RELATING TO THE HALL

OF FAME WHO CANNOT USE ALL THE GLA MEMBERS, ONLY HALL OF FAME

MEMBERS WHO ALREADY HAD SOME HALL OF FAME MEMBERS SIGNED UP, SO

THE LEAST CONTEXT.

AND THEN, THE REALITY IS, YOUR HONOR -- LET'S GO TO

WHAT THE FACTS WOULD BE.

THE FACTS ARE THIS CAME UP BECAUSE EA PAID 400,000 TO

THE HALL OF FAME, AND WAS COMPLAINING, NOT THAT THEY PAID TOO

LITTLE, WAS COMPLAINING:

"WE PAID TOO MUCH," OKAY?

1  AND WAS ASKING THE PLAYERS INC:

2  "WE THOUGHT YOU WERE GOING TO GIVE US SOME OF

3  THIS MONEY TO SUPPORT US IN DOING THIS, BECAUSE YOU WANTED US

4  TO HELP OUT THE HALL OF FAME."

5  AND PLAYERS INC SAYS:

6  "NO, THAT WASN'T THE DEAL."

7  THIS HAD NOTHING TO DO WITH THE BELOW-MARKET DEAL,

8  BUT THERE'S NO EVIDENCE OF THESE FACTS. THERE'S NO WITNESSES

9  ABOUT THIS. IT SHOULDN'T BE IN THE CASE. IT'S THE CLASSIC 403

10  DIVERSIONARY SIDESHOW.

11  AND NO MATTER WHAT INSTRUCTIONS YOUR HONOR GIVES, THE

12  JURY IS STILL GOING TO BE CONFUSED.

13  **THE COURT:** YOU BROUGHT UP ALL THESE AD HOCS.

14  **MR. KESSLER:** YOUR HONOR, FIRST OF ALL, WE NEVER

15  MENTIONED THE HALL OF FAMERS, YOUR HONOR.

16  **THE COURT:** YOU DID NOT, BUT YOU LEFT THE IMPRESSION

17  THAT YOU'RE OUT THERE LOOKING OUT FOR THE BEST INTEREST OF

18  RETIRED PEOPLE THROUGH AD HOCS.

19  **MR. KESSLER:** YOUR HONOR, IF YOU LOOK AT WHAT

20  HAPPENED IN OPENING STATEMENT, IN OPENING STATEMENT THEY RAISED

21  THE AD HOCS FIRST.

22  **THE COURT:** THAT'S BECAUSE THEY KNEW YOU WERE GOING

23  TO RAISE IT.

24  **MR. KESSLER:** THAT'S BECAUSE YOUR HONOR SAID -- AND

25  YOUR HONOR PROPERLY NOTED BEFORE -- AD HOCS CAN'T BE IGNORED

1 HERE BECAUSE AD HOCS WERE -- IN FACT, WHAT HAPPENED IS, AS YOU

2 HEARD THE TESTIMONY, PLAYERS INC WOULD SAY:

3 "WE TRIED TO SELL RETIRED PLAYERS, AND THE ONLY

4 THING LICENSEES WANTED WAS SMALL GROUPS OF PLAYERS, MANY OF

5 WHOM DIDN'T SIGN GLA'S, SO THEY HAD TO DO AD HOCS."

6 THEY HAVE TO EXPLAIN THAT PROCESS, THAT PROCESS, TO

7 SHOW, YES, THEY WEREN'T IN BAD FAITH. BECAUSE WHAT YOU HEARD

8 MR. PARCHER SAY IN OPENING:

9 "THEY NEVER DID ANYTHING. THEY NEVER SPOKE TO

10 ANYONE. THEY NEVER DID ANYTHING FOR RETIRED PLAYERS."

11 AND BROUGHT IN THE BROTHERHOOD, AND EVERYTHING ELSE.

12 SO WE HAD NO CHOICE, YOUR HONOR, BUT TO SAY:

13 "YES, WE TRIED TO DO RETIRED PLAYER MARKETING.

14 AND THE ONLY DEALS PEOPLE ARE INTERESTED IN ARE AD HOCS."

15 AND THAT WAS -- WE AGREE THAT IS EVIDENCE TO NEGATE

16 HIS CHARGE THAT WE TRIED TO DO NOTHING. BUT IT SHOULDN'T, YOUR

17 HONOR, GO TO THEM PUTTING IN THIS SIDESHOW ABOUT THIS AGREEMENT

18 THAT'S A HALL OF FAME LICENSE.

19 THEY MIGHT HAVE HAD SOME SLENDER ARGUMENT IF IT WAS A

20 PLAYERS INC LICENSE. BUT IT'S NOT EVEN A PLAYERS INC LICENSE.

21 IT'S A HALL OF FAME LICENSE, AND IT COULD NEVER INVOLVE THE

22 GROUP BECAUSE IT ONLY COULD BE HALL OF FAME PLAYERS.

23 **THE COURT:** BUT YOU SAID THAT YOUR PEOPLE WENT OUT

24 AND FACILITATED GETTING THE HALL OF FAME PLAYERS TO SIGN UP.

25 **MR. KESSLER:** ALL WE DID IS WE HELPED THE HALL OF

1  FAME AND EA CONTACT SOME OF THE PLAYERS AND DO THIS.

2           WE WEREN'T PARTIES EVEN.  WE -- THIS WAS NOT ONE LIKE

3  THE OTHER AD HOCS.

4           THE OTHER THING -- THIS IS IMPORTANT, YOUR HONOR.

5       **THE COURT:**  IF YOU DID SO LITTLE, HOW COME EA OWED

6  YOU A FAVOR?

7       **MR. KESSLER:**  THEY DIDN'T OWE US A FAVOR.

8       **THE COURT:**  THAT'S WHAT THE E-MAIL SAYS.  THEY OWED

9  YOU A FAVOR.

10      **MR. KESSLER:**  I GUESS BECAUSE WE WEREN'T A PARTY TO

11  THE AGREEMENT, WE HELPED THEM GET PLAYERS, OKAY.

12           THIS WAS, BY THE WAY, A STATEMENT OF A FORMER

13  EMPLOYEE WHO SAID THAT.

14      **MR. LECLAIR:**  YOUR HONOR --

15      **THE COURT:**  MR. LECLAIR, PLEASE SIT DOWN NOW.

16      **MR. KESSLER:**  IT WAS A STATEMENT OF A FORMER EMPLOYEE

17  WHO'S TRYING TO SAY:

18           "WELL, WHY DON'T YOU SAY THIS TO EA AS TO WHY WE

19  DON'T OWE THEM MONEY?"

20           BECAUSE THEY WERE ASKING US FOR MORE MONEY IN THIS

21  CONTEXT.  THEY WERE SAYING:

22           "COULD YOU GIVE US BACK SOME MONEY?  WE THOUGHT

23  WHEN WE DID THE HALL OF FAME DEAL YOU HAD INDICATED YOU HELPED

24  SUPPORT US WITHOUT MONEY."

25           WE'RE SAYING:

1          "NO, WE DIDN'T AGREE TO GIVE YOU MONEY."

2          BUT, YOUR HONOR, HERE'S THE REAL POINT.  WHEN WE TALK

3  ABOUT THE AD HOCS, WE HAVE NEVER ARGUED TO THE JURY, WE'VE

4  NEVER PRESENTED ANY EVIDENCE SAYING THE AMOUNT OF THE AD HOCS

5  IS FAIR OR THE AMOUNT OF THE AD HOCS IS MARKET PRICE.

6          IN OTHER WORDS, WE DIDN'T COME IN AND SAY:

7          "IS THE AD HOC MONEY EVIDENCE THAT IT IS A FAIR

8  AMOUNT OF MONEY?"

9          THAT'S WHAT THEY'RE CHALLENGING.  THEY'RE SAYING IN

10  THIS PARTICULAR AD HOC THE AMOUNT OF MONEY SHOULD HAVE BEEN

11  HIGHER WHEN THEY HAD NO DAMAGE CLAIM FOR IT, WHEN IT'S A HALL

12  OF FAME DEAL, WHEN THE CONTRACT IS -- THE 400,000 -- AND THIS

13  IS CRITICAL, MAYBE THE MOST CRITICAL, MOST CRITICAL.

14          **THE COURT:**  YOU SAID THAT SEVERAL TIMES.

15          **MR. KESSLER:**  I THINK AS I'M GOING.  THE 400,000 AND

16  THE OTHER AMOUNT IS AGREED TO BETWEEN THE HALL OF FAME AND EA.

17  IN OTHER WORDS, THAT'S WHERE THE 400,000 GOES THROUGH.

18          SO, YES, WE WERE INVOLVED IN FACILITATING THE

19  TRANSACTION.  BUT TO PUT US IN AND TO SAY THAT WE ARE

20  RESPONSIBLE FOR THAT NEGOTIATION BETWEEN THE -- HALL OF FAME IS

21  A SEPARATE COMPANY.  THEY ARE NOT IN THIS CASE.

22          **THE COURT:**  ALL RIGHT.  LET ME -- MR. LECLAIR, I'LL

23  GIVE YOU ONE MINUTE.

24          **MR. LECLAIR:**  YOUR HONOR, I DON'T SAY THIS LIGHTLY,

25  BUT HE IS MISREPRESENTING SOMETHING TO THE COURT, AND I DON'T

1   LIKE IT.  HE SAID THEY WERE NOT A PARTY TO THE AGREEMENT.

2          THAT'S WHAT MR. KESSLER JUST SAID.  THAT IS

3   ABSOLUTELY FALSE.  HE KNOWS IT'S FALSE.  THEY ARE A PARTY.  HE

4   IS LOOKING AT IT RIGHT NOW.  THEY ARE A PARTY TO THIS

5   AGREEMENT.

6          AND WHY ARE THEY INVOLVED, YOUR HONOR?  THIS IS

7   WHAT'S SO AMAZING TO ME.  THEY ARE INVOLVED BECAUSE THEY PUT A

8   PROVISION IN THEIR LICENSE AGREEMENT THAT SAYS THAT EA CANNOT

9   APPROACH ANY PLAYER WHO WAS EVER IN THE NATIONAL FOOTBALL

10  LEAGUE.  THEY HAVE TO GO THROUGH PLAYERS INC.

11         THEY ARE THE ONLY PERSON --

12         **THE COURT:**  WHICH AGREEMENT?

13         **MR. LECLAIR:**  IN THE EA LICENSE AGREEMENT, AND EVERY

14  LICENSE AGREEMENT THEY INSERT A PROVISION THAT SAYS THAT THE

15  LICENSEE CANNOT TALK TO OR APPROACH ANY PLAYER WHO EVER PLAYED

16  IN THE NATIONAL FOOTBALL LEAGUE.  THAT'S WHY --

17         **THE COURT:**  THE $25 MILLION DEAL HAS THAT?

18         **MR. LECLAIR:**  YES, IT DOES.

19         **THE COURT:**  YOU NEVER BROUGHT THAT TO ANYONE'S

20  ATTENTION.

21         **MR. LECLAIR:**  WELL, THEN WE SHOULD AND WE WILL.

22         **MR. KATZ:**  IT'S COMING.

23         **MR. LECLAIR:**  IT'S COMING, YOUR HONOR.

24         OKAY. AND, NOW, THE SECOND THING THEY MISREPRESENTED

25  IS HE SAID THIS LAWYER, MR. NAHRA, DIDN'T HAVE ANYTHING TO DO

1   WITH THE NEGOTIATION.

2        I WANT TO READ THE E-MAIL FROM ANDY FEFFER, WHO IS

3   THEIR CLIENT, THEIR WITNESS, EXHIBIT 522.

4        HE SAYS, QUOTE:

5        "I CAN TELL YOU THAT CLAY AND JOE'S" -- JOE IS

6   MR. NAHRA -- "CLAY AND JOE'S NEGOTIATION OF THESE DISCOUNTED

7   TERMS WAS A SIGNIFICANT CONTRIBUTION TO EA, AS YOU MORE THAN

8   LIKELY WOULD HAVE PAID IN EXCESS OF $1 MILLION FOR THESE RIGHTS

9   WITHOUT THEIR INVOLVEMENT AND ASSISTANCE."

10       I'M SORRY, YOUR HONOR, I GET WORKED UP.  I APOLOGIZE.

11       (LAUGHTER)

12       **MR. KATZ:**  IT'S HIS MOST CRITICAL POINT.

13       (LAUGHTER)

14       **MR. LECLAIR:**  BUT MR. NAHRA IS IN THE BIG FAT MIDDLE

15   OF THIS.  FOR THEM TO SAY HE HAD NOTHING TO DO WITH THIS IS AN

16   OUTRAGE, YOUR HONOR.

17       IT'S AN OUTRAGE, REALLY.  SO IT IS HIGHLY RELEVANT.

18       WE DID NOT CLAIM THAT MR. ADDERLEY HAS TO GIVE BACK

19   HIS MONEY.  THAT'S WHAT WE'VE SAID CONSISTENTLY.

20       WHAT WE SAY IS:  THEY SHOULD HAVE GIVEN US THE GROUP

21   MONEY.  THAT'S OUR CLAIM.

22       **THE COURT:**  THERE WASN'T ANY GROUP MONEY HERE.

23       **MR. LECLAIR:**  THERE WAS GROUP MONEY, YOUR HONOR.

24   THIS IS WHERE MAYBE WE HAVEN'T COMMUNICATED WELL WITH YOUR

25   HONOR.

1    THERE WAS A TON OF GROUP MONEY.  THEY JUST DIDN'T

2 SHARE IT WITH US.  THEY CALL IT "ACTIVE PLAYER MONEY."  BUT WE

3 SAY IT'S GROUP MONEY, AND IT SHOULD HAVE BEEN SHARED WITH OUR

4 CLIENTS.  THAT'S OUR THEORY OF THE CASE.

5    **THE COURT:**  WELL, THAT ASSUMES THE JURY IS GOING TO

6 GO WITH YOU ON THE MEANING OF THIS CONTRACT.

7    **MR. LECLAIR:**  ACTUALLY, YOUR HONOR --

8    **THE COURT:**  THAT'S THE CONTRACT THEORY.  I THOUGHT

9 YOU WERE TALKING ABOUT THE BREACH OF FIDUCIARY THEORY.

10    **MR. LECLAIR:**  YOUR HONOR, OUR THEORY -- WE HAVE

11 DIFFERENT THEORIES OF CONTRACT, AND MAYBE THIS IS NOT THE BEST

12 TIME TO GO INTO ALL OF THAT.  BUT WE DON'T HAVE TO -- WE SAY:

13    "SIX OR MORE MEANS SIX OR MORE, PRESENT OR

14 FORMER."

15    AND IF THEY DO A GROUP LICENSE, SIX OR MORE, PRESENT

16 OR FORMER, WE'RE ENTITLED TO SHARE IN THE MONEY.  THAT'S WHAT

17 HAPPENED.  THAT'S WHAT ALL THESE LICENSES ARE.

18    AND WE SHOULD HAVE SHARED IN THE GROUP MONEY.

19    **THE COURT:**  EVEN IF IT'S ALL ACTIVE.

20    **MR. LECLAIR:**  EVEN IF IT'S ALL ACTIVE.

21    WE ALSO SAY THAT IF THERE'S SIX OR MORE RETIRED

22 PLAYERS IN THE -- IN THE GROUP OF PEOPLE THEY USE IN THE

23 PRODUCT, WE'RE ENTITLED TO SHARE IN THE GROUP MONEY BECAUSE,

24 THAT'S WHAT THE RETIRED PLAYER GLA SAYS.

25    SO WE -- WE'RE ENTITLED TO SHARE IN THE MONEY

1  UNDER -- THE THEORY THAT WE'RE IN THE LICENSE IS ONE THEORY.

2  BUT IT'S NOT OUR ONLY THEORY, YOUR HONOR.  WE'RE ENTITLED TO

3  SHARE IN THE GROUP MONEY BECAUSE THEY WROTE THIS CONTRACT AND

4  SAID "SIX OR MORE, PRESENT OR FORMER."

5            THAT'S OUR THEORY OF THE CASE.

6            **THE COURT:**  LET'S GO THROUGH THESE E-MAILS ONE AT A

7  TIME, AND I WANT TO UNDERSTAND HOW YOU WOULD EVEN GET THEM INTO

8  EVIDENCE.

9            **MR. LECLAIR:**  ALL RIGHT.  I'M HAPPY TO DO SO.

10           **THE COURT:**  LET'S TAKE A LOOK AT 5 --

11           **MR. LECLAIR:**  521?

12           **THE COURT:**  521.  THIS IS AN E-MAIL -- I CAN'T TELL

13  WHO IT'S FROM.  JOE NAHRA.  ALL RIGHT.  HE'S HERE IN THE

14  COURTROOM.

15           **MR. KESSLER:**  WHICH ONE, YOUR HONOR?  BECAUSE THERE'S

16  THREE.

17           **MR. LECLAIR:**  THE TOP E-MAIL IS FROM JOE NAHRA.

18           **THE COURT:**  WHO IS PAUL CAIRNS?

19           **MR. LECLAIR:**  PAUL CAIRNS IS WITH EA.  I CAN TAKE IT

20  E-MAIL BY E-MAIL IF YOU'D LIKE, YOUR HONOR.

21           **THE COURT:**  JUST A SECOND.  I'M LOOKING AT 521 NOW.

22           IS IT YOUR VIEW THAT JOE NAHRA RECEIVED ALL OF THESE?

23           **MR. LECLAIR:**  ABSOLUTELY, YOUR HONOR.

24           **THE COURT:**  WHO IS CLAY WALKER?  WHO DID HE WORK FOR?

25           **MR. LECLAIR:**  CLAY WALKER WAS THE KEY BUSINESS

EXECUTIVE, A SENIOR VICE PRESIDENT OF MARKETING FOR PLAYERS

INC.

THE ONE E-MAIL IN HERE THAT HE WROTE AFTER THE TIME

WAS THIS E-MAIL IN 521.  BUT, YOUR HONOR, IT IS ADMISSIBLE

UNDER 801(D)(2)(B) AND (C.)

**THE COURT:**  801 WHAT?

**MR. LECLAIR:**  (D).

**THE COURT:**  ALL RIGHT.  (2).

**MR. LECLAIR:**  (2)(B) AND (C).

**THE COURT:**  (B) IS ADOPTION AND (C) IS --

**MR. LECLAIR:**  IS AUTHORIZATION.

**THE COURT:**  "AUTHORIZED BY THE PARTY TO MAKE A

STATEMENT CONCERNING THE SUBJECT."

**MR. LECLAIR:**  OKAY.

**THE COURT:**  LET'S -- WHAT IS THE SEQUENCE OF THIS

E-MAIL CHAIN?  WHICH ONE CAME FIRST?

**MR. LECLAIR:**  ALL RIGHT.  THE BOTTOM E-MAIL ON THIS

ONE, YOUR HONOR, IF YOU LOOK AT THE VERY BOTTOM, IT'S AN E-MAIL

FROM JOE NAHRA TO CLAY WALKER.

IT SAYS:

"CAN YOU PLEASE PUT YOUR PI HAT BACK ON, AND

PROVIDE SOME INSIGHT HERE?"

THAT IS AN AUTHORIZATION BY JOE NAHRA AT PI TO

MR. WALKER TO COMMUNICATE ON THIS SUBJECT, WHICH HE THEN DOES.

**MR. KESSLER:**  MR. WALKER WAS NOT AN EMPLOYEE AT THAT

1  TIME.

2       **MR. LECLAIR:**  I UNDERSTAND, YOUR HONOR.  THAT'S WHY

3  IF HE WAS AN EMPLOYEE THERE WOULDN'T BE ANY QUESTION.

4       **THE COURT:**  BUT MR. NAHRA DOES SAY:

5           "PUT HIS PI HAT BACK ON."

6       **MR. LECLAIR:**  RIGHT.  THAT'S WHY IT FITS UNDER

7  801(D)(2)(B) --

8       **MR. KESSLER:**  YOUR HONOR --

9       (COUNSEL SPEAKING SIMULTANEOUSLY, WHICH WAS NOT

10  REPORTABLE.)

11       **MR. LECLAIR:**  (C).

12       **MR. KESSLER:**  WE WOULD DISAGREE.  WHAT HE WAS SIMPLY

13  SAYING WAS A COLLOQUIAL PHRASE:   I DON'T KNOW ANY FACTS ABOUT

14  THIS, CLAY.  WOULD YOU THINK BACK TO WHEN YOU USED TO WORK AT

15  PI AND GIVE ME SOME FACTS?

16       BUT IT'S STILL HEARSAY FROM SOMEONE ELSE.

17       **THE COURT:**  YOU'RE INTERRUPTING MR. LECLAIR.

18       GO AHEAD, MR. LECLAIR.

19       **MR. LECLAIR:**  THE SECOND REASON THIS E-MAIL IS

20  ADMISSIBLE, YOUR HONOR, IS BECAUSE IT WAS ADOPTED.  AND THAT IS

21  IN EXHIBIT 522.

22       IF YOU LOOK AT EXHIBIT 522, THE TOP E-MAIL -- I'M

23  SORRY.  LET ME MAKE SURE.

24       YES.  THE TOP E-MAIL ON EXHIBIT 522 IS FROM ANDY

25  FEFFER TO PAUL CAIRNS AT EA.

1    ANDY FEFFER WAS MR. WALKER'S REPLACEMENT AT PLAYERS

2  INC.  MR. FEFFER, IN HIS E-MAIL, AT ABOUT THE MIDDLE OF

3  THE E-MAIL -- ALL RIGHT.  I'M SORRY -- AT THE START OF THE

4  E-MAIL SAYS:

5    "UNFORTUNATELY, I'M NOT IN A POSITION WHERE I

6  CAN ASSIST YOU WITH THIS.  I HAVE EXHAUSTIVELY REVIEWED THE

7  ISSUES WITH CLAY, JOE, OUR COUNSEL AND SEVERAL OTHERS."

8    AND THEN, HE GOES ON TO PARROT WHAT MR. CLAY WALKER

9  HAS SAID.  SO HE IS ADOPTING WALKER'S EXPLANATION.  THEY ARE

10  NOT DISAVOWING IT.  THEY'RE ADOPTING IT.  THAT'S WHY IT'S

11  ADOPTED AND AUTHORIZED, YOUR HONOR.

12    **MR. KESSLER:**  YOUR HONOR, THIS IS NOT AN ADOPTION OF

13  THE PRIOR E-MAIL.  I AGREE THAT MR. -- THERE'S AN -- IN OTHER

14  WORDS, MR. FEFFER MADE A STATEMENT HERE.  BUT THAT'S NOT AN

15  ADOPTION OF THE -- THERE IS NO REFERENCE TO THE PRIOR E-MAIL.

16  IT JUST SAYS, "I'VE SPOKEN..."  THIS IS DIFFERENT WORDS AND

17  DIFFERENT LANGUAGE AND DIFFERENT INFORMATION.

18    SO I DON'T THINK 522 HELPS 521.

19    **MR. LECLAIR:**  MR. NAHRA WILL TESTIFY THAT MR. FEFFER

20  GOT HIS FACTS FROM CLAY WALKER.  THAT'S WHAT HE TESTIFIED.

21    **THE COURT:**  521, THE DATE OF THAT IS NOVEMBER 1 AT

22  THE TOP.  AND THE 522 IS ALSO NOVEMBER 1.  AND IT'S A COUPLE OF

23  HOURS LATER.

24    **MR. LECLAIR:**  IN OTHER WORDS, YOUR HONOR --

25    **THE COURT:**  WAIT.  DOES HE ATTACH THE E-MAIL FROM --

1    **MR. LECLAIR:** HERE'S THE SEQUENCE, YOUR HONOR.

2  MR. WALKER WRITES HIS E-MAIL -- IN 521, MR. WALKER WRITES HIS

3  E-MAIL ON FEBRUARY 20TH, 2007.

4         ON NOVEMBER 1ST, 2007, MR. NAHRA FORWARDS IT TO ANDY

5  FEFFER, FORWARDS THE VERY E-MAIL IN QUESTION TO ANDY FEFFER.

6  OKAY?

7         THEN, ON THE SAME DAY, ABOUT AN HOUR LATER,

8  MR. FEFFER WRITES HIS E-MAIL AND SAYS:

9              "I'VE REVIEWED THE ISSUES WITH CLAY AND JOE,"

10  AND MR. NAHRA WILL TESTIFY HE THINKS THAT HE GOT IT, THIS

11  INFORMATION, FROM THE E-MAIL.

12         SO THEY HAVE ADOPTED IT, YOUR HONOR.  THAT'S THE

13  SEQUENCE OF EVENTS.

14         MR. FEFFER IS ADOPTING THE E-MAIL OF MR. WALKER.

15    **MR. KESSLER:** AND, YOUR HONOR, JUST TO RESPOND TO

16  THAT, FOR EXAMPLE, THERE'S NO REFERENCE IN THE E-MAIL OF

17  MR. FEFFER THAT "I'M LOOKING TO TAKE 2."

18         THERE IS NO REFERENCE IN THIS E-MAIL TO A LOT OF THE

19  THINGS IN THAT PREVIOUS E-MAIL.

20         THE MERE FACT THAT HE SENT AN E-MAIL BASED ON

21  INFORMATION FROM SOMEONE ELSE IS NOT AN ADOPTION UNDER THE

22  RULE.

23         AN ADOPTION UNDER THE RULE IS YOU LITERALLY TAKE THAT

24  AND ADOPT IT.  THERE'S NO ADOPTION HERE.

25    **MR. LECLAIR:** YOUR HONOR, I'VE GOT SOME CASES ON

1  THIS, IF YOUR HONOR IS INCLINED TO LOOK FURTHER INTO THIS.

2          **MR. KESSLER:**  MR. CLAY'S E-MAIL WAS NEVER FORWARDED

3  OUTSIDE THE COMPANY, THIS PARTICULAR ONE.  THAT'S THE KEY.

4          IF THEY FORWARDED MR. -- IF THEY FORWARDED

5  MR. WALKER -- MR. WALKER.  IF THEY FORWARDED CLAY WALKER'S

6  E-MAIL OUTSIDE THE COMPANY THEY WOULD HAVE AN ADOPTION

7  ARGUMENT.  THAT WAS NOT DONE FOR THIS PARTICULAR E-MAIL FOR

8  521.

9          **THE COURT:**  BUT WHEN MR. JOE NAHRA SENT IT TO

10  MR. FEFFER.

11          **MR. KESSLER:**  WHO IS INTERNAL.

12          **THE COURT:**  YES, BUT WHY DOES THAT MATTER?  HE'S

13  SENDING IT ON TO FEFFER FOR HIS INFORMATION.  WHY WOULD HE BE

14  SENDING BOGUS INFORMATION TO MR. FEFFER?

15          **MR. KESSLER:**  MR. FEFFER WAS MR. NAHRA'S CLIENT

16  INSIDE THE COMPANY.  MR. NAHRA'S THE COUNSEL.  HE SENT HIM THIS

17  INFORMATION.  NONE OF THAT, OF COURSE, MAKES IT DISCOVERABLE.

18          WHAT THEY'RE ARGUING IS WHEN MR. FEFFER -- I BELIEVE

19  IS HOW HE PRONOUNCES HIS NAME -- WHEN MR. FEFFER THEN SENT A

20  DIFFERENT E-MAIL TO EA, THAT SOMEHOW THAT ADOPTS THIS PRIOR

21  E-MAIL, WHICH WAS NEVER SHOWN TO EA WHICH IS NOT --

22          **THE COURT:**  SO YOU'RE SAYING FEFFER IS AT EA?

23          **MR. LECLAIR:**  NO.

24          **MR. KESSLER:**  NO.  FEFFER IS INTERNALLY AT PI.

25          THE FIRST -- 521 IS A SERIES OF INTERNAL CORE

1 E-MAILS --

2    **THE COURT:**  THAT DOESN'T MEAN IT'S NOT ADMISSIBLE.

3 WHY DOES THAT MATTER?

4    **MR. KESSLER:**  NO.  IT'S NOT ADMISSIBLE BECAUSE

5 MR. WALKER'S STATEMENT WAS A FORMER EMPLOYEE.  SO IT'S NOT A

6 STATEMENT OF A PARTY.

7    MR. WALKER DID NOT WORK AT PI AT THIS TIME.  HE WAS

8 ALREADY IN HIS OWN BUSINESS --

9    **THE COURT:**  YES, BUT THEY'RE ASKING HIM TO PUT HIS

10 HAT BACK ON AS A PI EMPLOYEE.

11    **MR. KESSLER:**  BUT I DO NOT BELIEVE ASKING SOMEONE TO

12 PUT HIS HAT BACK ON, WHICH MEANT -- DIDN'T MEAN "YOU ARE NOW

13 WORKING FOR US."

14    THEY DIDN'T REHIRE HIM.  WHAT THEY WERE SAYING IS --

15    **THE COURT:**  HAVE YOU EVER BROUGHT AN OUTSIDE PERSON

16 AS A 30(B)(6) WITNESS?

17    **MR. KESSLER:**  IF WE DESIGNATED HIM FOR THAT, FOR

18 30(B)(6) YOU COULD DO THAT, OF COURSE, YOUR HONOR.

19    **THE COURT:**  WELL, THEY ARE ASKING HIM TO PUT --

20 THEY'RE DESIGNATING HIM AS A PI HAT  WEARER.

21    **MR. KESSLER:**  NO, YOUR HONOR THEY'RE NOT.  THEY

22 DIDN'T SAY:

23    "WE DESIGNATE YOU TO GO TALK TO EA ON OUR

24 BEHALF."

25    THIS WAS SIMPLY -- AND MR. NAHRA WILL TESTIFY TO

1 THIS -- WAS A COLLOQUIAL PHRASE:

2        "THINK BACK TO WHEN YOU USED TO BE AT PI, AND

3 GIVE ME SOME FACTS."

4     THAT'S WHAT HE WAS ASKING WHEN HE SAID:

5       "PUT YOUR PI HAT BACK ON."

6     IT'S LIKE IF I HAD A FORMER ASSOCIATE, AND I NEEDED

7 TO REMEMBER SOMETHING, I'D SAY:

8       "PUT YOUR DEWEY HAT BACK ON. DO YOU REMEMBER

9 THIS?"

10     THAT'S WHAT THIS IS.  THAT WOULDN'T MAKE ME

11 DESIGNATING HIM A NEW EMPLOYEE OF DEWEY FOR PURPOSES OF

12 ADMISSIONS.  THERE'S NO WAY HE BECOMES AN EMPLOYEE FOR

13 ADMISSIONS UNDER THIS.

14     SO THEY NEED AN ADOPTION.  AND TO GET AN ADOPTION

15 THEY WOULD HAVE HAD TO HAVE RESENT THE E-MAIL TO SOMEBODY.

16 THEY DIDN'T DO THAT.

17     YOU KNOW, MR. FEFFER SAID SOMETHING DIFFERENT TO EA.

18 HE DIDN'T REPEAT WORD FOR WORD WHAT MR. WALKER TOLD HIM, WHICH

19 IS HEARSAY.

20     **MR. LECLAIR:**  CAN I QUOTE A CASE, YOUR HONOR?

21     **THE COURT:**  GO AHEAD.

22     **MR. LECLAIR:**  IN A D.C. CIRCUIT CASE, MAY 23, 2006,

23 UNITED STATES OF AMERICA VERSUS SAFAVIAN, S-A-F-A-V-I-A-N, THE

24 COURT STATED AS FOLLOWS:

25       "THE STATEMENTS ATTRIBUTED DIRECTLY TO

MR. SAFAVIAN COME IN AS ADMISSIONS BY A PARTY OPPONENT UNDER

RULE 801(D)(2)(A).  THE CONTEXT AND CONTENT OF CERTAIN E-MAILS

DEMONSTRATE CLEARLY THAT MR. SAFAVIAN MANIFESTED AN ADOPTION OR

BELIEF IN THE TRUTH OF THE STATEMENTS OF OTHER PEOPLE AS HE

FORWARDED THEIR E-MAILS.  THEY, THEREFORE, ARE ADMISSIBLE AS

ADOPTED ADMISSIONS."

   BECAUSE MR. -- MR. FEFFER'S E-MAIL DEMONSTRATES AN

ADOPTION OF WHAT MR. WALKER HAS SAID.

   **THE COURT:**  EXPLAIN TO ME HOW THAT -- AGAIN, YOUR

ARGUMENT ON THAT.  YOU SAID IT, BUT I DON'T SEE A REFERENCE TO

THE E-MAIL IN MR. FEFFER'S E-MAIL.

   **MR. LECLAIR:**  YOUR HONOR, WHEN HE SAYS:

    "I HAVE EXHAUSTIVELY REVIEWED THE ISSUES WITH

CLAY, JOE AND SEVERAL OTHERS," THEN HE SAYS:

    "I CAN TELL YOU THAT CLAY AND JOE'S NEGOTIATION

OF THESE DISCOUNTED TERMS WAS A SIGNIFICANT CONTRIBUTION TO EA

AS YOU MORE THAN LIKELY WOULD HAVE PAID IN EXCESS OF 1 MILLION

FOR THESE RIGHTS WITHOUT THEIR INVOLVEMENT AND ASSISTANCE."

   THAT IS AN ADOPTION OF MR. WALKER'S STATEMENT:

    "I WAS ABLE" -- THIS IS IN 521 -- "I WAS ABLE

TO" --

   **THE COURT:**  WAIT.  LET ME FIND THAT.  WHERE IS THAT?

"I WAS ABLE" WHERE?

   **MR. LECLAIR:**  "I WAS ABLE" IS IN THE MIDDLE OF 521.

    "I WAS ABLE TO FORGE THIS DEAL WITH THE HOF THAT

PROVIDES THEM WITH 400K PER YEAR, WHICH IS SIGNIFICANTLY BELOW

MARKET RIGHT IN EXCHANGE FOR THE HOF PLAYER RIGHTS."

MR. FEFFER HAS ADOPTED THAT VERY STATEMENT IN HIS

E-MAIL.  THIS IS THE SOURCE.

IT IS NOT A COINCIDENCE, YOUR HONOR, THAT HE RECEIVED

THIS E-MAIL, AND ONE HOUR LATER WROTE HIS E-MAIL TO EA.  THAT

IS A CLEAR INFERENCE AS TO WHAT IS GOING ON.

MR. -- MR. KESSLER CAN ARGUE TO THE JURY WHATEVER HE

WANTS TO.  BUT THERE IS A CLEAR INFERENCE HERE THAT THIS WAS

ADOPTED AND, THEREFORE, ADMISSIBLE.

**MR. KESSLER:**  YOUR HONOR, THE JURY DOESN'T GET TO

DECIDE ADOPTION.  THE COURT DOES.

THE CASE MR. LECLAIR READ -- AND HE QUOTED IT, SO I

THANK HIM FOR QUOTING IT ACCURATELY -- SAID THE E-MAIL THERE

WAS FORWARDED.

MR. WALKER'S E-MAIL WAS NOT FORWARDED TO EA OUTSIDE

THE COMPANY.  THAT IS A CRITICAL DISTINCTION ON IT NOT BEING

ADOPTED, BECAUSE THAT IS WHAT MANIFESTED THE ADOPTION.

SO, FOR EXAMPLE, THE WORDS "BELOW MARKET" APPEAR

NOWHERE IN MR. FEFFER'S E-MAIL.  THE REFERENCE TO TAKE 2 DOES

NOT APPEAR IN MR. FEFFER'S E-MAIL.

THEY WANT TO GET IN OUT-OF-COURT STATEMENTS OF A

WITNESS, CLAY WALKER, WHO WAS NOT AN EMPLOYEE OF THE COMPANY,

WHO THEY CHOSE NOT TO DEPOSE, SO HE'S NOT HERE TO EXPLAIN

CONTEXT, AND ATTRIBUTE THEM AS AN ADOPTION BY MR. FEFFER WHEN

1 HE DOESN'T REPEAT THAT.

2      IF YOUR HONOR ALLOWS THIS IN AT ALL, WHICH WE

3 CERTAINLY HOPE YOU WON'T, THE SECOND E-MAIL WAS OBVIOUSLY A

4 STATEMENT OF THE COMPANY, WHAT MR. FEFFER SAID.

5      BUT THAT DOESN'T MAKE 521 ADMISSIBLE.  IT ONLY MAKES

6 522 ADMISSIBLE, IF YOUR HONOR WERE TO ALLOW THIS LINE AT ALL.

7     **MR. LECLAIR:**  YOUR HONOR, IT'S BOTH ADOPTED AND

8 AUTHORIZED.

9      MR. NAHRA ASKED FOR THIS INFORMATION, AND THEN THEY

10 USED IT.  AND IT IS BOTH AN ADOPTION AND AN AUTHORIZATION.

11     **MR. KESSLER:**  AN AUTHORIZATION HE HAS TO AUTHORIZE

12 HIM TO SPEAK OUTSIDE THE COMPANY, WHICH THEY DID NOT DO.

13     **THE COURT:**  ALL RIGHT.  I'M GOING TO MAKE A RULING

14 NOW.  EVERYBODY HAVE A SEAT SO YOU WON'T BE TEMPTED TO LEAP UP

15 AND ARGUE WITH ME.

16      THE SUBJECT OF THE AD HOCS HAS BEEN BROUGHT UP MAINLY

17 BY THE DEFENSE.  IT'S BEEN BROUGHT UP IN ORDER TO SHOW THAT

18 WHILE ALMOST NOTHING, OR PROBABLY ZERO, WAS EVER PAID UNDER THE

19 GLA, RETIRED MEMBERS -- SOME RETIRED PLAYERS GOT SOME MONEY

20 UNDER THE AD HOC AGREEMENTS AND CLASS MEMBERS GOT $7 MILLION

21 UNDER AD HOC AGREEMENTS.

22      SO THIS IS BEING USED TO SHOW -- TO MEET THE ISSUE OF

23 FIDUCIARY DUTY, MAYBE EVEN HAS SOME RELEVANCE TO THE CONTRACT

24 CLAIM.  AND THE JURY HAS HEARD A LOT ABOUT THE AD HOC

25 AGREEMENTS.

1    NOW, THE IMPRESSION HAS BEEN LEFT WITH THE JURY THAT

2 THE DEFENDANTS -- IN FACT, THE IMPRESSION HAS BEEN LEFT BY THE

3 DEFENDANTS, THAT THE DEFENDANTS HAVE HONORED WHATEVER

4 OBLIGATIONS THEY HAVE TO BE FAIR TO THE RETIRED PLAYERS.

5    AND NOW THE ISSUE IS WHETHER OR NOT THE -- A SPECIFIC

6 AD HOC AGREEMENT CAN BE GONE INTO, IS SOMEWHAT DIFFERENT AD HOC

7 AGREEMENT, BUT THE HALL OF FAME ONE, TO SHOW THAT -- SHOW THAT

8 THE -- THE DEFENDANTS HAD AN OPPORTUNITY TO ARGUE FOR A GROUP

9 LICENSE ON BEHALF OF THE RETIRED PLAYERS, AND THAT INSTEAD OF

10 DOING THAT, THE DEFENDANTS FACILITATED A SWEETHEART DEAL WITH

11 EA SO AS TO CUT THE COMPETITOR OUT OF THE MARKET, AND THAT THAT

12 WAS WORTH A MILLION DOLLARS, AND THEY GOT IT FOR 400,000,

13 MEANING EA GOT A MILLION DOLLAR BENEFIT FOR ONLY 400,000, AND

14 THAT EA OWES ONE BACK TO THE DEFENDANTS.

15    NOW, IT -- THIS IS COMPLICATED BY THE FACT THAT

16 BECAUSE IT'S A CLASS ACTION, THE PLAINTIFFS, IN LIGHT OF THE

17 POSSIBLE CONFLICT OF INTEREST THEY WOULD HAVE, ARE NOT TRYING

18 TO RECOVER MONEY UNDER THE AD HOC AGREEMENTS TO REDISTRIBUTE

19 THAT AMONG CLASS MEMBERS.

20    I SAY THIS BECAUSE THE NINTH CIRCUIT LOOKING AT THIS

21 LATER MIGHT SAY:

22    "WELL, LOOK.  THE AD HOC AGREEMENTS WERE SIX OR

23 MORE.  WHY WASN'T THAT COVERED BY THE GLA?  WHY DIDN'T THEY

24 REALLOCATE THAT?"

25    AND THE ANSWER TO THAT IS:  THE PLAINTIFFS HAVE

1 FORSAKEN THAT ARGUMENT LIKELY BECAUSE OF THE -- THE POTENTIAL

2 CONFLICTS WITHIN THE CLASS.

3          SO, INSTEAD, THE PLAINTIFFS ARGUE THIS ENTIRE GROUP

4 THING.

5          NOW, IT MAY BE A STRETCH, AND IT MAY STRAIN THE

6 CREDULITY OF COUNSEL AND THE JURY TO ARGUE THAT -- WHAT

7 MR. LECLAIR SAID, THAT THE DEFENDANTS SHOULD HAVE GONE TO EA

8 AND SAID:

9              "HERE, TAKE THIS ENTIRE GROUP OF RETIRED

10 PLAYERS, ALL 2,000.  FORGET ABOUT THE HALL OF FAME.  JUST TAKE

11 THESE RETIRED PLAYERS AS A GROUP."

12          BUT THAT IS THE ARGUMENT THAT MR. LECLAIR AND HIS

13 TEAM IS MAKING.  AND THE IMPRESSION HAVING BEEN LEFT BY THE

14 DEFENSE THAT THE -- MR. ALLEN AND HIS TEAM WERE ALWAYS LOOKING

15 OUT FOR THE BEST INTERESTS OF RETIRED MEMBERS.  THE SEQUENCE OF

16 E-MAILS DOES HAVE SOME PROBATIVE VALUE TO THE CONTRARY AND CAN

17 BE READ TO MEAN THAT THE CLASS WAS SOLD OUT IN ORDER TO MAKE EA

18 HAPPY, AND THAT EA OWES A DEAL BACK TO -- OWES ONE BACK TO THE

19 DEFENDANTS.

20          THAT'S ONE INTERPRETATION.  MAYBE THERE IS AN

21 INNOCENT INTERPRETATION.

22          NOW, AT THE OUTSET I TRIED TO KEEP ALL OF THIS OUT OF

23 EVIDENCE BECAUSE I THOUGHT THE MAIN ISSUES OUGHT TO BE THE GLA.

24 AND I WARNED MR. KESSLER THAT THERE WAS A 50/50 CHANCE THAT HE

25 WAS GOING TO INJECT THIS BACK INTO THE CASE, AND IN MY JUDGMENT

1   HE HAS DONE SO.

2          SO I'M GOING TO ALLOW THIS LINE OF QUESTIONS, THIS

3   LINE OF E-MAILS.

4          I WANT TO TURN NOW TO THE ISSUE OF THE EVIDENTIARY

5   BASIS.  IT'S TRUE THAT MR. CLAY WALKER IN 521 WAS NO LONGER

6   WITH THE DEFENDANTS WHEN HE WROTE THIS CRITICAL E-MAIL.  BUT

7   HERE'S THE INTERESTING THING:  MR. JOE NAHRA, WHO IS THE

8   CORPORATE REPRESENTATIVE OF THE DEFENDANT HERE, FEBRUARY 22,

9   2007, SENT AN E-MAIL TO HIM AND SAID, QUOTE:

10         "CAN YOU PLEASE PUT YOUR PI HAT BACK ON AND

11  PROVIDE SOME INSIGHT HERE?"  CLOSED QUOTE.

12         AND THEN, IN DIRECT RESPONSE TO THAT, THE CRITICAL

13  E-MAIL WAS WRITTEN FROM MR. CLAY WALKER, WEARING HIS HAT AGAIN

14  AS THE PI PERSON.

15         NOW, FROM ANY PRACTICAL CONSTRUCTION OF THE RULES OF

16  EVIDENCE THIS WAS AN INVITED STATEMENT.  IT WAS ONE THAT WAS

17  INTENDED TO BE RELIED UPON BY MR. NAHRA.  HE WOULDN'T HAVE --

18  AT LEAST SOMEBODY COULD CONCLUDE REASONABLY, THAT MR. NAHRA

19  WOULD NOT HAVE ASKED MR. CLAY WALKER TO GIVE THIS SUMMARY OF

20  WHAT HAD HAPPENED UNLESS HE WAS INTENDING TO RELY UPON IT.

21         SO RIGHT OFF THE BAT THERE IS DEFINITE INDICIA OF

22  RELIABILITY TO THIS E-MAIL.

23         AND THEN, IN FURTHER RELIANCE ON IT MR. JOE NAHRA

24  SENDS IT TO MR. ANDY FEFFER.  IN FACT, YOU CAN TELL FROM THE

25  SEQUENCE HERE HE SENDS IT SEVERAL MONTHS LATER, INDICATING THAT

1  HE TOOK THE TROUBLE AND TIME TO GO BACK AFTER THE FACT, SIX

2  MONTHS LATER, AND SEND IT TO SOMEBODY ELSE IN THE COMPANY,

3  WHICH WOULD BE A FURTHER INDICATION THAT IT WAS WORTHY OF

4  RELIANCE.

5          THEN, YOU COME TO THE RECIPIENT, MR. FEFFER, IN

6  EXHIBIT 522.  WHILE HE DOESN'T REFER TO THAT E-MAIL, A FEW

7  HOURS LATER, AFTER HE SAYS THAT HE HAS TALKED WITH CLAY AND

8  HE'S ALSO TALKED TO -- HE COMES VERY CLOSE TO PARROTING THE

9  WORDS OF THE E-MAIL TO INDICATE THAT IT HAS BEEN ADOPTED, AND

10  IT HAS BEEN RELIED UPON, SO THAT THE COURT IS GOING TO FIND

11  THAT UNDER THREE RULES OF EVIDENCE THIS IS ADMISSIBLE:  THE TWO

12  THAT WERE CITED BY MR. LECLAIR, AND, FINALLY, UNDER RULE 807,

13  THE RESIDUAL EXCEPTION.

14          EVEN IF THIS IS NOT OTHERWISE ADMISSIBLE, WHICH I

15  THINK IT IS ADMISSIBLE, THE STATEMENT IS OFFERED ON A MATERIAL

16  FACT.  THE COURT FINDS FURTHER IT IS MORE PROBATIVE ON THE

17  POINT FOR WHICH IT IS OFFERED THAN ANY OTHER EVIDENCE WHICH THE

18  PROPONENT CAN PROCURE THE REASONABLE EFFORTS AND THE GENERAL

19  PURPOSES OF THESE RULES AND THE INTEREST OF JUSTICE WILL BE

20  SERVED BY THE ADMISSION OF THE STATEMENT IN EVIDENCE.

21          FURTHER, I WANT TO SAY THIS WAS MARKED AS AN EXHIBIT

22  BEFORE THE TRIAL, AND THE DEFENSE HAS HAD A FAIR OPPORTUNITY TO

23  MEET THE PARTICULARS OF IT, INCLUDING WHO THEIR DECLARANT IS.

24          SO THE COURT IS GOING TO ALLOW THE LINE OF QUESTIONS

25  AND ALLOW THE PLAINTIFFS TO CALL MR. NAHRA TO GO THROUGH THESE

1   E-MAILS. AND THE OBJECTIONS THERETO ARE OVERRULED, ASSUMING --

2   THIS IS WITHOUT PREJUDICE TO FOUNDATIONAL -- YOU'RE GOING TO

3   HAVE TO LAY THE FOUNDATION, BUT I'M FAIRLY CONFIDENT MR. NAHRA

4   WILL ADMIT HE RECEIVED AND SENT THE E-MAILS IN QUESTION. BUT

5   LET'S SEE WHAT HE SAYS WHENEVER HE IS CALLED AS A WITNESS.

6         SO THAT'S THE RULING. ALL RIGHT.

7         ARE WE READY TO CALL IN OUR JURY NOW?

8       **MR. HUMMEL:** YES, YOUR HONOR.

9       **MR. PARCHER:** YES, YOUR HONOR.

10      **MR. KESSLER:** YOUR HONOR.

11      **THE COURT:** YES.

12      **MR. KESSLER:** COULD I JUST ASK, THEN, COULD WE HAVE

13   AN INSTRUCTION AT THE TIME THIS IS COVERED THAT THERE IS NO

14   CLAIM FOR ANY DAMAGES TO THE CLASS FROM THIS HALL OF FAME

15   AGREEMENT?

16      **THE COURT:** I THINK THAT'S FAIR. I THINK I SHOULD

17   SAY THAT.

18      **MR. KESSLER:** THANK YOU, YOUR HONOR.

19      **THE COURT:** FROM THE -- NO, THAT'S NOT QUITE. THERE

20   IS NO CLAIM TO REDISTRIBUTE THE AD HOC -- THE MONEY PAID UNDER

21   THAT AGREEMENT.

22      **MR. KESSLER:** ALL RIGHT.

23      **THE COURT:** REMIND ME I AGREE THAT OUGHT TO BE GIVEN.

24      **MR. KESSLER:** YOUR HONOR, I THINK THERE ALSO HAS TO

25   BE, IF I MAY, THAT THERE WAS NO CLAIM THAT IT WAS WRONG TO USE

1  AD HOC INSTEAD OF DOING THIS UNDER THE GROUP LICENSE.

2  **THE COURT:**  I'M NOT SURE THAT'S BEEN AGREED TO.  HAS

3  THAT BEEN AGREED TO?

4  **MR. LECLAIR:**  NO, YOUR HONOR.

5  **THE COURT:**  WELL, I'M NOT GOING TO GO THAT FAR.  I'M

6  GOING TO READ WHAT THE -- I'M GOING TO READ THE STIPULATION

7  THAT YOU -- THAT YOU QUOTED IN YOUR LETTER.

8  **MR. KESSLER:**  THANK YOU.  THAT'S FINE, YOUR HONOR.

9  I WOULD NOTE, JUST FOR THE RECORD, IF PLAINTIFF IS

10  MAINTAINING A CLAIM THAT IT WAS WRONG TO USE THE AD HOCS

11  INSTEAD OF THE GLA FOR THOSE DEALS, WE BELIEVE THAT THE CLASS

12  WAS IMPROPERLY CERTIFIED, AND WE'RE GOING TO RENEW THAT MOTION

13  IF THEY PROCEED WITH THAT IN THIS CASE.  I'M JUST PUTTING

14  PLAINTIFFS ON NOTICE.

15  BECAUSE WHETHER OR NOT THEY ARE SEEKING THE MONEY

16  FROM MR. ADDERLEY OR NOT, IF THEY'RE CLAIMING IT WAS WRONGFUL

17  FOR MR. ADDERLEY TO HAVE ENTERED INTO THAT AGREEMENT AS AN AD

18  HOC, INSTEAD OF UNDER THE GLA, THAT RERAISES THE CLASS

19  CERTIFICATION ISSUE.

20  **THE COURT:**  FINE.  EVERYONE IS ON NOTICE.

21  I FULLY EXPECT YOU WHENEVER MR. ADDERLEY TESTIFIES TO

22  BRING OUT THE FACT THAT HE GOT MONEY UNDER THE HALL OF FAME

23  AGREEMENT, AND SAY:

24  "MR. ADDERLEY, ARE YOU TRYING TO SAY THAT YOU

25  WANT TO GIVE THAT MONEY UP AND HAVE IT REDISTRIBUTED TO THE

1    PEOPLE WHO WERE SITTING ON THE BENCH AND NEVER PLAYED IN ANY

2    GAME?"

3         ALL RIGHT.  YOU CAN HAVE PERFECT LATITUDE TO ASK

4    THOSE QUESTIONS.

5         **MR. KESSLER:**  IN LIGHT OF YOUR HONOR'S RULING, I

6    WOULD LIKELY COVER THAT SUBJECT.

7         **THE COURT:**  VERY WELL.  NOW, LET'S BRING IN OUR JURY.

8         (RECESS TAKEN FROM 8:30 TO 8:38 A.M.)

9         (THE FOLLOWING PROCEEDINGS WERE HELD IN OPEN COURT,

10        IN THE PRESENCE OF THE JURY.)

11        **THE COURT:**  ALL RIGHT.  EVERYBODY WELCOME BACK.  I

12   APOLOGIZE FOR VIOLATING MY PROMISE TO YOU THAT WE WOULD ALWAYS

13   START BY 8 O'CLOCK.

14        SOMETIMES THE LAWYERS BRING UP A POINT OF -- HERE,

15   HAVE A SEAT -- THAT MAKES IT NECESSARY FOR ME TO REGULATE WHAT

16   COMES INTO EVIDENCE AND SO FORTH.  SO THAT'S WHY WE WERE

17   WORKING IN HERE.

18        ALL RIGHT.  NOW, YOU WILL REMEMBER THAT WE WERE

19   READING IN THE DEPOSITION OF SOMEONE NAMED EYRICH, E-Y-R-I-C-H.

20        NOW, I BET SOME OF YOU HAVE PROBABLY FORGOTTEN WHO HE

21   IS AND WHAT HIS CONNECTION IS TO THE CASE.  SO BEFORE WE GET

22   STARTED WITH THE READING, EXPLAIN -- WHAT'S YOUR NAME AGAIN?

23        **MR. CHARHON:**  CHARHON.

24        **THE COURT:**  CHARHON?

25        **MR. CHARHON:**  YES.

1      **THE COURT:** EXPLAIN TO THE JURY, IN 30 SECONDS OR

2  LESS, WITHOUT ARGUMENT, WHAT IS THIS GUYS'S CONNECTION TO THE

3  CASE AND WHY ARE WE HEARING THIS?

4      **MR. CHARHON:** OKAY. GLENN EYRICH IS AN OUTSIDE

5  AUDITOR FOR THE DEFENDANTS, THAT THEY DESIGNATED AS THE PERSON

6  MOST KNOWLEDGABLE ABOUT THE FLOW OF LICENSING REVENUES

7  GENERATED UNDER THEIR THIRD-PARTY LICENSING AGREEMENTS.

8      HE'S TESTIFIED ABOUT THE ALLOCATION OF THE GLR POOL,

9  AND HE'S GOING TO TESTIFY HOW THOSE REVENUES ARE DISTRIBUTED TO

10 ACTIVE PLAYERS EQUALLY.

11     **THE COURT:** ALL RIGHT. THAT'S GOOD.

12     ANYTHING THE OTHER SIDE WANTS TO SAY, ADD OR SUBTRACT

13 FROM THAT?

14     **MR. KESSLER:** YES. MR. EYRICH WILL TESTIFY THAT ALL

15 OF THE MONEY IN THE GLR POOL WAS GENERATED 100 PERCENT FROM

16 ACTIVE PLAYER LICENSING AND NOT ONE PENNY CAME FROM RETIRED

17 PLAYER LICENSING.

18     **THE COURT:** ALL RIGHT. NOW, IF YOU WANT TO ADD 15

19 SECONDS OF ARGUMENT OF A EQUIVALENT CHARACTER YOU CAN RESPOND,

20 BECAUSE MR. KESSLER WAS A BIT ARGUMENTATIVE THERE.

21     **MR. CHARHON:** THE ONLY OTHER THING I'LL ADD IS THAT

22 I'M NOT SURE THAT MR. EYRICH CHARACTERIZES ONE WAY OR ANOTHER

23 WHAT'S IN THE GLR POOL. HE ALSO TESTIFIES ABOUT THE $8 MILLION

24 REALLOCATION THAT CAME DIRECTLY OUT OF THE GLR POOL.

25     **THE COURT:** ALL RIGHT. NOW, WHAT THE LAWYERS SAY IS

1   NOT EVIDENCE.  I'VE JUST ASKED THEM TO DO THIS TO GET YOU IN

2   THE RIGHT FRAME OF MIND SO THAT YOU WILL BE ABLE TO PICK

3   SOMETHING OF VALUE OUT OF THIS DEPOSITION.

4          ALL RIGHT.  YOU'VE GOT ABOUT 30 MORE MINUTES TO GO?

5          **MR. CHARHON:**  HOPEFULLY LESS.

6          **THE COURT:**  ALL RIGHT.  GO RIGHT AHEAD.

7                          **GLENN EYRICH**,

8   CALLED AS A WITNESS FOR THE PLAINTIFFS HEREIN, TESTIFIED VIA

9   DEPOSITION READ IN OPEN COURT IN THE PRESENCE AND HEARING OF

10  THE JURY AS-FOLLOWS:

11         (TRANSCRIPT OF DEPOSITION TESTIMONY READ BY MR.

12         CHARHON AND MR. GARZA AS FOLLOWS:)

13                         **EXAMINATION**

14  **Q.**   AND DOES THIS INCLUDE ROYALTIES THAT WERE PAID TO OR

15  PAYMENTS THAT WERE MADE TO RETIRED PLAYERS?

16  **A.**   IT INCLUDES BOTH ACTIVE AND RETIRED.

17  **Q.**   DOES IT INCLUDE PAYMENTS THAT WERE MADE PURSUANT TO GROUP

18  LICENSING AUTHORIZATIONS, SUCH AS EXHIBIT 19, THE ONE THAT

19  MR. ADDERLEY SIGNED?

20  **A.**   I DON'T KNOW SPECIFICALLY IF THAT WAS INCLUDED IN THIS

21  ACCOUNT, BUT THAT IS THE ACCOUNT THAT HAS ALL OF THE ROYALTIES

22  EARNED BY BOTH ACTIVE AND RETIRED PLAYERS.

23  **Q.**   SO WITH RESPECT TO ACTIVE PLAYERS, LET'S JUST FOCUS ON

24  THEM FIRST.  THEY GOT AN EQUAL SHARE; IS THAT CORRECT?

25  **A.**   CORRECT.

1  Q.   NOW, FOCUSING ON RETIRED PLAYERS, DO RETIRED PLAYERS GET

2  AN EQUAL SHARE ROYALTY?

3  A.   RETIRED PLAYERS ARE NOT INCLUDED IN THE EQUAL SHARE

4  ROYALTY POOL.

5  Q.   THERE IS AN ACTIVE PLAYER EQUAL SHARE ROYALTY POOL.

6  YOU'VE TESTIFIED TO THAT.

7  A.   CORRECT.

8  Q.   AND WITH RESPECT TO RETIRED PLAYERS EQUAL SHARE POOL, YOU

9  DON'T KNOW?

10  A.   CORRECT.

11  Q.   WELL, YOU KNOW THAT THEY GET PAYMENTS.  YOU KNOW THE

12  RETIRED PLAYERS GET PAYMENTS, RIGHT?

13  A.   CORRECT.

14  Q.   AND YOU KNOW THAT THEY DON'T GET IT FROM THE EQUAL SHARE

15  POOL, RIGHT?

16  A.   CORRECT.

17  Q.   NOW, IN THE PLAYER AND ROYALTY APPEARANCES OF $54 MILLION

18  ON THE SAME PAGE, 6033, HOW DID YOU AUDIT TEST THE

19  APPROPRIATENESS OF THAT AMOUNT, IF IT DID?

20  A.   WE REVIEW THE CALCULATION OF THE EQUAL SHARE POOL, WHICH

21  IS A LARGE COMPONENT OF THAT.

22  Q.   AND DO YOU COMPARE IT TO THE REVENUE THAT CAME IN, THE

23  54 -- EXCUSE ME, THE 67, APPROXIMATELY, AND THE 29 MILLION FROM

24  LICENSING AND PREMIUM PLAYER APPEARANCES, DO YOU COMPARE THOSE

25  EXPENSES TO THE REVENUE THAT CAME IN FOR APPROPRIATENESS?

1   **A.**   YES.

2   **Q.**   AND HOW DO YOU DO THAT?

3   **A.**   THERE'S A RECONCILIATION OF THE PREMIUM AND PLAYER

4   APPEARANCES FLOWING INTO THE PLAYER APPEARANCES AND PLAYER

5   EXPENSE, AS YOU SEE THERE.  AND THERE'S AN ALLOCATION OF THE

6   ACTIVE PLAYER EQUAL SHARE POOL THAT WE REVIEW.

7   **Q.**   ARE NFLPA AND PI RELATED PARTIES?

8   **A.**   YES.

9   **Q.**   AND WHY ARE RELATED PARTY TRANSACTIONS THE SUBJECT OF THE

10  FOOTNOTE?  WHY DID YOU SEE FIT TO MAKE IT THE SUBJECT OF A

11  FOOTNOTE?

12  **A.**   IT'S A TECHNICAL ACCOUNTING REQUIREMENT TO DISCLOSE

13  SIGNIFICANT RELATED-PARTY TRANSACTIONS.

14  **Q.**   AND WITH RESPECT TO, FOR EXAMPLE, PLAYERS' DUES, ACTIVE

15  PLAYERS' DUES, ARE THOSE USED TO FINANCE ANY PARTICULAR THING,

16  OR DO THEY ALSO JUST GO INTO THE GENERAL POOL?

17  **A.**   THEY JUST GO INTO THE GENERAL POOL.

18  **Q.**   WITH RESPECT TO RETIRED PLAYERS' DUES, DO THEY FINANCE ANY

19  PARTICULAR THING, OR DO THEY JUST GO INTO THE GENERAL POOL OF

20  REVENUES?

21  **A.**   THEY ALSO GO INTO THE GENERAL POOL OF REVENUES.

22  **Q.**   WELL, THE REVENUES COME FROM THE GENERAL POOL, RIGHT?

23  **A.**   THE REVENUES COME FROM THE GENERAL POOL, THE NET ASSETS OF

24  THE COMPANY ARE FROM THE GENERAL POOL THAT IS GENERATED.  BUT

25  SPECIFICALLY EXPENSES RELATING TO ANY ONE INDIVIDUAL REVENUE

1  ITEM, THERE IS NO TIE.

2  **Q.**   BUT THAT GENERAL POOL ALSO INCLUDES THE LICENSING

3  REVENUES, DOESN'T IT, SIR?

4  **A.**   CORRECT.

5  **Q.**   DIRECTING YOUR ATTENTION TO NOTE 11, REFERS TO AN

6  $8 MILLION REALLOCATION FROM PLAYERS INC TO THE NFLPA.  DO YOU

7  SEE THAT?

8  **A.**   YES.

9  **Q.**   AND CAN YOU JUST DESCRIBE TO US, AS BEST YOU CAN, WHAT

10  THAT IS, WHAT THAT WAS?

11  **A.**   THE $8 MILLION WAS A REALLOCATION BASED ON CHANGING MARKET

12  CONDITIONS IN THE OVERALL LICENSING OPERATION FOR PLAYERS INC

13  AND THE NFLPA.

14  **Q.**   AND WAS THAT REFLECTED IN AN AGREEMENT?

15  **A.**   YES.

16  **Q.**   AND HAVE YOU SEEN THE AGREEMENT?

17  **A.**   YES.

18  **Q.**   WHEN IT SAYS TO REFLECT CHANGED MARKET CONDITIONS, WHAT

19  WERE THOSE CHANGED MARKET CONDITIONS, SIR?

20  **A.**   THE BASIS FOR THE $8 MILLION WAS INCREASE OVER TIME IN THE

21  LOGO VALUE OF THE NFLPA AND PLAYERS INC.

22  **Q.**   SO IF I'M GETTING THIS CORRECTLY, THE INCREASE IN THE --

23  THE CHANGE IN MARKET CONDITIONS WAS AN INCREASE IN THE LOGO

24  VALUE OF THE LOGO OF BOTH PLAYERS INC AND THE NFLPA?

25  **A.**   CORRECT.

1  Q.   HOW DID THE REALLOCATION WORK?

2  A.   THE REALLOCATION WAS AN AMOUNT THAT WAS DEDUCTED FROM THE

3  EQUAL SHARE POOL, ALLOCATED TO THE NFLPA AND PLAYERS INC.

4  Q.   DO YOU UNDERSTAND WHAT THE EFFECT OF EXHIBIT 91 IS?

5  A.   YES.

6  Q.   PLEASE TELL ME.

7  A.   THE CHANGE IN MARKET CONDITIONS WAS DESIGNATED THAT THE

8  LOGO VALUE OF THE NFLPA AND PLAYERS INC WAS $8 MILLION.  THAT

9  WAS DETERMINED TO BE REALLOCATED FROM THE EQUAL SHARE POOL TO

10 BOTH NFLPA AND PLAYERS INC.

11 Q.   SO THE NFLPA -- OF THE $8 MILLION, HOW MUCH OF IT WENT TO

12 THE NFLPA?

13 A.   60 PERCENT.

14 Q.   AND HOW MUCH OF IT WENT TO PI?

15 A.   40 PERCENT.

16 Q.   AND 100 PERCENT OF IT WAS TAKEN FROM THE EQUAL SHARE POOL

17 WHICH WENT TO ACTIVE PLAYERS; IS THAT CORRECT?

18 A.   CORRECT.

19 Q.   I UNDERSTAND THAT.  BUT DID YOU DO ANYTHING AS A RESULT OF

20 THE FACT THAT BOTH OF THE SIGNATORIES OF THIS AGREEMENT ARE

21 HIGH OFFICERS OF BOTH ORGANIZATIONS THAT BENEFIT FROM THIS

22 AGREEMENT?

23 A.   PLAYERS INC MANAGEMENT, ALONG WITH LEGAL COUNSEL,

24 SUPPORTED -- WE REQUESTED SUPPORT FOR AN UNDERSTANDING OF THIS

25 REALLOCATION OF $8 MILLION.

1  Q.   AND WHAT SUPPORT DID YOU RECEIVE, IF ANY?

2  A.   THE PRIMARY SUPPORT FOR THAT $8 MILLION WAS A PEER REVIEW

3  OF ANOTHER SPORTS ORGANIZATION'S LOGO USE REVENUE.

4  Q.   AND WHO CONDUCTED THAT PEER REVIEW?

5  A.   LEGAL COUNSEL.

6  Q.   WAS THIS EVALUATION -- WHAT WAS THE OTHER SPORTS

7  ORGANIZATION?

8  A.   THE NBA PLAYERS ASSOCIATION.

9  Q.   WHAT I'M GETTING AT, I'M NOT ASKING YOU ABOUT ANY LEGAL

10 EVALUATION THAT WAS DONE.  THIS WAS A BUSINESS EVALUATION.  IT

11 WAS ABOUT THE VALUE OF A LOGO; IS THAT CORRECT?

12 A.   CORRECT.

13 Q.   WHO MADE THE EVALUATION; WHO MADE THE EVALUATION THAT THE

14 LOGO, THE VALUE OF THE LOGO WENT UP $8 MILLION?

15 A.   THERE WAS NO FORMAL EVALUATION PERFORMED.

16 Q.   AND NOW, I JUST HAVE TO UNDERSTAND, WAS THERE ANY INFORMAL

17 EVALUATION PERFORMED?

18 A.   THERE WAS AN EVALUATION PERFORMED AS FAR AS A REVIEW OF

19 PEER LOGO VALUE.

20 Q.   WHO MADE THAT REVIEW?

21 A.   PLAYERS INC MANAGEMENT IN CONSULTATION WITH LEGAL COUNSEL.

22 Q.   AND YOU WERE THE OUTSIDE CONSULTANT AT THE TIME?

23 A.   CORRECT.

24 Q.   AND IS IT CORRECT TO SAY THAT YOU BASED YOUR AUDIT OF THIS

25 PARTICULAR TRANSACTION ON WHAT YOU WERE TOLD BY MANAGEMENT OF

1   THE NFLPA?

2   **A.**   WE ALSO WERE AWARE OF WHAT THE NBA PLAYERS ASSOCIATION WAS

3   RECEIVING AS PART OF THEIR LOGO VALUE.

4   **Q.**   HOW DID YOU BECOME AWARE OF THAT?

5   **A.**   THAT INFORMATION WAS DISCLOSED IN THEIR LM-2, AND ALSO IN

6   THEIR FINANCIAL STATEMENTS.

7   **Q.**   MY QUESTION IS:  DID YOU RELY IN ANY WAY ON WHAT

8   MANAGEMENT IN THE NFLPA TOLD YOU IN COMING TO THE ASSESSMENT

9   THAT THIS WAS AN APPROPRIATE TRANSACTION?

10  **A.**   WE WOULD TAKE THE ADVICE OR UNDERSTANDING OF OUR CLIENTS

11  IN EVALUATING THE PROPRIETY OF IT, OF THE EVALUATION OF THE

12  $8 MILLION.

13  **Q.**   SO IT DID PLAY A ROLE?

14  **A.**   YES.

15  **Q.**   BUT YOU CAN'T RECALL WHAT THAT ROLE IS RIGHT NOW?

16  **A.**   NOT EXACTLY, NO.

17  **Q.**   ISN'T IT A FACT THAT YOU BASED YOUR ASSESSMENT OF THE

18  PROPRIETARY OF THIS TRANSACTION IN PART ON WHAT MANAGEMENT TOLD

19  YOU?

20  **A.**   YES.

21  **Q.**   WAS THERE ANYONE ELSE AT MANAGEMENT BESIDES MR. ALLEN AND

22  MS. DOUGLAS ON WHOM YOU SPOKE ON THE SUBJECT?

23  **A.**   NOT THAT I RECALL.

24  **Q.**   AND IT'S CORRECT TO SAY THERE WAS NO INDEPENDENT APPRAISAL

25  FIRM THAT WAS RETAINED TO DETERMINE THE ARM'S LENGTH VALUE OF

1  THIS TRANSACTION?

2  **A.**    THAT'S CORRECT.

3  **Q.**    HAVE YOU EVER SEEN THIS AGREEMENT, SIR?

4  **A.**    YES.

5  **Q.**    AND TELL US WHAT IT IS, PLEASE.

6  **A.**    IT'S THE ORIGINAL LICENSE AGREEMENT BETWEEN THE NFLPA AND

7  PLAYERS INC.

8  **Q.**    AND IN WHAT CONTEXT DID YOU -- HAVE YOU SEEN THIS?

9  **A.**    THIS HAS BEEN PART OF OUR AUDIT PERMANENT FILE IN

10 PERFORMING OUR AUDIT.

11 **Q.**    AND WHAT IS THE SIGNIFICANCE, IF ANY, OF THE DOCUMENT

12 BEING IN THAT FILE?

13 **A.**    THIS SUPPORTS THE LICENSE AMOUNT PAID TO NFLPA, RECEIVED

14 BY NFLPA.  AND THE AMOUNT OF ROYALTIES PAID TO THE PLAYERS.

15 **Q.**    IN THE AGREEMENT WE SAW EARLIER, THE $8 MILLION

16 REALLOCATION, THERE WAS NO INDEPENDENT THIRD-PARTY APPRAISAL

17 FIRM, WAS THERE?

18 **A.**    NO.

19 **Q.**    AND DO YOU BELIEVE THAT -- I THINK YOU'VE TESTIFIED THAT

20 SUCH AN INDEPENDENT APPRAISAL MAKES THE RESULT MORE RELIABLE,

21 DOES IT NOT?

22 **A.**    CORRECT.

23 **Q.**    HAVE YOU EVER SEEN THIS DOCUMENT, SIR?

24 **A.**    YES.

25 **Q.**    CAN YOU TELL US WHAT IT IS, PLEASE?

1    **A.**    IT'S THE INITIAL DUFF & PHELPS VALUATION OF THE LICENSING

2    OPERATIONS.

3    **Q.**    AND DID YOU SEE IT ON OR AROUND THE TIME OF ITS DATE,

4    JANUARY 1995?

5    **A.**    YES.

6    **Q.**    AND NOTHING LIKE THIS WAS DONE FOR THE $8 MILLION

7    REALLOCATION THAT WE'VE SEEN -- THAT WE TALKED ABOUT EARLIER;

8    ISN'T THAT RIGHT, SIR?

9    **A.**    CORRECT.

10   **Q.**    DO YOU KNOW HOW $8 MILLION WAS ARRIVED AT AS OPPOSED TO

11   5 MILLION, 25 MILLION, OR ANOTHER NUMBER?

12   **A.**    NO, I DON'T.

13   **Q.**    AND IS IT CORRECT TO SAY THAT YOU AGREED WITH THE

14   ASSESSMENT THAT THE VALUE OF THE ASSET WENT UP BY $8 MILLION?

15   **A.**    IN EVALUATING THE $8 MILLION TRANSACTION, WE DETERMINED

16   THAT IT WAS REASONABLE TO ASSESS THAT THE LOGO VALUE WAS

17   $8 MILLION.

18   **Q.**    ASIDE FROM THAT, THAT INCREASED VALUE OF $8 MILLION

19   DOESN'T APPEAR ANYWHERE?

20   **A.**    RIGHT.  IT'S INCLUDED IN THE LICENSING REVENUE NUMBERS,

21   UNDER THE SPECIFIC ALLOCATION TO THE ENTITIES.

22   **Q.**    SO THERE WAS A CERTAIN AMOUNT OF LICENSING REVENUE, WHAT

23   DID WE SAY, $67 MILLION.  THE LICENSING REVENUE WAS

24   APPROXIMATELY $67 MILLION; IS THAT CORRECT, LOOKING AT 6033

25   AGAIN?

1  **A.**   CORRECT.

2  **Q.**   SO WHAT THIS DEAL DID WAS SAY FROM THAT $67 MILLION WE'RE

3  GOING TO TAKE $8 MILLION THAT WE DIDN'T TAKE BEFORE FROM THE

4  EQUAL SHARE ROYALTY POOL AND WE'RE GOING TO PUT THAT

5  $8 MILLION, WE'RE GOING TO ALLOCATE THAT TO THE NFLPA AND PI?

6  **A.**   CORRECT.

7  **Q.**   THAT'S WHAT HAPPENED?

8  **A.**   CORRECT.

9  **Q.**   BUT THERE IS NOWHERE -- THERE IS NO ADDITIONAL $8 MILLION.

10 THE 67 MILLION, IF IT WOULD HAVE BEEN THE SAME THE YEAR BEFORE,

11 IT WOULD JUST HAVE BEEN ALLOCATED AND THAT $8 MILLION WOULD

12 HAVE STAYED IN THERE?

13 **A.**   CORRECT.

14 **Q.**   AND THIS YEAR THE $8 MILLION WAS TAKEN OUT?

15 **A.**   CORRECT.

16 **Q.**   DO YOU RECOGNIZE THIS DOCUMENT?

17 **A.**   YES.

18 **Q.**   CAN YOU TELL US WHAT IT IS?

19 **A.**   IT'S THE LICENSE AGREEMENT BETWEEN THE NFLPA AND PLAYERS

20 INC.

21 **Q.**   DATED MARCH 1ST, 2000?

22 **A.**   CORRECT.

23 **Q.**   HOW DID YOU MAKE A DETERMINATION, AS THE AUDITOR, OF THE

24 PROPRIETY OF THE TERMS OF EXHIBIT 95 WITHOUT AN INDEPENDENT

25 EVALUATION SUCH AS EXHIBIT 93?

1    **A.**    MY VIEW, THE AGREEMENT THAT YOU SEE HERE, DATED MARCH 1ST,

2    2000, WAS AN AGREEMENT THAT, IN CONJUNCTION WITH THE DUFF &

3    PHELPS VALUATION, CONTINUES THE ALLOCATION OF FUNDS OF THE

4    EQUAL SHARE POOL SPECIFICALLY AS IT HAS BEEN SINCE 1994,

5    GENERALLY.

6    **Q.**    SO IS WHAT YOU'RE SAYING THAT YOU BELIEVE THAT THE WORK OF

7    DUFF & PHELPS -- THE WORK THAT DUFF & PHELPS DID IN JANUARY OF

8    1995 COVERS THIS DOCUMENT DATED A LITTLE OVER FIVE YEARS LATER?

9    **A.**    CORRECT.

10   **Q.**    SO YOU SAID TO MY QUESTION A COUPLE OF QUESTIONS AGO THAT

11   YOU THOUGHT THAT -- THAT YOU THOUGHT THAT YOU COULD MAKE A

12   DETERMINATION ON THE PROPRIETY OF THE EXHIBIT 95, MARCH 2000

13   AGREEMENT, BASED ON WHAT DUFF & PHELPS HAD DONE IN 1995.  WAS

14   THERE ANY OTHER REASON THAT YOU THOUGHT THAT YOU COULD MAKE AN

15   ASSESSMENT OF THE PROPRIETY OF EXHIBIT 95?

16   **A.**    THE DUFF & PHELPS VALUATION WAS STILL THE BASIS FOR THE

17   ALLOCATION OF FUNDS AND THE REASONABLENESS OF IT THAT WE RELIED

18   ON INTO THIS AGREEMENT.

19   **Q.**    CAN YOU IDENTIFY FOR US 1307 THROUGH WHATEVER?

20   **A.**    THE TITLE REFERS TO THE ROYALTY ELIGIBILITY FOR 2002,

21   2003, 2004, 2005 AND 2006 SEASON.

22   **Q.**    UNDER 1310, IT'S CORRECT TO SAY THAT THE RETIRED PLAYERS

23   DO NOT MEET THE ELIGIBILITY REQUIREMENT?

24   **A.**    THAT IS CORRECT.

25   **Q.**    NOW, DIRECTING YOUR ATTENTION BACK TO EXHIBIT 95,

1  PARAGRAPH 4(B).  YOU'VE TESTIFIED ALREADY THAT THE DUFF  &

2  PHELPS REPORT, EXHIBIT 93, DID NOT MAKE ANY REFERENCE TO

3  RETIRED PLAYERS?

4  **A.**    CORRECT.

5  **Q.**    SO NOW MY QUESTION IS HOW, IF AT ALL, DID YOU ASSESS THE

6  PROPRIETY OF THIS, THE EXCLUSION OF RETIRED PLAYERS FROM THE

7  ELIGIBILITY REQUIREMENTS IN PARAGRAPH 4(B) OF EXHIBIT 95?

8  **A.**    I DON'T RECALL ASSESSING THE IMPACT ON EXCLUDING THE

9  RETIRED PLAYERS FROM THE PROGRAM.

10 **Q.**    AND DO YOU KNOW WHETHER ANYONE FROM THE RETIRED PLAYERS,

11 WHETHER THERE WAS ANY REPRESENTATIVE OF THE RETIRED PLAYERS

12 THAT HAD A SAY IN THIS AGREEMENT?

13 **A.**    I HAVE NO KNOWLEDGE OF THAT.

14 **Q.**    LET'S MOVE BACK TO THE 2006 FINANCIAL STATEMENTS WHICH ARE

15 EXHIBIT 85.  FOOTNOTE 11.  BEFORE MOVING TO THE SPECIFICS OF

16 NOTE 11, LET ME ASK YOU WHETHER THIS $8 MILLION REALLOCATION --

17 IF I ASKED YOU THIS BEFORE, I APOLOGIZE.  WHETHER THIS

18 $8 MILLION REALLOCATION WAS A ONE-TIME ONLY, OR DID IT HAPPEN

19 EVERY YEAR?

20 **A.**    THE $8 MILLION REALLOCATION OCCURRED THE YEAR ENDED

21 FEBRUARY 28, 2006, AND ALSO FEBRUARY 28TH, 2007.

22 **Q.**    AND IS IT YOUR UNDERSTANDING IT'S GOING TO OCCUR IN 2008?

23 **A.**    I DON'T KNOW THAT RIGHT NOW.

24 **Q.**    NOW, WHEN IT OCCURRED IN 2007, WAS IT JUST $8 MILLION OFF

25 THE TOP, OR ARE WE TALKING NOW ABOUT 16 MILLION?  8 MILLION FOR

1  2006 PLUS 8 MILLION FOR 2007?

2  **A.**   IT WAS 8 MILLION INDIVIDUALLY.

3  **Q.**   SO FOR 2006, 8 MILLION CAME OUT OF THE GROSS LICENSING

4  REVENUES AND WAS REALLOCATED TO NFLPA 60 PERCENT AND PI

5  40 PERCENT?

6  **A.**   CORRECT.

7  **Q.**   AND IN 2007 THE SAME THING HAPPENED?

8  **A.**   CORRECT.

9  **Q.**   TAKING A LOOK AGAIN AT EXHIBIT 95, WHICH IS THE MARCH 2000

10  AGREEMENT.  AND ON PAGE 135 WE HAVE THE DEFINITION OF GROSS

11  LICENSING REVENUES.  IS THAT THE DEFINITION THAT YOU USED FOR

12  GROSS LICENSING REVENUES IN YOUR WORK, IN YOUR WORK FOR THE

13  NFLPA?

14  **A.**   YES.

15  **Q.**   YOU'VE REVIEWED NOW THE DEFINITION OF GROSS LICENSING

16  REVENUES, EXHIBITS 92 AND 95; IS THAT CORRECT?  95 IS THE 2000

17  AGREEMENT.

18  **A.**   YES.

19  **Q.**   AND YOU'VE RESPONDED THAT THEY ARE DIFFERENT?

20  **A.**   CORRECT.

21  **Q.**   SO THE NFLPA IS SUPPOSED TO GET 40 PERCENT OF THE GROSS

22  LICENSING REVENUES; IS THAT CORRECT?

23  **A.**   APPROXIMATELY 40 PERCENT OF GROSS LICENSING REVENUE.

24  **Q.**   WHERE IS THE 60 PERCENT?  WHERE'S THE 40 PERCENT CUT SET

25  OUT?

1  **A.**   THE 40 PERCENT NFLPA LICENSE AMOUNT IS SET OUT IN THE

2  ORIGINAL DUFF & PHELPS VALUATION OF THE BREAKDOWN OF THE GROSS

3  LICENSING REVENUE.

4  **Q.**   SO IT'S SET OUT IN THE 1994 AGREEMENT?

5  **A.**   CORRECT.

6  **Q.**   AND THAT DIDN'T CHANGE IN EXHIBIT 95, IN THE 2000

7  AGREEMENT?

8  **A.**   FUNCTIONALLY, THE BREAKDOWN DIDN'T CHANGE ON THE

9  ALLOCATION BETWEEN THE NFLPA, PLAYERS INC. AND THE PLAYERS.

10 **Q.**   IN FACT, IT JUST CARRIED FORWARD BECAUSE IT WASN'T EVEN

11 MENTIONED SPECIFICALLY IN THE 2000 AGREEMENT?

12 **A.**   CORRECT.

13 **Q.**   WHY DON'T YOU TELL US WHAT THIS DOCUMENT IS.

14 **A.**   THIS IS THE FINANCIAL STATEMENT PACKET, INCLUDING THE

15 AUDITED FINANCIAL STATEMENTS, DESCRIPTIVE CHARTS AND GRAPHS AND

16 THE NFLPA AND PLAYERS INC BUDGET AND ANALYSIS FOR THE YEAR

17 ENDING 2/28/07.

18 **Q.**   DO YOU RECOGNIZE EXHIBIT 99?

19 **A.**   YES.

20 **Q.**   TELL US WHAT IT IS, PLEASE.

21 **A.**   THIS IS THE SPONSORSHIP AGREEMENT BETWEEN NFL PROPERTIES

22 AND PLAYERS INC.

23 **Q.**   AND I THINK YOU TESTIFIED A MOMENT AGO THAT THE MECHANICS

24 OF THIS AGREEMENT OR THE 25 PERCENT OF THE MONIES PAID BY THE

25 NFL TO NFLPA GO INTO SOME SORT OF PLAYER PROGRAMS AND

1    75 PERCENT GOES INTO THE ACTIVE PLAYER EQUAL SHARE POOL?

2    **A.**    I'M SORRY.  CAN YOU REPEAT THAT FOR ME?

3    **Q.**    OR CAN YOU JUST GIVE IT TO ME IN YOUR OWN WORDS?

4    **A.**    25 TO 28 PERCENT OF THE SPONSORSHIP REVENUE GOES INTO

5    PAYMENTS TO PLAYERS.  THE REMAINING AMOUNT GOES INTO THE ACTIVE

6    PLAYER EQUAL SHARE POOL.

7    **Q.**    CAN YOU TELL US WHAT THAT IS, SIR?

8    **A.**    LABOR ORGANIZATION ANNUAL REPORT LM-2, THE YEAR ENDED

9    FEBRUARY 28TH, 2005.

10   **Q.**    AND I THINK YOU TESTIFIED BEFORE THAT YOU REVIEW THESE

11   BEFORE THEY'RE FILED; IS THAT CORRECT?

12   **A.**    CORRECT.

13   **Q.**    CAN YOU TELL US WHAT EXHIBIT 101 IS?

14   **A.**    LABOR ORGANIZATION ANNUAL REPORT FORM LM-2 FOR THE YEAR

15   ENDED FEBRUARY 28TH, 2006.

16   **Q.**    WELL, WHY DON'T YOU TELL ME WHAT YOUR PROCEDURES WERE IN

17   GENERAL IN TRACKING THE FLOW OF LICENSING REVENUES FROM THE

18   LICENSEE TO PI AND THE NFLPA AND TO THE PLAYER, TO THE ACTIVE

19   PLAYER FIRST, AND THEN I'LL ASK THE SAME QUESTION FOR THE

20   RETIRED PLAYER.

21   **A.**    THERE ARE NUMEROUS PROCEDURES THAT WE PERFORM IN EACH

22   CYCLE OF EXPENSE AND DISBURSEMENT AND RECEIPT.  FOR THE

23   LICENSING MONEY THAT'S COMING IN THERE'S A SAMPLE OF LICENSEES'

24   LICENSING AGREEMENTS THAT WE WILL REVIEW TO ENSURE WHAT WAS TO

25   BE PAID, WHAT WAS PAID.  AND WITH THAT WE ALSO PERFORM CERTAIN

1  LICENSING AUDITS ON A ROTATING BASIS FOR THE REVENUES THAT ARE

2  COMING INTO PLAYERS INC AND THE NFLPA.

3  **Q.**   BUT ONCE IT GETS TO -- I THINK YOU JUST SAY BEFORE THEY

4  COME SIMULTANEOUSLY FROM THE LICENSEE TO BOTH NFLPA AND PI?

5  **A.**   CORRECT.

6  **Q.**   AND THEN FROM THERE TO THE PLAYER.  DID YOU AUDIT THAT?

7  **A.**   WE LOOK AT THE ELIGIBILITY REQUIREMENTS AND DO A SAMPLING

8  OF INDIVIDUAL PLAYERS TO THE AMOUNT OF MONEY THAT WAS RECEIVED.

9  **Q.**   NOW, I THINK YOU TESTIFIED THAT UNDER THE ELIGIBILITY

10  REQUIREMENTS, YOUR UNDERSTANDING WAS RETIRED PLAYERS WEREN'T

11  ELIGIBLE?

12  **A.**   CORRECT.

13  **Q.**   SO WITH RESPECT TO RETIRED PLAYERS, YOU DIDN'T DO ANYTHING

14  FURTHER TO CHECK THAT THEY WERE RECEIVING THE AMOUNTS OF MONEY

15  DUE THEM, BECAUSE YOU DIDN'T THINK THERE WERE ANY AMOUNTS OF

16  MONEY DUE THEM?

17  **A.**   ON THE EQUAL SHARE ROYALTY POOL, THAT IS CORRECT.

18  **Q.**   DO YOU RECOGNIZE THIS DOCUMENT?

19  **A.**   YES.

20  **Q.**   CAN YOU TELL US WHAT IT IS, PLEASE.

21  **A.**   IT'S THE CALCULATION.

22  **Q.**   EXCUSE ME.  THE QUESTION IS, SIR, WHAT IS THIS?

23  **A.**   THIS IS A CALCULATION PERFORMED BY THE PLAYERS INC FINANCE

24  DEPARTMENT ON THE ALLOCATION OF THE EQUAL SHARE ROYALTY POOL.

25  **Q.**   AND HAVE YOU REVIEWED IT, ALSO?

1  A.   YES.

2           (READING STOPPED.)

3        **MR. CHARHON:**  PLAINTIFFS OFFER EXHIBIT 102 INTO

4  EVIDENCE.

5        **MR. KESSLER:**  COULD I SEE?

6        YOUR HONOR, IF I JUST CAN SEE WHAT IT IS.

7        **THE COURT:**  ANY OBJECTION?

8        **MR. KESSLER:**  NO OBJECTION, YOUR HONOR.

9        **THE COURT:**  RECEIVED.

10          (TRIAL EXHIBIT 102 RECEIVED IN EVIDENCE.)

11          (READING RESUMED.)

12 Q.   CAN YOU TAKE US THROUGH IT, PLEASE?  THIS IS FOR 2003?

13 A.   RIGHT.  FISCAL YEAR ENDED 2/28/03.

14 Q.   IF YOU COULD TAKE US THROUGH THE FIRST PAGE OF THIS

15 DOCUMENT, SIR?

16 A.   UNDER THE GROSS LICENSING REVENUES YOU SEE THAT THERE'S

17 LICENSING ROYALTIES, NFLPA, WHICH REPRESENTS THE CALCULATED

18 40 PERCENT SHARE OF GROSS LICENSING REVENUE EQUAL SHARE POOL,

19 COMING TO $14,074,000.  LICENSING ROYALTIES, PLAYERS INC

20 REPRESENTS THE PLAYERS INC PORTION OF THE EQUAL SHARE POOL.

21 COMING TO TOTAL AMOUNT RECEIVED, TOTAL LICENSING ROYALTIES OF

22 $27.2 MILLION FOR THE YEAR ENDED 2/28/03.  IN ADDITION TO THE

23 TOTAL LICENSING ROYALTIES FOR THAT YEAR, THE NFL SPONSORSHIP

24 AND INTERNET AMOUNTS ARE ADDED THERE AT THAT $10 MILLION.

25 THERE'S A DEDUCTION FOR THE 25 PERCENT NFL FUND RELATING TO THE

1  SPONSORSHIP AGREEMENT OF $2.1 MILLION.

2          COMING DOWN TO THE NET GROSS LICENSING REVENUE OR

3  EQUAL SHARE POOL OF $35.1 MILLION.

4          GOING TO THE BOTTOM, GROSS LICENSING REVENUE, COMING

5  STRAIGHT DOWN FROM THE MIDDLE OF THE PAGE, $35.1 MILLION LESS

6  THE NFL PORTION, $14 MILLION, COMES TO $21,111,198, WHICH FROM

7  THERE 60 PERCENT OF THAT WOULD GO TO ACTIVE PLAYERS IN THE

8  PLAYER POOL, COMING TO $12,666,718.

9  **Q.**   AND THEN MOVING TO THE SECOND PAGE.

10 **A.**   STARTING AT THE TOP, NFLPA, WHAT IT CURRENTLY HAS

11 RECEIVED, $10.9 MILLION.  THE ACCRUALS AT THE END OF THE YEAR,

12 2/28/03, $2.8 MILLION.  PLAYERS INC CURRENTLY RECEIVED

13 12.2 MILLION.

14         THE ACCRUALS RELATED TO PLAYERS INC IS $1.$ MILLION.

15 THERE YOU SEE THE $10 MILLION FROM THE SPONSORSHIP AND THE

16 INTERNET AGREEMENT LESS THE 25 PERCENT SPONSORSHIP AGREEMENT,

17 DEDUCTION OF $2.1 MILLION, TO COME TO THE NET GROSS LICENSING

18 REVENUE OF $35.1 MILLION.

19         YOU CAN SEE THE NFLPA PORTION, WHICH IS 40 PERCENT OF

20 THAT $35.1 MILLION, IS 14,074,131.

21 **Q.**   THERE ARE TWO MORE NUMBERS THERE.

22 **A.**   I DON'T KNOW EXACTLY WHAT THE LESS WHAT PA WILL GET WITH

23 ACCRUALS MEANS.

24         THE NEXT LINE DUE TO NFLPA TO MEET PORTION OF GROSS

25 LICENSING REVENUE IS THE AMOUNT DUE TO NFLPA TO GET THEM TO

1    THEIR 40 PERCENT LICENSING AMOUNT.

2            LOOKING AT THE BOTTOM, GOING TO THE $21.1 MILLION,

3    THE 60 PERCENT THAT'S GOING TO THE PLAYERS CALCULATED ON THE

4    PREVIOUS PAGE IS DEDUCTED FROM THAT $21.1 MILLION, COMING TO

5    THE AMOUNT RETAINED BY PLAYERS INC, THE $8.4 MILLION FOR THE

6    YEAR.

7    **Q.**   THEN MOVING TO THE NEXT PAGE.  ACTUALLY, THE NEXT PAGE ARE

8    ALL THE SAME FORMAT.

9    **A.**   THE NEXT PAGES ARE ALL ROLLING UP INTO THE SECOND PAGE

10   HERE UNDER GROSS LICENSING REVENUE.

11   **Q.**   SO THE -- AFTER PAGE 2 OF EXHIBIT 102, AFTER THE SECOND

12   PAGE OF EXHIBIT 102, THE REMAINDER IS THE BACKUP FOR PAGE 2; IS

13   THAT FAIR TO SAY?

14   **A.**   CORRECT.

15   **Q.**   NOW LET'S DO THE SAME THING FOR 2004.  WHAT IS EXHIBIT

16   103, SIR?

17   **A.**   EXHIBIT 103 IS THE CALCULATION OF THE ACTIVE PLAYER EQUAL

18   SHARE POOL FOR 2004, THE YEAR ENDED FEBRUARY 28TH, 2004.

19           (READING STOPPED.)

20           **MR. CHARHON:**  PLAINTIFFS MOVE EXHIBIT 103 INTO

21   EVIDENCE.

22           **MR. KESSLER:**  NO OBJECTION.

23           **THE COURT:**  RECEIVED.

24           (TRIAL EXHIBIT 103 RECEIVED IN EVIDENCE.)

25           (READING RESUMED.)

1  Q.   IN THE HOPE OF MOVING THIS ALONG AND GETTING MR. FEHER ON

2  HIS TRAIN, COULD YOU COMPARE AND CONTRAST EXHIBIT 103 AND 102?

3  IF IT'S THE SAME FORMAT, THE SAME WAY OF CALCULATION, TELL US

4  THAT; IF IT'S DIFFERENT, TELL US THAT.

5  A.   THE ONLY THING DIFFERENT THAT I CAN SEE ON THE FIRST PAGE

6  RELATES TO THE 528,000 REFERRING TO LICENSING ROYALTIES NOT

7  SUBJECT TO THE POOL, 5 AND 10 PERCENT PORTIONS.

8  Q.   I'M SORRY.  OH, YES, I SEE THAT.

9  A.   THE THIRD LINE.

10 Q.   HOW IS THAT DIFFERENT?

11 A.   THE NFLPA -- WELL, THE TOTAL GROSS LICENSING REVENUES WAS

12 OVER $40 MILLION FOR THE FIRST TIME.  AND IN MAKING A

13 CALCULATION RELATING TO PLAYERS INC, NFLPA, AND WHAT THE

14 PLAYERS GET IN THAT ALLOCATION, THERE IS A DIFFERENCE OF

15 528,000 BETWEEN THE NFLPA GETTING 40 PERCENT AND EFFECTIVELY A

16 REDUCED AMOUNT BECAUSE IT WENT OVER $40 MILLION.

17 Q.   I SEE.  EXHIBIT 103 DOES NOT SHOW ANY FLOWS OF MONEY TO

18 RETIRED PLAYERS, RIGHT?

19 A.   BASED ON THE FORM OR LOOKING AT IT, IT'S NOT CLEAR,

20 WITHOUT HAVING DETAIL OF WHAT THE 25 PERCENT NFL FUND WHO THAT

21 WAS DISTRIBUTED TO.

22 Q.   ASIDE FROM THAT, IT DOES NOT TRACK A RETIRED PLAYERS --

23 A.   NO.

24 Q.   LET'S ASK THE REPORTER TO MAKE THIS THE NEXT EXHIBIT, 104.

25        CAN YOU TELL US WHAT EXHIBIT 104 IS?

1  **A.**   CALCULATION EQUAL SHARE ROYALTY POOL FOR THE YEAR ENDED

2  FEBRUARY 28, 2005.

3          (READING STOPPED.)

4          **MR. CHARHON:**  PLAINTIFFS OFFER EXHIBIT 104 INTO

5  EVIDENCE, YOUR HONOR.

6          **MR. KESSLER:**  NO OBJECTION.

7          **THE COURT:**  RECEIVED.

8          (TRIAL EXHIBIT 104 RECEIVED IN EVIDENCE.)

9          (READING RESUMED.)

10 **Q.**   FOR ACTIVE PLAYERS, RIGHT?

11 **A.**   EQUAL SHARE ROYALTY POOL IS FOR ACTIVE PLAYERS ONLY.

12 **Q.**   AND CAN YOU COMPARE AND CONTRAST EXHIBIT 104 WITH EXHIBIT

13 103 AND 102, JUST TELLING US IF IT'S THE SAME FORMAT OR

14 DIFFERENT?

15 **A.**   THE ONLY DIFFERENCE I CAN SEE ON THE FIRST PAGE IS THERE'S

16 MORE DETAIL IN THE INITIAL CATEGORIES OF GROSS LICENSING

17 REVENUES AS OPPOSED TO HAVING ONE ROLLED-UP LINE WITH NFLPA AND

18 PLAYERS INC.

19 **Q.**   AND THE DETAIL ROLLS INTO WHICH LINE?

20 **A.**   WELL, THE DETAIL -- IT'S ALL ROLLING UP IN THE TOP FOUR

21 LINES THERE.

22 **Q.**   ARE THERE ANY OTHER DIFFERENCES?

23 **A.**   NOT THAT I SEE HERE.

24 **Q.**   LET'S TAKE A LOOK AT 2006.

25          (READING STOPPED.)

1    **MR. CHARHON:**  PLAINTIFFS OFFER 106 INTO EVIDENCE,

2  YOUR HONOR.

3    **THE COURT:**  THERE IS NO 106 ON THE LIST.  ARE YOU

4  SURE OF THE NUMBER?  IT SKIPS FROM 105 TO 107.

5    **MR. CHARHON:**  105.  EXCUSE ME.

6    **THE COURT:**  105 IS RECEIVED.

7    (TRIAL EXHIBIT 105 RECEIVED IN EVIDENCE.)

8    **MR. KESSLER:**  NO OBJECTION TO 105.

9    (DOCUMENT DISPLAYED.)

10   (READING RESUMED.)

11 **Q.**  CAN YOU COMPARE AND CONTRAST EXHIBIT 106 WITH 105, 104 AND

12 103?

13 **A.**  THE ONLY DIFFERENCE THAT I NOTE BETWEEN THE THREE IS THE

14 CHANGE IN MARKET CONDITION ADJUSTMENT OF $8 MILLION.

15 **Q.**  WHERE DOES THAT APPEAR?

16 **A.**  THAT APPEARS ON THE SIXTH LINE, UNDER ACTUAL FISCAL YEAR

17 2006 REVENUE.

18 **Q.**  OKAY.  AND THEN FOOTNOTE ONE APPEARS TO READ SPONSOR,

19 DOLLAR SIGN, DOLLAR SIGN OF 20,453,778, LESS 500K.  INTERNET

20 DOLLAR SIGN OF 3 MILLION.  3 PERCENT FUND USED OF 169,500.

21   CAN YOU EXPLAIN THAT FOOTNOTE?

22 **A.**  THAT'S REFERRING TO THE NFL PROPERTIES SPONSORSHIP

23 AGREEMENT.  TOTAL REVENUE FROM THAT, $13,252,000 LESS 500,000,

24 AS DESCRIBED IN THE PLAYERS INC NFLPA AGREEMENT.  ADDING THE

25 INTERNET AMOUNT RECEIVED FOR THE YEAR OF 3 MILLION AND ALSO

1  ADDING CERTAIN AUDIT FINDINGS RELATED TO THESE AGREEMENTS OF

2  362,000, TOTALING THE AMOUNT THAT'S FLOWING INTO THAT FIRST

3  LINE.  ONE NOTE.

4  **Q.**  HAS THE EQUIVALENT DOCUMENT THAT WE'VE BEEN LOOKING AT FOR

5  2007 BEEN DONE?

6  **A.**  YES.

7  **Q.**  DO YOU KNOW AN INDIVIDUAL NAMED PAMELA ADOLPH?

8  **A.**  YES.

9  **Q.**  HAVE YOU EVER SEEN THIS PARTICULAR E-MAIL BEFORE, EXHIBIT

10  52?

11  **A.**  NO.

12  **Q.**  IT'S CORRECT THAT PAMELA ADOLPH IN DECEMBER 2003 WAS

13  ASSISTANT VICE PRESIDENT OF PLAYERS INC AS FAR AS YOU KNOW?

14  **A.**  AS FAR AS I KNOW?  YES.

15  **Q.**  SHE REFERS TO SOMETHING CALLED THE INC CUT OF THE

16  ROYALTIES.  INC IS IN ALL CAPS.  DOES THAT MEAN ANYTHING TO

17  YOU?

18  **A.**  I BELIEVE SHE'S REFERRING TO PLAYERS INC.

19  **Q.**  DO YOU KNOW HOW THE ROYALTIES FLOW WITH RESPECT TO RETIRED

20  PLAYER APPAREL?

21  **A.**  NO, I DON'T.

22  **Q.**  THE LICENSING REVENUES COME INTO A GENERAL POOL OF MONIES

23  FOR BOTH PI AND NFLPA; IS THAT CORRECT?

24  **A.**  IT GOES INTO THEIR RESPECTIVE BANK ACCOUNTS, CORRECT.

25  **Q.**  AND THAT'S JUST A GENERAL POOL OF MONEY?

1  **A.**   OPERATING ACCOUNT, YES.

2            (READING STOPPED.)

3            **MR. CHARHON:**  YOUR HONOR, AT THIS TIME WE HAVE A

4  NUMBER OF OTHER EXHIBITS THAT WE'D LIKE TO OFFER INTO EVIDENCE.

5            **THE COURT:**  ALL RIGHT.  GO AHEAD.

6            **MR. CHARHON:**  19.

7            **MR. KESSLER:**  YOUR HONOR, I HAVE TO SEE THEM ALL.

8  I'M SORRY.  IF YOU COULD GIVE ME THE LIST, AND WE WILL GET THEM

9  OUT.

10           IF YOU GIVE US THE LIST, WE'LL PULL THEM ALL.

11           **MR. CHARHON:**  I'VE GOT IT RIGHT HERE.

12           **THE COURT:**  IS THIS SOMETHING THAT WE CAN DO -- DO WE

13  NEED TO TAKE UP JURY TIME ON THIS?

14           **MR. CHARHON:**  LIKELY NOT.  WE CAN DO IT ON A BREAK.

15           **THE COURT:**  ALL RIGHT.  THEN ARE WE DONE WITH THE

16  READING?

17           **MR. CHARHON:**  WE ARE, YOUR HONOR.

18           **THE COURT:**  ALL RIGHT.  SO WE WILL --

19           **MR. KESSLER:**  THERE'S NO OBJECTION TO 19, YOUR HONOR.

20           **THE COURT:**  ALL RIGHT.  19 IS RECEIVED.

21           (TRIAL EXHIBIT 19 RECEIVED IN EVIDENCE.)

22           **MR. CHARHON:**  AND WE'LL TAKE THE REST UP ON A BREAK.

23           **THE COURT:**  ALL RIGHT.  THE BURDEN IS ON YOU, THE

24  PROPONENT, TO BRING IT BACK TO MY ATTENTION.

25           ALL RIGHT.  YOU CAN STEP DOWN, SIR.

1          NEXT WITNESS, PLEASE.

2          **MR. KESSLER:**  YOUR HONOR, I'M SORRY, 19 CONTAINS

3    MR. ADDERLEY'S SOCIAL SECURITY NUMBER.  I THINK THEY WANT TO DO

4    A REDACTED VERSION.

5          **THE COURT:**  PLEASE DO A REDACTED VERSION OF THAT.

6          ALL RIGHT.  THANK YOU.

7          NEXT WITNESS.

8          **MR. KATZ:**  I BELIEVE WE'RE CALLING MR. BYRD OUT OF

9    ORDER; IS THAT CORRECT?

10          **MR. KESSLER:**  YES, YOUR HONOR.

11          **MR. CLARK:**  THAT'S CORRECT.  THE DEFENSE IS GOING TO

12    CALL STEVEN BYRD NOW.

13          **THE COURT:**  OKAY.  LET ME EXPLAIN WHAT'S GOING TO

14    HAPPEN HERE.

15          OCCASIONALLY A WITNESS HAS TRAVELING PROBLEMS.  IN

16    THIS CASE, THE DEFENSE HAS A WITNESS THAT THEY WANT TO CALL,

17    BUT IT'S NOT THE DEFENSE CASE YET.  WE'RE STILL ON THE

18    PLAINTIFFS' CASE.  BUT THE PLAINTIFFS' COUNSEL HAVE BEEN

19    COURTEOUS ENOUGH TO AGREE THAT THE WITNESS CAN BE CALLED OUT OF

20    TURN.

21          SO WE'RE GOING TO LEAP FORWARD INTO THE DEFENSE CASE,

22    HEAR ONE WITNESS WHO HAS TO TRAVEL SOMEPLACE, AND THEN WE WILL

23    LEAP BACKWARDS INTO THE PLAINTIFFS' CASE AFTER THAT WITNESS HAS

24    COME AND GONE.

25          SO LET'S HEAR FROM MR. BYRD.

1          **MR. KESSLER:** I'M SORRY, YOUR HONOR. WE HAVE TO CALL

2    HIM FROM OUTSIDE. HE WAS WAITING, SEQUESTERED.

3          **THE COURT:** YOU MIGHT WONDER WHY IT IS THAT THE

4    WITNESSES ARE OUTSIDE. IT'S SO THEY CAN'T HEAR EACH OTHER

5    TESTIFY.

6          IT'S A STANDARD RULE. THE EXCEPTIONS TO THAT ARE

7    WITNESSES WHO ARE THE PARTIES IN THE CASE. THOSE CAN ALWAYS

8    STAY IN THE COURTROOM BECAUSE THEY HAVE AN INTEREST IN THE

9    CASE.

10          YES, SIR, ARE YOU MR. BYRD?

11          **THE WITNESS:** YES.

12          **THE COURT:** ALL RIGHT. PLEASE RAISE YOUR RIGHT HAND.

13   WE'LL SWEAR YOU IN.

14          (THEREUPON, THE WITNESS WAS SWORN.)

15          **THE WITNESS:** YES, I DO.

16          **THE CLERK:** OKAY. THANK YOU. PLEASE BE SEATED.

17          **THE COURT:** MR. BYRD, HAVE A SEAT. CAN WE TAKE YOUR

18   PICTURE SO IT CAN BE DISPLAYED TO THE CLOSING -- IN THE CLOSING

19   ARGUMENTS?

20          **THE WITNESS:** SURE.

21          **THE COURT:** SO WE CAN REMIND THE JURY WHO'S WHO.

22          **THE CLERK:** OKAY. THANKS.

23          **THE COURT:** ALL RIGHT. SCOOT FORWARD ENOUGH AND

24   ADJUST THE MIC SO IT CATCHES YOUR VOICE.

25          **THE WITNESS:** OKAY.

1           **THE COURT:**  ALL RIGHT.  GO RIGHT AHEAD, STATE YOUR

2    FULL NAME.

3           **THE WITNESS:**  STEVEN CHARLES BYRD.

4           **THE COURT:**  ALL RIGHT.  WELCOME.

5           GO AHEAD, COUNSEL.  REMIND THE JURY OF YOUR NAME.

6           **MR. CLARK:**  YES, YOUR HONOR.

7           LADIES AND GENTLEMEN, MY NAME IS JASON CLARK.  I'M AN

8    ATTORNEY FOR THE DEFENDANTS.

9           **THE COURT:**  GO AHEAD, MR. CLARK.

10          **MR. CLARK:**  THANK YOU, YOUR HONOR.

11                          **STEVEN BYRD**,

12   CALLED AS A WITNESS FOR THE DEFENDANTS HEREIN, HAVING BEEN

13   FIRST DULY SWORN, WAS EXAMINED AND TESTIFIED AS FOLLOWS:

14                      **DIRECT EXAMINATION**

15   BY MR. CLARK:

16   **Q.**   GOOD MORNING, MR. BYRD.

17   **A.**   GOOD MORNING.

18   **Q.**   ARE YOU CURRENTLY EMPLOYED?

19   **A.**   YES.

20   **Q.**   WHO IS YOUR EMPLOYER?

21   **A.**   STATS LLC.

22   **Q.**   AND WHAT DOES STATS DO?

23   **A.**   IT'S A SPORTS INFORMATION CONTENT AND FANTASY GAME

24   COMPANY.

25   **Q.**   IS STATS AFFILIATED WITH OR RELATED TO ANY OTHER

1  COMPANIES?

2  **A.**   YES.   STATS IS A JOINT VENTURE.   IT IS OWNED 50 PERCENT BY

3  NEWS CORPORATION AND 50 PERCENT BY THE ASSOCIATED PRESS, THE

4  AP.

5  **Q.**   AND HOW LONG HAVE YOU WORKED FOR STATS?

6  **A.**   11 YEARS.

7  **Q.**   SO SINCE 1997?

8  **A.**   YES.

9  **Q.**   AND WHAT POSITIONS HAVE YOU HELD AT STATS?

10  **A.**   INITIALLY, I WAS VICE PRESIDENT OF MARKETING, AND THEN I

11  WAS VICE PRESIDENT OF THE FANTASY SPORTS BUSINESS UNIT.   AND MY

12  CURRENT TITLE IS EXECUTIVE VICE PRESIDENT OVERSEEING SALES,

13  MARKETING AND THE FANTASY SPORTS BUSINESS UNIT.

14  **Q.**   AND WHAT TYPES OF DUTIES DO YOU DO AS THE EXECUTIVE VICE

15  PRESIDENT OVERSEEING ALL THOSE THINGS?

16  **A.**   I MANAGE STAFF.   I DEAL WITH CLIENTS.   I WORK WITH LEAGUES

17  AND PLAYER ASSOCIATIONS WITH THE RELATIONSHIPS STATS HAS WITH

18  THEM.

19  **Q.**   WHEN YOU WERE PREVIOUSLY THE VICE PRESIDENT OF THE FANTASY

20  SPORTS BUSINESS UNIT, WHAT TYPES OF RESPONSIBILITIES DID YOU

21  HAVE THEN?

22  **A.**   MORE DIRECTLY OVERSEEING THE DEVELOPMENT OF FANTASY SPORTS

23  GAMES AND THE MARKETING OF THOSE PRODUCTS.

24  **Q.**   WERE YOU INVOLVED IN LICENSING, AS WELL, IN THAT POSITION?

25  **A.**   YES.

1   Q.   AND TO WHOM DO YOU REPORT CURRENTLY AT STATS?

2   A.   THE CEO, GARY WALRATH.

3   Q.   MR. BYRD, SINCE YOU STARTED AT STATS IN 1997, HAS STATS

4   ENTERED INTO ANY LICENSE AGREEMENTS WITH PLAYERS INC?

5   A.   YES.

6   Q.   AND WHAT ROLE DID YOU PLAY IN NEGOTIATING ANY OF THESE

7   LICENSE AGREEMENTS?

8   A.   I WAS THE LEAD BUSINESS PERSON INVOLVED IN THOSE

9   DISCUSSIONS AND NEGOTIATIONS.

10          **MR. CLARK:**  MAY I APPROACH THE WITNESS, YOUR HONOR?

11          **THE COURT:**  GO AHEAD.

12          **MR. CLARK:**  I'D LIKE TO SHOW THE WITNESS TRIAL

13   EXHIBIT 1109, WHICH IS ALREADY IN EVIDENCE.

14          (DOCUMENT DISPLAYED.)

15   **BY MR. CLARK:**

16   Q.   MR. BYRD, ARE YOU FAMILIAR WITH THIS DOCUMENT?

17   A.   YES.

18   Q.   WHAT IS IT?

19   A.   IT IS THE LICENSE AGREEMENT THAT STATS HAD WITH PLAYERS

20   INC FOR THE 2006 NFL SEASON, TO OPERATE FANTASY GAMES UNDER A

21   LICENSE.

22   Q.   AND WERE YOU INVOLVED IN NEGOTIATING THIS AGREEMENT?

23   A.   YES.

24   Q.   AND IF YOU'LL LOOK AT THE -- IF WE COULD LOOK AT THE LAST

25   PAGE, PAGE 12 -- SORRY, I GUESS IT'S NOT THE VERY LAST PAGE.

1  THE LAST PAGE OF THE AGREEMENT.

2  A.    RIGHT.  OKAY.

3  Q.    THERE WE GO.  DO YOU RECOGNIZE THE SIGNATURE THAT'S

4  UNDERNEATH WHERE IT SAYS "STATS LLC"?

5  A.    YES.

6  Q.    WHOSE SIGNATURE IS THAT?

7  A.    THAT IS GARY WALRATH, OUR CEO.

8  Q.    AND DID YOU REPORT TO MR. WALRATH AT THE TIME YOU WERE

9  NEGOTIATING THIS AGREEMENT?

10 A.    YES.

11        **MR. CLARK:**  AND COULD WE GO BACK TO THE FIRST PAGE,

12 PLEASE, LAUREN?

13        (DOCUMENT DISPLAYED.)

14 **BY MR. CLARK:**

15 Q.    COULD I DIRECT YOUR ATTENTION TO PARAGRAPH 2A, THE GRANT

16 OF LICENSE, TOWARDS THE BOTTOM OF THE PAGE.

17        **MR. CLARK:**  IF WE COULD BLOW THAT UP.

18        THANK YOU.

19 **BY MR. CLARK:**

20 Q.    WHAT TYPE OF PRODUCT WAS STATS LICENSING IN THIS

21 AGREEMENT?

22 A.    FANTASY FOOTBALL GAMES.

23 Q.    AND SO THAT'S A FANTASY FOOTBALL GAME DISTRIBUTED OVER THE

24 INTERNET, IT SAYS, CORRECT?

25 A.    CORRECT, YES.

1  **Q.** SINCE YOU JOINED STATS IN 1997, HAS STATS EVER NEGOTIATED

2  A LICENSE AGREEMENT WITH PLAYERS INC FOR ANY PRODUCT BESIDES

3  FANTASY FOOTBALL?

4  **A.** NO.

5  **Q.** AND FROM YOUR PROFESSIONAL EXPERIENCE AND YOUR PERSONAL

6  EXPERIENCE ARE YOU FAMILIAR WITH HOW FANTASY FOOTBALL GAMES ARE

7  PLAYED?

8  **A.** YES.

9  **Q.** COULD YOU BRIEFLY EXPLAIN TO THE JURY THE TYPE OF FANTASY

10 GAME STATS PROVIDED WITH THIS LICENSE AGREEMENT?

11 **A.** SURE. THERE ARE A COUPLE OF DIFFERENT STYLES OF FANTASY

12 FOOTBALL, BUT THE CORE ESSENCE OF THEM IS THE SAME, WHERE

13 YOU -- YOU PICK NFL -- CURRENT NFL PLAYERS TO BE ON YOUR TEAM,

14 AND THEY CAN BE FROM ACROSS ANY OF THE TEAMS IN THE LEAGUE.

15        AND THEN, YOU GET POINTS BASED ON THE STATISTICS THAT

16 THEY ACCUMULATE IN THAT WEEKEND'S GAMES. AND THEN, YOU HAVE

17 DIFFERENT WAYS OF SCORING THE GAME, BUT ULTIMATELY YOU TRY TO

18 GET MORE POINTS THAN THE PEOPLE YOU ARE PLAYING AGAINST, AND

19 THEN YOU WIN.

20 **Q.** AND DID STATS PROVIDE THIS SERVICE DIRECTLY TO CONSUMERS

21 OR DID IT PROVIDE IT TO OTHERS? WHAT DID STATS PROVIDE?

22 **A.** BOTH. AT THAT TIME STATS DID RUN A GAME CALLED "STATS

23 FANTASY FOOTBALL." IT WAS ON OUR WEB SITE THAT CONSUMERS COULD

24 PLAY DIRECTLY WITH US. AND THEN, STATS ALSO PROVIDES A WHITE

25 LABEL SERVICE, PRIVATE LABEL, WHERE WE ARE THE OPERATING ENTITY

1  FOR OTHER COMPANIES' FANTASY FOOTBALL GAMES UNDER THEIR BRAND.

2  **Q.**   AND JUST TO GIVE THE JURY A LITTLE BIT MORE INFORMATION

3  ABOUT FANTASY FOOTBALL, AFTER PARTICIPANTS DRAFT THEIR TEAMS

4  THEY'RE GOING TO USE, WHAT DO THEY DO THE REST OF THE SEASON

5  WITH THESE TEAMS?

6  **A.**   SO YOU INITIALLY CHOOSE THE ROSTER FOR YOUR TEAM.  A

7  COUPLE OF DIFFERENT WAYS THAT YOU CAN DO THAT.  AND THEN,

8  AGAIN, THERE'S A FEW DIFFERENT STYLES OF PLAY, BUT BASICALLY

9  EACH WEEK FROM THE PLAYERS THAT YOU HAVE AVAILABLE ON YOUR TEAM

10  YOU PICK WHICH ONES WILL BE ACTIVE THAT WEEK.  SO YOU DON'T

11  PLAY EVERYONE.

12        YOU HAVE TO DECIDE WHO'S GOING TO START AND WHO'S

13  GOING TO BE ON YOUR BENCH.  AND YOU'RE HOPEFUL TO GET THE ONES

14  WHO ARE GOING TO DO THE BEST THAT WEEK, OBVIOUSLY.

15        AND IF SOMEONE'S INJURED, YOU OBVIOUSLY WOULDN'T

16  START THEM.  YOU WOULD BENCH THEM.

17        AND THEN, THROUGHOUT THE SEASON, THERE MAY BE NEW

18  PLAYERS COME ALONG THAT ARE ROOKIES THAT NO ONE KNEW ABOUT,

19  THAT SUDDENLY ARE DOING WELL.  SO YOU WANT TO TRY AND ADD THEM.

20        AND THE LEAGUES HAVE WAYS TO PICK UP FREE AGENTS.

21  IT'S CALLED TO PICK UP NEW PLAYERS WITH YOUR TEAM.  OR YOU CAN

22  TRADE WITH SOMEONE ELSE IN YOUR LEAGUE.  MAYBE THEY HAVE A

23  COUPLE OF QUARTERBACKS, AND YOUR QUARTERBACKS AREN'T ANY GOOD

24  OR THEY ARE HURT, SO YOU MIGHT TRADE YOUR DEFENSIVE TEAM FOR

25  THEIR QUARTERBACK KIND OF THING, BACK AND FORTH.

1    SO IT'S JUST KIND OF MANAGING EACH WEEK TO TRY TO GET

2  THE MOST POINTS.

3  **Q.**   AND YOU SAY YOU HOPEFULLY PICK THE ONES THAT ARE GOING TO

4  DO WELL THAT WEEK.  CAN YOU GIVE A FEW EXAMPLES OF HOW YOU

5  SCORE POINTS IN FANTASY FOOTBALL?

6  **A.**   SURE.  AGAIN, LEAGUES CAN SET DIFFERENT RULES.  BUT YOU

7  WOULD GET POINTS.  WHEN A PLAYER ON YOUR TEAM SCORES A

8  TOUCHDOWN, YOU MIGHT GET SIX POINTS, JUST LIKE THE SIX POINTS

9  THAT ARE SCORED IN THE REAL NFL GAME.

10    IF IT'S A PASS PLAY, BOTH THE QUARTERBACK AND THE

11  RECEIVER WOULD GET POINTS ON THEIR FANTASY TEAM.  IF IT'S A

12  RUSHING PLAY, THE PERSON WHO SCORED THE TOUCHDOWN WOULD GET THE

13  POINTS.  YOU CAN GET POINTS FOR THE NUMBER OF YARDS

14  ACCUMULATED, RUSHING YARDS, RECEIVING YARDS, ET CETERA.

15    YOU CAN GET POINTS FOR DEFENSIVE PLAYERS, FOR

16  INTERCEPTIONS AND FUMBLE RECOVERIES.  AND A DEFENSIVE TEAM CAN

17  GET POINTS FOR A SHUTOUT OF THE OTHER TEAM, ET CETERA.

18  **Q.**   THANK YOU.

19    AT THE TIME YOU WERE NEGOTIATING THE TRIAL EXHIBIT

20  1109, THE 2006 AGREEMENT, WHAT WAS YOUR UNDERSTANDING OF THE

21  TYPE OF PLAYER RIGHTS THAT STATS WAS ACQUIRING?

22  **A.**   THE -- IT WAS THE RIGHT TO USE THE CURRENT NFL PLAYERS

23  THAT WERE ACTIVE, THAT WE WERE ALLOWED TO THEN PUT THEM INTO

24  THE FANTASY FOOTBALL GAMES THAT WE WERE OPERATING AND HAVE

25  THEIR NAMES AND INFORMATION IN THOSE GAMES.

1  Q.   AND COULD I DIRECT YOUR ATTENTION TO PARAGRAPH 2A UNDER

2  THE GRANT OF LICENSE, AGAIN?

3        MR. CLARK:  PUT THAT BACK UP, LAUREN.  SORRY.  WE'RE

4  STAYING WITH THAT PARAGRAPH STILL.

5        (DOCUMENT DISPLAYED.)

6  BY MR. CLARK:

7  Q.   AND I WANT TO DIRECT YOUR ATTENTION SORT OF TOWARDS THE

8  END OF THE FIRST LINE WHERE IT SAYS:

9             "PLAYERS INC HEREBY GRANTS TO LICENSEE THE NAMES,

10 LIKENESSES" -- SORRY.  THEN IT PICKS UP IN THE MIDDLE.  I

11 SKIPPED A FEW WORDS, BUT:

12            "THE NAMES, LIKENESSES, PICTURES, PHOTOGRAPHS,

13 VOICES, FACSIMILE SIGNATURES, AND/OR BIOGRAPHICAL INFORMATION

14 OF THE NFL PLAYERS REFERENCED IN PARAGRAPH 1(A) ABOVE."

15       AT THE TIME YOU WERE NEGOTIATING THIS AGREEMENT, WHAT

16 PLAYERS DID YOU UNDERSTAND THAT YOU WERE LICENSING UNDER THIS

17 PROVISION?

18 A.   CURRENT NFL PLAYERS THAT WERE PLAYING IN THE LEAGUE THAT

19 YEAR.

20 Q.   NOW, I'D LIKE TO DIRECT YOUR ATTENTION UP TO PARAGRAPH

21 1(A) UNDER THE "REPRESENTATIONS."

22            AND, IN PARTICULAR, TO THE LAST SENTENCE THERE, WHICH

23 SAYS:

24            "LICENSEE ACKNOWLEDGES THAT PLAYERS INC ALSO, ON

25 OCCASION, SECURES AUTHORIZATION FOR INCLUSION IN PLAYERS INC

1   LICENSING PROGRAMS FROM PLAYERS, INCLUDING, BUT NOT LIMITED TO,

2   RETIRED PLAYERS."

3            AND IT CONTINUES ON FROM THERE.

4            WHAT WAS YOUR UNDERSTANDING AT THE TIME -- I'M SORRY.

5   WITHDRAWN.  LET ME START OVER.

6            YOU SEE THAT, RIGHT?

7   **A.**   YES, SIR.

8   **Q.**   DID YOU UNDERSTAND YOU WERE LICENSING ANY RETIRED PLAYER

9   RIGHTS AT THE TIME YOU WERE NEGOTIATING THIS AGREEMENT?

10           **MR. KATZ:**  OBJECT, LEADING.

11           **THE COURT:**  WHAT?

12           **MR. KATZ:**  OBJECT, LEADING.

13           **THE COURT:**  SUSTAINED.

14           PLEASE ASK IT IN A NONLEADING WAY.

15  **BY MR. CLARK:**

16  **Q.**   DID YOU UNDERSTAND THAT YOU WERE LICENSING ANY OTHER TYPES

17  OF PLAYER RIGHTS BESIDES WHAT YOU HAVE ALREADY TESTIFIED ABOUT

18  UNDER THIS PROVISION OF THE AGREEMENT?

19           **MR. KATZ:**  OBJECTION, LEADING.

20           **THE COURT:**  JUST SAY:

21            "WHAT WAS THE SIGNIFICANCE, IF ANY, OF THAT

22  SENTENCE" AND HIS UNDERSTANDING OF THE CONTRACT.

23           **MR. KATZ:**  NO OBJECTION, YOUR HONOR.

24           (LAUGHTER)

25

1  BY MR. CLARK:

2  Q.   AT THE TIME WERE YOU NEGOTIATING THIS AGREEMENT, MR. BYRD,

3  WHAT WAS YOUR UNDERSTANDING OF THIS PROVISION OF THE AGREEMENT,

4  IF ANY?

5  A.   THE -- THAT SOMETIMES PLAYERS INC MAY DO THINGS WITH THE

6  RETIRED PLAYERS.  THAT'S WHAT IT SAYS.  IT HAD NOTHING TO DO

7  WITH OUR LICENSE FOR FANTASY FOOTBALL, BECAUSE WE DIDN'T NEED

8  ANY RETIRED PLAYERS TO PLAY FANTASY FOOTBALL.

9  Q.   AS A NEGOTIATOR FOR STATS IN 2006, MR. BYRD, WOULD STATS

10  HAVE HAD ANY INTEREST IN LICENSING RETIRED PLAYER RIGHTS FOR

11  ANY OF ITS PRODUCTS?

12          MR. KATZ:  OBJECT, LEADING.

13          THE COURT:  IT IS LEADING.  IT'S AN IMPORTANT ENOUGH

14  QUESTION, I THINK YOU SHOULD BACK UP AND ASK IT IN LIKE:

15              "WHAT, IF ANY, INTEREST WOULD STATS HAVE HAD IN

16  LICENSING RETIRED PLAYERS?"

17          THAT'S NONLEADING AND GETS AT THE SAME POINT.

18          MR. CLARK:  YES, YOUR HONOR.

19  BY MR. CLARK:

20  Q.   MR. BYRD, IN 2006, WHEN YOU WERE NEGOTIATING THESE

21  AGREEMENTS, WHAT INTEREST, IF ANY, WOULD STATS HAVE HAD IN

22  LICENSING RETIRED PLAYERS?

23  A.   NONE.

24  Q.   SINCE YOU'VE WORKED AT STATS IN 1997, HAS STATS EVER USED

25  RETIRED PLAYER LICENSING RIGHTS IN ANY OF ITS PRODUCTS?

1          **MR. KATZ:**  OBJECT, LEADING.

2          **THE COURT:**  SUSTAINED.

3  BY MR. CLARK:

4  **Q.**   WHAT PLAYER RIGHTS HAS STATS USED IN ITS PRODUCTS SINCE

5  1997?

6  **A.**   WE HAVE HAD FANTASY LICENSES FOR ACTIVE PLAYERS FOR

7  FANTASY GAMES.

8  **Q.**   AND HAS STATS EVER HAD A LICENSE FROM PLAYERS INC FOR ANY

9  OTHER PRODUCTS -- HAS -- SORRY.  LET ME START OVER.  WITHDRAWN.

10         HAS STATS EVER HAD A LICENSE FROM PLAYERS INC FOR

11  PLAYER RIGHTS FOR ANY PRODUCT OTHER THAN FANTASY FOOTBALL?

12         **MR. KATZ:**  OBJECT, LEADING.

13         **THE COURT:**  WELL, IT IS LEADING, BUT GO AHEAD AND

14  ANSWER IT.

15         **THE WITNESS:**  NO.

16         **THE COURT:**  LET ME ASK YOU THIS:  TO WHAT EXTENT, IF

17  AT ALL, HAS STATS EVER LICENSED OR USED A RETIRED PLAYER IN

18  ANYTHING?

19         **THE WITNESS:**  FOR FOOTBALL?  NOTHING EVER.

20         **THE COURT:**  ALL RIGHT.  GO AHEAD.

21         **MR. CLARK:**  THANK YOU, YOUR HONOR.  THAT'S ALL MY

22  QUESTIONS.

23         **THE COURT:**  ALL RIGHT.  CROSS EXAMINATION.

24         **MR. KATZ:**  GOOD MORNING, LADIES AND GENTLEMEN OF THE

25  JURY.  MY NAME IS RON KATZ.  I'M NOT FROM BROOKLYN. I'M NOT

1  FROM TEXAS.  I'M ACTUALLY FROM OUR BEAUTIFUL BAY AREA.

2                      **CROSS EXAMINATION**

3  **BY MR. KATZ:**

4  **Q.**   GOOD MORNING, SIR.

5  **A.**   GOOD MORNING.

6  **Q.**   I REPRESENT THE PLAINTIFFS IN THIS MATTER.  DO YOU KNOW

7  THAT?

8            NOW, SIR, WHY ON EARTH WOULD YOU SIGN AN AGREEMENT

9  THAT MENTIONS RETIRED PLAYERS PROMINENTLY IF YOU DON'T THINK

10 YOU LICENSE RETIRED PLAYERS?

11 **A.**   I DON'T THINK IT MENTIONS IT PROMINENTLY.  AND IT SAYS

12 THEY MAY INCLUDE RETIRED PLAYERS AT SOME POINT.  BUT THERE'S A

13 SPECIFIC LIST OF PLAYERS THAT WE HAVE THAT WE ACCESS IN ORDER

14 TO KNOW WHO IS AVAILABLE FOR THE FANTASY GAMES.

15 **Q.**   WELL, LET'S TAKE A LOOK AT THE DOCUMENT YOU WERE TALKING

16 ABOUT, WHICH IS 1109.

17        **MR. KATZ:**  CAN YOU PUT THAT UP, PLEASE.

18        (DOCUMENT DISPLAYED.)

19 **BY MR. KATZ:**

20 **Q.**   AND YOU HAVE THAT IN FRONT OF YOU, DON'T YOU, SIR?

21 **A.**   YES.

22 **Q.**   SO THAT MENTIONS RETIRED PLAYERS AND WHAT YOU WERE ASKED

23 ABOUT IN 1(A), RIGHT?

24 **A.**   IT SAYS THAT ON OCCASION THEY MAY, YES.

25 **Q.**   WHY WOULD YOU EVEN CARE?

1  **A.**  WE DON'T.

2  **Q.**  SO WHY -- WHY MENTION THEM?

3  **A.**  IT'S NOT OUR LANGUAGE.  WE DIDN'T WRITE THAT IN, SO IT --

4  **Q.**  WHY DIDN'T YOU JUST TELL WHOEVER -- WHO DID YOU NEGOTIATE

5  WITH, MR. ALLEN?

6  **A.**  NO, NOT DIRECTLY.

7  **Q.**  WHO WERE YOU NEGOTIATING WITH?

8  **A.**  PROBABLY CLAY WALKER AT THE TIME.

9  **Q.**  WHY DIDN'T YOU JUST SAY:

10           "MR. WALKER, WE DON'T NEED THIS STUFF IN HERE

11 ABOUT RETIRED PLAYERS.  WE DON'T CARE ABOUT RETIRED PLAYERS"?

12 DID YOU TELL HIM THAT?

13 **A.**  THERE WAS NO NEED TO.

14 **Q.**  YOU JUST SIGNED AN AGREEMENT -- THIS AGREEMENT GENERATED

15 MILLIONS OF DOLLARS FOR YOUR COMPANY, DIDN'T IT, SIR?

16 **A.**  NO, NOT EVEN CLOSE.

17 **Q.**  HOW MUCH DID IT GENERATE FOR YOUR COMPANY?

18 **A.**  I DON'T KNOW.  NOT EVEN CLOSE.

19 **Q.**  HUNDREDS OF THOUSANDS?

20 **A.**  NO.

21 **Q.**  YOU DON'T KNOW?  YOU CAN'T TELL?

22 **A.**  NO.  I SAID "NO".

23 **Q.**  HOW MUCH DID IT GENERATE FOR YOUR COMPANY, SIR?

24 **A.**  PROBABLY LESS THAN A HUNDRED THOUSAND DOLLARS.

25 **Q.**  AND DO YOU THINK A HUNDRED THOUSAND DOLLARS IS AN

1  INSIGNIFICANT AMOUNT OF MONEY?

2  **A.**    I NEVER SAID THAT.

3  **Q.**    DO YOU THINK THAT?  YES OR NO.

4  **A.**    NO.

5  **Q.**    SO WHY WOULD YOU SIGN AN AGREEMENT FOR A HUNDRED THOUSAND

6  DOLLARS THAT MENTIONS SOMETHING THAT YOU DON'T CARE ABOUT?

7  **A.**    THE AGREEMENT WAS NOT FOR A HUNDRED THOUSAND DOLLARS.

8  **Q.**    WELL, IT'S GENERATED A HUNDRED THOUSAND DOLLARS.  WHY

9  WOULD YOU HAVE SOMETHING IN THERE THAT YOU DIDN'T CARE ABOUT,

10 SIR?

11 **A.**    BECAUSE THERE'S -- THERE'S NO -- IT HAD NO MEANING.  IT

12 HAD NO BEARING ON IT.

13 **Q.**    THAT'S MY POINT.

14 **A.**    THERE WAS NO NEGATIVE TO IT TO HAVE IT IN THERE.

15 **Q.**    WHY WOULD YOU PUT SOMETHING IN THERE THAT HAD NO MEANING?

16 **A.**    WE DIDN'T.

17         **MR. CLARK:**  OBJECTION, YOUR HONOR, ARGUMENTATIVE.

18 **BY MR. KATZ:**

19 **Q.**    YOU SIGNED IT, DIDN'T YOU, SIR?

20 **A.**    NO, I DIDN'T.

21         **MR. CLARK:**  SAME OBJECTION.

22         **THE COURT:**  OKAY.  WAIT. WAIT.

23 **BY MR. KATZ::**

24 **Q.**    YOU DIDN'T SIGN THIS AGREEMENT?

25         **THE COURT:**  YOU ARE BEING ARGUMENTATIVE WITH HIM.

1            MR. KATZ:  ALL RIGHT, SIR.

2            THE COURT:  I THINK YOU SHOULD MOVE TO NEW POINT.

3    BY MR. KATZ:

4    Q.   AND IT'S ALSO REFERENCED IN 2A.  RETIRED PLAYERS ARE ALSO

5    REFERENCED IN 2A BECAUSE PARAGRAPH 2A REFERENCES 1A, DOESN'T

6    IT?

7            MR. CLARK:  OBJECTION.

8            THE COURT:  SORRY.  I DON'T SEE THE WORD "RETIRED" IN

9    2A.

10           MR. KATZ:  IT REFERS TO THE NFL PLAYERS REFERENCED IN

11   1A AND RETIRED PLAYERS ARE REFERENCED IN 1A.

12           THE COURT:  THAT'S A BIT MISLEADING.  I THINK YOU

13   SHOULD BE MORE CLEAR.

14           MR. KATZ:  OKAY.

15           THE COURT:  WHY DON'T YOU HIGHLIGHT FOR THE JURY --

16           MR. KATZ:  SURE.

17           THE COURT:  -- THE EXACT PHRASE YOU HAVE IN MIND.

18           MR. KATZ:  RIGHT.

19           THE COURT:  AND ASK THE WITNESS IF HE AGREES WITH

20   YOUR INTERPRETATION.

21           MR. KATZ:  IF WE LOOK AT THE FIFTH LINE FROM THE

22   BOTTOM, IT SAYS "THE NFL PLAYERS REFERENCED IN 1A, PARAGRAPH 1A

23   ABOVE.  HIGHLIGHT THAT.

24   BY MR. KATZ:

25   Q.   AND IN 1A, RETIRED PLAYERS ARE REFERENCED, RIGHT?

1  **A.**   IN 1A RETIRED PLAYERS ARE REFERENCED.

2  **Q.**   SO THAT'S YET ANOTHER REFERENCE TO "RETIRED PLAYERS,"

3  RIGHT?

4  **A.**   NO.

5            **MR. CLARK:**  OBJECTION.  ARGUMENTATIVE.

6            **THE COURT:**  IT'S ARGUMENTATIVE, BUT THE WHOLE POINT

7  HERE IS TO FIND OUT WHAT THE UNDERSTANDING -- WELL, AS PHRASED,

8  AS PHRASED, I'M GOING TO LET YOU ASK THAT QUESTION.  BUT YOU'RE

9  NOT -- YOU OUGHT TO BE FOCUSING ON THE INTENTION AND

10 UNDERSTANDING AT THE TIME, AND NOT TRYING TO DISSECT THE

11 LANGUAGE IN PRESENT-DAY OPINIONS.

12           BUT IF THIS IS PRELIMINARY TO HIS UNDERSTANDING AT

13 THE TIME, THEN YOU CAN GO AHEAD.

14           YOUR QUESTION IS WHAT, MR. KATZ?

15           **MR. KATZ:**  I JUST ASKED HIM WHETHER THAT REFERENCES

16 1A AND 1A MENTIONS "RETIRED PLAYERS."

17 **BY MR. KATZ:**

18 **Q.**   ISN'T THAT RIGHT, SIR?

19           **THE COURT:**  YOU CAN ASK AT THE TIME HE SIGNED THE

20 AGREEMENT DID HE UNDERSTAND NFL PLAYERS REFERENCED IN PARAGRAPH

21 1A TO BE A LICENSE OF RETIRED PLAYERS?  THAT WOULD BE A FAIR

22 QUESTION.

23           **MR. KATZ:**  NO, I THINK THE LANGUAGE ITSELF, YOUR

24 HONOR, REFERENCES IT TODAY, YESTERDAY, AT THE TIME HE SIGNED

25 IT, A HUNDRED YEARS FROM NOW --

1    **THE COURT:** MR. KATZ, WE'VE GONE AROUND AND AROUND ON

2   BOTH SIDES ON THIS VERY ISSUE. AND IF SUBJECTIVE INTENTIONS

3   THAT WERE NOT DISCLOSED TO THE OTHER SIDE MAKE ANY DIFFERENCE

4   AT ALL, IT'S ONLY AT THE TIME THEY -- SO I HAVE INSISTED THAT

5   BOTH SIDES STICK TO WHAT THEIR UNDERSTANDINGS WERE AT THE TIME.

6    **MR. KATZ:** OKAY.

7   **BY MR. KATZ:**

8   **Q.** AT THE TIME THAT YOU SIGNED THIS CONTRACT, ISN'T IT A FACT

9   THAT THAT LANGUAGE, "NFL PLAYERS REFERENCED IN 1A ABOVE,"

10  REFERENCED RETIRED PLAYERS THAT WERE REFERENCED IN 1A ABOVE;

11  ISN'T THAT CORRECT, SIR?

12    **MR. CLARK:** OBJECTION. AGAIN, ARGUMENTATIVE.

13    **THE COURT:** NO. OVERRULED.

14    PLEASE ANSWER.

15    **THE WITNESS:** I DON'T UNDERSTAND THE POINT OF THE

16  QUESTION. I'M SORRY.

17  **BY MR. KATZ:**

18  **Q.** ALL RIGHT.

19  **A.** IT'S GOING AROUND SO MANY TIMES. WHAT -- WHAT -- ARE YOU

20  ASKING SPECIFICALLY: DOES IT SAY RETIRED PLAYERS THERE? I

21  THINK WE'VE ESTABLISHED THAT.

22  **Q.** YOU DON'T UNDERSTAND THE QUESTION?

23  **A.** THERE IS AN OPTION --

24  **Q.** IF YOU DON'T UNDERSTAND IT, THERE'S NOTHING I CAN DO ABOUT

25  IT.

1          LET'S MOVE TO PARAGRAPH 12, WHICH IS ON PAGE --

2          **MR. KESSLER:**  OBJECTION.

3    **BY MR. KATZ::**

4    **Q.**   -- PAGE 6.

5          **MR. KESSLER:**  WHAT WAS THE OBJECTION?  I NEED TO

6    STRIKE THAT COMMENT FROM COUNSEL.  HE JUST MISCHARACTERIZED

7    WHAT THE WITNESS SAID.

8          **THE COURT:**  THE JURY WILL DISREGARD ALL OF THE SIDE

9    COMMENTS MADE BY COUNSEL ON BOTH SIDES.  THEY DO IT ALL THE

10   TIME.  IT'S JUST RUNNING COMMENTARY LIKE CNN, AND IT'S NOT

11   EVIDENCE AT ALL, AND DISREGARD IT ON BOTH SIDES.

12         GO AHEAD, MR. KATZ.

13   **BY MR. KATZ:**

14   **Q.**   DOES THIS LICENSE INCLUDE SIX OR MORE PRESENT OR FORMER

15   NFL PLAYERS?

16   **A.**   PRESENT PLAYERS, YES.

17   **Q.**   OKAY.  SIX OR MORE?

18   **A.**   YES.

19   **Q.**   OKAY.  AND IF WE LOOK AT PARAGRAPH 12 ON PAGE 6 -- IS THIS

20   2000?  ON PAGE 7, EXCUSE ME.

21         **MR. KATZ:**  AND IF YOU CAN HIGHLIGHT 12A.  12A.

22         (DOCUMENT DISPLAYED.)

23   **BY MR. KATZ:**

24   **Q.**   LET ME READ IT TO YOU, SIR.  APPARENTLY, IT'S NOT IN OUR

25   SYSTEM.

1        YOU HAVE IT IN FRONT OF YOU?

2   A.    YES.

3   Q.    "THE LIST OF PLAYERS FOR WHOM PLAYERS INC HAS GROUP

4   LICENSING AUTHORIZATION, THE PLAYER AGREEMENT REPORT IS

5   AVAILABLE TO LICENSEE VIA THE INTERNET AT

6   WWW.NFLPLAYERS.COM/LICENSEE, WITH LICENSEE'S USER NAME AND

7   PASSWORD.  IN ADDITION, PLAYERS INC MAY SECURE AUTHORIZATION

8   FROM PLAYERS NOT LISTED ON THE PLAYER AGREEMENT REPORT,

9   INCLUDING BUT NOT LIMITED, TO RETIRED PLAYERS."

10       DO YOU SEE THAT, SIR?

11  A.    YES.

12  Q.    WAS THAT ANOTHER PART OF THE AGREEMENT YOU DIDN'T CARE

13  ABOUT?

14       I'M SORRY.  DID YOU ANSWER?

15  A.    WHAT DO YOU MEAN DID I CARE ABOUT?

16  Q.    YOU DIDN'T CARE ABOUT THE RETIRED PLAYERS PART, RIGHT?

17  A.    WE ABSOLUTELY DID NOT CARE ABOUT RETIRED PLAYERS FOR A

18  FANTASY FOOTBALL LICENSE, BECAUSE IF YOU LISTEN TO THE

19  DESCRIPTION OF FANTASY FOOTBALL, THEY ARE IRRELEVANT.  YOU

20  DON'T USE THEM IN FANTASY FOOTBALL.

21  Q.    SIR, YOU CAME HERE TODAY VOLUNTARILY; IS THAT CORRECT?

22  A.    YES.

23  Q.    AND IS IT BECAUSE -- DID YOU COME HERE VOLUNTARILY BECAUSE

24  THE LICENSE AGREEMENT REQUIRES YOU TO COOPERATE WITH DEFENDANTS

25  TO ASSIST PLAYERS INC TO THE EXTENT NECESSARY TO PROTECT ANY OF

1  THE RIGHTS CONVEYED UNDER THE LICENSE?  IS THAT ONE OF THE

2  REASONS YOU CAME HERE?

3  **A.**   UHM, NO, NOT -- NOT PARTICULARLY, NO.

4  **Q.**   DO YOU UNDERSTAND THAT YOU HAVE THAT LEGAL OBLIGATION

5  UNDER THE LICENSE?

6          **MR. CLARK:**  OBJECTION.  CALLS FOR A LEGAL CONCLUSION.

7          **THE COURT:**  WELL, YOU CAN ASK HIM IF HE IS AWARE OF

8  THE PROVISION.  YOU CAN ASK HIM IF HE WAS AWARE OF THAT

9  PROVISION AT THE TIME HE DECIDED TO COME HERE.

10         **MR. KATZ:**  ALL RIGHT.

11         **THE COURT:**  I'M NOT SURE THAT THE LEGAL IMPORT OF

12 THAT PARAGRAPH IS ENFORCEABLE AND SO FORTH, SO LET'S NOT GET

13 INTO THE LEGALITIES OF IT.

14 **BY MR. KATZ:**

15 **Q.**   ARE YOU AWARE OF THAT LEGAL PROVISION IN THE CONTRACT,

16 SIR?

17 **A.**   NOT SPECIFICALLY, NO.

18 **Q.**   LET'S TAKE A LOOK AT PARAGRAPH 10.

19         **THE COURT:**  WELL, IF HE WASN'T AWARE OF IT, WHY IS IT

20 RELEVANT TO GET INTO THAT?

21         **MR. KATZ:**  BIAS.

22         **THE COURT:**  ALL RIGHT.  PARAGRAPH 10, IS THAT THE ONE

23 ON THE SCREEN NOW?

24         **MR. KATZ:**  10.  AND THE LANGUAGE IS IN 10B.  EXCUSE

25 ME, 10A.  EXCUSE ME.  IT'S 10B.

1          "LICENSEE FURTHER AGREES TO ASSIST PLAYERS INC

2    TO THE EXTENT NECESSARY IN THE PROCUREMENT OF ANY PROTECTION TO

3    PROTECT ANY OF THE RIGHTS CONVEYED HEREUNDER, AND PLAYERS INC,

4    IF IT SO DESIRES, MAY COMMENCE OR PROSECUTE AT ITS OWN EXPENSE

5    ANY CLAIMS OR SUITS IN ITS OWN NAME, IN THE NAME OF LICENSEE OR

6    JOIN LICENSEE AS A PARTY HERETO."

7    **BY MR. KATZ:**

8    **Q.**   ARE YOU AWARE OF THAT OBLIGATION THAT YOU HAD, SIR?

9    **A.**   YES.

10   **Q.**   IS THAT ONE OF THE REASONS YOU'RE HERE?

11   **A.**   NO, BECAUSE THAT'S NOT WHAT'S GOING ON HERE.

12   **Q.**   ARE YOU HERE BECAUSE YOU'RE FRIENDS WITH MR. NAHRA?

13   **A.**   NO.

14   **Q.**   YOU WORK WITH MR. NAHRA ON THE FANTASY SPORTS ASSOCIATION,

15   DON'T YOU?

16   **A.**   WE ARE BOTH ON THE BOARD OF THAT ORGANIZATION.

17   **Q.**   ARE YOU FRIENDS WITH HIM?

18   **A.**   NO.

19   **Q.**   OKAY.  AND ARE YOU HERE BECAUSE YOU'RE FRIENDS WITH

20   MR. CLAY WALKER, WHO STARTED THE FANTASY SPORTS ASSOCIATION?

21   **A.**   NO, SIR.

22   **Q.**   ARE YOU HERE BECAUSE YOU'RE FRIENDS WITH MR. RICKY MEDINA

23   OF PLAYERS INC, WHO ALSO WORKS WITH YOU ON THE FANTASY SPORTS

24   ASSOCIATION?

25   **A.**   NO, SIR.

1    Q.   NOW, SIR, YOU CLAIM THAT YOU LICENSED ALL ACTIVE PLAYERS;

2    IS THAT CORRECT?

3    A.   THE PLAYERS THAT WERE ON THE LIST FOR THAT YEAR.

4    SOMETIMES PLAYERS OPT OUT OF THE GROUP LICENSING.  I DON'T KNOW

5    THAT THERE WERE ANY THAT YEAR.

6    Q.   AND YOU HAD TO PAY THEM WHETHER YOU USED THEM OR NOT,

7    RIGHT?  YOU HAD TO PAY -- YOU HAD TO MAKE YOUR $25,000 PAYMENT,

8    OR WHATEVER IT WAS, WHETHER YOU USED THOSE PLAYERS OR NOT;

9    ISN'T THAT RIGHT?

10   A.   UHM, WE DID USE ALL OF THEM.  BUT --

11   Q.   YOU DIDN'T USE ALL THE PLAYERS IN THE NATIONAL -- YOU

12   DIDN'T USE ALL THE ACTIVE PLAYERS IN THE NATIONAL FOOTBALL

13   LEAGUE, SIR, DID YOU, FOR YOUR FANTASY GAME?

14   A.   SURE.  THEY'RE ALL AVAILABLE.

15   Q.   WELL, YOU DON'T EVEN USE OFFENSIVE LINEMEN, DO YOU?

16   A.   THERE CAN BE OFFENSIVE TEAM POINTS AS AN OPTION IN SOME OF

17   THE COMMISSIONER-STYLE GAMES, WHERE YOU -- BECAUSE THE

18   CONSUMERS CAN PICK THEIR OWN RULES.  SO, I MEAN, WE BUILD THE

19   ENGINE SO CONSUMERS CAN CHOOSE.

20          SO THERE CAN BE ANY NUMBER OF COMBINATIONS OF PLAYERS

21   AND SCORING.

22   Q.   DO YOU HAVE EXHIBIT 2000 UP THERE, SIR?

23   A.   I DON'T BELIEVE SO.

24          MR. KATZ:  MAY I APPROACH, YOUR HONOR?

25          THE COURT:  GO AHEAD.

1  BY MR. KATZ:

2  Q.   CAN YOU TELL US WHAT 2000 IS, SIR?

3  A.   IT IS THE SAME AS THE OTHER DOCUMENT WE WERE JUST LOOKING

4  AT, EXCEPT IT WAS FOR THE 2007 SEASON.

5  Q.   SO IT'S A LICENSE BETWEEN --

6  A.   2006.

7  Q.   LICENSE BETWEEN STATS AND PLAYERS INC?

8  A.   CORRECT.

9  Q.   OKAY.  AND THAT'S SIGNED BY WHOM?

10  A.   BY STATS' CEO, GARY WALRATH.

11          MR. KATZ:  I OFFER 2000, YOUR HONOR.

12          MR. CLARK:  WE OBJECT, YOUR HONOR, BECAUSE IT'S

13  EFFECTIVE MARCH 1ST, 2007.  IT'S NOT RELEVANT.

14          THE COURT:  I'M SORRY.  YOUR OBJECTION IS WHAT?

15          MR. CLARK:  THAT IT'S EFFECTIVE MARCH 1ST, 2007, AND,

16  THEREFORE, NOT RELEVANT TO THIS CASE.

17          THE COURT:  WHAT'S THE RELEVANCE OF IT?

18          MR. KATZ:  WELL, IT'S RELEVANT FOR A COUPLE OF

19  REASONS, YOUR HONOR.  FIRST OF ALL, I THINK THAT IS -- JUST

20  BECAUSE IT'S AFTER THE STATUTORY PERIOD DOES NOT MEAN THAT IT

21  CANNOT REFLECT THINGS ABOUT THE NATURE OF FANTASY GAMES DURING

22  THE PERIOD.  AND THAT'S WHAT I'M TRYING TO SHOW.

23          THE COURT:  THIS IS 2007.

24          MR. KATZ:  RIGHT.  IF YOU LOOK AT ATTACHMENT C, IN

25  PARTICULAR, YOUR HONOR, IT TALKS ABOUT WHO IS ON THE ROSTER OF

1    THESE GAMES.

2              **THE COURT:**  ALL RIGHT.  2007 IS RECEIVED.

3              **MR. KATZ:**  IT'S NOT 2007.  IT'S 2000.

4              **THE COURT:**  I THOUGHT YOU SAID "2007."

5              **MR. KATZ:**  IT'S EXHIBIT 2000, YOUR HONOR.

6              **THE COURT:**  2000 IS RECEIVED.

7              **MR. KATZ:**  THANK YOU.

8              (TRIAL EXHIBIT 2000 RECEIVED IN EVIDENCE.)

9    **BY MR. KATZ:**

10   **Q.**  LET'S TAKE A LOOK AT ATTACHMENT C, YOUR HONOR -- SIR.

11             **MR. KATZ:**  CAN WE GET THAT?  IT'S PAGE 14.

12             (DOCUMENT DISPLAYED.)

13             AND IT SAYS "ROSTER."  IF YOU CAN ENLARGE THAT.

14   **BY MR. KATZ:**

15   **Q.**  NOW, THIS IS DESCRIBING THE RULES OF YOUR GAME, RIGHT,

16   SIR?

17   **A.**  NO, IT IS DESCRIBING THE RULES OF THE PARTICULAR GAME THAT

18   WE RAN FOR PLAYERS INC ON THEIR WEB SITE.  AS I MENTIONED

19   EARLIER, WE RUN GAMES FOR OTHER COMPANIES.  THIS IS THE

20   SPECIFIC SET OF RULES FOR THAT GAME THAT THEY RAN ON THEIR

21   WEB SITE, WHICH IS A SPECIFIC STYLE OF GAME.

22   **Q.**  AND IN THAT PARTICULAR GAME, RUN BY PLAYERS INC, THEY

23   DON'T USE OFFENSIVE LINEMEN, DO THEY, SIR?

24   **A.**  IN -- IN THAT PARTICULAR GAME AN OFFENSIVE LINEMAN WOULD

25   ONLY SHOW UP IF HE WAS ALSO ON SPECIAL TEAMS, WHICH IS

1   CERTAINLY POSSIBLE.

2   **Q.**   RIGHT.   BUT THEY DO NOT USE -- IS IT SAFE TO SAY THAT THEY

3   DO NOT USE ALL OFFENSIVE LINEMEN?   YOU LICENSED ALL THE

4   OFFENSIVE LINEMEN IN THE NFL, DIDN'T YOU, SIR?

5   **A.**   YES.

6   **Q.**   AND IS IT SAFE TO SAY THEY DIDN'T USE IN THE GAME ALL THE

7   OFFENSIVE LINEMEN IN THE NFL?

8   **A.**   IT'S POSSIBLE, SIR.

9   **Q.**   AND YOU WOULDN'T CARE IF THOSE OFFENSIVE LINEMEN HAD AN

10  AGREEMENT WITH PLAYERS INC THAT THEY SOMEHOW GOT PAID FROM YOUR

11  LICENSE, YOU WOULDN'T CARE ABOUT THAT.   IF PI PAID THEM, YOU

12  WOULDN'T CARE, WOULD YOU, SIR?

13  **A.**   NO.

14  **Q.**   AND YOU WOULDN'T CARE IF RETIRED PLAYERS GOT PAID AS A

15  RESULT OF YOUR AGREEMENT, IF PI PAID THEM, WOULD YOU, SIR?

16  **A.**   IF IT WOULDN'T CHANGE THE TERMS OF THE LICENSE.

17  **Q.**   YOU DON'T CARE, RIGHT?

18  **A.**   CORRECT.

19          **THE COURT:**  NOW, AGAIN, NOW IT SEEMS LIKE THE

20  OBJECTION HAS SOME VALIDITY.

21          **MR. KATZ:**  WHICH OBJECTION, YOUR HONOR?

22          **THE COURT:**  THIS IS AFTER THE PERIOD OF THE

23  LIMITATIONS PERIOD; IS THAT RIGHT?

24          **MR. KESSLER:**  THAT'S CORRECT, YOUR HONOR.

25          **MR. CLARK:**  YES, YOUR HONOR.

1          MR. KESSLER:  THIS IS DISCUSSION IS ALL AFTER THE

2   LIMITATION --

3          MR. KATZ:  RIGHT.  BUT THE RULES APPLY -- IN FANTASY

4   FOOTBALL, YOUR HONOR, YOU DON'T USE OFFENSIVE LINEMEN. YOU ONLY

5   USE PEOPLE WHO SCORE.

6          MR. CLARK:  HE'S TESTIFYING, YOUR HONOR.

7          MR. KATZ:  THAT'S WHAT THIS SHOWS.

8          THE WITNESS:  NOT TRUE.  YOU USE DEFENSE, AS WELL.

9          THE COURT:  WELL --

10         MR. KATZ:  I CAN MAKE A MORE GENERAL POINT, YOUR

11   HONOR.

12         THE COURT:  I JUST NEED TO -- THE ENTIRE UNIVERSE OF

13   TIME IS NOT OPEN.  WE HAVE A VERY SPECIFIC -- WHAT IS OUR EXACT

14   PERIOD?  FEBRUARY 14 '04 TO FEBRUARY 14 '07, RIGHT?

15         WILL ONE OF THE MANY LAWYERS IN THE COURTROOM PLEASE

16   LISTEN TO ME?

17         WHAT IS OUR LIMITATIONS PERIOD OPEN IN THIS CASE?

18         MR. KATZ:  IT ENDS ON FEBRUARY 14, 2007, YOUR HONOR.

19         THE COURT:  ALL RIGHT.  THERE'S A VERY SPECIFIC

20   LIMITATIONS PERIOD.  IN CONTRACTS THERE CAN'T BE ANY LAWSUIT

21   BASED ON A CLAIM TO GET MONEY FOR CONTRACTS THAT WERE ONE DAY

22   LATER OR ONE DAY EARLIER.

23         I'LL GIVE YOU MORE INSTRUCTIONS ON THIS LATER.  BUT

24   THE KEY TIME PERIOD FOR OUR CASE IS FEBRUARY '04 TO FEBRUARY

25   '07.

1          NONETHELESS, I'M GOING TO LET YOU HAVE SOME

2    FLEXIBILITY HERE, BECAUSE MAYBE THIS HAS SOMETHING TO DO WITH

3    THE TIME PERIOD THAT WE'RE INVOLVED WITH.  BUT I ASK YOU NOT TO

4    DWELL ON IT TOO MUCH.

5          **MR. KATZ:**  I WILL NOT, YOUR HONOR.

6          **THE COURT:**  GO AHEAD.

7    **BY MR. KATZ:**

8    **Q.**   THE FACT OF THE MATTER IS, SIR, YOU DON'T CARE WHAT PI

9    DOES WITH THE MONEY YOU PAY TO THEM.  THAT'S THEIR BUSINESS,

10   NOT YOUR BUSINESS, RIGHT?

11   **A.**   SURE.

12   **Q.**   AND IF THEY WANTED TO PAY IT ALL TO MR. ADDERLEY HERE,

13   THAT WOULD BE OKAY WITH YOU.  YOU WOULDN'T CARE?

14   **A.**   CORRECT.

15   **Q.**   THANK YOU.

16         NOW, YOUR COMPANY, SIR, SELLS HISTORICAL DATA

17   RELATING TO RETIRED PLAYERS, DOES IT NOT?

18         **MR. CLARK:**  OBJECTION.  RELEVANCE.

19         **MR. KATZ:**  IT'S RELEVANT --

20         **THE COURT:**  WHAT'S THE RELEVANCE?

21         **MR. KATZ:**  THE ISSUE OF THE VALUE OF RETIRED PLAYERS.

22   HOW MANY TIMES HAVE WE HEARD:

23              "NOBODY WANTS THEM.  NOBODY CARES ABOUT THEM."

24         **THE COURT:**  ALL RIGHT.  OVERRULED.

25         PLEASE ANSWER.

BY MR. KATZ:

Q.   YOU SELL THEIR DATA, DON'T YOU, SIR?

A.   WE SELL OUR DATA.

Q.   ABOUT RETIRED PLAYERS?

A.   WE SELL HISTORICAL DATA.  HAS NOTHING TO DO WITH FANTASY

OR THESE LICENSES.

Q.   YOU SELL DATA ABOUT RETIRED PLAYERS, DON'T YOU, SIR?

A.   NOT RELATED TO FANTASY.

          THE COURT:  WELL, DO YOU OTHERWISE DO IT?

          THE WITNESS:  YES, SIR.

          THE COURT:  ALL RIGHT.

BY MR. KATZ:

Q.   AND YOU SELL DATA RELATED TO RETIRED NFL PLAYERS, DON'T

YOU, SIR?

A.   YES.

Q.   AND, ACTUALLY, YOU'VE SOLD DATA RELATED TO MR. HERB

ADDERLEY'S FAMOUS TEAMS, THE GREENBAY PACKERS, HAVEN'T YOU,

SIR?

A.   SURE.

Q.   BECAUSE HE IS ONE OF THE MOST FAMOUS FOOTBALL PLAYERS OF

ALL TIME, ISN'T HE?

A.   I'D NEVER HEARD OF HIM BEFORE YOU JUST SAID HIS NAME.

Q.   AND THE GREENBAY PACKERS ARE ONE OF THE MOST FAMOUS

FOOTBALL TEAMS OF ALL TIME, AREN'T THEY, SIR?

A.   SURE.

1  Q.   AND YOUR CUSTOMERS ARE INTERESTED IN THEM, AREN'T THEY,

2  SIR?

3          THE COURT:  MR. KATZ, YOU'RE ALARMING THE JURY --

4          MR. PARCHER:  SOUNDS LIKE HE'S FROM BROOKLYN.

5          THE COURT:  -- WITH THE VOLUME OF YOUR VOICE.

6          YOU'VE EITHER GOT TO TURN DOWN THE VOLUME OR YOU HAVE

7  TO TURN DOWN YOUR VOLUME.

8          MR. KATZ:  I ALWAYS HEAR YOUR HONOR SAY:

9              "ADJUST THE MICROPHONE SO IT CATCHES YOUR VOICE."

10         THE COURT:  WELL, IT'S CATCHING YOUR VOICE BIG TIME.

11         ALL RIGHT.

12         MR. KATZ:  COULD I HAVE THE LAST QUESTION READ BACK?

13         THE COURT:  PLEASE.

14         MR. KATZ:  IN A SOTTO VOCE.

15 BY MR. KATZ:

16 Q.   YOUR CUSTOMERS GIVE VALUE TO THE RETIRED PLAYERS LIKE

17 MR. ADDERLEY, AND THEY WANT TO BUY HIS IMAGE; ISN'T THAT RIGHT?

18 A.   NO.  WE DON'T LICENSE THE IMAGE.  WE LICENSE HISTORICAL

19 FACTS WHICH ARE NEWS, WHICH WE OWN THAT ARE NOT UNDER ANY

20 LICENSE.

21 Q.   RIGHT.  AND, IN FACT --

22         MR. KATZ:  MAY I APPROACH, YOUR HONOR?

23         THE COURT:  GO AHEAD.

24 BY MR. KATZ:

25 Q.   DID YOU REMEMBER THAT YOU INCLUDED PICTURES AND

1 INFORMATION ABOUT THE PACKERS BIG WIN IN SUPER BOWL II?  DO YOU

2 REMEMBER THAT?

3 **A.**   I DON'T KNOW WHAT YOU'RE TALKING ABOUT.

4 **Q.**   WELL, LET ME SHOW YOU SOMETHING FROM --

5       **MR. CLARK:**  OBJECTION, YOUR HONOR.  I'VE NEVER SEEN

6 THIS BEFORE AND I --

7       **MR. KATZ:**  WELL, TAKE A LOOK.  TAKE A LOOK.

8       **MR. CLARK:**  IT HASN'T BEEN DISCLOSED --

9       **MR. KATZ:**  THIS IS TO REFRESH HIS RECOLLECTION, YOUR

10 HONOR.

11       (COUNSEL AND THE COURT SPEAKING SIMULTANEOUSLY, WHICH

12       WAS NOT REPORTABLE.)

13       **THE COURT:**  WELL, THEN, IT'S NOT GOING TO GO INTO

14 EVIDENCE.

15       MAKE NO REFERENCE WHAT TO IT WHATSOEVER, EXCEPT SHOW

16 IT TO THE WITNESS TO SEE WHETHER -- IS YOUR MEMORY NOW

17 REFRESHED ON THE SUBJECT OF WHICH YOU SAID YOU HAD NO

18 KNOWLEDGE?

19       **THE WITNESS:**  THIS HAS NOTHING TO DO WITH --

20       **THE COURT:**  WELL, IS YOUR MEMORY NOW REFRESHED ABOUT

21 SOMETHING THAT IT WASN'T -- THAT YOU HAD FORGOTTEN?

22       **THE WITNESS:**  I'M NOT EXACTLY SURE WHAT THIS IS

23 SUPPOSED TO MEAN.

24 **BY MR. KATZ:**

25 **Q.**   WELL, DOES YOUR --

1           **THE COURT:**  DO NOT DISPLAY THAT OR --

2           (COUNSEL AND THE COURT SPEAKING SIMULTANEOUSLY, WHICH

3           WAS NOT REPORTABLE.)

4           **THE COURT:**  -- BECAUSE IT WAS NOT PROVIDED TO THE

5    OTHER SIDE.

6           **MR. KATZ:**  IT'S TO REFRESH RECOLLECTION, YOUR HONOR.

7           **THE COURT:**  IT HASN'T DONE SO.  YOU CAN ASK A

8    QUESTION, BUT REFRESHING MEMORY DOESN'T MEAN IT SAILS INTO

9    EVIDENCE OR GETS SHOWN TO THE JURY.

10          **MR. KATZ:**  I'M NOT SAYING IT DOES, YOUR HONOR.  MAY I

11   ASK HIM A QUESTION?

12          **THE COURT:**  YOU MAY ASK QUESTIONS, BUT DON'T MAKE IT

13   SOUND LIKE IT'S IN THE DOCUMENT.

14          **MR. KATZ:**  RIGHT.

15   **BY MR. KATZ:**

16   **Q.**   DO YOU RECALL THAT YOUR COMPANY PROVIDES INFORMATION ABOUT

17   THE PACKERS' BIG SUPER BOWL WIN IN 1968?

18   **A.**   WE LICENSE AP IMAGES AND STORIES, WHICH CERTAINLY WOULD

19   INCLUDE HISTORICAL INFORMATION SUCH AS THE PACKERS WINNING THE

20   SUPER BOWL.

21   **Q.**   THANK YOU.

22          AND ISN'T IT A FACT, SIR, THAT YOU BELIEVE THAT, IN

23   ESSENCE, ANYTHING THAT HAS RESULTS CAN BE TRANSLATED INTO

24   FANTASY GAMES?

25   **A.**   CERTAINLY, SIR.

1   Q.   AND THAT WOULD INCLUDE PAST GAMES THAT WERE NEVER PLAYED,

2   LIKE THE 64 CLEVELAND BROWNS LIKE THE 89 49ERS.  THAT'S A

3   FANTASY, ISN'T IT, SIR?

4   A.   NO.

5   Q.   WELL, IT DIDN'T HAPPEN, DID IT?

6   A.   NO.  ANYTHING THAT HAS RESULTS THAT'S GOING ON NOW IS

7   GOING TO PLAY FANTASY AGAINST.  IF IT ALREADY HAPPENED, YOU

8   CAN'T MAY FANTASY AGAINST IT.

9   Q.   WELL, SIR, YOU'RE FAMILIAR WITH YOUR INDUSTRY, RIGHT?

10  RIGHT?

11  A.   SURE.

12  Q.   SO HAVE YOU HEARD -- CERTAINLY YOU'VE HEARD OF FOX SPORTS,

13  RIGHT?  THEY'RE A BIG OUTFIT IN YOUR INDUSTRY, AREN'T THEY?

14  A.   YES.

15  Q.   THEY HAVE FANTASY, DON'T THEY?

16  A.   YES.

17  Q.   AND DON'T THEY HAVE A -- A DIVISION CALLED "THE WHAT-IF

18  SPORTS"?  HAVE YOU HEARD OF WHAT-IF SPORTS?

19  A.   I'VE HEARD OF IT.

20  Q.   AND ISN'T WHAT-IF SPORTS ABOUT PREVIOUS TEAMS, VINTAGE

21  TEAMS, PLAYING EACH OTHER?

22  A.   I BELIEVE SO, YES.

23  Q.   AND DON'T THEY CALL THAT "FANTASY"?

24  A.   NO.

25  Q.   WELL, LET ME SHOW YOU SOMETHING TO REFRESH YOUR

1    RECOLLECTION.

2              **MR. KATZ:**  MAY I APPROACH, YOUR HONOR?

3              **THE COURT:**  PLEASE.  GO AHEAD.

4              **MR. CLARK:**  YOUR HONOR, I DON'T HAVE A COPY OF THIS

5    YET.

6              CAN YOU TELL ME WHAT IT IS, PLEASE?

7              **THE COURT:**  DON'T SAY IT IN FRONT OF THE JURY.

8    THINGS THAT ARE FOR REFRESHING MEMORY ARE NOT SUPPOSED TO BE

9    COMMUNICATED TO THE JURY UNLESS IT'S IN EVIDENCE OR IT'S GOING

10   TO BE OFFERED IN EVIDENCE, AND IT WAS PROPERLY NOTICED TO THE

11   OTHER SIDE.

12             THINGS THAT ARE JUST TO REFRESH THE MEMORY, YOU JUST

13   LAY IT BEFORE THE WITNESS, HE SILENTLY READS IT.  IF IT

14   REFRESHES HIS MEMORY, GREAT.  IF IT DOESN'T, THAT'S GREAT, TOO.

15             **MR. KATZ:**  OKAY.

16   **BY MR. KATZ:**

17   **Q.**   DOES THIS REFRESH YOUR RECOLLECTION ABOUT WHETHER VINTAGE

18   TEAMS PLAYING EACH OTHER CAN BE CONSIDERED FANTASY SPORTS?  LET

19   ME DIRECT YOUR ATTENTION TO THIS SENTENCE HERE (INDICATING).

20   **A.**   I HAVE ALWAYS REFERRED TO IT AS "SIMULATION."

21   **Q.**   NO.  MY QUESTION IS:  DOES THIS REFRESH YOUR RECOLLECTION?

22             **MR. CLARK:**  OBJECTION.  YOUR HONOR, THIS CAN'T BE --

23             **MR. KATZ:**  LET ME FINISH MY QUESTION.

24             **THE COURT:**  YES, LET'S HEAR THE QUESTION FIRST.

25

**BY MR. KATZ:**

**Q.**   DOES THAT REFRESH YOUR RECOLLECTION THAT THERE ARE PEOPLE IN THIS INDUSTRY WHO CONSIDER -- YOUR INDUSTRY, WHO CONSIDER VINTAGE TEAMS PLAYING ONE ANOTHER TO BE FANTASY SPORTS?

      **MR. CLARK:**  OBJECTION.

      **THE WITNESS:**  I DON'T BELIEVE THEY DO, NO.

      **MR. CLARK:**  OBJECTION.  THIS DOCUMENT --

      **THE COURT:**  WHETHER IT DOES OR NOT, THINK ABOUT THE -- FOR A SECOND.

      THE WITNESS IS THE ONE WHO'S UNDER OATH.  NOTHING THAT YOU LAWYERS SAY IS EVIDENCE, PERIOD.  I WANT THE JURY TO EXPUNGE IT FROM YOUR MIND.  IT'S WHAT THE WITNESS SAYS THAT COUNTS UNDER OATH.

      SO THIS BUSINESS ABOUT SOME DOCUMENT AND WHAT IT SAYS, YOU CANNOT START SPECULATING THAT IT SAYS SOMETHING INCONSISTENT WITH WHAT THE WITNESS SAYS.

      IT'S IMMATERIAL.  EITHER IT REFRESHED HIS MEMORY OR IT DID NOT.  THERE ARE RULES OF EVIDENCE, AND I'M GOING TO INSIST THAT WE FOLLOW THE RULES OF EVIDENCE.

      THE WITNESS IS TESTIFYING FROM HIS OWN MEMORY AND KNOWLEDGE.  HE DOESN'T -- HE'S NOT RELYING ON THIS DOCUMENT.

      ALL RIGHT.  GO AHEAD.

      MR. KATZ, I THINK YOU'RE -- I THINK WE MAY HAVE TO HAVE A CONFERENCE OUT OF THE PRESENCE OF THE JURY SOON, SO I WANT YOU TO -- CAN WE MOVE TO SOMETHING ELSE?

1        **MR. KATZ:** YES, YOUR HONOR.

2        **THE COURT:** ALL RIGHT.

3   **BY MR. KATZ:**

4   **Q.** ARE YOU -- DO YOU PAY A COMMISSION TO PLAYERS INC FOR THE

5   IMAGES THAT THEY PROVIDE TO YOU?

6   **A.** WE -- WE DON'T GET IMAGES FROM PLAYERS INC.

7   **Q.** YOU GET -- WHAT DO YOU LICENSE FROM PLAYERS INC?

8   **A.** CURRENTLY, NOTHING.

9   **Q.** WHAT HAVE YOU LICENSED FROM PLAYERS INC?

10  **A.** THE RIGHTS TO HAVE AN NFL PLAYER NAMES IN FANTASY FOOTBALL

11  PRODUCTS.

12  **Q.** AND DO YOU PAY SOME PERCENTAGE COMMISSION OF YOUR SALES

13  FOR THOSE RIGHTS?

14  **A.** WE DID.

15  **Q.** OKAY.  AND WHAT WAS THAT PERCENTAGE?

16  **A.** UHM, I BELIEVE -- IT'S IN THE DOCUMENT.  I BELIEVE IT WAS

17  8 AND A HALF PERCENT.

18  **Q.** AND DO YOU THINK 8 AND A HALF PERCENT IS A REASONABLE

19  PERCENTAGE TO PAY?

20  **A.** IT'S WHAT WE NEGOTIATED.

21  **Q.** DO YOU THINK IT'S REASONABLE?

22  **A.** YES.

23  **Q.** WOULD YOU HAVE BEEN WILLING TO PAY 69 PERCENT?

24  **A.** NO.

25  **Q.** WOULD YOU HAVE BEEN WILLING TO PAY 63 PERCENT?

1  **A.**   NO.

2  **Q.**   OKAY.  DID YOU GO TO THE -- YOU WERE A MEMBER OF THE FSTA,

3  THE FANTASY SPORTS TRADE ASSOCIATION; IS THAT RIGHT?

4  **A.**   I WAS, YES.

5  **Q.**   DID YOU GO TO THEIR MEETING IN LAS VEGAS IN 2005?

6  **A.**   I DON'T RECALL.

7          **MR. CLARK:**  OBJECTION, YOUR HONOR.  THIS IS ALL

8  BEYOND THE SCOPE OF DIRECT EXAMINATION.

9          **MR. KATZ:**  YOUR HONOR, HE'S HERE FOR ONE DAY.  WE ARE

10 ACCOMMODATING THEM.  I ASKED YOUR HONOR THE OTHER DAY

11 SPECIFICALLY:  "CAN WE GO BEYOND THE SCOPE?"  AND YOU SAID I

12 COULD.

13         **THE COURT:**  YES, BECAUSE -- IT IS BEYOND THE SCOPE,

14 BUT HE COULD BE CALLED BACK IN THE REBUTTAL CASE.  AND SINCE --

15 I'M GOING TO ALLOW THIS BECAUSE OTHERWISE WE ARE GOING TO HAVE

16 TO BRING THE WITNESS BACK IN THE REBUTTAL CASE.

17         THAT MEANS YOU WILL NOT BE ABLE TO GO ON YOUR

18 IMPORTANT BUSINESS TRIP.  YOU HAVE TO HANG AROUND THE HALLWAY

19 UNTIL THE REBUTTAL CASE COMES.  AND I KNOW YOU DON'T WANT TO DO

20 THAT.

21         **THE WITNESS:**  I SURE DON'T.

22         **THE COURT:**  SO I AM GOING TO LET HIM ASK HIS

23 QUESTIONS NOW.

24         **THE WITNESS:**  THAT'S FINE.

25         **MR. KATZ:**  I JUST HAVE A COUPLE MORE.

1      **THE COURT:**  GO AHEAD.

2   **BY MR. KATZ:**

3   **Q.**   DID YOU GO TO THAT AWARDS BANQUET IN LAS VEGAS IN 2005, OF

4   THE FANTASY SPORTS TRADE ASSOCIATION?

5   **A.**   I DON'T RECALL.  I'VE BEEN TO SOME OF THE FSTA

6   CONFERENCES.  I HAVEN'T BEEN TO ALL OF THEM.

7   **Q.**   WERE YOU AN OFFICER OF THE FSTA?

8   **A.**   AT ONE POINT I WAS, YES.

9   **Q.**   SO YOU KNEW WHAT THEIR PROGRAMS WERE, RIGHT?

10  **A.**   SURE.

11  **Q.**   DID YOU WHO WAS THE KEYNOTE SPEAKER IN 2005 AT THIS

12  FANTASY SPORTS CONFERENCE?

13          **MR. CLARK:**  OBJECTION.  FOUNDATION.

14          **THE COURT:**  HE'S ASKING IF HE DOES KNOW.

15          **THE WITNESS:**  NO.

16  **BY MR. KATZ:**

17  **Q.**   DO YOU KNOW IT WAS WARREN MOON, YOUR HONOR?

18          DO YOU KNOW IT WAS WARREN MOON, SIR?

19          **THE COURT:**  WAIT, WAIT.  DISREGARD THAT.

20          YOU'RE TESTIFYING, MR. KATZ.

21          HE SAYS HE DOESN'T KNOW, AND NOW YOU'RE BLURTING IT

22  OUT IN FRONT OF THE JURY.

23          DISREGARD THAT STATEMENT ABOUT WARREN MOON.

24          MR. KATZ, THAT WAS IMPROPER.

25          **MR. KATZ:**  I APOLOGIZE, YOUR HONOR.

1  **BY MR. KATZ:**

2  **Q.**   DO YOU KNOW WHETHER WARREN MOON WAS THE SPEAKER?

3         **MR. CLARK:**  SAME OBJECTION, YOUR HONOR.

4         **THE COURT:**  DO YOU REMEMBER OR DO YOU KNOW IF WARREN

5  MOON WAS THE SPEAKER?

6         **THE WITNESS:**  I DON'T REMEMBER.

7  **BY MR. KATZ:**

8  **Q.**   OKAY.

9         **THE COURT:**  IT DOES NOT REFRESH HIS MEMORY.

10        **MR. KATZ:**  MAY I SHOW HIM SOMETHING TO REFRESH HIS

11 RECOLLECTION?

12        **THE COURT:**  IS IT THAT YOU NEVER KNEW OR YOU DID KNOW

13 AND YOU HAVE FORGOTTEN?  IN OTHER WORDS, WAS THERE EVER A POINT

14 IN TIME WHEN YOU DID KNOW THE ANSWER TO THAT QUESTION AND YOU

15 HAVE JUST FORGOTTEN?

16        **THE WITNESS:**  SURE.  IF I WAS AT THAT CONFERENCE, I

17 JUST DON'T REMEMBER IF I --

18        **THE COURT:**  WERE YOU AT THAT CONFERENCE?

19        **THE WITNESS:**  I DON'T KNOW IF I WAS AT THAT

20 PARTICULAR ONE.

21        **THE COURT:**  ALL RIGHT.  I'LL LET COUNSEL SHOW YOU

22 SOMETHING TO SEE IF IT REFRESHES YOUR MEMORY THAT YOU WERE AT

23 THE CONFERENCE AND/OR THAT WHO WAS THE SPEAKER, IF YOU WEREN'T.

24 NOW, IT HAS TO ACTUALLY REFRESH YOUR MEMORY.  DON'T TAKE THE

25 WORD OF THE DOCUMENT.

1        **THE WITNESS:** RIGHT.

2        **THE COURT:** THE DOCUMENT COULD BE IN ERROR. SO IT

3   HAS TO BE SOMETHING THAT WOULD ACTUALLY CAUSE YOUR MEMORY:

4              "AH, YES. THE LIGHT WENT OFF. NOW I REMEMBER."

5        **THE WITNESS:** I HONESTLY DON'T THINK I WAS AT THAT

6   ONE, SO I DON'T REMEMBER THAT.

7        **THE COURT:** ALL RIGHT. HE DOESN'T REMEMBER.

8   **BY MR. KATZ:**

9   **Q.** IN 2005, WAS WARREN MOON A RETIRED FOOTBALL PLAYER? DO

10  YOU KNOW THAT?

11  **A.** PROBABLY. I DON'T REMEMBER EXACTLY WHEN HE RETIRED, BUT

12  PROBABLY.

13  **Q.** AND ISN'T IT A FACT THAT RETIRED FOOTBALL PLAYERS SPEAK AT

14  MANY FANTASY SPORT CONVENTIONS?

15  **A.** THEY SPEAK AT TRADING CARD SHOWS, A LOT OF DIFFERENT

16  EVENTS. SO I'M SURE THEY ALSO SPEAK AT FANTASY CONVENTIONS.

17  **Q.** BECAUSE THE PEOPLE WHO GO TO FANTASY CONVENTIONS ARE

18  INTERESTED IN RETIRED FOOTBALL PLAYERS, AREN'T THEY, SIR?

19  **A.** THE PEOPLE THAT GO TO THESE CONVENTIONS ARE JUST PEOPLE IN

20  THE INDUSTRY. THEY ARE NOT CONSUMERS.

21  **Q.** THEY'RE INTERESTED IN RETIRED FOOTBALL PLAYERS, AREN'T

22  THEY, SIR?

23  **A.** I'M NOT, BUT SOME OF THEM MAY BE.

24        **MR. KATZ:** THANK YOU, SIR.

25        **THE COURT:** ANYTHING MORE ON REDIRECT?

1          MR. CLARK:  YES, YOUR HONOR, JUST A COUPLE OF

2   QUESTIONS.

3          COULD WE GET TRIAL EXHIBIT 1109 BACK UP, PLEASE,

4   LAUREN?  CAN WE GO BACK TO PARAGRAPH 10B, MR. KATZ ASKED ABOUT

5   ON PAGE 5.

6          (DOCUMENT DISPLAYED.)

7                    **REDIRECT EXAMINATION**

8   **BY MR. CLARK:**

9   **Q.**  MR. BYRD, DOES THIS PARAGRAPH HAVE ANYTHING TO DO WITH

10  THIS CASE TODAY?

11         **MR. KATZ:**  OBJECTION, YOUR HONOR.

12         **THE COURT:**  HOW IS HE SUPPOSED TO KNOW WHAT THE CASE

13  IS?  HE HASN'T BEEN HERE SITTING AROUND HERE LIKE THE JURY HAS

14  BEEN.  I DON'T THINK THAT'S A FAIR QUESTION.

15         SUSTAINED.

16  **BY MR. CLARK:**

17  **Q.**  IF YOU LOOK AT THE SECOND LINE THERE, IT SAYS:

18          "PROTECTION OR TO PROTECT ANY OF THE RIGHTS

19  CONVEYED HEREUNDER."

20         WHAT RIGHTS WERE BEING CONVEYED IN THIS AGREEMENT,

21  MR. BYRD?

22         **MR. KATZ:**  OBJECT, YOUR HONOR.

23         **THE COURT:**  NO.  THAT'S -- THAT'S SOMETHING THAT BOTH

24  SIDES HAVE GONE INTO.  AND YOU RAISED THIS VERY PROVISION

25  YOURSELF.  SO THE OBJECTION IS OVERRULED.

1          YOU MAY ANSWER.

2          **THE WITNESS:**  THIS AGREEMENT WAS FOR LICENSING OF

3    ACTIVE NFL PLAYERS FOR FANTASY FOOTBALL GAME.

4    **BY MR. CLARK:**

5    **Q.**  IS IT YOUR UNDERSTANDING THAT THIS PROVISION OBLIGATES YOU

6    TO BE HERE IN ANY WAY?

7          **MR. KATZ:**  OBJECT.

8    **BY MR. CLARK:**

9    **Q.**  DO YOU HAVE AN UNDERSTANDING --

10         **THE COURT:**  NOW, WAIT.  WAIT.  YOU, YOURSELF,

11   MR. KATZ, YOU BROUGHT IT UP.

12         **MR. KATZ:**  I DIDN'T ASK A LEADING QUESTION, YOUR

13   HONOR.

14         **THE COURT:**  WHAT?

15         **MR. KATZ:**  HE'S ASKING A LEADING QUESTION.  I'M NOT

16   OBJECTING ON ANY GROUNDS EXCEPT THAT IT'S LEADING.

17         **THE COURT:**  ALL RIGHT.  WHY DON'T YOU ASK THIS

18   QUESTION:  WHAT -- TO WHAT EXTENT IS HE APPEARING HERE TODAY ON

19   ACCOUNT OF THAT CLAUSE IN THE AGREEMENT?

20   **BY MR. CLARK:**

21   **Q.**  MR. BYRD, TO WHAT EXTENT, IF ANY, ARE YOU APPEARING HERE

22   TODAY BECAUSE OF THIS CLAUSE IN THE AGREEMENT, 10B?

23   **A.**  NONE AT ALL.

24         (THEREUPON, AN ALARM SOUNDED.)

25         **THE COURT:**  SOMETIMES THAT GOES OFF AT 10 O'CLOCK.

1        I'VE BEEN ON THIS JOB ALMOST 10 YEARS, AND I STILL

2   HAVE NOT BEEN ABLE TO FIND OUT WHY.  BUT FIRST WE WERE ALARMED

3   AND WONDERED WHETHER WE HAD TO EVACUATE THE BUILDING.  AND

4   ABOUT ONE OUT OF FIVE TIMES THEY WILL COME ON ABOUT TWO MINUTES

5   LATER ON THE SPEAKER AND EXPLAIN WHY IT WENT OFF.

6        BUT 80 PERCENT OF THE TIME WE GET NO CLUE.  AND WE

7   SIT HERE WAITING FOR THEM TO INTERRUPT US TO TELL US IF THEY

8   HAVE A MESSAGE FOR US.  USUALLY THEY DON'T.

9        SO FROM EXPERIENCE, I'M JUST TELLING YOU IT MEANS

10  NOTHING.  IT IS YOUR THE GOVERNMENT SERVICES ADMINISTRATION

11  DOING ITS THING, AND WE CAN'T GET THEM TO EXPLAIN IT OR TO STOP

12  IT.

13        (LAUGHTER)

14        SO I'M GOING TO SUGGEST WE CONTINUE WITH YOUR

15  EXAMINATION.  AND THERE'S A SMALL CHANCE THEY WILL INTERRUPT US

16  IN ABOUT 30 MORE SECONDS.

17        **MR. CLARK:**  HOPEFULLY, I CAN GET IT DONE BEFORE THAT

18  HAPPENS, IF IT HAPPENS, YOUR HONOR.

19        **THE COURT:**  GO AHEAD.

20  **BY MR. CLARK:**

21  **Q.**   MR. BYRD, WOULD -- AS THE NEGOTIATOR FOR STATS IN 2006,

22  WOULD YOU HAVE BEEN WILLING TO PAY ANY EXTRA MONEY TO GET

23  RETIRED PLAYER RIGHTS?

24        **MR. KATZ:**  OBJECT.  LEADING.

25        **MR. CLARK:**  HE BROUGHT IT UP, YOUR HONOR.

1    **MR. KATZ:**  HAS NOTHING TO DO WITH LEADING, YOUR

2   HONOR.

3        **THE COURT:**  I KNOW.  BUT TRY NOT TO LEAD SO MUCH.  IT

4   IS REDIRECT.  YOU GET A LITTLE MORE LATITUDE.  I'M JUST GOING

5   TO OVERRULE IT.

6        THE JURY WILL TAKE INTO ACCOUNT THIS IS A LEADING

7   QUESTION.  BUT GIVEN THAT IT'S REDIRECT I'M GOING TO LET YOU

8   ASK THIS QUESTION.

9        **THE WITNESS:**  NO.  THERE IS NO VALUE FOR RETIRED

10  PLAYERS IN FANTASY FOOTBALL.  SO, NO, WE WOULD NOT HAVE.

11        **MR. CLARK:**  NO MORE QUESTIONS, YOUR HONOR.

12        **THE COURT:**  THANK YOU.  ALL RIGHT.

13        ANYTHING MORE?

14        **MR. KATZ:**  NO, YOUR HONOR.

15        **THE COURT:**  OKAY.  WE'RE GOING TO -- CAN THIS

16  WITNESS, MR. BYRD, BE EXCUSED?

17        **MR. KATZ:**  YES, HE MAY, YOUR HONOR.

18        **MR. KESSLER:**  HE MAY, YOUR HONOR.

19        **THE COURT:**  ALL RIGHT.  YOU ARE GOING TO BE

20  DISCHARGED FROM THE SUBPOENA, IF THERE WAS ONE.

21        I'M GOING TO EXCUSE YOU FOR GOOD.

22        **THE WITNESS:**  OKAY.

23        **THE COURT:**  YOU CAN GO ON YOUR TRIP.

24        **THE WITNESS:**  THANK YOU.  I APPRECIATE THAT.

25        **THE COURT:**  YOU ARE NOT SUBJECT TO RECALL.

1          **THE WITNESS:**  THANK YOU.  THANK YOU.  THANK YOU.

2          **THE COURT:**  THANK YOU, SIR, FOR COMING.

3          SEEMS LIKE -- GO AHEAD.  I'M JUST THINKING TO MYSELF.

4    HAVE WE HAD OUR BREAK THIS MORNING YET?  WE STARTED LATE,

5    DIDN'T WE?  IT'S TIME FOR A BREAK, THEN, ISN'T IT?

6          NOW, I WANT TO MAKE SURE OF SOMETHING.  HAVE ANY OF

7    YOU BEEN READING ANY NEWSPAPER ACCOUNTS OR LOOKING AT ANY TV OR

8    ANYTHING THAT HAS ANYTHING TO DO WITH THIS CASE?

9          (THEREUPON, THE JURORS RESPONDED IN THE NEGATIVE.)

10         **THE COURT:**  EVERYONE IS INDICATING "NO."

11         IT'S VERY IMPORTANT.  OCCASIONALLY, THERE IS GOING TO

12   BE SOMETHING ABOUT THIS CASE IN THE PAPERS OR ON TV OR THE

13   RADIO.  AND YOU HAVE JUST GOT TO TURN IT OFF AND NOT LISTEN TO

14   IT.  I DON'T WANT YOU TO GET CONTAMINATED BY ANY -- ANYTHING

15   YOU MIGHT HEAR OUT THERE, BECAUSE YOU HAVE AN IMPORTANT JOB TO

16   DO, WHICH IS TO DECIDE THIS CASE BASED ON THE EVIDENCE HERE.

17         SO REMEMBER THAT.  IF ANYBODY TRIES TO TALK TO YOU

18   ABOUT THIS CASE, INCLUDING ONE OF YOUR LOVED ONES, YOU HAVE TO

19   TELL THEM NOT TO DO SO.  AND THEN, YOU'VE GOT TO TELL ME THAT

20   SOMEBODY IS TRYING TO TALK TO YOU.

21         ALL RIGHT.  REMEMBER THE ADMONITION.  DON'T TALK TO

22   EACH OTHER.  KEEP AN OPEN MIND.

23         WE'LL SEE YOU BACK HERE IN 15 MINUTES.

24         **THE CLERK:**  ALL RISE.

25         (THEREUPON, THE JURY LEFT THE COURTROOM.)

1       **THE COURT:**  ALL RIGHT.  EVERYBODY HAVE A SEAT.

2       LISTEN, THE -- I WANT YOU TO KNOW FROM HERE ON OUT

3  I'M GOING TO START ENFORCING THIS.  THE PROPER WAY TO USE

4  REFRESHING RECOLLECTION -- IT'S A MUCH ABUSED THING BY LAWYERS.

5       THE ONLY PROPER WAY TO DO IT IS AFTER THE WITNESS

6  SAYS "I DON'T REMEMBER," THEN -- YOU CAN'T JUST SAY, "I WANT TO

7  REFRESH YOUR MEMORY."  YOU HAVE TO THEN SAY -- WELL, YOU CAN

8  THEN SAY:

9               "ALL RIGHT.  I'M GOING TO SHOW YOU SOMETHING."

10      AND YOU HAVE WIDE LATITUDE HERE, BUT YOU CANNOT

11  COMMUNICATE TO THE JURY WHAT IT IS.  AND THEN, YOU SAY:

12               "READ THAT SILENTLY TO YOURSELF."

13      THEN, ASK THE QUESTION:

14               "DOES THAT NOW REFRESH YOUR RECOLLECTION?"

15      AND IF THE WITNESS SAYS "NO," THEN YOU HAVE TO DROP

16  IT.  IF THE WITNESS SAYS "YES," YOU CAN THEN ELICIT FROM THEM

17  THEIR REFRESHED RECOLLECTION.

18      MANY LAWYERS TRY TO USE IT IF THEY SAY -- IF THE

19  QUESTION IS:

20               "WAS THE LIGHT RED," AND THEY SAY:

21               "NO, IT WAS GREEN," THEN THE LAWYER TROTS UP

22  THERE WITH A DOCUMENT AND SAYS:

23               "LET ME REFRESH YOUR MEMORY."

24      THAT'S TOTALLY IMPROPER.  THAT'S JUST AN ATTEMPT TO

25  IMPEACH.

1    BUT IMPEACHMENT CAN ONLY BE ALMOST ALWAYS THROUGH
2  ONLY A SIGNED STATEMENT, AN E-MAIL THAT THEY SENT, SOMETHING
3  THEY THEMSELVES WROTE.  IT CAN'T BE JUST SOME GENERALIZED
4  DOCUMENT THAT CONTRADICTS WHAT THEY SAID.  IT HAS TO BE
5  SOMETHING THEY SAID.  THAT'S TRUE IMPEACHMENT.  YOU CAN'T USE
6  IT -- YOU CAN'T -- LET'S SAY THERE'S ANOTHER WITNESS WHO
7  HAPPENED TO SAY THE LIGHT WAS A DIFFERENT COLOR.  YOU CAN'T
8  TROT THAT IN FRONT OF THE WITNESS AND SAY:
9        "AH-HA.  I'M IMPEACHING YOU WITH SOMEBODY ELSE'S
10 STATEMENT THAT THE LIGHT WAS A DIFFERENT COLOR."
11        NOW, IF THE WITNESS SAID:
12        "I CAN'T REMEMBER WHAT COLOR THE LIGHT WAS," AND
13 THEY -- THERE MIGHT BE -- THERE MIGHT BE SOMETHING THAT -- IT
14 DOESN'T HAVE TO BE A SIGNED STATEMENT.  LOTS OF THINGS MIGHT
15 REFRESH THEIR MEMORY.  BUT YOU HAVE TO -- YOU HAVE TO WAIT
16 UNTIL THEY SAY:
17        "I DON'T REMEMBER."
18        YOU HAVE TO SHOW IT TO THEM.  DO NOT READ IT ALOUD.
19 DO NOT INFER TO THE JURY WHAT IT IS.  AND THEN, WAIT AND ASK:
20        "DOES IT NOW REFRESH YOUR MEMORY?"
21        IF THE ANSWER IS "YES," YOU CAN GET THE TESTIMONY.
22 IF THE ANSWER IS "NO," YOU'VE GOT TO DROP IT.  SO THAT'S THE --
23        NOW, AND THEN TO SAY -- BLURT OUT "WARREN MOON WAS
24 IT," THAT -- YOU KNOW, THAT'S THE LAWYER TALKING AGAIN.  I'M
25 TRYING TO IMPRESS ON YOU THAT IT'S THE WITNESSES WHO GIVE THE

1  TESTIMONY, NOT THE LAWYERS.

2         SO YOU SHOULD NOT -- YOU SHOULD NOT HAVE SAID IT WAS

3  WARREN MOON.  THAT WAS NOT THE CORRECT THING TO DO.

4         **MR. KATZ:**  I APOLOGIZE TO THE COURT FOR THAT.  ALSO,

5  MY UNDERSTANDING, YOUR HONOR, OF RULE 8035 IS THAT IF HIS

6  MEMORY IS REFRESHED -- AND I ADMIT I DIDN'T HAVE MUCH LUCK ON

7  THAT -- THEN YOU'RE ALLOWED TO READ PORTIONS OF THE DOCUMENT

8  INTO THE RECORD.

9         **THE COURT:**  WAIT A MINUTE.

10        **MR. KATZ:**  IT'S NOT ACCEPTED AS AN EXHIBIT, BUT YOU

11 ARE ALLOWED TO READ IT INTO THE RECORD.

12        **THE COURT:**  NO.  WAIT A MINUTE.  8035?

13        **MR. KATZ:**  8025.  8025, EXCUSE ME.

14        **THE COURT:**  YOU MEAN, 8035.  NO --

15        **MR. KATZ:**  8035.

16        **THE COURT:**  NO RECORDED RECOLLECTION IS A TOTALLY

17 DIFFERENT THING.  RECORDED RECOLLECTION HAS TO BE SOMETHING HE

18 WROTE.

19        **MR. KATZ:**  RIGHT.

20        **THE COURT:**  HE WROTE.  HE NO LONGER HAS A MEMORY OF

21 IT, THAT HE WROTE IT AT THE TIME WHEN HIS MEMORY WAS FRESH.

22 AND THAT IN HIS PRACTICE AND SO FORTH IT WOULD HAVE BEEN -- SO

23 IT DOESN'T HAVE TO BE ACTUALLY A BUSINESS RECORD, JUST A

24 MEMORANDUM IN THE FILE THAT HE WROTE WHEN IT WAS FRESH.

25        THAT CAN COME INTO EVIDENCE.  BUT THAT'S GOT TO BE

1  SOMETHING HE WROTE.

2        NOW, ON REFRESHING MEMORY IT COULD BE -- IT COULD

3  EVEN BE A NEWSPAPER ARTICLE.

4        **MR. KATZ:**  IT COULD BE ANYTHING, REALLY.

5        **THE COURT:**  IT COULD BE HIS FAVORITE SONG.  SO -- BUT

6  YOU'VE GOT TO HAVE A GOOD FAITH BELIEF REASON FOR THINKING THAT

7  IT MIGHT REFRESH HIS MEMORY.

8        BUT WHAT YOU CAN'T DO IS PUBLISH IT TO THE JURY.

9        **MR. KATZ:**  RIGHT.

10       **THE COURT:**  IT'S JUST KIND OF A SECRET COMMUNICATION

11 BETWEEN YOU AND THE WITNESS:

12       "HEY, DOES THIS REFRESH YOUR MEMORY?"

13       IF THE ANSWER IS "NO," MOVE ON.

14       **MR. KATZ:**  I HAD A GOOD FAITH BELIEF, YOUR HONOR. I

15 HAD THE DOCUMENT.  AND I SHOULDN'T HAVE SAID "WARREN MOON."

16       BUT, IN FACT, I DID ASK HIM LATER ON IF WARREN MOON

17 IS A RETIRED FOOTBALL PLAYER.

18       **THE COURT:**  ALL RIGHT.  ANYTHING FOR ME?  WE ARE

19 GOING TO TAKE OUR BREAK.

20       **MR. KATZ:**  NOTHING, YOUR HONOR.

21       **THE COURT:**  HEARING NOTHING, ALL RIGHT.

22       OH, I NEED SOMETHING.  WHAT IS THE ALLOCATION ON

23 THE -- ON THE READ IN OF MR. EYRICH, WHICH WAS A TOTAL OF 47

24 MINUTES?

25       **MR. CHARHON:**  WE HAVE YET TO CONFER ON THIS ISSUE,

1 BUT WE WILL AT THE BREAK, YOUR HONOR.

2      **MR. KESSLER:**  WE'LL TO IT AT THE BREAK.  WE HAVEN'T

3 HAD A CHANCE, YOUR HONOR.

4      **THE COURT:**  I'M GOING TO LOSE TRACK OF IT. I'M GOING

5 TO ALLOCATE IT ARBITRARILY MYSELF, IF YOU DON'T TELL ME WHAT IT

6 IS.

7      **MR. KESSLER:**  WE'RE GOING TO DO IT RIGHT NOW ON THE

8 BREAK.

9      **THE COURT:**  WERE THERE OTHER EXHIBITS YOU WANTED TO

10 MOVE IN?

11      **MR. KATZ:**  THERE WERE.  DO YOU OBJECT TO ANY OF

12 THESE?

13      **MR. KESSLER:**  WE'LL REVIEW THAT AT THE BREAK, TOO.

14 WE JUST WERE BUSY WITH THE WITNESS.

15      **THE COURT:**  THANK YOU.  I'LL SEE YOU BACK HERE IN 15

16 MINUTES.

17      (RECESS TAKEN FROM 10:08 TO 10:21 A.M.)

18      **THE COURT:**  ALL RIGHT.  SHALL WE GO BACK TO WORK?

19 WHAT IS THE TIME ON ALLOCATION ON MR. EYRICH?

20      **MR. CHARHON:**  WE'VE CONFIRMED IT'S GOING TO BE

21 65 PERCENT TO THE PLAINTIFFS, 35 PERCENT TO THE DEFENDANTS.

22      **THE COURT:**  47 MINUTES TIMES TWO-THIRDS IS 31 MINUTES

23 TO PLAINTIFF AND 16 MINUTES TO THE DEFENDANT.

24      ALL RIGHT.  WHAT ELSE?

25      **MR. CHARHON:**  AS FAR AS EXHIBITS GO, PLAINTIFFS OFFER

1  19.

2      **THE COURT:**  19.  ANY OBJECTION?

3      **MR. KESSLER:**  NO.

4      **THE COURT:**  IT'S ALREADY IN.

5      **MR. CHARHON:**  85.

6      **THE COURT:**  85.

7      **MR. CHARHON:**  AND I --

8      **THE COURT:**  ALL RIGHT.  ALREADY IN.

9      **MR. CHARHON:**  -- THINK 85 SHOULD ALREADY BE IN, TOO.

10     96.

11     **THE COURT:**  IT'S NOT IN YET, BUT I WILL PUT IT IN.

12     (TRIAL EXHIBIT 96 RECEIVED IN EVIDENCE.)

13     **MR. CHARHON:**  AND 97.

14     **THE COURT:**  RECEIVED.  ALL RECEIVED.

15     (TRIAL EXHIBIT 97 RECEIVED IN EVIDENCE.)

16     **MR. CHARHON:**  THANKS.

17     **THE COURT:**  READY TO GO WITH THE NEXT WITNESS?

18     **MR. KATZ:**  MR. ADDERLEY.

19     **THE COURT:**  MR. ADDERLEY IS NEXT?

20     **MR. KATZ:**  YES.

21     **THE COURT:**  ALL RIGHT.  I'LL BRING IN THE JURY.

22     OH, BEFORE I DO THAT, I WANT TO BRING UP SOMETHING

23 ABOUT THE JURY.

24     **MR. KESSLER:**  I'M SORRY, YOUR HONOR?

25     **THE COURT:**  THE COMMENT THAT I MADE TO THE JURY ABOUT

1   THE PRESS AND SO FORTH MUST HAVE PROVOKED ONE OF THE JURORS TO

2   ASK DAWN A QUESTION.  AND THAT WAS WHETHER OR NOT WE HAD GIVEN

3   OUT THE NAMES OF THE -- THEIR NAMES TO THE -- ADDRESSES TO THE

4   PRESS.

5          AND THE ANSWER, OF COURSE, IS:  NO.  BUT THE NAMES

6   ARE PUBLIC.  SO THE NAMES WOULD HAVE BEEN KNOWN.

7          THIS JUROR SAID SOMEONE DROVE BY HER HOUSE AND TOOK A

8   PHOTOGRAPH.  SHE'S NOT ACCUSING ANYBODY HERE OF HAVING DONE

9   THAT, BUT SHE -- I THINK SHE, IN FACT, WAS WONDERING IF MAYBE

10  THE PRESS DID THAT.

11         I'M ASKING EVERYONE HERE, AS OFFICERS OF THE COURT TO

12  LET ME KNOW BY THE END OF TODAY IF EITHER SIDE HAS HAD ANYBODY

13  GO OUT TO TAKE PHOTOGRAPHS OF ANYBODY'S HOUSES ON THE JURY.

14         **MR. KESSLER:**  WE CAN LET YOU RIGHT NOW, WE HAVE NOT

15  DONE ANYTHING LIKE THAT, YOUR HONOR, AND WOULD NOT DO ANYTHING

16  LIKE THAT.

17         **MR. KATZ:**  AND WE CAN ALSO CONFIRM THAT NOT ONLY DID

18  WE NOT DO THAT, BUT WHEN YOUR HONOR MADE THE GAG ORDER THE

19  OTHER DAY WE SENT OUT A MAILING TO THE CLASS WHICH CONVEYED

20  YOUR GAG ORDER TO THE CLASS.

21         **THE COURT:**  WELL, I'M NOT TALKING ABOUT THE GAG

22  ORDER.

23         **MR. KATZ:**  I UNDERSTAND.

24         **THE COURT:**  I'M TALKING ABOUT IS ANYONE TRYING TO DO

25  AN INVESTIGATION ON ANY OF THE JURORS?

1       **MR. PARCHER:** NO.

2       **MR. KESSLER:** ABSOLUTELY NOT, YOUR HONOR.

3       **MR. PARCHER:** ABSOLUTELY NOT.

4       **THE COURT:** WELL, I BELIEVE THAT YOU ALL BELIEVE THAT

5  YOU ARE CORRECT, BUT I WANT YOU TO DOUBLE-CHECK WITH YOUR

6  CLIENTS, BECAUSE MAYBE YOUR CLIENTS HAVE BEEN DOING SOMETHING

7  YOU DON'T KNOW ABOUT.  AND IF -- THEY OUGHT TO STOP IT IF THEY

8  HAVE DONE ANYTHING LIKE THAT.  AND I NEED TO KNOW IF THERE'S

9  BEEN ANY -- ANYTHING -- ANYTHING CLOSE TO THAT, I WANT TO KNOW

10 ABOUT IT.

11      ALL RIGHT.  IT COULD HAVE JUST BEEN A REAL ESTATE

12 AGENT TAKING PICTURES OF THE NEIGHBORHOOD.  WHO KNOWS WHAT IT

13 IS?

14      ALL RIGHT.  WE'LL CALL THE JURY IN.

15      (THEREUPON, THE JURY RETURNED TO THE COURTROOM.)

16      **THE COURT:** ALL RIGHT.  BE SEATED EVERYONE.  NEXT

17 WITNESS.

18      **MR. KATZ:** YOUR HONOR, MAY IT PLEASE THE COURT, THE

19 PLAINTIFF CALLS MR. HERBERT ANTHONY ADDERLEY.

20      **THE COURT:** ALL RIGHT, MR. ADDERLEY.  WELCOME.

21 PLEASE RAISE YOUR HAND.  WE'LL SWEAR YOU IN.

22      (THEREUPON, THE WITNESS WAS SWORN.)

23      **THE WITNESS:** I DO.

24      **THE CLERK:** OKAY.  THANK YOU.

25      **THE COURT:** ALL RIGHT.  ARE YOU ABLE TO MAKE IT UP

1    THERE ON YOUR OWN?

2            **THE WITNESS:**  YES, SIR.  GOT ONE MORE BIG PLAY LEFT.

3            **THE COURT:**  DID WHAT?

4            **THE WITNESS:**  I HAVE ONE MORE BIG PLAY LEFT IN THIS

5    OLD BODY.

6            **THE COURT:**  THAT'S GREAT.

7            HAVE A SEAT.  WATCH THE MICROPHONE THERE.  IT'S

8    CAUGHT IN YOUR JACKET.

9            BY NOW YOU KNOW THE DRILL.  WE NEED TO TAKE YOUR

10   PICTURE.

11           **THE WITNESS:**  OKAY TO SMILE?

12           **THE COURT:**  PLEASE DO.

13           **THE CLERK:**  OKAY.

14           **THE COURT:**  ALL RIGHT.

15           MAKE SURE THE MIC CATCHES YOUR VOICE.

16           GO RIGHT AHEAD.

17                      **HERBERT ADDERLEY**,

18   A PLAINTIFF HEREIN, HAVING BEEN FIRST DULY SWORN, WAS EXAMINED

19   AND TESTIFIED AS FOLLOWS:

20                      **DIRECT EXAMINATION**

21   **BY MR. KATZ:**

22   **Q.**   GOOD MORNING, MR. ADDERLEY.

23   **A.**   GOOD MORNING, SIR.

24   **Q.**   WOULD YOU PLEASE TELL THE JURY YOUR NAME AND ADDRESS, FOR

25   THE RECORD.

1  **A.**   HERBERT ANTHONY ADDERLEY, 1058 T-R-I-S-T-R-A-M, TRISTRAM,

2  CIRCLE, MANTUA, M-A-N-T-U-A, NEW JERSEY, 08051.

3  **Q.**   DO YOU HAVE ANY CHILDREN, SIR?

4  **A.**   YES, SIR, I DO.

5  **Q.**   DO YOU HAVE A SON OR A DAUGHTER OR BOTH?

6  **A.**   I HAVE A DAUGHTER.

7  **Q.**   WHAT DOES SHE DO?

8  **A.**   SHE'S A DENTIST -- DOCTOR OF DENTAL SURGERY IN WASHINGTON,

9  D.C.

10  **Q.**   IS SHE MARRIED?

11  **A.**   YES.

12  **Q.**   WHAT DOES HER HUSBAND DO?

13  **A.**   HE'S A PHYSICAL SCIENTIST, WORKS FOR FBI, WASHINGTON, D.C.

14  **Q.**   DO YOU HAVE ANY GRANDCHILDREN, SIR?

15  **A.**   YES, I DO.

16  **Q.**   HOW MANY?

17  **A.**   TWO.

18  **Q.**   DID YOU GO TO COLLEGE, SIR?

19  **A.**   YES, SIR.

20  **Q.**   DID YOU GET YOUR DEGREE?

21  **A.**   YES.

22  **Q.**   WHERE DID YOU GO?

23  **A.**   MICHIGAN STATE UNIVERSITY.

24  **Q.**   DID YOU PLAY FOOTBALL THERE?

25  **A.**   YES, I DID, FOOTBALL SCHOLARSHIP.

1  **Q.**   AND ARE YOU A RETIRED NFL PLAYER?

2  **A.**   YES.

3  **Q.**   WERE YOU DRAFTED INTO THE NFL?

4  **A.**   YES, I WAS.

5  **Q.**   CAN YOU TELL US ABOUT THE DRAFT?

6  **A.**   I WAS THE NUMBER ONE DRAFT CHOICE OF THE GREENBAY PACKERS

7  AS A RUNNING BACK, WHICH IS AN OFFENSIVE PLAYER, OUT OF

8  MICHIGAN STATE UNIVERSITY IN 1961.

9  **Q.**   AND WHAT TEAMS DID YOU PLAY FOR?

10  **A.**   PLAYED FOR THE GREENBAY PACKERS FROM 1961 THROUGH '69.

11  AND THE DALLAS COWBOYS FROM 1970 THROUGH '72.

12  **Q.**   OKAY.  AND YOU SAID YOU WERE DRAFTED AS AN OFFENSIVE

13  PLAYER.  WHAT POSITION DID YOU PLAY IN THE PROS?

14  **A.**   I WAS A DEFENSIVE BACK SPECIALIZED AT THE LEFT CORNER

15  POSITION.

16  **Q.**   OKAY.  AND HAVE YOU RECEIVED ANY AWARDS AS A RESULT OF

17  YOUR PROFESSIONAL FOOTBALL CAREER?

18  **A.**   WELL, DURING MY PLAYING DAYS I WAS VOTED BY THE COACHES ON

19  FIVE DIFFERENT OCCASIONS TO PLAY IN THE ALL STAR GAME, A PRO

20  BOWL GAME.  AND I WAS ELECTED BY THE AP OR UPI EIGHT TIMES AS

21  AN ALL PRO.

22             AND IN 1980 I WAS ELECTED TO THE PRO FOOTBALL HALL OF

23  FAME.

24  **Q.**   I NOTICE, SIR, THAT YOU'VE BEEN WEARING THAT YELLOW JACKET

25  TO COURT.  DOES THAT HAVE ANYTHING TO DO WITH THE HALL OF FAME?

1  **A.**   YES, IT DOES.  IT'S GIVEN TO ALL THE HALL OF FAMERS.  ONCE

2  YOU ARE ENSHRINED AND ONCE YOU PUT THE JACKET ON THAT MEANS YOU

3  ARE OFFICIALLY A HALL OF FAMER ALL TIME.

4  **Q.**   AND OF THE THOUSANDS OF PLAYERS THAT HAVE PLAYED

5  PROFESSIONAL FOOTBALL, APPROXIMATELY HOW MANY ARE IN THE HALL

6  OF FAME?

7  **A.**   OH, I'D SAY ABOUT 239, JUST TAKING A GUESS.

8  **Q.**   SO SOMETHING UNDER A QUARTER OF 1 PERCENT OF THE PLAYERS?

9  **A.**   YES.

10  **Q.**   OKAY.  AND DID YOU WIN ANY CHAMPIONSHIPS WHEN YOU PLAYED?

11  **A.**   GREENBAY PACKERS, WE WON FIVE CHAMPIONSHIPS, INCLUDING THE

12  FIRST TWO SUPER BOWLS.  AND THE DALLAS COWBOYS I PLAYED IN TWO

13  SUPER BOWLS.  WE WON ONE AND LOST ONE.

14  **Q.**   DO YOU HAVE ANY CHAMPIONSHIP RINGS?

15  **A.**   SIX.

16  **Q.**   ARE YOU WEARING ANY OF THEM?

17  **A.**   YEAH, I'M WEARING MY FAVORITE RING.

18  **Q.**   WHICH ONE IS THAT?

19  **A.**   FROM SUPER BOWL II.

20  **Q.**   CAN YOU JUST SHOW THAT TO THE JURY?

21  **A.**   (INDICATING.)

22  **Q.**   OKAY.  AND DO YOU HAVE YOUR HALL OF FAME RING, TOO?

23  **A.**   YES, SIR.

24  **Q.**   OKAY.  WHAT WAS THE WON-LOSS RECORD OF THE TEAMS THAT YOU

25  PLAYED ON?

**A.**   DURING MY 12 YEARS THE WORST TEAM I PLAYED ON ENDED UP --
WE PLAYED 14 GAMES AT THAT PARTICULAR TIME, AND THE WORST
RECORD I HAD FOR THE TEAM WAS 8 AND 6.

**Q.**   DID ANY PLAYER HAVE A BETTER -- PLAY ON TEAMS THAT HAD A
BETTER WON-LOSS RECORD THAN YOU DID OVER YOUR 11- OR 12-YEAR
CAREER?

**A.**   I WOULD SAY ONLY MY TEAMMATES.

**Q.**   WHEN YOU WERE A PROFESSIONAL FOOTBALL PLAYER, DID YOU HAVE
TO HOLD ANOTHER JOB DURING THE OFF SEASON?

**A.**   YES.

**Q.**   WHY WAS THAT?

**A.**   BECAUSE THE SALARIES WERE SO LOW AT THAT PARTICULAR TIME,
WE HAD TO HAVE TWO JOBS IN ORDER TO SUPPLEMENT OUR SALARY TO
MAKE ENDS MEET.

**Q.**   OKAY.  AND WHAT WAS YOUR SECOND JOB?

**A.**   I ALWAYS WORKED IN SOME TYPE OF COMMUNICATIONS, BECAUSE I
MAJORED IN COMMUNICATIONS IN COLLEGE.  SO I WOULD DO A COLUMN
FOR THE PHILADELPHIA DAILY NEWS, MY HOMETOWN.  I WOULD DO A
COLUMN FOR THE PAPER.  I HAD SPORTS TALK SHOW, RADIO, CABLE
TELEVISION SHOW WHERE I INTERVIEWED THE PHILADELPHIA EAGLES
BEFORE GAMES, AFTER GAMES, AND THEIR OPPONENTS BEFORE AND AFTER
GAMES.

**Q.**   HOW MUCH PRACTICE DID YOU HAVE TO PUT IN TO BE A GOOD
PROFESSIONAL FOOTBALL PLAYER?

**A.**   WELL, ADDING HIGH SCHOOL, COLLEGE AND THE PROS, IT WAS 19

1   YEARS OF MY LIFE PLAYING FOOTBALL.  SO I WOULD SAY IT WAS MUCH,

2   MUCH LONGER THAN THAT IN PRACTICE.  SO IT HAD TO BE, I DON'T

3   KNOW, HALF MY LIFE JUST WORKING OUT AND BEING IN TREMENDOUS

4   PHYSICAL CONDITION TO BE ABLE TO PERFORM IN THE PROS.

5   **Q.**   AND CAN YOU GIVE THE JURY SOME IDEA OF WHAT A WORKOUT DAY

6   WOULD BE LIKE WHEN YOU WERE IN EXHIBITION, IN PRACTICE CAMP?

7   IN TRAINING CAMP, EXCUSE ME.

8   **A.**   WELL, DURING THE OFFSEASON, EVERY DAY I WOULD RUN FIVE

9   MILES IN THE MORNING, A.M., AND I WOULD RUN FIVE MILES IN THE

10  EVENING FOR MY PHYSICAL CONDITIONING.

11          SO ONCE WE GOT BACK TO GREENBAY, TRAINING CAMP LASTED

12  TWO WEEKS.  AND IT WAS PRETTY RUGGED TRAINING CAMP, WHAT WE HAD

13  TO GO THROUGH ON THE BODY.  WE HAD TO RUN, I'D SAY, A QUARTER

14  MILE BEFORE PRACTICE.

15          AND WE HAD SOMETHING CALLED "GRASS DRILLS," WHICH YOU

16  STAND IN PLACE AND YOU RUN UP AND DOWN.  THEY'D BLOW THE

17  WHISTLE, YOU'D HIT THE GROUND AND GET UP.  AND WE WOULD DO THAT

18  ABOUT 50 TIMES OF GRASS DRILLS, AND THEN WE'D RUN ANOTHER

19  QUARTER MILE, AND THEN PRACTICE WOULD START.

20          AND THIS WAS FOR TWO WEEKS, TWO-A-DAY PRACTICE

21  SESSIONS.

22  **Q.**   WERE THE PACKERS KNOWN FOR HAVING HARD TRAINING CAMPS?

23  **A.**   I THINK WE HAD THE MOST DIFFICULT TRAINING CAMP IN THE

24  HISTORY OF THE NFL.

25  **Q.**   OKAY.  AND WHAT HAVE YOU DONE SINCE YOUR PROFESSIONAL

1  FOOTBALL -- WHEN IT DID IT END, FIRST OF ALL, WHAT YEAR?

2  **A.**   1972.

3  **Q.**   WHAT HAVE YOU DONE SINCE THEN?

4  **A.**   WELL, AFTER I STOPPED PLAYING I WAS STILL INVOLVED IN

5  COMMUNICATIONS, AND I ENDED UP PART OWNER AND PRESIDENT OF A

6  CABLE CONSTRUCTION COMPANY, CABLE TELEVISION CONSTRUCTION

7  COMPANY.

8  **Q.**   AND WHAT DO YOU DO NOW?

9  **A.**   I'M RETIRED.  I RETIRED THREE YEARS AGO.

10 **Q.**   OKAY.  AND SINCE YOU RETIRED, HAVE YOU ATTEMPTED TO

11 SUPPLEMENT YOUR INCOME BY MARKETING THE IMAGE AND REPUTATION

12 YOU BUILT UP AS A PROFESSIONAL FOOTBALL PLAYER?

13 **A.**   NO.

14 **Q.**   HAVE YOU GONE TO CARD SHOWS OR ANYTHING LIKE THAT?

15 **A.**   YES.

16 **Q.**   CAN YOU TELL THE JURY WHAT A CARD SHOW IS, PLEASE?

17 **A.**   WELL, THE CARD SHOWS, MEMORABILIA SHOWS -- FIRST OF ALL, I

18 STOPPED FLYING IN 2001.  AND I HAD AN OPPORTUNITY TO GO TO

19 MANY, MANY MEMORABILIA SHOWS AROUND THE COUNTRY, WHICH I HAD TO

20 TURN DOWN.

21         AND THE LAST SHOW -- OR THE FIRST SHOW I WENT TO IN

22 SEVEN YEARS WAS THIS YEAR, MARCH 18, 2008.  AND THE ONLY REASON

23 I WENT, BECAUSE IT WAS DRIVING DISTANCE FROM MY HOME IN

24 NEW JERSEY DOWN TO CHANTILLY, VIRGINIA.

25         AND A CARD SHOW IS WHEN FANS COME TO THE BUILDING

1  WHERE THE CARD SHOW IS GOING ON, AND THEY BRING MEMORABILIA

2  WITH THEM, TRADING CARDS, HELMETS, FOOTBALLS, JERSEYS.  I EVEN

3  SIGNED A GOLF BALL, AND THAT'S DIFFICULT.

4           AND THEY WAIT IN LINE TO GET THE SIGNATURE.  AND

5  THAT'S ABOUT THE SIZE OF IT.

6  **Q.**   OKAY.  AND WERE THERE STILL PEOPLE INTERESTED IN GETTING

7  YOUR AUTOGRAPH AT THIS SHOW?

8  **A.**   YES.

9  **Q.**   HOW MANY DID YOU SIGN IN ONE DAY?

10 **A.**   700.

11 **Q.**   AND HOW MUCH DID YOU GET PAID FOR SIGNING THOSE?

12 **A.**   FIFTEEN DOLLARS PER AUTOGRAPH.  THAT'S FOR FLATS.  FLATS

13 ARE 8 BY 10 PHOTOGRAPHS, 16 BY 20, OR ANYTHING FLAT.  AND THEN,

14 THEY HAD PREMIUM ITEMS, WHICH WOULD BE HELMETS, FOOTBALLS,

15 JERSEYS WITH MY NAME ON THE BACK, AND MY NUMBER 26.  AND WE

16 WOULD GET FIVE DOLLARS MORE FOR THOSE TYPE ITEMS.  SO I GOT $20

17 FOR THOSE.

18 **Q.**   AND HOW MUCH DOES THE CARD SHOW CHARGE THE ATTENDANT, THE

19 PERSON ATTENDING THE CARD SHOW, FOR THAT AUTOGRAPH?  DO THEY

20 CHARGE MORE THAN $15?

21 **A.**   YES, THEY CHARGE MORE THAN 15, BUT I DON'T KNOW EXACTLY

22 HOW MUCH.

23 **Q.**   FINE.  HAVE YOU MADE ANY ATTEMPTS TO MARKET YOURSELF TO

24 EA, TOPPS OR UPPER DECK OR SOME OF THE OTHER NAMES WE HAVE

25 HEARD HERE?

1   **A.**   NO.

2   **Q.**   WHY NOT?

3   **A.**   IT'S DIFFICULT FOR AN INDIVIDUAL TO GO OUT AND TRY TO

4   MARKET YOURSELF TO THE LARGE COMPANIES THAT DEAL WITH PLAYERS

5   INC, BECAUSE THEY WON'T TALK TO US AS INDIVIDUALS.  AND I THINK

6   THEY ARE PROHIBITED FROM TALKING TO US, ALSO, BECAUSE IT HAS TO

7   GO THROUGH PLAYERS INC IN ORDER TO GET ANY TYPE OF DEAL WITH A

8   LICENSEE.

9   **Q.**   DO YOU STILL GET TRADING CARDS IN THE MAIL EVERY WEEK FROM

10  FANS?

11  **A.**   WELL, NOT NECESSARILY TRADING CARDS.  I GET SOMETHING IN

12  THE MAIL EVERY WEEK.  IT COULD BE A HELMET, FOOTBALL.  I'VE

13  RECEIVED JERSEYS WITH -- GREENBAY PACKER JERSEYS AND DALLAS

14  COWBOY JERSEYS WITH MY NAME ON THE BACK, MY NUMBER 26, REEBOK

15  LOGO, AND AT THE BOTTOM PLAYERS INC LOGO.

16  **Q.**   AND DO YOU CHARGE ANYTHING FOR SIGNING THOSE?

17  **A.**   NO.

18  **Q.**   HAVE YOU EVER BEEN INVITED TO COME BACK TO VISIT GREENBAY?

19  **A.**   YES, OFTEN.

20  **Q.**   AND HAVE YOU SIGNED SOME INDIVIDUAL DEALS?  WE'LL GET TO

21  THE GROUP LICENSING IN A MOMENT.  HAVE YOU SIGNED SOME

22  INDIVIDUAL DEALS SINCE YOU RETIRED?

23  **A.**   YES.

24  **Q.**   OKAY.  AND DID YOU NEGOTIATE THOSE DEALS ON YOUR OWN OR

25  WERE THEY NEGOTIATED THROUGH PLAYERS INC?

1  **A.**    THROUGH PLAYERS INC.

2  **Q.**    DID YOU EVER SIGN THE GLA?

3  **A.**    YES.

4  **Q.**    LET ME SHOW YOU EXHIBIT 110, WHICH IS IN EVIDENCE.

5              **MR. KATZ:**  MAY I APPROACH, YOUR HONOR?

6              **THE COURT:**  PLEASE.

7              **MR. KATZ:**  I'M GOING TO BRING EACH ONE.  DO YOU WANT

8  ME TO ASK EACH TIME?

9              **THE COURT:**  NO.  NOW THAT YOU'VE ASKED ONCE, I GIVE

10  YOU PERMISSION TO -- LET ME EXPLAIN TO THE JURY WHY THAT'S A

11  CUSTOM THAT I LIKE TO SEE HONORED.

12              IN THE OLD DAYS, THE LAWYERS WOULD GO UP BEHIND THE

13  WITNESS, STAND THERE, OFTEN AFTER HAVING EATEN A HAMBURGER WITH

14  ONIONS, AND BASICALLY HARASS THE WITNESS AND BERATE THEM INTO

15  ADMITTING ANYTHING THEY WANTED.

16              (LAUGHTER.)

17              SO TO PROTECT THE WITNESSES WE HAVE A RULE YOU CAN

18  ONLY APPROACH THE WITNESS WITH THE PERMISSION OF THE COURT.

19              REALLY THE LAWYERS DON'T DO THAT KIND OF CONDUCT ANY

20  MORE, ANYWAY, BUT AS A -- IT'S A TRADITION THAT IS STILL

21  HONORED IN THE COURTROOM.  AND THAT'S WHY YOU HEAR LAWYERS ASK

22  THAT NOW AND THEN.

23              SO THESE LAWYERS WOULD NOT MISBEHAVE IN THAT WAY, BUT

24  STILL IT'S A NICE TRADITION.

25              BUT YOU HAVE PERMISSION TO GO BACK AND FORTH WITH

1  THIS WITNESS.  SO THANK YOU FOR ASKING.

2          **MR. KATZ:**  THANK YOU, YOUR HONOR.

3  **BY MR. KATZ:**

4  **Q.**  IS THAT YOUR SIGNATURE, SIR?

5  **A.**  YES.

6  **Q.**  OKAY.  FINE.  LET ME SHOW YOU EXHIBIT 19.

7          **MR. KATZ:**  CAN YOU PUT THAT UP, PLEASE.

8          (DOCUMENT DISPLAYED.)

9          I DON'T THINK EXHIBIT 19 IS IN YET, SO PLEASE TAKE IT

10  OFF.

11  **BY MR. KATZ:**

12  **Q.**  IS THIS THE GLA THAT YOU SIGNED, SIR?

13  **A.**  YES.

14          **MR. KATZ:**  I OFFER 19, YOUR HONOR.

15          **MR. KESSLER:**  NO OBJECTION.

16          **THE COURT:**  19 IS IN EVIDENCE ALREADY.  BUT GO RIGHT

17  AHEAD.  YOU MAY PUT IT UP.

18          (DOCUMENT DISPLAYED.)

19          **MR. KATZ:**  ALL RIGHT.  FINE.  THANK YOU.

20  **BY MR. KATZ:**

21  **Q.**  WHAT WAS YOUR UNDERSTANDING OF THE GROUP LICENSING

22  AUTHORIZATION, SIR, WHEN YOU RECEIVED IT?

23  **A.**  WELL, AFTER READING OVER THIS GROUP LICENSING AGREEMENT

24  SEVERAL TIMES, IT REMINDED ME OF A HIGHLY-SKILLED ATTEMPT TO

25  CONFUSE US.  AND I WAS TOTALLY CONFUSED.

1              AND THEN I READ IT AND READ IT.  AND WHAT I GOT OUT

2     OF IT WAS THE FACT IT WAS SIX OR MORE PRESENT OR RETIRED

3     PLAYERS WHO WAS INVOLVED IN A DEAL WITH A THIRD PARTY, THERE

4     WOULD BE SOME MONIES FROM THE ROYALTIES RECEIVED GOING INTO AN

5     ESCROW ACCOUNT AND SHARED AMONG THE RETIRED PLAYERS.

6     **Q.**   OKAY.  AND HOW DID YOU RECEIVE THE GLA?

7     **A.**   THROUGH THE MAIL.

8     **Q.**   OKAY.  AND DID YOU ALSO RECEIVE FROM TIME TO TIME LETTERS

9     WITH THE GLA'S?

10    **A.**   YES.

11    **Q.**   AND WHAT WERE THOSE LETTERS ASKING YOU TO DO, IF ANYTHING?

12    **A.**   WELL, THEY WERE SOLICITING US AND ENCOURAGING US TO SIGN

13    THE GLA'S.

14    **Q.**   OKAY.  AND DID YOU RECEIVE A RETIRED PLAYERS DIRECTORY

15    FROM THE NFLPA?

16    **A.**   YES.

17    **Q.**   ARE YOU A MEMBER OF THE UNION?

18    **A.**   NOT NOW.

19    **Q.**   BUT YOU WERE A MEMBER OF THE UNION?

20    **A.**   YEAH, I WAS A PAYING MEMBER.  I PAID DUES FOR MANY YEARS.

21    **Q.**   OKAY.

22              **MR. KESSLER:**  YOUR HONOR, IF WE CAN JUST GET WHICH

23    YEARS SINCE WE HAVE SPECIFIC YEARS AT ISSUE IN THIS CASE.

24              **THE COURT:**  PLEASE ASK THAT.

25

1   BY MR. KATZ:

2   Q.   WHAT YEARS WERE YOU A MEMBER, SIR?

3   A.   I WAS A MEMBER OF THE PLAYERS' UNION UP UNTIL THEY CHANGED

4   THE DUES FROM $50 UP TO $100.

5   Q.   WHAT YEAR WAS THAT?

6   A.   I HAVE NO IDEA.  ABOUT THREE OR FOUR YEARS AGO.

7   Q.   OKAY.  LET ME SHOW YOU WHAT'S BEEN MARKED AS EXHIBIT 64.

8         DO YOU RECOGNIZE THAT, SIR?

9   A.   YES.

10  Q.   CAN YOU TELL US WHAT IT IS?

11  A.   IT'S A NFL PLAYERS ASSOCIATION RETIRED MEMBERS DIRECTORY

12  FROM YEARS 2004 TO YEARS 2006.

13        **MR. KATZ:**  YOUR HONOR, I WOULD OFFER THIS.

14        I WOULD NOTE FOR THE RECORD THAT IN THE INTEREST OF

15  SAVING SOME TREES WE DIDN'T PRINT EVERY NAME OF THE DIRECTORY.

16  WE DO HAVE A FULL COPY OF THE DIRECTORY HERE, IF YOUR HONOR

17  WANTS THAT TO BE THE EXHIBIT.  THIS IS LIKE THE FIRST TEN PAGES

18  AND LAST TEN PAGES.

19        **THE COURT:**  IF YOU WILL ALL AGREE THAT'S FINE WITH

20  ME.  SO YOU WANT TO HAVE A REDUCED VERSION OF 64 RECEIVED?

21        **MR. KATZ:**  YES.

22        **THE COURT:**  ANY OBJECTION TO THAT?

23        **MR. KESSLER:**  I HAVEN'T LOOKED AT WHAT THEY'VE CUT

24  OUT OR WHAT THEY'VE PUT IN, BUT I GUESS IT'S A PLAYERS

25  ASSOCIATION DOCUMENT, SO I HAVE NO OBJECTION.

1          **MR. KATZ:**  WE HAVE THE FULL DOCUMENT, YOUR HONOR,

2   TOO.

3          **THE COURT:**  ALL RIGHT.  IT'S RECEIVED.  RIGHT NOW ALL

4   THAT'S RECEIVED IS THE PAGES YOU'RE OFFERING.

5          **MR. KATZ:**  THAT'S RIGHT.

6          **THE COURT:**  OKAY.  THANK YOU.

7          (TRIAL EXHIBIT 64 RECEIVED IN EVIDENCE.)

8          (DOCUMENT DISPLAYED.)

9   **BY MR. KATZ:**

10  **Q.**   SO THIS WAS AN OFFICIAL PUBLICATION OF THE UNION, SIR?

11  **A.**   YES.

12  **Q.**   OKAY.  I'D LIKE TO DIRECT YOUR ATTENTION TO PAGE 7.

13         **MR. KATZ:**  IF WE CAN PUT THAT UP.

14         AND CAN WE ENLARGE THE TOP PART, NFLPA, RETIRED

15  PLAYERS CHAPTERS.

16         (DOCUMENT DISPLAYED.)

17         LET ME READ THAT INTO THE RECORD -- OH, NO, PAGE 7.

18             "NFLPA RETIRED PLAYERS LICENSING PROGRAMS."

19         YES.  ENLARGE THE TOP.  THANK YOU.

20         (DOCUMENT DISPLAYED.)

21             "NFLPA RETIRED PLAYERS LICENSING PROGRAMS.

22  PLAYERS INC, THE FOR-PROFIT LICENSING COMPANY OF THE NFL

23  PLAYERS ASSOCIATION, IS CONSTANTLY WORKING TO DEVELOP RETIRED

24  PLAYERS PROGRAMS.  THE NFLPA RETIRED PLAYERS DEPARTMENT HAS

25  OBTAINED GROUP LICENSING ASSIGNMENT AGREEMENTS, GLA'S, FROM

1    MORE THAN 2900 RETIRED NFL PLAYERS, AND IS IN THE PROCESS OF

2    BUILDING UP OUR LIST SO THAT PLAYERS INC CAN PROVIDE MORE

3    OPPORTUNITIES TO RETIREES."

4    **BY MR. KATZ:**

5    **Q.**  WAS THAT YOUR UNDERSTANDING OF THE PROGRAM AT THE TIME,

6    SIR?

7            **MR. KESSLER:**  YOUR HONOR, THE ONLY THING THAT YOUR

8    HONOR'S RULED ADMISSIBLE WAS HIS UNDERSTANDING AT THE TIME HE

9    SIGNED HIS GLA'S.  THIS DOCUMENT --

10            **MR. KATZ:**  I SAID "WAS THAT YOUR UNDERSTANDING," YOUR

11    HONOR.

12            **MR. KESSLER:**  THIS DOCUMENT THAT WAS JUST DISPLAYED

13    IS WAY PAST THE TIME HE SIGNED HIS RETIRED PLAYER GLA.  I DON'T

14    KNOW IF THE WITNESS EVEN HAD THE DOCUMENT.  SO I THINK HE'S

15    TRYING TO ARGUE FROM THE DOCUMENT TO HIS UNDERSTANDING.

16            WE SHOULD GET NONLEADING QUESTIONS ABOUT WHAT HIS

17    UNDERSTANDING WAS AT THE TIME HE SIGNED, NOT FROM THIS

18    POST-SIGNING DOCUMENT.

19            **THE COURT:**  IS THIS DOCUMENT AFTERWARDS?

20            **MR. KATZ:**  MAY I RESPOND?

21            **THE COURT:**  YES.

22            **MR. KATZ:**  THIS DOCUMENT, AS IT SAYS ON ITS FACE, IS

23    FROM 2004 TO 2006.  I THINK IT DOES ENCOMPASS --

24            **MR. KESSLER:**  HE SIGNED IN 2002, YOUR HONOR.

25            **MR. KATZ:**  I WOULD SUBMIT TO YOUR HONOR THAT IT IS

1    RELEVANT FOR STATING --

2          **THE COURT:**  SUSTAINED.  THIS IS A FORM OF LEADING THE

3    WITNESS.

4          SO YOU HAVE GOT TO ASK HIM TO SAY IN HIS OWN WORDS

5    WHAT HE THOUGHT IT MEANT.  THIS DOCUMENT CAME ALONG AFTER THE

6    FACT.

7          **MR. KESSLER:**  I WOULD ASK YOUR HONOR THAT IT NOT BE

8    DISPLAYED WHILE HE'S ASKING THE QUESTIONS --

9          **MR. KATZ:**  IT'S IN EVIDENCE, YOUR HONOR.

10         **MR. KESSLER:**  -- BECAUSE IT CAN'T BE RELEVANT TO HIS

11   QUESTION OF HIS UNDERSTANDING AT THE TIME.

12         **THE COURT:**  IT'S A FORM OF LEADING TO JUST HAVE IT UP

13   THERE, SO IT'S EASY FOR THE WITNESS TO GLANCE OVER THERE AND

14   SAY:

15         "THAT'S WHAT I MEANT."

16         THAT'S A FORM OF LEADING.

17         ASK NONLEADING QUESTIONS.  THIS IS YOUR WITNESS.  SO

18   PLEASE TAKE THAT DOWN.

19         AND IF YOU'RE ASKING QUESTIONS ABOUT THE -- ABOUT

20   WHAT HIS INTENTION WAS AND UNDERSTANDING WAS OF THE GLA AT THE

21   TIME THAT HE SIGNED IT.

22         **MR. KATZ:**  I CAN ASK A NONLEADING QUESTION.

23   **BY MR. KATZ:**

24   **Q.**   DID YOU READ THE LANGUAGE THAT I JUST READ TO YOU AT THE

25   TIME THAT YOU RECEIVED THIS DOCUMENT?

1    A.    YES.

2    Q.    OKAY.

3              MR. KESSLER:    YOUR HONOR, THAT WASN'T THE TIME WHEN

4    HE SIGNED THE GLA'S.

5              (COUNSEL SPEAKING SIMULTANEOUSLY, WHICH WAS NOT

6              REPORTABLE.)

7              THE COURT:    STOP.    MR. KATZ, I'LL SAY IT ONE MORE

8    TIME.    WHAT MATTERS IS WHEN HE SIGNED THE GLA, NOT -- AFTER HE

9    SIGNED IT, IT'S A DONE DEAL.

10             MR. KATZ:    RIGHT.    AND I'M NOT SPEAKING TO THE TIME

11   THAT HE SIGNED IT, YOUR HONOR.    I'M JUST SPEAKING TO -- THIS IS

12   A DOCUMENT THAT YOUR HONOR HAS NOW ADMITTED INTO EVIDENCE, AND

13   IT DESCRIBES THE PROGRAM.    AND I'M JUST ASKING:    DID HE RECEIVE

14   IT?    DID HE READ IT?

15             THAT'S NOT LEADING.

16             THE COURT:    PUT IT BACK UP THERE, AND LET ME SEE WHAT

17   WE'RE FIGHTING OVER.    RETIRED MEMBERS DIRECTORY.

18             MR. KATZ:    PAGE 7.

19             THE COURT:    ALL RIGHT.    AS LONG AS WE'RE TALKING

20   ABOUT AFTER -- DID HE READ THE -- WHAT YOU HAVE UP ON THE

21   SCREEN, EVEN THOUGH IT WAS AFTER THE GLA, DID HE READ THAT

22   LATER ON?

23   BY MR. KATZ:

24   Q.    DID YOU READ THIS WHEN YOU RECEIVED THE DOCUMENT, SIR?

25   A.    YES.    ONE OF THE --

1  **Q.**   "YES" IS FINE.

2  **A.**   YES.

3  **Q.**   AND DID YOU -- DID ANYONE FROM THE NFLPA EVER TELL YOU

4  THAT THE PROGRAM WAS ANYTHING DIFFERENT FROM THIS?

5  **A.**   NO.

6  **Q.**   THANK YOU.

7          **MR. KATZ:**  WE CAN TAKE IT DOWN, YOUR HONOR.

8          **THE COURT:**  ALL RIGHT.

9  **BY MR. KATZ:**

10 **Q.**   WHAT MONIES, IF ANY, DID YOU EVER RECEIVE AS A RESULT OF

11 SIGNING THESE TWO GLA'S?

12 **A.**   NONE.

13 **Q.**   WHY DID YOU KEEP SIGNING THE GLA'S, THEN?

14 **A.**   WELL, I CONTINUED TO SIGN THE GLA'S BECAUSE I HAD FAITH

15 AND TRUSTED IN THE UNION TO IMPLEMENT WHAT THE GLA STATED.

16 **Q.**   DID YOU EXPECT TO RECEIVE MONEY?

17 **A.**   YES.

18 **Q.**   OKAY.  DO YOU KNOW OF ANY ACTIVITIES THAT THE UNION

19 ENGAGED IN TO PROMOTE THIS GLA PROGRAM?

20 **A.**   NO.

21 **Q.**   DID YOU EVER RECEIVE ANY REPORTS ABOUT WHAT THE UNION WAS

22 DOING ABOUT THIS PROGRAM?

23 **A.**   NO.

24 **Q.**   DID YOU EVER ATTEND RETIRED PLAYERS' CONVENTIONS?

25 **A.**   NO.

1  Q.   DID YOU HIRE A LAWYER TO ADVISE YOU BEFORE YOU SIGNED

2  THESE AGREEMENTS?

3  A.   NO.

4  Q.   WHY NOT?

5  A.   BECAUSE I TRUSTED AND HAD FAITH IN THE UNION, AND THEY

6  HAVE ENOUGH ATTORNEYS TO TAKE CARE OF WHAT THE GLA STATED.  I

7  DIDN'T THINK THERE WAS A NEED FOR ME TO HIRE AN ATTORNEY TO

8  LOOK AFTER IT.

9  Q.   AT THIS TIME YOU SIGNED THE AGREEMENT, HOW DID YOU

10 DETERMINE WHAT THE AGREEMENT MEANT?

11 A.   BY READING OVER IT.

12 Q.   OKAY.

13 A.   AND INTERPRETING FOR MYSELF.

14 Q.   ALL RIGHT.  DID YOU SUGGEST ANY OF THE WORDS IN THIS

15 AGREEMENT?

16 A.   NO.

17 Q.   DID YOU HAVE ANY CONTROL OVER THE NFLPA WITH RESPECT TO

18 THIS AGREEMENT?

19 A.   YES.

20 Q.   AND WHAT CONTROL DID YOU HAVE, SIR?

21 A.   WELL, IF THERE WAS A CONFLICT OF INTEREST AND THEY WANTED

22 TO USE ME IN A PROMOTION, FOR EXAMPLE, IF I WAS DOING SOMETHING

23 FOR NIKE AND THEY WANTED ME TO DO SOMETHING FOR REEBOK, I COULD

24 SAY:

25           "WAIT.  THIS IS CONFLICT OF INTEREST."

1    OR IF THEY ASKED ME TO COME IN AND DO SOMETHING WITH

2  ALCOHOL OR TOBACCO, I COULD SAY:

3         "NO, I DON'T WANT ANY PARTS OF IT."

4  **Q.**   OKAY.  LET'S TAKE A LOOK AT THE SECOND PARAGRAPH --

5       **MR. KATZ:**  WHY DON'T YOU PUT UP 110.

6       (DOCUMENT DISPLAYED.)

7  **BY MR. KATZ:**

8  **Q.**   LET'S TAKE A LOOK AT THE SECOND PARAGRAPH.  IT SAYS:

9         "GROUP LICENSING PROGRAMS ARE DEFINED AS

10  PROGRAMS IN WHICH A LICENSEE UTILIZES A TOTAL OF SIX OR MORE

11  PRESENT OR FORMER NFL PLAYER IMAGES IN CONJUNCTION WITH OR ON

12  PRODUCTS THAT ARE SOLD AT RETAIL OR USED AS PROMOTIONAL OR

13  PREMIUM ITEMS."

14       DID ANYONE FROM THE NFLPA EVER TELL YOU THAT THAT

15  MEANT ANYTHING OTHER THAN WHAT IT SAYS?

16  **A.**   NO.

17  **Q.**   NOW, LET'S LOOK AT THE PARAGRAPH WITH THE ESCROW ACCOUNT,

18  THE SECOND TO THE LAST PARAGRAPH.  YEAH.

19       (DOCUMENT DISPLAYED.)

20       THIS IS THE ONE THAT WE TALKED ABOUT, THAT TALKS

21  ABOUT THE CREATION OF AN ESCROW ACCOUNT.

22       TO YOUR KNOWLEDGE, SIR, WAS SUCH AS ESCROW ACCOUNT

23  EVER CREATED?

24  **A.**   NO.

25  **Q.**   DID YOU EXPECT FOR AN ESCROW ACCOUNT TO BE CREATED?

1  A.   YES.

2  Q.   DID ANYONE FROM THE NFLPA EVER TELL YOU THAT AN ESCROW

3  ACCOUNT HAD NOT BEEN --

4         MR. KESSLER:  YOUR HONOR, WE ARE HAVING A LOT OF

5  LEADING HERE.

6         THE COURT:  YOU ARE LEADING.  VERY LEADING QUESTIONS.

7  BY MR. KATZ:

8  Q.   WHAT, IF ANYTHING, DID ANYONE FROM THE NFLPA EVER TELL YOU

9  ABOUT THE ESCROW ACCOUNT?

10  A.   NOTHING.

11  Q.   WERE YOU IN COURT ON MONDAY WHEN MR. ALLEN TESTIFIED THAT

12  WHAT THE SIX OR MORE LANGUAGE ACTUALLY MEANS IS THAT ALL 2100

13  PLAYERS WERE LICENSED TOGETHER?

14  A.   YES.

15  Q.   DO YOU AGREE WITH THAT?

16  A.   NO.

17         MR. KESSLER:  I OBJECT, BECAUSE HE MISSTATED THE

18  TESTIMONY OF MR. ALLEN.  BUT THE JURY WILL JUDGE THAT.

19         THE COURT:  FINE.

20  BY MR. KATZ:

21  Q.   HOW MUCH DID YOU EXPECT TO GET PAID FROM THIS AGREEMENT,

22  SIR?

23  A.   I DIDN'T HAVE A FIGURE IN MIND.  I HAD NO IDEA.  I JUST

24  THOUGHT THAT I WOULD GET A SHARE OF THE MONEY THAT WAS

25  DEPOSITED IN THE ESCROW ACCOUNT.

1  Q.   OKAY.  THIS PARAGRAPH THAT'S UP THERE TALKS ABOUT ELIGIBLE

2  NFLPA MEMBERS.

3       WHEN YOU SIGNED THESE TWO AGREEMENTS, SIR, DID YOU

4  BELIEVE THAT YOU WERE AN ELIGIBLE NFLPA MEMBER?

5  A.   YES.

6  Q.   WERE YOU DEPOSED IN THIS MATTER, SIR?

7  A.   YES.

8  Q.   CAN YOU TELL THE JURY WHAT A DEPOSITION IS, PLEASE?

9  A.   IT'S A QUESTION-AND-ANSWER SESSION UNDER OATH, DOCUMENTED,

10 ABOUT THE CASE, THAT IS ADMINISTERED BY THE DEFENDANTS'

11 LAWYERS.

12 Q.   OKAY.  AND AT THE TIME THAT YOU WERE DEPOSED, WERE YOU

13 PERMITTED TO SEE THE DEFENDANTS' DOCUMENTS IN THIS CASE?

14 A.   NO.

15 Q.   WHY NOT?

16       MR. KESSLER:  YOUR HONOR, I OBJECT TO THE QUESTION.

17       THE COURT:  WHAT'S THE RELEVANCE?

18       MR. KATZ:  RELEVANCE IS IT HAS TO DO WITH HIS STATE

19 OF KNOWLEDGE AT THE TIME THAT HE WAS DEPOSED.  THERE WAS A

20 PROTECTIVE ORDER.  HE WAS NOT PERMITTED TO SEE HUNDREDS OF

21 THOUSANDS OF DOCUMENTS IN THIS CASE.

22       HE WAS -- HIS OWN COMPLAINT WAS MOSTLY BLANKED OUT.

23 AND THAT HAD AN EFFECT ON HIS DEPOSITION TESTIMONY.  HE HAD NO

24 KNOWLEDGE.

25       MR. KESSLER:  YOUR HONOR, I DON'T THINK THIS IS

1   RELEVANT.  AND HE'S TRYING TO REHABILITATE THE WITNESS BEFORE I

2   EVEN EXAMINE HIM?

3           I DON'T THINK THIS IS APPROPRIATE.

4       **MR. KATZ:**  YOUR HONOR, THEY ASKED FOR THE PROTECTIVE

5   ORDER THAT PROHIBITED THIS MAN FROM SEEING THE DOCUMENTS IN HIS

6   OWN CASE.

7           **MR. KESSLER:**  YOUR HONOR, I --

8           **MR. KATZ:**  THEY BROUGHT THIS ON THEMSELVES.

9           **MR. KESSLER:**  YOUR HONOR, I WOULD NOW LIKE AN

10  INSTRUCTION, PLEASE, TO THE JURY THAT THE PROTECTIVE ORDER WAS

11  A COURT ORDER, AND IT WAS TOTALLY APPROPRIATE IN THIS CASE.

12  IT'S NOW BEEN SUGGESTED THERE'S SOMETHING INAPPROPRIATE ABOUT A

13  PROTECTIVE ORDER.

14          COULD YOU PLEASE EXPLAIN IT TO THE JURY AT THIS TIME?

15          **MR. KATZ:**  YOUR HONOR, THEY ASKED FOR THAT PROTECTIVE

16  ORDER.  WE WERE FINE WITH HAVING EVERY DOCUMENT SHOWN.

17          **MR. KESSLER:**  YOUR HONOR, IT WAS A STIPULATED

18  PROTECTIVE ORDER --

19          (COUNSEL AND THE COURT SPEAKING SIMULTANEOUSLY, WHICH

20          WAS NOT REPORTABLE.)

21          **THE COURT:**  I'M GOING TO DO THIS IN MY OWN WAY.

22  THERE ARE TWO THINGS THAT NEED TO BE MADE CLEAR HERE.  ONE IS

23  THAT IN THE COURSE OF PREPARING FOR THE CASE, BOTH SIDES -- I

24  TOLD YOU ABOUT THIS INVESTIGATION PERIOD BEFORE THE TRIAL --

25  BOTH SIDES CAN ASK THE OTHER SIDE TO PRODUCE DOCUMENTS.  YOU'VE

1   SEEN A LOT OF THEM ALREADY.  AND A LOT MORE WERE PRODUCED THAN

2   YOU'LL EVER SEE IN THIS CASE, BECAUSE IT'S JUST A LOT OF

3   DOCUMENTS WERE PRODUCED.

4          IN ORDER TO MAINTAIN THE BUSINESS CONFIDENTIALITY OF

5   THOSE DOCUMENTS AND THEIR PRIVACY, THE LAWYERS ENTERED INTO AND

6   ASKED ME TO SIGN, AND I DID -- THIS WAS STIPULATED TO, NOT

7   IMPOSED ON THE PARTS -- A PROTECTIVE ORDER.

8          BOTH SIDES WANTED IT.  THEY STIPULATED TO IT, RIGHT,

9   MR. KATZ?

10          **MR. KATZ:**  WE STIPULATED TO IT, BUT THERE'S ANOTHER

11   PORTION WHERE YOU ACTUALLY DESIGNATE DOCUMENTS THAT ARE

12   CONFIDENTIAL.  WE DID STIPULATE TO IT.

13          **THE COURT:**  UNDER THAT PROCEDURE THEY COULD DESIGNATE

14   DOCUMENTS THAT WOULD BE KEPT PRIVATE AND JUST FOR THE ATTORNEYS

15   TO SEE.  AND, APPARENTLY, SOME DOCUMENTS WERE DESIGNATED BY THE

16   DEFENDANTS AS ONLY FOR THE LAWYERS TO SEE.  THERE'S NOTHING

17   WRONG WITH THAT.

18          NO ONE EVER CAME TO ME AND SAID:

19          "HEY, UNSEAL THESE DOCUMENTS SO MR. ADDERLEY CAN

20   LOOK AT THEM."  THAT'S A FACT.

21          NOW, I DON'T KNOW WHAT I WOULD HAVE DONE IF THAT

22   MOTION HAD BEEN MADE OR NOT.  BUT THAT'S -- THAT'S WHAT

23   HAPPENED.  THAT'S POINT ONE.

24          POINT NUMBER TWO IS:  I'M ANTICIPATING FROM WHAT IS

25   BEING SAID HERE THAT -- THAT MAYBE SOME QUESTIONS ARE GOING TO

1  BE ASKED BY THE OTHER SIDE TO MR. ADDERLEY ABOUT WHAT HE SAID

2  IN HIS DEPOSITION.

3         AND WHAT HE SAID IN HIS DEPOSITION IS WHAT HE SAID IN

4  HIS DEPOSITION.  AND IT'S GOING TO BE UP TO YOU TO EVALUATE

5  WHETHER OR NOT HE WOULD HAVE SAID SOMETHING DIFFERENT IF HE HAD

6  HAD ACCESS TO DOCUMENTS THAT HE DIDN'T SEE BEFORE HIS

7  DEPOSITION.

8         THAT'S THE BEST I CAN DO WITH THIS.  SO I -- I --

9  YOU'RE GOING TO NOW MOVE ON TO YOUR NEXT QUESTION.

10        **MR. KESSLER:**  THANK YOU, YOUR HONOR.

11        **MR. KATZ:**  YOUR HONOR, I DON'T KNOW IF YOU WANT TO

12  ADD THAT NOW THE DOCUMENTS ARE UNSEALED, BASICALLY, BECAUSE OF

13  THIS PUBLIC NATURE OF THIS PROCEEDING.

14        **THE COURT:**  WELL, THE DOCUMENTS THAT ARE COMING INTO

15  EVIDENCE ARE UNSEALED.  THAT'S ABOUT THE TIP OF THE ICEBERG.

16  THERE'S STILL HUNDREDS AND HUNDREDS OF DOCUMENTS THAT NO ONE IS

17  EVER GOING TO LOOK AT, EXCEPT THE LAWYERS.

18        SO, YES, THAT'S TRUE.  THE DOCUMENTS THAT YOU'RE

19  SEEING ARE PART OF THE PUBLIC RECORD, WITH ONE EXCEPTION, WHICH

20  YOU WILL SEE, BUT THE PUBLIC WON'T SEE.

21  **BY MR. KATZ:**

22  **Q.**  HAVE YOU LEARNED ANY NEW THINGS SINCE YOUR DEPOSITION BY

23  VIRTUE OF BEING ABLE TO SEE THE DOCUMENTS?

24  **A.**   YES.

25        **MR. KESSLER:**  YOUR HONOR, ALL THAT'S GOING TO BE

1   RELEVANT IS HIS UNDERSTANDING AT THE TIME HE SIGNED THE GLA.

2   SO IF HE LEARNED OF THINGS SUBSEQUENTLY THAT CAN'T BE RELEVANT

3   TO HIS UNDERSTANDING.  THIS IS GOING TO THAT ISSUE.

4           **THE COURT:**  I'M GOING TO ALLOW THIS LINE OF

5   QUESTIONS.  BUT, HERE'S A WORD OF CAUTION.

6           WHEN PEOPLE REMEMBER THINGS, THEY WERE THERE.  THEY

7   REMEMBER IT.  EITHER THEY HAD A CERTAIN UNDERSTANDING OR THEY

8   DIDN'T HAVE AN UNDERSTANDING.  AND IF SOMETHING WAS FILED AWAY

9   IN THE FILES OF SOME OTHER PARTY, AND THEY DIDN'T KNOW IT, THEY

10  DIDN'T KNOW IT THEN, AND THEY DIDN'T KNOW IT NOW.

11          AND IF THEY FIND IT AFTER THE FACT, YOU HAVE TO

12  DECIDE WHETHER OR NOT THAT WOULD HAVE INFLUENCED WHAT THEY

13  THEMSELVES THOUGHT AT THE TIME THEY SIGNED THE CONTRACT.

14          BECAUSE YOU WILL HAVE TO BE EVALUATING WHEN YOU

15  EVALUATE THIS CASE WHAT, IN PART, AMONG A LOT OF OTHER THINGS,

16  WHAT EACH SIDE OF THE CONTRACTUALLY THOUGHT IT MEANT AT THAT

17  TIME.

18          SO IT WILL BE UP TO YOU TO DECIDE WHETHER OR NOT THAT

19  SOMEHOW CHANGES THE HISTORICAL FACTS OF WHAT THIS WITNESS FELT

20  AT THE TIME.

21          I DO THINK THERE'S -- THIS IS TURNING INTO AN

22  ARGUMENTATIVE -- OCCASION FOR ARGUMENT, MR. KATZ.  I FAIL TO

23  SEE HOW THINGS THAT HE LEARNED ABOUT AFTER THE FACT, THAT HE

24  DIDN'T EVEN KNOW ABOUT AT THE TIME THAT HE SIGNED THE

25  AGREEMENT, COULD POSSIBLY CHANGE THE -- WHAT HE ACTUALLY

1 THOUGHT AT THE TIME.

2        HOW COULD THAT BE?

3    **MR. KATZ:**  WELL, FOR EXAMPLE, IF HE HAD KNOWN THAT

4 PLAYERS, ACTIVE PLAYERS, WERE PAID REGARDLESS OF WHETHER THEIR

5 IMAGES WERE USED, THAT WOULD HAVE POSSIBLY CHANGED HIS

6 TESTIMONY ABOUT WHETHER HE SHOULD HAVE BEEN PAID WHETHER OR NOT

7 HIS IMAGE --

8    **THE COURT:**  THAT'S AN ARGUMENT.  THAT DOESN'T GO --

9 WHAT HE THOUGHT AT THE TIME, WHAT WAS IN HIS MIND AT THE TIME

10 HE SIGNED -- I'M NOT SAYING HE WAS FOOLED.  MAYBE HE WAS

11 COMPLETELY DEFRAUDED.  I'M NOT SAYING THAT.

12        BUT IT STILL DOESN'T CHANGE THE FACT OF WHAT WAS IN

13 HIS MIND AT THE TIME.  SO HE CAN'T -- HE CAN'T GO BACK AND

14 REWRITE HISTORY AND SAY:

15        "HERE'S WHAT I WOULD HAVE THOUGHT IF I HAD" --

16 THAT WOULD BE A FRAUD CLAIM.  BUT THAT'S NOT IN THE CASE.

17 WHAT'S IN THE CASE IS FIDUCIARY DUTY AND BREACH OF CONTRACT.

18        I'M GOING TO LET YOU ASK A COUPLE OF THESE QUESTIONS

19 AND SEE IF I ANTICIPATE CORRECTLY WHERE I THINK YOU'RE GOING

20 WITH THIS.  BUT I QUESTION WHETHER OR NOT THIS IS GOING TO BE

21 ADMISSIBLE.

22    **MR. KATZ:**  SINCE DISCRETION MAY BE THE BETTER PART OF

23 VALOR, YOUR HONOR, I'M GOING TO GO ON WITH THE NEXT PART OF MY

24 EXAMINATION.

25    **THE COURT:**  THANK YOU.  ALL RIGHT.

**BY MR. KATZ:**

**Q.**    WERE YOU HERE, SIR, WHEN MR. KESSLER READ A PORTION OF

YOUR DEPOSITION TESTIMONY IN HIS OPENING STATEMENT?

**A.**    YES.

          **MR. KATZ:**  I'D LIKE TO PUT THAT ON THE BOARD, YOUR

HONOR.

          **THE COURT:**  GO RIGHT AHEAD.  I DON'T SEE IT.

          (DOCUMENT DISPLAYED.)

          **MR. KATZ:**  THERE WE GO.  OKAY.

**BY MR. KATZ:**

**Q.**    AND THE FIRST QUESTION, SIR, READS AS FOLLOWS:

               "SIR, DO YOU BELIEVE, AS A RETIRED PLAYER,

YOU'RE ENTITLED TO ANY MONEY THAT'S GENERATED BY THE LICENSING

OF ACTIVE PLAYERS?

          **"ANSWER:**  NO."

          WHY DID YOU GIVE THAT ANSWER, SIR?

**A.**    I SAID "NO," BECAUSE I THOUGHT THEY WAS TALKING ABOUT AD

HOC AGREEMENTS.

**Q.**    DO YOU BELIEVE THAT YOU'RE ENTITLED TO ANY MONEY FROM

ACTIVE PLAYER INDIVIDUAL OR AD HOC CONTRACTS?

          **MR. KESSLER:**  YOUR HONOR, I NEED A QUESTION AT THE

TIME HE SIGNED THE GLA, IF HE'S GOING TO ASK THAT QUESTION; DID

HE HAVE AN UNDERSTANDING ABOUT THAT.

          **THE COURT:**  READ THE QUESTION FOR ME.  GIVE ME THE

QUESTION.

1          **MR. KATZ:**  SURE.

2          **THE COURT:**  SO I CAN HAVE IT IN MIND.

3          **MR. KESSLER:**  HE ASKED IN THE PRESENT TENSE.

4          **THE COURT:**  WELL, YOU DID, TOO.  YOU ASKED THAT

5   QUESTION, THAT FIRST QUESTION IS IN THE PRESENT TENSE, AND WHEN

6   YOU ASKED IT IN THE DEPOSITION --

7          **MR. KESSLER:**  NO, YOUR HONOR, ACTUALLY THERE WERE

8   PREVIOUS QUESTIONS, AND THEN AT THE BOTTOM SUBSEQUENT

9   QUESTIONS.  I KEPT ASKING HIM OVER AND OVER AGAIN:

10              "WAS THAT YOUR UNDERSTANDING OF THE AGREEMENT?"

11          SO IT'S VERY CLEAR FROM CONTEXT THAT'S WHY YOUR HONOR

12  ALLOWED THIS TESTIMONY WHEN YOU REVIEWED IT ALL.

13         **MR. KATZ:**  YOUR HONOR, THIS IS WHAT HE ASKED HIM.  HE

14  SHOWED THIS TO THE JURY IN HIS OPENING STATEMENT.  I DON'T KNOW

15  HOW MR. KESSLER CAN DENY THIS.

16         **THE COURT:**  HERE'S WHAT I'M GOING TO LET YOU DO, ON

17  THE ASSUMPTION MR. KESSLER IS GOING TO GO BACK INTO THAT.

18          I'M GOING TO LET -- IN HIS OWN WORDS, WITHOUT YOU

19  LEADING HIM -- I'M GOING TO LET HIM COMMENT ON WHETHER OR NOT

20  HE STANDS BY THAT TESTIMONY THAT'S UP ON THE SCREEN.  YOU CAN

21  DO THAT.

22          PRESENT TENSE, PAST TENSE, FUTURE TENSE.  I'M GOING

23  TO GIVE YOU THIS ONE OPPORTUNITY.  BUT YOU CAN'T LEAD HIM

24  THROUGH THIS.

25          YOU CAN ASK -- LET MR. ADDERLEY -- IF HE WANTS TO SAY

1  WHETHER HE STANDS BY THAT TESTIMONY OR NOT, AND IF NOT WHY NOT,

2  I'LL LET YOU DO THAT.

3  **BY MR. KATZ:**

4  **Q.**  SIR, WHAT IF ANY THOUGHTS HAVE YOU HAD, FROM THE BEGINNING

5  OF TIME TO RIGHT NOW, ABOUT WHETHER YOU COULD SHARE ANOTHER

6  PLAYER'S, AN ACTIVE PLAYER'S INDIVIDUAL AD HOC AGREEMENTS?

7      **MR. KESSLER:**  OBJECTION, YOUR HONOR, "FROM THE

8  BEGINNING OF TIME TO RIGHT NOW."  HE'S TRYING TO GET IN

9  TESTIMONY ABOUT WHAT HE THINKS RIGHT NOW AS OPPOSED TO AT THE

10  TIME OF THE GLA.  AND YOUR HONOR'S RULED THAT'S INADMISSIBLE.

11      **THE COURT:**  ARE YOU GOING TO ASK HIM ABOUT THE AD HOC

12  AGREEMENTS?

13      **MR. KESSLER:**  I'M GOING TO ASK HIM ONLY ABOUT HIS

14  INTENTION AT THE TIME HE SIGNED THE GLA'S.

15      **THE COURT:**  ALL RIGHT.  SINCE YOU'RE NOT TAKING MY

16  PROPOSAL, MR. KATZ, I'M GOING TO STICK BY MY EARLIER RULING.

17  YOU'VE GOT TO ASK ONLY -- YOU REJECTED MY PROPOSED QUESTION.

18      **MR. KATZ:**  ACTUALLY, I DIDN'T.  I MAY NOT HAVE

19  UNDERSTOOD.

20      **THE COURT:**  I WILL ASK THE QUESTION.

21      **MR. KATZ:**  THAT WOULD BE GREAT, YOUR HONOR.

22      **THE COURT:**  I'LL JUST ASK IT.

23      MR. ADDERLEY, CAN YOU SEE WHAT'S UP ON THE SCREEN?

24      **THE WITNESS:**  YES.

25      **MR. KESSLER:**  YOUR HONOR, JUST TO BE CLEAR -- I JUST

1    WANT TO MAKE SURE I WAS CLEAR -- I'D ASK ABOUT AD HOC

2    AGREEMENTS, BUT NOT RELATING TO THE -- NOT RELATING TO THE GLA,

3    WHICH ARE THESE QUESTIONS RELATING TO.

4           **THE COURT:**  I'M OFF OF THAT NOW.

5           **MR. KESSLER:**  OKAY.

6           **THE COURT:**  ALL RIGHT.  THIS IS SOMETHING THAT WAS

7    QUOTED FROM IN THE OPENING STATEMENT, AND THIS IS FROM YOUR

8    DEPOSITION.

9           CAN YOU READ THAT TO YOURSELF, THAT TESTIMONY UP

10   THERE?  I'LL JUST READ IT OUT LOUD SO IT WILL BE PART OF THE

11   RECORD.

12          **"QUESTION:**  SIR, DO YOU BELIEVE, AS A RETIRED

13          PLAYER, YOU'RE ENTITLED TO ANY MONEY THAT'S

14          GENERATED BY THE LICENSING OF ACTIVE PLAYERS?

15          **"ANSWER:**  NO."

16          THEN, THERE'S A BREAK --

17          **MR. KATZ:**  YOUR HONOR, THEY ARE SEPARATE.  APPRECIATE

18   IF YOU COULD DO IT IN TWO SEPARATE -- THEY ARE SEPARATE.  THEY

19   ARE SEPARATE CITES.

20          **THE COURT:**  I'LL STOP THERE.

21          DO YOU STAND BY THAT TESTIMONY, AND IF NOT, WHY NOT.

22          **THE WITNESS:**  I STAND BY THE TESTIMONY "NO."

23          **THE COURT:**  ALL RIGHT.  NOW, NEXT:

24          **"QUESTION:**  AND, WHAT YOU THOUGHT YOU WERE

25          AGREEING TO GET" --

1      I ASSUME THIS WAS AT THE TIME OF THE GLA.  I'LL START

2  OVER.

3           **"QUESTION:**  AND WHAT YOU THOUGHT YOU WERE

4           AGREEING TO GET WAS THAT IF YOUR RIGHTS WERE

5           LICENSED AND USED, YOU WOULD GET SOME MONEY;

6           CORRECT?

7           **"ANSWER:**  CORRECT.

8           **"QUESTION:**  AND THAT WAS YOUR UNDERSTANDING

9           OF THIS AGREEMENT?

10          **"ANSWER:**  YES."

11          DO YOU STAND BY THAT TESTIMONY?

12          **THE WITNESS:**  YES.

13          **THE COURT:**  DO YOU WANT TO AMEND IT OR MODIFY IT IN

14 SOME WAY?

15          **THE WITNESS:**  WELL, YES.

16          **THE COURT:**  ALL RIGHT.  HOW WOULD YOU AMEND IT OR

17 MODIFY IT?

18          **THE WITNESS:**  WELL, WHEN I SAID "NO," I WASN'T AWARE

19 OF THE GROUP LICENSING STATEMENT ABOUT "SIX ACTIVE PLAYERS OR

20 SIX RETIRED PLAYERS."

21          SO I GOT CONFUSED WITH THE AD HOC AND THE LICENSING

22 ACTIVE PLAYERS.  SO THE ANSWER WOULD BE "NO," IF IT'S AN AD

23 HOC; "YES," IF IT'S ACTIVE PLAYERS WHO SIGNED THE GLA ALONG

24 WITH THE SIX RETIRED PLAYERS.

25          **THE COURT:**  ALL RIGHT.  SO IF YOU COULD GO BACK AND

1    MODIFY THAT TESTIMONY TO, IN YOUR VIEW, MAKE IT MORE ACCURATE,

2    THAT'S THE WAY YOU WOULD ANSWER IT TODAY?

3              **THE WITNESS:**  YES, SIR.

4              **THE COURT:**  ALL RIGHT.  CAN WE NOW MOVE TO SOMETHING

5    ELSE?

6    **BY MR. KATZ:**

7    **Q.**   SIR, IN THE SECOND QUESTION THERE:

8                   "WHAT YOU THOUGHT YOU WERE AGREEING TO GET WAS

9    THAT IF YOUR RIGHTS," UNDERLINED, "WERE LICENSED AND USED YOU

10   WOULD GET SOME MONEY, CORRECT?"

11              NOW, YOU HAVE YOUR DEPOSITION IN FRONT OF YOU, SIR.

12   I WOULD LIKE YOU TO TURN TO THE PAGE OF THAT TESTIMONY, WHICH

13   IS PAGE 92, LINES 8 THROUGH 17.  I HAVE MARKED IT THERE.

14              NOW, ON THE OFFICIAL RECORD OF YOUR DEPOSITION -- DO

15   YOU HAVE IT?

16   **A.**   WHICH LINES?

17   **Q.**   8 TO -- 8 TO 17.

18   **A.**   OKAY.

19   **Q.**   NOW, ON THE OFFICIAL VERSION OF YOUR DEPOSITION, THERE'S

20   NO UNDERLINING UNDER "YOUR RIGHTS," IS THERE, SIR?

21   **A.**   NO.

22   **Q.**   THAT'S SOMETHING THAT MR. KESSLER ADDED IN THERE WITHOUT

23   TELLING THE JURY HE WAS ADDING THAT; IS THAT RIGHT?

24   **A.**   YES.

25   **Q.**   OKAY.  AND WHY DID YOU GIVE THAT ANSWER THAT IT WAS

1    CORRECT?  WHAT WERE YOUR RIGHTS THAT YOU WERE TALKING ABOUT?

2    **A.**    THE ONLY RIGHTS I HAD WERE WHAT THE GLA STATED, THAT SIX

3    OR MORE RETIRED PLAYERS.

4    **Q.**    AND THAT'S WHAT YOU MEANT BY YOUR RIGHTS?

5    **A.**    YES.

6    **Q.**    OKAY.  NOW, AT THE TIME YOU SIGNED THESE AGREEMENTS, DID

7    YOU BELIEVE THAT YOU -- NOW, I'M GOING TO TALK ABOUT AD HOCS

8    FOR A SECOND, OKAY?

9    **A.**    OKAY.

10   **Q.**    AT THE TIME YOU SIGNED THIS AGREEMENT, WHAT, IF ANY,

11   BELIEF DID YOU HAVE ABOUT WHETHER YOU HAD TO SHARE YOU ARE AD

12   HOC MONEY WITH ANYBODY ELSE?

13   **A.**    NONE WHATSOEVER.

14   **Q.**    DO YOU BELIEVE YOU HAD TO SHARE OR DIDN'T HAVE TO SHARE?

15   **A.**    I DIDN'T HAVE TO SHARE.

16   **Q.**    WHAT, IF ANY, BELIEF DID YOU HAVE ABOUT WHETHER ANYONE

17   ELSE, ACTIVE OR RETIRED, HAD TO SHARE THEIR AD HOC MONEY WITH

18   YOU?

19   **A.**    NO, NOTHING.

20   **Q.**    DO YOU MEAN THEY HAD TO SHARE IT OR DIDN'T HAVE TO SHARE

21   IT?

22   **A.**    THEY DIDN'T HAVE TO SHARE IT.

23   **Q.**    FINE.  THANK YOU.

24            NOW, YOU WERE HERE IN THE COURTROOM WHEN MR. MCNEIL

25   AND MR. BEACH AND MR. LAIRD TESTIFIED ABOUT THEIR IMAGES BEING

1   SCRAMBLED.  DO YOU RECALL THAT?

2   **A.**   YES.

3   **Q.**   OKAY.  AND THEY ALL TALKED ABOUT SOME RELATIVE OF THEIRS

4   WHO TOLD THEM:

5              "HEY, GRANDPA, I SAW YOU IN THE GAME" OR

6   WHATEVER.  DID YOU HAVE A SIMILAR EXPERIENCE?

7   **A.**   YES.

8   **Q.**   WHAT WAS THAT?

9   **A.**   MY SON-IN-LAW AND MY GRANDSON SHOWED ME ONE OF THE GAMES

10  WHERE THEY HAD THE DALLAS COWBOYS 19 -- I THINK IT WAS THE '71

11  SUPER BOWL, AND THE PACKERS '66 TEAM SUPER BOWL.  AND THEY WERE

12  PLAYING AGAINST EACH OTHER.  AND THAT WAS THE FIRST TIME I WAS

13  AWARE OF IT.

14  **Q.**   AND SINCE THEN, HAVE YOU ACTUALLY SEEN YOUR SCRAMBLED

15  IMAGE IN THE MADDEN GAME?

16  **A.**   YES.

17  **Q.**   HOW DO YOU KNOW IT WAS YOU?

18  **A.**   BECAUSE GREENBAY PACKERS BETWEEN 1961 AND '69, I WAS THE

19  ONLY PLAYER WHO PLAYED THE LEFT CORNERBACK POSITION.  AND THE

20  SAME WITH THE DALLAS COWBOYS.  FROM 1970 TO '72, I WAS THE ONLY

21  PERSON WHO PLAYED THE LEFT CORNERBACK POSITION.

22  **Q.**   COULD IT BE THE 1967 GREENBAY PACKERS IF HERBERT ANTHONY

23  ADDERLEY WERE NOT PLAYING LEFT CORNERBACK?

24  **A.**   NO.

25  **Q.**   COULD IT BE THE 1971 DALLAS COWBOYS IF HERBERT ANTHONY

1  ADDERLEY WERE NOT PLAYING CORNERBACK?

2  **A.**   NO.

3  **Q.**   DID YOU SEE YOUR HEIGHT AND WEIGHT ON THERE?

4  **A.**   YES.

5  **Q.**   DID YOU SEE YOUR AGE?

6  **A.**   YES.

7  **Q.**   DID YOU SEE YOUR YEARS IN THE LEAGUE?

8  **A.**   YES.

9  **Q.**   WERE THEY ALL CORRECT?

10  **A.**   YES.

11  **Q.**   NOW, YOU HAVE BEEN NAMED THE CLASS REPRESENTATIVE FOR

12  2,062 OTHER PLAYERS.  DOES THAT NUMBER HAVE ANY SIGNIFICANCE TO

13  YOU, THE 2,062?

14  **A.**   YES.  26 INVOLVED MY LUCKY NUMBER.

15  **Q.**   THAT'S YOUR NUMBER, YOUR UNIFORM NUMBER?

16  **A.**   YES, SIR.

17  **Q.**   THE ONE THEY SCRAMBLED IN THE MADDEN GAME?

18  **A.**   YES.

19  **Q.**   AND DO YOU UNDERSTAND WHAT THAT MEANS?

20  **A.**   YES.

21  **Q.**   TELL US -- TELL THE JURY WHAT THAT MEANS TO YOU?

22  **A.**   WELL, IT MEANS THAT IT ISN'T ABOUT ME.  IT'S ABOUT THE

23  2,062 CLASS MEMBERS, INCLUDING MYSELF.  AND THAT I'M HERE TO

24  SEEK JUSTICE FOR ALL OF US.

25  **Q.**   AND DO YOU UNDERSTAND WHY ALL THE 2061 OTHER MEMBERS ARE

1   IN THE SAME SITUATION AS YOU ARE?

2   A.   YES.

3           MR. KESSLER:  YOUR HONOR, I'M GOING TO OBJECT.  HE

4   HAS NO PERSONAL KNOWLEDGE OF THE OTHER 2,000 PLAYERS.

5           MR. KATZ:  YES, HE DOES, YOUR HONOR.  IN ONE RESPECT

6   HE DOES.

7           THE COURT:  LET'S HEAR THE ANSWER FIRST.  IF I THINK

8   IT'S TOO SPECULATIVE, I WILL STRIKE IT OUT.

9           GO AHEAD AND ANSWER.

10  BY MR. KATZ:

11  Q.   WHY ARE YOU IN THE SAME SITUATION AS THEY ARE, SIR?

12  A.   BECAUSE WE ALL SIGNED THE GLA.

13  Q.   THANK YOU.

14          NOW, YOU WERE IN COURT THE OTHER DAY WHEN A REQUEST

15  FOR ADMISSION WAS READ OUT ABOUT MR. UPSHAW SAYING SOMETHING

16  ABOUT DOG FOOD?

17  A.   YES.

18  Q.   OKAY.

19          MR. KATZ:  AND IF I MAY READ THAT AGAIN, YOUR HONOR,

20  TO REFRESH.

21          THE COURT:  FINE.  GO AHEAD.

22          MR. KATZ:  "REQUEST FOR ADMISSION NO. 19.  ADMIT THAT

23  GENE UPSHAW HAS SAID IN REFERENCE TO LICENSING OF IMAGES OF THE

24  RETIRED PLAYERS, QUOTE:  'WE COULD HAVE THE GREATEST DOG FOOD

25  IN THE WORLD, BUT IF THE DOGS DON'T LIKE IT, WE CAN'T SELL IT,'

1  CLOSED QUOTE.

2          "RESPONSE TO REQUEST FOR ADMISSION NUMBER 19:

3  SUBJECT TO AND WITHOUT WAIVER OF THE FORGOING OBJECTS, REQUEST

4  NUMBER 19 IS ADMITTED."

5  **BY MR. KATZ:**

6  **Q.**    DID YOU SEE THAT LANGUAGE WHEN MR. UPSHAW SPOKE IT, SIR?

7  **A.**    YES.

8  **Q.**    WHAT WAS YOUR REACTION TO IT?

9          **MR. KESSLER:**  YOUR HONOR, OBJECTION.  HIS REACTION TO

10 IT IS NOT EVIDENCE OF ANYTHING.

11         **THE COURT:**  WHY IS THAT RELEVANT?

12         **MR. KATZ:**  IT'S RELEVANT BECAUSE THEY HAVE MADE A BIG

13 CASE:  NOBODY WANTS THESE GUYS, NOBODY LIKES THESE GUYS.  THEY

14 ARE DOG FOOD.  AND THEY ACTUALLY ARE SAYING THAT WHEN THEY ARE

15 IN A FIDUCIARY POSITION TO THESE PEOPLE.  CALLING THEM "DOG

16 FOOD," I THINK HIS REACTION TO WHAT HIS FIDUCIARY SAYS ABOUT

17 HIM --

18         **THE COURT:**  YOU CAN ASK WHETHER OR NOT -- THERE IS NO

19 CLAIM FOR EMOTIONAL DISTRESS IN THIS CASE.  WHAT YOU CAN ASK IS

20 WHETHER OR NOT HE AGREES WITH MR. UPSHAW THAT THE RETIRED

21 PLAYERS ARE DOG FOOD.

22 **BY MR. KATZ:**

23 **Q.**    WOULD YOU ANSWER HIS HONOR'S QUESTION?

24         **MR. KESSLER:**  YOUR HONOR, THE QUOTE IS --

25         **MR. KATZ:**  YOUR HONOR, IS HE OBJECTING TO YOUR

1    QUESTION NOW, YOUR HONOR?

2              **THE COURT:**  I WANT -- I'LL REPHRASE IT.

3              DOES HE AGREE WITH THE STATEMENT --

4         **MR. KESSLER:**  THANK YOU, YOUR HONOR.

5         **THE COURT:**  -- THAT WAS ADMITTED TO IN THE REQUEST

6    FOR ADMISSION?

7              YOU CAN ASK THAT.

8    **BY MR. KATZ:**

9    **Q.**   WOULD YOU ANSWER HIS HONOR'S QUESTION.

10   **A.**   DO I AGREE WITH WHAT UPSHAW SAID?

11   **Q.**   RIGHT.

12   **A.**   ABOUT THE DOG FOOD?

13   **Q.**   RIGHT.

14   **A.**   NO.

15   **Q.**   WHY NOT?

16   **A.**   BECAUSE IT'S HUMILIATING AND HEARTBREAKING FOR THE

17   EXECUTIVE DIRECTOR OF THE UNION TO DIRECT A STATEMENT AT

18   RETIRED PLAYERS LIKE MYSELF AND THOUSANDS OF OTHERS WHO HELPED

19   BUILD THE GAME.

20   **Q.**   LET ME READ TO YOU SOME SWORN TESTIMONY FROM MR. UPSHAW'S

21   DEPOSITION.

22             **MR. KATZ:**  IT'S PAGE 58, LINES 1 THROUGH 16, YOUR

23   HONOR.  I THINK YOU HAVE THE DEPOSITION UP THERE.

24             **THE COURT:**  I DO.  ALL RIGHT.

25             **MR. KATZ:**  OKAY.

1        **"QUESTION:**  OKAY.  FINE.  SO DIRECTING YOUR

2        ATTENTION TO THE SECOND PAGE OF EXHIBIT 117,

3        IT QUOTES YOU AS FOLLOWS.  WELL, IN THE FIRST

4        PARAGRAPH IT SAYS:  'UPSHAW, 60, WHO HAS BEEN

5        EXECUTIVE DIRECTOR OF THE NFLPA SINCE 1987,

6        SAYS HE STANDS BY HIS RECORD AND REJECTS A

7        SUGGESTION HE'S SUPPOSED TO BE THE RETIREES'

8        REPRESENTATIVE.'  QUOTE:  'THE BOTTOM LINE IS

9        I DON'T WORK FOR THEM,' CLOSE QUOTE, HE SAID.

10       QUOTE:  'THEY DON'T HIRE ME, AND THEY CAN'T

11       FIRE ME.  THEY CAN COMPLAIN ABOUT ME ALL DAY

12       LONG.  THEY CAN HAVE THEIR OPINION.  BUT THE

13       ACTIVE PLAYERS HAVE THE VOTE.  THAT'S WHO

14       PAYS MY SALARY,' CLOSED QUOTE.

15       "DID YOU SAY THOSE WORDS?

16       **"ANSWER:**  I SAID THOSE WORDS DIRECTED AT ONE

17       INDIVIDUAL, JOE DELAMIELLEURE."

18       D-E-L-A-M-I-E-L-L-E-U-R-E.

19       JUST AS AN ASIDE, YOUR HONOR, I SPOKE TO

20   MR. DELAMIELLEURE THE OTHER DAY, AND TOLD HIM I HAD A HARD TIME

21   SPELLING HIS NAME.  AND HE SAID:

22       "WHAT?  IT'S J-O-E."

23       (LAUGHTER.)

24       **THE COURT:**  OKAY.  WHAT'S THE QUESTION?

25

1   **BY MR. KATZ:**

2   **Q.**   THE QUESTION IS:  WHAT WAS YOUR REACTION?  DID YOU READ

3   THOSE WORDS WHEN HE SPOKE THEM?

4   **A.**   YES.

5   **Q.**   WHAT WAS YOUR REACTION TO THOSE WORDS?

6           **MR. KESSLER:**  YOUR HONOR, HE SAW THEM IN A DEPOSITION

7   AND --

8           **MR. KATZ:**  NO.

9           **MR. KESSLER:**  -- WE'RE ASKING FOR HIS REACTION NOW

10  AFTER HE READ THEM IN A DEPOSITION?  THIS IS COMPLETELY

11  ARGUMENTATIVE.

12          (COUNSEL AND THE COURT SPEAKING SIMULTANEOUSLY, WHICH

13          WAS NOT REPORTABLE.)

14          **THE COURT:**  THIS IS ARGUMENT.  SUSTAINED.

15  **BY MR. KATZ:**

16  **Q.**   DID YOU READ THOSE WORDS WHEN -- IN THE CHARLOTTE OBSERVER

17  WHEN THEY WERE UTTERED IN JANUARY OF 2006?

18  **A.**   YES.

19  **Q.**   AND WHAT WAS YOUR REACTION?

20          **MR. KESSLER:**  SAME OBJECTION, YOUR HONOR.

21  **BY MR. KATZ:**

22  **Q.**   AT THAT TIME?

23          **MR. KESSLER:**  IT'S NOT EVIDENCE.  HE'S JUST GOING TO

24  GIVE ANOTHER SPEECH.

25          **THE COURT:**  SOUNDS LIKE IT, BUT ALL RIGHT.

1  OVERRULED.

2            GO AHEAD AND ANSWER.

3            **THE WITNESS:**  IT WAS HEARTBREAKING TO KNOW THAT I WAS

4  A DUES-PAYING MEMBER, HAD A DISTINGUISHED CAREER, TOUGH CAREER

5  AND HARD YEARS IN THE NFL, AND TO REALIZE THAT WE DIDN'T HAVE A

6  VOTE WAS REALLY SHOCKING BECAUSE I THOUGHT WE WERE PAYING DUES

7  TO BE REPRESENTED BY THE UNION.

8  **BY MR. KATZ:**

9  **Q.**   DID YOU CEASE BELONGING TO THE UNION AT THAT TIME?

10 **A.**   REPEAT THAT, PLEASE.

11 **Q.**   DID YOU CEASE BELONGING TO THE UNION AROUND THAT TIME?

12 **A.**   I DID BEFORE THAT.

13 **Q.**   WERE YOU IN THE COURTROOM, SIR, WHEN MR. ALLEN TESTIFIED

14 ABOUT AN ISSUE OF TOUCHBACK MAGAZINE?

15 **A.**   YES.

16 **Q.**   OKAY.

17            **MR. KATZ:**  IT'S IN EVIDENCE, YOUR HONOR.

18            COULD WE PUT 2046 UP?

19            (DOCUMENT DISPLAYED.)

20 **BY MR. KATZ:**

21 **Q.**   I'M GOING TO READ TO YOU A PORTION -- DID YOU READ

22 TOUCHBACK MAGAZINE?

23 **A.**   NO.

24 **Q.**   DID YOU CONSIDER TOUCHBACK MAGAZINE TO BE ANY SORT OF

25 REPORT TO YOU ABOUT THE GLA'S?

1   **A.**   NO.

2   **Q.**   LET ME READ TO YOU FROM PAGE 4.

3        **MR. KESSLER:**  YOUR HONOR, I OBJECT.  IF HE NEVER READ

4   TOUCHBACK MAGAZINE, WHICH WAS JUST IN SWORN --

5        **MR. KATZ:**  YOUR HONOR, THIS IS JUST ARGUMENT.  THIS

6   IS REALLY NOT AN OBJECTION.  IT'S WORSE THAN A SPEAKING

7   OBJECTION, BECAUSE IT'S NOT AN OBJECTION.  IT'S JUST SPEAKING.

8        **THE COURT:**  WHAT IS THE OBJECTION, LEGAL OBJECTION?

9   WHAT IS IT?

10        **MR. KESSLER:**  NO FOUNDATION FOR THIS WITNESS TO

11   TESTIFY ABOUT A DOCUMENT HE JUST STATED HE NEVER READ.

12        **MR. KATZ:**  YOUR HONOR --

13        (COUNSEL AND THE COURT SPEAKING SIMULTANEOUSLY, WHICH

14        WAS NOT REPORTABLE.)

15        **THE COURT:**  MAYBE THE SUBJECT MATTER IS SOMETHING HE

16   CAN COMMENT ON.

17        WHAT IS THE PART YOU WANT TO ASK HIM ABOUT?

18        **MR. KATZ:**  THIS IS WHAT YOU RULED ON YESTERDAY

19   MORNING, YOUR HONOR.

20        **THE COURT:**  YOU HAVE TO FORGIVE --

21        (COUNSEL AND THE COURT SPEAKING SIMULTANEOUSLY, WHICH

22        WAS NOT REPORTABLE.)

23        **MR. KATZ:**  YOU GAVE ME SPECIFIC PERMISSION TO ASK

24   THESE QUESTIONS ABOUT THE PENSION, THE INCREDIBLE, AMAZING

25   INCREASES IN THE PENSION.

1      **THE COURT:**  I GUESS I DID. ALL RIGHT.  GO AHEAD.

2      **MR. KATZ:**  THANK YOU.

3  **BY MR. KATZ:**

4  **Q.**  IF WE LOOK AT PAGE 4 OF THIS DOCUMENT --

5      **MR. KATZ:**  IF YOU COULD HIGHLIGHT THE LANGUAGE AT THE

6  BOTTOM, BEGINNING WITH THE NFLPA'S REPRESENTATION OF RETIRED

7  PLAYERS.  YEAH.

8      (DOCUMENT DISPLAYED.)

9      THIS WAS READ IN TO THE JURY BY MR. KESSLER.  IT

10 SAYS, QUOTE:

11      "THE NFLPA'S REPRESENTATION OF RETIRED PLAYERS

12 IS FUNDED MOSTLY BY ROYALTIES FROM PLAYERS INC LICENSING

13 PROGRAMS INVOLVING CURRENT PLAYERS.  THIS REPRESENTATION HAS

14 DELIVERED AMAZING GAINS IN PLAYER PENSIONS, ESPECIALLY OVER THE

15 LAST 10 YEARS."

16 **BY MR. KATZ:**

17 **Q.**  DO YOU SEE THAT, SIR?

18 **A.**  YES.

19 **Q.**  DID YOU RECEIVE A GAIN IN YOUR PENSION IN RECENT YEARS?

20 **A.**  YES.

21 **Q.**  FROM WHAT TO WHAT?

22 **A.**  WELL, I WAS RECEIVING $126.85 BEFORE THE LAST CBA

23 AGREEMENT.

24 **Q.**  126.85 PER MONTH?

25 **A.**  YES.

1  **Q.**   OKAY.

2  **A.**   AND MY PENSION WENT UP $50, TO 175.86.

3  **Q.**   OKAY.  AND DO YOU CONSIDER THAT TO BE AN AMAZING GAIN IN

4  YOUR PENSION?

5  **A.**   NO.

6  **Q.**   DO YOU CONSIDER YOUR PENSION TO BE ADEQUATE IN ANY WAY,

7  SHAPE OR FORM?

8  **A.**   NO.

9  **Q.**   THEN, IT SAYS A LITTLE BIT FURTHER ON:

10             "DURING THE LAST COLLECTIVE BARGAINING AGREEMENT

11  EXTENSION, FOR EXAMPLE, ALL PLAYER BENEFIT CREDITS PRIOR TO

12  1977" -- YOU PLAYED PRIOR TO 1977, SIR, RIGHT?

13  **A.**   YES.

14  **Q.**   -- "INCREASED TO A MINIMUM OF $200 PER MONTH, CAUSING 50

15  100 PERCENT INCREASES IN SOME OLDER PLAYERS' PENSIONS."

16             YOUR PENSION IS NOT $200 A MONTH, SIR, IS IT?

17  **A.**   NO.

18         **MR. KATZ:**  NOTHING FURTHER AT THIS TIME, YOUR HONOR.

19         **THE COURT:**  ALL RIGHT.  BEFORE WE START THE -- I

20  WANT -- LEAVE THAT UP THERE FOR A SECOND SO THAT I CAN -- I

21  JUST WANT THE JURY TO KEEP STRAIGHT WHAT THE ISSUES IN THE CASE

22  ARE.

23             AND BOTH SIDES HAVE DONE THIS, SO I'M NOT BLAMING

24  ANYBODY.  BOTH SIDES HAVE VEERED OUTSIDE THE STRICT ISSUES

25  YOU'RE GOING TO HAVE TO DECIDE.

1    THE ISSUES IN THIS CASE COME DOWN TO THREE WORDS:

2 GLA AND WHETHER OR NOT THE GLA WAS VIOLATED AND ANY FIDUCIARY

3 RIGHTS ARISING OUT OF THE GLA WERE VIOLATED.

4    IT DOES NOT INVOLVE THE BROADER ISSUES OF WHETHER OR

5 NOT THE LABOR UNION HAS ADEQUATELY REPRESENTED ITS UNION

6 MEMBERS IN COLLECTIVE BARGAINING OR IN ANY OTHER WAY.

7    BOTH SIDES HAVE VEERED OUTSIDE THE NARROWER ISSUES IN

8 THIS CASE FOR WHATEVER REASONS THAT YOU CAN IMAGINE.  BUT I

9 WANT YOU TO BE AWARE THAT AT THE END OF THE DAY IT MAKES NO

10 DIFFERENCE WHETHER THE PENSION IS A HUNDRED DOLLARS OR $600.

11 THAT'S NOT THE ISSUE IN THE CASE.

12    I'M NOT BLAMING MR. KATZ FOR BRINGING THIS UP,

13 BECAUSE MR. KESSLER BROUGHT THIS UP.  SO HE'S ENTITLED TO PUT

14 HIS POINT OF VIEW BEFORE YOU, AS WELL.  BUT THAT'S NOT YOUR

15 ISSUE.

16    YOU JUST BE THINKING "G-L-A."

17    NOW, WE'VE GOT ENOUGH ON OUR PLATE WITH JUST THAT,

18 BECAUSE YOU'VE GOT ALL THESE OTHER AGREEMENTS, ELECTRONIC ARTS,

19 AND HOW THEY FIT INTO THE GLA, AND SO FORTH.

20    BUT AT THE END OF THE DAY THAT'S WHAT YOU'RE GOING TO

21 HAVE TO PIECE TOGETHER.  AND YOU'RE NOT GOING TO BE OUT THERE

22 TRYING TO FIGURE OUT WHETHER OR NOT AS A GENERAL MATTER THE

23 UNION AND THE LEAGUE HAVE TREATED FORMER FOOTBALL PLAYERS

24 FAIRLY OR NOT.  THAT IS NOT THE ISSUE BEFORE YOU.

25    SO WHEN MR. KESSLER MAKES IT SOUND LIKE THEY HAVE

1   DONE SO, IGNORE THAT.

2          WHEN MR. KATZ TRIES TO MAKE IT SOUND LIKE THEY HAVE

3   NOT DONE THAT, IGNORE THAT.  AND FOCUS ON THE REAL ISSUE THAT

4   YOU HAVE TO DECIDE IN THE CASE.  ALL RIGHT.

5          CROSS EXAMINATION.

6          **MR. KESSLER:**  THANK YOU, YOUR HONOR.

7                          **<u>CROSS EXAMINATION</u>**

8   **BY MR. KESSLER:**

9   **Q.**   GOOD MORNING, MR. ADDERLEY.

10  **A.**   GOOD MORNING, SIR.

11  **Q.**   MR. ADDERLEY, I JUST WANT TO GET RID OF THIS IRRELEVANT

12  PENSION ISSUE, WHICH SHOULD NOT BE IN THE CASE, BUT SINCE

13  MR. KATZ ASKED YOU THIS, I JUST HAVE TO ASK YOU ONE OR TWO

14  QUESTIONS ABOUT THIS, SIR, SO PLEASE FORGIVE ME FOR THIS.  I

15  DON'T WANT TO INVADE YOUR PRIVACY.

16         MR. ADDERLEY, YOU VOLUNTARILY DECIDED TO TAKE YOUR

17  PENSION AT THE PAGE OF 45 YEARS OLD; IS THAT CORRECT?

18  **A.**   YES.

19  **Q.**   AND AS A RESULT OF MAKING THAT DECISION, WHEN YOU WERE

20  YOUNGER YOU WERE GETTING A PENSION OF $761 A MONTH, $856 A

21  MONTH WHEN YOU WERE YOUNGER, BUT NOW IT HAS DECREASED.

22         IS THAT TRUE?

23  **A.**   I DON'T REMEMBER GETTING THAT AMOUNT.

24  **Q.**   OKAY.  DO YOU REMEMBER YOU GOT A LOT MORE MONEY WHEN YOU

25  WERE YOUNGER, SIR?

1 **A.** THE NUMBER YOU JUST CALLED OUT?

2 **Q.** YES, SIR.

3 **A.** NO, I DON'T REMEMBER THAT.

4 **Q.** WHAT NUMBER DO YOU REMEMBER YOU WERE GETTING WHEN YOU WERE

5 YOUNGER?

6 **A.** THE HIGHEST I RECEIVED THAT I REMEMBER IS $548 A MONTH.

7 **Q.** OKAY. SO YOU REMEMBER GETTING -- YOU GOT 548 A MONTH.

8 NOW, MR. ADDERLEY, DID YOU KNOW THAT IF YOU HAD

9 WAITED UNTIL 65 YEARS OLD TO RETIRE, THE NORMAL RETIREMENT AGE,

10 AND IF YOU HAD WAITED FOR ALL THAT, THAT TODAY WITH ALL THE

11 AMAZING GAINS THAT WERE DESCRIBED IN THIS ARTICLE, YOU WOULD BE

12 HAVING A PENSION TODAY OF MORE THAN $80,000 A YEAR?

13 **MR. KATZ:** YOUR HONOR, THIS IS JUST TESTIMONY. THIS

14 IS REALLY JUST TESTIMONY.

15 **THE COURT:** JUST A SECOND.

16 DO YOU KNOW THAT OR NOT?

17 **THE WITNESS:** NO.

18 **THE COURT:** ALL RIGHT. THAT IS NOT EVIDENCE IN THE

19 CASE. MR. KESSLER, WITH GREAT FLOURISH, WAS READING FROM

20 SOMETHING. AND MAYBE IT'S TRUE. MAYBE IT'S NOT TRUE. IT IS

21 ZERO EVIDENCE RIGHT NOW.

22 MR. KESSLER IS ENTITLED TO BRING IN ANOTHER ACTUARY

23 FROM THE METROPOLITAN LIFE INSURANCE COMPANY. THEY CAN FIGURE

24 OUT WHAT HE WOULD HAVE GOTTEN IF HE HAD WAITED.

25 SO DON'T TAKE -- THIS IS A CLASSIC EXAMPLE. BOTH

1  SIDES ARE DOING THIS.  REMEMBER THAT'S NOT EVIDENCE.

2  **BY MR. KESSLER:**

3  **Q.**  DO YOU HAVE ANY FRIENDS WHO WAITED UNTIL THEY WERE 65 TO

4  GET THEIR PENSIONS?

5  **A.**  I HAVEN'T SPOKEN TO ANYBODY AT -- THAT I KNOW OF.

6  **Q.**  DO YOU STILL HAVE FRIENDS IN THE LEAGUE FROM THE PACKERS?

7  **A.**  YES.

8  **Q.**  YOU HAVE NEVER SPOKEN TO THEM ABOUT THOSE WHO CHOSE TO

9  WAIT, HOW GENEROUS THEIR PENSIONS ARE?

10  **A.**  I HAVE ONLY SPOKEN TO THE GUYS WHO ELECTED THE EARLY

11  RETIREMENT.  AND IF I MAY EXPLAIN WHY I ELECTED THE EARLY

12  RETIREMENT.

13  **Q.**  YOUR COUNSEL CAN ASK YOU THAT QUESTION.

14       **MR. KATZ:**  HE ASKED THE QUESTION.  HE OPENED THE

15  DOOR.

16       **THE COURT:**  NOT YET, NO.

17       LOOK.  THE BASIC QUESTION HE'S TRYING TO ASK IS THAT

18  MR. ADDERLEY, IF YOU HAD WAITED UNTIL YOU WERE 65 WOULD YOU

19  HAVE GOTTEN MORE MONTHLY PENSION THAN YOU'RE GETTING NOW?

20       **THE WITNESS:**  DID I KNOW THAT?

21       **THE COURT:**  IS THAT THE WAY IT WORKED, THAT IF YOU

22  HAD WAITED, INSTEAD OF DOING IT AT 45, YOU HAD WAITED UNTIL YOU

23  WERE 65 WOULD YOU HAVE GOTTEN A BIGGER PENSION THAN YOU ARE

24  GETTING RIGHT NOW?

25       **THE WITNESS:**  YES.

**BY MR. KESSLER:**

Q.   IN FACT, MR. ADDERLEY, ONE LAST QUESTION ON THIS.  DO YOU RECALL THAT WHEN YOU DECIDED TO TAKE YOUR PENSION AT 45, YOU ACTUALLY SIGNED THE FORM, AN OFFICIAL FORM FROM THE PENSION FUND, SAYING:

           "I KNOW I'M GIVING UP MY RIGHTS TO A MUCH LARGER PENSION, BUT THAT'S WHAT I WANT TO DO"?

           DO YOU REMEMBER SIGNING THAT FORM?

A.   IT WAS A MISLEADING FORM.  IT DIDN'T STATE EVERYTHING.

Q.   YOU REMEMBER YOU SIGNED THE FORM FROM THE PENSION FUND, CORRECT, TO DO THAT?

A.   I SIGNED SOMETHING.  I DON'T REMEMBER WHAT THE FORM WAS.

Q.   I DON'T WANT TO TALK ABOUT PENSIONS ANYMORE.  THE JUDGE IS RIGHT.  THAT'S NOT THE ISSUE IN THE CASE.  LET'S TALK ABOUT THE ISSUES IN THIS CASE.

           MR. ADDERLEY, DO --

           **MR. KESSLER:**  DID WE GIVE THE WITNESS A COPY OF HIS DEPOSITION?

           **MR. KATZ:**  HE HAS ONE.

**BY MR. KESSLER:**

Q.   DO YOU HAVE ONE UP THERE, A COPY OF YOUR DEPOSITION, MR. ADDERLEY?  IF YOU COULD LOOK AT THAT, PLEASE.

           **MR. KESSLER:**  YOUR HONOR, MR. ADDERLEY IS A PARTY SO I'M GOING TO FIRST READ IN HIS DEPOSITIONS.

           IF YOU LOOK, MR. ADDERLEY, AT THE TRANSCRIPT ON PAGE

1   100 OF YOUR DEPOSITION.  AND I'M GOING TO READ OVER TO PART OF

2   101.  I'LL TELL YOU THE LINES IN A SECOND.  I'M READING FROM

3   LINE 22, MR. ADDERLEY, ON PAGE 100.

4            AND THEN I'M GOING TO READ TO LINE 12 ON PAGE 101.

5            **"QUESTION:**  PLEASE TELL ME, PRIOR TO FILING

6            THIS ACTION AND RECEIVING THE COPIES OF THE

7            GLA'S PRODUCED BY DEFENDANTS IN THIS ACTION,

8            WHAT SPECIFIC TERMS OF THE GLA DID YOU KNOW

9            OR REMEMBER?

10           **"ANSWER:**  THAT I SIGNED THE GLA, I REMEMBER,

11           AND I WAS UNDER THE IMPRESSION THAT I WAS

12           SEEING SOME COMPENSATION FOR SIGNING IT.

13           **"QUESTION:**  IF YOUR IMAGE WAS USED?

14           "IF IT WAS USED?"

15           **THE COURT:**  YOU LEFT OUT "ANSWER."

16           **MR. KESSLER:**  SORRY.  LET ME READ THAT AGAIN.

17           **"ANSWER:**  THAT I SIGNED THE GLA, I REMEMBER,

18           AND I WAS UNDER THE IMPRESSION THAT I

19           RECEIVED SOME COMPENSATION FOR SIGNING IT.

20           **"QUESTION:**  IF YOUR IMAGE WAS USED?"

21           **MR. KATZ:**  YOUR HONOR, HE'S NOT READING IT.

22           **MR. KESSLER:**  "IF YOUR IMAGE WAS USED?"

23           I GUESS I STUTTERED.

24           "IF IT WAS USED.

25           "AND THAT'S ALL YOU KNEW AT THE TIME?"

1        **THE COURT:**  QUESTION.

2        **MR. KESSLER:**  YES.

3        **"QUESTION:**  AND THAT'S ALL YOU KNEW AT THE

4        TIME?

5        **"ANSWER:**  YES."

6   BY MR. KESSLER:

7   **Q.**   SO, MR. ADDERLEY, IT'S TRUE, ISN'T IT, THAT AT THE TIME

8   YOU SIGNED YOUR GLA, BEFORE YOU EVER FILED THE LAWSUIT, WHEN

9   YOU SIGNED YOUR GLA WAY BACK, THE ONLY THING YOU KNEW WAS THAT

10  IF YOUR IMAGE WAS USED YOU EXPECTED TO GET PAID, RIGHT?

11  **A.**   YES.

12  **Q.**   OKAY.  AND IT'S ALSO TRUE THAT WHEN YOUR IMAGE WAS USED IN

13  A TRADING CARD OR ANY KINDS OF PRODUCT -- AND BY "YOUR IMAGE,"

14  I MEAN YOUR NAME OR YOUR PICTURE -- WHEN THAT WAS USED YOU GOT

15  PAID FOR THAT, RIGHT?

16  **A.**   NO.

17  **Q.**   OKAY.  WHEN WAS YOUR NAME USED ON A PRODUCT SINCE YOU'RE A

18  RETIRED PLAYER THAT YOU DIDN'T GET PAID FOR IT SINCE YOU SIGNED

19  THE GLA?

20  **A.**   WELL, I'VE RECEIVED TRADING CARDS THAT I DIDN'T GET PAID

21  FOR.  THERE ARE FIGURINES OF MYSELF AND DEION SANDERS THAT WAS

22  PACKAGED IN A COLLECTIBLES AS DOUBLES, THAT DEION SANDERS WAS

23  PAID FOR, AND I DIDN'T GET A DIME.  IT WAS MARKETED.

24        THEY SENT ME A BOX WITH A DOZEN OF THOSE ITEMS IN IT,

25  WITH NO MONEY.

1  **Q.**  MR. ADDERLEY, SINCE YOU'RE A RETIRED PLAYER, IT'S TRUE,

2  ISN'T IT, THAT PLAYERS INC HAS NEVER LICENSED YOUR -- YOUR

3  PERSONAL IMAGE WHERE YOU DID NOT GET PAID FOR IT?  THAT'S TRUE,

4  ISN'T IT?

5  **A.**  NO, IT ISN'T TRUE.

6  **Q.**  MR. ADDERLEY -- OKAY.  LET ME GO NEXT -- NOW, YOU SAID YOU

7  WERE USING THE TRADING CARD.  WHAT TRADING CARD DO YOU THINK

8  YOUR IMAGE WAS USED IN?

9  **A.**  I GET TRADING CARDS ALL THE TIME THAT I DON'T GET PAID

10  FOR.  I DON'T KNOW.  TOPPS OR -- I DIDN'T LOOK AT THAT.  I JUST

11  SIGN THE CARDS AND SEND THEM BACK.

12  **Q.**  WHAT DO YOU MEAN YOU GET TRADING CARDS ALL THE TIME?  ARE

13  YOU TALKING ABOUT IN THE MAIL?

14  **A.**  YEAH.

15  **Q.**  OLD TRADING CARDS?

16  **A.**  YES.

17  **Q.**  FROM WHEN YOU WERE AN ACTIVE PLAYER?

18  **A.**  YES.

19  **Q.**  SIR, I'M ASKING YOU A DIFFERENT QUESTION.  PLEASE WORK

20  WITH ME, OKAY?

21  **A.**  WELL, MAKE THE QUESTION CLEAR.

22  **Q.**  I'LL TRY TO MAKE IT SO CLEAR.  AND IF I DON'T CLEAR TELL

23  ME YOU DON'T UNDERSTAND ME, TELL ME YOU DON'T UNDERSTAND ME,

24  OKAY?  BECAUSE I'M REALLY GOING TO TRY.

25          DO YOU BELIEVE YOU HAVEN'T BEEN PAID FOR SOMEONE

1  USING YOUR NAME OR PICTURE ON A PRODUCT, OKAY, SINCE YOU'VE

2  BEEN RETIRED?  NOT A TRADING CARD THAT WAS MADE WHEN YOU WERE

3  AN ACTIVE PLAYER, OKAY?

4          IS THAT QUESTION CLEAR?

5  **A.**  OKAY.

6  **Q.**  OKAY.  SO FOCUSING SINCE YOU'VE BEEN RETIRED, DO YOU KNOW

7  OF ANY PRODUCT THAT USED YOUR NAME WHERE YOU DIDN'T GET PAID?

8  **A.**  I HAVE A REEBOK JERSEY WITH MY NAME ON THE BACK, MY NUMBER

9  ON IT, THAT I DIDN'T GET PAID FOR.

10 **Q.**  ANYTHING ELSE?

11 **A.**  MR. KATZ HAS SEVERAL ITEMS THAT I DIDN'T GET PAID FOR.

12 **Q.**  MR. KATZ HAS?

13 **A.**  YES.

14 **Q.**  OKAY.  YOU'RE SITTING HERE TESTIFYING NOW.  MR. KATZ IS

15 NOT TESTIFYING.  DO YOU KNOW OF ANY OTHER ITEM BESIDES THE

16 REEBOK JERSEY?

17 **A.**  I DON'T KNOW EXACTLY.  I KNOW THERE ARE SOME OTHER ITEMS.

18 **Q.**  SO LET'S TALK ABOUT THE REEBOK JERSEY, THE ONLY ONE YOU

19 SEEM TO KNOW ABOUT NOW.  THE REEBOK JERSEY WAS NEVER SOLD; IS

20 THAT CORRECT?

21 **A.**  I DON'T KNOW.

22 **Q.**  OKAY.

23 **A.**  IT HAD TO BE SOLD, BECAUSE I GOT IT FROM A FAN IN

24 COLORADO. THEY SENT IT TO ME.

25 **Q.**  THE FAN WHO SENT YOU IN COLORADO, YOU TESTIFIED TO AT YOUR

1   DEPOSITION, MR. ADDERLEY, WAS THAT THEY SENT YOU A JERSEY.  IT

2   COULD HAVE BEEN THAT THE FAN JUST PUT A NAME ON IT.  YOU DON'T

3   KNOW WHETHER IT WAS PRODUCED BY REEBOK OR NOT WITH YOUR NAME ON

4   IT, RIGHT?

5           THAT'S WHAT YOU SAID?

6   **A.**   I SAID THAT THE JERSEY HAD A REEBOK LOGO ON IT AND ALSO A

7   PLAYERS INC LOGO ON IT.

8   **Q.**   RIGHT.

9           **MR. KATZ:**  YOUR HONOR, I HAVE THE JERSEY HERE, IF YOU

10  WOULD LIKE THE WITNESS TO INSPECT IT.  AND IT DOES HAVE THOSE

11  LOGOS ON IT.

12          **MR. KESSLER:**  YOUR HONOR, THE WITNESS OPENED UP THIS

13  REEBOK ISSUE.  YOUR HONOR ACTUALLY ISSUED A PRETRIAL DECISION

14  TO EXCLUDE REEBOK, BUT I'LL GO INTO IT SINCE HE'S GONE INTO IT.

15  BUT THIS JERSEY SHOULDN'T COME IN.  THERE'S NO CLAIM ABOUT THIS

16  REEBOK PROGRAM IN THE CASE, AS YOUR HONOR KNOWS.

17          **THE COURT:**  MR. KESSLER, YOU ASKED A VERY BROAD

18  QUESTION.

19          **MR. KESSLER:**  OKAY.

20          **THE COURT:**  THE WITNESS IS GIVING YOU AN ANSWER THAT

21  CALLS THAT OUT.  I THINK NOW --

22          **MR. KESSLER:**  OKAY.

23          (JUROR COUGHING.)

24          **THE COURT:**  I'M SORRY, MRS. HART.

25          YOU'VE GOTTEN  MRS. HART UPSET.  WE'RE GOING TO TAKE

1   A -- WE'RE GOING TO DO THIS.  WE'RE GOING TO TAKE A 15-MINUTE

2   BREAK, ALL RIGHT.

3           IF YOU NEED A COUGH DROP, I'VE GOT ONE.

4           **THE CLERK:**  ALL RISE.

5           **THE COURT:**  PLEASE REMEMBER THE ADMONITION.

6           **THE CLERK:**  ALL RISE.

7           **THE COURT:**  ARE YOU FEELING ILL?

8           **JUROR MS. HART:**  NO.

9           **THE COURT:**  ALL RIGHT.

10          (THEREUPON, THE JURY LEFT THE COURTROOM.)

11          **THE COURT:**  TAKE OUR LAST BREAK A LITTLE EARLY RIGHT

12  NOW.  ANYTHING YOU NEED ME FOR?

13          **MR. KESSLER:**  YES, YOUR HONOR.  MR. KATZ DISPLAYS A

14  JERSEY, OKAY?  OFFERS IN FRONT OF THE JURY TO SHOW IT.  IT WAS

15  NEVER IDENTIFIED IN THIS CASE AS AN EXHIBIT.  IT WAS NEVER

16  PRODUCED.  IT WASN'T SAID THAT.

17          HE OBVIOUSLY PLANNED ON DOING WITH IT, CAME ARMED, IF

18  YOU WILL, TO LIE IN THE WEEDS WITH THIS.

19          HE OBVIOUSLY PREPPED THE WITNESS TO MENTION THE

20  REEBOK IN RESPONSE TO MY QUESTION, BECAUSE PREVIOUSLY YOUR

21  HONOR HAD AGREED -- WHEN I WANTED TO USE SOMETHING ABOUT

22  REEBOK, YOUR HONOR AGREED AT THEIR REQUEST THAT REEBOK

23  SHOULDN'T BE MENTIONED IN THE CASE, BECAUSE IT WAS A CLAIM THAT

24  WASN'T IN THE CASE ABOUT REEBOK.

25          AND THIS IS OBVIOUSLY AN ORCHESTRATED PLAN, AND I

1    DON'T THINK IT'S RIGHT, YOUR HONOR.

2         **MR. KATZ:**  MAY I RESPOND, YOUR HONOR?

3         **THE COURT:**  YOU CAN.  BUT BEFORE YOU RESPOND, LET ME

4    SEE THIS JERSEY.

5         ALL RIGHT.  WHAT IS YOUR RESPONSE?  EVERYONE ELSE CAN

6    SIT DOWN.

7         **MR. KATZ:**  EXCUSE ME.

8         MR. ADDERLEY NEEDS NO PREPARATION WITH RESPECT TO THE

9    REEBOK JERSEY.  HE IS VERY ANGRY ABOUT THAT JERSEY, AND HE'S

10   BEEN ANGRY FOR YEARS AND YEARS.  HE DOESN'T NEED RON KATZ TO

11   TELL HIM WORD ONE ABOUT THAT.

12        IT'S NOT AN ISSUE IN THE CASE, BUT BECAUSE I KNEW

13   THAT MR. KESSLER, IN HIS INSISTENCE ABOUT ALL THE WONDERFUL

14   THINGS THAT THE DEFENDANTS HAVE DONE FOR THE RETIRED PLAYERS,

15   WOULD ASK THIS VERY QUESTION ABOUT:

16        "HAVEN'T YOU GOTTEN PAID FOR EVERYTHING?"

17        YES, I DID BRING IT TO COURT ON THAT HUNCH.  AND I

18   GUESS MY HUNCH PAID OFF.

19        **THE COURT:**  WHAT DO YOU SAY TO THAT, MR. KESSLER?

20        **MR. KESSLER:**  I SAY TO THAT, YOUR HONOR, I WAS NOT

21   GOING TO ASK ANYTHING ABOUT REEBOK.  WHEN YOUR HONOR ISSUES A

22   RULING I THINK GENERALLY THE RULINGS ARE GOING TO BE FOLLOWED.

23   AND IF HE WANTED TO USE IT WITH THE WITNESS HE STILL HAD TO

24   DISCLOSE IT AS AN EXHIBIT UNDER YOUR HONOR'S RULES.

25        **THE COURT:**  HE HASN'T USED IT YET.  AND THE -- YOU

1  BROUGHT IT UP.

2         **MR. KESSLER:**  BUT IT WAS IMPROPER FOR HIM TO STAND

3  UP, IN MY CROSS-EXAMINATION TO STAND UP WHEN YOU DON'T ALLOW

4  SPEAKING OBJECTIONS.

5         **THE COURT:**  THAT PART IS TRUE.

6         (COUNSEL AND THE COURT SPEAKING SIMULTANEOUSLY, WHICH

7             WAS NOT REPORTABLE.)

8         **MR. KESSLER:**  HE MADE A WAVING OBJECTION.

9         **THE COURT:**  MR. KATZ MADE A DEMONSTRATION IN FRONT OF

10  THE JURY BY BRINGING THIS OUT AND SHOWING IT TO THEM, WHICH WAS

11  NOT THE PROPER THING TO DO.

12         BUT, ON THE OTHER HAND, YOU DID BRING IT UP.  AND I

13  WOULD HAVE ALLOWED THIS TO BE USED AS EVIDENCE ON REDIRECT

14  BECAUSE YOU BROUGHT IT UP.

15         NOW, MR. KATZ FIGURED, MADE A HUNCH THAT YOU WOULD

16  ASK A BROAD QUESTION LIKE THAT.  AND, YES, HE WAS LYING IN THE

17  WEEDS, BUT IT WAS NOT IMPROPER.

18         THE ONLY THING YOU DID THAT WAS IMPROPER WAS

19  FLOURISHING THIS IN FRONT OF THE JURY.  THAT'S NOT THE RIGHT

20  WAY TO DO IT.

21         **MR. KATZ:**  I AGREE, YOUR HONOR.

22         **THE COURT:**  YOU SHOULD NOT HAVE DONE THAT.  BUT ON

23  REDIRECT EXAMINATION YOU CAN GET INTO THIS.

24         HOWEVER, IT'S NOT PART OF THE CASE, IS IT?

25         **MR. KATZ:**  I AGREE WITH THAT, YOUR HONOR, BUT IT

1  REALLY BOTHERS ME --

2          **THE COURT:**  I'M CURIOUS TO KNOW:  DID PLAYERS INC

3  LICENSE THIS?

4          **MR. KATZ:**  YES.

5          **MR. KESSLER:**  NO, YOUR HONOR.  WHAT HAPPENED, YOUR

6  HONOR, IS AS FOLLOWS.  AND WE HAVE NO IDEA WHERE THAT JERSEY

7  COMES FROM.  THERE WAS A LICENSE BETWEEN PLAYERS INC AND

8  REEBOK.

9          SOME SAMPLE JERSEYS WERE PREPARED OF RETIRED PLAYERS.

10  MR. ADDERLEY SIGNED AN AGREEMENT, SO DID MR. UPSHAW.  YOU'LL

11  FIND OUT WHY I MENTION MR. UPSHAW.

12          REEBOK LOOKED AT THEM AND THOUGHT WHICH ONES WOULD

13  SELL OR NOT.  THEY REJECTED MR. ADDERLEY OR CONCLUDED IT

14  WOULDN'T SELL.  THEY REJECTED MR. UPSHAW, CONCLUDED IT WOULDN'T

15  SELL.

16          SO THEY NEVER PUT ANY OF THESE ON SALE.  PLAINTIFFS

17  KNOW THAT.

18          **MR. KATZ:**  IT SAYS "REEBOK."  IT SAYS "REEBOK."  I

19  DON'T KNOW THAT.

20          **THE COURT:**  LOOK, HERE'S THE THING.  YOU CAN GO INTO

21  REEBOK ALL YOU WANT.  I'M GOING TO TAKE BACK WHATEVER MOTION I

22  HAD ON REEBOK BEFORE.  YOU CAN BRING IN YOUR WITNESSES TO

23  EXPLAIN THAT THIS ONE A ONE-TIME THING.  IT WAS REJECT, AND IT

24  NEVER WENT ANYWHERE.  THAT'S ONLY FAIR NOW, MR. KATZ.

25          **MR. KATZ:**  WE WOULD LOVE IT IF HE DOES THAT.

1          **THE COURT:**  YOU CAN DO THAT.

2          SO IT SOUNDS LIKE THIS WAS AN ABORTED ATTEMPT TO COME

3   UP WITH A WAY TO LICENSE A RETIRED PLAYER'S NAME.

4          **MR. KESSLER:**  SOME RETIRED PLAYERS THEY ACCEPTED.

5   THEY LIKED SOME.  THEY SAID:  "THOSE WE'LL SELL."

6          THEY DIDN'T SELL THE OTHERS.

7          **THE COURT:**  MR. KATZ, YOU INJECTED THIS INTO THE

8   CASE, SO I'M GOING TO LET BOTH SIDES GO REEBOK ALL THEY WANT.

9   WE'RE GOING TO TAKE A BREAK NOW FOR A FEW MINUTES.

10         **MR. KATZ:**  THANK YOU, YOUR HONOR.

11         (RECESS TAKEN FROM 11:36 TO 11:50 A.M.)

12         (DISCUSSION HELD OFF THE RECORD)

13         **THE COURT:**  LET'S BRING IN OUR JURY.

14         **THE CLERK:**  ALL RISE.

15         **THE COURT:**  ALL RIGHT.  PLEASE HAVE A SEAT.

16  MR. KESSLER, GO RIGHT AHEAD.

17         **MR. KESSLER:**  THANK YOU, YOUR HONOR.

18  **BY MR. KESSLER:**

19  **Q.**   MR. ADDERLEY, IF YOU COULD PLEASE OPEN YOUR DEPOSITION AND

20  TAKE A LOOK AT PAGE 117, LINE 6.

21         DO YOU HAVE IT, SIR?

22  **A.**   YES.

23  **Q.**   OKAY.

24         **"QUESTION:**  OKAY.  SO FOCUSING NOW JUST ON

25         THE REEBOK AGREEMENT, DO YOU AGREE THAT YOU

1          WOULD ONLY BE ENTITLED TO 6 PERCENT ROYALTY

2          IF YOUR ITEMS WERE SOLD AND THERE WAS

3          SOMETHING TO TAKE 6 PERCENT OF?"

4      **MR. KESSLER:** ANSWER BY THE WITNESS:

5          "YES."

6      **"QUESTION:** SO IF REEBOK NEVER SOLD YOUR

7          JERSEY THERE WOULD BE NOTHING DUE TO YOU,

8          CORRECT?"

9      **MR. KESSLER:** ANSWER BY THE WITNESS:

10         "CORRECT."

11 **BY MR. KESSLER:**

12 **Q.** LET'S STOP THERE FOR A MOMENT.

13         I TAKE IT, MR. ADDERLEY, YOU STILL AGREE TODAY --

14     **MR. KATZ:** YOUR HONOR, UNDER THE RULE OF

15 COMPLETENESS, WE WOULD AS FOR THE NEXT QUESTION --

16     **MR. KESSLER:** I INTEND TO READ ON.

17     **THE COURT:** HE'LL GET. OVERRULED FOR NOW.

18     **MR. KESSLER:** I UNDERSTAND --

19     **MR. KATZ:** I HAD AN OBJECTION TO THE LAST QUESTION,

20 YOUR HONOR, IF YOU WANT TO RULE ON THAT OR NOT. IT CALLS FOR A

21 LEGAL CONCLUSION.

22     **THE COURT:** OVERRULED. THE OBJECTION IS OVERRULED.

23 **BY MR. KESSLER:**

24 **Q.** MR. ADDERLEY, I TAKE IT THAT STILL TODAY YOU AGREE THAT

25 WHEN YOU SIGNED THE AD HOC LICENSE ABOUT REEBOK, IF THEY DIDN'T

1   SELL YOUR JERSEY YOU WEREN'T ENTITLED TO ANY MONEY, RIGHT?

2   **A.**   I HAD NO PROOF THAT THEY SOLD OR DIDN'T SELL.  THEY DIDN'T

3   ACKNOWLEDGE ME WHEN I TRIED TO FIND OUT WHETHER THE JERSEY WAS

4   SOLD.

5   **Q.**   I UNDERSTAND, SIR.  I'M ASKING A DIFFERENT QUESTION.

6   **A.**   NO.

7   **Q.**   NOW WOULD THIS BE CLEAR:  IF THEY DIDN'T SELL YOUR JERSEY,

8   THEN YOU WOULDN'T BE ENTITLED TO ANYTHING, RIGHT?

9   **A.**   CORRECT.

10  **Q.**   NOW, READING ON, ON LINE 21, AS YOUR COUNSEL WANTED ME TO:

11          **"QUESTION:**  OKAY.  AND AS YOU ARE SITTING

12          HERE NOW, DO YOU KNOW WHETHER REEBOK EVER

13          SOLD YOUR JERSEY?"

14      **MR. KESSLER:**  THE WITNESS:

15      **"ANSWER:**  YES.

16      **"QUESTION:**  DID THEY EVER SELL IT?

17      **"ANSWER:**  YES.

18      **"QUESTION:**  TO WHO?

19      **"ANSWER:**  WELL, ONE FAN IN PUEBLO, COLORADO

20          SENT ME THE JERSEY WITH REEBOK'S LOGO AND

21          PLAYERS INC LOGO, AND MY NAME ON THE BACK,

22          WITH MY NUMBER 26 ON THE FRONT.

23      **"QUESTION:**  WHEN DID YOU RECEIVE THAT, SIR?

24      **"ANSWER:**  SHORTLY AFTER I SIGNED THE

25          AGREEMENT WITH THE REEBOK DEAL.

1    **"QUESTION:**  AND DID THAT FAN TELL YOU HOW

2    THEY GOT THAT JERSEY?

3    **"ANSWER:**  YES.

4    **"QUESTION:**  WHAT DID THE FAN SAY?

5    **"ANSWER:**  I CONTACTED HIM TO FIND OUT WHERE

6    HE GOT THE JERSEY.  HE PURCHASED IT IN A

7    SPORTING GOODS STORE IN COLORADO.

8    **"QUESTION:**  AND DID HE TELL YOU WHETHER OR

9    NOT HE PAID TO HAVE YOUR NAME ADDED --

10   **"ANSWER:**  NO.

11   **"QUESTION:**  -- TO THE JERSEY?

12   **"ANSWER:**  NO.

13   **"QUESTION:**  DO YOU KNOW WHETHER HE PAID TO

14   HAVE YOUR NAME ADDED TO THE JERSEY?

15   **"ANSWER:**  I DON'T KNOW.

16   **"QUESTION:**  YOU'RE AWARE, ARE YOU NOT, SIR,

17   THAT STORES AROUND THE COUNTRY WILL ADD

18   PLAYER NAMES TO JERSEYS AT THE REQUEST OF

19   CUSTOMERS FOR A FEE?  ARE YOU AWARE OF THAT?"

20   **MR. KATZ:**  AND I OBJECTED, YOUR HONOR.  NO

21 FOUNDATION.

22   **THE COURT:**  I SEE LATER ON HE ANSWERS IT.  SO

23 OVERRULED.  GO AHEAD.

24   **MR. KESSLER:**  THE WITNESS ANSWER:

25   "WITH THE REEBOK LOGO?

1          **"QUESTION:** WITH ANY JERSEY."

2          THE WITNESS ANSWERS --

3          **MR. KATZ:** SAME OBJECTION.

4          **MR. KESSLER:** "YES."

5          **MR. KATZ:** NO FOUNDATION.

6          **THE COURT:** THE WITNESS ANSWERS, "YES," HE DOES KNOW

7 THAT. SO THAT'S FOUNDATION.

8          **MR. KATZ:** WELL --

9          **THE COURT:** OVERRULED.

10          **MR. KESSLER:** (READING)

11          **"QUESTION:** THAT HAPPENS, CORRECT?

12          **"ANSWER:** YES.

13          **"QUESTION:** YOU DON'T KNOW WHETHER THAT FAN'S

14          JERSEY WAS SOMETHING THAT CAME WITH YOUR NAME

15          WITH REEBOK OR WHETHER THE FAN ADDED THE

16          NAME, CORRECT?"

17          ANSWER FROM THE WITNESS:

18          "OKAY."

19          **"QUESTION:** OTHER THAN THAT ONE FAN AND ONE

20          JERSEY, DO YOU HAVE ANY OTHER INFORMATION

21          WHETHER REEBOK EVER SOLD YOUR JERSEY WITH A

22          NAME ON IT?

23          **"ANSWER:** NO."

24 **BY MR. KESSLER:**

25 **Q.** NOW, MR. ADDERLEY, THE JERSEY THAT COUNSEL WAS WAVING

1   AROUND IS THE SAME --

2          **MR. KATZ:**  I WOULD BE HAPPY TO PUT IT IN EVIDENCE,

3   YOUR HONOR.

4   **BY MR. KESSLER:**

5   **Q.**  -- THAT I ASKED QUESTIONS ABOUT AT THE DEPOSITION,

6   CORRECT?

7          **THE COURT:**  YOU'LL HAVE YOUR CHANCE ON THE JERSEY.

8   LET'S LET MR. KESSLER FINISH.

9          **THE WITNESS:**  CORRECT.

10  **BY MR. KESSLER:**

11  **Q.**  RIGHT.  AND SO AS YOU'RE SITTING HERE TODAY, YOU STILL

12  DON'T KNOW WHETHER REEBOK EVER SOLD ONE JERSEY WITH YOUR NAME

13  ON IT, RIGHT?

14  **A.**  THERE'S ONE RIGHT THERE BEHIND YOU THAT SOLD --

15  **Q.**  YOU DON'T KNOW WHETHER WHEN REEBOK SOLD IT IT HAD YOUR

16  NAME OR WHETHER THE FAN ADDED THE NAME.  YOU DON'T KNOW?

17  **A.**  NO.

18  **Q.**  OKAY.  AND, SIR, HAVE YOU EVER SEEN ANY OTHER JERSEYS FROM

19  REEBOK, ANYWHERE IN THE COUNTRY, WITH YOUR NAME ON IT, SOLD BY

20  REEBOK?

21  **A.**  NO.

22  **Q.**  OKAY.  NOW, WHEN YOU FIRST BROUGHT THIS LAWSUIT,

23  MR. ADDERLEY, THE ONLY COMPLAINT YOU HAD, YOU THOUGHT, ABOUT

24  LICENSING AGAINST PLAYERS INC WAS THIS REEBOK JERSEY ISSUE,

25  CORRECT?

1    (COUNSEL SPEAKING SIMULTANEOUSLY, WHICH WAS NOT

2    REPORTABLE.)

3         **MR. KATZ:**  YOUR HONOR, I OBJECT.  YOU RULED ON THE

4    MOTION IN LIMINE.

5         **THE COURT:**  THIS IS OUT OF THE BAG NOW.  YOUR OWN

6    CLIENT BROUGHT UP REEBOK, AND I'M GOING TO ALLOW THIS LINE OF

7    QUESTIONS.

8         **MR. KESSLER:**  THANK YOU, YOUR HONOR.

9         **THE COURT:**  MR. KATZ --

10        **MR. KATZ:**  THANK YOU, YOUR HONOR.

11        **THE COURT:**  -- YOU CAN'T HAVE IT BOTH WAYS.

12        ALL RIGHT.  PLEASE ANSWER THE QUESTION.

13   **BY MR. KESSLER:**

14   **Q.**  WHEN YOU BROUGHT THIS LAWSUIT AS THE NAMED PLAINTIFF IN

15   THIS CLASS, THE ONLY CLAIM YOU PERSONALLY HAD, SIR, WAS YOU

16   THOUGHT MAYBE YOUR REEBOK JERSEY WAS SOLD AND YOU WEREN'T

17   GETTING PAID FOR IT.  THAT WAS YOUR ONLY COMPLAINT, RIGHT?

18   **A.**  I HAD OTHER ITEMS ALSO --

19   **Q.**  OKAY.

20   **A.**  -- BESIDES THE JERSEY, THAT I DIDN'T GET PAID FOR.  AND I

21   WANTED TO.

22   **Q.**  LET ME READ FROM YOUR DEPOSITION, SIR, ON PAGE 77,

23   TRANSCRIPT 13:

24        **"QUESTION:**  OKAY.  WHAT DID YOU THINK WHEN

25        YOUR LAWSUIT WAS FILED, FIRST FILED?  WHAT

1        CLAIM DID YOU THINK YOU WERE ASSERTING, SIR?

2        **"ANSWER:**  I WAS THINKING THAT THIS REFERRED

3        TO THE AGREEMENT THAT I SIGNED WITH PLAYERS

4        NAMED WITH REEBOK THAT I DIDN'T GET PAID FOR.

5        I COULDN'T GET ANY ACKNOWLEDGMENT FROM THE

6        BEGINNING.

7        **"QUESTION:**  THAT'S WHAT YOU THOUGHT THIS WAS

8        ABOUT?

9        **"ANSWER:**  YES.

10       **"QUESTION:**  BUT THERE'S NOTHING IN HERE ABOUT

11       THAT, RIGHT?

12       **"ANSWER:**  RIGHT.

13 **Q.**  MR. ADDERLEY, IT'S TRUE THAT WHAT YOU THOUGHT WAS THE

14 REASON YOU FILED THIS LAWSUIT, THE REEBOK CLAIM, YOU'RE NOT

15 MAKING ANY CLAIM ABOUT REEBOK IN THIS CASE, RIGHT?

16 **A.**  RIGHT.

17 **Q.**  OKAY.  NOW --

18       **THE COURT:**  NOW, JUST A SECOND.  THAT PART IS

19 CORRECT.  THE CLAIMS THAT ARE GOING TO GO TO YOU TO DECIDE ARE

20 NOT REEBOK CLAIMS.  IT'S THE GLA.  THE GLA.

21       AND YOU CAN TAKE INTO ACCOUNT WHAT MR. ADDERLEY

22 THOUGHT OR DID NOT THINK AT THE TIME THAT HE FILED THE LAWSUIT.

23 THAT'S EVIDENCE FOR YOU TO WEIGH.

24       BUT AT THE END OF THE DAY, YOU'VE GOT TO DECIDE

25 WHETHER THE OVERALL TOTALITY OF THE EVIDENCE EITHER CARRIES THE

1   BURDEN OF PROOF OR IT DOES NOT CARRY THE BURDEN OF PROOF ON THE

2   CLAIMS THAT ARE ACTUALLY FOR YOU TO DECIDE.

3         I'M GOING TO TRY TO HELP YOU KEEP YOUR EYE ON THE

4   BALL EVEN THOUGH BOTH SIDES IN THIS CASE, BOTH SIDES, HAVE A

5   STRONG TENDENCY TO WANT TO VEER OFF INTO LEFT FIELD OR RIGHT

6   FIELD, TO USE A BAD ANALOGY.

7         ALL RIGHT.  GO AHEAD.

8   **BY MR. KESSLER:**

9   **Q.**  MR. ADDERLEY, LET ME DIRECT YOU NEXT TO THE TRANSCRIPT OF

10  YOUR DEPOSITION, 89, IF WE CAN.

11  **A.**  PAGE 89?

12  **Q.**  PAGE 89, SIR.  THANK YOU.  LINE 13.  ACTUALLY -- YES.

13  SORRY.  MAYBE I GAVE YOU THE WRONG THING.

14        LET'S GO TO 89, YEAH, STARTING LINE 13:

15        **"QUESTION:**  WHAT YOU THOUGHT, SIR, IS THAT IF

16        YOUR NAME WAS USED" --

17        **THE COURT:**  IMAGE.

18        **MR. KESSLER:**  I'M SORRY.  TROUBLE READING.

19        **"QUESTION:**  WHAT YOU THOUGHT, SIR, IS THAT IF

20        YOUR IMAGE WAS USED, YOU SHOULD GET SOMETHING

21        FOR THAT, RIGHT?

22        **MR. KATZ:**  AND I OBJECTED --

23        **MR. KESSLER:**  "ANSWER" --

24        **MR. KATZ:**  YOUR HONOR, I OBJECT THAT IT CALLED FOR A

25  LEGAL CONCLUSION.

1      **THE COURT:** NO.  ASK WHAT HE THOUGHT AT THE TIME.

2   THAT'S WHAT ALL THE WITNESSES HAVE BEEN TALKING ABOUT.  IT'S

3   JUST AS FAIR FOR HIM TO TESTIFY ON THIS AS ANYONE ELSE.

4   OVERRULED.

5          THE ANSWER IS WHAT?

6          **MR. KESSLER:** THE ANSWER TO THAT QUESTION IS:

7          "YES.

8          **"QUESTION:** PRIOR TO THIS LAWSUIT YOU NEVER

9          THOUGHT THAT YOU SHOULD GET SOMETHING IF

10         NOBODY USED YOUR IMAGE, RIGHT?"

11         **MR. KATZ:** I OBJECT, YOUR HONOR.  IT'S A DOUBLE

12   NEGATIVE, MAKES A VERY UNCLEAR QUESTION.

13         **THE COURT:** WHATEVER IT'S WORTH, OVERRULED.  YOU

14   CAN -- THE ANSWER IS GOING TO COME IN.

15         **MR. KESSLER:** THE WITNESS ANSWER:

16         "THAT'S CORRECT.

17         **"QUESTION:** THAT NEVER OCCURRED TO YOU BEFORE

18         THIS LAWSUIT, RIGHT?"

19         THE WITNESS:

20         "THAT'S CORRECT.

21         **"QUESTION:** YEAH, I WANT TO TAKE A LOOK AT

22         THIS GLA YOU SIGNED.  AND, SIR, WHEN YOU READ

23         THIS GLA THAT YOU SIGNED, YOU BELIEVE YOU

24         UNDERSTOOD WHAT IT MEANT, CORRECT?

25         **"ANSWER:** YES.

1          "**QUESTION:**  OKAY.  AND THAT WOULD BE TRUE OF

2          ALL THE GLA'S THAT YOU SIGNED, CORRECT?

3          "**ANSWER:**  YES.

4          "**QUESTION:**  I TAKE IT YOU READ THEM BEFORE

5          SIGNING IT?  YOU JUST DIDN'T JUST SIGN YOUR

6          NAME TO SOMETHING WITHOUT READING IT, RIGHT?

7          "**ANSWER:**  YES."

8    **BY MR. KESSLER:**

9    **Q.**   NOW, AGAIN, MR. ADDERLEY, IT'S CORRECT, ISN'T IT, THAT

10   BEFORE THIS LAWSUIT WAS FILED, WHAT YOU BELIEVED WAS IF SOMEONE

11   USED YOUR IMAGE YOU SHOULD GET PAID FOR IT, BUT IF SOMEBODY

12   DIDN'T USE YOUR IMAGE YOU DIDN'T HAVE ANY RIGHT, CORRECT?

13   **A.**   CORRECT.

14   **Q.**   SO THAT WOULD MEAN IF ONLY OTHER RETIRED PLAYERS' IMAGES

15   WERE USED, BUT NOT HERB ADDERLEY'S IMAGE, YOU DIDN'T EXPECT TO

16   GET PAID FOR THIS, RIGHT?

17         **MR. KATZ:**  YOUR HONOR, I OBJECT.  HIS LEGAL VIEWS ARE

18   NOT RELEVANT.

19   **BY MR. KESSLER:**

20   **Q.**   I'M ASKING, SAY, AT THE TIME YOU SIGNED THE GLA, AT THE

21   TIME YOU SIGNED THE GLA, YOU DIDN'T THINK IF OTHER RETIRED

22   PLAYERS WERE USED, NO MATTER WHAT THE NUMBER, IF THEY DIDN'T

23   USE HERB ADDERLEY'S IMAGE YOU DIDN'T THINK YOU WERE ENTITLED TO

24   THAT UNDER THE GLA, RIGHT?

25   **A.**   IF SIX OR MORE RETIRED PLAYERS WERE USED IN A PROMOTION, I

1  EXPECTED TO GET PAID FROM THE ESCROW ACCOUNT.

2  **Q.**   MR. ADDERLEY, I'LL READ TO YOU NOW FROM PAGE -- DID I READ

3  THIS ALREADY?  PAGE 92.  PAGE 92, LINE 8, OF YOUR TRANSCRIPT:

4           **"QUESTION:**  AND WHAT YOU THOUGHT YOU WERE

5           AGREEING TO GET WAS THAT IF YOUR RIGHTS WERE

6           LICENSED AND USED YOU WOULD GET SOME MONEY,

7           CORRECT?

8           **"ANSWER:**  CORRECT.

9           **"QUESTION:**  AND THAT WAS YOUR UNDERSTANDING

10          OF THIS AGREEMENT?

11          **"ANSWER:**  YES."

12          YOU STAND BY THAT TESTIMONY DON'T YOU, SIR?

13          **MR. KATZ:**  YOUR HONOR, UNDER THE RULE OF

14  COMPLETENESS, I WOULD ASK FOR PAGE 91, LINE 7 THROUGH 14, THE

15  PRECEDING PAGE, TO BE READ.  OR I'LL BE GLAD TO READ THEM.

16          **MR. KESSLER:**  OKAY.  "QUESTION" --

17          **THE COURT:**  GO AHEAD AND READ IT ALL THEN.

18          **MR. KATZ:**  I HOPE HE READS IT AS DRAMATICALLY AS HE

19  READS THE OTHERS.

20          **MR. KESSLER:**  (READING)

21          **"QUESTION:**  WHEN YOU READ THIS, YOU

22          UNDERSTOOD IT WAS ONLY TALKING ABOUT MONEY

23          GENERATED BY LICENSING OF RETIRED PLAYERS,

24          CORRECT?

25          **"ANSWER:**  I UNDERSTOOD IT TO MEAN ALL

1          PLAYERS, ACTIVE AND RETIRED PLAYERS.

2          **"QUESTION:**  OKAY.  AT THE TIME YOU READ THIS

3          DOCUMENT IN 2002, IT'S YOUR -- I'M SORRY --

4          IN 2001, IT'S YOUR SWORN TESTIMONY THAT YOU

5          THOUGHT THIS REFERRED TO THE LICENSING OF

6          ACTIVE PLAYER RIGHTS?"

7          THE WITNESS:

8          "NO.

9          **"QUESTION:**  YOU THOUGHT IT ONLY REFERRED AT

10         THE TIME" --

11         **MR. KATZ:**  I THINK HE HAS READ IT BEFORE, YOUR HONOR.

12         **MR. KESSLER:**  "TO RETIRED PLAYER RIGHTS."

13         **THE COURT:**  GO AHEAD AND READ THE WHOLE THING AGAIN

14  SO IT WILL ALL BE IN CONTEXT.

15         **MR. KESSLER:**  I'LL DO IT ALL IN CONTEXT, YOUR HONOR.

16         **THE WITNESS:**  WHAT PLACE ARE YOU ON?

17         **MR. KESSLER:**  (READING)

18         "YOU THOUGHT IT ONLY REFERRED AT THE TIME TO

19         RETIRED PLAYER RIGHTS?

20         "CORRECT."

21         **THE COURT:**  ANSWER.

22         **MR. KESSLER:**  (READING)

23         **"ANSWER:**  CORRECT."

24         THE WITNESS:

25         "YES."

1      HE ANSWERED TWICE.

2            **"QUESTION:**  AND WHAT YOU THOUGHT YOU WERE

3            AGREEING TO GET WAS THAT IF YOUR RIGHTS WERE

4            LICENSED AND USED, YOU WOULD GET SOME MONEY,

5            CORRECT?

6            **"ANSWER:**  CORRECT.

7            **"QUESTION:**  AND THAT WAS YOUR UNDERSTANDING

8            OF THIS AGREEMENT?

9            **"ANSWER:**  YES."

10  **BY MR. KESSLER:**

11  **Q.**   DO YOU STAND BY THAT TESTIMONY, SIR?

12  **A.**   YES, IF SIX OR MORE RETIRED PLAYERS ARE USED.

13  **Q.**   THANK YOU.  WELL, MR. ADDERLEY, LET'S TAKE A LOOK AT PAGE

14  96 OF YOUR DEPOSITION TESTIMONY.  QUESTION, LINE 13:

15            "SIR, DO YOU BELIEVE AS A RETIRED PLAYER

16            YOU'RE ENTITLED TO ANY MONEY THAT'S GENERATED

17            BY THE LICENSING OF ACTIVE PLAYERS?

18            **"ANSWER:**  NO."

19            YOU STAND THAT BY THAT TESTIMONY, CORRECT, SIR?

20  **A.**   I WAS CONFUSED AT THE TIME BETWEEN ACTIVE PLAYERS, AD HOCS

21  AND IN SIX OR MORE ACTIVE PLAYERS WHO SIGNED THE GLA.

22  **Q.**   SO YOU SAY YOU WANT TO CHANGE YOUR TESTIMONY, SIR?

23  **A.**   NO.

24  **Q.**   SIR, DID YOU KNOW THAT IN A DEPOSITION YOU HAVE AN

25  OPPORTUNITY AFTER THE DEPOSITION IS ALL TYPED UP TO REVIEW THEM

1  AND MAKE ANY CORRECTIONS YOU WANT TO?  DID YOU KNOW THAT, SIR?

2  **A.**   YES.

3  **Q.**   AND DID YOU REVIEW YOUR DEPOSITION IN THIS CASE?

4  **A.**   YES.

5  **Q.**   AND YOU DIDN'T MAKE EVEN ONE CORRECTION ABOUT ANY OF THE

6  TESTIMONY I READ, DID YOU?

7  **A.**   I NEED TO SEE THE CORRECTIONS.

8        **MR. KATZ:**  THERE'S AN ERRATA SHEET, YOUR HONOR.

9        **MR. KESSLER:**  THERE'S NO CORRECTIONS ABOUT THE

10  TESTIMONY I READ, YOUR HONOR, OR I WOULD HAVE READ THE

11  CORRECTIONS.

12        **THE COURT:**  IS THAT --

13        **MR. KATZ:**  THERE WAS NO CORRECTION ON THIS TESTIMONY,

14  YOUR HONOR, THAT'S RIGHT.

15        **THE COURT:**  ALL RIGHT.

16  **BY MR. KESSLER:**

17  **Q.**   NOW, MR. ADDERLEY, LET'S LOOK NOW AT PAGE 92 OF YOUR

18  TRANSCRIPT.  I THINK WE COVERED THIS ALREADY. OKAY.

19        MR. ADDERLEY, IT'S TRUE THAT YOU UNDERSTOOD THAT THE

20  GLA YOU SIGNED WAS NOT EXCLUSIVE, CORRECT?

21  **A.**   YES.

22  **Q.**   AND YOU KNEW THAT THAT MEANT YOU COULD LICENSE YOUR RIGHTS

23  TO ANYBODY ELSE YOU WANTED TO, CORRECT?

24  **A.**   YES.

25  **Q.**   AND DESPITE THAT FACT, MR. ADDERLEY, YOU NEVER MADE ANY

1    EFFORT AT ALL TO MARKET YOUR NAME TO BE USED ON ANY PRODUCT,

2    DID YOU?

3    **A.**   NO.

4    **Q.**   YOU NEVER MADE ANY EFFORT TO FIND ANY LICENSE TO A COMPANY

5    YOURSELF, DID YOU?

6    **A.**   NO.

7    **Q.**   NOW, YOU MENTIONED THE LANGUAGE IN THE GLA, WHICH SAID

8    "SIX OR MORE FORMER OR PRESENT PLAYERS."  RECALL THAT?

9    **A.**   YES.

10   **Q.**   OKAY.  NOW, THAT LANGUAGE EXISTED IN THE GLA WHEN YOU

11   SIGNED IT, RIGHT?

12   **A.**   YES.

13   **Q.**   AND DESPITE THAT FACT, YOUR BELIEF WAS THAT YOU WOULD ONLY

14   GET PAID IF YOUR IMAGE WAS USED, CORRECT?

15   **A.**   AT THAT PARTICULAR TIME, YES.

16       **MR. KATZ:**  YOUR HONOR, I OBJECT.  THIS IS ASKED AND

17   ANSWERED.  GONE OVER THIS A NUMBER OF TIMES ALREADY.  IT'S THE

18   SAME ISSUE.

19       **THE COURT:**  WHY ISN'T THIS THE SAME POINT?

20       **MR. KESSLER:**  I WAS REFERRING NOW IN THE CONTEXT OF

21   THE LANGUAGE WHICH MR. KATZ BROUGHT OUT WITH HIM ON THE SCREEN,

22   YOUR HONOR.

23       **THE COURT:**  WHICH LANGUAGE?

24       **MR. KESSLER:**  THE LANGUAGE OF SIX OR MORE FORMER OR

25   PRESENT.  AND I WANTED TO ESTABLISH DESPITE THAT LANGUAGE THAT

1  WAS HIS BELIEF AT THAT TIME.  AND I THINK THE WITNESS JUST

2  ANSWERED:  "YES."

3        **MR. KATZ:**  YOUR HONOR, FIRST OF ALL, THE WITNESS IS

4  NOT TO ANSWER UNTIL I OBJECT.  THAT IS MY UNDERSTANDING, YOUR

5  HONOR.

6        AND, SECONDLY, THIS IS JUST ALL THE EXCERPTS THAT HE

7  JUST READ AND THE THING THAT WAS FLASHED UP THERE.  WE'VE GONE

8  OVER THIS FOUR TIMES ALREADY.

9        **MR. KESSLER:**  YOUR HONOR, IT'S MY LAST QUESTION ON

10  THIS.  I WOULD LIKE TO HAVE AN ANSWER, BECAUSE HE RAISED THAT

11  LANGUAGE.

12        **MR. KATZ:**  I DON'T THINK HE'S ALLOWED TO GO OVER IT

13  FIVE TIMES, YOUR HONOR, WHETHER IT'S HIS LAST OR SECOND TO

14  LAST.

15        **THE COURT:**  WELL, IT'S AN IMPORTANT POINT IN THE

16  CASE.  AND SOMETIMES THE QUESTIONS AND ANSWERS HAVE NOT BEEN A

17  HUNDRED PERCENT CLEAR.  SO I'M GOING TO OVERRULE THE OBJECTION

18  AND ALLOW MR. KESSLER TO ASK -- YOU HAVE ONE MORE QUESTION ON

19  THIS.

20        **MR. KESSLER:**  ONE MORE ON THIS SUBJECT.

21        **THE COURT:**  GO AHEAD.

22  **BY MR. KESSLER:**

23  **Q.**  MR. ADDERLEY, TO BE VERY CLEAR, DESPITE THE FACT THAT YOUR

24  GLA AT THE TIME HAD THE LANGUAGE IN PARAGRAPH 2 OF "SIX OR MORE

25  FORMER OR PRESENT PLAYERS," AT THE TIME YOU SIGNED THE GLA YOU

1  DIDN'T THINK YOU WERE ENTITLED TO ANY ACTIVE PLAYER LICENSING

2  MONEY.

3  **A.**   IS THAT 2001 WHEN I FIRST SIGNED?

4  **Q.**   YES.

5  **A.**   NO.

6  **Q.**   YOU ONLY CAME TO THAT UNDERSTANDING SOMETIME AFTER THIS

7  LAWSUIT, CORRECT?

8  **A.**   WHEN THE THEORY WAS CHANGED.

9  **Q.**   IT WAS AFTER THIS LAWSUIT WAS FILED, CORRECT?

10 **A.**   YES.

11 **Q.**   OKAY.  AND, MR. ADDERLEY, YOU NEVER COMPLAINED TO ANYONE

12 IN THE UNION FROM 2001 -- I THINK YOU SIGNED YOUR GLA IN 2002.

13 I'M SORRY, SIR.  WHEN YOU SIGNED YOUR GLA GOING FORWARD YOU

14 NEVER COMPLAINED TO ANYONE AT THE UNION ABOUT NOT GETTING MONEY

15 UNDER YOUR GLA UNTIL AFTER THIS LAWSUIT WAS FILED, CORRECT?

16 **A.**   CORRECT.

17 **Q.**   AND MR. ADDERLEY, IT'S ALSO TRUE THAT YOUR GLA MAKES -- AT

18 THE TIME YOU DIDN'T UNDERSTAND IT TO REFER TO ANY KIND OF EQUAL

19 SHARE, RIGHT?  YOU HAD NO UNDERSTANDING WHEN YOU SIGNED IT IN

20 2001?

21 **A.**   WELL, I KNEW THAT IT SAID THERE WAS ESCROW ACCOUNT SET UP.

22 **Q.**   RIGHT.  BUT YOU HAD NO IDEA HOW THE MONEY WOULD BE PUT IN

23 OR HOW IT WOULD BE DIVIDED AT THE TIME YOU SIGNED IT, CORRECT?

24 **A.**   WELL, I READ WHAT IT SAID.  AND IT SAID "SIX OR MORE

25 ACTIVE PLAYERS."  THAT HASN'T CHANGED.

1  **Q.**   SIR, I'M JUST ASKING NOW ABOUT THE MONEY.

2           AT THE TIME YOU SIGNED IT, YOU HAD NO IDEA WHEN MONEY

3  WOULD BE PUT IN THE ESCROW ACCOUNT OR HOW IT WOULD BE DIVIDED

4  UP, RIGHT?

5  **A.**   THAT'S CORRECT.

6  **Q.**   OKAY.  AND DESPITE THAT FACT, YOU SIGNED MULTIPLE GLA'S;

7  IS THAT CORRECT?

8  **A.**   YES.

9  **Q.**   NOW, MR. ADDERLEY, I WOULD LIKE TO READ NOW FROM PAGE 98

10 OF YOUR DEPOSITION TRANSCRIPT.  AND I'M READING FROM LINE 23.

11 IT SAYS: .

12          "QUESTION:"

13          MAYBE I SHOULD READ EARLIER, FROM LINE -- FROM LINE

14 1:

15          **"QUESTION:**  HOW DID YOU HAVE AN ABILITY TO

16          CONTROL PLAYERS INC?

17          **"ANSWER:**  IF THERE WAS SOME TYPE OF CONFLICT,

18          FOR EXAMPLE, IF I WAS DOING SOMETHING FOR

19          NIKE AND THEY TRIED TO USE ME OR WANTED TO

20          USE ME IN REEBOK, IT WOULD BE A CONFLICT.  OR

21          IF THEY USED ME IN SOME TYPE OF PROMOTION

22          THAT I DIDN'T AGREE TO, THAT I WOULD HAVE THE

23          AUTHORITY TO ASK THEM NOT TO USE IT.

24          **"QUESTION:**  DID YOU EVER DO THAT?

25          **"ANSWER:**  NO.

1          **"QUESTION:** OKAY. AND WOULD YOUR -- WHAT

2          YOUR TESTIMONY IS, IF YOU HAD AN INDIVIDUAL

3          AGREEMENT THAT CONFLICTED WITH SOMETHING THEY

4          DID, YOU COULD ASK NOT TO BE INCLUDED IN WHAT

5          THEY WERE DOING, RIGHT?

6          **"ANSWER:** YES.

7          **"QUESTION:** BUT YOU NEVER HAD ANY SUCH

8          AGREEMENT, INDIVIDUAL AGREEMENT, CORRECT?

9          **"ANSWER:** CORRECT.

10          "SO APART FROM THAT, DID YOU HAVE ANY ABILITY TO

11          CONTROL PLAYERS INC USE OF YOUR GLA RIGHTS?

12          **"ANSWER:** NO."

13          AND YOU STAND BY THAT TESTIMONY, SIR, DO YOU NOT?

14  **A.**   CORRECT.

15  **Q.**   OKAY. NOW, MR. ADDERLEY, LET ME SHOW YOU A COPY OF AN

16  EXHIBIT THAT'S IN EVIDENCE, TRIAL EXHIBIT 2056. THE

17  COMPILATION.

18          DO I HAVE THAT HERE? I'M SORRY.

19          **MR. KESSLER:** MAY I APPROACH, YOUR HONOR?

20          **THE COURT:** GO AHEAD.

21  **BY MR. KESSLER:**

22  **Q.**   MR. ADDERLEY --

23          **MR. KATZ:** CAN YOU GIVE US A MOMENT? WE DON'T SEEM

24  TO HAVE IT.

25          (DOCUMENT DISPLAYED.)

1      **MR. KESSLER:**  IT'S THE COMPILATION ALREADY IN

2   EVIDENCE.

3           **MR. KATZ:**  THE --

4           **MR. KESSLER:**  COMPILATION.

5   **BY MR. KESSLER:**

6   **Q.**   THIS, MR. ADDERLEY, IS A COMPILATION OF DATA.

7           **MR. KATZ:**  YOUR HONOR, I DON'T BELIEVE THIS WAS

8   DISCLOSED.

9           **MR. KESSLER:**  IT'S IN EVIDENCE, YOUR HONOR.

10          **MR. KATZ:**  IT STILL HAS TO BE DISCLOSED, BY YOUR

11  HONOR'S RULES.

12          **THE COURT:**  DID YOU -- YOU MEAN, AS AN EXHIBIT TO BE

13  USED WITH THE WITNESS?

14          **MR. KATZ:**  YES.

15          **THE COURT:**  DID YOU DO THAT, MR. KESSLER?

16          **MR. KESSLER:**  I DON'T KNOW.

17          DID WE DISCLOSE THE COMPILATION?

18          **MR. KATZ:**  THEY DIDN'T DISCLOSE IT TO ME.  I CAN TELL

19  YOU THAT.

20  **BY MR. KESSLER:**

21  **Q.**   MR. ADDERLEY, DON'T LOOK AT THAT EXHIBIT.  LET ME ASK YOU

22  QUESTIONS ABOUT SOME DATA.

23          **THE COURT:**  JUST A SECOND.  HAVE I LET THE OTHER SIDE

24  USE A DOCUMENT THEY DIDN'T DISCLOSE?

25          **MR. KESSLER:**  YOU DID, YOUR HONOR.  AND I WOULD

1 APPRECIATE THE SAME COURTESY, IF POSSIBLE.

2          **MR. KATZ:**  WAIT.  I DON'T KNOW WHICH ONE IT WAS.  I'M

3 NOT RECALLING IT.

4          **THE COURT:**  SEEMS LIKE I DID, BUT I DON'T --

5          **MR. KATZ:**  I'M NOT RECALLING IT.

6          **MR. KESSLER:**  YOU DID, YOUR HONOR.

7          **MR. KATZ:**  WELL, MAYBE YOU COULD TELL ME THE

8 DOCUMENT. THAT WOULD HELP.

9          **MR. GREENSPAN:**  THE JERSEY.

10          **MR. KESSLER:**  WELL, BEFORE THE JERSEY --

11          (COUNSEL AND THE COURT SPEAKING SIMULTANEOUSLY, WHICH

12          WAS NOT REPORTABLE.)

13          **THE COURT:**  IT WAS SOMETHING EARLIER.  I'M GOING TO

14 LET YOU GO AHEAD AND USE THIS COMPILATION.

15          **MR. KESSLER:**  THANK YOU, YOUR HONOR.  I APPRECIATE

16 THAT.

17          **MR. KATZ:**  ELEMENT OF SURPRISE, YOUR HONOR.  I'M

18 SURPRISED.

19          (LAUGHTER)

20          **THE COURT:**  YOU'RE A BIG GUY, AND YOU CAN HANDLE

21 YOURSELF.

22          **MR. KESSLER:**  LET'S TAKE A LOOK AT THE SECOND PAGE OF

23 THIS DOCUMENT.

24          BLOW UP AT THE TOP WHERE IT SAYS:  "HERB ADDERLEY."

25          (DOCUMENT DISPLAYED.)

**BY MR. KESSLER:**

Q.   MR. ADDERLEY, I JUST WANT TO GET YOUR MEMORY AND

RECOLLECTION ON THIS.  THIS IS DATA FROM THE DATABASE THAT

PLAYERS INC HAS, A COMPUTERIZED DATABASE OF PAYMENTS MADE TO

PLAYERS.

AND IT STATES HERE THAT HERB ADDERLEY WAS PAID $6,800

FROM UPPER DECK, 1,600 FROM UPPER DECK, AND $3,820 FROM UPPER

DECK, PURSUANT TO AD HOC LICENSE AGREEMENTS THAT YOU ENTERED

INTO THROUGH PLAYERS INC; IS THAT TRUE?

A.   YES.

Q.   OKAY.  AND YOU RECEIVED ALL THAT MONEY, SIR, CORRECT?

A.   YES.

Q.   AND YOU KNEW, SIR, THAT THE UPPER DECK PROGRAM INVOLVED

TRADING CARDS, CORRECT?

A.   YES.

Q.   YOU SIGNED TRADING CARDS, AND THEY HAD AN IMAGE OF YOU IN

THOSE CARDS YOU SIGNED, AND IT WAS IN THE UPPER DECK PACKS,

CORRECT?

A.   NO.

Q.   EXPLAIN WHERE THE TRADING CARDS WERE SOLD, SIR?

A.   THEY SENT ME STRIPS OF ABOUT MAYBE THREE INCHES LONG AND A

QUARTER INCH WIDE.

Q.   AND YOU SIGNED THEM?

A.   I SIGNED THE STRIPS.

Q.   AND YOU KNEW WHAT UPPER DECK DID IS THEY TOOK THOSE AND

1  THEY PUT THEM INSIDE THE PACKS OF TRADING CARDS WITH THE ACTIVE

2  PLAYERS.  YOU KNEW THAT, DIDN'T YOU?

3           **MR. KATZ:**  OBJECT.  NO FOUNDATION.

4            **THE WITNESS:**  I DIDN'T KNOW UNTIL THEY SENT THEM BACK

5  TO ME.  SO, YES, I KNEW AFTER I GOT THEM BACK, SAMPLES.

6  **BY MR. KESSLER:**

7  **Q.**  YOU LEARNED THAT?

8  **A.**  YEAH.

9  **Q.**  OKAY.  SO YOUR IMAGE WOULD BE MIXED IN WITH THE IMAGES OF

10  ALL THE ACTIVE PLAYERS, CORRECT?

11  **A.**  I DON'T KNOW.

12  **Q.**  WELL, IF IT WAS IN THE SAME TRADING CARD PACK WITH THE

13  ACTIVE PLAYERS IT WOULD BE MIXED TOGETHER, WOULDN'T IT?

14  **A.**  I SAID I DON'T KNOW.  THEY SENT ME BACK THE SAMPLES OF

15  WHAT I SIGNED.  I HAVE NO IDEA WHAT WAS IN THE PACKS.

16  **Q.**  YOU KNEW MANY MORE THAN SIX RETIRED PLAYERS ENTERED INTO

17  THESE DEALS, RIGHT?

18  **A.**  I DIDN'T KNOW.  I HAD NO WAY OF KNOWING THAT.  THEY DIDN'T

19  TELL ME THAT.

20  **Q.**  MR. ADDERLEY, LET ME ASK YOU THIS.  IT'S CORRECT, ISN'T

21  IT, YOU DIDN'T BELIEVE AT THE TIME YOU ENTERED INTO THESE

22  AD HOCS THAT ANY OF THIS MONEY SHOULD HAVE GONE INTO AN ESCROW

23  ACCOUNT, RIGHT?

24  **A.**  NOT A DIME.

25  **Q.**  NO.  AND THAT'S BECAUSE THESE WERE AD HOC DEALS THAT YOU

1  ENTERED INTO OUTSIDE OF YOUR GLA, CORRECT?

2  **A.**    CORRECT.

3  **Q.**    AND SO EVEN THOUGH YOU HAD A GLA IN EFFECT, YOU THOUGHT IT

4  WAS PERFECTLY PROPER FOR YOU TO HAVE SEPARATE AD HOC DEALS

5  THROUGH PLAYERS INC, ALSO?

6  **A.**    YES.

7  **Q.**    OKAY.  IT'S ALSO CORRECT, MR. ADDERLEY, IS IT NOT, THAT

8  YOU HAD A DEAL WITH EA --

9            **MR. KATZ:**  YOUR HONOR, I'M GOING TO OBJECT.  I THINK

10  THIS IS OUTSIDE OF THE STATUTE OF LIMITATIONS.

11            **MR. KESSLER:**  YOUR HONOR, THIS MONEY WAS PAID IN THE

12  STATUTE OF LIMITATIONS IN 2003.

13            '3 OR '4?

14            **MR. KATZ:**  YOU'VE GOT THE WRONG STATUTE.

15            **MR. KESSLER:**  IT WAS PAID IN 2003.  BUT I'LL ASK YOU

16  THAT.

17            **MR. KATZ:**  IT'S OUTSIDE THE CURRENT STATUTE, YOUR

18  HONOR, REMEMBER?  WE'RE IN A DIFFERENT JURISDICTION NOW.

19            **THE COURT:**  THIS IS NOT OFFERED FOR DAMAGES.  IT'S

20  OFFERED FOR STATE OF MIND, IS THAT --

21            **MR. KESSLER:**  ABSOLUTELY, YOUR HONOR.

22            **THE COURT:**  IT GOES TO -- IT GOES TO THE COURSE OF

23  DEALING AFTER HE ENTERED INTO THE GLA.  AND THAT'S SOMETHING

24  THE JURY CAN LOOK AT TO DETERMINE HOW TO INTERPRET THIS

25  CONTRACT.

1       SO THE OBJECTION IS OVERRULED.

2  BY MR. KESSLER:

3  Q.  MR. ADDERLEY, YOU HAD A DEAL WITH ELECTRONIC ARTS THAT YOU

4  ENTERED INTO, ANOTHER AD HOC AGREEMENT, IN WHICH YOU RECEIVED

5  $750 IN 2003, CORRECT?

6  A.  YES.

7  Q.  AND, IN FACT, YOU RECEIVED MORE MONEY FROM EA FOR THAT

8  EVEN BEFORE 2003?

9  A.  FROM WHAT?

10 Q.  FROM EA FOR THAT SAME DEAL.  DIDN'T YOU GET TWO PAYMENTS

11 OF $750 THEN?

12 A.  I DON'T REMEMBER.

13 Q.  YOU JUST REMEMBER THIS ONE PAYMENT?

14 A.  YES.

15 Q.  OKAY.  NOW, MR. ADDERLEY, IN THE EA DEAL, THAT WAS TO

16 INCLUDE YOU WITH A GROUP OF OTHER RETIRED PLAYERS IN A SPECIAL

17 EDITION OF AN EA GAME; WAS THAT CORRECT?

18 A.  I DON'T KNOW.

19      MR. KATZ:  OBJECT, NO FOUNDATION.

20      THE WITNESS:  I DON'T REMEMBER.

21 BY MR. KESSLER:

22 Q.  YOU DON'T REMEMBER?

23 A.  NO.

24 Q.  NO?

25 A.  IT WASN'T STATED.

1   Q.   OKAY.  WHEN YOU GAVE YOUR RIGHTS TO EA, YOU DIDN'T CARE

2   HOW MANY RETIRED PLAYERS THEY WERE GOING TO USE YOU WITH OR

3   NOT, DID YOU?

4   A.   I GAVE THE RIGHTS TO PLAYERS INC, NOT EA.

5   Q.   YOU GAVE IT TO PLAYERS INC TO GIVE TO EA, RIGHT?

6   A.   OKAY.

7   Q.   YOU DIDN'T CARE HOW MANY RETIRED PLAYERS THEY MIXED YOUR

8   IMAGE WITH, DID YOU?

9   A.   NO.

10          **MR. KATZ:**  OBJECT, YOUR HONOR.

11  **BY MR. KESSLER:**

12  Q.   AND WITH RESPECT TO THE UPPER DECK DEALS WHEN YOU GAVE --

13  SIGNED THE CARDS AND GAVE THE RIGHTS FOR YOUR IMAGE TO BE IN

14  THE CARDS, YOU DIDN'T CARE HOW MANY OTHER RETIRED PLAYERS

15  SIGNED SIMILAR DEALS, DID YOU?

16  A.   AD HOC DEALS?

17  Q.   YES.

18  A.   NO.

19  Q.   OKAY.  NOW -- AND YOU DIDN'T CARE IF YOUR CARD WAS MIXED

20  WITH ACTIVE PLAYERS, EITHER, FOR AD HOC DEALS?

21  A.   NO.

22  Q.   AND EVEN THOUGH IT COULD HAVE BEEN MIXED WITH ACTIVE

23  PLAYERS, YOU DIDN'T THINK THIS MONEY SHOULD GO INTO AN ESCROW

24  FUND AT THE TIME YOU SIGNED THE DEAL.

25  A.   NOT IF IT WAS AN AD HOC.

1  Q.  NOT IF IT WAS AN AD HOC?

2  A.  CORRECT.

3  Q.  VERY GOOD.  NOW, MR. ADDERLEY, LET ME SHOW YOU NEXT A

4  DOCUMENT THAT'S BEEN MARKED AS TRIAL EXHIBIT 2336.  IN FACT,

5  I'M GOING TO GIVE YOU THREE EXHIBITS AT THE SAME TIME.

6          MR. KESSLER:  MAY I APPROACH, YOUR HONOR?

7          THE COURT:  PLEASE.

8  BY MR. KESSLER:

9  Q.  MR. ADDERLEY, DO YOU RECOGNIZE EXHIBIT 2336 AS AN

10 AGREEMENT THAT YOU HAD HAD WITH PLAYERS INC ABOUT THE UPPER

11 DECK DEAL?

12 A.  YES.

13         MR. KESSLER:  OKAY, YOUR HONOR, I MOVE 2336 INTO

14 EVIDENCE.

15         MR. KATZ:  NO OBJECTION, YOUR HONOR.

16         (DOCUMENT DISPLAYED.)

17         THE COURT:  SAY IT AGAIN.

18         MR. KESSLER:  2336, YOUR HONOR.

19         THE COURT:  VERY WELL.  RECEIVED.

20         (TRIAL EXHIBIT 2336 RECEIVED IN EVIDENCE.)

21         MR. KESSLER:  IF WE CAN DISPLAY, LAUREN, PLEASE THE

22 FIRST PARAGRAPH, AND THEN WE'LL GO TO THE "GRANT OF RIGHTS"

23 PARAGRAPH.

24         (DOCUMENT DISPLAYED.)

25         IT SAYS:

1      "DEAR HERB:  THANK YOU FOR AGREEING TO

2  PARTICIPATE IN THE PLAYERS INC PLAYER MARKETING PROGRAM.  THE

3  PURPOSE OF THIS LETTER AGREEMENT IS TO SET FORTH THE

4  UNDERSTANDING WHICH HAS BEEN REACHED BETWEEN YOU, HERB

5  ADDERLEY, PLAYER, AND NATIONAL FOOTBALL LEAGUE PLAYERS

6  INCORPORATED WITH REGARD TO THE UPPER DECK COMPANY, A NEVADA

7  CORPORATION."

8          AND THEN, IT SAYS:

9          "OUR UNDERSTANDING IS SET FORTH IN THE FOLLOWING

10 NUMBERED PARAGRAPHS."

11 **BY MR. KESSLER:**

12 **Q.**  NOW, LET ME DIRECT YOUR ATTENTION TO "GRANT OF RIGHTS."

13          IT SAYS:

14          "PLAYER AGREES THAT PLAYERS INC SHALL GRANT

15 COMPANY THE RIGHT, BUT NOT THE OBLIGATION, TO PRODUCE TRADING

16 CARDS BEARING PLAYER'S NAME, LIKENESS, IMAGE, AND BIOGRAPHICAL

17 INFORMATION IDENTITY TO INSERT INTO ITS 2005 FOOTBALL

18 PRODUCTS."

19          DO YOU SEE THAT?

20 **A.**  YES.

21 **Q.**  AND THE COMPANY BEING REFERRED TO HERE IS UPPER DECK,

22 RIGHT?  THAT'S THE COMPANY WHO'S GETTING THE RIGHTS?

23 **A.**  YES.

24 **Q.**  OKAY.  SO YOU KNEW WHEN YOU SIGNED THIS YOU WERE GRANTING

25 YOUR RIGHTS TO BE IN FOOTBALL PRODUCTS IN 2005 THAT UPPER DECK

1  WOULD BE SELLING, CORRECT?

2  **A.**   YES.

3  **Q.**   OKAY.  AND AT THIS TIME, IF UPPER DECK ALREADY HAD THE

4  RIGHTS TO HERB ADDERLEY TO PUT INTO ITS FOOTBALL PRODUCTS,

5  WOULD THERE BE ANY REASON TO PAY HERB ADDERLEY A SECOND TIME

6  FOR THOSE RIGHTS?

7          **MR. KATZ:**  YOUR HONOR, OBJECT.  IT'S AN IMPROPER

8  HYPOTHETICAL.  NO FOUNDATION.

9          **THE COURT:**  IF THE WITNESS FEELS HE CAN ANSWER THE

10  QUESTION, I'M GOING TO ALLOW IT.

11          OVERRULED.

12          **THE WITNESS:**  REPEAT THE QUESTION.

13  **BY MR. KESSLER:**

14  **Q.**   IF UPPER DECK ALREADY HAD THE RIGHTS TO USE HERB ADDERLEY

15  IN THEIR PRODUCTS, THERE WOULD BE NO REASON FOR THEM TO ENTER

16  INTO AN AGREEMENT TO PAY YOU AGAIN, RIGHT?

17  **A.**   CORRECT.

18  **Q.**   OKAY.  LET'S TAKE A LOOK AT THE COMPENSATION.  AND YOU

19  WERE PAID HERE, SIR, A TOTAL OF $6,800; IS THAT CORRECT?

20  **A.**   CORRECT.

21  **Q.**   OKAY.  AND YOU RECEIVED THAT MONEY?

22  **A.**   YES.

23  **Q.**   OKAY.  LET'S TAKE A LOOK NOW, IF YOU CAN TURN TO TRIAL

24  EXHIBIT 2087.  AND IS THIS, SIR, THE SECOND UPPER DECK

25  AGREEMENT YOU ENTERED INTO?  IF YOU CAN JUST LOOK AT THAT,

1  PLEASE?

2          **MR. KATZ:**  WHAT NUMBER IS THIS, MR. KESSLER?

3          **MR. KESSLER:**  2087.

4          **THE WITNESS:**  YES.

5          **MR. KESSLER:**  OKAY.  I MOVE INTO EVIDENCE 2087, YOUR

6  HONOR.

7          **MR. KATZ:**  NO OBJECTION, YOUR HONOR.

8          **THE COURT:**  2087 RECEIVED.

9          (TRIAL EXHIBIT 2087 RECEIVED IN EVIDENCE.)

10          (DOCUMENT DISPLAYED.)

11  **BY MR. KESSLER:**

12  **Q.**  AND THIS AGREEMENT, WHICH IS DATED JULY 8, 2005, THIS IS A

13  SECOND AGREEMENT WITH UPPER DECK YOU ENTERED INTO THAT SAME

14  YEAR, CORRECT?

15  **A.**  YES.

16  **Q.**  OKAY.  AND THIS WAS TO HAVE YOU SIGN A DIFFERENT IMAGE

17  THAT THEY WERE NOW GOING TO USE OF YOU, RIGHT?

18  **A.**  WRONG.

19  **Q.**  OKAY.  WHAT WAS THIS ONE?

20  **A.**  IT WAS -- ORIGINALLY, IT WAS ONE DEAL FOR ME TO SIGN 1700

21  STRIPS.  AND THEY DIDN'T WANT TO SEND THEM ALL TO ME AT THE

22  SAME TIME.  SO THEY SENT THEM TO ME IN INCREMENTS.  SO IT

23  WASN'T ANYTHING DIFFERENT.  IT WAS THE SAME DEAL.

24          AND THIS ONE LETTER THEY SAY THE SAME EXACT THING.

25  THEY JUST SPLIT THEM UP.

1  Q.   FOR THIS ONE YOU GOT PAID $1,600.  WE CAN SEE THE

2  COMPENSATION, CORRECT?

3  A.   YES.

4  Q.   AND YOU RECEIVED THAT MONEY?

5  A.   YES.

6  Q.   AND, FINALLY, IF WE CAN LOOK AT TRIAL EXHIBIT 2089.  THIS

7  IS THE THIRD AGREEMENT, MR. ADDERLEY, THAT YOU SIGNED WITH

8  UPPER DECK; IS THAT CORRECT?

9  A.   YES.

10       MR. KESSLER:  OKAY.  I WOULD MOVE INTO EVIDENCE TRIAL

11  EXHIBIT 2089.

12       THE COURT:  IT'S ALREADY IN EVIDENCE.

13       MR. KESSLER:  HAS IT BEEN ADMITTED, YOUR HONOR?

14       THE COURT:  IT'S ALREADY BEEN ADMITTED.

15       MR. KESSLER:  IF WE COULD SHOW THE EXHIBIT.

16       THIS IS THE THIRD ONE.  AND IF WE CAN LOOK AT THE

17  COMPENSATION PARAGRAPH.

18       (DOCUMENT DISPLAYED.)

19  BY MR. KESSLER:

20  Q.   YOU GOT ANOTHER $3,820 FOR THIS, CORRECT?

21  A.   YES.

22  Q.   NOW, THEY IF THEY DIDN'T GIVE YOU ALL THIS ADDITIONAL

23  MONEY, THEY COULDN'T HAVE KEPT PUTTING MORE CARDS WITH YOUR

24  NAME ON IT, COULD THEY?

25  A.   REPEAT THAT, PLEASE.

**Q.** THEY HAD TO GIVE YOU THIS MONEY SO YOU WOULD SIGN MORE

CARDS AND THEY COULD USE MORE CARDS?

**A.** YES.

**Q.** IF THEY DIDN'T HAVE THAT, THEY COULDN'T DO IT UNDER THE

FIRST AGREEMENT. THEY HAD TO GIVE YOU MORE MONEY EACH TIME?

**A.** RIGHT.

**Q.** OKAY. NOW, MR. ADDERLEY, YOU MENTIONED IN YOUR TESTIMONY

ABOUT HOW YOU WORKED HARD TO PREPARE FOR A FOOTBALL GAME, SIR;

IS THAT CORRECT?

**A.** YES.

**Q.** YOU SPOKE ABOUT TWO-A-DAYS?

**A.** CORRECT.

**Q.** HOW MANY TIMES DID YOU MEET WITH YOUR COUNSEL TO GO OVER

YOUR TESTIMONY TO PREPARE FOR TODAY?

**A.** UHM, EVERY DAY.

**Q.** EVERY DAY SINCE YOU'VE BEEN HERE YOU'VE BEEN GOING OVER

YOUR TESTIMONY?

**A.** YES.

**Q.** SO IT'S BEEN AT LEAST TEN TIMES ALREADY, SIR, SOMETHING

LIKE THAT?

**A.** YES, WHATEVER NUMBER OF DAYS, EXCEPT FOR SATURDAY AND

SUNDAY.

**Q.** AND WHAT YOU DID IS YOU MET WITH YOUR COUNSEL AND YOU

REHEARSED THAT TESTIMONY OVER AND OVER AGAIN, SIR, DIDN'T YOU?

**MR. KATZ:** OBJECTION.

1          **THE WITNESS:** I DON'T KNOW ABOUT REHEARSING, YOU

2   KNOW.  CONVERSATION ABOUT THE LAWSUIT.

3   **BY MR. KESSLER:**

4   **Q.**   YOU REVIEWED THE QUESTIONS YOU'D BE ASKED AND HOW YOU

5   WOULD ANSWER THEM, OVER AND OVER AGAIN, SIR, ISN'T THAT TRUE?

6          **MR. KATZ:** OBJECT, YOUR HONOR.

7          **THE COURT:** WAIT.

8          **THE WITNESS:** YES.

9          **THE COURT:** WAIT.

10         **MR. KATZ:** I'M NOT ON TRIAL HERE.  HE'S NOT ON TRIAL

11  HERE.  IT'S MALPRACTICE NOT TO PREPARE YOUR WITNESS.  HE

12  PREPARES HIS WITNESSES.

13         WHAT'S THE PROBLEM HERE?

14         **THE COURT:** WELL, SOMEBODY -- I BELIEVE ON YOUR SIDE

15  IT WAS MR. HUMMEL -- DID KIND OF THE SAME THING.

16         IT IS NORMAL FOR LAWYERS TO MEET WITH THEIR CLIENTS

17  TO GO OVER EVIDENCE IN THE CASE AND INTERVIEW THEM AND SO FORTH

18  BEFORE THEY TESTIFY.  IT'S ALSO PROPER FOR COUNSEL TO BRING TO

19  YOUR ATTENTION THE EXTENT TO WHICH HE HAS BEEN PREPARED TO

20  TESTIFY.  SO BOTH SIDES HAVE A POINT TO MAKE HERE.

21         BUT REMEMBER, THIS IS PROTECTED BY THE

22  ATTORNEY-CLIENT PRIVILEGE FOR THE MOST PART.  SO ARE YOU DONE

23  WITH THIS LINE OF QUESTIONS?

24         **MR. KESSLER:** I AM, YOUR HONOR.

25         **THE COURT:** ALL RIGHT.  LET'S MOVE ON TO SOMETHING

1  ELSE.

2          **MR. KESSLER:**  OKAY.  JUST HAVE TWO MORE SUBJECTS.

3          FORGIVE ME, MR. ADDERLEY, MAKING A MESS.

4  **BY MR. KESSLER:**

5  **Q.**  MR. ADDERLEY, AT ONE POINT DID YOU ENTER INTO AN AD HOC

6  LICENSE AGREEMENT WITH THE HALL OF FAME?

7  **A.**  YES.

8  **Q.**  AND THAT WAS A LICENSE TO CREATE A MADDEN HALL OF FAME

9  GAME; IS THAT CORRECT?

10 **A.**  I BELIEVE SO.

11 **Q.**  AND YOU WERE SOLICITED DIRECTLY BY THE HALL OF FAME FOR

12 THAT; IS THAT CORRECT?

13 **A.**  YES.

14 **Q.**  OKAY.  AND YOU ENTERED INTO A LICENSE WITH THE HALL OF

15 FAME, AND YOU AGREED UPON HOW MUCH MONEY YOU WOULD BE PAID FOR

16 YOUR IMAGE AND NAME, CORRECT?

17 **A.**  REPEAT THAT.

18 **Q.**  YOU AGREED WITH THE HALL OF FAME HOW MUCH THEY WOULD PAY

19 YOU TO PUT YOU IN THAT GAME?

20 **A.**  YES.

21 **Q.**  AND YOU WERE SATISFIED WITH HOW MUCH THEY WERE GOING TO

22 PAY YOU TO PUT YOU IN THAT GAME, CORRECT?

23 **A.**  NO.

24 **Q.**  BUT YOU AGREED TO IT?

25 **A.**  I CAN'T TURN DOWN MONEY.

1   **Q.**   OKAY.  THAT'S FAIR ENOUGH.  OKAY.  AND DO YOU RECALL HOW

2   MUCH YOU WERE PAID?

3   **A.**   IT WAS $8,000.  AND IT WAS SEPARATED $2,000 PER YEAR.  SO

4   THEY STILL OWE ME $2,000.  IT'S A 4-YEAR DEAL.  AND THEY GAVE

5   US $2,000 EACH YEAR.

6   **Q.**   OKAY.  NOW, FOR THAT -- THAT WAS AN AD HOC AGREEMENT WITH

7   THE HALL OF FAME, CORRECT?

8   **A.**   AS FAR AS I KNOW, YES.

9   **Q.**   RIGHT.  IN OTHER WORDS, PLAYERS INC DIDN'T NEGOTIATE THAT

10  $2,000 WITH YOU, DID THEY?  THAT WAS DIRECTLY THE HALL OF FAME?

11  **A.**   YES.

12  **Q.**   AND, IN FACT, THE HALL OF FAME TOLD YOU IN A LETTER THEY

13  SENT YOU THAT THIS WAS GOING TO BE A DEAL NOT JUST TO HELP

14  INDIVIDUAL PLAYERS, BUT THERE WAS GOING TO BE MONEY GIVEN TO

15  THE WHOLE HALL OF FAME IN THAT DEAL.  YOU KNEW THAT, RIGHT?

16         **MR. KATZ:**  OBJECT, YOUR HONOR.

17         **THE WITNESS:**  THEY DIDN'T SAY THAT TO ME.

18         **MR. KATZ:**  OBJECT, YOUR HONOR.  IF HE WANTS TO SHOW

19  HIM THE BEST EVIDENCE OF THIS LETTER, LET HIM SHOW IT TO HIM.

20  I THINK IT'S PROBABLY SOMETHING HE HAS TO DISCLOSE.

21         **THE COURT:**  WELL, THE -- YOU DON'T HAVE TO ALWAYS USE

22  THE BEST EVIDENCE, QUOTE THE BEST EVIDENCE.

23         YOU CAN BRING IN EVIDENCE IN OTHER WAYS.  AND THAT'S

24  WHAT MR. KESSLER IS TRYING TO DO HERE.

25         THE OBJECTION IS OVERRULED.

1      NOW, JUST BECAUSE COUNSEL SAYS IT DOESN'T MEAN IT'S

2  NECESSARILY TRUE.  SO YOU FEEL FREE TO ANSWER EXACTLY THE WAY

3  YOU FEEL IS THE MOST ACCURATE ANSWER.  AND IF YOU DON'T KNOW

4  THE ANSWER, THEN YOU SHOULD SAY:

5           "I DON'T KNOW."  OR YOU CAN SAY:

6           "I WOULD LIKE TO SEE THE LETTER.  IF YOU HAVE THE

7  LETTER, LET ME LOOK AT IT, AND I CAN TELL YOU EXACTLY WHAT IT

8  SAID," BECAUSE MAYBE COUNSEL IS SUMMARIZING IT.

9      SO YOU HAVE ALL THOSE OPTIONS.  THE QUESTION ITSELF

10  IS OKAY.  GO AHEAD.

11          **MR. KESSLER:**  YOUR HONOR, I'LL APPROACH THE WITNESS.

12  I HAVE A COPY OF THE FORM OF LETTER THAT WAS SENT OUT.  I

13  DIDN'T DISCLOSE --

14          **THE COURT:**  YOU DON'T HAVE TO MAKE A SPEECH.

15          **MR. KESSLER:**  NO, THE REASON I'M ASKING IS BECAUSE

16  MR. KATZ WILL SAY I DIDN'T DISCLOSE IT FOR THIS WITNESS.  BUT I

17  DON'T KNOW IF HE WANTS ME TO USE THE LETTER OR NOT.  IT'S UP TO

18  HIM.

19          **MR. KATZ:**  I WANT HIM TO FOLLOW THE RULES, YOUR

20  HONOR, WHICH MEANS DISCLOSE, AND THEN YOU CAN USE IT.

21          **THE COURT:**  WELL, THEN JUST ASK THE QUESTION YOU

22  ASKED EARLIER.  IF THE WITNESS WANTS TO SEE IT BEFORE HE

23  ANSWERS THE QUESTION, I AM GOING TO LET YOU USE IT.

24  **BY MR. KESSLER:**

25  **Q.**  I'LL ASK YOU, MR. ADDERLEY, OKAY, DID YOU SIGN A LETTER --

1  THE ONE I HAVE, BY THE WAY, IS NOT THE ONE SENT TO YOU, OKAY?

2  IT'S A FORM.  IF YOU ASK FOR IT, IT'S NOT GOING TO HAVE YOUR

3  NAME ON IT, JUST SO YOU KNOW.

4        DID YOU SIGN A LETTER WITH THE HALL OF FAME, OKAY, IN

5  WHICH THE HALL OF FAME ASKED YOU TO -- TO SUPPORT THE HALL OF

6  FAME AND YOUR FELLOW MEMBERS BY PARTICIPATING IN THE HALL OF

7  FAME PROGRAM, BECAUSE SOME OF THE MONEY WOULD GO TO THE HALL OF

8  FAME?

9  **A.**   YES.

10      **MR. KATZ:**  YOUR HONOR, NOW I'D LIKE IT SEE THE LETTER

11 SINCE APPARENTLY IT'S NOT THE ONE TO MR. ADDERLEY.

12      **THE COURT:**  NO.  THE QUESTION STANDS WITHOUT REGARD

13 TO THE LETTER ITSELF.

14      **MR. KATZ:**  ALL RIGHT.  I'M GOING TO WITHDRAW MY

15 DISCLOSURE OBJECTION, YOUR HONOR, AND LET HIM DISCLOSE THIS

16 DOCUMENT.

17      **THE COURT:**  VERY WELL.  THANK YOU.  ALL RIGHT.

18      **MR. KESSLER:**  OKAY.

19      **THE COURT:**  BUT THE WITNESS SAID "YES," ANYWAY,

20 RIGHT?  DIDN'T YOU SAY "YES"?

21      **THE WITNESS:**  YES.

22      **THE COURT:**  SO NOW YOU'VE MADE YOUR POINT.  LET'S

23 MOVE ON.

24      **MR. KESSLER:**  OKAY.  I WILL, YOUR HONOR.

25

1  BY MR. KESSLER:

2  Q.   I JUST HAVE ONE LAST QUESTION, MR. ADDERLEY.

3       IS IT TRUE, MR. ADDERLEY, THAT YOU HAVE MADE PUBLIC

4  STATEMENTS THAT THE REASON -- THAT THIS LAWSUIT YOU VIEWED AS

5  YOUR CHANCE TO GET SOME ACKNOWLEDGMENT?

6  A.   YES.

7       MR. KESSLER:  THANK YOU, YOUR HONOR, MR. ADDERLEY.

8       THE COURT:  OKAY.  MR. KATZ.  ANY REDIRECT?

9       MR. KATZ:  OKAY.  THANK YOU.

10                     **REDIRECT EXAMINATION**

11 BY MR. KATZ:

12 Q.   MR. ADDERLEY, WHAT DID YOU WANT TO GET ACKNOWLEDGMENT OF

13 WITH THIS LAWSUIT?

14 A.   I WANT TO GET ACKNOWLEDGMENT THAT THIS CASE WAS NOT

15 BASELESS AND THAT IT HAD NO MERIT.

16 Q.   AND WHY DID YOU WANT TO GET THAT ACKNOWLEDGMENT?

17 A.   BECAUSE I DIDN'T THINK IT WAS TRUE.

18 Q.   AND WHO SAID THAT?

19 A.   GENE UPSHAW SAID IT WHEN WE FILED THE LAWSUIT FEBRUARY 14,

20 2007.

21       MR. KESSLER:  YOUR HONOR?

22       THE WITNESS:  AND I'VE HEARD MR. KESSLER ALSO SAY THE

23 SAME EXACT THING.

24       MR. KESSLER:  YOUR HONOR, I THINK THOSE QUESTIONS

25 PUT --

1        **MR. KATZ:**  HE ASKED FOR IT.

2        **MR. KESSLER:**  PUTTING IN STATEMENTS ABOUT ME AND ALL

3  THE PREPARATION THAT THEY'VE DONE, YOUR HONOR, I DON'T THINK

4  THAT WAS AN APPROPRIATE RESPONSE.  CERTAINLY HEARSAY ABOUT ME.

5        **THE COURT:**  WELL, YOU DID ASK HIM ABOUT THE VERY

6  POINT.  HE'S ENTITLED TO EXPLAIN IT.

7        **MR. KESSLER:**  OKAY.

8        **THE COURT:**  SO THAT OBJECTION IS OVERRULED.

9        **MR. KATZ:**  AND I WILL STIPULATE, YOUR HONOR, THAT I

10  PREPARE MY WITNESSES VERY WELL.  THAT'S WHAT I'M PAID FOR.

11  **BY MR. KATZ:**

12  **Q.**  NOW, MR. ADDERLEY, ON THE SUBJECT OF PREPARATION, YOU

13  ACTUALLY DIDN'T TELL THE WHOLE TRUTH, DID YOU?  BECAUSE YOU

14  SAID WE DIDN'T PREPARE ON SATURDAYS AND SUNDAYS.  IS THAT TRUE?

15  **A.**  WELL, NOT AS MUCH AS WE DID DURING THE WEEK.

16  **Q.**  WE WERE TOGETHER LAST SUNDAY, WEREN'T WE?

17  **A.**  YES.  IN CHURCH.

18  **Q.**  OKAY.  AND WE DID SOME PREPARATION?

19  **A.**  AFTER CHURCH.

20  **Q.**  OKAY.  AND WITH RESPECT TO --

21        **THE COURT:**  WE'RE NOT TRYING TO BRING GOD INTO THIS,

22  ARE WE?

23        (LAUGHTER)

24        **THE COURT:**  I'M GOING TO TELL YOU THAT GOD HAS

25  NOTHING TO DO WITH THIS CASE, AND GOD IS ON NOBODY'S SIDE IN

1   THIS CASE.

2           **THE WITNESS:**  I WOULDN'T BE HERE WITHOUT GOD.

3           **THE COURT:**  HE IS NOT ON ANYBODY'S SIDE IN THIS CASE.

4   THIS IS FOR -- WE ARE GOING DECIDE THIS CASE UNDER THE LAW, AND

5   OUR JURY IS GOING TO DECIDE IT ON THE EVIDENCE.

6           SO LET'S NOT BRING CHURCH INTO THIS.

7   **BY MR. KATZ:**

8   **Q.**  NOW, DO YOU FEEL THAT YOU WERE DOING ANYTHING ILLEGAL OR

9   IMMORAL OR UNETHICAL BY CONSULTING WITH ME TO PREPARE FOR YOUR

10  TESTIMONY?

11          **MR. KESSLER:**  YOUR HONOR, I OBJECT TO THAT QUESTION.

12          **THE COURT:**  YOU BROUGHT IT UP.

13          **MR. KESSLER:**  OKAY.

14          **THE COURT:**  I MEAN, MY GOODNESS --

15          **MR. KESSLER:**  IT'S ARGUMENTATIVE.

16          **THE COURT:**  WELL, NO.

17          ANSWER THE QUESTION.

18          **THE WITNESS:**  NO.

19  **BY MR. KATZ:**

20  **Q.**  AND MR. KESSLER ASKED YOU ABOUT THE FACT YOU DIDN'T

21  COMPLAIN.  DID YOU FEEL YOU WERE DOING ANYTHING ILLEGAL,

22  IMMORAL OR UNETHICAL BY NOT COMPLAINING TO YOUR UNION AND

23  TRUSTING YOUR UNION?

24  **A.**  NO.

25          **MR. KESSLER:**  YOUR HONOR, IT'S LEADING.  I'LL GO THAT

1  WAY.

2       **THE COURT:**  ALL RIGHT.  YOU ARE LEADING THE WITNESS.

3  **BY MR. KATZ:**

4  **Q.**  THE -- NOW, IN TERMS OF COMPLAINING, YOU DID COMPLAIN

5  ABOUT THAT REEBOK DEAL, OR YOU TRIED TO COMPLAIN ABOUT THE

6  REEBOK DEAL, DIDN'T YOU?

7  **A.**  FOR THREE YEARS.

8  **Q.**  YEAH.  WELL, LET ME SHOW YOU -- I FEEL LIKE PERRY MASON

9  HERE -- EXHIBIT A, THE SMOKING JERSEY.

10       **MR. KATZ:**  I THINK WE NEED TO HAVE THIS MARKED FOR

11  IDENTIFICATION.  WE DON'T DO THIS MUCH ANYMORE.

12       **THE COURT:**  FINE.  MARK IT FOR IDENTIFICATION,

13  PLEASE.  WHAT THAT MEANS --

14       **MR. KATZ:**  I THINK YOUR CLERK --

15       **THE COURT:**  THAT MEANS THAT MR. ADDERLEY IS NOT GOING

16  TO HAVE IT ANYMORE.  IT'S GOING TO BE IN THE COURT FILES FOR

17  THE NEXT UMPTEEN YEARS.

18       **MR. KATZ:**  WELL, WE WILL NOT SEND AN INVOICE TO THE

19  COURT, YOUR HONOR.

20       **THE COURT:**  I'M SORRY.  IF YOU WANT IT MARKED, IT'S

21  GOING TO STAY MARKED.

22       **MR. KATZ:**  YES, I DO WANT IT MARKED.

23       IS THAT OKAY, MR. ADDERLEY?

24       **THE WITNESS:**  YES.

25       **MR. KATZ:**  HE NEVER GOT ANY MONEY OUT OF IT, ANYWAY.

1          **THE WITNESS:**  CORRECT.

2          **MR. KATZ:**  WHAT NUMBER ARE WE ON?

3          **THE CLERK:**  IT'S 1326.

4          (TRIAL EXHIBIT 1326 MARKED FOR IDENTIFICATION.)

5          **THE COURT:**  NOW, JUST WHILE THEY'RE MARKING IT,

6    PERHAPS THE REEBOK THING HAS SOME -- SOMETHING TO DO WITH THIS

7    CASE.  THOUGH NOT MUCH.

8          WHAT, AGAIN, I REMIND YOU IS THE GLA, THE GLA, THE

9    GLA.

10         IF THIS THING WAS SOLD UNDER THE GLA AND THE MONEY

11   WAS RECEIVED, AND SO FORTH, AND IT WAS A GROUP DEAL AND ALL OF

12   THAT, THEN, YES, THEN IT WOULD HAVE SOMETHING TO DO WITH THIS

13   CASE.

14         BUT YOU'RE GOING TO HAVE TO DECIDE WHETHER OR NOT ANY

15   OF THIS HAVING TO DO WITH REEBOK PROVES A THING ON THE ISSUES

16   THAT YOU HAVE TO DECIDE.

17         THE ONLY REASON THIS IS EVEN GOING INTO NOW IS

18   BECAUSE MR. KESSLER ASKED A VERY BROAD QUESTION, SOMETHING

19   LIKE:

20         "DID THEY EVER USE YOUR IMAGE OR NAME WITHOUT

21   YOU BEING PAID FOR IT?"

22         AND WHAMMO, THIS COMES UP.  THIS INCIDENT COMES UP.

23         SO HERE WE ARE.  I'M LETTING BOTH SIDES GET INTO THE

24   REEBOK, EVEN THOUGH IT MAY AT THE END HAVE NOTHING TO DO WITH

25   THE ISSUE YOU HAVE TO DECIDE.

1                SO GO AHEAD.

2   BY MR. KATZ:

3   Q.   CAN YOU TELL THE JURY WHAT THIS IS, SIR?

4   A.   THIS IS A REPLICA OF THE JERSEY THAT I WOULD BE WEARING IF

5   I WAS PLAYING.  AND IT'S THE SAME JERSEY THAT THE NFL PLAYERS

6   TODAY WEAR.  AND IT HAS EVERYTHING ON THERE THAT THE NFL

7   PLAYERS, THE CURRENT PLAYERS, ARE WEARING TODAY.

8                IT INCLUDES THE NFL LOGO, THE REEBOK LOGO, PLAYERS

9   INC LOGO, MY NAME ON THE BACK, WITH NUMBER 26.

10               AND THAT'S ALSO ON THE FRONT (INDICATING).

11               THIS DID NOT COME FROM A THIRD-WORLD COUNTRY.

12  Q.   CAN YOU POINT OUT TO THE JURY WHERE THE PLAYERS INC LOGO

13  IS?

14  A.   FIRST OF ALL, THIS IS THE REEBOK LOGO (INDICATING).  AT

15  THE BOTTOM OF THE JERSEY IS PLAYERS INC LOGO (INDICATING).

16               THIS JERSEY COULD NOT HAVE BEEN MADE IN A THIRD-WORLD

17  COUNTRY.

18               MR. KATZ:  I OFFER EXHIBIT 1326, YOUR HONOR.

19               MR. KESSLER:  NO OBJECTION AT THIS POINT, YOUR HONOR.

20               THE COURT:  OKAY.  1326 IS IN.

21               (TRIAL EXHIBIT 1326 RECEIVED IN EVIDENCE.)

22  BY MR. KATZ:

23  Q.   NOW, DID YOU TRY TO COMPLAIN TO YOUR UNION, SIR, ABOUT HOW

24  THEY HANDLED THIS REEBOK SITUATION?

25  A.   YES.

1  Q.   WHAT DID YOU DO?

2  A.   I CALLED A GENTLEMAN BY THE NAME OF HOWARD SKALL,

3  S-K-A-L-L.  AND HE'S THE ONE THAT CONTACTED ME ABOUT DOING THE

4  PROMOTION BETWEEN PLAYERS INC AND REEBOK.

5  Q.   DID YOU EVER HEAR BACK FROM HIM?

6  A.   NO.  I HEARD BACK FROM A GENTLEMAN BY THE NAME OF SETH

7  WYMAN AND MUNEER MOORE.  BOTH OF THOSE MARKETING REPS AT THE

8  TIME FOR PLAYERS INC.

9  Q.   HOW LONG DID IT TAKE THEM TO GET BACK TO YOU?

10 A.   BETWEEN SIX MONTHS AND A YEAR.

11 Q.   OKAY.  AND DID YOU ALSO WRITE THEM LETTERS?

12 A.   YEAH, I WROTE LETTERS TO MR. SKALL AND NEVER HEARD BACK

13 FROM HIM.  IN FACT, I NEVER TALKED TO HIM OR HEARD BACK

14 ANYTHING FROM HIM.

15 Q.   AND WHO CALLED YOU, MR. MUNEER MOORE?

16 A.   WELL, I CALLED.  AND THE SECRETARY OR THE RECEPTIONIST

17 SAID:

18          "JUST A MINUTE."

19          AND ONE TIME THERE WAS A GUY NAME SETH WYMAN THAT

20 CAME ON, AND HE SAID HE KNEW ABOUT IT, AND THAT HE WOULD TAKE

21 CARE OF IT, AND HE WOULD TALK TO HOWARD SKALL CONCERNING THE

22 PROMOTION.

23          AND THE NEXT TIME I TALKED TO HIM HE TOLD ME HE WAS

24 IN HAWAII AND DIDN'T HAVE TIME TO TALK TO MR. SKALL.

25          AND THEN, MUNEER MOORE, HE CALLED AND SAID THERE WAS

1   A MEMO ON HIS DESK TO CONTACT ME CONCERNING THE DEAL.  AND HE

2   SAID:

3                "REEBOK IS GOING TO SEND YOU A CATALOG.  AND THAT

4   YOU'RE ENTITLED TO GET $1,000 WORTH OF MERCHANDISE."

5           AND THERE WAS NO COVER LETTER.  NO ONE FOR ME TO

6   CONTACT TO TALK TO ABOUT THIS $1,000.  AND I IMAGINE IT WAS TO

7   MAKE UP FOR THEM NOT HONORING THE AGREEMENT.

8           AND TO ME, IT WAS AN INSULT.  AND I LET IT GO AT

9   THAT.

10          IN FACT, ON THE CATALOG THAT THEY SENT ME HAD A

11  PICTURE OF ONE OF MY FAVORITE BASKETBALL PLAYERS, ALLEN

12  IVERSON, ON THE COVER.  IT WAS MOSTLY BASKETBALL STUFF.  IT

13  WASN'T EVEN FOOTBALL STUFF.

14          SAID, OKAY, GO AHEAD AND PICK OUT A THOUSAND DOLLARS

15  WORTH OF MERCHANDISE.

16  **Q.**  WHAT, IF ANY, CONNECTION DID THAT EXPERIENCE HAVE WITH

17  YOUR FAILURE TO COMPLAIN ABOUT THE GLA?

18  **A.**  WELL, I KNEW IF I HAD SIGNED THE AGREEMENT, AND IT DIDN'T

19  HONOR THAT, THAT THE CHANCES OF ME HEARING FROM THEM CONCERNING

20  THE GLA WAS SLIM TO NONE.

21  **Q.**  SIR, MOVING TO THE UPPER DECK AUTOGRAPHS, YOUR UNION

22  NEGOTIATED FOR YOU A DEAL AT FOUR DOLLARS PER AUTOGRAPH.  DID

23  YOU THINK THAT WAS A GOOD DEAL?

24  **A.**  NO.

25  **Q.**  WHY NOT?

1  A.   BECAUSE I GET $15 GOING TO CARD SHOWS AND MEMORABILIA

2  SHOWS FOR PER AUTOGRAPH.

3  Q.   DO YOU THINK THEY WERE MAKING THEIR BEST EFFORTS FOR YOU?

4  A.   NO.

5  Q.   FOR THE HALL OF FAME DO YOU THINK YOU GOT THE APPROPRIATE

6  AMOUNT OF MONEY, $8,000?

7  A.   NO.

8  Q.   WHY NOT?

9  A.   BECAUSE WE WERE UNDERSOLD.  THEY UNDERSOLD OUR IMAGES TO

10 THE HALL OF FAME.

11 Q.   DO YOU THINK THEY MADE THEIR BEST EFFORTS FOR YOU ON THAT

12 ONE?

13 A.   NO.

14 Q.   NOW, ON THIS EARLY PENSION THAT YOU TOOK, DO YOU THINK

15 THAT YOU GOT THE CORRECT INFORMATION WHEN YOU TOOK THAT?

16 A.   NO.

17 Q.   WHAT INFORMATION DID YOU GET?

18 A.   WELL, THE UNION HAD REPRESENTATIVES GOING AROUND TO ALL OF

19 THE NFL TEAMS AT THAT PARTICULAR TIME AND TELLING US THAT NFL

20 PLAYERS' LIFE SPAN WAS 55 YEARS OF AGE.

21      THAT SCARED A LOT OF FELLOWS.  THAT'S WHY SOME OF US

22 TOOK THE EARLY RETIREMENT.  THERE WAS DIFFERENT REASONS WHY WE

23 TOOK THE EARLY RETIREMENT.

24      IF I HADN'T TAKEN THE EARLY RETIREMENT, MY DAUGHTER

25 WOULD NOT BE A SUCCESSFUL DENTIST, THE WAY SHE IS NOW, BECAUSE

1   I NEEDED THE MONEY TO PUT HER THROUGH COLLEGE.

2          **MR. KATZ:**  THANK YOU, SIR.

3          NO FURTHER QUESTIONS.

4          **THE COURT:**  ANYTHING MORE?

5          **MR. KESSLER:**  VERY BRIEFLY, YOUR HONOR.  I WILL A

6   FINISH BEFORE THE END OF THE DAY.

7                    **RECROSS EXAMINATION**

8   **BY MR. KESSLER:**

9   **Q.**  MR. ADDERLEY, YOU JUST TESTIFIED WITH YOUR COUNSEL'S

10  QUESTIONS ABOUT THAT YOU WERE DISSATISFIED WITH THE AMOUNT OF

11  MONEY FROM THE HALL OF FAME AD HOC, CORRECT?

12  **A.**  CORRECT.

13  **Q.**  BUT YOU NEGOTIATED THAT WITH THE HALL OF FAME, NOT PLAYERS

14  INC, CORRECT?

15  **A.**  I DID NOT NEGOTIATE ANYTHING.  THEY SENT A LETTER, AND

16  ASKED ME WHETHER WOULD I BE WILLING TO PARTICIPATE IN THE

17  PROGRAM.  I SIGNED THE LETTER, AND I SENT THE LETTER BACK.

18  **Q.**  IT CAME FROM THE HALL OF FAME, NOT PLAYERS INC, CORRECT?

19  **A.**  CORRECT.

20  **Q.**  OKAY.  AND WITH RESPECT TO THE REEBOK JERSEY, IF WE MAY,

21  WHEN REEBOK DID PUT OUT SOME RETIRED PLAYERS WHOSE PRODUCTS

22  THEY THOUGHT COULD SELL, DID THEY USE CURRENT JERSEYS LIKE

23  THIS, OR DID THEY USE VINTAGE JERSEYS; DO YOU KNOW?

24          **MR. KATZ:**  OBJECT.

25          **THE WITNESS:**  YOU HAVE TO CONTACT REEBOK.

1           **MR. KATZ:**  FOUNDATION.

2           **THE COURT:**  IF YOU DON'T KNOW THE ANSWER SAY YOU

3   DON'T KNOW.

4           **THE WITNESS:**  I DON'T KNOW.

5   **BY MR. KESSLER:**

6   **Q.**  THIS YOU IDENTIFIED AS A CURRENT JERSEY, CORRECT?

7   **A.**  I SAID AT THE TIME THEY WERE WEARING THE SAME TYPE OF

8   JERSEY.

9   **Q.**  IT WAS CURRENT WHEN YOU GOT THIS IN THE MAIL --

10  **A.**  YES.

11  **Q.**  -- RIGHT?

12          AND THIS STRIP THAT SAYS "ADDERLEY" HERE, THERE ARE

13  STORES ALL OVER THE COUNTRY WHO WILL ADD ANYBODY'S NAME.  THEY

14  WOULD EVEN ADD THE NAME "KESSLER," IF I PAID FOR IT AT A STORE,

15  CORRECT?

16          **MR. KATZ:**  OBJECT.  ASKED AND ANSWERED.

17          **THE WITNESS:**  I DON'T KNOW.

18          **THE COURT:**  THIS WAS ON REDIRECT.

19          OVERRULED.

20  **BY MR. KESSLER:**

21  **Q.**  YOU DON'T KNOW THAT?

22  **A.**  NO.  I DO KNOW THAT THEY WON'T ADD REEBOK'S LOGO AND

23  PLAYERS INC'S LOGO.

24  **Q.**  IF YOU BUY A BLANK JERSEY -- I CAN READ YOUR DEPOSITION

25  TRANSCRIPT AGAIN -- YOU KNOW THAT YOU CAN CUSTOMIZE THAT JERSEY

1  ANY WAY YOU WANT IN THE STORE, CORRECT?

2  **A.**   I DON'T KNOW.

3          **MR. KATZ:**  OBJECT.  ASKED AND ANSWERED.

4          **MR. KESSLER:**  IT'S AN EXHIBIT.  WHERE SHOULD I PUT

5  IT, YOUR HONOR?

6          **THE WITNESS:**  PUT IT ON.

7          (LAUGHTER)

8          **MR. KESSLER:**  I WOULD NEVER DO THAT, SIR.

9          **MR. KATZ:**  THE KESSLER JERSEY HAS NOT SOLD VERY WELL.

10         **MR. KESSLER:**  YOUR HONOR, IT WOULD NOT SELL AT ALL.

11  EVEN TO MY FAMILY.

12  **BY MR. KESSLER:**

13  **Q.**   JUST ONE LAST QUESTION WITH RESPECT TO THE PENSION ISSUE

14  THAT YOUR COUNSEL WENT INTO AGAIN.  AND, SIR, I GREATLY RESPECT

15  THE CHOICE YOU MADE FOR YOURSELF AND YOUR FAMILY WHEN YOU

16  DECIDED TO MAKE A DECISION TO ACCEPT YOUR RETIREMENT AT 45 AND,

17  THEREFORE, GET LESS MONEY.

18         BUT THAT WAS A CHOICE YOU MADE YOURSELF, RIGHT, SIR?

19  **A.**   I HAD NO CHOICE EXCEPT TO MAKE IT.

20  **Q.**   I KNOW.

21  **A.**   YES.

22  **Q.**   IT WAS YOUR DECISION, RIGHT?

23  **A.**   YES.

24         **MR. KESSLER:**  THANK YOU, SIR.

25         **THE COURT:**  MAY WE HAVE MR. ADDERLEY STEP DOWN?

1 WE'RE DONE WITH HIM, RIGHT?

2      **MR. KATZ:**  WE ARE, YOUR HONOR.  I THINK THAT HE'LL BE

3 HERE FOR THE REMINDER OF TRIAL.

4      **THE COURT:**  OF COURSE.

5      **MR. KATZ:**  BUT IF HE HAS TO LEAVE, MAY HE BE EXCUSED?

6      **THE COURT:**  WELL, MR. ADDERLEY, IF YOU NEED TO BE

7 EXCUSED TO GO SOMEPLACE, YES, OF COURSE YOU CAN.  BUT YOU ARE

8 THE CLASS REPRESENTATIVE.  I'M EXPECTING YOU TO BE HERE

9 THROUGHOUT THE ENTIRE TRIAL.  SO YOU'LL HAVE TO HAVE A GOOD

10 REASON FOR NOT BEING HERE.

11      WE'LL TAKE THAT UP OUT OF THE PRESENCE OF THE JURY,

12 ALL RIGHT?

13      **MR. KATZ:**  I'M NOT SAYING HE'S LEAVING, YOUR HONOR.

14 I'M JUST SAYING IF SOMETHING CAME UP.

15      **THE COURT:**  OF COURSE I WOULD CONSIDER THAT.  BUT

16 LET'S SEE IF ANYTHING COMES UP.

17      **MR. KATZ:**  SURE.  NO, NO.  HE INTENDS TO BE HERE.

18      **THE COURT:**  HE HAS BEEN HERE EVERY DAY.  HE IS THE

19 CLASS REPRESENTATIVE, AND I EXPECT HE WOULD BE HERE THROUGHOUT

20 THE TRIAL.

21      OKAY.  JUST STAY FOR THEIR FOR A MOMENT.  WE'RE

22 ALMOST DONE FOR THE DAY.

23      IS THERE A QUICK STIPULATION OR ANYTHING YOU WANT TO

24 HAVE READ IN?

25      OTHERWISE, WE ARE GOING TO BREAK EARLY TODAY.

1          **MR. KESSLER:** THERE IS NOTHING WE CAN DO IN THE FIVE

2    MINUTES.

3          **THE COURT:** JUST INFORM THE JURY IN THE MINUTES THAT

4    WE HAVE HERE --

5          **MR. KATZ:** WE CAN START MR. BERTHELSEN IF YOU WANT.

6          **THE COURT:** NO.  HOW MANY MORE WITNESSES DO YOU HAVE

7    ON THE PLAINTIFFS' CASE?

8          **MR. HUMMEL:** FOUR.

9          **THE COURT:** FOUR?  YOU TOLD ME YOU WERE GOING TO REST

10   TODAY.  SOMEBODY TOLD ME YOU WERE GOING TO REST TODAY.  YOU'VE

11   GOT FOUR MORE WITNESSES?  ARE WE GOING TO REST TOMORROW?

12         **MR. HUMMEL:** THAT'S OUR HOPE, YOUR HONOR, DEPENDING

13   ON WHAT THE CROSS IS.

14         **THE COURT:** MAYBE TOMORROW WE WILL BE AT THE HALFWAY

15   POINT.  AND, REALLY, I THINK WE'LL BE A LITTLE MORE THAN

16   HALFWAY BECAUSE YOU CAN SEE HOW IT WORKS.  THE DEFENSE PUTS IN

17   PART OF THEIR CASE AS THEY GO ALONG.

18         SO I SUSPECT THE DEFENSE CASE WILL NOT BE AS LONG AS

19   THE PLAINTIFF CASE HAS TAKEN.  ALL RIGHT.

20         REMEMBER THE ADMONITION.  PLEASE DON'T PAY ATTENTION

21   TO ANY NEWS STORIES.  DON'T TALK WITH ANYONE.  DON'T LET ANYONE

22   TRY TO TALK TO YOU.  KEEP AN OPEN MIND.  WE'LL SEE YOU BACK

23   HERE TOMORROW AT 7:45.

24         **THE CLERK:** ALL RISE.

25         (THEREUPON, THE JURY LEFT THE COURTROOM.)

1      **THE COURT:**  ALL RIGHT.  MR. ADDERLEY, DO YOU NEED

2  HELP AGAIN?

3      **THE WITNESS:**  NO, SIR.  I'M OKAY.

4      **THE COURT:**  YOU OKAY?

5      **THE WITNESS:**  YES.

6      **THE COURT:**  EVERYONE HAVE A SEAT.  I DON'T KNOW WHAT

7  YOU'RE TRYING TO GET AT THAT MR. ADDERLEY IS LEAVING.

8      **MR. KATZ:**  NO, NO.  HE MAY HAVE A MEDICAL REASON.  IF

9  HE HAD A MEDICAL REASON.  HE HAS A BAD BACK, YOUR HONOR.

10  SITTING IS VERY HARD FOR HIM.  HE DOESN'T INTEND TO.  IF

11  SOMETHING COMES UP --

12      **THE COURT:**  IF THERE'S GOOD CAUSE, OF COURSE HE CAN

13  GO TO THE DOCTOR, WHATEVER HE HAS TO DO.

14      **MR. PARCHER:**  JUDGE, HE'S GOING TO BE HERE.  BUT HE

15  NEEDED AN EPIDURAL SHOT FOR HIS BACK, AND HE THOUGHT HE COULD

16  GET IT IN SAN FRANCISCO.

17      **THE COURT:**  OF COURSE HE CAN BE EXCUSED FOR MEDICAL

18  REASONS.

19      **MR. PARCHER:**  EVERYBODY WANTS HIM TO BE HERE.

20      **THE COURT:**  OTHERWISE, I HOPE HE'S HERE.

21      **MR. KATZ:**  ABSOLUTELY, YOUR HONOR.

22      **THE COURT:**  HE IS AN IMPORTANT PERSON IN THIS CASE.

23      **MR. KATZ:**  ABSOLUTELY.

24      **THE COURT:**  OKAY.  YOU CAN GO BACK TO THE COUNSEL

25  TABLE, MR. ADDERLEY.

1        I HAVE GOT A COUPLE OF ITEMS TO BRING UP WITH

2   EVERYBODY.  I THINK THE JURY MAY BE WONDERING, I'M JUST

3   SPECULATING HERE, BUT YOU KNOW THESE GLA'S WERE SENT OUT BY

4   MAIL.  WAS THERE A COVER LETTER THAT EXPLAINED IT?

5        **MR. KATZ:**  ONE OF THEM IS IN, YOUR HONOR.  I THINK

6   IT'S NUMBER 63, THE DOUG ALLEN LETTER THAT SAYS "PAST, PRESENT,

7   FUTURE."

8        **THE COURT:**  WAS THAT INCLUDED WITH THE FORM THAT WENT

9   OUT TO THE PLAYERS?

10       **MR. KATZ:**  WE BELIEVE IT WAS, YOUR HONOR.

11  MR. ADDERLEY DIDN'T HAVE A SPECIFIC RECOLLECTION OF THAT

12  LETTER.  MR. ALLEN TESTIFIED TO IT.

13       **THE COURT:**  I MISSED THAT WHEN IT CAME THROUGH.

14       AGAIN, I REMIND YOU THAT ANY VIDEOTAPED DEPOSITIONS

15  THAT ARE PLAYED ARE NOT TRANSCRIBED BY THE COURT REPORTER.  IF

16  YOU WANT TO CITE THAT IN THE COURT OF APPEALS YOU BETTER WORK

17  IT OUT WITH THE OTHER SIDE TO HAVE SOME WAY TO STIPULATE TO

18  WHAT WAS SHOWN.

19       OTHERWISE, YOU WON'T BE ABLE TO RELY UPON THAT FOR

20  ANY APPEAL.

21       I'M NOT GOING TO SAY ANYTHING MORE ABOUT IT BECAUSE

22  IT'S YOUR JOB, NOT MINE, TO MAKE SURE THE RECORD IS DONE THE

23  WAY IT SHOULD BE DONE.

24       ANYTHING YOU WANT TO BRING UP WITH ME TODAY?

25       **MR. KESSLER:**  JUST, YOUR HONOR, ON SCHEDULE.  IF

1  PLAINTIFFS DO CLOSE TOMORROW, WHICH I DON'T KNOW IF THEY WILL

2  OR WON'T BECAUSE THEY DID SAY THEY'D CLOSE TODAY, AND WE WERE

3  SKEPTICAL ABOUT THAT GIVEN THE WITNESSES.

4       IF THEY DO CLOSE TOMORROW I ANTICIPATE DEFENDANTS

5  WOULD PROBABLY CLOSE ON WEDNESDAY.  IN OTHER WORDS, I THINK OUR

6  CASE WOULD JUST BE ABOUT THREE DAYS, INCLUDING MR. ALLEN WHO

7  THEY STILL INTEND TO CALL PAT ALLEN AS PART OF THAT.

8       SO I JUST WANTED TO LET YOUR HONOR KNOW FOR PURPOSES

9  ABOUT THINKING WHENEVER YOU WANT TO SCHEDULE EXTRA TIME FOR A

10  CHARGING CONFERENCE OR ANYTHING LIKE THAT, THAT YOUR HONOR BE

11  AWARE OF THAT.

12       **MR. HUMMEL:**  THAT'S ACTUALLY RIGHT.  WHEN I SAID

13  "FOUR," MR. KESSLER CORRECTED ME.  WE DO WANT TO CALL PAT ALLEN

14  IN OUR CASE.  SO WE WILL BE RESTING SUBJECT TO CALLING PAT

15  ALLEN, WHO YOU EXCUSED AND WE'LL CALL NEXT WEEK.

16       **THE COURT:**  SO IT'S THREE?

17       **MR. HUMMEL:**  IT'S FIVE.

18       **MR. KESSLER:**  THEY HAVE FOUR MORE TOMORROW, AND IF

19  THEY GET THROUGH --

20       **MR. HUMMEL:**  AND MS. ALLEN, RIGHT.

21       **THE COURT:**  ALL RIGHT.  I DON'T KNOW THAT I WILL BE

22  IN A POSITION TO GIVE YOU A DRAFT SET OF INSTRUCTIONS TOMORROW,

23  BUT I'M GOING TO TRY TO GIVE YOU THE FIRST CUT AT IT SO YOU CAN

24  HAVE IT OVER THE WEEKEND.  AND THEN, NEXT WEEK WE'LL HAVE A

25  CHARGING CONFERENCE SOME AFTERNOON.

1     **MR. KESSLER:** THANK YOU, YOUR HONOR. MY OTHER

2  QUESTION IS -- AND YOUR HONOR --

3     **THE COURT:** ACTUALLY, LET ME AMEND THAT. WHAT

4  I'LL -- I'LL DO IT IN TWO STEPS. IF I DO GIVE IT TO YOU

5  TOMORROW, THEN ON MONDAY AT 5:00 A.M. OR SOONER, BECAUSE I WILL

6  BE ABLE TO SEE IT. I GET HERE AT 5:30 IN THE MORNINGS. I WANT

7  YOU TO FILE A -- DO WHATEVER YOUR FIRST CUT COMMENTS ARE ON THE

8  INSTRUCTIONS.

9     **MR. KESSLER:** OKAY.

10     **THE COURT:** AND THEN, IN ADDITION, WE WILL HAVE YET

11  ANOTHER MORE FULL-BLOWN FULL-DRESS OPPORTUNITY TO HAVE ANOTHER

12  SHOT AT A DIFFERENT SET OF INSTRUCTIONS.

13     BUT THIS IS MY -- IT IS VERY USEFUL FOR ME, AND I

14  JUST WANT FIVE PAGES. FIVE PAGES ON WHAT YOU GET TOMORROW.

15  YOU GIVE ME FIVE PAGES. SO THAT WAY I KNOW YOU ARE TELLING ME

16  THE ONES YOU HAVE THE GREATEST HEARTBURN OVER, AND NOT JUST A

17  MILLION BIG-FIRM-LAW-FIRM POINTS.

18     I WANT THE THINGS THAT YOU REALLY CARE ABOUT. AND

19  THOSE ARE THE ONES I CAN GET -- AND THEN, I WILL GO BACK TO THE

20  DRAWING BOARDS, LOOK AT IT AGAIN, AND THEN GIVE YOU A VERSION

21  THAT YOU CAN WAX ELOQUENT ABOUT LATER.

22     **MR. KESSLER:** OKAY.

23     **THE COURT:** THAT'S MY PLAN. I'M NOT THERE YET. I'VE

24  GOT THE INSTRUCTIONS ABOUT TWO-THIRDS DONE. BUT JUST FOR A

25  FIRST CUT IS WHAT I MEAN.

1    WHAT ELSE?

2    **MR. KESSLER:**  ONE OTHER QUESTION.  YOUR HONOR, AGAIN,

3  YOU ALLUDED TO THIS PREVIOUSLY.  BECAUSE MS. ALLEN WILL

4  ACTUALLY BE DEFERRED UNTIL IN OUR CASE, JUST TO PRESERVE OUR --

5  YOU KNOW, OUR RULE 50 RIGHTS, SHOULD WE NOT RAISE THAT ISSUE

6  UNTIL AFTER MS. ALLEN'S TESTIFIED?  I GUESS THAT WOULD BE

7  APPROPRIATE.  EVEN THOUGH THEY ARE GOING TO CLOSE --

8    **THE COURT:**  I THINK WHAT YOU SHOULD BE DEEMED TO DO

9  IS TO MAKE YOUR RULE 50 MOTION AS SOON AS THEY REST.  BUT IT

10  CAN ONLY BE ONE SENTENCE.

11    AND THEN, WE CAN BRIEF IT OUT OVER TIME.  THEN YOU

12  CAN MAKE IT AGAIN AFTER SHE TESTIFIES.

13    **MR. KESSLER:**  VERY GOOD, YOUR HONOR.

14    **THE COURT:**  BUT JUST FOR THE RECORD YOU CAN MAKE IT

15  MAYBE A TWO-SENTENCE.  BUT IF WE DO HAVE TIME AND WE CAN GET TO

16  YOUR FIRST WITNESS, WE WILL PROCEED IMMEDIATELY TO THAT WITHOUT

17  DELAYING WITH ANY MOTION PRACTICE.

18    **MR. KESSLER:**  WE'LL HAVE A WITNESS READY TOMORROW,

19  ALTHOUGH, FRANKLY, SINCE TWO OF THEIR WITNESSES TOMORROW ARE

20  EXPERTS, I THINK IT'S EXTRAORDINARILY UNLIKELY THAT WE'RE GOING

21  TO GET TO OUR WITNESS TOMORROW.

22    **THE COURT:**  PROBABLY SO, BUT HAVE ONE READY, ANYWAY.

23    **MR. KESSLER:**  I WILL.  THAT'S IT.

24    **THE COURT:**  ALL RIGHT.  LET'S SEE WHAT ELSE I'VE GOT

25  ON MY LIST.  ALL RIGHT.  SEE YOU TOMORROW AT -- I HAVE HEARINGS

1   ALL AFTERNOON SO BE SURE YOU CLEAR AWAY THE COUNSEL TABLE.

2            **MR. HUMMEL:**  THANK YOU, YOUR HONOR.

3            **MR. KESSLER:**  THANK YOU, YOUR HONOR.

4            **MR. PARCHER:**  THANK YOU, YOUR HONOR.

5            **MR. KATZ:**  THANK YOU, YOUR HONOR.

6            (THEREUPON, THIS TRIAL WAS CONTINUED UNTIL FRIDAY,

7   OCTOBER 21, 2008 AT 7:30 O'CLOCK A.M.)

8

9

10                           -  -  -  -

11                 **CERTIFICATE OF REPORTER**

12           I CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT

13  FROM THE RECORD OF PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

14  DATE:   TUESDAY, OCTOBER 28, 2008.

15

16            S/B KATHERINE POWELL SULLIVAN

17

18            _____

19

20        KATHERINE POWELL SULLIVAN, CSR #5812, RPR, CRR
                     U.S. COURT REPORTER

21

22

23

24

25

 1                          **I N D E X**

 2   **PLAINTIFFS' WITNESSES**                    **PAGE**    **VOL.**

 3   **EYRICH, GLEN**
     DEPOSITION EXCERPTS READ BY
 4   MR. CHARON AND MR. GARZA               1412       7

 5   **ADDERLEY, HERBERT ANTHONY**
     (SWORN)                                1490       7
 6   Direct Examination by Mr. Katz         1490       7
     CROSS EXAMINATION BY MR. KESSLER       1536       7
 7   Redirect Examination by Mr. Katz       1587       7
     CROSS EXAMINATION BY MR. KESSLER       1596       7

 8

 9   **DEFENDANT'S WITNESSES**                    **PAGE**    **VOL.**

10   **BYRD, STEVEN**
     Direct Examination by Mr. Clark        1438       7
11   Cross Examination by Mr. Katz          1449       7
     REDIRECT EXAMINATION BY MR. CLARK      1477       7

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**E X H I B I T S**

| TRIAL EXHIBITS | IDEN | VOL. | EVID | VOL. |
|---|---|---|---|---|
| 102 | | | 1428 | 7 |
| 103 | | | 1430 | 7 |
| 104 | | | 1432 | 7 |
| 105 | | | 1433 | 7 |
| 19 | | | 1435 | 7 |
| 2000 | | | 1461 | 7 |
| 96 | | | 1487 | 7 |
| 97 | | | 1487 | 7 |
| 64 | | | 1503 | 7 |
| 2336 | | | 1576 | 7 |
| 2087 | | | 1579 | 7 |
| 1326 | 1591 | 7 | 1592 | 7 |