VOLUME 9

PAGES 1824 - 2039

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE WILLIAM H. ALSUP

BERNARD PAUL PARRISH, HERBERT          )
ANTHONY ADDERLEY, WALTER ROBERTS       )
III,                                   )
                                       )
          PLAINTIFFS,                  )
                                       )
  VS.                                  )   NO. C 07-0943 WHA
                                       )
NATIONAL FOOTBALL LEAGUE PLAYERS       )
ASSOCIATION AND NATIONAL FOOTBALL      )
LEAGUE PLAYERS INCORPORATED D/B/A      )
PLAYERS INC,                           )
                                       )   SAN FRANCISCO, CALIFORNIA
          DEFENDANTS.                  )   MONDAY
_____)   NOVEMBER 3, 2008

## TRANSCRIPT OF PROCEEDINGS

**APPEARANCES:**

**FOR PLAINTIFFS:**          MANATT, PHELPS & PHILLIPS
                             1001 PAGE MILL ROAD, BUILDING 2
                             PALO ALTO, CALIFORNIA 94304
                   **BY:  RONALD S. KATZ, ESQ.**
                         **RYAN S. HILBERT, ESQ.**


                             MANATT, PHELPS & PHILLIPS
                             7 TIMES SQUARE
                             NEW YORK CITY, NEW YORK 10036
                   **BY:  L. PETER PARCHER, ESQ.**


                             MANATT, PHELPS & PHILLIPS
                             11355 WEST OLYMPIC BOULEVARD
                             LOS ANGELES, CALIFORNIA  90064
                   **BY:  CHAD HUMMEL, ESQ.**

(APPEARANCES CONTINUED ON NEXT PAGE)

**APPEARANCES CONTINUED:**

**ALSO FOR PLAINTIFFS:**    MCKOOL SMITH
                            300 CRESCENT COURT
                            SUITE 1500
                            DALLAS, TEXAS  75201
                      **BY:  LEWIS T. LECLAIR, ESQ.**
                            **JILL ADLER NAYLOR, ESQ.**
                            **ANTHONY GARZA, ESQ.**
                            **BRETT CHARHON, ESQ.**

**FOR DEFENDANTS:**         DEWEY & LEBOEUF
                            1301 AVENUE OF THE AMERICAS
                            NEW YORK CITY, NEW YORK  10019-6092
                      **BY:  JEFFREY L. KESSLER, ESQ.**
                            **DAVID GREENSPAN, ESQ.**
                            **DAVID G. FEHER, ESQ.**
                            **ROY TAUB, ESQ.**
                            **MOLLY DONOVAN, ESQ.**
                            **JASON CLARK, ESQ.**

                            WEIL, GOTSHAL & MANGES LLP
                            767 FIFTH AVENUE
                            NEW YORK, NEW YORK 10153-0119
                      **BY:  BRUCE S. MEYER, ESQ.**

**REPORTED BY:**        *KATHERINE POWELL SULLIVAN, CSR # 5812*
                        *OFFICIAL REPORTER - U.S. DISTRICT COURT*

**P R O C E E D I N G S**

NOVEMBER 3, 2008                                      7:30 A.M.

 

     (THE FOLLOWING PROCEEDINGS WERE HELD IN OPEN COURT,

     OUTSIDE THE PRESENCE OF THE JURY.)

**THE COURT:** ALL RIGHT. HAVE A SEAT. ANYTHING YOU WANT TO BRING UP WITH THE COURT BEFORE WE GET STARTED?

**MR. KESSLER:** YOUR HONOR, I JUST WANT TO HAND UP -- YOU'VE SEEN THIS BEFORE -- THE DEPOSITION OF GENE UPSHAW. WE'RE OFFERING IT NOW. PREVIOUSLY PLAINTIFFS THOUGHT ABOUT OFFERING IT, BUT CHANGED THEIR MINDS.

**THE COURT:** SO --

**MR. KESSLER:** THESE ARE BOTH DESIGNATIONS.

**THE COURT:** SO I HAVE TO DO YOUR OBJECTIONS.

**MR. KESSLER:** YES. AGAIN, I THINK YOU LOOKED AT THEM IN THE CONTEXT OF THEM OFFERING IT, BUT WE'RE HOPING, YOUR HONOR, TO DO THAT AT THE END OF THE TODAY TOMORROW, IF YOUR HONOR GETS TO IT.

**THE COURT:** I GOT YOUR BRIEFS OVER THE WEEKEND. THANK YOU. I'D LIKE TO GIVE EACH SIDE THE OPPORTUNITY TO REPLY BY 4:00 P.M. TODAY. AND, AGAIN, LIMITED TO FIVE PAGES. ALL RIGHT?

     SINCE YOU HAVE SO MANY LAWYERS HERE, IT WILL BE EASY TO DO THAT.

     ANYTHING ELSE YOU WANT TO BRING UP?

1          **MR. KESSLER:**  NO, YOUR HONOR.

2          **THE COURT:**  WHO IS OUR FIRST WITNESS GOING TO BE?

3          **MR. KESSLER:**  I THINK IT'S MR. ROWLEY.

4          **MR. KATZ:**  IT'S MR. ROWLEY.

5          **THE COURT:**  ALL RIGHT.  NOW, JUST MENTION THIS TO THE

6    PLAINTIFF.  I THINK YOU STILL HAVE A REASONABLE AMOUNT OF TIME

7    LEFT BUT YOU SHOULD BE MINDFUL OF YOUR TIME LIMITS.

8          **MR. KATZ:**  WE ARE, YOUR HONOR.

9          **THE COURT:**  ALL RIGHT.  SO THE DEFENDANT HAS MORE

10   TIME, BUT YOU'LL BE STARTING YOUR CASE, SO YOU SHOULD BE

11   MINDFUL OF WHERE YOU ARE, AS WELL.

12         **MR. KESSLER:**  WE WILL BE, YOUR HONOR.

13         **MR. KATZ:**  DOES YOUR HONOR ESTIMATE THAT WE WILL BE

14   GIVING CLOSINGS ON THURSDAY?

15         **THE COURT:**  I HOPE SO.  I CAN'T BE -- THAT WOULD BE

16   THE BEST CASE.

17         **MR. KATZ:**  HOW DOES YOUR HONOR HANDLE THE CHARGING

18   CONFERENCE?  IS THAT IN THE AFTERNOON?

19         **THE COURT:**  THAT WILL HAVE TO BE IN THE AFTERNOON

20   SOMETIME.  THE PROBLEM IS ON WEDNESDAY I MAY HAVE TO CUT THIS

21   SESSION SHORT BY 30 MINUTES.  THAT'S STILL UP IN THE AIR.

22   DEPENDS ON WHAT HAPPENS IN A CAPITAL CASE THAT I HAVE, THAT HAS

23   A LARGE CONFERENCE ON WEDNESDAY AFTERNOON.

24         THEN, ALSO ON WEDNESDAY AFTERNOON, I'VE GOT TO GO

25   DOWN TO A CONFERENCE DEALING WITH THE FEDERAL CIRCUIT PATENT

1   CASES.

2          SO THAT'S A BUSY DAY.  SO THERE WON'T BE ANY

3   OPPORTUNITY TO DO A CHARGING CONFERENCE THEN.  SO I THINK IF WE

4   DON'T DO THE CHARGING CONFERENCE ON TUESDAY THEN IT'S GOING TO

5   NECESSARILY HAVE TO BE ON THURSDAY.  SO I'M -- I DON'T KNOW HOW

6   THAT'S GOING TO WORK.  IF I CAN GET YOU THE FINAL INSTRUCTIONS

7   BY TOMORROW MORNING, MAYBE WE CAN HAVE THE CHARGING CONFERENCE

8   TUESDAY AFTERNOON.

9          **MR. KESSLER:**  IT MAY BE THAT THE JURY WOULD HAVE A

10  DAY OFF THEN, YOUR HONOR, WHICH IS I'M SURE THE JURORS WOULD BE

11  HAPPY.  I THINK WE'RE GOING TO BE DONE WITH TESTIMONY ON

12  WEDNESDAY, IS MY GUESS.

13         **THE COURT:**  WELL, MAYBE.  THEN, IF THAT HAPPENS THEN

14  WE COULD USE THURSDAY TO GO OVER THE INSTRUCTIONS.

15         **MR. KATZ:**  AND WITH THE -- ALL THIS PRELIMINARY

16  BRIEFING ON THE JURY INSTRUCTIONS, WHICH I THINK IS A GOOD

17  IDEA, DO YOU VIEW THE CONFERENCE MORE AS -- WHERE SOME SERIOUS

18  ARGUMENT OCCURS OR --

19         **THE COURT:**  I'M WILLING TO ENTERTAIN GETTING ANY MORE

20  BRIEFS, IF YOU WANT.  AND WHAT I WILL DO IS GIVE YOU A COMPLETE

21  SET, INCLUDING THE PRELIMINARY AND FINAL INSTRUCTIONS, AND WE

22  WILL GO THROUGH PARAGRAPH BY PARAGRAPH AND EVERY ARGUMENT,

23  ADDITION, SUBTRACTION YOU WANT TO MAKE, I WOULD CONSIDER.

24         I WOULD SAY IN MOST CHARGING CONFERENCES EVEN AFTER

25  GOING THROUGH THIS PRELIMINARY PROCESS THE WAY WE HAVE THAT AT

1    LEAST -- AT LEAST A DOZEN CHANGES WOULD BE MADE, AND MAYBE

2    SOMETHING THAT'S VERY IMPORTANT WOULD BE MADE.

3           WE'LL JUST HAVE TO SEE.  I'VE HAD A FEW CONFERENCES

4    WHERE BOTH SIDES HAVE SAID "THEY'RE GREAT, LET'S JUST GO."

5           AND THEN, OTHER TIMES THEY ARGUE OVER EVERY SENTENCE.

6           **MR. KATZ:**  OKAY.

7           **THE COURT:**  SO WE'LL JUST HAVE TO SEE WHERE IT COMES

8    OUT.

9           IN TERMS OF HOW MUCH TIME YOU GET FOR THE CLOSINGS,

10   IT DEPENDS, IN PART, ON WHERE WE ARE IN THE WEEK.

11          THIS IS NOT THE ONLY CASE THAT I HAVE.  IF IT WERE,

12   I'D GIVE YOU MORE TIME, EVEN IF I DIDN'T THINK IT WAS

13   NECESSARY.  BUT I HAVE A LOT OF CASES THAT ARE STANDING IN LINE

14   TO BE TRIED.  AND I WOULD LIKE TO GET THIS CASE TO THE JURY IN

15   TIME THAT THEY COULD DELIBERATE ON FRIDAY.  BUT I'M STILL

16   THINKING ABOUT THE AMOUNT OF TIME THAT'S NEEDED.

17          ALL RIGHT.  IF THERE'S NOTHING ELSE TO BRING UP, I'M

18   GOING TO GO SEE IF THE JURY IS ALL PRESENT.  IF NOT, WE'LL TAKE

19   A SHORT RECESS.

20          YES, SIR.

21          **MR. PARCHER:**  I JUST WANTED TO SAY TWO THINGS, JUDGE.

22   MY WIFE HAS LEFT FOR NEW YORK, AND SHE LEFT ME WITH TWO

23   THOUGHTS.  ONE WAS WHEN I WAS ARGUING WITH YOU OR TALKING WITH

24   YOU ABOUT HOW MUCH TIME.  SHE SAYS, "YOU BETTER BE CAREFUL.

25   SOMEBODY MAY BE DOING YOU A FAVOR WHEN YOU MADE YOUR TWO-HOUR

1    COMMENT."

2          AND THE SECOND WAS I TOLD HER LAST NIGHT THAT I WAS

3    GOING TO WEAR MY BLACK SHIRT.  AND SHE SAID, "DON'T YOU DARE.

4    THE JUDGE WON'T LIKE IT."

5          **THE COURT:**  THIS IS NAVY BLUE.

6          **MR. PARCHER:**  WELL, IT'S THE SAME PRINCIPLE.  IT'S

7    NOT A WHITE BUTTON DOWN WITH A NONDESCRIPT TIE.

8          **THE COURT:**  WELL, YOU'RE THE LAWYER AND I'M THE

9    JUDGE.  SOMETIMES I CAN DO THINGS.  I'M NOT TRYING TO WIN ANY

10   CASE HERE, AND YOU ARE.

11         **MR. PARCHER:**  SO YOU AGREE WITH MY WIFE?

12         **THE COURT:**  I AGREE WITH YOUR WIFE.

13         **MR. KESSLER:**  YOUR HONOR, I ONCE WAS IN A COURT IN

14   LOUISIANA AND THE JUDGE REVEALED DURING THE TRIAL THAT HE WAS

15   WEARING SHORTS UNDERNEATH HIS ROBES.

16         **THE COURT:**  I'VE NEVER DONE THAT.  I'VE NEVER DONE

17   THAT.  I HAVE WORN HIKING BOOTS DURING THE WINTER.  WHEN IT'S

18   BAD WEATHER, I OFTEN WEAR HIKING BOOTS TO KEEP MY FEET WARM.

19         OKAY.  WHO IS THIS YOUNGSTER WHO'S JUST ARRIVED IN

20   COURT?

21         **UNIDENTIFIED FEMALE SPEAKER:**  GABRIEL.

22         **THE COURT:**  HELLO, GABRIEL.  HOW ARE YOU TODAY?

23         **GABRIEL:**  GOOD.

24         **THE COURT:**  ALL RIGHT.  WELCOME TO THE COURT.

25         ARE ALL OF OUR JURORS PRESENT?

1          **THE CLERK:**  NO.  THERE'S ONLY NINE.

2          WELL, WE'LL TAKE ABOUT A FIVE-MINUTE BREAK, AND THEN

3    WE WILL HOPEFULLY HAVE ALL OF OUR JURORS PRESENT.

4          (RECESS.)

5          **THE COURT:**  HERE ARE THE RULINGS ON THE GENE UPSHAW.

6          WE HAVE ALL OUR JURORS, BUT I'M GOING TO LET HER HAVE

7    A MOMENT OR TWO TO DRINK SOME TEA, AND THEN WE'LL GET STARTED.

8          (RECESS.)

9          **THE COURT:**  OKAY.  BE SEATED.  I THINK OUR JURY IS

10   READY TO COME IN.

11         ARE WE READY TO GET STARTED?

12         **MR. KESSLER:**  YOUR HONOR, I HAVE A QUESTION ABOUT

13   THIS.  WE COULD DO IT AT OUR BREAK.

14         **THE COURT:**  LET'S START WITH OUR NEXT WITNESS.  BRING

15   IN THE JURY.

16         (THEREUPON, AT 7:51 A.M. THE JURY ENTERED THE

17         COURTROOM.)

18         **THE COURT:**  WELCOME BACK.  HAVE A SEAT.

19         RAINY WEEKEND.  I SEE YOU ALL MANAGED TO DO FINE.

20   EVERYONE STILL IN GOOD HEALTH?

21         (JURORS RESPOND AFFIRMATIVELY.)

22         **THE COURT:**  GREAT.  THANK YOU FOR WASHING YOUR HANDS

23   AND SO FORTH.

24         NOW, TOMORROW BEING ELECTION TODAY IF WE STICK WITH

25   OUR NORMAL SCHEDULE WILL EVERYONE BE OKAY TO GET TO THE POLLING

1   PLACE?

2           (JURORS RESPOND AFFIRMATIVELY.)

3           **THE COURT:**  WE ARE STILL ON THE PLAINTIFFS' CASE.  WE

4   HAVE THE NEXT WITNESS READY TO GO.  WHO IS THAT?

5           **MR. HUMMEL:**  YOUR HONOR, PLAINTIFFS CALL PHILIP

6   ROWLEY, R-O-W-L-E-Y.

7           **THE COURT:**  VERY GOOD.  LET'S BRING HIM FORWARD.

8           **MR. HUMMEL:**  YOUR HONOR, I WOULD LIKE TO MOVE THAT TO

9   A PLACE WHERE HE CAN USE IT AND THE JURY CAN SEE IT.

10          IS THAT OKAY WITH YOU?

11          **THE COURT:**  THAT'S FINE.

12          NOW, JUST AS A WORD OF CAUTION, YOU KNOW THAT

13  NOW-FAMOUS DIAGRAM THAT MR. PARCHER DREW, THAT'S NOT IN

14  EVIDENCE.  IT'S JUST ILLUSTRATIVE.  IT'S NOT GOING TO BE IN THE

15  JURY ROOM.  AND ANYTHING THAT THIS WITNESS WRITES ON THIS CHART

16  IS NOT GOING TO BE IN THE JURY ROOM.

17          SO THE REASON I BRING THAT UP IS IF YOU WANT TO TAKE

18  NOTES SO YOU CAN REMEMBER WHAT WAS PUT ON ANY OF THESE CHARTS

19  THAT ARE JUST FOR ILLUSTRATIVE PURPOSES, I CAUTION YOU THAT YOU

20  MIGHT WANT TO DO THAT OR NOT DO THAT AS THE CASE MAY BE.

21          MR. ROWLEY, WELCOME.  PLEASE RAISE YOUR RIGHT HAND.

22          (THEREUPON, THE WITNESS WAS SWORN.)

23          **THE WITNESS:**  I DO.

24          **THE CLERK:**  THANK YOU.

25          **THE COURT:**  OKAY.  BE SEATED, PLEASE.  AND LET US

1  TAKE YOUR PICTURE FOR THE CLOSING ARGUMENTS SO THE JURY CAN BE

2  REMINDED WHAT YOU LOOK LIKE.

3          (PICTURE TAKEN.)

4          **THE COURT:**  ALL RIGHT.  AND NOW STATE YOUR NAME AND

5  SPEAK INTO THE MIC SO THE MIC CATCHES YOUR VOICE.

6          **THE WITNESS:**  PHILIP ROWLEY.

7          **THE COURT:**  VERY GOOD.

8          **MR. KESSLER:**  YOUR HONOR, I'M SORRY.  COULD WE

9  INQUIRE IF ANY OF THE JURORS HAVE THEIR VIEW BLOCKED OF THE

10 WITNESS?

11         **MR. HUMMEL:**  YOUR HONOR, COULD WE ASK IF EVERYBODY

12 CAN SEE THE WITNESS?

13         MAYBE I SHOULD MOVE THIS BACK.

14         **THE COURT:**  I WOULD MOVE IT BACK A LITTLE BIT,

15 ANYWAY.  AND WE'LL TRY TO REMEMBER TO MOVE THAT SO THAT YOUR

16 EGRESS AND INGRESS WILL NOT BE BLOCKED AS YOU GO BACK AND

17 FORTH.

18         ALL RIGHT.  GREAT.  LET'S GETS STARTED.

19         **MR. HUMMEL:**  THANK YOU VERY MUCH, YOUR HONOR.

20         GOOD MORNING, LADIES AND GENTLEMEN.

21                 **PHILIP ROWLEY,**

22 CALLED AS A WITNESS FOR THE PLAINTIFFS HEREIN, HAVING BEEN

23 FIRST DULY SWORN, WAS EXAMINED AND TESTIFIED AS FOLLOWS:

24

25

1                    **DIRECT EXAMINATION**

2   **BY MR. HUMMEL:**

3   **Q.**   GOOD MORNING, MR. ROWLEY.

4   **A.**   GOOD MORNING.

5   **Q.**   MR. ROWLEY, WHAT DO YOU DO FOR A LIVING?

6   **A.**   I AM THE PRESIDENT OF RESOLUTION ECONOMICS.

7   **Q.**   AND WHAT IS RESOLUTION ECONOMICS?

8   **A.**   RESOLUTION ECONOMICS IS A FIRM THAT I'M BUILDING OUT,

9   ROUGHLY A HUNDRED PEOPLE NOW, HERE IN SAN FRANCISCO, LOS

10  ANGELES AND CHICAGO.

11          AND WE PERFORM FINANCIAL AND ECONOMIC ANALYSES AROUND

12  COMPLEX DATA MATTERS, TYPICALLY IN THE LABOR EMPLOYMENT SPACE,

13  HEALTHCARE AND VALUATION.

14  **Q.**   YOU'RE GOING TO HAVE TO KEEP YOUR VOICE UP.  I'M HAVING

15  TROUBLE --

16  **A.**   PARDON ME.  I HAVE A LITTLE BIT OF A FROG THIS MORNING.

17  **Q.**   THERE IS SOME WATER THERE TO YOUR RIGHT.

18          DO YOU HAVE ANY PARTICULAR AREA OF EXPERTISE?

19  **A.**   MY AREA OF EXPERTISE IS IN FINANCIAL AND BUSINESS

20  ANALYSIS.  TYPICALLY, I'M ASKED TO REVIEW COMPLEX OR CONVOLUTED

21  BUSINESS RECORDS AND TO PREPARE ANALYSES THAT ALLOW A

22  DECISION-MAKER -- THAT COULD BE THE JURY, THAT COULD BE A CFO

23  OR A BOARD -- TO MEASURE THE IMPACT OF A POTENTIAL EVENT.

24  **Q.**   AND HAVE YOU USED THAT EXPERTISE IN ANALYZING COMPLEX

25  FINANCIAL DOCUMENTS IN THIS CASE?

1  **A.**   YES, I DID.

2  **Q.**   YOU HAVE.  NOW, HAVE YOU BEEN QUALIFIED BY FEDERAL COURTS

3  AND IN FEDERAL COURTS BEFORE TO TESTIFY ABOUT THAT SORT OF

4  ANALYSIS?

5  **A.**   YES, I HAVE.

6  **Q.**   OKAY.  ON HOW MANY OCCASIONS, APPROXIMATELY?

7  **A.**   PROBABLY A DOZEN OR SO OVERALL.  I'VE BEEN IN FRONT OF

8  JUDGE WARE AND JUDGE STEEL.  I'M CURRENTLY A COURT-APPOINTED

9  MONITOR OF CLASS ACTION SETTLEMENTS.

10  **Q.**   AND THOSE JUDGES ARE IN THIS DISTRICT IN THE BAY AREA,

11  RIGHT?  FEDERAL JUDGES IN THIS DISTRICT?

12  **A.**   WARE WAS, STEEL, YES.

13        **MR. HUMMEL:**  YOUR HONOR, AGAIN, WE HAVE A STIPULATION

14  AS TO THE QUALIFICATIONS OF MR. ROWLEY AS AN EXPERT IN

15  FINANCIAL ANALYSIS.  SO I TENDER HIM TO THE COURT AS AN EXPERT

16  UNDER RULE 702.

17        **THE COURT:**  IS THAT RIGHT?  THERE'S A STIPULATION?

18        **MR. KESSLER:**  WE HAVE A STIPULATION THAT ALL EXPERTS

19  ON BOTH SIDES ARE QUALIFIED TO TESTIFY.

20        **THE COURT:**  ALL RIGHT.  WELL, AGAIN, I CAUTION THE

21  JURY AS FOLLOWS:

22        IN COURT WE ALLOW SPECIALISTS TO COME IN AND GIVE

23  OPINIONS.  OPINIONS.  THEY'RE NOT FACTS.  THEY'RE OPINIONS.

24  AND YOU SHOULD EVALUATION EXPERTS ON BOTH SIDES BY TAKING INTO

25  ACCOUNT THE ASSUMPTIONS THAT THE EXPERT IS BASING THE OPINION

1  ON.

2          IF YOU WIND UP NOT AGREEING WITH THAT ASSUMPTION OR

3  ONE OF THE MANY ASSUMPTIONS, THEN YOU HAVE TO DISCOUNT THE

4  OPINION ACCORDINGLY.

5          AND IT'S ALWAYS UP TO YOU TO DECIDE WHETHER THE

6  ASSUMPTIONS ARE ACCURATE.  IT'S NOT UP TO ANY EXPERT TO TELL

7  YOU THAT, BECAUSE YOU'RE THE ONES THAT HAVE SAT THROUGH ALL THE

8  TRIAL AND NOT THE EXPERT.

9          SO YOU TAKE THE EXPERT OPINION FOR WHAT YOU THINK IT

10 IS WORTH.

11         THIS IS TRUE FOR THE EXPERTS ON BOTH SIDES, NOT JUST

12 ON ONE SIDE.

13         ALL RIGHT.  GO AHEAD.

14         **MR. HUMMEL:**  THANK YOU, YOUR HONOR.

15 **BY MR. HUMMEL:**

16 **Q.**  NOW, MR. ROWLEY, YOU'VE BEEN RETAINED BY THE PLAINTIFFS'

17 LAWYERS IN THIS CASE, RIGHT?

18 **A.**  YES, I HAVE.

19 **Q.**  AND YOU'RE BEING PAID BY THE HOUR; IS THAT CORRECT?

20 **A.**  THAT'S CORRECT.

21 **Q.**  DO YOU HAVE ANY FINANCIAL INCENTIVE, BASED ON HOW THE JURY

22 DECIDES THIS CASE?

23 **A.**  NO.

24 **Q.**  SO REGARDLESS OF WHAT HAPPENS, YOU'LL GET PAID YOUR HOURLY

25 FEE; IS THAT CORRECT?

1   **A.**   THAT'S CORRECT.

2   **Q.**   AND WHAT IS YOUR HOURLY FEE IN THIS CASE?

3   **A.**   $395 AN HOUR.

4   **Q.**   ALL RIGHT.  NOW, LET'S MOVE ON TO YOUR ASSIGNMENT.  YOU

5   WERE GIVEN A SPECIFIC ASSIGNMENT BY THE PLAINTIFFS' COUNSEL IN

6   THIS CASE, CORRECT?

7   **A.**   CORRECT.

8   **Q.**   COULD YOU TELL THE LADIES AND GENTLEMEN OF THE JURY WHAT

9   YOUR ASSIGNMENT WAS?

10  **A.**   I WAS ASKED TO REVIEW IF THE RETIRED PLAYERS WHO HAD

11  SIGNED THE RESPECTIVE GLA'S, THE CLASS MEMBERS, IF THEY HAD

12  BEEN OR ABLE TO PARTICIPATE IN THE GROUP LICENSING POOL, WHAT

13  WOULD THEY HAVE BEEN PAID?

14          I THEN WAS ASKED TO ALSO LOOK AT:  IF YOU FOUND THAT

15  THE 63 TO 69 PERCENT DEDUCTION THAT NFLPA/PI TOOK ON AN ANNUAL

16  BASIS WAS INAPPROPRIATE, WHAT WOULD THE PLAYERS HAVE BEEN PAID

17  BASED ON A MORE REASONABLE DEDUCTION THAT YOU WOULD DETERMINE?

18  **Q.**   ALL RIGHT.  IN COMPLETING YOUR ASSIGNMENTS, DID YOU -- YOU

19  NEED TO TURN YOUR CELL PHONE OFF.  THANKS.

20          DID YOU MAKE ANY ASSUMPTIONS IN COMPLETING THE

21  ASSIGNMENT, IN TERMS OF LIABILITY AND THOSE TYPES OF THINGS?

22  SO COULD YOU DESCRIBE IF YOU HAD ANY ASSUMPTION AND WHAT THOSE

23  WERE?

24  **A.**   THERE WERE TWO MAIN ASSUMPTIONS.  THE FIRST IS THAT

25  LIABILITY WOULD BE ESTABLISHED, THAT YOU WOULD FIND EITHER

1  THERE WAS A BREACH OF CONTRACT AND/OR A BREACH OF FIDUCIARY

2  DUTY.

3        THE SECOND WAS THAT THE COURT PROVIDED ME WHAT WAS

4  THE APPROPRIATE LAW.  THAT THEN DICTATED THE RELEVANT PERIOD TO

5  GO BACK AND LOOK AT THE ROYALTIES AS WELL AS AN INTEREST RATE,

6  IF APPROPRIATE.

7  **Q.**  HAVE YOU FORMED ANY OPINION AT ALL ABOUT WHETHER, IN FACT,

8  THE DEFENDANTS BREACHED THE GLA?

9  **A.**  NO.  I WASN'T ASKED TO DO THAT.

10 **Q.**  AND HAVE YOU FORMED ANY OPINION AT ALL ABOUT WHETHER, IN

11 FACT, THE DEFENDANTS VIOLATED ANY FIDUCIARY DUTY THEY MAY HAVE

12 HAD?

13 **A.**  NO.

14 **Q.**  ALL RIGHT.  SO THOSE WERE ASSUMPTIONS.  HAVE YOU FORMED

15 ANY OPINION AT ALL ABOUT THE PROPRIETY OF DIVIDING GROUP

16 LICENSING REVENUES AMONG NFL PLAYERS ON AN EQUAL SHARE BASIS?

17 **A.**  MY OPINION IS THAT THAT IS THE APPROPRIATE WAY TO DIVIDE

18 IT.

19 **Q.**  AND WHAT'S THAT BASED ON?

20 **A.**  THAT'S BASED ON HOW NFLPA/PI ACTUALLY CONDUCTED THE

21 REVENUE POOL.

22 **Q.**  OKAY.  AND IN TERMS OF WHAT YOU LOOKED AT IN COMPLETING

23 THE ASSIGNMENTS, CAN YOU EXPLAIN TO THE LADIES AND GENTLEMEN OF

24 THE JURY WHAT WAS THE FIRST THING THAT YOU DID, WHAT YOU LOOKED

25 AT?

1   **A.**   THE FIRST THING WAS REALLY TO LOOK AT NFLPA/PI'S, THEIR

2   OWN DOCUMENTS.   THEY PROVIDED FINANCIAL RECORDS OVER THE

3   RELEVANT YEARS, INCLUDING WORKSHEETS, THE BACKUP DATA AS TO HOW

4   THE LICENSEES PAID ROYALTIES.   THEY ALSO PROVIDED A LIST OF

5   ACTIVE PLAYERS, AS WELL AS LISTS OF RETIRED PLAYERS AND SIGNED

6   GLA'S.

7         SO I WENT THROUGH ALL OF THOSE DOCUMENTS.

8   **Q.**   ALL RIGHT.   SO MR. ROWLEY, COULD YOU TAKE A LOOK AT

9   EXHIBIT 1218, PLEASE, WHICH I BELIEVE IS IN FRONT OF YOU?   AND

10  TELL THE LADIES AND GENTLEMEN OF THE JURY WHAT EXHIBIT 1218 IS.

11  **A.**   EXHIBIT 1218 REPRESENTS A SUMMARY OF ROYALTY PAYMENTS MADE

12  BY CERTAIN LICENSEES FOR THE PERIODS 2004 TO 2007.

13  **Q.**   WAS THERE ANYTHING IN COMMON AMONG THOSE LICENSEES IN

14  TERMS OF HOW THE NFLPA AND PLAYERS INC TREATED THEM?

15  **A.**   YES.   THESE ARE THE LICENSE ROYALTIES THAT WENT INTO THE

16  GROUP LICENSING POOL.

17  **Q.**   THE GROUP LICENSING POOL.   OKAY.   GO AHEAD?

18  **A.**   WITH COUNSEL THERE ARE SOME ADDITIONAL MONIES THAT CAME IN

19  THROUGH AN NFL SPONSORSHIP AGREEMENT, SO IT'S NOT

20  ALL-INCLUSIVE.

21  **Q.**   WHAT IS THAT NFL SPONSORSHIP AGREEMENT?

22  **A.**   THERE ALSO WAS AN AGREEMENT BETWEEN THE NFL AND NFLPA

23  AROUND SPONSORS AND THE INTERNET WHERE THE NFL ALSO PAID

24  ROYALTIES TO NFLPA/PI.

25  **Q.**   AND IN YOUR CONCLUSIONS, WHICH WE'LL GET TO IN A MINUTE,

1    DID YOU INCLUDE THE VALUE OF THAT SPONSORSHIP AGREEMENT?

2    **A.**   YES.

3    **Q.**   BUT PUTTING THE SPONSORSHIP AGREEMENT ASIDE, 1218 IS A

4    SUMMARY OF -- LET ME SEE IF I HAVE THIS RIGHT SO THE LADIES AND

5    GENTLEMEN OF THE JURY CAN UNDERSTAND IT.

6           **MR. KESSLER:**   OBJECTION.  LEADING.  HE DOESN'T GET TO

7    SUMMARIZE HIS TESTIMONY.

8           **MR. HUMMEL:**   THAT'S FINE.

9    **BY MR. HUMMEL:**

10   **Q.**   DID YOU PREPARE EXHIBIT 1218?

11   **A.**   MY STAFF AND I DID, YES.

12   **Q.**   DID YOU SUPERVISE THE PREPARATION OF IT?

13   **A.**   YES.

14   **Q.**   IS IT AN ACCURATE REFLECTION OF THE ROYALTY PAYMENTS BY

15   LICENSEE BY DATE MADE BY LICENSEES TO THE NFLPA BETWEEN 2004

16   AND 2007?

17   **A.**   YES.

18           **MR. HUMMEL:**   YOUR HONOR, MOVE EXHIBIT 1218.  I

19   BELIEVE THERE IS NO OBJECTION.

20           **MR. KESSLER:**   NO OBJECTION.

21           **THE COURT:**   1218?

22           **MR. HUMMEL:**   YES.

23           **THE COURT:**   ALL RIGHT.  IT'S RECEIVED.

24           (TRIAL EXHIBIT 1218 RECEIVED IN EVIDENCE.)

25

1  **BY MR. HUMMEL:**

2  **Q.**  SO MR. ROWLEY --

3        **MR. HUMMEL:**  CAN YOU BLOW THAT UP, PLEASE?  MAYBE THE

4  FIRST FIVE LINES OR SO.

5        (DOCUMENT DISPLAYED.)

6  **BY MR. HUMMEL:**

7  **Q.**  SO WHEN THE LADIES AND GENTLEMEN OF THE JURY LOOK AT

8  EXHIBIT 1218, THEY'LL SEE COLUMNS.  CAN YOU BRIEFLY DESCRIBE

9  WHAT THE COLUMNS ARE?

10 **A.**  YES.  FAR LEFT-HAND COLUMN IS THE RELEVANT YEAR IN WHICH

11 THE ROYALTIES ARE PAID.  THE TRANSACTION DATE IS WHEN THE

12 PAYMENT WAS ACTUALLY MADE.  YOU MAY NOTE HERE YOU'LL SEE 2003,

13 AND IT'S THE 2004 YEAR.  THE REASON FOR THAT IS NFLPA/PI HAS A

14 FISCAL YEAR THAT ACTUALLY BEGINS MARCH 1ST AND ENDS

15 FEBRUARY 28TH OF THE FOLLOWING YEAR.

16        THE NAME, THAT COLUMN REPRESENTS THE LICENSEE WHO

17 TOOK THE LICENSE AND MADE THE PAYMENTS.

18        THERE'S -- YOU'LL SEE C'S.  THERE WAS AN ANALYSIS

19 THAT WAS DONE THAT LOOKED TO THE NATURE OF SOME OF THE

20 CONTRACTS.  THAT'S THE "INCLUDE" COLUMN.  THE AMOUNT ON THE

21 FAR-RIGHT COLUMN REPRESENTS THE PAYMENTS THAT WERE MADE.

22 **Q.**  CAN YOU LOOK AT THE LAST PAGE OF EXHIBIT 1218, PLEASE.

23        **MR. HUMMEL:**  PUT THAT UP ON THE BOARD.

24        (DOCUMENT DISPLAYED.)

25

**BY MR. HUMMEL:**

Q.   DOES THIS REFLECT A TOTALING OF THE AMOUNTS PAID OVER THOSE YEARS?

A.   YES.

Q.   AND WHAT IS THAT TOTAL, SIR?

A.   APPROXIMATELY $162 MILLION.

Q.   ALL RIGHT.  AND IF YOU ADDED THE SPONSORSHIP AGREEMENT, WHAT IS THE TOTAL?

A.   215 MILLION, IS MY RECOLLECTION.

Q.   215 MILLION, GIVE OR TAKE?

A.   TOTAL, YES.

Q.   OKAY.  NOW, COULD YOU LOOK AT EXHIBIT 1217, PLEASE.

     COULD YOU DESCRIBE, PLEASE, WHAT EXHIBIT 1217 IS?

A.   THIS IS ALSO A SUMMARY OF LICENSE PAYMENTS BY THE INDIVIDUAL LICENSEE OVER TIME SO YOU COULD SEE THE TOTAL BY LICENSEE.

Q.   IS THIS A SUMMARY THAT YOU PREPARED?

A.   YES.

Q.   AND THE INFORMATION CONTAINED ON IT IS AN ACCURATE REFLECTION OF UNDERLYING DOCUMENTS THAT YOU REVIEWED?

A.   YES.

          **MR. HUMMEL:**  YOUR HONOR, MOVE EXHIBIT 1217.  AND I BELIEVE THERE IS NO OBJECTION.

          **MR. KESSLER:**  NO OBJECTION.

          **THE COURT:**  RECEIVED.

1          (TRIAL EXHIBIT 1217 RECEIVED IN EVIDENCE.)

2   **BY MR. HUMMEL:**

3   **Q.**   SO SAME INFORMATION AS ON 1218 -- I'M SORRY, YES, 1218 --

4   BUT CATEGORIZED IN A DIFFERENT WAY, FAIR?

5   **A.**   CORRECT.

6   **Q.**   OKAY.  CAN YOU TELL THE LADIES AND GENTLEMEN OF THE JURY

7   HOW -- WHAT IS SHOWN ON THIS EXHIBIT?

8              **MR. HUMMEL:**  AND BLOW UP THE FIRST FIVE LINES OR SO.

9              (DOCUMENT DISPLAYED.)

10             **THE WITNESS:**  THANK YOU.

11             ON THE FAR LEFT-HAND COLUMN IS THE NAME OF THE

12   LICENSEE.  GOING ACROSS THE TOP YOU WILL SEE THE FISCAL YEARS

13   2004, 2005, 2006, 2007, AND THEN A TOTAL.

14             YOU'LL THEN SEE IN ANY GIVEN YEAR THE AMOUNTS THAT

15   THAT LICENSEE PAID, AND THEN WITH AN OVERALL TOTAL FOR THE

16   RELEVANT TIME PERIOD.

17   **BY MR. HUMMEL:**

18   **Q.**   ALL RIGHT.  SO, FOR EXAMPLE, IF THE JURY WANTED TO SEE HOW

19   MUCH WAS PAID BY EA SPORTS OVER THIS 4-YEAR PERIOD, COULD THEY

20   LOOK AT THIS EXHIBIT AND DO THAT?

21   **A.**   YES.

22   **Q.**   COULD YOU POINT -- COULD YOU HIGHLIGHT, PLEASE, THE LINE

23   EA?

24   **A.**   THE LINE 24.

25   **Q.**   OKAY.

1          SO HOW MUCH WAS PAID BY JUST EA, A SINGLE LICENSEE,

2   OVER THIS PERIOD OF TIME?

3   **A.**   $82 MILLION, APPROXIMATELY.

4   **Q.**   SO IF THE JURY WANTED TO LOOK AT HOW MUCH WAS PAID BY ANY

5   PARTICULAR LICENSEE, THEY WOULD LOOK AT EXHIBIT 1217?

6   **A.**   EXCLUDING THE NFL SPONSORSHIP, YES.

7   **Q.**   AND THAT TAKES THE VALUE, THE TOTAL FROM, AS YOU SAID,

8   2 -- IT TAKES THE TOTAL TO ROUGHLY 215?

9   **A.**   YES.

10  **Q.**   OKAY.  SO NOW YOU'VE LOOKED AT THIS DATA.  CAN YOU

11  PERHAPS, EVEN USING THAT CHART, EXPLAIN TO THE JURY WHAT YOU

12  DID?

13  **A.**   SURE.  MAY I?

14  **Q.**   SURE.

15          **MR. HUMMEL:**  YOUR HONOR, WITH THE COURT'S PERMISSION?

16  **A.**

17          **THE WITNESS:**  MAY I?

18          **THE COURT:**  YES, OF COURSE.  IS THERE A MARKER THAT

19  WILL DO THE TRICK?

20          **MR. HUMMEL:**  THERE IS, YOUR HONOR.

21          **THE COURT:**  OKAY.

22          **MR. HUMMEL:**  THERE'S A MARKER.  WHETHER IT WILL DO

23  THE TRICK OR NOT --

24          **THE COURT:**  LET'S MAKE SURE IT'S NOT DRIED UP.

25          **THE WITNESS:**  THE FIRST STEP WAS TO DETERMINE THE

1   GROSS LICENSING REVENUES.  AND WE'VE BEEN LOOKING AT TWO

2   EXHIBITS THAT GIVE US THOSE FIGURES.

3         SO THE FIRST STEP IS UP HERE GROSS LICENSING

4   REVENUES.

5         THIS IS IMPORTANT -- THESE ARE JUST WHAT ARE CALLED

6   GROSS LICENSING REVENUES THAT ARE TYPICALLY GROUP LICENSING.

7   THEY DO NOT INCLUDE SOME OTHER REVENUES AROUND LICENSING THAT

8   COME IN.

9   **BY MR. HUMMEL:**

10  **Q.**   WHAT OTHER REVENUES?

11  **A.**   THERE ALSO ARE PERFORMANCE LICENSES, AD HOC AGREEMENTS

12  THAT THE NFLPA/PI ALSO ACCEPTS.

13  **Q.**   OKAY.  HOW DID YOU DETERMINE WHAT WAS IN THAT SUBSET OF

14  THE GROUP LICENSING REVENUE BOX?

15  **A.**   THAT CAME FROM THE NFLPA/PI RECORDS.  THEY DELINEATE THE

16  TWO.

17  **Q.**   CAN YOU EXPLAIN THAT, PLEASE?  YOU'RE NOT MAKING ANY

18  DIFFERENT ASSUMPTIONS THAN WHAT THE UNION DID, RIGHT?

19  **A.**   NO.

20         **MR. KESSLER:**  OBJECTION.

21  **BY MR. HUMMEL:**

22  **Q.**   CAN YOU EXPLAIN THAT, PLEASE?

23  **A.**   NFLPA/PI FOR THEIR FINANCIAL REPORTING PURPOSES DELINEATES

24  THE LICENSES INTO TWO CATEGORIES.

25         THE FIRST CATEGORY IS A GROSS LICENSING REVENUE WHICH

1   TENDS TO BE GROUP LICENSES, LARGE GROUP LICENSES.  THE SECOND

2   ARE WHAT ARE CALLED "PERFORMANCE FEES," OR AD HOC AGREEMENTS

3   THAT ARE MORE ON AN INDIVIDUAL BASIS.  TWO SEPARATE CATEGORIES

4   WITHIN THE FINANCIALS.

5   Q.   SO YOU LOOKED AT THE GROUP LICENSING REVENUES, RIGHT?

6          **MR. KESSLER:**  OBJECTION, LEADING.

7          **THE WITNESS:**  YES.

8          **THE COURT:**  WELL, THIS IS PRELIMINARY ENOUGH.  IT'S

9   OKAY TO LEAD ON THINGS THAT ARE NOT -- IS THIS IN CONTROVERSY?

10         **MR. HUMMEL:**  NO.

11         **MR. KESSLER:**  YES, YOUR HONOR, ON WHAT GROUP

12  LICENSING IS IS IN CONTROVERSY, YOUR HONOR.

13         **THE COURT:**  WELL, ALL RIGHT.  I'M GOING TO ALLOW THIS

14  ONE QUESTION.  BUT TRY NOT TO LEAD ON ANYTHING THAT'S IN

15  CONTROVERSY.  IT'S OKAY TO LEAD SO THAT WE CAN SPEEDILY ARRIVE

16  AT THE POINT WHERE THE CONTROVERSY STARTS.

17         **MR. HUMMEL:**  THANK YOU, YOUR HONOR.

18  **BY MR. HUMMEL:**

19  Q.   WHAT DID YOU THEN DO WHEN YOU DETERMINED WHAT MONEY IS IN

20  THE GLA?

21  **A.**   THE NEXT STEP THAT OCCURS IS THERE IS A DEDUCTION BY

22  NFLPA/PI THAT THEY DEDUCT AND TAKE MONEY FOR THEMSELVES.

23  Q.   DID YOU SEPARATELY CALCULATE WHAT THAT DEDUCTION WAS?

24  **A.**   I WENT BACK AND VERIFIED THE CALCULATION.  ON AN ANNUAL

25  BASIS IT RANGES BETWEEN 63 TO 69 PERCENT.

1  **Q.**   OKAY.  WHAT DID YOU DO NEXT?

2  **A.**   NEXT WHAT HAPPENS IS YOU NOW HAVE WHAT COMES INTO WHAT'S

3  CALLED THE EQUAL SHARE POOL.

4  **Q.**   WHO CALLS IT "THE EQUAL SHARE POOL"?

5  **A.**   NFLPA.

6  **Q.**   HOW DOES THE NFLPA PRESENTLY TREAT THE DISTRIBUTION OF

7  THAT EQUAL SHARE POOL?

8  **A.**   FOR THE NUMBER OF PLAYERS WHO ARE ELIGIBLE IN A GIVEN

9  YEAR, THEY RECEIVE AN EQUAL SHARE OF THESE REVENUES ONCE THE

10 NFLPA/PI HAS TAKEN OUT THEIR DEDUCTION.

11 **Q.**   ALL RIGHT.  SO WHAT DID YOU DO THEN TO FULFILL YOUR

12 ASSIGNMENT OF DETERMINING HOW MUCH THE CLASS WOULD BE PAID IF

13 THEY HAD BEEN INVOLVED IN GROUP LICENSING?

14 **A.**   THE ASSUMPTION IS THAT THE RETIRED PLAYERS WOULD ALSO HAVE

15 PARTICIPATED IN THE EQUAL SHARE POOL.  SO THERE'S TWO ELEMENTS.

16 FIRST, THERE IS THE NUMBER OF ACTIVE PLAYERS IN ANY GIVEN YEAR.

17 THEN, YOU ALSO HAVE TO FIND IN ANY GIVEN YEAR THE NUMBER OF

18 RETIRED PLAYERS WHO HAD SIGNED THE RELEVANT GLA.

19         THAT THEN GIVES YOU A NEW NUMBER OF PLAYERS TO

20 PARTICIPATE IN THE EQUAL SHARE POOL.

21 **Q.**   DID YOU MAKE ANY DETERMINATIONS AS TO HOW THE NFL

22 DIVIDES -- PRESENTLY THE NFLPA DIVIDES AMONG THE ACTIVE PLAYERS

23 FROM THE EQUAL SHARE POOL?

24 **A.**   WELL, TO SOME EXTENT YOU DO HAVE TO VERIFY IN EACH YEAR.

25 THERE'S DIFFERENT ELIGIBILITY REQUIREMENTS.  AND IN SOME YEARS

1  THE NFLPA/PI MODIFIED SLIGHTLY THIS POOL, GENERALLY, TO MAKE IT

2  A ROUND NUMBER.  SO IT WASN'T $7,386.26.  THEY WOULD ROUND IT

3  TO $8,000.  SO WE WOULD GO TO WHAT WAS ACTUALLY DISTRIBUTED.

4  **Q.**   OKAY.  AND HOW DID THEY DISTRIBUTE IT TO THE -- HOW DID

5  THEY DISTRIBUTE THE EQUAL SHARE POOL TO THE ACTIVE PLAYERS?

6  **A.**   EACH PLAYER RECEIVED AN EQUAL SHARE.

7  **Q.**   REGARDLESS OF WHETHER IT WAS TOM BRADY OR A THIRD-STRING

8  OFFENSIVE TACKLE FOR THE PITTSBURGH STEELERS THEY GOT AN EQUAL

9  SHARE; IS THAT RIGHT?

10         **MR. KESSLER:**  OBJECTION.  LEADING.

11         **THE COURT:**  WELL, THAT IS LEADING.  BUT IS THIS IN

12 CONTROVERSY?

13         **MR. KESSLER:**  YES.  THE FACT THAT THIS WAS ALL EQUAL

14 SHARES IS IN CONTROVERSY.

15         **THE COURT:**  ALL RIGHT.  SUSTAINED.

16         PLEASE ASK A NONLEADING QUESTION.

17 **BY MR. HUMMEL:**

18 **Q.**   DID YOU MAKE ANY DETERMINATION ABOUT WHETHER PLAYERS

19 RECEIVED AN EQUAL SHARE BASED ON THEIR RELATIVE LEVEL OF FAME

20 OR PARTICIPATION ON A PARTICULAR TEAM DURING A YEAR?

21 **A.**   NO.

22 **Q.**   OKAY.

23         **THE COURT:**  YOU DID NOT MAKE ANY DETERMINATION?

24         **THE WITNESS:**  I DID NOT MAKE A SEPARATE

25 DETERMINATION, YOUR HONOR.  IT WAS EQUAL SHARE REGARDLESS OF

1   YOUR STATURE WITHIN THE GAME.

2           **THE COURT:**  ALL RIGHT.  I UNDERSTAND NOW.  THANK YOU.

3   GO AHEAD.

4           **MR. HUMMEL:**  THANK YOU, YOUR HONOR.

5   **BY MR. HUMMEL:**

6   **Q.**   NOW, THAT'S BASICALLY WHAT YOU DID.  DID YOU DO ANYTHING

7   ELSE BEFORE YOU REACHED YOUR CONCLUSIONS ABOUT WHAT THE GROUP

8   WOULD BE ENTITLED TO IF THEY WERE IN THE GROUP LICENSING

9   PROGRAM?

10  **A.**   THERE IS A MINOR ADJUSTMENT IN HERE THAT ARE FOR PRACTICE

11  SQUAD PLAYERS, BUT IT'S RELATIVELY SMALL.

12  **Q.**   ALL RIGHT.  MAYBE YOU COULD FLIP TO THE NEXT CHART AND

13  EXPLAIN TO THE JURY WHAT YOUR CONCLUSIONS WERE BASED ON THIS --

14  **A.**   I --

15  **Q.**   GO AHEAD.  WAS THERE ANYTHING ELSE YOU WANTED TO ADD?

16  **A.**   COUNSEL, IF YOU DON'T MIND, I HAVE NOT PROVIDED TO THE

17  JURY HOW THE CALCULATION IS MADE.

18  **Q.**   WHY DON'T YOU DO THAT?

19  **A.**   SO ONCE WE NOW HAVE AN EQUAL SHARE BASED ON ALL THE

20  PLAYERS BEING INCLUDED, RETIRED AND ACTIVE PLAYERS FOR THE

21  GIVEN YEAR, YOU THEN MULTIPLY THAT AMOUNT BY THE NUMBER OF JUST

22  RETIRED PLAYERS, TO DETERMINE WHAT THEY'RE OWED.

23           SO YOU HAVE AN EQUAL SHARE NOW OF ALL PLAYERS, IF

24  EVERYONE HAD PARTICIPATED.  I KNOW WHAT THAT AMOUNT IS.  IN

25  ANY GIVEN YEAR, I THEN MULTIPLY THAT AMOUNT BY THE NUMBER OF

1  RETIRED PLAYERS IN THAT GIVEN YEAR TO COME UP WITH WHAT THE

2  RETIRED PLAYERS ARE OWED FOR THE GIVEN YEAR.

3  **Q.**   SO YOU'VE NOW DESCRIBED THE CALCULATION THAT YOU MADE, THE

4  METHODOLOGY.  CAN YOU NOW TELL THE LADIES AND GENTLEMEN OF THE

5  JURY WHAT THE RESULTS OF YOUR METHOD -- OF THE APPLICATION OF

6  YOUR METHOD WERE?

7  **A.**   YES.

8  **Q.**   WHAT WERE YOUR CONCLUSIONS ABOUT WHAT AMOUNT WOULD BE DUE

9  TO THE CLASS?

10  **A.**   WELL, COUNSEL, THERE WERE -- THERE'S A VARIETY OF MODELS

11  AND DATA POINTS.

12  **Q.**   WHY DON'T YOU ASSUME FIRST THAT THE JURY FINDS THAT THE 63

13  TO 69 PERCENT ALLOCATION THAT THE NFLPA AND PI TOOK WAS

14  APPROPRIATE.

15  **A.**   ALL RIGHT.  SO WE'LL SET IT UP.

16  **Q.**   WHY DON'T YOU EXPLAIN WHAT THE COLUMNS ARE YOU ARE SETTING

17  UP?

18  **A.**   WHAT I'LL DO IS I'LL GIVE YOU A -- ASSUMING THE PERCENTAGE

19  FOR THE DEDUCTION THAT NFLPA/PI IS MAKING, I WILL GIVE YOU WHAT

20  AMOUNT WOULD BE OWED, AND THEN WHAT THAT AMOUNT WOULD BE,

21  ASSUMING THAT INTEREST SHOULD BE AWARDED.

22  **Q.**   OKAY.  SO ASSUME FIRST THAT THERE'S NO CHANGE IN THE

23  DEDUCTION BY THE NFLPA/PI, THAT THE JURY FINDS THAT THAT'S

24  FAIR.

25  **A.**   OKAY.  SO IF ON AVERAGE THE 63 TO 69 PERCENT IS ASSUMED TO

1  BE REASONABLE, THE AMOUNT OWED WOULD BE ROUGHLY $29 MILLION.

2  WITH INTEREST, THAT WOULD BE 32 MILLION.

3  **Q.**   JUST TO BE CLEAR -- WE'RE TRYING TO SAVE SOME TIME -- BUT

4  YOU APPLIED THE METHODOLOGY THAT YOU DESCRIBED ON THE PRIOR

5  PAGE TO ARRIVE AT THOSE NUMBERS, RIGHT?

6  **A.**   YES.

7  **Q.**   NOW, DID YOU MAKE ANY OTHER ASSUMPTIONS ABOUT OTHER

8  DIFFERENT PERCENTAGES RETAINED BY THE NFLPA AND PI?

9  **A.**   YES.

10  **Q.**   AND WHAT WERE THOSE BASED ON?

11  **A.**   I WAS PROVIDED BY DR. RASCHER THREE OTHER POTENTIAL DATA

12  POINTS FOR MORE APPROPRIATE OR REASONABLE ADJUSTMENTS.

13  **Q.**   OKAY.  WHY DON'T YOU TELL THE JURY WHAT THOSE WERE.

14  **A.**   THERE WERE THREE.  ONE WAS A 40 PERCENT.  ONE WAS A

15  25 PERCENT.  AND THE LAST IS THAT THE NFLPA/PI SHOULD HAVE ONLY

16  TAKEN OUT A 10 PERCENT DEDUCTION.

17  **Q.**   ALL RIGHT.  AND WHAT WERE YOUR CALCULATIONS BASED ON THOSE

18  DIFFERENT ASSUMPTIONS ABOUT HOW MUCH WAS RETAINED BY THE UNION

19  AND PLAYERS, INC?

20  **A.**   THE CORRESPONDING NUMBERS WOULD BE FOR THE 40 PERCENT,

21  49 MILLION BEFORE INTEREST, 54 MILLION WITH INTEREST.

22        FOR THE 25 PERCENT, IT WAS 61 MILLION, AND THEN

23  APPROXIMATELY 68 WITH INTEREST.

24        AND THEN, FOR THE 10 PERCENT, IT WAS 73 MILLION, AND

25  THEN 82 IF YOU INCLUDE THE INTEREST.

1  **Q.**   OKAY.  MR. ROWLEY, THE JURY HAS HEARD A LOT ABOUT AN

2  $8 MILLION REALLOCATION THAT PLAYERS INC AND NFLPA DECIDED TO

3  TAKE IN 2006.  DO YOU RECALL THAT?

4  **A.**   AND 2007, YES.

5  **Q.**   AND 2007, OKAY.

6         HOW DOES THAT REALLOCATION FACTOR INTO THOSE NUMBERS

7  YOU CALCULATED?  CAN YOU DESCRIBE THAT BRIEFLY?

8  **A.**   YES.  OBVIOUSLY, THERE WOULD BE NO ADJUSTMENT FOR THE

9  $8 MILLION HERE IF YOU ASSUME THAT THE 63 TO 69 WAS APPROPRIATE

10  BECAUSE ESSENTIALLY YOU'RE GETTING TO THE 69 PERCENT BECAUSE

11  THE $8 MILLION WAS TAKEN OUT.

12         I WOULD ASSUME THAT THE $8 MILLION IS BEING ADDED

13  BACK IN WHEN YOU'RE LOOKING AT THE 40 TO 25 AND THE 10.

14  **Q.**   OKAY.  NOW, THESE NUMBERS, CAN THEY REPRESENT A NUMBER

15  THAT THE JURY MIGHT FIND REASONABLE AS AN AWARD FOR PURPOSES OF

16  BREACH OF FIDUCIARY DUTY, DAMAGES, AND IF SO, HOW?

17         **MR. KESSLER:**  YOUR HONOR, I HAVE AN OBJECTION TO THIS

18  BASED ON OUR IN LIMINE MOTION.  THIS WITNESS IS HAS DONE

19  ANYTHING IN TERMS OF TALKING ABOUT WHAT WOULD BE APPROPRIATE

20  FOR WHAT SPECIFIC EVENT, YOUR HONOR, I BELIEVE.

21         THAT WAS THE ISSUE AS TO WHETHER HE JUST DID

22  CALCULATIONS OR WHETHER HE'S ACTUALLY DONE ANY TYPE OF ANALYSIS

23  LIMITED TO SPECIFIC EVENTS.

24         **THE COURT:**  SPECIFIC WHAT?

25         **MR. KESSLER:**  HE JUST ASKED THIS WITNESS TO GIVE AN

1    OPINION AS TO WHETHER DAMAGES WOULD BE APPROPRIATE FOR THE

2    BREACH OF FIDUCIARY DUTY CLAIM, IN PARTICULAR.  I DON'T BELIEVE

3    THERE'S ANYTHING IN HIS EXPERT REPORT THAT WOULD SUPPORT SUCH

4    AN OPINION.

5            **THE COURT:**  ALL RIGHT.  WHERE IS THIS IN THE REPORT?

6            **MR. HUMMEL:**  CAN YOU POINT TO HIS HONOR WHERE YOU'VE

7    ADDRESSED FIDUCIARY DUTY DAMAGES IN YOUR REPORT?

8            **MR. KESSLER:**  YOUR HONOR, MY ARGUMENT IS NOT THAT IT

9    WASN'T MENTIONED IN THE REPORT.

10           **MR. HUMMEL:**  IT IS DISCLOSED.

11           **MR. KESSLER:**  MY ARGUMENT IS THAT THERE IS NO DAUBERT

12   BASIS.

13           YOUR HONOR WILL RECALL WE ARGUED THIS PRIOR TO TRIAL,

14   AND YOUR HONOR SAID HE COULD TESTIFY WITH RESPECT TO THE

15   CALCULATIONS --

16           **MR. HUMMEL:**  THIS IS A SPEAKING OBJECTION, YOUR

17   HONOR.

18           **MR. KESSLER:**  -- BUT NOT WITH RESPECT TO CAUSATION OR

19   OPINIONS THAT SOME DAMAGE MEASURE WAS APPROPRIATE, BUT SIMPLY

20   THE CALCULATIONS.  I BELIEVE THAT'S HOW YOUR HONOR RULED.

21           **THE COURT:**  THAT'S CORRECT, ISN'T IT?

22           **MR. HUMMEL:**  IT'S PARTIALLY CORRECT.

23           **THE COURT:**  WHAT'S THE INCORRECT PART?

24           **MR. HUMMEL:**  THE INCORRECT PART IS, IS THERE ANY

25   DIFFERENCE IN YOUR CALCULATIONS BASED ON WHETHER THE JURY FINDS

1   A BREACH OF CONTRACT AND/OR BREACH OF FIDUCIARY DUTY.  THAT IS

2   IN HIS REPORT.

3        **MR. KESSLER:**  WHETHER HIS CALCULATIONS ARE DIFFERENT,

4   I DON'T HAVE AN OBJECTION TO.  HE ASKED HIM A QUESTION WHETHER

5   HE HAD AN OPINION AS TO WHAT WAS AN APPROPRIATE MEASURE OF

6   DAMAGES.  THAT YOUR HONOR HAS RULED OUT.

7        **THE COURT:**  WELL, I THINK THIS IS NOT A HARD PROBLEM.

8   LET ME EXPLAIN.

9        THIS WITNESS IS NOT HERE TO TELL YOU WHETHER THERE

10  WAS A BREACH OF FIDUCIARY DUTY.  AND HE'S NOT HERE TO TELL YOU

11  WHETHER THERE WAS ANY BREACH OF ANY CONTRACT.  HE HAS ALREADY

12  BASICALLY TOLD YOU THAT.

13       HE'S HERE TO CRUNCH NUMBERS AND TO RUN THROUGH SOME

14  OF THE ALTERNATIVE ASSUMPTIONS AND DO THE MATH, AND THEN SHOW

15  YOU HOW HE DID THE MATH SO THAT IT WILL HELP YOU IN THAT KIND

16  OF ANALYSIS.

17       SO I'M GOING TO OVERRULE THE OBJECTION AND ALLOW THE

18  QUESTION.  BUT BE MINDFUL THAT THIS JURY [SIC] IS NOT QUALIFIED

19  TO TELL YOU WHETHER THERE WAS ANY BREACH OF FIDUCIARY DUTY.

20  THAT'S FOR YOU TO DECIDE, ANYWAY, NOT FOR THE EXPERT WITNESS TO

21  COME IN HERE TO TELL YOU ABOUT TI.

22       BUT HE IS QUALIFIED TO CRUNCH THE NUMBERS AND TO TELL

23  YOU A METHODOLOGY BY WHICH IF YOU DECIDED THERE WAS A BREACH OF

24  FIDUCIARY DUTY, ONE WAY IN WHICH YOU COULD GO ABOUT MAKING THAT

25  CALCULATION.

1        I THINK THAT'S A FAIR STATEMENT OF THE PROBLEM.  SO

2   I'M GOING TO LEAVE IT AT THAT.

3        GO AHEAD WITH YOUR ANSWER.

4        **THE WITNESS:**  NO, I DID NOT -- I DID NOT HAVE

5   DIFFERENT CALCULATIONS.  THEY ARE THE SAME.

6   **BY MR. HUMMEL:**

7   **Q.**  WHY IS THAT?

8   **A.**  I WASN'T REALLY ASKED TO BREAK OUT THE TWO.  AND IN

9   LAYPERSON'S TERMS IT'S THE AMOUNT OF MONEY THAT WAS OWED AND

10  THE AMOUNT THAT THEY SHOULD HAVE ENSURED WAS PAID.  SO IT'S THE

11  SAME CALCULATION.

12  **Q.**  OKAY.  I THINK, MR. ROWLEY -- WELL, ONE MORE QUESTION.

13       YOU CAN TAKE A SEAT, ACTUALLY.

14       LET ME ASK YOU A QUESTION ABOUT THIS FIRST CHART.

15  IT'S STUCK TO MR. PARCHER'S CHART.

16       DOES YOUR DAMAGE ANALYSIS, IF THE JURY WERE TO FIND

17  BREACH OF CONTRACT, BREACH OF FIDUCIARY DUTY, REQUIRE THAT

18  MONIES -- OR DOES IT CONTEMPLATE THAT MONIES COME OUT OF THE

19  POCKETS OF ACTIVE PLAYERS?

20  **A.**  NO.

21  **Q.**  WHY IS THAT?

22  **A.**  FIRST OF ALL, MY UNDERSTANDING IS THE SUIT IS AGAINST

23  NFLPA/PI.  AND IF YOU LOOK TO THE DEDUCTIONS THAT ARE MADE,

24  THERE SHOULD BE MONIES AVAILABLE FROM NFLPA/PI TO PAY THIS.

25  **Q.**  ALL RIGHT.  ONE FINAL QUESTION FOR YOU, SIR.

1                GOING BACK TO THIS EXHIBIT, WHICH I THINK WAS 1217,

2    WHICH SHOWS THE AMOUNTS PAID BY LICENSEE.  AND I THINK HIS

3    HONOR PUT HIS FINGER ON THE QUESTION I WANT TO ASK YOU, WHICH

4    IS:  CAN YOU EXPLAIN TO THE JURY A METHODOLOGY -- AND MAYBE

5    IT'S WHAT YOU ALREADY TOLD THEM -- FOR HOW, IF THEY DETERMINE,

6    FOR EXAMPLE, THAT EA ALONE WAS THE -- DID, IN FACT, LICENSE

7    RETIRED PLAYERS OR THE RETIRED PLAYERS SHOULD HAVE BEEN

8    INCLUDED IN THAT GROUP, HOW WOULD THEY GO ABOUT CALCULATING AN

9    APPROPRIATE MEASURE?

10              **MR. KESSLER:**  OBJECTION, YOUR HONOR.  NOT IN ANY OF

11   HIS EXPERT REPORTS.

12              **THE COURT:**  WAS THIS IN THE REPORT?

13              **MR. HUMMEL:**  NO, YOUR HONOR.  WHAT I'M ASKING TO

14   DO --

15              **THE COURT:**  IF IT'S NOT IN THE REPORT, I CAN'T -- I'M

16   SORRY I ASKED THE QUESTION.  I THOUGHT IT WAS IN THE REPORT.

17              **MR. HUMMEL:**  NO, YOUR HONOR.  THE METHOD IS IN THE

18   REPORT.  THAT'S WHAT'S IMPORTANT FOR THE JURY TO KNOW.

19              **THE COURT:**  WELL, IF THE METHOD IS IN THE REPORT,

20   THAT'S OKAY.

21              **MR. HUMMEL:**  THE METHOD IS IN THE REPORT.

22              **MR. KESSLER:**  YOUR HONOR, THERE IS NO DISCLOSURE OF

23   ANY METHOD IN THE REPORT TO CALCULATE DAMAGES ON A SPECIFIC

24   LICENSE-BY-LICENSE BASIS, WHICH IS THE QUESTION HE JUST ASKED.

25   IT'S NOT IN THE REPORT.  IT'S NOT IN HIS SUPPLEMENTAL REPORT.

1    IT'S NOT IN HIS DEPOSITIONS.

2          IT'S NOWHERE UNTIL HE NOW WOULD LIKE TO DO IT FOR THE

3    FIRST TIME TODAY.

4          **MR. HUMMEL:**  THAT'S ABSOLUTELY UNTRUE.

5          I'LL WITHDRAW IT, YOUR HONOR.

6          **THE COURT:**  ALL RIGHT.

7          **MR. HUMMEL:**  I'LL WITHDRAW IT.

8    **BY MR. HUMMEL:**

9    **Q.**   MR. ROWLEY, DOES THE METHOD YOU DESCRIBED APPLY TO --

10   COULD THE JURY USE THE METHOD YOU DESCRIBED AND DISCLOSED IN

11   YOUR REPORT TO CALCULATE WHAT THE GROUP WOULD BE OWED BASED ON

12   INDIVIDUAL LICENSEES?

13   **A.**   IT COULD, YES.

14   **Q.**   HOW?

15   **A.**   IN TOOTLING, MY RESPONSE WOULD BE YOU COULD TAKE AS A

16   PERCENTAGE OF THE TOTAL THESE AMOUNTS OF ROYALTIES AND APPLY

17   THAT PERCENTAGE THEN TO THE DAMAGE FIGURES.

18   **Q.**   WHAT PERCENTAGE?

19   **A.**   WELL, EA WOULD BE, OF THE LICENSEES, ROUGHLY HALF.  BUT

20   THAT'S BEFORE YOU WOULD GET TO THE NFL SPONSORSHIP.

21   **Q.**   OKAY.  SO YOU -- WHAT YOU WOULD DO IS YOU TAKE THE TOTAL

22   PAID BY EA.  AND THAT WOULD BE -- IF YOU PUT THAT OVER 215,

23   THAT WOULD BE THE PERCENTAGE YOU WOULD APPLY TO THESE NUMBERS;

24   IS THAT ROUGHLY RIGHT?

25          **MR. KESSLER:**  YOUR HONOR, THAT'S LEADING.  AND I MOVE

1    TO STRIKE THE LAST TWO ANSWERS OF THE WITNESS.  THAT IS NOT

2    DISCLOSED ANYWHERE IN THE REPORT, SOME IDEA OF DOING AN

3    INDIVIDUAL CALCULATION --

4            **THE COURT:**  LET ME SAY TO THE WITNESS:  DON'T GO ONE

5    PHRASE BEYOND WHAT'S IN YOUR REPORT.  I DON'T HAVE IT IN FRONT

6    OF ME, BUT -- SO IF YOU GO BEYOND IT I'M GOING TO STRIKE YOUR

7    ANSWER.

8            BUT YOU CAN ANSWER IT IF IT IS IN THE REPORT.

9            ASK THE QUESTION AGAIN, BUT STOP LEADING THE WITNESS.

10           **MR. HUMMEL:**  I WILL, YOUR HONOR.

11   **BY MR. HUMMEL:**

12   Q.   HOW WOULD THE JURY GO ABOUT CALCULATING DAMAGES BASED ON A

13   FINDING OF SOME, BUT NOT ALL, OF THE LICENSES THAT ARE LISTED

14   ON EXHIBIT 1217?

15           **MR. KESSLER:**  OBJECTION, YOUR HONOR.  NOT IN THE

16   REPORT.  I WOULD LIKE A FOUNDATION QUESTION TO THE WITNESS IS

17   IT --

18           **THE COURT:**  IS IT IN YOUR REPORT?

19           (COUNSEL AND THE COURT SPEAKING SIMULTANEOUSLY, WHICH

20           WAS NOT REPORTABLE.)

21   **BY MR. HUMMEL:**

22   Q.   DID YOU DO THAT ON YOUR INITIAL REPORT?

23   A.   I CERTAINLY DESCRIBED THE METHODOLOGY ON TAKING ROYALTIES

24   AND REVENUES AND HOW YOU WALK THROUGH THE PROCESS TO COME UP

25   WITH THE EQUAL SHARE.

1      **MR. HUMMEL:**  FAIR ENOUGH.

2      YOUR HONOR, THAT'S ENOUGH.  NO FURTHER QUESTIONS.

3      **THE COURT:**  THANK YOU.  THANK YOU, MR. HUMMEL.

4      ALL RIGHT.  THERE WE GO.

5      CROSS EXAMINATION.

6                    **CROSS EXAMINATION**

7  **BY MR. KESSLER:**

8  **Q.**   JUST TAKE ME A MINUTE TO GET SET UP.

9  **A.**   NO PROBLEM, MR. KESSLER.  TAKE YOUR TIME.

10 **Q.**   GOOD MORNING, MR. ROWLEY.

11 **A.**   GOOD MORNING.

12     **MR. KESSLER:**  GOOD MORNING, LADIES AND GENTLEMEN OF

13 THE JURY.

14 **BY MR. KESSLER:**

15 **Q.**   MR. ROWLEY, LET'S FIRST IDENTIFY FOR THE JURY WHAT YOU DID

16 NOT DO, IF WE CAN, OKAY.

17     FIRST OF ALL, MR. ROWLEY, YOU DID NOT CALCULATE ANY

18 DAMAGES IN THIS CASE RESULTING FROM ANY AD HOC LICENSE

19 AGREEMENTS, CORRECT?

20 **A.**   THAT'S CORRECT.

21 **Q.**   OKAY.  AND SO, FOR EXAMPLE, THE JURY HAS HEARD ABOUT A

22 HALL OF FAME AGREEMENT INVOLVING EA AND AD HOC LICENSE.  YOU

23 DIDN'T CALCULATE ANY DAMAGES REGARDING THAT, CORRECT?

24     **MR. HUMMEL:**  OBJECT, YOUR HONOR.  I THINK WHAT MR. --

25 THE POINT OF MR. KESSLER'S ARGUMENT IS IN HIS OBJECTIONS WAS HE

1    DIDN'T CALCULATE DAMAGES AT ALL.  HE PROVIDE A METHODOLOGY AND

2    ANALYSIS.  IF MR. KESSLER WANTS TO ASK ABOUT DAMAGES, I'M HAPPY

3    TO DO THAT ON REDIRECT, BUT IT'S A WORD OF CAUTION.

4              **THE COURT:**  WELL, BE AWARE THAT HE MAY OPEN THE DOOR.

5    ON REDIRECT HE IS NOT LIMITED TO WHAT'S IN THE REPORT.  HE CAN

6    GO BEYOND WHAT'S IN THE REPORT, IF YOU OPEN THE DOOR.

7              **MR. KESSLER:**  OKAY.  I'LL ASK THIS QUESTION.

8    **BY MR. KESSLER:**

9    **Q.**   SO, IN OTHER WORDS -- I JUST WANT TO UNDERSTAND WHAT

10   COUNSEL SAID.  YOU DIDN'T CALCULATE ANY DAMAGES MEASUREMENTS AT

11   ALL IN THIS CASE; IS THAT CORRECT?

12   **A.**   WHAT I WAS ASKED TO DO WAS TO GO THROUGH AND REVIEW THE

13   ENTIRE POOL AND THE PROCESS AND WHAT WOULD HAVE BEEN PAID TO

14   THE RETIRED PLAYERS IF THEY HAD PARTICIPATED.

15   **Q.**   I'M GOING TO YOU ASK, MR. ROWLEY -- AND I THINK THE COURT

16   WILL DIRECT YOU -- IF YOU CAN ANSWER "YES" OR "NO," PLEASE TRY

17   TO ANSWER "YES" OR "NO."

18              I'M GOING TO ASK THE QUESTION AGAIN.

19              YOU DID NOT CALCULATE ANY DAMAGES MEASURE IN THIS

20   CASE; IS THAT CORRECT?

21              **MR. HUMMEL:**  I OBJECT, YOUR HONOR.  THAT'S A TOTALLY

22   UNFAIR QUESTION, GIVEN THE COURT'S RULING ON THE MOTION IN

23   LIMINE.  I STAYED FAR CLEAR OF THAT.

24              IT'S INCORRECT.  HE KNOWS IT.  AND HE'S ASKING A

25   QUESTION BASED ON THE MOTION IN LIMINE.  THAT'S COMPLETELY

 1  UNFAIR.

 2          **THE COURT:**  WHAT DO YOU SAY TO THAT?

 3          **MR. KESSLER:**  YOUR HONOR, I FIRST ASKED HIM WHAT HE

 4  DID.  HE TOLD ME -- HE ARGUED, WELL, HE HASN'T CALCULATED

 5  DAMAGES.  I JUST WANT TO ESTABLISH FOR THE JURY THAT IN

 6  EVIDENCE HE HASN'T CALCULATED DAMAGES.  IT'S EITHER ONE OR THE

 7  OTHER.

 8          **THE COURT:**  ALL RIGHT.  I'M GOING TO ALLOW THE

 9  QUESTION.  BUT ON REDIRECT YOU NEED SOME LEEWAY TO MEET THIS

10  CONTENTION.

11          ALL RIGHT.  GO AHEAD.

12  **BY MR. KESSLER:**

13  **Q.**  SO YOU HAVE NOT CALCULATED ANY DAMAGES MEASURE IN THIS

14  CASE, CORRECT?

15  **A.**  COUNSEL, I WAS ADVISED --

16  **Q.**  CAN YOU SAY "YES" OR "NO"?

17          **THE COURT:**  WAIT.  YOU SAID "DAMAGES MEASURE."  IS

18  THAT YOUR QUESTION?

19  **BY MR. KESSLER:**

20  **Q.**  HAVE YOU CALCULATED ANY DAMAGES IN THIS CASE?

21  **A.**  I HAVE NOT CALCULATED DAMAGES.

22  **Q.**  CORRECT.  NOW, YOU'VE TESTIFIED IN OTHER CASES IN WHICH

23  YOU HAVE CALCULATED DAMAGES, CORRECT?

24          **MR. HUMMEL:**  I OBJECT, YOUR HONOR.  AGAIN, THIS IS

25  BASED ON THE MOTION IN LIMINE.  IT'S AN UNFAIR LINE.  I'LL

1  CLEAN IT UP, BUT I WANT TO BE VERY CLEAR ON WHAT WE'RE DOING.

2          **THE COURT:** OVERRULED. OVERRULED.

3          GO AHEAD.

4          **THE WITNESS:** I HAVE BEEN ASKED IN OTHER MATTERS TO

5  OPINE ON DAMAGES.

6  **BY MR. KESSLER:**

7  **Q.** IN FACT, TYPICALLY, WHEN YOU COME IN AS A DAMAGES EXPERT

8  YOU DO A STUDY OF WHAT'S CALLED THE "BUT-FOR WORLD," CORRECT?

9          YOU KNOW WHAT THE "BUT-FOR WORLD" IS IN DAMAGES?

10 **A.** GENERALLY SPEAKING, YES.

11 **Q.** YES. AND THE BUT-FOR WORLD IS YOU TRY IN -- AS A DAMAGES

12 EXPERT IN THE CASE, IF THERE'S A BREACH OF CONTRACT ALLEGED OR

13 A BREACH OF FIDUCIARY DUTY ALLEGED, TO DETERMINE WHAT WOULD THE

14 WORLD LOOK LIKE IF THOSE BREACHES DIDN'T OCCUR. THAT'S WHAT

15 YOU WOULD DO IN A BUT-FOR DAMAGES ANALYSIS, CORRECT?

16 **A.** YOU CERTAINLY COULD.

17 **Q.** AND YOU WERE NOT ASKED TO DO THAT IN THIS CASE, CORRECT?

18 **A.** WELL, I WOULD DISAGREE WITH THAT.

19 **Q.** OKAY. WELL, LET'S GO WITH WHAT YOU WERE ASKED TO DO. LET

20 ME GO BACK. BEFORE I GET THERE, I WANT TO GO TO MY OTHER

21 QUESTIONS.

22          YOU DIDN'T CALCULATE ANY MEASURE OF DAMAGES

23 SEPARATELY FOR ANY AD HOC AGREEMENT LIKE THE HALL OF FAME

24 AGREEMENT, CORRECT?

25 **A.** THAT'S CORRECT.

1   Q.   OKAY.  AND THERE'S BEEN SOME TESTIMONY HERE ABOUT AN AD

2   HOC REEBOK AGREEMENT.  YOU DIDN'T CALCULATE ANY MEASURE OF

3   DAMAGES REGARDING THE REEBOK AGREEMENT, CORRECT?

4   A.   AN AD HOC REEBOK AGREEMENT?

5   Q.   YES.

6   A.   NO.

7   Q.   IN FACT, THE HALL OF FAME AGREEMENT AND THE REEBOK

8   AGREEMENT, THEY'RE NOT IN YOUR LIST OF LICENSEES BECAUSE THEY

9   WEREN'T PART OF THE GLR POOL, CORRECT?

10  A.   I WANT TO VERIFY.  THERE COULD BE AGREEMENTS THAT WERE

11  BOTH, HAD BOTH COMPONENT OF GLR AND AD HOC.  I'M NOT RECALLING

12  RIGHT NOW.

13  Q.   YOU DON'T RECALL.  OKAY.

14       BUT YOU'D AGREE WITH ME IF IT WAS AN AD HOC LICENSE

15  AGREEMENT YOU DIDN'T TEND TO GIVE ANY MEASURE OF DAMAGES

16  REGARDING AD HOCS IN THIS CASE?

17  A.   I DID THOSE SEPARATELY, YES.

18  Q.   YOU DON'T DO THAT IN THIS CASE AT ALL, AD HOC DAMAGES,

19  RIGHT?

20  A.   CORRECT.

21  Q.   OKAY.  NOW, YOU WERE ASKED BY COUNSEL TO ASSUME THAT THIS

22  JURY WOULD FIND THAT THE PLAINTIFFS WERE ENTITLED TO AN EQUAL

23  SHARE OF THE GLR POOL, CORRECT?

24  A.   NOT EXACTLY.

25  Q.   OKAY.  DID YOU MAKE ANY -- DO YOU HAVE ANY EXPERT OPINION

1   AS TO WHETHER OR NOT THE PLAINTIFFS ARE ENTITLED TO AN EQUAL

2   SHARE OF THE GLR POOL?

3   **A.**   THE EXPERT OPINION THAT I WOULD PROVIDE --

4   **Q.**   CAN YOU GIVE ME A "YES" OR "NO" FIRST?

5        DO YOU HAVE AN EXPERT OPINION AS TO WHETHER OR NOT

6   THE PLAINTIFFS ARE ENTITLED TO AN EQUAL SHARE OF THE GLR POOL,

7   YES OR NO?

8   **A.**   COUNSEL, I APOLOGIZE.  FROM A DAMAGES STANDPOINT OR FROM A

9   CONTRACTUAL STANDPOINT?

10  **Q.**   FROM A LIABILITY STANDPOINT.  DO YOU HAVE ANY --

11  **A.**   NO.

12  **Q.**   -- OPINION AT ALL?

13  **A.**   NO, NOT FROM A LIABILITY STANDPOINT.  I APOLOGIZE.  I'VE

14  TURNED THIS OFF.

15        **THE COURT:**  WHILE YOU'RE DOING THAT, JUST TO BE

16  CLEAR, I THOUGHT, THIS WITNESS HAS NEVER PURPORTED TO COME IN

17  AND GIVE AN OPINION ON LIABILITY BECAUSE THAT'S FOR THE JURY TO

18  DECIDE, ANYWAY.  BUT HE'S COME IN TO TESTIFY IN THE EVENT THAT

19  THE JURY FINDS LIABILITY.

20        **MR. KESSLER:**  YES, YOUR HONOR.  THAT'S --

21        **THE COURT:**  TO TRY TO GIVE HIS VIEW OF WHAT THE JURY

22  SHOULD THEN DO IN TERMS OF CALCULATIONS.  BUT HE HAS NEVER

23  PURPORTED TO, AS I HEARD IT, TO TRY TO INVADE THE PROVINCE OF

24  THE JURY ON WHETHER OR NOT THERE WAS LIABILITY.

25        **MR. KESSLER:**  RIGHT.

**BY MR. KESSLER:**

**Q.**   SO YOU WOULD AGREE, SIR, THAT IF THIS JURY FINDS THAT
THERE'S NO CONTRACTUAL ENTITLEMENT OF THE PLAINTIFF CLASS TO
THE REVENUES IN THE GLR POOL, OR NO OTHER LEGAL ENTITLEMENT TO
AN EQUAL SHARE OF THE REVENUES IN THE GLR POOL, YOUR MEASURE,
OKAY, WOULD NOT BE APPLICABLE, CORRECT?

**A.**   I WAS ASKED TO ASSUME LIABILITY, SO, YES, THAT WOULD BE
CORRECT.

**Q.**   NO, BUT YOU WEREN'T ASKED TO ASSUME JUST LIABILITY, IN
GENERAL.  YOU WERE ASKED TO ASSUME A SPECIFIC LIABILITY IN
WHICH THE JURY WOULD FIND NOT JUST SOME CONTRACTUAL BREACH OR
NOT JUST SOME BREACH OF DUTY, BUT A SPECIFIC ENTITLEMENT TO AN
EQUAL SHARE OF THE GLR POOL; ISN'T THAT CORRECT?

**A.**   NO, I THINK THAT OVERSTATES WHAT I WAS ASKED TO ASSUME IN
LIABILITY, SIR.

**Q.**   LET ME ASK YOU A QUESTION, THEN.

        LET'S SAY THIS JURY WERE TO FIND, OKAY, THAT JUST
SPECIFIC -- THAT -- THAT THERE WAS A BREACH BECAUSE PLAYERS INC
SHOULD HAVE DONE MORE TO MARKET RETIRED PLAYERS, CORRECT?
ASSUME THAT WITH ME, ALL RIGHT?

**A.**   OKAY.

**Q.**   BUT THEY DON'T FIND THAT THAT HAS ANYTHING TO DO WITH AN
ENTITLEMENT TO ANY SHARE OF THE GLR POOL.  ARE YOU WITH ME ON
THOSE ASSUMPTIONS?

**A.**   YES.

1  Q.  IN THAT CASE, YOU'RE NOT OFFERING ANY MEASURE OF DAMAGES,

2  CORRECT?

3  A.  I THINK THAT'S CORRECT.

4  Q.  YES.  IN OTHER WORDS, YOU'RE ONLY OFFERING THE MEASURE OF

5  DAMAGES IF THE JURY FINDS THAT THE GLR POOL IS SOMETHING THAT

6  THESE PLAINTIFFS HAVE AN ENTITLEMENT TO, CORRECT?

7  A.  COUNSEL, THAT'S DIFFERENT THAN WHAT YOU ASKED.

8  Q.  OKAY.

9  A.  YOU --

10  Q.  YES OR NO?  YOU WANT TO SAY NO?  SAY NO.

11  A.  NO.

12          MR. KESSLER:  IF I MAY, YOUR HONOR, I WANT TO WORK

13  WITH THE CHARTS.  I'M GOING TO WORK WITH ONE OF THE SHEETS.

14  BY MR. KESSLER:

15  Q.  NOW, MR. ROWLEY, I'M GOING TO TURN IT THIS WAY SO THAT YOU

16  CAN SEE IT AND THE JURY CAN SEE IT.

17          THE COURT:  CAN EVERYONE ON THE JURY SEE THAT CHART

18  OKAY?

19  BY MR. KESSLER:

20  Q.  NOW, MR. ROWLEY, YOU -- ALL OF YOUR CALCULATIONS ARE BASED

21  ON THE PLAINTIFFS RECEIVING AN EQUAL SHARE OF THIS GLR POOL,

22  CORRECT?

23  A.  CORRECT.  CORRECT.

24  Q.  OKAY.  AND THIS GLR POOL, OKAY, CONTAINS ONLY -- THIS

25  CONTAINS ONLY ACTIVE PLAYER MONEY, CORRECT?

1   **A.**   I CAN'T ANSWER THAT QUESTION.

2   **Q.**   YOU DON'T KNOW ONE WAY OR THE OTHER?

3   **A.**   NO, BECAUSE WE DID NOT --

4   **Q.**   YES OR NO?

5   **A.**   NO.

6   **Q.**   OKAY.  YOU DIDN'T STUDY THAT ISSUE, CORRECT?

7   **A.**   I ATTEMPTED TO STUDY THAT ISSUE --

8   **Q.**   BUT YOU DON'T KNOW ONE WAY OR THE OTHER?

9           **THE COURT:**  LET HIM FINISH HIS ANSWER.

10  **BY MR. KESSLER:**

11  **Q.**   OKAY.  PLEASE.

12  **A.**   NFLPA/PI, WHILE THEY PROVIDED THE ROYALTY AMOUNTS WHICH I

13  SUMMARIZED IN THESE EXHIBITS, THEY DID NOT PROVIDE THE OTHER

14  SIDE OF THE EQUATION, WHICH IS:  WHAT WAS THE ACTUAL NATURE OF

15  THE REVENUES THAT THE LICENSEES GENERATED AND, THEREFORE, WHAT

16  THEY WOULD BE PAYING ROYALTIES ON?

17          SO I CAN'T ANSWER THAT WITH "YES" OR "NO."

18  **Q.**   LET'S ASSUME THE JURY FINDS THAT ALL THE MONEY IN THE GLR

19  POOL IS ONLY ACTIVE PLAYER MONEY.  LET'S ASSUME THAT, CORRECT?

20  **A.**   I'M ASSUMING THAT.

21  **Q.**   OKAY.  AND THAT IT WAS ONLY GENERATED BY ACTIVE PLAYER

22  LICENSING OF ACTIVE PLAYER IMAGES.  LET'S ASSUME THAT, CORRECT?

23  **A.**   I'M ASSUMING THAT, YES.

24  **Q.**   OKAY.  YOU DON'T HAVE ANY OPINION, DO YOU, AS TO WHETHER

25  OR NOT A RETIRED PLAYER SHOULD BE ENTITLED TO ANY ACTIVE PLAYER

1   MONEY?  THAT'S NOTHING YOU'VE STUDIED OR HAVE AN OPINION ON,

2   RIGHT?

3   **A.**   WELL, THAT'S DIFFERENT FROM WHAT PLAINTIFFS ARE ARGUING.

4   I DIDN'T GO IN AND SEPARATE OUT THE REVENUES.

5   **Q.**   YOU DIDN'T MAKE ANY DETERMINATION AS TO WHETHER THERE'S

6   ANY ENTITLEMENT OF RETIRED PLAYERS TO ANY ACTIVE PLAYER MONEY

7   IN THE GLR POOL, YES OR NO?

8   **A.**   I DISAGREE WITH THAT.

9   **Q.**   OKAY.  AND YOUR ANSWER IS NO?

10  **A.**   YES.

11  **Q.**   OKAY.  SO YOU DID STUDY WHETHER -- WHETHER RETIRED PLAYERS

12  HAVE A LEGAL ENTITLEMENT TO ACTIVE PLAYER MONEY IN THE POOL?

13  YOU DID STUDY THAT, YES OR NO?

14  **A.**   IF THE ASSUMPTION --

15  **Q.**   YES OR NO?

16  **A.**   INDIRECTLY, YES.

17  **Q.**   OKAY.  SO INDIRECTLY YOU NOW SAY YOU HAVE A LIABILITY

18  OPINION?

19  **A.**   NO, COUNSEL.

20  **Q.**   OKAY.  WELL, I'M GOING TO BE VERY CLEAR.  I'M ASKING YOU:

21  DID YOU STUDY WHETHER OR NOT THESE PLAINTIFFS HAVE ANY LEGAL

22  ENTITLEMENT TO ACTIVE PLAYER MONEY IN THE GLR POOL?  THE ANSWER

23  IS "NO," RIGHT?

24  **A.**   FROM A LIABILITY STANDPOINT OR FROM A QUANTIFICATION

25  STANDPOINT?

1  Q.   FROM A LIABILITY STANDPOINT?

2  A.   I WAS NOT ASKED TO REVIEW LIABILITY.

3  Q.   RIGHT.  ALL YOU DID WAS ADD UP THE NUMBERS THAT

4  PLAINTIFFS' COUNSEL TOLD YOU TO ADD UP AND DIVIDE, CORRECT?  IS

5  THAT FAIR?

6  A.   COUNSEL, THAT'S WAY OVERSIMPLIFICATION.

7  Q.   YOU DID ARITHMETIC, RIGHT?

8  A.   ARITHMETIC WAS INVOLVED.

9  Q.   DID YOU DO ANY MATHEMATICAL EXERCISE MORE COMPLICATED THAN

10 ARITHMETIC?  MATHEMATICAL EXERCISE?

11 A.   ARITHMETIC IS A GENERAL -- THERE WAS A VARIETY OF

12 PERCENTAGES, DIVISION, ET CETERA, YES.

13 Q.   YOU DIDN'T DO ANY ALGEBRA.  YOU DIDN'T DO ANY CALCULUS.

14 YOU DID WHAT'S KNOWN AS SIMPLE ARITHMETIC THAT'S TAUGHT IN

15 GRADE SCHOOL, CORRECT?  THAT'S WHAT WAS DONE IN YOUR

16 CALCULATIONS, TRUE?

17 A.   COUNSEL, IT WAS MUCH MORE COMPLICATED THAN THAT.  BUT, YES

18 I PERFORMED ARITHMETIC.

19 Q.   THE SAME ARITHMETIC TAUGHT IN GRADE SCHOOLS, CORRECT?

20 A.   I HAVE FOUR CHILDREN, AND I CAN TELL YOU THEY'RE BRIGHT

21 AND SOME OF THIS IS NOT TAUGHT IN GRADE SCHOOLS.

22 Q.   OKAY.

23      MR. ROWLEY, IT WAS COUNSEL, PLAINTIFFS' -- WHICH

24 COUNSEL DID YOU WORK WITH, BY THE WAY?

25 A.   I WORKED WITH MR. KATZ.  I WORKED WITH MR. HUMMEL.  THERE

 1  ARE OTHER COLLEAGUES IN THE BACK.

 2  Q.   OKAY.  SO IT WAS COUNSEL FOR PLAINTIFFS WHO TOLD YOU WHAT

 3  THEY WANTED YOU TO CALCULATE WAS AN EQUAL SHARE OF THE GLR

 4  REVENUE POOL; IS THAT CORRECT?

 5  A.   THAT IS NOT CORRECT.

 6  Q.   OKAY.  YOU DECIDED ON YOUR OWN THAT YOU WERE GOING TO

 7  CALCULATE AN EQUAL SHARE OF THE GLR REVENUE POOL; IS THAT YOUR

 8  SWORN TESTIMONY?

 9  A.   I WENT AND REVIEWED WHAT NFLPA/PI HAD ACTUALLY DONE.  I

10  THEN ADMINISTERED THE PROGRAM LIKEWISE.

11  Q.   DO YOU HAVE YOUR DEPOSITION IN FRONT OF YOU, SIR?

12  A.   I DO.

13          THE COURT:  HAVE I GOT IT UP HERE?

14          MR. KESSLER:  YOU SHOULD HAVE IT, YOUR HONOR.

15          THE CLERK:  NO.

16          THE COURT:  OKAY.  I DO.

17          PAGE AND LINE.

18  BY MR. KESSLER:

19  Q.   LET'S TAKE A LOOK, MR. ROWLEY, IF WE CAN, AT DEPOSITION

20  TRANSCRIPT 60 TO 61, IF WE CAN.  I'M GOING -- ACTUALLY,

21  STARTING ON PAGE 59, OKAY.  LET'S SEE WHERE I SHOULD START.

22          THE COURT:  THIS IS NOT A PARTY DEPOSITION.  IT'S

23  TAKEN SO LONG I HAVE FORGOTTEN, AND I'M SURE THE JURY HAS

24  FORGOTTEN, WHAT THE QUESTION WAS.

25

**BY MR. KESSLER:**

**Q.**   MY QUESTION WAS:  DID YOU RELY UPON THE GUIDANCE OF COUNSEL IN DETERMINING TO LOOK AT THE GLR POOL TO CALCULATE EQUAL SHARES?

**A.**   NO.

**Q.**   OKAY.  NOW, LET'S START ON PAGE 59, LINE 2.

         **MR. KESSLER:**  UNFORTUNATELY, YOUR HONOR, IT TAKES A WHILE TO GET IT ALL OUT.

         STARTING ON LINE 2, QUESTION --

         **THE COURT:**  WELL, WAIT A MINUTE.  WHAT DO YOU WANT TO READ?  LET'S SEE.

         **MR. KESSLER:**  FROM LINE 2, YOUR HONOR.  AND I THEN HAVE TO GO THROUGH TO LINE 18 ON PAGE 60.  LINE 2 ON PAGE 59 TO LINE 18 ON PAGE 60, BECAUSE THERE'S A LOT OF BACK AND FORTH WITH THE WITNESS.

         **THE COURT:**  ANY OBJECTION?

         **MR. HUMMEL:**  YES, IT'S NOT IMPEACHING, YOUR HONOR.  I HAVE NO OBJECTION TO HIM READING THE WHOLE DEPO INTO THE RECORD, BUT IT'S NOT IMPEACHING.

         **THE COURT:**  WELL, IT MAY OR MAY NOT BE IMPEACHING, BUT SINCE YOU DON'T REALLY CARE, I AM GOING TO ALLOW IT TO BE READ.

         **MR. KESSLER:**  OKAY.

         "**QUESTION:**  I'M JUST SAYING WHAT BASIS AS AN
         EXPERT -- I UNDERSTAND AS A PERSON YOU MAY

1    HAVE AN OPINION.  BUT AS AN EXPERT, WHAT

2    BASIS DO YOU HAVE TO OFFER AN OPINION THAT IF

3    THERE WAS AN ESCROW ACCOUNT IT WOULD BE AN

4    EQUAL SHARE ESCROW ACCOUNT THAT LOOKED LIKE

5    THE GLR POOL?

6    "**ANSWER:**  IN A SENSE, IT IS IN."

7    FURTHER ANSWER:

8    "IN THE ANALYSIS I AM ATTEMPTING TO PERFORM,

9    LET'S TAKE IT ON THE BREACH OF CONTRACT, THE

10   ALLEGATION IS THEY WEREN'T PAID FOR CERTAIN

11   ROYALTIES THAT THEY SHOULD HAVE BEEN ENTITLED

12   TO AROUND THE GROUP LICENSING PROGRAM.  I AM

13   LOOKING AT WHAT ACCOUNTS, WHAT DID THE

14   NFLPA/PI ACTUALLY DO AROUND THE GROUP

15   LICENSING PROGRAM.  I CAN IDENTIFY WHAT THAT

16   ACCOUNT IS, HOW THEY ADMINISTERED OR HANDLED

17   THESE TYPE OF FUNDS.

18   "**QUESTION:**  OKAY.  BUT WE ALSO KNOW, DO WE

19   NOT, THAT THE NFLPA SET UP THE AD HOC

20   PROGRAMS ALSO INVOLVED GROUP LICENSING,

21   RIGHT?

22   "**ANSWER:**  THERE ARE CERTAIN GROUP LICENSING

23   WHERE MONIES GO INTO THE AD HOC ACCOUNTS.

24   "**QUESTION:**  RIGHT.  SO AS AN EXPERT, WHY

25   WOULD YOU -- IN YOUR VIEW, DO YOU HAVE AN

1          EXPERT OPINION THAT THE ESCROW FUND WOULD

2          MORE LOOK LIKE THE GLR POOL, OKAY, THAN IT

3          WOULD LOOK LIKE EITHER THE AD HOC AGREEMENT

4          ARRANGEMENTS OR THE PREMIUM LICENSE AGREEMENT

5          ARRANGEMENTS FOR ACTIVE PLAYERS?  WHAT

6          EXPERTISE DID YOU APPLY IN MAKING THAT

7          JUDGMENT?

8          **"ANSWER:**  PART" --

9          THIS IS WHAT I WAS COMING TO:

10          "PART OF IT IS SOME OF THE GUIDANCE FROM

11          COUNSEL AROUND LANGUAGE OF BEING DIVIDED

12          BETWEEN A PLAYER AND AN ESCROW ACCOUNT, AND

13          THEN FOR ALL ELIGIBLE NFLPA MEMBERS WHO HAVE

14          SIGNED A GROUP LICENSING AUTHORIZATION."

15  **BY MR. KESSLER:**

16  **Q.**   MR. ROWLEY, YOU RELY --

17          **MR. HUMMEL:**  YOUR HONOR, HE DIDN'T FINISH HIS ANSWER.

18          **MR. KESSLER:**  OKAY.

19          **"ANSWER:**  "AND SO I LOOKED TO WHERE I WOULD

20          FIND THE SURROGATE FOR SOMETHING WHERE A

21          GROUP OF ELIGIBLE PLAYERS HAVE SIGNED THE GLA

22          AND HOW DID THEY ADMINISTER THAT PROGRAM.

23          THAT'S THE MOST LIKELY."

24  **BY MR. KESSLER:**

25  **Q.**   NOW, I'M GOING TO ASK YOU, MR. ROWLEY, DID YOU RELY ON THE

1   GUIDANCE FROM COUNSEL TO MAKE YOUR DETERMINATION THAT THE GLR

2   POOL WAS SOMETHING YOU SHOULD USE TO CALCULATE AN EQUAL SHARE?

3   **A.**   AS I STATED, I RECEIVED SOME GUIDANCE FROM COUNSEL.

4   THAT'S NOT HOW I MADE THE DECISION.

5   **Q.**   BUT COUNSEL DID TELL YOU THAT THEY WOULD LIKE YOU TO

6   CALCULATE -- DID COUNSEL EVER TELL YOU THAT IT WAS THEIR

7   SUGGESTION THAT YOU CALCULATE EQUAL SHARES OF THE GLR POOL?

8   TRUE OR FALSE?

9   **A.**   NO, FALSE.

10  **Q.**   THEY NEVER MADE THAT SUGGESTION?

11  **A.**   NO.

12  **Q.**   NOW, IT'S TRUE, ISN'T IT, THAT YOU HAVE NO OPINION AS TO

13  WHICH OF YOUR DIFFERENT DAMAGE MEASURES THE JURY SHOULD

14  ACTUALLY USE, CORRECT?

15  **A.**   I GUESS IN A BROAD SENSE, DEPENDING UPON WHAT LIABILITY

16  WAS DETERMINED, I DID ALLUDE TO WHICH NUMBERS WOULD BE CORRECT.

17  BECAUSE IF THEY'VE ASSUMED THAT A 40 PERCENT DEDUCTION IS MORE

18  APPROPRIATE, I WOULD SUGGEST THAT THAT CALCULATION IS MORE

19  APPROPRIATE.

20  **Q.**   BUT YOU HAVEN'T OFFERED ANY EXPERT OPINION AS TO WHAT IS

21  THE BEST MEASURE OF DAMAGES HERE, RIGHT?

22  **A.**   WELL, WITHOUT DEFINING "BEST," NO, I HAVE NOT.

23  **Q.**   OKAY.  AND MR. ROWLEY, IT'S ALSO TRUE THAT YOU REVIEWED

24  THE GLA LANGUAGE, THE RETIRED PLAYER GLA?

25  **A.**   AS PART OF MY WORK, YES.

Q.   THAT RETIRED PLAYER GLA SAYS NOTHING ABOUT HOW MONEY WOULD
BE DIVIDED UP IN WHAT SHARES, WHETHER THEY BE EQUAL OR NOT
EQUAL, RIGHT?   THERE IS NO REFERENCE IN THE RETIRED PLAYER GLA
TO THAT, TRUE?

A.   I DON'T THINK IT DOESN'T SAY ANYTHING.   IT DOES SPEAK TO A
PLAYER ESCROW ACCOUNT.

Q.   IT DOESN'T SAY HOW THE MONEY WOULD BE DIVIDED UP AMONG THE
PLAYERS, DOES IT?

A.   I WOULD WANT TO REVIEW IT AGAIN.   I DON'T BELIEVE THERE IS
ABSOLUTE SPECIFICITY, BUT IT CERTAINLY ADDRESSED BETWEEN A
PLAYER AND AN ESCROW ACCOUNT.

Q.   TAKE A LOOK AT YOUR DEPOSITION TRANSCRIPT, PAGE 32, LINE
7.  AND WE'RE LOOKING AT THE RETIRED PLAYER GLA:

          "**QUESTION:**  OKAY.  DO YOU SEE ANY LANGUAGE

          THAT YOU CAN IDENTIFY THAT WOULD LEAD YOU TO

          CONCLUDE AS AN EXPERT THAT THERE IS SOMETHING

          IN THIS CONTRACT ABOUT HOW THE MONEY WILL BE

          DIVIDED IN TERMS OF PERCENTAGES OR REASONABLE

          PERCENTAGES OR ANYTHING LIKE THAT?

          "**ANSWER:**  STRICTLY LOOKING AT THE CONTRACT,

          NOT ATTEMPTING THE LEGAL OBLIGATIONS THAT MAY

          BE IMPLIED?

          "**QUESTION:**  RIGHT.

          "**ANSWER:**  I DON'T SEE THAT LANGUAGE.  EITHER

          THAT THERE ARE PERCENTAGES OR THAT ANY MONIES

1       WOULD BE TAKEN OUT OF THE FUND FOR ANY

2       PURPOSES, IT'S NOT THERE."

3           **MR. HUMMEL:**  YOUR HONOR, I ACTUALLY HAVE TO OBJECT AT

4  THIS POINT.  IT'S A PRIOR CONSISTENT STATEMENT AS OPPOSED TO

5  ANYTHING THAT'S IMPEACHING.  IT'S EXACTLY WHAT HE JUST SAID.

6           IF HE WANTS TO READ THE WHOLE DEPO, HE CAN.  BUT IT'S

7  NOT INCONSISTENT.

8           **THE COURT:**  IT WILL BE UP TO THE JURY TO DECIDE IF IT

9  WAS IMPEACHING OR INCONSISTENT IN ANY WAY.  OVERRULED.

10          **MR. KESSLER:**  COULD WE HAVE THE RETIRED PLAYER GLA,

11 EXHIBIT 110.

12 **BY MR. KESSLER:**

13 **Q.**   MR. ROWLEY, YOU HAVE LOOKED AT THE RETIRED PLAYER GLA,

14 CORRECT?

15 **A.**   YES.

16 **Q.**   LET ME SHOW YOU EXHIBIT 110, WHICH IS MR. ADDERLEY'S GLA.

17          **MR. KESSLER:**  IF WE CAN PUT THAT UP, PLEASE.

18          (DOCUMENT DISPLAYED.)

19 **BY MR. KESSLER:**

20 **Q.**   AND YOU'LL LOOK AT THE FOURTH PARAGRAPH OF THE NEXT TO

21 LAST PARAGRAPH.  OKAY.  THERE'S NOTHING HERE, ANY LANGUAGE AT

22 ALL, THAT INDICATES, FIRST, ANY REFERENCE SPECIFICALLY TO THE

23 GLR POOL; IS THERE?

24 **A.**   NO REFERENCE SPECIFICALLY TO THE GLR POOL.

25 **Q.**   AND THERE'S NO INDICATION HERE AS TO HOW ANY MONEY WOULD

1   BE DIVIDED OUT OF AN ESCROW ACCOUNT AMONG PLAYERS, RIGHT?  WHAT

2   THE PERCENTAGES WOULD BE OR WHETHER THEY WOULD BE EQUAL OR NOT,

3   THERE'S NO INDICATION, RIGHT?

4   **A.**   THERE'S NO SPECIFIC PERCENTAGES, NO.

5   **Q.**   NO.  SO THERE'S NOTHING AT ALL IN THE LANGUAGE OF THIS

6   CONTRACT THAT WOULD INDICATE BY WORDS THAT WHAT THE PLAYERS

7   SHOULD GET WOULD BE AN EQUAL SHARE OF THIS GLR POOL, CORRECT?

8   THERE'S NOTHING THERE?

9        YES OR NO, IF YOU CAN ANSWER.

10  **A.**   I REALLY ANALYZED MORE OF THE PRACTICE THAN WHAT TOOK

11  PLACE.  THERE IS NO SPECIFIC LANGUAGE HERE AS YOU'RE SPEAKING.

12  **Q.**   THANK YOU.

13       NOW, LET ME ASK YOU NEXT --

14       BY THE WAY, MR. ROWLEY, YOU KNOW, DO YOU NOT, THAT

15  THE ACTIVE PLAYERS SIGNED AN ENTIRELY DIFFERENT GROUP LICENSING

16  AUTHORIZATION, CORRECT?

17  **A.**   THAT'S MY GENERAL UNDERSTANDING, YES.

18  **Q.**   AND THAT ACTIVE PLAYER GROUP LICENSING AUTHORIZATION MAKES

19  NO REFERENCE TO ANY ESCROW ACCOUNT, CORRECT?

20  **A.**   I'M NOT RECALLING.

21  **Q.**   YOU DON'T RECALL ONE WAY OR THE OTHER?

22  **A.**   NO.

23  **Q.**   NOW, I'D LIKE TO TALK A LITTLE BIT MR. ROWLEY, ABOUT THE

24  DAMAGES NUMBERS YOU'VE PUT UP.

25       **MR. KESSLER:**  IF I MAY, YOUR HONOR, I'M GOING TO

1    APPROACH THE BOARD.

2           **THE COURT:** GO AHEAD.

3    **BY MR. KESSLER:**

4    **Q.** YOU PUT UP AT COUNSEL'S REQUEST THESE FOUR DAMAGES

5    NUMBERS, 32 MILLION TO 82 MILLION, CORRECT?

6    **A.** YES, I DID.

7    **Q.** NOW, IN YOUR REPORT YOU OFFERED A LOWER ESTIMATE OF

8    DAMAGES, TRUE?

9    **A.** FOR THESE ANALYSES?

10   **Q.** IN YOUR REPORT. DID YOU OFFER A SCENARIO IN WHICH DAMAGES

11   WOULD BE LOWER?

12   **A.** YES.

13   **Q.** OKAY. AND YOU DID NOT DISPLAY THAT TO THE JURY, DID YOU?

14   **A.** NO.

15   **Q.** BECAUSE COUNSEL DIDN'T ASK YOU TO, CORRECT?

16   **A.** CORRECT.

17   **Q.** OKAY. LET'S TAKE A LOOK AT TRIAL EXHIBIT 1323-1. I'LL

18   GIVE YOU A COPY OF THAT.

19           IS THIS A CALCULATION THAT YOU DID IN CONNECTION WITH

20   THIS CASE, MR. ROWLEY?

21   **A.** YES.

22           **MR. KESSLER:** OKAY. YOUR HONOR, I MOVE INTO EVIDENCE

23   1323-1.

24           **THE COURT:** ANY OBJECTION?

25           **MR. HUMMEL:** NO.

1          **THE COURT:**  ALL RIGHT.

2              (TRIAL EXHIBIT 1323-1 RECEIVED IN EVIDENCE.)

3          **MR. KESSLER:**  DISPLAY THAT, PLEASE.

4              (DOCUMENT DISPLAYED.)

5          **MR. KESSLER:**  IF WE COULD BLOW UP THE BOTTOM OF THIS

6  CHART, PLEASE, LAUREN.  THAT'S RIGHT.

7  **BY MR. KESSLER:**

8  **Q.**  NOW, IN THIS ANALYSIS THE AMOUNT OF RETIRED PLAYER DAMAGES

9  YOU CALCULATED WAS $11,380,435, CORRECT?

10  **A.**  THIS ANALYSIS --

11  **Q.**  YES OR NO?

12  **A.**  IT NEEDS TO BE ADJUSTED.

13  **Q.**  BUT --

14  **A.**  AT THE TIME, YES.

15  **Q.**  AND THE TIME YOU DID THIS WAS IN -- WHEN?  WHEN WAS THE

16  TIME?

17  **A.**  I WOULD SAY SEPTEMBER.

18  **Q.**  SEPTEMBER.  OKAY.  AND DOES IT NEED TO BE ADJUSTED UP OR

19  DOWN?

20  **A.**  DOWN.

21  **Q.**  SHOULD BE LOWER.  WHAT SHOULD THE ACTUAL NUMBER BE?

22  **A.**  APPROXIMATELY $11 MILLION.

23  **Q.**  OKAY.  SO INSTEAD OF 11,380,000, IT SHOULD ONLY BE 11.

24          NOW, THIS CALCULATION WAS DONE WHEN YOU ONLY LOOKED

25  AT THE LICENSE REVENUES IN THE GLR POOL THAT INCLUDED THE SAME

1  LANGUAGE AS IN THE EA LICENSE AGREEMENT, CORRECT?

2  **A.**    THAT'S THE SUBSET, YES.

3  **Q.**    OKAY.  SO YOUR NUMBERS HERE ON THIS CHART INCLUDES MANY

4  OTHER TYPES OF LICENSE AGREEMENT REVENUES THAT HAVE -- THAT

5  DON'T HAVE ANY LANGUAGE LIKE THAT CONTAINED IN THE EA LICENSE

6  AGREEMENT, CORRECT?

7            **MR. HUMMEL:**  OBJECTION.  THAT'S WAY OVERBROAD.  "ANY

8  LANGUAGE LIKE"?  THERE ARE MULTIPAGE LICENSES.  HE MAY BE

9  REFERRING TO SPECIFIC PARAGRAPHS IN THE LICENSES, BUT THAT'S

10 OVERBROAD AND INCOMPREHENSIVE AS ASKED.

11           **THE COURT:**  THE WITNESS CAN -- IS A PROFESSIONAL

12 WITNESS AND CAN DEFEND HIMSELF ON THIS.  OVERRULED.

13           PLEASE ANSWER.

14 **BY MR. KESSLER:**

15 **Q.**    DO YOU REMEMBER THE QUESTION?

16 **A.**    IF YOU COULD REPEAT IT ONE MORE TIME, COUNSEL.

17 **Q.**    SURE.

18 **A.**    THANKS.

19 **Q.**    THE CALCULATIONS YOU PUT UP FOR THE JURY INCLUDES REVENUES

20 FROM MANY LICENSE AGREEMENTS, LET'S START WITH THIS, THAT DON'T

21 MENTION RETIRED PLAYERS AT ALL?

22 **A.**    DON'T MENTION THEM SPECIFICALLY.

23 **Q.**    NOT JUST SPECIFICALLY.  THE AGREEMENTS DON'T USE THE WORDS

24 "RETIRED PLAYERS," CORRECT?

25 **A.**    THEY DON'T SAY "RETIRED."

1  Q.   THEY DON'T HAVE ANY REFERENCE TO RETIRED PLAYERS IN THE

2  ENTIRE AGREEMENTS, BUT YOU INCLUDED THEM IN THESE DAMAGE

3  CALCULATIONS, RIGHT?

4  A.   THEY ARE INCLUDED HERE BECAUSE THESE ARE GROUP LICENSES.

5  Q.   OKAY.  WELL, AD HOC LICENSES COULD ALSO BE GROUP LICENSES,

6  RIGHT?

7  A.   THERE COULD BE GROUP LICENSES THAT NFLPA/PI CLASSIFIED AS

8  AD HOC.

9  Q.   BUT INVOLVING SIX OR MORE PLAYERS, CORRECT?

10  A.   NFLPA/PI MAY HAVE DONE THAT, YES.

11  Q.   AND YOU KNOW PLAYERS LIKE MR. ADDERLEY RECEIVED MONEY

12  UNDER THOSE AD HOC LICENSES, RIGHT?

13  A.   I BELIEVE SO.

14  Q.   MR. ADDERLEY, FOR EXAMPLE, DO YOU KNOW RECEIVED ALMOST

15  $13,000 UNDER THE AD HOC LICENSES?

16  A.   I THINK I'VE SEEN THAT FIGURE.

17  Q.   AND YOU HAVEN'T MADE ANY DEDUCTION IN YOUR DAMAGE

18  CALCULATIONS FOR WHAT THE CLASS MEMBERS RECEIVED UNDER AD HOC

19  LICENSES, CORRECT?

20  A.   NO.  IT'S A TOTALLY SEPARATE POOL.

21  Q.   SO, FOR EXAMPLE, DO YOU KNOW THAT THE CLASS IN THIS CASE

22  RECEIVED A LITTLE OVER 7 MILLION IN AD HOC LICENSE PAYMENTS,

23  CORRECT?

24  A.   I'VE SEEN THAT ANALYSIS.

25  Q.   OKAY.  SO IF YOU TOOK YOUR $11 MILLION FIGURE AND HAD

1  SUBTRACTED $7 MILLION ALREADY PAID TO THE CLASS MEMBERS FOR AD

2  HOC LICENSES, IF I DID THAT MATH IT WOULD REDUCE THIS

3  CALCULATION TO ABOUT 4 MILLION, CORRECT?

4  **A.**   MATHEMATICALLY, THAT'S CORRECT.  THEORETICALLY, IT'S NOT

5  CORRECT.

6  **Q.**   NOW, YOU ALSO INCLUDE IN THESE FIGURES THE NFL SPONSORSHIP

7  AGREEMENT, CORRECT?

8  **A.**   YES.

9  **Q.**   AND THE NFL SPONSORSHIP AGREEMENT SPECIFICALLY ONLY

10 REFERENCES ACTIVE PLAYERS; IS THAT TRUE?

11           **MR. HUMMEL:**  OBJECTION.  BEST EVIDENCE.

12           **THE WITNESS:**  I DON'T --

13           **THE COURT:**  WELL, JUST A SECOND.

14           **THE WITNESS:**  YES, COUNSEL.

15           **THE COURT:**  I'M GOING TO OVERRULE THE OBJECTION,

16 BUT -- I'M OVERRULING IT BECAUSE YOU ARE AN EXPERIENCED WITNESS

17 AND I PRESUME HAVE READ THE FILE, AND IF YOU BELIEVE THIS

18 STATEMENT IS INCORRECT YOU WILL BE ABLE TO DEAL WITH IT.  BUT,

19 OF COURSE, YOU WANT TO -- IF YOU NEED THE TIME TO PAUSE AND

20 THINK OR REVIEW DOCUMENTS BEFORE YOU ANSWER ANY OF THAT

21 QUESTION, ANY SUCH QUESTION, FEEL FREE TO SAY SO.

22           ALL RIGHT.

23           **THE WITNESS:**  THANK YOU, YOUR HONOR.

24           **THE COURT:**  THE OBJECTION IS OVERRULED.

25           GO AHEAD.

**BY MR. KESSLER:**

**Q.**   YOU LOOKED AT THE NFL SPONSORSHIP AGREEMENT, CORRECT?

**A.**   YES.

**Q.**   AND YOU KNOW THAT AGREEMENT NOT ONLY DOESN'T MENTION

RETIRED PLAYERS, BUT IT SPECIFICALLY ONLY MENTIONS ACTIVE

PLAYERS; IS THAT CORRECT?

**A.**   I DON'T RECALL THAT.

**Q.**   OKAY.  LET ME HAND YOU A COPY OF TRIAL EXHIBIT 99.

            **MR. KESSLER:**  IF WE CAN DISPLAY THAT, PLEASE.

            (DOCUMENT DISPLAYED.)

            **MR. KESSLER:**  LET'S REMIND THE JURY WHAT THIS IS.

THIS IS THE NFL SPONSORSHIP AGREEMENT.

**BY MR. KESSLER:**

**Q.**   IS THAT CORRECT, SIR?

**A.**   YES.

**Q.**   AND HOW MUCH LICENSING REVENUE -- HOW MUCH OF YOUR DAMAGES

IN THESE FIGURES ON THE BOARD HERE ARE ATTRIBUTABLE TO THE NFL

SPONSORSHIP AGREEMENT?  WHAT PERCENTAGE; DO YOU KNOW?

**A.**   20 PERCENT OR SO.  ROUGHLY 20 PERCENT.

**Q.**   OKAY.  SO ROUGHLY 20 PERCENT OF THESE FIGURES COME FROM

THE NFL SPONSORSHIP AGREEMENT REVENUES, CORRECT?

**A.**   CORRECT.

**Q.**   OKAY.  AND LET'S TAKE A LOOK AT THE THIRD PAGE, IF YOU

CAN, OF THIS -- OF THIS AGREEMENT, I BELIEVE.  IT'S ACTUALLY

THE SECOND PAGE.  NUMBER 1 -- ET CETERA.

1          LET'S LOOK AT THE FIRST PAGE THERE.  IT SAYS:

2               "IN EXCHANGE FOR THE ANNUAL SPONSORSHIP PAYMENT

3  AS SET FORTH BELOW, AND EXCEPT AS SET FORTH BELOW, NFL

4  PROPERTIES SHALL ACQUIRE GROUP PLAYER LICENSING RIGHTS AS

5  DEFINED IN THE CBA."

6          DO YOU SEE THAT, SIR?

7  **A.**   YES.

8  **Q.**   AND YOU KNOW THE CBA IS THE COLLECTIVE BARGAINING

9  AGREEMENT BETWEEN THE NFL AND THE NFLPA, CORRECT?

10 **A.**   THAT'S MY UNDERSTANDING.

11 **Q.**   AND THE CBA REFERS TO GROUP LICENSING ONLY WITH RESPECT TO

12 ACTIVE NFL PLAYERS, CORRECT?

13 **A.**   FOR THE CBA?

14 **Q.**   YES.

15 **A.**   YES.

16 **Q.**   OKAY.  RETIRED PLAYER RIGHTS ARE NOT INCLUDED IN THE CBA,

17 CORRECT?

18 **A.**   THAT'S MY UNDERSTANDING.

19 **Q.**   OKAY.  AND, FURTHER, IF WE TAKE A LOOK UNDER THE PLAYER

20 PARTICIPATION SECTION, TAKE A LOOK AT PARAGRAPH 14 ON PAGE 7.

21          IF WE COULD BLOW THAT UP, PLEASE.

22               "DURING EACH YEAR OF THE AGREEMENT ON BEHALF OF

23 NFL SPONSORS, PLAYERS INC WILL PAY AT LEAST 25 PERCENT OF THE

24 ANNUAL SPONSORSHIP PAYMENT, THE ACTIVE USAGE CREDIT, DIRECTLY

25 TO ACTIVE NFL PLAYERS."

1          YOU KNEW, SIR, THE ONLY REFERENCE IN THIS SPONSORSHIP

2  AGREEMENT IS TO ACTIVE NFL PLAYERS, CORRECT?

3  **A.**   I WOULD DISAGREE WITH THAT.  I CARED FOR THE 25 PERCENT.

4  I ALSO BELIEVE THERE WAS TESTIMONY -- MAYBE MR. FEFFER -- WHO

5  SAID THAT, ACTUALLY, THERE WERE SOME PAYMENTS THAT WERE MADE TO

6  RETIRED PLAYERS.

7  **Q.**   I'M GOING TO ASK YOU TO LISTEN TO MY QUESTIONS.

8          THE SPONSORSHIP AGREEMENT ONLY REFERENCES ACTIVE NFL

9  PLAYERS, CORRECT?

10 **A.**   COUNSEL, I HAVE NOT READ IT IN THAT TYPE OF DETAIL.  I

11 THOUGHT THERE MAY HAVE BEEN LANGUAGE TO PLAYERS, IN GENERAL.  I

12 DON'T KNOW THE ANSWER TO THAT.

13 **Q.**   OKAY.

14 **A.**   IT'S A GROUP LICENSE IS WHAT I UNDERSTOOD IT TO BE.

15 **Q.**   WHEN YOU'RE ON EXAMINATION FROM YOUR COUNSEL IF YOU WANT

16 TO POINT OUT SOME REFERENCE IN THIS AGREEMENT, IN THE LANGUAGE

17 OF THIS AGREEMENT TO RETIRED PLAYERS, I WELCOME YOU TO DO SO.

18         BUT LET ME ASK YOU THIS:  WOULD IT MATTER TO YOUR

19 CALCULATIONS WHETHER THE NFL SPONSORSHIP AGREEMENT ONLY WAS

20 ACTIVE PLAYER MONEY?  DO YOU CARE?

21 **A.**   IN THESE CALCULATIONS IN THE REPORT THEY WOULD ALL BE

22 CAPTURED IN GROUP LICENSING REVENUES.

23 **Q.**   RIGHT.  IN OTHER WORDS, UNDER YOUR WORLD, 100 PERCENT OF

24 THE MONEY COULD BE FOR ACTIVE NFL PLAYERS, AND YOU WOULD

25 CALCULATE THAT SHARES OF ACTIVE PLAYER LICENSING MONEY SHOULD

1  GO TO THE RETIRED PLAYERS, IN YOUR WORLD, CORRECT?

2  **A.**    COUNSELOR, IT'S NOT MY WORLD.  GROUP LICENSING PROGRAMS

3  ARE DEFINED AS PROGRAMS IN WHICH A LICENSEE --

4           **MR. KESSLER:**  YOUR HONOR, I OBJECT.

5           (SIMULTANEOUS SPEAKING OF WITNESS AND COUNSEL; NOT

6           REPORTABLE.)

7           **MR. KESSLER:**  YOUR HONOR, I OBJECT.

8           **THE COURT:**  GO AHEAD AND FINISH YOUR ANSWER.

9           OBJECTION OVERRULED.

10          **THE WITNESS:**  I APOLOGIZE, YOUR HONOR.

11          WHEN I LOOK AT THE EXHIBIT, TRIAL EXHIBIT 110, GROUP

12  LICENSING PROGRAMS ARE DEFINED AS PROGRAMS IN WHICH A LICENSEES

13  UTILIZES A TOTAL OF SIX OR MORE PRESENT OR FORMER NFL PLAYER

14  IMAGES.  THAT'S WHAT I'VE INCLUDED.

15  **BY MR. KESSLER:**

16  **Q.**    YOU HAVE ABSOLUTELY NO OPINION YOU'RE OFFERING IN THIS

17  CASE AS TO WHAT THAT LANGUAGE MEANS, CORRECT?

18  **A.**    I'M NOT OFFERING AN OPINION ON WHAT THAT MEANS EXCEPT AS

19  DEFINED BY --

20  **Q.**    YOU ANSWERED MY QUESTION.

21          NOW, THESE CALCULATIONS -- YOUR CALCULATION -- YOU

22  KNOW ALMOST $30 MILLION WAS GENERATED FOR RETIRED PLAYERS

23  DURING THIS PERIOD OF TIME BY PLAYERS INC, CORRECT?  YOU'VE

24  SEEN THOSE NUMBERS?

25  **A.**    GENERALLY, YES.

1  Q.   YES.  AND YOU'RE NOT SUGGESTING IN YOUR CALCULATION THAT

2  THE RETIRED PLAYERS SHARE ANY OF THEIR MONEY WITH THE ACTIVE

3  PLAYERS, ARE YOU?  YES OR NO?

4  A.   THOSE ARE AD HOC AGREEMENTS JUST LIKE I WOULDN'T ASK

5  ACTIVE PLAYERS TO CONTRIBUTE FROM THOSE PREMIUM FEES BACK INTO

6  THIS POOL.  TOTALLY SEPARATE POOLS.

7  Q.   SO YOU DON'T BELIEVE IT'S APPROPRIATE TO HAVE THE RETIRED

8  PLAYERS SHARE ANY OF THEIR MONEY WITH THE ACTIVE PLAYERS,

9  RIGHT?  THAT'S YOUR TESTIMONY, YES OR NO?

10 A.   FIRST OFF, AS I SAID --

11 Q.   YES OR NO?

12      **THE COURT:**  I THINK YOU CAN ANSWER "YES" OR "NO."

13 THAT'S A FAIR QUESTION TO ANSWER "YES" OR "NO."

14      **THE WITNESS:**  NO.

15 **BY MR. KESSLER::**

16 Q.   OKAY.  BUT YOU DO THINK IT'S APPROPRIATE THAT THE ACTIVE

17 PLAYERS SHOULD BE GIVING SOME OF THEIR MONEY IN EQUAL SHARES TO

18 THE RETIRED PLAYERS, YES OR NO?

19 A.   I'M NOT --

20 Q.   YES OR NO?  OR NO OPINION?

21 A.   NO OPINION.

22 Q.   FINE.  THANK YOU.

23      NOW, IT'S TRUE, IS IT NOT -- WE CAN GO BACK TO THE

24 TRIAL EXHIBIT THAT WE HAD UP PREVIOUSLY, THAT WAS 12 -- 1323-1.

25      (DOCUMENT DISPLAYED.)

1          AND IN THIS CALCULATION, YOU DECIDED TO DO A

2     CALCULATION JUST FOR THE AGREEMENTS THAT INCLUDED LANGUAGE LIKE

3     IN THE EA AGREEMENT, CORRECT?

4     **A.**    ONE OF THE EA AGREEMENTS, YES.

5     **Q.**    RIGHT.  AND THE PERSON WHO TOLD YOU TO USE -- TO LOOK FOR

6     AGREEMENTS WITH THAT LANGUAGE WAS PLAINTIFFS' COUNSEL, CORRECT?

7     THEY MADE THAT DECISION?

8     **A.**    YES.

9     **Q.**    OKAY.  AND SO YOU JUST DID WHAT PLAINTIFFS' COUNSEL TOLD

10    YOU TO DO, CORRECT?

11    **A.**    WELL, IT WAS MORE COMPLICATED THAN FINDING THE AGREEMENTS.

12    BUT IN ESSENCE, THEY SAID THAT WAS A POTENTIAL LIABILITY POINT

13    AND TO GO LOOK FOR THOSE AGREEMENTS AND FIND THE RELEVANT

14    ROYALTIES.

15    **Q.**    SO EVEN THOUGH IT WAS PLAINTIFFS' COUNSEL WHO TOLD YOU TO

16    MAKE THIS CALCULATION, WHEN YOU CAME THERE TO THE STAND YOU

17    DIDN'T PRESENT THAT CALCULATION TO THE JURY, CORRECT?

18          YES OR NO?

19    **A.**    YES.

20    **Q.**    OKAY.  NOW, I WOULD NEXT LIKE TO SHOW YOU TRIAL EXHIBIT

21    1323-17.  I'LL GIVE YOU A COPY OF THAT.  IS THAT OVER HERE?

22          **MR. KESSLER:**  IF YOU, JASON, COULD HELP ME, PLEASE,

23    THAT WOULD BE GREAT.

24          THANK YOU.

25          **THE WITNESS:**  DO YOU WANT THESE BACK, COUNSEL?

1  **BY MR. KESSLER:**

2  **Q.**   NO, THEY'RE YOURS.  YOU CAN KEEP THEM THERE.

3          DO YOU RECOGNIZE TRIAL EXHIBIT 1323-17 AS A DOCUMENT

4  YOU PREPARED ON OCTOBER 7TH, 2008, IN CONNECTION WITH THIS

5  CASE?

6  **A.**   YES.

7          **MR. KESSLER:**  YOUR HONOR, I MOVE INTO EVIDENCE TRIAL

8  EXHIBIT 1323-17.

9          **MR. HUMMEL:**  NO OBJECTION.

10         **THE COURT:**  RECEIVED.

11         (TRIAL EXHIBIT 1323-17 RECEIVED IN EVIDENCE.)

12 **BY MR. KESSLER:**

13 **Q.**   THIS WAS --

14         **MR. KESSLER:**  BLOW UP THE WHOLE THING.

15         (DOCUMENT DISPLAYED.)

16 **BY MR. KESSLER::**

17 **Q.**   THIS WAS A CHART LISTING ALL OF YOUR ALTERNATIVE DAMAGE

18 CALCULATIONS THAT YOU MADE IN YOUR EXPERT REPORT, CORRECT?

19 **A.**   I'VE ADVISED THAT THEY'RE NOT DAMAGE CALCULATIONS.

20 **Q.**   ALL OF YOUR ALTERNATIVE CALCULATIONS YOU'VE MADE ARE IN

21 THIS CHART, CORRECT?

22 **A.**   CORRECT.

23 **Q.**   AND YOU HAD -- YOU HAD 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11,

24 12, 13, 14, 15, 16 DIFFERENT CALCULATIONS, CORRECT?

25 **A.**   YES.

1  Q.   OKAY.  AND THAT YIELDED A RANGE OF DIFFERENT MEASUREMENTS

2  BETWEEN, AS REVISED, ABOUT $11 MILLION ALL THE WAY UP TO

3  $82 MILLION, CORRECT?

4  A.   CORRECT.

5  Q.   OKAY.  AND YOU HAVE NO OPINION, AS TO BETWEEN 11 MILLION

6  AND 82 MILLION, WHICH MEASURE IS MORE REASONABLE AS DAMAGES IN

7  THIS CASE THAN ANOTHER ONE, CORRECT?  YOU HAVE NO OPINION,

8  HAVEN'T STUDIED IT?

9  A.   WELL, IT WOULD DEPEND ON THE LIABILITY DETERMINATION.

10  Q.   BUT YOU HAVEN'T STUDIED THAT, CORRECT?

11       YES?

12  A.   THE LIABILITY DETERMINATION?  THAT'S FOR THE JURY.  NO.

13  Q.   YOU HAVEN'T STUDIED WHICH, IF ANY, OF THESE MEASURES WOULD

14  BE THE RIGHT ONE FOR THE JURY TO USE?

15  A.   I'M NOT QUIBBLING.  YOU'RE SAYING "STUDY."  IF IT CAME

16  DOWN TO THEY FELT 10 PERCENT WAS APPROPRIATE OF ALL GROUP

17  LICENSING REVENUES I WILL SHOW THEM THE CALCULATION.  WITH

18  INTEREST, IT'S $82 MILLION.

19  Q.   AS YOU'RE SITTING HERE NOW AND IN YOUR EXPERT STUDY AND

20  REPORT YOU DIDN'T OFFER ANY OPINION AS TO WHICH WAS THE RIGHT

21  MEASURE, RIGHT?

22  A.   I DIDN'T.  I COULDN'T.

23  Q.   OKAY.

24  A.   IT'S NOT APPROPRIATE.

25  Q.   NOW, YOU REFERRED TO THE $8 MILLION ISSUE WITH COUNSEL,

1  CORRECT?

2  **A.**   YES.

3  **Q.**   AND YOU ALREADY HAVE IN YOUR CALCULATIONS ON THIS CHART

4  ADDITIONAL DAMAGES FOR THE $8 MILLION ADJUSTMENT.  THAT'S

5  ALREADY INCLUDED IN THESE FIGURES ON YOUR CHART OVER HERE,

6  COUNSEL -- YOU WROTE ON THE PAD?  I'M SORRY, NOT COUNSEL.

7  MR. ROWLEY.

8  **A.**   YES, I BELIEVE IF YOU WENT TO THOSE ADJUSTMENTS PART OF

9  THAT WOULD BE THAT THE $8 MILLION WOULD HAVE BEEN ADDED BACK

10  IN.

11  **Q.**   SO THERE ARE ALREADY CALCULATIONS TO ATTRIBUTE PAYMENTS TO

12  THE RETIRED PLAYERS FOR THAT ADJUSTMENT HERE, RIGHT?

13  **A.**   I THINK THAT'S FAIR.

14  **Q.**   OKAY.  NOW, IN YOUR OWN WORK ON OCTOBER 7, 2008 -- IF WE

15  CAN LOOK AT THAT, JUST THE DATE, TO SHOW WHEN IT WAS DONE --

16  YOU WROTE THESE WORDS, RIGHTS:

17          "DAMAGE MODEL SUMMARY REVISED OCTOBER 7, 2008."

18          THAT WAS YOUR WORDS, RIGHT?

19  **A.**   YES.

20  **Q.**   OKAY.  AND LET'S LOOK AT WHAT'S CALLED "D."  AND YOU

21  REFERRED TO THIS --

22          **MR. KESSLER:**  COULD WE BLOW THAT UP, PLEASE?  IS

23  THERE A WAY TO BLOW IT UP?  OR MAYBE DO A BIGGER ONE AND BLOW

24  IT UP?

25          THERE YOU GO.  THANK YOU.  THAT'S GREAT, LAUREN.

1          (DOCUMENT DISPLAYED.)

2    **BY MR. KESSLER:**

3    **Q.**   IT SAYS:

4              "ADJUSTMENT FOR CHANGED MARKET CONDITIONS."

5    CORRECT?

6    **A.**   YES.

7    **Q.**   NOW, THE REASON -- THOSE WERE YOUR WORDS, RIGHT?  YOU

8    WROTE THAT ON THE CHART.  I DIDN'T WRITE THAT, RIGHT?

9    **A.**   THOSE ARE MY WORDS, COUNSEL.

10   **Q.**   AND THE REASON YOU WROTE THE $8 MILLION ADJUSTMENT AS

11   BEING AN ADJUSTMENT FOR CHANGED MARKET CONDITIONS IS BECAUSE

12   WHAT CAUSED THIS ADJUSTMENT WAS THAT THE MARKET HAD CHANGED

13   WITH RESPECT TO THE VALUE OF THE LOGO, THE LOGOS OF THE NFLPA

14   AND PLAYERS INC, RIGHT?

15   **A.**   THAT'S WHAT'S BEEN REPRESENTED.

16   **Q.**   YOU HAVEN'T INDEPENDENTLY STUDIED THAT ISSUE, CORRECT?

17   **A.**   I HAVE NOT.

18   **Q.**   OKAY.  BUT YOUR UNDERSTANDING IS THAT THE STATED BASIS FOR

19   THAT CHANGE WAS THAT IT WAS BASED ON CHANGED MARKET CONDITIONS

20   RELATING TO THE LOGO VALUE, RIGHT?

21   **A.**   THAT'S WHAT NFLPA/PI REPRESENTED.

22   **Q.**   RIGHT.  AND YOU HAVE NO OPINION ONE WAY OR THE OTHER AS TO

23   WHETHER THAT'S CORRECT OR NOT?

24   **A.**   THAT THE ADJUSTMENT SHOULD HAVE BEEN MADE?

25   **Q.**   THAT THE MARKET CONDITIONS CHANGED AND WHAT THE CHANGE

1  WAS?

2  **A.**   AS TO THE $8 MILLION, I DO NOT HAVE AN ALTERNATIVE VALUE.

3  **Q.**   RIGHT.  AND THE IMPACT YOU CALCULATED OF THIS ADJUSTMENT

4  FOR CHANGED MARKET CONDITIONS, IT WASN'T $8 MILLION, WAS IT?

5  IT WAS MUCH LESS THAN 8 MILLION, RIGHT?

6  **A.**   WELL, BECAUSE, COUNSEL, REMEMBER IT'S BEING ADDED BACK

7  INTO THE POOL, THERE ARE DEDUCTIONS THAT WOULD HAVE BEEN TAKEN

8  BY NFLPA/PI.  SO A SMALLER AMOUNT ULTIMATELY THEN IS

9  DISTRIBUTED TO PLAYERS.

10  **Q.**   RIGHT.  AND I JUST WANT THE JURY TO BE CLEAR ON THIS.

11  OKAY.

12           IN YOUR ANALYSIS, TAKING $8 MILLION OUT OF THE POOL

13  DOESN'T TAKE A TOTAL OF $8 MILLION OUT OF THE PLAYER

14  DISTRIBUTION.  IT TAKES A MUCH SMALLER AMOUNT, CORRECT?

15           YES OR NO?

16  **A.**   I QUIBBLE WITH "MUCH SMALLER."

17  **Q.**   SMALLER?

18  **A.**   OBVIOUSLY, IT TAKES A SMALLER AMOUNT OUT BECAUSE THERE'S A

19  DEDUCTION.

20  **Q.**   THE AMOUNT YOU CALCULATED THAT WAS TAKEN OUT, FOR EXAMPLE,

21  IN ONE YEAR IT WAS 996,000?

22           YES OR NO?

23  **A.**   YES.

24  **Q.**   AND IN ANOTHER YEAR IT WAS 1,193,000 CORRECT?

25  **A.**   THAT'S BASED ON NFLPA/PI.

1  **Q.**   YES OR NO?

2  **A.**   YES.

3  **Q.**   SO IT WASN'T AN $8 MILLION REDUCTION IN THE AMOUNT THAT

4  WENT TO PLAYERS, CORRECT?

5  **A.**   IT CERTAINLY COULD HAVE BEEN.

6  **Q.**   BUT IT WASN'T, CORRECT?

7  **A.**   NOT EXACTLY $8 MILLION, BECAUSE THERE ARE DEDUCTIONS BY

8  NFLPA/PI.

9  **Q.**   WELL, IT'S NOT JUST NOT EXACTLY $8 MILLION.  THE TOTAL YOU

10 CAME UP WITH WAS 2,190,000, RIGHT?

11         YES?

12 **A.**   YES.

13 **Q.**   AND YOU'D AGREE WITH ME, 2,190,000 IS ABOUT 25 PERCENT OF

14 8 MILLION, CORRECT?  IS MY MATH RIGHT?

15 **A.**   YOUR MATH IS GENERALLY RIGHT.

16 **Q.**   THANK YOU.

17         NOW, I HAD LIKE TO ASK YOU A LITTLE BIT ABOUT YOUR

18 CALCULATIONS, THE 40, THE 25 AND THE 10 PERCENT.

19         WHAT YOU DID HERE, IF I CAN, LOOKING AT YOUR CHART,

20 IS YOU ASSUMED HERE THAT THERE WAS SOMETHING -- THAT THE JURY

21 WOULD FIND THERE WAS SOMETHING WRONG WITH THE UNION GETTING

22 40 PERCENT OF THE GLR POOL AND PLAYERS INC GETTING 23 PERCENT,

23 AND THAT INSTEAD THE UNION AND PLAYERS INC SHOULD HAVE ONE OF

24 THESE LOWER PERCENTAGES.  IS THAT FAIR?

25 **A.**   THAT'S FAIR.

1  Q.   OKAY.  SO IF THE JURY WERE TO FIND THAT THERE WAS NOTHING

2  WRONG WITH THE ACTIVE PLAYERS VOTING TO GIVE 40 PERCENT TO THE

3  UNION AND 23 PERCENT TO PLAYERS INC, THEN THESE LAST THREE

4  COLUMNS OF NUMBERS DON'T APPLY, RIGHT?

5  A.   I CAN'T NECESSARILY AGREE WITH THAT.

6  Q.   OKAY.  IF THE JURY FINDS THAT THE PERCENTAGES OF THE GLR

7  POOL GIVEN TO PLAYERS INC AND THE NFLPA WHICH YOU HAVE CALLED

8  63 TO 69 PERCENT, IF THEY FIND THAT WAS PROPER, THE ONLY DAMAGE

9  MEASURE YOU'RE OFFERING ON THIS CHART IS THE 29 MILLION PLUS

10 INTEREST, CORRECT?

11 A.   THAT'S CORRECT.

12 Q.   OKAY.  NOW, YOU SAID YOU RELIED 100 PERCENT ON DR. RASCHER

13 FOR THIS 10 TO 40 PERCENT RANGE, CORRECT?

14 A.   I RELIED ON DR. RASCHER TO COME UP WITH THE RANGES.

15 Q.   RIGHT.  YOU DIDN'T DO ANYTHING TO COME UP WITH THE RANGE,

16 CORRECT?

17 A.   I SPOKE WITH DR. RASCHER AND HIS TEAM.

18 Q.   BUT YOU'RE RELYING ON DR. RASCHER'S WORK, CORRECT?

19 A.   YES.

20 Q.   DR. RASCHER'S WORK, THE JURY HEARD ON FRIDAY, WAS THE WORK

21 THAT INVOLVED LOOKING AT COMPARING THE UNION, FOR EXAMPLE, TO

22 THE UNIVERSITY OF KENTUCKY LICENSING.  WAS THAT PART OF

23 DR. RASCHER'S ANALYSIS?

24 A.   I BELIEVE IT WAS PART OF IT.

25 Q.   YES.  AND HE LOOKED AT A COMPARISON WITH MAJOR LEAGUE

1  BASEBALL, BUT HE AVERAGED THE YEARS TOGETHER INSTEAD OF LOOKING

2  AT IT YEAR BY YEAR; YOU'RE FAMILIAR WITH THAT?

3  **A.**   GENERALLY SPEAKING, YES.

4  **Q.**   SO IF THE JURY FINDS THAT THEY DO NOT AGREE WITH

5  DR. RASCHER'S ANALYSIS, THEN THEY HAVE TO REJECT ALL THREE OF

6  THESE COLUMNS, CORRECT?  THEY HAVE TO REJECT THE 40 PERCENT

7  COLUMN, THE 25 PERCENT COLUMN, AND THE 10 PERCENT COLUMN,

8  BECAUSE THAT'S ALL BASED ON DR. RASCHER'S ANALYSIS, RIGHT?

9  **A.**   I WOULDN'T BE SO RASH AS TO TELL THE JURY WHAT TO DO.

10 THEY MAY FIND ON THEIR OWN A DIFFERENT PERCENTAGE.

11 **Q.**   BUT YOU WOULD AGREE WITH ME YOUR ONLY BASIS FOR THESE

12 NUMBERS IS DR. RASCHER, CORRECT?

13         YES OR NO?

14 **A.**   THE SPECIFIC NUMBERS, YES.

15         **THE COURT:**  WE'RE GETTING CLOSE TO WHEN WE NEED A

16 BREAK.  HOW MUCH MORE TIME DO YOU HAVE --

17         **MR. KESSLER:**  I HAVE ABOUT ANOTHER HALF HOUR, YOUR

18 HONOR.

19         **THE COURT:**  WELL, I THINK IT'S TIME THEN FOR OUR

20 15-MINUTE BREAK.

21         COUNSEL, BEFORE THE JURY GETS UP WOULD YOU MIND

22 REMOVING THE EASEL SO THEY CAN SLIP BY.

23         REMEMBER THE ADMONITION.  WE'LL SEE YOU BACK HERE IN

24 15 MINUTES.

25         **THE CLERK:**  ALL RISE.

1       (THE FOLLOWING PROCEEDINGS WERE HELD IN OPEN COURT,

2       OUTSIDE THE PRESENCE OF THE JURY.)

3       **THE COURT:**  MR. ROWLEY, YOU CAN CLOSE THAT DOOR FOR

4  ME.

5       ANYTHING THE LAWYERS NEED ME FOR?

6       **MR. HUMMEL:**  YES, YOUR HONOR.  WOULD YOU MIND

7  EXPLAINING TO MR. ROWLEY, BECAUSE I THINK I MIGHT NOT HAVE,

8  THAT HE'S NOT TO TALK TO ANYBODY?

9       **THE COURT:**  WE HAVE A RULE THAT WHILE YOU'RE ON

10 EXAMINATION DON'T TALK TO EITHER SIDE.  TAKE 15 MINUTES.  GO

11 DOWN AND GET SOME COFFEE, BUT NO TALKING TO LAWYERS ON EITHER

12 SIDE.

13      **THE WITNESS:**  UNDERSTOOD.

14      **THE COURT:**  ANY ANYONE ELSE FOR THAT MATTER ABOUT

15 YOUR TESTIMONY.  THANK YOU.

16      **MR. HUMMEL:**  THANK YOU, YOUR HONOR.

17      **THE COURT:**  I HAVE ONE UNRELATED THING TO BRING UP

18 WITH YOU ALL.

19      WHEN THE CASE GOES TO THE JURY -- YOU CAN ALL BE

20 SEATED -- I WOULD LIKE TO TELL THEM THAT THE LAWYERS ARE GOING

21 TO GIVE THEM AN INDEX OF THE DOCUMENTS IN EVIDENCE.

22      NOW, IT CANNOT BE WHAT YOU GAVE ME, BECAUSE THIS HAS

23 REFERENCE TO MANY OTHER THINGS.  IF YOU DON'T AGREE ON IT, THEN

24 I WON'T SEND ONE IN.  SO IT SHOULD BE JUST BASICALLY THE

25 EXHIBIT NUMBER AND A VERY NON-ARGUMENTATIVE DESCRIPTION,

1   PERIOD.

2          IF THERE IS A LIMITATION ON USE YOU JUST DESCRIBE

3   THAT, TOO.  BUT IF YOU DON'T AGREE, THEN IT WILL NOT GO IN.  IT

4   HAS TO BE COMPLETELY STIPULATED TO.

5          SO I BRING THIS TO YOUR ATTENTION NOW SO YOU WON'T BE

6   SCRAMBLING AT THE LAST MINUTE TRYING TO GET SOMETHING EACH SIDE

7   AGREES ON.

8          **MR. HUMMEL:**  THANK YOU, YOUR HONOR.

9          **MR. KESSLER:**  YOUR HONOR, I JUST NEED ONE

10  CLARIFICATION ON THE GENE UPSHAW RULINGS.  I'LL HAND BACK UP,

11  YOUR HONOR, THE DEPOSITION.

12         **THE COURT:**  GIVE IT TO DAWN.  SHE'LL --

13         **MR. KESSLER:**  PAGE 136.

14         **THE COURT:**  YES.

15         **MR. KESSLER:**  ON PAGE 136, YOUR HONOR --

16         **THE COURT:**  HERE'S WHY I LEFT THAT OUT, BECAUSE I

17  THINK IT'S SO SPECULATIVE.

18         **MR. KESSLER:**  I UNDERSTAND, YOUR HONOR.  MY QUESTION

19  IS WHERE IT ENDS.  AND I'LL EXPLAIN WHY.

20         I UNDERSTAND YOUR RULING AS APPLYING TO 136 UP TO

21  LINE 19.  LINE 20 ON IS CLEARLY NOT SPECULATIVE.  IT'S HIS

22  FIRST-HAND KNOWLEDGE.

23         "**QUESTION:**  I MEAN, THAT'S NOT YOUR JOB.  YOU

24         DON'T GO OUT AND SELL LICENSEES?

25         "**ANSWER:**  WELL, IT'S NOT MY JOB ON A

1          DAY-TO-DAY BASIS, BUT WHENEVER I HAVE CONTACT

2          WITH LICENSEES OR SPONSORS OR WHATEVER, I

3          ALWAYS REMIND THEM THAT WE ALSO HAVE THIS

4          GROUP OF PLAYERS BESIDES OUR ACTIVE PLAYERS,

5          AND THAT APPLIES TO ANY OF OUR PLAYERS, BOTH

6          ACTIVE AND RETIRED."

7          I ASSUME THAT'S NOT PART OF YOUR RULING, YOUR HONOR,

8    AND THAT'S IN BECAUSE THAT CLEARLY IS HIS PERSONAL KNOWLEDGE.

9          **THE COURT:**  WELL, ACTUALLY, I THINK YOU'RE RIGHT ON

10   THAT.  ALL RIGHT.

11          STARTING LINE 20 THEN, THAT PART CAN GO IN BECAUSE

12   HE'S PURPORTING TO SAY WHAT HE DOES, OF HIS OWN PERSONAL

13   KNOWLEDGE.

14          **MR. KESSLER:**  THANK YOU, YOUR HONOR.

15          **THE COURT:**  NOW, THE NEXT PAGE -- NEXT PAGE, STARTING

16   LINE 4, I DID SAY COULD COME IN BECAUSE IT'S TALKING ABOUT WHAT

17   HE PERSONALLY DID AND ALSO THE REEBOK JERSEY THING EVERYONE HAS

18   HEARD ABOUT.

19          **MR. KESSLER:**  VERY GOOD, YOUR HONOR.

20          **THE COURT:**  ALL RIGHT.  I'M HANDING THIS BACK.

21          **MR. KESSLER:**  THANK YOU.

22          **THE COURT:**  ALL RIGHT.  WE'RE GOING TO TAKE A

23   15-MINUTE BREAK.

24          **MR. HUMMEL:**  THANK YOU, YOUR HONOR.

25          (RECESS TAKEN FROM 9:21 TO 9:49 A.M.)

1           **THE COURT:**  ARE WE READY TO GO?  LET'S BRING IN OUR

2    JURY.

3           (THEREUPON, THE JURY ENTERS THE COURTROOM.)

4           **THE COURT:**  WELCOME BACK.  HAVE A SEAT.

5           ALL RIGHT.  PROCEED.

6    **BY MR. KESSLER:**

7    **Q.**  SIR, I MAY BE MISPRONOUNCING YOUR NAME.  IS IT ROWLEY

8    OR --

9    **A.**  IT'S ROWLEY.  HAPPENS ALL THE TIME.

10   **Q.**  I APOLOGIZE IF I HAVE CALLED YOU ROWLEY.

11   **A.**  NO OFFENSE TAKEN.

12   **Q.**  THANK YOU, MR. ROWLEY.

13          YOU TESTIFIED ON YOUR DIRECT, I THINK, YOU WERE PAID

14   AN HOURLY RATE.  DO YOU KNOW APPROXIMATELY HOW MUCH MONEY YOUR

15   COMPANY, RESOLUTION ECONOMICS, HAS BEEN PAID FOR YOUR WORK IN

16   CONNECTION WITH THIS CASE BY PLAINTIFFS?

17   **A.**  YES.  APPROXIMATELY $125,000.

18   **Q.**  125,000?

19   **A.**  YES.

20   **Q.**  THANK YOU.  NOW --

21          **MR. KESSLER:**  YOUR HONOR, AT THIS TIME I WOULD LIKE

22   TO MOVE INTO EVIDENCE TRIAL EXHIBIT 2057, WHICH IS THE

23   COMPILATION OF ALL OF THE MEMBERS OF THE ADDERLEY GLA CLASS.

24          **THE COURT:**  2057?

25          **MR. KESSLER:**  YES, YOUR HONOR.

1          **THE COURT:**  ANY OBJECTION?  ANY OBJECTION?

2          **MR. HUMMEL:**  MAY I LOOK AT IT, YOUR HONOR?

3          **THE COURT:**  SURE.

4          **MR. HUMMEL:**  NO OBJECTION.

5          **THE COURT:**  RECEIVED.

6          (TRIAL EXHIBIT 2057 RECEIVED IN EVIDENCE.)

7          **MR. KESSLER:**  I'M GOING TO HAND THIS TO THE WITNESS.

8          AND IF WE COULD DISPLAY TO THE JURY, PLEASE, THE

9     EXHIBIT.

10         (DOCUMENT DISPLAYED.)

11         BLOW IT ALL UP, LAUREN.  THANK YOU.

12    **BY MR. KESSLER:**

13    **Q.**  THIS EXHIBIT SHOWS EACH YEAR HOW MANY RETIRED PLAYERS HAD

14    GLA'S IN EFFECT.  DO YOU SEE THAT, SIR?  AND THE TOTAL WAS

15    2,074, DO YOU SEE THAT?

16    **A.**  YES.

17    **Q.**  AND THAT'S THE NUMBERS YOU USED IN YOUR ANALYSIS, CORRECT?

18    **A.**  COUNSEL, I WANT TO SAY CLOSE.  THERE MIGHT BE ONE OR TWO,

19    MAYBE AS MANY AS FOUR OR FIVE DIFFERENT IN SOME OF THE YEARS.

20    **Q.**  WELL --

21         **MR. KATZ:**  YOUR HONOR, MAY I JUST ASK THE COURT TO

22    CLARIFY SOMETHING THAT MAY HELP?  IT HAS TO DO WITH OPT-OUTS.

23    I DON'T KNOW IF YOUR HONOR WANTS TO EXPLAIN ABOUT OPT-OUTS TO

24    THE JURY.

25         **THE COURT:**  I HAVE FORGOTTEN, ACTUALLY.  DID WE HAVE

1    OPT-OUTS.

2           **MR. KESSLER:**  THERE WERE A FEW, YOUR HONOR.

3           **MR. KATZ:**  12.

4           **MR. KESSLER:**  THERE WERE A FEW.  12.

5           **THE COURT:**  12?

6           WELL, WHEN WE HAVE A CLASS ACTION, WE SEND OUT A

7    NOTICE TO ALL MEMBERS OF THE CLASS SO THAT THEY KNOW THAT THEY

8    ARE BEING REPRESENTED BY MR. ADDERLEY, AND GIVE THEM AN

9    OPPORTUNITY TO DO WHAT'S CALLED "OPT OUT."

10           AND THEY APPARENTLY -- I DIDN'T REMEMBER THIS, BUT 12

11   PEOPLE OPTED OUT OF THE CLASS.  SO THAT MEANS MR. ADDERLEY IS

12   REPRESENTING THE REMAINDER WHO DID NOT OPT OUT, WHO ARE -- WHO

13   HAVE SIGNED THE GLA'S OF THE TYPE THAT HE SIGNED.

14   **BY MR. KESSLER:**

15   **Q.**  MR. --

16           **MR. KATZ:**  THAT GETS US TO THE RIGHT NUMBER.

17   **BY MR. KESSLER:**

18   **Q.**  MR. ROWLEY, IS THIS APPROXIMATELY THE NUMBER YOU USED,

19   PLUS OR MINUS 12?

20   **A.**  YES.

21   **Q.**  OKAY.  AND LET'S LOOK AT THE SECOND PAGE OF THIS.

22           THIS EXHIBIT LISTS --

23           **MR. KESSLER:**  JUST BLOW UP ANY ONE, DOESN'T MATTER,

24   LAUREN.

25

**BY MR. KESSLER:**

Q.   IT LISTS EACH INDIVIDUAL CLASS MEMBER.  HERE ARE TWO,

MR. ABBOTT AND MR. ABRAMS, AND WHAT YEARS THEIR GLA WAS IN

EFFECT.

       YOU WERE AWARE THAT INFORMATION WAS AVAILABLE TO YOU,

SIR, CORRECT?

**A.**   YES.

Q.   NOW, MR. ROWLEY, YOU DIDN'T DO ANY ANALYSIS OF WHAT THE

ECONOMIC VALUE WAS OF THE LICENSING RIGHTS OF CLASS MEMBERS ON

A PLAYER-BY-PLAYER BASIS, CORRECT?

**A.**   THAT'S CORRECT.

Q.   OKAY.  SO YOU DIDN'T STUDY MR. ABBOTT, FOR EXAMPLE, AND

DETERMINE IF HIS LICENSING VALUE WAS ZERO OR WHETHER IT WAS

$5,000.  YOU JUST DIDN'T STUDY THAT ISSUE AT ALL, AS AN

INDIVIDUAL?

**A.**   NO.  NO, I DIDN'T, REALLY.

Q.   RIGHT.  AND YOU WOULD AGREE WITH ME, SIR, THAT WITHIN THIS

CLASS THERE ARE SOME PLAYERS WHOSE LICENSING RIGHTS ARE WORTH

NOTHING?  WOULD YOU AGREE WITH ME, SIR?

**A.**   WELL, IF I HAVEN'T ANALYZED IT, NO, I CAN'T AGREE WITH YOU

ON THAT.

Q.   WELL, LET ME ASK YOU THIS:  DID YOU KNOW -- FOR EXAMPLE,

LET'S TAKE MR. JOHN E. BECK.  LET'S GO TO MR. JOHN E. BECK ON

THIS LIST, IF WE COULD SHOW THAT.

       (DOCUMENT DISPLAYED.)

1              **MR. HUMMEL:**  YOUR HONOR, COULD I HAVE ONE MOMENT,

2    PLEASE.

3              (COUNSEL CONFER OFF THE RECORD.)

4    **BY MR. KESSLER:**

5    **Q.**   DO YOU KNOW WHETHER MR. BECK EVER PLAYED EVEN ONE NFL

6    GAME?  EVEN ONE?

7    **A.**   AS I SIT HERE, NO.

8    **Q.**   OKAY.  DO YOU KNOW HOW MANY MEMBERS OF THIS CLASS SIGNED

9    THEIR RETIRED PLAYER GLA, BUT NEVER PLAYED EVEN ONE NFL GAME

10   BECAUSE THEY WERE CUT IN TRAINING CAMP?

11   **A.**   BUT THEY WERE STILL ELIGIBLE AS RETIRED PLAYERS.

12   **Q.**   THEY STILL ARE IN YOUR CLASS THAT YOU LOOKED AT?

13   **A.**   I DON'T HAVE A NUMBER FOR THAT.

14   **Q.**   OKAY.  WELL, WOULD YOU AGREE WITH ME, SIR, THAT IT MAKES

15   NO SENSE TO CALCULATE ANY DAMAGES FOR A PLAYER IN THE CLASS WHO

16   NEVER PLAYED ANY NFL GAME AT ALL?

17   **A.**   NO.

18   **Q.**   OKAY.  SO YOU WOULD GIVE THEM TENS OF THOUSANDS OF DOLLARS

19   EVEN THOUGH THEY NEVER PLAYED A SINGLE NFL GAME?  THAT'S YOUR

20   TESTIMONY, YES OR NO?

21   **A.**   YES.

22   **Q.**   OKAY.  THANK YOU.

23              DO YOU ALSO KNOW HOW MANY PLAYERS IN THIS CLASS

24   PLAYED JUST A FEW NFL GAMES, LESS THAN ONE SEASON?

25   **A.**   I DIDN'T REVIEW THAT IN DETAIL, NO.

1  Q.   OKAY.  WOULD YOU AGREE WITH ME THAT A PLAYER WHO PLAYED

2  JUST A FEW GAMES, THE ECONOMIC VALUE OF HIS LICENSING RIGHTS IS

3  LIKELY TO BE ZERO, INDIVIDUALLY?

4  A.   NOT --

5  Q.   YES OR NO?

6  A.   NOT NECESSARILY.

7  Q.   OKAY.  IF A PLAYER PLAYED TWO GAMES IN THE NFL, TWO GAMES,

8  NEVER PLAYED IN THE NFL AGAIN, IT'S YOUR TESTIMONY TO THE JURY

9  THAT THERE'S SOME LICENSEE WHO WOULD HAVE AN ECONOMIC INTEREST

10 IN PAYING FOR A PLAYER WHO MAYBE 15 YEARS AGO PLAYED 2 GAMES?

11 IS THAT YOUR TESTIMONY TO THE JURY?

12        MR. HUMMEL:  YOUR HONOR, I OBJECT.  I'VE LET THIS GO,

13 BUT IT'S CLEARLY BEYOND THE SCOPE OF HIS REPORT.  HE ADDED

14 NUMBERS BASED ON THE METHOD HE'S TESTIFIED TO.  SO THIS IS

15 SIMPLY ARGUMENT.

16        THE COURT:  WHY ISN'T THAT RIGHT?  HE DIDN'T DO --

17        MR. KESSLER:  YOUR HONOR, WE BELIEVE THE STANDARD IS

18 THEY HAVE TO SHOW THE MEASURE PLAYER-BY-PLAYER, OKAY?  AND

19 THEY'VE DONE NOTHING TO SHOW ANY DAMAGES PLAYER-BY-PLAYER.

20        AND I THINK I'M ENTITLED TO INQUIRE INTO THAT SUBJECT

21 WITH THIS WITNESS.

22        MR. HUMMEL:  IT'S NEVER BEEN PROFFERED AS A DAMAGE

23 THEORY.  AND IT'S A REBUTTAL TO A DAMAGE THEORY, YOUR HONOR.

24        THE COURT:  WELL, I THINK IT WOULD BE LEGITIMATE FOR

25 YOU TO FIND OUT FROM THE WITNESS WHETHER OR NOT HE IS VOUCHING

1   FOR -- PROFESSIONALLY VOUCHING FOR THE DAMAGES METHODOLOGY THAT

2   HE WAS ASKED TO CRUNCH THE NUMBERS ON.  AND IF THE ANSWER TO

3   THAT IS "NO, I JUST CRUNCHED THE NUMBERS, THEN THE LAWYERS

4   ASKED ME TO PREPARE IT ALONG THESE LINES ON THE ASSUMPTION THAT

5   THE JURY ACCEPTED THAT PREMISE," THEN IT'S JUST ARGUMENT.

6           ON THE OTHER HAND, IF HE SAYS "NO, I DO VOUCH FOR

7   THIS METHODOLOGY," THEN YOUR LINE OF QUESTIONS IS PROPER.

8           BACK UP AND FIND OUT IF HE VOUCHES FOR THIS

9   METHODOLOGY.

10  **BY MR. KESSLER:**

11  **Q.**   DID YOU HEAR THE JUDGE'S QUESTION?

12  **A.**   YES.

13  **Q.**   DO YOU VOUCH FOR THIS METHODOLOGY, OR WERE YOU JUST

14  CRUNCHING THE NUMBERS THE LAWYERS TOLD YOU TO CRUNCH?  WHICH IS

15  IT?

16  **A.**   I DO VOUCH FOR IT, BECAUSE CLEARLY NFLPA/PI SAW VALUE OR

17  THEY WOULD NOT HAVE HAD MR. BECK SIGN A GLA.

18  **Q.**   OKAY.

19          **MR. KESSLER:**  SO, YOUR HONOR, I ASSUME I CAN NOW

20  QUESTION?

21          **THE COURT:**  NOW YOU CAN.

22  **BY MR. KESSLER:**

23  **Q.**   OKAY.  NOW, YOU'VE STUDIED THE ELIGIBILITY CRITERIA FOR

24  THE ACTIVE PLAYER GLR POOL, CORRECT?

25          **MR. HUMMEL:**  OBJECTION.  ASSUMES FACTS NOT IN

1   EVIDENCE.

2            **THE COURT:**  WHAT IS IT ASSUMING?

3            **MR. HUMMEL:**  THERE IS NO ACTIVE PLAYER GLR POOL.

4   THAT'S A CONSTRUCT OF DEFENSE COUNSEL.  THAT'S NOT WHAT HE

5   LOOKED AT.  IT'S A GROUP LICENSE POOL.

6            **THE COURT:**  OVERRULED.  THIS IS A POINT OF ARGUMENT

7   BETWEEN THE TWO SIDES.  THIS IS A PROFESSIONAL WITNESS.  HE CAN

8   MAKE WHATEVER DISTINCTIONS ARE NEEDED ON THIS POINT.

9            OVERRULED.

10  **BY MR. KESSLER:**

11  **Q.**  YOU STUDIED THE ELIGIBILITY CRITERIA FOR THE GLR POOL,

12  CORRECT?

13  **A.**  I UNDERSTAND HOW THE ACTIVE PLAYERS WERE INCLUDED, YES.

14  **Q.**  OKAY.  AND IN THE GLR POOL, IF AN ACTIVE PLAYER IS NOT ON

15  THE ROSTER AT THE BEGINNING OF THE YEAR OR ON THE ROSTER AT THE

16  END OF THE YEAR, THAT PLAYER, EVEN THOUGH HE SIGNED THE GLA,

17  GETS NOTHING, CORRECT?

18  **A.**  THAT'S INCORRECT.

19  **Q.**  OKAY.  IF A PLAYER WAS NOT ON ANY ROSTER THE FIRST GAME OR

20  THE LAST GAME, OKAY, YOUR UNDERSTANDING IS THAT THAT PLAYER

21  WOULD GET A SHARE FOR THAT YEAR?

22  **A.**  YOU'RE TALKING ABOUT THE LAST GAME OF THE CURRENT SEASON.

23  HE ALSO COULD BE ELIGIBLE IF IT WAS THE LAST GAME OF THE PRIOR

24  SEASON.

25  **Q.**  NO, SIR.  YOU ARE NOT LISTENING TO MY QUESTION.

1       ASSUME HE'S NEVER ON A FIRST GAME OR ENDING GAME

2  ROSTER.  HE PLAYS TWO GAMES IN THE MIDDLE OF THE SEASON.

3  NEVER -- NEVER IS ON A STARTING ROSTER, NEVER IS ON AN ENDING

4  ROSTER.

5       THAT ACTIVE PLAYER COULD SIGN A GLA AND WOULD GET

6  NOTHING UNDER THE ACTIVE PLAYER FORMULA, RIGHT?

7  **A.**  I THINK AS PART OF HIS CONTRACT HE WOULD HAVE SIGNED A GLA

8  AND WOULD HAVE BEEN PART OF IT.  BUT I WOULD NEED TO VERIFY IT.

9  **Q.**  WAIT A MINUTE, SIR.  YOU THOUGHT ACTIVE PLAYERS WOULD GET

10  MONEY SIMPLY FOR SIGNING A GLA, EVEN IF THEY WERE NEVER ON A

11  FIRST GAME ROSTER OR AN END OF SEASON ROSTER IN ANY SEASON?  IS

12  THAT WHAT YOU THOUGHT?

13  **A.**  I WOULD WANT TO BE TO GO BACK AND VERIFY.  I THOUGHT YOU

14  SAID HE DID PLAY DURING THE SEASON.

15  **Q.**  OKAY.  LET ME BE VERY CLEAR.  I DON'T WANT TO MISLEAD YOU.

16       UNDERSTAND THE NFL HAS 16 GAMES, CORRECT, IN A

17  SEASON, DO YOU KNOW THAT?

18  **A.**  PLUS THERE IS EXHIBITION.  PLUS THERE'S PLAYOFFS, YES.

19  **Q.**  YOU KNOW THERE IS OPENING-DAY ROSTER, WHICH IS THE FIRST

20  REGULAR GAME OF THE SEASON; DO YOU KNOW THAT?

21  **A.**  YES.

22  **Q.**  AND THERE'S A CLOSING DAY ROSTER, WHICH IS THE 16TH GAME

23  OF THE SEASON, CORRECT?

24  **A.**  YES.

25  **Q.**  AND FOR AN ACTIVE PLAYER TO RECEIVE ANY -- AN EQUAL SHARE

1  UNDER THE GLR POOL, HE EITHER HAS TO BE ON GAME ONE, THE

2  OPENING-DAY ROSTER, OR GAME 16, THE CLOSING DAY ROSTER,

3  CORRECT, IN SOME SEASON?

4  **A.**   IN SOME SEASON.

5  **Q.**   YES.  SO IF HE'S NEVER ON GAME 1 OR GAME 16 IN ANY SEASON,

6  EVEN THOUGH HE SIGNED THE GLA, HE GETS NOTHING, CORRECT?

7  **A.**   I WOULD WANT TO LOOK AT THE ELIGIBILITY DOCUMENT.  THAT'S

8  NOT MY RECOLLECTION.

9  **Q.**   THAT'S NOT YOUR RECOLLECTION.  OKAY.

10         **MR. KESSLER:**  COULD WE HAVE ONE OF THE ELIGIBILITY

11  CRITERIA.  I'LL HAND YOU UP -- I'LL NEED A COPY OF THIS,

12  PLEASE -- 1307.

13         I BELIEVE THIS IS IN EVIDENCE.  WE WILL PUT THAT UP,

14  PLEASE.  ACTUALLY, I PROBABLY DON'T NEED TO PUT IT.

15         (DOCUMENT DISPLAYED.)

16  **BY MR. KESSLER:**

17  **Q.**   IF WE TAKE A LOOK AT THE ELIGIBILITY CRITERIA, THE TOP

18  PART.  IT SAYS:

19              "IN ORDER FOR A PLAYER TO BE CONSIDERED

20  ELIGIBLE" -- THIS HAPPENED TO BE FOR THE 2003 SEASON, PAYMENT

21  DURING THE 2004 SEASON -- "HE MUST HAVE APPEARED ON THE LAST

22  GAME ROSTER OF THE 2002 SEASON AND/OR MUST HAVE APPEARED ON THE

23  FIRST GAME ROSTER OF THE 2003 SEASON."

24         DOES THAT REFRESH YOUR RECOLLECTION?

25  **A.**   YES.

1   Q.   OKAY.  SO FOR THE 2004 SEASON, IF AN ACTIVE PLAYER DIDN'T

2   APPEAR ON THE LAST GAME ROSTER OF 2002 OR THE FIRST GAME OF

3   2003, THAT ACTIVE PLAYER WOULD GET NOTHING EVEN IF HE SIGNED

4   THE GLA FOR THAT SEASON, RIGHT?

5   A.   I GUESS WHAT WAS CONFUSING ME WAS IN THE DEFINITION --

6   Q.   CAN YOU ANSWER YES OR NO, PLEASE.

7          THE COURT:  ANSWER YES OR NO, IF YOU CAN.  THAT'S A

8   FAIR QUESTION.

9          THE WITNESS:   WOULD YOU REPEAT THE QUESTION?

10  BY MR. KESSLER:

11  Q.   EVEN IF AN ACTIVE PLAYER SIGNED THE GLA, IF HE WAS NOT ON

12  THE LAST GAME ROSTER OF 2002 OR THE FIRST GAME OF 2003, HE

13  WOULD RECEIVE NO SHARE FOR THE 2003 SEASON, CORRECT?

14  A.   BASED ON THAT LANGUAGE, YES.

15  Q.   OKAY.  THANK YOU.

16          AND THAT'S THE ONLY ELIGIBILITY CRITERIA YOU KNOW

17  WERE APPLIED THAT SEASON, RIGHT?

18          MR. HUMMEL:  OBJECTION.  FOUNDATION.

19          THE COURT:  OVERRULED.

20          PLEASE ANSWER.

21          THE WITNESS:  IF YOU ALSO GO DOWN FURTHER, WHERE IT

22  DISCUSSES THE ROOKIE PLAYERS, THERE'S ALSO LANGUAGE ABOUT "MUST

23  HAVE APPEARED ON AT LEAST ONE GAME ROSTER, MUST HAVE SIGNED THE

24  GLA EFFECTIVE AND AGREED TO PARTICIPATE IN THE LICENSING

25  PROGRAM."

1    SO THAT MAY HAVE BEEN WHERE I WAS DRAWING MY

2    RECOLLECTION.

3    **BY MR. KESSLER:**

4    **Q.**    SO YOU WERE CONFUSED?

5    **A.**    NO.  FIRST OFF, WHAT I DID --

6    **Q.**    YOU WEREN'T CONFUSED?

7    **A.**    I WASN'T ASKED TO BE AN EXPERT ON THE ELIGIBILITY

8    REQUIREMENTS OF THE ACTIVE PLAYERS.

9    **Q.**    I'M NOT ASKING THAT, SIR, OKAY.

10    YOU BASED YOUR CONCLUSION THAT RETIRED PLAYERS WOULD

11    SHARE EQUALLY IN THE POOL BECAUSE YOU THOUGHT ALL THE ACTIVE

12    PLAYERS SHARED EQUALLY, RIGHT?  IS THAT TRUE?

13    **A.**    THE ELIGIBLE ACTIVE PLAYERS SHARED EQUALLY.

14    **Q.**    RIGHT.  SO WHAT I WANT TO GO OVER WITH YOU IS WHO WERE THE

15    ELIGIBLE ACTIVE PLAYERS?

16    NOW, IN YOUR ANALYSIS, IF A RETIRED PLAYER SIGNED THE

17    GLA IN 2003, OKAY?  LET'S SAY IN DECEMBER OF 2003 SIGNED A

18    RETIRED PLAYER GLA, OKAY?

19    **A.**    YES.

20    **Q.**    OKAY.  BUT HE WAS NEVER -- HE IN HIS CAREER WAS NEVER ON

21    ANY FIRST GAME ROSTER OR LAST GAME ROSTER -- YOU WITH ME?

22    **A.**    YES.

23    **Q.**    YOU WOULD GIVE THAT RETIRED PLAYER AN EQUAL SHARE,

24    CORRECT, IN YOUR CALCULATION?

25    YES OR NO?

1  **A.**   BASED ON THE GLA.

2  **Q.**   JUST SAY "YES" OR "NO."

3  **A.**   YES.

4  **Q.**   SO A RETIRED PLAYER IN YOUR ANALYSIS COULD GET AN EQUAL

5  SHARE IN A CIRCUMSTANCE WHERE AN ACTIVE PLAYER COULD NEVER GET

6  A SHARE, CORRECT, UNDER YOUR ANALYSIS?

7           YES OR NO?

8  **A.**   FOR THIS SEASON, IT WOULD APPEAR THAT THAT COULD BE THE

9  CASE.

10 **Q.**   AND THAT'S NOT JUST TRUE FOR THIS SEASON.  THIS WAS THE

11 SAME CRITERIA APPLIED IN 2003, 2004, 2005, 2006, 2007; ISN'T

12 THAT TRUE?

13 **A.**   COUNSEL, I DON'T KNOW.  YOU EVEN SAID IN YOUR QUESTION

14 THAT THEY COULD ALSO BE ON THE LAST GAME OF THE CURRENT SEASON.

15 AND I DON'T SEE --

16 **Q.**   PLEASE WORK WITH ME.  I KNOW YOU'RE TRYING.  OKAY.  I KNOW

17 YOU'VE TESTIFIED MANY, MANY TIMES.

18           HOW MANY TIMES HAVE YOU TESTIFIED?

19 **A.**   A DOZEN PLUS.

20 **Q.**   HOW MUCH?

21 **A.**   A DOZEN PLUS.

22 **Q.**   A DOZEN PLUS.  OKAY.  SO PLEASE WORK WITH ME ON THE

23 QUESTIONS, OKAY?  I KNOW YOU CAN DO THAT, OKAY.

24           YOU KNOW THESE CRITERIA DIDN'T CHANGE EVERY YEAR,

25 CORRECT, THAT YOU STUDIED FROM 2003 TO 2007, NEVER CHANGED?

1  **A.**   I'M NOT RECALLING THE SPECIFICITY OF THE DOCUMENTS.  AND

2  WHEN YOU POSED THE QUESTION YOU ALSO SAID IT COULD BE THE LAST

3  GAME OF THE SEASON.

4  **Q.**   I ASKED A VERY SIMPLE QUESTION.

5         SO YOU DON'T KNOW.  THE CRITERIA COULD HAVE CHANGED

6  EVERY YEAR, AS YOU'RE TESTIFYING NOW?

7  **A.**   I COULD LOOK AT THE DOCUMENTS AND TELL YOU EXACTLY.

8  **Q.**   YOU DON'T REMEMBER?

9  **A.**   I'M NOT RECALLING EXACTLY.

10 **Q.**   OKAY.

11        IT'S ALSO TRUE, MR. ROWLEY, THAT IF A RETIRED PLAYER

12 SIGNED A GLA IN DECEMBER OF THE NFL SEASON, LET'S SAY 2005,

13 OKAY, DECEMBER 2005 --

14 **A.**   YES.

15 **Q.**   -- OKAY, YOU AGREE WITH ME, SIR, DECEMBER IS THE END OF

16 THE NFL SEASON, THE LAST MONTH?

17 **A.**   OF THE REGULAR SEASON.

18 **Q.**   YES, OF THE REGULAR SEASON, LAST MONTH.  IF HE SIGNED IT

19 ON DECEMBER 31ST, YOU WOULD GIVE THAT RETIRED PLAYER IN YOUR

20 CALCULATION AN EQUAL SHARE FOR THE ENTIRE POOL FOR THAT YEAR,

21 CORRECT?

22        YES OR NO?

23 **A.**   YES.

24 **Q.**   SO THE PLAYER ON DECEMBER 31ST DOES NOTHING MORE BUT SIGN

25 A PIECE OF PAPER, OKAY, AND FOR THAT UNDER YOUR CALCULATIONS HE

1  WAS ENTITLED TO THOUSANDS OF DOLLARS FOR THAT YEAR, CORRECT?

2          THAT'S YOUR INTERPRETATION, YES OR NO?

3  **A.**   IT COULD HAVE BEEN THOUSANDS OF DOLLARS, YES.

4  **Q.**   AND, IN FACT, THE NFLPA WOULD HAVE NO OPPORTUNITY -- IF HE

5  SIGNED ON DECEMBER 31ST, THEY'D HAVE NO OPPORTUNITY TO INCLUDE

6  HIM IN ANY LICENSE FOR THAT YEAR BECAUSE ALL THE PROGRAMS ARE

7  ALREADY DONE FOR THAT SEASON; IS THAT TRUE?

8  **A.**   I DON'T KNOW THAT TO BE THE CASE.

9  **Q.**   YOU DIDN'T KNOW THAT IN THE NFL BY THE TIME YOU GET TO THE

10 END OF DECEMBER ALL THE LICENSING PROGRAMS ARE ALREADY IN PLACE

11 FOR THE SEASON?  YOU DIDN'T KNOW THAT?

12 **A.**   I DIDN'T SEE ANY DOCUMENTATION IT THAT EFFECT.

13 **Q.**   DID YOU READ THE LICENSE AGREEMENTS?

14 **A.**   I READ LICENSE AGREEMENTS, YES.

15 **Q.**   DO YOU KNOW WHAT THE PERIODS OF TIME ARE FOR THE LICENSE

16 AGREEMENTS, HOW THEY'RE DONE?

17         YES OR NO?

18 **A.**   IN GENERAL, YES.

19 **Q.**   OKAY.  DO YOU KNOW IF THERE'S ANYTHING IN THOSE AGREEMENTS

20 THAT WOULD INDICATE WHEN THE LICENSING PROGRAMS ARE DONE, WHAT

21 TIME OF THE YEAR?  DO YOU KNOW?

22 **A.**   FIRST OFF, WE CAN GO AND SEE --

23 **Q.**   DO YOU KNOW, YES OR NO?

24 **A.**   YES, I DO.

25 **Q.**   ALL RIGHT.  SO FROM YOUR REVIEW OF THOSE AGREEMENTS, DO

1  YOU KNOW, SIR, OKAY, THAT NFL LICENSING PROGRAMS FOR THE 2004

2  SEASON ARE ALL ALREADY IN PLACE BY DECEMBER OF 2004, WHEN THE

3  SEASON IS ENDING?  DO YOU KNOW THAT ONE WAY OR THE OTHER?

4  **A.**   NO, I DON'T.  I DON'T KNOW THAT.

5  **Q.**   OKAY.

6  **A.**   AND THERE CERTAINLY CAN BE SALES WHEN WE SEE ROYALTY

7  PAYMENTS BY LICENSEES THROUGHOUT THE YEAR.

8  **Q.**   RIGHT.  BUT IF YOU HAVE -- IF YOU PUBLISH TRADING CARDS,

9  RIGHT, FOR THE NFL, RIGHT, IF THE TRADING CARDS ARE ALREADY

10  MANUFACTURED AND BEING DISTRIBUTED BY DECEMBER OF 2004, THERE'S

11  NEVER BEEN A CASE, HAS THERE, IN HISTORY WHEN A TRADING CARD

12  COMPANY FOR THE NFL HAS SAID:

13           "OH, IN JANUARY LET'S ADD IN SOMEBODY ELSE FOR

14  THE LAST SEASON."

15           HAS THAT EVER HAPPENED, SIR, IN HISTORY?

16  **A.**   I'M NOT AN EXPERT ON TRADING CARDS.

17  **Q.**   YOU DON'T KNOW.  THAT'S NEVER HAPPENED, HAS IT?

18  **A.**   I DON'T KNOW.

19  **Q.**   LET ME ASK YOU THIS:  LET'S SAY THE JURY WERE TO FIND THAT

20  THERE WAS NO BREACH OF CONTRACT, OKAY, AND THERE WAS A BREACH

21  OF FIDUCIARY DUTY FOR NOT MARKETING, NOT SUFFICIENTLY MARKETING

22  THE RETIRED PLAYERS WHO SIGNED THE GLA'S, OKAY?  HAVE YOU DONE

23  ANY ANALYSIS OF SPECIFICALLY HOW MUCH THE RETIRED PLAYERS WOULD

24  HAVE EARNED FOR THEIR RIGHTS IF THEY HAD BEEN MORE AGGRESSIVELY

25  MARKETED, JUST ON THAT CLAIM SEPARATELY?

1  A.    NO.

2  Q.    NO.  IN FACT, YOU OFFERED THE SAME MEASURE CALCULATIONS OF

3  DAMAGES NO MATTER WHAT THE JURY FINDS.  WHETHER IT'S -- WHETHER

4  IT'S RELATED TO MARKETING, WHETHER IT'S RELATED TO BREACH OF

5  FIDUCIARY DUTY, WHETHER IT'S RELATED TO CONTRACT, ALL YOUR

6  CALCULATIONS ARE THE SAME.  IT DOESN'T DISTINGUISH BETWEEN

7  THEM, DO THEY?

8  A.    THEY WOULD HAVE BEEN ENTITLED TO THAT ONE POOL AT A

9  MINIMUM.

10  Q.    RIGHT.  IN OTHER WORDS, YOUR WHOLE PREMISE FOR EVERY ONE

11  OF YOUR CALCULATIONS IS THAT THE JURY WILL FIND THAT THE

12  RETIRED PLAYERS BY SIGNING A RETIRED PLAYER GLA WERE ENTITLED

13  TO AN EQUAL SHARE OF THE GLR POOL?  ALL YOUR CALCULATIONS ARE

14  PREMISED ON THAT, RIGHT?

15  A.    YES.

16  Q.    AND IF THE JURY DOESN'T FIND THAT THEN, YOUR CALCULATIONS

17  WOULD NOT APPLY, RIGHT?

18  A.    DOESN'T FIND WHAT, COUNSEL?

19  Q.    DOESN'T FIND THAT THE RETIRED PLAYERS ARE ENTITLED TO AN

20  EQUAL SHARE OF THE GLR POOL.  IF THE JURY REJECTS THAT, THEY

21  CANNOT USE YOUR CALCULATIONS, CORRECT?

22  A.    IF THEY REJECT IT THEY'RE NOT ENTITLED TO GROUP LICENSING

23  PROGRAM.  THOSE ARE THE REVENUES THAT I'VE LOOKED AT AND

24  PROVIDED THE CALCULATIONS.

25  Q.    RIGHT.  NOW, SIR, YOU ALSO HAVEN'T EXAMINED THAT, LET'S

1   SAY, IN THE WHAT WE CALL THE "BUT-FOR WORLD," OKAY?  IN THE

2   BUT-FOR WORLD IF THERE HAD BEEN NO ALLEGED BREACH YOU HAVEN'T

3   CALCULATED THAT IF THE ACTIVE PLAYERS HAD DECIDED TO GIVE ALL

4   RETIRED PLAYERS AN EQUAL SHARE OF THE GLR POOL, YOU HAVEN'T

5   CALCULATED HOW MANY MORE RETIRED PLAYERS MIGHT HAVE SIGNED

6   GLA'S, HAVE YOU?

7   **A.**   NO, BUT I DON'T THINK THAT'S THE RIGHT ANALYSIS.

8   **Q.**   BUT YOU HAVEN'T DONE THAT, RIGHT?

9   **A.**   NO, BECAUSE IT'S NOT THE RIGHT ANALYSIS.

10  **Q.**   OKAY.  WELL, JUST -- SIR, IF YOU WOULD BEAR WITH ME FOR A

11  SECOND.

12          DO YOU AGREE WITH ME IF A RETIRED PLAYER WAS TOLD:

13              "OH, IF YOU SIGN THIS PAPER, NOTHING ELSE, YOU

14  WILL GET THOUSANDS OF DOLLARS OF ACTIVE PLAYER MONEY," DON'T

15  YOU THINK MORE RETIRED PLAYERS WOULD SIGN THAT PIECE OF PAPER?

16          YES OR NO, IN THAT HYPOTHETICAL?

17  **A.**   COUNSEL --

18          (SIMULTANEOUS SPEAKING OF WITNESS AND COUNSEL; NOT

19          REPORTABLE.)

20  **Q.**   GIVE ME YES OR NO.  PLEASE DON'T ARGUE WITH ME.  JUST GIVE

21  ME A YES OR NO.

22  **A.**   NOT NECESSARILY.  THERE ARE --

23  **Q.**   OKAY.  FINE.

24          **MR. HUMMEL:**  YOUR HONOR --

25          **THE WITNESS:**  THERE MAY BE A VARIETY OF REASONS

1  WHY --

2  **BY MR. KESSLER:**

3  Q.   THAT'S FINE.  I DIDN'T ASK YOU ANYTHING FURTHER.

4          SO YOUR TESTIMONY TO THE JURY -- AND THE JURY WILL

5  APPLY ITS COMMON SENSE TO THAT -- THAT IF A RETIRED PLAYER WAS

6  TOLD THAT "IF YOU SIGN THIS PIECE OF PAPER YOU'LL GET THOUSANDS

7  OF DOLLARS EVERY YEAR FROM THE ACTIVE PLAYER MONEY," YOU DON'T

8  THINK THAT WOULD HAVE CAUSED MORE RETIRED PLAYERS TO SIGN THE

9  GLA'S?

10         THAT'S YOUR TESTIMONY, YES OR NO?

11 A.   FIRST OFF, ONE OF THE ALLEGATIONS --

12 Q.   YES OR NO?

13 A.   NO.

14         **THE COURT:**  YOU CAN ANSWER THAT "YES" OR "NO."

15 **BY MR. KESSLER:**

16 Q.   FINE.  I'LL ASK YOU, MR. ROWLEY, IF SOMEONE PRESENTED YOU

17 WITH A PIECE OF PAPER AND SAID "ALL YOU HAVE TO DO IS SIGN THIS

18 PIECE OF PAPER, AND IN EXCHANGE FOR THAT YOU'D GET TENS OF

19 THOUSANDS OF DOLLARS OF SOMEBODY ELSE'S MONEY," WOULD YOU

20 HESITATE TO SIGN THAT?

21         YES OR NO?

22 A.   YES.  IN PARTICULAR, I THOUGHT I ALREADY --

23 Q.   NO.  WOULD YOU HESITATE TO SIGN IT?

24 A.   YES.

25 Q.   OKAY.  THANK YOU.

1           NOW, YOU KNOW, BY THE WAY, THERE ARE 13,000 RETIRED

2   PLAYERS, NOT 2,000.

3   **A.**   GENERALLY, YES.

4   **Q.**   AND YOU KNOW MOST OF THE STAR NFL PLAYERS NEVER SIGNED

5   RETIRED PLAYER GLA'S.  YOU KNOW THAT, RIGHT?

6   **A.**   GETTING INTO DEFINING "STARS," TIME PERIOD.  I CAN'T

7   ANSWER THAT.

8   **Q.**   OKAY.  YOU KNOW THAT THE MOST WELL-KNOWN PLAYERS LIKE JOE

9   MONTANA, JOE NAMATH, WARREN MOON, STARS OF THAT CALIBER, HAVE

10  NEVER SIGNED RETIRED PLAYER GLA'S.  DO YOU KNOW THAT ONE WAY OR

11  THE OTHER?

12  **A.**   THERE ALSO HAVE BEEN GALE SAYERS AND ALL KINDS OF OTHER

13  STARS THAT HAVE SIGNED THEM.  HERB ADDERLEY.

14  **Q.**   HAVE YOU EXAMINED THE MEMBERS OF YOUR CLASS?

15  **A.**   DEFINE --

16          **MR. HUMMEL:**  THAT'S VAGUE.  DO YOU MEAN --

17          (SIMULTANEOUS SPEAKING; NOT REPORTABLE.)

18  **BY MR. KESSLER:**

19  **Q.**   HAVE YOU LOOKED AT THE MEMBERS OF YOUR CLASS AND SEEN

20  WHICH ONES IN THERE ARE STARS AND WHICH ONES ARE NOT?

21  **A.**   AGAIN, "STAR" IS DEFINITIONAL.

22  **Q.**   I'LL DO IT THIS WAY.

23  **A.**   FOR A LITTLE BOY, A PLAYER WHO TAKES THE TIME TO SIGN AN

24  AUTOGRAPH IS A STAR.

25  **Q.**   YOU'RE A FINANCIAL ANALYST, CORRECT?

1  A.   YES.

2  Q.   HAVE YOU EXAMINED WHAT THE FINANCIAL VALUE IS OF THE

3  RIGHTS OF ANY INDIVIDUAL PLAYERS IN YOUR CLASS?

4  A.   NOT SPECIFICALLY, NO.

5  Q.   NOT SPECIFICALLY.  AND NOT GENERALLY, EITHER.  ON A

6  PLAYER-BY-PLAYER BASIS YOU'VE DONE NOTHING, RIGHT?

7  A.   THAT'S NOT TRUE.

8  Q.   OKAY.  I WILL READ TO YOU SOME NAMES, OKAY, FROM THIS

9  LIST.

10       WELL, NO, I'LL LET YOU DO IT, SIR.  PICK ANY NAME IN

11  THAT 2,000, AND TELL THE JURY WHAT YOU'VE DONE TO ANALYZE THE

12  INDIVIDUAL LICENSING VALUE OF THAT PLAYER.  NOT IN THE GROUP.

13  INDIVIDUALLY.

14       HAVE YOU DONE ANYTHING?  PICK ANY PLAYER.

15  A.   I CAN TELL YOU EXACTLY WHAT I DID.

16  Q.   NO.  CAN --

17  A.   I DID LOOK AT --

18  Q.   CAN YOU SHOW ME A PLAYER?

19  A.   -- AD HOC PAYMENTS, FOR EXAMPLE, FOR ROGER STAUBACH, WHERE

20  I WAS TRYING TO SEE DIFFERENCES IN RETIRED PLAYERS WHEN I WAS

21  LOOKING AT DIFFERENT LICENSES.

22       I DIDN'T DO A VALUATION OF INDIVIDUAL PLAYERS, BUT I

23  DID GO AND LOOK AT, WITHIN THE PREMIUM PAYMENTS, WHAT WERE SOME

24  OF THE PAYMENTS TO INDIVIDUALS.

25  Q.   DID YOU KNOW, FOR EXAMPLE --

1    **MR. KESSLER:**  CAN I HAVE THE CHART FOR THE HIGHEST

2  PAID?

3  **BY MR. KESSLER:**

4  **Q.**   YOU KNOW, FOR EXAMPLE, IF YOU DID THAT ANALYSIS OF

5  AD HOCS, THAT THE PEOPLE WHO RECEIVED THE LARGEST AD HOC

6  PAYMENTS WERE NOT IN YOUR CLASS, RIGHT?

7        YOU KNOW THAT?

8  **A.**   I DON'T KNOW IF I LOOKED AT IT IN THAT GREAT A DETAIL.

9       **MR. KESSLER:**  CAN I HAVE THAT, PLEASE?  LET'S PUT UP

10  THIS DEMONSTRATIVE, E5.

11       **MR. HUMMEL:**  YOUR HONOR, I OBJECT TO DISPLAYING THIS.

12  THERE IS NO FOUNDATION.  IT WASN'T DISCLOSED FOR USE WITH THIS

13  WITNESS.

14       **MR. KESSLER:**  ACTUALLY, YOUR HONOR, THIS IS A

15  DEMONSTRATIVE REPRESENTATION OF WHAT IS IN EVIDENCE IN THE

16  COMPILATION EXHIBITS.

17       **MR. HUMMEL:**  NO, YOUR HONOR.  THERE IS NO FOUNDATION

18  FOR THIS.  NONE.

19       **THE COURT:**  LET ME SEE IT.

20        IT LOOKS TO ME LIKE THERE'S NO FOUNDATION FOR THIS

21  YET.

22       **MR. KESSLER:**  OKAY.

23       **THE COURT:**  SO I'M GOING TO SUSTAIN THE OBJECTION.

24       **MR. KESSLER:**  I'M GOING TO HAND THE WITNESS TRIAL

25  EXHIBIT 2056, WHICH IS IN EVIDENCE.  IF WE COULD DISPLAY THAT.

1    SHOW THE WHOLE THING TO THE JURY.

2              (DOCUMENT DISPLAYED.)

3    **BY MR. KESSLER:**

4    **Q.**   MR. ROWLEY, YOU TESTIFIED YOU EXAMINED THE AD HOC PAYMENTS

5    TO THE RETIRED PLAYER CLASS MEMBERS, CORRECT?

6    **A.**   AT A GENERAL LEVEL, YES.

7    **Q.**   AND AS A GENERAL LEVEL, DID YOU KNOW, SIR, THAT, FOR

8    EXAMPLE, THE TOTAL AMOUNT PAID TO THE CLASS MEMBERS WAS OVER

9    $7 MILLION?

10   **A.**   I DON'T RECALL IF I KNEW THAT EXACT NUMBER.

11   **Q.**   OKAY.  DID YOU KNOW THAT MOST OF THE CLASS MEMBERS

12   RECEIVED NO ROYALTY -- NO AD HOC PAYMENTS?  DID YOU KNOW THAT?

13             WELL, LET ME ASK YOU THIS WAY.  DO YOU SEE THE TOTAL

14   NUMBER OF CLASS MEMBERS WHO WERE IN AD HOC DEALS WAS 378?

15   **A.**   YES.

16   **Q.**   THAT WOULD BE A MINORITY OF THE OVER 2,000 CLASS MEMBERS,

17   CORRECT?

18   **A.**   YES.

19   **Q.**   OKAY.

20             AND DID YOU EXAMINE THIS LIST AT ALL TO SEE WHETHER

21   OR NOT THE PLAYERS WHO RECEIVED THE MOST MONEY, THE JOE

22   MONTANAS, PLAYERS LIKE THAT, ARE IN THE CLASS OR NOT?  DID YOU

23   EVER LOOK AT THAT ISSUE?

24   **A.**   NOT SPECIFICALLY, NO.

25   **Q.**   OKAY.  LET ME MOVE ON TO SOMETHING ELSE.

1          NOW, IF THE JURY WERE TO DECIDE THAT ONLY RETIRED

2    PLAYERS WHO WERE ON A FIRST GAME ROSTER OR A LAST GAME ROSTER

3    SHOULD SHARE IN THE EQUAL POOL, THE WAY THE RULE IS FOR ACTIVE

4    PLAYERS, YOUR CALCULATIONS DON'T PROVIDE ANY INFORMATION ON

5    THAT, DO THEY?

6    **A.**   NO.  THE RETIRED PLAYERS REPRESENT THOSE WHO SIGNED GLA'S

7    DURING THE RELEVANT TIME FRAME.  ONE COULD GO BACK AND REVIEW

8    EACH PLAYER.

9    **Q.**   NOW, YOU KNOW, SIR, THAT IN THE GLR POOL THAT WAS GIVEN TO

10   ACTIVE PLAYERS, PRACTICE SQUAD PLAYERS DID NOT GET AN EQUAL

11   SHARE.  THEY GOT $1,000, CORRECT?

12   **A.**   CORRECT.

13   **Q.**   OKAY.  NOW, UNDER YOUR ANALYSIS, SIR, IF SOMEONE WAS A

14   PRACTICE SQUAD PLAYER IN 2006, OKAY, THAT -- AND THAT'S ALL HE

15   DID, HE WOULD GET $1,000 FROM THE GLR POOL, CORRECT?

16   **A.**   YES.

17   **Q.**   IF THAT PRACTICE SQUAD PLAYER RETIRED IN 2006, IN THE

18   MIDDLE OF THE SEASON, SIGNED A RETIRED PLAYER GLA, BUT PLAYED

19   NO MORE GAMES, JUST SIGNED THE RETIRED PLAYER GLA, YOUR

20   ANALYSIS WOULD AWARD THAT PRACTICE SQUAD PLAYER TENS OF

21   THOUSANDS OF DOLLARS, RIGHT?

22   **A.**   MY --

23   **Q.**   YES OR NO?

24   **A.**   NO.  MY RECOLLECTION --

25          **MR. HUMMEL:**  I OBJECT, YOUR HONOR.  THERE'S NO

1   EVIDENCE IN THE RECORD, AND HE'S OFFERED NO OPINION ABOUT HOW

2   THE TOTAL DAMAGES TO THE CLASS WOULD BE ALLOCATED AMONG

3   INDIVIDUAL CLASS MEMBERS.  SO HIS HYPOTHETICAL --

4           **THE COURT:**  IT'S OVERRULED.

5           IT'S COMPLETELY PROPER TO ASK AN EXPERT HYPOTHETICAL

6   QUESTIONS.  THE ENTIRE EXERCISE BY THE EXPERT IS A HYPOTHETICAL

7   EXERCISE.  IT'S BASED ON THE HYPOTHESIS THAT THE JURY REACHES A

8   CERTAIN DETERMINATION AND SO IS PROPER TO HEAR THE HYPOTHETICAL

9   AND TEST ITS LIMITS.  THAT'S WHAT COUNSEL IS DOING.

10          OVERRULED.

11          PLEASE RESTATE THE QUESTION.

12  **BY MR. KESSLER:**

13  **Q.**   SO THE QUESTION IS:  YOU KNOW IF THE PLAYER WAS ON THE

14  PRACTICE SQUAD THE WHOLE YEAR -- LET'S SAY 2005, SO WE'RE

15  FAIRLY WITHIN THE PERIOD -- THAT THAT PLAYER WOULD ONLY GET

16  $1,000 UNDER THE GLR POOL ELIGIBILITY CRITERIA AS A PRACTICE

17  SQUAD PLAYER, CORRECT?

18  **A.**   CORRECT.

19  **Q.**   NOW, IF THAT PRACTICE SQUAD PLAYER RETIRED, HE WAS ON THE

20  PRACTICE SQUAD FOR THREE OR FOUR GAMES, THEN HE RETIRES, OKAY,

21  HE RETIRES, AND HE SIGNED A RETIRED PLAYER GLA AND BECAME A

22  CLASS MEMBER, UNDER YOUR ANALYSIS YOU WOULD SUDDENLY AWARD THAT

23  PRACTICE SQUAD PLAYER A FULL EQUAL SHARE, MUCH MORE THAN A

24  THOUSAND DOLLARS, CORRECT?

25  **A.**   I DON'T THINK THAT THAT IS POSSIBLE.

1  Q.   OKAY.  BY THE WAY -- WHY IS THAT -- WHY IS IT NOT

2  POSSIBLE -- LET ME ASK IT THIS WAY.

3  A.   SURE.

4  Q.   ANYONE WHO SIGNED A RETIRED PLAYER GLA DURING THE PERIOD

5  IS IN YOUR CLASS, RIGHT?

6  A.   THE RELEVANT GLA.

7  Q.   YES.

8  A.   YES.

9  Q.   OKAY.  SO LET'S SAY IN 2004 A RETIRED PLAYER SIGNED THE

10 RELEVANT GLA, OKAY.  THAT'S POSSIBLE, RIGHT?

11 A.   THAT'S POSSIBLE.

12 Q.   OKAY.  SO IN 2004 YOU'D HAVE A PRACTICE SQUAD PLAYER WHO

13 WOULD HAVE ONLY GOTTEN A THOUSAND DOLLARS.  BY LEAVING THE NFL

14 AND RETIRING AND NEVER PLAYING AGAIN AND SIGNING A RETIRED

15 PLAYER GLA IN DECEMBER, INSTEAD OF GIVING HIM A THOUSAND

16 DOLLARS, UNDER YOUR ANALYSES YOU WOULD BE GIVING HIM MULTIPLE

17 THOUSANDS OF DOLLARS, CORRECT?

18       YES OR NO?

19 A.   NO, I DON'T BELIEVE THAT'S THE CASE.

20 Q.   OKAY.  WELL, TELL ME, ISN'T IT TRUE THAT IF THAT PLAYER

21 DID NOTHING MORE THAN SIGN A RETIRED PLAYER GLA IN DECEMBER, HE

22 WOULD THEN GET A FULL EQUAL SHARE UNDER YOUR ANALYSIS?

23       YES OR NO?

24 A.   I DON'T BELIEVE THAT'S THE CASE.

25 Q.   OKAY.  I JUST WANT TO UNDERSTAND THIS NOW.  SO UNDER YOUR

1   ANALYSIS NOW, IF SOMEONE SIGNS A RETIRED PLAYER GLA IN

2   DECEMBER, THEY HAVE TO DO SOMETHING MORE TO GET AN EQUAL SHARE?

3           WHAT ELSE DO THEY HAVE TO DO?  WHAT DO THEY HAVE TO

4   DO?

5           **THE COURT:**  MR. KESSLER, I WANT -- I WANT YOU TO GIVE

6   YOUR COMPLETE ANSWER TO THIS HYPOTHETICAL AND EXPLAIN YOUR

7   ANSWER.  AND THEN, WE'LL LET MR. KESSLER ASK SOME MORE

8   QUESTIONS.

9           GO AHEAD.

10          **THE WITNESS:**  THANK YOU, YOUR HONOR.

11          MY UNDERSTANDING IS THAT A PRACTICE SQUAD PLAYER

12  WOULD NOT BE CONSIDERED ACTIVE AND COULD THEN NOT BE A RETIRED

13  PLAYER.  HE NEVER WOULD HAVE HAD A CONTRACT.  THAT'S MY

14  UNDERSTANDING.  SO I'M ASSUMING THAT THAT HAS NOT TAKEN PLACE.

15  **BY MR. KESSLER:**

16  **Q.**   YOU DIDN'T KNOW THAT THERE ARE MEMBERS OF THIS CLASS WHO

17  WERE NEVER ANYTHING MORE THAN A PRACTICE SQUAD PLAYER?  YOU

18  NEVER KNEW THAT?

19  **A.**   THAT WASN'T MY UNDERSTANDING.

20  **Q.**   WOULD THAT CAUSE YOU TO CHANGE YOUR ANALYSIS IF YOU KNEW

21  THAT?

22  **A.**   NOT NECESSARILY.

23  **Q.**   OKAY.  OKAY.  SO IT DOESN'T MATTER TO YOU WHETHER THEY'VE

24  DONE THAT OR NOT?  IN OTHER WORDS, UNDER YOUR WORLD, OKAY,

25  UNDER YOUR WORLD IT COULD HAVE BEEN JUST A PRACTICE SQUAD

1    PLAYER WHO RETIRES AND HIS REWARD FOR RETIRING AND SIGNING A

2    PIECE OF PAPER IN DECEMBER IS HIS SHARE WENT FROM $1,000 TO

3    MANY THOUSANDS OF DOLLARS IN YOUR ANALYSIS, CORRECT?

4              YOU HAVE NO PROBLEM WITH THAT?

5    **A.**   AT ISSUE IS THIS CONTRACT --

6              (SIMULTANEOUS SPEAKING OF WITNESS AND COUNSEL; NOT

7              REPORTABLE.)

8    **Q.**   -- IN YOUR ANALYSIS, YES OR NO?

9    **A.**   THE ISSUE IS THE GLA.

10   **Q.**   IN YOUR ANALYSIS, YOU HAVE NO PROBLEM WITH THAT?

11   **A.**   NOT BASED ON THE GLA, NO.

12   **Q.**   OKAY.  FINE.  THAT'S WHAT YOU'RE TELLING THE JURY.

13             **THE COURT:**  MR. KESSLER, THERE HAS BEEN NO PROOF THAT

14   I'M AWARE OF -- AND THERE MAY BE.  CORRECT ME IF I'M WRONG --

15   IS THERE ANY EVIDENCE IN THE RECORD THUS FAR, OR ARE YOU GOING

16   TO PUT IT IN IN YOUR CASE THAT ANY MEMBERS OF THE CLASS WERE

17   JUST ON THE PRACTICE SQUAD?

18             **MR. KESSLER:**  WE WILL PUT IN EVIDENCE, YOUR HONOR,

19   THAT THERE ARE MEMBERS OF THE CLASS WHO NEVER SEEN SIGNED AN

20   NFL PLAYER CONTRACT.  IN OTHER WORDS, THE ONLY REQUIREMENT WAS

21   THEY SIGNED -- IN THIS CLASS THEY SIGNED A FORM.  THERE WAS NO

22   LIMITATION.  THEY COULD HAVE BEEN ON THE PRACTICE SQUAD.  THEY

23   COULD HAVE BEEN ON AN ACTIVE PLAYER.

24             SOME OF THEM ARE HONORARY MEMBERS OF THE ASSOCIATION,

25   NEVER PLAYED.

1          **THE COURT:**  ALL RIGHT.  JUST A SECOND.  FINE.  BUT I

2   NEED TO SAY TO THE JURY, THE LAWYERS ON BOTH SIDES HAVE -- HAVE

3   LAID BEFORE YOU DOZENS UPON DOZENS OF STATEMENTS IN THEIR

4   QUESTIONS LIKE:  "DIDN'T YOU KNOW, SIR," AND THEN FILL IN THE

5   BLANK.  AND OFTENTIMES IT'S NOT CLEAR TO ME THAT ANY OF THAT IS

6   ACTUALLY IN EVIDENCE.

7          WHAT THE LAWYERS SAY IS NOT EVIDENCE.  IT MAY WELL BE

8   THAT MR. KESSLER IS GOING TO CONNECT THIS UP.  HE HASN'T PUT ON

9   HIS DEFENSE YET.

10          REMEMBER, YOU HAVE TO SEPARATE OUT WHAT THE LAWYERS

11  ARE SAYING FROM WHAT THE ACTUAL EVIDENCE IS, AND KEEP THAT

12  STRAIGHT.  I'VE MADE THIS SPEECH BEFORE.  IT'S OKAY IF COUNSEL

13  CONNECTS IT UP LATER, AND PUTS IT IN HIS CASE.

14          I'VE HEARD LAWYERS ON BOTH SIDES DO THIS REPEATEDLY.

15  I URGE YOU TO KEEP STRAIGHT WHAT IS IN EVIDENCE VERSUS WHAT IS

16  MERELY THE LAWYERS TALKING.

17          ALL RIGHT.  WITH THAT CAVEAT, I WANT YOU TO GO AHEAD.

18          **MR. KESSLER:**  I AM GOING TO ANOTHER SUBJECT, YOUR

19  HONOR, BECAUSE I THINK WE HAVE PROBABLY EXHAUSTED THIS SUBJECT.

20  **BY MR. KESSLER:**

21  **Q.**  LET'S GO SHOW YOUR TRIAL EXHIBIT 1217.  AND I THINK YOU

22  SHOULD HAVE THAT IN FRONT OF YOU.  YOU DON'T HAVE IT?

23  **A.**  I DO.

24          **MR. KESSLER:**  I THINK HE DOES HAVE IT.

25          **THE WITNESS:**  THANK YOU.

1    **MR. KESSLER:**  THANK YOU.

2         (DOCUMENT DISPLAYED.)

3  **BY MR. KESSLER:**

4  **Q.**  NOW, THIS INCLUDES --

5         **MR. KESSLER:**  SHOW THE TOP, LAUREN.

6         (DOCUMENT DISPLAYED.)

7  **BY MR. KESSLER:**

8  **Q.**  THIS INCLUDES CALCULATIONS FOR FOUR YEARS OF CALCULATIONS,

9  '04, '05, '06, '07; IS THAT CORRECT?

10 **A.**  YES.

11 **Q.**  NOW, IN THIS CASE ONLY THREE YEARS OF DAMAGES ARE

12 APPROPRIATE, CORRECT?  THE COURT HAS ALREADY DETERMINED THAT

13 AND SO INSTRUCTED THE JURY, CORRECT?

14 **A.**  THAT'S NOT MY UNDERSTANDING.

15 **Q.**  THAT'S NOT YOUR UNDERSTANDING?

16 **A.**  NO.

17 **Q.**  I WILL REPRESENT TO YOU, SIR, THAT THE JUDGE HAS ALREADY

18 INSTRUCTED THE JURY IN OPEN COURT THAT THERE ARE ONLY THREE

19 YEARS THAT ARE RELEVANT.  YOUR COUNSEL DIDN'T TELL YOU THAT?

20 **A.**  WHAT I UNDERSTOOD WAS THE STATUTE OF LIMITATIONS WENT BACK

21 TO FEBRUARY, I BELIEVE, 15TH OF 2004.  FISCAL YEAR 2004 FOR

22 NFLPA/PI FINISHES FEBRUARY 28, WHICH WOULD BE AFTER THAT CUTOFF

23 DATE IN 2004.

24        AND, IN FACT, THE ROYALTY PAYMENTS TYPICALLY WERE NOT

25 PAID TO THE PLAYERS UNTIL THE END OF THAT CALENDAR YEAR.

1          SO UNDER THAT GUIDANCE I DID INCLUDE THAT YEAR.  IF

2     I'M WRONG, I WILL MAKE -- I WILL ADJUST IT.  BUT THAT'S WHAT MY

3     DECISION WAS.

4     **Q.**   YOUR DECISION OR COUNSEL'S DECISION?

5     **A.**   I THOUGHT THE DATE WAS FEBRUARY 15TH, 2004.

6     **Q.**   OKAY.  LET ME ASK YOU THIS, SIR.  THE MONEY YOU HAVE

7     CALCULATED FOR 2004 --

8          **MR. KESSLER:**  LET'S LOOK AT THAT WHOLE COLUMN, AND

9     THIS GOES ON FOR PAGES.

10         (DOCUMENT DISPLAYED.)

11    **BY MR. KESSLER:**

12    **Q.**   THE MONEY IN 2004 THAT WAS BASED ON LICENSING PROGRAMS

13    WHERE THE REVENUE WAS EARNED MOSTLY IN 2003, CORRECT?  YES OR

14    NO?

15    **A.**   FISCAL YEAR 2004.

16    **Q.**   RIGHT.  BUT EXPLAIN TO THE JURY -- THE FISCAL YEAR STARTS

17    MARCH 1, 2003 AND ENDED FEBRUARY 1, 2004 -- NO, APRIL 1, 2003

18    AND ENDED MARCH 1, 2004, CORRECT?

19    **A.**   SO IT STARTS --

20    **Q.**   IS THAT CORRECT?

21    **A.**   IT STARTS MARCH, 2003.  IT ENDS FEBRUARY 28, 2004.

22    **Q.**   RIGHT.  NOW, YOU CERTAINLY HAVE STUDIED HOW NFL LICENSING

23    WORKS, CORRECT?

24    **A.**   I HAVE A GENERAL FAMILIARITY BASED ON MY WORK HERE.

25    **Q.**   AND YOU KNOW THE NFL SEASON BEGINS IN SEPTEMBER, CORRECT?

1  **A.**   YES.

2  **Q.**   AND THE SEASON ENDS, AS WE DISCUSSED, AT THE END OF

3  DECEMBER BEFORE THE POST-SEASON, CORRECT?

4  **A.**   THE REGULAR SEASON.

5  **Q.**   RIGHT.  AND SO, THEREFORE, FOR LICENSING REVENUES IN

6  FISCAL YEAR 2004, THIS THING (INDICATING), MOST OF THE

7  LICENSING REVENUES WOULD HAVE BEEN EARNED FROM SALES DURING

8  2003, CORRECT?

9         YES OR NO?

10 **A.**   FROM --

11 **Q.**   YES OR NO?

12 **A.**   -- CALENDAR YEAR PERSPECTIVE, YES.

13 **Q.**   YES.

14 **A.**   NOT FROM A FISCAL YEAR PERSPECTIVE.

15 **Q.**   WE LIVE IN A CALENDAR YEAR, PEOPLE, RIGHT?  WE LIVE IN A

16 CALENDAR YEAR, NOT A FISCAL YEAR.  YOU'LL GIVE ME THAT?

17 **A.**   SURE.

18 **Q.**   OKAY.  SO IN THE CALENDAR YEAR WHERE PEOPLE LIVE, OKAY,

19 MOST OF THE REVENUE WOULD HAVE BEEN EARNED FROM 2003, AND

20 YOU'RE INCLUDING IT IN 2004 SIMPLY BECAUSE IT WAS PAID IN 2004,

21 CORRECT?

22 **A.**   NFLPA/PI IS AN ACTUAL ENTITY AND MANY ENTITIES OPERATE IN

23 FISCAL YEARS SEPARATELY FROM CALENDAR YEARS.

24 **Q.**   LET ME JUST ASK IT THIS WAY.

25 **A.**   MANY OF THE LICENSEES ALSO WORK IN FISCAL YEARS.

1   Q.   YOU DIDN'T DO ANY ALLOCATION TO REMOVE FROM YOUR

2   CALCULATION THE REVENUES THAT WERE EARNED IN 2003; IS THAT

3   FAIR?

4             YES?  IS THAT FAIR?

5   A.   IN CALENDAR YEAR 2003.

6   Q.   YES?

7   A.   SO MARCH THROUGH DECEMBER OF 2003.

8   Q.   YOU DIDN'T REMOVE THAT, CORRECT?

9   A.   I DON'T THINK IT'S APPROPRIATE.

10  Q.   SO YOU DIDN'T DO IT BECAUSE YOU DIDN'T THINK IT WAS

11  APPROPRIATE?

12  A.   THAT'S CORRECT.

13  Q.   OKAY.  THAT'S ALL I HAVE.

14            NOW, TAKE A LOOK AT YOUR TRIAL EXHIBIT 1218.

15            (DOCUMENT DISPLAYED.)

16  Q.   IF YOU COULD LOOK AT THE TOP.  TRIAL EXHIBIT 1218 SAYS

17  "FISCAL YEAR 2002 TO 2007," CORRECT?

18  A.   YES, THAT'S FROM THE ORIGINAL SCHEDULE.

19  Q.   NOW, EVEN YOU, SIR, WILL AGREE THAT FISCAL YEAR 2003

20  SHOULD NOT BE THERE, RIGHT?

21  A.   IT SHOULD NOT BE THERE.

22  Q.   OKAY.  THANK YOU.

23            NOW, LET'S GO BACK TO THE TRIAL EXHIBIT.  IT WAS

24  1323-1, THE ONE THAT HAD THE $11 MILLION FIGURE.

25            (DOCUMENT DISPLAYED.)

1  **A.**   I'M SORRY, COUNSEL, THE NUMBER AGAIN?

2  **Q.**   IT'S 1323-1.

3          NOW, 1323-1, FIRST OF ALL, YOU APPLIED AN INTEREST

4  RATE OF 6 PERCENT, SIR; IS THAT CORRECT?

5  **A.**   YES.

6  **Q.**   AND WHEN DID YOU APPLY THAT?  IS THAT INTEREST RATE FROM

7  WHEN THE PAYMENTS WERE MADE GOING FORWARD TO WHAT DATE?

8  EXPLAIN HOW THE 6 PERCENT WAS APPLIED.

9  **A.**   ESSENTIALLY, I ASSUMED THE END OF THE YEAR, AND THEN

10 BROUGHT IT FORWARD TO JUNE OF THIS YEAR.

11 **Q.**   OKAY.  SO IF IT WAS A PAYMENT MADE IN 2004, YOU TOOK IT

12 FROM FEBRUARY OF 2004 UNTIL THE END OF WHICH YEAR?

13 **A.**   NO.  IF IT'S FEBRUARY 2004, SO FISCAL YEAR 2004, THAT

14 WOULD HAVE STARTED AT THE END OF CALENDAR YEAR 2004.  AND YOU

15 WOULD HAVE HAD -- FIVE, SIX, SEVEN, EIGHT -- THREE-AND-A-HALF

16 PERIODS.

17 **Q.**   WHAT WAS YOUR END DATE?

18 **A.**   JUNE OF 2008.

19 **Q.**   OKAY.  NOW, THE REASON YOU SELECTED 6 PERCENT IS BECAUSE

20 THE LAWYERS TOLD YOU TO USE THAT RATE, CORRECT?

21 **A.**   THAT'S CORRECT.

22 **Q.**   YOU DIDN'T MAKE ANY EXPERT JUDGMENT THAT 6 PERCENT WAS

23 CORRECT OR 3 PERCENT OR 2 PERCENT OR ANY OTHER PERCENTAGE,

24 RIGHT?

25 **A.**   I WAS TOLD THAT IS THE STATUTORY RATE.

1  Q.   SO YOU HAVE NO OPINION IF THAT'S THE CORRECT RATE OR NOT?

2  A.   WELL, IF THE JUDGE HAS SAID THAT'S THE APPROPRIATE LAW,

3  THAT IS THE APPROPRIATE LAW.

4  Q.   YOU HAVE NO EXPERT OPINION TO OFFER ON THAT SUBJECT?

5  A.   NOT ON THE LEGAL INTEREST RATES.

6  Q.   NOW, THIS $11 MILLION FIGURE, THIS INCLUDES IN IT

7  AGREEMENTS FOR FANTASY FOOTBALL GAMES, CORRECT?

8  A.   I BELIEVE SO, YES.

9  Q.   IT INCLUDES IN IT AGREEMENTS FOR ROOKIE DRAFT PICKS,

10 CORRECT?

11 A.   I BELIEVE SO.

12 Q.   OKAY.  SO IF THIS JURY WERE TO FIND THAT RETIRED PLAYERS

13 ARE NOT ENTITLED TO ANY MONEY FROM FANTASY FOOTBALL CARDS --

14 I'M SORRY -- FANTASY FOOTBALL GAMES OR ROOKIE DRAFT PICKS, YOU

15 DON'T DO ANY CALCULATIONS TO REMOVE THAT, RIGHT?

16 A.   CORRECT.  IT WAS GROUP LICENSING PROGRAMS.

17 Q.   OKAY.  NOW, YOU AGREE WITH ME, SIR, THAT FANTASY FOOTBALL

18 GAMES ONLY USE ACTIVE PLAYERS, RIGHT?  YOU AGREE WITH THAT YES

19 OR NO?

20 A.   YES.  NOT NECESSARILY ALL OF THEM, BUT YES.

21 Q.   AND YOU AGREE WITH ME THAT ROOKIE DRAFT PICK CARDS ONLY

22 USE ACTIVE ROOKIES WHO WERE DRAFTED THAT YEAR, CORRECT?  YOU

23 AGREE WITH THAT?

24 A.   GENERALLY, YES.

25 Q.   NOW, THIS $11 MILLION FIGURE ALSO, FOR EXAMPLE, INCLUDES

1 IN IT THE LICENSING REVENUE FROM THE EA LICENSE AGREEMENTS,

2 CORRECT?

3 A.   YES.

4 Q.   IN FACT, 40 PERCENT OF THIS NUMBER, ABOUT, IS ATTRIBUTABLE

5 TO THE EA LICENSE AGREEMENT, CORRECT?

6 A.   IT'S MY RECALL.  IT'S ABOUT RIGHT, YES.

7 Q.   OKAY.  NOW, DID YOU REVIEW THE TRIAL TESTIMONY OF MR. JOEL

8 LINZNER IN THIS CASE?

9 A.   NO.

10 Q.   DID YOU REVIEW HIS DEPOSITION TESTIMONY?

11 A.   YES.

12 Q.   AND DID YOU REVIEW HIS TESTIMONY WHERE MR. LINZNER

13 TESTIFIED THAT HIS UNDERSTANDING AS THE NEGOTIATOR FOR EA WAS

14 THAT THAT 40 PERCENT YOU INCLUDED WAS ALL ACTIVE PLAYER

15 LICENSING RIGHTS.

16         DID YOU REVIEW THAT?

17 A.   I REMEMBER HIM BEING SOMEWHAT CONFUSED AS EXACTLY WHAT HAD

18 BEEN LICENSED.

19 Q.   OKAY.

20 A.   HE WASN'T FAMILIAR WITH THE GLA, AND HE MORE THAN LIKELY

21 WAS INDIFFERENT AS TO WHO RECEIVED PAYMENTS.

22 Q.   OKAY.  YOU THOUGHT MR. LINZNER WAS CONFUSED.  LET'S SAY

23 THIS JURY FINDS THE WITNESS, MR. LINZNER'S TESTIMONY, THAT THEY

24 DID NOT THINK MR. LINZNER WAS CONFUSED, AND THAT THEY BELIEVE

25 MR. LINZNER TESTIFIED THAT HIS CLEAR UNDERSTANDING WAS THAT THE

1  EA AGREEMENT WAS ONLY ACTIVE PLAYER LICENSING.

2          AND LET'S ALSO ASSUME THAT MR. DOUG ALLEN, THE OTHER

3  NEGOTIATOR, ALSO TESTIFIED THAT HIS CLEAR UNDERSTANDING WAS

4  THAT THE EA AGREEMENT WAS ONLY ACTIVE PLAYER LICENSING.

5          AND LET'S ASSUME THE JURY FINDS THEM TO BE CREDIBLE

6  ON THAT POINT AND CONCLUDES THAT THE EA AGREEMENT, WHICH IS

7  40 PERCENT OF EVEN YOUR $11 MILLION FIGURE, LET'S ASSUME THE

8  JURY CONCLUDES THAT ALL THAT WAS ONLY ACTIVE PLAYER LICENSING,

9  OKAY?

10          YOU DON'T OFFER THE JURY ANY CALCULATION TO EXCLUDE

11  THAT, CORRECT?

12          DO YOU?  YES OR NO?

13  **A.**   I DON'T BECAUSE THE PREMISE --

14  **Q.**   YOU DON'T.

15  **A.**   -- IS GROUP LICENSING.

16  **Q.**   THANK YOU, SIR.  THANK YOU, SIR.

17          IF THE JURY FINDS THAT RETIRED PLAYERS ARE NOT

18  ENTITLED TO RETIRED PLAYER LICENSING, IF THAT'S WHAT THE JURY

19  FINDS, DO YOU AGREE THAT YOUR CALCULATIONS CANNOT BE USED BY

20  THEM BECAUSE YOU DON'T DISTINGUISH?

21          IS THAT TRUE?

22  **A.**   AGAIN, I HAVE NOT SEEN THE OTHER SIDE OF THE EQUATION, SO

23  I CAN'T TELL YOU --

24          (SIMULTANEOUS SPEAKING OF WITNESS AND COUNSEL; NOT

25          REPORTABLE.)

1  **Q.**  SUCH A SIMPLE QUESTION.

2  **A.**  -- WHAT --

3  **Q.**  IT'S SUCH A SIMPLE QUESTION.  REALLY, I WILL ASK YOU VERY

4  NICELY, OKAY, AND BE VERY CLEAR.

5       IF THE JURY FINDS, THE JURY FINDS --

6  **A.**  YES.

7  **Q.**  -- THAT RETIRED PLAYERS ARE NOT ENTITLED TO ANY LICENSING

8  REVENUES THAT WERE GENERATED SOLELY BY ACTIVE PLAYER LICENSING,

9  OKAY?  IF THE JURY FINDS THAT, AND THEY ALSO FIND THAT THE GLR

10  POOL WAS ONLY ACTIVE PLAYER LICENSING MONEY, IN THOSE TWO

11  ASSUMPTIONS DO YOU AGREE WITH ME THAT YOUR CALCULATIONS,

12  THEREFORE, SHOW NO DAMAGES, IF THAT'S WHAT THEY FIND?

13  **A.**  LIABILITY WOULD NOT HAVE BEEN ESTABLISHED, WHICH WAS ONE

14  OF MY ASSUMPTIONS.

15  **Q.**  RIGHT.  YOUR ASSUMPTION IS THE ONLY LIABILITY THAT WOULD

16  BE FOUND HERE WOULD BE ONE IN WHICH THE JURY CONCLUDED THAT

17  RETIRED PLAYERS WERE ENTITLED TO ACTIVE PLAYER LICENSING MONEY.

18       THAT'S YOUR ASSUMPTION OF YOUR TESTIMONY, CORRECT?

19  **A.**  NO.  THEY ARE ENTITLED TO GROUP LICENSING REVENUES.

20  **Q.**  BUT YOU'RE ASSUMING -- I DON'T WANT TO CONFUSE THE JURY.

21       YOU'RE ASSUMING THE JURY WOULD FIND THAT GROUP

22  LICENSING REVENUES TO WHICH THE RETIRED PLAYERS WOULD RECEIVE

23  MONEY INCLUDED ACTIVE PLAYER LICENSING.  THAT IS WHAT YOU'RE

24  ASSUMING, RIGHT?

25  **A.**  IT COULD, YES.

1  Q.   AND IF THEY REJECT THAT ASSUMPTION THEN THEY SHOULD FIND

2  NO DAMAGES UNDER YOUR MODEL, CORRECT?  YES OR NO?

3       IF THEY REJECT THAT ASSUMPTION?  PLEASE.  I KNOW IT'S

4  A YES OR NO.

5  A.   I HAVEN'T SEGREGATED OUT, BECAUSE I COULDN'T, RETIRED

6  VERSUS ACTIVE PLAYER REVENUES.  SO IF THAT WAS THEN ANOTHER

7  ASSUMPTION OR NUANCE, YOU WOULD HAVE TO GO BACK AND LOOK AT THE

8  NUMBERS.

9       AT THIS POINT WE COULDN'T SIMPLY APPLY WHAT I'VE

10 DONE, BECAUSE IT'S ALL GROUP LICENSING REVENUES.

11 Q.   YOU'VE GIVEN THE JURY NO BASIS TO CALCULATE ANY DAMAGES IF

12 THEY FIND THAT RETIRED PLAYERS ARE NOT ENTITLED TO ACTIVE

13 PLAYER LICENSING MONEY AND ALL THE MONEY IN THE GLR POOL IS

14 ACTIVE PLAYER LICENSING MONEY, CORRECT?

15 A.   IF THOSE TWO ASSUMPTIONS ARE TRUE, THEN, YES.

16      MR. KESSLER:  YOUR HONOR, I MAY BE FINISHED.  JUST

17 LOOKING THROUGH MY NOTES.

18      I THINK I'M GOING TO QUIT WHILE I'M AHEAD.  THANK

19 YOU, YOUR HONOR.

20      THE COURT:  ALL RIGHT.

21      ANY REDIRECT?

22      MR. HUMMEL:  YES, YOUR HONOR.

23                  **REDIRECT EXAMINATION**

24 BY MR. HUMMEL:

25 Q.   ALL RIGHT, MR. ROWLEY.  LET'S TRY TO SEPARATE BACK OUT

1    SOME APPLES FROM SOME ORANGES.

2              WHERE DID YOU GET YOUR DEFINITION OF "GROUP

3    LICENSING"?

4    **A.**   I GOT IT FROM THE GLA.

5              **MR. HUMMEL:**  COULD YOU PUT EXHIBIT 110 ON THE BOARD,

6    PLEASE.

7              (DOCUMENT DISPLAYED.)

8    **BY MR. HUMMEL:**

9    **Q.**   YOU DIDN'T MAKE UP A DEFINITION OF "GROUP LICENSING," DID

10   YOU?

11   **A.**   NO, SIR.

12   **Q.**   YOU DIDN'T PULL IT OUT OF WHOLE CLOTH, AS MR. KESSLER IS

13   TRYING TO EXPLAIN TO THIS JURY, RIGHT?

14             **MR. KESSLER:**  YOUR HONOR --

15             **MR. HUMMEL:**  COULD YOU BLOW UP THE SECOND PARAGRAPH.

16             I DIDN'T INTERRUPT HIM.

17             **MR. KESSLER:**  I'M OBJECTING BECAUSE YOU ARE LEADING,

18   COUNSEL.  I THINK I AM ENTITLED TO DO THAT.

19             **MR. HUMMEL:**  I DIDN'T INTERRUPT YOU.

20             **MR. KESSLER:**  YOUR HONOR, I HAD AN OBJECTION.

21             **THE COURT:**  SUSTAINED.  YOU ARE LEADING THE WITNESS.

22   **BY MR. HUMMEL:**

23   **Q.**   DID YOU PULL YOUR DEFINITION OF "GROUP LICENSING" OUT OF

24   THIN AIR, SIR?

25   **A.**   NO.

1   **Q.**   WHERE DID YOU GET IT?

2   **A.**   I TOOK IT FROM THE RELEVANT GLA.

3   **Q.**   WHERE, SPECIFICALLY?  COULD YOU READ THE WORDS TO THE JURY

4   THAT YOU TOOK YOUR DEFINITION OF "GROUP LICENSING" FROM.

5   **A.**   IT'S THE SECOND PARAGRAPH.  IT STATES:

6             "GROUP LICENSING PROGRAMS ARE DEFINED AS

7   PROGRAMS WHICH A LICENSEE UTILIZES A TOTAL OF SIX OR MORE

8   PRESENT OR FORMER" --

9   **Q.**   STOP RIGHT THERE.  "PRESENT OR FORMER."

10            **MR. KESSLER:**  YOUR HONOR, I OBJECT TO THIS.  HE

11  INTERRUPTED HIS OWN WITNESS SO HE CAN LEAD HIM --

12            **MR. HUMMEL:**  I'M NOT TRYING TO LEAD.

13            **MR. KESSLER:**  -- IN THE MIDDLE OF HIS ANSWER, YOUR

14  HONOR.

15            I AM ENTITLED TO THE WITNESS'S UN-LED ANSWER.

16            **MR. HUMMEL:**  HE DOESN'T LIKE THE LANGUAGE OF THE GLA.

17            YOU CAN READ THE WHOLE THING.

18            **MR. KESSLER:**  NOW HE'S ARGUING, YOUR HONOR.

19            **THE COURT:**  WELL, JUST FINISH READING THAT PARAGRAPH.

20  IT'S SHORT ENOUGH.  AND THEN, WE'LL HAVE A FRESH QUESTION.

21            **THE WITNESS:**  YES, SIR.

22            **THE COURT:**  GO AHEAD, PLEASE.

23            **THE WITNESS:**  "... PRESENT OR FORMER NFL PLAYER

24  IMAGES IN CONJUNCTION WITH OR ON PRODUCTS THAT ARE SOLD AT

25  RETAIL OR USED AS PROMOTIONAL OR PREMIUM ITEMS."

**BY MR. HUMMEL:**

Q.   NOW, MR. KESSLER, MR. KESSLER WROTE THREE WORDS ON THE

BOARD HERE:  "ACTIVE PLAYER MONEY."

        WHERE IN THE GLA DOES IT SAY "ACTIVE PLAYER MONEY"?

A.   IT DOESN'T, COUNSEL.

Q.   RIGHT.

        NOW, CAN YOU TELL THE LADIES AND GENTLEMEN OF THE

JURY, DID THE NFLPA AND PI, IN FACT, TREAT GLR MONEY AS ACTIVE

PLAYER MONEY VERSUS RETIRED PLAYER MONEY, AS MR. KESSLER

INSINUATES?

        **MR. KESSLER:**  YOUR HONOR, I BELIEVE THIS GOES BEYOND

ANY TESTIMONY THIS WITNESS HAS IN TERMS OF HIS CALCULATIONS.

        **THE COURT:**  WELL, BUT IN LIGHT OF ALL THOSE QUESTIONS

THAT -- IT MAY HAVE BEEN TRUE ON DIRECT, BUT IN LIGHT OF THE

CROSS EXAMINATION, FAIRNESS REQUIRES THAT THIS QUESTION BE

ALLOWED.

        GO AHEAD.

**BY MR. HUMMEL:**

Q.   HOW DID THEY -- HOW DID THEY TREAT THIS POOL?  WAS IT

ACTIVE VERSUS RETIRED?

A.   NO, IT WAS SIMPLY DISTRIBUTED TO ACTIVE PLAYERS.

Q.   DID THEY CHARACTERIZE IT AS ACTIVE PLAYERS OR DID THEY

CHARACTERIZE IT SOME OTHER WAY?

A.   GROSS LICENSING REVENUES.  GROUP LICENSING PROGRAM.

Q.   GROUP LICENSING PROGRAMS, RIGHT?

1   A.   YES.

2   Q.   OKAY.  SO THEY DIDN'T TREAT IT AS ACTIVE PLAYER MONEY, DID

3   THEY?

4   A.   NO.

5   Q.   HOW DID THEY TREAT IT?

6   A.   THEY TREATED IT AS GROUP LICENSING REVENUES ULTIMATELY

7   INTO AN EQUAL SHARE POOL.

8   Q.   AND IN ORDER FOR THERE TO BE THIS ACTIVE PLAYER MONEY THAT

9   MR. KESSLER LIKES TO TALK ABOUT, DID THEY HAVE TO WRITE --

10  REWRITE THE WORDS OF THE CONTRACTS?

11          MR. KESSLER:  OBJECTION, YOUR HONOR.

12          THE COURT:  THAT'S PRETTY ARGUMENTATIVE.  I WILL

13  SUSTAIN THAT OBJECTION.

14          MR. HUMMEL:  YOU MADE IT YOURSELF.

15  BY MR. HUMMEL:

16  Q.   ALL RIGHT.  IS THERE ANY DISTINCTION IN THE GLA FROM WHICH

17  YOU TOOK YOUR DEFINITION OF "GROUP LICENSING," THAT CARVES OUT,

18  THAT CARVES OUT FORMER PLAYERS?

19  A.   NO.

20  Q.   NOW, SO LET'S TALK ABOUT WHAT YOU, IN FACT, ANALYZED.

21          THIS MONEY, GLR, GROUP LICENSING REVENUE (INDICATING)

22  CAME FROM WHERE?

23  A.   IT CAME FROM A SERIES OF LICENSEES THAT THE NFLPA/PI HAS.

24  IT ALSO CAME FROM AN NFL SPONSORSHIP AGREEMENT.

25  Q.   DID THOSE LICENSES CONTAIN THE RIGHTS TO SIX OR MORE

1   PRESENT OR FORMER NFL PLAYERS?

2          **MR. KESSLER:**  OBJECTION, YOUR HONOR.  HE HAS NO

3   FOUNDATION ANYWHERE THAT HE'S EVER DONE THAT ANALYSIS.  IN

4   FACT, HE TESTIFIED HE DOESN'T KNOW WHAT RIGHTS ARE GRANTED

5   UNDER THOSE AGREEMENTS.

6          **THE COURT:**  WELL, THERE'S TRUTH TO THAT.  AND I

7   CAUTION THE WITNESS, YOU START GETTING OFF ON A LIMB ON

8   SOMETHING YOU'RE NOT AN EXPERT ON, IT'S GOING TO BE YOUR OWN

9   FAULT IF THE LIMB WILL GET SAWED OFF.

10          BUT, MR. KESSLER, YOU ASKED A LOT OF QUESTIONS ALONG

11   THESE SAME LINES, SO I FEEL IN FAIRNESS I HAVE TO ALLOW --

12          **MR. KESSLER:**  THAT'S FINE, YOUR HONOR.  MY QUESTIONS

13   HE SAID HE DIDN'T KNOW.  IF HE NOW KNOWS, I WILL CERTAINLY ASK

14   HIM ABOUT IT.

15          **THE COURT:**  I'M GOING TO ALLOW THE QUESTION.  AND --

16   I'VE SAID ENOUGH.

17          OVERRULED.  GO AHEAD.

18   **BY MR. HUMMEL:**

19   **Q.**   LET ME ASK IT THIS WAY:  DID YOU MAKE ANY INDEPENDENT

20   JUDGMENT AS TO WHETHER THE GLR IS ACTIVE OR RETIRED MONEY?

21   **A.**   NO.

22   **Q.**   ALL RIGHT.  DID YOU -- WHAT DID YOU ASSUME ABOUT THIS

23   MONEY?

24   **A.**   I ASSUMED THAT HOW NFLPA/PI HAD CLASSIFIED IT WAS THE

25   CORRECT MANNER.

1  **Q.**   RIGHT.  AND HOW DID THEY CLASSIFY IT?  WHAT WAS THE

2  DICHOTOMY THEY SET UP?

3  **A.**    THEY CALLED IT "GROUP LICENSING REVENUES," SEPARATE FROM

4  PERFORMANCE OR AD HOC AGREEMENTS.

5  **Q.**   ALL RIGHT.  SO THEY INTERNALLY SET UP A DISTINCTION

6  BETWEEN "GROUP" AND "AD HOC"?

7            **MR. KESSLER:**  OBJECTION, LEADING.

8  **BY MR. HUMMEL:**

9  **Q.**   IS THAT WHAT YOU FOUND?

10           **MR. KESSLER:**  LEADING, YOUR HONOR.

11           **THE WITNESS:**  YES, THAT IS CORRECT.  YOU CAN LOOK TO

12  THE FINANCIAL STATEMENTS.

13           **THE COURT:**  WELL, THE PRIOR QUESTION WAS NOT LEADING,

14  SO THAT SUMMARY QUESTION WILL BE ALLOWED.

15           OVERRULED.

16  **BY MR. HUMMEL:**

17  **Q.**   OKAY.  AND WHAT YOU LOOKED AT WAS JUST THE FLOW OF GROUP

18  MONEY, CORRECT?

19  **A.**   CORRECT.

20  **Q.**   AND DID YOUR DAMAGES, YOUR -- WELL, YOUR CALCULATIONS --

21  MR. KESSLER USED THE WORD "DAMAGES."  DID YOUR CALCULATIONS

22  EXAMINE THE AD HOC PART OF HOW THEY DIVIDED THE WORLD?

23  **A.**   NO.

24  **Q.**   JUST ANSWER THIS ONE QUESTION.  MR. KESSLER KEPT SAYING:

25           "THIS IS YOUR WORLD.  THIS IS YOUR WORLD."

1             WHOSE WORLD IS IT?

2   **A.**   IT'S NFLPA/PI.

3   **Q.**   THAT'S HOW THEY DID IT, RIGHT?

4   **A.**   CORRECT.

5   **Q.**   DID YOU MAKE ANY JUDGMENTS ANY DIFFERENT FROM HOW THEY DID

6   IT?

7   **A.**   AS TO THE GROUP REVENUES?

8   **Q.**   RIGHT.

9   **A.**   NO.

10  **Q.**   OKAY.  SO NOW WE ESTABLISHED WHAT YOU LOOKED AT.  YOU

11  LOOKED AT THE GROUP REVENUES.  AND YOU LOOKED AT THE GLA,

12  CORRECT?

13  **A.**   CORRECT.

14  **Q.**   ALL RIGHT.  NOW, MR. KESSLER ASKED YOU A QUESTION --

15          **MR. HUMMEL:**  YOUR HONOR, I'M GOING TO ASK PERMISSION

16  TO LEAD JUST TO PUT THE CONTEXT OF THE TOPIC I'M TALKING ABOUT.

17  IN OTHER WORDS, I'M GOING TO ASK HIM A QUESTION ABOUT WHAT

18  MR. KESSLER ASKED.

19          **THE COURT:**  AS LONG AS IT'S PRELIMINARY.

20          **MR. HUMMEL:**  IT IS.

21          **THE COURT:**  YOU ARE FINE TO LEAD.

22          GO AHEAD.

23  **BY MR. HUMMEL:**

24  **Q.**   ALL RIGHT.  SO IT'S PRELIMINARY.  SO MR. KESSLER ASKED

25  YOU:

1          "DID YOU DO A BUT-FOR WORLD ANALYSIS?"

2          DO YOU RECALL THAT?

3   **A.**   YES.

4   **Q.**   WHAT IS A BUT-FOR WORLD ANALYSIS?

5   **A.**   A BUT-FOR WORLD ANALYSIS IS:  HAD WHAT WAS ALLEGED TO HAVE

6   HAPPENED, HAD THE PLAYERS BEEN PAID, WHAT WOULD HAVE OCCURRED?

7   YOU'RE LOOKING TO IN THIS HYPOTHETICAL WHAT SHOULD HAVE

8   HAPPENED.

9   **Q.**   SO WHAT YOU DID WAS, IN FACT, A BUT-FOR WORLD ANALYSIS,

10  RIGHT?

11  **A.**   YES.

12  **Q.**   OKAY.  CAN YOU EXPLAIN TO THE LADIES AND GENTLEMEN OF THE

13  JURY WHAT THAT MEANS?

14  **A.**   WHAT THAT MEANS IS THERE WAS A GROUP -- A POOL OF GROUP

15  LICENSING REVENUES, ALL RIGHT?  NFLPA/PI PULLED OUT CERTAIN

16  MONEY.  THEY MADE CERTAIN DEDUCTIONS.

17          I THEN LOOKED TO:  IF THE RETIRED PLAYERS HAD

18  PARTICIPATED IN THAT POOL, WHAT WOULD HAVE BEEN THEIR SHARE?

19  **Q.**   OKAY.  NOW, HE TRIED TO QUESTION YOU ABOUT:

20          "WELL, THERE MIGHT HAVE BEEN A DIFFERENT BUT-FOR

21  WORLD BECAUSE IF, IN FACT" -- LET ME SEE IF I CAN GET THIS

22  RIGHT "IF, IN FACT, THEY LIVED UP TO THEIR PROMISE AND PAID

23  RETIRED PLAYERS, MAYBE MORE WOULD HAVE SIGNED UP."

24          WAS THAT HIS QUESTION TO YOU?

25  **A.**   IN ESSENCE, YES.

1    **Q.**   DOES THAT MAKE ANY SENSE?

2    **A.**   NO.   BECAUSE THERE'S AN ASSUMPTION HERE THAT WHEN THEY

3    WERE ATTEMPTING TO RECRUIT RETIRED PLAYERS THEY WERE GOING TO

4    PAY THEM.

5    **Q.**   SO -- AND THEN, HE ASKED YOU:

6              "WOULD YOU HAVE SIGNED THIS AGREEMENT," RIGHT?

7              AND SO HIS ASSUMPTION IS, WHAT, YOU GOT THE AGREEMENT

8    AND YOU KNEW THEY WERE GOING TO BREACH THEIR OBLIGATIONS?   IS

9    THAT WHAT HE'S ASKING?

10             **MR. KESSLER:**   YOUR HONOR, THAT'S JUST ARGUMENT AND

11   HE'S LEADING.

12             **MR. HUMMEL:**   WITHDRAWN.   WITHDRAWN.

13   **BY MR. HUMMEL:**

14   **Q.**   NOW, LET'S TALK ABOUT -- LET'S TALK ABOUT THIS ALTERNATIVE

15   MEASURE OF DAMAGES THAT MR. KESSLER ASKED YOU ABOUT, THIS

16   $11 MILLION NUMBER.

17             COULD YOU LOOK, PLEASE -- I THINK IT SHOULD BE UP

18   THERE -- AT EXHIBIT NO. 1221.   IT SHOULD BE IN FRONT OF YOU.

19   **A.**   YES.

20   **Q.**   DO YOU HAVE IT?

21   **A.**   YES, I DO.

22   **Q.**   CAN YOU TELL THE JURY WHAT EXHIBIT 1221 IS?

23   **A.**   1221 IS A LIST OF LICENSE AGREEMENTS THAT HAD PARTICULAR

24   LANGUAGE THAT COUNSEL ASKED ME TO REVIEW.

25   **Q.**   OKAY.   WHAT WAS THAT LANGUAGE?

1  **A.**   THE LANGUAGE WAS, AS I RECALL, A CERTAIN PARAGRAPH

2  REFERENCED PLAYERS AND NOT LIMITED TO RETIRED PLAYERS,

3  SPECIFIED RETIRED PLAYERS.

4         LATER THERE WAS ALSO 2A THAT REFERENCED BACK TO THAT

5  DEFINITION.

6  **Q.**   SO YOU WENT THROUGH THE LICENSE AGREEMENTS IN THIS CASE

7  AND IDENTIFIED THOSE THAT HAD THE LANGUAGE, WHAT I'LL CALL

8  "SIMILAR TO THE EA CONTRACT LANGUAGE," RIGHT?

9  **A.**   THAT'S CORRECT.

10  **Q.**   OKAY.  AND DID YOU PREPARE THIS SUMMARY?

11  **A.**   YES.

12  **Q.**   AND DOES IT ACCURATELY REFLECT THE LIST OF LICENSES THAT

13  HAD THAT -- WHAT I'LL CALL "THE EA LANGUAGE" FOR LACK OF A

14  BETTER WORD?

15  **A.**   YES.  I HAD A QUESTION ON THE TOPPS AGREEMENT, BUT, YES,

16  IT DOES.

17  **Q.**   ALL RIGHT.

18         **MR. HUMMEL:**  YOUR HONOR, MOVE 1221.

19         **MR. KESSLER:**  NO OBJECTION.

20         **MR. HUMMEL:**  DISPLAY 1221, PLEASE.

21         **THE COURT:**  RECEIVED.

22         (TRIAL EXHIBIT 1221 RECEIVED IN EVIDENCE.)

23         (DOCUMENT DISPLAYED.)

24  **BY MR. HUMMEL:**

25  **Q.**   SO THIS IS A SUBSET OF ALL THE LICENSES, RIGHT?

1  **A.**   THAT'S CORRECT.

2  **Q.**   AND THIS IS AN ANALYSIS THAT YOU PREPARED WHY?

3  **A.**   COUNSEL ASKED ME TO DO IT.

4  **Q.**   DID YOU UNDERSTAND THE REASON?

5  **A.**   I THINK IF THERE WAS A LIABILITY QUESTION AROUND THAT

6  LANGUAGE, COUNSEL WANTED THE ABILITY TO PRESENT THAT TO THE

7  JURY AS A CALCULATION.

8  **Q.**   ALL RIGHT.  IN OTHER WORDS -- AND WHAT WAS THE LIABILITY

9  QUESTION AT ISSUE HERE?

10 **A.**   MY UNDERSTANDING IS AS A LAYPERSON IS IF THAT LANGUAGE IS

11 WHAT TRIGGERED THE MOST RELEVANT GROUP LICENSES, THAT'S WHAT WE

12 WOULD ANALYZE.

13 **Q.**   SO DO YOU KNOW, FOR EXAMPLE, THIS 11 MILLION THAT

14 MR. KESSLER PUT ON THE BOARD, DOES THAT NUMBER ASSUME THE 63

15 THROUGH 69 WAS APPROPRIATE?

16 **A.**   YES.

17 **Q.**   ALL RIGHT.  SO THE 11 WOULD ACTUALLY GO THERE, RIGHT

18 (INDICATING)?

19 **A.**   CORRECT.

20 **Q.**   OKAY.  AND THEN, DID YOU DO FURTHER CALCULATIONS THAT HE

21 DIDN'T ASK YOU ABOUT, AS TO WHAT THE 40/25 AND 10 WOULD BE IF

22 THIS SUBSET OF LICENSES WERE ONLY THOSE TRIGGERED?

23 **A.**   YES.

24 **Q.**   WHAT ARE THOSE?  DO YOU KNOW OFF THE TOP OF YOUR HEAD?

25 **A.**   I CAN FIND IT.

1  Q.   IT'S IN ONE OF THE EXHIBITS MR. KESSLER SHOWED YOU.

2  A.   I KNOW HE PUT IT UP BECAUSE WE WALKED THROUGH THE -- WE

3  WALKED THROUGH THE 16 CALCULATIONS.

4  Q.   OKAY.  WOULD THE PERCENTAGES -- WITHOUT WASTING TOO MUCH

5  OF THE JURY'S TIME, MR. ROWLEY, WOULD THE PERCENTAGES ROUGHLY

6  TRACK?  SO IF YOU HAD 11 TO 29 YOU WOULD HAVE SOME OTHER NUMBER

7  TO 49 AND SOME OTHER NUMBER TO 61?

8  A.   YES.

9  Q.   DID IT FLOW LIKE THAT?

10  A.   YES.

11  Q.   THAT'S ENOUGH.

12          SO LET ME ASK YOU ABOUT THIS PARTICULAR --

13          **MR. HUMMEL:**  COULD YOU PUT THE GLA DEFINITION OF

14  "GROUP LICENSE" UP AGAIN, EXHIBIT 110?

15          (DOCUMENT DISPLAYED.)

16  **BY MR. HUMMEL:**

17  Q.   ALL RIGHT.  DID THAT SET ASSUME THAT THIS READ "SIX OR

18  MORE FORMER NFL PLAYER IMAGES" AND STRUCK THE PHRASE "PRESENT"?

19          **MR. KESSLER:**  YOUR HONOR, I OBJECT.  THE WITNESS

20  TESTIFIED HE HAS NO OPINION AS TO WHAT THIS LANGUAGE MEANS.

21          (COUNSEL SPEAKING SIMULTANEOUSLY; NOT REPORTABLE.)

22          **MR. HUMMEL:**  I'M ASKING ABOUT --

23          **MR. KESSLER:**  -- LAWYER'S ARGUMENT, AGAIN, IN GETTING

24  THE WITNESS TO SAY WHAT IT READS.

25          **THE COURT:**  NO, YOU WENT INTO VARIOUS ALTERNATIVE

1    ASSUMPTIONS.  COUNSEL CAN DO THAT ON REDIRECT.

2              OVERRULED.

3              **MR. HUMMEL:**  THANK YOU, YOUR HONOR.

4    **BY MR. HUMMEL:**

5    **Q.**   SO THIS SUBSET, DOESN'T IT ASSUME AN ALTERNATIVE READING

6    OF THE GLA, THAT THE LICENSES THAT CONFERRED RIGHTS TO RETIRED

7    PLAYERS SHOULD BE INCLUDED ONLY, AND NOT THOSE LICENSES THAT

8    LICENSE GROUPS OF ACTIVES?

9    **A.**   NO, IT DOESN'T ASSUME THAT.

10   **Q.**   WHAT DOES IT ASSUME?

11   **A.**   SIX OR MORE PRESENT -- SIX OR MORE PRESENT OR FORMER NFL

12   PLAYERS.

13   **Q.**   RIGHT.  BUT I'M ASKING YOU ABOUT EXHIBIT 1221, WHICH IS

14   THE SUBSET OF LICENSES THAT HAD A SPECIFIC REFERENCE TO RETIRED

15   PLAYERS.

16   **A.**   YES.

17   **Q.**   ALL RIGHT?

18   **A.**   THERE WAS A PARAGRAPH THERE THAT SPECIFICALLY REFERENCED

19   AND NOT LIMITED TO RETIRED PLAYERS.

20   **Q.**   RIGHT.  AND THERE'S ANOTHER SET OF LICENSES NOT LISTED ON

21   1221 THAT DOESN'T HAVE A SPECIFIC REFERENCE TO RETIRED PLAYERS,

22   CORRECT?

23   **A.**   THAT'S CORRECT.

24   **Q.**   OKAY.  SO IF YOU -- IF THE JURY WERE TO LIMIT ITSELF TO

25   THE LICENSEES LISTED ON 1221, WOULDN'T THEY HAVE TO READ OUT OF

1  THIS AGREEMENT "PRESENT"?

2         **THE COURT:**  I'M GOING TO SUSTAIN THAT OBJECTION.

3         **MR. KESSLER:**  THANK YOU, YOUR HONOR.

4         **THE COURT:**  LET ME SAY SOMETHING TO THE JURY FOR A

5  SECOND.

6         WHEN THIS CASE GOES TO YOU FOR DELIBERATIONS, YOU'RE

7  GOING TO HAVE TO DECIDE ON THE MEANING OF VARIOUS CONTRACTS.

8  AND I WILL BE GIVING YOU SOME GUIDELINES WHICH ARE CALLED

9  "RULES FOR CONSTRUCTION OF THE CONTRACTS."

10        SO YOU'RE THE ONE THAT'S GOING TO BE DECIDING ON

11  WHAT -- WHETHER OR NOT THIS RETIRED PLAYER GLA CONFERRED A

12  RIGHT ON THE PEOPLE WHO SIGNED IT TO PARTICIPATE ON AN EQUAL

13  SHARE BASIS IN THE GROUP LICENSING REVENUE.

14        BUT YOU HAVE TO DO THAT AS A MATTER OF CONTRACT

15  INTERPRETATION.  I'M GOING TO GIVE YOU A LOT OF GUIDELINES

16  ON -- A NUMBER OF GUIDELINES, NOT A LOT -- ON HOW TO GO ABOUT

17  MAKING THAT DECISION.

18        BUT ONE THING THAT THIS WITNESS -- HE IS QUALIFIED ON

19  A NUMBER OF THINGS.  HE IS NOT QUALIFIED TO GIVE YOU ANY

20  INTERPRETATIONS OF ANY OF THESE CONTRACTS.  AND I DON'T THINK

21  HE'S ACTUALLY PURPORTED TO DO THAT, ALTHOUGH YOU KEEP ASKING

22  HIM THESE QUESTIONS.

23        THIS WITNESS, HE IS A NUMBERS CRUNCHER.

24         **MR. HUMMEL:**  RIGHT.

25         **THE COURT:**  AN ECONOMIST.

1          NOW, PEOPLE -- THERE ARE A LOT OF PEOPLE YOU HAVE

2    HEARD FROM, LIKE THE VIEWS OF THE PEOPLE WHO SIGNED THE

3    AGREEMENTS, AND THE VIEWS OF THE SURROUNDING CIRCUMSTANCES AND

4    TRYING TO GET AT WHAT WERE THE REASONABLE EXPECTATIONS OF THE

5    PARTIES.

6          SO IT WOULD BE WRONG FOR YOU TO TAKE ANYTHING THIS

7    WITNESS SAID ON WHAT THE MEANING OF THESE CONTRACTS MEAN AND

8    GIVE THAT ANY WEIGHT IN DECIDING ON IT.

9          NOW, I THINK YOU ARE BOTH -- BOTH SIDES ARE REACHING

10   THE POINT HERE WHERE YOU ARE IN DANGER OF TRYING TO PUT THIS

11   WITNESS OUT ON A LIMB THAT HE'S NOT QUALIFIED TO GET OUT ON.

12          **MR. HUMMEL:**  I'M NOT DOING THAT, YOUR HONOR.

13          **THE COURT:**  SO LET'S MOVES TO SOMETHING HE'S

14   QUALIFIED TO ANSWER.

15          **MR. HUMMEL:**  WHAT I'M ASKING IS WHAT HIS ASSUMPTIONS

16   WERE IN EVEN PREPARING --

17          **THE COURT:**  YOU KEEP SAYING "THEY WOULD HAVE TO READ

18   THIS OUT."  THAT'S SO ARGUMENTATIVE.  YOU'RE ASKING HIM TO

19   INTERPRET THIS CONTRACT.

20          **MR. HUMMEL:**  FAIR ENOUGH.  I'M NOT.

21          **THE COURT:**  SO WE'RE NOT GOING TO GO DOWN THAT PATH.

22          **MR. HUMMEL:**  I'LL MOVE ON TO SOMETHING ELSE.  A

23   COUPLE MORE TOPICS, AND WE'RE DONE.

24   **BY MR. HUMMEL:**

25   **Q.**   MR. KESSLER ASKED YOU ABOUT WHETHER YOU HAVE A DAMAGE

1   STUDY THAT WOULD ALLOW THE JURY TO ASSESS IF THEY WERE TO FIND,

2   FOR EXAMPLE, THAT THE DEFENDANTS FAILED TO MARKET THE RETIRED

3   PLAYER GROUP, COULD YOU USE THAT DAMAGE STUDY.  AND I THINK YOU

4   SAID "NO."

5              BUT COULD YOU NOW EXPLAIN THAT ANSWER MORE FULLY?

6   **A.**   I THINK THAT THIS REPRESENTS AT A MINIMUM WHAT WOULD HAVE

7   BEEN AVAILABLE TO THE RETIRED PLAYERS HAD THEY PARTICIPATED IN

8   THE POOL.

9              IT DOESN'T REALLY LOOK TO HAD THERE BEEN INCREMENTAL

10  REVENUES OR LICENSES THAT WERE GENERATED FOR THE RETIRED

11  PLAYERS, WHAT MIGHT HAVE BEEN KICKED OFF.

12  **Q.**   SO DID YOU LOOK AT SEPARATE ALLEGED BREACHES OF FIDUCIARY

13  DUTY AND ALLOCATE SEPARATE AMOUNTS TO EACH SEPARATE ALLEGED

14  BREACH?

15  **A.**   IN MY ORIGINAL REPORT?

16  **Q.**   IN YOUR -- IN YOUR ORIGINAL REPORT.

17  **A.**   NO.

18  **Q.**   WHY NOT?

19  **A.**   AT THE TIME I INTERPRETED IT AS THE BREACH WAS THAT THE

20  PLAYERS DIDN'T RECEIVE THE MONEY, THE BREACH OF CONTRACT, AND

21  THAT THE BREACH OF FIDUCIARY DUTY WAS THE FACT THAT NFLPA/PI

22  DIDN'T ENSURE THAT THEY RECEIVED THAT MONEY.

23  **Q.**   OKAY.

24             NOW, ONE FINAL TOPIC.  MR. KESSLER HAD YOU LOOK AT

25  EXHIBIT NO. 1217.  DO YOU HAVE THAT IN FRONT OF YOU, SIR?

1          **MR. HUMMEL:**  CAN WE PUT 1217 ON THE BOARD?

2          (DOCUMENT DISPLAYED.)

3   **BY MR. HUMMEL:**

4   **Q.**   AND IT LOOKS, MR. ROWLEY -- AND I THINK THIS WAS

5   MR. KESSLER'S IDEA HERE -- THAT YOU WERE INCLUDING ONE YEAR

6   IN -- DO YOU HAVE 1217?  I'LL GIVE YOU A COPY.

7   **A.**   YES, I DO.

8   **Q.**   DO YOU HAVE IT?

9   **A.**   YES.

10  **Q.**   HE WAS ATTEMPTING TO MAKE IT LOOK AS IF YOU WERE INCLUDING

11  A YEAR THAT SHOULDN'T HAVE BEEN INCLUDED.  DO YOU RECALL THAT?

12         **MR. KESSLER:**  OBJECTION, YOUR HONOR.  HE'S

13  CHARACTERIZING --

14         **THE COURT:**  THAT'S THE WAY IT CAME ACROSS.  THAT'S A

15  FAIR CHARACTERIZATION.

16         (LAUGHTER)

17         **MR. HUMMEL:**  GOODNESS SAKES.

18         **MR. KESSLER:**  FINE.

19         **THE COURT:**  OVERRULED.

20  **BY MR. HUMMEL:**

21  **Q.**   THAT'S WHERE I WAS IN YOUR QUESTION.  SO HE WAS TRYING TO

22  DO THAT, RIGHT?

23         CAN YOU EXPLAIN TO THE JURY VERY SIMPLY WHY THE

24  NUMBERS INCLUDED ON 1217, IN YOUR VIEW, WERE APPROPRIATE?

25  **A.**   A COUPLE OF THINGS.  FIRST OFF, I UNDERSTOOD THAT THE

1  PERIOD STARTED IN FEBRUARY 15TH OF 2004.  THE FISCAL YEAR FOR

2  NFLPA/PI IS ACTUALLY FEBRUARY 28TH.  THAT'S HOW 2004 IS

3  ACTUALLY DETERMINED.

4       ULTIMATELY, THE PAYMENTS THAT WENT OUT TO PLAYERS ARE

5  IN THE FALL OR LATTER PART OF THE CALENDAR YEAR OF 2004.

6       I THEN FELT IT WAS APPROPRIATE IF YOU LOOK AT THE

7  OVERALL PROGRAM TO INCLUDE FROM A FISCAL YEAR STANDPOINT AND

8  WHEN THE PAYMENTS WERE MADE THOSE -- THOSE FIGURES THAT ARE

9  CLASSIFIED HERE AS 2004.

10 **Q.**  ALL RIGHT.  AND THEN, LET ME ASK YOU ONE FINAL QUESTION.

11      LOOK AT 2007.  WHAT'S THE END OF THE STATUTORY

12 PERIOD, AS YOU UNDERSTAND IT?

13 **A.**  ALSO FEBRUARY 14TH.

14 **Q.**  2000?

15 **A.**  8.  I NEED TO DOUBLE-CHECK.

16      **THE COURT:**  NO.

17 **BY MR. HUMMEL::**

18 **Q.**  YOU DON'T KNOW?  IT'S '07.

19      **THE COURT:**  '07?

20      **THE WITNESS:**  '07.

21      **MR. HUMMEL:**  RIGHT.

22      **THE COURT:**  IS THE THREE YEARS?

23      **MR. HUMMEL:**  RIGHT.

24 **BY MR. HUMMEL:**

25 **Q.**  SO WHY WERE THESE NUMBERS ON THIS CHART APPROPRIATE TO

1   USE?

2   **A.**   AGAIN, THAT WAS THE REMAINDER OF THAT FISCAL YEAR.  AND SO

3   I WENT AHEAD AND INCLUDED THEM.

4   **Q.**   OKAY.  AND YOU STAND BY THOSE NUMBERS?

5   **A.**   YES.

6          **MR. HUMMEL:**  OKAY.  NOTHING FURTHER, YOUR HONOR.

7          **THE COURT:**  CAN I JUST ASK A QUESTION?  I'M GOING TO

8   ASK COUNSEL FIRST.

9          WE HAVE A THREE-YEAR DAMAGES PERIOD, RIGHT?

10          **MR. HUMMEL:**  RIGHT.

11          **THE COURT:**  SO WITHOUT GETTING INTO WHETHER YOU GO

12   WITH WHEN IT'S ON A CASH BASIS VERSUS AN ACCRUAL BASIS.  IT'S

13   JUST GOING TO BE THREE.  YOU CAN'T HAVE FOUR YEARS.

14          **MR. HUMMEL:**  CORRECT.

15          **THE COURT:**  ARE YOU TRYING TO GET FOUR YEARS?

16          **MR. HUMMEL:**  NO, YOUR HONOR, WE ARE NOT.

17          **THE COURT:**  GO AHEAD.

18          **MR. KESSLER:**  SOME RECROSS.

19                        <u>**RECROSS EXAMINATION**</u>

20   **BY MR. KESSLER:**

21   **Q.**   YOU HAVE FOUR DIFFERENT YEARS OF PAYMENTS ON YOUR CHARTS,

22   CORRECT?

23   **A.**   YES.

24   **Q.**   SO THE JURY COULD ONLY CONSIDER, AS THE COURT JUST

25   EXPLAINED AND AS COUNSEL SAID, THREE YEARS OF PAYMENTS,

1    CORRECT?

2    **A.**   I THINK THAT WAS THE DIRECTION OF HIS HONOR.

3    **Q.**   RIGHT.  OKAY.  SO YOU AGREE THAT ONE OF THESE YEARS ON

4    YOUR CHART COULD NEVER BE USED IN THIS CASE?  HAS TO BE THREE.

5    CAN'T BE FOUR.  YES OR NO?

6    **A.**   THAT WASN'T MY UNDERSTANDING WHEN I MET WITH COUNSEL.

7    **Q.**   BUT IT'S YOUR UNDERSTANDING RIGHT NOW?

8    **A.**   YES.  MY UNDERSTANDING WAS ON A CALENDAR BASIS.

9    **Q.**   NOW, I JUST HAVE A FEW AREAS TO GO INTO, MR. ROWLEY.

10            MR. ROWLEY, LET'S GO BACK --

11            **MR. KESSLER:**  YOUR HONOR, IF I MAY APPROACH THE

12   CHART.

13            **THE COURT:**  I'M GOING TO GIVE YOU A LIMITED AMOUNT OF

14   TIME.  I THINK WE HAVE GONE -- HOW ABOUT MAKE IT FIVE MINUTES?

15   CAN YOU DO THIS IN FIVE MINUTES?

16            **MR. KESSLER:**  GIVE ME FIVE TO TEN, YOUR HONOR.

17            **THE COURT:**  TEN MINUTES, AND THAT'S IT.

18            **MR. KESSLER:**  OKAY.  VERY GOOD.  THANK YOU, YOUR

19   HONOR.

20   **BY MR. KESSLER:**

21   **Q.**   NOW, COUNSEL KEPT ASKING QUESTIONS ABOUT GLR, RIGHT?  AND

22   HE KEPT USING THE WORD "GROUP LICENSING REVENUE."  AND YOU KEPT

23   USING THE WORD "GROUP LICENSING REVENUE."

24            DO YOU RECALL THAT?

25   **A.**   YES.

1  Q.   TELL THE JURY WHAT THE G ACTUALLY STANDS FOR IN THE GLR

2  POOL.  IS IT GROUP?

3  A.   IT'S BOTH.

4  Q.   IS IT "GROUP," SIR, OR IS IT "GROSS"?

5  A.   IT IS BOTH.

6  Q.   OKAY.  LET ME TEST THAT WITH YOU.  SO YOUR TESTIMONY TO

7  THE JURY IS THAT THE G DOESN'T MEAN "GROSS"?  THAT'S YOUR SWORN

8  TESTIMONY?

9        YES OR NO?

10 A.   IT DOES.  YOU WILL SEE IT REFLECTED IN THE FINANCIAL

11 STATEMENTS AS "GROSS."  BUT YOU WILL ALSO SEE IN THE FOOTNOTES

12 IT REFERRED TO AS "GROUP."

13 Q.   LET ME SHOW YOU, FIRST, EXHIBIT 2004, IF WE CAN.

14        ARE THESE THE INFORMATION THAT YOU USED TO CALCULATE

15 YOUR GLR AMOUNTS?

16 A.   FOR 2005, YES.

17 Q.   OKAY.  LET'S MOVE THEM INTO EVIDENCE, YOUR HONOR?

18        THE COURT:  WHAT'S THE NUMBER?

19        MR. KESSLER:  EXHIBIT 104.

20        THE COURT:  104, ANY OBJECTION?

21        MR. KESSLER:  IT'S IN?

22        MR. HUMMEL:  IT'S IN ALREADY.

23        MR. KESSLER:  IT'S IN, YOUR HONOR.  SORRY.

24 BY MR. KESSLER:

25 Q.   NOW, LET'S BLOW UP -- WHAT IS THIS CALLED, THIS REVENUE

1   THAT'S USED?  IS THIS GROUP OR GROSS?  WHICH IS IT?

2   **A.**   ON THE WORKSHEET?

3   **Q.**   YES.

4   **A.**   SPEAKS FOR ITSELF.

5   **Q.**   GROSS?

6   **A.**   GROSS LICENSING REVENUES.

7   **Q.**   AND THAT WAS TRUE OF THE WORKSHEETS FOR EVERY YEAR YOU

8   USED, RIGHT?  NOT JUST 2005.

9   **A.**   I DON'T REMEMBER EXACTLY, BUT THAT COULD BE THE CASE.

10  **Q.**   THAT COULD BE THE CASE.

11          NOW, LET ME SHOW YOU TRIAL EXHIBIT 95.

12          HAVE YOU EVER LOOKED AT TRIAL EXHIBIT 95?

13          **MR. KESSLER:**  IT'S IN EVIDENCE, YOUR HONOR.

14          (DOCUMENT DISPLAYED.)

15  **BY MR. KESSLER:**

16  **Q.**   HAVE YOU EVER SEEN IT, SIR?

17  **A.**   I -- I -- I DO THINK I'VE SEEN THIS.

18  **Q.**   WHAT THIS IS, THIS IS THE 2000 AGREEMENT BETWEEN THE NFLPA

19  AND PLAYERS INC THAT SETS THE RULES FOR WHAT'S IN THE GLR POOL,

20  CORRECT?

21  **A.**   ARE YOU REFERRING TO THE SECOND PARAGRAPH?

22          "ENTERED INTO GROUP LICENSING AUTHORIZING" --

23  **Q.**   I'M --

24          (SIMULTANEOUS SPEAKING OF WITNESS AND COUNSEL; NOT

25          REPORTABLE.)

1                    (SIMULTANEOUS SPEAKING, NOT REPORTABLE.)

2    **A.**    -- "AGREEMENTS."

3    **Q.**    IS THIS THE AGREEMENT WHICH SET THE RULES FOR THE GLR

4    POOL?  YES OR NO, SIR?

5               YOU DON'T RECALL?

6    **A.**    IT'S A ONE-PAGE AGREEMENT WITH MULTIPLE PARAGRAPHS.

7               MAY I AT LEAST READ IT?

8    **Q.**    LET'S LOOK AT THE PARAGRAPH THAT DEFINES GLR.

9               **MR. KESSLER:**  IF WE CAN, LAUREN.

10              (DOCUMENT DISPLAYED.)

11              **THE WITNESS:**  4.

12   **BY MR. KESSLER:**

13   **Q.**    PARAGRAPH 4.  OKAY.  NO, THAT'S NOT IT.

14              SORRY.  YES, YOU ARE RIGHT.  4A, YOU'RE RIGHT.  OKAY.

15              "A, GROSS LICENSING REVENUE," CORRECT?  IS THAT WHAT

16   THAT REFERS TO?

17              **MR. FEHER:**  STARTING THE FIRST PARAGRAPH --

18   **BY MR. KESSLER:**

19   **Q.**    LET'S GO ON TO THE TITLE, PLEASE.  I'M SORRY.  LET'S DO

20   THE WHOLE THING.

21                   "THE TERM 'GROSS LICENSING REVENUE' SHALL MEAN,"

22   RIGHT?

23              DOES THIS REFRESH YOUR RECOLLECTION THAT THE GLR POOL

24   WHICH YOU PUT ON THIS CHART AND FOR WHICH YOU DID ALL YOUR

25   CALCULATIONS WAS NOT GROUP LICENSING REVENUES, IT'S GROSS

1  LICENSING REVENUES, CORRECT?

2         IS THAT TRUE?

3  **A.**   I THINK YOU'RE GETTING INTO SEMANTICS.  IT'S THE

4  OVERALL -- IT'S THE GROSS LICENSING REVENUES THAT COME FROM A

5  SERIES OF GROUP LICENSES.

6  **Q.**   THE DEFINED TERM IS "GROSS LICENSING REVENUES."  TRUE OR

7  FALSE?

8         TRUE OR FALSE?

9  **A.**   IT REPRESENTS THE ACTUAL CASH PROCEEDS.

10 **Q.**   ARE YOU DENYING TO THE JURY THAT THIS SAYS "GROSS

11 LICENSING REVENUES"?

12 **A.**   NO.

13 **Q.**   OKAY.  AND, IN FACT, WHEN THEY SAY THE ACTIVE PLAYERS WILL

14 GET 37 PERCENT LATER IN THIS AGREEMENT, THEY SAY 37 PERCENT OF

15 GROSS LICENSING REVENUES, NOT GROUP LICENSING REVENUES; IS THAT

16 TRUE?

17 **A.**   YES.

18 **Q.**   AND LOOK NOW, IF YOU CAN, ON THE NEXT PARAGRAPH, A.

19        YOU TESTIFIED THAT THERE WAS NOTHING YOU HAD SHOWN,

20 YOU HAD NOT SEEN ANYTHING, THAT CARVED OUT RETIRED PLAYER

21 LICENSING FROM THE GLR POOL.

22        DO YOU REMEMBER TESTIFYING TO THAT ON THE QUESTIONS

23 FROM YOUR COUNSEL?

24 **A.**   I HAVE NOT CARVED OUT SPECIFICALLY REVENUES ASSOCIATED

25 WITH RETIRED PLAYERS.

1  Q.   I THINK, SIR, YOU TESTIFIED YOU HAD NOT SEEN ANY DOCUMENT

2  OR ANYTHING ELSE WHICH CARVED OUT RETIRED PLAYER LICENSING

3  MONIES FROM THE GLR POOL.

4  A.   I THINK I DID SO ANSWER.

5  Q.   AND YOU SAID YOU DIDN'T SEE ANYTHING, RIGHT?

6  A.   I DIDN'T RECALL AT THE TIME.

7  Q.   WELL, NOW DO YOU RECALL THAT GROSS LICENSING REVENUE SHALL

8  EXCLUDE, NUMBER 5:

9           "AMOUNTS RECEIVED BY RETIRED PLAYERS PURSUANT TO

10 GROUP LICENSING ASSIGNMENTS OF THE GROUP LICENSING RIGHTS"?

11           DOES THAT NOW REFRESH YOUR RECOLLECTION THAT THE GLR

12 POOL NEVER HAD THE RETIRED PLAYER MONEY IN IT?

13 A.   THAT'S CERTAINLY WHAT APPEARS TO HAVE BEEN INTENDED.  BUT

14 I DON'T KNOW THAT TO BE THE CASE.

15 Q.   THANK YOU, SIR.

16           YOU HAVE NO INFORMATION TO THE CONTRARY, RIGHT?

17 A.   I DO NOT.

18 Q.   OKAY.  NOW, FINALLY, JUST ONE LAST QUESTION, SIR.

19           YOU TESTIFIED ON YOUR COUNSEL'S QUESTIONS THAT YOU

20 LOOKED AT THE RETIRED PLAYER GLA, AND THERE WAS NO REFERENCE TO

21 ACTIVE PLAYER LICENSING, CORRECT?

22           THAT'S WHAT YOU TESTIFIED?

23 A.   I THINK THESE SAID THE SPECIFIC LANGUAGE.  OBVIOUSLY, IT

24 SAYS "SIX OR MORE PRESENT."

25 Q.   IT DOESN'T -- AS YOU TESTIFIED, THERE'S NO REFERENCE TO

1   ACTIVE PLAYER LICENSING, CORRECT?

2   **A.**   I THINK THE QUESTION WAS TO THE SPECIFIC WORDS "ACTIVE."

3   **Q.**   THERE'S NO WORD -- THERE'S NO WORDS SAYING "ACTIVE PLAYER

4   LICENSING" IN THE RETIRED PLAYER GLA, CORRECT?  THAT WAS YOUR

5   TESTIMONY THREE MINUTES AGO.

6          I THINK THE JURY REMEMBERS IT.  DO YOU REMEMBER IT?

7   **A.**   YES, I DO.

8   **Q.**   AND YOU SAID "YES," IT WASN'T THERE?

9   **A.**   THE SALIENT POINT TO THE MATTER I'M GOING TO TAKE MY TIME

10  AND READ THE DOCUMENT, COUNSEL.

11  **Q.**   I'M NOT ASKING -- DO YOU REMEMBER TESTIFYING THREE MINUTES

12  AGO THAT THE RETIRED PLAYER GLA DID NOT REFERENCE ACTIVE PLAYER

13  LICENSING?  DO YOU REMEMBER?

14         MAYBE YOU DON'T.

15  **A.**   YES.  I THOUGHT THE QUESTION WAS --

16  **Q.**   THANK YOU.  THANK YOU.  THANK YOU.

17         NOW, IT'S ALSO TRUE THAT THE RETIRED PLAYER GLA

18  DOESN'T REFERENCE "GROSS LICENSING REVENUE" ANYWHERE IN THE

19  RETIRED PLAYER GLA, DOES IT?

20  **A.**   IT DOES NOT SAY "GROSS LICENSING REVENUE."

21  **Q.**   SO IN THE ENTIRE RETIRED PLAYER GLA THERE IS NO REFERENCE

22  TO THE "GROSS LICENSING REVENUE," IN WORDS, AND THERE'S NO

23  REFERENCE TO ACTIVE PLAYER LICENSING?  THAT'S TRUE; IS THAT

24  CORRECT?

25  **A.**   THE APPROVED LICENSING PROGRAM SAYS "SIX OR MORE PRESENT."

1    Q.   OKAY.

2    A.   IT DOESN'T SAY "ACTIVE."

3    Q.   AND IT DOESN'T SAY "GROSS," EITHER.  IT SAYS "GROUP,"

4    CORRECT?

5    A.   THAT'S CORRECT.

6    Q.   BY THE WAY, SIR, YOU ATTENDED MR. GLENN EYRICH'S

7    DEPOSITION?

8    A.   YES.

9    Q.   DO YOU RECALL THAT HE TESTIFIED UNDER OATH IN FRONT OF YOU

10   THAT THE GLR POOL ONLY INCLUDED ACTIVE PLAYER LICENSING MONEY?

11   A.   I BELIEVE THAT WAS HIS RECOLLECTION.  BUT HE COULDN'T

12   PROVIDE REALLY ANY FORMAL AUDIT TRAIL AS IT RELATES TO

13   SPECIFICALLY WHAT THE LICENSEES HAD PAID.

14   Q.   YOU HAVE NO CONTRARY INFORMATION, CORRECT, SIR?

15   A.   SPECIFICALLY, NO.

16   Q.   THANK YOU.

17          **MR. KESSLER:**  NO FURTHER QUESTIONS, YOUR HONOR.

18          **THE COURT:**  MR. HUMMEL, ANYTHING?

19          **MR. HUMMEL:**  NO, YOUR HONOR.

20          **THE COURT:**  MAY OUR WITNESS BE EXCUSED AND

21   DISCHARGED, NOT SUBJECT TO RECALL?

22          **MR. HUMMEL:**  YES, YOUR HONOR.

23          **MR. KESSLER:**  I'M SORRY.  NO, HE CAN BE RELEASED,

24   YOUR HONOR.

25          **THE COURT:**  ALL RIGHT.  MR. ROWLEY, YOU ARE FREE TO

1  GO.  THANK YOU.

2          **THE WITNESS:**  WHERE DO YOU --

3          **THE COURT:**  PLEASE LEAVE ALL OF OUR DOCUMENTS HERE.

4  BUT ANYTHING YOU BROUGHT WITH YOU, OF COURSE, YOU CAN TAKE

5  BACK.

6          **THE WITNESS:**  YES.

7          **THE COURT:**  ALL RIGHT.  GOOD LUCK.  THANK YOU.

8          **THE WITNESS:**  THANK YOU.

9          **THE COURT:**  I THINK IT'S TIME FOR ANOTHER 15-MINUTE

10  BREAK.

11          HOW MANY MORE WITNESSES DO WE HAVE?  ONE MORE

12  WITNESS, RIGHT?

13          **MR. HUMMEL:**  YEAH, WHO WILL BE HERE TOMORROW.  WE

14  HAVE TO READ SOME STIPULATED FACTS INTO THE RECORD.  AND THEN,

15  WE WILL, SUBJECT TO MS. ALLEN'S EXAMINATION TOMORROW --

16          **THE COURT:**  HOW LONG WILL THE STIPULATED FACTS LAST?

17          **MR. HUMMEL:**  IF I READ THEM FAST ENOUGH?

18          **THE COURT:**  READ THEM SO IT MAKES SENSE.  HOW LONG?

19          **MR. HUMMEL:**  A MINUTE.

20          **THE COURT:**  CAN YOU GO ONE MORE MINUTE?

21          OKAY.  LET'S DO THAT NOW, THEN.

22          **MR. HUMMEL:**  THANK YOU, YOUR HONOR.

23          THESE ARE FACTS STIPULATED BETWEEN THE PARTIES, YOUR

24  HONOR.

25          NUMBER 1:  "HERB ADDERLEY IS A RETIRED PROFESSIONAL

1    FOOTBALL PLAYER WHO PLAYED FOR MORE THAN TEN YEARS IN THE

2    NATIONAL FOOTBALL LEAGUE FOR THE GREENBAY PACKERS AND DALLAS

3    COWBOYS.

4              "2:  THE NATIONAL FOOTBALL LEAGUE PLAYERS

5    ASSOCIATION IS A NONPROFIT VIRGINIA CORPORATION.  THE NFLPA'S

6    HEADQUARTERS ARE IN WASHINGTON, D.C.

7              "3:  NATIONAL FOOTBALL LEAGUE PLAYERS INC IS A

8    VIRGINIA CORPORATION OWNED 79 PERCENT BY THE NFLPA AND

9    21 PERCENT BY THE PROFESSIONAL ATHLETES FOUNDATION, THAT IS

10   ENGAGED IN, AMONG OTHER THINGS, THE BUSINESS OF LICENSING THE

11   RIGHTS OF PRESENT AND SOME FORMER NFL PLAYERS.  ITS

12   HEADQUARTERS ARE IN WASHINGTON, D.C.

13             "4:  PLAINTIFF ADDERLEY IS THE NAMED

14   REPRESENTATIVE OF A CLASS OF ALL RETIRED PLAYERS WHO EXECUTED A

15   RETIRED PLAYER GROUP LICENSING AUTHORIZATION SOMETIMES REFERRED

16   TO AS A GROUPING LICENSING AGREEMENT, OR GLA, WITH THE NFLPA

17   THAT WAS IN EFFECT AT ANY TIME BETWEEN FEBRUARY 14, 2003, AND

18   FEBRUARY 14, 2007, AND WHICH CONTAINS THE FOLLOWING LANGUAGE:

19   QUOTE:  'THE MONIES GENERATED BY SUCH LICENSING OF RETIRED

20   PLAYER GROUP RIGHTS WILL BE DIVIDED BETWEEN THE PLAYER AND AN

21   ESCROW ACCOUNT FOR ALL ELIGIBLE NFLPA MEMBERS WHO HAVE SIGNED A

22   GROUP LICENSING AUTHORIZATION FORM'" -- BIG DEFINITION -- "'THE

23   GLA CLASS.'

24             "5:  THE GLA CLASS CONSISTS OF 2,062 MEMBERS."

25           YOUR HONOR, WE HAVE AN EXHIBIT, NO. 1164, WHICH IS

1  THE ENTIRETY OF ALL THE GLA'S SIGNED BY THE PLAYERS.  WE WILL

2  BE PREPARING A COMPILATION AND SUBMITTING THAT INTO EVIDENCE SO

3  THE JURY DOESN'T HAVE TO TAKE THE WHOLE BOX.

4          NEXT:

5              "EA, ELECTRONIC ARTS, MANUFACTURES AND SELLS A

6  VIDEO GAME CALLED 'EA MADDEN FOOTBALL,' A NEW VERSION OF WHICH

7  HAS BEEN RELEASED ANNUALLY FOR THE PAST 20 YEARS.  THE GAME

8  SIMULATES PRO FOOTBALL PLAY, AND IS ONE OF THE TOP TEN BEST

9  SELLING VIDEO GAMES OF ALL TIME."

10          THOSE ARE THE STIPULATED FACTS, YOUR HONOR.

11          **THE COURT:**  SO STIPULATED?

12          **MR. KESSLER:**  THOSE STIPULATIONS ARE CORRECT, YOUR

13  HONOR.

14          **THE COURT:**  ALL RIGHT.  THEN THAT WILL BE DEEMED TO

15  BE PROVEN IN THE CASE, AND THAT IS EVIDENCE IN THE CASE BECAUSE

16  BOTH SIDES HAVE AGREED TO IT.

17          ALL RIGHT.  SUBJECT TO YOUR ONE WITNESS TOMORROW --

18          **MR. HUMMEL:**  AND THE ONE EXHIBIT THAT I REFERENCED,

19  WHICH IS THE COMPILATION OF ALL THE GLA'S.

20          **THE COURT:**  ALL RIGHT.  YOU REST; IS THAT CORRECT?

21          **MR. HUMMEL:**  YOUR HONOR, SUBJECT TO THAT AND MAYBE

22  ONE OTHER EXHIBIT, WE REST.

23          **THE COURT:**  WHAT DO YOU MEAN "MAYBE ONE OTHER

24  EXHIBIT"?

25          **MR. HUMMEL:**  WELL --

1          (COUNSEL CONFER OFF THE RECORD.)

2          **MR. HUMMEL:**  -- CLASS MEMBER LIST, IS THAT IN

3 EVIDENCE?

4          **MR. KESSLER:**  I PUT IN THE CLASS MEMBER LIST WITH --

5          **MR. HUMMEL:**  OKAY.  SUBJECT TO THE ONE COMPILATION OF

6 THE GLA'S AND PAT ALLEN, PLAINTIFFS REST, YOUR HONOR.

7          **THE COURT:**  WE'VE REACHED A MILESTONE IN THE CASE.

8 PLAINTIFF HAS ALMOST RESTED.  SO WHEN YOU RETURN WE'RE GOING TO

9 START HEARING THE DEFENSE CASE.

10          AND WE WILL REOPEN TOMORROW TO HEAR FROM THE WITNESS

11 WHO COULD NOT BE HERE TODAY.  SO PLEASE REMEMBER THE

12 ADMONITION.  AND KEEP AN OPEN MIND.  YOU'VE ONLY -- YOU REALLY

13 HAVE HEARD MORE THAN HALF THE CASE.  I HAVE A FEELING THE --

14 SINCE THE DEFENSE HAS BEEN PUTTING IN THEIR POINTS AS WE GO

15 ALONG, I THINK THE -- I'M GUESSING WE'RE THREE-FOURTHS THE WAY

16 THROUGH THE EVIDENCE.

17          BUT REMEMBER THE ADMONITION.  WE'LL SEE YOU BACK HERE

18 IN 15 MINUTES.

19          **THE CLERK:**  ALL RISE.

20          (THE FOLLOWING PROCEEDINGS WERE HELD IN OPEN COURT,

21          OUTSIDE THE PRESENCE OF THE JURY.)

22          **THE COURT:**  ALL RIGHT.  BE SEATED.

23          WE WILL DEEM YOUR RULE 50 MOTION TO HAVE BEEN MADE,

24 BUT WE'RE GOING TO JUMP RIGHT INTO THE WITNESSES.  YOU CAN MAKE

25 YOUR MOTION IN WRITING AFTER MS. ALLEN TESTIFIES.

1    **MR. KESSLER:** THANK YOU, YOUR HONOR. ACTUALLY, I

2   UNDERSTOOD, YOUR HONOR, ACTUALLY WE'VE PUT IN A 2-LINE RULE 50

3   MOTION. IF YOUR HONOR WANTS US TO HAND IT UP, WE CAN.

4    **THE COURT:** GO AHEAD AND PUT IT IN FOR THE RECORD BUT

5   THERE'S NO POINT IN ARGUING IT NOW.

6    **MR. KESSLER:** THERE IS NO ARGUMENT OF THE MOTION,

7   YOUR HONOR, OTHER THAN TWO LINES STATING WE BELIEVE A

8   RULE 50 --

9    **THE COURT:** AT SOME POINT IN THE FUTURE YOU MIGHT

10  HAVE TO BE MORE DETAILED.

11   ALL RIGHT. ANYTHING TO RAISE WITH ME? GREAT. WHO'S

12  YOUR FIRST WITNESS?

13   **MR. KESSLER:** OUR FIRST WITNESS IS GOING TO BE

14  MR. DAN GOICH. HE'LL BE PRESENTED BY MR. GREENSPAN.

15   **THE COURT:** WHAT KIND OF WITNESS IS HE?

16   **MR. KESSLER:** HE IS A RETIRED NFL PLAYER, YOUR HONOR.

17   **THE COURT:** NOW, REMEMBER, YOU TOLD THE JURY THAT YOU

18  WERE GOING TO BE PUTTING IN SOME EVIDENCE ABOUT SCRIMMAGE

19  PLAYERS. I DON'T REMEMBER EXACTLY WHAT.

20   **MR. KESSLER:** PRACTICE SQUAD.

21   **THE COURT:** PRACTICE SQUAD. SO DON'T FORGET THAT YOU

22  MADE THAT COMMITMENT. AT SOME POINT YOU'VE GOT TO CONNECT THE

23  DOTS.

24   **MR. KESSLER:** WE WILL, YOUR HONOR.

25   **THE COURT:** ALL RIGHT. WE'RE GOING TO TAKE A

1    15-MINUTE RECESS.

2         **MR. HUMMEL:**  THANK YOU, YOUR HONOR.

3         (RECESS TAKEN FROM 11:18 TO 11:38 A.M.)

4         **THE COURT:**  OUR JURY IS COMING IN.

5         (THEREUPON, THE JURY RETURNED TO THE COURTROOM.)

6         **THE COURT:**  THANK YOU.  BE SEATED.

7         AT THIS TIME WE WILL CALL -- THE DEFENSE CASE WILL

8    NOW START, SUBJECT TO THAT ONE INTERRUPTION TOMORROW.

9         AND, MR. KESSLER, YOU MAY CALL YOUR FIRST WITNESS.

10        **MR. KESSLER:**  YES, YOUR HONOR.  MY ASSOCIATE,

11   MR. GREENSPAN, WILL CALL THE FIRST WITNESS.

12        **THE COURT:**  ALL RIGHT.  MR. GREENSPAN, GO RIGHT

13   AHEAD.

14        **MR. GREENSPAN:**  YOUR HONOR, DEFENDANTS CALL DAN

15   GOICH.

16        **THE COURT:**  OKAY.  ALL RIGHT.  HOW DO YOU SPELL THAT?

17        **MR. GREENSPAN:**  G-O-I-C-H.

18        **THE COURT:**  WELCOME, SIR.  IF YOU RAISE YOUR RIGHT

19   HAND, THE CLERK WILL SWEAR YOU IN.

20        (THEREUPON, THE WITNESS WAS SWORN.)

21        **THE WITNESS:**  YES, I DO.  ABSOLUTELY.

22        **THE CLERK:**  THANK YOU.  YOU CAN BE SEATED ON THE

23   WITNESS STAND.

24        **THE COURT:**  MAY WE TAKE YOUR PICTURE SO IT CAN BE

25   DISPLAYED TO THE JURY DURING THE CLOSING ARGUMENTS?

1          **THE WITNESS:**  (WITNESS NODS.)

2          (PICTURE TAKEN.)

3          **THE CLERK:**  THANKS.

4          **THE COURT:**  ALL RIGHT.  AND SCOOT FORWARD AND MAKE

5    SURE THAT MIC CATCHES YOUR VOICE.  IT'S ADJUSTABLE AS TO ITS

6    LOCATION, SO YOU CAN MAKE YOURSELF COMFORTABLE.

7          **THE WITNESS:**  OKAY.  THANK YOU.

8                          **DAN GOICH,**

9    CALLED AS A WITNESS FOR THE DEFENDANTS HEREIN, HAVING BEEN

10   FIRST DULY SWORN, WAS EXAMINED AND TESTIFIED AS FOLLOWS:

11                     **DIRECT EXAMINATION**

12   **BY MR. GREENSPAN:**

13   **Q.**  FIRST, LET ME SAY GOOD MORNING.  MY NAME IS DAVE

14   GREENSPAN.  I'M ONE OF THE LAWYERS FOR THE DEFENDANTS.

15          SIR, CAN YOU PLEASE STATE YOUR NAME FOR THE RECORD.

16   **A.**  DAN GOICH.

17   **Q.**  MR. GOICH, ARE YOU A RETIRED NFL PLAYER?

18   **A.**  YES, I AM.

19   **Q.**  ARE YOU CURRENTLY EMPLOYED?

20   **A.**  YES, I AM.

21   **Q.**  WHAT DO YOU DO FOR A LIVING, SIR?

22   **A.**  HIGH SCHOOL TEACHER.

23   **Q.**  WHERE DO YOU TEACH?

24   **A.**  CITY OF SAVANNAH.

25   **Q.**  WHAT SUBJECTS DO YOU TEACH?

1    A.    MATHEMATICS, ALL SOCIAL SCIENCES.

2    Q.    HOW LONG HAVE YOU BEEN A TEACHER?

3    A.    34 YEARS.

4    Q.    WHAT DO YOUR STUDENTS THINK OF HAVING A RETIRED FOOTBALL

5    PLAYER FOR A MATH TEACHER?

6    A.    MOST OF THEM DON'T BELIEVE IT.

7            (LAUGHTER)

8    Q.    SIR, ARE YOU A COLLEGE GRADUATE?

9    A.    AM I?

10   Q.    COLLEGE GRADUATE?

11   A.    YES, SIR.

12   Q.    WHERE DID YOU DO GO SCHOOL?

13   A.    CAL BERKELEY.

14   Q.    DID YOU PLAY FOOTBALL IN COLLEGE?

15   A.    YES, I DID.

16   Q.    YOU GRADUATE?

17   A.    YES, I DID, TWICE.

18   Q.    TWICE.  EXPLAIN THAT, SIR?

19   A.    TWO DEGREES.  WORKED ON MY DOCTORATE AT CAL.

20   Q.    WHAT DEGREES DO YOU HAVE?  ANY SPECIALTIES?

21   A.    NO.  JUST CRIMINOLOGY.

22   Q.    WHAT'S CRIMINOLOGY?

23   A.    WELL, I STUDIED ETIOLOGY, THE ORIGINS AND CAUSES OF

24   CRIMINAL BEHAVIOR.

25   Q.    MR. GOICH, LET'S TALK A LITTLE BIT ABOUT YOUR NFL CAREER.

1  WHAT POSITION DID YOU PLAY?

2  **A.**   DEFENSIVE LINE.

3  **Q.**   NOW, I THINK IN THIS CASE SO FAR WE'VE HEARD FROM A WIDE

4  RECEIVER, A FEW DEFENSIVE BACKS, A LINEBACKER.  YOU ARE THE

5  FIRST DEFENSIVE LINE, SO IF YOU COULD JUST GIVE A VERY BRIEF

6  EXPLANATION OF WHAT YOUR ROLE IS IN THE FOOTBALL FIELD.

7  **A.**   WELL, MOST OF TIME I WOULDN'T NEED THOSE OTHER GUYS

8  BECAUSE WE TAKE CARE OF BUSINESS UPFRONT.

9          (LAUGHTER)

10  **Q.**   SIR, EXPLAIN TO THE JURY, WHAT'S THE MENTALITY OF A

11  DEFENSIVE LINEMAN ON THE FOOTBALL FIELD?

12  **A.**   MENTALITY?

13  **Q.**   IS THERE ANYTHING YOU WERE KNOWN FOR AS A DEFENSIVE

14  LINEMAN?

15  **A.**   IT WAS -- I WAS A TEAM PLAYER, AND EVERYBODY WAS A

16  VALUABLE PART OF THE TEAM.  I DIDN'T THINK I WAS ANY MORE

17  SIGNIFICANT THAN ANYBODY ELSE.

18  **Q.**   I GUESS WHAT I'M GETTING AT IS DEFENSIVE LINEMAN, IS THAT

19  A PHYSICAL POSITION?

20  **A.**   OH, YES.  IF YOU'RE SAYING THAT, OKAY, SURE.  AS A

21  DEFENSIVE TACKLE YOU'RE HIT EVERY PLAY, WHERE A DEFENSIVE BACK

22  MAY JUST RUN AROUND FOR A WHILE AND COME BACK TO THE HUDDLE.

23  **Q.**   SIR, HOW MANY YEARS DID YOU PLAY IN THE NFL?

24  **A.**   I PLAYED EIGHT YEARS.

25  **Q.**   EIGHT YEARS IN THE NFL?  COULD YOU START FROM THE

1  BEGINNING?

2  **A.**   I WAS DRAFTED AS A JUNIOR OUT OF CAL, PLAYED MY SENIOR

3  YEAR.  ENDED UP PLAYING FOR -- WHAT DID I START WITH, ST. LOUIS

4  CARDINALS, AND THE NEW ORLEANS SAINTS AND ENDED UP WITH THE

5  NEW YORK GIANTS.  '74 WAS MY LAST YEAR.

6  **Q.**   DO YOU RECALL HOW MANY DIFFERENT TEAMS YOU PLAYED WITH IN

7  THE NFL?

8  **A.**   FOUR.  WELL, I HAD TO MAKE FOUR TEAMS, AND I MADE FOUR

9  TEAMS.

10  **Q.**   SO YOU'VE BEEN AROUND THE BLOCK IN THE NFL?

11  **A.**   YES, SIR, I HAVE.

12  **Q.**   ARE YOU WHAT'S SOMETIMES REFERRED TO AS "A JOURNEYMAN

13  PLAYER"?

14  **A.**   I WOULD SAY THAT, YEAH.

15  **Q.**   CAN YOU EXPLAIN TO THE JURY WHAT THAT MEANS, "A JOURNEYMAN

16  NFL PLAYER"?

17  **A.**   EASILY REPLACEABLE PART.  IF THEY NEEDED A DEFENSIVE BACK

18  MORE THAN THEY NEEDED ME, I'M GONE.

19  **Q.**   SIR, THROUGHOUT YOUR CAREER WERE YOU A STARTING PLAYER?

20  **A.**   ABOUT FOUR YEARS.

21  **Q.**   CAN YOU EXPLAIN TO THE JURY -- I THINK SOMETIMES IT'S COME

22  UP, PLAYERS ARE STARTERS.  WHAT DOES IT MEAN TO BE A STARTER?

23  **A.**   YOU START THE GAME.  I MEAN, THE PRESSURE'S ON YOU.  AND

24  I'M MOST OF THE TIME, FOUR OF MY EIGHT YEARS, I WAS BACKUP.

25  AND I WOULD BE WAITING TO SEE IF I COULD GET IN THE GAME IF

1  SOMEONE GOT HURT, GOD FORBID.  BUT IF THEY DID, YOU HAD TO BE

2  PREPARED TO GET IN THERE AND DO YOUR PART.

3  Q.    IN OTHER WORDS, A STARTER STARTS THE GAME ON THE FIELD AND

4  THE BACKUPS THEY COME IN AS A --

5  A.    YOU JUST WATCH.  MOST PEOPLE ALL THE TIME ARE WATCHING

6  FOOTBALL, EVEN THE TEAMMATES.  THERE'S ONLY 11 GUYS OUT IN THE

7  FIELD.

8  Q.    MR. GOICH, AS A PRO FOOTBALL PLAYER, DID YOU ACHIEVE ANY

9  INDIVIDUAL HONORS FOR YOUR PLAY IN THE FIELD?

10  A.    PROFESSIONALLY?

11  Q.    PROFESSIONALLY.

12  A.    NO.

13  Q.    MR. GOICH, IN THIS CASE WE'VE TALKED A LOT ABOUT SUPERSTAR

14  NFL PLAYERS, ALL TIME GREATS, LIKE MR. ADDERLEY, THE HALL OF

15  FAMER?

16  A.    SURE.

17  Q.    WE'VE TALKED ABOUT PLAYERS WHO MAY NEVER HAVE SAT FOOT ON

18  THE FIELD.

19          WHERE DO YOU FALL IN THAT CONTINUUM?

20  A.    WHEN I WAS SUITING UP I PLAYED EVERY GAME.  YOU DO

21  SOMETHING.  YOU HAVE TO CONTRIBUTE.  SO I WAS ON SPECIAL TEAMS

22  MOST OF THE TIME, OR I WAS STARTING, OR ALTERNATING, YOU KNOW,

23  SO --

24  Q.    WERE YOU A STAR PLAYER, SIR, OR WERE YOU AT THE OTHER END

25  OF THE SPECTRUM?

1  A.   IN THE COMMON TERM, STREET TERM, WHAT MY KIDS WOULD ASK

2  ME, MY HIGH SCHOOL STUDENTS, ABSOLUTELY NOT.  I WAS FORTUNATE,

3  AND THANKED GOD I COULD PLAY.

4  Q.   SIR, WHEN DID YOU RETIRE FROM THE NFL?

5  A.   I DIDN'T WANT TO RETIRE.  THEY RETIRED ME IN '74.  THERE

6  WAS A STRIKE IN '74.

7  Q.   THAT'S WHAT I WAS GOING TO ASK YOU.  WHAT WAS THE REASON

8  FOR YOUR RETIREMENT?

9  A.   I WAS PLAYER REP FOR THE NEW YORK GIANTS.

10 Q.   WHAT DOES THAT MEAN THAT YOU WERE A PLAYER REP?

11 A.   I WAS A SPOKESMAN.  THERE WERE TWO OF US FOR THE TEAM IN

12 REGARDS TO MANAGEMENT, OKAY?  COLLECTIVE BARGAINING AGREEMENT,

13 THINGS LIKE THAT.

14 Q.   WHAT DID YOUR ROLE AS A PLAYER REPRESENTATIVE HAVE TO DO

15 WITH YOUR RETIREMENT FROM THE NFL?

16      MR. KATZ:  OBJECT, YOUR HONOR, RELEVANCE.

17      MR. GREENSPAN:  IT'S JUST BACKGROUND.

18      THE COURT:  OVERRULED.

19      PLEASE ANSWER.

20      THE WITNESS:  WHAT'S THE QUESTION AGAIN?

21 BY MR. GREENSPAN:

22 Q.   WHAT DID YOUR ROLE AS A PLAYER REPRESENTATIVE HAVE TO DO

23 WITH YOUR RETIREMENT FROM THE NFL?

24 A.   IT'D BE HARD TO PROVE, BUT THERE WERE A BUNCH OF US THAT

25 NEVER PLAYED AGAIN AFTER '74, BECAUSE OF OUR ACTIVITIES WITH

1    THE UNION.  IT WASN'T REALLY -- IT WASN'T -- THE OWNERS

2    WOULDN'T EVEN NEGOTIATE WITH US FACE TO FACE.  SO IT WAS A BAD

3    TIME.

4    Q.    AFTER SERVING AS A PLAYER REPRESENTATIVE, YOU BELIEVE THAT

5    THE OWNERS WEREN'T LETTING YOU BACK ON THE FIELD?

6    A.    YEAH --

7              **MR. KATZ:**  OBJECTION, SPECULATIVE.

8              **THE WITNESS:**  I HAD PLAYED OUT MY OPTIONS.

9              **THE COURT:**  SORRY, WHAT?

10             **MR. KATZ:**  OBJECT AS SPECULATION, YOUR HONOR.  IT'S

11   IRRELEVANT.

12             **THE COURT:**  IT IS SPECULATION.  THIS CASE, I DON'T

13   THINK HAS -- THIS IS NOT A LAWSUIT AGAINST THE OWNERS.

14             **MR. GREENSPAN:**  IT'S BACKGROUND.

15             **THE COURT:**  ALL RIGHT.  SO LET'S MOVE ON TO SOMETHING

16   ELSE.

17             **MR. GREENSPAN:**  WE WILL.

18   **BY MR. GREENSPAN:**

19   Q.    MR. GOICH, AS AN ACTIVE PLAYER WERE YOU GENERALLY

20   RECOGNIZABLE?

21   A.    NO.

22   Q.    WERE YOU A FAMOUS PLAYER?

23   A.    NO.

24   Q.    SIR, HOW ABOUT WERE THERE ANY -- AGAIN, STICKING WITH AS

25   AN ACTIVE PLAYER, ANY OPPORTUNITIES FOR YOU TO MARKET OR

1  LICENSE YOUR NAME OR IMAGE?

2          **MR. KATZ:**  OBJECT.  LEADING.

3          **THE COURT:**  WELL, IT IS LEADING.  REPHRASE THAT

4  QUESTION.

5  **BY MR. GREENSPAN:**

6  **Q.**  AS AN ACTIVE PLAYER, WHAT OPPORTUNITIES DID YOU HAVE, IF

7  ANY, TO MARKET OR LICENSE YOUR NAME OR IMAGE?

8  **A.**  NONE.

9  **Q.**  HOW ABOUT AS A RETIRED PLAYER?

10 **A.**  NO.

11 **Q.**  AS A RETIRED PLAYER, HAVE YOU BEEN OFFERED ANY MARKETING

12 LICENSING OPPORTUNITIES?

13 **A.**  ABSOLUTELY NOT.

14 **Q.**  AND TO BE SPECIFIC, WE'LL FOCUS NOW ON THE NFLPA AND

15 PLAYERS INC.  HAVE THE NFLPA OR PLAYERS INC EVER PRESENTED YOU

16 WITH AN OPPORTUNITY TO LICENSE YOUR NAME OR IMAGE RIGHTS?

17 **A.**  NO.

18 **Q.**  HAVE YOU EVER RECEIVED ANY LICENSING PAYMENTS FROM THE

19 NFLPA OR PLAYERS INC?

20          **MR. KATZ:**  OBJECT.  LEADING.

21          **THE COURT:**  WELL, IT'S PRELIMINARY ENOUGH.

22 OVERRULED.

23          PLEASE ANSWER.

24          **THE WITNESS:**  NO.

25

1  **BY MR. GREENSPAN:**

2  **Q.**   MR. GOICH, WHAT VALUE, IF ANY, WOULD YOU ASCRIBE TO YOUR

3  NAME AND IMAGE RIGHTS?

4  **A.**   WHAT VALUE?

5  **Q.**   YES.

6  **A.**   MONETARY VALUE?

7  **Q.**   YES.

8  **A.**   NOTHING.

9  **Q.**   SIR, DO YOU KNOW WHETHER OTHER RETIRED PLAYERS HAVE BEEN

10  PRESENTED WITH LICENSING/MARKETING OPPORTUNITIES FROM PLAYERS

11  INC OR THE NFLPA?

12  **A.**   YES, I DO.

13  **Q.**   DID IT SURPRISE YOU THAT YOU WERE NOT ONE OF THE PLAYERS

14  RECEIVING THOSE OPPORTUNITIES?

15            **MR. KATZ:**  OBJECT.  LEADING.

16            **THE COURT:**  SUSTAINED.

17  **BY MR. GREENSPAN:**

18  **Q.**   WHAT'S YOUR FEELING, IF ANY, ABOUT THE FACT THAT OTHER

19  RETIRED PLAYERS WERE RECEIVING LICENSING OPPORTUNITIES FROM

20  PLAYERS INC AND THE NFLPA AND YOU WERE NOT?

21            **MR. KATZ:**  OBJECT.  NO FOUNDATION.

22            **THE COURT:**  WELL, HE CAN DESCRIBE WHAT HIS FEELINGS

23  WERE, AS LONG AS IT DOESN'T TURN OUT TO BE SPECULATION.

24            **MR. KATZ:**  YOUR HONOR, HE HAS A FOUNDATION AS TO HIS

25  OWN FEELINGS, BUT HE DOES NOT HAVE A FOUNDATION AS TO WHAT

1  OTHER PLAYERS WERE BEING OFFERED OR HAD RECEIVED.

2          **MR. GREENSPAN:**  TWO QUESTIONS AGO HE TESTIFIED HE'S

3  AWARE OF OTHER RETIRED PLAYERS RECEIVING OPPORTUNITIES.

4          **THE COURT:**  ALL RIGHT.  OVERRULED.

5          PLEASE ANSWER.

6          **THE WITNESS:**  THE QUESTION AGAIN, PLEASE?

7  **BY MR. GREENSPAN:**

8  Q.   THE QUESTION IS:  YOU TESTIFIED THAT YOU WERE AWARE THAT

9  OTHER RETIRED PLAYERS HAVE RECEIVED LICENSING AND MARKETING

10 OPPORTUNITIES FROM PLAYERS INC WITH THE NFLPA.

11         **MR. KATZ:**  OBJECT, YOUR HONOR.  THIS CAN ONLY COME

12 FROM HEARSAY.

13         **THE COURT:**  ALL RIGHT.  WELL, I'M GOING TO HAVE TO

14 WIND UP HEARING THE WHOLE THING BEFORE I DECIDE IT'S

15 INADMISSIBLE FOR SOME REASON.  FOR THE TIME BEING THE

16 OBJECTIONS ARE OVERRULED.

17         PLEASE GO AHEAD AND ANSWER.

18         **THE WITNESS:**  I DON'T SEE HOW IT COULD BE -- WHAT DID

19 HE SAY?  OBJECTION?  I MEAN, I READ ABOUT IT.  IT'S IN PRINT

20 THAT THEY'RE GETTING --

21 **BY MR. GREENSPAN:**

22 Q.   MY QUESTION IS:  WHAT'S YOUR FEELING ABOUT THE FACT SOME

23 PLAYERS --

24         **THE COURT:**  WHY IS HIS FEELING RELEVANT TO ANYTHING?

25         **MR. GREENSPAN:**  I DON'T THINK IT'S MUCH DIFFERENT

1   THAN THE QUESTIONS THAT HAVE BEEN ASKED OF THE RETIRED PLAYERS

2   THAT THE OTHER SIDE HAS PUT UP, BUT I CAN MOVE ON IF YOUR HONOR

3   WANTS.

4          **THE COURT:**  I THINK WE OUGHT TO MOVE ON.  THE

5   FEELINGS, THAT'S TOO -- TOO SOFT A TOPIC.  I THINK WE OUGHT TO

6   GET TO SOMETHING THAT'S MORE IN PLAY IN THE CASE.

7          **MR. GREENSPAN:**  JUST TRYING TO SOFTEN UP THE

8   PROCEEDING.

9          **THE COURT:**  LET'S MOVE ON.

10  **BY MR. GREENSPAN:**

11  **Q.**   MR. GOICH, I WOULD LIKE TO TALK TO YOU ABOUT YOUR RETIRED

12  PLAYER GLA.  AND ACTUALLY IT SHOULD BE THE ONE DOCUMENT THAT'S

13  UP THERE.  I BELIEVE IT'S THE FOLDER TO YOUR RIGHT.  IT WOULD

14  BE TRIAL EXHIBIT 2349.

15         **MR. GREENSPAN:**  MAY I APPROACH, YOUR HONOR?

16         (HANDING WITNESS A DOCUMENT.)

17         **THE WITNESS:**  YEAH, THAT'S ME.

18  **BY MR. GREENSPAN:**

19  **Q.**   IT WAS HIDING.

20         DO YOU RECOGNIZE THIS AS A RETIRED PLAYER GROUP

21  LICENSING AUTHORIZATION FORM?

22  **A.**   YES, I DO.

23  **Q.**   THAT YOU SIGNED?

24  **A.**   YES.

25  **Q.**   THAT'S YOUR SIGNATURE ON THE DOCUMENT?

1   **A.**   YES, IT IS.

2          **MR. GREENSPAN:**  YOUR HONOR, DEFENDANTS MOVE TRIAL

3   EXHIBIT 2349 INTO EVIDENCE.

4          **MR. KATZ:**  NO OBJECTION, YOUR HONOR.

5          **THE COURT:**  RECEIVED.

6          (TRIAL EXHIBIT 2349 RECEIVED IN EVIDENCE.)

7   **BY MR. GREENSPAN:**

8   **Q.**   MR. GOICH, WHAT, IF ANYTHING, DID YOU HAVE TO DO IN ORDER

9   TO SIGN THIS FORM?

10  **A.**   LISTEN TO THE PRESENTATIONS, I GUESS, AT THE CONVENTION.

11  THAT'S ABOUT IT.

12  **Q.**   MR. GOICH, WHAT MONEY, IF ANY, DID YOU HAVE TO PAY --

13  **A.**   NOTHING.

14  **Q.**   -- IN ORDER TO SIGN THIS FORM?

15  **A.**   NOTHING.

16  **Q.**   AT THE TIME YOU SIGNED THIS RETIRED PLAYER GLA, WHAT WAS

17  YOUR UNDERSTANDING, IF ANY, AS TO WHAT IT ENTITLED YOU TO

18  RECEIVE?

19  **A.**   IF I WAS PART OF THE LICENSING GROUP, I WOULD SUPPOSEDLY

20  RECEIVE MONIES.

21  **Q.**   SIR, WHAT DO YOU MEAN BY "PART OF THE LICENSING GROUP"?

22  **A.**   IF SOME LICENSEE WANTED THE GROUP I WAS IN OR IT EVEN SAYS

23  HERE ME, I WOULD GET SOME MONEY, I GUESS.

24  **Q.**   AT THE TIME YOU SIGNED THIS GLA, SIR, DID YOU HAVE -- WHAT

25  WAS YOUR HOPE OR EXPECTATION AS TO WHETHER YOU WOULD RECEIVE

1  MONEY UNDER THIS FORM?

2  **A.**   WELL, FOR ME PERSONALLY WOULD BE, YOU KNOW, A HOPE, A WING

3  AND A PRAYER THAT I COULD CATCH ON TO SOME GROUP SOME LICENSEE

4  WANTED, BECAUSE I DIDN'T THINK THEY WOULD EVER WANT ME.

5  **Q.**   SIR, WHEN YOU SIGNED THIS RETIRED PLAYER GLA, WHAT WAS

6  YOUR UNDERSTANDING, IF ANY, AS TO WHETHER IT ENTITLED YOU OR

7  MADE YOU ELIGIBLE FOR MONEY GENERATED BY ACTIVE PLAYER

8  LICENSING?

9  **A.**   ABSOLUTELY NONE.

10  **Q.**   UHM, MR. GOICH, ARE YOU FAMILIAR WITH THE NFLPA RETIRED

11  PLAYERS ASSOCIATION?

12  **A.**   SURE.

13  **Q.**   CAN YOU EXPLAIN TO THE JURY WHAT THAT -- WHAT THAT IS.

14  **A.**   IT'S A -- IT WAS FORMED AS A GROUP.  WE WERE INTERESTED --

15  THEY WERE INTERESTED, THE ACTIVE PLAYERS AND THE PAST PLAYERS,

16  OUR MOTTO IS "PAST, PRESENT AND FUTURE," TO KEEP THEM IN THE

17  LOOP TO DO WHAT THEY COULD FOR US WHEN THEY COULD.

18       IT'S BEEN A GREAT RELATIONSHIP, I THINK.  BUT -- AND

19  THIS WAS PART OF IT.  THIS COST THEM MONEY TO TRY TO PUT THIS

20  TOGETHER.  AND MY PERSONAL FEELING WAS IT WASN'T GOING TO BE

21  TOO GOOD.  BUT THEY GAVE IT A SHOT.

22  **Q.**   MR. GOICH, DID YOU HAVE ANY PARTICULAR ROLE -- OVER TIME

23  HAVE YOU HAD ANY PARTICULAR ROLE IN THE RETIRED PLAYERS

24  ASSOCIATION?

25  **A.**   YEAH.  I WAS THE VERY FIRST STEERING COMMITTEE.  I SERVED

1  11 OF THE FIRST 12 YEARS.

2  **Q.**   WHAT DOES THAT MEAN, SIR?

3  **A.**   IT WAS NINE MEMBERS THAT HAVE A VOICE.  WE LISTEN TO THE

4  GROUP, THEN WE GO TO GENE THROUGH FRANK WOSCHITZ, WHO WAS THE

5  DIRECTOR AT THAT TIME.  AND THEY WOULD LISTEN TO WHAT WE HAD TO

6  SAY.

7  **Q.**   WHO IS FRANK WOSCHITZ?  THAT MAY BE A NEW NAME FOR THE

8  JURY.

9  **A.**   IT WAS THE DIRECTOR OF THE RETIRED PLAYERS, THAT FACET,

10  FOR 25 YEARS.

11  **Q.**   WHEN YOU REFER TO "GENE," WHO ARE YOU REFERRING TO?

12  **A.**   GENE UPSHAW WAS THE EXECUTIVE DIRECTOR.  WE WERE ROOKIES

13  TOGETHER IN '67.

14  **Q.**   MR. GOICH, DO YOU KNOW WHETHER THERE'S A DIFFERENCE

15  BETWEEN BEING AN ACTIVE NFLPA MEMBER AND A MEMBER OF THE NFLPA

16  RETIRED PLAYERS ASSOCIATION?

17  **A.**   LIKE NIGHT AND DAY.

18  **Q.**   DO YOU KNOW WHETHER -- LET ME ASK YOU AS A RETIRED PLAYERS

19  ASSOCIATION MEMBER DO YOU HAVE A VOTE IN THE NFLPA?

20  **A.**   AS FAR AS ACTIVE PLAYER ISSUES?

21  **Q.**   CORRECT.

22  **A.**   NO.

23  **Q.**   DO YOU HAVE ANY VOTE IN THE UNION AS A WHOLE, APART FROM

24  JUST THE RETIRED PLAYERS --

25  **A.**   NO.

1   **Q.** -- ASSOCIATION ITSELF?

2        DO YOU THINK AS AN NFLPA RETIRED PLAYERS ASSOCIATION

3   MEMBER YOU SHOULD HAVE A VOTE IN NFLPA ISSUES?

4        **MR. KATZ:** OBJECT. LEADING.

5        **THE COURT:** OVERRULED.

6        PLEASE ANSWER.

7        **THE WITNESS:** NO.

8   **BY MR. GREENSPAN:**

9   **Q.** WHY NOT, SIR?

10  **A.** I'M NOT MAKING THE MONEY. I'M NOT PLAYING THE GAME. IT'S

11  NOT MY BLOOD, SWEAT AND TEARS. I HAD MY DAY. IT'S OVER.

12  **Q.** MR. GOICH, SINCE YOU RETIRED -- LET ME ASK THIS: DO YOU

13  KNOW WHAT THE ACTIVE PLAYER ANNUAL BOARD MEETINGS ARE?

14  **A.** I'VE BEEN TO TWO OF THEM.

15  **Q.** THAT'S WHAT I WAS GOING TO ASK YOU.

16  **A.** YEAH.

17  **Q.** WHEN YOU ATTENDED THESE MEETINGS, WHERE DID THESE MEETINGS

18  TAKE PLACE?

19  **A.** THE TWO I WENT TO, HAWAII.

20  **Q.** AND CAN YOU DESCRIBE GENERALLY TO THE JURY WHAT THE

21  PURPOSE OF THESE MEETINGS ARE, WHAT HAPPENS?

22  **A.** THEY STEER THE DIRECTOR IN WHICH WAY THEY WANT TO GO WITH

23  THE COLLECTIVE BARGAINING.

24  **Q.** WHEN YOU SAY "THEY" WHO ARE TALKING ABOUT?

25  **A.** THE 32 PLAYER REPS.

1   Q.   OKAY.  AND AS A RETIRED PLAYER YOU WERE INVITED TO --

2   A.   I WAS INVITED BY GENE UPSHAW, BECAUSE IT WAS ON -- I WAS

3   PRESIDENT OF THE RETIRED PLAYERS EXECUTIVE COMMITTEE.

4   Q.   NOW, AT THESE ANNUAL ACTIVE PLAYER BOARD MEETINGS, WHAT

5   MEETINGS, IF ANY, WERE YOU PERMITTED TO ATTEND?

6   A.   I COULD ATTEND ANY MEETING I WANTED TO.

7   Q.   WHAT INFORMATION, IF ANY, DID YOU HAVE ACCESS TO?

8   A.   I STILL HAVE THE BOOK, THE FINANCIALS, EVERYTHING THAT THE

9   PLAYER REPS GOT.

10          THE COURT:  IT'S UNCLEAR WHETHER THESE QUESTIONS ARE

11  WHILE HE WAS AN ACTIVE PLAYER OR WHETHER HE STILL GETS THIS

12  ACCESS AS A RETIRED PLAYER.

13          MR. GREENSPAN:  I'M SORRY, YOUR HONOR.

14          THE COURT:  YOU SHOULD MAKE THAT CLEAR.

15  BY MR. GREENSPAN:

16  Q.   WHEN YOU ATTENDED THE ACTIVE PLAYER ANNUAL BOARD MEETINGS,

17  WERE YOU A RETIRED PLAYER OR AN ACTIVE PLAYER AT THE TIME?

18  A.   I WAS RETIRED.

19  Q.   YOU WERE RETIRED?

20  A.   I WAS ON THE EXECUTIVE MEETING, OUR STEERING COMMITTEE FOR

21  RETIRED PLAYERS.  THE ACTIVE PLAYERS INVITE TWO TO THREE

22  PLAYERS TO THEIR MEETINGS IN HAWAII EVERY YEAR.

23  Q.   DO YOU KNOW WHETHER THIS PRACTICE OF STEERING COMMITTEE

24  MEMBERS OF THE RETIRED PLAYERS ASSOCIATION, DO YOU KNOW IF THE

25  PRACTICE CONTINUES OF THESE MEMBERS BEING INVITED TO THE ACTIVE

1  PLAYER BOARD MEETINGS CONTINUES TO THIS DAY?

2  **A.**    ABSOLUTELY.

3  **Q.**    OKAY.

4  **A.**    IT CONTINUES TO THIS DAY.

5  **Q.**    MR. GOICH, HAVE YOU ATTENDED ANY -- LET ME ASK YOU FIRST,

6  ARE YOU FAMILIAR WITH THE ANNUAL RETIRED PLAYERS ASSOCIATION

7  CONVENTIONS?

8  **A.**    YEAH.  I ATTENDED ALL OF THEM, YEAH.

9  **Q.**    CAN YOU EXPLAIN TO THE JURY, GIVEN THE PICTURE OF WHAT IT

10 IS, WHAT HAPPENS?

11 **A.**    COUPLE HUNDRED GUYS COME WITH THEIR WIVES AND THERE'S

12 PRESENTATIONS BY THE UNION.  GENE GIVES A STATE OF, QUOTE, LIKE

13 THE UNION ADDRESS.  AND ALL THE INFORMATION.  WE HAVE

14 POWERPOINTS.  WE HAVE THE PENSION DEPARTMENT TALK TO US.  WE

15 HAVE THE RETIRED PLAYERS DEPARTMENT TALK TO US.

16         SOMETIMES THE ACTIVE PLAYERS' PRESIDENT COMES TO THE

17 CONVENTION AND TALKS TO US.

18         MEANWHILE, PEOPLE ARE GOING IN AND OUT, IN AND OUT.

19 AND THERE'S A DESK, AND THERE'S ALWAYS AN OPEN FORUM TO ASK

20 QUESTIONS ABOUT ANYTHING FROM ANYBODY.  IT'S WIDE OPEN.

21         ARGUMENTS TAKE PLACE.  THIS TAKES PLACE, ET CETERA.

22         BUT THE INFORMATION -- WE GET ALL THE INFORMATION

23 THAT'S THERE, YEAH.

24 **Q.**    MR. GOICH, WAS THE RETIRED PLAYER GLA EVER DISCUSSED AT

25 THESE RETIRED PLAYERS ASSOCIATION CONVENTIONS?

1        **MR. KATZ:** OBJECT. LEADING.

2        **THE COURT:** IT'S PRELIMINARY. OVERRULED.

3        PLEASE ANSWER.

4        **THE WITNESS:** YES, IT WAS. IT WAS DISCUSSED --

5        **THE COURT:** BEFORE YOU SAY -- NEXT QUESTION. THAT

6   WAS THE PRELIMINARY QUESTION. WHAT'S THE NEXT QUESTION?

7   **BY MR. GREENSPAN:**

8   **Q.** WHO DISCUSSED THE RETIRED PLAYER GLA?

9   **A.** I HEARD THE GLA FROM DOUG, FROM GENE AND FROM FRANK.

10  **Q.** WHO IS DOUG?

11  **A.** DOUG ALLEN WAS THE SECOND-IN-CHARGE FOR MANY -- I DON'T

12  KNOW, 25 YEARS TO GENE. GENE UPSHAW WAS THE EXECUTIVE

13  DIRECTOR. I WOULD SAY DOUG ALLEN WAS THE ASSISTANT EXECUTIVE

14  DIRECTOR. AND THEN, THERE WAS FRANK, THE HEAD OF THE RETIRED

15  PLAYERS PART OF THE DEAL.

16  **Q.** ON HOW MANY DIFFERENT OCCASIONS, AS BEST YOU CAN RECALL,

17  WAS THE RETIRED PLAYER GLA DISCUSSED AT THESE CONVENTIONS?

18  **A.** EVERY CONVENTION THAT I CAN REMEMBER SINCE I THINK WE

19  STARTED THE GLA -- I WAS PRIVY TO INFORMATION PRIOR TO THE GLA

20  THAT THEY WERE FORMING SOMETHING LIKE THE GLA, GROUP LICENSING,

21  TO TRY TO HELP RETIRED PLAYERS.

22        AND THEN, EVERY YEAR WE SIGNED IT, AND IT CAME

23  THROUGH THE MAIL. THERE WAS THE TOUCHBACK, WHICH IS A

24  NEWSLETTER THAT COMES TO US AS UNION-PAYING MEMBERS.

25        I REMEMBER READING ABOUT THAT. I REMEMBER THE

1   POWERPOINT PRESENTATIONS, DISCUSSING IT WITH FRANK

2   INDIVIDUALLY, AND WITH THE GROUP, DISCUSSING IT WITH THE GUYS

3   AT THE CONVENTION, LISTENING TO DOUG TIME AND TIME AND TIME

4   AGAIN.

5            GENE, NOT SO OFTEN.  BUT, GENE, YES, ALSO DISCUSSED

6   THE GLA WITH ALL OF US AT THE CONVENTION.

7   **Q.**   MR. GOICH, DO YOU RECALL WHAT INFORMATION ABOUT THE

8   RETIRED PLAYER GLA WAS PROVIDED?

9   **A.**   THE -- IT WENT THROUGH THIS.

10  **Q.**   IT WENT THROUGH THE FORM?

11  **A.**   YEAH.

12  **Q.**   DID --

13  **A.**   I'M NOT SO SURE IT -- I THINK IT WAS PART OF THE

14  POWERPOINT PRESENTATION.

15  **Q.**   WAS THE SUCCESS OR LACK OF SUCCESS OF THE RETIRED PLAYER

16  GLA EVER DISCUSSED?

17  **A.**   YEAH.

18  **Q.**   AND WHAT WAS TOLD TO YOU?

19  **A.**   THE MARKETABILITY OF RETIRED PLAYERS, FRANKLY, FROM THE

20  LICENSEES' PERSPECTIVE WASN'T THERE.

21           I ALWAYS FELT IT WAS -- AGAIN, I'LL SAY IT -- A HOPE,

22  A WING AND A PRAYER.  I SAID, "IT'S NOT GOING TO WORK" WHEN

23  FRANK AND I WOULD TALK ONE-ON-ONE.

24           I SAID, "WHAT YOU'RE TRYING TO DO IS LICENSE A DEAD

25  HORSE."

1          I MEAN, I RESPECT RETIRED PLAYERS.  I'M ONE OF THEM.

2   I'LL DO ANYTHING I CAN FOR THEM.

3          BUT THIS, TO ME, WASN'T GOING TO WORK, MY INDIVIDUAL

4   OPINION.  BECAUSE IF I COULDN'T GET ANYTHING AS A STARTER FOR

5   TWO YEARS IN NEW YORK, WHY WOULD I GET ANYTHING THIS WAY,

6   UNLESS I ATTACHED MYSELF OUT OF TOTAL RESPECT TO HERB ADDERLEY,

7   THAT'S WHO I WOULD HAVE TO BE ATTACHED WITH.

8          PART OF THE GROUP OF THE ADDERLEYS OF THE WORLD,

9   BECAUSE THEY WEREN'T COMING AFTER ME.

10  **Q.**   WHY DID YOU KEEP SIGNING THE FORM IF YOU DIDN'T THINK IT

11  WOULD WORK, AND IF YOU DIDN'T GET ANY MONEY?

12  **A.**   I'M A TEAM PLAYER.  IF I COULD HELP ANY PLAYER LIKE

13  MR. ADDERLEY, I WOULD.  TO THIS DAY I WOULD, EVEN THOUGH IT

14  DOESN'T -- IT DIDN'T COST ME A DIME, OKAY?

15         BUT MY SIGNATURE WAS PART OF A SUPPORT THAT I CARED

16  FOR MY CONTEMPORARIES.

17  **Q.**   SIR, DID RETIRED PLAYERS HAVE THE OPPORTUNITY TO ASK

18  QUESTIONS ABOUT THE RETIRED PLAYER GLA AT THESE CONVENTIONS?

19  **A.**   ABSOLUTELY.  EVERY CONVENTION, SURE.  AND THEY WERE

20  ANSWERED.  WE HAD THE POWERPOINT, AND THEY WOULD ASK ABOUT THE

21  POWERPOINT.

22         DOUG -- DOUG'S A SMART GUY.  I MEAN, HE ANSWERED

23  QUESTION AFTER QUESTION AFTER QUESTION.

24  **Q.**   DID RETIRED PLAYERS EVER ASK "WHY AREN'T WE GETTING ANY

25  MONEY UNDER" --

1  **A.**   YES.  I DID, TOO.  THEY SAID WE ARE NOT MARKETABLE.  THIS

2  WHOLE THING WAS A TREMENDOUS EFFORT ON THE ACTIVE PLAYERS'

3  PART, AS FAR AS I WAS CONCERNED, TO GET US INTO THIS STUFF,

4  OKAY?

5          I MEAN, IT COST THEM MONEY, TIME AND EFFORT.  AND IT

6  SHOWED TO ME THAT THEY CARED.  BUT WE WEREN'T MARKETABLE.  AND

7  I COULD UNDERSTAND WHY, BECAUSE I'M -- I'VE BEEN IN VEGAS FOR

8  20 YEARS.  NO ONE KNOWS -- I NEVER GOT ANYTHING FROM ANYBODY.

9          THEY HAVE SUPER BOWL PARTIES.  THEY HAVE THIS PARTY,

10 THAT PARTY.  NOT THAT I LIKE PARTIES, I DON'T GO.  NO ONE HAS

11 CALLED MY NAME.  YOU KNOW, CUNNINGHAM IS THERE.  THERE'S OTHER

12 GUY'S THERE.  AND YOU SAY TO YOURSELF:

13              "OKAY.  IT'S JUST ALWAYS BEEN THAT WAY."

14          WHEN I WAS ACTIVE ONLY CERTAIN PLAYERS ON THE GIANTS

15 GOT THE DEALS.

16 **Q.**   SIR, AT THESE RETIRED PLAYER CONVENTIONS, DO YOU RECALL

17 WHETHER A RETIRED PLAYER EVER ASKED WHETHER HE WAS ELIGIBLE FOR

18 HIS SHARE OF ACTIVE PLAYER LICENSING MONEY BY VIRTUE OF SIGNING

19 THE RETIRED PLAYER GLA?

20 **A.**   I CAN UNEQUIVOCALLY TELL YOU NO.

21          IN PRIVATE CONVERSATIONS FROM THE FLOOR, GENE WOULD

22 SAY:  "ANY QUESTIONS ABOUT ANYTHING?"

23          DOUG WOULD SAY:  "ANY MORE QUESTIONS?"

24          TO ME, THEY BEAT THIS TO DEATH TO TRY TO EXPLAIN TO

25 THE PLAYERS WHAT WAS GOING DOWN.  OKAY?

1          AND I NEVER HEARD A QUESTION FROM THE FLOOR,

2   INDIVIDUALLY -- AND THEY KNEW I WAS ON THE COMMITTEE -- COME TO

3   ME AND SAY "HOW COME WE'RE NOT" -- YOU KNOW, THE ACTIVE PLAYER.

4   NOTHING.  EVER.

5   Q.   NO ONE EVER ASKED "WHERE'S MY ACTIVE PLAYER LICENSING

6   MONEY"?

7   A.   NO.

8          **MR. KATZ:**  OBJECT.  OBJECT, YOUR HONOR.  IT'S

9   LEADING.

10         **THE WITNESS:**  IT'S LIKE TWO DIFFERENT WORLDS.

11         **THE COURT:**  SUMMARY QUESTION.  OVERRULED.

12         PLEASE CONTINUE.

13  **BY MR. GREENSPAN:**

14  Q.   MR. GOICH, DO YOU ATTEND LOCAL CHAPTER MEETINGS?

15  A.   WE HAVE A CHAPTER.  EITHER I'M NOT BEING INVITED OR THEY

16  DON'T HAVE VERY MANY MEETINGS.  I DON'T KNOW IF THEY LIKE ME OR

17  NOT.

18         I DON'T DRINK.  I DON'T GOLF.  I DON'T GO FOR THAT

19  STUFF.  WHAT CAN I TELL YOU?

20  Q.   MR. GOICH, DO YOU HAVE ON OCCASION -- DO YOU SPEAK TO

21  OTHER RETIRED PLAYERS?

22  A.   YEAH, I'VE DONE THAT.  I'VE GONE TO RENO TO DO THIS, TO

23  GET THEM TO SIGN THE GLA, THE RENO CHAPTER.  THAT'S ONE OF THE

24  THINGS I DID.

25  Q.   SO YOU'VE BEEN TO SOME LOCAL CHAPTERS?

1    **A.**    YEAH.  DETROIT, RENO, COUPLE OTHERS.  BUT IT'S BEEN --

2    IT'S BEEN YEARS.  BUT, YES, THEY WOULD ASK ME TO GO, YEAH.

3    FRANK WOULD.

4    **Q.**    AND WHAT I'M DOING IS I'M JUST TRYING TO PUT THE ANNUAL

5    RETIRED PLAYER CONVENTION TO THE SIDE AND FOCUS ON ANY OTHER

6    OPPORTUNITIES THAT YOU'VE HAD TO TALK TO RETIRED PLAYERS,

7    WHETHER IN PRIVATE CHAPTERS --

8    **A.**    NOT UNLESS THEY ASKED ME FROM THE OFFICE TO GO, NO.

9    **Q.**    FRIENDSHIPS WITH ANY OTHER RETIRED PLAYERS?

10   **A.**    OH, ABSOLUTELY.  GUYS CALL ME ALL THE TIME.

11   **Q.**    SO WHAT I'M TRYING TO GET IS, APART FROM THE NATIONAL

12   CONVENTION, IN OTHER AREAS WHERE YOU MAY SPEAK TO RETIRED

13   PLAYERS, HAS ANY RETIRED PLAYER EVER ASKED YOU WHETHER HE WAS

14   ENTITLED TO A SHARE OF ACTIVE PLAYER LICENSING MONEY BY VIRTUE

15   OF SIGNING A RETIRED PLAYER GLA?

16   **A.**    ABSOLUTELY NOT.

17   **Q.**    DID THERE COME A POINT IN TIME WHEN YOU FIRST HEARD THAT

18   CLAIM BEING MADE?

19   **A.**    WHEN I GOT THE LETTER THAT THIS WAS GOING DOWN.  FIRST

20   TIME EVER.

21   **Q.**    WHAT LETTER ARE YOU REFERRING TO?

22   **A.**    UHM, CLASS ACTION LAWSUIT LETTER.  IT CAME TO MY HOUSE, MY

23   MAILBOX, POST OFFICE, P.O. BOX.  THAT'S THE FIRST TIME.

24   **Q.**    THANK YOU.

25   **A.**    YEAH.

1    **THE COURT:**  ALL RIGHT.  CROSS EXAMINATION.

2                    <u>**CROSS EXAMINATION**</u>

3    **BY MR. GREENSPAN:**

4    **Q.**  GOOD MORNING, MR. GOICH.

5    **A.**  GOOD MORNING.

6    **Q.**  MY NAME IS RON KATZ.

7         DID YOU SAY YOU PLAYED FOR THE ST. LOUIS CARDINALS,

8    SIR?

9    **A.**  YEAH.

10   **Q.**  WHAT YEAR?

11   **A.**  DRAFTED '67, '68.

12   **Q.**  WHO WAS THE QUARTERBACK DURING THAT YEAR?

13   **A.**  CHARLIE JOHNSON AND JIM HART, WHO I PLAYED AGAINST WHEN I

14   WENT TO SOUTHERN ILLINOIS.

15   **Q.**  I WAS A FAN OF YOURS.  I LIVED IN ST. LOUIS AT THAT TIME.

16   **A.**  REMEMBER ERNIE MCMILLIN, ROB BROWN, THOSE GUYS?

17   **Q.**  LARRY WILSON?

18   **A.**  GREAT BALLPLAYER.

19   **Q.**  A GOOD TEAM.

20        JIM HART CAME OUT OF SIU, I THINK.

21   **A.**  SOUTHERN ILLINOIS UNIVERSITY.  YEAH.  THAT'S RIGHT.

22   **Q.**  SIR, I THINK YOU JUST TESTIFIED THAT YOU ARE A TEAM

23   PLAYER; IS THAT RIGHT?

24   **A.**  YEAH.

25   **Q.**  SO ON THE FOOTBALL TEAM WHEN YOU'RE OUT THERE WITH YOUR

1   FELLOW DEFENDERS, THAT'S -- YOU'RE PART OF A TEAM OF 11 PEOPLE,

2   RIGHT?

3   **A.**   UHM, NO.  I WOULD SAY 40 PEOPLE.

4   **Q.**   OKAY.  BUT ON THE FIELD AT THAT TIME WAS 11?

5   **A.**   THE ONLY PEOPLE THAT COULD BE THERE BY THE RULES, YEAH.

6   BUT THAT'S NOT THE TEAM.

7   **Q.**   YOU NEED ALL 11?

8   **A.**   RIGHT.  BUT YOU NEED ALL 40.

9   **Q.**   RIGHT.  AND THEN, YOU NEED 11 MORE FOR OFFENSE, RIGHT?

10  **A.**   WELL, THAT'S THE ENEMY.  SO I DON'T CARE ABOUT THEM.

11  **Q.**   ON YOUR OWN TEAM?

12  **A.**   I WAS DEFENSE.

13  **Q.**   ON YOUR OWN TEAM?

14  **A.**   RIGHT.  I DON'T LIKE OFFENSIVE PLAYERS.

15          (LAUGHTER)

16  **Q.**   AND THEN -- AND YOU NEED SOME SUBSTITUTES IN CASE PEOPLE

17  GET HURT.

18  **A.**   ABSOLUTELY.

19  **Q.**   SO, AS YOU SAY, YOU NEED ABOUT 40?

20  **A.**   40 GUYS.  THEY'VE CHANGED THE RULE.  IT'S 53 OR WHATEVER

21  NOW.

22  **Q.**   IT WAS ACTUALLY 53 ON THE TEAM.

23  **A.**   OKAY.

24  **Q.**   YOU NEED ALL THOSE PLAYERS TO HAVE A TEAM, RIGHT?

25  **A.**   THAT IS CORRECT.

1   Q.   AND YOU TALKED ABOUT RECEIVING THE GLA, THE NOTICE OF THIS

2   SUIT.  AND THEN, YOU OPTED OUT -- YOU WERE ONE OF THE 12 OUT OF

3   2,074 THAT OPTED OUT OF THE SUIT?

4   A.   THERE WAS 12?  THERE WERE 12 GUYS THAT OPTED OUT?

5   Q.   YES.

6   A.   THAT'S MY TEAMMATES.

7   Q.   I THINK SOME OF THEM WERE OFFENSIVE PLAYERS.

8   A.   I'LL ACCEPT THEM NOW.

9   Q.   OKAY.

10        (LAUGHTER)

11  Q.   AND YOU TALKED ABOUT GOING TO SOME OF THESE CONVENTIONS.

12  YOU SAY THERE WAS ABOUT A COUPLE HUNDRED PEOPLE THERE?

13  A.   PLAYERS.

14  Q.   PLAYERS.

15  A.   THEN, THEY BRING THEIR WIVES.  I WOULD SAY 150, 200,

16  SOMETIMES, YEAH, AT THE CONVENTION OVER THE YEARS.

17  Q.   THERE'S SOMETHING LIKE ABOUT 13,000 RETIRED PLAYERS OUT

18  THERE, RIGHT?

19  A.   IF YOU SAY IT.  I'M SURE YOU'VE DONE YOUR RESEARCH, YEAH.

20  Q.   RIGHT.  OKAY.  AND YOU SAY THAT AT THESE MEETINGS THEY

21  TALKED TO YOU ABOUT THE GLA ITSELF, RIGHT?

22  A.   CORRECT, SIR.

23  Q.   IN FACT, WHY DON'T WE PUT UP 2349, WHICH IS THE ONE YOU

24  SIGNED?

25  A.   OKAY.

1  **Q.**   TALKED ABOUT JUST A FEW MOMENTS AGO.

2        AND DIRECTING YOUR ATTENTION TO THE SECOND PARAGRAPH

3  WHICH DEFINES "GROUP LICENSING PROGRAMS," DID ANYONE EVER TELL

4  YOU, SIR, THAT THE DEFINITION OF A GROUP LICENSE PROGRAM WAS

5  ANYTHING DIFFERENT FROM WHAT IT SAYS HERE, "SIX OR MORE PRESENT

6  OR FORMER NFL PLAYER IMAGES"?

7  **A.**   DID ANYONE EVER EXPLAIN THAT?

8  **Q.**   DID ANYONE EVER TELL YOU IT WAS ANY DIFFERENT FROM THAT?

9  **A.**   NOT TO MY KNOWLEDGE, NO.

10 **Q.**   OKAY.  AND DID ANYONE EVER TELL YOU THAT IN ORDER TO GET

11 PAID FROM THE GLA ALL 2100 GLA MEMBERS, MORE OR LESS, WOULD

12 HAVE TO BE LICENSED IN ONE GROUP TO A LICENSEE?  DID ANYONE

13 EVER TELL YOU THAT?

14 **A.**   THAT ALL 21 TO GET PAID?

15 **Q.**   YES.

16 **A.**   I DON'T RECALL THAT EITHER.

17 **Q.**   OKAY.  FINE.

18        AND DID ANYONE EVER TELL YOU HOW TO TELL THE

19 DIFFERENCE BETWEEN A GROUP AGREEMENT AND WHAT'S CALLED -- WELL

20 LET ME ASK YOU THIS.

21        HAD YOU EVER HEARD OF SOMETHING CALLED AN "AD HOC

22 AGREEMENT"?

23 **A.**   TO MY UNDERSTANDING OF THE AD HOC THAT THE GUYS COULD GO

24 OFF ON THEIR OWN.  AND THAT WOULD NOT STOP THEM FROM EARNING

25 ANY MONIES, INDIVIDUALLY.

1  **Q.**   AND DID ANYONE EVER TELL YOU HOW TO TELL THE DIFFERENCE

2  BETWEEN AN AD HOC AND A GROUP AGREEMENT?

3  **A.**   WELL, THEY SORT OF DIDN'T HAVE TO.  I THOUGHT I UNDERSTOOD

4  THAT, FROM THAT.

5  **Q.**   DID ANYONE EVER TELL YOU?

6  **A.**   I WOULD HAVE TO SAY I DON'T REMEMBER THAT, SIR.  I

7  UNDERSTOOD IT, THOUGH.

8  **Q.**   AND WHAT WAS YOUR UNDERSTANDING?

9  **A.**   MY UNDERSTANDING WAS THAT IF A PLAYER WANTED TO GO OFF ON

10  HIS OWN EVEN THOUGH HE SIGNED THAT, THAT PLAYERS INC WOULD NOT

11  STOP THEM.

12          SO, AGAIN, THAT -- THAT MADE ME FEEL COMFORTABLE IN

13  SIGNING THIS AGREEMENT, OKAY?

14          AND IF THEY -- IF THERE WAS A GROUP, AND I COULD GO

15  ALONG WITH THAT GROUP SOMEHOW, I WAS GOING -- IT DIDN'T COST ME

16  A THING.  I COULD POTENTIALLY HELP PEOPLE, EVEN MYSELF.  THAT'S

17  WHY I SIGNED THE AGREEMENT.  I DIDN'T GET INTO 2100 GROUP

18  PLAYERS AND ALL THAT.

19          IT JUST DIDN'T SEEM SIGNIFICANT.  BUT I THOUGHT I HAD

20  A CLEAR IDEA WHAT THIS WAS ABOUT.

21  **Q.**   WELL, YOU WANTED TO BE IN A GROUP WITH SOME -- YOU SAID

22  YOUR ONLY HOPE WAS TO BE IN A GROUP WITH SOME BETTER KNOWN

23  PLAYERS?

24  **A.**   I THOUGHT.

25  **Q.**   RIGHT?

1   **A.**   AND I STILL DO, YEAH, BECAUSE NOTHING HAS HAPPENED.

2   **Q.**   IN FACT, YOU SAID A BETTER KNOWN PLAYER LIKE MR. ADDERLEY,

3   RIGHT?

4   **A.**   A LOT OF RESPECT FOR MR. ADDERLEY'S PLAYING.

5   **Q.**   RIGHT.  AND DO YOU KNOW MR. ADDERLEY SIGNED THIS?  YOU

6   ACTUALLY WERE IN A GROUP WITH HIM.  YOU BOTH SIGNED THE GLA,

7   DID YOU KNOW THAT?

8   **A.**   I DIDN'T KNOW HE SIGNED IT UNTIL NOW.

9   **Q.**   OKAY.  AND DID ANYONE EVER TELL YOU HOW THE FUNDS RECEIVED

10  AS A RESULT OF THE GLA PROGRAM WERE TO BE DIVIDED?

11  **A.**   YEAH.  IF YOU WERE PART OF THE GROUP YOU WOULD SHARE IN

12  THOSE -- THOSE MONIES.

13  **Q.**   RIGHT.  BUT -- WELL, WHY DON'T WE LOOK AT THE SECOND TO

14  THE LAST PARAGRAPH -- SECOND TO LAST PARAGRAPH, YEAH.

15          AND ARE YOU FAMILIAR WITH THIS PARAGRAPH, SIR?

16  **A.**   I THINK I AM.

17  **Q.**   RIGHT.  SO IT SAYS:

18          "IT IS FURTHER UNDERSTOOD THAT THE MONIES

19  GENERATED BY SUCH LICENSING OF RETIRED PLAYER GROUP RIGHTS WILL

20  BE DIVIDED BETWEEN THE PLAYER AND AN ESCROW ACCOUNT FOR ALL

21  ELIGIBLE NFLPA MEMBERS WHO HAVE SIGNED A GROUP LICENSING

22  AUTHORIZATION FORM."

23          SO DID THAT TELL YOU HOW IT WAS TO BE DIVIDED, WHAT

24  PERCENTAGE YOU WERE TO GET OR WHAT WOULD HAPPEN IF MONIES CAME

25  IN?

1  **A.**   THAT WE WOULD SHARE IT.

2  **Q.**   RIGHT.  BUT DID YOU KNOW HOW YOU WOULD SHARE?  WERE YOU

3  TOLD HOW YOU WOULD SHARE?

4  **A.**   YOU MEAN, PERCENTAGE-WISE?

5  **Q.**   WELL, WOULD IT BE EQUAL SHARE?  WOULD YOU GET 10 PERCENT?

6  WOULD YOU GET -- WERE YOU TOLD ANYTHING ON THIS SUBJECT?

7  **A.**   NOT PERCENTAGES WHAT WE WERE GOING TO GET.

8  **Q.**   WELL, WHAT -- YOU'RE A MATH TEACHER, RIGHT?

9  **A.**   WELL --

10          (SIMULTANEOUS SPEAKING OF WITNESS AND COUNSEL; NOT

11          REPORTABLE.)

12 **Q.**   YOU'RE USED TO ADDING, SUBTRACTING, DIVIDING, ET CETERA?

13 **A.**   THAT'S CORRECT.

14 **Q.**   DID YOU HAVE ANY UNDERSTANDING JUST FROM A NUMBERS POINT

15 OF VIEW, A PERCENTAGE POINT OF VIEW, ANY POINT OF VIEW, HOW

16 THESE MONIES WERE TO BE DIVIDED?  IT SAYS THEY WILL BE DIVIDED?

17 **A.**   EQUALLY.

18 **Q.**   EQUALLY.

19 **A.**   TO THE GROUP THAT EARNED THOSE MONIES.  THAT'S THE WAY I

20 UNDERSTOOD IT.  IF YOU WERE PART OF THE GROUP THAT EARNED THE

21 MONIES, YOU WOULD SHARE EQUALLY.  AND IT WOULD BE IN AN ESCROW

22 ACCOUNT.  MY UNDERSTANDING, THERE WAS NEVER ENOUGH MONIES TO --

23 YOU KNOW, MAKE IT WORTHWHILE, I GUESS, TO GO TO AN ESCROW

24 ACCOUNT.

25 **Q.**   DID ANYONE EVER TELL YOU THAT PLAYERS INC WAS AGGRESSIVELY

1  MARKETING YOUR RIGHTS?

2  **A.**   ABSOLUTELY.  FRANK WOSCHITZ TIME AND TIME AGAIN.  HE WAS

3  SO SAD IT DIDN'T WORK.

4  **Q.**   OKAY.  NOW, EARLIER -- AND DID HE GIVE YOU EXAMPLES OF HOW

5  THEY WERE AGGRESSIVELY MARKETING PLAYERS?

6  **A.**   YEAH.  HE HIMSELF WOULD TALK TO LICENSEES.  FRANK.  AGAIN,

7  FRANK WAS THE DIRECTOR OF RETIRED PLAYERS.

8  **Q.**   DID HE GIVE YOU ANY SPECIFICS?

9  **A.**   HE SAID, "THERE'S NO MONEY IN IT, DAN.  THERE'S NO MONEY

10  IN IT."

11  **Q.**   DID HE GIVE YOU ANY SPECIFIC:  "I WENT OUT TO TALK TO THIS

12  LICENSEE?"

13  **A.**   HE PROBABLY DID, SIR.

14  **Q.**   COULD YOU RECALL?  DO YOU RECALL ANY AS YOU SIT HERE NOW?

15  **A.**   NO, NOT THE LICENSEE, THE SPECIFIC LICENSEES HE TRIED

16  OVER -- FRANK CARED.  I KNOW HE DID.

17  **Q.**   WHAT WAS HIS LAST NAME, SIR?

18  **A.**   WOSCHITZ.

19  **Q.**   HOW DO YOU SPELL IT?

20  **A.**   W-O-S-C-H-I-T-Z, I BELIEVE.

21  **Q.**   IS HE STILL WITH THE NFL?

22  **A.**   I WISH HE WAS.  HE ISN'T.  HE'S PROBABLY GETTING HIS AORTA

23  OPERATED ON AS WE SPEAK.  I TALKED TO HIM LAST WEEK.

24  **Q.**   I MIGHT HAVE MISHEARD YOU, SIR, BUT I THOUGHT YOU SAID ON

25  YOUR DIRECT -- AND TELL ME IF YOU DID OR YOU DIDN'T -- THAT YOU

1  NEVER RECEIVED AN OFFER OF MARKETING OPPORTUNITIES?  DID YOU

2  SAY THAT?

3  **A.**    THAT'S TRUE, YEAH.  I NEVER DID.

4  **Q.**    DIDN'T YOU CONSIDER THE GLA TO BE AN OFFER OF A MARKETING

5  OPPORTUNITY?

6  **A.**    ON A HOPE, A WING AND A PRAYER, IF I COULD ATTACH MYSELF

7  TO SOMEBODY, I PROBABLY --

8  **Q.**    SOMEBODY LIKE MR. ADDERLEY?

9  **A.**    THAT'S CORRECT.

10  **Q.**    THANK YOU, SIR.

11         NO FURTHER QUESTIONS.

12         **THE COURT:**  OKAY.  ANYTHING MORE?

13         **MR. GREENSPAN:**  JUST A FEW MORE.

14                 <u>**REDIRECT EXAMINATION**</u>

15  **BY MR. GREENSPAN:**

16  **Q.**    MR. KATZ ASKED YOU SOME QUESTIONS ABOUT AD HOC DEALS.

17  PUTTING THAT TERMINOLOGY ASIDE, AT RETIRED PLAYER CONVENTIONS,

18  WAS THERE ANY DISCUSSION OF RETIRED PLAYERS EARNING MONEY

19  THROUGH LICENSING APART FROM THE RETIRED PLAYER GLA?

20  **A.**    YEAH.  THE CONTRACT SAYS THEY COULD DO THAT.  THAT'S THE

21  WAY I UNDERSTOOD IT, THAT THAT WOULD NOT TIE UP INDIVIDUAL GUYS

22  THAT COULD GO OUT AND MAKE A BUCK, PUT IT WHERE IT'S AT.  THAT

23  AGREEMENT WASN'T SUPPOSED TO BE A ROADBLOCK TO THAT.

24         SO THEY COULD GO OUT AND MAKE DEALS ON THEIR OWN,

25  EVEN THOUGH THEY SIGNED THAT GROUP AGREEMENT.  I THOUGHT THAT

1   WAS EXCEPTIONAL, REALLY.  DIDN'T LOCK THEM UP.

2   **Q.**   LET ME -- LET ME ASK YOU THIS.  AND NOW IT'S GETTING BACK

3   TO THE RETIRED PLAYER GLA.

4          LET ME ASK YOU AGAIN.  AT THE TIME YOU SIGNED YOUR

5   RETIRED PLAYER GLA, WHAT WAS YOUR UNDERSTANDING OF WHAT, IF

6   ANYTHING, YOU WOULD BE ENTITLED TO RECEIVE?

7          **MR. KATZ:**  OBJECT.  ASKED AND ANSWERED, YOUR HONOR.

8          **THE COURT:**  WELL, IT HAS.  THAT WAS BACK IN THE OTHER

9   PART.  WE'RE GOING OVER THE SAME GROUND AGAIN.  BUT ONE MORE

10  TIME.

11         PLEASE ANSWER.

12         **THE WITNESS:**  IF THE GROUP EARNED MONEY -- I HOPE I'M

13  ANSWERING THE QUESTION.  I FORGET THE QUESTION.  IF THE GROUP

14  EARNED MONEY, AND I WAS PART OF THE GROUP, I WOULD GET SOME

15  MONIES, OKAY.

16         FROM MY UNDERSTANDING, IT DIDN'T HAPPEN TO A LOT OF

17  PLAYERS, MOST PLAYERS.  SOME PLAYERS DID GET MONIES.  IT WAS

18  MADE PUBLIC TO US THROUGH NEWSPRINT THROUGH THE TOUCHBACK, THE

19  GUYS WHO GOT IT -- NOT THE GUYS WHO GOT IT, HOW MUCH WAS GIVEN,

20  THAT THEY POTENTIALLY EARNED.  I JUST SAID "GOD BLESS 'EM" YOU

21  KNOW.

22  **BY MR. GREENSPAN:**

23  **Q.**   DID YOU HAVE ANY UNDERSTANDING AT THE TIME YOU SIGNED --

24  DID YOU HAVE ANY UNDERSTANDING AT THE TIME YOU SIGNED YOUR

25  RETIRED PLAYER GLA --

1   A.   YES.

2   Q.   -- AS TO WHETHER YOU WOULD RECEIVE ANY MONEY IF YOU WERE

3   NOT PART OF THE LICENSED GROUP?

4   A.   NO.

5           MR. KATZ:  OBJECT.

6           THE WITNESS:  I UNDERSTOOD --

7           MR. KATZ:  YOUR HONOR, I OBJECT.  IT'S LEADING.

8           THE COURT:  WELL, IT'S SOMEWHAT LEADING.

9           MR. KATZ:  AND ASKED AND ANSWERED.

10          THE COURT:  BOTH.  ON BOTH POINTS, YOU'RE RIGHT.

11          HOW MANY MORE OF THESE DO YOU HAVE?

12          MR. GREENSPAN:  HARDLY ANY, YOUR HONOR.

13          THE COURT:  OVERRULED.

14          PLEASE ANSWER.

15  BY MR. GREENSPAN:

16  Q.   MY QUESTION IS, SIR:  AT THE TIME YOU SIGNED YOUR RETIRED

17  PLAYER GLA, DID YOU HAVE ANY UNDERSTANDING AS TO WHETHER YOU

18  WOULD RECEIVE MONEY IF YOU WERE NOT PART OF A LICENSED GROUP?

19  A.   I WOULDN'T RECEIVE MONEY.

20  Q.   I COULDN'T HEAR YOU, SIR?

21  A.   I WOULDN'T RECEIVE MONEY.

22  Q.   WOULD NOT?

23  A.   YEAH.

24  Q.   OKAY.

25  A.   IF I WASN'T LICENSED, IF I WASN'T PART OF THE GROUP, I

1   WOULDN'T RECEIVE ANY MONIES.

2   **Q.**    AND, SIR, AT THE TIME -- AT THE TIME YOU SIGNED YOUR

3   RETIRED PLAYER GLA, WHAT WAS YOUR UNDERSTANDING AS TO WHETHER

4   IT MADE YOU ELIGIBLE FOR A SHARE OF ANY ACTIVE PLAYER LICENSING

5   MONEY?

6           **MR. KATZ:**  OBJECT.  ASKED AND ANSWERED.

7           **THE COURT:**  TRUE.

8           GO AHEAD.

9           **THE WITNESS:**  ANSWER IT?

10          **THE COURT:**  ANSWER.

11          **THE WITNESS:**  IT IS SO FAR OUT, I CAN'T COMPREHEND

12  WHY ANYONE WOULD ASK.  THE ACTIVE PLAYERS' MONEY WAS NEVER PART

13  OF THIS ISSUE.

14          AND I WENT TO EVERY CONVENTION.  I LISTENED INTENTLY.

15  TO STATE THAT WE WERE GOING TO MINGLE WITH THE ACTIVE PLAYERS,

16  THEIR MONIES, IS WAY OUT OF LEFT FIELD.

17          THIS WAS THE ACTIVE PLAYERS TRYING TO HELP US IN

18  THEIR WAY.  IT'S THE WAY I UNDERSTOOD IT, VERY SIMPLY PUT.  BUT

19  THEY WEREN'T -- THEIR LICENSING MONEY WAS GOING TO BE OUR

20  LICENSING MONEY?  IS WHAT YOU'RE SAYING?  IT NEVER WOULD HAVE

21  HAPPENED.

22          **MR. GREENSPAN:**  NOTHING FURTHER.

23          **THE COURT:**  ANYTHING FURTHER?

24          **MR. KATZ:**  I HAVE ONE FURTHER LEADING QUESTION, YOUR

25  HONOR.

1          THE COURT:  I'M SORRY?

2          MR. KATZ:  I SAID I HAD ONE FURTHER LEADING QUESTION.

3          THE COURT:  IT'S OKAY FOR YOU TO ASK A LEADING

4   QUESTION.

5          MR. KATZ:  THAT'S WHAT I THOUGHT.  I WAS JUST TRYING

6   TO ALERT THE CROWD.

7          CAN WE PUT THE 2349 BACK?  AND THE SECOND PAIR

8   PARAGRAPH, PLEASE.  AND IF YOU COULD HIGHLIGHT THE WORD

9   "PRESENT."

10          (DOCUMENT DISPLAYED.)

11                    **RECROSS EXAMINATION**

12   **BY MR. KATZ:**

13   **Q.**  IN THAT SENTENCE, "PRESENT PLAYER" MEANS "ACTIVE PLAYER,"

14   DOESN'T IT, SIR?

15   **A.**  THAT'S WHAT IT WOULD MEAN, YEAH.

16          MR. KATZ:  THANK YOU.

17          THE COURT:  ANYTHING MORE WITHIN THE SCOPE OF THAT

18   VERY NARROW RECROSS?

19          MR. GREENSPAN:  NO.  I CAN READ IT, TOO.

20          THE COURT:  ALL RIGHT.  GREAT.

21          MAY OUR WITNESS BE EXCUSED SO HE CAN GO BACK TO

22   TEACHING MATHEMATICS?

23          THE WITNESS:  THAT'S RIGHT.

24          MR. KATZ:  YES, YOUR HONOR.  THANK YOU.

25          THE WITNESS:  THANK YOU.

1          **THE COURT:**  THANK YOU, SIR.

2          **MR. KATZ:**  GREAT CARDINALS TEAM.

3          **THE WITNESS:**  WE DIDN'T WIN, THOUGH.  KEPT LOSING.

4    WITH ALL THAT TALENT, WE KEPT LOSING.

5          (LAUGHTER)

6          **THE COURT:**  WE HAVE TIME FOR ANOTHER WITNESS.  NEXT

7    WITNESS.

8          **MR. KESSLER:**  YOUR HONOR, THE DEFENDANTS NEXT CALL

9    MR. TRACE ARMSTRONG TO THE STAND.

10         **THE COURT:**  ALL RIGHT.  LET'S HEAR FROM MR. TRACE

11   ARMSTRONG.

12         ARE YOU MR. ARMSTRONG?

13         **THE WITNESS:**  YES.

14         **THE COURT:**  PLEASE STAND SOMEWHERE IN THERE, AND

15   RAISE YOUR RIGHT HAND.

16         **THE CLERK:**  I WILL SWEAR YOU IN, MR. ARMSTRONG.

17         (THEREUPON, THE WITNESS WAS SWORN.)

18         **THE WITNESS:**  I DO.

19         **THE CLERK:**  OKAY.  THANK YOU.

20         PLEASE BE SEATED.

21         **THE COURT:**  MR. ARMSTRONG, CAN WE TAKE YOUR PICTURE?

22         **THE WITNESS:**  SURE.

23         **THE COURT:**  SO WE CAN USE IT IN THE CLOSING --

24         **THE CLERK:**  IT WOULD BE EASIER IF YOU'RE SITTING.

25   YOU'RE TOO TALL FOR ME.

1    GREAT.  THANKS.

2         **THE COURT:**  OKAY.  BE SURE YOU LEAN FORWARD JUST

3    ENOUGH THAT THE VOICE GETS CAUGHT BY THE MIC.

4         GO AHEAD, MR. KESSLER.

5                    **TRACE ARMSTRONG**,

6    CALLED AS A WITNESS FOR THE DEFENDANTS HEREIN, HAVING BEEN

7    FIRST DULY SWORN, WAS EXAMINED AND TESTIFIED AS FOLLOWS:

8                    **DIRECT EXAMINATION**

9    **BY MR. KESSLER:**

10   **Q.**   GOOD MORNING, MR. ARMSTRONG.

11   **A.**   GOOD MORNING.

12   **Q.**   MR. ARMSTRONG, CAN YOU PLEASE STATE YOUR FULL NAME FOR THE

13   RECORD?

14   **A.**   TRACE ARMSTRONG.

15   **Q.**   OKAY.  AND, MR. ARMSTRONG, WHAT DO YOU CURRENTLY DO FOR A

16   LIVING?

17   **A.**   I'M AN AGENT FOR CREATIVE ARTISTS AGENCY.

18   **Q.**   AND AT CREATIVE ARTISTS AGENCY, WHO ARE YOU AN AGENT FOR?

19   WHAT TYPE OF PEOPLE?

20   **A.**   I REPRESENT NFL AND COLLEGE COACHES, AND ALSO

21   BROADCASTERS.

22   **Q.**   SO COACHES AND BROADCASTERS, BUT NO PLAYERS?

23   **A.**   NO PLAYERS, THAT'S RIGHT.

24   **Q.**   AND HOW LONG HAVE YOU BEEN AN AGENT FOR COACHES AND

25   BROADCASTERS AT CREATIVE ARTISTS AGENCY?

1  **A.**    ABOUT 14 MONTHS.

2  **Q.**    OKAY.  AND PRIOR TO THAT WHAT WAS YOUR OCCUPATION?

3  **A.**    I OWNED A FITNESS EQUIPMENT MANUFACTURING COMPANY.

4  ACTUALLY STILL OWN A PORTION OF THAT COMPANY.

5  **Q.**    OKAY.  AND PRIOR TO THAT OR DURING THAT PERIOD, DID YOU

6  HAVE ANY OTHER PROFESSIONS DURING YOUR CAREER?

7  **A.**    I DID.  I WAS A PROFESSIONAL ATHLETE.  I WAS AN NFL

8  FOOTBALL PLAYER FOR 15 SEASONS FROM 1989 UNTIL 2003.

9  **Q.**    OKAY.  LET ME GO BACK IN TIME THEN TO YOUR COLLEGE DAYS

10  FIRST.

11              MR. ARMSTRONG, DID YOU PLAY DIVISION 1 FOOTBALL IN

12  COLLEGE?

13  **A.**    I DID, YES.  I PLAYED AT THE UNIVERSITY OF FLORIDA, IN

14  GAINESVILLE.  AND I'VE BEEN PLAYING ORGANIZED FOOTBALL, I

15  GUESS -- OR I DID PLAY FOR 30-SOME YEARS.  WENT ALL THE WAY --

16  **Q.**    POP WARNER FOOTBALL YOU STARTED?

17  **A.**    ALL THE WAY BACK TO 7 YEARS OLD, YEAH.

18  **Q.**    WHEN YOU WERE AT THE -- IN COLLEGE, DID YOUR TEAMS DO

19  WELL?

20  **A.**    WELL, I SAY WE ARE BASKING IN THE REFLECTIVE GLORY THAT IS

21  THE UNIVERSITY OF FLORIDA NOW.  THEY ARE MUCH BETTER NOW THAN

22  WE WERE THEN.  BUT, YEAH, WE DID FAIRLY WELL.

23  **Q.**    HOW ABOUT YOU INDIVIDUALLY?  DID YOU WIN ANY HONORS WHEN

24  YOU WERE A COLLEGE FOOTBALL PLAYER?

25  **A.**    I DID.  I WAS AN ALL CONFERENCE PLAYER IN COLLEGE.  I WAS

1   ALSO AN ALL AMERICAN.

2   **Q.**   AND THEN, WERE YOU DRAFTED INTO THE NFL?

3   **A.**   I WAS.  I WAS A FIRST ROUND DRAFT PICK IN 1989.  I WAS

4   DRAFTED BY THE CHICAGO BEARS.

5   **Q.**   HOW MANY YEARS DID YOU PLAY FOR THE CHICAGO BEARS?

6   **A.**   I PLAYED FOR THE BEARS FOR SIX SEASONS, AND THEN I WAS

7   TRADED TO THE MIAMI DOLPHINS WHERE I PLAYED SIX SEASONS.  AND

8   THEN, IN 2000 I CAME TO OAKLAND AND PLAYED FOR THE RAIDERS FOR

9   THREE YEARS AT THE END OF MY CAREER.

10  **Q.**   LET'S GO BACK.  I HAVEN'T ASKED YOU YET.  THE JURY HAS

11  BEEN HEARING ABOUT THE DIFFERENT POSITIONS.  WHAT POSITION DID

12  YOU PLAY ON THE FOOTBALL FIELD?

13  **A.**   I WAS A DEFENSIVE END.

14  **Q.**   AND DURING THE TIME THAT YOU PLAYED IN THE NFL, DID YOU

15  WIN ANY HONORS AS A DEFENSIVE END?

16  **A.**   I DID.  I WAS ALL PRO SELECTION.  I WAS NAMED MULTIPLE

17  TIMES THE NFL PLAYER OF THE WEEK, PLAYER OF THE MONTH, SO

18  SEVERAL INDIVIDUAL HONORS.

19  **Q.**   DID YOU EVER GO TO THE PRO BOWL?

20  **A.**   I DID.

21  **Q.**   EXPLAIN TO THE JURY WHAT IS THE PRO BOWL?

22  **A.**   THE PRO BOWL IS THE NFL'S ALL STAR GAME.  IT'S A GAME

23  WHERE FANS AND PLAYERS VOTE FOR THE BEST PLAYERS, POSITION BY

24  POSITION, ON TEAMS ACROSS THE LEAGUE.

25          TWO TEAMS ARE SELECTED.  ONE FROM THE AMERICAN

1  FOOTBALL CONFERENCE, ONE FROM THE NATIONAL FOOTBALL CONFERENCE.

2  AND THEY PLAY AN ALL STAR GAME IN HAWAII.

3  **Q.**    NOW, YOU MENTIONED YOU PLAYED FOR THE OAKLAND RAIDERS HERE

4  IN THE BAY AREA.  DID YOU PLAY ON THE OAKLAND RAIDERS IN THE

5  1999 TO 2000 SEASON?

6  **A.**    UHM, I CAME OUT HERE FOR THE 2000 -- AFTER THE 2000

7  SEASON.  SO I WAS OUT HERE FOR 2001, '2 AND '3.

8  **Q.**    DURING THAT PERIOD OF TIME DID YOUR OAKLAND RAIDERS TEAM

9  EVER GET TO THE SUPER BOWL?

10  **A.**    WE WERE THE LAST GOOD OAKLAND RAIDERS TEAM, I LIKE TO SAY.

11  YEAH, WE DID GO TO THE SUPER BOWL IN 2002.

12  **Q.**    MR. ARMSTRONG, I HESITATE TO ASK, BUT DID YOU WIN THE

13  SUPER BOWL?

14  **A.**    NO.  SADLY WE LOST TO THE TAMPA BAY BUCCANEERS.

15  **Q.**    WHAT WAS THE SCORE, SIR?

16  **A.**    YOU KNOW, I DON'T REMEMBER.  I TRY TO FORGET THOSE THINGS.

17  IT'S PAINFUL.

18  **Q.**    MR. ARMSTRONG, WHEN YOU FIRST JOINED THE NFL AFTER BEING

19  DRAFTED, DID YOU BECOME INVOLVED IN UNION AFFAIRS AT ANY TIME?

20  **A.**    I DID, VERY EARLY ON.  I WAS A PLAYER, A YOUNG PLAYER.  I

21  ASKED A LOT OF QUESTIONS.  WHEN I GOT INTO THE LEAGUE IN 1989,

22  PLAYERS' UNION, PLAYERS WERE IN A BIG SCRAP WITH MANAGEMENT.

23  AND SO I BECAME -- STARTED EDUCATING MYSELF ON THE PROCESS, ON

24  THE ISSUES, MY ROOKIE YEAR.

25  **Q.**    DID YOU EVER BECOME AN ACTIVE PLAYER PLAYER REPRESENTATIVE

1    IN THE UNION?

2    **A.**    I DID.  I WAS ELECTED AS A PLAYER REPRESENTATIVE AS A TEAM

3    REPRESENTATIVE IN 1990.  SO IT WOULD HAVE BEEN MY SECOND YEAR

4    IN THE LEAGUE.

5    **Q.**    AND HOW MANY YEARS -- WELL, FIRST, EXPLAIN TO THE JURY HOW

6    WERE YOU CHOSEN AS THE ACTIVE PLAYER REPRESENTATIVE OF YOUR

7    TEAM?

8    **A.**    UHM, YOU GET ELECTED BY YOUR TEAMMATES.  I WAS APPROACHED

9    BY A COUPLE OF OLDER PLAYERS ON THE TEAM BECAUSE I KIND OF

10   IMMERSED MYSELF IN THE ISSUES IN THE PROCESS, BEEN VOCAL AT

11   TEAM MEETINGS.  A COUPLE OF THE OLDER GUYS ON THE TEAM

12   APPROACHED ME AND SAID:  "YOU SHOULD RUN FOR PLAYER REP."

13            SO I DID AND WAS ELECTED.

14            I RAN AGAINST A COUPLE OTHER TEAMMATES.  YOU HAVE

15   A -- MUCH LIKE A TOWN HALL STYLE MEETING WHERE YOU GET UP IN

16   FRONT OF A ROOM, DISCUSS ISSUES.  BALLOTS WERE TAKEN.  THE

17   WRITTEN BALLOTS WERE SUBMITTED.  THEY'RE COUNTED BY AN

18   INDEPENDENT PERSON.  AND THAT'S HOW I GOT ELECTED.

19   **Q.**    YOU WERE FIRST ELECTED IN '91; IS THAT CORRECT?

20   **A.**    '90, I THINK.  YES.  AND IN 1991, I WAS ELECTED TO THE

21   EXECUTIVE COMMITTEE.

22   **Q.**    OKAY.  EXPLAIN TO THE JURY WHAT IS THE EXECUTIVE COMMITTEE

23   OF THE NFLPA?

24   **A.**    THE EXECUTIVE COMMITTEE IS A SMALLER ACTION COMMITTEE.  SO

25   THE NFL PLAYERS' UNION HAS 32 TEAM REPRESENTATIVES.  SO EACH

1  TEAM -- WELL, AT THE TIME THERE WAS ONLY 28, BUT NOW THERE ARE

2  MORE TEAMS -- EACH TEAM AS AN ELECTED REPRESENTATIVE AND AN

3  ALTERNATIVE IN CASE SOMETHING HAPPENS TO THE ACTIVE REP.

4         OFTENTIMES -- THE EXECUTIVE COMMITTEE IS A SMALLER

5  ACTION ITEM -- ACTION TEAM THAT IS COMPRISED SOMETIMES OF BOARD

6  MEMBERS, BUT ALSO PLAYERS WHO MIGHT HAVE BEEN BOARD MEMBERS IN

7  THE PAST.

8         THE BOARD DICTATES ALL OF THE ACTIVITIES OF THE

9  UNION, BUT SOMETIMES THE BOARD WILL, SAY, NARROW A DECISION AND

10 GIVE THE AUTHORITY TO THE EXECUTIVE COMMITTEE TO CARRY OUT THE

11 FINAL WISHES.

12        SO AS A FOR INSTANCE, ONE YEAR WE BOUGHT OUR OFFICE

13 BUILDING, AND SO WE WERE ABLE TO GET THE DEALS OF THE TERM

14 RELATIVELY CLOSE, AND THE BOARD SAID TO THE EXECUTIVE

15 COMMITTEE:  "WE GIVE YOU THE AUTHORITY TO DO THIS AS LONG AS

16 IT'S WITHIN THESE PARAMETERS."

17 Q.   LET ME ASK YOU THIS:  WHO SELECTED THE EXECUTIVE COMMITTEE

18 MEMBERS OF THE NFLPA?

19 A.   THE BOARD DOES.

20 Q.   OKAY.  WAS THERE A VOTE?

21 A.   YES.

22 Q.   OKAY.  WERE THESE ELECTIONS GENERALLY EVEN CONTESTED AT

23 THE BOARD MEETINGS?

24 A.   YES.  THEY ARE HOTLY CONTESTED.

25        PLAYERS TAKE THAT POSITION VERY SERIOUSLY.  AGAIN,

1   THE EXECUTIVE COMMITTEE IS INVOLVED IN ALL THE DAY-TO-DAY

2   OPERATIONS OF THE UNION.  SO PLAYERS -- IT WAS A MUCH

3   SOUGHT-AFTER POSITION.

4   **Q.**   OKAY.  AND HOW MANY YEARS WERE YOU ON THE EXECUTIVE

5   COMMITTEE?

6   **A.**   I GOT ELECTED IN 1991 TO THE EXECUTIVE COMMITTEE.  AND

7   THEN, SERVED UNTIL THE END OF MY PLAYING CAREER, WHICH WOULD

8   HAVE BEEN 2003.

9   **Q.**   OKAY.  NOW, DURING THE TIME YOU WERE ON THE EXECUTIVE

10  COMMITTEE, WERE YOU EVER ELECTED PRESIDENT OF THE NFLPA?

11  **A.**   YES.

12  **Q.**   OKAY.  WOULD YOU EXPLAIN TO THE JURY HOW YOU WERE ELECTED

13  PRESIDENT OF THE NFLPA?

14  **A.**   AGAIN, I WAS ELECTED BY THE BOARD OF PLAYER

15  REPRESENTATIVES.  SO THE EXECUTIVE COMMITTEE IS COMPRISED OF 10

16  MEMBERS COMING FROM THE BOARD, THE PRESIDENT AND THE EXECUTIVE

17  DIRECTOR.

18         SO I WAS ELECTED IN 1995 WAS MY FIRST 2-YEAR TERM AS

19  PRESIDENT.  SO I WAS ELECTED TO FOUR CONSECUTIVE TWO-YEAR

20  TERMS.  AND, AGAIN, THAT'S VOTED ON BY THE 32 PLAYER

21  REPRESENTATIVES.

22  **Q.**   MR. ARMSTRONG, YOU HAVE -- AND HOW LONG DID YOU SERVE AS

23  PRESIDENT?

24  **A.**   FOURS TERMS, TOTAL EIGHT YEARS.

25  **Q.**   WHEN DID YOU FINISH YOUR TERM AS PRESIDENT OF THE NFLPA?

1   **A.**   IN 2003, WHICH WAS MY LAST YEAR AS AN ACTIVE PLAYER.

2   **Q.**   SO WHAT WAS THE LAST PLAYER BOARD MEETING YOU ATTENDED?

3   WHEN WAS THAT?

4   **A.**   UHM, AS PRESIDENT, IT WOULD HAVE BEEN 2003.

5   **Q.**   IN MARCH OF 2003?

6   **A.**   THAT'S RIGHT.

7   **Q.**   OKAY.  NOW, YOU SHOULD HAVE UP THERE IN FRONT OF YOU TRIAL

8   EXHIBIT 132.

9   **A.**   YES.

10  **Q.**   I BELIEVE IT IS ALREADY IN EVIDENCE.

11           DO YOU RECOGNIZE WHAT TRIAL EXHIBIT 132 IS?

12  **A.**   I DO.

13  **Q.**   WHAT IS IT?

14  **A.**   IT'S THE CONSTITUTION FOR THE NFLPA.

15  **Q.**   OKAY.  AND I'D LIKE TO DIRECT YOUR ATTENTION, IF I CAN,

16  FIRST TO PAGE 15 ON THE TOP, SECTION 502.

17  **A.**   YES.

18  **Q.**   IT SAYS:

19           "SUBJECT TO THE PROVISIONS OF THIS CONSTITUTION,

20  THE BOARD OF REPRESENTATIVES SHALL TRANSACT THE BUSINESS OF THE

21  NFLPA."

22           FIRST OF ALL, WAS THAT THE BOARD OF ACTIVE PLAYER

23  REPRESENTATIVES?

24  **A.**   YES.

25  **Q.**   THEN, IT SAYS:

1                    "THE BOARD SHALL HAVE THE AUTHORITY TO INTERPRET

2    AND APPLY THIS CONSTITUTION AND THE LEGISLATION OF THE NFLPA

3    SUCH POWERS, DUTIES AND AUTHORITY NOT OTHERWISE DELEGATED BY

4    THIS CONSTITUTION SHALL BE EXERCISED, ACTED UPON AND DETERMINED

5    BY THE BOARD.  SAID POWERS OF THE BOARD SHALL INCLUDE, BUT NOT

6    BE LIMITED TO:  ENACTMENT OF POLICIES GOVERNING THE AFFAIRS OF

7    THE NFLPA."

8                    AND I'M GOING TO ASK YOU, MR. ARMSTRONG, WAS THAT

9    CONSISTENT OR INCONSISTENT WITH YOUR TIME ON THE BOARD OF

10   ACTIVE PLAYER REPS?  WERE THESE POWERS EXERCISED BY THE BOARD

11   OF PLAYER REPS WHILE YOU WERE ON THE BOARD?

12   **A.**   YES, COMPLETELY CONSISTENT.

13                   THE PROCESS, THE 32 ELECTED REPRESENTATIVES, THEY

14   DICTATE ALL THE POLICY.

15                   THE PRESIDENT IS -- ONCE I BECAME PRESIDENT I LOST MY

16   ABILITY TO VOTE.  SO THE PRESIDENT, EXECUTIVE DIRECTOR AND THE

17   STAFF ACT ON THE BEHEST OF THE BOARD OF PLAYER REPRESENTATIVES.

18   **Q.**   WHEN YOU WERE THE PRESIDENT, YOU NO LONGER HAD A VOTE,

19   CORRECT?

20   **A.**   NO LONGER HAD A VOTE.

21   **Q.**   BY THE WAY --

22   **A.**   I WANTED ONE.

23   **Q.**   BY THE WAY, MR. UPSHAW, WHEN HE WAS EXECUTIVE DIRECTOR,

24   DID HE HAVE A VOTE?

25   **A.**   NO.

1  Q.   AND UNDER THE CONSTITUTION, WHO HAD THE AUTHORITY TO HIRE

2  AND FIRE THE EXECUTIVE DIRECTOR, SUCH AS MR. UPSHAW?

3  A.   WELL, ULTIMATELY, THE BOARD.  THE BOARD WAS ELECTED --

4  ELECTED THE EXECUTIVE DIRECTOR.

5  Q.   AND WAS HE ELECTED FOR A SPECIFIC TERM AT A TIME?

6  A.   YES, THREE-YEAR TERMS.

7  Q.   AND EVERY THREE YEARS DID THE BOARD HAVE TO DECIDE AGAIN

8  WHETHER TO HIRE HIM?

9  A.   YES, THAT'S RIGHT.

10 Q.   NOW, THERE'S BEEN A LOT OF DISCUSSION IN THIS COURTROOM

11 ABOUT MR. UPSHAW AND MR. ALLEN SIGNING AGREEMENTS.

12        COULD MR. UPSHAW AND MR. ALLEN TAKE ANY POLICY

13 ACTIONS ON BEHALF OF THE NFLPA WITHOUT THE APPROVAL OF THE

14 BOARD OF PLAYER REPS?

15 A.   NO.  ALL THE ACTIONS HAD TO HAVE BEEN APPROVED BY THE

16 BOARD OF PLAYER REPS.

17        SO ANY DECISION WOULD -- THAT MIGHT HAVE BEEN MADE

18 WOULD HAVE BEEN WITHIN PARAMETERS THAT WERE AGREED TO BY THE

19 BOARD FIRST.

20 Q.   NOW, IN YOUR EXPERIENCE AT THE TIME YOU SERVED ON THE

21 BOARD OF PLAYER REPS, WAS THE BOARD OF PLAYER REPS JUST A

22 RUBBER STAMP FOR WHATEVER MR. UPSHAW SAID THE BOARD SHOULD DO?

23 A.   NO.  UHM, IT'S A REPRESENTATIVE DEMOCRACY, SO IT FUNCTIONS

24 A LOT LIKE WHAT YOU'D SEE ON C SPAN.  SOMETIMES WHERE

25 PROCEEDINGS WERE VERY ORDERLY AND BUSINESS-LIKE.  AND THEN,

1  THERE WERE TIMES WHERE THERE WAS SOME SCREAMING, SHOUTING,

2  FINGER-POINTING.

3          **THE COURT:**  KIND OF LIKE THIS COURTROOM.

4          (LAUGHTER)

5          **THE WITNESS:**  AND SOME HUMOR IN THERE, TOO.  SO IT

6  WAS A GOOD MIX.  BUT A LOT OF HEALTHY DEBATE.

7          WE SAY, YOU KNOW, THE MINORITY -- EVERYONE WOULD BE

8  HEARD, BUT IN THE END THE MAJORITY WOULD RULE.  AND THAT'S HOW

9  WE FUNCTIONED.

10 **BY MR. KESSLER:**

11 **Q.**   TAKE A LOOK AT PAGE 13 OF EXHIBIT -- TRIAL EXHIBIT 132.

12 SECTION 406.

13 **A.**   YES.

14          (DOCUMENT DISPLAYED.)

15 **Q.**   IT SAYS:

16          "THE PRESIDENT SHALL BE THE PRINCIPLE EXECUTIVE

17 OFFICER OF THE NFLPA AND, SUBJECT TO THIS CONSTITUTION AND THE

18 DIRECTION OF THE BOARD OF REPRESENTATIVES, SHALL SUPERVISE AND

19 DIRECT THE BUSINESS AND AFFAIRS OF THE NFLPA."

20          MR. ARMSTRONG, DID YOU EXERCISE THOSE

21 RESPONSIBILITIES WHEN YOU WERE PRESIDENT OF THE NFLPA?

22 **A.**   YES.

23 **Q.**   NOW, AT THE ANNUAL PLAYER MEETINGS THAT YOU ATTENDED,

24 WOULD THERE BE REPORTS FROM THE DIFFERENT DEPARTMENTS OF THE

25 NFLPA?

1   **A.**   THAT'S RIGHT.  THE MEETINGS TYPICALLY LASTED FOUR DAYS.

2   THEY WOULD RUN -- A TYPICAL DAY WOULD BE EIGHT HOURS, BUT

3   SOMETIMES IF THERE WAS A BIG ISSUE OR SOMETHING THAT WAS HOTLY

4   DEBATED WE HAD MEETINGS GO 14, 16 HOURS IN A PARTICULAR DAY.

5   **Q.**   YOU WOULD HAVE PLAYERS MEETING FOR 14, 16 HOURS IN A ROOM

6   IN HAWAII?

7   **A.**   YEAH.  WE'VE HAD MANY MEALS CATERED IN AND FAMILIES,

8   WIVES, KIDS, ALL WAITING ON THE OUTSIDE WHERE WE'RE KIND OF

9   LOCKED IN THE ROOM TRYING TO REACH AN ACCORD ON SOMETHING.

10  **Q.**   AND DURING THOSE MEETINGS, WOULD THERE ALWAYS BE -- WOULD

11  THERE BE REPORTS FROM THE LICENSING OPERATIONS OF THE NFLPA OR

12  PLAYERS INC?

13  **A.**   YES, THAT'S RIGHT.

14          TYPICALLY, YOU'D HAVE THE PRESIDENT WOULD GIVE A

15  REPORT.  THE EXECUTIVE DIRECTOR WOULD GIVE A REPORT.  THERE

16  WOULD BE A REPORT FROM LEGAL, LICENSING AND MARKETING, AND FROM

17  RETIRED PLAYERS.  THOSE WERE THE BIG AREAS THAT WE ALWAYS HAD

18  REPORTS ON.

19  **Q.**   WOULD THERE BE A LICENSING REPORT EVERY YEAR OR JUST SOME

20  YEARS?

21  **A.**   EVERY YEAR.

22  **Q.**   OKAY.  AND DURING THOSE LICENSING REPORTS -- WITHDRAWN.

23  LET ME DO IT THIS WAY.

24          WHEN YOU WERE AT THE BOARD OF PLAYER REPRESENTATIVES

25  DID MEMBERS -- SOME MEMBERS OF THE RETIRED PLAYERS STEERING

1   COMMITTEE SOMETIMES GET INVITED TO THOSE MEETINGS.

2   **A.**   YES.  LYNN TAVIS (PHONETIC) WAS THERE EVERY YEAR THAT I

3   WAS THERE.  HE WAS PART OF THE STEERING COMMITTEE.  SO THERE

4   WAS ALWAYS A MEMBER OF THE RETIRED PLAYERS GROUP THERE.

5   **Q.**   AND WOULD THE RETIRED PLAYERS STEERING COMMITTEE MEMBER BE

6   ABLE TO ATTEND THE PART THAT WAS THE LICENSING REPORTS?

7   **A.**   YES.

8   **Q.**   AND AT THOSE LICENSING REPORTS WAS THERE A DISCUSSION OF

9   ALL THE RETIRED PLAYERS WHO WERE GETTING LICENSING MONEY?

10  **A.**   YES.

11  **Q.**   OKAY.  WERE LISTS GIVEN OUT OF THOSE RETIRED PLAYERS?

12  **A.**   YEAH, DETAILED LISTS.  LINE ITEM LISTS THAT WOULD LIST

13  PAYMENTS TO ALL ACTIVE AND RETIRED PLAYERS.

14  **Q.**   SO IT WASN'T JUST THE ACTIVE, BUT THE RETIRED PLAYERS WHO

15  GOT MONEY, AS WELL?

16  **A.**   THAT'S RIGHT.  EVERYBODY WHO GOT A PAYMENT WAS LISTED IN A

17  DETAILED REPORT.

18  **Q.**   OKAY.  AND WAS IT DISCUSSED AT THOSE MEETINGS HOW RETIRED

19  PLAYER GROUP LICENSING WORKED?

20  **A.**   YES.

21  **Q.**   OKAY.  NOW, LET ME SHOW YOU NEXT -- SHOULD BE IN FRONT OF

22  YOU -- TRIAL EXHIBIT 2245.

23          DO YOU RECOGNIZE THIS, MR. ARMSTRONG?

24  **A.**   I DO.

25  **Q.**   WHAT IS THIS?

1  A.   THIS WOULD BE THE FINANCIAL REPORT FROM MARCH OF 2002 TO

2  FEBRUARY 2003, WHICH WOULD HAVE BEEN MY LAST YEAR IN OFFICE.

3         MR. KESSLER:  YOUR HONOR, I MOVE INTO EVIDENCE TRIAL

4  EXHIBIT 2245.

5         MR. LECLAIR:  NO OBJECTION.  I THOUGHT THIS WAS IN

6  EVIDENCE ALREADY, BUT IT'S NOT.

7         NO OBJECTION, YOUR HONOR.

8         THE COURT:  2245 RECEIVED.

9         (TRIAL EXHIBIT 2245 RECEIVED IN EVIDENCE.)

10        MR. KESSLER:  THANK YOU, YOUR HONOR.

11        LAUREN, WOULD YOU PLEASE DISPLAY IT.

12        (DOCUMENT DISPLAYED.)

13  BY MR. KESSLER:

14  Q.   NOW, THIS SAYS THIS IS FOR THE PERIOD MARCH 1, 2002 TO

15  FEBRUARY 28, 2003.

16        WAS A -- WHAT WOULD BE CONTAINED IN THIS?  DO YOU

17  REMEMBER WHAT'S CONTAINED IN THIS DOCUMENT?

18  A.   YES.  IT WOULD BE THE PREVIOUS YEAR'S FINANCIALS.  IT

19  WOULD BE THE REPORT OF OUR INDEPENDENT AUDITOR.  AND IT WOULD

20  BE THE BUDGET FOR NEXT YEAR.  SO THOSE THREE ELEMENTS.

21  Q.   NOW, WOULD THERE BE A SEPARATE PART OF THE BUSINESS

22  MEETING EACH YEAR DEVOTED TO THESE -- TO FINANCIAL STATEMENTS

23  LIKE THIS?

24  A.   YEAH.  THIS WAS TYPICALLY OUR MOST PAINFUL DAY.  IT WAS --

25  THE BUDGET MEETING, THIS MEETING WOULD LAST AN ENTIRE DAY.  SO

1  IT WOULD BE -- IF WE WERE LUCKY -- EIGHT HOURS, SOMETIMES MORE,

2  GOING INTO THIS IN GREAT DETAIL.

3  **Q.**   WOULD THE ACCOUNTANTS, THE OUTSIDE ACCOUNTANTS, MAKE A

4  PRESENTATION OF THE FINANCIAL STATEMENTS?

5  **A.**   YEAH, THAT'S RIGHT.  BILL VORHEES, AND I BELIEVE AT THE

6  END IT WOULD HAVE BEEN THE CALIBER GROUP WAS THE COMPANY HE WAS

7  WITH, THEY WOULD PRESENT THE INDEPENDENT AUDIT SOMETIMES WITH

8  COOPERATION FROM BILL GARNER, WHO WAS OUR COMPTROLLER AT THAT

9  TIME.

10  **Q.**   DID MR. EYRICH SOMETIMES PARTICIPATE IN THOSE

11  PRESENTATIONS?

12  **A.**   HE DID, YEAH.

13  **Q.**   LET ME DIRECT YOUR ATTENTION TO -- IF YOU LOOK AT THE

14  BOTTOM NUMBER ON THE RIGHT, I THINK IS THE EASIEST WAY.  IT'S

15  6225.

16  **A.**   YES.

17  **Q.**   AND I'M GOING TO LOOK AT THE TOP FIRST.  SEE WHAT THIS IS.

18          **MR. KESSLER:**  NO, NO, INCLUDING THE NOTES, PLEASE,

19  LAUREN.

20          THANK YOU.

21          (DOCUMENT DISPLAYED.)

22  **BY MR. KESSLER::**

23  **Q.**   IT TALKS ABOUT "NOTES TO CONSOLIDATED FINANCIAL

24  STATEMENTS."

25          EXPLAIN TO THE JURY, WHAT WERE THE NOTES TO THE

1  FINANCIAL STATEMENTS?

2  **A.**   THEY WERE JUST AN EXPLANATION OF THE FINANCIALS, MORE

3  DETAILED EXPLANATION OF HOW THINGS WERE CALCULATED.

4  **Q.**   EVERY YEAR THAT YOU WERE THERE ON THE BOARD OF PLAYER

5  REPRESENTATIVES, DID SOMEONE GO THROUGH EACH ONE OF THE NOTES

6  IN THE FINANCIAL STATEMENTS?

7  **A.**   YES.  IN GREAT, PAINSTAKING DETAIL ONE OF THE MEMBERS OF

8  THE OUTSIDE COUNSEL OR ONE OF THE MEMBERS OF THE STAFF AND THEN

9  OUR PLAYER REPRESENTATIVES, INVARIABLY WE ALWAYS HAD SOME CPA'S

10 OR CFA'S IN THE GROUP WHERE WE WENT THROUGH IT IN DETAIL.

11 **Q.**   YOU HAD SOME PLAYERS WHO -- WERE THEY LITERALLY CPA'S OR

12 THEY ACTED LIKE CPA'S?

13 **A.**   WELL, THEY STUDIED ACCOUNTING IN COLLEGE.  SO I THINK THAT

14 MADE THEM FEEL LIKE THEY HAD TO GET THEIR MONEY'S WORTH OUT OF

15 THEIR COLLEGE EDUCATION.  WE HAD YEARS WHERE WE LITERALLY WENT

16 DOWN TO WHAT WE SPENT ON PAPERCLIPS.

17        SO, AGAIN, THIS WAS A MEETING WHERE THINGS WERE WENT

18 THROUGH IN A GREAT MATTER OF DETAIL.

19 **Q.**   DO YOU REMEMBER WHETHER THERE WAS EVER A VIGOROUS PROPOSAL

20 TO CHANGE THE USE OF FEDEX VERSUS MAIL AT THE NFLPA?

21 **A.**   THE FEDEX MEETING.  WE HAD ONE YEAR WHERE THERE WAS A LOT

22 OF CORRESPONDENCE THAT HAD TO GO OUT TO UNION REPRESENTATIVES,

23 AND YOU WANTED TO BE SURE GUYS GOT THE INFORMATION IMMEDIATELY,

24 AND YOU WANTED TO BE SURE IT WENT DIRECTLY TO THEM.

25        SO AT THE TIME FEDEX WAS THE BEST WAY, AND WE HAD A

1   BIG FEDEX BILL.

2          SO IN THE STATEMENT YOU'LL SEE THE BUDGET, AND THEN

3   WHERE THE OVERAGES ARE.  OF COURSE, WE HAD A BIG OVERAGE IN

4   FEDERAL EXPRESS, LIKE $12,000, WHICH SPARKED A HUGE DEBATE:

5   WHAT WERE WE DOING INTERNALLY?  WERE WE BIDDING THIS OUT?  WERE

6   WE SHOPPING THIS NUMBER?  WHAT WAS THE PROCESS?

7          SO, YEAH, I SPENT MUCH MORE TIME THAN I CARE TO

8   REMEMBER DISCUSSING LINE ITEMS.

9   **Q.**   SO THE ACTIVE PLAYERS WOULD ACTUALLY VIEW LINE ITEMS IN

10  THE BUDGETS?

11  **A.**   ABSOLUTELY.  YEARS WHERE WE WOULD LITERALLY BREAK IT OUT

12  TO HOW MUCH WE SPENT ON PAPER, HOW MUCH WE SPENT ON COMPUTERS.

13  AGAIN, IT WOULD BE A GREAT AMOUNT OF DETAIL.  AND THEN, IF

14  THERE WERE ANY VARIANCES, THOSE WOULD BE GONE THROUGH PRETTY

15  RIGOROUSLY.

16  **Q.**   TAKE A LOOK AT FOOTNOTE 12.  IF YOU LOOK AT FOOTNOTE 12

17  THERE'S A DISCUSSION -- I'M SORRY, FOOTNOTE 12 IS ON PAGE 6321.

18          **MR. KESSLER:**  LAUREN, IF WE COULD DO THAT.

19          (DOCUMENT DISPLAYED.)

20  **BY MR. KESSLER::**

21  **Q.**   AND YOU'LL SEE THE DISCUSSION OF LICENSING AND PAYMENT TO

22  PLAYERS.  AND I'M GOING TO DIRECT YOUR ATTENTION TO THE SECOND

23  SENTENCE.  IT SAYS:

24          "THE NFLPA AND PLAYERS INC HAVE AGREED THAT

25  APPROXIMATELY 40 PERCENT OF LICENSING REVENUE ATTRIBUTABLE TO

1  THESE RIGHTS IS PAYABLE TO THE NFLPA, AND APPROXIMATELY

2  23 PERCENT OF LICENSING REVENUE IS PAYABLE TO PLAYERS INC.  THE

3  REMAINING 30 [SIC] PERCENT OF LICENSING REVENUE IS PAID TO

4  PLAYERS PARTICIPATING IN THE GROUP LICENSING PROGRAM."

5         DO YOU SEE THAT?

6  **A.**   YES.

7  **Q.**   NOW, MR. ARMSTRONG, THIS DIVISION OF 40 PERCENT,

8  23 PERCENT, 37 PERCENT, OKAY?  WAS THAT SOMETHING THAT THE

9  BOARD OF PLAYER REPS DECIDED, OR DID SOMEBODY ELSE DECIDE THAT?

10 **A.**   WELL, THE BOARD OF PLAYER REPS DECIDED IT.  IT WAS DECIDED

11 WITH THE INPUT FROM OUR INSIDE AND OUTSIDE COUNSEL.

12 **Q.**   OKAY.  DID YOU GET ANY INPUT FROM TAX COUNSEL?

13 **A.**   YES.

14 **Q.**   DO YOU RECALL WHETHER YOU GOT ANY INPUT FROM AN INVESTMENT

15 VALUATION SERVICE WHEN THIS FIRST STARTED?

16 **A.**   YES.  WE HAD AN INDEPENDENT VALUATION DONE ON THE COMPANY

17 AND PROJECTED REVENUES.  AND SO WE TOOK INTO ACCOUNT WHEN WE

18 CAME UP WITH THESE PERCENTAGES INDEPENDENT VALUATION AND THE

19 OPINION OF OUR OUTSIDE TAX COUNSEL.

20 **Q.**   OKAY.  AND DO YOU RECALL IF THE NAME OF THAT VALUATION WAS

21 DUFF & PHELPS?

22 **A.**   YES.

23 **Q.**   OKAY.  AND, MR. ARMSTRONG, EXPLAIN TO THE JURY WHY

24 WOULD -- LET ME ASK A PRELIMINARY QUESTION.

25         THE MONEY THAT THIS WAS, THE 40 PERCENT, THE

1  23 PERCENT AND THE 37 PERCENT, DID YOU HAVE AN UNDERSTANDING

2  WHILE YOU WERE ON THE BOARD OF PLAYER REPS AND PRESIDENT,

3  WHETHER THIS MONEY WAS ACTIVE PLAYER LICENSING MONEY, RETIRED

4  PLAYER LICENSING MONEY OR SOME COMBINATION OF IT?

5  **A.**   IT WAS ACTIVE PLAYER LICENSING MONEY.

6  **Q.**   WAS THERE ANY RETIRED PLAYER LICENSING MONEY IN HERE?

7  **A.**   NO.

8  **Q.**   THAT WAS BEING DIVIDED?

9  **A.**   NO.

10 **Q.**   NOW, EXPLAIN TO THE JURY, WHY DID THE ACTIVE PLAYERS ON

11 THE BOARD OF PLAYER REPS WANT TO DEVOTE AS MUCH AS 40 PERCENT

12 OF THE ACTIVE PLAYER LICENSING IN THE GLR POOL TO THE UNION?

13 **A.**   WELL, WE STARTED PLAYERS INC.  PLAYERS INC WAS A

14 FOR-PROFIT COMPANY OWNED BY THE UNION.  AND WE STARTED PLAYERS

15 INC WITH TWO OBJECTIVES.  THE FIRST BEING GETTING THE RESOURCES

16 TO SECURE, THE FINANCIAL RESOURCES TO SECURE THE LONG-TERM

17 FUTURE OF THE UNION.

18          REVENUE WAS UPSTREAM FROM PLAYERS INC TO THE UNION TO

19 HELP US IN OUR -- THEY HAVE THE RESOURCES TO SHOW UP AGAINST

20 MANAGEMENT IN LABOR ISSUES AND COURT AND ON AND ON.

21          SO THE FIRST ISSUE WAS COMING UP WITH A STRUCTURE

22 THAT WOULD SECURE THE FINANCIAL STABILITY OF THE UNION.

23          THE SECOND WAS TO REWARD PLAYERS WHO WERE INVOLVED IN

24 GROUP LICENSING OR MARKETING.

25 **Q.**   WELL, LET ME GO TO THE FIRST ISSUE.

1           WHY WOULD THE PLAYERS, THE ACTIVE PLAYERS, GIVE AS

2    MUCH AS 40 PERCENT FOR THE UNION?  WHY -- WHY DID THE PLAYERS

3    MAKE THAT DECISION, IF YOU KNOW, FROM THAT TIME?

4    **A.**   WELL, BECAUSE WE KNEW HOW CRITICAL IT WAS.  WE HAD,

5    THROUGHOUT OUR HISTORY, HAD A NUMBER OF ALMOST DEATH FIGHTS

6    WITH MANAGEMENT.  SO WE KNEW THAT JUST PLAYERS PAYING DUES

7    ALONE WAS NOT ENOUGH TO COMBAT THE RESOURCES OF 32 NFL TEAMS.

8    SO WE HAD TO COME UP WITH ANOTHER WAY TO DO IT.

9           PLAYERS -- THIS IS WHAT WE CAME UP WITH.  AND

10   40 PERCENT WAS WHAT WE WANTED -- WE WANTED A BIG CHUNK, THE

11   LARGEST CHUNK, TO GO TO THE UNION, BECAUSE WE KNEW -- IT WAS

12   LIKE US INVESTING IN OURSELVES.

13          WE KNEW THAT IF WE DIDN'T DO THIS THE LONG-TERM

14   FUTURE OF THE UNION WOULD BE AT RISK, AND ULTIMATELY PLAYERS

15   WOULD BE AT RISK.

16   **Q.**   NOW, WHEN YOU DEVOTED THIS 40 PERCENT TO THE UNION, DID

17   YOU USE ANY RETIRED PLAYER LICENSING MONEY TO GO TO THE UNION?

18   **A.**   NO.  IT WAS DONE WITH THE UNDERSTANDING IT WAS ALL ACTIVE

19   PLAYER LICENSING.

20   **Q.**   NOW, AT THE TIME YOU WERE ON THE BOARD OF PLAYER REPS, DID

21   YOU KNOW THERE WAS MONEY GENERATED FOR RETIRED PLAYER

22   LICENSING?

23   **A.**   YES.

24   **Q.**   AND EXPLAIN TO THE JURY, WHERE DID THE MONEY FROM RETIRED

25   PLAYER LICENSING GO?

1              **MR. LECLAIR:**  YOUR HONOR?

2              **THE WITNESS:**  TO RETIRED PLAYERS.

3              **MR. LECLAIR:**  I OBJECT, BECAUSE I DON'T KNOW THE TIME

4   FRAME.  IF WE'RE TALKING ABOUT '94, WHICH IS WAY, WAY, WAY

5   BACK, OR IF WE'RE TALKING ABOUT DURING THE RELEVANT TIME OF THE

6   CLASS PERIOD, WHEN THE WITNESS, I DON'T THINK, WAS EVEN ON THE

7   BOARD.

8              SO I THINK I OBJECT TO IT FOR LACK OF FOUNDATION.

9              **THE COURT:**  IN YOUR ANSWER PLEASE TELL US WHAT TIME

10  PERIOD YOU'RE TALKING ABOUT.

11  **BY MR. KESSLER:**

12  **Q.**  I'M ASKING THE ENTIRE TIME PERIOD YOU WERE ON THE BOARD,

13  SO GO FROM '91 UP THROUGH 2003.

14  **A.**  RIGHT.

15  **Q.**  OKAY?

16  **A.**  YES.

17  **Q.**  WHERE DID RETIRED PLAYER LICENSING MONEY GO?

18  **A.**  TO RETIRED PLAYERS.

19  **Q.**  OKAY.  WELL, WAS ANY OF THE RETIRED PLAYER LICENSING GIVEN

20  TO RUN THE UNION?

21  **A.**  NO.

22  **Q.**  WHY NOT?

23  **A.**  WELL, ACTIVE PLAYERS FELT LIKE THAT IT WAS THEIR

24  RESPONSIBILITY TO FUND THE UNION WITH THE PORTION FROM THE

25  PROCEEDS.  AND WE FELT LIKE ANYTHING THAT A RETIRED PLAYER

1    EARNED IN THIS AREA SHOULD BE THEIRS.

2    **Q.**   NOW, WAS ONE OF THE DEPARTMENTS IN THE UNION THE RETIRED

3    PLAYERS DEPARTMENT?

4    **A.**   YES.

5    **Q.**   AND WAS THAT A DEPARTMENT TO HELP RETIRED PLAYERS?

6    **A.**   YES, IT WAS.

7    **Q.**   NOW, WHOSE LICENSING MONEY, WHEN YOU WERE THERE, WAS USED

8    TO FUND THE -- THE RETIRED PLAYER DEPARTMENT, ACTIVE PLAYER

9    MONEY OR RETIRED PLAYER MONEY?

10   **A.**   ACTIVE PLAYER MONEY.

11         SO ALL THE STAFF AND ALL OF THE ACTIVITIES OF THE

12   RETIRED PLAYERS DEPARTMENT WAS FUNDED BY THE NFLPA.  THE FUNDS

13   FROM THOSE CAME FROM -- FOR THOSE ACTIVITIES CAME FROM ACTIVE

14   PLAYERS.

15   **Q.**   NOW, WE DISCUSSED THE 40 PERCENT THAT WAS GIVEN OF THE GLR

16   POOL TO THE UNION.  WHY WAS 23 PERCENT GIVEN TO PLAYERS INC?

17   WHAT WAS THAT FOR?

18   **A.**   WELL, WE CONSTRUCTED PLAYERS INC TO OPERATE ON A LEAN

19   BUDGET.  AND BASED ON THE VALUATION WE GOT FROM DUFF & PHELPS

20   AND BASED ON THE ADVICE OF COUNSEL, IS WE HAD TO HAVE ENOUGH

21   FOR PLAYERS INC TO FUND NORMAL OPERATIONS TO HAVE STAFF, TO BE

22   ABLE TO FLY PLACES, GO OUT AND MEET PEOPLE AND DO DEALS.

23         AND THIS WAS THE AMOUNT, BASED ON THE VALUATION WE

24   HAD, THAT WAS -- AND THERE'S SOME TAX IMPLICATIONS WITH THAT,

25   AS WELL, AGAIN.  BUT THAT IS BASED OFF OF COUNSEL.

1  Q.   NOW, PLAYERS INC WAS THE LICENSING ENTITY?

2  A.   THAT'S RIGHT.

3  Q.   IT HAD TO FUND ITS OPERATIONS; IS THAT CORRECT?

4  A.   THAT'S RIGHT.

5  Q.   NOW, PLAYERS INC DIDN'T JUST WORK ON THE MONEY THAT WAS IN

6  THE GLR POOL, CORRECT?  WAS THERE OTHER LICENSING MONEY?

7  A.   YES.

8  Q.   SO, FOR EXAMPLE, WHEN PLAYERS INC WOULD WORK ON RETIRED

9  PLAYER DEALS, AD HOC DEALS, AND WOULD GENERATE MONEY FROM THAT,

10 DID 23 PERCENT OF THAT GO TO PLAYERS INC?

11 A.   NO.  ALL OF IT WENT BACK TO RETIRED PLAYERS.

12 Q.   OKAY.  SO PLAYERS INC HAD TO FUND THAT RETIRED PLAYER

13 LICENSING OPERATION WITHOUT USING ANY OF THE RETIRED PLAYER

14 MONEY?

15 A.   THAT'S RIGHT.

16 Q.   AND WERE THERE ALSO LICENSING FOR PLAYERS THAT DID NOT

17 GO -- FOR ACTIVE PLAYERS THAT DID NOT GO INTO THE GLR POOL?

18 A.   YES.

19 Q.   EXPLAIN TO THE JURY, WAS THERE SOMETHING CALLED A "35 AND

20 UNDER RULE"?

21 A.   YES.

22 Q.   WHAT WAS THAT?

23 A.   WELL, ANYTHING --

24          MR. LECLAIR:  I'M SORRY, YOUR HONOR.  COULD I OBJECT?

25 I NEED TO HAVE A TIME FRAME.  I DON'T KNOW WHEN WE'RE TALKING

1   ABOUT, WHEN THIS RULE IS.

2   **BY MR. KESSLER:**

3   Q.   LET'S TALK ABOUT IN THE TIME PERIOD -- AND I THOUGHT THIS

4   WAS CLEAR -- THAT YOU WERE ON THE BOARD OF ACTIVE PLAYER

5   REPRESENTATIVES, OKAY?

6   **A.**   YES.

7   Q.   WAS THERE A 35 AND UNDER RULE?

8   **A.**   THERE WAS.  AND A 35 AND UNDER RULE WOULD BE ANY PROGRAM

9   THAT INVOLVED 35 OR FEWER PLAYERS, PAYMENTS WOULD BE GIVEN

10   DIRECTLY TO THEM.  SO THEY WERE CALLED "PREMIUM PAYMENTS" TO

11   PLAYERS.

12   Q.   THAT INCLUDED -- THAT WAS FOR ACTIVE PLAYERS?

13   **A.**   YES, FOR ACTIVE PLAYERS.

14   Q.   SO IF IT WAS A PROGRAM OF 35 AND FEWER PLAYERS FOR THE

15   ACTIVE PLAYERS, THAT WOULD NOT BE EQUALLY SHARED WITH ALL

16   PLAYERS?

17   **A.**   NO, THAT'S RIGHT.  YEAH.  PLAYERS WOULD GET THAT MONEY

18   DIRECTLY.

19   Q.   WHICH PLAYERS, THE --

20   **A.**   ACTIVE PLAYERS.

21   Q.   THE ONES WHO WERE IN THE PROGRAM OR OTHER PLAYERS?

22   **A.**   THE ONES THAT WERE USED IN A PARTICULAR -- IN THE

23   PARTICULAR PROGRAM.

24   Q.   OKAY.  SO WAS THAT MONEY IN THE GLR POOL OR WAS IT

25   EXCLUDED FROM THE GLR?

1  **A.**   IT WAS EXCLUDED FROM THE GLR POOL, YEAH.

2  **Q.**   NOW, MR. ARMSTRONG, WERE YOU INVOLVED, AND THE BOARD OF

3  PLAYER REPS, IN REVIEWING THE ELIGIBILITY CRITERIA FOR THE GLR

4  POOL EACH YEAR?

5  **A.**   YES.

6  **Q.**   AND -- JUST ONE SECOND, MR. ARMSTRONG.  I APOLOGIZE.

7           **THE COURT:**  WE HAVE ABOUT FOUR MINUTES.

8           **MR. KESSLER:**  OKAY, YOUR HONOR.  I PROBABLY WON'T

9  FINISH THE DIRECT ON THIS WITNESS TODAY.  DO YOU WANT ME TO

10 STOP NOW, YOUR HONOR?  IT'S UP TO YOU.

11          **THE COURT:**  YOU FIND A GOOD RESTING POINT SO WE DON'T

12 STOP IN THE MIDDLE.

13          **MR. KESSLER:**  I'M ABOUT TO TURN TO ANOTHER SUBJECT.

14 MAYBE THIS IS A GOOD RESTING POINT.

15          **THE COURT:**  WE'LL STOP AT THIS POINT.  SO TOMORROW

16 BEING ELECTION TODAY, AND EVERYBODY IS INDICATING THAT THEY

17 DON'T NEED TO CHANGE THE TIME FRAME, SO WE'LL SEE YOU BACK HERE

18 TOMORROW, REGULAR TIME, 7:45.

19          PLEASE REMEMBER THE ADMONITION.  THANK YOU.  HAVE A

20 GOOD EVENING.

21          **THE CLERK:**  ALL RISE.

22          (THE FOLLOWING PROCEEDINGS WERE HELD IN OPEN COURT,

23          OUTSIDE THE PRESENCE OF THE JURY.)

24          **THE COURT:**  OKAY.  MR. ARMSTRONG, CAN I ASK YOU TO

25 COME BACK AT 7:30 IN THE MORNING?

1          THE WITNESS:  YES.

2          THE COURT:  PLEASE DON'T TALK TO EITHER SIDE, THE

3  LAWYERS ON EITHER SIDE, WHILE YOU'RE UNDER EXAMINATION.

4          MR. KESSLER:  YOUR HONOR, CAN I HAVE A QUESTION?

5  SINCE HE'S STILL ON MY DIRECT, I MAY BE WRONG, I THOUGHT THE

6  UNDERSTANDING THAT YOUR HONOR WAS THAT IF HE WAS STILL ON THE

7  DIRECT THAT I ACTUALLY COULD HAVE A CONVERSATION WITH HIM.  IF

8  YOUR HONOR TELLS ME NOT TO, I WON'T.  BUT I DID THINK THAT WAS

9  THE GROUND RULE.

10         THE COURT:  I DON'T REMEMBER NOW.  WE WENT BACK AND

11  FORTH ON THESE GROUND RULES.  I'M NOT GOING TO START

12  AMENDING -- WHATEVER I SAID BEFORE STILL GOVERNS.  IF YOU GO

13  BACK AND FIND THAT I SAID SOMETHING TO THE CONTRARY --

14         MR. KESSLER:  I'LL ASK THE OTHER SIDE.  IS THAT YOUR

15  UNDERSTANDING THAT DURING YOUR OWN DIRECT YOU STILL COULD TALK

16  TO COUNSEL?

17         MR. LECLAIR:  THAT WAS OUR UNDERSTANDING.

18         MR. KESSLER:  THAT WAS THE UNDERSTANDING, YOUR HONOR.

19         THE COURT:  FINE.

20         MR. PARCHER:  EXCEPT YOU SAID "YOU'VE GOT FIVE

21  MINUTES LEFT ON YOUR DIRECT."  SO IT WOULD BE APPROPRIATE FOR

22  YOU TO TALK ABOUT YOUR FIVE MINUTES OF DIRECT.  IT WOULD NOT BE

23  APPROPRIATE TO SAY: "NOW ON THE THINGS THAT YOU ALREADY

24  TESTIFIED TO, WHAT'S THIS OR WHAT'S THAT?"

25         MR. KESSLER:  THAT'S EXACTLY WHAT I WOULD PLAN TO DO,

1  MR. PARCHER, IS TALK ABOUT THE REMAINING TIME.

2           **MR. PARCHER:** WELL, THAT WASN'T CLEAR TO THE COURT.

3           **MR. KESSLER:** THANK YOU.

4           **THE COURT:** WELL, WITH THAT, THEN MODIFY WHAT YOU

5  SAY. YOU HEARD THAT.

6           **THE WITNESS:** UNDERSTOOD.

7           **THE COURT:** OKAY. WE'LL SEE YOU AT 7:30.

8           **THE WITNESS:** THANK YOU.

9           **MR. KESSLER:** THANK YOU.

10          **MR. LECLAIR:** YOUR HONOR, I HAVE ONE ISSUE.

11          **THE COURT:** EVERYONE BE SEATED, PLEASE.

12          WHAT'S YOUR ISSUE?

13          **MR. LECLAIR:** THEY'VE NOW OPENED THE DOOR, YET AGAIN.

14  THEY'VE GOT -- THEY'VE ELICITED FROM THIS WITNESS: "WE HAD TO

15  KEEP THIS MONEY. WE DESPERATELY NEEDED IT FOR THE UNION SO WE

16  COULD FIGHT THE EVIL MANAGEMENT."

17          WE ARE ENTITLED TO SHOW THE MONEY THEY WERE PAYING

18  OUT FROM THE UNION FOR COMPENSATION TO GENE UPSHAW, THE OTHER

19  THINGS THAT THEY DID WITH THEIR MONEY. THEY PUT AT ISSUE THE

20  MONEY AND SAID: "WE HAD TO HAVE THIS MONEY. IT WAS WHAT WE

21  NEEDED TO PROTECT THE UNION."

22          WE'RE ENTITLED TO REBUT THAT NOW AND TO SHOW HOW THEY

23  SPENT THE MONEY. IF THEY SAY THEY NEEDED IT: "WHY DID YOU DO

24  THIS? WHY DID YOU DO THAT?"

25          **THE COURT:** I THOUGHT THERE WAS LIKE $68 MILLION IN

1 THE RAINY DAY FUND.

2       **MR. LECLAIR:** THERE IS, YOUR HONOR. BUT THE POINT

3 IS, WE'RE ENTITLED TO SHOW -- THEY'RE SAYING -- THEY WANT TO

4 HANG ON TO IT ALL. AND THEY'RE SAYING: "WE HAVE TO HAVE IT TO

5 PROTECT THE UNION."WE ARE ENTITLED TO REBUT THAT.

6       **MR. KESSLER:** YOUR HONOR, I COULDN'T --

7       **THE COURT:** HOW IS IT GOING TO REBUT ANYTHING TO SHOW

8 THAT GENE UPSHAW WAS A WELL-PAID EXECUTIVE.

9       **MR. LECLAIR:** YOUR HONOR, THEIR CONTENTION THROUGH

10 THIS WITNESS IS THEY WANTED TO GIVE 40 PERCENT TO THE UNION,

11 AND THEY NEEDED TO DO THAT SO THEY COULD HAVE THE MONEY

12 AVAILABLE TO PROTECT THE UNION FROM MANAGEMENT. THE REBUTTAL

13 TO THAT IS: "IF IT WAS SO IMPORTANT FOR YOU TO PROTECT THE

14 UNION'S MONEY, WHY ARE YOU SPENDING IT LAVISHLY ON EXECUTIVE

15 COMPENSATION?"

16       **THE COURT:** MAYBE GENE UPSHAW EARNED EVERY PENNY OF

17 IT.

18       **MR. LECLAIR:** THAT'S A FAIR ARGUMENT, YOUR HONOR.

19 BUT WE ARE AT LEAST ENTITLED TO REBUT. WE ARE ENTITLED TO PUT

20 ON THE EVIDENCE TO SAY THEY REALLY DIDN'T NEED THE MONEY, THEY

21 WERE GIVING IT AWAY LAVISHLY.

22       THAT'S A REASONABLE ARGUMENT FOR US TO MAKE.

23       **THE COURT:** IT IS A STRETCH. AND UNDER RULE 403

24 WE'RE JUST NOT GOING TO GET INTO IT. MOTION DENIED.

25       ANYTHING MORE TO BRING UP?

1          **MR. KESSLER:**  I KNOW WELL ENOUGH TO SAY NOTHING, YOUR

2 HONOR.

3          **THE COURT:**  I THINK YOU'VE USED ABOUT -- I'M ROUNDING

4 OFF HERE -- ROUGHLY 800 MINUTES.  AND THE PLAINTIFFS HAVE USED

5 886 MINUTES.

6          **MR. KESSLER:**  WE'RE CATCHING UP.

7          **THE COURT:**  YOU'RE CATCHING UP.  SO TOMORROW, BY THE

8 END OF TOMORROW SOMEBODY WILL BE PRETTY CLOSE TO HAVING USED UP

9 ALL THEIR TIME.  ALL RIGHT.  HEARING NOTHING MORE, WE WILL SEE

10 YOU AT 7:30 IN THE MORNING.

11          I HAVE A HEARING IN HERE IN AN HOUR.  I APPRECIATE IT

12 IF YOU WOULD MAKE ENOUGH ROOM FOR THE LAWYERS AND THE

13 DEFENDANTS IN A CRIMINAL CASE TO GET SITUATED.  THANK YOU.

14          **MR. KATZ:**  THANK YOU, YOUR HONOR.

15          **MR. KESSLER:**  THANK YOU, YOUR HONOR.

16          (THEREUPON, THIS TRIAL WAS CONTINUED UNTIL TUESDAY,

17 NOVEMBER 4, 2008, AT 7:30 O'CLOCK A.M.)

18                              -  -  -  -

19                **CERTIFICATE OF REPORTER**

20          I CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT

21 FROM THE RECORD OF PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

22 DATE:  MONDAY, NOVEMBER 3, 2008

23              S/B KATHERINE POWELL SULLIVAN
            _____
24
         KATHERINE POWELL SULLIVAN, CSR #5812, RPR, CRR
25                    U.S. COURT REPORTER

1                          **I N D E X**

2   **PLAINTIFFS' WITNESSES**                       **PAGE**    **VOL.**

3   **ROWLEY, PHILLIP**
    DIRECT EXAMINATION BY MR. HUMMEL               1833        9
4   CROSS EXAMINATION BY MR. KESSLER               1859        9
    REDIRECT EXAMINATION BY MR. HUMMEL             1938        9
5   RECROSS EXAMINATION BY MR. KESSLER             1957        9

6

7   **DEFENDANTS WITNESSES**                        **PAGE**    **VOL.**

8   **GOICH, DANIEL**
    DIRECT EXAMINATION BY MR. GREENSPAN            1972        9
9   CROSS EXAMINATION BY MR. KATZ                  1995        9
    REDIRECT EXAMINATION BY MR. GREENSPAN          2003        9
10  RECROSS EXAMINATION BY MR. KATZ                2007        9
    **ARMSTRONG, TRACE**
11  DIRECT EXAMINATION BY MR. KESSLER              2009        9

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# E X H I B I T S

| TRIAL EXHIBITS | IDEN | VOL. | EVID | VOL. |
|---|---|---|---|---|
| 1218 | | | 1840 | 9 |
| 1217 | | | 1843 | 9 |
| 1323-1 | | | 1879 | 9 |
| 1323-17 | | | 1889 | 9 |
| 2057 | | | 1901 | 9 |
| 1221 | | | 1948 | 9 |
| 2349 | | | 1983 | 9 |
| 2245 | | | 2022 | 9 |