VOLUME 10

PAGES 2040 - 2273

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE WILLIAM H. ALSUP

BERNARD PAUL PARRISH, HERBERT      )
ANTHONY ADDERLEY, WALTER ROBERTS   )
III,                               )
                                   )
          PLAINTIFFS,              )
                                   )
   VS.                             )   NO. C 07-0943 WHA
                                   )
NATIONAL FOOTBALL LEAGUE PLAYERS   )
ASSOCIATION AND NATIONAL FOOTBALL  )
LEAGUE PLAYERS INCORPORATED D/B/A  )
PLAYERS INC,                       )
                                   )   SAN FRANCISCO, CALIFORNIA
          DEFENDANTS.              )   TUESDAY
_____)   NOVEMBER 4, 2008

## TRANSCRIPT OF PROCEEDINGS

**APPEARANCES:**

**FOR PLAINTIFFS:**        MANATT, PHELPS & PHILLIPS
                           1001 PAGE MILL ROAD, BUILDING 2
                           PALO ALTO, CALIFORNIA 94304
                    **BY:  RONALD S. KATZ, ESQ.
                           RYAN S. HILBERT, ESQ.**

                           MANATT, PHELPS & PHILLIPS
                           7 TIMES SQUARE
                           NEW YORK CITY, NEW YORK 10036
                    **BY:  L. PETER PARCHER, ESQ.**

                           MANATT, PHELPS & PHILLIPS
                           11355 WEST OLYMPIC BOULEVARD
                           LOS ANGELES, CALIFORNIA  90064
                    **BY:  CHAD HUMMEL, ESQ.**

(APPEARANCES CONTINUED ON NEXT PAGE)

**APPEARANCES CONTINUED:**

**ALSO FOR PLAINTIFFS:**    MCKOOL SMITH
    300 CRESCENT COURT
    SUITE 1500
    DALLAS, TEXAS  75201
    BY:  **LEWIS T. LECLAIR, ESQ.**
    **JILL ADLER NAYLOR, ESQ.**
    **ANTHONY GARZA, ESQ.**
    **BRETT CHARHON, ESQ.**

**FOR DEFENDANTS:**    DEWEY & LEBOEUF
    1301 AVENUE OF THE AMERICAS
    NEW YORK CITY, NEW YORK  10019-6092
    BY:  **JEFFREY L. KESSLER, ESQ.**
    **DAVID GREENSPAN, ESQ.**
    **DAVID G. FEHER, ESQ.**
    **ROY TAUB, ESQ.**
    **MOLLY DONOVAN, ESQ.**
    **JASON CLARK, ESQ.**

    WEIL, GOTSHAL & MANGES LLP
    767 FIFTH AVENUE
    NEW YORK, NEW YORK 10153-0119
    BY:  **BRUCE S. MEYER, ESQ.**

**REPORTED BY:**    *KATHERINE POWELL SULLIVAN, CSR # 5812*
    *OFFICIAL REPORTER - U.S. DISTRICT COURT*

                    P R O C E E D I N G S

**NOVEMBER 4, 2008**                                    7:30 A.M.


          (THE FOLLOWING PROCEEDINGS WERE HELD IN OPEN COURT,

          OUTSIDE THE PRESENCE OF THE JURY.)

          **THE COURT:**  GOOD MORNING.

          **MR. KESSLER:**  GOOD MORNING, YOUR HONOR.

          **THE COURT:**  HOW IS EVERYBODY?

          **MR. HUMMEL:**  VERY WELL.  THANK YOU.

          **THE COURT:**  HAVE A SEAT.  ALL RIGHT.  WHAT ITEMS DO

YOU HAVE FOR ME THIS MORNING?

          **MR. KATZ:**  WE HAVE TWO MATTERS, YOUR HONOR.

          **THE COURT:**  ALL RIGHT.

          **MR. KATZ:**  ONE RELATES TO A FILING THAT WE MADE LAST

NIGHT WITH RESPECT TO STRIKING A PORTION OF MR. ARMSTRONG'S

TESTIMONY BECAUSE OF DISCOVERY ABUSE.

          **THE COURT:**  I RECEIVED THAT.  I READ IT.

          **MR. KATZ:**  DO YOU WANT ME TO ELABORATE ON IT, OR DO

YOU WANT TO HEAR FROM MR. KESSLER?

          **THE COURT:**  WELL, LET'S HEAR FROM THE OTHER SIDE,

FIRST.

          **MR. KESSLER:**  YOUR HONOR, I THINK THIS MOTION IS

COMPLETELY UNFOUNDED.

          FIRST OF ALL, THE ONLY YEAR THAT COULD BE AT ISSUE IS

2003, BECAUSE MR. ARMSTRONG ONLY TESTIFIED THROUGH 2003.  HE

1   THEN LEFT.

2          AND YOUR HONOR WILL RECALL THAT YOU CUT OFF ALL

3   DISCOVERY PRIOR TO 2003 IN ONE OF YOUR DISCOVERY RULINGS.

4   THERE WAS SOME DOCUMENTS PRODUCED PRIOR TO THAT, BUT BASICALLY

5   YOU SAID THERE WAS NO PRODUCTION REQUIRED BEFORE THAT.

6          SO EVERYTHING HE TESTIFIED ABOUT, ANYTHING UP TO

7   2003, THERE'S NOT EVEN AN ISSUE.

8          SECOND, WHAT THEY CITED, THE RETIRED PLAYER REPORTS,

9   THE DEPARTMENT REPORTS ON LICENSING AND RETIRED PLAYERS, THEY

10  WERE PRODUCED FROM THE ANNUAL MEETING.

11         IN FACT, THEY'VE EVEN IDENTIFIED ONE OF THOSE

12  DOCUMENTS FROM THE ANNUAL MEETINGS TO USE WITH MS. ALLEN.  I

13  DON'T KNOW IF THEY'RE GOING TO USE IT OR NOT.  BUT THOSE

14  REPORTS THAT ARE DISCUSSED IN THE CITED TESTIMONY WERE

15  COMPLETELY PRODUCED WITH RESPECT TO THAT.

16         THE ONLY ARGUMENT THEY MAKE IS THAT THEY HAVE A

17  DOCUMENT REQUEST WHICH SAYS:

18             "ANY COMMUNICATION WITH RETIRED PLAYERS."

19         OKAY.  AND THEY SAID:

20             "WELL, SINCE THERE WERE TWO MEMBERS OF THE

21  RETIRED PLAYERS STEERING COMMITTEE THERE, MAYBE THERE WAS

22  SOMETHING ELSE THAT THEY SAW THAT WASN'T PRODUCED."

23         YOUR HONOR, TO OUR KNOWLEDGE, THERE ARE NO OTHER

24  DOCUMENTS THAT WE HAVE THAT DISCUSS RETIRED PLAYER LICENSING

25  THAT WERE AT THOSE MEETINGS THAT WE HAVEN'T PRODUCED.

1    SO I DON'T THINK THERE'S AN ISSUE ABOUT ANYTHING

2 HERE.  I THINK THAT'S THE END OF THE STORY.

3    **THE COURT:**  WHAT DO YOU SAY ABOUT THE MINUTES PART?

4    **MR. KESSLER:**  TO MY KNOWLEDGE, THOSE MINUTES DON'T

5 DISCUSS RETIRED PLAYER LICENSING.  I'M ACTUALLY HAVING SOMEONE

6 GO BACK AND CONFIRM THAT NOW, BUT I DON'T THINK THERE'S

7 ANYTHING IN THOSE MINUTES ABOUT RETIRED PLAYER LICENSING.

8    THE MINUTES GENERALLY TALK ABOUT RESOLUTIONS AND

9 THINGS LIKE THAT, THAT WERE PASSED.  I'M NOT AWARE OF ANY

10 SPECIFIC RESOLUTION ABOUT RETIRED PLAYER LICENSING IN THE YEARS

11 '04, '05, OR ANYTHING LIKE THAT.  BUT WE'LL TAKE A LOOK AND

12 LOOK AT THAT.  BUT I'M NOT AWARE OF ANYTHING.

13    **THE COURT:**  LET'S SEE IF I UNDERSTAND THE POINT

14 MR. KATZ IS TRYING TO MAKE HERE.  HE SAYS:

15    "DURING DISCOVERY PLAINTIFFS REQUESTED AND

16 DEFENDANTS AGREED TO PRODUCE DOCUMENTS ENCOMPASSING THE ISSUES

17 MR. ARMSTRONG TESTIFIED ABOUT, AND THAT MR. SAXON CONFIRMED

18 WERE IN EXISTENCE."

19    NOW, HE'S TALKING ABOUT --

20    **MR. KESSLER:**  IT'S A NON SEQUITUR, YOUR HONOR.  IF

21 YOU LOOK AT THE DOCUMENT REQUEST WHICH THEY CITE, WHICH IS ON

22 THE SECOND PAGE OF HIS LETTER, I BELIEVE, THE DOCUMENT REQUEST,

23 WHICH WE AGREED TO PRODUCE, IS:

24    "ANY DOCUMENT SUMMARIZING," ET CETERA,

25 "COMMUNICATIONS WITH RETIRED PLAYERS."

1      WE HAVE PRODUCED ALL SUCH DOCUMENTS THAT WE WERE ABLE

2   TO LOCATE.  WE WITHHELD NO SUCH DOCUMENTS.  I'M NOT AWARE OF

3   ANY SUCH DOCUMENT THAT'S THERE.

4      HE CITES MR. SAXON SAYING THERE WERE MINUTES PREPARED

5   OF THE ANNUAL MEETINGS.  THERE WERE MINUTES PREPARED, OKAY.  TO

6   MY KNOWLEDGE, WE DON'T BELIEVE THERE'S ANYTHING IN THOSE

7   MINUTES DISCUSSING -- IN THE MINUTES, DISCUSSING RETIRED PLAYER

8   LICENSING.

9      WHERE THE RETIRED PLAYER LICENSING WAS DISCUSSED WAS

10  IN THE LICENSING DEPARTMENT REPORTS AND IN THE RETIRED PLAYER

11  DEPARTMENT REPORTS.  WE PRODUCED THOSE TO THEM.

12     THEY HAVE THOSE FROM THE MEETINGS MR. ARMSTRONG

13  TESTIFIED ABOUT AND FROM SUBSEQUENT MEETINGS WHICH HE DIDN'T

14  TESTIFY ABOUT.

15     SO THERE'S REALLY NO ISSUE HERE.

16     **THE COURT:**  WELL, THE GROUND RULE IN MY SUPPLEMENTAL

17  ORDER SAYS:

18     "EXCEPT FOR GOOD CAUSE, NO ITEM SHALL BE

19  RECEIVED AS CASE-IN-CHIEF EVIDENCE IF THE PROPONENT HAS FAILED

20  TO PRODUCE IT IN RESPONSE TO A REASONABLE AND PROPER DISCOVERY

21  REQUEST."

22     THE PROBLEM, MR. KATZ, IS THAT THERE'S NO ITEM BEING

23  OFFERED IN EVIDENCE.  WE'RE JUST TALKING ABOUT VERBAL

24  TESTIMONY.

25     **MR. KATZ:**  WELL, ONLY YOUR HONOR CAN INTERPRET YOUR

1  OWN RULE AS TO WHAT "ITEM" MEANS.

2          BUT I THINK THE POINT OF YOUR RULE IS THAT YOU CAN'T

3  SANDBAG SOMEONE.  YOU CAN'T NOT PRODUCE SOMETHING IN DISCOVERY.

4          I MEAN, HERE THIS MAN COMES --

5          **THE COURT:**  THEY SAY THEY DID PRODUCE EVERYTHING YOU

6  REQUESTED, ACCORDING TO MR. KESSLER.

7          **MR. KESSLER:**  YES.

8          **THE COURT:**  AND YOU'RE COMPLAINING BECAUSE THEY

9  DIDN'T CREATE MORE DOCUMENTS.

10         **MR. KATZ:**  WELL, YOUR HONOR, THIS MAN COMES IN AND

11 TESTIFIES TO THESE EXTENSIVE DISCUSSIONS THAT OCCUR ON

12 LICENSING AT THESE MEETINGS.  AND WHAT MR. KESSLER IS SAYING

13 NOW IS THE INCREDIBLE POINT THAT DESPITE THESE EXTENSIVE

14 DISCUSSIONS, SOMEHOW THEY WERE NOT MENTIONED IN THE MINUTES

15 WHICH WERE CAREFULLY TAKEN BY THEIR GENERAL COUNSEL EVERY YEAR.

16         SO I WOULD SAY AT THE VERY LEAST WE SHOULD HAVE AN

17 INSTRUCTION TO THE JURY THAT WHAT HE'S SAYING DID NOT APPEAR IN

18 THE MINUTES.  I QUESTION WHAT THOSE MINUTES ACTUALLY SAY.

19         WITH RESPECT TO MR. KESSLER'S POINT THAT THIS ALL

20 HAPPENED BEFORE 2003, WELL, THEN IT SHOULD BE STRICKEN BECAUSE

21 IT'S IRRELEVANT.

22         WHEN HE SAYS DOCUMENTS WERE NOT PRODUCED BEFORE 2003,

23 THAT IS JUST FLAT OUT WRONG.  HE'S PRODUCED DOCUMENTS FROM THE

24 '80S.  THERE ARE MANY, MANY DOCUMENTS THAT PREDATE 2003 HERE.

25         SO IF WHAT HE SAYS IS CORRECT, THEN YOUR HONOR SHOULD

1  GIVE AN INSTRUCTION TO THE JURY TO STRIKE MR. ARMSTRONG'S

2  TESTIMONY ON THE GROUNDS THAT WHAT HAPPENED BEFORE 2003 ON THIS

3  POINT IS SIMPLY IRRELEVANT.

4          **MR. KESSLER:** YOUR HONOR --

5          **MR. KATZ:** MAY I FINISH?

6          **MR. KESSLER:** YES.

7          **MR. KATZ:** THEY ARE CLEARLY SANDBAGGING US, YOUR

8  HONOR. THERE'S JUST NO QUESTION ABOUT IT.

9          **THE COURT:** WAIT, WAIT, WAIT.

10          A DISCOVERY VIOLATION CAN ONLY OCCUR IF THERE WAS

11  SOMETHING THAT WAS REQUESTED THAT WAS NOT TURNED OVER, AND IT

12  DID EXIST. I'VE SEEN OTHER CASES WHERE THAT DEFINITELY HAS

13  HAPPENED.

14          BUT IN THIS CASE MR. KESSLER IS SAYING THAT HE DID

15  TURN OVER EVERYTHING.

16          **MR. KATZ:** WHAT HE'S SAYING IS HE'S GOING TO CHECK

17  WHETHER HE TURNED OVER EVERYTHING.

18          **MR. KESSLER:** NO, I BELIEVE --

19          **MR. KATZ:** YOU SAID YOU WERE GOING TO CHECK. YOU

20  JUST SAID IT FIVE SECONDS AGO.

21          **MR. KESSLER:** PLEASE DON'T SHOUT AT ME, SIR.

22          **THE COURT:** MR. KATZ, IT'S YOUR BURDEN TO PROVE A

23  DISCOVERY VIOLATION.

24          **MR. KATZ:** RIGHT.

25          **THE COURT:** AND YOU HAVEN'T PROVEN IT.

1          **MR. KATZ:**  I THINK I HAVE PROBABLE CAUSE.

2          **THE COURT:**  THAT'S NOT ENOUGH.  AT THIS STAGE, IN

3    CONCESSION TO THE SHORTNESS OF LIFE, WE CAN'T HAVE -- I TOLD

4    YOU AT THE PRETRIAL CONFERENCE, IF YOU WANT TO ASSERT A

5    DISCOVERY VIOLATION, COME IN WITH CHAPTER AND VERSE, PROVE IT

6    AT THE HEARING.  DON'T RAISE A PROBABLE CAUSE IDEA.

7          SO THIS -- THE ENTIRE PREMISE IS NOT PROVEN UP HERE.

8    YOU HAVE NOT PROVEN A DISCOVERY VIOLATION.  SO I'M NOT GOING TO

9    GRANT THIS MOTION.

10         **MR. KATZ:**  WELL, THEN, WOULD IT BE PERMISSIBLE, YOUR

11   HONOR, TO ASK THE QUESTION -- I THINK THERE IS FOUNDATION TO

12   ASK THE QUESTION OF MR. ARMSTRONG:

13              "ISN'T IT A FACT THAT THESE EXTENSIVE

14   DISCUSSIONS ABOUT LICENSING THAT YOU HAVE TESTIFIED ABOUT ARE

15   NOT REFLECTED IN THE MINUTES OF THOSE MEETINGS?"

16         WE HAVE FOUNDATION FOR THAT.

17         **THE COURT:**  IF YOU TELL ME IN GOOD FAITH THAT'S TRUE,

18   THEN YOU CAN ASK THAT QUESTION.

19         **MR. KATZ:**  I'M TELLING YOU IN GOOD FAITH BASED ON --

20         **THE COURT:**  NOW, HE MIGHT SAY:

21              "WELL, I DON'T KNOW."

22         WHERE ARE YOU GOING TO BE THEN?

23         **MR. KATZ:**  RIGHT.  HIS SPECIALTY IS JUST REMEMBERING

24   THINGS, EXCEPT THE MINUTES.  HE JUST DOESN'T REMEMBER THAT.

25   HE'S GOT A LITTLE GAP, 18 MINUTE GAP IN HIS MEMORY.

1          **MR. KESSLER:** YOUR HONOR, I WANT TO SAY A WORD ABOUT

2     THE TIME PERIOD HERE.

3          IT IS CORRECT, YOUR HONOR ORDERED WE DIDN'T HAVE TO

4     PRODUCE DOCUMENTS BEFORE 2003 --

5          **MR. KATZ:** ACTUALLY, I DISAGREE WITH THAT, TOO.

6          **THE COURT:** I DON'T REMEMBER.

7          **MR. KATZ:** YOU DIDN'T ORDER THAT. I CAN SHOW YOU

8     WHAT YOU ORDERED.

9          **MR. KESSLER:** THEY HAVE PUT INTO EVIDENCE OBVIOUSLY

10    IN THIS CASE THE 1994 AGREEMENT, THE 2000 AGREEMENT. IN OTHER

11    WORDS, THERE HAS BEEN EXTENSIVE DISCUSSIONS OF EVENTS PRIOR TO

12    2003. AND MR. ARMSTRONG WAS TESTIFYING ABOUT THAT. AND THERE

13    WAS NEVER ANY REQUEST FOR ANY DOCUMENTS -- HIS DOCUMENT REQUEST

14    AT ISSUE DID NOT GO BACK BEFORE 2003. SO HE CAN'T MAKE

15    STATEMENTS TO MR. ARMSTRONG.

16         I TELL YOU, YOUR HONOR, WE DIDN'T LOOK AT MINUTES IN

17    2000 OR 2001, 2002, BECAUSE THEY WEREN'T CALLED FOR BY HIS

18    REQUEST, AND YOUR HONOR NEVER REQUIRED THAT. SO HE CAN'T MAKE

19    REPRESENTATIONS ABOUT THAT.

20         HE CAN ASK HIM ABOUT THE 2003 MINUTES, WHICH WERE

21    CALLED FOR AND DIDN'T REFLECT ANYTHING.

22         **THE COURT:** WHY WOULDN'T IT BE PROPER -- HAS NOTHING

23    TO DO WITH THE DISCOVERY VIOLATION -- WHY WOULDN'T IT BE PROPER

24    FOR MR. KATZ ON CROSS EXAMINATION TO SAY TO MR. ARMSTRONG:

25              "CAN YOU POINT TO SINGLE MINUTE, A SET OF

1    MINUTES, OF ANY MEETING WHICH SUPPORTS WHAT YOU TESTIFIED TO?"

2              **MR. KESSLER:**  HE CAN DO THAT.  THAT'S A FAIR CROSS

3    QUESTION.

4              **THE COURT:**  AND THEN, HE CAN SAY:

5                   "BEFORE COMING TO TESTIFY, DID YOU MEET WITH

6    MR. KESSLER OR HIS TEAM?"

7              AND THE ANSWER TO THAT, I ASSUME, IS GOING TO BE:

8                   "YES.

9                   "AND DID MR. KESSLER OR HIS TEAM SHOW YOU A

10   SINGLE SET OF MINUTES?"

11             THAT'S NOT PRIVILEGED.  HE COULD ASK THAT QUESTION.

12             **MR. KESSLER:**  THANK YOU.

13             **THE COURT:**  BUT I THINK YOU COULD DO THAT.

14             BUT WHAT YOU CAN'T SAY IS:

15                  "I REVIEWED ALL THE MINUTES, MR. ARMSTRONG," AND

16   THAT'S JUST LAWYER TESTIFYING.

17             **MR. KATZ:**  WELL, IN THE INTEREST OF VINDICATING THE

18   INTEGRITY OF DISCOVERY PROCESS AND OF YOUR RULE NUMBER 16, WE

19   WOULD ASK FOR PRODUCTION OF THOSE MINUTES.

20             **THE COURT:**  IT'S TOO LATE.  I'M NOT GOING TO START --

21   I'M NOT GOING TO START GETTING INTO DISCOVERY VIOLATIONS -- I

22   MEAN, NEW DISCOVERY.  OLD DISCOVERY VIOLATIONS I CAN DEAL WITH.

23   BUT, NO, THAT'S DENIED.

24             **MR. KATZ:**  WHAT ABOUT MR. KESSLER'S REPRESENTATION,

25   QUOTE, THAT HE'S "GOING TO GO BACK AND CHECK TO MAKE SURE THESE

1    THINGS AREN'T MENTIONED"?

2              **THE COURT:**  THAT'S UP TO HIM.  I'M NOT GOING TO

3    REQUIRE THAT.  I'M NOT GOING TO REQUIRE THAT.  IF HE

4    DETERMINES, THOUGH, THAT HE HAS VIOLATED DISCOVERY OBLIGATIONS

5    IN THIS CASE WHEN HE DOES WHATEVER CHECKING HE'S GOING TO DO,

6    THEN WE HAVE A PROBLEM.

7              **MR. KESSLER:**  YOUR HONOR, JUST, AGAIN, SO YOUR HONOR

8    UNDERSTANDS JUST FOR BACKGROUND, FOR EXAMPLE, WE PRODUCED THIS

9    DOCUMENT, THIS THICK (INDICATING), FROM THE ANNUAL MEETING, ALL

10   DISCUSSING LICENSING, INCLUDING RETIRED PLAYER LICENSING.

11             SO THERE'S EXTENSIVE DOCUMENTS FROM THESE MEETINGS

12   THERE WHICH THEY HAVE HAD IN PRODUCTION, OKAY?  AND WHICH ARE

13   CONSISTENT WITH MR. ARMSTRONG'S TESTIMONY.  SO I DON'T EVEN

14   UNDERSTAND THIS POINT.

15             THEY'RE JUST COMPLAINING, WELL, WE DIDN'T PRODUCE A

16   MINUTE THAT SHOWS THAT, AS OPPOSED TO EXTENSIVE MATERIALS FROM

17   THOSE MEETINGS THAT WERE HANDED OUT AND GIVEN AT THOSE

18   MEETINGS.

19             **THE COURT:**  LOOK, I'VE SAID AS MUCH AS I CAN SAY.

20   THIS MOTION IS DENIED.

21             **MR. KESSLER:**  THANK YOU, YOUR HONOR.

22             **THE COURT:**  YOU CAN CROSS-EXAMINE -- I'VE SUGGESTED A

23   COUPLE OF LINES OF QUESTIONS WHICH I THINK WOULD BE FINE.  BUT

24   THERE HAS BEEN NO DISCOVERY VIOLATION PROVEN HERE.  SO THE

25   WHOLE PREMISE OF THIS MOTION IS MISTAKEN.

1      **MR. KATZ:**  WE HAVE A SECOND MATTER, YOUR HONOR.

2      **THE COURT:**  WHAT'S THAT?

3      **MR. KATZ:**  THE SECOND MATTER IS MUCH MORE SIMPLE.

4   AND THAT IS APPARENTLY WHEN READING MR. UPSHAW'S DEPOSITION

5   THEY JUST WANT TO READ THE CORRECTED VERSION AND NOT READ THE

6   UNCORRECTED VERSION, AS WELL.  WE THINK THEY SHOULD READ AT

7   LEAST BOTH.

8      **THE COURT:**  THEY'VE GOT TO READ BOTH.

9      **MR. KESSLER:**  THAT'S FINE, YOUR HONOR.  MY ONLY

10  QUESTION WAS THERE'S THE QUESTION AND ANSWER AT ISSUE THEY

11  ALREADY READ IN IN THEIR CASE, AND IT WAS READ IN ORIGINALLY

12  AND CORRECTED.

13     THEY REDESIGNATED IT AGAIN NOW TO BE READ.  SO WE

14  DIDN'T KNOW IF WE HAD TO READ IT BOTH TIMES AGAIN.

15     **THE COURT:**  THE WAY YOU'VE GOT TO DO THIS -- IS IT

16  GOING TO BE READ OR PLAYED?

17     **MR. KESSLER:**  IT'S GOING TO BE READ.

18     **THE COURT:**  THE THING TO DO IS SAY, ALL RIGHT, THEN

19  DO AS AN ASIDE TO THE JURY:

20     "I'M NOW GOING TO READ THE ORIGINAL TESTIMONY."

21  READ IT.  AND THEN, SAY:

22     "AND THIS IS THE WAY IT WAS CORRECTED BY THE

23  WITNESS," AND THEN READ IT AGAIN.

24     **MR. KESSLER:**  OKAY.

25     **THE COURT:**  THEN MOVE ON TO THE NEXT QUESTION AND

1   ANSWER.

2         **MR. KESSLER:** MR. TAUB WILL BE READING FOR

3   MR. UPSHAW.

4         **THE COURT:** YOU'VE GOT TO DO IT THEN AND THERE,

5   OTHERWISE THE DISCREPANCY IS LOST.

6         **MR. KESSLER:** OKAY. VERY GOOD.

7         **MR. HUMMEL:** GOOD MORNING, YOUR HONOR.

8         **THE COURT:** GOOD MORNING.

9         **MR. HUMMEL:** WE HAVE ONE MORE POINT, AND WE CAN TAKE

10   IT UP AT THE FIRST BREAK, BUT I WANTED TO CORRECT A

11   MISIMPRESSION THAT I AM CONFIDENT I LEFT WITH THE COURT ABOUT

12   MR. ROWLEY'S TESTIMONY. IT HAD TO DO WITH THE THREE YEAR OR

13   MORE ISSUE OF DAMAGES THAT YOUR HONOR ACTUALLY ASKED ME ABOUT.

14   WOULD YOU LIKE ME TO DO THAT NOW OR WAIT? IT WILL TAKE 30

15   SECONDS.

16         **THE COURT:** SURE.

17         **MR. HUMMEL:** THERE ARE THREE PERIODS IN PLAY IN THIS

18   CASE. THERE'S THE CLASS PERIOD, WHICH RUNS FROM FEBRUARY 14,

19   2004 THROUGH FEBRUARY 14, 2007. AND THAT IS THE -- THAT'S THE

20   PERIOD THAT DEFINES WHO'S IN THE CLASS, WHO SIGNED GLA'S THAT

21   WERE IN EFFECT IN THAT PERIOD.

22         AND THEN, THERE'S THE STATUTE OF LIMITATIONS PERIOD,

23   WHICH IS UNDER D.C. LAW THREE YEARS.

24         BUT, YOUR HONOR, WHAT YOU ASKED ME YESTERDAY, AND I

25   THINK I PROBABLY ANSWERED INCORRECTLY AT THE TIME WAS:

1          "DO WE HAVE A THREE-YEAR DAMAGES PERIOD?"

2          THE ANSWER TO THAT IS "NO," BECAUSE IF SOMEONE HAD A

3  GLA THAT EFFECT, FOR EXAMPLE, IN THE THIRD YEAR OF THAT CLASS

4  PERIOD, AND HE WASN'T PAID IN THE FOURTH OR FIFTH YEAR AND THE

5  GLA WAS STILL IN EFFECT, THAT WOULD BE DAMAGES THAT WE WOULD BE

6  CLAIMING.

7          THAT'S WHY THERE WERE MORE YEARS IN MR. ROWLEY'S

8  REPORT THAN THE SIMPLE THREE-YEAR STATUTE.

9          I JUST WANTED TO CORRECT THAT.  WE WILL MAKE IT CLEAR

10 TO THE JURY AT AN APPROPRIATE POINT, YOUR HONOR, IN THE CASE,

11 BUT I DIDN'T WANT TO LEAVE YOU WITH A MISIMPRESSION.

12         **THE COURT:**  WAIT A MINUTE.  WHEN YOU BRING A

13 LAWSUIT -- THE LAWSUIT WAS FILED ON FEBRUARY 14, '07.

14         **MR. HUMMEL:**  RIGHT.

15         **THE COURT:**  ANYTHING THAT SHOULD HAVE BEEN PAID

16 WITHIN THREE YEARS BACK FROM THAT --

17         **MR. HUMMEL:**  RIGHT.

18         **THE COURT:**  -- IS CLAIMABLE.  BUT ANYTHING THAT'S

19 LONGER BACK THAN THREE YEARS IS NOT CLAIMABLE.

20         **MR. HUMMEL:**  THAT'S RIGHT.

21         **THE COURT:**  SO HOW CAN YOU GET MORE THAN THREE YEARS

22 OF DAMAGES?

23         **MR. HUMMEL:**  BECAUSE YOU CAN HAVE FUTURE DAMAGES.

24 YOU CAN HAVE DAMAGES THAT ARE AFTER THE LAWSUIT.  IN OTHER

25 WORDS, THE GLA WAS IN EFFECT --

1          **THE COURT:** NOT UNLESS -- NOT UNLESS -- THE

2    TRADITIONAL RULE IS THAT DAMAGES CUT OFF AS OF THE DATE OF THE

3    FILING OF THE COMPLAINT.

4          NOW, I HAVE -- I ALLOW THE EXPERTS TO DO IT AS OF THE

5    DATE OF THE EXPERT REPORT BECAUSE THIS ISSUE COMES UP SO OFTEN.

6          **MR. HUMMEL:** RIGHT.

7          **THE COURT:** SO WHEN WAS THE DATE OF THE EXPERT

8    REPORT?

9          **MR. HUMMEL:** I DON'T HAVE IT IN FRONT OF ME.

10         JUNE 1, '08.  JUNE 1, '08.

11         **THE COURT:** THEN DAMAGES COULD BE COLLECTED UP TO

12   THAT DATE.

13         **MR. HUMMEL:** OKAY.

14         **THE COURT:** THEN IF HE DID A SPECIFIC FUTURE

15   ANALYSIS, WHICH I DON'T THINK HE TESTIFIED TO --

16         **MR. HUMMEL:** HE DID NOT.

17         **THE COURT:** ALL RIGHT.  WELL, THEN --

18         **MR. HUMMEL:** I JUST WANTED TO CLARIFY.

19         **THE COURT:** THAT SEEMS LIKE THAT'S CORRECT, ISN'T IT?

20         **MR. KESSLER:** NO, YOUR HONOR.  IT'S VERY SIMPLE.

21   THERE WERE THREE YEARS AT ISSUE, OKAY?  AND WHAT THEY'RE TRYING

22   TO DO IS CONFUSE THE FISCAL YEARS FROM THE CALENDAR YEARS.  BUT

23   IT DOESN'T MATTER.  IN OTHER WORDS, ONCE A YEAR THERE'S A

24   PAYMENT.  SO THERE WAS A PAYMENT IN EACH OF THE THREE YEARS OF

25   THE STATUTE OF LIMITATIONS, OKAY.

1       THEY CAN'T SQUEEZE FOUR YEARS WORTH OF PAYMENTS INTO

2 THREE YEARS BY CLAIMING THAT BECAUSE THE FISCAL YEAR EXTENDS

3 LATER THAT THEY SOMEHOW WOULD HAVE GOTTEN THOSE PAYMENTS.

4       **THE COURT:** WHEN IS THE PAYMENT MADE?

5       **MR. KESSLER:** THE PAYMENT IS MADE IN MARCH?

6       **MR. HUMMEL:** SEPTEMBER.

7       **MR. KESSLER:** SEPTEMBER OF EACH YEAR. THAT'S WHAT

8 THEY'RE ENTITLED TO, THE SEPTEMBER PAYMENTS DURING EACH OF

9 THOSE YEARS.

10       **THE COURT:** ALL RIGHT. WELL, OKAY. JUST A SECOND.

11 I DON'T WANT TO MISSTATE THIS. I'VE GOT TO DRAW A DIAGRAM.

12       **MR. HUMMEL:** SO THERE'S A PAYMENT -- THE FIRST

13 PAYMENT WITHIN THE CLASS PERIOD, YOUR HONOR, THEN, IS IN

14 SEPTEMBER '04.

15       **MR. KESSLER:** CORRECT.

16       **MR. HUMMEL:** THERE'S ANOTHER ONE IN '05. THERE'S

17 ANOTHER ONE IN '06, AND THERE'S ONE IN '07.

18       **THE COURT:** RIGHT. WHY ISN'T THAT RIGHT?

19       **MR. HUMMEL:** AND THE ONE IN '07 -- THAT'S RIGHT.

20       **MR. KESSLER:** NO, THE ONE IN '07 IS SEPTEMBER OF '07.

21       **THE COURT:** RIGHT. I ALLOW DAMAGES -- THE CLASS

22 MEMBERS ARE DEFINED AS THEY ARE. BUT IF THOSE CLASS MEMBERS

23 WERE ENTITLED -- I'M NOT SAYING THEY WERE, BUT IF THEY WERE

24 ENTITLED AND PLAINTIFF PROVES THAT, TO RECOVER, THEY'RE

25 ENTITLED TO RECOVER FOR THE '07 PAYMENT, TOO. I THINK THAT'S

1    RIGHT.  I'M GOING TO ALLOW THAT.

2              **MR. HUMMEL:**  THANK YOU, YOUR HONOR.

3              **THE COURT:**  THAT'S THE WAY --

4              **MR. KESSLER:**  HERE'S THE PROBLEM, YOUR HONOR.  THE

5    SEPTEMBER '04 PAYMENT WAS FOR RIGHTS THAT ARE GOING TO INCLUDE

6    PEOPLE BEFORE THE PERIOD OF TIME.  THAT'S THE PROBLEM.

7              IN OTHER WORDS, YOU CAN'T SQUEEZE IN MORE THAN THREE.

8    SO THE '04 PAYMENT INCLUDED RIGHTS IN '03, BEFORE THE CLASS

9    STARTED.

10             THAT'S THE PROBLEM, RIGHT?

11             **THE COURT:**  LET ME TEST YOU OUT ON THAT.  LET'S SAY

12   SOMEBODY SIGNS AN RP GLA ON FEBRUARY 15, '04.

13             **MR. KESSLER:**  YES.

14             **THE COURT:**  THE FIRST AND SECOND DAY OF THE PERIOD.

15             **MR. KESSLER:**  YES.

16             **THE COURT:**  ALL RIGHT.  AND LET'S ASSUME THE

17   PLAINTIFFS ARE CORRECT ON THEIR THEORY.  WOULD THEY BE ALLOWED

18   TO PARTICIPATE IN THE '04 -- SEPTEMBER '04 PAYMENT?

19             **MR. KESSLER:**  NO.

20             **THE COURT:**  WHY NOT?

21             **MR. KESSLER:**  THE SEPTEMBER '04 PAYMENT WAS FOR

22   FISCAL YEAR '03.  SEE --

23             **THE COURT:**  LOOK.  HAVE YOU PUT IN EVIDENCE ON THIS

24   POINT?

25             **MR. KESSLER:**  I WILL PUT IN EVIDENCE ON THIS POINT IF

1    WE NEED IT.  BUT IT WAS THEIR BURDEN OF PROOF.  THEIR EXPERT

2    UNDERSTOOD THAT THE FISCAL YEAR PAYMENTS -- AND I'LL PUT

3    THAT --

4          **THE COURT:**  I THINK YOU BETTER PUT IN EVIDENCE.

5    RIGHT NOW YOU LAWYERS ARE TELLING ME THIS IS THE WAY THE POOL

6    WORKS, BUT I HAVEN'T HEARD ANY EVIDENCE ON THIS.

7          **MR. KESSLER:**  WE'LL PUT IN EVIDENCE THAT --

8          **THE COURT:**  ALL RIGHT.  SUBJECT TO WHAT MR. KESSLER

9    SAID, IF IT ALWAYS WORKS THAT THE SEPTEMBER PAYMENT IS ONLY FOR

10   PEOPLE WHO ARE PART OF THE POOL IN '03, THEN WE GET INTO AN

11   ISSUE OF:  IS IT ON AN ACCRUED BASIS OR A CASH BASIS?

12          HOW DO THEY DO IT FOR THE ACTIVE PLAYERS?

13          **MR. KESSLER:**  THE SAME WAY.  IN OTHER WORDS, THEY

14   WOULD PAY IN SEPTEMBER OF THE NEXT CALENDAR YEAR FOR THE PRIOR

15   FISCAL YEAR, WHICH CLOSED PREVIOUSLY.  AND MOST OF THE CLASS --

16   I DON'T THINK THERE ARE ANY CLASS MEMBERS WHO WOULD BE ENTITLED

17   TO THE SEPTEMBER '04 PAYMENT.

18          THE ONLY POSSIBILITY -- AND I DON'T THINK THERE ARE

19   ANY -- WOULD BE A CLASS MEMBER WHO SIGNED IN FEBRUARY, YOU

20   KNOW, IN THE TWO WEEKS BEFORE THE BOOKS WERE CLOSED.

21          I DON'T THINK THERE ARE ANY SUCH CLASS MEMBERS.

22   CERTAINLY WASN'T THE WHOLE CLASS.

23          **THE COURT:**  I'M NOT RULING ON THIS POINT.  I'M NOT

24   SAYING YES.  I'M NOT SAYING NO TO THIS POINT.  IT MIGHT END UP

25   BEING A MATTER OF PROOF.

1          WE GOT INTO IT WITH ONE WITNESS YESTERDAY.  THE

2  INTRICACIES OF HOW THE -- WHEN THE CUTOFFS ARE AND SO FORTH.  I

3  THINK IN YOUR CROSS EXAMINATION OF THEIR DAMAGES EXPERT YOU GOT

4  INTO IT.  BUT A LOT OF THAT WAS JUST YOU TALKING, MR. KESSLER.

5  IT WASN'T THE WITNESS ADMITTING IT.

6          SO I'M CONFUSED IN MY OWN MIND OF WHAT THE RECORD

7  ACTUALLY SHOWS.  AND IF I WAS IN YOUR POSITION I WOULD PROVE

8  WHATEVER YOU'RE TRYING TO PROVE UP ON THIS POINT.

9          **MR. KESSLER:**  I UNDERSTAND, YOUR HONOR.

10         **THE COURT:**  AND WHAT THE LEGAL SIGNIFICANCE OF IT IS,

11  I DON'T KNOW, BECAUSE YOU GET INTO CASH VERSUS ACCRUAL.  YOU

12  GET INTO -- YOU GET INTO:  HOW DOES IT WORK FOR THE ACTIVE

13  PLAYERS?  IT SHOULD WORK THE SAME WAY FOR THE RETIRED PLAYERS.

14         **MR. KESSLER:**  IT ACTUALLY WILL BE PRETTY

15  STRAIGHTFORWARD BECAUSE IT'S A CASH SYSTEM.  THEY CLOSE THEIR

16  BOOKS.  IT'S JUST A QUESTION OF WHAT PERIOD OF TIME, WHEN DID

17  THEY MAKE THE PAYMENTS, AND WE'LL PROVE THAT UP.

18         **MR. HUMMEL:**  I JUST WANTED TO CLARIFY MY POINT.

19         **THE COURT:**  I ACCEPT WHAT YOU SAID ON THE END OF THE

20  PERIOD.

21         **MR. HUMMEL:**  RIGHT.

22         **THE COURT:**  SO YOU STILL HAVE THIS ISSUE ABOUT THE

23  FIRST OF THE PERIOD.

24         **MR. HUMMEL:**  I APPRECIATE THAT, YOUR HONOR.  THANK

25  YOU.

1          **THE COURT:**  ALL RIGHT.  WHAT ELSE DO WE HAVE?

2          **MR. KESSLER:**  NOTHING FROM US.

3          **MR. KATZ:**  NOTHING, YOUR HONOR.

4          **THE COURT:**  WHAT WITNESS DO WE HAVE ON THE STAND NOW?

5          **MR. KESSLER:**  MR. ARMSTRONG WAS STILL IN MY DIRECT.

6   WE WILL CALL HIM FROM OUTSIDE, IF THE JURY IS HERE.

7          **THE COURT:**  WE WILL SEE IF THEY ARE ALL HERE.

8          **MR. KATZ:**  HE'S JUST OUTSIDE REVIEWING THE MINUTES,

9   YOUR HONOR.

10         **THE COURT:**  GOOD.  HIS MEMORY WILL BE REFRESHED.

11              (THE FOLLOWING PROCEEDINGS WERE HELD IN OPEN COURT,

12              IN THE PRESENCE OF THE JURY.)

13         **THE COURT:**  WELCOME BACK.  HAVE A SEAT.

14         MR. ARMSTRONG IS OUR WITNESS ON THE STAND.  AND YOU

15  WILL REMEMBER THAT WE HAD ABOUT, LOOKS LIKE, 32 MINUTES OF

16  DIRECT TESTIMONY.

17         MR. KESSLER IS STILL IN HIS DIRECT TESTIMONY PHASE.

18         YOU MAY CONTINUE.

19                          **TRACE ARMSTRONG,**

20  CALLED AS A WITNESS FOR THE DEFENDANTS HEREIN, HAVING BEEN

21  PREVIOUSLY DULY SWORN, WAS EXAMINED AND TESTIFIED FURTHER AS

22  FOLLOWS:

23                    **DIRECT EXAMINATION RESUMED**

24  **BY MR. KESSLER:**

25  **Q.**   GOOD MORNING, MR. ARMSTRONG.

1  **A.**   GOOD MORNING.

2             **MR. KESSLER:**  GOOD MORNING, LADIES AND GENTLEMEN.

3  **BY MR. KESSLER:**

4  **Q.**   MR. ARMSTRONG, WHEN WE CONCLUDED YESTERDAY I WAS JUST

5  ABOUT TO ASK YOU ABOUT THE ELIGIBILITY CRITERIA FOR THE GLR

6  POOL, THE GROSS LICENSING REVENUE POOL?

7  **A.**   YES.

8  **Q.**   AND MR. ARMSTRONG, DURING THE TIME YOU WERE A PLAYER

9  REPRESENTATIVE OR AN OFFICER OF THE UNION, DID THE PLAYERS VOTE

10 ON THE ELIGIBILITY CRITERIA FOR THE GLR POOL?

11 **A.**   WE DID.

12 **Q.**   OKAY.  LET ME SHOW YOU -- YOU SHOULD HAVE IN FRONT OF YOU

13 A COPY OF TRIAL EXHIBIT 2247, ALREADY IN EVIDENCE.

14          YOU DON'T HAVE IT?

15 **A.**   SORRY, ANOTHER FOLDER.

16 **Q.**   TAKE THIS ONE.

17 **A.**   I'VE GOT IT.

18 **Q.**   AND DO YOU RECOGNIZE THIS RESOLUTION FROM THE MARCH 18TH

19 TO 20TH, 1991 MEETING OF THE NFLPA BOARD OF DIRECTORS MEETING?

20 **A.**   I DO.

21 **Q.**   DID YOU ATTEND THAT MEETING?

22 **A.**   I DID.

23 **Q.**   AND IT SAYS THAT:

24             "THE BOARD THEN DISCUSSED WHO SHOULD BE REGARDED

25 AS A PARTICIPATING PLAYER IN THE GROUP LICENSING PROGRAM.

1    AFTER EXTENSIVE DISCUSSION, DAVE DUERSON MOVED THAT SUCH A

2    PARTICIPATING PLAYER SHOULD BE ELIGIBLE IF HE WAS ON THE

3    INJURED RESERVE OR ACTIVE LIST OF A CLUB AT THE END OF THE 1989

4    SEASON OR WAS ON THE REGULAR SEASON ROSTER AT THE BEGINNING OF

5    THE 1990 SEASON.

6              "HE EXPANDED HIS MOTION TO ALSO INCLUDE ANY

7    PLAYER WHO SIGNED A GROUP LICENSING AUTHORIZATION AND WAS ON

8    THE DEVELOPMENTAL SQUAD AT THE END OF THE 1989 SEASON, AND ALSO

9    ANY PRACTICE SQUAD PLAYER WHO SIGNED A GROUP LICENSING

10   AUTHORIZATION AND WAS ON THE PRACTICE SQUAD ROSTER AT THE

11   BEGINNING OF THE 1990 SEASON."

12             THEN, IT SAYS:

13             "DAVE'S MOTION WAS SECONDED BY GARY REASONS.

14   AFTER EXTENSIVE DISCUSSION IT PASSED UNANIMOUSLY."

15             DO YOU RECALL THAT, MR. ARMSTRONG?

16   **A.**   VERY WELL.

17   **Q.**   WAS THIS SOMETHING THAT WAS DISCUSSED EXTENSIVELY,

18   DISCUSSED A LITTLE?  WHAT DO YOU RECALL?

19   **A.**    IT WAS ONE OF THOSE EXTENSIVE DISCUSSIONS THAT WE TALKED

20   ABOUT YESTERDAY.  THIS WAS DEBATED OVER THE COURSE OF SEVERAL

21   HOURS IN THAT MEETING.

22   **Q.**   NOW, WAS THE POOL OF MONEY BEING DISCUSSED HERE MONEY THAT

23   CONTAINED MONEY FROM ACTIVE PLAYER LICENSING OR RETIRED PLAYER

24   LICENSING, OR BOTH?

25   **A.**    IT WAS JUST ACTIVE PLAYER LICENSING.  THE WAY IT WAS

1  CONSTRUCTED WITH THE PLAYER BEING ON THE ROSTER AT THE

2  BEGINNING OF THE YEAR AND THE END OF THE YEAR, WE WANTED THE

3  PLAYERS THAT PARTICIPATED IN EARNING THE REVENUE FOR THAT YEAR

4  TO SHARE IN THE REVENUE.

5          SO IT WOULD ONLY BE A PLAYER THAT WAS ON THE

6  BEGINNING AND THE END OF THE YEAR.

7          WE DIDN'T WANT A SITUATION WHERE A GUY WAS ADDED FOR

8  ONE GAME, AND THEN HE WOULD BE ENTITLED TO AN EQUAL SHARE OF

9  THE REVENUE.  WE DIDN'T THINK THAT WAS FAIR.  SOMEBODY HAD TO

10 BE ON THE TEAM THE ENTIRE YEAR.

11         AND THEN, THE WAY THE REVENUES WERE PAID OUT THEY

12 WERE PAID OUT IN THE FOLLOWING YEAR AFTER WE HAD A CHANCE TO

13 REVIEW THE FINANCIALS AND SEE WHAT WE ACTUALLY EARNED IN THAT

14 SEASON.

15 **Q.**  NOW, IF A PLAYER PLAYED JUST THREE OR FOUR GAMES, AN

16 ACTIVE PLAYER, IN THE MIDDLE OF THE SEASON, WOULD HE BE

17 ENTITLED TO AN EQUAL SHARE EVEN IF HE SIGNED A GLA?

18 **A.**  NO.  HE HAD TO MEET THE CRITERIA.

19 **Q.**  NOW, MR. ARMSTRONG, WAS THE CRITERIA REVIEWED EACH OF THE

20 YEARS AT THE MEETINGS; DO YOU RECALL?

21 **A.**  YES.

22 **Q.**  LET'S TAKE A LOOK NEXT AT TRIAL EXHIBIT 1307 THAT'S IN

23 EVIDENCE.  I DON'T KNOW IF YOU HAVE IT UP THERE, MR. ARMSTRONG.

24 **A.**  THANK YOU.

25         **MR. KESSLER:**  IF WE COULD SHOW THIS.

1          (DOCUMENT DISPLAYED.)

2    **BY MR. KESSLER:**

3    **Q.**   THIS WAS THE ELIGIBILITY CRITERIA FOR THE 2003 SEASON,

4    PAYMENT DURING THE 2004 SEASON.  DO YOU SEE THAT?  CORRECT?

5    **A.**   UH-HUH.

6    **Q.**   BY THE WAY, DO YOU KNOW WHAT IT MEANS THAT YOU'RE ELIGIBLE

7    FOR THE 2003 SEASON, BUT THE PAYMENT'S MADE IN THE SUBSEQUENT

8    SEASON?

9    **A.**   YES.  WE WOULD WAIT UNTIL THE FINAL ACCOUNTING WAS IN.

10   OFTENTIMES, WHEN YOU HAVE A LICENSING AND MARKETING PROGRAM

11   CHECKS WOULD NOT COME IN UNTIL THE END OF THE YEAR.  AND SO WE

12   HAD TO GO THROUGH A FINAL ACCOUNTING IN MARCH, TO DETERMINE,

13   BASICALLY, HOW MUCH MONEY THE LICENSING AND MARKETING

14   OPPORTUNITIES EARNED FOR THAT YEAR, AND THEN THE POOL WOULD BE

15   DIVIDED UP EQUALLY BASED ON THE CRITERIA.

16   **Q.**   SO IF A PAYMENT WAS MADE, LET'S SAY, IN MARCH -- I'M

17   SORRY, IN SEPTEMBER -- WAS SEPTEMBER THE TIME THE MONEY WAS

18   USUALLY DISTRIBUTED; DO YOU RECALL?

19   **A.**   YES, FOR THE PRIOR YEARS.

20   **Q.**   SO IF THE PAYMENTS WERE DISTRIBUTED FROM THE GROSS

21   LICENSING REVENUE POOL --

22   **A.**   UH-HUH.

23   **Q.**   -- IN SEPTEMBER OF 2004, FOR WHAT SEASON WOULD THAT BE?

24   **A.**   FOR THE PREVIOUS SEASON.

25   **Q.**   FOR THE 2003 SEASON?

1  **A.**   2003 SEASON.

2  **Q.**   THANK YOU.  NOW, THIS HAS CRITERIA:

3           "IN ORDER FOR A PLAYER TO BE CONSIDERED ELIGIBLE

4  HE MUST HAVE APPEARED ON THE LAST GAME ROSTER OF THE 2002

5  SEASON AND/OR MUST HAVE APPEARED ON THE FIRST GAME ROSTER OF

6  THE 2003 SEASON."

7           IS THAT THE SAME CRITERIA YOU HAD ADOPTED BACK IN

8  1994?

9  **A.**   YES.

10 **Q.**   SO THE CRITERIA DIDN'T CHANGE DURING THAT PERIOD?

11 **A.**   NO.

12 **Q.**   AND IF YOU LOOK DOWN ON PRACTICE SQUAD PLAYERS.

13        **MR. KESSLER:**  IF WE CAN GO TO THAT, WHICH I THINK IS

14 THE NEXT PARAGRAPH.

15        (DOCUMENT DISPLAYED.)

16 **BY MR. KESSLER:**

17 **Q.**   IT SAYS -- WELL, THIS IS ROOKIE PLAYERS?

18 **A.**   UH-HUH.

19 **Q.**   LET'S GO TO PRACTICE SQUAD PLAYERS.

20        **MR. KESSLER:**  I DON'T HAVE IT IN FRONT OF ME, LAUREN,

21 IF YOU COULD FIND WHERE THAT IS.  THANK YOU.

22        IT SAYS -- NO.  IF I CAN SEE A COPY OF THE DOCUMENT,

23 IF SOMEONE GIVES IT TO ME FOR MR. ARMSTRONG.

24        (DOCUMENT DISPLAYED.)

25

1  **BY MR. KESSLER:**

2  **Q.**   OH, HERE IT IS:

3              "PLAYERS WHO MEET THE ABOVE CRITERIA WITH ONLY

4  THE STATUS OF PS RECEIVE A REDUCED AMOUNT OF 1,000."

5          SO I WANT TO UNDERSTAND THAT, OKAY.

6          DOES "PS" MEAN PRACTICE SQUAD?

7  **A.**   IT DOES.

8  **Q.**   EXPLAIN TO THE JURY WHAT IS THE PRACTICE SQUAD?  WE'VE

9  SPOKEN ABOUT THAT.  WHAT IS THAT?

10 **A.**   PRACTICE SQUAD IS A SMALL GROUP OF SIX PLAYERS THAT THE

11 CLUB WILL SIGN.  AND THEY'RE DEVELOPMENTAL PLAYERS, USUALLY

12 VERY YOUNG PLAYERS WHO ARE MAYBE NOT TALENTED ENOUGH TO MAKE

13 THE REGULAR ROSTER, BUT THE CLUB WANTED TO HAVE THEM STILL OUT

14 THERE PRACTICING.  THEY GET PAID A LESSER AMOUNT OF MONEY AND

15 WERE DEVELOPMENTAL PLAYERS.

16          DID NOT PLAY ON SUNDAY.  OFTENTIMES DID NOT TRAVEL

17 WITH THE TEAM, IF WE LEFT TO GO ON THE ROAD AND PLAY A GAME.

18 **Q.**   COULD THEY PLAY IN AN ACTUAL GAME WITHOUT BECOMING AN

19 ACTIVE PLAYER?

20 **A.**   NO.  NO.

21 **Q.**   SO THEY WOULD JUST BE PRACTICING DURING THE WEEK?

22 **A.**   THAT'S RIGHT.

23 **Q.**   NOW, DID THE BOARD OF PLAYER REPS DECIDE TO ONLY PAY THE

24 PRACTICE SQUAD PLAYERS $1,000?

25 **A.**   WE DID.

1  Q.   AND WHY WAS THAT DECISION MADE?

2  A.   BECAUSE THEY WEREN'T ACTUALLY PLAYING THE GAMES ON

3  SUNDAYS.  THEY WEREN'T ON THE ACTIVE ROSTER.  WE FELT LIKE THE

4  PRACTICE SQUAD GUYS WERE VERY IMPORTANT TO A TEAM, IN THAT THEY

5  GIVE YOU MANPOWER DURING THE WEEK AS GUYS GET INJURED.  AND

6  THEY ARE ALSO ANOTHER CHANCE TO DEVELOP YOUNG PLAYERS.

7          SO OFTENTIMES YOU MIGHT HAVE ONE OR TWO PLAYERS FROM

8  THIS PRACTICE SQUAD THAT DEVELOPS, AND YOU BRING THEM UP ON TO

9  THE ACTIVE ROSTER.  SO WE FELT LIKE IT WAS APPROPRIATE FOR THEM

10 TO PARTICIPATE IN THE PROGRAM, BUT JUST NOT GET A FULL SHARE,

11 AS MOST OF THOSE GUYS WEREN'T ON THE ACTIVE ROSTER EVER.

12 Q.   NOW, AGAIN, WE'RE IN 2003 CRITERIA NOW, YOUR LAST PERIOD

13 OF TIME THAT YOU WERE IN THE BOARD.

14          WERE THESE CRITERIA FOR -- WERE THESE THE CRITERIA

15 FOR THE GROSS LICENSING REVENUE POOL?

16 A.   YES.

17 Q.   OKAY.  AND DID THAT POOL HAVE ANY RETIRED PLAYER MONEY IN

18 IT, TO YOUR KNOWLEDGE?

19 A.   NO, IT DID NOT.

20 Q.   NOW, WHY DIDN'T THE BOARD OF PLAYER REPRESENTATIVES SIMPLY

21 DECIDE TO GIVE THE ACTIVE PLAYER MONEY IN THE GROSS LICENSING

22 REVENUE POOL, GIVE SHARES TO THE RETIRED PLAYERS?

23 A.   WELL, IT WOULDN'T HAVE FIT WITH THE OBJECTIVES FOR

24 STARTING PLAYERS INC AND DEVELOPING THIS PROGRAM.

25          MR. LECLAIR:  YOUR HONOR, EXCUSE ME.  I APOLOGIZE FOR

1    INTERRUPTING, BUT I HAVE AN OBJECTION.

2            IS THIS TALKING ABOUT DURING THE MEETING?  OR IS THIS

3    SOME OTHER DISCUSSION?

4            **THE COURT:**  PLEASE CLARIFY THAT POINT.

5    **BY MR. KESSLER::**

6    **Q.**   OKAY.  DO YOU HAVE AN UNDERSTANDING -- YOU WERE PRESIDENT

7    OF THE UNION AT THIS TIME?

8    **A.**   YES.

9    **Q.**   DID YOU HAVE AN UNDERSTANDING AS PRESIDENT OF THE UNION AT

10   THAT TIME AS TO WHY THERE WOULDN'T -- WHY THE ACTIVE PLAYER

11   BOARD DIDN'T JUST SAY:

12           "LET'S TAKE THE ACTIVE PLAYER LICENSING MONEY IN

13   THE GROSS LICENSING REVENUE POOL AND GIVE SHARES TO THE RETIRED

14   PLAYERS"?

15           **MR. LECLAIR:**  YOUR HONOR, SAME OBJECTION: FOUNDATION.

16   I DON'T KNOW IF WE'RE TALKING ABOUT A DISCUSSION THAT OCCURRED

17   AT THE BOARD MEETING, OR ARE WE TALKING ABOUT SOME OTHER

18   DISCUSSION?  I WOULD LIKE TO HAVE A FOUNDATION.

19           **THE COURT:**  CORRECT.  SUSTAINED.

20           IF HE'S JUST GIVING HIS OWN PERSONAL OPINIONS I'M NOT

21   SURE THAT'S -- IT SOUNDED LIKE YOU WERE TALKING ABOUT SOME

22   MEETING WHERE THE DISCUSSION TOOK PLACE, AND THIS WAS EXPRESSLY

23   STATED.  MAYBE WE VEERED OFF OF THAT, AND THAT'S NOT WHAT YOU

24   HAVE IN MIND.  BE VERY CLEAR.

25

**BY MR. KESSLER:**

**Q.**   I'LL ASK MR. ARMSTRONG:  WHAT'S THE BASIS FOR YOUR

UNDERSTANDING?

**A.**   THE BASIS IS 15 YEARS OF BOARD MEETINGS AND BEING INVOLVED

IN WHEN WE STARTED PLAYERS INC WHAT THE ORIGINAL INTENT OF THE

COMPANY WAS, AND THEN EVERY YEAR AS WE REVISITED LICENSING AND

MARKETING WE ALWAYS WENT BACK TO THE ORIGINAL INTENT.

          SO EVERY DECISION THAT WAS MADE, EVERY DISCUSSION WAS

DONE WITH THE BASIS OF, YOU KNOW:  WHY ARE WE DOING THIS?

          AND WHY WE WERE DOING IT WAS TO SECURE THE FINANCIAL

FUTURE OF THE UNION TO PROVIDE LEVERAGE AND RESOURCES FOR OUR

ORGANIZATION IN OUR EFFORTS AND BATTLES AGAINST MANAGEMENT.

AND THEN, ALSO TO BE ABLE TO REWARD PLAYERS, ACTIVE PLAYERS WHO

PARTICIPATED IN LICENSING AND MARKETING.

          THE WAY THIS SYSTEM WAS STRUCTURED, YOU CAN SEE THERE

HAD TO BE A FULL ACCOUNTING OF LICENSING AND MARKETING REVENUE

FOR A YEAR, AND THEN THE PLAYERS WHO WERE REWARDED FOR THAT

WERE JUST THE PLAYERS THAT PARTICIPATED.

          IT WAS CONSTRUCTED SPECIFICALLY THAT WAY SO THAT --

FOR THE ACTIVE PLAYER MONEY.  THE ONLY GUYS THAT GOT THE MONEY

WERE THE GUYS THAT WERE A PART OF THE PROGRAM.

**Q.**   IF -- IF THOUSANDS OF RETIRED PLAYERS COULD SIMPLY SIGN A

PIECE OF PAPER AND GET AN EQUAL SHARE OF THE ACTIVE PLAYER

LICENSING MONEY COULD THE UNION IN YOUR VIEW HAVE ACHIEVED ITS

OBJECTIVES THAT WAY?

1  **A.**   NO.

2            **MR. LECLAIR:**  OBJECTION.  SPECULATION, YOUR HONOR.

3            **THE COURT:**  WELL, THIS IS A PRESENT DAY OPINION, AS

4  PHRASED.

5            I WANT TO GO BACK TO THE PRIOR THING.  I'M GOING TO

6  ALLOW THAT PRIOR ANSWER TO STAND, BUT NOW THAT I'VE HEARD WHAT

7  THE FOUNDATION IS, I NEED A WORD OF CAUTION TO THE JURY.

8            IT SOUNDS LIKE THIS WITNESS WAS PRESENT AT A LOT OF

9  MEETINGS AND IS BASING HIS TESTIMONY ON 15 YEARS AND SO FORTH.

10           BUT HE'S NOT TRYING TO RECOUNT ANY SPECIFIC

11 CONVERSATION OR MEETING, BUT, RATHER, HE'S GIVING WHAT I CALL

12 LAY OPINION.

13           THIS IS HIS LAY OPINION OF WHY THE CHANGE WAS MADE.

14 AND LIKE ALL OPINIONS, YOU MUST EVALUATE IT AND DECIDE HOW MUCH

15 WEIGHT TO GIVE TO IT.  IT'S NOT QUITE THE SAME THING AS, YOU

16 KNOW, "THE LIGHT WAS RED" OR "THE LIGHT WAS GREEN."

17           THIS IS A LAY OPINION BY THIS WITNESS ABOUT WHAT HE

18 THINKS THE COURSE AND REASONING WAS BY A GROUP OF PEOPLE OVER A

19 COURSE OF 15 YEARS.  THAT'S OPINION.  THAT'S NOT AS BRIGHT A

20 LINE AS "THE LIGHT WAS RED" OR "THE LIGHT WAS GREEN."

21           SO YOU TAKE THAT OPINION FOR WHAT YOU THINK IT WAS

22 WORTH.

23           **MR. KESSLER:**  THANK YOU, YOUR HONOR.

24 **BY MR. KESSLER:**

25 **Q.**   AND I ASK ONE MORE QUESTION:  IN 15 YEARS TIME AS

1    PRESIDENT IN 2003 --

2    **A.**    YES.

3    **Q.**    -- I'LL ASK THE QUESTION:  COULD ALL RETIRED PLAYERS WHO

4    SIGNED THE FORM, COULD THE UNION, THE ACTIVE PLAYERS, HAVE

5    GIVEN THEM EACH AN EQUAL SHARE OF ACTIVE PLAYER LICENSING, AND

6    COULD YOU STILL HAVE ACHIEVED THE OBJECTIVES OF USING LICENSING

7    IN UNION ACTIVITIES AS YOU UNDERSTOOD THEM BASED ON THOSE 15

8    YEARS?

9    **A.**    NO.

10            **MR. LECLAIR:**  EXCUSE ME, YOUR HONOR.  I OBJECT TO

11   SPECULATION UNLESS THIS WAS ACTUALLY DISCUSSED.

12            **THE COURT:**  NO.  HE CAN GIVE A LAY OPINION ON THIS

13   POINT AND EXPLAIN WHY.  IT IS AN OPINION, AND AT SOME POINT

14   OPINIONS BECOME SPECULATION.

15            YOU HAVE A POINT, MR. LECLAIR.  HE HAS 15 YEARS OF

16   EXPERIENCE TO BASE THIS ON.  AND IT'S UP TO THE JURY TO

17   EVALUATE HOW RELIABLE THE LAY OPINION IS.

18            OVERRULED.

19   **BY MR. KESSLER:**

20   **Q.**    SO COULD YOU PLEASE EXPLAIN TO THE JURY?

21   **A.**    YES.  THIS ISSUE WAS ADDRESSED EVERY YEAR.  SO WHEN WE

22   STARTED THE COMPANY BACK IN 1994, SO EVERY YEAR YOU WOULD GO

23   THROUGH THE FINANCIALS, AND YOU WOULD LOOK AT:  OKAY.  THIS IS

24   HOW MUCH REVENUE CAME IN FROM LICENSING AND MARKETING.  THIS IS

25   HOW IT'S BEING ALLOCATED.

1    SO THE PREMISE FOR THE COMPANY AND THE MISSION FOR

2 THE COMPANY WAS ACTUALLY ADDRESSED EVERY YEAR.  THE BOARD

3 MEMBERS ADDRESSED IT EVERY YEAR.

4    SO WE EVALUATE THE PERFORMANCE OF THE COMPANY AND IS

5 IT DOING WHAT WE WANT IT AS PLAYERS TO DO.

6    AND THERE WOULD BE TIMES WHEN DOUG OR PAT ALLEN WOULD

7 BE QUESTIONED AT LENGTH AND QUITE HEAVILY ABOUT SPECIFIC

8 PERFORMANCE IN DIFFERENT AREAS:  ARE THERE OTHER AREAS WE NEED

9 TO BE LOOKING AT?

10    AND SO, AGAIN, ALL THAT QUESTIONING WAS TO ENSURE

11 THAT THE COMPANY WAS DOING WHAT WE INTENDED TO DO.  WAS IT

12 MEETING THE TWO CRITERIA?

13 **Q.**  NOW, I TAKE IT FROM THE CRITERIA IT WAS SPECIFICALLY

14 DISCUSSED AND VOTED UPON THAT ONLY ACTIVE PLAYERS COULD SHARE

15 IN THE GLR POOL?

16 **A.**  THAT'S RIGHT.

17 **Q.**  NOW, MR. ARMSTRONG, THE GLR POOL MONEY THAT THE ACTIVE

18 PLAYERS SHARED, 40 PERCENT WENT TO THE UNION?

19 **A.**  YES.

20 **Q.**  23 PERCENT WENT TO PLAYERS INC?

21 **A.**  YES.

22 **Q.**  FOR RETIRED PLAYER LICENSING MONEY THAT WAS GENERATED, DID

23 40 PERCENT GO TO THE UNION?

24 **A.**  NO.

25 **Q.**  HOW MUCH WENT TO THE UNION?

1   A.   VIRTUALLY NOTHING.

2   Q.   OKAY.  FOR RETIRED PLAYER LICENSING MONEY, DID 23 PERCENT

3   GO TO PLAYERS INC?

4   A.   NO.

5   Q.   HOW MUCH WENT TO PLAYERS INC?

6   A.   NONE.

7   Q.   OKAY.  WHO GOT THE RETIRED PLAYER LICENSING MONEY?

8   A.   RETIRED PLAYERS.

9   Q.   NOW, MR. ARMSTRONG, IF THERE HAD BEEN A DECISION MADE IN

10  THE UNION WHILE YOU WERE THERE TO GIVE EVERY RETIRED PLAYER AN

11  EQUAL SHARE INTEREST IN THE LICENSING MONEY OF ACTIVE PLAYERS

12  IN THE GLR POOL, WOULD THAT HAVE TO HAVE BEEN PRESENTED TO THE

13  BOARD OF ACTIVE PLAYER REPS FOR APPROVAL?

14  A.   YES.  YES, IT WOULD HAVE HAD TO BEEN PRESENTED TO THE

15  BOARD AND VOTED ON.

16  Q.   OKAY.

17  A.   I CAN TELL YOU THAT THERE WOULD NOT HAVE BEEN MUCH OF A

18  CHANCE THAT THAT WOULD HAVE HAPPENED.

19  Q.   WELL, DON'T SPECULATE WHAT WOULD HAVE HAPPENED.  WAS IT

20  EVER PRESENTED?

21  A.   NO.

22  Q.   WAS IT EVER -- DID ANYONE EVER PROPOSE DOING THAT?

23  A.   NO.

24  Q.   FINALLY, MR. ARMSTRONG, I WOULD LIKE TO ASK YOU NOW ABOUT

25  YOUR OWN SITUATION.

1          YOU TESTIFIED YESTERDAY THAT YOU WERE ON A SUPER BOWL

2    TEAM?

3    **A.**   YES.

4    **Q.**   IS THAT CORRECT?

5    **A.**   YEAH.

6    **Q.**   YOU WERE ON ONE PRO BOWL?

7    **A.**   YES.

8    **Q.**   YOU WERE ALL PRO?

9    **A.**   YES.

10   **Q.**   OKAY.  SINCE YOU'VE -- WHEN DID YOU RETIRE?

11   **A.**   2003.

12   **Q.**   OKAY.  SO THAT WASN'T SO LONG AGO, JUST FIVE YEARS AGO.

13   OKAY.

14          SINCE YOU LEFT THE NFL AS A RETIRED PLAYER, HAS

15   ANYBODY LICENSED YOUR NAME AND IMAGE FOR ANY PRODUCT?

16   **A.**   NO.

17   **Q.**   HAS ANYONE TRIED -- ASKED YOU OR SOUGHT YOU OUT TO LICENSE

18   YOUR NAME AND IMAGE FOR ANY PRODUCT?

19   **A.**   NO.

20   **Q.**   OKAY.  DO YOU GET MANY REQUESTS WHERE YOU'RE RECOGNIZED

21   FOR AUTOGRAPHS TODAY?

22   **A.**   YEAH, SOMETIMES.

23   **Q.**   DO YOU GET AS MUCH AS WHEN YOU FIRST RETIRED?

24   **A.**   NO.

25   **Q.**   DESCRIBE TO THE JURY WHAT YOU PERCEIVE ABOUT YOUR OWN

1   NOTORIETY TO THE PUBLIC SINCE YOU'VE RETIRED?

2   **A.**   I WAS, YOU KNOW, VERY FORTUNATE.  I WAS -- I PLAYED IN

3   GREAT PLACES AND I WAS, I WOULD SAY, A GOOD PLAYER FOR A LONG

4   PERIOD OF TIME IN THE NFL.  WHILE YOU'RE PLAYING IT'S VERY

5   EXCITING.  YOU ARE PART OF SOMETHING THAT IS BIGGER THAN YOU

6   ARE.  IT'S FUN, AND THERE'S A LOT OF NOTORIETY THAT GOES WITH

7   THAT.

8           AND SOME OF THAT FOLLOWS YOU IN YOUR FIRST YEAR OR

9   TWO OUTSIDE THE GAME.  BUT THAT VERY QUICKLY FADES.

10          AND I'M 43.  I'VE BEEN OUT OF THE GAME FIVE YEARS.

11  AND NOW MY TIME AS A PLAYER IS JUST AN INTERESTING CHAPTER IN

12  MY LIFE.

13          I HAVE KIDS.  I GO TO THEIR GAMES.  I GO TO THEIR

14  SCHOOLS.  NOBODY TREATS ME ANY DIFFERENTLY.  NOBODY ASKS FOR

15  AUTOGRAPHS.

16          AGAIN, IT'S JUST SOMETHING INTERESTING I USED TO DO.

17  **Q.**   DO YOU THINK THE LICENSING OF YOUR NAME OR IMAGE HAS ANY

18  MATERIAL ECONOMIC VALUE?

19  **A.**   NO.

20  **Q.**   DOES THAT SURPRISE YOU?

21  **A.**   NO.

22          **MR. KESSLER:**  THANK YOU, MR. ARMSTRONG.  I HAVE NO

23  FURTHER QUESTIONS AT THIS TIME.

24          **THE COURT:**  MR. LECLAIR, CROSS EXAMINATION.

25          **MR. LECLAIR:**  THANK YOU, YOUR HONOR.

1                       **CROSS EXAMINATION**

2    **BY MR. LECLAIR:**

3    **Q.**   GOOD MORNING, MR. ARMSTRONG.

4    **A.**   GOOD MORNING.

5    **Q.**   MR. ARMSTRONG, DURING YOUR TENURE -- YOU WERE THE

6    PRESIDENT OF THE UNION FOR EIGHT YEARS, CORRECT?

7    **A.**   YES.

8    **Q.**   AND DURING YOUR TENURE DID YOU WORK CLOSELY WITH GENE

9    UPSHAW, DOUG ALLEN AND RICHARD BERTHELSEN?

10   **A.**   I DID.

11   **Q.**   DID YOU REMAIN CLOSE TO GENE UPSHAW AFTER YOU LEFT THE

12   PRESIDENCY?

13   **A.**   I DID.

14   **Q.**   AS A MATTER OF FACT, YOU SPOKE AT HIS FUNERAL, DIDN'T YOU,

15   SIR?

16   **A.**   I DID.

17   **Q.**   DOES CREATIVE ARTISTS AGENCY -- BY THE WAY, THAT'S A VERY

18   LARGE TALENT AGENCY, IS IT NOT, SIR?

19   **A.**   YES.

20   **Q.**   ONE OF THE BIGGEST IN THE COUNTRY?

21   **A.**   YES, I IMAGINE.

22   **Q.**   DO THEY REPRESENT PROFESSIONAL FOOTBALL PLAYERS?

23   **A.**   YES.  THERE'S A DIVISION OF THE COMPANY THAT DOES.

24   **Q.**   AN ENTIRE DIVISION REPRESENTING FOOTBALL PLAYERS?

25   **A.**   RIGHT.

1   **Q.**   OKAY.  DOES --

2   **A.**   THERE'S ALSO ONE REPRESENTING TV ACTORS, MUSICIANS.

3   **Q.**   RIGHT.  SO, IN OTHER WORDS, IT'S A VERY LARGE AGENCY.  BUT

4   ONE OF THE DIVISIONS IS REPRESENTATION OF PROFESSIONAL FOOTBALL

5   PLAYERS?

6   **A.**   UH-HUH.

7   **Q.**   ALTHOUGH YOU SAID YOU PERSONALLY DON'T REPRESENT ANY

8   FOOTBALL PLAYERS?

9   **A.**   I DO NOT.

10  **Q.**   ALL RIGHT.  DO GOOD RELATIONSHIPS WITH THE UNION HELP IN

11  CONNECTION WITH REPRESENTATION OF PROFESSIONAL FOOTBALL

12  PLAYERS?

13  **A.**   I DON'T KNOW THAT IT HELPS OR HURTS.

14  **Q.**   ALL RIGHT, SIR.  NOW, YOU RETIRED AFTER THE 2003 SEASON;

15  IS THAT CORRECT, SIR?

16  **A.**   YES.

17  **Q.**   AND JUST -- THE JURY MAY NOT KNOW THIS.  YOU DID NOT

18  ACTUALLY SIGN THE GLA WHICH IS AT ISSUE IN THIS CASE, CORRECT?

19  **A.**   I SIGNED A -- I SIGNED MANY GLA'S.  I DON'T KNOW WHICH ONE

20  YOU'RE REFERRING TO, SPECIFICALLY.

21  **Q.**   WELL, THE ONE -- I THINK YOU HAVE IT IN FRONT OF YOU, I

22  HOPE, EXHIBIT 1164-3.

23          OKAY.  I'M SORRY.  I'VE GOT IT.

24  **A.**   NO.

25          **MR. LECLAIR:**  MAY I APPROACH, YOUR HONOR?

1  **BY MR. LECLAIR:**

2  **Q.**   MY APOLOGIES, SIR.

3  **A.**   UH-HUH.

4  **Q.**   IS THIS THE -- OUR INFORMATION IS THIS IS THE GLA YOU

5  SIGNED AFTER YOU RETIRED.

6  **A.**   YES.

7  **Q.**   ALL RIGHT, SIR.

8           **MR. LECLAIR:**  I'LL MOVE THE ADMISSION OF EXHIBIT

9  1164-3, YOUR HONOR.

10          **MR. KESSLER:**  NO OBJECTION.

11          **THE COURT:**  RECEIVED.

12          (TRIAL EXHIBIT 1164-3 RECEIVED IN EVIDENCE.)

13          **MR. LECLAIR:**  AND IF WE COULD BLOW THIS UP.

14          (DOCUMENT DISPLAYED.)

15  **BY MR. LECLAIR:**

16  **Q.**   YOU SIGNED THIS ON APRIL 11, 2006, MR. ARMSTRONG; IS THAT

17  CORRECT?

18  **A.**   YES.

19  **Q.**   AND IS THAT BECAUSE YOUR ACTIVE PLAYER GLA REMAINED IN

20  EFFECT, OR DID YOU HAVE A PERIOD OF TIME WHEN YOU DIDN'T SIGN

21  ANY GLA?

22  **A.**   I BELIEVE THERE WAS A PERIOD OF TIME WHEN I DIDN'T SIGN A

23  GLA.

24  **Q.**   ALL RIGHT, SIR.  AND THIS GLA -- ACTUALLY, THE JURY IS

25  VERY FAMILIAR WITH THE GLA AT ISSUE IN THIS CASE.

1          THIS ONE IS THE ONE THAT WAS PUT INTO PLACE IN LATE

2   2005, STARTED BEING USED.  WERE YOU AWARE OF THAT, SIR?

3   **A.**   YES.

4   **Q.**   THAT THERE WAS A CHANGE IN THE GLA?

5   **A.**   UHM, I KNEW THERE WAS A NEW DOCUMENT, YES.

6   **Q.**   OKAY.  AND, FOR EXAMPLE, THIS DOCUMENT HAS NO LANGUAGE IN

7   IT ABOUT DIVIDING MONEY BETWEEN THE PLAYER AND AN ESCROW

8   ACCOUNT FOR ALL ELIGIBLE NFLPA MEMBERS.  DID YOU KNOW THAT

9   CHANGE HAD BEEN MADE?

10  **A.**   YES.

11  **Q.**   SO THE REASON THAT YOU'RE NOT A MEMBER OF THE CLASS IS YOU

12  NEVER SIGNED THE GLA THAT HAS THE LANGUAGE ABOUT DIVIDING THE

13  MONEY BETWEEN THE PLAYER AND AN ESCROW ACCOUNT FOR ELIGIBLE

14  NFLPA MEMBERS, CORRECT?

15  **A.**   YES.

16  **Q.**   OKAY.  NOW, I WANT TO ASK YOU --

17        **MR. LECLAIR:**  YOU CAN TAKE THAT OFF THE SCREEN.

18  **BY MR. LECLAIR:**

19  **Q.**   I WANT TO ASK YOU, MR. ARMSTRONG, ABOUT THE DISCUSSIONS AT

20  THE BOARD.  AND LET'S FOCUS ON THE GLA AT ISSUE IN THIS CASE.

21  DO YOU KNOW THAT IT WAS PUT INTO EFFECT, THE LANGUAGE OF IT WAS

22  PUT INTO EFFECT IN 2001?

23  **A.**   I'M FAMILIAR WITH THE DOCUMENT.

24  **Q.**   ALL RIGHT, SIR.

25        AND AT THE TIME THAT THE BOARD CONSIDERED IN -- LET'S

1   TAKE 2001.  AT THE TIME THE BOARD CONSIDERED THE ISSUE OF THE

2   DIVISION OF LICENSING REVENUES, THE 37/23/40, DID ANYBODY, GENE

3   UPSHAW, DOUG ALLEN OR ANYBODY RAISE AT THE BOARD THE QUESTION

4   OF WHETHER A RETIRED PLAYER MIGHT BE ENTITLED TO SHARE IN THAT

5   REVENUE UNDER THE GLA THAT'S AT ISSUE IN THIS CASE?

6   **A.**    THAT WAS NEVER -- NEVER BROUGHT UP SPECIFICALLY.  BUT --

7   **Q.**    THAT'S FINE, SIR.  THAT'S ALL I NEED TO KNOW.  IT WAS

8   NEVER BROUGHT UP SPECIFICALLY.

9           AND, IN FACT, IS IT TRUE, SIR, THAT NOBODY EVER EVEN

10  SUGGESTED THAT RETIRED PLAYERS WHO SIGNED THE GLA AT ISSUE IN

11  THIS CASE WOULD BE ENTITLED TO SHARE IN THAT MONEY?  IS THAT

12  TRUE, SIR?

13  **A.**    WELL, THE PEOPLE THAT WOULD HAVE HAD TO SUGGEST IT WOULD

14  HAVE BEEN THE BOARD.  THE BOARD WOULD HAVE HAD TO SUGGEST THAT

15  RETIRED PLAYERS PARTICIPATE IN THAT POOL.

16  **Q.**    RIGHT.  AND AS FAR AS YOU CAN RECALL, NOBODY EVEN RAISED

17  THE QUESTION AT THE BOARD MEETING 2001, CORRECT?

18  **A.**    THAT'S CORRECT.

19  **Q.**    AND, IN FACT, NOBODY RAISED THAT QUESTION IN 2002 OR '3

20  WHILE YOU WERE ON THE BOARD; IS THAT TRUE, SIR?

21  **A.**    THAT'S CORRECT.

22  **Q.**    IS IT TRUE, SIR, THAT IT WAS THE UNION THAT RECOMMENDED

23  THE 37/23/40 SPLIT IN THE FIRST INSTANCE?

24  **A.**    NO.  IT WAS DONE WITH -- UNDER THE ADVICE OF OUTSIDE

25  COUNSEL.

1  Q.  WELL, I UNDERSTAND, SIR.  I DON'T WANT TO GET INTO

2  PRIVILEGED MATTERS.  BUT WOULD WHATEVER ADVICE -- AND I TAKE IT

3  THIS WAS ADVICE SOUGHT BY THE ACTUAL EXECUTIVES THAT RAN THE

4  UNION DAY-TO-DAY, THAT BEING GENE UPSHAW, DOUG ALLEN AND THAT

5  GROUP, CORRECT?

6  A.  IT WAS DONE UNDER THE ADVICE OF OUTSIDE COUNSEL AND

7  PRESENTED TO THE BOARD BY OUTSIDE COUNSEL.

8  Q.  ALL RIGHT.

9  A.  SO THESE PERCENTAGES WERE DEBATED FAIRLY INTENSELY ON WHAT

10  WOULD BE APPROPRIATE AS FAR AS ACCOMPLISHING THE TWO

11  OBJECTIVES.

12  Q.  ALL RIGHT.  YOU'RE TALKING NOW, ARE YOU NOT, SIR, ABOUT

13  1994?  WHAT TIME PERIOD ARE YOU TALKING ABOUT?

14  A.  WELL, EVERY YEAR IT WAS ADDRESSED.

15  Q.  ALL RIGHT.

16  A.  EVERY YEAR IT WAS ADDRESSED.  THERE WOULD BE -- IF YOU

17  LOOK BACK IN THE BUDGET THAT WE LOOKED AT YESTERDAY, THERE

18  WOULD BE A FLOW CHART AND -- AN ORGANIZATIONAL FLOW CHART.  AND

19  IT WOULD SHOW HOW REVENUE GENERATED BY INC, WHERE IT WENT, HOW

20  IT WENT.  AND SO THAT WAS CLOSELY EXAMINED EVERY YEAR.

21  Q.  ALL RIGHT, SIR.  AND WOULD YOU AGREE WITH ME,

22  MR. ARMSTRONG, THAT IT WOULD HAVE BEEN ADVERSE TO THE INTERESTS

23  OF THE ACTIVE PLAYERS THAT YOU REPRESENTED IF YOU DECIDED TO GO

24  AGAINST THE UNION RECOMMENDATION?

25          MR. FEHER:  WELL, IT --

1    **MR. KESSLER:** YOUR HONOR I HAVE AN OBJECTION TO THE

2  FORM. AGAIN, "THE UNION RECOMMENDATION"? THE ACTIVE PLAYERS

3  ARE THE UNION? I DON'T UNDERSTAND THE QUESTION.

4    **THE COURT:** WELL, DOES THE WITNESS UNDERSTAND THE

5  QUESTION?

6    **THE WITNESS:** WELL, IT -- FOR SOMETHING TO HAVE

7  CHANGED IT WOULD HAVE HAD TO HAVE COME FROM THE BOARD. THE

8  BOARD WOULD HAVE HAD TO SAY -- AND THOSE ARE ACTIVE PLAYERS.

9  IT WOULD HAVE HAD TO COME TO THE BOARD. THEY WOULD SAY:

10    "WE WANT TO CHANGE THIS."

11 **BY MR. LECLAIR:**

12 **Q.** ALL RIGHT, SIR. ALL I'M ASKING IS A PRETTY SIMPLE

13 QUESTION, WHICH IS: IF YOU DECIDED TO GO AGAINST WHAT HAD BEEN

14 RECOMMENDED BY WHOEVER IT WAS, TAX COUNSEL, WHOEVER, WOULD THAT

15 HAVE BEEN ADVERSE TO THE INTERESTS OF THE ACTIVE PLAYERS YOU

16 REPRESENTED?

17 **A.** YOU'RE ASKING IF I DECIDED?

18 **Q.** IF YOU VOTED AGAINST IT.

19 **A.** I DIDN'T -- DURING THAT TIME I WAS THE PRESIDENT. I

20 DIDN'T HAVE A VOTE.

21 **Q.** OKAY. FAIR ENOUGH. IF YOU DECIDED TO RECOMMEND AGAINST

22 IT, WOULD THAT HAVE BEEN ADVERSE TO THE INTERESTS OF THE ACTIVE

23 PLAYERS THAT YOU WERE REPRESENTING?

24 **A.** IT WOULD HAVE GONE AGAINST THE OBJECTIVES FOR STARTING THE

25 COMPANY.

1  Q.   ALL RIGHT.  THAT'S NOT QUITE MY QUESTION, SO LET ME ASK IT

2  AGAIN.

3          WOULD IT HAVE BEEN ADVERSE TO THE INTERESTS OF THE

4  ACTIVE PLAYERS THAT YOU REPRESENTED?

5  A.   I THINK IT COULD BE, YES.

6  Q.   ALL RIGHT, SIR.

7          NOW, WOULD YOU AGREE WITH ME, MR. ARMSTRONG, THAT IF

8  THIS -- THE 63 PERCENT THAT'S BEING RETAINED BY THE UNION,

9  OKAY, YOU'VE GOT 40 PERCENT GOING TO THE NFLPA AND 23 PERCENT

10  TO PLAYERS INC, ALL RIGHT?

11          IF THAT 63 PERCENT IS SUPPOSED TO BE USED FOR A

12  STRIKE FUND FOR THE FUTURE, THAT WOULD BE OF NO BENEFIT TO

13  RETIRED PLAYERS; IS THAT TRUE, SIR?

14  A.   NO, THAT'S NOT TRUE.  AND I'D LIKE TO ADDRESS YOUR EARLIER

15  POINT ABOUT -- YOU'RE KIND OF LUMPING TOGETHER THE 40 PERCENT

16  AND THE 23 PERCENT.

17          40 PERCENT WAS UPSTREAM TO THE UNION.  AND, AGAIN,

18  THAT WAS TO PROVIDE FOR LONG-TERM SECURITY.

19          THE 23 PERCENT HAD TO BE RETAINED BY PLAYERS INC

20  BECAUSE WE WERE ADVISED UNDER TAX LAW --

21  Q.   DON'T INTERJECT, BUT I DON'T THINK THAT YOU SHOULD BE

22  TALKING ABOUT YOUR PRIVILEGED CONVERSATIONS WITH YOUR TAX

23  COUNSEL.

24          **MR. KESSLER:**  ACTUALLY, THE TAX ADVICE OF THIS

25  SUBJECT HAS BEEN THE SUBJECT OF DEPOSITION, SO WE DID NOT

1    ASSERT OBJECTION AS TO WHAT THIS SPECIFIC TAX ADVICE IS.

2           **MR. LECLAIR:**  YOUR HONOR, WE'RE GOING TO HAVE TO TAKE

3    THAT UP OUTSIDE THE PRESENCE OF THE JURY.  I DISAGREE.  I WAS

4    THE ONE WHO TOOK THAT DEPOSITION.  I THINK THEY ASSERTED

5    PRIVILEGE ON THE COMMUNICATION, SO ...

6           **THE COURT:**  I CAN'T RESOLVE THAT WITHOUT SEEING THE

7    DEPOSITION, SO IF YOU WANT TO LIMIT FOR THE TIME BEING YOUR

8    QUESTIONS TO THINGS THAT DIDN'T COME FROM TAX COUNSEL, YOU'RE

9    THE ONE FRAMING THE QUESTION.  SO JUST DO SO.

10          **MR. LECLAIR:**  THAT'S FINE.

11   **BY MR. LECLAIR:**

12   **Q.**   CAN YOU ANSWER WITHOUT ADVICE OF TAX COUNSEL?

13   **A.**   THE 23 PERCENT, PLAYERS INC HAD TO BE A VIABLE,

14   STAND-ALONE COMPANY.  AND SO IT HAD TO HAVE -- WE HAD TO PAY

15   STAFF SALARIES.  SO AT THE END OF THE DAY YOU WANTED TO BE ABLE

16   TO LOOK AT PLAYERS INC AND SAY:

17               "OKAY.  IS IT GENERATING REVENUE?"

18          IT HAD TO PAY ITS OWN EXPENSES.  IT HAD TO HAVE SOME

19   RETAINED EARNINGS TO INVEST IN OPERATIONS FOR THE FOLLOWING

20   YEAR.  SO THE 23 PERCENT WAS RETAINED FOR THE OPERATION OF

21   PLAYERS INC.

22   **Q.**   ALL RIGHT, SIR.  LET'S TALK ABOUT THE 40 PERCENT, THEN.

23   **A.**   YES.

24   **Q.**   IF THE 40 PERCENT -- YOU HAD DUES THAT YOU BUILT UP FOR

25   THE -- FOR A STRIKE FUND, RIGHT?  DIDN'T YOU TALK ABOUT THAT

1    YESTERDAY?

2    **A.**    UHM, YES, WE DID HAVE DUES.

3    **Q.**    AND, IN FACT, DIDN'T YOU SAY THAT THAT WASN'T ENOUGH, AND,

4    THEREFORE, RETAINING THE LICENSING REVENUES, THE 40 PERCENT,

5    WAS FOR THAT PURPOSE, AS WELL?

6    **A.**    YES.

7    **Q.**    ALL RIGHT.  AND MY QUESTION TO YOU, SIR, BACK TO THE

8    QUESTION IS:  ISN'T IT TRUE THAT IF THAT'S THE PURPOSE, THAT

9    DOESN'T BENEFIT RETIRED PLAYERS?

10   **A.**    NO.  IT ABSOLUTELY DOES.

11           WHEN WE STARTED -- IN 1993, PRIOR TO FORMATION OF

12   PLAYERS INC, WE HAD JUST WON A LONG BATTLE WITH MANAGEMENT, AND

13   WERE ABLE TO SECURE THINGS LIKE FREE AGENCY, A PERCENT OF THE

14   GROSS.  IT WAS A REAL VICTORY FOR PLAYERS.

15           WE KNEW THAT -- THE FINANCIAL STRAIN THAT THAT FIGHT

16   PUT ON THE ORGANIZATION, AND WE KNEW THAT DUES ALONE WOULDN'T

17   BE ENOUGH TO FUND ANOTHER FIGHT.

18           IN 1993, WE WENT BACK -- AS PART OF THAT COLLECTIVE

19   BARGAINING AGREEMENT, WE WENT BACK AND MADE SIGNIFICANT CHANGES

20   TO OUR BENEFIT SYSTEM THAT BENEFITED RETIRED PLAYERS.

21           WHEN THE AGREEMENTS WERE REDONE LATER, IN '95, AND

22   SUBSEQUENT COLLECTIVE BARGAINING AGREEMENTS, WE WENT BACK AND

23   SIGNIFICANTLY IMPROVED BENEFITS FOR RETIRED PLAYERS.

24           WHAT ALLOWED US TO DO THAT WAS THE LEVERAGE WE HAD OF

25   HAVING A WAR CHEST, HAVING CAPITAL.

1          WE TALKED MANY TIMES ABOUT LEADERSHIP, LEVERAGE,

2   RESOURCES.  TO BE SUCCESSFUL AS A UNION, YOU HAVE TO HAVE ALL

3   THREE.  RESOURCES AND LEVERAGE OFTENTIMES COME FROM FUNDS.

4          IF YOU LOOK AT A UNION YOU'RE FIGHTING THE COLLECTIVE

5   RESOURCES OF 32 CLUBS THAT ARE VALUED AT OVER A BILLION

6   DOLLARS.  SO THAT MONEY VERY MUCH BENEFITED RETIRED PLAYERS.

7   **Q.**   SO IN YOUR VIEW, IT WAS NECESSARY TO RETAIN EVERY BIT OF

8   IT SO YOU HAD MAXIMUM LEVERAGE?

9   **A.**   YES.

10  **Q.**   ARE YOU AWARE, SIR, THAT DURING THE CLASS PERIOD MILLIONS

11  OF DOLLARS OF DUES WERE REBATED TO ACTIVE PLAYERS?

12  **A.**   YES.

13  **Q.**   SO, IN OTHER WORDS, YOU WERE GIVING BACK THE DUES TO THE

14  ACTIVE PLAYERS DURING THAT SAME TIME PERIOD, RIGHT?

15  **A.**   YES, WE DID REBATE DUES.

16  **Q.**   WHILE YOU WERE RETAINING THE LICENSING MONEY, YOU WERE

17  REBATING THE DUES, CORRECT?

18  **A.**   YES.

19  **Q.**   ALL RIGHT, SIR.

20         DID ANYBODY SUGGEST AT ANY TIME -- LET'S FOCUS ON THE

21  PERIOD 2001 THROUGH 2003, WHILE THIS RETIRED PLAYER GLA AT

22  ISSUE WAS IN EFFECT.

23         DID ANYBODY SUGGEST THAT THERE MIGHT BE A POSSIBILITY

24  OF A CONFLICT OF INTEREST FOR THE UNION AND THE BOARD

25  CONCERNING THE INTERESTS OF ACTIVE PLAYERS ON THE ONE HAND, AND

1  RETIRED PLAYERS ON THE OTHER HAND?

2  **A.**    NO.  WE ALWAYS FELT LIKE THEY WERE RELIANT.  WE KNEW THAT

3  YOU'RE ALWAYS ONE PLAY AWAY FROM BEING A RETIRED PLAYER.  AND

4  THAT'S WHY THE MANTRA OF OUR UNION IS "PAST, PRESENT AND

5  FUTURE."

6         AND THAT'S WHY IN EVERY COLLECTIVE BARGAINING

7  AGREEMENT EVERY OPPORTUNITY WE HAD TO ADVANCE BENEFITS FOR OUR

8  RETIRED PLAYERS WE DID THAT.

9         AS AN EXAMPLE, LAST YEAR, IF YOU WATCHED ANY NFL

10 FOOTBALL, EVERY PLAYER YOU SAW ON THE FIELD LAST YEAR GAVE

11 ABOUT $84,000 OUT OF HIS POCKET FOR BENEFITS FOR RETIRED

12 PLAYERS.  THAT'S HOW PASSIONATELY WE FEEL ABOUT IT IN THE

13 ORGANIZATION.

14 **Q.**    SIR, DID YOU CONSIDER -- DID ANYBODY SUGGEST THAT THERE

15 WAS ANY POTENTIAL CONFLICT OF INTEREST WHEN YOU SET THE

16 ELIGIBILITY CRITERIA EVERY YEAR, RELATED TO THE RETIRED PLAYER

17 GLA?

18 **A.**    NO.

19 **Q.**    ALL RIGHT, SIR.

20        IS IT CORRECT THAT NOBODY SUGGESTED AT THE MEETING,

21 2001 THROUGH 2003, THAT THERE SHOULD BE ANY SHARING UNDER THE

22 RETIRED PLAYER GLA AT ISSUE IN THIS CASE?

23 **A.**    I'M NOT SURE I UNDERSTAND YOUR QUESTION.

24 **Q.**    IN OTHER WORDS, NOBODY BROUGHT UP, GENE UPSHAW, DOUG

25 ALLEN, NOBODY BROUGHT UP THE QUESTION TO THE BOARD AND SAID:

1              "GEE, UNDER THIS RETIRED PLAYER GLA LANGUAGE

2     THERE MIGHT BE A QUESTION ABOUT WHETHER THERE SHOULD BE A

3     SHARING WITH THE RETIRED PLAYERS OF THIS GROUP LICENSING

4     MONEY"?

5     **A.**   UHM, NO.  NO.  IT WAS NOT BROUGHT UP.

6     **Q.**   ALL RIGHT, SIR.

7              THE -- WHEN YOU WENT -- I CHANGING SUBJECTS NOW,

8     MR. ARMSTRONG.

9              WHEN YOU WENT TO CHICAGO IN 1989, IS IT TRUE, SIR,

10    THAT THE CITY OF CHICAGO HAD A GREAT AFFINITY FOR SOME OF THE

11    VINTAGE CHICAGO BEARS TEAMS WHO HAD PLAYED?

12    **A.**   SURE.

13    **Q.**   FOR EXAMPLE, THE '85 BEARS ARE REGARDED AS ONE OF THE BEST

14    TEAMS IN THE HISTORY OF FOOTBALL?

15    **A.**   UH-HUH.

16    **Q.**   AND DID THE FANS OF CHICAGO HAVE AN AFFINITY FOR THAT

17    TEAM, BASED ON BEING IN THE CITY OF CHICAGO AND HOW THEY FELT

18    ABOUT THAT TEAM?

19    **A.**   YES.

20    **Q.**   AND WHEN YOU WENT TO MIAMI AND PLAYED FOR MIAMI, AND YOU

21    DID THAT IN WHAT YEAR, SIR?

22    **A.**   WOULD HAVE BEEN 1995.

23    **Q.**   DID PEOPLE STILL TALK ABOUT THE UNDEFEATED '72 MIAMI

24    DOLPHINS?

25    **A.**   YES.

1  Q.   AND THIS IS 23 YEARS LATER, PEOPLE WERE STILL TALKING

2  ABOUT A TEAM THAT PLAYED IN '72, CORRECT, SIR?

3  A.   YES.

4  Q.   WHEN YOU RETIRED, YOU PLAYED IN '02 WITH THE OAKLAND

5  RAIDERS, CORRECT?

6  A.   YES.

7  Q.   DID YOU KNOW THAT AFTER YOU RETIRED THAT THE '02 OAKLAND

8  RAIDERS WERE ACTUALLY A VINTAGE TEAM IN THE MADDEN FOOTBALL

9  GAME?

10  A.   NO.

11  Q.   DID YOU KNOW THAT YOUR TEAM IN '02 -- DID YOU KNOW IN '02

12  IT WAS IN THE MADDEN FOOTBALL GAME AS AN ACTIVE TEAM?

13  A.   I'VE SEEN -- MY KIDS PLAY THAT GAME, SO I HAVE SEEN THE

14  GAME.

15  Q.   BUT YOU DIDN'T KNOW THAT YOU COULD PLAY THE '02 OAKLAND

16  RAIDERS IN THE '03 MADDEN FOOTBALL GAME?

17  A.   NO.

18  Q.   DID YOU KNOW THAT YOU AND YOUR TEAMMATES WERE SCRAMBLED IN

19  THE '03 VERSION VERSUS HOW YOU LOOKED IN THE '02 VERSION?

20  A.   I DIDN'T SEE THE GAME, SO I DON'T KNOW IF I WAS SCRAMBLED

21  OR NOT.

22  Q.   ALL RIGHT, SIR.  NOW, MR. KESSLER ASKED YOU A QUESTION

23  ABOUT AD HOC MONEY AND DEDUCTIONS FROM AD HOC MONEY.  AND I'D

24  LIKE TO BE SURE THE RECORD ISN'T MISLEADING ON THAT.

25          YOU SAID RETIRED PLAYER MONEY, THERE'S NO DEDUCTIONS

1    OR VERY FEW DEDUCTIONS FROM AD HOC MONEY.

2              ISN'T IT TRUE, SIR, THAT ACTIVE PLAYERS GET A TON OF

3    AD HOC PAYMENTS?

4    **A.**   YES.

5    **Q.**   AND HOW MUCH IS DEDUCTED FROM THE ACTIVE AD HOC PAYMENTS?

6    **A.**   UHM, IT WOULD DEPEND, I THINK, ON THE PROGRAM.

7    **Q.**   ISN'T IT TRUE, SIR, THAT LITTLE OR NOTHING IS DEDUCTED

8    FROM ACTIVE AD HOC PAYMENTS?

9    **A.**   YES.  THE INTENT IS THAT MOST OF THE MONEY GOES TO THE

10   PLAYERS THAT EARNED IT.

11   **Q.**   EXACTLY RIGHT.  AND YOU TALKED ABOUT THE 35 OR FEWER.  SO

12   IF 35 OR FEWER ARE USED, IT'S AD HOC AND PAID DIRECTLY TO THE

13   ACTIVE PLAYERS, CORRECT, SIR?

14   **A.**   YES.

15   **Q.**   AND, IN FACT, ISN'T IT TRUE, SIR, THAT MUCH MORE MONEY

16   WENT TO THE ACTIVE PLAYERS FOR AD HOC PAYMENTS THAN WENT TO THE

17   RETIRED PLAYERS IN ANY GIVEN YEAR?

18   **A.**   YES.

19   **Q.**   FINALLY, MR. ARMSTRONG, ISN'T IT TRUE THAT YOU ARE A

20   CANDIDATE TO REPLACE GENE UPSHAW AS HEAD OF THE UNION?

21   **A.**   WELL, ULTIMATELY, THE PLAYERS WILL DECIDE WHO THE

22   CANDIDATES ARE.

23   **Q.**   HAS IT BEEN PUBLICLY REPORTED, SIR, THAT YOU ARE THE

24   LEADING CANDIDATE TO BE THE PRESIDENT OF THE UNION?

25   **A.**   UHM --

1    **Q.**   I'M SORRY.  NOT THE PRESIDENT OF THE UNION.  I'M SORRY.

2    THE EXECUTIVE DIRECTOR OF THE UNION?

3    **A.**   MY NAME HAS BEEN MENTIONED IN THE MEDIA.

4    **Q.**   WELL, HAS IT BEEN MENTIONED AS THE LEADING CANDIDATE?

5    **A.**   YOU WOULD HAVE TO SHOW ME A PUBLICATION.  I THINK IT

6    DEPENDS ON THE PUBLICATION.

7              **MR. KESSLER:**  YOUR HONOR, I JUST OBJECT.  WHAT

8    DIFFERENCE DOES IT MAKE WHAT THE MEDIA SAID AS TO WHO'S

9    LEADING?  HE DOESN'T RECALL WHETHER THEY SAID IT OR NOT.

10             **MR. LECLAIR:**  CAN I SHOW IT TO HIM TO REFRESH HIS

11   RECOLLECTION, YOUR HONOR?

12             **THE COURT:**  GO AHEAD.

13   **BY MR. LECLAIR:**

14   **Q.**   WERE YOU MENTIONED AS A LEADING CANDIDATE?

15   **A.**   IN THIS ARTICLE, YES.

16   **Q.**   OKAY.  AND CAN YOU TELL US WHO THAT ARTICLE IS WRITTEN BY?

17   **A.**   LET'S SEE --

18   **Q.**   OR WHAT ENTITY, WHAT SPORTS ORGANIZATION?

19   **A.**   ESPN.

20             **MR. LECLAIR:**  ALL RIGHT, SIR.

21             I HAVE NO FURTHER QUESTIONS.

22             **MR. KESSLER:**  I JUST HAVE A FEW, YOUR HONOR.

23             **THE COURT:**  GO AHEAD.

24

25

1                        **REDIRECT EXAMINATION**

2   **BY MR. KESSLER:**

3   Q.   MR. ARMSTRONG, YOU WERE ASKED ABOUT WHETHER IT WAS EVER

4   SUGGESTED THAT THE RETIRED PLAYERS GLA SHOULD -- WELL,

5   WITHDRAWN.

6         YOU WERE ASKED WHETHER IT WAS EVER SUGGESTED AT A

7   MEETING THAT THE RETIRED PLAYERS SHOULD SHARE IN THE GROSS

8   LICENSING REVENUE POOL.  DO YOU RECALL THOSE QUESTIONS?

9   A.   YES.

10  Q.   OKAY.  WAS THERE ANY RETIRED PLAYER MONEY IN THE GROSS

11  LICENSING REVENUE POOL?

12  A.   NO.

13  Q.   IN YOUR EXPERIENCE AND JUDGMENT, WOULD THERE BE ANY REASON

14  FOR ANYONE TO MAKE SUCH A SUGGESTION?

15  A.   NO.

16  Q.   NOW, YOU ALSO GOT ASKED ABOUT THE REBATING OF ACTIVE

17  PLAYER DUES.

18        HOW MANY YEARS WOULD THE DUES BE KEPT BEFORE THEY

19  WOULD BE REBATED?

20  A.   IT WAS A FIVE-YEAR POOL.  AND WE DID THAT SO A PLAYER

21  WOULD PAY -- LET'S SAY HE CAME IN THE LEAGUE, AND HE PAID DUES

22  HIS FIRST YEAR.  THOSE DUES WOULD NOT BE REBATED UNTIL AFTER

23  HIS FIFTH YEAR.

24        AND SO DUES THAT WOULD BE PAID IN HIS SECOND YEAR

25  WOULD BE AFTER THE SIXTH SEASON OR SEVENTH SEASON.  SO IT WAS A

1    FIVE-YEAR ROLLING POOL.  SO THE UNION HELD THOSE DUES FOR A

2    PERIOD OF FIVE YEARS.  THAT GAVE US, AGAIN, A ROLLING POOL OF

3    FUNDS, IN CASE WE NEEDED IT WITH MANAGEMENT.

4              AND WHEN WE STARTED, WHEN WE CREATED THAT POOL, THAT

5    ALLOWED US, I BELIEVE, IN 1998 TO MAKE SIGNIFICANT GAINS IN

6    COLLECTIVE BARGAINING.  AS SOON AS WE ANNOUNCED WE WERE DOING

7    THAT WE GOT A CALL FROM MANAGEMENT LITERALLY HOURS AFTER OUR

8    BOARD MEETING IN HAWAII, AND WE WERE ABLE TO GET CONCESSIONS.

9    SO THE INTENDED EFFECT WAS POWERFUL.

10   **Q.**   NOW, HOW MUCH WERE THE ACTIVE PLAYER DUES AT THE TIME YOU

11   WERE THERE?

12   **A.**   $5,000 A YEAR.

13   **Q.**   WERE THEY SUBSEQUENTLY RAISED; DO YOU KNOW?

14   **A.**   YES.

15   **Q.**   WHAT DID THEY BECOME?

16   **A.**   10,000.

17   **Q.**   NOW, DO YOU KNOW HOW MUCH DUES WERE TO BE A RETIRED MEMBER

18   OF THE NFLPA?

19   **A.**   YES.  I BELIEVE IT WAS A HUNDRED DOLLARS.

20   **Q.**   AND WAS $50 OF THAT REBATED?

21   **A.**   YES.

22   **Q.**   SO IT WAS A NET TOTAL OF $50?

23   **A.**   YES.

24   **Q.**   OKAY.  WAS THAT SUFFICIENT TO FUND THE RETIRED PLAYER

25   DEPARTMENT AND SERVICES?

1  **A.**   NO.

2  **Q.**   OKAY.  WHEN THE 40 PERCENT OF THE GLR POOL WAS USED FOR

3  THE UNION, DID ANY OF THAT GO TO FUND THE RETIRED PLAYER

4  DEPARTMENT?

5  **A.**   YES, ABSOLUTELY.

6  **Q.**   OKAY.  SO THE QUESTION YOU WERE ASKED ABOUT WHETHER OR NOT

7  ANY OF THAT 40 PERCENT BENEFITED THE RETIRED PLAYERS, DID IT?

8  **A.**   YES.

9  **Q.**   DID ANYONE THE WHOLE TIME YOU WERE A PLAYER REP, THAT YOU

10  WERE PRESIDENT, DID ANYONE -- DID YOU HEAR ANY RETIRED PLAYER

11  EVER SUGGEST TO YOU IN ANY FORM, ANY SITUATION, THAT BECAUSE

12  THEY HAD SIGNED THE RETIRED PLAYER GLA, THEY WERE ENTITLED TO A

13  SHARE OF THE ACTIVE PLAYER LICENSING MONEY IN THE GLR POOL?

14  **A.**   NO, THEY DID NOT, NOT EVER.

15  **Q.**   DID YOU EVER HEAR ANYONE IN THE WORLD SUGGEST THAT, UNTIL

16  AFTER THIS LAWSUIT WAS FILED?

17  **A.**   NO.

18          **MR. KESSLER:**  I HAVE NO FURTHER QUESTIONS.

19                    <u>**RECROSS EXAMINATION**</u>

20  **BY MR. LECLAIR:**

21  **Q.**   MR. ARMSTRONG, YOU BROUGHT IN THE QUESTION OF THESE

22  INCREASES IN BENEFITS TO RETIRED PLAYERS.  YOU UNDERSTAND, SIR,

23  YOU DO NOT, THERE IS A HUGE DEBATE OUT THERE ABOUT WHETHER

24  RETIRED PLAYERS ARE BEING TREATED PROPERLY BY THE UNION?  YOU

25  UNDERSTAND THAT, DON'T YOU, SIR?

1  **A.**   I DO.

2  **Q.**   AND, IN FACT, DID YOU TESTIFY TO CONGRESS ON THAT VERY

3  ISSUE?

4  **A.**   I DID NOT, NO.

5  **Q.**   BUT YOU ARE AWARE THAT CONGRESSIONAL HEARINGS WERE HELD ON

6  THAT SUBJECT?

7  **A.**   YES.

8  **Q.**   AND A LOT OF CRITICISM WAS LEVIED AT THE UNION ABOUT ITS

9  TREATMENT OF RETIRED PLAYERS.  ARE YOU AWARE OF THAT, SIR?

10  **A.**   I AM AWARE OF IT.

11           **MR. LECLAIR:**  NO FURTHER QUESTIONS.

12           **MR. KESSLER:**  NOTHING FURTHER FOR THIS WITNESS, YOUR

13  HONOR.

14           **THE COURT:**  ALL RIGHT.  MAY -- MAY MR. ARMSTRONG BE

15  DISCHARGED FROM THE SUBPOENA AND FREE TO GO?

16           **MR. KESSLER:**  HE WAS NOT SUBPOENAED, YOUR HONOR.  HE

17  IS DISCHARGED AS FAR AS WE'RE CONCERNED.

18           **THE COURT:**  MAY HE BE FREE TO GO.

19           **MR. LECLAIR:**  HE'S FREE TO GO, YOUR HONOR.

20           **THE COURT:**  YOU ARE FREE TO GO.

21           **THE WITNESS:**  THANK YOU.

22           **THE COURT:**  THE LAWYERS CANNOT CALL YOU BACK.

23           OKAY.  DID YOU HAVE A WITNESS --

24           **MR. LECLAIR:**  WE'RE CALLING A WITNESS OUT OF ORDER,

25  YOUR HONOR, PAT ALLEN.

1          **THE COURT:**  LET'S BRING PAT ALLEN IN.

2          WHILE THAT'S HAPPENING, I WILL REMIND THE JURY, NOW

3    WE ARE -- THIS IS LIKE "BACK TO THE FUTURE," REMEMBER THAT

4    MOVIE?  WE'RE GOING BACK TO THE PLAINTIFFS' CASE AND PICK UP A

5    WITNESS THAT WAS NOT AVAILABLE AT THAT TIME PERIOD.  YOU SEE

6    HOW IT WORKS.

7          ARE YOU MS. ALLEN?

8          **THE WITNESS:**  YES.

9          **THE COURT:**  PLEASE COME FORWARD.

10         STAND SOMEWHERE IN THERE AND RAISE YOUR RIGHT HAND.

11   THE CLERK WILL SWEAR YOU IN.

12         (THEREUPON, THE WITNESS WAS SWORN.)

13         **THE WITNESS:**  I DO.

14         **THE CLERK:**  OKAY.  THANK YOU.  PLEASE BE SEATED.

15         **THE COURT:**  MAY WE TAKE YOUR PICTURE SO IT CAN BE

16   SHOWN IN CLOSING ARGUMENTS?

17         **THE WITNESS:**  YES.

18         **THE CLERK:**  TOO BLURRY.  I'M SORRY.  I NEED TO DO IT

19   AGAIN.

20         (PICTURE TAKEN.)

21         THANKS.  BETTER.  THANK YOU.

22         **THE COURT:**  PLEASE ADJUST THE MIC SO IT WILL CATCH

23   YOUR VOICE.  WE WANT TO MAKE SURE EVERYBODY ON THE JURY CAN

24   HEAR YOU.

25         STATE YOUR NAME NOW.

1  **THE WITNESS:** PATRICIA ALLEN.

2  **THE COURT:** ALL RIGHT. VERY GOOD.

3  GO AHEAD, MR. LECLAIR.

4  <u>**PATRICIA ALLEN**</u>,

5  CALLED AS A WITNESS FOR THE PLAINTIFFS HEREIN, HAVING BEEN

6  FIRST DULY SWORN, WAS EXAMINED AND TESTIFIED AS FOLLOWS:

7  **DIRECT EXAMINATION**

8  **BY MR. LECLAIR:**

9  **Q.** GOOD MORNING, MS. ALLEN.

10 **A.** GOOD MORNING.

11 **Q.** YOU ARE THE WIFE OF DOUG ALLEN, ARE YOU NOT?

12 **A.** YES, I AM.

13 **Q.** AND YOU WERE EMPLOYED, I GUESS, FIRST AS THE DIRECTOR OF

14 LICENSING AND SPECIAL PROJECTS AT THE NFLPA BEGINNING IN 1985?

15 **A.** NO, THAT'S NOT TRUE.

16 **Q.** OKAY. WHEN DID YOU START?

17 **A.** I STARTED EMPLOYMENT AT THE NFLPA IN 1973.

18 **Q.** OH, OKAY. AND DID YOU -- DID YOU BECOME -- DID YOU CHANGE

19 JOBS IN '85?

20 **A.** YES, I DID. I WAS PROMOTED.

21 **Q.** AND DID YOU BECOME -- WHEN PLAYERS INC WAS FORMED IN 1994,

22 DID YOU GO TO WORK THEN FOR PLAYERS INC?

23 **A.** YES, I DID.

24 **Q.** AND BECAME THE EXECUTIVE VICE PRESIDENT AND CHIEF

25 OPERATING OFFICER?

1  A.    YES.

2  Q.    OKAY.  WERE YOU ALSO ON THE BOARD OF DIRECTORS?

3  A.    YES, I WAS.

4  Q.    YOU ARE FAMILIAR WITH THE TERM "GROUP LICENSING

5  AUTHORIZATION," ARE YOU NOT, MRS. ALLEN?

6  A.    YES, I AM.

7  Q.    AND YOU WERE AWARE THAT THERE WERE BOTH ACTIVE PLAYER

8  GLA'S AND RETIRED PLAYER GLA'S?

9  A.    YES.

10 Q.    AND, IN FACT, YOUR VIEW WAS THAT THERE WERE ONLY MINOR

11 DIFFERENCES IN LANGUAGE BETWEEN THE TWO, CORRECT?

12 A.    UHM, NO, THAT'S NOT CORRECT.

13 Q.    OKAY.  WOULD YOU -- WOULD YOU LOOK AT YOUR DEPOSITION?  I

14 THINK SHOULD BE IN FRONT OF YOU.

15        **MR. LECLAIR:**  MAY I APPROACH THE WITNESS, YOUR HONOR?

16        **THE COURT:**  GO AHEAD.

17        **MR. LECLAIR:**  MAKE SURE WE'VE GOT -- I'VE GOT IT

18 HERE.

19        THERE WE GO.  THERE YOU GO.

20        **THE COURT:**  DO I NEED ONE, OR DO I HAVE ONE UP HERE?

21        **MR. LECLAIR:**  I CAN GIVE YOU ONE, YOUR HONOR.

22        **THE COURT:**  ALL RIGHT.  PAGE AND LINE?

23        **MR. LECLAIR:**  THIS IS PAGE -- I'LL READ PAGE 86, LINE

24 4, THROUGH PAGE 86, LINE 12.

25        "QUESTION:" --  ACTUALLY, LET ME START ON PAGE 85,

1  LINE 22.

2          "**QUESTION:** AND THROUGH THE YEARS THERE HAVE

3          BEEN DIFFERENT VERSIONS OF GLA'S; IS THAT

4          ACCURATE?

5          "**ANSWER:** I THINK IT WAS MODIFIED FROM TIME

6          TO TIME.

7          "**QUESTION:** AND AS FAR AS YOU'RE AWARE, IS

8          THE ACTIVE PLAYER GLA DIFFERENT THAN A

9          RETIRED PLAYER GLA?

10         "**ANSWER:** AS FAR AS THE WORDS IN THE

11         AGREEMENTS?

12         "**QUESTION:** YEAH.

13         "**ANSWER:** BASICALLY" --

14         SORRY, EXCUSE ME.

15         "**QUESTION:** BASICALLY ARE THEY DIFFERENT

16         FORMS OR ARE THEY THE EXACT SAME FORMS, IF

17         YOU'RE AWARE?

18         "**ANSWER:** I THINK THERE MAY HAVE BEEN SOME

19         MINOR DIFFERENCES."

20  **BY MR. LECLAIR:**

21  **Q.** WERE YOU AWARE, MRS. ALLEN, THAT THE NFLPA HAD SECURED

22  OVER 2,000 RETIRED PLAYER GLA'S?

23  **A.** YES.

24  **Q.** WITH RESPECT TO THE ACTIVE PLAYER GLA'S, IT'S CORRECT,

25  ISN'T IT, THAT ONE OF THE STAFF MEMBERS IN THE TRADING CARDS

1   AND COLLECTIBLES DEPARTMENT HAD THE RESPONSIBILITY OF RECEIVING

2   THE ACTIVE PLAYER GLA'S AND INPUTTING THAT INFORMATION INTO THE

3   COMPUTER SYSTEM?

4   **A.**   YES, THAT'S CORRECT.

5   **Q.**   AND IF YOU WANTED TO SEE A SPECIFIC ACTIVE PLAYER GLA, YOU

6   COULD GO TO THAT PERSON AND GET IT, CORRECT?

7   **A.**   I'M NOT SURE IF THAT PERSON HAD THE RECORD OR IF THOSE

8   RECORDS WERE FILED SOMEPLACE THAT THEY WERE -- THEY WERE

9   ACCESSIBLE.  I'M NOT SURE IF IT WAS ONE PARTICULAR PERSON IN

10  THAT DEPARTMENT.

11  **Q.**   ALL RIGHT.  BUT IN ANY EVENT THEY ACTUALLY TOOK THE

12  TROUBLE TO INPUT THOSE INTO THE COMPUTER SYSTEM, CORRECT?

13  **A.**   YES.

14  **Q.**   WITH RESPECT TO RETIRED PLAYER GLA'S, YOU ARE NOT EVEN

15  SURE WHO KEPT THOSE, ARE YOU, SIR?  ARE YOU, MA'AM?

16  **A.**   I'M NOT ABSOLUTELY SURE, NO.

17  **Q.**   YOU DON'T REMEMBER WHETHER THEY WERE KEPT WITH THE ACTIVE

18  GLA'S OR WHETHER THE RETIRED PLAYERS' DEPARTMENT AT THE NFLPA

19  KEPT THEM, CORRECT?

20  **A.**   I DON'T KNOW THAT FOR SURE, NO.

21  **Q.**   IS THE CORRECT, MRS. ALLEN, THAT YOU DON'T KNOW WHETHER

22  ANY RETIRED PLAYER RIGHTS WERE EVER LICENSED TO ANY THIRD PARTY

23  PURSUANT TO A GLA?

24  **A.**   COULD YOU REPEAT THAT QUESTION, PLEASE?

25  **Q.**   SURE.

1            IS IT CORRECT THAT YOU DON'T KNOW WHETHER ANY RETIRED

2    PLAYER RIGHTS WERE EVER LICENSED TO ANY THIRD PARTY PURSUANT TO

3    A GLA?

4    **A.**   PURSUANT TO THE GLA, I'M NOT SURE IF THEY WERE.

5    **Q.**   OKAY.  NOW, I WANT TO ASK YOU A FEW QUESTIONS ABOUT

6    MARKETING.  IS IT -- IS IT CORRECT, MRS. ALLEN -- BY THE WAY,

7    YOU HAD PEOPLE THAT WORKED UNDER YOU.  THERE WAS A TEAM OF

8    PEOPLE, AND THEY WERE RESPONSIBLE FOR MARKETING BOTH ACTIVE AND

9    RETIRED PLAYERS, CORRECT?

10   **A.**   YES.

11   **Q.**   AND DID THEY OFTEN MARKET ACTIVE AND RETIRED PLAYERS

12   TOGETHER?

13   **A.**   YES.

14   **Q.**   AND, IN FACT, WEREN'T RETIRED PLAYERS SOMETIMES PART OF A

15   BIGGER ACTIVE PLAYER PROGRAM?

16   **A.**   SOMETIMES.

17   **Q.**   FOR EXAMPLE, I THINK YOU HAVE UP THERE EXHIBIT 1049.  DO

18   YOU HAVE THAT IN FRONT OF YOU?

19            MAYBE I CAN HELP YOU.

20        **MR. LECLAIR:**  MAY I APPROACH, YOUR HONOR?

21   **BY MR. LECLAIR:**

22   **Q.**   GOT A LOT OF EXHIBITS HERE.  HERE IT IS.

23            IS THIS AN E-MAIL CHAIN THAT YOU RECEIVED ON OR ABOUT

24   MARCH 15, 2004, MRS. ALLEN?

25   **A.**   APPARENTLY I DID.

1              MR. LECLAIR:  I'LL MOVE EXHIBIT 1049 INTO EVIDENCE,

2    YOUR HONOR.

3              MR. FEHER:  NO OBJECTION, YOUR HONOR.

4              THE COURT:  RECEIVED.

5              (TRIAL EXHIBIT 1049 RECEIVED IN EVIDENCE.)

6              (DOCUMENT DISPLAYED.)

7              MR. LECLAIR:  LET'S START IN THE MIDDLE AND BLOW UP

8    THAT E-MAIL.

9    BY MR. LECLAIR:

10   Q.   THIS IS AN E-MAIL FROM PAMELA ADOLPH TO PAT ALLEN AND CLAY

11   WALKER, JOSHUA GOODSTADT AND NICHOLE KRZESNY.

12              WERE THOSE ALL PLAYERS THAT WORKED UNDER YOU AT

13   PLAYERS INC?

14   A.   YES, THEY WERE.

15   Q.   THIS E-MAIL STATES, QUOTE:

16              "AS PAT AND I DISCUSSED YESTERDAY, WE NEED TO

17   REVISIT THE MANNER IN WHICH WE CONSTRUCT RETIRED PLAYER

18   LICENSING DEALS.  IN THE COLLECTIBLES CATEGORY, ALL RETIRED

19   PLAYERS ARE PART OF A BIGGER ACTIVE PLAYER PROGRAM."

20              WAS THAT TRUE, MRS. ALLEN?

21   A.   WELL, TO THE EXTENT THEY WERE PART OF A BIGGER ACTIVE

22   PLAYER PROGRAM, THE RIGHTS WERE NEVER COMBINED.

23              THE ACTIVE PLAYER RIGHTS WERE PROVIDED, AND THEN IF A

24   LICENSEE WISHED TO USE RETIRED PLAYERS, THEY WOULD COME TO US,

25   AND WE WOULD TALK TO THEM ABOUT WHAT THE SPECIFICS WOULD BE

1    ABOUT INCLUDING THOSE RETIRED PLAYERS.

2    **Q.**   SO ARE YOU SAYING MS. ADOLPH WAS INCORRECT IN WHAT SHE

3    SAID HERE?

4    **A.**   WELL, I'M NOT QUITE SURE WHAT SHE MEANT BY THAT, BUT THOSE

5    RIGHTS WERE NEVER COMBINED IN ONE LICENSING AGREEMENT.

6    **Q.**   AND THAT --

7    **A.**   THERE MAY HAVE BEEN RETIRED PLAYERS INVOLVED IN A

8    PARTICULAR PROGRAM, BUT NOT AS PART OF THE LICENSE AGREEMENT

9    WITH THAT LICENSEE.

10   **Q.**   SO WHEN PLAYERS INC DID THE LICENSES THEY ALWAYS SEPARATED

11   RETIRED PLAYERS OUT, CORRECT?

12   **A.**   PLAYERS INC LICENSED COMPANIES FOR ACTIVE PLAYER RIGHTS.

13   WE MARKETED THE FACT THAT WE HAD ACCESS TO RETIRED PLAYERS, AND

14   IF THEY -- WE ENCOURAGED THEM TO USE RETIRED PLAYERS.  AND IF

15   THEY WANTED TO, THEY WOULD LET US KNOW, AND WE WOULD DO OUR

16   BEST TO SECURE THOSE RETIRED PLAYERS FOR THE PROGRAM.

17   **Q.**   I'M GOING TO TALK WITH YOU MORE ABOUT THAT IN A MOMENT.

18            LET ME ASK YOU TO LOOK AT THE NEXT PARAGRAPH.  IT

19   SAYS, QUOTE:

20            "I HAVE A NEW WATCH LICENSEE WHO WANTS TO DO

21   RETIRED PLAYERS, AND I TOLD THEM THEY NEEDED TO ALSO DO AT

22   LEAST SIX ACTIVE GUYS," CLOSED QUOTE.

23            DO YOU SEE THAT LANGUAGE, MS. ALLEN?

24   **A.**   YES.

25   **Q.**   SO, IN OTHER WORDS, WHAT YOUR FOLKS WERE TELLING SOMEBODY

1  WHO CAME IN AND SAID THEY WERE INTERESTED IN RETIRED PLAYERS

2  IS:

3               "YOU NEED TO BE SURE YOU ALSO DO ACTIVE

4  PLAYERS," CORRECT?

5  **A.**   NO, THAT'S NOT WHAT WE TOLD THEM.

6  **Q.**   IS THAT NOT WHAT YOU READ IN MRS. ADOLPH'S E-MAIL?

7  **A.**   THAT'S WHAT THE E-MAIL SAYS, BUT WE NEVER DID THAT.

8  **Q.**   SHE WAS JUST --

9  **A.**   I'M NOT SURE WHAT SHE MEANT BY THAT, BUT THAT IS NOT --

10  THAT WAS NOT A PRACTICE AT PLAYERS INC.

11  **Q.**   SO SHE JUST GOT IT WRONG?

12  **A.**   I -- I CAN'T SPEAK TO WHAT SHE MEANT.  BUT, AGAIN, THAT'S

13  NOT SOMETHING THAT WE DID.

14  **Q.**   LET ME ASK YOU, THEN, ABOUT YOUR INVOLVEMENT IN THE

15  MARKETING OF RETIRED PLAYERS.

16               IS IT CORRECT THAT THE ONLY CONVERSATIONS YOU EVER

17  HAD DIRECTLY WITH LICENSEES REGARDING THE MARKETING OF RETIRED

18  PLAYERS WERE MEETINGS IN WHICH YOU SIMPLY STATE THAT PLAYERS

19  INC HAD ACCESS TO RETIRED PLAYERS IF THEY WERE INTERESTED IN

20  USING THEM?

21  **A.**   WELL, WE -- EVERY MEETING THAT WE HAD WITH LICENSEES,

22  PROSPECTIVE LICENSEES AND SPONSORS WE MADE SURE THEY UNDERSTOOD

23  THAT WE HAD ACCESS TO RETIRED PLAYERS.  AND THAT WAS DISCUSSED

24  IN ALL OF THOSE MEETINGS AS A STANDARD PRACTICE.

25  **Q.**   LET ME AGAIN ASK YOU TO LOOK AT YOUR DEPOSITION,

1   MRS. ALLEN, ON PAGE 41.

2           I'M GOING TO READ LINES 14 THROUGH 23.

3           "**QUESTION:**  DID YOU EVER SPEAK TO ANY

4           LICENSEE REGARDING THE LICENSING OF RETIRED

5           PLAYERS WHILE YOU WERE AT PLAYERS INC?

6           "**ANSWER:**  THE ONLY -- THE ONLY CONVERSATIONS

7           I EVER HAD WITH RESPECT TO RETIRED PLAYERS

8           WOULD HAVE BEEN IN THE CONTEXT OF MEETINGS

9           WITH LICENSEES OR PROSPECTIVE LICENSEES TO

10          THE EXTENT THAT I ATTENDED THEM.  THAT SIMPLY

11          STATED THAT PLAYERS INC HAD ACCESS TO RETIRED

12          PLAYERS IF THEY WERE INTERESTED IN UTILIZING

13          THEM," PERIOD, CLOSED QUOTE.

14          IT'S TRUE, ISN'T IT, MRS. ALLEN, THAT EVEN IN

15  MARKETING RETIRED PLAYERS, YOU NEVER REALLY DISTINGUISHED THOSE

16  WHO SIGNED A GLA FROM THOSE THAT DIDN'T SIGN A GLA?

17  **A.**   I'M NOT SURE I UNDERSTAND THE QUESTION.

18  **Q.**   IN OTHER WORDS, WHEN YOU'RE OUT SELLING RETIRED PLAYERS,

19  IT DIDN'T MAKE ANY DIFFERENCE TO YOU WHETHER THEY HAD SIGNED A

20  GLA OR HADN'T SIGNED A GLA, YOU WERE MARKETING EVERYBODY THAT

21  YOU HAD ACCESS TO?

22  **A.**   WELL, WE HAD A LARGE NUMBER OF PLAYERS WHO HAD SIGNED

23  GLA'S.  BUT UNFORTUNATELY, THERE WEREN'T A LOT OF PLAYERS IN

24  THAT GROUP WHO WERE SOUGHT AFTER BY LICENSEES.  SO WE HAD

25  ACCESS TO PLAYERS.  THE MORE RECOGNIZABLE PLAYERS WERE

1   GENERALLY THE ONES THAT THEY WANTED TO INCLUDE.

2          SO WHEN WE LET IT BE KNOWN THAT WE HAD ACCESS, WHAT

3   WE WERE SAYING WAS THAT WE HAD ALL THE PLAYERS WHO HAD SIGNED A

4   GLA.  WE HAD ACCESS TO PLAYERS WHO HAD NOT SIGNED A GLA, BUT

5   WHO WANTED TO BE DEALT WITH ON A CASE-BY-CASE BASIS, MOST OF

6   WHOM WERE THE MORE RECOGNIZABLE PLAYERS.

7          AND WE HAD ACCESS THROUGH RELATIONSHIPS WITH AGENTS

8   AND OTHER WAYS THAT WE HAD CONTACT WITH THEM.

9   Q.   WITH A LOT OF RETIRED PLAYERS WHO DIDN'T SIGN A GLA?

10  A.   YES, SOME.

11  Q.   IS IT TRUE THAT YOU DON'T RECALL ASKING ANYONE AT PLAYERS

12  INC TO SEND ANY THIRD-PARTY LICENSEE INFORMATION REGARDING

13  POTENTIAL LICENSING WITH RETIRED PLAYERS?

14  A.   I'M SORRY.  COULD YOU STATE THAT QUESTION AGAIN, PLEASE?

15  Q.   SURE.  IS IT TRUE THAT YOU DON'T RECALL ASKING ANYONE AT

16  PLAYERS INC TO SEND ANY THIRD-PARTY LICENSEE INFORMATION

17  REGARDING POTENTIAL LICENSING WITH RETIRED PLAYERS?

18  A.   WELL, I DON'T RECALL ASKING SPECIFICALLY, BECAUSE THAT WAS

19  SOMETHING THAT WAS PART OF THEIR RESPONSIBILITIES ON A

20  DAY-TO-DAY BASIS.  EVERYBODY WAS RESPONSIBLE FOR PROMOTING THE

21  FACT THAT WE HAD ACCESS TO RETIRED PLAYERS.

22  Q.   LET'S TALK ABOUT EA FOR A MOMENT.  EA WAS THE BIGGEST

23  LICENSEE IN TERMS OF DOLLARS THAT PLAYERS INC HAD, CORRECT?

24  A.   YES.

25  Q.   AT THE MEETINGS THAT YOU ATTENDED WITH EA, YOU DON'T EVEN

1 RECALL THE SUBJECT OF RETIRED PLAYERS COMING UP, CORRECT?

2 **A.**    THERE WERE SO MANY MEETINGS THAT WE ATTENDED, I DON'T

3 RECALL SPECIFIC MENTION OF RETIRED PLAYERS.  BUT THE TIME OF MY

4 DEPOSITION I HAD NOT BEEN AT PLAYERS INC FOR TWO YEARS, SO A

5 LOT OF THIS INFORMATION WAS KIND OF OUT OF MY HEAD.

6         I'VE HAD A LOT OF TIME TO THINK ABOUT A LOT OF THESE

7 THINGS, AND I -- I KNOW THAT THOSE THINGS WERE DISCUSSED, BUT I

8 CAN'T PINPOINT -- WE HAD HUNDREDS OF MEETINGS WITH PEOPLE.  I

9 CAN'T TELL YOU A SPECIFIC MEETING IN WHICH I STATED THAT WE HAD

10 ACCESS TO RETIRED PLAYERS.

11 **Q.**    IS IT TRUE THAT YOU DON'T EVEN RECALL MENTIONING THAT YOU

12 HAD A SPECIFIC NUMBER OF RETIRED PLAYER GLA'S?

13 **A.**    I DON'T RECALL THAT I MENTIONED THAT.  BUT I WASN'T THE

14 ONLY PERSON IN THE ROOM DURING THOSE MEETINGS.

15 **Q.**    IS IT TRUE THAT YOU DON'T RECALL ANY DISCUSSION OF A

16 SPECIFIC NUMBER OF GLA'S AT ALL?

17 **A.**    I DON'T RECALL A SPECIFIC DISCUSSION, BECAUSE WE HAD SO

18 MANY MEETINGS WITH SO MANY DIFFERENT COMPANIES.

19         BUT AS A STANDARD PRACTICE, AND AS A COURSE OF

20 BUSINESS, OUR STAFF ALWAYS, IN ALL OF THEIR MEETINGS, LET IT BE

21 KNOWN TO ANY LICENSEES OR PROSPECTIVE LICENSEES THAT WE HAD

22 ACCESS TO RETIRED PLAYERS.

23 **Q.**    RIGHT.  AND I'M TALKING NOW ABOUT THE RETIRED PLAYERS WHO

24 SIGNED A GLA.  AND YOU DON'T RECALL TELLING ANY LICENSEE THAT

25 YOU HAD A SPECIFIC NUMBER OF RETIRED PLAYERS WHO SIGNED A GLA;

1    IS THAT TRUE?

2    **A.**    NO, WE DID TELL THEM THAT.

3    **Q.**    YOU DID?  ALL RIGHT.  LET'S LOOK AT YOUR DEPOSITION, PAGE

4    102.  AND I WILL READ LINES 5 THROUGH 14.

5              "**QUESTION:**  AN EXAMPLE:  DID YOU EVER GO TO,

6              FOR INSTANCE, EA AND SAY TO THEM 'OH, WE HAVE

7              A CERTAIN AMOUNT OF GLA'S ALREADY SIGNED BY

8              RETIRED PLAYERS'?  DID ANY CONVERSATIONS LIKE

9              THAT EVER TAKE PLACE THAT YOU'RE AWARE OF?

10             "**ANSWER:**  I DON'T RECALL ANY SPECIFIC MENTION

11             OF A PARTICULAR NUMBER OF GLA'S, NO.

12             "**QUESTION:**  WHAT ABOUT GLA'S GENERALLY?

13             "**ANSWER:**  NO."

14             LET ME BROADEN THE QUESTION, MRS. ALLEN.  IS IT TRUE

15   THAT YOU DON'T RECALL THAT ANY EMPLOYEE OF PI, PLAYERS INC,

16   EVER SENT A LIST OF RETIRED PLAYERS WHO HAD SIGNED A GLA TO ANY

17   THIRD-PARTY LICENSEE?

18   **A.**    I DON'T RECALL A SPECIFIC INSTANCE OF A SPECIFIC PERSON.

19             BUT WE HAD THE LIST OF PLAYERS WHO HAD SIGNED GLA'S.

20   AND IF THEY ASKED FOR IT, WE PROVIDED IT FOR THEM.

21   **Q.**    YOU JUST DON'T RECALL IT EVER HAPPENING, SPECIFICALLY?

22   **A.**    I DON'T RECALL A SPECIFIC INSTANCE OF IT.  BUT NO ONE HAD

23   TO COME TO ME AND ASK PERMISSION.  THAT WAS SOMETHING THAT AS A

24   GENERAL COURSE OF BUSINESS THEY WERE AUTHORIZED TO DO IF ANYONE

25   ASKED.

1  Q.   WERE YOU AWARE THAT MR. SKALL -- WHO WAS MR. SKALL?

2  A.   HE WAS THE VICE PRESIDENT OF PLAYER MARKETING.

3  Q.   WERE YOU AWARE HE WASN'T EVEN AWARE OF SUCH A LIST?

4  A.   I DON'T KNOW.

5       MR. FEHER:  OBJECTION, YOUR HONOR.  HE'S TESTIFYING.

6       THE COURT:  WELL, THE WITNESS HAS SAID SHE DOESN'T

7  KNOW, SO THERE'S NO FOUNDATION TO PROCEED ON THAT LINE OF

8  QUESTIONS.

9       MR. LECLAIR:  I'M NOT GOING TO PROCEED ON THAT, YOUR

10 HONOR.

11 BY MR. LECLAIR:

12 Q.   I'M GOING TO CHANGE SUBJECTS, MRS. ALLEN.

13      IS IT TRUE THAT PLAYERS INC MADE PRESENTATIONS AT THE

14 ANNUAL MEETING OF THE NFLPA?

15 A.   YES.

16 Q.   ALL RIGHT.  I WANT TO SHOW YOU SOME OF THE -- SOME PARTS

17 OF THOSE REPORTS, IF I COULD.

18      I BELIEVE THEY'RE IN FRONT OF YOU.  I WANT TO FIRST

19 START WITH EXHIBIT 1296.  I THINK IT'S A BIG, THICK ONE.

20 SHOULD BE RIGHT THERE.

21      IS EXHIBIT 1296 A COPY OF ONE OF THE REPORTS YOU MADE

22 AT THE 2004 ANNUAL MEETING?

23 A.   YES.

24      MR. LECLAIR:  YOUR HONOR, I'LL MOVE EXHIBIT 1296 IN

25 EVIDENCE.

1          **MR. FEHER:**  NO OBJECTION AT ALL, YOUR HONOR.

2          **THE COURT:**  RECEIVED.

3          (TRIAL EXHIBIT 1296 RECEIVED IN EVIDENCE.)

4   **BY MR. LECLAIR:**

5   **Q.**   LET'S GO, IF WE COULD, TO PAGE WHICH IS BATES STAMPED 271.

6   **A.**   SORRY?

7   **Q.**   THERE'S A BATES STAMP AT THE BOTTOM OF THE PAGE, ON THE

8   RIGHT, MRS. ALLEN.  I WANTED TO LOOK AT PAGE 271, WHICH IS

9   SEVERAL PAGES BACK.

10  **A.**   OKAY.

11         **THE COURT:**  THIS IS EXHIBIT WHAT?  1296?

12         **MR. LECLAIR:**  YES, YOUR HONOR.

13         **THE COURT:**  THANK YOU.  IT'S RECEIVED.

14  **BY MR. LECLAIR:**

15  **Q.**   THIS PAGE IS A STATEMENT OF THE SUMMARY OF REVENUES AND

16  PAYMENTS FOR THIS PARTICULAR YEAR; IS THAT CORRECT?

17  **A.**   YES.

18  **Q.**   LET'S LOOK AT THE VERY BOTTOM PARAGRAPH.

19         **MR. LECLAIR:**  IF WE COULD HIGHLIGHT THAT.

20         (DOCUMENT DISPLAYED.)

21  **BY MR. LECLAIR:**

22  **Q.**   STATES, QUOTE:

23              "A RECORD TOTAL OF 25.8 MILLION IN UNSHARED

24  PAYMENTS TO PLAYERS WAS MADE BY PLAYERS INC'S LICENSEES AND

25  SPONSORS.  THE LIST OF DIFFERENT PLAYERS WHO RECEIVED THOSE

1  PAYMENTS INCLUDED 1,017 ACTIVE AND 328 RETIRED PLAYERS.  THE

2  LIST IS ATTACHED AS APPENDIX J."

3           AND, IN FACT, IF YOU LOOK AT THE BACK OF THIS EXHIBIT

4  THERE'S A VERY LONG EXHIBITS, MRS. ALLEN, WHICH SETS FORTH

5  THESE PAYMENTS.  AND ARE THOSE WHAT'S EVERYONE HAS BEEN

6  REFERRING TO AS THE "AD HOC PAYMENTS"?

7  **A.**   YOU MEAN, WITH RESPECT TO RETIRED PLAYERS?

8  **Q.**   NO.  IN GENERAL, WERE THESE UNSHARED PAYMENTS?  WERE THOSE

9  THE AD HOC PAYMENTS MADE DIRECTLY TO PLAYERS, BOTH ACTIVE AND

10 RETIRED?

11 **A.**   YES.

12 **Q.**   AND SO IN THIS PARTICULAR YEAR, IN AD HOC PAYMENTS THERE

13 WERE OVER $25 MILLION OF SUCH PAYMENTS MADE, CORRECT?

14 **A.**   THAT'S CORRECT.

15 **Q.**   AND IF YOU LOOK AT THE LIST -- LET'S TURN TO THE PAGE

16 BATES STAMPED 475 AT THE BOTTOM, WHICH IS NEAR THE BACK.

17          WHO ACTUALLY PREPARED THIS PRINTOUT EACH YEAR,

18 MRS. ALLEN?

19 **A.**   I BELIEVE THE PRINTOUT WAS -- IT WAS RUN FROM OUR COMPUTER

20 PROGRAM.  I DON'T KNOW THAT THE SAME PERSON ACTUALLY RAN IT

21 EVERY YEAR.  BUT IT WAS RUN FROM OUR ACCOUNTING RECORDS.

22 **Q.**   WELL, HERE'S THE QUESTION I WANT TO ASK ABOUT IT.  ISN'T

23 IT TRUE THAT THIS REPORT, WHICH WAS PREPARED EVERY SINGLE YEAR,

24 BREAKS OUT THE PAYMENTS BY EACH ACTIVE PLAYER BY TEAM, CORRECT?

25 AND THEN, IT BREAKS IT INTO TWO OTHER CATEGORIES:  HALL OF

1   FAME, AND THEN RETIRED.  IS THAT TRUE?

2   **A.**   THIS PARTICULAR DOCUMENT DOES, YES.

3   **Q.**   ALL RIGHT.  DO YOU HAVE ANY REASON TO BELIEVE THAT ANY

4   OTHER YEAR WAS ANY DIFFERENT THAN THIS YEAR?

5   **A.**   I DON'T RECALL --

6   **Q.**   IS IT --

7   **A.**   -- HOW WE DID EACH YEAR.

8   **Q.**   PARDON ME.

9            IS IT TRUE THAT THIS LIST, WHICH IS WHAT WAS

10  PRESENTED, MAKES ABSOLUTELY NO DISTINCTION BETWEEN RETIRED

11  PLAYERS WHO SIGNED A GLA AND THOSE WHO DIDN'T?

12  **A.**   NO, IT DOESN'T.

13  **Q.**   OKAY.  NOW, LET'S TURN, IF WE COULD, TO THE PAGE BATES

14  STAMPED 1326.

15           **MR. LECLAIR:**  UNFORTUNATELY, THIS IS A BIG DOCUMENT,

16  YOUR HONOR.  TAKES A MOMENT TO GET IT ON THE SCREEN.  I

17  APOLOGIZE.

18           **THE COURT:**  MAY I MAKE A SUGGESTION?  I'LL LET EACH

19  SIDE HERE HAVE ABOUT HALF A MINUTE.

20           IT MAY BE NOT CLEAR TO THE JURY WHY WE'RE GOING INTO

21  THIS.

22           **MR. LECLAIR:**  OKAY.

23           **THE COURT:**  SO I'M GOING TO GIVE YOU 30 SECONDS TO

24  EXPLAIN TO THE JURY THE POINT OF THIS EXAMINATION, AND THEN I'M

25  GOING TO GIVE YOU 30 SECONDS TO RESPOND.

1          **MR. LECLAIR:** RIGHT.

2          LADIES AND GENTLEMEN OF THE JURY, THE REASON I'M

3 GOING INTO THIS IS OUR CONTENTION IN THIS CASE IS THAT PLAYERS

4 INC DID NOT CARE ABOUT MARKETING GLA RETIRED PLAYERS.  THEY

5 MARKETED RETIRED PLAYERS.  THEY DIDN'T MAKE ANY DISTINCTION.

6 THEIR RECORDS ARE GOING TO SHOW YOU THEY HAD NO DISTINCTION AT

7 ALL.  NO -- YOU COULD NEVER TELL WHETHER THERE WAS A GLA OR NOT

8 A GLA, BECAUSE THEY DIDN'T CARE.  THEY DIDN'T EVEN KNOW WHERE

9 THE LIST WAS.

10          AND, SECONDLY, THIS SHOWS -- WHAT WE'RE ABOUT TO PUT

11 UP IS THE SHARED PAYMENTS AND THE UNSHARED PAYMENTS.  THE

12 UNSHARED PAYMENTS, WHICH WENT TO BOTH ACTIVE AND RETIRED

13 PLAYERS, WERE EXTENSIVE.  MORE TO THE ACTIVES, LESS TO THE

14 RETIREDS.  THE UNSHARED PAYMENTS, ALL TO THE ACTIVES, NONE TO

15 THE RETIREDS.

16          THAT'S THE SIGNIFICANCE OF WHAT WE'RE DOING.

17          **THE COURT:** ALL RIGHT.  THANK YOU.

18          THIRTY SECONDS FROM THE DEFENSE.

19          **MR. FEHER:** LADIES AND GENTLEMEN OF THE JURY, I'M

20 ACTUALLY GLAD THAT MR. LECLAIR IS BRINGING THIS UP, BECAUSE IT

21 SHOWS THAT PLAYERS INC WORKED HARD TO MARKET RETIRED PLAYERS,

22 GENERALLY.

23          THE EXHIBIT THAT HE'S POINTING OUT SHOWS A GREAT

24 AMOUNT OF MONEY WHEN WE COULD GET LICENSEES TO BE INTERESTED IN

25 RETIRED PLAYERS, THAT WE GENERATED FOR RETIRED PLAYERS AS A

1  GENERAL MATTER, WHETHER THEY SIGNED A GLA OR DIDN'T SIGN A GLA.

2        WE'VE ALREADY SHOWN THROUGH PRIOR TESTIMONY THAT

3  PLAYERS INC WAS NOT ABLE TO GET ALL RETIRED PLAYERS TO SIGN

4  GLA'S AND, AS A MATTER OF FACT, HAD GREAT DIFFICULTY GETTING

5  LARGE NUMBERS OF STARS TO SIGN GLA'S.

6        **THE COURT:**  ALL RIGHT.  THAT'S ABOUT IT.

7        HOW MUCH LONGER DO YOU HAVE ON DIRECT?

8        **MR. LECLAIR:**  YOUR HONOR, I'M GOING TO GO THROUGH

9  THREE MORE REPORTS.  VERY FEW QUESTIONS.  JUST TAKES A FEW

10 MINUTES TO GET THEM IDENTIFIED.  IF YOU WANT TO BREAK, THAT'S

11 FINE.

12       **THE COURT:**  WE NEED TO BREAK IN A MINUTE, BUT I WANT

13 YOU TO FINISH UP THE -- FIND A GOOD RESTING POINT.

14       **MR. LECLAIR:**  LET ME FINISH THIS EXHIBIT, YOUR HONOR.

15       **THE COURT:**  FINE.

16       **MR. LECLAIR:**  WERE WE ABLE TO GET TO PAGE 1236?  ARE

17 WE STILL STRUGGLING WITH THAT?

18       LET ME DO THIS.  I'M GOING TO HOLD THIS UP FOR THE

19 JURY, IF WE COULD, YOUR HONOR.

20       **THE COURT:**  THAT'S FINE.

21       **MR. LECLAIR:**  BECAUSE I THINK THEY CAN SEE IT.

22       WAIT.  WE FINALLY GOT IT.

23       (DOCUMENT DISPLAYED.)

24       **THE COURT:**  ALL RIGHT.

25

1  **BY MR. LECLAIR:**

2  **Q.**   AND, MRS. ALLEN, WAS THIS A CHART SHOWING THE PAYMENTS

3  YEAR-BY-YEAR, BOTH SHARED AND UNSHARED?

4  **A.**   YES.

5  **Q.**   AND IT'S TRUE, IS IT NOT, FOR EXAMPLE, FOR 2003-2004, YOU

6  SEE THAT THERE'S THE SAME 23.8 MILLION OF UNSHARED PAYMENTS

7  THAT WAS REFERENCED IN THE FIRST PAGE THAT WE LOOKED AT?

8  **A.**   YES.

9  **Q.**   SO THAT INCLUDES BOTH ACTIVE AND RETIRED PLAYERS?

10 **A.**   YES, I BELIEVE IT DOES.

11 **Q.**   AND THE TITLE OF THIS CHART IS:

12           "TOTAL PAYMENTS TO NFL PLAYERS," CORRECT?

13 **A.**   THAT'S CORRECT.

14 **Q.**   ALL RIGHT.  AND OF THE 25.8 MILLION OF UNSHARED AD HOC

15 PAYMENTS, WHAT PERCENTAGE WENT TO ACTIVES VERSUS RETIREDS, IF

16 YOU KNOW?

17 **A.**   I DON'T KNOW THE PERCENTAGE.

18 **Q.**   WE'LL DO THAT SEPARATELY.

19           AND THEN, THE 15.4 MILLION IN 2003, 2004, 13.7 IN

20 2002-'3, THAT WAS THE SHARED GROUP LICENSING MONEY THAT WENT TO

21 THE EQUAL SHARE POOL, CORRECT?

22 **A.**   YES.

23 **Q.**   NOW, FINALLY, TO FINISH THIS EXHIBIT, IF WE TURN TWO PAGES

24 BACK, IF WE CAN, TO PAGE 1324.  GREAT.

25           THIS IS A CHART YOU ALSO PRESENTED AT THE ANNUAL

1  MEETING, MRS. ALLEN, CORRECT?

2  **A.**   NO, I DON'T --

3  **Q.**   IT WAS IN THE MIDST OF YOUR REPORT.  THAT'S WHY I INCLUDED

4  IT.

5  **A.**   YES.

6  **Q.**   GREAT.  AND THIS WAS A CHART SHOWING THE HISTORY OF THE

7  AMOUNT OF EQUAL SHARE ROYALTY, CORRECT?

8  **A.**   YES.

9  **Q.**   AND IT SHOWS THE AMOUNT OF THE CHECK TO EACH PLAYER

10  YEAR-BY-YEAR WITH THE LAST YEAR BEING 2002.  THE AMOUNT WAS

11  $6,100, CORRECT?

12  **A.**   YES.

13  **Q.**   PAID TO 2230 PLAYERS, FOR A TOTAL OF $13,772,000, CORRECT?

14  **A.**   YES.

15          **MR. LECLAIR:**  YOUR HONOR, I THINK WE'LL BREAK AT THIS

16  POINT.

17          **THE COURT:**  ALL RIGHT.  WE'LL TAKE 15 MINUTES.

18          LET ME ASK, MS. MARTIN, ARE YOU FEELING ALL RIGHT?

19  SOMETIMES I NOTICE YOUR EYES ARE CLOSED, BUT IT SEEMS LIKE YOU

20  ARE PAYING ATTENTION.  YOU'RE PAYING ATTENTION?

21          **JUROR MS. MARTIN:**  (NODDING.)

22          **THE COURT:**  ALL RIGHT.  YOU'RE INDICATING "YES."

23  SOMETIMES PEOPLE LISTEN WITH THEIR EYES CLOSED, AND THAT'S

24  PERFECTLY OKAY.

25          ALL RIGHT.  WE'LL TAKE A 15-MINUTE BREAK.  YOU

1    REMEMBER THE ADMONITION.

2              **THE CLERK:**  ALL RISE.

3              (THEREUPON, THE JURY LEFT THE COURTROOM.)

4              **THE COURT:**  MS. ALLEN, YOU CAN STEP DOWN.  WHILE

5    YOU'RE ON EXAMINATION WE HAVE GROUND RULES FOR NOT TALKING WITH

6    LAWYERS.  SO PLEASE REMEMBER THAT.

7              **THE WITNESS:**  YES, YOUR HONOR.

8              **THE COURT:**  THANK YOU.  YOU CAN TAKE A 15-MINUTE

9    BREAK, TOO.

10             ANYTHING THE LAWYERS NEED ME FOR?

11             **MR. LECLAIR:**  NO, YOUR HONOR.

12             **MR. FEHER:**  NO, YOUR HONOR.

13             **MR. KESSLER:**  NO, YOUR HONOR.

14             **THE COURT:**  WE'LL TAKE OUR BREAK, TOO.

15             OH, I'VE GOT A QUESTION FOR YOU.

16             YOU CAN GO AHEAD, MS. ALLEN.

17             TWO THINGS.  FIRST IS THAT I HAVE A LIST OF THE

18   EXHIBITS THAT ARE RECEIVED IN EVIDENCE.  AND SOMETIME TODAY,

19   TOMORROW, THE NEXT DAY, THE LAWYERS OUGHT TO VET THIS, BECAUSE

20   THIS IS WHAT'S GOING IN THE JURY ROOM.  IF YOU THINK I'VE MADE

21   A MISTAKE, YOU'VE GOT TO BRING IT TO MY ATTENTION SOON ENOUGH

22   TO FIX IT.

23             NUMBER TWO, REMEMBER THAT IF YOU WANT AN INDEX OF THE

24   EXHIBITS TO GO INTO THE JURY ROOM, YOU'VE GOT TO STIPULATE TO

25   THAT AND HAVE IT READY TO GO.  IT WILL NOT GO IN AUTOMATICALLY.

1        NUMBER THREE, I CAN'T REMEMBER.  IS THERE A CLAIM FOR

2  PUNITIVE DAMAGES IN THIS CASE?

3        **MR. LECLAIR:**  THERE IS, YOUR HONOR.

4        **THE COURT:**  ALL RIGHT.  THEN, I'LL HAVE TO INCLUDE

5  THAT IN THE JURY INSTRUCTIONS.

6        **MR. LECLAIR:**  I UNDERSTOOD, YOUR HONOR, THAT'S A

7  SEPARATE PROCEEDING AFTER THE FIRST PROCEEDING.

8        **THE COURT:**  NO, NO.  THEY'VE GOT TO ANSWER THE

9  QUESTION WHETHER OR NOT OPPRESSION, FRAUD, SO FORTH HAS BEEN

10  PROVEN.  WE DON'T HAVE A SEPARATE TRIAL ON THAT.

11        THE ONLY THING YOU HAVE A SEPARATE TRIAL ON IS THE

12  AMOUNT OF PUNITIVE DAMAGES.

13        **MR. KESSLER:**  AND YOUR HONOR, OUR ARGUMENT WOULD BE

14  THAT AT THE CONCLUSION OF THEIR CASE THERE'S NOT GOING TO BE A

15  BASIS FOR WHICH A REASONABLE JURY COULD ANSWER THAT QUESTION.

16  AND, THEREFORE, THERE WOULD BE NO REASON TO ASK THE QUESTION,

17  SO I'LL HAVE A PARTIAL RULE 50 MOTION WITH RESPECT TO THAT.

18        I DON'T THINK THEY HAVE PUT IN ANY EVIDENCE THAT

19  WOULD SATISFY THE D.C. STANDARD FOR EGREGIOUS INTENT.

20        **THE COURT:**  WE'RE NOT GOING TO ARGUE THIS NOW.

21        **MR. KATZ:**  I THINK ALL OF OUR EVIDENCE SHOWS THAT,

22  YOUR HONOR.

23        **THE COURT:**  WE'RE NOT GOING TO ARGUE THIS POINT NOW.

24  I JUST WANTED TO KNOW IF IT WAS STILL IN THE CASE.

25        THANK YOU.

1          **MR. KESSLER:** THANK YOU.

2          **MR. FEHER:** THANK YOU, YOUR HONOR.

3          (RECESS TAKEN FROM 9:10 TO 9:31 A.M.)

4          **THE COURT:** WE ARE GOING TO BRING BACK THE JURY.

5          MS. ALLEN, YOU CAN COME BACK UP HERE.

6          **THE CLERK:** ALL RISE.

7          (THEREUPON, THE JURY RETURNED TO THE COURTROOM.)

8          **THE COURT:** HAVE A SEAT.

9          SOMETHING FUNNY HAS HAPPENED. SOME OF OUR JURORS ARE

10   HAVING SMILES. BUT THAT'S GOOD. THAT'S GOOD.

11          OKAY. MR. LECLAIR, GO RIGHT AHEAD.

12   **BY MR. LECLAIR:**

13   **Q.** MS. ALLEN, JUST A COUPLE MORE EXHIBITS, WE'LL BE DONE.

14          IF YOU COULD TAKE A LOOK AT EXHIBIT 1298, WHICH

15   SHOULD BE THERE. IT'S ONE OF THE THICKER ONES.

16          IS THIS THE ANNUAL REPORT YOU MADE AT THE ANNUAL

17   MEETING IN MARCH OF 2005?

18   **A.** YES, IT IS.

19          **MR. LECLAIR:** YOUR HONOR, I'LL MOVE IN EXHIBIT 1298.

20          **MR. FEHER:** NO OBJECTION, YOUR HONOR.

21          **THE COURT:** OKAY. RECEIVED.

22          (TRIAL EXHIBIT 1298 RECEIVED IN EVIDENCE.)

23   **BY MR. LECLAIR:**

24   **Q.** AND I'M JUST GOING TO SHOW ONE PAGE. I BELIEVE WE'VE

25   WORKED OUT OUR SCREEN PROBLEMS. I WOULD LIKE TO SHOW THE PAGE

1   BATES STAMPED 510, MRS. ALLEN.

2            **MR. LECLAIR:**  IF WE COULD HIGHLIGHT THAT LANGUAGE.

3            (DOCUMENT DISPLAYED.)

4   **BY MR. LECLAIR:**

5   **Q.**   IN 2005, THIS STATES, QUOTE:

6                "A RECORD TOTAL OF 32.7 MILLION IN UNSHARED

7   PAYMENTS TO PLAYERS WAS MADE BY PLAYERS INC'S LICENSEES AND

8   SPONSORS COMPARED TO 25.8 MILLION IN FY '04.  THE LIST OF

9   DIFFERENT PLAYERS WHO RECEIVED THOSE PAYMENTS INCLUDED 1,082

10  ACTIVE AND 335 RETIRED PLAYERS.  THE LIST IS INCLUDED WITH THIS

11  REPORT."

12           AND I NOTE THIS COPY DOESN'T HAVE IT ATTACHED.  I

13  DON'T THINK IT WAS ACTUALLY PRODUCED CONTEMPORANEOUSLY, BUT WAS

14  THERE ACTUALLY A LIST THAT WAS ATTACHED WHEN YOU PRESENTED IT

15  AT THE MEETING?

16  **A.**   YES, THERE WAS.

17  **Q.**   ALL RIGHT.  LET'S LOOK NEXT, IF WE COULD, MRS. ALLEN, AT

18  EXHIBIT 1299.  ON THIS ONE THE DATE IS HARD TO READ, BUT I

19  BELIEVE, EVEN THOUGH YOU CAN'T READ IT, THIS IS THE 2006 ANNUAL

20  REVIEW.

21           CAN YOU TAKE A LOOK AND JUST LOOK AT A FEW PAGES AND

22  DETERMINE THAT THAT'S THE CASE FOR ME?

23  **A.**   YES, IT IS.

24  **Q.**   ALL RIGHT.

25           **MR. LECLAIR:**  I'LL MOVE IN EXHIBIT 1299, YOUR HONOR.

1              **MR. FEHER:**  NO OBJECTION, YOUR HONOR.

2              **THE COURT:**  RECEIVED.

3              (TRIAL EXHIBIT 1299 RECEIVED IN EVIDENCE.)

4    BY MR. LECLAIR:

5    Q.   AND WE'LL TURN AGAIN TO THE PAGE 4, WHICH IS BATES STAMPED

6    589.  AND THIS PAGE STATES, QUOTE:

7              "A RECORD TOTAL OF 36.6 MILLION IN UNSHARED

8    PAYMENTS TO PLAYERS WAS MADE BY PLAYERS INC'S LICENSEES AND

9    SPONSORS COMPARED TO 32.7 MILLION IN FY '05.  THE LIST OF

10   DIFFERENT PLAYERS WHO RECEIVED THOSE PAYMENTS INCLUDED 1,036

11   ACTIVE (AN AVERAGE OF 32 PLAYERS PER TEAM) AND 421 RETIRED

12   PLAYERS.  THE LIST IS INCLUDED WITH THIS REPORT."

13             AGAIN, MS. ALLEN, IT DOES NOT APPEAR TO BE ATTACHED,

14   THE ACTUAL LIST, BUT WHEN YOU ATTENDED THE MEETING THERE WAS A

15   LIST OF PLAYERS AND PAYMENTS?

16   A.   YES.

17             **MR. LECLAIR:**  YOUR HONOR, I HAVE NO OTHER QUESTIONS.

18             **THE COURT:**  THANK YOU.

19                      **CROSS EXAMINATION**

20   BY MR. FEHER:

21   Q.   GOOD MORNING, MRS. ALLEN.

22   A.   GOOD MORNING, MR. FEHER.

23   Q.   WHAT IS YOUR CURRENT EMPLOYMENT?

24   A.   I'M CURRENTLY RETIRED.

25   Q.   AND HOW LONG HAVE YOU BEEN RETIRED?

1  **A.**    TWO YEARS.  A LITTLE OVER TWO YEARS, ACTUALLY.

2  **Q.**    OKAY.  AND WHEN THANK YOU START AT THE NFLPA?

3  **A.**    UHM, MY EMPLOYMENT BEGAN IN 1973.  I WAS THE -- HIRED AS

4  THE SECRETARY TO THE GENERAL COUNSEL, RICHARD BERTHELSEN.  AND

5  WORKED FOR HIM FOR, I THINK, THREE YEARS.

6         AND THEN, IN 1976 WAS PROMOTED TO SECRETARY TO THE

7  EXECUTIVE DIRECTOR, ED GARVEY.

8         THEN, IN 1979, I WAS PROMOTED TO ASSISTANT DIRECTOR

9  OF LICENSING AND SPECIAL EVENTS, A POSITION I HELD UNTIL 1985,

10 WHEN I WAS PROMOTED TO DIRECTOR OF LICENSING AND SPECIAL

11 EVENTS.

12        AND THEN, SUBSEQUENTLY WHEN PLAYERS INC WAS FORMED IN

13 1994, I WAS NAMED THE EXECUTIVE VICE PRESIDENT AND COO.

14 **Q.**    OKAY.  NOW, DID THERE COME A TIME WHEN YOU MARRIED DOUG

15 ALLEN?

16 **A.**    YES, THERE DID.  THERE WAS.

17 **Q.**    AND WHEN YOU MARRIED DOUG ALLEN, HOW WAS IT HANDLED IN

18 TERMS OF ANY OF YOUR REVIEWS OR PROMOTIONS OR ANY

19 BUSINESS-RELATED MATTERS IN TERMS OF ANY INVOLVEMENT OR

20 NONINVOLVEMENT BY MR. ALLEN?

21 **A.**    WELL, IN TERMS OF MY EMPLOYMENT, MY SALARY, MY PROMOTIONS,

22 I REPORTED TO GENE UPSHAW.

23        IN TERMS OF DAY-TO-DAY PLAYERS INC BUSINESS, I

24 REPORTED TO DOUG ALLEN.

25 **Q.**    BUT MR. UPSHAW WAS RESPONSIBLE FOR ANY PROMOTIONS OR

1   SALARY ON YOUR PART?

2   **A.**   YES.

3   **Q.**   OKAY.  IN TERMS OF YOUR RESPONSIBILITIES AT PLAYERS INC,

4   WHEN YOU WERE COO, COULD YOU JUST TELL THE JURY BRIEFLY AS TO

5   WHAT YOU DID?

6   **A.**   I WAS RESPONSIBLE FOR THE DAY-TO-DAY OPERATIONS.  I

7   MANAGED THE STAFF.  I MONITORED THE BUDGET.  BASICALLY MADE

8   SURE THE TRAINS RAN ON TIME AND MADE SURE THAT THE STAFF WAS

9   HELD ACCOUNTABLE FOR ALL THEIR RESPONSIBILITIES.

10  **Q.**   DID YOU HAVE DAY-TO-DAY MARKETING RESPONSIBILITIES?  OR IF

11  SO, TO WHAT EXTENT, IF AT ALL?

12  **A.**   I'M NOT SURE I UNDERSTAND THE QUESTION.

13  **Q.**   IN TERMS OF DAY-TO-DAY MARKETING TO INDIVIDUAL LICENSEES,

14  HOW MUCH RESPONSIBILITY DID YOU HAVE ON THAT?

15  **A.**   WELL, TO THE EXTENT THAT I ATTENDED MEETINGS, WE HAD -- WE

16  WERE STRUCTURED BY DEPARTMENT.  SO THERE WERE OFTEN MEETINGS

17  HELD THAT I DID NOT ATTEND.  TO THE EXTENT I DID ATTEND, I WAS

18  INVOLVED IN THE DISCUSSION WITH RESPECT TO PLAYERS INC'S ASSETS

19  AND WHAT WE WERE SELLING TO THE PROSPECTIVE LICENSEE OR

20  SPONSOR.

21  **Q.**   COULD YOU JUST BRIEFLY DESCRIBE HOW IT WAS ORGANIZED IN

22  TERMS OF THE STAFF THAT WORKED UNDER YOU AND HOW IT WORKED?

23  **A.**   WE HAD NUMEROUS DEPARTMENTS.  WE HAD CATEGORY MANAGERS WHO

24  HANDLED DIFFERENT CATEGORIES OF LICENSED PRODUCTS.  WE HAD A

25  MARKET -- A PLAYER MARKETING DEPARTMENT.  WE HAD A CORPORATE

1  MARKETING DEPARTMENT.  WE HAD A SPECIAL EVENTS DEPARTMENT.

2  OPERATIONS MANAGER THAT HANDLED SORT OF THE NUTS AND BOLTS OF

3  THE OFFICE.

4          YOU KNOW, OPERATION SUPPLIES AND THAT SORT OF THING.

5          WE HAD A COMMUNICATIONS DEPARTMENT.  AND THE -- THERE

6  WERE APPROXIMATELY 35 PEOPLE, AND IT WAS BROKEN DOWN.

7          I HAD ABOUT FIVE OR SIX DIRECT REPORTS.  AND THEN, IT

8  WAS BROKEN DOWN FROM THERE.

9  **Q.**  OKAY.  OF THE PEOPLE AT PLAYERS INC WHO WORKED WITH YOU,

10  HOW MANY OF THEM DURING THE PERIOD OF 2004 TO '06 WORKED ON

11  MATTERS RELATING TO RETIRED PLAYER LICENSING?

12  **A.**  PROBABLY DURING THAT TIME PERIOD I WOULD SAY MAYBE ABOUT

13  SIX OR EIGHT.

14  **Q.**  UHM, AS TO WHETHER ANY MARKETING MATERIALS WERE EVER

15  PREPARED RELATING TO RETIRED PLAYERS, TO YOUR RECOLLECTION WERE

16  ANY SUCH MARKETING MATERIALS EVER PREPARED?

17  **A.**  YES, THERE WERE.

18  **Q.**  OKAY.  ACTUALLY, I'D LIKE -- SHOULD BE ON YOUR STACK.  IF

19  YOU HAVE ANY TROUBLE FINDING IT, LET ME KNOW.  IT'S TRIAL

20  EXHIBIT 2260.

21          COULD YOU LOOK AT THAT, PLEASE?

22  **A.**  IS THAT ON THIS ONE?

23  **Q.**  I THINK SO.

24  **A.**  YES.

25  **Q.**  COULD YOU JUST IDENTIFY THAT DOCUMENT?  TELL US WHAT IT

1    IS.

2    **A.**   THIS WAS A MARKETING PIECE, A BROCHURE THAT WAS PRINTED OR

3    PRODUCED IN -- LET'S SEE WHAT -- I CAN'T TELL WHAT YEAR IT WAS,

4    UNLESS I LOOK AT EACH PAGE.

5         BUT THESE PIECES WERE GENERALLY PRODUCED ON AN ANNUAL

6    BASIS AS MARKETING TOOLS TO PROMOTE THE BUSINESS OF PLAYERS

7    INC.

8         **MR. FEHER:**  I'D MOVE THIS TRIAL EXHIBIT 2260 INTO

9    EVIDENCE, YOUR HONOR.

10         **MR. LECLAIR:**  NO OBJECTION, YOUR HONOR.

11         **THE COURT:**  2260?

12         **MR. FEHER:**  YES.

13         **THE COURT:**  RECEIVED.

14         (TRIAL EXHIBIT 2260 RECEIVED IN EVIDENCE.)

15   **BY MR. FEHER:**

16   **Q.**   MS. ALLEN, IF YOU COULD GO TO PAGE SIX, THE SIXTH PAGE OF

17   THE DOCUMENT.  JUST TO SEE, THERE ARE SOME VIDEO GAMES ON

18   THERE.  DOES THAT PROVIDE ANY INDICATION AS TO WHEN THIS

19   DOCUMENT WAS PRODUCED?

20   **A.**   2004.

21   **Q.**   AND, GENERALLY, WHAT WAS THE PURPOSE OF THIS DOCUMENT WHEN

22   IT WAS PREPARED?

23   **A.**   UHM, THIS WAS A MARKETING PIECE THAT WAS -- IT WAS

24   INCLUDED IN INFORMATIONAL PACKETS TO -- IN MEETINGS WITH

25   LICENSEES, PROSPECTIVE LICENSEES, SPONSORS.

1          IT WAS GIVEN TO PLAYERS AT EVENTS, ALONG WITH SOME

2   OTHER MATERIALS.  IT WAS PROVIDED TO THE MEDIA AT PRESS

3   CONFERENCES.

4          ANYTIME WE WERE TALKING ABOUT THE BUSINESS OF PLAYERS

5   INC, THESE WERE THE KINDS OF MATERIALS THAT WERE PASSED OUT TO

6   WHICHEVER GROUP WE WERE SPEAKING TO.

7   **Q.**   WAS ANY PART OF THIS BROCHURE SPECIFICALLY DIRECTED TO THE

8   SUBJECT OF RETIRED PLAYERS?

9   **A.**   YES.  THE LAST PAGE SPEAKS TO THE -- TO THE RETIRED PLAYER

10  PROGRAM.

11          **MR. FEHER:**  LAUREN, COULD YOU BRING THIS UP?  I

12  BELIEVE IT'S PAGES 18 AND 19.  LAY THEM SIDE BY SIDE.

13          (DOCUMENT DISPLAYED.)

14  **BY MR. FEHER:**

15  **Q.**   OKAY.  JUST FIRST OFF, MRS. ALLEN, CAN YOU IDENTIFY THIS

16  PERSON, WHO IT IS?

17  **A.**   TONY DORSETT.

18  **Q.**   AND AT THE TIME THIS BROCHURE WAS DISTRIBUTED, WHAT WAS

19  HIS STATUS?

20  **A.**   HE WAS A RETIRED PLAYER.

21  **Q.**   IN TERMS OF THE TEXT OF THIS, DO YOU SEE IT SAYS:

22          "LEGENDARY CAREERS MAY VARY.  CONSULT YOUR

23  RECORD BOOKS."

24          AND THEN, UNDERNEATH THERE'S FURTHER TEXT:

25          "IT'S AMAZING WHAT THE STAR POWER OF NFL PLAYERS

1   CAN DO FOR YOUR ADVERTISING, YOUR MARKETING AND YOUR BRAND."

2           CAN YOU JUST TELL US GENERALLY AS TO WHAT THE PURPOSE

3   WAS OF THESE TWO PAGES IN RESPECT OF RETIRED PLAYERS AND THIS

4   BROCHURE, WHAT IT WAS INTENDED TO DO?

5   **A.**   WELL, AS I STATED EARLIER, IT WAS OUR STANDARD PRACTICE TO

6   PROMOTE RETIRED PLAYERS TO ALL THE COMPANIES WE DID BUSINESS

7   WITH.  AND THIS WAS AN EXAMPLE OF INCLUDING THE FACT THAT WE

8   HAD ACCESS -- AND I THINK IN THIS BOOKLET IT STATES -- TO --

9   SAYS:

10          "UNLEASH THE INFLUENCE OF NEARLY 5,000 FOOTBALL

11  GREATS."

12          SO THE PURPOSE WAS TO MAKE IT KNOWN TO THE COMPANIES

13  THAT WE DID BUSINESS WITH OR WHO WE WERE ABOUT TO DO BUSINESS

14  WITH THAT WE HAD ACCESS TO THESE PLAYERS.

15  **Q.**   WHEN THIS BROCHURE WAS DISTRIBUTED, WAS IT INTENDED TO

16  MAKE ANY PARTICULAR DISTINCTION BETWEEN ANY PARTICULAR TYPES OF

17  RETIRED PLAYERS, IN TERMS OF HOW THEY MIGHT BE LICENSED?

18  **A.**   NO.  NO.

19  **Q.**   OKAY.  HOW OFTEN WERE BROCHURES OF THIS TYPE PRODUCED BY

20  PLAYERS INC?

21  **A.**   GENERALLY, THEY WERE PRODUCED ANNUALLY.  ONCE IN A WHILE

22  WE WOULD USE ONE MAYBE FOR A COUPLE OF YEARS, AND WE WOULD

23  UPDATE THE ARTWORK AND THE PRODUCTS TO KEEP IT TIMELY.

24  **Q.**   DIRECT YOUR ATTENTION, MRS. ALLEN, TO TRIAL EXHIBIT 2263,

25  WHICH IS IN FRONT OF YOU.

1    CAN YOU IDENTIFY THIS DOCUMENT, GENERALLY?

2  **A.**   THIS WAS ANOTHER SIMILAR MARKETING BROCHURE THAT WAS

3  PRINTED OR THAT WAS PRODUCED IN 2001.

4        **MR. FEHER:**  YOUR HONOR, I WOULD MOVE EXHIBIT 2263

5  INTO EVIDENCE.

6        **MR. LECLAIR:**  YOUR HONOR, I THINK SHE SAID "2001," SO

7  IT SEEMS TO ME THIS IS IRRELEVANT.

8        **MR. FEHER:**  YOUR HONOR --

9        **THE COURT:**  WHAT'S THE RELEVANCE?

10        **MR. FEHER:**   YOUR HONOR, THIS IS CERTAINLY BACKGROUND

11  INFORMATION IN TERMS OF ESTABLISHING A COURSE OF CONDUCT WITH

12  RESPECT TO HOW RETIRED PLAYERS WERE TREATED.  CERTAINLY THERE

13  HAS BEEN EVIDENCE PRECEDING 2003 WITH RESPECT TO THE REGULAR

14  PRACTICES OF PLAYERS INC WITH REGARD TO HOW RETIRED PLAYERS

15  HAVE BEEN MARKETED.

16        **THE COURT:**  ALL RIGHT.  RECEIVED.

17        THE JURY WILL TAKE INTO ACCOUNT THE POSSIBILITY THAT

18  THE EVIDENCE IS STALE, BUT IT MAY HAVE SOME RELEVANCE.  THAT'S

19  UP TO THE JURY TO DECIDE.

20        (DOCUMENT DISPLAYED.)

21        (TRIAL EXHIBIT 2263 RECEIVED IN EVIDENCE.)

22  **BY MR. FEHER:**

23  **Q.**   ON THE FIRST PAGE OF THIS BROCHURE -- I WON'T BELABOR THE

24  POINT, BUT CAN YOU IDENTIFY WHETHER THERE ARE ANY RETIRED

25  PLAYERS ON THE COVER OF THIS BROCHURE?

1 **A.**   YES.  ONE OF THE PLAYERS IS ED "TOO TALL" JONES.

2 **Q.**   AND CAN YOU TELL US, AS TO WHAT THE REGULAR PRACTICE WAS,

3 IF ANY, WITH RESPECT TO PLAYERS INC IN TERMS OF FEATURING OR

4 PROMOTING RETIRED PLAYERS IN BROCHURES OF THIS KIND THROUGHOUT

5 THE TIME THAT THESE BROCHURES WERE USED?

6 **A.**   FROM AS FAR BACK AS I CAN REMEMBER WHEN WE STARTED TO

7 PRINT THESE BROCHURES WE ALWAYS INCLUDED A SECTION OR A

8 REFERENCE TO OR INCLUSION OF RETIRED PLAYERS TO PROMOTE THE

9 FACT THAT WE HAD ACCESS TO THEM, AND THEY WERE A BIG PART OF

10 OUR PROGRAM.

11 **Q.**   MS. ALLEN, I WOULD LIKE TO DIRECT YOUR ATTENTION TO A

12 SMALL PILE OF DOCUMENTS THAT ARE IN FRONT OF YOU.  IT'S TRIAL

13 EXHIBITS 2292 THROUGH 2306.

14        **MR. FEHER:**  YOUR HONOR, THESE ARE PLAYERS INC MONTHLY

15 REPORTS, SIMILAR TO DOCUMENTS ALREADY ADMITTED INTO EVIDENCE.

16 **BY MR. FEHER::**

17 **Q.**   MRS. ALLEN, I WOULD LIKE YOU TO JUST BRIEFLY REVIEW THESE

18 DOCUMENTS SO THAT WE CAN GET THESE INTO EVIDENCE, AS TO IF

19 YOU --

20 **A.**   SORRY, WHAT WAS THE -- HOW MANY?

21 **Q.**   IT'S 2292 THROUGH 2306.  THEY ARE PLAYERS INC MONTHLY

22 REPORTS FROM PAT ALLEN TO GENE UPSHAW FROM SEPTEMBER 2004

23 THROUGH SEPTEMBER 2006.

24        **THE COURT:**  IS THERE GOING TO BE AN OBJECTION TO

25 THESE?

1          **MR. LECLAIR:**  NO, YOUR HONOR.

2          **THE COURT:**  2292 ALL THE WAY THROUGH 2306 ARE

3    RECEIVED THAT WILL SPEED THINGS ALONG.

4              (TRIAL EXHIBIT 2292 THROUGH 2306 RECEIVED IN

5              EVIDENCE.)

6    **BY MR. FEHER:**

7    **Q.**   MRS. ALLEN, YOU AUTHORED THESE DOCUMENTS?

8    **A.**   I'M SORRY?

9    **Q.**   YOU AUTHORED THESE DOCUMENTS?

10   **A.**   YES, I DID.

11   **Q.**   OKAY.  AND COULD YOU JUST BRIEFLY TELL THE JURY AS TO WHAT

12   THEY DID IN TERMS OF DESCRIBING ANY MARKETING EFFORTS RELATING

13   TO RETIRED PLAYERS?

14   **A.**   WELL, THESE DOCUMENTS WERE PRODUCED ON A MONTHLY BASIS AS

15   SORT OF A -- JUST SORT OF AN UPDATE, A SYNOPSIS OF WHAT HAD

16   TRANSPIRED.

17          THE BULLET POINTS, MAJOR BULLETS POINTS OF WHAT HAD

18   TRANSPIRED AT PLAYERS INC IN THE COURSE OF THE LAST MONTH.  AND

19   I THINK THAT TO THE EXTENT RETIRED PLAYERS ARE MENTIONED,

20   THEY'RE MENTIONED THROUGHOUT IN DIFFERENT DEPARTMENT REPORTS,

21   DEPENDING ON WHAT PROGRAMS THEY PARTICIPATED IN.

22   **Q.**   OKAY.  JUST BRIEFLY, IF WE COULD GO TO JUST ONE OF THESE,

23   I THINK, IS ENOUGH.  IF WE COULD GO TO TRIAL EXHIBIT 2294.  DO

24   YOU SEE THAT ONE?

25          (DOCUMENT DISPLAYED.)

1   A.   YES.

2   Q.   AND THEN, GO TO THE FOURTH PAGE OF THIS ONE, UNDER "PLAYER

3   MARKETING."

4   A.   YES.

5   Q.   THERE YOU GO.

6   A.   IT'S THE SECOND PAGE.

7   Q.   IT'S BATES NUMBER 2197.  DO YOU SEE THAT, MRS. ALLEN?

8   A.   YES.

9   Q.   OKAY.  JUST IN TERMS OF SOME OF THESE ITEMS, THE THIRD AND

10  FOURTH BULLETS FROM THE BOTTOM, YOU SEE HERE -- ACTUALLY, I

11  DON'T KNOW THAT --

12          MR. FEHER:  I'M NOT SURE THAT WE'RE ON 2197.  I THINK

13  YOU HAVE 2297.

14          LAUREN, 2197.

15          I APOLOGIZE, YOUR HONOR.  IT'S 22 -- OH, IT'S 2295.

16  I APOLOGIZE.

17          THE WITNESS:  2295?

18          (DOCUMENT DISPLAYED.)

19  BY MR. FEHER:

20  Q.   2295, THE SECOND PAGE, JUST TOWARD THE BOTTOM.

21          DO YOU SEE HERE IT SAYS:

22              "CONFIRMED REMAINING 25 PLAYERS (WITH HELP OF

23  RETIRED PLAYERS DEPARTMENT) FOR TOPPS RETIRED PLAYER PROGRAM.

24  10 SESSIONS REMAIN."

25          AND THEN, RIGHT ABOVE IT, IT SAYS:

1           "CONFIRMED THAT 11 PLAYERS FOR REEBOK RETIRED

2  PLAYERS PROGRAM - TOTAL OF 38."

3  **A.**   YES.

4  **Q.**   DID YOU REGULARLY MAKE REPORTS OF THIS KIND WITH RESPECT

5  TO RETIRED PLAYERS BEING LICENSED BY PLAYERS INC?

6  **A.**   YES.

7  **Q.**   AND IN TERMS OF THE REEBOK RETIRED PLAYERS PROGRAM -- AND

8  HERE IT SAYS:

9           "11 PLAYERS, TOTAL OF 38," WHO SELECTED THOSE

10 PLAYERS?

11 **A.**   THE LICENSEE.

12 **Q.**   LET'S GO TO TRIAL EXHIBIT 1296, THE ANNUAL REVIEW THAT

13 MR. LECLAIR HAS ALREADY OFFERED INTO EVIDENCE.

14          COULD YOU JUST GIVE US A LITTLE BACKGROUND,

15 MRS. ALLEN -- IT'S THE BIG THICK ONE, THE ONE WITH THE LIST OF

16 PLAYERS AT THE BACK.

17 **A.**   I'M SORRY.

18 **Q.**   COULD YOU JUST GIVE THE JURY A LITTLE BACKGROUND AS TO

19 WHAT THIS DOCUMENT IS?  WHAT DID IT REPRESENT?

20 **A.**   WELL, THIS WAS A DOCUMENT THAT WAS PREPARED ANNUALLY FOR

21 THE BOARD OF PLAYER REPRESENTATIVES.  AND IT BASICALLY WAS A

22 REVIEW OF PLAYERS INC'S BUSINESS THROUGHOUT THE COURSE OF THE

23 PREVIOUS YEAR.

24          IT WAS MEANT TO REVIEW WITH THEM WHAT WE HAD

25 ACCOMPLISHED, YOU KNOW, WHETHER WE MET OUR GOALS FOR THE

1  PREVIOUS YEAR, WHAT WE HAD ACCOMPLISHED DURING THE YEAR, AND TO

2  OUTLINE WHAT OUR PLANS WERE FOR THE COMING YEAR.

3  **Q.**   OKAY.  AND WAS THIS REPORT REVIEWED VERBALLY WITH THE

4  BOARD OF PLAYER REPS IN ANY MANNER BY YOU OR ANYONE UNDER YOUR

5  DIRECTION?  HOW DID THAT WORK?

6  **A.**   YES.  THIS WAS -- THIS WAS PASSED OUT TO THE ATTENDEES AT

7  THE MEETING, INCLUDING THE LISTS AND SOME OTHER MATERIALS.  AND

8  I, ALONG WITH -- IT VARIED IN DIFFERENT YEARS.  SOMETIMES IT

9  WAS ONE OR TWO OR THREE OTHER STAFF PEOPLE.  I DID THE LION'S

10 SHARE OF THE ORAL REPORT.

11        BUT IT WAS BASICALLY -- IT WAS TAKEN FROM THE

12 INFORMATION IN THIS DOCUMENT, AND REPORTED TO THE BOARD.

13 **Q.**   OKAY.  AT THESE BOARD MEETINGS, DO YOU RECALL IF THERE

14 WERE EVER ANY RETIRED PLAYERS WHO WERE PRESENT AT THESE BOARD

15 MEETINGS WHEN THIS DOCUMENT WAS REVIEWED?

16 **A.**   YES, I BELIEVE THERE WERE.  THERE WAS, I THINK, AT LEAST

17 ONE, IF NOT MORE.

18 **Q.**   OKAY.  AND JUST VERY BRIEFLY GOING BACK TO THE LIST,

19 BECAUSE MR. LECLAIR REVIEWED IT WITH YOU, DO YOU SEE --

20        **MR. FEHER:**  LAUREN, IF YOU COULD PUT UP STARTING

21 ON -- IT SAYS PAGE "148 OF 172," WHERE THERE'S A LISTING OF

22 HALL OF FAME PLAYERS STARTING.  I THINK IT'S ON PAGE 209,

23 LAUREN.  TURN IT SIDEWAYS.

24        (DOCUMENT DISPLAYED.)

25

1  **BY MR. FEHER:**

2  **Q.**  DO YOU SEE THAT, MRS. ALLEN?

3  **A.**  YES.

4  **Q.**  IN TERMS OF THE LENGTH OF THE LIST OF THE HALL OF FAME

5  PLAYERS THAT WERE LICENSED, HOW LONG DOES THIS LIST GO ON IN

6  THIS?  I DON'T WANT TO GET TOO --

7  **A.**  THE HALL OF FAME?

8  **Q.**  YEAH, THE HALL OF FAME.  HOW LONG DOES IT GO ON?  THERE'S

9  JUST A BRIEF THING TO GO OVER HERE.

10  **A.**  LOOKS LIKE AROUND 10 PAGES.

11  **Q.**  OKAY.  MY COUNT WAS A LITTLE DIFFERENT, ACTUALLY.

12  **A.**  OH.

13  **Q.**  IT SAYS "148 OF 172."  AND THEN, HALL OF FAME ENDS UP IN

14  THE MIDDLE OF PAGE 156 OF 172.  SO ABOUT EIGHT OR NINE PAGES?

15  **A.**  YES.

16  **Q.**  OKAY.

17  **A.**  I MIGHT HAVE MISCOUNTED.

18  **Q.**  SORRY ABOUT THAT.

19          AND THEN, AFTER THE HALL OF FAME LIST IS DONE, DO YOU

20  SEE, MRS. ALLEN, THERE'S A DIFFERENT CATEGORY WHERE IT SAYS

21  "RETIRED"?

22  **A.**  YES.

23  **Q.**  WHAT DOES THAT INDICATE IN TERMS OF WHO THESE PLAYERS ARE?

24  **A.**  THAT INDICATES ALL OF THE PLAYERS THAT WERE NOT IN THE

25  HALL OF FAME THAT WE DID AD HOC DEALS WITH.

1    **Q.**   OKAY.  NOW, I WILL NOTE THAT THERE ARE SOME PLAYERS IN

2    HERE WHO SUBSEQUENTLY MADE THE HALL OF FAME AFTER THEY RETIRED,

3    SUCH AS MR. AIKMAN.

4            BUT EVEN WITH THAT, IN TERMS OF HOW MANY LICENSING

5    DEALS WITH NON-HALL OF FAME RETIRED PLAYERS THAT ARE IDENTIFIED

6    IN THIS DOCUMENT, CAN YOU JUST GO THROUGH AND TELL THE JURY HOW

7    LONG THAT LIST IS, AND HOW IT COMPARES TO THE LENGTH OF THE

8    HALL OF FAME DEALS THAT ARE MENTIONED HERE?  JUST ROUGHLY.

9            **MR. FEHER:**  LAUREN, COULD YOU FLIP THROUGH, JUST TO

10   GET TO PAGE 232.  IT'S --

11           **THE WITNESS:**  LOOKS LIKE IT'S ABOUT 16 PAGES MAYBE.

12   **BY MR. FEHER:**

13   **Q.**   SO IT'S ABOUT TWICE AS LONG AS THE HALL OF FAME LIST?

14   **A.**   YES.

15   **Q.**   IN TERMS OF THIS LIST AND ITS COMPARATIVE LENGTHS, WHAT,

16   IF ANYTHING, DOES THIS REFLECT IN TERMS OF THE MARKETING

17   EFFORTS THAT PLAYERS INC DID FOR RETIRED PLAYERS WHO WEREN'T

18   HALL OF FAME PLAYERS, LIKE MR. ADDERLEY?

19   **A.**   WELL, I THINK IT SPEAKS TO THE FACT THAT WE MARKETED ALL

20   OF THE RETIRED PLAYERS THAT WE HAD ACCESS TO.  THE FACT WAS

21   THAT A MAJORITY, IF NOT MOST, OF THE PLAYERS WHO SIGNED GLA'S

22   WERE NOT THE PLAYERS THAT WERE GENERALLY REQUESTED BY

23   LICENSEES.

24           BUT THERE ARE A LOT OF PLAYERS IN HERE WHO WERE

25   REQUESTED, WHO WERE NOT HALL OF FAME PLAYERS.

1  **Q.**   OKAY.  MRS. ALLEN, I WOULD JUST LIKE TO MOVE ON TO THE

2  MORE RECENT VERSION OF THIS ANNUAL REVIEW THAT MR. LECLAIR

3  REVIEWED WITH YOU, TRIAL EXHIBIT 1299, WHICH I BELIEVE IS

4  ALREADY ADMITTED INTO EVIDENCE.

5         **MR. FEHER:**  LAUREN, IF WE COULD START INSIDE OF THIS

6  DOCUMENT, I BELIEVE IT'S THE EIGHTH PAGE.

7         **THE WITNESS:**  YES.

8         (DOCUMENT DISPLAYED.)

9  **BY MR. FEHER:**

10 **Q.**   MS. ALLEN, IF YOU COULD TELL THE JURY WHAT THE PURPOSE WAS

11 OF THESE NARRATIVE DESCRIPTIONS IN TERMS OF MARKETING EFFORTS.

12 WHAT WERE THESE NARRATIVE DESCRIPTIONS ALL ABOUT?

13 **A.**   WELL, THAT THE REPORT WAS BROKEN DOWN BY DEPARTMENT,

14 GENERALLY.  AT LEAST THE FIRST PART OF IT WAS.

15         AND EACH DEPARTMENT WOULD TALK ABOUT WHAT THEY HAD

16 ACCOMPLISHED OR WHAT WE HAD ACCOMPLISHED DURING THE LAST FISCAL

17 YEAR.  AND THEN, THEY WOULD DISCUSS A LITTLE BIT ABOUT WHAT

18 KIND OF PLAYER PAYMENTS OR AD HOC DEALS WERE DONE FOR PLAYERS

19 WITHIN THAT CATEGORY.

20         AND THEN, WE WOULD TALK ABOUT WHAT OUR PROJECTIONS

21 WERE FOR THE COMING YEAR IN EACH CATEGORY, AND WHAT WE EXPECTED

22 TO DO IN TERMS OF GROWING THE BUSINESS.

23 **Q.**   OKAY.  LET'S JUST FLIP THROUGH A FEW PAGES AND JUST GET --

24         **MR. FEHER:**  I THINK IT'S ON PAGE 10 OF THIS, LAUREN.

25         (DOCUMENT DISPLAYED.)

1          UNDER "POSTERS, CALENDARS AND PHOTOGRAPHY," IF YOU

2  COULD BLOW THAT UP.

3  **BY MR. FEHER:**

4  **Q.**   YOU SEE THERE'S A DESCRIPTION IN HERE OF THIS FATHEAD

5  DIRECT-TO-CONSUMER PRODUCT, AND INCLUDING REFERENCES TO RETIRED

6  PLAYERS BEING PAID A TOTAL OF $155,000 IN GUARANTEED ROYALTIES

7  FOR THESE PLAYERS?

8          DO YOU SEE THAT, MRS. ALLEN?

9  **A.**   YES.

10 **Q.**   IN TERMS OF MARKETING PLANS FOR INDIVIDUAL LICENSEES, WHAT

11 WAS THIS DOCUMENT INTENDED TO CONVEY TO THE BOARD OF PLAYER

12 REPS?  WHAT WAS THE POINT OF THIS?

13 **A.**   THE WHOLE DOCUMENT?

14 **Q.**   IN TERMS OF RETIRED PLAYERS AND MARKETING PLANS, YES.

15 **A.**   WELL, I THINK IT WAS INTENDED TO -- TO SHOW THE BOARD THAT

16 WE WERE ALWAYS LOOKING FOR OTHER BUSINESS.  AND TO THE EXTENT

17 THAT WE REPORTED THAT IN EACH DEPARTMENT AND EACH AREA OF THE

18 BUSINESS, I THINK THAT WAS A WAY OF SHOWING THEM THAT WE HAD --

19 EACH LICENSEE WOULD SUBMIT MARKETING PLANS FOR THE COMING YEAR,

20 AND WE WOULD TALK TO THEM ABOUT WHAT THEY WERE EXPECTING TO DO.

21         BUT THEN, THERE WERE ALSO OTHER AREAS OF BUSINESS,

22 LIKE THE SPONSORS, AND HOW MUCH THEY EXPECTED TO INTEGRATE THE

23 PLAYERS INTO THEIR PROGRAMS.

24         AND THIS DOCUMENT WAS A WAY OF SHOWING, AGAIN, WHAT

25 WE HAD DONE DURING THE PAST FISCAL YEAR, AND WHAT WE EXPECTED

1  TO DO IN ALL OF THOSE CATEGORIES IN THE NEXT FISCAL YEAR.

2  **Q.**   IN TERMS OF ANY NOTION THAT PLAYERS INC NEVER DID ANY

3  MARKETING PLANS FOR RETIRED PLAYERS, DO YOU HAVE ANY REACTION

4  TO THAT?

5  **A.**   THAT'S NOT TRUE.  WE DID.

6  **Q.**   JUST GOING BACK, VERY BRIEFLY, TO MR. LECLAIR'S QUESTIONS,

7  HE ASKED YOU SOMETHING ABOUT DIFFERENCES BETWEEN, I BELIEVE,

8  THE GLA'S IN TERMS OF A STATEMENT BY YOU THAT ANY DIFFERENCES

9  WERE ONLY MINOR.  DO YOU RECOLLECT THAT QUESTION AND ANSWER?

10  **A.**   YES, I DO.

11  **Q.**   WHY DID YOU SAY THAT?

12  **A.**   THE -- MY RESPONSE TO HIS QUESTION, OR WHAT WAS IN MY

13  DEPOSITION?

14  **Q.**   YOUR RESPONSE TO THE QUESTION, IN TERMS OF ANY DIFFERENCES

15  BEING MINOR.  IF YOU COULD JUST EXPLAIN YOUR ANSWER TO -- AS TO

16  WHY -- WELL, LET'S REPHRASE THIS.

17          IN TERMS OF YOUR DEPOSITION, OKAY, ANY REFERENCE TO

18  ANY DIFFERENCES BEING MINOR, WHY DID YOU SAY THAT?

19  **A.**   AS I SAID, I HADN'T REALLY SEEN ANY OF THESE DOCUMENTS IN

20  TWO YEARS.  AND I WAS REALLY NOT -- I HADN'T SEEN THE RETIRED

21  PLAYER GLA PROBABLY IN LONGER THAN THAT.  SO I WASN'T REALLY

22  FAMILIAR WITH, AT THAT POINT, WHAT THE LANGUAGE WAS.

23  **Q.**   AND IN TERMS OF YOUR RESPONSIBILITIES TO PLAYERS INC, DID

24  YOU HAVE ANY SIGNIFICANT INVOLVEMENT IN DRAFTING THE PARTICULAR

25  LANGUAGE IN ANY OF THESE GLA FORMS?

1  A.   NO, I DID NOT.

2       **MR. FEHER:**  I HAVE NO FURTHER QUESTIONS, YOUR HONOR.

3       **THE COURT:**  THANK YOU.

4       ANYTHING MORE?

5       **MR. LECLAIR:**  JUST A LITTLE BIT, YOUR HONOR.

6                      **REDIRECT EXAMINATION**

7  BY MR. LECLAIR:

8  Q.   MRS. ALLEN, IS IT YOUR TESTIMONY THAT THIS IS A MARKETING

9  PLAN?  IS THAT WHAT YOU'RE SAYING?  OR ARE YOU SAYING THERE'S

10 SOMETHING ELSE?

11 A.   NO.  I'M SAYING THAT THIS WAS THE DOCUMENT WHICH LAID OUT

12 BY CATEGORY WHAT OUR PLANS WERE FOR THE COMING YEAR.

13 Q.   SO JUST SO WE'RE CLEAR, YOU'RE SAYING THAT THE ANNUAL

14 REVIEW IS A MARKETING PLAN?

15 A.   IT'S NOT JUST A MARKETING PLAN, BUT IT DOES INCLUDE

16 MARKETING PLANS.

17 Q.   ALL RIGHT.  NOW, WITH RESPECT TO THE REPORTS THAT YOU

18 GENERATE WHICH WERE PUT IN AS A GROUP -- I THINK IT'S 2294 AND

19 FOLLOWING -- WOULD IT BE CORRECT THAT NOT ONE MENTION OF

20 MARKETING RETIRED PLAYERS WHO SIGNED GLA'S AS A GROUP IS IN ONE

21 SINGLE ONE OF THESE REPORTS?

22 A.   I COULDN'T ANSWER THAT QUESTION.

23 Q.   ALL RIGHT.  DO YOU HAVE ANY REASON TO BELIEVE THAT IF THE

24 JURY LOOKS AT THESE REPORTS THEY'RE GOING TO FIND ANY REFERENCE

25 TO MARKETING RETIRED PLAYERS WHO SIGNED GLA'S AS A GROUP?

1  A.   I CAN'T -- I DON'T KNOW.

2  Q.   ALL RIGHT.  IN THE BROCHURES THAT YOU LOOKED AT -- LET'S

3  TALK ABOUT SPECIFICALLY EXHIBIT 2260.  YOU HIGHLIGHTED --

4         MR. LECLAIR:  COULD WE PUT THIS UP, 2260?  YES.  AND

5  LET'S PULL UP THE PAGES THEY HAD WITH TONY DORSETT.

6         (DOCUMENT DISPLAYED.)

7  BY MR. LECLAIR:

8  Q.   BY THE WAY, TONY DORSETT, DID HE SIGN A GLA?  HE DIDN'T,

9  DID HE?

10  A.   I DON'T KNOW FOR SURE.  I DON'T THINK HE DID.

11  Q.   ALL RIGHT.  AND THERE'S A REFERENCE -- IT'S VERY HARD TO

12  READ AT THE BOTTOM.  LET'S SEE -- ON THE SECOND PAGE, UNDER

13  TONY DORSETT'S PICTURE -- WHO HAPPENS TO BE ONE OF MY FAVORITE

14  PLAYERS, BECAUSE I'M FROM DALLAS -- BUT HE'S NOT A GLA.

15         AND IF YOU LOOK AT THAT LANGUAGE, IT SAYS -- WE NEED

16  THE FIRST PAGE ALONG WITH YOU WITH IT.

17         MR. LECLAIR:  COULD YOU BLOW IT UP AND PUT IT UNDER

18  IT OR ON TOP OF IT?  NO, I'M SORRY.  AT THE VERY BOTTOM.  THERE

19  YOU GO.  PUT THAT ON TOP OF THAT, IF YOU CAN.

20         (DOCUMENT DISPLAYED.)

21  BY MR. LECLAIR:

22  Q.   "PLAYERS INC IS YOUR CONNECTION TO THE MEN OF PRO

23  FOOTBALL.  LEGENDS, VETERANS AND ROOKIES COMPRISE THE ROSTERS

24  OF MORE THAN 1800 ACTIVE AND 3500 RETIRED PLAYERS WHO CAN

25  IMPACT THE WAY YOU DO BUSINESS."

1          AND THAT REFERENCE TO 3500 RETIRED PLAYERS, THAT'S

2   NOT THE GLA GROUP AT ALL, IS IT?

3   **A.**   IT INCLUDES THEM, YES.

4   **Q.**   SURE.  BUT YOU'RE NOT MARKETING THE GLA GROUP.  YOU'RE

5   MARKETING A BIGGER GROUP, WHICH INCLUDES TONY DORSETT, WHO

6   DIDN'T SIGN A GLA, RIGHT?

7   **A.**   WE WERE MARKETING THE PLAYERS WHO HAD GLA'S AND THE

8   PLAYERS WE HAD ACCESS TO BEYOND THAT.

9   **Q.**   UNDERSTOOD.  BUT YOU NEVER MARKETED THE GLA PLAYERS BY

10  THEMSELVES AS A GROUP; IS THAT FAIR?

11  **A.**   THERE WERE TIMES AND MEETINGS WHERE WE DID PROVIDE THAT

12  LIST TO SPONSORS OR LICENSEES WHO WERE INTERESTED IN RETIRED

13  PLAYERS.  BUT NINE TIMES OUT OF TEN, THERE WEREN'T A LOT, IF

14  ANY, PLAYERS ON THAT LIST THAT ANYBODY WAS INTERESTED IN.

15  **Q.**   RIGHT.  DO YOU REMEMBER -- YOU JUST SAID THAT YOU DID

16  PROVIDE IT.  DO YOU REMEMBER TESTIFYING AT YOUR DEPOSITION YOU

17  DON'T RECALL EVER PROVIDING THAT LIST?

18  **A.**   WHAT I'M SAYING IS THAT IF SOMEONE WAS INTERESTED IN

19  RETIRED PLAYERS, WE LET IT BE KNOWN THAT WE HAD X NUMBER OF

20  PLAYERS SIGNED TO GLA'S.

21          IF THEY WANTED TO SEE THAT LIST, WE WERE -- WE

22  READILY PROVIDED IT TO THEM.

23          I DID NOT PERSONALLY PROVIDE IT TO THEM, BUT OUR

24  STAFF WAS INSTRUCTED TO DO SO WHENEVER ANYONE ASKED FOR IT.

25  **Q.**   DO YOU HAVE ANY EXPLANATION AS TO WHY MR. SKALL WOULDN'T

1   HAVE KNOWN ABOUT SUCH A LIST?

2           **MR. FEHER:**  OBJECTION, YOUR HONOR.

3           **THE COURT:**  SUSTAINED.

4           **MR. FEHER:**  NO FOUNDATION.

5           **THE COURT:**  ASSUMES A FACT NOT IN EVIDENCE.

6           **MR. LECLAIR:**  THAT'S ALL I HAVE, YOUR HONOR.

7           **THE COURT:**  PLEASE REMEMBER WHAT I SAID:  WHEN THE

8   LAWYERS START TALKING LIKE THAT, I DON'T WANT YOU TO GET IN THE

9   JURY ROOM AND ASSUME THAT'S IN EVIDENCE.  I DON'T REMEMBER THAT

10  EVER COMING INTO EVIDENCE.

11          **MR. LECLAIR:**  YOUR HONOR, CAN I READ FROM THE

12  DEPOSITION OF MR. SKALL?

13          **MR. FEHER:**  OBJECTION, YOUR HONOR.

14          **MR. KESSLER:**  YOUR HONOR --

15          **THE COURT:**  YOUR CASE IS CLOSED.

16          **MR. KESSLER:**  THANK YOU, YOUR HONOR.

17          **MR. FEHER:**  YOUR HONOR, I JUST HAVE ONE FOLLOW-UP

18  QUESTION RELATING TO SOMETHING THAT MR. LECLAIR SPECIFICALLY

19  ASKED MRS. ALLEN.

20          **THE COURT:**  GO AHEAD.

21          **MR. FEHER:**  I WOULD ACTUALLY LIKE TO OFFER INTO

22  EVIDENCE TWO GLA'S SIGNED BY ED "TOO TALL" JONES, DATED

23  DECEMBER 17, 2003, MAY 1ST, 2001.  THESE ARE IN THE SET OF

24  DOCUMENTS THAT WERE DISCUSSED THAT WOULD BE INCLUDED IN THE

25  MASTER EXHIBIT TO BE PROVIDED TO THE JURY.

1          THE COURT:  YOU'RE SAYING THERE IS A GLA BY "TOO

2     TALL" JONES?

3          MR. FEHER:  THERE IS.

4          THE COURT:  IS THAT THE ONE?  BUT THAT WASN'T --

5          MR. LECLAIR:  IT WASN'T THE ONE I REFERRED TO.

6          THE COURT:  -- MR. LECLAIR'S FAVORITE PLAYER.

7          MR. FEHER:  IT'S THE FELLOW ON THE COVER OF THE OTHER

8     BROCHURE, YOUR HONOR.

9          THE COURT:  HE WAS TALKING ABOUT SOMEONE ELSE.

10         MR. LECLAIR:  TONY DORSETT, YOUR HONOR.

11         THE COURT:  DO YOU HAVE ONE FROM TONY DORSETT?

12         MR. FEHER:  I HAVE ONE FROM MR. JONES, YOUR HONOR.  I

13    HAVE NO OTHER --

14         MR. KESSLER:  1164-50, YOUR HONOR.  IT'S PART OF

15    THEIR BIGGER EXHIBIT.  BUT THIS WILL BE AN INDIVIDUAL EXHIBIT.

16         THE COURT:  11 WHAT?

17         MR. FEHER:  1164-50 AND 1164-51, YOUR HONOR.

18         THE COURT:  ALL RIGHT.  ANY OBJECTION?

19         IT'S ALREADY IN EVIDENCE, ANYWAY, RIGHT?

20         MR. LECLAIR:  ACTUALLY, YOUR HONOR, THE ONE THING WE

21    RESERVED, WE WERE GOING TO PUT IN THE WHOLE GLA LIST.  1164-4.

22    1164-4.

23         THE COURT:  ALL RIGHT.  NOW, ONLY TWO PAGES OF THAT

24    ARE IN.

25         MR. LECLAIR:  I WAS GOING TO DO THAT AT THE

1    CONCLUSION OF MR. ALLEN'S TESTIMONY, YOUR HONOR.

2              **THE COURT:** ALL RIGHT. IT'S ALL RECEIVED. 1164 IS

3    ALL IN.

4              (TRIAL EXHIBIT 1164 RECEIVED IN EVIDENCE.)

5                        **RECROSS EXAMINATION**

6    **BY MR. FEHER:**

7    **Q.** OKAY, MS. ALLEN, JUST ONE QUESTION. ED "TOO TALL" JONES,

8    THE PLAYER WHO SIGNED THESE TWO GLA'S, YOU PUT HIM ON THE COVER

9    OF ONE OF YOUR MARKETING BROCHURES; IS THAT RIGHT?

10   **A.** YES, WE DID.

11             **MR. FEHER:** THAT'S ALL.

12             **MR. LECLAIR:** NOTHING FURTHER, YOUR HONOR.

13             **THE COURT:** MAY THIS WITNESS BE EXCUSED, NOT SUBJECT

14   TO RECALL?

15             **MR. LECLAIR:** YES, YOUR HONOR.

16             **MR. FEHER:** YES, YOUR HONOR.

17             **THE COURT:** YOU ARE FREE TO GO.

18             **THE WITNESS:** THANK YOU.

19             **MR. LECLAIR:** AND THEN, YOUR HONOR, AS I SAID, WE ARE

20   GOING TO OFFER THE GLA'S INTO EVIDENCE, WHICH IS A RATHER LARGE

21   EXHIBIT. AND SUBJECT TO THE DEFENDANTS' VERIFICATION -- THEY

22   HAVE NO OBJECTION -- IT WILL BE MARKED AS 1164-4.

23             **THE COURT:** CORRECT?

24             **MR. KESSLER:** WE HAVE NO OBJECTION, SUBJECT TO MAKING

25   SURE THE BOX CONTAINS THE RIGHT --

1          THE COURT:  ALL RIGHT.  IT'S ALL RECEIVED.

2          OKAY.  NOW WE GO BACK TO THE -- BACK TO THE DEFENSE

3   CASE.

4          (TRIAL EXHIBIT 1164-4 RECEIVED IN EVIDENCE.)

5          MR. KESSLER:  I GUESS, YOUR HONOR, I GUESS PLAINTIFFS

6   HAVE NOW COMPLETELY RESTED.  I GUESS WE SHOULD ESTABLISH THAT.

7          THE COURT:  HAVE YOU COMPLETELY RESTED, MR. LECLAIR?

8          MR. LECLAIR:  YES, YOUR HONOR.

9          THE COURT:  GREAT.  WE HAVE REACHED A MILESTONE, AS I

10  SAID SOMEWHAT PREMATURELY YESTERDAY.

11         OKAY.  CAN WE CONTINUE ON WITH THE DEFENSE CASE?

12         MR. KESSLER:  YES, YOUR HONOR.  AS OUR NEXT WITNESS

13  WE CALL PROFESSOR ROGER NOLL OF STANFORD UNIVERSITY.

14         THE COURT:  HOW DO YOU SPELL THAT?

15         MR. KESSLER:  N-O-L-L.

16         THE COURT:  ALL RIGHT.

17         MR. KESSLER:  WE ARE GETTING MR. NOLL NOW.

18         THE COURT:  ALL RIGHT.  PLEASE COME FORWARD.

19         IF YOU'LL STAND SOMEWHERE IN THERE, AND RAISE YOUR

20  RIGHT HAND, WE'LL SWEAR YOU IN.

21         (THEREUPON, THE WITNESS WAS SWORN.)

22         THE WITNESS:  I DO.

23         THE CLERK:  THANK YOU.

24         THE COURT:  ALL RIGHT.  WE NEED TO TAKE YOUR

25  PHOTOGRAPH.  IS THAT OKAY?

1    **THE WITNESS:** SURE. IF I DON'T BREAK THE CAMERA.

2    **THE COURT:** ALL RIGHT. GO AHEAD.

3    (PICTURE TAKEN.)

4    <u>**ROGER NOLL**</u>,

5    CALLED AS A WITNESS FOR THE DEFENDANTS HEREIN, HAVING BEEN

6    FIRST DULY SWORN, WAS EXAMINED AND TESTIFIED AS FOLLOWS:

7    <u>**DIRECT EXAMINATION**</u>

8    **BY MR. KESSLER:**

9    **Q.** GOOD MORNING, PROFESSOR NOLL.

10   **A.** GOOD MORNING, MR. KESSLER.

11   **Q.** PROFESSOR, WILL YOU PLEASE STATE YOUR NAME FOR THE RECORD?

12   **A.** MY NAME IS ROGER G. NOLL.

13   **Q.** AND, PROFESSOR NOLL, WHAT IS YOUR CURRENT EMPLOYMENT?

14   **A.** I'M PROFESSOR EMERITUS -- WHICH MEANS RETIRED -- AT

15   STANFORD. AND I'M ALSO A SENIOR FELLOW AT THE STANFORD

16   INSTITUTE FOR ECONOMIC POLICY RESEARCH AND THE STANFORD CENTER

17   FOR INTERNATIONAL DEVELOPMENT.

18   **Q.** OKAY. AND WERE YOU A TENURED PROFESSOR AT STANFORD

19   UNIVERSITY?

20   **A.** YES.

21   **Q.** FOR HOW MANY YEARS WERE YOU A PROFESSOR AT STANFORD?

22   **A.** UHM, 23.

23   **Q.** OKAY. AND PROFESSOR NOLL, WHAT WAS YOUR AREA OF

24   SCHOLARSHIP AT STANFORD?

25   **A.** MY FIELD OF RESEARCH AND TEACHING IS PUBLIC POLICIES

1   TOWARDS BUSINESS, OR AS THE FIELD IS CALLED IN ECONOMICS,

2   INDUSTRIAL ORGANIZATION.

3   **Q.**   HAVE YOU DONE ANY PARTICULAR WORK IN THE AREA OF SPORTS

4   ECONOMICS?

5   **A.**   YES, I HAVE.

6   **Q.**   WOULD YOU PLEASE EXPLAIN THAT TO THE JURY?

7   **A.**   I HAVE -- I AM THE EDITOR AND AUTHOR OF SEVERAL CHAPTERS

8   OF TWO BOOKS ON THE ECONOMICS OF SPORTS.  ONE IS CALLED

9   THE GOVERNMENT IN THE SPORTS BUSINESS, AND THE OTHER IS CALLED

10  SPORTS JOBS AND TAXES.

11         THE LATTER IS ABOUT STADIUM SUBSIDIES.  THE FORMER IS

12  JUST A GENERAL SURVEY OF ALL THE ISSUES IN THE ECONOMICS OF

13  SPORTS.

14         AND THEN, I PERIODICALLY WRITE RESEARCH PAPERS THAT

15  ARE PUBLISHED IN PROFESSIONAL JOURNALS OR IN BOOKS.

16  **Q.**   HAVE YOU EVER BEEN A CONSULTANT TO ANY GOVERNMENT AGENCIES

17  IN THE AREA OF INDUSTRIAL ORGANIZATION ECONOMICS?

18  **A.**   YES, I HAVE.

19  **Q.**   COULD YOU PLEASE EXPLAIN TO THE JURY BRIEFLY SOME OF THOSE

20  ASSIGNMENTS.

21  **A.**   I HAVE ON SEVERAL OCCASIONS WORKED WITH THE ANTITRUST

22  DIVISION OF THE DEPARTMENT OF JUSTICE AND THE FEDERAL TRADE

23  COMMISSION.

24         I HAVE CONSULTED FOR THE -- WHAT WAS THEN CALLED THE

25  SENATE SUBCOMMITTEE ON ANTITRUST AND MONOPOLY.  THE NAME KEEPS

1    CHANGING.  I DON'T KNOW WHAT THE CURRENT NAME IS.

2            AND I HAVE ALSO CONSULTED WITH THE FEDERAL

3    COMMUNICATIONS COMMISSION ON BROADCASTING ISSUES.

4    **Q.**   AND PROFESSOR NOLL, HAVE YOU EVER TAUGHT A COURSE ON THE

5    ECONOMICS OF PROFESSIONAL SPORTS?

6    **A.**   I HAVE TAUGHT COURSES IN WHICH THE ECONOMICS OF SPORTS ARE

7    A PART.  IN MY VIEW, IT DOESN'T SUSTAIN AN ENTIRE COURSE.  BUT

8    I HAVE TAUGHT COURSES ON SPORTS, ENTERTAINMENT AND THE MEDIA,

9    WHICH I BELIEVE IS THE APPROPRIATE FIELD IN ECONOMICS.

10   **Q.**   PROFESSOR NOLL, SO THE JURY KNOWS, HAVE YOU BEEN A WITNESS

11   IN CASES THAT I'VE BEEN INVOLVED IN BEFORE?

12   **A.**   YES, I HAVE.

13   **Q.**   HAVE YOU SOMETIMES BEEN A WITNESS WHO I CALLED?

14   **A.**   I HAVE SOMETIMES BEEN SOMEONE YOU CALLED, YES.

15   **Q.**   AND HAVE YOU SOMETIMES BEEN A WITNESS WHO MY ADVERSARY

16   CALLED?

17   **A.**   YES, I HAVE.

18   **Q.**   PROFESSOR NOLL, WERE YOU RETAINED IN CONNECTION WITH THIS

19   LITIGATION?

20   **A.**   YES, I WAS.

21   **Q.**   AND YOU'RE BEING COMPENSATED FOR THAT?

22   **A.**   YES, I AM.

23   **Q.**   WHAT WAS YOUR HOURLY RATE WITH RESPECT --

24   **A.**   $700.

25   **Q.**   AND DO YOU RECALL IN TOTAL APPROXIMATELY HOW MUCH YOU'VE

1  BEEN COMPENSATED IN CONNECTION WITH THIS MATTER?

2  **A.**   UHM, IT'S AROUND $85,000 TOTAL.

3  **Q.**   OKAY.  PROFESSOR NOLL, DOES THE OUTCOME OF THIS CASE IN

4  ANY WAY AFFECT YOU FINANCIALLY ONE WAY OR THE OTHER?

5  **A.**   NO.

6  **Q.**   OKAY.  PROFESSOR NOLL, WHAT WERE YOU ASKED TO DO IN

7  CONNECTION WITH THIS CASE?

8  **A.**   REVIEW AND EVALUATE THE TESTIMONY OF DR. RASCHER AND ITS

9  LINKAGES TO THE TESTIMONY OF MR. ROWLEY.

10 **Q.**   SO THAT WAS DR. RASCHER WHO WAS CALLED TO TESTIFY FOR THE

11 PLAINTIFFS?

12 **A.**   THAT'S CORRECT.

13 **Q.**   I THINK THE JURY HAS ALREADY SEEN HIM.

14          PROFESSOR NOLL, I WOULD LIKE YOU TO TAKE A LOOK AT

15 E1, WHICH IS A DEMONSTRATIVE EXHIBIT WE PREPARED FOR YOU.

16          **MR. HUMMEL:**  YOUR HONOR, I OBJECT.  THIS IS NOT

17 DISCLOSED IN HIS EXPERT REPORT.  IT'S A FORM OF LEADING.  IT IS

18 A WAY THAT HE CAN OUTLINE FOR THE WITNESS HIS TESTIMONY.

19          **THE COURT:**  I'M GOING TO SUSTAIN THAT OBJECTION.

20          **MR. HUMMEL:**  IT'S INAPPROPRIATE.

21          **THE COURT:**  SUSTAINED.

22          **MR. HUMMEL:**  AND THE WITNESS SHOULD NOT BE ABLE TO

23 LOOK AT IT.

24          **MR. KESSLER:**  OKAY.

25          **THE COURT:**  WELL, AFTER YOU GO THROUGH THE SUBJECT

1  MATTER, THEN ONCE HE'S TESTIFIED TO IT, THEN YOU CAN GO BACK

2  OVER IT.

3          IS THIS AN ILLUSTRATIVE CHART?

4          **MR. KESSLER:**  YES, THESE ARE ILLUSTRATIVE CHARTS,

5  YOUR HONOR, THAT BASICALLY THE WITNESS -- I WASN'T GOING TO PUT

6  IT UP FIRST.  I WAS GOING TO ASK THE WITNESS TO EXPLAIN WHAT

7  CONCLUSIONS HE HAS REACHED, AND THEN I THOUGHT IT WOULD BE

8  HELPFUL FOR THE JURY TO SEE A SUMMARY OF THOSE CONCLUSIONS.

9  BUT IT'S UP TO YOUR HONOR.

10         **THE COURT:**  THE THING TO DO, WITHOUT SHOWING IT TO

11 HIM FIRST, GO THROUGH HIS CONCLUSIONS.

12         AND THEN -- NOW, DID YOU ON YOUR SIDE OVER THERE,

13 MR. HUMMEL, DID YOU DO A SIMILAR THING WITH ANY OF YOUR

14 EXPERTS?

15         **MR. HUMMEL:**  NO, YOUR HONOR.

16         **MR. KESSLER:**  THEY COULD HAVE, YOUR HONOR.  AND, IN

17 FACT, THESE ARE THE SAME CONCLUSIONS THAT ARE IN HIS EXPERT

18 REPORT.  SO IT'S ALREADY FULLY DISCLOSED IN THE EXPERT REPORTS.

19         **THE COURT:**  WELL, AFTER HE HAS TESTIFIED TO IT, YOU

20 CAN PUT IT UP ON THE SCREEN AND SUMMARIZE IT.

21         **MR. KESSLER:**  THANK YOU, YOUR HONOR.

22 **BY MR. KESSLER:**

23 **Q.**   DID YOU REACH ANY PARTICULAR CONCLUSIONS CONCERNING

24 DR. RASCHER'S ANALYSIS?

25 **A.**   YES, I DID.

1   Q.   OKAY.  LET ME FIRST ASK YOU ABOUT DR. RASCHER'S OPINION

2   THAT RETIRED PLAYERS HAVE CONTRIBUTED TO -- EQUALLY TO THE

3   LICENSING REVENUES TO PLAYERS INC.  DO YOU RECALL THAT THAT'S

4   ONE OF HIS OPINIONS?

5           MR. HUMMEL:  OBJECTION.  MISSTATES HIS OPINION, YOUR

6   HONOR.

7           THE COURT:  WELL, IT WILL BE FOR THE WITNESS AND THE

8   JURY TO SORT THAT OUT.

9           SOMETIMES THE LAWYERS DISAGREE OVER WHAT OPINION WAS

10  GIVEN.  AND IF YOUR MEMORY IS DIFFERENT, YOUR MEMORY CONTROLS.

11          WITH THAT, OVERRULED.

12          PLEASE ANSWER.

13  BY MR. KESSLER:

14  Q.   DO YOU RECALL WHAT YOUR CONCLUSION WAS ABOUT DR. RASCHER'S

15  OPINION ABOUT RETIRED PLAYERS CONTRIBUTING TO THE LICENSING

16  REVENUES OF PLAYERS INC?

17  A.   YES, I DO RECALL.

18  Q.   OKAY.  AND WHAT WAS YOUR CONCLUSION ABOUT DR. RASCHER'S

19  OPINION?

20  A.   MY CONCLUSION WAS THAT THE EVIDENCE THAT HE CITED DID NOT,

21  IN FACT, ESTABLISH THE CONCLUSION THAT THERE IS NO BASIS IN HIS

22  TESTIMONY FOR THAT CONCLUSION, AND THAT, IN FACT, IT'S WRONG.

23  Q.   WAS THERE ANY BASIS IN ECONOMIC ANALYSIS FOR THAT

24  CONCLUSION?

25  A.   NO, THERE WAS NO BASIS IN ECONOMIC ANALYSIS FOR THAT

1  CONCLUSION.

2          **MR. HUMMEL:**  OBJECTION, YOUR HONOR, LEADING.  MOTION

3  TO STRIKE.  HE IS READING FROM THE EXHIBIT, AND IT'S LEADING.

4          **THE COURT:**  WHO'S --

5          **MR. HUMMEL:**  MR. KESSLER JUST READ FROM THE EXHIBIT A

6  QUESTION TO THIS WITNESS.  IT WAS A LEADING QUESTION, AND I

7  OBJECT.  I ASK THAT THERE NOT BE LEADING OF THIS WITNESS.

8          **THE COURT:**  WELL, DON'T LEAD THE WITNESS.  BUT

9  OVERRULED FOR NOW.

10          YOU CAN READ FROM WHATEVER YOU WANT, COUNSEL, BUT YOU

11  CAN'T BE -- WHEN IT COMES OUT, IT CAN'T BE A LEADING QUESTION.

12          **MR. KESSLER:**  YOUR HONOR, I DO NOT BELIEVE THAT WAS A

13  LEADING QUESTION.

14          **THE COURT:**  ALL RIGHT.  WE'LL PASS ON TO THE NEXT

15  QUESTION.  NO LEADING.

16          **MR. KESSLER:**  OKAY.

17  **BY MR. KESSLER:**

18  **Q.**   DO YOU RECALL THAT DR. RASCHER HAD AN OPINION ABOUT

19  DEFENDANTS' MARKET POWER OR LEVERAGE?

20  **A.**   YES, I DO RECALL THAT OPINION.

21  **Q.**   LET ME MAKE SURE I'M NOT LEADING.  WHAT DO YOU RECALL WAS

22  DR. RASCHER'S OPINION ABOUT THAT?

23  **A.**   DR. RASCHER'S OPINION IS THAT THE NFL PLAYERS ASSOCIATION

24  AND NFL PLAYERS INC SOMEHOW HAD SOME FORM OF BARGAINING POWER,

25  EITHER LEVERAGE OR MARKET POWER, ARISING FROM THEIR POSITION AS

1  THE LICENSEES OF THE IMAGES OF BOTH ACTIVE AND RETIRED PLAYERS.

2  **Q.**   AND DID YOU HAVE ANY CONCLUSION THAT YOU REACHED AS TO

3  WHETHER THAT OPINION OF DR. RASCHER IS SUPPORTED OR

4  UNSUPPORTED?

5  **A.**   UHM, FROM MY PERSPECTIVE -- MY ANALYSIS WITH RESPECT TO

6  THE RETIRED PLAYERS IS IT'S COMPLETELY UNSUPPORTED.  IT IS

7  SIMPLY NOT TRUE.

8  **Q.**   NOW, DO YOU RECALL WHETHER DR. RASCHER DID SOME COMPARISON

9  OF THE SHARE OF PLAYER LICENSING REVENUES THAT THE DEFENDANTS

10 KEPT VERSUS WHAT OTHER ORGANIZATIONS KEPT?

11 **A.**   YES.

12 **Q.**   OKAY.  AND DID YOU HAVE ANY CONCLUSION THAT YOU REACHED

13 ABOUT THAT OPINION OF DR. RASCHER?

14 **A.**   YES, I DID.

15 **Q.**   AND WHAT WAS YOUR CONCLUSION?

16 **A.**   MY CONCLUSION WAS THAT HIS -- HIS CONCLUSION THAT THERE'S

17 SOMEHOW A SUBSTANTIAL OR SIGNIFICANT DIFFERENCE BETWEEN THE

18 PRACTICES OF THE NATIONAL FOOTBALL LEAGUE PLAYERS ASSOCIATION

19 AND ANY OTHER COMPARABLE ORGANIZATION ARE FALSE.  THERE ARE NO

20 SIGNIFICANT OR SUBSTANTIAL DIFFERENCES IN THE PRACTICES OF THE

21 NFLPA AND OTHER ENTITIES THAT ENGAGE IN LICENSING.

22 **Q.**   OKAY.  WELL, SPECIFICALLY, DID YOU EXAMINE HOW THE

23 LICENSING REVENUES FOR PLAYERS RETAINED BY THE NFLPA AND

24 PLAYERS INC COMPARED TO SOME OTHER SPORTS UNIONS?

25 **A.**   YES.  I -- YES, I DID ANALYZE THAT.

1  Q.   DID YOU REACH ANY CONCLUSION ABOUT WHETHER THERE WAS ANY

2  MATERIAL DIFFERENCE?

3  A.   YES, I DID REACH --

4  Q.   WHAT WAS YOUR CONCLUSION?

5  A.   THERE IS NO MATERIAL DIFFERENCE BETWEEN THE BEHAVIOR OF

6  THE NFLPA AND THE OTHER PLAYERS UNIONS IN PROFESSIONAL SPORTS.

7          MR. KESSLER:  YOUR HONOR, I WOULD LIKE TO DISPLAY

8  NOW -- I BELIEVE I CAN HAND UP TO YOUR HONOR A DEMONSTRATIVE

9  EXHIBIT THAT DISPLAYS THOSE CONCLUSIONS.

10          MR. HUMMEL:  I OBJECT, YOUR HONOR.

11          THE COURT:  OVERRULED.  NOW, YOU CAN GO AHEAD AND GO

12  OVER THE SUMMARY.

13          MR. KESSLER:  THANK YOU, YOUR HONOR.

14          (DOCUMENT DISPLAYED.)

15  BY MR. KESSLER:

16  Q.   PROFESSOR NOLL, I'M GOING TO REVIEW WHAT THE BASIS IS FOR

17  EACH OF THESE THREE MAJOR CONCLUSIONS THAT YOU REACHED.

18  A.   IF YOU'RE GOING TO DO THAT, YOU'RE GOING TO HAVE TO GIVE

19  ME A COPY, BECAUSE I CAN'T READ THE SCREEN FROM HERE.

20  Q.   I'M SO SORRY.  WE CAN BLOW IT UP, TOO.

21  A.   THAT'S OKAY.

22  Q.   THE FIRST CONCLUSION I WANT TO FOCUS ON IS THAT:

23          "THERE IS NO BASIS IN ECONOMIC ANALYSIS FOR

24  DR. RASCHER'S OPINION THAT RETIRED PLAYERS HAVE CONTRIBUTED

25  EQUALLY TO CURRENT LICENSING REVENUES."

1          MY FIRST QUESTION IS:  DO YOU RECALL DR. RASCHER

2   CITED WHAT HE CALLED "PEER-REVIEW ARTICLES" IN SUPPORT OF HIS

3   ANALYSIS?

4   **A.**   YES, I DO.

5   **Q.**   OKAY.  DID YOU LOOK AT THOSE PEER-REVIEW ARTICLES?

6   **A.**   I LOOKED NOT ONLY AT THE ARTICLES THAT HE CITED, BUT EVERY

7   ARTICLE I COULD FIND THAT DEALT WITH THAT ISSUE.

8   **Q.**   WHAT IS "ANY ARTICLE"?  WERE YOU LOOKING AT SCHOLARLY

9   RESEARCH?

10  **A.**   YES.  THESE ARE IN, NATURALLY, THE SAME ACADEMIC JOURNALS.

11  THE "JOURNAL OF SPORTS MANAGEMENT" IS THE MOST IMPORTANT IN

12  THIS FIELD.  BUT THERE ARE A NUMBER OF OTHER JOURNALS THAT

13  REGULARLY PUBLISH ARTICLES IN THIS AREA, AND I READ ALL THE

14  ARTICLES THAT DEALT WITH THE ISSUES THAT HE REFERRED TO IN HIS

15  TESTIMONY.

16  **Q.**   OKAY.  AND DID THE RESEARCH CITED BY DR. RASCHER MEASURE

17  ANY RELATIONSHIP BETWEEN PAST PLAYERS, RETIRED PLAYERS, AND

18  BRAND VALUE?

19  **A.**   NO.

20  **Q.**   WOULD YOU EXPLAIN TO THE JURY WHAT THOSE ARTICLES DID AND

21  DID NOT DO?

22  **A.**   HAPPILY.

23          THE ARTICLES THAT HE CITES, AND A MUCH LARGER NUMBER

24  OF OTHER ARTICLES THAT HE DOESN'T, DEAL WITH ONE PART OF A LINK

25  OF ARGUMENTS.  AND THE LINK OF ARGUMENTS GOES AS FOLLOWS:

1  THERE'S SOMETHING OUT THERE CALLED "THE ATTACHMENT OF PEOPLE AS

2  FANS TO A TEAM."

3          AND PRESUMABLY THAT'S RELATED TO SOMETHING ABOUT THE

4  TEAM.  IT MAY HAVE TO DO WITH THE PERSONALITIES OF THE CURRENT

5  PLAYERS, THE RECORDS OF THE CURRENT TEAM, THE HISTORY OF THE

6  TEAM, THE STADIUM IN WHICH IT PLAYS, THE TREATMENT OF THE FANS

7  IN THE STADIUM BY THE PERSONNEL WHO WORK THERE, A WHOLE HOST OF

8  ART -- OF ISSUES.

9          ONE OF THE AUTHORS THAT HE CITES, STEVEN ROSS, LISTS

10 41 SEPARATE THINGS THAT HE BELIEVES CONTRIBUTE TO CAUSING

11 PEOPLE TO BE FANS TO A TEAM.

12         SO THE -- THE FIRST LINK IS GOING FROM FEATURES OF A

13 TEAM TO HOW INTENSE ITS FAN BASE IS.  ALL RIGHT.

14         THEN, THE SECOND LINK IN THAT THEORETICAL ARGUMENT IS

15 TO GO FROM THE INTENSITY OF FAN LOYALTY, THE ATTACHMENT, TO

16 SOMETHING CALLED "BRAND EQUITY."

17         BRAND EQUITY IS A CONCEPT IN MARKETING THAT BASICALLY

18 MEANS YOU BUY A PRODUCT NOT JUST FOR ITS INTRINSIC QUALITIES,

19 BUT BECAUSE OF THE BRAND ASSOCIATED WITH.

20         THAT IS TO SAY, YOU PAY EXTRA WHEN YOU GO TO THE

21 GROCERY STORE WHEN YOU BUY AN ORANGE THAT HAS "SUNKIST" ON IT

22 THAN YOU WOULD IF IT DIDN'T HAVE "SUNKIST" ON IT.

23         ALL RIGHT.  NOW, THAT DIFFERENCE IN PRICE OR

24 DIFFERENCE IN PROFITS THAT A FIRM CAN MAKE BETWEEN THE PRICE IT

25 COULD GET IF THERE WERE NO BRAND ASSOCIATED WITH THE PRODUCT

1  AND THE PRICE AND PROFITS THEY CAN GET BECAUSE OF THEIR BRAND,

2  THAT IS CALLED "BRAND EQUITY."

3  **Q.**    PROFESSOR NOLL, IF I CAN, MAYBE TO HELP FOCUS THE JURY,

4  COULD YOU EXPLAIN DOES ANY OF THAT HAVE ANYTHING TO DO WITH

5  WHETHER OR NOT RETIRED NFL PLAYERS HAVE CONTRIBUTED EQUALLY TO

6  CURRENT LICENSING REVENUES?

7  **A.**    IT COULD, IN THEORY.  IN PRACTICE, THERE'S NO EVIDENCE

8  THAT IT DOES.

9          BECAUSE THAT GETS TO THE LAST LINK, WHICH IS, AS I

10  SAID, IT HAS SOMETHING TO DO WITH SALES AND PRICES.  SO THE

11  LAST LINK YOU WOULD HAVE TO MAKE IS THAT SOME SOURCE OF

12  REVENUE, LIKE TICKET SALES, BROADCASTING REVENUES OR LICENSING

13  REVENUES OF A TEAM WOULD BE RELATED TO BRAND EQUITY, WHICH

14  WOULD BE RELATED TO FAN LOYALTY, WHICH WOULD BE RELATED TO

15  THESE 41 CHARACTERISTICS.

16          NOW, THE WAY THAT RETIRED PLAYERS -- THE WAY THAT IT

17  WOULD BE TRUE THAT RETIRED PLAYERS CONTRIBUTED EQUALLY TO

18  LICENSING REVENUES THROUGH THIS CHAIN WOULD BE THE RETIRED

19  PLAYERS EQUALLY CONTRIBUTE TO THIS FAN LOYALTY, THE ATTACHMENT;

20  THAT FAN LOYALTY THEN FEEDS IN TO BRAND EQUITY THROUGH

21  LICENSING.

22          THERE IS -- NOT ONLY IS IT THE CASE, THERE IS NOT A

23  SINGLE RESEARCH PAPER IN THE LITERATURE THAT LINKS REVENUE TO

24  THE FAN ATTACHMENT ARISING FROM RETIRED PLAYERS.  THERE'S NOT A

25  SINGLE PAPER THAT DOES THAT.

1        STEVEN ROSS, WHO IS ONE OF THE AUTHORS CITED BY

2   DR. RASCHER, ACTUALLY HAS A MAY 2008 PAPER IN WHICH HE

3   EXPLICITLY STATES THAT IS THE BIG UNSOLVED PART OF THE PUZZLE,

4   IS THAT NO LINK HAS EVER BEEN MADE TO HIS RESEARCH, WHICH IS

5   THE SOURCE OF FAN LOYALTY, AND ANY SOURCE OF REVENUE.

6        SO THERE'S JUST NO BASIS IN THAT.  IT'S NOT TRUE THAT

7   THERE'S ANY PEER-REVIEWED RESEARCH THAT HAS EVER ESTABLISHED

8   THAT ANY REVENUE ENJOYED BY A TEAM HAS ANYTHING TO DO WITH FAN

9   LOYALTY OR THAT IT HAS ANYTHING TO DO WITH RETIRED PLAYERS AS

10  ONE OF THE 41 ELEMENTS THAT MIGHT CONTRIBUTE TO FAN LOYALTY.

11  **Q.**   PUTTING ASIDE -- YOU MENTIONED TEAMS.  DO ALL THE PAPERS

12  THAT DR. RASCHER CITED HAVE TO DO WITH THE VALUE OF TEAMS?

13  **A.**   YES.

14  **Q.**   OKAY.

15  **A.**   THEY ALL HAVE TO DO WITH TEAMS.  AND SO THE REVENUE YOU

16  WOULD LOOK AT IS THE LICENSING REVENUE OF TEAMS, WHICH HAS

17  NOTHING TO DO WITH THE LICENSING REVENUE OF PLAYERS.

18  **Q.**   IS THERE ONE STUDY THAT DR. RASCHER CITED, AT ALL, THAT

19  DISCUSSES THE REVENUES OR THE IMPACT ON REVENUES OF PLAYER

20  LICENSING?

21  **A.**   NO.  THERE'S NO -- THERE'S NOTHING IN THE PUBLISHED

22  RESEARCH LITERATURE AT ALL ABOUT PLAYER LICENSING.

23  **Q.**   DID DR. RASCHER, IN HIS ANALYSIS AND REPORT, PRESENT ANY

24  EVIDENCE CONCERNING WHAT IMPACT RETIRED PLAYERS HAD ON

25  LICENSING BY PLAYERS INC, SPECIFICALLY?  IS THERE ANY EVIDENCE

1  HE PRESENTED AT ALL?

2  **A.**   NO.

3  **Q.**   NOTHING?

4  **A.**   NOTHING.

5  **Q.**   NOW, PROFESSOR NOLL, DID YOU STUDY ANY DATA THAT WOULD

6  BEAR ON THE ISSUE OF WHAT THE MARKETING VALUE WAS OF RETIRED --

7  INDIVIDUAL RETIRED PLAYER LICENSING RIGHTS?

8  **A.**   YES.

9  **Q.**   EXPLAIN TO THE JURY WHAT DATA YOU LOOKED AT.

10 **A.**   I LOOKED AT ALL OF THE RETIRED PLAYER LICENSING DATA SINCE

11 2003, FROM THE NFLPI, ALL OF THE LICENSING ACTIVITIES ON BEHALF

12 OF RETIRED PLAYERS THAT NFLPI HAS DONE.

13 **Q.**   DID YOU LOOK AT THAT DATA AND ANALYZE IT ANY PARTICULAR

14 WAY?

15 **A.**   YES.  I -- I TRIED TO -- WHAT I DID IN MY ANALYSIS WAS

16 DETERMINE HOW EQUAL IT IS, WHO GETS THE REVENUE AND WHO

17 DOESN'T.  WHO -- WHO CAN BE LICENSED AND WHO CAN'T, ONE OF THE

18 CHARACTERISTICS OF THE PLAYERS WHO ARE LICENSED VERSUS THE ONES

19 WHO ARE NOT.

20          **MR. KESSLER:**  WHAT HAPPENED TO MY SET OF EXHIBITS FOR

21 PROFESSOR NOLL?  I'M LOOKING AT TRIAL EXHIBIT 2397.  DO YOU

22 HAVE THAT?

23          **MR. CLARK:**  HE ALREADY HAS IT.

24 **BY MR. KESSLER:**

25 **Q.**   LET ME HAND YOU A COPY OF TRIAL EXHIBIT 2397.  FIRST OF

1  ALL, DOES TRIAL EXHIBIT 2397 REFLECT SOME OF THE ANALYSIS YOU

2  DID OF THIS LICENSING DATA?

3  **A.**   IT REFLECTS SOME IT.   THERE IS ONE TABLE THAT IS THE

4  RESULT OF THIS ANALYSIS.

5  **Q.**   WAS IT PREPARED UNDER YOUR DIRECTION?

6  **A.**   IT WAS PREPARED UNDER MY DIRECTION, YES.

7          **MR. KESSLER:**  YOUR HONOR, I MOVE INTO EVIDENCE TRIAL

8  EXHIBIT 2397.

9          **MR. HUMMEL:**  NO OBJECTION.

10         **THE COURT:**  RECEIVED.

11         (TRIAL EXHIBIT 2397 RECEIVED IN EVIDENCE.)

12         (DOCUMENT DISPLAYED.)

13 **BY MR. KESSLER:**

14 **Q.**   AND THIS SAYS:

15             "DISTRIBUTION OF LICENSING REVENUES AMONG

16 PLAYERS WHO SIGNED RETIRED PLAYER GLA'S 2003 TO EARLY 2008."

17             SO JUST SO THE JURY UNDERSTANDS, DID THE DATA SET YOU

18 LOOKED AT CONTAIN THOSE WHO SIGNED THE RETIRED PLAYERS GROUP

19 LICENSING AUTHORIZATIONS?

20 **A.**   YES, IT DID.

21 **Q.**   OKAY.  AND FOR WHAT PERIOD OF TIME DID YOU COVER?

22 **A.**   IT WAS ALL OF THE YEARS 2003 THROUGH 2007, 2003 THROUGH

23 2007, AND THEN, PART OF 2008.  AT THE TIME I GOT THE DATA, 2008

24 OBVIOUSLY ISN'T DONE YET.

25 **Q.**   WAS THE DATE BEFORE YOU DID YOUR REPORT IN THIS CASE?

1  **A.**   YES.

2  **Q.**   EXPLAIN TO THE JURY WHAT THIS CHART SHOWS AND WHAT THE

3  SIGNIFICANCE IS OF THIS CHART TO YOUR CONCLUSIONS.

4  **A.**   WHAT THIS CHART SHOWS IS THAT VIRTUALLY ALL OF THE

5  PLAYERS, OF THE REVENUE DERIVED FROM LICENSING OF RETIRED

6  PLAYERS, IS ACCOUNTED FOR BY A RELATIVELY SMALL FRACTION OF

7  THEM.

8          THERE ARE ON THE ORDER OF 2,000 RETIRED PLAYERS WHO

9  SIGNED GLA'S, AND 1700 OF THEM NOTHING EVER HAPPENED.  THERE

10 WAS NO REVENUE.

11         BUT ON THE OTHER HAND, 30 OF THEM RECEIVED OVER

12 $50,000.  SO --

13 **Q.**   THAT WOULD BE THIS BOTTOM LINE, 30 OF THE PLAYERS --

14 **A.**   YES.

15 **Q.**   -- RECEIVED OVER 50,000?

16 **A.**   RIGHT.  SO WHAT IT SHOWS IS THAT THERE IS EXTREME

17 INEQUALITY AMONG OF THE PLAYERS AS THEIR ATTRACTIVENESS AS

18 POTENTIAL LICENSEES.

19 **Q.**   AS AN ECONOMIST, DOES THIS DATA LEAD YOU TO ANY

20 CONCLUSIONS ABOUT THE MARKET VALUE OF RETIRED PLAYERS?

21 **A.**   WHAT IT TELLS ME IS -- THE DATA ON LICENSING ACTUALLY SHOW

22 THAT THE VAST MAJORITY OF RETIRED PLAYERS HAVE NO MARKET VALUE

23 IN TERMS OF LICENSING THEIR IMAGE.

24 **Q.**   AND IS THAT RELATED TO THE FACT THAT SIX -- 1684 OF THE

25 PLAYERS WERE NOT DESIRED BY LICENSEES AT ALL, AND 30 ONLY

1  RECEIVED UP TO $25?

2  **A.**    YES.  SO -- SO MANY -- SUCH A LARGE FRACTION OF THEM

3  RECEIVED NOTHING OR NEXT TO NOTHING, AND THEN A SMALL GROUP

4  RECEIVED SOMETHING.

5  **Q.**    LET ME SHOW YOU NEXT TRIAL EXHIBIT 2398.

6          PROFESSOR NOLL, DOES THIS REFLECT SOME FURTHER

7  ANALYSIS THAT YOU DID OF THIS LICENSING DATA?

8  **A.**    YES.  THIS TAKES THE -- THE 378 PLAYERS WHO RECEIVED

9  SOMETHING AND LOOKS AT THE FRACTION OF TOTAL LICENSING REVENUE

10 THAT ARE ACCOUNTED BY THE TOP TEN, THE NEXT TEN, ET CETERA, IN

11 TERMS OF THEIR RANK ORDERING WITH RESPECT TO LICENSING REVENUE.

12         **MR. KESSLER:**  YOUR HONOR, I MOVE INTO EVIDENCE TRIAL

13 EXHIBIT 2398.

14         **MR. HUMMEL:**  NO OBJECTION.

15         **THE COURT:**  RECEIVED.

16         (TRIAL EXHIBIT 2398 RECEIVED IN EVIDENCE.)

17 **BY MR. KESSLER:**

18 **Q.**    AND IT SAYS:

19         "DISTRIBUTION OF LICENSING REVENUES AMONG

20 PLAYERS WHO SIGNED RETIRED PLAYER GLA'S."

21         WOULD YOU EXPLAIN TO THE JURY, TAKE THEM THROUGH

22 THESE LINES AND EXPLAIN WHAT THIS CHART SHOWS?

23 **A.**    YES.  IF YOU RECALL, THE LAST CHART SHOWED THAT LIKE 30

24 PLAYERS RECEIVED OVER $50,000.  WELL, TEN OF THOSE 30 WOULD BE

25 IN THIS TOP TEN.  THEY WOULD BE THE TEN WHO GOT THE MOST MONEY.

1      AND THOSE TEN PLAYERS -- THAT'S TEN OUT OF

2 APPROXIMATELY 2,000 WHO HAD SIGNED GLA'S -- ACCOUNTED FOR

3 41 PERCENT OF ALL THE LICENSING REVENUE.

4      AND THEN, EVEN AMONG THOSE WHO RECEIVED MONEY,

5 NUMBERS 201 THROUGH 378 GOT ONLY 2 PERCENT OF IT.  SO THEY GOT

6 ALMOST NOTHING, AS WELL.

7      SO, AGAIN, THIS JUST DEMONSTRATES THAT ALMOST ALL OF

8 THE REVENUE, 90 PERCENT OF THE REVENUE, IS ACCOUNTED FOR BY A

9 HUNDRED OF THESE 2,000 PLAYERS.

10 **Q.**   NOW, PROFESSOR NOLL, AS AN ECONOMIST, IF YOU WERE

11 EXAMINING WHAT AN INDIVIDUAL PLAYER'S LICENSING RIGHTS WOULD BE

12 WORTH IF THAT PERSON WAS MARKETED, WHAT WOULD THIS DATA TELL

13 YOU ABOUT THAT?

14 **A.**   WELL, THESE DATA ACTUALLY CONFIRM WHAT YOU WOULD EXPECT AS

15 AN ECONOMIST, WHICH IS THAT LICENSING REVENUE OUGHT TO BE A LOT

16 LIKE PLAYER SALARIES.  WE KNOW FROM OBSERVING PLAYER SALARIES

17 THAT SOME PLAYERS ARE PAID $10 MILLION A YEAR OR MORE.  OTHERS

18 EARN MINIMUM SALARIES, WHICH IS NOW ABOUT 225,000.

19      AND THE REASON FOR THAT, OF COURSE, IS THAT WE -- WE

20 KNOW WHO THE STAR PLAYERS ARE.  WE KNOW WHO JOE MONTANA WAS OR

21 STEVE YOUNG.

22      WE KNOW WHO THE MOST IMPORTANT PLAYERS ARE.  WE

23 FOLLOW THEM AS FANS.  BUT THE VAST MAJORITY OF PLAYERS ARE

24 ANONYMOUS.  THEY ARE NOT -- THE TYPICAL CAREER LENGTH IN THE

25 NFL, THE AVERAGE CAREER LENGTH IS ABOUT THREE YEARS.

1          MANY PLAYERS NEVER EVEN GET INTO A GAME.  THEY --

2    THEY COME IN AS ROOKIES.  MAYBE MAKE A PRACTICE SQUAD.  MAYBE

3    MAKE THE ACTIVE SQUAD FOR A FEW GAMES, AND THEN THAT'S IT.

4    THEIR CAREER IS OVER.

5          THEY EARN ALMOST NOTHING FROM THE SPORT.

6          **MR. HUMMEL:**  OBJECTION, YOUR HONOR.  HE HAS NOW GONE

7    FAR BEYOND HIS EXPERT REPORT.  THERE IS NOTHING IN HIS EXPERT

8    REPORT --

9          **THE COURT:**  MR. KESSLER, IS THAT RIGHT?

10         **MR. KESSLER:**  I DON'T AGREE, YOUR HONOR.  HIS ENTIRE

11   ANALYSIS OF HIS DATA IS DESCRIBED IN HIS EXPERT REPORT.  AND

12   THIS WAS EXPLORED AT LENGTH IN HIS DEPOSITION.

13         **THE COURT:**  IT DOESN'T MATTER ABOUT THE DEPOSITION.

14   SHOW ME WHERE IT IS IN THE REPORT.  TAKE THE TIME.  GIVE ME THE

15   REPORT.  SHOW ME WHERE IT IS IN THE REPORT.

16         WHILE YOU'RE LOOKING FOR THAT, THIS IS THE GROUND

17   RULE -- THIS IS NOT MY RULE, THIS IS THE FEDERAL RULES -- THAT

18   EXPERTS LIKE OUR PRESENT EXPERT, HAS TO SIGN AND PREPARE BEFORE

19   THE TRIAL EVER STARTS A DETAILED REPORT THAT LAYS OUT ALL OF

20   THEIR OPINIONS AND ALL OF THE REASONS FOR THEIR OPINIONS.

21         AND THEN, THEY ARE STUCK WITH THAT.  THEY CANNOT GO

22   BEYOND THE FOUR CORNERS OF THAT REPORT, AT LEAST ON DIRECT

23   EXAMINATION.

24         SO WHEN THIS OBJECTION IS MADE, AND I HAVE TO DECIDE

25   WHETHER OR NOT -- WHAT THE WITNESS IS SAYING IS IN THE REPORT

1   OR WHETHER HE'S GOING BEYOND IT.

2           **MR. KESSLER:**  YOUR HONOR, IT STARTS ON PAGE 19, AND

3   IT'S AN EXTENSIVE DISCUSSION OF THIS ENTIRE SUBJECT, ALL THE

4   WAY TO 25.  AND I BELIEVE IT'S ENCOMPASSED BETWEEN THAT ENTIRE

5   DISCUSSION, IF YOUR HONOR HAS IT.

6           LET ME HAND IT UP TO YOU.

7           **THE COURT:**  I'VE GOT 19 TO 25.

8           **MR. KESSLER:**  OKAY, YOUR HONOR.  WHERE IT BEGINS:

9               "RELEVANCE TO INJURY TO THE GLA CLASS."

10          **THE COURT:**  I FORGOT EXACTLY THE POINT THAT THE

11  WITNESS WAS ON, BUT --

12          **THE WITNESS:**  SALARIES.

13          **MR. KESSLER:**  OH, 23 HAS THE SPECIFIC DISCUSSION IN

14  THIS, YOUR HONOR, WITH THE CHARTS NEXT TO IT.

15          **MR. FEHER:**  AND CITATIONS.

16          **MR. KESSLER:**  TAKE A LOOK, FOR EXAMPLE, THAT THE

17  PARAGRAPH THAT BEGINS:

18              "THESE FINDINGS ARE NOT SURPRISING."

19          **THE COURT:**  ALL RIGHT.  THE OBJECTION IS OVERRULED.

20  THE COURT FINDS THAT THE SENTENCE THAT READS:

21              "ECONOMIC RESEARCH CONFIRMS THIS EXPECTATION,

22  FINDING THAT SALARIES IN ALL PROFESSIONAL SPORTS, INCLUDING THE

23  NFL, ARE STRONGLY CORRELATED WITH A PLAYER'S PERFORMANCE, YEARS

24  OF SERVICE AND POSITION, AS WELL AS THE RULES GOVERNING THE

25  PLAYER MARKET."

1          THAT'S PRETTY CLOSE TO WHAT THE WITNESS WAS SAYING.

2    IT'S NOT EXACTLY THE SAME WORDS, BUT IT'S CLOSE ENOUGH THAT

3    FAIR DISCLOSURE WAS MADE.

4          SO THE OBJECTION IS OVERRULED.

5          **MR. KESSLER:**  THANK YOU, YOUR HONOR.

6    **BY MR. KESSLER:**

7    **Q.**    PROFESSOR NOLL, TO GO BACK --

8    **A.**    I HAVE NO IDEA WHERE I WAS.

9    **Q.**    OKAY.  WOULD YOU EXPLAIN TO THE JURY, OKAY, WHY, AS AN

10   ECONOMIST, BASED ON YOUR REVIEW OF THE ECONOMICS LITERATURE,

11   YOU WOULD EXPECT DIFFERENT RETIRED NFL PLAYERS TO HAVE

12   DIFFERENT LICENSING VALUES RAISING -- RANGING FROM, YOU KNOW,

13   FROM ZERO TO SOME SIGNIFICANT VALUE?

14   **A.**    AND THE REASON IS BASICALLY THE SAME REASON THE SALARIES

15   DIFFER, IS THAT PLAYERS DIFFER IN THEIR CONTRIBUTION TO THE

16   TEAM.  THEY DIFFER IN TERMS OF THEIR APPEAL TO FANS.  AND,

17   CONSEQUENTLY, THEIR SALARIES DIFFER WHEN THEY PLAY.

18          AND ONE WOULD EXPECT THAT LATER ON THE SAME FANS WHO

19   ATTENDED GAMES BECAUSE JOE MONTANA WAS THE QUARTERBACK AND NOT

20   BECAUSE SOME SECOND-STRINGER WAS THE BACKUP CORNERBACK, THOSE

21   SAME FANS WOULD BE MORE LIKELY TO WANT TO BUY MERCHANDISE THAT

22   HAD JOE MONTANA'S NAME OR PICTURE ON IT THAN THEY WOULD THE

23   BACKUP CORNERBACK.

24   **Q.**    PROFESSOR NOLL, HAVE YOU LOOKED IN YOUR DATA SET AND

25   PREPARED EXAMPLES OF PARTICULAR PLAYERS OUT OF THAT DATA SET?

1   **A.**   YES, I HAVE.

2   **Q.**   I WOULD LIKE TO SHOW TRIAL EXHIBIT 2056.

3          **MR. HUMMEL:**  OBJECTION, YOUR HONOR.  THIS IS A CLEAR

4   VIOLATION OF PARAGRAPH 15 OF YOUR ORDER.  THIS IS NOT DISCLOSED

5   IN HIS REPORT.  IT'S A COMPILATION THAT WAS NEVER SHOWN.  IT

6   WAS NEVER SUBJECT TO DEPOSITION OR IN THE REPORT.

7          **THE COURT:**  IS THIS IN THE REPORT?

8          **MR. KESSLER:**  YOUR HONOR, THE ENTIRE DATA SET WAS

9   PRODUCED.  THIS IS SIMPLY TAKING -- AND IS DISCUSSED IN THE

10  REPORT.  IT'S THE SAME DATA THAT WENT INTO THE EXHIBITS ALREADY

11  IN EVIDENCE.

12         THIS IS SIMPLY PULLING SOME INDIVIDUAL NAMES OUT OF

13  THAT DATA SET SO THE JURY, WHO COULD NOT INSPECT THE ENTIRE

14  DATA SET, CAN SEE SOME PIECES OF IT.

15         **MR. HUMMEL:**  YOUR HONOR, IF I MIGHT, PARAGRAPH 15 OF

16  YOUR ORDER, QUOTE:

17         "ILLUSTRATIVE ANIMATIONS, DIAGRAMS, CHARTS AND

18  MODELS MAY BE USED ON DIRECT EXAMINATION ONLY IF THEY WERE PART

19  OF THE EXPERT REPORT, WITH THE EXCEPTION OF SIMPLE DRAWINGS AND

20  TABULATIONS THAT PLAINLY ILLUSTRATE WHAT IS ALREADY IN THE

21  REPORT WHICH CAN BE DRAWN BY THE WITNESS AT TRIAL OR OTHERWISE

22  SHOWN TO THE JURY."

23         THIS IS NOT SOMETHING THAT WAS IN THE REPORT.  IT IS

24  NOT SOMETHING THAT WAS SHOWN TO US.  IT IS NOT SOMETHING HE DID

25  IN CONNECTION WITH THIS REPORT.  IT'S CLEARLY A VIOLATION OF

1    THE RULE.

2              **MR. KESSLER:**  YOUR HONOR, I'LL LAND IT UP TO YOUR

3    HONOR.  THIS IS SIMPLY A SIMPLE ILLUSTRATION OR DRAWING OF THE

4    DATA THAT EASILY COULD BE EXTRACTED FROM THE DATABASE THAT IS

5    DESCRIBED IN PROFESSOR NOLL'S REPORT.

6              **MR. HUMMEL:**  YOUR HONOR, THE DATABASE IS NOT IN

7    EVIDENCE.

8              **MR. KESSLER:**  THE ISSUE IS WHETHER IT'S DESCRIBED IN

9    HIS REPORT, WHICH IT IS.  AND IT WAS PRODUCED TO PLAINTIFFS.

10             **THE COURT:**  THIS WAS NOT PRODUCED TO PLAINTIFFS.

11             **MR. KESSLER:**  THAT INFORMATION WAS PRODUCED TO

12   PLAINTIFFS IN THE DATA BACKUP THAT WAS GIVEN TO THEM, YOUR

13   HONOR.  IT SIMPLY -- THIS BREAKS OUT SOME EXAMPLES OF PLAYERS.

14             **THE COURT:**  NO, NO, SHOULD HAVE BEEN ATTACHED.  THE

15   RULE SAYS IT SHOULD HAVE BEEN ATTACHED.

16             AND BY THE WAY, THE -- JUST A MOMENT.  I'M GOING TO

17   READ.

18             RULE 26, WHICH IS NOT SOMETHING I WROTE:

19                "THE REPORT SHALL CONTAIN A COMPLETE STATEMENT

20   OF ALL OPINIONS TO BE EXPRESSED AND THE BASIS AND REASONS

21   THEREFORE; THE DATA OR OTHER INFORMATION CONSIDERED BY THE

22   WITNESS IN FORMING THE OPINIONS; ANY EXHIBITS TO BE USED AS A

23   SUMMARY OR SUPPORT FOR THE OPINIONS."

24             WELL, THIS IS -- THIS IS AN EXHIBIT TO BE USED AS

25   SUPPORT FOR THE OPINIONS, AND IT WASN'T ATTACHED TO THE REPORT.

1          **MR. KESSLER:**  YOUR HONOR, I UNDERSTAND YOUR HONOR'S

2    RULING.  I'LL MOVE ON.

3          BUT THAT DATA WAS ATTACHED, JUST NOT BROKEN OUT BY

4    INDIVIDUAL PLAYER NAMES.  BUT IT'S OKAY.  WE'LL MOVE ON.

5          **THE COURT:**  OKAY.  THANK YOU.  SUSTAINED.

6    **BY MR. KESSLER:**

7    **Q.**  PROFESSOR NOLL, LET ME SHOW YOU E2, WHICH I NOW BELIEVE

8    SUMMARIZES THE OPINIONS THAT YOU'VE JUST EXPRESSED.

9          YOU HAVE E2 IN FRONT OF YOU, PLEASE?

10         **THE COURT:**  I DO HAVE THIS QUESTION, THOUGH.

11         **MR. KESSLER:**  YES.

12         **THE COURT:**  MR. HUMMEL, THOSE DIAGRAMS THAT YOU PUT

13   UP ON THE EASEL, WERE THEY DONE WITH AN EXPERT?

14         **MR. HUMMEL:**  PARDON ME?

15         **THE COURT:**  IT SEEMS TO ME THAT YOU HAD -- YOU DREW

16   ON THE EASEL CHARTS THAT HAD COLUMNS OF NUMBERS.

17         **MR. HUMMEL:**  THAT'S CORRECT.  AND THOSE WERE DIRECTLY

18   OUT OF THE REPORT.  AND I TRIED TO FOLLOW THE EXACT LETTER OF

19   YOUR RULE, WHICH I BELIEVE I DID.

20         **THE COURT:**  THOSE EASEL DIAGRAMS WERE NOT ATTACHED TO

21   THE REPORT.

22         **MR. HUMMEL:**  NO.  THEY WERE ACTUALLY -- THE NUMBERS

23   WERE ABSOLUTELY IN HIS REPORT AND DISCLOSED.

24         **THE COURT:**  IN EXACTLY THE SAME FORM?

25         **MR. HUMMEL:**  IN EXACTLY THE SAME FORM.

1          **MR. KESSLER:**  THAT WOULD BE INCORRECT, YOUR HONOR.

2   THAT'S NOT IN THE EXACT FORM.

3          **THE COURT:**  HERE'S THE THING, I DON'T LIKE IT

4   WHENEVER THE LAWYERS TRY TO HAVE ONE RULE FOR THE OTHER SIDE.

5          **MR. HUMMEL:**  I AGREE.

6          **THE COURT:**  AND ONE RULE FOR THEMSELVES.

7          **MR. HUMMEL:**  I AGREE.  I DID NOT --

8          **THE COURT:**  I'M NOT GOING TO ARGUE THIS OUT IN THE

9   PRESENCE OF THE JURY.  BUT IF IT TURNS OUT WHEN WE TAKE A BREAK

10  THAT WE'RE NOT BEING FAIR IN HAVING THE SAME RULE BOTH WAYS,

11  WE'RE GOING TO ADJUST THINGS.

12          SO FOR RIGHT NOW I'M GOING TO LEAVE -- I'M GOING TO

13  FOLLOW THE -- I'M GOING TO STICK BY THE RULING THAT I'VE MADE.

14          **MR. KESSLER:**  THANK YOU, YOUR HONOR.

15          **THE COURT:**  ALL RIGHT.  GO AHEAD.

16  **BY MR. KESSLER:**

17  **Q.**   PROFESSOR NOLL, DOES E2 -- YOU HAVE IN FRONT OF YOU?

18  **A.**   I DON'T HAVE E2.  I HAVE E1, BUT NOT E2.

19  **Q.**   DOES THAT REFLECT THE CONCLUSIONS YOU HAVE ALREADY JUST

20  TESTIFIED TO?

21  **A.**   YES, THIS IS BASICALLY WHAT I SAID.

22          **MR. KESSLER:**  YOUR HONOR, I WOULD LIKE TO MOVE IN NOW

23  E2, WHICH IS JUST A SUMMARY OF WHAT THE WITNESS HAS JUST

24  TESTIFIED TO.

25          **MR. HUMMEL:**  OBJECTION, YOUR HONOR.

1        **THE COURT:**  IS THIS ATTACHED TO THE REPORT?

2        **MR. KESSLER:**  NO, YOUR HONOR.  THIS IS LIKE THE FIRST

3   ONE.  HE HAS NOW TOTALLY TESTIFIED TO THESE CONCLUSIONS.

4        **THE COURT:**  BUT THEY DON'T COME INTO EVIDENCE.

5        **MR. KESSLER:**  NO, I JUST WANT TO DISPLAY IT, YOUR

6   HONOR.  I DON'T WANT TO MOVE IT INTO EVIDENCE.

7        **THE COURT:**  YOU SAID YOU WANTED TO MOVE IT INTO

8   EVIDENCE.

9        **MR. KESSLER:**  FORGIVE ME, YOUR HONOR.  I'M A LITTLE

10  CONFUSED NOW.

11        **THE COURT:**  YOU CAN DISPLAY IT TO THE JURY, BUT NOT

12  MOVE IT INTO EVIDENCE.

13        **MR. KESSLER:**  YES, YOUR HONOR.  I WOULD LIKE TO

14  DISPLAY IT.

15        **THE COURT:**  THAT'S FINE.

16        (DOCUMENT DISPLAYED.)

17  **BY MR. KESSLER:**

18  Q.   "ECONOMIC ANALYSIS DOES NOT SUPPORT THE OPINION THAT

19  RETIRED PLAYERS CONTRIBUTE EQUALLY TO CURRENT LICENSING

20  REVENUES."

21        JUST TO SUMMARIZE NOW YOUR TWO OPINIONS FOR THE JURY,

22  AND THEN WE'LL MOVE ON, COULD YOU EXPLAIN THE BASIS, BRIEFLY,

23  TO SUMMARIZE, OF WHY YOU CONCLUDED THAT THE BRAND EQUITY

24  RESEARCH CITED BY DR. RASCHER DOES NOT MEASURE ANY RELATIONSHIP

25  BETWEEN PAST PLAYERS AND BRAND VALUE?

A.    BECAUSE NONE OF THE PAPERS IN THIS LITERATURE MEASURE ANY

RELATIONSHIP BETWEEN ANY ATTRIBUTE OF A TEAM AND ITS LICENSING

REVENUE, AND MOST CERTAINLY DON'T MEASURE ANYTHING REGARDING

PLAYER LICENSING REVENUE.

Q.    AND YOUR SECOND CONCLUSION, THAT:

          "LICENSING DATA SHOW THAT THE DEMAND FOR

LICENSEES [SIC] FOR RETIRED PLAYERS IS CONCENTRATED AMONG THE

STARS OF THE PAST.  AND FOR THE VAST MAJORITY OF CLASS MEMBERS,

THE MARKET VALUE OF THEIR LICENSING RIGHTS IS LITTLE OR

NOTHING," EXPLAIN TO THE JURY WHAT IS THE BASIS FOR YOUR

CONCLUSION THERE, BRIEFLY, TO SUMMARIZE?

A.    THE BASIS -- THERE'S TWO BASES FOR IT.  AND ONE ISN'T A

SUMMARY, BECAUSE YOU DIDN'T ASK ME ABOUT IT, SO I DON'T KNOW

WHAT TO DO.

Q.    YOU CAN EXPLAIN THE BASIS FOR IT.  IT'S OKAY.

A.    OKAY.  THE FIRST BASIS FOR IT IS IN THE APPENDIX, THE DATA

APPENDIX TO MY REPORT WHICH LISTS ALL THE LICENSING REVENUE BY

PLAYER.

          AND THAT DATA APPENDIX SHOWS THAT A VERY SMALL

FRACTION OF PLAYERS ACCOUNT FOR THE VAST MAJORITY OF THE

LICENSING DATA; THAT THE DISTRIBUTION OF THE LICENSING DATA IS

MOST ASSUREDLY NOT EQUAL.  THE VAST MAJORITY RECEIVED NOTHING.

          AND IN ADDITION TO THAT, THE OTHER PIECE OF EVIDENCE

THAT I CONSIDERED AND DECIDED SUPPORTED THIS CONCLUSION WAS THE

FACT THAT THE VAST MAJORITY OF RETIRED PLAYERS HAVE NOT SIGNED

1  GLA'S.  OF THE 13,000 OF RETIRED PLAYERS, ONLY 2,000 HAVE

2  SIGNED GLA'S.

3       SO IF ANYBODY WANTED TO GET INTO THE BUSINESS OF

4  LICENSING RETIRED PLAYERS, THERE IS NO IMPEDIMENT.

5       IN ADDITION TO THAT, THE GLA'S ARE NON-EXCLUSIVE.  SO

6  EVEN THOSE WHO HAVE SIGNED GLA'S, IF THERE WAS MARKET

7  OPPORTUNITY OUT THERE, SOMEBODY COULD TAKE ADVANTAGE OF IT.

8  AND, INDEED, SOME HAVE.

9       THERE HAVE BEEN A FEW LICENSES OF RETIRED PLAYERS

10  OUTSIDE THE CONTEXT OF PLAYERS INC.  THEY ARE MINOR, AND,

11  AGAIN, THEY ARE ALL THE MOST FAMOUS PLAYERS.  THEY ARE NOT THE

12  VAST MAJORITY OF PLAYERS WHO ARE RETIRED FROM THE NFL.

13  **Q.**  IS THERE ANY EVIDENCE IN THE ECONOMICS LITERATURE THAT

14  YOU'VE REVIEWED THAT NONSTAR RETIRED PLAYERS GENERATE -- IN ANY

15  SPORT -- GENERATE SIGNIFICANT LICENSING REVENUES INDIVIDUALLY?

16  **A.**  NO.  THERE'S NO EVIDENCE AT ALL.  I MEAN, THINK AGAIN

17  ABOUT THE LOGIC OF BRAND EQUITY, WHICH IS THE REAL ISSUE.  THE

18  ISSUE IS BRAND EQUITY.

19       OF COURSE, BRAND EQUITY IS AN INVESTMENT.  IT'S LIKE

20  A BUILDING OR A FACTORY.  IT'S SOMETHING YOU INVEST IN AT A

21  GIVEN MOMENT IN TIME.

22       THE PEOPLE WHO WORKED FOR THE COMPANY WHEN THAT

23  INVESTMENT WAS MADE AREN'T THOUGHT OF AS THEN CONTRIBUTING TO

24  THE REVENUE OF THE COMPANY 30 YEARS AFTER THEY RETIRED, RIGHT?

25       THAT IS TO SAY, IF THEY -- IF THEY BUILT AN ASSET,

1   THEY BUILT IT AS AN EMPLOYEE.  THEY WERE PAID FOR IT.  AND THEY

2   MAY HAVE GOTTEN A PENSION AS PART OF THEIR EMPLOYMENT.  BUT

3   ONCE THEIR EMPLOYMENT IS OVER, THEY HAVE -- YOU DON'T ATTRIBUTE

4   THE SUBSEQUENT REVENUE OF THAT COMPANY TO THE FACT THEY CREATED

5   AN ASSET.

6            AND THAT'S EXACTLY WHAT BRAND EQUITY IS HERE.  THAT

7   IF IT WERE THE CASE THAT RETIRED PLAYERS CONTRIBUTED TO BRAND

8   EQUITY, THEY DID IT IN THE CONTEXT OF THEIR EMPLOYMENT.  THERE

9   WOULDN'T BE ANY NECESSARY CONNECTION TO ANY LICENSING REVENUE

10  30 YEARS LATER.

11  Q.   THANK YOU, PROFESSOR NOLL.

12            LET ME TURN NOW TO YOUR SECOND CONCLUSION.

13       **MR. KESSLER:**  LAUREN, IF WE COULD PUT UP THE FIRST

14  DEMONSTRATIVE THE JUDGE PERMITTED US TO SHOW.

15            (DOCUMENT DISPLAYED.)

16  **BY MR. KESSLER:**

17  Q.   WHICH IS THE SUMMARY OF YOUR THREE MAJOR CONCLUSIONS.

18       **MR. HUMMEL:**  YOUR HONOR, I'M SORRY TO INTERRUPT.

19            THIS MAY HAVE COME IN EVIDENCE, BUT TO THE EXTENT IT

20  DID, I THINK IT'S INAPPROPRIATE.  IT CERTAINLY CAN BE

21  DISPLAYED.

22       **MR. KESSLER:**  THIS IS NOT IN EVIDENCE.  IT IS TO BE

23  DISPLAYED.  THAT'S ALL WE'VE DONE.

24       **THE COURT:**  I DIDN'T ALLOW IT IN EVIDENCE, BUT I

25  ALLOWED IT TO BE PUT UP AS A SUMMARY TO HELP KEEP -- IT'S LIKE

1    A -- IT'S LIKE A GUIDEPOST SO THE JURY WILL KNOW HE'S GOT THREE

2    OPINIONS, AND NOW WE'RE GOING TO THE SECOND OPINION.  AND THIS

3    IS JUST A WAY TO HELP ORGANIZE THE -- HE'S ALREADY TESTIFIED TO

4    THESE OPINIONS.

5          **MR. KESSLER:**  YES, HE HAS, YOUR HONOR.

6          **THE COURT:**  SO I'M ALLOWING THIS.

7          **MR. KESSLER:**  THANK YOU, YOUR HONOR.

8    **BY MR. KESSLER:**

9    **Q.**   YOUR SECOND OPINION WAS ABOUT DR. RASCHER'S OPINION, WHICH

10   WAS THAT DR. RASCHER'S OPINION THAT THE DEFENDANTS HAVE MARKET

11   POWER OR LEVERAGE IN RETIRED PLAYER LICENSING IS UNSUPPORTED.

12         COULD YOU PLEASE EXPLAIN TO THE JURY WHAT IS THE

13   BASIS FOR YOUR CONCLUSIONS ON THIS SUBJECT?

14   **A.**   THE -- I THINK I HAVE TO DEFINE WHAT LEVERAGE AND MARKET

15   POWER ARE FIRST --

16   **Q.**   OKAY.  LET ME DO THAT.

17   **A.**   -- BEFORE I CAN DO THAT.

18   **Q.**   LET'S GO WITH MARKET POWER.  EXPLAIN TO THE JURY, WHAT IS

19   MARKET POWER IN ECONOMICS?

20   **A.**   MARKET POWER IS -- ARISES IN A CIRCUMSTANCE WHERE A FIRM

21   HAS SUFFICIENTLY LITTLE COMPETITION THAT IT CAN EXTRACT PROFITS

22   THAT ARE GREATER THAN YOU WOULD EXPECT TO FIND IN A COMPETITIVE

23   INDUSTRY.

24         THAT IS THE EXTREME EXAMPLE IS A MONOPOLY.  IF IT'S

25   THE ONLY SELLER OF A PARTICULAR PRODUCT, YOU EXPECT IT TO BE

1   ABLE TO CHARGE A REALLY HIGH PRICE RELATIVE TO THE COST OF

2   PRODUCING IT, BECAUSE THERE'S NO ONE TO COMPETE WITH IT TO

3   FORCE THE PRICE DOWN.

4           WELL, MARKET POWER IS A SOFTER VERSION OF THAT.  IT'S

5   WHEN THERE'S THREE OR FOUR OR FIVE FIRMS IN AN INDUSTRY.  IT

6   STILL MAY BE THE CASE THAT COMPETITION ISN'T INTENSE ENOUGH

7   AMONG THOSE FIRMS THAT THEY WILL BE FORCED TO CHARGE A

8   COMPETITIVE PRICE.

9   **Q.**   LET ME STOP YOU THERE.  IN YOUR REVIEW OF DR. RASCHER'S

10  WORK, HAS HE DONE ANY ANALYSIS AT ALL OF WHETHER OR NOT

11  DEFENDANTS HAVE ANY MARKET POWER IN THEIR LICENSING ACTIVITIES?

12  **A.**   NONE.

13  **Q.**   EXPLAIN TO THE JURY WHY -- WHAT'S MISSING FROM THAT

14  ANALYSIS?

15  **A.**   THERE'S -- THERE'S NO ANALYSIS, FIRST OF ALL, WHAT THE

16  MARKET IS AND WHO'S IN IT.  AND THEN, WHO IN THAT MARKET HAS A

17  BIG ENOUGH SHARE OF TOTAL SALES THAT THEY MIGHT HAVE MARKET

18  POWER.

19          THE WAY ECONOMISTS GO ABOUT MEASURING MARKET POWER IS

20  THEY BEGIN BY IDENTIFYING THE MARKET AND THE PLAYERS IN THE

21  MARKET WHO COMPETE WITH EACH OTHER, AND THEN THEY TAKE THAT

22  INFORMATION AND USE IT TO DETERMINE IF ANYBODY HAS MARKET

23  POWER.

24          AND, OF COURSE, DR. RASCHER DIDN'T DISCUSS WHO MIGHT

25  COMPETE WITH NFLPI IN SELLING LICENSES FOR RETIRED PLAYERS.

1  THERE ISN'T ANY DISCUSSION OF THAT AS A MARKET, LET ALONE

2  WHETHER NFLPI HAS ACTUAL MARKET POWER IN THAT MARKET.

3          SO, IN OTHER WORDS, NONE OF THE THINGS YOU WOULD

4  NORMALLY DO AS AN ECONOMIST WERE DONE.

5  Q.   IN YOUR REVIEW OF DR. RASCHER'S REPORTS, DOES HE EVEN

6  CONTEND ANYMORE THAT HE'S DONE ANY STUDY OF MARKET POWER?

7  A.   I BELIEVE HE NOW AGREES WITH ME THAT HE HAS NOT DONE ANY

8  STUDY OF MARKET POWER AND THAT HE -- HE -- I THINK HE NO LONGER

9  ADHERES TO THE VIEW THAT THERE'S -- NFLPI HAS MARKET POWER IN

10 RETIRED PLAYERS.

11 Q.   NOW, EXPLAIN, THEN, WHAT WOULD BE LEVERAGING IN THIS

12 CONTEXT REGARDING RETIRED PLAYER LICENSING AS A DIFFERENT

13 CONCEPT FROM MARKET POWER.

14 A.   OKAY.  LEVERAGING, ACTUALLY, I THINK HE DIDN'T REALLY MEAN

15 TO USE THAT.  I THINK WHAT HE MEANT TO USE WAS "BARGAINING

16 POWER ARISING FROM SUPERIOR EFFICIENCY."

17         LEVERAGE IS ANOTHER CONCEPT THAT HAS NOTHING TO DO

18 WITH THIS CASE, SO I WON'T DISCUSS THAT.

19         WHAT I THINK HE MEANT WAS THAT IF YOU REPRESENT A

20 VERY LARGE NUMBER OF PEOPLE, THAT'S EFFICIENT BECAUSE A

21 POTENTIAL LICENSEE CAN COME TO YOU AND LICENSE LOTS OF PEOPLE

22 AT THE SAME TIME.

23         THEY DON'T HAVE TO SEARCH THROUGH THE UNIVERSE TO

24 FIND ALL THE PEOPLE WHOSE IMAGES THEY WANT TO LICENSE.

25         SO I THINK WHAT HE WAS REFERRING TO IS THAT THEY HAVE

1   AN EFFICIENCY ADVANTAGE OVER OTHERS THAT ENABLES THEM TO CHARGE

2   A HIGHER PRICE THAN THE ACTUAL COST OF DOING LICENSES ONE AT A

3   TIME.

4   **Q.**    AND DID DR. RASCHER PRESENT ANY EVIDENCE THAT YOU, AS

5   ECONOMIST, BELIEVES SUPPORTS THAT CONCLUSION?

6   **A.**    NO.  NOT ONLY DID HE NOT PRESENT ANY EVIDENCE, I THINK

7   IT'S SORT OF OBVIOUS FROM THE FACTS, THE LICENSING OF RETIRED

8   PLAYERS, THAT UNFORTUNATELY NFLPI DOESN'T EVEN HAVE THIS.

9   **Q.**    CAN YOU EXPLAIN TO THE JURY, HAVE YOU DRAWN A CONCLUSION

10  AS TO WHETHER OR NOT THE DEFENDANTS HAVE ANY LEVERAGING IN

11  RETIRED PLAYER LICENSING?

12  **A.**    I -- MY CONCLUSION IS THEY DON'T.  AND THE REASON FOR IT

13  IS THAT MOST OF THE PLAYERS WHO GET HIGH LICENSING REVENUES

14  FROM NFLPI HAVEN'T SIGNED GLA'S.  THEY ARE PEOPLE WHO ARE --

15  MOST OF THE STAR PLAYERS ARE NOT SIGNED GLA'S.

16          WHAT HAPPENS IS THAT FOR NFLPI, SAY, TO SELL A GROUP

17  LICENSE FOR A BUNCH OF RETIRED PLAYERS, THEY TYPICALLY HAVE TO

18  GO OUT AND GET THESE PLAYERS OR THEIR AGENTS TO AGREE TO BE

19  PART OF THE GROUP.

20          AND TYPICALLY, THESE PLAYERS HAVEN'T EVER SIGNED A

21  GLA.

22          OF THOSE TOP TEN PLAYERS THAT WERE IN MY PREVIOUS

23  SLIDE, NINE OF THOSE TEN HAVE NEVER SIGNED A GLA, IN TERMS OF

24  THE TOP TEN PLAYERS IN TERMS OF TOTAL REVENUES DERIVED FROM

25  LICENSING FROM PLAYERS INC.

1  Q.   SO IF THE TOP NFL PLAYERS -- WITHDRAWN.

2        IF THE TOP RETIRED NFL PLAYERS IN TERMS OF LICENSING

3  VALUE HAVE NEVER SIGNED RETIRED PLAYER GLA'S, WHAT DOES THAT DO

4  TO THE ABILITY OF THE NFLPA OR PLAYERS INC TO EXERCISE ANY KIND

5  OF BARGAINING POWER OR LEVERAGE?

6  A.   WELL, IF THEY ATTEMPTED TO EXTRACT ANY -- ANY EXCESS

7  PROFIT, IF YOU WILL, OUT OF THIS RELATIONSHIP, ANYBODY COULD

8  JUST COME IN AND GET THEIR OWN DEAL.

9        I MEAN, THERE'S NOTHING TO PREVENT -- FIRST OF ALL,

10 THE GLA'S THEMSELVES ARE NON-EXCLUSIVE.

11       SECONDLY, MOST OF THE PLAYERS WHO HAVE HIGH LICENSING

12 VALUE HAVEN'T EVEN SIGNED THE GLA.

13       SO THERE'S ABSOLUTELY NOTHING PREVENTING ANY ONE OF

14 US FROM IMMEDIATELY GETTING INTO THE LICENSING BUSINESS FOR TOP

15 RETIRED NFL STARS AND CHARGING A LOWER PRICE THAN THE NFLPI

16 WOULD CHARGE.

17       SO IT'S NOT A MARKET IN WHICH YOU WOULD ARGUE THAT

18 THERE IS NO POTENTIAL FOR COMPETITION TO TAKE AWAY ANY ABILITY

19 OF NFLPI TO EXTRACT ANYTHING FROM THESE LICENSES.

20 Q.   IN THE VIDEO GAME INDUSTRY, DID YOU FIND ANY EVIDENCE THAT

21 ANOTHER VIDEO GAME COMPANY CAME IN AND LICENSED RETIRED PLAYERS

22 OUTSIDE OF PLAYERS INC?

23 A.   YES.  THAT'S THE TAKE TWO EXAMPLE.

24 Q.   WOULD YOU EXPLAIN TO THE JURY WHAT THAT WAS?

25 A.   OKAY.  TAKE TWO IS A COMPETITOR WITH EA.  AND AS YOU

1   RECALL, EA HAS THIS LICENSE WITH NFLPI THAT ACTUALLY SAYS FOR

2   THE GAMES THAT ARE LICENSED EA MUST DEAL WITH NFLPI FOR THE

3   PLAYERS WHO ARE IN THOSE GAMES, THOSE PARTICULAR GAMES.

4           WELL, THAT WOULD SEEMINGLY PREVENT ANYBODY FROM

5   GETTING INTO THIS BUSINESS.  WELL, OF COURSE, IT DIDN'T.  TAKE

6   TWO WENT DIRECTLY TO 240 RETIRED STARS, GOT THEIR LICENSING

7   RIGHT, CREATED A VIDEO GAME THAT WAS INTRODUCED IN JULY OF LAST

8   YEAR, WHERE THERE'S THESE 240 PLAYERS.

9           IF YOU WANT TO PLAY THE GAME, YOU DRAFT PLAYERS, JUST

10  LIKE YOU WOULD IN A NORMAL FOOTBALL LEAGUE, AND THEN YOU PLAY A

11  GAME WHERE YOUR DRAFTED PLAYERS PLAY THE OTHER GUY'S DRAFTED

12  PLAYERS.

13          SO THIS IS SORT OF AN ILLUSTRATION OF THE FACT THAT

14  GETTING -- YOU KNOW, GETTING INTO THIS BUSINESS WITHOUT DEALING

15  WITH NFLPI AND HAVING LICENSING COME FROM SOME OTHER MECHANISM

16  IS PERFECTLY FEASIBLE.  THERE IS NO PREVENTION OF THAT.

17  **Q.**   IN THE TAKE TWO GAMES, WERE SOME OF THE RETIRED PLAYERS

18  WHO LICENSED THEIR RIGHTS TO TAKE TWO MEMBERS OF THIS CLASS?

19  **A.**   YES.

20  **Q.**   RETIRED PLAYERS WHO SIGNED GLA'S?

21  **A.**   YES.

22  **Q.**   NOW --

23  **A.**   SOME WERE AND SOME WEREN'T.  MOST WEREN'T.

24  **Q.**   PROFESSOR NOLL, IN OPENING STATEMENT MR. PARCHER, COUNSEL

25  FOR PLAINTIFFS, ACTUALLY QUOTED FROM YOUR DEPOSITION.  PUT A

1   NICE LITTLE PICTURE OF YOU.  AND IT HAD TO DO WITH THE ISSUE OF

2   AN ANNOUNCEMENT EFFECT REGARDING RETIRED PLAYERS.

3           WOULD YOU EXPLAIN TO THE JURY, OKAY, WHAT YOUR

4   CONCLUSION WAS WHETHER OR NOT THE NFLPA OR PI GOT ANY

5   ANNOUNCEMENT EFFECT BENEFIT IN PRACTICE?

6           DID THEY GET SUCH A BENEFIT AS A RESULT OF HAVING

7   RETIRED PLAYER GLA'S?

8   **A.**   THE TESTIMONY I GAVE WASN'T ABOUT PI.  IT WAS ABOUT THE

9   RETIRED PLAYERS.

10  **Q.**   SO WHY DON'T YOU EXPLAIN TO THE JURY WHAT YOUR CONCLUSIONS

11  HAVE BEEN ABOUT ANNOUNCEMENT EFFECT?

12  **A.**   THE ANNOUNCEMENT EFFECT STORY IS BASICALLY AS FOLLOWS:

13  SUPPOSE THERE'S SOMEBODY OUT THERE WHO WANTS TO LICENSE RETIRED

14  PLAYERS, BUT THEY HAVE NO IDEA HOW TO FIND THEM?  THEY ARE

15  PEOPLE WHO PLAYED 20 OR 30 YEARS AGO.

16          AND THE POINT THAT I WAS MAKING HERE IS THAT FROM THE

17  RETIRED PLAYERS' POINT OF VIEW, HAVING THE NFLPA ANNOUNCE THAT

18  IT WAS GOING TO ARRANGE FOR GROUP LICENSES FROM A LARGE NUMBER

19  OF RETIRED PLAYERS WOULD HAVE THE EFFECT OF TELLING THESE

20  LICENSEES:

21          "OH, NOW I KNOW WHERE I CAN GO AND FIND THESE

22  PLAYERS."

23          BUT THE -- BUT THE -- THEN, THE ISSUE IS:  WELL,

24  THEN, WHO IS THE BENEFICIARY OF THE ANNOUNCEMENT EFFECT?

25          WELL, THE BENEFICIARY OF THE ANNOUNCEMENT EFFECT

1    COULD, IN THEORY, BE EITHER THE RETIRED PLAYERS OR THE NFLPI,

2    IF THERE WERE A HUGE GAP BETWEEN THE LICENSE FEES THAT THE

3    NFLPI COLLECTED AND THE LICENSE REVENUE GENERATED BY THE --

4    THAT WAS ACTUALLY PAID TO THE RETIRED PLAYERS.  LIKE IF -- IF

5    THEY COLLECTED A MILLION DOLLARS FOR A GROUP LICENSE FOR SOME

6    RETIRED PLAYERS, AND THEN PAID A HUNDRED THOUSAND OF THAT TO

7    THE PLAYERS, THEN OBVIOUSLY PI WOULD BE THE BENEFICIARY.

8           IN REALITY, LESS THAN 1 PERCENT OF THE LICENSING

9    REVENUE FOR RETIRED PLAYERS ACTUALLY GOES TO PI.  OVER

10   99 PERCENT OF IT ACTUALLY GOES TO THE RETIRED PLAYERS.  SO THE

11   BENEFICIARIES ARE VIRTUALLY ALL THE RETIRED PLAYERS NOW THAT

12   THERE EXISTS AN NFLPI, AN ENTITY WHERE SOMEBODY WHO WANTS TO

13   LICENSE THEIR IMAGES CAN GO.

14          AND NFLPI WILL FACILITATE THAT NOT ONLY WITH THE GLA

15   PLAYERS, BUT FOR ALL THE RETIRED PLAYERS.  IF YOU WANTED A

16   RETIRED PLAYER WHO HADN'T SIGNED A GLA, THEY WILL FIND HIM AND

17   TRY TO GET HIM IN ON THE DEAL.

18   **Q.**   PROFESSOR NOLL, TAKE A LOOK AT TRIAL EXHIBIT 2056 ALREADY

19   IN EVIDENCE.  IT SHOULD BE IN YOUR STACK.

20   **A.**   2056.

21          **MR. KESSLER:**  IF YOU CAN DISPLAY THAT, PLEASE.

22          (DOCUMENT DISPLAYED.)

23          **THE WITNESS:**  OKAY.

24          **MR. KESSLER:**  DISPLAY 2056.

25          THANK YOU.

1          (DOCUMENT DISPLAYED.)

2          **THE WITNESS:**  OKAY.

3          **MR. KESSLER:**  IF WE COULD JUST BLOW UP THIS WHOLE

4  THING, LAUREN, TO THE BOTTOM.  THANK YOU.

5  **BY MR. KESSLER:**

6  **Q.**  THIS IS ALREADY IN EVIDENCE.  IT'S A COMPILATION OF THE

7  ROYALTIES FROM AD HOC AGREEMENTS PAID OUT TO RETIRED PLAYER

8  CLASS MEMBERS.

9          ARE YOU FAMILIAR WITH THIS DATA?

10  **A.**  YES, I AM.  THIS ACTUALLY IS VERY SIMILAR TO WHAT YOU PUT

11  UP A FEW SLIDES AGO.

12  **Q.**  IT'S THE SAME DATA YOU UTILIZED IN YOUR ANALYSIS?

13  **A.**  YEAH, THIS WHOLE EXHIBIT IS THE TABLE.  AND THEN, ALL

14  THE -- ALL THE -- ALL THE INFORMATION IT'S BASED ON, WHICH IS

15  THE -- THIS IS THE PAYMENTS TO EVERY SINGLE RETIRED PLAYER THAT

16  IS REPRESENTED IN THIS TABLE.

17  **Q.**  OKAY.  AND WHAT THIS TABLE SHOWS IS THAT OF THE

18  $7,116,196.29 PAID TO CLASS MEMBERS, ONLY $66,000 -- LESS THAN

19  1 PERCENT -- WAS KEPT BY PLAYERS INC OR THE NFLPA?

20  **A.**  THAT'S CORRECT.

21  **Q.**  AND SO WHAT DOES THIS DATA INDICATE TO YOU ABOUT WHO

22  BENEFITED, IF THERE WAS ANY ANNOUNCEMENT EFFECT?

23  **A.**  IT WAS OBVIOUSLY THE RETIRED PLAYERS.  RETIRED PLAYERS --

24  THE GLA PLAYERS HAVE GOTTEN $7 MILLION, AND THE NON-GLA PLAYERS

25  HAVE GOTTEN OVER $20 MILLION.

1  Q.   SO WAS THERE ANY MATERIAL ECONOMIC BENEFIT TO THE NFLPA OR

2  PLAYERS INC AT ALL FROM DOING THIS RETIRED PLAYER LICENSING?

3  A.   NO.

4  Q.   NOW, LET ME MOVE ON NOW TO YOUR THIRD CONCLUSION.

5           MR. KESSLER:  YOUR HONOR, SHOULD WE TAKE OUR BREAK?

6           THE COURT:  WE'LL TAKE A 15-MINUTE BREAK AT THIS

7  TIME.

8           PLEASE REMEMBER THE ADMONITION.

9           THE CLERK:  ALL RISE.

10          (THEREUPON, THE JURY LEFT THE COURTROOM.)

11          (THE FOLLOWING PROCEEDINGS WERE HELD IN OPEN COURT,

12          OUTSIDE THE PRESENCE OF THE JURY.)

13          THE COURT:  WE MAY NEED YOU HERE FOR THIS.

14          THE WITNESS:  OKAY.

15          THE COURT:  EVERYONE HAVE A SEAT.

16          ON THIS DOCUMENT, NUMBER 2056, WHICH HAS NOT BEEN

17 ALLOWED TO BE SHOWN TO THE JURY, IS THIS SOMETHING YOU STILL

18 WANT TO USE?

19          MR. KESSLER:  YOUR HONOR, I THINK -- GIVEN MY

20 LIMITATIONS OF TIME, AND SINCE WE SPENT TIME DEBATING IT, I

21 THINK AT THIS POINT I DON'T REALLY NEED IT, YOUR HONOR, BECAUSE

22 I JUST DON'T WANT TO GO BACK AND SPEND TIME ON IT NOW.  MY

23 COLLEAGUES ARE TELLING ME MY CLOCK IS RUNNING.

24          I MIGHT PUT IT IN MAYBE FOR A SECOND, YOUR HONOR --

25          THE COURT:  IF YOU DON'T CARE ABOUT IT, LET'S NOT

1  FIGHT OVER IT.

2          **MR. KESSLER:**  OKAY.

3          **THE COURT:**  ANYTHING THE LAWYERS NEED ME FOR?

4          OKAY.  WE'LL TAKE A 15-MINUTE RECESS.

5          (RECESS TAKEN FROM 11:01 TO 11:19 A.M.)

6          (THE FOLLOWING PROCEEDINGS WERE HELD IN OPEN COURT,

7          IN THE PRESENCE OF THE JURY.)

8          **THE COURT:**  THE JURY IS COMING IN.

9          OKAY.  EVERYONE HAVE A SEAT.

10          MR. KESSLER, GO RIGHT AHEAD.

11          **MR. KESSLER:**  THANK YOU, YOUR HONOR.

12  **BY MR. KESSLER:**

13  **Q.**   BEFORE WE GET TO YOUR FINAL CONCLUSION, FINAL AREA,

14  DR. RASCHER EXPRESSED SOME VIEW ABOUT THE UNION BEING ABLE TO

15  EXERCISE LEVERAGE OVER ITS OWN PLAYERS.

16          DO YOU RECALL HIM EXPRESSING THAT VIEW?

17  **A.**   YES, I DO.

18  **Q.**   AND DO YOU HAVE A CONCLUSION ABOUT WHETHER THAT VIEW MAKES

19  ANY SENSE IN THE ECONOMICS?

20  **A.**   IT MAKES NO ECONOMIC SENSE AT ALL TO SAY YOU HAVE LEVERAGE

21  OR MONOPOLY OF POWER OVER YOURSELF.

22          THE UNION IS THE ACTIVE PLAYERS.  THEY RUN IT.  THE

23  CHIEF EXECUTIVE OFFICER IS CHOSEN BY THE PLAYERS.  THE PLAYER

24  REPRESENTATIVES, ONE FROM EACH TEAM, ARE THE ENTITY THAT

25  RUNS -- SETS THE POLICY.

1          SO WHAT HE'S BASICALLY SAYING IS THEY HAVE BARGAINING

2    POWER OVER THEMSELVES, AND THAT'S RIDICULOUS.  WHAT THEY DO IS

3    DECIDE HOW TO ALLOCATE THE VARIOUS STREAMS OF INCOME FROM THE

4    PLAYERS ASSOCIATION, AMONG COST, AMONGST SAVINGS FOR A RAINY

5    DAY, AMONG ALLOCATING PAYOUTS TO PLAYERS.

6    Q.   WITH RESPECT TO SOMETHING LIKE THE GROSS LICENSING REVENUE

7    POOL, IF DECISIONS ARE MADE TO DIVIDE THAT POOL UP CERTAIN

8    WAYS, IS THERE ANY ECONOMIC EVIDENCE THAT THAT WOULD BE THE

9    UNION EXERCISING POWER AGAINST ITS PLAYERS?

10   A.   NO, BECAUSE THE PEOPLE WHO MAKE THAT DECISION ARE THE

11   PLAYERS THEMSELVES.

12          SO THAT WOULD BE SAYING THAT EACH -- THAT THE PLAYERS

13   AND THE CALL ACTIVITY WERE SOMEHOW DOING THEMSELVES IN, AND

14   THAT DOESN'T MAKE SENSE.

15   Q.   PROFESSOR NOLL, I WOULD LIKE TO GO BACK TO E1, WHICH WAS

16   JUST A DEMONSTRATIVE OF YOUR THREE CONCLUSIONS.  WE ARE NOW ON

17   THE THIRD CONCLUSION, WHICH IS THAT DR. RASCHER'S COMPARISON OF

18   THE SHARE OF PLAYER LICENSING REVENUES DEFENDANTS RETAINED IS

19   INVALID.  THE DATA SHOW THE PERCENTAGE RETAINED BY DEFENDANTS

20   IS NOT MATERIALLY DIFFERENT FROM OTHER SPORTS UNIONS.

21   A.   RIGHT.

22   Q.   IS THAT A CONCLUSION YOU REACHED IN THIS CASE?

23   A.   YES, IT IS.

24   Q.   OKAY.  FIRST OF ALL, I'D LIKE YOU TO EXPLAIN TO THE JURY,

25   OKAY, DOES IT MAKE ANY ECONOMIC SENSE IN YOUR VIEW, ONE WAY OR

1   THE OTHER, TO COMPARE THE LICENSING PERCENTAGE RETAINED BY THE

2   NFLPA AND PLAYERS INC TO NONSPORTS UNION ENTITIES LIKE THE

3   UNIVERSITY OF KENTUCKY'S LICENSING AGENT?

4   **A.**   OF COURSE NOT.

5   **Q.**   COULD YOU EXPLAIN TO THE JURY WHY NOT?

6   **A.**   WELL, THE KEY POINT, OF COURSE, IS THE FUNDAMENTAL

7   ECONOMIC PRINCIPLE IS THAT LICENSING ACTIVITY COSTS MONEY TO

8   HAVE TO DO.  YOU HAVE TO HAVE AN ORGANIZATION.  YOU CAN EITHER

9   DO IT YOURSELF, OR YOU CAN HIRE SOMEONE TO DO IT.  THERE'S A

10  CERTAIN AMOUNT OF COST ASSOCIATED WITH THAT.

11          IN THE CASE OF COLLEGES, SOME COLLEGES CHOOSE TO USE

12  AN ENTITY, AN OUTSIDE ENTITY, TO DO THAT FOR THEM, AND THEY PAY

13  A FEE FOR IT.

14          IN THE CASE OF THE NFL PLAYERS ASSOCIATION, THEY HAVE

15  AN ENTITY CALLED "PLAYERS INC" TO DO THAT FOR THEM.

16          THE RELATIVE COMPARISON, IF THERE IS ONE, ABOUT THE

17  COST OF THE LICENSING PROGRAM RELATIVE TO THE REVENUES IT

18  BRINGS IN, WOULD BE TO COMPARE THE LICENSING FEE PAID BY THE

19  COLLEGES WITH JUST THE COST TO PLAYERS INC.

20  **Q.**   WOULD THAT BE THE 23 PERCENT?

21  **A.**   THAT WOULD BE -- WELL, 23 PERCENT IS THE WRONG NUMBER.

22  THAT'S THE NUMBER THAT DR. RASCHER USES.  BUT 23 PERCENT IS THE

23  FRACTION FROM THE GENERAL SHARED LICENSING POOL THAT IS KEPT.

24          BUT PLAYERS INC TAKES IN LESS THAN HALF OF ITS MONEY

25  FROM THE MONEY THAT GOES INTO THE EQUALLY-SHARED POOL.

1          SO IF YOU LOOK AT PLAYERS INC'S COSTS AS A FRACTION

2  OF THE TOTAL LICENSING REVENUE OF THE NFL PLAYERS ASSOCIATION,

3  IT'S MUCH LESS THAN 23 PERCENT.

4  **Q.**   DO YOU KNOW APPROXIMATELY WHAT -- LOOKING AT -- WELL, LET

5  ME GET THIS FIRST.

6          IN TERMS OF DOING THIS COMPARISON, DR. RASCHER JUST

7  LOOKED AT THE GROSS LICENSING REVENUE POOL, CORRECT?

8  **A.**   THAT'S CORRECT.

9  **Q.**   HE DID NOT LOOK AT ALL THE LICENSING REVENUES GENERATED

10 FOR PLAYERS BY THE NFLPA AND PLAYERS INC; IS THAT CORRECT?

11 **A.**   RIGHT.  HE LOOKED AT JUST THAT PORTION OF THE LICENSING

12 REVENUE THAT'S EQUALLY SHARED.

13 **Q.**   AND WHEN HE DID HIS COMPARISONS TO OTHER ENTITIES, DID HE

14 LOOK AT JUST A PORTION OF THEIR LICENSING REVENUES, OR DID HE

15 LOOK AT ALL THEIR LICENSING REVENUES?

16 **A.**   HE LOOKED AT ALL --

17          **MR. HUMMEL:**  OBJECTION.  LEADING.

18          **THE COURT:**  THAT QUESTION IS NOT LEADING.  IT WAS

19 EITHER/OR.  OVERRULED.

20          GO AHEAD.

21          **THE WITNESS:**  YEAH.  HE LOOKED AT ALL OF THE

22 LICENSING REVENUES WITH RESPECT TO EVERYBODY ELSE, AND A

23 FRACTION OF THE LICENSING REVENUES WITH RESPECT TO THE NFL

24 PLAYERS ASSOCIATION AND PLAYERS INC.

25

1  **BY MR. KESSLER:**

2  **Q.**   SO WHAT'S WRONG, IF ANYTHING, WITH LOOKING AT A PORTION OF

3  THE LICENSING REVENUES AND COMPARING IT TO ALL THE REVENUES FOR

4  SOME OTHER ENTITIES, FROM AN ECONOMIC STANDPOINT?  WHAT'S YOUR

5  VIEW OF THAT?

6  **A.**   THE THING THAT'S WRONG WITH IT IS THAT THE COSTS

7  ASSOCIATED WITH LICENSING SHOULD BE THAT THE REASONABLENESS OF

8  PLAYERS INC EXPENDITURES IS DETERMINED BY WHETHER THEY BEAR A

9  REASONABLE RELATIONSHIP TO THE TOTAL INCOME THEY GENERATE, NOT

10  JUST A FRACTION OF IT.

11        IT'S A STRANGE THING TO SAY THAT ALL THE COSTS OF THE

12  ORGANIZATION ARE GENERATED BY SOMETHING THAT'S AROUND HALF OF

13  ITS TOTAL INCOME AND ALL THE REST IS FOR FREE.

14        THE RIGHT WAY TO DO THE COMPARISON IS TO SAY:  IS

15  PLAYERS INC REASONABLY EFFICIENT AT GENERATING LICENSING INCOME

16  IN THE SENSE THAT PER DOLLAR SPENT THE AMOUNT OF REVENUE THAT

17  COMES IN IS REASONABLE?

18        AND, OF COURSE, IT IS.

19  **Q.**   SO DO YOU HAVE AN UNDERSTANDING OR AN ESTIMATE OF HOW MUCH

20  OF ALL LICENSING REVENUE DOES PLAYERS INC RETAIN AS ITS

21  LICENSING FEE, APPROXIMATELY?

22  **A.**   IT'S IN THE RANGE OF 10 TO 15 PERCENT.  IT'S MUCH LESS

23  THAN 23 PERCENT.

24  **Q.**   10 TO 15 PERCENT?

25  **A.**   YES.

1   Q.   AND LOOKING AT THAT 10 TO 15 PERCENT FIGURE, HOW DOES THAT

2   COMPARE TO THE OTHER LICENSING COMPANIES THAT DR. RASCHER

3   LOOKED AT, LIKE COLLEGIATE LICENSING?

4   A.   IT'S ACTUALLY LOWER.

5         SO, I MEAN, THE POINT IS, HE'S -- THE CONCLUSION IS

6   HE HAS HUGE RANGE, ALL RIGHT?  THIS WOULD BE AT THE BOTTOM OF

7   THE RANGE AS -- AMONG THE THINGS HE REGARDS AS REASONABLE.

8   Q.   SO FROM AN ECONOMIC STANDPOINT, IS THERE ANY EVIDENCE THAT

9   PLAYERS INC'S SHARE WAS LOWER THAN OTHER COMPARABLE LICENSING

10  ENTITIES?

11  A.   NO, THERE'S NO EVIDENCE AT ALL.  I THINK ANYBODY WHO DID

12  THE CORRECT COMPARISON OF REVENUES GENERATED VERSUS COSTS,

13  WOULD CONCLUDE THAT THE FRACTION OF REVENUES ACCOUNTED FOR BY

14  THE COST OF THE LICENSING OPERATION IS COMPLETELY WITHIN THE

15  RANGE OF REASONABLENESS.  INDEED, IT'S BELOW AVERAGE.

16  Q.   SO WAS THERE ANY MATERIAL DIFFERENCE?

17  A.   NO, THERE'S NONE.

18  Q.   NOW, YOU MENTIONED EARLIER -- AND THIS IS JUST PRELIMINARY

19  TO GET THE JURY FOCUSED -- THAT YOU THOUGHT IT WAS

20  INAPPROPRIATE TO COMPARE A SPORTS UNION'S RETENTION OF THE

21  LICENSING REVENUES WITH NONSPORTS UNIONS.  COULD YOU EXPLAIN

22  WHY, JUST THAT POINT?

23  A.   WELL, THE CRUCIAL FACT IS, THE UNION AS A CALL ACTIVITY IS

24  GOING TO HAVE OTHER COSTS ASSOCIATED WITH RUNNING THE UNION.

25  THE MEMBERS OF THE UNION CAN DECIDE:  HOW ARE THEY GOING TO

1  BEAR THESE OTHER COSTS?  ARE THEY GOING TO BEAR IT BY PAYING

2  DUES AND KEEPING THE LICENSING REVENUE?  OR ARE THEY GOING TO

3  BEAR IT BY REDUCING THE DUES AND USING THE LICENSING REVENUES

4  TO RUN THE UNION?

5          THERE IS NO COMPARABLE TO THAT IN THE CASE OF THE

6  UNIVERSITY OF KENTUCKY, RIGHT?  IT'S NOT PAYING PART OF ITS

7  LICENSING REVENUES TO ITS PLAYERS OR -- IT'S JUST A SOURCE OF

8  REVENUES.

9          IT'S RUNNING IT SORT OF LIKE A BUSINESS, WHERE IT'S

10 THE UNIVERSITY OF KENTUCKY THAT'S GETTING THE REVENUES.

11         THERE'S NO COMPARABLE DECISION-MAKING THERE WITH

12 RESPECT TO:  HOW IS SOME OTHER ASPECT GOING TO BE PAID FOR?  IS

13 IT GOING TO BE PAID FOR OUT OF DUES, OR IS IT GOING TO BE PAID

14 OUT OF THE LICENSING REVENUES?

15         THERE IS JUST NO COUNTERPART TO THAT IN ALL OF HIS

16 OTHER EXAMPLES BESIDES THE BASEBALL PLAYERS.

17 **Q.**  AS PART OF YOUR WORK IN THIS CASE AND, GENERALLY, IN YOUR

18 STUDY OF THE SPORTS LITERATURE, ARE YOU FAMILIAR AS TO THE

19 PRACTICES OF SPORTS LABOR UNIONS AS TO HOW THEY USE LICENSING

20 MONEY?

21 **A.**  YES, I AM.

22 **Q.**  OKAY.  AND WOULD YOU TELL THE JURY, WHAT IS -- IS THERE A

23 COMMON PRACTICE REGARDING THE USE OF LICENSING MONEY BY PLAYERS

24 FOR THEIR UNIONS OR NOT?

25 **A.**  YES, THERE IS A COMMON PRACTICE.

Q.   AND WHAT IS THAT PRACTICE?

A.   THE COMMON PRACTICE AMONG ALL SPORTS UNIONS IS TO PAY A

SUBSTANTIAL FRACTION, IF NOT ALL, OF THE COSTS OF THE UNION NOT

FROM DUES, BUT FROM LICENSING REVENUES.

        IF THE LICENSING REVENUES ARE SUFFICIENT TO PAY FOR

THE -- THE FUNCTION OF THE UNION, THEN TYPICALLY WHAT THEY THEN

DO IS REBATE THE DUES.

        NOW, THERE'S A BIG EXCEPTION TO THAT, ALL RIGHT?  AND

THE BIG EXCEPTION TO THAT IS WHEN THERE'S GOING TO BE A LABOR

PROBLEM.

        UNION CONTRACTS IN PROFESSIONAL SPORTS TYPICALLY LAST

FOR FIVE TO SEVEN YEARS.  NEAR THE END OF THAT, PLAYERS HAVE TO

MAKE AN ASSESSMENT:  IS THIS COLLECTIVE BARGAINING SESSION

GOING TO BE EASY OR HARD?  AND "HARD" MEANS IT MAY LEAD TO A

STRIKE.  IT MAY LEAD TO A LOCKOUT.  IT MAY LEAD TO PROTRACTED

LITIGATION ABOUT WHETHER ONE SIDE OR THE OTHER IS ENGAGING IN

FAIR BARGAINING OR, INDEED, VIOLATING THE ANTITRUST LAWS.

        SO THERE'S CERTAIN EXPENSES THAT COME UP SOMETIMES,

BUT NOT VERY FREQUENTLY, THAT HAVE TO DO WITH THE COLLECTIVE

BARGAINING PROCESS ITSELF.  THE STANDARD PRACTICE OF UNIONS IS

TO BUILD UP A FUND TO PAY FOR THAT.  AND THE FUND HAS TWO

PARTS.

        IT'S THE COST OF RUNNING THE UNION AND FIGHTING THE

LITIGATION DURING A PERIOD WHEN THERE MIGHT BE A STRIKE OR A

LOCKOUT AND YOU WON'T HAVE ANY DUES TO PAY FOR IT BECAUSE OF

1  THE STRIKE OR LOCKOUT.

2          AND THEN, SECONDLY, PROVIDING FINANCIAL ASSISTANCE TO

3  PLAYERS WHO NO LONGER ARE GETTING PAID BECAUSE THERE'S A STRIKE

4  OR A LOCKOUT.

5          AS YOU COME CLOSE TO A COLLECTIVE BARGAINING EPISODE

6  THAT THE UNION BELIEVES IS GOING TO BE DIFFICULT, THEY SAVE

7  LICENSING REVENUE AND DUES INTO BIG FUNDS TO GET THEM THROUGH

8  THAT PERIOD.  AND, AGAIN, LICENSING REVENUES CAN TYPICALLY

9  CONTRIBUTE TO THOSE STRIKE FUNDS, AND ALL THE UNIONS DO IT.

10 **Q.**   NOW, PROFESSOR, DR. RASCHER DID COMPARE THE LICENSING

11 RETENTION OF REVENUES OF THE NFLPA AND PLAYERS INC WITH ONE

12 OTHER SPORTS UNION, THE MAJOR LEAGUE BASEBALL PLAYERS

13 ASSOCIATION?

14 **A.**   THAT'S CORRECT.

15 **Q.**   DID YOU EXAMINE THAT ANALYSIS?

16 **A.**   YES, I DID.

17 **Q.**   FIRST, AS A PRELIMINARY MATTER, DID YOU REACH A CONCLUSION

18 AS TO WHETHER DR. RASCHER DID THE ANALYSIS CORRECTLY?

19 **A.**   UHM, YEAH.  MY -- MY VIEW ABOUT IT WAS HE DID IT

20 INCORRECTLY, BECAUSE HE DIDN'T TAKE ACCOUNT OF THIS LAST

21 PHENOMENON, WHICH IS THE COLLECTIVE BARGAINING ISSUES.

22 **Q.**   WHAT ABOUT ON THE ISSUE OF WHETHER HE, FOR THE COMPARISON,

23 LOOKED AT ALL THE NFLPA REVENUES VERSUS SOME OF THEM?  DID HE

24 DO THAT CORRECTLY?

25 **A.**   WELL, HE HAD TWO THINGS THAT HE DID.  ONE IS TO COMPARE

1  THE -- THE DISBURSAL OF JUST THE EQUAL SHARE REVENUE.  AND, OF

2  COURSE, THAT'S RIDICULOUS.  THAT DOESN'T MAKE SENSE.  IT ONLY

3  MAKES SENSE TO LOOK AT HOW THEY DEAL WITH ALL THE LICENSING

4  REVENUE; HOW MUCH OF THAT GOES TO THE PLAYERS AND HOW MUCH OF

5  IT IS RETAINED.

6  **Q.**    AND THAT WAS A SEPARATE ISSUE?  WAS THAT A SEPARATE

7  PROBLEM IN THE ANALYSIS?  WAS IT GOOD THING, BAD THING?  HOW

8  DID YOU VIEW THAT?

9  **A.**    NO?  THE APPROPRIATE WAY -- AGAIN?  LET'S GET BACK TO WHAT

10 QUESTION THIS -- THIS MATTERS FOR.

11         THE QUESTION THAT IT MATTERS FOR IS HOW IN SOME SENSE

12 ARE THE PLAYERS GETTING A JUST REWARD FOR THEIR LICENSING

13 REVENUES?  AND SO THE -- THE QUESTION HE'S TRYING TO ADDRESS

14 IS:  IS THE FRACTION OF LICENSING REVENUES THAT ACTUALLY GOES

15 IN THE POCKETS OF PLAYERS REASONABLE?

16         IT'S SORT OF LIKE THE COST BEING REASONABLE, RIGHT?

17 WE HAD THE QUESTION OF PLAYERS INC'S COSTS BEING REASONABLE.

18 AND WE DECIDED THOSE WERE REASONABLE.

19         AND THEN, THE SECOND PART IS OF THE REMAINDER, IF WE

20 LOOK AT THE AMOUNT THAT'S BEING KEPT TO RUN THE UNION VERSUS

21 THE AMOUNT THAT'S GOING IN THE POCKETS OF THE PLAYERS, IS THAT

22 DIVISION REASONABLE?

23         AND, OBVIOUSLY, IF YOU ONLY LOOK AT ONE FRACTION OF

24 THE REVENUES, ONE TINY PIECE OF THE REVENUES, YOU CAN'T ADDRESS

25 THE QUESTION AS TO WHETHER PLAYERS, IN GENERAL, ARE GETTING A

1   REASONABLE SHARE OF THE TOTAL INCOME OF THE ASSOCIATION.

2   **Q.**   HAVE YOU STUDIED THE ISSUE AS TO WHETHER THE NFL PLAYERS

3   ARE GETTING A REASONABLE SHARE OF THE LICENSING REVENUES?

4   **A.**   YES, I HAVE.

5   **Q.**   OKAY.  LET ME ASK YOU TO TAKE A LOOK AT TRIAL EXHIBIT

6   2399.

7         IS THIS EXHIBIT -- DOES THIS EXHIBIT REFLECT THE DATA

8   THAT'S IN YOUR EXPERT REPORT AND IN YOUR COMPARISON?

9   **A.**   YES, IT DOES.

10        **MR. KESSLER:**  YOUR HONOR, MOVE INTO EVIDENCE TRIAL

11  EXHIBIT 2399.

12        **MR. HUMMEL:**  NO OBJECTION.

13        **THE COURT:**  RECEIVED.

14        (TRIAL EXHIBIT 2399 RECEIVED IN EVIDENCE.)

15  **BY MR. KESSLER:**

16  **Q.**   THIS SAYS:

17             "PERCENTAGE OF LICENSING INCOME PAID TO PLAYERS

18  BY THE MLBPA AND NFLPA FROM 2003 TO 2007."

19             FIRST OF ALL, PROFESSOR NOLL, "MLBPA," WHAT IS THAT?

20  **A.**   MAJOR LEAGUE BASEBALL PLAYERS ASSOCIATION.

21  **Q.**   IS THAT THE UNION FOR BASEBALL PLAYERS?

22  **A.**   YES.

23  **Q.**   OKAY.  AND WHEN IT SAYS "NFLPA," FOR THIS PURPOSE DID YOU

24  AGGREGATE TOGETHER BOTH THE NFLPA AND PLAYERS INC?

25  **A.**   YES.  IT'S EVERYTHING, YES.

1    Q.   OKAY.  AND I WANT TO ASK YOU, FIRST, YOUR CALCULATIONS, IN

2    2003, YOU CALCULATED THAT THE PLAYERS RECEIVED 73.9 PERCENT OF

3    ALL THE LICENSING INCOME RECEIVED BY THE NFLPA AND NFLPI; IS

4    THAT CORRECT?

5    A.   THAT'S CORRECT.

6    Q.   OKAY.  AND SO 73.9 PERCENT IS OBVIOUSLY MUCH MORE THAN

7    37 PERCENT, CORRECT?

8    A.   THAT'S CORRECT.

9    Q.   NOW, THIS -- DOES THIS INCLUDE THE AMOUNT PAID TO ACTIVE

10   AND RETIRED PLAYERS, OR JUST RETIRED PLAYERS, OR JUST ACTIVE

11   PLAYERS?

12   A.   IT'S EVERYONE.  IT INCLUDES BOTH THE RETIRED AND THE

13   ACTIVE PLAYERS.

14   Q.   OKAY.  SO WHEN YOU ADD TOGETHER ALL THE LICENSING REVENUE

15   RECEIVED BY THE NFLPA AND PLAYERS INC, AND YOU COUNT UP HOW

16   MUCH OF THAT WAS PAID TO PLAYERS, EITHER ACTIVE PLAYERS OR

17   RETIRED PLAYERS, COULD YOU TELL THE JURY WHAT ARE THE

18   PERCENTAGES YOU CALCULATED EACH YEAR FROM 2003 TO 2007?

19   A.   YEAH.  IT'S SHOWN THERE AS THE LAST -- LAST LINE, THAT

20   IT'S, YOU KNOW, 73.9, 72.4, ET CETERA, DOWN TO THE LOW OF 63.7

21   LAST YEAR.

22   Q.   SO IT NEVER GOT LOWER THAN 63.7 PERCENT, THE AMOUNT OF ALL

23   THE LICENSING REVENUES PAID OUT TO PLAYERS, CORRECT?

24   A.   THAT'S CORRECT.

25   Q.   NOW, YOU ALSO CALCULATED THE AVERAGE.  DO YOU SEE THAT?

1  A.   YES.

2  Q.   OKAY.  IN LOOKING AT THIS TYPE OF ANALYSIS, IS IT MORE

3  APPROPRIATE TO LOOK AT THE AVERAGE OR THE YEAR-BY-YEAR

4  COMPARISONS?

5  A.   AS YOU CAN TELL BY LOOKING AT MAJOR LEAGUE BASEBALL, IT

6  MAKES MUCH MORE SENSE TO LOOK AT IT ON A YEAR-BY-YEAR BASIS,

7  AND THEN TRY TO FIGURE OUT WHAT'S GOING ON.

8           MAJOR LEAGUE BASEBALL WAS FEARFUL OF ITS LAST

9  COLLECTIVE BARGAINING SESSION.  THEY THOUGHT THEY MIGHT HAVE A

10  TERRIBLE EVENT.  REMEMBER, BASEBALL HAD A STRIKE OR A LOCKOUT

11  IN 1994, AND WE LOST THE WORLD SERIES.  BASEBALL PLAYERS WERE

12  AFRAID THE SAME THING WOULD HAPPEN TO THEM.

13           IT'S NOT AN INDICTMENT OF THE PLAYERS' UNION IN

14  BASEBALL THAT THEY KEPT ALL THE LICENSING REVENUE IN THE UNION

15  PRIOR TO THE SIGNING OF THAT COLLECTIVE BARGAINING AGREEMENT,

16  WHICH HAPPENED IN DECEMBER OF 2006.

17           SO TO SAY -- PUT ANOTHER HAT ON:  SHOULD WE BE

18  ATTACKING MAJOR LEAGUE BASEBALL PLAYERS ASSOCIATION IN 2006

19  BECAUSE IT DIDN'T PAY ANYTHING TO PLAYERS?  OF COURSE NOT.  IT

20  WAS PROTECTING THE INTERESTS OF THE PLAYERS BY BUILDING A

21  STRIKE FUND.

22           OF COURSE, THE VERY NEXT YEAR WHICH THE COLLECTIVE

23  BARGAINING AGREEMENT IS SIGNED, THE BAD EVENT DIDN'T HAPPEN.  A

24  PERFECTLY AMICABLE COLLECTIVE BARGAINING AGREEMENT WAS REACHED.

25  THERE WASN'T A STRIKE.  THERE WASN'T A LOCKOUT.  NOBODY SHOT

1   ANYBODY.  IT WAS JUST FINE.

2            THEN, THEY JUST TURNED AROUND AND GAVE OUT A HUGE

3   AMOUNT OF MONEY TO THEIR PLAYERS.

4            THAT'S EXACTLY WHAT UNIONS DO, ALL RIGHT?  AND SO THE

5   SAME THING HAPPENS IN THE NFLPA.  IT'S BUILDING UP A STRIKE

6   FUND BECAUSE THE OWNERS HAVE CANCELLED THE CURRENT COLLECTIVE

7   BARGAINING AGREEMENT.  THEY WANT TO REOPEN IT.  AND IT WILL

8   BE -- 2010 WILL BE THE LAST YEAR PLAYED UNDER THE CURRENT

9   AGREEMENT.  AND THE CURRENT FOOTBALL PLAYERS ARE AFRAID OF

10  EXACTLY THE SAME THING BASEBALL PLAYERS WERE AFRAID OF, SO THEY

11  ARE BUILDING UP A STRIKE FUND.

12  **Q.**  WHEN YOU DID THIS COMPARISON OF MAJOR LEAGUE BASEBALL

13  PLAYERS ASSOCIATION WITH THE NFLPA IN THESE YEARS, DO YOU FIND

14  AS AN ECONOMIST THERE'S ANY MATERIAL DIFFERENCE BETWEEN THE

15  PERCENTAGES THAT -- BETWEEN THE ECONOMIC ACTIVITY GOING ON HERE

16  OR THE PERCENTAGES RETAINED?

17  **A.**  WELL, I FIND THERE'S NO MATERIAL DIFFERENCE EVEN IF YOU

18  USE DR. RASCHER'S NUMBERS.  YOU'VE USED MINE.

19            BUT I WOULD ALSO LIKE TO SAY, IF YOU USE

20  DR. RASCHER'S VERSION OF THE TOTAL LICENSING REVENUES AND THE

21  TOTAL PAYOUTS TO PLAYERS, YOU GET SOMEWHAT SMALLER NUMBERS THAN

22  MINE, BUT YOU DON'T GET MATERIALLY DIFFERENT NUMBERS FROM MINE.

23            IN OTHER WORDS, YOU END UP WITH A LOWER AVERAGE AND

24  THE NUMBERS ARE BY AND LARGE LOWER.  BUT YOU GET THE SAME

25  ANSWER, WHICH IS THERE'S NOTHING DIFFERENT ABOUT THE NFLPA AND

1  OTHER UNIONS.  IT'S BEHAVING EXACTLY AS YOU WOULD EXPECT IT TO.

2  **Q.**   SO IN YOUR OPINION AS AN ECONOMIST, IS THERE ANY SUPPORT

3  FOR DR. RASCHER'S CONCLUDING THAT THE EVIDENCE SHOWS THAT THE

4  NFLPA AND PI TOOK OUT AN UNREASONABLE -- AN ECONOMICALLY

5  UNREASONABLE PERCENTAGE OF PLAYER LICENSING REVENUE?

6  **A.**   NO.  AS I SAID BEFORE, EVEN DR. RASCHER'S OWN NUMBERS DO

7  NOT SUPPORT THE VIEW THAT THERE WAS ANY UNREASONABLE AMOUNT OF

8  MONEY WITHHELD FROM THE PLAYERS DURING THIS PERIOD.

9  **Q.**   NOW, DR. RASCHER ALSO SAID THAT HE HAD AN OPINION THAT A

10 RANGE OF 10 TO 40 PERCENT WAS THE CUSTOMARY PERCENTAGE.  DO YOU

11 RECALL THAT?

12 **A.**   RIGHT.

13 **Q.**   OKAY.  AND WAS THERE ANY STUDY TO SHOW WHAT THE CUSTOMARY

14 PERCENTAGES WERE OF UNIONS THAT HE DID?

15 **A.**   WELL, SINCE HE ONLY USED ONE UNION -- SUPPOSE HE HAD COME

16 UP WITH THE DIFFERENCE, RIGHT, THAT ONE OF THEM PAID OUT 60

17 PERCENT AND ANOTHER ONE PAID OUT 40 PERCENT.  WHICH ONE IS

18 CUSTOMARY?  ALL RIGHT.

19        I MEAN, YOU WOULD HAVE TO ASK THE QUESTION:  WHY DO

20 THESE UNIONS DIFFER?  AND HE NEVER ASKED THAT QUESTION.

21        SO TO ASSIGN THE WORD "CUSTOMARY" TO ONE IN A TWO

22 COMPARISON DOESN'T MAKE SENSE.

23 **Q.**   SO IS THERE ANY SUPPORT FOR HIS OPINION THAT A 10 TO

24 40 PERCENT RANGE WAS CUSTOMARY AS IT REGARDS TO THE ISSUES IN

25 THIS CASE?

1  **A.**   NO.  IF YOU TAKE THE TWO UNIONS HE STUDIED, YOU'D HAVE TO

2  SAY THE CUSTOMARY RANGE IS BETWEEN THE LOWER ONE AND THE HIGHER

3  ONE, BECAUSE THAT'S ALL YOU HAVE.

4  **Q.**   OKAY.  FINALLY, TAKE A LOOK AT TRIAL EXHIBIT 3000.  DO YOU

5  HAVE THAT?

6  **A.**   PROBABLY.

7  **Q.**   I HOPE SO.

8  **A.**   3000.

9       **MR. CLARK:**  IT'S PROBABLY THE TOP ONE ON YOUR LEFT

10  STACK.

11       **THE WITNESS:**  THAT'S 2399.  OH, 3000.

12  **BY MR. KESSLER:**

13  **Q.**   YES.  DO YOU HAVE THAT?

14  **A.**   YES, I DO.

15  **Q.**   AND DOES THIS EXHIBIT REFLECT DATA AND ANALYSIS THAT'S

16  CONTAINED IN YOUR EXPERT REPORT?

17  **A.**   YES, IT DOES.

18       **MR. KESSLER:**  YOUR HONOR, I MOVE IN TRIAL EXHIBIT

19  3000.

20       **MR. HUMMEL:**  I DON'T OBJECT AS A DEMONSTRATIVE.  I DO

21  OBJECT TO IT COMING INTO EVIDENCE.  IT WASN'T A PART OF HIS

22  EXPERT REPORT.

23       **MR. KESSLER:**  IT ABSOLUTELY WAS PART OF HIS EXPERT

24  REPORT.  THE ONLY THING THAT'S ADDED, YOUR HONOR, IS THERE ARE

25  SOME PICTURES OF A FOOTBALL AND --

1          **THE COURT:**  EXPERT REPORTS DO NOT COME INTO EVIDENCE.

2   THEY ARE HEARSAY.  THEY DO NOT COME INTO EVIDENCE.

3          **MR. KESSLER:**  OH, I DIDN'T MEAN THAT, YOUR HONOR.

4          **THE COURT:**  NOW, DO YOU WANT TO USE IT AS

5   ILLUSTRATIVE ONLY?

6          **MR. KESSLER:**  I'LL USE IT AS AN ILLUSTRATIVE.  THAT'S

7   FINE.

8          **MR. HUMMEL:**  NO OBJECTION.

9          **THE COURT:**  ILLUSTRATIVE ONLY.

10          **MR. KESSLER:**  FINE.

11          (DOCUMENT DISPLAYED.)

12  **BY MR. KESSLER:**

13  **Q.**   "THERE IS NO MATERIAL DIFFERENCE IN THE PERCENTAGE OF

14  PLAYER LICENSING REVENUES DISTRIBUTED BY SPORTS UNIONS TO

15  PLAYERS."

16          DR. NOLL, AS PART OF YOUR EXPERT ANALYSIS IN THIS

17  CASE DID YOU ALSO LOOK AT THE NATIONAL BASKETBALL PLAYERS

18  ASSOCIATION?

19  **A.**   YES, I DID.

20  **Q.**   IS THAT THE UNION FOR BASKETBALL PLAYERS?

21  **A.**   YES, IT IS.

22  **Q.**   DID YOU STUDY THE AMOUNT OF LICENSING REVENUE RETAINED BY

23  EACH OF THESE UNIONS DURING 2003 TO 2007, AND HOW MUCH WAS PAID

24  OUT TO PLAYERS?

25  **A.**   YES.

1  Q.   OKAY.  AND DID YOU FIND THAT THE BASKETBALL PLAYERS PAID

2  OUT ABOUT 76 PERCENT; IS THAT CORRECT --

3  A.   YES --

4  Q.   -- OVER TIME?

5  A.   -- IT'S CORRECT.  BUT YOU HAVE TO MAKE A FOOTNOTE HERE.

6  Q.   WHAT'S THE FOOTNOTE?

7  A.   THE FOOTNOTE IS THE BASKETBALL PLAYERS ASSOCIATION DOESN'T

8  HAVE THEIR OWN LICENSING OPERATION.  THE NBA DOES THE

9  LICENSING, KEEPS SOME OF THE REVENUE, AND THEN PAYS THE

10  BASKETBALL PLAYERS THE REST.

11          SO THE PLAYERS INC COUNTERPART ISN'T IN THERE.  IT'S

12  IN THE NBA SOMEWHERE.  SO WHAT THE NATIONAL BASKETBALL PLAYERS

13  ASSOCIATION GET IS A NET REVENUE FROM LICENSING AFTER THE COSTS

14  OF LICENSING HAVE BEEN PAID.

15          SO THEIR NUMBER REALLY ISN'T 76.4.  IT'S SOME LOWER

16  NUMBER, BUT WE DON'T KNOW WHAT IT IS BECAUSE WE DON'T KNOW HOW

17  MUCH THE NBA KEEPS OUT OF ITS LICENSING REVENUE.

18  Q.   OKAY.  HAVE YOU REACHED AN OPINION AS TO WHETHER BASED ON

19  THIS DATA THERE'S ANY MATERIAL DIFFERENCE BETWEEN THE

20  PERCENTAGE OF LICENSING REVENUES KEPT BY THE NFLPA AND PLAYERS

21  INC VERSUS OTHER SPORTS UNIONS?

22  A.   THERE IS NO DIFFERENCE.  PARTICULARLY, WHEN YOU LOOK ON

23  THE YEAR-TO-YEAR BASIS, BECAUSE EVERY SINGLE ONE OF THEM HAS

24  THIS HUGE YEAR-TO-YEAR VARIATION IN THE FRACTION OF THE

25  REVENUES THAT THEY KEEP, DEPENDING ON CIRCUMSTANCES.

1          SO -- AND IF YOU LOOK AT IT THAT WAY, WHICH IS THE

2    RIGHT WAY, THEN IT'S ABSOLUTELY CLEAR THAT THEY ARE ALL

3    BEHAVING BASICALLY THE SAME WAY, AND THERE'S NO DIFFERENCES

4    AMONG THEM.

5    **Q.**    ONE FINAL SUBJECT.  AS PART OF YOUR EXPERT STUDY IN THIS

6    CASE, AND AS PART OF YOUR FIRST EXPERT REPORT, DID YOU EXAMINE

7    THE ISSUE OF THE -- OF THE $8 MILLION ADJUSTMENT THAT WAS MADE

8    BY THE NFLPA AND PLAYERS INC IN -- OUT OF THE GROSS LICENSING

9    REVENUE POOL?

10   **A.**    YES, I DID.

11   **Q.**    OKAY.  AND DID YOU REACH ANY CONCLUSION AS AN ECONOMIST AS

12   TO WHETHER THERE WAS AN ECONOMIC BASIS FOR THAT $8 MILLION

13   ADJUSTMENT?

14   **A.**    YES.

15   **Q.**    WHAT WAS YOUR CONCLUSION?

16   **A.**    THE CONCLUSION IS THAT THERE OBVIOUSLY IS SOME VALUE TO

17   THE LOGOS OF THE ASSOCIATION, ALL RIGHT, THE PLAYERS

18   ASSOCIATION AND PLAYERS INC.

19          AND, MOREOVER, THE ONLY COMPARABLE WE HAVE TO IT IS

20   THE NBA PLAYERS ASSOCIATION.  AND THEY ARE PAID SOMETHING FOR

21   THOSE LOGO RIGHTS BY THE NBA, SEPARATELY FROM THE LICENSING

22   REVENUES.  THE NUMBERS ARE COMPARABLE.

23          SO THERE'S NOTHING PARTICULAR OR UNUSUAL ABOUT THE

24   NFLPA'S CHARGING FOR THE LOGOS OF ITS ASSOCIATION.

25   **Q.**    TELL THE JURY, IF YOU KNOW AS PART OF YOUR STUDY, HOW MUCH

1  PER YEAR, ON AVERAGE, DOES THE NBA PAY THE NBA PLAYERS

2  ASSOCIATION FOR ITS EXCLUSIVE LOGO RIGHTS?

3  **A.**   IT HAS VARIED FROM YEAR TO YEAR, BUT IT'S NOW UP TO

4  $11 MILLION.

5  **Q.**   MORE THAN $8 MILLION?

6  **A.**   IT'S MORE THAN 8.

7  **Q.**   NOW, AS AN ECONOMIST, WOULD YOU EXPECT THE VALUE OF THE

8  LOGOS OF THE NFLPA AND PI TO BE MORE OR LESS THAN THE VALUE OF

9  THE BASKETBALL PLAYERS ASSOCIATION LOGOS?

10  **A.**   I WOULD EXPECT THE FOOTBALL PLAYERS LOGO TO BE WORTH MORE

11  THAN THE BASKETBALL PLAYERS' LOGOS.

12  **Q.**   WHY IS THAT?

13  **A.**   FOR TWO REASONS.  FIRST OF ALL, FOOTBALL IS MORE POPULAR

14  THAN BASKETBALL ON EVERY MEASURE:  AMOUNT OF MONEY THEY TAKE

15  IN; AUDIENCE RATING BY TELEVISION OR WHATEVER.  SO IT'S MORE

16  POPULAR.

17          AND, SECONDLY, THE DEAL WITH THE NFL IS THAT THE

18  LOGOS OF THE NFLPA ARE ACTUALLY DISPLAYED IN LICENSING BY THE

19  NFL.  WHEREAS, THERE IS NO SIMILAR DEAL WITH THE NBA.

20          SO THE DEGREE TO WHICH THAT LOGO IS BEING ADVERTISED

21  AND, THEREFORE, IS GENERATING RECOGNITION VALUE, WHICH IS WHAT

22  LICENSEES WANT, IS GREATER FOR THE NFL THAN FOR THE NBA.

23  **Q.**   SO ARE YOU AWARE OF ANY ECONOMIC EVIDENCE THAT THE

24  $8 MILLION ADJUSTMENT WAS IN ANY WAY EXCESSIVE FROM AN ECONOMIC

25  STANDPOINT?

1  **A.**   NO.  I -- FOR THE LIFE OF ME, I DO NOT UNDERSTAND WHY

2  SOMEONE WOULD CLAIM THAT THAT WAS AN UNREASONABLE NUMBER.

3         IT MAY NOT BE THE RIGHT NUMBER, BUT IT'S NOT AN

4  UNREASONABLE NUMBER.  IT'S PERFECTLY REASONABLE GIVEN THE

5  HISTORY OF THE NBA PLAYERS --

6  **Q.**   WHEN YOU SAY IT'S NOT THE RIGHT NUMBER, IT COULD BE THAT A

7  HIGHER ADJUSTMENT WAS WARRANTED?

8  **A.**   YES.  I THINK IT'S, IN FACT, MORE LIKELY TO BE HIGHER THAN

9  LOWER.  BUT, YOU KNOW, I HAVEN'T DONE THE ANALYSIS, EITHER.  I

10 JUST KNOW WHAT THE NBA GETS.

11        **MR. KESSLER:**  YOUR HONOR, I HAVE NO FURTHER QUESTIONS

12 FOR THIS WITNESS AT THIS TIME.

13        **THE COURT:**  THANK YOU.

14        ALL RIGHT.  CROSS EXAMINATION.

15        **MR. HUMMEL:**  THANK YOU, YOUR HONOR.

16                    <u>**CROSS EXAMINATION**</u>

17 **BY MR. HUMMEL:**

18 **Q.**   DR. NOLL, GOOD MORNING.

19 **A.**   GOOD MORNING.

20 **Q.**   MY NAME IS CHAD HUMMEL.  I HAVE A FEW QUESTIONS FOR YOU

21 THIS MORNING.

22        YOU UNDERSTAND THAT THIS CASE IS ABOUT GROUP

23 LICENSING AUTHORIZATIONS, CORRECT?

24 **A.**   I UNDERSTAND IT IS ABOUT GROUP LICENSING, YES.

25 **Q.**   ALL RIGHT.  AND YOU'RE AWARE OF THE FACT THAT THERE WAS AN

1    EXPECTATION, IN CONNECTION WITH THE GROUP LICENSING

2    AUTHORIZATIONS, THAT IT WOULD BE POSSIBLE TO LICENSE THE GROUP

3    OF RETIRED PLAYERS THAT SIGNED THOSE GLA'S, CORRECT?

4              **MR. KESSLER:**  YOUR HONOR, I HAVE AN OBJECTION TO THIS

5    WITNESS HE'S TRYING TO USE TO INTERPRET THE GLA.  I DON'T THINK

6    THAT'S APPROPRIATE FOR AN EXPERT WITNESS TO DO, EITHER EXPERT

7    WITNESS, IF THAT'S WHAT MR. HUMMEL IS SUGGESTING.

8              **MR. HUMMEL:**  I'M NOT.  I'M TALKING ABOUT AN ECONOMIC

9    EXPECTATION.

10             **THE COURT:**  I'M GOING TO ALLOW THIS LINE OF

11   QUESTIONS, BUT IF YOU'RE AIMED AT TRYING TO INTERPRET THE GLA,

12   FORGET IT.  WE'RE NOT GOING TO GO DOWN THAT PATH, BECAUSE THIS

13   WITNESS IS NOT QUALIFIED TO DO THAT, JUST LIKE THE OTHER DAY.

14             MR. KESSLER, YOU ASKED A LOT OF QUESTIONS YESTERDAY

15   OF THE EXPERT THAT WERE OUTSIDE WHAT HE HAD PUT IN HIS REPORT,

16   AND THAT WAS THE POINT YOU WERE TRYING TO MAKE.  AND I'M GOING

17   TO LET MR. HUMMEL DO THE SAME THING HERE.

18             SO FOR THE TIME BEING, I'M GOING TO GO ALONG WITH

19   THIS LINE OF QUESTIONS, AND SEE WHERE IT GOES.

20             BUT IF IT'S AIMED AT TRYING TO GET THIS WITNESS TO

21   INTERPRET THE GLA, HE'S NOT QUALIFIED TO DO THAT.

22             **MR. HUMMEL:**  IT'S NOT, YOUR HONOR.

23   **BY MR. HUMMEL:**

24   **Q.**   AND JUST TO BE CLEAR ON THE RECORD, DR. NOLL, YOU'RE

25   OFFERING NO OPINION HERE TODAY ABOUT THE MEANING OF THE GLA,

1    RIGHT?

2    **A.**    CORRECT.

3    **Q.**    AND YOU'RE OFFERING NO OPINION HERE -- AND I'M NOT GOING

4    TO ASK YOU -- ABOUT YOUR INTERPRETATION OF ANY THIRD-PARTY

5    LICENSES, RIGHT?

6    **A.**    GREAT.

7    **Q.**    OKAY.

8    **A.**    I'M NOT AN EXPERT ON THAT, YES.

9    **Q.**    BUT YOU ARE AN EXPERT ECONOMIST, RIGHT?

10   **A.**    I THINK SO, YES.

11   **Q.**    AND ONE OF THE DATA POINTS IN THIS CASE THAT YOU

12   CONSIDERED WAS:  WHETHER THERE WAS AN EXPECTATION -- DURING THE

13   TIME THAT THE UNION WAS SOLICITING THESE RETIRED PLAYERS TO

14   SIGN GLA'S, THERE WAS AN EXPECTATION THAT THERE WOULD BE A

15   POSSIBILITY TO LICENSE THE GROUP TO THIRD-PARTY LICENSEES,

16   CORRECT?

17   **A.**    I BELIEVE THAT'S PROBABLY TRUE THAT BOTH THE PLAYERS

18   ASSOCIATION AND THE RETIRED PLAYERS WHO SIGNED GLA'S THOUGHT

19   THAT, INDEED, THERE WAS THE POSSIBILITY OF LICENSING THE GROUP.

20   **Q.**    I DON'T MEAN TO BE RUDE, BUT ONE OF THE GROUND RULES WE'VE

21   HAD HERE IS THAT IF I ASK A QUESTION THAT CALLS FOR A YES OR

22   NO, I WOULD APPRECIATE A YES OR NO ANSWER, IF YOU CAN DO THAT.

23           **THE COURT:**  I'M GOING TO BACK THAT UP.  IF YOU CAN

24   SAY "YES" OR "NO," THIS IS CROSS EXAMINATION.  AND MR. KESSLER

25   GOT THE SAME GROUND RULE.  YOU EITHER SAY "YES," "NO," "I DON'T

1    KNOW," "I DON'T UNDERSTAND THE QUESTION," OR IN THE RARE CASE

2    GIVE A ONE-SENTENCE EXPLANATION.

3              SO THAT'S THE GROUND RULE.

4              **MR. KESSLER:**  I WOULD NOTE, YOUR HONOR, I GOT THAT

5    RULE, BUT THEIR WITNESS DIDN'T EXACTLY FOLLOW IT.

6              **THE COURT:**  WELL, I TRIED MY BEST.  SO THIS WITNESS

7    IS GOING TO TRY HIS BEST.

8              THANK YOU.

9              **MR. HUMMEL:**  ALL RIGHT.

10   **BY MR. HUMMEL:**

11   **Q.**   SO IT'S TRUE THAT THERE WAS AN EXPECTATION THAT THE GROUP

12   LICENSING RIGHTS COULD BE SOLD TO THIRD-PARTY LICENSEES,

13   CORRECT?

14   **A.**   YES, IF YOU DEFINE "EXPECTATION BY WHOM" CORRECTLY.

15   **Q.**   OKAY.  AND IT'S TRUE, IS IT NOT, SIR, THAT IF SOME COMPANY

16   CREATED OR SOLD A GAME, CALL IT A VIDEO GAME, IN WHICH THERE

17   WERE HISTORICAL TEAMS -- LET'S TAKE, FOR EXAMPLE, THE '88 49ERS

18   VERSUS THE 1965 GREENBAY PACKERS -- YOU, AS AN ECONOMIST, WOULD

19   EXPECT THAT THE RETIRED PLAYERS COULD OBTAIN SIGNIFICANT

20   LICENSING REVENUES FROM THAT VENTURE; IS THAT TRUE?

21   **A.**   PARTIALLY TRUE, PARTIALLY FALSE.

22   **Q.**   AND ISN'T IT TRUE THAT YOU WOULD EXPECT THAT SUCH A GAME

23   THAT HAD HISTORICAL TEAMS IN IT WOULD GENERATE SIGNIFICANT

24   LICENSING REVENUES EVEN FOR RETIRED PLAYERS WITH NO NAME

25   RECOGNITION?

1  **A.**   I WOULDN'T EXPECT THAT.  IF THEY, IN FACT, LICENSED THEM,

2  I WOULD EXPECT THEM TO PAY FOR IT, YES.

3  **Q.**   SIR, YES OR NO, ISN'T IT TRUE THAT IF THERE WERE SUCH A

4  GAME THAT HAD HISTORICAL TEAMS IN IT, THE 1989 49ERS, 1985

5  BEARS, THE 1972 DOLPHINS, THAT THAT GAME COULD GENERATE

6  SIGNIFICANT LICENSING REVENUES, EVEN FOR RETIRED PLAYERS WITH

7  NO NAME RECOGNITION?

8          **MR. KESSLER:**  OBJECTION, YOUR HONOR, TO INCOMPLETE

9  HYPOTHETICAL.  I THINK HE HAS TO SPECIFY WHETHER THE PLAYER

10 NAMES ARE IN THE GAME OR NOT.

11         **THE COURT:**  WELL, OVERRULED.  THE WITNESS CAN ADD AN

12 EXPLANATION, IF YOU THINK THAT'S NECESSARY.

13         PLEASE ANSWER.

14         **THE WITNESS:**  THAT WAS WHY I HESITATED THE FIRST

15 TIME.  YOU GET TWO LICENSES WHEN YOU DO A HISTORICAL TEAM.  YOU

16 GET A LICENSE FOR THE TEAM, WHICH IS YOU CAN SHOW THE UNIFORMS

17 AND USE THE TEAM NAME AND ALL THAT.  AND THEN, YOU GET LICENSES

18 FOR IMAGES.

19         AND THE TEAM ITSELF IS WORTH A LOT BECAUSE THERE ARE

20 FANS OUT THERE WHO HAVE MEMORIES OF IT.  BUT THE INDIVIDUAL

21 PLAYERS MAY OR MAY NOT BE WORTH ANYTHING.

22         I THINK, TO GET TO YOUR FIRST QUESTION ABOUT

23 EXPECTATION, I THINK THE EXPECTATION --

24         **THE COURT:**  WAIT.  YOU'RE GIVING A LONG SPEECH.  THIS

25 IS LONGER THAN THE GROUND RULE ALLOWS.

1          **THE WITNESS:**  OKAY.  OKAY.  OKAY.

2          **THE COURT:**  NEXT QUESTION.

3    BY MR. HUMMEL:

4    **Q.**   ISN'T IT TRUE, SIR, THAT EVEN WITH RESPECT TO THE PLAYERS

5    WHO COULD EXPECT SIGNIFICANT LICENSING REVENUES IF SUCH A GAME

6    EXISTED, WOULD INCLUDE THOSE PLAYERS WHO HAD NO INDEPENDENT

7    LICENSING VALUE IN THE MARKETPLACE?  THOSE PLAYERS COULD EXPECT

8    SIGNIFICANT LICENSING REVENUES?

9          **THE COURT:**  DO YOUR QUESTION AGAIN.  I LOST IT.

10         **MR. HUMMEL:**  THAT'S FINE.  I'LL DO IT IN TWO PIECES.

11         **THE COURT:**  ALL RIGHT.

12   BY MR. HUMMEL:

13   **Q.**   ONE, IF SUCH A GAME EXISTED -- AND I'M TALKING ABOUT A

14   VIDEO GAME WITH HISTORICAL TEAMS.

15         **THE COURT:**  AND TAKE INTO ACCOUNT MR. KESSLER,

16   HISTORICAL TEAMS WITH THE IDENTITIES OF THE PLAYERS OR NOT?

17         **MR. HUMMEL:**  NO.

18         **THE COURT:**  JUST SCRAMBLED NAMES.

19   BY MR. HUMMEL:

20   **Q.**   SUCH A GAME THAT HAD HISTORICAL TEAMS, OKAY?  YOU WOULD

21   EXPECT THAT SUCH A GAME COULD GENERATE SIGNIFICANT LICENSING

22   REVENUES EVEN FOR RETIRED PLAYERS WITH NO NAME RECOGNITION, YES

23   OR NO?

24   **A.**   NO, I DON'T --

25   **Q.**   NO?

1  **A.**   -- AGREE THAT --

2  **Q.**   IS THAT "NO"?

3  **A.**   YES.

4  **Q.**   THAT'S NO.  OKAY.

5        AND THAT WOULD MEAN RETIRED PLAYERS WHO HAD NO

6  INDEPENDENT LICENSING VALUE IN THE MARKET, THEY COULD ALSO

7  EXPECT SIGNIFICANT REVENUES FROM SUCH A GAME, CORRECT?

8  **A.**   THEY COULD EXPECT IT.  THEY MIGHT EXPECT IT, YES.

9  **Q.**   ALL RIGHT.  AND THAT'S BECAUSE NUMEROUS RETIRED PLAYERS

10  WITH NO INDEPENDENT NAME RECOGNITION PLAYED ON SOME OF THE BEST

11  TEAMS IN HISTORY THAT COULD BE INCORPORATED IN SUCH A GAME,

12  ASSUMING IT EXISTED, CORRECT?

13  **A.**   THAT'S WHY THEY WOULD HAVE THAT EXPECT -- THEY COULD HAVE

14  THAT EXPECTATION, YES.

15  **Q.**   SO IF SUCH A GAME EXISTED THAT HAD HISTORICAL TEAMS,

16  RETIRED PLAYERS WHO SIGNED GLA'S COULD EXPECT SIGNIFICANT

17  REVENUES FROM SUCH A GAME, CORRECT?

18  **A.**   MIGHT EXPECT, YES.

19  **Q.**   ALL RIGHT.

20  **A.**   YEAH.

21  **Q.**   NOW, DID YOU CONSIDER, SIR, IN CONNECTION WITH YOUR REPORT

22  IN THIS CASE, THE FACT THAT EA HAD MANUFACTURED JUST SUCH A

23  GAME THAT HAD OVER A HUNDRED RETIRED TEAMS?  HAD YOU CONSIDERED

24  THAT?

25  **A.**   YOU DON'T MEAN "RETIRED TEAMS."

1  **Q.**   HISTORIC TEAMS?

2  **A.**   YES.

3  **Q.**   HAD YOU, IN FACT, CONSIDERED THAT?

4  **A.**   YES, EA DOES HAVE --

5  **Q.**   THAT'S NOT MY QUESTION.

6  **A.**   YES, I HAVE CONSIDERED IT.

7  **Q.**   NO, SIR.  MY QUESTION IS THIS:  WHEN YOU WROTE YOUR EXPERT

8  REPORT UNDER RULE 26 OF THE FEDERAL RULES OF CIVIL PROCEDURE,

9  AND YOU GAVE YOUR DEPOSITION IN THIS CASE UNDER OATH ON JULY 9,

10 2008, WHEN YOU FORMED YOUR OPINIONS, DID YOU KNOW THAT EA HAD

11 SUCH A GAME?

12          **MR. KESSLER:**  YOUR HONOR, I'M GOING TO OBJECT BECAUSE

13 AT THE TIME HE'S TALKING ABOUT THIS ISSUE OF SCRAMBLING, AS

14 YOUR HONOR --

15          (COUNSEL SPEAKING SIMULTANEOUSLY; NOT REPORTABLE.)

16          **MR. HUMMEL:**  IT'S A SPEAKING OBJECTION, YOUR HONOR.

17          **MR. KESSLER:**  -- WAS NOT EVEN IN THE CASE.

18          **MR. HUMMEL:**  IT'S A SPEAKING OBJECTION, YOUR HONOR.

19          **THE COURT:**  WELL, THAT COULD BE BROUGHT OUT LATER ON,

20 IF THAT'S A FACTOR.

21          OBJECTION OVERRULED.  PLEASE ANSWER.

22          **THE WITNESS:**  I DID NOT ANALYZE THAT.  I DIDN'T

23 ANALYZE THE HISTORICAL TEAMS IN EA'S GAMES, NO.

24 **BY MR. HUMMEL:**

25 **Q.**   YOU DIDN'T EVEN KNOW THEY HAD HISTORICAL TEAMS IN THE

1   GAMES, RIGHT?

2   **A.**   THAT'S NOT WHAT I SAID.  I SAID I WASN'T SURE.

3   **Q.**   THAT IS NOT WHAT YOU SAID?

4   **A.**   I SAID I DIDN'T KNOW.

5   **Q.**   IS THAT WHAT YOU SAID?

6   **A.**   YES.

7   **Q.**   LET'S READ YOUR DEPOSITION, SIR.

8   **A.**   FINE.

9           **THE COURT:**  DO I HAVE THAT HERE?

10          **MR. HUMMEL:**  YES, YOU DO.

11          PAGE 209, LINES 12 THROUGH 210, LINE 3.

12          **THE COURT:**  ANY OBJECTION?

13          **MR. KESSLER:**  NO.

14          **THE COURT:**  ALL RIGHT.  GO RIGHT AHEAD.

15          **MR. HUMMEL:**  (READING)

16          **"QUESTION:**  SO YOU THINK THAT EA, FOR

17          EXAMPLE, WOULD BE WELL ADVISED TO CREATE A

18          GAME WHERE YOU COULD BE A SUCCESSFUL VINTAGE

19          TEAM LIKE THE '68 PACKERS?

20          **"ANSWER:**  NO, I DIDN'T SAY THAT.  WHAT I SAID

21          WAS I CAN IMAGINE THAT HAPPENING.  THEY HAVE

22          CHOSEN NOT TO DO SO.  I DON'T KNOW WHETHER

23          THAT'S A GOOD DECISION OR A BAD DECISION.  I

24          CAN IMAGINE SOMEONE DOING THAT JUST AS, YOU

25          KNOW, YOU, THE GREATEST FOOTBALL TEAMS --

1           GAMES EVER PLAYED, WHETHER COLLEGE OR PRO, DO

2           GET PERIODICALLY REBROADCAST WITH SMALL

3           AUDIENCE RATINGS ON ESPN OR SOMETHING LIKE

4           THAT."

5           **MR. KESSLER:**  YOUR HONOR, NOW I HAVE AN OBJECTION.

6   HE'S READING MORE, BUT NONE OF THIS IS IMPEACHING.

7           **MR. HUMMEL:**  I WAS GOING TO READ THE COMPLETE ANSWER.

8           **MR. KESSLER:**  HE IS NOW JUST READING A LONG PORTION

9   OF HIS DEPOSITION.

10          **THE COURT:**  OVERRULED.  PLEASE CONTINUE.

11          **MR. HUMMEL:**  (READING)

12          "BUT YOU DON'T EVER SEE A 1968 NFL GAME

13          BETWEEN TWO TEAMS WHO FINISHED THE SEASON 2

14          AND 14, ALL RIGHT?  THAT'S JUST NOT WHAT'S ON

15          TELEVISION.  THERE'S INTEREST IN HISTORICAL

16          BAD GAMES INVOLVING BAD PLAYERS WITH A SINGLE

17          EXCEPTION OF THE NEW YORK METS."

18  **BY MR. HUMMEL:**

19  **Q.**   WHICH IS A BASEBALL TEAM, RIGHT?

20  **A.**   CORRECT.

21  **Q.**   SO, SIR, ISN'T IT TRUE THAT YOU CAME TO COURT IN A

22  DEPOSITION AND WITH AN EXPERT REPORT WITHOUT EVEN KNOWING THAT

23  EA HAD PAID THE NFLPA AND THE UNION OVER $80 MILLION IN

24  LICENSING REVENUE FOR A TEAM THAT INCLUDED HISTORIC GAMES,

25  WHICH YOU CONCEDED WOULD GENERATE SIGNIFICANT LICENSING REVENUE

1    FOR THIS CLASS, AND YOU DIDN'T EVEN KNOW IT EXISTED.  YOU

2    DIDN'T DO YOUR HOMEWORK, DID YOU?  DID YOU, YES OR NO?

3    **A.**    NO.

4    **Q.**    NO.  THANK YOU.

5    **A.**    I DID MY HOMEWORK, AND I DIDN'T ANALYZE THE GAMES -- THE

6    TEAMS IN THAT GAME.  THE QUESTION WAS ABOUT A SEPARATE GAME

7    INVOLVING JUST HISTORICAL TEAMS.

8    **Q.**    YOU --

9    **A.**    THAT'S WHAT THE QUESTION WAS ABOUT.

10   **Q.**    YOU DIDN'T EVEN KNOW, DID YOU?

11   **A.**    I SAID IN THE DEPOSITION THAT I DID NOT STUDY WHETHER --

12   WHAT EXACTLY WAS IN THE MADDEN GAME.  I THOUGHT I WAS ANSWERING

13   THE QUESTION ABOUT ANOTHER GAME THAT, IN PRINCIPLE, COULD BE

14   CREATED, INVOLVING ONLY HISTORICAL TEAMS.  AND I SAID THAT

15   MIGHT BE A REASONABLE PRODUCT, TOO.  THAT'S WHAT THAT

16   DEPOSITION TESTIMONY IS ABOUT.

17   **Q.**    LET'S LOOK AT OTHER DEPOSITION TESTIMONY, SIR, WHERE YOU

18   ADMITTED YOU DIDN'T KNOW?

19   **A.**    A LOT OF THINGS I DON'T KNOW.

20   **Q.**    YOU DIDN'T KNOW, RIGHT?

21   **A.**    LOTS OF THINGS I DON'T KNOW.

22   **Q.**    RIGHT.  BUT YOU DIDN'T KNOW ONE OF THE CENTRAL ISSUES IN

23   THE CASE.

24            **THE COURT:**  WAIT.

25            **MR. KESSLER:**  YOUR HONOR, NOW I'M OBJECTING.  THIS IS

1  ARGUMENT, AND HE'S NOW ADMITTING THAT THE DEPOSITIONS HE JUST

2  READ HAD NOTHING TO DO WITH THIS ISSUE --

3          **MR. HUMMEL:**  THAT'S A SPEAKING OBJECTION, YOUR HONOR.

4          (SIMULTANEOUS SPEAKING, NOT REPORTABLE.)

5          **THE COURT:**  PLEASE.  JUST A SECOND.  I'M GOING TO LET

6  YOU READ MORE.

7          **MR. HUMMEL:**  THANK YOU, YOUR HONOR.

8          **THE COURT:**  BUT YOU ARE OVERTAKING ONE QUESTION AFTER

9  THE OTHER WITH A SERIES OF QUESTIONS, LEAVING US IN THE DARK AS

10  TO WHICH ONE YOU WANT THE WITNESS TO ANSWER.  AND SO I WANT TO

11  GO BACK TO ONE OF YOUR OTHER QUESTIONS, AND LET'S JUST FIND OUT

12  IF YOU DO.

13          AT THE TIME OF YOUR DEPOSITION, DR. NOLL, DID YOU

14  KNOW ABOUT THE MADDEN GAME AND THE FACT THAT IT PORTRAYED

15  HISTORICAL TEAMS?

16          **THE WITNESS:**  I KNEW THERE WERE SCRAMBLED PLAYERS IN

17  IT.  I DIDN'T KNOW THAT WAS AN ISSUE IN THE CASE BECAUSE AT

18  THAT TIME IT WASN'T, SO I DIDN'T STUDY IT.

19          **MR. HUMMEL:**  OKAY.

20          **THE COURT:**  ALL RIGHT.  NOW, IF YOU WANT TO READ

21  SOMETHING FROM THE DEPOSITION, GIVE US THE PAGE AND LINE.

22          **MR. HUMMEL:**  PAGE 67, LINE 17 THROUGH PAGE 69, LINE

23  10.

24          **THE COURT:**  67/17.  ALL RIGHT.  GO AHEAD.

25          **MR. HUMMEL:**  (READING)

1      **"QUESTION:** WELL, YOU JUST MENTIONED

2      DOCUMENTS THAT EXPRESSED THE HOPE THAT ALL

3      COULD BE LICENSED, BUT THAT THIS HAS FAILED.

4      CAN YOU NAME ANY SPECIFIC DOCUMENTS?

5      **"ANSWER:** NO. I MEAN, I'M JUST TRYING TO BE

6      RESPONSIVE. THIS ISN'T PART OF MY REPORT AND

7      SO I DIDN'T SEARCH FOR DOCUMENTS THAT SAID

8      THAT PRIOR TO THE DEPOSITION. I DON'T SAY

9      ANYTHING LIKE THAT IN MY REPORT. I'M JUST

10     BEING RESPONSIVE TO YOUR QUESTION. I AM

11     AWARE OF THE FACT THAT THERE WAS AN

12     EXPECTATION TO BEGIN WITH THAT IT WOULD BE

13     POSSIBLE TO LICENSE THE ENTIRE GROUP. BUT

14     THAT EXPECTATION WASN'T REALIZED, THAT THE

15     OUTCOME FRANKLY WOULD BE -- WOULD BE ONE THAT

16     AN ECONOMIST WOULD PREDICT, WHICH IS THAT

17     ONLY PLAYERS WHO WERE, WHO HAD ACHIEVED A

18     SIGNIFICANT LEVEL OF FAME, WOULD, IN FACT,

19     HAVE SIGNIFICANT LICENSING REVENUES. I THINK

20     THERE IS, YOU KNOW, ONE OF THE THINGS I

21     ACTUALLY LOOKED FOR AND I WAS INTERESTED IN

22     WAS WHETHER THERE WERE LICENSES OUT THERE FOR

23     THE ENTIRE HISTORICAL CLASSIC TEAMS, LIKE,

24     YOU KNOW, YOU COULD SAY THE BART STAR TEAM

25     THAT WON THE NFL CHAMPIONSHIP IN THE SNOW, OR

1        THE 49ERS TEAM WHERE THEY WON THE GAME AT THE

2        VERY LAST MINUTE WITH DWIGHT CLARK MAKING

3        'CATCH,' QUOTE/UNQUOTE.  THERE ARE A NUMBER

4        OF EXAMPLES OF HISTORICAL TEAMS WHEN I

5        THOUGHT, WELL, GEE, MAYBE, MAYBE SOME PLAYERS

6        WHO AREN'T VERY FAMOUS, WHO WERE THE BOTTOM

7        HALF OF THOSE TEAMS, WHO ARE NOT PEOPLE WHO

8        HAVE ANY NAME RECOGNITION PAST THE END OF

9        THEIR CAREER, MAYBE YOU COULD LICENSE THAT.

10       I CAN IMAGINE SOMEONE SELLING A GAME IN WHICH

11       YOU HAD THE HISTORICAL TEAMS OF ALL TIME AS

12       LICENSEES IN THE GAME, YOU KNOW.  SO THAT YOU

13       COULD HAVE THE 1988 SAN FRANCISCO 49ERS PLAY

14       THE 1965 GREENBAY PACKERS, OR SOMETHING LIKE

15       THAT.  UNFORTUNATELY, NO SUCH GAME EXISTS AND

16       NO SUCH LICENSE EXISTS.  SO I CAN SEE HOW YOU

17       MIGHT EXPECT THAT YOU COULD GET SIGNIFICANT

18       LICENSING REVENUES, AT LEAST FOR THOSE

19       RETIRED PLAYERS WITH NO NAME RECOGNITION WHO

20       PLAY ON THE BEST TEAMS.  BUT I DIDN'T FIND

21       ANYTHING LIKE THAT, SO THAT I GUESS THAT

22       FALLS INTO THE CATEGORY OF SOME KIND OF HOPE

23       SOMEONE MIGHT HAVE WHEN ENTERING THIS PROGRAM

24       THAT TURNED OUT NOT TO BE REALIZED," END

25       QUOTE.

1          **MR. KESSLER:**  YOUR HONOR, THERE'S NO FOLLOW-UP

2     QUESTION.  IT HAD NOTHING TO DO WITH IMPEACHMENT.  THIS IS NOT

3     A PROPER USE OF DEPOSITION TESTIMONY.

4          **THE COURT:**  WELL, THAT'S FOR THE JURY TO DECIDE.  BUT

5     I DO THINK IT WOULD BE WORTHWHILE TO READ THE NEXT QUESTION AND

6     ANSWER THAT GOES OVER TO THE LINE 17 ON PAGE 70.

7          **MR. HUMMEL:**  I'LL DO THAT.

8          "HAVE YOU LOOKED IN THE MADDEN GAMES FOR ANY

9           SUCH VINTAGE TEAMS?

10          **"ANSWER:**  THE MADDEN, YES.  THE MADDEN GAMES

11          HAVE SOME STAR RETIRED PLAYERS IN THEM, YES.

12          THE REASON -- WHAT I UNDERSTAND TO BE THE

13          CASE IS THE GUYS WHO MAKE GAMES WANT TO BE

14          ABLE TO UPDATE THEM PERIODICALLY TO BE ABLE

15          TO RESELL THEM OVER AND OVER AGAIN.  AND THE

16          TROUBLE WITH A CLASSIC TEAM IS THAT IT'S JUST

17          THERE.  AND SO YOU JUST GET A ONE-HIT WONDER

18          OUT OF IT.  AND SO, YOU KNOW, THE ATTRACTION

19          OF, BY CONTRAST, THE EA MADDEN LICENSE THAT

20          HAS ALL THE ROSTERS OF THE CURRENT TEAMS OR

21          EVEN THE ATTRACTION OF THE TAKE TWO LICENSE

22          ON THE HALL OF FAME IS THAT THE ROSTERS

23          CHANGE FROM YEAR TO YEAR.  IN THE HALL OF

24          FAME, THEY CHANGE BY VIRTUE OF THE PEOPLE WHO

25          ARE ELECTED IN THE HALL OF FAME.  SO FIVE

1    YEARS FROM NOW PROBABLY THERE WILL BE TEN

2    MORE PEOPLE IN THE HALL OF FAME THAN THERE

3    ARE NOW.  AND SO YOU CAN REISSUE THE GAME

4    WITH A DIFFERENT CAST OF CHARACTERS, SO THAT

5    SEEMS TO BE THE EXPLANATION OF WHY THERE

6    DOESN'T APPEAR TO BE MUCH OF A MARKET FOR THE

7    CLASSIC TEAMS."

8    OKAY.  SUFFICIENT, YOUR HONOR?

9    **THE COURT:**  READ THE NEXT QUESTION AND ANSWER.

10   **MR. HUMMEL:**  SURE.

11   **"QUESTION:**  HAVE YOU CHECKED THE MADDEN GAMES

12   FOR VINTAGE TEAMS LIKE THE '88 49ERS, OR THE

13   '84 49ERS OR THE '68 GREENBAY PACKERS, ET

14   CETERA?

15   **"ANSWER:**  NOT IN THE CONTEXT OF THIS CASE.  I

16   DID WORK ON A CASE IN WHICH GAME MACHINES

17   WERE AN ISSUE SEVERAL YEARS AGO.  AND ONE OF

18   MY DIFFICULT DUTIES WAS TO PLAY THE SAME

19   MADDEN GAMES ON ALTERING MACHINES TO SEE IF

20   IT MATTERED.  BUT I DON'T REMEMBER MUCH ABOUT

21   IT, AND I DIDN'T STUDY IT IN THE CASE OF THIS

22   TEAM, THIS CASE.

23   **"QUESTION:**  SO AS YOU SIT HERE NOW YOU DON'T

24   BELIEVE THAT YOU CAN FIND VINTAGE TEAMS ON

25   THE -- IN THE MADDEN GAMES?

1        **"THE WITNESS:**  I DIDN'T -- THAT'S NOT WHAT I SAID.

2        WHAT I SAID IS THERE IS NO SERIOUS AMOUNT OF REVENUE

3        COMING IN FROM THAT."

4        THEN, IT GOES ON.

5        **THE COURT:**  ALL RIGHT.  I'LL LET YOU STOP THERE,

6   UNLESS COUNSEL WANTS YOU TO CONTINUE.

7        **MR. KESSLER:**  NO, YOUR HONOR.

8        **THE COURT:**  ALL RIGHT.  WE WILL STOP THERE.

9        NEXT QUESTION.

10  **BY MR. HUMMEL:**

11  **Q.**   IN CONNECTION WITH YOUR WORK ON THIS CASE, SIR, AS AN

12  ECONOMIST, DID YOU EXAMINE THE OUTCOMES OF LICENSING MARKET

13  CONDUCT IN TERMS OF WHETHER RETIRED PLAYERS COMMAND SIGNIFICANT

14  LICENSING REVENUE?

15  **A.**   I ANALYZED -- YES, IN THE CONTEXT OF THE PLAYERS INC

16  LICENSING, YES.

17  **Q.**   AS AN ECONOMIST, IS IT IMPORTANT TO STUDY REAL WORLD

18  MARKETPLACE BEHAVIOR IN ORDER TO DRAW CONCLUSIONS ABOUT THE

19  VALUE OF THE PRODUCT BEING MARKETED?

20  **A.**   OF COURSE.

21  **Q.**   OKAY.  AND YET YOU COME TO COURT, CAME TO YOUR DEPOSITION,

22  YOU OFFERED A REPORT IGNORING THE SINGLE MOST IMPORTANT

23  LICENSEE, EA, WHICH HAD VINTAGE TEAMS IN THE MADDEN GAME THAT

24  YOU YOURSELF SAID WOULD HAVE PROVIDED A SIGNIFICANT OPPORTUNITY

25  FOR LICENSING REVENUE TO THE GLA CLASS, TRUE?

1          **MR. KESSLER:**  YOUR HONOR, I'M GOING TO OBJECT NOW.

2    HE KEEPS SAYING THAT THE SCRAMBLING IS THE SINGLE MOST

3    IMPORTANT ISSUE IN THE CASE.

4          **MR. HUMMEL:**  I DIDN'T SAY THAT.

5          **MR. KESSLER:**  YOUR HONOR HAS GIVEN INSTRUCTIONS --

6          **THE COURT:**  HE DIDN'T SAY THAT THIS TIME.  HE SAID EA

7    WAS THE SINGLE MOST IMPORTANT LICENSEE, BUT HE DID NOT SAY THAT

8    SCRAMBLING WAS THE SINGLE MOST IMPORTANT -- I'M GOING TO

9    ALLOW -- WHY CAN'T YOU ASK THE QUESTION BEING NOT SO

10   ARGUMENTATIVE?

11         **MR. HUMMEL:**  BECAUSE WE HAVE AN ARGUMENT, YOUR HONOR.

12         **THE COURT:**  WELL, I'M GOING TO SUSTAIN THE OBJECTION,

13   THEN.

14         **MR. HUMMEL:**  ALL RIGHT.

15         **THE COURT:**  YOU CAN RE-ASK THAT QUESTION IN A MUCH

16   LESS ARGUMENTATIVE WAY TO MAKE THE SAME POINT, AND YET YOU'VE

17   LARDED IT IN WITH A LOT OF ARGUMENT THAT OUGHT TO BE SAVED FOR

18   THE CLOSING ARGUMENT.

19         I'M SUSTAINING THE OBJECTION.

20         ALTHOUGH MR. KESSLER WAS MISTAKEN ON THE POINT THAT

21   HE WAS MAKING, THIS QUESTION IS STILL VERY ARGUMENTATIVE.

22   **BY MR. HUMMEL:**

23   Q.  ISN'T IT TRUE, SIR, THAT AS AN ECONOMIST YOU WOULD

24   ACTUALLY WANT TO KNOW WHAT PRODUCTS ARE OUT THERE THAT COULD

25   HAVE UTILIZED THE GLA CLASS IN CONNECTION WITH RENDERING AN

1  OPINION THAT YOU THINK THE GLA CLASS IS WORTHLESS?

2  **A.**   OF COURSE.  AND THE EA CONTRACT IS ONE THAT, IN PRINCIPLE,

3  COULD HAVE USED RETIRED PLAYERS.

4  **Q.**   BUT YOU DIDN'T LOOK AT THE GAME, DID YOU?

5  **A.**   I DIDN'T PLAY THE GAME.  I'VE LOOKED AT THE GAME.  I KNOW

6  WHAT THE GAME IS ABOUT.  BUT I --

7  **Q.**   DO YOU KNOW HOW MANY VINTAGE TEAMS ARE IN THE GAME?  YES

8  OR NO?

9  **A.**   I DON'T -- OF COURSE I DON'T KNOW HOW MANY VINTAGE TEAMS.

10  I KNOW THERE ARE VINTAGE TEAMS IN THE GAME, BUT I DON'T KNOW

11  HOW MANY THERE ARE.

12  **Q.**   HAVE YOU STUDIED THAT?

13  **A.**   NO, BECAUSE ALL I KNOW IS THE IMAGES OF THE PLAYERS ARE

14  NOT THERE, EXCEPT FOR A FEW STARS.

15  **Q.**   ALL RIGHT.  LET'S TALK ABOUT OTHER MARKET OUTCOMES THAT

16  YOU SAID WERE IMPORTANT TO CONSIDER.

17          DID YOU GO THROUGH TO DETERMINE WHETHER THE

18  HUNDRED-PLUS LICENSEES OF THE DEFENDANTS UTILIZE ACTIVE PLAYERS

19  IN THE PRODUCTS THAT THEY MARKET AND SELL?

20  **A.**   I DON'T FULLY UNDERSTAND THE QUESTION.  I'M SURE THEY USE

21  ACTIVE PLAYERS.  I DON'T UNDERSTAND WHAT YOU'RE AFTER.

22  **Q.**   DO YOU KNOW IF ANY OF THESE COMPANIES THAT LICENSE

23  PRODUCTS FROM THE NFLPA ACTUALLY UTILIZE RETIRED PLAYERS IN THE

24  PRODUCTS THEY SELL?

25  **A.**   SOME OF THEM HAVE RETIRED PLAYER LICENSES, YES.  BOTH

1  RETIRED AND ACTIVE PLAYER LICENSES.

2  Q.   AND YOU TOLD ME BEFORE, SIR, THAT IT'S IMPORTANT TO YOU AS

3  AN ECONOMIST TO STUDY REAL WORLD MARKETPLACE BEHAVIOR IN ORDER

4  TO DRAW CONCLUSIONS ABOUT THE VALUE OF THE PRODUCT BEING

5  MARKETED, CORRECT?

6  A.   I SAID THAT, YES.

7  Q.   NOW, DID YOU LOOK AT, FOR EXAMPLE, ONE OF THE NFL'S

8  LICENSEES NAMED ACTIVA?  DID YOU EXAMINE WHAT THEY, IN FACT,

9  LICENSED FROM THE NFLPA?

10  A.   I DID LOOK AT ALL THE LICENSES.  I DON'T REMEMBER VERY

11  MANY OF THEM AS TO WHAT SPECIFICALLY THEY LICENSED.  I CAN'T

12  GIVE YOU A LICENSEE-BY-LICENSEE BREAKDOWN OF WHAT PRODUCTS THEY

13  SELL, NO.

14  Q.   MY QUESTION IS THIS:  DID YOU LOOK AT ACTIVA TO DETERMINE

15  WHETHER THEY USED RETIRED PLAYERS IN THEIR PRODUCTS?

16  A.   I DO NOT RECALL WHETHER THEY WERE ONE THAT USED BOTH

17  ACTIVE AND RETIRED PLAYERS OR NOT.

18  Q.   WHAT ABOUT ATARI?  DO YOU KNOW WHETHER THEY USED ACTIVE

19  AND RETIRED PLAYERS?

20  A.   I DIDN'T MEMORIZE THE LIST OF PEOPLE WHO USED BOTH.  AND I

21  CAN'T ANSWER THAT QUESTION FOR JUST ABOUT ANY LICENSEE.

22  Q.   WHAT ABOUT FLEAR?

23  A.   I DON'T REMEMBER.  WELL, THEY PROBABLY USED BOTH, BUT I

24  DON'T KNOW THAT FOR SURE.

25  Q.   WHAT ABOUT ONFIELD APPAREL?

1  A.   I DON'T KNOW.

2  Q.   YOU DON'T KNOW.

3       WHAT ABOUT A COMPANY CALLED "PLAYOFF"?

4  A.   I DON'T REMEMBER WHETHER THEY USED BOTH.

5  Q.   YOU DON'T KNOW.

6       WHAT ABOUT SEGA?

7  A.   I DON'T REMEMBER WHETHER THEY USED BOTH.

8  Q.   WHAT ABOUT TOPPS?

9  A.   TOPPS PROBABLY USES BOTH, BUT I CAN'T -- I WOULDN'T SWEAR

10 TO IT BECAUSE I HAVEN'T LOOKED AT THAT LICENSE IN A LONG TIME.

11 Q.   WHAT ABOUT UPPER DECK?

12 A.   PROBABLY, BUT I WOULDN'T WANT TO SWEAR TO IT.

13 Q.   WHAT ABOUT YAHOO!?

14 A.   I DON'T RECALL.

15 Q.   WHAT ABOUT WHATIF SPORTS?

16 A.   I DON'T RECALL.

17 Q.   SO, IN FACT, SIR, ISN'T IT TRUE THAT YOU DIDN'T STUDY AT

18 ALL AS AN ECONOMIST THE REAL WORLD MARKETPLACE BEHAVIOR OF THE

19 NFLPA AND PI AS THEY WERE DEALING WITH LICENSEES IN TERMS OF

20 WHETHER THOSE LICENSEES ACTUALLY WANTED TO LICENSE RETIRED

21 PLAYERS?

22 A.   THAT'S JUST NOT TRUE.  THE FACT THAT I CAN'T REMEMBER

23 WHICH LICENSES HAD WHICH PLAYERS IN THEM DOESN'T MEAN I DIDN'T

24 READ THE LICENSES AND STUDY THEM, BECAUSE I DID.

25 Q.   IT'S A DIFFERENT QUESTION.  DID YOU LOOK AT THE PRODUCTS

1  THAT THESE LICENSEES ACTUALLY PRODUCED?

2  **A.**   YES, AT THE TIME I READ THE LICENSES I KNEW WHAT THE

3  PRODUCTS WERE.  BUT I DON'T REMEMBER ON A LICENSE-BY-LICENSE

4  BASIS WHAT THE PRODUCTS WERE.

5  **Q.**   ALL RIGHT.  NOW, YOU DID PREPARE A 65-PAGE REPORT IN THIS

6  CASE, CORRECT?

7  **A.**   YES.

8  **Q.**   THAT WAS PREPARED BY YOU AND YOUR STAFF?

9  **A.**   I HAVE NO STAFF.  I DID IT ALL MYSELF.

10  **Q.**   YOU WROTE THE REPORT?

11  **A.**   I WROTE EVERY WORD.

12  **Q.**   OKAY.  AND YOU'VE BEEN PAID ABOUT $80,000 FOR IT?

13  **A.**   WELL, NOT JUST THAT.  I'VE BEEN PAID A TOTAL OF 85,000 FOR

14  EVERYTHING I'VE DONE IN THIS CASE, INCLUDING THE REPORT.

15  **Q.**   AND HOW MUCH TIME DID YOU SPEND FORMULATING YOUR OPINIONS

16  IN THIS CASE?

17  **A.**   PROBABLY 60 HOURS, 50 HOURS, SOMETHING LIKE THAT.

18  **Q.**   AND HAVE THERE BEEN ANY OPINIONS THAT YOU FORMED THAT YOU

19  WERE TOLD NOT TO OFFER BY COUNSEL?

20  **A.**   NO.  I FORMED LOTS OF OPINIONS THAT HE DIDN'T ASK ME

21  QUESTIONS ABOUT TODAY, BUT I'VE -- THERE'S NOTHING I'VE DONE

22  THAT HE TOLD ME NOT TO HAVE THAT OPINION.

23  **Q.**   ALL RIGHT.  AND HAVE YOU INTERVIEWED, PERSONALLY, ANY OF

24  THE LICENSEES AT ISSUE IN THIS CASE?

25  **A.**   NO, I HAVEN'T.

1  Q.   HAVE NOT.  HAVE YOU INTERVIEWED ANY OF THE PLAYERS INC

2  LICENSING PERSONNEL WHO WERE DEALING WITH THE LICENSEES, TO

3  DETERMINE WHETHER THEY, IN FACT, ATTEMPTED TO, FOR EXAMPLE,

4  LICENSE THE GLA CLASS TO ANY LICENSEE?

5  A.   I WAS ON TWO CONFERENCE CALLS INVOLVING PEOPLE FROM BOTH

6  PLAYERS INC AND THE NFLPA, ABOUT THEIR LICENSING ACTIVITIES.

7          AMONG OTHER THINGS THAT ISSUE WAS DISCUSSED.

8  Q.   WHO WERE ON THOSE CALLS?

9  A.   I REMEMBER MR. NAHRA WAS ON IT.  I DON'T REMEMBER WHO

10 EVERYBODY ELSE WAS.

11 Q.   MR. NAHRA, HE'S A LAWYER INSIDE AT THE UNION, RIGHT?

12 A.   UHM, I DON'T -- I THINK I REMEMBER HE'S A LAWYER, YES, BUT

13 I DON'T REMEMBER WHAT HIS TITLE IS.

14 Q.   WHO DID YOU TALK TO THAT WAS RESPONSIBLE FOR MARKETING THE

15 RETIRED GLA PLAYERS?

16 A.   I KNOW IT WAS A CONFERENCE CALL INVOLVING SEVERAL PEOPLE.

17 THE PERSON I TALKED TO MOSTLY WAS MR. NAHRA.

18 Q.   WHO WAS RESPONSIBLE FOR MARKETING THE RETIRED GLA PLAYERS?

19 A.   I DON'T KNOW WHO WAS RESPONSIBLE FOR PARTICULAR LICENSING

20 ACTIVITIES.

21          I WOULD NOT IMAGINE THEY SEPARATED OUT RETIRED VERSUS

22 ACTIVE.

23 Q.   THAT'S NOT MY QUESTION.  DO YOU KNOW --

24 A.   NO.

25 Q.   -- WHO DID IT?  NO.

1        SO YOU DIDN'T TALK TO THAT PERSON TO FIND OUT WHAT,

2    IN FACT, THEY DID TO TRY TO MARKET THE GLA RETIRED PLAYERS,

3    RIGHT?

4        **MR. KESSLER:**  THAT'S ARGUMENT, YOUR HONOR.

5        **THE COURT:**  NO, THIS IS A FAIR POINT OR QUESTION.

6        GO AHEAD.  PLEASE ANSWER.

7        **THE WITNESS:**  I DIDN'T TALK TO ANYBODY THAT I CAN

8    IDENTIFY BY NAME WHO MARKETED RETIRED PLAYER LICENSES.

9    **BY MR. HUMMEL:**

10   **Q.**  AND IS IT FAIR TO SAY THAT WITH RESPECT TO EA, YOU DIDN'T

11   INTERVIEW ANYONE AT EA TO FIND OUT IF, IN FACT, THEY WOULD HAVE

12   HAD INTEREST IN LICENSING THE RIGHTS OF RETIRED NFL PLAYERS WHO

13   SIGNED GLA'S?

14   **A.**  WELL, I ALREADY KNEW ABOUT THAT FROM --

15   **Q.**  THAT'S NOT MY QUESTION.  DID YOU INTERVIEW THEM?

16   **A.**  NO, I DIDN'T INTERVIEW THEM.

17   **Q.**  YOU DIDN'T DO IT?

18   **A.**  THAT'S NOT USEFUL INFORMATION.

19   **Q.**  IT'S NOT USEFUL INFORMATION TO FIND OUT WHAT THE LICENSEES

20   COULD HAVE USED?

21   **A.**  NOT WHEN IT TRUMPS THINGS LIKE DEPOSITIONS AND

22   DECLARATIONS, NO.  IF YOU DON'T -- I -- IN NO CASE I'VE EVER

23   BEEN INVOLVED WITH DID I RELY ON NONSWORN INTERVIEWS WITH

24   PARTICIPANTS IN LITIGATION.  I JUST NEVER WOULD DO THAT.

25   **Q.**  OKAY.  NOTHING PRECLUDED YOU FROM DOING THAT HERE, RIGHT?

1    **A.**   NO, NOBODY PREVENTED ME FROM DOING IT.  BUT AS MY STANDARD

2    PRACTICE, I JUST DON'T ASK PARTIES WHO HAVE AN INTEREST IN A

3    CASE WHAT THEIR VIEWS OF THE CASE ARE.  I JUST DON'T DO THAT.

4    **Q.**   IN YOUR REVIEW OF THE EVIDENCE IN THIS CASE, SIR, TO FORM

5    THE OPINIONS THAT YOU HAVE EXPRESSED, HAVE YOU SEEN ANY

6    EVIDENCE THAT PLAYERS INC ACTUALLY PROVIDED A LIST OF THE

7    RETIRED NFL PLAYERS WHO SIGNED GLA'S TO ANY LICENSEE?

8    **A.**   NO.  THEY HAD SUCH A LIST, BUT I DON'T KNOW THAT THEY EVER

9    GAVE IT TO ANYBODY.

10   **Q.**   HAVE YOU SEEN THE LIST?

11   **A.**   IT'S IN MY REPORT SO, OBVIOUSLY, YES.

12   **Q.**   YOU HAVE A LIST THAT WAS PREPARED IN THE CONTEXT OF THIS

13   LITIGATION.  HAVE YOU SEEN A LIST THAT WAS USED, THAT YOU KNOW

14   WAS USED BY PI, PLAYERS INC, IN CONNECTION WITH ATTEMPTING TO

15   MARKET THOSE PLAYERS TO LICENSEES?

16          **MR. KESSLER:**  AGAIN, YOUR HONOR, THIS IS -- NOW HE'S

17   TRYING TO GET FACT TESTIMONY FROM THIS WITNESS.  HAS NOTHING TO

18   DO WITH HIS OPINIONS THAT HAVE BEEN EXPRESSED.  IT'S CERTAINLY

19   BEYOND THE SCOPE.

20          **THE COURT:**  WELL, YOU WENT BEYOND THE SCOPE ON THEIR

21   EXPERTS.  THIS IS -- IT'S UP TO THE JURY TO DECIDE HOW MUCH

22   WEIGHT TO GIVE IT, BUT THIS IS FAIR CROSS EXAMINATION TO TEST

23   WHAT THE EXPERT DID OR DID NOT RELY UPON.

24          OVERRULED.

25          SO ASK THE QUESTION AGAIN.

**BY MR. HUMMEL:**

**Q.**   HAVE YOU SEEN SUCH A LIST THAT WAS ACTUALLY USED BY

PLAYERS INC IN CONNECTION WITH ATTEMPTING TO MARKET THE RETIRED

PLAYER GROUP RIGHTS?

**A.**   THE QUESTION HAS TWO PARTS.  HAVE I SEEN SUCH A LIST ON A

YEAR-BY-YEAR BASIS OF WHO THE PEOPLE ARE WHO SIGNED GLA'S?  THE

ANSWER TO THAT IS:  YES.

         THE SECOND PART OF THE QUESTION IS:  WAS THAT LIST

ACTUALLY USED TO TRY TO MARKET IT?

         THE ANSWER TO THAT IS:  I DON'T KNOW.

**Q.**   YOU DON'T KNOW IF YOU'VE SEEN IT OR NOT?

**A.**   NO, I DON'T KNOW IF IT WAS USED.  I'VE SEEN SUCH LISTS,

BUT I DON'T KNOW IF THAT WAS THE REASON FOR THE LISTS.  I DON'T

KNOW IF THAT'S WHAT THEIR USE WAS FOR.

**Q.**   SO YOU THOUGHT, DID YOU NOT, AT THE TIME THAT YOU PREPARED

YOUR REPORT, AND THE TIME THAT YOU GAVE YOUR DEPOSITION, THAT

THIS IDEA OF A GAME THAT WOULD UTILIZE HISTORIC TEAMS WAS SOME

KIND OF UNREALIZED HOPE; IS THAT CORRECT?  ISN'T THAT WHAT YOU

TESTIFIED?

**A.**   AS A SEPARATE FREESTANDING GAME, YES.  I THOUGHT I WAS

ANSWERING QUESTIONS ABOUT A FREESTANDING GAME.

**Q.**   THAT'S WHAT YOU THOUGHT?  SO YOU MISINTERPRETED THE

QUESTION OR YOU REALLY DIDN'T KNOW?

**A.**   THE QUESTION ACTUALLY WAS THAT.  BUT THAT'S OKAY.  I MEAN,

IT DOESN'T MATTER.  WHAT I THOUGHT WE WERE TALKING ABOUT WAS

1   SOMETHING LIKE A HISTORIC -- IT'S SORT OF LIKE THE NFL CLASSICS

2   TELEVISION PROGRAM.  I THOUGHT WE WERE TALKING ABOUT A GAME

3   THAT WOULD FEATURE CLASSIC TEAMS AS THE THING THE GAME HAD HAD.

4        OBVIOUSLY, THERE'S CLASSIC TEAMS IN MADDEN FOOTBALL,

5   AS WELL.  THAT'S WHAT I THOUGHT.  I THOUGHT I WAS TALKING ABOUT

6   THE FIRST AND NOT THE SECOND.

7   Q.   FROM AN ECONOMIC PERSPECTIVE, IF PLAYERS INC, IN FACT, HAD

8   THE BEST INTERESTS OF THE CLASS OF RETIRED GLA MEMBERS AT

9   HEART, WOULD YOU HAVE EXPECTED THAT PLAYERS INC COULD HAVE

10  OBTAINED SIGNIFICANT LICENSING REVENUES FOR THOSE RETIRED

11  PLAYERS FROM EA?

12       **MR. KESSLER:**  I'M GOING TO OBJECT TO THE FORM OF THAT

13  QUESTION, YOUR HONOR.  WHAT DOES IT HAVE TO DO WITH ECONOMIC

14  EXPERT TESTIMONY?

15       **THE COURT:**  OVERRULED.

16       PLEASE ANSWER.

17       **THE WITNESS:**  I THINK THE TEAMS ARE VALUABLE AND CAN

18  GET REVENUES.  BUT THE IMAGES OF MOST OF THE PLAYERS I DO NOT

19  THINK ARE VALUABLE AND CAN GENERATE REVENUES.

20  **BY MR. HUMMEL:**

21  Q.   LET'S TALK ABOUT THE ALLOCATION OF THE REVENUES, LICENSING

22  REVENUES THAT CAME IN --

23  A.   YES.

24  Q.   -- FROM THE LICENSEES, OKAY?

25  A.   YES.

1  Q.   AND IS IT TRUE THAT YOU'RE NOT OFFERING A SEPARATE

2  ASSESSMENT OF WHETHER THAT ALLOCATION WAS FAIR OR APPROPRIATE,

3  CORRECT?

4  A.   I'M NOT HERE TO TESTIFY ABOUT FAIRNESS.

5  Q.   ALL RIGHT.  YOU DO KNOW THAT THAT ALLOCATION THAT WAS SET

6  UP, WHERE THE PLAYERS GOT 37 PERCENT AND THE UNION AND PI GOT A

7  COMBINED 63 PERCENT.  YOU KNOW THAT WAS REVIEWED BY A COMPANY

8  CALLED DUFF & PHELPS BACK IN 1995, CORRECT?  YOU'VE SEEN THAT

9  REPORT?

10  A.   YES, I HAVE.

11  Q.   AND DID YOU READ IT?

12  A.   I DID, BUT I DON'T REMEMBER TODAY WHAT'S IN IT.

13  Q.   ALL RIGHT.  YOU LISTED IT AS ONE OF THE DOCUMENTS YOU

14  CONSIDERED IN CONNECTION WITH YOUR REPORT.

15  A.   THAT'S RIGHT.

16  Q.   SO LET ME ASK YOU THIS:  DID YOU UNDERSTAND WHEN YOU READ

17  THIS THAT THE BASIS OF THE DUFF & PHELPS REPORT WAS THAT THE

18  PLAYERS ON THE ONE HAND AND THE UNION ON THE OTHER HAND HAD

19  DECIDED THAT THIS WOULD BE AN ALLOCATION, CORRECT?

20  A.   YES, THAT'S RIGHT.

21  Q.   OKAY.  AND YOU UNDERSTOOD, DID YOU NOT, THAT THAT

22  ALLOCATION WAS DECIDED BETWEEN PI, PLAYERS INC, ON THE ONE

23  HAND, AND THE UNION, THE NFLPA ON THE OTHER, CORRECT?

24  A.   THAT'S CORRECT.

25  Q.   AND DID YOU UNDERSTAND THAT THE DUFF & PHELPS REPORT, THE

1   BASIS OF THE DUFF & PHELPS BLESSING OF THIS IN 1995 --

2   WITHDRAWN.

3           LET ME ASK YOU THIS:  YOU DO KNOW THAT THIS REPORT

4   THAT WAS PREPARED IN 1995 WAS NEVER UPDATED.  THEY NEVER DID

5   ANOTHER FAIRNESS REVIEW OF THIS --

6           **MR. KESSLER:**  YOUR HONOR --

7   **BY MR. HUMMEL:**

8   **Q.**   -- CORRECT?

9           **MR. KESSLER:**  -- I'M GOING TO OBJECT BECAUSE THEY

10  DIDN'T DISCLOSE THIS DOCUMENT FOR HIS EXAMINATION PURSUANT TO

11  YOUR HONOR'S RULES AT ALL FOR THIS WITNESS.

12          **MR. HUMMEL:**  I HAVEN'T SHOWN HIM THE DOCUMENT.  I'M

13  NOT USING THE DOCUMENT.

14          **MR. KESSLER:**  I DON'T THINK YOU CAN EVADE YOUR

15  HONOR'S RULES BY WAVING THE DOCUMENT, DISCUSSING THE DOCUMENT

16  AND SAYING YOU ARE NOT DISPLAYING IT.

17          I THINK YOUR HONOR'S RULES ARE VERY CLEAR HERE.  AND

18  IF I'M NOT GOING TO BE PERMITTED AT MR. HUMMEL'S OBJECTIONS TO

19  SHOW CERTAIN THINGS, I DON'T THINK HE SHOULD BE PERMITTED TO

20  VIOLATE YOUR HONOR'S RULES ON THIS.

21          **THE COURT:**  WELL, YOU -- IS THAT A DOCUMENT THAT HE

22  SIGNED?

23          **MR. HUMMEL:**  NO.

24          **THE COURT:**  WELL, THEN, IT'S NOT GOING TO BE PROPER

25  IMPEACHMENT THEN.  SO --

1          **MR. HUMMEL:**  IT'S A DOCUMENT THAT HE CONSIDERED IN

2    CONNECTION WITH FORMULATING HIS OPINION, YOUR HONOR.  HE RELIED

3    ON IT IN HIS REPORT.

4          **THE COURT:**  WELL, LOOK, ARE YOU TRYING TO OFFER IT

5    INTO EVIDENCE?

6          **MR. HUMMEL:**  IT'S IN EVIDENCE.

7          **MR. KESSLER:**  MY OBJECTION, YOUR HONOR, IS NOT THAT

8    IT'S --

9          **MR. HUMMEL:**  IT'S TRIAL EXHIBIT 93.

10          **MR. KESSLER:**  -- NOT IN EVIDENCE.  MY OBJECTION IS IT

11    WAS NOT DISCLOSED PURSUANT TO YOUR HONOR'S RULES AS TO WHAT

12    DOCUMENTS WOULD BE USED IN EXAMINATION, AS WE'VE ALWAYS

13    COMPLIED WITH THAT, THEY SHOULD COMPLY, AS WELL.

14          **MR. HUMMEL:**  YOUR HONOR, I DIDN'T KNOW THE SCOPE OF

15    DIRECT, AND I THINK I'M ENTITLED TO SOME LATITUDE ON

16    IMPEACHMENT.

17          **THE COURT:**  ALL RIGHT.  THE OBJECTION IS OVERRULED.

18          **MR. HUMMEL:**  THANK YOU, YOUR HONOR.

19    **BY MR. HUMMEL:**

20    **Q.**   SO DID YOU KNOW, SIR, THAT THE BASIS OF THE DUFF & PHELPS

21    REPORT THAT THIS WAS A FAIR ALLOCATION WAS THAT THIS WAS AN

22    ARM'S-LENGTH TRANSACTION BETWEEN PLAYERS INC, ON THE ONE HAND,

23    AND THE NFLPA ON THE OTHER?

24    **A.**   OR THAT IT REPLICATED IT, YES.

25    **Q.**   RIGHT.

1    A.   REPLICATION, I THINK, IS THE KEY CONCEPT.

2    Q.   OKAY.  BUT YOU KNOW, IN FACT, THAT THIS TRANSACTION WAS

3    NOTHING LIKE AN ARM'S-LENGTH TRANSACTION, CORRECT?

4    A.   WELL, PI IS WHOLLY-OWNED BY NFLPA, SO IT IS A TRANSFER

5    WITHIN -- BETWEEN TWO DIVISIONS OF THE SAME ORGANIZATION.

6    Q.   RIGHT.  PI AND PA DON'T HAVE AN ARM'S-LENGTH RELATIONSHIP,

7    DO THEY?

8    A.   OF COURSE NOT.

9    Q.   OF COURSE NOT.  AND THAT'S TRUE IN CONNECTION WITH THE

10   $8 MILLION REALLOCATION, CORRECT?  THAT WAS NOT AN ARM'S-LENGTH

11   TRANSACTION, WAS IT?

12   A.   NO TRANSACTION BETWEEN THE TWO OF THEM IS ARM'S LENGTH

13   BECAUSE ONE IS OWNED BY THE OTHER.

14   Q.   ALL RIGHT.

15          NOW, LET'S TALK ABOUT THE -- I THINK YOU MENTIONED OR

16   YOU TALKED A LITTLE BIT ABOUT THE ANNOUNCEMENT EFFECT IN YOUR

17   DIRECT EXAMINATION.  DO YOU RECALL THAT?

18   A.   THAT'S CORRECT.

19   Q.   THERE WERE A NUMBER OF BENEFITS THAT WERE CONFERRED ON THE

20   UNION AS A RESULT OF A LARGE NUMBER OF RETIRED PLAYERS SIGNING

21   GLA'S, CORRECT?

22   A.   I DON'T THINK THE UNION WAS THE BENEFICIARY, NO.

23   Q.   ALL RIGHT.  WHAT WERE THE PURPOSES THAT YOU CAN THINK OF

24   THE -- FROM AN ECONOMIC PERSPECTIVE, PURPOSES OF SOLICITING ALL

25   THESE THOUSANDS OF GLA'S?

**A.**   I THINK THAT THE EXPECTATION WAS IT COULD BE SOMETHING TO

BENEFIT THE PLAYERS, THE RETIRED PLAYERS.  I THINK THAT'S THE

REASON THEY DID IT, WAS TO TRY TO GENERATE SOME ADDITIONAL

INCOME FOR SOME RETIRED PLAYERS.

**Q.**   YOU THINK THE PURPOSE WAS TO BENEFIT RETIRED PLAYERS.

HOW?

**A.**   BY GENERATING A SIGNIFICANT AMOUNT OF LICENSING INCOME FOR

THEM.

**Q.**   PURPOSE WAS TO TRY TO GENERATE SIGNIFICANT LICENSING

REVENUE FOR THEM; IS THAT CORRECT?

**A.**   AS FAR AS I CAN UNDERSTAND IT, YES.  THAT'S MY BELIEF.

**Q.**   OKAY.  LET ME READ --

          **MR. HUMMEL:**  PERMISSION TO READ FROM THE DEPOSITION

TESTIMONY OF RICHARD BERTHELSEN, WHO IS A PARTY REPRESENTATIVE,

PAGE 52, LINES 8 THROUGH 20.

          MAY I PROCEED?

          **THE COURT:**  ALL RIGHT.  GO AHEAD.

          **MR. HUMMEL:**  THANK YOU.

          **"QUESTION:**  DO YOU KNOW WHY THE NFLPA AND

          PLAYERS INC WERE SOLICITING RETIRED PLAYERS

          TO SIGN THESE FORMS?

          **"ANSWER:**  I'M AWARE OF WHAT WAS TOLD TO ME.

          **"QUESTION:**  WAS THAT BY DOUG ALLEN?

          **"ANSWER:**  PRIMARILY, YES.

          **"QUESTION:**  WHAT DID HE SAY ABOUT THAT?

1    **"ANSWER:** WELL, IT WAS AN EFFORT TO MAKE THE

2            RETIRED PLAYERS' ORGANIZATION A MORE

3            ATTRACTIVE ORGANIZATION FOR RETIRED PLAYERS

4            TO JOIN.  AND IT WAS TO GET RETIRED PLAYERS

5            INVOLVED IN THAT ORGANIZATION AND WORKING

6            WITH ACTIVE PLAYERS."

7    **BY MR. HUMMEL:**

8    **Q.**   DID YOU CONSIDER THAT TESTIMONY --

9    **A.**   YES, I READ THAT.

10   **Q.**   YOU DID READ THAT?

11   **A.**   RIGHT.

12   **Q.**   HE DOESN'T MENTION THAT THE PURPOSE OF SOLICITING WAS TO

13   DO ANYTHING GOOD FOR RETIRED PLAYERS, RIGHT?  HE WAS TRYING TO

14   GET THEM TO JOIN THE UNION, RIGHT?

15   **A.**   RIGHT, TO JOIN THE RETIRED PLAYERS' ORGANIZATION, WHICH

16   ITSELF IS AN ORGANIZATION TO TRY TO PROVIDE BENEFITS TO RETIRED

17   PLAYERS.

18   **Q.**   AND HE SAID IT WAS "TO GET RETIRED PLAYERS INVOLVED IN

19   WORKING WITH ACTIVE PLAYERS," RIGHT?

20   **A.**   YEAH.  I -- YOU CAN READ IT ANY WAY YOU WANT.  I READ THAT

21   AS THE FOCUS OF IT WAS THE RETIRED PLAYERS.  IF YOU DON'T WANT

22   TO READ IT THAT WAY, THAT'S FINE.  BUT IT SEEMED TO ME

23   EVERYTHING WAS INVOLVED IN TRYING TO DO SOMETHING FOR RETIRED

24   PLAYERS.

25   **Q.**   WERE THERE A NUMBER OF GLA SIGNATORIES -- FOLKS WHO SIGNED

1  THE GLA -- WHO WERE NOT EVER MEMBERS OF THE NFLPA?

2  **A.**   YES.

3  **Q.**   DO YOU KNOW THE NUMBER?

4  **A.**   I DON'T THINK YOU MEAN THAT.  YOU MEAN RETIRED PLAYERS'

5  ORGANIZATION.

6  **Q.**   NO, I MEAN THE NFLPA.

7  **A.**   I DON'T REMEMBER WHETHER THERE ARE PLAYERS WHO WERE NOT

8  MEMBERS OF THE NFLPA WHEN THEY WERE ACTIVE PLAYERS.  I DON'T

9  REMEMBER THAT.

10 **Q.**   YOU DO KNOW THAT RETIRED PLAYERS CAN JOIN THE NFLPA,

11 RIGHT?

12 **A.**   THEY CAN JOIN THE RETIRED PLAYERS PART OF THE NFLPA, YES.

13 **Q.**   OKAY.  AND THEY PAY DUES FOR THAT, RIGHT?

14 **A.**   THEY PAY MUCH LESS DUES.  THEY PAY A MUCH LOWER DUE, YEAH.

15 **Q.**   FINE.  BUT THEY DON'T VOTE, CORRECT?

16 **A.**   THEY DON'T VOTE IN THE ACTIVE PLAYER ORGANIZATION.  THEY

17 CAN -- THEY CAN RUN THEIR OWN BRANCH, WHICH IS CALLED "THE

18 RETIRED PLAYERS ORGANIZATION."

19         BUT THAT'S NOT BEING A MEMBER OF THE NFLPA; THAT'S

20 BEING A MEMBER OF THE RETIRED PLAYERS' ORGANIZATION.

21 **Q.**   AND ISN'T IT TRUE THAT THE GLA CAN SERVE -- HAVING A

22 NUMBER OF GLA'S CAN SERVE TO REDUCE TRANSACTION COSTS OF

23 GETTING PEOPLE INTO LICENSE AGREEMENTS?

24 **A.**   IN PRINCIPLE IT COULD, YES.  IF YOU HAD A LARGE ENOUGH

25 GROUP OF ATTRACTIVE PLAYERS IT WOULD REDUCE THE TRANSACTION

1    COSTS.

2    Q.   AND WHO BENEFITS FROM THAT, THE UNION OR THE PLAYERS, THE

3    RETIRED PLAYERS?

4    A.   I SAID IN MY EARLIER TESTIMONY IT COULD BE EITHER ONE.  IT

5    DEPENDS.

6    Q.   AND THE NUMBER TWO PURPOSE THAT YOU'VE IDENTIFIED AS THE

7    PURPOSE FOR SOLICITING THE GLA'S IS TO PRODUCE A LIST OF

8    RETIRED PLAYERS THAT CAN BE SHOWN TO POTENTIAL LICENSEES AS:

9              "HERE IS THE PEOPLE THAT WE HAVE ALREADY SIGNED

10   UP THAT WE CAN GUARANTEE YOU WILL BE PART OF THIS LICENSE

11   UNLESS THEY HAVE A CONFLICT."

12             ISN'T THAT TRUE?

13   A.   THAT'S RIGHT.

14   Q.   OKAY.  AND YOU DON'T KNOW -- I THINK WE'VE TALKED ABOUT

15   THIS -- WHETHER THE UNION EVER, IN FACT, SHOWED THAT LIST TO

16   ANY RETIREE -- TO LICENSEES, CORRECT?

17   A.   THAT IS CORRECT.  I DON'T KNOW WHETHER ANY LICENSEES EVER

18   LOOKED AT THAT LIST.

19   Q.   AND YOU CERTAINLY HAD AN UNDERSTANDING, SIR, THAT BY

20   ADVERTISING PUBLICLY THE FACT THAT THE UNION REPRESENTED ALL

21   ACTIVE PLAYERS AND THOUSANDS OF RETIRED PLAYERS, THEY WERE

22   HOLDING THEMSELF OUT AS A ONE-STOP SHOP, CORRECT, FOR

23   LICENSEES?

24   A.   FOR THE LICENSEES THEY HAD, YES.

25   Q.   OKAY.  AND -- WELL, AND FOR OTHER POTENTIAL LICENSEES,

1  TOO, RIGHT?

2  **A.**   WELL, IT -- YEAH.  IT TURNS OUT THAT CAME LATER.  THE

3  EXPECTATION AT THE BEGINNING, I THINK, WAS THEY WOULD HAVE MANY

4  MORE GLA'S SIGNED THAN THEY DID.  BUT THE NUMBER THEY HAD

5  SIGNED WAS SUCH A SMALL FRACTION OF THE RETIRED PLAYERS THE

6  MAIN ISSUE HAD TO BE GETTING OTHER PEOPLE WHO HADN'T SIGNED

7  THEM INTO THE DEAL.

8  **Q.**   NOW, LET'S TALK ABOUT LEVERAGE.  I THINK THAT'S A CONCEPT

9  THAT YOU'RE FAMILIAR WITH AS AN ECONOMIST, RIGHT?

10 **A.**   I'M FAMILIAR WITH IT AS AN ECONOMIST.  I'M NOT REALLY

11 FAMILIAR WITH IT IN THE WAY THAT DR. RASCHER USED IT, BUT I

12 THINK I UNDERSTOOD WHAT HE MEANT.

13 **Q.**   LET'S THINK ABOUT THIS.  THE NFLPA AND PLAYERS INC DOES

14 HAVE A MONOPOLY OVER ACTIVE PLAYER LICENSING RIGHTS, CORRECT?

15 **A.**   IT HAS AN EXCLUSIVE LICENSE.  WHETHER IT'S A MONOPOLY

16 DEPENDS ON WHAT THE RELEVANT MARKET IS; WHETHER FOOTBALL

17 PLAYERS CONSTITUTE A SEPARATE RELEVANT MARKET FROM OTHER

18 PROFESSIONAL ATHLETES.

19 **Q.**   FAIR ENOUGH.  THE FIRST STEP YOU HAVE TO DO TO DETERMINE

20 MARKET POWER IS TO FIND A RELEVANT GEOGRAPHIC AND PRODUCT

21 MARKET, RIGHT?

22 **A.**   THAT'S CORRECT.

23 **Q.**   AND ONCE YOU DO THAT, ISN'T IT TRUE, THEN, YOU CAN ASSESS

24 WHETHER THERE ARE REASONABLE SUBSTITUTES WITHIN A PRODUCT

25 MARKET, RIGHT?

**A.** WELL, THAT'S THE WAY -- THAT'S THE WAY THAT IT'S -- THAT'S THE WAY THE LAW HAS DEFINED THE TASK OF THE ECONOMIST. CONCEPTUALLY, THAT'S NOT WHAT ECONOMISTS DO. BUT LEGALLY, THAT'S WHAT YOU DO IN A CASE, YES.

**Q.** OKAY. AND HERE YOU WOULD CONCEDE THAT IF -- IF ACTIVE NFL PLAYERS FOR LICENSING PURPOSES TO THIRD PARTIES IS A RELEVANT MARKET, CLEARLY THE NFLPA AND PI WOULD HAVE MARKET POWER, CORRECT?

**A.** IF THE MARKET FOR ACTIVE PLAYERS --

**Q.** RIGHT.

**A.** -- IS A RELEVANT MARKET, THEN THEY ARE THE ONLY PARTICIPANTS IN THAT MARKET FOR GROUP LICENSING. BUT THERE'S STILL THE DEGREE OF SUBSTITUTION BETWEEN INDIVIDUAL LICENSING AND GROUP LICENSES.

**Q.** FAIR ENOUGH. BUT AS FOR GROUP LICENSING, THEY HAVE EFFECTIVELY A MONOPOLY CONFERRED BY THE LICENSE AGREEMENT, CORRECT?

**MR. KESSLER:** OBJECTION, YOUR HONOR. HE MOVED FROM A HYPOTHETICAL TO NOW NONHYPOTHETICAL. HE'S CONFUSING THE TWO QUESTIONS.

**THE COURT:** TRUE. YOU DID DO THAT. PLEASE REPHRASE IT.

**MR. HUMMEL:** SURE.

**BY MR. HUMMEL:**

**Q.** ASSUMING THAT IT WE'VE ESTABLISHED THE RELEVANT A

1  MARKET --

2           **MR. HUMMEL:**  AND, YOUR HONOR, I'D ASK THAT THAT

3  ASSUMPTION CARRY THROUGH THESE QUESTIONS.

4  **BY MR. HUMMEL:**

5  **Q.**   THAT THERE IS A RELEVANT MARKET FOR ACTIVE PLAYER

6  LICENSING RIGHTS, OKAY?

7  **A.**   YOU NEED MORE THAN THAT.  YOU NEED GROUP LICENSING RIGHTS.

8  **Q.**   ALL RIGHT.  FOR GROUP LICENSING RIGHTS.

9           AND LET'S TALK ABOUT THAT FOR A MINUTE, ACTUALLY,

10  BECAUSE YOU TESTIFIED AT GREAT LENGTH ABOUT THE COMBINED MONIES

11  THAT WERE PAID TO PLAYERS OUT OF LICENSING REVENUES, CORRECT?

12  **A.**   CORRECT.

13  **Q.**   AND IN THAT YOU LUMP TOGETHER GROUP OR SHARED REVENUES

14  WITH AD HOC LICENSING REVENUES, CORRECT?

15  **A.**   WELL, THEY ARE ALL GROUP LICENSES.  SOME ARE AD HOC AND

16  SOME ARE SHARED.

17  **Q.**   NO.  JUST TALK ABOUT THE LICENSE FOR JOE MONTANA.  THAT

18  WOULD HAVE BEEN INCLUDED IN YOUR -- IN YOUR HYPOTHETICAL,

19  RIGHT, OR IN YOUR DATA, RIGHT?

20  **A.**   THAT IS PART OF A GROUP LICENSE.

21  **Q.**   HOW IS IT PART OF THE GROUP LICENSE?

22  **A.**   ANY LICENSE FOR THE SAME PRODUCT THAT INVOLVES SIX OR MORE

23  PLAYERS IS A GROUP LICENSE, REGARDLESS OF WHETHER THE PLAYERS

24  ARE PAID THE SAME OR THE PLAYERS ARE PAID DIFFERENTLY.

25           SO IN THE CASE OF THE HALL OF FAME GAME, JOE MONTANA

1   IS PART OF THAT AS PART OF A GROUP.  IN THE CASE OF THE

2   FIGURINES AND CLOTHING, JOE MONTANA IS PART OF A -- CAN BE PART

3   OF A GROUP.  BUT HE WOULD BE PAID DIFFERENT AMOUNTS IN THOSE

4   DIFFERENCE LICENSES.  AND SOME LICENSES HE WOULD BE PAID IN

5   PROPORTION TO THE TOTAL AMOUNT OF REVENUE GENERATED FROM THE

6   PRODUCT THAT HAD HIS NAME AND IMAGE.

7   **Q.**   OKAY.  SO YOU TREAT EVERYTHING AS GROUP LICENSING?

8   **A.**    NOT ONLY I TREAT IT, BUT SO DOES THE NFLPA AND PLAYERS

9   INC.  BY DEFINITION, A GROUP LICENSE IS ANYTHING INVOLVING SIX

10  OR MORE PLAYERS FOR THE SAME PRODUCT.

11  **Q.**   HOW DOES THE NFLPA AND PLAYERS INC DECIDE WHAT GOES INTO

12  THE EQUAL SHARE POOL?

13          **MR. KESSLER:**  YOUR HONOR, AGAIN, I THINK WE'RE WAY

14  BEYOND ANYTHING THAT THIS WITNESS HAS COVERED.  I THINK IT'S

15  FAR AFIELD AT THIS POINT.

16          **THE WITNESS:**  I DON'T KNOW --

17          **THE COURT:**  WAIT.  WAIT A SECOND.  WHAT IS THIS ALL

18  LEADING UP TO?

19          **MR. HUMMEL:**  HE TESTIFIED, HE GAVE A LONG

20  EXPLANATION, YOUR HONOR, THAT THE AMOUNTS RETAINED BY THE UNION

21  WERE WITHIN THE REALM OF REASON.  AND HE SHOWED OTHER UNIONS,

22  OTHER ENTITIES --

23          **THE COURT:**  I REMEMBER ALL THAT.  BUT WHAT HAS THIS

24  LINE OF QUESTIONS GOT TO DO WITH THAT?

25          **MR. HUMMEL:**  THIS LINE OF QUESTIONING, YOUR HONOR,

1    HAS SPECIFICALLY TO DO WITH HE HAS LUMPED APPLES IN WITH

2    ORANGES; THAT THE UNION ITSELF TREATED GROUP LICENSING, SHARED

3    REVENUES, ONE WAY, AND THEY TREATED AD HOCS ANOTHER WAY.

4            AND THIS IS NOT A CASE ABOUT AD HOCS.

5            WHAT WE'RE TALKING ABOUT IS HOW THEY DEALT WITH THE

6    GROUP LICENSING.  SO I'M ENTITLED ASK HIM WHETHER HE KNOWS IF

7    HE HAS, IN FACT, ANALYZED APPLES AND ORANGES MIXED UP, OR

8    WHETHER, IN FACT, HE COULD HAVE SEGREGATED THE APPLES.

9            **THE COURT:**  ALL RIGHT.  GO AHEAD.

10           **MR. HUMMEL:**  THANK YOU, YOUR HONOR.

11           **THE WITNESS:**  I DON'T REMEMBER THE QUESTION, SO YOU

12   ARE GOING TO HAVE TO DO AGAIN.

13   **BY MR. HUMMEL:**

14   **Q.**   IT HAD TO DO WITH APPLES, BUT I'LL TRY TO GET BACK.

15   **A.**   PIPPIN OR GREEN?

16   **Q.**   DO YOU KNOW HOW THE NFLPA AND PI ITSELF TREATED -- WELL,

17   STRIKE THAT.  NO.  THIS WAS THE QUESTION.

18           IT WAS:  HOW DID THEY DETERMINE WHAT FUNDS WENT IN

19   THE EQUAL SHARE POOL THAT WAS DISTRIBUTED EQUALLY AMONG ALL

20   ACTIVE PLAYERS?

21   **A.**   THAT -- I DO NOT KNOW THE BASIS FOR IT IN THE SENSE OF

22   EVER HAVING ASKED THEM OR READ A DOCUMENT, BECAUSE I DON'T

23   THINK THAT'S WRITTEN DOWN.

24           I CAN TELL YOU WHAT I THINK HAPPENS AS AN ECONOMIST,

25   BUT I CAN'T TELL YOU THAT I KNOW THAT ON THE BASIS OF BEING

1   TOLD THAT BY ANYBODY AT NFLPA OR HAVING READ ANY DOCUMENTS.

2   **Q.**   AGAIN, ONE OF THE DOCUMENTS YOU SAID AT THE OUTSET OF THIS

3   EXAMINATION WAS IT'S IMPORTANT TO STUDY THE REAL WORLD

4   MARKETPLACE.  IN OTHER WORDS, WHAT REALLY HAPPENED.  I'M NOT

5   INTERESTED IN THEORY.

6         I WANT TO KNOW FROM YOU IF YOU KNOW WHY THEY TREATED

7   OR HOW THEY DECIDED THAT CERTAIN MONIES WENT INTO AN EQUAL

8   SHARE POOL AND OTHER MONIES WERE PAID DIRECTLY TO THE PLAYERS

9   UNDER AD HOCS.  DO YOU KNOW?

10  **A.**   WHAT I SAID, I WILL REPEAT, WHICH I CAN INFER IT FROM THE

11  LICENSES.  BUT I DIDN'T ASK THEM WHY THEY DID IT OR HOW THEY

12  DID IT.

13  **Q.**   OKAY.  NOW, IF YOU COULD LOOK, PLEASE, AT EXHIBIT 2397.

14  **A.**   OKAY.

15        **MR. HUMMEL:**  COULD YOU DISPLAY 2397, PLEASE?

16        (DOCUMENT DISPLAYED.)

17  **BY MR. HUMMEL:**

18  **Q.**   ALL RIGHT.  SO THIS IS A DOCUMENT THAT MR. KESSLER SHOWED

19  YOU.  ISN'T IT TRUE THAT EVERY SINGLE PAYMENT ON THIS CHART

20  REPRESENTS AN AD HOC PAYMENT TO A RETIRED PLAYER, OR IS THE SUM

21  OF AD HOC PAYMENTS?

22  **A.**   NO, THAT'S NOT CORRECT.  THAT'S NOT CORRECT.  I MEAN, WHAT

23  IT -- IT'S ONLY CORRECT IF YOU DEFINE AN AD HOC AS AN AD HOC

24  AGREEMENT A GROUP LICENSE THAT COVERS A SUBSET OF PEOPLE, AND

25  THAT SUBSET IS TREATED EQUALLY, BUT WE STILL CALL IT "AD HOC."

1            IF YOU WANT TO CALL THAT "AD HOC," THEN EVERYTHING

2    WOULD BE AD HOC.

3    Q.   FAIR ENOUGH.  SO UNDER THAT DEFINITION, EVERYTHING ON THIS

4    CHART IS AD HOC, RIGHT?

5    A.   YES.

6    Q.   ALL RIGHT.

7    A.   INCLUDING EQUAL SHARED AMONG THE SUBSET.

8    Q.   IN FACT, YOU DO KNOW THAT NOT ONE PENNY, NOT ONE PENNY OF

9    FUNDS FOR GROUP LICENSING OF THE RETIRED PLAYER CLASS WAS

10   DISTRIBUTED EQUALLY AMONG THE CLASS, CORRECT?

11   A.   THAT'S CORRECT.  NOT A SINGLE PENNY WAS DISTRIBUTED TO ALL

12   PEOPLE WHO HAD SIGNED A GLA.

13   Q.   NOW, LET'S TALK ABOUT HOW THE UNION TREATED THE MONEY THAT

14   CAME IN FROM GROUP LICENSING THAT WENT INTO THE EQUAL SHARE

15   POOL.  OKAY?

16   A.   OKAY.

17   Q.   ALL RIGHT?  ISN'T IT TRUE THAT ALL OF THAT MONEY WAS

18   DIVIDED EQUALLY AMONG ALL THE ACTIVE PLAYERS?

19   A.   THAT'S NOT QUITE TRUE.  ALL THE ELIGIBLE ACTIVE PLAYERS.

20   Q.   ALL RIGHT.  I WILL ADD "ALL THE ELIGIBLE ACTIVE PLAYERS."

21           BUT "ELIGIBLE" DIDN'T HAVE ANYTHING TO DO WITH THE

22   RELATIVE VALUE OF THAT PLAYER TO THE TEAM, RIGHT?

23   A.   THAT'S CORRECT.

24   Q.   RIGHT.

25   A.   IT'S SHARED EQUALLY AMONG THE ELIGIBLE PLAYERS.

**Q.** OKAY. AND SO, IN THAT SENSE, THE UNION IN HOW THEY DEALT WITH ACTIVE PLAYERS, DIDN'T TREAT THE DISTRIBUTION OF THOSE GROUP FUNDS ACCORDING TO RELATIVE WORTH. THEY DIDN'T TREAT IT LIKE PLAYERS' SALARIES, RIGHT?

**A.** WELL, YES AND NO. REMEMBER, EACH OF THESE AGREEMENTS WILL USUALLY HAVE AN AD HOC ASSOCIATED WITH IT. AGAIN, THE GROUP LICENSE WILL HAVE MULTIPLE AGREEMENTS ASSOCIATED WITH IT.

**Q.** I'M ASKING YOU A DIFFERENT QUESTION.

ISN'T IT TRUE THAT -- I'M JUST TALKING ABOUT THE FUNDS THAT WENT INTO THE EQUAL SHARE POOL. DO YOU UNDERSTAND ME?

**A.** YES.

**Q.** AND YOU KNOW THAT ALL OF THOSE FUNDS WERE DISTRIBUTED ON AN ANNUAL BASIS TO ALL ACTIVE PLAYERS EQUALLY, RIGHT? EACH ONE GOT AN EQUAL SHARE, CORRECT?

**A.** THAT'S TRUE. THE MONEY THAT WENT INTO THAT POOL WAS SHARED EQUALLY.

**Q.** AND THAT WAS TRUE REGARDLESS OF WHETHER THE PLAYER WAS TOM BRADY, THE MOST FAMOUS QUARTERBACK IN THE NFL TODAY, ALTHOUGH HE'S INJURED THIS YEAR, OR THE THIRD STRING LINEMAN FOR THE PHOENIX CARDINALS, CORRECT?

**A.** THAT'S CORRECT.

**Q.** AS LONG AS THEY WERE ELIGIBLE, RIGHT?

**A.** THAT'S CORRECT.

**Q.** SO THAT THIRD STRING LINEMAN ON THE PHOENIX CARDINALS, WHO

1  MAYBE NEVER EVEN GOT IN FOR A DOWN, BUT HE WAS ON THE ACTIVE

2  ROSTER, GOT AN EQUAL SHARE.  HE GOT THE SAME AS TOM BRADY,

3  RIGHT?

4  **A.**   FROM THAT PART --

5  **Q.**   FROM THAT POOL.

6  **A.**   -- OF THE GROUP LICENSES, RIGHT.

7  **Q.**   SO AS AN ECONOMIST, HOW DO YOU EXPLAIN THAT?

8  **A.**   I EXPLAIN THAT THE WAY THAT WE WERE TALKING ABOUT EARLIER,

9  ABOUT TEAMS, COMPLETE TEAMS HAVING VALUE TO EA IN THEIR GAME,

10 THAT AS I RECALL YOU READ, I THINK, FROM MY DEPOSITION THAT

11 EXPLANATION OF HOW THE REASON THAT EA CAN SELL MADDEN NFL

12 FOOTBALL EVERY SINGLE YEAR TO THE SAME PEOPLE IS BECAUSE THE

13 CAST OF CHARACTERS CHANGES.

14           AND THE WAY THE GAME WORKS, THE IMAGE OF EVERY SINGLE

15 PLAYER IS USED IN THE GAME.  AND THAT HAS MARKETING VALUE

16 BECAUSE THE PLAYERS CHANGE.  AND SO THEY'RE WILLING TO PAY FOR

17 ALL THE PLAYERS THAT ARE ON THE ROSTER, NOT JUST THE STARS.

18 **Q.**   SO FOR THAT REASON YOU CERTAINLY ACCEPT THE CONCEPT THAT

19 HISTORICALLY-SUCCESSFUL TEAMS BUILD SUPPORT FOR THE LEAGUE,

20 CORRECT?

21 **A.**   WHAT DID I SAY THAT CAUSED YOU TO SAY THAT?  I DON'T

22 UNDERSTAND THE QUESTION.

23 **Q.**   WHAT YOU WERE SAYING WAS THERE'S A TEAM CONCEPT.  THERE'S

24 A TEAM CONCEPT.  THAT IS, YOU CAN'T HAVE A VALUE BUILT UP OVER

25 TIME UNLESS YOU HAVE THE WHOLE TEAM; IS THAT RIGHT?  THAT'S THE

1  BASIS OF THE EQUAL SHARE DIVISION.

2  **A.**   THAT WAS THE BASIS OF THE EQUAL SHARE OF A CERTAIN AMOUNT

3  OF THE REVENUE, YES.  BUT IT -- NOTHING ABOUT THE EA STRATEGY

4  OF SELLING THE SAME GAME TO THE SAME PERSON YEAR AFTER YEAR

5  PERTAINS TO THE HISTORICAL TEAMS, BECAUSE THEIR ROSTERS DON'T

6  CHANGE.

7        SO THERE WOULD BE NO INCENTIVE FOR EA TO BUILD A GAME

8  WITH ALL THE IMAGES OF ALL 52 PLAYERS ON IT, BECAUSE THAT

9  WOULDN'T CHANGE FROM YEAR TO YEAR.  IT WOULDN'T ENABLE THEM --

10  IT WOULDN'T GIVE THEM ANY LEVERAGE TO SELL THE GAME OVER AND

11  OVER AND OVER AGAIN TO THE SAME PERSON.

12  **Q.**   DO YOU AGREE THAT HISTORICALLY SUCCESSFUL TEAMS BUILD

13  SUPPORT FOR THE LEAGUE?

14  **A.**   I BELIEVE THAT HISTORICAL EVENTS HAVE BUILT SUPPORT FOR

15  THE LEAGUE.  I BELIEVE THAT HISTORICAL HIGH-QUALITY TEAMS HAVE

16  BUILT SUCCESS FOR THAT TEAM, YES.

17  **Q.**   DO YOU AGREE THAT THE PERFORMANCE OF EXTREMELY GOOD

18  PLAYERS AND EXTREMELY GOOD TEAMS IS BENEFICIAL TO BUILDING FAN

19  SUPPORT FOR THE LEAGUE?

20  **A.**   I BELIEVE THAT FAN LOYALTY IS, IN FACT, DETERMINED IN PART

21  BY THE HISTORY OF A PARTICULAR TEAM.  THE FAN LOYALTY TO THAT

22  TEAM IS DETERMINED, IN PART, BY THE HISTORICAL PERFORMANCE OF

23  THAT TEAM.

24  **Q.**   AND IN TERMS OF THE ALLOCATION OF THE EQUAL SHARE POOL

25  WHERE BEFORE IT EVEN GETS TO THE EQUAL SHARE POOL, THE UNION

1  AND PI TAKE OUT 63 TO 69 PERCENT, YOU'RE AWARE THAT THEY DO

2  THAT, RIGHT?

3  **A.**   YES.

4  **Q.**   OKAY.   THAT IS NOT -- NOTHING WOULD PREVENT THEM FROM

5  DOING SOMETHING DIFFERENT.   IN OTHER WORDS, THAT'S A POLICY

6  DECISION THAT THEY'VE MADE, CORRECT?

7  **A.**   IT IS A POLICY DECISION BY THE NFLPA HOW TO DIVIDE THE

8  REVENUES FROM LICENSING THAT GO INTO THE GROUP LICENSING EQUAL

9  SHARE POOL.

10 **Q.**   NOW, LET'S GO BACK TO THIS CONCEPT -- AND I'LL TRY TO END

11 WITH THIS -- THAT THE NFLPA HAS MARKET POWER OVER ACTIVE PLAYER

12 LICENSING.   DO YOU RECALL WE WERE TALKING ABOUT BEFORE?

13 **A.**   YES.

14 **Q.**   ALL RIGHT.   NOW, WAS THERE ANYTHING TO PREVENT THE NFLPA

15 FROM USING THE LEVERAGE THEY HAD AS A RESULT OF THAT MARKET

16 POWER TO ATTEMPT TO HAVE LICENSEES TAKE THE RIGHTS FOR THE GLA

17 RETIRED CLASS MEMBERS?

18 **A.**   MARKET POWER OVER THE RETIRED PLAYERS?

19 **Q.**   NO, SIR.   LET ME GIVE YOU THIS HYPOTHETICAL.   LET'S ASSUME

20 EA HYPOTHETICALLY COMES TO THE NFLPA AND SAYS:

21          "WE WANT A LICENSE TO ALL ACTIVE PLAYERS,"

22 RIGHT?   WHERE ELSE CAN THEY GO FOR THAT?

23 **A.**   IF THEY WANT TO DO A GROUP LICENSE FOR A SINGLE PRODUCT,

24 THEY HAVE TO GO TO NFLPI.

25 **Q.**   SO NFLPI HAS LEVERAGE OVER THEM.   THEY HAVE TO COME TO

1    THEM, RIGHT?

2    **A.**    WELL, I CAN THINK OF A WAY IN WHICH THEY COULD GET AROUND

3    THAT.

4    **Q.**    I COULD, TOO.  BUT, THEORETICALLY, EA DID COME TO THEM,

5    RIGHT?

6    **A.**    THEY DID COME TO THEM, BUT THAT DOESN'T PROVE THEY HAVE

7    MARKET POWER, BECAUSE I CAN THINK OF AN OBVIOUS WAY TO GET

8    AROUND THAT.

9    **Q.**    WHAT'S THAT?

10   **A.**    THE OBVIOUS WAY IS THE EXACT SAME WAY THEY DO IT WITH

11   HISTORICAL TEAMS, WHICH IS MAKE A LICENSE WITH THE NFL FOR USE

12   OF THE TEAM LOGOS; SIGN INDIVIDUAL LICENSES WITH THREE OR FOUR

13   STAR PLAYERS ON EACH TEAM; AND SCRAMBLE EVERYBODY ELSE.  AND

14   THEN, THEY DON'T HAVE TO DEAL WITH PLAYERS INC OR THE NFLPA.

15   **Q.**    AND YOU THINK THAT WOULD HAVE BEEN RATIONAL FOR EA TO DO?

16   **A.**    I DON'T KNOW. I DON'T RUN EA.

17             BUT THE ISSUE OF MARKET POWER IS ABOUT WHAT THE

18   SUBSTITUTES ARE.

19   **Q.**    RIGHT.

20   **A.**    AND AT SOME PRICE THAT PI WOULD CHARGE, IT WOULD BE

21   SUFFICIENTLY HIGH THAT IT WOULD BE CHEAPER TO DO IT THE OTHER

22   WAY.

23             I HAVEN'T STUDIED THE ISSUE, NOR HAS DR. RASCHER, OF

24   WHETHER INDIVIDUAL LICENSES ARE IN THE SAME RELEVANT MARKET AS

25   GROUP LICENSES.  BUT I'VE RAISED THE ISSUE FOR YOU THAT

1  SOMEBODY WOULD HAVE TO STUDY IN ORDER TO REACH THE CONCLUSION

2  THAT THEY HAD MARKET POWER OVER ON -- ON THE LICENSING OF

3  ACTIVE PLAYERS.

4  **Q.**   WHAT WOULD IT INDICATE TO YOU THAT EA, WHEN THEY WERE

5  OBTAINING A NON-EXCLUSIVE LICENSE TO GROUP PLAYER RIGHTS FROM

6  THE NFLPA, PAID THEM $500,000 A YEAR, AND WHEN THEY GOT AN

7  EXCLUSIVE LICENSE TO THAT SAME GROUP THEY PAID THEM $25 MILLION

8  A YEAR?

9  **A.**   WHAT THEY WERE BUYING WAS A MONOPOLY IN THE MARKET FOR

10 VIDEO GAMES INVOLVING NFL TEAMS.  THAT'S WHY THEY PAID MORE FOR

11 IT.

12 **Q.**   AND WAS THERE ANYTHING TO PREVENT -- GIVEN THE VALUE THAT

13 THEY WERE GOING TO PLACE ON THAT RIGHT TO HAVE A MONOPOLY, WAS

14 THERE ANYTHING TO PREVENT THEM FROM USING THE NFLPA'S POWER IN

15 CONNECTION WITH HAVING ALL THOSE ACTIVE PLAYERS UNDER LICENSE

16 TO SAY:

17               "HEY, TAKE OUR GUYS.  TAKE THE GLA'S GUYS"?

18          **MR. KESSLER:**  YOUR HONOR, I'M GOING TO OBJECT.  THIS

19 HAS ANYTHING TO DO WITH THE GLA IN THIS CASE.  THIS IS NOW

20 ARGUMENT OF COUNSEL ABOUT ISSUES THAT ARE SO FAR AFIELD, YOUR

21 HONOR, AND I WOULD OBJECT.

22 **BY MR. HUMMEL:**

23 **Q.**   THAT'S WHAT DR. RASCHER MEANT BY LEVERAGING, SIR.

24          **THE COURT:**  OVERRULED.  IF YOU UNDERSTAND THE

25 QUESTION, PLEASE ANSWER.

1      **THE WITNESS:**  I HAVE NO IDEA HOW YOU CAN GET FROM THE

2   GLA'S THAT DIDN'T COVER MOST OF THE STAR PLAYERS, TO THE NOTION

3   THAT NFLPI WAS EXERCISING SOME SORT OF MARKET POWER IN THE

4   MARKET FOR RETIRED PLAYER RIGHTS.

5      **THE COURT:**  THAT'S NOT QUITE COUNSEL'S QUESTION.

6   HE'S ASKING THIS QUESTION.

7      **THE WITNESS:**  OKAY.

8      **THE COURT:**  WHAT WOULD HAVE BEEN THE OUTCOME IF

9   PLAYERS INC HAD SAID TO EA:

10          "YOU'RE NOT GOING TO GET EVEN OUR ACTIVE PLAYERS

11   UNLESS YOU TAKE ALL THE GLA RETIRED PLAYERS."

12      OR, FIRST, COULD THEY HAVE SAID THAT?

13      **THE WITNESS:**  WELL, LET ME SKIP THE LEGAL ISSUE ABOUT

14   WHETHER THAT WOULD BE --

15      **THE COURT:**  SKIP IT.  WE'RE TALKING ABOUT AS AN

16   ECONOMIC MATTER, COULDN'T PI HAVE DONE THAT?

17      **THE WITNESS:**  IN PRINCIPLE, THEY COULD HAVE SAID IT.

18   WHETHER IT WOULD BE HAVE BEEN EFFECTIVE AND WHETHER IT WOULD

19   HAVE CAUSED ALL THE RETIRED PLAYERS' IMAGES TO ACTUALLY --

20      **THE COURT:**  NO, JUST THE GLA RETIRED PLAYERS.

21      **THE WITNESS:**  THAT'S WHAT I MEANT.  I SAID THAT IF

22   THEY HAD DONE IT, WOULD IT HAVE LED TO AN AGREEMENT IN WHICH

23   ALL THE GLA RETIRED PLAYER IMAGES WERE ACTUALLY ACQUIRED.

24      **THE COURT:**  THE FIRST QUESTION I THINK COUNSEL WAS

25   ASKING IS:  COULD, AS A MATTER OF ECONOMICS, PI COULD HAVE

1  TRIED TO SAY:

2           "NO GLA RETIRED PLAYERS, IF YOU DON'T WANT TO

3  TAKE THEM, THEN YOU'RE NOT GOING TO GET THE ACTIVE PLAYERS,

4  EITHER."

5           THEY COULD HAVE SAID THAT.

6       **THE WITNESS:**  THEY, IN PRINCIPLE, COULD HAVE SAID

7  THAT, YES.

8       **THE COURT:**  ALL RIGHT.  NOW, DO YOU HAVE AN OPINION

9  AS TO WHAT WOULD HAVE HAPPENED IN THE EVENT THAT PI HAD TAKEN

10 THAT TACT?

11      **THE WITNESS:**  WELL, I'M SURE THAT EA WOULD HAVE

12 RESISTED IT.  BUT THE ISSUE WOULD ALL TURN ON PRICE, RIGHT?  IT

13 WOULD TURN ON WHETHER THE LICENSE FEE WOULD HAVE BEEN

14 SUBSTANTIALLY HIGHER THAN THE CURRENT SUM OF THE ACTIVE PLAYER

15 PLUS RETIRED PLAYER LICENSE FEES THAT EA IS ALREADY PAYING.

16          AND MY EXPECTATION IS THAT THAT SUM OF LICENSE FEES

17 WOULDN'T HAVE BEEN ANY DIFFERENT.

18      **MR. KESSLER:**  YOUR HONOR --

19      **THE COURT:**  NOW, I WANT TO SAY ONE ADMONITION TO THE

20 JURY.  THAT WAS THE QUESTION THAT COUNSEL, I THINK, WAS TRYING

21 TO ASK.  IN MY TRYING TO MAKE -- SPEED THIS ALONG, I DON'T WANT

22 THERE TO BE ANY SUGGESTION IN MY QUESTION THAT PI HAD A DUTY TO

23 DO SUCH A THING.

24          THAT'S GOING TO BE FOR YOU TO DECIDE.  BUT THAT WAS

25 THE PURPORT OF HIS QUESTION.  AND IT SEEMED TO ME THAT WE

1    WEREN'T GETTING A CLEAR-CUT ANSWER.

2            YES, MR. --

3            **MR. KESSLER:**  YOUR HONOR, I MUST ASK FOR THE COURT'S

4    INSTRUCTION BECAUSE OF THE LEGAL ISSUE RAISED TO TYING ONE

5    PRODUCT TO ANOTHER COULD VERY WELL BE ILLEGAL TYING.  AND SO

6    IT'S BEEN NOW SUGGESTED AND INJECTED INTO THIS CASE THAT

7    WHETHER OR NOT PLAYERS ASSOCIATION SHOULD HAVE DONE SOMETHING,

8    YOUR HONOR, THAT IT VERY WELL MAY HAVE BEEN CONTENDED BY EA TO

9    BE A LEGAL TYING.  I THINK YOU HAVE TO EXPLAIN TO THE JURY THAT

10   IT'S VERY UNCLEAR THAT THERE WAS ANY LEGAL ABILITY FOR THE

11   NFLPA OR PI EVEN TO MAKE SUCH A REQUEST OF THE --

12           **THE COURT:**  I DON'T KNOW IF THAT'S CLEAR OR NOT.  WE

13   CAN CLEAR THAT UP IN ANY INSTRUCTIONS AT THE END.

14           WHAT I WILL SAY TO THE JURY RIGHT NOW IS THAT I'M NOT

15   SUGGESTING IN ANY WAY THAT PI HAD SUCH A DUTY TO MAKE SUCH A

16   TIE-IN, IF IT IS A TIE-IN.  THAT WAS THE QUESTION COUNSEL WAS

17   ASKING, AND WE WERE BEATING AROUND THE BUSH AND NOT GETTING TO

18   AN ANSWER.

19           ALL RIGHT.  ARE WE DONE?

20           **MR. HUMMEL:**  I HAVE ONE MORE QUESTION THAT HAS TO DO

21   WITH TIE-IN, JUST SO WE'RE CLEAR FROM A STANFORD ECONOMIST WHO

22   UNDERSTANDS, I THINK, ANTITRUST LAW AT LEAST, AND HOW IT

23   APPLIES IN ECONOMICS.

24   **BY MR. HUMMEL:**

25   **Q.**   A TIE ONLY EXISTS WHEN THERE'S A COERCED SALE, RIGHT?

**A.**   A TIE IS LIKE -- "COERCE" MEANS YOU HAVE NO ALTERNATIVE.

YOU HAVE TO TAKE BOTH OR NOTHING.

**Q.**   RIGHT.

**A.**   AND IF -- I THOUGHT YOUR QUESTION -- THE REASON I SAID

"ILLEGAL" TO BEGIN WITH --

**Q.**   SURE.

**A.**   -- I THOUGHT YOU WERE ASKING ME:

SUPPOSE THEY HAD A MONOPOLY IN THE ACTIVE PLAYER

LICENSING MARKET, AND THEY TRIED TO TIE THAT TO A MARKET IN

WHICH THEY DIDN'T HAVE A MONOPOLY, WHICH IS LICENSES FOR

RETIRED PLAYERS, AND INSIST THAT EA, IN FACT, LICENSE BOTH.

THEY LICENSE THE PRODUCT IN WHICH THEY DIDN'T HAVE A MONOPOLY

IN ORDER TO GET ACCESS TO THE ONE IN WHICH THEY DID HAVE A

MONOPOLY.

I THOUGHT THAT'S WHAT YOUR QUESTION WAS ASKING ME.

AND THAT'S WHY I WAS RELUCTANT TO SAY:

OH, YEAH, THEY COULD HAVE DONE THAT, BECAUSE I

THINK THAT'S PROBABLY ILLEGAL.

**Q.**   WELL, YOU DO?  BUT DOESN'T THAT DEPEND ON WHETHER THERE

ARE TWO PRODUCTS OR ONE?

**A.**   EXACTLY.

**Q.**   RIGHT.

**A.**   IT DEPENDS.

**Q.**   SO IF AS AN ECONOMIST YOU WERE TO CONCLUDE THAT THIS IS

ONE PRODUCT, THIS IS THE SINGLE PRODUCT LICENSED BY THIS UNION,

1   THAT THEY'RE SELLING TO LICENSEES, THAT'S NOT A TIE?

2          **MR. KESSLER:**  NOW, YOUR HONOR --

3   **BY MR. HUMMEL:**

4   **Q.**   THAT'S THE LICENSING OF A SINGLE PRODUCT, RIGHT?

5          **MR. KESSLER:**  WE'RE HAVING A DEBATE WITH AN ECONOMIST

6   ON WHETHER IT'S A LEGAL TYING, WHICH IS NOT AN ISSUE IN THIS

7   CASE.  I'M AFRAID, YOUR HONOR, WE HAVE SO STEERED THIS JURY IN

8   THE WRONG DIRECTION --

9          **THE COURT:**  ALL RIGHT.  FORGET IT.

10         **MR. HUMMEL:**  YOUR HONOR, I WITHDRAW THE QUESTION, AND

11  I'M DONE.

12         **THE COURT:**  LET'S NOT GO DOWN THE PATH OF WHAT THE

13  SHERMANN ACT REQUIRES OR DOESN'T REQUIRE.

14         ALL RIGHT.  ARE YOU DONE?

15         **MR. HUMMEL:**  YES.

16         **THE COURT:**  CAN WE FINISH THIS WITNESS?

17         **MR. KESSLER:**  I'LL TRY, YOUR HONOR.  I'LL TRY.

18         **THE COURT:**  GO FOR IT.

19                      <u>**REDIRECT EXAMINATION**</u>

20  **BY MR. KESSLER:**

21  **Q.**   I DON'T WANT TO GO INTO THIS AREA AT ALL, EXCEPT YOU

22  STUDIED ANTITRUST ECONOMICS, CORRECT?

23  **A.**   YES, I DID.

24  **Q.**   AND ARE YOU AWARE JUST THAT THERE ARE PRINCIPLES OF TYING

25  THINGS TOGETHER IN SOME CIRCUMSTANCES WHERE IT'S ILLEGAL TO DO

1    SO, CORRECT?

2    **A.**    YES, I AM.

3    **Q.**    OKAY.  NOW, PROFESSOR NOLL, YOU GOT ASKED ABOUT WHETHER OR

4    NOT YOU EXAMINED WHETHER THERE WAS A DESIRE FOR EA OR OTHER

5    LICENSEES TO USE RETIRED PLAYERS IN GROUPS.

6            DO YOU RECALL THOSE QUESTIONS?

7    **A.**    YES.

8    **Q.**    AND YOU GOT CRITICIZED FOR NOT INTERVIEWING THE LICENSEES?

9    **A.**    YES.

10   **Q.**    DID YOU READ MR. JOEL LINZNER'S DEPOSITION TESTIMONY?

11   **A.**    YES.

12   **Q.**    AND ARE YOU FAMILIAR WITH WHAT MR. LINZNER SAID ABOUT EA'S

13   INTEREST IN LICENSING A WHOLE GROUP -- ALL THE RETIRED PLAYERS?

14   **A.**    YES.

15   **Q.**    DID HE HAVE SUCH AN INTEREST?

16   **A.**    NO, HE DIDN'T HAVE ANY INTEREST IN THAT AT ALL.

17   **Q.**    DID YOU REVIEW THE DEPOSITION TESTIMONY OF MR. FRISS AND

18   MR. ZUCKER FROM TOPPS?

19   **A.**    YES, I DID.

20   **Q.**    AND THAT'S ANOTHER LICENSEE OF PLAYERS INC?

21   **A.**    THAT'S CORRECT.

22   **Q.**    DID THEY HAVE ANY INTEREST IN LICENSING THE WHOLE GROUP OF

23   RETIRED PLAYERS WHO SIGNED GLA'S?

24   **A.**    NO.

25            **MR. HUMMEL:**  OBJECTION, YOUR HONOR.  IT'S NOT BASED

1  ON EVIDENCE IN THE CASE.

2          **THE COURT:**  I DON'T REMEMBER -- I DON'T REMEMBER

3  TOPPS THAT THEY DIDN'T -- I REMEMBER WHAT HE SAID ABOUT WHAT HE

4  FELT THE CONTRACT MEANT.  I DON'T REMEMBER ANY TESTIMONY THAT

5  THEY WERE OR WERE NOT INTERESTED IN HIRING -- IN GETTING THE

6  RIGHTS TO ALL THE RETIRED PLAYERS.

7          **MR. KESSLER:**  YOUR HONOR, THIS HAS TO DO --

8          (COUNSEL AND THE COURT SPEAKING SIMULTANEOUSLY; NOT

9          REPORTABLE.)

10         **THE COURT:**  WHY DON'T YOU READ THE TRANSCRIPT?

11         **MR. KESSLER:**  NO, YOUR HONOR.  I CAN READ THE

12 TRANSCRIPT, IF YOUR HONOR WANTS.  BUT ALL I'M ESTABLISHING HERE

13 IS WHAT THE WITNESS REVIEWED, BUT I'LL READ THE TRANSCRIPT IF

14 YOUR HONOR WANTS ME TO.

15         **THE COURT:**  THIS IS JUST TURNING INTO LEADING THE

16 WITNESS BY -- IF WE HAVE TO BRING HIM BACK TOMORROW, WE'LL

17 BRING HIM BACK TOMORROW.

18         BUT REMEMBER HOW -- SEE, THE LAWYERS GET CARRIED

19 AWAY, AND THEY PUT THEIR OWN LITTLE SPINS ON WHAT THE PRIOR

20 WITNESSES SAID.  MAYBE IT'S PARTLY RIGHT.  MAYBE IT'S TOTALLY

21 RIGHT.  BUT THE BEST EVIDENCE IS REALLY GOING TO BE FROM THE

22 TRANSCRIPT, ISN'T IT?

23         SO IF YOU DON'T HAVE THAT, I'M GOING TO SUSTAIN THE

24 OBJECTION.

25

**BY MR. KESSLER:**

**Q.**   OKAY.  WITHOUT IDENTIFYING SPECIFIC ONES, DID YOU REVIEW MANY DEPOSITIONS OF LICENSEES?

**A.**   YES, I READ NUMEROUS DEPOSITIONS.

**Q.**   WAS THAT PART OF WHAT YOU STUDIED IN YOUR REPORT?

**A.**   THAT'S PART OF WHAT I STUDIED.

**Q.**   AND WHAT INFORMATION DO YOU GLEAN, WITHOUT IDENTIFYING SPECIFIC ONES, ABOUT WHETHER PLAYERS INC LICENSEES HAD ANY INTEREST IN LICENSING THE ENTIRE GROUP OF RETIRED PLAYER GLA'S?

**A.**   TO MY KNOWLEDGE, THERE IS NO DEPOSITION OR ANY DOCUMENT IN THIS CASE THAT INDICATES THAT ANY LICENSEE IS INTERESTED IN LICENSING THE ENTIRE GLA GROUP OR THE ENTIRE GROUP OF RETIRED PLAYERS.

          NOBODY HAS EXPRESSED AN INTEREST IN THAT, TO MY KNOWLEDGE.

**Q.**   AND IS THAT SOMETHING YOU TOOK INTO ACCOUNT IN YOUR ANALYSIS?

**A.**   RIGHT.  I SAID IT IN MY REPORT.

**Q.**   NOW, PROFESSOR NOLL, YOU ALSO GOT, I THINK, CRITICIZED FOR NOT EXAMINING THE SCRAMBLING ISSUE.  DO YOU RECALL THAT?

**A.**   THAT'S CORRECT.

**Q.**   WHOSE REPORT WERE YOU ASKED TO EXAMINE IN THIS CASE?

**A.**   DR. RASCHER'S.

**Q.**   DOES DR. RASCHER GIVE ANY OPINIONS ABOUT THE SCRAMBLING ISSUE?

1    **A.**    HE DIDN'T IN HIS ORIGINAL REPORT.  THERE WAS -- THAT WAS

2    NOT PART OF HIS REPORT, AND I WAS ASKED TO READ HIS REPORT AND

3    EVALUATE IT.  I DID.

4          SCRAMBLING WAS NOT AN ISSUE AT THE TIME HE WROTE HIS

5    REPORT.

6    **Q.**    SO DESPITE MR. HUMMEL SUGGESTING THAT SCRAMBLING WAS THIS

7    GIGANTIC ISSUE, DR. RASCHER DIDN'T ADDRESS THAT IN HIS ORIGINAL

8    REPORT, DID HE?

9    **A.**    NO.  AND HE DIDN'T AND I DIDN'T.  NEITHER ONE OF US DID.

10   **Q.**    NOW, YOU ALSO GOT ASKED:

11          "DID YOU STUDY REAL WORLD MARKET BEHAVIOR?"

12          DID YOU STUDY REAL WORLD MARKET BEHAVIOR IN THIS

13   CASE?

14   **A.**    YES.

15   **Q.**    EXPLAIN TO THE JURY WHEN YOU STUDIED THE LICENSING

16   PAYMENTS, IS THAT REAL WORLD MARKET BEHAVIOR?

17   **A.**    OF COURSE.  THOSE ARE REAL TRANSACTIONS.  CONTRACTS ARE

18   REAL TRANSACTIONS.  THEY ARE ACTUAL HONEST-TO-GOD MARKET

19   BEHAVIOR.  SOMEBODY WAS A BUYER AND SOMEBODY WAS A SELLER AND

20   THERE WAS A PRICE.

21          THAT'S WHAT MARKET IS.

22   **Q.**    SO IS YOUR EXPERT OPINIONS BASED ON JUST THEORIES, OR WAS

23   IT BASED STUDYING THE REAL WORLD MARKETPLACE BEHAVIOR?  WHICH

24   WAS IT?

25   **A.**    IT'S OBVIOUSLY THE LATTER.  I STUDIED ALL THESE CONTRACTS,

1  ALL THESE AGREEMENTS, AND IT'S BASED ON THAT.

2  **Q.**   NOW, YOU GOT SOME ASKED QUESTIONS ABOUT HISTORICAL TEAMS

3  IN THE MADDEN GAME.

4  **A.**   YES.

5  **Q.**   DO YOU RECALL THAT?

6  **A.**   YES.

7  **Q.**   AND YOU SAID, I BELIEVE, THERE WERE TWO CATEGORIES OF

8  RIGHTS, THE TEAM RIGHTS AND THE PLAYER RIGHTS?

9  **A.**   EXACTLY.

10  **Q.**   LET'S GO THROUGH THIS QUICKLY FOR THE JURY.  FOR THE TEAM

11  RIGHTS, WHAT ARE THOSE RIGHTS, AND WHO GETS PAID FOR TEAM

12  RIGHTS?

13  **A.**   THE TEAM RIGHTS ARE THE JERSEYS, THE NAME OF THE TEAM, THE

14  LOGO OF THE TEAM, THE HELMET AND EVERYTHING LIKE THAT.  THAT IS

15  LICENSED BY THE NFL, AND IT'S THE TEAMS OF THE NFL THAT OWN THE

16  RIGHTS TO THEIR OWN JERSEYS AND LOGOS AND TEAM NAME.

17        SO IF YOU WANT TO DO A HISTORICAL TEAM, YOU HAVE TO

18  GET A LICENSE FROM THE NFL FOR ALL THE TEAM STUFF.  AND THEN,

19  THERE'S A SECOND THING YOU WOULD NEED TO DO IF YOU WANT TO SHOW

20  THE IMAGES OF SPECIFIC PLAYERS AND USE THOSE PLAYERS IN THE

21  GAME AS IDENTIFIABLE PLAYERS, YOU THEN HAVE TO GO TO PLAYERS

22  INC AND GET A LICENSE TO USE THE PLAYERS.

23  **Q.**   NOW, IF YOU DON'T USE PLAYERS' NAMES OR PICTURES, DO YOU

24  NEED ANY LICENSE FROM PLAYERS INC?

25  **A.**   NO.

**Q.** NOW, YOU GOT ASKED A QUESTION ABOUT THE MADDEN GAME, AGAIN, AND WHAT THE EXPECTATIONS WERE OF PLAYERS.

DOES THE FACT THAT EA DID NOT CHOOSE TO PAY ANY MONEY TO SHOW RETIRED PLAYERS' NAMES AND FACES, AS AN ECONOMIST TELL YOU ANYTHING ABOUT WHETHER THE EXPECTATIONS THAT THE RETIRED PLAYER GROUP LICENSING PROGRAM WOULD YIELD MONEY FROM VIDEO GAMES WERE REALISTIC OR NOT?

**A.** OF COURSE IT DOES.

**Q.** WHAT DOES IT TELL YOU AS AN ECONOMIST?

**A.** THAT MEANS THERE WAS NO SIGNIFICANT MARKET VALUE ASSOCIATED WITH THOSE PLAYER IMAGES, OR THEY WOULD HAVE LICENSED THEM. I MEAN, THAT'S -- THE POINT IS THEY COULD CHOOSE ON THE ONE HAND TO HAVE A SMALL NUMBER OF LICENSES FOR STARS, OR THEY COULD CHOOSE ON THE OTHER HAND TO HAVE LICENSES FOR ALL THE PLAYERS ON THE TEAM, FOR THESE HISTORICAL TEAMS.

THEY CHOSE JUST TO DO THE STARS. THEY COULD HAVE GOTTEN THE REST. THEY CHOSE NOT TO PAY ANYTHING FOR THEM, AND SO THEY DIDN'T USE THEM. THAT'S A REAL MARKET EXAMPLE. THAT'S A REAL MARKET TRANSACTION.

**THE COURT:** MAY I ASK A QUESTION ON THIS?

**THE WITNESS:** SURE.

**MR. KESSLER:** SURE.

**THE COURT:** I DON'T WANT TO INTERRUPT YOUR EXAM.

**MR. KESSLER:** NO, CERTAINLY, YOUR HONOR. YOUR HONOR CAN ASK ANY QUESTION YOU LIKE AT ANY TIME.

1          **THE COURT:** ALL RIGHT. I WANT TO MAKE SURE I

2    UNDERSTAND THIS VERY POINT YOU ARE MAKING.

3          WE KNOW THAT THEY HAVE A MADDEN GAME, HISTORICAL GAME

4    WHERE THE PLAYERS ARE NOT IDENTIFIED, PER SE. SO ARE YOU

5    SAYING THAT IF THEY INSTEAD HAD A HISTORICAL GAME WHERE THE

6    PLAYERS WERE IDENTIFIED BY NUMBER, NAME AND THE WAY THEY ARE

7    WITH THE -- WITH THE CURRENT TEAMS, THAT THAT HISTORICAL GAME

8    WOULD NOT SELL FOR MORE IN THE MARKETPLACE?

9          **THE WITNESS:** I DON'T KNOW THE ANSWER TO THAT. ONLY

10   EA REALLY KNOWS THE ANSWER TO THAT.

11         WHAT I'M SAYING IS THERE'S A REASON THAT YOU WOULD

12   EXPECT CURRENT TEAMS' ENTIRE ROSTERS TO HAVE SOME VALUE, BUT

13   NOT HISTORICAL TEAM ENTIRE ROSTERS TO HAVE VALUE.

14         AND IT WOULD GET TO THE FACT THAT WHEN YOU'RE PLAYING

15   THE REAL GAMES, WHEN YOU'RE BUYING A MADDEN GAME TO PLAY WITH

16   CURRENT TEAMS, YOU'RE PLAYING WITH THE CURRENT ROSTERS THAT YOU

17   ARE READING ABOUT IN THE NEWSPAPERS. IF YOU FOLLOW THE 49ERS,

18   YOU KNOW WHO THEIR OFFENSIVE LINE IS AND WHO THEIR DEFENSIVE

19   LINEBACKERS ARE.

20         BUT IF YOU'RE A HISTORICAL 49ERS FAN, YOU PROBABLY DO

21   NOT REMEMBER THE NAMES OF MORE THAN A HANDFUL OF PLAYERS FROM

22   THAT HISTORICAL TEAM.

23         **THE COURT:** SO YOU'RE SAYING THAT -- LET'S TAKE --

24   SAY YOU'VE GOT THE 49ER TEAM NOW.

25         **THE WITNESS:** YES.

1          **THE COURT:**  YOU'RE SAYING THERE'S VALUE IN HAVING THE

2    ACTUAL NAMES ASSOCIATED OF THE PLAYERS, ASSOCIATED WITH THAT

3    PRODUCT IF IT'S A CURRENT PRODUCT.  BUT IF YOU FAST FORWARD

4    INTO THE FUTURE TEN YEARS AND NOW THAT SAME TEAM BECOMES A

5    HISTORICAL TEAM, THERE'S NO LONGER ANY INTEREST IN HAVING THE

6    ACTUAL NAMES ASSOCIATED WITH THOSE PLAYERS?

7          **THE WITNESS:**  THERE'S TWO THINGS GOING ON, WHICH IS

8    THE VALUE OF THE TEAM, PER SE, DECLINES THROUGH TIME, ALL

9    RIGHT?

10          THAT IS TO SAY THE SAN FRANCISCO 49ERS OF 1985 ARE

11    LESS VALUABLE IN 2008 THAN THEY WERE IN 1985, ALL RIGHT?  AND

12    THEN, THERE'S THE SECOND THING THAT'S GOING ON IS THAT THE NAME

13    RECOGNITION TENDS TO ATTENUATE AS TIME PROGRESSES, SO THAT IF I

14    ASK A RABID 49ERS FAN WHO HIS FAVORITE PLAYERS WERE IN 1988, HE

15    COULD PROBABLY NAME THEM.

16          BUT IF I SAY:

17          "NAME THE OFFENSE -- YOU KNOW, ALL THE PEOPLE WHO

18    GOT IN THE GAME PLAYING ON THE OFFENSIVE LINE," HE WOULDN'T BE

19    ABLE TO.  BUT HE MIGHT BE ABLE TO DO IT FOR THE CURRENT TEAM.

20    SO I THINK THOSE TWO THINGS ARE GOING ON SIMULTANEOUSLY.

21          BUT IT'S EA, NOT AN ECONOMIST, WHO ULTIMATELY

22    DECIDES:  IS IT WORTHWHILE TO PAY A LICENSING REVENUE TO SHOW

23    THE IMAGES OF ALL THE PLAYERS FROM A HISTORICAL TEAM?  AND IS

24    IT WORTH IT TO SHOW THE IMAGES OF ALL THE PLAYERS FROM A

25    CURRENT TEAM?

1          THEY HAVE DECIDED TO USE STAR PLAYERS AND ANONYMOUS

2   OTHER THINGS FOR THE HISTORICAL GAME TEAMS.  AND THEY'VE

3   DECIDED TO USE EVERYBODY FOR THE CURRENT TEAMS.  AND I'D

4   UNDERSTAND THE BUSINESS REASON FOR IT.  I DON'T NECESSARILY

5   UNDER -- KNOW THAT IT'S TRUE THAT IF THEY ADDED ONE MORE

6   HISTORICAL PLAYER TO A HISTORICAL TEAM IT WOULDN'T HAVE ANY

7   VALUE.

8          I DON'T KNOW WHETHER THAT'S TRUE.

9          **THE COURT:**  ALL RIGHT.  THANK YOU.

10         GO AHEAD.

11         **MR. KESSLER:**  WELL, YOUR HONOR, I HAVE ABOUT 10 MORE

12  MINUTES, AND IT'S 1:00 O'CLOCK, SO I'M ASKING YOUR HONOR FOR

13  GUIDANCE ABOUT THIS.

14         **THE COURT:**  ALL RIGHT.  WE'RE GOING TO HAVE TO COME

15  BACK TOMORROW, BECAUSE WE HAVE REACHED THE MAGIC HOUR.  AND THE

16  WITNESS WILL HAVE TO RETURN TOMORROW.

17         PLEASE REMEMBER THE ADMONITION.  I CAN TELL YOU,

18  LADIES AND GENTLEMEN, THE LAWYERS -- I'M KEEPING TRACK OF THE

19  TIME.  AND THERE'S AT LEAST SOME CHANCE THAT ONE SIDE OR THE

20  OTHER WILL RUN OUT OF TIME TOMORROW.  SO WE'RE GETTING CLOSE TO

21  THE END.

22         ALL RIGHT?  SO REMEMBER THE ADMONITION.  WE'LL SEE

23  YOU BACK HERE TOMORROW.

24         **THE CLERK:**  ALL RISE.

25         (THEREUPON, THE JURY LEFT THE COURTROOM.)

1          (THE FOLLOWING PROCEEDINGS WERE HELD IN OPEN COURT,

2          OUTSIDE THE PRESENCE OF THE JURY.)

3          **THE COURT:**  WHAT IS OUR GROUND RULE ON THE WITNESS?

4 EVERYONE BE SEATED.

5          HE'S NOT SUPPOSED TO TALK TO EITHER SIDE, CORRECT?

6          **MR. HUMMEL:**  THAT'S CORRECT, YOUR HONOR.

7          **MR. KESSLER:**  I THINK AT THIS POINT THE WITNESS

8 SHOULD NOT TALK TO EITHER SIDE.  CROSS EXAMINATION HAS ALREADY

9 TAKEN PLACE.

10          **THE COURT:**  HE HAS GOT RECROSS COMING UP.

11          **MR. KESSLER:**  YES.

12          **THE COURT:**  SO YOU CANNOT TALK TO EITHER SIDE.  ALL

13 RIGHT.  WE'LL SEE YOU BACK HERE TOMORROW AT 7:30.

14          THANK YOU, SIR.

15          ANYTHING THAT THE LAWYERS NEED ME FOR?

16          **MR. KESSLER:**  YOUR HONOR, ONLY THAT IT WOULD BE

17 HELPFUL TO KNOW WHAT YOUR CURRENT COUNT IS, IF YOU HAVE ONE,

18 SINCE TOMORROW I DO THINK IS GOING TO BE THE LAST DAY, SO BOTH

19 SIDES CAN PLAN.

20          **THE COURT:**  ALL RIGHT.  WELL, YOU'RE GOING TO HAVE TO

21 DO THE MATH YOURSELF.  FOR THE PLAINTIFF IT'S 906 PLUS 35 PLUS

22 60.

23          AND FOR THE DEFENSE IT'S 821 PLUS 30 PLUS 27 PLUS 53.

24 I'VE GOT A SUBTOTAL, BUT NOT A FINAL TOTAL.

25          **MR. KESSLER:**  YOUR HONOR, ONE OTHER QUESTION.  IF

1  YOUR HONOR HAS ANY GUIDANCE TO US AS TO -- FURTHER GUIDANCE AS

2  TO WHEN THE CHARGING CONFERENCE MIGHT BE AND CLOSINGS.

3          **THE COURT:**  ALL RIGHT.  HERE IS MY GUIDANCE.  THIS IS

4  TENTATIVE.  FIRST, I'M GOING TO HAND TO YOU A PROPOSED CHARGE.

5  I WANT YOU TO KNOW I'VE TAKEN INTO ACCOUNT YOUR OBJECTIONS.

6          I'VE ADDED A COUPLE OF PARAGRAPHS THAT NEITHER SIDE

7  ASKED FOR, QUITE, BUT WHICH I BELIEVE TO BE A CORRECT STATEMENT

8  OF THE LAW.

9          THIS IS ON THE FIDUCIARY DUTY POINT.  AND SO YOU'LL

10 WANT TO EXAMINE THAT.

11         I AM GOING TO GIVE TO DAWN A COPY OF THAT, AS WELL AS

12 THE SPECIAL VERDICT FORM.  AND THEN, YOU SHOULD BE GIVING ME

13 YOUR COMMENTS BY 4:00 P.M. TOMORROW IN A 10-PAGE CRITIQUE.

14         WE WILL HAVE A CHARGING CONFERENCE, TOO.  BUT

15 OVERNIGHT I WILL BE LOOKING AT YOUR 10-PAGE CRITIQUES.

16         AND THEN, BY MIDNIGHT IF SOMEBODY WANTS TO SUBMIT A

17 REPLY, THEY CAN, BUT THEY DON'T HAVE TO.  I WILL LOOK AT THAT,

18 TOO.

19         OUR CHARGING CONFERENCE WILL BE SOMETIME THURSDAY,

20 THE TIME TO BE SELECTED, DEPENDING ON FACTORS.  AND OUR CLOSING

21 ARGUMENTS ARE VERY LIKELY TO BE FRIDAY.  RIGHT NOW I'M

22 TENTATIVELY THINKING THAT EACH SIDE WILL GET A TOTAL OF 100

23 MINUTES.

24         THAT'S 60 PLUS 40. I'M SORRY, 80 MINUTES.  THAT WOULD

25 BE 60 PLUS 20.  AND THAT YOU CAN RESERVE UP TO 30 MINUTES FOR

1    REBUTTAL.

2              AGAIN, I WANT TO SAY THAT WHEN I ASK A QUESTION I DO

3    NOT WANT ANYONE IN THE CLOSING ARGUMENTS SAYING:

4                   "AND REMEMBER, THE JUDGE ASKED THIS QUESTION."

5              IF I HEAR THAT I'M GOING TO INTERRUPT YOU AND SAY:

6                   "YOU WERE INSTRUCTED NOT TO DO THAT."

7              NOW, YOU CAN SAY "THE QUESTION WAS ASKED."  THAT'S

8    OKAY.  BUT I DON'T WANT ANYONE SAYING THAT I'M ASKING

9    QUESTIONS.

10             I'M ASKING QUESTIONS THAT I THINK ARE ON THE JURY'S

11   MIND.  I AM NOT ONE OF THE ADVOCATES IN THIS CASE.  AND I ASK

12   QUESTIONS THAT ARE FAIRLY SUGGESTED BY THE OTHER QUESTIONS THAT

13   HAVE BEEN ASKED.

14             **MR. KESSLER:**  YOUR HONOR, I WOULD JUST ASK, IN

15   CLOSING, IS IT APPROPRIATE TO REFER TO THE SPECIAL VERDICT FORM

16   ONCE IT'S FINALIZED.

17             **THE COURT:**  SURE.  YOU CAN PUT IT UP THERE IN YOUR

18   ENTIRE CLOSING AND SAY:

19                  "HERE'S WHAT YOU FILL OUT:  YES.  NO.  YES.

20   NO."

21             **MR. KESSLER:**  AND WHEN THE INSTRUCTIONS ARE FINAL,

22   CAN WE PUT THE EVIDENCE IN THE CONTEXT OF THE INSTRUCTIONS AS

23   WE SEE THEM?

24             **THE COURT:**  YOU CAN PUT THE INSTRUCTIONS ON THE

25   SCREEN.  THIS SET IS NOT THE FINAL SET.

1          **MR. KESSLER:**  I UNDERSTAND THAT, YOUR HONOR.

2          **THE COURT:**  YOU HAVE TO WAIT UNTIL THE FINAL SET.

3  YOU DEFINITELY CAN DO THAT.  I ENCOURAGE YOU TO DO THAT.  YOU

4  CAN SAY:

5               "HERE'S WHAT THE JUDGE IS GOING TO INSTRUCT

6  YOU."  BOTH SIDES CAN DO THAT, OF COURSE.

7          ALL RIGHT.  ANYTHING MORE TODAY?

8          **MR. KESSLER:**  OH, YOUR HONOR, IT'S BEEN POINTED OUT

9  TO ME THAT YOUR HONOR HAD TWO ENTRIES FOR PLAINTIFF TODAY ON

10  TIME AND THREE FOR US.  BUT --

11          **THE COURT:**  I COLLAPSED SOME OF IT.

12          **MR. KESSLER:**  I WAS GOING TO SAY THEY HAD --

13          **THE COURT:**  I DID SOME MENTAL COLLAPSING LIKE IT WAS

14  A ONE-MINUTE ONE, I COLLAPSED THAT WITH AN 8 MINUTE AND 21

15  MINUTE.

16          ALL RIGHT.  LOOK.  HERE'S -- LOOK.  YOUR SIDE WAS

17  906, PLUS 28, PLUS 3, PLUS 4, PLUS 6.

18          THE OTHER SIDE WAS 821, PLUS 21, 1, 53, 27 AND 8.  I

19  JUST DID SOME MATH IN MY HEAD TO MAKE IT EASIER.

20          **MR. KESSLER:**  DO WE HAVE A MAJOR DISCREPANCY, LAUREN?

21          **MR. GREENSPAN:**  I THINK SO.

22          **THE COURT:**  I'M GOING TO REPEAT IT.  ARE YOU

23  LISTENING?

24          THE DEFENSE HAD 821, 21, 1, 53, 27 AND 8.  AND I'M

25  STARTING WITH PAT -- I SKIPPED OVER TRACE ARMSTRONG.  I ALREADY

1    SUMMARIZED HIM.

2              AND THEN, THIS IS WITH PAT ALLEN.  AND THEN, 906 UP

3    TO PAT ALLEN FOR PLAINTIFF.  AND THEN, WITH PAT ALLEN FORWARD:

4    28, 3, 4 AND 60.  THAT'S WHAT I HAVE.

5              **MR. KESSLER:**  OKAY.  THANK YOU, YOUR HONOR.  IF WE

6    HAVE ANY QUESTIONS AFTER FURTHER REVIEWING I'LL LET YOUR HONOR

7    KNOW TOMORROW.  THANK YOU.

8              **THE COURT:**  ALL RIGHT.

9              **MR. KESSLER:**  THAT'S IT.

10             **THE COURT:**  ANYTHING MORE?  GREAT.  I HAVE A CRIMINAL

11   CALENDAR AT 2 O'CLOCK, SO I'LL NEED THE COURTROOM.  THANK YOU.

12             **MR. KATZ:**  THANK YOU.

13             (THEREUPON, THIS TRIAL WAS CONTINUED UNTIL WEDNESDAY,

14   NOVEMBER 5, 2008, AT 7:30 O'CLOCK A.M.)

15                            -  -  -  -

16

17                    **CERTIFICATE OF REPORTER**

18             I CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT

19   FROM THE RECORD OF PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

20   DATE:  TUESDAY, NOVEMBER 4, 2008

21

22             S/B KATHERINE POWELL SULLIVAN
         _____

23        KATHERINE POWELL SULLIVAN, CSR #5812, RPR, CRR
                    U.S. COURT REPORTER

24

25

I N D E X

**PLAINTIFFS' WITNESSES**                                    **PAGE**    **VOL.**

**ALLEN, PATRICIA**
DIRECT EXAMINATION BY MR. LECLAIR              2097     10
CROSS EXAMINATION BY Mr. FEHER                2121     10
REDIRECT EXAMINATION BY MR. LECLAIR           2139     10
RECROSS EXAMINATION BY MR. FEHER              2144     10


**DEFENDANTS' WITNESSES**                                    **PAGE**    **VOL.**

**ARMSTRONG, TRACE**
DIRECT EXAMINATION RESUMED BY MR. KESSLER     2060     10
CROSS EXAMINATION BY MR. LECLAIR              2076     10
REDIRECT EXAMINATION BY MR. KESSLER           2092     10
RECROSS EXAMINATION BY MR. LECLAIR            2094     10

**NOLL, ROGER**
DIRECT EXAMINATION BY MR. KESSLER             2146     10
CROSS EXAMINATION BY MR. HUMMEL               2205     10
REDIRECT EXAMINATION BY MR. KESSLER           2257     10

# E X H I B I T S

| TRIAL EXHIBITS | IDEN | VOL. | EVID | VOL. |
|---|---|---|---|---|
| 1164-3 | | | 2078 | 10 |
| 1049 | | | 2102 | 10 |
| 1296 | | | 2110 | 10 |
| 1298 | | | 2119 | 10 |
| 1299 | | | 2121 | 10 |
| 2260 | | | 2125 | 10 |
| 2263 | | | 2128 | 10 |
| 2206 THROUGH 2306 | | | 2130 | 10 |
| 1164 | | | 2144 | 10 |
| 1164-4 | | | 2145 | 10 |
| 2397 | | | 2160 | 10 |
| 2398 | | | 2162 | 10 |
| 2399 | | | 2195 | 10 |