VOLUME 11

PAGES 2274 - 2492

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE WILLIAM H. ALSUP

BERNARD PAUL PARRISH, HERBERT      )
ANTHONY ADDERLEY, WALTER ROBERTS   )
III,                               )
                                   )
          PLAINTIFFS,              )
                                   )
  VS.                              )   NO. C 07-0943 WHA
                                   )
NATIONAL FOOTBALL LEAGUE PLAYERS   )
ASSOCIATION AND NATIONAL FOOTBALL  )
LEAGUE PLAYERS INCORPORATED D/B/A  )
PLAYERS INC,                       )
                                   )   SAN FRANCISCO, CALIFORNIA
          DEFENDANTS.              )   WEDNESDAY
_____)   NOVEMBER 5, 2008

## TRANSCRIPT OF PROCEEDINGS

**APPEARANCES:**

**FOR PLAINTIFFS:**        MANATT, PHELPS & PHILLIPS
                           1001 PAGE MILL ROAD, BUILDING 2
                           PALO ALTO, CALIFORNIA 94304
                 **BY:  RONALD S. KATZ, ESQ.**
                       **RYAN S. HILBERT, ESQ.**


                           MANATT, PHELPS & PHILLIPS
                           7 TIMES SQUARE
                           NEW YORK CITY, NEW YORK 10036
                 **BY:  L. PETER PARCHER, ESQ.**


                           MANATT, PHELPS & PHILLIPS
                           11355 WEST OLYMPIC BOULEVARD
                           LOS ANGELES, CALIFORNIA  90064
                 **BY:  CHAD HUMMEL, ESQ.**

(APPEARANCES CONTINUED ON NEXT PAGE)

**APPEARANCES CONTINUED:**

**ALSO FOR PLAINTIFFS:**    MCKOOL SMITH
300 CRESCENT COURT
SUITE 1500
DALLAS, TEXAS 75201
BY: **LEWIS T. LECLAIR, ESQ.**
**JILL ADLER NAYLOR, ESQ.**
**ANTHONY GARZA, ESQ.**
**BRETT CHARHON, ESQ.**

**FOR DEFENDANTS:**    DEWEY & LEBOEUF
1301 AVENUE OF THE AMERICAS
NEW YORK CITY, NEW YORK 10019-6092
BY: **JEFFREY L. KESSLER, ESQ.**
**DAVID GREENSPAN, ESQ.**
**DAVID G. FEHER, ESQ.**
**ROY TAUB, ESQ.**
**MOLLY DONOVAN, ESQ.**
**JASON CLARK, ESQ.**

WEIL, GOTSHAL & MANGES LLP
767 FIFTH AVENUE
NEW YORK, NEW YORK 10153-0119
BY: **BRUCE S. MEYER, ESQ.**

**REPORTED BY:**    *KATHERINE POWELL SULLIVAN, CSR # 5812*
*OFFICIAL REPORTER - U.S. DISTRICT COURT*

1 **P R O C E E D I N G S**

2 **NOVEMBER 5, 2008**                                      **7:30 A.M.**

3

4              (THE FOLLOWING PROCEEDINGS WERE HELD IN OPEN COURT,

5              OUTSIDE THE PRESENCE OF THE JURY.)

6         **THE COURT:**  GOOD MORNING.

7         **MR. KESSLER:**  GOOD MORNING.

8         **MR. PARCHER:**  GOOD MORNING, YOUR HONOR.

9         **MR. KATZ:**  GOOD MORNING, YOUR HONOR.

10         **MR. HUMMEL:**  GOOD MORNING, YOUR HONOR.

11         **THE COURT:**  HOW IS EVERYBODY?

12         (COUNSEL RESPONDED AFFIRMATIVELY.)

13         **THE COURT:**  HAVE A SEAT.  I HOPE YOU GOT TO SEE SOME

14 OF THE ELECTION EXCITEMENT AND NOT JUST TO WORK ON THIS CASE.

15 BUT HERE WE ARE BACK AT WORK.

16         OKAY.  WHAT DO YOU HAVE FOR ME THIS MORNING?

17         **MR. KESSLER:**  I THINK, YOUR HONOR, JUST TWO ISSUES

18 AND A QUESTION.

19         THE FIRST ISSUE IS WE FILED A BRIEF LAST NIGHT.  I

20 DON'T KNOW IF YOUR HONOR HAS SEEN IT.

21         **THE COURT:**  I HAVE SEEN IT.  I HAVEN'T READ IT ALL

22 YET, BUT I STARTED READING IT.

23         **MR. KESSLER:**  AND THE ISSUE IS THE FOLLOWING:  WE

24 BELIEVE THAT THE HYPOTHETICAL THAT PLAINTIFFS GOT INTO WITH

25 PROFESSOR NOLL ABOUT WHETHER OR NOT IF THERE WAS A MONOPOLY

1   POWER IN ACTIVE PLAYER LICENSING, WHICH WAS THE HYPOTHETICAL,

2   YOU KNOW:  COULD THEY HAVE USED THE ACTIVE PLAYER LICENSING

3   INDUCING EA TO FORCE THEM TO TAKE RETIRED PLAYERS, IN FACT,

4   WOULD VERY LIKELY BE ILLEGAL TYING.

5              AND WE THINK THAT IT'S NOW BEEN SUGGESTED TO THE JURY

6   THAT IT COULD BE A POSSIBLE BREACH OF DUTY THAT PLAYERS INC

7   DIDN'T DO SOMETHING THAT WOULD BE ILLEGAL.  AND WE THINK

8   THERE'S A LOT OF CASE LAW THAT WE CITED THAT THAT'S NOT

9   CORRECT.

10             AND YOUR HONOR DID GIVE A DIRECTION YOU WEREN'T

11  SUGGESTING IN YOUR QUESTIONS THAT IT WAS A DUTY, BUT YOU LEFT

12  OPEN THE POSSIBILITY THAT THE JURY COULD FIND IT COULD BE A

13  DUTY.

14             AND FOR US TO NOW HAVE TO GO TO CLOSING ARGUMENT AND

15  EXPLAIN IT'S ILLEGAL AND THERE'S NO EVIDENCE OF THAT, THIS IS A

16  HUGE 403 MESS.

17             IT'S SO FAR AFIELD OF THE GLA ISSUE THAT'S IN THIS

18  CASE OR ANYTHING, FRANKLY, EVEN IN THEIR BREACH OF FIDUCIARY

19  DUTY CLAIMS, THAT WE THINK WE'RE ENTITLED TO AN INSTRUCTION TO

20  THE JURY THAT THEY SHOULD GIVE NO REGARD TO ANY TESTIMONY

21  CONCERNING, YOU KNOW, WHETHER OR NOT PLAYERS INC COULD HAVE

22  FORCED EA TO TAKE RETIRED PLAYERS BY USING ITS POWER OVER

23  ACTIVE, BECAUSE THAT WOULD BE VERY LIKELY ILLEGAL, AND,

24  THEREFORE, THEY SHOULD DISREGARD IT.  SOMETHING TO THAT EFFECT.

25             AND THAT'S WHAT OUR BRIEF SAYS, YOUR HONOR.

1          **THE COURT:** ALL RIGHT. WHAT DO YOU SAY TO THAT,

2  MR. HUMMEL?

3          **MR. HUMMEL:** FIRST AND FOREMOST, I HAVEN'T READ THEIR

4  BRIEF. I WILL DO SO AND WILL FILE A BRIEF ON IT TODAY.

5          SECOND POINT, YOUR HONOR, IS THIS: JUST LISTENING TO

6  MR. KESSLER, AND WITHOUT HAVING THE BENEFIT OF THE BRIEF, THE

7  POINT IS NOT TYING.

8          THE POINT WAS -- OF THE CROSS EXAMINATION WAS TO

9  REBUT MR. KESSLER'S POINT THAT THERE'S NO -- AND THE WITNESS'S

10  TESTIMONY THAT THERE'S NOT LEVERAGING IN THE CASE, OR THE

11  POSSIBILITY OF LEVERAGING.

12          LEVERAGING CAN BE PERFECTLY LEGAL IN MANY

13  CIRCUMSTANCES. THERE'S NO QUESTION ABOUT THAT. AND OUR

14  PRIMARY POINT WAS THAT THE UNION DID HAVE THE ABILITY

15  THROUGH -- THROUGH THE POWER THAT THEY HAD BY HAVING A

16  SIGNIFICANT GROUP OF RETIRED PLAYERS AND ALL THE ACTIVE PLAYERS

17  TO SAY TO THE LICENSEES:

18              "HEY, TAKE OUR GUYS. PUT THEM IN THE LICENSE."

19          AND THAT MAY HAVE BEEN A QUESTION OF ALLOCATION OF

20  THE REVENUES DERIVED FROM THOSE GROUP LICENSING, OR IT MAY HAVE

21  BEEN SIMPLY MARKETING THEM IN THE APPROPRIATE WAY, WHICH THEY,

22  OBVIOUSLY, GIVEN ALL THE WEIGHT OF THE EVIDENCE HERE, FAILED TO

23  DO.

24          BUT, YOUR HONOR, I'LL TAKE A LOOK AT THEIR BRIEF. I

25  WOULD LIKE THE COURT NOT TO RULE ON IT NOW, OBVIOUSLY, WITHOUT

1   OUR HAVING THE BENEFIT OF LOOKING AT IT.

2          AND IF YOUR HONOR IS INCLINED TO DO SOMETHING ON IT,

3   CLEARLY THE POINT'S NOT TYING.  AND THIS WOULD NOT BE AN

4   ILLEGAL TIE.

5          NOBODY ON THAT SIDE, INCLUDING MR. KESSLER, WHO IS AN

6   ANTITRUST LAWYER -- AND I'VE TRIED TYING CASES MYSELF -- WOULD

7   SUGGEST THAT WHAT I TOLD PROFESSOR NOLL WOULD BE AN ILLEGAL

8   TYING.  THAT WAS NOT THE IMPORT OF MY QUESTIONS, NOR WAS IT THE

9   IMPORT OF YOUR QUESTIONS.

10         **THE COURT:**  ARE YOU GOING TO ARGUE TO THE JURY -- AND

11  IF NOT, WHY SHOULDN'T I JUST GO AHEAD AND TELL THEM -- THAT THE

12  JURY OR THAT THE DEFENDANTS HAVE A DUTY TO SAY TO EA:

13             "YOU CAN'T HAVE ANY OF THE ACTIVES UNLESS YOU

14  TAKE ALL OF THE RETIREDS"?

15         **MR. PARCHER:**  IT'S AN ISSUE FOR THE JURY.  THAT'S AN

16  ISSUE FOR THE JURY.

17         **THE COURT:**  SO YOU WANT TO LEAVE THAT OPEN?

18         **MR. PARCHER:**  OF COURSE.

19         **MR. KESSLER:**  AND THAT'S ILLEGAL, YOUR HONOR.  THAT'S

20  EXACTLY MY POINT.

21         **THE COURT:**  THEN, WHAT MR. HUMMEL TOLD ME WAS NOT

22  TRUE.

23         **MR. HUMMEL:**  NO.  MAY I LOOK --

24         **THE COURT:**  EITHER WE TAKE IT -- LOOK.  I'M NOT

25  SAYING IT IS AN ANTITRUST VIOLATION.

1          **MR. HUMMEL:**  RIGHT.

2          **THE COURT:**  BUT YOU CAN'T WAFFLE THROUGH THIS TRYING

3   TO HAVE DOUBLESPEAK.

4          **MR. HUMMEL:**  I AGREE.

5          **THE COURT:**  SO EITHER YOU WANT THE JURY TO BE ABLE TO

6   HAVE THAT ISSUE ON THE TABLE OR NOT.  AND I'M GOING TO

7   DISREGARD WHAT YOU TOLD ME --

8          **MR. HUMMEL:**  WHAT I TOLD YOU?

9          **THE COURT:**  YEAH, BECAUSE MR. PARCHER ADMITTED THAT

10  HE WANTS THE JURY TO HAVE THAT ON THE TABLE.  AND YOU TRIED TO

11  REPAINT IT.

12          BUT IF YOU WANT THAT ISSUE ON THE TABLE, THEN IT

13  CAN'T -- IT -- YOU'VE GOT TO BRIEF IT.

14          **MR. HUMMEL:**  ALL RIGHT.  WE'LL BRIEF IT.

15          **THE COURT:**  I'M NOT GOING TO GIVE ANY PRELIMINARY

16  INSTRUCTION ON THIS, MR. KESSLER.

17          **MR. KESSLER:**  OKAY, YOUR HONOR.

18          **THE COURT:**  THIS IS NOT SO IMPORTANT THAT IT HAS TO

19  BE DEALT WITH RIGHT NOW.  IT CAN BE DEALT WITH IN THE FINAL

20  INSTRUCTIONS.

21          SO YOUR BRIEF IS GOING TO BE DUE AT 4:00 P.M. TODAY.

22          **MR. HUMMEL:**  THANK YOU.

23          **MR. KESSLER:**  THANK YOU.

24          VERY BRIEF, YOUR HONOR.  THE SECOND ISSUE IS --

25          **THE COURT:**  I HAVE GOT A QUESTION FOR YOU.

1          **MR. KESSLER:**  YES.

2          **THE COURT:**  COULD EA HAVE GONE TO EACH OF THE

3     INDIVIDUAL ACTIVE PLAYERS -- ACTIVE PLAYERS, NOW -- AND GOTTEN

4     A LICENSE?

5          **MR. KESSLER:**  I DIDN'T UNDERSTAND, YOUR HONOR.  I'M

6     SORRY.

7          **THE COURT:**  COULD EA HAVE NEGOTIATED DIRECTLY WITH AN

8     ACTIVE PLAYER?

9          **MR. KESSLER:**  INDIVIDUALLY IN GROUPS OF LESS THAN

10    SIX.  IN OTHER WORDS, THE ACTIVE PLAYERS GIVE THEIR EXCLUSIVE

11    RIGHT -- UNLIKE THE RETIRED, THE ACTIVE PLAYERS GIVE THEIR

12    EXCLUSIVE RIGHTS TO THE UNION IN GROUPS OF SIX OR MORE.

13            SO IF YOU WANTED SIX OR MORE ACTIVE PLAYERS YOU DID

14    HAVE TO COME -- YOU DID HAVE TO COME TO PLAYERS INC FOR THAT.

15    AND THAT WAS THE BASIS OF HIS HYPOTHETICAL.

16            AND, BY THE WAY, DR. RASCHER ADMITTED HE NEVER

17    STUDIED WHETHER THERE WAS ANY MARKET POWER IN THEM.  SO THE

18    WHOLE HYPOTHETICAL HAS NOW SUGGESTED EVIDENCE, WHICH

19    MR. PARCHER WOULD LIKE TO ARGUE IN CLOSING THAT'S NOT EVEN IN

20    THE RECORD, WHICH IS TO SUGGEST THAT THERE'S EVIDENCE THAT

21    THERE'S MARKET POWER IN ACTIVE PLAYERS, AND THAT PLAYERS INC

22    SHOULD HAVE USED THAT MARKET POWER TO FORCE EA TO TAKE RETIRED

23    PLAYERS THEY DIDN'T WANT.

24            AND THAT'S THE WHOLE PROBLEM WE HAVE.  YOUR HONOR, I

25    STATED IN OUR BRIEF IT WOULD BE ILLEGAL, IF THAT'S TRUE.

1          **MR. PARCHER:**  IF YOUR HONOR PLEASES, I'M NOT

2     COMMITTING TO WHAT I WOULD OR WOULD NOT LIKE TO ARGUE AT THIS

3     MOMENT.  I WOULD LIKE YOUR HONOR TO MAKE A RULING, FIRST OF

4     ALL, AFTER YOU'VE HEARD FROM US.

5               **THE COURT:**  YOU JUST WANT --

6               **MR. PARCHER:**  THEY ARE ALSO --

7               (COUNSEL AND THE COURT SPEAKING SIMULTANEOUSLY; NOT

8               REPORTABLE.)

9               **THE COURT:**  YOU DON'T WANT TO ANSWER MY QUESTION.

10    YOU JUST WANT TO SEE WHAT I RULE SO THEN YOU CAN THEN TELL THE

11    NINTH CIRCUIT:

12                   "OH, I WOULD HAVE ARGUED" --

13              **MR. PARCHER:**  NO.

14              **THE COURT:**  TELL ME IF YOU'RE GOING TO ARGUE IT OR

15    NOT.

16              **MR. PARCHER:**  I'M NOT INTERESTED IN THE NINTH

17    CIRCUIT.  YOUR HONOR KEEPS SAYING IT.  I'M INTERESTED IN WHAT I

18    CAN AND CAN'T SAY TO THE JURY.

19              **THE COURT:**  WHY DON'T YOU TELL ME IF YOU WANT TO SAY

20    TO THE JURY THAT THEY HAD A DUTY TO TIE.

21              **MR. PARCHER:**  RIGHT.  OR FOR THEM TO CONSIDER WHETHER

22    THEY HAD A DUTY.

23              **THE COURT:**  THEY DON'T HAVE TO CONSIDER SOMETHING

24    THAT'S ILLEGAL.

25              **MR. PARCHER:**  I NEED -- I BELIEVE THAT I NEED TO

1 PHRASE SOME TYPE OF SENTENCE TO THE JURY THAT ALLOWS THEM TO

2 CONSIDER WHETHER THE RIGHT THING TO DO FROM THE GET-GO WAS TO

3 OFFER EA A LICENSE FOR EVERYBODY.

4       THEY NEVER DID THAT.  THE TESTIMONY IS VERY CLEAR IN

5 THIS CASE THAT MR. ALLEN NEVER PRESENTED MR. LINZNER WITH A

6 LIST OF 2100 GLA'S.

7       NOW, HOW I FASHION THAT, OR WHAT I CAN OR CAN'T SAY,

8 DEPENDS IN PART UPON WHAT YOUR HONOR IS THINKING.  I'M NOT

9 GOING TO SAY TO THE JURY "ILLEGAL TYING."  THAT WOULD BE SILLY,

10 IF IT IS AN ILLEGAL TYING.

11       BUT I DON'T WANT TO SKIP OUT THE GRAY AREAS BECAUSE

12 OF WHAT -- BECAUSE OF THE STYLE.

13       **THE COURT:**  YOU NEED TO PUT IN A BRIEF AND YOU NEED

14 TO COVER THE PARTS ABOUT MARKET POWER AND SO FORTH THAT WOULD

15 HELP ADDRESS THIS ISSUE.  AND KEEPING IN MIND WHAT YOUR OWN

16 EXPERT TESTIFIED TO AND DID NOT TESTIFY TO.

17       **MR. PARCHER:**  AND THERE MAY BE A BETTER WAY TO SAY IT

18 THAN ALL OF THAT, YOU KNOW.

19       **THE COURT:**  LET'S BE CLEAR ON THE DISTINCTIONS THAT I

20 THINK IS IN PLAY HERE, IN CASE THE NINTH CIRCUIT EVER READS

21 THIS TRANSCRIPT.

22       IT'S ONE THING TO SAY THAT THE DEFENDANTS SHOULD HAVE

23 GONE TO EA AND AFFIRMATIVELY OFFERED THE ENTIRE GROUP OF

24 RETIRED PLAYERS, WITHOUT TYING IT IN ANY WAY TO THE ACTIVE

25 PLAYERS.

1    THAT'S WHAT I THOUGHT THE THEORY OF YOUR CASE WAS,

2 THAT -- THAT IRRESPECTIVE OF WHETHER EA TOOK THE ACTIVE PLAYERS

3 AS A GROUP, THAT THE DEFENDANTS SHOULD HAVE, IN ADDITION,

4 ATTEMPTED TO MARKET EXPRESSLY -- AND MAYBE THEY DID -- BUT

5 ATTEMPTED TO MARKET THE GROUP OF RETIRED PLAYERS AS A

6 STANDALONE GROUP.

7    **MR. PARCHER:**  NO, YOUR HONOR.

8    **THE COURT:**  NOW, IF YOU'RE MOVING BEYOND THAT TO SAY

9 AND THEY SHOULD NEVER HAVE -- THEY SHOULD HAVE TIED THE ACTIVE

10 PLAYERS AND THE RETIRED PLAYERS TOGETHER, SUCH THAT IT'S ALL OR

11 NOTHING -- IS THAT WHAT YOU WANT TO ARGUE?

12    **MR. PARCHER:**  IT'S NOT NECESSARILY ALL OR NOTHING.

13    YOU SEE, WE THINK THE BUSINESS OF AN ACTIVE PLAYERS

14 GROUP AND A RETIRED PLAYERS GROUP IS AN ARTIFICIAL CONSTRUCT,

15 CONSTRUCTED BY THE DEFENDANTS FOR THIS CASE.

16    WE THINK THAT IF SIX OR MORE CURRENT OR FORMER

17 PLAYERS, WHETHER THEY ARE ALL AD HOC -- WHETHER THEY'RE ALL

18 ACTIVES OR WHETHER THEY ARE ALL RETIREDS, IF SIX OR MORE ARE

19 LICENSED FOR UTILIZATION TO ANY LICENSEE, WE THINK WE'RE

20 ENTITLED TO BE PAID.

21    WHETHER WE'RE IN THE CONTRACT OR NOT, WHETHER THEY

22 HAD A DUTY TO PUT US IN THE CONTRACT OR THEY DIDN'T, WE THINK

23 IT'S A BREACH OF CONTRACT AND A BREACH OF FIDUCIARY DUTY.

24    BUT EVEN IF IT WEREN'T, WE THINK WE'RE ENTITLED TO BE

25 PAID.  NOW, HOW THAT PLAYS ITSELF OUT IS SOMETHING TO CONSIDER

1    IN ARGUING TO THE JURY.

2         BUT WE DON'T THINK THEY EVER SHOULD HAVE GONE AND

3    JUST OFFERED RETIRED PLAYERS, PERIOD.  IT'S NOT A SEPARATE

4    GROUP.  IT'S NOT A SEPARATE CLASS OF PEOPLE.

5         **THE COURT:**  YOU SEE, THAT ARGUMENT TURNS ON YOUR

6    INTERPRETATION OF THE GLA.

7         **MR. PARCHER:**  CORRECT.

8         **THE COURT:**  YOU MAY BE WRONG ABOUT THAT.

9         **MR. PARCHER:**  THAT'S TRUE.

10        **THE COURT:**  BUT EVEN IF YOU'RE WRONG ABOUT THAT,

11   THERE COULD BE A FIDUCIARY DUTY THAT ARISES OUT OF THE GLA, AND

12   YOU'RE CONFOUNDING THOSE TWO THINGS.

13        IF YOU LOSE ON THE CONTRACT CLAIM, THEN THE ISSUE

14   COMES UP:  WELL, WHAT, IF ANYTHING, SHOULD -- DID THEY HAVE A

15   FIDUCIARY DUTY?  AND IF SO, WHAT SHOULD -- WHAT MORE SHOULD THE

16   DEFENDANTS HAVE DONE THAN THEY ACTUALLY DID --

17        **MR. PARCHER:**  YES, SIR.

18        **THE COURT:**  -- TO TRY TO MARKET THEM.

19        AND IF ONE OF THE ARGUMENTS YOU'RE GOING TO MAKE IS,

20   HAVING LOST ON THE CONTRACT CLAIM, THAT THE DEFENDANTS SHOULD

21   HAVE TIED THE ACTIVES AND THE RETIREDS TOGETHER AS A

22   TAKE-IT-OR-LEAVE-IT PROPOSITION, THEN WE ARE LOOKING SQUARELY

23   AT A POSSIBLE ANTITRUST VIOLATION.

24        I'M NOT SAYING IT IS AN ANTITRUST VIOLATION, BUT I

25   KNOW ENOUGH ABOUT ANTITRUST LAW TO KNOW THERE'S AN ISSUE HERE.

1      AND SO YOU BETTER WRITE A GOOD BRIEF.

2          **MR. LECLAIR:**  YOUR HONOR --

3          **THE COURT:**  NO POINT IN ARGUING THIS NOW.  I WANT TO

4  SEE YOUR BRIEF.

5          **MR. LECLAIR:**  I AGREE, YOUR HONOR.  AND I WANT TO SAY

6  WE ARE NOT TRYING TO DO SOMETHING THAT PUTS YOUR HONOR IN A

7  POSITION WHERE WE'RE SAYING WE'RE GOING TO WAIT ON.  WE WILL

8  TAKE A VERY CLEAR POSITION ON THIS.  WE WILL SAY WHAT WE WANT

9  TO DO.

10          **THE COURT:**  IN YOUR BRIEF.

11          **MR. LECLAIR:**  IN OUR BRIEF.  AND LET YOUR HONOR RULE

12  ON IT.

13          **THE COURT:**  THANK YOU.

14          **MR. KESSLER:**  THE SECOND ISSUE, YOUR HONOR, IS I WILL

15  GIVE YOU SOME NEWS, WHICH I HOPE WILL MAKE THE COURT HAPPY.

16          **THE COURT:**  IS MR. NOLL SUPPOSED TO BE HERE?

17          **MR. KESSLER:**  MR. NOLL, JUST WAIT OUTSIDE.

18          **THE WITNESS:**  TOLD ME TO BE HERE AT 7:00.

19          **THE COURT:**  THANK YOU.  JUST WAIT OUTSIDE, THOUGH.

20          **MR. KESSLER:**  IT DOESN'T REALLY CONCERN PROFESSOR

21  NOLL, BUT I'M HAPPY TO HAVE HIM WAIT OUTSIDE.

22          YOUR HONOR, AFTER PROFESSOR NOLL HAS CONCLUDED WE'RE

23  GOING TO BE READING THE DEPOSITION OF GENE UPSHAW, AND THEN

24  WE'RE ACTUALLY GOING TO BE CLOSING OUR CASE.  WE'VE DECIDED

25  THAT WE HAVE ENOUGH EVIDENCE IN THIS CASE TO DECIDE THIS.

1        WE'VE HEARD FROM PLAINTIFFS THAT THEY WOULD LIKE TO

2   PUT TWO DEPOSITIONS IN IN REBUTTAL.  OKAY.  AND WE DON'T

3   BELIEVE EITHER ARE REBUTTAL, SO WE NEED TO HAVE THAT DECIDED

4   NOW.  AND THERE'S ALSO DESIGNATIONS INVOLVED.

5        THE FIRST REBUTTAL THEY WANT TO PUT IN IS MR. HOWARD

6   SKALL, WHO THEY SAY IS REBUTTAL TO TESTIMONY OF PAT ALLEN.  THE

7   PROBLEM WITH THAT, YOUR HONOR, IS PAT ALLEN WAS CALLED IN THEIR

8   CASE.

9        THERE'S NO CONCEIVABLE THEORY I KNOW OF, YOUR HONOR,

10  IN WHICH THEY CAN HAVE REBUTTAL TO A WITNESS CALLED --

11        **THE COURT:**  WHAT DO YOU SAY TO THAT?

12        **MR. KESSLER:**  -- IN THEIR CASE.

13        **THE COURT:**  WHAT DO YOU SAY TO THAT?

14        **MR. LECLAIR:**  YOUR HONOR, WE'RE PUTTING IN A VERY

15  SMALL EXCERPT FROM HOWARD SKALL WHERE HE SAID HE DIDN'T KNOW

16  ABOUT ANY LIST OF RETIRED PLAYER GROUP LICENSE PEOPLE.

17        THE REASON WE'RE ENTITLED TO DO THAT, YOUR HONOR, IS

18  THE ONLY REASON -- IF WE HAD CALLED PAT ALLEN IN OUR CASE --

19        **THE COURT:**  IT HAS TO BE REBUTTAL TO SOMETHING IN

20  THEIR CASE.

21        **MR. LECLAIR:**  CAN I EXPLAIN MY POSITION, YOUR HONOR?

22        **THE COURT:**  ALL RIGHT.

23        **MR. LECLAIR:**  LET'S ASSUME THAT PAT ALLEN HAD

24  TESTIFIED DURING OUR CASE AS WE WANTED HER TO DO, WE WOULD HAVE

25  BEEN ENTITLED TO PUT IN MR. SKALL'S DEPO AFTER SHE SAID IN HER

1  DEPOSITION:

2              "WELL, WE HAD A LIST."  WE'D HAVE BEEN ENTITLED

3  TO PUT IT IN IN OUR CASE.

4          SHE THEN SAYS -- AND WHEN SHE'S CALLED, SHE'S CALLED

5  NOT JUST IN OUR CASE.  WE AGREED THAT SHE COULD TESTIFY BEYOND

6  THE SCOPE AND WOULD BE A WITNESS IN THEIR CASE AND OUR CASE.

7          WHEN SHE SAYS IN HER TESTIMONY:

8              "THERE WAS A LIST, AND, GEE, I THINK WE SENT IT

9  AROUND," WE'RE ENTITLED TO REBUT THAT BY SAYING FROM HOWARD

10  SKALL'S DEPOSITION:

11              "I DIDN'T KNOW ABOUT A LIST."

12          **THE COURT:**  ALL RIGHT.  WHO WAS IT THAT REQUESTED SHE

13  COME LATE?

14          **MR. LECLAIR:**  THEY DID, YOUR HONOR.

15          **THE COURT:**  THERE'S A POINT OF FAIRNESS HERE.  WHAT

16  DO YOU SAY TO THAT, MR. KESSLER?

17          **MR. KESSLER:**  YOUR HONOR, THEY ORIGINALLY NOTICED

18  MR. SKALL IN THEIR CASE, THESE SAME EXCERPTS.

19          THE TESTIMONY THEY ELICITED FROM PAT ALLEN ABOUT THE

20  LIST WAS THEIR QUESTIONING, NOT MY QUESTIONING.

21          SO WHAT HAPPENED HERE IS, THEY KNEW -- AND IT WAS IN

22  THEIR CASE -- THEY KNEW THAT THEY WERE GOING TO ASK THESE

23  QUESTIONS OF PAT ALLEN.

24          THEY WERE ANSWERS SHE HAD ALREADY GIVEN IN HER

25  DEPOSITION.  SO THEY KNEW WHAT THE ANSWERS WERE GOING TO BE,

1  OKAY?

2          AND THEY DELIBERATELY WITHHELD MR. SKALL.  AFTER

3  NOTICING HIM FIRST IN THEIR CASE, THEY THEN SAID:  "OH, NO,

4  WE'RE NOT CALLING MR. SKALL," SIMPLY SO STRATEGICALLY THEY

5  COULD PLAY IT AT THE END AS IF IT'S REBUTTAL, WHEN IT'S

6  REBUTTAL TO QUESTIONS THEY ASKED OF A WITNESS IN THEIR OWN

7  CASE.

8          I DIDN'T ELICIT THIS INFORMATION.  THEY ELICITED THIS

9  INFORMATION.  SO IT MAKES ABSOLUTELY NO SENSE.

10         **THE COURT:**  HOW LONG IS THIS WHOLE DEPOSITION GOING

11  TO BE?

12         **MR. LECLAIR:**  OUR EXCERPT IS FIVE LINES, YOUR HONOR.

13         **MR. KESSLER:**  AND, YOUR HONOR, IF THEY DO THAT WE

14  HAVE A LOT TO DESIGNATE FROM MR. SKALL, BECAUSE ONCE THEY DO

15  THAT THE JURY HAS TO UNDERSTAND A LOT MORE THAN FIVE LINES OF

16  MR. SKALL.  AND YOUR HONOR WOULD HAVE TO REVIEW THOSE NOW.  WE

17  HAVE THEM.  BUT WE DO NOT THINK THIS IS PROPER REBUTTAL.

18         **THE COURT:**  I'M GOING TO ALLOW IT, GIVEN THAT THE

19  DEFENSE ASKED SHE BE OUT-OF-TURN, AND IT'S PLAUSIBLE WHAT

20  MR. LECLAIR SAYS.

21         SO I THINK IF SHE HAD TESTIFIED IN THE NORMAL COURSE,

22  PROBABLY THE PLAINTIFF WOULD HAVE ALLOWED -- WOULD HAVE ASKED

23  FOR THIS IN THEIR OWN CASE-IN-CHIEF.

24         SO THE ANSWER IS:  I'M GOING TO ALLOW THAT.

25         **MR. KESSLER:**  YOUR HONOR, CAN I MAKE ONE MORE POINT?

1          **THE COURT:**  YES.

2          **MR. KESSLER:**  PAT ALLEN WAS HERE IN COURT SEVERAL

3   DAYS DURING THEIR CASE.  THEY CHOSE NOT TO CALL HER IN THAT

4   ORDER.

5          IN OTHER WORDS, THEY ASKED FOR HER TO COME, AND THEY

6   DIDN'T GET TO HER.  THE ONLY REASON SHE WAS OUT-OF-TURN IS

7   BECAUSE AT THE END OF THEIR CASE SHE HAD TO GO TO HER 60TH

8   BIRTHDAY PARTY.  YOUR HONOR LET HER GO.

9          BUT, AGAIN, IT WAS THEIR STRATEGIC DECISION HOW THEY

10  DID THIS WITH THE WITNESS, AND I DON'T THINK IT'S FAIR.

11         **THE COURT:**  ALL RIGHT.  OBJECTION OVERRULED.  THAT

12  WON'T BE ALLOWED.

13         WHAT'S NEXT?

14         **MR. KESSLER:**  THE SECOND ONE IS THEY DESIGNATED

15  MR. FRISS, AGAIN.  YOUR HONOR HAS BEEN THROUGH THIS BEFORE,

16  OKAY?

17         THIS WAS THE TOPPS PERSON.  YOU'VE BEEN THROUGH THAT

18  DEPOSITION.  AND THEY'RE CLAIMING THAT BECAUSE OF A QUESTION

19  THAT YOUR HONOR SUSTAINED THE OBJECTION TO FOR ROGER NOLL, WHEN

20  ROGER NOLL -- I ASKED HIM.  THEY SAID:

21              "DID YOU EVER TALK TO ANY LICENSEES?"  THEY

22  ASKED IN THEIR CROSS EXAMINATION.  OKAY.

23         AND I THEN SAID:

24              "YOU DIDN'T TALK TO THEM, BUT DID YOU READ THEIR

25  DEPOSITIONS?"

1          AND I STARTED TO ASK HIM ABOUT MR. FRISS.  THEY

2     OBJECTED AND SAID IT WASN'T IN EVIDENCE, WHICH IT WASN'T.  IT

3     WASN'T.  BUT YOUR HONOR SUSTAINED THE OBJECTION, SO THERE WAS

4     NOTHING IN IT ABOUT MR. FRISS.

5          NOW THEY WANT TO PLAY MR. FRISS'S DEPOSITION AS

6     REBUTTAL BECAUSE OF A SUSTAINED OBJECTION.  AND WE NEVER GOT

7     INTO MR. FRISS WITH RESPECT TO THAT.

8          **THE COURT:**  THIS IS VERY UNCLEAR TO ME.  TELL ME --

9     GO THROUGH THAT AGAIN.  I DIDN'T UNDERSTAND IT.

10         **MR. KESSLER:**  OKAY.  IN THEIR CROSS EXAMINATION OF

11    ROGER NOLL, THEY SAID TO MR. NOLL:

12              "DID YOU EVER INTERVIEW ANY LICENSEES?"

13         **THE COURT:**  I REMEMBER THAT, YES.

14         **MR. KESSLER:**  HE SAID:  "NO."

15         AND THEY MADE THAT A BIG POINT.

16         **THE COURT:**  ALL RIGHT.

17         **MR. KESSLER:**  ON MY REDIRECT I SAID:

18              "DID YOU EVER READ THE DEPOSITIONS OF ANY

19    LICENSEES?"

20         **THE COURT:**  YES, I REMEMBER THAT.

21         **MR. KESSLER:**  OKAY.  AND HE FIRST SPOKE ABOUT

22    MR. LINZNER, AND THAT WAS FINE.

23         AND THEN, I SAID:

24              "DID YOU READ MR. FRISS?"

25         THEY SAID:

1      "OBJECTION, NOT IN EVIDENCE."

2      OKAY?  BECAUSE NO ONE PUT IN MR. FRISS.  OKAY.

3      AND YOUR HONOR SAID:

4          "SUSTAINED."

5      SO I SAID:

6          "OKAY."

7      I MOVED ON.  IN OTHER WORDS, WE DIDN'T ASK ABOUT

8  MR. FRISS.

9          **THE COURT:**  WHY DID I SUSTAIN THAT?

10         **MR. KESSLER:**  YOU SUSTAINED IT BECAUSE YOU DIDN'T

11  THINK -- I DON'T KNOW. YOUR HONOR SUGGESTED IF IT WASN'T IN

12  EVIDENCE, I COULDN'T ASK ABOUT IT, SO I DIDN'T.

13         **THE COURT:**  NO, NO, THEY ARE TWO DIFFERENT THINGS.

14         IT WOULD HAVE BEEN OKAY FOR HIM TO SAY:  "I DIDN'T

15  READ THE GUY'S DEPOSITION."

16         BUT PROBABLY WHAT YOU DID WAS EMBELLISH IT BY SAYING:

17          "DID YOU READ MR. FRISS WHEN HE SAID A, B AND

18  C?"

19         **MR. KESSLER:**  YES, I DID, YOUR HONOR.

20         **THE COURT:**  WELL, THAT'S THE IMPROPER PART.

21         **MR. KESSLER:**  OKAY.  I'M NOT ARGUING THE OBJECTION

22  AGAIN.  YOUR HONOR SUSTAINED IT.  I ACCEPT THAT.

23         I'M SAYING THE ONLY THING MR. NOLL TESTIFIED TO IS

24  THAT I READ MR. FRISS.  THAT'S THE ONLY THING THAT CAME IN.  ON

25  THE BASIS OF THAT, THEY NOW WANT TO PUT IN THE FRISS

1  DEPOSITION, WHICH, AGAIN, I DON'T THINK THAT'S PROPER REBUTTAL

2  TO PUT IN THAT THING, JUST BECAUSE HE SAID HE READ THE

3  DEPOSITION.  THERE'S NO OTHER INFORMATION GIVEN TO THE JURY

4  ABOUT IT.

5       **THE COURT:**  WELL, IS THE PART THAT YOU WANT TO READ

6  IN LIMITED STRICTLY TO THE POINT THAT WAS BEING ASKED OF THIS

7  WITNESS?

8       **MR. LECLAIR:**  YES, YOUR HONOR.  AND, ACTUALLY, HE'S

9  TALKING ABOUT THE WRONG QUESTION.  THERE WAS A QUESTION TO

10 MR. NOLL IN WHICH HE WAS ASKED:

11          "DID YOU LOOK AT EVERYTHING, AT ANY DOCUMENT OR

12 ANY DEPOSITION IN THE CASE?  DID YOU EVER SEE ANYTHING

13 SUGGESTING THAT RETIRED PLAYERS WERE MARKETABLE AS A GROUP?"

14 OKAY?

15          AND HE SAID:

16           "NO, I DIDN'T SEE ANYTHING IN ANYTHING I EVER

17 READ."

18          OKAY?  SO WE'RE ENTITLED TO PUT IN SNIPPETS OF

19 TESTIMONY FROM MR. FRISS THAT IMPEACH WHAT MR. NOLL SAID.

20       **THE COURT:**  AND WHAT IS THAT TESTIMONY?

21       **MR. LECLAIR:**  IT'S TESTIMONY THAT HE DIDN'T KNOW

22 ABOUT THE GLA'S.  AND I'M NOT THE ONE WHO --

23       **THE COURT:**  I DON'T REMEMBER WHO HE IS.  WHO IS HE?

24       **MR. LECLAIR:**  I'M SORRY, YOUR HONOR.  HE WAS A TOPPS

25 EXECUTIVE.

1      **THE COURT:** ALL RIGHT. SO HE WOULD TESTIFY TO WHAT?

2      **MR. LECLAIR:** HE'S -- THE SNIPPET OF TESTIMONY -- AND

3 I WISH -- I'M NOT THE PERSON WHO KNOWS THE MOST ABOUT IT.

4      HE WOULD HAVE ACCEPTED THE RETIRED PLAYERS AS A

5 GROUP, IS WHAT THE TESTIMONY IS.

6      **THE COURT:** HAND IT TO DAWN SO SHE CAN HAND IT TO ME.

7      **MR. LECLAIR:** THERE YOU GO.

8      **THE COURT:** ALL RIGHT. THE QUESTION IS -- THIS IS A

9 DEPOSITION OF MR. FRISS, APRIL 4TH OF THIS YEAR:

10      **"QUESTION:** AND THE FACT IS THAT YOU HAD NO

11      IDEA THAT PLAYERS INC HAD ALREADY GOTTEN

12      RIGHTS FROM A LARGE NUMBER OF RETIRED PLAYERS

13      BECAUSE THEY DIDN'T TELL YOU THAT, DID THEY?

14      **"ANSWER:** I DON'T KNOW WHETHER THEY HAVE

15      RIGHTS, SO --"

16      AND THEN SOMEBODY INTERRUPTS THE ANSWER AND SAYS:

17      **"QUESTION:** SO, IN FACT, IF IN 2004 AND 2007

18      PLAYERS INC HAD SAID 'WE'VE ALREADY GOT ALL

19      THESE RIGHTS,' YOU WOULD HAVE BEEN HAPPY TO

20      GET THEM GRANTED IN THE LICENSE AGREEMENT,

21      WOULDN'T YOU?

22      **"ANSWER:** YES.

23      "NO FURTHER QUESTIONS."

24      SO THIS IS A THEORY THAT IF THE RETIREDS HAD BEEN

25 THROWN IN FOR FREE THEY WOULD HAVE TAKEN THEM?

1        **MR. KESSLER:**  YES.

2        **THE COURT:**  WELL, WHAT GOOD IS THAT?  ANYBODY WILL

3   TAKE ANYTHING FOR FREE.

4        **MR. LECLAIR:**  YOUR HONOR, THAT'S EXACTLY THE POINT,

5   WHICH IS THIS GOES TO OUR FIDUCIARY DUTY THEORY, YOUR HONOR,

6   WHICH IS THEY REPRESENT THE WHOLE GROUP.

7        AND THEY HAD A DUTY EITHER TO OFFER THE GROUP OR TO

8   SAY:

9        "YOU KNOW, MAYBE WE HAVE A CONFLICT OF INTEREST.

10  MAYBE WE HAVE A CONFLICT OF INTEREST HERE.  IF WE'RE NOT GOING

11  TO OFFER THE WHOLE GROUP, IF WE'RE PICKING AND CHOOSING AMONG

12  OUR GROUP, MAYBE WE OUGHT TO LET THE PEOPLE WE ARE LEAVING OUT

13  BE ON THEIR OWN."

14        THAT'S WHY IT'S RELEVANT TO OUR FIDUCIARY DUTY CLAIM,

15  YOUR HONOR.

16        **MR. KESSLER:**  AND, YOUR HONOR, I DON'T THINK --

17        **THE COURT:**  THEN, WHAT WOULD HAVE HAPPENED TO THE

18  ACTIVES?  THEN, THE ACTIVES WOULDN'T HAVE GOTTEN AS MUCH AS

19  THEY OTHERWISE WOULD HAVE.

20        **MR. LECLAIR:**  HERE'S THE POINT, YOUR HONOR.  THEY HAD

21  TWO CHOICES.  ONE WAS TO SAY:

22        "TAKE THE WHOLE GROUP.  WE REPRESENT A GROUP

23  THAT INCLUDES ACTIVES AND CERTAIN RETIREDS.  AND YOU KNOW WHAT?

24  TAKE THE WHOLE GROUP."

25        **THE COURT:**  WHAT DO YOU MEAN "CERTAIN"?  IT WOULD BE

1 THE ENTIRE CLASS.

2       **MR. LECLAIR:** THAT'S NOT ALL THE RETIREDS, IS WHAT

3 I'M SAYING.

4         "WE REPRESENT A GROUP OF RETIREDS" --

5       **THE COURT:** YOU REPRESENT ALL ACTIVES AND THOSE

6 RETIREDS WHO --

7       **MR. LECLAIR:** -- SIGNED A GLA. AND CHOICE ONE IS:

8         "WE HAVE A GROUP. WE'LL GIVE YOU THE GROUP.

9       THE OTHER CHOICE WAS:

10         "YOU KNOW WHAT? IF WE'RE GOING TO HAVE TO PICK

11 AND CHOOSE ..."

12       AND, BY THE WAY, OUR EVIDENCE WILL BE, YOUR HONOR,

13 THIS WAS ALL DONE WITH A MOTIVE TO DEPRIVE THE RETIRED PLAYERS

14 OF SHARING IN THE GROUP MONEY. AND WE HAVE EVIDENCE TO SHOW

15 THAT. BUT IF --

16       **THE COURT:** I DIDN'T HEAR THAT EVIDENCE --

17       **MR. LECLAIR:** YOUR HONOR --

18       **THE COURT:** -- IN YOUR CASE-IN-CHIEF.

19       **MR. LECLAIR:** WELL, YOUR HONOR, THAT'S GOING TO TAKE

20 A WHILE FOR ME TO ITEMIZE THAT.

21       **THE COURT:** IS THAT IN EVIDENCE NOW?

22       **MR. LECLAIR:** YES, IN EVIDENCE IN THE CASE. I CAN

23 TELL YOU EXACTLY WHAT THE EVIDENCE IS AND HOW IT FITS TOGETHER.

24 BUT WE'RE GOING TO DO THAT IN CLOSING, FOR SURE.

25       **THE COURT:** LET'S GO THROUGH IT. I MISSED IT IF IT

1    CAME IN.

2            **MR. LECLAIR:**  YOUR HONOR, OKAY.  THEY REPRESENT --

3    THEY GO OUT AND SOLICIT RETIRED PLAYERS YEAR AFTER YEAR AFTER

4    YEAR AND SAY:

5                "WE'RE GOING TO DO GROUP LICENSING."

6            BUT THE REALITY IS THERE WASN'T ANY GROUP LICENSING

7    FOR RETIRED PLAYERS.  IT WAS ENTIRELY INDIVIDUAL.

8            IF YOU LOOK AT ALL OF THEIR MATERIALS, IF YOU LOOK AT

9    ALL THEIR MARKETING MATERIALS, WHAT YOU SEE IS:  IT'S ALL ABOUT

10   YOU CAN BE A RETIRED PLAYER.  AND IF YOU CAN STAND ON YOUR OWN

11   AND SOME LICENSEE WANTS TO PICK YOU OUT, YOU CAN BE -- MAYBE

12   GET AN AD HOC PAYMENT.

13           BUT THERE WAS NEVER ANY INTENTION TO LICENSE THE

14   GROUP.  THERE'S NOT A SHRED OF EVIDENCE IN THE RECORD THAT

15   SUGGEST THEY EVEN OFFERED THE GROUP AS A WHOLE.

16           THERE IS TESTIMONY BY PAT ALLEN --

17           **THE COURT:**  MR. ALLEN TESTIFIED THAT HE DID EXACTLY

18   THAT.

19           **MR. LECLAIR:**  YOUR HONOR --

20           **THE COURT:**  YOU MAY SAY IT WAS A LIE.

21           **MR. LECLAIR:**  WELL, YOUR HONOR, I THINK HIS TESTIMONY

22   CAN BE READ DIFFERENTLY.  AND THERE MAY BE A QUESTION FOR THE

23   JURY ABOUT EXACTLY WHAT HE SAID AND WHAT HE MEANT.  AND I

24   THINK -- I THINK THAT WE'RE GOING TO HAVE EVIDENCE THAT WILL

25   SUGGEST THEY DIDN'T OFFER THE GROUP OF RETIRED PLAYERS WHO

1 SIGNED GLA'S.

2       THEY MAY HAVE SAID:

3        "WE HAVE -- WE HAVE PLAYERS AVAILABLE."  BUT

4 WHAT THEY DIDN'T DO, WE BELIEVE WE'RE ENTITLED TO ARGUE TO THE

5 JURY, THEY DIDN'T OFFER THE GROUP.

6       AND OUR POINT IS, IF YOU ASSUME FOR A MOMENT THAT

7 THEY ARE FIDUCIARIES, THEY SHOULD HAVE EITHER OFFERED THE

8 ENTIRE GROUP, OR THEY SHOULD HAVE SAID:

9       "YOU KNOW, WE MAY HAVE A CONFLICT OF INTEREST

10 HERE."

11       WE'RE KIND OF SETTING UP A SITUATION WHERE THE

12 SITUATION IS THE ACTIVE PLAYERS -- ALWAYS THE GROUP MONEY IS

13 THE ACTIVE PLAYERS.  AND THEN, THE ACTIVES GET A BUNCH OF AD

14 HOC INDIVIDUAL PAYMENTS, AND RETIRED PLAYERS GET TO ADD ON WITH

15 AD HOC INDIVIDUAL PAYMENTS.

16       BUT THAT WASN'T IN THE BEST INTEREST OF THE RETIRED

17 PLAYERS.  WHAT THEY SHOULD HAVE DONE WAS GRANTED A LICENSE

18 WHICH SAID:

19       "YOU CAN HAVE THIS GROUP OF ACTIVE PLAYERS.  YOU

20 CAN HAVE -- AND THIS GROUP OF RETIRED PLAYERS."

21       THE GROUP MONEY SHOULD HAVE BEEN SHARED.  AND

22 EVERYBODY COULD HAVE HAD AD HOCS BEYOND THAT.  THE MONEY WOULD

23 HAVE FLOWED IN EXACTLY THE SAME WAY, EXCEPT IN ONE RESPECT,

24 WHICH IS THE GROUP MONEY WOULD HAVE BEEN SHARED.  THAT'S OUR

25 THEORY.

1       AND IF THEY WEREN'T GOING TO DO THAT, YOUR HONOR, IF

2 THEY WERE NOT GOING TO SAY:

3       "WE'RE GOING TO DO IT AS A GROUP, BECAUSE WE HAVE

4 TOLD EVERYBODY GROUP LICENSING IS ESSENTIAL.  IT'S A GROUP.  DO

5 THE GROUP.  SIGN UP.  SIGN UP.  SIGN UP.  SIGN UP."

6       IF THEY AREN'T GOING TO SAY:

7       "WE'RE MARKETING THIS ENTIRE GROUP THAT WE HAVE

8 SOLICITED TOGETHER," THEY SHOULD HAVE SAID:

9       "YOU KNOW WHAT?  MAYBE WE DO HAVE A CONFLICT OF

10 INTEREST, BECAUSE, BY THE WAY, IF WE DO IT AS ALL ACTIVE IN THE

11 BIG GROUP LICENSE, WE GET TO KEEP 64 PERCENT OF IT TO FUND OUR

12 OPERATIONS."

13       IF WE THROW THE RETIREDS INTO THE GROUP, WE GOT A

14 PROBLEM, WHICH IS WHY MR. BERTHELSEN TESTIFIED:

15       "WE HAD TO KEEP THEM ENTIRELY SEPARATE."

16       BUT THAT BEING ENTIRELY SEPARATE WAS THEIR CHOICE TO

17 BENEFIT THEMSELVES AT THE EXPENSE OF THE RETIRED PLAYERS.

18     **THE COURT:**  HAS THERE BEEN ANYONE WHO -- SO LET ME

19 JUST -- THERE ARE 2,000-PLUS GLA MEMBERS.  AND HOW MANY -- HOW

20 MANY ACTIVES ARE THERE IN ANY GIVEN SEASON?

21     **MR. LECLAIR:**  2,000.

22     **THE COURT:**  SO, ROUGHLY, IT WOULD HAVE REDUCED BY

23 ONE-HALF.  WHATEVER THE ACTIVE PLAYERS GOT, THEY WOULD HAVE

24 GOTTEN HALF OF THAT.

25     **MR. PARCHER:**  NO.

1          **THE COURT:**  YEAH, THEY WOULD.

2          **MR. LECLAIR:**  YOUR HONOR, THAT'S NOT NECESSARILY

3  TRUE.

4          **THE COURT:**  WHY IS THAT NOT TRUE?

5          **MR. LECLAIR:**  BECAUSE THEY COULD -- AS WE'VE SAID,

6  THEY COULD HAVE TAKEN THE MONEY OUT OF THE 64 PERCENT.

7          **THE COURT:**  WELL, BUT WHATEVER -- IN OTHER WORDS,

8  WHETHER THE -- SO, BASICALLY, YOUR THEORY COMES DOWN TO -- THIS

9  IS GOING TO BE A HARD SELL FOR A JURY.  IT COMES DOWN TO YOU

10 SAY TO THOSE ACTIVE PLAYERS -- WHO RUN THE UNION, BY THE WAY,

11 THE ACTIVE PLAYERS ARE ON THE BOARD -- YOU SAY:

12          "YOU CAN'T HAVE A STRIKE FUND.  YOU'VE GOT TO

13 TAKE AWAY FROM YOUR STRIKE FUND AND GIVE IT TO THE RETIRED

14 PLAYERS, OR TAKE IT OUT OF YOUR OWN WHATEVER PERCENTAGE YOU'RE

15 GOING TO GET."

16          **MR. LECLAIR:**  OR, YOUR HONOR, THEY COULD HAVE SAID:

17          "YOU KNOW WHAT?  MAYBE WE HAVE A CONFLICT OF

18 INTEREST.  MAYBE WE DON'T REPRESENT THE BEST INTERESTS OF THE

19 RETIRED PLAYERS BECAUSE" --

20          **THE COURT:**  WHERE WOULD THAT HAVE LED -- THEN, UNDER

21 THE GLA, THERE WOULDN'T HAVE BEEN -- NOBODY -- NO RETIRED

22 PLAYER WOULD HAVE GOTTEN A PENNY, BECAUSE THEY WOULDN'T HAVE

23 DONE THE GLA PROGRAM AT ALL.

24          **MR. LECLAIR:**  YOUR HONOR --

25          **THE COURT:**  OF COURSE, THEY DIDN'T GET A PENNY,

1   ANYWAY.

2           **MR. KATZ:**  IF THEY DID DO IT.

3           **THE COURT:**  IF THEY DID DO IT.  THEY DID DO IT.

4           **MR. KATZ:**  THEY MADE A PROMISE.

5           **THE COURT:**  IT'S A FAIR QUESTION, I ACKNOWLEDGE THIS

6   PART.  IT'S A FAIR QUESTION WHY THEY UNDERTOOK TO DO THIS IF

7   NOT ONE PENNY OF IT EVER CAME TO FRUITION.  THAT'S A GOOD

8   QUESTION.

9           **MR. KATZ:**  THAT IS THE QUESTION.

10          **MR. LECLAIR:**  BECAUSE THEY DIDN'T WANT IT TO COME TO

11  FRUITION, YOUR HONOR.  I'M SORRY.  I INTERRUPTED YOU, YOUR

12  HONOR.  I APOLOGIZE.

13          **THE COURT:**  HERE'S THE OTHER ISSUE.  AND THIS IS JUST

14  A FACT ISSUE.  AND THAT IS, MR. KESSLER MADE A POINT THE OTHER

15  DAY, WHICH IS PROBABLY A GOOD ONE ON THE FACTS.  IT DOESN'T

16  MEAN AS A MATTER OF LAW HE WINS ANYTHING.

17          BUT WITHOUT ANY QUESTION, IF THE GRAVY TRAIN WAS MADE

18  AVAILABLE TO EVERY RETIRED PLAYER -- HOW MANY ARE THERE,

19  11,000?

20          **MR. KESSLER:**  13,000.

21          **THE COURT:**  YOU WOULD HAVE HAD 13,000 SIGN UP

22  IMMEDIATELY, BECAUSE THEY WOULD HAVE SAID:

23          "HEY, YOU KNOW, WITHOUT PUTTING IN A PENNY WE

24  GET A SHARE OF THIS GIGANTIC FUND."

25          SO EVERYONE WOULD HAVE SIGNED UP FOR THAT THING.  SO

1  PRETTY SOON, THE ACTIVES WOULD HAVE BEEN GETTING 2/15THS OF

2  WHATEVER WAS DISTRIBUTED AFTER WHATEVER -- NOW, YOU GOT A GOOD

3  TABLE FULL OF LAWYERS OVER THERE, AND YOU MIGHT BE ABLE TO SELL

4  THAT.  BUT I THINK IT'S A HARD SELL.

5         **MR. LECLAIR:**  CAN I TELL YOU THE RESPONSE TO THAT,

6  YOUR HONOR?

7         **THE COURT:**  GO AHEAD.

8         **MR. LECLAIR:**  WHO WAS IN CHARGE OF THIS PROGRAM?

9  THEY WERE.  WE DIDN'T PICK WHO THEY SOLICITED.  THEY COULD HAVE

10  DECIDED AT ANY TIME THEY DIDN'T WANT TO SHARE.  THEY DIDN'T

11  HAVE TO SOLICIT THESE PEOPLE TO SIGN UP.  THEY COULD HAVE

12  PICKED A SMALLER GROUP.

13         THEY HAD THE ENTIRE CONTROL OF THIS PROGRAM.  FOR

14  THEM TO COME IN AND SAY:

15              "WE'VE LOST CONTROL, 13,000 PEOPLE ARE GOING TO

16  COME IN," THAT'S BOGUS, YOUR HONOR.  THEY HAVE THE ENTIRE

17  CONTROL OF WHO THEY SIGN UP.

18         AND THEY CHOSE TO DO IT.  THEY JUST DIDN'T WANT TO

19  LIVE UP TO THEIR OBLIGATIONS.

20         **THE COURT:**  LET ME ASK YOU THIS.  IN HOLLYWOOD WHEN

21  SOMEBODY, AN AGENT, REPRESENTS SEVERAL STARS -- WE DON'T HAVE

22  ANY EVIDENCE OF THIS IN THE RECORD -- BUT HOW DO THEY GO ABOUT

23  RESOLVING ANY CONFLICTS?

24         LET'S SAY YOU REPRESENT THREE PEOPLE, ALL OF WHOM

25  WOULD BE EXCELLENT FOR THE PART.

1      **MR. LECLAIR:** THEY HAVE A LOT OF PROBLEMS, YOUR

2  HONOR. THAT'S THE VERY PROBLEM THEY HAVE. THEY HAVE FIDUCIARY

3  DUTIES AND BIG PROBLEMS, AND THEY GET SUED SOMETIMES FOR THAT

4  VERY REASON.

5      **MR. KESSLER:** AND THEY ALWAYS WIN, YOUR HONOR. IT'S

6  VERY SIMPLE. IT'S VERY SIMPLE.

7      **THE COURT:** WHAT'S THE SIMPLE ANSWER?

8      **MR. KESSLER:** THE SIMPLE ANSWER IS DISCLOSURE, WHICH

9  IS THAT RETIREDS KNOW THAT THEY ALSO REPRESENT ACTIVES.

10 ACTIVES KNOW WE'RE DOING RETIREDS. RETIREDS KNOW THE ACTIVE

11 PLAYERS HAVE THE VOTE AND CONTROL OF THE UNION.

12      IN OTHER WORDS, THE SAME THING FOR THE AGENTS.

13      WHEN YOU'RE A HOLLYWOOD AGENT, YOU KNOW YOU'RE

14 REPRESENTING MULTIPLE STARS. HAPPENS IN SPORTS, TOO. AND

15 EVERYONE IS COMFORTABLE WITH THAT, THAT THE INTERESTS -- AS MR.

16 ARMSTRONG TESTIFIED, THE INTERESTS OF THE RETIREDS AND ACTIVES

17 ARE ALIGNED, NOT IN CONFLICT.

18      AND WHAT THEY'RE REALLY SUGGESTING IS THAT WE

19 SHOULDN'T HAVE TRIED TO HELP THE RETIRED PLAYERS AT ALL.

20      WE'RE VERY COMFORTABLE HAVING THAT DEBATE BEFORE THE

21 JURY.

22      **MR. PARCHER:** IF YOUR HONOR PLEASES, ONE OF THE

23 PROBLEMS THAT I'M HAVING -- NOT THAT YOUR HONOR HAS MADE UP

24 YOUR MIND ABOUT ANYTHING. I DON'T THINK THAT, SO DON'T

25 MISUNDERSTAND ME. I THINK YOU HAVE TO GO BACK TO THE VERY

1 BEGINNING AND THE PREMISE OF WHETHER THEY WERE ACTUALLY TRYING

2 TO HELP RETIRED PLAYERS OR NOT.

3      AT THE BEGINNING OF THIS VENTURE, THE UNION MADE A

4 DECISION WHICH WAS QUITE UNUSUAL, AND THAT IS TO GO INTO THE

5 LICENSING AGENCY BUSINESS ON THEIR OWN. NOT TO FARM IT OUT TO

6 ANYONE IN WHAT YOU CALL "HOLLYWOOD AGENCIES." I WILL TELL YOU

7 THERE ARE A FEW OF THEM IN NEW YORK, TOO, BECAUSE I REPRESENT

8 SOME OF THEM.

9      AND AT THAT MOMENT IN TIME THEY HAD NO EXPERIENCE IN

10 THAT FIELD. THEY HAD NO CREDIBILITY IN THAT FIELD. AND THEY

11 WERE ABOUT TO STEP INTO A VERY LUCRATIVE, POTENTIALLY LUCRATIVE

12 SITUATION: THE REPRESENTATION OF FOOTBALL PLAYERS.

13      AND THEY NEEDED TO DO SEVERAL THINGS:

14      ONE, GAIN CREDIBILITY IN THE MARKETPLACE.

15      TWO, STAVE OFF COMPETITION SO THE PEOPLE WHO WERE

16 INTERESTED IN GETTING A LICENSE FOR THEIR BRAND WOULD COME TO

17 THEM AS A ONE-STOP SHOP.

18      WHEN THEY STARTED OFF, WHAT THEY DID WAS THEY

19 SOLICITED AS MANY ATHLETES, FOOTBALL PLAYERS, AS THEY POSSIBLY

20 COULD. AND IT WAS DESPERATELY IMPORTANT TO THEM TO GET WHAT

21 THE ECONOMISTS -- AND I DON'T GIVE A FIG ABOUT THE ECONOMISTS,

22 TO BE BLUNT -- WHAT THE ECONOMISTS CALL "A CRITICAL MASS."

23      WHAT THEY NEEDED TO DO WAS GET CREDIBILITY TO, RIGHT

24 FROM THE BEGINNING, GET A HOME RUN WITH THE BASES LOADED, AND

25 ANNOUNCE TO THE WORLD THEY HAD 5,000 OR 4000 WHATEVER THE

1  NUMBER WAS, PLAYERS.

2  "AND IF YOU EVER WANTED A FOOTBALL PLAYER FOR

3  YOUR BRAND, OR YOU EVER WANTED A GROUP OF FOOTBALL PLAYERS FOR

4  YOUR BRAND, COME TO US.  DON'T GO TO CAA, TRACE ARMSTRONG'S

5  COMPANY, OR ANY ONE OF THE POWERFUL COMPANIES.  YOU'VE GOT TO

6  COME TO US."

7  AND FOR THAT THEY SOLICITED RETIRED FOOTBALL PLAYERS,

8  MEN WHO WERE NOT BANDED INTO A GROUP, INDIVIDUAL MEN WHO,

9  EXCEPT FOR THE STARS, HAD SEEN THEIR DAYS PASS.  AND THEY

10  SOLICITED THEM VORACIOUSLY.  IT WAS AS IF SIGNING WITH THE

11  NFLPA WAS THEIR PATRIOTIC DUTY.

12  AND THE RESULT OF THESE MEN SIGNING -- AS A RESULT OF

13  THESE MEN SIGNING, THEY GOT WHAT THEY WERE FIGHTING FOR, WHICH

14  IS THEY BECAME A ONE-STOP SHOP.

15  AND WHAT THE MEN GAVE THEM, ALL OF THESE MEN WHO

16  INDIVIDUALLY -- MR. KESSLER, WHO'S A VERY FINE LAWYER CALLS

17  "WORTHLESS," WHAT THEY WERE -- WHAT THEY WERE GIVEN WAS THE

18  COLLECTIVE IDENTITY OF ALL 2100 OF THESE PERSONS IN THE CLASS,

19  WHO WERE THE ONLY ONES WHO CHOSE TO SIGN.  AND AS A RESULT OF

20  THAT, THEY GOT THEMSELVES IN THE POSITION WHERE THEY BROUGHT IN

21  HUNDREDS OF MILLIONS OF DOLLARS.

22  THIS GLA -- AND I DIDN'T GO TO THE HARVARD LAW

23  SCHOOL.  I WENT TO ST. JOHN'S LAW SCHOOL AND DROVE A PEPSI-COLA

24  TRUCK TO GET THROUGH IT.

25  BUT THIS GLA IS VERY CLEAR.  THERE'S NO AMBIGUITY IN

1 IT WHATSOEVER.

2      AND THE INVENTION OF MR. ALLEN THAT RETIREDS OR

3 ACTIVES DON'T MEAN "RETIRED" OR "ACTIVES," THEY MEAN 2,062

4 RETIREDS, AND "ELIGIBLE" DOESN'T MEAN "ELIGIBLE," AND ALL OF

5 THAT, IS NOT, IN MY OPINION, WITH ANY LUCK AT ALL, GOING TO BE

6 BOUGHT BY THIS JURY WHO'S GOING TO BRING THEIR COMMON SENSE TO

7 IT.

8      AND I WOULD URGE YOUR HONOR TO UNDERSTAND THAT FROM

9 THE BEGINNING WHAT MR. KESSLER, WHO IS A VERY ABLE LAWYER, HAS

10 DONE IS CREATE AN ARTIFICIAL CONSTRUCT HERE, WHICH IS THAT

11 THESE RETIRED PLAYERS GAVE NOTHING.  IT COST THEM NOTHING.

12      GUESS WHAT?  IT DIDN'T COST THE UNION ANYTHING BUT A

13 POSTAGE STAMP TO GET 2100 GUYS TO SIGN AND GET THEMSELVES IN A

14 POSITION WHERE THEY COULD RUN THE FOOTBALL WORLD.

15      **MR. KESSLER:**  AND, YOUR HONOR --

16      **MR. PARCHER:**  AND FROM THAT STEMS OBLIGATIONS UNDER

17 THE CONTRACT, FIDUCIARY OBLIGATIONS.  AND THESE UNION PEOPLE,

18 UNDER THE GUISE OF HELPING THEM -- FOR GOD'S SAKE, LEAVING

19 ANTITRUST ASIDE FOR A MINUTE, HERE YOU GET A MADDEN GAME WITH

20 147 VINTAGE TEAMS.  AND YOU THINK YOU'D SAY TO YOURSELF:

21      "OH, MY GOD.  FINALLY, WE'VE GOT A SHOT.

22 FINALLY, WE'VE GOT A SHOT TO MARKET THESE GUYS."

23      AND INSTEAD, LASHUN -- I FORGOT HER LAST NAME --

24 SENDS THAT KIND OF LETTER WHICH SAYS:

25      "DON'T YOU DO THAT."

1              IT'S DISGRACEFUL.  IT'S DISGRACEFUL.

2              YOU GET A BEAUTIFUL YOUNG MAN LIKE TRACE ARMSTRONG,

3   AND GET THEM REPRESENTING THESE 2100 PLAYERS, THERE WILL BE

4   PLENTY OF A MARKET FOR THEM.

5              THE IDEA THAT YOU CAN'T MARKET THESE FELLOWS IF YOU

6   REALLY TRY, AND THAT THESE FELLOWS CAN'T ATTRACT SOME OF THEIR

7   AD HOCS WHO PLAYED BALL WITH THEM TO GO TO ANOTHER AGENCY OR

8   SOME OF THE ACTORS TO REBEL IF THEY ONLY UNDERSTOOD WHAT

9   HAPPENED, JUST ISN'T FAIR, AND IT ISN'T RIGHT.

10             IN SOME WAY, WE NEED TO ARGUE THAT TO THE JURY.  AND

11  I DON'T THINK IT'S A THEORY.  I THINK IT'S A FACT.

12             THANKS FOR LISTENING TO ME.

13         **THE COURT:**  ALL RIGHT.  THE COURT IS GOING TO RULE

14  NOW ON THE IMMEDIATE MOTION, WHICH IS MR. FRISS.

15             THE COURT WILL ALLOW THE FIRST QUESTION, BUT NOT THE

16  SECOND.

17         **MR. KESSLER:**  YOUR HONOR --

18         **THE COURT:**  THE QUESTION --

19         **MR. KESSLER:**  I'M SORRY.

20         **THE COURT:**  MR. KESSLER, I'M GOING TO MAKE A RULING

21  NOW.

22         **MR. KESSLER:**  OKAY.

23         **THE COURT:**  PAGE 77, LINE 2 THROUGH 7 CAN BE READ.

24             THE COURT IS GOING TO FIND THAT THAT'S SUFFICIENT

25  REBUTTAL -- I MEAN, THAT IS REBUTTAL TO MR. NOLL.  BUT THE

1  QUESTION 8 THROUGH LINES 14 WHICH READS:

2        "SO, IN FACT, IF IN 2004 AND 2007 PLAYERS INC

3        HAD SAID, 'WE'VE ALREADY GOT ALL THESE

4        RIGHTS,' YOU WOULD HAVE BEEN HAPPY TO GET

5        THEM GRANTED IN THE LICENSE AGREEMENT,

6        WOULDN'T YOU?

7        **"MR. GREENSPAN:** OBJECTION. FORM.

8        **"ANSWER:** YES."

9        ALL RIGHT. THERE ARE TWO OF THEM.

10        THE OBJECTION TO FORM IS SUSTAINED. THE QUESTION

11 IS -- THE QUESTION IS HYPOTHETICAL, CALLS FOR SPECULATION AND

12 IS A LEADING QUESTION.

13        MR. LECLAIR ASKED -- MR. LECLAIR IS THE PROPONENT OF

14 THE WITNESS. NOT ONLY DID HE TAKE THE DEPOSITION AND STARTED

15 IT OFF, BUT, IN ADDITION, HE IS A PROPONENT OF THE TESTIMONY

16 HERE AT TRIAL. SO THAT'S A LEADING QUESTION. IT SHOULD NOT

17 HAVE BEEN ASKED IN THAT FORM.

18        SO THE FIRST -- THE FIRST -- THE ANSWER:

19        "I STILL DON'T KNOW WHETHER THEY HAD RIGHTS

20        SO" -- AND THE ANSWER GOT CUT OFF, THAT PART

21        CAN BE READ, BUT NOT THE SECOND PART.

22        **MR. KESSLER:** I'M SORRY, YOUR HONOR. I DIDN'T MEAN

23 TO INTERRUPT YOU. MY QUESTION IS: WE HAVE OTHER DESIGNATIONS

24 WHERE THERE ARE OBJECTIONS AND THINGS --

25        **THE COURT:** I THOUGHT THIS WAS THE ONLY ONE.

1          **MR. KESSLER:**  NO, THAT'S THEIR'S.  WE'VE ACTUALLY

2    COUNTER-DESIGNATED.

3          **THE COURT:**  YOU WANT TO HAVE COUNTER-DESIGNATIONS TO

4    THIS ONE POINT?

5          **MR. KESSLER:**  IF THEY ARE GOING TO ASK THAT, THERE IS

6    SOME MATERIAL THAT WE BELIEVE --

7          **THE COURT:**  YOU BETTER HURRY UP, AND GET IT TO ME.

8          **MR. LECLAIR:**  IT'S RIGHT HERE, YOUR HONOR.

9          **MR. KESSLER:**  THEY HAVE IT, YOUR HONOR.  THAT'S --

10         **MR. LECLAIR:**  AND WE REJECT IT.  MOST OF IT IS WAY

11   BEYOND THE SCOPE.

12         **THE COURT:**  I WILL DO MY BEST TO GET -- THE GREEN

13   TAGS ARE WHAT?  GREEN TAGS ARE THE ONES --

14         **MR. KESSLER:**  IT WAS PREPARED BY PLAINTIFFS, YOUR

15   HONOR.

16         **MR. LECLAIR:**  THOSE ARE OUR OBJECTIONS, YOUR HONOR,

17   TO THEIR DESIGNATIONS.

18         **THE COURT:**  ALL RIGHT.  I'LL LOOK AT IT WHEN I CAN.

19         OKAY.  WHAT'S NEXT?

20         **MR. KESSLER:**  THAT'S IT, YOUR HONOR.  THIS GETS A

21   QUESTION WHICH CAN BE ANSWERED ANYTIME.

22         I LOOKED AT YOUR HONOR'S INSTRUCTIONS, AND IT

23   INDICATED TO THE JURY THAT YOU'D LIKE COUNSEL TO BE IN THE

24   COURT WHILE THEY'RE DELIBERATING?

25         IS THAT YOUR HONOR'S POLICY.

1          **THE COURT:**  YOU'VE GOT TO BE VERY -- YOU'VE GOT TO BE

2  IN THE BUILDING.  WHAT IF THEY HAVE A QUESTION?

3          **MR. KESSLER:**  I JUST WANT TO KNOW.

4          **THE COURT:**  THE ANSWER IS:  YOU'VE GOT TO BE IN THE

5  COURTHOUSE SOMEWHERE AND BE HERE WITHIN TWO MINUTES IF THEY

6  HAVE A QUESTION.

7          **MR. KESSLER:**  I JUST WANTED TO KNOW WHAT YOUR HONOR'S

8  PREFERENCE IS.

9          **THE COURT:**  YOU CAN'T BE DOWN AT THE LOCAL BAR.

10          **MR. KESSLER:**  NOT THE BAR.  I GUESS IN OTHER CASES

11  I'VE BEEN IN OUR OFFICE TEN MINUTES AWAY, IF THAT'S ALL RIGHT.

12          **THE COURT:**  NO.  TEN MINUTES IS A WASTE OF TIME.

13          **MR. KESSLER:**  OKAY.

14          **THE COURT:**  THE JURY WILL LIKELY HAVE QUESTIONS, AND

15  WE WANT TO BE ABLE TO RESPOND QUICKLY TO THEM.  SO WHAT I DO IS

16  AS SOON AS THE QUESTION COMES OUT, DAWN CALLS YOU.  YOU GET

17  HERE.  LOOK AT THE QUESTION AND DECIDE HOW TO ANSWER IT.

18          **MR. KESSLER:**  OKAY.  WE WILL DO WHATEVER YOUR HONOR

19  WANTS, OF COURSE.

20          **THE COURT:**  ANYTHING MORE BEFORE WE GET STARTED?

21  OKAY.  LETS IT'S BRING IN OUR JURY.

22          **THE CLERK:**  OKAY.

23          **THE COURT:**  BRING IN THE WITNESS.

24          READY?

25          (THEREUPON, THE JURY RETURNED TO THE COURTROOM.)

1          **THE COURT:**  WELCOME BACK.

2          ALL RIGHT.  WELCOME BACK.  WE HAD AN EXCITING

3    ELECTION DAY YESTERDAY.  AND THANK YOU FOR BEING BACK AND ON

4    TIME.

5          SO NOW THE COUNTRY HAS TAKEN PART OF ARTICLE I OF THE

6    CONSTITUTION, AND ARTICLE II, WHICH IS THE EXECUTIVE AND THE

7    LEGISLATIVE BRANCHES.

8          BUT NOW WE ARE BACK TO ARTICLE III, WHICH IS THE

9    COURT SYSTEM.  AND I WANT TO THANK YOU.  YOU'RE THE BACKBONE --

10   THE JURY IS THE BACKBONE OF ARTICLE III, IN MY OPINION.

11         EVERYONE OVER THERE IS DOING A GREAT JOB PAYING

12   ATTENTION.  SO KEEP UP THE GOOD WORK.

13         ALL RIGHT.  MR. KESSLER, WHERE ARE WE?

14         **MR. KESSLER:**  WE'RE ON REDIRECT EXAMINATION, YOUR

15   HONOR.

16         **THE COURT:**  ALL RIGHT.  I THINK THAT'S WHAT I

17   REMEMBER, TOO.

18         SO YOU WILL REMEMBER THAT MR. NOLL HAD BEEN EXAMINED

19   ON DIRECT AND CROSS, AND NOW WE'RE BACK TO THE REDIRECT.

20         OKAY.  GO RIGHT AHEAD.

21         **MR. KESSLER:**  THANK YOU, YOUR HONOR.

22                        **ROGER NOLL**,

23   CALLED AS A WITNESS FOR THE DEFENDANTS HEREIN, HAVING BEEN

24   PREVIOUSLY DULY SWORN, WAS EXAMINED AND TESTIFIED FURTHER AS

25   FOLLOWS:

1        **REDIRECT EXAMINATION RESUMED**

2   BY MR. KESSLER:

3   Q.   GOOD MORNING, PROFESSOR NOLL.

4   A.   GOOD MORNING.

5            MR. KESSLER:   GOOD MORNING, LADIES AND GENTLEMEN.

6   BY MR. KESSLER:

7   Q.   PROFESSOR NOLL, YESTERDAY YOU WERE QUESTIONED BY COUNSEL

8   ABOUT THE EA MADDEN GAME.  YOU RECALL THAT LINE OF QUESTIONING?

9   A.   YES.

10  Q.   OKAY.  AND YOU WERE QUESTIONED ABOUT EVIDENCE THAT YOU'VE

11  LOOKED AT CONCERNING PLAYERS INC'S NEGOTIATIONS AND DISCUSSIONS

12  WITH EA.

13           DO YOU RECALL BEING ASKED ABOUT THAT?

14  A.   YES.

15  Q.   OKAY.  PROFESSOR NOLL, DID YOU SEE ANY EVIDENCE IN YOUR

16  REVIEW OF THE RECORD THAT EA WAS WILLING TO PAY ANY MONEY AT

17  ALL FOR THE ENTIRE GROUP OF RETIRED PLAYERS WHO SIGNED GLA'S,

18  THE WHOLE GROUP AS A WHOLE?

19  A.   I SAW NO SUCH EVIDENCE.  IN PARTICULAR, I SAW WITHIN THE

20  CONTRACTS FOR ALL THE LICENSEES, INCLUDING EA, NO EVIDENCE THAT

21  ANYBODY ACTUALLY LICENSED EVEN ENTIRE TEAMS OF RETIRED PLAYERS.

22  Q.   NOW, DID YOU SEE EVIDENCE THAT OCCASIONALLY EA WAS

23  INTERESTED IN SPECIFIC RETIRED PLAYERS?

24  A.   WELL, THE DEPOSITION TESTIMONY FROM EA SAID THAT THEY

25  ACTUALLY DECIDED IN THEIR OWN GAME DEVELOPMENT DEPARTMENT WHICH

1  PLAYERS THEY WANTED.

2  **Q.**   NOW, HAVE YOU ALSO EXAMINED WHETHER OR NOT MOST OF THE

3  STAR RETIRED PLAYERS SIGNED RETIRED PLAYER GLA'S OR NOT?

4  **A.**   YES, I OBSERVED THAT ALMOST NONE OF THE TOP STARS SIGNED

5  GLA'S.

6  **Q.**   NOW, AS AN ECONOMIST, BASED ON WHAT YOU OBSERVED, THAT

7  MOST OF THE STAR RETIRED PLAYERS DO NOT SIGN GLA'S; THAT

8  THERE'S NO EVIDENCE EA WAS WILLING TO PAY FOR THE ENTIRE GROUP,

9  BUT WAS WILLING TO PAY FOR CERTAIN RETIRED PLAYERS, WHAT

10 CONCLUSIONS DO YOU DRAW ABOUT THAT AS AN ECONOMIST?

11 **A.**   THE CONCLUSION I DRAW FROM THAT FACT, COMBINED WITH THE

12 FACT THAT ONLY 2,000 OF THE 13,000 RETIRED PLAYERS ACTUALLY

13 SIGNED GLA'S, IS THAT THIS GOAL OF CREATING A ONE-STOP SHOPPING

14 PLACE FOR RETIRED PLAYERS AND ACHIEVING THESE ECONOMIES OF

15 SCALE BY HAVING THE COMPLETE PACKAGE WERE NEVER ACHIEVED.

16         AND CONSEQUENTLY IT TELLS ME TWO THINGS:  THERE'S

17 REALLY NO MARKET FOR THE PACKAGE AS A PACKAGE BECAUSE YOU

18 COULDN'T EVEN CONSTRUCT AN ENTIRE TEAM OUT OF IT IF YOU WANTED

19 TO; AND, SECONDLY, THE BASIS FOR THAT IS, IN PART, THAT FOR A

20 VERY LARGE NUMBER OF PEOPLE WHO SIGNED GLA'S THERE'S SIMPLY NO

21 MARKET DEMAND FOR THE USE OF THEIR IMAGE.

22 **Q.**   AND IF THERE'S NO MARKET DEMAND FOR THE USE OF YOUR IMAGE,

23 AS AN ECONOMIST WHAT DOES THAT MEAN THE ECONOMIC VALUE IS FOR

24 THE USE OF THE IMAGE?

25 **A.**   ZERO.  IT MEANS THAT IF YOU ATTEMPT TO SELL IT YOU'LL

1  GENERATE NO REVENUE.

2  **Q.**   NOW, PROFESSOR NOLL, YOU ALSO GOT ASKED SPECIFICALLY ABOUT

3  THE SCRAMBLING ISSUE IN EA?

4  **A.**   YES.

5  **Q.**   OKAY.  AS AN ECONOMIST, THE FACT THAT EA WAS NOT WILLING

6  TO PAY FOR THE NAMES AND IMAGES, BUT SHOWED NO NAMES AND NO

7  PICTURES, DOES THAT TELL YOU ANY -- DID YOU DRAW ANY

8  CONCLUSIONS FROM THAT AS AN ECONOMIST?

9  **A.**   WELL, THE CONCLUSION I DRAW IS THAT GOING TO THE NEXT STEP

10  AND SHOWING THE ACTUAL PICTURES OF THE PLAYERS AND PUTTING THE

11  NAMES ON THE JERSEYS AND ADVERTISING THEM AS SPECIFIC PLAYERS

12  HAS SO LITTLE INCREMENTAL VALUE THAT IT'S NOT EVEN WORTH SORT

13  OF THE TRIVIAL AVERAGE LICENSE FEE THAT MOST OF THE GLA PEOPLE

14  RECEIVED.

15          I MEAN, IF YOU LOOK -- REMEMBER THAT TABLE I

16  PRESENTED, THE VAST MAJORITY OF THEM WOULD HAVE BEEN BETTER OFF

17  AT $25 OR SOMETHING LIKE THAT.  AND NOT EVEN THAT AMOUNT IS

18  WORTH IT.

19          IF IT WOULD HAVE BEEN WORTH IT, EA WOULD HAVE SAID:

20              "GET US THE WHOLE TEAM.  WE'LL TAKE 25 BUCKS A

21  POP."

22  **Q.**   NOW, YOU ALSO GOT ASKED SOME QUESTIONS ABOUT WHETHER THE

23  AGREEMENTS BETWEEN PLAYERS INC AND THE NFLPA WOULD BE ARM'S

24  LENGTH FROM AN ECONOMIC STANDPOINT.

25          DO YOU RECALL THAT?

1   **A.**   YES.

2   **Q.**   AND I THINK YOU TESTIFIED THAT ANYTIME A COMPANY DEALS

3   WITH ITS MAJORITY-OWNED SUBSIDARY AS AN ECONOMIST YOU WOULD

4   SAY IT'S NOT ARM'S LENGTH, CORRECT?

5   **A.**   THAT'S CORRECT.

6   **Q.**   TELL THE JURY, DOES THE FACT THAT IT'S NOT ARM'S LENGTHS

7   HAVE ANY IMPACT AT ALL AS TO WHETHER OR NOT THE TERMS OF THE

8   AGREEMENT ARE ECONOMICALLY REASONABLE OR NOT?

9   **A.**   NO.  IT JUST MEANS THAT THE ONLY THING THAT HAPPENS WHEN

10  YOU HAVE A TRANSACTION LIKE THAT IS THAT YOU GO TO EXTERNAL

11  PIECES OF EVIDENCE TO DETERMINE REASONABLENESS.  IT DOESN'T

12  MEAN THAT IN PRINCIPLE IT'S NOT REASONABLE.

13  **Q.**   NOW, DR. RASCHER DID AN ANALYSIS OF THE AGREEMENTS IN

14  TERMS OF HOW IT DIVIDED THE MONEY, 23 PERCENT, 40 PERCENT,

15  37 PERCENT, CORRECT?

16  **A.**   CORRECT.

17  **Q.**   WHAT WAS YOUR OPINION OF DR. RASCHER'S ANALYSIS?  DID HE

18  DEMONSTRATE THAT THE DIVISION OF MONIES WAS UNREASONABLE?

19  **A.**   NO.

20          **MR. HUMMEL:**  OBJECTION, LEADING.

21          **THE WITNESS:**  HE DID NOT DEMONSTRATE THAT IT WAS

22  UNREASONABLE.

23          **THE COURT:**  IT IS -- BE MINDFUL.  OVERRULED, BUT

24  THAT'S TENDING TOWARD A LEADING QUESTION.

25          **MR. KESSLER:**  I'LL BE CAREFUL, YOUR HONOR.

1          **THE COURT:**  SO YOU SHOULD BE AWARE WHEN YOU GET ON TO

2    SOMETHING THAT REALLY IS IN CONTROVERSY, TRY NOT TO LEAD.

3    **BY MR. KESSLER:**

4    Q.   HAVE YOU STUDIED -- I BELIEVE YOU TESTIFIED IN YOUR DIRECT

5    THAT YOU DID STUDY --

6          **MR. KESSLER:**  THIS IS JUST PRELIMINARY, YOUR HONOR.

7    **BY MR. KESSLER:**

8    Q.   -- AS TO WHETHER OR NOT THE PERCENTAGE OF REVENUES

9    RETAINED FROM PLAYER LICENSING BY NFLPA AND PI, WHETHER OR NOT

10   IT WAS ECONOMICALLY REASONABLE.  DID YOU STUDY THAT?

11   A.   YES.  I DID STUDY IT, YES.

12   Q.   AND WHAT DID YOU CONCLUDE?

13   A.   AS I TESTIFIED IN DIRECT THAT THERE'S NO SUBSTANTIAL

14   DIFFERENCE IN A STATISTICAL SENSE.

15          IF WE WERE GOING TO DO A TEST OF STATISTICAL

16   SIGNIFICANCE, WE WOULDN'T FIND THAT THE BEHAVIORS OF THE THREE

17   MAJOR PLAYERS ASSOCIATIONS IN PROFESSIONAL SPORTS WERE ANY

18   DIFFERENT.

19          **MR. KESSLER:**  LET'S TAKE A LOOK AT TRIAL EXHIBIT

20   2399, IF WE CAN, ALREADY IN EVIDENCE.

21   **BY MR. KESSLER:**

22   Q.   YOU SHOULD HAVE IT IN FRONT OF YOU, PROFESSOR NOLL.

23   A.   WHICH ONE?

24   Q.   2399.  IT'S ONE OF YOUR EXHIBITS.

25          **MR. KESSLER:**  SEEMS LIKE WE'VE HAVING A TECHNICAL

1    PROBLEM.  WE'LL USE THE ELMO.

2              THANK YOU.

3              COULD YOU ZOOM OUT A LITTLE BIT SO THEY COULD SEE THE

4    WHOLE THING, JASON?

5              THE OTHER WAY.  THAT'S IT.  GREAT.  THAT'S FINE.

6    OKAY.

7              (DOCUMENT DISPLAYED.)

8    **BY MR. KESSLER:**

9    **Q.**   AND PROFESSOR NOLL, JUST REMIND THE JURY, IS THIS AN

10   EXHIBIT THAT YOU HAD PREPARED AT YOUR DIRECTION?

11   **A.**   YES.  THIS ACTUALLY IS FROM -- YEAH, I DID HAVE THIS

12   PREPARED FROM THE DATA THAT'S AVAILABLE IN BOTH MY REPORT AND

13   DR. RASCHER'S REPORT.

14   **Q.**   OKAY.  AND WHAT THIS EXHIBIT SHOWED WAS THAT IN 2003,

15   2004, 2005, 2006, 2007, EVERY YEAR YOU CALCULATED, DID THE

16   PLAYERS RECEIVE MORE OR LESS THAN 60 PERCENT IN EVERY SINGLE

17   YEAR, THE PLAYERS, OF ALL THE LICENSING REVENUES?

18   **A.**   THEY ALWAYS RECEIVED MORE THAN 60, YES.

19   **Q.**   OKAY.  AND DID YOU REACH ANY JUDGMENT, BASED ON COMPARING

20   TO THE MAJOR LEAGUE BASEBALL PLAYERS ASSOCIATION, WHETHER THIS

21   PERCENTAGE OF REVENUE KEPT WAS REASONABLE OR NOT?

22   **A.**   YES, I BELIEVE THAT IT IS REASONABLE.  I WOULD ALSO ADD

23   THAT I DO NOT BELIEVE THE FACT THAT THE MAJOR LEAGUE BASEBALL

24   PLAYERS ASSOCIATION IN MOST OF THESE YEARS PAID OUT LESS MEANS

25   THEY WERE UNREASONABLE.

1          I THINK THEY BOTH BEHAVED REASONABLY GIVEN THE

2   CIRCUMSTANCES THEY WERE IN.

3   Q.   EXPLAIN TO THE JURY WHY THERE WOULD BE DIFFERENCES IN

4   BEHAVIOR EACH YEAR BY A SPORTS UNION AS TO HOW MUCH MONEY IT

5   KEPT IN LICENSING REVENUES.

6   A.   THE FIRST REASON WOULD BE:  WHAT'S THE MAGNITUDE OF THE

7   LICENSING REVENUE RELATIVE TO THE COST OF RUNNING A UNION?

8          AND THE SECOND WOULD BE THE COLLECT BARGAINING

9   CIRCUMSTANCES.  ARE YOU FACING THE POSSIBILITY OF A STRIKE OR A

10  LOCKOUT, WITH THE EXPENSES ASSOCIATED WITH THAT OR NOT?

11         AND, ACTUALLY, THAT SECOND FACTOR IS BY FAR THE MOST

12  IMPORTANT IN TERMS OF DETERMINING HOW UNIONS DEAL WITH THEIR

13  LICENSING REVENUES.

14  Q.   AND, IN FACT, IF YOU LOOK AT YOUR DATA YOU'LL SEE THAT

15  STARTING IN 2006, THE PERCENTAGE KEPT BY THE PLAYERS, AS

16  OPPOSED TO GIVING THE UNION, DECREASES A LITTLE BIT COMPARED TO

17  THE EARLIER YEARS.

18         DO YOU KNOW, BASED ON YOUR STUDY OF THIS INDUSTRY,

19  WHAT MIGHT HAVE HAPPENED BETWEEN 2006 GOING FORWARD, IN TERMS

20  OF THE LABOR SITUATION IN THE NFL?

21         **MR. HUMMEL:**  OBJECTION.  BEYOND THE SCOPE.  AND THAT

22  OPINION IS NOWHERE DISCLOSED IN HIS EXPERT REPORT.

23         **THE COURT:**  WELL, IS THIS -- THE ONLY IMMEDIATE ISSUE

24  IS WHETHER OR NOT IT'S WITHIN THE SCOPE OF THE DIRECT AND CROSS

25  EXAMINATION.

1          WHY IS THIS WITHIN THE SCOPE?

2          **MR. KESSLER:**  THERE WAS A SUGGESTION BY COUNSEL THAT

3    BECAUSE THEY WERE NOT ARM'S LENGTH, BECAUSE ONE OWNS THE OTHER,

4    THAT THE REASONABLENESS OF THESE FIGURES COULD BE CALLED INTO

5    QUESTION MERELY BECAUSE THEY'RE NOT ARM'S LENGTH IN AN ECONOMIC

6    SENSE.

7          AND I'M HAVING THE WITNESS ACTUALLY GO TO THE REAL

8    ISSUE AS TO WHETHER OR NOT ARM'S LENGTH AFFECTS THIS ISSUE.

9    AND THAT'S WHAT I'M GOING TO COME BACK TO ON THIS, YOUR HONOR.

10         **MR. HUMMEL:**  YOUR HONOR, HE ALSO TESTIFIED ON MY

11   CROSS EXAMINATION THAT HE WAS NOT OFFERING ANY OPINION ONE WAY

12   OR THE OTHER ABOUT THE REASONABLENESS OF THE AMOUNTS THAT WERE

13   RETAINED BY THE UNION.

14         SO THIS IS AN ATTEMPT TO GET AN ANALYSIS THAT HE

15   EXPRESSLY DISCLAIMED ON CROSS EXAMINATION AND IN THE

16   DEPOSITION.

17         **MR. KESSLER:**  AND I DISAGREE WITH THAT, YOUR HONOR.

18   I DO NOT BELIEVE THAT WAS THE TESTIMONY.

19         **THE COURT:**  HOW LONG IS THIS GOING TO BE?

20         **MR. KESSLER:**  TWO MORE MINUTES.

21         **THE COURT:**  ALL RIGHT.  THE OBJECTION IS OVERRULED.

22         **MR. KESSLER:**  THANK YOU.

23   **BY MR. KESSLER:**

24   Q.   DO YOU HAVE KNOWLEDGE AS TO WHAT HAPPENED IN FOOTBALL IN

25   THE LABOR SITUATION IN THE LATER YEARS?

**A.**   YES.  I MEAN, IN 2006, THE OWNERS DECLARED THEY WERE GOING

TO TERMINATE THE COLLECTIVE BARGAINING AGREEMENT AS PER ITS

PROVISIONS FOR CANCELLATION AND EARLY TERMINATION.  SO THE

NFLPA IS BUILDING UP A STRIKE FUND.

**Q.**   IN THAT REGARD, TO CLOSE THIS LINE, DOES WHETHER OR NOT

YOU'RE ARM'S LENGTH HAVE ANYTHING TO DO WITH WHETHER OR NOT THE

AMOUNTS RETAINED ARE REASONABLE OR NOT FROM AN ECONOMIC

STANDPOINT?

**A.**   NO.  THE -- THE POINT IS, AS I SAID BEFORE, THE UNION IS

THE PLAYERS.  THE PLAYERS DECIDE HOW TO ALLOCATE THEIR

LICENSING REVENUE BETWEEN BUILDING UP A STRIKE FUND AND PAYING

IT OUT TO THE PLAYERS.

AND ANY DECISION THEY MAKE, I THINK, WOULD BE VERY

DIFFICULT FOR ANY OUTSIDER AND CERTAINLY AN ECONOMIST TO

SECOND-GUESS.

**Q.**   AND ONE FINAL QUESTIONS ON THIS.  YOU STUDIED FINANCIAL

STATEMENTS OF THE NFLPA AND PLAYERS INC IN CONNECTION WITH YOUR

WORK?

**A.**   YES, OF COURSE.

**Q.**   THERE'S BEEN SOME ISSUES RAISED ABOUT DESIGNATED FUNDS

VERSUS UNDESIGNATED FUNDS OF 60 MILLION-PLUS-MILLION-DOLLARS.

FROM YOUR STUDY OF THE FINANCIAL STATEMENTS, IS THERE

ANY DIFFERENCE ONE WAY OR THE OTHER, WHETHER IT'S DESIGNATED OR

UNDESIGNATED, WHETHER OR NOT THOSE FUNDS COULD BE USED TO

SUPPORT THE UNION DURING A STRIKE OR A LOCKOUT OR A WORK

1  STOPPAGE?

2           **MR. HUMMEL:** OBJECTION. BEYOND THE SCOPE OF THE

3  CROSS.

4           **THE COURT:** OVERRULED.

5           PLEASE ANSWER.

6           **THE WITNESS:** NO. THE POINT OF THE FUNDS, FUND A AND

7  FUND B, IS, IN FACT, TO PREPARE FOR THE POSSIBILITY OF A WORK

8  STOPPAGE OR LITIGATION.

9  **BY MR. KESSLER:**

10 **Q.** AND WOULD THAT BE TRUE OF ANY FUNDS THE UNION HAD

11 AVAILABLE TO IT?

12 **A.** OF COURSE.

13 **Q.** NOW, PROFESSOR NOLL, YOU ALSO GOT ASKED A QUESTION WHERE

14 YOU SPOKE ABOUT IN THE MADDEN GAME, THAT CERTAIN PAYMENTS WERE

15 MADE TO THE TEAMS BY EA.

16          DO YOU RECALL THAT?

17 **A.** YES.

18 **Q.** JUST SO THE JURY UNDERSTANDS --

19 **A.** YES.

20 **Q.** -- ARE THE TEAMS THE PLAYERS OR THE OWNERS? WHO WERE "THE

21 TEAMS" WHEN YOU TESTIFIED ABOUT THAT?

22 **A.** THAT WHOLE LINE WAS SO CONFUSING. WHAT I WAS TALKING

23 ABOUT WAS LICENSING TEAMS IN THE SENSE OF THE IMAGES OF THE

24 INDIVIDUAL MEMBERS OF THE TEAMS. THAT'S WHAT'S RELEVANT IN

25 THIS CASE. THAT'S THE EVIDENCE I'VE SEEN WITH REGARD TO THE

1   LICENSES THAT WERE SIGNED BY PLAYERS INC.

2           AND THAT'S TO BE DISTINGUISHED FROM LICENSING THE

3   TEAM LOGO AND THE TEAM IDENTIFICATION FROM THE NFL.

4   **Q.**   LET ME JUST MAKE SURE, BECAUSE I AGREE WITH YOU IT WAS

5   CONFUSING.

6           WHEN YOU HAVE A HISTORIC TEAM WITH NO PLAYER NAMES

7   AND NO PLAYER PICTURES, OKAY?  WHO DID EA PAY LICENSING MONEY

8   TO FOR THAT TYPE OF A GAME:  NO PLAYER NAMES, NO IMAGES?  WHO

9   GOT THAT MONEY?

10  **A.**   JUST THE NFL.

11  **Q.**   THE NFL ARE THE OWNERS?

12  **A.**   THE OWNERS.  THE OWNERS OF THE TEAMS.  THE LEAGUE IS THE

13  ONE WHO ACTUALLY DOES THE LICENSING THROUGH NFL PROPERTIES.

14  AND THEN, TO THE EXTENT THEY MAKE MONEY OFF OF THAT THAT

15  EXCEEDS THE COST OF DOING THE LICENSING, IT'S DISTRIBUTED AMONG

16  THE TEAMS.

17  **Q.**   AND WHO DOES EA PAY MONEY TO WHEN IT'S LICENSING THE NAMES

18  OF PLAYERS?

19  **A.**   PLAYERS INC, FOR THE IMAGES AND IDENTITIES OF THE PLAYERS.

20  **Q.**   OKAY.  THERE'S BEEN SOME DISCUSSION IN YOUR EXAMINATION

21  ABOUT EA POSSIBLY TAKING RETIRED PLAYERS FOR FREE.  DO YOU

22  REMEMBER THAT?

23  **A.**   YES.

24  **Q.**   OKAY.  AS AN ECONOMIST, OKAY, WOULD IT MAKE ANY SENSE FOR

25  PLAYERS INC TO THROW IN RETIRED PLAYERS FOR FREE?

**A.**    NO.  IT WOULD MAKE NO SENSE AT ALL TO GIVE AWAY SOMETHING

FOR FREE.

**Q.**    WHY NOT?

**A.**    MOREOVER --

**Q.**    WHY NOT?

**A.**    FIRST OF ALL, YOU ONLY LET PEOPLE TO HAVE ACCESS TO THINGS

WHEN YOU'RE GETTING COMPENSATED FOR IT, OBVIOUSLY.  THE RETIRED

PLAYERS, AGAIN, REMEMBERING THAT MOST OF THEIR INCOME IS BEING

DERIVED FROM LICENSES THAT DO NOT COVER ALL -- ANY MORE THAN A

HANDFUL OF PLAYERS, YOU KNOW, GIVING IT ALL AWAY, SO TO SPEAK,

THOSE RETIRED PLAYERS WHO ARE GETTING PAID NOW SUBSTANTIAL

AMOUNTS OF MONEY WOULD JUST BOLT.  AND THEY WOULDN'T LET

PLAYERS INC HANDLE THEIR -- THEIR LICENSING IF THEY HAD TO

SHARE THE REVENUES THAT WERE CREATED BY SIX OR SEVEN PLAYERS

WITH 2,000.

        BY THE SAME TOKEN, THE NFL PLAYERS' UNION, THE ACTIVE

PLAYERS' UNION WOULD NEVER AGREE TO SHARE ITS REVENUES WITH

13,000 RETIRED PLAYERS.  YOU KNOW, THAT IS TO SAY THERE'S LESS

THAN 2,000 ACTIVE PLAYERS.

        THEY HAVE CREATED A UNION WITH EXCLUSIVE RIGHTS TO

LICENSE THEIR STUFF.  IF 2,000 PLAYERS THAT ARE ACTIVE VERSUS

13,000 THAT AREN'T, IF YOU BUNDLED IT ALL TOGETHER AND SAID YOU

HAD TO TAKE IT ALL OR NOTHING, ALMOST ALL THE MONEY WOULD GO TO

RETIRED PLAYERS, AND THE UNION WOULD JUST FOLD.  IT WOULD JUST

NO LONGER BE IN THE LICENSING BUSINESS BECAUSE THE PLAYERS

1   WOULDN'T STAND FOR IT.

2   **Q.**   PROFESSOR NOLL, YOU GOT ASKED SOME QUESTIONS ABOUT AD HOC

3   LICENSING AND THE -- VERSUS -- I THINK THEY CALLED IT "SHARED

4   VERSUS UNSHARED LICENSING."

5        DO YOU REMEMBER THOSE QUESTIONS?

6   **A.**   I DO.

7   **Q.**   OKAY.  NOW, FOR THE ACTIVE PLAYERS, ARE YOU FAMILIAR WITH

8   THE 35-AND-UNDER RULE?

9   **A.**   YES.

10  **Q.**   OKAY.  AND WHEN YOU EXPLAIN -- WHEN PLAYERS INC LICENSES

11  35 OR FEWER ACTIVE PLAYERS, IS THAT MONEY SHARED WITH ALL THE

12  ACTIVE PLAYERS OR SOME PARTICULAR GROUP; DO YOU KNOW?

13  **A.**   IT'S JUST -- NO, IT'S NOT SHARED WITH EVERYONE.

14  **Q.**   WHO IS IT SHARED WITH?

15  **A.**   JUST THE GUYS WHO GET LICENSED.  YOU CAN GET GROUP

16  LICENSES FROM PLAYERS INC FOR ANY NUMBER OF ACTIVE PLAYERS YOU

17  WANT.  AND THERE'S TWO PARTS TO THE STORY.

18        THE FIRST PART IS TYPICALLY THESE LICENSES THAT ARE

19  FOR A SUBSET ARE A FAIRLY SMALL SUBSET, AND THEY ARE LIMITED TO

20  THE PEOPLE IN THAT GROUP.

21        SECONDLY, THE PAYOUTS, EVEN WITHIN THAT SUBSET, DON'T

22  HAVE TO BE EQUAL.  IN FACT, MOST OF THEM AREN'T.  THEY PAY

23  DIFFERENT AMOUNTS TO DIFFERENT PLAYERS.

24  **Q.**   AND TALKING ABOUT THE GROSS LICENSING REVENUE POOL YOU

25  WERE ASKED ABOUT, THAT IS SHARED TO ELIGIBLE ACTIVE PLAYERS?

1  **A.**   THAT'S SHARED AMONG THE ELIGIBLE ACTIVE PLAYERS.

2  **Q.**   DO YOU KNOW, IS THERE ANY RETIRED PLAYER LICENSING MONEY

3  AT ALL IN THAT GLR POOL?

4  **A.**   NOT THAT I'M AWARE OF.

5  **Q.**   YOU ALSO GOT ASKED ABOUT WHETHER YOU DID ANY REAL WORLD

6  ANALYSIS, OKAY?

7          LET'S TAKE A LOOK AT TRIAL EXHIBIT 2397, IF WE CAN.

8          **MR. KESSLER:**  I DON'T KNOW.  WE HAVE A TECHNICAL

9  PROBLEM TODAY, SO USE THE ELMO.  THAT'S WHY WE HAVE IT.

10         (DOCUMENT DISPLAYED.)

11 **BY MR. KESSLER:**

12 **Q.**   REMIND THE JURY WHAT DATA THIS EXAMINES.

13 **A.**   THIS IS THE ACTUAL LICENSING REVENUES TO RETIRED PLAYERS

14 BY PLAYERS INC.  A DISTRIBUTION OF THE PAYOUT, ACCORDING TO HOW

15 MUCH MONEY EACH RETIRED PLAYER WAS PAID, AMONG THOSE WHO SIGNED

16 A GLA.

17 **Q.**   OKAY.

18 **A.**   NOW, THAT'S ONLY ABOUT A QUARTER OF THE TOTAL AMOUNT OF

19 MONEY THAT WENT TO RETIRED PLAYERS, BUT THAT'S FROM AMONG THOSE

20 THAT SIGNED A GLA.

21 **Q.**   OKAY.  NOW, IS THIS THEORETICAL EVIDENCE OR REAL WORLD

22 EVIDENCE?

23 **A.**   WELL, THAT'S REAL TRANSACTIONS.  I MEAN, THOSE ARE ACTUAL,

24 HONEST-TO-PETE LICENSES.  THAT'S MONEY THAT WAS ACTUALLY PAID

25 TO THE PLAYERS ON THE BASIS OF REAL LICENSES, REAL

1  TRANSACTIONS.

2  **Q.**   AND WHAT ECONOMIC CONCLUSIONS DID YOU DRAW ABOUT THE VALUE

3  OF THOSE RETIRED PLAYERS WHO SIGNED GLA'S FROM THIS REAL WORLD

4  EVIDENCE?

5  **A.**   THAT THE VAST MAJORITY OF THEM HAVE NO MARKET VALUE.  NO

6  ONE WANTS TO PAY ANYTHING FOR THEIR LICENSE, TO LICENSE THEIR

7  IMAGE.

8           **MR. KESSLER:**  THANK YOU, PROFESSOR NOLL.  I HAVE NO

9  FURTHER QUESTIONS.

10          **THE WITNESS:**  OKAY.

11          **THE COURT:**  ANYTHING MORE?

12          **MR. HUMMEL:**  YES, YOUR HONOR.

13          **THE COURT:**  GO AHEAD.

14          **MR. HUMMEL:**  THANK YOU VERY MUCH, YOUR HONOR.

15                       **RECROSS EXAMINATION**

16  **BY MR. HUMMEL:**

17  **Q.**   GOOD MORNING, DR. NOLL.

18  **A.**   GOOD MORNING.

19  **Q.**   LET'S CLEAR UP ONE THING IN TERMS OF THE TIMING RIGHT NOW,

20  BECAUSE I WANT TO BE VERY CLEAR AS TO WHAT YOU WERE ASKED TO DO

21  IN THIS CASE AND WHAT YOU -- WHAT YOU WERE LOOKING AT.

22          YOUR ASSIGNMENT WAS TO STUDY, AND THEN, I GUESS, TO

23  CRITIQUE, IF THERE WAS ANY CRITIQUE APPROPRIATE, PROFESSOR

24  RASCHER'S REPORT; IS THAT RIGHT?

25  **A.**   WELL, IN PART.  IT WAS ALSO THE -- THE ASPECT OF

1    MR. ROWLEY'S REPORT TO THE DEGREE IT WAS LINKED TO

2    DR. RASCHER'S REPORT.

3    **Q.**    ALL RIGHT.

4    **A.**    THE LINKAGE BETWEEN THE TWO.

5    **Q.**    OKAY.  BUT LET'S FOCUS ON PROFESSOR RASCHER'S REPORT,

6    OKAY?

7             AND ISN'T IT TRUE, SIR, THAT IN DR. RASCHER'S REPORT

8    THERE WAS AN OPINION THAT THERE WAS SUBSTANTIAL VALUE FOR

9    LICENSING REVENUES TO THE GLA CLASS BASED ON THE EXISTENCE OF

10   THE MADDEN GAME WHICH INCLUDED HISTORIC TEAMS?

11   **A.**    YES.  HE -- HE SAID "TEAMS," AND I THOUGHT WHAT HE MEANT

12   BY THAT WAS TEAM IMAGES.  BUT IT TURNS OUT THAT'S NOT WHAT HE

13   MEANT.  WHAT HE MEANT IS JUST THE TEAM PART OF THE LICENSE.

14   **Q.**    SO WHEN MR. KESSLER GOT UP HERE YESTERDAY AND SAID, WELL,

15   THIS WAS SOME NEW ISSUE IN THE CASE THAT YOU DIDN'T KNOW ABOUT,

16   THIS MADDEN GAME, THIS MADDEN FOOTBALL GAME, IN FACT, THAT

17   ISSUE, WHETHER THE MADDEN FOOTBALL GAME BY ELECTRONIC ARTS USES

18   RETIRED PLAYERS IN THE GAME WHICH INDICATES THAT THERE IS VALUE

19   TO EA IN HAVING RETIRED PLAYERS IN THE GAME, YOU KNEW THAT WAS

20   IN DR. RASCHER'S REPORT, RIGHT?

21           **MR. KESSLER:**  YOUR HONOR, I OBJECT.  MISSTATES -- MY

22   QUESTION WAS ABOUT SCRAMBLING.  THIS HAS NOTHING TO DO WITH

23   SCRAMBLING.  SO HE MISSTATED MY QUESTION.  IT'S AN IMPROPER

24   QUESTION.

25           **THE COURT:**  I DON'T REMEMBER THE EXACT WORDING OF THE

1   QUESTION.  THE JURY, I'M SURE, WILL.  AND YOU WILL HAVE TO TAKE

2   INTO ACCOUNT ANY DISCREPANCIES, IF YOU THINK THEY EXIST,

3   SUBJECT TO THAT.

4          THE OBJECTION IS OVERRULED.  THE WITNESS WILL ANSWER.

5          **THE WITNESS:**  I THOUGHT THE ISSUE IN DR. RASCHER'S

6   REPORT, WHEN I READ IT, WAS THAT THERE WERE TEAMS, HISTORICAL

7   TEAMS IN THE MADDEN GAME IN WHICH THE IMAGES OF ALL THE MEMBERS

8   OF THAT TEAM WERE PRESENT.

9          AND THEN, I INVESTIGATED THE LICENSES, AND I

10  DISCOVERED IT WASN'T TRUE.  SO THAT PARAGRAPH REFERS TO

11  LICENSES FOR TEAMS FROM THE NFL, NOT TO LICENSES OF THE IMAGES

12  OF ALL THE PLAYERS ON THOSE TEAMS.

13  **BY MR. HUMMEL:**

14  **Q.**  DO YOU REMEMBER WHAT IT SAYS IN THE PARAGRAPH, SIR?

15  **A.**  YES.  YOU JUST READ IT TO ME.  IT SAYS ABOUT TEAM -- THE

16  PRESENCE OF TEAMS IN THE MADDEN GAME, HISTORICAL TEAMS,

17  INDICATES A POSITIVE VALUE FOR RETIRED PLAYERS, IN GENERAL.

18  ALL RIGHT?

19         AND I DO NOT BELIEVE THAT A LICENSE FOR A TEAM LOGO

20  AS OPPOSED TO THE INDIVIDUAL IMAGES PROVES THAT THE INDIVIDUAL

21  IMAGES HAVE MARKET VALUE.

22  **Q.**  ACTUALLY, SIR, THE PARAGRAPH I READ JUST DOESN'T HAVE THE

23  WORD "TEAM" IN IT AT ALL.

24         CAN I SHOW IT TO YOU --

25  **A.**  SURE.

1  **Q.**   -- TO REFRESH YOUR RECOLLECTION?

2  **A.**   SURE.

3         **MR. HUMMEL:**  SO I'M SHOWING HIM IN THE RASCHER

4  REPORT, PAGE 5, LINES 2 THROUGH 4.

5  **Q.**   AND COULD YOU READ WHAT I'VE UNDERLINED TO REFRESH YOUR

6  RECOLLECTION, TO THE JURY, PLEASE?

7  **A.**   YOU WANT ME TO READ THE WHOLE THING?

8  **Q.**   NO, JUST WHAT I'VE UNDERLINED, AND SEE IF IT REFRESHES

9  YOUR RECOLLECTION.

10  **A.**   YOU WANT ME TO READ IT OUT LOUD?

11  **Q.**   YES, PLEASE.

12  **A.**   DO YOU WANT ME TO OR NOT?

13  **Q.**   PLEASE READ WHAT I'VE UNDERLINED TO THE JURY.

14  **A.**   YOU HAVEN'T UNDERLINED ANYTHING.  YOU PUT A BRACKET AROUND

15  SOMETHING.

16         "SEE FIRST WAVE OF" --

17  **Q.**   NO.  NO.

18         **MR. HUMMEL:**  I'M SORRY, YOUR HONOR.

19  **BY MR. HUMMEL:**

20  **Q.**   I'VE UNDERLINED IT.

21  **A.**   OH, UP HERE.

22  **Q.**   YES, IN THE TEXT OF THE REPORT.

23  **A.**   I WAS READING THE FOOTNOTE TO THAT.

24         "IN THE MADDEN FOOTBALL GAME BY ELECTRONIC ARTS

25  IT IS POSSIBLE TO USE RETIRED PLAYERS IN THE GAME, WHICH

1  INDICATES THAT THERE IS VALUE TO EA IN HAVING THE RETIRED

2  PLAYERS IN THE GAME."

3          OKAY?  SO THAT IS ACTUALLY ABOUT ANOTHER FEATURE OF

4  THE GAME, YES.

5  **Q.**  AND YOU DIDN'T LOOK AT THAT FEATURE, RIGHT?

6  **A.**  NO, THAT'S NOT TRUE, BECAUSE YOU WERE ASKING ME ABOUT

7  TEAMS.  THE QUESTIONS YOU WERE ASKING ME, BOTH IN MY DEPOSITION

8  AND IN MY CROSS EXAMINATION, WERE ABOUT TEAMS, HISTORICAL

9  TEAMS.

10  **Q.**  OKAY.  WELL, THE JURY HAS THE TESTIMONY.  THEY'LL READ IT.

11  THEY'LL DECIDE.

12          **MR. KESSLER:**  OBJECTION.  MOVE TO STRIKE COUNSEL'S

13  NON-QUESTION ARGUMENT.

14  **BY MR. HUMMEL:**

15  **Q.**  THE TRUTH IS, SIR --

16          **MR. KESSLER:**  COUNSEL'S --

17          **THE COURT:**  PLEASE.  THAT'S JUST ARGUMENT.

18          **MR. HUMMEL:**  YOU'RE RIGHT.

19  **BY MR. HUMMEL:**

20  **Q.**  THE TRUTH IS, SIR, WHEN YOU GAVE YOUR DEPOSITION IN THIS

21  CASE YOU HAD NO IDEA THAT THE MADDEN EA GAME HAD HISTORIC TEAMS

22  IN IT, CORRECT?

23  **A.**  I DID NOT KNOW HOW MANY THERE WERE AND WHAT THEIR -- AND

24  WHAT IT WAS.  I KNEW THERE WERE NOT IMAGES OF ENTIRE TEAMS OF

25  HISTORICAL NATURE IN THE MADDEN GAME.  ALL RIGHT?  THAT'S WHAT

1  I KNEW.

2          YOU KNOW, I DID NOT KNOW HOW MANY TEAMS WERE

3  LICENSED, NO.  I KNEW THERE WERE RETIRED PLAYERS, AS I TOLD YOU

4  IN MY DEPOSITION, AND I KNEW THAT THERE WERE SOME HISTORICAL

5  TEAMS LICENSED AS TEAMS.

6          AND I ALSO KNEW THAT NO HISTORICAL TEAM HAD THE

7  IMAGES OF ALL THE PLAYERS ON THAT TEAM.

8  **Q.**   AND ISN'T IT TRUE, SIR, THAT BECAUSE YOU DIDN'T KNOW THAT

9  THE MADDEN GAME HAD HISTORIC TEAMS, THAT YOU CANDIDLY ADMITTED

10 IN YOUR DEPOSITION THAT IF SUCH A GAME EXISTED, THAT WOULD

11 PROVIDE A SIGNIFICANT SOURCE OF REVENUE FOR THE RETIRED CLASS

12 MEMBERS?

13 **A.**   I AGREED.  IF A GAME EXISTED THAT HAD THE IMAGES OF ALL

14 THE PLAYERS THAT WERE HISTORICAL TEAMS ON IT, THEY WOULD HAVE

15 TO PAY A LICENSE FEE FOR THAT, AND THE RETIRED PLAYERS WOULD

16 GET THAT, YES.

17 **Q.**   ALL RIGHT.  NOW, LET'S MOVE ON.

18         MR. KESSLER ASKED YOU IF YOU'VE SEEN ANY EVIDENCE, IN

19 HIS REDIRECT, IF YOU HAVE SEEN ANY EVIDENCE IN THIS CASE THAT

20 ANY LICENSEE WAS INTERESTED IN LICENSING THE ENTIRE GLA GROUP

21 OF RETIRED PLAYERS.

22         DO YOU RECALL THAT?

23 **A.**   YES.

24 **Q.**   ALL RIGHT.  AND YOU SAID THAT, "NO," YOU'VE SEEN NO SUCH

25 EVIDENCE, CORRECT?

1   **A.**   I HAVEN'T SEEN ANY SUCH EVIDENCE.

2   **Q.**   NOW, SIR, HAVE YOU SEEN ANY EVIDENCE THAT LICENSEES WERE

3   INTERESTED IN LICENSING SIX OR MORE PRESENT OR FORMER PLAYERS?

4   **A.**   OF COURSE.

5   **Q.**   RIGHT.  AND, IN FACT, ISN'T EVERY SINGLE LICENSE IN THIS

6   CASE PROOF POSITIVE --

7             **MR. HUMMEL:**  STANDING UP?

8   **BY MR. HUMMEL:**

9   **Q.**   ISN'T EVERY SINGLE LICENSE IN THIS CASE EVIDENCE OF A

10  SIGNIFICANT ECONOMIC DEMAND FOR A GROUP THAT INCLUDES SIX OR

11  MORE PRESENT OR FORMER PLAYERS?

12  **A.**   OF COURSE, YES.  THERE'S SIGNIFICANT DEMAND FOR GROUP

13  LICENSES OR ELSE PLAYERS INC WOULDN'T EXIST.

14  **Q.**   YOU ADMIT THAT, THAT EVERY SINGLE LICENSE IN THIS CASE IS

15  ECONOMIC EVIDENCE THAT THERE IS SIGNIFICANT DEMAND FOR GROUPS

16  OF SIX OR MORE ACTIVE OR RETIRED PLAYERS?

17  **A.**   YES.

18  **Q.**   HA, OKAY.

19            NOW, IF A LICENSEE FROM THE YEARS 2003 TO 2008

20  DESIRED A GROUP LICENSE THAT INCLUDED ALL PRESENT PLAYERS AND

21  SOME FORMER RETIRED PLAYERS, THAT LICENSEE HAD NO CHOICE, NO

22  VIABLE ECONOMIC ALTERNATIVE, BUT TO DEAL WITH PLAYERS INC;

23  ISN'T THAT TRUE?

24            **MR. KESSLER:**  OBJECTION, YOUR HONOR.  AND THIS IS

25  GETTING INTO EXACTLY THE SUBJECT WE DISCUSSED BEFORE THE JURY

1  CAME IN.

2          **MR. HUMMEL:**  NOT AT ALL, YOUR HONOR.

3          **THE COURT:**  OVERRULED.

4          PLEASE ANSWER.

5          **THE WITNESS:**  MY UNDERSTANDING OF THE LICENSES IS

6  THAT FOR THE SAME PRODUCT, IF IT'S GOING TO BE THE SAME

7  PRODUCT, THEN PLAYERS INC IS -- HAS THE RIGHT TO BE THE

8  LICENSEE FOR ALL, BOTH ACTIVE AND RETIRED PLAYERS WHO ARE PART

9  OF THAT PRODUCT.  THAT'S MY UNDERSTANDING OF THE NATURE OF THE

10 LICENSE.

11 **BY MR. HUMMEL:**

12 **Q.**  OKAY.  BUT THAT WASN'T MY QUESTION.

13 **A.**  OKAY.  WELL, THEN, I DON'T KNOW WHAT YOUR QUESTION --

14 **Q.**  LET'S ASSUME HYPOTHETICALLY THAT A LICENSEE WANTS TO

15 LICENSE ALL ACTIVE PLAYERS, AND THEY ALSO WANT RETIRED PLAYERS,

16 OKAY?

17          DO YOU HAVE MY HYPOTHETICAL IN MIND?

18 **A.**  OKAY.

19 **Q.**  ALL RIGHT.  BETWEEN 2003 AND 2008, DID THE LICENSEE HAVE

20 ANY CHOICE OF WHERE TO GO TO GET THAT SORT OF DEAL, OTHER THAN

21 TO THE DEFENDANTS?

22 **A.**  I DON'T KNOW HOW TO ANSWER IT OTHER THAN TO SAY IF IT'S

23 FOR THE SAME PRODUCT THEY DON'T HAVE A CHOICE.  IF IT'S FOR

24 MULTIPLE PRODUCTS, THEY DO HAVE A CHOICE.

25 **Q.**  WHAT WAS THEIR CHOICE?  IF THEY WANTED A LICENSE FOR ALL

1    ACTIVE PLAYERS, WHERE WOULD THEY GO?

2    **A.**   THEY WOULD GET THE ACTIVE PLAYERS FROM PLAYERS INC, BUT

3    THEY WOULDN'T NECESSARILY GET THE RETIRED PLAYERS FROM PLAYERS

4    INC UNLESS IT WAS GOING TO BE PART OF THE SAME PRODUCT.

5    **Q.**   YOU'RE MISSING MY POINT.  THEY WANT A LICENSE FOR ALL

6    ACTIVES AND SOME RETIREDS.  WHERE DO THEY GO?  THEY WANT THAT

7    LICENSE, THAT GROUP LICENSE.  WHERE DO THEY GO OTHER THAN

8    PLAYERS INC?

9    **A.**   THEY COULD ONLY GET ACTIVE PLAYERS FROM PLAYERS INC.

10   **Q.**   SO THEY HAVE NO CHOICE, RIGHT?

11   **A.**   NO CHOICE ON THE ACTIVE PLAYERS AT ALL.

12   **Q.**   ALL RIGHT.  NOW, SIR, HAVE YOU HEARD OF A COMPANY CALLED

13   "TAKE TWO"?

14   **A.**   I HAVE HEARD OF TAKE TWO.

15   **Q.**   YOU HAVE HEARD OF THEM?  WHAT DO THEY DO?

16   **A.**   THEY ARE A COMPETITOR TO EA.  THEY MAKE COMPUTER GAMES.

17   **Q.**   ARE YOU AWARE, SIR, IN YOUR STUDY -- I THINK IN CONNECTION

18   WITH YOUR REPORT YOU REVIEWED THE AFFIDAVIT OF ANDREW FEFFER,

19   RIGHT?

20            **MR. KESSLER:**  YOUR HONOR, EXCEEDS THE SCOPE OF THE

21   REDIRECT EXAMINATION LATE TODAY OR YESTERDAY.

22            **MR. HUMMEL:**  ALL THIS HAS TO DO WITH HIS OPINION,

23   WHICH WAS BROUGHT OUT ON REDIRECT, THAT THERE WAS NO DEMAND FOR

24   RETIRED PLAYERS, RETIRED GROUP LICENSES.

25            **MR. KESSLER:**  I DON'T THINK --

1          **THE COURT:**  OVERRULED.

2          **MR. HUMMEL:**  THANK YOU, YOUR HONOR.

3  **BY MR. HUMMEL:**

4  **Q.**  NOW, YOU'VE HEARD OF THIS COMPANY CALLED "TAKE TWO"?

5  **A.**  IT'S IN MY REPORT.  I WROTE ABOUT IT IN MY REPORT.

6  **Q.**  OKAY, GOOD.  SO YOU'RE AWARE -- AND WE TALKED ABOUT IT IN

7  YOUR CROSS -- LET ME SET THIS UP SO THE JURY UNDERSTANDS WHERE

8  I AM.

9          ELECTRONIC ARTS, EA, ENTERED INTO AN EXCLUSIVE

10  LICENSE WITH PLAYERS INC IN 2004, CORRECT?

11  **A.**  YES, EXCLUSIVE IN THE SENSE THAT THE FOOTBALL GAME, THE

12  MADDEN GAME, WOULD ONLY HAVE IMAGES IN IT THAT WERE LICENSED

13  THROUGH PLAYERS INC.

14  **Q.**  AND THAT EXCLUSIVE LICENSE REPRESENTED A DYNAMIC CHANGE IN

15  THE MARKET.  IN OTHER WORDS, IT TOOK -- THIS IS HARD TO SAY --

16  IT TOOK TAKE TWO OUT OF THE MARKET FOR A COMPETING VIDEO GAME

17  THAT INCLUDED ACTIVE PLAYERS, CORRECT?

18  **A.**  IT TOOK EVERYBODY OUT OF THE MARKET WHO WANTED TO DO THAT,

19  YES.

20  **Q.**  RIGHT.  AND TAKE TWO FOUGHT BACK, RIGHT?

21  **A.**  THAT'S -- WELL, "FOUGHT" IS A STRANGE WORD.  THEY CREATED

22  THEIR OWN PRODUCT TO COMPETE WITH EA.

23  **Q.**  WELL, YOU'VE READ THE PRESS, HAVE YOU NOT, ABOUT THIS

24  WHOLE SCENARIO?

25  **A.**  I HAVE READ THE PRESS.  I'M JUST SAYING I WOULDN'T AS AN

1   ECONOMIST USE THE WORD "FOUGHT."  BUT THAT'S OKAY.

2   **Q.**   FAIR ENOUGH.

3   **A.**   YEAH.

4   **Q.**   THEY ARE A COMPETITOR.  HOW ABOUT THIS:  THEY WANTED TO

5   TAKE -- THEY THOUGHT ABOUT HOW TO MAKE A COMPETITIVE REACTION.

6   THAT'S AN ECONOMIC TERM, RIGHT?

7   **A.**   YES.  THEY FIGURED OUT A WAY TO ENTER THE FOOTBALL GAME

8   MARKET DESPITE THE EXCLUSIVE LICENSE.

9   **Q.**   LET'S SET THE TIME FOR THE JURY.  THE EXCLUSIVE'S IN 2004.

10  WHEN WAS TAKE TWO ABLE TO COME BACK IN THE MARKET?

11  **A.**   JULY, 2007.

12  **Q.**   '07.  '07.  THREE YEARS, RIGHT?

13  **A.**   THAT'S CORRECT.

14  **Q.**   NOW, THE WAY THEY CAME BACK INTO THE MARKET WAS TO OFFER A

15  GAME THAT INCLUDED ONLY WHAT?

16  **A.**   240 RETIRED PLAYERS, SUPERSTAR RETIRED PLAYERS.

17  **Q.**   RETIRED PLAYERS, RIGHT?

18  **A.**   YES.

19  **Q.**   OKAY.  SO HERE'S MY QUESTION:  DURING THAT THREE-YEAR

20  PERIOD WHEN TAKE TWO IS THINKING ABOUT A COMPETITIVE REACTION,

21  WHAT, IF ANYTHING, PREVENTED THESE DEFENDANTS FROM GOING TO

22  TAKE TWO AND SAYING:

23              "WE'VE GOT 2100 RETIRED PLAYERS UNDER GLA'S.

24  THAT'S A HECK OF A COMPETITIVE OPTION FOR YOU.  WHY DON'T YOU

25  TAKE THESE GUYS?"

1          **MR. KESSLER:**  YOUR HONOR, I'M GOING TO OBJECT.

2    THERE'S NO EVIDENCE IN THE RECORD ABOUT THIS THAT THE

3    PLAINTIFFS HAVE PRESENTED AT ALL, ABOUT THIS SUBJECT OF TAKE

4    TWO.  SO WE HAVE A HYPOTHETICAL AND NO FOUNDATION TO ANYTHING.

5          **THE COURT:**  OVERRULED.

6          PLEASE ANSWER.

7          **THE WITNESS:**  NOTHING PREVENTED TAKE TWO FROM GOING

8    TO PLAYERS INC AND -- AS FAR AS I KNOW.

9    **BY MR. HUMMEL:**

10   **Q.**  DIFFERENT QUESTION.  WHAT PREVENTED PLAYERS INC. FROM

11   GOING TO TAKE TWO?

12   **A.**  NOTHING.

13   **Q.**  NOTHING.  FOR A THREE-YEAR PERIOD THAT A COMPETITOR IS

14   FOISTING AROUND FOR A WAY TO GET BACK IN THE MARKET.  THEY

15   ULTIMATELY DECIDED TO DO IT WITH RETIRED PLAYERS, BUT NOTHING

16   PREVENTED THEM IN THE INTERIM FROM DOING THAT, RIGHT?  "THEM"

17   BEING THE DEFENDANTS.

18   **A.**  THE PLAYERS THEY HAD TO OFFER WEREN'T, FOR THE MOST PART,

19   THE PLAYERS THAT TAKE TWO USED.

20   **Q.**  YOU DON'T KNOW THAT.

21   **A.**  I DO KNOW THAT BECAUSE THE GLA'S -- I KNOW WHO THE GLA'S

22   ARE.  AND MOST OF THE TOP STARS OF RETIRED PLAYERS HAVE NOT

23   SIGNED GLA'S.

24   **Q.**  HOW MANY GLA'S SIGNATORIES ARE IN THE GROUP THAT TAKE TWO

25   TOOK?

1   **A.**   I DON'T KNOW WHAT THE NUMBER IS, BUT I DO KNOW THAT THE

2   FAMOUS STAR PLAYERS, FOR THE MOST PART, HAVEN'T SIGNED GLA'S.

3   **Q.**   MORE THAN SIX, RIGHT?

4   **A.**   OH, YEAH.  YOU COULD HAVE GOTTEN A GROUP LICENSE FOR SOME

5   OF THEM THROUGH PLAYERS INC, YES, BUT YOU COULDN'T HAVE GOTTEN

6   ALL 240 UNLESS PLAYERS INC HAD, IN FACT, NEGOTIATED SOME SORT

7   OF ARRANGEMENT WITH THOSE PLAYERS, JUST LIKE TAKE TWO DID.

8   **Q.**   OKAY.  NOW, WITH RESPECT TO EA, YOU TESTIFIED YESTERDAY

9   THAT IT WAS EA'S DECISION TO LICENSE ALL THE CURRENT PLAYERS IN

10  THE MADDEN GAME AND ONLY SELECT CERTAIN STAR RETIRED PLAYERS;

11  THAT'S WHAT YOU SAID, RIGHT?

12  **A.**   THAT'S WHAT THE TESTIMONY OF -- I FORGET HIS NAME -- THE

13  MAN FROM EA IS.

14  **Q.**   AND YOU SAID YESTERDAY THAT IN YOUR VIEW THAT WAS A

15  BUSINESS DECISION BY EA, AND THAT YOU, AS AN ECONOMIST,

16  UNDERSTOOD THE REASON FOR IT, RIGHT?

17  **A.**   YES.  I MEAN, I UNDERSTAND WHY HE DID IT, YES.

18  **Q.**   OKAY.  WELL, HAVE YOU REVIEWED DOCUMENTS IN THE CASE WHICH

19  SHOW THAT IT WAS EA'S PERSONNEL'S BELIEF THAT EA -- EXCUSE

20  ME -- THAT PLAYERS INC DID NOT WANT EA TO INCLUDE ANY RETIRED

21  PLAYERS IN THE GAME?

22          **MR. KESSLER:**  OBJECTION, YOUR HONOR.  MISSTATES FACTS

23  IN EVIDENCE.  THIS IS THE TESTIMONY CONCERNING THE --

24  CONCERNING THE SCRAMBLING ISSUE.  HAS NOTHING TO DO WITH THIS.

25          AND I THINK HE'S PRESENTED AN INCOMPLETE SET OF

1   FACTS.  THERE'S NO BASIS FOR THE QUESTION.

2           **MR. HUMMEL:**  I HAVE THE E-MAIL IN MY HAND.  I'M HAPPY

3   TO --

4               (COUNSEL SPEAKING SIMULTANEOUSLY; NOT REPORTABLE.)

5           **MR. KESSLER:**  -- HYPOTHETICAL YOUR HONOR.

6           **MR. HUMMEL:**  HAS NOTHING TO DO WITH SCRAMBLING.

7           **THE COURT:**  THIS IS SOMETHING -- WE'VE GONE OVER

8   THIS, AND I'VE TOLD YOU WHICH PARTS ARE ADMISSIBLE AND NOT.

9           **MR. HUMMEL:**  RIGHT.

10          **THE COURT:**  AND DO NOT -- DO NOT GET INTO ANYTHING

11  THAT THE COURT HAS RULED OUT OF EVIDENCE.

12          **MR. HUMMEL:**  ABSOLUTELY NOT, YOUR HONOR.  ABSOLUTELY

13  NOT.

14          **THE COURT:**  ALL RIGHT.

15          **MR. KESSLER:**  AND, YOUR HONOR, HE IS.

16          **MR. HUMMEL:**  NO, I'M NOT.  OKAY.  COULD YOU PUT THE

17  FIRST PAGE OF --

18          **THE COURT:**  THE PART THAT WAS ALREADY SHOWN TO THE

19  JURY, THAT -- IS THIS THAT E-MAIL CHAIN WE SHOWED TO THE JURY?

20          **MR. HUMMEL:**  YES, IN REDACTED FORM, CONSISTENT WITH

21  THE COURT'S ORDER.

22          **THE COURT:**  DON'T GET INTO ANYTHING THAT WAS

23  REDACTED.

24          **MR. HUMMEL:**  ABSOLUTELY NOT.

25          **THE COURT:**  IT WAS INADMISSIBLE.

1          **MR. HUMMEL:**  RIGHT.

2    **BY MR. HUMMEL:**

3    **Q.**   SO LET'S GO TO THE THIRD PAGE OF THIS DOCUMENT, SIR, AND

4    I'M GOING TO ASK YOU IF YOU CONSIDERED THIS IN FORMULATING YOUR

5    OPINION THAT IT WAS EA THAT MADE THE DECISION.

6          **MR. HUMMEL:**  NOW, COULD YOU HIGHLIGHT, PLEASE --

7          (DOCUMENT DISPLAYED.)

8          **THE WITNESS:**  I CAN'T READ THAT FROM HERE.  I'M

9    SORRY.

10   **BY MR. HUMMEL:**

11   **Q.**   I UNDERSTAND.  I'LL HAND IT TO YOU.

12         **MR. HUMMEL:**  COULD YOU HIGHLIGHT, PLEASE, THIS

13   PARAGRAPH, AND HIGHLIGHT THE SECOND SENTENCE (INDICATING).

14         (DOCUMENT DISPLAYED.)

15   **BY MR. HUMMEL:**

16   **Q.**   DO YOU KNOW WHO JEREMY STRAUSSER IS, SIR?

17   **A.**   I DON'T RECALL, NO.  THE NAME IS FAMILIAR, BUT I WOULDN'T

18   WANT TO TESTIFY AS TO WHAT HE IS.

19   **Q.**   DO YOU KNOW HIM TO BE AN EA EMPLOYEE?

20   **A.**   I DON'T REMEMBER WHO HE IS.

21   **Q.**   YOU DIDN'T INTERVIEW EA EMPLOYEES, SO YOU PROBABLY DIDN'T

22   TALK TO JEREMY STRAUSSER, RIGHT?

23   **A.**   I DIDN'T INTERVIEW ANYBODY.  I READ DEPOSITIONS, AND I

24   READ E-MAILS AND THINGS LIKE THAT, DOCUMENTS.  I DIDN'T

25   INTERVIEW ANYBODY.

1  Q.   NOW, THE PREMISE OF YOUR ENTIRE OPINION ON EA WAS THAT EA

2  DIDN'T WANT RETIRED PLAYERS IN THE GAME THAT THEY DIDN'T HAVE A

3  LICENSE TO, RIGHT?

4           BUT HERE, SIR, DID YOU CONSIDER --

5           **THE COURT:**  WAIT, WAIT, WAIT.  ARE YOU ASKING THAT,

6  OR ARE YOU NOW SAYING THAT?

7           **MR. HUMMEL:**  I'LL WITHDRAW THAT, YOUR HONOR.

8           **THE COURT:**  A PRELIMINARY QUESTION WOULD BE DID HE,

9  IN PREPARING HIS OPINIONS, REVIEW THE E-MAIL YOU HAVE ON THE

10  SCREEN.

11           **MR. HUMMEL:**  RIGHT.  THAT'S WHAT I WAS GOING TO ASK.

12           **THE COURT:**  WHY DON'T YOU ASK THAT QUESTION?

13           **MR. HUMMEL:**  I WILL.

14  **BY MR. HUMMEL:**

15  Q.   DR. NOLL, IN CONNECTION WITH FORMULATING YOUR OPINIONS

16  ABOUT EA, DID YOU CONSIDER JEREMY STRAUSSER'S E-MAILS IN WHICH

17  HE WROTE:

18           "I KNOW PLAYERS INC DOESN'T WANT US TO INCLUDE

19  ANY 'RETIRED PLAYERS,' QUOTE, IN THE GAME"?

20  A.   I'VE SEEN THIS E-MAIL BEFORE, YES.  AND I DO NOT THINK

21  THAT MEANS THEY DIDN'T WANT -- I THINK IT'S WITHIN THE CONTEXT,

22  IF THAT'S YOUR INTERPRETATION OF IT, CORRECT.  BUT, YES, I'VE

23  SEEN THAT E-MAIL.

24  Q.   DOESN'T MEAN WHAT IT SAYS?

25           **MR. HUMMEL:**  I HAVE NOTHING FURTHER.

1          **THE WITNESS:**  THERE ARE RETIRED PLAYERS IN THE GAME,

2   AND THEY'VE PAID FOR IT.  I MEAN --

3          **THE COURT:**  ALL RIGHT.

4          **MR. HUMMEL:**  NOTHING FURTHER, YOUR HONOR.

5          **THE COURT:**  THAT'S ENOUGH.  YOU'VE MADE ENOUGH OF AN

6   EXPLANATION.

7          ALL RIGHT.

8          **MR. KESSLER:**  I HAVE A LITTLE MORE, YOUR HONOR.

9          **THE COURT:**  LOOK.  THIS HAS GOT TO COME TO AN END.

10  HOW MUCH DO YOU NEED?

11         **MR. KESSLER:**  FIVE MINUTES ON THE NEW THINGS HE PUT

12  UP.

13         **THE COURT:**  FIVE MINUTES.

14         **MR. KESSLER:**  YES.

15                  **FURTHER REDIRECT EXAMINATION**

16  **BY MR. KESSLER:**

17  **Q.**   MR. HUMMEL JUST SHOWED YOU AN E-MAIL DOCUMENT WITH -- FROM

18  AN EA INTERNAL DOCUMENT TALKING ABOUT THAT THEY THOUGHT PLAYERS

19  INC DIDN'T WANT THEM TO USE RETIRED PLAYERS.

20  **A.**   YES.

21  **Q.**   FIRST OF ALL --

22         **THE COURT:**  WAIT.  THAT E-MAIL WAS TO PLAYERS INC,

23  WASN'T IT?

24         **MR. KESSLER:**  YEAH.  WELL, THERE'S A CHAIN.

25

**BY MR. KESSLER:**

Q.   AND SAID THEY DIDN'T WANT TO USE.  THAT WAS A DISCUSSION,

WAS IT NOT -- DID YOU LOOK -- DID YOU HAVE A CHANCE TO REVIEW

THE DOCUMENT?

A.   HE FLIPPED IT AWAY FROM ME.

          **MR. KESSLER:**  PUT IT UP, PLEASE.

          **THE WITNESS:**  I DON'T HAVE TO IT, SO I HAVE TO READ

IT.

          **MR. HUMMEL:**  I HAVE IT.

          **MR. KESSLER:**  WHY DON'T YOU GIVE IT TO THE WITNESS?

**BY MR. KESSLER:**

Q.   IS THAT A DISCUSSION, SIR, OF USING HISTORICAL FACTS

WITHOUT PLAYER NAMES AND IMAGES?

A.   EXACTLY.  THIS IS BASICALLY GETTING AROUND THE REQUIREMENT

TO HAVE A LICENSE TO BE ABLE TO USE INFORMATION ABOUT RETIRED

PLAYERS WITHOUT LICENSING THEM.

Q.   SO DOES THIS HAVE ANYTHING TO DO WITH PAYING FOR RETIRED

PLAYER IMAGES?

A.   IF IT DOES, I CERTAINLY DON'T SEE WHAT IT HAS TO DO WITH

IT.

Q.   NOW, DID YOU KNOW THAT MR. LINZNER WAS ASKED AT THIS TRIAL

AS FOLLOWS:

          "**QUESTION:**  AND HE WROTE ON BEHALF OF EA,

          YOUR COMPANY, IN THE SECOND PARAGRAPH: 'I

          KNOW THAT PLAYERS INC DOESN'T WANT US TO

1          INCLUDE ANY RETIRED PLAYERS IN THE GAME.

2          HOW DID HE KNOW THAT?"

3          AND THE ANSWER FROM MR. LINZNER IS:

4          **"QUESTION:**  DID YOU KNOW THAT?

5          **"ANSWER:**  THAT'S NOT CORRECT."

6          SO DID YOU KNOW THAT MR. LINZNER SAID THAT IT WASN'T

7    CORRECT?

8               **MR. HUMMEL:**  OBJECTION.  ARGUMENTATIVE.

9               **THE COURT:**  LOOK --

10              **MR. KESSLER:**  HE RAISED THIS, YOUR HONOR.

11              **THE COURT:**  THIS IS ALL AFTER HE DID HIS REPORT.  HOW

12   IS HE SUPPOSED TO KNOW THIS?

13              **MR. KESSLER:**  WELL, HE DIDN'T SEE THIS DOCUMENT,

14   EITHER.  WHAT MR. HUMMEL DID IS HE PUT BEFORE THE WITNESS --

15   NEVER SHOWED HIM THE DOCUMENT, SAYS SOMETHING HAPPENED.  HE

16   KNOWS MR. LINZNER CAME UP TO THIS STAND BEFORE THIS JURY AND

17   SAID IT'S NOT CORRECT.  AND HE TRIED TO CONVINCE THE WITNESS

18   THAT SOMETHING HAPPENED THAT HE KNOWS IS FALSE.

19          I THINK I'M ENTITLED TO BRING THAT OUT, YOUR HONOR.

20              **THE COURT:**  THERE'S A DIFFERENCE.  THE DOCUMENT, THE

21   E-MAIL CHAIN IS IN EVIDENCE AND IS SOMETHING THAT THIS WITNESS

22   REVIEWED PRIOR TO GIVING HIS REPORT.  SO IT WAS OKAY FOR

23   MR. HUMMEL TO ASK HIM WHETHER OR NOT THAT SUPPORTED HIS OPINION

24   OR NOT.

25          THAT'S A DIFFERENT QUESTION.  IT IS A DIFFERENT

1   QUESTION WHETHER OR NOT MR. HUMMEL'S INTERPRETATION OF THAT

2   DOCUMENT WAS A FAIR ONE OR NOT.  THAT'S FOR THE JURY.

3          WHAT YOU'RE GETTING AT IS THE LATTER QUESTION, AND

4   NOT -- YOU'RE JUST ARGUING OVER THE INTERPRETATION OF THIS

5   E-MAIL CHAIN.

6          **MR. KESSLER:**  I'M --

7          **THE COURT:**  AND YOU STARTED DOWN THAT LINE OF

8   QUESTIONS, AND THAT WAS PROPER.  BUT NOW TO GET INTO TRIAL

9   TESTIMONY AND ASK THIS WITNESS, "DID YOU KNOW THAT," WELL, HE

10  DIDN'T KNOW THAT.

11         THE TRIAL HAS HAPPENED AFTER THE REPORT.  THERE'S NO

12  WAY ANY EXPERT COULD KNOW WHAT HAPPENED AT THE TRIAL OF OTHER

13  WITNESSES.  THIS IS JUST AN OPPORTUNITY FOR ARGUMENT.

14         **MR. KESSLER:**  YOUR HONOR, I UNDERSTAND YOUR HONOR'S

15  RULING.  BUT MR. HUMMEL KNEW THAT, WHETHER THE WITNESS KNEW IT

16  OR NOT.

17         TWO MORE POINTS, YOUR HONOR.

18  **BY MR. KESSLER:**

19  **Q.**  HE ASKED YOU WHETHER A LICENSE FOR SIX OR MORE PRESENT OR

20  FORMER PLAYERS HAD A SIGNIFICANT VALUE.  AND YOU SAID "YES,

21  SIR," CORRECT?

22  **A.**  WHETHER THE LICENSES DO HAVE VALUE, AND OF COURSE THEY DO.

23  **Q.**  WERE YOU TALKING ABOUT ACTIVE PLAYER LICENSING IN THAT

24  ANSWER, RETIRED PLAYER LICENSING?  WHAT WERE YOU TALKING ABOUT?

25  **A.**  I WAS TALKING ABOUT ANY LICENSE THAT CURRENTLY EXISTS.  WE

1    HAVE, YOU KNOW, THIS HUGE STACK OF LICENSES, OF GROUP LICENSES,

2    ALL OF WHICH INVOLVE SIX OR MORE PLAYERS.

3           THAT IS CONCLUSIVE PROOF THAT THERE EXISTS POSITIVE

4    MARKET DEMAND FOR SOME TYPES OF LICENSES.  IT DOES NOT MEAN

5    THAT THERE IS POSITIVE MARKET DEMAND FOR ANY CONCEIVABLE

6    COMBINATION OF SIX PLAYERS YOU WANT TO PUT TOGETHER.  IT DOES

7    MEAN THAT THERE ARE COMBINATIONS OF SIX OR MORE PLAYERS THAT

8    HAVE POSITIVE MARKET VALUE, SOME OF WHICH INCLUDE RETIRED

9    PLAYERS.

10   **Q.**   JUST A COUPLE MORE QUESTIONS.

11          HAVE YOU SEEN ANY EVIDENCE THAT THERE IS ANY ECONOMIC

12   VALUE FOR A LICENSE TO ALL OF THE RETIRED PLAYERS IN THIS CLASS

13   WHO SIGNED THE GLA AS A GROUP?

14   **A.**   NO.  THERE IS NO SUCH EVIDENCE.

15   **Q.**   AND, FINALLY, HE ASKED YOU QUESTIONS ABOUT WHAT WAS IN

16   MR. RASCHER'S REPORT ABOUT THE MADDEN GAME.

17   **A.**   YES.

18   **Q.**   OKAY.  DID THAT HAVE TO DO WITH THE HALL OF FAME FEATURE?

19   DID YOU READ THE FOOTNOTE?

20   **A.**   YEAH, THE FOOTNOTE THAT I THOUGHT HE WAS GETTING ME TO

21   READ IS ABOUT THAT, YES.  I HAVE -- HE HAS TWO MARKS ON THIS

22   PAGE:  ONE UP HERE IN THE TEXT, AND ONE IN THE FOOTNOTE.  AND I

23   STARTED TO READ THE FOOTNOTE.  THAT'S NOT WHAT HE WANTED.

24   **Q.**   WOULD YOU READ THE FOOTNOTE NOW, SIR?

25   **A.**   "SEE FIRST WAVE OF MADDEN INVASION HITS AS EA SHIPS MADDEN

1   NFL 2001 FOR THE PLAY STATION.  MARKET WIRE AUGUST 2000.  THE

2   2007 VERSION OF THE GAME WAS AVAILABLE AS A HALL OF FAME

3   EDITION WHERE GAMERS COULD PLAY AS THEIR FAVORITE HISTORICAL

4   TEAM OR PLAYER."

5   Q.   WAS THE HALL OF FAME EDITION AN AD HOC LICENSE OF SPECIFIC

6   RETIRED PLAYERS?

7           MR. HUMMEL:  OBJECTION.  FOUNDATION.

8   BY MR. KESSLER:

9   Q.   DO YOU KNOW?

10  A.   YES.

11          MR. HUMMEL:  CONCLUSION.

12          THE COURT:  DO YOU KNOW THAT?  IN OTHER WORDS, IS

13  THAT SOMETHING YOU KNOW, OR ARE YOU JUST TAKING COUNSEL'S WORD

14  FOR IT?

15          THE WITNESS:  IT'S IN MY REPORT, ACTUALLY.

16          THE COURT:  ALL RIGHT.  OVERRULED.

17          YOU MAY ANSWER.

18  BY MR. KESSLER:

19  Q.   EXPLAIN TO THE JURY WHAT WAS THE HALL OF FAME LICENSE WITH

20  RETIRED PLAYERS?

21  A.   IT WAS PLAYERS INC, AGAIN, BECAUSE PLAYERS INC HAS THIS

22  RIGHT TO APPROVE ANYTHING THAT GOES INTO THE GAME, IN THE

23  MADDEN GAME.  IF EA WANTED TO ADD RETIRED PLAYERS IT HAD TO

24  DEAL WITH PLAYERS INC.

25          WHAT IT WANTED TO DO WAS ADD 168 MEMBERS OF THE

1  FOOTBALL HALL OF FAME, ALMOST ALL OF WHICH ARE PLAYERS, A FEW

2  OF WHICH ARE COACHES.

3          AND IN ORDER TO DO THAT, THEY HAD TO GO TO PLAYERS

4  INC.  BUT THEN, PLAYERS INC JUST TURNED AROUND AND ACTED AS THE

5  AGENT FOR HALL OF FAME.  AND, ACTUALLY, WHAT THEY DID WAS

6  LICENSE IT FROM HALL OF FAME.

7          SO THERE WAS A PAYMENT THAT WENT FROM PLAYERS INC,

8  WENT FROM -- EXCUSE ME, WENT FROM EA TO PLAYERS INC, AND THEN

9  WENT FROM PLAYERS INC TO THE HALL OF FAME FOR $400,000.  AND

10 THEN, THESE 168 PEOPLE WHO ARE IN THE GAME AS HALL OF FAME

11 MEMBERS WERE EACH PAID $2,000 EACH.  THE DIFFERENCE BETWEEN

12 400,000 AND WHAT THEY WERE PAID WAS KEPT BY THE HALL OF FAME.

13 PLAYERS INC KEPT NOTHING.

14 **Q.**   AND ONE OF THE PLAYERS WHO GOT THAT MONEY WAS

15 MR. ADDERLEY; DID YOU KNOW?

16 **A.**   PARDON?

17 **Q.**   DO YOU KNOW IF MR. ADDERLEY WAS ONE OF THE PLAYERS WHO GOT

18 THAT MONEY?

19 **A.**   I BELIEVE HE WAS, YES.  I THINK HE'S IN THE HALL OF FAME.

20 **Q.**   SO JUST TO END THIS -- WILL BE MY LAST QUESTION -- WHEN

21 MR. HUMMEL WAS ASKING YOU ABOUT YOUR DEPOSITION TESTIMONY ABOUT

22 A GAME THAT MIGHT EXIST THAT WOULD USE ALL THE IMAGES OF

23 RETIRED PLAYERS, AND YOU TESTIFIED THAT WOULD HAVE VALUE, HAS

24 SUCH A GAME EVER EXISTED TO YOUR KNOWLEDGE?

25 **A.**   NO.  THAT WAS THE WHOLE POINT OF THAT TESTIMONY, WAS TO

1  SAY THAT I HAD THOUGHT IT PLAUSIBLE THAT SOMEONE MIGHT BELIEVE

2  THAT A GAME WHERE YOU HAD ALL THE MEMBERS OF THESE HISTORICAL

3  TEAMS AND YOU'D PLAY, YOU KNOW, SOME GREAT DALLAS COWBOYS TEAM

4  WITH A GREAT SAN FRANCISCO 49ERS TEAM OF A COMPLETELY DIFFERENT

5  VINTAGE, I THOUGHT MAYBE THERE WOULD BE A DEMAND FOR THAT.

6          BUT THEN IT TURNS OUT THAT'S NOT WHAT THEY ACTUALLY

7  DID.  THAT'S WHAT THAT TESTIMONY WAS ALL ABOUT.  THERE REALLY

8  ISN'T ANYBODY OUT THERE WHO'S COLLECTED THE ENTIRE ROSTERS OF

9  HISTORICAL TEAMS AND PUT THEM ON A VIDEO GAME.

10 **Q.**   AND HAVE YOU SEEN ANY EVIDENCE OF ANY MARKETPLACE DEMAND

11 FROM LICENSEES FOR SUCH A GAME?

12 **A.**   I KNOW OF NO DEMAND.  I'VE SEEN NOTHING THAT INDICATES

13 THERE IS SUCH A DEMAND.

14 **Q.**   LAST THING ON TAKE TWO, OKAY?  IF, IN FACT, IN THE

15 HYPOTHETICAL THE FACT THAT PLAYERS INC GAVE AN EXCLUSIVE ON

16 ACTIVE PLAYERS TO EA, IF THAT STIMULATED TAKE TWO TO DO A

17 RETIRED PLAYER GAME, DID THAT BENEFIT, HURT, HELP?  WHAT IMPACT

18 DID IT HAVE ON RETIRED PLAYERS WHO WERE INCLUDED IN THAT GAME?

19 **A.**   WELL, IT BENEFITED THE 240 PLAYERS WHO WERE IN THAT GAME,

20 YES.

21 **Q.**   WERE THOSE RETIRED PLAYERS OR ACTIVE PLAYERS?

22 **A.**   THOSE ARE ALL RETIRED PLAYERS.

23          **MR. KESSLER:**  THANK YOU.  NO FURTHER QUESTIONS.

24          **MR. HUMMEL:**  ONE QUESTION, YOUR HONOR.  ONE.

25          **THE COURT:**  ALL RIGHT.

**FURTHER RECROSS EXAMINATION**

BY MR. HUMMEL:

Q.   DR. NOLL, REFERRING TO THE HALL OF FAME, HAVE YOU SEEN ANY EVIDENCE IN THIS CASE THAT WOULD SUGGEST TO YOU THAT PLAYERS INC SOLD OUT HALL OF FAME RETIRED PLAYERS TO CURRY FAVOR WITH EA?

A.   THERE IS -- I -- I HAVE SEEN AN E-MAIL STRING THAT'S IN RESPONSE TO AN ATTEMPT TO EA TO HAVE TO PAY LESS, YES.  AND IT HAS AN ARGUMENT BACK:  WELL, NO.  YOU'RE GETTING A GOOD DEAL, SO YOU SHOULD BE HAPPY TO GET WHAT YOU'RE GETTING.

          **MR. HUMMEL:**  NO FURTHER QUESTIONS.

          **MR. KESSLER:**  I JUST HAVE ONE QUESTION ON THAT, YOUR HONOR.

**FURTHER REDIRECT EXAMINATION**

BY MR. KESSLER:

Q.   IS THERE ANY EVIDENCE THAT THE EA PAYMENTS WERE BELOW MARKET VALUE IN ANY WAY IN THE HALL OF FAME GAME?

A.   NO.  IF THEY WERE BELOW MARKET VALUE, WHY WOULD EA THINK IT PAID TOO MUCH?  I MEAN, THEY WERE TRYING TO GET A HUNDRED THOUSAND DOLLARS OFF.

Q.   THEY THOUGHT IT WAS ABOVE OR BELOW MARKET VALUE?

A.   THAT WOULD INDICATE THAT THEY THOUGHT IT WAS ABOVE MARKET VALUE.

          **MR. KESSLER:**  THANK YOU, PROFESSOR NOLL.

          **THE COURT:**  MAY THE PROFESSOR BE EXCUSED NOT SUBJECT

1    TO RECALL?

2            **MR. HUMMEL:**  YES, YOUR HONOR.

3            **THE WITNESS:**  THANK YOU.

4            **MR. KESSLER:**  YES, YOUR HONOR.

5            **THE COURT:**  ALL RIGHT.  THANK YOU.

6            ALL RIGHT.  HOW MUCH LONGER IS -- YOU HAVE ONE MORE

7    WITNESS?

8            **MR. KESSLER:**  WE DO.  HE IS ABOUT -- HOW LONG IS IT?

9    ABOUT 25 MINUTES, YOUR HONOR.

10           **THE COURT:**  ALL RIGHT.  WE'RE GETTING CLOSE TO A

11   MILESTONE, AREN'T WE?  25 MORE MINUTES.  BUT WE'RE GOING TO

12   TAKE A 15-MINUTE RECESS AT THIS TIME.  PLEASE REMEMBER THE

13   ADMONITION.

14           **THE CLERK:**  ALL RISE.

15           (THEREUPON, THE JURY LEFT THE COURTROOM.)

16           (THE FOLLOWING PROCEEDINGS WERE HELD IN OPEN COURT,

17           OUTSIDE THE PRESENCE OF THE JURY.)

18           **THE COURT:**  ANYTHING YOU NEED ME FOR?

19           **MR. KESSLER:**  IF YOUR HONOR WILL GET TO THEIR

20   REBUTTAL CASE.  I DON'T KNOW IF YOU CAN DO IT IN THIS AMOUNT OF

21   TIME.

22           **THE COURT:**  I'M GOING TO TRY TO LOOK AT IT RIGHT NOW.

23           **MR. KESSLER:**  AND I WOULD JUST REMIND YOUR HONOR,

24   ONLY BECAUSE YOU CALLED THIS DISTINCTION BEFORE, THEY ARE NOW

25   PROPOUNDING MR. FRISS AS OPPOSED TO WE'RE DOING IT.  AND THE

1 REASON I MENTION THAT IS WHEN YOUR HONOR LOOKED AT THIS TWICE

2 YOU SAID IT MADE A DIFFERENCE TO YOU ON THE QUESTION OF LEADING

3 AS TO WHO WAS PROPOUNDING THE WITNESS.

4       **THE COURT:** YES, I NEED TO LOOK AT THAT. THANK YOU.

5       **MR. KESSLER:** THANK YOU.

6       **MR. LECLAIR:** YOUR HONOR, I'M SORRY. I WAS INCORRECT

7 ON ONE THING.

8       ON SKALL WE HAVE ONE GLOBAL OBJECTION THAT ALL OF

9 THEIR DESIGNATIONS ARE BEYOND THE SCOPE. AND SO I DON'T THINK

10 WE DESIGNATED THAT WITH EACH. I THINK THEY PUT A NOTE ON THE

11 FRONT AND SAID: EVERYTHING THEY DESIGNATE IS BEYOND THE SCOPE

12 OF OUR SHORT DESIGNATION.

13       AND THEY'RE TRYING --

14       **THE COURT:** I WASN'T GIVEN SKALL. THERE WAS THAT ONE

15 QUESTION AND ANSWER YOU RAISED THIS MORNING. OR YOU RAISED

16 THIS MORNING. AND WHAT DID I RULE ON THAT?

17       **MR. KESSLER:** NO, I RAISED SKALL, IN GENERAL. YOU

18 SHOULD HAVE SKALL AND FRISS BEFORE YOU.

19       **MR. LECLAIR:** I THINK WE GAVE YOU BOTH OF THEM, YOUR

20 HONOR.

21       **THE COURT:** DIDN'T I RULE ON SKALL?

22       **MR. LECLAIR:** ON FRISS.

23       **MR. KESSLER:** THE ISSUE ON SKALL WAS THEY SAID IT WAS

24 REBUTTAL FOR PAT ALLEN, AND WE ARGUED WHETHER PAT ALLEN WAS IN

25 THEIR CASE OR NOT. AND YOU SAID ON THAT BASIS YOU WOULD ALLOW

1   IT.

2         BUT THERE ARE DESIGNATIONS THEY'VE OBJECTED TO AND

3   WE'VE OBJECTED TO, SO YOU NEED TO RULE ON THAT.

4         **THE COURT:**  ALL RIGHT.

5         **MR. KESSLER:**  WE DIDN'T ARGUE THAT YET.

6         **THE COURT:**  OKAY.  15 MINUTES.

7         **MR. KESSLER:**  THANK YOU.

8         (RECESS TAKEN FROM 9:04 TO 9:21 A.M.)

9         (THE FOLLOWING PROCEEDINGS WERE HELD IN OPEN COURT,

10        OUTSIDE THE PRESENCE OF THE JURY.)

11        **THE COURT:**  ALL RIGHT.  LET'S -- I GOT THE MESSAGE

12  THAT YOU WITHDREW FRISS.

13        WITH RESPECT TO SKALL, I'VE ALREADY STATED THAT

14  PLAINTIFF CAN READ THE PORTION THAT RELATES TO THE LIST.

15  HOWEVER, THE DEFENDANTS' COUNTER-DESIGNATIONS WILL BE EXCLUDED,

16  IN PART.  THE PART THAT DEALS WITH REEBOK WILL BE EXCLUDED.

17  THAT ISSUE WAS IN THE CASE.

18        IT'S UNFAIR NOW TO BRING UP ALL THIS VERY LENGTHY

19  QUESTION AND ANSWERS ON REEBOK, AND YOU COULD HAVE PUT THAT IN

20  YOUR CASE.

21        IN FACT, WE HAVEN'T FINISHED YOUR CASE YET.  I GUESS,

22  IF YOU WANTED TO --

23        **MR. KESSLER:**  I GUESS, YOUR HONOR, WE WOULD THEN

24  DESIGNATE THAT PORTION TO BE IN OUR CASE AND WHY DON'T WE DO IT

25  TOGETHER BEFOREHAND, BECAUSE WE ARE GOING TO DO MR. SKALL.  WE

1  WOULD LIKE THAT PORTION IN.

2          AND RATHER THAT SPLIT IT, WE COULD DO IT --

3      **THE COURT:**  THEN, WE COME TO THE SECOND PART, WHICH

4  IS SOME OF THIS IS HEARSAY.  WHENEVER THIS WITNESS SAYS:

5          "I CALLED UP PEOPLE AT REEBOK, AND THEY SAID

6  THEY NEVER SOLD ANYTHING," THAT'S JUST RANK HEARSAY.

7          AND WHEN I GOT TO THAT, I JUST THREW MY HANDS UP AND

8  SAID:

9          "WE'RE NOT GOING TO ALLOW THIS."

10         SO I HAVEN'T GONE THROUGH THIS TO -- IF YOU WILL GO

11  THROUGH AND TAKE ALL THE HEARSAY.

12     **MR. KESSLER:**  WE WILL TAKE OUT WHATEVER WAS OBJECTED

13  TO, IF IT WAS HEARSAY, YOUR HONOR.

14     **MR. LECLAIR:**  IT WOULDN'T HAVE TO BE OBJECTED TO.

15     **THE COURT:**  DO WHAT?

16     **MR. LECLAIR:**  IT WOULDN'T HAVE TO BE OBJECTED TO AS

17  HEARSAY.

18     **THE COURT:**  NO, HEARSAY YOU DON'T HAVE TO OBJECT TO

19  AT THE DEPOSITION.

20     **MR. LECLAIR:**  RIGHT.

21     **THE COURT:**  IF THEY'VE OBJECTED TO IT NOW AS HEARSAY,

22  THEN IT OUGHT TO COME OUT.

23     **MR. KESSLER:**  SO HOW WOULD YOUR HONOR LIKE US TO DO

24  THIS?  SHOULD WE READ THAT PORTION IN OUR CASE, AND THEN HAVE

25  THEM READ A PORTION IN THEIR CASE?  WHAT'S MOST EFFICIENT FOR

1 THE JURY?

2       WE COULD AGREE IT'S IN BOTH OF OUR CASES AND JUST

3 HAVE IT READ. IT DOESN'T MATTER TO US. OR WE COULD READ IT

4 TWICE.

5       **THE COURT:** JUST SEEMS LIKE JUST A LONG, EXTENDED,

6 OVER A SMALL, INCONSEQUENTIAL POINT.

7       **MR. KESSLER:** WE AGREE WITH THAT, YOUR HONOR, EXCEPT

8 THEY INJECTED THE REEBOK THING, YOU RECALL, WITH THE WAVING

9 JERSEY, WHEN MY EXAMINATION WAS INTERRUPTED BY MR. KATZ --

10       **THE COURT:** WHAT IS THIS GOING TO PROVE? IF YOU TAKE

11 OUT THE FACTS -- BECAUSE YOU CAN'T BRING IN THEY NEVER SOLD

12 ANYTHING THROUGH HEARSAY.

13       **MR. KESSLER:** NO. WE BELIEVE THE NONHEARSAY PORTIONS

14 ESTABLISH THAT IT WAS NEVER SOLD. IN OTHER WORDS, WE THINK

15 THERE ARE PORTIONS OF THAT THAT SHOW IT WAS NEVER SOLD. AT

16 LEAST, TO MR. SKALL'S KNOWLEDGE, PERSONAL KNOWLEDGE, HE KNEW

17 ABOUT THE PROGRAM.

18       AGAIN, IF YOUR HONOR -- YOU KNOW, GIVEN WHAT THEY

19 DID, I THINK WE CAN'T IGNORE IT.

20       **THE COURT:** ARE YOU GOING TO BE HAVING A READER OR IS

21 THIS GOING TO BE VIDEOTAPE?

22       **MR. KESSLER:** OKAY. WE'LL -- WE'LL DROP IT. WE'LL

23 DROP --

24       **THE COURT:** YOU'RE DROPPING SKALL?

25       **MR. KESSLER:** NO, WE'LL DROP --

1          (DEFENSE COUNSEL CONFER OFF THE RECORD.)

2          **MR. KESSLER:**  OKAY.  WE'LL DROP IT.  WE'LL DROP IT.

3          **THE COURT:**  DROP WHAT?

4          **MR. KESSLER:**  THE REEBOK DISCUSSION THAT YOUR HONOR

5 DIDN'T THINK WAS APPROPRIATE.

6          **THE COURT:**  THAT'S THE ONLY PART I WAS GOING TO

7 SUSTAIN ANY OBJECTIONS TO.  SO WITH THAT, YOU CAN THEN READ

8 EVERYTHING AS A COUNTER-DESIGNATION, BECAUSE --

9          **MR. KESSLER:**  YOUR HONOR, THEY ARE ATTEMPTING NOW --

10 THEY WANT TO RAISE THIS NOW -- TO INTRODUCE A DIFFERENT

11 WITNESS.  WE HAD NO NOTICE ABOUT THIS.  MR. ZUCKER.  YOUR

12 HONOR'S RULES ARE VERY CLEAR.  THEY HAD TO LET US KNOW.  WE HAD

13 NO CHANCE TO DO ANY COUNTER-DESIGNATIONS.

14          BECAUSE YOUR HONOR RULED ONE WAY ON MR. FRISS, NOW

15 THEY WANT TO COME UP WITH MR. ZUCKER.  THIS IS INAPPROPRIATE

16 UNDER YOUR HONOR'S RULES.  THEY CAN'T KEEP PICKING AND DOING

17 THIS.  WE HAVE NO TIME NOW TO REVIEW THEIR DESIGNATIONS ON

18 MR. ZUCKER, WHETHER THEY'RE PROPER, WHAT OUR

19 COUNTER-DESIGNATIONS ARE.

20          THEY HAD TO GIVE US NOTICE OF THIS YESTERDAY, UNDER

21 YOUR HONOR'S RULES.  THEY GAVE US NOTICE OF THE OTHER TWO,

22 NOTHING ABOUT ZUCKER.

23          **MR. LECLAIR:**  YOUR HONOR, TWO THINGS.  THIS RELATES

24 TO MR. NOLL'S TESTIMONY THIS MORNING.  WE'RE REBUTTING

25 DR. NOLL'S TESTIMONY THIS MORNING.  I THINK WE ARE ENTITLED TO

1 DO THAT.

2       **THE COURT:** WHAT IS IT?

3       **MR. LECLAIR:** IT'S ABOUT 15 LINES OF A DEPOSITION.

4 DR. NOLL'S TESTIMONY WAS THERE'S NO DEMAND FOR THE GROUP. WHAT

5 THIS TESTIMONY SHOWS IS FROM A LICENSEE THAT THEY DON'T USE ALL

6 THE ACTIVE PLAYERS.

7       WHAT DR. NOLL SAID IS THERE'S DEMAND FOR INDIVIDUAL

8 RETIRED PLAYERS, NO DEMAND FOR THE GROUP.

9       THIS TESTIMONY SHOWS THAT ON ACTIVE PLAYERS THEY

10 DON'T NEED ALL THE ACTIVE PLAYERS, BUT THEY LICENSE THE ENTIRE

11 GROUP. IT SHOWS THAT INDIVIDUAL DEMAND CREATES DEMAND FOR THE

12 GROUP. AND THAT'S A FAIR POINT FOR US TO PUT IN. IT'S 15

13 LINES.

14       **THE COURT:** THAT ISSUE HAS BEEN IN THE CASE FOR A

15 LONG TIME. AND YOU SHOULD NOT BE -- YES, IT'S TRUE THAT THAT

16 ISSUE WAS VENTILATED WITH DR. NOLL, BUT IT'S ALSO COME UP

17 BEFORE, AND THIS IS NOT PROPER REBUTTAL. SO THAT'S NOT GOING

18 TO BE ALLOWED. IT'S TOO SHORT A NOTICE, AND IT'S COMMON SENSE,

19 ANYWAY.

20       THEY'RE NOT GOING -- THEY'VE GOT PEOPLE ON THE ACTIVE

21 ROSTER WHO PLAY VERY FEW GAMES AND SURELY THEY DON'T USE

22 EVERYBODY. YOU CAN MAKE THAT ARGUMENT JUST FROM COMMON SENSE.

23       **MR. LECLAIR:** IN FAIRNESS, YOUR HONOR --

24       **THE COURT:** WE'RE NOT GOING TO HAVE ANY MORE

25 DESIGNATIONS. AT LEAST THAT DESIGNATION WE'RE NOT GOING TO

1 HAVE.

2     **MR. LECLAIR:** YOUR HONOR, YOU JUST ALLOWED THEM TO

3 DECIDE, WHEN WE DROPPED FRISS, THEY'RE GOING TO READ PORTIONS

4 OF FRISS, I THOUGHT.

5     **THE COURT:** NO, THEY ARE NOT.

6     **MR. LECLAIR:** OH, THEY ARE DROPPING FRISS. OKAY.

7     **MR. KESSLER:** WE'RE DROPPING.

8     **MR. LECLAIR:** OKAY.

9     **MR. KESSLER:** THEY'RE NOT OFFERING FRISS. WE'RE NOT

10 OFFERING FRISS.

11     **MR. LECLAIR:** VERY GOOD, YOUR HONOR.

12     **THE COURT:** AND THEN, THEY ARE DROPPING REEBOK OUT OF

13 SKALL. SKALL CAN BE READ -- I'LL GIVE YOU A CHOICE. YOU CAN

14 READ IT NOW OR READ -- WHY DON'T YOU --

15     **MR. LECLAIR:** ACTUALLY, YOUR HONOR, THAT WAS MY

16 POINT.

17     **THE COURT:** WHAT?

18     **MR. LECLAIR:** I'M SORRY. MAYBE I'M DOING TOO MUCH

19 THIS MORNING. WITH NO NOTICE TO US, ALL THE SKALL DESIGNATIONS

20 ARE BEYOND THE SCOPE OF OUR SHORTEN ENTRY. BUT THEY'RE GOING

21 TO READ IT BECAUSE THEY SAY:

22     "WELL, WE'RE GOING TO PUT IT IN NOW," WITH NO

23 NOTICE.

24     **THE COURT:** NO. HERE'S THE THING.

25     YOU CALLED HER OUT OF TURN. THE ONLY REASON I'M

1    LETTING YOU EVEN READ SKALL IS BECAUSE OF THE PROCEDURAL SNAFU

2    THAT SHE GOT CALLED OUT OF TURN.

3            AND I'M PRETENDING, FOR PURPOSES OF THIS ANALYSIS, AS

4    IF MRS. PAT ALLEN HAD BEEN CALLED IN YOUR CASE-IN-CHIEF.

5            **MR. LECLAIR:**  I UNDERSTAND, YOUR HONOR.

6            **THE COURT:**  HAD THAT BEEN DONE THIS WOULD HAVE BEEN

7    ALLOWED.

8            **MR. LECLAIR:**  I UNDERSTAND, YOUR HONOR.  THAT'S FINE.

9            **THE COURT:**  ALL RIGHT.  SO WITH THAT EXPLANATION, I'M

10   HANDING ALL THIS BACK.  IGNORE MY NOTES, BECAUSE IT'S ALL MOOT

11   NOW, IN LIGHT OF THE WITHDRAWAL OF THE LARGE PART OF THIS

12   DESIGNATION BY THE DEFENSE.

13           ARE WE READY TO GO?

14           **MR. KESSLER:**  YES, WE ARE, YOUR HONOR.

15           **THE COURT:**  ALL RIGHT.  LET'S BRING OUR JURY BACK IN.

16           (THEREUPON, THE JURY RETURNED TO THE COURTROOM.)

17           **THE COURT:**  OKAY.  WELCOME BACK.  HAVE A SEAT.

18           REMEMBER WHERE WE ARE.  WE ARE STILL IN THE DEFENSE

19   CASE.

20           NEXT WITNESS.

21           **MR. KESSLER:**  YOUR HONOR, OUR NEXT WITNESS WILL BE BY

22   DEPOSITION, THE LATE GENE UPSHAW.

23           AND MY ASSOCIATE, MOLLY DONOVAN, WILL PRESENT THE

24   WITNESS, AND MY ASSOCIATE, ROY TAUB, WILL READ FOR MR. UPSHAW.

25           **THE COURT:**  ALL RIGHT.  VERY WELL.  YOU KNOW THE

1   DRILL BY NOW.  LET'S GIVE THE JURY A HEADS-UP ON HOW LONG IT'S

2   GOING TO BE.

3            **MS. DONOVAN:**  I THINK IT WILL LAST ABOUT 25 MINUTES.

4            **THE COURT:**  ALL RIGHT.

5            **MS. DONOVAN:**  YOUR HONOR, THE TIME ALLOTMENT ON THIS

6   IS TWO MINUTES FOR THE PLAINTIFFS, AND THE REMAINING TIME FOR

7   DEFENDANTS.

8            **THE COURT:**  ALL RIGHT.  I'LL KEEP THAT IN MIND.

9            ALL RIGHT.  SO THE -- THIS IS THE DEPOSITION OF

10  MR. GENE UPSHAW, TAKEN ON WEDNESDAY, FEBRUARY 13TH OF THIS

11  YEAR, IN WASHINGTON, D.C.

12           AND IT LOOKS LIKE THE QUESTIONING WAS CONDUCTED BY

13  MR. -- MR. KATZ.  DID ANYONE ELSE ASK QUESTIONS THAT YOU'RE

14  GOING TO BE READING?

15           **MS. DONOVAN:**  MR. KESSLER.

16           **THE COURT:**  ALL RIGHT.  GO RIGHT AHEAD.

17                         **GENE UPSHAW**,

18  CALLED AS A WITNESS FOR THE DEFENDANTS HEREIN, TESTIFIED VIA

19  DEPOSITION READ IN OPEN COURT IN THE PRESENCE AND HEARING OF

20  THE JURY AS-FOLLOWS:

21           (DEPOSITION TESTIMONY READ BY MS. DONOVAN AND MR.

22           TAUB AS FOLLOWS:)

23                         **EXAMINATION**

24  **Q.**   GOOD MORNING, MR. UPSHAW.

25  **A.**   GOOD MORNING.

1  **Q.**   YOU'RE THE EXECUTIVE DIRECTOR OF THE NFLPA; IS THAT

2  CORRECT, SIR?

3  **A.**   YES.

4  **Q.**   DO YOU HOLD ANY OTHER POSITIONS WITH THE NFLPA?

5  **A.**   NO.  I'M JUST THE EXECUTIVE DIRECTOR.  AND I'M THE

6  CHAIRMAN OF PLAYERS INC.  THAT'S SEPARATE FROM THE NFLPA.

7  **Q.**   ARE YOU ON THE BOARD OF THE NFLPA?

8  **A.**   THE BOARD?

9  **Q.**   YES.  ARE YOU A DIRECTOR?

10 **A.**   I'M A NONVOTING MEMBER OF THE BOARD OF THE NFLPA.

11 **Q.**   AND ARE YOU A MEMBER OF THE BOARD -- WELL, YOU'RE CHAIRMAN

12 OF THE BOARD OF PI?

13 **A.**   PLAYERS INC.

14 **Q.**   IS IT OKAY IF I CALL IT "PI"?

15 **A.**   SURE.

16 **Q.**   ALL RIGHT.  GOOD.

17      DO YOU HOLD ANY OTHER OFFICES OR TITLES IN OTHER

18 FOOTBALL-RELATED ORGANIZATIONS, LIKE PROFESSIONAL ATHLETES

19 TRUST OR --

20 **A.**   YES.  I'M THE PRESIDENT OF PROFESSIONAL ATHLETES

21 INCORPORATED.

22 **Q.**   DO YOU HOLD ANY OTHER OFFICES OR TITLES IN

23 FOOTBALL-RELATED ORGANIZATIONS?

24 **A.**   YES.  I'M THE EXECUTIVE DIRECTOR OF THE ARENA FOOTBALL

25 LEAGUE PLAYERS ASSOCIATION.

1  Q.   OKAY.

2  A.   I'M ALSO THE EXECUTIVE DIRECTOR OF THE NFL COACHES

3  ASSOCIATION.  THOSE ARE ALL OF THE TITLES I HOLD RELATED TO

4  FOOTBALL.

5  Q.   OKAY.  AND THERE'S SOMETHING CALLED "THE PROFESSIONAL

6  ATHLETES FOUNDATION."  DID YOU MENTION THAT?

7  A.   YES.

8  Q.   AND PROFESSIONAL ATHLETES TRUST.  IS THERE ANOTHER ONE

9  CALLED "PROFESSIONAL ATHLETES TRUST"?

10  A.   PROFESSIONAL ATHLETES FOUNDATION.  I'M THE PRESIDENT.

11  Q.   I'D LIKE TO DIRECT YOUR ATTENTION TO PAGE 4.  AT THE TOP

12  OF IT IT SAYS:

13              "A CONTINUED VOICE IN YOUR UNION."

14       DO YOU BELIEVE THAT THE RETIRED PLAYERS HAVE A VOICE

15  IN THE UNION, SIR?

16  A.   YES.

17  Q.   AND IT REFERS IN THE FIRST SENTENCE TO:

18              "IN 1984, THE RETIRED PLAYERS ASSOCIATION WAS

19  FORMED TO PROVIDE AN ACTIVE VOICE IN THE ORGANIZATION OF ALL

20  FORMER PROFESSIONAL FOOTBALL PLAYERS."

21       IN 1984, WAS THAT BEFORE THEY BECAME MEMBERS OF THE

22  NFLPA?

23  A.   YES.

24  Q.   AND DO YOU HAVE AN UNDERSTANDING OF WHAT THE RETIRED

25  PLAYERS ASSOCIATION WAS AT THAT TIME?

1  **A.**   IN 1984?

2  **Q.**   YES.

3  **A.**   IT WAS REALLY -- IT WAS PROBABLY IN THE SAME FORM THAT

4  IT'S IN NOW.  WE HAD CHAPTERS.  WE HAD PLAYERS THAT PAID DUES.

5  WE HAD ALL OF THE THINGS THAT WE HAVE TODAY, EXCEPT IT WAS NOT

6  RECOGNIZED IN THE CONSTITUTION AS MEMBERS, WAS THE ONLY

7  DIFFERENCE.  I MEAN, EVERYTHING THAT APPLIED IN 1984 WHEN WE

8  FORMED THE ORGANIZATION STILL APPLIES.

9  **Q.**   AND WERE YOU RETIRED YET IN 1984, SIR?

10 **A.**   YES, I WAS.

11 **Q.**   WERE YOU A MEMBER OF THE RETIRED PLAYERS ASSOCIATION?

12 **A.**   I FOUNDED THIS WHOLE DEPARTMENT.

13 **Q.**   SO YOU FOUNDED THE RETIRED PLAYERS ASSOCIATION?

14 **A.**   THAT'S RIGHT.

15 **Q.**   WHO WERE THE OTHER FOUNDERS, OR WERE THERE ANY OTHERS?

16 **A.**   NO.  WE MADE THIS AS A DEPARTMENT WITHIN THE NFL PLAYERS

17 ASSOCIATION.  UNTIL 1984, THERE WAS NO SUCH DEPARTMENT IN THE

18 PLAYERS ASSOCIATION.

19 **Q.**   NUMBER 113 APPEARS TO BE A FORM LETTER, SIR.  BUT YOUR

20 SIGNATURE APPEARS TO APPEAR AT THE BOTTOM.  IS THAT YOUR

21 SIGNATURE?

22 **A.**   YES, IT IS.

23 **Q.**   THEN, IF WE TAKE A LOOK AT THE NEXT PARAGRAPH, SECOND

24 SENTENCE, IT SAYS:

25           "IN THE PAST, WE HAVE DISTRIBUTED ALL OF THE

1  LICENSING FEES RECEIVED FOR USE OF RETIRED PLAYERS' NAMES AND

2  IMAGES TO THE RETIRED PLAYERS UTILIZED, AND WE WILL CONTINUE TO

3  DO SO."

4          SO DOES THAT MEAN THAT -- THERE WAS NO DISTRIBUTION,

5  OF COURSE, TO AN ESCROW ACCOUNT, BECAUSE NO ESCROW ACCOUNT

6  EXISTED; IS THAT RIGHT?

7  **A.**   THAT'S CORRECT.  THE MONEY THAT WAS GENERATED BY A RETIRED

8  PLAYER WENT TO THE RETIRED PLAYER.

9  **Q.**   DO YOU KNOW WHY THE ESCROW ACCOUNT THAT WAS MENTIONED IN

10  THE GLA WAS NOT CREATED?

11  **A.**   THE REASON IT WASN'T CREATED, BECAUSE WE PASSED THE MONEY

12  STRAIGHT TO THE PLAYERS.  THERE WAS NO MONEY TO SET UP AN

13  ESCROW ACCOUNT.  I WILL BE GLAD TO TAKE A LOAN.  WE CAN SET ONE

14  UP TODAY.  BUT WE DON'T HAVE ONE.  WE NEVER DID.

15  **Q.**   AND DID YOU EVER INFORM ANY RETIRED PLAYER THAT THE ESCROW

16  ACCOUNT WAS NOT BEING SET UP?

17  **A.**   NO.

18  **Q.**   NOW, WHEN YOU SAY, "WE HAVE DISTRIBUTED ALL OF THE

19  LICENSING FEES RECEIVED FOR USE OF RETIRED PLAYERS' NAMES AND

20  IMAGES TO THE RETIRED PLAYERS UTILIZED AND WE WILL CONTINUE TO

21  DO SO," WHEN YOU SAY "ALL OF THE LICENSING FEES," DOESN'T PI

22  TAKE A CUT OF THE LICENSING FEES, SIR?

23          **MR. TAUB:**  AT HIS DEPOSITION, MR. UPSHAW TESTIFIED:

24              "NOT OF RETIRED PLAYERS."

25          SUBSEQUENT TO HIS DEPOSITION, MR. UPSHAW REVIEWED HIS

1  TRANSCRIPT AND CORRECTED IT AS FOLLOWS:

2          "I DON'T KNOW ABOUT RETIRED PLAYERS.  I JUST

3          DON'T KNOW IF PLAYERS INC HAS CHARGED AN

4          ADMINISTRATIVE FEE.  AND THAT APPLIES TO ALL

5          OF THE PROGRAMS WE DO.  I AM NOT FAMILIAR

6          WITH THEM CHARGING, AND I JUST DON'T KNOW."

7          **THE COURT:**  ALL RIGHT.  NOW, LET ME JUST CLARIFY

8  THAT.  COUNSEL READ IT EXACTLY THE RIGHT WAY, BUT YOU WILL

9  REMEMBER EARLIER IN THE TRIAL I TOLD YOU THAT DEPONENTS,

10 MEANING PEOPLE WHO HAVE HAD THEIR DEPOSITIONS TAKEN, GET AN

11 OPPORTUNITY AFTER THE DEPOSITION TO READ AND CORRECT THEIR

12 TRANSCRIPT.

13         IF THEY WANT IT CHANGE THEIR TESTIMONY THEY CAN

14 CHANGE IT FROM "THE LIGHT WAS RED" TO "THE LIGHT WAS GREEN."

15         BUT AT TRIAL, BOTH VERSIONS CAN BE READ IN AND

16 CONSIDERED BY YOU AS EVIDENCE.  SO WHEN THERE IS A CORRECTION,

17 THEN IT'S THE NORMAL PROCEDURE FOR YOU TO HEAR BOTH VERSIONS.

18         SO I'M GOING TO ASK -- SINCE YOU MIGHT NOT HAVE

19 UNDERSTOOD WHAT YOU WERE HEARING, I'M GOING TO ASK COUNSEL TO

20 READ THE INITIAL QUESTION AGAIN, AND THEN THE READER TO GO BACK

21 OVER IT AGAIN SO IT WILL MAKE SENSE TO YOU.

22         (DEPOSITION WAS CONTINUED TO BE READ AS FOLLOWS:)

23 Q.  NOW, WHEN YOU SAY, "WE HAVE DISTRIBUTED ALL OF THE

24 LICENSING FEES RECEIVED FOR USE OF RETIRED PLAYERS' NAMES AND

25 IMAGES TO THE RETIRED PLAYERS UTILIZED AND WE WILL CONTINUE TO

1  DO SO," WHEN YOU SAY "ALL OF THE LICENSING FEES," DOESN'T PI

2  TAKE A CUT OF THE LICENSING FEES, SIR?

3          **MR. TAUB:**  AT HIS DEPOSITION, MR. UPSHAW TESTIFIED:

4          "NOT OF RETIRED PLAYERS."

5          SUBSEQUENT TO HIS DEPOSITION, MR. UPSHAW REVIEWED HIS

6  TRANSCRIPT AND CORRECTED IT AS FOLLOWS:

7          "I DON'T KNOW ABOUT RETIRED PLAYERS.  I JUST

8          DON'T KNOW IF PLAYERS INC HAS CHARGED AN

9          ADMINISTRATIVE FEE.  AND THAT APPLIES TO ALL

10         OF THE PROGRAMS WE DO.  I AM NOT FAMILIAR

11         WITH THEM CHARGING, AND I JUST DON'T KNOW."

12 **Q.**   DOESN'T NFLPA TAKE A CUT?

13 **A.**   NO, NOT OF RETIRED PLAYERS.

14 **Q.**   SO NEITHER PI NOR NFLPA HAVE EVER TAKEN A CUT OF RETIRED

15 PLAYERS' FEES, TO YOUR KNOWLEDGE?

16         YOU MAY ANSWER, SIR.

17         **MR. TAUB:**  AT HIS DEPOSITION, MR. UPSHAW TESTIFIED AS

18 FOLLOWS:

19         "ANY FEES THAT UTILIZE -- THAT RETIRED

20         PLAYERS WERE USED IN OR UTILIZED RETIRED

21         PLAYERS WENT DIRECTLY TO THE RETIRED PLAYERS,

22         NO ONE ELSE.  WE WERE JUST A PASS-THROUGH."

23         MR. UPSHAW CORRECTED HIS TESTIMONY TO READ AS

24 FOLLOWS:

25         "TO MY UNDERSTANDING, ANY FEES THAT UTILIZE,

1          THAT RETIRED PLAYERS WERE USED IN OR UTILIZED

2          RETIRED PLAYERS WENT DIRECTLY TO THE RETIRED

3          PLAYERS, NO ONE ELSE.  TO MY KNOWLEDGE, WE

4          WERE JUST A PASS-THROUGH.  HOWEVER, I JUST

5          DON'T KNOW IF PLAYERS INC HAS CHARGED AN

6          ADMINISTRATIVE FEE."

7    **Q.**    AND BY FEES, WOULD YOU INCLUDE ROYALTIES IN THAT?

8    **A.**    WHATEVER WAS ENTITLED, WHATEVER THE RETIRED PLAYERS WERE

9    ENTITLED TO, THEY RECEIVED.

10   **Q.**    SO EVERY PAYMENT THAT A RETIRED PLAYER RECEIVED, EVERY

11   PAYMENT THAT A RETIRED PLAYER HAS RECEIVED FROM LICENSEE, AS

12   FAR AS YOU KNOW, HAS NOT BEEN SUBJECTED TO ANY CUT TO PLAYERS

13   INC?

14          YOU MAY ANSWER, SIR.

15          **MR. TAUB:**  AT HIS DEPOSITION, MR. UPSHAW TESTIFIED AS

16   FOLLOWS:

17          "THE FEE WENT TO DIRECTLY TO THE PLAYER.  NO

18          ONE TOOK A CUT."

19          MR. UPSHAW SUBSEQUENTLY CORRECTED IT TO READ AS

20   FOLLOWS:

21          "TO MY KNOWLEDGE, THE FEE WENT DIRECTLY TO

22          THE PLAYER.  NO ONE TOOK A CUT.  BUT I JUST

23          DON'T KNOW IF PLAYERS INC HAS CHARGED

24          ADMINISTRATIVE FEE, AND THAT APPLIES TO ALL

25          OF THE PROGRAMS THAT WE DO."

1  Q.   SAME QUESTION WITH RESPECT TO THE NFLPA.

2  A.   YES.

3  Q.   SAME ANSWER?

4  A.   YES.

5  Q.   OKAY.  THEN, IT SAYS, IN THE SECOND PARAGRAPH IT SAYS:

6  "LIKE ANY OTHER LABOR UNION, WE REPRESENT ONLY ACTIVE PLAYERS."

7        AND WHEN YOU SAY "REPRESENT" THERE, YOU MEAN IN

8  COLLECTIVE BARGAINING?

9  A.   YES.

10 Q.   BECAUSE YOU DO REPRESENT THE RETIRED PLAYERS IN OTHER

11 WAYS, RIGHT?

12 A.   YES.

13 Q.   FOR EXAMPLE, YOU REPRESENT THEM IN THEIR LICENSING; ISN'T

14 THAT RIGHT?

15 A.   WE PROVIDE ACCESS FOR THE RETIRED PLAYERS THROUGH OUR

16 PROGRAMS, YES.

17 Q.   YOU REPRESENT THEM, THE NFLPA REPRESENTS THEM, AND PLAYERS

18 INC REPRESENTS THEM IN THEIR LICENSING ACTIVITIES; ISN'T THAT

19 CORRECT, SIR?

20 A.   SOME, YES.

21 Q.   THEN IT SAYS:  "AS A RETIRED PLAYER, YOU'RE NOT A UNION

22 MEMBER."

23        THAT'S ACTUALLY NOT RIGHT, IS IT, SIR?  THEY ARE

24 UNION MEMBERS, RIGHT?

25 A.   THEY'RE NOT UNION MEMBERS IN THE SENSE OF COLLECTIVE

1  BARGAINING.  THAT IS ACCURATE.  THEY ARE NOT UNION MEMBERS.

2  THEY ARE NOT PART OF THE BARGAINING UNIT.

3  **Q.**  I UNDERSTAND THAT.  BUT THEY ARE MEMBERS OF THE NFLPA,

4  CORRECT?

5  **A.**  THAT DOESN'T MAKE THEM MEMBERS OF THE BARGAINING UNIT.

6  **Q.**  I DON'T WANT TO ARGUE WITH YOU, SIR.

7  **A.**  THAT'S MY ANSWER.

8  **Q.**  I AGREE WITH YOU.  THEY ARE NOT MEMBERS OF THE BARGAINING

9  UNIT, OKAY?  I'M NOT ASKING THAT QUESTION.  THE QUESTION I'M

10  ASKING IS SIMPLY:  IS IT CORRECT THAT RETIRED PLAYERS ARE

11  MEMBERS OF THE NFLPA?

12  **A.**  YES.

13  **Q.**  I MEAN, AS EXECUTIVE DIRECTOR OF THE UNION, YOU BELIEVE

14  THAT YOU HAVE OBLIGATIONS TO YOUR MEMBERS, TO YOUR RETIRED

15  MEMBERS, DON'T YOU?

16         YOU MAY ANSWER, SIR.

17  **A.**  WELL, AS EXECUTIVE DIRECTOR I AM BY LAW REQUIRED TO

18  REPRESENT THE ACTIVE PLAYERS IN COLLECTIVE BARGAINING.

19  **Q.**  RIGHT.  I'M JUST GOING TO PUT THAT ASIDE FOR A MOMENT.

20  **A.**  SURE.

21  **Q.**  AND I'M ASKING YOU, AS EXECUTIVE DIRECTOR OF THE UNION, DO

22  YOU THINK THAT YOU HAVE -- DO ANY OF YOUR DUTIES RELATE TO

23  RETIRED PLAYERS?

24  **A.**  OTHER THAN COLLECTIVE BARGAINING?

25  **Q.**  PUTTING ASIDE COLLECTIVE BARGAINING, YES.

1   A.   YES.

2   Q.   AND WHAT ARE THOSE?

3   A.   THE BENEFITS AND THE PROGRAMS WHICH WE DEVELOP TO HELP THE

4   RETIRED PLAYERS, IMPROVING THEIR PENSION BENEFITS, THEIR

5   DISABILITY BENEFITS, THEIR -- ALL OF THOSE THINGS THAT WE DO.

6   Q.   OKAY.

7   A.   WE TRY TO IMPROVE THOSE.  BUT LEGALLY WE HAVE NO

8   OBLIGATION TO DO THAT.

9   Q.   WELL, ONE OF THE THINGS YOU JUST MENTIONED WAS THEIR

10  DISABILITY BENEFITS.  DO YOU HAVE ANY DIFFERENT -- STRIKE THAT.

11          WITH RESPECT TO THEIR PENSION BENEFITS, DO YOU YOUR

12  DUTIES TO THEM, ARE THEY ANY DIFFERENT FROM WHAT YOUR DUTIES

13  ARE TO THE ACTIVE PLAYERS?

14  A.   YES.

15  Q.   HOW IS THAT?

16  A.   BECAUSE I REPRESENT THE ACTIVE PLAYERS IN COLLECTIVE

17  BARGAINING.  I DO NOT REPRESENT THE RETIRED PLAYERS IN

18  COLLECTIVE BARGAINING.  AND PENSION IS PART OF COLLECTIVE

19  BARGAINING.

20  Q.   EXHIBIT 121, I WILL REPRESENT TO YOU, IS A COPY, CAPTURE

21  OF THE NFLPLAYERS.COM WEBSITE IN EARLY 2007.  AND I TAKE IT

22  THAT'S FAMILIAR TO YOU; IS THAT CORRECT, SIR?

23  A.   OKAY.

24  Q.   AND NOW DIRECTING YOUR ATTENTION TO THE FIRST PARAGRAPH ON

25  THE SECOND PAGE UNDER THE HEADING:  "WHAT IS PLAYERS INC."  THE

1  LAST SENTENCE OF THAT PARAGRAPH SHOULD READ:

2              "PLAYERS INC, WHICH REPRESENTS MORE THAN 1800

3  ACTIVE PLAYERS AND OVER 3,000 RETIRED PLAYERS, HAS BEEN

4  AGGRESSIVE IN ITS EFFORTS TO EXPAND PLAYER MARKETING

5  OPPORTUNITIES."

6          WAS IT CORRECT AT THIS TIME THAT PLAYERS INC

7  REPRESENTED OVER 3,000 RETIRED PLAYERS?

8  **A.**   YES.

9  **Q.**   AND WERE THOSE THAT -- DID THAT MEAN THAT OVER 3,000 HAD

10 SIGNED GLA'S AT THIS POINT?

11 **A.**   NO, IT DIDN'T MEAN OVER 3,000 HAD SIGNED GLA'S.

12 **Q.**   OKAY.

13 **A.**   BECAUSE GLA'S IS NOT THE ONLY FORM IN WHICH YOU REPRESENT

14 PLAYERS OR EVEN UTILIZE THEM IN MARKETING OPPORTUNITIES.

15 **Q.**   OKAY.  WHAT DOES IT MEAN THAT YOU REPRESENT THEM?

16 **A.**   WHAT 300 -- I MEAN 3,000?

17 **Q.**   OVER 3,000, YES.

18 **A.**   IT'S PROBABLY THE NUMBER OF PLAYERS THAT ARE INCLUDED IN

19 THE DIRECTORY --

20 **Q.**   OKAY.

21 **A.**   -- THE RETIRED PLAYERS' DIRECTORY.

22 **Q.**   WHETHER OR NOT THEY HAVE SIGNED A GLA?

23 **A.**   THAT'S CORRECT.

24 **Q.**   WHY IS IT THAT YOU CLAIM YOU REPRESENT THOSE WHO DID NOT

25 SIGN A GLA?

1  **A.**   BECAUSE THERE ARE OPPORTUNITIES OUT THERE FOR PLAYERS THAT

2  DON'T SIGN GLA'S.  WE DIDN'T ONLY JUST DO REPRESENTATION FOR

3  GLA PARTICIPANTS.

4  **Q.**   OKAY.  DID YOU INFORM THE PLAYERS WHO DID NOT SIGN GLA'S

5  THAT YOU REPRESENTED THEM?

6  **A.**   IF THEY WERE INCLUDED IN A PROGRAM, IT WAS NOT A MATTER OF

7  INFORMING THEM.  WHAT WE DID BY PRACTICE WAS INCLUDE THEM.  AND

8  WE PAID IT.

9  **Q.**   RIGHT.  BUT MY QUESTION IS, DID YOU EVER INFORM THOSE WHO

10  DID NOT SIGN GLA'S:

11          "WE ARE REPRESENTING YOU.  WE, PLAYERS INC, OR

12  WE, THE NFLPA, ARE REPRESENTING YOU"?

13          DID YOU EVER TELL THEM THAT?

14  **A.**   THE ONLY WAY I WOULD ANSWER THAT QUESTION IS TO ANSWER IT

15  BY THE PRACTICE IN WHICH WE OPERATED.  THAT WAS IF THERE WAS A

16  TRADING CARD PROGRAM OR AN APPEARANCE OR A MARKETING

17  OPPORTUNITY, AND A COMPANY SAID THAT THEY WERE INTERESTED IN

18  GENE UPSHAW, WE WOULD THEN PROVIDE THAT.  AND IF I DIDN'T HAVE

19  A GLA, WE WOULD STILL PROVIDE THAT PLAYER'S NAME TO THAT

20  COMPANY.

21  **Q.**   WE WERE TALKING ABOUT EXHIBIT 91, MR. UPSHAW.  CAN YOU

22  TELL US WHAT THAT IS, PLEASE?

23          **MS. DONOVAN:**  I BELIEVE EXHIBIT 91 IS IN EVIDENCE.

24  **A.**   I HAVE TO FIND IT.

25  **Q.**   IT'S THE LAST ONE THAT I SHOWED YOU RIGHT HERE, 91, OKAY.

1              TELL US WHAT THAT IS, SIR?

2              (DOCUMENT DISPLAYED.)

3    **A.**   IT'S AN AMENDMENT OF A LICENSING TRANSACTION BETWEEN THE

4    NFLPA AND PLAYERS INC.

5    **Q.**   AND IS IT CORRECT TO SAY THAT THE RESULTS OF THIS IS THAT

6    THE $8 MILLION WAS REALLOCATED FROM THE ACTIVE PLAYERS EQUAL

7    SHARE POOL TO THE NFLPA AND PI?

8    **A.**   YES.

9    **Q.**   SO WHEN IT SAYS HERE IN THE LAST PARAGRAPH, LAST "WHEREAS"

10   PARAGRAPH OF THE FIRST PAGE IT SAYS:

11              "WHEREAS, THE NFLPA AND PLAYERS INC AGREE THAT

12   FURTHER ADJUSTMENT MAY BE NECESSARY AFTER COMPLETION OF AN

13   INDEPENDENT, THIRD-PARTY EVALUATION OF THE VALUE CONFERRED BY

14   THE PLAYERS, THE NFLPA, AND PLAYERS INC," WHAT WAS THAT

15   THIRD-PARTY EVALUATION?  WAS THAT THE TAX COUNSEL THAT YOU

16   MENTIONED?

17   **A.**   NO.  IT SAYS THAT:

18              "NFLPA AND PLAYERS INC AGREE THAT FURTHER

19   ADJUSTMENTS MAY BE NECESSARY."

20   **Q.**   YEAH.  I AGREE IT SAYS THAT.  IT SAYS:

21              "AFTER COMPLETION OF AN INDEPENDENT THIRD-PARTY

22   EVALUATION."

23              I'M ASKING YOU:  WAS THAT THIRD-PARTY EVALUATION EVER

24   COMPLETED?

25   **A.**   NO, NOT THAT I'M AWARE OF.  I MEAN, I'M NOT AWARE THAT

1   THERE WAS A -- NO, I'M NOT.

2   **Q.**   LOOKING AT THE LAST PARAGRAPH ON THE SECOND PAGE,

3   PARAGRAPH E, IT SAYS:

4              "NOTWITHSTANDING THE OTHER PROVISIONS OF THIS

5   SECTION 4, $8 MILLION OF THE AMOUNT DESCRIBED IN THE SECTION 4A

6   SHALL BE PAID OUT OF THE LICENSING REVENUE DEPOSITORY ACCOUNT."

7           IS THAT THE ACTIVE PLAYERS EQUAL SHARE ROYALTY POOL?

8   **A.**   EVERYTHING IN THIS TRANSACTION DEALS WITH ACTIVE PLAYERS.

9   **Q.**   I UNDERSTAND.  I'M JUST ASKING.

10  **A.**   BUT THAT'S, YES, THAT'S WHERE IT CAME FROM.  IT'S THE

11  ACTIVE PLAYERS.

12  **Q.**   OKAY.  AND DID YOU MAKE EFFORTS TO GET THE LICENSEES TO

13  DESIGNATE RETIRED PLAYERS?

14  **A.**   IT'S UP TO THE LICENSEE.  IT'S THEIR BUSINESS.  THEY

15  DETERMINE WHAT'S BEST FOR THEIR BUSINESS.  WE HAVE NO INPUT

16  WHATSOEVER IN TELLING THEM WHO THEY SHOULD USE AND WHO THEY

17  SHOULD NOT USE.  THEY HAVE THEIR OWN COMPANY.  WE JUST

18  FACILITATE AS MUCH AS WE POSSIBLY CAN HELP.

19  **Q.**   BUT YOU DON'T MAKE ANY AFFIRMATIVE EFFORTS TO SELL THEM

20  THE IMAGES OF RETIRED PLAYERS AS A GROUP OR INDIVIDUALLY?

21  **A.**   I DON'T RUN ANY LICENSEES' COMPANY.  THAT'S UP TO THEM.

22  **Q.**   SO YOU DON'T MAKE THOSE AFFIRMATIVE SALES EFFORTS TO SELL

23  RETIRED PLAYERS TO LICENSEES, IMAGES TO LICENSEES?

24  **A.**   I'VE ANSWERED IT.  I CAN'T ANSWER ANY DIFFERENT.

25  **Q.**   AND DO YOU MAKE ANY EFFORTS WITH RESPECT TO SELLING THE

1   IMAGES OF RETIRED PLAYERS TO COMPANIES THAT REQUEST -- MAKE

2   REQUESTS FOR NFL PLAYER SERVICES?

3   **A.**   IF THEY'RE MAKING A REQUEST, IT'S PRETTY MUCH SOLD.

4   **Q.**   RIGHT.  BUT DO YOU MAKE ANY EFFORTS TO SELL THAT PRIOR TO

5   THEIR MAKING A REQUEST?

6           **MR. TAUB:**  AT HIS DEPOSITION, MR. UPSHAW TESTIFIED AS

7   FOLLOWS:

8                "NOT REALLY."

9           MR. UPSHAW SUBSEQUENTLY CORRECTED THE TESTIMONY TO

10  READ AS FOLLOWS:

11               "IF THEY MAKE A REQUEST, THERE IS NO NEED TO

12               MAKE AN EFFORT.  SO, NO, NOT REALLY."

13  **Q.**   I MEAN, THAT'S NOT YOUR JOB.  YOU DON'T GO OUT AND SELL

14  LICENSES?

15  **A.**   WELL, IT'S NOT MY JOB ON A DAY-TO-DAY BASIS.  BUT WHENEVER

16  I HAVE CONTACT WITH LICENSEES OR RESPONSORS, OR WHATEVER, I

17  ALWAYS REMIND THEM THAT WE ALSO HAVE THIS GROUP OF PLAYERS

18  BESIDES OUR ACTIVE PLAYERS.  AND THAT APPLIES TO ANY OF OUR

19  PLAYERS, BOTH ACTIVE AND RETIRED.

20  **Q.**   DID YOU PERSONALLY EVER PROMOTE MR. ADDERLEY'S IMAGE TO A

21  LICENSEE?

22  **A.**   WELL, I THINK HIS IMAGE WAS PROMOTED.  AND I DON'T KNOW IF

23  I PERSONALLY DID IT, NO.  I NEVER -- I HAVE NEVER PERSONALLY.

24  **Q.**   DO YOU HAVE FIRSTHAND KNOWLEDGE THAT ANYONE ELSE IN PI OR

25  NFLPA HAS DONE THAT?

1    **A.**    AS PART OF THE PROGRAM, YES, I DO.

2    **Q.**    AND WHICH PROGRAM WAS THAT?

3    **A.**    THAT WAS A JERSEY PROGRAM WHICH I ACTUALLY PARTICIPATED

4    IN.

5    **Q.**    WAS THAT THE REEBOK PROGRAM?

6    **A.**    YES.  AND I PROBABLY -- JUST TO FOLLOW UP ON THAT, MY

7    JERSEY HAD THE SAME DEATH AS HERB'S.  NO ONE WANTED IT.  WE

8    COULDN'T SELL IT.  THEY EVEN QUIT MAKING IT.  THEY MADE THE

9    REPLICA, AND THAT WAS THE END OF IT.

10   **Q.**    LET ME SHOW YOU, SIR, WHAT HAS ALREADY BEEN MARKED AS

11   EXHIBIT 99 IN YESTERDAY'S DEPOSITION.

12         **MS. DONOVAN:**  AND THIS IS ALSO IN EVIDENCE.

13   **A.**    ALL RIGHT.

14   **Q.**    AND IS THAT YOUR SIGNATURE ON THE FIRST PAGE?

15   **A.**    YES, IT IS.

16   **Q.**    AND CAN YOU TELL US WHAT THIS IS, PLEASE?

17   **A.**    THIS IS AN AGREEMENT BETWEEN NFL PROPERTIES AND PLAYERS

18   INC.  IT'S A SPONSORSHIP AGREEMENT.

19   **Q.**    OKAY.  AND WHO NEGOTIATED THIS AGREEMENT?

20   **A.**    THIS AGREEMENT?

21   **Q.**    YES.

22   **A.**    I DID.

23   **Q.**    OKAY.  AND WITH WHOM DID YOU NEGOTIATE?

24   **A.**    WITH -- AT THE TIME IT WAS ROGER GOODELL, WHO WAS THE

25   PRESIDENT OF NFL PROPERTIES.

1  Q.   MR. UPSHAW, YOU JUST GOT ASKED A QUESTION ABOUT THE

2  SPONSORSHIP AGREEMENT WHICH TALKS ABOUT GROUP PLAYER LICENSING

3  RIGHTS AS DEFINED IN THE CBA.  DO YOU SEE THAT?

4  A.   YES.

5  Q.   DOES THE COLLECTIVE BARGAINING AGREEMENT COVER ANYBODY BUT

6  ACTIVE PLAYERS?

7  A.   NO, ONLY --

8  Q.   YOU CAN ANSWER.

9  A.   THE CBA ONLY COVERS ACTIVE PLAYERS.

10 Q.   NOW, YOU GOT ASKED SOME QUESTIONS ABOUT WHETHER OR NOT

11 PLAYERS INC EVER ENGAGED IN ANY MARKETING EFFORTS FOR RETIRED

12 NFL PLAYERS.  DO YOU RECALL A QUESTION ABOUT THAT?

13 A.   YES.

14 Q.   HAVE YOU PERSONALLY EVER MADE ANY EFFORTS TO TRY TO MARKET

15 RETIRED PLAYERS TO POTENTIAL LICENSEES?

16 A.   YES, I'VE HAD DISCUSSIONS WITH SEVERAL LICENSEES ABOUT THE

17 RETIRED PLAYERS AND HOW THEY WOULD BE HELPFUL AND BENEFICIAL IN

18 CERTAIN PROGRAMS.  YES, I'VE DONE THAT.

19 Q.   CAN YOU GIVE SOME EXAMPLES?

20 A.   WELL, THE MOST RECENT EXAMPLE WOULD BE THE EA CONTRACT

21 THAT WE JUST EXECUTED NOT LONG AGO.  AND I OFFERED RETIRED

22 PLAYERS IN THAT AREA, BUT THERE WAS -- THERE WAS REALLY NO

23 INTEREST.

24 Q.   THERE WAS NO INTEREST IN EA?

25 A.   NO.

1  Q.   ARE OTHER PEOPLE ON PLAYERS INC INVOLVED IN ANY EFFORTS TO

2  MARKET RETIRED PLAYERS THAT YOU KNOW ABOUT?

3        YOU CAN ANSWER.

4  A.   YES.  I'M FAMILIAR WITH PEOPLE IN PLAYERS INC MARKETING

5  RETIRED PLAYER RIGHTS.

6  Q.   NOW --

7  A.   AND THAT WOULD BE -- WE HAVE A WHOLE DEPARTMENT OF PLAYER

8  MARKETING.  THAT'S WHAT THEY DO.

9  Q.   BUT WOULD THAT INCLUDE RETIRED PLAYERS?

10 A.   OF COURSE.  IT WOULD INCLUDE -- AT THE TIME WE WERE

11 TALKING ABOUT, THAT WOULD INCLUDE HOWARD SKALL, WHO WAS HEAD OF

12 THAT DEPARTMENT.  THAT WAS ONE OF HIS DUTIES, WAS PLAYER

13 MARKETING, BOTH ACTIVE AND RETIRED.

14 Q.   NOW, WHEN PLAYERS INC HAS WHAT'S CALLED "DESIGNATED

15 PROGRAMS," ARE YOU FAMILIAR WITH THAT IDEA FOR RETIRED PLAYERS?

16 A.   YES, I AM.

17 Q.   ARE DESIGNATED PROGRAMS TYPICALLY ENTERED INTO WITH

18 RETIRED PLAYERS, WITH THE RETIRED PLAYER GLA OR WITH SOME OTHER

19 TYPE OF ARRANGEMENT?

20        YOU CAN ANSWER.

21 A.   THE DESIGNATED PROGRAMS ARE -- IT'S JUST ONE FORM IN WHICH

22 RETIRED PLAYERS ARE UTILIZED BY OUR LICENSEES.  THE MAIN AREA

23 IN WHICH THEY ARE UTILIZED IS REALLY AD HOC PROGRAMS IN WHICH

24 WE CONTACT THE PLAYER, WE TELL THEM ABOUT THE OPPORTUNITY, AND

25 HE DECIDES IF HE WANTS TO BE IN OR OUT.  AND IF HE DECIDES TO

1  BE IN, THERE'S A SEPARATE AGREEMENT THAT DEALS WITH AD HOC

2  OPPORTUNITIES THAT'S DIFFERENT FROM GLA'S.

3         GLA'S, IN FACT, YIELD VERY LITTLE REVENUE -- YIELD

4  VERY LITTLE WHEN IT COMES TO REVENUES GENERATED BY THE RETIRED

5  PLAYERS.

6  **Q.**   I WAS GOING TO ASK THAT QUESTION.  FOR BOTH DESIGNATED

7  PROGRAMS AND ANY OTHER KIND OF PROGRAMS, IS MORE OF THE RETIRED

8  PLAYER MONEY GENERATED THROUGH AD HOC AGREEMENTS OR THROUGH THE

9  GLA'S?

10  **A.**   MORE IS GENERATED THROUGH AD HOC AGREEMENTS, NOT THROUGH

11  GLA'S.  GLA'S YIELD VERY LITTLE.

12  **Q.**   NOW, YOU GOT ASKED SOME QUESTIONS ABOUT THE $8 MILLION

13  THAT WAS ALLOCATED BETWEEN THE NFLPA AND PLAYERS INC, CORRECT?

14  **A.**   YES, I WAS ASKED ABOUT THAT.

15  **Q.**   WAS ANY OF THAT $8 MILLION IN ANY WAY RELATED TO,

16  ATTRIBUTABLE TO, OR CONSTITUTING RETIRED PLAYER LICENSING

17  MONEY?

18  **A.**   ABSOLUTELY NONE OF THAT MONEY, NONE OF THE $8 MILLION, HAD

19  ANYTHING TO DO WITH RETIRED PLAYERS' MONEY AT ALL.

20  **Q.**   YOU ALSO GOT ASKED QUESTIONS ABOUT THE 1994 AGREEMENT, AND

21  THEN THE 2000 AGREEMENT BETWEEN PLAYERS INC AND THE NFLPA

22  REGARDING HOW TO VALUE DIFFERENT RIGHTS AND ALLOCATE MONIES.

23         DO YOU RECALL THAT?

24  **A.**   YES.

25  **Q.**   DID ANY OF THOSE MONIES THAT WERE THE SUBJECT OF THOSE

1  AGREEMENTS HAVE ANYTHING TO DO WITH RETIRED PLAYER MONIES OR

2  LICENSING RIGHTS?

3  **A.**   NO.   NONE OF THOSE AGREEMENTS HAD ANYTHING TO DO WITH

4  RETIRED PLAYER RIGHTS.

5  **Q.**   WHOSE RIGHTS AND MONIES DID THOSE AGREEMENTS RELATE TO?

6  **A.**   IT WAS ACTIVE PLAYERS AND ACTIVE PLAYERS ONLY.

7  **Q.**   WHEN MR. KESSLER WAS QUESTIONING YOU, MR. UPSHAW, HE ASKED

8  YOU ABOUT WHETHER YOU HAD MADE EFFORTS TO PROMOTE THE LICENSING

9  OF RETIRED PLAYERS' IMAGES.   AND YOU SAID THAT YOU DID THAT.

10 AND I THINK YOU SAID YOU SPOKE WITH SOMEONE AT ELECTRONIC ARTS;

11 IS THAT CORRECT?

12 **A.**   THAT'S CORRECT.

13 **Q.**   WITH WHOM DID YOU SPEAK AT ELECTRONIC ARTS?

14 **A.**   I SPOKE TO -- ACTUALLY, AT THE TIME IT WAS LARRY PROBST,

15 WHO WAS CEO, BUT ALSO WITH JOEL LINZNER, WHO WAS VERY MUCH

16 INVOLVED WITH THE NEGOTIATION OF OUR AGREEMENT.

17 **Q.**   AND DO YOU RECALL WHAT YOU SAID TO MR. -- IS IT

18 P-R-O-B-S-T -- MR. PROBST?

19 **A.**   SAME THING I SAID TO JOEL.   THEY WERE BOTH IN THE SAME

20 ROOM AT THE SAME TIME WHEN WE WERE TALKING ABOUT THE RIGHTS WE

21 HAVE, AND I TOLD HIM I THOUGHT THAT IT WOULD BE HELPFUL IF THEY

22 USED SOME OF THE RETIRED PLAYERS IN SOME OF THEIR DESIGNATED

23 PROGRAMS.

24 **Q.**   AND WHAT DID THEY SAY TO YOU?

25 **A.**   THEY DIDN'T HAVE VERY MUCH INTEREST IN THAT.

1          (READING CONCLUDED.)

2          **MS. DONOVAN:**  THAT'S ALL.  THANK YOU.

3          **THE COURT:**  IS THAT IT?

4          **MS. DONOVAN:**  YES.

5          **THE COURT:**  ALL RIGHT.  THANK YOU.

6          NEXT WITNESS.

7          **MR. KESSLER:**  YOUR HONOR, AT THIS TIME I'D LIKE TO

8  MOVE INTO EVIDENCE SOME DOCUMENTS.

9          FIRST, I'D LIKE TO MOVE INTO EVIDENCE EXHIBIT 113,

10 WHICH WAS DISCUSSED IN MR. UPSHAW'S DEPOSITION THAT WAS JUST

11 REVIEWED, TRIAL EXHIBIT 113.

12         **THE COURT:**  ANY OBJECTION?

13         **MR. KATZ:**  I NEED TO SEE IT, YOUR HONOR.

14         **THE COURT:**  LET'S GET IT OUT AND SHOW COUNSEL.

15         **MR. KESSLER:**  AND THEN, I WOULD ALSO MOVE IN, WHILE

16 HE'S LOOKING AT THAT, TRIAL EXHIBIT 1268-108, WHICH IS PART OF

17 THE MADDEN GAME THAT IS ALREADY IN EVIDENCE.  IT'S A SCREEN

18 SHOT FROM THAT GAME.

19         AND, ALSO, EXHIBIT 2272 --

20         **THE COURT:**  1268, I HAVE THE ENTIRE THING BEING IN.

21         **MR. KESSLER:**  I DIDN'T KNOW THAT.  THIS IS A SEPARATE

22 SCREEN SHOT, 108, THAT BREAKS IT OUT, YOUR HONOR.

23         **THE COURT:**  1268-108?

24         **MR. KESSLER:**  DASH 108.

25         **MR. KATZ:**  MAY I SEE THAT?  I HAVE NO OBJECTION TO

1   113.

2           **THE COURT:**  113 IS RECEIVED.

3           (TRIAL EXHIBIT 113 RECEIVED IN EVIDENCE.)

4       **MR. KESSLER:**  AND THEN --

5       **MR. KATZ:**  MAY I SEE THE ONE YOU JUST MENTIONED?

6       **MR. KESSLER:**  YES.

7       **THE COURT:**  DASH 108.

8       **MR. KATZ:**  IS IT THIS ONE PAGE?

9       **MR. KESSLER:**  IT'S THE SCREEN SHOT.  THAT'S ALL.

10      **MR. KATZ:**  WE HAVE NO OBJECTION.

11      **THE COURT:**  IT'S IN.

12          (TRIAL EXHIBIT 1268-108 RECEIVED IN EVIDENCE.)

13      **MR. KESSLER:**  THEN TRIAL EXHIBIT 2272, WITH IS

14  ANOTHER SCREEN SHOT FROM THE MADDEN GAME ALREADY IN EVIDENCE.

15      **MR. KATZ:**  IT'S IN EVIDENCE.

16      **THE COURT:**  2272, ANY OBJECTION?

17      **MR. KATZ:**  WELL, HE SAID IT'S IN EVIDENCE ALREADY.

18      **MR. KESSLER:**  WELL, THE SCREEN SHOT.

19      **THE COURT:**  2272 IS NOT IN EVIDENCE.

20      **MR. KATZ:**  I HAVE NO OBJECTION.

21      **THE COURT:**  ALL RIGHT.  RECEIVED.

22          (TRIAL EXHIBIT 2272 RECEIVED IN EVIDENCE.)

23      **MR. KESSLER:**  YOUR HONOR, AT THIS TIME I WOULD LIKE

24  TO DISPLAY TO THE JURY TRIAL EXHIBIT 113, WHICH WAS JUST

25  ADMITTED, IF I MAY.

1          **THE COURT:**  WELL, WHAT DO YOU MEAN, JUST PUBLISH IT?

2          **MR. KESSLER:**  I WOULD LIKE TO PUBLISH IT BY VISUAL

3   MEANS, YOUR HONOR.

4          **THE COURT:**  WAS THIS IN THE UPSHAW TESTIMONY?

5          **MR. KESSLER:**  IT WAS, YOUR HONOR.  AND HE TESTIFIED

6   WHAT IT WAS.

7          **THE COURT:**  GO AHEAD.  WE'LL LEAVE IT ON THE SCREEN

8   FOR 30 SECONDS SO THE JURY CAN SEE IT.

9          **MR. KESSLER:**  CAN WE BLOW UP, IF WE CAN, LAUREN, THE

10  FIRST SEVERAL PARAGRAPHS?

11          AND I WOULD, IN PARTICULAR, CALL THE --

12          **THE COURT:**  THIS IS JUST ARGUMENT.

13          **MR. KESSLER:**  I WAS JUST GOING TO READ.  CAN I READ,

14  YOUR HONOR?

15          **THE COURT:**  YOU CAN READ THE WHOLE THING.

16          **MR. KESSLER:**  OKAY.  I'LL START FROM THE BEGINNING,

17  IF WE CAN.  GREAT NEWS --

18          "GOOD NEWS.  ONCE AGAIN, PLAYERS INC LICENSED

19  VIDEO GAME COMPANIES" -- AND THIS IS DATED JUNE 20, 2003 --

20  "HAVE UTILIZED RETIRED PLAYER NAMES AND IMAGES IN THEIR GAMES.

21  YOUR NAME AND IMAGE RIGHTS WERE UTILIZED BY ONE OR MORE VIDEO

22  GAME COMPANIES UNDER LICENSE BY PLAYERS INC FOR A GAME THAT

23  FEATURED ACTIVE PLAYER ROSTERS FOR THE 2002 NFL SEASON, EA

24  SPORTS MADDEN 2003."

25          NEXT LINE, IF WE CAN.

1                "BASED ON THE RIGHTS FEES PAID TO PLAYERS INC BY

2     VIDEO GAME LICENSEES, FOR EACH RETIRED PLAYER UTILIZED UNDER

3     SUCH LICENSE FOR THE PERIOD ENDED FEBRUARY 28, 2003, THE SHARE

4     IS 750.  IN THE PAST, WE HAVE DISTRIBUTED ALL OF THE LICENSING

5     FEES RECEIVED FOR USE OF RETIRED PLAYERS' NAMES AND IMAGES TO

6     THE RETIRED PLAYERS UTILIZED, AND WE WILL CONTINUE TO DO SO.

7                "ENCLOSED WITH THIS LETTER, THEREFORE, IS YOUR

8     PAYMENT OF 750 FOR INCLUSION IN THE VIDEO GAME CATEGORY LAST

9     YEAR.  WE APPRECIATE YOUR SUPPORT FOR AND PARTICIPATION IN THE

10    PLAYERS INC RETIRED GROUP LICENSING PROGRAM."

11               NEXT LINE, I GUESS.

12               "PLAYERS INC IS THE LICENSING AND MARKETING

13    SUBSIDY OF THE NFLPA.  PAYMENTS BY PLAYERS INC TO THE NFLPA

14    PERMIT YOUR UNION TO SPREAD FAR MORE THAN -- TO SPEND FAR MORE

15    THAN RETIRED PLAYER DUES TO SERVICE THE NEEDS OF RETIRED

16    PLAYERS.  THAT MEANS, BECAUSE ACTIVE PLAYERS ENTHUSIASTICALLY

17    SUPPORT THE RETIRED PLAYERS WHO BUILT THE GAME, YOUR NFLPA DUES

18    ARE LOW, SERVICES ARE MANY, AND YOUR BENEFITS HAVE IMPROVED

19    DRAMATICALLY OVER THE PAST 10 YEARS.  ACTIVE PLAYERS' DUES AND

20    ACTIVE PLAYER LICENSING ROYALTIES PAID TO THE NFLPA MAKE THAT

21    POSSIBLE.

22               "FOR EXAMPLE, THE ANNUAL COST OF THE NFLPA

23    RETIRED PLAYERS DEPARTMENT AND BENEFITS DEPARTMENT IS

24    1.5 MILLION, WHILE RETIRED PLAYERS' DUES LAST YEAR TOTALED ONLY

25    175,000."

1          NEXT PARAGRAPH:

2               "WE LOOK FORWARD TO CONTINUING PLAYERS INC'S

3    SUCCESSFUL EFFORTS ON BEHALF OF RETIRED NFL PLAYERS.  BECAUSE

4    YOU AND THE MANY OTHER NFL STARS OF THE PAST HAVE PROVIDED YOUR

5    NAME AND IMAGE RIGHTS TO THE NFLPA AND PLAYERS INC, GROUP

6    LICENSING ROYALTIES, AUTOGRAPH SESSIONS, APPEARANCES AND

7    ENDORSEMENT OPPORTUNITIES ARE INCREASING EACH YEAR.

8               "IF YOU HAVE ANY QUESTIONS, PLEASE CONTACT US.

9    PLEASE CHECK OUT THE RETIRED PLAYER SECTION ON

10   WWW.NFLPLAYERS.COM, OUR VERY POPULAR WEB SITE.  MORE

11   INFORMATION ABOUT PLAYERS INC AND CONTACT INFORMATION ABOUT OUR

12   STAFF ARE AVAILABLE THERE, AS WELL.

13              "THANK YOU, AGAIN, FOR YOUR SUPPORT."

14         AND, FINALLY:

15              "SINCERELY, GENE UPSHAW, CHAIRMAN."

16         YOUR HONOR, AT THIS POINT, DEFENDANTS ARE PLEASED TO

17   SAY THAT WE REST OUR CASE.

18         **THE COURT:**  ALL RIGHT.

19         **MR. KATZ:**  YOUR HONOR, I HAVE A POINT.

20         THE OTHER DAY YOUR HONOR ADMONISHED MR. KESSLER TO

21   LINK SOMETHING UP.  AND HE SAID HE WOULD, AND HE DIDN'T.

22         I HAVE THE -- YOUR HONOR'S ADMONITION HERE.  SO,

23   THEREFORE, WE WOULD SEEK AN INSTRUCTION TO THE JURY ON THAT.

24         **MR. KESSLER:**  YOUR HONOR, I WOULD LIKE TO BE ABLE TO

25   ARGUE THIS ISSUE, BUT I THINK IT SHOULD BE DONE OUT OF THE

1   PRESENCE OF THE JURY.

2           **MR. KATZ:**  IT'S PAGE 1970.  LINE 17 THROUGH 24 WAS

3   YOUR ADMONITION, YOUR HONOR.

4           **THE COURT:**  I'M SORRY, WHAT PAGE?

5           **MR. KATZ:**  PAGE 1970, LINE 17 THROUGH 24.

6           **THE COURT:**  WELL, I'D HAVE TO HEAR FROM -- DO YOU

7   WANT TO DO THIS IN THE PRESENCE OF THE JURY OR NOT?

8           **MR. KATZ:**  WHATEVER YOUR HONOR WANTS.

9           **MR. KESSLER:**  I THINK IT SHOULD BE DONE OUTSIDE THE

10  PRESENCE OF THE JURY.

11          **THE COURT:**  ALL RIGHT.  YOU'VE RESTED YOUR CASE.

12          **MR. KESSLER:**  I HAVE RESTED MY CASE, YOUR HONOR.

13          **THE COURT:**  IS THERE GOING TO BE A REBUTTAL CASE?

14          **MR. LECLAIR:**  WE DO HAVE THAT SHORT DEPOSITION

15  EXCERPT, YOUR HONOR, TO READ, AND ONE EXHIBIT TO PUT IN.

16          **THE COURT:**  ALL RIGHT.  WE'RE GOING TO TAKE A

17  15-MINUTE RECESS.  I THINK WE'RE GOING TO BE ABLE TO LET YOU GO

18  EARLY TODAY, BECAUSE I THINK THE LAWYERS ARE GOING TO RUN OUT

19  OF EVIDENCE.  OR AT LEAST RUN OUT OF TIME TO PRESENT EVIDENCE.

20  AND, THEREFORE, WE WILL BE LETTING YOU GO A LITTLE EARLY TODAY.

21          BUT I WANT TO HEAR WHAT THE LAWYERS HAVE TO SAY OUT

22  OF YOUR PRESENCE.  SO PLEASE REMEMBER THE ADMONITION.  15

23  MINUTES.

24          **THE CLERK:**  ALL RISE.

25          (THE FOLLOWING PROCEEDINGS WERE HELD IN OPEN COURT,

1          OUTSIDE THE PRESENCE OF THE JURY.)

2          **THE COURT:** ALL RIGHT. EVERYONE BE SEATED. I'M

3     NOT -- YOU'VE GOT TO HELP ME FOCUS ON YOUR POINT, MR. KATZ.

4          **MR. KATZ:** SURE.

5          **THE COURT:** I SEE THE PASSAGE ABOUT SCRIMMAGE

6     PLAYERS. IS THAT IT?

7          **MR. KATZ:** RIGHT. WHAT MR. --

8          **THE COURT:** GIVE ME THE CONTEXT. I DON'T REMEMBER

9     VERY WELL.

10         **MR. KATZ:** MR. KESSLER ASKED A NUMBER OF QUESTIONS OF

11    MR. ROWLEY TO THE EFFECT:

12              "WHAT IF SOMEBODY WAS ON THE PRACTICE SQUAD, AND

13    THEN THEY ONLY PLAYED TWO GAMES IN THE MIDDLE OF THE SEASON,"

14    ET CETERA. THERE WERE A NUMBER OF THOSE.

15              "WHAT IF NOBODY EVER PLAYED A GAME," ET CETERA.

16         IN FACT, YOUR HONOR, MOST, IF NOT ALL, OF THE PEOPLE

17    WHO SIGNED GLA'S HAD CAREERS LASTING YEARS AND YEARS. SO THERE

18    SIMPLY WAS NO FOUNDATION FOR THAT.

19         SO I BELIEVE -- I'M SPECULATING A LITTLE BIT AS TO

20    WHY YOUR HONOR ADMONISHED MR. KESSLER, BUT I BELIEVE WHAT YOU

21    WERE SAYING IS THERE'S A LOT OF QUESTIONS OUT HERE, BUT THERE'S

22    NO EVIDENCE. AND SUCH THAT THE JURY COULD THINK THAT THERE'S A

23    LOT OF PEOPLE ON THIS LIST THAT WERE REALLY JUST NOTHINGS. I

24    MEAN, IN THE SENSE THEY NEVER EVEN PLAYED A GAME.

25         SO YOU GAVE THAT ADMONITION. I'M SPECULATING A

1  LITTLE BIT AS TO WHAT YOUR HONOR WAS THINKING.  OBVIOUSLY, I

2  DON'T KNOW THAT.  BUT YOU DID GIVE THE ADMONITION.

3  　　　　　HE SAID HE WOULD LINK IT UP.  HE NEVER DID LINK IT

4  UP.  THERE IS NO EVIDENCE AT ALL ON THOSE SUBJECTS, AND THERE

5  NEVER COULD BE EVIDENCE.  THERE IS NO FOUNDATION.

6  　　　　　**THE COURT:**  WHAT DO YOU SAY TO THAT?

7  　　　　　**MR. KESSLER:**  YOUR HONOR, TO BEGIN WITH, ALL OF THESE

8  WERE HYPOTHETICAL QUESTIONS.  LET ME GO TO THE TRANSCRIPT.

9  THIS STARTS BACK IN 1923.  IN FACT, ON 17 -- WELL, 13:

10  　　　　　"NOW, UNDER YOUR ANALYSIS, SIR" -- I WAS

11  　　　　　ASKING THE EXPERT -- "IF SOMEONE WAS A

12  　　　　　PRACTICE SQUAD PLAYER IN 2006, OKAY, THAT --

13  　　　　　AND THAT'S ALL HE DID, HE WOULD GET 1,000

14  　　　　　FROM THE GLR POOL, CORRECT?

15  　　　　　**"ANSWER:**  YES.

16  　　　　　**"QUESTION:**  IF THAT PRACTICE SQUAD PLAYER

17  　　　　　RETURNED IN 2006 IN THE MIDDLE OF THE SEASON,

18  　　　　　SIGNED A RETIRED PLAYER GLA, BUT PLAYED NO

19  　　　　　MORE GAMES, JUST SIGNED THE RETIRED PLAYER

20  　　　　　GLA, YOUR ANALYSIS WOULD AWARD THAT PRACTICE

21  　　　　　SQUAD PLAYER TENS OF THOUSANDS OF DOLLARS,

22  　　　　　RIGHT?

23  　　　　　**"ANSWER:**  MY --

24  　　　　　"YES OR NO?

25  　　　　　**"ANSWER:**  NO."

1      **"MR. HUMMEL:** I OBJECT, YOUR HONOR. THERE'S

2      NO EVIDENCE IN THE RECORD, AND HE'S OFFERED

3      NO OPINION ABOUT HOW THE TOTAL DAMAGES TO THE

4      CLASS WOULD BE ALLOCATED AMONG INDIVIDUAL

5      CLASS MEMBERS, SO HIS HYPOTHETICAL --

6      "THE COURT: IT'S OVERRULED."

7      THIS IS THE COURT SPEAKING.

8      "IT'S COMPLETELY PROPER TO ASK AN EXPERT

9      HYPOTHETICAL QUESTIONS. THE ENTIRE EXERCISE

10     BY THE EXPERT IS A HYPOTHETICAL EXERCISE.

11     IT'S BASED ON THE HYPOTHESIS THAT A JURY

12     REACHES A CERTAIN DETERMINATION AND SO IS

13     PROPER TO HEAR THE HYPOTHETICAL AND TEST ITS

14     LIMITS. THAT'S WHAT COUNSEL'S DOING.

15     "OVERRULED.

16     "PLEASE RESTATE THE QUESTION."

17     AND THEN, THIS IS WHEN I CONTINUE:

18     "SO THE QUESTION IS: YOU KNOW IF THE PLAYER

19     WAS ON THE PRACTICE SQUAD THE WHOLE YEAR,

20     LET'S SAY 2000 SO WE'RE FAIRLY WITHIN THE

21     PERIOD, THAT THE PLAYER WOULD ONLY GET 1,000

22     UNDER THE GLR POOL ELIGIBILITY CRITERIA AS A

23     PRACTICE SQUAD PLAYER, CORRECT?

24     "CORRECT."

25     AND I KEEP GOING ON ASKING THIS WHOLE THING. IT'S

1  CLEAR ALL OF THIS IS HYPOTHETICAL.  IT'S TRUE YOUR HONOR LATER

2  SAID TO ME CAN I PROVE THAT UP?  AND AT THE TIME I SAID TO YOUR

3  HONOR I THOUGHT I WOULD BE ABLE TO PROVE IT UP.

4         NOW, WE DO HAVE THE EVIDENCE THAT TOOK PLACE.  IT'S

5  IN THE FORM OF PRINTOUTS FROM THE PLAYERS ASSOCIATION, WHICH WE

6  NEVER DESIGNATED AS EXHIBITS.  OKAY?

7         I CONSIDERED WHETHER I SHOULD TRY TO BRING IN AN

8  UNDISCLOSED EXPERT -- SORRY -- AN UNDISCLOSED WITNESS WHO WAS

9  ON MY -- WHO I NEVER PUT ON THE LIST, BECAUSE I DIDN'T REALIZE

10 THIS WAS GOING TO BE A POINT.  AND WE CONCLUDED IT WAS GOING TO

11 BE A POOR WASTE OF THE JURY'S TIME, AND THEY WOULD OBJECT TO

12 OUR CALLING A WITNESS WHO HAD NEVER BEEN DISCLOSED AND A

13 DOCUMENT THAT WAS NEVER THERE.

14        BUT I CAN OFFER IT TO YOUR HONOR.  WE HAVE THE

15 PRINTOUT THAT SHOWS THERE ARE SUCH PRACTICE SQUAD PLAYERS IN

16 THE GROUP.

17        SO I HAD A GOOD FAITH BASIS FOR THE HYPOTHETICAL.

18 BUT I DIDN'T THINK IT WAS APPROPRIATE TO TRY TO BRING IN A

19 WITNESS I NEVER DISCLOSED AND DOCUMENTS I NEVER DISCLOSED NOW

20 TO PUT IT IN.

21        SO THAT'S THE ISSUE.  I DON'T THINK THERE SHOULD BE

22 AN INSTRUCTION.  I DIDN'T PUT IT IN.

23        THEY COULD ARGUE IT IN CLOSING, IF THEY WANT TO,

24 ABOUT THIS PRACTICE SQUAD PLAYER.

25        BUT I THINK AS A HYPOTHETICAL IT WAS A PROPER

1  QUESTION. AND WHILE I DID SAY I THOUGHT I WOULD PROVE IT UP, I

2  CONCLUDED I CAN ONLY DO IT THROUGH EVIDENCE I NEVER DISCLOSED

3  TO THEM.

4        THAT'S WHAT IT COMES DOWN TO.

5        I'D BE HAPPY TO OFFER THAT EVIDENCE, BY THE WAY, YOUR

6  HONOR, BUT I ASSUME THEY'D OBJECT.

7        **THE COURT:** LET ME ASK A QUESTION TO JUMP AHEAD A

8  MINUTE. WHAT IS GOING TO BE THE REBUTTAL CASE?

9        **MR. LECLAIR:** YOUR HONOR, THE ONLY REBUTTAL CASE IS

10 READING THE SKALL DEPOSITION EXCERPT, AND THEN ONE COMPILATION

11 EXHIBIT THAT WE'VE TENDERED IT IN, WE INTEND TO OFFER IN

12 EVIDENCE.

13       **THE COURT:** THAT NUMBER IS WHAT?

14       **MR. LECLAIR:** THE COMPILATION EXHIBIT IS EXHIBIT

15 1327, YOUR HONOR.

16       **MR. KESSLER:** IS THAT ALL THE RETIRED PLAYER GLA'S?

17       **MR. LECLAIR:** NO, NO. THIS IS ONE WE SENT OVER.

18       **THE COURT:** WELL, LET ME ASK -- I WANT TO ASK A

19 DIFFERENT QUESTION.

20       AT ONE POINT IN -- THIS IS A DIFFERENT -- IT RELATES

21 TO THE PENDING MOTION. MR. HUMMEL SAID TO THE JURY THAT THE

22 WEB SITE HAD BEEN CHANGED AFTER -- I THINK HE SAID AFTER THIS

23 LAWSUIT WAS FILED, BUT MIGHT HAVE BEEN AFTER SOMETHING ELSE.

24       WAS THERE ACTUALLY -- IS THERE ANY EVIDENCE THAT

25 OCCURRED?

1          **MR. HUMMEL:**  YES, YOUR HONOR.  I READ REQUEST FOR

2    ADMISSION RESPONSE BY THE DEFENDANTS.

3          **THE COURT:**  AND READ THAT TO ME AGAIN.

4          **MR. HUMMEL:**  IF I HAD IT, I COULD.  WE'LL GET IT IN A

5    MINUTE.

6          **THE COURT:**  WHAT DID IT SAY?

7          **MR. HUMMEL:**  THE REQUEST FOR ADMISSION WAS:  AFTER

8    THIS LAWSUIT WAS FILED ADMIT YOU CHANGED THE WEB SITE.

9          AND THE ANSWER WAS:  WE ADMIT, AND WE CHANGED THE WEB

10   SITE TO READ Y, WHEN IT HAD BEEN X.

11         **THE COURT:**  ALL RIGHT.

12         **MR. HUMMEL:**  THERE'S NO DISPUTE ABOUT THAT.

13         **THE COURT:**  ALL RIGHT.  WELL, I WAS THINKING, ANYWAY,

14   ABOUT GIVING THE JURY AN INSTRUCTION ABOUT THE -- I'M POSITIVE

15   BOTH SIDES HAVE DONE THIS, HAVE MADE STATEMENTS THAT HAVE GONE

16   OUTSIDE THE ACTUAL TRIAL RECORD, AND HOW THE JURY SHOULD

17   EVALUATE THE EVIDENCE.

18         SINCE I AM POSITIVE THAT BOTH SIDES HAVE DONE THIS,

19   IT WOULD BE UNFAIR TO SINGLE OUT THIS ONE INSTANCE, EXCEPT AS

20   PERHAPS AN EXAMPLE, WHICH I THINK MAYBE I SHOULD DO.

21         BUT TO JUST ADMONISH THE JURY ON THIS ONE POINT,

22   WITHOUT MAKING IT AN EVEN-HANDED THING, WOULD BE UNFAIR.  SO I

23   WILL SAY SOMETHING APPROPRIATE TO THE JURY ON THIS POINT.

24         ALL RIGHT.  ARE WE READY TO BRING --

25         **MR. KESSLER:**  YES, YOUR HONOR, ON THIS COMPILATION

1   THEY WANT TO OFFER, THIS IS, IN EFFECT -- IS A WAY OF THEM

2   OFFERING FOR MR. RASCHER IN EXHIBIT FORM.  IT'S HIS DATA

3   REDISPLAYED IN A NEW FORM THAT WAS NEVER OFFERED IN HIS

4   EXPERT -- OR MR. ROWLEY.  I'M NOT SURE IF IT'S ROWLEY OR

5   RASCHER.

6           **THE COURT:**  IS THERE AS OBJECTION TO IT?

7           **MR. KESSLER:**  THERE'S AN OBJECTION TO IT.

8           **THE COURT:**  IT IS HEARSAY.  IT'S NOT GOING TO COME

9   IN.  I DON'T KNOW WHY YOU LAWYERS EVEN THOUGHT YOU'VE ALLOWED

10  IT.

11          EXPERT REPORTS NEVER COME INTO EVIDENCE.

12          **MR. LECLAIR:**  YOUR HONOR, THIS HAS NOTHING TO DO WITH

13  MR. ROWLEY OR AN EXPERT.

14          **THE COURT:**  WHO PREPARED IT?

15          **MR. LECLAIR:**  YOUR HONOR, MY OFFICE PREPARED --

16          **THE COURT:**  LET ME SEE IT.

17          **MR. LECLAIR:**  THIS IS A PURE COMPILATION, YOUR HONOR.

18  THIS COMES FROM PAT ALLEN'S TESTIMONY, YOUR HONOR.  SHE --

19  REMEMBER SHE HAD --

20          **THE COURT:**  WHY DIDN'T YOU DRAG IT OUT OF HER WHEN

21  SHE WAS HERE?

22          **MR. LECLAIR:**  YOUR HONOR, BECAUSE IT'S A PURE

23  COMPILATION.  SHE DIDN'T DO IT.  IT'S JUST A COMPILATION OF THE

24  NUMBERS.

25          **THE COURT:**  SORRY.  THIS IS HEARSAY.  I'M NOT

1   TAKING -- THERE'S NO FOUNDATION THAT THIS IS A PURE

2   COMPILATION.  AND THE IDEA THAT PURE COMPILATIONS -- NO.  THIS

3   IS NOT COMING IN.

4          **MR. KESSLER:**  THANK YOU.

5          **THE COURT:**  WHAT IS THE EXHIBIT NUMBER?  1327 IS

6   EXCLUDED.

7          ALL RIGHT.  WHAT ELSE?

8          **MR. KESSLER:**  THAT'S ALL FROM US, YOUR HONOR.

9          **THE COURT:**  NOW, THERE IS A POINT I WANT TO SAY ON

10  MR. KESSLER'S PART, PARTLY IN HIS DEFENSE.

11         WHEN YOU ARE EXAMINING AN EXPERT YOU CAN VARY THE

12  HYPOTHETICAL AND SEE HOW IT WOULD CHANGE THE ANSWER BECAUSE THE

13  ENTIRE EXERCISE WITH AN EXPERT IS HYPOTHETICAL.

14         SO THAT'S OKAY.  THE PROBLEM IS THAT THE WAY IN WHICH

15  THAT EXAMINATION CAME DOWN LEFT THE IMPRESSION THAT THE FACTS

16  WERE ABOUT THE SCRIMMAGE PLAYERS, AS THEY WERE INDICATING.  NOW

17  IT TURNS OUT THERE'S NOTHING IN THE RECORD TO EVALUATE THAT.

18  SO THAT'S THE PROBLEM.

19         **MR. KATZ:**  WELL, IT'S A BIG PROBLEM, YOUR HONOR,

20  BECAUSE OUR PLAYERS PLAYED FOR YEARS.  YOU COULD GO THROUGH

21  THAT LIST AND ALL OF THEM PLAYED FOR YEARS.

22         AND YET, ALL THEY HEARD -- AND HE ASKED IT SEVERAL

23  TIMES -- WAS, YOU KNOW, SOMEBODY WHO NEVER PUT ON A UNIFORM,

24  SOMEBODY WHO PLAYED ONE GAME.

25         IT'S JUST A COMPLETELY AND TOTALLY INCORRECT

1  IMPRESSION.

2       YOUR HONOR NOTED IT AT THE TIME.  YOU ADMONISHED HIM.

3  HE DIDN'T SAY:

4            "I'M GOING TO THINK ABOUT IT."

5         HE SAID:

6            "I WILL," AND HE DIDN'T.

7       **THE COURT:**  ALL RIGHT.  OKAY.  LET'S TAKE TEN MINUTES

8  OURSELVES, AND THEN WE'LL BRING THE JURY BACK AND HEAR THE

9  REBUTTAL CASE.

10           (RECESS TAKEN FROM 10:12 TO 10:23 A.M.)

11           (THE FOLLOWING PROCEEDINGS WERE HELD IN OPEN COURT,

12           OUTSIDE THE PRESENCE OF THE JURY.)

13      **MR. KESSLER:**  YOUR HONOR, I DON'T KNOW IF YOU INTEND

14  TO USE MY COMMENTS AS AN EXAMPLE IN YOUR INSTRUCTION.  YOUR

15  HONOR, IF YOU DO, I WOULD LIKE TO MAKE ONE POINT.  I THINK THE

16  ONLY FAIR THING, THEN, WOULD BE TO USE AN EXAMPLE FROM

17  PLAINTIFFS AT THE SAME TIME.

18      **THE COURT:**  DO YOU HAVE ONE?

19      **MR. KESSLER:**  YES.  FOR EXAMPLE, JUST TODAY

20  MR. HUMMEL ASKED ROGER NOLL ABOUT TAKE TWO'S MOTIVE IN WAITING

21  YEARS BEFORE INTRODUCING THEIR GAME, AND HOW THEY -- AND THAT

22  THEY WERE DRIVEN OUT BY THE USE OF -- THAT THERE WAS A DELAY OF

23  THREE YEARS BECAUSE ... THAT WAS ALL PURE SPECULATION.

24       THIS WITNESS HAD NO PERSONAL KNOWLEDGE OF IT.

25  THERE'S NO EVIDENCE IN IT ABOUT TAKE TWO.  AND IT WAS RIGHT

1   DONE BEFORE THE JURY.

2          SO I THINK IF YOUR HONOR IS GOING TO USE ANY EXAMPLE

3   YOU WOULD HAVE TO USE ONE FOR BOTH SIDES.

4          SECOND, BECAUSE MR. KATZ MADE A STATEMENT TO THIS

5   COURT THAT EVERY OTHER COUNSEL AT HIS TABLE SAID TO EACH OTHER

6   IS FALSE, AND THEY KNEW IT.  I HAVE TO CORRECT IT, YOUR HONOR.

7          **MR. HUMMEL:**  WHAT?

8          **MR. KESSLER:**  IT IS NOT TRUE THAT EVERY ONE OF THE

9   MEMBERS IN THIS RETIRED PLAYER CLASS PLAYED FOR YEARS.  IN

10  FACT, THE OTHER SIDE KNOWS -- THERE'S NO EVIDENCE ON THIS FROM

11  THEM, EITHER.

12         THE OTHER SIDE KNOWS THAT MANY OF THESE CLASS MEMBERS

13  PLAYED A FEW GAMES AT BEST, TOTALLY APART FROM THIS PRACTICE

14  SQUAD THING.

15         AND IF THEY THINK THAT'S WRONG, THEY SHOULD COME UP

16  AND SAY THAT.  BUT THEY KNOW MR. KATZ MISSPOKE.  I'M NOT SAYING

17  HE WAS DELIBERATING MISSPEAKING, BUT IT WAS WRONG.

18         I HAVE HERE, YOUR HONOR, FOR EXAMPLE, TWO CLASS

19  MEMBERS WHO WERE REFEREES, WHO NEVER PLAYED IN THE NFL.  THEY

20  SIGNED THE GLA, SO THEY ARE IN THE CLASS.

21         ONE IS NAMED MR. JOHN WESTINHAVER (PHONETIC) AND THE

22  OTHER IS NAMED -- WHAT WAS THE OTHER ONE?  IT'S JOHN

23  WESTINHAVER.  AND THE OTHER ONE IS MR. DON WEDGE.  THEY ARE NOW

24  CLASS MEMBERS BECAUSE THEY SIGNED --

25         **THE COURT:**  WAIT.

1          **MR. KESSLER:**  SORRY.

2          **THE COURT:**  WAIT UNTIL THE DOOR IS COMPLETELY CLOSED.

3          ALL RIGHT.  GO AHEAD.

4          **MR. KESSLER:**  THEY'RE CLASS MEMBERS BECAUSE THEY

5   SIGNED THIS FORM IN THE GLA.  AGAIN, I DON'T WANT YOUR HONOR IN

6   THE INSTRUCTION TO GIVE ANY SENSE TO THE JURY THAT, IN FACT,

7   THERE'S EVIDENCE THAT ALL THESE CLASS MEMBERS PLAYED FOR YEARS,

8   BECAUSE THERE'S NO SUCH EVIDENCE ON THAT POINT.

9          THOSE ARE MY TWO REQUESTS, YOUR HONOR.

10          **THE COURT:**  MR. HUMMEL?

11          **MR. HUMMEL:**  SURE.  I'LL RESPOND BRIEFLY.

12          THE QUESTIONS I ASKED ABOUT TAKE TWO OF DR. NOLL

13   RELATE -- WERE ATTACHED TO A DECLARATION OF ANDREW FEFFER THAT

14   HE RELIED ON IN CONNECTION WITH FORMULATING HIS OPINIONS.  HE

15   SAID HE WAS FAMILIAR WITH THE ARTICLE.

16          I ASKED HIM A QUESTION BASED ON A PREMISE THAT HE WAS

17   ABSOLUTELY FAMILIAR WITH.  HE WAS WELL AWARE OF THE FACTS.

18          **THE COURT:**  I'M NOT DENYING YOU HAD A GOOD FAITH

19   BASIS FOR THE QUESTION, PERHAPS, BUT THAT'S NOT IN EVIDENCE.

20          **MR. HUMMEL:**  IT IS IN EVIDENCE, YOUR HONOR -- HIS

21   OPINION BASED ON FACTS THAT HE CONSIDERED --

22          **THE COURT:**  INTERROGATORIES WERE NEVER READ INTO

23   EVIDENCE.

24          **MR. HUMMEL:**  THEY ARE NOT INTERROGATORIES.

25          **THE COURT:**  YOU SAID THERE WAS SOME INTERROGATORY YOU

1    RELIED ON.

2          **MR. HUMMEL:**  NO, I SAID IT'S A DECLARATION BY --

3          **THE COURT:**  IT'S NOT IN EVIDENCE.

4          **MR. HUMMEL:**  CORRECT.  I DIDN'T READ IT TO HIM.

5          **THE COURT:**  SO IT'S NOT BEFORE THE JURY.  IT WON'T BE

6    IN THE JURY ROOM, AND THEY NEVER HEARD THAT.

7          **MR. HUMMEL:**  NO.  BUT, YOUR HONOR, THIS IS APPLES AND

8    ORANGES COMPLETELY.

9          WHAT I ASKED HIM WAS:

10          "DID YOU CONSIDER, IN CONNECTION WITH THIS

11    REPORT, THIS DECLARATION AND THE EVIDENCE CONTAINED THEREIN?

12          "YES."

13          AND THEN, I'M ENTITLED TO CROSS HIM ON IT.

14          **THE COURT:**  I DON'T REMEMBER YOU ASKING HIM --

15          **MR. HUMMEL:**  IT'S IN THE RECORD.  I ABSOLUTELY DID,

16    AND HE KNOWS IT.

17          **THE COURT:**  HERE'S WHAT WE ARE GOING TO DO.  I'M NOT

18    GOING TO DEAL WITH THIS NOW, BECAUSE I AM CONVINCED TO A MORAL

19    CERTAINTY THAT BOTH SIDES HAVE DONE THIS.

20          SO HERE'S WHAT WE'RE GOING TO DO.  TODAY YOU GET --

21    MR. KESSLER, YOU PICK OUT ONE OR TWO EXAMPLES THAT YOU THINK

22    ARE JUST BLATANT -- MR. KATZ OR SOMEONE ELSE -- BLATANT

23    STATEMENTS TO THE JURY FOR WHICH THERE IS NO EVIDENCE IN THE

24    RECORD.

25          THEN, THEY CAN RESPOND.  AND IF THEY WANT TO PUT OUT

1  TWO THAT THEY -- THAT YOU'VE SAID LIKE THIS ONE, WHERE THERE'S

2  NO EVIDENCE IN THE RECORD, YOU CAN RESPOND.  AND -- WAIT JUST A

3  MINUTE.

4          SO THIS IS DUE AT 4 O'CLOCK TODAY.  BY MIDNIGHT THE

5  OTHER SIDE CAN RESPOND.  WHENEVER I GET THE FINAL JURY

6  INSTRUCTIONS I'M GOING TO TELL THE JURY SOMETHING.  AND I MIGHT

7  USE AN EXAMPLE FROM BOTH SIDES.

8          THIS IS -- THIS IS ONE I CAN USE, MR. -- MR. KESSLER,

9  BUT IT WOULD BE UNFAIR TO DO IT UNTIL HE GETS HIS OPPORTUNITY

10 TO SHOW THAT YOU HAVE DONE THE SAME THING.

11         **MR. KATZ:**  MAY I RESPOND, YOUR HONOR?

12         **THE COURT:**  YES.

13         **MR. KATZ:**  FIRST OF ALL, YOU ARE NOT GOING TO FIND

14 ANY FROM ME.  HE WON'T FIND ONE.  I'M SAYING THAT RIGHT NOW.

15         **THE COURT:**  I WILL JUST SAY THIS:  I HAVE HEARD A LOT

16 OF THINGS IN THIS TRIAL THAT WHEN I HEARD IT AT THE TIME, MY

17 EYEBROW WENT UP, AND I SAID:

18              "I HAVE NOT HEARD A THING ALONG THOSE LINES, AND

19 I'M WONDERING IF I EVER WILL."

20         AND I HEARD IT FROM YOUR SIDE, TOO, MR. KATZ.  I

21 DIDN'T WRITE IT DOWN AT THE TIME.

22         **MR. KATZ:**  ALL I'M SAYING IS TWO THINGS.  NUMBER ONE,

23 YOU'RE NOT GOING TO FIND ONE FROM ME.

24         AND NUMBER TWO, ALL I DID WAS GET UP AND READ YOUR

25 HONOR'S ADMONITION AND MAKE A MOTION.

1          AND ALL OF THIS BLOWBACK NOW --

2          **THE COURT:**  I THINK THERE'S SOME GOOD MERIT TO THIS

3 MOTION.

4          **MR. KATZ:**  YEAH, ABSOLUTELY, BECAUSE THERE'S NO

5 EVIDENCE BACKING IT UP.  IT'S AN IMPROPER HYPOTHETICAL.  YOU

6 CAN'T ASK A HYPOTHETICAL AND JUST MAKE IT UP OUT OF WHOLE

7 CLOTH.

8          WE HAVE HAD FOUR PEOPLE COME HERE --

9          **THE COURT:**  I BELIEVE YOUR SIDE DID THE SAME THING,

10 BUT I CAN'T GIVE YOU CHAPTER AND VERSE.  AND I'M GOING TO GIVE

11 THE OTHER SIDE A CHANCE TO GIVE ME THE EXAMPLE SO I CAN GIVE A

12 BALANCED INSTRUCTION THAT CASTS A PLAGUE ON BOTH HOUSES.

13          **MR. KESSLER:**  YOUR HONOR, YOU ASKED FOR TWO.

14          **THE COURT:**  YOU CAN GIVE THREE.  I DON'T CARE.  I

15 JUST NEED ONE THAT WILL HOLD UP.

16          **MR. KESSLER:**  OKAY.  VERY GOOD.

17          **THE COURT:**  INSTEAD OF --

18          **MR. KESSLER:**  WE'LL GIVE YOU A VARIETY --

19          **THE COURT:**  IF IT TURNS ON EXTENDED ARGUMENT, THEN IT

20 DOESN'T HOLD UP.

21          **MR. KESSLER:**  WE'LL GIVE YOU A VARIETY OF CHOICES

22 WHICH WE THINK EACH WILL HOLD UP, BUT YOUR HONOR CAN PICK.

23          **MR. KATZ:**  I JUST WANT TO SAY FOR THE RECORD

24 MR. ADDERLEY PLAYED 11 YEARS?

25          **MR. ADDERLEY:**  12.

1          **MR. KATZ:**  MR. MCNEIL, I THINK, PLAYED FIVE YEARS?

2          **MR. MCNEIL:**  11.

3          MR. BEACH, I THINK PLAYED, WHAT?  FIVE YEARS?

4          **MR. ADDERLEY:**  SIX.

5          **MR. KATZ:**  SIX YEARS.

6          AND MR. LAIRD PLAYED 11 YEARS.

7          **THE COURT:**  WELL, BUT THE PURPORT OF HIS QUESTIONS

8   WERE:  IS THERE SOMEBODY IN THIS CLASS WHO DIDN'T DO ALL THAT?

9          **MR. KATZ:**  NO.  THE PURPORT OF THE QUESTION WAS

10  EVERYBODY WAS LIKE THIS.  EVERYBODY IS JUST A FREE RIDER.

11  EVERYBODY IS WORTHLESS.  EVERYBODY WANTS SOMETHING FOR NOTHING.

12         **THE COURT:**  NO, HE NEVER WENT THAT FAR.  HE NEVER

13  WENT THAT FAR.

14         **MR. KESSLER:**  NOR WOULD I, YOUR HONOR.

15         **THE COURT:**  BUT HE DID -- HE DID GIVE THE EXAMPLE OF

16  THE SCRIMMAGE PLAYER.

17         **MR. KATZ:**  IT'S NOT AN EXAMPLE, BECAUSE IT DOESN'T

18  EXIST.

19         **MR. KESSLER:**  IT DOES.  I CAN GIVE MR. KATZ THE

20  EXAMPLE OF THE PLAYER.  IT EXISTS.  I AGREE, YOUR HONOR, WE

21  DIDN'T PUT IN THE EVIDENCE --

22         **THE COURT:**  HERE'S WHAT WE'LL DO.  HOW ABOUT LETTING

23  THEM REOPEN THEIR CASE?  WE WILL LET THEM PUT ON THE WITNESS SO

24  THIS WILL JUST EVAPORATE.

25         **MR. KATZ:**  MY TIMING WAS ACTUALLY COORDINATED WITH

1 THEIR CLOSING OF THE CASE.  THERE WAS A REASON FOR IT.

2        **THE COURT:**  I CAN ALLOW THEM TO REOPEN.

3        **MR. KATZ:**  YES, YOU CAN.

4        **THE COURT:**  HOW HARD IS IT GOING TO BE TO PUT ON A

5 WITNESS TO DO THIS?

6        **MR. KESSLER:**  IF HE CAN TESTIFY FROM THE RECORDS OF

7 THE UNION, I COULD PUT UP MR. NAHRA TO TESTIFY FROM THE RECORDS

8 OF THE UNION, AND I HAVE HERE AS TO WHEN THE PLAYER PLAYED --

9        **MR. KATZ:**  SO WAIT.

10        **MR. KESSLER:**  -- AND WHAT STATUS HE WAS.

11        **MR. KATZ:**  I'M NOT GOING TO BE PUNISHED FOR MAKING

12 THIS MOTION?  I DON'T GET IT.  I JUST DON'T GET IT.

13        **THE COURT:**  I THINK THIS IS A SAND-BOX-TYPE THING ON

14 BOTH SIDES.  I'M GOING TO INSTRUCT THE JURY, BECAUSE THIS IS A

15 BROADER PROBLEM THAN THIS ONE THING.

16        I'M GOING TO INSTRUCT THE JURY IN THE FINAL

17 INSTRUCTIONS ON THIS GENERAL PROBLEM OF THE LAWYERS SAYING

18 THINGS THAT ARE NOT SUPPORTED BY THE EVIDENCE.  AND I'M GOING

19 TO TRY TO FIND AN EXAMPLE THAT IS A PLAGUE ON BOTH HOUSES.

20        **MR. KATZ:**  WELL, YOUR HONOR --

21        **THE COURT:**  ONE FROM YOUR SIDE, ONE FROM THAT SIDE.

22        **MR. KATZ:**  YOUR HONOR --

23        **THE COURT:**  NO, I'M NOT GOING TO LET YOU REOPEN,

24 BECAUSE I THINK YOU SHOULD HAVE DONE THIS, AND YOU SHOULD NOT

25 HAVE USED THIS EXAMPLE -- THERE WAS -- I ACCEPT THAT THERE WAS

1  A GOOD FAITH BASIS FOR THE QUESTION.

2          **MR. KESSLER:**  YES.

3          **THE COURT:**  BUT THEN, YOU DIDN'T FOLLOW THROUGH TO

4  LAY THAT BEFORE THE JURY.

5          **MR. KESSLER:**  I UNDERSTAND THAT, YOUR HONOR.  I AM

6  CERTAINLY NOT DISAGREEING WITH YOUR HONOR.  I GUESS AS LONG AS

7  YOU GIVE ONE EXAMPLE FROM EACH SIDE OR DON'T GIVE EXAMPLES

8  THAT'S FINE.

9          **THE COURT:**  I AM GOING TO INSTRUCT THE JURY.  BUT

10  YOU -- I'M GIVING YOU UNTIL 4 O'CLOCK TODAY TO COME UP WITH

11  YOUR EXAMPLES THAT SHOW THE OTHER SIDE HAS DONE THINGS JUST AS

12  BAD.

13          THEN, IT WILL BE BALANCED.

14          **MR. KESSLER:**  OKAY.

15          **THE COURT:**  BECAUSE I DO BELIEVE THAT BOTH SIDES HAVE

16  DONE THIS.

17          **MR. KESSLER:**  AND WHAT WE WILL DO IS FACTS THEY PUT

18  IN THAT ARE NOT IN EVIDENCE, WHICH WE WILL SHOW YOU.

19          **MR. KATZ:**  WELL, YOUR HONOR, I AM CONCERNED ABOUT

20  YOUR HONOR'S SAND BOX REMARK, BECAUSE I DON'T CONSIDER THIS TO

21  BE A SAND BOX, AND I HEREBY WITHDRAW MY MOTION.

22          **THE COURT:**  ALL RIGHT.  THEN, THE MOTION IS

23  WITHDRAWN.  I'M STILL GOING TO SAY SOMETHING, THOUGH, WITHOUT

24  USING EXAMPLES, BECAUSE I'M CONVINCED TO A MORAL CERTAINTY THAT

25  BOTH SIDES ARE GOING TO GET UP IN THEIR CLOSING ARGUMENTS AND

1  SAY THINGS THAT ARE NOT SUPPORTED BY THE EVIDENCE.

2          **MR. KESSLER:**  WE HAVE NO OBJECTION WITH THAT EXAMPLE,

3  SO LONG AS HE'S WITHDRAWN HIS MOTION.

4          **THE COURT:**  ALL RIGHT.  MOTION WITHDRAWN.

5          WHAT DO YOU HAVE, MR. HUMMEL?

6          **MR. HUMMEL:**  YOUR HONOR, SOMETHING YOUR COURTROOM

7  DEPUTY GAVE ME, WHICH IS AN INQUIRY FROM THE PRESS ABOUT HOW

8  THEY GET ACCESS TO EXHIBITS.  WE DON'T HAVE TO DEAL WITH IT

9  NOW.  BUT WE -- BOTH SIDES --

10         **THE COURT:**  THERE WERE TWO, TWO DOCUMENTS THEY

11 WANTED.

12         **MR. HUMMEL:**  RIGHT.

13         **THE COURT:**  WHY CAN'T YOU JUST TAKE CARE OF IT FOR ME

14 AND GIVE THEM THE COPIES?

15         **MR. HUMMEL:**  WE WILL.  I JUST WANTED TO MAKE SURE

16 THAT'S NOT A VIOLATION OF THE COURT'S ORDER ABOUT CONTACTING

17 PRESS.

18         **THE COURT:**  WERE THEY CONFIDENTIAL DOCUMENTS OR

19 SOMETHING?

20         **MR. HUMMEL:**  NO, NO.

21         **THE COURT:**  WOULD YOU TWO TAKE CARE OF THIS SO I

22 DON'T HAVE TO HAVE DAWN --

23         **MR. HUMMEL:**  WE WILL.

24         **THE COURT:**  -- DO --

25         **MR. KESSLER:**  WHY DON'T WE DO THAT?

1          **MR. HUMMEL:**  WE WILL DO IT, YOUR HONOR, YES.

2          **MR. KESSLER:**  WE'LL MAKE SURE NONE OF US SPEAK TO THE

3 PRESS.

4          **THE COURT:**  ALL RIGHT.  THAT WOULD BE OKAY.

5          **MR. HUMMEL:**  THANK YOU, YOUR HONOR.

6          **THE COURT:**  ALL RIGHT.  LET'S BRING THE JURY BACK,

7 AND WE WILL FINISH THE CASE ON EVIDENCE.

8          (THEREUPON, THE JURY RETURNS TO THE COURTROOM.)

9          (THE FOLLOWING PROCEEDINGS WERE HELD IN OPEN COURT,

10          IN THE PRESENCE OF THE JURY.)

11          **THE COURT:**  OKAY.  WELCOME BACK.  HAVE A SEAT.  WE

12 TOOK SOME TIME TO SORT OUT A MATTER WHICH REALLY GETS

13 SIMPLIFIED, AND I WILL TELL YOU WHAT YOU NEED TO KNOW ON THIS

14 TOMORROW.

15          SO WE'RE GOING TO NOW JUST PROCEED TO -- WE'VE

16 REACHED A MILESTONE.  PLAINTIFF HAS RESTED.  DEFENSE HAS

17 RESTED.  BUT BOTH SIDES NOW GET A CHANCE TO PUT ON A REBUTTAL

18 CASE.  AND THEN, THE DEFENSE GETS TO PUT ON A, QUOTE,

19 "SURREBUTTAL CASE."

20          TYPICALLY, THESE ARE VERY SHORT, AND I KNOW FROM WHAT

21 THE LAWYERS HAVE TOLD ME THIS IS GOING TO BE VERY SHORT RIGHT

22 NOW.

23          SO, MR. LECLAIR, DO YOU HAVE A REBUTTAL CASE TO

24 PRESENT AT THIS TIME?

25          **MR. LECLAIR:**  YES, YOUR HONOR.  WE'RE JUST GOING TO

1   READ A VERY SHORT DEPOSITION EXCERPT.  AND MR. HILBERT AND

2   MR. GARZA ARE GOING TO READ THE TRANSCRIPT FOR US.

3           **THE COURT:**  ALL RIGHT.  COME FORWARD, PLEASE.

4           WHAT IS THE NAME OF THE WITNESS?

5           **MR. HILBERT:**  AND THE WITNESS IS HOWARD J. SKALL,

6   YOUR HONOR.

7           **THE COURT:**  S-K-A-L-L?

8           **MR. HILBERT:**  THAT'S CORRECT.

9           **THE COURT:**  ALL RIGHT.  AND HOW LONG -- YOU WILL TELL

10  ME HOW THE TIME IS ALLOCATED, BUT GIVE THE JURY A HEADS-UP ON

11  HOW LONG IT'S GOING TO BE.

12          **MR. HILBERT:**  WE HAVEN'T ACTUALLY MEASURED IT, BUT

13  IT'S GOING TO BE MAYBE TEN MINUTES TOPS.

14          **THE COURT:**  AND MR. SKALL WAS AN EMPLOYEE OF WHO?

15          **MR. HILBERT:**  HE WAS AN EMPLOYEE OF PLAYERS INC.

16  FORMER EMPLOYEE.  HE WAS THEIR VICE PRESIDENT OF PLAYER

17  MARKETING.

18          **THE COURT:**  ALL RIGHT.  WHAT IS THE DATE OF THE

19  DEPOSITION?

20          **MR. HILBERT:**  THE DATE OF THE DEPOSITION IS FEBRUARY

21  14, 2008.

22          **THE COURT:**  ALL RIGHT.  PLEASE GO RIGHT AHEAD.

23          **MR. HILBERT:**  LET ME GIVE ONE CAVEAT, WHICH IS THIS

24  IS A DEPOSITION THAT I ACTUALLY TOOK, SO I'M GOING TO READ MY

25  OWN PART.

1          MR. GARZA IS GOING TO BE PLAYING THE ROLE OF HOWARD

2    SKALL.

3          AND, INCIDENTALLY, MY NAME IS RYAN HILBERT.  I'M AN

4    ATTORNEY WITH THE PLAINTIFFS.

5                          **HOWARD SKALL,**

6    CALLED AS A WITNESS FOR THE PLAINTIFFS HEREIN, TESTIFIED VIA

7    DEPOSITION READ IN OPEN COURT IN THE PRESENCE AND HEARING OF

8    THE JURY AS-FOLLOWS:

9          (DEPOSITION TESTIMONY READ BY MR. HILBERT AND MR.

10         GARZA AS FOLLOWS:)

11                          **<u>EXAMINATION</u>**

12   **Q.**  AS YOU HEARD, MY NAME IS RYAN HILBERT, AND I'M WITH

13   MANATT, PHELPS & PHILLIPS OUT IN PALO ALTO.

14         **THE COURT:**  READ SLOWER.

15         **MR. HILBERT:**  SORRY.

16   **Q.**  AND WE'RE COUNSEL FOR THE PLAINTIFFS IN THIS MATTER.

17         CAN YOU PLEASE STATE YOUR NAME AND ADDRESS FOR THE

18   RECORD.

19   **A.**  HOWARD SKALL.  ADDRESS IS 18524 RUSHBROOKE DRIVE IN OLNEY,

20   MARYLAND.

21   **Q.**  WHEN DID YOU START WORKING FOR PLAYERS INC?

22   **A.**  FOR PLAYERS INC OR THE NFLPA?

23   **Q.**  FOR PLAYERS INC, INITIALLY.

24   **A.**  IT WOULD HAVE BEEN MARCH OR APRIL 1995.

25   **Q.**  AND WHAT WAS YOUR TITLE UPON JOINING PLAYERS INC?

1   A.   I BELIEVE MY FIRST TITLE WAS PLAYER MARKETING COORDINATOR.

2   Q.   AND FOR HOW LONG DID YOU HOLD THAT POSITION?

3   A.   PROBABLY ABOUT THREE OR FOUR YEARS.

4   Q.   SO UNTIL AROUND 1995 TO 1999?

5   A.   CORRECT.

6   Q.   AND WHAT WERE YOUR JOB DUTIES AS PLAYER MARKETING

7   COORDINATOR?

8   A.   I WAS RESPONSIBLE FOR RUNNING THE PLAYER MARKETING

9   DEPARTMENT.  AND WHAT WE DID IN THE PLAYER MARKETING DEPARTMENT

10  WAS A FEW DIFFERENT THINGS.  WE PROCURED PLAYERS FOR OUR

11  INTERNAL NEEDS, WHETHER IT WAS AN INTERNAL EVENT THAT WE WERE

12  PUTTING ON, ANYTHING ELSE WE WERE DOING FROM A PLAYERS INC

13  STANDPOINT, WHICH WE WERE LOOKING TO INCORPORATE PLAYERS,

14  PLAYERS INC RADIO OR RADIO PROPERTY.  WE HAD THINGS OF THAT

15  NATURE.  AND THEN, THE OTHER MAIN RESPONSIBILITY WAS PROCURING

16  PLAYERS FOR PLAYERS INC LICENSEES AND SPONSORS WHEN THEY WANTED

17  TO INCORPORATE PLAYERS TO PROMOTE THEIR PRODUCTS OR SERVICES.

18  Q.   AND WHEN YOU SAY "PLAYERS," DO YOU MEAN TO INCLUDE ACTIVE

19  AND RETIRED NFL PLAYERS?

20  A.   YES.

21  Q.   YOU SAID YOU WERE IN CHARGE OF THE DEPARTMENT.  HOW MANY

22  PEOPLE WERE IN THE DEPARTMENT?

23  A.   IN 1995, WHEN I STARTED, IT WAS ME.  AND IN 2006, WHEN I

24  LEFT, I WAS RUNNING A DEPARTMENT OF TEN PEOPLE.

25  Q.   IN 1998 OR 1999 WHAT DID YOUR TITLE CHANGE TO?

1  **A.**   ASSISTANT VICE PRESIDENT, PLAYER MARKETING.

2  **Q.**   AND WAS THAT THE TITLE THAT YOU HAVE HAD UP UNTIL YOUR

3  DEPARTURE FROM PLAYERS INC?

4  **A.**   NO.

5  **Q.**   FOR HOW LONG DID YOU HOLD THE TITLE OF ASSISTANT VICE

6  PRESIDENT OF PLAYER MARKETING?

7  **A.**   PROBABLY ANOTHER THREE TO FOUR YEARS.

8  **Q.**   ALL RIGHT.  AND THEN IN 2002 YOUR JOB TITLE CHANGED AGAIN,

9  CORRECT?

10  **A.**   CORRECT.

11  **Q.**   AND WHAT DID IT CHANGE TO AT THAT POINT?

12  **A.**   VICE PRESIDENT, PLAYER MARKETING.

13  **Q.**   FIRST YOU WERE ASSISTANT VICE PRESIDENT OF PLAYER

14  MARKETING, AND IN 2002 IT CHANGED TO VICE PRESIDENT OF PLAYER

15  MARKETING?

16  **A.**   CORRECT.

17  **Q.**   AND IS THAT THE TITLE THAT YOU HELD UP UNTIL THE TIME OF

18  YOUR DEPARTURE FROM PLAYERS INC?

19  **A.**   YES.

20  **Q.**   WAS YOUR DEPARTMENT INVOLVED IN THE LICENSING OF RETIRED

21  PLAYER RIGHTS?

22  **A.**   NO.

23  **Q.**   IS THERE A LIST OF APPROXIMATELY 3,000 RETIRED PLAYERS

24  THAT'S MADE AVAILABLE TO LICENSEES?

25  **A.**   NOT THAT I WAS AWARE OF.

1  Q.   IS THERE A FLAT FEE AVAILABLE FOR THE LICENSING OF GROUP

2  OF RETIRED PLAYERS?

3  A.   NOT THAT I WAS AWARE OF.

4  Q.   DO YOU HAVE ANY IDEA HOW MANY OF THE 765 RETIRED PLAYER

5  OPPORTUNITIES, HOW MANY RETIRED PLAYERS WERE INVOLVED IN THOSE

6  765?

7  A.   LOOKING AT CHART 2, THERE WERE 95 HALL OF FAME PLAYERS AND

8  255 NON-HALL OF FAME PLAYERS FOR A TOTAL OF 350 DIFFERENT

9  RETIRED PLAYERS WHICH HAD GONE UP FROM 210 THE PREVIOUS YEAR.

10 AND THEN THROUGHOUT THE TIME I WAS THERE WE WERE VERY PROUD OF

11 THE PROGRESS THAT WE MADE GETTING OPPORTUNITIES FOR BOTH ACTIVE

12 AND RETIRED PLAYERS.  YOU CAN SEE HOW MUCH MORE WE WERE GOING

13 UP FROM ONE YEAR TO THE NEXT YEAR BY THIS CHART.

14 Q.   WAS ANYONE OTHER THAN HALL OF FAME PLAYERS INCLUDED IN

15 THOSE 765 RETIRED PLAYER OPPORTUNITIES?

16 A.   YES.  AND THE BREAKDOWN IS RIGHT THERE IN CHART 2.  THERE

17 WAS 490 OPPORTUNITIES FOR NON-HALL PLAYERS IN THAT FISCAL YEAR,

18 WHICH WAS AN INCREASE OF DOUBLE THE YEAR BEFORE.

19          (READING CONCLUDED.)

20          **MR. HILBERT:**  THAT'S ALL WE HAD, YOUR HONOR.

21          **THE COURT:**  WHAT WAS THE BREAKDOWN TIME-WISE ON THAT?

22          **MR. HILBERT:**  PARDON?

23          **THE COURT:**  WHY DON'T I JUST SAY FIVE AND FIVE?

24          **MR. GARZA:**  SOUNDS FAIR, YOUR HONOR.

25          **MR. HILBERT:**  THANK YOU.

1          THE COURT:  OKAY, MR. LECLAIR, YOUR NEXT ITEM?

2          MR. LECLAIR:  YOUR HONOR, I JUST WANT TO NOTE FOR THE

3 RECORD WE OFFERED 1164-4 YESTERDAY, SUBJECT TO VERIFICATION.

4 AND DEFENDANTS HAVE SAID THEY HAVE NO OBJECTION.

5          SO 1164-4, I THINK, IS NOW ADMITTED WITHOUT

6 OBJECTION.

7          THE COURT:  LET ME PUT IT ON MY LIST.  1164 DASH

8 WHAT?

9          MR. LECLAIR:  4.

10          THE COURT:  IS IN EVIDENCE.  ALL RIGHT.

11          THANK YOU.

12          (TRIAL EXHIBIT 1164-4 RECEIVED IN EVIDENCE.)

13          MR. LECLAIR:  AND WITH THAT, YOUR HONOR, I THINK

14 WE'RE DONE.

15          THE COURT:  ALL RIGHT.  SEE, I TOLD YOU THAT WOULD BE

16 SHORT.

17          IS THERE A SURREBUTTAL CASE?

18          MR. KESSLER:  YOUR HONOR, I'M HAPPY TO INFORM THE

19 JURY THAT ALL THE EVIDENCE HAS BEEN PRESENTED, AND THE

20 DEFENDANTS ARE VERY HAPPY TO REST.

21          THE COURT:  ALL RIGHT.  SO NOW WE'VE REACHED DOUBLE

22 MILESTONES IN QUICK ORDER.

23          AND YOU HAVE NOW HEARD ALL OF THE EVIDENCE THAT

24 YOU'RE GOING TO HEAR FROM THE WITNESSES.

25          NOW, THERE ARE A FEW DOCUMENTS YOU PROBABLY HAVEN'T

1  COMPLETELY READ THAT WILL BE IN THAT ARE IN EVIDENCE.  BUT ALL

2  THE EVIDENCE IS IN.  THERE'S NO MORE WITNESSES.  NO MORE

3  DOCUMENTS TO MOVE IN.

4          SO WHAT'S LEFT?  REALLY, THREE THINGS.  YOU'VE GOT TO

5  HEAR THE CLOSING ARGUMENTS.  YOU'VE GOT TO HEAR ME TELL YOU

6  WHAT THE LAW IS.  THEN, YOU GET TO GO DELIBERATE AND LAY THE

7  LAW ALONGSIDE THE FACTS AS YOU DETERMINE THEM TO BE, TO DECIDE

8  THE CASE.

9          SO THAT'S THE -- AND IT HAS TO BE A UNANIMOUS VERDICT

10 ON EACH -- EACH QUESTION.  SO ALL TEN OF YOU WILL HAVE TO

11 AGREE.

12         NOW, LET'S TALK ABOUT THE SCHEDULE FOR A MOMENT.

13 IT'S ONLY 10:45 IN THE MORNING, BUT I NEED TO TAKE AT LEAST

14 SEVERAL HOURS TO SORT OUT ISSUES OF LAW WITH THE LAWYERS.

15 WE'VE MADE A LOT OF PROGRESS ON THIS ALREADY.  NOT TO BORE YOU

16 WITH IT, BUT WE'VE ALREADY GOTTEN THROUGH ONE-AND-A-HALF DRAFTS

17 OF THE INSTRUCTIONS OF LAW I WILL GIVE TO YOU.

18         BUT I NEED TO HAVE A CAREFUL SESSION WITH THE LAWYERS

19 ON THIS SUBJECT SO THAT WHENEVER I DO GIVE YOU THE LAW AT THE

20 END, IT IS AS FAIR A STATEMENT OF THE LAW AS I CAN MAKE IT FIT

21 THESE FACTS.

22         SO YOU -- WE NEED TO TAKE TOMORROW OFF, IS WHAT I'M

23 LEADING UP TO, FOR YOU.  NOT US.  THE LAWYERS AND I WILL BE

24 WORKING HARD ON THIS CASE.

25         BUT I WANT TO GIVE YOU TOMORROW OFF.  AND TODAY IS

1  WEDNESDAY, WEDNESDAY THE 5TH.  SO THURSDAY, TOMORROW, YOU DON'T

2  HAVE TO COME TO COURT.

3        BUT PLEASE COME BACK ON FRIDAY MORNING AT THE REGULAR

4  TIME.  AND BY THEN, WE'LL BE READY TO GIVE YOU THE CLOSING

5  ARGUMENTS AND THE INSTRUCTIONS, AND THEN YOU CAN DELIBERATE.

6        NOW, HEADS UP ON THAT, ON FRIDAY.  WE'VE BEEN HERE

7  HOW LONG?  ABOUT TWO WEEKS OF EVIDENCE.  I THINK THAT'S ABOUT

8  RIGHT.

9        SO I -- IT WILL TAKE ROUGHLY AN HOUR TO READ YOU THE

10 INSTRUCTIONS.  IT WILL TAKE -- I'M INCLINED TO GIVE EACH

11 SIDE -- WELL, I'M INCLINED TO GIVE EACH SIDE ENOUGH TIME THAT

12 EVEN IF WE START AT THE REGULAR TIME THIS CASE WON'T GO TO YOU

13 UNTIL CLOSE TO SOMETIME BETWEEN 11:15 AND NOON ON FRIDAY,

14 ROUGHLY.

15        SO I WANT TO GIVE THE LAWYERS ENOUGH TIME TO ARGUE

16 THE CASE SO THAT THEY CAN GO BACK, AND IF THEY WANT TO, PUT

17 THINGS UP ON THE SCREEN AND SAY:

18        "HERE'S THE TESTIMONY" THAT SOMEBODY GAVE IN THE

19 CASE, OR THEY WANT TO PUT A DOCUMENT UP THERE.  THAT'S WHAT

20 CLOSING ARGUMENT IS ALL ABOUT.

21        SO WHAT I'M LEADING UP TO IS, I'M GOING TO SUGGEST TO

22 YOU THAT YOU ARRANGE YOUR SCHEDULE SO THAT YOU CAN STAY FRIDAY

23 AFTERNOON.

24        NOW, IF SOMEBODY HAS GOT A MEDICAL APPOINTMENT AND

25 JUST CAN'T DO THAT, THEN WE'LL -- WE -- WE WON'T DO THAT.  BUT

1   NORMALLY WHEN THE JURIES START TO DELIBERATE THEY STAY PAST

2   1 O'CLOCK.  BUT IT'S UP TO YOU.  YOU SHOULD BE THINKING ABOUT

3   THAT.

4           AND, IN FACT, WHAT I WILL DO IS, WITH THE LAWYER'S

5   PERMISSION, WHEN YOU -- BEFORE YOU LEAVE TODAY YOU MIGHT SPEND

6   FIVE MINUTES AND JUST TALK ABOUT THE SCHEDULE FOR FRIDAY.  AND

7   FOR THAT MATTER, FOR NEXT WEEK, IF -- BECAUSE YOU MIGHT BE

8   COMING BACK NEXT WEEK TO CONTINUE YOUR DELIBERATIONS.

9           IS THAT OKAY, AS LONG AS THEY DON'T TALK ABOUT THE

10  CASE?

11          **MR. KESSLER:**  THAT'S FINE, YOUR HONOR.

12          **MR. PARCHER:**  YES.

13          **THE COURT:**  NOW, THE ADMONITION STILL APPLIES.  EVEN

14  THOUGH YOU HAVE HEARD ALL THE EVIDENCE YOU STILL CANNOT TALK

15  ABOUT THE CASE, THE MERITS IN THE CASE, THE EVIDENCE IN THE

16  CASE, ARGUMENTS AND SO FORTH.  IT WILL BE YOUR DUTY TO DO THAT

17  VERY SOON, BUT YOU CAN'T DO IT YET.  SO JUST WAIT UNTIL IT'S

18  YOUR DUTY TO DO IT, AND THEN YOU WANT TO TALK.  BUT NOT YET.

19          YOU WANT TO HEAR THE ARGUMENTS AND YOU WANT TO HEAR

20  THE INSTRUCTIONS BEFORE YOU START DOING THAT.  BUT IN TERMS OF

21  THE SCHEDULE, SO YOU CAN PLAN YOUR LIVES, IF ANY OF YOU HAVE A

22  GOOD REASON FOR NOT DELIBERATING ON FRIDAY AFTERNOON, THEN

23  DON'T.  IT'S OKAY.

24          I'M JUST GIVING YOU A SUGGESTION BASED ON WHAT OTHER

25  JURIES HAVE DONE IN THE PAST.  THEY GET INTO THEIR

1   DELIBERATIONS AND JUST PLOW RIGHT THROUGH.

2          ALL RIGHT.  I THINK I'M GOING TO LEAVE IT THERE

3   UNLESS SOMEBODY HAS -- I JUST -- SINCE WE'RE GOING TO HAVE A

4   DAY OFF, I WANT TO EMPHASIZE THIS.  PLEASE DON'T GO DO SOME

5   HOMEWORK ON THIS CASE.

6          DON'T GO ON THE INTERNET.  DON'T READ PRESS ACCOUNTS

7   ABOUT THIS CASE.  DON'T -- DON'T DO ANYTHING THAT WOULD VIOLATE

8   ANY OF THE ADMONITIONS.  DON'T TALK TO YOUR FRIENDS, FAMILY,

9   LOVED ONES, WHATEVER, ABOUT THIS CASE, OR AMONG YOURSELVES.

10         IT WILL BE YOUR DUTY TO DO THAT SOON ENOUGH.  OKAY.

11  DO ANY OF YOU HAVE QUESTIONS ABOUT THE SCHEDULE?

12         NEXT WEEK WE HAVE TUESDAY OFF.  BUT ALL THE OTHER

13  DAYS WOULD BE FREE FOR YOU TO DELIBERATE.

14         AND HOW LONG YOU NEED TO DELIBERATE IS ENTIRELY UP TO

15  YOU.  THAT'S YOUR CALL.  BUT THAT'S -- I'VE GOT THE JURY ROOM

16  RESERVED FOR YOU, IF YOU NEED THAT TIME.  BUT TUESDAY IS A

17  HOLIDAY.  WE CAN'T ASK YOU TO COME IN ON TUESDAY, BECAUSE IT'S

18  ARMISTICE'S DAY.

19         ALL RIGHT.  ANYTHING THE LAWYERS WANT ME TO SAY

20  BEFORE WE LET THE JURY GO?

21         **MR. KESSLER:**  NOT FROM US, YOUR HONOR.

22         **MR. PARCHER:**  NO, SIR.

23         **THE COURT:**  ALL RIGHT.  YOU ALL HAVE A GREAT REST OF

24  THE DAY AND GOOD DAY OFF, AND WE'LL SEE YOU BACK HERE AT THE

25  REGULAR TIME ON FRIDAY MORNING.  THANK YOU.

1          **THE CLERK:**  ALL RISE.

2          (JURY EXCUSED.)

3          (THE FOLLOWING PROCEEDINGS WERE HELD IN OPEN COURT,

4          OUTSIDE THE PRESENCE OF THE JURY.)

5          **THE COURT:**  ALL RIGHT.  ON -- HAVE A SEAT EVERYBODY.

6          I WOULD LIKE FOR YOU TO -- LET'S GO OVER THE SCHEDULE

7     FOR THE LAWYERS.  THE JURY IS NOT PRESENT NOW.

8          ABOUT 4:00 P.M. TODAY I THINK I'D ASKED YOU TO GIVE

9     ME YOUR 10-PAGE CRITIQUE OF THE INSTRUCTIONS.

10          THIS TIME, THOUGH, YOU GOT TO PUT IN ANYTHING THAT

11     YOU THINK IS AN ERROR.  OTHERWISE, IT WILL BE DEEMED TO BE

12     WAIVED.

13          AND THE FACT THAT YOU MONTHS AGO OR WEEKS AGO GAVE ME

14     SOME STRAY INSTRUCTION -- I TRIED TO INCLUDE EVERYTHING THAT I

15     THINK IS RELEVANT -- IF YOU DON'T RERAISE IT, IT WILL BE DEEMED

16     TO BE WAIVED.

17          **MR. KESSLER:**  IN THE 10 PAGES, YOUR HONOR?

18          **THE COURT:**  DO YOU NEED MORE THAN THAT?

19          **MR. KESSLER:**  I DON'T KNOW. IN OTHER WORDS, WE

20     THOUGHT WHAT YOUR HONOR SAID WAS THAT THE TEN PAGES SHOULD

21     CLEARLY BE MORE COMPREHENSIVE THAN THE FIVE, BUT THAT THE FINAL

22     OPPORTUNITY --

23          **THE COURT:**  YOU TAKE AS MANY PAGES AS YOU WANT, THEN.

24     AND IF I STOP READING AFTER TEN PAGES, I'M GOING TO MAKE A

25     JUDGMENT CALL.  I'LL READ AS MUCH AS I CAN POSSIBLY READ.

1          MR. KESSLER:  OKAY.

2          THE COURT:  BUT YOU -- IF YOU DON'T BRING IT TO MY

3  ATTENTION AGAIN, IT IS WAIVED.

4          MR. KESSLER:  UNDERSTOOD.

5          THE COURT:  SO IF YOU -- IF THERE'S SOMETHING YOU

6  WANT TO ADD OR SUBTRACT FROM THESE INSTRUCTIONS YOU'VE GOT TO

7  SAY IT AGAIN, AND DON'T RELY ON SOMETHING LURKING IN THE RECORD

8  EARLIER TO ASSIGN ERROR ON APPEAL.  THAT'S POINT ONE.

9          NOW, THE REPLIES ARE NOT MANDATORY, BUT MIGHT BE

10  HELPFUL.  AND THOSE WOULD BE DUE AT MIDNIGHT.  BUT PLEASE DON'T

11  RAISE NEW OBJECTIONS IN YOUR MIDNIGHT FILING.  ONLY RESPONSIVE

12  TO THE OTHER SIDE.

13          IN OTHER WORDS, DON'T SAY:

14          "AH, WE'LL PUT IT IN," OR, "WE FORGOT TO PUT

15  THAT ONE IN, SO NOW WE'LL RAISE IT IN THE MIDNIGHT ONE,"

16  BECAUSE I WANT TO BE ABLE TO LOOK AT WHAT YOU FILED AT

17  4 O'CLOCK TODAY SAYING THIS IS THE UNIVERSE OF THE PROBLEMS

18  THAT ARE BEING CLAIMED IN THE INSTRUCTIONS THAT I CAME UP WITH.

19          THEN, WE'LL COME BACK HERE TOMORROW AT THE REGULAR

20  TIME TO START ON THE -- THIS WILL BE THE FINAL CHARGING

21  CONFERENCE.

22          MR. KESSLER:  YES.

23          THE COURT:  IN TERMS OF THE JURY ARGUMENTS, I THOUGHT

24  NOW THAT I'VE HEARD ALL THE EVIDENCE, ONE HOUR AND 20 MINUTES

25  PER SIDE IS PLENTY.

1    YOU CAN RESERVE 30 MINUTES FOR YOUR -- THE LAST PART.

2  IN OTHER WORDS, PLAINTIFF GOES FIRST AND LAST.  YOU CAN DIVIDE

3  THE HOUR AND 20 MINUTES AND RESERVE UP TO 30 MINUTES FOR

4  REBUTTAL, BUT NOT ANYMORE THAN THAT.

5    AND IF YOU WIND UP, SAY, USING AN HOUR AND FIVE

6  MINUTES IN YOUR OPENING, THEN YOU WOULD HAVE 15 MINUTES LEFT.

7  SO THAT'S THE WAY THAT WOULD WORK.

8    NOW, THERE'S A RULE ABOUT NO SANDBAGGING.  YOU KNOW

9  WHAT THAT MEANS.  THAT MEANS IN THE LAST 15 MINUTES OR LAST 30

10  MINUTES, WHATEVER YOU RESERVE, YOU CAN GO INTO ANYTHING THAT

11  MR. KESSLER BRINGS UP.  ANYTHING THAT MR. KESSLER TOUCHES,

12  YOU'RE FREE TO GO INTO.  AND ANYTHING THAT YOU TOUCHED ON IN

13  YOUR OPENING YOU ARE FREE -- BY "OPENING" I MEAN THE FIRST PART

14  OF YOUR CLOSING.

15    BUT WHAT IS UNFAIR TO DO IS TO BRING UP A NEW SUBJECT

16  THAT YOU DIDN'T TOUCH ON, AND THEN MR. KESSLER LEFT ALONE.

17  CLASSIC EXAMPLE IS PUNITIVE DAMAGES.  PLAINTIFF CANNOT DO THE

18  FOLLOWING, AS I'M USING THIS ONLY AS AN EXAMPLE:  IGNORE

19  PUNITIVE DAMAGES IN THE FIRST PART OF THE CLOSING, WAIT AND SEE

20  IF THE OTHER SIDE ADDRESSES IT.  IF THEY LEAVE WELL ENOUGH

21  ALONE AND IGNORE IT, YOU CANNOT THEN HAMMER THEM AND SAY:

22    "AH-HA, NOW I GOT THEM IN PUNITIVE DAMAGE CITY."

23    YOU CANNOT DO THAT.  THAT'S CALLED "SANDBAGGING."

24    YOU AT LEAST HAVE TO ASK FOR PUNITIVE DAMAGES IN

25  YOUR -- OF COURSE, YOU CAN -- YOU DON'T HAVE TO USE THE SAME

1  WORDS ALL OVER AGAIN, BUT THE SUBJECT HAS TO BE TOUCHED UPON TO

2  GIVE FAIR NOTICE TO THE OTHER SIDE THAT THEY BETTER ADDRESS IT.

3           I'M USING THE PUNITIVES ONLY AS AN EXAMPLE.

4           ALL RIGHT.  THE OTHER THING WHICH I WANT TO REMIND

5  YOU IS THAT YOU SHOULD NOT BE SAYING THINGS LIKE "WE" OR "I

6  BELIEVE" OR "WE BELIEVE."

7           WHAT YOU CAN SAY -- REALLY, IT'S IMPROPER FOR A

8  LAWYER TO SAY:

9               "I THINK MR. SO-AND-SO TOLD THE TRUTH."

10          OR:

11              "I THINK WE HAVE PROVEN."  THAT'S IMPROPER.

12          YOU CAN SAY:

13              "WE HAVE PROVEN."  THAT'S OKAY.

14              "WE HAVE PROVEN X."

15          BUT WHENEVER YOU PUT YOUR PERSONAL IMPRIMATUR ON IT,

16  THEN THAT IS VOUCHING.  IN A CRIMINAL CASE IF THE GOVERNMENT

17  DOES IT, IT'S GROUNDS FOR REVERSAL ON APPEAL.  AT LEAST IN THE

18  NINTH CIRCUIT.

19          BUT IT'S ALSO IMPROPER TO DO IT IN A CIVIL CASE.

20          NOW, I WILL NOT INTERRUPT YOU THE FIRST OR SECOND

21  TIME THAT YOU GET CARRIED AWAY AND DO THAT.  BUT AT SOME POINT

22  I MAY FEEL AN OBLIGATION TO REGULATE THE CONDUCT OF THE

23  OFFICERS OF THE COURT TO MAKE SURE THEY DON'T ENGAGE IN THAT.

24          SO I'LL BE A LITTLE LAX ON IT, BUT AT SOME POINT I

25  MAY HAVE TO SAY:

1      "PLEASE, YOU'VE GOT TO STOP THAT."

2            NOW, I AM THINKING ABOUT SAYING TO THE JURY -- I WILL

3 SAY TO THE JURY FOR SURE:

4            "BE CAREFUL ABOUT WHAT THE LAWYERS SAY VERSUS

5 WHAT THE EVIDENCE IS."

6            I ENCOURAGE YOU, IF YOU THINK THE EVIDENCE THAT YOU

7 HAVE IS GREAT STUFF, TO PUT IT UP ON THE SCREEN.  YOU CAN PUT

8 THE TRANSCRIPT.  YOU CAN SAY "QUESTION" THIS, "ANSWER" THIS.

9 THAT WOULD BE OKAY.

10           UNLESS IT'S THE QUESTION WHERE IT'S THE COURT ASKING

11 THE QUESTION, THEN YOU -- YOU CAN READ IT, BUT YOU DON'T SAY

12 "THE COURT," BECAUSE I DO NOT WANT ONE SIDE OR THE OTHER TRYING

13 TO MAKE IT APPEAR AS IF THE JUDGE IS AN ADVOCATE FOR ONE SIDE

14 OR THE OTHER.

15      **MR. KESSLER:**  AND I TAKE IT, THEN, THE WORD "COURT"

16 SHOULD NOT APPEAR UP ON THE SCREEN, EITHER.

17           **THE COURT:**  NOT WITH ME ASKING QUESTIONS.

18           **MR. KESSLER:**  THAT'S WHAT I MEANT, YOUR HONOR.  YES.

19           **THE COURT:**  YOU CAN READ THAT AND WORK AROUND THE

20 PROBLEM WITH THE COURT ASKING QUESTIONS.

21           SO WE'VE GOT A FEW MINUTES HERE.  IF YOU HAVE OTHER

22 QUESTIONS, I WILL BE HAPPY TO TRY TO ANSWER THEM.  OTHERWISE,

23 WE'LL LET YOU GO HOME EARLY, TOO.

24           **MR. KESSLER:**  MY ONLY QUESTION IS, YOUR HONOR, HOW

25 SHOULD WE HANDLE THE RULE 50 MOTION ISSUE?

1          **THE COURT:**  OH.  I GUESS -- HAVE YOU FILED ANYTHING

2    YET?

3          **MR. KESSLER:**  WELL, WE FILED JUST THE 2-PAGER, YOUR

4    HONOR.  WHAT WOULD YOUR HONOR LIKE US TO DO?

5          **THE COURT:**  WE'RE MOVING ON A FAST TRACK TOWARDS A

6    VERDICT.  YOU BETTER HURRY UP.

7          **MR. KESSLER:**  I'M PREPARED TO JUST ARGUE IT, YOUR

8    HONOR, AT SOME POINT, WITHOUT GOING THROUGH BRIEFING, IF YOUR

9    HONOR WOULD LIKE TO DO THAT.

10         **THE COURT:**  HERE'S WHAT I THINK WE OUGHT TO DO, THEN,

11   BECAUSE I THINK WE SHOULD TAKE A 15-MINUTE BREAK, AND THEN

12   WE'LL COME BACK HERE, AND YOU CAN ARGUE YOUR RULE 50 MOTION.

13         **MR. KESSLER:**  THANK YOU, YOUR HONOR.

14         **THE COURT:**  ALL RIGHT.  IS THAT ALL RIGHT WITH

15   EVERYONE?  THAT WAY WE'LL GET IT DONE TODAY.

16         **MR. LECLAIR:**  YOUR HONOR, I THOUGHT IT WOULD BE MORE

17   EFFICIENT TO DO IT IN WRITING.  WE'LL DO WHATEVER YOUR HONOR

18   WANTS TO DO.

19         **THE COURT:**  IF IT TURNS OUT I FEEL LIKE IT HAS TO BE

20   IN WRITING, THEN -- BUT MOST OF THESE MOTIONS ARE DONE ORALLY,

21   AND I -- I THINK IT -- WHY DON'T YOU DO THIS SO THAT THE 15

22   MINUTES CAN BE PUT TO GOOD USE?  WHAT ARE YOUR MAIN POINTS

23   GOING TO BE, SO THE OTHER SIDE CAN BE THINKING ABOUT IT?

24         **MR. KESSLER:**  MY FIRST POINT WILL FOCUS ON THE

25   FIDUCIARY DUTY CLAIM.  WE BELIEVE THAT UNDER D.C. LAW THE

1  CONTROLLING TEST IS, IN FACT, CONTROL.

2       IN FACT, ALL THE EVIDENCE HAS BEEN THAT PLAINTIFFS

3  DON'T HAVE THE CONTROL THAT'S NECESSARY TO CONSTITUTE A

4  FIDUCIARY DUTY UNDER DISTRICT OF COLUMBIA LAW.  ALL FOUR

5  PLAINTIFFS HAVE ADMITTED THEY DON'T HAVE CONTROL.

6       AND WE'LL DISCUSS THE ONE PROVISION THEY'VE CITED

7  THAT THEY THINK GIVES THEM SOME CONTROL:  THE OPT-OUT FOR

8  EXCLUSIVE ENDORSEMENTS.  WE DO NOT THINK THAT SATISFIES IT.  WE

9  THINK ON THAT BASIS THERE COULD BE NO FIDUCIARY DUTY CLAIM HERE

10 AND SHOULD BE DISMISSED.

11      SECOND, YOUR HONOR, WE WILL ARGUE THAT WITH RESPECT

12 TO THE PUNITIVE DAMAGES CLAIM THAT THERE'S NOT ANY POSSIBLE

13 EVIDENCE IN THIS CASE THAT CAN MEET THE DISTRICT COLUMBIA

14 STANDARD TO SUPPORT A PUNITIVE DAMAGE CLAIM IN TERMS OF THE

15 MALICE THAT'S REQUIRED OR THE DESPICABLE CONDUCT THAT'S

16 REQUIRED.

17      THAT WHATEVER ISSUES THERE ARE WITH RESPECT TO BREACH

18 OF CONTRACT OR FIDUCIARY DUTY, OTHERWISE, THIS IS CLEARLY NOT A

19 PUNITIVE DAMAGE CLAIM, AND, THEREFORE, THAT SHOULD BE DISMISSED

20 ON RULE 50 AND SHOULD NOT GO TO THE JURY.

21      THIRD, YOUR HONOR, WE INTEND TO ARGUE MORE BROADLY

22 THAT WITH RESPECT TO THE INJURY ELEMENT OF FIDUCIARY DUTY, THAT

23 BECAUSE THE ONLY EVIDENCE THEY'VE OFFERED IS MR. ROWLEY'S

24 TESTIMONY OF -- THAT THEY WOULD GET AN EQUAL SHARE OF THE GLR

25 GROSS LICENSING POOL, THAT THEY'VE OFFERED NOTHING TO CAUSALLY

1  LINK ANY CLAIM TO THAT POOL TO ANY BREACH OF FIDUCIARY DUTY.

2         SO, FOR EXAMPLE, IF THERE'S A MARKETING CLAIM THAT WE

3  DIDN'T ADEQUATELY MARKET, THEY'VE OFFERED NOTHING TO SHOW THAT

4  IF THERE HAD BEEN PROPER MARKETING IT WOULD LEAD TO AN EQUAL

5  SHARE OF THE GLR POOL WITH THE ACTIVE PLAYER MONEY.

6         THEY JUST CAN'T PROVE IT UP.

7         AND BECAUSE INJURY IS A SEPARATE LIABILITY ELEMENT OF

8  FIDUCIARY DUTY, THEY CAN'T -- AND THAT'S IN D.C. LAW VERY

9  CLEAR -- THEY CAN'T SHOW THE INJURY ELEMENT.

10        WE ALSO BELIEVE, YOUR HONOR -- AND WE WILL ARGUE THIS

11  FOR BOTH BREACH OF CONTRACT AND FIDUCIARY DUTY -- THAT INJURY

12  HATS TO BE PROVEN INDIVIDUALLY TO CLASS MEMBERS.  WE'VE CITED

13  AUTHORITY FOR THAT.

14        AND THAT WHILE YOU CAN HAVE A CLASS-WIDE

15  DEMONSTRATION, THEY HAVEN'T SHOWN ANY CLASS-WIDE DEMONSTRATION

16  INDIVIDUALLY, AS THEY HAVE TO.

17        ALL THEY DID IS HAVE MR. ROWLEY TESTIFY THERE'S THIS

18  GLR POOL.  AND THAT IF THEY PROVED THAT THEY WERE ENTITLED TO A

19  SHARE OF THAT POOL, THIS IS WHAT IT WOULD BE, WE DON'T THINK

20  THAT SHOWS INJURY.

21        AND FINALLY, ON THE BREACH OF CONTRACT, THERE'S

22  NOTHING IN THE CONTRACT THAT LINKS TO THE GLR POOL, AN EQUAL

23  SHARE OF THE GLR POOL OR ANYTHING THAT WOULD CONNECT TO THE GLR

24  POOL.

25        SO WHATEVER ELSE THEY THINK ABOUT THEIR BREACH OF

1 CONTRACT CLAIM, THERE'S NO EVIDENCE OF THAT. THOSE WOULD BE

2 THE MAIN POINTS, YOUR HONOR. I DON'T THINK I MISSED ANYTHING,

3 BUT I THINK THOSE WOULD BE THE POINTS.

4     **THE COURT:** HERE'S WHAT WE'LL DO. WE'LL ARGUE IT

5 WHEN WE COME BACK, AND WE WILL ARGUE ONE POINT AT A TIME. AND

6 EACH SIDE WILL GET ABOUT FIVE MINUTES ON EACH POINT.

7     SO, IN OTHER WORDS, ON YOUR NO NEXUS CLAIM YOU WILL

8 HAVE FIVE MINUTES. THEY'LL HAVE FIVE MINUTES. THEN WE'LL GO

9 TO THE NEXT POINT.

10     IT WILL TAKE CLOSE TO AN HOUR TO WORK OUR WAY THROUGH

11 IT.

12     **MR. KESSLER:** VERY GOOD, YOUR HONOR. THANK YOU.

13     **THE COURT:** ALL RIGHT. WE'LL TAKE 15 MINUTES NOW.

14     FOR THE RECORD, BOTH SIDES WOUND UP RESTING WITH --

15 I'M JUST EYEBALLING THIS -- BUT OVER 30 MINUTES AND PROBABLY 45

16 MINUTES OF UNUSED TIME. SO THAT'S FOR THE RECORD. NO ONE

17 SHOULD CLAIM ON APPEAL THAT THEY DID NOT HAVE ENOUGH TIME. ALL

18 RIGHT.

19     (RECESS TAKEN FROM 11:00 TO 11:21 A.M.)

20     **THE COURT:** ALL RIGHT. ARE WE READY TO BEGIN?

21     **MR. KESSLER:** WE ARE, YOUR HONOR.

22     **THE COURT:** OKAY. WHAT WE'LL DO IS ON EACH -- TAKE

23 IT IN LIKE THREE SEGMENTS. SO ON THE CONTRACT CLAIM, MAKE ALL

24 OF YOUR POINTS ON THE CONTRACT CLAIM. THEN, WE'LL HEAR FROM

25 THE OTHER SIDE. THEN, WE'LL GO TO THE FIDUCIARY. THEN, WE'LL

1 GO TO THE PUNITIVE.

2　　　　　SO WE CAN BREAK IT INTO THREE PIECES.  ALL RIGHT?

3　　　　**MR. KESSLER:**  VERY GOOD, YOUR HONOR.

4　　　　　WITH RESPECT TO THE CONTRACT CLAIM, YOUR HONOR, THE

5 ONLY EVIDENCE THAT PLAINTIFFS HAVE OFFERED OF ANY INJURY OR

6 DAMAGES FROM THE BREACH OF CONTRACT CLAIM HAS BEEN A CLAIMED

7 ENTITLEMENT TO THE GLR, THE GROSS LICENSING REVENUE POOL.

8　　　　　IN OTHER WORDS, WHAT THEY HAVE NOT DONE IS THEY HAVE

9 NOT HAD ANY EXPERT OR ANYONE ELSE COME IN AND SAY:

10　　　　　"HOW MUCH WERE THESE RIGHTS WORTH THAT YOU GAVE

11 UP IN THE GLA?"  THEY HAVEN'T DONE THAT.

12　　　　　OKAY.  AND SAY:

13　　　　　"YOU WEREN'T PAID FOR THEM, SO WHAT WERE THEY

14 WORTH?"

15　　　　　INSTEAD, THEIR CLAIM IS DEPENDENT ON THE JURY FINDING

16 THAT THERE IS A CONTRACTUAL RIGHT TO AN EQUAL SHARE OF THE GLR

17 POOL.  IF THEY CANNOT FIND THAT, THEN THERE'S NO INJURY IN

18 DAMAGES.

19　　　　　AND THIS DID NOT COME FROM ME.  THIS CAME FROM THEIR

20 OWN EXPERT, FOR EXAMPLE.  SO I ASKED THEIR EXPERT, TRANSCRIPT

21 1938/11-15:

22　　　　**"QUESTION:**  YOU'VE GIVEN THE JURY NO BASIS TO

23　　　　　CALCULATE ANY DAMAGES IF THEY FIND THAT

24　　　　　RETIRED PLAYERS ARE NOT ENTITLED TO ACTIVE

25　　　　　PLAYER LICENSING MONEY AND ALL THE MONEY IN

1        THE GLR POOL IS ACTIVE PLAYER LICENSING

2        MONEY, CORRECT?

3        **"ANSWER:** IF THOSE TWO ASSUMPTIONS ARE TRUE

4        THEN, YES."

5        AND THEN, MORE PROFOUNDLY, ON TRANSCRIPT 1685, LINE

6   2:

7        **"QUESTION:** SO YOU WOULD AGREE, SIR, THAT IF

8        THIS JURY FINDS THAT THERE'S NO CONTRACTUAL

9        ENTITLEMENT OF THE PLAINTIFF CLASS TO THE

10       REVENUES IN THE GLR POOL, OR NO OTHER LEGAL

11       ENTITLEMENT TO AN EQUAL SHARE OF THE REVENUES

12       IN THE GLR POOL, YOUR MEASURE, OKAY, WOULD

13       NOT BE APPLICABLE, CORRECT?

14       **"ANSWER:** I WAS ASKED TO ASSUME LIABILITY SO,

15       YES, THAT WOULD BE CORRECT."

16       WHAT THE WITNESS WAS INDICATING IS THAT THE ONLY WAY

17  THEY'VE OFFERED ANY DAMAGES -- AND THEY'VE OFFERED NO OTHER

18  DAMAGES EVIDENCE, YOUR HONOR.  THEY DIDN'T HAVE -- NONE OF

19  THEIR PLAINTIFFS TESTIFIED IN LAY TESTIMONY:

20       "HERE'S WHAT MY RIGHTS WERE WORTH."  SO THERE'S

21  NO NON-EXPERT TESTIMONY OF THE VALUE.

22       THE ONLY THING THEY'VE OFFERED IS ENTITLEMENT.  NOW,

23  WE LOOK AT THE TERMS OF GLA, THIS CORE DOCUMENT.

24       THERE IS NO REFERENCE IN THE GLA TO THE GROSS

25  LICENSING REVENUE POOL.

1          THEY, YOUR HONOR, YOU KNOW, HAVE TRIED TO CONFUSE

2    GROUP LICENSING, WHICH IS DEFINED, WITH GLR, BUT IT'S GROSS

3    LICENSING REVENUE.

4          AND AS YOUR HONOR KNOWS, IN TRIAL EXHIBIT 95, WHICH

5    IS IN EVIDENCE, WHICH DEFINES -- DEFINES THE GROSS LICENSING

6    REVENUE POOL, IT SAYS IN PARAGRAPH 4A5 THAT IT SPECIFICALLY

7    EXCLUDES ANY OF THE AMOUNTS REGARDING RETIRED PLAYERS.

8          SO THERE'S NO CONTRACTUAL LINK TO THAT GROSS

9    LICENSING REVENUE POOL.  THERE'S ALSO NO INDICATION IT WOULD BE

10   AN EQUAL SHARE.

11         WHAT THE CONTRACT SAYS IS THAT IF THERE'S MONEY

12   GENERATED FROM RETIRED PLAYER GROUP RIGHTS, IT WILL BE DIVIDED

13   ETWEEN, A, THE PLAYER -- THAT WOULD BE THE PLAYER WHO SIGNED --

14   AND THEN, AN ESCROW ACCOUNT FOR ALL ELIGIBLE NFLPA MEMBERS WHO

15   HAVE SIGNED A GROUP LICENSING FORM.

16         THE ONLY EVIDENCE IN ON WHAT THAT WOULD BE WAS

17   MR. ALLEN TESTIFIED THAT IF MONEY HAD BEEN GENERATED AND PUT

18   INTO AN ESCROW ACCOUNT, IT WOULD HAVE BEEN ALL RETIRED PLAYERS,

19   NOT MIXED IN THE GLR POOL.  AND THEY WOULD HAVE THEN DETERMINED

20   WHO WAS ELIGIBLE AS A MEMBER OF THE RETIRED PLAYERS TO SHARE IN

21   THAT.

22         SO WHERE IS THERE NO EVIDENCE?

23         THERE'S NO EVIDENCE, ONE, OF ANY CONNECTION BETWEEN

24   THIS CONTRACT AND THE GLR POOL.

25         THERE'S NO EVIDENCE ON HOW IT WOULD BE DIVIDED UP.

1   IT'S JUST PURE SPECULATION.  OKAY.

2           THERE'S NO EVIDENCE OF WHAT THE DIVISION WOULD BE

3   BETWEEN THE PLAYER WHO SIGNED THE GLR AND HOW MUCH WOULD GO

4   INTO THE ESCROW ACCOUNT.

5           AND THERE'S NO EVIDENCE OF WHAT THE ELIGIBILITY

6   REQUIREMENTS WOULD BE.

7           SO YOUR HONOR COULD SAY:

8               "WELL, IT'S ALL VAGUE, SO HOW DO THEY KNOW THIS?"

9           WHAT THEY SHOULD HAVE DONE IS HAVE AN EXPERT WHO CAME

10  IN AND SAID:

11              "I VALUE HOW MUCH THESE LICENSING RIGHTS ARE

12  WORTH.  HERE'S HOW MUCH THEY WOULD HAVE BEEN WORTH HAD THEY

13  BEEN MARKETED."

14          OR:

15              "HERE'S HOW MUCH SHOULD HAVE BEEN PAID FOR

16  THEM."

17          THEY DIDN'T DO THAT.  THEY TRIED TO TAKE THE ACTIVE

18  PLAYER GLR POOL AND LINK THIS TO THIS CONTRACT.

19          YOUR HONOR, THIS CANNOT SUSTAIN A CLAIM, WE BELIEVE,

20  UNDER RULE 50.

21          MY SECOND CONTRACTUAL ARGUMENT, YOUR HONOR -- AND

22  WE'VE CITED THE CASE LAW ON THIS -- IS WE BELIEVE FOR BOTH

23  CONTRACT AND LATER FIDUCIARY DUTY, THAT THERE MUST BE

24  INDIVIDUAL INJURY SHOWN FOR EACH CLASS MEMBER.  AND, IN

25  PARTICULAR, YOUR HONOR, I'M GOING TO CITE YOU CONTROLLING NINTH

1  CIRCUIT LAW WHICH I BELIEVE APPLIES FOR THIS.

2          AND THE CONTROLLING NINTH CIRCUIT CASES ARE, FIRST,

3  KLINE V. COLDWELL BANKER & COMPANY.  THIS IS CITED IN OUR

4  PROPOSED JURY INSTRUCTIONS, 508 F.2D 226, 236 NOTE 8, WHICH

5  SAYS:

6              "RULE 23 DOES" -- I'M QUOTING NOW -- "DOES NOT

7  ELIMINATE THE ULTIMATE NEED FOR INDIVIDUAL PROOF OF DAMAGES BY

8  EACH MEMBER OF THE CLASS.

9          MY SECOND NINTH CIRCUIT CASE IS ABUAN, A-B-U-A-N, VS.

10  GENERAL ELECTRIC COMPANY, 3 F.3D, 329-334.  AND THIS SAYS THAT,

11  AGAIN, AT SOME POINT IN A RULE 23 CASE THAT CLASS MEMBERS MUST

12  PROVE THAT THEY WERE INDIVIDUALLY DAMAGED.

13          NOW, YOUR HONOR, THERE CAN BE CLASS-WIDE PROOF, BUT

14  ONLY IF THEY CAN SHOW THE INDIVIDUAL INJURIES, THAT THEY ALL

15  HAD THE SAME WORTH, THE SAME VALUE, WHAT IT WOULD BE.

16          THEY CAN'T SIMPLY SAY BECAUSE EVERYBODY SIGNED THIS

17  GLA, THAT SOMEHOW THAT GIVES THEM A RIGHT TO A GLR POOL IN

18  WHICH IT'S NOT TIED OR LINKED TO THE CONTRACT.

19          YOUR HONOR, WE DO BELIEVE THERE ARE OTHER REASONS FOR

20  OUR RULE 50 MOTION ON THIS BREACH OF CONTRACT CLAIM, BUT I

21  THINK SINCE YOU ARE GIVING ME FIVE MOMENTS, THOSE ARE THE TWO

22  POINTS I'VE CONFINED MY ARGUMENTS TO.

23          BUT, IN GENERAL, WE DO NOT BELIEVE A REASONABLE JURY

24  COULD FIND A BREACH OF CONTRACT BASED ON THE EVIDENCE

25  PRESENTED.

1        THANK YOU.

2             **THE COURT:**  ALL RIGHT.  MR. LECLAIR.

3             **MR. LECLAIR:**  YOUR HONOR, OUR CLAIM IN THE CASE FOR

4   BREACH OF CONTRACT -- LET'S START WITH THAT -- IS OUR CLIENTS

5   SIGNED A CONTRACT THAT ENTITLED THEM TO SHARE.  IT SAYS

6   "DIVIDED BETWEEN."  AND THE TESTIMONY IS THAT THE PLAYER IS THE

7   PEOPLE WHO SIGNED THE CONTRACT.

8             AND THE REVENUE THAT WE SEEK BY WAY OF DAMAGES IS THE

9   GROUP LICENSING REVENUE, WHICH IS, IN FACT, THE VERY REVENUE

10  THAT GOES INTO THE GROSS LICENSING REVENUE POOL.

11            AND SO OUR -- WE'RE SEEKING EXACTLY THE DAMAGES THAT

12  MR. ROWLEY TALKED ABOUT.  BUT IT'S NOT BECAUSE WE'RE

13  CONTRACTUALLY ENTITLED TO THE GROSS LICENSING REVENUE POOL BY

14  VIRTUE OF THE CONTRACT.

15            OUR CLAIM IS BECAUSE OF THE LANGUAGE OF "SIX OR MORE"

16  AND THE LANGUAGE OF THE GLA, WE'RE ENTITLED TO RECOVER THE

17  GROUP REVENUE THAT WAS NOT PAID TO US.

18            AND THE MEASURE OF THE GROUP REVENUE IS ALL OF THE

19  LICENSES.  AND THAT'S EITHER BECAUSE THE LICENSES ACTUALLY

20  INCLUDE US, BECAUSE OF THE LANGUAGE OF 1(A) AND 2(A) -- THAT'S

21  A THEORY WE'RE ARGUING TO THE JURY -- OR BECAUSE THE LANGUAGE

22  OF "SIX OR MORE" UNDER THE GLA INCLUDES US IN EVEN THE ACTIVE

23  LICENSES.  SO, THEREFORE, WE ARE ENTITLED TO RECOVER OUR SHARE

24  OF THE GROUP LICENSING REVENUE.

25            NOW, IS THERE LANGUAGE ABOUT "EQUAL"?  NO.  THERE'S

1 NO LANGUAGE IN THE ACTIVE, EITHER.

2      WHAT WE ARE SAYING IS WE SHOULD HAVE BEEN DISTRIBUTED

3 THE GROSS GROUP LICENSING REVENUE IN THE SAME WAY.  AND THE

4 EVIDENCE WILL SHOW THAT WAS ON EQUAL BASIS.

5      AS A MATTER OF FACT, EVEN THEIR WITNESS, MR. GOICH,

6 TESTIFIED THAT HE THOUGHT IT WOULD BE DISTRIBUTED EQUALLY.

7      WE KNOW THAT'S WHAT THE NFLPA ITSELF DID, WAS

8 DISTRIBUTE IT EQUALLY.

9      SO FOR THAT REASON, UNDER THE CONTRACT, WE HAVE AN

10 EXACT MATCH TO THE INJURY TO THE CLASS, WHICH IS THE REVENUE

11 FROM THE -- NOT THE AD HOC REVENUE, WHICH IS SEPARATE, BUT THE

12 GROUP REVENUE IS WHAT WE ARE SEEKING.  WE ARE ENTITLED

13 CONTRACTUALLY TO SHARE IN EVERY PENNY OF IT.

14      AND THAT'S EXACTLY THE CALCULATIONS THAT WERE GONE

15 THROUGH BY MR. EYRICH, WHO TESTIFIED, AND BY MR. ROWLEY, WHO

16 TESTIFIED ABOUT THE METHODOLOGY AND HOW YOU GET TO THE BOTTOM

17 LINE AS TO WHAT THE RETIRED PLAYERS WOULD HAVE SHARED.  SO WE

18 ARE FULLY ENTITLED TO TAKE THAT CLAIM TO THE JURY.

19      WHAT MR. KESSLER IS DOING IS HE'S ASSUMING WE LOSE,

20 AND THEN SAY:

21          "WELL, OF COURSE YOU DON'T HAVE DAMAGES, BECAUSE

22 YOU LOSE."

23      WELL, THAT'S JUST NOT THE WAY IT WORKS.  IF WE WIN,

24 WE ARE ENTITLED TO THE GROUP REVENUE UNDER THE LICENSE

25 AGREEMENTS THAT WERE ISSUED.  AND WE'RE ENTITLED TO OUR SHARE

1    OF IT.  AND THAT'S EXACTLY WHAT WE CALCULATED, YOUR HONOR.

2            **THE COURT:**  ALL RIGHT.

3            REBUTTAL?

4        **MR. KESSLER:**  NEXT POINT, YOUR HONOR?

5        **THE COURT:**  NO, NO.  DO YOU HAVE A REBUTTAL?  I'LL

6    GIVE YOU A FEW MOMENTS FOR REBUTTAL --

7        **MR. KESSLER:**  YES, YOUR HONOR.

8        **THE COURT:**  -- JUST ON THIS ONE POINT.

9        **MR. KESSLER:**  VERY QUICKLY.

10           THE CONCESSION BY COUNSEL THAT THERE IS NO

11   CONTRACTUAL ENTITLEMENT TO THE GLR POOL IS FATAL TO THEIR

12   POSITION, BECAUSE THERE ARE TWO -- AND THAT'S WHAT HE STATED TO

13   YOUR HONOR IN ARGUMENT.  HE SAID:

14               "WE'RE NOT CONTENDING A CONTRACTUAL ENTITLEMENT

15   TO THE GLR POOL."

16       **THE COURT:**  HE DID SAY THAT, BUT HE WENT ON TO SAY --

17   I THINK WHAT HE MEANT BY THAT IS UNDER THE THIRD-PARTY LICENSE

18   AGREEMENT.  BUT HE DID GO ON TO SAY THAT UNDER THE GLA, THE

19   GROUP -- THE RETIRED PLAYER GROUP LICENSING FORM, HE

20   UNDERSTANDS THAT THAT SHOULD BE READ TO SAY THAT THE RETIRED

21   PLAYERS SHARE IN THE ACTIVE PLAYER MONEY.

22       **MR. KESSLER:**  THE ONLY THING HE POINTS TO, YOUR

23   HONOR, IS NO LANGUAGE AT ALL IN THE PARAGRAPH THAT SAYS WHEN

24   YOU WILL GET PAID.

25           AS YOU KNOW, THAT'S THE FOURTH PARAGRAPH.  THAT SAYS

1   IT WILL BE DIVIDED BETWEEN THE PLAYER AND THE ESCROW ACCOUNT.

2          HE DOES NOT POINT TO ANYTHING IN THAT PARAGRAPH, THE

3   PAY PARAGRAPH, TO LINK TO THE GLR POOL.

4          WHAT HE CLAIMS IS THE DEFINITION OF "GROUP LICENSING"

5   SOMEHOW ENTITLES HIM TO OTHER REVENUES.  BUT THE GLR POOL IS

6   NOT EVEN ALL GROUP LICENSING REVENUES.  AD HOC AGREEMENTS, FOR

7   EXAMPLE, AS YOUR HONOR KNOWS, MEET THE DEFINITION OF "SIX OR

8   MORE FORMER OR PRESENT PLAYERS."  OKAY?

9          SO HE CAN'T USE THAT PARAGRAPH 2 AS THE BASIS TO GET

10  INTO THE GLR POOL.

11          THE GLR POOL WAS A SPECIFIC POOL THAT EXCLUDED

12  RETIRED PLAYER MONEY.  AND IF HE WAS ENTITLED TO A PORTION OF

13  THE GLR POOL, HE'D HAVE TO SHOW:  WELL, WHAT PORTION?  WHICH

14  AGREEMENTS ARE THEY?  IS IT THE EA AGREEMENT?  IS IT THE

15  AGREEMENTS THAT DON'T MENTION RETIRED PLAYERS AT ALL?  IS IT

16  THE NFL SPONSORSHIP AGREEMENT THAT ONLY SAYS "ACTIVE PLAYERS"?

17          IN OTHER WORDS, THEY'VE TAKEN A POOL THAT'S UNRELATED

18  TO THEIR CLAIM.  IF HE WANTED TO PROVE HIS CASE -- AND THIS WAS

19  NOT OUR DECISION -- HE COULD HAVE PUT UP A DAMAGES EXPERT WHO

20  SAID:

21          "THEY'RE ENTITLED TO GROUP LICENSING REVENUE OF

22  SIX OR MORE.  HERE IS THE REVENUE I THINK THEY WOULD HAVE

23  EARNED, OR THEY DID EARN.  YOU CAN LOOK IN THE RECORD THEY

24  EARNED."

25          NOBODY DID THAT.  MR. ROWLEY DIDN'T OFFER THAT

1   OPINION.  HE DIDN'T COME IN AND SAY:

2               "THIS IS THE REVENUE -- THAT THIS IS THE REVENUE

3   THAT WAS THERE."

4               I ALSO WOULD NOTE, YOUR HONOR, THAT THE GLR POOL

5   EXCLUDES 35-AND-UNDER DEALS BY ACTIVE PLAYERS.

6               IN OTHER WORDS, THERE'S NO LINKAGE OF THAT PARTICULAR

7   POOL TO THE INJURY THEY'RE CLAIMING IN THIS CONTRACT.

8               FINALLY, I NOTE, YOU HAVE HEARD NO CONTRARY CITATION

9   TO MY CONTROLLING NINTH CIRCUIT AUTHORITY ON INDIVIDUAL INJURY,

10  YOUR HONOR.  I BELIEVE THAT'S DISPOSITIVE.

11              **THE COURT:**  WAIT.  WAIT.  TAKE A MOMENT.

12              ONE OF THE FUNDAMENTAL ISSUES IN THIS CASE:  WHAT WAS

13  THE POINT OF THE DEFENDANTS ASKING 2,000 PLUS PEOPLE TO SIGN

14  THESE AGREEMENTS --

15              **MR. KESSLER:**  YOUR HONOR, THE --

16              **THE COURT:**  -- IF IT HAS NEVER GENERATED A PENNY FOR

17  THESE PEOPLE AND THERE NEVER WAS AN ESCROW?

18              SO WHAT -- FROM THE POINT OF VIEW OF YOUR CLIENTS --

19              **MR. KESSLER:**  YES.

20              **THE COURT:**  -- WHEN DID THEY EVER EXPECT THAT THIS

21  WOULD GET TRIGGERED?

22              **MR. KESSLER:**  YOUR HONOR, I THINK I CAN ONLY GO

23  THROUGH WHAT THE EVIDENCE IS.

24              **THE COURT:**  WHAT DOES THE EVIDENCE SAY ON IT?

25              **MR. KESSLER:**  THE ONLY EVIDENCE ON THIS POINT IS,

1  OKAY, FIRST MR. ALLEN TESTIFIED.  REMEMBER THE QUESTIONS THAT

2  HE WAS AN OPTIMIST?  HE HOPED THAT HE WOULD EVENTUALLY ATTRACT

3  ENOUGH OF THE TOP RETIRED PLAYERS AND THE QUANTITY OF PLAYERS

4  SO THAT THERE WOULD BE AN INTEREST IN LICENSEES IN LICENSING

5  THE WHOLE GROUP, JUST LIKE THEY'RE ABLE TO DO FOR THE ACTIVES.

6           WHEN THEY DO A LICENSE, AS YOUR HONOR KNOWS, WITH EA,

7  EA IS INTERESTED:

8                "I WANT ALL THE ACTIVE PLAYERS."

9           MR. ALLEN HOPED THAT HE WOULD BUILD A PROGRAM WHERE

10 YOU WOULD GET THE JOE MONTANAS, YOU WOULD GET THE JOE NAMATHS,

11 YOU WOULD GET THE JIM BROWNS.  THEY WOULD ALL SIGN THESE FORMS.

12          NON-EXCLUSIVE, BY THE WAY.  IT DIDN'T HARM A SOUL

13 BECAUSE THE EVIDENCE IS THEY DIDN'T PAY ANYTHING.  IT WAS

14 NON-EXCLUSIVE.  THEY COULD DO WHATEVER THEY WANTED TO.  SO WHAT

15 WAS THE HARM IN TRYING?

16          THEY TRIED TO PUT TOGETHER THE GROUP.  AND, AGAIN, AS

17 PROFESSOR NOLL TESTIFIED -- AND NO ONE DISPUTES THIS -- THE

18 BEST PLAYERS DIDN'T SIGN.

19          SO WHAT HAPPENED IS, WHAT CAME BACK IS:

20                "YEAH, WE WANT SOME OF YOUR GUYS."

21          NONE OF THEM -- NOT NONE OF THEM.  MANY OF THEM WERE

22 NOT THE GLA PLAYERS.

23          SO WHAT THEY HAD TO DO WAS USE THE AD HOC MECHANISM

24 BECAUSE THEY -- BECAUSE THEY DIDN'T HAVE THE CRITICAL MASS.

25 YOU HEARD ABOUT THE CRITICAL MASS.

1          SO, NOW, YOU COULD SAY THAT WAS FOOLISH.  THEY SHOULD

2     HAVE GIVEN IT UP EARLIER.  EVENTUALLY, THEY DID GIVE UP.  THEY

3     TOOK OUT THE ESCROW LANGUAGE.  THEY SAID:  WE'RE NOT

4     GENERATING ANYTHING FOR IT IN '05 AND DURING THIS PERIOD OF

5     TIME.

6          BUT THE POINT IS, THAT DOESN'T MAKE IT A BREACH OF

7     CONTRACT.  THE ONLY EVIDENCE IS MAYBE THEY WERE STUPID.  THEY

8     SHOULDN'T HAVE DONE IT.  I SAY THAT IN FRONT OF MY CLIENT.  IT

9     WAS NAIVE TO THINK YOU COULD INTEREST A WHOLE GROUP.

10         BUT THAT DOESN'T GIVE THEM A CONTRACTUAL CLAIM.

11    THINK OF WHAT THEIR CLAIM IS.  THEIR CLAIM -- AND WE'LL GET TO

12    THIS ON MOTIVE.  THEIR CLAIM IS WE DID THIS DELIBERATELY.  HOW

13    WOULD WE DO THIS DELIBERATELY?

14         THINK ABOUT WHAT THEY'RE ARGUING.  WE DELIBERATELY

15    PUT IN LANGUAGE THAT MEANT YOU GET ACTIVE PLAYER LICENSING

16    MONEY.  BUT WE DON'T TELL ANY OF THE RETIRED PLAYERS THAT.  SO

17    ONLY 2,000 SIGNED INSTEAD OF 13,000, BECAUSE, AS YOUR HONOR

18    POINTED OUT, THEY WOULD ALL SIGN; JUST FOR SIGNING THEY WOULD

19    GET THE ACTIVE PLAYER MONEY.  SO WE DON'T TELL THEM THAT.  SO

20    NO ONE SIGNS, AND IT DEFEATS THE PROGRAM.  AND WE DO THIS

21    WITHOUT TELLING THE ACTIVE PLAYERS.

22         HOW COULD WE TAKE AWAY THEIR MONEY TO GIVE IT TO

23    ANYONE WITHOUT VOTING --

24         **THE COURT:**  YOU'RE OFF NOW --

25         **MR. KESSLER:**  I'M SORRY.

1      **THE COURT:** -- ON THEIR THEORY.  I WANT TO STICK WITH

2  WHAT'S WRONG WITH YOUR THEORY.

3      **MR. KESSLER:** SURE.

4      **THE COURT:** I DIDN'T HEAR A SINGLE PERSON, INCLUDING

5  MR. ALLEN, SAY HE WENT TO JOE MONTANA AND TRIED TO GET HIM TO

6  SIGN THIS, SIGN THIS UP.

7      YOU CAN SEE IT'S NOT GOING TO WORK UNLESS THE

8  CELEBRITIES SIGNED UP.  AND NO ONE TESTIFIED THAT JOE MONTANA

9  WAS APPROACHED OR THAT THE FAMOUS PEOPLE WERE APPROACHED.  AND

10 SO --

11     **MR. KESSLER:** I COULD BE WRONG, YOUR HONOR.  I

12 BELIEVE MR. ALLEN DID TESTIFY THAT THEY TRIED TO GET THE

13 SUPERSTARS TO SIGN, AND COULDN'T DO SO.  I'M PRETTY CONFIDENT

14 OF THAT.

15     WE'LL LOOK FOR THAT TESTIMONY.

16     **THE COURT:** LOOK FOR IT.  MAYBE IT'S THERE.

17     **MR. KESSLER:** I BELIEVE THAT'S THERE, YOUR HONOR.

18     FINALLY, YOUR HONOR, THIS LAST POINT ON THIS.  YOUR

19 QUESTION DID GO A LITTLE FURTHER AFIELD.  REMEMBER, THEIR OWN

20 WITNESSES TESTIFIED BEFORE THEY BROUGHT IN, AND THEN MR. GOICH

21 CONFIRMED, THAT MR. ADDERLEY SAID HE DIDN'T EXPECT TO GET PAID

22 UNTIL HIS LICENSE RIGHTS WERE USED.

23     MR. BEACH TESTIFIED TO THAT.  MR. GOICH TESTIFIED TO

24 THAT.  MR. ALLEN TESTIFIED TO THAT.  AND ALL OF THEM, EVEN

25 MR. MCNEIL, WHO SAID:

1              "WELL, I THOUGHT I'D GET ACTIVE PLAYER MONEY."

2         NO ONE EVER COMPLAINED UNTIL THIS LITIGATION WAS

3 FILED.

4         IN FACT, WHAT I'M GETTING AT IS MR. ALLEN TESTIFIED

5 THAT FAMOUS -- THAT IT WAS PRECISELY BECAUSE THE FAMOUS PEOPLE

6 WOULDN'T -- THE FAMOUS PLAYERS WOULDN'T SIGN THE EXCLUSIVE

7 GLA'S, THAT THAT'S WHY THEY CHANGED IT TO MAKE IT

8 NON-EXCLUSIVE, THIS GLA, BECAUSE THEY WERE HOPING TO TRY TO GET

9 THOSE FAMOUS PEOPLE TO SIGN.  AND THAT'S RIGHT IN THE RECORD.

10         **THE COURT:**  BUT THAT'S NOT ANSWERING THE QUESTION OF:

11 DID THEY GO TO JOE MONTANA, MEANING YOUR CLIENT, AND SAY:

12              "JOE, PLEASE SIGN THIS.  IT WILL HELP THE RETIRED

13 PLAYERS."

14         **MR. KESSLER:**  WE'LL LOOK FOR THAT, UNLESS MR. FEHER

15 IS HANDING --

16         **THE COURT:**  I DON'T REMEMBER THAT.  MAYBE IT'S IN

17 THERE SOMEWHERE.

18         **MR. KESSLER:**  OKAY.

19         **THE COURT:**  GO AHEAD, IF YOU HAVE SOME NUGGET THERE

20 YOU WANT TO READ.

21         **MR. KESSLER:**  I'M TRYING TO SEE WHAT HE'S GIVEN ME

22 NOW.  OKAY.  HOLD ON.

23         **THE COURT:**  ALL RIGHT.

24         **MR. KESSLER:**  YOUR HONOR, I CAN'T FIND IT, YOUR

25 HONOR, RIGHT AWAY HERE.  I'LL HAVE TO LOOK THROUGH THE

1  TRANSCRIPT AND SEE IF IT'S THERE.

2          IN ANY EVENT, YOUR HONOR, REGARDLESS OF WHETHER YOUR

3  HONOR QUESTIONS, I UNDERSTAND, WHY DID WE DO THIS, I DO NOT

4  BELIEVE -- EVEN IF YOUR HONOR THOUGHT THERE WAS EVIDENCE OF A

5  BREACH, WITHOUT ANY EVIDENCE IT WAS PLAINTIFFS' COUNSEL'S

6  CHOICE TO INDICATE WHAT THE REAL DAMAGES WERE FOR SOME BREACH,

7  THEY JUST CAN'T WITHOUT ANY --

8          **THE COURT:**  AS I UNDERSTAND IT, THEIR SOLE THEORY FOR

9  DAMAGES IS AN EQUAL SHARE OF THE GROSS LICENSING REVENUE.

10          **MR. KESSLER:**  AND THERE'S NO POSSIBLE CONNECTION TO

11  THAT, AND THERE'S NOT INDIVIDUALIZED PROOF.

12          **THE COURT:**  POSSIBLY YOU'RE RIGHT ON THAT, BUT THAT'S

13  THE ARGUMENT IS -- THE ARGUMENT GOES LIKE THIS:

14          "MONIES GENERATED BY SUCH LICENSING UNDER

15  RETIRED PLAYER GROUP RIGHTS WILL BE DIVIDED BETWEEN THE PLAYER

16  AND AN ESCROW ACCOUNT FOR ALL ELIGIBLE NFLPA MEMBERS."

17          AND THEN, THEY SAY:

18          "WELL, ELIGIBLE NFLPA MEMBERS INCLUDES ACTIVES

19  WHO HAVE SIGNED THE GROUP LICENSING AUTHORIZATION FORM."

20          AND THEN, THE SECOND PARAGRAPH DOES REFER TO ACTIVES.

21          **MR. KESSLER:**  AND THERE'S NO -- OTHER THAN COUNSEL

22  SAYING IT, THERE'S NO EVIDENCE AT ALL THAT ELIGIBLE NFLPA

23  PLAYERS FOR THE ESCROW ACCOUNT WOULD HAVE ANY ACTIVE PLAYERS IN

24  IT.

25          THIS IS A PERFECT EXAMPLE, YOUR HONOR, OF COUNSEL'S

1  QUESTIONS VERSUS WITNESSES.  NO WITNESS HAS TESTIFIED TO THAT.

2  THE ONLY WITNESSES WHO HAVE BEEN ASKED ABOUT THAT WHO HAD

3  KNOWLEDGE, MR. ALLEN SAID IT WOULD ONLY BE RETIRED PLAYERS.

4  AND THE STANDARDS WOULD BE SET WHEN THAT WAS DONE.

5          I WOULD ALSO NOTE, YOUR HONOR -- NOW THEY JUST HANDED

6  ME SOMETHING HERE.

7          CAN YOU SHOW ME WHERE, PLEASE?

8          **MR. GREENSPAN:**  START HERE BECAUSE -- THEN HERE.

9          **MR. KESSLER:**  OKAY.  I'M READING FROM MR. ALLEN'S

10  TESTIMONY.

11          "WE WERE" -- THIS IS 622, LINE 7:

12          "BECAUSE WE DIDN'T GIVE UP, WE WERE -- WE

13          WERE HOPING TO TAKE ADVANTAGE OF ACHIEVING

14          THAT CRITICAL MASS AND HOPING THAT THE

15          MARKETPLACE WOULD RESPOND TO THAT CRITICAL

16          MASS."

17          AND THEN, SAYS:

18          "BUT THAT HADN'T HAPPENED AND DIDN'T HAPPEN

19          IN THE TIME I WAS THERE.

20          **"QUESTION:**  SO, IN OTHER WORDS, IF YOU GOT

21          MORE RETIRED PLAYERS THAT NOBODY WANTED FOR

22          YOUR CRITICAL MASS, YOU WOULD DO BETTER FOR

23          THEM?

24          "WELL, WE WERE -- FOR ANOTHER 1002 RETIREDS

25          THAT NOBODY WANTED SIGN UP WITH YOU?  IF WE

1        HAD" -- IT'S A LITTLE RAMBLED UNTIL WE GET TO

2        IT.

3        "EXCUSE ME.  LET ME FINISH THIS QUESTION."

4        AND THIS WAS BY COUNSEL FOR PLAINTIFFS:

5        "YOUR CONTENTION FOR THIS COURT AND THIS JURY

6        IS YOU WOULD YOU DO BETTER FOR THEM.  YOU

7        WOULD HAVE A BETTER SHOT AT IT IF YOU HAD

8        ANOTHER 2,000 GUYS NO ONE CARED ABOUT?

9        **"ANSWER:**  WELL, IT'S NOT JUST ASKING THE

10       RETIRED GUYS WHO NOBODY CARED ABOUT.  IT'S

11       ASKING EVERYBODY WHO'S A RETIRED TO SIGN,

12       SAYING THAT EVERY SINGLE MEMBER, AND THAT

13       INCLUDES PLAYERS THAT COMPANIES DO CARE

14       ABOUT.

15       **"QUESTION:**  AND, YES, AND THOSE PLAYERS ARE

16       THE JOE MONTANAS, THE JOE NAMATHS OF THE

17       WORLD, RIGHT?

18       **"ANSWER:**  THAT'S TWO OF THEM."

19       WHAT MR. ALLEN WAS TESTIFYING ABOUT, HE WAS TRYING TO

20  SIGN UP THOSE GUYS BECAUSE THE QUESTION WAS:

21             YOU'RE SAYING YOU WERE TRYING TO SIGN MORE

22  NOBODIES?

23       HE SAID:

24             NO, I'M TRYING TO SIGN THE JOE MONTANAS.

25       **THE COURT:**  I DON'T HEAR HIM IN THERE EVER SAYING

1  THAT HE EVER APPROACHED JOE MONTANA OR JOE NAMATH.  IT'S ONE

2  THING TO SAY:

3          "YEAH, IT WOULD HAVE BEEN GOOD TO GET THEM."

4          BUT WHAT ACTUAL EVIDENCE IS THERE THAT JOE MONTANA

5  WAS EVER APPROACHED?

6          **MR. KESSLER:**  THIS CAME, YOUR HONOR, SAYING HE WAS

7  ASKING EVERYBODY WHO'S A RETIRED PLAYER TO SIGN.

8          HE THEN GOT QUESTIONED:

9          YOU'RE TALKING ABOUT THE JOE MONTANAS AND THE

10  JOE NAMATHS?

11          HE SAID:

12          THAT WOULD BE TWO OF THEM.

13          THE QUESTION WAS HE WAS ASKING EVERYBODY.

14          **THE COURT:**  YOU MEAN, JOE MONTANA JUST GOT THE

15  ORDINARY THING IN THE MAIL.  AND NO ONE WENT TO HIM AS A

16  DELEGATION AND SAID:

17          "YOU CAN REALLY HELP OUT THE RETIRED PLAYERS."

18  THAT'S NOT IN EVIDENCE.

19          **MR. KESSLER:**  THAT SPECIFIC IS NOT IN EVIDENCE, YOUR

20  HONOR.  BUT, AGAIN, I WOULD SAY THAT WHETHER THAT SHOULD BE IN

21  EVIDENCE OR NOT, IT HAS NOTHING TO DO WITH THIS EVIDENCE OF

22  PROVING THEIR DAMAGES IN THIS BREACH.

23          AND, CERTAINLY, ON AN INDIVIDUAL BASIS WHERE I THINK

24  NINTH CIRCUIT AUTHORITY IS CONTROLLING, THEY'VE NEVER CITED A

25  CONTRARY CASE IN THE NINTH CIRCUIT.

1            **THE COURT:**  ALL RIGHT.  LOOK, ON THIS PIECE THE

2     MOTION IS DENIED.  IT'S DENIED WITHOUT PREJUDICE FOR RENEWAL

3     AFTER THE VERDICT.

4            I THINK THERE ARE SOME POSSIBLE POINTS THAT DEFENDANT

5     RAISES THAT ARE TROUBLING.  BUT IF THE VERDICT GOES AGAINST THE

6     DEFENDANTS THEY CAN RENEW THE MOTION.

7            **MR. KESSLER:**  THANK YOU, YOUR HONOR.

8            **THE COURT:**  ALL RIGHT.  LET'S GO TO THE NEXT --

9            **MR. KESSLER:**  BREACH OF FIDUCIARY DUTY.

10           **THE COURT:**  BREACH OF FIDUCIARY DUTY.

11           **MR. KESSLER:**  OUR FIRST POINT ON -- WELL, OUR FIRST

12    POINT ON BREACH OF FIDUCIARY DUTY, YOUR HONOR, IS THE CONTROL

13    POINT.

14           WHAT WE BELIEVE D.C. CIRCUIT LAW STATES, AND WE THINK

15    THIS IS CONTROLLING, IS THAT HAVING CONTROL IN AN AGENCY

16    RELATIONSHIP, WHICH IS THE ONLY THEORY YOUR HONOR PERMITTED TO

17    GO FORWARD.  YOU HAVEN'T PERMITTED ANY OTHER THEORY OF

18    FIDUCIARY DUTY TO GO FORWARD ON A CLASS BASIS.  THAT CONTROL

19    WOULD BE A PREREQUISITE.

20           IN OTHER WORDS, THERE ARE OTHER FACTORS YOU THAT YOU

21    CONSIDER.  CONTROL ALONE IS NOT ENOUGH TO CREATE THE AGENCY.

22           BUT IF YOU DON'T HAVE CONTROL, THEN IT'S -- YOU CAN'T

23    HAVE THE DUTY UNDER D.C. LAW.

24           AND OUR CITATIONS FOR THAT, YOUR HONOR, IS:

25           C & E SERVS. V. ASHLAND, INC., 498 F. SUPP 2D,

1   242-264.  THAT'S THE DISTRICT COURT OF D.C. 2007.

2          AND LOTT V. BURNING TREE CLUB, 516 F. SUPP 913-917.

3   (D.D.C. 1980.)

4          AND, ALSO, JACKSON V. LOEWS WASHINGTON CINEMAS, INC.,

5   944 A.2D 1088-1097 (D.C. 2008).

6          JUDAH V. REINER, 744, A.2D 1037-1040 (D.C. 2000).

7          AND AMES V. YELLOW CAB COMPANY, 2006 WESTLAW

8   2711546,5, DISTRICT COURT OF D.C., SEPTEMBER 21ST, 2006.

9          SO WE BELIEVE THAT HAS TO BE HERE.  ON THE EVIDENCE,

10  YOUR HONOR, THE ONLY EVIDENCE IN THIS CASE, ALL FOUR OF THE

11  PLAINTIFFS ADMITTED THAT THEY DID NOT HAVE SUCH CONTROL.

12         I MAY HAVE JUST PUT THOSE DOWN.  LET ME JUST GO LOOK

13  FOR THEM.

14         MR. LAIRD.  "QUESTION."  TRANSCRIPT 980/20 TO 22:

15         "WELL, WHEN YOU SENT THIS LETTER BACK IN" --

16         THAT WAS THE GLA -- "DID YOU RETAIN ANY

17         CONTROL OVER WHAT THE UNION COULD OR COULDN'T

18         DO?

19         **"ANSWER:** OH, NO."

20         MR. BEACH.  THIS IS TRANSCRIPT 1181/6-10:

21         "MR. BEACH, DO YOU BELIEVE YOU HAVE ANY

22         CONTROL OVER DEFENDANTS' LICENSING

23         OPERATIONS?

24         **"ANSWER:** OH, NO."

25         SIMILAR ANSWER.

1          "I DON'T HAVE ANY CONTROL ABOUT THAT."

2          MR. MCNEIL.  TRANSCRIPT 433/2-7:

3          **"QUESTION:**  OKAY.  AND I THINK YOU HAVE NO

4          CONTROL OVER THE DEFENDANTS' LICENSING

5          OPERATIONS, RIGHT?

6          **"ANSWER:**  NO, I DON'T HAVE ANY CONTROL TO MY

7          KNOWLEDGE.  I DON'T HAVE ANY CONTROL."

8          FINALLY, MR. ADDERLEY, THE CLASS REPRESENTATIVE,

9   TRANSCRIPT, 1568/1-14:

10         **"QUESTION:**  AND WHAT YOUR TESTIMONY IS, IF

11         YOU HAD AN INDIVIDUAL AGREEMENT THAT

12         CONFLICTED WITH SOMETHING THEY DID, YOU COULD

13         ASK NOT TO BE INCLUDED IN WHAT THEY WERE

14         DOING, RIGHT?

15         **"ANSWER:**  YES.

16         **"QUESTION:**  BUT YOU NEVER HAD ANY SUCH

17         AGREEMENT, INDIVIDUAL AGREEMENT, CORRECT?

18         **"ANSWER:**  CORRECT.

19         **"QUESTION:**  SO APART FROM THAT, DID YOU HAVE

20         ANY ABILITY TO CONTROL PLAYERS INC'S USE OF

21         YOUR GLA RIGHTS?

22         **"ANSWER:**  NO.

23         **"QUESTION:**  AND YOU STAND BY THAT TESTIMONY,

24         SIR, DO YOU NOT?

25         **"ANSWER:**  CORRECT."

1        EVERYBODY ADMITTED ON THEIR SIDE -- AND THERE WAS

2   SIMILAR TESTIMONY FROM MR. ALLEN ON THE OTHER SIDE -- THAT THE

3   GLA WAS SIMPLY AN AUTHORIZATION TO GO OUT AND LICENSE

4   NON-EXCLUSIVE, WHICH IS SIGNIFICANT.

5        SO IT DIDN'T LIMIT THEM IN ANY WAY OR WHAT THEY CAN

6   DO.  NON-EXCLUSIVE RIGHTS.  AND IT DID NOT IMPOSE ANY DUTY

7   BECAUSE UNDER AN AGENT THEORY, AN AGENT THEORY, UNDER D.C. LAW,

8   A PREREQUISITE IS THAT THE PRINCIPAL HAS TO RETAIN CONTROL OVER

9   THE AGENT.

10       **THE COURT:**  BUT LET'S STOP WITH THAT.  YOUR THEORY,

11  THEN, HAS TO BE THAT THIS WAS A BARE LICENSE AND NOTHING MORE.

12       **MR. KESSLER:**  YES, YOUR HONOR.  THIS IS A BARE

13  LICENSE.

14       OR I WOULDN'T SAY "NOTHING MORE."  NOTHING MORE THAT

15  WOULD GIVE RISE TO A FIDUCIARY DUTY.

16       **THE COURT:**  BUT WAS THERE IS ANY DUTY ON BEHALF OF

17  PLAYERS -- NFLPA OR THE PLAYERS INC TO MARKET THE IMAGES OF

18  THESE PLAYERS?

19       **MR. KESSLER:**  UNDER THE TERMS OF THE GLA THERE WERE

20  NOT, YOUR HONOR.  AND WHAT YOUR HONOR HAS NOTED, THIS IS NOT --

21       **THE COURT:**  SO THEY COULD HAVE PUT IT IN A DRAWER.

22       **MR. KESSLER:**  THEY COULD HAVE.

23       **THE COURT:**  THEY COULD HAVE JUST -- ACCORDING TO YOU,

24  AFTER COLLECTING ALL THESE THINGS THEY COULD PUT THEM ON A

25  SHELF AND LET THEM COLLECT DUST AND DO NOTHING.

1          **MR. KESSLER:** RIGHT. AS YOU COULD IN A BARE LICENSE.

2               IN OTHER WORDS, YOUR HONOR MAKES THAT SOUND HORRIBLE,

3 BUT IN A BARE LICENSE, IF YOU GIVE SOMEONE -- SAY "HERE'S MY

4 RIGHTS," BECAUSE THEY'RE NON-EXCLUSIVE, BECAUSE THEY'RE

5 NON-EXCLUSIVE, BECAUSE IF YOU -- WHAT MR. GOICH SAID:

6               "IF IT GENERATED SOME MONEY FOR ME, GREAT."

7          SAYS:

8               "IF IT DIDN'T, OKAY."

9          **THE COURT:** WHY, THEN, DID THEY PUT UP ON THE

10 WEB SITE THAT THEY REPRESENTED ALL THESE RETIRED PLAYERS AND

11 THAT THEY AGGRESSIVELY MARKETED THEM?

12          **MR. KESSLER:** BECAUSE DESPITE THE ABSENCE OF A

13 FIDUCIARY DUTY, DESPITE THE ABSENCE OF A FIDUCIARY DUTY, THEY

14 ACTUALLY TRIED TO HELP THESE PLAYERS.

15          OKAY? YOUR HONOR CAN'T SAY, WELL, BECAUSE THEY

16 ACTUALLY TRIED THAT, THAT SOMEHOW READS THE DUTY IN.

17          AS A MATTER OF LAW, YOU CAN'T DO THAT. IT HAS TO

18 BE -- THE DUTY HAS TO COME OUT OF THE GLA TERMS.

19          YOUR HONOR ONLY CERTIFIED THE CLASS ARISING OUT OF

20 THE GLA. THERE'S GOT TO BE SOMETHING THERE.

21          AND, IN FACT --

22          **THE COURT:** ONE EXPLANATION IS THAT IT WAS JUST A

23 GOOD DEED. THEY DIDN'T HAVE TO DO IT, AND IT WAS A GOOD DEED.

24 THAT'S TRUE. THAT'S ONE EXPLANATION.

25          BUT ANOTHER EXPLANATION IS THAT THE REASON THEY WENT

1   TO ALL THIS GROUP LICENSING AND SO FORTH IS THAT THEY WERE

2   GOING TO BE LIKE THE HOLLYWOOD AGENT FOR ALL OF THE -- ALL OF

3   THE RETIRED PLAYERS.

4           **MR. KESSLER:**  AND, YOUR HONOR, IF THAT WERE TRUE --

5   THINK ABOUT IT.  IF THAT WERE TRUE, WHY WOULD THEY GIVE BACK --

6   AND THE ONLY EVIDENCE IN THE CASE IS WHAT A REASONABLE JURY CAN

7   FIND.  THAT'S OUR STANDARD HERE ON RULE 50.

8           THE ONLY EVIDENCE IN THE CASE IS FOR THE RETIRED

9   PLAYER LICENSING THEY GAVE BACK 99-AND-A-HALF PERCENT TO THE

10  RETIRED PLAYERS.  THEY DIDN'T TAKE EVEN A 1 PERCENT COMMISSION

11  OUT OF THIS.

12          **THE COURT:**  DOESN'T THAT ARGUMENT HURT YOU?  THINK

13  ABOUT THAT FOR A MINUTE.  IN A BARE LICENSE, THE WAY IT USUALLY

14  WOULD WORK, IS YOUR SIDE WOULD PAY:  HERE'S A HUNDRED DOLLARS.

15  CASH SUM CERTAIN.  AND GIVE THAT TO THE PLAYER.

16          AND THEN, YOU WOULD SAY IF IT WAS -- YOU WOULD SAY TO

17  THE PLAYER:

18              "WE OWN THESE RIGHTS.  WE CAN PUT THEM IN THE

19  SHELF, IF WE WANT, OR WE CAN GO LICENSE THEM.  WE'RE GOING TO

20  KEEP THE MONEY, OR WE'LL GIVE YOU A PERCENTAGE OF IT."

21          BUT, IF YOU THINK ABOUT IT, THE ONLY WAY THE

22  ADDERLEYS OF THE WORLD WERE GOING TO GET PAID UNDER THIS IS

23  THEY GOT NOTHING OUT OF THIS UNLESS YOU ARE OUT THERE -- NOT

24  YOU, YOUR CLIENT -- WAS OUT THERE TRYING TO MARKET IT.  AND FOR

25  WHOSE ACCOUNT -- IF YOU WERE -- IF YOUR CLIENT WAS OUT THERE

1   DOING IT, BY WHOSE ACCOUNT WERE THEY WORKING?

2          BECAUSE BY YOUR OWN TESTIMONY YOU KEPT NONE OF IT; IT

3   WAS ALL FOR THE ACCOUNT OF THE ADDERLEYS OF THE WORLD.

4          **MR. KESSLER:**  WE KEPT A HALF PERCENT OUT OF THE

5   WHOLE.

6          **THE COURT:**  SO 99-AND-A-HALF PERCENT.  SO THAT

7   SUGGESTS, DOESN'T IT, THAT THIS WAS -- THAT THE PLAYERS

8   ASSOCIATION WAS REPRESENTING --

9          **MR. KESSLER:**  YOUR HONOR, WITH ALL DUE RESPECT, THE

10  POINT YOUR HONOR IS MAKING HAS NOTHING TO DO WITH THE LAW OF

11  THE DISTRICT OF COLUMBIA.  IT MAY HAVE SOMETHING TO DO WITH, I

12  DON'T KNOW, CALIFORNIA LAW -- I HAVEN'T STUDIED IT -- OR SOME

13  OTHER --

14         **THE COURT:**  GENERAL PRINCIPLES.

15         **MR. KESSLER:**  THE GENERAL PRINCIPLES I DON'T --

16         **THE COURT:**  THE GENERAL PRINCIPLES.

17         **MR. KESSLER:**  I DO NOT -- I BELIEVE THE CONTROLLING

18  LAW -- WHICH THEY STIPULATED TO, OKAY?  THEY DIDN'T HAVE TO

19  STIPULATE TO D.C. LAW.

20         **THE COURT:**  YOU FIND ME SOME LAW THAT SAYS WHAT I

21  SAID IS NOT CORRECT.

22         I DON'T HAVE TO JUST CUT AND PASTE FROM SOME JUDGE IN

23  THE D.C. SUPERIOR COURT.

24         **MR. KESSLER:**  YOUR HONOR, WHAT I WOULD SUGGEST IS THE

25  FOLLOWING.  AT LEAST, IT'S OUR POSITION.  OKAY?  WE'VE CITED

1   SIX CASES THAT SAY WITHOUT CONTROL THERE COULD BE NO DUTY IN AN

2   AGENCY THING THERE.

3           THEY'VE CITED NO CASES TO SAY WHAT YOUR HONOR JUST

4   STATED IS CORRECT.  I THINK YOUR HONOR HAS TO GO -- UNLESS YOUR

5   HONOR HAS YOUR CLERK DO SOME RESEARCH FOR YOU AND FIND A CASE,

6   I THINK YOU HAVE TO GO WITH D.C. LAW.

7           **THE COURT:**  I SAW SOME OF THOSE SAYING THAT CONTROL

8   WAS IMPORTANT.  I NEVER SAW ONE THAT SAID IT'S A SINE QUA NON.

9           **MR. KESSLER:**  WELL, YOUR HONOR, WE'RE BRIEFING THAT

10  AGAIN TODAY, IN OUR 10-PAGE INSTRUCTION TO THE JURY, BECAUSE IT

11  OBVIOUSLY COMES UP THERE, AS WELL.  AND MAYBE YOUR HONOR WILL

12  LOOK AT IT AGAIN.

13          WE DO BELIEVE THAT'S THE LAW OF THE D.C. CIRCUIT.

14          **THE COURT:**  I AM GOING TO LOOK AT IT.  I AM GOING TO

15  LOOK AT IT AGAIN.

16          ALL RIGHT.  LET'S HEAR FROM THE OTHER SIDE.

17          **MR. KESSLER:**  ONE OTHER POINT ON FIDUCIARY DUTY, IF

18  YOU WANT.

19          **THE COURT:**  GO AHEAD.

20          **MR. KESSLER:**  MY SECOND POINT ON FIDUCIARY DUTY IS

21  THAT EVEN -- I KNOW YOUR HONOR DECLINED THIS WITH RESPECT TO

22  THE BREACH OF CONTRACT CLAIM.  BUT WITH RESPECT TO THE

23  FIDUCIARY DUTY CLAIM, IT'S AN EVEN MORE, WE BELIEVE, COMPELLING

24  ARGUMENT THAT YOU CAN'T USE THE GLR POOL, WHICH THEIR ONLY

25  DAMAGE MEASUREMENT, AS -- THERE'S NO CAUSAL PROOF, FOR EXAMPLE,

1  ON A MARKETING CLAIM, WHICH I KNOW YOUR HONOR BELIEVES THERE

2  POSSIBLY IS A CLAIM YOU SHOULD HAVE MARKETED.

3      IF WE SHOULD HAVE MARKETED, THEN THEY NEEDED TO HAVE

4  A DAMAGE EXPERT STATE:

5          "IF YOU MARKETED THESE PLAYERS, HERE'S WHAT I

6  BELIEVE THEY WOULD HAVE BEEN WORTH, THOSE RIGHTS."

7      THAT'S NOT WHAT WAS DONE.  AND I ASKED MR. ROWLEY

8  THIS SPECIFICALLY, SPECIFICALLY ON THIS.

9      THIS IS ON 1915.  THIS COULDN'T BE CLEARER.

10 "QUESTION," LINE 19:

11          "LET ME ASK YOU THIS.  LET'S SAY THE JURY

12          WERE TO FIND THERE WAS NO BREACH OF CONTRACT,

13          OKAY?  AND THERE WAS A BREACH OF FIDUCIARY

14          DUTY FOR NOT MARKETING, NOT SUFFICIENTLY

15          MARKETING THE RETIRED PLAYERS WHO SIGNED THE

16          GLA'S, OKAY?  HAVE YOU DONE ANY ANALYSIS OF

17          SPECIFICALLY OF HOW MUCH THE RETIRED PLAYERS

18          WOULD HAVE EARNED FOR THEIR RIGHTS IF THEY

19          HAD BEEN MORE AGGRESSIVELY MARKETED, JUST ON

20          THAT CLAIM SEPARATELY?

21          **"ANSWER:** NO."

22      IN OTHER WORDS, HE DID NO ANALYSIS OF ANY BREACH FROM

23 MARKETING.  HE DID NO SEPARATE ANALYSIS OF ANY BREACH INVOLVING

24 SCRAMBLING.  HE DID NO SEPARATE ANALYSIS OF ANY BREACH FROM,

25 QUOTE, "CONFLICT OF INTEREST."

1       AND FIDUCIARY DUTY LAW -- THIS IS VERY IMPORTANT,

2  YOUR HONOR -- FIDUCIARY DUTY LAW IS NOT DISPUTED.  IT'S EVEN IN

3  YOUR HONOR'S CHARGES.  THERE HAS TO BE AN INDIVIDUAL ELEMENT OF

4  THE INJURY UNDER FIDUCIARY DUTY LAW, EVEN MORE STRONGLY THAN

5  CONTRACT, BECAUSE OF ITS TORT NATURE.

6       SO, AGAIN, WHATEVER YOUR HONOR MIGHT BELIEVE

7  GENERALLY, WE DON'T BELIEVE THEY OFFERED ANY DAMAGE CAUSAL

8  LINKUP TO ANY KIND OF FIDUCIARY DUTY CLAIM SO THEY COULD HAVE

9  AN ABSTRACT CLAIM FOR LACK OF MARKETING.  HOW WOULD THIS JURY

10  DECIDE ANY REASONABLE BASIS WHAT PORTION OF THE GLR POOL HAD TO

11  DO WITH LACK OF MARKETING?

12       IT MAKES NO SENSE AT ALL, YOUR HONOR.  AND THE

13  WITNESS HAS SO TESTIFIED.

14       **THE COURT:**  MR. LECLAIR.

15       **MR. LECLAIR:**  YOUR HONOR, LET ME DEAL FIRST WITH THE

16  EXISTENCE OF THE FIDUCIARY DUTY.

17       **THE COURT:**  I'M JUST SMILING BECAUSE I GUESS I'M

18  LOOKING FORWARD TO THE CLOSING ARGUMENTS TO SEE HOW YOU LAWYERS

19  DEAL WITH -- BECAUSE BOTH SIDES HAVE GOT MOUNTAINS -- MAYBE NOT

20  MOUNTAINS, BUT AT LEAST SOME -- YOU'VE GOT SOME PROBLEMS WITH

21  YOUR CASE, PLAINTIFFS AND THE DEFENSE.

22       ALL RIGHT.  GO AHEAD.  WHAT DO YOU HAVE TO SAY?

23       **MR. LECLAIR:**  YOUR HONOR, I THINK THIS IS A CLASSIC

24  FACT QUESTION ON FIDUCIARY DUTY.  FIRST OF ALL --

25       **THE COURT:**  HOW ABOUT THE LAW PART?  IS IT TRUE THAT

1  CONTROL IS A SINE QUA NON?

2         **MR. LECLAIR:**  ABSOLUTELY NOT.  IT'S A FACTOR, YOUR

3  HONOR, UNDER D.C. LAW.  IT'S A FACTOR.  THEY SAY IT'S AN

4  IMPORTANT FACTOR.

5         BUT THE QUESTION, YOUR HONOR, IS AGENCY.  CONTROL IS

6  SIMPLY A FACTOR TO DETERMINE WHETHER AGENCY EXISTS.  AND THE

7  RECORD IS REPLETE WITH EVIDENCE ON THEIR AGENCY.

8         FOR EXAMPLE, EXHIBIT 36, WHICH IS ONE OF THE LICENSE

9  AGREEMENTS, THE TOPPS LICENSE AGREEMENT, SAYS:

10         "NFLPA REPRESENTS THAT THE NFLPA HAS BEEN DULY

11  APPOINTED AND IS ACTING ON BEHALF OF THE ACTIVE AND RETIRED

12  FOOTBALL PLAYERS OF THE NATIONAL FOOTBALL LEAGUE WHO HAVE

13  ENTERED INTO A GROUP LICENSING ASSIGNMENT" DAH, DAH, DAH, DAH,

14  DAH.

15         MY POINT IS, THEY THEMSELVES, AS YOU POINT OUT, ON

16  THEIR WEB SITE SAID THEY REPRESENT RETIRED PLAYERS.  THEY

17  ACTIVELY MARKET THEM.  THEY THEMSELVES HAVE ABSOLUTELY SET

18  FORTH THE AGENCY EXPRESSLY.

19         JOEL LINZNER TESTIFIED THAT THAT'S WHAT HE THOUGHT

20  BECAUSE OF HIS DEALINGS WITH THEM, THAT THEY WERE REPRESENTING

21  THE RETIRED PLAYERS.

22         AND SO AGENCY IS VERY CLEARLY ESTABLISHED.  IT MAY BE

23  ESTABLISHED, NOT JUST A FACT ISSUE, BASED ON THE EVIDENCE IN

24  THE RECORD.

25         IN ADDITION, BRUCE LAIRD TESTIFIED:

1          "THEY WERE MY AGENT."

2          AND I'VE ALREADY TALKED ABOUT THE WEB SITE.  SO IN

3   TERMS OF THE EXISTENCE OF THE AGENCY, THE ADMISSIONS OF THE

4   DEFENDANTS THEMSELVES ARE SUFFICIENT TO ESTABLISH AGENCY.

5          **THE COURT:**  WELL, OKAY.  GO TO THE SECOND POINT.

6          **MR. LECLAIR:**  ALL RIGHT.  WITH RESPECT TO CONTROL,

7   YOUR HONOR, AGAIN, THIS IS JUST A FACT QUESTION.  AND CONTROL

8   IS ONE OF THE FACTORS TO BE CONSIDERED BY THE JURY.

9          **THE COURT:**  BUT THOSE WITNESSES ALL SAID THEY DIDN'T

10  HAVE ANY --

11         **MR. LECLAIR:**  THAT'S NOT CORRECT, YOUR HONOR.  THEY

12  QUOTED BITS AND PIECES.  FOR EXAMPLE, MR. BEACH SAID -- FOR

13  EXAMPLE, WHAT MR. BEACH IS SAYING:

14          I DON'T CONTROL THE OPERATIONS.

15         AND HE EXPLAINED.  WHEN HE SAT IN THE WITNESS CHAIR,

16  TO THE JURY HE SAID:

17          I THOUGHT THEY WERE TALKING ABOUT THE FAX

18  MACHINE WHEN THEY ASKED ME THAT QUESTION, WHETHER I HAD CONTROL

19  OF THE FAX MACHINE.

20         HE SAID:  SURE, I HAD CONTROL.

21         I'M PARAPHRASING, BECAUSE I DON'T HAVE THE

22  TRANSCRIPT.  I HAVEN'T HAD TIME TO PULL IT.  BUT I REMEMBER

23  WHEN HE SAT THERE AND TESTIFIED, HE SAID HE HAD CONTROL.

24         HERE ARE THE THINGS THAT, YOUR HONOR, GIVE US CONTROL

25  SPECIFICALLY, AS A MATTER OF LAW.

1    WHEN YOU HAVE A SCOPE OF REPRESENTATION CLAUSE IN A

2  CONTRACT, HERE THERE'S THE HOLE THAT EXCLUDES FIVE OR LESS.

3  THAT KIND OF SCOPE CLAUSE IS EVIDENCE OF LEGAL CONTROL.  THAT'S

4  ONE.

5    SECOND, RIGHT OF TERMINATION.  WHEN THEY AMENDED THE

6  GLA IN 2005, AFTER THIS GLA THAT WE ARE TALKING ABOUT, THEY

7  AMENDED IT TO PUT IN AN EXPRESS CLAUSE THAT SAYS:

8    "YOU CAN'T REVOKE THIS CLAUSE.  YOU CAN'T REVOKE

9  THIS GLA."

10    THAT IS EVIDENCE THAT WHEN THEY WROTE THE ONE IN 2001

11  THAT IS THE ONE AT ISSUE IN THIS CASE THEY DID NOT PUT THAT

12  LANGUAGE IN.

13    THEREFORE, IT IS -- GIVES US THE ABILITY TO ARGUE TO

14  THIS JURY THAT WE HAD A RIGHT TO REVOKE, WHICH IS ULTIMATE

15  EVIDENCE OF CONTROL.

16    THEN, THERE IS THE CONFLICTS PROVISION WHICH PROVIDES

17  FOR US TO BE ABLE TO GET OUT OF THEIR ABILITY TO REPRESENT US.

18    SO ALL THE FACTS AND CIRCUMSTANCES.

19    AND THEN, FINALLY, YOUR HONOR, VERY, VERY IMPORTANT,

20  THE NONINTERFERENCE CLAUSE.  THEY DON'T WANT TO TALK ABOUT

21  THIS.  IT'S NOT JUST A CONTRACT ITSELF.  THEY THEMSELVES PUT IN

22  EVERY SINGLE LICENSE AGREEMENT.

23    AS JOSEPH NAHRA TESTIFIED FROM THE WITNESS STAND,

24  EVERY SINGLE LICENSE AGREEMENT CONTAINS THIS NONINTERFERENCE

25  CLAUSE.  WHICH MEANS THEY PUT THEMSELVES BETWEEN EVERY SINGLE

1  LICENSEE OUT THERE, ALL 200 OF THEM, AND THE PLAYERS, THE

2  RETIRED PLAYERS.

3          THEY CANNOT DEAL WITH THEM ON THE LICENSE PRODUCTS,

4  WHICH, ARE BROADLY DEFINED.  SO THEY HAVE TO BE OUR AGENT, YOUR

5  HONOR.  THAT'S THE PROBLEM.  THEY HAVE PUT THEMSELVES BETWEEN

6  US AND THE LICENSEES.

7          SO FOR ALL OF THOSE REASONS, IT IS AT THE VERY LEAST

8  A FACT QUESTION FOR THE JURY, IF NOT ESTABLISHED CONCLUSIVELY,

9  THAT THEY ACTED AS OUR AGENT UNDER THIS CONTRACT.

10          NOW, WITH RESPECT TO DAMAGES, WHAT WE HAVE SAID --

11  AND, OBVIOUSLY, WE'VE NOT DONE A GOOD JOB OF THIS WITH YOUR

12  HONOR.  AND I'M SORRY FOR THAT.  I WISH WE HAD DONE BETTER, BUT

13  WE DIDN'T.

14          OUR THEORY OF THIS CASE IS FROM THE VERY BEGINNING

15  THEY SET UP THIS PROGRAM AS BASICALLY A SCAM OF RETIRED

16  PLAYERS.  IT WAS NOT A GOOD DEED.  IT WAS DESIGNED -- WHAT THEY

17  WANTED TO DO WAS TO CONTROL THE MARKET.

18          THEY DID NOT WANT ANYBODY ELSE TO GET INTO THIS

19  PICTURE OF GROUP LICENSING, BECAUSE THEY WANTED TO BE THE

20  ONE-STOP SHOP ON GROUP LICENSING.

21          AND WHAT THEY DID IS THEY SET THIS UP WITH A CONTRACT

22  THAT SUGGESTS TO THE RETIRED PLAYERS THAT THEY'RE GOING TO

23  SHARE WITH THE ACTIVES.  AND THERE'S PLENTY OF TESTIMONY.

24          CLIFTON MCNEIL, THE VERY FIRST WITNESS IN THE CASE,

25  SAID ON THE WITNESS STAND:

1        I READ THIS CONTRACT.  I THOUGHT IT MEANT WHEN IT

2   SAYS "ELIGIBLE NFLPA MEMBERS," AND WHEN IT TALKED ABOUT SIX OR

3   MORE PRESENT OR FORMER I UNDERSTOOD WE WERE SHARING WITH THE

4   ACTIVE PLAYERS.  THAT'S THE REASON I WANTED TO DO THIS.

5        AND THAT'S THE VERY IMPRESSION THEY WROTE THIS

6   CONTRACT.  IT IS, AS YOUR HONOR HAS SAID, A MASTERPIECE OF

7   OBFUSCATION.  AND THEY WROTE IT SPECIFICALLY TO MISLEAD AND

8   CONFUSE THE RETIRED PLAYERS.

9        AND WHAT THEY WERE TRYING TO DO WAS THEY WERE TRYING

10  TO SET IT UP IN A WAY THAT WAS AS FOLLOWS:  BY SUGGESTING

11  EVERYBODY'S GOING TO SHARE TOGETHER.  AND IF YOU ASSUME NOW --

12  ASSUME THAT WE'RE WRONG UNDER CONTRACT, AND THAT WE WEREN'T

13  INCLUDED IN EVERY SINGLE LICENSE AGREEMENT.  THE POINT WAS,

14  THEY THEMSELVES DID THAT.  AND THEY DID IT INTENTIONALLY

15  BECAUSE THEY DID NOT WANT TO HAVE THE RETIRED PLAYERS AS A PART

16  OF THE GROUP LICENSES.

17       THE TESTIMONY OF PAT ALLEN WAS, OF COURSE, THEY

18  MARKETED RETIRED AND ACTIVE PLAYERS TOGETHER.

19       YOU REMEMBER THE DOCUMENT I PUT IN EVIDENCE

20  YESTERDAY, YOUR HONOR, WHERE SHE TRIED TO SAY:

21            OH, THIS SAYS THEY'RE PART OF A BIGGER ACTIVE

22  PLAYER PROGRAM.

23       AND SHE WAS LIKE:

24            OH, WELL, MAYBE ON ONE THEY WERE, AFTER ALL.

25       AND THEN, SHE SAID:

1              BY THE WAY, THEY WANTED -- THEY WANTED TO DO

2    RETIRED GUYS, BUT I TOLD THEM THEY HAD TO HAVE SIX ACTIVES.

3              YOUR HONOR, WHAT THEY DID WAS THEY WERE SAYING:

4              "WAIT.  WE CAN'T DO RETIREDS AS A GROUP.  WE GOT

5    TO MAKE SURE WE HAVE SIX ACTIVE PLAYERS IN HERE SO WE CAN DO AN

6    ACTIVE PLAYER GROUP LICENSE TO MAKE SURE THAT WE DO ALL THE

7    GROUP MONEY AS ACTIVE GROUP MONEY."

8              AND THE POINT WAS IT WAS A SCAM, YOUR HONOR.  IT

9    REALLY WAS.

10              WHAT THEY WANTED TO DO WAS SET UP A PROGRAM WHERE

11    THEY COULD DO A BUNCH OF AD HOCS FOR THE ACTIVE PLAYERS THAT

12    WERE STARS, DO THE LOW-HANGING FRUIT AD HOCS FOR THE RETIRED

13    PLAYERS WHO WERE STARS.

14              THEY NEVER INTENDED TO DO ANYTHING FOR THE GROUP THAT

15    THEY ACTUALLY WERE OUT SOLICITING EVERY WEEK, EVERY MONTH, TO

16    SIGN THESE DOCUMENTS.

17              AND WHAT THEY WERE DOING WAS, IN FACT, TRYING TO SET

18    IT UP SO THEY SEPARATED OFF THE RETIRED PLAYERS FROM THE ACTIVE

19    PLAYERS, EVEN THOUGH WHAT THEY TOLD THEM IN THEIR CONTRACT WAS:

20              "YOU'RE GOING TO BE TOGETHER."

21              THAT WAS WHY IT WAS A BREACH OF FIDUCIARY DUTY.

22              AND THE DAMAGES FROM THAT WERE IF THEY HAD DONE --

23    LET'S TAKE THE WORLD.  LET'S ASSUME THAT WE HAD AN AGENT WHO

24    WAS ACTUALLY A TRUE AGENT WITH OUR BEST INTEREST AT HEART.  AND

25    THEY GOT TOGETHER AND SAID:

1          "LOOK, HERE IS TOPPS.  THEY WANT TO SIGN A GROUP

2   LICENSE.  THEY WANT TO USE 500 ACTIVE PLAYERS AND 500 RETIRED

3   PLAYERS.  AND THEY WANT TO MAKE CARDS FOR MR. ADDERLEY TO SIGN,

4   AND THEY WANT MAKE CARDS FOR 27 ACTIVE PLAYERS AND 37 OTHER

5   RETIRED PLAYERS.  WHAT SHOULD WE DO?"

6          IF WE SIGN A GROUP LICENSE THAT SAYS:

7          "YOU CAN HAVE ALL THE ACTIVE PLAYERS YOU WANT

8   AND ALL THE RETIRED PLAYERS YOU WANT FROM THIS LIST," WHAT

9   WOULD HAVE BEEN THE EFFECT?  THE EFFECT WOULD HAVE BEEN WE

10  WOULD HAVE SHARED IN THE GROUP LICENSING REVENUE.  BUT THEY

11  NEVER WANTED THAT TO HAPPEN.

12         AND THE REASON THEY DIDN'T IS BECAUSE THEY HAD SET

13  ALL THIS UP TO FUND THEMSELVES WITH A 1994 STUDY.

14         AND DID YOUR HONOR WONDER WHY THEY NEVER DID ANOTHER

15  STUDY AFTER 1994?  BECAUSE THEY KNEW THEY HAD A PROBLEM WITH

16  THE RETIRED PLAYERS, AND THEY DIDN'T KNOW WHAT TO DO ABOUT IT.

17         SO THEY NEVER DID -- EVEN THOUGH THEY SAID IN A

18  FOOTNOTE OF THEIR FINANCIAL STATEMENT:

19         "WE'RE GOING TO DO ANOTHER STUDY IN 2007," THEY

20  HAD TO ADMIT THEY DIDN'T TO IT, BECAUSE THEY COULDN'T FIGURE

21  OUT HOW TO DO THE SHARING WITH THE RETIRED PLAYERS SO THEY

22  JUST --

23         **THE COURT:**  NOW, THAT'S YOUR SURMISE.  I NEVER SAW

24  ANY EVIDENCE THAT THAT WAS THE REASON.

25         **MR. LECLAIR:**  THAT WHAT WAS THE REASON?

1        **THE COURT:**  THE REASON THEY DIDN'T DO THAT STUDY HAD

2   SOMETHING TO DO WITH THE RETIREDS.

3        **MR. LECLAIR:**  NO, YOUR HONOR.  THAT'S THE ARGUMENT.

4   THAT'S ARGUMENT BASED ON THE EVIDENCE THAT WE'RE ENTITLED TO

5   ARGUE TO THE JURY.

6        OUR THEORY OF THE CASE IS --

7        **THE COURT:**  A SMOKING GUN WOULD BE:

8            "HEY, WE BETTER NOT DO THIS STUDY, BECAUSE THEN

9   WE'LL HAVE TO DEAL WITH THE RETIREDS.  SIGNED DOUG ALLEN."

10       THAT WOULD BE A SMOKING GUN.  BUT YOU DON'T HAVE

11  THAT, SO IT'S A SURMISE.

12       **MR. LECLAIR:**  WE DON'T HAVE A SMOKING GUN, BUT WE

13  HAVE REASONABLE INFERENCES FROM THE EVIDENCE, YOUR HONOR, THAT

14  THEY NEVER INTENDED -- RICHARD BERTHELSEN TESTIFIED THAT FROM

15  THE VERY BEGINNING THEY NEVER INTENDED TO PUT THESE PEOPLE

16  TOGETHER.  AND THE QUESTION IS:

17           "WHY NOT?  WHY NOT PUT THEM TOGETHER?"

18       AND THE ANSWER IS:

19           "BECAUSE WE DON'T WANT TO SHARE.  WE DON'T WANT

20  TO SHARE THE GROUP REVENUE.  WE'RE GOING TO GIVE ALL THIS AD

21  HOC MONEY TO THE ACTIVE PLAYERS, ALL THIS AD HOC MONEY TO THE

22  STAR RETIRED PLAYERS, AND WE'RE GOING TO SHARE THE GROUP

23  LICENSING REVENUE WITH ALL THESE JOURNEYMEN ACTIVE PLAYERS, THE

24  THIRD STRINGS, THE SPECIAL TEAMS, BUT WE DON'T WANT TO SHARE IT

25  WITH THE RETIRED JOURNEYMENS," EVEN THOUGH THAT'S WHAT WE SAY

1  THEY REPRESENTED.

2        **THE COURT:**  WHAT, THEN, WAS THE MOTIVE FOR -- WHY GO

3  OUT AND GET THESE GLA'S IN ANY EVENT, THEN?

4        **MR. LECLAIR:**  I'LL TELL YOU EXACTLY WHY, YOUR HONOR.

5  THE REASON WAS BECAUSE THEY DID NOT WANT TO LET ANY OTHER GROUP

6  EVER DEVELOP FOR PROFESSIONAL FOOTBALL PLAYERS --

7        **THE COURT:**  ALL RIGHT.

8        **MR. LECLAIR:**  -- WHO WOULD COMPETE WITH THEM.

9        **THE COURT:**  THAT'S WHAT I THOUGHT YOU WOULD SAY.  SO

10  LET'S PURSUE THAT FOR A MINUTE.

11        LET'S SAY THAT A DIFFERENT HOLLYWOOD AGENCY HAD COME

12  FORWARD AND SIGNED UP THE SAME GROUP OF CLASS MEMBERS.  SO IT

13  HAD NOTHING TO DO WITH THE NFLPA.  IT WAS A DIFFERENT AGENT.

14        AND LET'S SAY THEY JUST SAID FLAT OUT:

15        "WE'RE GOING TO BE YOUR AGENT AND YOUR

16  REPRESENTATIVE."

17        SO THEN THE ACTIVE PLAYER MONEY WOULD HAVE CONTINUED

18  TO GO TO THE ACTIVE PLAYERS.  AND MR. HOLLYWOOD WOULD BE OUT

19  THERE TRYING TO SELL THE 2,000 RPGLA CLASS MEMBERS.

20        NOW, POSSIBLY A DEAL COULD HAVE BEEN DONE FOR SOME

21  MONEY.  BUT THE RECORD SHOWS NOTHING ABOUT HOW MUCH THAT MONEY

22  WOULD BE AND WITH WHOM IT MIGHT BE.  THERE'S NO -- THERE'S NO

23  TESTIMONY, IS THERE, OR ANALYSIS THAT THIS GROUP OF 2,000

24  RETIRED PLAYERS WOULD COMMAND A CERTAIN RANGE OF PRICE IF THEY

25  HAD BEEN SOLD AS A GROUP BY A REASONABLE AGENT?

1        **MR. LECLAIR:**  THAT'S NOT OUR THEORY OF DAMAGE, YOUR

2  HONOR.  LET ME EXPLAIN OUR --

3        **THE COURT:**  I KNOW IT'S NOT.  BUT SINCE THAT'S NOT

4  THERE, WHAT -- YOUR ONLY THEORY IS YOU SHOULD HAVE GOTTEN AN

5  EQUAL SHARE OF THE ACTIVES.

6        **MR. LECLAIR:**  NO.  AS I STARTED TO SAY THIS MORNING,

7  YOUR HONOR, THEY HAD A CHOICE.  IF THEY WERE GOING TO COMPLY

8  WITH THEIR FIDUCIARY DUTY, THEY COULD EITHER HAVE DONE WHAT I

9  SUGGESTED, WHICH IS TO LICENSE ACTIVES AND RETIREDS TOGETHER,

10  IN WHICH CASE WE WOULD HAVE BEEN ENTITLED TO A SHARE OF THE

11  GROUP REVENUE, WHICH IS EXACTLY WHAT IS CALCULATED IN THE GROSS

12  LICENSING REVENUE POOL, AND WHAT MR. ROWLEY TOLD THE JURY.

13        SO WE WOULD HAVE BEEN ENTITLED TO RECOVER EXACTLY

14  WHAT WE HAVE TOLD THE JURY IF THEY HAD COMPLIED WITH THEIR

15  FIDUCIARY DUTY AND PUT US IN THE LICENSES AS THEY WERE REQUIRED

16  TO DO.

17        IF THEY DID NOT WANT TO DO THAT -- AND I UNDERSTAND.

18  YOUR HONOR SAYS:  WELL, MAYBE BAD THINGS; THEY COULD HAVE DONE

19  THIS OR THAT.

20        IF THEY DIDN'T WANT TO DO THAT, THEY HAD A DUTY TO

21  SAY:

22            "WE'VE GOT A CONFLICT OF INTEREST HERE.  OUR

23  INTEREST IS BETTER SERVED IF WE DON'T DO THIS.  YOUR INTEREST

24  WOULD BE BETTER SERVED IF WE DO."

25        AND SO --

1          **THE COURT:** BUT THINK ABOUT IT FOR A SECOND. IF YOU

2    WIN ON THE MEANING OF THE CONTRACT, LET'S SAY, AND IF THAT'S

3    NOT SET ASIDE UNDER RULE 50 OR THE NINTH CIRCUIT, LET'S JUST

4    SAY IF YOU WIN ON THE CONTRACT THEORY ALONE, SINCE YOUR CLASS

5    GETS TO SHARE EQUALLY IN THE GROSS LICENSING REVENUE, ALL

6    RIGHT? THAT'S ONE SCENARIO.

7          THEN, THE FIDUCIARY DUTY CLAIM ADDS NO ADDITIONAL

8    DAMAGES.

9          ON THE OTHER HAND, IF YOU LOSE ON THAT, LET'S SAY THE

10   JURY DISAGREES WITH YOUR MEANING OF THE CONTRACT. AND LET'S

11   SAY THE JURY SAYS THERE'S NO WAY THIS EVER MEANT THEY WERE

12   GOING TO SHARE IN THE GROSS LICENSING REVENUE.

13         BUT THEN, LET'S SAY THE JURY AGREES THAT THE NFLPA

14   HELD THEMSELVES OUT AS A REPRESENTATIVE AND AN AGENT AND

15   UNDERTOOK A FIDUCIARY DUTY TO MARKET THESE PEOPLE, THESE CLASS

16   MEMBERS.

17         NOW, WE GET TO THAT JUNCTURE IN THE DECISION TREE BY

18   ONLY -- ON THE ASSUMPTION THAT THE CONTRACT DOES NOT REQUIRE

19   PARTICIPATION IN THE GROSS LICENSING REVENUE.

20         SO IS THERE THEN A DAMAGE THEORY THAT CAN GET YOU TO

21   THAT OUTCOME?

22         MR. KESSLER SAID, NO, THERE'S NOT.

23         **MR. LECLAIR:** YOUR HONOR --

24         **THE COURT:** SO WHAT IS THE MEASURE OF DAMAGES?

25         **MR. LECLAIR:** THE MEASURE OF DAMAGES IS THE SAME

1   REVENUE FROM THE SAME LICENSES, BECAUSE OUR THEORY IS THEY

2   SHOULD HAVE INCLUDED US.  WE SHOULD HAVE BEEN PUT TOGETHER WITH

3   THE -- BECAUSE THEY WERE ACTING AS OUR AGENT.

4           **THE COURT:**  EVEN THOUGH THE CONTRACT DID NOT

5   REQUIRE -- EVEN THOUGH THE JURY SAYS:  LOOK, THE CONTRACT DOES

6   NOT REQUIRE -- THE THING THAT EVERYBODY SIGNED DOES NOT REQUIRE

7   THAT, AND THEN, NONETHELESS, YOU'RE SAYING THAT THE AGENCY

8   WOULD HAVE --

9           **MR. LECLAIR:**  ACTUALLY, I AM SAYING THAT.

10          **THE COURT:**  TAKE THE HOLLYWOOD EXAMPLE.  TAKE THE

11  HOLLYWOOD EXAMPLE.  LET'S SAY AN AGENT HAS A CONTRACT WITH A

12  FAMOUS HOLLYWOOD STAR, AND IT SAYS FLAT OUT:

13              "YOU DO NOT HAVE TO TRY TO GET ME INTO MOVIE X,

14  Y, Z.  YOU'VE GOT TO TRY TO GET ME IN SOME OTHER MOVIE, BUT NOT

15  MOVIE X, Y, Z."

16              TURNS OUT X, Y, Z IS THE BIGGEST MOVIE OF ALL TIME.

17  CAN THAT STAR COME ALONG AND SAY:

18              "YEAH, BUT THEY OWED ME A FIDUCIARY DUTY, DESPITE

19  THE WORDING OF THE CONTRACT, TO TRY TO GET ME INTO X, Y, Z."

20              IT JUST SEEMS TO ME THAT'S TOPSY-TURVY.

21              AND WHY EVER HAVE A CONTRACT IF YOU CAN DISREGARD THE

22  WORDING OF IT?

23          **MR. LECLAIR:**  YOUR HONOR, I THINK RESPECTFULLY THAT'S

24  NOT -- THAT ANALOGY ISN'T THE SAME AS OUR SITUATION.

25              BECAUSE THIS IS NOT A CONTRACT THAT SAYS WE'RE GOING

1  TO FAVOR THE ACTIVE -- THIS WOULD BE DIFFERENT.  IF THE

2  CONTRACT SAID:

3           "BY THE WAY, WE'RE GOING TO FAVOR THE ACTIVE

4  PLAYERS; WE'RE GOING TO DO EVERYTHING WE CAN TO AVOID PUTTING

5  YOU IN A GROUP LICENSE; WE'RE GOING TO DO WHAT WE CAN TO KEEP

6  FROM PAYING YOU; WE'RE GOING TO DO OUR BEST TO MAKE SURE IF

7  YOU'RE A STAR PLAYER YOU GET YOUR MONEY; AND IF YOU'RE A

8  JOURNEYMAN, WE THINK YOU'RE WORTHLESS, AND YOU'RE NEVER GOING

9  TO GET ANYTHING," IF THEY HAD SAID ALL THAT IN THE CONTRACT WE

10 WOULDN'T BE HERE.

11          BUT THAT'S NOT WHAT THEY SAID.  THEY SAID IN THE

12 CONTRACT -- THE CONTRACT CLAIM IS THAT THE LANGUAGE REQUIRES

13 THAT THEY PAY US BY VIRTUE OF THAT FOR EVERY LICENSE.

14          THE FIDUCIARY CLAIM IS:

15          "YOU SHOULD HAVE PUT US IN BY VIRTUE OF BEING

16 OUR AGENT."

17          AND IF YOU HAVE A CONTRACT --

18     **THE COURT:**  EVEN THOUGH THE CONTRACT DID NOT REQUIRE

19 IT?

20     **MR. LECLAIR:**  "EVEN THOUGH THE CONTRACT DID NOT

21 REQUIRE YOU TO DO IT, YOU SHOULD HAVE AS OUR FIDUCIARY.  AND IF

22 YOU WEREN'T GOING TO DO THAT, YOU SHOULD HAVE DISCLOSED YOUR

23 CONFLICT OF INTEREST AND TOLD US WE DIDN'T HAVE TO."

24     **THE COURT:**  BUT THE CONTRACT INTERPRETATION IS

25 SUPPOSED TO BE -- AS THE DRAFT INSTRUCTIONS SAY, IT IS SUPPOSED

1  TO CARRY OUT THE REASONABLE EXPECTATIONS -- REASONABLE

2  EXPECTATIONS OF THE PARTIES BASED ON THE LANGUAGE AND THE

3  SURROUNDING CIRCUMSTANCES.

4        SO IF THE REASONABLE EXPECTATIONS OF THE PARTIES WAS

5  IN NO WAY THAT THE RETIRED PLAYERS WERE GOING TO SHARE WITH THE

6  ACTIVE MONEY, HOW CAN YOU THEN SAY THAT THE CONTRACT AND THE

7  CIRCUMSTANCES IMPOSED A FIDUCIARY DUTY TO DO THE OPPOSITE,

8  I.E., TO GET THEM INTO THE SHARE AND SHARE ALIKE WITH THE

9  ACTIVE MONEY?

10       **MR. LECLAIR:**  I DO UNDERSTAND YOUR HONOR'S QUESTION.

11  NOW I COMPLETELY UNDERSTAND WHAT YOU ARE SAYING.  THERE IS A

12  GOOD ANSWER.  LET ME GIVE IT TO YOU.

13       **THE COURT:**  ALL RIGHT.  WHAT IS IT?

14       **MR. LECLAIR:**  WHAT WE'RE SAYING UNDER THE CONTRACT --

15  THEY HAVE THIS ARGUMENT UNDER THE CONTRACT, AND THEY HAVE BEAT

16  US AND BEAT US AND BEAT US WITH IT SAYING, EVERY WITNESS ON THE

17  STAND:

18        "IS THIS ALL ACTIVE PLAYER MONEY?  IS THIS ALL

19  ACTIVE?  IS THIS ALL ACTIVE PLAYER MONEY?  IS IT ALL ACTIVE

20  PLAYER MONEY?"

21        OKAY?  ASSUME THEY CONVINCE THE JURY THAT'S TRUE,

22  BECAUSE THEY DECIDED -- THEY THEMSELVES DID THE LICENSES --

23  EXPRESSLY TO SAY:

24        "CONTRARY TO WHAT WE SAY, ASSUME THE LICENSES DON'T

25  INCLUDE THE ACTIVE -- DON'T INCLUDE THE RETIRED PLAYERS."

```
 1              WHAT WE'RE SAYING IS:

 2                   "OKAY.  WE ACCEPT THAT YOU DIDN'T DO THAT.  YOU

 3    DIDN'T INCLUDE US IN THE LICENSES, SO WE DON'T HAVE A

 4    CONTRACTUAL CLAIM."

 5              BUT THE FIDUCIARY CLAIM IS TOTALLY DIFFERENT.  WHAT

 6    WE'RE SAYING IS:

 7                   "NOT THAT YOU DID INCLUDE US, BUT THAT YOU

 8    SHOULD HAVE.  AND IF YOU WEREN'T GOING TO INCLUDE US, YOU

 9    SHOULD HAVE TOLD US YOU HAD A CONFLICT OF INTEREST."

10              SO IT'S NOT INCONSISTENT AT ALL.

11         THE COURT:  WELL, IF THE CONTRACT DIDN'T REQUIRE IT

12    IN THE FIRST PLACE, THEN WHY SHOULD -- IN OTHER WORDS, LET'S

13    SAY THAT THE CONTRACT HAD BEEN MORE CLEAR, FOR THE SAKE OF

14    ARGUMENT, AND IT SAID FLAT OUT:

15                   "THIS MEANS YOU WILL NOT PARTICIPATE IN THE" ...

16              SO YOU'RE SAYING THAT THEY SHOULD HAVE MADE MORE

17    CLEAR THAT THEY WEREN'T GOING TO PARTICIPATE.  BUT I COME BACK

18    TO THE RULE OF CONTRACT INTERPRETATION IS:  WHAT WERE THE

19    REASONABLE EXPECTATIONS OF THE PARTIES?

20              AND IF IT WAS THE REASONABLE EXPECTATION OF THE

21    PARTIES TO BEGIN WITH THAT THERE WOULD BE NO PARTICIPATION IN

22    THE GROSS LICENSING REVENUE, THEN THEY HAVE BEEN TOLD.  THEY

23    HAVE BEEN TOLD, BECAUSE THAT'S THE REASONABLE EXPECT -- THAT'S

24    THE MEANING OF THE CONTRACT.

25         MR. LECLAIR:  YOUR HONOR, IF THEY'VE BEEN TOLD
```

1   THEY'RE NOT IN THE CONTRACT, BUT WHAT THEY DON'T KNOW IS THE

2   REASON THEY'RE NOT IN THE CONTRACT, WHICH IS WHY THEIR AGENT

3   HAS STABBED THEM IN THE BACK.  THAT'S THE FIDUCIARY CLAIM IS

4   THEIR AGENT, INSTEAD OF SAYING TO THEM -- WHAT DID THEY SAY?

5   WHAT THEY SAID WAS:

6           "OH, THERE'S NOT MUCH INTEREST.  YOU'RE KIND OF

7   WORTHLESS.  NOBODY WANTS YOU."

8           AND WHAT WE ARE SAYING TO THE JURY IS THE EVIDENCE IS

9   TO THE CONTRARY.  IT'S NOT THAT THEY DIDN'T WANT US.  IT'S

10  THAT THE FACT OF THE MATTER IS THEY DIDN'T WANT TO INCLUDE US

11  IN THE LICENSES.

12          PEOPLE WANTED -- THERE'S ABUNDANT EVIDENCE THAT THESE

13  LICENSEES WANTED TO USE RETIRED PLAYERS.  TONS OF EVIDENCE OF

14  THAT, INCLUDING SOME THEY HAVE PUT IN.

15          THE POINT IS:  HOW DID THEY STRUCTURE THE LICENSE?

16  AND IF THEY CONTRACTUALLY SAY:

17          "OKAY.  WE'RE GOOD LAWYERS.  WE WROTE THE PAPERS.

18  AND WE WROTE 'ACTIVE' OVER HERE AND 'RETIRED' OVER HERE, SO YOU

19  DON'T GET ANY OF THIS MONEY," AND THEY CONVINCE THE JURY THAT

20  THEY'RE RIGHT ABOUT THAT, WE LOSE ON CONTRACT.

21          BUT THAT HAS NOTHING TO DO WITH THEIR FIDUCIARY DUTY

22  TO EITHER KEEP US TOGETHER OR TO TELL US WE HAVE A CONFLICT OF

23  INTEREST.

24          AND WHEN THEY DON'T DO THAT, THEY HAVE BREACHED THEIR

25  FIDUCIARY DUTY, AND THEY HAVE BLOCKED US FROM DEALING WITH THE

1  VERY PEOPLE --

2  **THE COURT:** LET'S PURSUE THAT, THOUGH.

3  IF THAT'S -- IF THE BREACH IS THAT THEY FAILED TO

4  DISCLOSE A CONFLICT OF INTEREST, THEN THE DAMAGES THAT WOULD

5  FLOW FROM THAT WOULD BE IF MR. ADDERLEY HAD KNOWN AND OTHER

6  CLASS MEMBERS HAD KNOWN THAT THERE WAS A CONFLICT OF INTEREST,

7  THEN CONCEIVABLY THEY COULD HAVE GONE OUT AND HIRED

8  MR. HOLLYWOOD TO BE THEIR GROUP LICENSING AGENT, AND MAY TRY TO

9  MAKE THEIR OWN DEALS.

10  AND ONCE AGAIN WE COME BACK TO THE QUESTION OF:  HAD

11  MR. HOLLYWOOD GONE OUT TO DO THAT, WHAT WOULD BE THE PLAUSIBLE

12  RANGE OF POTENTIAL ROYALTIES THAT SUCH A GROUP LICENSE WOULD

13  HAVE COMMANDED IN THE MARKET?

14  THERE'S NO EVIDENCE ON THIS POINT.

15  **MR. LECLAIR:**  YOUR HONOR, IF THE EVIDENCE IS THAT

16  THEY COULD HAVE DONE A GROUP LICENSE, WHICH THERE IS EVIDENCE,

17  THEY COULD HAVE DONE A GROUP LICENSE, IT DOESN'T EVEN MATTER

18  WHETHER IT'S THE SAME MONEY OR ONE DOLLAR MORE, OR IT DOESN'T

19  MAKE ANY DIFFERENCE.  BECAUSE THE POINT IS:  EVERYBODY GOT

20  THEIR AD HOC MONEY.

21  AND IF -- ALL THEY HAD TO DO -- LET'S TAKE THE EA

22  LICENSE AS AN EXAMPLE.  LET'S BE VERY SPECIFIC.  LET'S TAKE THE

23  EA LICENSE AS AN EXAMPLE.

24  WHAT IF INSTEAD OF THE WAY THEY STRUCTURED THE

25  LICENSE AGREEMENT THEY HAD SIMPLY SAID -- YOU KNOW, THIS IS

1   WHAT WE ARGUE.  BUT LET'S ASSUME IT'S REJECTED THAT WE'RE

2   ACTUALLY IN THE LANGUAGE.  LET'S ASSUME THAT THE LANGUAGE ABOUT

3   MENTIONING  RETIRED PLAYERS ISN'T EVEN THERE.

4          IF THEY HAD, IN FACT, HAD A CONTRACT THAT HAD BOTH --

5   IF WE SAY:

6          "WHAT YOU SHOULD HAVE DONE IS JUST -- YOU ENDED

7   UP -- USING THESE RETIRED PLAYERS."

8          THERE'S NO QUESTION THEY USED THEM.  EA USED THEM.

9   LOTS OF OTHER LICENSEES USED THEM.

10          IF THEY HAD WRITTEN A LICENSE AGREEMENT THAT SAYS:

11           "YOU HAVE ALL THE ACTIVE PLAYERS TO CHOOSE FROM,

12   AND YOU HAVE THIS GROUP OF RETIRED PLAYERS TO CHOOSE FROM," IF

13   THEY HAD DONE THAT, WHICH WE SAY WAS WHAT THEIR FIDUCIARY DUTY

14   REQUIRED THEM TO DO, WE WOULD HAVE SHARED IN THE MONEY.  WE'D

15   HAVE SHARED IN THE GROUP MONEY.  AND THAT'S WHY WE'RE ENTITLED

16   TO THE DAMAGES FROM THAT.

17          AND THE BREACH IS THAT THEY DIDN'T DO THAT, AND THEY

18   DIDN'T DO THE CONFLICT OF INTEREST.

19          **THE COURT:**  YOU HAVE GONE OFF AND NOT ACCEPTED MY

20   HYPOTHETICAL.  YOU SAID --

21          **MR. LECLAIR:**  I TRIED TO, YOUR HONOR.  I APOLOGIZE.

22          **THE COURT:**  YOU SAID THAT THE PROBLEM WAS CONFLICT OF

23   INTEREST.  THAT THEN SAYS:  OKAY.  WHAT WOULD THEY HAVE DONE IN

24   THE ALTERNATIVE?

25          THE ALTERNATIVE WOULD HAVE BEEN MR. HOLLYWOOD.

1          MR. HOLLYWOOD COULD HAVE THEN GONE TO EA IN

2     CONNECTION WITH THE MADDEN GAME AND SAID:

3               "I'VE GOT THIS ENTIRE GROUP OF 2,053 RETIRED

4     PLAYERS, INCLUDING MR. ADDERLEY, HALL OF FAME.  WOULD YOU

5     LICENSEES" -- AND THEN, AT LEAST THOSE YOU COULD USE THEIR REAL

6     NAMES IN THE MADDEN GAME.

7          AND, FRANKLY, I THINK JUST USING PLAUSIBILITY,

8     THERE'S SOME PLAUSIBILITY TO THE IDEA THAT EA WOULD HAVE SAID:

9               "OKAY, WE'LL GIVE YOU $10,000 FOR THAT, OR MAYBE

10    EVEN -- MAYBE EVEN A HUNDRED THOUSAND DOLLARS FOR THAT."

11         I DON'T KNOW WHAT THE NUMBER WOULD BE.  BUT IT

12    WOULD -- CONTRARY TO MR. NOLL, I THINK EA, IF CONFRONTED WITH

13    THAT, MIGHT HAVE PAID SOME MONEY FOR THOSE PARTICULAR GROUP

14    RIGHTS.

15         **MR. LECLAIR:**  OKAY.

16         **THE COURT:**  BUT NO WAY THAT -- THE JURY COULD

17    DECIDE -- BUT IT IS HARD TO BELIEVE THAT EA WOULD HAVE PAID THE

18    SAME FOR THE -- FOR THE ACTIVE PLAYERS AS THEY WOULD FOR THE

19    RETIRED PLAYERS.

20         SO THE IDEA THAT YOU -- SO WE'RE FOLLOWING THE

21    MR. HOLLYWOOD SCENARIO NOW, BECAUSE MR. HOLLYWOOD DOESN'T HAVE

22    ANY ACTIVE PLAYERS TO MARKET.

23         ANYWAY, YOU -- YOU COME BACK AT EACH JUNCTURE TO SAY,

24    BASICALLY THIS, THAT THE BREACH OF FIDUCIARY DUTY HAS TO BE

25    THAT THE DEFENDANTS SHOULD HAVE THROWN IN THE RETIREDS FOR

1  FREE, AND THEN SHARED THE $25 MILLION ON A PLAYER-BY-PLAYER

2  BASIS, WHICH I THINK -- AND WE ONLY GET TO THIS SCENARIO IF

3  YOU'RE ASSUMING FOR THE SAKE OF ARGUMENT THAT THE CONTRACT DOES

4  NOT -- DID NOT REQUIRE SHARING IN THE GROSS LICENSING REVENUE

5  TO BEGIN WITH.

6          SO I THINK THERE'S A POSSIBLE CIRCULARITY HERE

7  THAT -- JUST A MINUTE.

8          ALL RIGHT.  I'M GOING TO DENY THE MOTION.  I'M GOING

9  TO LET THE JURY DECIDE THIS, WITHOUT PREJUDICE TO RENEWING THE

10 MOTION AT THE END.

11         JUST A WORD OF CAUTION, THOUGH.  I'VE SEEN THIS

12 HAPPEN.  WHEN PLAINTIFFS GO TO THE JURY WITH MULTIPLE THEORIES,

13 AND THEY WIN ON ONE THAT IS FATALLY DEFECTIVE, THEY WIND UP

14 WITH NOTHING.

15         WHEREAS, IF THEY HAD -- IF DISCRETION HAD BEEN THE

16 BETTER PART OF VALOR, AND THEY HAD RECOGNIZED FATAL PROBLEMS

17 WITH THEIR THEORY AND GONE WITH ONE THAT HAD A SHOT, THEY MIGHT

18 HAVE WON SOMETHING.

19         I'M DENYING THIS MOTION, AND I'M GOING TO LET THE

20 JURY HAVE THE FIRST SHOT AT IT.  BUT I WANT YOU TO KNOW IF THE

21 SCENARIO TURNS OUT AS I SAY, AND YOU WIND UP WITH A BIG ZERO

22 HERE --

23         **MR. PARCHER:**  COULD YOU BE MORE SPECIFIC?  SCENARIOS

24 YOU SAY IS --

25         **THE COURT:**  I'M TELLING YOU ALL OF YOUR THEORIES ARE

1  TENUOUS.  ALL OF THEM.  BUT I'M NOT SAYING I'M GOING TO TAKE

2  THEM AWAY.  I'M SAYING THESE ARE VERY SUBSTANTIAL RULE 50

3  MOTIONS THAT HAVE BEEN MADE.

4          AND I'M GOING -- BECAUSE THERE IS A REASONABLE

5  POSSIBILITY THE JURY WILL REJECT ALL OF THE ARGUMENTS, THEN

6  THAT WILL END THE CASE.

7          BUT I AM NOT -- I WANT YOU TO BE AWARE THAT IF YOU

8  PREVAIL -- I AM NOT SAYING YOU WILL GET IT TAKEN AWAY.  I'M

9  JUST TRYING TO SAYING I'VE TRIED TO EXPRESS WHAT MY CONCERNS

10  ARE ABOUT YOUR THEORY, AND YOU NOW KNOW MOST OF THEM.

11          BUT IF YOU CHOOSE TO GO TO THE JURY ON A THEORY THAT

12  ULTIMATELY GETS TAKEN AWAY, AND THAT'S THE ONLY ONE YOU WON ON

13  BEFORE THE JURY, YOU SHOULD BE AWARE -- I'M TELLING YOU RIGHT

14  NOW -- YOU'RE AT RISK ON ALL YOUR THEORIES.

15          **MR. PARCHER:**  I APPRECIATE WHAT YOUR HONOR SAID VERY

16  MUCH, BECAUSE IT'S INSTRUCTIVE AS TO HOW TO SUM UP.

17          BUT I NEED TO RAISE YOUR HONOR'S CONSCIOUSNESS TO ONE

18  THING THAT I DON'T THINK YOUR HONOR HAS FOCUSED ON, WHICH MAY

19  NOT HAVE BEEN APPEARING ON ANYTHING --

20          **THE COURT:**  I'M DENYING THE MOTION.  GO AHEAD.

21          **MR. PARCHER:**  I UNDERSTAND.  I UNDERSTAND.  BUT IT'S

22  A RACE FOR YOUR MIND, AS WELLS AS FOR THE JURORS' MIND HERE.

23          THERE IS A REALITY HERE.  ASSUME FOR THE PURPOSES OF

24  DISCUSSION, ASSUME THAT THE DEFENDANTS SOLD THE PLAINTIFFS DOWN

25  THE RIVER.  JUST ASSUME IT, BECAUSE I THINK THERE'S A

 1  LIKELIHOOD THAT THE JURY IS GOING TO BELIEVE THAT.

 2          ASSUME FURTHER --

 3      **THE COURT:**  WELL, THE EXPERT, MR. NOLL, CAME CLOSE TO

 4  SAYING THAT AT THE END.

 5      **MR. PARCHER:**  YES, HE DID.

 6      **THE COURT:**  HE SAID THAT THERE WAS EVIDENCE THAT

 7  DEFENDANTS HAD "SOLD OUT," WAS THE PHRASE HE USED.  "SOLD OUT."

 8      **MR. PARCHER:**  I HEARD IT.  I ACTUALLY WROTE IT DOWN

 9  ON MY --

10      **THE COURT:**  YEAH.

11      **MR. PARCHER:**  OKAY.  ASSUME FURTHER THAT THE

12  DEFENDANTS FOUND THEMSELVES IN A DILEMMA WHEN THEY STARTED.

13  WHEN THEY STARTED, THEY DESPERATELY WANTED AS MANY PLAYERS AS

14  POSSIBLE, PAST, PRESENT, EVEN TRYING TO LAY THE GROUNDWORK FOR

15  THE FUTURE, SO THEY COULD BE THE ONLY GAME IN TOWN, SO THAT THE

16  BOSSES OF THE TRACE ARMSTRONGS OF THIS WORLD WOULDN'T BE IN

17  THERE COMPETING, OR SUCCESSFULLY COMPETING, BECAUSE THEY

18  PRACTICALLY GOT A MONOPOLY AS A RESULT OF WHAT OUR GUYS GAVE

19  THEM ALONG WITH THE ACTIVES.

20          AND THEN, THEY FOUND THEMSELVES IN THE A QUAGMIRE.

21  AND THE QUAGMIRE WAS THEY NEEDED TO PLEASE -- "THEY" IS ALLEN

22  AND MR. UPSHAW, THE LATE MR. UPSHAW -- THEY NEEDED TO PLEASE

23  THEIR CONSTITUENCY, WHICH, AFTER ALL, AT THE END OF THE DAY ARE

24  ACTIVE PLAYERS.  OUR PLAYERS ARE DOG FOOD.  THEY NEEDED TO

25  PLEASE THEIR CONSTITUENCY BECAUSE THEY VOTE.

1    AND ONE OF THE VOTES THEY COULD CAST IS TO CAST

2  MR. UPSHAW AND MR. ALLEN OUT OF OFFICE, AND PERHAPS GET

3  SOMEBODY ELSE IN THERE.

4    AND SO, THEREFORE, THEY WANTED AS MUCH MONEY AS

5  POSSIBLE TO GO INTO THE ACTIVE TILL.

6    BY THE SAME TOKEN, THEY DID NOT WANT THE RETIREDS TO

7  BOLT AND SIGN UP MR. ARMSTRONG'S BOSSES, BECAUSE IF THEY SIGNED

8  UP MR. ARMSTRONG -- IF THE RETIREDS WERE SIGNED UP BY

9  MR. ARMSTRONG'S BOSSES THERE'S A VERY STRONG LIKELIHOOD THAT

10  THE JOE MONTANAS AND THE JOE NAMATHS OF THE WORLD, WHO ACTUALLY

11  BECAME JOE NAMATHS AND JOE MONTANAS BECAUSE SOME OF THESE

12  FELLOWS BLOCKED FOR THEM, AND SOME OF THESE FELLOWS TACKLED FOR

13  THEM, AND SOME OF THESE FELLOWS CAUGHT PASSES FOR THEM, THAT

14  WHEN THEY'RE PLAYING POKER OR DRINKING BEER, OR GOING TO

15  CHURCH, OR WHATEVER THEY DO WHEN THEY GET TOGETHER, THEY MIGHT

16  HAVE SAID:

17    "DO YOU LIKE YOUR AGENT?  YOU LIKE YOUR" -- YOU

18  CALLED HIM "MR. HOLLYWOOD."

19    IT'S ACTUALLY SOME GUYS IN PINSTRIPED SUITS AND

20  ATTRACTIVE TIES WITH DIMPLES IN THEM, YOU KNOW, THAT SOME OF

21  THESE MEN AND WOMEN ACTUALLY LIKE.  THEY ARE NOT ALL

22  STEREOTYPICALLY WHAT MAKES SAMMY RUN.

23    IN FACT, MR. ARMSTRONG WAS ONE OF THEM, AS YOUR HONOR

24  SAW.  QUITE AN ATTRACTIVE YOUNG MAN.

25    AND SUPPOSE THE RETIREDS SAID:

1          "SURE. WE WERE BEING SOLD DOWN THE RIVER BY --

2 BY THE SO-CALLED 'UNION AGENT.'"

3          **THE COURT:** ALL RIGHT. SO LET'S -- I SEE WHERE

4 YOU'RE GOING. THAT'S WHERE MR. LECLAIR WAS GOING.

5          SO LET'S SAY THAT MR. ARMSTRONG'S COMPANY SIGNED UP

6 THE ENTIRE CLASS.

7          **MR. PARCHER:** RIGHT.

8          **THE COURT:** HOW MUCH OF A ROYALTY COULD THAT CLASS

9 COMMAND IN THE MARKETPLACE?

10          **MR. PARCHER:** I THINK THAT'S THE WRONG QUESTION.

11          **THE COURT:** WHAT IS THE --

12          **MR. PARCHER:** THE QUESTION IS -- FIRST OF ALL, THE

13 FIDUCIARY CLAIM CARRIES WITH IT NOT ONLY COMPENSATORY DAMAGES,

14 WHICH IS OSTENSIBLY EQUAL TO THE CONTRACTUAL DAMAGES, ASSUMING

15 OUR VIEW OF THE CONTRACT PREVAILS, BUT ALSO CARRIES WITH IT

16 PUNITIVE DAMAGES.

17          AND WHAT -- AND WHAT IS IT WORTH, WHAT IS IT WORTH IF

18 YOU FIND OUT THAT YOUR AGENT, THE PERSON THAT YOU -- THE

19 COMPANY THAT YOU TRUSTED, THE ONES THAT YOU THOUGHT WERE GOING

20 TO HELP YOU, THE ONES THAT YOU HELPED TO BUILD INTO THE

21 POWERHOUSE THEY ARE, WERE NOT ONLY SELLING YOU DOWN THE RIVER

22 BUT WERE WRITING YOU THINGS LIKE "GROUP LICENSING IS

23 ESSENTIAL," LONG AFTER, SIX, SEVEN, EIGHT, NINE, TEN YEARS

24 AFTER THEY REALIZED THAT THERE WAS NOBODY -- YOU KNOW, THAT

25 NOBODY WAS SIGNING UP. WHAT IS IT WORTH? WHAT IS IT WORTH

1    HERE WHEN YOU FINALLY FIND -- WHEN YOU FINALLY FIND OUT THAT

2    YOU WERE STABBED IN THE BACK?

3           AND THE REASON YOU WERE STABBED IN THE BACK AND THEY

4    KEPT LURING YOU BACK IN WAS THEY DIDN'T WANT YOU TO GO

5    ELSEWHERE, BECAUSE IF YOU WENT THAT MIGHT START THE RUN ON THE

6    BANK AND UNRAVEL THE WHOLE CABOODLE.

7           NOW, I'M SAYING THAT TO YOUR HONOR WITHOUT ANY --

8    WITHOUT ANY NECESSARILY INSERTION INTO ANY CHARGE, OR PERHAPS

9    THERE IS AN INSERTION, BUT TO RAISE YOUR HONOR'S CONSCIOUSNESS

10   HERE AS TO WHAT PROBABLY WAS GOING ON.

11          BECAUSE, OTHERWISE --

12          **THE COURT:**  WHY IS THAT ANY DIFFERENT FROM WHAT

13   MR. LECLAIR SAID?

14          WHAT I'M SUGGESTING TO YOU IS IF YOU -- IF YOU PURSUE

15   THAT THEORY, AND THEN MR. HOLLYWOOD HAS GOT TO BE BROUGHT INTO

16   THE PICTURE BECAUSE YOU HAVE TO ASK THE QUESTION:

17          "ALL RIGHT.  IF THIS GROUP HAD BEEN REPRESENTED

18   BY AN INDEPENDENT AGENT WITH NO BREACH OF CONTRACT -- I MEAN,

19   NO BREACH OF FIDUCIARY DUTY, WHAT WOULD THEY HAVE NEGOTIATED ON

20   BEHALF OF THIS GROUP?"

21          **MR. PARCHER:**  AND IF THE GROUP HAD BEEN REPRESENTED

22   BY AN INDEPENDENT AGENT WHO, AS A RESULT OF THE REPRESENTATION

23   OF THAT GROUP WAS ABLE TO PERSUADE AD HOC PLAYERS TO COME OVER,

24   STAR RETIRED AD HOC PLAYERS TO COME OVER, EVENTUALLY TO GET THE

25   UNION -- TRACE ARMSTRONG AND THE LOVEABLE MR. GOICH TO REALIZE

1  WHAT THE CON GAME WAS AND SAY:

2           "WE'RE ALL GOING OVER THERE, AND WE'RE GOING TO

3  THEN BE A LICENSOR FOR BOTH ACTIVES AND GROUPS," WHAT WOULD

4  THAT HAVE BEEN WORTH?

5           I MEAN, YOUR HONOR IS CUTTING IT OFF AT ITS ANKLE.

6           **THE COURT:**  I'M NOT CUTTING OFF.  I'M ASKING YOU,

7  WHAT EVIDENCE -- YOU ARE THE PLAINTIFF.

8           **MR. PARCHER:**  YES, SIR.

9           **THE COURT:**  IT'S YOUR BURDEN OF PROOF.  WHAT EVIDENCE

10  DID YOU PUT IN ON WHAT THAT INDEPENDENT AGENT WHO HAD NOTHING

11  TO DO WITH THE LEAGUE, NOTHING TO DO WITH THE DEFENDANTS, WHAT

12  THEY WOULD HAVE BEEN ABLE TO NEGOTIATE IN THE MARKETPLACE?

13           I DIDN'T HEAR ANY EVIDENCE ON THAT.

14           **MR. PARCHER:**  DEPENDS ON WHO THEY REPRESENTED AND WHO

15  THEY COULD PUT IN.

16           **THE COURT:**  THE EXACT GROUP THAT WE HAVE HERE, THE

17  ENTIRE CLASS.  THAT'S THE TEST.

18           **MR. PARCHER:**  WHAT IF IT WAS THE ENTIRE CLASS PLUS

19  THE AD HOCS?  WHAT IF IT WAS THE ENTIRE CLASS PLUS THE AD HOCS

20  AND THE ACTIVES?

21           **THE COURT:**  WE DIDN'T EVEN GET EVIDENCE ON THAT

22  SCENARIO.  LOOK, I'M DENYING THE MOTION FOR NOW.  I THINK MY

23  CONSCIOUSNESS HAS BEEN RAISED ALREADY.  BUT YOU'VE RAISED IT

24  AGAIN.

25           **MR. PARCHER:**  RIGHT.  AND YOU'VE RAISED MINE.

1        **THE COURT:** AND I'VE RAISED WITH YOU A POINT THAT

2   COUNSEL OUGHT TO CONSIDER.

3        ALL RIGHT. I WILL NOW GO INTO THE LAST ARGUMENT, ON

4   PUNITIVE DAMAGES.

5        **MR. KESSLER:** BEFORE GOING TO THAT, I WOULD JUST

6   STATE I KNOW YOUR HONOR IS DENYING THE MOTION, BUT I WOULD ASK

7   WHEN YOU LOOK AT THE JURY INSTRUCTIONS THAT THEY SHOULD NOT

8   THEN BE PERMITTED -- FOR EXAMPLE, YOUR HONOR CHARGED NOW ON

9   MARKETING. THEY APPARENTLY DON'T HAVE A MARKETING THEORY

10  ANYMORE FOR DAMAGES.

11       SO THEY SHOULDN'T -- IN OTHER WORDS, THEY SHOULDN'T

12  BE ABLE TO GO TO THE JURY MIXED TOGETHER ALL THESE DIFFERENT

13  FIDUCIARY DUTY CLAIMS. BUT WHAT ABOUT THE PROFESSOR NOLL WAS

14  ASKED ABOUT? THAT WAS ABOUT THE HALL OF FAME AGREEMENT.

15  THAT'S NOT EVEN IN THEIR DAMAGES CLAIM.

16       SO, AGAIN, WE HAVE THIS GREAT DANGER, YOUR HONOR,

17  THAT UNLESS YOU CHARGE -- IF YOU'RE GOING TO ALLOW ANYTHING, TO

18  JUST THIS THEORY THAT WE SHOULD HAVE INCLUDED THEM IN THE

19  LICENSE FOR FREE, OR SOMETHING LIKE THAT, THAT SHOULD BE THE

20  ONLY CLAIM THAT GOES TO THE JURY OR WE'RE NOT GOING TO KNOW

21  WHICH ONE THEY'RE AWARDING FOR.

22       **THE COURT:** LOOK, LET'S GO TO PUNITIVES.

23       **MR. KESSLER:** OKAY. FINALLY, ON PUNITIVES, YOUR

24  HONOR, WHATEVER ELSE YOUR HONOR DOES, IN THE D.C. CIRCUIT THERE

25  HAS TO BE TWO THINGS, TWO THINGS.

1      FIRST, THERE HAS TO BE EVIDENCE, EVIDENCE THAT A

2 REASONABLE JURY COULD FIND THAT THEY ACTED WITH EVIL MOTIVE,

3 ACTUAL MALICE -- WHICH YOUR HONOR KNOWS IS A VERY TOUGH

4 STANDARD -- DELIBERATE VIOLENCE OR OPPRESSION, OR WITH INTENT

5 TO INJURE, OR IN WILLFUL DISREGARD FOR THE RIGHTS OF PLAINTIFFS

6 AND -- THERE'S THEN AN "AND," SO YOU NEED ONE OF THOSE THINGS.

7      AND THEN, YOU NEED THAT DEFENDANTS' CONDUCT ITSELF

8 WAS OUTRAGEOUS, GROSSLY FRAUDULENT OR RECKLESS TOWARD THE

9 SAFETY OF PLAINTIFFS.

10      WHATEVER ELSE THIS CASE IS -- AND THE BURDEN IS BY

11 CLEAR AND CONVINCING, AS YOUR HONOR KNOWS.

12      **THE COURT:**  DID YOU SEE THE INSTRUCTIONS I GAVE ON

13 THIS POINT?

14      **MR. KESSLER:**  YES.  AND I BELIEVE --

15      **THE COURT:**  ARE THEY ARE INADEQUATE?

16      **MR. KESSLER:**  THEY ARE INADEQUATE, YOUR HONOR.  FIRST

17 OF ALL -- TWO THINGS.

18      ONE IS THERE'S NO WAY A REASONABLE JURY FROM THE

19 EVIDENCE IN THIS CASE COULD FIND ANY OF THAT TYPE OF BEHAVIOR.

20      **THE COURT:**  BUT I JUST HEARD MR. PARCHER MAKE THE

21 ARGUMENT.

22      **MR. KESSLER:**  AND WITHOUT EVIDENCE, YOUR HONOR.

23      **THE COURT:**  WHEN YOU STAB SOMEBODY IN THE BACK,

24 THAT'S NOT DESPICABLE --

25      **MR. KESSLER:**  YOUR HONOR, IS THAT EVIDENCE?  IS THAT

1 EVIDENCE?

2         **THE COURT:**  THAT'S ARGUMENT.

3         **MR. KESSLER:**  YOUR HONOR, I'M BEGGING YOUR HONOR ON

4 THIS POINT TO LOOK AT THE D.C. LAW OF THIS.  BECAUSE WHAT IT

5 DOES --

6         **THE COURT:**  WHERE CAN I FIND THAT?  WE LOOKED FOR IT

7 AND COULDN'T FIND IT.

8         YOU LAWYERS GAVE ME ONLY 42,012 PAGES.

9         **MR. KESSLER:**  THIS IS VERY EASY.  STANDARD

10 INSTRUCTIONS OF D.C. 1601 MODIFIED.

11         **THE COURT:**  DO YOU HAVE A COPY RIGHT HERE?

12         **MR. KESSLER:**  IF WE HAVE IT, WE WILL GIVE IT TO YOU.

13         **THE COURT:**  I'M GOING TO FOLLOW THE D.C. LAW.

14         **MR. KESSLER:**  BUT MY POINT ON THE RULE 50 MOTION IS,

15 APPLYING THE D.C. LAW YOU HAVE TO MAKE A DETERMINATION IS THERE

16 EVIDENCE -- NOT FROM ARGUMENT, BUT EVIDENCE -- BECAUSE YOU HAD

17 A LOT OF ARGUMENTS ABOUT HOW HORRIBLE --

18         **THE COURT:**  IT'S ALWAYS GOING TO BE CIRCUMSTANTIAL.

19         **MR. KESSLER:**  RIGHT.  RIGHT.  BUT EVEN FROM

20 CIRCUMSTANTIAL, IT HAS TO BE BY CLEAR AND CONVINCING THAT A

21 JURY COULD FIND REASONABLY BY CLEAR AND CONVINCING EVIDENCE --

22 CIRCUMSTANTIAL IS OKAY, BUT NOT JUST BY LAWYERS' ARGUMENT --

23 THAT THAT TYPE OF OUTRAGEOUS BEHAVIOR OCCURRED TO WARRANT

24 THIS -- WHAT IS THAT YOU'RE HANDING ME?

25         **MS. DONOVAN:**  THAT'S MODIFIED FROM THE D.C.

1   INSTRUCTIONS.

2       **THE COURT:** IF THERE WAS A BREACH OF FIDUCIARY DUTY,

3   DOES IT HAVE TO BE INTENTIONAL OR CAN IT BE NEGLIGENT?

4       **MR. KESSLER:** IT HAS TO BE INTENTIONAL.

5       **THE COURT:** WELL, THEY ARGUED THERE IS AN

6   INTENTIONAL. ISN'T THAT BAD ENOUGH?

7       **MR. KESSLER:** NO, NO, NO. IT HAS TO BE -- THIS IS

8   IMPORTANT -- A SPECIFIC TYPE OF INTENT. IT HAS TO BE EVIL

9   MOTIVE, WHICH IS DEFINED IN D.C. AS REALLY EVIL; ACTUAL MALICE,

10   WHICH IS ALSO DEFINED IN THESE HORRIBLE THINGS; DELIBERATE

11   VIOLENCE OR OPPRESSION; OR IN WILLFUL DISREGARD FOR THE RIGHTS

12   OF PLAINTIFFS.

13       AND THE INTENT ALONE IS NOT ENOUGH. THE CONDUCT HAS

14   TO BE OUTRAGEOUS, GROSSLY FRAUDULENT -- NOT JUST FRAUDULENT,

15   MERE FRAUD IS NOT ENOUGH -- OR RECKLESS TOWARDS SAFETY.

16   CLEARLY, THIS ISN'T A SAFETY ISSUE.

17       THE PROBLEM, YOUR HONOR, IS BY PUTTING ANY

18   INSTRUCTION ON THIS IS THE COURT'S SUGGESTING A JURY COULD

19   POSSIBLY FIND SUCH OUTRAGEOUS BEHAVIOR.

20       WHEN THERE'S NO EVIDENCE OF IT, IT'S PREJUDICIAL EVEN

21   TO GIVE THE INSTRUCTION. BECAUSE THEN THE JURY IS SAYING:

22       "AH-HA, THE COURT'S TELLING ME I MIGHT FIND THIS

23   IS AN OUTRAGEOUSLY RECKLESS, DANGEROUS, MALICE."

24       YOUR HONOR, THERE IS JUST NO EVIDENCE OF IT.

25   WHATEVER ELSE YOUR HONOR DOES ON RULE 50, WE BELIEVE

1  RESPECTFULLY THERE SHOULD BE NO PUNITIVE DAMAGES CLAIM IN THIS

2  CASE.

3       **MR. LECLAIR:**  YOUR HONOR, WE TENDERED OUR

4  INSTRUCTION, WHICH IS BASED ON THE D.C. STANDARDIZED JURY

5  INSTRUCTIONS.  AND WHAT IT SAYS IS, THE PLAINTIFF HAS TO PROVE

6  IN CLEAR AND CONVINCING EVIDENCE THAT THE DEFENDANTS' CONDUCT

7  WAS WILLFUL AND OUTRAGEOUS OR EXHIBITS RECKLESS DISREGARD FOR

8  THE RIGHTS OF OTHERS.

9       SO THE POINT IS, IF THEY BREACHED THEIR -- IF THEY

10  DID WHAT WE SAY THEY DID, IF THE JURY FINDS THEY DID WHAT WE

11  SAY THEY DID, IF THEY INTENDED NOT TO SHARE THIS MONEY WITH

12  RETIRED PLAYERS, AND THEY INTENTIONALLY MISLED THE RETIRED

13  PLAYERS BY WHAT THEY DID AND WHAT THEY SAID, AND THE

14  CIRCUMSTANTIAL --

15       **THE COURT:**  IT WOULD HAVE TO BE AN INTENTIONAL

16  BREACH OF DUTY.  YOU CAN'T INTRODUCE FRAUD IN THE CASE.  IT

17  WOULD HAVE TO BE FIRST THEY FIND A FIDUCIARY DUTY.

18       **MR. LECLAIR:**  AND THAT THEY INTENDED TO DO IT.

19       **THE COURT:**  THAT IT WAS BREACHED, AND THEY INTENDED

20  TO BREACH, AND THEN THEY DID IT THROUGH THIS DESPICABLE CONDUCT

21  TEST.

22       **MR. LECLAIR:**  ABSOLUTELY, YOUR HONOR.  AND WE THINK

23  THE EVIDENCE WILL SHOW THAT'S EXACTLY WHAT THEY DID.  BUT IF

24  THEY DID, THEY DID.  IF THEY DIDN'T, THEY DIDN'T.

25       **MR. KESSLER:**  AND, AGAIN, YOUR HONOR, I WOULD JUST

1  SAY WHILE THEY ARGUE IT'S DESPICABLE, THEY HAVE TO ACTUALLY

2  HAVE CONDUCT THAT'S DESPICABLE.  THEY HAVE NO EVIDENCE OF

3  CONDUCT THAT'S DESPICABLE.

4         IN FACT, THEY DON'T HAVE ANY KIND OF EVIDENCE SAYING:

5            "OH, YES.  WE DELIBERATELY GAVE THESE FORMS,

6  SAYS NOT INTENDING TO LICENSE THEM, WITHOUT TELLING THE ACTIVE

7  PLAYERS THAT WE WERE GIVING AWAY THEIR MONEY, EVEN THOUGH WE

8  KNEW WE COULDN'T GIVE AWAY THEIR MONEY, AND WE DECEIVED THE

9  RETIRED PLAYERS TO GIVE IT OUT."

10        FOR WHAT?  THAT'S ALL ARGUMENT, YOUR HONOR.

11        THIS WHOLE STUFF ABOUT THE AGENT, THE PLOT TO

12  DOMINATE THE WORLD IS ARGUMENT.  WHATEVER ELSE YOUR HONOR MAY

13  THINK, IT'S NOT A BASIS FOR PUNITIVE DAMAGES.  NOT UNDER D.C.

14  LAW.

15        **MR. LECLAIR:**  YOUR HONOR, FIRST OF ALL,

16  MR. BERTHELSEN SAID THEY NEVER INTENDED TO PUT THIS TOGETHER.

17  THEY ALWAYS INTENDED TO KEEP IT SEPARATE, EVEN THOUGH

18  EVERYTHING THEY TOLD US WAS IT WAS GOING TO BE TOGETHER.

19  THAT'S THE REASON WHY IT WAS INTENTIONAL.

20        **THE COURT:**  HE ALSO TESTIFIED THAT HE -- THEY NEVER

21  INTENDED TO PUT IT TOGETHER BECAUSE HE ALWAYS UNDERSTOOD THE

22  CONTRACT TO KEEP THE RETIREDS SEPARATE FROM THE ACTIVE.

23        **MR. KESSLER:**  RIGHT.  HIS TESTIMONY WAS THAT

24  EVERYBODY UNDERSTOOD RETIRED PLAYER MONEY WOULD GO TO RETIRED

25  AND ACTIVE WOULD GO TO ACTIVE.  THAT'S DESPICABLE CONDUCT?

1   THAT'S PUNITIVE DAMAGES THAT SOMEONE COULD ARGUE?

2          YOUR HONOR, HOW COULD THAT BE A REASONABLE BASIS?  IT

3   WILL BE EMOTION.  IT WILL BE INFLAMING THE JURY.  YOU'VE SEEN

4   WHAT MR. PARCHER'S STYLE IS.  AND THAT IF YOU LET HIM LOOSE ON

5   THIS JURY, OKAY.

6          (LAUGHTER.)

7          IF YOU DO THAT ON PUNITIVE DAMAGES, WHAT YOU'RE GOING

8   TO GET IS YOU'RE GOING TO GET INFLAMMATORY STUFF, WILD STUFF

9   NOT IN THE RECORD.  AND THERE'S NO BASIS FOR IT.

10          **MR. PARCHER:**  SOUNDS LIKE HE'S A WORRIED MAN.

11          **THE COURT:**  CAN I JUST SAID AS AN ASIDE ON THIS --

12   THIS IS NOT A RULING ON YOUR MOTION -- BUT THERE WOULD BE A

13   NUMBER OF LAWYERS IN YOUR POSITION, MR. KESSLER, PRAYING THAT I

14   LEAVE THIS IN.  BECAUSE IF THE JURY THINKS THAT THIS IS NOT

15   EVEN CLOSE TO A PUNITIVE DAMAGES CASE, THE WHOLE PLAINTIFFS'

16   CASE CAN GO DOWN THE TOILET, EVEN IF THERE IS SOME OTHER --

17   BECAUSE OF CREDIBILITY.

18          I'M NOT SAYING THE CASE IS THAT WEAK ON PUNITIVE

19   DAMAGES.  BUT IF IT'S AS WEAK AS YOU THINK IT IS, THEN IT'S --

20   AT LEAST MY EXPERIENCE IN THIS DISTRICT IS THAT WE HAVE VERY

21   SMART JURORS WHO CAN SEE THROUGH THE LAWYERING.

22          SO IF IT'S AS WEAK AS YOU SAY IT IS, YOU MAY -- YOU

23   MIGHT BE BETTER OFF LEAVING THE CLAIM IN.

24          BUT HERE, LET ME JUST ADDRESS THE MERITS OF THE

25   MOTION FOR A SECOND.

1          IF YOU TAKE THE -- HERE ARE SOME OF THE POINTS THAT

2   WORK IN THE PLAINTIFFS' FAVOR.  YOU'VE GOT A CONTRACT THAT

3   CALLS FOR AN ESCROW AND NO ESCROW WAS EVER SET UP.

4          YOU'VE GOT A CONTRACT THEY TRIED FOR 14 YEARS TO GET

5   PEOPLE TO SIGN UP, AND NOT ONE PENNY WAS EVER DISTRIBUTED UNDER

6   THIS CONTRACT.  SO WHAT WAS THE -- WHY WAS THAT?  AND WHY WAS

7   IT SO HARD?

8          IT'S TRUE THAT YOU HAVE SOME VERBAL TESTIMONY SAYING:

9          "YES, WE TRIED TO INTEREST THE LICENSEES IN THE

10  GROUP LICENSING CLASS MEMBERS."  BUT IT'S NOT STRONG EVIDENCE.

11  IT'S VERBAL.

12         AND THERE IS IN WRITING A LETTER SAYING:

13         "DON'T USE THEIR NAMES AND IMAGES.  YOU MUST

14  SCRAMBLE."

15         IT WOULD HAVE BEEN NICE IF THAT SAME LETTER HAD SAID:

16         "AND, BY THE WAY, WE STAND READY TO GIVE YOU A

17  GROUP LICENSE ON THESE PEOPLE, OR AT LEAST ON A LARGE NUMBER OF

18  THEM."

19         BUT THE DEFENSE PERSON -- I HAVE FORGOTTEN HER

20  NAME -- WHO WROTE THAT LETTER, DIDN'T DO THAT.  INSTEAD, SHE

21  SAID:

22         "DON'T USE THEM."

23         NOW, I UNDERSTAND THE EXPLANATION.  BUT IF THE -- IF

24  THE DEFENDANTS WERE SO KEEN ON TRYING TO MARKET THESE RIGHTS,

25  THAT WOULD HAVE BEEN A VERY NATURAL OPPORTUNITY TO SAY:

1          "AND, BY THE WAY, WE HAVE 20,000 -- I MEAN 2,053

2    SIGNED UP.  WE WILL LICENSE THESE TO YOU FOR $10,000."

3          OKAY?  FOR SOME REASONABLE SUM OVER AND ABOVE.

4          SOMETHING TO INDICATE IN WRITING THAT THERE WAS A

5    GENUINE, SINCERE EFFORT TO MARKET.

6          NO, THAT DID NOT OCCUR.

7          THAT -- LASHANDA, WAS THAT HER NAME?

8          **MR. HUMMEL:**  LASHUN LAWSON.

9          **THE COURT:**  MS. LAWSON DID NOT DO THAT.  INSTEAD, SHE

10   JUST SAYS:

11          "NO.  SCRAMBLE."

12         THEN, YOU HAVE THE PROBLEM WITH OWING THE FAVOR AND

13   TRYING TO HELP EA OUT AND SAVING THEM MONEY.

14         ONE COULD INFER THAT THE DEFENDANTS WANTED TO

15   MONOPOLIZE -- THAT'S TOO STRONG A WORD -- WANTED TO KEEP

16   SOMEONE ELSE OUT, LIKE TWO DECK OR DOUBLE DECK OR --

17         **MR. KATZ:**  TWO K.

18         **THE COURT:**  WHO?

19         **MR. KATZ:**  TWO K.

20         **MR. PARCHER:**  TAKE TWO.

21         **THE COURT:**  KEEP TAKE TWO OUT OF THE MARKET SO THAT

22   THEY WOULD NOT EMERGE AN ALTERNATIVE SOURCE FOR FOOTBALL

23   PLAYERS.

24         AND THAT THIS WAS A PREEMPTIVE MOVE, A DEFENSIVE MOVE

25   TO BOTTLE UP THE PLAYERS AND -- IT'S NOT EXCLUSIVE, BUT,

1  NONETHELESS, MAKE THE PLAYERS THINK THAT THEY WERE DOING

2  SOMETHING SO THAT THEY WOULD NOT GET ANY INTEREST IN TAKE TWO.

3          WHAT I'M DOING IS RECITING FOR THE RECORD A THEORY

4  THAT THE PLAINTIFFS HAVE IN WORDS, MORE OR LESS, ARTICULATED,

5  WHICH WOULD SUPPLY EVIL MOTIVE, SUPPLY GREED, TRYING TO TRICK

6  THE RETIRED PLAYERS.

7          I RECOGNIZE THAT THERE IS AN ALTERNATIVE VERSION THAT

8  MAKES MR. ALLEN AND HIS GROUP LOOK LIKE ANGELS, GOOD

9  SAMARITANS, HONESTLY.  AND IT GOES SOMETHING LIKE THIS:

10          THEY SET UP A GROUP -- A RETIRED THING.  THE ACTIVE

11  PLAYERS PAID FOR IT.  IT COST MILLIONS OF DOLLARS.  THE ACTIVE

12  PLAYERS PAID FOR IT.  THE ACTIVE PLAYERS TRIED TO FIGURE OUT A

13  WAY TO GET THE RETIREDS SOME MONEY, SO THEY DID ALL THESE

14  AD HOCS, MILLIONS AND MILLIONS OF DOLLARS OF AD HOCS.

15          AND THEN, THEY TRIED THIS GROUP LICENSING THING.  AND

16  IN ORDER TO GET THAT TO WORK YOU NEEDED 11,000, THEY ONLY GOT

17  TWO.  SO NO WONDER IT FAILED.

18          THEY TRIED FOR 14 YEARS TO GET EVERYBODY TO SIGN UP,

19  BUT IT NEVER GOT TO THE CRITICAL MASS.  THAT'S WHY NO MONEY WAS

20  EVER PAID UNDER THIS.

21          THAT'S AN ALTERNATIVE THEORY.

22          AND NOW NO GOOD DEED EVER GOING UNPUNISHED,

23  MR. PARCHER IS ON THEIR CASE.  THAT'S THE ALTERNATIVE.

24          BUT TO GO BACK TO THE EVIL VERSION FOR A MOMENT, THE

25  EVIL VERSION CONCEIVABLY COULD BE ACCEPTED BY THE JURY.  IF SO,

1  THAT COULD LEAD TO PUNITIVE DAMAGES.

2          I THINK THE MORE FUNDAMENTAL PROBLEM THAT THE COURT

3  HAS IS THE -- IF THERE IS A BREACH OF FIDUCIARY DUTY, AND

4  THERE'S NO CONTRACT VIOLATION, THERE MAY NOT BE A VIABLE AVENUE

5  TO COLLECT DAMAGES.

6          SO THAT'S THE ONE THAT I'M GOING TO RESERVE ON.  I'M

7  RESERVING ON ALL OF THESE.  YOU CAN MAKE ALL YOUR MOTIONS AT

8  THE END, ANYWAY.

9          SO I'M AFRAID THAT I'M GOING TO HAVE TO LET

10  MR. PARCHER LOOSE ON THE JURY TO SEE WHAT HE CAN DO.

11          **MR. KESSLER:**  I'LL TAKE IT AS A GIFT, YOUR HONOR.

12          **THE COURT:**  ALL RIGHT.  TAKE IT AS A GIFT.

13          SO THOSE MOTIONS ARE ALL DENIED WITHOUT PREJUDICE FOR

14  RENEWAL AT THE END OF THE VERDICT.

15          I HAVE TO BRING THIS TO A CLOSE.  IS THERE ANYTHING

16  MORE RIGHT NOW?

17          **MR. KESSLER:**  NO, YOUR HONOR.  AGAIN, I WOULD NOTE

18  THAT ON THIS AREA, IN PARTICULAR, IN THE INSTRUCTIONS AND IN

19  THE VERDICT FORM, I WOULD ASK YOUR HONOR -- WE WILL BE

20  SUBMITTING IN OUR BRIEF -- TO PLEASE MAKE SURE THAT YOU REVIEW

21  D.C. LAW ON THIS PUNITIVE DAMAGES --

22          **THE COURT:**  I'M GOING TO LOOK AT THAT AS SOON AS --

23          **MR. KESSLER:**  AND THE VERDICT FORM, IN PARTICULAR, WE

24  THINK, DOESN'T HAVE IT IN A WAY WE THINK IS CONSISTENT.

25          **THE COURT:**  WE'LL HAVE OUR CONFERENCE TOMORROW

1    STARTING AT 7:30.

2              THANK YOU.

3         **MR. KESSLER:**  THANK YOU, YOUR HONOR.

4         **MR. PARCHER:**  THANK YOU, YOUR HONOR.

5         (THEREUPON, THIS TRIAL WAS CONTINUED UNTIL THURSDAY,

6    NOVEMBER 6, 2008, AT 7:30 O'CLOCK A.M.)

7                              -   -   -   -

8

9

10

11

12

13

14

15                    **CERTIFICATE OF REPORTER**

16         I CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT

17   FROM THE RECORD OF PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

18

19   DATE:  WEDNESDAY, NOVEMBER 5, 2008

20

21             S/B KATHERINE POWELL SULLIVAN
          _____

22        KATHERINE POWELL SULLIVAN, CSR #5812, RPR, CRR
                    U.S. COURT REPORTER

23

24

25

I N D E X

**DEFENDANTS' WITNESSES**                                      **PAGE**    **VOL.**

**NOLL, ROGER**
REDIRECT EXAMINATION RESUMED BY MR. KESSLER        2312        11
RECROSS EXAMINATION BY MR. HUMMEL                  2326        11
FURTHER REDIRECT EXAMINATION BY MR. KESSLER        2342        11
FURTHER RECROSS EXAMINATION BY MR. HUMMEL          2350        11
FURTHER REDIRECT EXAMINATION BY MR. KESSLER        2350        11


**UPSHAW, GENE**
DEPOSITION TESTIMONY READ BY MS. DONOVAN            2360        11
AND MR. TAUB


**PLAINTIFFS' WITNESSES**                                      **PAGE**    **VOL.**

**SKALL, HOWARD**
DEPOSITION TESTIMONY READ BY MR. HILBERT            2407        11
AND MR. GARZA

# E X H I B I T S

| TRIAL EXHIBITS | IDEN | VOL. | EVID | VOL. |
|---|---|---|---|---|
| 113 | | | 2382 | 11 |
| 1268-108 | | | 2382 | 11 |
| 2272 | | | 2382 | 11 |
| 1164-4 | | | 2411 | 11 |