Todd Padnos (Bar No. 208202)
*tpadnos@dl.com*
DEWEY & LEBOEUF LLP
One Embarcadero Center, Suite 400
San Francisco, CA 94111
Tel: (415) 951-1100; Fax: (415) 951-1180

Jeffrey L. Kessler (*pro hac vice*)
*jkessler@dl.com*
David G. Feher (*pro hac vice*)
*dfeher@dl.com*
David Greenspan (*pro hac vice*)
*dgreenspan@dl.com*
DEWEY & LEBOEUF LLP
1301 Avenue of the Americas
New York, NY 10019
Tel: (212) 259-8000; Fax: (212) 259-6333

Kenneth L. Steinthal (*pro hac vice*)
*kenneth.steinthal@weil.com*
WEIL, GOTSHAL & MANGES LLP
201 Redwood Shores Parkway
Redwood Shores, CA 94065
Tel: (650) 802-3000; Fax: (650) 802-3100

Bruce S. Meyer (*pro hac vice*)
*bruce.meyer@weil.com*
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, NY 10153
Tel: (212) 310-8000; Fax: (212) 310-8007

Attorneys for Defendants National Football League Players Association
and National Football League Players Incorporated d/b/a Players Inc

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| BERNARD PAUL PARRISH, HERBERT ANTHONY ADDERLEY, WALTER ROBERTS III,<br><br>Plaintiffs,<br><br>v.<br><br>NATIONAL FOOTBALL LEAGUE PLAYERS ASSOCIATION and NATIONAL FOOTBALL LEAGUE PLAYERS INCORPORATED d/b/a/ PLAYERS INC,<br><br>Defendants. | Case No. C 07 0943 WHA<br><br>**DEFENDANTS' REPLY TO PLAINTIFFS' NOVEMBER 5, 2008 BRIEF RE: "COURT'S DRAFT CHARGE TO THE JURY" PROVIDED NOVEMBER 4, 2008** |

Defs.' Reply to Pls.' Nov. 5, 2008 Brief Re:  Civ. Action No. C07 0943 WHA
Court's "Draft Charge to the Jury" Provided November 4, 2008

# MEMORANDUM OF POINTS AND AUTHORITIES

Defendants hereby reply and object to Plaintiffs' November 5, 2008 Brief Re: "Court's Draft Charge to the Jury" Provided November 4, 2008. Defendants expressly preserve all objections.

## I. DEFENDANTS' RESPONSES AND OBJECTIONS TO PLAINTIFFS' REQUESTS FOR MODIFICATIONS

**Instruction No. 16:**

Plaintiffs' request for a separate instruction on Defendants' failure to create an escrow account (which would have contained no "moneys generated by such licensing of retired player group rights" since all such moneys were paid to the GLA Class members whose rights were licensed) is improper, highly prejudicial to Defendants, and intended to confuse the jury. As discussed at length during today's hearing on Defendants' Motion for Judgment as a Matter of Law, Plaintiffs' <u>only</u> purported evidence of damages is Mr. Rowley's arithmetic calculations of "equal" shares of the GLR pool:

> Q. IT'S SUCH A SIMPLE QUESTION. REALLY, I WILL ASK YOU VERY NICELY, OKAY, AND BE VERY CLEAR. IF THE JURY FINDS, THE JURY FINDS --
>
> A. YES.
>
> Q. -- THAT RETIRED PLAYERS ARE NOT ENTITLED TO ANY LICENSING REVENUES THAT WERE GENERATED SOLELY BY ACTIVE PLAYER LICENSING, OKAY? IF THE JURY FINDS THAT, AND THEY ALSO FIND THAT THE GLR POOL WAS ONLY ACTIVE PLAYER LICENSING MONEY, IN THOSE TWO ASSUMPTIONS DO YOU AGREE WITH ME THAT YOUR CALCULATIONS, THEREFORE, SHOW NO DAMAGES, IF THAT'S WHAT THEY FIND?
>
> A. LIABILITY WOULD NOT HAVE BEEN ESTABLISHED, WHICH WAS ONE OF MY ASSUMPTIONS.
>
> \* \* \*
>
> Q. YOU'VE GIVEN THE JURY NO BASIS TO CALCULATE ANY DAMAGES IF THEY FIND THAT RETIRED PLAYERS ARE NOT ENTITLED TO ACTIVE PLAYER LICENSING MONEY AND ALL THE MONEY IN THE GLR POOL IS ACTIVE PLAYER LICENSING MONEY, CORRECT?

