VOLUME 13

PAGES 2621 - 2829

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE WILLIAM H. ALSUP

BERNARD PAUL PARRISH, HERBERT      )
ANTHONY ADDERLEY, WALTER ROBERTS   )
III,                               )
                                   )
          PLAINTIFFS,              )
                                   )
   VS.                             )   NO. C 07-0943 WHA
                                   )
NATIONAL FOOTBALL LEAGUE PLAYERS   )
ASSOCIATION AND NATIONAL FOOTBALL  )
LEAGUE PLAYERS INCORPORATED D/B/A  )
PLAYERS INC,                       )
                                   )   SAN FRANCISCO, CALIFORNIA
          DEFENDANTS.              )   FRIDAY
_____)   NOVEMBER 7, 2008

## TRANSCRIPT OF PROCEEDINGS

**APPEARANCES:**

**FOR PLAINTIFFS:**          MANATT, PHELPS & PHILLIPS
                             1001 PAGE MILL ROAD, BUILDING 2
                             PALO ALTO, CALIFORNIA 94304
                     BY:  **RONALD S. KATZ, ESQ.**
                          **RYAN S. HILBERT, ESQ.**


                             MANATT, PHELPS & PHILLIPS
                             7 TIMES SQUARE
                             NEW YORK CITY, NEW YORK 10036
                     BY:  **L. PETER PARCHER, ESQ.**


                             MANATT, PHELPS & PHILLIPS
                             11355 WEST OLYMPIC BOULEVARD
                             LOS ANGELES, CALIFORNIA  90064
                     BY:  **CHAD HUMMEL, ESQ.**


(APPEARANCES CONTINUED ON NEXT PAGE)

**APPEARANCES CONTINUED:**

**ALSO FOR PLAINTIFFS:**    MCKOOL SMITH
        300 CRESCENT COURT
        SUITE 1500
        DALLAS, TEXAS  75201
      BY:  **LEWIS T. LECLAIR, ESQ.**
          **JILL ADLER NAYLOR, ESQ.**
          **ANTHONY GARZA, ESQ.**
          **BRETT CHARHON, ESQ.**

**FOR DEFENDANTS:**    DEWEY & LEBOEUF
        1301 AVENUE OF THE AMERICAS
        NEW YORK CITY, NEW YORK  10019-6092
      BY:  **JEFFREY L. KESSLER, ESQ.**
          **DAVID GREENSPAN, ESQ.**
          **DAVID G. FEHER, ESQ.**
          **ROY TAUB, ESQ.**
          **MOLLY DONOVAN, ESQ.**
          **JASON CLARK, ESQ.**

        WEIL, GOTSHAL & MANGES LLP
        767 FIFTH AVENUE
        NEW YORK, NEW YORK 10153-0119
      BY:  **BRUCE S. MEYER, ESQ.**

**REPORTED BY:**    *KATHERINE POWELL SULLIVAN, CSR # 5812*
        *OFFICIAL REPORTER - U.S. DISTRICT COURT*

**P R O C E E D I N G S**

**NOVEMBER 7, 2008**                                          7:30 A.M.

            (THE FOLLOWING PROCEEDINGS WERE HELD IN OPEN COURT,

            OUTSIDE THE PRESENCE OF THE JURY.)

            **THE COURT:**  ALL RIGHT.  PLEASE BE SEATED.

            ANY ITEMS THAT ANYONE WANTS TO BRING UP?

            **MR. KESSLER:**  GOOD MORNING, YOUR HONOR.

            WE HAVE OBJECTED TO A FEW OF THE SLIDES OR BOARDS

THAT PLAINTIFFS WANT TO PUT UP, BECAUSE WHAT THEY DO IS THEY

QUOTE A WITNESS'S PARTIAL ANSWER.  AND WE'RE NOT SAYING THEY

CAN'T JUST GIVE ONE ANSWER AND QUESTION, BUT WE DON'T THINK

THAT THEY CAN GIVE PART OF AN ANSWER WHEN THE WITNESS

CONTINUES.

            WE WILL HAND UP, YOUR HONOR, THE ONES WE THINK ARE A

PROBLEM WITH RESPECT TO THAT, IF WE MAY.

            AND I'LL SHOW YOUR HONOR HOW MISLEADING THIS COULD BE

BECAUSE, YOUR HONOR, I BELIEVE EVEN MISREMEMBERED ONE OF THESE

PREVIOUSLY.

            THE FIRST ONE IS WITH PROFESSOR NOLL.  AND YOU'LL

REMEMBER THE QUESTION WAS -- AND THE LAWYER'S QUESTION IS NOT

EVIDENCE:

                "HAVE YOU SEEN ANY EVIDENCE IN THIS CASE THAT

WOULD SUGGEST TO YOU THAT PLAYERS INC SOLD OUT HALL OF FAME

RETIRED PLAYERS TO CURRY FAVOR WITH EA?"

1          AND THEY STOP THE ANSWER:

2                  "THERE IS -- I -- I HAVE SEEN AN E-MAIL STRING

3  THAT IS IN RESPONSE TO AN ATTEMPT TO EA TO HAVE TO PAY LESS,

4  YES."

5          YOUR HONOR, LOOK AT THE REST OF THE ANSWER.

6          **THE COURT:**  WHERE IS IT?

7          **MR. KESSLER:**  IT'S ATTACHED RIGHT BEHIND IT, YOUR

8  HONOR.

9          IT THEN SAYS:

10                 "AND IT HAS AN ARGUMENT BACK.  WELL, NO, YOU'RE

11  GETTING A GOOD DEAL."

12         **THE COURT:**  WAIT.  WAIT.  WAIT.

13         OF COURSE, YOU HAVE TO QUOTE THE ENTIRE ANSWER.  THAT

14  CHART WILL NOT BE USED UNLESS YOU FIX IT TO DO THE ENTIRE

15  ANSWER.

16         **MR. PARCHER:**  EXCUSE ME, YOUR HONOR.  IF THAT'S WHAT

17  YOUR HONOR'S RULING IS --

18         **THE COURT:**  THAT IS MY RULING.  YOU'RE NOT GOING TO

19  DECEIVE THIS JURY.

20         **MR. PARCHER:**  EXCUSE ME.  I HAVE NO INTENTION OF

21  DECEIVING THE JURY.

22         **THE COURT:**  PUT UP THE ENTIRE --

23         **MR. PARCHER:**  HE CAN PUT UP THE ENTIRE ANSWER.

24  THAT'S WHAT --

25         **THE COURT:**  IT'S NOT GOING TO BE USED, MR. PARCHER.

1   THAT'S THE RULING.

2         **MR. PARCHER:** OKAY. SURE. BUT THE IDEA THAT I'M

3   TRYING TO DECEIVE THE JURY, I'M AN OFFICER OF THIS COURT, AND

4   IT'S VERY UPSETTING TO ME WHEN YOU SAY THAT.

5         HE'S A VERY COMPETENT LAWYER.

6         **THE COURT:** NO. THAT'S NOT THE WAY IT WORKS.

7         **MR. PARCHER:** OKAY. THAT'S NOT THE WAY IT WORKS IN

8   YOUR HONOR'S COURTROOM. I UNDERSTAND THAT.

9         **THE COURT:** YOU CAN DO THIS. PUT UP THE ENTIRE

10   ANSWER, AND THEN YOU CAN EMPHASIZE LIKE CRAZY THE PART YOU'RE

11   INTERESTED IN. BUT YOU CANNOT, YOU CANNOT GIVE A PARTIAL

12   ANSWER TO --

13         **MR. PARCHER:** YOUR HONOR, I DON'T THINK IT'S A

14   PARTIAL ANSWER.

15         **THE COURT:** I TAKE BACK THE "DECEIVE" THING. LET ME

16   REPHRASE WHAT I MEANT TO SAY.

17         **MR. PARCHER:** YES.

18         **THE COURT:** NOT THAT YOU INTENDED TO.

19         **MR. PARCHER:** I CERTAINLY DIDN'T.

20         **THE COURT:** BUT IT WOULD HAVE THE EFFECT OF DECEIVING

21   THE JURY.

22         **MR. PARCHER:** OKAY. JUST GIVE ME TEN SECONDS,

23   PLEASE. I WOULD VERY MUCH APPRECIATE IT. IT WOULD BE ONE

24   THING IF I STOPPED A TRANSCRIPT IN MID-SENTENCE.

25         **THE COURT:** ONE THING IF YOU STOPPED IT IN

1  MID-ANSWER.

2          **MR. PARCHER:**  NO, IT'S NOT MID-ANSWER.

3          **THE COURT:**  IT IS.

4          **MR. PARCHER:**  HE NEEDS ANOTHER QUESTION TO GET THE

5  ANSWER.

6          **THE COURT:**  I'M LOOKING AT IT RIGHT HERE.

7          **MR. PARCHER:**  I DON'T HAVE IT.  WHAT NUMBER?  WHAT

8  NUMBER IS IT?

9          **THE COURT:**  THE ANSWER IS ON PAGE 2350.

10          **MR. PARCHER:**  LET ME FIND THE EXHIBIT, MAY I?

11          **MR. KESSLER:**  AND EVERY ONE WE HANDED UP, YOUR HONOR,

12  IS LIKE THIS.  SO THERE ARE FIVE --

13          **THE COURT:**  I WANT COUNSEL TO SEE IT.

14          **MR. PARCHER:**  YEAH.  YEAH.  I -- THIS IS NOLL?

15          **THE COURT:**  NOLL, PAGE 2350.

16          **MR. KESSLER:**  HERE'S THE TRANSCRIPT.  YOU STOPPED AT

17  "YES."

18          **MR. PARCHER:**  I DON'T WANT TO WALK AWAY FROM A

19  GRAPHIC.  I WAS JUST TAKING THE GRAPHICS AND HADN'T READ

20  TRANSCRIPTS.  BUT I HAVE TO SAY, I STILL THINK HE CAN GET UP

21  AND DO WHAT HE WANTS.  THE PROBLEM WITH IT NOW IS IF I ARGUED

22  IT NOW I WOULD BE FOOLISH.  THAT'S THE REAL PROBLEM ON MY MIND.

23          BECAUSE -- YOU KNOW WHAT I'M SAYING?

24          **THE COURT:**  YOU CAN TAKE --

25          **MR. PARCHER:**  BECAUSE HE WOULD COME BACK AND READ IT

1   BACK, AND THEY'D SAY: "WHAT'S THIS GUY TELLING US?"

2         THAT I UNDERSTAND.

3         **THE COURT:**  YOU CAN TAKE THE EXACT SAME QUESTION,

4   WHICH I THINK HAS -- A SUBSTANTIAL PART OF THE ANSWER FAVORS

5   YOU.

6         **MR. PARCHER:**  YEAH.

7         **THE COURT:**  BUT YOU'VE GOT TO READ THE ENTIRE ANSWER.

8   YOU CAN PUT IT ON THE ELMO, AND PUT IT UP ON THE SCREEN.  JUST

9   DON'T USE THE GRAPHIC THAT IS INCOMPLETE.

10         **MR. PARCHER:**  RIGHT.  I --

11         **MR. KESSLER:**  YOUR HONOR, WE OBJECTED LAST NIGHT, SO

12   THEY HAD TIME TO REDO THE GRAPHICS IF THEY WANTED TO.

13         THE SECOND ONE, YOUR HONOR, IS MR. ALLEN'S TESTIMONY.

14   AND IF YOUR HONOR WILL LOOK AT THE ACTUAL TRANSCRIPT, THEY

15   ELLIPSED OUT THE PART -- THE FRONT PART OF THE ANSWER IN THIS

16   ONE.

17         **THE COURT:**  WAIT A MINUTE.  THERE'S SO MANY OF THESE.

18         **MR. KESSLER:**  I GAVE THEM TO YOUR HONOR, I THINK, IN

19   ORDER.  TESTIMONY REGARDING EQUAL SHARES.

20         **THE COURT:**  THIS IS --

21         **MR. KESSLER:**  YES.

22         **THE COURT:**  -- TESTIMONY REGARDING EQUAL SHARES.  ALL

23   RIGHT.

24         **MR. KESSLER:**  AND THE QUESTION AND THE ANSWER IS:

25          "THAT'S RIGHT."

1          AS YOUR HONOR WILL SEE, THEY ELLIPSED OUT THE FRONT

2    PART OF THE ANSWER, WHICH CHANGES ITS MEANING.

3          **MR. PARCHER:**  I HAVE TO SAY THAT I'M NOT FOLLOWING

4    HIM, JUDGE.  I NEED A NUMBER OR A PAGE OR SOMETHING.

5          **THE COURT:**  PLEASE HAND MR. PARCHER A SET OF WHAT YOU

6    GAVE ME.

7          **MR. KESSLER:**  IT'S HIS SET.  I'LL GET ANOTHER ONE FOR

8    HIM.

9          **THE COURT:**  I CAN'T TELL WHERE THIS IS.

10          **MR. KESSLER:**  I WILL SHOW HIM, YOUR HONOR.

11          **MR. PARCHER:**  YOU NEED TO SHOW HE ME WHAT YOU'RE

12    TALKING ABOUT.

13          **MR. KESSLER:**  THIS IS WHAT I'M TALKING.

14    UNFORTUNATELY, I THOUGHT YOU HAD YOUR OWN SET.

15          **MR. PARCHER:**  I DO HAVE MY OWN SET.  I STILL DON'T

16    KNOW WHAT YOU'RE TALKING ABOUT.

17          **MR. KESSLER:**  THIS ONE, TESTIMONY REGARDING EQUAL

18    SHARE.

19          **MR. PARCHER:**  RIGHT.

20          **MR. KESSLER:**  "AND THE RETIREDS, MY CLIENTS GOT ZERO,

21    CORRECT?"

22          **MR. PARCHER:**  YEAH, THAT'S RIGHT.

23          **MR. KESSLER:**  OKAY.  AND THE ANSWER WAS:

24              "ZERO OUT OF GLR POOL, THAT'S RIGHT."

25          HE TOOK OUT "ZERO OUT OF GLR POOL," WHICH TOTALLY

1  CHANGES ITS MEANING.  HE JUST ELLIPSED IT OUT.

2          **MR. PARCHER:**  THE ONLY THING I'LL SAY ABOUT THIS,

3  JUDGE, IS COUNSEL IS DOING ME A BIG FAVOR.  WHAT HE'S SAYING

4  IS:

5          "IF YOU DO SOMETHING LIKE THAT, WATCH WHAT'S

6  GOING TO HAPPEN WHEN I READ IT."

7          THE IDEA THAT I WOULD WANT TO PUT SOMETHING IN THAT

8  WOULD DISTORT SOMETHING WOULD BE VERY FOOLISH ON MY PART, AND

9  IT'S SILLY.

10          SO IF THAT'S THE EFFECT OF SOMETHING I'M GOING TO

11  WATCH MYSELF.  THAT'S FOR SURE.  YOU DON'T NEED TO TROUBLE

12  YOURSELF ABOUT THAT.

13          **THE COURT:**  ALL RIGHT.

14          **MR. PARCHER:**  JUST POINT IT OUT TO ME.

15          **THE COURT:**  THIS ONE ALSO LEAVES OUT SOME IMPORTANT

16  PARTS OF THE QUESTION AND THE ANSWER.  I THINK YOU'VE GOT TO

17  FIX THAT ONE, TOO.

18          **MR. KESSLER:**  THE NEXT ONE, YOUR HONOR, I WOULD LIKE

19  TO CALL YOUR ATTENTION TO, IT SAYS:

20          "DEFENDANTS' DOUBLE-TALK.  NO EVALUATION OF

21  8 MILLION REALLOCATION."

22          IF YOU LOOK AT THE TRANSCRIPT, YOU'LL SEE THEY CUT

23  OUT AFTER THE WORD "ANSWER, AS YOU REFER TO IT THERE."  IT THEN

24  GOES ON TO SAY:

25          "I DON'T KNOW ABOUT YOUR PROMISE, BUT" --

1          IN OTHER WORDS, HE WAS REJECTING THE PART OF THE

2    QUESTION ABOUT "PROMISE," AND THEY JUST CUT IT OUT.

3          **THE COURT:**  THIS IS CALLED "DOUBLE-TALK."  THERE'S

4    NOTHING WRONG WITH THE HEADINGS.  THAT'S ALL ARGUMENT.  THAT'S

5    FINE.  BUT THE --

6          **MR. PARCHER:**  I SEE HIS POINT.  I SEE HIS POINT.  I

7    DON'T KNOW IF --

8          **THE COURT:**  YOU'RE NOT GOING TO USE THIS ONE?

9          **MR. PARCHER:**  I'M JUST SAYING, FRANKLY, IT'S A

10   TACTICAL POINT, IN MY MIND.  I WOULD BE VERY FOOLISH TO SAY

11   THAT:

12          "THE ANSWER WAS THE MOON IS BLUE," AND THEN, I LEFT

13   OUT A COMMA, AND SAYS:

14             "YOU KNOW, THE MORE I THINK ABOUT IT, IT REALLY

15   WAS RED AND PURPLE, AND IT WASN'T BLUE," BECAUSE HE'LL MAUL ME

16   ON HIS SUMMATION.

17          **THE COURT:**  WELL, POSSIBLY HE WOULD.

18          **MR. PARCHER:**  YEAH.  I CREATED A PROBLEM HERE --

19             (COUNSEL AND THE COURT SPEAKING SIMULTANEOUSLY, WHICH

20             WAS NOT REPORTABLE.)

21          **MR. PARCHER:**  -- INADVERTENTLY WITHOUT MATCHING

22   THINGS.  I JUST GOT A SET OF GRAPHICS, AND I FILLED THEM INTO

23   MY SUMMATION.

24          **THE COURT:**  YOU'VE EITHER GOT TO FIX OR NOT USE THE

25   ONE CALLED --

1          (COUNSEL AND THE COURT SPEAKING SIMULTANEOUSLY, WHICH

2          WAS NOT REPORTABLE.)

3          **MR. KESSLER:**  THE NEXT ONE, YOUR HONOR, IS

4    "DEFENDANTS' DOUBLE-TALK OFFERING AS A GROUP," MR. LINZNER'S

5    TESTIMONY.  AGAIN, CUT OFF THE END OF THE ANSWER AFTER THE LIST

6    OF 2100 PLAYERS.  JUST CUT IT OFF.

7          THAT'S ON THE SECOND PAGE, YOUR HONOR, ON LINES 3 TO

8    7.  THEY CUT OUT 6 AND 7.

9          **THE COURT:**  WAIT A MINUTE.  I'M NOT FOLLOWING.

10          **MR. KESSLER:**  I'M SORRY, YOUR HONOR.  THIS IS THE ONE

11   THAT SAYS:  "DEFENDANTS' DOUBLE-TALK OFFERING AS A GROUP."

12          **THE COURT:**  WHERE IT SAYS:  "WE TYPICALLY WOULD TELL

13   THEM WHO WE WANTED"?  IS THAT THE PART OF THE ANSWER YOU'RE

14   SAYING IS CUT OFF?

15          **MR. GREENSPAN:**  YES.

16          **MR. KESSLER:**  YES, IT'S CUT OFF.

17          **THE COURT:**  PART OF THE VERY SAME ANSWER, AND IT

18   SHOULD BE IN THERE.  SO THAT ONE CAN'T BE USED UNLESS YOU FIX

19   IT.

20          **MR. KESSLER:**  FINALLY, YOUR HONOR, THIS ONE IS EVEN

21   STRANGER.  THEY HAVE THIS HUGE THING OF MR. BERTHELSEN:

22          "DEFENDANTS HAVE TO TAKE RESPONSIBILITY FOR THE

23   DOCUMENT."  THEY HAVE NO QUESTION.  SO IT'S JUST AN ABSTRACT

24   STATEMENT.

25          **MR. PARCHER:**  HE SAID THAT BEYOND ALL DOUBT.

1        **THE COURT:** WHERE IS IT?

2        **MR. KESSLER:** IT'S THIS ONE, YOUR HONOR.

3        **MR. PARCHER:** HE SAID THAT BEYOND ALL DOUBT.

4        **THE COURT:** BUT IS IT IN THE TRANSCRIPT?

5        **MR. PARCHER:** OF COURSE IT IS.

6        (COUNSEL AND THE COURT SPEAKING SIMULTANEOUSLY, WHICH

7        WAS NOT REPORTABLE.)

8        **THE COURT:** JUST A SECOND. LET ME SEE IT. IT MAY OR

9  MAY NOT BE MISLEADING. DEPENDS ON THE CONTEXT.

10        WHERE DOES HE SAY THAT?

11        **MR. KESSLER:** PAGE 18 HE SAYS:

12        **"QUESTION:** DO YOU ACTUALLY KNOW, YES OR NO,

13        WHETHER DEFENDANTS ARE RESPONSIBLE FOR THIS

14        DOCUMENT OR NOT?"

15        **"ANSWER:"** -- AND HE TOOK OUT THE FIRST PART:

16        "RESPONSIBILITY IS A DIFFERENT QUESTION.

17        YES, DEFENDANTS HAVE TO TAKE RESPONSIBILITY

18        FOR THE DOCUMENT."

19        WHAT DOCUMENT ARE WE TALKING ABOUT?

20        **MR. PARCHER:** I'M SORRY. THAT'S LIKE VOODOO

21  ECONOMICS. COME ON.

22        **MR. KESSLER:** NO. IT'S THE RECORD OF THIS CASE.

23        **MR. PARCHER:** COME ON. THAT'S LIKE SAYING:

24        "I GOT YOU ON 1 AND 2 AND 3, SO LET ME JUST PRESS

25  MY POINT HERE." THAT'S COMPLETELY WRONG.

1          **THE COURT:** WAIT A MINUTE. I'M GOING TO OVERRULE THE

2  OBJECTION ON ONE CONDITION. ON THIS ONE, IT'S NOT SO

3  MISLEADING, AS LONG AS WHEN YOU USE IT YOU SAY: HE WAS ASKED

4  WHETHER DEFENDANTS ARE RESPONSIBLE FOR THIS DOCUMENT, AND THE

5  ANSWER HE GAVE WAS THIS.

6          **MR. PARCHER:** OKAY. WHAT I NEED TO DO --

7          **THE COURT:** THAT ONE IS NOT MISLEADING.

8          **MR. PARCHER:** WHAT I NEED TO DO, JUDGE -- I'M SORRY

9  TO DO THIS TO YOU BECAUSE I'M UPSETTING YOUR SCHEDULE HERE, BUT

10 I NEED TO TAKE FIVE MINUTES TO MAKE SURE I'VE GOT THE RIGHT

11 TRANSCRIPT.

12         **THE COURT:** I'LL GIVE YOU FIVE MINUTES.

13         **MR. PARCHER:** I'M VERY SORRY ABOUT THAT, JUDGE. BUT

14 THE IDEA THAT I WAS TRYING TO DECEIVE SOMEBODY, PLEASE TAKE

15 THAT OUT OF YOUR MIND.

16         **THE COURT:** YOU WERE NOT TRYING TO DECEIVE ME, BUT IT

17 WOULD HAVE THE EFFECT.

18         NEXT, I HAVE A LETTER FROM MR. PARCHER ABOUT

19 PARAGRAPH 46.

20         **MR. PARCHER:** YES, SIR.

21         **THE COURT:** I'VE READ YOUR LETTER.

22         **MR. PARCHER:** YES, SIR.

23         **THE COURT:** ANYTHING YOU WANT TO SAY TO YOUR LETTER?

24         **MR. PARCHER:** WELL, I WROTE IT AS CAREFULLY -- I

25 WROTE IT AS CAREFULLY AS I COULD. I THINK THAT HONESTLY --

1      **THE COURT:** IS THIS -- I'M GOING TO GIVE PARAGRAPH

2  46, BUT I'M CONSIDERING GIVING AN ADDITIONAL SENTENCE SOMEWHAT

3  ALONG THE LINES THAT YOU SUGGESTED.  IT WOULD SAY:

4      "NEITHER WOULD IT HAVE BEEN ILLEGAL FOR

5  DEFENDANTS TO HAVE OFFERED THE OPTION OF PRESENT AND FORMER

6  PLAYERS TOGETHER AS A PACKAGE LICENSE, SO LONG AS ONE WAS NOT

7  CONDITIONED ON THE OTHER."

8      **MR. PARCHER:** THANK YOU, JUDGE.

9      **THE COURT:** I WANT TO MAKE SURE YOU HAVE NO

10 OBJECTION.

11      **MR. KESSLER:** I HAVE NO OBJECTION TO THAT.

12      **MR. PARCHER:** EXCUSE ME.  I WANT TO SAY ONE MORE

13 THING, JUDGE.  AND THAT IS I DON'T WANT YOU TO HAVE THE

14 IMPRESSION THAT WHAT MR. HUMMEL WAS DOING -- AND HE CAN SPEAK

15 FOR HIMSELF -- WAS GOING FOR AN ILLEGAL TYING.  HE WAS GOING

16 FOR A LEVERAGING.

17      **THE COURT:** I HEARD ALL KINDS OF --

18      **MR. PARCHER:** AND YOUR HONOR THOUGHT THAT PERHAPS HE

19 WAS GOING -- AND I PROBABLY WASN'T ANYTHING ABOUT ILLEGAL

20 TYING.  YOUR HONOR THOUGHT HE WAS GOING INTO IT FURTHER.  THE

21 WITNESS THEN BROUGHT UP THE ILLEGALITY, AND WE WERE OFF TO THE

22 RACES HERE.

23      BUT NOBODY HERE WAS TRYING TO BRING ILLEGAL TYING

24 INTO THE CASE.  I DON'T WANT YOU TO THINK THAT OF MR. HUMMEL.

25      **THE COURT:** PERHAPS IT WASN'T, BUT IT WAS VERY

1  STRANGE EXAMINATION GETTING INTO MONOPOLY POWER AND WHAT --

2  "MONOPOLY" AND "MONOPOLY POWER." THOSE TERMS WERE USED BY

3  MR. HUMMEL.

4  　　　　　**MR. PARCHER:** OKAY. I DON'T THINK THAT THAT WAS

5  INAPPROPRIATE, BUT IN ANY EVENT, IT WAS YOUR HONOR THAT ASKED

6  THE QUESTION THAT PROMPTED WHAT YOUR HONOR IS NOW BOTHERED

7  ABOUT. AND I'M NOT FAULTING THE COURT FOR DOING THAT. IF YOU

8  THOUGHT THAT'S WHAT HUMMEL WAS DOING, YOU WANTED TO CLEAR IT

9  UP.

10  　　　　　**THE COURT:** THAT'S WHAT I THOUGHT HE WAS DOING, AND I

11  THINK THAT THAT WAS FAIRLY RAISED BY THE LINE OF QUESTIONS HE

12  WAS ASKING. SO YOU CAN BLAME ME IN THE NINTH CIRCUIT.

13  　　　　　**MR. PARCHER:** YOU KEEP SAYING "THE NINTH CIRCUIT."

14  PLEASE STOP SAYING "THE NINTH CIRCUIT." I DON'T HAVE THE NINTH

15  CIRCUIT ON MY MIND.

16  　　　　　**THE COURT:** BUT I THINK WHAT I DID WAS A FAIR ATTEMPT

17  TO CLARIFY THE ANSWER ON THE LINE OF QUESTIONS THAT MR. HUMMEL

18  WAS ASKING.

19  　　　　　NONETHELESS, THAT HAVING BEEN SAID, I DID GIVE A

20  CAUTIONARY INSTRUCTION IMMEDIATELY AFTERWARDS.

21  　　　　　**MR. PARCHER:** YES, YOU DID.

22  　　　　　**THE COURT:** AND I DON'T THINK IT WENT QUITE FAR

23  ENOUGH, SO THIS IS WHAT WE'RE GOING TO GIVE.

24  　　　　　**MR. PARCHER:** YOUR HONOR, I WOULD APPRECIATE IT IF

25  YOU WOULD GIVE THIS YOUNG MAN JUST A MINUTE TO SAY HIS PEACE.

1          **THE COURT:**  ALL RIGHT.

2          **MR. PARCHER:**  THANK YOU.

3          **THE COURT:**  GO AHEAD, MR. HUMMEL.

4          **MR. HUMMEL:**  THANK YOU, YOUR HONOR.

5          THE ONLY POINT I WANTED TO MAKE WITH RESPECT TO THE

6  INSTRUCTION IS THE INSINUATION THAT THIS WAS STARTED BY

7  PLAINTIFFS' COUNSEL.

8          THE POINT OF MY QUESTIONING WAS SIMPLY THIS:  TO SAY

9  THAT LICENSEES HAD TO COME TO DEFENDANTS.  THEY HAD NO CHOICE.

10 THEY HAD A MONOPOLY ON ACTIVE PLAYERS.

11         ONCE THEY CAME, THERE WAS ABSOLUTELY NOTHING WRONG.

12 AND, IN FACT, THEY SHOULD HAVE SAID AFFIRMATIVELY:  "TAKE OUR

13 GUYS, TAKE OUR GUYS," MEANING THE GLA CLASS.

14         NOW, YOUR HONOR THEN -- I DO ASK FOR FAIRNESS HERE --

15 YOUR HONOR THOUGHT I WAS SAYING:

16              "WE WON'T SELL YOU OUR ACTIVES, UNLESS YOU TAKE

17 OUR RETIREDS."

18         THAT WAS ABSOLUTELY NOT THE IMPORT OF MY QUESTIONS.

19 WHAT I WAS ASKING WAS PERFECTLY CONSISTENT WITH DR. RASCHER'S

20 OPINION ABOUT LEVERAGE, WHICH DR. NOLL THEN CRITICIZED.

21         AND THE FACT OF THE MATTER IS, AND THIS IS WHAT WE

22 ARE, YOU KNOW, I THINK, FAIRLY ENTITLED TO ARGUE IS, FOR

23 LICENSEES IN THE MARKET, YOUR HONOR, IF THEY WANTED ACTIVE

24 PLAYERS AS A GROUP FOR GROUP LICENSING, THEY HAD TO COME TO THE

25 DEFENDANTS.

1          AND WHEN THEY DID, THE DEFENDANTS HAD A CHOICE.  AND

2    THE CHOICE WAS TO SAY:  "WE HAVE THIS GROUP OF RETIREDS, PLEASE

3    TAKE THEM" OR NOT.

4          OUR ARGUMENT IS THEY NEVER REALLY DID THAT.  THAT WAS

5    THE ENTIRE POINT OF THE QUESTION.  YOUR HONOR THEN, TO BE FAIR,

6    ASKED QUESTIONS ABOUT TYING.  ACTUALLY, MR. KESSLER RAISED IT

7    BY OBJECTION.

8          SO I HOPE YOUR HONOR UNDERSTANDS MY POINT, AND I

9    WOULD ONLY ASK --

10          **THE COURT:**  YOU KNOW, YOU WERE USING WORDS LIKE

11    "MONOPOLY."

12          **MR. HUMMEL:**  ABSOLUTELY RIGHT.

13          **THE COURT:**  "MONOPOLY POWER," "LEVERAGE."

14          **MR. HUMMEL:**  RIGHT.

15          **THE COURT:**  WHAT ELSE IS SOMEONE LIKE ME, WHO

16    UNDERSTANDS THE ANTITRUST LAW, TO THINK WHAT YOU'RE GETTING AT

17    IN SOME KIND OF ROUNDABOUT, EVASIVE WAY?

18          **MR. HUMMEL:**  YOUR HONOR, YOU KEEP -- YOU KNOW WHAT?

19    ALL I'M ASKING, YOUR HONOR, IS THAT YOU TAKE OUT THE PHRASE IN

20    THE INSTRUCTION THAT IT WAS PLAINTIFFS' COUNSEL'S QUESTIONING.

21    BECAUSE I'VE GAVE GIVEN YOU A GOOD FAITH ANSWER.  I'M TELLING

22    YOU THAT'S WHAT I WAS GETTING AT.

23          THE TRUTH IS --

24          **THE COURT:**  I'M GOING TO CHANGE IT TO SAY:

25               "QUESTIONS WERE ASKED."

1          **MR. HUMMEL:** "QUESTIONS WERE ASKED."

2          THANK YOU, YOUR HONOR.  THAT'S ALL I WANTED.

3          **MR. KESSLER:**  YOUR HONOR, I WOULD NOTE FOR THE RECORD

4  THAT MR. HUMMEL -- AND I'M READING FROM THE TRANSCRIPT AT

5  2252-14 -- SPOKE ABOUT THE NFLPA'S POWER IN CONNECTION WITH THE

6  ACTIVE PLAYERS AFTER ASKING MR. NOLL TO ASSUME THERE'S A

7  RELEVANT ECONOMIC MARKET, AND THAT THERE WERE NO OTHER

8  ALTERNATIVES.

9          YOUR HONOR'S INTERPRETATION OF HIS QUESTION WERE VERY

10 REASONABLE AND FAIR.  AND THE JURY WOULD HAVE THE SAME

11 IMPRESSION, WHICH IS WHY THE INSTRUCTION IS NECESSARY.

12         **THE COURT:**  WELL, I THINK THE SUBSTANCE -- I'M JUST

13 GOING TO SWITCH THAT PART, BECAUSE QUESTIONS WERE ASKED.  I

14 THINK THAT'S -- I DID ASK ONE OF THE QUESTIONS, BUT IT WAS

15 BECAUSE THAT'S WHAT I THOUGHT WERE YOU GETTING AT.

16         **MR. HUMMEL:**  BUT I WASN'T.

17         **THE COURT:**  WELL, THEN, YOU BETTER STOP USING WORDS

18 LIKE "MARKET POWER."

19         **MR. HUMMEL:**  NO.

20         **THE COURT:**  "LEVERAGE."

21         **MR. HUMMEL:**  NO.  BECAUSE THAT'S --

22         **THE COURT:**  YOU USED THOSE TERMS.

23         **MR. HUMMEL:**  -- ABSOLUTELY RIGHT.  AND THAT'S WHAT

24 THEY HAVE OVER ACTIVE PLAYERS.  AND THEY HAVE LICENSEES.

25         OH, MR. KESSLER, YOU KNOW WHAT?  THEY HAD TO COME TO

1 THEM.  THAT WAS MY ONLY POINT.

2          I APPRECIATE YOU CHANGING THE INSTRUCTION, YOUR

3 HONOR.

4          **THE COURT:**  YOU WERE USING ANTITRUST AND MONOPOLY

5 TERMS TO MAKE SOME KIND OF OTHER POINT THAT YOU WERE TRYING TO

6 USE.  AND YOU SUGGESTED TO THE JURY SOMETHING THAT WOULD HAVE

7 BEEN ILLEGAL, EVEN THOUGH YOU DIDN'T USE IT IN SO MANY TERMS.

8 OR IF IT WASN'T INTENTIONAL, IT HAD THE EFFECT.

9          **MR. HUMMEL:**  ALL RIGHT, YOUR HONOR.

10          **THE COURT:**  THIS LINE -- THIS CAUTIONARY INSTRUCTION

11 IS IN ORDER.

12          **MR. HUMMEL:**  YOUR HONOR, AND I WANTED TO -- JUST TO

13 PRESERVE THE RECORD, I WANT TO NOTE OUR OBJECTION TO IT IN ANY

14 FORM, BUT I APPRECIATE YOUR HONOR'S CHANGES.

15          **THE COURT:**  IN OUR NEXT TRIAL, IF THE NINTH CIRCUIT

16 DIRECTS US TO HAVE A NEW TRIAL, THEY WILL FIX ALL THIS UP, AND

17 THESE ISSUES WILL NOT BE BEFORE US.

18          ALL RIGHT.  WHAT DO YOU HAVE TO SAY?

19          **MR. KESSLER:**  I HAVE AN ADMINISTRATIVE MATTER IS THAT

20 I HAD ERRONEOUSLY MOVED IN TRIAL EXHIBIT 1263-108.  I CALLED IT

21 "1268-108."

22          SO I'VE BEEN ADVISED BY YOUR STAFF THAT I SHOULD

23 FORMALLY STATE THAT IT WAS TRIAL EXHIBIT 12 --

24          **THE COURT:**  I'M NOT GOING TO CHANGE A THING UNLESS

25 IT'S STIPULATED TO.

1          **MR. KESSLER:** WELL, THE STAFF ASKED US TO CORRECT IT,

2 BECAUSE I JUST MISREAD IT.

3          **MR. HUMMEL:** I'LL LOOK AT THIS.

4          YOUR HONOR, MAY I ASK ONE QUESTIONS ABOUT THE

5 GRAPHICS?

6          **THE COURT:** YES.

7          **MR. HUMMEL:** WE SPENT A LOT OF TIME DOING THIS. OUR

8 INTENT WAS NOT TO MISLEAD.

9          WOULD IT BE OKAY, IF WE PUT IT ON THE BOARD, IF AT

10 THAT TIME THERE'S AN OBJECTION, I READ THE REMAINDER OF THE

11 QUESTION?

12          **THE COURT:** NO, I'M NOT GOING TO HAVE YOU PUT UP

13 SOMETHING THAT YOU SHOULD HAVE KNOWN THAT WAS SO LIKELY TO DRAW

14 AN OBJECTION. I'M NOT GOING TO LET YOU --

15          **MR. KESSLER:** AND WE OBJECTED LAST NIGHT, YOUR HONOR,

16 AS SOON AS WE RECEIVED THEM. THEY COULD HAVE CHANGED IT LAST

17 NIGHT. THEY DELIBERATELY DIDN'T CHANGE IT, BECAUSE THEY

18 THOUGHT THEY COULD ARGUE --

19          **THE COURT:** YOU CAN PUT UP ON THE SCREEN THE ACTUAL

20 TRANSCRIPT. WE'VE GOT AN ELMO. IT WOULD BE EASY TO DO. YOU

21 COULD EVEN HIGHLIGHT THE PART YOU'RE INTERESTED IN AND NOT

22 HIGHLIGHT THE PART YOU'RE NOT INTERESTED IN, BUT ALL OF IT

23 OUGHT TO BE UP ON THE SCREEN --

24          **MR. HUMMEL:** ALL RIGHT.

25          **THE COURT:** -- SO THEY CAN SEE IT.

1          **MR. HUMMEL:**  THANK YOU.

2          **MR. KESSLER:**  I'M SORRY.  MY LAST QUESTION, YOUR

3    HONOR, IS, WILL THIS BOARD -- OF COURSE IT WILL HAVE TO COME

4    DOWN, PROFESSOR NOLL'S, BECAUSE IT'S MISLEADING, AS YOUR HONOR

5    HAS RULED.

6          **THE COURT:**  DID I RULE ON THAT?

7          **MR. PARCHER:**  THAT'S NOT THE ONE.

8          **THE COURT:**  I DON'T REMEMBER RULING ON THAT ONE.

9          **MR. KESSLER:**  I'M SORRY.  NO.  NO.  NO.  SORRY.

10   THAT'S MY MISTAKE, YOUR HONOR.

11         **MR. PARCHER:**  HE JUST WANTS TO SAY --

12         (COUNSEL AND THE COURT SPEAKING SIMULTANEOUSLY, WHICH

13         WAS NOT REPORTABLE.)

14         **MR. KESSLER:**  MY QUESTION IS:  IS YOUR HONOR

15   COMFORTABLE WITH CUTTING OFF THE VIEW OF THE ENTIRE AUDIENCE BY

16   SURROUNDING ALL -- I DON'T MIND PUTTING UP ONE BOARD AT A TIME,

17   OR SOMETHING, BUT I THINK IT'S UNFAIR.  THE PUBLIC HAS A RIGHT

18   TO SEE THESE PROCEEDINGS.

19         **THE COURT:**  ALL RIGHT.

20         **MR. KATZ:**  WELL, YOU ASKED FOR THE GAG ORDER.

21         **THE COURT:**  I'M SORRY.  I'M SORRY.  I HAVE AN IDEA,

22   THOUGH.  WHY DON'T YOU LAWYERS GET A GIGANTIC MIRROR UP HERE,

23   AND THEN THE AUDIENCE CAN USE SOME KIND OF REVERSE GLASSES THAT

24   ALLOW IT TO BE READ.

25         LOOK.  AS A CONCESSION TO -- I WANT THE LAWYERS -- AS

1   LONG AS IT'S FAIR GAME, YOU CAN SURROUND THAT JURY BOX.  AND AS

2   LONG AS THEY CAN'T TELL WHAT YOU HAD FOR BREAKFAST, YOU CAN

3   SURROUND THE JURY BOX WITH ANY KIND OF DEMONSTRATIVES YOU WANT.

4           I WANT TO GIVE YOU AS MUCH OPPORTUNITY TO ARGUE

5   FAIRLY.  AND THIS IS FAIR ARGUMENT TO PUT UP THESE --

6           **MR. PARCHER:**  THE WHOLE THING ABOUT PUTTING IT THERE

7   IS -- I DON'T WANT TO MAKE COMPARISONS -- BUT IN THE SOUTHERN

8   DISTRICT, WHICH I KNOW IS NOT NEARLY AS GOOD AS THE NORTHERN

9   DISTRICT OF CALIFORNIA, I UNDERSTAND THAT --

10          **THE COURT:**  I'M GOING TO GET A COPY OF THE TRANSCRIPT

11  AND SEND THAT TO --

12          **MR. PARCHER:**  I LEARNED THAT FROM MY PAL AND OTHER

13  PEOPLE.  YOU KNOW WHAT OUR PROBLEMS ARE THERE.  WE GET TO ASK

14  THE QUESTIONS BACK THERE.

15          I HAVE A HERKY-JERKY WAY OF DOING THINGS THAT EVEN

16  MR. KESSLER SAID:

17              "LOOK AT HIM WAVING HIS ARMS."

18          AND ALL OF THAT, YOU KNOW?  MY MOTHER DIDN'T BRING ME

19  UP THAT WAY.  SO I TRIED TO PUT IT IN A PLACE WHERE IT WOULD BE

20  A SMOOTHER DELIVERY.

21          AND HE'S LIKE A CHOREOGRAPHER.  HE'S NOT ONLY THE

22  DEFENSE COUNSEL, HE'S A CHOREOGRAPHER.  HE'S A DIRECTOR.  YOU

23  KNOW, HE'S AN ASSISTANT JURIST.

24          **THE COURT:**  WHO IS?

25          **MR. PARCHER:**  MR. KESSLER.

1      **THE COURT:**  WHAT ARE YOU?

2      **MR. PARCHER:**  WHAT AM I?

3      **MR. KESSLER:**  RINGMASTER, YOUR HONOR.

4      (LAUGHTER)

5      **MR. PARCHER:**  3,000 MILES FROM HOME.  A STRANGER IN A

6   FOREIGN LAND, YOU KNOW.

7      **THE COURT:**  NOW, AS LONG AS THE CHARTS ARE NOT

8   MISLEADING, I ENCOURAGE IT.  I THINK IT HELPS TO MAKE THE

9   ARGUMENT MOVE FASTER.  THIS IS LIKE A STAGED PERFORMANCE.  WE

10  HAVE TWO GOOD ACTORS HERE.

11     **MR. PARCHER:**  ADVOCATES.  ADVOCATES.

12     **MR. KESSLER:**  YOUR HONOR, WE HAVE A STIPULATION FROM

13  PLAINTIFFS.

14     MR. HUMMEL AGREES THE CORRECT TRIAL EXHIBIT THAT

15  SHOULD HAVE BEEN ENTERED IS 1263-108.  1268-108 SHOULD NOT HAVE

16  BEEN ENTERED.  THAT WAS A DIFFERENT EXHIBIT.

17     **THE COURT:**  DAWN, PLEASE MAKE THAT CHANGE.

18     **THE CLERK:**  OKAY.

19     (TRIAL EXHIBIT 1263-108 RECEIVED IN EVIDENCE AND

20     1268-108 WAS WITHDRAWN.)

21     **MR. PARCHER:**  I HAVE TWO REQUESTS.  PLEASE DON'T

22  SHOOT ME AFTER I ASK THEM, BECAUSE I NEED TO GIVE THE

23  SUMMATION.

24     OKAY.  THE FIRST IS --

25     **THE COURT:**  I'LL SHOOT YOU AFTERWARDS.

1          **MR. PARCHER:**  I JUST GO LIKE THIS (INDICATING) ON

2    THESE TWO QUESTIONS.

3          THE FIRST QUESTION IS:  CAN WE HAVE A VERY FEW

4    MINUTES TO SEE IF WE CAN'T STRAIGHTEN OUT THE PROBLEM THAT WE

5    CAUSED WITH THE GRAPHICS?  THAT'S QUESTION ONE.

6          **THE COURT:**  HOW MANY IS "A VERY FEW MINUTES"?

7          **MR. HUMMEL:**  FIVE MINUTES.

8          **THE COURT:**  ALL RIGHT.  FIVE MINUTES.  I'LL GIVE YOU

9    FIVE MINUTES.

10          **MR. PARCHER:**  THAT'S NICE.  THANK YOU.

11          AND THE SECOND IS -- HERE IT COMES -- I GOT A LOT OF

12    GROUND TO COVER.  AND I DID A LOT OF EDITING ON THE GROUND.

13    AND WE'VE BEEN HERE -- I DON'T KNOW HOW LONG THE TRIAL HAS

14    BEEN.  I'M SAYING A MONTH, BECAUSE I'VE BEEN HERE ABOUT A

15    MONTH.

16          WOULD IT BE VERY OFFENSIVE TO YOUR HONOR IF WE TOOK

17    AN EXTRA TEN MINUTES IF -- IF WE NEEDED IT?  I MEAN, IS IT SO

18    IMPORTANT?

19          **THE COURT:**  IT IS IMPORTANT.  YOU KNOW, I HAVE TO --

20    I WANT TO GET THE CASE TO THE JURY TODAY.  I HAVE TO TAKE INTO

21    ACCOUNT, WHEN I HAVE A COURT REPORTER, BREAKS THAT ARE

22    NECESSARY.

23          I HAVE WORKED MY WAY THROUGH THIS IN MANY TRIALS, AND

24    I'M TELLING YOU, THE EXTRA TEN MINUTES IS GOING TO MEAN MORE

25    BREAKS.  IT DOESN'T TRANSLATE THAT -- TEN MINUTES EXTRA ON EACH

1  SIDE TRANSLATES TO AN HOUR ADDITIONAL.

2        **MR. PARCHER:** I JUST NEED TO SAY, JUDGE, THAT

3  MR. KESSLER WHO IS A VERY FINE LAWYER, EVEN IF HE AGGRAVATES ME

4  SOMETIMES, MR. KESSLER HAS AN EASIER PRESENTATION. NOT A MORE

5  EFFECTIVE PRESENTATION. I DON'T THINK HE HAS A BETTER CASE.

6        **THE COURT:** HOW COULD THAT BE?

7        **MR. PARCHER:** BECAUSE HE'S GOT A SIMPLER THING. ALL

8  HE'S GOING TO SAY IS:

9              "THESE GUYS ARE WORTHLESS, WORTHLESS, WORTHLESS.

10  SEPARATE THEM, SEPARATE THEM, SEPARATE THEM. EVERYBODY KNOWS

11  YOU WANT TO TAKE THE MONEY FROM THE ACTIVES. LET'S GO HOME."

12  YOU KNOW? "LET'S TRY TO CATCH THE PLANE TO NEW YORK QUICKLY."

13        **THE COURT:** ALL YOURS IS GOING TO BE IS:

14              "DOUBLE-TALK, DOUBLE-TALK, DOUBLE-TALK."

15        **MR. PARCHER:** NO, I'M GOING RIGHT TO THE GLA. I

16  HEARD THE COURT.

17        **THE COURT:** "DOUBLE-TALK, DOUBLE-TALK, GLA, GLA,

18  DOUBLE-TALK, DOUBLE-TALK."

19        **MR. PARCHER:** NO, "DOUBLE-TALK" --

20        **THE COURT:** HE'LL COME BACK AND SAY:

21              "WORTHLESS, WORTHLESS, WORTHLESS."

22        AND YOU'LL COME BACK AND SAY:

23              "GLA, DOUBLE-TALK."

24        **MR. KESSLER:** YOUR HONOR, I DON'T THINK THERE SHOULD

25  BE ANY MORE TIME ALLOTTED.

1          **MR. PARCHER:**  OF COURSE HE DOESN'T.

2          **MR. KESSLER:**  AND I'M GOING TO HAVE, FRANKLY, THE

3   GREATER BURDEN, BECAUSE HE'S GOING TO MAKE EVERY WILD

4   ALLEGATION UNDER THE SUN, AND I'M GOING TO HAVE TO DEAL WITH IT

5   IN MY TIME, WHICH I WILL.

6          **MR. PARCHER:**  WOW.

7          **THE COURT:**  AN HOUR AND 20 MINUTES PER SIDE IS IT.

8          **MR. PARCHER:**  OKAY.  BUT LET ME UNDERSTAND THIS,

9   THOUGH.  IF I TAKE MORE THAN THE HOUR, IT JUST COMES OFF THE

10  20, RIGHT?

11         **THE COURT:**  RIGHT.

12         **MR. PARCHER:**  THAT'S NUMBER ONE.  AND NUMBER TWO, IF

13  I DON'T GET TO EVERYTHING I WANT TO IN AN HOUR, SO LONG AS

14  BEFORE I SIT DOWN I TELL THE JURY WHERE I'M GOING LATER SO THAT

15  HE'S'S NOT SURPRISED, BECAUSE HE HAS GOT ALL MY DOUBLE-TALK

16  THINGS, YOU KNOW.

17         **THE COURT:**  YOU HAVE TO AT LEAST TOUCH ON THE ISSUE.

18  YOU DON'T HAVE TO SAY IT IN THE SAME WORDS, BUT YOU HAVE TO

19  GIVE FAIR NOTICE.

20         **MR. PARCHER:**  RIGHT.  THAT'S WHAT I MEAN.

21         **THE COURT:**  FOR EXAMPLE, IF YOU JUST SAY:

22              "AND YOU GOT TO GIVE THEM PUNITIVE DAMAGES," THAT

23  MAY NOT BE ENOUGH.

24         YOU'VE GOT TO AT LEAST HAVE A COHERENT 30-SECOND

25  ARGUMENT THAT PUTS MR. KESSLER ON -- FOR EXAMPLE, ON PUNITIVE

1   DAMAGES, TO USE THAT AS AN EXAMPLE, YOU CAN SAY:

2               "IN THIS CASE YOU OUGHT TO AWARD, IN ADDITION,

3   PUNITIVE DAMAGES, BECAUSE THE CONDUCT IN THIS CASE WAS" -- AND

4   THEN, WHATEVER THE STANDARD IS.

5           AND THEN SAY:

6               "AT THE END OF THE CASE, YOU TELL US WHETHER OR

7   NOT YOU AGREE WITH THAT."

8           THAT WOULD BE ENOUGH.

9           AND THEN, IF MR. KESSLER WANTED -- THEN, YOU COULD

10  COME BACK, AND YOU COULD ADD 10 OR 12 SENTENCES WHY PUNITIVES

11  WOULD BE IN ORDER.  THAT WOULD BE OKAY.

12          BUT WHAT YOU CAN'T DO IS JUST SAY:

13              "AND ON MY NEXT PRESENTATION I'M GOING TO ADDRESS

14  YOU ON PUNITIVE DAMAGES."

15          **MR. PARCHER:**  LET ME GIVE FROM MY POINT OF VIEW A

16  MORE REALISTIC EXAMPLE.  REMEMBER, I'M CONCERNED ABOUT TIME.

17  THAT'S THE ONLY REASON FOR BRINGING IT UP.

18          MR. KESSLER HAS EVERY GRAPHIC THAT WE THOUGHT WE WERE

19  GOING TO USE ON DOUBLE-TALK, AND SOME THAT MAYBE WE'LL END UP

20  NOT USING, YOU KNOW, BECAUSE OF, YOU KNOW, SOME OF THE VALID

21  POINTS HE MAY BE MAKING HERE.

22          HE'S NOT SANDBAGGED IF I SAY TO THIS JURY, IF I RUN

23  OUT OF TIME:

24              "I'M GOING TO TELL YOU ABOUT ALL THE DOUBLE-TALK

25  THAT WAS DONE BY WITNESS A AND B AND C AND D AND Q."

1    HE KNOWS EXACTLY WHAT I'M TALKING ABOUT, BECAUSE
2  THEY'RE IN THE GRAPHICS.
3    **THE COURT:**  IF YOU BRING UP THE GENERAL SUBJECT OF
4  DOUBLE-TALK --
5    **MR. PARCHER:**  RIGHT.
6    **THE COURT:**  -- AND LET'S SAY THAT YOU HAVE FIVE
7  WITNESSES THAT YOU WANT TO PRESENT ON THAT.  AND LET'S SAY THAT
8  YOU PRESENT THREE OF THEM.  AND THEN, IN YOUR REBUTTAL YOU WANT
9  TO PRESENT TWO MORE, THAT'S OKAY, BECAUSE YOU BROUGHT UP THE
10  GENERAL SUBJECT OF DOUBLE-TALK.
11    **MR. KESSLER:**  YOUR HONOR, THE PROBLEM I HAVE WITH
12  THAT --
13    **THE COURT:**  I'M SORRY.  THAT IS THE WAY IT WORKS.  HE
14  IS ENTITLED TO BRING UP NEW EVIDENCE IN HIS REBUTTAL.
15    **MR. KESSLER:**  I UNDERSTAND THAT, YOUR HONOR.  JUST
16  GIVE ME A MINUTE, PLEASE.
17    I DON'T THINK SIMPLY SAYING THE WORDS "DOUBLE-TALK"
18  IS SUFFICIENT.  IF HE AT LEAST MENTIONS THE WITNESSES, WHAT
19  THEY ARE, AND I'LL TELL YOU WHY.  HE GAVE ME 70 SLIDES LAST
20  NIGHT.
21    HE CLEARLY IS GOING TO USE, I DON'T KNOW, 15, 20 IN
22  HIS OPENING.  AND THEN, I HAVE TO ALLOCATE MY TIME.
23    SO HE SHOULDN'T BE ABLE -- THAT IS SANDBAGGING TO
24  MAKE ME SAY I'M GOING TO DEAL WITH EVERY SLIDE HE DID JUST
25  BECAUSE HE SAID THE WORD "DOUBLE-TALK" AND USED MY TIME.

1    AND THE THOUGHT THAT HE'LL DO IT AT THE END AND

2 MISLEAD THE JURY, IT'S NOT FAIR.

3    **THE COURT:**  NO.  LOOK.  PERHAPS THERE'S A MINOR

4 DEGREE OF UNFAIRNESS THERE, BUT AS LONG AS THE GENERAL TOPIC

5 AND SOME EVIDENCE IS PRESENTED, HE CAN THEN GO BACK TO IT WITH

6 ADDITIONAL EVIDENCE ON THAT SAME THEME IN HIS REBUTTAL.  THAT

7 IS OKAY.  IT'S DONE IN EVERY CASE.

8    AND WHAT YOU HAVE TO SAY TO MEET THAT IS:

9    "MR. PARCHER IS GOING TO GET THE LAST WORD.  I

10 DON'T KNOW WHAT HE'S GOING TO SAY.  HE'S GOING TO BRING UP

11 THINGS" --

12    **MR. PARCHER:**  DON'T TELL HIM HOW TO SUM UP, JUDGE.

13 COME ONE.

14    **THE COURT:**  "AND YOU, IN THE JURY ARE ROOM, ARE GOING

15 TO HAVE TO SAY 'WHAT WOULD MR. KESSLER HAVE SAID?'"

16    **MR. KESSLER:**  THANK YOU, YOUR HONOR.  I UNDERSTAND.

17    **THE COURT:**  THAT HAPPENS IN EVERY SINGLE TRIAL.

18    **MR. KESSLER:**  I UNDERSTAND.

19    **THE COURT:**  THERE'S THIS DEGREE OF UNFAIRNESS,

20 PERHAPS, BUT THAT'S THE WAY IT WORKS.

21    YES.

22    **MR. KATZ:**  YOUR HONOR, ON A LIGHTER NOTE, WE HAVE A

23 NUMBER OF DISTINGUISHED GUESTS IN THE COURTROOM TODAY.

24    I CAN'T MENTION THEM ALL BY NAME, BUT I DO WANT TO

25 MENTION THAT ONE OF MR. ADDERLEY'S TEAMMATES TRAVELED HERE FROM

1   ALABAMA.

2           **THE COURT:**  WHERE IS HE?

3           **MR. KATZ:**  MR. BART STARR, MVP OF TWO SUPER BOWLS AND

4   A HALL OF FAMER.

5           **THE COURT:**  OKAY.  WELCOME TO OUR COURTROOM,

6   MR. STARR.

7           **MR. KATZ:**  AND ALSO, YOUR HONOR, MY MVP'S OF MY LIFE,

8   MY WIFE AND TWO OF MY SONS, ARE HERE TODAY.

9           **THE COURT:**  WHERE ARE THEY?  OKAY.

10          **MR. KATZ:**  THANK YOU, YOUR HONOR.

11          **THE COURT:**  ALL RIGHT.  WELL, WELCOME TO ALL OF YOU.

12  I'M GLAD YOU'RE HERE.

13          OKAY.  WHAT ELSE?

14          **MR. HUMMEL:**  YOUR HONOR?

15          **THE COURT:**  MR. HUMMEL.

16          **MR. HUMMEL:**  THANK YOU.  JUST STAGECRAFT.

17          YOUR HONOR IS PARTICULAR ABOUT WHERE BOARDS GO.  I

18  WANTED TO PUT ONE HERE.

19          **THE COURT:**  THAT'S FINE.

20          **MR. HUMMEL:**  AND THE REST HERE, IS THAT OKAY WITH

21  YOU, YOUR HONOR?  THANK YOU.

22          **THE COURT:**  JUST AS LONG AS YOU MOVE IT WHEN THE JURY

23  GOES IN AND OUT.

24          **MR. HUMMEL:**  WILL DO, SIR.  THANK YOU.

25          **MR. KESSLER:**  FINALLY, YOUR HONOR, DID WE GET ANY

1   FURTHER INFORMATION AS TO WHETHER THE JURY IS DELIBERATING THIS

2   AFTERNOON, SO PEOPLE CAN PLAN THEIR SCHEDULES?

3            **THE CLERK:**  4:00 P.M.

4            **THE COURT:**  4:00 P.M.

5            ALL RIGHT.  DAWN IS SAYING EXHIBIT 2370 IS BEING

6   WITHDRAWN TOTALLY?

7            **MR. KESSLER:**  WE KNOW NOTHING ABOUT THIS, YOUR HONOR.

8            **THE CLERK:**  THAT'S ACTUALLY ANOTHER DOCUMENT NUMBER.

9            **MR. HUMMEL:**  YES, 2370 IS WITHDRAWN.

10           **THE COURT:**  ALL RIGHT.  IT'S WITHDRAWN.

11           (TRIAL EXHIBIT 2370 WAS WITHDRAWN.)

12           (TRIAL EXHIBIT 2370 WAS WITHDRAWN.)

13

14           **MR. HUMMEL:**  THANK YOU.

15           **THE COURT:**  JUST SHOW ON THE LIST THAT IT WAS

16   WITHDRAWN.

17           **THE CLERK:**  THANKS.

18           **MR. PARCHER:**  I HAVE A QUICK ADMINISTRATIVE QUESTION,

19   JUDGE.

20           **THE COURT:**  ALL RIGHT.

21           **MR. PARCHER:**  IF WE'RE HERE ON MONDAY -- AND IT'S

22   REASONABLE TO ASSUME WE MAY BE -- I'M A SPECIAL MASTER IN SOME

23   CASE BACK IN MANHATTAN, LOTS OF PEOPLE.  AND I NEED TO USE A

24   PHONE FOR A CONFERENCE CALL.  IS THERE A PHONE -- I MEAN, I

25   WANT TO BE IN THE COURTROOM, BECAUSE YOU'VE GOT THE TWO-MINUTE

1   RULE, WHICH I UNDERSTAND.

2           **THE COURT:**  WE WILL CERTAINLY WORK SOMETHING OUT.  WE

3   DO HAVE THE ATTORNEYS' LOUNGE DOWN THERE THAT HAS PHONES.

4           **MR. PARCHER:**  THEN, THAT'S FINE.

5           **THE COURT:**  ESPECIALLY FOR THAT.  IT'S LIKE A RED

6   CARPET ROOM DOWN THERE.  I THINK YOU'LL FIND IT WORKS GOOD.

7           **MR. PARCHER:**  THEY LET PEOPLE FROM THE SOUTHERN

8   DISTRICT IN THERE?

9           **THE COURT:**  WELL, WITH A COURT ORDER I GUESS IT CAN

10  BE ARRANGED.

11          (LAUGHTER)

12          **MR. KATZ:**  ONE FINAL THING, YOUR HONOR, AND THAT IS

13  YOUR HONOR SAID THE OTHER DAY THAT WE WOULD GO INTO A PUNITIVE

14  DAMAGES HEARING WITHIN 15 MINUTES OR SO OF VERDICT, IF THAT WAS

15  APPROPRIATE.  AND WE WOULD PROBABLY PUT MR. BERTHELSEN ON THE

16  STAND, IF THAT'S THE CASE.  AND WE WOULD LIKE YOUR HONOR TO

17  ORDER MR. BERTHELSEN TO REMAIN.

18          **THE COURT:**  MR. BERTHELSEN, YOU'VE GOT TO REMAIN IN

19  THAT EVENT.

20          OKAY.  BUT THE ONLY TOPIC WOULD BE THE FINANCIAL

21  CONDITION.

22          **MR. KATZ:**  RIGHT.

23          **THE COURT:**  WE WOULDN'T BE GETTING BACK INTO ISSUES

24  OF REPREHENSIBLE CONDUCT.

25          **MR. KATZ:**  I UNDERSTAND, YOUR HONOR.

1          THE COURT:  ALL RIGHT.

2          MR. KESSLER:  YOUR HONOR, I HAVE TO TELL

3    MR. BERTHELSEN.  HE IS THE EXECUTIVE DIRECTOR OF THE UNION.  I

4    DON'T KNOW HOW MANY DAYS THE JURY IS GOING TO SIT.  I DON'T

5    OBJECT TO HIM COMING BACK, FOR HIM TO HAVE TO STAY, IF IT GOES

6    ON LONGER, IT REALLY COULD DISRUPT THE UNION'S BUSINESS AT SOME

7    POINT WITH RESPECT TO THAT.

8          FOR THEM TO RECALL HIM AGAIN FOR SOMETHING ELSE,

9    PERHAPS YOUR HONOR WOULD CONSIDER THAT IF HE HAS A NEED TO BE

10   AWAY HE WOULD COME BACK THE NEXT DAY, BUT HE DOESN'T

11   NECESSARILY HAVE TO BE HERE EACH DAY.

12         I JUST RAISE IT, YOUR HONOR.  I HAVEN'T SPOKEN TO HIM

13   YET.  BUT HE HAS SUBSTANTIALLY BEEN HERE, WHICH OBVIOUSLY MEANT

14   HE'S NOT BE BEEN DOING A LOT OF THINGS HE NEEDS TO DO FOR THE

15   UNION.

16         THE COURT:  ALL RIGHT.  I WILL VACATE THE ORDER AND

17   NOT RULE ON THIS YET.

18         MR. KESSLER:  THANK YOU, YOUR HONOR.

19         THE COURT:  WE WILL TAKE THAT UP LATER.

20         WE HAVE SOME TIME WHILE THE JURY IS DELIBERATING.

21         BUT DON'T LEAVE TOWN, MR. BERTHELSEN, UNTIL I GIVE

22   YOU PERMISSION TO.

23         ALL RIGHT.  WE'LL TAKE FIVE MINUTES SO YOU CAN

24   ARRANGE YOUR BOARDS, AND THEN WE'LL BRING IN OUR JURY FOR THE

25   CLOSING ARGUMENTS.

1          THE COURT REPORTER SAYS YOU BETTER KEEP YOUR VOICES

2   UP IF YOU WANT YOUR THING TO BE TRANSCRIBED, OTHERWISE I'M

3   GOING TO INSTRUCT THE COURT REPORTER TO INTERRUPT YOU AND SAY

4   SHE CAN'T HEAR YOU.

5          SO YOU PLEASE DO THAT, MADAM REPORTER.  AND IF THESE

6   LAWYERS ARE NOT COURTEOUS TO YOU, AND YOU JUST SAY SO RIGHT

7   THERE IN FRONT OF THE JURY, AND LET THE JURY TAKE THAT INTO

8   ACCOUNT.

9          (RECESS WAS TAKEN.)

10          **THE COURT:**  REMAIN SEATED.  LET'S GO TO WORK.  THANK

11  YOU.

12          BE SEATED, PLEASE.

13          ARE WE READY TO BRING IN THE JURY AND PROCEED WITH

14  CLOSING ARGUMENTS?

15          **MR. PARCHER:**  YES, YOUR HONOR.

16          **MR. KESSLER:**  YES, YOUR HONOR.

17          **THE COURT:**  OKAY.  LET'S DO SO.

18          (THEREUPON, THE JURY RETURNED TO THE COURTROOM.)

19          **THE COURT:**  WELCOME BACK, EVERYONE.  PLEASE HAVE A

20  SEAT.

21          WE'RE ABOUT TO HAVE OUR CLOSING ARGUMENTS.  LET ME

22  JUST TAKE A MOMENT TO TELL YOU HOW THAT'S GOING TO WORK.

23          I THINK I TOLD YOU THE OTHER DAY ROUGHLY HOW LONG IT

24  WOULD TAKE.  AND EACH SIDE GETS AN HOUR AND 20 MINUTES TOTAL

25  ARGUMENT TIME.

1       AND IN OUR SYSTEM, THE PLAINTIFF, OF COURSE, HAS THE

2 BURDEN OF PROOF, SO THERE'S A SPECIAL RULE THAT GIVES THE

3 PLAINTIFF THE OPPORTUNITY TO OPEN THE CLOSINGS, WHICH SOUNDS

4 CONTRADICTORY, TO START, MAKE THEIR MAIN ARGUMENT.

5       THEN, WE HEAR FROM THE DEFENSE.  AND THEN, THE

6 PLAINTIFF GETS TO COME BACK AND MAKE A REBUTTAL.  BUT THE GRAND

7 TOTAL OF TIME FOR BOTH SIDES IS STILL AN HOUR AND 20 MINUTES.

8       SO YOU ARE GOING TO HEAR THREE CHAPTERS, PLAINTIFF,

9 DEFENDANT, PLAINTIFF.  OKAY?

10       AND THEN, AFTER ALL THAT'S DONE, I HAVE THE DUTY TO

11 TELL YOU WHAT THE LAW IS THAT GOVERNS THIS CASE.  AND THE

12 LAWYERS AND I HAVE WORKED HARD TO COME UP WITH SOME

13 INSTRUCTIONS THAT WILL TELL YOU WHAT THE LAW IS.

14       AND THEN, OF COURSE, IT WILL BE YOUR DUTY TO GO INTO

15 THE JURY ROOM AND TALK, TALK, TALK, NOT BEING ALLOWED TO DO

16 THAT ABOUT THE CASE, BUT THEN IT WILL BE YOUR DUTY TO DO THAT

17 AND TO DECIDE THE CASE.

18       SO THAT'S WHERE WE ARE TODAY.  NOW, YOU KNOW, MANY

19 TIMES DURING THE TRIAL I TOLD YOU THAT WHAT THE LAWYERS SAY IS

20 NEVER, NEVER, NEVER EVIDENCE.  NEVER.

21       THE EVIDENCE IN THE CASE IS WHAT THE WITNESSES SAY

22 FROM THE WITNESS STAND AND WHAT THE DOCUMENTS SAY THAT YOU HAVE

23 IN THE JURY ROOM.

24       IN THE CLOSING ARGUMENTS, THOUGH, IT IS ARGUMENT.

25 AND IT'S PERFECTLY LEGITIMATE AND PROPER AND TIME HONORED FOR

THE LAWYERS TO BE AS EXERCISED AS THEY WANT TO GET, TO MAKE

WHATEVER ARGUMENTS THAT THEY WOULD LIKE TO MAKE, PUT THE

EVIDENCE TOGETHER IN WAYS THAT MAYBE YOU HAVEN'T SEEN IT IN

THAT LIGHT YET.

IT'S PERFECTLY OKAY.  BUT ALWAYS KEEP IN MIND THAT

YOU NEED TO DECIDE THE CASE BASED ON THE EVIDENCE IN THE CASE.

I HAVE ENCOURAGED THE LAWYERS TO -- THEY CAN'T DO

THIS IN EVERY INSTANCE, BUT ON THINGS THEY BELIEVE TO BE OF

UTMOST IMPORTANCE TO PUT IT UP ON THE BOARD, LIKE SOME OF THE

ONES YOU SEE HERE, AND ACTUALLY QUOTE THE EVIDENCE OR PUT IT UP

ON THE SCREEN SO YOU CAN SEE FOR YOURSELF OR BE REMINDED FOR

YOURSELF WHAT THE WITNESSES SAID OR WHAT THE DOCUMENTS SAID.

THEY WON'T BE ABLE TO DO THAT IN EVERY CASE.  AND IF

YOU REMEMBER THE EVIDENCE IN A WAY THAT'S DIFFERENT FROM THE

WAY THE LAWYERS ARE PRESENTING IT, OF COURSE YOUR MEMORY ALWAYS

CONTROLS OVER WHAT THE LAWYERS SAY.

SO I GIVE YOU THAT WORD OF CAUTION.  THIS APPLIES TO

BOTH SETS OF LAWYERS.  WE HAVE AN EXCELLENT, EXCELLENT SET OF

LAWYERS ON BOTH SIDES TO MAKE THESE ARGUMENTS.  WE'RE

PRIVILEGED TO HAVE THAT.

SO WITH THAT WORD OF CAUTION, I AM NOW GOING TO YIELD

THE FLOOR TO MR. PARCHER, WHO WILL MAKE THE CLOSING ARGUMENT

FOR THE PLAINTIFFS.

MR. PARCHER.

1                    **CLOSING ARGUMENT**

2          **MR. PARCHER:** THANK YOU SO MUCH, YOUR HONOR.

3          IF COURT PLEASES, LADIES AND GENTLEMEN OF THE JURY,

4  MR. KESSLER AND HIS TEAM, MY CLIENTS, SOME OF MY CLIENTS, I

5  NEED TO SAY THAT IT'S A PRIVILEGE FOR ME TO BE MAKING THIS

6  ARGUMENT ON BEHALF OF THE PLAINTIFFS.

7          YOU KNOW, FOR ME, FOR ME, SIMILARLY TO THE COURT, THE

8  JURY SYSTEM IS ONE OF THE GREATEST THINGS AMERICA HAS, YOU

9  KNOW.

10         SO I'M GOING TO TAKE MY BEST SHOT AT TELLING YOU WHAT

11 OUR CASE IS.  I'M SURE MR. KESSLER IS GOING TO DO THE SAME.

12 AND THE JUDGE WILL GIVE YOU THE LAW, AND THEN IT'S IN YOUR

13 HANDS, WHICH IS THE WAY IT SHOULD BE.

14         IF I PERSUADE YOU THAT WE PROVED OUR CASE, I'M SURE

15 YOU'LL COME THROUGH.  AND IF HE PERSUADES YOU THAT I HAVEN'T,

16 I'M SURE YOU'LL COME THROUGH, TOO.  THAT'S THE WAY IT'S

17 SUPPOSED TO BE.  I'M EASY WITH THAT.

18         SO HERE I GO.

19         I REPRESENT 2,062 RETIRED PLAYERS WHOSE CONTRACTUAL

20 RIGHTS HAVE BEEN BREACHED.  THEIR AGENTS -- THAT'S THE

21 DEFENDANTS, IN MY ESTIMATION -- BREACHED ITS FIDUCIARY

22 OBLIGATIONS TOWARD THEM.  I USED A HARSH WORD.  I HAVE GOT TO

23 USE IT AGAIN:  DESPICABLY.  I USED IT IN THE OPENING.

24         THEY LIED.  THEY CHEATED.  THEY TRICKED.  AND THEY

25 DEMEANED THEM.

1          FOR ALL THIS THEY ARE SEEKING THE MONEY TO WHICH THEY

2    ARE ENTITLED TO.  IT'S THE GLA.  IT'S THE GLA.  IT'S THE GLA.

3    AND PUNITIVE DAMAGES TO PUNISH THE DEFENDANTS FOR THEIR

4    CONDUCT.

5          NOW, THE GLA, WHICH IS UP HERE ON THE BOARD, WE CAN

6    FLASH IT ON THE SCREEN.  THE GLA IS CLEAR, DOUG ALLEN -- DOUG

7    ALLEN ACKNOWLEDGED IT WAS CLEAR.  HE HAD A DIFFERENT VERSION OF

8    THE CLARITY THAN OUR SIDE DOES, BUT WHAT I'M COUNTING ON IS

9    THAT WITH ALL THE TESTIMONY THAT'S BEEN GIVEN HERE, THE JURY

10   WILL SEE ITS CLARITY, BECAUSE I PERSONALLY DON'T THINK IT'S A

11   COMPLICATED DOCUMENT AT ALL.

12         UNDER THE GLA, THE PLAINTIFFS WERE ENTITLED TO SHARE

13   EQUALLY, AN EQUAL SHARE OF GROUP LICENSING, BUT RECEIVED

14   NOTHING.

15         THAT'S MY CLUMSY DRAWING EVERYBODY HAD FUN WITH,

16   EXCEPT ME.  YOU KNOW?  63/37/0.  THEY RECEIVED NOTHING.

17         THE LICENSEES, OF WHICH THERE ARE 96 INVOLVED IN THIS

18   CASE, REPEATEDLY REQUESTED AND OBTAINED RIGHTS TO SIX OR MORE

19   CURRENT OR FORMER PLAYERS.  AND UNDER THE GLA, IF SIX OR MORE

20   CURRENT OR FORMER PLAYERS ARE LICENSED, MY CLIENTS ARE ENTITLED

21   TO THEIR SHARE OF THE MONEY.

22         SO WE SAY THE DEFENDANTS BREACHED THE CONTRACT.

23         NOW, I WANT TO BE CLEAR ABOUT THIS.  THE FACT SOME OF

24   THE SIX OR MORE MAY HAVE BEEN RETIRED PLAYERS WHO DID NOT SIGN

25   GLA'S, AND SOME WERE PLAYERS WHO DID, IS OF NO CONSEQUENCE

1   WHATSOEVER.

2        YOU'LL NEVER SEE THE WORD "AD HOC" IN THE GLA.  THAT

3   WAS A WORD THAT WAS INVENTED BY THE DEFENDANTS TO THROW YOU

4   WAY, WAY, WAY OFF THE TRACK.

5        WHAT THE CONTRACT SAYS IS "SIX OR MORE CURRENT OR

6   FORMER PLAYERS."  A FORMER PLAYER IS A FORMER PLAYER WHETHER HE

7   SIGNED A GLA AGREEMENT, WHETHER HE GOT WHAT THEY CALL AN "AD

8   HOC AGREEMENT," WHICH IS AN INDIVIDUAL CONTRACT, OR EVEN IF HE

9   WAS AN ACTIVE FELLOW THAT DIDN'T SIGN THE GLA.  SIX OR MORE IS

10  SIX OR MORE.

11       THE WORD "AD HOCS" IS AN ARTIFICIAL CONSTRUCT OF THE

12  DEFENDANTS IN AN ATTEMPT TO CONFUSE THE CLARITY OF THE GLA.

13       ON THE FIDUCIARY SIDE, WHAT I WOULD LIKE TO SAY IS

14  THAT PLAYERS INC WAS THE TRUSTED AGENT, THE LICENSING AGENT

15  REPRESENTING THE CLASS.

16       NOW, A TRUSTED AGENT REPRESENTED THEM.  THEY SAID

17  THEY WERE REPRESENTING THE 2100 PEOPLE.  I DON'T HAVE TO SHOW

18  YOU ANY BULLETIN BOARDS OF THAT.

19       AS A TRUSTED AGENT REPRESENTING THEM, THE DEFENDANTS

20  OWED THE PLAINTIFFS A FIDUCIARY DUTY.

21       LOOK, I'M HERE AS AN AGENT OF THE PLAINTIFFS.  I'M

22  THEIR LAWYER.  I HAVE A DUTY NOT TO SELL THEM OUT DOWN THE

23  RIVER.  I HAVE A DUTY TO DO MY BEST FOR THEM.

24       I HAVE A DUTY TO TRY AS HARD AS I POSSIBLY CAN TO

25  PERSUADE YOU IN THE JUSTICE OF THEIR CAUSE.  THAT'S A

1  FIDUCIARY.  THAT'S WHAT I SAID YOU'LL FIND -- I HOPE YOU'LL

2  FIND -- THAT THE DEFENDANTS WERE IN THIS CASE.

3          THE DEFENDANTS DID EVERYTHING IN THEIR POWER TO

4  DEPRIVE PLAINTIFFS OF THEIR JUST ENTITLEMENTS.  AND WORSE THAN

5  THAT, WORSE THAN THAT, THEY PRETENDED TO BE DOING GOOD DEEDS.

6  THEY PRETENDED TO BE DOING GOOD DEEDS.

7          NO WORSE PERSON THAN A PERSON WHO PRETENDS TO BE YOUR

8  FRIEND, WHO PRETENDS TO BE YOUR ALLY, WHO PRETENDS TO BE ON

9  YOUR SIDE, AND THE TRUTH IS HE'S NOT AT ALL.  HE'S NOT AT ALL.

10          MY CLIENTS, A BUNCH OF WHOM ARE OUT THERE, TRUSTED

11  THESE PEOPLE.  AND THE DEFENDANTS ACTED ENTIRELY TO PROTECT

12  THEIR OWN INTERESTS TO THE DETRIMENT OF THE PLAINTIFFS BY

13  DOUBLE-TALK, WHICH I HOPE I GET TO IN THIS HOUR, DOUBLE-DEALING

14  AND DOUBLE STANDARDS.

15          THE DEFENDANTS BREACHED THEIR DUTY.  THEY DID NOT

16  HONOR THEIR FIDUCIARY DUTY, AND HERE'S THE POINT:  IT'S TIME

17  FOR THEM TO LIVE UP TO THE DEAL THEY MADE.

18          RIGHT?  WHAT IT FINALLY COMES DOWN TO, AT THE BOTTOM

19  LINE, IS:  A DEAL IS A DEAL.  IF I SAID THE DEAL WAS THIS, THAT

20  IS WHAT THE DEAL IS.  THE DEAL ISN'T "THIS," BUT YOU DON'T

21  REALIZE IT'S REALLY "THAT."  IT'S TIME FOR THEM TO LIVE UP TO

22  THE DEAL THEY MADE.

23          LET'S GO TO THE GLA.  IF YOU COULD BLOW IT UP.  I

24  GUESS YOU GOT TO GO PARAGRAPH-BY-PARAGRAPH.

25          AND I DON'T WANT TO BE A GUY THRASHING AROUND NOW.

1          IF SIX OR MORE PRESENT OR FORMER PLAYERS' IMAGES ARE

2    UTILIZED, THEN THE PLAINTIFFS, ALL 2,062 OF THEM WHO SIGNED

3    GLA'S IN EFFECT FOR THE YEARS 2004 TO 2007, ARE ENTITLED TO

4    SHARE THE GROUP LICENSING REVENUE.

5          YOU GET ALL THESE EXPERTS UP HERE.  I PERSONALLY

6    DON'T THINK AN EXPERT WAS AT ALL NECESSARY IN THIS CASE FOR

7    EITHER SIDE.  THAT'S MY OWN OPINION.

8          YOU GET ALL THE EXPERTS UP HERE, AND THEY'RE USING

9    THE WORD "GROUP LICENSING REVENUE."  GROUP LICENSING REVENUE,

10   IN OTHER WORDS, THE MONIES DERIVED FROM THE LICENSEES AND

11   RECEIVED BY PI.  THEY ARE ENTITLED TO DIVIDE THAT MONEY UNDER

12   THE GLA WITH ALL ELIGIBLE NFLPA MEMBERS WHO SIGNED GLA'S.

13         VERY SIMPLY, A DOLLAR COMES IN.  WHAT DID THE UNION

14   OR PI GIVE THE ACTIVE PLAYERS?  OUR GUYS ARE ENTITLED -- EXCUSE

15   ME -- THE PLAINTIFFS ARE ENTITLED TO AN EQUAL SHARE.

16         NOW, LOOK.  THERE'S BEEN SOME FIGHTING ABOUT THE WORD

17   "ELIGIBLE."  TAKE AT LOOK AT THE -- I GUESS IT'S THE FIFTH --

18   THE LAST PARAGRAPH THERE.

19         IF WE CAN GO DOWN TO -- WE HAVE "ELIGIBLE" IN IT.

20         (DOCUMENT DISPLAYED.)

21         THANK YOU.

22         WHAT DOES THE WORD "ELIGIBLE" MEAN?  I WAS STUNNED --

23   I DON'T KNOW IF YOU WERE -- TO HEAR MR. ALLEN SUGGEST THAT

24   "ELIGIBLE" MEANT RETIRED PLAYERS.

25         HE ACKNOWLEDGES VERY PLAINLY THAT THE "PLAYER" IN

1  THAT PARAGRAPH IS THE SIGNATORY, MEANING ALL 2,062 OF THE

2  PLAINTIFFS.  BUT THEN HE SAYS "ELIGIBLE MEANS RETIRED."

3           NOW, LOOK.  I DON'T HAVE TIME IN ONE HOUR TO GO OVER

4  EVERY SINGLE DOCUMENT.  PAPI AND PI MADE AN AGREEMENT AMONGST

5  THEMSELVES THAT THEY WOULD FOLLOW THE ELIGIBILITY RULES BETWEEN

6  EACH OTHER.  AND THEN, THEY WENT TO SOME MINUTES.  WE CAN GET

7  THE MINUTES ON THE BOARD.

8           AND IN THE MINUTES, AND IT'S THERE, THEY SAID, "IN

9  ORDER FOR A PLAYER TO BE CONSIDERED ELIGIBLE ..."  AND IT GOES

10 ON.  YOU CAN TAKE IT INTO THE JURY ROOM, IF YOU WANT TO.

11          THE BOTTOM LINE OF THAT IS THAT'S AN ACTIVE PLAYER

12 MEMORANDUM.  THERE'S NO IFS, ANDS OR BUTS ABOUT IT.

13          IF YOU WANT TO BE ELIGIBLE, AN ELIGIBLE MEMBER OF THE

14 NFLPA, YOU HAVE GOT TO BE ACTIVE.  FORGET WHETHER YOU ARE OFF

15 TO THE LEFT OR OFF TO THE RIGHT A LITTLE BIT.  YOU HAVE TO BE

16 ACTIVE.

17          THERE IS NO OTHER DEFINITION.

18          THE FACT THAT MR. ALLEN SAYS "ELIGIBLE MEANS RETIRED"

19 IS A FARCE, AN ABSOLUTE FARCE.

20          LISTEN, ALLEN HIMSELF TESTIFIED -- I THINK DR. NOLL

21 DID, TOO, BUT I COULD BE WRONG -- AND, OF COURSE, AS THE JUDGE

22 SAID YOUR MEMORY, YOU KNOW -- I WON'T INTENTIONALLY MISSTATE

23 ANYTHING, BUT I COULD BE WRONG.  I THINK DR. NOLL SAID IT, TOO.

24 BUT CERTAINLY I KNOW MR. ALLEN DID, BECAUSE I CROSS-EXAMINED

25 HIM.  HE ACKNOWLEDGED THAT THERE WERE RETIRED SIGNATORIES OF

1    THE GLA THAT WERE NOT MEMBERS OF THE NFLPA.

2           SO HOW IN THE WORLD, ASIDE FROM THE FACT THAT THERE'S

3    NO DEFINITION THAT MADE THEM ANYBODY BUT ACTIVES RETIRED, HOW

4    IN THE WORLD, HOW IN THE WORLD CAN YOU SAY THAT "ELIGIBLE"

5    MEANS "RETIRED"?

6           THAT WOULD MEAN THAT A GOOD PORTION OF THE PEOPLE WHO

7    SIGNED THE GLA'S WOULDN'T BE ELIGIBLE, BECAUSE THEY WEREN'T

8    MEMBERS OF THE GLA.

9           AND, FINALLY, IF "ELIGIBLE" MEANT "RETIREDS," THEN IF

10   YOU HAD SIX OR MORE ACTIVES, THEY COULDN'T SHARE, EITHER,

11   BECAUSE "ELIGIBLE" ONLY MEANT "RETIREDS."

12          THE ONLY, ONLY -- I DON'T MEAN THIS IS A THEORY --

13   THE ONLY POSSIBLE CONSTRUCTION YOU CAN GET OUT OF THE PLAYERS

14   WHO WERE ELIGIBLE NFLPA MEMBERS WOULD SHARE, RIGHT, IS THE

15   PLAYERS, AS MR. ALLEN CONCEDED, MEANS MY CLIENTS AND ELIGIBLE

16   AS THEY DEFINED IT UP ON THE BOARD BEFORE IN THE MINUTES THAT

17   WERE PUT UP BY MR. KESSLER HIMSELF WITH A LINE ITEM, ELIGIBLE

18   WAS ACTIVE PLAYERS.

19          OKAY.  I WANT TO JUST SAY A FEW THINGS SO THAT WHAT

20   WE FEEL THE CASE IS ABOUT IS CLEAR.

21          NUMBER ONE, WHAT COMBINATION IT TAKES TO GET TO SIX

22   OR MORE IS IRRELEVANT.

23          YOU KNOW, MR. KESSLER, THE DEFENDANTS -- I DON'T WANT

24   TO PERSONALIZE THIS.  HE IS DOING HIS JOB.  HE IS DOING A GOOD

25   JOB.

1              THE DEFENDANTS HAVE TAKEN YOU DOWN A PATH, A PATH

2    OF -- I DON'T KNOW WHAT TO SAY.  IT'S LIKE A CIA THING OR

3    SOMETHING.  JUST TAKES YOU DOWN THE ROAD, AND HE GETS YOU

4    GOING.

5              IT DOESN'T SAY IT'S GOT TO BE SIX ACTIVES.  IT

6    DOESN'T SAY IT'S GOT TO BE SIX RETIREDS.  IT DOESN'T SAY

7    AD HOCS CAN'T BE IT.

8              ANY COMBINATION OF SIX OR MORE, AND THIS GLA KICKS

9    IN.  THERE'S NO OTHER EXPLANATION THEY CAN GIVE YOU.

10             HE'LL GET UP THERE -- AND THE JUDGE WILL SAY:

11   "FAIRNESS ISN'T WHAT IT'S ABOUT," ALTHOUGH I BELIEVE I'M GOING

12   TO CONVINCE YOU IT IS FAIR, YOU KNOW.

13             BUT HE'S GOING TO GET UP THERE AND INSINUATE:

14             "WELL, IT'S NOT FAIR.  THE ACTIVES DROVE THE

15   ENGINES.  THE RETIREDS WERE WORTHLESS."  YOU KNOW?

16             "YOU DON'T UNDERSTAND AD HOCS.  THE STARS WERE

17   THE ONLY ONES PEOPLE WANTED."

18             IT HAS NOTHING TO DO WITH THE CASE.  EXCUSE ME.  IT'S

19   GOT NOTHING TO DO WITH THE GLA.

20             SIX OR MORE ACTIVE OR RETIRED.  THAT'S IT.  THAT'S

21   IT.

22             AND HE COULD TALK TO SWEET TUESDAY.  HE COULD TALK

23   HIS WAY THROUGH ARMISTICE'S DAY.  THAT'S IT.  SIX OR MORE

24   ACTIVE OR RETIRED.  AND A DEAL IS A DEAL.

25             OKAY.  IT DOES NOT EVEN MATTER WHETHER RETIREDS ARE

1    INCLUDED OR EXCLUDED FROM THE LICENSE, IF IT'S SIX OR MORE.  WE

2    BELIEVE WE'RE GOING TO PERSUADE YOU THAT THE EA LICENSE, YOU

3    REMEMBER THAT.  WE FOUGHT ABOUT PARAGRAPHS 1(A) AND 2 AND

4    PARAGRAPH 13.

5             WE BELIEVED WE WERE GOING TO PERSUADE YOU THAT THE

6    RETIREDS WERE IN IT.  BUT IT DOESN'T MAKE ANY DIFFERENCE.

7    DOESN'T MAKE ANY DIFFERENCE.  COULD HAVE TRIED THE CASE WITHOUT

8    GETTING INTO THAT ISSUE AT ALL.

9             IF IT WAS ALL ACTIVE PLAYERS IN THE EA LICENSE,

10   THAT'S SIX OR MORE.  SIX OR MORE.  BALL GAME.  DIVIDE THE MONEY

11   UP RIGHT NOW.

12            IF IT HAPPENED -- WHICH IT NEVER DID HAPPEN -- THAT

13   IT WAS ALL RETIRED PLAYERS IN THE DEAL WITH EA, THEY'D HAVE HAD

14   TO DIVIDE THE MONEY.

15            THIS IS A GROUP LICENSE.  IT'S NOT A GROUP LICENSE OF

16   RETIREDS AND A GROUP LICENSE OF ACTIVES.  THAT'S NOT WHAT IT

17   SAYS.  IT'S A GROUP LICENSE.  IT'S A RETIRED PLAYERS' GROUP

18   LICENSE.  WHAT YOUR RIGHTS WILL BE IS SIX OR MORE ACTIVE OR

19   RETIRED PLAYERS GIVE UP THEIR NAMES AND IMAGES.

20            TAKE A LOOK AT EA FOR JUST A MOMENT.  IN THE BOTTOM

21   PARAGRAPH OF EA, IT REFERS TO RETIRED PLAYERS WHO HAVE NOT

22   ENTERED INTO SUCH GROUP LICENSING AUTHORIZATION.

23            THOSE ARE OUR GUYS.  EXCUSE ME.  THOSE ARE THE

24   PLAINTIFFS.  THOSE ARE THE PLAINTIFFS.

25            THE REALITY IS THAT IF YOU READ THAT WHOLE PARAGRAPH

1  YOU'LL SEE IT COULD ONLY BE TALKING ABOUT US.  PARAGRAPH 2

2  SAYS:

3          "WHATEVER RIGHTS WE GAVE YOU IN 1(A), WHATEVER

4  RIGHTS WE GAVE YOU IN 1(A), YOU GOT THEM," WHICH MEANS THEY

5  LICENSED RETIREDS, TOO.

6          AND THE CLINCHER WILL BE, THE FINAL PROOF WOULD BE,

7  IF YOU TURN TO PARAGRAPH 13, JUST MAKE BELIEVE THAT RETIREDS

8  AREN'T IN THE EA AGREEMENT.  JUST MAKE BELIEVE IT.  WOULD YOU

9  TELL ME WHY IN THE WORLD THEY GET THE LICENSEE TO SIGN AN

10 AGREEMENT THAT SAYS -- THIS IS EA, RIGHT?  THESE ARE MY WORDS.

11 YOU GOT TO READ IT FOR YOURSELF -- "YOU CAN'T GO ANYWHERE NEAR

12 ANYBODY WHO AT ANY TIME IN THE PAST WAS UNDER CONTRACT TO AN

13 NFL CLUB."

14         WHO ARE WE TALKING ABOUT HERE?  WHO?  WHO IN THE PAST

15 WAS UNDER CONTRACT TO AN NFL CLUB?  RETIRED BALLPLAYERS.

16 THEY'RE SITTING OUT THERE.

17         SO THE FACT IS, YOU KNOW, YOU COULD CREDIT

18 MR. LINZNER.  YOU COULD NOT CREDIT MR. LINZNER.  I SUGGEST TO

19 YOU THAT HE WAS IN THE DEFENDANTS' POCKET.  YOU KNOW?

20         MAYBE YOU DON'T THINK SO.  MAYBE YOU THINK HE WAS THE

21 NICEST GUY UP IN THE WORLD UP THERE SMILING AT YOU, ACTING LIKE

22 HE WAS TOTALLY NEUTRAL AND ALL THAT.

23         THAT'S YOUR PREROGATIVE.  THAT'S YOUR PREROGATIVE.

24 BUT THE FACT OF THE MATTER IS IT WOULD APPEAR TO BE A GROUP

25 LICENSE OF ACTIVES AND RETIREDS.

1    BUT SAY IT WAS NOT.  SAY IT WAS A LICENSE.  YOU

2 DON'T -- YOU, I'M RESPECTFULLY SAYING THIS, YOU CAN DO WHATEVER

3 YOU WANT.  SAY IT WAS LICENSE, YOU KNOW, OF 1800 ACTIVES AND A

4 WHOLE BUNCH OF -- USING MR. KESSLER'S WORDS -- "RETIRED

5 AD HOCS."  THAT'S AN AGREEMENT OF SIX OR MORE CURRENT OR FORMER

6 PLAYERS.  THAT'S IT.  THAT IS IT.

7    LET'S TALK ABOUT THE ORIGINS OF THIS PARTICULAR

8 AGREEMENT, BECAUSE I THINK IT WILL LEND SOME IMPORTANT THOUGHTS

9 TO YOUR UNDERSTANDING IN THIS CASE.

10    IN 1994 -- AND MAYBE I GOT THE WRONG YEAR, BUT, YOU

11 KNOW, IN THE '90S SOMEWHERE THE DEFENDANTS DECIDED TO GO INTO

12 THE TALENT AGENCY BUSINESS.

13    NOW, UNDERSTAND THIS.  THE BUSINESS OF A UNION IS TO

14 BE A UNION.  THE BUSINESS OF A TALENT AGENCY -- AND THEY USED

15 THE WORD "LICENSING."  DO YOU KNOW?  BUT LICENSING IS A LOT

16 BIGGER WORD THAN JUST GOING TO VIDEO GAME PEOPLE AND POSTER

17 PEOPLE AND T-SHIRT PEOPLE, YOU KNOW?

18    LICENSING IS TELEVISION, AND TELEVISION SHOWS, AND

19 MOVIE DOCUMENTARIES, AND RADIO, AND STORIES IN NEWSPAPERS, AND

20 ADVERTISEMENTS, AND ALL KINDS OF THINGS THAT AN AGENCY --

21 REMEMBER THAT TRACE ARMSTRONG?  YOU KNOW?  THE FELLOW WAS A

22 FORMER BALL PLAYER WHO CAME IN OUT OF CENTRAL CASTING FROM

23 HOLLYWOOD, YOU KNOW?

24    THEY HAD 13,000 RETIRED PEOPLE TO PICK ON, AND THEY

25 PICKED TRACE ARMSTRONG.  JOHN WAYNE, DO YOU KNOW?  SEEMED LIKE

1   A PRETTY NICE GUY TO ME, ACTUALLY.  YOU KNOW?

2           HE WORKS WITH CAA.  AND HE ACKNOWLEDGES CAA IS ONE OF

3   THE MOST POWERFUL AGENCIES IN THE COUNTRY.  AND THERE WERE

4   PLENTY OF OTHERS.

5           THEY ARE IN HOLLYWOOD.  NO OFFENSE TO ANYBODY.  THEY

6   ARE IN MY CITY, TOO, NEW YORK, NEW YORK.  HOLLYWOOD THEY WEAR

7   T-SHIRTS, YOU KNOW, AND OPEN COLLARS.  AND IN NEW YORK THEY PUT

8   ON PINSTRIPE SUITS.

9           BUT THEY'RE AGENTS, AND THEY FIGHT LIKE HECK TO GET

10  THEIR CLIENTS' NAMES AND LIKENESSES PUT ALL OVER THE PLACE.

11  ALL OVER THE PLACE.

12          THEY DON'T GO OVER TO SOMEBODY AND SAY:

13              "WELL, ARE YOU INTERESTED IN MY RETIREDS?

14              "NO, NOT REALLY.

15              "OH, THAT'S OKAY.  THEY'RE WORTHLESS, ANYWAY.

16  NOTHING MUCH I CAN DO ABOUT IT."

17          NO, THEY GO TO WAR.  THEY GO TO WAR TO FIGHT FOR

18  THEIR GUYS.

19          AT ANY RATE, THAT'S NOT REALLY THEIR BUSINESS,

20  ALTHOUGH THEY'RE MAKING HUNDREDS OF MILLIONS OF DOLLARS OUT OF

21  IT; DO YOU KNOW?

22          BUT THAT'S NOT THEIR BUSINESS.

23          SO THEY DECIDED THAT THEY WERE GOING INTO THE

24  BUSINESS OF LICENSING.  WHEN THEY STARTED IN THE '90'S, PLEASE

25  UNDERSTAND THIS:  THEY HAD NO CREDIBILITY IN THIS FIELD.  IT

 1  WAS LIKE:  WHOA.

 2          NO CAA.  I DON'T KNOW IF YOU KNOW THE NAMES OF THE

 3  OTHER AGENCIES, YOU KNOW?  NO, WE'RE GOING TO SELF-LICENSE.  WE

 4  ARE FORMING PLAYERS INC FOR PROFIT, AND WE'RE GOING TO

 5  SELF-LICENSE.

 6          THEY NEEDED -- THEY, THE DEFENDANTS, NEEDED TO CREATE

 7  CREDIBILITY IN THE FIELD.  NO CREDIBILITY, NOBODY IS GOING TO

 8  GO TO YOU.

 9          DID YOU HEAR MR. ARMSTRONG SAY:

10              "WELL, CAA REPRESENTS SOME FOOTBALL PLAYERS."

11          OKAY.  YOU'RE A LICENSEE.  YOU WANT FOOTBALL PLAYERS

12  FOR YOUR BRAND.  YOU WANT THEM FOR A BIG TELEVISION

13  DOCUMENTARY.  YOU WANT THEM FOR A REALITY TV SHOW.  THESE GUYS

14  MIGHT MAKE A GOOD REALITY TV SHOW, THESE WORTHLESS GUYS?

15          YOU KNOW?  YOU KNOW WHAT YOU DO?  YOU KNOW WHAT YOU

16  DO?  CALL UP CAA.  CALL UP TRACE, AND SAY:

17              "WHO HAVE YOU GOT AT CAA?"

18          THEY NEEDED TO KNOCK THE COMPETITION OUT BEFORE IT

19  BEGAN.  THAT'S CALLED "ONE-STOP SHOPPING."  THAT'S CALLED "THE

20  ONLY GAME IN TOWN."

21          NOW, UNDERSTAND, YOU KNOW, THIS IS THE STUFF THAT

22  COMES IN A VIDEO OR COMES IN A DOCUMENT.  BUT FOLLOW IT

23  THROUGH.  IF THEY'RE NOT ON TOP, THEY DON'T CONTROL.  THEY

24  DON'T CONTROL THE FIELD.

25          SO WHAT DID THEY DO?  THEY SOLICIT.  THEY GOT THE

1  ACTIVES.  AND THEY SOLICIT ALL THE GLA'S WHO ARE RETIRED.  AND

2  THEY PUSH, AND THEY PUSH.

3          YOU SAW THAT ALLEN LETTER.  YOU SAW THE HEADLINE THAT

4  SAID:  "GROUP LICENSING IS ESSENTIAL."

5          LONG AFTER, EIGHT YEARS OR SO, EIGHT YEARS OR SO

6  AFTER, NOT ONE PENNY.

7          ACCORDING TO MR. ALLEN, HAS COME IN FOR THE RETIREDS,

8  HE HAS A HEADLINE IN TOUCHBACK -- HOPE I GET TO IT ON THIS --

9  THAT SAYS:

10          "GROUP LICENSING IS ESSENTIAL."

11          NOW, WHY, WHY FROM THE VERY START ARE THEY PUSHING SO

12  HARD?  FROM THE FIRST MINUTE OF THE FIRST SECOND THAT THEY

13  DECIDED THEY WANTED TO GO INTO THE TALENT AGENCY BUSINESS

14  UNTIL THE LAST.  MR. KESSLER WOULD HAVE YOU BELIEVE IT WAS FROM

15  THE GOODNESS OF THEIR HEARTS.

16          OH, DO THEY LOVE THOSE RETIRED PLAYERS, YOU KNOW?

17  OH, DO THEY LOVE THEM.  THEY BROUGHT IN ABOUT $200 MILLION

18  DURING THE YEARS IN QUESTION.  I THINK IT WAS 215.  THEY

19  BROUGHT IN A LOT MORE, BUT I'M JUST TALKING ABOUT '04 THROUGH

20  '07.  DO YOU KNOW?

21          OH, DID THEY LOVE THEM.  DID THEY TAKE CARE OF THEM.

22  THEY GAVE THEM NOT ONE SINGLE PENNY.  THEY GAVE THEM A LITTLE

23  NIBBLE HERE AND A LITTLE NIBBLE THERE.  TAKE THEM TO THE

24  CONVENTION, LIKE THAT LOVELY FELLOW, MR. GOICH.

25          DON'T YOU THINK HE'S A HAPPY GUY?  GETS TO GO TO

1  HAWAII TWICE A YEAR, OR WHATEVER IT IS?  THEY DON'T HAVE ANY

2  CONFERENCES IN ROMANIA, YOU KNOW?

3           THEY GO RIGHT TO WHERE THE SUN SHINES, YOU KNOW?  AND

4  THE PINA COLADAS.  AND THE PINA COLADAS ARE THERE, YOU KNOW?

5  HE SEES ALL HIS GUYS.  EVERYBODY PATS EACH OTHER ON THE BACK,

6  YOU KNOW?  AND HE'S A HAPPY MAN.

7           MEANWHILE, THEY'RE MAKING A COUPLE HUNDRED MILLION

8  DOLLARS, AND HE DOESN'T EVEN KNOW IT.

9           YOU KNOW, THE FACT IS -- AND THIS IS NOT HIS CASE --

10 THE ACTIVES WERE DUPED, TOO.  BUT MAYBE I'LL GET TO IT, AND

11 MAYBE I WON'T GET TO IT.

12          BUT THE REALITY IS HERE THEY NEEDED TO ACHIEVE

13 ONE-STOP SHOPPING.  THEY NEEDED TO DEFEAT THE COMPETITION

14 BEFORE THE GAME BEGAN.

15          SO WHAT DID THEY DO?  THEY WANTED TO CREATE -- YOU

16 KNOW, THE ECONOMIST'S WORD, DO YOU KNOW?  AND MR. ALLEN, WHO IS

17 NOW IN HOLLYWOOD WITH THE SCREEN ACTORS GUILD, HE'S GOT THE

18 WORD:  CRITICAL MASS.  DO YOU KNOW?

19          WE GO TO WAR IN IRAQ, AND WE WENT TO WAR IN KOREA

20 WHEN I WAS A KID.  IT'S CONFLICT, YOU KNOW.  CRITICAL MASS,

21 LIKE THAT'S SOME WORD THAT GOES OVER EVERYBODY'S HEAD.

22          WHAT HE MEANS IS, WHAT THEY MEAN IS:  IF YOU GET

23 THOUSANDS AND THOUSANDS OF BALLPLAYERS, AND YOU ANNOUNCE TO THE

24 WORLD -- AND THEY DO IT ON THEIR WEB SITE.  THEY DO IT ON THEIR

25 WEB SITE, RIGHT?  YOU ANNOUNCE TO THE WORLD:  "WE REPRESENT

1    MORE THAN 1800 ACTIVE PLAYERS AND OVER 3,000 RETIRED PLAYERS."

2            YOU KNOW WHAT YOU'RE TELLING THE WORLD?  "IF YOU'RE

3    INTERESTED IN LICENSING A FOOTBALL PLAYER, FAT, SKINNY, GOOD,

4    BAD, RICH, POOR, STAR, BENCH WARMER, IF YOU'RE INTERESTED COME

5    TO US.  DON'T GO TO CAA.  DON'T GO TO NEW YORK TO ALL THESE

6    TALENT AGENTS, BECAUSE WE'RE THE GUYS WITH THE MOST INFLUENCE.

7    WE'RE THE GUYS WITH THE MOST POWER."

8            AND THEY GOT IT.  SURE THE ACTIVES WERE IMPORTANT IN

9    THEIR GETTING IT, YOU KNOW?  AND THE FOOTBALL LEAGUE MADE SURE

10   THAT THE ACTIVES WERE -- ALL WENT OVER THERE.

11           BUT THEY HAVE A SECOND THING, YOU KNOW?  WHICH IS

12   THEY WANTED TO SAY IT WAS EVERYBODY.  THEY DIDN'T WANT ANY

13   DISSENSION.  THEY DIDN'T WANT ANY IDEA THAT MAYBE, YOU KNOW,

14   YOU COULD GET -- YOU COULD GET HERB -- WELL, LEAVE OUT HERB.

15   ANY -- ANY -- I DON'T MEAN LEAVE HIM OUT.  BELIEVE ME, HE

16   COUNTS.  BELIEVE ME, HE DOES, YOU KNOW?

17           BUT GET ONE OF THESE FELLOWS.  MAYBE.  JUST MAYBE HE

18   PLAYS BALL WITH BART STARR, OR SOMETHING LIKE THAT, YOU KNOW?

19   AND MAYBE HE'LL SAY:

20               "BUT I'VE GOT THE MOST TERRIFIC AGENT IN THE

21   WORLD.  WHY DON'T YOU COME HERE INSTEAD OF THE UNION?"

22           AND BEFORE YOU KNOW IT, THERE'S A SEAM.  THERE'S A

23   CRACK.  THERE'S A LEAK IN THE DAM.

24           SO THEY, TO GET THEIR CREDIBILITY, GET ALL OUR GUYS

25   TO SIGN.  AND WHAT DID THEY DO?  THEY MERGE THEIR LICENSING

1  RIGHTS, IMAGE RIGHTS, IDENTITY RIGHTS WITH THE ACTIVES.

2          NOW, UNDERSTAND SOMETHING.  IF ANYTHING WAS OFFENSIVE

3  IN THIS CASE, I DON'T THINK MR. KESSLER CONSCIOUSLY MEANT TO BE

4  OFFENSIVE.  HE'S JUST TRYING THE CASE FOR HIS GUYS AS BEST HE

5  COULD.  THAT'S WHAT HE'S SUPPOSED TO DO IN THE SYSTEM, YOU

6  KNOW?  YOU KNOW, SUGGESTED THAT THEY WERE WORTHLESS; THAT THEY

7  GAVE NOTHING; THAT ALL IT COST THEM WAS A POSTAGE STAMP.

8          WELL, NUMBER ONE, LET ME ASK YOU THIS:  WHAT DID IT

9  COST THE UNION TO GET ALL THESE GUYS TO SIGN UP?  I THINK THEY

10  WERE THE ONES WHO BOUGHT THE POSTAGE STAMP.  I DON'T REMEMBER

11  WHETHER THEY GAVE YOU A POSTAGE STAMP OR THE RETIREDS HAD TO

12  PUT ONE ON.

13          BUT WHOEVER HAD TO PUT A STAMP ON, THE WAY

14  MR. KESSLER LOOKS AT IT, THAT'S WHAT IT COST THEM.  IF THEY PUT

15  THE STAMP ON, THAT'S WHAT IT COST THEM.  OTHERWISE, IT COST

16  THEM NOTHING.

17          THEY PLAYED ON -- ON THE RETIREDS' PATRIOTISM.  THEY

18  PLAYED ON THEIR SENSE OF BELONGING.  THEY PLAYED ON THEIR SENSE

19  OF FAMILY.  THEY PLAYED ON THEIR SENSE OF TRUST.

20          THESE ARE NOT ORGANIZED MEN.  THEY WEREN'T ORGANIZED

21  UNTIL THE LAWSUIT.  THESE ARE 2100 INDIVIDUAL GUYS, LIVING ALL

22  OVER THE COUNTRY.  GUYS WHO HAD THEIR GLORY DAYS, YOU KNOW?

23  WHO WERE CALLED UPON TO GIVE THEIR IDENTITY RIGHTS.

24          NOW, LOOK, YOU KNOW, I DON'T -- I DON'T WANT TO

25  PERSONALIZE THIS, YOU KNOW?  BUT I DON'T THINK -- DON'T

1  THINK -- I HOPE THIS JURY DOESN'T THINK THAT MATERIAL THINGS

2  ARE WHERE IT'S AT.

3          THE JUDGE WILL INSTRUCT YOU, NO DOUBT, THAT EVERY

4  CONTRACT REQUIRES CONSIDERATION.  "CONSIDERATION" MEANS YOU'VE

5  GOT TO GIVE SOMETHING TO GET SOMETHING.

6          WHAT DID THESE MEN GIVE?  THEY GAVE THEIR IDENTITY

7  RIGHTS.  THEY GAVE WHO THEY WERE.  THEY TURNED OVER THEIR MOST

8  VALUABLE RIGHT, YOU KNOW, NEXT TO THEIR WIVES OR THEIR CHILDREN

9  OR THEIR GRANDCHILDREN FOR SOME OF THEM, YOU KNOW?  WHAT'S MORE

10 VALUABLE THAN THAT?

11          "TAKE MY NAME.  TAKE MY LICENSE, IF IT WILL HELP

12 YOU TO GET WHERE YOU WANT TO GO.  AND THEN, HOPEFULLY, I'LL GET

13 MY SHARE, LIKE YOU SAID."  DO YOU KNOW?  "BUT I'LL GIVE IT TO

14 YOU WHETHER I DO OR I DON'T."

15          ALL THESE GUYS LOVED THE GAME.  THEY LOVED THE

16 COMRADERY OF IT.  YOU KNOW?

17          SO THEY GAVE THEIR NAME AND LIKENESS WHICH IS OF

18 INCREDIBLE VALUE.  IT'S PRICELESS.  REALLY PERSONAL.  GIVE ME

19 YOUR NAME AND LIKENESS.  PUT IT IN MY POCKET.  LET ME GO OUT

20 AND DO WHAT I THINK IS APPROPRIATE WITH IT.

21          SEE IF YOU JUST SAY:

22          "WELL, THAT'S JUST A CASUAL THING."

23          NOT EVEN WORTH A BUCK AND A QUARTER, YOU KNOW?  I

24 DON'T THINK SO.  I DON'T THINK SO.

25          THEY GAVE THEM THAT.  AND WITH THAT, COMBINED WITH

1  THE ACTIVES, BECAUSE IT WAS A GROUP, WHAT DID THEY GIVE THE

2  DEFENDANTS?  A MONEY-MAKING MACHINE.  HUNDREDS OF MILLIONS OF

3  DOLLARS.  THIS ISN'T LIKE:

4              "COME ON, MAN, YOU KNOW?  WE ONLY MADE 10 BUCKS,

5  AND NOW YOU'RE GOING TO ASK ME FOR HALF OF IT?  WHAT'S WRONG

6  WITH YOU?  I'VE GOT TO PUT THE FOOD ON THE TABLE."

7          NO, GAVE THEM THE ABILITY TO MAKE HUNDREDS AND

8  HUNDREDS OF MILLIONS OF DOLLARS.  AND I DON'T WANT TO GET TOO

9  CARRIED AWAY WITH MYSELF, AS I CAN, AS YOU JURORS, YOU GUYS ALL

10 KNOW, YOU KNOW?  BUT THAT'S DISGRACEFUL.  THAT'S DISGRACEFUL.

11         SO WHAT WOULD A DEFENDANT SAY?  BECAUSE, YOU KNOW,

12 MR. KESSLER GETS HIS HOUR AND 20 MINUTES, RIGHT?  AS HE SHOULD.

13 WELL, THE DEFENDANTS WILL SAY:

14              "IT'S ACTIVE PLAYER MONEY, NOT RETIRED MONEY.

15 ONLY THE ACTIVES DROVE THE ENGINE."

16         NOW, THAT'S NOT WHAT THE GLA SAYS.  THAT'S NOT WHAT

17 THE GLA SAYS.  THAT'S NOT WHAT THEY WROTE.  THAT'S NOT WHAT

18 THEY SENT OUT YEAR AFTER YEAR AFTER YEAR.  THEY COULD HAVE DONE

19 THAT.  THEY COULD HAVE SEPARATED IT.  YOU KNOW, MAYBE THEY

20 SHOULD HAVE SEPARATED IT.  I DON'T KNOW.  I DON'T KNOW.

21         BUT THAT'S NOT WHAT THEY DID.  THAT'S NOT WHAT THEY

22 DID.  A DEAL IS A DEAL.  THEY DIDN'T SEPARATE ACTIVES FROM

23 RETIREDS.

24         THEN, THEY'LL SAY:

25              "WELL, ACTIVES SHARE WITH ACTIVES.  RETIREDS

1 SHARE WITH RETIREDS."

2          WHERE DOES IT SAY THAT?  WHERE DOES IT SAY THAT?

3 WHERE DOES IT SAY IT?  NOT ONLY IN THE GLA, WHERE DOES IT SAY

4 THAT?

5          OH, I SUPPOSE, YOU KNOW, IF YOU HAD YOUR PH.D., OR

6 SOMETHING, AND YOU CHOSE TO READ THEIR FINANCIAL STATEMENTS

7 SOMEWHERE YOU COULD FIGURE IT OUT.  YOU KNOW.  IT DOESN'T SAY

8 ANYTHING OF THE SORT.

9          IT'S SMOKE AND MIRRORS.  IT'S SMOKE AND MIRRORS.

10 WANT TO KNOW WHY IT'S SMOKE AND MIRRORS?  BECAUSE THEY CAN'T

11 DEFEND AGAINST THE GLA.  THEY CAN'T DEFEND AGAINST THE GLA.

12 AND THEY HIRED A VERY CAPABLE LAWYER.

13          AND HE CAME UP WITH A WAY, CAME UP WITH A DIVERSION,

14 YOU KNOW?  HE CAME UP WITH A WAY TO GET YOUR EYE OFF THE BALL

15 AND TRIED THREE-QUARTERS OF THE CASE WITH THAT.  THREE-QUARTERS

16 OF THE CASE WAS ABOUT THAT.

17              "ACTIVES GO WITH ACTIVES.  RETIREDS GO WITH

18 RETIREDS.  AD HOCS ARE NOT PART OF THIS THING.  SINCE WE'RE NOT

19 ASKING FOR THE MONEY, THEY'RE NOT REALLY RETIRED PEOPLE."

20          OKAY.  EVERY ONE OF THE 95 LICENSEES THAT ARE AT

21 ISSUE IN THIS CASE HAD A COMBINATION OF SIX OR MORE ACTIVE OR

22 RETIRED PLAYERS.  THERE'S JUST NO QUESTION ABOUT IT.

23          THE DEFENDANTS WILL SAY THE ONLY RETIRED THE

24 LICENSEES WANTED ARE THE AD HOCS.  WELL, I DON'T THINK THEY

25 TRIED VERY HARD.  I DON'T THINK THEY PUSHED THE ENVELOPE.

1          SUPPOSE THAT'S TRUE.  FOR PURPOSES OF THIS SUMMATION,

2   SUPPOSE THAT'S TRUE.  SO WHAT?  AN AD HOC IS NOT A RETIRED?  AN

3   AD HOC DID NOT PLAY THE GAME?  AN AD HOC IS SEPARATED OUT FROM

4   THIS DOCUMENT?  NOT A CHANCE.

5          I HAVE TO SAY THIS, YOU KNOW:  IT WOULD BE NICE TO

6   TRY A CASE WHERE WE WERE JUST TALKING ABOUT A BREACH OF

7   CONTRACT.  THEN, YOU DON'T HAVE TO CALL PEOPLE NAMES.  YOU

8   DON'T HAVE TO SAY:

9              "LIAR, LIAR, PANTS ON FIRE."  YOU KNOW?

10  EVERYBODY COULD BE ABOVE THE FRAY IN OUR BLUE SUITS AND STRIPED

11  TIES, YOU KNOW?

12         BUT THE FACT IS -- IT IS A FACT -- THAT THE

13  PLAINTIFFS ARE AGENTS, AND THEY'RE INVENTING THINGS BECAUSE OF

14  THEIR CONFLICT OF INTEREST.

15         OH, THAT'S A BAD WORD:  "CONFLICT OF INTEREST."

16         THAT'S NOT A LAWYER'S WORD.  LET'S BREATHE A LITTLE

17  LIFE IN THIS.  CONFLICT OF INTEREST.

18         I'M SUPPOSED TO REPRESENT YOU AND YOU AND YOU AND YOU

19  AND YOU AND YOU AND YOU AND YOU.  BUT I'M ONLY GOING TO

20  REPRESENT FIVE OF YOU.  THE REST OF YOU, I'M SORRY.  I'M SORRY.

21  YOU HAVE NO VALUE, RIGHT?  YOU GOT NOTHING TO COMPLAIN ABOUT.

22  WE'LL TAKE YOU TO HAWAII, DRINK A PINA COLADA.  NO PROBLEM.  NO

23  PROBLEM.  YOU KNOW?

24         THAT'S NOT THE WAY IT WORKS.  THAT'S NOT THE WAY IT

25  WORKS.

1     IF I TAKE ON EACH OF YOU AS A CLIENT, I OWE THE SAME

2 HIGH DUTY TO EACH ONE OF YOU.  AND IF I LET YOU DOWN ON

3 PURPOSE, IT'S TERRIBLE.  IF I LET YOU DOWN TO FAVOR SOMEBODY

4 ELSE -- I DON'T KNOW WHAT WORD TO USE FOR IT.  BUT THAT'S WHAT

5 HAPPENED.

6     AND THEN, HE COMES UP WITH -- "HE," I WILL STOP

7 PERSONALIZING IT.

8     THE DEFENDANTS COME UP WITH ANOTHER TRICK.

9     "WELL, WE GAVE THE RETIRED PLAYERS $30 MILLION."

10     WE'RE NOT SEEKING AN INDIVIDUAL'S MONEY.  CALL HIM AN

11 "AD HOC," BECAUSE HE DID.  IT GETS CONFUSING IF I DON'T.

12     WE'RE NOT SEEKING AN INDIVIDUAL'S MONEY WHO SIGNED AN

13 INDIVIDUAL AGREEMENT.  BUT THAT'S NOT TAKING CARE OF THE

14 RETIRED GLA 2100 GUYS.  THAT'S TAKING CARE OF SUPERSTARS WHO

15 DESERVE THEIR MONEY, YOU KNOW.

16     YOU'RE TOO YOUNG, EVERY ONE OF YOU, TO KNOW WHO BART

17 STARR IS, OR SOMETHING LIKE THAT, YOU KNOW, PLAYED IN THE FIRST

18 SUPER BOWL.  PROBABLY YOU DON'T CARE ABOUT FOOTBALL, MOST OF

19 YOU, YOU KNOW?

20     BUT -- OKAY.  SKIP THAT PART, YOU KNOW?

21     I DON'T BEGRUDGE ANY OF THEM THEIR SHARE OF THE

22 $30 MILLION.

23     BUT THAT'S NOT TAKING CARE OF THE GROUP.  WHAT ARE

24 YOU TALKING ABOUT?  THAT'S NOT GROUP MONEY.

25     AND LATER ON, YOU'LL SEE HOW THEY ADD THAT MONEY IN,

1   IF I GET THE TIME, TO INFLATE THE FIGURES AS TO WHAT THEY DID.

2   YOU WATCH.

3           NOW, IN OTHER WORDS, USING THE RIGHT WORD, THE

4   "UNSHARED MONEY," THE "AD HOC MONEY" IS NOT GLA MONEY, AND

5   PLAINTIFFS AREN'T ASKING FOR IT.

6           THEY WILL SAY THAT THE PLAINTIFFS WERE NOT USED IN

7   THE LICENSES.  WELL, FIRST, I THINK YOU'LL FIND, IF YOU STUDY

8   1(A) AND 2 AND 13, THAT THEY MAY VERY WELL DID, NO MATTER WHAT

9   MR. LINZNER WANTS TO SAY.

10          REMEMBER SOMETHING ABOUT MR. LINZNER, RIGHT?  NOT TO

11  KNOCK HIM.  I DON'T WANT TO GO AROUND AND BASH-EVERYBODY-BUT-US

12  BUSINESS, YOU KNOW?

13          BUT LINZNER IS THE SAME GUY THAT GOT THE BENEFITS OF

14  THAT HALL OF FAME TRICKERY.  REMEMBER WHAT I'M TALKING ABOUT?

15  MAYBE I'LL GET TO IT LATER.  WHERE THEY KNOCK OUT TAKE TWO, AND

16  SAVE THEM ABOUT A MILLION -- ABOUT A MILLION BUCKS.  SAVE EA

17  ABOUT A MILLION BUCKS.

18          LINZNER'S IN THEIR POCKET.  LINZNER'S GOT AN

19  EXCLUSIVE LICENSE.  KNOCKS OUT ALL THE COMPETITION FOR HIMSELF.

20  PAYS A NICE CHECK FOR IT, WHICH WE DON'T GET NONE OF IT; DO YOU

21  KNOW?

22          BUT LINZNER, LINZNER, HE DOESN'T WANT TO MESS -- HE

23  DOESN'T WANT TO MESS WITH THE UNION.  THEY'RE THE ONLY GAME IN

24  TOWN.

25          MAYBE HE GETS A LITTLE ANNOYING, MAYBE HE GETS A

1  LITTLE ANNOYING TO THEM, YOU KNOW, THEY'LL GO TO TAKE TWO NEXT

2  TIME AND MAKE THEM RICH FOR 25 MILLION BUCKS.

3          MAYBE IF TRACE ARMSTRONG DOESN'T SHOW UP HERE --

4  BECAUSE HE FORGOT TO TELL YOU THIS -- MAYBE THEY WON'T GET HIM

5  ELECTED PRESIDENT OF THE UNION.  YOU KNOW?

6          THIS UNION IS A POWERFUL, POWERFUL MACHINE.  YOU

7  KNOW, YOU PLAY BALL WITH THEM, YOU GET ALONG WITH THEM, YOU

8  KNOW, YOU'LL DO PRETTY WELL, UNLESS YOU'RE VALUELESS, UNLESS

9  YOU DON'T HAVE A COLLECTIVE POWER.  UNLESS ALL YOU'VE GOT IS

10  YOUR NAME AND YOUR LIKENESS, YOU KNOW?  AND YOU GAVE IT ALL,

11  AND YOU TRUSTED PEOPLE.

12          LET'S TAKE A LOOK AT HOW THE DEFENDANTS REWROTE THE

13  GLA.

14          PUT IT UP ON THE BOARD.  LET'S GET TO THE "SIX OR

15  MORE" PARAGRAPH.

16          LOOK, I'M SUPPOSED TO WRITE THIS DOWN WITH A RED

17  PENCIL.  BUT I'M AFRAID TO DO IT, BECAUSE I'LL MESS IT UP THE

18  WAY I DID MY DRAWINGS.  FOLLOW IT ALONG, AND I THINK YOU'LL

19  UNDERSTAND WHAT I MEAN, YOU KNOW?

20          IF YOU LISTEN TO MR. ALLEN, YOU HAVE TO BELIEVE THAT

21  "SIX OR MORE" DOESN'T MEAN "SIX OR MORE CURRENT OR FORMER";

22  THAT WHAT IT MEANS IS "2,062 RETIREDS."

23          IN OTHER WORDS, CROSS OUT THE WORD "CURRENT OR

24  FORMER."  JUST CROSS IT OUT IN THE REWRITE, WHICH IS AGAINST

25  THE LAW.  CROSS IT OUT IN THE REWRITE.  INSTEAD OF JUST SAYING

1  "CURRENT OR FORMER," CROSS OUT "CURRENT," YOU KNOW.  AND FOR

2  "FORMER" PUT "ALL 2,062."

3          WELL, THAT'S NOT THE DEAL.  THAT'S HIS TESTIMONY.

4  LOOKED JUDGE ALSUP IN THE EYE.  TURNED AROUND, LOOKED YOU IN

5  THE EYE, YOU KNOW?  PERFECT DIRECTION, YOU KNOW?  HOLLYWOOD

6  DIRECTOR COULDN'T HAVE DONE IT BETTER.

7          FIRST TURNS TO JUDGE ALSUP, THEN TURNS TO THE JURY,

8  "ALL 262 -- 2,062."

9          IT'S MADE UP.  IT'S ALICE IN WONDERLAND.

10          THEN, ESCROW ACCOUNT.  SEE THE WORD "ESCROW ACCOUNT"

11  UP THERE?  IT'S IN PARAGRAPH 5.

12          I WOULD LIKE TO SHOW IT ON THE -- WHATEVER YOU DO,

13  OMAR, PUT A CIRCLE AROUND IT OR SOMETHING SO EVERYBODY CAN SEE

14  IT.  I'M SURE YOU KNOW WHAT I'M TALKING ABOUT NOW.  I HOPE YOU

15  DO.

16          (DOCUMENT DISPLAYED.)

17          SEE THE WORD "ESCROW ACCOUNT"?  CROSS IT OUT.  CROSS

18  IT OUT.  THERE'S NO ESCROW ACCOUNT.  NO ESCROW ACCOUNT.

19          WHY NO ESCROW ACCOUNT?  WELL, HE SAID THERE WAS NEVER

20  ANY MONEY TO GIVE THEM.

21          IF I TELL YOU I'M GOING TO OPEN UP AN ESCROW ACCOUNT

22  WHEN YOU SIGN THIS PIECE OF PAPER, WHAT AM I SUPPOSED TO DO?

23          SUPPOSED TO WALK OVER TO THE BANK OF AMERICA OR WELLS

24  FARGO -- I DON'T KNOW THE NAMES OF ALL THE BANKS IN CALIFORNIA.

25  AFTER THIS ECONOMIC CRISIS I DON'T KNOW IF THERE'S ANY BANKS

1    ANYMORE, YOU KNOW?

2              LET'S WALK OVER TO THE BANKS, AND OPEN UP AN ESCROW

3    ACCOUNT.  NO ESCROW ACCOUNT WHATSOEVER.

4              AND THEN, HE GOES TO ELIGIBILITY, WHICH HE TALKS

5    BEFORE.  AND HE ADMITS IN HIS TESTIMONY, ALLEN, THAT PLAYER --

6    PLEASE GO DOWN TO THE NEXT -- TO THE GLA.

7              OKAY.  OKAY.  DO IT THERE.  YOU'RE RIGHT.  I'M WRONG.

8    GO BACK TO THAT.

9              "THE PLAYER, PRESUMABLY, IS THE PERSON WHO SIGNS

10   THE GLA, RIGHT?

11              "ANSWER:  YES.

12              "SO WHEN YOU GO TO THE PARAGRAPH IN THE GLA THAT

13   SAYS HOW THE MONEY GETS DIVIDED" -- BLOW IT UP, PLEASE --

14   "YOU'LL SEE THAT WHAT IT'S SAYING IS IT GETS DIVIDED BETWEEN

15   THE PLAYER."

16              THAT'S THESE GUYS.  THAT'S THE 262 [SIC].  EVEN ALLEN

17   ACKNOWLEDGES THAT.

18              YOU KNOW, "AND THE ELIGIBLE MEMBERS OF THE NFLPA,"

19   WHICH CAN ONLY MEAN ACTIVES.  HE WANTS TO SAY:

20              "NO, RETIREDS WOULD SHARE WITH RETIREDS.  BUT

21   THERE'S NO MONEY THERE."

22              THE ONLY DEFINITION OF "ELIGIBLE" COMES FROM THOSE

23   BOARD MINUTES THAT SAYS "ACTIVES."

24              HE SAID:

25              "WELL, THAT DOESN'T COUNT."

1        BUT HE NEVER BOTHERED TO WRITE DOWN AN ELIGIBLE FOR

2   RETIREDS THAT WAS DIFFERENT OR TELL ANYBODY THAT ELIGIBLE FOR

3   RETIREDS WAS DIFFERENT.

4        SO WHY WOULD THE PLAYER BE SHARING WITH THE RETIREDS

5   WHO ARE NFLPA MEMBERS?  A LOT OF THOSE GUYS BY THEIR OWN

6   TESTIMONY, RETIRED GUYS, ARE NOT NFLPA MEMBERS.

7           "TOO BAD.  WE DIDN'T TELL YOU THIS WHEN YOU

8   SIGNED THE GLA, BUT YOU ALSO GOT TO JOIN THE UNION."

9        AND LAST -- AND LAST BUT NOT LEAST, IF THAT MEANT

10  "RETIREDS," IF "ELIGIBLE" MEANT "RETIREDS," SUPPOSE YOU HAD --

11  I DON'T WANT TO MAKE UP NUMBERS -- 1800 ACTIVES AND SIX

12  RETIREDS LICENSED, WHICH YOU DON'T HAVE TO.  ALL YOU HAVE TO

13  HAVE IS SIX OR MORE TO BE IN THE CATEGORY.

14       HOW WOULD YOU PAY THOSE 1800 ACTIVES?  THEY ARE NOT

15  ELIGIBLE, SO WHO WOULD THE PLAYER, THE MAN WHO SIGNED THE GLA,

16  BE DIVIDING IT WITH?  IT'S A JOKE.  IT'S A JOKE.

17       IT'S NOT A JOKE.  IT'S NOT A JOKE, BECAUSE IT'S NOT

18  FUNNY.  IT'S HEARTBREAKING, AS A MATTER OF FACT.

19       OKAY.  AT LEAST 95 OF THE LICENSEES WERE GRANTED

20  RIGHTS TO SIX OR MORE ACTIVES OR RETIREDS DURING THE YEARS 2004

21  TO 2007.

22       DR. NOLL, THE ECONOMIST FROM STANFORD, HE HIMSELF

23  ACKNOWLEDGED THAT.  DR. NOLL ADMITTED THAT EVERY LICENSEE IN

24  THIS CASE HAD A DEMAND FOR GROUPS OF SIX OR MORE ACTIVE OR

25  RETIRED PLAYERS.  FORGET WHAT CATEGORY THEY FELL INTO.  THERE'S

1   NO QUESTION ABOUT THAT.  EVERY ONE OF THOSE LICENSES, JUST LIKE

2   EA, ALL THE ACTIVES WENT OVER THERE.  THE AD HOCS WENT OVER

3   THERE.

4           AND, BY THE WAY, SOME OF THOSE AD HOCS -- NOBODY TOLD

5   YOU THIS -- ARE MEN, FOOTBALL PLAYERS WHO SIGNED GLA'S.  TWO

6   HATS ON.  BUT THERE'S NO QUESTION THAT WE MEET THE DEFINITION.

7           NOW, AS A RESULT OF THE LICENSING OF THESE 95

8   LICENSEES -- AND THIS IS JUST DR. ROWLEY'S MATH.  THIS ISN'T:

9   BELIEVE DR. ROWLEY'S TESTIMONY; DON'T BELIEVE DR. ROWLEY'S

10  TESTIMONY.  SINCE MR. KESSLER WENT AFTER HIM PRETTY GOOD.  I

11  HOPE I GET TO THAT.

12          I'M TELLING YOU, IF YOU DO THE MATH, TAKE THE

13  DOCUMENTS IN AND DO THE MATH, YOU'RE GOING TO FIND OUT THAT

14  $161 MILLION WAS PAID TO THE DEFENDANTS DURING THE YEARS 2004

15  THROUGH 2007.  THAT'S A LOT OF MONEY.

16          AND IF YOU ADD IN THERE THE INTERNET SPONSORSHIP

17  MONEY, WHICH IS CERTAINLY LICENSING MONEY, THEN THE MONEY COMES

18  TO $215 MILLION.

19          THAT'S JUST A FACT.  THAT'S NOT, YOU KNOW:

20              "I THINK THIS.  THEY THINK THAT."

21          $215 MILLION IS WHAT THEY COLLECTED.

22          THERE'S AN EXHIBIT, 1217.  IT'S TOO LONG TO SHOW IT

23  TO YOU, BUT IF YOU HAVE ANY QUESTION ABOUT THE NUMBERS TAKE

24  THAT EXHIBIT IN WITH YOU, AND YOU'LL SEE THAT I'M CORRECT.

25          NOW, FOR THE YEARS 2004 THROUGH 2007, THE DEFENDANTS

1  RETAINED 63 TO 69 PERCENT OF THE MONEY AND GAVE THE BALANCE,

2  37 PERCENT OR 31 PERCENT TO THE ACTIVE PLAYERS.

3          NOW, THE DIFFERENCE IS THE $8 MILLION, HOWEVER YOU

4  WANT TO FIGURE IT.  THAT'S MY DRAWING THAT EVERYBODY LAUGHED

5  AT:  63/37/0.

6          THERE ARE NO IFS, ANDS AND BUTS ABOUT THAT IT WAS 63.

7  THEN, DO THE MATH, IF YOU WANT TO, ABOUT $8 MILLION, AND YOU'LL

8  SEE HOW IT GOES UP TO 69 AND 31.

9          ALL OF THE ACTIVE PLAYERS SHARED IN THAT MONEY,

10  37 PERCENT MONEY.  THEY SHARED WHETHER THEY WERE BENCH WARMERS

11  OR WHETHER AT THE WERE STARS.  THEY SHARED WHETHER THEY GOT IN

12  THE GAME, OR THEY DIDN'T GET IN THE GAME.  DO YOU KNOW?

13          MR. KESSLER, AROUND THE EDGES, SAID:

14              "WELL, NOT QUITE THIS GUY OR NOT QUITE THAT

15  GUY."

16          BUT 99.9 PERCENT OF THE ACTIVE PLAYERS SHARED IN THIS

17  MONEY.

18          ANY REASON YOU DIDN'T SHARE WITH THE RETIREDS IN A

19  GROUP LICENSE?

20          WELL, ONE OF THE REASONS WAS THAT THE UNION DIDN'T

21  WANT TO GIVE IT TO THEM.  ANOTHER REASON WAS THEY NEVER TOLD

22  THE ACTIVE PLAYERS.

23          THIS TRACE ARMSTRONG, THIS YOUNG MAN SHOWED UP HERE,

24  HE HAD NO IDEA.  THEY NEVER ONCE GAVE HIM WHAT GLA, AND SAID:

25              "YOU READ IT.  YOU READ IT.  YOU LOOK LIKE A

1  REALLY SHARP GUY, EVEN THOUGH YOU'RE 22, 23, 24" AT THE TIME.

2  HE WAS THE PRESIDENT, YOU KNOW?  IT'S NOT THAT WE'RE YOUR

3  FATHER FIGURES.

4          UPSHAW AND THE GENERAL COUNSEL, MR. BERTHELSEN, WHO

5  I'M SURE IS VERY FINE LAWYER, YOU KNOW?  AND MR. ALLEN, YOU

6  KNOW?  THEY NEVER SHOWED IT TO HIM.  THEY NEVER SHOWED IT TO

7  HIM.  BUT THEY SHARE WITH THEIR OWN GUYS, THE ACTIVES, EQUALLY.

8          SO THE ACTIVES SHARE WITH ACTIVES, USED OR NOT USED,

9  BEST OR WORST.

10          HERE'S ONE EXAMPLE:  ONE OF THE FELLOWS GOT UP THERE,

11  STEVE BYRD, HE WAS FROM STATS, THE FANTASY FOOTBALL FELLOW.

12  AND HE ACKNOWLEDGED -- AND, BY THE WAY, THEY ONLY PUT UP TWO

13  LICENSEES.  THERE'S 93 MISSING CHAIRS HERE.  THERE ARE 93

14  MISSING LICENSEES THAT DIDN'T GET UP AND LOOK YOU IN THE EYE.

15          OKAY.  RIGHT.  STEVE BYRD ACKNOWLEDGES THAT IN

16  FANTASY FOOTBALL, A GAME THAT SOME OF YOU KNOW, PROBABLY MOST

17  OF YOU DON'T KNOW, YOU CAN'T USE OFFENSIVE LINEMEN, BUT THE

18  OFFENSIVE LINEMEN STILL GET PAID THEIR SHARE IF THEY'RE

19  ACTIVES.

20          ACCORDING TO ROWLEY, WHO DID THE MATH -- PUT A CHART

21  UP HERE -- IF YOU THOUGHT IT WAS FAIR FOR THE DEFENDANTS TO

22  KEEP 63 TO 69 PERCENT -- AND I, FOR ONE, AM GOING TO URGE YOU

23  IN A MINUTE THAT IT IS NOT FAIR.

24          BUT ASSUMING FOR THE MINUTE -- NOT FAIR TO MY

25  CLIENTS.  ACTIVES CAN DO WHAT THEY WANT.  AND THEY'RE PUTTING

1  THE MONEY IN A STRIKE FUND OR A DO-WHAT-YOU-WANT-WITH-IT FUND.

2  I THINK IT'S CALLED "AN ALLOCATED FUND," $68 MILLION.

3          BUT IF YOU THINK IT'S FAIR -- AND THE PLAINTIFFS

4  DON'T -- THAT AN EQUAL SHARE TO THE RETIREDS OR THE AMOUNT PAID

5  BY THE UNION TO THE ACTIVES WOULD BE $29 MILLION.  AND AFTER

6  INTEREST IT WOULD BE $32 MILLION.

7          THAT'S IT.  THAT'S NOT FIGHTING FOR THESE GUYS, NOT

8  SAYING:

9          "YOU LEFT TOO MUCH MONEY IN THE UNION.  YOU

10 SHOULD HAVE GIVEN MORE TO THE PLAYERS FOR THE RETIREDS TO

11 SHARE, TOO."

12         IF YOU JUST WENT WITH THAT, IT'S $29 MILLION, AND

13 AFTER INTEREST IT'S 32.

14         RIGHT.  NOW, REMEMBER THIS, PLEASE, BECAUSE IT'S

15 IMPORTANT TO YOUR OWN SENSE OF WHAT YOU'RE DOING HERE, NOT JUST

16 GOING IN THERE BLIND.

17         RIGHT NOW, OR AT LEAST AS OF THE DATE OF THE EXHIBIT

18 THAT CAME INTO EVIDENCE, THERE WAS APPROXIMATELY $68 MILLION IN

19 WHAT I'LL CALL "A SLUSH FUND," WHAT THEY CALL "AN UNDESIGNATED

20 FUND" OR A FUND THAT YOU CAN DO WHATEVER YOU WANT WITH.  IT'S

21 JUST MONEY SITTING THERE, 68 MILLION BUCKS.

22         AND THAT'S GOT NOTHING TO DO WITH THE STRIKE FUND

23 MONEY, FOR WHICH THERE IS NO STRIKE, AND FOR WHICH THEIR

24 TEMPLATE OF 63/37 IS FROM 1994.  AND MOST OF THOSE YEARS THERE

25 WAS NO STRIKE AND NO THREAT OF A STRIKE.

1          BUT IF YOU JUST GO WITH WHAT THEY DID, THEY GAVE THE

2    ACTIVES 37 PERCENT OF THE MONEY.  AND INSTEAD OF CONSIDERING

3    FOR A MOMENT GIVING THE RETIREDS THEIR GLA SHARE, THEY PUT

4    $68 MILLION IN AN UNALLOCATED MONEY FUND, NOT DESIGNATED FOR

5    STRIKE OR ANYTHING.

6          SO IF THIS JURY DECIDES THAT I AM RIGHT IN WHAT I'M

7    TELLING YOU -- AND I FOR ONE -- I'M NOT GOING TO SAY THAT.

8    YOU'LL DECIDE WHAT YOU'LL DECIDE.  JUST TELL ME MY TRUTH, DO

9    YOU KNOW?

10          BUT IF YOU DECIDE THAT THE ACTIVES ARE -- THE

11   RETIREDS ARE ENTITLED TO SHARE IN THE MONEY, THERE'S

12   $68 MILLION JUST SITTING THERE.

13          NOW, WE COULD BE ASKING -- NOT "WE."  EXCUSE ME.

14   PLAINTIFFS COULD BE ASKING, THEY COULD BE ASKING FOR THEIR

15   SHARE OF THE STRIKE FUND, BECAUSE THEY DON'T BENEFIT FROM THE

16   STRIKE.  AN ELECTION WAS PAID.  NOBODY IS ASKING FOR THAT.  THE

17   PLAINTIFFS COULD BE ASKING TO TAKE MORE MONEY OUT OF THAT.

18   DON'T MAKE IT 63/37.

19          THE PLAINTIFFS COULD BE ASKING FOR SOME EXPENSES.

20          YOU KNOW, IT GALLS A LITTLE BIT FROM OUR EYES TO SEE

21   MR. ALLEN'S SALARY BEING PAID OUT OF THE MILLIONS THAT ARE

22   BROUGHT IN, DO YOU KNOW, AFTER HE AND OTHERS DID WHAT THEY DID

23   TO THE PLAINTIFFS.

24          BUT NOBODY IS ASKING FOR THAT.  ALL THEY'RE SAYING IS

25   IT IS THE RETIREDS HAVE BEEN PAID WHAT THEY BARGAINED FOR WITH

1   THEIR UNION.  I DON'T THINK IT WAS ARM'S-LENGTH.

2           BUT WHAT THEY BARGAINED FOR IS 37 PERCENT.  KEEP THE

3   REST OF THE MONEY IN THE TILL.  AFTER YOU GET THROUGH WITH THE

4   STRIKE FUND AND PAID ALL THE SALARIES AND THE CARS AND THE

5   TRIPS TO HAWAII AND ALL OF THAT, WHAT YOU GET DOWN TO IS THERE

6   IS STILL $68 MILLION IN A BANK SOMEPLACE.  AND THERE'S NO

7   REASON IN THE WORLD THAT THE RETIREDS CAN'T GET THEIR 29- TO

8   $32 MILLION FOR THAT.

9           **MR. KESSLER:**  YOUR HONOR?  YOUR HONOR, I ASK FOR AN

10  ADMONISHMENT TO THE JURY ABOUT THIS LAST LINE OF QUESTIONING,

11  PLEASE -- OR ARGUMENTS.

12          **THE COURT:**  WELL, YOU CAN RESPOND TO IT IN YOUR

13  CLOSING.

14          YOU'VE USED 45 MINUTES.  YOU ASKED ME TO TELL YOU.

15          **MR. PARCHER:**  THANK YOU.  I'M MOVING ON QUICKLY.

16          **THE COURT:**  YOU'RE AT THE 45-MINUTE MARK.

17          **MR. PARCHER:**  THANK YOU.

18          REMEMBER IN 2007 ALONE, THE UNION REBATED

19  $8.7 MILLION IN DUES TO THE ACTIVES, AND THE UNION STILL HAS A

20  BUNDLE.  SO IF YOU THINK THAT THE TEMPLATE OF 63 TO 69 IS FAIR,

21  $32 MILLION IS THE NUMBER.

22          NOW, THERE WAS TALK ABOUT MAJOR LEAGUE BASEBALL.  AND

23  THAT'S WHERE MR. KESSLER, GOT TO GIVE HIM CREDIT, HE TORE RIGHT

24  INTO DR. RASCHER.  TORE RIGHT INTO DR. RASCHER ON CROSS

25  EXAMINATION.

1          AND BY THE TIME HE WAS DONE, HE MADE IT LOOK --

2    BECAUSE THAT'S THE ONE THAT'S MOST COMPARABLE.  BY THE TIME HE

3    GOT DONE HE MADE IT LOOK AS IF BASEBALL PLAYERS RETAINED VERY

4    LITTLE OF THEIR MONEY AND GAVE THE UNION A WHOLE LOT MORE.

5          THE TRUTH IS BASEBALL PLAYERS RETAIN 61 PERCENT OF

6    THEIR MONEY, AND FOOTBALL PLAYERS SHARE IN 37 PERCENT OF THE

7    GROUP MONEY.

8          NOW, HOW DID MR. KESSLER MANAGE TO KNOCK US OFF THE

9    TRACK THERE?  BY GOING INTO THE YEARS, A COUPLE OF YEARS WHERE

10   THERE WERE STRIKE FUNDS.

11         WELL, IT WOULD BE UNDERSTANDABLE WHEN YOU PUT MONEY

12   IN THE STRIKE FUND YOU DON'T PUT IT IN YOUR POCKET.  YOU GIVE

13   IT TO THE UNION.

14         BUT AT THE END OF THE DAY, WHEN THERE WAS NO STRIKE,

15   THEY GAVE ALL THE MONEY OR MOST OF THE MONEY BACK TO THE

16   BALLPLAYERS.  SO THE CORRECT FIGURES ARE EXACTLY AS DR. RASCHER

17   SAID.

18         BASEBALL PLAYERS RETAINED 61 PERCENT OF THEIR MONEY.

19   FOOTBALL PLAYERS RETAINED 37 PERCENT.

20         AND THEN, MR. KESSLER, WITH -- OKAY.  IT IS A SHOT AT

21   HIM.  WHAT I CALL VOODOO ECONOMICS.  HE DREW SOMETHING.  I

22   DON'T KNOW.  HE WAS OVER THERE.  VERY POLITELY DREW SOMETHING

23   THAT MADE IT LOOK LIKE THE FOOTBALL ACTIVES WERE SHARING

24   68 PERCENT, WHICH IS EXACTLY THE WAY THIS CASE WAS TRIED BY

25   THEM.

1      IT'S EXACTLY WHAT ALL THEIR WITNESSES DID.

2      IN ORDER TO GET TO THAT NUMBER, YOU HAD TO ADD IN THE

3   AD HOCS, WHICH IS UNSHARED MONEY.  IF YOU TAKE OUT THE AD HOCS

4   WHICH DON'T BELONG THERE, BECAUSE IT NEVER WAS SHARED, DO YOU

5   KNOW?  THAT MONEY THAT THEY SAY THEY, QUOTE, "GAVE TO

6   RETIREDS," DO YOU KNOW?  THEN, THE NUMBER IS 37 PERCENT.

7   THERE'S NO DOUBT ABOUT IT.

8      IT'S NOT LIKE, YOU KNOW, GET A PH.D. AT BERKELEY, AND

9   THEN YOU GOT IT.  YOU KNOW?  IT'S JUST A MADE-UP CONSTRUCTION

10  TO THROW YOU OFF.

11     OKAY.  NOW, THE CHART ALSO TELLS YOU WHAT THE DOLLAR

12  AMOUNTS ON A SHARED BASIS WOULD BE.  FOR EXAMPLE, IF YOU

13  THOUGHT THAT THE PLAYERS SHOULD HAVE GOTTEN 61 PERCENT ACTIVES,

14  THEN WHAT WOULD, YOU KNOW, WHAT WOULD THE FOOTBALL PLAYERS GET,

15  AND SO ON.

16     I'M JUST GOING TO LEAVE THAT UP TO YOU BECAUSE OF

17  TIME.

18     NOW, REMEMBER THIS ON FIDUCIARY DUTY.  THE PLAINTIFFS

19  RECEIVED SOLICITATION LETTERS ON A REGULAR BASIS.  YOU HAVE

20  SEEN SOME OF THEM.  THE PLAINTIFFS WERE TOLD THAT IT WAS

21  ESSENTIAL.

22     THAT'S THE TOUCHBACK, IF WE CAN GET IT UP THERE.

23     THEY WERE TOLD THAT ALL RETIRED MEMBERS SIGNED

24  CURRENT GROUP LICENSING AUTHORIZATIONS.

25     WHY WAS IT ESSENTIAL?  DOES ANYBODY REALLY BELIEVE

1  THAT MR. ALLEN WAS JUST OPTIMISTIC?  IT WAS ESSENTIAL.  AND

2  THEY COMPLIED, BECAUSE YOU DO WHAT YOUR AGENT TELLS YOU TO DO.

3  YOU DO WHAT YOUR FIDUCIARY TELLS YOU TO DO.  YOU TRUST YOUR

4  AGENT.  YOU TRUST YOUR FIDUCIARY.

5        AND THEN, THERE WAS THIS QUESTION IN ALLEN'S

6  TESTIMONY.

7        "SO ANYBODY WHO WAS RETIRED THAT WAS ASKED TO

8  SIGN THE GLA AND SIGNED A GLA, WOULD HAVE THE RIGHT TO BELIEVE

9  THAT WHAT PLAYERS INC WAS GOING TO DO FOR THEM WAS TAKE THE

10 HELMETS OFF THE PLAYERS AND MARKET THEM AS PERSONALITIES, AS

11 WELL AS PROFESSIONAL ATHLETES, CORRECT?

12        "YES."

13        WELL, THAT'S WHAT A FIDUCIARY DOES.  THE WEB SITE

14 SAYS -- YOU SAW IT BEFORE -- THAT THEY REPRESENTED OVER 3,000

15 PLAYERS.

16        LAIRD TESTIFIED:

17        "I ASSUME THEY'RE ACTING AS AN AGENT FOR ACTIVE

18 AND RETIRED PLAYERS, AND THEY WOULD TRY TO GET -- THEY WERE

19 GOING TO TRY TO GET DEALS FOR US AND WE WOULD GET PAID.

20        "MR. LINZNER, IS IT TRUE THAT YOU UNDERSTOOD

21 THAT, IN EFFECT, THAT PLAYERS INC WAS ACTING AS A SORT OF AGENT

22 FOR RETIRED PLAYERS IN DEALING WITH YOU?"

23        ARE YOU READY?  THIS IS LINZNER, THEIR GUY:

24        "YEAH, THEY WERE AN AGENT OR MIDDLEMAN BETWEEN

25 THE RETIRED PLAYERS AND US TO LICENSE THE RIGHTS OF THOSE

1    RETIRED PLAYERS."

2              THAT'S AN AGENT.

3              AND ON THE QUESTION OF CONTROL, MR. ADDERLEY

4    TESTIFIED:

5              "YOU KNOW, IF I DIDN'T WANT TO GO INTO TOBACCO

6    OR SOMETHING LIKE THAT OR LIQUOR I COULD ALWAYS WALK AWAY."

7              NOW, MR. KESSLER IS SUGGESTING BECAUSE THE GLA IS

8    SILENT, THAT THERE WAS NO RIGHT TO TERMINATE THE AGREEMENT.

9              BUT THE FACT IS, IF YOU TAKE A LOOK AT THE NEW GLA,

10   THE ONE THAT BY COINCIDENCE -- NOT SO COINCIDENTALLY, THEY SENT

11   OUT, RIGHT AFTER THEY GOT $25 MILLION FROM ELECTRONIC ARTS,

12   RIGHT AFTER THEY WENT FROM 500,000 TO 25 MILLION, THEY CHANGED

13   THE GLA.

14             AND RIGHT THERE DOWN AT THE BOTTOM IT SAYS:

15             "IT MAY NOT BE REVOKED OR TERMINATED BY THE

16   UNDERSIGNED PLAYER UNTIL SUCH DATE."

17             WELL, YOU KNOW, IT'S A FUNNY THING.  YOU GO DOWN THE

18   STREET AND YOU SEE A SIGN THAT SAYS -- THAT'S FADED.  YOU SEE A

19   SIGN THAT'S FADED, AND SOMEBODY GETS INTO AN ACCIDENT.  AND

20   YOU'RE WONDERING WHETHER THAT FADED SIGN HAD SOMETHING TO DO

21   WITH THE ACCIDENT.

22             AND THEN, THE NEXT DAY AFTER THE ACCIDENT YOU SEE A

23   SIGN UP THERE THAT'S CLEAR AND BRIGHT AS CAN BE, OR THAT

24   CHANGES WHAT THE SIGN SAYS.

25             YOU KNOW, YOU COULD DRAW AN INFERENCE MAYBE THAT THE

1    FIRST SIGN WASN'T ADEQUATE.  IF THERE WAS NO RIGHT TO REVOKE OR

2    TERMINATE THE GLA THAT WE'RE FIGHTING ABOUT, WHY WAS IT SILENT,

3    AND THEN WHY DID THEY SAY IT'S NECESSARY TO PUT IT IN THERE?

4             WHY DIDN'T THEY SAY "YOU'RE NOT ALLOWED TO REVOKE IT

5    OR TERMINATE IT" IF YOU WEREN'T ALLOWED TO REVOKE IT OR

6    TERMINATE IT ALL ALONG?

7             I WANT TO TALK ABOUT TRUST.  THESE ARE ATHLETES, MY

8    CLIENTS.  THEY SIGNED THIS GLA AND CONTINUED TO SIGN THIS GLA

9    JUST BASED ON TRUST.  THERE'S NO LAWYER.  YOU DON'T SIGN A

10   CONTRACT WITH A STRANGER WITHOUT A LAWYER, IF IT'S AN IMPORTANT

11   CONTRACT.

12            THERE'S NO NEGOTIATION.  NO NEGOTIATION.  WHAT'S HIS

13   NAME, WALTER BEACH, TRIED WITH A FEW QUESTIONS THAT HE ASKED

14   THAT WERE NEVER ANSWERED.  BUT 2100 GUYS, I DON'T KNOW HOW MANY

15   GLA'S, THERE'S NO NEGOTIATION.

16            THERE'S NO REAL UNDERSTANDING OF THEIR RIGHTS.  THESE

17   ARE LAYPEOPLE.  THEY DON'T HAVE A LAWYER SITTING THERE WITH

18   THEM.

19            THEY NEVER MAKE A COMPLAINT.  THEY DON'T KNOW.  THEY

20   TRUSTED THEIR UNION.  THEY CONTINUED TO SIGN, THESE MEN WHO

21   BUILT THE GAME.  AND MAKE NO MISTAKE ABOUT IT.  ALL THE MONEY

22   THAT'S COMING IN, ALL MONEY THAT'S COMING IN FOR LICENSING NOW

23   STARTS WITH THEM.  THEY BUILT THE GAME.  THESE MEN HAVE BUILT

24   THE GAME.

25            THEY'RE LIKE CHILDREN TRUSTING THEIR FATHER.  YOU

1  DON'T CHALLENGE YOUR FATHER.  YOU DON'T CHALLENGE -- I'M UNCLE

2  DICK -- I DON'T HAVE TIME TO TELL YOU ABOUT HIM.  I THOUGHT HE

3  WAS THE GREATEST GUY, YOU KNOW.  TURNS OUT MAYBE HE WASN'T.  I

4  DON'T KNOW.  NO PLACE TO TALK ABOUT THAT HERE.

5           I TRUST HIM WITH MY LIFE.  I TRUST HIM WITH MY LIFE.

6           THESE MEN TRUSTED THEIR FAMILY.  THEY TRUSTED THE

7  UNION THAT THEY HAD BELONGED TO, WHETHER THEY BELONGED TO IT OR

8  NOT.  THEY GAVE THEM THEIR IDENTITY RIGHTS.

9           YOU KNOW, I THINK THAT YOU'LL FIND THAT THE CLEAREST

10  OF ALL BREACHES OF CONTRACT AND THE BREACH OF FIDUCIARY IS

11  MADDEN.

12           MADDEN, IF WE CAN GET IT UP ON THE BOARD MAYBE, I

13  DON'T KNOW, MADDEN HAS 147 VINTAGE TEAMS AND ONLY 32 ACTIVE

14  TEAMS.  STRIP IT DOWN TO BASICS, PLEASE.  JUST STRIP IT DOWN TO

15  BASICS.

16           YOU'LL HEAR THAT THERE ARE 147 VINTAGE OR 32 ACTIVE.

17  YOU THINK YOU MIGHT THINK THAT'S A RETIRED PLAYERS' GROUP

18  LICENSE, EVEN THE WAY THEY WANT TO DEFINE IT?  TEAMS AND

19  PLAYERS AND I DON'T KNOW WHAT.

20           BUT RIGHT FROM THE GET-GO THEY WAKE UP ONE MORNING.

21  THEY'RE MAKING $500,000 FROM ELECTRONIC ARTS.  AND THROUGH NO

22  EFFORT ON THEIR PART, NO AGENCY EFFORT ON THEIR PART, NO

23  SELLING, PUSHING, MARKETING, NOTHING, EA'S TEAM, ACCORDING TO

24  MR. LINZNER, COMES UP WITH A GAME.

25           AND, FINALLY, NEVER MIND WHAT THE GLA SAYS, BECAUSE

1   WE'RE ENTITLED WHETHER WE'RE IN IT OR NOT, IF IT'S SIX OR MORE,

2   FINALLY THEY'RE IN HEAVEN.  THERE'S GOING TO BE A MADDEN GAME,

3   AND THEY'RE GOING TO GET $25 MILLION BUCKS, WHETHER OR NOT

4   NAMES OR LIKENESSES ARE USED OR NOT.  WHETHER THEY'RE USED OR

5   NOT.

6            NOW, WOULDN'T YOU THINK THAT WOULD BE A PERFECT

7   OPPORTUNITY, RIGHT, TO HAND IN A LICENSE, WHICH WE THINK THEY

8   DID -- MAYBE NOT IN THE CLEAREST WAY -- THAT SAID YOU'VE GOT

9   1300 ACTIVES AND YOU'VE GOT 2100 RETIREDS.

10           WOULDN'T YOU THINK THAT'S WHAT YOUR AGENT WOULD DO

11  FOR YOU?  DON'T YOU THINK THAT'S WHAT YOUR FIDUCIARY WOULD DO

12  FOR YOU?  WOULDN'T YOU THINK THAT THE CONTRACT IMPLIES THAT,

13  AND THAT'S WHAT YOU'RE ENTITLED TO?

14           SO WHAT DID THEY DO?  AND I DON'T MEAN -- I DON'T

15  MEAN COERCE ANYBODY.  I DON'T MEAN DEMAND IT.  I DON'T MEAN

16  FORCE THEM, DO YOU KNOW?  I SIMPLY MEAN -- DON'T EVEN MEAN

17  LEVERAGE THEM, BECAUSE THEY'RE THE ONLY GAME IN TOWN.  JUST

18  SIMPLY SAY TO THEM:

19              "LOOK, I'M AN AGENT FOR 2100 RETIREDS, 1800

20  ACTIVES.  YOU GUYS GOT A MADDEN GAME OR EITHER YOU DON'T HAVE A

21  MADDEN GAME.  EVERYBODY THAT YOU TAKE IS GOING TO GET -- WE'RE

22  GOING TO GET PAID WHETHER YOU USE THEM OR NOT."

23           SO HERE'S THE LIST, 3900 GUYS.  NO, SIR.  THEY DON'T

24  GIVE THEM THE RETIREDS.  THEY DON'T GIVE THEM THE RETIREDS.

25  WHY?  WHY?

1        NOW, PROFESSOR MADDEN -- PROFESSOR NOLL WAS

2  QUESTIONED AT HIS DEPOSITION ABOUT MADDEN.  AND THERE WAS A

3  MOMENT IN TIME WHEN HE DIDN'T REALIZE WHAT THE MADDEN STORY

4  WAS.

5        IN HIS WORDS, HE HAD AN UNREALIZED HOPE.  THE HOPE

6  WAS THERE WOULD AN VINTAGE TEAM OF STAR VALUE THAT COULD

7  GENERATE INCOME FOR PLAINTIFFS.  HE DID NOT KNOW AT THE TIME

8  THAT THE MADDEN GAME EXISTED.  HE BELIEVED YOU COULD GET A

9  SIGNIFICANT LICENSING REVENUE, AT LEAST FOR THOSE RETIRED

10 PLAYERS WITH NO NAME RECOGNITION, WHO PLAYED ON THE BEST TEAMS.

11        THAT'S NORMAL.  THAT'S NORMAL.  YOU'VE GOT A NONUSE

12 LICENSE.  YOU'VE GOT ALL THESE TEAMS.  WHY CAN'T YOU PUT ALL

13 THE PLAYERS IN WITH THEIR NAMES AND LIKENESSES?  WHY CAN'T YOU

14 JUST HAND OVER ONE LICENSE FOR THAT?

15        YOU KNOW, UNLESS YOU'VE GOT A CONFLICT OF INTEREST.

16 UNLESS YOU FAVORED ONE SET OF GUYS, THE GUYS WHO VOTE, OVER THE

17 GUYS WHO HAVE NO POWER WHATSOEVER.  DO YOU KNOW?

18        YOU KNOW, THE RETIREDS, YOU KNOW, IN A CULTURE THAT

19 I'M FROM YOU TAKE CARE OF YOUR OWN.  YOU DON'T TURN YOUR BACK

20 ON THEM, STAB THEM IN THE BACK, MAKE BELIEVE YOU'RE WITH THEM,

21 AND YOU'RE NOT.

22        IN A FAMILY YOU DON'T TAKE THE GRANDFATHER AND WALK

23 AWAY FROM HIM AND MAKE BELIEVE YOU'RE TAKING CARE OF HIM.

24        WHY COULDN'T THEY HAVE DONE THAT?  NOT FORCE ANYBODY.

25 NOT INSIST ON ANYTHING.  JUST SAY:

1          "HERE'S YOUR LIST, GUYS.  OKAY.  WE'LL GET

2   $25 MILLION BUCKS.  HERE'S YOUR LIST.  1800 AND 2100.  YOU WANT

3   SOME OTHER GUYS?"

4          I DON'T KNOW WHO, JOE NAMATH OR WHOEVER IT IS.

5   "WE'LL GO OUT THERE AND TRY TO GET IT.  HE'S A RETIRED PLAYER,

6   BUT WE'LL TRY TO GET IT."

7          NO, THEY DON'T DO THAT.  NO, THEY DON'T DO THAT.

8   WHAT DO THINK DO?  WELL, YOU SAW LASHUN LAWSON'S LETTER.  I

9   MEAN, REALLY.  PLEASE, REALLY.  YOU KNOW, I DON'T WANT TO -- I

10  DON'T WANT TO HIT THE ROOF, BUT I'M RUNNING OUT OF TIME.

11         YOU KNOW, IT'S A DISGRACE, THAT LETTER.  YOU WOULD

12  THINK THE LETTER WOULD SAY:

13             "OH, WE'RE SO GLAD YOU'RE TAKING OUR GUYS, YOU

14  KNOW.  NOW, WE CAN DO RETIREDS AND ACTIVES.  WHAT COULD WE DO

15  NOW?  WHAT COULD WE DO TO HELP YOU?"

16         SHE TELLS THEM THEY MUST BE SCRAMBLED.  AND THEN,

17  THEY -- I THINK IT'S MR. LINZNER.  I DON'T KNOW WHO ELSE DID

18  IT.  I THINK IT MIGHT HAVE BEEN DR. NOLL -- BELIEVED THEY WERE

19  ONLY TALKING ABOUT THE NUMBER HERE.  WHICH WOULD HAVE BEEN BAD

20  ENOUGH, BY THE WAY.

21         YOU KNOW, THAT'S PART OF WHO A BALLPLAYER IS.  HERB

22  ADDERLEY HAS GOT A NUMBER.  HE KNOWS WHAT HIS NUMBER IS, YOU

23  KNOW?  RIGHT?

24         BUT, NO.  THEY TOLD THEM:

25             "YOU CAN'T DO THIS."

1      WHY CAN'T YOU DO IT?  WELL, I'LL ADD A TRUTHFUL

2   COMMENT TO THAT LETTER:

3          "YOU CAN'T DO IT, BECAUSE IF YOU DO AND THE

4   RETIREDS FIGURE OUT THAT WE'RE STABBING THEM IN THE BACK, WE'LL

5   HAVE TO SHARE THE MONEY WITH THEM."

6      THAT'S WHY.

7      **THE COURT:**  MR. PARCHER, YOU'RE COMING UP ON AN HOUR

8   NOW.

9      **MR. PARCHER:**  YES, SIR.

10      WANT TO TALK ABOUT MARKETING FOR A MINUTE.  THERE WAS

11  NO MARKETING HERE.  TAKE INTO THE ROOM WITH YOU THE FOUR

12  BROCHURES.  TAKE INTO THE ROOM WITH YOU PAT ALLEN'S MONTHLY

13  REPORTS AND ADD THAT UP FOR THE YEARS IN QUESTION.

14      FIRST OF ALL, THAT'S ALL?  THAT'S ALL THEY DID?

15  OTHER THAN UPSHAW'S -- MR. UPSHAW'S TESTIMONY, WAS TELLING YOU

16  THE TRUTH.  WE ASKED HIM THE QUESTION, WHICH PROBABLY HE DID.

17  THEY SAY:

18          "NO, WE DIDN'T PUSH ANY MORE.  NOT REALLY."

19  THAT'S ALL THEY DID FOR THESE MEN.

20      NOW, JUST IMAGINE IN TAKE TWO, WHEN TAKE TWO WANTED

21  200 AND SOME ODD RETIRED PLAYERS, JUST IMAGINE IF THEY HAD

22  LICENSED THEM AS A GROUP, INSTEAD OF KNOCKING THEM OUT SO THAT

23  THEIR ELECTRONIC ARTS CLIENT COULD CONTINUE TO BE SUPREME IN

24  THE VIDEO GAME FOOTBALL PLAYER MARKET.

25      HOW COULD YOU DO THAT TO GUYS?  TAKE TWO WANTED THEM.

1  AND THEY GO GET EA A LICENSE FOR CHEAP.  MAYBE EA DIDN'T THINK

2  IT WAS CHEAP, BUT PLAYERS INC THOUGHT IT WAS FOR CHEAP.  AND

3  THEY KNOCK OUT TAKE TWO.

4          IMAGINE IF THEY HAD GONE TO TAKE TWO, GIVEN THEM THE

5  GROUP LICENSE, NAME AND LIKENESS, EA, NAME AND LIKENESS, AND

6  THEN STARTED A MEDIA BLITZ.

7          LOOK, I'M NO AGENT, YOU KNOW.  BUT I KNOW WHAT AGENTS

8  DO.  I SUSPECT YOU'VE GOT SOME IDEA WHAT AGENTS DO.

9          THEY GO ON TELEVISION.  THEY GO ON THE RADIO.  THEY

10  GO TO THE NEWSPAPERS.  THEY BRING THE GUYS OUT FOR DINNERS AND

11  DANCES.  AND THE WHOLE WORLD STARTS TO KNOW WHAT -- WHAT THIS

12  GRANDFATHER KNOWS, DO YOU KNOW?  AND EVERY OTHER GRANDFATHER OR

13  GRANDMOTHER MAYBE KNOWS, YOU KNOW, WHICH IS THESE PLAYERS IN

14  THEIR DAY HAD GREATNESS IN THE GAMES THEY PLAYED.

15          AND WOULDN'T IT BE WONDERFUL TO PLAY THESE GAMES, TO

16  HAVE MOVIES, TO HAVE TELEVISION SHOWS, YOU KNOW, WHERE WE COULD

17  TALK ABOUT THEM AND SHARE IT WITH OUR GRANDCHILDREN AND OUR

18  CHILDREN?

19          AND IT WOULD START BUILDING THIS THING UP.  BUT NO,

20  THEY DIDN'T WANT THAT.  THEY DIDN'T WANT THAT, BECAUSE THEY

21  WEREN'T REALLY OUR AGENT.  THEY WERE THERE TO KNOCK US OUT.

22          AND AS SOON AS -- AS SOON AS THEY REALIZED THAT BIG

23  MONEY WAS COMING -- WAS COMING IN, THEY CHANGED THE -- THE GLA.

24          YOU GOT TO TAKE A LOOK AT THE CHANGED GLA, BECAUSE

25  UNDER THE GLA IT DOESN'T SAY THAT THE PLAYER SHARES WITH THE

1  ELIGIBLE NFLPA MEMBERS.  IT DOESN'T SAY THAT AT ALL.

2          IT SAYS:

3          "WE'LL FOLLOW THE OBJECTIVES OF THE UNION,"

4  WHICH MEANS THEY DON'T HAVE TO GIVE THEM A PENNY.  THAT'S WHAT

5  THEY DID.  WHY DO YOU THINK THEY CHANGED IT?  THEY CHANGED IT

6  FOR ONE REASON AND ONE REASON ONLY:  DIRTY TRICK.

7          OKAY.  I WANT TO TALK ABOUT DOUBLE-TALK, AND I'LL TRY

8  TO GET TO MORE OF IT.  YOU KNOW, YOU'VE GOT DOUG ALLEN, RIGHT?

9  HE SAYS THAT "SIX OR MORE PRESENT OR FORMER" DOESN'T MEAN THAT.

10 RIGHT?

11         HE SAYS THAT IT ONLY MEANS RETIREDS.  AND IT MEANS

12 THE ENTIRE GROUP OF RETIREDS.  IF YOU CAN'T LICENSE ALL 2,062

13 CLASS MEMBERS, THEN YOU CAN'T HAVE A DEAL.

14         THAT'S OUTRAGEOUS.  IT DOESN'T SAY THAT.

15         TALK ABOUT RICHARD BERTHELSEN.  THE DEFENDANTS SAY

16 THAT "PRESENT OR FORMER" MEANS "RETIRED ONLY."

17         "I CONSISTENTLY SAID THAT IT WAS THE INTENT THAT

18 THEY BE CONSISTENTLY SEPARATE PROGRAMS, YES."

19         IT JUST -- IT JUST BOGGLES MY MIND.

20         THE DEFENDANTS NEVER CREATED AN ESCROW ACCOUNT.

21 ALLEN ACKNOWLEDGED THAT.

22         THE DEFENDANTS' MOTTO WAS:  "PAST, PRESENT AND

23 FUTURE."

24         AND ALONG COMES THE LATE GENE UPSHAW:

25         "WE COULD HAVE THE GREATEST DOG FOOD IN THE

1  WORLD, BUT IF THE DOGS DON'T LIKE IT, WE CAN'T SELL IT."

2         HOW DOES THAT FEEL?  HOW DOES THAT FEEL?  DOG FOOD?

3  HOW DOES THAT FEEL?  THAT'S YOUR AGENT.  THAT'S YOUR AGENT

4  TELLING IT TO THE WORLD.  HOW DOES THAT FEEL?

5         YOU THINK THAT'S A FIDUCIARY?  YOU THINK THAT'S

6  SOMEBODY IN YOUR CORNER FIGHTING, EVERY OUNCE OF HIS BODY, OR

7  HER BODY, FIGHTING FOR YOU?  DOG FOOD.

8              "RETIRED PLAYERS ARE EXPRESSLY INCLUDED IN THE

9  THIRD-PARTY LICENSE AGREEMENT," NOT THAT IT MATTERS.  READ THE

10 ALLEN TESTIMONY AT A DEPOSITION WHERE HE SAYS:

11              "I BELIEVE SO."

12         READ THE ALLEN TESTIMONY NOW IN THE COURTROOM WHERE

13 HE SAYS:

14              "NO."

15         THE TOUCHBACK ARTICLE:

16              "THE VIDEO GAME COMPANY'S RESPONSE HAS BEEN

17 RESTRAINED."

18         TAKE A LOOK AT THE EXHIBIT FOR THE YEARS 2003 TO

19 2007.  IT TELLS YOU THERE WERE 147 RETIRED TEAMS IN THEIR

20 MADDEN.

21         AND TAKE A LOOK AT THAT TOUCHBACK, THE HEADLINE,

22 PLEASE:

23              "GROUP LICENSING IS ESSENTIAL."

24         WHY KEEP WRITING THESE GUYS TELLING THEM GROUP

25 LICENSING IS ESSENTIAL?  WHY?  ASK YOURSELF THAT QUESTION.

1          ALLEN:

2              "DID YOU EVER FAVOR THE INTERESTS OF THE

3     LICENSEES OVER THE INTERESTS OF THE PLAYERS THAT YOU

4     REPRESENTED?  YES OR NO?

5              "NO."

6          THEN, READ THE HALL OF FAME LETTER.  OF COURSE, HE

7     DID.

8          STABBED THE HALL OF FAMERS.  NEVER MIND THE CLASS,

9     THE STABBED THE HALL OF FAMERS IN THE BACK.

10         ARE YOU TELLING THE COURT AND JURY THAT YOU USED YOUR

11    BEST EFFORTS FOR THE RETIRED GUYS?

12         LASHUN:

13             "IT MUST BE SCRAMBLED."

14         DO YOU REALLY THINK HE WAS TRYING TO USE BEST IN

15    MADDEN, OR ANYPLACE ELSE, FOR THAT MATTER?

16         PAT ALLEN:  THE DEFENDANTS CONTEND THEY MARKETED THE

17    ENTIRE GLA GROUP WITH A LIST.

18         TAKE A LOOK AT HOWARD SKALL FOR PLAYERS INC:

19             "IS THERE A LIST OF APPROXIMATELY 3,000 RETIRED

20    PLAYERS THAT'S MADE AVAILABLE?

21             "NOT THAT I WAS AWARE OF."

22         AND IT GOES ON WITH UPSHAW AND ALLEN AND OTHERS,

23    WHICH I JUST DON'T HAVE TIME TO READ TO YOU RIGHT NOW.  I'LL

24    GET TO IT, I PROMISE YOU, ON THE RESPONSE.

25         PUNITIVE DAMAGES.  LADIES AND GENTLEMEN, I JUST

1   SHOWED YOU HOW THE DEFENDANTS, I HOPE, BREACHED THE GLA AND

2   THEIR FIDUCIARY DUTIES.

3           THERE'S ONE MORE THING THAT I'M GOING TO ASK YOU TO

4   FIND.  AND THAT IS THAT THE DEFENDANTS ACTED WITH AN INTENT TO

5   INJURE THE PLAINTIFFS, WITH WILLFUL DISREGARD FOR THEIR RIGHTS,

6   AND THAT THEIR CONDUCT WAS OUTRAGEOUS.

7           THE COURT WILL INSTRUCT YOU ON THE STANDARDS.  I

8   DIDN'T SHOW THE SLIDES.  I ONLY TOUCHED ON IT.  I'LL SAY MORE

9   IN THE SUMMATION.

10          BUT WHAT I WAS JUST READING YOU ILLUSTRATED THE

11  DOUBLE-TALK, THE DOUBLE-DEALING, THE DECEIT, THE DOUBLE

12  STANDARDS, THE STABBINGS IN THE BACK, THE CONFLICT OF

13  INTERESTS.

14          THESE WERE MERELY EXAMPLES THAT I THINK PROVE BEYOND

15  A DOUBT THAT THE DEFENDANTS ACTED HORRIBLY.  IF YOU FIND THAT,

16  THE COURT WILL INSTRUCT THAT YOU CAN CONSIDER PUNITIVE DAMAGES.

17          MR. BERTHELSEN, THE GENERAL COUNSEL, HE SAID IT BEST.

18  THERE'S A CARD OR A SLIDE ABOUT THAT.  HE ACKNOWLEDGED IT.  I

19  THINK CHAD HUMMEL WAS QUESTIONING HIM.

20          "THE DEFENDANTS HAVE TO TAKE RESPONSIBILITY FOR

21  THE DOCUMENT."

22          I'M JUST GOING TO ASK YOU THIS.  WHEN YOU GO TO

23  LISTEN TO MR. KESSLER, KEEP THESE QUESTIONS IN MIND, PLEASE.

24  ANYTIME MR. KESSLER SHOWS YOU RETIRED PLAYER LICENSING REVENUES

25  PAID TO RETIRED PLAYERS OR COMPARES WHAT THE UNION DID IN THIS

1  CASE TO OTHER SPORTS UNIONS, ASK YOURSELF:

2          ARE THESE AD HOCS PAYMENTS?  IS HE INCLUDING AD

3  HOC PAYMENTS?

4          IF SO, THEY ARE IRRELEVANT AND AN ATTEMPT TO DISTRACT

5  YOU.  HE MIXES APPLES AND ORANGES.  NOT A PENNY OF AD HOC

6  PAYMENTS WENT INTO AN ESCROW ACCOUNT TO BE DIVIDED AMONG

7  PLAINTIFFS.

8          AND, LASTLY, ASK YOURSELF:

9          DOES ANYTHING HE'S SAYING DEFEAT THE PLAYER

10 LANGUAGE OF THE GLA THAT THEY DRAFTED?

11         "FUNDS RECEIVED FROM GROUP LICENSING INVOLVING SIX OR

12 MORE PRESENT OR FORMER PLAYERS WILL BE DIVIDED BETWEEN THE

13 PLAYER AND AN ESCROW ACCOUNT, FROM AN ESCROW ACCOUNT WITH THE

14 ELIGIBLE NFLPA GUYS."

15         NOTHING HE WOULD TELL YOU SHOULD ALTER YOUR VIEW OF

16 THE DEAL.  A DEAL IS A DEAL.

17         AND YOU'RE GOING TO HEAR, I BELIEVE, A WHOLE BUNCH OF

18 EXCUSES.  I WILL COME BACK WITH WHATEVER TIME I HAVE LEFT TO

19 SAY A FEW MORE WORDS TO YOU.

20         THANKS FOR LISTENING TO ME.  WHATEVER YOU DO IS ALL

21 RIGHT WITH ME.

22         **THE COURT:**  THANK YOU, MR. PARCHER.

23         **MR. PARCHER:**  THANK YOU.

24         **THE COURT:**  IS THERE ROOM FOR THE JURY TO SCOOT BY

25 THERE?

1          MR. PARCHER:  I'LL --

2          THE COURT:  ALL RIGHT.  WE WILL TAKE A 15-MINUTE

3    RECESS.  REMEMBER THE ADMONITION.  PLEASE DON'T TALK ABOUT THE

4    CASE.  YOU WILL HAVE A DUTY TO DO SO IN ABOUT AN HOUR AND A

5    HALF OR TWO, BUT NOT YET.  THANK YOU.

6          WE'LL SEE YOU BACK HERE IN 15 MINUTES.

7          THE CLERK:  ALL RISE.

8          (THEREUPON, THE JURY LEFT THE COURTROOM.)

9          THE COURT:  PLEASE BE SEATED.

10          MR. PARCHER, YOU USED AN HOUR AND 8 MINUTES.  I'M

11    GOING TO ENLARGE YOUR TIME SLIGHTLY.  YOU CAN HAVE 15 MINUTES.

12          MR. PARCHER:  THAT'S NICE OF YOU, JUDGE.

13          THE COURT:  15 MINUTES.

14          AND YOU CAN HAVE AN HOUR AND 25 MINUTES IN YOUR

15    ARGUMENT, MR. KESSLER.

16          MR. PARCHER:  THAT'S VERY NICE.

17          THE COURT:  15 MINUTES.  THAT'S AN ENLARGEMENT --

18          MR. PARCHER:  I APPRECIATE IT.  I REALLY DO.

19          MR. KESSLER:  YOUR HONOR?

20          THE COURT:  YES.

21          MR. KESSLER:  YOUR HONOR, I WOULD NOTE, AGAIN, SINCE

22    YOUR HONOR WAS CAREFUL ABOUT THIS IN OPENING AND WARNED US,

23    THERE WAS QUITE A BIT OF VOUCHING, PARTICULARLY AT THE END.

24    THE DISCUSSIONS OF STUFF OUT OF THE RECORD ABOUT HOLLYWOOD

25    AGENTS.

1          HE MENTIONED "OUR ARGUMENTS," YOUR HONOR.

2          AGAIN, I DON'T --

3          **THE COURT:** HE CAN MENTION YOUR ARGUMENT.

4          **MR. KESSLER:** NO, NO. HE SAID "OUR ARGUMENT."

5          **THE COURT:** YES, HE DID.

6          **MR. KESSLER:** WITH RESPECT TO THAT THEN --

7          **THE COURT:** IT'S -- I KNOW YOU'RE GOING TO DO THE

8    SAME THING.

9          **MR. PARCHER:** I TRIED TO CORRECT IT QUITE A FEW

10   TIMES.

11         **MR. KESSLER:** YOUR HONOR, I WON'T DO ANY MORE. I

12   JUST WANT TO KNOW THAT HE HAS PUT THIS INTO PLAY A LITTLE BIT.

13         **THE COURT:** YOU CAN HAVE THE SAME DEGREE OF

14   FLEXIBILITY THAT HE TOOK --

15         **MR. KESSLER:** THAT'S ALL I'M ASKING FOR.

16         **THE COURT:** -- TO PERSONALIZE THE CASE.

17         **MR. PARCHER:** I DON'T WANT TO HURT MR. KESSLER'S

18   FEELINGS, BUT I'LL BE PERFECTLY HAPPY FOR THE JURY TO IDENTIFY

19   THE DEFENDANTS WITH HIM. VERY CONTENT.

20         **THE COURT:** WELL, YOU ALL CAN FIND OUT WHAT THE JURY

21   THINKS --

22         **MR. PARCHER:** RIGHT.

23         **THE COURT:** -- IN A FEW DAYS. ALL RIGHT.

24         MR. KESSLER, DO YOU WANT TO TAKE THE 15 MINUTES TO

25   REARRANGE THE COURTROOM AND BE READY TO GO IN 15 MINUTES?

1          **MR. KESSLER:**  I WILL, YOUR HONOR.

2          **THE COURT:**  WE WILL TAKE A SHORT BREAK.

3          **MR. KESSLER:**  THANK YOU.

4          (RECESS WAS TAKEN.)

5          **THE COURT:**  EVERYONE HAVE A SEAT.  ARE WE READY,

6  MR. KESSLER?

7          **MR. KESSLER:**  I'M READY.

8          **THE COURT:**  IF THERE ARE PEOPLE IN THE HALLWAY WHO

9  WANT TO COME IN, LET'S GET THEM IN SO WE DON'T HAVE

10  INTERRUPTIONS.

11          (THEREUPON, THE JURY RETURNED TO THE COURTROOM.)

12          **THE COURT:**  PLEASE BE SEATED.

13          AT THIS TIME WE WILL HAVE THE CLOSING ARGUMENT OF THE

14  DEFENDANTS.

15          MR. KESSLER.

16          **MR. KESSLER:**  YOUR HONOR, IF YOU WOULD BE KIND ENOUGH

17  TO LET ME KNOW WHEN I'M ONE HOUR IN, I WOULD APPRECIATE THAT.

18          **THE COURT:**  I WILL.  IT WILL BE APPROXIMATE,

19  PROBABLY.  BUT AT SOME LOGICAL BREAKING POINT I'LL GIVE YOU A

20  HEADS UP.

21                    **CLOSING ARGUMENT**

22          **MR. KESSLER:**  THANK YOU, YOUR HONOR.

23          GOOD MORNING, LADIES AND GENTLEMEN OF THE JURY.

24  WE'RE FINALLY HERE.

25          ON BEHALF OF MY CLIENTS, THE NATIONAL FOOTBALL LEAGUE

1  PLAYERS ASSOCIATION AND PLAYERS INC, I WANT TO THANK YOU ON

2  THEIR BEHALF FOR DEVOTING YOUR TIME AND CAREFUL ATTENTION TO

3  THIS CASE.

4           WE KNOW THERE ARE MANY THINGS GOING ON IN YOUR LIVES,

5  AND THAT JURY SERVICE IS BOTH A WONDERFUL OBLIGATION, BUT IT IS

6  ALSO A BURDEN AT TIMES.  AND WE REALLY DO APPRECIATE YOUR

7  DEVOTING YOURSELF TO THIS SERVICE.

8           FROM THE VERY BEGINNING, THIS CASE, AS YOU KNOW,

9  BECAUSE YOU'VE BEEN SITTING HERE, HAS BEEN FILLED WITH

10  FINGER-POINTING, ACCUSATIONS, JERSEY-WAVING, A LOT OF SOUND, A

11  LOT OF FURY.  THAT'S BEEN THE STORY OF THIS CASE.

12          BUT WHAT YOU'VE SEEN IS TIME AND TIME AGAIN, TIME AND

13  TIME AGAIN, WHEN THE EVIDENCE IS LOOKED AT IN ITS FULL CONTEXT,

14  WHEN YOU'VE SEEN THE WITNESSES, WHEN YOU'VE HEARD THE

15  TESTIMONY, THE PICTURE WAS NOT QUITE HOW PLAINTIFFS' COUNSEL

16  HAS PRESENTED IT.

17          TODAY IS NO DIFFERENT.  TODAY IS NO DIFFERENT.

18          WE'RE GOING TO CAREFULLY REVIEW THE EVIDENCE WITH YOU

19  TODAY.  WE CANNOT DO IT ALL.  THERE'S TIME CONSTRAINTS.  BUT

20  WE'RE GOING TO SHOW YOU THE MOST IMPORTANT PIECES OF EVIDENCE

21  IN ITS FULL CONTEXT.

22          AND WHAT YOU'RE GOING TO SEE IS THAT THE ALLEGATIONS

23  OF DOUBLE-TALKING, DOUBLE-DEALING, DECEIT, UNTRUTHFULNESS BY

24  GENE UPSHAW, DOUG ALLEN, PAT ALLEN, TRACE ARMSTRONG, DAN GOICH,

25  ALL OF THESE PEOPLE TOGETHER IN SOME TYPE OF GIGANTIC

1   CONSPIRACY AGAINST THE RETIRED PLAYERS, WHICH IS THE ONLY WAY

2   MR. PARCHER'S ALLEGATIONS MAKE SENSE, THERE'S NO EVIDENCE OF

3   THAT.  THERE'S NO EVIDENCE OF THAT.

4         YOU'VE SEEN THE WITNESSES AND THE EVIDENCE, AND YOU

5   KNOW THAT.  YOU KNOW THAT.

6         I WANT TO REMIND YOU OF THAT MORNING WHEN THE SIREN

7   WENT OFF.  REMEMBER THE SIREN AND EVERYBODY BECAME ALARMED?

8   SURELY THAT SIREN MUST MEAN SOMETHING.  PERHAPS IT WAS A SAFETY

9   ISSUE.  WE SHOULD LEAVE OR SOMETHING.

10        BUT WHAT THE JUDGE THEN INFORMED US IS:  NO, IT

11  ACTUALLY SIGNIFIED NOTHING.  IT WAS THE 10 O'CLOCK SIREN.

12        THAT'S WHAT THIS CASE HAS BEEN ABOUT.  IT'S BEEN

13  ABOUT AN ALARMING NOISE, ALARMING ALLEGATIONS.  BUT WHEN YOU

14  LOOK AT THE EVIDENCE, THE EVIDENCE, IT'S SIMPLY NOT THERE.

15  THAT'S WHAT I'M GOING TO DO THE REST OF MY TIME.  WE'RE GOING

16  TO LOOK AT THE EVIDENCE.

17        YOU'LL RECALL, IF WE TAKE A LOOK AT THE THREE KEY

18  POINTS TO DECIDE THIS CASE, C1.  IN MY OPENING I SAID THESE ARE

19  THE THREE POINTS WHICH WOULD HELP YOU DECIDE THIS CASE.

20        STILL TRUE TODAY.

21        THE FIRST POINT WAS THAT THE LICENSING MONEY WAS

22  GENERATED -- THE MONEY THAT THEY'RE SEEKING, THE GLR POOL,

23  REMEMBER THAT'S THE MONEY THEY'RE SEEKING -- WAS GENERATED

24  SOLELY FOR THE RIGHTS OF ACTIVE, NOT RETIRED, PLAYERS.

25        EVIDENCE IS OVERWHELMING ON THAT POINT, AND WE WILL

1  REVIEW IT.

2         SECOND, WHENEVER RETIRED PLAYERS' RIGHTS WERE

3  LICENSED, WHO GOT THE MONEY?  THE RETIRED PLAYER GOT THE MONEY,

4  NOT THE ACTIVE PLAYERS.

5         AGAIN, THE EVIDENCE IS OVERWHELMING.  MR. PARCHER

6  SAID NOT ONE PENNY WENT TO THE RETIRED PLAYERS.

7         WELL, WHAT THE UNDISPUTED EVIDENCE SHOWS -- AND WE'LL

8  GO THROUGH THIS -- IS $7 MILLION -- THAT'S A LOT OF PENNIES --

9  WENT TO THE CLASS MEMBERS OF THIS CASE.

10         13,000 WENT TO MR. ADDERLEY.  HE DOESN'T THINK IT'S

11  ENOUGH.  I UNDERSTAND THAT.

12         BUT THE FACT THAT WE WERE NOT OUT THERE MARKETING AND

13  GENERATING OPPORTUNITIES FOR RETIRED PLAYERS MAKES NO SENSE.

14  COMPLETELY CONTRARY TO THE EVIDENCE.

15         THIRD POINT IS THAT MOST RETIRED CLASS MEMBERS

16  RECEIVED NO LICENSING MONEY.  WHY?  BECAUSE LICENSEES IN THE

17  MARKETPLACE PUT NO VALUE ON THEIR LICENSING RIGHTS.

18         WHAT WAS THE PROBLEM?  WHAT DID THE EVIDENCE SHOW?

19  WE'RE GOING TO REVIEW THIS.

20         THE EVIDENCE SHOWED THE STAR RETIRED PLAYERS WOULDN'T

21  SIGN THE GLA'S ON THE WHOLE.  TRIED, COULDN'T GET THEM.

22         IT WAS MENTIONED THAT MR. BART STARR IS HERE.  VERY

23  FAMOUS RETIRED PLAYER.  MR. BART STARR DIDN'T SIGN A RETIRED

24  PLAYER GLA.  WE COULDN'T GET SOMEBODY LIKE A BART STARR TO JOIN

25  IN, OKAY?

1      WITHOUT THOSE STAR PLAYERS, THE GROUP WAS SIMPLY NOT

2  MARKETABLE.  IT'S NOBODY'S FAULT.  IT'S NOT BECAUSE THERE

3  WASN'T EFFORT.  IT'S NOT BECAUSE THERE WAS SOMETHING EVIL GOING

4  ON, AS YOU HEARD.  THERE'S NOTHING EVIL GOING ON.

5      THIS WAS AN EFFORT, AND THE EVIDENCE SHOWS, OF THE

6  ONLY SPORTS UNION TO TRY TO DO THIS FOR THEIR RETIRED PLAYERS.

7      YOU HEARD EVIDENCE FROM PROFESSOR NOLL, THE BASEBALL

8  PLAYERS' UNION DIDN'T TRY THIS.  THE HOCKEY PLAYERS' UNION

9  DIDN'T TRY THIS.  THE BASKETBALL PLAYERS' UNION DIDN'T TRY

10 THIS.

11     BUT GENE UPSHAW, WHO WAS A RETIRED PLAYER HIMSELF,

12 WANTED TO TRY TO DO SOMETHING FOR THE RETIRED PLAYERS.

13     EVEN MY GRANDMOTHER, IF SHE WERE HERE TODAY, WOULD BE

14 SHOCKED AT THE VINDICTIVE ATTACK OF DECEIT, NAME CALLING,

15 REQUESTS FOR PUNITIVE DAMAGES, THAT CAME OUT OF THIS EFFORT TO

16 TRY TO HELP THESE RETIRED PLAYERS.

17     BUT I TOLD THEM IN THE EVIDENCE.  I'M NOT GOING TO DO

18 A LOT OF RHETORIC HERE.  I REALLY WANT TO FOCUS ON THE

19 EVIDENCE.

20     SO, WHAT SHOULD WE TALK ABOUT FIRST?  WELL, THE FIRST

21 AND MOST IMPORTANT THING TO TALK ABOUT IS THE GLA, THE RETIRED

22 PLAYER GLA.

23     IF WE COULD PUT UP EXHIBIT 110.  IS IT 110?  YES.

24     (DOCUMENT DISPLAYED.)

25     AND I DO WANT TO MENTION TO YOU, AS THE COURT HAS

1    INSTRUCTED YOU, REMEMBER IT'S THE PLAINTIFFS WHO HAVE THE

2    BURDEN OF PROOF.  THIS IS VERY IMPORTANT, BECAUSE THAT'S HOW

3    OUR LEGAL SYSTEM WORKS.

4            SO IF THEY HAVEN'T SHOWN THE EVIDENCE, THEY CAN'T

5    PREVAIL.

6            WE ARE HEARD MR. PARCHER SAY WELL, WE, DEFENDANTS,

7    ONLY CALLED THE TWO LICENSEES HERE OUT OF THE 95.

8            IT WASN'T DEFENDANTS' BURDEN TO BRING IN THE 95

9    LICENSEES.  IT WAS PLAINTIFFS' BURDEN.  THEY HAVE TO COME UP

10   WITH SOME EVIDENCE, NOT JUST ACCUSATIONS.

11           BUT I WANT TO GO TO RETIRED PLAYER GLA.

12           COULD WE GO TO THE BOTTOM PARAGRAPH?

13           WHAT'S EXTRAORDINARY TO ME, EXTRAORDINARY,

14   MR. PARCHER KEPT SAYING "THE GLA," AND HE PUT UP A BIG BOARD OF

15   THE GLA.  HE DIDN'T DISCUSS WITH YOU THE MOST IMPORTANT

16   LANGUAGE IN THE RETIRED PLAYER GLA.  THE MOST IMPORTANT.

17           THE MOST IMPORTANT IS HOW THE MONEY IS DIVIDED.  THE

18   PARAGRAPH THAT TALKS ABOUT HOW IT'S DIVIDED IS WHERE YOU SAY

19   WHEN YOU WOULD GET MONEY AND WHEN.  WHEN DO YOU GET MONEY?

20              "IT IS FURTHER UNDERSTOOD THAT THE MONIES

21   GENERATED BY SUCH LICENSING OF" -- AND THIS IS WHAT HE WOULDN'T

22   MENTION.  I CAN'T GET THE WORDS OUT -- "RETIRED PLAYER GROUP

23   RIGHTS."  NOT ACTIVE PLAYER GROUP RIGHTS.  RETIRED PLAYER GROUP

24   RIGHTS.

25           IT'S WHEN YOU HAVE MONEY GENERATED BY LICENSING OF

1  RETIRED PLAYER GROUP RIGHTS, THEN IT WILL BE DIVIDED BETWEEN

2  THE PLAYER AND AN ESCROW ACCOUNT.

3         SO THERE IS NO POSSIBLE WAY TO CONSTRUE THIS

4  AGREEMENT, TO CONSTRUE IT -- AND THE JUDGE WILL SAY:  LOOK AT

5  THE WORDS" -- THAT "RETIRED PLAYER GROUP RIGHTS" REFER TO

6  "ACTIVE PLAYER GROUP RIGHTS," WHICH IS WHAT THEIR ARGUMENT IS.

7  IT MAKES NO SENSE.

8         HE WILL NOT DEAL WITH THE RETIRED PLAYER GROUP

9  RIGHTS.  JUST CAN'T.  HE WON'T.

10         NOW, I'M GOING TO COME BACK AND TALK ABOUT THE ESCROW

11  ACCOUNT, AND I'M GOING TO TALK ABOUT THE ELIGIBILITY CRITERIA.

12         FOR RIGHT NOW I WANT YOU TO FOCUS ON THE FACT THIS

13  WAS -- IF YOU LOOK AT THE TITLE, THIS WAS A RETIRED PLAYER

14  GROUP LICENSING AUTHORIZATION FORM.

15         AND YOU RECALL THE ACTIVE PLAYER FORM IS VERY

16  DIFFERENT, COMPLETELY DIFFERENT.  NO ESCROW ACCOUNT MENTIONED.

17  COMPLETELY DIFFERENT FORM.  AND IT WAS ABOUT RETIRED PLAYER

18  GROUP RIGHTS.

19         NOW, HE POINTS TO THE SECOND PARAGRAPH -- I DON'T

20  WANT TO IGNORE HIS PARAGRAPH.  THE PARAGRAPH HE KEEPS GOING TO

21  IS THE SECOND ONE, WHICH SAYS WHAT GROUP LICENSING PROGRAMS ARE

22  DEFINED AS.  AND THERE'S NO DISPUTE GROUP LICENSING COULD

23  INVOLVE SIX OR MORE PRESENT OR FORMER NFL PLAYER IMAGES.

24         BUT THAT JUST TELLS YOU WHAT KINDS OF PROGRAMS YOU

25  COULD PUT RETIRED PLAYERS IN.  IT DOESN'T TELL YOU:  WHEN DO

1   YOU DIVIDE MONEY?  IT TALKS ABOUT THE MONIES GENERATED BY

2   LICENSING OF RETIRED PLAYER GROUP RIGHTS.

3           THE MERE FACT THAT YOU COULD COMBINE PRESENT AND

4   FORMER PLAYERS WAS NEVER UNDERSTOOD BY ANYONE, ANYONE, NOT ANY

5   OF THE PLAYERS IN THIS CASE -- THE PLAINTIFFS WILL TALK ABOUT

6   THAT -- NOT BY THE DEFENDANTS, NOT BY ANYONE, THAT RETIRED

7   PLAYERS, BY SIGNING A PIECE OF PAPER, BY SIGNING A PIECE OF

8   PAPER YOU COULD GET TENS OF THOUSANDS OF DOLLARS A YEAR OF THE

9   ACTIVE PLAYER LICENSING MONEY.

10          DOES THIS MAKE ANY SENSE TO YOU?

11          FIRST OF ALL, IF THAT WAS TRUE, WOULDN'T ALL 13,000

12  HAVE SIGNED?  WHY WOULD WE HAVE TO BE GOING OUT AND TELLING

13  PEOPLE:  OH, PLEASE, SIGN THESE.?

14          IF YOU JUST SIGNED THE PIECE OF PAPER AND YOU GOT

15  TENS OF THOUSANDS OF DOLLARS OF ACTIVE PLAYER MONEY, WOULDN'T

16  ALL 13,000 HAVE SIGNED?

17          AND IF WE WERE GOING TO DO THAT, WOULDN'T WE HAVE TO

18  TELL THE ACTIVE PLAYER BOARD OF PLAYER REPS WHO RAN THIS UNION?

19  I'M GOING TO TALK ABOUT THAT.

20          LET ME GO NEXT TO TESTIMONY.  MR. ROWLEY, THEIR

21  DAMAGES EXPERT, WAS ASKED BY MR. HUMMEL THIS QUESTION.  IT WAS

22  AN EXTRAORDINARY BIT OF TESTIMONY:

23              "NOW, MR. KESSLER, MR. KESSLER WROTE THESE

24  [SIC] WORDS ON THE BOARD HERE:  'ACTIVE PLAYER MONEY.'  WHERE

25  IN THE GLA DOES IT SAY 'ACTIVE PLAYER MONEY'?"

1          THIS IS THEIR WITNESS:

2               "IT DOESN'T, COUNSEL."

3          HE'S RIGHT.  THE RETIRED PLAYER GLA NEVER TALKS ABOUT

4    "ACTIVE PLAYER MONEY."

5          THE COURT'S GOING TO INSTRUCT YOU THAT ADMISSIONS

6    AGAINST SELF-INTEREST ARE FAIRLY SIGNIFICANT IN YOUR

7    EVALUATION.

8          YOU CAN LOOK ALL THROUGH THE GLA, AND THERE'S NO

9    REFERENCE TO ACTIVE PLAYER LICENSING MONEY.  THERE'S ALSO NO

10   REFERENCE TO THE GROSS LICENSING REVENUE POOL.

11         YOU MAY ALL REMEMBER HOW FIRST COUNSEL KEPT CALLING

12   IT "GROUP LICENSING REVENUE POOL."  BUT WHEN WE LOOKED AT IT,

13   IT WAS "GROSS LICENSING."

14         AGAIN, THERE'S NO REFERENCE TO "GROSS LICENSING" IN

15   THE RETIRED PLAYER GLA.  ONLY TO THE GROUP LICENSE.  WE'LL COME

16   BACK TO THAT.

17         I WANT TO GO NEXT TO MR. ADDERLEY'S TESTIMONY.  THIS

18   IS VERY SIGNIFICANT, AGAIN, BECAUSE THIS WAS HIS TRUTHFUL

19   UNDERSTANDING BEFORE THIS LITIGATION WAS FILED.  AND THE

20   COURT'S GOING TO TELL YOU THAT'S VERY SIGNIFICANT.

21              "MR. ADDERLEY" -- THIS IS THE QUESTION -- "AT

22   THE TIME YOU SIGNED THE GLA" -- THAT'S THE CRITICAL TIME WHEN

23   HE SIGNED IT -- "YOU DIDN'T THINK YOU WERE ENTITLED TO ANY

24   ACTIVE PLAYER LICENSING MONEY"?

25              "ANSWER:  IS THAT 2001 WHEN I FIRST SIGNED?

1           "QUESTION:  YES.

2           "ANSWER:  NO.

3           "QUESTION:  YOU ONLY CAME TO THAT UNDERSTANDING

4   SOMETIME AFTER THIS LAWSUIT, CORRECT?"

5       LOOK AT THIS ANSWER:

6           "WHEN THE THEORY WAS CHANGED."

7       I WANT TO FOCUS ON THAT FOR A SECOND.

8       FACTS ARE FACTS.  THEORIES ARE THEORIES.  THE FACT

9   THAT AFTER THIS LAWSUIT THE LAWYERS CAME UP WITH SOME THEORIES

10  TO TRY TO TWIST THE DEFINITION OF GROUP LICENSING, PRESENT OR

11  FORMER, TO ARGUE THAT RETIRED PLAYERS WERE BEING GIVEN AN

12  AGREEMENT TO GIVE THEM ACTIVE PLAYER LICENSING MONEY, IF THE

13  THEORY CHANGES, THE FACTS DON'T CHANGE.

14      THE FACTS WERE MR. ADDERLEY UNDERSTOOD UNTIL HIS

15  LAWYER SPOKE TO HIM AFTER THIS LAWSUIT WAS FILED AND CHANGED

16  THE THEORY THAT HE WAS NOT ENTITLED TO ACTIVE PLAYER LICENSING.

17      C3, NEXT SLIDE.

18      WHAT ELSE DID MR. ADDERLEY TESTIFY TO?

19          "QUESTION:  NOW, YOU MENTIONED THE LANGUAGE IN

20  THE GLA WHICH SAID 'SIX OR MORE FORMER OR PRESENT PLAYERS.'  DO

21  YOU RECALL THAT?

22          "YES.

23          "OKAY.  NOW, THAT LANGUAGE EXISTED IN THE GLA

24  WHEN YOU SIGNED IT, RIGHT?

25          "YES.

1          "AND DESPITE THAT FACT, YOUR BELIEF WAS THAT YOU

2    WOULD ONLY GET PAID IF YOUR IMAGE WAS USED, CORRECT?

3          "AT THAT PARTICULAR TIME, YES."

4          WELL, THE PARTICULAR TIME WAS WHEN HE SIGNED THE GLA.

5    SO HE READ THE LANGUAGE ABOUT "SIX OR MORE FORMER OR PRESENT

6    PLAYERS," AND HE UNDERSTOOD THAT HE WOULD GET PAID IF HIS IMAGE

7    WAS USED, NOT IF SOMEBODY ELSE'S IMAGE WAS USED.

8          THIS IS JUST A THEORY.  IT'S A THEORY OF PLAINTIFFS'

9    COUNSEL, AND THEY'RE TRYING TO USE THAT THEORY AND DISTORTION

10   TO ENFORCE TERMS THAT DON'T EXIST.

11         YOU KNOW, IT'S INTERESTING.  THEY MADE A BIG ISSUE OF

12   THE FACT -- I DON'T KNOW WHAT THEY WERE SAYING -- THAT

13   DEFENDANTS SAID:

14         "WE TAKE RESPONSIBILITY FOR THE GLA, RETIRED

15   PLAYER GLA."

16         YOU BET WE DO.  SHOULDN'T SAY "WE."YOU BET DEFENDANTS

17   DO.  YOU BET THEY DO.

18         BOTH SIDES TO THE AGREEMENT, TO THE DEAL, HAVE TO

19   TAKE RESPONSIBILITY FOR IT.  AN AGREEMENT IS A TWO-WAY STREET.

20   IT'S A TWO-WAY STREET.

21         AND THE OTHER SIDE OF THIS AGREEMENT, THE RETIRED

22   PLAYERS, THEY KNEW IT WASN'T ACTIVE PLAYER LICENSING MONEY.

23   AND WE KNEW -- THE DEFENDANTS KNEW IT WASN'T ACTIVE PLAYER

24   LICENSING MONEY.  BOTH SIDES KNEW.  THE PLAINTIFFS KNEW THEY

25   WOULD ONLY GET PAID IF THEIR RIGHTS WERE USED.  AND THE

1  DEFENDANTS KNEW THAT.

2          SO BOTH SIDES HAVE TO TAKE RESPONSIBILITY FOR THIS

3  AGREEMENT.

4          NOW, I'D LIKE TO SHOW WHAT MR. GOICH TESTIFIED ABOUT

5  THIS.  MR. GOICH SIGNED ONE OF THESE RETIRED PLAYER GLA'S.  I

6  THINK HE WAS A CREDIBLE WITNESS.  YOU WILL BE THE JUDGE OF

7  THAT.  I CANNOT VOUCH FOR HIM.  YOU HAVE TO DETERMINE.  YOU

8  HAVE TO DETERMINE WHETHER HE WAS CREDIBLE.

9          WHAT DID HE SAY?

10          "QUESTION:  AND, SIR, AT THE TIME -- AT THE TIME

11  YOU SIGNED YOUR RETIRED PLAYER GLA, WHAT WAS YOUR UNDERSTANDING

12  AS TO WHETHER IT MADE YOU ELIGIBLE FOR A SHARE OF ANY ACTIVE

13  PLAYER LICENSING MONEY?

14          "ANSWER:  IT IS SO FAR OUT, I CAN'T COMPREHEND

15  WHY ANYONE WOULD ASK.  THE ACTIVE PLAYERS' MONEY WAS NEVER PART

16  OF THIS ISSUE.  AND I WENT TO EVERY CONVENTION.  I LISTENED

17  INTENTLY.  TO STATE THAT WE WERE GOING TO MINGLE WITH THE

18  ACTIVE PLAYERS, THEIR MONIES, IS WAY OUT OF LEFT FIELD.  THAT

19  WAS THE ACTIVE PLAYERS TRYING TO HELP US IN THEIR WAY.  IT'S

20  THE WAY I UNDERSTOOD IT, VERY SIMPLY PUT.  BUT THEY WEREN'T --

21  THEIR LICENSING MONEY WASN'T GOING TO BE OUR LICENSING MONEY?

22  IS THAT WHAT YOU'RE SAYING?  IT NEVER WOULD HAVE HAPPENED."

23          YOU JUDGE THE CREDIBILITY OF DAN GOICH.  HE AGREES

24  WITH HERB ADDERLEY AT THE TIME THEY SIGNED THE AGREEMENTS,

25  WHICH IS THE RELEVANT POINT.

1          **THE COURT:**  MR. KESSLER, I THINK YOU OUGHT TO -- I

2     DON'T THINK -- YOU MISREAD THE LAST LINE THERE.

3          **MR. KESSLER:**  "IS THAT WHAT YOU'RE SAYING?  IT NEVER

4     WOULD HAVE HAPPENED."

5          **THE COURT:**  NO, IT SAYS:

6               "BUT THEY WEREN'T -- THEIR LICENSING" --

7          (COUNSEL AND THE COURT SPEAKING SIMULTANEOUSLY, WHICH

8          WAS NOT REPORTABLE.)

9          **MR. KESSLER:**  YOU'RE SAYING --

10         **THE COURT:**  "QUESTION:  IS THAT WHAT YOU'RE SAYING?"

11         BE CLEAR ON THAT.

12         **MR. KESSLER:**  YES, AND THEN:

13              "IT NEVER WOULD HAVE HAPPENED."

14         THANK YOU.

15         LOOK AT WHAT ELSE MR. GOICH SAID.

16              "QUESTION:   MY QUESTION IS, SIR, AT THE TIME

17    YOU SIGNED YOUR RETIRED PLAYER GLA, DID YOU HAVE ANY

18    UNDERSTANDING AS TO WHETHER YOU WOULD RECEIVE MONEY IF YOU WERE

19    NOT PART OF A LICENSED GROUP?

20              "I WOULDN'T RECEIVE MONEY.

21              "WOULD NOT?

22              "YEAH.

23              "QUESTION:  OKAY.

24              "IF I WASN'T LICENSED, IF I WASN'T PART OF THE

25    GROUP, I WOULDN'T RECEIVE ANY MONIES."

1    THAT'S EXACTLY WHAT THE PLAYERS UNDERSTOOD.  ALL THE

2 EVIDENCE IN THE CASE IS CONSISTENT ABOUT THIS.

3    LET'S LOOK AT MR. BEACH.  WE'RE GOING TO GO THROUGH

4 THE DIFFERENT WITNESSES, BECAUSE THAT'S WHAT YOU HAVE TO DECIDE

5 ON, NOT ON PLAINTIFFS' ARGUMENTS, NOT ON MY ARGUMENTS.

6    WHAT THE COURT IS GOING TO TELL YOU IS DECIDE BASED

7 ON THE EVIDENCE.

8    LET'S TAKE A LOOK, IF WE CAN, MR. BEACH.

9    "QUESTION:  OKAY.  SO IT'S ALSO TRUE, SIR, THAT

10 YOUR UNDERSTANDING AT THE TIME IF THERE WAS NO MONEY GENERATED

11 FROM THIS RETIRED PLAYER GLA, THEN YOU WOULD GET NOTHING."

12    AND WHAT DID MR. BEACH SAY?

13    "OF COURSE.

14    "QUESTION:  OKAY.  YOU ALSO UNDERSTAND, SIR" --

15    **THE COURT:**  "UNDERSTOOD."  "UNDERSTOOD."

16    **MR. KESSLER:**  SORRY.

17    "OKAY.  YOU ALSO UNDERSTOOD, SIR, IF THERE WAS

18 NO MONEY GENERATED FROM THE SPECIFIC RIGHTS THAT YOU GRANTED,

19 YOU WOULD GET NOTHING?

20    "ANSWER:  THAT'S CORRECT."

21    MR. BEACH UNDERSTOOD IT HAD TO BE FROM HIS RIGHTS,

22 NOT FROM ACTIVE PLAYER LICENSING RIGHTS.

23    I'D ALSO LIKE TO GO TO THE NEXT TESTIMONY FROM

24 MR. BEACH.  MR. BEACH WAS A SMART GUY.  HE UNDERSTOOD THAT HOW

25 COULD HE GET ACTIVE PLAYER LICENSING MONEY IN AN ESCROW ACCOUNT

1    UNLESS THE ACTIVE PLAYER SIGNED A SIMILAR AGREEMENT?

2            SO HE SAID:

3                "QUESTION:  SO IT'S TRUE, ISN'T IT, THAT YOUR

4    UNDERSTANDING AT THE TIME YOU SIGNED THE GLA WAS THAT IF THE

5    ACTIVE PLAYERS DIDN'T SIGN THIS TYPE OF FORM, THAT YOU WOULD

6    NOT BE ENTITLED -- NOT BE ENTITLED -- TO ANY REVENUE GENERATED

7    BY ACTIVE PLAYER LICENSING?  THAT WAS YOUR UNDERSTANDING?

8                "ANSWER:  THAT'S CORRECT.  THAT'S MY

9    UNDERSTANDING."

10            WELL, IF YOU LOOK AT C6, AS YOU KNOW WHAT'S IN

11   EVIDENCE, THE ACTIVE PLAYER LICENSING FORM IS A COMPLETELY

12   DIFFERENT FORM FROM THE RETIRED PLAYER LICENSING FORM.  IT HAS

13   NO REFERENCE TO AN ESCROW ACCOUNT.

14            IT'S EXCLUSIVE.  THE RETIRED PLAYER FORM IS

15   NON-EXCLUSIVE.  SO MR. BEACH, LIKE MR. ADDERLEY, LIKE

16   MR. GOICH, ALL UNDERSTOOD THEY WOULD GET PAID IF THEIR OWN

17   RIGHTS WERE USED, AND THEY WOULD NOT GET ACTIVE PLAYER

18   LICENSING MONEY.

19            NOW, MR. LAIRD, LET'S LOOK AT C7, BRUCE LAIRD.

20                "QUESTION:  BUT WHAT YOU MEAN BY THAT IS YOUR

21   UNDERSTANDING IN 2006 IS THAT IF YOUR RIGHTS WERE USED, SO YOU

22   WOULD BE ONE OF THE 358, YOU WOULD GET MONEY?

23                "YES."

24            AND THAT WAS REFERRING TO THE 358 RETIRED PLAYERS WHO

25   GOT PAID LICENSING MONEY THAT YEAR.

1          "QUESTION:  AND IF YOUR RIGHTS WEREN'T USED,

2    YOU DIDN'T GET MONEY, BECAUSE THEY DIDN'T USE YOUR RIGHTS.

3    THAT WAS YOUR UNDERSTANDING, CORRECT?

4          "ANSWER:  YES."

5          YES.

6          BRUCE LAIRD.  NOW, BRUCE LAIRD ALSO TESTIFIED.  HE

7    DOES HAVE SOME TESTIMONY, AND HE TRIES UNDER PLAINTIFFS'

8    COUNSEL'S COACHING TO SAY HE THOUGHT HE WOULD SOMETIMES BE

9    ENTITLED TO ACTIVE PLAYER MONEY.  HE TRIED TO SAY THAT.  YOU'LL

10   BE THE JUDGE OF WHAT HIS TESTIMONY MEANS ON THE WHOLE, WHAT HIS

11   REAL ANSWERS WERE, WHAT WERE TRUTHFUL OR NOT.

12         BUT EVEN HE HAD TO ADMIT THAT HE DIDN'T THINK HE WAS

13   ENTITLED TO MONEY FROM TRADING CARD AGREEMENTS OR OTHER

14   AGREEMENTS LIKE VIDEO GAMES THAT ALREADY EXISTED.

15         WE ASKED HIM:

16          "AND YOU TESTIFIED THAT A FEW MOMENTS AGO THAT

17   THE GLA WOULD ONLY APPLY TO NEW PROGRAMS GOING FORWARD?

18          "ANSWER:  THAT WAS MY BELIEF."

19         AND YOU WILL RECALL WHAT THAT WAS IS HE HAD SAID:

20          "IF THERE WAS AN EXISTING LICENSEE, IF IT WAS

21   SOMEONE, A CATEGORY YOU'RE ALREADY DEALING WITH, I DON'T GET

22   ANY MONEY FROM THAT."

23         THAT WAS HIS UNDERSTANDING.

24          "NOW, IT'S ALSO TRUE, IS IT NOT, SIR, THAT AT

25   THE TIME YOU SIGNED YOUR RETIRED PLAYER GLA, YOUR EXPECTATION

1  IS THAT YOU WOULD NEVER RECEIVE ANY LICENSING MONEY FROM

2  TRADING CARDS?

3           "ANSWER:  PROBABLY SO.  PROBABLY SO."

4           THAT'S THE TRUTHFUL TESTIMONY ABOUT THE UNDERSTANDING

5  OF THESE PLAYERS.  AND THEY COULD HAVE BROUGHT IN ANY MEMBERS

6  OF THIS CLASS THAT THEY WANTED TO BRING IN.  PRESUMABLY THEY

7  BROUGHT IN THE FOUR WHO THEY THOUGHT WOULD MOST STRONGLY

8  SUPPORT THEIR CLAIMS.

9           AND WHAT WE SEE IS THAT NONE OF THEM SUPPORT THE

10  CLAIMS, THE INTERPRETATION OF MR. PARCHER, WHICH SOUNDS REAL

11  GOOD IN THE ABSTRACT AS A THEORY.  THERE'S NO EVIDENCE.  NO

12  EVIDENCE.

13          NOW, ALSO, WHAT THE JUDGE IS GOING TO INSTRUCT YOU IN

14  HIS INSTRUCTIONS IS ONE IMPORTANT FACT TO CONSIDER IS IF ONE

15  PARTY, PLAYERS INC, NFLPA, ACTS ONE WAY, DOESN'T GIVE ACTIVE

16  PLAYER LICENSING MONEY TO RETIRED PLAYERS UNDER THE GLA, WHICH

17  WE DIDN'T DO BECAUSE IT WAS NOT THE DEAL, AND THE OTHER PARTY

18  KNOWS THEY'RE NOT GETTING SOMETHING IN THE ACTIVE PLAYER

19  LICENSING MONEY, AND THEY DO NOTHING ABOUT IT, THEY DON'T

20  COMPLAIN, THEY DON'T RAISE IT FOR YEARS, THEY ACQUIESCE, YOU'LL

21  SEE IN THE JUDGE'S INSTRUCTIONS, THEY ACQUIESCE, YOU SHOULD

22  GIVE GREAT SIGNIFICANCE TO THAT.

23          IF WE LOOK AT C8, WHAT YOU'LL SEE IS NONE OF THE

24  PLAYERS -- AND, IN FACT, NO RETIRED PLAYERS EVER COMPLAINED

25  THAT THEY WEREN'T GETTING ACTIVE PLAYER LICENSING MONEY UNTIL

1  WHEN?  UNTIL THIS CASE WAS FILED, LONG AFTER THIS CASE WAS

2  FILED.

3          ASK YOURSELF:  IF YOU HAD SIGNED SOMETHING AND YOU

4  REALLY THOUGHT YOU WERE ENTITLED TO THOUSANDS OF DOLLARS EACH

5  YEAR OF ACTIVE PLAYER LICENSING MONEY, AND YOU NEVER GOT A

6  CHECK FOR YEARS, WOULD YOU CALL UP?  WOULD YOU ASK, SAY:

7          "HEY, WHERE'S MY MONEY?"

8          NO ONE ASKED.  NO ONE DID ANYTHING UNTIL THEY MET

9  WITH THE LAWYERS THAT CAME UP WITH THE THEORY THAT NO ONE

10  BELIEVED WAS A FACT.

11          "QUESTION:"  THIS WAS MR. LAIRD:

12          "YOU NEVER ONCE TOLD ANYONE IN THE UNIVERSE FROM

13  2000 UNTIL AFTER THIS LAWSUIT WAS FILED, ANYBODY, THAT YOU WERE

14  OWED MONEY FROM ACTIVE PLAYER LICENSING, CORRECT?

15          "ANSWER:  CORRECT."

16      MR. BEACH:

17          "IT'S ALSO TRUE THAT YOU NEVER COMPLAINED TO

18  ANYONE AT THE UNION THAT YOU WEREN'T RECEIVING ANY MONEY UNDER

19  YOUR RETIRED PLAYER GLA, CORRECT?

20          "ANSWER:  THAT'S CORRECT.

21          "YOU NEVER COMPLAINED ABOUT IT TO ANYBODY IN THE

22  WORLD?

23          "ANSWER:  THAT'S CORRECT.

24          "OKAY.  AND YOU -- IT'S ALSO CORRECT THAT THIS

25  WHOLE ISSUE OF RETIRED PLAYER LICENSING WAS NOT THAT

1   SIGNIFICANT TO YOU?

2              "ANSWER:  THAT'S CORRECT."

3         YOU HEARD MR. PARCHER SAY HOW THEY WERE MISLED, HOW

4   THIS WAS AN IMPORTANT POINT, IT WAS AN ISSUE OF TRUST.  IT

5   WASN'T EVEN THAT SIGNIFICANT TO MR. BEACH, ACCORDING TO HIS

6   SWORN TESTIMONY.

7         WE LOOK AT THE NEXT ONE, MR. ADDERLEY AND MR. MCNEIL.

8              "MR. ADDERLEY, WHEN YOU SIGNED YOUR GLA GOING

9   FORWARD, YOU NEVER COMPLAINED TO ANYONE AT THE UNION ABOUT NOT

10  GETTING MONEY UNDER YOUR GLA UNTIL AFTER THIS LAWSUIT WAS

11  FILED, CORRECT?

12             "ANSWER:  CORRECT."

13        MR. MCNEIL, THE FOURTH PLAYER WHO TESTIFIED FOR

14  PLAINTIFFS:

15             "NOW, YOU NEVER COMPLAINED -- I THINK WE

16  ESTABLISHED EARLIER YOU NEVER COMPLAINED UNTIL YOU BECAME

17  INVOLVED IN THIS CASE, CORRECT?

18             "ANSWER:  CORRECT."

19        AND YOU'LL RECALL MR. MCNEIL DIDN'T EVEN BECOME

20  INVOLVED IN THIS CASE UNTIL MORE THAN A YEAR AFTER IT WAS

21  FILED.  HE WAS CONTACTED VERY LATE IN THE PROCESS.

22        NOW, LOOK AT MR. LAIRD'S TESTIMONY, C40.  I'M SORRY

23  TO SPEND SO MUCH TIME GOING OVER THIS, BUT THIS IS THE

24  EVIDENCE.  THIS IS WHAT YOU NEED TO DECIDE THE CASE FROM.

25        MR. LAIRD:

1            "QUESTION:  BUT AT THE TIMES YOU DID TALK TO

2   RETIRED PLAYERS ABOUT LICENSING" -- AND REMEMBER, MR. LAIRD WAS

3   A PRESIDENT OF A CHAPTER OF RETIRED PLAYERS.  HE SPOKE TO THEM

4   QUITE A BIT.

5            "BUT AT THE TIME YOU DID TALK TO RETIRED PLAYERS

6   ABOUT LICENSING, DID ANY RETIRED PLAYER EVER SAY TO YOU 'I

7   SHOULD GET PAID, EVEN IF THEY DON'T USE MY RIGHTS'?

8            "ANSWER:  NO.

9            "QUESTION:  DID ANY RETIRED PLAYER BEFORE THIS

10  LAWSUIT EVER SAY TO YOU 'I SHOULD GET PAID OUT OF ACTIVE

11  LICENSING'?

12           "NO.  GLA'S WEREN'T EVEN BROUGHT UP."

13           WELL, IF ALL OF THESE THOUSANDS OF PLAYERS THOUGHT

14  THEY WEREN'T GETTING MONEY THEY WERE ENTITLED TO, BECAUSE THEY

15  ALL KNEW THERE WERE TRADING CARDS, THEY ALL KNEW THERE WERE

16  VIDEO GAMES, THEY ALL KNEW THERE WAS ACTIVE PLAYER LICENSING.

17  WOULDN'T SOMEBODY BRING IT UP SOMEWHERE?

18           NOW, WE ALSO HAVE TESTIMONY FROM THE OTHER PARTY TO

19  THESE CONTRACTS.  DOUG ALLEN TESTIFIED ON BEHALF OF THE NFLPA

20  AND PLAYERS INC.  THEY CALLED HIM AS A WITNESS IN THEIR CASE.

21           BUT THE JUDGE WILL INSTRUCT YOU THE EVIDENCE APPLIES

22  FOR BOTH OF US.  WHATEVER EVIDENCE THAT COMES IN GOES TO ALL

23  PARTIES.

24           WHAT DID HE SAY?

25           "QUESTION:  MR. ALLEN, UNDER THIS FORM, WERE

1   RETIRED PLAYERS GOING TO RECEIVE ANY MONEY FROM ACTIVE PLAYER

2   LICENSING?

3              "ANSWER:  NO.

4              "QUESTION:  WHAT TYPE OF MONEY WOULD THE RETIRED

5   PLAYERS RECEIVE UNDER THIS FORM?

6              "ANSWER:  UHM, MONEY THAT WOULD HAVE BEEN

7   GENERATED BY A LICENSE THAT WAS THE RESULT OF PROVIDING ALL OF

8   THE RETIRED PLAYER GROUP LICENSING AUTHORIZATION FORM PLAYERS

9   TO SIGN ONE IN RETURN FOR PAYMENT, FOR THE RIGHT TO USE ANY OR

10  ALL OF THEM."

11             NOW, THIS IS SIGNIFICANT, TOO.  YOU RECALL THE

12  EVIDENCE IS THAT FOR ACTIVE PLAYERS THE LICENSEES WOULD

13  GENERALLY WANT TO GET A LICENSE TO ALL THE ACTIVE PLAYERS.  AND

14  THAT'S HOW THE SHARED LICENSING WAS DONE.  THAT'S WHAT WAS PUT

15  INTO THE GLR, GROSS LICENSING REVENUE POOL.

16             YOU HEARD TESTIMONY, YOU'LL RECALL, IF IT WAS 35 OR

17  FEWER ACTIVE PLAYERS, EVEN THAT MONEY DIDN'T GO INTO THAT.  IT

18  WAS GIVEN DIRECTLY TO THE PLAYERS, JUST LIKE THE AD HOCS FOR

19  THE RETIRED PLAYERS.

20             BUT FOR THE RETIRED PLAYERS, BECAUSE THE STARS

21  WEREN'T IN THE RETIRED PLAYER GLA, DESPITE MARKETING -- AND

22  WE'LL SHOW THIS -- THEY JUST COULDN'T GENERATE A MARKETPLACE

23  DEMAND FOR THE WHOLE GROUP.

24             SO WHAT THEY HAD TO DO, THE EVIDENCE WILL BE -- NOT

25  GOING TO REVIEW IT -- THAT THEY HAD TO GO OUT AND GET A JOE

1  MONTANA, OR OTHER STAR PLAYER, GET THEM TO SIGN UP IN GROUPS,

2  BY THE WAY, OF SIX OR MORE.  THERE'S NO DISPUTE ABOUT THAT.

3  AND DO AD HOC LICENSES, AND GAVE THEM ALL THE MONEY.

4          AND THEN, IF THE LICENSEES WANTED GLA MEMBERS WHO WE

5  WERE PROMOTING, WHO WE ARE MARKETING -- HOW ELSE WOULD THEY GET

6  THESE DEALS -- THEN THEY WOULD ALSO GET ALL THE MONEY.

7  $7 MILLION TOTAL TO THE CLASS.  ABSOLUTELY UNDISPUTED ABOUT

8  THAT.

9          AND IT'S VERY IMPORTANT THAT YOU KNOW, THE COURT WILL

10  INSTRUCT YOU, NOT ONLY IS THERE NO CLAIM THAT PLAINTIFFS ARE

11  SEEKING TO REALLOCATE THE MONEY TO TAKE AWAY MR. ADDERLEY'S

12  MONEY AND SHARE IT WITH THE OTHER RETIRED PLAYERS.

13  MR. ADDERLEY DOESN'T WANT TO DO THAT.  I RESPECT HIM FOR THAT.

14  THAT'S FINE.

15          BUT THERE ALSO IS NO CLAIM IN THIS CASE THAT USING

16  SIX OR MORE RETIRED PLAYERS AND AD HOCS -- BECAUSE AD HOCS

17  FREQUENTLY INVOLVE SIX OR MORE -- TRIGGERED ANY RIGHTS UNDER

18  THE RETIRED PLAYER GLA.

19          THINK ABOUT THAT.  IF USING SIX OR MORE PLAYERS IN

20  AD HOCS TRIGGERED NO RIGHTS UNDER THE RETIRED PLAYER GLA, AS

21  THE COURT WILL INSTRUCT YOU, THEN MR. PARCHER'S CLAIM CAN'T BE

22  RIGHT.

23          HE SAYS ANYTIME THAT SIX OR MORE RETIRED PLAYERS.

24  WELL, IT'S GOT TO ALL GO INTO THE ESCROW ACCOUNT.

25          BUT THE COURT IS GOING TO INSTRUCT YOU, NO, THERE IS

1   NOTHING WRONG AT ALL WITH USING THE AD HOC LICENSES INVOLVING

2   SIX OR MORE RETIRED PLAYERS.  THERE'S NOTHING WRONG AT ALL.

3   DOESN'T VIOLATE THE GLA, INSTEAD OF USING THE GLA FORM.

4          BECAUSE WHAT MR. ALLEN SAID IS THAT:

5              "IF WE DIDN'T GET THE CRITICAL MASS OF PLAYERS,

6   WHICH HE HOPED TO DO, AND THERE WAS NO DEMAND FOR THE WHOLE

7   GROUP, THEN IT MADE MUCH MORE SENSE TO USE THE AD HOC PROGRAM."

8          AND THERE'S ABSOLUTELY NO VIOLATION EVEN ALLEGED IN

9   THIS CASE FROM THE AD HOC PROGRAMS.  NOT EVEN ALLEGED.

10         SO DON'T BE MISLED BY MR. PARCHER'S FOCUS ON THAT

11  "SIX OR MORE" LANGUAGE.  IT WAS NOT THE LANGUAGE THAT SAID WHEN

12  YOU WOULD GET PAID.  YOU GOT PAID THROUGH RETIRED PLAYER

13  LICENSING, AS THE FORM UNEQUIVOCALLY STATES.

14         NOW, LET'S LOOK NEXT ABOUT MR. -- MR. ARMSTRONG,

15  BECAUSE WHAT I WANT TO TURN TO NOW IS MR. ARMSTRONG WAS

16  ASKED -- IF WE CAN GO TO TRANSCRIPT AT 2073, PLEASE.

17         HE EXPLAINED WHY THE GLR POOL COULDN'T BE USED FOR

18  RETIRED PLAYERS, BECAUSE IT WAS ACTIVE PLAYER LICENSING MONEY.

19         LET'S SEE WHAT MR. ARMSTRONG SAID.

20             "QUESTION:  NOW, MR. ARMSTRONG, IF THERE HAD

21  BEEN A DECISION MADE IN THE UNION WHILE YOU WERE THERE TO GIVE

22  EVERY RETIRED PLAYER AN EQUAL SHARE INTEREST IN THE LICENSING

23  MONEY OF ACTIVE PLAYERS IN THE GLR POOL, WOULD THAT HAVE TO

24  HAVE BEEN PRESENTED TO THE BOARD OF ACTIVE PLAYER REPS FOR

25  APPROVAL?

1        "ANSWER:  YES.  YES, IT WOULD HAVE HAD TO BEEN

2   PRESENTED TO THE BOARD AND VOTED ON.

3        "OKAY.

4        "ANSWER:  I CAN TELL YOU THAT THERE WOULD NOT

5   HAVE BEEN MUCH OF A CHANCE THAT THAT WOULD HAVE HAPPENED.

6        "QUESTION:  WELL, DON'T SPECULATE WHAT WOULD

7   HAVE HAPPENED.  WAS IT EVER PRESENTED?

8        "NO.

9        "WAS IT EVER -- DID ANYONE EVER PROPOSE DOING

10  THAT?

11       "NO."

12       NOW, THE TESTIMONY YOU HEARD ABOUT WHY IT COULDN'T BE

13  DONE -- AND THIS CAME FROM MR. ARMSTRONG.  AND I MAY GET TO

14  THIS A LITTLE BIT LATER TO SHOW YOU -- WAS BECAUSE IF ALL

15  13,000 PLAYERS, RETIRED PLAYERS, WERE SHARING IN ACTIVE

16  LICENSING, THEN EVERY PLAYER WOULD SIGN.  IF ALL YOU HAD TO DO

17  WAS SIGN YOUR NAME, YOU WOULD GET TENS OF THOUSANDS OF DOLLARS,

18  YOU WOULDN'T HAVE THE MONEY LEFT TO RUN THE UNION.

19       WHAT HE TESTIFIED IS THE REASON THEY TOOK 40 PERCENT

20  OF THE GLR POOL AND GAVE IT TO THE UNION, THEY NEEDED IT TO

21  FIGHT THE MANAGEMENT.  OKAY?  THEY'RE A LABOR UNION.

22       THEY WERE AFRAID OF BEING LOCKED OUT.  THEY WERE

23  AFRAID OF STRIKES.  THEY HAD TO USE THAT MONEY TO RUN THEIR

24  UNION.

25       AND IT WAS ACTIVE PLAYER MONEY.  THERE'S NOTHING

1    WRONG WITH THAT.

2            SO IT WOULD HAVE MADE NO SENSE AT ALL, NO SENSE, TO

3    SAY ACTIVE PLAYER MONEY SHOULD JUST BE GIVEN OUT TO THE RETIRED

4    PLAYERS.  WE WOULD ALL LIKE TO GET MORE MONEY, ESPECIALLY IN

5    THESE TIMES.  WE WOULD ALL LIKE TO GET MORE MONEY.  OKAY.

6            BUT THE ACTIVE PLAYERS, THEY HAD TO RUN THE UNION,

7    WHICH BENEFITED NOT ONLY THEM, BUT BENEFITED THE RETIRED

8    PLAYERS, AS WELL.

9            TAKE A LOOK AT C72, IF WE CAN.

10           BY THE WAY, MR. PARCHER SAID, OH, WE PICKED

11   MR. ARMSTRONG, I GUESS, BECAUSE HE'S LIKE SO HANDSOME OR

12   SOMETHING, TO TESTIFY HERE.  I'M SURE HE WILL LIKE TO HEAR

13   MR. PARCHER'S COMPLIMENTS TO HIM.

14           MR. ARMSTRONG WAS THE PRESIDENT OF THE NFLPA DURING

15   THE RELEVANT TIME PERIOD.  THAT'S WHY WE CALLED HIM AS A

16   WITNESS.

17           WHAT DID HE SAY?

18           "QUESTION:  COULD MR. UPSHAW AND MR. ALLEN TAKE

19   ANY POLICY ACTIONS ON HALF OF THE NFLPA WITHOUT THE APPROVAL OF

20   THE BOARD OF PLAYER REPS?

21           "NO.  ALL THE ACTIONS HAD TO HAVE BEEN APPROVED

22   BY THE BOARD OF PLAYER REPS.  SO ANY DECISION WOULD -- THAT

23   MIGHT HAVE BEEN MADE WOULD HAVE BEEN MADE WITHIN THE PARAMETERS

24   THAT WERE AGREED TO BY THE BOARD FIRST."

25           NOW, WHY IS THAT SIGNIFICANT?  REMEMBER IN HIS

1   OPENING, MR. PARCHER TRIED TO DISPLAY THIS AS IF DOUG ALLEN,

2   GENE UPSHAW COULD GO OFF IN A ROOM AND MAKE SECRET DEALS AND NO

3   ONE WOULD KNOW ABOUT IT.  THEY WOULD BE EXPLOITING THE ACTIVE

4   PLAYERS.

5           THE ACTIVE PLAYERS, YOU WOULD HAVE GOTTEN THE

6   IMPRESSION, DIDN'T KNOW ABOUT THE 40 PERCENT, DIDN'T KNOW ABOUT

7   THE 23 PERCENT GOING TO PLAYERS INC.

8           YOU HEARD FROM MR. ARMSTRONG.  WHAT YOU HEARD FROM

9   MR. ARMSTRONG WAS THE ACTIVE PLAYERS APPROVED EVERY DECISION,

10  KNEW ABOUT IT, RAN THE UNION, HAD THE POWER TO FIRE MR. UPSHAW.

11          AND YOU SAW MR. UPSHAW -- YOU SAW MR. BERTHELSEN.  I

12  AM SORRY.  YOU SAW MR. ARMSTRONG.

13          DO YOU THINK MR. ARMSTRONG COULD BE PUSHED AROUND?

14  DO YOU THINK THAT THE ACTIVE PLAYERS WERE INCAPABLE OF KNOWING

15  WHAT WAS GOING ON IN THEIR UNION?  I'LL LET YOU BE THE JUDGE OF

16  THAT.

17          NOW, AGAIN, LET'S LOOK AT C11.  THERE'S NO DOUBT.

18  THERE IS ONLY EVIDENCE ONE WAY.  THERE IS NO OTHER EVIDENCE

19  THAT ALL THE MONEY IN THE GLR POOL IS ACTIVE PLAYER LICENSING

20  MONEY.

21          THIS WILL BECOME CRITICAL LATER, BECAUSE WHEN WE GET

22  TO THE ISSUE OF DAMAGES -- YOU SHOULD NEVER GET THE DAMAGES.

23  THE REASON IS THE JUDGE WILL INSTRUCT YOU, IF THERE'S NO BREACH

24  OF CONTRACT, NO BREACH OF FIDUCIARY DUTY, YOU DON'T HAVE TO

25  WASTE YOUR TIME WITH DAMAGES.  YOU CAN GO HOME AND RETURN TO

1   YOUR LIVES.

2          BUT IF YOU DO GET TO DAMAGES, THE ONLY DAMAGES THAT

3   MR. ROWLEY CLAIMED IS AN EQUAL SHARE OF THE ACTIVE PLAYER

4   LICENSING MONEY.

5          THAT'S NOT GOING TO GIVE YOU ANY BASIS TO AWARD ANY

6   DAMAGES IN THIS CASE, BECAUSE THERE'S NO EVIDENCE THEY WERE

7   ENTITLED TO AN EQUAL SHARE OF THE GLR POOL.  BUT WHAT WAS THE

8   EVIDENCE HERE?

9          QUESTION TO DOUG ALLEN:

10          "EXPLAIN TO THE JURY WHAT TYPE OF MONEY WAS IN

11   THIS GLR POOL.

12          "IT WAS IN THE MONEY THAT WAS GENERATED BY

13   LICENSING ACTIVE PLAYERS."

14          QUESTION TO MR. ARMSTRONG:

15          "THE MONEY THAT THIS WAS, THE 40 PERCENT, THE 23

16   PERCENT, AND THE 37 PERCENT, DID YOU HAVE AN UNDERSTANDING

17   WHILE YOU WERE ON THE BOARD OF PLAYER REPS AND PRESIDENT,

18   WHETHER THIS MONEY WAS ACTIVE PLAYER LICENSING MONEY, RETIRED

19   PLAYER LICENSING MONEY OR SOME COMBINATION OF IT?

20          "ANSWER:  IT WAS ACTIVE PLAYER LICENSING MONEY.

21          "WAS THERE ANY RETIRED PLAYER LICENSING MONEY IN

22   HERE?

23          "ANSWER:  NO."

24          MR. EYRICH, WHO TESTIFIED BY DEPOSITION, THE

25   ACCOUNTANT:

1          "EQUAL SHARE POOL IS REFERRED TO AS 'THE ACTIVE

2   PLAYER LICENSING POOL' THAT IS ALLOCATED BY PLAYERS INC AND THE

3   NFLPA AND ACTIVE PLAYERS."

4          I'LL ALSO SHOW YOU TRIAL EXHIBIT 95.  TRIAL EXHIBIT

5   95 WAS THE 2000 AGREEMENT, YOU'LL REMEMBER, WHICH DEFINES THE

6   GROSS LICENSING REVENUE.

7          THIS WAS AN IMPORTANT PART OF THE CASE THAT HAPPENED

8   BECAUSE THIS IS WHERE THE CONFUSION IS WHERE PLAINTIFFS IN

9   THEIR QUESTIONS KEPT TALKING ABOUT GROUP LICENSING REVENUE,

10  GROUP LICENSING REVENUES, TRYING TO CONFUSE THE ISSUE AS IF

11  THAT'S WHAT WAS REFERRED TO IN THE RETIRED PLAYER GLA.

12         OF COURSE, WHAT WE KNOW AND YOU KNOW FROM THE

13  EVIDENCE IS IT'S GROSS LICENSING REVENUE.

14         AND IF WE LOOK AT PAGE -- LAUREN, PAGE 3 OF THE

15  DOCUMENT, THERE IS THE DEFINITION -- START WITH THE DEFINITION

16  UNDERNEATH THAT, THE DEFINITION.  THAT'S FINE.

17            "THE TERM GROSS LICENSING REVENUES SHALL

18  MEAN..."

19         SO IT'S GROSS LICENSING REVENUE, RIGHT?  GROSS

20  LICENSING.

21         AND LET'S LOOK AT (V), A(V).  YOU GOT TO SHOW WHAT IT

22  IS, ALL THE WAY DOWN.

23            "GROSS LICENSING REVENUE SHALL EXCLUDE ANY

24  REVENUES DERIVED FROM THE FOLLOWING:  AMOUNTS RECEIVED BY

25  RETIRED PLAYERS PURSUANT TO GROUP LICENSING ASSIGNMENTS OR

1   GROUP LICENSING RIGHTS."

2              SO WHAT DO THE DOCUMENTS SHOW?  THE RETIRED PLAYER

3   GLA ONLY SPOKE ABOUT REVENUES FROM RETIRED PLAYER LICENSING.

4              REVENUES FROM RETIRED PLAYER LICENSING ARE EXCLUDED

5   FROM THE GROSS LICENSING REVENUE POOL.

6              HOW COULD THEY ARGUE THAT SOMEHOW THEY HAVE A CLAIM

7   TO THIS?  THAT'S NOT WHAT HAPPENED.

8              IN FACT, MR. ROWLEY ADMITTED, IF YOU LOOK AT C50,

9   WHEN HE HAD TO:

10                  "AND, IN FACT, WHEN THEY SAY THE ACTIVE PLAYERS

11  WOULD GET 37 PERCENT LATER IN THE AGREEMENT" -- IT WAS THE 2000

12  AGREEMENT -- "THEY SAY 37 PERCENT OF GROSS LICENSING REVENUES,

13  NOT GROUP LICENSING REVENUES.  IS THAT TRUE?

14                  "YES."

15             AND THIS IS REALLY, REALLY IMPORTANT TESTIMONY.

16  REALLY IMPORTANT.

17                  "NOW, IT'S ALSO TRUE THAT THE RETIRED PLAYER

18  GLA DOESN'T REFERENCE GROSS LICENSING REVENUE ANYWHERE IN THE

19  RETIRED PLAYER GLA, DOES IT?

20                  "IT DOES NOT SAY 'GROSS LICENSING REVENUE.'"

21             AND YOU CAN SEE THAT FOR YOURSELF WHEN YOU LOOK AT

22  TRIAL EXHIBIT 110.

23             NOW, MR. BERTHELSEN, IF YOU GO TO TRANSCRIPT 1655,

24  EXPLAINED WHY THE RETIRED PLAYER LICENSING REVENUE WAS KEPT

25  SEPARATE FROM THE ACTIVE PLAYER REVENUE.  AND IT WAS A VERY

1   GOOD REASONS, AND IT WAS CONSISTENT WITH THE GLA, AND IT WAS

2   CONSISTENT WITH THE FIDUCIARY DUTY.  VERY CONSISTENT.

3                    "MR. BERTHELSEN, EXPLAIN TO THE JURY, PLEASE,

4   WHY RETIRED PLAYER MONEY WAS KEPT SEPARATE FROM ACTIVE PLAYER

5   MONEY."

6            NOT LICENSING, BY THE WAY.  THEY TRY TO SAY

7   MR. BERTHELSEN SAID "KEEP THE LICENSING SEPARATE."  HE SAID:

8                 "NO, KEEP THE MONEY SEPARATE."

9            EVERYBODY'S MONEY BELONGS TO EVERYONE.  IF I HAVE

10  SOME MONEY THAT BELONGS TO ME, AND MR. PARCHER HAS SOME MONEY

11  THAT BELONGS TO HIM, IF WE HAD SUMMONED A BANKER WHO WAS

12  KEEPING OUR TWO ACCOUNTS, YOU WOULDN'T WANT THE BANKER TO TAKE

13  ANY OF MR. PARCHER'S MONEY AND GIVE IT TO ME.  YOU WOULDN'T

14  WANT THE BANKER TO TAKE ANY OF MY MONEY AND GIVE IT TO

15  MR. PARCHER.

16           SO MR. BERTHELSEN SAID:

17                "BECAUSE IT WAS THE VIEW THAT WHOEVER EARNS THE

18  MONEY SHOULD GET IT.  IT WOULDN'T BE FAIR TO HAVE A DOLLAR

19  EARNED BY MR. ADDERLEY GO TO ACTIVE PLAYERS."

20           I THINK MR. ADDERLEY WOULD AGREE WITH THAT.  SAYS:

21                "AND IT WOULDN'T BE FAIR FOR A DOLLAR EARNED BY

22  AN ACTIVE PLAYER TO GO TO MR. ADDERLEY."

23           AND WHERE DID THE RETIRED PLAYER MONEY GO?  LET'S

24  LOOK AT MR. ALLEN'S TESTIMONY.

25                "QUESTION:  MR. PARCHER PUT UP AN EXHIBIT THAT

1  SAID THAT RETIRED PLAYER MONEY WAS EXCLUDED FROM THIS CIRCLE."

2         THAT WAS THE FAMOUS PARCHER CHART, YOU'LL REMEMBER.

3         "DO YOU RECALL THAT FROM THE -- DO YOU RECALL

4  THAT FROM THE GLR POOL?

5         "YES.

6         "NOW, WHERE DID ANY RETIRED PLAYER MONEY GO?

7         "TO THE RETIRED PLAYERS.

8         "IF -- WHEN IT GOES TO THE RETIRED PLAYERS, DOES

9  ANY OF THIS GO TO PLAYERS ASSOCIATION?

10         "NO."

11         SO THE RETIRED PLAYERS GIVE NONE OF THEIR LICENSING

12  MONEY TO THE PLAYERS ASSOCIATION, AND THIS CLASS GOT $7 MILLION

13  OF THAT MONEY.  AND ALL RETIRED PLAYERS GOT 30 MILLION DURING

14  THIS PERIOD OF TIME.

15         "DOES ANY OF IT GO TO THE ACTIVE PLAYERS?

16         "NO."

17         AND THIS IS AN IMPORTANT QUESTION:

18         "SO WOULD IT BE BETTER -- SO IS IT BETTER OR

19  WORSE FOR THE RETIRED PLAYERS TO STAY OUT OF THE GLR POOL FOR

20  THEIR MONEY?

21         "IT'S BETTER, BECAUSE THEY GET ALL OF IT."

22         AND WHAT'S BEING REFERRED TO HERE IS THE ACTIVE

23  PLAYERS FOR THEIR MONEY IN THE GLR POOL SAYING:

24         "WE'RE GOING TO GIVE 40 PERCENT TO THE UNION TO

25  SUPPORT THE UNION ACTIVITIES," AND THEY GIVE 23 PERCENT TO

1   PLAYERS INC TO RUN THE LICENSING OPERATIONS.

2           WHEN THE RETIRED PLAYERS GET THEIR LICENSING MONEY,

3   THEY GET 99 PERCENT OF IT.

4           SO WOULD IT BE BETTER, AS MR. PARCHER ARGUES, TO MIX

5   IT ALL INTO THE GLR POOL?  AND BY THE WAY, THEY DON'T WANT TO

6   DO THAT.  YOU HAVEN'T HEARD THEIR DAMAGES EXPERT SAY:

7           "YEAH, LET'S TAKE MR. ADDERLEY'S MONEY AND THE

8   OTHER 30 MILLION GIVEN TO ALL RETIRED PLAYERS AND PUT THEM IN

9   THE POOL WITH THE ACTIVE PLAYERS."

10          THEY JUST WANT TO KEEP THE RETIRED PLAYER MONIES FOR

11  RETIRED PLAYERS, WHICH IS THEIR RIGHT.  BUT THEN, THEY ALSO

12  WANT TO TAKE THE ACTIVE PLAYERS' MONEY, WHICH IS NOT THEIR

13  RIGHT.

14          IT'S NOT THEIR RIGHT UNDER THE CONTRACT.  AND THERE'S

15  CERTAINLY NO FIDUCIARY DUTY TO TAKE ACTIVE PLAYER MONEY AND

16  GIVE IT TO ANOTHER ONE, ANY MORE -- MR. PARCHER TALKED ABOUT

17  LAWYERS.  IF I WAS A LAWYER, AND I HAD A TRUST ACCOUNT, AND I

18  HAD MULTIPLE CLIENTS, AND I HAD ONE CLIENT'S TRUST ACCOUNT, AND

19  I HAVE A FIDUCIARY DUTY TO EVERY CLIENT, BECAUSE LAWYERS HAVE

20  SPECIAL FIDUCIARY DUTIES, COULD I TAKE ONE CLIENT'S TRUST

21  ACCOUNT MONEY AND GIVE IT TO ANOTHER CLIENT?  NO, OF COURSE

22  NOT.

23          YOU HAVE TO KEEP IT SEPARATE.  COULD YOUR LANDLORD

24  TAKE YOUR MONEY THAT'S IN AN ACCOUNT AND GIVE IT TO SOME OTHER

25  TENANT, IF YOU ARE A TENANT?  NO.

1          YOU KNOW WHAT HE'S ARGUING MAKES NO SENSE AT ALL.

2          NOW, WHAT I'D LIKE TO TURN TO NEXT IS WE ALSO KNOW

3    THAT A LOT OF THE MONEY IN THE GLR POOL -- AND I HAVE TO DO

4    THIS QUICKLY -- IS NOT POSSIBLY RETIRED PLAYER MONEY.

5          THE NFL SPONSORSHIP AGREEMENT IS THERE.  THAT'S TRIAL

6    EXHIBIT 99.  I'M NOT GOING TO SHOW IT NOW.  YOU RECALL IT ONLY

7    APPLIES TO ACTIVE PLAYERS WHO SIGNED IN THE CBA, REFERENCED IN

8    THE CBA.

9          SO THE GLR POOL HAS ALL THAT SPONSORSHIP MONEY.  AND,

10   BY THE WAY, MR. ROWLEY SAYS AWARD THE RETIRED PLAYERS A SHARE

11   OF THAT?  NOTHING TO DO WITH RETIRED PLAYERS.

12         YOU KNOW ABOUT FANTASY FOOTBALL.  IF YOU LOOK AT C14,

13   YOU SAW MR. BYRD TESTIFY.  FANTASY FOOTBALL HAS NO USE FOR

14   RETIRED PLAYERS.  AND THAT MONEY IS IN THE GLR POOL.  HOW COULD

15   IT GO TO RETIRED PLAYERS?

16         MR. BYRD:

17              "QUESTION:  WOULD -- AS THE NEGOTIATOR FOR STATS

18   IN 2006, WOULD YOU HAVE BEEN WILLING TO PAY ANY EXTRA MONEY TO

19   GET RETIRED PLAYER RIGHTS?

20              "NO.  THERE IS NO VALUE FOR RETIRED PLAYERS IN

21   FANTASY FOOTBALL."

22         THAT'S NOT DEMEANING.  THAT'S JUST THE MARKETPLACE

23   REALITY.

24              "QUESTION:  SO BASED ON YOUR KNOWLEDGE OF

25   FANTASY FOOTBALL PRODUCTS, DO FANTASY FOOTBALL PRODUCTS HAVE

1   ANY USE AT ALL FOR RETIRED PLAYERS?"

2           DO WE HAVE THE ANSWER SOMEWHERE?  WE MESSED UP THAT

3   SLIDE.  SORRY.  DISREGARD THAT QUESTION.  I JUST DON'T KNOW WHY

4   IT'S NOT ON THE SLIDE.

5           LET'S GO NEXT.  WHAT WAS THE UNDERSTANDING -- I'M NOT

6   GOING TO SPEND A LOT OF TIME ON THIS, BECAUSE MR. PARCHER

7   DIDN'T, ABOUT THE MEANING OF THE EA LICENSE AGREEMENT, THE

8   PARAGRAPH 1(A), 1(B), THE GRANT.  YOU HEARD EXTENSIVE TESTIMONY

9   OF WHAT THE PARTIES UNDERSTOOD.  SO I'M JUST GOING TO DO THIS

10  VERY QUICKLY.

11          MR. BYRD, FOR EXAMPLE, TESTIFIED THAT -- AS FOLLOWS:

12          "QUESTION:  AT THE TIME YOU WERE NEGOTIATING

13  THIS AGREEMENT, WHAT PLAYERS DID YOU UNDERSTAND THAT YOU WERE

14  LICENSING UNDER THIS PROVISION?

15          "CURRENT NFL PLAYERS THAT WERE PLAYING IN THE

16  LEAGUE THAT YEAR.

17          "ANSWER:  AT THE TIME YOU WERE NEGOTIATING THIS

18  AGREEMENT, MR. BYRD, WHAT WAS YOUR UNDERSTANDING OF THIS

19  PROVISION OF THE AGREEMENT" -- THAT WAS PARAGRAPH 1(A) -- "IF

20  ANY?

21          "THE -- THAT SOMETIMES PLAYERS INC MAY DO THINGS WITH

22  THE RETIRED PLAYERS.  THAT'S WHAT IT SAYS.  IT HAD NOTHING TO

23  DO WITH OUR LICENSE OF FANTASY FOOTBALL, BECAUSE WE DIDN'T NEED

24  ANY RETIRED PLAYERS TO PLAY FANTASY FOOTBALL."

25          EA, I THINK IT'S CRITICAL.  NOW, YOU HEARD

1  MR. PARCHER QUESTION MR. LINZNER'S TRUTHFULNESS.  YOU SAW

2  MR. LINZNER TESTIFY.  YOU SHOULD JUDGE MR. LINZNER'S

3  CREDIBILITY.  I WILL LEAVE THAT IN YOUR HANDS.

4          WHAT DID MR. LINZNER TESTIFY?

5          "QUESTION:  DID YOU HAVE ANY UNDERSTANDING AT THIS

6  TIME THIS AGREEMENT WAS NEGOTIATED AS TO WHAT THIS REFERRED TO,

7  'THE NFL PLAYERS,' IN TERMS OF ACTIVE VERSUS RETIRED?"

8          YOU'LL REMEMBER THAT'S THE KEY LANGUAGE IN THE EA

9  LICENSE AGREEMENT, WHICH APPEARS IN THE 95 AGREEMENTS HE'S

10 TALKING ABOUT, THAT LANGUAGE, "NFL PLAYERS."

11             "NFL PLAYERS ARE THE PLAYERS ACTIVELY PLAYING IN

12 THE NFL.  AND THAT'S WHAT I UNDERSTOOD AT THE TIME, AND THAT'S

13 WHAT THE INTENDED LICENSE THROUGH EXHIBIT 28 WAS, WAS RIGHTS TO

14 ACTIVE NFL PLAYERS."

15         EVERYBODY UNDERSTOOD THIS.  DOUG ALLEN TESTIFIED TO

16 THAT.  I'M NOT GOING TO PUT IT UP NOW.  YOU RECALL MR. ALLEN

17 TESTIFIED THAT THE EA LICENSE AGREEMENT, THE $25 MILLION

18 PAYMENT HE TALKS ABOUT, THE 40 PERCENT OF THEIR DAMAGES NUMBER,

19 WAS ALL JUST FOR ACTIVE PLAYER LICENSING RIGHTS.

20         AGAIN, I'M NOT GOING TO HAVE TIME TO GO THROUGH THE

21 AGREEMENT NOW. IT'S TRIAL EXHIBIT 28.  YOU SAW THIS DISCUSSED

22 AT LENGTH IN MR. ALLEN'S TESTIMONY, MR. LINZNER'S TESTIMONY AND

23 AS TO WHAT THEIR UNDERSTANDING WAS.

24         IN FACT, WHAT THE EVIDENCE SHOWS, BECAUSE THE EA

25 LICENSE DID NOT LICENSE RETIRED PLAYER RIGHTS, WHEN MR. LINZNER

1    WANTED TO PAY FOR SOME RETIRED PLAYERS HE HAD TO DO A SEPARATE

2    LICENSE, AN AD HOC LICENSE.

3            WHY WOULD HE DO THAT IF HE ALREADY HAD THE RIGHTS?

4    WHY WOULD HE PAY TWICE?

5            TAKE A LOOK AT C18.

6                "IF EA ALREADY HAD THE RIGHTS TO RETIRED PLAYERS

7    THROUGH THE MAIN LICENSE AGREEMENTS, AS PLAINTIFFS CONTEND,

8    WOULD YOU EVER HAVE PAID ANY ADDITIONAL -- AN ADDITIONAL PENNY

9    TO SECURE THOSE ADDITIONAL RIGHT?

10                "ANSWER:  I DON'T KNOW ABOUT WHAT PLAINTIFFS

11   CONTEND, BUT OBVIOUSLY I WOULDN'T PAY EXTRA FOR RIGHTS THAT I

12   ALREADY HAD."

13           OKAY.  THE BEHAVIOR OF THE PARTIES UNDER THE

14   AGREEMENT, THE JUDGE WILL INSTRUCT YOU, IS VERY PERSUASIVE

15   EVIDENCE.

16           THE JUDGE WILL ALSO TELL YOU THE PARTIES TO THIS

17   AGREEMENT WERE EA AND PLAYERS INC.  OR THE LICENSEES AND

18   PLAYERS INC, NOT THE PLAYERS, TO THE LICENSE AGREEMENTS.

19           AND SO THE UNDERSTANDING OF THE PARTIES TO THE

20   AGREEMENTS IS WHAT YOU MUST PAY ATTENTION TO IN THE EVIDENCE,

21   NOT SOME THIRD PARTY, WHICH IS WHAT THE PLAYERS HERE, SAYING:

22                "OH, LET'S ARGUE WHAT SOMEBODY ELSE'S AGREEMENT

23   MEANS."

24           THAT'S NOT EVIDENCE YOU SHOULD GAVE WEIGHT TO.

25           NOW, WHAT DOES THIS ALL MEAN?  I BELIEVE THIS ALL

1  MEANS THAT THE EVIDENCE IS OVERWHELMING THAT THE MONEY THEY

2  SEEK IS ACTIVE PLAYER LICENSING RIGHTS, MY FIRST POINT.  IT

3  DEFEATS THEIR BREACH OF CONTRACT CLAIM, SO YOU SHOULD ANSWER

4  "NO" ON THE QUESTION:  "WAS THERE BREACH OF CONTRACT?"

5          AND IT ALSO DEFEATS THEIR FIDUCIARY DUTY CLAIM, AS I

6  WILL DISCUSS SOON.

7          I WANT TO TALK NOW ABOUT THE OTHER TWO CRITICAL

8  POINTS.  SOME OF THIS WE COVERED ALREADY.  THE FACT THAT WHEN

9  RETIRED PLAYER LICENSING WAS DONE, WHEN THERE WAS RETIRED

10  PLAYER RIGHTS, THE RETIRED PLAYERS GOT THE MONEY.  LET'S LOOK

11  AT TRIAL EXHIBIT 2056.

12          THIS WAS A COMPILATION OF ALL OF THE LICENSING MONEY

13  PAID TO THE RETIRED PLAYERS.  ALL THE MONEY EARNED AND THE

14  PAYOUT.  AND WHAT WAS IT UNDISPUTED?

15          IF WE CAN JUST GO FROM THE BOTTOM, FROM "TOTAL

16  NUMBER" DOWN.  THANK YOU, LAUREN.

17          THE TOTAL NUMBER OF CLASS MEMBERS WHO RECEIVED

18  LICENSING MONEY, THE ONES LICENSEES WANTED, WERE 378; TOTAL

19  ROYALTIES PAID WAS 7,116,196.29.

20          HOW MUCH WAS KEPT BY PLAYERS INC?  $66,000 AND

21  CHANGE.

22          93 PERCENT WENT TO THE RETIRED PLAYERS.

23          NOW, WHY, PLAINTIFFS ASKED, DIDN'T WE JUST LICENSE

24  THE ENTIRE RETIRED PLAYER GROUP?

25          WELL, THAT'S OUR BART STARR PROBLEM.  PLAYERS LIKE

1  MR. STARR, THE STARS, WOULD NOT SIGN RETIRED PLAYER GLA'S.

2          TAKE A LOOK AT THE TESTIMONY OF DR. RASCHER, C20.

3          "DR. RASCHER" -- QUESTION -- "AND YOU KNOW, DO

4  YOU NOT, THAT IN THIS CLASS MOST OF THE CLASS MEMBERS WERE NOT

5  STAR PLAYERS?  YOU KNOW THAT, DON'T YOU?

6          "ANSWER:  YES."

7          IN FACT, IF YOU LOOK AT C19, ANY PLAYER -- OH, BY THE

8  WAY, I'VE BEEN TOLD BY MY COLLEAGUES I SAID "93 PERCENT."

9  99 PERCENT WAS PAID TO THE RETIRED PLAYERS, WE'VE SHOWN ON THE

10  FORM.  I MISSPOKE, AND YOU'LL LOOK AT THAT EXHIBIT YOURSELF.

11  DON'T BELIEVE ME ON 93 OR 90 PERCENT.  LOOK AT THE TRIAL

12  EXHIBIT.  BUT I THINK YOU WILL SEE IT'S 99 PERCENT.

13          ANY RETIRED PLAYER COULD SIGN A GLA.  THIS IS

14  IMPORTANT.  QUESTION TO MR. ALLEN:

15          "ARE THERE PLAYERS WHO SIGNED NFL PLAYER

16  CONTRACTS WHO NEVER MAKE A TEAM?

17          "CERTAINLY.  THERE ARE LOTS OF PLAYERS WHO SIGN

18  AND TRY OUT AND DON'T MAKE THE TEAM."

19          SO THAT WOULD BE A PLAYER WHO SIGNED AN NFLPA PLAYER

20  CONTRACT AND NEVER PLAYED A GAME.  NEVER PLAYED A GAME.

21          "QUESTION:  NOW, FROM THE STANDPOINT OF SIGNING

22  A RETIRED PLAYER GROUP LICENSING AUTHORIZATION, ARE ALL THOSE

23  DIFFERENT KINDS OF PLAYERS ALLOWED TO SIGN RETIRED PLAYER

24  GLA'S?

25          "ANSWER:  ABSOLUTELY.

1      "SO IF A PLAYER SIGNED AN NFL PLAYER CONTRACT

2  AND NEVER PLAYED A GAME, COULD HE HAVE SIGNED ONE?

3      "YES.  AND DID."

4      AND DID.

5      "WERE THERE RETIRED PLAYERS WHO SIGNED GLA'S WHO

6  WERE NOT EVEN MEMBERS OF THE UNION?

7      "YES."

8      THE WHOLE POINT HERE IS THAT MR. ROWLEY TESTIFIED HE

9  DID NO ANALYSIS OF WHO THESE RETIRED PLAYERS WERE.  HE WAS THE

10  DAMAGES EXPERT.  HE DOESN'T KNOW WHETHER THEY PLAYED ONE GAME,

11  NO GAMES, FOUR GAMES, HOW MANY.  HE DIDN'T DO ANY ANALYSIS.

12      YET, HE WANTS YOU TO AWARD EACH OF THEM TENS OF

13  THOUSANDS OF DOLLARS?  AGAIN, WE ALL WOULD LIKE TO RECEIVE SUCH

14  MONEY.  WE ALL WOULD LIKE TO RECEIVE THAT.

15      BUT IF SOMEONE DIDN'T PLAY A GAME IN THE NFL,

16  SHOULDN'T MR. ROWLEY CHECK THAT FIRST BEFORE SAYING "GIVE THEM

17  $10,000 OF THE ACTIVE PLAYER LICENSING MONEY," WHICH THE ACTIVE

18  PLAYERS NEED TO FUND THE UNION AND FIGHT MANAGEMENT?  SHOULDN'T

19  MR. ROWLEY HAVE DONE THAT SOMEWHERE?

20      NOW, THE EVIDENCE ALSO SHOWS THAT MOST RETIRED

21  PLAYERS IN THE GLA CLASS ARE NOT MARKETABLE.  LET'S TAKE A LOOK

22  AT MR. ARMSTRONG.  HE'S NOT IN THE CLASS, MR. ARMSTRONG, BUT

23  HE'S A RETIRED PLAYER.

24      "QUESTION:  DESCRIBE TO THE JURY WHAT YOU

25  PERCEIVE ABOUT YOUR OWN NOTORIETY TO THE PUBLIC SINCE YOU'VE

1    RETIRED.

2              "ANSWER:  I WAS, I WOULD SAY, A GOOD PLAYER FOR

3    A LONG PERIOD OF TIME IN THE NFL.  IT'S FUN, AND THERE'S A LOT

4    OF NOTORIETY THAT GOES WITH THAT.  AND SOME OF THAT FOLLOWS YOU

5    IN YOUR FIRST YEAR OR TWO OUTSIDE THE GAME.  BUT THAT VERY

6    QUICKLY FADES."

7              THAT'S THE TESTIMONY.  NOW, MR. ARMSTRONG WAS AN ALL

8    PRO, OKAY?  HE WAS PRESIDENT OF THE PLAYERS ASSOCIATION.  HE'S

9    A HANDSOME GUY, OKAY?  A HOLLYWOOD GUY, ACCORDING TO

10   MR. PARCHER.  I DON'T THINK HE'S QUITE LIKE THAT, BUT THAT'S

11   WHAT MR. PARCHER SAID.  HE ACTUALLY COMES FROM DOWN SOUTH.

12             BUT HE DOESN'T HAVE THAT NOTORIETY, AND HE ONLY

13   RETIRED A FEW YEARS AGO.  THINK ABOUT A PLAYER WHO MAY HAVE

14   RETIRED 20 YEARS AGO OR 30 YEARS AGO.

15             "MR. GOICH, DID RETIRED PLAYERS EVER ASK WHY

16   AREN'T WE GETTING ANY MONEY UNDER?

17             "YES, I DID, TOO.  THEY SAID WE'RE NOT

18   MARKETABLE.  THE WHOLE THING WAS A TREMENDOUS EFFORT ON THE

19   ACTIVE PLAYERS' PART, AS FAR AS I WAS CONCERNED, TO GET US INTO

20   THIS STUFF, OKAY?  I MEAN, IT COST THEM MONEY TIME AND EFFORT."

21             HE'S TALKING ABOUT THE PLAYERS ASSOCIATION.

22             "AND IT SHOWED ME THAT THEY CARED.  BUT WE

23   WEREN'T MARKETABLE, AND I UNDERSTAND WHY.  AND YOU JUST SAY TO

24   YOURSELF: 'OKAY.  IT'S JUST ALWAYS BEEN THAT WAY.'  WHEN I WAS

25   ACTIVE, ONLY CERTAINLY PLAYERS ON THE GIANTS GOT DEALS."

1          NOW, DR. RASCHER ADMITTED IN C21 -- I'M NOT GOING TO

2  DO ALL OF THIS -- THAT:

3              "IT'S THE PLAYERS WHO HAVE THE GREATEST

4  ECONOMIC VALUE WILL GET THE MOST LICENSING REVENUE, CORRECT?

5              "CORRECT.

6              "AND PEOPLE OF NO VALUE WOULD GET NO AD HOC

7  LICENSING REVENUE, BECAUSE NOBODY WANTS THEM, RIGHT?  YOU WOULD

8  AGREE WITH THAT?  I MEAN, IF THEY DON'T SIGN UP DEALS, THEY

9  DON'T SIGN UP DEALS."

10          SO THE WHOLE POINT IS, AGAIN, IT'S NOBODY'S FAULT.

11  MR. ALLEN WOULD HAVE LIKED TO HAVE FOUND LICENSING DEALS FOR

12  EVERYONE.  FOR EVERYONE.  BUT HE CAN'T FORCE THE LICENSEES TO

13  DO WHAT THEY DON'T WANT.

14          YOU'RE GOING TO GET AN INSTRUCTION FROM THE JUDGE,

15  OKAY?  THERE MAY HAVE BEEN SOME SUGGESTIONS IN COUNSEL'S

16  QUESTIONS THAT MADE YOU THINK THAT IT WOULD BE OKAY FOR THE

17  NFLPA AND PLAYERS INC TO SAY TO EA, OR SOMEONE ELSE:  HEY, IF

18  YOU WANT THE ACTIVE PLAYERS, YOU MUST TAKE THE RETIRED PLAYERS.

19  USE THE POWER OVER ACTIVE PLAYERS TO FORCE THEM TO DO THAT.

20          THE JUDGE IS GOING TO TELL YOU UNDER THAT SUGGESTION

21  IT'S ILLEGAL.

22          **MR. PARCHER:**  JUDGE?

23          **THE COURT:**  WHAT?

24          **MR. PARCHER:**  THERE IS NO POSITION HERE THAT THEY'RE

25  SUPPOSED TO COERCE ANYBODY.  THAT'S --

1          **THE COURT:**  WELL, I UNDERSTAND THAT YOU'RE NOT MAKING

2    THAT ARGUMENT, MR. PARCHER.  AND THANK YOU FOR MAKING THAT

3    CLARIFICATION.  BUT DURING SOME OF THE EXAMINATION OF DR. NOLL,

4    OR CROSS EXAMINATION, THAT POSSIBLE SUGGESTION WAS MADE.  AND I

5    AM GOING TO INSTRUCT THE JURY TO MAKE SURE -- CLARIFY THAT.

6          BUT LET'S BE CLEAR:  MR. PARCHER IS NOT MAKING THAT

7    ARGUMENT.  BECAUSE IT MIGHT OCCUR TO SOME MEMBERS OF THE JURY,

8    I WANT TO, WHEN I GIVE YOU THE INSTRUCTIONS, MAKE SURE YOU

9    DON'T --

10         **MR. PARCHER:**  THANK YOU.

11         **THE COURT:**  -- STEP OFF INTO THE WRONG DIRECTION

12   THROUGH -- EVEN THOUGH NO ONE IS MAKING THAT ARGUMENT.

13         I'LL DEAL WITH THAT IN THE INSTRUCTIONS.

14         **MR. KESSLER:**  THANK YOU, YOUR HONOR.

15         **MR. PARCHER:**  SORRY TO INTERRUPT.

16         **MR. KESSLER:**  THANK YOU, MR. PARCHER.

17         **MR. PARCHER:**  YEAH.

18         **MR. KESSLER:**  SO THE IMPORTANT POINT HERE IS WHETHER

19   MR. PARCHER IS ARGUING THAT IN CLOSING OR NOT, YOU, AS JURORS,

20   SHOULD UNDERSTAND THAT WE COULDN'T -- NOT "WE" -- THE NFLPA

21   COULDN'T USE THE ACTIVE PLAYERS AS A WEDGE TO TRY TO FORCE

22   LICENSEES TO PAY FOR ALL THE RETIRED PLAYERS IF THEY DIDN'T

23   WANT TO DO THAT.

24         THAT WOULD BE UNLAWFUL, AS THE JUDGE WOULD TELL YOU.

25   AND WE CERTAINLY WEREN'T GOING TO DO ANYTHING UNLAWFUL.

1          NOW, WE KNOW THAT THE REASON WE COULDN'T -- THE NFLPA

2   COULDN'T GET LICENSES FOR THE WHOLE RETIRED PLAYER GROUP, WHICH

3   IS WHAT THEY'RE SAYING, TAKE THE WHOLE GROUP TOGETHER AND PUT

4   IN THE ESCROW ACCOUNT, BECAUSE THE STARS WOULDN'T SIGN.

5          LOOK AT MR. ALLEN'S TESTIMONY:

6          "QUESTION:  NOW, FOR THE RETIRED PLAYERS, WERE

7   YOU ABLE TO CONVINCE MOST OF THE STAR RETIRED PLAYERS TO SIGN

8   THE RETIRED PLAYER GLA?

9          "ANSWER:  NO.

10          "DID THE FAILURE OR THE UNWILLINGNESS OF THE

11   STAR RETIRED PLAYERS TO SIGN THE RETIRED PLAYER GLA HAVE ANY

12   IMPACT ON YOUR ABILITY TO CONVINCE LICENSEES WHETHER TO LICENSE

13   THE WHOLE GROUP?

14          "ANSWER:  YES.

15          "QUESTION:  WHAT WAS THE IMPACT?

16          "ANSWER:  THEY WEREN'T INTERESTED IN A GROUP

17   THAT DIDN'T INCLUDE THE HIGH PROFILE CELEBRITY PLAYERS THAT

18   THEY KNEW WOULD BE MARKETABLE IN THEIR PRODUCTS."

19          AND EVEN PLAINTIFFS AGREED, EVEN THE PLAINTIFFS

20   AGREED THAT THEY -- IN FACT, I THINK I HAVE SOME -- DO I HAVE

21   SOME TRANSCRIPT TESTIMONY COMING UP NOW ON THIS, LAUREN, ON

22   THIS ISSUE FROM DOUG ALLEN?

23          NO?  OKAY.

24          EVEN THE PLAINTIFFS AGREED THAT THEY HAVE LITTLE

25   NOTORIETY AS RETIRED FOOTBALL PLAYERS.

1          MR. BEACH:

2              "ON A REGULAR BASIS DO YOU HAVE KIDS AND PEOPLE

3   COME UP TO YOU FOR AUTOGRAPHS, THINGS LIKE THAT?

4              "NO.  NO.  NOT ON A REGULAR BASIS AT ALL."

5          YOU RECALL -- I DON'T KNOW WHY -- ON DIRECT

6   EXAMINATION MR. BEACH TESTIFIED TO YOU THE OPPOSITE, BUT THEN

7   HE DID CORRECT HIS TESTIMONY WHEN I CROSS-EXAMINED HIM.

8          MR. MCNEIL:

9              "BUT, FOR EXAMPLE, DALLAS, A PLACE WHERE YOU

10  HAVEN'T PLAYED, YOU WOULDN'T BE RECOGNIZED, OF COURSE.

11             "ANSWER:  NO."

12         MR. LAIRD:

13             "WHEN YOU RETIRED IN '86, FROM THAT MOMENT UNTIL

14  2000, WHEN YOU FIRST SIGNED THE RETIRED PLAYER GLA, YOU NEVER

15  HAD ONE LICENSE ENTERED INTO FOR YOUR NAME OR LIKENESS ON ANY

16  PRODUCT OR MERCHANDISE, CORRECT?

17             "NO.

18             "OKAY.  SO PRIOR TO SIGNING A RETIRED PLAYER

19  GLA, YOU HAD NO LICENSING DEALS?

20             "NO."

21         SO WHY IS THERE NO ESCROW ACCOUNT?  THE REASON THERE

22  WAS NO ESCROW ACCOUNT -- CAN WE PUT UP C24?

23         YOU'LL REMEMBER THIS:  AN ESCROW ACCOUNT NEEDS MONEY.

24  WHAT THE RETIRED PLAYER GLA SAID IS THAT IF THERE WERE REVENUES

25  GENERATED FROM THE RETIRED PLAYER LICENSING IN THE GLA, IT

1  WOULD BE DIVIDED BETWEEN THE PLAYER AND AN ESCROW ACCOUNT.

2          WHAT HAPPENED IS, BECAUSE THEY COULDN'T DO THE WHOLE

3  GROUPS, THEY USED THE AD HOC LICENSING, WHICH THE COURT WILL

4  INSTRUCT YOU IS ENTIRELY PROPER.

5          AND SO THAT MONEY WAS PAID OUT A HUNDRED PERCENT TO

6  THE RETIRED PLAYERS, AND THERE WASN'T MONEY TO PUT INTO AN

7  EMPTY ESCROW ACCOUNT.  THAT'S NOT A VIOLATION.  THAT CAUSED NO

8  HARM.

9          IN FACT, MR. BEACH TESTIFIED HE DIDN'T CARE ABOUT AN

10 ESCROW ACCOUNT.

11           "AND IT'S ALSO TRUE YOU DIDN'T CARE ANYTHING

12 ABOUT WHETHER THERE WOULD BE AN ESCROW ACCOUNT OR NOT?  YOU

13 DIDN'T CARE?

14           "NO, I DIDN'T REALLY CARE WHETHER THERE WAS AN

15 ESCROW ACCOUNT OR NOT."

16         MR. BEACH JUST WANTED -- IF HIS IMAGE WAS USED, HE

17 WANTED TO BE PAID.  THAT WAS HIS RIGHT.  BUT THAT NEVER

18 HAPPENED.  NO ONE EVER USED MR. BEACH'S IMAGE WITHOUT PAYING

19 HIM.

20         NOW, THERE WERE A LOT OF QUESTIONS ABOUT WHAT WAS

21 KNOWN, WHAT WAS DISCLOSED, WHAT WERE PEOPLE TOLD.

22         YOU SAW EVIDENCE, FOR EXAMPLE, OF THE TOUCHBACK.  I

23 MAY NOT HAVE TIME TO DO THIS, BUT I ASK YOU TO LOOK AT THE

24 TOUCHBACK.  THERE WAS A WHOLE DISCLOSURE OF THE DIVISION OF

25 40 PERCENT, 23, 37 PERCENT IN THAT.

1      THERE WAS A DISCLOSURE OF HOW INDIVIDUAL -- HUNDREDS

2 OF INDIVIDUAL RETIRED PLAYERS GOT INDIVIDUAL AD HOCS.  THAT WAS

3 ALL DISCLOSED.

4      NOW, THERE WAS TESTIMONY HERE THAT SOME OF THE

5 PLAYERS THREW AWAY TOUCHBACK AND DIDN'T LOOK AT IT.  BUT THAT

6 DOESN'T MEAN IT WASN'T DISCLOSED.

7      BUT HERE'S ANOTHER DISCLOSURE, TRIAL EXHIBIT 113.

8 THIS IS ONE OF THE LAST EXHIBITS INTRODUCED.  IT WAS

9 MR. UPSHAW'S DEPOSITION TESTIMONY.

10      IF WE COULD DO THE WHOLE THING, PLEASE, SO THEY COULD

11 SEE IT?  OKAY.

12      **THE COURT:**  YOU'RE AT THE ONE-HOUR MARK.

13      **MR. KESSLER:**  THANK YOU.  I'LL GO A LITTLE FASTER.

14      GO, THEN, PLEASE, TO THE PARAGRAPH THAT YOU HAVE, THE

15 THIRD PARAGRAPH.

16      IT SAYS:

17           "BASED ON THE RIGHTS -- FEES PAID TO PLAYERS INC

18 BY VIDEO GAME LICENSEES, FOR EACH RETIRED PLAYER UTILIZED UNDER

19 SUCH LICENSE FOR THE PERIOD ENDED FEBRUARY 28, 2003, THE SHARE

20 IS 750."

21      SO THEY WERE GIVING OUT $750 CHECKS TO THE RETIRED

22 PLAYERS WHOSE WRITES WERE USED.

23           "IN THE PAST, WE HAVE DISTRIBUTED ALL OF THE

24 LICENSING FEES RECEIVED FOR USE OF RETIRED PLAYER NAMES AND

25 IMAGES TO THE RETIRED PLAYERS UTILIZED" -- UNDERSCORE

1   "UTILIZED," IF WE CAN, LAUREN, IT'S VERY IMPORTANT -- "AND WE

2   WILL CONTINUE TO DO SO."

3           THIS WAS A LETTER SENT OUT TO THE GLA CLASS MEMBERS

4   WHO WERE RECEIVING THIS MONEY, TELLING THEM EXACTLY HOW THE GLA

5   WORKED.  THERE WERE NO DISCLOSURES -- THERE WAS NO FAILURE TO

6   DISCLOSE HERE.

7           NOW, THERE WAS A REFERENCE TO THE HALL OF FAME

8   AGREEMENT.  I HAVE TO DO THIS QUICKLY.  TRIAL EXHIBIT 56.  I

9   DON'T KNOW WHAT MR. PARCHER IS GOING TO SAY ABOUT THIS.

10          AGAIN, YOU REMEMBER THE WHOLE THING WITH MR. WALKER

11  AND THE HALL OF FAME AND ALLEGING IT WAS BELOW COST, AND THERE

12  WAS SOMETHING WRONG WITH THAT.

13          FIRST OF ALL, THE HALL OF FAME AGREEMENT IS AN AD

14  HOC.  THERE'S NO DAMAGES CLAIM OR ANY CLAIM ABOUT THE HALL OF

15  FAME AGREEMENT IN THIS CASE.

16          SECOND, IT INVOLVED 13 CLASS MEMBERS.  BECAUSE MOST

17  OF THEM WERE HALL OF FAME PLAYERS, HAD NOTHING TO DO HERE.  BUT

18  MOST IMPORTANTLY, IT IS UNDISPUTED:  THE MONEY PAID WAS PAID TO

19  THE HALL OF FAME, NOT THE PLAYERS INC.

20          YOU'LL RECALL IT WAS AN AGREEMENT WITH THE PRO

21  FOOTBALL HALL OF FAME.  AND THE LICENSE IN PARAGRAPH 2, IF WE

22  LOOK AT THAT, WAS GRANTED BY THE HALL OF FAME.

23          PLAYERS INC DIDN'T GET THE PLAYER RIGHTS FOR THIS.

24  THE HALL OF FAME DID.

25          AND MR. ADDERLEY ADMITTED WHEN HE NEGOTIATED HIS HALL

1   OF FAME PAYMENT HE GOT $2,000 A YEAR; SAID IT WASN'T ENOUGH FOR

2   HIM, BUT HE AGREED TO IT.  HE AGREED TO THAT.  HE SAID IT WAS

3   THE HALL OF FAME, NOT PLAYERS INC.

4           TAKE A LOOK AT TRANSCRIPT 1583.

5           (DOCUMENT DISPLAYED.)

6               "MR. ADDERLEY, AT ONE POINT DID YOU ENTER INTO

7   AN AD HOC LICENSE AGREEMENT WITH THE HALL OF FAME?

8               "ANSWER:  YES.

9               "AND THAT WAS A LICENSE TO CREATE A MADDEN HALL

10  OF FAME GAME; IS THAT CORRECT?

11              "ANSWER:  I BELIEVE SO.

12              "AND YOU WERE SOLICITED DIRECTLY BY THE HALL OF

13  FAME FOR THAT; IS THAT CORRECT?

14              "ANSWER: YES.

15              "OKAY.  AND YOU ENTERED INTO A LICENSE WITH THE

16  HALL OF FAME, AND YOU AGREED UPON HOW MUCH MONEY YOU WOULD BE

17  PAID FOR YOUR IMAGE AND NAME, CORRECT?

18              "ANSWER:  REPEAT THAT."

19           KEEP GOING.

20              "YOU AGREED WITH THE HALL OF FAME HOW MUCH THEY

21  WOULD PAY YOU TO PUT YOU IN THAT GAME?

22              "ANSWER: YES.

23              "AND YOU WERE SATISFIED WITH HOW MUCH THEY WERE

24  GOING TO PAY YOU TO PUT YOU IN THAT GAME, CORRECT?

25              "ANSWER:  NO.

1          "BUT YOU AGREED TO IT?

2          "ANSWER:  I CAN'T TURN DOWN THAT MONEY."

3      NEXT QUESTION.

4          "OKAY.  THAT'S FAIR ENOUGH.  OKAY.  AND DO YOU

5  RECALL HOW MUCH YOU WERE PAID?

6          "IT WAS $8,000.  IT WAS 2,000 A YEAR."

7      I AM GOING TO SKIP THAT.  THIS IS THE IMPORTANT PART.

8          "OKAY.  NOW, FOR THAT, THAT WAS AN AD HOC

9  AGREEMENT WITH THE HALL OF FAME, CORRECT?

10         "AS FAR AS I KNOW, YES."

11     KEY QUESTION:

12         "RIGHT.  IN OTHER WORDS, PLAYERS INC DIDN'T

13 NEGOTIATE THAT 2,000 WITH YOU, DID THEY?  THAT WAS DIRECTLY THE

14 HALL OF FAME?

15         "ANSWER:  YES."

16     SO, MR. PARCHER, TO COME IN ABOUT PLAYERS INC DOING

17 SOMETHING WRONG IN THE HALL OF FAME TO BETRAY THE PLAYERS'

18 TRUST, THERE'S NO EVIDENCE OF THAT.  IT'S JUST ALLEGATIONS.

19     HE MIGHT SHOW YOU SOME TESTIMONY FROM DR. NOLL ABOUT

20 THIS, IN WHICH THEY SAID:

21         "DR. NOLL, DO YOU KNOW OF ANY EVIDENCE WHERE

22 PLAYERS WERE SOLD OUT?"

23     AND DR. NOLL STARTS TO TALK ABOUT THE HALL OF FAME.

24     IF HE DOES THAT -- BECAUSE I WON'T BE ABLE TO GET UP

25 AGAIN -- MAKE SURE HE SHOWS YOU DR. NOLL'S ENTIRE ANSWER, NOT A

1    PIECE OF IT.

2           BECAUSE THE ENTIRE ANSWER SHOWS DR. NOLL WAS SAYING

3    THE OPPOSITE.  HE WAS SAYING WHAT IT SHOWED.  AS YOU WILL

4    RECALL FROM HIS TESTIMONY THAT IT WASN'T A BELOW-MARKET DEAL.

5    EA WAS COMPLAINING IT PAID TOO MUCH TO THE HALL OF FAME, NOT

6    TOO LITTLE.

7           NOW, ON FIDUCIARY DUTY, YOU'RE GOING TO BE CHARGED

8    YOU HAVE TO DETERMINE A DUTY AS TO WHETHER ONE OF THE IMPORTANT

9    FACTORS IS CONTROL.  CONTROL.  I CAN'T GO THROUGH THIS NOW.

10          BUT YOU WILL RECALL THAT THERE WAS LOTS OF TESTIMONY

11   FROM EACH OF THE PLAYERS THEY HAD NO CONTROL HERE.

12          THE GLA ITSELF DOESN'T SAY "AGENCY."  THEY KEEP

13   SAYING IT'S AN AGENCY.  THERE ARE AGENCY AGREEMENTS.  READ THE

14   TERMS OF THE GLA.  THERE WAS NO AGENCY.

15          NOW, THEY ALSO HAD UP HERE, BY THE WAY, A BIG

16   POSTER -- THEY MAY PUT IT UP AGAIN -- PROFESSOR NOLL SAYING

17   THAT THERE WAS SIGNIFICANT VALUE IN THE LICENSING OF RETIRED

18   PLAYERS IN A HYPOTHETICAL QUESTION HE WAS ASKED.

19          HYPOTHETICALS MEANS IT MAY NOT EXIST.  WHAT DID

20   PROFESSOR NOLL SAID IN THE REAL WORLD EVIDENCE?  C71.

21              "HAVE YOU SEEN ANY EVIDENCE THAT THERE WAS ANY

22   ECONOMIC VALUE FOR A LICENSE TO ALL THE RETIRED PLAYERS IN THIS

23   CLASS WHO SIGNED THE GLA AS A GROUP?

24              "NO.  THERE NO SUCH EVIDENCE."

25              PROMOTION OF PLAYERS.  I CAN'T GO THROUGH ALL THIS

1  EVIDENCE, BUT LET ME SHOW YOU C33.

2          MR. LINZNER ON WHETHER OR NOT DEFENDANTS PROMOTED THE

3  USE OF RETIRED PLAYERS:

4          "DID THEY, DEFENDANTS, EVER TRY TO MARKET THOSE

5  RETIRED PLAYERS TO YOU?

6          "ANSWER:  YES.

7          "QUESTION:  WHAT DID THEY SAY?

8          "THEY SAY IF, YOU KNOW, THEY'D ASK US IF WE

9  INTERESTED IN USING FORMER NFL PLAYERS, RETIRED PLAYERS.  AND

10  ON THOSE OCCASIONS WHEN WE WERE INTERESTED, WHICH WE WERE ON

11  SEVERAL OCCASIONS, THEY HELPED US LICENSE THEM.  AND WE

12  NEGOTIATED A SEPARATE CHARGE FOR THAT.

13          "DID DOUG ALLEN AND OTHERS AT PLAYERS INC MAKE

14  EFFORTS TO PROMOTE RETIRED PLAYERS TO EA TO YOUR KNOWLEDGE?

15          "DOUG ALLEN AND OTHER EXECUTIVES AT PLAYERS INC

16  FREQUENTLY ENCOURAGED US TO LICENSE THE RIGHTS TO RETIRED

17  PLAYERS THROUGH THEM, IF, INDEED, WE WANTED SUCH A FEATURE IN

18  OUR GAME."

19          NOW, I HAVE TO SKIP OVER.  I HAVE BROCHURES.  I HAVE

20  MARKETING EVIDENCE.  YOU'RE GOING TO HAVE TO REVIEW THEM IN THE

21  JURY ROOM.

22          REMEMBER, EVEN MR. BEACH WAS FEATURED IN ONE OF THE

23  BROCHURES.  REMEMBER HOW THEY GOT UP AND SAID:

24          "OH, YOU DIDN'T DO CLASS MEMBERS.  ONLY TONY

25  DORSETT."

1        THEN, WE SHOWED YOU "TOO TALL" JONES, WHO IS A MEMBER

2   OF THIS CLASS.

3        GENE UPSHAW.  THEY DO A LOT TO ATTACK MR. UPSHAW.

4   SEE WHAT MR. UPSHAW SAID IN FULL CONTEXT ABOUT MARKETING

5   PLAYERS.  THEY SHOW YOU A LITTLE SNIPPET OF CORRECTED

6   TESTIMONY.  THEY DIDN'T EVEN SHOW YOU THE CORRECTION.

7        BUT LET ME GIVE YOU THE FULL CONTEXT OF WHAT WAS

8   PRESENTED TO YOU BY DEPOSITION.

9        "QUESTION:  I MEAN, THAT'S NOT YOUR JOB.  YOU

10  DON'T GO OUT AND SELL LICENSEES [SIC].

11        "ANSWER:  WELL, IT'S NOT MY JOB ON A DAY-TO-DAY

12  BASIS.  BUT WHENEVER I HAVE CONTACT WITH LICENSEES OR SPONSORS,

13  OR WHATEVER, I ALWAYS REMIND THEM THAT WE ALSO HAVE THIS GROUP

14  OF PLAYERS BESIDES OUR ACTIVE PLAYERS, AND THAT APPLIES TO ANY

15  OF OUR PLAYERS, BOTH ACTIVE AND RETIRED."

16        FOR THEM TO SUGGEST THAT GENE UPSHAW, WHO THE

17  EVIDENCE WAS, FOUNDED THE RETIRED PLAYER LICENSING PROGRAM,

18  DIDN'T TRY TO PROMOTE RETIRED PLAYERS, IT JUST BOGGLES THE

19  MIND.

20        NOW, ALSO KEEP IN MIND, PLAINTIFFS, ON THE OTHER

21  HAND, THEY COMPLAIN WE DIDN'T MARKET THEM.  THEY DID NOTHING TO

22  MARKET THEMSELVES.  THESE WERE NON-EXCLUSIVE GLA'S.

23        THEY COULD HAVE TAKEN SOME RESPONSIBILITY.  THEY

24  COULD HAVE TRIED.  DID THEY DO ANYTHING?  LET'S LOOK AT C39.

25        MR. BEACH:

1                    "AND, MR. BEACH, IT'S ALSO TRUE THAT YOU NEVER

2    MADE EFFORTS TO MARKET YOURSELF SINCE YOUR RETIREMENT AS AN

3    NFLPA PLAYER, CORRECT?

4                    "THAT'S CORRECT.

5                    "AND, IN FACT, YOU HAD NO DESIRE TO MARKET

6    YOURSELF AS A RETIRED PLAYER FOR ANY PURPOSE.  THAT IS CORRECT,

7    ISN'T IT?

8                    "THAT'S CORRECT."

9            BUT HE'S HERE SEEKING NOW TENS OF THOUSANDS OF

10   DOLLARS.

11                   "YOU UNDERSTOOD THAT EVEN THOUGH YOU SIGNED THE

12   GLA YOU STILL HAD THE RIGHT TO TRY TO GO OUT YOURSELF AND TO

13   TRY TO GENERATE REVENUE FROM LICENSING YOUR NAME AND IMAGE,

14   RIGHT?"

15           MR. MCNEIL:

16               "YES.

17               "DID YOU EVER TRY TO DO THAT?

18               "I JUST EXPLAINED TO YOU THAT I DIDN'T."

19           MR. ADDERLEY, C45:

20               "MR. ADDERLEY, IT'S TRUE THAT YOU UNDERSTOOD

21   THAT THE GLA YOU SIGNED WAS NOT EXCLUSIVE, CORRECT?

22               "YES.

23               "AND YOU KNEW THAT MEANT YOU COULD LICENSE YOUR

24   RIGHTS TO ANYBODY ELSE YOU WANTED TO, CORRECT?

25               "YES.

1          "AND DESPITE THAT FACT, MR. ADDERLEY, YOU NEVER

2 MADE ANY EFFORT AT ALL TO MARKET YOUR NAME TO BE USED ON ANY

3 PRODUCT, DID YOU?

4          "NO."

5          LADIES AND GENTLEMEN OF THE JURY, THERE'S NO BREACH

6 OF FIDUCIARY DUTY IN THIS CASE.  THIS INFORMATION WAS REVEALED,

7 YOU HEARD FROM MR. GOICH AT RETIRED PLAYER CONVENTIONS.  IT WAS

8 ALL DISCUSSED WHEN THEY WENT OVER THE GLA.

9          THEY INVITED STEERING MEMBERS OF THE RETIRED PLAYERS

10 ASSOCIATION TO COME TO THE ACTIVE PLAYER MEETINGS WHERE THEY

11 HEARD AND SAW EVERYTHING.

12          FOR THEM TO COME IN THAT THERE WAS SOME GRAND

13 CONSPIRACY INVOLVING MR. ARMSTRONG, MR. ALLEN, MRS. ALLEN, GENE

14 UPSHAW, DAN GOICH, EVERYONE IN THE HISTORY OF THE ASSOCIATION,

15 IT FRANKLY IS ABSOLUTELY OUTRAGEOUS.

16          NOW, I HAVE TO SKIP FORWARD HERE, BECAUSE I'M RUNNING

17 OUT OF TIME.

18          I CAN'T TALK ABOUT THE $8 MILLION EXCEPT TO NOTE THE

19 EVIDENCE WAS ALL ACTIVE PLAYER MONEY.  YOU REMEMBER THAT.  IT

20 WAS THE ACTIVE PLAYER DECISION.  IT WAS BASED ON THE TRADEMARK.

21 THAT'S WHAT DR. NOLL TESTIFIED.  THE VALUE OF THE TRADEMARK,

22 18 MILLION FOR THEM, 11 MILLION FOR THE NBA.  YOU RECALL THAT

23 TESTIMONY.  THERE WASN'T ANYTHING WRONG WITH THAT.

24          NOW, I THINK I NEED TO SPEND A LITTLE TIME, EVEN

25 THOUGH THERE'S NO BASIS FOR ANY CLAIM HERE, ON THE SCRAMBLING

1  THING.  THIS IS THE BIGGEST DISTRACTION OF ALL.  OKAY, START

2  WITH C35.

3          THE REASON WHY EA DECIDED TO SCRAMBLE -- AND THE

4  COURT WILL INSTRUCT YOU IT VIOLATED NO PLAYER RIGHTS TO

5  SCRAMBLE.  IT'S VERY IMPORTANT.  THEY USE NO NAME.  THEY USE NO

6  NUMBER.  THEY USE NO PICTURE.  SO IT VIOLATED NO RIGHTS.  SO

7  THIS IS A TOTAL DISTRACTION.

8          THE REASON IS THEY DIDN'T WANT TO PAY ANY MONEY FOR

9  IT.

10          "QUESTION:  WOULD YOU HAVE PAID ADDITIONAL MONEY

11  FOR THE RETIRED PLAYERS YOU WEREN'T INTERESTED IN?

12          "IF THEY HAD NO VALUE TO US IN THE GAME FOR

13  WHATEVER REASON, THEN WE WOULDN'T HAVE PAID ANY ADDITIONAL

14  MONEY FOR THAT.  OKAY.  WHEN WE HAVE BEEN INTERESTED IN RETIRED

15  PLAYERS FOR THE GAME, WE HAVE PAID THEM ADDITIONAL MONEY.

16          "QUESTION:  WAS EA EVER INTERESTED, DURING THIS

17  PERIOD OF TIME, IN LICENSING THE RIGHTS TO RETIRED PLAYERS WHO

18  WERE NOT STARS?

19          "AGAIN, THE TEAM DOWN IN ORLANDO WOULD DECIDE

20  WHICH PLAYERS THEY WERE INTERESTED IN LICENSING.  BUT BASED ON

21  MY DISCUSSION WITH THEM, MY UNDERSTANDING IS TYPICALLY WE

22  WANTED WELL-KNOWN PLAYERS WHO WOULD BE OF INTEREST TO OUR

23  CUSTOMERS."

24          NOW, THEY PUT UP THE LETTER, TRIAL EXHIBIT 1320 FROM

25  LASHUN LAWSON.  SHE WAS PROTECTING PLAYER RIGHTS BECAUSE EA

1   WOULDN'T PAY FOR THEM.  ALL SHE DID IS SAY:

2            "THE ADDENDUM THAT WAS SIGNED LAST JULY WAS A

3   THREE-YEAR AGREEMENT THAT GRANTED ELECTRONIC ARTS THE RIGHT TO

4   USE THE IMAGES AND IDENTITIES OF PLAYERS LISTED IN ATTACHMENTS

5   A AND B."

6            YOU REMEMBER WE PUT THAT AS ATTACHMENTS INTO

7   EVIDENCE.  THOSE WERE SPECIFIC RETIRED PLAYERS THEY PAID MONEY

8   FOR.  WHERE DID THAT MONEY GO?  TO THE RETIRED PLAYERS.  THAT

9   WAS THE $750.

10           "AND FOR ALL RETIRED PLAYERS THAT ARE NOT LISTED

11  IN EITHER ATTACHMENT A OR B, THEIR IDENTITY MUST BE ALTERED SO

12  IT CANNOT BE RECOGNIZED."

13           WHAT'S WRONG WITH THAT?  IF YOU DON'T PAY FOR IT, YOU

14  CAN'T USE SOMEONE ELSE'S RIGHTS.  WE HAD TO DO THAT TO PROTECT

15  THE RETIRED PLAYERS.  NOW THEY TWIST IT AND MAKE IT SEEM LIKE

16  THERE'S SOMETHING WRONG FOR THAT.

17           IT'S ABSOLUTELY UNBELIEVABLE.  UNBELIEVABLE.

18           AND, IN FACT, WE ASKED MR. BEACH:

19           "DO YOU BELIEVE THE NFLPA SHOULD HAVE GIVEN AWAY

20  YOUR NAME FOR FREE?"

21           TRANSCRIPT 1185 TO 1186.

22           AND WHAT DID MR. BEACH SAID?  HE SAID:

23           "NO.

24           "OKAY.  SO IT IS YOUR BELIEF THAT THE NFLPA

25  SHOULD HAVE GIVEN AWAY YOUR NAME FOR FREE TO EA?

1        "ANSWER:  NO."

2        SO THIS WHOLE CLAIM WE SHOULD HAVE JUST THROWN IN THE

3   RETIRED PLAYERS IN FOR FREE, MR. BEACH DIDN'T BELIEVE THAT.

4   NOBODY WOULD BELIEVE THAT.

5        NOW, DAMAGE.  THIS IS VERY IMPORTANT.  THE COURT IS

6   GOING TO TELL YOU, IF YOU EVER GET TO DAMAGE -- YOU SHOULDN'T

7   GET THERE, BUT I CAN'T LEAVE IT OUT.  IF YOU GET TO DAMAGES,

8   YOU CAN'T USE SPECULATION, CONJECTURE.  THERE HAS TO BE

9   EVIDENCE.  EVIDENCE THAT GIVES YOU A REASONABLE BASIS TO

10  DETERMINE DAMAGES.  YOU GOT NOTHING LIKE THAT FROM MR. ROWLEY.

11        WHAT DID YOU GET?  AND I ASKED HIM -- IF WE CAN,

12  FIRST, LET'S LOOK AT 1915.

13        LET'S SAY YOU WERE TO FIND -- AND YOU SHOULDN'T --

14  THAT DEFENDANTS DID NOT ADEQUATELY MARKET THE RETIRED PLAYERS.

15  AND THAT'S SOME BREACH OF FIDUCIARY DUTY.  WE BELIEVE THE

16  EVIDENCE SHOWS EXACTLY THE OPPOSITE.  I SHOULDN'T SAY "WE."

17        DEFENDANTS BELIEVE THE EVIDENCE SHOWS EXACTLY THE

18  OPPOSITE.  BUT LET'S SAY YOU FOUND THAT.  DID MR. ROWLEY GIVE

19  YOU ANY BASIS TO DECIDE THE DAMAGES?

20        LET ME SHOW YOU WHAT HE SAID.

21        "QUESTION:  LET ME ASK THIS:  LET'S SAY THE JURY

22  WERE TO FIND THERE WAS NO BREACH OF CONTRACT, OKAY?  AND THERE

23  WAS A BREACH OF FIDUCIARY DUTY FOR NOT MARKETING, NOT

24  SUFFICIENTLY MARKETING THE RETIRED PLAYERS WHO SIGNED THE

25  GLA'S, OKAY?  HAVE YOU DONE ANY ANALYSIS OF SPECIFICALLY HOW

1    MUCH THE RETIRED PLAYERS WOULD HAVE EARNED FOR THEIR RIGHTS IF

2    THEY HAD BEEN MORE AGGRESSIVELY MARKETED, JUST ON THAT CLAIM

3    SEPARATELY?"

4              LOOK AT THIS ANSWER.  THE ANSWER IS:

5                 "NO."

6              NO.  SO IF THEY PRESENT NO EVIDENCE, IT'S THEIR

7    BURDEN OF PROOF.  YOU CAN'T AWARD ANY DAMAGES ON A MARKETING

8    CLAIM.  AND EVEN IF IT WAS A BREACH OF CONTRACT CLAIM.

9              LOOK WHAT MR. ROWLEY TESTIFIED.  C48:

10                "NOW, YOU'VE GIVEN THE JURY NO BASIS TO

11   CALCULATE ANY DAMAGES IF THEY FIND THAT RETIRED PLAYERS ARE NOT

12   ENTITLED TO ACTIVE PLAYER LICENSING MONEY, AND ALL THE MONEY IN

13   THE GLR POOL IS ACTIVE PLAYER LICENSING MONEY, CORRECT?

14                "IF THOSE TWO ASSUMPTIONS ARE TRUE, THEN, YES."

15             HE IS ADMITTING TO YOU -- HE'S AN HONEST GUY IN THIS,

16   HONEST GUY -- IF YOU FIND THE GLR POOL WAS ALL ACTIVE PLAYER

17   LICENSING MONEY, HE HAS GIVEN YOU NO BASIS TO MEASURE ANY

18   DAMAGES IN THIS CASE.

19             AND THE JUDGE WILL TELL YOU YOU CAN'T BASE DAMAGES ON

20   SPECULATION, CONJECTURE.  IT WAS THEIR BURDEN.

21             PLAINTIFFS ADMITTED, C37, THEY HAD NO IDEA HOW THE

22   MONEY WOULD BE DIVIDED UP.  THERE'S NO REFERENCE IN THE GLA TO

23   A GROSS LICENSING REVENUE POOL.  LOOK AT THE LANGUAGE.

24             THERE'S NO REFERENCE TO EQUAL SHARES OF A GROSS

25   LICENSING REVENUE POOL.  DAMAGES HAVE TO BE DONE WITH SOME

1  ELEMENT OF CAUSATION.

2          MR. ROWLEY TESTIFIED WHEN I ASKED HIM IN OTHER CASES

3  HE'S A DAMAGE EXPERT HE STUDIED CAUSATION.  HERE THE LAWYERS,

4  HE TESTIFIED, JUST TOLD HIM WHAT NUMBERS TO TAKE AND DIVIDE UP.

5  WELL, THAT'S NOT ADEQUATE.

6          AND, FINALLY, ON THIS POINT.  HE WOULD AWARD DAMAGES

7  TO PEOPLE WHO PLAYED -- HE DOESN'T KNOW WHETHER THEY PLAYED ONE

8  GAME, TWO GAMES, NO GAMES.  HE DOESN'T KNOW WHAT SEASONS.  HE

9  DOESN'T -- YOU DON'T HAVE A BASIS TO KNOW WHAT SEASONS THEY

10 ARE.

11         LET'S TAKE A LOOK AT TRIAL EXHIBIT 2,074.

12         **THE COURT:**  TEN MINUTES TO GO.

13         **MR. KESSLER:**  TEN MINUTES.  THANK YOU.

14         2074, PLEASE.  2057.  SORRY. GOT A LITTLE DISTRACTED.

15         THIS IS IN EVIDENCE.  IT SHOWS HOW MANY CLASS MEMBERS

16 HAD A GLA EFFECT EVERY YEAR.  WELL, IN 2007, THERE WERE ONLY

17 22.

18         DID YOU EVER HEAR THAT FROM PLAINTIFFS BEFORE?  WERE

19 YOU EVER TOLD THAT THE NUMBER OF CLASS MEMBERS DECLINED EACH

20 YEAR FROM 2003 TO 22?  WHY IS THIS SIGNIFICANT?

21         THIS IS SIGNIFICANT BECAUSE THEY OFFER YOU DIFFERENT

22 YEARS OF DAMAGES AMOUNTS.  THEY HAVE GIVEN YOU NO BASIS TO

23 DECIDE, NO BASIS TO DECIDE WHICH PLAYERS SHOULD GET WHICH

24 MONEY.  YOU CAN'T SPECULATE.  YOU JUST -- THAT'S NOT OUR FAULT.

25 IT WAS THEIR BURDEN TO DO SOMETHING.

1        NOW, IF WE COULD PUT UP THAT OTHER DAMAGES EXHIBIT

2   WITH THE LICENSING.  IT'S TRIAL EXHIBIT 1217.

3        (DOCUMENT DISPLAYED.)

4        THEY ALSO PUT IN, IF YOU LOOK HERE, FOUR YEARS OF THE

5   DAMAGES.  2004 TO 2007.  THE JUDGE IS GOING TO INSTRUCT YOU

6   IT'S A THREE-YEAR DAMAGE PERIOD.

7        THEY'VE GIVEN YOU NO BASIS TO DECIDE HOW FOUR FITS

8   INTO THREE.  OKAY?  OR WHETHER OR NOT WHICH OF THE FOUR FITS

9   INTO THREE.

10        DID YOU HEAR ANY EXPLANATION FROM THAT FROM THEIR

11   DAMAGES EXPERT?

12        MAYBE MR. PARCHER NOW WILL TRY TO EXPLAIN THAT TO

13   YOU.  BUT THEY HAVE TO HAVE EVIDENCE, NOT MR. PARCHER'S

14   ARGUMENT.  THEY'VE GOT TO HAVE EVIDENCE.  THEY'VE DONE NOTHING

15   HERE.

16        AND WHAT IS THE INJURY?  THINK ABOUT THAT.  IF YOU

17   SIGNED THE PAPER, PIECE OF PAPER, AND YOU AUTHORIZE SOMEONE TO

18   LICENSE IT, HOW WERE ANY OF THESE PLAINTIFFS WORSE OFF?

19        IF THEY GOT AD HOC LICENSING, THEY MADE MONEY.  SOME

20   OF THEM MADE A LOT OF MONEY.  MR. ADDERLEY MADE $13,000.

21        IF THEY DIDN'T MAKE THE MONEY -- I HEARD MR. PARCHER

22   SAY:

23        "WELL, THEY GAVE THE RIGHT TO USE THEIR

24   IDENTITY."

25        IT'S TRUE.  IT'S NOT IDENTITY THEFT.  IT WAS SIMPLY

1  AN OPPORTUNITY.

2          IF YOU FOUND SOMETHING, AS MR. GOICH TESTIFIED:

3              "WELL, IF IT WAS GENERATED FROM MY RIGHTS, THEY

4  WOULD GET A BENEFIT."

5          BUT THEY WEREN'T HURT.  THEY WEREN'T INJURED.  THEIR

6  LIVES DIDN'T CHANGE.  THEY PAID NOTHING.  NOTHING HAPPENED

7  HERE.

8          THAT BRINGS ME, AGAIN, TO THIS INCREDIBLE SUBJECT OF

9  PUNITIVE DAMAGES.

10          THE JUDGE IS GOING TO CHARGE YOU PUNITIVE DAMAGES,

11  THERE HAS TO BE SOMETHING OUTRAGEOUS, MALICE, EVIL INTENT, SOME

12  HORRIBLE BEHAVIOR, THREATS TO SAFETY.

13          DID YOU SEE ANY OF THAT?  DID YOU SEE IN THE

14  WITNESSES HERE -- WHEN YOU SAW MR. ARMSTRONG, WOULD HAVE TO BE

15  PART OF THIS CONSPIRACY?  HE SAID:

16              "MR. ARMSTRONG LIED TO YOU BECAUSE MAYBE HE'LL BE

17  THE FUTURE HEAD OF THE UNION."

18          DO YOU THINK MR. ARMSTRONG WAS LYING TO YOU?  DO YOU

19  THINK MR. GOICH WAS LYING TO YOU?  DO YOU THINK THEY ARE EVIL,

20  THEY ARE IN SOME CABAL ALL THIS TIME?

21          PLAINTIFFS' LAWYERS WILL SAY ANYTHING IN AN EFFORT TO

22  TRY TO INFLAME YOU, INFLAME YOU TO SAY:  "YEAH, LET'S GIVE SOME

23  PUNITIVE DAMAGES," YET, WHEN THERE ARE NO INDIVIDUAL DAMAGES.

24  THERE ARE NO INDIVIDUAL DAMAGES.

25          LADIES AND GENTLEMEN OF THE JURY, I COME BACK TO MY

1  THREE POINTS AGAIN.

2          IF WE CAN PUT UP C1, PLEASE.

3          THE LICENSING MONEY WAS GENERATED SOLELY FOR THE

4  RIGHTS OF ACTIVE, NOT RETIRED PLAYERS.  IT'S ESTABLISHED WITH

5  ALL THE EVIDENCE BEYOND ANY POSSIBLE DISPUTE.

6          WHENEVER RETIRED PLAYERS' RIGHTS WERE LICENSED, THE

7  RETIRED PLAYERS GOT THAT MONEY.  99 PERCENT OF IT.  NOT 93,

8  BECAUSE I MAY HAVE MISSPOKEN.

9          MOST RETIRED CLASS MEMBERS RECEIVED NO LICENSING

10 MONEY BECAUSE LICENSEES -- BECAUSE LICENSEES AND THE

11 MARKETPLACE PUT NO VALUE IN THEIR LICENSING RIGHTS.  THAT'S NOT

12 A BREACH OF FIDUCIARY DUTY.  IT'S NOT A LACK OF EFFORT.  IT'S

13 NOT A CONSPIRACY.  IT'S NOT DECEITFUL.  IT'S NOT

14 DOUBLE-TALKING.  IT'S THE WAY THE MARKETPLACE WORKS.

15         WHAT THE EVIDENCE SHOWS IS THAT THIS IS THE ONLY

16 UNION THAT TRIED TO DO LICENSING FOR RETIRED PLAYERS, BECAUSE

17 GENE UPSHAW WAS DEDICATED TO THOSE PLAYERS.

18         AND THEY PUT UP THIS QUOTE, THIS THING ABOUT "IF YOU

19 DON'T HAVE THE WORLD'S BEST DOG FOOD, YOU CAN'T SELL IT IF THE

20 DOGS DON'T EAT IT."

21         IS THAT OFFENSIVE TO YOU?  NOT OFFENSIVE TO ME.  IS

22 THAT ANY DIFFERENT THAN MR. GOICH TESTIFYING ON THE STAND, YOU

23 REMEMBER, TRYING TO SELL HIS RIGHTS WAS LIKE TRYING TO SELL A

24 DEAD HORSE?

25         I MEAN, THEY ARE BOTH PEOPLE OF THE SOUTH.  OKAY?

1          WHAT THEY WERE SAYING IS -- AND MR. UPSHAW, BY THE

2   WAY, WAS ONE OF THE RETIRED PLAYERS WHOSE RIGHTS HE WAS TALKING

3   ABOUT COULDN'T BE SOLD.

4          FOR THEM TO SAY THAT'S THEIR CASE, THAT QUOTE, THAT'S

5   THE REASON TO FIND GENE UPSHAW, THE MAN TO DID MORE FOR RETIRED

6   AND ACTIVE NFL PLAYERS IN HISTORY, THAT'S THE REASON TO CONDEMN

7   HIM AND FIND HE HAD AN EVIL INTENT AND DESTROY HIS LEGACY?

8          THAT'S WHAT MR. PARCHER WANTS TO DO IN THIS CASE.

9          HAS THERE BEEN ANY EVIDENCE, ANY EVIDENCE THAT YOU'VE

10  SEEN TO JUSTIFY THOSE ALLEGATIONS AND CLAIMS?

11         LADIES AND GENTLEMEN OF THE JURY, YOU'VE BEEN

12  EXTRAORDINARILY PATIENT.

13         I APOLOGIZE FOR SHOUTING.  I GET A LITTLE BIT

14  EMOTIONAL ABOUT THIS CASE.  I TOLD YOU I WOULDN'T SHOUT, BUT I

15  DID.  I APOLOGIZE.

16         YOU'VE BEEN EXTREMELY PATIENT.  WHAT HAPPENS NOW IS

17  MR. PARCHER GETS TO GO AGAIN.  I DON'T GET TO GO AGAIN.

18         REMEMBER THE HISTORY OF THIS CASE.  HOW MANY TIMES

19  DID PLAINTIFFS SAY SOMETHING, THEIR LAWYERS OR THEIR WITNESSES,

20  AND THEN WE WERE ABLE TO GET UP AND SHOW YOU THE FULL PICTURE

21  AND THE EVIDENCE, AND IT WAS THE OPPOSITE?

22         DID IT HAPPEN TODAY?  DID IT HAPPEN TODAY?  I CAN'T

23  CORRECT ANYTHING AGAIN.  YOU'RE GOING TO HAVE TO DO THE

24  CORRECTIONS.  DEFENDANTS RELY UPON YOU, AFTER MR. PARCHER GOES,

25  TO REVIEW THE EVIDENCE, TO APPLY YOUR COMMON SENSE TO THAT

 1  EVIDENCE.

 2          DEFENDANTS ARE CONFIDENT YOU WILL LOOK AT THAT

 3  EVIDENCE AND RENDER A JUST AND FAIR VERDICT IN THIS CASE.  AND

 4  THAT'S ALL DEFENDANTS COULD POSSIBLY HOPE FOR.

 5          THANK YOU SO MUCH FOR YOUR TIME AND YOUR PATIENCE.

 6          **THE COURT:**  ALL RIGHT.  WE'RE GOING TO TAKE A

 7  15-MINUTE BREAK.

 8          WHEN WE COME BACK WE WILL HAVE THE LAST PART OF

 9  MR. PARCHER'S ARGUMENT, AND THEN I WILL PROCEED TO GIVE YOU THE

10  INSTRUCTIONS OF LAW.  AND THEN, IT WILL BE YOUR DUTY TO

11  DELIBERATE ON THE CASE.  BUT NOT YET.  PLEASE DON'T DISCUSS THE

12  CASE YET.

13          THANK YOU.  WE'LL SEE YOU BACK HERE IN 15 MINUTES.

14          **THE CLERK:**  ALL RISE.

15          (THE FOLLOWING PROCEEDINGS WERE HELD IN OPEN COURT,

16          OUTSIDE THE PRESENCE OF THE JURY.)

17          **THE COURT:**  OKAY.  EVERYONE HAVE A SEAT.

18          SO REARRANGE THE COURTROOM WITH POSTER BOARDS OR

19  WHATEVER, BUT YOU'VE GOT 15 MINUTES, MR. PARCHER.

20          **MR. PARCHER:**  YES, SIR.  APPRECIATE THE EXTRA THREE.

21          **THE COURT:**  ALL RIGHT.

22          NOW, I'M GOING TO SAY TO THE AUDIENCE, YOU'RE WELCOME

23  TO STAY THROUGH THE READING OF THE INSTRUCTIONS, WHICH WILL

24  IMMEDIATELY FOLLOW MR. PARCHER.  BUT I WILL PAUSE A LITTLE

25  BEFORE TO LET ANY OF YOU LEAVE WHO WANT TO LEAVE.

1          USUALLY THE PUBLIC FINDS THE READING OF THE

2   INSTRUCTIONS TO BE BORING.  THEY ARE VERY BORING.

3          AND I WANT TO MAKE SURE THE JURY HEARS IT.  SO TO

4   AVOID DISTRACTIONS OF PEOPLE COMING IN AND OUT, IF YOU WANT TO

5   LEAVE, THAT'S FINE.

6          BUT TRY TO LEAVE IN THAT BREAK SO THAT YOU DON'T BE

7   WALKING IN AND OUT AS THE INSTRUCTIONS ARE READ.

8          WE'LL TAKE A 15-MINUTE BREAK OURSELVES AT THIS POINT,

9   AND THEN RETURN.

10          THANK YOU.

11          **MR. KESSLER:**  THANK YOU, YOUR HONOR.

12          **MR. HUMMEL:**  THANK YOU, YOUR HONOR.

13          (RECESS WAS TAKEN.)

14          **THE COURT:**  ALL RIGHT.  LET'S GO BACK TO WORK.

15          **MR. PARCHER:**  CAN I HAVE 15 MINUTES?

16          **THE COURT:**  15.

17          **MR. PARCHER:**  I GET FIVE MORE, OR THAT'S OUTRAGEOUS?

18   I TRIED TO READ MY NOTES.

19          **THE COURT:**  SORRY, 15.

20          **MR. PARCHER:**  ALL RIGHT.  RULES ARE RULES.

21          (DISCUSSION HELD OFF THE RECORD.)

22          **THE COURT:**  ARE READY TO BRING IN THE JURY?  LET'S GO

23   GET THEM.

24          **MR. PARCHER:**  CAN I RUN TO THE MEN'S ROOM?

25          **THE COURT:**  YOU NEED TO GO.  GO AHEAD.

1           **MR. PARCHER:** "NEED" IS A BIG WORD, BUT I'D LIKE TO.

2           **THE COURT:** WE'LL WAIT. PLEASE. EVERYONE BE SEATED.

3 WE'RE GOING TO HAVE A SHORT FACILITIES BREAK.

4           (RECESS TAKEN.)

5           (THE FOLLOWING PROCEEDINGS WERE HELD IN OPEN COURT,

6           IN THE PRESENCE OF THE JURY.)

7           **THE COURT:** WELCOME BACK, EVERYONE. HAVE A SEAT,

8 PLEASE.

9           MR. PARCHER, YOU HAVE 15 MINUTES.

10                      **REBUTTAL ARGUMENT**

11           **MR. PARCHER:** YES, SIR.

12           ALL RIGHT. LET'S GO. THIS IS MY LAST CHANCE TO

13 SPEAK UP FOR THE GUYS, FOR THE PLAINTIFFS.

14           LOOK, IN NO PARTICULAR ORDER -- MY COLLEAGUE IS

15 TALKING TO ME TO TELL ME TO SPEAK SLOWLY, EVEN THOUGH I'M IN A

16 HURRY. LET ME JUST GO WITH THIS.

17           YOU KNOW, YOU SAW MR. KESSLER FLASH UP ON THE BOARD

18 THAT CLAUSE OF THE PA/PI AGREEMENT BETWEEN MR. UPSHAW AND

19 MR. ALLEN AND MR. UPSHAW AND MR. ALLEN AND RATIFIED BY THE

20 ACTIVE PLAYERS, IN WHICH IT SAID THE RETIRED PLAYERS DON'T GET

21 ANYTHING.

22           ASIDE FROM THE FACT THAT IT'S AN OUTRAGE, IF IT

23 APPLIES, THAT'S NOT THE GLA. WE DIDN'T SIGN A PA/PI AGREEMENT.

24 2100 GUYS DIDN'T SIGN A PA/PI AGREEMENT. NOBODY ELSE US ABOUT,

25 DID EXCUSE PLEASE, PLAINTIFFS ABOUT WHAT'S IN AN PA/PI

1   AGREEMENT.

2          YOU CAN'T WRITE PEOPLE OUT OF YOUR LITTLE PA/PI

3   AGREEMENT THAT'S BETWEEN ALL OF YOU AND YOUR SECRET CLUB.  THIS

4   IS WHAT COUNTS (INDICATING).

5          JUDGE ALSUP IS GOING TO TELL YOU LOTS OF STUFF.  I'M

6   NOT GOING TO PRETEND TO TELL YOU WHAT JUDGE ALSUP IS GOING TO

7   TELL YOU.  BUT IT'S THE GLA.  IT'S THE GLA.  IT'S THE GLA.

8          DOUBLE-TALK.  THE NERVE OF THE MAN.  THE HALL OF

9   FAME, WELL, HE SAYS THE HALL OF FAME IS NOT REALLY A GLA

10  AGREEMENT, SO IT'S GOT NOTHING TO DO WITH THIS CASE.

11         READ THE HALL OF FAME AGREEMENT.  THEY STABBED THE

12  STAR PLAYERS IN THE BACK.  THAT'S WHO THESE PEOPLE ARE.  WHAT

13  DOES HE MEAN IT HAS NOTHING TO DO WITH IT?

14         IT DOESN'T COUNT.  I STAB PEOPLE IN THE BACK, BUT IT

15  DOESN'T COUNT BECAUSE IT'S NOT A GLA.

16         LASHUN LAWSON WAS PROTECTING, DID YOU HEAR?  LASHUN

17  LAWSON WAS PROTECTING THE RETIRED PLAYERS.  PROTECTING THEIR

18  IDENTITIES BY MAKING SURE THAT THEY DIDN'T GET A SHARE OF

19  $25 MILLION FOR THREE YEARS IN A ROW.  LASHUN LAWSON WAS

20  PROTECTING THEM.

21         MAN ALIVE, WITH FRIENDS LIKE THAT, I DON'T WANT

22  ENEMIES.  I DON'T WANT ENEMIES.

23         WHAT ARE WE TALKING ABOUT?  I FEEL LIKE I'M IN THE

24  TWILIGHT ZONE.

25         TAKE TWO WANTED 200 SOME ODD RETIRED GUYS.  THEY

1   DROVE THEM OUT OF BUSINESS.

2           ELIGIBLE, WHICH IS THE KEY WORD.  NOBODY IS WALKING

3   AWAY FROM THE GROUP LICENSING AGREEMENT LANGUAGE THAT

4   MR. KESSLER TALKED TO YOU.  WHAT IS A GROUP LICENSING

5   AGREEMENT?

6           A GROUP LICENSING AGREEMENT IS "SIX OR MORE CURRENT

7   OR ACTIVES."  OR ACTIVES.  OR ACTIVES OR CURRENTS.  OR CURRENTS

8   OR RETIREDS.  EXCUSE ME.

9           AND IF IT'S LICENSE, IF IT'S LICENSE, THAT'S A GLA

10  AGREEMENT.  I -- LOOK.  I'M RELYING ON YOU.  I'M RELYING ON

11  YOU.

12          THE IDEA THAT YOU COULD STAB US IN THE BACK, AND THEN

13  SAY IT'S NOT DESPICABLE, IT'S NOT DISGRACEFUL.

14          THE IDEA THAT YOU GOT AN OPPORTUNITY TO ISSUE A

15  LICENSE THAT INCLUDES ALL ACTIVES AND ALL RETIREDS, WHICH IS

16  YOUR MANDATE.  THAT'S WHAT THE GROUP LICENSING AGREEMENT IS.

17  AND THAT YOU WOULD TURN AROUND AND SAY:

18          "IT'S JUST AN ACTIVE AGREEMENT.  IT'S JUST ACTIVE

19  MONEY," FIRST OF ALL, IT'S NOT THE CONTRACT, WHICH IS WHAT

20  YOU'RE SUPPOSED TO DECIDE ON.

21          BUT SECOND OF ALL, IT'S THE RANKEST OF CONFLICT OF

22  INTEREST.

23          "I'LL PROTECT YOU, BUT I WON'T PROTECT YOU.

24  I'LL PROTECT YOU, BUT I WON'T PROTECT YOU."

25          AND, ALSO, DO YOU KNOW?  YOU KNOW, WHO ARE YOU

1  PROTECTING?  YOU'RE PROTECTING THE GUYS WHO VOTE.  YOU'RE

2  PROTECTING THE GUYS WHO MAKE MILLIONS OF DOLLARS, YOU KNOW.

3         BUT THE LITTLE PEOPLE?  WE DON'T PROTECT YOU.  WHAT

4  WE TO DO WITH YOU IS WE TURN OUR BACK ON YOU AND MAKE BELIEVE,

5  AND MAKE BELIEVE THAT WE CARE.  MAKE BELIEVE THAT WE'RE YOUR

6  REPRESENTATIVES.

7         THEY'RE NOT OUR AGENT?  WHAT DO YOU CALL IT WHEN

8  SOMEBODY SAYS:

9         "GIVE ME YOUR LICENSING RIGHTS, YOUR NAME AND

10 LICENSING RIGHTS.  GIVE ME YOUR IDENTITY RIGHTS, AND I'LL DO MY

11 BEST TO MARKET IT."

12        WHAT DO YOU CALL THAT PERSON, BUT YOUR AGENT?

13        AND HOW WOULD I EXPLAIN THE FACT THAT MR. LINZNER,

14 MR. LINZNER HIMSELF TESTIFIED THAT THEY WENT TO HIM AND TOLD

15 HIM THAT THEY WERE THE AGENTS.

16        HONESTLY, HONESTLY, MAYBE IT'S BECAUSE OF TIME.  I

17 DON'T KNOW.  I DON'T KNOW.  I DON'T KNOW WHERE TO BEGIN.

18        THEY MAKE A BIG THING OF NO COMPLAINTS.

19        YOU KNOW, FOR ME, I CAN ONLY PICTURE THE NFLPA THE

20 WAY I COULD PICTURE MY FATHER OR MY GRANDFATHER.  I DON'T HAVE

21 A LAWYER.  I DON'T HAVE A NEGOTIATOR.  I DON'T HAVE SOMEBODY

22 EXPLAINING THE DOCUMENT TO ME.

23        I'M ASKED TO GIVE AWAY MY IDENTITY RIGHTS.  I GIVE

24 YOU MY IDENTITY RIGHTS.  I BELIEVE YOU.  I TRUST YOU.  I

25 BELIEVE YOU'RE ON MY SIDE.  I BELIEVE YOU'LL SEND ME A CHECK

1  WHEN I'M ENTITLED TO IT.

2          I'M NOT REALLY SURE WHAT THE AGREEMENT MEANS.  I

3  DIDN'T GO TO LAW SCHOOL.  I'M NOT A SCHOLAR.  I'M TRUSTING YOU

4  GUYS.

5          IF YOU WANT TO GIVE ME MY MONEY WHEN I'M ENTITLED TO

6  IT, THANK YOU.  HOWEVER, IF YOU DON'T GIVE ME MY MONEY, MAYBE

7  IT DOES TAKE A LAWYER.  MAYBE EVENTUALLY YOU DO GO TO A LAWYER,

8  FINALLY, AND SAY:

9          "SOMETHING'S WRONG HERE."

10          WHAT'S WRONG WITH THAT?  LOOK, YOU DON'T HAVE TO LOVE

11  ME, BUT IT'S NOT A DIRTY WORD.  "LAWYER" IS NOT A DIRTY WORD.

12  PEOPLE WHO ARE DISENFRANCHISED, WHO HAVE BEEN BETRAYED, WHO

13  HAVE BEEN IGNORED, WHO HAVE BEEN DEMEANED WHO HAVE BEEN CALLED

14  "WORTHLESS," WHO HAVE BEEN CALLED "DOG FOOD."

15          MR. KESSLER HAS THE TEMERITY TO GET UP HERE AND

16  JUSTIFY THE USE OF THE WORD "DOG FOOD."  MAN'S FROM THE SOUTH.

17  OH, I GET IT.  IF YOU'RE A SOUTHERNER IT'S OKAY TO CALL PEOPLE

18  "DOG FOOD."

19          I DON'T THINK SO.  THOSE PEOPLE ARE ENTITLED TO A

20  LAWYER.  AND, GUESS WHAT?  LAWYERS LOOK AT AN AGREEMENT, AND

21  LAWYERS POINTS OUT WHAT YOUR RIGHTS ARE AND WHAT YOUR RIGHTS

22  AREN'T.

23          AND THEN, IT BEGINS.  AND THEN, IT BEGINS.  AND WHAT

24  HE DOESN'T LIKE IS THESE PEOPLE DIDN'T LIE DOWN.  THEY DIDN'T

25  LIE DOWN LIKE DOGS.  THEY CAME HERE.

1          THEY CAME HERE TO TESTIFY, AND TO THEIR BEST.

2          YOU KNOW, TRACE ARMSTRONG, I SAY HE'S A HOLLYWOOD

3    GUY.  MAYBE THAT'S A GOOD THING.  MAYBE YOU LOVE HOLLYWOOD

4    GUYS, YOU KNOW.

5          I DON'T THINK HE'S PART OF ANY CONSPIRACY.  I THINK

6    IT'S A LITTLE -- PICK YOUR WORD.  THE MAN COMES, AND HE GETS TO

7    MENTION THAT HE'S NOT JUST A, YOU KNOW, SWEET OBJECTOR,

8    SIX-TEN, 240-POUND GUY.  BUT HE'S RUNNING AS PRESIDENT FOR THE

9    UNION.  I THINK THAT'S A LITTLE DISINGENUOUS.

10         I THINK IT'S ALL PART OF THE SAME THING THAT THEY DO

11   HERE ALL ALONG.  BUT HE'S NOT A CONSPIRACY GUY.

12         WHAT HE IS IS A GUY WHO NEVER WAS TOLD -- HE SAID IT

13   HIMSELF ON CROSS EXAMINATION.  HE NEVER WAS EVER TOLD THAT

14   MAYBE OUR GUYS HAD RIGHTS UNDER THE GLA.

15         AND, BY THE WAY, IF HE WAS, HE MIGHT HAVE BEEN PRETTY

16   UPSET AT MR. UPSHAW AND MR. ALLEN.

17         AND, BY THE WAY, IT WAS AT THE TIME IN HIS

18   SELF-INTEREST, NOT TO MAKE A FUSS ABOUT ANY OF THAT.  BECAUSE

19   IF YOU MAKE A FUSS ABOUT ANY OF THAT, THE MONEY IS GOING TO BE

20   SHARED.  AND NOBODY WANTED TO SHARE THE MONEY.  NOBODY WANTED

21   TO SHARE THE MONEY.

22         YOU KNOW, THERE'S A CHANGED GLA.  I DON'T KNOW IF WE

23   HAVE TIME TO GET IT ON THE BOARD.  IF WE DO, WE DO.  IF WE

24   DON'T, WE DON'T.

25         THE CHANGED GLA REMOVES THE LANGUAGE ABOUT ELIGIBLE

1  NFLPA MEMBERS, THAT IT WILL BE DIVIDED AMONG ELIGIBLE NFLPA

2  MEMBERS.  AND IT SAYS:

3          "THE MONEY WILL BE DISPENSED PURSUANT TO THE

4  OBJECTIVES OF THE UNION."

5          THE REASON THEY MADE THAT CHANGE WAS AFTER THE

6  $25 MILLION STARTED TO COME IN, WHERE THEY DIDN'T WANT IT TO

7  CONTINUE.  IF THEY DIDN'T GET CAUGHT IN WHAT THEY WERE DOING,

8  THEY DIDN'T WANT TO MAKE THE SWITCH EVER AGAIN.

9          AND SO THEY VIRTUALLY WROTE THE RETIRED PLAYERS OUT

10 OF GETTING MONEY IN THE REVISED GLA AGREEMENT.  BUT WE'RE NOT

11 SUING UNDER THE REVISED GLA AGREEMENT.

12         WE'RE SUING ON THE AGREEMENT THAT WAS IN EFFECT IN

13 2004, 2005, 2006, 2007, WHEN IT SAID:  "DIVIDE IT WITH THE

14 ELIGIBLE NFLPA MEMBERS," WHICH WOULD ONLY MEAN THE ACTIVE

15 MEMBERS.  THERE'S NO POSSIBILITY, NONE, THAT IT COULD HAVE BEEN

16 TO ANYBODY ELSE.

17         ONE, IT'S IN THE MINUTES, WHICH MR. KESSLER HAS PUT

18 ON THE BOARD.

19         TWO, THERE WAS TESTIMONY THAT MANY OF THE RETIRED

20 GLA'S WERE NOT MEMBERS OF THE NFLPA THAT WOULD WIPE THEM OUT

21 COMPLETELY.

22         AND, THREE, IF THAT'S WHAT IT MEANT, THEN ANY ACTIVE

23 THAT WAS IN THE DEAL -- SAY IT WAS 1800 ACTIVE AND 2100

24 RETIREDS DID SOME DEAL, NONE OF THE ACTIVES COULD GET ANY MONEY

25 BECAUSE YOU WOULD HAVE TO READ THE "ELIGIBLE" TO BE THE

1  RETIREDS.  THE RETIRED SHARING WITH THE -- WITH THE ELIGIBLE,

2  MEANING RETIREDS.

3          IT'S JUST -- IT'S THE TWILIGHT ZONE.  IT'S THE

4  TWILIGHT ZONE.  AND WHAT MR. KESSLER IS HOPING, YOU KNOW, IS

5  THAT SOMEHOW NOBODY IS GOING TO LIKE TAKE FIVE MINUTES TO THINK

6  ABOUT IT.

7          AND SO HE SAYS, YOU KNOW, "PARCHER IS HYSTERICAL" OR

8  WHATEVER HE IS SAYING.  I DON'T KNOW, WAVING HIS ARMS AROUND OR

9  SOMETHING LIKE THAT.

10         YOU SEE HOW IT WOULD FEEL, GOD FORBID -- NOT YOU, I

11 SHOULDN'T SAY IT, YOU KNOW?

12         THINK ABOUT HOW A PERSON FEELS WHO'S IN A FAMILY AND

13 TRUSTS SOMEBODY, TRUSTS A FAMILY MEMBER, TRUSTS A FAMILY UNIT

14 WHICH I THINK EVERYBODY -- I THINK EVERYBODY -- NOT BEING

15 PRESUMPTUOUS, HAS A RIGHT TO HONOR, YOU KNOW.  AND THEN, FIND

16 OUT THAT THE MAIN PERSONS IN THE FAMILY UNIT, WHICH IS UPSHAW

17 AND ALLEN, NOT MR. GOICH, NOT MR. LINZNER, NOT TRACE ARMSTRONG.

18 EVERYBODY'S NOT IN THE CONSPIRACY.  SOME OF THESE PEOPLE CAME

19 HERE IN THEIR GOOD WILL TO DO THEIR BEST.

20         I THINK MR. LINZNER WAS IN THEIR POCKET.  I DO.  YOU

21 KNOW, YOU DON'T HAVE TO IF YOU DON'T WANT TO.  THAT'S OKAY WITH

22 ME.

23         BUT HOW DOES IT FEEL, YOU KNOW, IF YOU'RE THE -- IF

24 YOU'RE -- WELL, MAYBE IF YOU WERE THE OLDER PERSON, IS WHAT I

25 WANT TO SAY.  YOU'RE THE RETIRED PERSON.  YOU'RE THE ONE WHO

1    MAYBE BUILT THE GAME, YOU KNOW.

2            BUT YOU DON'T HAVE THAT INDIVIDUAL TALENT, YOU KNOW?

3    COLLECTIVELY, YOU'VE GOT SOMETHING.  AND YOU GIVE IT YOUR BEST.

4    AND YOU GIVE IT WHAT YOU'RE ASKED FOR, YOU KNOW, WHICH IS YOUR

5    IDENTITY.

6            AND THEN, THEY MASSACRE YOU.  COME ON.  NOBODY'S

7    SAYING COERCE MR. LINZNER, PUT A GUN TO HIS HEAD AND SAY:

8                "YOU'VE GOT TO TAKE THE RETIREDS."

9            YOU KNOW, NOBODY IS SAYING THAT, YOU KNOW.

10           WHY DIDN'T THEY JUST HAND IT OVER IN THE BEGINNING?

11               "WE REPRESENT -- MR. LINZNER, WE REPRESENT 1800

12   ACTIVE PEOPLE, 2100 RETIRED PEOPLE.  HERE'S YOUR LICENSE.

13   HERE'S YOUR LICENSE FOR $25 MILLION."

14           HE SAYS:

15               "WELL, THAT WOULD BE FOR FREE, BECAUSE THE

16   ACTIVES DROVE THE ENGINE."  DO YOU KNOW?

17           WELL, THE FACT IS:  THAT'S THE DEAL HE MADE TO GET

18   THESE GUYS TO SIGN, MR. ALLEN DID.

19           BUT, SECONDLY, IF IT HAD BEEN THE REVERSE, IF THE

20   WORLD TURNED AROUND AND SUDDENLY THERE WAS A RETIRED PLAYERS'

21   GAME THAT MADE TRILLIONS, THE ACTIVES WOULD BE ENTITLED TO A

22   SHARE, WOULDN'T IT?

23           THIS PRESUMPTION THAT THEY ARE WORTHLESS, NO AGENT

24   HAS REALLY GOTTEN IN THERE AND TRIED.

25           I MEAN, THE NERVE.  I SHOULDN'T SAY THAT.  THAT'S

1    LIKE A PERSONAL ATTACK.  I ALWAYS DO THAT, YOU KNOW?

2            COME ON.  "TOO TALL" JONES, TONY DORSETT, YOU KNOW,

3    THAT'S YOUR MARKETING PLAN?  THAT'S YOUR MARKETING PLAN AS YOU

4    MARCH OUT TO FIGHT FOR THESE GUYS?  IT'S REALLY -- IT'S

5    REALLY -- IT IS SO HURTFUL.  IT IS SO HURTFUL TO THINK -- TO

6    THINK -- YOU KNOW, THIS IS A BEAUTIFUL MAN.

7            THIS IS A BEAUTIFUL MAN THAT SPEAKS FOR THE CLASS, DO

8    YOU KNOW?  RIGHT?

9            TALK ABOUT A PROUD ATHLETE.  THEY ARE ALL PROUD

10   ATHLETES, WHETHER THEY WERE CONFUSED OR THEY WEREN'T CONFUSED.

11           AND TO TRUST, YOU KNOW, AND THEN BE TREATED THIS WAY,

12   AND THEN RIDICULED.  THAT'S NOT RIGHT.  I MEAN, THAT'S NOT

13   RIGHT.  IT REALLY ISN'T RIGHT.

14           SO GO TO THE GLA.  PLEASE, GO TO THE GLA.  JUST GO TO

15   IT.

16           HE SAYS:

17               "THERE'S NO EVIDENCE.  IT'S JUST PETER PARCHER

18   TALKING."

19           THE GLA IS THE EVIDENCE IN THE CASE.  THE REST OF THE

20   EVIDENCE IS THE EVIDENCE OF BAD DEEDS ON THEIR PART.

21   OUTRAGEOUS ACTIONS ON THEIR PART.

22           BUT THE GLA IS THE EVIDENCE IN THE CASE.  THERE'S NO

23   AMBIGUITY IN THE GLA.  NONE WHATSOEVER.

24           AND IF THEY HADN'T HAD 2100 GUYS SIGN THE GLA, OR

25   OVER 3,000, THEY SAID AT THE BEGINNING, IF THEY HADN'T HAD THAT

1  THEY COULDN'T HAVE BUILT THEIR ONE-STOP SHOP.

2          ONCE YOU GOT IT IN THE MINDS OF THE PUBLIC THAT

3  YOU'RE THE ONLY GAME IN TOWN, ONCE YOU GOT IT IN YOUR MIND THAT

4  YOU'RE THE ONLY GAME IN TOWN, IT'S OVER.  EVERYBODY'S COMING TO

5  YOU.  YOU KNOW?

6          AND, YET, THEY KEPT ON.  THERE'S A GROUP LICENSING

7  HEADLINE IN THE 2004 TOUCHBACK.  FOR THE LIFE OF ME, TO THIS

8  MINUTE, IT CONTINUES TO PUZZLE ME.

9          THE HEADLINE SAYS -- TAKE IT INTO THE ROOM WITH YOU.

10  IT'S THE ONLY TOUCHBACK IN THE THING -- "GROUP LICENSING IS

11  ESSENTIAL."

12          AND IF YOU READ FURTHER DOWN, THE SAME THING WHERE,

13  IF YOU READ IT, WHICH MOST OF THESE GUYS DON'T READ IT.  IS

14  THAT HOW YOU ADVISE PEOPLE THEIR RIGHTS?  YOU SEND THEM OUT A

15  TOUCHBACK MAGAZINE?

16          BUT IF YOU READ IT, YOU KNOW, YOU WOULD SEE THAT IN

17  THAT DOCUMENT, THE SAME DOCUMENT WHERE THEY SAY WE HAVEN'T BEEN

18  DOING SO GOOD IN LICENSING RETIRED PEOPLE, THEY TELL YOU THAT

19  IT'S ESSENTIAL THAT YOU KEEP SIGNING IT.

20          WHY IS IT ESSENTIAL, IF NOT TO MAINTAIN THIS IMAGE

21  THAT YOU'RE A POWER STRUCTURE?

22          AND BY THE WAY, THEY DIDN'T PUT INTO TOUCHBACK, THAT

23  SAME TOUCHBACK, THEY DIDN'T PUT IN:

24          "HEY, THERE'S MADDEN."

25          MADDEN IS MADDENING.  I DON'T MEAN THAT.  I JUST MADE

1   THAT UP.  MADDEN IS MADDENING.

2          LOOK WHAT THEY DID. LOOK WHAT THEY DID.

3          YOU GET THE SAN FRANCISCO 49ERS ALL LINED UP.  ALL

4   YOU GOT TO SAY TO EA IS:

5               "IT'S IN THE LICENSE, 1 (A) AND 2, AND PARAGRAPH

6   13," OR "HERE IT IS, GUYS."

7          THIS IS THE GREATEST CHANCE IN THE WORLD FOR ME TO

8   TREAT MY PEOPLE EQUALLY.  RETIREDS AND ACTIVES EQUALLY.

9          HERE'S YOUR -- HERE IS YOUR GUYS.  HERE'S YOUR GUYS.

10  GIVE THEM A NAME.  THEY HAVE NAMES.  GIVE THEM A FACE.  THEY

11  HAVE FACES.  GIVE THEM A NUMBER.  THEY HAD NUMBERS.  THEY HAD

12  NUMBERS.

13         AND INSTEAD, LASHUN WRITES THAT LETTER.  SHE WRITES

14  THAT LETTER:  "KNOCK THESE GUYS OUT.  YOU MUST SCRAMBLE."

15         THEY DON'T PUT THAT INTO A TOUCHBACK.  THEY DON'T PUT

16  THAT INTO ANYTHING.  THEY COVERED IT UP.

17         **THE COURT:**  MR. PARCHER, TAKE TWO MORE MINUTES.  15

18  MINUTES IS UP.  TAKE TWO MORE MINUTES TO CLOSE.

19         **MR. PARCHER:**  THANK YOU.  THANK YOU VERY MUCH.

20         THE MINIMUM OF $29 MILLION, THE MINIMUM OF

21  $29 MILLION MAY SOUND LIKE A LOT OF MONEY.  IT'S SHARING

22  EQUALLY WITH THE ACTIVE PLAYERS.  IT COULD BE TAKEN OUT OF THE

23  $68 MILLION SLUSH FUND THAT THEY HAVE, WHICH WAS REALLY OUR

24  MONEY.

25         IT WOULD AMOUNT TO APPROXIMATELY -- I DON'T HAVE THE

1 MATH PERFECT.  IT WOULD AMOUNT TO ABOUT $15,000 A PLAYER, IF

2 YOU DIVIDE THE NUMBERS INTO 2100.

3          THAT'S NOT A LOT OF MONEY TO BE ASKING FOR HELPING TO

4 BUILD THE GAME, FOR HELPING YOU TO BECOME A ONE-STOP SHOP.

5          THAT'S NOT A LOT OF MONEY TO BE ASKING, IF THE

6 CONTRACT IS WHAT WE SAY IT IS.  AND I DEFY ANYBODY TO COME TO A

7 CONCLUSION THAT IT ISN'T "PRESENT OR FORMER," MEANS "PRESENT OR

8 FORMER," NOT ONLY 2,062 FORMER.  IT JUST DOESN'T.  IT JUST

9 DOESN'T.

10          I'LL SAY THIS IN CONCLUSION ABOUT PUNITIVE DAMAGES,

11 BECAUSE MR. KESSLER HAD SOME CONCERN ABOUT IT.

12          YOU KNOW, IN THE ORDINARY COURSE OF EVENTS YOU GET

13 YOUR CONTRACT MONEY.  PEOPLE ENTER INTO A CONTRACT, YOU'RE

14 DEALT WITH AT ARM'S LENGTH.  YOU COME INTO COURT. YOU HAVE AN

15 HONEST DISPUTE.  THE JURY AGREES WITH YOU.

16          OKAY.  YOU GET YOUR MONEY, WHICH IS THE 29 MILLION

17 WITH 32 MILLION IN INTEREST.  BECAUSE ALL MR. ROWLEY DID WAS

18 THE MATH.  THERE'S NOTHING COMPLICATED ABOUT IT.

19          YOU DIDN'T NEED MR. ROWLEY TO DO IT.  YOU COULD HAVE

20 DONE IT YOURSELF.

21          BUT WHEN SOMEBODY IS YOUR AGENT, WHEN SOMEBODY IS

22 YOUR REPRESENTATIVE, WHEN SOMEBODY PRETENDS TO BE YOUR FRIEND,

23 WHEN SOMEBODY PRETENDS TO BE YOUR FAMILY, WHEN SOMEBODY

24 PRETENDS, YOU KNOW, TO BE PAST, PRESENT AND FUTURE, TO BE YOUR

25 BROTHER, THERE'S NO WORSE PERSON THAN THAT.  THERE'S NO WORSE

1  PERSON THAN THAT, THAT KIND OF PERSON DESERVES TO BE CHARGED

2  MORE, TO SEND THEM A MESSAGE.

3         YOU GOT ALL THE POWER, BUT YOU DON'T STEP ON OTHER

4  PEOPLE.  YOU DON'T STEP ON THE NAMELESS FACES OF PEOPLE.

5         NUMBER ONE, LET ME BE CLEAR.  I'M ASKING YOU TO

6  ENFORCE THE AGREEMENT.  IF YOU DON'T AGREE ON THE AGREEMENT,

7  YOU DON'T AGREE.  I BELIEVE YOU WILL.

8         IF THE AGREEMENT IS CLEAR TO YOU WE'RE RIGHT, WE'RE

9  ENTITLED TO A MINIMUM OF THAT AMOUNT OF MONEY.  IF YOU AGREE

10 WITH ME THAT THERE WAS A LOT OF DIRTY TRICKS HERE, YOU KNOW,

11 AND THEY WERE CLEVER DIRTY TRICKS.  THEY WERE NOT EASILY

12 DISCOVERABLE DIRTY TRICKS, YOU KNOW.  THEN, YOU GOT TO PUNISH

13 THESE GUYS, OR AT LEAST YOU'VE GOT TO KEEP AN OPEN MIND ABOUT

14 THAT.

15        THE JUDGE CHARGES YOU.

16        I'VE GONE OVER TIME.  I'M NOT GOING TO SAY ANYTHING

17 MORE EXCEPT I FEEL GOOD I'VE SPOKEN MY PEACE.  THANK YOU.

18        THANK YOU FOR THE TIME, JUDGE.

19        **THE COURT:**  THANK YOU, MR. PARCHER.

20        MAY I HAVE THE ASSISTANCE OF COUNSEL TO TAKE DOWN ALL

21 THE POSTER BOARDS?

22        **MR. HUMMEL:**  YES, YOUR HONOR.

23        **THE COURT:**  I INVITE THE PUBLIC TO STAY DURING THE

24 READING OF THE INSTRUCTIONS, BUT I UNDERSTAND MANY OF YOU WOULD

25 LIKE TO LEAVE AT THIS TIME.

1        SO PLEASE GO AHEAD IF YOU WOULD LIKE, BEFORE WE GET

2   TO THE READING OF THE INSTRUCTIONS.

3        I HAVE ONE REQUEST DURING THE READING OF THE

4   INSTRUCTIONS -- I WANT TO DIRECT THIS TO COUNSEL -- WHEN WE GET

5   TO THE PARAGRAPH 28, WHICH HAPPENS TO DEAL WITH EXHIBIT 28, IT

6   WOULD BE USEFUL TO PUT UP ON THE SCREEN THAT EXHIBIT, THE

7   PORTIONS THAT ARE QUOTED IN THE INSTRUCTIONS.

8        CAN WE DO THAT?

9        **MR. KESSLER:**  NO OBJECTION.  OBJECTION YOU, YOUR

10  HONOR.

11       **THE COURT:**  MAY WE DO THAT, MR. KATZ?

12       **MR. KATZ:**  NO PROBLEM.

13       **THE COURT:**  WILL ONE OF THE ELECTRONICS PEOPLE BE IN

14  A POSITION TO DO THAT?

15       **MR. KESSLER:**  LAUREN WILL DO THAT, YOUR HONOR.

16       **THE COURT:**  ALL RIGHT.  LET ME GIVE THE JURY A

17  HEADS-UP.

18       THIS IS GOING TO BE THE LAW.  ALSO, IT COMES IN THREE

19  PARTS.  IT'S LIKE A SANDWICH:  THE MEAT OF THE INSTRUCTIONS ARE

20  IN THE MIDDLE.  BUT THERE'S SOME IMPORTANT PRELIMINARY

21  INSTRUCTIONS ABOUT EVALUATING WITNESS TESTIMONY, AND THEN

22  THERE'S SOME CONCLUDING INSTRUCTIONS ON YOUR DELIBERATIONS.

23       THIS IS GOING TO TAKE ABOUT 45 MINUTES.  AND YOU WILL

24  HAVE A COPY OF THESE IN THE JURY ROOM.  BUT THE TIME-HONORED

25  TRADITION OF OUR COURT SYSTEM, WHAT COUNTS IS WHAT I READ TO

1   YOU.

2          SO THIS IS THE OFFICIAL EVENT.  AND THE REASON THAT I

3   INVITED MEMBERS OF THE PUBLIC TO LEAVE IS THAT SOMETIMES PEOPLE

4   FIND THIS TO BE THE LEAST INTERESTING PART.  THE LAW IS VERY

5   IMPORTANT, OF COURSE.  BUT I DON'T WANT ANY DISTRACTIONS WHILE

6   YOU ARE LISTENING TO THE CHARGE.

7          IF DURING THE -- DURING THIS YOU GET THE URGE AND

8   HAVE TO USE THE FACILITY, JUST RAISE YOUR HAND, AND WE'LL TAKE

9   A BREAK.  BUT I'M GOING TO TRY TO GO ALL THE WAY THROUGH IT,

10  AND THEN YOU CAN GO TO DELIBERATE.  ALL RIGHT.

11         READY?

12         HERE WE GO.

13         MEMBERS OF THE JURY, IT IS MY DUTY TO INSTRUCT YOU ON

14  THE LAW THAT APPLIES TO THIS CASE.  COPIES OF THESE

15  INSTRUCTIONS WILL BE AVAILABLE IN THE JURY ROOM FOR YOU TO

16  CONSULT AS NECESSARY.

17         IT IS YOUR DUTY TO FIND THE FACTS FROM ALL THE

18  EVIDENCE PRESENTED IN THE CASE.  TO THOSE FACTS YOU MUST APPLY

19  THE LAW AS I GIVE IT TO YOU.

20         YOU MUST NOT BE INFLUENCED BY ANY PERSONAL LIKES OR

21  DISLIKES, OPINIONS, PREJUDICES OR SYMPATHY.  THAT MEANS YOU

22  MUST DECIDE THE CASE SOLELY ON THE EVIDENCE BEFORE YOU.

23         IN FOLLOWING MY INSTRUCTIONS, YOU MUST FOLLOW ALL OF

24  THEM, AND NOT SINGLE OUT SOME AND IGNORE OTHERS.  THEY ARE ALL

25  EQUALLY IMPORTANT.

1            YOU MUST NOT READ INTO THESE INSTRUCTIONS OR INTO

2   ANYTHING THE COURT MAY HAVE SAID OR DONE AS SUGGESTING WHAT

3   VERDICT YOU SHOULD RETURN.  THAT IS A MATTER ENTIRELY UP TO

4   YOU.

5            THE EVIDENCE FROM WHICH YOU ARE TO DECIDE WHAT THE

6   FACTS ARE CONSISTS OF:

7            ONE:  THE SWORN TESTIMONY OF WITNESSES ON BOTH DIRECT

8   AND CROSS EXAMINATION, REGARDLESS OF WHO CALLED THE WITNESS;

9            TWO:  THE EXHIBITS WHICH HAVE BEEN RECEIVED INTO

10  EVIDENCE;

11           THREE:  THE SWORN TESTIMONY OF WITNESSES IN

12  DEPOSITIONS READ INTO EVIDENCE;

13           AND, FOUR:  ANY FACTS TO WHICH ALL THE LAWYERS HAVE

14  STIPULATED HERE IN THE COURTROOM BEFORE YOU.

15           YOU MUST TREAT ANY STIPULATED FACTS AS HAVING BEEN

16  CONCLUSIVELY PROVEN.

17           IN REACHING YOUR VERDICT, YOU MAY CONSIDER ONLY THE

18  TESTIMONY AND EXHIBITS RECEIVED INTO EVIDENCE.  CERTAIN THINGS

19  ARE NOT EVIDENCE, AND YOU MAY NOT CONSIDER THEM IN DECIDING

20  WHAT THE FACTS ARE.  I WILL LIST THEM FOR YOU.

21           ONE:  ARGUMENTS AND STATEMENTS BY LAWYERS ARE NOT

22  EVIDENCE.  THE LAWYERS ARE NOT WITNESSES.  WHAT THEY HAVE SAID

23  IN THEIR OPENING STATEMENTS, CLOSING ARGUMENTS AND AT OTHER

24  TIMES IS INTENDED TO HELP YOU INTERPRET THE EVIDENCE, BUT IT IS

25  NOT EVIDENCE ITSELF.

1    IF THE FACTS AS YOU REMEMBER THEM DIFFER FROM THE WAY

2 THE LAWYERS HAVE STATED THEM, YOUR MEMORY OF THEM CONTROLS.

3    A SUGGESTION -- NUMBER TWO:  A SUGGESTION IN A

4 QUESTION BY COUNSEL OR THE COURT IS NOT EVIDENCE UNLESS IT IS

5 ADOPTED BY THE ANSWER.  A QUESTION BY ITSELF IS NOT EVIDENCE.

6 CONSIDER IT ONLY TO THE EXTENT IT IS ADOPTED BY THE ANSWER.

7    THREE:  OBJECTIONS BY LAWYERS ARE NOT EVIDENCE.

8    FOUR:  TESTIMONY OR EXHIBITS THAT ARE BEEN EXCLUDED

9 OR STRICKEN OR THAT YOU HAVE BEEN INSTRUCTED TO DISREGARD ARE

10 NOT EVIDENCE AND MUST NOT BE CONSIDERED.

11    FIVE:  ANYTHING YOU MAY HAVE SEEN OR HEARD WHEN THE

12 COURT WAS NOT IN SESSION IS NOT EVIDENCE.  YOU ARE TO DECIDE

13 THE CASE SOLELY ON THE EVIDENCE RECEIVED HERE AT THE TRIAL.

14    NOW, EVIDENCE MAY BE DIRECT OR CIRCUMSTANTIAL.

15 DIRECT EVIDENCE IS DIRECT PROOF OF A FACT, SUCH AS TESTIMONY BY

16 A WITNESS ABOUT WHAT THAT WITNESS PERSONALLY SAW OR HEARD OR

17 DID.  CIRCUMSTANTIAL EVIDENCE IS PROOF OF ONE OR MORE FACTS

18 FROM WHICH YOU COULD FIND ANOTHER FACT.  BY WAY OF EXAMPLE, IF

19 YOU WAKE UP IN THE MORNING AND SEE THAT THE SIDEWALK IS WET,

20 YOU MAY FIND FROM THAT FACT THAT IT RAINED DURING THE NIGHT.

21 HOWEVER, OTHER EVIDENCE, SUCH AS A TURNED-ON GARDEN HOSE, MIGHT

22 EXPLAIN THE PRESENCE OF WATER ON THE SIDEWALK.

23    THEREFORE, BEFORE YOU DECIDE THAT A FACT HAS BEEN

24 PROVEN BY CIRCUMSTANTIAL EVIDENCE, YOU MUST CONSIDER ALL OF THE

25 EVIDENCE IN LIGHT OF REASON, EXPERIENCE AND COMMON SENSE.

1          YOU SHOULD CONSIDER BOTH KINDS OF EVIDENCE.  IT IS

2    FOR YOU TO DECIDE HOW MUCH WEIGHT TO GIVE ANY EVIDENCE.

3          IN DECIDING THE FACTS IN THIS CASE, YOU MAY HAVE TO

4    DECIDE WHICH TESTIMONY TO BELIEVE AND WHICH TESTIMONY NOT TO

5    BELIEVE.  YOU MAY BELIEVE EVERYTHING A WITNESS SAYS OR PART OF

6    IT OR NONE OF IT.

7          IN CONSIDERING THE TESTIMONY OF ANY WITNESS YOU MAY

8    TAKE INTO ACCOUNT, FIRST:  THE OPPORTUNITY AND ABILITY OF THE

9    WITNESS TO SEE OR HEAR OR KNOW THE THINGS TESTIFIED TO;

10          SECOND:  THE WITNESSES MEMORY;

11          THIRD:  THE WITNESS'S MANNER WHILE TESTIFYING;

12          FOUR:  THE WITNESS'S INTEREST IN THE OUTCOME OF THE

13    CASE AND ANY BIAS OR PREJUDICE;

14          FIVE:  WHETHER OTHER EVIDENCE CONTRADICTED THE

15    WITNESS'S TESTIMONY;

16          SIX:  THE REASONABLENESS OF THE WITNESS'S TESTIMONY

17    IN LIGHT OF ALL OF THE EVIDENCE;

18          AND, SEVEN:  ANY OVER FACTORS THAT BEAR ON

19    BELIEVABILITY.

20          THE WEIGHT OF THE EVIDENCE AS TO A FACT DOES NOT

21    NECESSARILY DEPEND ON THE NUMBER OF WITNESSES WHO TESTIFY.  NOR

22    DOES IT DEPEND ON WHICH SIDE CALLED THE WITNESSES OR PRODUCED

23    EVIDENCE.

24          A WITNESS MAY BE DISCREDITED OR IMPEACHED BY

25    CONTRADICTORY EVIDENCE OR BY EVIDENCE THAT AT SOME OTHER TIME

1 THE WITNESS HAS SAID OR DONE SOMETHING OR FAILED TO SAY OR DO

2 SOMETHING THAT IS INCONSISTENT WITH THE WITNESS'S PRESENT

3 TESTIMONY.

4          IF YOU BELIEVE ANY WITNESS HAS BEEN IMPEACHED AND

5 THUS DISCREDITED, YOU MAY GIVE THE TESTIMONY OF THAT WITNESS

6 SUCH CREDIBILITY, IF ANY, YOU THINK IT DESERVES.  DISCREPANCIES

7 IN A WITNESS'S TESTIMONY OR BETWEEN A WITNESS'S TESTIMONY AND

8 THAT OF OTHER WITNESSES DO NOT NECESSARILY MEAN THAT SUCH A

9 WITNESS SHOULD BE DISCREDITED.

10          INABILITY TO RECALL IS COMMON.  INNOCENT

11 MISRECOLLECTION IS NOT UNCOMMON.  TWO PERSONS WITNESSING AN

12 INCIDENT OR A TRANSACTION SOMETIMES WILL SEE OR HEAR IT

13 DIFFERENTLY.

14          WHETHER A DISCREPANCY PERTAINS TO AN IMPORTANT MATTER

15 OR ONLY TO SOMETHING TRIVIAL SHOULD BE CONSIDERED BY YOU.

16          HOWEVER, A WITNESS WILLFULLY FALSE IN ONE PART OF HIS

17 OR HER TESTIMONY IS TO BE DISTRUSTED IN OTHERS.  YOU MAY REJECT

18 THE ENTIRE TESTIMONY OF A WITNESS WHO HAS WILLFULLY TESTIFIED

19 FALSELY ON A MATERIAL POINT, UNLESS FROM ALL THE EVIDENCE YOU

20 BELIEVE THAT THE PROBABILITY OF TRUTH FAVORS HIS OR HER

21 TESTIMONY IN OTHER PARTICULARS.

22          YOU HAVE HEARD TESTIMONY FROM WITNESSES REFERRED TO

23 AS "EXPERT WITNESSES."  THESE ARE PERSONS WHO, BECAUSE OF

24 EDUCATION OR EXPERIENCE, ARE PERMITTED TO STATE OPINIONS AND

25 THE REASONS FOR THEIR OPINIONS.

1       OPINION TESTIMONY SHOULD BE JUDGED JUST LIKE OTHER

2  TESTIMONY.  YOU MAY ACCEPT IT OR REJECT IT AND GIVE IT AS MUCH

3  WEIGHT AS YOU THINK IT DESERVES, CONSIDERING THE WITNESS'S

4  EDUCATION AND EXPERIENCE, THE REASONS GIVEN FOR THE OPINION,

5  AND ALL THE OTHER EVIDENCE IN THE CASE.

6       IF AN EXPERT WITNESS WAS NOT PRESENT AT THE EVENTS IN

7  QUESTION, HIS OR HER OPINION IS NECESSARILY BASED ON AN ASSUMED

8  SET OF CIRCUMSTANCES.  IN EVALUATING THE OPINION DURING THE

9  TRIAL YOU SHOULD TAKE INTO ACCOUNT THE EXTENT TO WHICH YOU DO

10  AGREE OR DO NOT AGREE WITH THE CIRCUMSTANCES ASSUMED BY THE

11  EXPERT WITNESS.

12       IN THESE INSTRUCTIONS, I WILL OFTEN REFER TO THE

13  BURDEN OF PROOF.  THE PRINCIPLE BURDEN OF PROOF IN THIS CASE

14  IS KNOWN AS PROOF -- BURDEN OF PROOF BY A PREPONDERANCE OF THE

15  EVIDENCE.  I'LL REPEAT THAT:  PREPONDERANCE OF THE EVIDENCE.

16       WHEN A PERSON HAS THE BURDEN OF PROOF ON ANY ISSUE BY

17  A PREPONDERANCE OF THE EVIDENCE, IT MEANS YOU MUST BE PERSUADED

18  BY THE EVIDENCE THAT THE ISSUE IS MORE PROBABLY TRUE THAN NOT

19  TRUE.

20       TO PUT IT DIFFERENTLY, IF YOU WERE TO PUT THE

21  EVIDENCE FAVORING PLAINTIFF AND THE EVIDENCE FAVORING DEFENDANT

22  ON OPPOSITE SIDES OF A SCALE, THE PARTY WITH THE BURDEN OF

23  PROOF ON THE ISSUE WOULD HAVE TO MAKE THE SCALE TIP SOMEWHAT

24  TOWARD ITS SIDE.  IF THE PARTY FAILS TO MEET THIS BURDEN, THEN,

25  THE PARTY WITH THE BURDEN OF PROOF LOSES ON THAT ISSUE.

1          PREPONDERANCE OF THE EVIDENCE BASICALLY MEANS "MORE

2   LIKELY THAN NOT."

3          NOW, PLAINTIFF HAS THE BURDEN OF PROOF ON ALL ISSUES

4   IN THIS CASE.  IF YOU FIND THAT PLAINTIFF CARRIED ITS BURDEN OF

5   PROOF ON -- AS TO AN ISSUE, YOUR VERDICT SHOULD BE FOR

6   PLAINTIFF ON THAT ISSUE.  IF YOU FIND THAT PLAINTIFF DID NOT

7   CARRY ITS BURDEN OF PROOF, YOU MUST FIND AGAINST PLAINTIFF ON

8   THAT ISSUE.

9          I WILL NOW TURN TO THE LAW THAT APPLIES TO THIS CASE.

10  SO NOW WE'RE AT THE MIDDLE PART OF THE INSTRUCTIONS.

11         I WILL NOW TURN TO THE LAW THAT APPLIES TO THIS CASE.

12  THIS IS A CLASS ACTION LAWSUIT.  A CLASS ACTION LAWSUIT IS ONE

13  WHERE THE PLAINTIFF IS ALLOWED TO BRING A CLAIM ON BEHALF OF A

14  LARGE GROUP WHO SHARE A COMMON INTEREST IN THE SAME ISSUE.

15         AS TO THE CLAIMS MADE IN THIS CASE, YOUR VERDICT WILL

16  GOVERN FOR THE ENTIRE CLASS.  THIS CLASS ACTION ARISES OUT OF A

17  FORM AGREEMENT BETWEEN VARIOUS INDIVIDUAL RETIRED PLAYERS AND

18  THE NATIONAL FOOTBALL LEAGUE PLAYERS ASSOCIATION, WHICH I WILL

19  REFER TO AS THE NFLPA.

20         THE FORM IS ENTITLED, QUOTE, "RETIRED PLAYER GROUP

21  LICENSING AUTHORIZATION FORM," CLOSED QUOTE.  I WILL REFER TO

22  IT AS THE "RPGLA."

23         MR. HERB ADDERLEY IS THE REPRESENTATIVE OF A CLASS OF

24  2,062 RETIRED NFL PLAYERS WHO, LIKE MR. ADDERLEY, SIGNED

25  RPGLA'S WITH THE NFLPA THAT WERE IN EFFECT BETWEEN FEBRUARY 14,

1  2004 TO FEBRUARY 14, 2007.

2            THE STARTING DATE WAS DETERMINED BY THE STATUTE OF

3  LIMITATIONS, NOT ON ANY CHANGE IN FORMAT OF THE RPGLA.

4            MR. ADDERLEY AND THE CLASS HE REPRESENTS ARE REFERRED

5  TO IN THESE INSTRUCTIONS AS "PLAINTIFF" OR THE "RPGLA CLASS

6  MEMBERS."

7            YOUR JOB IS TO DECIDE THE CLASS CLAIMS ASSERTED ON

8  BEHALF OF THE ENTIRE CLASS.  THERE IS NO CLAIM FOR ANY SUBSET

9  OF RETIRED PLAYERS ON ANY PARTICULAR DEAL OR ANY ISOLATED

10 EVIDENCE.  RATHER, SINCE THIS IS A CLASS ACTION, THE ONLY

11 CLAIMS FOR YOU TO DECIDE ARE CLAIMS COMMON TO THE ENTIRE CLASS.

12            UNDER THE RPGLA, THE RETIRED PLAYER AUTHORIZED THE

13 NFLPA AND PLAYERS INC TO USE AND TO LICENSE TO THIRD PARTIES

14 HIS NAME, IMAGE, VOICE, SIGNATURE, BIOGRAPHICAL INFORMATION IN

15 THE, QUOTE, "NFLPA RETIRED PLAYER GROUP LICENSING PROGRAM,"

16 CLOSED QUOTE.

17            ON BEHALF OF THE RPGLA CLASS, PLAINTIFF ASSERTS TWO

18 CLAIMS AGAINST DEFENDANTS:  ONE, BREACH OF THE RPGLA CONTRACT;

19 AND, TWO:  BREACH OF FIDUCIARY DUTY AS IT RELATES TO THE RPGLA.

20            ON THE OTHER HAND, DEFENDANTS CLAIM THERE WAS NO

21 BREACH OF CONTRACT OR BREACH OF ANY FIDUCIARY DUTY RELATING TO

22 THE RPGLA.

23            YOU MUST -- YOU MUST APPLY THE FOLLOWING INSTRUCTIONS

24 IN DECIDING WHETHER PLAINTIFF HAS PROVEN THESE CLAIMS:

25            ON THE BREACH OF CONTRACT CLAIM, PLAINTIFF HAS THE

1   BURDEN OF ESTABLISHING BY A PREPONDERANCE OF THE EVIDENCE THE

2   FOLLOWING:  FIRST, THAT MONIES WERE GENERATED BY DEFENDANTS'

3   LICENSING OF RIGHTS TO WHICH MONEY THE RPGLA CLASS WAS

4   ENTITLED.

5           LET REREPEAT THAT.  NUMBER ONE, THAT MONIES WERE

6   GENERATED BY DEFENDANTS' LICENSING OF RIGHTS TO WHICH MONEY THE

7   RPGLA CLASS WAS ENTITLED.

8           AND, NUMBER TWO, THAT AT LEAST SOME OF ANY SUCH MONEY

9   WAS NOT PAID TO THE RPGLA CLASS PURSUANT TO THE RPGLA.

10          NOW, THIS CASE INVOLVES MANY CONTRACTS, SOME OF WHICH

11  WERE LICENSE AGREEMENTS.  WITH RESPECT TO THE LICENSE

12  AGREEMENTS, I WANT TO EXPLAIN THREE DIFFERENT LEVELS THAT I

13  WILL IDENTIFY FOR YOU.

14          ONE IS THE RPGLA BETWEEN AN INDIVIDUAL PLAYER AND

15  DEFENDANTS, LIKE THE ONE MR. ADDERLEY SIGNED.

16          A SECOND ARE THE SO-CALLED "AD HOC" AGREEMENTS. THESE

17  WERE LICENSES BETWEEN INDIVIDUAL PLAYERS AND A THIRD PARTY LIKE

18  EA AND DEFENDANTS.  UNDER THESE AGREEMENTS CERTAIN RETIRED

19  PLAYERS RECEIVED MONEY, 7 MILLION OF WHICH WENT TO CLASS

20  MEMBERS.  NO ONE IN THIS CASE IS SUING TO RECOVER ANY OF THAT

21  MONEY.  THAT IS, NO ONE CONTENDS THAT ANY OF THE AD HOC LICENSE

22  REVENUE SHOULD BE REDISTRIBUTED TO ALL CLASS MEMBERS UNDER THE

23  RPGLA OR THAT THE AD HOC AGREEMENTS TRIGGERED ANY RIGHTS UNDER

24  THE RPGLA.

25          RATHER, THE CLASS OF RETIRED PLAYERS IS CONTENDING

1  THAT THEY SHOULD HAVE RECEIVED SOME OF THE THIRD-PARTY

2  LICENSING REVENUE CLAIMED BY DEFENDANTS TO HAVE BEEN FOR ACTIVE

3  PLAYERS ONLY.

4          THAT LEADS TO THE THIRD LEVEL OF LICENSES.  THE THIRD

5  LEVEL ARE THE THIRD-PARTY LICENSES.  THESE ARE THE LICENSES

6  BETWEEN DEFENDANTS AND THIRD-PARTY MAKERS OR VENDORS OF PLAYER

7  CARDS, VIDEO GAMES AND OTHER FOOTBALL PRODUCTS.

8          THE INDIVIDUAL PLAYERS WERE NOT PARTIES TO THESE

9  THIRD-PARTY LICENSES, FOR THESE AGREEMENTS WERE BETWEEN

10 DEFENDANTS AND VARIOUS THIRD PARTIES, LIKE ELECTRONIC ARTS.

11         I WILL REFER TO THESE AS "THIRD-PARTY LICENSES."

12 THERE ARE ABOUT 95 OF THEM IN EVIDENCE.  A BASIC QUESTION YOU

13 WILL NEED TO CONSIDER IS THE EXTENT TO WHICH, IF AT ALL,

14 REVENUES FLOWING OUT OF THE THIRD LEVEL OF LICENSES WERE

15 REQUIRED TO HAVE BEEN PAID TO CLASS MEMBERS UNDER THE RPGLA.

16         THIS IS THE REVENUE THAT WENT INTO THE GLR OR GROSS

17 LICENSING REVENUE POOL, WHICH DEFENDANTS CLAIM WAS ACTIVE

18 PLAYER MONEY, BUT WHICH PLAINTIFF ASSERTS SHOULD HAVE BEEN

19 SHARED WITH CLASS MEMBERS PURSUANT TO THE RPGLA.

20         YOUR RESOLUTION OF THIS QUESTION WILL INVOLVE YOUR

21 INTERPRETATION OF THE RELEVANT AGREEMENTS.

22         IN THIS CONNECTION, THE RPGLA STATED THAT, QUOTE,

23 "THE MONIES GENERATED BY SUCH LICENSING OF RETIRED PLAYER GROUP

24 RIGHTS WILL BE DIVIDED BETWEEN THE PLAYER AND AN ESCROW ACCOUNT

25 FOR ALL ELIGIBLE NFLPA MEMBERS WHO HAVE SIGNED A GROUP

1  LICENSING AUTHORIZATION FORM," CLOSED QUOTE.

2          YOU HAVE HEARD EVIDENCE THAT LITTLE OR NO MONEY WAS

3  EVER PAID TO ANY RETIRED PLAYER PURSUANT TO AN RPGLA, AND THAT

4  NO SUCH ESCROW ACCOUNT WAS EVER ESTABLISHED.  TO THIS

5  DEFENDANTS RESPOND THAT LITTLE OR NO MONEY WAS EVER GENERATED

6  OR DUE WITHIN THE MEANING OF THE RPGLA AND, THEREFORE, THERE

7  WAS NOTHING OR VERY LITTLE TO PUT INTO ESCROW.

8          BY CONTRAST, PLAINTIFF CONTENDS THAT LARGE SUMS OF

9  MONIES WERE, IN FACT, GENERATED BY THIRD-PARTY LICENSES AND PUT

10 INTO THE GLR, BUT WERE NOT SHARED WITH RETIRED PLAYERS UNDER

11 THE RPGLA AND INSTEAD WERE SPLIT ONLY BETWEEN ACTIVE PLAYERS

12 AND DEFENDANTS.

13         AGAIN, THE PLAINTIFF CLASS SEEKS TO SHARE IN THE

14 GROUP LICENSING REVENUES THAT DEFENDANTS CLAIM WAS DUE ONLY TO

15 ACTIVE PLAYERS.

16         WHETHER ANY SUCH MONEY WAS DUE TO THE CLASS UNDER THE

17 RPGLA DEPENDS ON THE COVERAGE OF THE RPGLA, AS WELL AS POSSIBLY

18 THE COVERAGE OF THE THIRD-PARTY LICENSES, QUESTIONS OF COVERAGE

19 FOR THE JURY.

20         PLAINTIFF HAS THE BURDEN TO PROVE LIABILITY ON THE

21 CLAIM, AND IT MUST DO SO BY A PREPONDERANCE OF THE EVIDENCE.

22         SO I WILL NOW GIVE YOU THE RULES THAT YOU MUST FOLLOW

23 IN INTERPRETING THE VARIOUS CONTRACTS AT ISSUE.

24         INTERPRETATION OF A CONTRACT IS A DETERMINATION OF

25 THE REASONABLE AND MUTUAL EXPECTATIONS OF THE PARTIES TO A

1  CONTRACT, TAKING INTO ACCOUNT THE WORDS AND PHRASES USED AND

2  THE CIRCUMSTANCES SURROUNDING THE FORMATION OF THE CONTRACT.

3          YOU SHOULD START WITH THE WORDS ACTUALLY USED.  THE

4  EXPRESS WRITTEN LANGUAGE OF A CONTRACT IS THE PRIMARY REFERENCE

5  YOU SHOULD CONSULT WHEN INTERPRETING THE MEANING OF THE

6  CONTRACT.

7          THAT IS BECAUSE THE WHOLE POINT OF YOUR WRITTEN

8  CONTRACT IS TO REDUCE THE AGREEMENT TO WRITING.  AND THE ONLY

9  WAY TO DO SO IS THROUGH WORDS AND PHRASES.  WORDS AND PHRASES

10  USED BY THE PARTIES IN A CONTRACT SHOULD BE GIVEN THEIR USUAL

11  AND ORDINARY MEANING UNLESS IT IS PROVEN THAT THEY HAD A

12  SPECIAL MEANING ACCEPTED BY THOSE IN THE BUSINESS INVOLVED,

13  HERE PROFESSIONAL FOOTBALL, OR WERE DEFINED IN THE CONTRACT

14  ITSELF TO MEAN SOMETHING SPECIAL.

15          SOMETIMES, HOWEVER, WORDS AND PHRASES AS USED IN A

16  CONTRACT ARE SUBJECT TO TWO OR MORE POSSIBLE MEANINGS.  THIS IS

17  CALLED "AMBIGUITY."

18          TO RESOLVE SUCH AMBIGUITIES THE LAW HAS DEVELOPED

19  FURTHER GUIDELINES FOR CONTRACT INTERPRETATION THAT I WILL NOW

20  DISCUSS.

21          IN DETERMINING THE REASONABLE AND MUTUAL EXPECTATIONS

22  OF THE PARTIES TO THE CONTRACT IT, YOU SHOULD ALSO CONSIDER THE

23  RELEVANT FACTS AND CIRCUMSTANCES KNOWN TO THE PARTIES AT THE

24  TIME OF MAKING THE AGREEMENT AND EVALUATE HOW THOSE SURROUNDING

25  CIRCUMSTANCES INFORMED THE MUTUAL AND REASONABLE EXPECTATIONS

1  OF THE PARTIES CONCERNING THE AGREEMENT.

2         YOU MAY CONSIDER THE CIRCUMSTANCES THAT EXISTED AT

3  THE TIME THE CONTRACT WAS MADE, INCLUDING THE APPARENT PURPOSE

4  OF THE PARTIES IN ENTERING INTO THE CONTRACT, THE HISTORY OF

5  NEGOTIATIONS LEADING UP TO THE CONTRACT, AND ANY STATEMENTS OF

6  THE PARTIES ABOUT THEIR UNDERSTANDING OF THE CONTRACT AT THE

7  TIME THE CONTRACT WAS ENTERED INTO.

8         FACTS AND CIRCUMSTANCES KNOWN TO BOTH SIDES OF A

9  CONTRACT ARE ENTITLED TO MORE WEIGHT THAN FACTS AND

10 CIRCUMSTANCES KNOWN ONLY TO ONE SIDE OF THE CONTRACT.  THAT IS

11 BECAUSE OUR GOAL IS TO DETERMINE THE MUTUAL INTENT AND

12 EXPECTATION OF BOTH SIDES.

13        IN DETERMINING THE REASONABLE AND MUTUAL EXPECTATIONS

14 OF THE PARTIES TO A CONTRACT, YOU MAY ALSO CONSIDER THE CONDUCT

15 OF THE PARTIES IN CARRYING OUT THE CONTRACT BEFORE ANY

16 CONTROVERSY AROSE.  THAT IS, HOW THE PARTIES TO A CONTRACT

17 IMPLEMENTED THEIR CONTRACT BEFORE ANY CONTEMPLATION OF

18 LITIGATION.

19        IF BOTH SIDES TO A CONTRACT CONSISTENTLY ACTED AS IF

20 CERTAIN WORDS AND PHRASES MEANT ONE THING AND NOT ANOTHER, THEN

21 THEIR CONDUCT MAY BE VIEWED BY YOU AS THEIR OWN PRACTICAL

22 CONSTRUCTION OF THOSE WORDS AND PHRASES, AND ANY SUCH

23 CONSISTENT AND MUTUAL CONDUCT WOULD BE ENTITLED TO CONSIDERABLE

24 WEIGHT.

25        SIMILARLY, EVEN IF ONLY ONE SIDE ACTED CONSISTENTLY

1   AS IF THE WORDS AND PHRASES MEANT ONE THING AND NOT ANOTHER,

2   AND THAT ACTION WAS MADE KNOWN TO THE OTHER PARTY, AND

3   ACQUIESCED IN WITHOUT OBJECTION, ALL PRIOR TO ANY CONTEMPLATION

4   OF LITIGATION, THEN YOU MAY ALSO CONSIDER THAT COURSE OF KNOWN

5   AND UNPROTESTED CONDUCT AS THE PARTIES' OWN PRACTICAL

6   CONSTRUCTION OF THE WORDS AND PHRASES, AND YOU MAY ADOPT ANY

7   SUCH INTERPRETATION AS THE PROPER INTERPRETATION.

8          THE POINT IN TIME THAT MATTERS IS WHEN THE CONTRACT

9   WAS ENTERED INTO.  YOU MUST DETERMINE THE REASONABLE AND MUTUAL

10  EXPECTATIONS OF THE PARTIES AS OF THAT POINT IN TIME.  YOU MAY

11  CONSIDER SUBSEQUENT EVENTS, SUCH AS ANY PRACTICAL CONSTRUCTION

12  OF THE PARTIES IN IMPLEMENTING THE CONTRACT, ONLY AS IT SHEDS

13  LIGHT ON THE REASONABLE AND MUTUAL EXPECTATION OF THE PARTIES

14  AT THE TIME THEY MADE THE AGREEMENT.

15         YOU HAVE HEARD MUCH TESTIMONY FROM BOTH SIDES AS TO

16  HOW VARIOUS PARTICIPANTS INDIVIDUALLY EXPECTED THE CONTRACTS AT

17  ISSUE WOULD WORK OR HOW THEY UNDERSTOOD THE CONTRACTS AT THE

18  TIME THEY WERE SIGNED.

19         YOU SHOULD CONSIDER ALL SUCH EVIDENCE, BUT THERE ARE

20  CAVEATS.  AGAIN, YOUR PRIMARY CONSIDERATION SHOULD ALWAYS BE

21  THE ACTUAL WORDS OF THE CONTRACT.  ONCE LITIGATION ARISES,

22  WITNESSES OFTEN SAY THEY HAD ONE UNDERSTANDING OR THE OTHER OF

23  A CONTRACT.  SUCH GENERAL TESTIMONY SHOULD BE VIEWED WITH A

24  MEASURE OF SKEPTICISM, GIVEN THE RISK THAT A WITNESS MIGHT BE

25  TEMPTED SIMPLY TO TESTIFY AFTER THE FACT IN A MANNER CONVENIENT

1  TO HIS INTEREST.

2        IF, HOWEVER, THE WITNESS COMMUNICATED HIS

3  UNDERSTANDING TO THE OTHER PARTY IN THE COURSE OF MAKING THE

4  CONTRACT ITSELF, THEN SUCH A COMMUNICATION IS ENTITLED TO

5  GREATER WEIGHT THAN A STATEMENT FIRST EXPRESSED ONLY AFTER

6  LITIGATION AROSE.

7        THIS IS BECAUSE A DISCLOSURE DURING NEGOTIATIONS OF

8  HOW A PARTY UNDERSTOOD A PROPOSED TERM, ASSUMING IT WAS

9  PLAUSIBLE, PUT THE OTHER SIDE ON FAIR NOTICE AND HELPED INFORM

10 THE REASONABLE EXPECTATIONS AND INTENT OF THE PARTIES.

11       ALSO, YOU MAY CONSIDER WHETHER OR NOT THE SUPPOSED

12 INTERPRETATION WAS EVER EXPRESSED IN A CONTEMPORANEOUS LETTER

13 OR E-MAIL OR OTHER WRITING, EVEN IF IT WAS NOT COMMUNICATED TO

14 THE OTHER SIDE IN THE TRANSACTIONS.

15       CIRCUMSTANCES KNOWN ONLY TO ONE SIDE OF A TRANSACTION

16 CAN BE CONSIDERED BY YOU IN DECIDING THE REASONABLE

17 EXPECTATIONS OF THE PARTY WITH RESPECT TO THE MEANING OF THE

18 CONTRACT.  BUT IF THOSE CIRCUMSTANCES WERE NOT DISCLOSED OR

19 KNOWN TO THE OTHER SIDE, THEN THOSE CIRCUMSTANCES ARE ENTITLED

20 TO LESS WEIGHT IN THE REASONABLE EXPECTATIONS OF THE PARTIES.

21       SUCH A CIRCUMSTANCE COULD NOT HAVE INFLUENCED THE

22 REASONABLE EXPECTATIONS OF THE OTHER CONTRACTING PARTY, BUT AT

23 LEAST IT COULD PROVIDE CORROBORATION OF THE TESTIMONY.

24       AGAIN, THE ULTIMATE QUESTION IS A REASONABLE AND

25 MUTUAL EXPECTATION OF THE PARTIES, NOT THE SUBJECTIVE AND

1  UNILATERAL EXPECTATIONS OF ONLY ONE SIDE, ALTHOUGH YOU MAY

2  CONSIDER SUCH EVIDENCE IN DECIDING THE ULTIMATE ISSUE.

3          IN EVALUATING EVIDENCE OF AN UNDERSTANDING TESTIFIED

4  TO BY A PARTY TO A CONTRACT, YOU MAY TAKE INTO ACCOUNT WHETHER

5  THE INTERPRETATION WAS AGAINST THE INTEREST OF THAT TESTIFYING

6  PARTY, RATHER THAN IN THE SELF-INTEREST OF THAT TESTIFYING

7  PARTY.

8          AN ADMISSION AGAINST ONE'S OWN INTEREST IS USUALLY

9  MORE PROBATIVE -- OF MORE PROBATIVE VALUE THAN A SELF-SERVING

10 STATEMENT.  THIS IS BECAUSE ADMISSIONS AGAINST INTEREST ARE

11 USUALLY MADE ONLY IF THEY ARE TRUE.

12         A SELF-SERVING INTERPRETATION, HOWEVER, MAY ALSO BE

13 ACCURATE.  IT IS ENTIRELY UP TO YOU TO DECIDE HOW MUCH WEIGHT

14 TO GIVE ANY WITNESS TESTIMONY.

15         AGAIN, YOU HAVE HEARD MUCH TESTIMONY ABOUT VARIOUS

16 UNDERSTANDINGS BY WITNESSES AT THE TIME IN QUESTION.  SUCH

17 TESTIMONY SHOULD BE EVALUATED IN LIGHT OF THE ACTUAL WORDS USED

18 IN THE CONTRACT ITSELF.

19         IN OTHER WORDS, YOU SHOULD TAKE INTO ACCOUNT WHETHER

20 THE ACTUAL WORDS USED IN THE CONTRACT WERE REASONABLY

21 SUSCEPTIBLE TO ANY SUCH UNDERSTANDING, TAKING INTO ACCOUNT THE

22 CIRCUMSTANCES KNOWN TO THE CONTRACTING PARTIES.

23         IF A CONTRACT WORD OR PHRASE SEEMS AMBIGUOUS, MEANING

24 THAT IT IS SUSCEPTIBLE TO TWO OR MORE DIFFERENT MEANINGS, YOU

25 MAY USE VERBAL TESTIMONY TO HELP SELECT AMONG THE ALTERNATIVE

1 MEANINGS.  YOU MAY NOT USE TESTIMONY, HOWEVER, TO ADOPT A

2 MEANING THE WORDS AND PHRASES THEMSELVES WILL NOT REASONABLY

3 BEAR OR THAT WOULD LEAD TO ABSURD RESULTS.

4        THE CONTRACT SHOULD BE CONSIDERED AS A WHOLE.  NO

5 PART OF IT SHOULD BE IGNORED.  THE CONTRACT SHOULD BE

6 INTERPRETED TO GIVE EFFECT TO ALL OF ITS PARTS.  NO WORD OR

7 PHRASE IN A CONTRACT SHOULD BE TREATED AS MEANINGLESS IF ANY

8 MEANING WHICH IS REASONABLE AND CONSISTENT WITH OTHER PARTS OF

9 THE CONTRACT CAN BE GIVEN TO IT.

10        IF A TERM OF A CONTRACT IS AMBIGUOUS, YOU ARE NOT

11 REQUIRED TO CHOOSE BETWEEN ONLY THE INTERPRETATIONS OFFERED BY

12 THE TWO SIDES, BUT YOU ARE FREE TO ADOPT ANY MEANING CONSISTENT

13 WITH THE ACTUAL WORDS OF THE CONTRACT, USING THE RULES OF

14 CONTRACT INTERPRETATION GIVEN ABOVE.

15        IF, AFTER APPLYING ALL OF THE FOREGOING RULES OF

16 CONSTRUCTION, YOU ARE UNABLE TO RESOLVE AN AMBIGUITY IN THE

17 MEANING OF A WORD OR PHRASE IN THE CONTRACT, SUCH DOUBT OR

18 AMBIGUITY MAY BE RESOLVED AGAINST THE PARTY WHO DRAFTED THE

19 CONTRACT, SO LONG AS YOU ADOPT A REASONABLE INTERPRETATION OF

20 THE CONTRACT.  THIS IS BECAUSE THE DRAFTER OF THE CONTRACT WAS

21 IN THE BEST POSITION TO HAVE AVOIDED AN AMBIGUITY IN THE FIRST

22 PLACE.

23        AS I INSTRUCTED YOU EARLIER, IN EVALUATING THE CLAIMS

24 IN THIS CASE YOU MAY HAVE TO DECIDE THE MEANING OF THIRD-PARTY

25 LICENSE AGREEMENTS LIKE THE ELECTRONIC ARTS LICENSE AGREEMENTS.

1    IN EVALUATING THAT QUESTION, IF YOU DECIDE YOU NEED

2 TO REACH IT, YOU SHOULD REACH THE SAME RULES OF INTERPRETATION.

3 BUT, OF COURSE, YOU SHOULD APPLY THEM FROM THE POINT OF VIEW OF

4 THE REASONABLE EXPECTATIONS OF THE SPECIFIC PARTIES TO THOSE

5 THIRD-PARTY LICENSE AGREEMENTS.

6    IN THIS CONNECTION, THERE IS A RECITAL IN THE VARIOUS

7 THIRD-PARTY LICENSES THAT DESERVES MENTION.  I WILL USE TRIAL

8 EXHIBIT 28 AS AN EXAMPLE.

9    FOR THE RECORD, I'VE ASKED THE LAWYERS TO PUT THAT ON

10 THE SCREEN SO YOU CAN FOLLOW THIS AS I EXPLAIN THE POINT I'M

11 TRYING TO MAKE HERE.

12    I WILL USE TRIAL EXHIBIT 28 AS AN EXAMPLE.  EXHIBIT

13 28 IS AN ELECTRONIC ARTS AGREEMENT.  THE FIRST PARAGRAPH

14 STARTED WITH A RECITAL THAT STATED AS FOLLOWS, AND I WILL

15 QUOTE:

16    "PLAYERS INC REPRESENTS THAT IT IS A LICENSING

17 AFFILIATE OF THE NATIONAL FOOTBALL LEAGUE PLAYERS ASSOCIATION

18 (NFLPA); THAT THE NFLPA HAS BEEN DULY APPOINTED AND IS ACTING

19 ON BEHALF OF THE FOOTBALL PLAYERS OF THE NATIONAL FOOTBALL

20 LEAGUE WHO HAVE ENTERED INTO A GROUP LICENSING AUTHORIZATION,

21 EITHER IN THE FORM ATTACHED HERETO AS ATTACHMENT A, OR THROUGH

22 THE ASSIGNMENT CONTAINED IN PARAGRAPH 4 (B) OF THE NFL PLAYER

23 CONTRACT, WHICH HAVE BEEN ASSIGNED TO PLAYERS INC; AND THAT IN

24 SUCH CAPACITY PLAYERS INC HAS THE RIGHT TO NEGOTIATE THIS

25 CONTRACT AND THE RIGHT TO GRANT RIGHTS AND LICENSES DESCRIBED

1  HEREIN."

2          NOW, PLAINTIFF AND DEFENDANTS AGREE IN THIS CASE THAT

3  THIS PASSAGE REFERRED ONLY TO ACTIVE NFL PLAYERS.  I'M GOING TO

4  REPEAT THAT.  PLAINTIFFS AND DEFENDANTS, BOTH SIDES IN THIS

5  CASE, AGREE THAT THIS PASSAGE REFERRED ONLY TO ACTIVE NFL

6  PLAYERS.

7          ONE REASON IS THAT ATTACHMENT A REFERENCED IN THE

8  PASSAGE WAS USED EXCLUSIVELY WITH ACTIVE PLAYERS.  AS WELL, THE

9  ELECTRONIC ARTS WITNESS TESTIFIED THAT IT REFERRED ONLY TO

10 ACTIVE PLAYERS.  THEREFORE, YOU SHOULD TREAT IT AS ESTABLISHED

11 THAT THAT SENTENCE REFERRED SOLELY TO ACTIVE PLAYERS.

12          THE TWO SIDES IN THIS LITIGATION, HOWEVER, DISAGREE

13 ON THE MEANING OF THE NEXT SENTENCE IN THE RECITAL, WHICH

14 STATED AS FOLLOWS:

15              "LICENSEE ACKNOWLEDGES THAT PLAYERS INC ALSO ON

16 OCCASION SECURES AUTHORIZATION FOR INCLUSION IN PLAYERS INC

17 LICENSING PROGRAMS FROM PLAYERS, INCLUDING, BUT NOT LIMITED TO

18 RETIRED PLAYERS, WHO HAVE NOT ENTERED INTO SUCH GROUP LICENSING

19 AUTHORIZATION, BUT WHO, NEVERTHELESS, AUTHORIZE PLAYERS INC TO

20 REPRESENT SUCH PLAYERS FOR DESIGNATED PLAYERS INC LICENSED

21 PROGRAMS."

22          THROUGHOUT THE TRIAL YOU HAVE HEARD COMPETING

23 INTERPRETATIONS OF THIS SENTENCE.  AS STATED, THIS WAS A

24 RECITAL.  A RECITAL IS SOMETIMES USED IN A CONTRACT TO SET THE

25 STAGE FOR TERMS THAT FOLLOW IN THE DOCUMENT.  THE PURPOSE OF A

1  RECITAL IS TO EXPLAIN AT LEAST SOME OF THE BACKGROUND AND

2  SURROUNDING CIRCUMSTANCES SO AS TO PLACE THE CONTRACTUAL TERMS

3  IN A CONTEXT.

4          AFTER THE RECITAL IN TRIAL EXHIBIT 28 CAME THE KEY

5  PROVISION, WHICH WAS THE GRANT OF A LICENSE.  IT STATED AS

6  FOLLOWS:

7          "UPON THE TERMS AND CONDITIONS HEREINAFTER SET

8  FORTH, PLAYERS INC HEREBY GRANTS TO LICENSEE AND LICENSEE

9  HEREBY ACCEPTS THE EXCLUSIVE RIGHT, LICENSE AND PRIVILEGE OF

10 UTILIZING THE TRADEMARKS AND NAMES OF PLAYERS INC WHICH MAY BE

11 AMENDED FROM TIME TO TIME BY PLAYERS INC AND THE NAMES,

12 LIKENESSES (INCLUDING, WITHOUT LIMITATION, NUMBERS), PICTURES,

13 PHOTOGRAPHS, VOICES, FACSIMILE SIGNATURES, AND/OR BIOGRAPHICAL

14 INFORMATION (HEREINAFTER 'IDENTITY') OF THE NFL PLAYERS

15 REFERENCED IN PARAGRAPH 1 (A) ABOVE."

16         IN THIS LAWSUIT, PLAINTIFF CONTENDS THAT THE PHRASE

17 "THE NFL PLAYERS REFERENCED IN PARAGRAPH 1 (A) ABOVE," AS JUST

18 QUOTED, INCLUDED BOTH RETIRED AND ACTIVE PLAYERS, WHEREAS

19 DEFENDANTS CONTEND IT INCLUDED ONLY ACTIVE PLAYERS.

20         IN RESOLVING THIS DISPUTE, YOU SHOULD APPLY THE RULES

21 OF INTERPRETATION STATED ABOVE.  ALTHOUGH THE PARTIES TO THIS

22 LITIGATION DISAGREE OVER THE MEANING OF THESE TERMS, IF YOU

23 FIND THAT THE ACTUAL PARTIES TO THE ELECTRONIC ARTS CONTRACT

24 ITSELF HAVE CONSISTENTLY AND MUTUALLY UNDERSTOOD AND CARRIED

25 OUT THE TERMS IN QUESTION AS IF THEY MEANT ONE THING AND NOT

1  ANOTHER, THEN, AS I HAVE SAID EARLIER, YOU SHOULD GIVE

2  CONSIDERABLE WEIGHT TO SUCH A PRACTICAL CONSTRUCTION OF THE

3  PARTIES IN CARRYING OUT THEIR OWN CONTRACT.

4         I HAVE REFERRED TO THE ELECTRONIC ARTS AGREEMENT, BUT

5  ONLY AS AN EXAMPLE.  YOU SHOULD, OF COURSE, CONSIDER AND

6  EVALUATE EACH OF THE THIRD-PARTY AGREEMENTS IN EVIDENCE OF

7  WHICH THERE ARE 95.

8         TO BE CLEAR AND TO STEP BACK FOR A MOMENT, PLAINTIFF

9  MAKES A LINE OF ARGUMENT BASED ON THE RPGLA ALONE, REGARDLESS

10 OF THE MEANING OF THE THIRD-PARTY AGREEMENTS.

11        THIS ARGUMENT IS THAT THE TERMS OF THE RPGLA ITSELF

12 ENTITLED THE CLASS TO A SHARE OF THE GROUP REVENUE AND THAT ALL

13 OF THE GROSS LICENSING REVENUE WAS SUCH GROUP MONEY.

14        DEFENDANTS, ON THE OTHER HAND, CONTEND THAT THE CLASS

15 WAS ONLY ENTITLED TO MONIES GENERATED BY LICENSING OF RETIRED

16 PLAYER GROUP RIGHTS.

17        IN EVALUATING THESE ARGUMENTS YOU, OF COURSE, WILL

18 NOT NEED TO CONSTRUE ANY THIRD-PARTY LICENSE AGREEMENTS.

19        WITH RESPECT TO THE CONTRACT CLAIM, YOU MUST DECIDE

20 WHETHER OR NOT PLAINTIFF HAS PROVEN THAT MONIES WERE RECEIVED

21 BY DEFENDANTS' LICENSING OF RIGHTS TO WHICH THE RPGLA CLASS WAS

22 ENTITLED AND, IF SO, THE EXTENT TO WHICH THOSE MONIES WERE

23 PAYABLE TO THE CLASS UNDER THE RPGLA.

24        NEW SUBJECT.  A SEPARATE CLAIM YOU MUST DECIDE IS A

25 CLAIM FOR BREACH OF FIDUCIARY DUTY AS RELATED TO THE RPGLA.

1  YOU HAVE HEARD SOME TESTIMONY RELATING TO WHETHER OR NOT CLASS

2  MEMBERS WERE UNION MEMBERS.  IN THIS REGARD, PLEASE REMEMBER

3  THAT SOME CLASS MEMBERS ARE NOT UNION MEMBERS.

4          PLAINTIFFS' BREACH OF FIDUCIARY CLAIM IS NOT BASED ON

5  UNION MEMBERSHIP.  THE FIDUCIARY CLAIM IS ALLEGED TO ARISE ONLY

6  FROM THE RPGLA.

7          ALTHOUGH YOU HAVE HEARD INFORMATION ABOUT PENSIONS,

8  BENEFITS AND COLLECTIVE BARGAINING, THERE IS NO CLAIM IN THIS

9  CASE FOR UNFAIR REPRESENTATION BY THE UNION OF ITS MEMBERS.

10  THIS CASE INVOLVES THE RPGLA.

11          ON PLAINTIFFS' BREACH OF FIDUCIARY DUTY CLAIM,

12  PLAINTIFF HAS THE BURDEN OF ESTABLISHING BY A PREPONDERANCE OF

13  THE EVIDENCE THE FACTS NECESSARY TO PROVE THE FOLLOWING

14  ELEMENTS:

15          ONE:  THAT IN CONNECTION WITH THE RPGLA, DEFENDANTS

16  OWED A FIDUCIARY DUTY TO THE RPGLA CLASS MEMBERS TO MARKET AND

17  PROMOTE THEIR NAMES, IMAGES AND IDENTITIES AS AN ENTIRE GROUP;

18          NUMBER TWO:  THAT DEFENDANTS BREACHED ANY SUCH

19  FIDUCIARY DUTY;

20          NUMBER THREE:  THAT THE RPGLA CLASS MEMBERS SUFFERED

21  DAMAGES AS A RESULT.

22          TO ESTABLISH A FIDUCIARY RELATIONSHIP, PLAINTIFF MUST

23  PROVE AN AGENCY RELATIONSHIP THAT REQUIRED DEFENDANTS TO

24  PROMOTE THE NAMES AND IMAGES OF THE RPGLA CLASS.  THE MERE

25  EXISTENCE OF A LICENSE AGREEMENT BY ITSELF DOES NOT GIVE RISE

1  TO A FIDUCIARY OR AGENCY RELATIONSHIP.

2          AN AGENCY RELATIONSHIP RESULTS WHEN ONE PERSON,

3  CALLED THE PRINCIPAL, AGREES THAT ANOTHER PERSON, CALLED THE

4  AGENT, SHALL ACT ON THE PRINCIPAL'S BEHALF AND SUBJECT TO THE

5  PRINCIPAL'S CONTROL, AND THE AGENT AGREES TO DO SO.

6          IN THIS CASE PLAINTIFF ALLEGES THAT THEY WERE THE

7  PRINCIPALS AND THE DEFENDANTS WERE THEIR AGENTS.  DEFENDANTS

8  ADMIT THAT A LICENSE WAS ACQUIRED BY THEM, BUT DENY THAT THERE

9  WAS ANY AGENCY OR FIDUCIARY RELATIONSHIP REQUIRING DEFENDANTS

10  TO ACTIVELY PROMOTE RETIRED PLAYERS.

11          AN AGENCY RELATIONSHIP IS SOMETIMES CREATED BY AN

12  EXPRESS CONTRACT.

13          YOU HAVE HEARD EVIDENCE, FOR EXAMPLE, THAT SOME

14  SPORTS FIGURES HAVE AGENTS TO NEGOTIATE ON THEIR BEHALF AND TO

15  PROMOTE THEIR INTEREST.  A MERE LICENSE IS NOT THE SAME AS AN

16  AGENCY CONTRACT.

17          A LICENSE BY ITSELF GIVES THE LICENSEE THE OPTION TO

18  USE OR SELL RIGHTS OWNED BY THE LICENSOR AND DOES NOT

19  NECESSARILY REQUIRE THE LICENSEE TO PROMOTE THOSE RIGHTS OR

20  CREATE A FIDUCIARY RELATIONSHIP, IT BEING UP TO THE LICENSEE

21  TO DECIDE HOW TO USE THE RIGHTS FOR ITS PURPOSES.

22          ON THE OTHER HAND -- FOR ITS OWN PURPOSES.

23          ON THE OTHER HAND, A LICENSEE MAY, DEPENDING ON THE

24  CIRCUMSTANCES, ALSO UNDERTAKE TO ACT AS A MARKETING AGENT AND

25  TO AFFIRMATIVELY PROMOTE THE RIGHTS ON BEHALF OF THE LICENSORS.

1   IN THAT CASE, THE LICENSEE IS NOT ONLY A LICENSEE, BUT ALSO AN

2   AGENT WITH FIDUCIARY DUTIES.

3         IN EVALUATING WHETHER DEFENDANTS UNDERTOOK TO BE AN

4   AGENT WITH FIDUCIARY DUTIES, YOU MUST CONSIDER NOT ONLY THE

5   ACTUAL WORDS USED IN THE AGREEMENT, BUT ALL OF THE

6   CIRCUMSTANCES SURROUNDING THE LICENSED RIGHTS AT ISSUE AND THE

7   PARTIES' RELATIONSHIP.

8         AN IMPORTANT FACTOR TO CONSIDER IS CONTROL.  IN AN

9   AGENCY RELATIONSHIP, THE PRINCIPAL USUALLY HAS THE ABILITY TO

10  CONTROL THE AGENT'S CONDUCT.  FOR EXAMPLE, THE PRINCIPAL MAY

11  DIRECT THE AGENT TO TRY TO MAKE CERTAIN DEALS AND NOT OTHER

12  DEALS.  THIS IS CALLED CONTROL.

13        THE PRESENCE OF SUCH CONTROL IS A FACTOR INDICATIVE

14  OF AN AGENCY RELATIONSHIP.  ON THE OTHER HAND, THE ABSENCE OF

15  CONTROL IS AN INDICATION THAT THE RELATIONSHIP WAS A MERE

16  LICENSE ARRANGEMENT WHEREBY THE LICENSEE WAS FREE TO TRY MARKET

17  OR NOT MARKET SUCH LICENSE RIGHTS AS IT WISHED.

18        BE AWARE, HOWEVER, THAT THE CONTROL DOES NOT HAVE TO

19  BE ACTUALLY EXERCISED; INSTEAD, IT IS SIMPLY THE RIGHT TO

20  CONTROL, RATHER THAN ITS ACTUAL EXERCISE, THAT CAN BE

21  INDICATIVE OF AN AGENCY RELATIONSHIP.

22        ANOTHER FACTOR YOU MAY CONSIDER IS THE FINANCIAL

23  ARRANGEMENT BETWEEN THE LICENSORS AND THE LICENSEE.  REMEMBER

24  THAT PERTAINING TO THE RPGLA THE LICENSORS WERE THE RPGLA CLASS

25  MEMBERS AND THE LICENSEES WERE THE DEFENDANTS.

1          TO THE EXTENT THAT A LICENSEE PAID A SUM CERTAIN FOR

2     THE RIGHTS AND WAS ENTITLED TO KEEP ALL OR MOST OF ANY

3     THIRD-PARTY REVENUE, SUCH A CIRCUMSTANCE WOULD BE INDICATIVE OF

4     A BARE LICENSE WITH NO AGENCY RELATIONSHIP.  IN SUCH A CASE THE

5     LICENSEE WOULD BE MAKING ANY MARKETING EFFORTS FOR ITS OWN

6     ACCOUNT AND NOT FOR THE ACCOUNT OF THE LICENSOR.

7          ON THE OTHER HAND, IF THE LICENSOR GAVE CONSIDERATION

8     TO THE LICENSEE TO GO OUT AND TO MARKET THE RIGHTS AND TO PASS

9     THROUGH -- PASS A LARGE PART OF THE REVENUES THROUGH TO THE

10    LICENSORS, THEN THAT WOULD BE INDICATIVE OF AN AGENCY

11    RELATIONSHIP.

12         ANOTHER FACTOR IS A RIGHT TO DISCHARGE.  IN AN AGENCY

13    RELATIONSHIP, THE PRINCIPAL USUALLY HAS THE RIGHT TO DISCHARGE

14    THE AGENT AND TO TERMINATE THE RELATIONSHIP.

15         ONE REASON IS SO THAT THE PRINCIPAL CAN ENGAGE

16    SOMEONE ELSE TO PROMOTE HIM OR TO MAKE OTHER PROMOTIONAL

17    ARRANGEMENTS.

18         ON THE OTHER HAND, THE ABSENCE OF A RIGHT TO

19    DISCHARGE IS MORE INDICATIVE OF A BARE LICENSE RELATIONSHIP,

20    WHEREIN THE LICENSEE IS FREE DURING THE LIFE OF THE LICENSE TO

21    USE OR NOT USE THE RIGHTS AS IT WISHES.

22         SO ANOTHER FACTOR YOU SHOULD EXAMINE IS WHETHER THERE

23    WAS OR WAS NOT A POWER TO DISCHARGE.

24         ANOTHER FACTOR YOU SHOULD CONSIDER IS THE REASONABLE

25    EXPECTATIONS OF THE PARTIES SUPPORTED BY THE RELATIONSHIP.

1  THAT IS, WHAT REASONABLE PERSONS IN THE SAME CIRCUMSTANCES

2  WOULD HAVE EXPECTED FROM THE OTHER SIDE IN THE RELATIONSHIP.

3  IN EVALUATING THIS, YOU MAY NOT IMPOSE ON DEFENDANTS A

4  FIDUCIARY DUTY, IF AT ALL, THAT WOULD EXCEED THE REASONABLE

5  EXPECTATIONS OF THE PARTIES IN THE CIRCUMSTANCES OF THIS CASE.

6          THE BASIC ISSUE YOU MUST DECIDE, AS STATED, IS

7  WHETHER OR NOT IN ADDITION TO ACQUIRING LICENSE RIGHTS,

8  DEFENDANTS ALSO UNDERTOOK A FIDUCIARY DUTY TO PROMOTE AND TO

9  MARKET THOSE RETIRED PLAYERS WHO SIGNED RPGLA'S.

10         IF YOU FIND THERE WAS NO SUCH FIDUCIARY UNDERTAKING,

11 APPLYING THE FACTORS STATED ABOVE, THEN YOU MUST FIND FOR

12 DEFENDANTS ON THE FIDUCIARY-DUTY CLAIM.

13         IT IS UP FOR YOU TO DECIDE HOW MUCH WEIGHT TO GIVE

14 THE VARIOUS FACTORS I HAVE LISTED IN MAKING YOUR DECISION.  IF

15 YOU FIND SUCH A DUTY EXISTED, THEN YOU MUST CONSIDER WHETHER

16 THAT DUTY WAS BREACHED.

17         SO I WILL NOW TELL YOU THE DUTIES OWED BY A

18 FIDUCIARY.

19         A FIDUCIARY OWES SEVERAL DUTIES TO A PRINCIPAL.  A

20 FIDUCIARY MUST EXERCISE GOOD FAITH TO HIS PRINCIPAL.  A

21 FIDUCIARY HAS A DUTY TO ACT REASONABLY AND WITH THE CARE,

22 COMPETENCE AND DILIGENCE NORMALLY EXERCISED BY FIDUCIARIES IN

23 SIMILAR CIRCUMSTANCES.  SPECIAL SKILLS OR KNOWLEDGE POSSESSED

24 BY A FIDUCIARY ARE CIRCUMSTANCES TO BE TAKEN INTO ACCOUNT IN

25 DETERMINING WHETHER THE FIDUCIARY ACTED WITH DUE CARE AND

1  DILIGENCE.

2          IF A FIDUCIARY CLAIMS TO POSSESS SPECIAL SKILLS OR

3  KNOWLEDGE, THE FIDUCIARY HAS A DUTY TO THE PRINCIPAL TO ACT

4  WITH THE CARE, COMPETENCE AND DILIGENCE NORMALLY EXERCISED BY

5  FIDUCIARIES WITH SUCH SKILL OR KNOWLEDGE.

6          A FIDUCIARY ALSO HAS A DUTY OF LOYALTY TOWARD HIS

7  PRINCIPAL.  THIS MEANS THE FIDUCIARY MUST PUT THE PRINCIPAL'S

8  INTERESTS AHEAD OF HIS OWN AS TO ALL MATTERS CONNECTED WITH THE

9  RELATIONSHIP.

10          THE FIDUCIARY IS ALSO REQUIRED TO REFRAIN FROM

11  CONDUCT THAT IS ADVERSE TO OR LIKELY TO DAMAGE THE PRINCIPAL'S

12  INTERESTS.

13          A FIDUCIARY HAS A DUTY TO USE REASONABLE EFFORT TO

14  PROVIDE THE PRINCIPAL WITH FACTS THAT THE AGENT KNOWS, HAS

15  REASON TO KNOW OR SHOULD KNOW WHEN THE AGENT KNOWS OR HAS

16  REASON TO KNOW THAT THE PRINCIPAL WOULD WISH TO HAVE THE FACTS

17  OR THE FACTS ARE MATERIAL TO THE AGENT'S DUTIES TO THE

18  PRINCIPAL.

19          A FIDUCIARY HAS A DUTY NOT TO ACQUIRE A MATERIAL

20  BENEFIT FROM A THIRD PARTY IN CONNECTION WITH TRANSACTIONS

21  CONDUCTED, OR OTHER ACTIONS TAKEN ON BEHALF OF THE PRINCIPAL OR

22  OTHERWISE THROUGH THE FIDUCIARY'S USE OF HIS POSITION.

23          FINALLY, A FIDUCIARY HAS A DUTY TO ACT IN ACCORDANCE

24  WITH THE EXPRESS AND IMPLIED TERMS OF ANY CONTRACT BETWEEN THE

25  FIDUCIARY AND THE PRINCIPAL.

1          PLAINTIFF HAS THE BURDEN TO PROVE THAT DEFENDANTS

2   BREACHED ANY FIDUCIARY DUTY.

3          YOU HAVE HEARD THAT ELECTRONIC ARTS SCRAMBLED THE

4   NAMES AND IDENTITIES OF RETIRED PLAYERS.  I REMIND YOU AGAIN

5   THAT THERE IS NO CLAIM IN THIS CASE THAT THIS SCRAMBLING BY

6   ELECTRONIC ARTS VIOLATED ANY PLAYER'S RIGHTS.  INSTEAD,

7   PLAINTIFFS' CLAIM IS THAT DEFENDANTS BREACHED A FIDUCIARY DUTY

8   BY INSISTING ON SCRAMBLING RATHER THAN LICENSING THE ENTIRE

9   GROUP OF RPGLA RIGHTS TO ELECTRONIC ARTS.

10          DEFENDANTS RESPOND THAT ELECTRONIC ARTS WAS NOT

11   WILLING TO PAY ANY MONEY TO LICENSE THE ENTIRE GROUP OF RPGLA

12   RIGHTS AND THEREFORE DEFENDANTS WERE ACTING TO PROTECT RETIRED

13   PLAYERS IN INSISTING ON SCRAMBLING.

14          DURING THE CROSS EXAMINATION OF PROFESSOR NOLL,

15   QUESTIONS WERE ASKED SUPPOSING THAT DEFENDANTS HAD CERTAIN

16   MONOPOLY AND MARKET POWER WITH RESPECT TO ACTIVE PLAYER

17   LICENSING AND ASKED WHETHER THERE HAD BEEN ANYTHING TO PREVENT

18   DEFENDANTS FROM USING THAT POWER TO INDUCE THIRD-PARTY

19   LICENSEES TO ALSO TAKE RETIRED PLAYERS AS A GROUP.

20          IN THIS REGARD, I INSTRUCT YOU THAT AN AGENT HAS NO

21   DUTY TO MARKET ITS PRINCIPALS IN A WAY THAT WOULD BE ILLEGAL OR

22   THAT WOULD RAISE A SUBSTANTIAL QUESTION OF ILLEGALITY.

23          ON THE ASSUMPTIONS OF MARKET POWER AND MONOPOLY USED

24   IN THE EXAMINATION OF PROFESSOR NOLL, A SUBSTANTIAL QUESTION OF

25   ILLEGALITY UNDER THE ANTITRUST LAWS WOULD HAVE BEEN RAISED HAD

1  DEFENDANTS REFUSED TO LICENSE ACTIVE PLAYERS TO A THIRD-PARTY

2  LICENSEE, LIKE ELECTRONIC ARTS, EXCEPT ON CONDITION THAT IT

3  ALSO TOOK A LICENSE FOR ALL RPGLA CLASS MEMBERS.

4         ON THE OTHER HAND, NO QUESTION OF ILLEGALITY WOULD

5  HAVE BEEN PRESENTED BY A STANDALONE OFFER BY DEFENDANTS TO

6  LICENSE ALL RPGLA CLASS MEMBERS AS AN ENTIRE GROUP.  NEITHER

7  WOULD IT HAVE BEEN ILLEGAL FOR DEFENDANTS TO HAVE OFFERED THE

8  OPTION OF PRESENT AND FORMER PLAYERS TOGETHER AS A PACKAGE SO

9  LONG AS ONE WAS NOT CONDITIONED ON THE OTHER.

10        NEW TOPIC.

11        I WILL NOW INSTRUCT YOU ON DAMAGES.  IT IS THE DUTY

12 OF THE COURT TO INSTRUCT YOU ABOUT THE MEASURE OF DAMAGES.  BY

13 INSTRUCTING YOU ON DAMAGES THE COURT DOES NOT MEAN TO SUGGEST

14 FOR WHICH PARTY YOUR VERDICT SHOULD BE RENDERED.

15        IF YOU FIND FOR PLAINTIFF, THE RPGLA CLASS MEMBERS,

16 ON A PARTICULAR CLAIM YOU MUST DETERMINE THE AMOUNT OF DAMAGES,

17 IF ANY, THEY SUFFERED.  DAMAGES MEAN THE AMOUNT OF MONEY THAT

18 WILL COMPENSATE THE RPGLA CLASS MEMBERS FOR ANY INJURY YOU FIND

19 WAS CAUSED BY DEFENDANTS FOR A PARTICULAR CLAIM.

20        YOU MAY AWARD PLAINTIFF DAMAGES THAT ARE BASED ON A

21 JUST AND REASONABLE ESTIMATE DERIVED FROM RELEVANT EVIDENCE.

22        UNDER THE RELEVANT LAW, THE CLAIMS AT ISSUE MUST BE

23 BROUGHT WITHIN THREE YEARS OF THE TIME WHEN THE BREACH

24 OCCURRED.  IN THIS CASE THE LIMITATIONS PERIOD REACHES BACK TO

25 FEBRUARY 14, 2004.  NO DAMAGES MAY BE AWARDED FOR ANY CONTRACT

1  VIOLATION OR FIDUCIARY DUTY VIOLATION OCCURRING PRIOR TO

2  FEBRUARY 14, 2004.

3          IF YOU DECIDE THAT PLAINTIFFS HAVE PROVEN THEIR

4  BREACH OF CONTRACT CLAIM AGAINST DEFENDANTS, THEN THE RPGLA

5  CLASS MEMBERS ARE ENTITLED TO RECOVER AS DAMAGES THE SUM OF

6  MONEY THAT WOULD PUT THE RPGLA CLASS MEMBERS IN THE SAME

7  ECONOMIC POSITION AS THEY WOULD HAVE BEEN IF THE CONTRACT HAD

8  NOT BEEN BREACHED BY DEFENDANTS, BUT ONLY TO THE EXTENT SUCH

9  DAMAGES WERE REASONABLY FORESEEABLE BY THE PARTIES IN THE EVENT

10 OF BREACH.

11         THE PLAINTIFF HAS THE BURDEN TO PROVE BY A

12 PREPONDERANCE OF THE EVIDENCE THE AMOUNT OF DAMAGES SUFFERED BY

13 THE RPGLA CLASS MEMBERS.

14         YOU MUST NOT AWARD DAMAGES BASED ON SYMPATHY,

15 CONJECTURE, SPECULATION, GUESSWORK OR PUNISHMENT.

16         ON THE OTHER HAND, THE LAW DOES NOT REQUIRE THAT

17 PLAINTIFF PROVE THE AMOUNT OF DAMAGES WITH MATHEMATICAL

18 PRECISION, BUT ONLY WITH REASONABLE CERTAINTY.

19         THE PURPOSE OF THE LAW OF DAMAGES IS TO COMPENSATE A

20 PLAINTIFF FOR THE LOSS, IF ANY, WHICH RESULTS FROM A

21 DEFENDANTS' CONDUCT.  IF YOU FIND THAT PLAINTIFF HAS PROVEN

22 DEFENDANTS BREACHED ANY FIDUCIARY DUTY TO PLAINTIFF, THEN

23 PLAINTIFF ALSO HAS THE BURDEN OF PROVING DAMAGES BY A

24 PREPONDERANCE OF THE EVIDENCE.

25         THE MEASURE OF DAMAGES FOR BREACH OF A FIDUCIARY DUTY

1  IS THE AMOUNT OF MONEY NECESSARY TO PLACE THE RPGLA CLASS

2  MEMBERS IN THE SAME ECONOMIC POSITION THEY WOULD HAVE BEEN IN

3  IF DEFENDANTS' FIDUCIARY DUTY HAD NOT BEEN BREACHED.

4         IN OTHER WORDS, THE PURPOSE OF AWARDING DAMAGES TO

5  THE RPGLA CLASS FOR BREACH OF FIDUCIARY DUTY IS TO MAKE THEM

6  WHOLE FOR ANY INJURIES THEY SUFFERED.

7         PLAINTIFF MUST FIRST PROVE THAT THEY SUFFERED

8  ECONOMIC INJURY AS A RESULT OF DEFENDANTS' BREACH OF FIDUCIARY

9  DUTY.  IF PLAINTIFF FAILS TO MEET THEIR BURDEN, THEN YOU MAY

10 NOT AWARD ANY DAMAGES FOR THAT CLAIM.

11        IF, HOWEVER, YOU FIND THAT PLAINTIFFS SUFFERED

12 ECONOMIC INJURY AS A RESULT OF DEFENDANTS' BREACH OF FIDUCIARY

13 DUTY -- THAT, OF COURSE, IS IF YOU FIND A BREACH OF FIDUCIARY

14 DUTY -- THEN YOU MUST NEXT CONSIDER WHETHER PLAINTIFF HAS

15 PROVEN THE AMOUNT OF SUCH DAMAGES.

16        AS THE PARTY SEEKING DAMAGES, PLAINTIFF HAS THE

17 BURDEN OF PROVING THE AMOUNT OF DAMAGES BY A PREPONDERANCE OF

18 THE EVIDENCE.  WHILE PLAINTIFF IS NOT REQUIRED TO PROVE DAMAGES

19 WITH MATHEMATICAL PRECISION, IT MUST PROVE THEIR DAMAGES WITH

20 REASONABLE CERTAINTY.

21        IF PLAINTIFF HAS MET THEIR BURDEN, YOUR DAMAGES AWARD

22 SHOULD PUT PLAINTIFF IN APPROXIMATELY THE FINANCIAL POSITION

23 THEY WOULD HAVE BEEN IN HAD THE BREACH NOT OCCURRED.

24        YOU MAY ONLY AWARD PLAINTIFF DAMAGES THAT ARE

25 ADEQUATE TO COMPENSATE FOR THE BREACH.  YOU MAY NOT AWARD ANY

1  MORE OR LESS DAMAGES.

2          PLAINTIFF IS NOT ENTITLED TO RECOVER DAMAGES WHICH

3  ARE SPECULATIVE, REMOTE, IMAGINARY, CONTINGENT OR MERELY

4  POSSIBLE.

5          YOUR AWARD MUST BE BASED UPON EVIDENCE AND NOT UPON

6  SPECULATION, GUESSWORK OR CONJECTURE.  NOR MAY YOU INCLUDE ANY

7  AMOUNT FOR THE PURPOSE OF PUNISHING DEFENDANTS FOR SETTING AN

8  EXAMPLE.

9          RECOVERY OF DAMAGES MAY BE LIMITED TO A NOMINAL SUM

10 IF THE PLAINTIFF HAS FAILED IT PROVE THE EXTENT AND AMOUNT OF

11 DAMAGES, EVEN THOUGH THEY HAVE PROVEN THAT THEY HAVE BEEN

12 WRONGED.  A NOMINAL SUM IS A SMALL SYMBOLIC AMOUNT OF MONEY,

13 SUCH AS ONE DOLLAR, AWARDED AS RECOGNITION THAT AN INJURY WAS

14 SUSTAINED.  IF YOU FIND THAT DEFENDANTS BREACHED THE RPGLA OR

15 THAT THEY BREACHED THEIR FIDUCIARY DUTIES TO RPGLA CLASS

16 MEMBERS, BUT THAT PLAINTIFF HAS NOT PROVEN ANY ACTUAL DAMAGES,

17 OR THAT PLAINTIFFS' PROOF OR VAGUE OR SPECULATIVE, THEN YOU MAY

18 AWARD NOMINAL DAMAGES.

19         PLAINTIFF HAS MADE CLAIMS AGAINST DEFENDANTS FOR

20 BREACH OF CONTRACT AND BREACH OF FIDUCIARY DUTY.  IF YOU DECIDE

21 THAT PLAINTIFF HAS PROVEN MORE THAN ONE OF THESE CAUSES OF

22 ACTION, THE SAME DAMAGES THAT RESULTED FROM MULTIPLE CLAIMS CAN

23 BE AWARDED ONLY ONCE.

24         NEW SUBJECT.  PUNITIVE DAMAGES.

25         IN ADDITION TO COMPENSATORY DAMAGES, PLAINTIFF ALSO

1  SEEKS AN AWARD OF PUNITIVE DAMAGES IN THIS CASE AGAINST

2  DEFENDANTS.  PUNITIVE DAMAGES ARE DAMAGES ABOVE AND BEYOND THE

3  AMOUNT OF COMPENSATORY OR NOMINAL DAMAGES YOU MAY AWARD.

4          PUNITIVE DAMAGES ARE AWARDED TO PUNISH THE DEFENDANT

5  FOR HIS OR HER CONDUCT AND TO SERVE AS AN EXAMPLE TO PREVENT

6  OTHERS FROM ACTING IN A SIMILAR WAY.

7          YOU MAY AWARD PUNITIVE DAMAGES ONLY IF PLAINTIFF HAS

8  PROVEN WITH CLEAR AND CONVINCING EVIDENCE, NUMBER ONE, THAT THE

9  DEFENDANTS ACTED WITH EVIL MOTIVE, ACTUAL MALICE, DELIBERATE

10  VIOLENCE OR OPPRESSION OR WITH AN INTENT TO INJURE OR A WILLFUL

11  DISREGARD OF THE RIGHTS OF THE RPGLA CLASS MEMBERS, AND NUMBER

12  TWO, THAT THE DEFENDANTS' CONDUCT ITSELF WAS OUTRAGEOUS,

13  GROSSLY FRAUDULENT, OR RECKLESS TOWARD THE SAFETY OF THE RPGLA

14  CLASS MEMBERS.

15          YOU MAY CONCLUDE THAT DEFENDANTS ACTED WITH A STATE

16  OF MIND JUSTIFYING PUNITIVE DAMAGES BASED ON DIRECT EVIDENCE OR

17  BASED ON CIRCUMSTANTIAL EVIDENCE FROM THE FACTS OF THE CASE.

18          CLEAR AND CONVINCING EVIDENCE MEANS EVIDENCE --

19  EVIDENCE OF SUCH CONVINCING FORCE THAT IT DEMONSTRATES, IN

20  CONTRAST TO THE OPPOSING EVIDENCE, A HIGH PROBABILITY OF THE

21  TRUTH OF THE FACTS FOR WHICH IT IS OFFERED.  SUCH EVIDENCE

22  REQUIRES A HIGHER STANDARD OF PROOF THAN PROOF BY A

23  PREPONDERANCE OF THE EVIDENCE.

24          IF YOU DECIDE THAT PUNITIVE DAMAGES SHOULD BE

25  AWARDED, YOU WILL HAVE A SHORT, SUPPLEMENTAL PROCEEDING

1 IMMEDIATELY FOLLOWING YOUR VERDICT IN ORDER TO RECEIVE MORE

2 EVIDENCE AND ARGUMENT AS TO THE AMOUNT THAT SHOULD BE AWARDED.

3 NOW WE'RE COMING TO THE VERY LAST PART. WHEN YOU

4 BEGIN YOUR DELIBERATIONS, YOU SHOULD ELECT ONE MEMBER OF YOUR

5 JURY -- OF THE JURY AS YOUR FOREPERSON. THAT PERSON WILL

6 PRESIDE OVER THE DELIBERATIONS AND SPEAK FOR YOU HERE IN COURT.

7 I RECOMMEND THAT YOU SELECT A FOREPERSON WHO WILL BE

8 GOOD AT LEADING A FAIR AND BALANCED DISCUSSION OF THE EVIDENCE

9 AND THE ISSUES.

10 IN YOUR DELIBERATIONS, IT IS USUALLY A MISTAKE TO

11 TAKE A STRAW VOTE EARLY ON. THIS IS DUE TO THE RISK OF JURY

12 MEMBERS EXPRESSING A PREMATURE OPINION, AND THEN OUT OF PRIDE,

13 DIGGING IN THEIR HEELS.

14 RATHER, IT IS USUALLY BEST TO DISCUSS THE EVIDENCE,

15 PRO AND CON, ON THE VARIOUS ISSUES BEFORE PROCEEDING TO TAKE

16 EVEN A STRAW VOTE.

17 IN THIS WAY, ALL OF THE VIEWPOINTS WILL BE ON THE

18 TABLE BEFORE ANYONE EXPRESSES A VOTE.

19 THESE ARE MERELY RECOMMENDATIONS, HOWEVER, AND IT IS

20 UP TO YOU TO DECIDE ON HOW YOU WISH TO DELIBERATE.

21 YOUR VERDICT AS TO EACH CLAIM AND AS TO DAMAGES, IF

22 ANY, MUST BE UNANIMOUS. I'M GOING TO REPEAT THAT.

23 YOUR VERDICT AS TO EACH CLAIM AND AS TO DAMAGES, IF

24 ANY, MUST BE UNANIMOUS.

25 EACH OF YOU MUST DECIDE THE CASE FOR YOURSELF, BUT

1  YOU SHOULD DO SO ONLY AFTER YOU HAVE CONSIDERED ALL THE

2  EVIDENCE, DISCUSSED IT FULLY WITH THE OTHER JURORS, AND

3  LISTENED TO THE VIEWS OF YOUR FELLOW JURORS.

4           DO NOT BE AFRAID TO CHANGE YOUR OPINION IF THE

5  DISCUSSION PERSUADES YOU THAT YOU SHOULD.  DO NOT COME TO A

6  DECISION MERELY BECAUSE OTHER JURORS THINK IT IS RIGHT.  IT IS

7  IMPORTANT THAT YOU ATTEMPT TO REACH A UNANIMOUS VERDICT, BUT,

8  OF COURSE, ONLY IF EACH OF YOU CAN DO SO AFTER HAVING MADE YOUR

9  OWN CONSCIENTIOUS DECISION.

10          DO NOT CHANGE AN HONEST BELIEF ABOUT THE WEIGHT AND

11  EFFECT OF THE EVIDENCE SIMPLY TO REACH A VERDICT.

12          SOME OF YOU HAVE TAKEN NOTES DURING THE TRIAL.

13  WHETHER OR NOT YOU TOOK NOTES, YOU SHOULD RELY ON YOUR OWN

14  MEMORY FOR WHAT WAS SAID.  NOTES ARE ONLY TO ASSIST YOUR

15  MEMORY.  YOU SHOULD NOT BE OVERLY INFLUENCED BY NOTES.

16          WHEN YOU RETIRE TO THE JURY ROOM TO DELIBERATE, THE

17  CLERK WILL BRING YOU THE FOLLOWING:  ONE, ALL OF THE EXHIBITS

18  RECEIVED IN EVIDENCE;

19          NUMBER TWO:  AN INDEX OF THE EXHIBITS;

20          NUMBER THREE:  A WORK COPY OF THESE JURY -- OF THESE

21  JURY INSTRUCTIONS FOR EACH OF YOU;

22          FOUR:  A WORK COPY OF THE VERDICT FORM FOR EACH OF

23  YOU;

24          AND, FIVE, AN OFFICIAL VERDICT FORM.

25          YOU DO NOT HAVE TO DISCUSS THE QUESTIONS IN THE

1   STRICT SEQUENCE INDICATED IN THE SPECIAL VERDICT FORM.  BUT YOU

2   MUST BY THE END ANSWER UNANIMOUSLY AS INDICATED IN THE FORM.

3           WHEN YOU RECESS AT THE END OF A DAY, PLEASE PLACE

4   YOUR WORK MATERIALS IN THE BROWN ENVELOPE PROVIDED AND COVER UP

5   ANY EASELS CONTAINING YOUR WORK NOTES, SO THAT IF MY STAFF

6   NEEDS TO GO INTO THE JURY ROOM, THEY WILL NOT EVEN

7   INADVERTENTLY SEE ANY OF YOUR WORK IN PROGRESS.

8           A U.S. MARSHAL WILL BE OUTSIDE THE JURY ROOM DOOR

9   DURING YOUR DELIBERATIONS.  IF IT BECOMES NECESSARY DURING YOUR

10  DELIBERATIONS TO COMMUNICATE WITH ME, YOU MAY SEND A NOTE

11  THROUGH THE MARSHAL, SIGNED BY YOUR FOREPERSON, OR BY ONE OR

12  MORE MEMBERS OF THE JURY.

13          NO MEMBER OF THE JURY SHOULD EVER ATTEMPT TO

14  COMMUNICATE WITH ME EXCEPT BY A SIGNED WRITING.  AND I WILL

15  RESPOND TO THE JURY CONCERNING THE CASE ONLY IN WRITING OR HERE

16  IN OPEN COURT.

17          IF YOU SEND OUT A QUESTION, I WILL CONSULT WITH THE

18  LAWYERS BEFORE ANSWERING IT, WHICH MAY TAKE SOME TIME.

19          YOU MAY CONTINUE YOUR DELIBERATIONS WHILE WAITING FOR

20  THE ANSWER TO ANY QUESTION.

21          REMEMBER THAT YOU ARE NOT TO TELL ANYONE, INCLUDING

22  ME, HOW THE JURY STANDS, NUMERICALLY OR OTHERWISE, UNTIL AFTER

23  YOU HAVE REACHED A UNANIMOUS VERDICT OR HAVE BEEN DISCHARGED.

24          DO NOT DISCLOSE ANY VOTE COUNT IN ANY NOTE TO THE

25  COURT.

1    YOU HAVE BEEN REQUIRED TO BE HERE EACH DAY FROM 7:45

2  TO 1:00.  NOW THAT YOU ARE GOING TO BEGIN YOUR DELIBERATIONS,

3  HOWEVER, YOU ARE FREE TO MODIFY THIS SCHEDULE WITHIN REASON.

4    FOR EXAMPLE, IF YOU WISH TO CONTINUE DELIBERATING IN

5  THE AFTERNOONS, AFTER A REASONABLE LUNCH BREAK, THAT IS FINE.

6  THE COURT DOES RECOMMEND, HOWEVER, THAT YOU CONTINUE TO START

7  YOUR DELIBERATIONS BY 8:00 A.M.

8    IT IS VERY IMPORTANT THAT YOU LET THE CLERK KNOW IN

9  ADVANCE WHAT HOURS YOU WILL BE DELIBERATING SO THAT THE LAWYERS

10  MAY BE PRESENT IN THE COURTHOUSE AT ALL TIMES THE JURY IS

11  DELIBERATING.

12    I'M GOING TO REPEAT THAT IN SLIGHTLY DIFFERENT WORDS.

13    ALWAYS LET US KNOW WHEN YOU'RE IN SESSION OR NOT

14  GOING TO BE IN SESSION, OR WHEN YOU'RE GOING TO TAKE A LUNCH

15  BREAK SO I CAN MAKE SURE THE LAWYERS ARE RIGHT HERE AND READY

16  TO RESPOND TO ANY NOTE OR VERDICT THAT YOU MAY BE PREPARED TO

17  RENDER.

18    IT IS VERY IMPORTANT THAT YOU LET THE CLERK -- I'VE

19  ALREADY READ THAT.

20    ALL RIGHT.  YOU MAY DELIBERATE ONLY WHEN ALL OF YOU

21  ARE TOGETHER.  REPEAT THAT.  YOU MAY ONLY DELIBERATE WHEN ALL

22  OF YOU ARE TOGETHER.

23    THAT MEANS, FOR EXAMPLE, THAT IN THE MORNINGS BEFORE

24  EVERYONE HAS ARRIVED, OR WHEN SOMEONE STEPS OUT OF THE JURY

25  ROOM TO GO TO THE RESTROOM, YOU MAY NOT DISCUSS THE CASE.  AS

1   WELL, THE ADMONITION THAT YOU ARE NOT TO SPEAK TO ANYONE

2   OUTSIDE THE JURY ROOM ABOUT THIS CASE STILL APPLIES DURING YOUR

3   DELIBERATIONS.

4           AFTER YOU HAVE REACHED A UNANIMOUS AGREEMENT ON A

5   VERDICT, YOUR FOREPERSON WILL FILL IN, DATE AND SIGN THE

6   VERDICT FORM AND ADVISE THE COURT THROUGH THE MARSHAL THAT YOU

7   HAVE REACHED A VERDICT.

8           THE FOREPERSON SHOULD HOLD ON TO THE FILLED-IN

9   VERDICT FORM AND BRING IT INTO THE COURTROOM WHEN THE JURY

10  RETURNS THE VERDICT.

11          THANK YOU FOR YOUR CAREFUL ATTENTION.  THE CASE IS

12  NOW IN YOUR HANDS.  YOU MAY NOW RETIRE TO THE JURY ROOM AND

13  BEGIN YOUR DELIBERATIONS.  THANK YOU.

14          **THE CLERK:**  ALL RISE.

15          (THEREUPON, THE JURY RETIRED TO BEGIN DELIBERATIONS.)

16          **THE COURT:**  ALL RIGHT.  BE SEATED, PLEASE.  A COUPLE

17  OF SMALL THINGS.  I WILL -- I NOTED A COUPLE OF SMALL ERRORS

18  I'M GOING TO CORRECT IN THE WAY I READ THESE.  I'M GOING TO GO

19  GET IT FIXED SO IT WILL CORRESPOND TO WHAT I ACTUALLY TOLD THE

20  JURY.  I WILL GIVE EACH SIDE A COPY, BUT I WILL QUICKLY SEND IT

21  IN TO THE JURY ROOM.  SO I DON'T THINK THERE'S ANY -- AT THIS

22  POINT IT'S JUST A MATTER OF MAKING SURE IT TRACKS WHAT I SAID.

23          NUMBER TWO, AS SOON AS WE KNOW THEIR SCHEDULE WE WILL

24  LET YOU KNOW.  AND YOU SHOULD NEVER GO OUTSIDE THE BUILDING

25  WHILE -- IN OTHER WORDS, DON'T GO DOWN TO THE CUSHY LAW OFFICE.

1    SIT ON THE HARD BENCHES OR GO TO THE LAWYERS' LOUNGE.  BUT BE

2    HERE IN THE BUILDING SO THAT I CAN GET YOU ON VERY SHORT

3    NOTICE.  DAWN TOLD ME YOU CAME UP WITH A JOINT EXHIBIT LIST, SO

4    THAT'S GREAT.  WE'LL SEND THAT IN, AS WELL.  DAWN WILL VERY

5    QUICKLY TAKE IN -- PROBABLY WITHIN THREE TO TEN MINUTES -- ALL

6    OF THE EXHIBITS.  AND THEN, WE JUST WAIT.

7            SO ANY -- ANYTHING YOU WANT TO SAY BEFORE WE TAKE A

8    SHORT RECESS?

9            **MR. KESSLER:**  JUST A QUESTION, YOUR HONOR.  SO IN

10   CASE WE'RE DOWN IN THE CAFETERIA OR SOMETHING SHOULD WE LEAVE

11   OUR CELL PHONE WITH YOUR CLERK OR SOMEONE SO THAT YOU WOULD

12   KNOW WE MIGHT BE ON THE SECOND FLOOR?

13           **THE COURT:**  THAT'S WHAT YOU SHOULD DO, BUT LET US

14   KNOW WHERE YOU WILL BE IN CASE THE CELL PHONE DOESN'T WORK OR

15   SOMETHING.

16           **MR. KESSLER:**  OKAY.

17           **THE COURT:**  IF YOU'RE GOING TO BE IN THE CAFETERIA,

18   THAT'S FINE.  WHEN THE JURY GOES TO THE CAFETERIA, PLEASE DON'T

19   GO THERE.  I JUST DON'T EVEN WANT TO TAKE A CHANCE THAT THEY

20   WOULD THINK THAT YOU'RE TRYING TO -- I DON'T KNOW THAT THEY'RE

21   GOING TO DO THAT.  THEY OFTEN HAVE LUNCH BROUGHT IN.  IT'S UP

22   TO THEM.  BUT IF THEY DO GO TO THE CAFETERIA, YOU OUGHT TO GO

23   SOMEWHERE ELSE.

24           **MR. KESSLER:**  YOU TOLD US NOT TO LEAVE THE BUILDING,

25   THOUGH.  SO --

1       **THE COURT:** THERE'S ALSO A SMALL STAND THAT SELLS

2  FOOD IN CELLOPHANE PACKAGES ON THE TENTH FLOOR, I BELIEVE.

3  IT'S NOT CUSTOMARY FARE FOR YOUR FIRM, I'M SURE, BUT YOU'LL

4  HAVE TO SUFFER.

5       **MR. KESSLER:** WE'LL MAKE DUE, YOUR HONOR, WITH

6  WHATEVER IS AVAILABLE.

7       **THE COURT:** I KNOW IT'S NOT FOR MR. PARCHER, EITHER,

8  IN YOUR LAW FIRM. BUT IT'S THE KIND OF STUFF WE HAVE TO EAT

9  HERE IN THE FEDERAL COURTHOUSE.

10      ALL RIGHT. ANYTHING MORE? OKAY. WELL, YOU LAWYERS

11 HAVE DONE YOUR JOB NOW. THERE'S NOTHING MORE YOU CAN DO BUT

12 WAIT. I SUPPOSE IF THERE'S A NOTE YOU'LL STILL HAVE TO DO SOME

13 MORE WORK.

14      BUT YOU CAN BREATH A SIGH OF RELIEF AND SIT BACK AND

15 RELAX A BIT, I GUESS.

16      **MR. KATZ:** WE WOULD LIKE TO THANK YOU, YOUR HONOR,

17 FOR YOUR DILIGENCE AND ATTENTION.

18      **MR. KESSLER:** YES. YES, YOUR HONOR. WE SHARE THAT.

19 AND AFTER 4 O'CLOCK SHOULD WE ASSUME 7:30 ON MONDAY? IS THAT

20 WHEN YOU WOULD LIKE US BACK?

21      **THE COURT:** I SUSPECT WE WILL KNOW THEIR TIME. IF

22 THEY SAY "8 O'CLOCK," THEN YOU DON'T HAVE TO BE HERE UNTIL

23 8 O'CLOCK, EITHER. BUT LET'S SEE WHAT THEY SAY WILL BE THEIR

24 HOURS, AND THEN YOU SHOULD ALWAYS BE HERE.

25      NOW, YOU DON'T ALL HAVE TO BE HERE. YOU CAN JUST

1  HAVE ONE LAWYER PER SIDE.  AND, AGAIN, MR. BERTHELSEN SHOULD

2  NOT BE LEAVING WITHOUT ME KNOWING ABOUT IT.  I THINK HE SHOULD

3  NOT LEAVE TODAY.  IF THIS STARTS TO DRAG OUT, THEN WE'LL HAVE

4  AN ISSUE, UNLESS THERE'S SOME URGENT MATTER --

5           **MR. KESSLER:**  I ASSUME, YOUR HONOR, IF HE STAYS UNTIL

6  4:00 TODAY, AND THERE'S NO VERDICT, THAT HE CAN GO OVER THE

7  WEEKEND AND COME BACK BEFORE MONDAY.  THAT'S NOT A PROBLEM.

8           **THE COURT:**  HE CAN DO THAT.

9           **MR. KESSLER:**  YES.

10          **THE COURT:**  I WANT HIM HERE IN CASE WE HAVE TO HAVE A

11 SHORT SUPPLEMENTAL PROCEEDING.  THAT'S THE -- THAT'S THE

12 BUGABOO.  ALL RIGHT.  THANK YOU, COUNSEL.  WE'LL KEEP YOU

13 POSTED AS SOON AS WE KNOW WHAT THE DEAL IS.

14          **MR. KESSLER:**  THANK YOU.

15          (THEREUPON, THIS TRIAL WAS CONTINUED UNTIL MONDAY,

16 NOVEMBER 10TH, 2008, AT 7:30 O'CLOCK A.M.)

17                        -  -  -  -

18              **CERTIFICATE OF REPORTER**

19          I CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT

20 FROM THE RECORD OF PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

21 DATE:  FRIDAY, NOVEMBER 7, 2008

22

23              S/B KATHERINE POWELL SULLIVAN
        _____

24      KATHERINE POWELL SULLIVAN, CSR #5812, RPR, CRR
                   U.S. COURT REPORTER

25

**I N D E X**

| | | |
|---|---|---|
| CLOSING ARGUMENT BY MR. PARCHER | 2657 | 13 |
| CLOSING ARGUMENT BY MR. KESSLER | 2708 | 13 |
| REBUTTAL CLOSING ARGUMENT BY MR. PARCHER | 2773 | 13 |
| JURY INSTRUCTED | 2787 | 13 |

**E X H I B I T S**

| TRIAL EXHIBITS | IDEN | VOL. | EVID | VOL. |
|---|---|---|---|---|
| 1263-108 | | | 2643 | 13 |
| | | | **WITHDRAWN** | |
| 1268-108 | | | 2643 | 13 |
| 2370 | | | 2651 | 18 |