VOLUME 8

PAGES  1609 –

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE WILLIAM H. ALSUP

BERNARD PAUL PARRISH, HERBERT      )
ANTHONY ADDERLEY, WALTER ROBERTS   )
III,                               )
                                   )
          PLAINTIFFS,              )
                                   )
  VS.                              )  NO. C 07-0943 WHA
                                   )
NATIONAL FOOTBALL LEAGUE PLAYERS   )
ASSOCIATION AND NATIONAL FOOTBALL  )
LEAGUE PLAYERS INCORPORATED D/B/A  )
PLAYERS INC,                       )
                                   )  SAN FRANCISCO, CALIFORNIA
          DEFENDANTS.              )  FRIDAY
_____)  OCTOBER 31, 2008

## TRANSCRIPT OF PROCEEDINGS

**APPEARANCES:**

**FOR PLAINTIFFS:**          MANATT, PHELPS & PHILLIPS
                             1001 PAGE MILL ROAD, BUILDING 2
                             PALO ALTO, CALIFORNIA 94304
                   BY:  **RONALD S. KATZ, ESQ.**
                        **RYAN S. HILBERT, ESQ.**

                             MANATT, PHELPS & PHILLIPS
                             7 TIMES SQUARE
                             NEW YORK CITY, NEW YORK 10036
                   BY:  **L. PETER PARCHER, ESQ.**

                             MANATT, PHELPS & PHILLIPS
                             11355 WEST OLYMPIC BOULEVARD
                             LOS ANGELES, CALIFORNIA  90064
                   BY:  **CHAD HUMMEL, ESQ.**

(APPEARANCES CONTINUED ON NEXT PAGE)

**APPEARANCES CONTINUED:**

**ALSO FOR PLAINTIFFS:**    MCKOOL SMITH
        300 CRESCENT COURT
        SUITE 1500
        DALLAS, TEXAS  75201
    BY:  **LEWIS T. LECLAIR, ESQ.**
        **JILL ADLER NAYLOR, ESQ.**
        **ANTHONY GARZA, ESQ.**
        **BRETT CHARHON, ESQ.**

**FOR DEFENDANTS:**    DEWEY & LEBOEUF
        1301 AVENUE OF THE AMERICAS
        NEW YORK CITY, NEW YORK  10019-6092
    BY:  **JEFFREY L. KESSLER, ESQ.**
        **DAVID GREENSPAN, ESQ.**
        **DAVID G. FEHER, ESQ.**
        **ROY TAUB, ESQ.**
        **MOLLY DONOVAN, ESQ.**
        **JASON CLARK, ESQ.**

        WEIL, GOTSHAL & MANGES LLP
        767 FIFTH AVENUE
        NEW YORK, NEW YORK 10153-0119
    BY:  **BRUCE S. MEYER, ESQ.**

**REPORTED BY:**    *KATHERINE POWELL SULLIVAN, CSR # 5812*
        *OFFICIAL REPORTER - U.S. DISTRICT COURT*

1           **P R O C E E D I N G S**

2    **OCTOBER 31, 2008**                                        **7:30 A.M.**

3

4                (THE FOLLOWING PROCEEDINGS WERE HELD IN OPEN COURT,

5                OUTSIDE THE PRESENCE OF THE JURY.)

6           **THE COURT:**  OKAY.  LET'S GET STARTED.  I'VE TALLIED

7    UP SOME TIME HERE.  I HAVE THE PLAINTIFFS HAVE USED SLIGHTLY

8    UNDER 700 HOURS.  USED 697 HOURS.

9           **MR. HUMMEL:**  MINUTES?

10          **THE COURT:**  MINUTES.

11          **MR. HUMMEL:**  SEEMS LIKE HOURS.

12          **THE COURT:**  SEEMS LIKE HOURS.  MINUTES.  AND 1,080

13   HAVE BEEN ALLOCATED.

14          THEN DEFENSE I HAVE AT 525.  IF ANYONE THINKS I'M OFF

15   MORE THAN 5 PERCENT, I WOULD LIKE TO KNOW, BECAUSE I'VE DONE

16   THE MATH A COUPLE OF TIMES, BUT I COULD MAKE AN ERROR OF

17   COURSE.

18          ANYTHING ANYONE WANTS TO RAISE THIS MORNING?

19          **MR. KESSLER:**  YOUR HONOR, I DO, JUST ONE ISSUE.  THE

20   FIRST WITNESS THAT PLAINTIFFS ARE CALLING THIS MORNING IS

21   RICHARD BERTHELSEN.

22          MR. BERTHELSEN, UNTIL VERY RECENTLY, WAS THE LONG

23   TIME GENERAL COUNSEL OF THE NFLPA.  AND ON THE ISSUE OF THE

24   RETIRED PLAYER GLA, THE ONLY INFORMATION HE HAS ABOUT THAT

25   DOCUMENT IS IN THE CONTEXT OF ATTORNEY-CLIENT INFORMATION.

1    IN OTHER WORDS, HE'S NEVER ADDRESSED IT IN ANY OTHER

2 CONTEXT.  AND, THEREFORE, RATHER THAN -- I DON'T KNOW IF THEY

3 INTEND TO ASK HIM ABOUT THE GLA OR ITS MEANING, OR ANYTHING

4 ELSE, BUT HE HAS NO NONPRIVILEGED INFORMATION.

5    AND I JUST WANT TO RAISE THAT NOW SO I DON'T HAVE TO,

6 IN FRONT OF THE JURY, START ASSERTING "OBJECTION, PRIVILEGE" IF

7 THAT'S WHAT THEY INTEND TO GO INTO IN RESPECT TO THAT.

8    **THE COURT:**  MR. BERTHELSEN WAS A LAWYER WHERE?

9    **MR. KESSLER:**  GENERAL COUNSEL FOR THE NATIONAL

10 FOOTBALL LEAGUE PLAYERS ASSOCIATION.  HE WAS PURELY A LEGAL

11 OFFICER UNTIL HE ASSUMED MR. UPSHAW'S POSITION JUST, YOU KNOW,

12 A MONTH OR SO AGO.  BEFORE THAT HE WAS THE LAWYER.

13    **THE COURT:**  WELL, LET'S HEAR FROM THE OTHER SIDE.

14    ARE YOU GOING TO BE INQUIRING INTO ATTORNEY-CLIENT

15 PRIVILEGE?

16    **MR. HUMMEL:**  CERTAINLY NOT INTO ATTORNEY-CLIENT

17 COMMUNICATIONS, NO.

18    **MR. KESSLER:**  THE POINT WOULD BE, YOUR HONOR, IF THEY

19 ASK HIM DID HE HAVE AN UNDERSTANDING OF THE GLA, THE ONLY THING

20 HE WOULD HAVE IS HIS ATTORNEY MENTAL PROCESS.  SO I DON'T THINK

21 THERE ARE ANY QUESTIONS ABOUT THE GLA THAT ARE APPROPRIATE.

22    THERE MAY BE OTHER QUESTIONS THAT ARE APPROPRIATE

23 THAT ARE NONPRIVILEGED.  BUT THAT PARTICULAR SUBJECT, IN

24 PREPARING MR. BERTHELSEN, WE ESTABLISHED THAT HE HAS NO

25 UNDERSTANDING OF THE GLA OTHER THAN HE HAS GOTTEN IN

1    ATTORNEY—CLIENT PRIVILEGED DISCUSSIONS.  HE WAS NOT THE DRAFTER

2    OF THE GLA, EITHER.

3            **THE COURT:**  SO DO YOU PLAN ON INQUIRING INTO THAT

4    SUBJECT?

5            **MR. HUMMEL:**  SUBJECT OF COMMUNICATIONS REGARDING THE

6    GLA?  NO.

7            **THE COURT:**  NO, BUT HE WASN'T INVOLVED IN THE

8    DRAFTING OF THE GLA, WAS HE?

9            **MR. HUMMEL:**  HE WAS THE GENERAL COUNSEL OF THE

10   COMPANY.  HE IS NOW HEAD OF THE UNION.  I AM CERTAINLY ENTITLED

11   TO ASK —

12           **THE COURT:**  I'M NOT GOING TO ALLOW YOU TO ASK A

13   WITNESS WHO WAS NOT INVOLVED IN THE NEGOTIATION —

14           **MR. HUMMEL:**  I'M NOT GOING TO ASK THAT.

15           **THE COURT:**  YOU MUST FIRST ESTABLISH THAT HE WAS

16   INVOLVED IN THE ACTUAL NEGOTIATIONS.

17           **MR. HUMMEL:**  THERE WERE NO NEGOTIATIONS.

18           **THE COURT:**  JUST A SECOND, COUNSEL.  YOU ARE ASKING

19   ABOUT ALTERNATIVE MEANINGS OF THE GLA FOR A WITNESS WHO WAS NOT

20   IN THE NEGOTIATIONS —

21           **MR. HUMMEL:**  I DO NOT INTEND TO DO THAT, YOUR HONOR.

22           **THE COURT:**  — OR THE DRAFTING.

23           **MR. HUMMEL:**  I DON'T INTEND TO DO THAT.

24           **THE COURT:**  ALL RIGHT.  SO IF WE GO THERE, I'M GOING

25   TO ADMONISH THE JURY.

1          **MR. HUMMEL:**  FINE.

2          **THE COURT:**  NOW, I -- MERELY BECAUSE HE IS THE

3   GENERAL COUNSEL DOES NOT MEAN THAT ANY AND ALL E-MAILS AND

4   COMMUNICATIONS THAT HE HAD WERE PRIVILEGED.  IT'S A

5   CASE-BY-CASE THING.

6          IT HAS TO BE ON A CONVERSATION-BY-CONVERSATION BASIS.

7   SO WE WILL JUST -- IF YOU GET INTO A CONVERSATION THAT WAS

8   PRIVILEGED, WE HAVE TO DECIDE:  WAS IT PRIVILEGED OR NOT?  BUT

9   THAT'S SEPARATE FROM THIS OTHER GRANDSTANDING THING.

10         THIS WITNESS, BEFORE YOU ASK HIM ABOUT THE MEANING OF

11  THE GLA, YOU HAVE TO ESTABLISH SOME FOUNDATION THAT HE IS IN

12  ONE OF THE NORMAL POSITIONS THAT HE WOULD HAVE FOUNDATION TO

13  EXPRESS AN OPINION, SUCH AS THAT HE DRAFTED IT, THAT HE

14  RECEIVED SOME -- THAT HE WAS IN SOME KIND OF A LOOP THAT WOULD

15  GIVE HIM AN OCCASION.

16         IF ALL IT'S GOING TO BE THAT HE IS LOOKING AT IT

17  TODAY OR WAS INVOLVED IN THIS LITIGATION, AND HERE IS HIS

18  OPINION TODAY, THAT'S NOT HELPFUL.

19         **MR. KESSLER:**  YOUR HONOR, IF I MAY -- AND THIS WILL

20  HELP:  MY UNDERSTANDING IS THE ONLY INVOLVEMENT THIS WITNESS

21  HAD WITH THE GLA IS YOU'LL REMEMBER THAT THERE'S ANOTHER

22  LITIGATION CALLED THE "JUSTIN LITIGATION," WHICH PLAINTIFFS

23  MOVED TO EXCLUDE ANY REFERENCE ABOUT, WHICH -- BY OTHER RETIRED

24  PLAYERS.  AND YOUR HONOR GRANTED THEIR MOTION AND SAID:

25              "NO ONE MAY REFER TO THE JUSTIN LITIGATION."

1                IN THE CONTEXT OF THAT LITIGATION, HE RENDERED LEGAL

2    ADVICE TO HIS CLIENT BECAUSE THERE WAS A LITIGATION, AND HE GOT

3    INFORMATION IN ATTORNEY-CLIENT PRIVILEGE ABOUT THE GLA IN

4    RESPONDING TO LITIGATION.

5                **THE COURT:**  LOOK, LOOK.

6                **MR. KESSLER:**  WE'RE CONCERNED NOT TO GET INTO THAT

7    BECAUSE YOUR HONOR HAS PRECLUDED THAT.  WE DON'T WANT TO GET

8    INTO THAT.

9                **THE COURT:**  LOOK.  THAT'S OFF THE TABLE, ANYWAY,

10   BECAUSE YOU MADE THE MOTION, RIGHT?

11               **MR. KESSLER:**  YES.

12               **MR. HUMMEL:**  WELL, CERTAINLY WE MADE THE MOTION.

13               **THE COURT:**  ALL RIGHT.

14               **MR. HUMMEL:**  BUT WHETHER DOUG ALLEN TOLD HIM THINGS

15   THAT HE TESTIFIED ABOUT IN HIS DEPOSITION, WHERE THERE WAS NOT

16   AN OBJECTION ON PRIVILEGE GROUNDS, CERTAINLY THAT'S FAIR GAME.

17   IT GOES TO WHAT DOUG ALLEN TOLD HIM ABOUT THE GLA.

18               **THE COURT:**  IF IT WAS NOT -- IF A PRIVILEGE WAS NOT

19   ASSERTED.

20               **MR. HUMMEL:**  CORRECT.

21               **THE COURT:**  IN OTHER WORDS, IF DOUG ALLEN MADE AN

22   ADMISSION AND SAID:

23               "YES, WE SCREWED THE RETIRED PLAYERS, AND WE'RE

24   IN DEEP, DEEP TROUBLES" -- AND I'M MAKING THAT UP AS A

25   HYPOTHETICAL --

1          **MR. HUMMEL:**  IT'S NOT HYPOTHETICAL.

2          **THE COURT:**  -- THAT HE EVER SAID SUCH A THING.

3          **MR. HUMMEL:**  RIGHT.

4          **THE COURT:**  IF HE MADE SUCH ADMISSION, AND HE

5    TESTIFIED TO --

6          **MR. HUMMEL:**  RIGHT.  YES, OF COURSE.

7              (COUNSEL AND THE COURT SPEAKING SIMULTANEOUSLY, WHICH

8              WAS NOT REPORTABLE.)

9          **MR. KESSLER:**  ANYTHING HE SAID IN HIS DEPOSITION

10   WOULD NOT ASSERT PRIVILEGE.  BUT I WOULD NOTE IF HE GOES INTO

11   THINGS WHERE THE ONLY WAY MR. BERTHELSEN CAN EXPLAIN IT IS THE

12   DOOR OPENING, EXPLAIN THERE IS THIS CLAIM, AND THE REASON THEY

13   DON'T WANT THIS IS THE RETIRED PLAYERS THERE LOOKED AT IT AND

14   CONCLUDED THERE WAS NO CLAIM AND WENT AWAY.  AND THAT'S WHY

15   THEY WANT IT EXCLUDED.  IF THEY'RE GOING TO PUSH IN THAT

16   SPECIFIC AREA --

17         **MR. HUMMEL:**  I AM NOT OPENING THAT DOOR ONE IOTA.

18         **THE COURT:**  WELL, LOOK.  I AM NOT MAKING ANY RULING

19   RIGHT NOW.  I'M JUST GIVING YOU SOME GUIDELINES.  BUT I AM

20   SAYING THIS.  IF THIS WERE TO DEGENERATE INTO PUTTING A WITNESS

21   ON THE STAND WHO HAS NO BASIS TO GIVE -- WHO HAD NO SUBJECTIVE

22   INTENT AT THE TIME BECAUSE HE WASN'T INVOLVED AT THE TIME, AND

23   ALL YOU'RE DOING NOW IS SAYING:

24              "WELL, YOU'RE THE GENERAL COUNSEL.  WHAT DO YOU

25   THINK THIS MEANS?" THAT'S NOT GOING -- THAT'S NOT HELPFUL.  SO

1   WE'RE NOT GOING TO DO THAT.

2           **MR. KESSLER:**  THANK YOU, YOUR HONOR.

3           **THE COURT:**  BUT I EXPECT THERE'S A LOT OF GROUND YOU

4   COULD COVER WITHOUT EVER GETTING TO THAT POINT.  AND WE'LL HAVE

5   TO TAKE IT QUESTION BY QUESTION.

6           ALL RIGHT.  WHAT ELSE DO YOU WANT TO RAISE?

7           **MR. KESSLER:**  THAT'S ALL I HAD TO RAISE.

8           **THE COURT:**  ALL RIGHT.  ARE WE ALL SET TO GO?  LET'S

9   SEE IF THE JURY IS PRESENT.

10          (BRIEF PAUSE IN THE PROCEEDINGS.)

11          (THE FOLLOWING PROCEEDINGS WERE HELD IN OPEN COURT,

12          IN THE PRESENCE OF THE JURY.)

13          **THE COURT:**  PLEASE BE SEATED.  HAPPY HALLOWEEN TO ALL

14  OF OUR JURORS.

15          YEARS FROM NOW YOU'RE GOING TO REMEMBER THIS CASE

16  BECAUSE DURING THIS CASE WE HAD THE GREATEST STOCK MARKET CRASH

17  SINCE THE DEPRESSION, HALLOWEEN CAME, WE'RE GOING TO HAVE AN

18  ELECTION DAY NEXT WEEK, AND HERE YOU ARE DOING YOUR COUNTRY'S

19  WORK EVERY DAY.  THANK YOU FOR THAT.  BUT A LOT OF THINGS HAVE

20  HAPPENED.

21          TODAY BEING HALLOWEEN, I SEE WE HAVE ONE JUROR,

22  MRS. MARTIN, SHE DRESSED APPROPRIATELY TODAY.  THANK YOU FOR

23  DOING THAT.

24          I WAS EXPECTING THAT MAYBE ONE OF THE LAWYERS WOULD

25  COME DRESSED AS BABE RUTH AND THE OTHER YOGI BERRA TODAY.  NO,

1    I THINK NOT.

2          OKAY.  WE'RE GOING TO START.  WE'RE STILL ON THE

3    PLAINTIFFS' CASE, AND THE PLAINTIFF CAN CALL THEIR NEXT

4    WITNESS.

5          **MR. HUMMEL:**  THANK YOU, YOUR HONOR.  PLAINTIFFS CALL

6    RICHARD BERTHELSEN.

7          **THE COURT:**  ALL RIGHT.  MR. BERTHELSEN, PLEASE COME

8    FORWARD.

9          RAISE YOUR RIGHT HAND AND WE'LL SWEAR YOU IN.

10         (THEREUPON, THE WITNESS WAS SWORN.)

11         **THE COURT:**  I DO.

12         **THE CLERK:**  OKAY.  THANK YOU.

13         **THE COURT:**  ALL RIGHT.  MR. BERTHELSEN, YOU'VE BEEN

14   HERE EVERY DAY.

15         **THE WITNESS:**  GOOD MORNING.

16         **THE COURT:**  SO YOU KNOW THE DRILL.  CAN WE TAKE YOUR

17   PICTURE FOR CLOSING ARGUMENTS?

18         (PICTURE TAKEN.)

19         **THE CLERK:**  THANK YOU.

20         **THE COURT:**  BE SURE TO SPEAK UP SO THE MIC CATCHES

21   YOUR VOICE.

22         MR. HUMMEL, YOU MAY GO AHEAD.

23         **MR. HUMMEL:**  THANK YOU, YOUR HONOR.

24         GOOD MORNING, LADIES AND GENTLEMEN.

25

1   **RICHARD BERTHELSEN,**

2   CALLED AS A WITNESS FOR THE PLAINTIFFS HEREIN, HAVING BEEN

3   FIRST DULY SWORN, WAS EXAMINED AND TESTIFIED AS FOLLOWS:

4   **DIRECT EXAMINATION**

5   **BY MR. HUMMEL:**

6   **Q.**   MR. BERTHELSEN, HOW ARE YOU EMPLOYED BY THE NFL PLAYERS

7   ASSOCIATION?

8   **A.**   I'M THE ACTING EXECUTIVE DIRECTOR AND GENERAL COUNSEL.

9   **Q.**   YOU'RE NOW THE HEAD OF THE UNION, CORRECT?

10  **A.**   ON AN INTERIM BASIS, YES.

11  **Q.**   OKAY.  AND HOW LONG HAVE YOU BEEN WITH THE UNION, SIR?

12  **A.**   SINCE MAY 15TH OF 1972.

13  **Q.**   1972.  THAT'S EFFECTIVELY A CAREER WITH THE NFLPA,

14  CORRECT?

15  **A.**   HOPEFULLY, AN EFFECTIVE CAREER, YES.

16  **Q.**   AND YOU'VE BEEN THE GENERAL COUNSEL FOR OVER 25 YEARS; IS

17  THAT RIGHT?

18  **A.**   JUST ABOUT 25 YEARS.  I WAS APPOINTED AS GENERAL COUNSEL

19  IN 1983.

20  **Q.**   AND AM I CORRECT THAT THE GENERAL COUNSEL FOR A COMPANY IS

21  THE HEAD LAWYER WITHIN THAT ORGANIZATION; IS THAT RIGHT?

22  **A.**   THE HEAD IN-HOUSE COUNSEL IS THE WAY I ALWAYS TEND TO PUT

23  IT, YES.

24  **Q.**   AND YOU FROM TIME TO TIME HAVE RETAINED OUTSIDE COUNSEL TO

25  WORK WITH YOU.  THAT'S WHY YOU SAY "INSIDE," RIGHT?

1   A.   THAT'S RIGHT, YES.

2   Q.   OKAY.  NOW, PLAYERS INC WAS FORMED IN 1994; IS THAT RIGHT?

3   A.   I BELIEVE THAT WAS THE YEAR, YES.

4   Q.   DID YOU SERVE AS THE GENERAL COUNSEL FOR PLAYERS INC AS

5   WELL?

6   A.   NO.

7   Q.   WAS THERE A SEPARATE GENERAL COUNSEL FOR PLAYERS INC?

8   A.   NOT -- NOT BY THAT TITLE.  BUT WE USED OUTSIDE COUNSEL

9   ALMOST EXCLUSIVELY WITH REGARD TO THAT.

10  Q.   DID YOU HAVE ANY ROLE IN CONNECTION WITH PLAYERS INC OVER

11  THE YEARS?

12  A.   NOT IN PARTICULAR, NO.  I DID NOT SERVE AS -- SERVE IN ANY

13  TITLE AS FAR AS PLAYERS INC IS CONCERNED.

14  Q.   YOU CERTAINLY KNEW WHAT IT DID, RIGHT?

15  A.   YES, I DID.

16  Q.   AND YOU CERTAINLY KNEW WHAT ITS MISSION WAS, RIGHT?

17  A.   YES.

18  Q.   AND ITS MISSION WAS TO TAKE THE HELMETS OFF THE PLAYERS

19  AND MARKET THEM AS PERSONALITIES AS WELL AS PROFESSIONAL

20  ATHLETES; IS THAT RIGHT?

21  A.   THAT WAS PART OF IT, CERTAINLY.

22  Q.   AND WAS IT ALSO TRUE THAT PLAYERS INC REPRESENTED MORE

23  THAN 1800 ACTIVE PLAYERS AND OVER 3,000 RETIRED PLAYERS?

24  A.   THAT SOUNDS CORRECT.

25  Q.   OKAY.  AND WAS IT TRUE THAT IN CONNECTION WITH THAT GROUP,

1  THAT 1800 ACTIVE PLAYERS AND 3,000 RETIRED PLAYERS, THAT

2  PLAYERS INC WAS AGGRESSIVE IN ITS EFFORTS TO EXPAND PLAYER

3  MARKETING OPPORTUNITIES?

4  **A.**   YES.

5  **Q.**   OKAY.  NOW, IF I COULD JUST SHOW YOU WHAT'S ALREADY BEEN

6  PREVIOUSLY MARKED AS EXHIBIT 5.

7           (DOCUMENT DISPLAYED.)

8           THAT'S BASICALLY WHAT I JUST READ TO YOU, SIR.

9  THAT'S THE WEB SITE OF PLAYERS INC.  AND IT SAYS THERE THAT

10 PLAYERS INC REPRESENTS MORE THAN 1800 ACTIVE PLAYERS AND OVER

11 3,000 RETIRED PLAYERS.

12          NOW, DID YOU HAVE ANY HAND IN WRITING THAT WEBSITE?

13 **A.**   NO.

14 **Q.**   YOU DON'T DISAVOW IT, THOUGH, AS THE CORPORATE

15 REPRESENTATIVE OF THE UNION AND PLAYERS INC HERE TODAY, DO YOU?

16 **A.**   NO.

17 **Q.**   OKAY.  CAN YOU TELL ME THEN WHY, SIR, IMMEDIATELY AFTER

18 THIS LAWSUIT WAS FILED PLAYERS INC CHANGED ITS WEB SITE?

19 **A.**   I'M NOT AWARE OF THAT CHANGE.

20          **MR. HUMMEL:**  YOUR HONOR, PERMISSION TO READ REQUEST

21 FOR ADMISSION AND THE ANSWER TO NO. 14.

22          **THE COURT:**  ANY OBJECTION?

23          **MR. KESSLER:**  NO OBJECTION IF IT'S A REQUEST FOR

24 ADMISSION.

25          **THE COURT:**  ALL RIGHT.  PLEASE READ THE REQUEST

1    EXACTLY AND THE ANSWER EXACTLY.

2              **MR. HUMMEL:**  I WILL, YOUR HONOR.

3                   "REQUEST FOR ADMISSION NO. 14:  ADMIT THAT AFTER

4    THIS LAWSUIT WAS FILED YOU CHANGED THE LANGUAGE ON YOUR

5    WEB SITE TO SAY THAT PLAYERS INC REPRESENTS MANY MEMORABLE

6    RETIRED PLAYERS INSTEAD OF CLAIMING TO REPRESENT MORE THAN A

7    SPECIFIC NUMBER OF RETIRED PLAYERS.

8                   "RESPONSE TO REQUEST FOR ADMISSION NUMBER 14:

9    SOMETIME AFTER FEBRUARY 14, 2007, PLAYERS INC CHANGED THE

10   LANGUAGE ON ITS WEB SITE SO THAT IT CURRENTLY STATES, QUOTE:

11   'FORMED IN 1994, PLAYERS INC REPRESENTS MORE THAN 1800 ACTIVE

12   AND MANY MEMORABLE RETIRED NFL PLAYERS.'"

13   **BY MR. HUMMEL:**

14   **Q.**   ARE YOU SAYING, MR. BERTHELSEN, YOU HAVE NO PERSONAL

15   KNOWLEDGE OF WHY THAT CHANGE WAS MADE?

16   **A.**   I DON'T HAVE ANY PERSONAL KNOWLEDGE.

17   **Q.**   NOW, LET'S GO TO THE TIME THAT PLAYERS INC WAS

18   ESTABLISHED:  1994.  AND LET'S LOOK AT, IF YOU WOULD, TRIAL

19   EXHIBIT NO. 125.  IT'S IN EVIDENCE.

20              (DOCUMENT DISPLAYED.)

21              MR. BERTHELSEN, WERE YOU INVOLVED IN THE DRAFTING OF

22   THIS AGREEMENT?

23   **A.**   NO.

24   **Q.**   DO YOU HAVE KNOWLEDGE OF ITS TERMS?

25   **A.**   I HAVE KNOWLEDGE I'VE ACCUMULATED IN THE CONTEXT OF

1   LITIGATION.

2   **Q.**   LET'S NOT TALK ABOUT HOW YOU ACQUIRED THE KNOWLEDGE.

3   **A.**   OKAY.

4   **Q.**   MY QUESTION IS:  DO YOU HAVE KNOWLEDGE OF THE CONTENTS OF

5   TRIAL EXHIBIT 125?

6   **A.**   TO SOME DEGREE.

7   **Q.**   TO SOME DEGREE.  COULD YOU LOOK, PLEASE, AT PARAGRAPH 5(A)

8   ON PAGE 6?

9           **MR. KESSLER:**  YOUR HONOR, I'M JUST GOING TO OBJECT.

10  I THINK THE WITNESS SAID THE ONLY KNOWLEDGE HE ACQUIRED WAS IN

11  THE CONTEXT OF THIS LITIGATION.  I'M NOT SURE, THEREFORE --

12          **MR. HUMMEL:**  I HAVEN'T ASKED A QUESTION, YOUR HONOR.

13          **THE COURT:**  WELL, I THINK YOU'RE GETTING DANGEROUSLY

14  CLOSE TO VIOLATING THE ADMONITION I GAVE YOU BEFORE.  BUT GO

15  AHEAD AND ASK THE QUESTION.

16          YOU HAVE LAID NO FOUNDATION OTHER THAN JUST TO HAVE

17  AN ARGUMENT SESSION WITH THIS WITNESS OVER THE MEANING OF THIS

18  PROVISION.

19          **MR. HUMMEL:**  I DO NOT INTEND TO DO THAT.

20          **THE COURT:**  ALL RIGHT.  I'LL BEAR WITH YOU TO SEE IF

21  YOU'RE GOING TO A PLACE THAT'S OKAY.

22  **BY MR. HUMMEL:**

23  **Q.**   MR. BERTHELSEN, YOU'RE AWARE, ARE YOU NOT, THAT THIS IS

24  THE PROVISION THAT ESTABLISHED THAT PLAYERS WOULD BE PAID A

25  ROYALTY AMOUNT FROM GROUP LICENSING ACTIVITIES IN THE AMOUNT OF

1    37 PERCENT, CORRECT?

2    **A.**   I CAN CONFIRM THAT THAT'S WHAT THIS SAYS ON THE DOCUMENT,

3    YES.

4    **Q.**   OKAY.  AND ARE YOU AWARE THAT IN 1995 THE UNION

5    COMMISSIONED A STUDY OF THIS PARTICULAR ALLOCATION BY A COMPANY

6    CALLED DUFF & PHELPS?

7          YOU TESTIFIED ABOUT THAT IN YOUR DEPOSITION.  DO YOU

8    RECALL THAT?

9    **A.**   RIGHT, BUT I DON'T THINK I SAID "1995."

10   **Q.**   ALL RIGHT.

11          **MR. HUMMEL:**  WELL, CAN WE PUT EXHIBIT 94 ON THE

12   BOARD, PLEASE?  IT'S'S ON --

13   **BY MR. HUMMEL:**

14   **Q.**   DO YOU HAVE ANY INDEPENDENT RECOLLECTION THIS WAS 1995?

15   **A.**   I DON'T.

16   **Q.**   BUT YOU CERTAINLY WERE AWARE OF THIS STUDY, CORRECT?

17   **A.**   I WAS AWARE OF IT, YES.

18   **Q.**   NOW, WHAT WAS YOUR UNDERSTANDING OF THE PURPOSE OF THIS

19   STUDY IN CONNECTION WITH THE 37 -- WHAT MR. PARCHER DREW UP

20   HERE AS THE 37/63 SPLIT?  WHAT WAS YOUR UNDERSTANDING OF WHAT

21   DUFF & PHELPS DID?

22   **A.**   THE UNDERSTANDING THAT I HAD WAS DEVELOPED IN THE COURSE

23   OF MY SERVICES AS AN ATTORNEY FOR THE PEOPLE TALKING TO ME

24   ABOUT IT.

25   **Q.**   SO --

1   **A.**   SO IT WAS IN THE CONTEXT OF MY ROLE AS A LAWYER.

2   **Q.**   ALL RIGHT.  DID YOU UNDERSTAND THAT THIS DUFF & PHELPS

3   STUDY SET UP A TEMPLATE FOR HOW THE MONEY THAT CAME IN FROM

4   LICENSES, GROUP LICENSES, WAS TO BE DIVIDED?

5          **MR. KESSLER:**  YOUR HONOR, I JUST -- IF THE WITNESS

6   GOT IT IN A PRIVILEGED LAWYER RELATIONSHIP I WOULD HAVE TO

7   ASSERT AN OBJECTION.

8          **MR. HUMMEL:**  WELL, HE TESTIFIED ABOUT THIS VERBATIM

9   IN HIS DEPOSITION, YOUR HONOR.

10          **THE COURT:**  JUST READ THE DEPOSITION TESTIMONY.  AND

11   THEN, DEPENDING ON WHAT THAT WAS, I'LL ALLOW YOU TO ASK

12   FOLLOW-UP QUESTIONS THAT ARE CLOSELY RELATED TO WHAT HE SAID IN

13   THE DEPOSITION.

14          I THINK MAYBE THAT WOULD BE A WAY -- BECAUSE THERE

15   WON'T BE ANY PRIVILEGE IF IT WAS TESTIFIED TO IN THE

16   DEPOSITION.

17          **MR. HUMMEL:**  YOUR HONOR, I PREFER NOT TO READ THE

18   DEPOSITION NOW.  I PREFER TO HOLD THAT FOR A LATER POINT.

19          **THE COURT:**  RIGHT NOW THERE'S NO -- HE SAID HE

20   LEARNED ABOUT THIS THROUGH ATTORNEY-CLIENT COMMUNICATIONS.

21          **MR. HUMMEL:**  OKAY.

22          **THE COURT:**  WHICH ARE PRIVILEGED.  AND IT REALLY

23   SERVES NO PURPOSE TO ASK HIM ABOUT THAT.

24          **MR. HUMMEL:**  OKAY.  I'LL MOVE ON.

25

1  **BY MR. HUMMEL:**

2  **Q.**   DID, TO YOUR KNOWLEDGE, AFTER THE 1995 DUFF & PHELPS -- I

3  GUESS WE'LL CALL IT AN ANALYSIS OF THE LICENSING OPERATION IN

4  THE DIVISION.

5         TO YOUR KNOWLEDGE, SIR, DID THE UNION OR PI EVER

6  COMMISSION ANOTHER ASSESSMENT OF WHETHER THIS DIVISION WAS

7  APPROPRIATE?

8  **A.**   NOT TO MY KNOWLEDGE.  NOT FROM A FIRM LIKE DUFF & PHELPS.

9  **Q.**   FROM ANY OTHER FIRM?

10  **A.**   WE HAD CONTINUAL INPUT IN THE AREA BY OUTSIDE COUNSEL.

11  **Q.**   LEGAL ADVICE, RIGHT?

12  **A.**   LEGAL, YES.

13  **Q.**   I DON'T WANT TO GET INTO LEGAL ADVICE.

14         **MR. HUMMEL:**  YOUR HONOR, COULD I ASK FOR AN

15  INSTRUCTION TO THE JURY AS TO WHY ATTORNEY-CLIENT PRIVILEGE

16  COMMUNICATIONS ARE OFF LIMITS WITH THIS WITNESS IN HIS CAPACITY

17  AS GENERAL COUNSEL?

18         **THE COURT:**  SURE.  I'LL TRY MY BEST.

19         **MR. HUMMEL:**  THANK YOU.

20         **THE COURT:**  YOU KNOW, IF YOU WERE TO GO AND HAVE A

21  CONVERSATION WITH A LAWYER OVER SOME LITIGATION OR JUST SOME

22  PERSONAL FINANCIAL PROBLEM OR WHATEVER, UNDER THE LAW THAT

23  CONVERSATION IS PRIVILEGED.  MEANING IT'S CONFIDENTIAL AND

24  SECRET AS BETWEEN YOU AND THE LAWYER.

25         AND THE REASON FOR THAT IS THAT THE LAW HAS

1   RECOGNIZED THAT FROM TIME TO TIME EVERYONE NEEDS TO HAVE LEGAL

2   ADVICE.  AND IN ORDER TO GET THE BEST POSSIBLE LEGAL ADVICE,

3   YOU WANT TO ENCOURAGE CANDOR BETWEEN THE CLIENT AND THE LAWYER.

4   THAT IS SO THE LAWYER WILL HAVE THE BENEFIT OF THE MOST

5   ACCURATE AND LEGAL INFORMATION.

6          SO UNDER THE LAW THAT'S CALLED "A PRIVILEGE."  IT'S A

7   PRIVILEGED COMMUNICATION.  WHAT THE LAWYER SAYS TO THE CLIENT,

8   AND VICE VERSA, IN A CONFIDENTIAL RELATIONSHIP FOR THE PURPOSE

9   OF OBTAINING LEGAL ADVICE IS PRIVILEGED FROM DISCLOSURE.

10          IT CAN BE WAIVED, BUT IF IT IS WAIVED, THEN IT OPENS

11   THE DOOR -- IT CAN'T BE A SELECTIVE WAIVER.  IT HAS TO BE A

12   COMPLETE WAIVER ON THAT ENTIRE SUBJECT.

13          SO THE COUNSEL IS ASKING ME TO EXPLAIN TO YOU WHY IT

14   IS THAT WE'RE NOT ALLOWING HIM TO INQUIRE INTO THAT.  AND HE

15   UNDERSTANDS THAT.  HE'S DOING NOTHING WRONG.  IT'S PERFECTLY

16   PROPER FOR MR. HUMMEL TO ASK QUESTIONS OF THIS WITNESS THAT ARE

17   NOT PRIVILEGED.  AND HE'S ALREADY ANSWERED A NUMBER, AND

18   THERE'S NO DOUBT THAT THERE'S A LOT OF THINGS THAT HE KNOWS AND

19   CAN TESTIFY TO THAT ARE NOT PRIVILEGED.

20          BUT ON SOME THINGS, BECAUSE HE DID HAVE THE ROLE OF

21   BEING GENERAL COUNSEL, IT'S GOING TO BE PRIVILEGED.  SO WE'RE

22   HAVING TO TREAD A LITTLE CAREFULLY HERE TO MAKE SURE THAT WE

23   DON'T INVADE SOME ATTORNEY-CLIENT PRIVILEGE ITEM.

24          SO THAT'S WHAT'S GOING ON HERE.  AND THERE'S NOTHING

25   IMPROPER ABOUT INVOKING THE ATTORNEY-CLIENT PRIVILEGE.  IT'S

1  PERFECTLY OKAY TO DO THAT.  AND PLEASE DO NOT DRAW ANY ADVERSE

2  INFERENCE ON ACCOUNT OF THE EXERCISE OF THE PRIVILEGE.

3         ALL RIGHT.  GO AHEAD.

4         **MR. HUMMEL:**  THANK YOU, YOUR HONOR.

5  **BY MR. HUMMEL:**

6  **Q.**  MR. BERTHELSEN, YOU JUST HEARD THAT ADMONITION BY THE

7  COURT ABOUT THE PRIVILEGE?

8  **A.**  YES.

9  **Q.**  AND YOU HEARD THE COURT SAY TO YOU AND TO THE JURY THAT

10  THE CLIENT CAN WAIVE THE PRIVILEGE?

11  **A.**  I HEARD THE JUDGE SAY THAT, YES.

12  **Q.**  AND JUST SO WE'RE CLEAR THAT YOU AS THE GENERAL COUNSEL,

13  ACTING HEAD OF THE UNION, AND CORPORATE REPRESENTATIVE OF THE

14  COMPANY HERE, ARE ELECTING NOT TO WAIVE THE PRIVILEGE, CORRECT?

15  **A.**  THAT'S CORRECT.

16  **Q.**  OKAY.

17         **THE COURT:**  THERE'S NOTHING WRONG WITH THAT.  ARE YOU

18  SUGGESTING THERE'S SOMETHING WRONG WITH --

19         **MR. HUMMEL:**  ABSOLUTELY NOT.  I JUST WANT TO BE VERY

20  CLEAR ON THE RECORD THAT THERE IS NOT A WAIVER OF THE PRIVILEGE

21  HERE.

22         **THE COURT:**  ALL RIGHT.  THERE IS NO WAIVER OF THE

23  PRIVILEGE.

24         BUT BY THE SAME TOKEN YOU, SHOULD NOT THINK:

25             "OH, THEY'RE TRYING TO HIDE SOMETHING FROM ME."

1    THAT IS NOT TRUE.

2            I DON'T KNOW WHY THEY'RE EXERCISING THE PRIVILEGE,

3    BUT IT'S PERFECTLY NORMAL TO DO SO, AND YOU SHOULD NOT DRAW ANY

4    ADVERSE INFERENCE WHATSOEVER FROM THE EXERCISE OF THE

5    PRIVILEGE.

6    **BY MR. HUMMEL:**

7    **Q.**   NOW, MR. BERTHELSEN, GO BACK, IF YOU WOULD, TO THE PRIOR

8    EXHIBIT 125.  THIS IS THE 1994 AGREEMENT BETWEEN THE NFLPA AND

9    PLAYERS INC.  AND THIS WAS SIGNED, WAS IT NOT, SIR, BY GENE

10   UPSHAW AND DOUG ALLEN?

11   **A.**   LOOKING AT THE LAST PAGE, THAT'S APPARENT, YES.

12   **Q.**   AND IN THE YEAR 2000, SIR, THERE WAS A SUBSEQUENT

13   AGREEMENT BETWEEN THE NFLPA AND PI.  THAT'S EXHIBIT 95, WHICH

14   IS IN EVIDENCE.

15           **MR. HUMMEL:**  COULD YOU PLEASE DISPLAY THAT, PLEASE.

16           (DOCUMENT DISPLAYED.)

17   **BY MR. HUMMEL::**

18   **Q.**   WERE YOU INVOLVED, SIR, IN THE NEGOTIATION OF THIS

19   DOCUMENT BETWEEN MR. UPSHAW AND MR. ALLEN?

20   **A.**   NO.

21   **Q.**   DID YOU, YES OR NO, PROVIDE ANY LEGAL ADVICE REGARDING

22   THIS AMENDMENT?

23   **A.**   NO.

24   **Q.**   NOW, WHAT HAPPENED NEXT -- THAT'S 2000.  WHAT HAPPENED

25   NEXT IS IN 2006, THERE WAS AN AMENDMENT TO THIS 2000 AGREEMENT.

1   ARE YOU AWARE OF THAT AMENDMENT?

2   **A.**   YES.

3   **Q.**   ALL RIGHT.

4        **MR. HUMMEL:**   COULD YOU PUT EXHIBIT 91 ON THE BOARD,

5   PLEASE.

6        (DOCUMENT DISPLAYED.)

7   **BY MR. HUMMEL:**

8   **Q.**   NOW, EXHIBIT 91 --

9        **MR. HUMMEL:**   IF YOU COULD HIGHLIGHT THE ONE, TWO,

10  THREE, FOUR, FIFTH PARAGRAPH DOWN.

11       (DOCUMENT DISPLAYED.)

12  **BY MR. HUMMEL::**

13  **Q.**   WERE YOU AWARE, SIR, THAT THE NFLPA AND PLAYERS INC AGREED

14  THAT $8 MILLION OF GROSS LICENSING REVENUE AS DEFINED IN

15  PARAGRAPH 4A OF THAT 2000 AGREEMENT SHOULD BE REALLOCATED AMONG

16  THE NFLPA AND PLAYERS INC?

17  **A.**   I AM AWARE THAT THAT HAPPENED.

18  **Q.**   ALL RIGHT.  AND LOOK AT THE BOTTOM PARAGRAPH, IF YOU

19  WOULD, SIR.  BOTTOM PARAGRAPH OF THAT AGREEMENT STARTS WITH THE

20  "WHEREAS"?

21  **A.**   YES.

22  **Q.**   IT SAYS:

23            "WHEREAS THE NFLPA AND PLAYERS INC AGREE THAT

24  FURTHER ADJUSTMENT MAY BE NECESSARY AFTER COMPLETION OF AN

25  INDEPENDENT, THIRD-PARTY VALUATION OF THE VALUE CONFERRED BY

1    THE PLAYERS, THE NFLPA, AND PLAYERS INC."

2              DO YOU SEE THAT?

3    **A.**   I SEE IT.

4    **Q.**   TO YOUR KNOWLEDGE, SIR, WAS SUCH AN INDEPENDENT

5    THIRD-PARTY EVALUATION OF THAT VALUE EVER CONDUCTED BY THE

6    UNION OR PLAYERS INC?

7    **A.**   NOT TO MY KNOWLEDGE.

8    **Q.**   WOULD YOU LOOK, SIR, AT PAGE -- TRIAL EXHIBIT 1130.

9    **A.**   THE LAST ONE.

10   **Q.**   DO YOU HAVE THAT IN FRONT OF YOU?

11   **A.**   I DO.

12   **Q.**   DO YOU RECOGNIZE THAT DOCUMENT?

13   **A.**   YES.

14   **Q.**   AND WHAT IS IT?

15   **A.**   IT APPEARS TO BE AT LEAST AN EXCERPT -- I DON'T KNOW IF IT

16   WOULD BE THE FULL DOCUMENT OR NOT -- OF A FINANCIAL STATEMENT

17   FOR THE PERIOD MARCH 1, 2005 TO FEBRUARY 28, 2006.

18   **Q.**   FINANCIAL STATEMENT OF WHOM?

19   **A.**   OF THE NFLPA AND PLAYERS INC. COMBINED STATEMENTS.

20            **MR. HUMMEL:**  YOUR HONOR, MOVE TRIAL EXHIBIT 1130.

21            **THE COURT:**  1130.

22            **MR. KESSLER:**  YOUR HONOR, WE HAVE A COMPLETENESS

23   OBJECTION.  THE COMPLETE VERSION, I BELIEVE, WAS ALREADY PUT

24   INTO EVIDENCE DURING MR. EYRICH'S DEPOSITION.  AND WE HAVE A

25   COMPLETENESS OBJECTION TO THIS ONE.  IT'S NOT THE ENTIRE

1  DOCUMENT.

2          **MR. HUMMEL:**  WHAT'S THE FULL DOCUMENT NUMBER?  I

3  DON'T KNOW.

4          **MR. CLARK:**  I THINK IT'S TRIAL EXHIBIT 85, I BELIEVE.

5  LET ME CHECK.

6          **MR. HUMMEL:**  I HAVE NO PROBLEM, YOUR HONOR.  WE WON'T

7  SEPARATELY MOVE IN ONE THAT'S INCOMPLETE.

8  **BY MR. HUMMEL:**

9  **Q.**  I DO WANT TO ASK YOU ABOUT -- DO YOU HAVE 1130 IN FRONT OF

10  YOU, SIR?

11  **A.**  I DO.  THE FOLDER SAYS IT'S "1130."

12  **Q.**  RIGHT.  AND THERE'S A TAG ON THE FIRST PAGE THAT SAYS

13  "1130"?

14  **A.**  YES.

15          **MR. KESSLER:**  YOUR HONOR, IT'S 85.

16          **MR. HUMMEL:**  THANK YOU, MR. KESSLER.

17          **THE COURT:**  WHY DON'T YOU USE 85 SO THAT WE WILL HAVE

18  REFERENCES MADE TO A DOCUMENT IN EVIDENCE?

19          **MR. HUMMEL:**  YOU DON'T HAVE EXHIBIT 85 IN FRONT OF

20  YOU, BUT IT'S OKAY.  I NOW HAVE ONE.

21          **MR. KESSLER:**  I THINK 85 IS IN EVIDENCE, YOUR HONOR.

22          **THE COURT:**  IT IS.

23  **BY MR. HUMMEL:**

24  **Q.**  OKAY.  SO YOU SAID THIS IS THE CONSOLIDATED FINANCIAL

25  STATEMENT OF PLAYERS INC ON THE ONE HAND, AND NFLPA ON THE

1  OTHER.  DO YOU KNOW WHY, OTHER THAN IN A PRIVILEGED CONTEXT OR

2  BASED ON PRIVILEGED COMMUNICATIONS, PLAYERS INC AND THE NFLPA

3  HAD A CONSOLIDATED FINANCIAL STATEMENT?

4  **A.**   IT'S ACTUALLY MORE THAN THAT.  I THINK THE BUILDING

5  CORPORATION WOULD BE IN THERE, TOO.  IT'S THE ACCOUNTANT'S

6  ADVICE TO DO IT THAT WAY.

7  **Q.**   SO YOU RELY ON YOUR ACCOUNTANT'S ADVICE TO DO IT THAT WAY;

8  IS THAT RIGHT?

9  **A.**   YES, AND COUNSEL, AS WELL.

10  **Q.**   IS THIS A PUBLIC DOCUMENT OR PRIVATE DOCUMENT, DO YOU

11  KNOW?

12  **A.**   IT'S A PRIVATE DOCUMENT.

13  **Q.**   IT'S NOT FILED WITH ANY UNITED STATES DEPARTMENT OF LABOR

14  OR ANYBODY ELSE?

15  **A.**   THAT ISN'T, BUT SOMETHING THAT'S A LOT BROADER AND MORE

16  DETAILED THAN THAT IS FILED EVERY YEAR WITH THE FEDERAL

17  GOVERNMENT.

18  **Q.**   OKAY.  WHAT IS THE PURPOSE, IF YOU KNOW, OF HAVING A

19  CONSOLIDATED FINANCIAL STATEMENT?

20  **A.**   SO THAT THE ENTIRE PICTURE IS SHOWN TO THE PEOPLE WHO THAT

21  REPORT IS PREPARED FOR.

22  **Q.**   AND WHO IS THE REPORT PREPARED FOR?

23  **A.**   OUR BOARD OF PLAYER REPRESENTATIVES, THE GOVERNING BODY OF

24  THE ORGANIZATION.

25  **Q.**   SO YOU'RE SHOWING THIS TO THE BOARD OF PLAYER

1  REPRESENTATIVES, RIGHT?

2  **A.**    YES.

3  **Q.**    OKAY.  LET'S GO TO PAGE 14, NOTE 11.

4          THIS BOARD OF PLAYER REPRESENTATIVES, BY THE WAY, IS

5  THE SAME BOARD THAT AUTHORIZES, INITIALLY AUTHORIZED, ACCORDING

6  TO MR. ALLEN, THIS INITIAL SPLIT, RIGHT?

7  **A.**    YES.

8  **Q.**    ALL RIGHT.  SO YOU'VE NOW DONE THIS $8 MILLION

9  REALLOCATION.

10  **A.**    COUNSEL, I'M SORRY.  IF YOU ARE REFERRING TO SOMETHING

11  OVER THERE, I DON'T UNDERSTAND THAT.

12  **Q.**    I DON'T, EITHER.

13  **A.**    OKAY.

14  **Q.**    I ACTUALLY DO.  IT'S AN ARTISTIC RENDERING.

15          WHAT BUT WHAT I'M TALKING ABOUT, I UNDERSTAND THAT

16  THE BOARD OF PLAYERS INC NEVER RATIFIED THIS CHART?

17  **A.**    RIGHT.

18  **Q.**    BUT THEY DID RATIFY THE ALLOCATION OF 63 PERCENT GOING TO

19  THE UNION AND PI COMBINED, AND 37 PERCENT TO THE PLAYERS,

20  RIGHT?

21  **A.**    40 PERCENT TO NFLPA, 37 PERCENT TO THE PLAYERS AND

22  23 PERCENT TO PLAYERS INC, YES.

23  **Q.**    RIGHT.  AND THE TOTAL OF 40 AND 23 IS, OF COURSE, 63,

24  RIGHT?

25  **A.**    MATHEMATICALLY THAT'S THE TOTAL.  BUT IT'S A SEPARATE

1    ALLOCATION.

2    **Q.**   I UNDERSTAND.  BUT 63 PERCENT DOESN'T GO TO THE PLAYERS,

3    RIGHT?

4    **A.**   IT GOES TO THEIR ORGANIZATIONS.  IT GOES TO THEIR UNION,

5    WHICH SERVES THEIR INTERESTS AND PROTECTS THEIR INTERESTS.

6    **Q.**   FAIR ENOUGH.  AND THE UNION IS -- THE BODY THAT IS

7    SUPPOSED TO REPRESENT THE PLAYERS IN THE UNION IS THE BOARD OF

8    PLAYER REPS, RIGHT?

9    **A.**   THAT'S THE GOVERNING BODY, YES.

10   **Q.**   OKAY.  AND THIS CONSOLIDATED FINANCIAL STATEMENT, EXHIBIT

11   85, IS WHAT YOU'RE TELLING THE PLAYER REPS.  AND WHAT I'M GOING

12   TO SHOW YOU, IS WHAT YOU'RE TELLING THE PLAYER REPS ABOUT THAT

13   $8 MILLION REALLOCATION, OKAY?

14   **A.**   OKAY.

15   **Q.**   SO IF YOU COULD LOOK AT NOTE 11.  AND THE YEAR HERE IS

16   2005, ENDING FEBRUARY 28, 2006.  SO THE REALLOCATION HAS

17   OCCURRED, AND HERE'S WHAT YOU'RE TELLING THE PLAYER REPS:

18             "THE NFLPA AND PLAYERS INC" --

19        **MR. HUMMEL:**  CAN WE HIGHLIGHT THAT, PLEASE, RIGHT

20   HERE?  I'LL JUMP.

21   **BY MR. HUMMEL:**

22   **Q.**   THERE (INDICATING).

23             "THE NFLPA AND PLAYERS INC PLAN TO OBTAIN A

24   THIRD-PARTY VALUATION TO REEVALUATE THE CURRENT ECONOMIC

25   STRUCTURE OF THE PAYMENTS TO ALL PARTIES DURING THE YEAR ENDING

1    FEBRUARY 28, 2007.  DEPENDING UPON THE RESULTS OF THE

2    THIRD-PARTY VALUATION" -- SORRY, IT SAID "VALUATION -- FUTURE

3    AMOUNTS OF LICENSING REVENUE ALLOCATED TO PLAYERS" -- THAT'S

4    THE 37, PERCENT, RIGHT?

5    **A.**   YES.

6    **Q.**   --- "PLAYERS INC AND THE NFLPA MAY BE REVISED."

7           DO YOU SEE THAT?

8    **A.**   YES.

9    **Q.**   DID THE NFLPA OR PLAYERS INC EVER OBTAIN THE THIRD-PARTY

10   VALUATION THAT YOU PROMISED TO THE BOARD OF PLAYER REPS?

11   **A.**   TO MY KNOWLEDGE, THERE WAS NO THIRD-PARTY VALUATION, AS

12   YOU REFER TO IT THERE.  I DON'T KNOW ABOUT YOUR PROMISE, BUT --

13   **Q.**   AND, IN FACT, AFTER -- AFTER THE REALLOCATION OF

14   $8 MILLION, DO YOU KNOW, SIR, IF THIS AMOUNT, 63, ACTUALLY WENT

15   TO 69 PERCENT?

16   **A.**   I'D HAVE TO DO THE MATH.  I DON'T THINK IT WOULD BE THAT

17   BIG OF A JUMP.

18   **Q.**   YOU DON'T KNOW?

19   **A.**   WELL, I DO KNOW FROM CERTAINLY LISTENING TO EVIDENCE IN

20   THIS CASE, AND SO ON, FROM PRIOR WITNESSES, AND LOOKING AT SOME

21   OF THE ISSUES THAT MATHEMATICALLY HOWEVER MUCH GOES IS A

22   FUNCTION OF THE TOTAL AMOUNT IN THE POOL SO YOU COULD DO THE

23   CALCULATION.  YOU WOULD HAVE TO DO A CALCULATION.  IF YOU

24   REDUCED THE POOL BY SOME AMOUNT OF MONEY, YEAH, THERE WOULD BE

25   A REDUCTION IN THE DOLLAR AMOUNT THAT PLAYERS WOULD GET.

1          BUT GIVEN THE SIZE OF THE POOL, IT WOULD BE A VERY

2   SMALL AMOUNT.

3   **Q.**   RIGHT.  AND, IN FACT, IF THIS GOES TO 69, JUST TO BE

4   CLEAR, THIS GOES TO 31 PERCENT, AND THIS DOCUMENT WE JUST TOLD

5   YOU ABOUT WENT TO THE BOARD OF PLAYER REPS, AND SAID:

6          "DON'T WORRY.  WE'RE GOING TO CONDUCT AN

7   INDEPENDENT VALUATION" THAT YOU NEVER DID; ISN'T THAT TRUE?

8   **A.**   THESE ARE THE DECISIONS OF THE BOARD ITSELF.  THEY APPROVE

9   ALL OF THIS.  A REPORT IS GIVEN TO THEM, AND THEN THEY APPROVE

10  THAT REPORT AND IMPLEMENT WHAT IS RECOMMENDED BY VIRTUE OF

11  THEIR PASSING OF OUR BUDGET.

12         THIS IS ALL FOR THE ACTIVE PLAYER POOL.

13  **Q.**   ISN'T IT TRUE, SIR, THAT YOU NEVER CONDUCTED THAT

14  INDEPENDENT VALUATION BECAUSE YOU DIDN'T WANT TO MESS WITH THE

15  TEMPLATE?

16  **A.**   NO.

17  **Q.**   IT'S NOT TRUE?

18  **A.**   NO.

19  **Q.**   OKAY.  AND THAT TEMPLATE WAS SET UP BY DUFF & PHELPS IN

20  1995 AND NEVER REEVALUATED THEREAFTER; ISN'T THAT TRUE?

21  **A.**   YOU MEAN THE 40/37/23?

22  **Q.**   YES.

23  **A.**   YES, THAT WAS ORIGINALLY SET UP IN '94, '95.

24  **Q.**   AND YOU NEVER TOUCHED THAT THEREAFTER, RIGHT?

25  **A.**   TOUCHED THE VALUATION?

1   **Q.**   CHANGED THE TEMPLATE.

2   **A.**   NO, NOT -- NOT REALLY.

3   **Q.**   OKAY.

4   **A.**   BUT IT WAS THE ACTIVE PLAYERS' DECISION ON WHAT THEY WERE

5   GOING TO DO WITH THEIR LICENSING REVENUE.

6   **Q.**   RIGHT.  AND YOU TOLD THE ACTIVE PLAYERS YOU WERE GOING TO

7   DO A THIRD-PARTY VALUATION AND NEVER DID IT?

8   **A.**   IT SAYS:

9            "THE NFLPA AND PLAYERS INC PLANNED TO OBTAIN."

10  **Q.**   NEVER DID?

11  **A.**   NOT TO THIS MOMENT.

12  **Q.**   OKAY.  NOW, HIS HONOR KEEPS SAYING -- AND HE'S QUITE

13  RIGHT -- THAT THIS CASE IS ABOUT THE GLA. IN FACT, YESTERDAY

14  DID YOU HEAR HIM SAY:

15           "THREE WORDS IN THIS CASE:  G-L-A"?  DO YOU

16  RECALL THAT?

17  **A.**   I HEARD HIS HONOR SAY THAT, YES.

18  **Q.**   YOU WERE HERE FOR THE OPENING STATEMENT OF MR. KESSLER,

19  RIGHT?

20  **A.**   YES.

21  **Q.**   YOU HEARD HIM SAY:

22           "LET'S NOT POUND ON THE TABLE.  LET'S TALK ABOUT

23  THE EVIDENCE."

24           SO I WANT TO TALK ABOUT THE GLA.  OKAY.

25           **MR. HUMMEL:**  LET'S PUT EXHIBIT 110 ON THE BOARD,

1    PLEASE.

2                (DOCUMENT DISPLAYED.)

3    **BY MR. HUMMEL:**

4    **Q.**   NOW, THIS IS THE GLA THAT MR. ADDERLEY SIGNED IN NOVEMBER

5    OF 2002.  CORRECT, SIR?

6    **A.**   EXHIBIT 110.

7    **Q.**   YOU MIGHT HAVE 17 IN FRONT OF YOU.  IS THAT WHAT YOU HAVE?

8                **MR. HUMMEL:**  MAY I APPROACH?

9                **THE WITNESS:**  WHAT DATE DID YOU GIVE, NOVEMBER?

10   **BY MR. HUMMEL::**

11   **Q.**   IT'S EXHIBIT 110.  NOVEMBER, '02.

12   **A.**   OKAY.

13   **Q.**   WE'RE ON THE SAME PAGE.  EXHIBIT 110.

14                NOW, DID YOU, AS THE GENERAL COUNSEL OF THE COMPANY,

15   HAVE ANY INVOLVEMENT IN DRAFTING THE GLA?

16   **A.**   NO.

17   **Q.**   DO YOU KNOW WHO DRAFTED THE GLA?

18   **A.**   NOT SPECIFICALLY.

19   **Q.**   WAS IT THE UNION AND PLAYERS INC, OR WAS IT A PLAYER?

20                **MR. KESSLER:**  YOUR HONOR, I'M GOING TO OBJECT.

21   COUNSEL POINTED AT ME.

22                **MR. HUMMEL:**  NO, NO, NO.  I WASN'T --

23                **MR. KESSLER:**  THAT'S GOING TO THE SAME ISSUE --

24                (SIMULTANEOUS SPEAKING, NOT REPORTABLE.)

25                **MR. KESSLER:**  YOUR HONOR HAS ALREADY TOLD THE JURY

1    ABOUT THAT.  THAT'S NOT APPROPRIATE.

2            **MR. HUMMEL:**  THAT'S NOT TRUE.  I DO NOT MEAN -- WHEN

3    I POINTED, I POINTED AT DEFENDANTS VERSUS PLAINTIFFS.  I

4    ACTUALLY POINTED AT MR. PARCHER.  SO --

5            **THE COURT:**  YOU'RE JUST TRYING TO ASK:  DID THE

6    PLAYER DRAFT THIS?

7            **MR. HUMMEL:**  CORRECT.

8            **THE COURT:**  OR DID THE DEFENDANTS DRAFT IT, SOMEBODY

9    FROM THE DEFENDANTS DRAFT IT VERSUS THE PLAYER?

10           **MR. HUMMEL:**  RIGHT.

11           **THE COURT:**  IT'S ALMOST SELF-EVIDENT.

12           GO AHEAD.  YOU CAN ANSWER THAT QUESTION.

13           **THE WITNESS:**  I DON'T KNOW WHO DRAFTED IT ORIGINALLY.

14   I DOUBT THAT A PLAYER DRAFTED IT, THOUGH, IF YOU'RE TALKING

15   ABOUT LIKE AN ACTIVE PLAYER WHO IS A MEMBER OF THE

16   ORGANIZATION.

17   **BY MR. HUMMEL:**

18   **Q.**   DO YOU ACTUALLY KNOW, YES OR NO, WHETHER THE DEFENDANTS

19   ARE RESPONSIBLE FOR THIS DOCUMENT OR NOT?

20   **A.**   RESPONSIBILITY IS A DIFFERENT QUESTION.  YES, DEFENDANTS

21   HAVE TO TAKE RESPONSIBILITY FOR THE DOCUMENT.

22   **Q.**   DEFENDANTS TAKE RESPONSIBILITY FOR THE DOCUMENT.  OKAY.

23           NOW, I CAN'T REMEMBER WHICH WITNESS MR. KESSLER ASKED

24   ABOUT THIS WITH, BUT IF YOU COULD GO TO THE FIRST PARAGRAPH OF

25   THIS GLA.

1          HE WANTED TO POINT OUT THAT THIS IS A NON-EXCLUSIVE

2   RIGHT THAT THE PLAYER WAS SIGNING OVER.  DO YOU RECALL THAT?

3   **A.**   DO I RECALL HIM TESTIFYING TO THAT EFFECT?

4   **Q.**   MR. KESSLER, I'M CONFIDENT, DID NOT TESTIFY.  BUT HE SAID

5   IT.  DO YOU RECALL THAT?

6   **A.**   IT'S BEEN SAID, YES.

7   **Q.**   NOW, DO YOU SEE THAT WORD HIGHLIGHTED:  "NON-EXCLUSIVE

8   RIGHT"?  DO YOU SEE IT?

9   **A.**   I SEE IT HIGHLIGHTED, YEAH.

10  **Q.**   AND, MR. BERTHELSEN, YOU'RE A MEMBER OF THE -- WHAT'S IT

11  CALLED -- SPORTS LAWYERS ASSOCIATION?

12  **A.**   I AM.

13  **Q.**   WHAT IS THE SPORTS LAWYERS ASSOCIATION?

14  **A.**   IT'S LIKE A BAR ASSOCIATION OF SPORTS LAWYERS.

15  **Q.**   IT'S A BUNCH OF LAWYERS WHO DO SPORTS LAW?

16  **A.**   OR WHO WANT TO, YEAH.

17  **Q.**   FAIR ENOUGH.  AND YOU'VE ACTUALLY LISTED YOUR RESUME ON

18  THE WEB SITE FOR THE SPORTS LAWYERS ASSOCIATION, RIGHT?

19  **A.**   I BELIEVE THERE IS A RESUME OF ME ON THERE.  I DON'T KNOW

20  HOW CURRENT IT IS.

21  **Q.**   ON THE RESUME YOU SAY YOU'VE BEEN RESPONSIBLE SINCE --

22          **MR. KESSLER:**  YOUR HONOR, I OBJECT TO READING FROM

23  IT.  IT'S NOT A DISCLOSED EXHIBIT, AND HE'S TRYING TO GET AN

24  EXHIBIT IN.

25          **THE COURT:**  SUSTAINED.  YOU SHOULDN'T BE READING FROM

1  A DOCUMENT THAT'S NOT IN EVIDENCE.

2  **BY MR. HUMMEL:**

3  **Q.** WAS IT TRUE, SIR, THAT IN -- SINCE 19 -- SINCE 1972,

4  YOU'VE BEEN INVOLVED IN NEGOTIATING AND DRAFTING PLAYER GROUP

5  LICENSING AGREEMENTS?

6  **A.** AT ONE TIME I WAS, YEAH.

7  **Q.** OKAY.

8  **A.** NOT THIS ONE, THOUGH?

9  **Q.** WHICH ONE?

10  **A.** THE ONE ON THE SCREEN.

11  **Q.** THIS IS NOT A GROUP LICENSING AGREEMENT, IS IT?

12  **A.** WELL, I'M MAKING IT CLEAR TO YOU I WAS NOT INVOLVED IN THE

13  DRAFTING OF THAT.

14  **Q.** I UNDERSTAND. I'M NOT ASKING YOU ABOUT THE GLA, EVEN

15  THOUGH IT'S ON THE BOARD.

16  **A.** OKAY.

17  **Q.** YOU UNDERSTAND -- AND LET'S BE VERY CLEAR -- THAT THERE'S

18  A GLA, AND THAT'S AN AGREEMENT BETWEEN A PLAYER AND THE NFLPA,

19  CORRECT?

20  **A.** RIGHT.

21  **Q.** AND YOU ALSO UNDERSTAND THAT THE NFLPA ASSIGNED THOSE

22  RIGHTS TO PLAYERS INC, CORRECT?

23  **A.** RIGHT.

24  **Q.** OKAY. AND ON THE OTHER HAND, THEN, WHAT PLAYERS INC DID

25  WAS IT WENT OUT TO THIRD-PARTY LICENSEES, LIKE EA, AND IT

1  OBTAINED GROUP LICENSES, RIGHT?

2  **A.**   RIGHT.

3  **Q.**   NOW, WERE YOU INVOLVED SINCE 1972 IN NEGOTIATING WITH

4  THOSE THIRD-PARTY LICENSEES ABOUT THOSE LICENSES?

5  **A.**   I WAS NOT.

6  **Q.**   OKAY.  WHAT NEGOTIATING AND DRAFTING OF PLAYER GROUP

7  LICENSING AGREEMENTS HAVE YOU BEEN INVOLVED IN?

8  **A.**   FOR A SHORT TIME WHEN I STARTED, FIRST STARTED IN 1972, WE

9  HAD A LIMITING LICENSING PROGRAM, ALL OF THE FUNDS OF WHICH

10 WENT TO THE UNION.  AND I WAS INVOLVED TO SOME EXTENT WITH

11 THOSE EARLY ON.

12       BUT AFTER WE CREATED OUR OWN LICENSING DEPARTMENT AND

13 EVERYTHING, I WAS NO LONGER INVOLVED IN THAT.  I ALSO DID SOME

14 WORK FOR THE SOCCER PLAYERS WHEN WE HELPED THEM ORGANIZE THE

15 UNION WAY BACK IN THE, I THINK, EARLY '80S.

16 **Q.**   OKAY.  FAIR ENOUGH.

17       SO YOU'RE GENERALLY, THOUGH, FAMILIAR WITH THE PHRASE

18 "NON-EXCLUSIVE RIGHT."  AND I'M NOT GOING TO ASK YOU ABOUT YOUR

19 PRESENT UNDERSTANDING OF THAT AT ALL.

20       BUT WHAT I DO WANT TO ASK YOU IS:  DO YOU KNOW THAT

21 EVEN THOUGH THIS DOCUMENT SAYS "NON-EXCLUSIVE RIGHT," EACH OF

22 THE LICENSEES THAT PLAYERS INC SIGNED A CONTRACT WITH ARE

23 CONTRACTUALLY PRECLUDED FROM DEALING WITH THOSE PLAYERS WHO

24 SIGNED GLA'S?

25       **MR. KESSLER:**  YOUR HONOR --

1  **BY MR. HUMMEL:**

2  Q.   AND THESE ARE THE LICENSES.

3       **MR. KESSLER:**  I'M GOING TO OBJECT.  THIS IS EXACTLY

4  WHAT YOUR HONOR WAS HAVING AN ADMONITION ABOUT PREVIOUSLY ABOUT

5  THIS IS JUST ARGUMENT.  HE DIDN'T ASK ANY FACTUAL QUESTION

6  ABOUT -- OF THE WITNESS ABOUT THIS DOCUMENT.  HE IS ARGUING

7  ABOUT THE MEANING AND INTERPRETATION.

8       **THE COURT:**  AS THE QUESTION IS FRAMED, SUSTAINED.

9  **BY MR. HUMMEL:**

10 Q.   DO YOU KNOW, SIR, THAT, IN FACT, NOTWITHSTANDING WHAT IT

11 SAYS IN THAT DOCUMENT --

12      **THE COURT:**  THIS IS ARGUMENT.  I CAN TELL ALREADY

13 IT'S GOING TO BE AN ARGUMENT.

14      **MR. HUMMEL:**  IT IS NOT AN ARGUMENT, YOUR HONOR.

15      **THE COURT:**  YOU'RE SAYING "NOTWITHSTANDING."  RIGHT

16 AWAY THAT IS AN ARGUMENT.

17      **MR. HUMMEL:**  FINE.

18 **BY MR. HUMMEL:**

19 Q.   DO YOU HAVE ANY KNOWLEDGE, SIR, ABOUT WHETHER A PLAYER WHO

20 SIGNED A GLA CAN GET A CONTRACT DIRECTLY WITH ANY OF THE

21 LICENSEES WITH WHICH PLAYERS INC HAS ENTERED INTO AN AGREEMENT?

22 A.   I DON'T KNOW.

23 Q.   COULD I DRAW YOUR ATTENTION, SIR, TO EXHIBIT 28, WHICH IS

24 THE EA AGREEMENT?

25      **MR. KESSLER:**  YOUR HONOR, AGAIN, I'M GOING TO OBJECT.

1  THE WITNESS JUST SAID HE DOESN'T KNOW.  HE'S NOW GOING TO MAKE

2  AN ARGUMENT ABOUT LANGUAGE.

3          **THE COURT:**  YOU DON'T KNOW THAT YET.  IT MAY BE

4  COUNSEL CAN ESTABLISH A FOUNDATION TO ASK THESE QUESTIONS WITH

5  THE SPECIFIC AGREEMENT, THEN IT WILL BE PROPER TO ASK.

6          **MR. KESSLER:**  I WOULD ASK, YOUR HONOR, THAT HE START

7  OUT BY LAYING FOUNDATION OF THE WITNESS'S KNOWLEDGE OF THIS

8  AGREEMENT.

9          **THE COURT:**  WELL, I THINK THAT'S A FAIR POINT.

10          SO YOU SHOULD ESTABLISH WHAT ROLE THE WITNESS HAD

11  WITH EXHIBIT 28.

12          **MR. HUMMEL:**  RIGHT.

13  **BY MR. HUMMEL:**

14  **Q.**  DO YOU HAVE 28 IN FRONT OF YOU?

15  **A.**  28?  I THOUGHT YOU SAID "26."  I'M SORRY.

16  **Q.**  28.

17  **A.**  ALL RIGHT.  I HAVE IT IN FRONT OF ME.

18  **Q.**  WERE YOU INVOLVED, SIR, AS THE GENERAL COUNSEL OF THE

19  COMPANY IN DRAFTING, REVIEWING OR APPROVING THE GENERAL

20  TEMPLATE FOR LICENSE AGREEMENTS BETWEEN PI AND ANY THIRD-PARTY

21  LICENSEE?

22  **A.**  NO.

23  **Q.**  YOU HAD NO KNOWLEDGE OF THAT AT ALL?

24  **A.**  THAT'S A DIFFERENT QUESTION.

25  **Q.**  YOU HAD NO INVOLVEMENT IN THE DRAFTING OF THIS?

1  **A.**   THAT'S CORRECT.

2  **Q.**   YOU NEVER REVIEWED IT OUTSIDE THE CONTEXT OF LITIGATION?

3  **A.**   THAT'S CORRECT.

4  **Q.**   AND YOU HAVE NO KNOWLEDGE OF ITS IMPORT?  IN OTHER WORDS,

5  YOU HAVE NO IDEA HOW THIS CONTRACT WAS ACTUALLY IMPLEMENTED OR

6  WHAT IT WAS INTENDED TO COVER, CORRECT?

7  **A.**   CORRECT.  WELL, WE HAVE TO SEPARATE THE KNOWLEDGE THAT I

8  GAINED IN LITIGATION FROM THAT.

9  **Q.**   I UNDERSTAND.

10  **A.**   SO APART FROM THE LITIGATION, I HAVE NO KNOWLEDGE.

11  **Q.**   NO INDEPENDENT VIEW.  ALL RIGHT.

12        SO YOU HAVE NO KNOWLEDGE WHATSOEVER OF THE IMPORT,

13  WHAT WAS INTENDED BY THE NONINTERFERENCE CLAUSES IN THESE

14  CONTRACTS; IS THAT RIGHT?

15        **THE COURT:**  HE SAID THAT HE HAS SOME KNOWLEDGE BASED

16  ON THE LITIGATION THAT HE HAS ACQUIRED, BUT APART FROM THAT HE

17  WAS NOT INVOLVED AND HAS NO KNOWLEDGE.

18        IS THAT CORRECT?

19        **THE WITNESS:**  THAT'S CORRECT.

20        **THE COURT:**  WHY ARE YOU TRYING TO RECAST IT IN A

21  DIFFERENT WAY, MR. HUMMEL?

22        **MR. HUMMEL:**  I WON'T, YOUR HONOR.

23        **THE COURT:**  I DON'T UNDERSTAND WHY IT WASN'T CLEAR

24  ENOUGH.

25        LET'S MOVE ON TO SOMETHING ELSE.

1          **MR. HUMMEL:**  I'LL MOVE ON.

2     **BY MR. HUMMEL:**

3     **Q.**   LET'S GO BACK TO THE GLA, SIR.

4     **A.**   OKAY.

5     **Q.**   LET'S TALK ABOUT THE EVIDENCE.

6     **A.**   WHAT EXHIBIT, 17?

7     **Q.**   110.

8     **A.**   OKAY.

9     **Q.**   JUST SO WE'RE ABSOLUTELY CLEAR, OUTSIDE OF THE CONTEXT OF

10    LITIGATION YOU NEVER SAW THIS GLA?

11    **A.**   THAT'S CORRECT.

12    **Q.**   YOU WERE NOT INVOLVED IN DRAFTING IT?

13    **A.**   I THINK I TOLD YOU THAT BEFORE.  I WAS NOT, YES.

14    **Q.**   YOU DON'T KNOW IF ANYONE IN YOUR DEPARTMENT -- BY THE WAY,

15    WITHIN NFLPA, HOW MANY LAWYERS ARE ON STAFF?

16    **A.**   DEPENDS ON WHETHER YOU COUNT ME NOW.  BUT IF YOU COUNT ME,

17    IT'S SIX.

18    **Q.**   SIX LAWYERS?

19    **A.**   YES.

20    **Q.**   DO YOU HAVE ANY KNOWLEDGE THAT ANY OF THOSE SIX LAWYERS

21    WHO REPORTED TO YOU BLESSED THIS GLA?

22    **A.**   WHAT DO YOU MEAN BY "BLESSING"?

23    **Q.**   WERE INVOLVED IN DRAFTING?

24    **A.**   NOBODY WORKING ON OUR LEGAL STAFF RIGHT NOW WAS INVOLVED

25    IN DRAFTING THIS AGREEMENT.

1  Q.   IN THE PAST DO YOU KNOW IF ANYBODY ON YOUR LEGAL STAFF WAS

2  INVOLVED IN DRAFTING THIS AGREEMENT?

3  **A.**   THAT'S WHAT I MEANT TO JUST SAY.

4  **Q.**   YOU HAVE NO KNOWLEDGE OF ANYBODY EVER, WITHIN THE LEGAL

5  DEPARTMENT OF THE NFLPA, DRAFTING THIS; IS THAT RIGHT?

6  **A.**   THIS DOCUMENT.

7  **Q.**   RIGHT.  AND YOU, AS YOU SIT HERE AS THE CORPORATE

8  REPRESENTATIVE, CANNOT TESTIFY AS TO WHO WROTE THIS; IS THAT

9  RIGHT?

10         **MR. KESSLER:**  OBJECTION, YOUR HONOR, AS THE CORPORATE

11  REPRESENTATIVE HE'S SUGGESTING SOME OTHER ROLE.  A CORPORATE

12  REPRESENTATIVE HAS NOTHING TO DO --

13         **THE COURT:**  NO, NO, IT WOULD NOT BE PRIVILEGED.  IF

14  HE KNOWS WHO ACTUALLY DID DRAFT IT, THAT'S NOT PRIVILEGED.

15         **MR. KESSLER:**  NO, I'M NOT ASSERTING PRIVILEGE.  I'M

16  OBJECTING TO HIS SUGGESTING AS THE CORPORATE REPRESENTATIVE

17  GIVES HIM SOME SPECIAL STATUS TO TESTIFY.

18         **THE COURT:**  MR. BERTHELSEN, IF YOU KNOW WHO WAS

19  INVOLVED IN DRAFTING THIS WITHIN THE -- IF ANYONE, IN YOUR

20  IN-HOUSE LEGAL DEPARTMENT, THEN THAT'S NOT PRIVILEGED, AND YOU

21  SHOULD TELL US WHO THAT WAS.

22         **THE WITNESS:**  I BELIEVE I ANSWERED THAT NONE OF THE

23  LAWYERS WERE INVOLVED IN THE DRAFTING OF THIS DOCUMENT.

24         **THE COURT:**  ALL RIGHT.  THANK YOU.

25

1  **BY MR. HUMMEL:**

2  **Q.**   WAS MR. UPSHAW INVOLVED?

3  **A.**   I DON'T KNOW.  I DOUBT IT.

4  **Q.**   WAS MR. ALLEN INVOLVED?

5  **A.**   POSSIBLY.

6  **Q.**   WELL, TO THE BEST OF YOUR KNOWLEDGE, WAS MR. ALLEN

7  INVOLVED IN DRAFTING THIS DOCUMENT?

8  **A.**   TO THE BEST OF MY KNOWLEDGE, POSSIBLY HE WAS, YES.

9  **Q.**   OKAY.  LET'S LOOK AT THE SECOND TO LAST PARAGRAPH OF THE

10  GLA.  NO.  THAT ONE.

11          DO YOU SEE WHERE IN THAT PARAGRAPH THERE'S REFERENCE

12  TO AN ESCROW ACCOUNT?

13  **A.**   YES.

14  **Q.**   YES OR NO, SIR:  WAS AN ESCROW ACCOUNT EVER SET UP?

15  **A.**   MY KNOWLEDGE OF THIS IS IN THE CONTEXT OF LITIGATION.

16  **Q.**   YOU HAVE NO INDEPENDENT KNOWLEDGE?

17  **A.**   I KNOW THAT IT WASN'T SET UP.

18  **Q.**   WAS NOT SET UP?

19  **A.**   RIGHT.

20  **Q.**   NOW, LET'S GO TO THE SECOND PARAGRAPH, WHICH IS THE

21  DEFINITION OF GROUP LICENSING.

22  **A.**   OKAY.

23  **Q.**   OUTSIDE OF THE CONTEXT OF WHAT YOU LEARNED IN LITIGATION

24  OR WHAT YOU LEARNED IN A PRIVILEGED CONTEXT AS THE GENERAL

25  COUNSEL OF THE COMPANY, DID YOU HAVE AN UNDERSTANDING THAT IT

1    WAS THE INTENT OF THE UNION AND THE PLAYERS INC TO CREATE A

2    MARKETING PROGRAM, A GROUP LICENSING PROGRAM FOR THE BENEFIT OF

3    THE PRESENT AND FORMER NFL PLAYERS?

4    **A.**    OUTSIDE OF -- WHAT WAS THE PREMISE OF YOUR QUESTION,

5    AGAIN:  OUTSIDE OF LITIGATION DID I KNOW?

6    **Q.**    OUTSIDE OF LITIGATION AND OUTSIDE OF WHAT YOU MAY HAVE

7    LEARNED IN YOUR ROLE AS GENERAL COUNSEL OF THE COMPANY, DO YOU

8    KNOW WHETHER OR NOT IT WAS THE INTENT OF THE NFLPA, THE UNION,

9    AND PLAYERS INC, TO ESTABLISH A GROUP LICENSING PROGRAM FOR THE

10   BENEFIT OF SIX OR MORE PRESENT OR FORMER NFL PLAYERS?

11   **A.**    NONE OF THIS IS REALLY OUTSIDE MY ROLE AS COUNSEL.  I

12   THINK THAT WAS THE PREMISE OF YOUR QUESTION.  WHAT I KNOW, I

13   KNOW IN MY ROLE AS AN ATTORNEY AND IN DEALING IN LITIGATION.

14   **Q.**    WELL, ISN'T IT TRUE, SIR, THAT YOU ALWAYS UNDERSTOOD THAT

15   RETIRED PLAYER LICENSING WOULD BY THE UNION AND PI BE KEPT

16   TOTALLY SEPARATE FROM ACTIVE PLAYER LICENSING?

17   **A.**    I CONSISTENTLY -- THAT WAS THE INTENT THAT THEY BE TOTALLY

18   SEPARATE PROGRAMS, YES.

19   **Q.**    TOTALLY SEPARATE PROGRAMS.  AND THE REASON FOR THAT, SIR,

20   ISN'T IT TRUE, IS THAT IF -- IF THE UNION AND NFL PI WERE TO

21   INCLUDE A GROUP LICENSING PROGRAM OF SIX OR MORE PRESENT OR

22   FORMER NFL PLAYERS, YOU COULD NO LONGER RELY ON A DUFF & PHELPS

23   TEMPLATE WHERE 69 PERCENT OF THE GROSS LICENSING REVENUES WENT

24   TO THE UNION AND PLAYERS INC?

25   **A.**    NO.

1    Q.    THAT'S NOT TRUE?

2          **MR. HUMMEL:**  YOUR HONOR, PERMISSION TO READ FROM HIS

3    DEPOSITION, PAGE 74, LINES 7 -- EXCUSE ME, 5 THROUGH 17.

4          **THE COURT:**  74, 5 THROUGH 17.  SINCE THIS IS A PARTY

5    DEPOSITION, YOU MAY PROCEED.

6          **MR. HUMMEL:**  THANK YOU, YOUR HONOR.

7          "**QUESTION:**  BUT WHY NOT JUST LICENSE BOTH" --

8          **MR. KESSLER:**  WAIT.  THAT'S NOT THE CORRECT CITE.

9          **MR. HUMMEL:**  PAGE 74, LINE 5.

10         **THE COURT:**  THAT STARTS IN THE MIDDLE OF SOMETHING.

11         **MR. KESSLER:**  I DON'T KNOW WHAT HE'S READING FROM.

12         **MR. HUMMEL:**  WELL, I HAVE A MINI VERSION OF THE

13   DEPOSITION.

14         **THE COURT:**  SOMETIMES THEY HAVE IT WRONG.  WHAT'S THE

15   FIRST WORD IN THE SENTENCE?

16         **MR. HUMMEL:**  THE QUESTION IS:  "BUT."

17         **THE COURT:**  THAT'S NOT WHAT'S ON THIS PAGE.  HERE,

18   WHY DON'T YOU LOOK AT THE OFFICIAL --

19         **MR. HUMMEL:**  I WILL, YOUR HONOR.

20         **THE COURT:**  AND FIND OUT WHERE YOU WANT TO START.

21         SOMETIMES THOSE SHORTENED DOWN THINGS GIVE YOU THE

22   WRONG PAGE NUMBER.

23         **MR. HUMMEL:**  I CAN'T FIND IT, YOUR HONOR, BASED ON --

24   THE TRANSCRIPT THAT I HAVE IS APPARENTLY DIFFERENT FROM THE

25   OFFICIAL.

1          **THE COURT:**  WELL, IT'S PROBABLY THE SAME, BUT I HAVE

2    SEEN IT BEFORE WHERE THE SHRUNK DOWN VERSION, IF THAT'S WHAT

3    YOU'RE GETTING, GETS THE PAGINATION OFF.

4          **MR. HUMMEL:**  DO WE HAVE THE PAGE AND LINE CITE?

5          **UNIDENTIFIED SPEAKER:**  LOOK AT 76/5.

6          **MR. HUMMEL:**  PAGE 76, LINE 5.

7          **THE COURT:**  ALL RIGHT.  SO LET'S GO AHEAD.  YOU MAY

8    READ THAT.

9          **MR. KESSLER:**  YOUR HONOR, MY OBJECTION ONLY IS FOR

10   COMPLETENESS.  I WOULD LIKE TO HAVE READ IN FROM PAGE 75, LINE

11   12, AND THEN HE CAN READ IN WHAT COMES AFTER IT, BECAUSE IT

12   PUTS IT INTO CONTEXT FOR COMPLETION.

13         **MR. HUMMEL:**  WHERE YOU DO YOU WANT ME TO START,

14   MR. KESSLER?

15         **MR. KESSLER:**  75, LINE 12.

16         **MR. HUMMEL:**  STARTING WITH "WHY WOULD THAT BE"?

17         **MR. KESSLER:**  YES.

18         **THE COURT:**  ALL RIGHT.  YOU MAY DO THIS.  READ THAT.

19   BUT WHEN YOU GET TO THE PART WHERE YOU ARE MOST INTERESTED, YOU

20   MAY PAUSE AND SAY TO THE JURY:

21              "AND HERE'S THE PART THAT I WOULD LIKE TO

22   EMPHASIZE."

23         **MR. HUMMEL:**  FINE.

24         **THE COURT:**  GO AHEAD.  YOU MAY DO IT THAT WAY.

25         **MR. HUMMEL:**  THANK YOU.

1          **THE COURT:**  SAY "QUESTION" AND "ANSWER."

2          **MR. HUMMEL:**  YOUR HONOR, MAY I HAVE THE CONTEXT

3   AGAIN?  I APOLOGIZE FOR THE PAGE SNAFU.

4   **BY MR. HUMMEL:**

5   **Q.**  BUT THE CONTEXT IS, SIR, THAT THE UNION NEVER DID THIS,

6   NEVER INCLUDED RETIRED PLAYERS IN A GROUP LICENSING PROGRAM

7   BECAUSE YOU DIDN'T WANT TO DISTURB THE TEMPLATE WHERE THE UNION

8   KEPT 69 PERCENT.  AND TO THAT YOU SAID "NO."

9          NOW, READING PARAGRAPH --

10  **A.**  THAT WASN'T YOUR QUESTION, COUNSEL.  THAT'S NOT HOW I

11  UNDERSTOOD YOUR QUESTION.

12  **Q.**  THE RECORD WILL BE WHAT IT IS.

13  **A.**  OKAY.

14  **Q.**  PAGE 75, LINE 12:

15          "**QUESTION:**  WHY WOULD THAT BE?  WHY WOULD YOU

16          WANT TO KEEP THEM SEPARATE?

17          "**ANSWER:**  AGAIN, THIS IS NOT MY AREA.  THIS

18          IS NOT MY RESPONSIBILITY.

19          "**QUESTION:**  FAIR ENOUGH.  HAS ANYONE EVER

20          EXPLAINED TO YOU WHY KEEP THEM SEPARATE?

21          "**ANSWER:**  I CAN DRAW MY OWN CONCLUSIONS.

22          "**QUESTION:**  TELL ME WHAT YOUR CONCLUSIONS

23          ARE.

24          "**ANSWER:**  BECAUSE YOU WANT THE PEOPLE WHO

25          GENERATE THE MONEY TO BENEFIT FROM IT.

1          ACTIVE PLAYERS WOULD NOT BE GENERATING THE

2          MONEY FROM RETIRED PLAYER GROUP LICENSING

3          PROGRAMS.  IT WOULD BE UNFAIR TO THE RETIRED

4          PLAYERS TO GIVE ACTIVE PLAYERS A SHARE OF

5          THAT.  AND THAT'S TRUE ON THE FLIP SIDE.  IF

6          THE MONEY IS GENERATED BY ACTIVE PLAYERS,

7          IT'S UNFAIR TO THE ACTIVE PLAYERS TO DIVIDE

8          IT WITH RETIRED PLAYERS."

9          AND NOW, MR. BERTHELSEN, THE QUESTION I WAS

10   INTERESTED IN:

11          "BUT WHY NOT JUST LICENSE BOTH TOGETHER?

12          "**ANSWER:**  BECAUSE ONE IS A VIABLE, ONGOING

13          PROGRAM AND HAS BEEN FOR DECADES.  THE OTHER

14          WAS A TRY-AND-SEE, WHICH DID NOT SUCCEED.  IT

15          WOULDN'T MAKE SENSE TO COMBINE THE TWO.

16          "AS I TESTIFIED PREVIOUSLY, THERE WAS AN

17          ALLOCATION SET UP BY DUFF & PHELPS FROM THE

18          BEGINNING, AND THAT WAS AN ALLOCATION AS

19          BETWEEN THE UNION, PLAYERS INC AND ACTIVE

20          PLAYERS.  WHY WOULD WE UNDERMINE THAT

21          TEMPLATE, THAT ADVICE, OR THAT VALUATION BY

22          INCLUDING ANOTHER GROUP?"

23          NOW, MR. BERTHELSEN, ISN'T IT TRUE THAT EVEN THOUGH

24   THE UNION AND PLAYERS INC REPRESENTED THOUSANDS OF RETIRED

25   PLAYERS THAT THEY WERE GOING TO HAVE A GROUP LICENSING PROGRAM

1    THAT INVOLVED SIX OR MORE ACTIVE OR RETIRED PLAYERS, THE UNION

2    NEVER INTENDED TO HONOR THAT PROMISE?

3    **A.**   THAT'S NOT TRUE.

4           **MR. HUMMEL:**  NOTHING FURTHER, YOUR HONOR.

5           **MR. KESSLER:**  YOUR HONOR, I JUST HAVE VERY BRIEF

6    EXAMINATION.

7           **THE COURT:**  ALL RIGHT.  WAIT A MINUTE.  GO AHEAD.

8                          **CROSS EXAMINATION**

9    **BY MR. KESSLER:**

10   **Q.**   GOOD MORNING, MR. BERTHELSEN.

11   **A.**   GOOD MORNING.

12          **MR. KESSLER:**  GOOD MORNING, LADIES AND GENTLEMEN OF

13   THE JURY.

14   **BY MR. KESSLER:**

15   **Q.**   MR. BERTHELSEN, EXPLAIN TO THE JURY, PLEASE, WHY RETIRED

16   PLAYER MONEY WAS KEPT SEPARATE FROM ACTIVE PLAYER MONEY.

17   **A.**   BECAUSE IT WAS THE VIEW THAT WHOEVER EARNS THE MONEY

18   SHOULD GET IT.  IT WOULDN'T BE FAIR TO HAVE A DOLLAR EARNED BY

19   MR. ADDERLEY GO TO ACTIVE PLAYERS.  AND IT WOULDN'T BE FAIR FOR

20   A DOLLAR EARNED BY AN ACTIVE PLAYER TO GO TO MR. ADDERLEY.

21   **Q.**   IF THERE WAS ANY RETIRED PLAYER MONEY EARNED, WHETHER IT

22   WAS JUST RETIRED PLAYERS IN AN AGREEMENT OR IF IT WAS A

23   COMBINATION OF RETIRED PLAYERS AND ACTIVE PLAYERS IN AN

24   AGREEMENT, WHERE WOULD THE RETIRED PLAYER MONEY GO?

25          **MR. HUMMEL:**  OBJECTION --

1          (COUNSEL AND WITNESS SPEAKING SIMULTANEOUSLY, WHICH

2          WAS NOT REPORTABLE.)

3          (REPORTER INTERRUPTS.)

4          **MR. HUMMEL:**  OBJECTION, FOUNDATION.

5          **THE COURT:**  ALL RIGHT.  YOU CAN ANSWER THIS IF YOU

6    HAD KNOWLEDGE OF THIS OUTSIDE YOUR ROLE AS A LAWYER.  BUT IF

7    YOU HAVE TO DRAW UPON WHAT YOU LEARNED IN THIS LITIGATION THEN

8    THERE IS'S A PROBLEM.

9    **BY MR. KESSLER:**

10   **Q.**   CAN YOU ANSWER THIS, MR. BERTHELSEN, OUTSIDE OF YOUR ROLE

11   AS A LAWYER BASED ON YOUR KNOWLEDGE OF HOW THE POOLS WORK?

12   **A.**   I'D HAVE TO HAVE THAT QUESTION READ BACK, I THINK.

13   **Q.**   MR. BERTHELSEN, YOU WERE ASKED QUESTIONS BY COUNSEL ABOUT

14   PROGRAMS WHERE RETIRED AND ACTIVE PLAYERS COULD BE COMBINED.

15   DO YOU RECALL THAT?

16   **A.**   I RECALL HIS QUESTION, YES.

17   **Q.**   OKAY.  IF THERE WERE ANY RETIRED PLAYER MONEY EARNED IN A

18   COMBINED PROGRAM, DO YOU HAVE KNOWLEDGE, APART FROM LEGAL

19   KNOWLEDGE, AS TO WHO WOULD GET THAT MONEY FROM THE RETIRED

20   PLAYER RIGHTS?

21          **MR. HUMMEL:**  OBJECTION.  FOUNDATION.

22          **THE COURT:**  ALL RIGHT.

23          **THE WITNESS:**  YES.

24   **BY MR. KESSLER:**

25   **Q.**   YOU HAVE SOME SUCH?

1  A.    YES.

2  Q.    WHO WOULD GET SUCH MONEY?

3  A.    THE RETIRED PLAYERS.

4  Q.    EVEN IF IT WAS IN A COMBINATION PROGRAM WITH ACTIVE

5  PLAYERS?

6  A.    IT --

7          **MR. HUMMEL:**  OBJECTION, YOUR HONOR.

8          (COUNSEL AND WITNESS SPEAKING SIMULTANEOUSLY, WHICH

9          WAS NOT REPORTABLE.)

10         **THE COURT:**  WHAT IS THE OBJECTION?

11         **MR. HUMMEL:**  THERE WAS A CLEAR LINE THAT WAS DRAWN,

12  AND NOW THAT LINE IS BEING TROT OVER.  I JUST WANT TO BE VERY

13  CLEAR THAT I INTEND TO CROSS EXAMINE ON THIS.

14         **THE COURT:**  WAIT A SECOND.  WHEN YOU DID ASK -- YOU

15  READ INTO EVIDENCE THIS QUESTION ABOUT THE TEMPLATE AND THE

16  ACTIVE VERSUS THE RETIRED, AND HE GAVE AN ANSWER IN HIS

17  DEPOSITION.  AND FAIRNESS ENTITLES HIM, STICKING WITH THIS VERY

18  SUBJECT IN THE DEPOSITION, TO GIVE AN EXPLANATION THAT IS NOT

19  FAR AFIELD BUT CLOSELY ALLIED TO THE SUBJECT THAT WAS BROUGHT

20  UP IN THE DEPOSITION AND WHICH WAS READ TO THE JURY A MOMENT

21  AGO.

22         SO I'M GOING TO ALLOW THAT.

23         SO YOU CAN GO THAT FAR.  BUT AFTER YOU DO THAT, YOU

24  MAY NOT EXCEED GOING BEYOND THE SCOPE OF WHAT YOU HAD PERSONAL

25  KNOWLEDGE OF BECAUSE YOU HAVE INVOKED THIS PRIVILEGE ON THE

1  ATTORNEY-CLIENT.

2          MR. KESSLER:  VERY GOOD, YOUR HONOR.  THAT'S EXACTLY

3  MY INTENTION.

4  BY MR. KESSLER:

5  Q.  ONE LAST QUESTION WHICH COUNSEL OBJECTED TO SO, I'LL ASK

6  IT AGAIN:  EVEN IF IT WAS A COMBINATION PROGRAM, DO YOU HAVE

7  KNOWLEDGE WHETHER THE RETIRED PLAYERS WOULD GET THE RETIRED

8  PLAYER MONEY?

9  A.  THE PORTION GENERATED BY RETIRED WOULD GO TO RETIRED.  THE

10  SAME THING FOR ACTIVE.  PORTION GENERATED BY ACTIVE WOULD GO TO

11  ACTIVE.

12  Q.  THANK YOU.

13          MR. KESSLER:  I WOULD NOW LIKE TO PUT UP TRIAL

14  EXHIBIT 91, WHICH COUNSEL SHOWED YOU.

15  BY MR. KESSLER:

16  Q.  THIS WAS THE DOCUMENT ABOUT THE $8 MILLION ALLOCATION.

17  AND I'D LIKE TO DIRECT YOUR ATTENTION -- I'LL JUST SHOW THE

18  JURY AGAIN ON THE TOP WHAT THIS IS TO REMIND THEM.  THIS WAS

19  THE AGREEMENT REACHED IN MARCH 1, 2000.  AND IT RELATES TO THE

20  $8 MILLION ALLOCATION.

21          MR. KESSLER:  IF WE COULD LOOK AT THIS MIDDLE

22  "WHEREAS" CLAUSE, IF WE CAN, THE FOURTH ONE, PLEASE, JUST SO WE

23  CAN REMIND THE JURY.

24          MR. FEHER:  2006.

25          MR. KESSLER:  I'M SORRY.  I MISSPOKE.

1          GO BACK TO THE TOP AGAIN.

2     **BY MR. KESSLER:**

3     **Q.**   THIS AGREEMENT RELATES TO AN AMENDMENT TO THE 2000

4     AGREEMENT, BUT IT WAS ENTERED INTO IN FEBRUARY OF 2006; IS THAT

5     CORRECT?

6     **A.**   YES.

7     **Q.**   NOW, LOOKING AT THE FOURTH "WHEREAS," THE NEXT ONE.  I'M

8     SORRY.

9          THIS AGREEMENT RELATED TO THE REALLOCATION OF THE

10    $8 MILLION; IS THAT CORRECT?

11    **A.**   YES.

12    **Q.**   LOOKING AT THE LAST "WHEREAS" CLAUSE THAT YOU WERE ASKED

13    ABOUT, IT SAYS:

14              "WHEREAS, THE NFLPA AND PLAYERS INC AGREE THAT

15    FURTHER ADJUSTMENTS MAY BE NECESSARY AFTER COMPLETION OF AN

16    INDEPENDENT, THIRD-PARTY VALUATION OF THE VALUE CONFERRED BY

17    PLAYERS, THE NFLPA, AND PLAYERS INC."

18         MR. BERTHELSEN, WERE THERE ANY FURTHER ADJUSTMENTS

19    MADE AFTER THIS DATE TO THE ALLOCATION OF THE MONEY, TO YOUR

20    KNOWLEDGE?

21    **A.**   NOT TO MY KNOWLEDGE.

22    **Q.**   OKAY.  SO IF THERE WERE NO FURTHER ADJUSTMENTS MADE, WAS

23    THERE ANY NEED YET TO DO A THIRD-PARTY VALUATION, ANOTHER ONE?

24    **A.**   APPARENTLY NOT.

25    **Q.**   AND, FINALLY, MR. BERTHELSEN, YOU TESTIFIED ABOUT HOW THIS

1  WAS DISCUSSED WITH THE BOARD OF PLAYER REPS.  DID THE -- WAS

2  THE BOARD OF PLAYER REPS INFORMED AT THEIR MEETING THAT THERE

3  HAS NOT YET BEEN A NEED TO DO THE THIRD-PARTY VALUATION?

4  **A.**   YES.

5  **Q.**   NO FURTHER QUESTIONS.

6         **MR. KESSLER:**  NO FURTHER QUESTIONS.

7         **MR. HUMMEL:**  NO QUESTIONS, YOUR HONOR.

8        **THE COURT:**  ALL RIGHT.  THANK YOU, MR. BERTHELSEN.

9  YOU MAY RETURN TO YOUR SEAT.

10        **THE WITNESS:**  THANK YOU, YOUR HONOR.

11        **THE COURT:**  ALL RIGHT.  NEXT WITNESS.

12        **MR. LECLAIR:**  YOUR HONOR, WE CALL JOSEPH NAHRA.

13        **THE COURT:**  OKAY.  MR. NAHRA.

14        MR. NAHRA, RAISE YOUR RIGHT HAND.

15        (THEREUPON, THE WITNESS WAS SWORN.)

16        **THE WITNESS:**  I DO.

17        **THE COURT:**  VERY WELL.  PLEASE HAVE A SEAT.  WE'LL

18  TAKE YOUR PICTURE LATER BECAUSE MY PHOTOGRAPHER IS ABSENT.

19        SCOOT FORWARD AND MAKE SURE THE MIC CATCHES YOUR

20  VOICE.  AND STATE YOUR FULL NAME.

21        **THE WITNESS:**  JOSEPH NAHRA.  THAT'S N-A-H-R-A.

22        **THE COURT:**  OKAY.  THANK YOU.

23        COUNSEL, GO RIGHT AHEAD.

24

25

1       **JOSEPH NAHRA**,

2   CALLED AS A WITNESS FOR THE PLAINTIFFS HEREIN, HAVING BEEN

3   FIRST DULY SWORN, WAS EXAMINED AND TESTIFIED AS FOLLOWS:

4                       **DIRECT EXAMINATION**

5   **BY MR. LECLAIR:**

6   **Q.**   GOOD MORNING, MR. NAHRA.

7   **A.**   GOOD MORNING.

8   **Q.**   YOU'RE A LAWYER, ARE YOU, SIR?

9   **A.**   YES, SIR.

10  **Q.**   AND BY WHOM ARE YOU EMPLOYED?

11  **A.**   THE NATIONAL FOOTBALL LEAGUE PLAYERS ASSOCIATION.

12  **Q.**   IN FACT, YOU'RE HERE AS THE CORPORATE REPRESENTATIVE OF --

13  IS IT PLAYERS INC OR THE PLAYERS ASSOCIATION?

14  **A.**   THE PLAYERS ASSOCIATION.

15  **Q.**   ALL RIGHT, SIR.  IN FACT, YOU DO LEGAL WORK FOR BOTH THE

16  PLAYERS ASSOCIATION AND PLAYERS INC?

17  **A.**   I DO.

18  **Q.**   COULD YOU TELL THE JURY WHO CLAY WALKER IS?

19  **A.**   CLAY WALKER IS A FORMER SENIOR VICE PRESIDENT OF PLAYERS

20  INC.

21  **Q.**   WAS HE INVOLVED IN DEALINGS WITH LICENSEES LIKE

22  ELECTRONIC ARTS?

23  **A.**   YES.

24  **Q.**   COULD YOU TELL THE JURY WHO ANDREW FEFFER IS?

25  **A.**   ANDREW FEFFER IS THE CURRENT CHIEF OPERATING OFFICER, AND

1    I BELIEVE HE ALSO IS THE EXECUTIVE VICE PRESIDENT OF PLAYERS

2    INC.

3    Q.    DID MR. FEFFER REPLACE MR. WALKER?

4    A.    NO.

5    Q.    DID HE COME AFTER MR. WALKER LEFT?

6    A.    YES.

7    Q.    DID HE ASSUME SOME OF MR. WALKER'S RESPONSIBILITIES?

8    A.    I'M NOT SURE ABOUT THAT.

9    Q.    ALL RIGHT, SIR.

10         MR. NAHRA, DID YOU WORK ON AN AGREEMENT IN 2006

11   BETWEEN ELECTRONIC ARTS, PLAYERS INC AND THE PRO FOOTBALL HALL

12   OF FAME?

13   A.    YES, I DID.

14   Q.    AND WAS CLAY WALKER THE BUSINESS EXECUTIVE AT PLAYERS INC

15   WHO WORKED ON THAT SAME DEAL?

16   A.    HE WAS A BUSINESS EXECUTIVE.  I'M NOT SURE WHETHER HE WAS

17   THE ONLY.

18   Q.    DO YOU RECALL, MR. NAHRA, THAT IN 2005 ELECTRONIC ARTS AND

19   PI ENTERED INTO AN EXCLUSIVE 5-YEAR AGREEMENT TO MAKE THE

20   MADDEN GAME?

21   A.    YES, I DO.

22   Q.    NOW, AT THAT TIME WAS -- PRIOR TO THE EXCLUSIVE

23   ARRANGEMENT, WAS TAKE TWO ANOTHER COMPANY LIKE ELECTRONIC ARTS

24   THAT WAS MAKING VIDEO GAMES WITH FOOTBALL PLAYERS?

25   A.    I'M NOT SURE.

1  **Q.**   IS IT TRUE, SIR, THAT AFTER THE EXCLUSIVE DEAL WAS DONE

2  BETWEEN THE UNION AND -- OR BETWEEN PI AND ELECTRONIC ARTS THAT

3  TAKE TWO WAS OUT SOLICITING RETIRED PLAYERS TO GO INTO A

4  FOOTBALL VIDEO GAME?

5  **A.**   YES, I HAD HEARD THAT.

6  **Q.**   AND IS IT TRUE, SIR, THAT ELECTRONIC ARTS EXPRESSED

7  CONCERN TO PLAYERS INC ABOUT THAT HAPPENING?

8  **A.**   UHM, I DON'T HAVE ANY FIRSTHAND KNOWLEDGE OF THAT.  I HAD

9  HEARD THAT.

10  **Q.**   DO YOU RECALL, SIR, THAT YOU GOT A CALL FROM A LAWYER AT

11  ELECTRONIC ARTS WHO WANTED TO KNOW WHAT WAS GOING ON WITH

12  RETIRED PLAYERS AND TAKE TWO?

13  **A.**   UHM, I CERTAINLY MAY HAVE.  AS I'M SITTING HERE TODAY I

14  DON'T RECALL THE SPECIFICS OF THE CONVERSATION.  BUT YOU

15  CERTAINLY COULD BE RIGHT.  I MAY HAVE TESTIFIED TO IT IN MY

16  DEPOSITION.

17          **MR. LECLAIR:**  LET ME READ, IF I COULD, YOUR HONOR,

18  FROM MR. NAHRA'S DEPOSITION, PAGE 239, LINES 9 THROUGH 19.

19          **MR. KESSLER:**  YOUR HONOR, IT'S NOT IMPEACHING.  HE

20  COULD ASK QUESTIONS.

21          **THE COURT:**  ISN'T HE A REPRESENTATIVE?

22          **MR. KESSLER:**  HE WAS DESIGNATED NOW AS A

23  REPRESENTATIVE.  HE WAS NOT A 30(B)(6) ON THAT TOPIC AT HIS

24  DEPOSITION.

25          **THE COURT:**  WELL, THE FAILURE TO RECALL IS THE SAME,

1  AND YOU CAN READ -- YOU CAN READ THE PRIOR TESTIMONY AS

2  IMPEACHMENT.

3           **MR. KESSLER:**  VERY GOOD, YOUR HONOR.

4           **THE COURT:**  THAT'S THE RULE IN THIS COURTROOM.

5           **MR. KESSLER:**  OKAY.

6           **THE COURT:**  GO AHEAD AND READ IT.

7           **MR. LECLAIR:**  LET ME MAKE SURE I HAVE THE RIGHT --

8  OKAY.  ACTUALLY, YOUR HONOR, I BELIEVE IT -- NO, IT IS 239,

9  LINE 13 THROUGH 19.

10          MAY I PROCEED, YOUR HONOR?

11          **THE COURT:**  GO AHEAD.

12          **THE WITNESS:**  I'M SORRY, WHAT WERE THE LINES AGAIN?

13          **MR. LECLAIR:**  13 THROUGH 19.

14          **THE WITNESS:**  OKAY.

15          **MR. LECLAIR:**  ACTUALLY, I'LL BEGIN AT LINE 9,

16  MR. NAHRA.  THE QUESTION WAS:

17          "**QUESTION:**  WAS EA CONCERNED AT THIS POINT IN

18          TIME ABOUT THE COMPETITION FROM TAKE TWO?"

19          THERE WAS AN OBJECTION.  THEN:

20          "**QUESTION:**  DID YOU EVER HEAR OF THAT FROM

21          ANYONE?

22          "**ANSWER:**  I CANNOT ANSWER AS TO WHETHER THEY

23          WERE CONCERNED OR NOT, BUT I THINK I PROBABLY

24          GOT A CALL FROM -- I DON'T THINK IT WAS JOEL

25          LINZNER, BUT A LAWYER AT EA TO SEE WHAT WE

1     KNEW ABOUT TAKE TWO AND RETIRED PLAYER VIDEO

2     GAMES."

3 **BY MR. LECLAIR:**

4 **Q.**   NOW, IS IT CORRECT, MR. NAHRA, THAT IF EA WANTED TO MAKE

5 CONTACT WITH RETIRED PROFESSIONAL FOOTBALL PLAYERS THEY HAD TO

6 GO THROUGH PLAYERS INC BECAUSE OF A CONTRACTUAL ARRANGEMENT?

7 **A.**   NOT NECESSARILY.

8 **Q.**   ALL RIGHT.  TAKE A LOOK, IF YOU WOULD, AT EXHIBIT 1148.

9 **A.**   OKAY.

10 **Q.**   IS IT CORRECT, MR. NAHRA, THAT YOU WERE THE LAWYER WHO

11 OFTEN DEALT WITH LICENSE AGREEMENTS WITH THESE THIRD PARTIES?

12 **A.**   YES, SIR.

13 **Q.**   ALL RIGHT, SIR.  AND THIS IS A -- THIS LICENSE AGREEMENT,

14 IT'S NOT PARTICULARLY IMPORTANT WHO IT'S WITH.  THIS ONE

15 HAPPENS TO BE WITH -- I THINK IT'S FANTASY SPORTS

16 CHAMPIONSHIPS.

17     DO YOU RECOGNIZE THIS AGREEMENT, SIR?

18 **A.**   I DO.

19     **MR. LECLAIR:**  ALL RIGHT.  I WOULD MOVE 1148 IN

20 EVIDENCE, YOUR HONOR.

21     **MR. KESSLER:**  NO OBJECTION.

22     **THE COURT:**  RECEIVED.

23     (TRIAL EXHIBIT 1148 RECEIVED IN EVIDENCE.)

24 **BY MR. LECLAIR:**

25 **Q.**   TURN TO PARAGRAPH 13, IF YOU WOULD, AND PUT IT UP ON PAGE

1  8.

2                (DOCUMENT DISPLAYED.)

3                IS IT CORRECT, MR. NAHRA, THAT THIS PARTICULAR CLAUSE

4  CALLED "NON-INTERFERENCE" IS A STANDARD PROVISION WHICH APPEARS

5  IN VIRTUALLY EVERY SINGLE LICENSE AGREEMENT THAT PI DOES WITH

6  LICENSEES WITH EA AND OTHERS?

7  **A.**   YES, THAT'S TRUE.

8  **Q.**   ALL RIGHT.  LET'S READ THIS INTO THE RECORD.

9                "NONINTERFERENCE.  LICENSEE AGREES AND

10  ACKNOWLEDGES" --

11            **MR. LECLAIR:**  I'M IN THE WAY HERE.  CAN I MOVE OVER

12  HERE, YOUR HONOR?

13            **THE COURT:**  YES.

14            **MR. LECLAIR:**  "LICENSEE AGREES AND ACKNOWLEDGES THAT

15  IT SHALL NOT SECURE OR SEEK TO SECURE, DIRECTLY FROM ANY

16  PLAYER, WHO IS UNDER CONTRACT TO AN NFL CLUB, IS SEEKING TO

17  BECOME UNDER CONTRACT TO AN NFL CLUB, OR AT ANY TIME IN THE

18  PAST WAS UNDER CONTRACT TO AN NFL CLUB, OR FROM SUCH PLAYER'S

19  AGENT, PERMISSION OR AUTHORIZATION FOR THE USE OF SUCH PLAYER'S

20  IDENTITY IN CONJUNCTION WITH THE LICENSED PRODUCT HEREIN."

21  **BY MR. LECLAIR:**

22  **Q.**   THAT WAS THE STANDARD PROVISION IN YOUR LICENSE

23  AGREEMENTS, WAS IT NOT, MR. NAHRA?

24  **A.**   YES, IT IS.

25  **Q.**   AND SO IF ELECTRONIC ARTS WANTED TO TALK TO ANY RETIRED

1   PLAYER, ANY RETIRED PLAYER, ABOUT BEING IN THE MADDEN GAME OR

2   ANY OF EA'S VIDEO GAME PRODUCTS COVERED BY THE LICENSE, THEY

3   HAD TO COME TO PLAYERS INC TO DO THAT?

4   **A.**   THAT'S TRUE.  BUT THAT WASN'T YOUR PRIOR QUESTION.

5   **Q.**   OKAY.  BUT IT IS TRUE THAT THEY HAD TO DO THAT FOR THE

6   VIDEO GAME PRODUCTS THEY WERE MAKING?

7   **A.**   RIGHT, FOR THE -- FOR THE PRODUCTS THAT WERE LICENSED

8   THROUGH THEIR LICENSE AGREEMENT WITH PLAYERS INC, THAT'S

9   CORRECT.

10  **Q.**   ALL RIGHT, SIR.

11          NOW, YOU WORKED ON, SIR, THE AGREEMENT WITH PLAYERS

12  INC AND THE HALL OF FAME RELATED TO THE FOOTBALL GAME, CORRECT,

13  SIR?

14  **A.**   YES, SIR.

15  **Q.**   ALL RIGHT.  LET'S -- EXHIBIT 56 IS IN EVIDENCE.  YOU HAVE

16  IT IN FRONT OF YOU, SIR.  THAT IS THE AGREEMENT WITH -- BETWEEN

17  EA, PLAYERS INC AND THE HALL OF FAME; IS THAT CORRECT?

18  **A.**   YES, SIR.

19          **MR. LECLAIR:**  LET'S LOOK AT PARAGRAPH 1B.  AND

20  HIGHLIGHT THAT, IF WE COULD.

21          (DOCUMENT DISPLAYED.)

22  **BY MR. LECLAIR:**

23  **Q.**   THIS PARAGRAPH REFERS TO -- IT'S LANGUAGE THAT WE'VE SEEN.

24          BEFORE, MR. NAHRA, THAT SAYS THAT THE NFLPA HAS BEEN

25  DULY APPOINTED AND IS ACTING ON BEHALF OF THE FOOTBALL PLAYERS

1    OF THE NATIONAL FOOTBALL LEAGUE WHO HAVE ENTERED INTO A GROUP

2    LICENSING ASSIGNMENT WHICH HAVE BEEN ASSIGNED TO PLAYERS INC.

3         IT GOES ON TO SAY:

4              "LICENSEE ACKNOWLEDGES THAT PLAYERS INC ALSO ON

5    OCCASION SECURES AUTHORIZATION FOR INCLUSION IN PLAYERS INC

6    LICENSING PROGRAMS FROM PLAYERS INCLUDING, BUT NOT LIMITED TO,

7    THE H.O.F. PLAYERS REFERENCED ABOVE AND OTHER RETIRED PLAYERS

8    WHO HAVE NOT ENTERED INTO SUCH GROUP LICENSING AUTHORIZATION

9    BUT WHO, NEVERTHELESS, AUTHORIZED PLAYERS INC TO REPRESENT SUCH

10   PLAYERS FOR DESIGNATED PLAYERS INC LICENSED PROGRAMS."

11        AND THEN, IT GOES ON TO SAY AS FOLLOWS:  IN SUCH

12   CAPACITY, PLAYERS INC HAS GRANTED LICENSEE CERTAIN RIGHTS AS

13   SET FORTH IN THE LICENSE AGREEMENT EFFECTIVE MARCH 1, 2006, THE

14   PLAYERS INC LICENSE AGREEMENT."

15        SO WHAT IT'S SAYING IN THIS PARAGRAPH, IS IT CORRECT,

16   MR. NAHRA, IN THE CAPACITY AS SET FORTH IN THIS PARAGRAPH YOU

17   HAD GRANTED RIGHTS UNDER THE MARCH 1, 2006 EA AGREEMENT, WHICH

18   WAS THE BIG $25 MILLION A YEAR AGREEMENT, CORRECT?

19   **A.**   RIGHT.  WE HAD GRANTED EA THE LICENSE FOR THE ACTIVE

20   PLAYERS IN THE MARCH 2006 AGREEMENT.

21   **Q.**   SO WHAT YOU'RE SAYING IS THAT THIS LANGUAGE THAT TALKS

22   ABOUT THE H.O.F. PLAYERS AND THE RETIRED PLAYERS, THAT THAT

23   LANGUAGE DOESN'T HAVE ANYTHING TO DO WITH THE LAST SENTENCE

24   THAT TALKS ABOUT "IN SUCH CAPACITY"; IS THAT WHAT YOU'RE

25   SAYING, SIR?

1   **A.**   I'M JUST SAYING THE INTENT OF THIS PARAGRAPH WAS TO STATE

2   THE FACT THAT WE HAD ENTERED INTO AN AGREEMENT WITH

3   ELECTRONIC ARTS ON MARCH 1ST, 2006, FOR THE ACTIVE PLAYERS.

4   WHICH -- YOU'LL READ FURTHER IN THE AGREEMENT, WHICH REQUIRES

5   PLAYERS INC'S APPROVAL WHENEVER THEY WANT TO USE OTHER PLAYERS

6   IN THAT LICENSED PRODUCT, SUCH AS THE HALL OF FAME PLAYERS.

7   **Q.**   WELL, DO YOU ACKNOWLEDGE, SIR, THAT PLAYERS INC WAS

8   REPRESENTING THE HALL OF FAME PLAYERS, SUCH AS MR. ADDERLEY, IN

9   CONNECTION WITH THIS AGREEMENT?

10  **A.**  NO, WE WERE NOT.

11  **Q.**   THAT'S NOT WHAT THIS SAYS TO YOU?

12  **A.**   THE HALL OF FAME IS REPRESENTING THE HALL OF FAME PLAYERS

13  IN THIS AGREEMENT.

14  **Q.**   AND YOUR TESTIMONY TO THIS JURY IS THAT EVEN THOUGH YOU

15  REQUIRED EA TO COME TO PI IN ORDER TO TALK TO A RETIRED PLAYER

16  ABOUT THE VIDEO GAMES THAT EA WAS MAKING, YOU'RE SAYING THAT

17  YOU WEREN'T REPRESENTING THE RETIRED PLAYERS IN THIS AGREEMENT?

18  **A.**   IN THIS -- THIS IS A VERY UNIQUE LICENSE AGREEMENT.  AND

19  IN THIS AGREEMENT THE HALL OF FAME IS ACTUALLY THE ORGANIZATION

20  THAT HOLDS THE RIGHTS TO THE HALL OF FAME PLAYERS.

21          AND IT WAS THE HALL OF FAME THAT WAS GRANTING THE

22  RIGHTS TO ELECTRONIC ARTS UNDER THIS AGREEMENT.

23          THERE MAY HAVE BEEN HALL OF FAME MEMBERS WHO PLAYERS

24  INC ALSO HAD RIGHTS TO, BUT UNDER THIS AGREEMENT THE HALL OF

25  FAME WAS GRANTING THE HALL OF FAME PLAYERS TO EA.

1  Q.   SO ARE YOU TELLING THE JURY, SIR, THAT REALLY PI WASN'T

2  INVOLVED IN THIS NEGOTIATION WITH RESPECT TO THESE RETIRED

3  PLAYERS?

4  A.   UHM, I DON'T KNOW -- I DON'T HAVE FIRSTHAND KNOWLEDGE OF

5  PLAYERS INC'S INVOLVEMENT IN THE NEGOTIATIONS.  BUT THE REASON

6  THAT PLAYERS INC WAS A PARTY TO THIS AGREEMENT WAS NOT TO

7  REPRESENT THE HALL OF FAME PLAYERS.  IT WAS BECAUSE WE HAD

8  APPROVAL RIGHTS OVER WHAT WOULD BE GOING INTO THE MADDEN GAME,

9  WHICH WE HAD LICENSED FOR THE ACTIVE PLAYERS.

10 Q.   ISN'T IT TRUE, SIR, THAT AFTER THIS AGREEMENT WAS SIGNED

11 IN 2006, THAT PI, PLAYERS INC, TOLD ELECTRONIC ARTS THAT IT

12 WAS, QUOTE, "A REAL COUP," CLOSED QUOTE, THAT PI WAS ABLE TO

13 GET THE HALL OF FAME PLAYERS SO CHEAPLY FOR THIS AGREEMENT?

14 A.   DID PLAYERS INC TELL THAT SPECIFICALLY TO EA?

15 Q.   YES, SIR.

16 A.   I DON'T BELIEVE SO.

17 Q.   YOU DON'T THINK THAT HAPPENED?

18      LET ME ASK YOU THIS:  IS IT CORRECT, SIR, THAT

19 BECAUSE OF THE COMPETITION FROM TAKE TWO, WHICH WAS OUT SIGNING

20 UP RETIRED PLAYERS, THAT CLAY WALKER FROM PI FORGED A 3-WAY

21 DEAL WITH THE HALL OF FAME TO PROVIDE THE HALL OF FAME PLAYERS

22 FOR THE MADDEN GAME?

23 A.   I'M NOT SURE WHAT THE BASIS WAS FOR THIS LICENSE

24 AGREEMENT, BUT I ALREADY TESTIFIED THAT EA HAD CONTACTED US AND

25 WAS WONDERING WHAT WAS HAPPENING WITH TAKE TWO IN SECURING

1    RIGHTS TO RETIRED PLAYERS FOR A VIDEO GAME.

2    **Q.**   ISN'T IT TRUE, MR. NAHRA, THAT PLAYERS INC TOLD

3    ELECTRONIC ARTS THAT ELECTRONIC ARTS OWED PLAYERS INC A HUGE

4    FAVOR BECAUSE THE THREAT OF THIS HALL OF FAME AGREEMENT WAS

5    ENOUGH TO TAKE -- CAUSE TAKE TWO TO BACK OFF OF ITS PLANS,

6    LEAVING EA AS THE ONLY VIDEO GAME MANUFACTURER FOR PROFESSIONAL

7    FOOTBALL?

8    **A.**   WELL, TAKE TWO DID MAKE A VIDEO GAME FOR RETIRED PLAYERS.

9    I DON'T KNOW EXACTLY WHAT WAS COMMUNICATED TO ELECTRONIC ARTS

10   ABOUT WHAT YOU JUST QUOTED.  I BELIEVE THERE ARE SOME E-MAILS.

11            IF YOU WOULD LIKE ME TO TAKE A LOOK AT THOSE E-MAILS

12   I CAN TELL YOU WHAT IT SEEMS TO BE COMMUNICATING TO EA.

13            **MR. KESSLER:**  YOUR HONOR, AT THIS POINT DEFENDANTS

14   WOULD REQUEST THAT THE COURT ISSUE AN INSTRUCTION TO THE JURY

15   THAT THE HALL OF FAME AGREEMENT BEING DISCUSSED IS NOT THE

16   SUBJECT OF ANY CLAIM IN THIS CASE, YOUR HONOR.  IT'S ONE OF THE

17   AD HOC AGREEMENTS.

18            **MR. LECLAIR:**  ACTUALLY, THAT'S NOT CORRECT, YOUR

19   HONOR.  AS I'VE SAID, WE ARE CLAIMING THE GROUP LICENSING

20   MONEY, WHICH INCLUDES THE GROUP LICENSING MONEY FROM EA.

21            YOUR HONOR WILL CERTAINLY INSTRUCT THE JURY

22   APPROPRIATELY, AND THAT'S FINE.

23            **THE COURT:**  JUST A PRELIMINARY MATTER.

24            MR. LECLAIR READ FROM SOMETHING AND USED THE WORD

25   "FORGED."

1        AND YOUR NATURAL REACTION IS TO SAY:

2            "OH, MY GOD.  NOW, THEY'RE IN FORGERY."

3        NO, THAT'S NOT WHAT THE WORD MEANT.  IT WAS -- I'VE

4 SEEN THIS E-MAIL HE WAS READING FROM.  IT MEANT "FORGED,"

5 PULLED TOGETHER.

6        AND MR. LECLAIR DIDN'T MEAN TO SUGGEST THAT SOMEBODY

7 WAS CREATING CRIMINAL ACTS OF FORGERY.

8        THAT'S THE WAY IT CAME ACROSS.

9        **MR. LECLAIR:**  I'M SORRY.  I DIDN'T EVEN REALIZE --

10        **THE COURT:**  I KNOW YOU DIDN'T.  BUT YOU WERE ACTING

11 IN TOTAL GOOD FAITH.  I'M JUST MAKING THAT POINT CLEAR SO NO

12 ONE GETS OFF ON THE TANGENT THAT NOW WE'RE INVOLVED IN FORGERY.

13        OKAY.  NOW, I THINK ALL I NEED TO SAY IS THIS CASE IS

14 ABOUT THE GLA AND WHETHER OR NOT THE GLA ENTITLED THE CLASS

15 MEMBERS TO GET A SHARE OF THE MONEY THAT THE DEFENDANTS GOT

16 FROM COMPANIES LIKE EA THAT THE DEFENDANTS TREATED AS BEING

17 ACTIVE PLAYER MONEY.

18        AND YOU HAVE ALL HEARD ABOUT THESE AD HOC AGREEMENTS,

19 AND THE DEFENDANTS HAVE SAID -- I'M SORRY -- THE PLAINTIFFS

20 HAVE SAID, AND THE DEFENDANTS HAVE SAID SEVERAL TIMES, THAT

21 THE -- THIS CASE IS NOT ABOUT TRYING TO REDISTRIBUTE THE MONEY

22 THAT WAS PAID ON THE AD HOCS, SOME OF WHICH DID GO TO RETIRED

23 PLAYERS, TRYING TO REDISTRIBUTE THAT IN SOME WAY.

24        RATHER, IT'S OVER THE FIRST SET OF ISSUES THAT I

25 MENTIONED.  THE HALL OF FAME AGREEMENT FALLS INTO THE CATEGORY

1   OF AN AD HOC AGREEMENT.  BUT THERE MAY BE -- THERE MAY BE SOME

2   SUB ISSUES ON WHICH THIS AFFAIR HAS SOME BEARING.  AND THAT'S

3   WHY YOU'RE BEING ALLOWED TO HEAR ABOUT THE HALL OF FAME

4   AGREEMENT.

5           HAVE I SAID IT MORE OR LESS RIGHT?  DID YOU WANT TO

6   ADD OR SUBTRACT ANYTHING FROM WHAT I'VE SAID?

7           **MR. LECLAIR:**  I'M FINE WITH THAT, YOUR HONOR.

8           **MR. KESSLER:**  I THINK THAT'S FINE, YOUR HONOR.  I

9   WILL PROBABLY READ IN A STIPULATION AT THE APPROPRIATE POINT.

10          **THE COURT:**  ALL RIGHT.  FINE.  NOW, LET'S MOVE ON.

11  **BY MR. LECLAIR:**

12  **Q.**   MR. NAHRA, IT'S TRUE, ISN'T IT, SIR, YOU KNOW EXACTLY WHAT

13  WAS SAID BECAUSE YOU'VE READ THESE VERY E-MAILS, HAVE YOU NOT,

14  SIR?

15  **A.**   RIGHT.  THERE WERE -- THERE WAS A CHAIN OF E-MAILS.  SOME

16  OF THOSE E-MAILS WERE INTERNAL OR DID NOT INVOLVE ANY DIRECT

17  COMMUNICATION WITH EA.  AND SOME OF THEM DID INVOLVE DIRECT

18  COMMUNICATION WITH EA.  AND THE LANGUAGE IS SIMILAR, BUT NOT

19  THE SAME.  AND THAT'S WHY I'M NOT -- I'M NOT POSITIVE AS TO

20  WHICH E-MAILS YOU'RE REFERRING WHEN YOU QUOTE LANGUAGE.

21  **Q.**   ALL RIGHT, SIR.  WELL, WE'RE GOING TO LOOK AT ALL OF THEM.

22  SO LET'S DO IT RIGHT NOW.

23  **A.**   SURE.

24  **Q.**   LET'S LOOK AT EXHIBIT 1034.

25          **THE COURT:**  ALL RIGHT.  BEFORE YOU DO THAT, YOU DID

1  NOT MOVE EXHIBIT 56 IN EVIDENCE.

2          **MR. LECLAIR:**  I APOLOGIZE.  I MOVE IT INTO EVIDENCE,

3  YOUR HONOR.

4          **THE COURT:**  ANY OBJECTION?

5          **MR. KESSLER:**  NO OBJECTION.

6          **THE COURT:**  YOU SHOULD ALWAYS MOVE IT IN BEFORE YOU

7  SHOW IT TO THE JURY.

8          (TRIAL EXHIBIT 56 RECEIVED IN EVIDENCE.)

9          **THE COURT:**  ALL RIGHT.  NOW, ARE YOU GOING TO SHOW

10  THESE TO THE JURY?  IF YOU ARE, YOU OUGHT TO MOVE THEM INTO

11  EVIDENCE FIRST.

12          **MR. LECLAIR:**  I WILL DO THAT, YOUR HONOR.

13          **THE WITNESS:**  WHAT NUMBER?

14          **MR. LECLAIR:**  1034.

15          **THE COURT:**  LAY THE FOUNDATION, AND THEN --

16  **BY MR. LECLAIR::**

17  **Q.**   THIS IS A SERIES OF E-MAILS ON WHICH YOU WERE COPIED,

18  MR. NAHRA, CORRECT?

19  **A.**   YES.

20          **MR. LECLAIR:**  ALL RIGHT.  I MOVE 1034 INTO EVIDENCE,

21  YOUR HONOR.

22          **MR. KESSLER:**  I THINK YOUR HONOR HAS ALREADY RULED

23  THEM.

24          (COUNSEL AND THE COURT SPEAKING SIMULTANEOUSLY, WHICH

25           WAS NOT REPORTABLE.)

 1          **THE COURT:**  THIS IS GOING TO BE ADMISSIBLE SUBJECT

 2  TO YOUR PRIOR OBJECTIONS.

 3          **MR. KESSLER:**  YES.

 4          (TRIAL EXHIBIT 1034 RECEIVED IN EVIDENCE.)

 5          **MR. LECLAIR:**  LET'S PUT UP 1034, PLEASE, AND

 6  HIGHLIGHT THE TOP E-MAIL.

 7  **BY MR. LECLAIR:**

 8  **Q.**   THIS IS AN E-MAIL FROM WHICH YOU WERE COPIED FROM CLAY

 9  WALKER AT PI, WHO WAS THE EXECUTIVE AT PLAYERS INC, AND IT'S TO

10  PAUL CAIRNS AT EA, ELECTRONIC ARTS, CORRECT?

11  **A.**   YES, SIR.

12  **Q.**   I WOULD LIKE FOCUS ON THE THIRD LINE OF THIS E-MAIL.

13          IN THE MIDDLE IT SAYS, QUOTE:

14          "THE PER PLAYER PRICE FOR MOST OF THESE GUYS WAS

15  TENS OF THOUSANDS OF DOLLARS LESS THAN WHAT THEY WERE

16  GUARANTEED BY TAKE TWO INTERACTIVE, SO IT'S A REAL COUP THAT WE

17  WERE ABLE TO PULL THIS OFF SO CHEAPLY."

18          ALL RIGHT, SIR?  NOW, DO YOU HAVE ANY INFORMATION,

19  MR. NAHRA, TO SUGGEST THAT AT THE TIME ANYBODY SAID THIS WAS

20  WRONG?

21  **A.**   UHM, YES, I DO.

22  **Q.**   AT THE TIME WHEN THIS WAS DONE ARE YOU TELLING THE JURY

23  THAT YOU SAID THIS WAS WRONG?

24  **A.**   AT THE TIME THAT THIS WAS SENT, I'M NOT SURE IF I HAD ANY

25  INFORMATION TO SUGGEST THAT -- THAT THE MONEY WAS LESS THAN

1  WHAT TAKE TWO WAS OFFERING.

2  **Q.**   AT THE TIME --

3        **THE COURT:**  WAIT.  WAIT.  WAIT.  DO YOU MEAN

4  INACCURATE OR DO YOU MEAN MORALLY WRONG?  THE WORD "WRONG" HAS

5  TWO MEANINGS HERE.

6  **BY MR. LECLAIR:**

7  **Q.**   WAS IT INACCURATE?

8  **A.**   WELL, WHAT I DO -- WHAT I KNOW NOW AND WHAT I KNEW AT THE

9  TIME WAS THAT THE RIGHTS THAT TAKE TWO WAS ATTEMPTING TO SECURE

10 WERE EXCLUSIVE RIGHTS.  BUT I DON'T KNOW HOW MUCH THEY WERE

11 OFFERING FOR THOSE RIGHTS.

12 **Q.**   LET ME JUST ASK THIS SIMPLE QUESTION, MR. NAHRA.

13       AT THE TIME WHEN THIS E-MAIL WAS SENT BY CLAY WALKER,

14 DID YOU SAY TO ANYONE:

15          "THIS IS NOT CORRECT" WHAT YOU'RE SAYING?

16       **THE COURT:**  WHAT DO YOU MEAN "CORRECT"?  YOU MEAN --

17 **BY MR. LECLAIR:**

18 **Q.**   ACCURATE.  "WHAT YOU, MR. WALKER, ARE SAYING IS

19 INCORRECT?"

20 **A.**   I DON'T RECALL SAY THAT.

21 **Q.**   ALL RIGHT.  LET'S GO ON THE E-MAIL.  AT THE END OF THE

22 FIFTH LINE IT SAYS, QUOTE:

23          "WE KNOW THAT TAKE TWO OFFERED SIX-FIGURE DEALS

24 TO SEVERAL FORMER NFL PLAYERS, SO THE TOTAL COST IS MILLIONS

25 BELOW MARKET PRICES," PERIOD, CLOSED QUOTE.

1     THAT'S WHAT MR. WALKER WAS SAYING TO EA IN 2006 IN

2 FEBRUARY, CORRECT?

3 **A.**   YES, THAT'S WHAT THE E-MAIL SAYS.

4 **Q.**   THEN, IT GOES ON TO SAY, QUOTE:

5          "THAT BEING SAID, WE WILL CONTINUE TO GO AFTER

6 THE NEW INDUCTEES FOR THE SAME PRICE PER PLAYER PAREN (AROUND

7 $2,500) AND I THINK WE'LL BE SUCCESSFUL," PERIOD, CLOSED QUOTE.

8 DO YOU SEE THAT?

9 **A.**   I SEE IT, YES.

10 **Q.**   NOW, I THOUGHT A LITTLE EARLIER YOU TOLD THE JURY THAT IT

11 WAS THE HALL OF FAME THAT WAS NEGOTIATING WITH THESE PLAYERS.

12 **A.**   THE LICENSE AGREEMENT THAT YOU REFERENCED WITH THE HALL OF

13 FAME LICENSE AGREEMENT, THAT -- UNDER THAT AGREEMENT THE HALL

14 OF FAME LICENSED MOST, IF NOT ALL, OF THEIR MEMBERS TO

15 ELECTRONIC ARTS.

16          IT WASN'T A LICENSE FROM PLAYERS INC TO

17 ELECTRONIC ARTS.  IT WAS A LICENSE FROM THE HALL OF FAME,

18 BECAUSE THEY ALSO HAD RIGHTS.  THEY HAVE -- THEY HAVE RIGHTS TO

19 HALL OF FAME MEMBERS.  AND THEY GRANTED THOSE RIGHTS TO

20 ELECTRONIC ARTS.

21          AT THE TIME THAT THEY GRANTED THOSE RIGHTS, THERE WAS

22 A CERTAIN NUMBER OF PLAYERS, BECAUSE ONLY A CERTAIN NUMBER OF

23 PLAYERS WERE IN THE HALL OF FAME.

24          BUT EVERY YEAR THERE'S A NEW CLASS OF MEMBERS.  AND

25 THIS STATEMENT THAT HE'S TALKING ABOUT IS FOR NEW INDUCTEES.

1        SO I BELIEVE THERE'S SOME LANGUAGE IN THE LICENSE

2   AGREEMENT THAT TALKS ABOUT HOW PLAYERS INC COULD HELP TO SECURE

3   PLAYERS WHO WERE NOT GRANTED BY THE HALL OF FAME, WHICH THE

4   PRIMARY EXAMPLE WOULD BE NEW INDUCTEES.  THE HALL OF FAME COULD

5   ALSO SECURE THOSE RIGHTS AND GRANT THEM TO EA, BUT WE ALSO

6   COULD DO THAT.

7   **Q.**  ISN'T IT CORRECT, SIR, THAT IT WAS YOU AND MR. WALKER WHO

8   WERE RESPONSIBLE FOR THE NEGOTIATION OF THESE DISCOUNTED

9   PRICES?

10  **A.**  NO, THAT'S NOT TRUE.

11  **Q.**  ALL RIGHT, SIR.  LET'S LOOK AT EXHIBIT 521.

12       ARE THESE E-MAILS BETWEEN YOU, MR. WALKER AT PI AND

13  ANDY FEFFER AT PI?

14  **A.**  YES.

15       **MR. LECLAIR:**  YOUR HONOR, I'LL MOVE EXHIBIT 521 INTO

16  EVIDENCE.

17       **MR. KESSLER:**  SUBJECT TO THE SAME OBJECTIONS, YOUR

18  HONOR.

19       **THE COURT:**  ALL RIGHT.  RECEIVED.

20       (TRIAL EXHIBIT 521 RECEIVED IN EVIDENCE.)

21  **BY MR. LECLAIR:**

22  **Q.**  FIRST OF ALL, LET'S FOCUS ON THE BOTTOM E-MAIL.  THIS IS

23  FROM YOU, MR. NAHRA, TO CLAY WALKER:

24            "SUBJECT:  HALL OF FAME."

25  **A.**  I'M SORRY.  WHICH E-MAIL ARE YOU REFERRING TO?

1   Q.   521 AT THE BOTTOM OF THE FIRST PAGE.

2   A.   OKAY.

3   Q.   IS THAT AN E-MAIL FROM YOU TO CLAY WALKER?

4   A.   YES.

5   Q.   AND, IN FACT, MR. WALKER HAD BY THIS POINT LEFT PI,

6   CORRECT?

7   A.   RIGHT.

8   Q.   AND YOU SENT HIM AN E-MAIL AND SAID, QUOTE:

9            "CAN YOU PLEASE PUT YOUR PI HAT BACK ON AND

10  PROVIDE SOME INSIGHT HERE," CORRECT?

11  A.   RIGHT.

12  Q.   AND THEN, MR. WALKER RESPONDED TO YOU WITH THE E-MAIL IN

13  THE MIDDLE.  AND I WANT TO FOCUS ON THIS E-MAIL NOW.

14           IS IT CORRECT, SIR, THAT EA WAS ASKING PI TO ABSORB

15  PART OF THE COST OF THIS LICENSE AGREEMENT?

16  A.   YES.  PI DIDN'T WANT TO PAY THAT MUCH MONEY FOR THE HALL

17  OF FAME MEMBERS.

18  Q.   RIGHT.  OR MAYBE THEY THOUGHT THEY HAD ALREADY PAID

19  $25 MILLION?

20  A.   NO, THEY DIDN'T WANT -- THEY DIDN'T WANT TO PAY 400,000.

21  THEY WANTED TO PAY -- I THINK THEY WANTED -- THEY WERE WILLING

22  TO PAY 200,000, BUT THEY WANTED --

23           THE COURT:  WHO IS THE "THEY"?

24           THE WITNESS:  ELECTRONIC ARTS.

25           THE COURT:  EARLIER YOU SAID PI DIDN'T WANT TO PAY.

1    DID YOU MEAN "EA"?

2            **THE WITNESS:**  YES, I DID.

3            **THE COURT:**  ALL RIGHT.

4    **BY MR. LECLAIR:**

5    **Q.**   WELL, LET'S LOOK AT WHAT MR. WALKER SAYS IN THE MIDDLE.

6    LET'S START IN THE MIDDLE WHERE IT SAYS:

7                "FOR THE RECORD."

8            HE STATES:  QUOTE:

9                "FOR THE RECORD, THIS CAME UP BECAUSE TAKE TWO

10   WENT AFTER RETIRED PLAYERS TO CREATE AN NFL-STYLE VIDEO GAME

11   AFTER WE GAVE THE EXCLUSIVE TO EA."

12           PARDON ME, AGAIN.

13               "I WAS ABLE TO FORGE THIS DEAL WITH THE

14   H.O.F" -- THAT'S THE HALL OF FAME -- "THAT PROVIDES THEM WITH

15   400K PER YEAR, PAREN, (WHICH IS SIGNIFICANTLY BELOW MARKET

16   RATE), CLOSED PAREN, IN EXCHANGE FOR THE H.O.F. PLAYER RIGHTS.

17   EA OWES ME A HUGE FAVOR, BECAUSE THAT THREAT WAS ENOUGH TO

18   PERSUADE TAKE TWO TO BACK OFF ITS PLANS, LEAVING EA AS THE ONLY

19   PROFESSIONAL FOOTBALL VIDEO GAME MANUFACTURER OUT THERE,"

20   CLOSED QUOTE.

21           SO, MR. NAHRA, YOU ASKED CLAY WALKER TO PUT HIS PI

22   HAT BACK ON AND TELL YOU WHAT HAPPENED IN THE NEGOTIATION,

23   CORRECT?

24   **A.**   YES.  I WAS LOOKING FOR SOME INFORMATION AS TO WHAT

25   HAPPENED, BECAUSE EA HAD -- DID NOT WANT TO PAY 400,000.  THEY

1  THOUGHT THEY WERE BEING ASKED TO PAY TOO MUCH FOR THE RIGHTS.

2          AND I WANTED TO KNOW, EA MADE THE CLAIM THAT WE HAD

3  SOMEHOW AGREED TO PAY A HUNDRED THOUSAND OF THEIR 400,000.  AND

4  I WAS JUST TRYING TO FIGURE OUT WHETHER WE OWED EA ANY MONEY OR

5  NOT.

6  **Q.**  AND SO MR. WALKER THEN WROTE BACK TO YOU AND SAID EXACTLY

7  WHAT HE SAID IN THIS E-MAIL, CORRECT?

8  **A.**  THAT'S HIS E-MAIL, YES.

9  **Q.**  AND WHAT YOU DID WAS YOU TOOK MR. WALKER'S E-MAIL AND YOU

10  FORWARDED IT TO ANDY FEFFER, WHO WAS THE NEW PERSON RESPONSIBLE

11  WITHIN PLAYERS INC FOR THIS RELATIONSHIP WITH EA, CORRECT?

12  **A.**  SEVERAL MONTHS LATER EA AGAIN CONTACTED, I BELIEVE, ANDY

13  FEFFER, AND AGAIN WANTED US TO PAY A HUNDRED THOUSAND DOLLARS

14  WORTH OF COSTS.

15          AND AT THAT POINT, ANDY FEFFER ASKED ME IF I KNEW

16  ANYTHING ABOUT IT.  AND I SAID:

17              "I WASN'T INVOLVED IN THE NEGOTIATION, BUT

18  HERE'S WHAT CLAY SAID."

19          AND I FORWARDED CLAY'S E-MAIL TO ANDY.

20  **Q.**  OKAY.  LET'S NOW GO TO EXHIBIT 522.

21  **A.**  OKAY.

22  **Q.**  IS THIS ANOTHER SERIES OF E-MAILS ON WHICH YOU WERE COPIED

23  RELATED TO THIS SAME HALL OF FAME AGREEMENT?

24  **A.**  YES.

25          **MR. LECLAIR:**  MOVE EXHIBIT 522 INTO EVIDENCE, YOUR

1   HONOR.

2               **MR. KESSLER:**  YOUR HONOR, SAME OBJECTIONS.

3               **THE COURT:**  ALL RIGHT.  SAME RULING.

4               (TRIAL EXHIBIT 522 RECEIVED IN EVIDENCE.)

5   **BY MR. LECLAIR:**

6   **Q.**   NOW, SO IS IT CORRECT, MR. NAHRA, THAT ON NOVEMBER 1ST --

7   LET ME GET THE TIMING STRAIGHT.

8               MR. WALKER WRITES HIS E-MAIL TO YOU, EXHIBIT 521, IN

9   FEBRUARY OF 2007, CORRECT?

10              COULD YOU LOOK BACK AT 521 AND JUST TELL ME IF THAT'S

11  THE DAY HE WROTE IT?

12  **A.**   FEBRUARY 20, 2007.

13  **Q.**   OKAY.  SO NOW FAST FORWARD TO NOVEMBER OF 2007, ALMOST

14  EIGHT MONTHS LATER, OKAY?

15              YOU THEN FORWARD -- YOU HAD TO GO BACK AND FIND

16  MR. WALKER'S E-MAIL, AND YOU THEN FORWARDED IT TO ANDY FEFFER,

17  CORRECT?

18  **A.**   YES.

19  **Q.**   ALL RIGHT.  AND MR. FEFFER WAS DEALING AGAIN WITH EA ABOUT

20  THIS HALL OF FAME AGREEMENT AND WHO OUGHT TO ABSORB THE COST OF

21  IT, CORRECT?

22  **A.**   YES.

23  **Q.**   ALL RIGHT.  AND NOW, MR. FEFFER SENDS AN E-MAIL TO PAUL

24  CAIRNS AT ELECTRONIC ARTS.

25              **MR. LECLAIR:**  AND LET'S BLOW UP THE TOP E-MAIL.

1              (DOCUMENT DISPLAYED.).

2  **BY MR. LECLAIR:**

3  **Q.**   AND MR. FEFFER WRITES TO PAUL CAIRNS AND SAYS TO

4  MR. CAIRNS, QUOTE:

5              "UNFORTUNATELY, I'M NOT IN A POSITION WHERE I

6  CAN ASSIST YOU WITH THIS.  I HAVE EXHAUSTIVELY REVIEWED THE

7  ISSUES WITH CLAY, JOE, OUR COUNSEL, AND SEVERAL OTHERS, ALL WHO

8  MAKE VERY CLEAR THAT THERE WAS NEVER A COMMITMENT FROM US TO

9  PAY THE HUNDRED THOUSAND OR ANY AMOUNT AS PART OF THIS OVERALL

10 DEAL."

11             IS IT TRUE, MR. NAHRA, AS MR. FEFFER SAYS IN HIS

12 E-MAIL, THAT HE EXHAUSTIVELY REVIEWED THE ISSUES WITH YOU AND

13 MR. WALKER?

14 **A.**   I DON'T KNOW WHAT COMMUNICATION, IF ANY, HE HAD WITH CLAY

15 WALKER.  I DON'T KNOW.

16 **Q.**   HE SAYS HE EXHAUSTIVELY REVIEWED IT WITH CLAY AND WITH

17 YOU.  DID HE DO THAT?

18 **A.**   NOT TOGETHER.

19 **Q.**   DID HE DO IT WITH YOU SEPARATELY?

20 **A.**   HE TALKED TO ME ABOUT IT.

21 **Q.**   ALL RIGHT, SIR.

22             AND THEN, HE GOES ON TO SAY, QUOTE:

23             "I UNDERSTAND THAT THE TOTAL PAYMENT TO H.O.F.

24 IS $400,000.  I CAN TELL YOU THAT CLAY AND JOE'S NEGOTIATION OF

25 THESE DISCOUNTED TERMS WAS A SIGNIFICANT CONTRIBUTION TO EA AS

1   YOU MORE THAN LIKELY WOULD HAVE PAID IN EXCESS OF $1 MILLION

2   FOR THESE RIGHTS WITHOUT THEIR INVOLVEMENT AND ASSISTANCE,"

3   PERIOD, CLOSED QUOTE.

4           THAT WAS WHAT MR. FEFFER SAID.  HE COPIED YOU, AND I

5   THEREFORE ASSUME YOU THOUGHT IT WAS CORRECT?

6   **A.**   UHM, I DIDN'T REALLY HAVE AN OPINION AS TO IT ONE WAY OR

7   ANOTHER.  I TOLD ANDY I WAS INVOLVED IN DRAFTING THE LEGAL

8   LANGUAGE.  I WAS NOT INVOLVED IN THE NEGOTIATIONS OF ANY DOLLAR

9   AMOUNTS OR ANY AGREEMENT TO PAY A HUNDRED THOUSAND OR NOT PAY A

10  HUNDRED THOUSAND.

11  **Q.**   ARE YOU TELLING THE JURY, MR. NAHRA, THAT WHEN ANDY FEFFER

12  SAID THAT YOU AND MR. WALKER NEGOTIATED, QUOTE, "DISCOUNTED

13  TERMS," YOU'RE TELLING THE JURY THAT WASN'T TRUE?

14  **A.**   WELL, AGAIN, I DON'T KNOW WHAT CLAY WALKER NEGOTIATED

15  WITH -- IF HE NEGOTIATED AT ALL, EVEN, REALLY, BECAUSE IT WAS

16  THE HALL OF FAME THAT WAS GRANTING THE RIGHTS.  SO I'M ASSUMING

17  THAT THE HALL OF FAME HAD SOMEONE WHO WAS RESPONSIBLE FOR

18  NEGOTIATING THE PRICE THEY WOULD RECEIVE FOR THOSE RIGHTS.

19          BUT I WAS NOT INVOLVED IN THE NEGOTIATION OF ANYTHING

20  OTHER THAN THE LEGAL LANGUAGE IN THE CONTRACTS, WHICH WAS MY --

21  WHICH IS MY ROLE IN PRETTY MUCH ALL OF THE LICENSE AGREEMENTS.

22          I NEGOTIATE THE LEGAL LANGUAGE, NOT THE BUSINESS

23  TERMS LIKE THE DOLLAR AMOUNTS THAT ARE PAID FOR THE RIGHTS.

24  **Q.**   I WANT TO SEE IF I CAN GET A "YES" OR "NO" TO THIS

25  QUESTION, MR. NAHRA.

1          IS IT TRUE THAT YOU AND MR. WALKER NEGOTIATED

2   DISCOUNTED TERMS?

3          **THE COURT:**  THAT'S --

4          **MR. KESSLER:**  IT'S COMPOUND, YOUR HONOR.

5          **THE COURT:**  SUSTAINED.  IT IS COMPOUND.

6          YOU CAN ASK HIM ONE AT A TIME.

7   **BY MR. LECLAIR:**

8   **Q.**  IS IT TRUE --

9          **MR. LECLAIR:**  I'M SORRY, YOUR HONOR.

10         **THE COURT:**  YOU CAN ASK AS TO JOE.  YOU CAN ASK AS TO

11  CLAY.

12         AND SO YOU ANSWER TO THE BEST OF YOUR KNOWLEDGE AND

13  INFORMATION AS TO EACH OF THE TWO.

14  **BY MR. LECLAIR:**

15  **Q.**  IS IT TRUE, YES OR NO, THAT CLAY WALKER NEGOTIATED

16  DISCOUNTED TERMS FOR THE HALL OF FAME PLAYERS?

17  **A.**  ALL I KNOW ABOUT WHAT CLAY WALKER NEGOTIATED --

18  **Q.**  CAN YOU ANSWER "YES" OR "NO," SIR?

19         (SIMULTANEOUS SPEAKING, NOT REPORTABLE.)

20  **A.**  -- EMAIL.

21  **Q.**  CAN YOU ANSWER THE QUESTION?  I HAVEN'T ASKED YOU TO DO

22  THIS, BUT I WANT TO GET A "YES" OR "NO" TO THAT QUESTION, IF

23  YOU CAN DO IT, SIR?

24  **A.**  NO.

25  **Q.**  IT DIDN'T HAPPEN?

**A.**   WELL, IF I CAN EXPLAIN MY ANSWER I CAN PROBABLY SHED SOME

LIGHT ON THAT.  BUT IF YOU JUST WANT ME TO ANSWER:  "IS IT

TRUE" --

          **THE COURT:**  GO AHEAD.  EXPLAIN.

          **THE WITNESS:**  AGAIN, I DON'T KNOW WHETHER CLAY WALKER

NEGOTIATED ANYTHING.  WHAT HE SAID IN HIS E-MAIL SUGGESTS THAT

HE WAS INVOLVED IN THE NEGOTIATION.

          BUT, TYPICALLY, IN THIS SITUATION PLAYERS INC WAS

JUST A MIDDLEMAN.  THE HALL OF FAME WAS THE ONE GRANTING THE

RIGHTS AND AGREEING TO WHAT THE COMPENSATION WOULD BE FOR THOSE

RIGHTS.

          SO CLAY WALKER'S E-MAIL SPEAKS FOR ITSELF AS TO WHAT

HIS INVOLVEMENT WAS.

**BY MR. LECLAIR:**

**Q.**   AND YOU'RE TELLING THE JURY THAT EVEN THOUGH THE E-MAIL

FROM MR. FEFFER ON WHICH YOU WERE COPIED SAYS THAT YOU WERE

INVOLVED IN NEGOTIATING DISCOUNTED TERMS, YOU'RE TELLING THE

JURY THAT'S NOT TRUE?

**A.**   THAT IS NOT TRUE.  I WAS NOT INVOLVED IN ANY NEGOTIATION

OF MONETARY TERMS.

**Q.**   AND I ASSUME THAT YOU IMMEDIATELY E-MAILED BACK TO

MR. FEFFER AND SAID:

          "NO, NO, YOU'VE GOT IT ALL WRONG.  I DIDN'T DO

THAT"?

**A.**   NO, I DIDN'T E-MAIL ANDY FEFFER THAT.

1    **Q.**    YOU NEVER DID?

2    **A.**    NO, I DIDN'T.

3    **Q.**    ISN'T IT A FACT, SIR, IN THE LAST SENTENCE -- I TAKE IT

4    BACK.  THE NEXT TO THE LAST SENTENCE.  IT SAYS, QUOTE:

5                "WHILE THIS MIGHT NOT SATISFY YOUR REQUEST FOR

6    PAYMENT, I HOPE TO CONVEY TO YOU THE GREAT VALUE THAT WAS

7    BROUGHT BY US AS PART OF SECURING THIS DEAL," CLOSE QUOTE.

8                DO YOU SEE THAT LANGUAGE, SIR?

9    **A.**    I DO.

10   **Q.**    AND ISN'T IT CORRECT, MR. NAHRA, THAT THE GREAT VALUE THAT

11   PI BROUGHT TO THIS DEAL WAS TO DISCOUNT PLAYERS LIKE

12   MR. ADDERLEY, WHO WAS IN THE HALL OF FAME?  THAT'S THE GREAT

13   VALUE YOU BROUGHT TO THIS DEAL?

14   **A.**    I'M NOT SURE WHAT ANDY FEFFER MEANT ABOUT "GREAT VALUE."

15   I DON'T KNOW WHAT HIS MEANING WAS.

16             **THE COURT:**  HE'S NOT ASKING YOU WHAT MR. FEFFER --

17   HE'S SAYING JUST DO YOU AGREE WITH IT OR NOT?  YOU WERE

18   INVOLVED IN THIS DEAL.

19             THE QUESTION IS:  DID YOUR COMPANY, PI, CONFER A

20   BENEFIT ON EA BY HELPING NEGOTIATE A DEAL TO GET THESE PLAYERS

21   AT LESS THAN WHAT THE COMPETITOR WAS TRYING TO PAY THEM?

22   THAT'S A FAIR QUESTION, AND YOU'VE NOT ANSWERED IT.  SO PLEASE

23   ANSWER.

24             **THE WITNESS:**  WELL, I THINK WE CONFERRED A BENEFIT ON

25   EA BY APPROVING THEIR SECURING THE HALL OF FAME RIGHTS TO

1   INCLUDE IN THEIR GAME.

2           I CAN'T SPEAK TO WHETHER THE PRICE THAT THE HALL OF

3   FAME AGREED TO PAY WAS A BENEFIT TO EA OR NOT A BENEFIT TO EA,

4   BECAUSE I'M NOT A MARKETER.  I'M NOT A SALESPERSON.  I DON'T

5   PUT DOLLAR AMOUNTS ON THINGS.

6           THE BUSINESS PEOPLE HAVE MUCH BETTER UNDERSTANDING OF

7   WHAT THE RIGHTS ARE WORTH THAN I DO.

8           BUT WITHOUT US BEING INVOLVED IN APPROVING IT, THEN

9   EA COULD NOT HAVE PUT HALL OF FAME PLAYERS IN THEIR GAME.  THEY

10  NEEDED APPROVAL FROM US BECAUSE OF THE TERMS OF OUR LICENSE

11  AGREEMENT.

12  **BY MR. LECLAIR:**

13  **Q.**   ARE YOU TELLING THIS JURY, MR. NAHRA, THAT THE GREAT VALUE

14  THAT PI BROUGHT TO THIS DEAL, ARE YOU TELLING THEM THAT HAD

15  NOTHING TO DO WITH THE DISCOUNT FOR PLAYERS LIKE MR. ADDERLEY?

16  IS THAT WHAT YOU'RE TELLING THE JURY?

17  **A.**   WELL, YOU'RE ASSUMING THAT THERE WAS A DISCOUNT.  I'M JUST

18  TESTIFYING --

19  **Q.**   THAT'S WHAT HE SAID IN THE E-MAIL, ISN'T IT TRUE, SIR?

20  **A.**   THAT'S WHAT ANDY FEFFER SAID, YES.

21  **Q.**   ALL RIGHT, SIR.  AND I'M ASKING YOU:  ARE YOU TELLING THE

22  JURY THAT THAT GREAT VALUE THAT HE REFERRED TO HAS NOTHING TO

23  DO WITH THE DISCOUNT FOR THE PLAYERS?

24  **A.**   IF THERE WAS A DISCOUNT, THEN THAT WOULD BE PART OF THE

25  VALUE OF IT, I WOULD ASSUME.  BUT I DON'T KNOW WHETHER THERE

1    WAS A DISCOUNT OR NOT.  HE'S CONVEYING THAT THERE WAS.

2              **MR. LECLAIR:**  NO FURTHER QUESTIONS.

3              **THE COURT:**  ALL RIGHT.  REDIRECT (SIC).

4              HOW LONG IS IT GOING TO BE?

5              **MR. KESSLER:**  15, 20 MINUTES, YOUR HONOR.

6              **THE COURT:**  WE NEED A BREAK, MY COURT REPORTER IS

7    TELLING ME.  AND I THINK THE JURY NEEDS A BREAK, TOO.  SO WE'LL

8    TAKE A 15-MINUTES RECESS.

9              PLEASE REMEMBER THE ADMONITION.

10             **THE CLERK:**  ALL RISE.

11             (THEREUPON, THE JURY LEFT THE COURTROOM.)

12             **THE COURT:**  ALL RIGHT.  ANYTHING THE LAWYERS NEED ME

13   FOR?

14             **MR. KESSLER:**  I ASSUME YOUR HONOR WANTS TO DIRECT THE

15   WITNESS --

16             **THE COURT:**  DON'T DISCUSS ANYTHING WITH THE LAWYERS

17   ON THE CROSS EXAMINATION NOW.

18             ALL RIGHT.

19             THANK YOU.

20             **MR. HUMMEL:**  THANK YOU.

21             **MR. KESSLER:**  THANK YOU.

22             **THE COURT:**  15-MINUTE BREAK.

23             (RECESS TAKEN FROM 9:19 TO 9:34 A.M.)

24             (THE FOLLOWING PROCEEDINGS WERE HELD IN OPEN COURT,

25             OUTSIDE THE PRESENCE OF THE JURY.)

1          **MR. HUMMEL:**  YOUR HONOR, ONE HOUSEKEEPING MATTER

2     BEFORE WE START.

3          **THE COURT:**  GO AHEAD.

4          **MR. HUMMEL:**  THERE ARE 95 LICENSE AGREEMENTS THAT

5     WE'RE MOVING INTO EVIDENCE.  THERE'S NO OBJECTION FROM THE

6     DEFENSE.  THEY'RE STIPULATED IN.  I HAVE THE LIST FOR YOUR

7     HONOR.  AND THEY ARE THE LICENSE AGREEMENTS BETWEEN THE PLAYERS

8     INC AND THE LICENSEES THAT HAVE THE LANGUAGE.

9          **THE COURT:**  WHICH, THIRD-PARTY LICENSEES?

10         **MR. HUMMEL:**  YES, YOUR HONOR.

11         **THE COURT:**  CAN I SEE THE LIST?

12         **MR. HUMMEL:**  SURE.

13         **THE COURT:**  IS IT AGREED TO?

14         **MR. HUMMEL:**  IT'S AGREED TO.

15         **MR. KESSLER:**  THESE ARE LICENSE AGREEMENTS WITH

16    THIRD-PARTY LICENSEES.  WE HAVE NO OBJECTION.  SO WE AGREED

17    THAT HE CAN MOVE THEM IN, IF YOU WILL, EN MASSE AND YOU ARE --

18         **THE COURT:**  I'M NOT GOING TO READ THE ENTIRE LIST,

19    BUT THIS IS A MULTI-PAGE LIST THAT STARTS WITH TRIAL EXHIBIT

20    28, 29, 32, AND THEN IT GOES UP 1150, 1151, 1152.

21         I JUST DEEM EVERYTHING ON THIS LIST IS IN EVIDENCE.

22    AND PLEASE MAKE THIS A PART OF THE CLERK'S RECORD.

23         **MR. HUMMEL:**  WE WILL, YOUR HONOR.  THANK YOU VERY

24    MUCH.

25         **THE COURT:**  DONE.

1          **MR. HUMMEL:**  THANK YOU.

2          (TRIAL EXHIBITS REFERRED TO ABOVE WERE RECEIVED IN

3          EVIDENCE.)

4          **THE COURT:**  ALL RIGHT.  SO CAN WE BRING OUR JURY

5   BACK?

6          **MR. KESSLER:**  YES, YOUR HONOR.

7          **MR. HUMMEL:**  YES, YOUR HONOR.

8          (THEREUPON, THE JURY RETURNED TO THE COURTROOM.)

9          **THE COURT:**  WELCOME BACK.  PLEASE HAVE A SEAT.

10          BEFORE WE GET STARTED, I WANT TO TAKE YOUR PICTURE.

11          **THE CLERK:**  GOOD.  THANKS.

12          **MR. KESSLER:**  YOUR HONOR, NO ONE EVER WANTS TO TAKE

13   MY PICTURE.

14          **THE COURT:**  ALL RIGHT.

15          **MR. KESSLER:**  FOR GOOD REASON.

16          **THE COURT:**  MAYBE THERE WILL BE, LIKE FOOTBALL CARDS,

17   WE'LL HAVE LAWYER CARDS.

18          (LAUGHTER)

19          **MR. KESSLER:**  THERE WOULD REALLY BE NO MARKET FOR

20   THAT.

21          **THE COURT:**  AND IT WOULD SAY ON THE BACK:  "NUMBER OF

22   LEADING QUESTIONS."

23          (LAUGHTER)

24          **MR. KESSLER:**  ARE YOU SUGGESTING I WOULD LEAD THE

25   LEAGUE, YOUR HONOR?

1          **THE COURT:**  IT WOULD BE A CLOSE CALL WHO WOULD GET

2    THE NUMBER OF LEADING QUESTIONS.

3          **MR. KESSLER:**  MR. PARCHER AND I COULD BE ON THE CARD

4    TOGETHER FOR THAT, HONOR.

5          **THE COURT:**  IT WOULD BE A TEAM CARD.

6          ALL RIGHT.  GO AHEAD.

7                    **CROSS EXAMINATION**

8    **BY MR. KESSLER:**

9    **Q.**  GOOD MORNING, MR. NAHRA.

10   **A.**  GOOD MORNING.

11   **Q.**  MR. NAHRA, I'M GOING TO ASK YOU MOSTLY ABOUT THE HALL OF

12   FAME AGREEMENT, SINCE THAT'S WHAT YOU WERE QUESTIONED ABOUT.

13          WHAT TYPE OF PLAYERS WERE BEING LICENSED BY THE HALL

14   OF FAME TO EA IN THE HALL OF FAME AGREEMENT?

15   **A.**  MEMBERS OF THE HALL OF FAME, THE GREATEST PLAYERS IN THE

16   HISTORY OF THE NFL.

17   **Q.**  OKAY.  DO MOST MEMBERS OF THE -- HAVE MOST MEMBERS OF THE

18   HALL OF FAME EVER SIGNED A RETIRED PLAYER GLA?

19          **MR. LECLAIR:**  OBJECTION.  LEADING, YOUR HONOR.

20          **THE COURT:**  IT IS.  IT IS LEADING.

21          **MR. KESSLER:**  I'LL REPHRASE, YOUR HONOR.

22   **BY MR. KESSLER:**

23   **Q.**  DO YOU KNOW WHETHER OR NOT RETIRED -- WHETHER MOST HALL OF

24   FAME MEMBERS HAVE OR HAVE NOT SIGNED RETIRED PLAYER GLA'S?

25   **A.**  YES, I DO.

1  Q.   WOULD YOU TELL THE JURY THE FACTS ABOUT THAT?

2  A.   YES.  MOST OF THE MEMBERS OF THE HALL OF FAME HAVE NEVER

3  SIGNED RETIRED PLAYER GLA'S.  AND THAT WAS ONE OF THE BIGGEST

4  PROBLEMS WE HAD WITH BUILDING OUR RETIRED PLAYER GROUP

5  LICENSING PROGRAM IS WE COULD NOT GET --

6       **THE COURT:**  WAIT.  YOU ARE GOING BEYOND THE QUESTION

7  NOW.  THE QUESTION WAS --

8       **MR. KESSLER:**  I THINK HE ANSWERED THE QUESTION.

9       **THE COURT:**  ALL RIGHT.  SO YOU CAN ASK A FOLLOW-UP

10 QUESTION AND MAYBE ELICIT THE INFORMATION HE WAS ABOUT TO PUT

11 IN THERE.  BUT HE WAS BEYOND THE ACTUAL QUESTION.

12 **BY MR. KESSLER:**

13 Q.   MR. NAHRA, WHAT IMPACT DID IT HAVE ON THE RETIRED PLAYER

14 GLA PROGRAM THAT YOU DIDN'T HAVE MOST HALL OF FAME PLAYERS?

15 A.   WELL, I THINK IT WAS PROBABLY THE BIGGEST REASON THAT WE

16 WEREN'T ABLE TO CONVINCE A LICENSEE THAT THEY SHOULD LICENSE

17 AND PAY FOR ALL OF OUR RETIRED PLAYERS THAT WE HAD GLA'S FOR,

18 BECAUSE IT WAS REALLY THE, IN MOST CASES, THE HALL OF FAME

19 PLAYERS THEY WERE INTERESTED IN USING.

20 Q.   IS SO TO THE EXTENT HALL OF FAME PLAYERS GAVE THEIR RIGHTS

21 IN THIS AGREEMENT, WAS IT A -- WAS IT A GROUP -- WAS IT A

22 PROGRAM UNDER THE RETIRED PLAYER GLA, OR WAS IT WHAT WE'VE BEEN

23 REFERRING TO AS "AD HOC PROGRAMS"?

24 A.   WELL, IT CERTAINLY WASN'T UNDER OUR RETIRED PLAYER GLA,

25 BECAUSE, AGAIN, THE RIGHTS WERE COMING FROM THE HALL OF FAME.

1  Q.   WAS IT AN AD HOC PROGRAM FOR THE HALL OF FAME?

2  A.   I BELIEVE IT WAS AN AD HOC PROGRAM FOR THE HALL OF FAME,

3  YES.

4           MR. KESSLER:  YOUR HONOR, AT THIS TIME I WOULD LIKE

5  TO READ IN JOINT STIPULATED FACT NO. 13, IF I MAY.

6           THE COURT:  READ IT SLOWLY, AND THEN I WILL ASK

7  COUNSEL IF IT'S STIPULATED TO.

8           MR. KESSLER:  "NO. 13:  PLAINTIFFS DO NOT SEEK TO

9  RECOVER IN THIS CASE ANY MONIES PAID TO SOME GLA CLASS MEMBERS

10 UNDER SEPARATE SO-CALLED 'AD HOC LICENSE AGREEMENTS.'"

11          THE COURT:  STIPULATED TO?

12          MR. LECLAIR:  STIPULATED, YOUR HONOR.

13          THE COURT:  THANK YOU.  ALL RIGHT.  THAT'S NOW PROVEN

14 IN THE CASE.  YOU MUST TAKE THAT A GIVEN.

15          ALL RIGHT.  THANK YOU.  GO AHEAD.

16 BY MR. KESSLER:

17 Q.   NOW, MR. NAHRA, LET'S TAKE A LOOK AT TRIAL EXHIBIT 56,

18 WHICH IS IN EVIDENCE.  AND LET'S GO TO THE FIRST PARAGRAPH,

19 PLEASE.

20          (DOCUMENT DISPLAYED.)

21             "THIS AGREEMENT IS MADE AND ENTERED INTO THIS

22 25TH DAY OF APRIL, 2006, BY AND AMONG ELECTRONIC ARTS INC.,

23 EA."

24          AND THEN, IT'S -- IT'S ANOTHER EA ENTITY, EACV.  IS

25 THAT ALSO ANOTHER ELECTRONIC ARTS ENTITY?

1  **A.**   YES, I BELIEVE SO.

2  **Q.**   OKAY.  AND THEN, IT SAYS:

3          "THE "NATIONAL FOOTBALL MUSEUM DOING BUSINESS,

4  DBA, THE PRO FOOTBALL HALL OF FAME."

5          WHAT IS THAT, MR. NAHRA?

6  **A.**   THAT IS THE ENTITY THAT REPRESENTS THE HALL OF FAME

7  MEMBERS IN THIS DEAL.

8  **Q.**   AND THEN, IT'S REFERRED TO IN THE AGREEMENT AS HOF; IS

9  THAT CORRECT?

10 **A.**   YES, FOR HALL OF FAME.

11 **Q.**   AND THEN, IT SAYS:

12          "NATIONAL FOOTBALL LEAGUE PLAYERS INCORPORATED."

13          THAT WOULD BE PLAYERS INC?

14 **A.**   CORRECT.

15          **MR. KESSLER:**  LET'S LOOK AT THE GRANT OF RIGHTS,

16 PLEASE.  GRANT OF RIGHTS, PLEASE, PARAGRAPH 2.

17 **BY MR. KESSLER:**

18 **Q.**   IT SAYS:

19          "UPON THE TERMS AND CONDITIONS SET FORTH IN THIS

20 AGREEMENT, HOF HEREBY GRANTS TO LICENSEE AND LICENSEE HEREBY

21 ACCEPTS THE NON-EXCLUSIVE RIGHT, LICENSE AND PRIVILEGE OF

22 UTILIZING THE TRADEMARKS AND NAMES OF HOF, WHICH MAY BE AMENDED

23 FROM TIME TO TIME BY HOF IN AND IN CONNECTION WITH THE

24 MARKETING OF LICENSED PRODUCTS.  II, THE NAMES, LIKENESSES,

25 INCLUDING WITHOUT LIMITATION, NUMBERS, PICTURES OWNED BY HOF,

1   PHOTOGRAPHS OWNED BY HOF, FACSIMILE SIGNATURES AND/OR

2   BIOGRAPHICAL INFORMATION HEREINAFTER IDENTITY OF THE PLAYERS."

3           I'LL ASK YOU, MR. NAHRA, WHO WAS GRANTING THE PLAYER

4   RIGHTS TO EA IN THIS AGREEMENT?

5   **A.**   HOF, THE HALL OF FAME.

6   **Q.**   DID PLAYERS INC GRANT ANY PLAYER RIGHTS IN THIS AGREEMENT?

7   **A.**   NO.

8   **Q.**   NOW, LET'S LOOK, IF WE CAN, AT THE PAYMENT TERMS.

9   PARAGRAPH 5.

10          (DOCUMENT DISPLAYED.)

11          OKAY.  IT SAYS:

12              "EA SHALL PAY PLAYERS INC ON BEHALF OF HOF A

13  ONE-TIME, FLAT-FEE PAYMENT OF $400,000."

14          DO YOU SEE THAT, SIR?

15  **A.**   YES.

16  **Q.**   OKAY.  WHO DID THAT $400,000 GO TO?

17  **A.**   IT WENT TO THE HALL OF FAME.

18  **Q.**   OKAY.  THANK YOU.

19          NOW, I'D LIKE TO REFER YOUR ATTENTION TO THE EXHIBIT,

20  EXHIBIT A OF THIS AGREEMENT.  I'M SORRY.  IT'S PAGE 8.  OKAY.

21      **MR. KESSLER:**  IF YOU COULD JUST DO THE BEGINNING

22  FIRST SO THEY COULD UNDERSTAND WHAT THIS IS.

23          (DOCUMENT DISPLAYED.)

24  **BY MR. KESSLER::**

25  **Q.**   WHAT IS THIS AN EXHIBIT OF, IF YOU KNOW, SIR?

1   A.   I BELIEVE IT'S A LIST OF THE PLAYERS WHO ARE BEING GRANTED

2   BY THE HALL OF FAME TO ELECTRONIC ARTS FOR THIS PRODUCT.

3   Q.   WHO IS GRANTING THESE RIGHTS?  IS IT HALL OF FAME OR

4   PLAYERS INC?

5   A.   THE HALL OF FAME.

6   Q.   IF YOU TAKE A LOOK DOWN THE LIST IN THE RIGHT-HAND COLUMN.

7            MR. KESSLER:  IF YOU COULD GIVE ME THE BOTTOM THIRD

8   OF THE LIST.  THANK YOU.

9            THANK YOU.  GOT IT.  GO A LITTLE BIT HIGHER.  THERE.

10           (DOCUMENT DISPLAYED.)

11  BY MR. KESSLER::

12  Q.   THIS SAYS "GENE UPSHAW."

13           DO YOU SEE THAT?

14  A.   YES, I DO.

15  Q.   WAS MR. UPSHAW A HALL OF FAME PLAYER?

16  A.   YES, HE WAS.

17  Q.   WAS HE ONE OF THE PLAYERS WHO THE HALL OF FAME WAS

18  GRANTING RIGHTS TO?

19  A.   YES.  THAT APPEARS TO BE.  HE'S ON THIS EXHIBIT.

20  Q.   SO IF THERE WAS ANY DISCOUNT HERE OF PLAYERS, WOULD THAT

21  BE A DISCOUNT ON MR. UPSHAW'S RIGHTS, ALSO, IF THERE WAS SUCH A

22  THING?

23  A.   YES.

24  Q.   NOW, YOU WERE HERE FOR MR. ADDERLEY'S TESTIMONY, WERE YOU

25  NOT?

1  **A.**   I WAS.

2  **Q.**   AND YOU HEARD MR. ADDERLEY TESTIFY THAT HE ONLY NEGOTIATED

3  WITH THE HALL OF FAME FOR HOW MUCH THEY WOULD PAY HIM FOR THIS

4  AGREEMENT, CORRECT?

5  **A.**   YES.

6          **MR. LECLAIR:**  OBJECTION.  MISSTATES THE TESTIMONY OF

7  MR. ADDERLEY, YOUR HONOR.

8          **THE COURT:**  WAIT A MINUTE.

9          WELL, IT WOULD BE UP TO THE JURY TO DECIDE WHETHER OR

10 NOT COUNSEL IS ACCURATELY REFERRING TO WHAT MR. ADDERLEY

11 ACTUALLY SAID.  I DON'T FRANKLY REMEMBER.  BUT I'M POSITIVE

12 THAT COLLECTIVELY THE JURY WILL.

13         AND, THEREFORE, IF THIS MISSTATES THE TESTIMONY TAKE

14 THAT INTO ACCOUNT IN DISCOUNTING THE QUESTION AND THE ANSWER.

15         IF YOU HAVE THE ACTUAL TRANSCRIPT OF THE TESTIMONY

16 THAT WOULD BE A BETTER WAY TO PROCEED.

17         **MR. KESSLER:**  I WILL DO THAT, YOUR HONOR.  THANK YOU.

18         **THE COURT:**  THAT WAY THERE WON'T BE ANY QUESTION

19 ABOUT WHAT MR. ADDERLEY SAID.

20         **MR. KESSLER:**  WANT TO GO TO SOMETHING ELSE WHILE

21 THEY'RE LOOKING FOR THAT.  COME BACK TO THAT.

22         **THE COURT:**  GO AHEAD.

23 **BY MR. KESSLER:**

24 **Q.**   OKAY.  MR. NAHRA, APART FROM MR. ADDERLEY'S TESTIMONY FOR

25 THE MOMENT, DO YOU KNOW WHETHER THE HALL OF FAME OR PLAYERS INC

1   ACQUIRED THE RIGHTS TO ANY HALL OF FAME PLAYERS WHO THE HALL OF

2   FAME DID NOT ALREADY HAVE THE RIGHTS TO?

3   **A.**   I BELIEVE THAT EITHER ONE OF THEM COULD ACQUIRE RIGHTS TO

4   PEOPLE -- ARE YOU TALKING ABOUT NEW INDUCTEES?

5   **Q.**   LET ME ASK THIS WAY.  LET ME SHOW YOU A COPY OF TRIAL

6   EXHIBIT 2320.  IT'S IN FRONT OF YOU.

7           BEFORE WE GET TO THAT, WE NOW FOUND MR. ADDERLEY'S

8   TESTIMONY.  AND I'LL READ TO YOU FROM TRANSCRIPT 1584.  AND MY

9   QUESTION TO MR. ADDERLEY WAS IN THE CONTEXT OF THIS HALL OF

10  FAME AGREEMENT WAS:

11          "**QUESTION:**  RIGHT.  IN OTHER WORDS, PLAYERS

12          INC DIDN'T NEGOTIATE THAT 2,000 WITH YOU, DID

13          THEY?  THAT WAS DIRECTLY THE HALL OF FAME?

14          "**ANSWER:**  YES."

15          **MR. LECLAIR:**  YOUR HONOR, FOR OPTIMAL COMPLETENESS,

16  CAN I READ 1596, LINE 13 THROUGH 16?

17          **MR. KESSLER:**  YOUR HONOR, THAT'S -- I DON'T KNOW WHAT

18  IT SAYS, BUT IT'S FOR COMPLETENESS, IT'S LIKE 12 PAGES LATER IN

19  THE TRANSCRIPT.  SO I DON'T THINK IT COULD BE FOR COMPLETENESS.

20          **THE COURT:**  YOU CAN DO THAT LATER ON.

21          **MR. LECLAIR:**  FINE.

22          **THE COURT:**  SO WHAT IS YOUR QUESTION?

23  **BY MR. KESSLER:**

24  **Q.**   MY QUESTION IS:  DO YOU KNOW, MR. NAHRA, WHETHER

25  MR. ADDERLEY WAS CORRECT THAT IT WAS THE HALL OF FAME WHO WAS

1  CONTACTING THE PLAYERS TO NEGOTIATE HOW MUCH THEY WOULD BE PAID

2  FOR THE HALL OF FAME AGREEMENT AND NOT PLAYERS INC?  DO YOU

3  KNOW?

4  **A.**   YES, THAT'S MY UNDERSTANDING.

5  **Q.**   WHO WAS IT, SIR?

6  **A.**   IT WAS THE HALL OF FAME.

7  **Q.**   OKAY.  AND TO THE EXTENT THE 400,000 WAS NEGOTIATED

8  BETWEEN THE HALL OF FAME AND EA, AND TO THE EXTENT THAT

9  MR. WALKER WAS INVOLVED IN THE 400,000 NEGOTIATION, WHO DID

10  THAT MONEY GO TO?

11          DID IT GO TO THE PLAYERS, OR WAS THAT THE AMOUNT THAT

12  WENT TO THE HALL OF FAME?  WHICH WAS IT?

13  **A.**   IT'S THE AMOUNT THAT EA AGREED TO PAY TO THE HALL OF FAME.

14  **Q.**   AND WAS THE HALL OF FAME FREE TO PAY WHATEVER THEY WANTED

15  TO TO THE PLAYERS?

16  **A.**   AS FAR AS I KNOW.

17  **Q.**   NOW, TAKE A LOOK AT TRIAL EXHIBIT 2320.  ARE YOU FAMILIAR

18  WITH THIS AS TO WHAT THIS WAS?

19  **A.**   I'M FAMILIAR WITH IT.

20  **Q.**   OKAY.  TELL THE JURY WHAT THIS WAS, AND THEN -- WHAT THIS

21  WAS.  THANK YOU.

22  **A.**   THIS IS A LETTER FROM THE HALL OF FAME.  I'M ACTUALLY NOT

23  SURE WHO MRS. HUNT IS.  BUT IT'S A LETTER FROM THE HALL OF FAME

24  SORT OF ANNOUNCING THE DEAL THAT THE PRO FOOTBALL HALL OF FAME

25  WANTS TO ENTER INTO WITH EA FOR THE MADDEN NFL VIDEO GAME.

1  AND --

2           **MR. LECLAIR:**  YOUR HONOR, I THINK HE'S READING FROM

3  AN EXHIBIT THAT'S NOT IN EVIDENCE.  WAS THIS A DISCLOSED

4  DOCUMENT?

5           **MR. KESSLER:**  YES.

6           **MR. LECLAIR:**  I APOLOGIZE.

7           **THE COURT:**  HE'S JUST TALKING OUT LOUD.

8           **MR. KESSLER:**  I'M SORRY.  IT WASN'T DISCLOSED FOR

9  THIS WITNESS BECAUSE WHEN WE DID OUR DESIGNATIONS THE HALL OF

10 FAME WASN'T THERE.

11          **MR. LECLAIR:**  THEN, I OBJECT, YOUR HONOR.

12          **THE COURT:**  HE'S JUST READING FROM IT, ANYWAY.  IT'S

13 NOT IN EVIDENCE.

14          **MR. KESSLER:**  LET ME JUST ASK HIM.

15 **BY MR. KESSLER:**

16 **Q.**  ARE YOU FAMILIAR WITH THIS DOCUMENT?

17 **A.**  YES.

18          **MR. KESSLER:**  OKAY.  I WOULD LIKE TO MOVE THIS INTO

19 EVIDENCE, YOUR HONOR.  I AGREE IT WAS NOT DISCLOSED FOR THIS

20 WITNESS, BUT WHEN WE DID OUR DISCLOSURES IT WAS BEFORE THIS

21 HALL OF FAME SUBJECT CAME INTO THE CASE.

22          **MR. LECLAIR:**  YOUR HONOR, I HAVE TWO OBJECTIONS TO

23 THIS.  ONE:  THEY DIDN'T DISCLOSE IT.  TWO:  THIS WITNESS IS

24 NOT COPIED, NOT SHOWN TO HAVE ANY CONNECTION TO THIS LETTER

25 WHATSOEVER.

1          **THE COURT:**  ON THE FIRST POINT, SINCE WE AMENDED THE

2   PARAMETERS OF THE TRIAL TO GET INTO THE HALL OF FAME, I'M GOING

3   TO EXCUSE THE FAILURE TO DISCLOSE IT BECAUSE THAT'S

4   UNDERSTANDABLE.

5          BUT IF THE WITNESS -- NOW, EARLIER YOU MADE A POINT

6   OF DISTINGUISHING BETWEEN WHAT YOU KNEW, MR. NAHRA, VERSUS

7   ANYTHING ELSE.  NOW YOU HAVE GONE INTO TESTIFYING TO YOUR

8   UNDERSTANDINGS AND YOUR, QUOTE, "FAMILIARITY."

9          SO IF YOU ARE JUST READING FROM A DOCUMENT AND TRYING

10  TO INTERPRET IT FOR THE JURY AND HAVE HAD NO ROLE IN IT, THEN

11  THAT'S IMPROPER.  I'M NOT GOING TO ALLOW THAT.

12  **BY MR. KESSLER:**

13  **Q.**   I'M GOING TO --

14         **THE COURT:**  IF HE HAD SOME CONNECTION WITH THE

15  TRANSACTION THAT ALLOWED HIM TO SPEAK FROM ACTUAL FIRSTHAND

16  KNOWLEDGE, I'M OKAY WITH THAT.  BUT I DON'T WANT HIM JUST

17  INTERPRETING DOCUMENTS AND GIVING HIS, QUOTE, "UNDERSTANDINGS"

18  TO THE JURY.

19         **MR. KESSLER:**  UNDERSTOOD, YOUR HONOR.

20  **BY MR. KESSLER:**

21  **Q.**   MR. NAHRA, WERE YOU FAMILIAR WITH THE TYPES -- WITH THE

22  ANNOUNCEMENTS AND FORMS THE HALL OF FAME WAS SENDING OUT ABOUT

23  THIS AT THIS TIME?

24  **A.**   YES.

25  **Q.**   AND DOES THIS -- DO YOU RECOGNIZE THIS AS ONE OF THOSE

1    ANNOUNCEMENTS?

2    **A.**   I'M NOT SURE I'VE EVER SEEN THIS BEFORE, BUT I UNDERSTAND

3    WHAT'S BEING COMMUNICATED.  I WAS AWARE THAT THAT WAS BEING

4    COMMUNICATED.

5         **MR. KESSLER:**  IF YOUR HONOR DOESN'T THINK THAT'S

6    SUFFICIENT, THEN I WON'T MOVE IT IN.  I'LL JUST ASK HIM WHAT

7    HIS UNDERSTANDING WAS.

8         **THE COURT:**  THANK YOU.  THAT'S WHAT YOU HAVE TO -- IF

9    HE HAS A FIRST -- WAS IT AN UNDERSTANDING OF HEARSAY GOSSIP IN

10   THE HALLWAY?  OR DOES HE HAVE FIRSTHAND KNOWLEDGE?

11   **BY MR. KESSLER:**

12   **Q.**   DID YOU HAVE FIRSTHAND KNOWLEDGE AT THE TIME, NOT ABOUT

13   THIS SPECIFIC ONE, ABOUT THE ANNOUNCEMENTS THAT HALL OF FAME

14   WAS MAKING AT THAT TIME TO RETIRED PLAYERS?

15   **A.**   NO.  I DON'T HAVE FIRSTHAND KNOWLEDGE ABOUT ANNOUNCEMENTS.

16   **Q.**   OKAY.  THAT'S FINE.

17         **THE COURT:**  PASS TO SOMETHING ELSE.

18         **MR. KESSLER:**  THAT'S FINE.  WE'LL MOVE ON.

19   **BY MR. KESSLER:**

20   **Q.**   MR. NAHRA, YOU WERE ASKED SOME QUESTIONS ABOUT TAKE TWO.

21   DO YOU KNOW, DO YOU HAVE KNOWLEDGE WHETHER OR NOT TAKE TWO DID

22   COME OUT WITH ITS VIDEO GAME OF FEATURING SOME RETIRED NFL

23   PLAYERS?

24   **A.**   YES, THEY DID.

25   **Q.**   SO DESPITE WHAT MR. WALKER SAID IN THAT E-MAIL ABOUT TAKE

1  TWO NOT COMING OUT, THERE WAS A TAKE TWO GAME, CORRECT?

2  **A.**   THERE WAS A TAKE TWO GAME, YES.

3  **Q.**   AND DO YOU KNOW WHETHER RETIRED PLAYERS WHO SIGNED THE GLA

4  WITH PLAYERS INC, DO YOU KNOW WHETHER ANY OF THEM ALSO SIGNED

5  UP WITH TAKE TWO?

6  **A.**   YES, THEY DID.

7  **Q.**   OKAY.   AND DOES THE NON-EXCLUSIVE RETIRED PLAYER GLA

8  PREVENT PLAYERS FROM SIGNING WITH TAKE TWO?

9  **A.**   NO, IT DOESN'T.

10  **Q.**   NOW, THERE WERE QUESTIONS RAISED ABOUT COMMENTS BY

11  MR. WALKER IN THE E-MAIL ABOUT WHETHER OR NOT PAYMENTS TO

12  PLAYERS WERE BELOW MARKET OR NOT.   DO YOU RECALL THAT IN THE

13  E-MAIL?

14  **A.**   YES.

15  **Q.**   HE'S DISCUSSING THE $400,000 NUMBER, CORRECT, IN THOSE

16  E-MAILS?

17  **A.**   RIGHT.

18            **MR. LECLAIR:**  OBJECTION.  LEADING, YOUR HONOR.

19            **MR. KESSLER:**  IT'S PRELIMINARY, YOUR HONOR.

20            **THE COURT:**  WELL, THAT QUESTION IS PRELIMINARY, SO

21  YOU CAN LEAD ON THE PRELIMINARY POINT.

22  **BY MR. KESSLER:**

23  **Q.**   WAS THE $400,000 NUMBER THE NUMBER PAID TO THE HALL OF

24  FAME OR THE NUMBER THAT WAS PAID TO INDIVIDUAL PLAYERS?

25  **A.**   IT WAS THE NUMBER THAT WAS PAID TO THE HALL OF FAME.

1    Q.   NOW, IN THE E-MAILS THAT AROSE WHEN EA STARTED THIS, WHAT

2    WAS EA SAYING TO PLAYERS INC WHEN THESE E-MAILS AROSE ABOUT THE

3    $400,000 PAYMENT?

4    A.   THE REASON IT CAME TO MY ATTENTION WAS BECAUSE EA WAS

5    CLAIMING THAT THEY DIDN'T WANT TO PAY 400,000 IN THAT THEIR

6    UNDERSTANDING WAS THAT WE HAD AGREED TO PAY SOME OF THAT MONEY.

7    Q.   SO IS EA SAYING THAT THEY WERE PAYING TOO MUCH OR TOO

8    LITTLE?

9    A.   EA BELIEVED THAT THEY HAD PAID TOO MUCH FOR THE RIGHTS.

10   Q.   SO DID EA SAY ANYTHING TO YOU TO INDICATE THEY THOUGHT

11   THEY GOT A BELOW-MARKET DEAL?

12   A.   NO.

13   Q.   NOW, MR. NAHRA, YOU MENTIONED THAT THE TAKE TWO DEAL IN

14   YOUR TESTIMONY ON DIRECT EXAMINATION WAS, TO YOUR

15   UNDERSTANDING, AN EXCLUSIVE LICENSE, CORRECT?

16   A.   MY UNDERSTANDING IS THAT EA -- TAKE 2 WHEN THEY WERE

17   TRYING TO SIGN UP RETIRED PLAYERS FOR THEIR GAME, THEY WERE

18   TRYING TO SECURE THE EXCLUSIVE RIGHTS TO THOSE PLAYERS.

19   Q.   NOW, BASED ON YOUR UNDERSTANDING OF THE LICENSING

20   BUSINESS, DO COMPANIES PAY MORE FOR EXCLUSIVE RIGHTS THAN

21   NON-EXCLUSIVE RIGHTS?

22   A.   YES.

23        **MR. LECLAIR:**  OBJECTION, YOUR HONOR.  THIS IS BEYOND

24   THE SCOPE, AND IT'S ALSO IRRELEVANT.

25        **MR. KESSLER:**  THEY RAISED THE COMPARISON WITH THE

1  TAKE TWO GAME, YOUR HONOR.

2          **THE COURT:**  OVERRULED.  IT'S WITHIN THE SCOPE.  IT'S

3  A FAIR QUESTION.

4          PLEASE ANSWER.

5  **BY MR. KESSLER:**

6  **Q.**  EXPLAIN TO THE JURY WHY A VIDEO GAME COMPANY MIGHT PAY

7  MORE FOR EXCLUSIVE RIGHT TO RETIRED PLAYERS THAN NON-EXCLUSIVE

8  RIGHTS.

9  **A.**  WELL, BECAUSE IF THEY CAN OBTAIN EXCLUSIVE RIGHTS TO THE

10  PLAYERS, THEN THEY'RE THE ONLY COMPANY OUT THERE WITH THE

11  ABILITY TO PUT THOSE PLAYERS INTO A PRODUCT, AND THEREBY BE THE

12  ONLY COMPANY WITH THE ABILITY TO SELL THAT PRODUCT.  SO IT'S

13  WORTH MORE MONEY TO BE THE ONLY PRODUCT ON THE SHELF.

14  **Q.**  NOW, MR. NAHRA, LET ME DIRECT YOUR ATTENTION TO TRIAL

15  EXHIBIT 1148 THAT COUNSEL SHOWED TO YOU.

16          **MR. KESSLER:**  PUT THAT UP, PLEASE.

17          (DOCUMENT DISPLAYED.)

18  **BY MR. KESSLER::**

19  **Q.**  AND 1148 WAS THIS LICENSE THAT HE SHOWED YOU --

20          **MR. KESSLER:**  LOOK AT THE TOP, PLEASE, LAUREN.

21  **BY MR. KESSLER:**

22  **Q.**  -- BY AND BETWEEN FANTASY SPORT CHAMPIONS AND PLAYERS INC;

23  DO YOU REMEMBER THAT?

24  **A.**  YES, I DO.

25  **Q.**  AND HE DIRECTED YOUR ATTENTION TO PARAGRAPH 13.

1  "NONINTERFERENCE."

2          **MR. KESSLER:**  IF WE CAN DO THAT, LAUREN.  THAT'S ON

3  PAGE 8, 13.

4  **BY MR. KESSLER::**

5  **Q.**   AND HE ASKED YOU IF THIS WAS A -- THANK YOU.

6          HE ASKED YOU IF THIS WAS A PARAGRAPH THAT APPEARED IN

7  MOST PLAYERS INC AGREEMENTS, AND I THINK YOU SAID IT DID; IS

8  THAT CORRECT?

9  **A.**   YES.

10  **Q.**   OKAY.  NOW, UNDER THIS NONINTERFERENCE CLAUSE, LET'S SAY

11  IT WAS IN AN EA AGREEMENT, WAS EA PRECLUDED FROM HAVING DEALS

12  WITH RETIRED PLAYERS, FOR EXAMPLE, IF IT WAS NOT A LICENSED

13  PLAYERS INC PRODUCT?

14  **A.**   NO.

15  **Q.**   COULD YOU EXPLAIN THAT TO THE JURY, PLEASE?

16  **A.**   WELL, EA'S A HUGE COMPANY.  AND WHILE THEY PRIMARILY DO

17  VIDEO GAMES, THEY DO OTHER THINGS, AS WELL.  IF THEY WANTED TO

18  USE A RETIRED PLAYER TO -- OR ANY PLAYER TO DO SOMETHING THAT

19  DIDN'T INVOLVE THEIR MADDEN GAME, THAT WE LICENSED, THEN THEY

20  WOULDN'T HAVE TO DO IT THROUGH PLAYERS INC.  WE WOULD HAVE NO

21  INVOLVEMENT IN IT.

22  **Q.**   LET ME GIVE YOU AN EXAMPLE FROM ANOTHER LICENSEE.  TAKE A

23  COMPANY LIKE TOPPS TRADING CARDS, OKAY?

24          IF TOPPS TRADING CARDS -- DO THEY HAVE A

25  NONINTERFERENCE CLAUSE IN THEIR AGREEMENTS?

1   A.   I'M CERTAIN THEY DO.

2   Q.   YES?  IF TOPPS TRADING CARDS WANTED TO LICENSE A LINE OF

3   RETIRED PLAYER TRADING CARDS, SEPARATE AND APART FROM THE

4   PRODUCTS THAT THEY LICENSED FROM YOU, COULD THEY DO THAT

5   PRODUCT ON THEIR OWN?

6   A.   YES.

7   Q.   FINALLY, MR. NAHRA, OUT OF THE CLASS MEMBERS IN THIS CASE,

8   DO YOU KNOW WHETHER MORE THAN 17 OF THOSE MEMBERS WERE IN THE

9   EA HALL OF FAME AGREEMENT GAME?

10  A.   I'M SORRY.  CAN YOU REPEAT THAT QUESTION?

11  Q.   DO YOU KNOW THE NUMBER OF CLASS MEMBERS IN THIS CASE WHO

12  SIGNED HALL OF FAME AGREEMENTS WHERE THERE WAS MORE THAN 17?

13  A.   UHM, NO.  THAT SOUNDS LIKE A PRETTY REASONABLE NUMBER.

14  Q.   DO YOU KNOW IT WOULD BE A VERY SMALL NUMBER?

15  A.   YEAH.

16        MR. KESSLER:  THANK YOU.  I HAVE NO FURTHER

17  QUESTIONS, YOUR HONOR.

18        THE COURT:  ALL RIGHT.  I THINK THIS LAST POINT IS

19  ONE THAT DESERVES TO BE -- OUGHT TO BE A CLEAR-CUT THING.

20        MR. LECLAIR, I WANT A STIPULATION.  HOW MANY CLASS

21  MEMBERS WERE IN THE HALL OF FAME DEAL?

22        MR. LECLAIR:  I BELIEVE IT'S 17, YOUR HONOR.  BUT

23  WE'LL MAKE SURE THAT'S RIGHT AND STIPULATE TO IT.

24        THE COURT:  IS THAT YOUR UNDERSTANDING?

25        MR. KESSLER:  OUR UNDERSTANDING IS 17 CLASS MEMBERS

1    HAD AN AGREEMENT IN EFFECT WHILE THEY WERE IN THE HALL OF

2    FAME -- WHILE THEY WERE IN THE HALL OF FAME AGREEMENT.

3           THE REASON I SAY THAT, YOUR HONOR, IS SOME CLASS

4    MEMBERS HAD AN AGREEMENT IN EFFECT FOR ONE YEAR OF THE PERIOD,

5    BUT NOT ANOTHER.  SO THOSE CLASS MEMBERS WHO HAD A GLA IN

6    EFFECT DURING THE HALL OF FAME GAME WAS 17.  THAT'S IT.

7           **THE COURT:**  MR. KESSLER, I'M TRYING TO MAKE THIS

8    SIMPLE FOR THE JURY.

9           **MR. KESSLER:**  17.

10          (LAUGHTER)

11          **THE COURT:**  17 IS THE ANSWER.

12          **MR. KESSLER:**  YES.

13          **THE COURT:**  THANK YOU.  GO AHEAD.

14                    **REDIRECT EXAMINATION**

15   **BY MR. LECLAIR:**

16   **Q.**   MR. NAHRA, I JUST HAVE A FEW QUESTIONS FOR YOU.

17          MR. KESSLER ASKED YOU ABOUT THIS INTERFERENCE CLAUSE.

18   WHY DID YOU PUT THAT INTERFERENCE CLAUSE IN ALL OF YOUR LICENSE

19   AGREEMENTS?

20   **A.**   UHM, I'M NOT SURE I KNOW ALL THE REASONS, BUT THE REASON

21   THAT COMES UP MOST OFTEN IS THAT AS THE LICENSORS, AS THE

22   COMPANY THAT IS GRANTING RIGHTS TO SOMEONE ELSE TO USE IN THEIR

23   PRODUCT, WE ALWAYS WANT TO BE AWARE OF WHAT PLAYERS IT IS THEY

24   PLAN ON PUTTING INTO THAT PRODUCT.

25          AND SO THROUGH THE NONINTERFERENCE CLAUSE, IF THERE'S

1    A PLAYER WHOSE RIGHTS THEY HAVE NOT ALREADY BEEN GRANTED THAT

2    THEY WANT TO USE IN ANY WAY IN CONJUNCTION WITH THAT PRODUCT,

3    THEN THEY NEED TO GET IN TOUCH WITH US IN ORDER TO DO THAT.

4    **Q.**   ISN'T ONE OF THE REASONS YOU PUT THAT IN THERE IS BECAUSE

5    YOU WERE REPRESENTING RETIRED PLAYERS AS YOU SAID ON YOUR

6    WEB SITE?

7    **A.**   NO.

8    **Q.**   THAT'S JUST NOT -- THAT HAS NOTHING TO DO WITH YOUR

9    PRECLUDING YOUR LICENSEES FROM GOING DIRECTLY TO THE RETIRED

10   PLAYERS?  IT HAS NOTHING TO DO WITH THE FACT THAT YOU REPRESENT

11   THEM?

12   **A.**   I'VE NEVER HEARD THAT AS A REASON FOR THIS CLAUSE.

13   **Q.**   ALL RIGHT, SIR.  NOW, MR. KESSLER ASKED YOU ABOUT THE

14   MONEY PAID TO THE HALL OF FAME VERSUS THE PLAYERS.

15            ARE YOU TRYING TO TELL THIS JURY THAT THE $400,000

16   THAT WAS NEGOTIATED DIDN'T HAVE ANYTHING TO DO WITH WHAT WAS

17   PAID TO THE PLAYERS?  IS THAT WHAT YOU'RE TELLING THE JURY?

18   **A.**   I'M TELLING THE JURY THAT EA AGREED TO PAY THE HALL OF

19   FAME $400,000.  IT WAS UP TO THE HALL OF FAME WHAT THEY DID

20   WITH THAT MONEY.

21   **Q.**   YOU KNEW, DIDN'T YOU, MR. NAHRA, THAT THEY WERE GOING TO

22   DISTRIBUTE THE MONEY THAT WAS PAID TO THEM IN THE AGREEMENT;

23   DIDN'T YOU, SIR?

24   **A.**   I DIDN'T.  I DIDN'T KNOW.

25   **Q.**   YOU JUST HAVE NO IDEA?  YOU THOUGHT THEY'D PAY 2 MILLION,

1  EVEN THOUGH THEY ONLY GOT 400,000; IS THAT WHAT YOU'RE TELLING

2  THE JURY?

3  **A.**   NO.  LIKE I TESTIFIED EARLIER, WHEN YOU SHOWED ME THE --

4  I'M NOT SURE I CAN TESTIFY ABOUT THIS.  THE LETTER FROM --

5  **Q.**   CAN YOU JUST ANSWER MY QUESTION, SIR?  ARE YOU TELLING THE

6  JURY THAT IT WAS IRRELEVANT WHAT WAS PAID, THE 400,000 IS

7  IRRELEVANT TO WHAT WENT TO THE PLAYERS?  ARE YOU TELLING THE

8  JURY THAT?

9  **A.**   WELL, IN OUR MIND IT'S NOT IRRELEVANT.  BUT IT'S UP TO THE

10  HALL OF FAME TO MAKE THAT DETERMINATION.

11  **Q.**   RIGHT.  AND WHEN MR. WALKER TOLD EA THAT HE HAD DONE THEM

12  A HUGE FAVOR BY GETTING THIS DISCOUNTED TERM, YOU THOUGHT IT

13  WAS JUST COMPLETELY IRRELEVANT IN THE IMPACT ON THE PLAYERS

14  THEMSELVES?  YOU THOUGHT IT HAD NOTHING TO DO WITH THAT?

15  **A.**   I WASN'T INVOLVED IN THOSE NEGOTIATIONS.  I DIDN'T THINK

16  ABOUT IT ONE WAY OR ANOTHER.

17  **Q.**   ALL RIGHT, SIR.

18       NOW, MR. -- MR. KESSLER ASKED YOU ABOUT TAKE TWO, AND

19  DID THEY COME OUT WITH A VIDEO GAME.  ARE YOU AWARE, SIR, OF

20  WHETHER THE TAKE TWO VIDEO GAME WAS ACTUALLY DELAYED IN COMING

21  OUT?

22  **A.**   UHM, I'M NOT EXACTLY SURE WHEN IT CAME OUT.

23  **Q.**   DO YOU THINK IT MIGHT HAVE BEEN DELAYED BECAUSE OF YOUR

24  DEAL?

25  **A.**   I DON'T KNOW.

1   Q.   ALL RIGHT, SIR.

2           **MR. LECLAIR:**  YOUR HONOR, I HAVE A SUBJECT THAT WAS

3   UNDER THE MOTION IN LIMINE AND I WANT TO -- I BELIEVE THE DOOR

4   HAS BEEN OPENED, AND I WANT TO BE ABLE TO ASK THE WITNESS ABOUT

5   IT.

6           I DON'T KNOW.  DO YOU WANT TO DO A SIDEBAR ON THIS?

7           **THE COURT:**  I THINK WE BETTER.

8           (THE FOLLOWING PROCEEDINGS WERE HELD AT SIDEBAR.)

9           **MR. LECLAIR:**  YOUR HONOR, THEY PUT UP GENE UPSHAW'S

10  NAME.  THEY'RE TELLING THE JURY THERE WOULDN'T HAVE BEEN ANY

11  DISCOUNT HERE BECAUSE GENE UPSHAW WAS ON THE DEAL.

12          I WANT TO NOW ASK THIS WITNESS DOES HE KNOW THAT GENE

13  UPSHAW WAS PAID MILLIONS OF DOLLARS A YEAR BY THE PLAYERS INC

14  AND THE NFLPA?  HE DOESN'T CARE ABOUT $2,000 IN A LICENSE

15  AGREEMENT, UNLIKE SOME OF THESE PLAYERS IN OUR CLASS.

16          THEY OPENED THE DOOR.  THEY'RE SUGGESTING TO THE JURY

17  THAT GENE UPSHAW WOULD CARE ABOUT THIS MONEY AND, THEREFORE,

18  WOULDN'T ALLOW IT TO HAPPEN.  AND THAT'S JUST FALSE.

19          HE WAS MAKING MILLIONS OF DOLLARS.  HIS CONCERN WAS

20  ABOUT EA, NOT ABOUT THIS $2,000 LICENSE PAYMENT.  AND THEY'RE

21  SUGGESTING A TOTALLY IMPROPER INFERENCE TO THE JURY.

22          **MR. KESSLER:**  YOUR HONOR, I COULDN'T DISAGREE WITH

23  THAT MORE.  HE WANTS TO MAKE WILDLY INFLAMMATORY INFORMATION

24  ABOUT MR. UPSHAW'S SALARY.  THE NUMBERS, BY THE WAY, ARE

25  INACCURATE, SO HE WOULD BE PUTTING INACCURATE INFORMATION --

1      (SIMULTANEOUS SPEAKING, NOT REPORTABLE.)

2      **MR. KESSLER:**  YOUR HONOR, THIS RULE IS THE EXACT

3  INFLAMMATORY INFORMATION I'M ENTITLED TO.  IN FACT, THEY DON'T

4  EVEN KNOW THE ACTUAL SALARY INFORMATION BECAUSE YOUR HONOR WILL

5  RECALL YOU DENIED THEIR MOTION TO GET IT AND SAID:

6           "IF THAT'S YOUR THEORY OF THE CASE, YOU BETTER

7  GET ANOTHER THEORY."

8           THAT WAS YOUR HONOR'S WORDS IN RESPECT TO THIS.  IN

9  NO WAY DID WE DO ANYTHING OTHER THAN POINT OUT IN A DOCUMENT

10  THEY PUT IN EVIDENCE THAT MR. UPSHAW WAS LISTED THERE.  DIDN'T

11  ARGUE ANYTHING ABOUT WHAT MR. UPSHAW'S FINANCIAL SITUATION WAS

12  OR ANYTHING ELSE.  AND IT'S REALLY NO BASIS FOR THEM TO

13  INTERJECT THIS HERE.

14      **THE COURT:**  WE'RE NOT GETTING INTO THAT POINT.  BUT

15  YOU WOULD BE FREE IN YOUR CLOSING ARGUMENT TO MAKE THE ARGUMENT

16  THAT SURELY MR. UPSHAW WAS WELL PAID AND, THEREFORE, EVEN

17  THOUGH -- I'M GOING TO ALLOW THAT INFERENCE IF THIS POINT EVEN

18  HAS ANY CONSEQUENCE.  AND, THEREFORE, IF THEY -- HE WOULD NOT

19  CARE WHETHER OR NOT HE WAS -- HE GOT DISCOUNTED OR NOT.  THAT

20  WOULD BE OKAY.

21           BUT WE'RE NOT GOING TO TAKE THE TIME TO GET INTO THE

22  SPECIFICS OF HIS SALARY.

23      **MR. LECLAIR:**  YOUR HONOR, YOU'VE TOLD THE JURY THAT

24  THEY'RE ONLY SUPPOSED TO CONSIDER EVIDENCE.  THERE'S NOT GOING

25  TO BE ANY EVIDENCE UNLESS WE GET SOME EVIDENCE ON THIS.  IT'S

1  NOT FAIR TO LET THEM ARGUE THAT GENE UPSHAW WOULD HAVE CARED

2  ABOUT THIS $2,000.

3          I'LL PUT IN THE LM-2, WHICH HAS THEIR NUMBERS

4  PUBLICLY REPORTED.  ONE LM-2.  THAT'S ALL I WANT TO PUT IN,

5  BECAUSE IT'S NOT FAIR TO LET THEM MAKE THAT INFERENCE TO THE

6  JURY.

7          **THE COURT:**  IT'S ONE DOCUMENT, A PUBLIC DOCUMENT.

8          **MR. KESSLER:**  THAT WOULD BE A TOTAL DISTORTION,

9  BECAUSE NOT ONLY IS THAT LM-2 ABOUT -- HAS ANNUAL PAYMENTS

10  MIXING TOGETHER ALL OF MR. UPSHAW'S RETIREMENT PAYMENTS IN A

11  SALARY THAT HE GETS INTO AND EXPLAIN -- SO IT'S COMPLETELY

12  THE -- COMPLETELY THE WRONG NUMBER.

13          I THINK YOUR HONOR IS RIGHT.  I THINK THIS JURY KNOWS

14  MR. UPSHAW WAS THE HEAD OF THE UNION.  THERE IS NO DISPUTE HE

15  WAS GOING TO BE COMPENSATED SUFFICIENTLY.  THAT'S NOT THE

16  ISSUE.

17          FOR THEM TO PUT SPECIFIC NUMBERS IN MILLIONS, OR

18  SOMETHING LIKE THAT, THAT'S INFLAMMATORY.  AND THAT'S WHY THEY

19  WANT TO DO IT.

20          **MR. LECLAIR:**  WHY DID THEY MAKE THAT ARGUMENT, JUDGE?

21  THEY DID IT SO THE JURY WOULDN'T BELIEVE PI WOULD DO THIS.  AND

22  THEY'VE OPENED THIS DOOR BY SAYING GENE UPSHAW --

23          **THE COURT:**  I'M GOING TO TELL THE JURY, IF YOU AGREE,

24  OTHERWISE, I'M GOING TO ALLOW THIS LINE OF QUESTIONS.  I'M

25  GOING TO TELL THE JURY TO DISREGARD THE PRIOR STATEMENT BY THIS

1   WITNESS ABOUT GENE UPSHAW AND THE FACT THAT HE WAS PART OF THIS

2   GROUP, AND WHETHER HE GOT A DISCOUNT OR NOT.

3          **MR. KESSLER:**  I'M PERFECTLY CONTENT WITH THAT, YOUR

4   HONOR.

5          **THE COURT:**  AND YOU DON'T MAKE THE ARGUMENT, AND THEY

6   DISREGARD IT, AND WE WILL MOVE ON.

7          **MR. KESSLER:**  ABSOLUTELY, YOUR HONOR.  IT WAS NOT A

8   MAJOR POINT, AND SO THAT'S FINE.

9          **THE COURT:**  ALL RIGHT.  THANK YOU.

10         (SIDEBAR CONCLUDED.)

11         **THE COURT:**  TO MAKE OUR CASE SLIGHTLY SIMPLER, I'M

12  GOING TO INSTRUCT YOU TO DISREGARD SOMETHING THAT CAME UP ABOUT

13  TEN MINUTES AGO.  AND THAT WILL SAVE US FROM HAVING TO GET INTO

14  FURTHER QUESTIONS AND ANSWERS ABOUT THAT SUBJECT.

15         YOU WILL REMEMBER A QUESTION THAT WAS ASKED BY MR.

16  KESSLER ABOUT WHETHER OR NOT GENE UPSHAW, WHO WAS THE DIRECTOR

17  OF THE -- OF THE UNION, WAS IN THE HALL OF FAME PROGRAM.  AND

18  SOME SUGGESTION WAS MADE THAT HE WAS TREATED LIKE ALL THE OTHER

19  RETIRED HALL OF FAME PEOPLE.

20         AND I'M TELLING YOU TO COMPLETELY DISREGARD THAT

21  COUPLE OF QUESTIONS, BECAUSE IF I ALLOW YOU TO CONSIDER THAT,

22  IN FAIRNESS I'VE GOT TO ALLOW THE OTHER SIDE TO GET INTO SOME

23  RESPONSE.

24         SO IT'S JUST SIMPLER TO MAKE -- IT'S SO FAR AFIELD

25  FROM THE ISSUE YOU HAVE TO DECIDE IN THIS CASE I'M JUST TAKING

1   THAT AWAY.  THAT'S NOT SOMETHING FOR YOU TO CONSIDER, GENE

2   UPSHAW'S -- WHETHER HE WAS HAPPY OR UNHAPPY, WENT ALONG WITH OR

3   DISCOUNTED OR WHATEVER.  THAT'S OUT OF THE CASE.

4          AND I TOLD MR. KESSLER NOT TO MAKE THAT ARGUMENT IN

5   THE CLOSING ARGUMENT.  HE'S AGREED.

6          SO SUBTRACT THAT FROM YOUR MEMORY, PLEASE, AND PLACE

7   NO RELIANCE ON THAT POINT.

8          ALL RIGHT.

9          **MR. LECLAIR:**  NO FURTHER QUESTIONS.

10         **THE COURT:**  ANYTHING MORE?

11         **MR. KESSLER:**  NOTHING FURTHER, YOUR HONOR.

12         **THE COURT:**  YOU CAN STEP DOWN, MR. NAHRA.  THANK YOU

13  VERY MUCH.

14         **THE WITNESS:**  THANK YOU.

15         **THE COURT:**  NEXT WITNESS.

16         **MR. KESSLER:**  I ASSUME MR. NAHRA IS DISCHARGED, YOUR

17  HONOR.

18         **THE COURT:**  I THOUGHT HE WAS A CORPORATE

19  REPRESENTATIVE.

20         **MR. KESSLER:**  WELL, HE WILL BE HERE, BUT HE MAY NOT

21  BE HERE EVERY DAY.  HE HAS OTHER BUSINESS TO --

22         **THE COURT:**  ALL RIGHT.  YOU ARE DISCHARGED.

23         YOU DON'T WANT HIM RETAINED, DO YOU?

24         **MR. LECLAIR:**  WE WILL NOT DISCHARGE MR. NAHRA, YOUR

25  HONOR, BUT IT'S FINE.  WE'LL WORK ON HIS SCHEDULING PROBLEMS HE

1    MAY HAVE.

2           **THE COURT:**  YOU ARE NOT DISCHARGED.  YOU CANNOT GO

3    OUT OF THE DISTRICT WITHOUT -- YOU'VE GOT TO MAKE YOURSELF

4    AVAILABLE FOR RECALL ON REASONABLE NOTICE.

5           **MR. KESSLER:**  WE'LL WORK THAT OUT WITH PLAINTIFFS, IF

6    THEY NEED HIM FOR SOME REASON.

7           **THE COURT:**  I HOPE YOU WILL.

8           THANK YOU.

9           NEXT WITNESS.

10          **MR. HUMMEL:**  YOUR HONOR, PLAINTIFFS CALL DANIEL

11   RASCHER.

12          **THE COURT:**  DANIEL RASCHER, PLEASE COME FORWARD.

13          **MR. HUMMEL:**  I HAVE A NOTEBOOK FOR YOUR HONOR.

14          **THE COURT:**  ALL RIGHT.  PLEASE RAISE YOUR RIGHT HAND.

15          THE CLERK WILL SWEAR YOU IN.

16          (THEREUPON, THE WITNESS WAS SWORN.)

17          **THE WITNESS:**  I DO.

18          **THE COURT:**  OKAY.  WE NEED TO TAKE YOUR PICTURE SO

19   THE JURY CAN BE REMINDED WHAT YOU LOOK LIKE, AND MAYBE REMEMBER

20   YOUR TESTIMONY.

21          (PICTURE TAKEN.)

22          **THE COURT:**  THANK YOU.

23          PLEASE STATE YOUR NAME AND SPEAK SO THAT THE MIC

24   CATCHES YOUR VOICE.

25          **THE WITNESS:**  OKAY.  MY NAME IS DAN RASCHER.

1        **THE COURT:**  GO AHEAD.

2        **MR. HUMMEL:**  THANK YOU, YOUR HONOR.

3                        <u>**DAN RASCHER,**</u>

4   CALLED AS A WITNESS FOR THE PLAINTIFFS HEREIN, HAVING BEEN

5   FIRST DULY SWORN, WAS EXAMINED AND TESTIFIED AS FOLLOWS:

6                    <u>**DIRECT EXAMINATION**</u>

7   **BY MR. HUMMEL:**

8   **Q.**  DR. RASCHER, WHAT DO YOU DO FOR A LIVING?

9   **A.**  I'M AN ECONOMIST.  I'M A PROFESSOR AT THE UNIVERSITY OF

10  SAN FRANCISCO.  I DIRECT THE SPORT MANAGEMENT PROGRAM.

11  **Q.**  IS THERE ANY -- WHAT IS THE SPORT MANAGEMENT PROGRAM?

12  **A.**  ALL RIGHT.  SO AT USF WE HAVE A MASTER'S PROGRAM IN SPORTS

13  MANAGEMENT.  STUDENTS TAKE COURSES IN ECONOMICS, FINANCE, LAW

14  AND SO FORTH.

15         AND I RUN THE ACADEMIC PORTION OF THE PROGRAM.  THERE

16  ARE ABOUT 200 MASTER STUDENTS IN SAN FRANCISCO AND IN ORANGE

17  COUNTY.

18  **Q.**  DR. RASCHER, I AM GOING TO ACTUALLY DO MY BEST TO SLOW

19  DOWN, BECAUSE THE COURT REPORTER IS HAVING TROUBLE.  SO IF YOU

20  COULD JUST KEEP YOUR ANSWERS SLOW, WE'LL GET THIS DONE MORE

21  EFFICIENTLY, I THINK.

22         DR. RASCHER, DO YOU HAVE A PARTICULAR AREA OF

23  EXPERTISE?

24  **A.**  YES, I'M SPORTS ECONOMIST, SO I APPLY ECONOMIC PRINCIPLES

25  TO THE SPORTS INDUSTRY.

**Q.**   CAN YOU TELL THE LADIES AND GENTLEMEN OF THE JURY WHAT A

SPORTS ECONOMIST IS?

**A.**   SPORTS ECONOMIST STUDIES SPORT LEAGUES, THE LABOR MARKET

IN SPORTS, SPONSORSHIPS, ENDORSEMENTS, LICENSING IN SPORTS.

AND AS AN ECONOMIST, YOU APPLY THE PRINCIPLES OF

MICROECONOMICS.  YOU KNOW, PRICES, DEMAND FOR CERTAIN PRODUCTS,

THE SUPPLY OF CERTAIN PRODUCTS TO THE MARKETPLACE, WHAT PRICES

PREVAIL IN THOSE CASES, AND OTHER AREAS WITHIN THE SPORTS

INDUSTRY.

**Q.**   AND DO YOU HAVE AN ADVANCED DEGREE IN ECONOMICS, SIR?

**A.**   YES. I HAVE A PH.D. IN ECONOMICS FROM UC BERKELEY.  AND I

FOCUSED ON THE SPORTS INDUSTRY DURING MY DISSERTATION WORK.

AND AFTER THAT, I WENT TO THE UNIVERSITY OF MASSACHUSETTS AND

TAUGHT IN THE SPORT MANAGEMENT DEPARTMENT THERE, WHICH IS

WIDELY CONSIDERED ONE OF THE TOP ONE OR TWO SPORT MANAGEMENT

DEPARTMENTS.

THEN AFTER THAT IS WHEN I CAME BACK TO THE BAY AREA,

MY HOME, AND STARTED TEACHING AT THE UNIVERSITY OF

SAN FRANCISCO.

**MR. HUMMEL:**  YOUR HONOR, WE ACTUALLY HAVE A

STIPULATION AMONG THE PARTIES AS TO THE QUALIFICATIONS UNDER

RULE 702 OF THE FEDERAL RULES OF EVIDENCE.

**MR. KESSLER:**  WE AGREED, YOUR HONOR, THAT ALL OF THE

EXPERTS FOR BOTH SIDES ARE QUALIFIED.

**THE COURT:**  WELL, THEN WHY DON'T YOU JUST MOVE ON?

1          **MR. HUMMEL:**  WE WILL, YOUR HONOR.  I TENDER

2   DR. RASCHER, THEN, PURSUANT TO THAT STIPULATION AS AN EXPERT IN

3   SPORTS ECONOMICS.

4          **THE COURT:**  ALL RIGHT.  YOU'RE GOING TO HEAR SOME --

5   NORMALLY, WE DON'T ALLOW ANYONE TO TESTIFY TO ANYTHING EXCEPT

6   WHAT THEY SAW OR THEY HEARD OR THEY DID.  YOU KNOW, YOU'VE

7   HEARD A LOT ABOUT THAT IN THIS TRIAL.

8          WE DO OCCASIONALLY ALLOW OPINIONS.  ONE OCCASION

9   WHERE OPINIONS COME IN, AS OPPOSED TO FACTS, IS WHENEVER THE --

10  WE HAVE AN EXPERT WITNESS.  AN EXPERT WITNESS IS SOMEONE WHO BY

11  SPECIAL TRAINING OR EDUCATION IS ALLOWED TO GIVE OPINIONS TO

12  THE JURY.

13         I'M PRETTY SURE IT'S GOING TO TURN OUT THAT THIS

14  WITNESS, AS WELL AS ANY EXPERTS ON THE OTHER SIDE, WERE NOT

15  PRESENT AT ANY OF THE EVENTS IN QUESTION.  RATHER, THEY'VE DONE

16  SOME REVIEWS AND THAT THEY HAVE FORMED OPINIONS BASED UPON

17  THOSE REVIEWS.

18         SO YOU NEED TO EVALUATE EXPERT TESTIMONY JUST LIKE

19  YOU WOULD ANY OTHER, EXCEPT THERE'S AN ADDITIONAL WRINKLE.  YOU

20  ALWAYS SHOULD BE THINKING ABOUT:  WHAT IS THIS OPINION BASED

21  ON?

22         AND, ALSO, IN OTHER WORDS, WHAT ARE THE UNDERLYING

23  FACTS AND ASSUMPTIONS, AND HAVE THOSE FACTS AND ASSUMPTIONS

24  BEEN PROVEN UP IN THE CASE?

25         SO THEN THAT'S THE MAIN POINT.

1      THIS IS GOING TO BE TRUE FOR ALL OF THE EXPERTS IN

2  THE CASE, NOT JUST THIS EXPERT.

3      ALL RIGHT.  GO AHEAD, MR. HUMMEL.

4      **MR. HUMMEL:**  THANK YOU, YOUR HONOR.

5  **BY MR. HUMMEL:**

6  **Q.**  NOW, DR. RASCHER, YOU WERE RETAINED BY PLAINTIFFS' COUNSEL

7  IN THIS CASE TO PROVIDE SOME OPINIONS?

8  **A.**  YES, THAT'S RIGHT.

9  **Q.**  WERE YOU PAID FOR THAT WORK?

10  **A.**  YES.

11  **Q.**  DO YOU HAVE ANY FINANCIAL INTEREST IN THE OUTCOME OF THIS

12  CASE?  IN OTHER WORDS, IF PLAINTIFFS PREVAIL, WILL YOU MAKE

13  MORE MONEY?

14  **A.**  NO.

15  **Q.**  YOU WERE PAID BY THE HOUR?

16  **A.**  I'M BEING PAID BY THE HOUR.  THAT'S RIGHT.

17  **Q.**  NOW, YOU WERE GIVEN SOME VERY SPECIFIC ASSIGNMENTS IN THIS

18  CASE BY PLAINTIFFS' COUNSEL, CORRECT?

19  **A.**  THAT'S RIGHT.

20  **Q.**  LET'S TALK ABOUT THEM ONE BY ONE.  AND WHAT I'M GOING TO

21  DO IS ASK SPECIFICALLY WHAT THE ASSIGNMENT WAS.  AND THEN, I'M

22  GOING TO ASK YOU WHAT YOU DID TO ANALYZE THE PROBLEM.  AND THEN

23  I'M GOING TO ASK YOU TO TELL THE LADIES AND GENTLEMEN OF THE

24  JURY WHAT YOUR CONCLUSION WAS, AND AS HIS HONOR POINTED OUT,

25  WHAT IT WAS BASED ON, OKAY?

1    **A.**   OKAY.

2    **Q.**   THAT'S WHAT WE'LL DO.

3            SO THE FIRST ASSIGNMENT YOU WERE GIVEN WAS THE

4    FOLLOWING:  DID THE RETIRED NATIONAL FOOTBALL LEAGUE PLAYERS

5    HELP TO MAKE THE GAME WHAT IT IS TODAY?

6            WAS THAT YOUR UNDERSTANDING OF YOUR ASSIGNMENT?

7    **A.**   YES.

8    **Q.**   AS AN ECONOMIST, AS A SPORTS ECONOMIST, HOW DID YOU GO

9    ABOUT EVALUATING THAT PROBLEM?

10   **A.**   RIGHT.  SO AS THAT QUESTION IS KIND OF A BROAD QUESTION OR

11   A NON-ECONOMIC QUESTION.  SO AS AN ECONOMIST I HAD TO LOOK AT

12   THAT AND SAY:  WHAT IS THE ECONOMIC MEANING OF THAT QUESTION?

13           AND SO I TOOK IT TO MEAN:  IS THE VALUE OF TODAY'S

14   NFL, THE GAMES, THE TEAMS, THE LICENSING RIGHTS, IS THAT

15   AFFECTED BY PLAYERS IN THE PAST, PERFORMANCES IN THE PAST,

16   TEAMS IN THE PAST?

17           IN OTHER WORDS, DOES THE BRAND AND FAN LOYALTY BUILD

18   UP OVER TIME SO THAT AFFECTS PEOPLE'S DECISIONS TODAY TO BUY

19   LICENSED MERCHANDISE OR BUY TICKETS OR WATCH IT ON TELEVISION

20   AND SO FORTH.

21   **Q.**   THAT'S HOW YOU INTERPRETED THE QUESTION.  NOW, WHAT DID

22   YOU DO TO ANALYZE THAT QUESTION?

23   **A.**   SO I LOOKED AT -- SO ANOTHER THING ECONOMISTS DO IS WE

24   LOOK AT PEER-REVIEWED ECONOMIC RESEARCH OR PUBLISHED RESEARCH.

25           AND SO ONE OF THE THINGS I DID WAS I WENT OUT AND

LOOKED AT THE LITERATURE. RESEARCH THAT'S BEEN -- GONE THROUGH

A PEER-REVIEW PROCESS AND THEN GETS PUBLISHED IN ECONOMIC

JOURNALS.

     I LOOKED AT MARKET ACTIVITY. ANOTHER THING THAT

ECONOMISTS DO IS WE LOOK AT ACTUAL TRANSACTIONS IN THE

MARKETPLACE, ACTIVITY IN THE MARKETPLACE AND SEE IF WE CAN

GLEAN SOME INFORMATION FROM THAT.

**Q.** OKAY. AND DID YOU DO THAT IN CONNECTION WITH THIS PROBLEM

WHICH, AGAIN, WAS: DID THE RETIRED NFL PLAYERS HELP MAKE THE

GAME WHAT IT IS TODAY?

**A.** YES.

**Q.** SO WHEN YOU LOOKED AT THAT, WHAT WERE YOUR CONCLUSIONS?

**A.** SO, FOR INSTANCE, ONE OF THE PEER REVIEW ARTICLES I LOOKED

AT WHICH WAS VERY COMPELLING WAS BY PROFESSOR STEVEN ROSS AND

HIS COLLEAGUES AT THE UNIVERSITY OF MINNESOTA.

     HE SHOWED THAT -- THAT TEAM HISTORY -- AND THIS WAS

AN EMPIRICAL ARTICLE, MEANING THAT HE GATHERED DATA FROM THE

INDUSTRY AND DID SURVEYS AND SO FORTH.

     I'M SORRY ABOUT SPEAKING FAST.

     HE FOUND THAT TEAM HISTORY -- AND THE ELEMENT OF TEAM

HISTORY THAT'S IMPORTANT HERE IS THE HISTORY OF THE TEAM'S

PERSONNEL. SO SPECIFICALLY THE PLAYERS ON THE TEAM AND THE

COACHES ON THE TEAM.

     THE HISTORY OF THE TEAM'S PERSONNEL WAS IMPORTANT IN

DEVELOPING THE BRAND OF THAT TEAM. SO OVER TIME, THAT BRAND

1    GETS BUILT UP BY THE PLAYERS ON THE TEAM AND BY OTHER FACTORS.

2           AND SO TODAY, THE VALUE OF THAT BRAND, THE ABILITY TO

3    SELL LICENSED MERCHANDISE, TO BE ABLE TO DRAW PEOPLE TO GAMES

4    AND WATCH ON TELEVISION IS AFFECTED BY THE HISTORY OF THE

5    FRANCHISE, FOR INSTANCE.

6           THAT WAS ONE EXAMPLE.

7           ANOTHER EXAMPLE IS BY PROFESSOR UNDERWOOD AND HIS

8    COLLEAGUES.  HE SHOWED THAT THE -- THAT THERE'S AN APPRECIATION

9    AND RECOGNITION OF FORMER TEAMS AND PLAYERS THAT HAS A FACTOR

10   IN DEVELOPING FAN LOYALTY.

11          SO IT'S NOT SURPRISING THAT OVER TIME, IF ANY OF YOU

12   ARE SPORTS FANS OR NOT, IF YOU KNOW SPORTS FANS, OVER TIME THEY

13   DEVELOP A PASSION FOR THAT TEAM, AN EMOTIONAL ATTACHMENT TO

14   THAT TEAM.

15          SO THESE, AMONG OTHER RESEARCH ARTICLES, SHOW THAT

16   THAT, IN FACT, IS THE CASE.  AND THAT EVENTUALLY LEADS TO

17   PEOPLE BUYING MORE TICKETS, BUYING MORE LICENSED MERCHANDISE

18   AND SO FORTH.

19   Q.   SO DID YOU DRAW ANY CONCLUSION AS A MATTER OF ECONOMICS AS

20   TO THE VALUE TO WOULD-BE LICENSEES TO USE NAMES OR LIKENESSES

21   OF CURRENT OR FORMER PLAYERS BASED ON THOSE CONCLUSIONS YOU

22   REACHED?

23   A.   I DIDN'T -- I DIDN'T CONCLUDE A QUANTITATIVE NUMBER.  I

24   DIDN'T SET OUT TO SAY WHAT IS THE EXACT DOLLAR VALUE OF RETIRED

25   FOOTBALL PLAYERS' LICENSING RIGHTS AND SO FORTH.

1          WHAT I SHOWED WAS REALLY A QUALITATIVE RESULT, WAS

2     THAT THE VALUE OF -- OF TODAY'S LICENSING RIGHTS, TICKET SALES,

3     THE ENTIRE DEMAND FOR THE PRODUCT IS AFFECTED BY THE PLAYERS

4     FROM THE PAST.

5          THERE'S A LOT OF OTHER EVIDENCE, TOO, FROM THE

6     MARKETPLACE.

7          FOR INSTANCE, I KNOW YOU'VE HEARD ABOUT THE EA MADDEN

8     FOOTBALL GAME, I IMAGINE.  IN THAT GAME YOU CAN PLAY WITH

9     ACTIVE PLAYERS.  YOU CAN PLAY WITH RETIRED PLAYERS.  YOU CAN

10    PLAY WITH HISTORICAL TEAMS.

11         SO IT'S A PRINCIPLE IN ECONOMICS IF A BUSINESS, A

12    SAAVY BUSINESS LIKE ELECTRONIC ARTS GOES OUT AND SIGNS UP

13    RETIRED PLAYERS AND PUTS ALL THESE PLAYERS IN THE GAME AND GETS

14    THE STATISTICS RIGHT AND EVERYTHING, THAT THEY PERCEIVE THERE'S

15    GOING TO BE A VALUE TO THAT, THAT THEY ARE DOING THAT FOR A

16    REASON SO THEY CAN SELL MORE GAMES.

17         GOING OUT TO THE MARKETPLACE, THAT'S A PIECE OF

18    EVIDENCE THAT THE RETIRED PLAYERS AND THE TEAMS OF THE PAST

19    HAVE VALUE IN TODAY'S MARKETPLACE.

20    Q.   SO IF THIS JURY WERE TO CONCLUDE THAT EA SPORTS, IN FACT,

21    UTILIZED HISTORIC OR RETIRED -- HISTORIC TEAMS OR RETIRED

22    PLAYERS IN ITS GAME, WOULD THAT INDICATE ANYTHING TO YOU ABOUT

23    WHETHER OR NOT THERE WAS A VALUE OF THOSE RETIRED PLAYERS?

24         **MR. KESSLER:**  YOUR HONOR, I OBJECT.  THIS WAS NOT IN

25    HIS -- HIS DISCLOSED FIRST EXPERT REPORT.  AND, THEREFORE,

1   UNDER YOUR HONOR'S RULES THIS IS A SUBJECT HE CAN'T COVER.

2            **MR. HUMMEL:**  PAGE 5, LINES 2 THROUGH 4.

3            AND YOU HAVE IT, YOUR HONOR.

4        **THE COURT:**  MAY I SEE THE REPORT, PLEASE?

5        **MR. HUMMEL:**  SURE.  I HANDED YOU A NOTEBOOK OF THE

6   REPORT.

7            **THE COURT:**  THIS IS THE ORIGINAL REPORT?

8            **MR. HUMMEL:**  THE ORIGINAL REPORT, YOUR HONOR, PAGE 5,

9   LINES 2 THROUGH 4.

10           **THE COURT:**  OKAY.  AND THE QUESTION, AGAIN, IS WHAT?

11           **MR. HUMMEL:**  COULD I HAVE IT READ BACK, PLEASE.

12           (THE REPORTER READ THE PENDING QUESTION AS FOLLOWS:)

13           "**QUESTION:**  SO IF THIS JURY WERE TO CONCLUDE

14           THAT EA SPORTS, IN FACT, UTILIZED HISTORIC OR

15           RETIRED -- HISTORIC TEAMS OR RETIRED PLAYERS

16           IN ITS GAME, WOULD THAT INDICATE ANYTHING TO

17           YOU ABOUT WHETHER OR NOT THERE WAS A VALUE OF

18           THOSE RETIRED PLAYERS?")

19           **MR. KESSLER:**  I THINK THAT'S FAIR, YOUR HONOR.

20           **THE COURT:**  I THINK YOU'RE RIGHT, MR. KESSLER.

21           WE'LL ALLOW THE QUESTION.

22           THANK YOU.

23           **MR. HUMMEL:**  THANK YOU, YOUR HONOR.

24  **BY MR. HUMMEL:**

25  **Q.**   DO YOU HAVE THE QUESTION IN MIND, SIR?

**A.**   YES.  SIMILAR TO WHAT I HAD JUST STATED, WHICH WAS THAT
THE EA BUILDS THESE GAMES, AND THEY WANT TO SELL UNITS, RIGHT?
SO THEY PUT THE ACTIVE PLAYERS IN THERE, AND THEY PUT THE
RETIRED PLAYERS IN THERE, AND THE HISTORIC TEAMS.

AND THEY DO THAT TO INCREASE THE -- YOU KNOW, TO SELL
MORE GAMES.

SO THE LICENSING RIGHTS THAT THE ACTIVE PLAYERS AND
RETIRED PLAYERS GIVE UP OR ESSENTIALLY SELL TO PUT IN THOSE
GAMES CLEARLY HAS -- HAS VALUE.

**Q.**   ALL RIGHT.  LET'S MOVE ON TO THE SECOND ONE OF YOUR
ASSIGNMENTS.

IT WAS -- AND I'LL READ THIS:

"DO THE NFLPA AND NFL PI'S LM-2 DOCUMENTS
SUBMITTED ANNUALLY TO THE UNITED STATES DEPARTMENT OF LABOR
ACCURATELY REFLECT THE LICENSING REVENUES THAT HAVE ACTUALLY
BEEN PAID TO PLAYERS?"

DO YOU RECALL THAT WAS YOUR SECOND ASSIGNMENT?

**A.**   YES.

**Q.**   AND CAN YOU TELL THE LADIES AND GENTLEMEN OF THE JURY WHAT
AN "LM-2" IS, AS YOU UNDERSTAND IT?

**A.**   SO AN LM-2 IS A FILING THAT UNIONS SUBMIT TO THE
DEPARTMENT OF LABOR IN ORDER TO BE TRANSPARENT.  SOME UNIONS IN
THE PAST UNITED STATES HISTORY HAVE MAYBE MISAPPROPRIATED FUNDS
OR EMBEZZLED FUNDS OR MISMANAGED FUNDS, OR WHATEVER.

SO THE DEPARTMENT OF LABOR REQUIRES THESE UNIONS TO

1  SUBMIT AN LM-2 DOCUMENT.  IT'S ESSENTIALLY SHOWING THE CASH

2  FLOWS COMING IN AND THE CASH FLOWS GOING OUT.

3  **Q.**   DID YOU, SIR, IN COMPLETING THIS ASSIGNMENT REVIEW THE

4  LM-2 FORMS THAT WERE SUBMITTED BY THE NFLPA AND PI TO THE

5  UNITED STATES DEPARTMENT OF LABOR?

6  **A.**   YES, I DID.  I REVIEWED EACH YEAR DURING THE CLASS PERIOD.

7  **Q.**   AND DID YOU, BASED ON THAT REVIEW AND BASED ON YOUR REVIEW

8  OF THE INTERNAL FINANCIAL DOCUMENTS OF THE DEFENDANTS', DRAW

9  ANY CONCLUSION ABOUT WHETHER THE LM-2S ACCURATELY REFLECT THE

10 LICENSING REVENUES THAT HAVE ACTUALLY BEEN PAID TO THE PLAYERS?

11 **A.**   YES, I DID.  SO IF YOU LOOK AT THE LM-2S, THEY DON'T

12 REFLECT THE SHARED GROUP LICENSING REVENUES THAT ARE REFLECTED

13 WHEN YOU GET THE INTERNAL BUSINESS DOCUMENTS FROM THE NFLPA.

14         THEY TURN THOSE OVER IN DISCOVERY.  SO WHEN YOU LOOK

15 AT THE INTERNAL BUSINESS DOCUMENTS YOU CAN TRACK THROUGH.  IN

16 FACT, I RECEIVED ACTUAL SPREADSHEETS SO I COULD KIND OF TRACK

17 THROUGH IN EXCEL AND EVERYTHING.

18         AND YOU CAN TRACK THROUGH THERE, AND YOU CAN MATCH

19 THOSE NUMBERS UP WITH THE AGREEMENT BETWEEN THE PLAYERS

20 ASSOCIATION AND PLAYERS INC.

21         WHEN YOU LOOK AT THE LM-2S, IT JUST DOESN'T -- THOSE

22 NUMBERS JUST DON'T MATCH UP.

23 **Q.**   AND CAN YOU TELL THE LADIES AND GENTLEMEN OF THE JURY HOW

24 THEY DON'T MATCH UP?  CAN YOU DESCRIBE THAT?

25 **A.**   WELL, THE INTERNAL BUSINESS DOCUMENTS -- SO WHEN GROUP --

1    SHARED GROUP LICENSING REVENUE COMES IN, THE PLAYERS

2    ASSOCIATION AND PLAYERS INC TAKE A CHUNK.  AND IN 2003, THEY

3    TOOK 64 PERCENT, AND THE PLAYERS GOT 36 PERCENT.

4            SO THE UNION KEPT 64 PERCENT OF THE LICENSING, THE

5    SHARED GROUP LICENSING REVENUE, AND 36 PERCENT WENT TO THE

6    PLAYERS.

7            IN 2004, THE SAME NUMBER.  2005, THE SAME NUMBER.

8            IN 2006, THE PLAYERS GOT 31 PERCENT INSTEAD OF

9    36 PERCENT, LIKE THEY HAD RECEIVED IN THE YEARS BEFORE.

10            AND IN 2007, THEY RECEIVED 32 PERCENT.  NOW, THAT ALL

11    COMES FROM THE INTERNAL BUSINESS DOCUMENTS.

12    Q.   IT DOES NOT COME FROM THE -- YOU CAN'T TELL THAT BASED ON

13    WHAT PUBLICLY FILED WITH THE UNITED STATES DEPARTMENT OF LABOR;

14    IS THAT RIGHT?

15            **MR. KESSLER:**  YOUR HONOR, HE'S LEADING AN EXPERT.

16    **BY MR. HUMMEL:**

17    Q.   CAN YOU TELL THAT?

18    A.   NO, YOU CAN'T TELL THAT.

19            **THE COURT:**  IT IS LEADING.  I AM GOING TO ALLOW IT IN

20    THIS INSTANCE.

21            GO AHEAD.

22            **THE WITNESS:**  SO THE LM-2 -- SO THE LM-2, IT LOOKS

23    LIKE THE PLAYERS ARE RECEIVING A HIGHER SHARE OF THE GROUP

24    LICENSING REVENUES.

25

**BY MR. HUMMEL:**

**Q.**   ALL RIGHT.   NOW, DID YOU -- YOU JUST REFERENCED THAT YOU

DID AN ANALYSIS LOOKING AT THE INTERNAL FINANCIAL DOCUMENTS OF

THE DEFENDANTS, AND YOU DETERMINED PRECISELY BASED ON THE FLOW

OF FUNDS HOW MUCH, IN FACT, WAS RETAINED BY THE UNION AND HOW

MUCH WAS PAID TO THE PLAYERS; IS THAT RIGHT?   IS THAT WHAT YOU

DID?

**A.**   YES.

**Q.**   AND DID YOU PREPARE A SUMMARY CHART BASED ON YOUR REVIEW?

**A.**   YES.

**Q.**   COULD I SHOW, PLEASE -- WOULD YOU TAKE A LOOK AT EXHIBIT

1208?   DON'T PUT IT ON THE BOARD YET.

**A.**   IS THAT THE FIRST ONE HERE?

**Q.**   IT'S 1208.   THERE SHOULD BE A LITTLE TAB NUMBER ON THERE.

        DO YOU HAVE 1208 IN FRONT OF YOU, DR. RASCHER?

**A.**   YES, I DO.

**Q.**   WOULD YOU LOOK AT THE THIRD -- WELL, YEAH, IT'S THE THIRD

PAGE OF THAT EXHIBIT.

**A.**   OKAY.

**Q.**   DO YOU HAVE THAT IN FRONT OF YOU?

**A.**   YES.

**Q.**   AND CAN YOU DESCRIBE FOR THE LADIES AND GENTLEMEN OF THE

JURY WHAT IT SAYS AT THE TOP?

**A.**   IT SAYS:

            "NFLPA, NFL PI LICENSING SPLITS PER NFLPA/NFL PI

1   SPREADSHEETS."

2   **Q.**   WAS THIS A DOCUMENT PREPARED BY YOU OR UNDER YOUR

3   SUPERVISION?

4   **A.**   YES.

5   **Q.**   IS IT AN ACCURATE REFLECTION OR SUMMARY OF DOCUMENTS

6   PRODUCED BY THE DEFENDANTS IN THIS CASE?

7   **A.**   YES.

8           **MR. HUMMEL:**   YOUR HONOR, I'D MOVE ADMISSION OF PAGE

9   2, EXHIBIT 2 OF 1208, AND ASK IT BE DISPLAYED TO THE JURY.

10          **MR. KESSLER:**   NO OBJECTION TO THAT PAGE.

11          **THE COURT:**   PAGE WHAT?

12          **MR. HUMMEL:**   IT'S THE THIRD PAGE OF TRIAL EXHIBIT

13  1208.  IT'S A SUMMARY.

14          **THE COURT:**   THIRD PAGE IS RECEIVED.

15          **MR. HUMMEL:**   THANK YOU, YOUR HONOR.

16          I'LL CALL IT 1208A.

17          **THE COURT:**   HOW ABOUT–3?

18          **MR. HUMMEL:**   DASH 3.  1208–3.

19          (TRIAL EXHIBIT 1208–3 RECEIVED IN EVIDENCE.)

20          ALL RIGHT.  CAN YOU BLOW THAT UP FOR THE JURY,

21  PLEASE?

22          (DOCUMENT DISPLAYED.)

23  **BY MR. HUMMEL:**

24  **Q.**   DR. RASCHER, CAN YOU EXPLAIN TO THE JURY BRIEFLY WHAT THIS

25  SHOWS?

1 **A.** YES.  IF YOU GO TO THE BOTTOM LINE -- WE'LL START THERE AT

2 THE BOTTOM -- THAT'S -- THOSE ARE THE NUMBERS THAT I HAD JUST

3 TOLD YOU ABOUT.

4    SO YOU CAN SEE UNDER 2003 --

5 **Q.** HANG ON.

6 **A.** YEAH.

7 **Q.** WHICH BOTTOM LINE?

8 **A.** SORRY.  THE BOTTOM LINE OF THE ENTIRE PICTURE THERE.

9 **Q.** "IN AGGREGATE"?

10 **A.** YES.  THANK YOU.

11    SO WHAT THAT SHOWS, THE THIRD BOX THERE YOU CAN SEE

12 THAT IT SAYS "PLAYER PERCENTAGE."

13    WHAT THAT SHOWS IS IN 2003, THE PLAYERS RECEIVED

14 36 PERCENT OF THE SHARED GROUP LICENSING REVENUE.

15    NOW, IF YOU GO STRAIGHT UP TO THE SECOND BOX, WHERE

16 IT SAYS "NFL PI PERCENTAGE," AND THAT'S THE TOP.  THAT'S WHERE

17 IT SAYS "NFLPA PERCENTAGE," CORRECT.

18    YOU CAN SEE THAT IF YOU ADD THOSE TOGETHER THAT'S THE

19 64 PERCENT THAT THE UNION AND PI KEPT.

20    SO IN 2003, THE PLAYERS RECEIVED 36 PERCENT, AND THE

21 UNION AND PI COMBINED RECEIVED 64 PERCENT.

22    NOW, IN 2006, YOU CAN SEE THAT IT DROPPED, WHAT THE

23 PLAYERS RECEIVED DOWN TO 31 PERCENT, WHICH, AGAIN, THIS IS THE

24 BOTTOM LINE OF THE ENTIRE GRAPHIC UP THERE.

25 **Q.** LET ME STOP YOU RIGHT THERE.

1  **A.**    OKAY.

2  **Q.**    DO YOU KNOW OR DO YOU HAVE AN OPINION BASED ON YOUR REVIEW

3  OF THE FINANCIAL RECORDS WHY IT DROPPED FROM 36 PERCENT TO

4  31 PERCENT?

5  **A.**    YES.

6  **Q.**    WHAT'S YOUR UNDERSTANDING, SIR?

7  **A.**    THE -- IN 2006, THE PLAYERS ASSOCIATION AND PLAYERS INC

8  DECIDED TO TAKE SHARED GROUP LICENSING REVENUE, A CERTAIN

9  AMOUNT OF IT, IN PARTICULAR $8 MILLION.

10         SO THE YEAR BEFORE THOSE MONIES WERE BEING SHARED AT

11  THE 36 PERCENT/64 PERCENT SPLIT.  AND THEN, THEY DECIDED TO

12  TAKE THAT AND GIVE THE PLAYERS ZERO PERCENT AND SHARE THAT

13  AMONGST THEMSELVES AT, I THINK, A 60 TO 40 PERCENT SPLIT.

14         AND THE REASON GIVEN IN THE -- IN THE EVIDENCE THAT

15  I'VE SEEN IS THAT THEY'RE VALUING THE LOGO OF PLAYERS INC AND

16  PLAYERS ASSOCIATION, AND SO THAT'S NOT FOR THE PLAYERS, YOU

17  KNOW, IS WHAT I'VE SEEN IN THE EVIDENCE.  SO THEY --

18  **Q.**    I'M SORRY.  HAVE YOU SEEN IN YOUR REVIEW OF THE DOCUMENTS

19  ANY INDEPENDENT ASSESSMENT OF THE FAIRNESS OF THAT REALLOCATION

20  THAT RESULTED IN THE 36 TO 31 PERCENT DEDUCTION?

21  **A.**    NO, I HAVE NOT SEEN ANY EVIDENCE THAT THEY'VE TRIED TO

22  VALUE WHAT THAT SHOULD BE WORTH, OR THAT THEY SHOULD EVEN DO IT

23  IN THE FIRST PLACE OR ANYTHING LIKE THAT.

24  **Q.**    ALL RIGHT.  JUST SO WE'RE CLEAR, YOU'VE BROKEN IT OUT

25  BETWEEN NFLPA, NFL PI AND THE PLAYER.  HOW DID THE UNION, IF

1  YOU'VE FORMED AN OPINION ABOUT THIS, ACTUALLY TREAT THEIR

2  FINANCIALS WITH PI?

3  **A.**  WELL, THE NFL PI AND NFLPA -- NFL PI IS A SUBSIDIARY

4  HUNDRED PERCENT OWNED BY NFLPA.  THEY SHARE THE SAME EXECUTIVES

5  AND DECISION-MAKERS, AND SO FORTH, SO IT'S REALLY ONE AND THE

6  SAME.

7  **Q.**  DID THEY FILE SEPARATE OR CONSOLIDATED FINANCIAL

8  STATEMENTS?

9  **A.**  THEY FILED CONSOLIDATED FINANCIAL STATEMENTS.

10  **Q.**  ALL RIGHT.  AND JUST TO FINISH UP THIS ONE TOPIC, THESE

11  NUMBERS, THESE AGGREGATE PLAYER PERCENTAGES, WHERE THE PLAYER

12  GOT 31 PERCENT IN '06, 32 PERCENT IN '07, THAT WAS NOT

13  PUBLICLY-DISCLOSED TO THE LABOR DEPARTMENT, RIGHT?

14  **A.**  WHEN YOU LOOK AT THE LM-2 DOCUMENTS, YOU CAN'T TELL THAT

15  THAT'S IN THERE AT ALL.

16  **Q.**  CAN'T SEE IT.  OKAY.

17        NOW, LET'S GO TO YOUR NEXT ASSIGNMENT, WHICH WAS:

18  YOU WERE ASKED, QUOTE.

19          "HOW DOES -- HOW DO THOSE PERCENTAGES RETAINED

20  BY THE UNION AND PI COMPARE WITH OTHER PROFESSIONAL SPORTS

21  UNIONS OR THIRD-PARTY LICENSING ENTITIES?  HOW DOES THE

22  PERCENTAGE KEPT BY NFLPA PI COMPARE TO WHAT IS CUSTOMARY IN

23  SPORTS LICENSING?"

24          DO YOU HAVE EXPERIENCE IN THIS AREA SUCH THAT -- OR

25  LEARNED STUDY IN THIS AREA SUCH THAT YOU CAN OFFER AN OPINION

1  IN THAT AREA?

2  **A.**   YES, I HAVE PUBLISHED IN THE AREA OF THE SPORTS LICENSING.

3  I'VE WORKED ON OTHER LAWSUITS INVOLVED IN SPORTS LICENSING,

4  MAJOR LEAGUE SOCCER, FOR INSTANCE.

5         I VALUE ENDORSEMENTS AND SPONSORSHIPS WHICH ARE

6  CLOSELY RELATED TO LICENSING.

7  **Q.**   SO TO ANSWER THAT QUESTION AS TO HOW THIS COMPARES TO

8  COMPARABLES, WHAT DID YOU DO?

9  **A.**   SO I WENT OUT AND LOOKED -- AND LOOKED AT OTHER SITUATIONS

10  WHERE THERE'S A LICENSING ENTITY.  THERE'S A SET OF LICENSING

11  LICENSES, AND THOSE ARE BEING SOLD.  AND IF THERE'S AN OUTSIDE

12  THIRD PARTY SELLING THEM, WHAT COMMISSION, WHAT RATE DO THEY

13  CHARGE BEFORE THEY GIVE THE LICENSING REVENUES TO THE

14  LICENSORS?

15         SO, AS AN EXAMPLE, COLLEGIATE LICENSING COMPANY,

16  THEY'VE GOT HUNDREDS OF COLLEGES AND UNIVERSITIES AS THEIR

17  CLIENTS.  THEY'LL TAKE THE LICENSING RIGHTS FROM THE

18  UNIVERSITY, AND THEY'LL GO OUT AND SELL THEM IN THE

19  MARKETPLACE.

20         SO IF YOU GO BUY, YOU KNOW, SHIRTS AND JERSEYS AND

21  CUPS AND MUGS AND EVERYTHING, THOSE ARE LICENSED PRODUCTS.

22         THEY'LL CHARGE A FEE OF ABOUT 15 TO 20 PERCENT.

23  MEANING THAT THE UNIVERSITY, LIKE CAL BERKELEY, FOR INSTANCE,

24  IS ONE OF THEIR CLIENTS, THE UNIVERSITY WILL KEEP 85 PERCENT OR

25  80 PERCENT OF LICENSING REVENUES, AND THE COMMISSION WILL BE 15

1   TO 20 PERCENT.

2           FROM A LEADING TEXTBOOK IN SPORTS MANAGEMENT MENTIONS

3   A RATE OF ABOUT 20 PERCENT.  ANOTHER BOOK MENTIONS A RATE FOR

4   SMALLER LEAGUES UP TO 35 PERCENT.

5           SO YOU CAN SEE THAT THERE'S -- THERE'S SOME RANGE

6   THERE, DEPENDING ON THE CIRCUMSTANCES.

7           NOW, THIS BRINGS UP A GOOD POINT ABOUT SMALLER

8   LEAGUES.

9           IF YOU'RE GOING TO PUT A LICENSING PROGRAM TOGETHER

10  THERE'S GOING TO BE SOME OVERHEAD COSTS AND SOME UPFRONT COSTS.

11  IF YOU CAN'T SELL MUCH IN LICENSING REVENUES, THEN YOU'RE NOT

12  GOING TO GET VERY MUCH BACK TO COVER THOSE COSTS.

13          AND SO THE AMOUNT OF KIND OF LEFT OVER LICENSING

14  REVENUE THAT YOU CAN GIVE TO THE LICENSORS IS PROBABLY GOING TO

15  BE SMALLER.

16          **MR. KESSLER:**  YOUR HONOR, I ASK THAT WE GET A FRESH

17  QUESTION.  THIS WITNESS IS NOW GOING OFF ON ANOTHER SUBJECT

18  AND --

19          (COUNSEL AND THE COURT SPEAKING SIMULTANEOUSLY, WHICH

20          WAS NOT REPORTABLE.)

21          **THE COURT:**  THAT'S TRUE.

22          I'M NOT BEING CRITICAL OF YOU, MR. RASCHER, BUT WE'VE

23  GOT TO HAVE QUESTIONS AND ANSWERS.

24          SO THE ANSWER'S GOT TO BE LIKE THREE OR FOURS

25  SENTENCES LONG, SO THAT WE CAN GET A NEW -- THAT WAY COUNSEL

1    GETS A CHANCE TO OBJECT TO THE NEXT QUESTION.

2            ALL RIGHT.  NEW QUESTION.

3            **MR. HUMMEL:**  THANK YOU, YOUR HONOR.

4    **BY MR. HUMMEL:**

5    **Q.**  SO, DR. RASCHER, DID YOU LOOK AT COMPARABLES TO RENDER AN

6    OPINION ABOUT WHETHER OR HOW THE NFLPA AND PI COMPARED TO WHAT

7    IS CUSTOMARY IN SPORTS LICENSING?

8    **A.**  YES.

9    **Q.**  DESCRIBE THE COMPARABLES YOU LOOKED AT.

10   **A.**  OKAY.  SO I MENTIONED THE CLC, THE COLLEGIATE LICENSING

11   COMPANY, ABOUT 15 TO 20 PERCENT, AND A COUPLE OTHERS I

12   MENTIONED.

13           MAJOR LEAGUES BASEBALL PLAYERS ASSOCIATION IS A

14   COMPARABLE.  IT'S ANOTHER PROFESSIONAL LEAGUE WITH A UNION.

15   MAJOR LEAGUE BASEBALL PLAYERS ASSOCIATION, THEY SELL GROUP

16   LICENSING, SHARED GROUP LICENSING, ALSO.  OR THEY PACKAGE IT,

17   AND THEY SELL IT OUT TO THE MARKETPLACE.

18           THEY KEEP ABOUT 38 TO 39 PERCENT.  SO, IN THIS

19   EXAMPLE, YOU CAN SEE THE NFLPA PA/PI KEEPS 64 PERCENT OR AS

20   HIGH AS 69 PERCENT, AND THE REST GO TO THE PLAYERS.

21           IN BASEBALL, IT'S REALLY THE OPPOSITE.  THE PLAYERS

22   RECEIVE OVER 60 PERCENT, AND THE UNION, THE BASEBALL UNION

23   KEEPS ABOUT 38 OR 39 PERCENT.

24   **Q.**  SO DO YOU HAVE ANY OVERALL OPINION THAT YOU CAN OFFER FOR

25   THIS JURY AS A GUIDE TO THEM AS TO WHAT'S CUSTOMARY IN SPORTS?

1  **A.**   YEAH.   CUSTOMARY RANGE IN SPORTS FOR SELLING THESE

2  LICENSES WOULD BE SOMEWHERE BETWEEN 10 AND 40 PERCENT.

3  **Q.**   OKAY.  NOW, FINAL ASSIGNMENT THAT WAS GIVEN TO YOU WAS THE

4  FOLLOWING:

5            "WHAT EFFECT, IF ANY, WAS THE FACT THAT THE

6  NFLPA NFL PI REPRESENTS BOTH THE ACTIVE AND THE RETIRED PLAYERS

7  FOR GROUP LICENSING HAVE ON THE BARGAINING POSITION OF THE

8  NFLPA NFL PI WITH RESPECT TO RETIRED PLAYERS AND LICENSEES?"

9            DID YOU LOOK AT THAT QUESTION?

10 **A.**   YES, I DID.

11 **Q.**   HOW DID YOU BRING YOUR EXPERTISE IN SPORTS ECONOMICS TO

12 BEAR ON THAT QUESTION?

13 **A.**   WELL, ONE AREA THAT ECONOMISTS FOCUS ON OFTEN IS, AS I

14 MENTIONED BEFORE, IN MARKETS.  YOU'VE GOT SUPPLY AND YOU'VE GOT

15 DEMANDS.

16            SO IN THIS CASE YOU'VE GOT THE PLAYERS GROUPING THEIR

17 LICENSING RIGHTS TOGETHER AND SUPPLYING THOSE TO THE MARKET.

18            THE MARKET, IN RETURN, EA SPORTS, TOPPS, YOU KNOW,

19 FOR TRADING CARDS, ADIDAS FOR CLOTHING, AND SO FORTH, THEY

20 DEMAND THESE LICENSES SO THEN THEY CAN GO OUT AND SELL

21 PRODUCTS.

22            AND SO WITH RESPECT TO THE SHARED GROUP LICENSES OF

23 THE NFLPA, THE ACTIVE PLAYERS ARE AUTOMATICALLY BEING

24 REPRESENTED BY THE NFLPA. THAT'S PART OF WHAT HAPPENS IN THE

25 UNION.

1    SO EA, FOR INSTANCE, COULDN'T GO TO A THIRD PARTY AND

2 SAY:

3         "WE WOULD LIKE TO GET ACTIVE FOOTBALL PLAYERS OR

4 A GROUP OF -- A LARGE ENOUGH GROUP OF ACTIVE FOOTBALL PLAYERS."

5         THEY WOULD GO DIRECTLY TO THE PLAYERS ASSOCIATION.

6         SO THAT GIVES THE PLAYERS ASSOCIATION LEVERAGE IN THE

7 MARKETPLACE, BECAUSE IF YOU WANT TO MAKE A PRODUCT WITH ACTIVE

8 FOOTBALL PLAYERS YOU WOULD HAVE TO GO TO THE PLAYERS

9 ASSOCIATION.

10        NOW, WHEN THE PLAYERS ASSOCIATION SIGNS A CONTRACT

11 WITH EA TO MAKE VIDEO GAMES -- SO THEY'RE OVER HERE, THE

12 PLAYERS ASSOCIATION IS SIGNING A CONTRACT WITH EA.  A RETIRED

13 PLAYER ALL OF A SUDDEN IS AFFECTED BY THAT.  BECAUSE THERE'S A

14 CLAUSE CALLED "A NONINTERFERENCE CLAUSE," THAT SAYS THAT IF EA

15 WANTS TO GET ANY MORE PLAYERS, SUCH AS RETIRED PLAYERS, THAT

16 THEY HAVE TO GO THROUGH THE PLAYERS ASSOCIATION IN ORDER TO PUT

17 THOSE PLAYERS IN THE GAME.

18        SO EFFECTIVELY, WHAT THAT DOES IS IT MAKES THE

19 PLAYERS ASSOCIATION THE SINGLE SELLER OF ALL OF THESE LICENSING

20 RIGHTS, ACTIVE PLAYERS, RETIRED PLAYERS.  AND SO THEY CAN GO

21 OUT TO THE MARKETPLACE AND SAY:

22         "WE'VE GOT EVERYBODY.  YOU KNOW, COME TO US AND

23 WE'LL -- WE'LL GET YOU THOSE LICENSING RIGHTS."

24        SO IT GIVES THEM LEVERAGE SO THEY CAN CHARGE A HIGHER

25 LICENSING FEE THAN IF EA COULD GO OUT AND GET THESE FROM A

1  BUNCH OF OTHER DIFFERENT GROUPS.

2  **Q.**   DID YOU REACH ANY CONCLUSION ABOUT WHETHER THIS -- THIS

3  BENEFIT TO THE UNION OF HAVING ACTIVES AND RETIRED PLAYERS HAS

4  ANY -- ALLOWS THE UNION TO EXERCISE ANY LEVERAGE OVER ITS OWN

5  MEMBERS?

6  **A.**   RIGHT.  AND SO IT'S INTERESTING.  I MEAN, WHEN YOU GROUP

7  LICENSES TOGETHER IT LOWERS THE COST OF DOING THE LICENSING.

8  SO THAT'S POSITIVE.

9         IT LOWERS THE COST FOR EA BECAUSE THEY CAN GO TO ONE

10  SPOT IN TERMS OF THEIR COSTS OF GETTING ALL THESE SIGNED UP.

11         IT LOWERS THE COST -- NOT THE COST.  IT LOWERS THE

12  COST TO THE PLAYERS ASSOCIATION BECAUSE THEY'VE GOT EVERYONE

13  TOGETHER.

14         AT THE SAME TIME, THE RETIRED PLAYERS IN THIS CASE

15  DON'T HAVE VOTING RIGHTS IN THE UNION.  AND SO THE EXTENT TO

16  WHICH THE PLAYERS ASSOCIATION IS GOING TO GIVE SOME OF THOSE

17  LICENSING RIGHTS TO THE RETIRED PLAYERS THEY DON'T HAVE AS MUCH

18  CONTROL BECAUSE THEY DON'T HAVE VOTING RIGHTS.

19         AND SO I DIDN'T STUDY THAT, IN PARTICULAR, ABOUT THE

20  UNION.  I DIDN'T LOOK INSIDE THE UNION AND SEE IF THAT WAS THE

21  CASE.  BUT YOU CAN SEE THAT THE RETIRED PLAYERS DON'T HAVE

22  VOTING RIGHTS, AND SO THEY DON'T HAVE AS MUCH ABILITY TO -- TO

23  SAY:

24         "HEY, WE WOULD LIKE MORE OF THOSE LICENSING

25  RIGHTS," FOR INSTANCE.

1  **Q.**   DR. RASCHER, FINAL QUESTIONING.

2        WHEN YOU UNDERSTOOD THAT THE NFLPA AND PI REPRESENTED

3  BOTH ACTIVE AND RETIRED PLAYERS FOR GROUP LICENSING, WAS THAT

4  AN ADVANTAGE FOR THEM FROM AN ECONOMIC PERSPECTIVE IN THE

5  MARKETPLACE IN TERMS OF HOW THEY COULD HOLD THEMSELVES OUT IN

6  THE MARKETPLACE?

7  **A.**   YES.   THE -- WHEN THEY GROUPED THE ACTIVE AND THE RETIRED

8  LICENSING RIGHTS TOGETHER, YOU KNOW, THEY BECOME THE SINGLE

9  SELLER OUT IN THE MARKETPLACE.

10       SO IF ANYBODY WANTS TO DO LICENSED FOOTBALL PRODUCTS,

11 THEN THEY WILL HAVE TO GO THROUGH THE PLAYERS ASSOCIATION.  SO

12 IT GIVES THEM THAT LEVERAGE, THAT SINGLE-SELLER POWER.

13          **MR. HUMMEL:**  NOTHING FURTHER, YOUR HONOR.

14          **THE COURT:**  CROSS EXAMINATION.

15          **MR. KESSLER:**  THANK YOU, YOUR HONOR.

16          **THE COURT:**  IS THERE A DEPOSITION YOU NEEDED TO GIVE

17 ME?

18          **MR. CLARK:**  WE'VE ALREADY HANDED IT UP.

19          **THE COURT:**  I'VE ALREADY GOT IT.  THANK YOU.

20          **MR. KESSLER:**  JASON, IF YOU COULD SIT RIGHT HERE YOU

21 CAN LOOK THROUGH THE EXHIBITS IF I NEED THEM WITH RESPECT TO

22 THAT.

23                    **CROSS EXAMINATION**

24 **BY MR. KESSLER:**

25 **Q.**   GOOD MORNING.

1  **A.**   GOOD MORNING.

2  **Q.**   DO YOU PREFER TO BE CALLED "PROFESSOR RASCHER,

3  DR. RASCHER"?

4          WHAT'S YOUR PREFERENCE, SIR?

5  **A.**   DR. RASCHER, PROFESSOR RASCHER.  THOSE ARE FINE.

6  **Q.**   OKAY.  I'LL CALL YOU DR. RASCHER, OKAY.

7          DR. RASCHER, YOU DID NOT MEAN TO SUGGEST TO THIS JURY

8  IN ANY WAY THAT YOU HAVE AN OPINION THAT THE LM-2 FORMS FILED

9  BY THE PLAYERS ASSOCIATION WITH THE DEPARTMENT OF LABOR ARE IN

10 ANY WAY INACCURATE, DID YOU?

11 **A.**   NO.

12 **Q.**   OKAY.  SO I WANT TO BE THIS VERY CLEAR, OKAY?  YOU BELIEVE

13 THOSE LM-2 FORMS ARE COMPLETELY ACCURATE, CORRECT?

14 **A.**   RIGHT.  THE PROBLEM WITH THE LM-2 FORMS --

15 **Q.**   JUST WORK WITH ME ON A "YES" OR "NO" ANSWER.  THE ANSWER

16 IS "YES," RIGHT?

17 **A.**   YES.

18 **Q.**   OKAY.  AND WHAT YOUR ONLY OPINION IS IS THAT THE LM-2

19 FORMS TO THE DEPARTMENT OF LABOR DON'T BREAK OUT SEPARATELY THE

20 POOL OF ACTIVE PLAYER LICENSING MONEY THAT IS EQUALLY SHARED,

21 WHAT WE'VE BEEN CALLING THE GLR POOL, RIGHT?

22          **MR. HUMMEL:**  OBJECTION TO THE FORM OF THE QUESTION.

23 IT ASSUMES FACTS NOT IN EVIDENCE, SPECIFICALLY, THAT IT'S AN

24 ACTIVE PLAYER POOL.  THAT'S A CONCLUSION.

25          **THE COURT:**  OVERRULED.  THIS IS CROSS EXAMINATION,

1  AND THE WITNESS IS AN EXPERT.  HE CAN SAY IF IT'S NOT TRUE OR

2  WHATEVER.  SO PLEASE, IF YOU DON'T AGREE WITH THE QUESTION JUST

3  SAY YOU DON'T AGREE WITH IT.

4          BUT IT YOU DO AGREE, THEN AGREE.

5  **BY MR. KESSLER:**

6  **Q.**   I'LL PHRASE IT AGAIN, OKAY?  YOUR ONLY COMMENT ABOUT THE

7  DEPARTMENT OF LABOR FORMS WAS THAT THEY DON'T BREAK OUT

8  SEPARATELY THE GLR POOL THAT PLAINTIFFS' COUNSEL ASKED YOU TO

9  FOCUS ON IN THIS CASE, CORRECT?

10  **A.**   RIGHT.  THERE'S THE SHARED GROUP LICENSING POOL OF THE

11  RETIRED AND ACTIVE PLAYERS.  AND THE LM-2 -- SO THE AD HOC

12  LICENSE AGREEMENT -- AGAIN, I HAVEN'T READ THE TRANSCRIPTS.  I

13  IMAGINE YOU GUYS HAVE HEARD THAT TERM.  THOSE ARE COMBINED IN

14  THE LM-2 DOCUMENT WITH THE SHARED GROUP LICENSING REVENUES.

15          AND SO YOU CAN'T SEPARATE OUT.  YOU CAN'T SAY:

16          "WELL, HERE'S THE AD HOC AMOUNT.  HERE'S THE

17  SHARED AMOUNT.  NOW WE CAN ANALYZE IT."

18          THAT DOESN'T HAPPEN IN THE LM-2.  IT'S ALL AGGREGATED

19  TOGETHER, SO YOU DON'T KNOW WHAT PERCENTAGE THE PLAYERS RECEIVE

20  WHEN YOU LOOK AT THE LM-2 DOCUMENT.

21  **Q.**   AND THE REASON IT DOESN'T HAPPEN IN THE LM-2 IS BECAUSE

22  THE DEPARTMENT OF LABOR ASKS THE UNION TO DISCLOSE ALL OF THE

23  LICENSING REVENUES AND PAYMENTS, NOT JUST THOSE THAT ARE IN A

24  GLR POOL, CORRECT?

25  **A.**   I MEAN, THE DEPARTMENT OF LABOR IS ASKING EXCEPT THAT THEY

1    WANT THEM TO DISCLOSE EVERYTHING.  AND IT JUST HAPPENS TO BE

2    AGGREGATED IN THIS WAY.

3            I MEAN, I'M SURE THEY COULD HAVE DISCLOSED THEM

4    SEPARATELY HAD THEY WANTED TO.  BUT I'M NOT SAYING THAT THE

5    DEPARTMENT OF LABOR ASKED THEM TO -- YOU SAID THEY ASKED

6    THEM -- ASKED THEM TO DISCLOSE.

7    **Q.**   HAVE YOU AT ALL, SIR, STUDIED THE DEPARTMENT OF LABOR

8    REQUIREMENTS AS TO HOW THE INFORMATION SHOULD BE DISCLOSED?

9    **A.**   I'VE LOOKED AT A LITTLE BIT, BUT NO.

10   **Q.**   NO.  SO YOU HAVE NO OPINION TO OFFER TO THE JURY THAT THIS

11   UNION DID ANYTHING WRONG AT ALL IN THEIR DEPARTMENT OF LABOR

12   DISCLOSURES, DO YOU?

13   **A.**   RIGHT.  I MEAN, I AGREE THAT I DON'T HAVE ANY OPINION THAT

14   THEY DID ANYTHING WRONG IN THERE DISCLOSURES FOR THE LM-2.

15   **Q.**   THANK YOU.

16           NOW, LET'S TAKE A LOOK AT TRIAL EXHIBIT 280 --

17   1208-1.

18           **THE COURT:**  IT'S NOT IN EVIDENCE YET.  ONLY DASH 3 IS

19   IN EVIDENCE.

20           **MR. KESSLER:**  IS THAT NOT IN EVIDENCE?

21           **THE COURT:**  DASH 3 IS IN EVIDENCE.

22   **BY MR. KESSLER:**

23   **Q.**   I'M SORRY.  I WOULD LIKE TO PUT IN 1208-1.  DO YOU

24   RECOGNIZE THIS AS PART OF YOUR EXPERT REPORT IN THIS CASE?

25   **A.**   ARE YOU ON THIS PAGE?

1    Q.   YES.

2    A.   CAN I JUST --

3    Q.   SURE.

4            **THE COURT:**  ANY OBJECTION?

5            **MR. HUMMEL:**  NO OBJECTION.

6            **THE COURT:**  RECEIVED.

7            (TRIAL EXHIBIT 1208-1 RECEIVED IN EVIDENCE.)

8            **MR. KESSLER:**  HERE'S THE OFFICIAL COURT COPY, YOUR

9    HONOR, IF I MAY, SO YOU'LL HAVE THAT ONE.

10           IF WE CAN MOVE THAT AROUND PLEASE.

11           (DOCUMENT DISPLAYED.)

12   **BY MR. KESSLER:**

13   Q.   BY THE WAY, BEFORE WE COME TO THIS EXHIBIT, IT'S CORRECT,

14   ISN'T IT, THAT ALL UNIONS FILE LM-2S WITH THE DEPARTMENT OF

15   LABOR.  IT'S JUST A STANDARD REQUIREMENT FOR ALL UNIONS IN THIS

16   COUNTRY?

17   A.   I DON'T -- I BELIEVE SO.  I DON'T KNOW EXACTLY WHO IS

18   REQUIRED TO FILE AN LM-2.

19   Q.   YOU HAVE NO REASON TO DISAGREE WITH THE FACT THAT ALL

20   UNIONS ARE REQUIRED TO FILE LM-2S IF THEY'RE IN THIS COUNTRY?

21   A.   CORRECT.

22   Q.   NOW, THIS WAS AN EXHIBIT THAT YOU PREPARED, CORRECT, SIR?

23   A.   YES.

24   Q.   NOW, WHAT THIS EXHIBIT SHOWS, IF ALL THE LICENSING

25   REVENUES COLLECTED BY THE UNION ARE COUNTED, AND ALL THE

1  PAYMENTS TO PLAYERS ARE COUNTED, THAT THE PLAYERS ACTUALLY GOT

2  68.6 PERCENT OF THE LICENSING REVENUE, NOT 36 PERCENT, CORRECT?

3  **A.**    IF YOU -- IF YOU INCLUDE THE AD HOC --

4  **Q.**    CAN YOU ANSWER THAT QUESTION "YES" OR "NO," SIR?

5  **A.**    CAN YOU READ IT BACK?

6  **Q.**    SURE.  WHAT THE LM-2 SHOWS IS THAT IF YOU COUNT ALL OF THE

7  LICENSING REVENUES TAKEN IN BY THE PLAYERS ASSOCIATION AND PI,

8  AND YOU COUNT ALL THE PAYMENTS MADE TO PLAYERS FROM THOSE

9  LICENSING REVENUES, WHAT THE PLAYERS ACTUALLY RECEIVED IN 2003

10  WAS 68.6 PERCENT, RIGHT?

11  **A.**    BUT -- RIGHT.  BUT IT'S NOT THE GROUP SHARED LICENSING.

12  **Q.**    RIGHT.  BUT IF YOU LOOK AT ALL THE REVENUES THEY RECEIVED

13  68.6 PERCENT, CORRECT?

14  **A.**    RIGHT.  IF YOU LOOK AT THE AD HOC LICENSING REVENUES THAT

15  THE STAR ACTIVE PLAYERS GET, BECAUSE THEY GET MOST OF THEIR

16  REVENUES.  THE UNION ESSENTIALLY PASSES THOSE THROUGH TO THE

17  STARS.

18           IT'S THE GROUP LICENSING REVENUE, THE SHARED GROUP

19  LICENSING REVENUE THAT EVERYBODY GETS, THE STARS AND THE

20  JOURNEYMEN AND, YOU KNOW, THE ONE-YEAR PLAYER.  THAT'S THE

21  NUMBER THAT WHERE THEY ONLY GET 36 PERCENT OR 31 PERCENT.

22  **Q.**    DR. RASCHER, THERE'S LOTS OF LICENSING REVENUES AND LOTS

23  OF PAYMENTS TO PLAYERS THAT ARE NOT IN THAT GLR POOL, CORRECT?

24  YES OR NO?

25  **A.**    CORRECT.

1   Q.   AND NOT ALL THOSE PAYMENTS ARE JUST TO STAR PLAYERS, THE

2   AD HOC PAYMENTS; IS THAT CORRECT?

3   A.   WELL, STAR PLAYERS ON AVERAGE ARE GOING TO GET MORE OF AD

4   HOC REVENUES BECAUSE IT'S INDIVIDUAL LICENSEES THAT GO AFTER

5   THESE STAR PLAYERS.

6   Q.   SURE.   THE PLAYERS WHO HAVE THE GREATEST ECONOMIC VALUE

7   WILL GET THE MOST LICENSING REVENUE, CORRECT?

8   A.   CORRECT.

9   Q.   AND PEOPLE WHO HAVE NO VALUE WOULD GET NO AD HOC LICENSING

10  REVENUE BECAUSE NOBODY WANTS THEM, RIGHT?   YOU WOULD AGREE WITH

11  THAT?

12  A.   I MEAN, IF THEY DON'T SIGN UP DEALS, THEN THEY DON'T SIGN

13  UP DEALS.

14  Q.   RIGHT.   IF THE MARKETPLACE DOESN'T WANT YOU, YOU DON'T GET

15  ANY REVENUES FROM THAT, RIGHT?   YOU KNOW THAT AS AN ECONOMIST?

16  A.   RIGHT, FOR THE AD HOCS.

17  Q.   WELL, IT WOULD BE TRUE OF A GROUP, AS WELL.   IN ANY

18  GROUP -- IN ANYTHING YOU'RE SELLING, IF THE MARKETPLACE DOESN'T

19  WANT IT, THEN YOU DON'T GET ANY MONEY FOR IT.   THAT'S A SIMPLE

20  PROPOSITION, RIGHT?

21  A.   RIGHT.

22  Q.   NOW, DR. RASCHER, I JUST WANT TO GO EACH YEAR.   SO IF YOU

23  COUNTED ALL THE LICENSING REVENUE IN 2004 RECEIVED BY THE

24  UNION, AND ALL OF THE MONEY PAID OUT, THAT WOULD BE

25  67.5 PERCENT RIGHT, GIVEN TO THE PLAYERS?

1   **A.**   YEAH.  I MEAN, IT'S --

2   **Q.**   THAT'S ALL "YES, YES," RIGHT?

3   **A.**   RIGHT.

4   **Q.**   AND IN 2005, THE PERCENTAGE GIVEN TO THE PLAYERS WAS

5   68.9 PERCENT, CORRECT?

6   **A.**   YES.

7   **Q.**   AND IN 2006, IT WAS 42.8 PERCENT, CORRECT?

8   **A.**   RIGHT.

9   **Q.**   YES?

10       (SIMULTANEOUS SPEAKING, NOT REPORTABLE.)

11   **Q.**   I'M ASKING YOU "YES" OR "NO," SIR?  IS IT "YES"?

12   **A.**   IT IS WHAT IT SAYS.

13   **Q.**   AND IN 2007, IT WAS 54 PERCENT, RIGHT?

14   **A.**   CORRECT.

15   **Q.**   SO IN EVERY YEAR THAT YOU STUDIED, IF YOU COUNT ALL THE

16   LICENSING REVENUES AND ALL THE PAYERS -- THE PLAYERS, THE

17   PERCENTAGE GIVEN TO THE PLAYERS IS MUCH GREATER THAN 36 PERCENT

18   OR 37 PERCENT, CORRECT?

19       YES OR NO?

20   **A.**   CORRECT.

21       (SIMULTANEOUS SPEAKING, NOT REPORTABLE.)

22   **Q.**   YOU'LL HAVE A CHANCE IF YOUR COUNSEL WANTS TO ASK YOU

23   MORE.

24       **THE COURT:**  I NEED TO SAY SOMETHING.  YOU ARE A

25   PROFESSIONAL EXPERT AND WITNESS.  YOU'VE TESTIFIED BEFORE.  YOU

1  KNOW HOW THIS WORKS.  THIS IS CROSS EXAMINATION.

2  MR. KESSLER IS ENTITLED TO ASK A LEADING QUESTION AND

3  GET A SPECIFIC "YES" OR "NO," BECAUSE THIS IS HIS CHANCE TO

4  MAKE HIS POINTS.

5  IT'S NOT YOUR CHANCE TO ARGUE YOUR CASE.  YOU'VE

6  ALREADY DONE THAT.  IF YOU NEED TO EXPLAIN BECAUSE YOU CAN'T

7  POSSIBLY SAY "YES" OR "NO," THEN I WILL LET YOU DO THAT.

8  BUT FOR 90 PERCENT OF THE QUESTIONS IT OUGHT TO BE

9  "YES, NO" OR "I DON'T REMEMBER" OR "I DON'T UNDERSTAND THE

10  QUESTION."

11  SO THAT'S ALL YOU GET TO SAY.  THIS IS CROSS

12  EXAMINATION.

13  NOW, IF YOU CAN'T SAY "YES" AND YOU CAN'T SAY "NO,"

14  AND IT JUST CALLS OUT FOR -- I'LL LET YOU HAVE A ONE-SENTENCE

15  EXPLANATION, ALL RIGHT?

16  **THE WITNESS:**  YES, YOUR HONOR.

17  **THE COURT:**  IN FAIRNESS, THIS IS WHAT WE DO IN ALL

18  CROSS EXAMINATIONS.  THE CROSS-EXAMINER IS ENTITLED TO SEE IF

19  THE OTHER SIDE -- IF THE WITNESS WILL ANSWER AND ADMIT THAT

20  PARTICULAR SPECIFIC POINT.

21  ALL RIGHT.  I KNOW YOU'RE DOING FINE.  I'M NOT

22  ACCUSING YOU OF ANYTHING, BUT THAT'S THE GROUND RULES HERE.

23  ALL RIGHT.  GO AHEAD, MR. KESSLER.

24  **MR. KESSLER:**  THANK YOU, YOUR HONOR.

25

**BY MR. KESSLER:**

**Q.** DR. RASCHER, INCLUDED IN THE PAYMENTS PAID TO THE PLAYERS

IN THE LM-2, IS THE MILLIONS OF DOLLARS PAID TO RETIRED PLAYERS

UNDER AD HOC AGREEMENTS, CORRECT?

**A.** YES.

**Q.** IN FACT, I BELIEVE YOU KNOW -- YOU LOOKED AT THE DATA --

THAT ABOUT $30 MILLION WAS PAID TO RETIRED PLAYERS DURING THE

PERIOD AT ISSUE IN THIS CASE, CORRECT?

      **MR. HUMMEL:** OBJECTION, VAGUE.

**BY MR. KESSLER:**

**Q.** BY THE PLAYERS ASSOCIATION, CORRECT?

      **MR. HUMMEL:** OBJECTION.

      **THE WITNESS:** I DON'T KNOW THE NUMBER. I DIDN'T LOOK

AT THE AD HOC REVENUES THAT CLOSELY --

**BY MR. KESSLER:**

**Q.** YOU DIDN'T STUDY THAT AT ALL?

**A.** I DID A LITTLE BIT, BUT I DON'T HAVE THE NUMBER AS I SIT

HERE. I DON'T REMEMBER.

      **THE COURT:** THAT'S A GOOD ANSWER. THE OBJECTION IS

OVERRULED.

      GO AHEAD.

**BY MR. KESSLER:**

**Q.** NOW, YOU AGREE WITH ME, THOUGH, THAT THERE IS RETIRED

PLAYER PAYMENTS IN THESE NUMBERS HERE, RIGHT?

**A.** YES. I MEAN --

1    Q.    YES?

2    A.    THEY REPORT THE TOTAL LICENSING REVENUES GOING IN AND OUT.

3    Q.    YES.  YES.  OKAY.

4          NOW, THE ONLY REASON YOU FOCUSED ON THE GROUP

5    LICENSING REVENUE POOL IS BECAUSE PLAINTIFFS' LAWYERS ASKED YOU

6    TO DO THAT, RIGHT?  YOU HAD NO ECONOMIC REASON FOR FOCUSING

7    JUST ON THAT POOL?

8    A.    WELL, WHEN YOU COMPARE TO --

9    Q.    COULD YOU ANSWER "YES" OR "NO"?

10          **THE COURT:**  WELL, HE CAN EXPLAIN.

11          GIVE YOUR ONE-SENTENCE EXPLANATION.

12          **THE WITNESS:**  NOW, WHEN YOU COMPARE TO MAJOR LEAGUE

13   BASEBALL PLAYERS ASSOCIATION YOU WANT TO DO AN APPLES-TO-APPLES

14   COMPARISON.

15          SO MAJOR LEAGUE BASEBALL PLAYERS ASSOCIATION THEY DO

16   JUST ONLY GROUP SHARED LICENSING REVENUES.  SO THAT'S THIS SET

17   OF APPLES.

18          THEN, THE NFLPA DOES THE GROUP SHARED LICENSING, A

19   SET OF APPLES, BUT THEY ALSO DO AD HOC LICENSING, AS

20   MR. KESSLER MENTIONED.  THAT'S ORANGES.

21          IN OTHER WORDS, YOU'RE DOING ORANGES AND APPLES TO

22   APPLES.  YOU WANT TO GET RID OF THE ORANGES AND COMPARE JUST

23   THE APPLES TO THE APPLES, WHICH MEANS YOU WANT TO COMPARE THE

24   SHARED GROUP LICENSING REVENUES OF THE NFLPA, AS AN EXAMPLE, TO

25   THE SHARED GROUP LICENSING REVENUES OF MAJOR LEAGUE BASEBALL.

1   **BY MR. KESSLER:**

2   **Q.**   LET'S TALK ABOUT APPLES TO APPLES.

3       MOST OF THE COMPARISONS YOU DID TO THE SHARE RETAINED

4   FOR THE UNION WERE NOT WITH THE MLB PA.  THEY WERE WITH

5   COLLEGES, OTHER SPORTS LEAGUES, ET CETERA, CORRECT?

6   **A.**   RIGHT.  I TOOK --

7   **Q.**   YES OR NO, SIR?

8   **A.**   YES.

9   **Q.**   MOST?  YES.

10       AND FOR EVERYONE BUT THE MAJOR LEAGUE BASEBALL

11   PLAYERS ASSOCIATION, THOSE AREN'T SHARED LICENSING REVENUES IN

12   ANY WAY.  THEY WERE ALL THEIR LICENSING REVENUES, CORRECT?

13       YES OR NO?

14   **A.**   NO, THAT'S NOT CORRECT.

15   **Q.**   OKAY.  DO YOU KNOW WITH RESPECT TO COLLEGES HOW SHARING IS

16   DONE AMONG THE COLLEGES --

17   **A.**   MAJOR LEAGUE BASEBALL --

18   **Q.**   YES OR NO?  DO YOU KNOW?

19       YOU HAVE TO ANSWER, SIR.  I'M SORRY.

20   **A.**   DO I KNOW HOW THE SHARING IS DONE?

21   **Q.**   FOR EXAMPLE, WHEN YOU'RE REPRESENTING THE COLLEGIATE

22   ATHLETIC ASSOCIATION, IS IT SHARED IN SOME EQUAL SHARING POOL?

23   **A.**   IT DEPENDS ON THE DEAL.  SOME ARE SHARED AND SOME AREN'T.

24   **Q.**   HAVE YOU STUDIED THAT, SIR?

25   **A.**   NOT IN RESPECT TO THIS CASE, NO.

1   Q.   OKAY.  SO IN THIS CASE WHEN YOU COMPARED TO THE COLLEGIATE

2   LICENSING AUTHORITY, FOR EXAMPLE, YOU HAVE NO IDEA HOW MUCH OF

3   THAT WAS SHARED OR NOT.  YOU LOOKED AT ALL THE MONEY, CORRECT?

4   A.   CORRECT.

5   Q.   YET, WHEN YOU TOOK JUST ALL THE MONEY FROM THE COLLEGIATE

6   LICENSING ASSOCIATION, YOU ONLY COMPARED IT TO A PORTION OF THE

7   MONEY FOR THE PLAYERS ASSOCIATION AND PLAYERS INC, CORRECT?

8          YES OR NO?

9   A.   I MEAN, I LOOKED AT THE --

10  Q.   YES OR NO, SIR?  DID YOU LOOK AT A PORTION OR ALL?

11         **THE COURT:**  I THINK YOU CAN ANSWER THAT "YES" OR

12  "NO."

13         **THE WITNESS:**  CAN YOU ASK IT AGAIN?

14  **BY MR. KESSLER:**

15  Q.   YES.  WHEN YOU COMPARED THE COLLEGIATE LICENSING

16  ASSOCIATION, WHEN YOU LOOKED AT ALL THE MONEY, YOU JUST

17  COMPARED IT TO A PORTION OF THE LICENSING MONEY FOR THE PLAYERS

18  ASSOCIATION, CORRECT?

19  A.   THE GROUP SHARED LICENSING REVENUES.

20  Q.   OKAY.  AND IF YOU HAD COMPARED THE TOTAL AMOUNT OF

21  LICENSING FOR THE PLAYERS ASSOCIATION WITH THE TOTAL AMOUNT OF

22  LICENSING FOR COLLEGIATE ATHLETIC ASSOCIATION, YOU WOULD HAVE

23  HAD A VERY DIFFERENT COMPARISON, WOULDN'T YOU, SIR?

24  A.   RIGHT.  IF YOU THREW THE AD HOC REVENUES IN, BUT, YOU

25  KNOW, THAT'S NOT -- THE RETIRED PLAYERS DON'T HAVE ACCESS TO

1    THOSE.

2            SO IF YOU WANT TO DO THE APPLES-TO-APPLES COMPARISON,

3    AS I SAID, YOU WANT TO COMPARE THE SHARED GROUP LICENSING, SAY,

4    OF FOOTBALL TO THE SHARED GROUP LICENSING OF

5    BASEBALL-TO-BASEBALL UNION OR EVEN BASEBALL-TO-BASEBALL

6    PROPERTIES.  THEY SELL SHARED GROUP LICENSING, AND THEY CHARGE

7    A FEE OF ABOUT 15 PERCENT.

8            **MR. KESSLER:**  YOUR HONOR, I MOVE TO STRIKE.  THE

9    WITNESS IS NOW GIVING A SPEECH.  IT HAD NOTHING TO DO WITH THE

10   QUESTION I JUST ASKED.

11           **THE WITNESS:**  IT'S SHARED.  IT'S SHARED COMPARISON.

12           **THE COURT:**  WELL, HE WAS TALKING ABOUT COLLEGIATE.

13   THE ANSWER IS -- PART OF YOUR ANSWER IS STRICKEN.  YOU VEERED

14   OFF INTO MAJOR LEAGUE BASEBALL.

15           **MR. KESSLER:**  WOULD YOU EXPLAIN TO THE JURY WHAT IT

16   MEANS WHEN YOU STRIKE AN ANSWER?

17           **THE COURT:**  IT MEANS DISREGARD IT.

18           **MR. KESSLER:**  THANK YOU, YOUR HONOR.

19           I WANT TO SAY AGAIN, THIS IS A PROFESSIONAL WITNESS.

20   HE IS HERE TO GIVE OPINION.  HE KNOWS -- HE'S TESTIFIED AS A

21   WITNESS BEFORE.

22           THIS IS GOING TO BE TRUE FOR YOUR SIDE, TOO.

23           **MR. KESSLER:**  OF COURSE, YOUR HONOR.

24           **THE COURT:**  THE GUY WHO -- THE LAWYER WHO IS

25   CROSS-EXAMINING IS ENTITLED TO ASK A POINTED QUESTION AND GET A

1 "YES" OR "NO" TO IT.

2          AND IF YOU START BLURRING IT UP WITH A LOT OF

3 SPEECHES, THEN IT GETS CONFUSED AND NO ONE KNOWS WHAT'S BEEN

4 ADMITTED TO.

5          AT LEAST, THAT'S THE WAY I LIKE TO DO A TRIAL.

6          I'M GOING TO ASK YOU AGAIN, SAY "YES NO, I DON'T

7 RECALL" OR "I DON'T UNDERSTAND THE QUESTION," AND OCCASIONALLY

8 IF I THINK A QUESTION DOES REQUIRE TO ALLOW FOR A ONE-SENTENCE

9 EXPLANATION, I'LL ALLOW YOU IN CERTAIN CASES TO DO THAT.

10 **BY MR. KESSLER:**

11 **Q.** DR. RASCHER, SPEAKING ABOUT YOUR PROFESSIONAL STATUS,

12 YOU'RE A PRINCIPLE IN THE ECONOMIC CONSULTING FIRM THAT YOU

13 WORK FOR; IS THAT CORRECT?

14 **A.** YES.

15 **Q.** THAT MEANS YOU'RE AN OWNER?

16 **A.** YES.

17 **Q.** WOULD YOU TELL THE JURY APPROXIMATELY HOW MUCH MONEY YOUR

18 COMPANY HAS BEEN PAID BY THE PLAINTIFFS FOR YOUR TESTIMONY HERE

19 TODAY?

20 **A.** I DON'T KNOW EXACTLY. I KNOW WE WENT THROUGH THIS IN

21 DEPOSITION.

22          **MR. HUMMEL:** I OBJECT, YOUR HONOR. THAT QUESTION, AS

23 PHRASED, IS ARGUMENTATIVE. WE ARE NOT PAYING FOR HIS

24 TESTIMONY.

25          **THE COURT:** IT IS. HE IS BEING PAID TO DO THE STUDY

1  AND TO COME IN HERE AND TESTIFY.  BUT YOU'RE IMPLYING THAT HE

2  HAS BEEN PAID TO COME UP WITH A SPECIFIC ANSWER.  I THINK YOU

3  SHOULD REPHRASE THAT QUESTION.

4  **BY MR. KESSLER:**

5  **Q.**  VERY GOOD.

6          HOW MUCH WERE YOU PAID BY PLAINTIFFS IN CONNECTION

7  WITH YOUR WORK IN THIS CASE?  YOUR COMPANY, NOT YOU PERSONALLY.

8  **A.**  THAT I DON'T KNOW.  I DON'T TRACK THAT.  I'M NOT THE

9  MANAGING PRINCIPAL WHO TRACKS THAT.

10  **Q.**  WELL, YOU KNOW, SIR, IS IT HUNDREDS OF THOUSANDS OF

11  DOLLARS?

12  **A.**  IT'S PROBABLY A HUNDRED THOUSAND OR SOMETHING AROUND

13  THERE.  BUT I DON'T --

14  **Q.**  OKAY.

15  **A.**  AGAIN, I DON'T KNOW.  I'M NOT TRACKING THAT.

16  **Q.**  YOU DIDN'T THINK IT WAS IMPORTANT IN YOUR PREPARATION FOR

17  THIS CASE TO COME PREPARED TO TELL THE JURY HOW MUCH YOUR

18  COMPANY WAS MAKING IN CONNECTION WITH THIS CASE?

19  **A.**  NO.  IT'S NOT RELEVANT.

20  **Q.**  LET ME ASK YOU THIS, SIR.

21          YOU'RE AWARE, ARE YOU NOT, THAT THE MONEY IN THE GLR

22  POOL THAT YOU STUDIED, OKAY, IS ALL ACTIVE PLAYER MONEY?

23          YOU'RE AWARE OF THAT, ARE YOU NOT?

24  **A.**  WHAT DO YOU MEAN WHEN YOU SAY "ACTIVE PLAYER MONEY"?

25  **Q.**  CAN YOU ANSWER MY QUESTION?

1  **A.**   WELL, I MEAN, CAN YOU EXPLAIN WHEN YOU SAY "ACTIVE PLAYER

2  MONEY"?

3  **Q.**   DO YOU RECALL MY QUESTIONING YOU ABOUT THAT AT YOUR

4  DEPOSITION?

5       LET ME ASK YOU THIS:  IT'S TRUE, IS IT NOT, THAT YOU

6  UNDERSTAND THAT ALL THE MONEY IN THIS POOL, OKAY, IS MONEY

7  GENERATED FROM LICENSING AGREEMENTS THAT INVOLVE ACTIVE

8  PLAYERS?

9  **A.**   ALL THE MONEY WENT TO THE ACTIVE PLAYERS.

10  **Q.**   OKAY.  I'M ASKING A DIFFERENT QUESTION.  IT'S TRUE, ISN'T

11  IT, THAT YOU KNOW THAT ALL OF THE MONEY IN THIS POOL COME FROM

12  LICENSING AGREEMENTS THAT LICENSED ACTIVE PLAYER RIGHTS; IS

13  THAT TRUE OR FALSE?

14  **A.**   I DON'T KNOW THAT.

15  **Q.**   HAVEN'T YOU EXAMINED THE LICENSING AGREEMENTS IN THIS CASE

16  AT ALL?

17  **A.**   I EXAMINED MANY LICENSING AGREEMENTS IN THIS CASE.

18  **Q.**   OKAY.  FROM ALL THE LICENSING AGREEMENTS THAT YOU

19  EXAMINED, DO YOU KNOW WHICH ONES HAD REVENUES IN THE GLR POOL

20  AND WHICH DID NOT?

21  **A.**   YEAH.

22  **Q.**   OKAY.  SO FOR THOSE YOU EXAMINED THAT HAD REVENUES IN THE

23  GLR POOL, DID THEY ALL LICENSE ACTIVE PLAYER RIGHTS, EVERY

24  SINGLE ONE?

25       **MR. HUMMEL:**  OBJECTION, VAGUE.

1                    **THE COURT:**  WHAT?

2                    **MR. HUMMEL:**  OBJECTION, VAGUE.

3                    **THE COURT:**  I THINK IT'S A FAIR ENOUGH QUESTION.

4    OVERRULED.

5                    PLEASE ANSWER.

6                    **THE WITNESS:**  I'M NOT A LAWYER, SO WHEN I READ THESE

7    CONTRACTS SOMETIMES THERE'S SOME LEGALESE -- WHEN I --

8                    (MR. KESSLER AND THE WITNESS SPEAKING SIMULTANEOUSLY;

9    NOT REPORTABLE.)

10                   **THE COURT:**  MR. KESSLER, I'M GOING TO INTERRUPT HERE

11   FOR A SECOND.

12                   THIS WITNESS IS AN ECONOMIST.

13                   **MR. KESSLER:**  YES, SIR.

14                   **THE COURT:**  WE'VE HAD LOTS OF TESTIMONY ON THE

15   MEANING OF THE ELECTRONIC ARTS AGREEMENT AND ALL THE OTHER

16   THIRD-PARTY AGREEMENTS THAT YOU'RE REFERRING TO.

17                   WE'VE GONE VERY FAR AFIELD IN WHAT PEOPLE OF VARIOUS

18   UNDERSTANDINGS.

19                   THIS WITNESS WAS NOT INVOLVED IN ANY OF THOSE

20   NEGOTIATIONS.

21                   **MR. KESSLER:**  ABSOLUTELY NOT, YOUR HONOR.

22                   **THE COURT:**  SO YOU CAN ASK MAYBE WHAT HIS ASSUMPTION

23   IS.  BUT HE IS NOT -- UNLESS HE'S CLAIMING TO BE QUALIFIED TO

24   READ THOSE AGREEMENTS, I'M NOT GOING TO ALLOW HIM TO TESTIFY

25   ABOUT WHETHER THEY COVERED RETIRED PLAYERS OR NOT.  YOU CAN GET

1  INTO WHAT HE ASSUMED WAS THE CASE, AND THEN MAKE IT CLEAR TO

2  THE JURY IT'S A MERE ASSUMPTION.  IF THE JURY DISAGREES WITH IT

3  THEY CAN GO OFF IN A DIFFERENT DIRECTION.

4         BUT HE IS NOT, I DON'T THINK, QUALIFIED TO START

5  TELLING US WHAT THAT CONTRACT MEANT.

6         **MR. KESSLER:**  VERY GOOD, YOUR HONOR.

7  **BY MR. KESSLER:**

8  **Q.**  DID YOU HAVE ANY ASSUMPTION AS TO WHETHER THE GLR POOL

9  INVOLVED CONTRACTS THAT ONLY LICENSED ACTIVE PLAYER RIGHTS?

10 **A.**  I LOOKED AT THE GROUP LICENSING REVENUES THAT WERE

11 REPORTED BY THE NFLPA IN THEIR -- IN THE DISCOVERY, IN THEIR

12 SPREADSHEETS.

13        I LOOKED AT INDIVIDUAL CONTRACTS.  AND YOU COULD SEE

14 THE PAYMENTS BY DIFFERENT LICENSEES.

15        BUT I DON'T KNOW -- YOU KNOW, I DON'T KNOW WHICH

16 PLAYERS RIGHTS WERE ACTUALLY BEING LICENSED.  I MEAN, OKAY,

17 THAT WASN'T PART OF WHAT I STUDIED.

18        I WAS JUST STUDYING THE MONEY COMING IN AND THE MONEY

19 GOING OUT.

20 **Q.**  WELL, YOU WERE STUDYING ONLY THE MONEY GOING INTO THE GLR

21 POOL AND THE MONEY GOING OUT OF THE GLR POOL.  YOU DIDN'T STUDY

22 THE MONEY COMING IN FOR ALL --

23 **A.**  RIGHT.

24 **Q.**  -- LICENSING AND GOING OUT FOR ALL LICENSING, RIGHT?

25 **A.**  JUST THE SHARED GROUP LICENSING.

1 **Q.** NOW, YOU TESTIFIED THAT YOU -- THE COMPARISON WITH A LOT

2 OF ENTITIES THAT WERE NOT SPORTS UNIONS, AND ONE SPORTS UNION,

3 MAJOR LEAGUE BASEBALL PLAYERS ASSOCIATION, CORRECT?

4 **A.** CORRECT.

5 **Q.** OKAY. SO I WANT TO FOCUS ON THE UNION.

6 SIR, IS IT YOUR UNDERSTANDING THAT IT IS TYPICAL IN A

7 SPORTS UNION, WHEN THERE IS LICENSING OF ACTIVE PLAYER RIGHTS,

8 THAT THE ACTIVE PLAYERS TYPICALLY WILL DEVOTE A PORTION OF

9 THEIR LICENSING REVENUES TO FUND THE UNION AND COLLECTIVE

10 BARGAINING ACTIVITIES OF THEIR ASSOCIATION?

11 IS THAT TYPICAL?

12 **MR. HUMMEL:** OBJECTION. BEYOND THE SCOPE.

13 **THE COURT:** OVERRULED.

14 **THE WITNESS:** IN MAJOR LEAGUE BASEBALL, FOR INSTANCE,

15 THEY GET DUES FROM THE PLAYERS, AND THEN THEY ALSO GET

16 LICENSING REVENUES, GROUP LICENSING REVENUES. AND THEY USE

17 SOME OF THOSE GROUP LICENSING REVENUES -- THEY CALL THEM

18 SPECIAL DUES, AND THEY USE THEM FOR VARIOUS THINGS PARTLY TO

19 RUN THE UNION, PARTLY TO SAVE UP FOR COLLECTIVE BARGAINING

20 PURPOSES.

21 NOW, IN THE NFLPA --

22 **BY MR. KESSLER:**

23 **Q.** I'LL ASK YOU ANOTHER QUESTION. YOU'VE GONE BEYOND THIS.

24 **MR. HUMMEL:** YOUR HONOR --

25

**BY MR. KESSLER::**

**Q.**   SO IN BASEBALL --

          (COUNSEL SPEAKING SIMULTANEOUSLY; NOT REPORTABLE.)

          **MR. HUMMEL:**  -- TO COMPLETE THAT QUESTION.  HE HAS AN

EXPLANATION.

          **THE COURT:**  WELL, IT SEEMS TO ME HE DID COMPLETE THE

ANSWER.

          ASK A FRESH QUESTION.

          IF YOU THINK THERE'S MORE, YOU CAN GO INTO IT IN

REDIRECT.

**BY MR. KESSLER:**

**Q.**   I WANT TO DO THIS IN BITES.  I'LL GIVE YOU A CHANCE TO

TALK ABOUT ALL THE UNIONS.

          IN BASEBALL, THE PLAYERS DECIDE THAT SOME OF THEIR

LICENSING MONEY WILL GO TO RUN THE UNION FOR THINGS LIKE STRIKE

FUNDS, COLLECTIVE BARGAINING, AND THOSE TYPES OF ACTIVITIES,

CORRECT?

**A.**   IT'S IN THEIR AUDITED FINANCIALS.  WELL, I MEAN, I'M

SAYING IT'S STRICTLY IN THEIR AUDITED FINANCIALS THAT THEY DO

THAT.

**Q.**   BUT THEY DO THAT.  GIVE ME A "YES," PLEASE?

**A.**   YES.

**Q.**   THAT'S ALL I NEED IS A "YES."

          AND YOU ALSO KNOW AS A SPORTS ECONOMIST THAT THE NBA

PLAYERS ASSOCIATION, THE BASKETBALL PLAYERS ASSOCIATION, ALSO

1 HAS USED ITS LICENSING REVENUES FROM TIME TO TIME TO SUPPORT

2 THE UNION ACTIVITIES, ESPECIALLY DURING POSSIBLE WORK

3 STOPPAGES.

4       YOU KNOW THAT, CORRECT?

5 **A.**   YES.

6 **Q.**   AND YOU ALSO KNOW THAT THE NFLPA, THE UNION IN THIS CASE,

7 OKAY, USES SOME OF ITS LICENSING REVENUES TO SUPPORT UNION

8 OPERATIONS, CORRECT?

9       YOU KNOW THAT?

10 **A.**   BUT NOT --

11 **Q.**   COULD YOU SAY "YES" OR "NO"?

12       DO YOU KNOW THAT?

13 **A.**   YOU NEED TO BE MORE SPECIFIC ON "UNION OPERATIONS."

14       (MR. KESSLER AND THE WITNESS SPEAKING SIMULTANEOUSLY;

15 NOT REPORTABLE.)

16 **Q.**   UNION OPERATIONS, INCLUDING COLLECTIVE BARGAINING.  YOU

17 KNOW THEY USE IT TO SUPPORT COLLECT BARGAINING?

18 **A.**   NO.  IT'S STRICTLY IN THEIR AUDITED FINANCIALS THAT THEY

19 DON'T -- THEY -- TO SUPPORT COLLECTIVE BARGAINING, THEY USE THE

20 PLAYERS' DUES.  SO THE PLAYERS' DUES COME RIGHT OFF THE CHECKS

21 OF THE PLAYERS.

22       THAT MONEY IS BUILT UP OVER TIME FOR COLLECTIVE

23 BARGAINING PURPOSES.

24       SECONDLY, THE SHARED GROUP LICENSING REVENUES COME

25 IN, AND THEY DO USE SOME OF THOSE FOR THE OPERATIONS OF THE

1    UNION.

2          AND THEN, THERE'S A WHOLE LARGE AMOUNT, $68 MILLION,

3    THAT BUILDS UP OVER TIME THAT'S JUST SITTING THERE.  IT'S AN

4    UNRESTRICTED NET ASSET.

5          SO THE GROUP LICENSING REVENUE COMES IN, AND SOME OF

6    IT'S USED TO RUN THE UNION, BUT NOT FOR THE STRIKE FUND.

7          AND THEN, THE REST OF IT IS BUILT UP OVER TIME, SO

8    THERE'S SHARED GROUP LICENSING REVENUES THAT ARE WORTH ABOUT

9    $68 MILLION THAT ARE JUST SITTING THERE IN THE UNION THAT ARE

10   UNRESTRICTED.

11   Q.   DR. RASCHER, OKAY, HAVE YOU EXAMINED THE EVIDENCE AT ALL

12   TO DETERMINE WHETHER OR NOT THE REASON FOR THAT $68 MILLION IN

13   UNRESTRICTED ASSETS IS TO SUPPORT THE UNION IF THERE'S A WORK

14   STOPPAGE, A STRIKE OR OTHER LABOR ACTIVITY?

15         DO YOU KNOW ONE WAY OR THE OTHER, SIR?

16   A.   WELL, SPECIFICALLY, IN THE AUDITED FINANCIALS THEY HAVE

17   WHAT'S FUNDS B WHICH IS --

18   Q.   SIR, CAN YOU ANSWER MY QUESTION, PLEASE?

19         DO YOU KNOW WHAT THE ACTIVE PLAYER BOARD MEMBERS HAVE

20   VOTED UPON AS TO WHAT THAT $68 MILLION IS FOR?

21         DO YOU KNOW, SIR, YES OR NO?

22   A.   NO, I DON'T KNOW.  THE $68 MILLION IN SHARED LICENSING

23   REVENUE THAT'S BEEN BUILDING UP OVER TIME.

24   Q.   YOU DON'T KNOW ONE WAY OR THE OTHER?

25   A.   I DON'T --

1          (MR. KESSLER AND THE WITNESS SPEAKING SIMULTANEOUSLY;

2     NOT REPORTABLE.)

3     Q.   THAT'S MY QUESTION.

4          **THE COURT:**  WERE YOU TRYING TO SAY THAT THERE'S SOME

5     AUDITED FINANCIAL THAT SAYS WHAT THE 68 MILLION IS FOR?

6          **THE WITNESS:**  SO THE AUDITED FINANCIAL SAYS WHAT

7     EVERYTHING ELSE IS FOR, BUT THESE ARE UNRESTRICTED NET ASSETS.

8     SO, BY DEFINITION, THEY ARE NOT RESTRICTED.

9          **THE COURT:**  HOW DO YOU KNOW IF IT'S FOR A STRIKE FUND

10    OR FOR WORK STOPPAGE OR NOT, THEN?

11         **THE WITNESS:**  THEY HAVE A SEPARATE STRIKE FUND OF

12    $120 MILLION.  SO, NO.  SO IT'S TRUE.  IT'S POSSIBLE THEY WOULD

13    USE THAT AND HAVE $2 MILLION WORTH OF STRIKE FUND.  I MEAN, IT

14    DOESN'T SAY WHAT THEY DO WITH THE UNRESTRICTED NET ASSETS IN

15    THE AUDITED FINANCIALS.

16    **BY MR. KESSLER:**

17    Q.   SO YOU CAN'T TELL FROM THE AUDITED FINANCIALS, RIGHT, WHAT

18    THEY ARE GOING TO DO WITH THE 68 MILLION?

19         YOU CAN'T TELL?

20    A.   NO, IT'S REVENUES THAT ARE BUILDING UP OVER TIME.  IT'S

21    JUST SITTING THERE.

22    Q.   NOW, DR. RASCHER, IT'S ALSO CORRECT, IS IT NOT, THAT IF

23    YOU LOOKED AT THE AUDITED FINANCIALS THAT THE NFLPA REFUNDS ITS

24    DUES FOR THE UNION PERIODICALLY; IS THAT TRUE?

25         YES OR NO?

1   **A.**   YES.  THEY REFUND --

2   **Q.**   OKAY.  THAT'S A YES.  IT'S A YES.

3        AND WHEN THEY REFUND THEIR DUES TO THE EMPLOYEES, THE

4   REASON THEY COULD FUND THOSE DUES IS BECAUSE THEY'VE GOTTEN THE

5   40 PERCENT OF THE LICENSING REVENUE, CORRECT?

6   **A.**   NO.  THEY'RE FUNDING THE DUES --

7   **Q.**   SIR, YOU JUST TESTIFIED THEY NEED THE DUES TO RUN THE

8   ORGANIZATION, RIGHT?

9   **A.**   NO, NO, NO.  I DIDN'T SAY THAT.  I SAID THAT THE SHARED

10   GROUP LICENSING REVENUE THEY USE TO RUN THE ORGANIZATION, THE

11   DUES, FUND A AND FUND B, IT SAYS IN THERE ARE USED -- ARE

12   DESIGNATED FOR THE -- ESSENTIALLY, A STRIKE FUND.

13   **Q.**   OKAY.  MAYBE I MISUNDERSTOOD YOUR TESTIMONY.  SO YOU'RE

14   NOW TESTIFYING -- MAYBE YOU DID BEFORE.  MAYBE I MISUNDERSTOOD

15   IT -- THAT YOU AGREE THAT THE 40 PERCENT IS USED TO RUN THE

16   UNION?

17        YOU AGREE WITH THAT?

18   **A.**   THE 64 TO 69 PERCENT IS USED FOR TWO THINGS:  PART --

19   **Q.**   SIR?

20   **A.**   NO.

21   **Q.**   FIRST OF ALL, LET ME CLARIFY THIS.  DO YOU UNDERSTAND THAT

22   23 PERCENT IS PAID TO PLAYERS INC SEPARATELY, AND THAT THE

23   UNION GETS ITS OWN PAYMENTS?  DO YOU UNDERSTAND THAT, SIR?

24   **A.**   THAT'S NOT WHAT HAPPENS.

25        FIRST OF ALL --

1  **Q.**  I DON'T HAVE A QUESTION.

2  **A.**  OKAY.

3  **Q.**  OKAY?

4  **A.**  OKAY.

5  **Q.**  DID YOU READ THE AGREEMENTS BETWEEN THE PLAYERS

6  ASSOCIATION AND PLAYERS INC AS TO HOW THE MONEY IS DIVIDED?

7  **A.**  YES.

8  **Q.**  DO THOSE AGREEMENTS PROVIDE THAT PLAYERS INC WILL GET

9  23 PERCENT AS ITS LICENSING FEE, CORRECT?  DO THEY PROVIDE

10  THAT?

11  **A.**  THE AGREEMENTS SAY THAT, BUT THAT'S NOT WHAT HAPPENS.

12  **Q.**  OKAY.  SO THE AGREEMENTS SAY THAT, RIGHT?

13          DO YOU AGREE, WHATEVER THE AMOUNT IS -- I KNOW YOU

14  HAVE YOUR OWN CALCULATIONS OF THE AMOUNTS -- BUT WHATEVER THE

15  AMOUNTS ARE, THAT PLAYERS INC GETS SEPARATE MONIES FROM THE

16  NFLPA?

17          DO YOU AGREE WITH THAT?

18  **A.**  THEY'RE ONE IN THE SAME.  THERE'S NOT A DIFFERENCE BETWEEN

19  PLAYERS INC AND PLAYERS ASSOCIATION.

20          SO FROM AN ECONOMIC PERSPECTIVE IT'S NOT IMPORTANT

21  THAT ONE OF THEM IS CALLED "PLAYERS INC" AND ONE OF THEM IS

22  CALLED "PLAYERS ASSOCIATION."

23

24  **Q.**  SO, DR. RASCHER, IS IT YOUR OPINION AS AN ECONOMIST THAT

25  EVERY COMPANY IF IT HAS A WHOLLY-OWNED SUBSIDIARY THEY ARE ALL

1   ECONOMICALLY THE SAME?

2   **A.**   IF IT'S WHOLLY OWNED, AND THEY HAVE THE SAME

3   DECISION-MAKERS ON BOTH SIDES OF THE FENCE, THEN IT'S SHAKING

4   HANDS WITH YOURSELF.  IF YOU'RE A DEAL BETWEEN THE PLAYERS

5   ASSOCIATION AND PLAYERS INC.  IT'S LIKE SHAKING YOUR OWN HANDS.

6   **Q.**   YES.  NOW, YOU KNOW LEGALLY THEY ARE SEPARATE COMPANIES.

7   YOU DON'T DISAGREE WITH THAT, SIR, DO YOU?

8   **A.**   RIGHT.

9   **Q.**   AND YOU KNOW THAT THESE TWO LEGALLY-SEPARATE COMPANIES

10  HAVE SEPARATE MONIES THAT GO TO EACH ONE, CORRECT?

11  **A.**   I MEAN, THEY FILE AUDITED -- CONSOLIDATED AUDITED

12  FINANCIALS, BUT I'M SURE THEY HAVE -- I DIDN'T SEE A BANK

13  ACCOUNT.  I DON'T KNOW WHAT THEIR BANK ACCOUNTS ARE.  I AM SURE

14  THAT THEY HAVE SEPARATE BANK ACCOUNTS.

15  **Q.**   WELL, DID YOU KNOW --

16  **A.**   I ---

17  **Q.**   -- THAT THE NFLPA IS A NONPROFIT COMPANY, BUT THAT PLAYERS

18  INC IS A PROFIT COMPANY?

19  **A.**   YES.

20  **Q.**   AND THAT MEANS PLAYERS INC FILES A TAX RETURN FOR ITSELF

21  AS A PROFIT COMPANY, CORRECT?

22  **A.**   RIGHT.

23  **Q.**   AND THAT MEANS THE NFLPA FILES DIFFERENT INFORMATION AS A

24  NONPROFIT COMPANY, CORRECT?

25  **A.**   BUT ALSO CONSOLIDATED.

1    Q.    THAT'S YES OR NO.

2    A.    YES.

3    Q.    YOU DON'T FILE CONSOLIDATED RETURNS ANYWHERE WITH THE TAX

4    DEPARTMENT, DO YOU?

5             **MR. HUMMEL:**  OBJECTION, YOUR HONOR.  WAY BEYOND THE

6    SCOPE.  NO FOUNDATION.

7             **THE COURT:**  OVERRULED IN LIGHT OF THE WITNESS'S PRIOR

8    TESTIMONY.  I THINK THIS IS FAIR CROSS EXAMINATION.

9             GO AHEAD.

10   **BY MR. KESSLER:**

11   Q.    YOU DON'T FILE CONSOLIDATED RETURNS WITH THE TAX

12   DEPARTMENT, DO YOU?

13            **THE COURT:**  YOU MEAN, HIM PERSONALLY?

14   **BY MR. KESSLER:**

15   Q.    I DON'T MEAN YOU PERSONALLY, SIR.  PLAYERS INC AND THE

16   NFLPA DON'T FILE CONSOLIDATED RETURNS OF FINANCIAL INFORMATION

17   WITH THE TAX DEPARTMENT, WOULD THEY?

18   A.    RIGHT.  I LOOK --

19            (MR. KESSLER AND THE WITNESS SPEAKING SIMULTANEOUSLY;

20   NOT REPORTABLE.)

21   Q.    THAT WAS MY QUESTION.

22            (MR. KESSLER AND THE WITNESS SPEAKING SIMULTANEOUSLY;

23            NOT REPORTABLE.)

24            (COURT REPORTER INTERRUPTS.)

25            **THE COURT:**  WE'RE GOING TO HAVE TO BRING THE WHOLE

1  TRIAL TO AN END BECAUSE YOU LAWYERS AND WITNESSES CAN'T BEHAVE.

2          PLEASE, ONE AT A TIME.

3          START OVER WITH A FRESH QUESTION.

4          **MR. KESSLER:**  I JUST ASK YOU TO PLEASE --

5          (COUNSEL AND THE COURT SPEAKING SIMULTANEOUSLY, WHICH

6  WAS NOT REPORTABLE.)

7          **THE COURT:**  YOU INTERRUPT HIM, AND HE'S A

8  FAST-TALKING -- HE TALKS SO FAST I CAN'T -- GOES BY AT

9  LIGHTENING SPEED.

10          HE SAYS "YES," AND THERE IS A NANOSECOND BEFORE

11  THERE'S AN EXPLANATION.

12          AND HE'S GOOD AT IT.  SO I SUGGEST TO YOU THAT JUST

13  LET -- IF HE'S GOING TO MAKE AN EXPLANATION AND IT GETS OUT OF

14  HAND, I'LL STRIKE IT.

15          BUT STOP INTERRUPTING HIM.

16          **MR. KESSLER:**  THANK YOU, YOUR HONOR.

17  **BY MR. KESSLER:**

18  **Q.**  DR. RASCHER, DO YOU UNDERSTAND THAT YOU'RE SUPPOSED TO TRY

19  TO ANSWER "YES" OR "NO," IF YOU CAN?

20          DO YOU UNDERSTAND THAT, SIR?

21  **A.**  YES.

22  **Q.**  THANK YOU.

23          DR. RASCHER, THE CONSOLIDATED FINANCIAL STATEMENTS

24  YOU'RE TALKING ABOUT WERE ONLY FOR THE INTERNAL USE OF THE

25  BOARD OF PLAYER REPRESENTATIVES, CORRECT?

1  **A.**   I MEAN, THEY WERE AUDITED BY AN OUTSIDE COMMITTEE, SO I

2  DON'T KNOW WHAT ELSE -- I DON'T KNOW WHAT THEY USE THEM FOR.

3  **Q.**   YOU KNOW THAT THERE WAS JUST TESTIMONY TODAY PRESENTED

4  THAT THEY WERE ONLY FOR THE INTERNAL USE FOR THE BOARD PLAYER

5  REPRESENTATIVES?

6  **A.**   I DON'T KNOW ABOUT TODAY'S TESTIMONY.

7           **THE COURT:**  CAN I CUT THROUGH THIS FOR A SECOND?

8           **MR. KESSLER:**  YES.

9           **THE COURT:**  IT SEEMS TO ME WE ARE TAKING UP AN UNDUE

10  AMOUNT OF TIME OF THE JURY, AND THAT THE FOLLOWING POINTS

11  PROBABLY ARE CORRECT.  AND LET'S SEE IF THE WITNESS AGREES WITH

12  THIS.

13           THAT AT LEAST ON PAPER THESE -- PLAYERS INC IS A

14  SEPARATE ORGANIZATION FROM THE UNION.

15           DO YOU AGREE WITH THAT?  AT LEAST ON PAPER.

16           **THE WITNESS:**  ON PAPER.  NOT ECONOMICALLY.

17           **THE COURT:**  ALL RIGHT.  SO PUTTING ASIDE THE QUESTION

18  FOR THE MOMENT OF WHETHER OR NOT UNDER THE LAW THESE TWO

19  ENTITIES COULD BE MERGED TOGETHER AND TREATED AS ONE, PUT

20  THAT -- AT LEAST ON PAPER, SOME PERCENTAGE GOES TO THE UNION OF

21  THIS MONEY AND SOME PERCENTAGE GOES TO PLAYERS INC OF THIS

22  MONEY; IS THAT TRUE?

23           **THE WITNESS:**  YES.

24           **THE COURT:**  IS THAT ALL YOU WERE TRYING TO ESTABLISH?

25           **MR. KESSLER:**  YES.

1      **THE COURT:**  DO WE NEED TO GET INTO WHETHER OR NOT WE

2  ARE GOING TO -- THIS WITNESS IS NOT QUALIFIED TO SAY WHETHER OR

3  NOT THE TWO COMPANIES OUGHT TO BE TREATED AS ONE UNDER THE

4  15-FACTOR TEST.

5      **MR. KESSLER:**  OF COURSE, YOUR HONOR.  IF THE WITNESS

6  WOULD GIVE ME A "YES" OR "NO," I WOULDN'T HAVE TO DO ANY OF

7  THIS.

8      **THE COURT:**  THE WAY THE YOU PHRASE YOUR QUESTION

9  SOMETIMES IT INVITES THIS KIND OF RESPONSE.

10 **BY MR. KESSLER:**

11 **Q.**   LET ME TRY TO GET A "YES" OR "NO."

12      SO YOU AGREE -- OR DO YOU AGREE THAT AS THE --

13 PLAYERS INC IS THE ONE WHO IS THE LICENSING ENTITY, CORRECT?

14 **A.**   YES.

15 **Q.**   OKAY.  AND DO YOU AGREE THAT THE LICENSING ENTITY IS

16 ENTITLED TO SOME MUCH PERCENTAGE FOR ITS SERVICES AS A

17 LICENSING ENTITY, CORRECT?

18 **A.**   YES.

19 **Q.**   OKAY.  AND THAT WOULD BE SEPARATE AND APART FROM WHATEVER

20 THE PLAYERS MIGHT DECIDE TO GIVE TO THE UNION TO FUND THE UNION

21 OPERATIONS, CORRECT?  YES OR NO?

22 **A.**   ECONOMICALLY, NO.  YOUR HONOR'S TALKED ABOUT ON PAPER.

23 AND THAT'S THE DIFFERENCE BETWEEN THE ECONOMICS OF THE

24 SITUATION AND WHAT'S WRITTEN DOWN ON PAPER.

25 **Q.**   YOU AGREE THE LICENSING ENTITY DESERVES A PAYMENT FOR

1  BEING A LICENSING ENTITY, CORRECT?

2  **A.**   YES.

3  **Q.**   OKAY.   SO WHEN YOU'RE DEALING WITH SOMETHING LIKE

4  COLLEGIATE LICENSING, IT'S ONLY A LICENSING ENTITY, NOT A

5  UNION, CORRECT?

6  **A.**   CORRECT.

7  **Q.**   OKAY.  SO WOULDN'T THE APPLES-TO-APPLES COMPARISON BE:

8  WHAT IS THE PERCENTAGE THAT PLAYERS INC GETS AS A LICENSING

9  ENTITY VERSUS WHAT COLLEGIATE LICENSING GETS AS A LICENSING

10 ENTITY, AND NOT MIX IN WHAT THE PLAYERS GIVE TO THE UNION TO

11 FUND ITS OPERATIONS AS A UNION?

12         WOULDN'T THAT BE AN APPLES-TO-APPLES COMPARISON, YES

13 OR NO?

14 **A.**   IF YOU COULD DO THAT.

15 **Q.**   THANK YOU.

16 **A.**   BUT YOU CAN'T DO THAT HERE.

17 **Q.**   BUT THAT WOULD BE AN APPLES TO APPLES IF YOU COULD DO IT?

18 **A.**   IF YOU COULD DO IT.

19 **Q.**   THAT'S ALL.  YES OR NO.  THANK YOU.

20         **THE COURT:**  DID THIS WITNESS GIVE AN EXPERT REPORT ON

21 THE ALTEREGO TEST TRYING TO MERGE TWO COMPANIES TOGETHER?

22         **MR. KESSLER:**  IN NONE OF HIS REPORTS HAS HE GIVEN ANY

23 DISCLOSURE OF ANY OPINION THAT THEY'RE ECONOMICALLY AS ONE,

24 YOUR HONOR.  AND I MOVE TO STRIKE ALL HIS TESTIMONY ABOUT THAT.

25         **THE COURT:**  I'M NOT GOING TO STRIKE.  YOU'VE ELICITED

1  A LOT OF THIS TESTIMONY.

2          I WANT TO ADMONISH THE JURY ABOUT SOMETHING.  THERE

3  IS A WHOLE DIFFERENT BODY OF LAW OUT THERE ABOUT WHEN YOU TREAT

4  A COMPANY AND ITS SUBSIDARY AS ONE IN THE SAME, AS OPPOSED TO

5  TWO LEGAL ENTITIES.

6          I WILL TELL YOU THE FACT THEY HAVE A CONSOLIDATED

7  FINANCIAL STATEMENT IS NOT THE TEST.  THERE ARE A WHOLE BUNCH

8  OF FACTORS, ABOUT 15 OF THEM, IF YOU WOULD LOOK AT.

9          IF IT'S GOING TO BE AN ISSUE IN THIS CASE, I AM

10  SURPRISED.  I HAVEN'T HEARD THAT YET.

11          THIS WITNESS IS NOT GOING TO REPORT ON THAT SUBJECT.

12  SO YOU TAKE INTO ACCOUNT THE FACT THAT WHAT THIS WITNESS SAYS

13  ABOUT WHETHER OR NOT THEY OUGHT TO BE TREATED AS ALTEREGOS OF

14  THE OTHERS, HE HAS NO FOUNDATION FOR THAT.  IT MAY BE TRUE.

15  BUT HE DOESN'T HAVE FOUNDATION TO PROVIDE YOU WITH THAT

16  TESTIMONY.

17          SO I'D ASK YOU TO TAKE THAT AS A WORD OF CAUTION.

18          NOW, THAT IS ONLY A SMALL, TINY PART OF THIS

19  EXAMINATION.

20          HE HAS SAID OTHER THINGS.

21          I'M NOT TRYING TO ADDRESS THAT.

22          I'M JUST ADDRESSING THIS POINT ABOUT ALTEREGO.

23          AND I ASK THE LAWYERS TO PLEASE GET OFF THE ALTEREGO

24  AT LEAST UNTIL WE CAN ADDRESS IT OUT OF THE PRESENCE OF THE

25  JURY.

1          **MR. KESSLER:** I'M OFF IT, YOUR HONOR.

2          **THE COURT:** IS IT TIME FOR A BREAK? ALL RIGHT. ALL

3 RIGHT. MY COURT REPORTER NEEDS A BREAK. HER FINGERS HAVE BEEN

4 WORKING AT LIGHTENING SPEED, SO WE'RE GOING TO TAKE A 15-MINUTE

5 RECESS.

6          PLEASE REMEMBER THE ADMONITIONS.

7          (THEREUPON, THE JURY LEFT THE COURTROOM.)

8          **THE COURT:** ALL RIGHT. HAVE A SEAT.

9          EXPLAIN TO ME THIS: AM I GOING TO HAVE TO GIVE

10 INSTRUCTIONS TO THE JURY ON ALTEREGO? IS THE JURY GOING TO

11 HAVE TO MAKE FINDINGS ON WHETHER OR NOT THESE TWO COMPANIES ARE

12 ONE AND THE SAME?

13          **MR. KESSLER:** ABSOLUTELY NOT, YOUR HONOR. THERE HAS

14 BEEN NO ISSUE IN THAT CASE. IN THEIR PROPOSED JURY

15 INSTRUCTIONS THEY DIDN'T RAISE THAT ISSUE. THE FIRST TIME I'VE

16 EVER HEARD THAT IS OUT OF THIS WITNESS WHO I BELIEVE WAS

17 PREPARED, FRANKLY, TO INJECT THAT ISSUE IN THE CASE.

18          HE DIDN'T RAISE IT IN ANY OF HIS REPORTS. IT WAS

19 NEVER DISCLOSED. HE DID INJECT IT IN RESPONSE TO MY QUESTIONS,

20 WHICH, YOUR HONOR, I WOULD POINT OUT WERE QUESTIONS THAT COULD

21 HAVE BEEN ANSWERED "YES" OR "NO," BUT HE INJECTED IT IN THE

22 SPEECH, AND THEN I HAD TO FOLLOW UP ON IT. THAT DOES NOT

23 BELONG IN THIS CASE.

24          **MR. HUMMEL:** RIGHT.

25          **THE COURT:** WHAT?

1          **MR. HUMMEL:**  RIGHT.

2          **THE COURT:**  WELL, THEN, WHY NOT LET US JUST MOVE ON

3    TO OTHER THINGS?

4          DO YOU HAVE ANY MORE EXAMINATION?

5          **MR. KESSLER:**  OH, I DO, YOUR HONOR, ON OTHER PARTS OF

6    HIS TESTIMONY.

7          **MR. HUMMEL:**  I CERTAINLY DIDN'T ELICIT ANYTHING

8    HAVING TO DO WITH ALTEREGO ON DIRECT EXAMINATION.  IT'S NOT

9    TRUE.

10         **MR. KESSLER:**  NO, HIS WITNESS VOLUNTEERED IT.

11         **THE COURT:**  THE JURY IS NOT HERE.  IT'S PERFECTLY

12   OKAY, AS THIS WITNESS PUT IN, TO HAVE A HANDSHAKE DEAL WITH

13   YOURSELF.

14         **MR. HUMMEL:**  SURE.

15         **THE COURT:**  THAT IS DONE.  I'VE SEEN MANY CASES, AND

16   AS LONG AS EACH PERSON IS WEARING THE APPROPRIATE HAT, THERE'S

17   NOTHING NECESSARILY WRONG WITH THAT.

18         AND IF WE GET OFF INTO THAT, I'M GOING TO HAVE TO

19   GIVE JURY INSTRUCTIONS TO THAT VERY POINT.

20         SO I WANT US TO STICK TO THE ISSUES AT HAND.  ALL

21   RIGHT.

22         WE'RE GOING TO TAKE A SHORT BREAK.

23         **MR. KATZ:**  YOUR HONOR, MAY I HAVE ONE MOMENT?

24         **THE COURT:**  ALL RIGHT.  WHAT'S THAT?

25         **MR. KATZ:**  TWO DAYS AGO I ASKED PERMISSION FROM YOUR

1  HONOR -- I ASKED IF YOUR HONOR WOULD READ AN INSTRUCTION TO THE

2  JURY ON THE ISSUE OF THE IP RIGHTS WITH RESPECT TO THE

3  SCRAMBLING VIS-A-VIS THE FIDUCIARY DUTY RIGHTS VIS-A-VIS THE

4  SCRAMBLING.

5           AND WE HAVE DONE THAT.  I WOULD LIKE TO HAND IT UP TO

6  YOUR HONOR.  I HAVE JUST GIVEN IT TO MR. KESSLER.  SO YOU BOTH

7  CAN STUDY IT OVER THE BREAK.

8           **MR. KESSLER:**  I CAN TELL YOUR HONOR ALREADY WE WOULD

9  PROPOSE A DIFFERENT INSTRUCTION THAN THAT.  WHY DON'T WE HAVE A

10 CHANCE TO STUDY IT AND PERHAPS PROPOSE SOMETHING ON MONDAY?

11          **THE COURT:**  I'LL STUDY IT OVER THE BREAK AND LET YOU

12 KNOW WHEN I COME BACK.

13          THANK YOU.

14          (RECESS TAKEN.)

15 **BY MR. KESSLER:**

16 **Q.**  MR. RASCHER, JUST TO CLOSE OFF THIS ISSUE ABOUT COLLEGIATE

17 LICENSING, A COMPANY LIKE COLLEGIATE LICENSING DOESN'T ENGAGE

18 IN ANY UNION ACTIVITIES, RIGHT?

19 **A.**   RIGHT.

20 **Q.**   AND IT'S ALSO TRUE, WHEN YOU DID THE COMPARISON WITH

21 COLLEGIATE LICENSING, YOU DIDN'T TAKE OUT THE STAR UNIVERSITIES

22 IN SPORTS AND DISTINGUISH THEM FROM THE OTHER UNIVERSITIES WHO

23 MAY NOT BE BIG SPORTS POWERS, RIGHT?  YOU TREATED IT ALL

24 TOGETHER?

25 **A.**   RIGHT.

**Q.** OKAY. NOW, LET ME SHOW YOU, DR. RASCHER, I PUT IN FRONT

OF YOU ON YOUR RIGHT-HAND SIDE EXHIBIT 1275-3, WHICH I BELIEVE

IS AN EXHIBIT THAT YOU'VE PREPARED IN CONNECTION WITH YOUR WORK

IN THIS CASE; IS THAT TRUE?

**A.** YES.

      **MR. KESSLER:** YOUR HONOR, I MOVE 1275-3 INTO

EVIDENCE.

      **THE COURT:** 1275-3.

      **MR. KESSLER:** YES. WE'RE PUTTING IN PAGES OF THIS AS

OPPOSED TO --

      **THE COURT:** ANY OBJECTION?

      **MR. HUMMEL:** NO OBJECTION.

      **THE COURT:** RECEIVED.

      (TRIAL EXHIBIT 1275-3 RECEIVED IN EVIDENCE.)

      **MR. KESSLER:** IF WE CAN BLOW UP THE WHOLE THING.

THAT WOULD BE GREAT.

      THANK YOU. JUST THE TITLE AND THE BOX. I DON'T NEED

THE NOTES FOR RIGHT NOW.

      GET A BIGGER VIEW FOR THE JURY.

**BY MR. KESSLER:**

**Q.** THIS IS THE REVENUE -- THE LICENSING REVENUES AND THE

PLAYER SHARES THAT YOU CALCULATED FOR THE MAJOR LEAGUE BASEBALL

PLAYERS ASSOCIATION, CORRECT?

**A.** YES.

**Q.** AND THIS IS THE ONLY SPORTS UNION, OTHER THAN THE NFLPA,

1    THAT YOU'RE OFFERING TO THE JURY AS EVIDENCE IN THIS CASE,

2    CORRECT?

3    **A.**    YES.  IT WAS THE ONLY ONE THAT --

4    **Q.**    THANK YOU.

5    **A.**    -- WAS COMPARABLE.  OKAY.

6    **Q.**    "YES" WOULD HAVE BEEN SUFFICIENT, SIR.  OKAY?

7              THANK YOU.

8              NOW, YOU TOLD THE JURY THAT MAJOR LEAGUE BASEBALL

9    PLAYERS ASSOCIATION ONLY KEPT 38 TO 39 PERCENT OF THE LICENSING

10   REVENUE AND PAID THE REST OUT TO THE PLAYERS; IS THAT CORRECT?

11   **A.**    YES.

12   **Q.**    WHAT YOU DIDN'T TELL THE JURY IS THAT THAT WAS AN AVERAGE

13   CALCULATION, CORRECT?

14   **A.**    CORRECT.

15   **Q.**    IF I LOOK YEAR BY YEAR, OKAY, THE MAJOR LEAGUE BASEBALL

16   PLAYERS ASSOCIATION IN 2003, FOR EXAMPLE, PAID 54 PERCENT TO

17   THE PLAYERS AND KEPT 46 PERCENT FOR ITSELF, CORRECT?

18   **A.**    CORRECT.

19   **Q.**    AND THAT WOULD BE MORE THAN YOUR 10 TO 40 PERCENT

20   CUSTOMARY RANGE, CORRECT?

21             46 IS MORE THAN 40, CORRECT?

22   **A.**    RIGHT.

23   **Q.**    OKAY.  AND IN 2004, MAJOR LEAGUE BASEBALL PLAYERS

24   ASSOCIATION KEPT 47 PERCENT OF THE REVENUE FOR ITS UNION

25   OPERATIONS, AND THAT'S MORE THAN YOUR 10 TO 40 PERCENT

1  CUSTOMARY RANGE, CORRECT?

2  **A.**   CORRECT.

3  **Q.**   AND IN 2005, MAJOR LEAGUE BASEBALL PLAYERS ASSOCIATION

4  KEPT 84 AND A HALF PERCENT OF THE REVENUES OF ITS LICENSING FOR

5  THE UNION OPERATIONS, CORRECT?

6  **A.**   RIGHT.

7  **Q.**   AND THAT 84 AND A HALF PERCENT IS A BIGGER PERCENTAGE THAN

8  THE NFLPA AND PI -- EVEN COMBINE THEM TOGETHER IF YOU WANT --

9  EVER KEPT OUT OF THE PLAYER LICENSING YOU LOOKED AT, CORRECT?

10 YES OR NO?

11 **A.**   I MEAN, YES.

12 **Q.**   THANK YOU.

13 **A.**   THEY ARE --

14 **Q.**   AND IN 2006, THE MAJOR LEAGUE BASEBALL PLAYERS ASSOCIATION

15 KEPT 99.6 PERCENT OF THE LICENSING REVENUES.  AND THAT IS

16 VASTLY MORE THAN THE NFLPA AND PI EVER KEPT OUT OF PLAYER

17 LICENSING REVENUE, CORRECT?

18 **A.**   RIGHT.

19 **Q.**   AND THE REASON FOR THAT FLUCTUATION IS BECAUSE WHEN THERE

20 ARE TIMES WHEN LABOR ACTIVITY IS GREATER, THE ACTIVE PLAYERS

21 MIGHT SAY:

22          "LET'S KEEP MORE MONEY IN THE UNION," CORRECT?

23 **A.**   YES.

24 **Q.**   AND THAT'S WHAT HAPPENED IN BASEBALL, CORRECT?

25 **A.**   THAT'S WHAT HAPPENED IN BASEBALL.

1  Q.   AND THAT'S WHY IN 2007 THERE'S A REAL BIG PAYOUT TO THE

2  PLAYERS, 165 PERCENT -- THAT'S MORE THAN THEY GOT IN -- BECAUSE

3  THEY HAD SETTLED A COLLECTIVE BARGAINING AGREEMENT, AND THEY

4  DECIDED TO PAY MONEY BACK TO THE PLAYERS, RIGHT?

5  A.   THAT'S RIGHT.

6  Q.   AND WHAT YOU KNOW, SIR, IS YOU DID NO ANALYSIS OF THE

7  COLLECTIVE BARGAINING SITUATION IN THE NFL DURING ANY OF THE

8  YEARS YOU STUDIED TO DETERMINE IF THE LABOR SITUATIONS WERE

9  COMPARABLE OR NOT COMPARABLE ON A YEAR-BY-YEAR BASIS, CORRECT?

10  A.   I ACTUALLY DID LOOK AT THAT.

11  Q.   OKAY.  FINE.  THEN YOU KNOW, FOR EXAMPLE, THAT IN 2006,

12  THE NFL HAD A VERY TENSE LABOR NEGOTIATION WITH THE OWNERS?

13  ARE YOU AWARE OF THAT, SIR?

14  A.   YES.

15  Q.   SO 2006 WOULD BE A YEAR, YOU'D AGREE, THE PLAYERS MAY WANT

16  TO HAVE SOME MONEY IN THEIR UNION FOR PROTECTION, CORRECT?

17       YES OR NO?

18  A.   CORRECT.  IF --

19  Q.   THAT'S MY QUESTION.

20       AND AFTER 2006, IN 2007, THE OWNERS IMMEDIATELY SAID,

21  THE VERY NEXT YEAR, THEY'RE GOING TO TERMINATE THE AGREEMENT

22  EARLY.  THAT'S WHAT THEY ARE THINKING OF, SO THE PLAYERS HAD TO

23  STILL KEEP THAT MONEY IN THE UNION, CORRECT?

24  A.   SO WHICH MONEY ARE YOU TALKING ABOUT?

25  Q.   YES OR NO?

1   **A.**   I DON'T KNOW WHICH MONEY YOU'RE TALKING ABOUT.

2   **Q.**   REVENUES TO SUPPORT THE UNION.  THERE WAS A TENSE LABOR

3   SITUATION, YES OR NO?

4   **A.**   THERE WAS DEFINITELY A TENSE LABOR SITUATION.

5   **Q.**   THANK YOU, SIR.

6           NOW, WHEN YOU LOOKED AT THE UNIVERSITY OF KENTUCKY OR

7   COLLEGIATE LICENSING, WERE YOU TAKING A LOT OF DIFFERENT YEARS

8   AND AVERAGING THEM ALL TOGETHER, OR JUST ONE FIGURE?

9   **A.**   WELL, IT'S ONE FIGURE, BUT --

10  **Q.**   THANK YOU.  THAT'S ALL I ASKED.  ONE FIGURE FOR --

11          (SIMULTANEOUS SPEAKING, NOT REPORTABLE.)

12  **A.**   THEY'RE AVERAGING IT.

13  **Q.**   FOR THE UNION YOU DECIDED TO TAKE -- FOR BASEBALL YOU TOOK

14  ALL THESE DIFFERENT YEARS, AND YOU JUST PRESENTED TO THE JURY

15  AN AVERAGE AND NEVER DISCLOSED IT WAS AN AVERAGE, DID YOU?

16  **A.**   DISCLOSED IT IN WHAT WAY?  YOU MEAN, TOLD THEM IT WAS AN

17  AVERAGE?

18  **Q.**   YEAH.  YOU DIDN'T TELL THEM ON YOUR DIRECT EXAMINATION,

19  DID YOU?

20  **A.**   RIGHT.

21  **Q.**   NOW, IS IT FAIR TO SAY THAT THERE'S NOT ONE SINGLE YEAR,

22  NOT ONE SINGLE YEAR WHEN THE PERCENTAGE RETAINED BY MAJOR

23  LEAGUE BASEBALL PLAYERS ASSOCIATION WAS WITHIN THE 10 TO

24  40 PERCENT RANGE YOU SAID WAS CUSTOMARY?  THERE'S NOT ONE

25  SINGLE YEAR?

1  **A.**   RIGHT.  IT'S THE WAY --

2  **Q.**   RIGHT.  RIGHT.

3       SO YOU TOLD THIS JURY THAT SOMETHING WAS CUSTOMARY

4  BASED ON MAJOR LEAGUE BASEBALL, WHEN NOT ONE SINGLE YEAR IS

5  WITHIN THE CUSTOMARY RANGE.  YOU JUST AVERAGED IT ALL TOGETHER

6  TO PRESENT SOME OTHER NUMBER TO THE JURY.

7       IS THAT FAIR, SIR?

8  **A.**  NO, THAT'S NOT -- THAT'S NOT WHAT'S HAPPENING HERE.

9  THAT'S JUST NOT A GOOD REPRESENTATION OF WHAT GOES ON IN

10 BASEBALL, WHAT GOES ON IN FOOTBALL, WHAT GOES ON AT COLLEGIATE

11 LICENSING CORPORATION.

12      THAT'S JUST NOT A FAIR REPRESENTATION.

13 **Q.**  OKAY.  I'M GOING TO MOVE ON.

14      NOW, SIR, IN YOUR REPLY REPORT -- I'M SORRY, IN YOUR

15 MAIN REPORT, THE QUESTION YOU WERE ASKED TO DO BY COUNSEL WAS

16 THE FOLLOWING:

17      "WHAT IS THE PERCENTAGE OF LICENSING MONIES KEPT

18 BY THE NFLPA, NFL PI?"

19      THAT WAS THE QUESTION, RIGHT?

20      AND THEN, IT WAS:

21      "HOW DOES IT COMPARE WITH OTHER PROFESSIONAL

22 SPORTS UNIONS OR THIRD-PARTY LICENSING ENTITIES?  HOW DOES THE

23 PERCENTAGE KEPT BY THE NFLPA, NFL PI COMPARE TO WHAT IS

24 CUSTOMARY IN SPORTS LICENSING," CORRECT?

25      THOSE ARE THE QUESTIONS.  I READ THEM ACCURATELY?

1    **A.**   YES.

2    **Q.**   THESE QUESTIONS DON'T TELL YOU:

3             "ONLY LOOK AT A PORTION OF THE LICENSING REVENUES

4    THAT ARE EQUALLY SHARED."

5             THERE'S NOTHING IN THE QUESTION THAT SAYS THAT,

6    RIGHT?

7    **A.**   I'D HAVE TO LOOK AT IT.  BUT -- MY INTERPRETATION WAS --

8    **Q.**   I WILL ASK YOU A SPECIFIC THING.  IS THERE ANYTHING IN THE

9    LANGUAGE OF THE QUESTION THAT SAYS:

10             "ONLY LOOK AT EQUAL SHARE -- THE GLR EQUAL SHARE

11   POOL, AND DON'T LOOK AT ALL THE OTHER LICENSING REVENUE"?  IS

12   THERE ANYTHING IN THE QUESTION THAT SAYS THAT?

13   **A.**   IT DOESN'T SAY THAT.

14   **Q.**   THANK YOU.  THANK YOU.

15             YOU NOW, LET'S MOVE ON TO ANOTHER SUBJECT.

16             YOU TESTIFIED THAT ONE OF YOUR OPINIONS IS THAT --

17   WELL, LET ME ASK YOU THIS:

18             RE-EXPRESS IN ONE LINE, WHAT IS YOUR OPINION ABOUT

19   THE CONTRIBUTION OF FORMER PLAYERS TO THE BUSINESS TODAY?  I

20   WANT TO JUST UNDERSTAND:  WHAT IS YOUR OPINION, BECAUSE I

21   COULDN'T FOLLOW IT.

22             **THE COURT:**  YOU CAN TAKE TWO OR THREE SENTENCES, IF

23   YOU WANT.

24             **MR. KESSLER:**  OKAY.  THANK YOU.

25             **THE WITNESS:**  MY OPINION IS THAT THE RETIRED PLAYERS

1 BUILT THE BRAND, BUILT THE FAN LOYALTY THAT TODAY CAUSES PEOPLE

2 TO BUY LICENSED MERCHANDISE, GO TO GAMES, WATCH ON TELEVISION,

3 AND ESSENTIALLY BE COMMITTED FANS TO THE VARIOUS TEAMS AND

4 PLAYERS THAT ARE OUT THERE.

5 **BY MR. KESSLER:**

6 **Q.** OKAY. JUST WANTED TO GET IT IN YOUR OWN WORDS.

7 NOW, YOU TOLD THE JURY THAT YOU STUDIED SOMETHING TO

8 REACH THAT OPINION, RIGHT?

9 **A.** YES.

10 **Q.** YOU DIDN'T JUST LIKE WAKE UP IN THE MORNING WITH THAT

11 OPINION, RIGHT?

12 **A.** RIGHT.

13 **Q.** AND WHAT YOU TOLD THE JURY YOU DID IS FIRST YOU SAID YOU

14 LOOKED AT PEER-REVIEWED ARTICLES, RIGHT?

15 **A.** YES.

16 **Q.** NOW, THAT'S SOMEBODY ELSE'S WORK, NOT YOUR WORK, RIGHT?

17 **A.** WELL, NO, SCIENTIFIC WORK IS -- IS LOOKING AT OTHER

18 STUDIES, UNDERSTANDING THEM AND COMPILING THEM TO SEE IF

19 THERE'S A THEME.

20 **Q.** SIR, I'M JUST TRYING TO UNDERSTAND. YOU DIDN'T WRITE

21 THOSE ARTICLES?

22 **A.** I DIDN'T WRITE THE ARTICLES.

23 **Q.** YOU DIDN'T DO THOSE STUDIES, CORRECT?

24 **A.** CORRECT.

25 **Q.** SOMEBODY ELSE DID THOSE STUDIES WHO'S NOT IN THIS

1    COURTROOM, CORRECT?

2    **A.**    CORRECT.

3    **Q.**    NOW, IT'S ALSO TRUE THAT NONE OF THOSE STUDIES, NONE OF

4    THE STUDIES YOU LOOKED AT SPECIFICALLY LOOKED AT THE

5    RELATIONSHIP BETWEEN RETIRED NFL PLAYERS AND A PLAYER LICENSING

6    BUSINESS, TRUE?

7    **A.**    YOU MEAN, THEY LOOKED AT RETIRED PLAYERS, PLAYERS FROM THE

8    PAST, TEAMS' PERSONNEL FROM THE PAST, WHICH ARE THE PLAYERS

9    FROM THE PAST.

10   **Q.**    COULD YOU ANSWER "TRUE" OR "FALSE" TO MY QUESTION.  YOU

11   CAN SAY "FALSE."

12   **A.**    SORRY.  FALSE.

13   **Q.**    OKAY.  IT'S FALSE.  YOU JUST TOLD THE JURY IT'S FALSE TO

14   MY QUESTION AS TO WHETHER ANY OF THESE ARTICLES LOOKED AT THE

15   RELATIONSHIP BETWEEN RETIRED NFL PLAYERS TO A PLAYER LICENSING

16   BUSINESS.

17          LET ME ASK YOU ABOUT THE TWO ARTICLES YOU CITED, SIR:

18   THE FIRST ARTICLE YOU CITED WAS BY STEVEN D. ROSS, CORRECT?

19   **A.**    CORRECT.

20   **Q.**    AND THAT ARTICLE WAS A STUDY INTENDED TO MEASURE

21   PROFESSIONAL SPORTS TEAM BRAND ASSOCIATION, CORRECT?

22   **A.**    RIGHT.

23   **Q.**    THERE'S NOTHING IN THIS ARTICLE THAT DISCUSSES PLAYER

24   LICENSING AT ALL, TRUE OR FALSE?

25   **A.**    IT DOESN'T SAY "PLAYER LICENSING."

1   Q.   THERE'S NOT A WORD ABOUT PLAYER LICENSING IN THIS ARTICLE,

2   TRUE?

3   A.   TRUE.

4   Q.   OKAY.   THE OTHER ARTICLE YOU CITED WAS BY ROBIN UNDERWOOD,

5   CORRECT?

6   A.   CORRECT.

7   Q.   NOW, THAT WAS DESIGNED TO TALK ABOUT BRAND EQUITY FOR

8   SERVICE MARKETERS, CORRECT?

9   A.   CORRECT.

10  Q.   AND THERE'S NO DISCUSSION IN THIS ARTICLE ABOUT PLAYER

11  LICENSING, IS THERE?   NOTHING?

12  A.   IT TALKS ABOUT FAN LOYALTY, SO IT DOESN'T SAY THE WORD

13  "PLAYER LICENSING."

14  Q.   IT DOESN'T DO ANY DATA ON THE SALE OF LICENSED PLAYER

15  MERCHANDISE, DOES IT?

16  A.   NO.

17  Q.   RIGHT.   SO AND THAT'S TRUE OF EVERY PEER-REVIEW ARTICLE

18  YOU LOOKED AT.   NOT A SINGLE ONE STUDIED THE ISSUE OF RETIRED

19  NFL PLAYERS SPECIFICALLY, WHAT THEIR IMPACT WAS ON PLAYER

20  LICENSING; THAT'S TRUE, YES OR NO?

21  A.   THE ART --

22  Q.   YES OR NO?

23  A.   NO.

24  Q.   OKAY.   TELL ME AN ARTICLE, AN ARTICLE, THAT SPECIFICALLY

25  DISCUSSES PLAYER LICENSING, ACTUALLY TALKS ABOUT THE LICENSING

1 BY A PLAYERS ASSOCIATION OF PLAYERS' RIGHTS AND THE IMPACT OF

2 RETIRED PLAYERS.

3       IS THERE SUCH AN ARTICLE, YES OR NO?

4 **A.**   THERE ARE ARTICLES --

5 **Q.**  YES OR NO?  WOULD YOU LISTEN TO MY QUESTION, SIR --

6       **THE COURT:**  YOU CAN DO THIS.

7       ANSWER "YES" OR "NO," AND THEN YOU CAN ADD A SENTENCE

8 BY WAY OF EXPLANATION.

9 **BY MR. KESSLER:**

10 **Q.**  IS THERE ANY ARTICLE YOU RELIED UPON WHICH LOOKS AT THE

11 LICENSING, PLAYER LICENSING BUSINESS OF A PLAYERS ASSOCIATION,

12 AND SAYS WHAT'S THE IMPACT OF RETIRED PLAYERS ON THAT BUSINESS?

13 ANY ARTICLE?

14 **A.**   NOT SPECIFICALLY THE WAY --

15 **Q.**  THANK YOU.  THANK YOU.

16       **THE COURT:**  YOU DO YOU WANT TO ADD A SENTENCE?

17       **THE WITNESS:**  I LOOKED AT DOZENS OF ARTICLES.  SOME

18 OF THEM LOOKED AT MERCHANDISE SALES OF NFL TEAMS AND HOW THAT'S

19 IMPACTED BY THE PAST AND THE BRAND EQUITY THAT'S BEEN BUILT UP.

20       THOSE MERCHANDISE SALES OF THOSE TEAMS INCLUDE, YOU

21 KNOW, IF YOU BUY A 49ER'S JERSEY IT'S GOT "ROGER CRAIG" OR

22 "DWIGHT CLARK" OR SOMEONE ON THE BACK.

23       THAT'S PLAYER LICENSING.  THEY DIDN'T USE THE WORD

24 "PLAYER LICENSING" IN THE RESEARCH, BUT IT'S ABOUT THE OVERALL

25 SALES OF TEAM MERCHANDISE AND THE OVERALL DEMAND FOR THE

1    PRODUCT.

2          THEY USE THE WORD "MERCHANDISE" IN THERE, LICENSED

3    MERCHANDISE.

4          **THE COURT:**  ALL RIGHT.  NEXT QUESTION.

5    **BY MR. KESSLER:**

6    **Q.**   DR. RASCHER, YOU'RE A SPORTS ECONOMIST, RIGHT?

7    **A.**   YES.

8    **Q.**   YOU TOLD THE JURY YOU'RE FAMILIAR WITH THE LICENSING IN

9    THE SPORTS BUSINESS, RIGHT?

10   **A.**   YES.

11   **Q.**   THE TEAMS LICENSE THEIR RIGHTS SEPARATELY FROM THE

12   PLAYERS, CORRECT?

13   **A.**   CORRECT.

14   **Q.**   RIGHT.  SO IF YOU'RE STUDYING TEAM RIGHTS THAT'S NOT THE

15   SAME THING AS STUDYING THE VALUE OF PLAYER RIGHTS, IS IT?

16          YES OR NO?

17   **A.**   UNLESS THEY ARE JOINT PRODUCTS.  LIKE THE EA PRODUCT HAS

18   TO GET THE TEAM LICENSING AND THE PLAYER LICENSING.

19          WHEN SOMEONE BUYS A UNIT OR BUYS A GAME, THE VIDEO

20   GAME, THEY ARE NOT ONLY CREATING MONEY FOR THE TEAM LICENSING

21   RIGHTS, BUT THEY ARE CREATING MONEY FOR THE PLAYER LICENSING

22   RIGHTS.

23   **Q.**   GREAT POINT.  HAVE YOU DONE ANY STUDY, SPECIFICALLY AN

24   ECONOMICAL ANALYSIS OF DATA RELATING TO THE SALES OF EA GAMES

25   AND HOW IT'S IMPACTED BY RETIRED PLAYERS RIGHTS?  ANY KIND OF

1   ANALYSIS?

2   **A.**   I'VE NOTED THEY HAVE SOLD BILLIONS OF DOLLARS WORTH OF --

3         (SIMULTANEOUS SPEAKING, NOT REPORTABLE.)

4   **Q.**   THAT'S NOT MY --

5   **A.**   WELL, THAT'S --

6   **Q.**   MY QUESTION IS:  DID YOU DO ANY TYPE OF ECONOMIC STUDY?

7   YOU KNOW WHAT AN ECONOMIC STUDY IS, SIR?

8   **A.**   YES.

9   **Q.**   YOU'RE FAMILIAR WITH REGRESSION ANALYSIS, RIGHT?

10   **A.**   THAT'S NOT THE ONLY --

11   **Q.**   OKAY.

12   **A.**   -- KIND OF ANALYSIS.

13   **Q.**   OKAY.  THERE ARE A LOT OF ECONOMIC STUDIES.

14   **A.**   RIGHT.

15   **Q.**   HAVE YOU DONE ANY ANALYSIS OF THE ECONOMIC DATA IN THIS

16   CASE TO COME TO A CONCLUSION ABOUT ANY KIND OF RELATIONSHIP IN

17   A DATA SENSE BETWEEN SALES OF EA GAMES AND RETIRED PLAYERS, ANY

18   KIND OF DATA ANALYSIS?

19   **A.**   YOU MEAN, LIKE SPECIFIC QUANTITATIVE --

20         (SIMULTANEOUS SPEAKING, NOT REPORTABLE.)

21   **Q.**   YES, NO QUANTITATIVE --

22   **A.**   QUALITATIVE ANALYSIS.

23   **Q.**   OKAY. BUT YOU'VE DONE NO QUANTITIVE ANALYSIS?

24   **A.**   RIGHT.  QUALITATIVE ANALYSIS.

25   **Q.**   BUT YOU'VE DONE NO QUANTITIVE ANALYSIS?  YOU HAVE DONE NO

1    ANALYSIS INVOLVING NUMBERS.  THAT'S QUANTITIVE, RIGHT?

2    **A.**    RIGHT.

3    **Q.**    SO NO NUMBER ANALYSIS.  LET'S TRY TO MAKE IT SIMPLE.

4            NOW, SIR, IT'S ALSO TRUE, IS IT NOT, THAT YOU AGREE

5    THAT ALL THE RETIRED PLAYERS WHO ARE IN THIS CLASS WOULD NOT

6    CONTRIBUTE EQUALLY TO THE VALUE OF A LICENSING BUSINESS OR ANY

7    TYPE OF SPORTS BUSINESS.  THEY WOULD ALL HAVE DIFFERENT VALUES,

8    RIGHT?

9    **A.**    I MEAN, YEAH.  INDIVIDUAL PLAYERS WOULD HAVE DIFFERENT

10   VALUES.  IT'S INTERESTING IN THE EA GAME THAT IF THEY HAVE ALL

11   THE PLAYERS ON THE TEAM, THEN IN A SENSE IT'S -- IF YOU WANT TO

12   PLAY THE GAME YOU HAVE GOT TO HAVE A TACKLE AND A GUARD AND A

13   CENTER, AND SO FORTH.

14           SO IN THAT SENSE THEY'RE ALL CONTRIBUTING THE SAME

15   VALUE.  NOW, IN EA THEY HAVE THE HALL OF FAME THAT ARE

16   HIGHLIGHTED, AND SO FORTH.  AND THEN, THEY'VE GOT THE

17   JOURNEYMEN PLAYERS WHO AREN'T HIGHLIGHTED.

18   **Q.**    OKAY.

19   **A.**    BUT --

20   **Q.**    SIR, YOU UNDERSTAND, DO YOU NOT, THAT IF YOU HAVE STAR

21   QUARTERBACKS, FOR EXAMPLE, THEIR ECONOMIC LICENSING RIGHTS ARE

22   GOING TO BE WORTH A LOT MORE THAN A JOURNEYMAN PLAYER WHO

23   BARELY PLAYED?

24           YES OR NO?

25   **A.**    THEY SELL --

1      (SIMULTANEOUS SPEAKING, NOT REPORTABLE.)

2   **Q.** THANK YOU.

3   **A.** -- THEM AS A GROUP.

4   **Q.** YES OR NO?  CAN I GET A YES OR NO?  IS IT YES?

5   **A.** YOU SAID --

6   **Q.** YES?

7   **A.** YOU SAID "WORTH MORE"?

8   **Q.** ECONOMICALLY WORTH MORE IN A MARKETPLACE.  WOULD A STAR'S

9   LICENSING RIGHTS BE WORTH MORE THAN A JOURNEYMAN PLAYER'S, YES

10  OR NO?

11  **A.** YES.

12  **Q.** AND YOU KNOW, DO YOU NOT, THAT IN THIS CLASS, MOST OF THE

13  CLASS MEMBERS WERE NOT STAR PLAYERS?  YOU KNOW THAT, DON'T YOU?

14  **A.** YES.

15  **Q.** OKAY.  AND YOU WOULD AGREE THAT MOST OF THE CLASS MEMBERS

16  IN THIS CASE -- AND THIS IS NO CRITICISM OF THEM -- DON'T HAVE

17  ANY SIGNIFICANT ECONOMIC LICENSING VALUE IN THEIR INDIVIDUAL

18  RIGHTS?

19      THAT'S TRUE, ISN'T IT?

20  **A.** IN THEIR INDIVIDUAL RIGHTS --

21  **Q.** YES.

22  **A.** -- AS OPPOSED TO THEIR GROUP RIGHTS.

23  **Q.** YES.

24  **A.** I MEAN, I DIDN'T STUDY INDIVIDUAL DEALS THAT A PLAYER MAY

25  GO OUT AND DO AN ENDORSEMENT OR A SPONSORSHIP OR A LICENSING

1 DEAL WITH A CHEVY DEALER OR SOMEONE THAT DIDN'T GO THROUGH THE

2 PLAYERS ASSOCIATION.

3 **Q.**   LET ME ASK YOU THIS.  LET'S SAY THERE'S A CLASS MEMBER.

4 LET'S SAY THERE'S A CLASS MEMBER WHO NEVER PLAYED A GAME.

5 WOULD YOU AGREE WITH ME NO COLLECTABLE COMPANY IS GOING TO

6 LICENSE THAT PLAYER'S RIGHTS?

7 **A.**   RIGHT.

8 **Q.**   WHETHER IT'S IN A GROUP OR INDIVIDUALLY, THEY HAVE NO USE

9 FOR THOSE PLAYER RIGHTS?

10 **A.**   IN A GROUP -- GROUP LICENSE IS A DIFFERENT THAN AN

11 INDIVIDUAL LICENSE.

12 **Q.**   I'M TALKING ABOUT COLLECTIBLES.  DO YOU KNOW WHAT

13 COLLECTIBLES ARE?

14 **A.**   YES.

15 **Q.**   LET'S TALK ABOUT FIGURINES.  DO YOU THINK WHETHER IT'S A

16 GROUP OR INDIVIDUAL THAT A COLLECTIBLE COMPANY WOULD WANT THE

17 RIGHTS TO A PLAYER WHO NEVER PLAYED A GAME?  THEY WOULD PUT OUT

18 A --

19             (SIMULTANEOUS SPEAKING, NOT REPORTABLE.)

20 **A.**   WELL, NO --

21 **Q.**   AND THAT WOULD ALSO BE TRUE OF JERSEY.  OKAY.  IF YOU HAD

22 A JERSEY, IF A PLAYER NEVER PLAYED A GAME, SAYS YOU'RE NOT

23 GOING TO WANT THAT PLAYER'S RIGHTS FOR THE JERSEY WHETHER IT'S

24 IN A GROUP OR NOT, RIGHT?

25 **A.**   RIGHT.

1  **Q.**   AND LET'S SAY YOU HAD A WHOLE GROUP AS A HYPOTHETICAL.

2  LET'S SAY YOU HAD A GROUP OF INDIVIDUALS WITH -- LET'S SAY IT'S

3  A HUNDRED PLAYERS WHO NEVER PLAYED MORE THAN THREE GAMES.  IF

4  YOU HAD A HUNDRED OF THOSE PLAYERS, AND YOU PUT THEM IN A

5  GROUP, THERE'S NOT GOING TO BE ANY VALUE IN THAT GROUP IF THEY

6  NEVER PLAYED A GAME FOR LICENSING, IS THERE?

7  **A.**   I DON'T KNOW WHY THEY WOULD HAVE --

8          (SIMULTANEOUS SPEAKING, NOT REPORTABLE.)

9  **Q.**   FOR THOSE PLAYERS WHO HAVE NO VALUE, YOU CAN ADD UP -- IF

10 YOU ADD UP A ZERO PLUS A ZERO TIMES A ZERO, FOR THOSE WHO HAVE

11 NO VALUE YOU CAN'T CREATE VALUE OUT OF NOTHING, RIGHT?

12 **A.**   IF YOU HAVE A GROUP OF THOSE PLAYERS, IF YOU HAVE A GROUP

13 OF RETIRED PLAYERS, THEN THERE'S CERTAINLY VALUE IN THAT, AND

14 I'VE TESTIFIED TO THAT.

15 **Q.**   THE VALUE WOULD COME FROM THE STAR PLAYERS IN THE GROUP,

16 RIGHT?

17 **A.**   IT COMES FROM ALL THE PLAYERS AS A GROUP.  YOU NEED EVERY

18 PLAYER ON THE TEAM.  FOOTBALL IS A TEAM SPORT.  IT'S NOT A GOLF

19 OR A TENNIS.  IT'S A TEAM SPORT.

20 **Q.**   YOU KNOW THAT THE GLA CLASS HERE DOESN'T INCLUDE MOST OF

21 THE STAR PLAYERS, RIGHT?  YOU KNOW THAT?

22 **A.**   I MEAN, I DON'T KNOW THE PERCENTAGES, BUT --

23 **Q.**   THAT'S FAIR.  MOST STAR PLAYERS NEVER SIGN THE RETIRED

24 PLAYER GLA.  THAT'S CORRECT, ISN'T IT?  YOU KNOW THAT.

25 **A.**   NO, I DON'T KNOW THAT.

1 **Q.**   DID YOU EVEN EXAMINE THAT ISSUE?

2 **A.**   I LOOKED AT IT, BUT I WASN'T LOOKING AT THAT PARTICULAR

3 ISSUE, SO I DON'T KNOW THE PERCENTAGES.  WHEN YOU SAY "MOST,"

4 DO YOU MEAN 90 PERCENT?  80 PERCENT?

5 **Q.**   MAJORITY OF STAR PLAYERS DON'T SIGN GLA'S.  YOU'LL GIVE ME

6 THAT, WON'T YOU?

7 **A.**   I DON'T KNOW THAT.

8 **Q.**   YOU HAVEN'T LOOKED AT THE GLA'S IN THIS CASE ENOUGH TO

9 MAKE THAT JUDGMENT, SIR?  THAT'S YOUR TESTIMONY?

10 **A.**   I'VE LOOKED AT INDIVIDUAL GLA'S, BUT I WAS LOOKING AT THE

11 TOTAL REVENUES, TOTAL GROUP LICENSING REVENUES.  IF YOU LOOK AT

12 THE QUESTIONS I WAS ASKED BY COUNSEL, BY PLAINTIFFS' COUNSEL, I

13 WASN'T LOOKING AT INDIVIDUAL GLA'S TO DETERMINE WHO SIGNED THEM

14 AND WHO DIDN'T SIGN THEM.

15 **Q.**   SO THE COUNSEL NEVER ASKED YOU TO LOOK AT THE CENTRAL

16 ISSUE IN THIS CASE:  THE GLA.  THAT'S WHAT YOUR TESTIMONY IT

17 IS?

18 **A.**   NO, I LOOKED --

19            **MR. HUMMEL:**  OBJECTION, YOUR HONOR.

20            **MR. KESSLER:**

21 **Q.**   OKAY.  YOU DID LOOK AT THE GLA.

22            **THE COURT:**  WELL, LOOK.  THIS WITNESS DOESN'T HAVE TO

23 ADDRESS EVERY SINGLE ISSUE IN THE CASE.  HE WAS CALLED HERE TO

24 ADDRESS CERTAIN ISSUES THAT COUNSEL READ OUT TO HIM.  AND

25 WITHIN THE SCOPE OF CROSS -- YOU'RE ENTITLED TO CROSS-EXAMINE,

1    BUT I THINK THAT LAST QUESTION WAS TOO ARGUMENTATIVE.

2            **MR. KESSLER:**  OKAY, YOUR HONOR.

3            I'LL ASK A DIFFERENT QUESTION.

4    **BY MR. KESSLER:**

5    **Q.**   YOU NEVER DID ANY ANALYSIS OF THE ECONOMIC VALUE OF

6    INDIVIDUAL GLA CLASS MEMBERS IN LICENSING, RIGHT?

7            YOU DID NOT?

8    **A.**   RIGHT.  NO, I DIDN'T.

9    **Q.**   I WANTED TO MAKE SURE YOUR VOICE WAS --

10   **A.**   INDIVIDUAL, YOU SAID.  RIGHT?  NO.

11   **Q.**   OKAY.  NOW --

12           **THE COURT:**  HOW CLOSE TO THE END ARE YOU?

13           **MR. KESSLER:**  OH, I'D SAY ABOUT 10 OR 15 MINUTES,

14   YOUR HONOR.

15           I'LL TRY TO MOVE IT QUICKER.

16           **THE COURT:**  I WOULD LIKE TO GET -- YOU HAVE ONE MORE

17   WITNESS, RIGHT, THEN YOU REST?

18           **MR. HUMMEL:**  SUBJECT TO WHAT WE'VE TALKED ABOUT

19   BEFORE.

20           **THE COURT:**  I DON'T REMEMBER WHAT THAT IS.  BUT IT

21   WOULD BE NICE FOR THE PLAINTIFF TO REST BEFORE WE BREAK.

22           **MR. KESSLER:**  I'M AFRAID, YOUR HONOR, SINCE IT'S

23   THEIR DAMAGES EXPERT I WILL HAVE SOME CROSS ON THAT, AS WELL.

24           **THE COURT:**  IT'S IMPOSSIBLE, ANYWAY.

25           **MR. KESSLER:**  YEAH.

1    **THE COURT:** ANYWAY, PLEASE TRY TO TAKE YOUR 10

2  MINUTES OR SO AND LET'S TRY TO WIND UP THIS WITNESS.

3  **BY MR. KESSLER:**

4  **Q.** I WILL TRY.

5    IT'S TRUE, ISN'T IT, THAT IT'S YOUR OPINION THAT NOT

6  JUST RETIRED PLAYERS CONTRIBUTE TO THE VALUE OF THE NFL GAME

7  TODAY, BUT THAT YOU BELIEVE THAT OTHERS WHO CONTRIBUTE ARE

8  COACHES, CORRECT?

9  **A.** CORRECT.

10 **Q.** TRAINERS, CORRECT?

11    YES OR NO?

12 **A.** EVERYBODY ON -- EVERYBODY CONTRIBUTES AT DIFFERENT LEVELS,

13 OF COURSE, BUT EVERYBODY CONTRIBUTES.

14 **Q.** TICKET-TAKERS, CORRECT?

15 **A.** WHY WOULD THEY HAVE THEM OTHERWISE?

16 **Q.** OKAY. PEOPLE -- AND I'M NOT IN ANY WAY SAYING THIS --

17 PEOPLE WHO DO SECURITY IN THE STADIUM OR DO PARK THE CARS OR

18 SELL CONCESSIONS, THEY ALL CONTRIBUTE, CORRECT?

19 **A.** ALL THE EMPLOYEES CONTRIBUTE VALUE AT DIFFERENT LEVELS TO

20 AN NFL TEAM, TO THE NFL LEAGUE, AND SO FORTH.

21 **Q.** RIGHT. JUST LIKE ALL EMPLOYEES OF ANY BUSINESS CONTRIBUTE

22 TO IT, CORRECT?

23 **A.** RIGHT.

24 **Q.** RIGHT. SO YOU'RE NOT OFFERING AN OPINION THAT AN NFL

25 TICKET-TAKER SHOULD SHARE IN THE GLR POOL, ARE YOU? IS THAT

1    YOUR OPINION?

2    **A.**    NO.

3    **Q.**    OKAY.  LET ME MOVE ON NOW TO YOUR POINT ABOUT LEVERAGE.

4          WHEN YOU FIRST EXPLAINED YOUR CREDENTIALS TO THE

5    JURY, YOU SAID YOU'RE AN ECONOMIST AND YOU APPLY MICROECONOMIC

6    PRINCIPLES, CORRECT?

7    **A.**    CORRECT.

8    **Q.**    IN YOUR OPINION ABOUT LEVERAGE, YOU DIDN'T DO ANY TYPE OF

9    MICROECONOMIC ANALYSIS OF POWER OR MARKET POWER OR ANY ISSUE

10   LIKE THAT, DID YOU?

11   **A.**    NOT IN AN ANTITRUST SENSE OF DEFINING PRODUCT MARKETS,

12   DEFINING GEOGRAPHIC MARKETS.

13   **Q.**    IN THE STANDARD PRINCIPLES OF MICROECONOMIC ANALYSIS OF

14   INDUSTRIAL ORGANIZATION -- YOU'RE FAMILIAR WITH THAT, CORRECT?

15   **A.**    OF COURSE.

16   **Q.**    THAT'S YOUR AREA OF EXPERTISE, CORRECT?

17   **A.**    YES.

18   **Q.**    YOU DIDN'T DO ANY STUDY OF THAT ISSUE APPLYING THE

19   PRINCIPLES OF INDUSTRIAL ORGANIZATION OF WHICH YOU ARE AN

20   EXPERT, RIGHT?

21   **A.**    NO, I DID.

22   **Q.**    YOU DIDN'T DO ANY MARKET DEFINITION, RIGHT?

23   **A.**    NO, I DIDN'T DO A MARKET DEFINITION.

24   **Q.**    AND YOU WOULD AGREE WITH ME THAT UNDER MICROECONOMIC

25   STANDARD PRINCIPLES, WITHOUT A MARKET DEFINITION, YOU CAN'T

1   GIVE ANY ECONOMIC OPINION AS TO WHETHER THERE'S MARKET POWER,

2   CORRECT?

3           YES OR NO?

4   **A.**   FOR MARKET POWER, BUT NOT LEVERAGE OR BARGAINING POWER.

5   **Q.**   I'M ASKING ABOUT MARKET POWER.

6   **A.**   CORRECT.

7   **Q.**   SO YOU HAVE NO OPINION TO THIS JURY ABOUT MARKET POWER OR

8   MONOPOLY POWER, RIGHT?  NO OPINION AT ALL?

9   **A.**   CORRECT.

10  **Q.**   SO WHAT YOU'RE TALKING ABOUT IS WHAT YOU CALL "LEVERAGE,"

11  CORRECT?

12  **A.**   CORRECT.

13  **Q.**   AND WHAT YOU TESTIFIED TO THE JURY IS BECAUSE THE NFLPA

14  CAN OFFER ALL THE ACTIVE PLAYERS, FOR EXAMPLE, THAT THAT GIVES

15  THEM A ONE-STOP-SHOPPING BENEFIT, CORRECT?

16  **A.**   CORRECT.

17  **Q.**   AND YOU SAID THAT GIVES THEM LEVERAGE OVER LICENSEES LIKE

18  EA, CORRECT?

19  **A.**   CORRECT.

20  **Q.**   NOW, AS AN ECONOMIST, IT'S YOUR OPINION THAT'S A VERY GOOD

21  THING, ISN'T IT?

22          YES OR NO?

23  **A.**   NO.

24  **Q.**   OKAY.  ISN'T IT TRUE THAT BY HAVING LEVERAGE OVER

25  LICENSEES THERE ARE EFFICIENCY RATES CREATED?

**A.**   NOT FROM THE LEVERAGE, FROM THE COLLECTIVITY.  SO THERE

ARE TWO SEPARATE ISSUES.  THERE'S EXCLUSIVITY.  THERE'S

EXCLUSIVE RIGHTS THEY HAVE TO SELL IN THE MARKETPLACE AND THEY

CAN CHARGE A HIGHER PRICE.

AND THERE'S COLLECTIVE RIGHTS.  WHEN YOU SELL THEM

ALL TOGETHER YOU SAVE EVERYBODY TIME AND MONEY.  YOU SAY BOTH

SIDES, THE EA'S OF THE WORLD AND YOU SAVE THE PLAYERS

ASSOCIATION TIME AND MONEY SO THEY CAN DO A DEAL ON WHAT ONE

CONTRACT, INSTEAD OF GOING OUT TO EACH AND EVERY INDIVIDUAL

PLAYER.

SO THOSE ARE TWO DIFFERENT THINGS.

**Q.**   LET'S TAKE A LOOK, SIR, AT YOUR DEPOSITION, IF YOU WILL.

**A.**   OKAY.

**Q.**   TAKE A LOOK -- AND I'M GOING TO READ TO YOU -- I'M SORRY?

**THE COURT:**  WHAT IS THE --

**MR. KESSLER:**  I APOLOGIZE, SIR.  I THOUGHT YOU HAD IT

UP THERE.

ALL RIGHT.  I'M SORRY.

**THE COURT:**  WHAT IS THE PAGE NUMBER?

**MR. KESSLER:**  PAGE 171.

**THE COURT:**  WAIT UNTIL WE ALL GET THERE.

**MR. KESSLER:**  AND I'M GOING TO READ FROM 14, YOUR

HONOR, ALL THE WAY TO LINE 12 ON 172.

**THE COURT:**  ANY OBJECTION?

**MR. HUMMEL:**  NO.

1      **THE COURT:**  GO AHEAD.

2      **MR. KESSLER:**  OKAY.

3      **"QUESTION:**  BUT YOU HAVEN'T REACHED ANY

4      CONCLUSION AS TO WHETHER THERE'S A RELEVANT

5      ECONOMIC MARKET OR NOT HERE?

6      **"ANSWER:**  RIGHT.

7      **"QUESTION:**  OR WHAT IT IS?

8      **"ANSWER:**  MY CONCLUSION, RIGHT.  MY

9      CONCLUSION IS THAT THE NFLPA/PI FOR THE

10     FOOTBALL -- FOR THE FOOTBALL RIGHTS IS ABLE

11     TO, SINCE THEY GATHERED THEM TOGETHER ACTIVE

12     AND RETIRED, THEY'RE ABLE TO GO OUT TO

13     POTENTIAL LICENSEES AND HAVE LEVERAGE, YOU

14     KNOW, IN TERMS OF NEGOTIATING A FAVORABLE

15     DEAL FOR THEMSELVES.

16     **"QUESTION:**  NOW, YOU ALSO TALKED ABOUT

17     EFFICIENCY RENTS THAT ARE EARNED, CORRECT?

18     **"ANSWER:**  CORRECT.

19     **"QUESTION:**  IN ECONOMICS, EFFICIENCY RENTS

20     ARE A GOOD THING NOT A BAG THING, RIGHT?

21     **"ANSWER:**  RIGHT.

22     **"QUESTION:**  RIGHT.  IT'S A POSITIVE THING TO

23     CREATE EFFICIENCY RENTS AS OPPOSED TO

24     MONOPOLY RENTS; IS THAT TRUE?

25     **"ANSWER:**  CORRECT, THAT'S TRUE.

**BY MR. KESSLER::**

**Q.**   NOW, DR. RASCHER, WHEN THE NFLPA AND PI PUT TOGETHER

ACTIVE PLAYER RIGHTS AND THEY ALSO SAY "WE CAN ALSO PROVIDE YOU

WITH RETIRED PLAYER RIGHTS," THAT CREATES EFFICIENCY RENTS,

TRUE OR FALSE?

**A.**   TRUE.

**Q.**   AND THOSE ARE GOOD THINGS, CORRECT?

**A.**   YES.

**Q.**   THANK YOU.

          **MR. KESSLER:**   YOUR HONOR, I'M TRYING TO LIVE WITHIN

YOUR ADMONITION.

          I HAVE NO FURTHER QUESTIONS AT THIS MOMENT.

          **THE COURT:**   THANK YOU, MR. KESSLER.

          LET'S GO TO REDIRECT.

          **MR. HUMMEL:**   THANK YOU, YOUR HONOR.

                    <u>**REDIRECT EXAMINATION**</u>

**BY MR. HUMMEL:**

**Q.**   DR. RASCHER, MR. KESSLER ASKED YOU ABOUT BASEBALL.  DO YOU

RECALL THIS?

**A.**   CORRECT.

**Q.**   AND HE SHOWED YOUR EXHIBIT ON THE BOARD WHICH HAD SOME

DIFFERENT -- DIFFERENT AMOUNTS RETAINED BY THE LICENSING ENTITY

OVER THE YEARS, RIGHT?  AND YOU TESTIFIED THAT YOU AVERAGED

THOSE TOGETHER?

**A.**   YES.

1  **Q.**   WHAT WAS THE AVERAGE?

2  **A.**   THE AVERAGE WAS THAT THE PLAYERS RECEIVED WAS 62.3 PERCENT

3  IN BASEBALL.

4  **Q.**   62.3 PERCENT.  OVER WHAT YEARS DID YOU STUDY THAT?

5  **A.**   2003 TO 2007.

6  **Q.**   2003 TO 2007.

7         NOW, IN CONNECTION WITH THE NFLPA AND PI DO YOU KNOW

8  WHEN THEY STARTED MAKING THIS DIVISION WHERE THE PLAYERS ONLY

9  GOT 37 PERCENT?

10         **MR. KESSLER:**  YOUR HONOR, LEADING.  IT'S HIS EXPERT.

11         **THE COURT:**  HE'S ASKING WHETHER HE KNOWS.  AND THEN,

12  WE'LL FIND OUT IN A NONLEADING QUESTION WHAT THE ANSWER IS, IF

13  HE DOES KNOW.

14         SO JUST SAY "YES" OR "NO"; DO YOU KNOW?

15         **THE WITNESS:**  YES.

16  **BY MR. HUMMEL:**

17  **Q.**   WHEN DID THE NFLPA AND PI ESTABLISH THAT THE PLAYERS WOULD

18  ONLY GET 37 PERCENT?

19  **A.**   TO MY KNOWLEDGE, IT WAS 1994 WHEN THEY FIRST SIGNED THE

20  DEAL TO SET UP PI, PLAYERS INC AND THE PLAYERS ASSOCIATION.

21  **Q.**   SO FROM 1994 THROUGH 2008, ROUGHLY, WHAT WAS THE AVERAGE

22  THAT THE PLAYERS GOT?

23  **A.**   ACCORDING TO THE CONTRACTS BETWEEN THE PLAYERS ASSOCIATION

24  AND PLAYERS INC FROM 1994 THROUGH 2002, THEY GOT 37 PERCENT.

25  **Q.**   HOW MANY TIMES IN THAT PERIOD WAS THERE ANY QUESTION --

1 WELL, IN HOW MANY YEARS IN THERE WAS THERE LABOR UNREST THAT

2 THEY HAD TO BE WORRIED ABOUT?

3 **A.**    I MEAN, I DON'T -- I DIDN'T STUDY THAT PARTICULAR QUESTION

4 RIGHT NOW.   THERE ARE LABOR UNREST KIND OF AT THE END OF EACH

5 COLLECTIVE BARGAINING AGREEMENT.

6 **Q.**    HOW LONG ARE THE COLLECTIVE BARGAINING AGREEMENTS, DO YOU

7 KNOW?

8 **A.**    SOME ARE THREE, FOUR, FIVE YEARS, DEPENDING ON THE LEAGUE

9 AND THE SPORT.

10 **Q.**    SO THERE WERE NUMEROUS YEARS IN THAT PERIOD WHEN THERE WAS

11 NO CONCERN ABOUT LABOR UNREST, CORRECT?

12 **A.**    YES.

13 **Q.**    AND THROUGHOUT THAT ENTIRE PERIOD, NFLPA/PI KEPT, ON

14 AVERAGE, 63 TO 69 PERCENT?

15 **A.**    I MEAN --

16          **MR. KESSLER:**   YOUR HONOR, LACK OF FOUNDATION.   THIS

17 WITNESS ONLY STUDIED THE MORE RECENT PERIOD.   HE CAN'T KNOW THE

18 NUMBERS FOR THE EARLIER PERIOD.

19          LACK OF FOUNDATION.

20          **THE COURT:**   WELL, HE DID NOT STUDY IT.

21          DID YOU STUDY THAT?

22          **THE WITNESS:**   I LOOKED AT THE CONTRACT.   SO I

23 STUDIED -- FROM THE ACTUAL DATA I STUDIED 2003 TO 2007, WHICH

24 IS WHAT WE SHOWED.   FROM 1994 --

25          **THE COURT:**   BASED ON THE CONTRACTS YOU CAN ANSWER.

1   BUT MAKE IT CLEAR --

2        **THE WITNESS:** RIGHT.

3        **THE COURT:** -- THAT YOU'RE --

4        **THE WITNESS:** RIGHT.

5        **THE COURT:** -- THAT'S BASED ON WHAT THE CONTRACT

6   SAYS.

7        **THE WITNESS:** THAT'S BASED ON WHAT THE CONTRACTS SAY

8   ABOUT DIVIDING THE MONEY BETWEEN THE PLAYERS AND PLAYERS INC

9   AND THE PLAYERS ASSOCIATION.

10   **BY MR. HUMMEL:**

11   **Q.** OKAY. AND MR. KESSLER, I GUESS, WAS IMPLYING TO YOU IN

12   HIS QUESTIONS THAT THEY WERE BUILDING UP SOME KIND OF STRIKE

13   FUND.

14        DO YOU RECALL THAT?

15   **A.** YES.

16   **Q.** NOW, CAN YOU TELL LOOKING AT THE CONSOLIDATED FINANCIALS

17   IS THERE, IN FACT, A STRIKE FUND?

18   **A.** YOU'RE TALKING FOOTBALL?

19   **Q.** JUST FOOTBALL.

20   **A.** YEAH. IN THE NFL PLAYERS ASSOCIATION THEY BUILD UP A

21   STRIKE FUND IN WHAT THEY CALLED "FUND B," AND THE AUDITED

22   FINANCIALS ARE PRETTY CLEAR ON THAT.

23        THEY HAVE A SEPARATE FUND CALLED "FUND A." THOSE TWO

24   FUNDS ARE DESIGNATED, MEANINGS THAT THERE ARE ONLY CERTAIN

25   THINGS THEY CAN DO WITH THOSE FUNDS.

1        AND THOSE COME FROM -- WELL, FUND B COMES FROM UNION

2  DUES, OKAY?  SO IT'S DUES THAT COME RIGHT OFF THE PAYCHECKS OF

3  THE FOOTBALL PLAYERS.

4  **Q.**   AND FUND B IS THE STRIKE FUND?

5  **A.**   AND FUND B IS THE STRIKE FUND.

6  **Q.**   OKAY.

7  **A.**   SEPARATELY, THE SHARED GROUP LICENSING REVENUES COME IN,

8  AND THEY GIVE SOME OF THOSE 36, 31, 32 PERCENT TO THE PLAYERS.

9        THEN, THEY A TAKE SOME OF THOSE AND THEY -- THEY

10 ESSENTIALLY RUN THE UNION WITH THEM.

11       BUT THEN THEY HAVE THIS OTHER PART LEFT OVER, AND

12 RIGHT NOW IT'S ABOUT $68 MILLION.

13 **Q.**   WHAT'S THAT FUND CALLED?

14 **A.**   IT'S -- WHAT IS IT?

15       **THE COURT:**  UNRESTRICTED.

16       **THE WITNESS:**  "UNRESTRICTED NET ASSETS."  THANK YOU.

17 THANK YOU, YOUR HONOR.

18       UNRESTRICTED NET ASSETS.

19       **MR. HUMMEL:**  THANK YOU, YOUR HONOR.

20       **THE WITNESS:**  SO WHAT THAT MEANS IS THEY CAN DO --

21 NOT WHATEVER THEY WANT -- WITHIN THE LAW, THOSE AREN'T

22 RESTRICTED TO CERTAIN SPENDING AREAS.

23 **BY MR. HUMMEL:**

24 **Q.**   AND IF THE JURY WANTED TO LOOK AT WITH THE FINANCIAL

25 STATEMENTS THAT ARE IN EVIDENCE, THAT UNRESTRICTED MONEY, WHERE

1   WOULD THEY LOOK?

2   **A.**   IT'S IN THE CONSOLIDATED FINANCIALS ON -- IF YOU LOOK AT

3   THE REVENUES AND EXPENSES, YOU KIND OF SEE IT AS A NET REVENUE

4   AT THE END.  AND EACH YEAR IT GOES UP BY 8, $9 MILLION.  SO

5   IT'S BUILT UP TO $68 MILLION.

6   **Q.**   THE COLUMN IS CALLED "UNRESTRICTED"?

7   **A.**   YEAH.  IF I SAW IT --

8           **MR. HUMMEL:**  I'M SHOWING THE WITNESS EXHIBIT 1024.

9           **THE COURT:**  FINE.

10          **MR. HUMMEL:**  TO REFRESH HIS RECOLLECTION AS TO WHAT

11  THAT COLUMN IS CALLED.

12          **THE WITNESS:**  YEAH.  FOR EXHIBIT 1024, IF YOU LOOK AT

13  WHAT'S LISTED AS PAGE 5, IT'S THE CONSOLIDATED STATEMENTS OF

14  ACTIVITY OF THE NFL PLAYERS ASSOCIATION AND ITS SUBSIDIARIES.

15  IT'S GOT THE REVENUES AND EXPENSES.  IT'S GOT --

16          **MR. HUMMEL:**  YOUR HONOR, PERMISSION TO PUBLISH THAT.

17  I DON'T THINK THERE IS ANY DISPUTE ABOUT THAT, SO WE CAN FOLLOW

18  IT EASILY.

19          **MR. KESSLER:**  YOUR HONOR, THEY DIDN'T NOTICE THIS

20  EXHIBIT FOR THIS WITNESS AT ALL.  IT'S ALSO NOT SUBJECT OF HIS

21  EXPERT REPORT.  WE HAD NO DISCUSSION OF THIS ISSUE --

22          **THE COURT:**  WE'RE NOT GOING --

23          **MR. KESSLER:**  -- IN HIS EXPERT REPORT.

24          **THE COURT:**  -- TO TAKE ANY MORE TIME ON THIS.

25          THE JURY UNDERSTANDS THAT IT'S 86 MILLION OR

1  WHATEVER.

2  **MR. HUMMEL:**  ALL RIGHT.

3  **THE COURT:**  67 MILLION.  JUST TELL US THE NUMBER

4  AGAIN.

5  **THE WITNESS:**  IT'S 68 MILLION.

6  **THE COURT:**  68 MILLION.  ALL RIGHT.

7  LET'S MOVE ON TO SOMETHING ELSE.

8  **BY MR. HUMMEL:**

9  **Q.**  ALL RIGHT.  FINALLY, DR. RASCHER, IS THERE ANY DOUBT IN

10  YOUR MIND, BASED ON YOUR ECONOMIC ANALYSIS, THAT RETIRED

11  PLAYERS BUILT BRAND EQUITY IN THE CURRENT VALUE OF LICENSING IN

12  THE NATIONAL FOOTBALL LEAGUE?

13  **A.**  THERE IS NO DOUBT IN MY MIND.  IN FACT, IT'S KIND OF

14  COMMON SENSE.

15  **MR. HUMMEL:**  THANK YOU.

16  **THE COURT:**  ANYTHING MORE, MR. KESSLER?

17  **RECROSS EXAMINATION**

18  **BY MR. KESSLER:**

19  **Q.**  JUST ONE QUESTION:  THE UNRESTRICTED NET ASSETS, DOES THAT

20  INCLUDE THE VALUE OF ANY BUILDINGS?

21  DO YOU KNOW?

22  **A.**  IT'S THE NET REVENUE LEFT OVER AFTER EACH YEAR.  THE PA

23  BRINGS IN REVENUES, IF YOU LOOK AT THE LINE ITEMS.  THE PA

24  SPENDS SOME OF THOSE ON THE LICENSING MONEY THAT GOES OUT TO

25  THE PLAYERS, AS I SAID.

1    SPENDS SOME OF THOSE ON OTHER EXPENSES LIKE RENT AND

2  INSURANCE AND POSTAGE AND DELIVERIES AND SO FORTH, AND A NET

3  AMOUNT LEFT OVER.  AND EACH YEAR THAT'S BEEN BUILT UP TO

4  AMOUNTS AROUND 68 MILLION.

5  **Q.**  THIS FINANCIAL STATEMENT ALSO CONSOLIDATES THE REVENUES

6  AND ASSETS OF A COMPANY THAT OPERATES A BUILDING; IS THAT

7  CORRECT?

8  **A.**  YES.

9  **Q.**  BUILDING CORP?

10  **A.**  YES.

11  **Q.**  HAVE YOU DONE ANY ANALYSIS AS TO WHAT PORTION OF THE

12  NUMBER YOU JUST TESTIFIED TO THE JURY IS DUE TO RENTS RECEIVED

13  BY BUILDING CORP, FOR EXAMPLE?

14  **A.**  I MEAN, THESE ARE --

15  **Q.**  HAVE YOU DONE AN ANALYSIS OF THAT, SIR?

16  **A.**  OF THE PARTICULAR RENTS RECEIVED, NO.

17  **Q.**  NO.  SO YOU HAVE NO IDEA WHETHER THE NUMBER YOU'RE TALKING

18  ABOUT COMES FROM LICENSING REVENUE OR FROM RENTS ON A BUILDING,

19  DO YOU?  YOU DON'T KNOW HOW MUCH --

20  **A.**  NO, IT SAYS IT.  IT SAYS IT IN HERE.  IT SAYS:

21           "ROYALTIES, $55 MILLION."

22           AGENTS PAY THE PLAYERS ASSOCIATION TO BE MEMBERS TO

23  REPRESENT PLAYERS.  THAT'S $2.2 MILLION.

24           "INVESTMENT INCOME:  $1.3 MILLION."

25  **Q.**  WHAT PAGE ARE YOU ON?

1   **A.**   BUILDING RENT IS $415,000 OF THE 68 MILLION. I MEAN --

2   **Q.**   COULD YOU SHOW ME WHAT LINE YOU'RE REFERRING TO, SIR?

3   **A.**   THIS IS PAGE 5 OF 1024.

4   **Q.**   PAGE 5. WHAT LINE ARE YOU LOOKING AT, SIR?

5   **A.**   RIGHT. SO IF YOU GO DOWN -- OKAY.

6        **THE COURT:** WHY DON'T YOU GO -- LOOK OVER --

7        **THE WITNESS:** DO YOU WANT ME TO SHOW YOU?

8        (SIMULTANEOUS SPEAKING, NOT REPORTABLE.)

9        **MR. KESSLER:** THANK YOU. THAT WILL HELP ME.

10       **THE WITNESS:** YOU HAVE BUILDING RENTS OF 415,000.

11 **BY MR. KESSLER:**

12   **Q.**   WHAT ARE YOU LOOKING AT AS THE UNRESTRICTED ASSET LINE?

13   **A.**   UNRESTRICTED.

14       **THE COURT:** KEEP YOUR VOICES UP.

15       **THE WITNESS:** UNRESTRICTED NET ASSETS AT THE

16 BEGINNING OF THE YEAR FOR THIS PARTICULAR YEAR SAYS

17 "34 MILLION," THEN THEY ADDED ABOUT 8 MILLION RIGHT THERE.

18 **BY MR. KESSLER:**

19   **Q.**   OKAY. SO THIS LINE INCLUDES, FOR EXAMPLE, SETTLEMENT

20 PAYMENTS. DO YOU HAVE ANY IDEA WHAT THAT IS?

21   **A.**   SETTLEMENTS FROM THE NFL.

22   **Q.**   DOES THAT HAVE ANYTHING TO DO WITH PLAYER LICENSING, THAT

23 SETTLEMENT OF A LITIGATION, DO YOU KNOW, SIR?

24   **A.**   THAT'S $5 MILLION VERSUS THE ENTIRE 92 MILLION IN REVENUE

25 THAT YEAR.

1    Q.    DO YOU KNOW IF IT HAS ANYTHING TO DO WITH PLAYER LICENSING

2    ONE WAY OR THE OTHER?

3            DO YOU KNOW?

4    A.    I DOESN'T NO.

5    Q.    OKAY.  AND THEN, SOMETHING ELSE HERE IS:

6            "AGENT FINANCIAL ADVISORS AND RETIRED MEMBERSHIP

7    FEES."

8            DOES THAT HAVE ANYTHING TO DO WITH PLAYER LICENSING?

9    A.    NO.

10   Q.    OKAY.  THAT'S ANOTHER 2 MILLION.  THEN YOU HAVE:

11           "INVESTMENT INCOME.  INTEREST 1.379 MILLION."

12           DOES THAT HAVE ANYTHING TO DO WITH PLAYER LICENSING?

13   A.    IT'S INTEREST OFF OF MONEY SITTING THERE.  PART OF IT IS

14   GOING TO GROW FROM THE PLAYER LICENSING REVENUES.  PART IS

15   GOING TO GROW FROM THE OTHER REVENUES.

16   Q.    YOU DON'T KNOW WHAT PORTION IS FROM PLAYER LICENSING AND

17   WHAT PORTION IS FROM OTHER INCOME, RIGHT?

18           YOU JUST DON'T KNOW?

19   A.    I DON'T KNOW.

20   Q.    THANK YOU.

21           THEN, I SEE --

22           **THE COURT:**  LOOK, ARE WE GOING DOWN THE ENTIRE --

23           **MR. KESSLER:**  NO.  I'LL DO ONE LAST QUESTION.

24           **THE COURT:**  YOU'VE MADE YOUR POINT.

25           **MR. KESSLER:**  THANK YOU, YOUR HONOR.  I MADE MY

1  POINT, I THINK.

2          **THE COURT:**  ALL RIGHT.  ANYTHING MORE?

3          **MR. HUMMEL:**  NOTHING FURTHER, YOUR HONOR.

4          **MR. KESSLER:**  NOTHING FURTHER, YOUR HONOR.

5          **THE COURT:**  CAN THIS WITNESS BE DISCHARGED FROM ANY

6  SUBPOENA AND FREE TO GO?

7          **MR. HUMMEL:**  YES, YOUR HONOR.

8          **MR. KESSLER:**  WE HAVE NO FURTHER USE FOR THIS

9  WITNESS.

10         **THE COURT:**  DR. RASCHER, THANK YOU FOR COMING.

11 YOU'RE FREE TO GO.  YOU ARE NOT SUBJECT TO RECALL.  YOU CAN

12 TAKE WITH YOU ANY ANYTHING YOU BROUGHT, BUT PLEASE LEAVE OUR

13 EXHIBITS HERE.

14         **THE WITNESS:**  THANK YOU, YOUR HONOR.  THANK YOU,

15 MEMBERS OF THE JURY.

16         **THE COURT:**  YOU ARE MOST WELCOME.

17         LET'S GIVE A HEADS-UP TO THE JURY.

18         I'M NOT SURE WE SHOULD START ANOTHER WITNESS IF WE

19 ARE NOT GOING TO FINISH HIM.

20         **MR. HUMMEL:**  I AGREE WITH THAT, YOUR HONOR.  I DON'T

21 SEE A WAY TO DO THAT.

22         **THE COURT:**  TAKE A MOMENT AND GIVE THE JURY A

23 HEADS-UP ON WHERE WE ARE IN TERMS OF WHERE YOU ARE IN YOUR

24 CASE, SO THEY CAN HAVE AN IDEA.

25         **MR. HUMMEL:**  I WILL, YOUR HONOR.

1        LADIES AND GENTLEMEN, WE HAVE TWO MORE WITNESSES TO

2   GO.  THE SECOND WITNESS IS A FINANCIAL ANALYST WHO LOOKED AT --

3   AN EXPERT FINANCIAL ANALYST WHO LOOKED AT THEIR INTERNAL

4   RECORDS AND MADE A DETERMINATION ABOUT THE FOLLOWING QUESTION:

5   WHETHER IF THE RETIRED PLAYERS WERE INCLUDED IN THE GROUP

6   LICENSING POOL, WHAT AMOUNTS WOULD HAVE FLOWED TO THE RETIRED

7   PLAYER GROUP.

8        THAT'S THE ISSUE, AND HE WILL TESTIFY TO THAT UNDER

9   SOME ASSUMPTIONS ON MONDAY.

10       WE HAVE ONE OTHER WITNESS WHO IS PAT ALLEN, WHO IS

11  THE WIFE OF DOUG ALLEN, AND SHE WILL COME IN, I THINK, TUESDAY,

12  MR. KESSLER?

13       **MR. KESSLER:**  TUESDAY.

14       **MR. HUMMEL:**  TUESDAY TO PROVIDE TESTIMONY.  SHE HAD

15  TO BE OUT OF TOWN, SO WE'RE GOING TO CALL HER ON TUESDAY.

16       **THE COURT:**  OUT OF TURN.

17       **MR. HUMMEL:**  OUT OF TURN DURING THEIR CASE.

18       **MR. KESSLER:**  YOUR HONOR, IF I COULD HAVE ONE MINUTE.

19       **THE COURT:**  TAKE YOUR MINUTE.

20       **MR. KESSLER:**  LADIES AND GENTLEMEN, I'M HAPPY TO

21  INFORM YOU THAT THE DEFENSE CASE IS GOING TO BE MERCIFULLY

22  SHORT.  OKAY?

23       WE DON'T BELIEVE THAT THERE'S A LOT MORE INFORMATION

24  YOU'RE GOING TO NEED IN THIS CASE IN ORDER TO DECIDE IT FAIRLY

25  AND CORRECTLY.

1          SO I EXPECT WE'LL BE ON A FEW DAYS NEXT WEEK IN OUR

2  CASE, PROBABLY TO WEDNESDAY OR THURSDAY, DEPENDING ON HOW LONG

3  THEY GO.

4          BUT THEN, HOPEFULLY, YOU CAN THEN BRING THIS CASE TO

5  AN END.

6          SO THANK YOU VERY MUCH.

7          **THE COURT:**  ALL RIGHT.  THAT'S WHERE WE ARE.

8          MY ESTIMATE IS THAT THE CASE WILL GO TO YOU FOR

9  ARGUMENT ON MAYBE FRIDAY OF NEXT WEEK.  AND THEN -- WHAT IS

10 FRIDAY NEXT WEEK?  THAT'S THE 7TH.  BUT THAT YOU SHOULD COUNT

11 ON BEING HERE THE FOLLOWING WEEK.  I THINK AT A MINIMUM YOU

12 WOULD BE DELIBERATING THE FOLLOWING WEEK, ALTHOUGH THE 11TH, AS

13 I TOLD YOU, IS ARMISTICE'S DAY, NOVEMBER 11, 11:00 A.M. THE

14 11TH MONTH, THE 11TH DAY, THE ELEVENTH HOUR, IF YOU SOME YOU OF

15 KNOW YOUR HISTORY.

16         I SEE BLANK LOOKS OVER THERE.  YOU THINK I'M A

17 LUNATIC.  BUT, ANYWAY, WHEN I WAS A KID IN SCHOOL THEY MADE US

18 LEARN ALL THAT.

19         ANYWAY, THAT'S ARMISTICE'S DAY.  AND YOU WILL GET

20 BONUS POINTS IF YOU KNOW WHERE THAT TOOK PLACE.

21         ANY OF YOU KNOW?

22         (NO RESPONSE.)

23         **THE COURT:**  NO.  ALL RIGHT.  WELL, YOU CAN LOOK THAT

24 UP OVER THE WEEKEND.  WHAT YOU CAN'T LOOK UP IS ANYTHING HAVING

25 TO DO WITH THIS CASE.  YOU CAN'T LOOK AT ANY PRESS REPORTS.

1  YOU CAN'T TALK TO ANYONE.  YOU'VE GOT TO KEEP AN OPEN MIND.

2       THE LAWYERS SAY IT'S OKAY IF YOU TAKE YOUR NOTEBOOKS

3  HOME AND STUDY THOSE.  THAT'S FINE.

4       REMEMBER THE EVIDENCE YOU'VE GOT TO DECIDE THIS CASE

5  FROM COMES SOLELY FROM HERE IN THE COURTROOM.  NO INDEPENDENT

6  INVESTIGATIONS, NO NOTHING.

7       SO WE -- WE WILL SEE YOU PACK HERE AT THE REGULAR

8  TIME ON MONDAY, NOVEMBER 3RD.  AND I HOPE YOU HAVE A HAPPY

9  HALLOWEEN.

10       ALL RIGHT.  ANYTHING MORE BEFORE I LET THE JURY GO?

11       **MR. KESSLER:**  NO, YOUR HONOR.

12       **THE COURT:**  OKAY.  GREAT.  SEE YOU ON MONDAY.  THANK

13  YOU.

14       (THEREUPON, THE JURY LEFT THE COURTROOM.)

15       **THE COURT:**  OKAY.  HAVE A SEAT.

16       ANYTHING THE LAWYERS WANT TO BRING UP?

17       **MR. KESSLER:**  I'LL JUST HAND UP, YOUR HONOR, WE MADE

18  OUR SUGGESTIONS TO THEIR SCRAMBLING INSTRUCTION.

19       YOUR HONOR CAN LOOK AT THAT.  WE JUST MADE A FEW

20  CHANGES TO IT.

21       **MR. KATZ:**  DO I GET A COPY?

22       **MR. KESSLER:**  I CAN READ IT TO YOU OR THE COURT CAN.

23       **THE COURT:**  I'M SORRY, WHAT DID I DO WITH IT?  HERE

24  IT IS.  HAVE A SEAT, EVERYONE.

25       I LOOKED AT IT, AS WELL, AND I DID MAKE A CHANGE TO

1 WHAT I'M ABOUT TO HAND YOU, BASED ON WHAT MR. KATZ HANDED UP.

2          BUT IT'S NOT EXACTLY WHAT HE HANDED UP, EITHER.

3          I'M GOING TO GIVE TO EACH OF YOU -- DAWN, WOULD YOU

4 HAND ONE COPY TO EACH SIDE?

5          THIS IS A PRELIMINARY DRAFT OF THE MEAT OF THE

6 INSTRUCTIONS.  IT DOES NOT HAVE THE PRELIMINARY INSTRUCTIONS ON

7 BURDEN OF PROOF AND SO FORTH.  BUT -- NOR DOES IT HAVE THE

8 CONCLUDING INSTRUCTIONS.

9          BUT IT HAS A PRETTY GOOD FIRST CUT AT THE SUBSTANTIVE

10 LAW.

11          SO WHAT I WANT YOU TO DO BY SUNDAY AT 5:00 P.M. IS TO

12 FILE A 5-PAGE CRITIQUE.  JUST FIVE PAGES.  PLEASE DON'T DO

13 ANYTHING MORE.  FIVE PAGES ONLY.  AND THAT WAY I'LL GET WHAT I

14 KNOW IS THE THINGS THAT YOU HAVE THE GREATEST HEARTBURN OVER.

15          AND THEN, YOU WILL LATER -- NEXT WEEK YOU WILL GET A

16 MUCH -- YOU KNOW, A COMPLETE SET THAT WILL TAKE INTO ACCOUNT

17 YOUR CRITIQUE.

18          AND THEN, WE'LL GET A CHANCE TO DO IT ALL OVER AGAIN,

19 AND YOU'LL HAVE A CHANCE TO OBJECT TO EVEN THE SMALL POINTS

20 THAT YOU DON'T LIKE ABOUT THESE INSTRUCTIONS.

21          BUT I URGE YOU TO CONCENTRATE YOUR FIRE IN THOSE FIVE

22 PAGES ON THE POINTS THAT YOU THINK MEAN THE MOST TO YOU.  AND

23 WE'LL -- THAT YOU MOST OBJECT TO.  OR THINGS THAT YOU THINK YOU

24 MIGHT EVEN THINK:

25          "WELL, THESE ARE FINE AS FAR AS THEY GO, BUT

1    WE'VE GOT TO ADD THINGS."

2              SO THAT CRITIQUE WILL BE VERY -- VERY USEFUL.

3              NOW, I HAVE DRAFTED THESE LARGELY MYSELF, WITH A

4    LITTLE BIT OF INPUT FROM MY LAW CLERK.  AND I'VE DRAFTED IT

5    WITH A VIEW TOWARDS EVERYTHING THAT I'VE HEARD IN THE TRIAL, SO

6    THAT I HAVE A GOOD SENSE OF WHAT THE ISSUES ARE AND THE

7    SPECIFIC POINTS THAT THE JURY MUST DECIDE.

8              AND THAT'S THE WAY I LIKE TO DO INSTRUCTIONS.  I LIKE

9    TO ZERO IN ON THE POINTS THAT THEY REALLY HAVE GOT TO DECIDE,

10   AND THEN GIVE THEM THE LAW THAT WILL HELP THEM DECIDE THAT

11   POINT.

12             ANYWAY, I'M JUST NOW -- I'M JUST RUNNING ON, SO I'LL

13   STOP ON THAT.

14             THERE'S NOTHING YOU NEED TO SAY ON THIS AT THIS

15   POINT.

16             BUT 5:00 P.M. WOULD YOU PLEASE SUBMIT IT ON SUNDAY?

17        **MR. KESSLER:**  5:00 P.M. SUNDAY?

18        **THE COURT:**  SUNDAY.  SO I CAN GET IT THAT EVENING AND

19   I WILL BE IN A POSITION TO LOOK AT IT THE NEXT MORNING.  I

20   EARLIER SAID 5:00 O'CLOCK ON MONDAY MORNING.  FORGET THAT.  I

21   WANT IT 5:00 P.M. ON SUNDAY.

22        **MR. KESSLER:**  THAT'S WHY I SAID THAT.

23        **THE COURT:**  THANK YOU FOR CLARIFYING.

24             IN TERMS OF TIME, THE PLAINTIFFS HAVE NOW USED BY MY

25   NOTES 828 MINUTES OUT OF A TOTAL OF 1,080 THAT IS AVAILABLE.

1          SO YOU'RE GETTING DOWN TO THE POINT WHERE YOU NEED TO

2   BE CAREFULLY MARSHALING IF YOU WANT TO HAVE ANY TIME LEFT FOR

3   CROSS EXAMINATION OR FOR ANY REBUTTAL.

4          AND THEN, FOR THE -- I CAN GIVE YOU THE NUMBERS FOR

5   THE DEFENSE ARE 532 PLUS 24, 38 AND 30.  I HAVEN'T DONE THE

6   MATH ON THAT.  BUT IT IS LESS THAN WHAT THE PLAINTIFFS HAVE

7   USED SO FAR.

8          OKAY.  NOW, WITH THAT IS THERE ANYTHING THAT YOU WANT

9   TO RAISE WITH ME BEFORE WE ADJOURN FOR THE WEEKEND?

10          **MR. KESSLER:**  NOTHING FURTHER FROM DEFENDANTS, YOUR

11   HONOR, EXCEPT TO WISH YOU A GOOD WEEKEND.

12          **THE COURT:**  THANK YOU.  ANYTHING ON YOUR SIDE?

13          **MR. PARCHER:**  NOTHING.

14          **MR. KATZ:**  THANK YOU, YOUR HONOR.

15          **THE COURT:**  ALL RIGHT.  DAWN, I WANT TO GIVE THE

16   LAWYERS A HEADS-UP.  IT SEEMS LIKE THERE'S SOME DAYS NEXT WEEK

17   WHEN WE HAVE SOME CONFLICTS IN THE --

18          **THE CLERK:**  CONFLICTS FOR THE TRIAL?

19          **THE COURT:**  WELL, LET'S SEE.  ON THE DIAZ CASE, IS

20   THAT GOING TO BE IN THE AFTERNOON, THE PRETRIAL CONFERENCE?

21          **THE CLERK:**  PRETRIAL WAS ALWAYS SET IN THE AFTERNOON.

22          **THE COURT:**  DID YOU PUT THAT INTO THE AFTERNOON?

23          **THE CLERK:**  IT WAS ALREADY, PREVIOUSLY SET.

24          **THE COURT:**  IS THERE ANY OTHER CONFLICT?

25          **THE CLERK:**  THE LAW AND MOTION.  THAT'S IT.

1          **THE COURT:**  NOTHING ELSE?  ALL RIGHT.

2          **MR. PARCHER:**  MAY I ASK YOU A QUESTION?

3          **THE COURT:**  OF COURSE.

4          **MR. PARCHER:**  HAVE YOU GIVEN US ANY THOUGHT ON HOW

5  LONG YOU ARE GOING TO GIVE US ON SUMMATION, IN MY CASE THE

6  SUMMATION AND A LITTLE EXTRA AFTER WHAT MR. KESSLER HAS TO SAY?

7          **THE COURT:**  I WANT TO GET YOUR INPUTS ON THAT.

8          **MR. PARCHER:**  OKAY.

9          **THE COURT:**  WHAT DO YOU THINK?

10          **MR. PARCHER:**  WELL, I HAVE TO BE CANDID AND SAY I'M

11  NOT USED TO THE LIMITATION.  SO I'M TRYING TO GAUGE MY ANSWER

12  SO IT'S CALCULATED TO GET YOUR HONOR TO SAY YES.

13          I THINK TWO HOURS WOULD DO IT.

14          **MR. KESSLER:**  I THINK THAT'S MORE THAN WE NEED, YOUR

15  HONOR.  I WOULD SAY PERHAPS 90 MINUTES.  AND I THINK IT SHOULD

16  BE THE SAME TOTAL FOR BOTH SIDES.

17          AND IF MR. PARCHER WANTS TO BREAK IT UP I THINK HE'S

18  ENTITLED TO DO THAT, TO GO FIRST AND LAST, AS I UNDERSTAND HOW

19  YOUR HONOR CONDUCTS THIS.  BUT IT SHOULD BE THE SAME TOTAL, NOT

20  ANY MORE.

21          **THE COURT:**  WELL, IT WILL BE THE SAME AMOUNT,

22  WHATEVER IT IS.  BUT TWO HOURS -- I'VE BEEN ON THIS BENCH NOW

23  NINE AND A HALF YEARS AND NO ONE HAS EVER GOTTEN TWO HOURS.

24  THAT'S TOO MUCH.

25          **MR. PARCHER:**  WE'RE COMING UP TO ARMISTICE'S DAY.

1          **THE COURT:**  PORTENDS NOTHING FOR SETTLEMENT IN THIS

2    CASE.  THERE'S NO ARMISTICE IN THIS.

3          **MR. PARCHER:**  I KNEW THE QUOTE.  YOU SAID WE GET

4    POINTS.

5          **THE COURT:**  YOU DO.  YES, YOU DO.

6          **MR. PARCHER:**  OKAY.

7          **THE COURT:**  BUT YOU DIDN'T GIVE ME THE MAGIC ANSWER

8    WHERE IT TOOK PLACE.

9          **MR. PARCHER:**  I DON'T KNOW.

10          **MR. KATZ:**  VERSAILLES.

11          **MR. PARCHER:**  WELL, IF YOU GIVE ME A CHANCE, I WAS

12    GOING TO --

13          **MR. FEHER:**  COMPIEGNE.

14          **THE COURT:**  VERY GOOD.

15          **MR. FEHER:**  THE RAILROAD CAR.

16          **THE COURT:**  RAILROAD CAR, AND IT'S STILL THERE

17    SOMEPLACE.

18          THE OTHER SIDE GOT THE BONUS POINTS.

19          **MR. PARCHER:**  AS HE POINTED OUT SO GRACIOUSLY TO THE

20    JURY, MERCIFULLY HIS CASE IS GOING TO BE A LOT SHORTER.

21          **MR. KESSLER:**  I HAVE TO TALK ABOUT HIS CASE, TOO.

22          **MR. PARCHER:**  DOESN'T HAVE MUCH TO SAY IN DEFENSE OF

23    HIMSELF.

24          **THE COURT:**  I DON'T THINK ANYBODY CAN COUNT ON TWO

25    HOURS.  I KNOW YOU ARE GOING TO GET MORE THAN ONE HOUR.  I

1    DON'T KNOW WHERE IN-BETWEEN.  I GOT TO THINK.  I NEED TO

2    BALANCE A LOT OF FACTORS.

3           IF THIS WAS THE ONLY CASE I HAD, I STILL WOULD HAVE

4    TO TAKE INTO ACCOUNT THE CONVENIENCE TO THE JURY.  BUT THERE

5    ARE A LOT OF FACTORS TO TAKE INTO ACCOUNT.  AND -- BUT IT WILL

6    BE SOMEWHERE BETWEEN 60 AND SOMETHING LESS THAN TWO HOURS.  SO

7    YOU JUST HAVE TO LET ME THINK ABOUT WHAT IS A FAIR THING TO DO.

8           **MR. KESSLER:**  THAT'S FINE, YOUR HONOR.  AND IT WOULD

9    BE HELPFUL -- I'M SORRY.  GO AHEAD.

10          **MR. PARCHER:**  I'M NOT TRYING TO PRESS MY LUCK HERE.

11   I WANT TO GIVE A SPEECH BEFORE I MADE --

12          **THE COURT:**  PRESS YOUR LUCK.

13          **MR. PARCHER:**  -- MY COMMENT, BUT WE'RE GOING TO HAVE

14   BEEN HERE ABOUT A MONTH.  I DON'T WANT -- I DON'T WANT TO STAY

15   ONE MINUTE MORE THAN I HAVE TO.  I PROMISE YOU THAT.  I DON'T

16   WANT TO STAY ONE MINUTE MORE.

17          AND I'LL TRY TO SAY A LOT LESS BECAUSE I KNOW HOW

18   YOUR HONOR FEELS ABOUT IT.  BUT BE MERCIFUL IS THE WORD.

19          **THE COURT:**  YOU CAN'T HELP YOURSELF.  YOU SAY ALL

20   THESE EXTRA THINGS.

21          **MR. PARCHER:**  WELL, THAT'S PART OF MY CHARM.

22          (LAUGHTER)

23          **MR. PARCHER:**  JOYCIE HAS BEEN MARRIED TO ME FOR 48

24   YEARS, AND SHE -- WELL, SHE COMPLAINS  A LITTLE BIT ABOUT IT,

25   BUT NOT PUBLICLY.

1          **MR. KESSLER:**  WHAT I WOULD ASK YOUR HONOR, IF

2     POSSIBLE, AS I SAID WE THINK 90 MINUTES IS ADEQUATE.  BUT IF

3     YOU COULD LET US KNOW BY TUESDAY MORNING, BECAUSE OBVIOUSLY

4     WE'RE GOING TO BE PREPARING OUR CLOSING EVEN AS WE'RE STILL

5     DOING THE CASE.  AND SO IF WE HAVE SOME GUIDANCE AS TO THE TIME

6     IT WILL HELP US FOCUS THAT.

7          **THE COURT:**  I KNOW YOU DO.  AND I KNOW YOU NEED IT.

8     BUT IT'S TOO SOON.

9          **MR. KESSLER:**  I UNDERSTAND.

10          **THE COURT:**  IT'S TOO SOON TO SETTLE ON A TIME LIMIT.

11          **MR. PARCHER:**  AND IF I GET THE TIME I'LL START OFF

12     THE SUBMISSION BY SAYING "GLA, GLA."  I'LL SAY IT TWICE

13          **THE COURT:**  OKAY.  HEARING NOTHING MORE WE'RE GOING

14     TO ADJOURN.  AND SEE YOU AT 7:30 ON MONDAY MORNING.

15          **MR. KESSLER:**  THANK YOU, YOUR HONOR.

16          **MR. PARCHER:**  THANK YOU, JUDGE.

17      (THEREUPON, THIS TRIAL WAS CONTINUED UNTIL MONDAY, NOVEMBER 3,

18     2008 AT 7:30 O'CLOCK A.M.)

19                         **CERTIFICATE OF REPORTER**
               I CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT
20     FROM THE RECORD OF PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

21     DATE:  FRIDAY, OCTOBER 31, 2008

22                    S/B KATHERINE POWELL SULLIVAN

23          _____

               KATHERINE POWELL SULLIVAN, CSR #5812, RPR, CRR
24                       U.S. COURT REPORTER

25

<u>**I N D E X**</u>

| **PLAINTIFF'S WITNESSES** | **PAGE** | **VOL.** |
|---|---|---|
| **BERTHELSEN, RICHARD** | | |
| Direct Examination by Mr. Hummel | 1619 | 8 |
| Cross Examination by Mr. Kessler | 1655 | 8 |
| **NAHRA, JOSEPH** | | |
| Direct Examination by Mr. Leclair | 1661 | 8 |
| Cross Examination by Mr. Kessler | 1692 | 8 |
| Redirect Examination by Mr. LeClair | 1709 | 8 |
| **RASCHER, DAN** | | |
| Direct Examination by Mr. Hummel | 1718 | 8 |
| Cross Examination by Mr. Kessler | 1741 | 8 |
| REDIRECT EXAMINATION BY MR. HUMMEL | 1801 | 8 |
| RECROSS EXAMINATION BY MR. KESSLER | 1807 | 8 |

## E X H I B I T S

| TRIAL EXHIBITS | IDEN | VOL. | EVID | VOL. |
|---|---|---|---|---|
| 1148 | | | 1665 | 8 |
| 56 | | | 1674 | 8 |
| 1034 | | | 1675 | 8 |
| 521 | | | 1678 | 8 |
| 522 | | | 1682 | 8 |
| Multiple Exhibits Listed On Record | | | 1691 | 8 |
| 1208-3 | | | 1731 | 8 |
| 1208-1 | | | 1745 | 8 |
| 1275-3 | | | 1777 | 8 |