Volume 14

Pages 2830 - 2902

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE WILLIAM H. ALSUP

BERNARD PAUL PARRISH, HERBERT            )
ANTHONY ADDERLEY, WALTER ROBERTS         )
III,                                     )
                                         )
            Plaintiffs,                  )
                                         )
  VS.                                    )   No. C 07-0943 WHA
                                         )
NATIONAL FOOTBALL LEAGUE PLAYERS         )
ASSOCIATION and NATIONAL FOOTBALL        )
LEAGUE PLAYERS INCORPORATED d/b/a        )
PLAYERS INC,                             )
                                         )   San Francisco, California
            Defendants.                  )   Monday
_____)   November 10, 2008

### TRANSCRIPT OF PROCEEDINGS

**APPEARANCES**:

**For Plaintiffs:**          MANATT, PHELPS & PHILLIPS
                             1001 Page Mill Road, Building 2
                             Palo Alto, California 94304
                     BY:  **RONALD S. KATZ, ESQ.**
                          **RYAN S. HILBERT, ESQ.**

                             MANATT, PHELPS & PHILLIPS
                             7 Times Square
                             New York City, New York 10036
                     BY:  **L. PETER PARCHER, ESQ.**

                             MCKOOL SMITH
                             300 Crescent Court
                             Suite 1500
                             Dallas, Texas  75201
                     BY:  **LEWIS T. LECLAIR, ESQ.**
                          **BRETT CHARHON, ESQ.**

(Appearances continued on next page)

Katherine Powell Sullivan, CSR, RPR, CRR
Official Reporter - U.S. District Court
(415) 794-6659

**APPEARANCES (CONTINUED):**

For Defendants:        DEWEY & LEBOEUF
                       1301 Avenue of the Americas
                       New York City, New York  10019-6092
              BY:   **JEFFREY L. KESSLER, ESQ.**
                    **DAVID GREENSPAN, ESQ.**
                    **DAVID G. FEHER, ESQ.**
                    **ROY TAUB, ESQ.**
                    **MOLLY DONOVAN, ESQ.**
                    **JASON CLARK, ESQ.**


Reported By:     *Katherine Powell Sullivan, CSR # 5812*
                 *Official Reporter - U.S. District Court*

1          **P R O C E E D I N G S**

2 **NOVEMBER 10, 2008**                                    **1:41 P.M.**

3          (The following proceedings were held in open court,

4          outside the presence of the jury.)

5          **THE COURT:**  Welcome back.  Everyone have a seat.

6          We have a note saying they have reached a verdict.

7 So my plan is to bring them in and get the verdict.

8          Any objections?

9          **MR. KATZ:**  No objection.

10          **MR. KESSLER:**  No objections, Your Honor.  Sounds like

11 a plan.

12          **THE COURT:**  Let's bring our jury in.

13          (Thereupon, the jury returned to the courtroom.)

14          **THE COURT:**  All right.  Welcome back.  Have a seat,

15 everyone.

16          Ms. Desouza, you're our foreperson, correct?

17          **FOREPERSON MS. DESOUZA:**  Yes.

18          **THE COURT:**  Have you reached a unanimous verdict?

19          **FOREPERSON MS. DESOUZA:**  Yes.

20          **THE COURT:**  Did you date and sign the form?

21          **FOREPERSON MS. DESOUZA:**  Yes.

22          **THE COURT:**  In other words, there is a date on there?

23          **FOREPERSON MS. DESOUZA:**  Yes.

24          **THE COURT:**  And a signature?

25          **FOREPERSON MS. DESOUZA:**  Yes.

1    **THE COURT:**  Would you hand the form to the marshal.

2  The marshal will hand it to me.

3    Now, what I'm going to do is look at this, in just a

4  moment, to make sure it's in the right form.  And then if it

5  is, I'll hand it to the clerk to read.

6    But I would like to say what I'm about to say before

7  I open this up so there won't be any doubt as to what you

8  decide.  It's completely your decision, and my thanks to you is

9  independent of that, and makes no difference to me which way

10  your verdict is.  That's a great thing about our American jury

11  system.  So I want to thank all of you for your hard work and

12  attention in this case over many weeks.  It's what makes our

13  country great, to have good citizens like you who will come in

14  and serve their country.  You made a big sacrifice.  Thank you

15  for doing that.

16    Now I'm going to open this up.  It's all sealed up.

17  If it's in good order, I'll get the clerk to read it.

18    All right.  What I'm going to do is give this to the

19  clerk.  The clerk will read each question.  And at the end, we

20  will ask you whether or not the verdict as read is your

21  individual verdict.  That way we will know that it's unanimous.

22  So, please, listen carefully as the clerk reads the verdict.

23    **THE CLERK:**  Okay.  Thanks.

24    Ladies and gentlemen of the jury, listen to your

25  verdict as it will stand recorded.

1          In the case of Herbert Anthony Adderley versus

2  National Football League Players Association and National

3  Football Players –– I'm sorry, National Football League Players

4  Incorporated, the special verdict form is:

5          Answer to question number 1:

6          "On behalf of the class, has plaintiff proven by a

7  preponderance of the evidence a class-wide breach of any term

8  of the RPGLA?"

9          No.  I'm sorry.  Answer:

10         "Yes."

11         Question 2:

12         "If the answer to question No. 1 is 'Yes,' then state

13  the amount of damages to class members, if any, plaintiff has

14  proven by reason of any such breach."

15         Dollar amount is zero.

16         Question 3:

17         "On behalf of the class, has plaintiff proven by a

18  preponderance of the evidence that defendants owed a fiduciary

19  duty to the RPGLA Class in connection with the RPGLA?"

20         Answer:  "Yes."

21         Question 4:

22         "If your answer to Question No. 3 is 'Yes,' then

23  state whether plaintiff has proven by a preponderance of the

24  evidence any class-wide breach of fiduciary duty by defendants

25  under the RPGLA.

1          Answer:  "Yes."

2          Question 5:  "If your answer to Question No. 4 is

3   'Yes,' then state the amount of damages to class members, if

4   any, plaintiff has proven by reason of any such breach.

5          Answer:  "7.1 million."

6          Question 6:  "If the answer to Questions No. 3 and

7   No. 4 are 'Yes,' then state whether plaintiff has proven by

8   clear and convincing evidence that punitive damages should be

9   imposed on defendants."

10          Answer:  "Yes."

11          It's signed and dated by the foreperson on

12  November 10, 2008.

13          **THE COURT:**  All right.  Let's poll each member of the

14  jury, please.

15          **THE CLERK:**  Lisa Desouza, is the verdict read your

16  verdict?

17          **FOREPERSON MS. DESOUZA:**  Yes.

18          **THE CLERK:**  Nancy Jean Smith is the verdict read your

19  verdict?

20          **JUROR MS. SMITH:**  Yes.

21          **THE CLERK:**  Danny C. Chui, is the verdict read your

22  verdict?

23          **JUROR MR. CHUI:**  Yes.

24          **THE CLERK:**  Douglas Neville, is the verdict read your

25  verdict?

1          **JUROR MR. NEVILLE:**  Yes.

2          **THE CLERK:**  Debra Jean Martin, is the verdict read

3 your verdict?

4          **JUROR MS. MARTIN:**  Yes.

5          **THE CLERK:**  Lana Lim Ma, is the verdict read your

6 verdict?

7          **JUROR MS. MA:**  Yes.

8          **THE CLERK:**  Laura Yamane, is the verdict read your

9 verdict?

10          **JUROR MS. YAMANE:**  Yes.

11          **THE CLERK:**  Ofelia Schwartzler, is the verdict read

12 your verdict?

13          **JUROR MS. SCHWARTZLER:**  Yes.

14          **THE CLERK:**  Natalie Hart, is the verdict read your

15 verdict?

16          **JUROR MS. HART:**  Yes.

17          **THE CLERK:**  And, Amy Holm, is the verdict read your

18 verdict?

19          **JUROR MS. HOLM:**  Yes.

20          **THE CLERK:**  Your Honor, the verdict is unanimous.

21          **THE COURT:**  All right.  We will move directly into

22 the proceeding where you determine the amount of punitive

23 damages.  That's the short, supplemental proceeding.  I'm going

24 to ask you to take a 15-minute break at this point.  And when

25 you come back, you will hear the supplemental proceedings and

the supplemental argument, and then you will go back into the

jury room to determine the amount of any punitive damages.

All right.  So thank you.  Your job is not done yet.

We'll see you back in here in a few minutes.

**THE CLERK:**  All rise.

(Jury in recess.)

(The following proceedings were held in open court,

outside the presence of the jury.)

**THE COURT:**  Plaintiff, do you have any additional

witnesses you wish to put on?

**MR. KATZ:**  Yes, we do, Your honor.

We are calling now Mr. Rowley, our damages expert, to

come back.

**THE COURT:**  He better be here in 15 minutes.

**MR. KATZ:**  He is within 15 minutes of the courtroom,

Your Honor.  He's on standby and he's coming right away from

One Market.

**THE COURT:**  All right.  The --

**MR. KATZ:**  And we also will call Mr. Berthelsen.

**THE COURT:**  You can call him first.  Each side only

has about 30 minutes of time left.  So this is going to be

brief, as we promised the jury.

**MR. KATZ:**  I'm going to call Mr. Berthelsen.  I think

I have about 15 minutes with him and about 15 minutes with

Mr. Rowley.

1          THE COURT:  All right.  You have enough time to do

2   that.

3          MR. KATZ:  All right.

4          THE COURT:  Enough time remaining, is what I mean.

5          MR. KATZ:  What is Your Honor's thought with respect

6   to closings?

7          THE COURT:  Each side will get about 15 minutes to do

8   their argument.

9          MR. KATZ:  All right.

10          THE COURT:  Then the jury goes back and decides the

11   amount.

12          MR. KATZ:  So I would take then ten, and then five

13   after Mr. Kessler's case.

14          THE COURT:  That's fine.

15          Mr. Kessler, anything you want to bring up by way of

16   procedure?

17          MR. KESSLER:  Well, first, Your Honor, I don't know

18   if you want now to hear we obviously would renew our motion for

19   JMOL, Your Honor, both with respect to the liability

20   determinations, and with respect to the damage determinations,

21   and with respect to the punitive damages --

22          THE COURT:  All of that is renewed.  But we have a

23   jury that hasn't had a completed verdict yet.

24          MR. KESSLER:  Okay.

25          THE COURT:  So we can't just hold them in abeyance

1    until we argue ad infinitum over those items.

