1  Todd Padnos (Bar No. 208202)
   *tpadnos@dl.com*
2  DEWEY & LEBOEUF LLP
   One Embarcadero Center, Suite 400
3  San Francisco, CA 94111
   Tel: (415) 951-1100; Fax: (415) 951-1180
4
   Jeffrey L. Kessler (*pro hac vice*)
5  *jkessler@dl.com*
   David G. Feher (*pro hac vice*)
6  *dfeher@dl.com*
   David Greenspan (*pro hac vice*)
7  *dgreenspan@dl.com*
   DEWEY & LEBOEUF LLP
8  1301 Avenue of the Americas
   New York, NY 10019
9  Tel: (212) 259-8000; Fax: (212) 259-6333

10 Kenneth L. Steinthal (*pro hac vice*)
   *kenneth.steinthal@weil.com*
11 WEIL, GOTSHAL & MANGES LLP
   201 Redwood Shores Parkway
12 Redwood Shores, CA 94065
   Tel: (650) 802-3000; Fax: (650) 802-3100
13
   Bruce S. Meyer (*pro hac vice*)
14 *bruce.meyer@weil.com*
   WEIL, GOTSHAL & MANGES LLP
15 767 Fifth Avenue
   New York, NY 10153
16 Tel: (212) 310-8000; Fax: (212) 310-8007

17 Attorneys for Defendants National Football League Players Association
   and National Football League Players Incorporated d/b/a Players Inc

18

19 **UNITED STATES DISTRICT COURT**
   **NORTHERN DISTRICT OF CALIFORNIA**
   **SAN FRANCISCO DIVISION**

20

21 BERNARD PAUL PARRISH, HERBERT     Case No. C 07 0943 WHA
   ANTHONY ADDERLEY, WALTER
22 ROBERTS III,                            **DEFENDANTS' RENEWED**
                                        **MOTION FOR JUDGMENT AS A**
22                                      **MATTER OF LAW**
23          Plaintiffs,
                                    Date: January 8, 2009
24          v.                               Time: 8:00 am
                                    Ctrm: 9
25 NATIONAL FOOTBALL LEAGUE
   PLAYERS ASSOCIATION and NATIONAL    Judge: William H. Alsup
   FOOTBALL LEAGUE PLAYERS
26 INCORPORATED d/b/a/ PLAYERS INC,

27          Defendants.

28

---

Dewey & LeBoeuf LLP
One Embarcadero Center, Suite 400
San Francisco, CA 94111

Dockets.Justia.com

**Dewey & LeBoeuf LLP**
One Embarcadero Center, Suite 400
San Francisco, CA 94111

**TO PLAINTIFFS AND THEIR ATTORNEYS OF RECORD:**

PLEASE TAKE NOTICE that on January 8, 2009 at 8:00 a.m., or as soon thereafter as the matter may be heard in the above-referenced Court, Defendants National Football League Players Association ("NFLPA") and National Football League Players Incorporated d/b/a Players Inc ("Players Inc") (collectively, "Defendants"), will and hereby do move, pursuant to Fed. R. Civ. P. 50, for judgment as a matter of law against Herbert Anthony Adderley and the class he represents (the "GLA Class"), which was certified by this Court in its Order dated April 29, 2008.

This Motion is based on the accompanying Memorandum of Points and Authorities, the accompanying declaration, the pleadings in this matter, and on such further evidence and argument as may be presented at the hearing on this Motion.

Date:  November 26, 2008                           DEWEY & LEBOEUF LLP


BY: ___/s/Jeffrey L. Kessler_____

Jeffrey L. Kessler

*Attorneys for Defendants*

TABLE OF AUTHORITIES ................................................................................................ iii

PRELIMINARY STATEMENT ........................................................................................ 1

ARGUMENT .................................................................................................................... 4

I.    THERE IS INSUFFICIENT EVIDENCE TO SUPPORT THE JURY'S
      COMPENSATORY DAMAGES AWARD FOR BREACH OF FIDUCIARY
      DUTY ................................................................................................................... 4

      A.    Plaintiffs' Only Damages Evidence Was For "Equal Shares" of the GLR
            Pool – But The Jury Rejected Plaintiffs' GLR Pool Claim ................................... 4

      B.    Plaintiffs Also Failed to Prove Individualized Damages or Evidence of a
            Class-Wide Formula to Support the $7.1 Compensatory Damages Award.......... 11

II.   THE PUNITIVE DAMAGES AWARD MUST BE VACATED ................................... 12

      A.    Plaintiffs' Failure of Proof on the Compensatory Damages Award Means
            That The Punitive Damages Award Must Also Be Vacated................................ 12

      B.    There Was No "Clear and Convincing" Evidence Upon Which a
            Reasonable Jury Could Award Punitive Damages ............................................. 13

      C.    At an Absolute Minimum, the Punitive Damages Award Must be
            Dramatically Reduced.............................................................................................. 18

III.  THERE IS INSUFFICIENT EVIDENCE FOR A REASONABLE JURY TO
      HAVE FOUND IN FAVOR OF PLAINTIFFS ON THEIR FIDUCIARY DUTY
      CLAIM.................................................................................................................. 19

      A.    There is Insufficient Evidence for a Reasonable Jury to Have Found That
            Defendants Owed a Fiduciary Duty to the GLA Class......................................... 19

            1.    Plaintiffs Did Not Present Sufficient Evidence to Establish That
                  They Had Control Over Defendants' Licensing Operations.................... 20

            2.    Plaintiffs Did Not Present Sufficient Evidence to Establish They
                  Had the Right to Discharge Defendants Under the RPGLA.................... 21

            3.    Plaintiffs Did Not Present Sufficient Evidence to Establish That
                  Defendants Had Undertaken to Act as a Marketing Agent and to
                  Affirmatively Promote their Rights ........................................................ 22

Dewey & LeBoeuf LLP
One Embarcadero Center, Suite 400
San Francisco, CA 94111

4.      Plaintiffs Did Not Present Sufficient Evidence That the Fiduciary
        Duty That Plaintiffs Seek to Impose on Defendants was Within the
        Parties' Reasonable Expectations ............................................................ 23

5.      Plaintiffs' Evidence on the Financial Arrangement Between the
        Parties Was Insufficient to Support a Fiduciary Duty Claim ................... 24

B.      There Was Insufficient Evidence for a Reasonable Jury to Find That
        Defendants Breached Any Fiduciary Duty ......................................................... 26

CONCLUSION ............................................................................................................ 30

**Dewey & LeBoeuf LLP**
**One Embarcadero Center, Suite 400**
**San Francisco, CA 94111**

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

Abuan v. General Elec. Co.,
  3 F.3d 329 (9th Cir. 1993) .................................................................................. 11

Ago v. Begg, Inc.,
  911 F.2d 819, 1990 WL 125683 (D.C. Cir. 1990)........................................... 17

Ames v. Yellow Cab of D.C., Inc.,
  No. 00-3116 (RWR)(DAR), 2006 WL 2711546 (D.D.C. Sept. 21, 2006).................. 19, 21, 25

Anderson v. Liberty Lobby, Inc.,
  477 U.S. 242 (1986)............................................................................................ 4

Aurora Assocs., Inc. v. Bykofsky,
  750 A.2d 1242 (D.C. 2000) ............................................................................. 2, 12

Bay General Indus. Inc. v. Johnson,
  418 A.2d 1050 (D.C. 1980) ............................................................................... 12

Boynton v. Lopez,
  473 A.2d 375 (D.C. 1984) ................................................................................. 17

Daka, Inc. v. McRae,
  839 A.2d 682 (D.C. 2003) ............................................................................... 2, 13

Entm't Research Group, Inc. v. Genesis Creative Group, Inc.,
  122 F.3d 1211 (9th Cir. 1997) ........................................................................... 15

Environmental Research Int'l Inc. v. Lockwood Greene Engineers, Inc.,
  355 A.2d 808 (D.C. 1976) ................................................................................. 21

Ficken v. AMR Corp.,
  --- F.Supp.2d ----, 2008 WL 4381906 (D.D.C. Sept. 29, 2008) ....................... 16

Fisher v. City of San Jose,
  509 F.3d 952 (9th Cir. 2000) ............................................................................... 4

Franklin Investment Co. v. Smith,
  383 A.2d 355 (D.C. 1978) ................................................................................. 12

Ft. Lincoln Civic Ass'n, Inc. v. Ft. Lincoln New Town Corp.,
  944 A.2d 1055 (D.C. 2008) ............................................................................... 22

Dewey & LeBoeuf LLP
One Embarcadero Center, Suite 400
San Francisco, CA 94111

*Garcia v. Llerena*,
  599 A.2d 1138 (D.C. 1991) ................................................................................... 8

*Giles v. Shell Oil Corp.*,
  487 A.2d 610 (D.C. 1985) ................................................................................... 19

*Government of Rwanda v. Johnson*,
  409 F.3d 368 (D.C. Cir. 2005) ............................................................................. 19

*Gray v. Fulner*,
  No. 85-1735, 1987 WL 11086 (D.D.C. 1987) ..................................................... 17

*Hendry v. Pelland*,
  73 F.3d 397 (D.C. Cir. 1996) ............................................................................... 18

*Hilao v. Estate of Marcos*,
  103 F.3d 767 (9th Cir. 1996) ............................................................................... 12

*Hotmar v. Howell H. Listrom & Co.*,
  808 F.2d 1384 (10th Cir. 1987) ........................................................................... 25

*In re Hotel Telephone Charges*,
  500 F.2d 86 (Cal. Ct. App. 1974) ........................................................................ 12

*Jackson v. Byrd*,
  No. 01-ca-825, 2004 WL 3249693 (D.C. Super. June 30, 2004) ......................... 18

*Judah v. Reiner*,
  744 A.2d 1037 (D.C. 2000) ........................................................................... 21, 25

*Kline v. Coldwell, Banker & Co.*,
  508 F.2d 226 (9th Cir. 1974) ............................................................................... 11

*LeGrand v. Ins. Co. of North Am.*,
  241 A.2d 734 (D.C. 1968) ................................................................................... 21

*Marshall v. Honeywell Tech. Solutions, Inc.*,
  536 F. Supp. 2d 59 (D.D.C. 2008) ....................................................................... 16

*Maxwell v. Gallagher*,
  709 A.2d 100 (D.C. 1998) ................................................................................... 12

*Mellencamp v. Riva Music Ltd.*,
  698 F. Supp. 1154 (S.D.N.Y. 1988) .................................................................... 25

*Mendez v. County of San Bernadino*,
  540 F.3d 1109 (9th Cir. 2008) ............................................................................. 12

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Dewey & LeBoeuf LLP
One Embarcadero Center, Suite 400
San Francisco, CA 94111

N.Y. State Teamsters Conference Pension and Retirement Fund v. Pension
 Benefit Guar. Corp.,
 591 F.2d 953 (D.C. Cir. 1979)..........................................................................22

Nelson v. Silverman,
 No. 88-0930, 1995 U.S. Dist. LEXIS 12562 (S.D. Cal. June 6, 1995) ......................4

Pearce v. Hutton Group,
 664 F. Supp. 1490 (D.D.C. 1987)......................................................................16

Pro Football Weekly, Inc. v. Gannett Co.,
 988 F.2d 723 (7th Cir. 1993) ............................................................................25

PSG Co. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,
 417 F.2d 659 (9th Cir. 1969) ..............................................................................8

