MANATT, PHELPS & PHILLIPS, LLP
RONALD S. KATZ (Bar No. CA 085713)
E-mail: rkatz@manatt.com
RYAN S. HILBERT (California Bar No. 210549)
E-mail: rhilbert@manatt.com
NOEL S. COHEN (California Bar No. 219645)
E-mail: ncohen@manatt.com
1001 Page Mill Road, Building 2
Palo Alto, CA 94304-1006
Telephone: (650) 812-1300
Facsimile: (650) 213-0260

McKOOL SMITH, P.C.
LEWIS T. LECLAIR (Bar No. CA 077136)
E-mail: lleclair@mckoolsmith.com
JILL ADLER NAYLOR (Bar No. CA 150783)
E-mail: jnaylor@mckoolsmith.com
300 Crescent Court, Suite 1500
Dallas, TX 75201
Telephone: (214) 978-4000
Facsimile: (214) 978-4044

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| BERNARD PAUL PARRISH, HERBERT ANTHONY ADDERLEY, and WALTER ROBERTS, III on behalf of themselves and all others similarly situated,<br><br>          Plaintiffs<br><br>vs.<br><br>NATIONAL FOOTBALL LEAGUE PLAYERS ASSOCIATION, a Virginia corporation, and NATIONAL FOOTBALL LEAGUE PLAYERS INCORPORATED d/b/a PLAYERS INC, a Virginia corporation,<br><br>          Defendants. | CIVIL ACTION NO. C07 0943 WHA<br><br><br>**PLAINTIFFS' OPPOSITION TO DEFENDANTS' RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW**<br><br>Date:     January 8, 2009<br>Time:     8:00 a.m.<br>Judge:   Honorable William H. Alsup |

# TABLE OF CONTENTS

|  |  | Page |
|---|---|---|
| I. | INTRODUCTION | 1 |
| II. | LEGAL STANDARD | 1 |
| III. | Defendants Have Not Met and Cannot Meet the Extremely High Standard Required to Overturn the Jury's Verdict on Compensatory Damages | 2 |
|  | A. Defendants' Argument that the Jury Rejected Plaintiffs' GLR Pool Claim Is Purely Speculative | 3 |
|  | B. Defendants Misstate and Fail to Acknowledge the Broad Scope and Nature of Plaintiffs' Damages Evidence | 4 |
|  | C. The Jury Had Sufficient Information To Determine That Plaintiffs Were Entitled To $7.1 Million In Damages For Breach Of Fiduciary Duty | 7 |
|  | D. Defendants' Attempt To Misapply The Court's Prior Comments About The Evidence Is Unavailing | 10 |
|  | E. Defendants' Recycled Argument That Plaintiffs Failed To Prove Individualized Damages Fails For The Same Reasons It Failed In Previous Motions | 11 |
| IV. | THE JURY'S DETERMINATION ON PUNITIVE DAMAGES SHOULD STAND | 14 |
|  | A. Plaintiffs Offered Clear and Convincing Evidence That Defendants' Actions Warranted Punitive Damages | 14 |
|  | 1. Even Though Defendants Actively Solicited Plaintiffs To Sign GLAs, Defendants Never Intended To Honor Their Terms | 15 |
|  | 2. Defendants Did Nothing To Market Retired Players' Images, And When A Third Party Expressed An Interest In Retired Players, Defendants Maliciously Went Behind Their Backs To Attempt To Cut Retired Players Out | 17 |
|  | B. The Punitive Damages Award Is Well Within Constitutional Limits | 19 |
| V. | THE JURY'S DETERMINATION ON FIDUCIARY DUTY SHOULD BE UPHELD | 21 |
|  | A. Defendants' Recycled Arguments On Fiduciary Duty Liability Fail For The Same Reasons That They Failed In Defendants' Motion For Summary Judgment And Previous Motion Under Rule 50 | 21 |
|  | 1. There Was Sufficient Evidence To Show That The Parties Reasonably Expected That Defendants Were Plaintiffs' Marketing Agents | 23 |
|  | 2. There Was Sufficient Evidence Of The Right To Control And/Or The Right To Discharge On Behalf Of Plaintiffs | 27 |
|  | 3. There Was Sufficient Evidence Of The Parties' Financial Arrangement To Support The Jury's Verdict On Fiduciary Duty | 28 |
|  | B. There Was Sufficient Evidence for the Jury to Conclude that Defendants Breached Their Fiduciary Duties to Plaintiffs. | 28 |
| VI. | CONCLUSION | 29 |

Manatt, Phelps &
Phillips, LLP
Attorneys At Law
Los Angeles

i

OPPOSITION TO DEFENDANTS'
RENEWED MOTION FOR JMOL
C07 0943 WHA

**Cases**

*Abuan v. Gen. Elec. Co.*,
   3 F.3d 329 (9th Cir. 1993) .................................................................................. 13

*Affordable Elegance Travel, Inc. v. Worldspan, L.P.*,
   774 A.2d 320 (D.C. 2001) .................................................................................... 6

*Allapattah Servs. v. Exxon Corp.*,
   157 F. Supp. 2d 1291 (S.D. Fla. 2001) .............................................................. 12

*Ames v. Yellow Cab of D.C., Inc.*,
   2006 WL 2711546 (D.D.C. Sept. 21, 2006) ...................................................... 22

*Bogle v. McClure*,
   332 F.3d 1347 (11th Cir. 2003) .......................................................................... 20

*Brown v. Pro Football*,
   146 F.R.D. 1 (D.D.C. 1992) .......................................................................... 12, 13

*C&E Servs., Inc. v. Ashland, Inc.*,
   498 F. Supp. 2d 242 (D.D.C. 2007) .............................................................. 21, 22

*Carter v. Duncan-Huggins, Ltd.*,
   727 F.2d 1225 (D.C. App. 1984) .......................................................................... 6

*Columbia Broadcasting Systems, Inc. v. Stokely-Van Camp, Inc.*,
   522 F.2d 369 (2d Cir. 1975) ................................................................................ 21

*Creative Computing v. Getloaded.com, LLC*,
   386 F.3d 930 (9th Cir. 2004) .............................................................................. 10

*Daka Inc. v. McCrae*,
   839 A.2d 682 (D.C. 2003) ................................................................................... 20

*Del Monte Dunes v. City of Monterrey*,
   95 F.3d 1422 (9th Cir. 1995) ......................................................................... 7, 10

*Eden Elec., Ltd v. Amana Co.*,
   370 F.3d 824 (8th Cir. 2004) .............................................................................. 21

*Environmental Research Int'l, Inc. v. Lockwood Greene Engineers, Inc.*,
   355 A.2d 808 (D.C. 1976) ................................................................................... 22

*Gallick v. Baltimore & Ohio R.R. Co.*,
   372 U.S. 108 (1963) .............................................................................................. 2

*Giles v. Shell Oil Corp.*,
   487 A.2d 610 (D.C. 1985) ................................................................................... 22

*Green v. H & R Block, Inc.*,
   735 A.2d 1039 (Md. 1999) .................................................................................. 22

*Hilao v. Estate of Marcos*,
   103 F.3d 767 (9th Cir. 1996) .............................................................................. 13

*In Re First Alliance Mort. Co.*,
   471 F.3d 977 (9th Cir. 2006) .............................................................................. 10

Manatt, Phelps &
Phillips, LLP
Attorneys At Law
Los Angeles

*In Re Hotel Telephone Charges*,
500 F.2d 86 (9th Cir. 1974)...................................................................................... 14

*Judah v. Burton Reiner and Morris Mgmt., Inc.*,
744 A.2d 1037 (D.C. 2000).............................................................................. 21, 23

*Kemp v. AT&T*,
393 F.3d 1354 (11th Cir. 2004)............................................................................. 20

*Kern v. Levolor Lorentzen, Inc.*,
899 F.2d 772 (9th Cir. 1990).................................................................................. 1

*Kline v. Coldwell, Banker & Co.*,
508 F.2d 226 (9th Cir. 1974)................................................................................. 13

*Landes Const. Co., Inc. v. Royal Bank of Canada*,
833 F.2d 1365 (9th Cir. 1987).................................................................................. 1

*Lieb v. Merrill Lynch*,
461 F. Supp. 951 (E.D. Mich. 1978)...................................................................... 23

*Lincoln v. Case*,
340 F.3d 283 (5th Cir. 2003)................................................................................. 20

*Los Angeles Land Co. v. Brunswick Corp.*,
6 F.3d 1422 (9th Cir. 1993)............................................................................. 1, 26

*Los Angeles Memorial Coliseum Comm'n v. National Football League*,
791 F.2d 1356 (9th Cir. 1986).................................................................................. 7

*Los Angeles Nut House v. Holiday Hardware Corp.*,
825 F.2d 1351 (9th Cir. 1987).................................................................................. 2

*LuMetta v. U.S. Robotics, Inc.*,
824 F.2d 768 (9th Cir. 1987)............................................................................. 1, 7

*Marques v. Bank of Am.*,
59 F. Supp. 2d 1005 (N.D. Cal. 1999) ..................................................................... 1

*Mathias v. Accor Econ. Lodging*,
347 F.3d 672 (7th Cir. 2003)................................................................................. 20

*Mendez v. Gonzalez*,
540 F.3d 1109 (9th Cir. 2008)............................................................................... 20

*Merrill Lynch v. Cheng*,
901 F.2d 1124 (D.C. Cir. 1990)............................................................................. 23

*Mosesian v. Peat, Marwick, Mitchell & Co.*,
727 F.2d 873 (9th Cir. 1984).................................................................................. 1

*National Football League Players Association v. National Football League and National Football League Management Council*,
Case No. 08CV6254 RHK/JJG (D. Minn. December 4, 2008) ............................... 22

*NCRIC, Inc. v. Columbia Hosp. for Women Med. Ctr., Inc.*,
957 A.2d 890 (D.C. 2008)........................................................................................ 6

*Omega Envt'l, Inc. v. Gilbarco, Inc.*,
127 F.3d 1157 (9th Cir. 1997).................................................................................. 1