A.  IF THOSE TWO ASSUMPTIONS ARE TRUE, THEN, YES.

Trial Tr. 1937:3-1938:15 (Testimony of Mr. Rowley). The consequence is that Plaintiffs have <u>no</u> evidence of damages for any breach based merely upon Defendants' failure to create an escrow account. Indeed, if the jury were to find that Defendants had no contractual obligation to share active player licensing revenues with GLA Class members, but that Defendants nevertheless breached the RPGLA by failing to create an escrow account, the jury could not reasonably award the GLA Class the tens of millions of dollars in "equal shares" of the GLR pool that Plaintiffs are seeking. This is one of the reasons why Defendants believe that the Court should have granted their Rule 50 motion as to Plaintiffs' breach of contract claim. Providing a separate instruction on the failure to create an escrow account would create a risk that the jury could award damages based upon an alleged contractual breach that has absolutely no nexus to the claimed damages.

If, however, the Court is inclined to provide a separate instruction on the failure to create an escrow account, Defendants request that the Court further instruct the jury that if this is the only contractual breach they find, they may only award nominal damages.

**Instruction 17**:

As described fully in Defendants' other briefing on this issue, Defendants believe that Draft Instruction 17 does not go nearly far enough to diffuse the high likelihood of juror confusion over the fact that Plaintiffs have disavowed any claim that Defendants breached any contractual or fiduciary obligations arising from the RPGLA by licensing six or more retired players pursuant to ad hoc agreements. See, e.g., Pls.' Opp'n to Defs.' Mot. to Decertify, Rec. Doc. 371 (Aug. 21, 2008) at 10 ("Neither the Court nor Plaintiffs have suggested that individual <u>ad hoc</u> agreements themselves are improper or that they require sharing of the individually negotiated payments…."). Defendants will not repeat all of those arguments here, but instead respond to Plaintiffs' argument that Draft Instruction 17 goes too far.

Bluntly, Plaintiffs' brand new contention that "under the RPGLA, it was a breach

of fiduciary duty for the Defendants to choose to do ad hoc license agreements without including Plaintiffs in the shared group license with that same third party licensee" is a blatant reversal of their prior positions, and a backdoor attempt to confuse the jury with a claim that is not in this case. Pls.' Brief at 2. Plaintiffs are apparently now arguing that, for example, when Mr. Adderley's and approximately 29 other retired players' rights were licensed pursuant to ad hoc agreements to Upper Deck (see Defs.' Mot. for Summary Judgment at 8-9 (June 13, 2008)), Defendants should have instead licensed their rights pursuant to RPGLAs, and distributed the resulting revenues with the GLA Class. This would, of course, create irreconcilable conflicts between the GLA Class members who did and did not receive ad hoc payments, and would require immediate decertification of the class.

In fact, by denying Defendants' Motion to Decertify the Class, the Court has already ruled that Plaintiffs may not assert a legal challenge to Defendants' "use in retired player group licensing of ad hoc agreements, rather than the GLAs." See Defs.' Motion to Decertify, Rec. Doc. 361 (Aug. 15, 2008) at 4; Order Denying Motion to Decertify, Rec. Doc. 391 (Sept. 2, 2008) at 2.

Equally improper is Plaintiffs' request that the Court add language to the effect that Defendants' use of ad hoc license agreements "cannot be a defense to their breach of the RPGLA." Pls. Brief at 1. Defendants' use of ad hoc agreements is an essential part of their defense to Plaintiffs' claim that Defendants did not act in good faith with respect to GLA Class members, that Defendants made "no" efforts to market GLA Class members, and that GLA Class members received "nothing." Moreover, the execution of an ad hoc license agreement each and every time a GLA Class member's rights were utilized by a third party licensee reflects a course of dealing that is critical to Defendants' ability to defend against Plaintiffs' claim that the so-called "collective" license agreements conveyed GLA Class members' rights. Plaintiffs' proposed instruction suggests that the jury should disregard all of this critical evidence and should be rejected out of hand.

**Instruction No. 27**:

Plaintiffs' request for an instruction on construing ambiguities in a contract against the drafter is a <u>major</u> departure from D.C. law, which indicates that the jury not be given <u>any</u> instruction at all on this secondary rule of contract interpretation, let alone any instruction that ambiguities should be "strongly" construed against the drafter. Indeed, Defendants believe such an instruction has <u>never</u> been approved by any D.C. court, and the <u>Standardized Civil Jury Instructions for the District of Columbia</u> (2008) ("D.C. Standard Instructions") provide for <u>no</u> such instruction.