2            **MR. KESSLER:**  I understand, Your Honor.

3            **THE COURT:**  You have to let them make their decision.

4            **MR. KESSLER:**  I wanted to preserve our motions which

5    we will argue at some point.  Obviously, Your Honor, in terms

6    of timing, I will need some time, and I understand the

7    constraints, to cross-examine, obviously, their witnesses that

8    they are going to put on.

9            **THE COURT:**  Each side has about 30 minutes left of

10   time.  So when we run out of time, we run out of time.

11           Can I just give each side 30 minutes -- can we just

12   agree on 30 minutes of evidence time per side?

13           **MR. KATZ:**  Sure.

14           **THE COURT:**  All right.  So use your -- how about you,

15   Mr. Kessler?

16           **MR. KESSLER:**  If that's all Your Honor is allowing,

17   that's it.  I do think this is an important issue, but I

18   understand Your Honor's determination.  But I guess I would

19   object to the limitations on the time on this issue, but, Your

20   Honor --

21           **THE COURT:**  Do you want me to go back and add up the

22   amount of time you have left?  I will.  It might not even be 30

23   minutes.  But if it's more, then I will give each side more.

24           **MR. KATZ:**  Your Honor, if you're finished with that,

25   I have another subject.

1          **THE COURT:**  Sure.

2          **MR. KATZ:**  Your Honor has given an instruction on

3 punitive damages, but, then, there is yet another standard D.C.

4 instruction, number 16.3, which deals with the computation.

5          **THE COURT:**  Yes, I need to have that.  Do we have

6 that here?

7          **MR. KATZ:**  I have a copy of it, Your Honor.  It's

8 slightly marked, but I can give it to you.

9          **THE COURT:**  I'm going to need to instruct on that.

10 I'll ask my law clerk to go find whatever we have on that

11 subject.

12          **MR. KATZ:**  If you'll just give me a moment, Your

13 Honor.

14          **THE COURT:**  Sure.

15          **MR. KATZ:**  Do you intend to read 16.01 again to them,

16 which is what you gave the other day?

17          **THE COURT:**  I have already given that once before.

18          **MR. KATZ:**  Right.

19          **THE COURT:**  Let me see the part that I haven't given

20 yet.

21          **MR. KATZ:**  Here's 16.01 and 16.03.  I have made some

22 underlinings on them, but they are of no consequence.

23          **MR. KESSLER:**  Well, Your Honor, there are factors

24 here in which we never had -- I don't know what he intends to

25 put in.  We've never even had any discovery on, for example,

1    charging them about the amount of attorneys' fees the

2    plaintiffs have incurred in the case, or things of that nature.

3           I don't know whether he intends to put that on.  But

4    if that's to be the case, Your Honor, frankly, I don't think

5    there should be a proceeding immediately.

6           **MR. KATZ:**  We don't intend to put on evidence

7    regarding attorneys' fees, Your Honor.  Although, I think Your

8    Honor can still give that instruction.

9           The jury obviously is going to know --

10          **THE COURT:**  I'll take out the word "the costs," and

11   put in "the duration of the litigation."

12          I think they can infer and use common sense as to

13   what the -- that entails, costs.

14          But I think the attorneys' fees, it would be unfair

15   at this stage to inject that into the case.

16          **MR. KATZ:**  We're not going to inject it, but I still

17   think that those words can remain in the instruction because

18   the jury will obviously know that attorneys' fees are part of

19   this.  And the parties did agree to D.C. law.

20          **THE COURT:**  I'm going to put in "burden" instead.

21   I'll say "the burden and duration of the litigation."

22          That will just be a point of argument.  You can say:

23   Look how many lawyers were in the courtroom, and so forth, how

24   many depositions you heard from.

25          But it would be unfair to start trotting out -- and

1  you can argue attorneys' fees.  In other words, you can say:

2  All these attorneys aren't free, they cost something.

3       **MR. KATZ:**  Okay.

4       **THE COURT:**  But the -- discovery wasn't taken on

5  this.  It wouldn't be fair, at this stage, to start laying

6  attorneys' fees and billing rates and so forth before the jury.

7       But I'll substitute "the burden and duration of the

8  litigation."

9       **MR. KATZ:**  Also, Your Honor, we will be -- I don't

10 know where the exhibits are right now.  I will be using a

11 couple of those exhibits.

12      **THE COURT:**  Which ones?  The financial statements?

13      **MR. KATZ:**  Yeah, 22 -- one is in.  The 2007 financial

14 statement is in.  I believe that's 1024.  And, also, we're

15 going to put in the 2008 financial statement, which is 2242, I

16 believe.

17      **THE COURT:**  Is that in yet?

18      **MR. KATZ:**  It is not in yet.

19      **THE COURT:**  At this point, it should be in.

20      So, do you want the jury to return, for use during

21 the argument, the earlier exhibit you mentioned?

22      **MR. KATZ:**  Well, I -- actually, I think that it's

23 overtaken by the '08 ones.  And I believe that Mr. Berthelsen

24 is going to be able to --

25      **THE COURT:**  Do you have that here in the courtroom?

1          **MR. KATZ:**  I have copies of it, yeah.

2          **THE COURT:**  All right.

3          **MR. KATZ:**  Now, another thing, Your Honor, we don't

4   have our audiovisual equipment anymore.  So what we have done

5   is that we have made sufficient -- I'm going to be using, I

6   want to say, three or four exhibits.  We've made sufficient

7   copies to give to the jury and to give, of course, Your Honor,

8   and Mr. Kessler.

9          We would ask permission to hand those out --

10          **THE COURT:**  It's okay with me, as long as Mr. Kessler

11   looks at it and makes sure it's an accurate copy.

12          **MR. KATZ:**  Yeah, these are like the Duff & Phelps

13   report, their financial statement --

14          **THE COURT:**  It could be three documents on it.

15          **MR. KESSLER:**  I have a question.  You say the Duff &

16   Phelps report from 1994?

17          I can't imagine why that would be admissible or

18   relevant to this proceeding.  He's not entitled now, Your

19   Honor, to reargue liability issues.

20          **MR. KATZ:**  I don't intend to do that, Your Honor.

21          **THE COURT:**  What does that have to do with the

22   financial net worth or the issues that we're -- the jury has

23   already determined that there should be punitive damages.

24          And, now, it's true that they say "the nature of the

25   wrong committed," but we're not going to go back and start

1  putting exhibits before the jury on the nature -- we had a

2  whole trial on that.

3        **MR. KATZ:**  Your Honor, the Duff & Phelps report does

4  give a methodology for computing what they call "enterprise

5  value," which is essentially net worth.  Mr. Rowley will

6  testify to that.  So I --

7        **THE COURT:**  Is that already in evidence?

8        **MR. KATZ:**  The Duff & Phelps report is.  That's

9  number 93.

10        **THE COURT:**  I think the only ones that you should be

11  putting in the jury box are financial statements.  I will give

12  you permission to argue, to put the new financial statement in

13  the jury box.

14        But the others are already in evidence.  And you can

15  just refer to it in your argument.  If you think the Phelps --

16  I think what you have in mind will just deluge the jury with a

17  lap full of documents in what is supposed to be a short

18  proceeding.

19        So I think anything that's already in evidence you

20  just have to argue it.  I'm sorry you don't have your equipment

21  here, but you can just argue it the old-fashioned way.

22        But the new financial statement, that one you can

23  hand out.

24        **MR. KATZ:**  All right.  And then I can show, for

25  example, the Duff & Phelps report to Mr. Rowley, because he

1  will be referring to it in his testimony.  I don't --

2          **THE COURT:**  Yeah, you can do that.

3          **MR. KATZ:**  Yeah.

4          **THE COURT:**  You can do that with the testimony of the

5  witness, of course.

6          **MR. KESSLER:**  Your Honor, I assume he's going to have

7  a copy for me of these documents.

8          **MR. KATZ:**  Oh, yeah.

9          **MR. KESSLER:**  We don't have those in the courtroom

10  anymore.

11          **MR. KATZ:**  I have a copy for you.

12          **THE COURT:**  I'm not going to send in a written

13  version of the instructions.  I'm going to read it the

14  old-fashioned way.

15          All right.  So --

16          **MR. KATZ:**  Your Honor --

17          **THE COURT:**  Let's take a moment to let you get

18  organized, and then we'll bring the jury back.

19          **MR. KATZ:**  Okay.  So do you want the podium here?

20          **THE COURT:**  You can move it back, if you want.  It's

21  up to you.

22          **MR. KATZ:**  For the witnesses, it can be here.  For

23  the closing, I would rather -- maybe I can move it over.

24          **THE COURT:**  Move it around the way you want.  All

25  right.  We'll take another 10-minute break, and then we'll come

1  back.

2         **MR. KATZ:**  Thank you, Your Honor.

3         (Recess taken from 1:59 to 2:18 p.m.)

4         **THE COURT:**  All right.  Let's go back to work.  We

5  have to get going.

6         Mr. Katz has returned.  I did the math, and each side

7  has roughly 40 minutes of time.  But I want to say this --

8  evidence time.

9         This is not an occasion, in these supplemental

10  proceedings, to go back over the conduct that led to the wrong

11  in the first place.  That evidence is already before the jury.

12  We don't embellish it, at this point.

13         The whole purpose of the supplemental proceeding is

14  to introduce financial information which is usually objected to

15  by the defendant because they don't want that before the jury

16  in deciding liability.

17         So that is what the purpose of the evidence at this

18  stage is, to lay before the jury the factors on which you would

19  not have had an opportunity, like net worth of the defendant,

20  at the time of trial.  If there had been discovery provided on

21  the burden and duration of the litigation, but I think the jury

22  can infer from the number of depositions and the number of

23  lawyers and so forth, get a rough estimate of what the burden

24  has been.

25         But we're not going to go back into making

Mr. Berthelsen look like a bad guy from the nature of the

wrong.  That's been done.  So don't start asking him questions

about fraud and so forth, intending to commit fraud.

All right.

**MR. KATZ:**  Well, Your Honor, obviously, I'm going to

follow your guidelines.

I have been in other proceedings of this nature where

remorse is considered because that goes to the need to deter

the behavior.  But if Your Honor doesn't want me to go into

that, then I won't go into that.

I do think it's relevant.  And it does require

talking a bit about some of the issues that have come up; for

example, the scrambling.

**THE COURT:**  Well, let's ask, Mr. Kessler, are you

going to get into those kinds of things?

**MR. KESSLER:**  Absolutely not, Your Honor.  And I

object to him doing it, too, certainly, under these time

constraints.