Pyne v. Jamaica Nutrition Holdings Ltd.,
 497 A.2d 118 (D.C. 1985) ................................................................................12

Robinson, Leatham & Nelson, Inc. v. Nelson,
 109 F.3d 1388 (9th Cir. 1997) ..........................................................................25

Schmidt v. Allstate Insurance Co.,
 No. 05-00480, 2008 U.S. Dist. LEXIS 61904 (D. Haw. Aug. 11, 2008) ....................8

Sere v. Group Hospitalization, Inc.,
 443 A.2d 33 (D.C. 1982) ..................................................................................13

Slidell Ford Tractor, Inc. v. Ford Motor Co.,
 570 F.2d 947 (5th Cir. 1978) ..............................................................................8

State Farm Mut. Auto. Ins. Co. v. Campbell,
 538 U.S. 408 (2003)...................................................................................13, 18

Stivers v. George Washington Univ.,
 320 F.2d 751 (D.C. Cir. 1963) ..........................................................................11

Sys. Council EM-3 v. AT&T Corp.,
 159 F.3d 1376 (D.C. Cir. 1999) ........................................................................21

Tillery v. District of Columbia Contract Appeals Bd.,
 912 A.2d 1169 (D.C. 2006) ........................................................................21, 22

United Mine Workers of Am. v. Moore,
 717 A.2d 332 (D.C. 1998) ..........................................................................13, 17

USA Machinery Corp. v. CSC, Ltd.,
 184 F.3d 257 (5th Cir. 1999) ..............................................................................8

Dewey & LeBoeuf LLP
One Embarcadero Center, Suite 400
San Francisco, CA 94111

Vassiliades v. Garfinckel's,
    492 A.2d 580 (D.C. 1985) ................................................................ 14

Wash. Props., Inc. v. Chin, Inc.,
    760 A.2d 546 (D.C. 2000) ........................................................ 21, 22

Wexler v. United Air Lines, Inc.,
    496 F. Supp. 2d 150 (D.D.C. 2007) ............................................ 13-14

Work v. Commercial Underwriters Ins. Co.,
    No. 01-60880, 2003 U.S. App. LEXIS 27943 (5th Cir. Jan. 30, 2003) ...................... 8

**STATUTES**

Fed. R. Civ. P. 50(a) ................................................................................. 4

Fed. R. Civ. P. 50(b) ................................................................................. 4

**OTHER AUTHORITIES**

"NFL Union to Pay $28.1 Million to Retirees,"
    Associated Press, Nov. 10, 2008 ................................................................ 20

"Upshaw Maintains Royalties Were Distributed Properly,"
    New York Times, Feb. 16, 2007 ................................................................ 16

Dewey & LeBoeuf LLP
One Embarcadero Center, Suite 400
San Francisco, CA 94111

**PRELIMINARY STATEMENT**

Plaintiffs presented to the jury numerous contractual and fiduciary duty theories that were all premised upon <u>the same basic damages claim</u>:  by virtue of signing a Retired Player Group Licensing Authorization form ("RPGLA"), GLA Class members were allegedly entitled to equal shares of the active player gross licensing revenue pool (the "GLR pool").  The jury unequivocally <u>rejected</u> this claim for "equal shares" of the GLR pool by returning a verdict of zero damages for breach of contract.  The only damages award was a verdict of $7.1 million in compensatory damages for breach of fiduciary duty – an amount that was unrelated to any damages evidence presented to the jury.  Plaintiffs presented no damages evidence for a breach of fiduciary duty claim independent of their claim to equal shares of the GLR pool.  For this reason alone, as the Court repeatedly warned Plaintiffs' counsel during oral argument on Defendants' original Rule 50 motion (Trial Tr. 2463-2478 (attached as Exhibit 1 to the Declaration of David Greenspan (Greenspan Decl.), submitted concurrently herewith)), the jury's award of $7.1 million in compensatory damages and $21 million in punitive damages must be set aside.[1]

As this Court knows, the <u>only</u> proof of damages that Plaintiffs presented to the jury was Plaintiffs' damages expert's (Mr. Rowley's) calculations of equal shares of the GLR pool.  Thus, once the jury rejected Plaintiffs' damages claims to equal shares of the GLR pool (both as a matter of contract and fiduciary duty), there was <u>no evidence</u> upon which a jury could properly award any damages.  Mr. Rowley admitted this conclusion during his trial testimony:

> Q.  You've given the jury no basis to calculate any damages if they find that retired players are not entitled to active player licensing money and all the money in the GLR pool is active player licensing money, correct?
> A.  If those two assumptions are true, then, yes.

Trial Tr. 1937:3-1938:15.

---

[1] Defendants also move to set aside the jury's finding of liability on Plaintiffs' breach of contract claim for insufficient evidence.  However, since the jury awarded no damages for that claim, Defendants will limit the discussion in this Brief to the fiduciary duty and punitive damages verdicts and awards.

The jury's $7.1 million compensatory damages award was either the product of pure speculation, or, just as improper, an invalid attempt by the jury to ignore the Court's Final Charge (Trial Tr. 2796:16-2797:3) and to re-distribute the $7.1 million that Defendants paid to certain GLA Class members through ad hoc licensing. See Trial Ex. 2056 (Greenspan Decl., Ex. 2) (showing $7,116,196.29 in ad hoc licensing money paid to GLA Class members). Either way, this unsupportable damages award must be set aside as a matter of law.

Such a result should come as no surprise to Plaintiffs. During the trial, the Court expressly warned class counsel that this very scenario – where the jury rejected Plaintiffs' GLR pool damages theory but nevertheless awarded damages with no evidence to support that award – would result in the GLA Class getting "nothing":

> THE COURT: I'm going to deny [Defendants' Rule 50] motion. I'm going to let the jury decide this, without prejudice to renewing the motion at the end. Just a word of caution, though. I've seen this happen. <u>When Plaintiffs go to the jury with multiple theories, and they win on one that is fatally defective, they wind up with nothing. Whereas, if they had – if discretion had been the better part of valor, and they had recognized fatal problems with their theory and gone with one that had a shot, they might have won something.</u> I'm denying this motion, and I'm going to let the jury have the first shot at it. <u>But I want you to know if the scenario turns out as I say, and you wind up with a big zero here</u> –

Trial Tr. 2472:8-2473:14 (emphases added).

Once the Court vacates the compensatory damages award (or reduces it to a nominal sum), then, under District of Columbia law, the punitive damages award must also be vacated. The law is unequivocal on this point: there cannot be punitive damages without compensatory damages, and there cannot be punitive damages beyond a nominal sum if the compensatory damages are nominal. See, e.g., Aurora Assocs., Inc. v. Bykofsky, 750 A.2d 1242, 1247 (D.C. 2000); Daka, Inc. v. McRae, 839 A.2d 682, 698 (D.C. 2003).

Further, the punitive damages award must also be vacated for the additional reason that there was no evidence presented at trial – much less "clear and convincing" evidence – of the type of evil mental state and outrageous conduct from which a reasonable jury could award punitive damages under D.C. law. Plaintiffs offered <u>no</u> evidence about Defendants' mental state, and the conduct they relied upon in support of their request for punitive damages – e.g.,

"scrambling," Gene's Upshaw's statement about "the greatest dog food," and the Hall of Fame ad hoc license agreement – was not the type of outrageous behavior which D.C. law would permit a jury to find to be either "extreme, grossly fraudulent, or committed with reckless disregard for plaintiffs' safety."

Moreover, there are two independent reasons why the fiduciary duty liability verdict must also be overturned. First, there is no evidence from which a reasonable jury could conclude that the RPGLA gave rise to an agency relationship under District of Columbia law. To the contrary, examining the evidence under each of the factors set forth in the Court's Final Charge for determining the existence of an agency relationship (e.g., control, the right to discharge, and the terms of the RPGLA), it is clear that no reasonable jury could conclude that such a fiduciary relationship existed.

Second, there is no evidence from which a reasonable jury could find a breach of any fiduciary duty. As this Court noted during the trial, all of Plaintiffs' fiduciary duty claims were circularly linked to the single injury allegation that the RPGLA created a duty to include GLA Class members in active player licensing and the GLR pool. Consequently, once the jury rejected the entitlement of the GLA class to participate in the GLR pool, there was no evidentiary basis for the jury to conclude that Defendants engaged in any breach of any purported fiduciary duty to Plaintiffs. In the words of the Court:

> [THE COURT]: So if the reasonable expectations of the parties was in no way that the retired players were going to share with the active money, how can you then say that the contract and the circumstances imposed a fiduciary duty to do the opposite, i.e., to get them into the share and share alike with the active money?

Trial Tr. 2465:24-2466:9.

For all of these reasons, as well as for the reasons set forth below, the compensatory and punitive damages awards must be vacated, and the fiduciary duty liability verdict must be overturned.

**ARGUMENT**

A motion for judgment as a matter of law must be granted when "a party has been fully heard on an issue . . . and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue . . . ." Fed. R. Civ. P. 50(a).[2] "The question is not whether there is no evidence supporting the party against whom the motion is directed but whether the evidence is sufficient for the jury to properly find a verdict for the party." Nelson v. Silverman, No. 88-0930, 1995 U.S. Dist. LEXIS 12562, *4-7 (S.D. Cal. June 6, 1995) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986)).

**I. THERE IS INSUFFICIENT EVIDENCE TO SUPPORT THE JURY'S COMPENSATORY DAMAGES AWARD FOR BREACH OF FIDUCIARY DUTY**

**A. Plaintiffs' Only Damages Evidence Was For "Equal Shares" of the GLR Pool – But The Jury Rejected Plaintiffs' GLR Pool Claim**

The compensatory damages award on Plaintiffs' breach of fiduciary duty claim must be vacated because it is not supported by <u>any</u> evidence presented to the jury. The <u>only</u> damages evidence that Plaintiffs presented at trial was predicated upon the jury finding that GLA Class members were entitled to equal shares of the active player gross licensing revenue ("GLR") pool. This is made clear from the unequivocal trial testimony of Mr. Rowley, Plaintiffs' damages expert:

> Q. Now, Mr. Rowley, you – <u>all</u> of your calculations are based on the Plaintiffs receiving an equal share of this GLR pool, correct?
> A. Correct. Correct.
>
>        \*       \*       \*
>
> Q: Right. In other words, your whole premise for every one of your calculations is that the jury will find that the retired players by signing a Retired Player GLA were entitled to an equal share of the GLR pool? All your calculations are premised on that, right?
> A: Yes.
>
>        \*       \*       \*
>
> Q. It's such a simple question. Really, I will ask you very nicely, okay, and be very clear. If the jury finds, the jury finds –
> A. Yes.

---

[2] Where, as here, the Court did not grant a party's motion for judgment as a matter of law made under Rule 50(a), then the movant may file a renewed motion for judgment as a matter of law under Rule 50(b). <u>See</u> Fed. R. Civ. P. 50(b). The same legal standard applies under Rule 50(b) as under Rule 50(a). <u>See</u> Fisher v. City of San Jose, 509 F.3d 952, 957 (9th Cir. 2000).

Q. – that retired players are not entitled to any licensing revenues that were generated solely by active player licensing, okay? If the jury finds that, and they also find that the GLR pool was only active player licensing money, in those two assumptions do you agree with me that your calculations, therefore, show no damages, if that's what they find?