Manatt, Phelps &
Phillips, LLP
ATTORNEYS AT LAW
LOS ANGELES

OPPOSITION TO DEFENDANTS'
RENEWED MOTION FOR JMOL
C07 0943 WHA

*Oviatt v. Pearce*,
954 F.2d 1470 (9th Cir. 1992).................................................................. 7

*Pacific Mutual Life Insurance Co. v. Haslip,*
499 U.S. 1 (1991)........................................................................................ 19

*Pavao v. Pagay,*
307 F.3d 915 (9th Cir. 2002)....................................................................... 1

*Peterson v. Davenport Community School Dist.*,
626 N.W.2d 99 (Iowa 2001) ....................................................................... 12

*Robles v. Consolidated Graphics, Inc.*,
965 S.W.2d 552 (Tex. App. 1997)............................................................... 23

*Rwanda v. Johnson,*
409 F.3d 368 (D.C. Cir. 2005) .................................................................... 20

*S. Union Co. v. Irvin*,
2008 U.S. App. LEXIS 23403,
*5 (9th Cir. Nov. 7, 2008).......................................................................... 20

*Safeway Stores, Inc. v. Kelly*,
448 A.2d 856 (D.C. 1982)........................................................................... 22

*State Farm Mutual Automobile Ins. Co. v. Campbell*,
538 U.S. 408 (2002) ............................................................................... 19, 20

*Stogsdill v. Healthmark Partners, LLC,*
377 F.3d 827 (8th Cir. 2004) ...................................................................... 20

*Tanno v. S.S. President Madison Ves.*,
830 F.2d 991 (9th Cir. 1987) ........................................................................ 2

*The Home Indemnity Co. v. Lane Powell Moss & Miller*,
43 F.3d 1322 (9th Cir. 1995)........................................................................ 2

*Toner v. Lederle Labs.*,
828 F.2d 510 (9th Cir. 1987)........................................................................ 2

*TransAmerica Leasing, Inc. v. Venezuela,*
200 F.3d 843 (D.C. Cir. 2000) .................................................................... 23

*TXO Prod. Corp. v. Alliance Res. Corp.*,
509 U.S. 443 (1993) .................................................................................... 19

*United Mine Workers of America v. Moore,*
717 A. 2d 332 (D.C. 1998)........................................................................... 15

*Windham v. Am. Brands, Inc.*,
565 F.2d 59 (4th Cir. 1977)......................................................................... 12

*Zhang v. Am. Gem Seafood, Inc.*,
339 F.3d 1020 (9th Cir. 2003) .................................................................... 20

**Statutes**

Fed. R. Civ. Pro. 23 ............................................................................... 12, 13

Manatt, Phelps &
Phillips, LLP
Attorneys At Law
Los Angeles

**Other Authorities**

3 Newburg on Class Actions (4th ed. 2002) ............................................................ 12, 13

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Manatt, Phelps &
Phillips, LLP
Attorneys At Law
Los Angeles

v

OPPOSITION TO DEFENDANTS'
RENEWED MOTION FOR JMOL
C07 0943 WHA

## I.    **INTRODUCTION**

The Ninth Circuit sets a very high standard for overturning a jury verdict.  Judgment as a matter of law ("JMOL") under Rule 50 is appropriate only if the evidence, construed in the light most favorable to the nonmoving party, permits only one reasonable conclusion, and that conclusion is contrary to the jury's verdict.

Defendants' speculation on what the jury must have done comes nowhere close to meeting this standard.  Plaintiffs therefore respectfully request that the Court deny Defendants' renewed motion for judgment as a matter of law ("Motion").

## II.    **LEGAL STANDARD**

Jury verdicts are entitled to great deference.  *Kern v. Levolor Lorentzen, Inc.*, 899 F.2d 772, 775 (9th Cir. 1990).  They can be overturned only if the evidence, construed in the light most favorable to the prevailing party, permits only *one* reasonable conclusion, and that conclusion is contrary to the jury's verdict.  In this trial, there was substantial evidence, described herein, that Defendants breached the GLAs, acted as an "agent" for the retired class of GLA signatories (thereby owing them fiduciary duties), and breached those fiduciary duties in a number of ways. The trial record is also replete with evidence, aside from testimony by Philip Rowley, from which a jury could very reasonably assess and render an award of damages for those breaches.  *Pavao v. Pagay*, 307 F.3d 915, 918 (9th Cir. 2002); *Marques v. Bank of Am.*, 59 F. Supp. 2d 1005, 1009 (N.D. Cal. 1999) (quoting *Omega Envt'l, Inc. v. Gilbarco, Inc.*, 127 F.3d 1157, 1161 (9th Cir. 1997)).  Defendants' Motion must be denied if – construing the evidence in the light most favorable to Plaintiffs – there is substantial evidence for any reasonable interpretation that supports the jury's verdict.  *Los Angeles Land Co. v. Brunswick Corp.*, 6 F.3d 1422, 1425 (9th Cir. 1993); *Mosesian v. Peat, Marwick, Mitchell & Co.*, 727 F.2d 873, 877 (9th Cir. 1984). "Substantial evidence," in turn, simply means relevant evidence that a reasonable person might accept as adequate to support the conclusions reached.  *Landes Const. Co., Inc. v. Royal Bank of Canada*, 833 F.2d 1365, 1371 (9th Cir. 1987); *LuMetta v. U.S. Robotics, Inc.*, 824 F.2d 768, 770 (9th Cir. 1987).

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
PALO ALTO

Furthermore, Defendants have waived their right to challenge what they allege is an inconsistent jury verdict by failing to raise this objection before the jury was discharged. When counsel for a party is invited to consider discharging the jury, counsel's answer risks waiver of objections to any later alleged inconsistencies. *The Home Indemnity Co. v. Lane Powell Moss & Miller*, 43 F.3d 1322, 1331 (9th Cir. 1995) (waiver of inconsistent verdict argument because party failed to object to the alleged inconsistency before the jury's dismissal). Here, as in *The Home Indemnity*, the Court gave Defendants' counsel the opportunity to object to the jury's verdict before the jury was dismissed.[1] Defendants' agreement to discharge the jury before raising their inconsistency argument now constitutes a waiver. *See Los Angeles Nut House v. Holiday Hardware Corp.*, 825 F.2d 1351, 1354-55 (9th Cir. 1987) (waiver where party fails to object immediately and move for re-submission of the inconsistency before jury dismissed).

Moreover, the proper remedy for an inconsistent verdict is a new trial, not a reversal of the jury's verdict, and Defendants have sought only a reversal of the verdict in their Motion. When a party claims a verdict is inconsistent, the court must attempt to reconcile any alleged inconsistencies, and if it cannot, then it must grant a new trial. *Gallick v. Baltimore & Ohio R.R. Co.*, 372 U.S. 108, 119-20 (1963) (court must try to harmonize inconsistent verdicts); *Tanno v. S.S. President Madison Ves.*, 830 F.2d 991, 992 (9th Cir. 1987) (new trial required if inconsistent findings are irreconcilable); *Toner v. Lederle Labs.*, 828 F.2d 510, 512-13 (9th Cir. 1987) (court must exhaust efforts to read the verdict coherently before remanding for a new trial). Of course, for the reasons detailed herein, the verdict is completely coherent, is not inconsistent, and no new trial is warranted.

## III. DEFENDANTS HAVE NOT MET AND CANNOT MEET THE EXTREMELY HIGH STANDARD REQUIRED TO OVERTURN THE JURY'S VERDICT ON COMPENSATORY DAMAGES

Defendants fail to meet the standard for overturning the jury's verdict on compensatory damages. Defendants do not offer an alternative conclusion to the jury's verdict, other than to state that the one legitimately reached is incorrect.

---

[1] *See* Declaration of Ryan S. Hilbert ("Hilbert Decl."), Exh. A (Trial Transcript ("Trial Tr.") 2898:5-2898:7) (Court: "Any reason, though, why the jury cannot be discharged?" Defendants: "No, your Honor.").

MANATT, PHELPS & PHILLIPS, LLP
ATTORNEYS AT LAW
PALO ALTO

Even then, Defendants are wrong.  Defendants' argument in favor of JMOL rests solely on two premises: (1) that the only damages evidence available to the jury was testimony related to calculation of equal shares of the gross licensing revenue ("GLR") pool; and (2) that the jury rejected this claim.  Motion at 5.  Even though Plaintiffs need to negate only one of these premises to defeat Defendants' Motion, each is false.

### A.    Defendants' Argument that the Jury Rejected Plaintiffs' GLR Pool Claim Is Purely Speculative.

The crux of Defendants' argument that "the jury rejected Plaintiffs' GLR pool damages evidence and theory" is that the jury found that Defendants breached the GLA, but did not award any corresponding damages.  Motion at 5.  Defendants, however, ignore the obvious and cogent reason why the jury awarded zero damages for breach of contract after finding a breach of contract: **the jury was simply following the Court's instructions not to double-count damages**.[2]  Given the jurors' view of Defendants' reprehensible conduct, it is hardly surprising that they chose to award the damages for breach of fiduciary duty (so that they could also award punitive damages) covering both the breach of contract and breach of fiduciary duty.

Under Paragraph 53 of the jury instructions, the jury was expressly cautioned about awarding Plaintiffs damages for each of their breach of contract and breach of fiduciary duty claims: "Plaintiff has made claims against defendants for breach of contract and breach of fiduciary duty.  If you decided that plaintiff has proved more than one of these causes of action, the same damages that resulted from multiple claims can be awarded only once."  Based on this instruction, it is perfectly reasonable that the jury found that Plaintiffs were entitled to damages for breach of contract and breach of fiduciary duty, but chose only to award damages for one of these claims, as instructed.

---

[2]    Furthermore, the Court's instruction regarding breach of contract did not require the jury to state a specific amount of damages in order to find a breach: "On the breach-of-contract claim, Plaintiff has the burden of establishing by a preponderance of the evidence: (1) that moneys were generated by defendants' licensing of rights to which money the RPGLA class was entitled; and (2) that at least some of any such money was not paid to the RPGLA class pursuant to the RPGLA."  Final Charge to the Jury No. 16, Docket No. 546 (filed November 6, 2008).