In fact, the D.C. Standard Instructions do not include <u>any</u> mention that ambiguities are to be construed against the drafter because, under D.C. law, that rule is strongly disfavored. The principle is only used by courts (<u>not juries</u>) as a last resort and only when all other rules of contract interpretation fail to resolve the ambiguities at issue. <u>Sagalyn v. Foundation for Preservation of Historic Georgetown</u>, 691 A.2d 107, 112-114 (D.C. 1997) (the rule that ambiguities are construed against the drafter "applies only after the ordinary rules of construction have been applied and the agreement is still ambiguous;" "[h]ere, the ambiguity is resolved by reference to other rules of construction as previously discussed. Therefore, we need not apply this rule."); <u>Wisconsin Public Power Inc. System v. F.E.R.C.</u>, 918 F.2d 225, 1990 WL 183796 at *4 (D.C. Cir. 1990) ("WPPI challenges this interpretation and argues that the Commission should have construed the Agreement against the drafter, WEPCO. But as the Commission noted, 'the mere fact that WEPCO may have drafted the contract does not automatically dictate its interpretation against WEPCO and for WPPI. <u>Contra proferentum</u> has never been and is not now the sole guide to interpretation."); <u>D.C. Dept. Of Housing and Comm. Development v. Pitts</u>, 370 A.2d 1377, 1379-80 (D.C. 1977) (rule that contract ambiguities be resolved against the drafter is a "secondary rule of contract interpretation" that "arises when 'certain other rules (of contract interpretation) have failed to give the writing one definite meaning). Because any instruction on construing against the drafter is inherently prejudicial to Defendants, no instruction should be given on this rule at all, let alone any instruction to "strongly" construe against the drafter. Defendants therefore object to any such instruction.

Further, as a matter of D.C. law, the jury must be instructed that even if it construes the RPGLA against Defendants, the ultimate interpretation of the contract must be reasonable. Plaintiffs' suggestion otherwise – that an instruction on reasonableness is "unsupported by D.C. law" – is simply wrong. Under D.C. law, contracts must be construed reasonably and in a way that makes commercial sense. <u>Nello L. Teer Co. v. Wash. Metropolitan Area Transit Authority</u>, 921 F.2d 300, 302 (D.C. Cir. 1990) ("The Court of Appeals emphasized the 'fundamental principle' that contract provisions be construed so as to honor the parties' reasonable expectations at the time they executed the contract."); <u>A/S Ivarans Rederi v. U.S.</u>, 938 F.2d 1365, 1369 (D.C. Cir. 1991) ("Finally, the Commission's construction makes commercial sense. The Atlantic and Gulf Agreements were drafted together and had never overlapped before. The Commission wisely decided on a construction that would preserve commercial expectations by preserving the agreements' symmetry."); Restatement (Second) of Contracts § 206 (1981) ("In choosing among the <u>reasonable</u> meanings of a promise or agreement or a term thereof, that meaning is generally preferred which operates against the party who supplies the words or from whom a writing otherwise proceeds.") (emphasis added). Indeed, one of the leading D.C. Standard Instructions on contract interpretation directs the jury to "consider what a <u>reasonable</u> person…would have believed was the meaning of the words." § 11.13.

**Instruction No. 28**:

Defendants do not believe that the Court's draft instruction overemphasizes the EA witness's testimony. Moreover, a fundamental issue in this case is the difference between active and retired player licensing, and, by extension, the difference between the terms of the active player GLA and the RPGLA. There is no dispute as to this distinction, and thus the Court's instruction is an appropriate step to ensure that there is no confusion as to the meaning of the first sentence of Paragraph 1(A) of one of the EA Agreements, <u>i.e.</u>, the undisputed fact that the paragraph referred only to active NFL players.

**Instruction No. 29**:

Plaintiffs' proposed insertion – that the jury only look at third party license

agreements other than the EA agreement "if [they] see it as appropriate" – is totally improper. Since Plaintiffs are claiming revenues from the entire GLR pool, which includes licensing revenues from contracts that do not even include the word "retired" (such as the NFL Sponsorship and Internet Agreement), and from other third party license agreements that could not possibly convey retired player rights (such as fantasy football and rookie trading card agreements), it would be completely inappropriate for the jury to consider only the EA agreements.