**THE COURT:**  Look.  We have already had one trial on

the state of mind of the defendant when the wrong was

committed.  We don't need to embellish that.  So remorse is not

indicated in this instruction you gave me.  So we're just not

going to get into that.

What you should be getting into is the relative

financial condition of the defendant.  That's fair game.  But

all of these other factors -- really, in all the other cases

that I've done where there has been punitives, the lawyers

don't even try to put on evidence.  The only thing additional

that comes in is the financial statement, and then we

immediately proceed to the argument.

So just giving you this opportunity to put on more

evidence is already going beyond what is normally done on

punitive damages.

I just want it to be clear, the purpose of this

supplemental evidence is to address issues we haven't addressed

yet, namely financial condition.  So that's going to be the

ruling.

Now, if the witness blurts out something that

requires a follow-up and so forth, I won't say never, but going

into this the ground rule has got to be the number one and only

relevant consideration is financial condition of the defendant.

I think all of these other factors are either

self-evident or -- you -- I will allow you to ask him about the

burden and duration of the litigation, because, for example, I

guess you could even ask how much has he paid in fees to the

other side.

**MR. KATZ:**  To his lawyers?

**THE COURT:**  That would be okay.  To his lawyers.

That would be roughly --

**MR. KESSLER:**  I would object to that, Your Honor.  I

1  don't think that's relevant.

2         THE COURT:  Well, then, let me ask, has your law firm

3  been paid money, or are you doing this on a contingency?

4         MR. KATZ:  On a contingency -- it's not a

5  contingency.  Your Honor sets the fees.

6         THE COURT:  How can you get up and say attorneys'

7  fees?  Plaintiff hasn't incurred any attorneys' fees.

8         MR. KATZ:  Actually, it's worse than that.  Your

9  Honor sets the fees.

10         THE COURT:  What?

11         MR. KATZ:  Only you will know what the fees are going

12  to be, because you set the fees.

13         THE COURT:  I'm just going to rule:  Off limits.

14         You can ask him how long the litigation has gone on,

15  how many depositions there were, if he knows, how many lawyers

16  were involved by -- on the defense side.  But to get -- or on

17  the plaintiff side.

18         But we're not going to get into the dollar amount,

19  because the dollar amount of attorneys' fees paid by the

20  defendant is not in your -- it's not in your write-up here,

21  this instruction you gave me.

22         MR. KATZ:  Well, the instruction does include

23  language about attorneys' fees, Your Honor.  I think you've

24  changed that.

25         THE COURT:  Attorneys' fees that the plaintiff has

1  incurred.

2          **MR. KATZ:**  Right.

3          **THE COURT:**  It doesn't say that the defendant has

4  incurred.

5          **MR. KATZ:**  Right.  And I think that --

6          **THE COURT:**  I just think to be safe here, I'm not

7  going to go beyond what's in this paragraph.

8          And I think that we ought to stick to what is

9  normally done and customary on these supplemental proceedings,

10  and be very short.  So I think you -- I've indicated what I

11  think you can get into.

12          So let's -- but let's get started.  This jury is

13  ready to go.  We have a shot at getting this over today.  I'd

14  like to get it done today.

15          **MR. KATZ:**  Also, Your Honor, I have put -- asked your

16  clerk to give you the financial statement.

17          **THE COURT:**  I got it.

18          **MR. KATZ:**  It's not the original.  So -- I mean, I

19  know your rule is we have to use the original document.  I'm

20  just saying this is not the original.

21          **THE COURT:**  In this case, 2242 can be used without

22  being the original.

23          **MR. KATZ:**  Mr. Kessler has a copy, and I put one up

24  there for the witness.

25          **THE COURT:**  All right.  Dawn, let's bring in our

1  jury.

2  **THE CLERK:**  Okay.

3  (Thereupon, the jury returned to the courtroom.)

4  **THE COURT:**  Welcome back.  Have a seat.

5  All right.  We need to have a supplemental

6  proceeding.  And let me give you what that's all about.

7  This comes in two parts.  The first part is the

8  evidence part, in which you will hear some additional evidence

9  that mainly goes to the financial condition of the defendant at

10  the time of the trial.

11  And as you will see from the jury instructions, the

12  reason that that is relevant is that you can consider, in

13  deciding what the amount of punitive damages should be, what

14  the relative wealth is of the defendant at the time of trial,

15  or the net worth.  So there's no set formula.  It's just a

16  factor that you can consider.

17  And then, you've already heard most of the evidence

18  in the case that relates to the issue you still need to decide,

19  but you will get, first, some additional evidence, mainly on

20  financial condition.  And then there will be part two, which is

21  a short, this time short, argument, 15 minutes per side, that

22  will be on what the dollar amount should be.  And then you go

23  and -- to the jury room and decide that issue.

24  At this time, then, we reopen the evidence, and

25  Mr. Katz is going to call a witness for plaintiffs.

1          Mr. Katz.

2          **MR. KATZ:**  Thank you, Your Honor.  Good afternoon.

3          Good afternoon, ladies and gentlemen of the jury.

4          Plaintiff calls Richard Berthelsen.

5          **THE COURT:**  All right.  Mr. Berthelsen, please come

6  forward.

7          I can't remember if we excused you, so we'll have to

8  swear you in again.  So, please, raise your right hand

9  somewhere in there.

10                     **RICHARD BERTHELSEN**,

11  called as a witness for the Plaintiffs herein, having been

12  first duly sworn, was examined and testified as follows:

13          **THE WITNESS:**  I do.

14          **THE CLERK:**  Okay.  Thank you.

15          **THE COURT:**  All right.  Thank you, Mr. Berthelsen.

16  You know the drill by now.

17          If you can speak into the microphone and adjust it so

18  that it catches your voice, that would be great.  Okay.

19  Mr. Katz, please proceed.

20          **MR. KATZ:**  Thank you, Your Honor.  May it please the

21  Court.

22                     **DIRECT EXAMINATION**

23  **BY MR. KATZ:**

24  **Q.**   Good afternoon, Mr. Berthelsen.

25          You have before you Exhibit 2242.  Could you take a

1   look at that, please.

2   **A.**    Okay.

3   **Q.**    And just to refresh everybody's recollection, you are

4   currently the interim head of the union, the interim executive

5   director; is that correct?

6   **A.**    I'm the acting executive director, yes.

7   **Q.**    And you have been with the union for over 27 years; is

8   that correct?

9   **A.**    Quite a bit over 27 years, yes.

10  **Q.**    Right.  And you have been the general counsel of the

11  union?

12  **A.**    I have been, yes.

13  **Q.**    So the top legal officer?

14  **A.**    If you want to call it that, yes.

15  **Q.**    And you also offer legal advice to Players Inc; isn't that

16  right?

17  **A.**    Very rarely.

18  **Q.**    But you have done that?

19  **A.**    On infrequent occasions.

20  **Q.**    Yes.  Isn't it a fact, sir, that Exhibit 2242 is the

21  annual financial report for the National Football League

22  Players Association and NFL Players for the period March 1st,

23  2007, to February 29, 2008?

24  **A.**    It appears to be.

25          **MR. KATZ:**  I offer Exhibit 2242, Your Honor.

1          **MR. KESSLER:**  No objection.

2          **THE COURT:**  All right.  That's received.  2242 is in.

3          (Trial Exhibit 2242 received in evidence.)

4          **MR. KATZ:**  Also, Your Honor, because we don't have

5    our audiovisual material, I have made copies for the jury, if

6    Your Honor --

7          **THE COURT:**  Please hand those to Ms. Desouza, and she

8    will pass them around.

9          **MR. KATZ:**  Thank you.

10          Your Honor, on --

11   **BY MR. KATZ:**

12   **Q.**  Mr. Berthelsen, I would like to direct your attention and

13   the jury's attention to numbers on the bottom right-hand corner

14   of the pages.  They're called Bates numbers.

15          I would like to direct your attention to the one that

16   is PI 140393.

17   **A.**  Okay.

18   **Q.**  And can you tell the jury what that is, sir, please.

19   **A.**  It's entitled, "Consolidated Statements of Activities."

20   **Q.**  This is a document prepared by your accountants?

21   **A.**  Yes.

22   **Q.**  For financial reporting purposes?

23   **A.**  For reporting to our Board of Player Representatives, the

24   governing body of our organization.

25   **Q.**  Okay.  And this is the official report for that period of

1    March 1st, 2007, to February 29, 2008?

2    **A.**    It appears to be.

3    **Q.**    Directing your attention to the bottom of page PI 140393,

4    there's an item which is labeled -- if you look at the

5    left-hand column, it says, "Unrestricted Net Assets."

6          Do you see that?

7    **A.**    I do.

8    **Q.**    And then if you go to the bottom line, it says, "End of

9    Year."  And if you go over three columns, it gives the number

10   $219,655,553.  Do you see that, sir?

11   **A.**    I do.

12   **Q.**    Is that the net worth of the NFLPA, of the defendants?

13   **A.**    I don't know.  The words "net worth" are not here.  I

14   don't know that that's the net worth.

15   **Q.**    Do you believe that to be the net worth?

16   **A.**    Well, it's been a while since I've had -- I had accounting

17   in college, and I understood net worth to be the difference

18   between your assets and your liabilities.  If that's what this

19   number is, then it would comport with my understanding of what

20   net worth is.

21   **Q.**    Okay.  And then if we look at the top line, there's -- if

22   you look at the left-hand column, it says "Revenue."  At the

23   top of the left-hand column, "Revenue" --

24   **A.**    Yes.

25   **Q.**    -- do you see that?

1           And then it says "Royalties" after that?

2   **A.**   Yes.

3   **Q.**   And then from licensing, licensing royalties for this

4   period of time from 2007 and 2008, were approximately

5   $81 million; is that correct?

6   **A.**   That's the number that appears there.

7   **Q.**   And you have no reason to doubt that, do you, sir?

8   **A.**   No.

9   **Q.**   Okay.  And then you were here when Mr. Parcher gave his

10  closing argument the other day.

11  **A.**   I was.

12  **Q.**   And he mentioned a figure of unrestricted -- an

13  unrestricted account which he said was about $68 million.  If

14  you look, again, at the unrestricted net assets beginning of

15  year, that was $67 million, where it says "Beginning of Year."

16  It's, again, at the bottom left.

17  **A.**   You have to show me where you're pointing to.

18  **Q.**   At the bottom left, if you go down the column, it says,

19  "Unrestricted Net Assets"?

20  **A.**   Yes.