A. Liability would not have been established, which was one of my assumptions.

\*     \*     \*

Q. You've given the jury no basis to calculate any damages if they find that retired players are not entitled to active player licensing money and all the money in the GLR pool is active player licensing money, correct?

A. If those two assumptions are true, then, yes.

Trial Tr. 1866:20-23 (emphasis added); 1915:19-1916:24; 1937:3-1938:15 (Greenspan Decl., Ex. 1).

Because Plaintiffs chose to offer only <u>one</u> type of damages evidence – <u>i.e.</u>, calculations of an equal share redistribution of the GLR pool – they did not provide the jury with any evidentiary basis to award damages under any fiduciary duty theory that was different from Plaintiffs' breach of contract claim. The result is that when the jury rejected Plaintiffs' GLR pool damages evidence and theory by finding zero damages for breach of contract, it was legally improper for the jury to award fiduciary duty damages under any other theory. As Mr. Rowley testified:

Q. Okay. Now, these numbers, can they represent a number that the jury might find reasonable as an award for purposes of breach of fiduciary duty, damages, and if so, how?

[Counsel's objections]

A. No, I [Mr. Rowley] did not – <u>I did not have different calculations. They are the same</u>.

Q. Why is that?

A. <u>I wasn't really asked to break out the two</u>. And in a layperson's terms it's the amount of money that was owed and the amount that they should have ensured was paid. <u>So it's the same calculation</u>.

\*     \*     \*

Q. No. In fact, you [Mr. Rowley] offered the same measure calculations [sic] of damages no matter what the jury finds. Whether it's – whether it's related to marketing, whether it's related to breach of fiduciary duty, whether it's related to contract, all your calculations are the same. It doesn't distinguish between them, do they?

A. They would have been entitled to that one pool at a minimum.

Trial Tr. 1852:14-1855:11 (emphases added); 1916:2-9.

Dewey & LeBoeuf LLP
One Embarcadero Center, Suite 400
San Francisco, CA 94111

Recognizing that Plaintiffs had put all of their damages claims – both breach of contract and breach of fiduciary duty – into a single "GLR pool" basket, the Court explored this high risk gamble with Plaintiffs' counsel:

> THE COURT:  So what is the measure of damages [for breach of fiduciary duty if the jury disagrees on the meaning of the RPGLA]?
> MR. LECLAIR:  The measure of damages is <u>the same revenue from the same licenses</u>, because our theory is they should have included us.

Trial Tr. 2463:24-2464:9 (emphasis added).  This decision by Plaintiffs' counsel to rest on a single damages theory limited to equal shares of the GLR pool is now fatal to the jury's compensatory damages award.

Indeed, the <u>only</u> damages evidence that Plaintiffs presented to the jury was Mr. Rowley's testimony about how much money the GLA Class would receive if the jury found that the RPGLA created a legal right to equal shares of the GLR pool.  Specifically, Mr. Rowley testified that if the GLR pool were redistributed in equal shares among both active players and GLA class members, the GLA Class would receive $29 million ($32 million with interest) based upon the current allocation (37% to players, 40% to the NFLPA, and 23% to Players Inc); $49 million ($54 million with interest) if Defendants retained a total of 40% of the GLR pool; $61 million ($68 million with interest) if Defendants retained a total of 25% of the GLR pool; and $73 million ($82 million with interest) if Defendants retained a total of 10% of the GLR pool.  Trial Tr. 1850:12-1851:25.  These calculations of equal share re-distributions of the GLR pool were the only damages evidence that Plaintiffs presented to the jury.

As the Court warned Plaintiffs' counsel prior to the jury's verdict, the complete absence of any other damages evidence would be fatal in the event that the jury rejected Plaintiffs' GLR pool theory but awarded fiduciary duty damages on some other theory.  <u>See</u> discussion at 9-11, <u>infra</u>.  This, of course, is precisely what happened.  The jury rejected Plaintiffs' theory that they were entitled to equal shares of the GLR pool by returning a verdict of zero damages on the breach of contract claim.  If the jury had concluded that the RPGLA gave Plaintiffs a right to share in the GLR pool (Plaintiffs' damages theory based on the "present or former" language in the second paragraph of the RPGLA (Trial Ex. 110) (Greenspan Decl., Ex. 3)), then it would

have awarded at least $29 million in contractual damages (or some other permutation of Mr. Rowley' equal share payouts based upon Defendants retaining a lower percentage of the GLR pool). Likewise, if the jury had concluded that the GLR pool contained "moneys generated by such licensing of retired player group rights" (Plaintiffs' alternative theory under paragraph 5 of the RPGLA based upon the claim that the active player license agreements (such as the EA agreements) conveyed retired player rights (id.)), then the jury also would have awarded at least $29 million in contractual damages. But the jury unequivocally rejected any claim of GLA Class entitlement to equal shares of the GLR pool by awarding zero damages on the breach of contract claim.[3]

Having rejected Plaintiffs' claim to equal shares of the GLR pool, there was no evidence upon which the jury could reasonably award damages for any fiduciary duty breach based on other theories such as "conflict of interest" or "failure to adequately market."[4] Accordingly, the $7.1 million damages award – an amount which bears no correlation to any of Plaintiffs' damages calculations ($29 or $32 million, $49 or $54 million, $61 or $68 million, and $73 or $82 million) – could only have been the result of either pure speculation or an improper attempt by the jury to redistribute the $7.1 million in ad hoc licensing money that was paid to GLA Class members. See Trial Ex. 2056 (showing that $7,116,196.29 in ad hoc licensing money was paid to GLA Class members) (Greenspan Decl., Ex. 2). Such a damages award was disavowed by Plaintiffs through stipulation, and specifically precluded by the Court's Final Charge to the Jury:

> Stipulated Fact No. 13: "Plaintiffs do not seek to recover in this case any monies paid to some GLA Class members under separate so-called 'ad hoc license agreements.'"
>
> * * *
>
> Court's Final Charge to the Jury: "Under these [ad hoc] agreements certain retired players received money, 7 million of which went to class members. No

---

[3] Possibly, the jury found that Defendants breached the RPGLA by not creating an escrow account, but that there could be no damages stemming from a failure to create an escrow account that would have contained no money. In any event, it is clear that the jury rejected Plaintiffs' equal shares of the GLR pool theory upon which Plaintiffs premised all of their damages claims.

[4] As set forth below, class counsel has stated in no uncertain terms that these various fiduciary duty theories (e.g., failure to market, conflict of interest, and "scrambling") ultimately boil down to the same equal shares of the GLR pool injury theory – i.e., that the GLA Class should have been included in the active players' licenses and the GLR pool. See Point III.B, infra.

---

one in this case is suing to recover any of that money. That is, no one contends that any of the ad hoc license revenue should be redistributed to all class members under the RPGLA or that the ad hoc agreements triggered any rights under the RPGLA."

Trial Tr. 1694:8-10; 2796:16-2797:3; see also Joint Final Pre-Trial Order ("Final Pre-Trial Order") at 12 (Oct. 8, 2008) (Rec. Doc. 458); Final Charge to the Jury no. 17, at 6 (Nov. 7, 2008) (Rec. Doc. 549). Whether pure speculation or redistribution of the ad hoc licensing money, the jury's $7.1 million compensatory damages award must be vacated.[5]

Prophetically, at the hearing on Defendants' Rule 50(a) motion, the Court warned Plaintiffs' counsel about the prospect – now a reality – that the jury would reject Plaintiffs' GLR pool damages theory, but nevertheless award damages on one of Plaintiffs' other fiduciary duty theories for which no damages evidence was submitted (e.g., failure to adequately market):

> THE COURT: But think about it for a second. If you win on the meaning of the contract, let's say, and if that's not set aside under Rule 50 or the Ninth Circuit, let's just say if you win on the contract theory alone, since your class gets to share equally in the gross licensing revenue, all right? That's one scenario.
> Then, the fiduciary duty claim adds no additional damages.
> On the other hand, if you lose on that, let's say the jury disagrees with your meaning of the contract and let's say the jury says there's no way this ever meant that they were going to share in the gross licensing revenue.
> But then, let's say the jury agrees that the NFLPA held themselves out as a representative and an agent and undertook a fiduciary duty to market these people, these class members.
> Now, we get to that juncture in the decision tree by only – on the assumption that the contract does not require participation in the gross licensing revenue. So is there then a damage theory that can get you to that outcome?

---

[5] See e.g., PSG Co. v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 417 F.2d 659, 663 (9th Cir. 1969) (affirming directed verdict because there was no evidence that appellant suffered any actual damages as a result of appellee's alleged breach); Garcia v. Llerena, 599 A.2d 1138, 1142-45 (D.C. 1991) (affirming directed verdict because there was no evidence of "fairly certain, ascertainable damages"); see also USA Machinery Corp. v. CSC, Ltd., 184 F.3d 257, 265 & 267-68 (5th Cir. 1999) (affirming judgment as a matter of law because "there was no evidence upon which a jury could base a finding of damages with the 'reasonable certainty'"); Schmidt v. Allstate Insurance Co., No. 05-00480, 2008 U.S. Dist. LEXIS 61904, *6-7 (D. Haw. Aug. 11, 2008) (granting defendant's motion for judgment as a matter of law, in part, because plaintiff did not present "reliable evidence on the amount of his damages"); Work v. Commercial Underwriters Ins. Co., No. 01-60880, 2003 U.S. App. LEXIS 27943, *16 (5th Cir. Jan. 30, 2003) (reversing district court's denial of motion for judgment as a matter of law "[b]ecause [plaintiff] failed to produce any evidence from which the jury could estimate, with reasonable certainty, the amount of his lost income attributable to Commercial . . . ."); Slidell Ford Tractor, Inc. v. Ford Motor Co., 570 F.2d 947 (5th Cir. 1978) (affirming directed verdict because plaintiff failed to prove damages with sufficient certainty).

Trial Tr. 2463:1-20 (emphases added).  As shown at pp. 4-6 above (by the testimony of Mr. Rowley and the statements of class counsel), the answer to the Court's question is an emphatic "no."  Plaintiffs presented <u>no proof of damages other than for an award of equal shares of the GLR pool</u>.  <u>E.g.</u>, Trial Tr. 1866:20-23 ("Q.  Now, Mr. Rowley, you – <u>all</u> of your calculations are based on the Plaintiffs receiving an equal share of this GLR pool, correct?  A.  Correct. Correct.") (emphasis added).

For example, with respect to Plaintiffs' fiduciary duty theories for "failure to adequately market" and "conflict of interest" (discussed in detail in Point III.B, <u>infra</u>), Plaintiffs offered <u>no</u> evidence about what licensing revenues, if any, an independent marketing agent – "Mr. Hollywood" – might have been able to generate for the GLA Class:

> Q.  Let me ask you [Mr. Rowley] a question, then.  Let's say this jury were to find, okay, that just specific – that – there was a breach because Players Inc should have done more to market retired players, correct?  Assume that with me, all right?
> A.  Okay.
> Q.  But they don't find that that has anything to do with an entitlement to any share of the GLR pool.  Are you with me on those assumptions?
> A.  Yes.
> Q.  <u>In that case, you're not offering any measure of damages, correct?</u>
> A.  <u>I think that's correct.</u>
>
>         *        *        *
>
> Q.  Let me ask you this:  let's say the jury were to find that there was no breach of contract, okay, and there was a breach of fiduciary duty for not marketing, not sufficiently marketing the retired players who signed the GLA's, okay?  <u>Have you done any analysis of specifically how much the retired players would have earned for their rights if they had been more aggressively marketed, just on that claim separately</u>?
> A.  <u>No.</u>

Trial Tr. 1865:16-1866:3; 1915:19-1916:1 (emphases added).