OPPOSITION TO DEFENDANTS'
RENEWED MOTION FOR JMOL
C07 0943 WHA

Nowhere on the Special Verdict Form does it say that the jury must award damages for each of Plaintiffs' claims if liability is established for both; choosing to put a damages number in one blank over the other is entirely consistent with the Court's instructions. Indeed, it was Defendants who urged the Court to adopt this instruction.[3]

**B.      Defendants Misstate and Fail to Acknowledge the Broad Scope and Nature of Plaintiffs' Damages Evidence.**

Defendants incorrectly state that "[t]he only damages evidence that Plaintiffs presented at trial was predicated upon the jury finding that GLA Class members were entitled to equal shares of the . . . gross licensing revenue ('GLR') pool." Motion at 4. This is not the first time Defendants have made this argument. During the charging conference on November 6, 2008, Defendants expressly asked that the jury be instructed that "the only damage evidence that's been presented to the jury is a claim to equal shares of the GLR pool." Trial Tr. 2589:18-23. The Court rejected Defendants' request by refusing to include such language in the final instructions.

---

[3]      There are many possible explanations for why the jury awarded damages for breach of fiduciary duty as opposed to breach of contract. For example, it would have been plausible for the jury to decide not to award damages pursuant to breach of contract in light of Paragraph 4(A)(v) of the 2000 Agreement between the NFLPA and PLAYERS INC. Hilbert Decl. Exh. B (Trial Exh. 95). Paragraph 4(A)(v) states: "Gross Licensing revenues shall exclude any revenues derived from the following: (v) amounts received by retired players pursuant to Group Licensing Assignments or Group Licensing Rights." *Id.* The jury could have reasonably concluded that this Agreement eliminated licensing revenue that should have been paid under the appropriate construction of the GLA, but since the conduct was also a breach of fiduciary duty, damages more properly were awarded in response to the fiduciary question.

As another example, the jury could have found breach of fiduciary duty from the Defendants' determination not to render the retired players eligible for sharing in the equal share royalty, particularly given the conflicts inherent in that decision by Defendants. Trial Tr. 748:4-11. Such a finding is perfectly consistent with a breach of the contract, but since the dollars were not treated as owed under the RPGLA because the retired players were later, without their knowledge or consent, rendered ineligible for payment, the damages more properly were awarded for breach of fiduciary duty.

Plaintiffs do not, of course, concede that the verdict would be inconsistent or improper in any way, even if the jury were not required to follow the jury charge on double-counting of damages (which, of course, they were). In addition to the above scenarios that are consistent with a finding of a breach of contract yielding zero damages and a breach of fiduciary duty yielding damages, Plaintiffs do not concede that a finding of no breach of contract at all (contrary to the verdict) would preclude breach of fiduciary duty damages. The jury could have found (but did not find) that the retired players were not included in the contracts but that the Defendants had a fiduciary duty to include them in the contracts. The damage number and methodology would be the same under either of those scenarios and the jury verdict should be upheld for that reason.

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
PALO ALTO

OPPOSITION TO DEFENDANTS'
RENEWED MOTION FOR JMOL
C07 0943 WHA

*See* Final Charge to the Jury No. 47, Docket No. 546 (filed November 6, 2008) (failing to include

Defendants' proposed language).

To say that Plaintiffs have not offered any evidence separate and apart from the "GLR

pool" is to penalize Plaintiffs simply for following the same methodology Defendants used.  As

Plaintiffs explained to the Court when it rejected Defendants' narrow characterization of

Plaintiffs' claim, the only reason Plaintiffs used the term "GLR pool" was that that was a term

used by Defendants:  "[Plaintiffs] completely disagree with [Defendants' proposed] instruction

because what [Plaintiffs] claim is the revenue.  They put it [the gross licensing revenue] in the

GLR pool, which is why [Plaintiffs] [] used the methodology that [they] did.  But [Plaintiffs']

claim is to the revenue from the license agreements.  And to start instructing the jury that

[Plaintiffs] have to be a part of the GLR pool is confusing and misleading to the jury, because

what [Plaintiffs are] claiming is the revenue."  Trial Tr. 2590:18-25; *see generally* Trial Tr.

2590:18-2591:8.

Defendants also fail to acknowledge that the jury had ample evidence to make an

appropriate determination of damages wholly apart from the actual calculation testified to by

Philip Rowley.  The jury had at its disposal all of the evidence required to make its own

calculation, including:  (1) all of the GLAs signed by the GLA Class (Exh. 1164-4); (2) a

summary list of each member of the GLA Class and the years in which each member had a GLA

in effect (Exh. 2057); (3) a chart of Total Royalty Payments by Year by Licensee during the

period FY 2003-2007 (Exh. 1217); (4) a chart of Royalty Payments showing the detail of actual

payments made by licensees during the period FY 2003-2007 (Exh. 1218); (5) documents

showing the NFLPA's own report of the amount of the equal share royalty for pertinent years,

including the total dollars paid out to active players, the amount of each annual check for the

equal share royalty, and the number of active players who received payments from the GLR pool

(Exhs. 1296, 1298 and 1299); and (6) copies of all of the pertinent license agreements (Exh.

1221).  *See* Hilbert Decl. Exhs. V (2057), C (1217), D (1218), S (1296), T (1298), U (1299), and

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
PALO ALTO

5

OPPOSITION TO DEFENDANTS'
RENEWED MOTION FOR JMOL
C07 0943 WHA

E (1221).[4]  The jury also had at its disposal testimony about how the NFLPA handled the revenue from such licenses.  Trial Tr. 1412:23-25; 1427:18-1434:6; 1838:14-21.  From these materials and testimony, the jury was free to determine any damage amount it deemed appropriate so long as that amount was supported by the evidence (as is the case here).

The possible range of damages is quite broad, and would certainly include the modest $7.1 million that the jury did award.  Indeed, the Court considered this very point during the charging conference and rejected Defendants' same contention that the evidence was insufficient:

> I'm going to deny this motion, because it looks to me like there's sufficient evidence from which the jury could figure out for each payment into the fund how many active players participated in it.  And we know how many class members there were by year. It's true that there is some loosey-goosey room on the practice squad people.  But if you look at the actual dollars that could be – it's going to be 150 to 200 per year.  And at a thousand dollars a pop, that's only 200,000, at most, out of 13, $14 million.  It's going to be so *de minimus* that this is close enough.  So that motion is denied.  There is – there is a methodology before the jury whereby they could crank the numbers and come up with – all right.

Trial Tr. 2559:20-2560:8.

For the same reason, Defendants' argument that the damage amount represents an award of the "ad hoc" payments in evidence is nothing more than raw speculation and legally improper. Although the jury could have based its damages award on other reasonable permutations of the evidence, we "need not – and indeed cannot – reconstruct the precise mathematical formula that the jury adopted.  Nor need we explore every possible quantitative analysis or compute the basis of each penny and dollar in the award." *NCRIC, Inc. v. Columbia Hosp. for Women Med. Ctr., Inc.*, 957 A.2d 890, 904 (D.C. 2008) (quoting *Carter v. Duncan-Huggins, Ltd.*, 727 F.2d 1225, 1239 (D.C. App. 1984)) ("Our inquiry ends once we are satisfied that the award is within a reasonable range and that the jury did not engage in speculation or other improper activity."). The jury's "award will be upheld as long as it is a 'just and reasonable estimate based on relevant data,' even if it is not proven with mathematical precision." *Id.* (citing *Affordable Elegance Travel, Inc. v. Worldspan, L.P.*, 774 A.2d 320, 329 (D.C. 2001)).  Defendants' attempt to "play Monday morning quarterback" and supplant the jury's evaluation of the complex and conflicting

---

[4]     Trial Exhibit 1164-4, which is all of the GLAs signed by the GLA Class, is fairly voluminous and thus is not included with the Hilbert Declaration.

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
PALO ALTO

6

OPPOSITION TO DEFENDANTS'
RENEWED MOTION FOR JMOL
C07 0943 WHA

evidence with their own is improper. *Los Angeles Memorial Coliseum Comm'n v. National Football League*, 791 F.2d 1356, 1367 (9th Cir. 1986).

### C. The Jury Had Sufficient Information To Determine That Plaintiffs Were Entitled To $7.1 Million In Damages For Breach Of Fiduciary Duty.

Courts give substantial deference to the jury's finding of the appropriate amount of damages. *Del Monte Dunes v. City of Monterrey*, 95 F.3d 1422, 1435 (9th Cir. 1995) (jury's damages figure must be affirmed "unless the amount is grossly excessive or monstrous, clearly not supported by the evidence, or based solely on speculation or guesswork."). Where, as here, a jury verdict is challenged for insufficiency of the evidence on damages, such verdict will be upheld if it is supported by "such relevant evidence as reasonable minds might accept as being adequate to support the conclusion reached. A court will not disturb a damage award unless it is clearly unsupported by the evidence." *LuMetta*, 824 F.2d at 770 (stating while the "evidence could not establish an exact monetary value to the agreement, it substantially supports the jury's finding of a formula by which such value could be ascertained."); *see also Del Monte Dunes*, 95 F.3d at 1435; *Oviatt v. Pearce*, 954 F.2d 1470, 1473 (9th Cir. 1992) (it is within the jury's province to determine credibility of witnesses in awarding damages). Here, there is no question the jury had sufficient information to determine that Plaintiffs were entitled to a modest $7.1 million in damages for their breach of fiduciary duty claim.

During trial, Philip Rowley carefully explained the methodology he used in calculating the various damages numbers in his report. Trial Tr. 1838:22-1850:2. Among the principles on which Mr. Rowley relied was that any proceeds owed to the GLA Class be divided on an equal share basis by the GLA Class members. Trial Tr. 1838:14-20. This is the same principle used by Defendants for active players (Trial Tr. 939:22-940:9; 1412:23-25), and was confirmed by one of Defendants' own witnesses, Dan Goich. Trial Tr. 2000:9-2001:14 ("That's the way I understood it. If you part of the group that earned the monies, you would share equally.").[5]

---

[5] Mr. Goich was in a position to know this because of the many meetings he attended where Defendants' officers explained the GLA program. Trial Tr. 1988:5-8; 1989:24-1990:6.