Defendants acknowledge Plaintiffs' argument that the RPGLA somehow provides for a share of active player licensing revenues, but if the jury agrees with this theory (which Defendants do not believe any reasonable jury could do), then there would be no need to review the EA agreements in the first place. If, however, the jury decides to consider the EA agreements (which is what Draft Instruction 28 specifically contemplates), then it would be completely improper for the jury not to consider the other third party license agreements whose revenues flow into the GLR pool.

**Instruction No. 31**:

Plaintiffs may be entitled only to those damages suffered within the three-year limitations period from February 14, 2004 through February 14, 2007. John McShain, Inc. v. L'Enfant Plaza Prop., Inc., 402 A.2d 1222, 1230-31 (D.C. 1979) (limiting the plaintiff's damages to those suffered during the applicable statutory period). Plaintiffs fail to specify in any comprehensible way what additional damages they could possibly be entitled to, which purportedly "extend after the end of the class period…because Defendants changed the form." The bottom line is that, as briefed fully in Defendants' Memorandum and Objections Regarding the Court's Draft Charge, Rec. Doc. 541 (Nov. 5, 2008), at 7 ("Defs.' Objections"), Plaintiffs are attempting to confuse the jury into awarding them four years worth of damages in a three-year statute of limitations period. The Court should not permit this and should instead give an instruction that makes clear that Plaintiffs can only seek damages for any breach in three years

(February 14, 2004 to February 14, 2007), the same length as the class period. See Defendants' Objections at 8.

**Instruction No. 38**:

Plaintiffs' objection to the Court's instruction on control as a factor in determining whether a fiduciary relationship existed seriously misstates the law. Under D.C. law, the element of control is a <u>dispositive</u> factor in deciding whether a fiduciary relationship exists." Judah v. Reiner, 744 A.2d 1037, 1040 (D.C. 2000) (finding that the right to control is the "determinative" factor); see also Giles v. Shell Oil Corp., 487 A.2d 610, 611 (D.C. 1985) ("While it is said that at common law there are four elements which are considered upon the question whether the relationship of a master and servant exists . . . the really <u>essential</u> element of the relationship is the right of control, that is the right of one person, the master, to order and control another, the servant, the performance of work by the latter, and the right to direct the manner in which the work shall be done."). No D.C. court has limited the consideration of control as the "determinative" factor to simply the employer/employee relationship, as Plaintiffs suggest.

Plaintiffs cite to a completely inapposite line of cases involving a broker/investor relationship to contend that, contrary to the multiple pronouncements of the D.C. courts, lack of control militates in favor of finding that an agency relationship exists. See Pls.' Br. at 3:14-24. This argument is unavailing. First, a broker/investor relationship is a different type of relationship, implicating unique duties arising from the trust and confidence the investor reposes in the broker's special skills, and is not at all relevant to the agency theory which Plaintiffs assert in this case. See, e.g., MidAmerica Fed. Sav. and Loan Ass'n v. Shearson/American Exp., Inc., 886 F.2d 1249, 1258 (10th Cir. 1989) (affirming jury instruction that "[i]n the context of securities investments, a fiduciary duty develops between a broker and a customer when a broker holds itself out to a customer as possessing special knowledge or expertise with respect to security investment advice and recommends an investment by the customer in a particular security.").

Second, under an agency theory, the relevant analysis is whether the principal had the right to exercise control over the agent. Judah, 744 A.2d at 1040. None of Plaintiffs' cited authorities found that a principal's lack of exercise of control created a fiduciary relationship. One case expressly did not find any fiduciary duty. See Merrill Lynch v. Cheng, 901 F.2d 1124, 1129 (D.C. Cir. 1990). Another did not even involve a breach of fiduciary duty claim and, in any event, found the plaintiff to be the defendant's agent because of "proof of Gulf Printing's control over Robles." Robles v. Consolidated Graphics, Inc., 965 S.W.2d 552, 558 (Tex. Ct. App. 1997). Plaintiffs' citations to cases from outside D.C., including to two federal cases from the 1970s, are simply irrelevant; D.C. law controls in this case. Plaintiffs are simply trying to avoid application of the well-established D.C. law that the principal must be able to exercise control over the agent.

Moreover, as Defendants have discussed in their submissions, the proper instruction on this point should also explain that the element of control is the sole and determinative factor to consider in deciding whether a fiduciary relationship exists, and that the requisite level of control is "control over the day-to-day operations . . . and the manner in which the work is performed." Ames v. Yellow Cab of D.C., Inc., Civ. No. 00-3116, 2006 WL 2711546, *5 (D.D.C. Sept. 21, 2006); see also Defendants' Objections at 5-7.