21  **Q.**   And then it says "Beginning of Year."  And then it gives

22  the number $67,961,194.  Do you recall that that's the number

23  that Mr. Parcher gave to the jury the other day?

24  **A.**   I think he gave a number that was close to that.

25  Although, he mischaracterized it, in my view.

1   **Q.**   $68 million, right?

2   **A.**   There is a figure on the financial, saying that, yes.  But

3   all of our funds are basically restricted because they're

4   basically held in trust for the interests of the people we

5   represent.

6           **MR. KATZ:**  I move to strike, Your Honor.  It's

7   nonresponsive.

8           **THE COURT:**  Overruled.  Please continue.

9   **BY MR. KATZ:**

10  **Q.**   And then that number has actually gone up -- Mr. Parcher

11  gave the number for the beginning of the year, which was March

12  of 2007.  But that number has actually gone up, as of

13  February 29, 2008, to $98,038,660; is that correct?

14  **A.**   I don't have the previous statement in front of me.

15  **Q.**   It says here "Beginning of Year."

16  **A.**   Okay.

17  **Q.**   Beginning of year would be, if we look at the cover,

18  March 1, 2007; isn't that correct, sir?

19  **A.**   Yes.

20  **Q.**   And then at the end of the year was 98,038,660; is that

21  right?

22  **A.**   I see what you're referring to.

23  **Q.**   Is that right?

24  **A.**   That number appears at the bottom, under the column "End

25  of Year."

1  **Q.**   Do you have any reason to believe that that number is not

2  correct?

3  **A.**   As of that date, it was probably correct.

4  **Q.**   Okay.

5  **A.**   It may not be now.

6  **Q.**   Do you have any reason to believe that any of the numbers

7  in this document are not correct?

8  **A.**   No, I don't.

9  **Q.**   The -- now, you testified, sir, about the Duff & Phelps

10  report that was issued in 1994.

11  **A.**   I think I may have been asked about it.  I don't recall

12  much testimony about it.  But I know what you're referring to.

13  **Q.**   I think Mr. Hummel was asking you about that.  Do you

14  recall?

15  **A.**   I recall I was asked about it in my testimony, yes.

16  **Q.**   Has Duff & Phelps issued any other reports since that

17  report, which is Exhibit 93?

18  **A.**   No.

19          **MR. KATZ:**  I have nothing further, Your Honor.

20          **THE COURT:**  All right.  Anything more?

21          **MR. KESSLER:**  I have some questions, Your Honor.

22          **THE COURT:**  Sure.  Please.

23          **MR. KESSLER:**  Good afternoon ladies and gentlemen of

24  the jury.  Mr. Berthelsen, good afternoon.

25

1                          **CROSS EXAMINATION**

2  **BY MR. KESSLER:**

3  **Q.**   The document the jury has been given and you were looking

4  at is dated February 29, 2008; is that correct?

5  **A.**   That's correct.

6  **Q.**   Okay.  Are the unrestricted assets of the NFLPA and

7  Players Inc generally invested?

8  **A.**   Yes, they are.

9  **Q.**   Take a look at page 406.  It begins with a PI 140406.

10 **A.**   I got it.

11 **Q.**   Okay.  And you'll see here that it talks about

12 investments.  And there's an indication here that as of

13 February 29, 2008, there was $111,158,000 invested.

14          Do you see that, sir?

15 **A.**   Yes, I do.

16 **Q.**   And, generally speaking, since last February, has the

17 market for stocks, alternative investments, municipal

18 obligations, et cetera, gone up or down?

19          **MR. KATZ:**  Objection, Your Honor.  There is no

20 foundation.

21          **THE COURT:**  Well, first of all, establish that he's

22 in a position to know.  And then he can then answer the

23 question.

24 **BY MR. KESSLER:**

25 **Q.**   Do you know, sir, whether or not the investment value of

1  funds that the union has had invested has gone up or down since

2  last February?

3  **A.**    Yes.

4  **Q.**    Okay.  Has it gone up or down?

5  **A.**    Down, along with everybody else's investments in the stock

6  market.

7  **Q.**    Has it gone down significantly or --

8           **MR. KATZ:**  Object, Your Honor.

9  **BY MR. KESSLER:**

10 **Q.**    -- or just a little bit?

11          **MR. KATZ:**  Object, Your Honor.  There is no

12 foundation.  Not the best evidence.

13          **THE COURT:**  Doesn't have to be the best evidence, as

14 long as he is competent to testify to it.

15          Do you know this of your own personal knowledge?

16          **THE WITNESS:**  Well, in the same way that all of us

17 would.  I check every day in the newspapers, and I check

18 periodically with our director of finance.

19          **THE COURT:**  All right.  The objection is overruled.

20 Go ahead.

21 **BY MR. KESSLER:**

22 **Q.**    Has it gone down significantly?

23 **A.**    Yes.

24 **Q.**    And, Mr. Berthelsen, whatever amount of unrestricted net

25 assets you have left, would you explain to the jury, please,

1  you said those assets were held in trust for the active

2  players.  What did you mean by that?

3  **A.**    Well, in effect, all of our assets are restricted because

4  they come from either active player licensing or from dues.

5  And we, in effect, hold the money in trust for the players, the

6  active players, to help protect their future.

7         It's a decision that they make that instead of having

8  their dues refunded or instead of having more of the licensing

9  money go back to the players, that it's put aside so that we're

10  protected in the future.  We're going to be facing a possible

11  lockout in the year 2011.

12         We recently saw how the hockey players were locked

13  out and they lost an entire season.  Literally, hundreds of

14  millions of dollars were lost as a result of that lockout.

15         So we, in effect, are holding all of these assets in

16  a restricted way, in trust for the players, in case they have

17  to go through what the hockey players did.

18         And every indication, at this point, is that that's

19  what the NFL owners want to do, and that's what they're

20  threatening the players with.

21  **Q.**    If there is a lockout or strike or an end of this

22  bargaining agreement -- first, have they always given notice as

23  to when the collective bargaining agreement is going to expire?

24  **A.**    Yes, they have.

25         **MR. KATZ:**  I'm going to object, Your Honor.  It is

1  beyond the scope.

2            **THE COURT:**  It is beyond the scope, but the defendant

3  is entitled to recall Mr. Berthelsen to testify.

4            So the objection is overruled.

5            **MR. KATZ:**  Your Honor, it also would be opening the

6  door, I think, to some of the topics we talked about in the

7  break.

8            **THE COURT:**  I don't see that.

9            **MR. KESSLER:**  I don't see that, Your Honor, either.

10            **MR. KATZ:**  Well, I'll take them one at a time.

11  Sorry, Your Honor.

12            **THE COURT:**  All right.  Go ahead.

13  **BY MR. KESSLER:**

14  **Q.**   Have the owners given notice as to whether or not they're

15  going to terminate the collective bargaining agreement early?

16  **A.**   Yes, they gave us notice earlier this year that they

17  intend to terminate it two years prior to its expiration.

18  Which puts us at a possible lockout in the year 2011.

19  **Q.**   Have you been through labor battles with the NFL owners

20  before?

21  **A.**   On many, many past occasions, yes.

22  **Q.**   And based on your experience through labor battles with

23  the NFL owners, even if your unrestricted net assets had not

24  declined during the stock market, is the -- would 98 million

25  even be a large amount of money to go into a labor battle with,

1    in your judgment?

2              **MR. KATZ:**  Object.  Leading.

3              **THE COURT:**  It is leading.  Sustained.

4    **BY MR. KESSLER:**

5    **Q.**  Explain to the jury, based on your more than 30 years of

6    experience in the union, the need or lack of need for these

7    assets in any labor battle and why.

8    **A.**  We have an enormous need for this amount of money, and

9    even more, because all of the National Football League owners

10   are, by definition, billionaires.

11             They have almost unlimited resources because their

12   franchises are worth, on average, over a billion dollars.  They

13   go up in value each year by a tremendous amount, an average of

14   $85 million.

15             So you take that times 32, $85 million, that's just

16   the growth in the value of their franchises, add the 25 million

17   in profit that they all average, and you can see that they

18   would have enormous sums of money.  Probably would be able to

19   outspend us 10 or 20 or 50 to 1.

20             And that's why it's so important for us to put every

21   penny aside that we can.

22   **Q.**  Do you know whether or not pensions for retired players,

23   including class members, could or could not be the subject of

24   this next bargaining fight?

25             **MR. KATZ:**  Object, Your Honor.  Now he's really --

1      **THE COURT:**  Sustained.  Sustained.  It's too far

2  afield.

3      **MR. KESSLER:**  Okay.

4  **BY MR. KESSLER:**

5  **Q.**   Mr. Berthelsen, these unrestricted net assets, if you take

6  a look at what it was generated from, it's above it on the

7  page, the revenue.

8  **A.**   Which page number?

9  **Q.**   This is the same page.  393, page 4, that you've been

10  discussing.

11  **A.**   Yes.

12  **Q.**   If you look at the revenue that went into this, it says,

13  "Licensing Revenue" and "Premium Player Appearance Revenue."

14  Was that active player licensing revenue or retired player

15  licensing revenue; do you know?

16  **A.**   For the most part, active player.  Although, there are

17  funds that are paid to us, which we turn over 100 percent to

18  the active [sic] players.  So there could be a pass-through in

19  terms of some of that.  I'm just not totally sure.

20  **Q.**   Let me just break it down.  What happens to the retired

21  player licensing money?

22  **A.**   It's received and sent to the retired players.

23  **Q.**   Okay.

24  **A.**   So it's just a pass-through.

25      **MR. KATZ:**  Your Honor, object.  We're definitely

1  getting, now, into a subject that we talked about at the break.

2       **THE COURT:**  The retired money -- the jury has heard

3  about that ad infinitum.  What we should be focusing on is the

4  financial condition of the defendant.

5       I think the jury has heard everything else that is

6  relevant to their determination.  So --

7       **MR. KESSLER:**  Very good, Your Honor.

8       **THE COURT:**  -- please stick to the program.

9  **BY MR. KESSLER:**

10 **Q.**  Given the current labor situation, okay, can the union

11 afford a significant damages, punitive damages, award in this

12 case?

13 **A.**  No, not at all.  The union cannot.

14      **MR. KESSLER:**  Thank you.  I have no further

15 questions, Mr. Berthelsen.

16      **THE COURT:**  Thank you.  Anything more?

17      **MR. KATZ:**  I have a couple.  May I consult with

18 Mr. Parcher for a moment?

19      **THE COURT:**  Sure.

20      **MR. KATZ:**  May it please the court.