For this reason, the Court itself recognized Plaintiffs' failure to offer any proof of damages other than for their now rejected claim that Plaintiffs were entitled to equal shares of the GLR pool:

> THE COURT: Let's pursue that, though.  If that's – if the breach is that they failed to disclose a conflict of interest, then the damages that would flow from that would be if Mr. Adderley had known and other class members had known that there was a conflict of interest, then conceivably they could have gone out

Dewey & LeBoeuf LLP
One Embarcadero Center, Suite 400
San Francisco, CA 94111

and hired Mr. Hollywood to be their group licensing agent, and may try to make their own deals.

<u>And once again we come back to the question of: Had Mr. Hollywood gone out to do that, what would be the plausible range of potential royalties that such a group license would have commanded in the market?</u>

<u>There's no evidence on this point.</u>

\*     \*     \*

THE COURT: <u>It's your burden of proof. What evidence did you put in on what that independent agent who had nothing to do with the league, nothing to do with the defendants, what they would have been able to negotiate in the marketplace? I didn't hear any evidence on that.</u>

MR. PARCHER: Depends on who they represented and who they could put in.

THE COURT: <u>The exact group that we have here, the entire class. That's the test</u>.

MR. PARCHER: What if it was the entire class plus the ad hocs? What if it was the entire class plus the ad hocs and the actives?

THE COURT: <u>We didn't even get evidence on that scenario</u>. Look, I'm denying the motion for now. I think my consciousness has been raised already. But you've raised it again.

Trial Tr. 2469:2-14; 2478:9-24 (emphases added).

Not only did the Court identify this fatal flaw in Plaintiffs' damages evidence, it offered Plaintiffs the opportunity to try to avoid an unsupportable damages verdict by dropping the fiduciary duty theories for which they had offered no evidence of damages:

THE COURT: I'm going to deny [Defendants' Rule 50] motion. I'm going to let the jury decide this, without prejudice to renewing the motion at the end. Just a word of caution, though. I've seen this happen. <u>When Plaintiffs go to the jury with multiple theories, and they win on one that is fatally defective, they wind up with nothing. Whereas, if they had – if discretion had been the better part of valor, and they had recognized fatal problems with their theory and gone with one that had a shot, they might have won something</u>. I'm denying this motion, and I'm going to let the jury have the first shot at it. <u>But I want you to know if the scenario turns out as I say, and you wind up with a big zero here</u> –

MR. PARCHER: Could you be more specific? Scenarios you say is –

THE COURT: <u>I'm telling you all of your theories are tenuous. All of them</u>. But I'm not saying I'm going to take them away. <u>I'm saying these are very substantial Rule 50 motions that have been made</u>. And I'm going – because there is a reasonable chance the jury will reject all of the arguments, then that will end the case. But I am not – I want you to be aware that if you prevail – I am not saying it will get taken away. I'm just trying to saying [sic] I've tried to express what my concerns are about your theory, and you now know most of them. <u>But if you choose to go to the jury on a theory that ultimately gets taken away, and that's the only one you won on before the jury, you should be aware – I'm telling you right now – you're at risk on all your theories.</u>

Trial Tr. 2472:8-2473:14 (emphases added).

Plaintiffs' counsel chose to ignore the Court's warning. They proceeded to submit to the jury multiple theories of fiduciary duty, but their <u>only</u> damages evidence was based on a theory of equally sharing in the GLR pool. The jury then flatly rejected this GLR pool damages theory, and instead awarded damages that were either entirely speculative, or improperly based upon the $7.1 million in ad hoc licensing revenues (for which there is no claim in the case). Either way, there was <u>no</u> evidence at trial to support the compensatory damages award of the jury, and it thus must be vacated.[6]

**B. Plaintiffs Also Failed to Prove Individualized Damages or Evidence of a Class-Wide Formula to Support the $7.1 Compensatory Damages Award**

Another reason why the compensatory damages award must be vacated is that Plaintiffs presented no evidence to support a claim of damages to each individual class member, or even a class-wide formula to support a $7.1 million compensatory damages award. Specifically, while Plaintiffs did present a methodology for calculating equal share distributions of the GLR pool to the class – <u>i.e.</u>, dividing the GLR pool equally between active players and GLA Class members with RPGLAs in effect – there was no such class-wide damages formula presented to the jury for any other type of damages award. Trial Tr. 2559:20-2560:8 (Court recognizing that Plaintiffs' only methodology for calculating individual damages was based on GLA Class members sharing equally with active players in the GLR pool) (Greenspan Decl., Ex. 1).

This failure to prove damages for each individual class member – or even a class-wide methodology for doing so – is fatal in the Ninth Circuit. <u>See</u>, <u>e.g.</u> <u>Kline v. Coldwell, Banker & Co.</u>, 508 F.2d 226, 236 n.8 (9th Cir. 1974) ("It has been suggested that generalized proof of damages might suffice under Rule 23. But the rule does not eliminate the ultimate need for individual proof of damages by each member of the class."); <u>Abuan v. General Elec. Co.</u>, 3 F.3d

---

[6] In this connection, Plaintiffs did not present any separate damages evidence for the fiduciary duty and contract claims. <u>See</u> Trial Tr. 1852:17-1855:11 ("I did not have different calculations. They are the same.") (Rowley testimony). It was thus improper, as a matter of law, for the jury to award $7.1 million on the breach of fiduciary duty claim after awarding zero damages on the breach of contract claim based upon the exact same damages theory and evidence. <u>See</u> <u>Stivers v. George Washington Univ.</u>, 320 F.2d 751, 753 (D.C. Cir. 1963) (affirming JNOV for defendant where the jury's verdicts in favor of a doctor but against the hospital for which he worked were "inconsistent and incompatible").

Dewey & LeBoeuf LLP
One Embarcadero Center, Suite 400
San Francisco, CA 94111

329, 334 (9th Cir. 1993) ("It is clear that at some point in the litigation Plaintiffs would be required to prove individual causation and damages."); <u>Hilao v. Estate of Marcos</u>, 103 F.3d 767, 788 (9th Cir. 1996) ("Even in the context of a class action, individual causation and individual damages must still be proved individually."); <u>In re Hotel Telephone Charges</u>, 500 F.2d 86, 89 (Cal. Ct. App. 1974) ("After the basis for computing damages had been individually determined for each defendant, each member of the class seeking recovery would then be required to prove that he patronized the hotel while the surcharge was in effect and that he absorbed the cost of the surcharge. Furthermore, it would then be necessary to compute the amount of damages due the class member."). The $7.1 million compensatory damages award must thus be vacated for the additional reason that the jury had no evidentiary basis to find damages for individual class members, as the Ninth Circuit requires.

## II. THE PUNITIVE DAMAGES AWARD MUST BE VACATED

### A. Plaintiffs' Failure of Proof on the Compensatory Damages Award Means That The Punitive Damages Award Must Also Be Vacated

Plaintiffs' failure to present <u>any</u> evidence capable of supporting the jury's compensatory damages award (Point I) precludes any award of punitive damages because D.C. law requires that "before punitive damages may be awarded, there must be a basis in the record for an award of actual damages, even if nominal." <u>Aurora Assocs., Inc. v. Bykofsky</u>, 750 A.2d 1242, 1247 (D.C. 2000) (vacating award of punitive damages because plaintiffs were not entitled to compensatory damages) (quoting <u>Maxwell v. Gallagher</u>, 709 A.2d 100, 103 (D.C. 1998)).[7]

Indeed, even if the jury or the Court were to determine that nominal damages should be awarded for a breach of fiduciary duty, due process would then require that the $21 million punitive damages award either be vacated or reduced to a nominal amount. <u>See</u>, <u>e.g.</u>, <u>Mendez v. County of San Bernadino</u>, 540 F.3d 1109, 1121-23 (9th Cir. 2008) (holding that punitive

---

[7] <u>See also</u> <u>Pyne v. Jamaica Nutrition Holdings Ltd.</u>, 497 A.2d 118, 133 (D.C. 1985) ("a verdict assessing punitive damages can be returned only when there is also a verdict assessing compensatory or actual damages"); <u>Bay General Indus. Inc. v. Johnson</u>, 418 A.2d 1050, 1058 n.21 (D.C. 1980) ("actual damages are a prerequisite to exemplary or punitive damages in this jurisdiction"); <u>Franklin Investment Co. v. Smith</u>, 383 A.2d 355, 358 (D.C. 1978) ("punitive damages may not be awarded where there is no basis for an award of compensatory damages").

damages of $250,000 violated due process where nominal damages of only $2 were awarded on plaintiff's tort claims for false imprisonment and illegal search). Both the United States Supreme Court and the D.C. Court of Appeals have held that "few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process," and thus any punitive damages award would have to be within the "single-digit ratio" range of any nominal damages award. State Farm Mut. Auto. Ins. Co. v. Campbell, 538 U.S. 408, 425 (2003); Daka, Inc. v. McCrae, 839 A.2d 682, 698 (D.C. 2003). Accordingly, once the Court vacates the compensatory damages award, the punitive damages award must be vacated as well.[8]

### B. There Was No "Clear and Convincing" Evidence Upon Which a Reasonable Jury Could Award Punitive Damages

Independent of whether the compensatory damages award is vacated (as it must be), the punitive damages award must be vacated because there was no evidence for a reasonable jury to conclude that Plaintiffs satisfied their very high burden of proof to obtain punitive damages under D.C. law. As the Court knows, punitive damages are strongly disfavored under D.C. law, and available "only in cases which present circumstances of extreme aggravation." Sere v. Group Hospitalization, Inc., 443 A.2d 33, 37 (D.C. 1982).

Plaintiffs had the burden to prove with clear and convincing evidence that Defendants acted with an evil motive or deliberate violence, and that Defendants' conduct was outrageous, grossly fraudulent or reckless toward the safety of the GLA Class. Id; United Mine Workers of Am. v. Moore, 717 A.2d 332, 341 (D.C. 1998) (plaintiffs "must prove by clear and convincing evidence that the [breach of fiduciary duty] was accompanied by conduct and a state of mind evincing malice or its equivalent."). District of Columbia law required the jury to consider whether the alleged harm was physical as opposed to economic, whether the "tortious conduct evinced an indifference to or a reckless disregard of the health of safety of others," and whether the harm was "the result of intentional malice, trickery, or deceit." Wexler v. United Air Lines,

---

[8] As discussed in Point III below, there is also insufficient evidence to support the jury's findings that a fiduciary duty arose from the RPGLA, or that any such duty was breached. If judgment as a matter of law is granted against Plaintiffs' breach of fiduciary duty claim for either of these reasons, then the compensatory and punitive damages awards must be vacated on this ground as well.

Dewey & LeBoeuf LLP
One Embarcadero Center, Suite 400
San Francisco, CA 94111

Dewey & LeBoeuf LLP
One Embarcadero Center, Suite 400
San Francisco, CA 94111

<u>Inc.</u>, 496 F. Supp. 2d 150, 154 n.4 (D.D.C. 2007) (quoting <u>State Farm</u>, 538 U.S. at 419). This Court must now determine "whether a sufficient legal foundation exists to award punitive damages." <u>Vassiliades v. Garfinckel's</u>, 492 A.2d 580, 593 (D.C. 1985).