MANATT, PHELPS & PHILLIPS, LLP
ATTORNEYS AT LAW
PALO ALTO

OPPOSITION TO DEFENDANTS' RENEWED MOTION FOR JMOL
C07 0943 WHA

Also during trial, Defendants' expert, Dr. Roger Noll, testified that every single license agreement in this case was evidence of significant demand for a group that includes six or more active or retired players. Trial Tr. 2332:9-17 ("Q: You admit that, every single license in this case is economic evidence that there is significant demand for groups of six or more active or retired players. A: Yes."). In light of this wide-ranging demand, the jury could have determined that Plaintiffs were entitled to any number attributed to a specific licensee, or to any part of the income attributable to a licensee, or to part or all of the income attributable to any combination of licensees. Trial Tr. 1847:11-20; 1857:9-1859:1. The equal share principle explained by Mr. Rowley provides that the GLA Class receive its proportionate share of any such number.[6]

Plaintiffs introduced into evidence a chart prepared by Mr. Rowley showing each royalty payment made by a licensee during the relevant time period (Trial Exh. 1218) and a chart showing the annual payments made by each licensee during this period (Trial Exh. 1217). Hilbert Decl. Exhs. C (Trial Exh. 1217) and D (Trial Exh. 1218); *see also* Trial Tr. 1842:12-1844:6 (explaining the charts). In addition, Plaintiffs introduced into evidence 95 license agreements between Players Inc and its licensees. Trial Tr. 1690:4-1691:3; Hilbert Decl. Exh. E (Trial Exh. 1221) (listing the 95 license agreements that were entered into evidence).

Mr. Rowley explained to the jury how it could use these documents and his methodology to calculate what the GLA Class would be owed based on individual licenses. Trial Tr. 1857:9-1859:1 (explaining how the amount of Plaintiffs' damages could be determined on a licensee-by-licensee basis). Such an independent look could generate on an equal share basis any number within the dollar amount of those licenses divided by the number of players sharing equally (which the jury also had before it as admissible evidence).

Nor was the jury constrained by any particular application of the "equal share" formula in determining the uniform share to be awarded equally to retired players. Defendants themselves brought to the jury's attention the role of practice squad players who received a lesser uniform

---

[6] Adding the number of GLA class members (approximately 2062) to the number of active players (approximately 2300) yields a total number of players to share in the pool, which is then divided into the appropriate licensing revenues. The retired players' share is a percentage of the whole pie based on the number of eligible active players and the number of GLA retired players.

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
PALO ALTO

payment of $1000. Trial Tr. 1923:9-12. Thus, the jury was free to determine an appropriate damage award to the RPGLA Class on an equal share basis among the retired players based on the evidence. The number awarded by the jury is less than the total amount calculated by Mr. Rowley for all licensee revenue for all years and is well within the range of reason based on the evidence. The jury could have reduced the sharing percentage paid equally to retired players, the licensees from whom revenue was shared, or the particular revenue that was required to be shared. All that matters is that the number fall within the reasonable range based on the evidence admitted of licensing revenue paid and the amounts paid to active players. There is no debate that the number awarded by the jury here, a modest $7.1 million, was entirely reasonable and results in a payment per retired GLA Class member that is significantly less on a per year basis than the equal share payment made to active players.

Defendants make the baseless argument that the jury could choose from only eight numbers for damages: $29 million ($32 million with interest); $49 million ($54 million with interest); $61 million ($68 million with interest); or $73 million ($81 million with interest). Motion at 6. This argument is without merit for at least three reasons.

First, as noted above, Mr. Rowley explained to the jury how to determine appropriate damages amounts separate and apart from the eight numbers suggested in his damages report. Trial Tr. 1857:9-1859:1. More specifically, Mr. Rowley explained to the jury how it could use documents in evidence and his methodology to calculate what the GLA Class would be owed based on individual licenses. *Id.* (explaining how the amount of Plaintiffs' damages could be determined on a licensee-by-licensee basis).

Second, although Defendants insist that Mr. Rowley was presenting the jury with "damages evidence" (*see, e.g.,* Motion at 6), in fact Defendants won a motion *in limine* precluding Mr. Rowley from presenting anything but possible numerical alternatives which the jury could accept or replace with a number of its own. *See* Order Adopting Summary of Rulings on Motions *In Limine* Subject to Stated Modifications, Docket No. 494 (filed October 21, 2008) ("Mr. Philip Y. Rowley, shall be permitted to testify as to his *arithmetic calculation* of different damages amounts based upon various assumptions provided to him as to liability.") (emphasis

added); Transcript of October 15, 2008 Pre-Trial Hearing 39:21-23 (opposing counsel stating no objection to Mr. Rowley "[a]s long as Your Honor, he offers no opinion because he has no basis, that this is an appropriate measure of damages for this finding."). That is precisely what Mr. Rowley did, and the jury, as it had a right to do, chose a number of its own.

Third, "the jury is not bound to accept the bottom line provided by any particular damages expert." *In re First Alliance Mort. Co.*, 471 F.3d 977, 1002 (9th Cir. 2006); *see Creative Computing v. Getloaded.com, LLC*, 386 F.3d 930, 936 (9th Cir. 2004) (jury need not "blindly" adopt an expert's conclusions; validity of verdict depends on whether substantial evidence supports it, not whether the verdict matches expert testimony). As one of an essentially infinite number of examples supported by the evidence, the jury could have determined that Defendants breached their contractual and fiduciary duties to Plaintiffs only with respect to Electronic Arts ("EA") and calculated damages accordingly. Because EA was such a significant percentage of the total licensing revenue, the EA Agreement would support the full damage amount on any number of reasonable calculations that the jury could have made. *See Del Monte Dunes*, 95 F.3d at 1435.

**D.    Defendants' Attempt To Misapply The Court's Prior Comments About The Evidence Is Unavailing.**

As further support for their argument that the verdict awarding damages must be set aside, Defendants quote extensively from the trial transcript to suggest that the Court has somehow prophesied the granting of Defendants' Motion. Motion at 8-9. Defendants' argument in this regard is misleading and wrong, but Plaintiffs are confident that the Court will best understand the limited nature of its own prior remarks.

Before closing arguments, the Court expressed two concerns about Plaintiffs' case. The first was that the jury would find no breach of contract (which would suggest the parties did not reasonably expect that active and retired players would share revenues under the contract), but would find a breach of fiduciary duty (which could have the effect of validating the very contract provision at issue). Trial Tr. 2464:4-2466:9. This concern was never realized, however, because, by finding for Plaintiffs on breach of contract, the jury concluded "(1) that moneys were

OPPOSITION TO DEFENDANTS'
RENEWED MOTION FOR JMOL
C07 0943 WHA

1   generated by defendants' licensing of rights to which money the RPGLA class was entitled; and

2   (2) that at least some of any such money was not paid to the RPGLA class pursuant to the GLA."

3   Final Charge to the Jury No. 16, Docket No. 546 (filed November 6, 2008).

4          The Court's second concern was that Plaintiffs had not offered a damages methodology

5   that would exist separate and apart from Plaintiffs' breach of contract claim.  Trial 2463:1-21.  As

6   above, this concern never materialized because the jury returned verdicts of both breach of

7   contract and breach of fiduciary duty in Plaintiffs' favor.  *See, e.g.,* Trial Tr. 2463:17-19.  In fact,

8   the Court made clear that its concern was the potential of a negative jury finding for Plaintiffs on

9   contract interpretation that would make a jury finding of damage on fiduciary duty more difficult

10  to comprehend.  But, the jury found for Plaintiffs on the contract interpretation and damages are

11  fully supported by the evidence.  As explained in Section C immediately above, the jury had

12  ample evidence before it from which it could have arrived at the damage numbers at which it did

13  arrive.  As instructed, the jury did not double-count (see Section III.A above).

14       **E.      Defendants' Recycled Argument That Plaintiffs Failed To Prove**
             **Individualized Damages Fails For The Same Reasons It Failed In Previous**
15           **Motions.**

16         Defendants rehash their argument that Plaintiffs must prove individual damages.  The

17  Court already has rejected this argument several times, including in connection with the granting

18  of class certification, the denial of summary judgment, and the adoption of the jury instructions.

19  As already explained, the damages were properly presented and calculated on a class-wide basis

20  with an equal share or uniform methodology – the same methodology used by Defendants

21  themselves when distributing money to active players.  Trial Tr. 939:22-940:9; 1412:23-25.

22         Even assuming that Plaintiffs had to prove individualized damages, they already

23  accomplished this task by virtue of setting forth an "equal share" theory of recovery.  Under this

24  theory, each member of the GLA class was to share equally in the proceeds he should have but

25  did not receive as a result of signing the GLA.  Trial Tr. 1838:14-20.  Put another way, each

26  individual GLA class member was damaged in the same way as every other individual GLA class

27  member.  This alone moots Defendants' argument.

28

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
PALO ALTO

11

OPPOSITION TO DEFENDANTS'
RENEWED MOTION FOR JMOL
C07 0943 WHA

Defendants' contention that Plaintiffs must prove individual damages for each member of the GLA Class undermines the purpose of class actions. As Plaintiffs previously explained, an aggregate damages finding is often the preferable method of determining damages in class actions. *See* 3 Newburg on Class Actions ("Newburg") § 10.02 at 477 (4th ed. 2002) ("the ultimate goal in class actions is to determine the aggregate sum, which fairly represents the collective value of claims of individual class members.") (*citing Peterson v. Davenport Comm'ty Sch. Dist.*, 626 N.W.2d 99 (Iowa 2001)); *id.* at 479 ("it is not unusual, and probably more likely in many types of cases, that aggregate evidence of the defendant's liability is more accurate and precise than would be so with individual proofs of loss"). In fact, damages common to a class are often computed as an aggregate sum. *See id* § 10.03 at 479 ("One acknowledged occasion for aggregate proof of monetary relief is the situation in which monetary liability can be demonstrated by a mathematical computation based on a formula common to an identified class."); *see also Allapattah Servs. v. Exxon Corp.*, 157 F. Supp. 2d 1291, 1313 (S.D. Fla. 2001) ("The case law supports the calculation of compensatory damages . . . through a common mathematical factor in a class context."); *Windham v. Am. Brands, Inc.*, 565 F.2d 59, 68 (4th Cir. 1977) (rejecting individualized damages "in cases where the fact of injury and damage breaks down in what may be characterized as 'virtually a mechanical task,' 'capable of mathematical or formula calculation'").