**Instruction No. 39**:

Instruction No. 39 should not be given, because it is inconsistent with D.C. law in stating that one factor indicating an agency relationship is if the licensor is paid "only through marketing by the licensee to third parties and most or all of any third-party revenue was to be paid to the licensor." Draft Charge at 17:8-12. There is no case in which this factor has been applied under D.C. law. Rather, the only financial arrangement that D.C. courts consider when evaluating whether an agency relationship exists is whether payments from a principal to the agent exist, not vice versa, as the payments to a purported agent from a principal is a factor indicative of an agency relationship under D.C. law. See Judah, 744 A.2d at 1040; Ames, 2006 WL 2711546 at *6 (holding that no agency relationship existed in part because of no payment by

purported principal to purported agent). Draft Instruction No. 39 would suggest that any license agreement that calls for the payment of a royalty, rather than a fixed sum at the outset of the licensing relationship, could create a fiduciary relationship. This is not the law in any jurisdiction. See, e.g., Mellencamp v. Riva Music Ltd., 698 F. Supp. 1154, 1159 (S.D.N.Y. 1988) (holding that "the express and implied obligations assumed by a publisher in an exclusive licensing contract [calling for payment of royalties] are not, as a matter of law, fiduciary duties.").

**Instruction No. 41**:

Plaintiffs' requested instruction on the recognition of a fiduciary relationship based on surrounding circumstances is not applicable to this case. There is simply no basis for such an instruction in this case, which is contrary to this Court's rulings on class certification and summary judgment. This Court has already held, in no uncertain terms, that the GLA Class's breach of fiduciary duty claim was certified "only insofar as [it] arises out of the GLAs between the NFLPA and retired players." Class Cert. Order at 14 & 10 (Apr. 29, 2008) (Rec. Doc. 275).

Plaintiffs' proposed instruction is rehashing an argument they made for the first time in their Opposition to Defendants' Motion for Summary Judgment that "[f]ederal courts in Virginia and D.C. recognize that unions owe fiduciary duties to their members." Pls.' Opp'n to Defs.' Mot. for Summ. J., R. Doc. 310, July 1, 2008, at 33 ("Pls.' Opp'n"). However, this Court rejected this argument by holding that the determination of whether there was a fiduciary relationship will be "dictated by the terms of the GLA." Order Denying Defs.' Mot. for Summ. J., Rec. Doc. 353, Aug. 6, 2008, at 7 (emphasis added).

To the extent Plaintiffs suggest that a fiduciary duty exists simply because some Plaintiffs may have been retired player members of the NFLPA, this argument is contrary to law and must be rejected. First, Plaintiffs have offered no trial evidence that all or, for that matter, any specific number of the class members were NFLPA members in any relevant year, which would raise significant class issues. Second, the relevant case on this point cited by Plaintiffs provides only that a labor union's duty to fairly deal and represent its members in collective

9

bargaining is "in a sense fiduciary in nature," and does not give rise to a cause of action for breach of fiduciary duty. See Int'l Brotherhood of Teamsters v. Wirtz, 346 F.2d 827, 832 (D.C. Cir. 1965) (citing Int'l Union of Elec., R. & M. Workers v. NLRB, 307 F.2d 679, 683 (D.C. Cir. 1962) ("The requirement of fair dealing between a union and its members is in a sense fiduciary in nature;" "the Union is bound by law to represent all employees in the bargaining unit.")). Any GLA Class members who were retired members of the NFLPA have not – and could not have been – represented by the NFLPA in collective bargaining. See generally Allied Chem. and Alkali Workers of Am. v. Pittsburgh Plate Glass Co., 404 U.S. 157 (1971).

This Court has already instructed the jury numerous times on this point. See Trial Tr. 487:24-25, 488:2-3, 488:4-8, 489:6-8 ("THE COURT: . . . This case is not about a broad-ranging duty of fairness by the union to its members. . . . This case is about the GLA that the class members signed. . . . The Court has previously said there are two issues for you to decide: The meaning of the GLA and whether it was violated by the defendants, and secondly, whether or not the defendants violated any fiduciary duty as it relates to the GLA."); ("THE COURT: [A]t the end of the day the fiduciary duties that count have to be related to the GLA. Otherwise, it's not in this case."). A jury instruction stating the exact opposite would therefore be wholly inappropriate.