21                  <u>**REDIRECT EXAMINATION**</u>

22 **BY MR. KATZ:**

23 **Q.**  I take it that you're not aware of the exact figure that

24 your stock holdings have declined?

25 **A.**  As I sit here today, no, because I don't know how the

1  market did today.  And it's not something that I have been able

2  to monitor --

3  **Q.**    Okay.

4  **A.**    -- being away from my office as I've been.

5  **Q.**    And you're talking about a strike that might possibly

6  occur, or not, three years from now; isn't that right, sir?

7  **A.**    No one has said strike.

8          Every indication is, is that the owners, given what

9  they have said, given who's representing them, given what

10 they've been doing, it's a lockout.  That's a lot different.

11 It's when the employer says, "You can't come to work and we're

12 not going to pay you."  And that's what is expected.

13         I would consider a strike to be extremely unlikely.

14 The players are not about to withhold their services.

15         What's likely is the owners are going to keep them

16 from being able to work.  And the labor laws allow that to

17 happen, unfortunately.

18 **Q.**    Your current contract extends through 2011; isn't that

19 right, sir?

20 **A.**    No.  It extends through 2010.

21 **Q.**    2010.

22 **A.**    Through the 2010 season, yes.

23 **Q.**    So two more seasons?

24 **A.**    Yes.

25 **Q.**    Do you have any reason to believe you will not be

1  generating at least 81 or $82 million of licensing revenues

2  during each of those two years?

3  **A.**    Yes.

4  **Q.**    You don't believe you will?

5  **A.**    Frankly, the way the economy has turned in the last few

6  months, there's a concern by everyone in terms of revenues,

7  because we are talking about discretionary spending of the

8  American public.  And there's concerns about its impact on

9  professional sports, just like any other industry.  Whatever

10  impacts professional sports, certainly impacts our union.

11  **Q.**    Well, have you actually spoken to any of your professional

12  advisors that told you the number will go down from

13  $81 million?

14  **A.**    Well, you would not talk to our professional advisors --

15  **Q.**    It calls for a yes or no.  It calls for a yes or no, sir.

16  **A.**    I have not -- your question mentions two things --

17  **Q.**    It calls for a yes or no.

18  **A.**    -- so I cannot say yes or no.  I would like to explain.

19          **THE COURT:**  Well, if he says he can't answer yes or

20  no -- why can't you answer yes or no?

21          **THE WITNESS:**  Because it would not be those people

22  from whom we would get that information.  Our professional

23  advisors are not sports economists.

24  **BY MR. KATZ:**

25  **Q.**    My question is, simply, have you spoken to any of your

1  professional advisors about the likelihood, or not, that your

2  licensing revenues of $81 million a year are likely to go down?

3  **A.**   We don't have professional advisors who give that type of

4  advice.  That type of information we get from other places.

5  **Q.**   You have accountants; is that right?

6  **A.**   We have accountants, yes.

7  **Q.**   Have any of them told you that your revenues might go down

8  from the $81 million level?

9  **A.**   No, but they would not be the people who would tell us

10  that.

11  **Q.**   And you have attorneys that help you; is that right?

12  **A.**   Yes, indeed.

13  **Q.**   And what advisors are you referring to, sir?

14  **A.**   Uhm, people that I talk to who are familiar with league

15  economics and the efforts by teams to sell tickets at new

16  stadiums and to sell sponsorships and to -- to expand their

17  product in other markets like Europe.

18  **Q.**   So not people that you're paying for advice?

19  **A.**   Not really.

20  **Q.**   Okay.  And you're aware, sir, are you not -- you've

21  reviewed the EA contract, for example; is that right?

22  **A.**   I'm familiar with the contract.

23  **Q.**   Right.  And that is -- provides a minimum of $25 million a

24  year; does it not, sir?

25  **A.**   I believe so.

1  **Q.**   That goes out to like 2019 or something?

2  **A.**   I don't think that -- I don't think it's that long of a

3  term.

4  **Q.**   2013?  It goes out at least five years; isn't that right?

5  **A.**   It's in evidence.  I can't recall.  I wanted to say 2,012,

6  but I could be wrong.

7  **Q.**   And that $25 million a year is guaranteed, isn't that

8  right, regardless of economic conditions?

9  **A.**   Yes, it is.

10 **Q.**   Now, you talked, sir, and testified in response to

11 questions from Mr. Kessler, about your concerns of preserving

12 monies for the active players.

13 **A.**   Not only the active players.  It's -- every time we go to

14 the bargaining table we're there for -- we've improved a lot of

15 things, a lot of benefits in the past.  And that includes

16 inactive, retired players as well and our ability to fight for

17 them.

18 **Q.**   Well, in fact, you were here when Mr. Armstrong testified,

19 weren't you?

20 **A.**   I was not, except for his second day.

21 **Q.**   In his second day of testimony do you recall that he

22 testified about the Congressional hearings that have been held

23 about your treatment of retired players?

24        **MR. KESSLER:**  Your Honor, I object to this.  This is

25 not relevant subject.

1          **MR. KATZ:**  It's responsive to what he asked about,

2    Your Honor.

3          **MR. KESSLER:**  I don't believe it is, Your Honor.

4          **THE COURT:**  Well, the -- how many questions do you

5    have on this?

6          **MR. KATZ:**  One or two.

7          **THE COURT:**  In light of the fact that the witness

8    himself brought up collective bargaining for retireds and

9    pensions, Mr. Katz has got a point.

10         So you can -- subject to Rule 403, you may ask your

11   next couple of questions on this subject.

12         **MR. KATZ:**  Thank you, Your Honor.

13   **BY MR. KATZ:**

14   **Q.**   And you were here when Mr. Armstrong testified that

15   Congressional hearings had been held into the subject of the

16   union's treatment of retired players; isn't that right?

17   **A.**   If that occurred in the second day that he testified.  I

18   wasn't here for the Monday session.

19   **Q.**   And you were here when he testified in his second day that

20   a lot of criticism has been levied at the union about its

21   treatment of retired players; you're aware of that, sir?

22   **A.**   Totally unjustified criticism, yes.

23         **MR. KATZ:**  Thank you.

24         **THE COURT:**  I need to say one thing, though, for the

25   jury.  It's not Mr. Katz's fault and it's really not even the

1   witness's fault.

2          I told you that we're not here to award punitive

3   damages against the union for broader issues.  We're here on

4   account of the GLA, the RPGLA, and the issues that relate

5   directly to that.

6          Collective bargaining is not part of what you're here

7   to decide.  And I would not want you to in any way factor that

8   into your decision on the amount of damages.

9          I think we should go to something new.

10         **MR. KATZ:**  I have no further questions.

11         **THE COURT:**  Anything more?

12         **MR. KESSLER:**  Just a couple more, Your Honor.

13                     <u>**RECROSS EXAMINATION**</u>

14  **BY MR. KESSLER:**

15  **Q.**   Mr. Berthelsen, if you look back to that page 393, which

16  was page 4, the financial statements, Mr. Katz asked you about

17  that there was a $25 million a year guaranteed payment from EA,

18  in licensing.

19         Do you recall that?

20  **A.**   Yes.

21  **Q.**   Will you read to the jury what were the total expenses of

22  the union, if you look at total expense line in the year ending

23  February of 2008.

24         **MR. KATZ:**  Object.  Beyond the scope.

25         **THE COURT:**  Why isn't this beyond the scope?

 1          **MR. KESSLER:**  This goes directly to why the

 2   25 million is not adequate, at all, to pay for the expenses,

 3   Your Honor.

 4          **THE COURT:**  All right.  Overruled.  Please go ahead.

 5          **THE WITNESS:**  It's $125,225,147.

 6   BY MR. KESSLER:

 7   **Q.**   Okay.  So you would have to have a lot more than an EA

 8   agreement to meet your union expenses, before you got to any

 9   assets; isn't that correct?

10   **A.**   Most definitely.

11   **Q.**   And, Mr. Berthelsen, you got asked a question by Mr. Katz,

12   just now, about Congressional hearings and desires to improve

13   retired player pension benefits.

14          If there were going to be any improvements, could you

15   do that unilaterally or does it have to be in collective

16   bargaining?

17   **A.**   The latter.  It has to be in collective bargaining.

18   **Q.**   And if you had an award which significantly reduced your

19   assets for collective bargaining, would that have any impact on

20   your ability to do anything for the retired players in the next

21   bargaining?

22          **MR. KATZ:**  Object, Your Honor.

23          **THE COURT:**  Sustained.  This is too far afield.

24          **MR. KESSLER:**  Your Honor, I have nothing further.

25          **MR. KATZ:**  I have just one further question, Your

1    Honor.

2              **THE COURT:**  Please, Mr. Katz.

3              **MR. KATZ:**  May I consult with Mr. Parcher for a

4    moment?

5              **THE COURT:**  Can't we bring this to an end?

6              **MR. KATZ:**  I just have one more question.

7                    **FURTHER REDIRECT EXAMINATION**

8    **BY MR. KATZ:**

9    **Q.**  Are you telling the jury, Mr. Berthelsen, that the union

10   is having trouble getting by on $81 million of licensing

11   revenue a year?

12   **A.**  We need all the help --

13   **Q.**  That calls for a yes or no.

14   **A.**  We need all the help --

15   **Q.**  Calls for a yes or no.

16              (Counsel and the witness speaking simultaneously; not

17              reportable.)

18   **A.**  -- we can in order to prepare for the lockout.

19              **MR. KATZ:**  Your Honor.

20              **THE COURT:**  Can you answer that yes or no?

21              **THE WITNESS:**  Would you repeat the question, please.

22   **BY MR. KATZ:**

23   **Q.**  Are you telling the jury that the union is having troubles

24   getting by on $81 million of licensing revenue a year?

25   **A.**  Not at the moment.

1          **MR. KATZ:**  Thank you.

2          **THE COURT:**  All right.  You can step down,

3  Mr. Berthelsen.  Thank you.

4          All right.  Do you have any other witness?

5          **MR. KATZ:**  Yes.  Mr. Philip Rowley.

6          **THE COURT:**  Is he here?

7          **MR. KATZ:**  He is.

8          **MR. KESSLER:**  Your Honor, we have an objection to

9  this witness.

10         This witness did not cover in his expert reports,

11  either the first or the supplemental, anything on the subject

12  of the union's net worth.

13         In fact, Your Honor, it first came up at his

14  deposition when plaintiffs tried to get him to put in this

15  information.  And I asked him --

16         **THE COURT:**  Is it in the report?