With respect to Plaintiffs' burden to prove by clear and convincing evidence that Defendants acted with a "state of mind evincing malice or its equivalent," <u>United Mine Workers</u>, 717 A.2d at 341, there was simply no such evidence. In particular, there was no evidence presented to support a claim that the conduct by Defendants purportedly justifying punitive damages – <u>e.g.</u>, "scrambling" and Mr. Upshaw's statement in a newspaper article that "we could have the greatest dog food in the world, but if the dogs don't like it, we can't sell it" (<u>see</u> Trial Tr. 2881:25-2884:22) – was done with actual malice. To the contrary, the only evidence about the mental state of Defendants was from their current and former employees and officers, who uniformly testified that the NFLPA and Players Inc were trying to <u>help</u> retired players.[9] Even if the jury chose to disregard this testimony, it was <u>Plaintiffs' burden</u> to prove by "clear and convincing" evidence a "state of mind evincing malice or its equivalent" – not Defendants' burden to disprove that state of mind. Plaintiffs' failure of proof as to Defendants' mental state by itself compels vacating the punitive damages award.

Further, Plaintiffs had the <u>additional</u> burden to prove with clear and convincing evidence that the conduct at issue (which was economic, not physical), was extreme, grossly fraudulent, or committed with reckless disregard for Plaintiffs' safety. Once again, the trial record is devoid of any evidence from which a reasonable jury could conclude that Plaintiffs met this burden with "clear and convincing" proof. To the contrary, Plaintiffs did not even allege – much less offer

---

[9] <u>See</u> Trial Tr. 731:25-732:20 (Doug Allen testifying that Defendants started the retired player group licensing program to "try to provide the opportunity for retired players to earn some money."); Trial Tr. 2087:2-17 (Trace Armstrong testifying that "[w]e knew you're always one play away from being a retired player. That's why the mantra of our union is 'Past, Present and Future,' And that's why in every collective bargaining agreement every opportunity we had to advance benefits for retired players we did that."); Trial Tr. 2029:23-2030:14 (Trace Armstrong testifying that the active players used their licensing revenues to fund union departments, including the Retired Players Department, which was a department to help retired players); <u>see also</u> Trial Tr. 1989:18-21 (Dan Goich testifying that "Every convention I can remember since I think we started the GLA – I was privy to information prior to the GLA that they were forming something like the GLA, group licensing, to try to help retired players.").

---

Dewey & LeBoeuf LLP
One Embarcadero Center, Suite 400
San Francisco, CA 94111

1    evidence of – conduct that was extreme, grossly fraudulent or reckless with respect to the safety

2    of the GLA class.[10]

3         Simply put, the conduct relied upon by Plaintiffs in seeking punitive damages did not

4    come close to meeting the high threshold for extreme behavior required to support a punitive

5    damages award under D.C. law.  As the Court knows, Plaintiffs relied upon the "scrambling"

6    issue, Mr. Upshaw's "greatest dog food" comment, and complaints about Defendants' behavior

7    with respect to the Hall of Fame ad hoc license agreement to support their claim for punitive

8    damages.  See Trial Tr. 2880:21-2884:22.  With respect to the "scrambling" issue, Plaintiffs'

9    argument was that rather than telling EA to "scramble" the identities of the retired players whose

10   rights EA was unwilling to pay any money for, Defendants should have given EA the GLA Class

11   members' rights for free and then included the GLA Class in the GLR pool.[11]  Putting aside the

12   (lack of) merit of this theory as a fiduciary duty breach (Point III.B), Defendants' failure to give

13   away the GLA Class's rights for free cannot, as a matter of law, constitute the type of "extreme"

14   conduct necessary to support a punitive damages award.  In fact, because it was undisputed that

15   it was lawful for EA to scramble retired player identities (see Final Charge to the Jury no. 45, at

16   17), and that Defendants indicated that EA should "scramble" any identities that EA was not

17   paying for prior to the statute of limitations,[12] it could not possibly be tortious behavior – much

18   less "extreme" tortious behavior – for Defendants to have allegedly "conspired" with EA to

19   "permit it" to engage in this entirely lawful activity.[13]

---

20
21   [10] Plaintiffs' lone fraud claim – under Section 17200 of the California Unfair Practices Act – was
     long ago dismissed.  Order Granting Motions to Dismiss at 7-14 (Sept. 6, 2007) (Rec. Doc. 133).

22   [11] See Final Charge to the Jury no. 45, at 17 ("I remind you again that there is no claim in this
23   case that this scrambling by Electronic Arts violated any player's rights.  Instead, plaintiff's
     claim is that defendants breached a fiduciary duty by insisting on scrambling rather than
24   licensing the entire group of RPGLA rights to Electronic Arts."); Trial Tr. 95:9-24 ("MR.
     HUMMEL:  They could have said, 'We have this retired player program.  And for not a penny
     more, you get these rights.  Use them.  Don't scramble them.'").

25   [12] The "scrambling" letter which Plaintiffs heavily relied upon to support their claim for punitive
     damages solely related to conduct by the Defendants in 2001 – three years prior to the limitations
26   period.  See Trial Exhibit 1320 (Greenspan Decl., Ex. 4).

27   [13] A defendant can be liable under a tort theory for conspiring with third parties only if some
     underlying independent tort is committed by the third party.  See Entm't Research Group, Inc. v.
28   Genesis Creative Group, Inc., 122 F.3d 1211, 1228 (9th Cir. 1997) (quoting 5 B. Witkin,
     Summary of California Law, Torts § 44 (9th ed. 1988) as stating that "there is no civil action for

---

Defendants' Renewed Motion for Judgment as a Matter of Law          Civ. Action No. C07 0943 WHA

Similarly, Mr. Upshaw's "greatest dog food" statement, published in a newspaper article <u>after</u> this case was filed, could not reasonably be found to be conduct so extreme as to support a punitive damages award – no matter how offensive the jury might have found that statement to be.[14]  Indeed, punitive damages are especially disfavored in cases involving speech (even when slanderous).  <u>See</u> <u>e.g.</u>, <u>Pearce v. Hutton Group</u>, 664 F. Supp. 1490, 1518 (D.D.C. 1987) ("Since punitive damages are akin to criminal sanctions and may have little relation to any actual harm suffered, they can have a tremendous chilling effect on speech.  To be eligible for such damages, plaintiffs must overcome very substantial hurdles.").  In any event, a single statement, even if insulting, cannot constitute the type of "outrageous" conduct necessary to justify a punitive damages award.  <u>Cf</u>. <u>Ficken v. AMR Corp.</u>, --- F.Supp.2d ----, 2008 WL 4381906, *6 (D.D.C. Sept. 29, 2008) (mere "insults, indignities, threats, annoyances or offensive or unfair treatment" are not sufficiently "outrageous" to support a claim of intentional infliction of emotional distress); <u>Marshall v. Honeywell Tech. Solutions, Inc.</u>, 536 F. Supp. 2d 59, 69 (D.D.C. 2008) (insulting statements made by defendant at a press conference, including referring to plaintiff as "garbage," not sufficiently "outrageous" to constitute intentional infliction of emotional distress).

Nor can a punitive damages award be based upon the emails referring to the Hall of Fame ad hoc license agreement as a "below market" deal.  To begin with, Plaintiffs did not present <u>any</u> (much less "clear and convincing") evidence that the fees paid by EA for this ad hoc agreement were, in fact, "below market."  <u>See</u> Trial Tr. 1789:15-1790:2 (Plaintiffs' expert Daniel Rascher

---

conspiracy to commit a recognized tort unless the wrongful act itself is committed and damage results therefrom" and affirming grant of summary judgment in favor of defendant on a conspiracy claim because no underlying torts existed).

[14] Defendants note that Mr. Upshaw's "greatest dog food" remark was made in response to the initial complaint in this case, which did not assert <u>any</u> claim under the RPGLA.  <u>See</u> "Upshaw Maintains Royalties Were Distributed Properly," New York Times, Feb. 16, 2007, D1 (attached as Exhibit R to Third Amended Complaint (Nov. 15, 2007) (Rec. Doc. 180)); Complaint for Breach of Fiduciary, Unjust Enrichment and an Accounting (Feb. 14, 2007) (Rec. Doc. 1); Pls.' Opp'n to Defs.' Mot. for J. on the Pleadings at 1 ("Plaintiffs have not alleged a relationship with Players Inc based upon the GLA") (May 10, 2007) (Rec. Doc. 55).  The comment thus could not relate to the GLA Class members in particular, but only to the difficulty of marketing retired players in general.

Dewey & LeBoeuf LLP
One Embarcadero Center, Suite 400
San Francisco, CA 94111

testifying that he has "done no quantitative analysis" "of the economic data in this case to come to a conclusion about any kind of relationship . . . between sales of EA games and retired players . . . ."); Trial Tr. 1859:15-1862:25 (Plaintiffs' expert Philip Rowley testifying that he "didn't calculate any measure of damages separately for any ad hoc agreement like the Hall of Fame agreement . . . ."); Trial Tr. 2350:15-23 ("Q: Is there any evidence that the EA payments were below market value in any way in the Hall of Fame game? [Defendants' Expert Roger Noll]: No. If they were below market value, why would EA think it paid too much? I mean, they were trying to get a hundred thousand dollars off. . . . That would indicate that they thought it was above market value."). Further, even if the Hall of Fame ad hoc agreement had been "below market" (and there is no such clear and convincing evidence in the trial record), that could not support a punitive damages award for the GLA class since the ad hoc licenses were not part of the claims in this case and, even if that hurdle could be overcome (it cannot), only 17 class members were licensed pursuant to the EA-Hall of Fame ad hoc license agreement. See, e.g., Stipulated Fact no. 13, Final Pre-Trial Order at 12 (ad hoc licensing money not subject to any claims); Trial Tr. 1708:7-1709:13. In addition, the only evidence submitted on this issue – testimony from Mr. Adderley and NFLPA Staff Counsel Joe Nahra – was that the Hall of Fame, not Defendants, negotiated the prices paid to each Hall of Fame retired player. See Trial Tr. 1583:5-1584:11 (Mr. Adderley testifying that "Players Inc didn't negotiate that $2,000 with [him] . . . . That was directly the Hall of Fame"); 1699:7-1700:16 (Mr. Nahra testifying that "it was the Hall of Fame who was contacting the players to negotiate how much they would be paid for the Hall of Fame agreement and not Players Inc").

In cases where, as here, there is no evidence of gross fraud or reckless conduct, punitive damages are not proper as a matter of D.C. law. This is true even where the defendant's conduct is intentional,[15] discriminatory,[16] or even fraudulent (but not grossly fraudulent). See Gray v.