*Brown v. Pro Football*, 146 F.R.D. 1, 3 (D.D.C. 1992) is illustrative. In *Brown*, the NFL defendants sought to de-certify a class action brought by the NFLPA on behalf of its professional football player members. Like Defendants here, the NFL alleged that "[t]he injury and damage determinations will require separate proof as to each class member; thus, common issues no longer predominate over individual issues as required by Fed. R. Civ. Pro. 23." *Id.* at 3. The NFL defendants sought to support this allegation by "examining several members of the class and highlighting the differences among them." *Id.* Nonetheless, the court noted that there existed numerous common issues of fact, including that "[e]ach member of the plaintiff class signed a similar contract to play on similarly-developed and -operated Development Squads for the same weekly salary." *Id.* at 7. With respect to damages, the court also noted that there was a "common

OPPOSITION TO DEFENDANTS'
RENEWED MOTION FOR JMOL
C07 0943 WHA

method of proof of damages." *Id*. The court stated: "Although individual circumstances necessarily exist among the members of the plaintiff class, a reasonable approximation of damages is achievable through a common formula. Thus, the factual basis of the damages is common to all members." *Id*.

As with the players in *Brown*, a reasonable approximation of the damages suffered by Plaintiffs in this case was achievable through a common formula. The jury's damage award was based on acts by Defendants that affected the GLA Class as whole, and are to be shared among the GLA Class members equally. Moreover, as explained above, Plaintiffs' damages are "demonstrated by a mathematical computation based on a formula common to an identified class." Newberg § 10.03 at 479. Mr. Rowley testified that Plaintiffs sought damages to the GLA Class as a whole based on an equal share basis – a reasonable class-wide formula. Trial Tr. 1838:14-20; *see also* Trial Tr. 2000:9-2001:14 (Defendants' witness confirming that equal share was consistent with the parties' expectations). Significantly, Mr. Rowley's methodology – *i.e.*, distribution to each retired player on an equal share basis – is the same methodology Defendants themselves use for active players. Trial Tr. 939:22-940:9; 1412:23-25. Such class-wide calculations are and were appropriate.

None of the cases Defendants cite support the proposition of individualized damages. In *Abuan v. General Electric Co.*, 3 F.3d 329, 334 (9th Cir. 1993), the court considered whether each member of a class of workers who claimed to be exposed to toxic chemicals was actually exposed to such materials. There was no discussion of individualized damages aside from a vague reference in *dicta*. Similarly, in *Kline v. Coldwell, Banker & Co.*, 508 F.2d 226, 238 n.8 (9th Cir. 1974), the court re-considered the district court's decision to certify a class of residential home sellers. The court determined that the case could not be maintained as a class action on the ground that, among other things, the individualized nature of each Plaintiff's claim made the class action unmanageable. *Kline v. Coldwell, Banker & Co.*, 508 F.2d 226, 238 n.8. Here, the class was properly certified.[7]

---

[7] Defendants' other cases are similarly inapposite. *Hilao v. Estate of Marcos*, 103 F.3d 767, 788 (9th Cir. 1996) is a case involving torture victims whose causation and damages will necessarily be distinct due to the nature of their injury. Moreover, *In re Hotel Telephone*

MANATT, PHELPS & PHILLIPS, LLP
ATTORNEYS AT LAW
PALO ALTO

OPPOSITION TO DEFENDANTS'
RENEWED MOTION FOR JMOL
C07 0943 WHA

# IV. THE JURY'S DETERMINATION ON PUNITIVE DAMAGES SHOULD STAND

## A. Plaintiffs Offered Clear and Convincing Evidence That Defendants' Actions Warranted Punitive Damages.

Defendants cannot meet the standard for overturning the jury's punitive damages award. Defendants cannot establish that no reasonable jury could interpret the evidence against them, and failing that, the motion must be denied. As above, this is not the first time Defendants have sought to re-introduce an argument that has already been rejected. During both the November 5 hearing on their Rule 50 motion and the November 6 charging conference, Defendants implored the Court not to instruct the jury on punitive damages. Trial Tr. 2481:14-2483:2; 2483:25-2484:14; 2593:19-24. The Court, having heard over two weeks of evidence by that time, thought that the matter was ripe for the jury and thus rejected Defendants' request. Trial Tr. 2486:1-2489:1; 2593:19-24. Indeed, as the Court observed during the hearing on Plaintiffs' Rule 50 motion:

> Here are some of the points that work in the plaintiffs' favor. You've got a contract that calls for an escrow and no escrow was ever set up. You've got a contract they tried for 14 years to get people to sign up, and not one penny was ever distributed under this contract. So what was the – why was that? And why was it so hard? It's true that you have some verbal testimony saying: "Yes, we tried to interest the licensees in the group licensing class members" but it's not strong evidence. It's verbal. And there is in writing a letter saying: "Don't use their names and images. You must scramble." It would have been nice if that same letter had said: "And, by the way, we stand ready to give you a group license on these people, or at least on a large number of them." But the defense person – I have forgotten her name – who wrote that letter, didn't do that. Instead, she said: "Don't use them." Now, I understand the explanation. But if the – if the defendants were so keen on trying to market these rights, that would have been a very natural opportunity to say: "And, by the way, we have 20,000 – I mean 2,053 signed up. We will license these to you for $10,000." Okay? For some reasonable sum over and above. Something to indicate in writing that there was a genuine, sincere effort to market. No, that did not occur.
>
> \*    \*    \*
>
> Instead, [LaShun Lawson of Players Inc] just says: "No. Scramble." Then, you have the problem with owing the favor and trying to help EA out and saving them money. One could infer that the defendants wanted to monopolize – that's too strong a word – wanted to keep someone else out, like [Take Two] . . . keep take two out of the market so that they would not emerge [as] an alternative source for football players. And that this was a preemptive move, a defensive move, to bottle

*Charges*, 500 F.2d 86 (9th Cir. 1974) is a case in which the court denied certification in a far-reaching antitrust suit, where, unlike here, common questions did not predominate over individual questions.

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
PALO ALTO

up the players and – it's not exclusive, but, nonetheless, make the players think that they were doing something so that they would not get any interest in Take Two. What I'm doing is reciting for the record a theory that the plaintiffs have in words, more or less, articulated, which would supply evil motive, supply greed, trying to trick the retired players.

Trial Tr. 2486:1-2488:6.

The facts below (as indicated by the Court above) demonstrate that Plaintiffs have met their burden by proving with clear and convincing evidence that Defendants acted with evil motive and that their conduct was outrageous, grossly fraudulent or reckless. *See United Mine Workers of Am. v. Moore,* 717 A. 2d 332, 341 (D.C. 1998).

> **1. Even Though Defendants Actively Solicited Plaintiffs To Sign GLAs, Defendants Never Intended To Honor Their Terms.**

Defendants called a number of witnesses to testify how they actively solicited retired players to sign GLAs. *E.g.,* Trial Tr. 498:19-24. These witnesses (all former executives of Defendants except Trace Armstrong, who is a candidate to replace former NFLPA Executive Director, Gene Upshaw) testified that they were trying to "help" retired players in requesting that all retired players turn over their licensing rights and allow Defendants to act as their representatives by going out and marketing these rights. Motion at 14 n. 9. But on cross-examination, these witnesses had no choice but to admit the obvious: Even though Defendants actively and aggressively solicited signed GLAs from their retired player members for years – thereby offering such players hope and implying that such signed GLAs had value – Defendants never marketed these players as a group. Trial Tr. 609:11-19; 947:7-18; 1242:13-15; 1244:1-5; 1249:11-14; 1263:3-5; 2108:14-20 Defendants also wanted the ability to be, as they put it, a "one-stop shop" for third parties who wanted to license the rights of active or retired players. Hilbert Decl. Exh. F (Trial Exh. 29). The GLAs allowed them to publicly proclaim that they represented more than 3500 retired players.[8] *See, e.g.,* Hilbert Decl. Exh. G (Trial Exh. 5).

After implementing the GLA program, Defendants then worked behind the retired players' backs to ensure that Defendants would never have to compensate retired players under

---

[8] Defendants altered this language within days of the filing of this lawsuit to state that Defendants represented "many memorable" retired players. Hilbert Decl. Exh. G (Trial Exh. 5).

MANATT, PHELPS & PHILLIPS, LLP
ATTORNEYS AT LAW
PALO ALTO

15

those agreements. For example, Defendants drafted "eligibility" standards that specifically excluded retired players, even though they have conceded that such standards could have included retired players if Defendants wished. *Id.* Hilbert Decl. Exh. H (Trial Exh. 96); Trial Tr. 545:9-12 (stating that there was nothing that could have prevented Defendants from defining eligibility in a manner to include retired players). In 2000, Defendants also executed a contract between themselves that excluded from the definition of "gross licensing revenue" amounts received by retired players pursuant to Group Licensing Assignments or Group Licensing Rights. Hilbert Decl. Exh. B (Trial Exh. 95). To make matters worse, even though Defendants knew that they did not intend to pay retired players under the GLA, they continued to offer retired players hope by stating in an issue of Touchback magazine – the newsletter for retired players – that the players' continued participation in the GLA program was "essential." Hilbert Decl. Exh. I (Trial Exh. 2046).

Finally, the GLA unambiguously defines retired player group licensing programs as "programs in which a licensee utilizes a total of six (6) or more *present or former player* NFL player images in conjunction with or on products that are sold at retail or used as promotional or premium items." Hilbert Decl. Exh. J (emphasis added) (Trial Exh. 110); *see also* Trial Tr. 541:15-24. Despite this clear language, Mr. Allen testified that a retired player would get paid under the GLA only "in the event that a third party like EA agreed to license the entire stable of retired players who had signed up under the GLA." Trial Tr. 759:23-760:3. Of course, this is not what the agreement says or contemplates nor was this rationale ever shared with the retired players.[9]

---

[9]      The GLA also mandated the creation of an escrow account for monies collected under the GLA. Mr. Allen testified that it was never created, which is an express breach of the GLA. Trial Tr. 746:5-7.