**Instruction No. 43**:

The Court's draft charge already includes at least three instructions on the duty of loyalty. See Court's Draft Charge at 18:14-16 ("A fiduciary also has a duty of loyalty toward his principal. This means that the fiduciary must put the principal's interests ahead of his own, as to all matters connected with the relationship."), 18:16-17 ("The fiduciary is also required to refrain from conduct that is adverse to or likely to damage this principal's interests."); 18:22-25 ("A fiduciary has a duty not to acquire a material benefit from a third party in connection with transactions conducted or other actions taken on behalf of the principal or otherwise through the fiduciary's use of his position."). Further instruction on this same point, i.e., that a fiduciary has to act in the interest of his principal, is unduly repetitive and prejudicial to Defendants.

**Instruction No. 45**:

Plaintiffs' suggested changes to Instruction 45 should be rejected in their entirety. First, the Court has already ruled that this case does not involve any violation by <u>anyone</u> – EA or Defendants – of any player's intellectual property rights. Trial Tr. 409-712. Plaintiffs' attempt to limit lines 16-17 to read only that "there is no claim in this case that <u>Electronic Arts</u> violated the intellectual property rights of any retired player by scrambling" is incomplete and prejudicial because it unfairly suggests that <u>Defendants</u> may have violated the intellectual property rights of retired players by insisting on scrambling the identities of players for whom EA did not own the rights. Moreover, this instruction should not be limited, as Plaintiffs suggest, to "intellectual property rights" as opposed to "player's rights." There is no reason to believe that the lay persons on the jury have any understanding of "intellectual property rights" without further instruction.

## II. DEFENDANTS' RESPONSES AND OBJECTIONS TO PLAINTIFFS' REQUESTS FOR ADDITIONAL INSTRUCTIONS

### A. <u>Plaintiffs' Improper Request for an Instruction re: Breach of the Covenant of Good Faith and Fair Dealing</u>

Plaintiffs once again seek a jury instruction regarding their never-asserted claim for breach of the implied covenant of good faith and fair dealing. Although each contract contains an implied covenant, none of Plaintiffs' four complaints ever contained this claim on which they now seek an instruction. The Court is correct in rejecting Plaintiffs' request for an instruction on their untimely raised and not cognizable claim for breach of the implied covenant of good faith and fair dealing.

Plaintiffs first raised this claim in their Statement of the Claims in the Joint Final Pretrial Order, although they did not provide any specifics. <u>See</u> Joint Final Pretrial Order (Oct. 8, 2008) at 6 ("Plaintiffs contend that each of the above actions constitute . . . a breach of the covenant of good faith and fair dealing . . . ."). Now, on the eve of the jury charge, Plaintiffs explain their breach of the implied covenant claim is "a complaint that instead of ensuring group licensing under the RPGLA, the Defendants designed around the RPGLA with the creative use

of ad hoc licenses, in an effort to deprive the Class from 'receiv[ing] the fruits of contract.'" Pls.' Br. at 6:6-8.

But Plaintiffs' attempt to avoid the black letter principle that a breach of implied covenant claim cannot duplicate the allegations in an extant claim, (Jacobson v. Oliver, 201 F. Supp. 2d 93, 98 n. 2 (D.D.C. 1996) ("[A] party is not entitled to maintain an implied duty of good faith claim where the allegations of bad faith are 'identical to' a claim for 'relief under an established cause of action.")), leads them into an even greater legal barrier. This is the <u>exact</u> claim that Plaintiffs expressly disavowed in order to avoid class decertification. Specifically, Plaintiffs argued in their Opposition to Defendants' Motion to Decertify that "[t]his case is not about the payments made pursuant to individually negotiated <u>ad hoc</u> agreements . . . ." Pls.' Opp'n to Defs.' Mot. to Decertify (Aug. 21, 2008) at 7; <u>see also</u> <u>id.</u> at 9 ("The Court has consistently rejected the Defendants' persistent efforts to try to make this case one that addresses payment under individual agreements. It is not about that . . . ."). As if that were not clear enough, Plaintiffs' unambiguously concluded their Opposition by stating that "Neither the Court nor Plaintiffs have suggested that individual <u>ad hoc</u> agreements themselves are improper . . . ." <u>Id.</u> at 10. Plaintiffs cannot resuscitate a claim they expressly disavowed, and even if they could do so, the GLA Class would have to immediately be decertified.