17         **MR. KATZ:**  It is not in the report, Your Honor.

18         **THE COURT:**  All right.  Well, then it's not proper

19  for him to start testifying about something that's not in the

20  report.

21         **MR. KATZ:**  All right.  We will not call him.

22         **THE COURT:**  All right.  Thank you.

23         Do you have any other witnesses?

24         **MR. KATZ:**  No, Your Honor.  The plaintiff rests.

25         **THE COURT:**  All right.  Any witnesses by the defense?

1        **MR. KESSLER:**  No, Your Honor, just Mr. Berthelsen.

2   We have already done that.

3        **THE COURT:**  Have a seat for a second.

4        We've reached another milestone and you've now heard

5   all the evidence you're going to hear on the additional

6   information.

7        But I need to make something clear to you.  You've

8   heard an entire trial, and most of that has something that

9   could bear on the issue of the amount of punitive damages.

10       So this very short proceeding was -- was directed

11  mainly at financial condition, current financial condition,

12  which you have not heard about.

13       And that's just normal in the way these kinds of

14  trials are run, is that you -- if you decide there's going to

15  be punitive damages, then you -- we have a two part thing,

16  where the second part of the trial is related to the financial

17  condition.  But everything else that you need for your decision

18  has already been presented to you in the main event.  Okay.

19       Now, what I'm going to do is read to you an

20  instruction that is related to the amount, and some guidelines

21  for the amount of punitive damages.

22       I won't be able to get this reduced to written form,

23  I don't think, so this will be the time you hear it.  This is

24  the old-fashioned way.  They used to do it until about 1988.

25  Pick a number at random.

1    In the old days, we didn't have word processing and

2  all that, so the jury just heard it.  And you never got it in

3  writing.  But these days we can give you most things in

4  writing.

5    But on this one I will not be able to give you this

6  in writing, so I will try to say it twice to you.  It's very

7  short.

8    Now that you have found that the plaintiff class is

9  entitled to an award of punitive damages, then you must decide

10  the amount of the award.

11    To determine the amount of the award, you may

12  consider the net worth and relative wealth of the defendant at

13  the time of trial; the nature of the wrong committed, the state

14  of mind of the defendant when the wrong was committed; the

15  burden and duration of the litigation.

16    Your award should be sufficient to punish the

17  defendant for his or her conduct and to serve as an example to

18  prevent others from acting in a similar way.

19    Okay.  That's the end of it.

20    Now, I'm going to read it again in case you missed

21  something the first time.

22    Now that you have found that the plaintiff class is

23  entitled to an award of punitive damages, you must now decide

24  the amount of the award.

25    To determine the amount of the award you may consider

the net worth and relative wealth of the defendant at the time

of trial; the nature of the wrong committed; the state of mind

of the defendant when the wrong was committed; and the burden

and duration of the litigation.

Your award should be sufficient to punish the

defendant for his or her conduct and to serve as an example to

prevent others from acting in a similar way.

Now, does anyone want me to go over that a third time

or do you think you have it in mind?

(No response.)

**THE COURT:** Okay. You've got it in mind.

All right. So you know the drill. I have a special

verdict form to be sent into the jury room in a few moments,

that has a blank for you to fill in. And that's the only

remaining question for you to consider.

And, again, I want to make it clear that the evidence

presented in the entire trial is fair game for you to consider,

pro and con, on the subject.

However, before we get there -- I have now told you

what the factors are -- we have to have an argument by each

side as to what the dollar amount should be. This is going to

be very short.

Mr. Katz, you get to go first.

**MR. KATZ:** Thank you, Your Honor.

May I just set up that easel for a moment? I'm going

1    to draw.

2              **THE COURT:**  Yes, go ahead.

3                          **<u>CLOSING ARGUMENT</u>**

4          **MR. KATZ:**  May it please the Court.  Good afternoon,

5    ladies and gentlemen of the jury.

6          Again, to refresh your recollection, my name is Ron

7    Katz.  And I want to add my thanks for your diligence, for your

8    service.

9          The judge has told you that you are sitting here

10   during some very historic times.  We've had changes in our

11   executive branch.  We've had changes in our legislative branch.

12   And, of course, you've been participating in the judicial

13   branch.

14         I think it's important to note that there's one thing

15   that those three branches have in common.  They all have the

16   same boss.  That boss is us.  All of us.  We the people of the

17   United States are the bosses of the executive branch, the

18   judicial branch, and the legislative branch.

19         That's the way our system works, so that we have

20   nobody to complain to but ourselves if we live in a society

21   where people do not act in an appropriate manner, where people

22   act, as you'll see from the instructions, with actual malice,

23   willful disregard for the rights of plaintiffs, where the

24   conduct was outrageous, grossly fraudulent, et cetera, et

25   cetera.

1          It's up to you.  And why do we do this?  Why have you

2     been sitting here this time?  Essentially, we do it for each

3     other because it may be that some day you'll have a problem

4     with your union or with your employer or with another person.

5     And what will you want?  You want to come to a fair place where

6     a jury of your peers can make a decision about how people

7     should conduct themselves.

8          And this is a very important decision that you will

9     be making now because you will be deciding whether to set an

10    example for whether this is the way a union should act toward

11    its members or not.  That's up to you.

12         Because unless it costs them money -- this is not a

13    criminal proceeding -- they will not pay attention.  And that's

14    why we're allowed to put on the net worth evidence of the

15    defendant because, obviously, if someone is extremely wealthy,

16    if they have, as the plaintiff does, $221 million of net worth,

17    you can't set an example by fining them a thousand dollars.

18    They could pay that out of petty cash.  It has to be something

19    that they will feel.  It has to be something that will cause

20    them to change the conduct that you have already adjudged to be

21    worthy of punitive damages.

22         So that's what we're about to do right now.  I don't

23    intend to take a lot of your time, but I think I can show that

24    this conduct was outrageous and willful and was a result of

25    actual malice.

1           Just to go over some of the -- I wouldn't call them

2   highlights, I would call them lowlights -- but the eligibility

3   criteria, the fact that these men were supposed to share with

4   the eligible NFLPA members who could only have been active

5   players; the fact that that was -- that they were defined out

6   of existence in an agreement between the NFLPA and PI that was

7   negotiated behind the back of these men, they had nothing --

8   Mr. Adderley had nothing, no knowledge of this agreement

9   whatsoever; the Hall of Fame agreement, where their rights were

10  sold for below market; the scrambling; and, most of all, I

11  think, the demeaning.

12          You know, of course, we're going to have

13  disagreements in our society.  We have disagreements within our

14  families, within our friends.  That's not a problem.

15          The problem is we must learn how to disagree with one

16  another in a civil manner.  I respectfully disagree with your

17  opinion.  Here's my view.  Here's your view.

18          We just had a presidential election.  Sometimes the

19  presidential candidates were civil to one another.  Sometimes

20  they're not so civil to one another.  But that is the goal.

21          And referring to someone as worthless, referring to

22  someone as dog food, is not a way of disagreeing with someone.

23  It's a way of demeaning people.  And in this case they're

24  demeaning their own union members.  I think it's a very serious

25  matter.

1      So what I would like to do, because of the time

2 limits that we have, is just take one example and show you how

3 this conduct -- I'm not going to use the words from the -- from

4 the instruction.  I'm going to use more colloquial words.  This

5 conduct was rotten to the core.

6      Let me demonstrate that to you.  We start out at the

7 middle and the core is, basically, demeaning people.  You are

8 worthless --

9      **MR. KESSLER:**  Your Honor, doesn't this exceed -- I

10 object -- what Your Honor said was the purpose of this

11 particular argument now?

12      **THE COURT:**  No.  The evidence was limited to

13 financial condition.  But in determining the amount, Counsel is

14 entitled to argue broader than just the financial condition,

15 and to get into those types of factors such that I gave in the

16 original instructions, evil motives, actual malice, et cetera,

17 and conduct that was outrageous, grossly fraudulent or reckless

18 toward the safety, that can be argued, as well as the state of

19 mind of the defendant and the nature of the wrong that was

20 committed.

21      So this is -- this is okay to get into in the

22 argument part.

23      Go ahead, Mr. Katz.

24      **MR. KATZ:**  Thank you, Your Honor.

25      So we start out with the demeaning.  You are

1  worthless.  You are dog food.

2          Then the next level is that we see that that is

3  simply not true.  Again, this is all about scrambling.  There

4  are other examples I could give, but I'm just going to use the

5  scrambling.

6          We see evidence that that's simply not true.  How do

7  we know that it's not true?  Because EA -- there is demand from

8  EA.  There's 143 vintage teams.  There are -- they are teams

9  that are people's favorites.  They want to play those games.

10 They want to be Joe Montana on the '89 49ers.  They want to be

11 Herb Adderley on the '66 Packers.

12         So you can see with your own eyes.  I don't have to

13 tell you that my clients are worthwhile.  EA is saying that

14 they're worthwhile because they have 143 games in this

15 multi-million, hundreds of million dollars games.  There are

16 actually many more vintage teams than there are current teams.

17         So that's the second level.  And then the third level

18 is the misconduct.  What do you do if you are the defendants

19 and you have this belief, for whatever reason, that they're

20 worthless and dog food, but now the real world is telling you

21 something else, there is demand?

22         So what do they do?  They scrambled.  LaShun Lawson

23 wrote a letter to EA and said:  Scramble.  We can't pay these

24 people.  We can't have these people out there.

25         And, of course, scrambling doesn't really do any good

because if you want to be the '66 Greenbay Packers, it can only be Herb Adderley there. If you want to be the '89 49ers, it can only be Joe Montana.

This distinction that Dr. Noll made that it's the teams and not the players, teams are made up of players.

Okay. So we've got the wrongdoing now. We've got the scramble. And then they've got a final problem. Final problem is that they have to meet we the people. They have to meet you in a court of law.

And what did they do when they met you? They basically insulted your intelligence. They insulted your intelligence with their excuse.

And their excuse was -- Mr. Kessler said this just last Friday, and he said it many times -- We did this, we did the scrambling to protect their rights. You heard it so many times.

Now, why does this insult your intelligence? Insults your intelligence because it goes right to the core. I said I will show you it's rotten to the core.

Let's go back to the core. They're worthless. They're dog food.

Why do you need to protect the rights of people who are worthless? There's no -- there's nothing to protect. What are they saving them for? They've had this program for 16 years. They've never paid a penny. So what are they

1  protecting them for, another 16 years of not being paid a

2  penny?