---

[15] See Boynton v. Lopez, 473 A.2d 375, 377-78 (D.C. 1984) ("The tortious act must be 'willful and outrageous conduct, or it must result in gross fraud. While the record supports the finding of intentional misrepresentation, the record is devoid of evidence showing those particular elements necessary for an award of punitive damages.") (internal quotations omitted); Ago v. Begg, Inc., 911 F.2d 819, 1990 WL 125683, at *4 (D.C. Cir. 1990) ("Indeed, even 'the finding of intentional misrepresentation' does not warrant the award of punitive damages in the absence of such

<u>Fulner</u>, No. 85-1735, 1987 WL 11086, *2 (D.D.C. 1987) ("This is not a case of blatant over-reaching. Rather it is a case of negligence compounded with fraudulent misrepresentations made to conceal that negligence."). In fiduciary duty cases in particular, D.C. courts have held that punitive damages are <u>not</u> permitted in the absence of gross fraud, such as where a defendant merely failed to "properly protect" the plaintiff's interests, or "ignored advice" that might have benefited the plaintiff. While such conduct may be "imprudent" or "incompetent," it "fall[s] <u>far</u> short of showing the blatant wrongdoing necessary" for punitive damages. <u>Hendry v. Pelland</u>, 73 F.3d 397, 400 (D.C. Cir. 1996) (emphasis added). Under this controlling standard of D.C. law, punitive damages cannot be awarded in this case.

### C. At an Absolute Minimum, the Punitive Damages Award Must be Dramatically Reduced

In the event the Court does not vacate the punitive damages award, at a minimum, the $21 million punitive damages award must be dramatically reduced. To determine whether the amount of a punitive damages award is proper, a court must consider the degree of reprehensibility of the defendant's misconduct. <u>State Farm Mutual Automobile Ins. Co. v. Campbell</u>, 538 U.S. 408, 418 (2003). As set forth above, the trial record here is devoid of any evidence of any malicious or grossly fraudulent behavior by Defendants. A punitive damages award that is three times the compensatory damages amount is thus clearly excessive.

Indeed, such an award of three times compensatory damages stretches the constitutional limit. <u>See</u> <u>Jackson v. Byrd</u>, No. 01-ca-825, 2004 WL 3249693, *2 (D.C. Super. June 30, 2004) ("The Court is mindful of the United States Supreme Court' holding in <u>State Farm Mutual Auto Ins. Co. v. Campbell</u>, 538 U.S. 408 (2003) that a punitive damage award can be so excessive as to violate the Defendant's right to due process. 'When compensatory damages are substantial <u>then a lesser ratio, perhaps only equal to compensatory damages</u>, can reach the outermost limit of

---

evidence. Because the conduct of defendants did not amount to fraud, the district court properly denied the [plaintiff's] request for an instruction on punitive damages.") (unpublished opinion).

[16] <u>United Mine Workers of Am.</u>, 717 A.2d at 341 ("While UMWA's behavior was discriminatory, the record before us lacks any showing by clear and convincing evidence, of malicious, wanton, reckless or willful actions on the part of UMWA.").

---

Dewey & LeBoeuf LLP
One Embarcadero Center, Suite 400
San Francisco, CA 94111

the due process guarantee.") (emphasis added).  The law in the District of Columbia, which disfavors punitive damages awards, is even more restrictive on this point.  See, e.g., Government of Rwanda v. Johnson, 409 F.3d 368, 376 (D.C. Cir. 2005) (remanding for reconsideration of a $10,000 punitive damages award on a $19,275 compensatory damages award (less than a 1:1 ratio)).  For all of the above reasons, if the punitive damages award is not completely vacated – as it must be – it should be dramatically reduced to less than a 1 to 1 ratio with any compensatory damages award.

## III. THERE IS INSUFFICIENT EVIDENCE FOR A REASONABLE JURY TO HAVE FOUND IN FAVOR OF PLAINTIFFS ON THEIR FIDUCIARY DUTY CLAIM

### A. There is Insufficient Evidence for a Reasonable Jury to Have Found That Defendants Owed a Fiduciary Duty to the GLA Class

Plaintiffs allege that the RPGLA created an express agency – and thus a fiduciary – relationship.  See, e.g., Final Pre-Trial Order, at Plaintiffs' Statement of Claims 3:16-19.  The mere existence of the RPGLA, in and of itself, however, is not enough to create a fiduciary relationship.  See Final Charge to the Jury no. 34, at 13.  As the Court is aware, Defendants' position is that, under D.C. law, there can be no such agency relationship unless the RPGLA gave GLA Class members the right to "control . . . [Defendants'] day-to-day operations."  Giles v. Shell Oil Corp., 487 A.2d 610, 611 (D.C. 1985) ("the really essential element of the relationship is the right of control").[17]  Since Plaintiffs failed to prove (or even try to prove) that they had any such "day-to-day" control over Defendants' licensing operations, Defendants believe that this failure of proof is dispositive of Plaintiffs' fiduciary duty claim, and that judgment as a matter of law should be entered in Defendants' favor for this reason alone.

That said, even under the five agency factors that the Court charged to the jury (to which

---

[17] See also Ames v. Yellow Cab of D.C., Inc., No. 00-3116 (RWR)(DAR), 2006 WL 2711546, *5 (D.D.C. Sept. 21, 2006) (Plaintiffs must prove that they had "control over [Defendants'] day-to-day operations . . . and the manner in which the work is performed."); Defs.' Memo. in Support of Their Position on Disputed Jury Instructions at 17-21 (Oct. 8, 2008) (Rec. Doc. 445); Defs.' Memo. Re: the Court's Draft Charge to the Jury at 2-4 (Nov. 2, 2008) (Rec. Doc. 521); Defs.' Reply to Pls.' Brief Re: "Court's Draft Charge to the Jury" Provided Oct. 31, 2008; Objs. Thereto at 4-5 (Nov. 3, 2008) (Rec. Doc. 533); Defs.' Memo. and Objs. Re: the Court's Draft Charge to the Jury and Special Verdict Form of Nov. 4, 2008 at 5-7 (Nov. 5, 2008) (Rec. Doc. 541); Defs.' Reply to Pls.' Nov. 5, 2008 Brief Re: "Court's Draft Charge to the Jury" Provided Nov. 4, 2008 at 7-8 (Nov. 5, 2008) (Rec. Doc. 543).

---

Defendants' Renewed Motion for Judgment as a Matter of Law                    Civ. Action No. C07 0943 WHA

Defendants objected), there was insufficient evidence for a reasonable jury to have found that the

RPGLAs gave rise to a fiduciary duty.[18]

### 1. Plaintiffs Did Not Present Sufficient Evidence to Establish That They Had Control Over Defendants' Licensing Operations

One fiduciary duty issue the jury was instructed on was "control," which the Court stated

is "[a]n important factor to consider . . . ." Final Charge to the Jury no. 33, at 14-15. Plaintiffs

failed to present at trial evidence sufficient to establish they had the ability to control

Defendants' licensing activities. To the contrary, all of the GLA Class members who testified

conceded that they had no right to control Defendants' licensing business. GLA Class

representative Herb Adderley testified that the only "control" he had was to ask to be kept out of

a promotion in the event of a conflict with an individual, exclusive endorsement. See Trial Tr.

1568:1-14 (Greenspan Decl., Ex. 1). Clifton McNeil testified that "I don't have any control"

over Defendants' licensing activities. Trial Tr. 433:2-11.[19] Walter Beach testified, "Oh no. I

don't have any control about that," (Trial Tr. 1181:6-11), and Bruce Laird testified to the same

lack of any right of control. See Trial Tr. 980:20-22 ("Q. Well, when you sent this letter back in,

did you retain any control over what the union could or couldn't do? A. Oh, no.").

In fact, the only purported and limited "control" that the RPGLA provided was the right

for a retired player to opt out of a "particular" licensing program "[i]f" – and only if – "the

[retired] player's inclusion … will conflict with an individual exclusive endorsement agreement,

and the player provides the NFLPA with timely notice of that conflict." Trial Ex. 110

(Greenspan Decl., Ex. 3) (emphases added). This narrow exclusion provision on its face does

not provide the type of "control" necessary to create an agency relationship under D.C. law. Nor

can Plaintiffs attempt to manufacture a jury issue out of this unambiguous contractual

---

[18] Following the trial, at least one juror publicly commented that "we felt we had to send a message that the union needs to represent and protect all its members." See "NFL Union to Pay $28.1 Million to Retirees," Associated Press, Nov. 10, 2008 (Greenspan Decl., Ex. 5). However, as this Court explicitly instructed the jury, this case did not involve any union membership claim under the federal labor laws or otherwise. Trial Tr. 487:18-488:18. Thus, any fiduciary relationship found by the jury based on such a union member relationship would be improper.

[19] See also id. at 370:9-13 ("Q. Now, did you [Mr. McNeil] have anything to do with when the union was out negotiating with a third party, as to whether they were doing a group license, an individual ad hoc agreement? Did you have anything to do with that? A. No, I didn't.").

Dewey & LeBoeuf LLP
One Embarcadero Center, Suite 400
San Francisco, CA 94111

provision.[20]  Indeed, even if GLA Class members could have opted out of particular licensing programs for any reason at all, such a right would still not rise to the level of "control" necessary to create an express agency relationship under D.C. law.  Rather, D.C. law puts the burden on Plaintiffs to prove that they had "control over [Defendants'] day-to-day operations . . . and the manner in which the work is performed."  Ames v. Yellow Cab of D.C., Inc., No. 00-3116 (RWR)(DAR), 2006 WL 2711546, *5 (D.D.C. Sept. 21, 2006) (applying D.C. law).[21]  Plaintiffs have never attempted to make any such showing.  And even if the absence of evidence of such control was not dispositive under D.C. law (Defendants contend that it is), Plaintiffs' evidence with regard to the four remaining agency factors charged by the Court would still be insufficient to overcome Plaintiffs' failure of proof on this "important" control factor.[22]

### 2. Plaintiffs Did Not Present Sufficient Evidence to Establish They Had the Right to Discharge Defendants Under the RPGLA

Another factor that the Court instructed the jury to consider was whether Plaintiffs had "the right to discharge the agent [Defendants] and to terminate the relationship."  Final Charge to the Jury no. 40, at 15.  While one GLA Class member testified that he believed he could terminate the RPGLA (Trial Tr. 1095:12-14), each RPGLA had an unambiguous fixed term of three years, and no RPGLA provided for a contractual right of early termination.  See, e.g., Trial

---

[20] Neither party has ever contended that this "exclusion" provision in the RPGLA is ambiguous, "and courts are enjoined not to create ambiguity where none exists.'"  Tillery v. District of Columbia Contract Appeals Bd., 912 A.2d 1169, 1177 (D.C. 2006) (quoting Wash. Props., Inc. v. Chin, Inc., 760 A.2d 546, 548 (D.C. 2000)).

[21] See also Judah v. Reiner, 744 A.2d 1037, 1040 (D.C. 2000) ("[T]he determinative [factor] is usually whether the [principal] has the right to control and direct the [agent] in the performance of his work and the manner in which the work is to be done.") (emphases added) (internal quote omitted) (emphases added); Giles, 487 A.2d at 611 ("[T]he really essential element of the relationship is the right of control, that is the right of one person, the master, to order and control another, the servant, the performance of work by the latter, and the right to direct the manner in which the work shall be done.") (emphases added).

[22] See, e.g., LeGrand v. Ins. Co. of North Am., 241 A.2d 734, 734 (D.C. 1968) ("Standing alone, none of these indicia, excepting (4) [the power to control the servant's conduct], seem controlling in the determination as to whether such relationship exists.  The decisive test is whether the employer has the right to control and direct the servant in the performance of his work and the manner in which the work is to be done." (emphases added) (quotations omitted); Environmental Research Int'l Inc. v. Lockwood Greene Engineers, Inc., 355 A.2d 808, 812 n.7 (D.C. 1976) ("The record supports the trial court's conclusion by failing to reveal that degree of control by appellees over appellant's actual performance of its functions which would be necessary for an agency relationship.").