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
PALO ALTO

16

OPPOSITION TO DEFENDANTS'
RENEWED MOTION FOR JMOL
C07 0943 WHA

**2. Defendants Did Nothing To Market Retired Players' Images, And When A Third Party Expressed An Interest In Retired Players, Defendants Maliciously Went Behind Their Backs To Attempt To Cut Retired Players Out.**

Once they obtained the signed GLAs, and contrary to their obligations under the GLA,[10] Defendants intentionally did absolutely nothing. Even the former head of the union admitted as much. When asked "do you make efforts to sell that [retired players images] prior to them making requests," Mr. Upshaw nonchalantly responded "not really." Trial Tr. 609:11-19. Mr. Upshaw also infamously referred publicly to retired players as "dog food." Hilbert Decl. Exh. K ( RFA No. 19). When retired players complained about their lack of support from their fiduciary, Mr. Upshaw fired back by insinuating that he wanted nothing to do with retired players Defendants contracted to represent: "the bottom line is I don't work for them . . . they don't hire me, and they can't fire me. They can complain about me all day long. They can have their opinion. But the active players have the vote. That's who pays my salary." Trial Tr. 1529:8-14.

Of course, Defendants attempted at trial (and in their Motion) to argue that they did in fact use their "best efforts" to market retired players. Trial Tr. 928:12-15. But, in addition to Mr. Upshaw's own testimony, the overwhelming evidence established that they did not. For instance, Mr. Allen's wife, former Players Inc executive Pat Allen, testified that a list of retired players who had signed GLAs was available to all third party licensees (or potential licensees). Trial Tr. 2108:14-20. Yet, Players Inc's VP of Players Marketing, who worked directly under Ms. Allen, testified that he was not aware of such a list. Trial Tr. 2409:23-25. And EA's Joel Linzner testified that Defendants' largest licensee, EA, never was provided with a list of retired players who had signed GLAs. Trial Tr. 1243:13-15; 1244:1-5.

If that were not bad enough, Defendants went one step further: They affirmatively discouraged third-party licensees from licensing retired players so licensing revenue would not have to be shared with retired players. For example, in response to EA's request to utilize retired

---

[10] Mr. Allen testified that players had a right to believe that Defendants would aggressively market them. Trial Tr. 492:24-493:6. Mr. Linzner testified that Defendants were "an agent or middleman between the retired players and [EA] to license the rights of those retired players." Trial Tr. 1246:4-9.

players in the Madden video games, LaShun Lawson, a former assistant vice president at Players Inc, instructed EA to "scramble" their images. Hilbert Decl. Exh. L (Trial Exh. 1320). Defendants argue that they gave the scrambling instruction to protect retired players because the right to utilize their images was not in the EA Agreement. Trial Tr. 915:20-25. This rationalization contradicts on its face Defendants' oft-repeated mantra that the images of the class members were "worthless."

Other evidence has re-affirmed the original LaShun Lawson letter mentioning that EA should scramble the rights of retired players. Specifically, in an email chain about use of retired players images in the Madden games between EA and Ms. Lawson, EA wrote "I know that Players Inc. does not want us to include any retired players 'in the game' . . . ." Put simply, rather than offering the retired players to EA pursuant to EA's request (let alone marketing them to EA), Defendants refused EA's request to use retired players. Such conduct is outrageous, malicious and committed in reckless disregard of Plaintiffs' rights.

Finally, there was evidence that Defendants put the interests of third-party licensees before those to whom they owed a duty. In one instance, Players Inc was involved in negotiations between EA and certain retired players, such as Mr. Adderley, who were members of the Pro Football Hall of Fame. In an email between former NFLPA executive Clay Walker and Joe Nahra, Players Inc's in-house counsel, Mr. Walker bragged about selling out the retired players in proclaiming that EA owed him a "huge favor" because he "was able to forge this deal with the HOF that provides them with $400K per year (which is significantly below market rate)." Hilbert Decl. Exh. M (Trial Exh. 521).

Defendants in their motion have simply failed to make the adjustment to losing at trial. At trial, Defendants were free to argue their interpretation of the evidence and to try to convince the jury to believe their story, however lacking in credibility it might be. Now that the jury has spoken, however, Defendants are not free to argue the evidence in the light most favorable to them. To obtain JMOL, Defendants must establish that no reasonable jury could have concluded that they acted with the requisite intent, as the jury so clearly found. The evidence, however, was strongly to the contrary, and it is clear from the examples above that a reasonable jury could have

Manatt, Phelps &
Phillips, LLP
Attorneys At Law
Palo Alto

18

OPPOSITION TO DEFENDANTS'
RENEWED MOTION FOR JMOL
C07 0943 WHA

1  concluded, as it did, that there was clear and convincing evidence that Defendants' conduct was

2  outrageous and that they acted with evil motive toward Plaintiffs.

3       **B.     The Punitive Damages Award Is Well Within Constitutional Limits.**

4       Defendants argue that the $21 million punitive damages award must be dramatically

5  reduced to a one-to-one ratio with the compensatory damages award because, under the Supreme

6  Court's holding in *State Farm Mutual Automobile Ins. Co. v. Campbell,* 538 U.S. 408 (2002)*,* an

7  award of three times compensatory damages "stretches the constitutional limit." Motion at 18-19.

8  This is absolutely false.  In fact, none of the cases that Defendants cite, let alone *State Farm¸*

9  articulate a rule that only a one-to-one ratio between compensatory and punitive damages is

10  appropriate.  In fact, as set forth below, <u>all</u> of Defendants' authorities actually support denial of

11  Defendants' request that the jury's punitive damages award be reduced.

12       In *State Farm,* the Supreme Court did not, as Defendants argue, even suggest that a one-

13  to-one ratio was required.  To the contrary, the Supreme Court expressly declined "to impose a

14  bright line ratio which a punitive damages award cannot exceed." *Id*. at 425.  Rather, the Court

15  held that "fee awards exceeding single digit ratios between punitive and compensatory damages,

16  to a significant degree, will satisfy due process."  In reaching this conclusion, the Court surveyed

17  its prior decisions, including its decision in *Pacific Mutual Life Insurance Co. v. Haslip,*[11] which

18  allowed punitive damages four times greater than compensatory damages, and observed, "single-

19  digit multipliers are more likely to comport with due process, while still achieving the state's

20  goals of deterrence and retribution, than awards with ratios in the range of 500 to 1, or in this

21  case, of 145 to 1." *Id.* at 410.  The Supreme Court further noted that although ratios that are

22  "double, treble or quadruple . . . are not binding, they are instructive." *Id.* at 425; *see also TXO*

23  *Prod. Corp. v. Alliance Res. Corp.,* 509 U.S. 443 (1993) (upholding a $10 million punitive

24  damage award despite the fact that it was over 526 times as large as the actual damage award of

25  $19,000).

26

27  ───────────────
    [11]     In *Haslip,* the Supreme Court further noted that "an award of more than four times the
28  amount of compensatory damages might be close to the line of constitutional impropriety."
    *Haslip,* 499 U.S. 1, 23-24 (1991).

MANATT, PHELPS & PHILLIPS, LLP
ATTORNEYS AT LAW
PALO ALTO

19

OPPOSITION TO DEFENDANTS'
RENEWED MOTION FOR JMOL
C07 0943 WHA

Nor do the other cases Defendants cite support their position.  In *Mendez v. Gonzalez*, 540 F.3d 1109 (9th Cir. 2008) , the Ninth Circuit reduced the punitive damages award because the ratio was 250,000:1.  In *Daka Inc. v. McCrae*, 839 A.2d 682 (D.C. 2003) , the D.C. Court of Appeals reduced an award with a 26:1 ratio because it significantly exceeded the single digit ratio (*i.e.*, greater than 9:1).[12]  And in a post-*State Farm* Ninth Circuit case that Defendants neglected to cite, the Ninth Circuit upheld a 7:1 ratio and noted that "this is, of course, a single-digit ratio, far below the ratios at issue in *BMW, Cooper Industries and State Farm.*  <u>We are aware of no Supreme Court or Ninth Circuit case disapproving of a single-digit ratio between punitive and compensatory damages, and we decline to extend the law in this case.</u>"  *Zhang v. Am. Gem Seafood, Inc.,* 339 F.3d 1020, 1044 (9th Cir. 2003) (emphasis added); *see also S. Union Co. v. Irvin*, 2008 U.S. App. LEXIS 23403, *5-6 (9th Cir. Nov. 7, 2008) (upholding a 3:1 ratio of punitive to compensatory damages).

Here, the jury's punitive damages award of $21 million dollars is well within the single-digit range that the Supreme Court found to be instructive in evaluating whether a punitive damages award satisfied due process.  In fact, since *State Farm*, a number of courts throughout the country have upheld punitive damages awards with ratios that were far greater than the 3:1 ratio in the case at bar.  *See, e.g. Kemp v. AT&T,* 393 F.3d 1354 (11th Cir. 2004) (2,173:1 ratio affirmed in RICO class action); *Lincoln v. Case,* 340 F.3d 283 (5th Cir. 2003) (110:1 ratio upheld in discrimination action); *Mathias v. Accor Econ. Lodging,* 347 F.3d 672 (7th Cir. 2003) (affirming 37:1 ratio); *Bogle v. McClure,* 332 F.3d 1347 (11th Cir. 2003) (upholding 4:1 ratio in employment discrimination lawsuit).

Even in those cases where punitive damages have been reduced to comply with constitutional limits, they have been reduced to a greater ratio than Plaintiffs were awarded here.  *See, e.g., Stogsdill v. Healthmark Partners, LLC,* 377 F.3d 827, 833 (8th Cir. 2004) (reducing

---

[12]     Defendants also cite *Rwanda v. Johnson,* 409 F.3d 368, 376 (D.C. Cir. 2005) for the proposition that punitive damages should be reduced to a 1:1 ratio if compensatory damages are reduced.  But, although the *Rwanda* court remanded the action for reconsideration of the punitive damages award after the compensatory damages were reduced, it did so "without suggesting that [the punitive award] is necessarily inappropriate."  *Id.* at 22.