As if this were not enough, the fact that this claim has never been asserted in any of their four complaints, standing alone, is sufficient to reject any instruction. See <u>Travel Ctr. of Fairfield County, Inc. v. Royal Cruise Line Ltd.</u>, 154 F. Supp. 2d 281, 289 (D. Conn. 2001) ("Given that four iterations of the complaint have been filed in this case, the Court does not think it overly onerous to require that plaintiff include all its relevant substantive claims in the final version, instead of confronting the defendant with a new theory of liability at trial, after the opportunity for discovery has passed."). Even the model jury instruction that Plaintiffs originally cited as supporting authority, and then conveniently withdrew although their proposed instruction still quotes it nearly verbatim, provides that "[t]his instruction should be given <u>only</u> when the plaintiff has brought <u>a separate cause of action</u> for breach of the covenant of good faith

and fair dealing." Judicial Council of California Civil Jury Instructions, No. 325 (2008) (emphasis added).

Plaintiffs' argument that there is no surprise in their breach of implied covenant claim is factually incorrect and legally unsupported. Defendants had no opportunity to develop discovery on a claim that was first raised months after the close of fact discovery, and articulated after the close of both parties' cases-in-chief at trial. Moreover, the mere fact that Plaintiffs placed in their Statement of the Claims in the Joint Final Pretrial Order a reference to a breach of implied covenant claim does nothing to rescue this claim, and Plaintiffs' cases are completely inapposite. The Ninth Circuit's decision in 999 v. C.I.T. Corp. has nothing to do with the timing of a claim or anything related to a final pretrial order, but instead concerned whether the district court properly denied the defendants' request to withdraw an instruction on the breach of the implied covenant that it had originally requested. 776 F.2d 866, 870 (9th Cir. 1985). In the other case cited by Plaintiffs, Ryan v. Illinois Department of Children & Family Services, the district court granted plaintiffs leave to amend their complaint, and everyone had proceeded for months as if they had done so. 185 F.3d 751, 763 (7th Cir. 1999).

### B. Plaintiffs' Improper Request for an Instruction re: Disgorgement

The Court was also correct in rejecting Plaintiffs' request for an instruction on disgorgement as a form of damages for breach of fiduciary duty, and should likewise reject Plaintiffs' latest request. "A party is entitled to an instruction about his or her theory of the case if it is supported by law and has foundation in the evidence." Jones v. Williams, 297 F.3d 930, 934 (9th Cir. 2002); see also Gen. Elec., Inc. v. Taalohimoineddin, 579 A.2d 729, 734 (D.C. 1990). Plaintiffs have never asserted in any of their four complaints any claim for disgorgement.

Nor have Plaintiffs advanced any evidence in support of such a claim. Plaintiffs have not offered any damages study or evidence regarding the amount that allegedly should be disgorged. The only damages theory offered by Plaintiffs' damages expert is for an "equal share" of the GLR pool. As the authorities Plaintiffs themselves cite recognize, disgorgement is a remedy only meant to prevent unjust enrichment by allowing the beneficiary to obtain the

benefits derived from the breach. In re Estate of Corriea, 719 A.2d 1234, 1240 (D.C. 1998) ("The remedy of disgorgement, much like that of a constructive trust, is meant to provide just compensation for the wrong, not to impose a penalty; it is given in accordance with the principles governing equity jurisdiction, not to inflict punishment but to prevent an unjust enrichment.") (internal quotations omitted); Restatement (First) of Restitution, (2008) § 138 cmt. a ("As an alternative, the beneficiary is entitled to obtain the benefits derived by the fiduciary through the breach of duty."). Generally a claim of disgorgement is for the "net profits" that were earned as a result of the breach of fiduciary duty. See In re Estate of Corriea, 719 A.2d at 1241. Plaintiffs, however, have offered no analysis about Defendants' alleged profits for any claimed breach, let alone net profits, in this case. Having no evidence or damages theory regarding the purported benefits derived by Defendants from the alleged breach of fiduciary duty, Plaintiffs have no basis for seeking disgorgement in this case. Any disgorgement award would require the jury to select a speculative "net profit" figure that has not been offered into evidence.

Even if a jury instruction on disgorgement were justified in this case (which it is not), Plaintiffs' proposed instruction is also improper because it misstates and ignores the law of disgorgement. Plaintiffs' instruction states that disgorgement is "an additional form of damages available to Plaintiffs." However, as the authorities relied upon by Plaintiffs state, disgorgement is an alternative remedy. Restatement (First) of Restitution, (2008) § 138 cmt. a ("A fiduciary who commits a breach of his duty as fiduciary is guilty of tortuous conduct and the beneficiary can obtain redress either at law or in equity for the harm done. As an alternative, the beneficiary is entitled to obtain the benefits derived by the fiduciary through the breach of duty.") (emphasis added).