3          It's just an untruth.  It's not true that they're

4  protecting their rights.  They are protecting their own right

5  to a stream of $81 million a year.  And they're having trouble.

6  They're scrimping by.  You heard Mr. Berthelsen tell you.

7          So that, I think, is an example of what's happened

8  here, a graphic example that you've seen with your own eyes.

9          There's a lot of distractions, ad hoc agreements,

10 this, that, and the other thing.  Accusations that these men

11 didn't complain.

12         They trusted their union.  I mean, what did these men

13 do, really?  They signed an agreement; they trusted their

14 union; and they didn't get paid.  And, yet, they were put on

15 trial, all of them.

16         Mr. Laird, Mr. Beach, Mr. McNeil, they were all put

17 on trial.  Why?  How dare you, you didn't complain.

18         These men did nothing except to trust their union.

19 And a union is something you should be able to trust.

20         And that's what you have to tell this union.  You

21 better be trustworthy the next time because it's going to cost

22 you some money.

23         **THE COURT:**  Mr. Katz, you've used about 11 of your 15

24 minutes.  If you want to save anything for rebuttal, keep that

25 in mind.

1              **MR. KATZ:**  Thank you, Your Honor.

2              How much money?  The wealth of the defendants is

3      $219,655,553.  You can see that on the page that I talked

4      about.

5              And what we believe is an appropriate number here,

6      that will cause the plaintiffs -- the defendants to think about

7      what they've done and hopefully to change their behavior, is

8      10 percent of their net worth.  So approximately $211 million,

9      we think, is appropriate.

10             My clients don't want to break the union.  They don't

11     want to hurt the active players.  But they want to send a

12     message.  And they need you to send that message.

13             Unions have to be trustworthy.  And this is how you

14     do that.  This is how we the people does that.

15             Thank you.

16             **THE COURT:**  Thank you, Mr. Katz.  Could you move

17     the --

18             **MR. KATZ:**  Sorry.

19             **THE COURT:**  Move the easel, unless you're going to

20     use it.

21             **MR. KESSLER:**  I'm not going to use the easel, Your

22     Honor.

23             **THE COURT:**  All right.  Mr. Kessler.

24                          **CLOSING ARGUMENT**

25             **MR. KESSLER:**  Good afternoon, ladies and gentlemen of

1   the jury.

2           Obviously, you know that I had a different view of

3   this case.  But at this point in the proceedings I have to

4   respect the fact that you've come to a different conclusion

5   with respect to liability.  And so I accept that.  And I thank

6   you for working hard on this case.

7           I hope, though, that at this point some things will

8   be clear to you.  Again, respecting your decision.

9           You have already set an example here.  $7.1 million

10  in damages is not a small amount for this union.  It's not, as

11  Mr. Katz said, a $1,000 fine, okay.

12          That already is going to be a significant reduction

13  in the amount of money that the active players have in their

14  coming labor battle to fight management, not just on behalf of

15  the active players, but on behalf of the retired players, as

16  well.

17          This is very, very important for you to keep in mind,

18  and I hope and trust that you will keep that in mind.

19          The union has many, many obligations.  It's a large

20  union.  It also runs a licensing business.  So to look just at

21  their net restricted, unrestricted assets and say, oh, it's

22  just 10 percent that they're asking for, an additional number

23  of that amount, $21 million, which gets us up to almost

24  $30 million, would be a major reduction in their assets at a

25  time when, as we all know -- we said we're in historic times.

1  Unfortunately, not all the history is good.

2         And part of the history, as we know, is that the

3  value of their investments, that you saw as of February, as of

4  February, I don't have to tell you how much the stock market

5  has gone down with respect to that.

6         You can take almost notice of that fact as to what's

7  happened.

8         The fact that the licensing money is not going to be

9  there at the same levels the next two years because everybody

10 is tight now and people are not buying as many products, I

11 don't have to tell you that.  You know that yourselves.  This

12 is going to be a union that, no matter what, is going to need

13 this money if it's going to do its job.

14        And what's very important here, the original

15 instructions you received on this part of the case still apply.

16 This is not the preponderance of the evidence burden.  This is

17 the part of the case that is the clear and convincing evidence

18 burden.

19        And the importance of that is, plaintiffs have not

20 come forward with clear and convincing evidence that this

21 amount of money they've asked for can be rendered without doing

22 severe damage to this union, without hurting the active

23 players, and demonstrating that the 7.1 million you've already

24 given is not enough.

25        They haven't even come in with any evidence as to

1 what the value is today.  They just haven't.  They came in with

2 what the value was back in February, before the terrible

3 problems we've had in the financial markets, before the

4 licensing business came under this onslaught.

5          So I would ask you, ladies and gentlemen of the jury,

6 to please think about the size of the verdict you've already

7 offered and do think about the conduct here.

8          Again, I respect your decision that you've obviously

9 found that there was a breach here.  Okay.  I cannot deny that.

10 That's your decision.  But what is the nature of the breach?

11 Is it really the type of outrageous conduct, threat to public

12 safety, the types of things described in the punitive damage

13 instructions that the Court has already given you and is still

14 here?

15          Was there the type of evidence that someone like

16 Mr. Armstrong, who is the president of the Players Association

17 at this time, had such a severe, evil intent that he was rotten

18 to the core, that you need to send that type of measure of

19 punishment?

20          And I ask you to also, please, consider the fact this

21 was the only sports union that tried to do retired player

22 licensing.  Please keep that in mind.

23          Because what would be the message of a large punitive

24 damage verdict here?

25          One message would be to this union and other sports

1  union societies:  Don't try.  Don't try to go out and help find

2  licensing opportunities for the retired players because if you

3  do so, and you make some mistakes, then you're not only going

4  to have the actual damages here but you're going to have some

5  large punitive damage award on top of that.

6          Think about it.  If you were in the active players'

7  shoes, if you were sitting there and a large punitive damages

8  award came down, how would you react at all these sports unions

9  about whether or not this is something that should be tried?

10          I also would remind you that this class already

11  received in the ad hoc $7 million.  So if you're giving them

12  another $7 million in the class, that's already $14 million for

13  this class, because none of that $7 million is coming back from

14  the ad hoc members who've already received that.

15          So, again, looking at the nature of the conduct,

16  looking at the need for this money in a labor battle, which you

17  could all appreciate.

18          And I would also point out, when you look at those

19  financial statements, a lot of the obligations for this union

20  are even things for pensions and obligations to their own

21  employees, okay, things that they have to fund, things where

22  the money has been invested in securities that we all know are

23  at risk now in terms of that.

24          Think about what it's going to do to this ability of

25  this union to thrive and function for the benefit of not just

1   the active players but for the retired players as well.

2          Again, I respect the hard work that you've done in

3   this verdict.  And I'm asking you, please, don't let any

4   appeal, as the judge has instructed you, just for sympathy or

5   other emotional appeals on issues that have nothing to do with

6   the GLA lead you to punish this union and the active players in

7   a way that really is not required.

8          You've sent the message.  We hear the message loud

9   and clear.  The defendants hear your message.

10          I do not believe any award of the type or magnitude

11  that's been asked for here is warranted.  Either we would ask

12  you to either just give a symbolic punitive damage award of a

13  small amount of money, if you want to make that statement, it's

14  completely within your discretion.  It could be a small amount

15  that you feel appropriate.  Or -- or even no punitive damage

16  award.  That's probably too much for me to ask in light of your

17  verdict.

18          But, please, don't do something that's going to have

19  an effect that you don't want.  Don't hurt this union to

20  protect its active and retired players.  And don't send the

21  message to all the sports unions that what you should do is

22  stay as far away from your retired players as possible so that

23  you never get caught in this type of situation.

24          Thank you for your time and attention.  You've been

25  here quite a while.  I'm not going to take any more time right

1  now.  But thank you.

2          **THE COURT:**  Thank you, Mr. Kessler.

3          Mr. Katz, you have three minutes.

4                  **REBUTTAL ARGUMENT**

5          **MR. KATZ:**  Thank you, Your Honor.

6          First of all, I presented you with facts.  We don't

7  want your sympathy.  Mr. Adderley would be the first one to say

8  he did not come here for your sympathy.  He came here for what

9  he believes is owed him.  And you have given an answer on that

10 already.

11         With respect to why this is needed, I think

12 Mr. Kessler's presentation is proof of that.  He's still trying

13 to fool you with these ad hoc payments.  He said it just a

14 moment ago.

15         Go back and look at the instructions that Judge Alsup

16 gave you.  He made it very clear, this case is not about those

17 ad hoc payments.

18         He had the opportunity to apologize for something

19 that he said last Friday.  He said that he didn't consider the

20 dog food remark to be offensive, that that's just a southern

21 kind of thing.

22         Well, I don't know if any of you spent time in the

23 south.  The people of the south are just as courteous and

24 respectful as our people in the Bay Area.

25         This is not an acceptable comment anywhere.  He had

1  the opportunity to apologize for it.  He did not.

2          I didn't say that Mr. Armstrong was rotten to the

3  core.  I think Mr. Armstrong is probably a bit naive to think

4  that he can go to Maui for a few days each year and run a

5  hundred million dollar organization.  That's not the way things

6  happen.

7          The organization was run by Mr. Upshaw and Mr. Allen.

8  They betrayed the trust of their members.  And the only way

9  that they will understand that is if you dock them for punitive

10  damages.

11          If you look at that document that I gave you, you can

12  see -- if you look at the bottom line, there's that

13  $219 million number.  It's the third number over.  It's made up

14  of two numbers.  The first is $98 million, which is what

15  Mr. Parcher referred to as the slush fund.  That's completely

16  unrestricted.  And then $121 million is their strike fund.

17  They have an adequate strike fund.  So we would not be cutting

18  into any of that.  We don't want to.  We're not asking you to

19  do that.

20          We're asking you to give a moderate piece of their

21  net worth because of the conduct that you yourself have seen,

22  you yourself have heard as recently as five minutes ago.

23          Thank you very much.

24          **THE COURT:**  Thank you, Mr. Katz.

25          All right.  Let me just remind you, again, what the

1  factors are.  I'm going to give it to you the third time.

2        The factors you must use to decide the amount of the

3  award for punitive damages, you may consider the net worth and

4  relative wealth of the defendant at the time of trial; the

5  nature of the wrong committed; the state of mind of the

6  defendant when the wrong was committed; and the burden and

7  duration of the litigation.

8        Your award should be sufficient to punish the

9  defendants for their conduct and to serve as an example to

10 prevent others from acting in a similar way.