---

Ex. 110 (Greenspan Decl., Ex. 3). In fact, any early termination would have been an unlawful repudiation and breach of the RPGLA term. See, e.g., N.Y. State Teamsters Conference Pension and Retirement Fund v. Pension Benefit Guar. Corp., 591 F.2d 953, 957 (D.C. Cir. 1979) ("Under traditional doctrine, repudiation constitutes a breach of contract even though made in advance of the time performance is due."); see also Sys. Council EM-3 v. AT&T Corp., 159 F.3d 1376, 1383 (D.C. Cir. 1999).

The testimony of Plaintiffs' witnesses about their purported right to terminate the RPGLA was legally irrelevant since the contract was unambiguous and to the contrary.[23] Further, the testimony by Plaintiffs on this issue was itself contradictory and clearly insufficient to support the existence of an "unstated" termination right. Compare Trial Tr. at 1095:12-14 ("Q. Did you believe you had the right to revoke this GLA as well? A. That's correct.") (Beach testimony) with Trial Tr. 1183:18-21 ("Q. . . . So I just want to be clear for the jury. You don't think there's anything that gives you the right to revoke the whole authorization? A. No, no, not the whole –") (Beach testimony).

### 3. Plaintiffs Did Not Present Sufficient Evidence to Establish That Defendants Had Undertaken to Act as a Marketing Agent and to Affirmatively Promote their Rights

The Court also instructed the jury that "a licensee may, depending on the circumstances, also undertake to act as a marketing agent and to affirmatively promote the rights on behalf of the licensor. In that case, the licensee is not only a licensee but also an agent with fiduciary duties." Final Charge to the Jury no. 36, at 14. Putting aside Defendants' objections to this instruction under D.C. law, the fact is that Plaintiffs presented no evidence that Defendants agreed to act as the GLA Class members' marketing agent or to affirmatively promote their rights. To the contrary, the terms of the RPGLA say nothing about Defendants acting as an agent or engaging in affirmative marketing efforts, see Trial Ex. 110, and there is no evidence

---

[23] See Ft. Lincoln Civic Ass'n, Inc. v. Ft. Lincoln New Town Corp., 944 A.2d 1055, 1064 (D.C. 2008) ("Where the language [of the contract] in question is unambiguous, its interpretation is a question of law for the court."); Tillery, 912 A.2d at 1177 ("[A] contract is not ambiguous 'merely because the parties disagree over its meaning, and courts are enjoined not to create ambiguity where none exists.'") (quoting Wash. Props., 760 A.2d at 548).

that Defendants verbally made any such representation to GLA Class members.  See, e.g., Trial

Tr. 422:4-7 ("Q.  Did you rely on any representations by anyone from the NFLPA or Players Inc

about what the agreement meant before you signed it?  A.  No, I didn't.") (McNeil testimony).

Because Plaintiffs could not identify any representations made by Defendants to

Plaintiffs to act as their marketing agent, Plaintiffs relied solely upon testimony from third party

Joel Linzner, EA's representative, that he understood that "Players Inc was acting as a sort of

agent for retired players."  Trial Tr. 1246:4-9; 2692:20-2693:2.  Mr. Linzner's testimony,

however, cannot be evidence of whether Defendants led Plaintiffs to believe that Defendants

would act as their marketing agents.  As the Court instructed the jury, it is only the "reasonable

expectations of the parties" to the RPGLA that is relevant to determining the meaning of the

RPGLA.  Final Charge to the Jury no. 41, at 15 (emphasis added).[24]

### 4. Plaintiffs Did Not Present Sufficient Evidence that the Fiduciary Duty That Plaintiffs Seek to Impose on Defendants was Within the Parties' Reasonable Expectations

The Court also instructed the jury to consider "what reasonable persons in the same

circumstances would have expected from the other side in the relationship.  In evaluating this,

you may not impose on defendants a fiduciary duty, if at all, that would exceed the reasonable

expectations of the parties in the circumstances of this case."  Final Charge to the Jury no. 41, at

15.  Here, the fiduciary duty that Plaintiffs seek to impose upon Defendants is the duty to include

the GLA Class in active player licensing and to distribute to them equal shares of the GLR pool

(as discussed in Point III.B, infra, this was the underlying injury theory of all of Plaintiffs'

fiduciary duty claims).  In particular, class counsel argued that the common premise of Plaintiffs'

fiduciary duty claims is that Defendants should have licensed GLA Class members' rights to all

---

[24] Mr. Linzner's perception of Defendants' role vis-à-vis the GLA Class members could have been relevant only to a theory of a fiduciary relationship arising from "agency by estoppel" (cf. Restatement (Third) of Agency § 2.05 (2008)) – a fiduciary duty theory that was not certified by the Court as a class-wide issue and which Plaintiffs disavowed before the Ninth Circuit.  See Class Cert. Order at 14 & 10 (April 29, 2008) (Rec. Doc. 275) (certifying class-wide breach of fiduciary duty claim "only insofar as [it] arises out of the GLAs between the NFLPA and retired players"); Pls.' Opp'n to Pet. for Permission to Appeal Under Fed. R. Civ. P. 23(f) at 10 (May 21, 2008) (conceding that "there is no longer an 'agency by estoppel' claim at issue" in this case) (attached as Ex. 3 to the Decl. of Roy Taub in Support of Defs.' Memo. in Support of Their Position on Disputed Jury Instructions (Oct. 8, 2008) (Rec. Doc. 449)).

Dewey & LeBoeuf LLP
One Embarcadero Center, Suite 400
San Francisco, CA 94111

third parties – along with active players' rights – even if it were at no additional cost to the licensees, and that, consequently, the GLA Class members should have shared in the GLR pool containing active player licensing money. See, e.g., Trial Tr. 1378:5-7 ("MR. LECLAIR: Our theory of the case is they should have licensed our group. And they didn't do it, and that's why we think it's a breach of fiduciary duty."); 2465:14-16 ("MR. LECLAIR:  The fiduciary duty claim is:  'You should have put us in [the active player license agreements] by virtue of being our agent.'").[25]

However, as the zero verdict on the breach of contract claim makes clear, the jury determined that it was not reasonable for Plaintiffs to expect that the RPGLA entitled them to equal shares in the active player GLR pool.  The Court specifically addressed this issue at the hearing on Defendants' original Rule 50 motion:

> THE COURT:  But the contract interpretation is supposed to be – as the draft instructions say, it is supposed to carry out the reasonable expectations – reasonable expectations of the parties based on the language and the surrounding circumstances.  So if the reasonable expectations of the parties was in no way that the retired players were going to share with the active money, how can you then say that the contract and the circumstances imposed a fiduciary duty to do the opposite, i.e., to get them into the share and share alike with the active money?

Trial Tr. 2465:24-2466:9.  Plaintiffs simply presented no evidence that the fiduciary duty they are seeking to impose upon Defendants did not exceed the reasonable expectations of the parties.

### 5. Plaintiffs' Evidence on the Financial Arrangement Between the Parties Was Insufficient to Support a Fiduciary Duty Claim

Finally, the last remaining fiduciary duty factor the Court charged to the jury related to "the financial arrangement between the licensor and the licensee."  Final Charge to the Jury no. 39, at 15.  In particular, the Court charged the jury that:

> To the extent that a licensee paid a sum certain for the rights and was entitled to keep all or most of any third-party revenue, such a circumstance would be indicative of a bare license with no agency relationship.  In such a case, the licensee would be making any marketing efforts on its own account and not for the account of the licensor.  On the other hand, if the licensor gave consideration to the licensee to go out and market the rights and to pass a large part of the

---

[25] Further evidence that a purported fiduciary duty to give away the rights of the GLA class members for free would "exceed the reasonable expectations of the parties" is that Mr. Beach testified that he did not believe that Defendants "should have given away [his] name for free . . . ."  Trial Tr. 1185:25-1186:2.

Dewey & LeBoeuf LLP
One Embarcadero Center, Suite 400
San Francisco, CA 94111

1   revenues through to the licensor, then that would be indicative of an agency
    relationship.

2   Id.  Defendants objected to this instruction because, among other things, there is no case in

3   which this factor has ever been applied under D.C. law.  Rather, the only financial arrangement

4   that D.C. courts consider when evaluating whether an agency relationship exists is the payments

5   of wages from a principal to the agent (i.e., whether GLA Class members paid Defendants to act

6   as their agents), not vice versa.  See Judah, 744 A.2d at 1040; Ames, 2006 WL 2711546, *6

7   (holding that no agency relationship existed in part because of no payment by purported principal

8   to purported agent).[26]

9        Putting aside Defendants' objections to the Court's charge on this legally improper

10  factor, the fact that Defendants did not pay a "sum certain" for the GLA Class members' RPGLA

11  rights would still be overwhelmed by the absence of evidence as to the other four fiduciary duty

12  factors charged by the Court (i.e., lack of control, lack of termination rights, absence of evidence

13  that Defendants undertook to act as the GLA class members' marketing agent, and absence of

14  evidence that Plaintiffs' attempt to impose a fiduciary duty to include them in the GLA pool did

15  not exceed the reasonable expectations of the parties).  Taking into account all five of the

16  fiduciary duty "agency" factors identified in the Final Charge to the Jury, there was clearly

17  insufficient evidence for a reasonable jury to find the existence of a fiduciary duty arising out of

18  the RPGLA.[27]

19

20

21  _____
    [26] Defendants also note that this instruction would effectively mean that any license agreement
22  that calls for the payment of a royalty, rather than a fixed sum at the outset of the licensing
    relationship, would create a fiduciary relationship.  This is not the law in any jurisdiction.  See,
23  e.g., Mellencamp v. Riva Music Ltd., 698 F. Supp. 1154, 1159 (S.D.N.Y. 1988) (holding that
    "the express and implied obligations assumed by a publisher in an exclusive licensing contract
24  [calling for payment of royalties] are not, as a matter of law, fiduciary duties.").

    [27] See Robinson, Leatham & Nelson, Inc. v. Nelson, 109 F.3d 1388, 1391 (9th Cir. 1997)
25  (affirming judgment as a matter of law for defendants because plaintiffs had "produced no
    evidence of a continuing fiduciary relationship between [plaintiff] and [defendant]"); Pro
26  Football Weekly, Inc. v. Gannett Co., 988 F.2d 723, 727-28 (7th Cir. 1993) (affirming directed
    verdict for defendant on plaintiff's breach of fiduciary duty claim because of lack of control);
27  Hotmar v. Howell H. Listrom & Co., 808 F.2d 1384, 1387 (10th Cir. 1987) (affirming directed
    verdict "because of the nature of the relationship between Hotmar and Brown, there was
28  insufficient evidence of a fiduciary relationship between the two.").

---

Defendants' Renewed Motion for Judgment as a Matter of Law        Civ. Action No. C07 0943 WHA

### B. There Was Insufficient Evidence for a Reasonable Jury to Find That Defendants Breached Any Fiduciary Duty

In addition to there being insufficient evidence for the jury to find a fiduciary relationship, there was also insufficient evidence to support the jury's breach of fiduciary duty verdict. Specifically, all of Plaintiffs' fiduciary duty claims were necessarily negated once the jury refused to award damages based on Plaintiffs not receiving equal shares of the GLR pool – the only fiduciary duty "injury" asserted by Plaintiffs. It is undisputed that proof of such an economic injury is an essential liability element of a fiduciary claim. <u>See</u> Final Charge to the Jury no. 50, at 18-19 (instructing jury that "Plaintiffs must first prove that they suffered economic injury as a result of defendants' breach of fiduciary duty").