OPPOSITION TO DEFENDANTS' RENEWED MOTION FOR JMOL
C07 0943 WHA

punitive award to 4:1 in medical malpractice action); *Eden Elec., Ltd v. Amana Co.,* 370 F.3d 824, 829 (8th Cir. 2004) (reducing punitive award to a ratio of 4.76:1).

Because the jury's punitive damages award is well within the ratio contemplated by the Supreme Court and other authoritative courts, it should not be disturbed.

## V.    THE JURY'S DETERMINATION ON FIDUCIARY DUTY SHOULD BE UPHELD

### A.    Defendants' Recycled Arguments On Fiduciary Duty Liability Fail For The Same Reasons That They Failed In Defendants' Motion For Summary Judgment And Previous Motion Under Rule 50.

Both parties presented abundant evidence concerning the existence of a fiduciary relationship. Under D.C. law, agency is a broad concept. It is determined based upon the agreement, the circumstances surrounding the agreement, and the parties' relationship. *See* Final Charge to the Jury No. 37, Docket No. 546 (filed November 6, 2008) ("In evaluating whether defendants undertook to be an agent with fiduciary duties, you must consider not only the actual words used in the agreement, but all of the circumstances surrounding the licensed rights at issue and the parties' relationship.").

The law of agency takes into account the factual context between the parties. *See, e.g., C&E Servs., Inc. v. Ashland, Inc.*, 498 F. Supp. 2d 242, 264 (D.D.C. 2007) ("[I]n determining whether an agency relationship exists, courts examine both 'the terms of [the] contract . . . and . . . the actual course of dealings between the parties.'") (quoting *Judah*, 744 A.2d at 1040).[13] The Restatement (Third) of Agency § 1.01, accepted as authoritative by the D.C. courts,[14] acknowledges: "Agency encompasses a wide and diverse range of relationships and circumstances. . . . Authors, performers, and athletes often retain specialized agents to represent their interests in dealing with third parties. Some industries make frequent use of nonemployee

[13]    As a further example of the breadth of agency, the Second Circuit examined the metes and bounds of an advertiser-advertising agency relationship in *Columbia Broadcasting Systems, Inc. v. Stokely-Van Camp, Inc.*, 522 F.2d 369, 374-77 (2d Cir. 1975). In that case, the court recognized that findings of agency and authority are not governed exclusively by the same considerations as the employee/independent contractor dichotomy. *See id.* at 375 ("We also are fully aware that an independent contractor, one who is not subject to the right of another to control his physical conduct in the performance of an undertaking, may or may not be an agent."). In the context of this particular relationship, the court noted that "professional agents can properly assume that they have the authority usually exercised by others in the same field." *Id.* at 376.

[14]    The District of Columbia follows the Restatement of Agency.   *C & E Servs., Inc. v. Ashland*, 498 F. Supp. 2d 242, 264 n.12 (D.D.C. 2007).

MANATT, PHELPS & PHILLIPS, LLP
ATTORNEYS AT LAW
PALO ALTO

OPPOSITION TO DEFENDANTS'
RENEWED MOTION FOR JMOL
C07 0943 WHA

agents to communicate with customers and enter into contracts that bind the customer and a vendor." In determining whether an agency relationship exists, and in evaluating the factors that support a finding of agency, the jury is entitled to look at the course of dealing between the parties. *See Judah*, 744 A.2d at 1040 ("In deciding [whether there is an agency relationship], courts will look to . . . the actual course of dealings between the parties."). D.C. courts have emphasized the importance of looking at the course of dealing in evaluating a potential agency relationship. *See C&E Servs.*, 498 F. Supp. 2d at 264 (D.D.C. 2007).

Control is one factor to be considered (*see* Trial Transcript 2811) (Jury instructions); however, the type and level of control is dependent upon the type of relationship.[15] For example, although agency covers the employer/employee relationship, and, *in that context*, control is often a key distinction between an employee and an independent contractor[16] (*see Safeway Stores, Inc. v. Kelly*, 448 A.2d 856, 860 (D.C. 1982)), other contexts suggest that control may be quite attenuated and still permit a finding of agency. *See Green v. H & R Block, Inc.*, 735 A.2d 1039, 1051 (Md. 1999) ("In sum, the control a principal exercises over its agent is not defined rigidly to mean control over the minutia of the agent's actions, such as the agent's physical conduct, as is required for a master-servant relationship. The level of control may be very attenuated with respect to the details. However, the principal must have ultimate responsibility to control the end result of his or her agent's actions; such control may be exercised by prescribing the agents' obligations or duties before or after the agent acts, or both.") (cited in Restatement (Third) of Agency § 1.01(f)). Agency also covers the broker/investor relationship, where a determination of agency is *more* likely if the investor does not control the day-to-day activities of the broker, and

---

[15] Ironically, despite claiming that "day-to-day" control is a *sine qua non* of a fiduciary relationship, the NFLPA recently initiated a lawsuit against the NFL and the NFL Management Council in which it alleged breach of fiduciary duty without even referencing the same type of onerous "control" requirement Defendants insist on here. *See National Football League Players Association v. National Football League and National Football League Management Council,* Case No. 08CV6254 RHK/JJG (D. Minn. December 4, 2008), attached as Exhibit N to the Hilbert Declaration (StarCaps Complaint).

[16] Employer/employee is the exclusive category on which Defendants wish – erroneously – to rely. *See* Motion at 19, 21 (citing only employment cases: *Giles v. Shell Oil Corp.*, 487 A.2d 610,611 (D.C. 1985); *Ames v. Yellow Cab of D.C., Inc.*, 2006 WL 2711546 (D.D.C. 2006); *LeGrand v Ins. Co. of North Am.*, 241 A.2d 734 (D.C. 1968); *Environmental Research Int'l, Inc. v. Lockwood Greene Engineers, Inc.*, 355 A.2d 808, 812 n. 7 (D.C. 1976).

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
PALO ALTO

22

OPPOSITION TO DEFENDANTS'
RENEWED MOTION FOR JMOL
C07 0943 WHA

instead, the broker retains control over those activities. *See Merrill Lynch v. Cheng*, 901 F.2d 1124, 1128 (D.C. Cir. 1990) ("A broker is an agent who owes his principal a duty to act only as authorized."); *Lieb v. Merrill Lynch*, 461 F. Supp. 951, 954 (E.D. Mich. 1978) (considering whether the broker had "usurped actual control over a technically non-discretionary account" in determining the extent of duties owed to the investor); *Robles v. Consol. Graphics, Inc.*, 965 S.W.2d 552, 557 (Tex. App. 1997) ("Clearly, Robles was hired by both CCI and Gulf Printing on a commission basis to make or negotiate bargains or contracts on their behalf in matters of trade and commerce. Accordingly, Robles was acting as an agent and broker for both Gulf Printing and CCI.").

In the context of a parent and a subsidiary, a court has recognized that agency may be found if "the parent exercises its control in a manner more direct than by voting a majority of the stock in the subsidiary or making appointments to the subsidiary's Board of Directors." *See TransAmerica Leasing, Inc. v. Venezuela*, 200 F.3d 843, 849-850 (D.C. Cir. 2000). Importantly, D.C. cases emphasize that the *right* to control, rather than its actual exercise, is the proper focus when determining agency. *See Judah*, 744 A.2d at 1040. Defendants have not cited and cannot cite a case in which a member of a large class must specifically control the day-to-day activities of his agent. Such a minute level of control by thousands of individuals is an absurd concept.

As noted immediately below, the jury instructions offered many different factual scenarios, any one of which may amount to a fiduciary relationship in the context of the GLA relationship. Based upon its consideration of such factors, the jury properly found an agency relationship.

1.    **There Was Sufficient Evidence To Show That The Parties Reasonably Expected That Defendants Were Plaintiffs' Marketing Agents.**

The evidence indicated a reasonable expectation of the parties both that the Defendants would act as their marketing agents and that the Class would share in marketing proceeds. This same evidence supports the jury's conclusion that Defendants in fact were the marketing agents of the GLA Class members. For example, Players Inc sent solicitation letters to retired players to sign a GLA "on a regular basis." Trial Tr. 498:19-24; Hilbert Decl. Exhs. O (Trial Exh. 23) and I

MANATT, PHELPS & PHILLIPS, LLP
ATTORNEYS AT LAW
PALO ALTO

23

OPPOSITION TO DEFENDANTS'
RENEWED MOTION FOR JMOL
C07 0943 WHA

(Trial Exh. 2046).   The players were told that their participation in group licensing was "essential."  *Id.*, Exh. I (Exh. 2046).  A letter from Doug Allen implored the retired players to "[j]oin the thousands of retired NFL players who have provided their name and image rights to the NFLPA and Players Inc.  You may get the opportunity to receive royalty payments or appearance fees."  Hilbert Decl. Exh. O (Trial Exh. 23).   Mr. Allen testified that players had a right to believe that Players Inc. would market them:

> Q. So anybody who was retired, that was asked to sign a GLA and signed a GLA, would have a right to believe that what Players Inc was going to do for them is take the helmets off the players and market them as personalities as well as professional athletes, correct?
>
> A. . . . .  Yes.

Trial Tr.  492:24-493:6.

> Q.      So any retired player who was being asked to sign a group licensing authorization by the union would have a right to believe from this [website] that Players Inc had been aggressive on behalf of retired players to expand their marketing opportunities, right?
>
> A. That's correct.

Trial Tr. 493:17-22.

Players Inc also gave the impression to the rest of the world that it was responsible for marketing the retired players.  Its website stated that it represented "over 3,000 retired players".  Hilbert Decl. Exh. G (Trial Exh. 5).  Similarly, it touted itself in its marketing materials as the "one-stop licensing and market shop for NFL players".[17]   Hilbert Decl. Exh. F (Trial Exh. 29).  Even Players Inc's own licensees – including Mr. Linzner of Electronic Arts, Defendants' biggest licensee – were led to believe that Players Inc acted as an agent for the retired players:

> Q. Is it true that you understood that, in effect, the NFLPI, Players Inc was acting as a sort of agent for retired players in dealing with you?
>
> A. Yeah, they were an agent or middleman to- between the retired players and us to license the right of those retired players.