Plaintiffs' proposed instruction on disgorgement is also incorrect because it omits that, under District of Columbia law, disgorgement is not an available remedy where the plaintiffs have received the benefits they expected. Breezevale Ltd. v. Dickinson, 879 A.2d 957, 970 n.12 (D.C. 2005) (quoting Remsen Partners, Ltd. v. Stephen A. Goldberg Co., 755 A.2d 412, 416 (D.C. 2000) ("There is no equitable reason for ordering disgorgement where plaintiffs have

received the benefits they expected.")). The court in Remsen explained, "recovery is generally not allowed where there is no proof that the services rendered to the party were defective or that in any other way the party did not receive value for the money paid." 755 A.2d at 416. Where, as here, plaintiffs have offered no evidence that the licensing rights of each of the individual GLA class members had any economic value or that the class members did not receive what they expected, disgorgement is not available under D.C. law.

Plaintiffs' proposed instruction also omits that, where a defendant received no fees or other benefit for serving as a fiduciary, there is nothing to disgorge. See In re Randolph-Bray, 942 A.2d 1142, 1147 n.10 (D.C. 2008) (holding that a prior opinion allowing a disgorgement remedy was inapposite because appellant "earned no fees for her service as fiduciary that she could be required to forfeit."). Where, as here, the Defendant received no benefit from acting as an alleged fiduciary of the GLA Class members – and there is no question that the "equal shares" of the GLR pool from 2004 to 2007 have already been distributed – there can be no disgorgement remedy. Plaintiffs' effort to cast the money they seek as Defendants' "commissions" in order to augment damages is mere rhetoric that has no basis in the evidence or claims of this case.

Moreover, Plaintiffs severely misstate the law in stating that "Plaintiff need not prove its harm at all," or that "[f]or each violation of duty of loyalty, Plaintiffs need only to prove only [sic] that Defendants breached their duty of loyalty, not that their breach proximately caused them injury." Pls.' Br. at 7:19-21, 8:25-27 (emphasis added). That is simply not the law in the District of Columbia. See, e.g., Remsen Partners, Ltd. v. Stephen A. Goldberg Co., 755 A.2d 412, 420 (D.C. 2000) (holding that disgorgement is not appropriate if the plaintiffs suffer no injury because it would be an unjust enrichment, and the court "generally disfavors a remedy that entails unjust enrichment"). Indeed, an authority Plaintiffs themselves cite flatly rejects applying the principle when a plaintiff seeks compensatory damages in addition to disgorgement, which is clearly the case here. See Hendry v. Pelland, 73 F.3d 397, 401-402. As the D.C. Circuit explained, it was solely because plaintiffs in Hendry revised their claims so that they sought only disgorgement of legal fees, and no compensatory damages, that "they needed to

prove only that [defendant] breached his duty of loyalty, not that his breach proximately caused them injury." Id. at 401.

The D.C. Circuit contrasted that with the general rule "that clients must prove injury and proximate causation in a fiduciary duty claim against their lawyer if they seek <u>compensatory damages</u>, not if, as here, they seek only <u>forfeiture of legal fees</u>." Id. at 401-402 (emphases in original). Indeed, the D.C. Circuit noted a decision from the D.C. Court of Appeals in which it "described the elements of the clients' negligence claim as including a 'causal relationship between the violation and the harm complained of,' <u>Mills v. Cooter</u>, 647 A.2d 1118, 1123 (D.C. 1994); the court stated that its disposition of the negligence claim 'applie[d] with equal force to the [clients'] claim of <u>breach of fiduciary duty</u>," id. at 402 (quoting <u>Mills v. Cooter</u>, 647 A.2d at 1123, 1120 n.6) (emphasis in original). Plaintiffs' own cited authority therefore leaves no doubt that their proposed instruction is wildly inconsistent with the law.

Because Plaintiffs have no grounds for seeking disgorgement as a remedy, no jury instruction should be given on this claim.

Date: November 5, 2008　　　　　　　　　　　　　　DEWEY & LEBOEUF LLP

　　　　　　　　　　　　　　　　　　　　　　　　BY: __/s/ Jeffrey Kessler_____
　　　　　　　　　　　　　　　　　　　　　　　　　　　Jeffrey L. Kessler
　　　　　　　　　　　　　　　　　　　　　　　　　　　*Attorneys for Defendants*

16