11       All right.  At this time, I'm going to ask you to go

12 back to the jury room.  In a few moments, I will send in a very

13 short special verdict form that has a blank to fill in.

14       And now, remember, that I gave you instructions

15 earlier, which I -- starting at paragraph 54 of the group of

16 instructions you've already got, which tell you what the

17 standards are for whether or not punitive damages are in order.

18       Now, you've already said that they are, but you, of

19 course, can consider those factors, as well, in determining

20 your amount.

21       All right?  Okay.  Please retire to the jury room to

22 continue your deliberations.

23       **THE CLERK:**  All rise.

24       (Thereupon, the jury retired for further

25       deliberations.)

 1          **THE COURT:**  All right.  Everyone be seated.  May I

 2    have my law clerk up here for a minute.

 3          Just a question that I don't need your input right

 4    now on, but I want us to be thinking about it.

 5          The first step will be to enter a judgment based upon

 6    the verdict.  That will trigger the post trial motion times

 7    under the rules.

 8          Second question that we have in this case goes to

 9    plan of distribution and attorneys' fees awards based out of

10    the verdict.

11          And I don't want to rule on any of that now, but I

12    would like to get the input of the lawyers, say, by Friday of

13    this week, a 2- or 3-page memorandum, 5 pages, maybe, on what

14    the proper procedure is to follow, given that this is a class

15    action and not an individual action.

16          So you don't have to address that now, but it is a

17    procedural concern that we only have in class actions and not

18    in an individual action.

19          Okay.  Anything anyone else wants to say?  Otherwise,

20    I will go wait.  Please don't go far because I think we will

21    have, most likely, a verdict within half an hour.

22          **MR. KESSLER:**  Your Honor, just a question.

23          Will Your Honor entertain briefing on the Rule 50

24    motions after verdict?

25          **THE COURT:**  Of course, yes.

```
 1              Take a look at the rule in the next few minutes.  As
 2    soon as the judgment is entered, you can make -- there's a
 3    whole procedure for making post-trial motions, including motion
 4    for new trial, motions for entry of judgment on the record.
 5              So that's -- why don't you get the Rules of Civil
 6    Procedure and our local rules out, and see if you can figure
 7    out what that timeline is.
 8              But that would be the time and place to do that.
 9         MR. KESSLER:  Very good, Your Honor.
10         THE COURT:  All right.  Anything more?  Please don't
11    go very far.  You can just stay right here in the courtroom.
12              (Proceedings in recess for jury deliberations.)
13         THE COURT:  Please be seated.
14              I have been told, but I haven't seen the note, that
15    we have a verdict on the punitive damages.
16              So unless there's some reason, I'm going to bring the
17    jury in now to take the verdict.
18         MR. KATZ:  No objection.
19              (Thereupon, the jury returned to the courtroom.)
20         THE COURT:  All right.  Welcome back.  Please be
21    seated.
22              Ms. Desouza, do you have an unanimous verdict on the
23    question of the amount of punitive damages?
24         FOREPERSON MS. DESOUZA:  Yes.
25         THE COURT:  Please give it to the marshal.  The
```

marshal will hand it to me.

Now, I've already thanked you, so I don't need to do that again. But, of course, you know that the Court appreciates your service in this case.

All right. I will hand this to the clerk to be read. Please listen, and we will ask you if this is your verdict, as well, individually.

**THE CLERK:** As to the case of Herbert Anthony Adderley vs. National Football League Players Association and the National Football League Players Inc, the Special Verdict Form Re Punitive Damages. Your answer must be unanimous.

"As punitive damages, we the jury award to the plaintiff class, and against the defendants, the sum of $21 million."

Sign and dated by the foreperson on November 10, 2008.

**THE CLERK:** Lisa Desouza, is the verdict read your verdict?

**FOREPERSON MS. DESOUZA:** Yes.

**THE CLERK:** Nancy Jean Smith, is the verdict read your verdict?

**JUROR MS. SMITH:** Yes.

**THE CLERK:** Danny C. Chui, is the verdict read your verdict?

**JUROR MR. CHUI:** Yes.

1          **THE CLERK:**  Douglas Neville, is the verdict read your

2     verdict?

3          **JUROR MR. NEVILLE:**  Yes.

4          **THE CLERK:**  Debra Jean Martin, is the verdict read

5     your verdict?

6          **JUROR MS. MARTIN:**  Yes.

7          **THE CLERK:**  Lana Lim Ma, is the verdict read your

8     verdict?

9          **JUROR MS. MA:**  Yes.

10          **THE CLERK:**  Laura Yamane, is the verdict read your

11     verdict?

12          **JUROR MS. YAMANE:**  Yes.

13          **THE CLERK:**  Ofelia Schwartzler, is the verdict read

14     your verdict?

15          **JUROR MS. SCHWARTZLER:**  Yes.

16          **THE CLERK:**  Natalie Hart, is the verdict read your

17     verdict?

18          **JUROR MS. HART:**  Yes.

19          **THE CLERK:**  Amy Holm, is the verdict read your

20     verdict?

21          **JUROR MS. HOLM:**  Yes.

22          **THE CLERK:**  Your Honor, the verdict is unanimous.

23          **THE COURT:**  All right.  The clerk will record the

24     verdicts in the record of the Court.

25          Any reason why the jury cannot be discharged at this

1  time?

2        **MR. KATZ:**  No, Your Honor.

3        May we speak to the jury afterwards?

4        **THE COURT:**  I'm coming to that in a moment.

5        Any reason, though, why the jury cannot be

6  discharged?

7        **MR. KESSLER:**  No, Your Honor.

8        **THE COURT:**  We have reached another milestone in the

9  case.  I am about to turn you back into being civilians.

10       You have been here several weeks deciding this case

11  and paying close attention.  I thank you, again, for that

12  service in this case.

13       I'm going to turn you back into being ordinary

14  civilians.  I will ask you to go back to the jury room for

15  three or four minutes while Dawn will pick up your badges.

16       We will shred your notepads, so you don't have to

17  worry about that.

18       If there are any issues about getting your payments

19  as -- and your daily charges, travel, Dawn can help you with

20  that as well.

21       I would like to bring you into my chambers, which I

22  haven't had a chance to do, and spend not very long, just a few

23  minutes of your time to thank you again.

24       I will not talk to you about this case.  You are free

25  to talk to anyone you want now, but I am not, because there are

future proceedings in this case.

　　　　Your part is over.  So you will be able to go down to the front of the courthouse and hold a press conference, if you want, or you can talk to the lawyers in the case.  When we meet in chambers, I will give you some more heads up on that.

　　　　You are now officially relieved.  You can talk with your loved ones, your friends.  You can watch TV.  You can see the news stories about this case.  You can hold a press conference.  You can do anything you want because you have now done your duty in this case and you're back to being not the decision-maker anymore but being the ordinary civilians.  And very good civilians you are at that, too.

　　　　I thank you for taking the time out of your lives to come here to work for your United States District Court.

　　　　So at this time -- I'm sorry, Mr. Parcher, are you --

**MR. PARCHER:**  My absolute apologies.

**THE COURT:**  What were you over there saying?

**MR. PARCHER:**  I was simply telling Ron that rather than interview people he should just thank them.

　　　　Everything I did was inappropriate.

**THE COURT:**  Wait until -- this is an important thing, to thank the jury.

**MR. PARCHER:**  Everything I did was just inappropriate.

**THE COURT:**  All right.  I know Mr. Parcher did not

1   mean any ill will toward you.

2           Thank you, again, for your service.  You are now

3   discharged.  Please go to the jury room.  Dawn will meet you

4   there and we will take back your badges, and you'll be on your

5   way in just a few more moments.

6           All right.  Thank you.

7           **THE CLERK:**  All rise.

8           (Thereupon, the jury was discharged.)

9           **THE COURT:**  All right.  Everyone be seated.

10          The rules provide for timelines on motions for new

11  trial, Rule 50, and so forth.  I'm just going to leave it to

12  the rules.  Please keep in mind the time frames.

13          What I will tell the jury is that they are free to

14  come out here and talk to the -- I like to have them come out

15  here and talk to the lawyers in the jury box.  Some do.  Some

16  don't.

17          I've had cases where the jury says, "I've had enough

18  of this case.  I'm going home."  Especially late in the day

19  like this.  I've had other cases where they want to talk about

20  it.  So I think it would probably be worth your while to stay

21  around.

22          You're free to use -- well, let's see.  I have

23  another matter.  I may have to move you to the lawyers' lounge,

24  because I do have another matter that's been hanging fire since

25  3 o'clock.  But for at least starters, I'll have them come out

1  here.  And if there's anyone who wants to talk to the lawyers,

2  fine.

3            As far as the press is concerned, you can talk to the

4  jury.  It's okay.  You're discharged now.  And you can talk to

5  the lawyers.  No more gag rule, or whatever it's called.  Both

6  sides are free to talk to the press and issue press releases,

7  do whatever you would like to do, because there's no issue of

8  jury contamination anymore.

9            So with that, I'm going to say good-bye for now.  I'm

10  sure I'll see you back here on motion practice.

11            All right.  Done.

12            (All counsel simultaneously thank the Court.)

13            **MR. ADDERLEY:**  Thank you, sir.

14                        -   -   -   -

15

16

17                    **CERTIFICATE OF REPORTER**

18        I certify that the foregoing is a correct transcript

19  from the record of proceedings in the above-entitled matter.

20

21  DATE:  Monday, November 10, 2008

22

                  s/b Katherine Powell Sullivan

23      _____

24      Katherine Powell Sullivan, CSR #5812, RPR, CRR
                    U.S. Court Reporter

25

<u>**I N D E X**</u>

**PLAINTIFFS' WITNESS**       <u>**PAGE**</u> <u>**VOL.**</u>

**BERTHELSEN, RICHARD**
Direct Examination by Mr. Katz    2852 14
Cross Examination by Mr. Kessler   2859 14
Redirect Examination by Mr. Katz   2865 14
Recross Examination by Mr. Kessler  2871 14
Further Redirect Examination by Mr. Katz 2873 14


<u>**ARGUMENT**</u>

Closing Argument by Mr. Katz    2878 14
Closing Argument by Mr. Kessler   2885 14
Rebuttal Argument by Mr. Katz    2891 14

–  –  –  –

<u>**E X H I B I T S**</u>

| **TRIAL EXHIBITS** | <u>**IDEN**</u> | <u>**VOL.**</u> | <u>**EVID**</u> | <u>**VOL.**</u> |
|---|---|---|---|---|
| 2242 | | | 2854 | 14 |