In the Final Pre-Trial Order, Plaintiffs enumerated their fiduciary duty claims as follows:

(i) failing to adequately market the retired players; (ii) failing to disclose their actions; (iii) defining "eligibility" in such a way as to deprive the retired players of their shared escrow; (iv) failing to establish an escrow account on behalf of the GLA Class; (v) failing to accurately report group licensing revenues to members of the GLA Class; (vi) failing to distribute revenues to the members of the GLA Class that should have been distributed; (vii) failing to distribute to retired players their equal share of the fund from which the active players were paid; (viii) misappropriating funds totaling eight million dollars or more that should have been paid, in part, to the GLA Class; (ix) misappropriating 64-69% of the funds for themselves; (x) failing to include the retired players in the active players' group licenses; and (xi) placing themselves in a position of conflict of interest and acting adversely to the interest of retired NFL players who signed a GLA.

Final Pre-Trial Order at 6.

By rejecting Plaintiffs' claim for equal shares of the GLR pool in both the zero damages verdict (breach of contract) and the $7.1 million verdict (breach of fiduciary duty), the jury necessarily rejected Plaintiffs' six fiduciary duty theories directly challenging the distribution of the GLR pool as its only injury claim: "(iii) defining 'eligibility' in such a way as to deprive the retired players of their shared escrow"; "(iv) failing to establish an escrow account on behalf of the GLA Class"; "(vi) failing to distribute revenues to the members of the GLA Class that should have been distributed"; "(vii) failing to distribute to retired players their equal share of the fund from which the active players were paid"; "(viii) misappropriating funds totaling eight million

dollars or more that should have been paid, in part, to the GLA Class"; and

"(ix) misappropriating 64-69% of the funds for themselves."[28]  Id.

Similarly, the jury's rejection of Plaintiffs' claim to share in the active player GLR pool constituted a rejection of any economic injury from Defendants' alleged failure to disclose information about the GLR pool and active player licensing money:  "(ii) failing to disclose their actions"; and "(v) failing to accurately report group licensing revenues to members of the GLA Class."  Id.  Indeed, once the jury determined that the GLA Class was not entitled to share in the GLR pool, it could not reasonably find any economic injury from Defendants' alleged failure to disclose information about such active player licensing money.

Plaintiffs' three remaining fiduciary duty theories – "(i) failing to adequately market the retired players"; "(x) failing to include the retired players in the active players' group licenses"; and "(xi) placing themselves in a position of conflict of interest and acting adversely to the interest of retired NFL players who signed a GLA" also were fatally dependent on Plaintiffs' "equal share" of the GLR pool injury theory.  Specifically, class counsel made it clear at trial that all of Plaintiffs' fiduciary duty theories were grounded in the single injury and damages theory that Defendants breached their alleged fiduciary duties by not licensing – even for free – the rights of the GLA Class members in the active player license agreements so that they could then claim a right to share equally in the GLR pool.  For example, with respect to Plaintiffs' "conflict of interest" fiduciary duty theory, class counsel stated as follows:

> MR. LECLAIR: And if you weren't going to include us [in the active player license agreements], you should have told us you had a conflict of interest.
>
> \*       \*       \*
>
> MR. LECLAIR: But that has nothing to do with their fiduciary duty to either keep us together or to tell us we have a conflict of interest.
>
> \*       \*       \*
>
> MR. PARCHER:  Why can't you put all the players in with their names and likenesses? . . . You know, unless you've got a conflict of interest.  Unless you

---

[28] The jury's zero verdict on the breach of contract claim also plainly reflects its conclusion that there were no "moneys generated by such licensing of retired player group rights" with which to create any escrow account.  Trial Ex. 110 (Greenspan Decl., Ex. 3).

1  favored one set of guys, the guys who vote, over the guys who have no power
   whatsoever.

2  Trial Tr. 2467:8-9, 2468:21-24, 2697:12-17 (Greenspan Decl., Ex. 1).

3      With respect to Plaintiffs' "failure to adequately market" fiduciary duty theory, the Court

4  asked a series of questions about the "Mr. Hollywood" scenario during the Rule 50 hearing, and

5  class counsel's responses made it clear that Plaintiffs' failure to market claim was also based

6  solely on the theory now rejected by the jury that Defendants had a duty to include Plaintiffs'

7  rights for free in the active player license agreements so that Plaintiffs could share equally in the

8  GLR pool:

9      [THE COURT]:  But then, let's say the jury agrees that the NFLPA held
   themselves out as a representative and an agent <u>and undertook a fiduciary duty to</u>

10  <u>market these people</u>, these class members…. So what is the measure of damages?
    [MR. LECLAIR]:  <u>The measure of damages is the same revenue from the same</u>

11  <u>licenses, because our theory is they should have included us.</u>  We should have
    been put together with the [actives] – because they were acting as our agent.

12  [THE COURT]:  Even though the contract did not require – even though the jury
    says:  look, the contract does not require – the thing that everybody signed does

13  not require that, and then, nonetheless, you're saying the agency would have –
    [MR. LECLAIR]:  <u>Actually, I am saying that.</u>

14

15                *      *      *

16  [THE COURT]:  So the idea that you – so we're following the Mr. Hollywood
    scenario now, because Mr. Hollywood doesn't have any active players to market.

17  <u>Anyway, you – you come back at each juncture to say, basically this, that the</u>
    <u>breach of fiduciary duty theory has to be that Defendants should have thrown in</u>

18  <u>the retireds for free</u> ….

19  Trial Tr. 2463:13-2464:9; 2471:16-2472:22 (emphases added).[29]

20      Plaintiffs' "scrambling" theory (the final iteration of Plaintiffs' fiduciary duty claim) also

21  comes down to the same rejected economic injury claim, <u>i.e.</u>, that "Defendants should have

22  thrown in the retireds for free" so that they could share equally in the GLR pool:

23      MR. HUMMEL:  They could have said, "We have this retired player program.

24  And for not a penny more, you get these rights.  Use them.  Don't scramble
    them."

25  ────────────────

26  [29] <u>See also</u> Trial Tr. 2467:5-8 ("MR. LECLAIR: But the fiduciary claim is totally different. What
    we're saying is: not that you did include us, but that you should have."); 1378:5-7 ("MR.

27  LECLAIR: Our theory of the case is they should have licensed our group. And they didn't do it,
    and that's why we think it's a breach of fiduciary duty."); 409:21-24 ("MR. PARCHER: Our

28  fiduciary point is that if for any reason the EA agreement . . . didn't include the group, the class,
    that the union breached its fiduciary obligation by not turning it over.").

Dewey & LeBoeuf LLP
One Embarcadero Center, Suite 400
San Francisco, CA 94111

* * *

MR. PARCHER: Nobody's saying coerce Mr. Linzner . . . Why didn't they just hand it [retired players' rights] over [to EA] in the beginning? . . . "Mr. Linzner, we represent 1800 active people, 2100 retired people . . . Here's your license for $25 million."

Trial Tr. 95:18-20; 2781:6-10; Final Charge to the Jury no. 45, at 17 ("I remind you again that there is no claim in this case that this scrambling by Electronic Arts violated any player's rights. Instead, plaintiff's claim is that defendants breached a fiduciary duty by insisting on scrambling rather than licensing the entire group of RPGLA rights to Electronic Arts.").

But there was simply no evidence for a reasonable jury to conclude that Defendants breached any fiduciary duty by not giving away the GLA Class members' rights for free and including them in the GLR pool.[30] As the Court foreshadowed, once the jury concluded that the RPGLA did not entitle GLA Class members to share equally in the GLR pool (awarding zero damages for breach of the RPGLA), there could no longer be any breach of fiduciary duty claim for Defendants' failure to include GLA Class members in the GLR pool:

> [THE COURT]: So if the reasonable expectations of the parties was in no way that the retired players were going to share with the active money, how can you then say that the contract and the circumstances imposed a fiduciary duty to do the opposite, i.e., to get them into the share and share alike with the active money?
>
> * * *
>
> [THE COURT]: You come back at each juncture to say, basically this, that the breach of fiduciary duty theory has to be that Defendants should have thrown in the retireds for free, and then shared the $25 million on a player-by-player basis, which I think – and we only get to this scenario if you're assuming for the sake of argument that the contract does not – did not require sharing in the [GLR pool] to begin with. So I think there's a possible circularity here ….

Trial Tr. 2465:24-2466:9; 2471:16-2472:22 (emphases added).

Finally, to the extent that Plaintiffs argue that their "conflict of interest" breach of fiduciary theory encompasses their ad hoc licensing complaints (e.g., their complaints about the "below-market" emails relating to the EA-Hall of Fame ("HOF") ad hoc license agreement), this

---

[30] Indeed, as set forth above, Mr. Beach testified that he did not want Defendants to give his rights away for free, and former Players Inc President Doug Allen and Professor Noll both testified that if Defendants had simply given away for free the GLA Class members' rights, they would have been unable to sell those rights in the future. Trial Tr. 1185:25-1186:2 (Beach); 955:16-956:1 (Allen); 2322:24-2324:1 (Noll).

too cannot support a breach of fiduciary duty verdict for the GLA class. For starters, the GLA class does not assert any claims or damages relating to any of the ad hoc license agreements. See Stipulated Fact no. 13, Final Pre-Trial Order at 12. Nor do any complaints about the EA-HOF ad hoc license agreement being "below market" present a class-wide issue. See, e.g., Trial Tr. 2703:6-9 ("MR. PARCHER: Read the Hall of Fame letter. Of course, he [Doug Allen] did [favored the interests of licensees]. Stabbed the Hall of Famers. Never mind the class, [he] stabbed the Hall of Famers in the back.") (emphasis added). Indeed, it is undisputed that the EA-HOF deal involved only 17 of the 2,062 class members. See id. at 1708:22-1709:11. Further, as discussed at pp. 16-17 supra, the evidence at trial uniformly established that it was the Hall of Fame – not Defendants – who negotiated with the HOF players, like Mr. Adderley, on how much they would be paid. Accordingly, evidence relating to any alleged "conflict of interest" in the EA-HOF agreement or any other ad hoc license agreement cannot support any breach of fiduciary duty claim with respect to the GLA Class.

## CONCLUSION

For all of the foregoing reasons, both the compensatory damages and punitive damages awards must be vacated, and the breach of fiduciary duty liability verdict must be overturned. This Court warned class counsel in no uncertain terms that "[w]hen Plaintiffs go to the jury with multiple theories, and they win on one that is fatally defective, they wind up with nothing. Whereas, if they had – if discretion had been the better part of valor, and they had recognized fatal problems with their theory and gone with one that had a shot, they might have won something." Trial Tr. 2472:11-22. Plaintiffs, however, consciously ignored this caution, and instead chose to continue to present their various fiduciary duty theories to the jury without any damages evidence to support them. On this record, the verdict must be set aside. Id.

Date: November 26, 2008                    DEWEY & LEBOEUF LLP

                                           BY:   /s/ Jeffrey Kessler
                                                  Jeffrey L. Kessler
                                                  *Attorneys for Defendants*