---

[17]      Defendants even testified at trial that they used their "best efforts" to market the retired player group rights and were "aggressive in . . . efforts to expand [retired] player marketing opportunities."   Trial Tr. 928:12-15;  Trial Tr. 1620:25-1621:4.  In further support of the fulfillment of their fiduciary obligations, they offered evidence of their marketing materials.  Trial Tr. 810:55-812:3.

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
PALO ALTO

Trial Tr. 1246:4-9.

Not surprisingly, in part because of Defendants' efforts, the GLA class members testified that they reasonably believed that Players Inc had a duty to market them and to generate revenue for them.

> Q. Did you have a mindset about what the union was going to do on your behalf under this agreement?
>
> A. I assumed they're acting as an agent for active and retired players, and they were going to try to get deals for us, and we would get paid.

Trial Tr. 980:23-981:2.

> Q. All right. So you signed [the GLA], right? And you're giving them what?
>
> A. The right to act as my agent. I'm giving them my image as a professional football players.
>
> Q. And did you think they were going to do anything with that right?
>
> A. I assumed so. Why would they ask me to sign something?
>
> Q. All right. And what did you expect them to do?
>
> A. I expected them to market retired and active players in the group licensing agreements.
>
> Q. As your what?
>
> A. As my representative, my agent, whatever you want to call them.

Trial Tr. 990:8-20.

> Q. And tell me what you expected to happen after you signed this agreement, Mr. McNeil. Did you think you were going to do something, or did you think Union was going to do something?
>
> A. I felt that the Union was going to market the rights to six or more players to a third party and that there would be revenue or income generated, and I would get an opportunity to earn some monies.

Trial Tr. 364:2-9.

> Q. What did you expect from the union, if anything?
>
> A. Well, my-- my belief was that these particular documents, the GLA would probably be collected by the union, and then the union would take those and market it through -- through a third party.

Trial Tr. 1087:11-15.

MANATT, PHELPS & PHILLIPS, LLP
ATTORNEYS AT LAW
PALO ALTO

The GLA Class members also testified that they had a reasonable expectation of sharing in the money generated from such group licensing:

> Q. And if the union was able to sell a group license of six or more present or active players . . . did you think you were entitled to share in the money?
>
> A. Yes.
>
> Q. And what led you to believe that?
>
> A. Because [the GLA] says it's a collective-- it's a group licensing agreement . . . .

Trial Tr. 1087:16-23.

> Q. And why did you sign [the GLA]?
>
> A. Because I thought I would still have a shot at licensing monies if it came to fruition.

Trial Tr. 990:21-23. Of course, this is not surprising because the GLA states as much: "the moneys generated by such licensing of retired player group rights will be divided between the player and an escrow account for all eligible NFLPA members who have signed a group licensing authorization form." Hilbert Decl. Exh. J (Trial Exh. 110). Indeed, Defendants' own expert, Dr. Roger Noll, testified that retired players could expect payment from video games like EA's popular Madden franchise:

> Q. So if such a game existed that had historical teams, retired players who signed a GLA's could expect significant revenues from such a game, correct?
>
> A. Might expect, yes.

Trial Tr. 2211:15-18.

Based on evidence such as this, a jury could conclude that the parties' reasonable expectations were that the Defendants would promote and market the retired players as their agents and that the retired players would share in the proceeds. The same evidence supports the conclusion that the Defendants, in fact, undertook to be their marketing agent and to affirmatively promote the retired player rights. *See Los Angeles Land Co.*, 6 F.3d at 1425 (JMOL must be denied if, construing the evidence in the light most favorable to the non-moving party, there is substantial evidence for any reasonable interpretation that supports the jury's verdict).

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
PALO ALTO

26

OPPOSITION TO DEFENDANTS'
RENEWED MOTION FOR JMOL
C07 0943 WHA

## 2. There Was Sufficient Evidence Of The Right To Control And/Or The Right To Discharge On Behalf Of Plaintiffs.

The GLA evidences the ability to control[18] and to discharge. For example, Defendants concede that the GLA allows any assignee to opt out of any particular program which he believes conflicts with another program in which he is participating. Motion at 22; *see also* Hilbert Decl. Exh. J (Trial Exh. 110) ("If the undersigned player's inclusion in a particular NFLPA program will conflict with an individual exclusive endorsement agreement and the players provides the NFLPA with timely notice of that conflict, the NFLPA aggress to exclude that player from that particular program").

Similarly, the GLA limited the scope of representation to that of group licensing of "6 or more" players. Hilbert Decl. Exh. J (Trial Exh. 110) ("The undersigned player retains the right to grant the use of his image to another entity for use in a group of five (5) or less present or former players . . . ."). Defendants themselves displayed several examples to the jury of class members who had sought to limit the scope of their particular GLA. For example, one GLA Class member testified that he thought he could opt out of any licensing program involving products associated with alcohol. Trial Tr. 1094:21-1095:14.

Furthermore, Plaintiffs' witnesses testified they had the right to some control over Defendants regarding the GLA. For example, Mr. Adderley testified:

Q. Did you have control over the NFLPA with respect to this agreement?

A. Yes.

Q. And what control did you have, sir?

A. Well, if there was a conflict of interest and they wanted to use me in a promotion, for example, if I was doing something for Nike and they wanted me to do something for Reebok, I could say: "Wait, this is a conflict of interest." Or, if they asked me to come in and do something with alcohol or tobacco, I could say: "No, I don't want any part of it."

Trial Tr. 1508:17-1509:3. Messrs. Beach and Laird also testified along these lines. *See* Trial Tr. 1094:24-1095:14 (Beach) and 989:2-17 (Laird).

---

[18] Although Defendants inaptly focus on this point as applied solely to an employer/employee relationship, it is, according to the law, to be construed in accordance with the circumstances.

Plaintiffs' understanding of their control over Defendants was also corroborated by Defendants' actions. In 2005, Defendants revised the GLA. Unlike the prior version that was signed by the GLA Class members, the new GLA stated that it could not be "revoked or terminated by the undersigned player" prior to the expiration date. Hilbert Decl. Exh. P (Trial Exh. 506). The fact that Defendants needed to include new language precluding revocation indicates that such a right existed beforehand.

When viewed as a whole, there is no question there was sufficient evidence of the right of control in the record to support the jury's verdict.

### 3. There Was Sufficient Evidence Of The Parties' Financial Arrangement To Support The Jury's Verdict On Fiduciary Duty.

Another important factor in determining the existence of a fiduciary relationship is "the financial arrangement between [Plaintiffs] and [Defendants]." Final Charge to the Jury No. 39, Docket No. 546 (filed November 6, 2008). One purpose of this factor is to determine whether the GLA was a mere license that excused Defendants from any remaining obligation to the Class upon the payment of a sum certain, or a license that obligated Defendants to attempt to generate income for the Class such that they would get paid for having licensed their rights to Defendants.

The evidence was clear in this regard. It is undisputed that the GLA Class members were not paid merely for signing the GLA. Trial Tr. 431:14-18; 1057:11-13. It is also undisputed that the GLA Class members had to rely on Defendants' ability and effort to sell their images to third parties, who were not even permitted under their license agreements to talk with retired players. *See, e.g.,* Hilbert Decl. Exhs. Q (Trial Exh. 65) and R (Trial Exh. 66).

Any one of these factors in the context of the GLA is sufficient to support the jury's finding of a fiduciary relationship.

### B. There Was Sufficient Evidence for the Jury to Conclude that Defendants Breached Their Fiduciary Duties to Plaintiffs.

Defendants argue that "there was also insufficient evidence to support the jury's breach of fiduciary duty verdict." Motion at 26. The reasons Defendants cite in support of this argument are the same reasons they cite in connection with their arguments on compensatory damages and

punitive damages. More specifically, Defendants claim that there is insufficient evidence to show breach of fiduciary duty based on the jury's purported rejection of Plaintiffs' claim for equal shares of the GLR pool. Motion at 26. Defendants' argument on this issue lacks merit for the same reasons explained in Sections I and II above. For this reason, and the reasons given above, there is no question that there was sufficient evidence to show that Defendants breached their fiduciary duties to Plaintiffs. The jury's verdict on this issue should be upheld.

## VI.    CONCLUSION

Defendants try mightily to undermine an entirely proper verdict in which the jurors' dutifully followed the Court's instruction (proposed by Defendants) not to double-count damages applying both to breach of contract and breach of fiduciary duty. But following this instruction did not lead to an inconsistent verdict, nor to a verdict that generated an unconstitutional ratio of punitive damages, nor to a verdict that supports any of Defendants' other recycled arguments. Therefore, Plaintiffs respectfully request that Defendants' Motion be denied.

Dated: December 18, 2008                 Respectfully submitted,

                                         MANATT, PHELPS & PHILLIPS, LLP

                                         By: /s/ L. Peter Parcher
                                              L. Peter Parcher (*pro hac vice*)
                                              Ronald S. Katz (SBN 085713)
                                              Chad S. Hummel (SBN 139055)
                                              Ryan S. Hilbert (SBN 210549)
                                              Noel S. Cohen (SBN 219645)
                                         1001 Page Mill Road, Building 2
                                         Palo Alto, CA 94304-1006
                                         Telephone: (650) 812-1300
                                         Facsimile: (650) 213-0260

                                         MCKOOL SMITH, P.C.
                                         Lewis T. LeClair (SBN 077136)
                                         Jill Adler Naylor (SBN 150783)
                                         300 Crescent Court
                                         Dallas, TX 75201
                                         Telephone: (214) 978-4984
                                         Facsimile: (214) 978-4044

                                         *Attorneys for Plaintiffs*

Manatt, Phelps &
Phillips, LLP
Attorneys At Law
Palo Alto

29

OPPOSITION TO DEFENDANTS'
RENEWED MOTION FOR JMOL
C07 0943 WHA