Todd Padnos (Bar No. 208202)
*tpadnos@dl.com*
DEWEY & LEBOEUF LLP
One Embarcadero Center, Suite 400
San Francisco, CA 94111
Tel: (415) 951-1100; Fax: (415) 951-1180

Jeffrey L. Kessler (*pro hac vice*)
*jkessler@dl.com*
David G. Feher (*pro hac vice*)
*dfeher@dl.com*
David Greenspan (*pro hac vice*)
*dgreenspan@dl.com*
DEWEY & LEBOEUF LLP
1301 Avenue of the Americas
New York, NY 10019
Tel: (212) 259-8000; Fax: (212) 259-6333

Kenneth L. Steinthal (*pro hac vice*)
*kenneth.steinthal@weil.com*
WEIL, GOTSHAL & MANGES LLP
201 Redwood Shores Parkway
Redwood Shores, CA 94065
Tel: (650) 802-3000; Fax: (650) 802-3100

Bruce S. Meyer (*pro hac vice*)
*bruce.meyer@weil.com*
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, NY 10153
Tel: (212) 310-8000; Fax: (212) 310-8007

Attorneys for Defendants National Football League Players Association
and National Football League Players Incorporated d/b/a Players Inc

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| BERNARD PAUL PARRISH, HERBERT ANTHONY ADDERLEY, WALTER ROBERTS III, <br><br>         Plaintiffs, <br><br>    v. <br><br> NATIONAL FOOTBALL LEAGUE PLAYERS ASSOCIATION and NATIONAL FOOTBALL LEAGUE PLAYERS INCORPORATED d/b/a/ PLAYERS INC, <br><br>         Defendants. | Case No. C 07 0943 WHA <br><br> **DEFENDANTS' REPLY BRIEF IN FURTHER SUPPORT OF THEIR RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW** <br><br> Date: January 8, 2009 <br> Time: 2:00 pm <br> Ctrm: 9 <br> Judge: William H. Alsup |

Dewey & LeBoeuf LLP
One Embarcadero Center, Suite 400
San Francisco, CA 94111

---

Defendants' Reply Brief in Further Support of Motion for JMOL      Civ. Action No. C07 0943 WHA

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................... iii

PRELIMINARY STATEMENT ......................................................................................... 1

ARGUMENT ....................................................................................................................... 2

I.  THE $7.1 MILLION COMPENSATORY DAMAGES AWARD CANNOT
    STAND ..................................................................................................................... 2

    A.  The Jury Rejected Plaintiffs' GLR Pool Damages Theory ................................. 2

    B.  Having Rejected Plaintiffs' GLR Pool Contractual Damages Theory,
        There Was No Evidence Upon Which The Jury Could Reasonably
        Award Fiduciary Duty Damages ......................................................................... 4

        1.  "There's No Evidence on This [Mr. Hollywood] Point" ........................ 4

        2.  There is No Basis for Plaintiffs' Argument That the Jury Could
            Have Reasonably "Calculated" the $7.1 Million Damages
            Award from the Trial Evidence ............................................................... 5

        3.  The $7.1 Million Damages Award Was Improperly Based on
            the Ad Hoc Licensing Payments ............................................................. 8

    C.  There Is No Evidence Or Formula In The Record For Awarding The
        $7.1 Million Amount To Individual Class Members, And Plaintiffs
        Made No Showing Of Individual Damages ......................................................... 10

II. THE JURY'S PUNITIVE DAMAGES AWARD MUST ALSO BE VACATED .......... 11

    A.  Plaintiffs Point To No Evidence Upon Which A Reasonable Jury
        Could Award Punitive Damages .......................................................................... 11

        1.  Plaintiffs Point to No Evidence that Defendants Acted with the
            Requisite Mental State ........................................................................... 12

        2.  Defendants' Conduct Cannot Support Punitive Damages Under
            D.C. Law .................................................................................................. 13

    B.  Alternatively, The Punitive Damages Award Should Be Dramatically
        Reduced ................................................................................................................ 14

*Dewey & LeBoeuf LLP*
*One Embarcadero Center, Suite 400*
*San Francisco, CA 94111*

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

III. THERE IS INSUFFICIENT EVIDENCE TO SUSTAIN THE JURY'S FINDING OF LIABILITY ON THE BREACH OF FIDUCIARY DUTY CLAIM ..............................................................................................15

    A.    Plaintiffs Failed To Present Sufficient Evidence Of A Fiduciary Relationship ..........................................................................15

           1.    Plaintiffs Lacked the Requisite Control Over Defendants ....................15

           2.    Plaintiffs Did Not Have a Right of Early Termination ...........................17

           3.    Defendants Did Not Undertake to Act as Plaintiffs' Marketing Agents ..............................................................................17

           4.    The Fiduciary Duty That Plaintiffs Seek to Impose Was Beyond the Parties' Reasonable Expectations .......................................18

           5.    The Financial Arrangement Between the Parties Could Not Support the Finding of a Fiduciary Duty .................................................19

    B.    Plaintiffs Have Not Proven Any Breach Of Fiduciary Duty .............................20

CONCLUSION ..............................................................................................20

Dewey & LeBoeuf LLP
One Embarcadero Center, Suite 400
San Francisco, CA 94111

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**CASES**

Abuan v. General Elec. Co.,
   3 F.3d 329 (9th Cir. 1993) ..................................................................10

Allapattah Servs. v. Exxon Corp.,
   157 F. Supp. 1291 (S.D. Fla. 2001) ....................................................11

Arnold Prods., Inc. v. Favorite Films Corp.,
   298 F.2d 540 (2d Cir. 1962) ...............................................................18

Austin v. Chisick,
   No. SACV 01-971 DOC (C.D. Cal. Apr. 12, 2004) .............................9

Bains LLC v. Arco Prods. Co.,
   405 F.3d 764 (9th Cir. 2005) ..............................................................15

Bragdon v. Tenty-Five Twelve Assoc. Ltd. Partnership,
   856 A.2d 1165 (D.C. 2004) .................................................................12

Brown v. Pro Football,
   146 F.R.D. 1 (D.D.C. 1992)..................................................................11

Cambridge Holdings Grp., Inc. v. Fed. Ins. Co.,
   357 F. Supp. 2d 89 (D.D.C. 2004) ......................................................12

Daka, Inc. v. McCrae,
   839 A.2d 682 (D.C. 2003) ...................................................................15

Del Monte Dunes v. City of Monterrey,
   95 F.3d 1422 (9th Cir. 1995) ................................................................8

District of Columbia v. Jackson,
   810 A.2d 388 (D.C. 2002) ...................................................................15

Ficken v. AMR Corp.,
   578 F. Supp. 2d 134 (D.D.C. 2008) .....................................................14

In re First Alliance Mortgage Co.,
   471 F.3d 977 (9th Cir. 2006) ...........................................................9, 10

Flores v. Shephard, No. 04cv2337-IEG(NLS),
   2008 WL 5046062 (S.D. Cal. Nov. 21, 2008) ......................................8

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Dewey & LeBoeuf LLP
One Embarcadero Center, Suite 400
San Francisco, CA 94111

Giles v. Shell Oil Corp.,
   487 A.2d 610 (D.C. 1985) ................................................................17

Hendry v. Pelland,
   73 F.3d 397 (D.C. Cir. 1996) ...........................................................14

Hilao v. Estate of Marcos,
   103 F.3d 767 (9th Cir. 1996) .......................................................10, 11

Home Indemnity Co. v. Lane Powell Moss and Miller,
   43 F.3d 1322 (9th Cir. 1995) ..............................................................8

In re IBM Peripheral EDP Devices Antitrust Litig.,
   481 F. Supp. 965 (N.D. Cal. 1979) ......................................................7

Informatica Corp. v. Business Objects Data Integration, Inc.,
   No. C 02-3378 EDL, 2007 WL 2344962 (N.D. Cal. Aug. 16,
   2007) ...............................................................................................7

Institut Pasteur v. Simon.,
   383 F. Supp. 2d 809 (E.D. Pa. 2005) ....................................................7

J.A. Jones Constr. Co. v. Steel Erectors, Inc.,
   No. CV486-373, 1988 U.S. Dist. LEXIS 4277 (D. Ga. May 10, 1988) ...................10

Jackson v. Byrd,
   No. 01-ca-825, 2004 WL 3249693 (D.C. Super. June 30,
   2004) .............................................................................................14

Judah v. Reiner,
   744 A.2d 1037 (D.C. 2000) ..........................................................16, 19

Kline v. Coldwell, Banker & Co.,
   508 F.2d 226 (9th Cir. 1974) .............................................................10

Kosmynka v. Polaris Indus., Inc.,
   462 F.3d 74 (2d Cir. 2006) .................................................................8

L.A. Nut House v. Holiday Hardware Corp.,
   825 F.2d 1351 (9th Cir. 1987) .............................................................8

Marshall v. Honeywell Tech. Solutions, Inc.,
   536 F. Supp. 2d 59 (D.D.C. 2008) ......................................................14

Mellencamp v. Riva Music Ltd.,
   698 F. Supp. 1154 (S.D.N.Y. 1988) ................................................18, 20

Dewey & LeBoeuf LLP
One Embarcadero Center, Suite 400
San Francisco, CA 94111

Merrill Lynch v. Cheng,
     901 F.2d 1124 (D.C. Cir. 1990) .................................................................16

MidAmerica Fed. Sav. And Loan Ass'n v. Shearson/American Exp., Inc.,
     886 F.2d 1249 (10th Cir. 1989) ...............................................................16

Noyes v. Kelly Servs., Inc.,
     No. 2:02-cv-2685-GEB-CMK, 2008 WL 2915113 (E.D. Cal.
     July 25, 2008) .........................................................................................15

NCRIC, Inc. v. Coumbia Hosp. for Women Med. Center, Inc.,
     957 A.2d 890 (D.C. 2008) ........................................................................7

Pearce v. Hutton Group,
     664 F. Supp. 1490 (D.D.C. 1987) ............................................................14

Robles v. Consolidated Graphics, Inc.,
     965 S.W.2d 552 (Tex. Ct. App. 1997) .....................................................16

Rogers v. City of Kennewick,
     No. CV-04-5028-EFS, 2007 WL 2055038 (E.D. Wash. July
     13, 2007) .................................................................................................8

Sere v. Group Hospitalization Inc.,
     443 A.2d 33 (D.C. 1982) ................................................................12, 14, 15

Sony Music Entm't Inc. v. Robison,
     01 Civ. 6415 (LMM), 2002 U.S. Dist. LEXIS 3100 (S.D.N.Y
     Feb. 26, 2002)) ........................................................................................20

State Farm Mut. Auto. Ins. Co. v. Campbell,
     538 U.S. 408 (2003) .................................................................................15

United Mine Workers of Am. v. Moore,
     717 A.2d 332 (D.C. 1998) ..................................................................12, 13

Van Valkenburgh, Nooger & Neville, Inc. V. Hayden Publishing
     Co..,
     330 N.Y.S.2d 329 (N.Y. 1972) .................................................................18

Windham v. Am. Brands, Inc.,
     565 F.2d 59 (4th Cir. 1977) .....................................................................11

Wirtz v. Kansas Farm Bureau Servs., Inc.,
     311 F. Supp. 2d 1197 (D.Kan. 2004) ..................................................12, 13

Wolf v. Super. Ct. of L.A. County,
     107 Cal. App. 4th 25 (Cal. Ct. App. 2003) ...............................................20

Dewey & LeBoeuf LLP
One Embarcadero Center, Suite 400
San Francisco, CA 94111

v

Yates v. GunAllen Financial,
    No. C05-1510 BZ, 2006 WL 1821194 (N.D. Cal. June 30,
    2006) ....................................................................................................................15

**RULES**

Fed. R. Civ. Proc. 49 .........................................................................................................8

Dewey & LeBoeuf LLP
One Embarcadero Center, Suite 400
San Francisco, CA 94111

**PRELIMINARY STATEMENT**

Plaintiffs' Opposition provides <u>no explanation</u> for how the jury's $7.1 million compensatory damages award is reasonably supported by <u>any</u> evidence in the trial record. In fact, Plaintiffs do not cite any evidence that is in any way related to that amount. This is not surprising since, as the Court knows, there is nothing in the record that would allow the jury to award this amount as damages for breach of fiduciary duty without resorting to rank speculation and guesswork or an improper attempt to redistribute the $7.1 million in ad hoc licensing payments to the GLA Class members. For this reason alone, the compensatory damages award must be set aside.

Indeed, once the jury rejected Plaintiffs' Gross Licensing Revenue ("GLR") pool damages theory, as shown by their returning a verdict of <u>zero</u> damages for breach of contract, there was <u>no</u> evidence to support a damages award under any of Plaintiffs' fiduciary duty claims. Plaintiffs do not dispute that the jury had no evidentiary basis, for example, to calculate "failure to market" or "conflict of interest" damages using the "Mr. Hollywood" scenario (<u>i.e.</u>, an estimate of the revenues that an independent agent – "Mr. Hollywood" – could have generated for the GLA Class). Instead, Plaintiffs' Opposition just ignores their failure of proof altogether, even though the Court has already stated that the absence of such evidence would be fatal if, as turned out to be the case, the jury concluded that the Retired Player GLA ("RPGLA") did not entitle retired players to share equally with active players in the GLR pool. As the Court expressly warned during the trial: "When Plaintiffs go to the jury with multiple theories, and they win on one that is fatally defective, they wind up with nothing." Trial Tr. 2472:12-14.[1]

Plaintiffs assert that the jury calculated its own GLR pool payment for the GLA Class members out of the financial data in the trial record, but, tellingly, they are unable even to

---

[1] Plaintiffs construct a strawman argument that Defendants are asserting an inconsistent verdict. Opp'n at 2. But Defendants do not and have not argued that the jury's verdicts were inconsistent. Rather, Defendants' position is that the jury's award of zero damages on Plaintiffs' breach of contract claim is consistent, and that it also shows that the award of $7.1 million in damages for breach of fiduciary duty could not be based upon the GLR pool damages theory and was thus either entirely speculative or improperly based upon the $7.1 million in ad hoc licensing revenues that were not at issue in this case. Mot. at 4-12.

speculate – much less provide a reasonable explanation – as to how the jury could have possibly arrived at the $7.1 million damages amount from such evidence.  That is because the only plausible source of that damages award is pure speculation or the $7.1 million in ad hoc licensing payments that Defendants made to certain GLA Class members.  This evidentiary failure dooms Plaintiffs' damages verdcict since even Plaintiffs cannot – and do not – deny that a damages award based upon either guesswork or the ad hoc licensing payments must be set aside.

As for the punitive damages award, Plaintiffs do not dispute that if the compensatory damages award is set aside, the punitive damages award must be vacated as well.  But the punitive damages award must also be vacated for the independent reason that Plaintiffs have failed to identify any evidence in the trial record – much less clear and convincing evidence – of an evil mental state and outrageous conduct by Defendants to warrant the extraordinary remedy of punitive damages under D.C. law, which strictly limits the award of such damages.  Plaintiffs have failed to identify a single case sustaining punitive damages under D.C. law on even a remotely similar set of facts.

With respect to fiduciary duty liability, Defendants' Motion was not, as Plaintiffs imply, premised on control being the sole factor.  Rather, Defendants' Motion reviewed the evidence under all five of the agency factors included in the Court's Final Jury Charge, and demonstrated that, based upon all of these factors, the evidence could not support a reasonable jury finding that the RPGLA gave rise to a fiduciary agency relationship.  Finally, Plaintiffs do not respond to Defendants' showing that all of Plaintiffs' breach of fiduciary duty claims were circularly linked to the single injury theory that the RPGLA created a duty to distribute the GLR pool equally among active players and GLA Class members.  Since there was no reasonable evidentiary support for such a theory and the jury rejected it, there was also no basis for the jury to find any breach of fiduciary duty.

## ARGUMENT

## I.  THE $7.1 MILLION COMPENSATORY DAMAGES AWARD CANNOT STAND

### A.  The Jury Rejected Plaintiffs' GLR Pool Damages Theory

The essential factual premise of each of Plaintiffs' damages theories is that, by virtue of

signing RPGLAs, GLA Class members were entitled to share equally with the active players in the GLR pool. Plaintiffs did not present to the jury evidence of any damages independent of this GLR pool theory. Indeed, Plaintiffs' Opposition concedes the absence of any other type of damages proof (<u>e.g.</u>, "Mr. Hollywood"): "[t]o say that Plaintiffs have not offered any evidence separate and apart from the 'GLR pool' is to penalize Plaintiffs simply for following the same methodology Defendants used." Opp'n at 5; <u>see also</u> Mot. at 1, 4-6. But, as discussed in Defendants' Motion and below, the jury clearly rejected Plaintiffs' contention that GLA Class members were contractually entitled to equal shares of the GLR pool by awarding <u>zero damages</u> on Plaintiffs' breach of contract claim.

In a futile effort to avoid this conclusion, Plaintiffs argue that the zero damages verdict for breach of contract does not indicate that the jury actually found zero contractual damages. Instead, Plaintiffs speculate that the jury was "simply following the Court's instructions not to double-count damages." Opp'n at 3. But this unsupported assertion cannot be reconciled with the Special Verdict Form, which expressly instructed the jury to subtract any award of fiduciary duty damages from the amount of any contractual damages awarded for the same conduct – <u>not</u> the other away around. Special Verdict Form at Nos. 2, 5 (attached as Exhibit 1 to the Declaration of Ian Papendick ("Papendick Decl."), submitted concurrently herewith)).

Specifically, with respect to the breach of contract claim, the Special Verdict Form clearly instructed the jury to "state the amount of damages to class members, if any, plaintiff has proven by reason of any such breach," without reference to any damages award for breach of fiduciary duty. <u>Id.</u> By contrast, with respect to Plaintiffs' breach of fiduciary duty claim, the Special Verdict Form stated that any such award "should exclude any damages on [breach of contract]." <u>Id.</u> at No. 5. Thus, if the jury had concluded that the GLA Class suffered contractual <u>and</u> fiduciary duty damages each in the amount of $7.1 million (as Plaintiffs claim), then the breach of contract damages award would have been $7.1 million, and the breach of fiduciary duty damages award would have been zero – not, as the jury found, the exact opposite. There is simply no basis for Plaintiffs' contention that the zero contractual damages award means anything other than what it says – zero contractual damages.

Even more significantly, it is crystal clear that the $7.1 million breach of fiduciary damages award cannot stand because it bears no correlation to – and is not reasonably supported by – any damages evidence in the record, including any permutation of an equal share distribution of the GLR pool between active players and GLA Class members.  Trial Tr. 1850:12-1851:25 (Mr. Rowley calculating equal share amounts of $29 or $32 million, $49 or $54 million, $61 or $68 million, and $73 or $82 million, varying by the percentage of revenues to be retained by the NFLPA and Players Inc, and by whether interest was to be awarded) (Papendick Decl., Ex. 2); Mot. at 6-7.  The fact that the jury awarded an amount that bears no relationship to any evidence in the trial record renders the damages verdict unsupportable.

**B. Having Rejected Plaintiffs' GLR Pool Contractual Damages Theory, There Was No Evidence Upon Which The Jury Could Reasonably Award Fiduciary Duty Damages**

**1. "There's No Evidence on This [Mr. Hollywood] Point"**

At the hearing on Defendants' Rule 50(a) motion, the Court prophetically warned class counsel about the (now realized) prospect that the jury would reject Plaintiffs' GLR pool damages theory, but nevertheless award damages on one of Plaintiffs' fiduciary duty claims for which no separate damages evidence was submitted.  For example, with respect to Plaintiffs' fiduciary duty claims for "failure to adequately market" and "conflict of interest," the Court noted the total absence of evidence about what licensing revenues, if any, an independent marketing agent – "Mr. Hollywood" – might have been able to generate for the GLA Class:

> THE COURT: Let's pursue that, though.  If that's – if the breach is that they failed to disclose a conflict of interest, then the damages that would flow from that would be if Mr. Adderley had known and other class members had known that there was a conflict of interest, then conceivably they could have gone out and hired Mr. Hollywood to be their group licensing agent, and may try to make their own deals.  And once again we come back to the question of:  Had Mr. Hollywood gone out to do that, what would the plausible range of potential royalties that such a group license would have commanded in the market? There's no evidence on this point.
>
>        *   *   *
>
> THE COURT: It's your burden of proof.  What evidence did you put in on what that independent agent who had nothing to do with the league, nothing to do with the defendants, what they would have been able to negotiate in the marketplace? I didn't hear any evidence on that.

Trial Tr. 2469:2-14; 2478:9-24 (emphases added) (Papendick Decl., Ex. 2); see also Mot. at 9

(Mr. Rowley testifying that he offered <u>no measure of damages</u> for any alleged failure to market to the GLA Class).

After identifying this fatal flaw in Plaintiffs' fiduciary duty damages evidence, the Court offered Plaintiffs the opportunity to try to avoid an unsupportable damages verdict by dropping the breach of fiduciary duty claims for which they had offered no evidence of damages:

> THE COURT: . . . <u>When Plaintiffs go to the jury with multiple theories, and they win on one that is fatally defective, they wind up with nothing</u>. Whereas, if they had – if discretion had been the better part of valor, and they had recognized fatal problems with their theory and gone with one that had a shot, they might have won something…. <u>I'm telling you all of your theories are tenuous. All of them.</u> But I'm not saying I'm going to take them away. <u>I'm saying these are very substantial Rule 50 motions that have been made</u>…. But if you choose to go to the jury on a theory that ultimately gets taken away, and that's the only one you won on before the jury, you should be aware – <u>I'm telling you right now – you're at risk on all your theories</u>.

Trial Tr. 2472:8-2473:14 (emphases added) (Papendick Decl., Ex. 2).

At trial, Plaintiffs chose to ignore the Court's warning and to submit to the jury their breach of fiduciary duty claims without <u>any</u> damages evidence apart from the calculations of equal shares of the GLR pool. For this reason, Plaintiffs cannot point to any evidence to support the jury's $7.1 million damages verdict. Instead, Plaintiffs argue that the Court's warnings about the fatal flaws in their fiduciary duty damages evidence do not apply because the jury held Defendants liable for breach of contract. Opp'n at 10-11. But the Court's warnings were not limited to a situation in which the jury found no liability for breach of contract. Rather, those warnings prophesized the current situation in which "the jury disagree[d] with [Plaintiffs'] meaning of the contract[] [a]nd … sa[id] there's no way [the RPGLA] ever meant that [retireds] were going to share in the gross licensing revenues." Trial Tr. 2463:1-20; Mot. at 8-11. This is, of course, exactly the conclusion the jury reached when it awarded no contractual damages. As the Court cautioned, "[w]hen Plaintiffs go to the jury with multiple theories, and they win on one that is fatally defective, they wind up with nothing." Trial Tr. 2472:8-2473:14.

### 2. There is No Basis for Plaintiffs' Argument That the Jury Could Have Reasonably "Calculated" the $7.1 Million Damages Award from the Trial Evidence

In a desperate attempt to save the verdict, Plaintiffs argue that the $7.1 million

Dewey & LeBoeuf LLP
One Embarcadero Center, Suite 400
San Francisco, CA 94111

compensatory damages award could be the product of the jury's "own calculation" of an equal share distribution of the GLR pool based upon Mr. Rowley's "methodology" and the financial data contained in the trial record. Opp'n at 5-10. Specifically, Plaintiffs argue that "Mr. Rowley explained to the jury how it could use these documents and his methodology to calculate what the GLA Class would be owed based on individual licenses." Opp'n at 8. This argument is specious as there is <u>no evidence</u> in the record to support the $7.1 million damages award.

First, as Mr. Rowley testified, his damages "methodology" was based upon the assumption that the jury would conclude that retired players were entitled to share equally with active players in the GLR pool. <u>See</u> Mot. at 4-7. Because the jury rejected this premise (<u>supra</u>, p. 2-4), Mr. Rowley's "methodology" could not provide any evidence to support the jury's fiduciary duty damages award.

Second, despite Plaintiffs' <u>ipse dixit</u> assertion that the jury could have arrived at the $7.1 million by making unspecified calculations based on "individual licenses," their Opposition cannot identify <u>any</u> individual license or combination of licenses that could reasonably support the $7.1 million damages award. This is not surprising, because there is no such evidence. Plaintiffs claim that the "jury could have determined that Defendants breached their contractual and fiduciary duties only with respect to [EA] and calculated damages accordingly." Opp'n at 10. But applying Mr. Rowley's methodology solely to the EA licensing revenues – $82.3 million from 2004-2007 (Trial Ex. 1217 at 1, 4) (Papendick Decl., Ex. 3) – would not result in anything resembling a $7.1 million damages award.

Third, Plaintiffs did not provide the jury with any non-speculative basis to calculate GLR pool damages for individual licensees. The trial testimony cited by Plaintiffs (Opp'n at 8 (citing Tr. 1857:9-1859:1)), simply states that the jury could determine a licensee's percentage of the total revenue in the GLR pool and apply that percentage to Mr. Rowley's GLR pool calculations. But this testimony provides no reasonable basis for the jury to pick and choose among the revenues that were paid pursuant to the 95 different license agreements, and certainly no reasonable basis for a $7.1 million damages award.

The truth is that class counsel cannot identify any basis upon which the jury could have

Dewey & LeBoeuf LLP
One Embarcadero Center, Suite 400
San Francisco, CA 94111

1   awarded $7.1 million in damages other than by improperly redistributing the $7.1 million in ad

2   hoc licensing payments that were paid to certain GLA Class members.  So, in desperation,

3   Plaintiffs point to various financial data and make the wild assertion that this evidence could

4   support "an essentially infinite number" of damages awards.  Opp'n at 8, 10.  Specifically,

5   Plaintiffs cite to Trial Exhibit 1217 (totaling payments from over 120 licensees), Trial Exhibit

6   1218 (listing over 1,100 payments from licensees), and Trial Exhibit 1221 (including 95 different

7   license agreements) (Papendick Decl., Exs. 3, 4, 5).  Opp'n at 8.  But within these thousands of

8   pages of financial data, class counsel cannot cite to <u>a single piece of evidence or combination of</u>

9   <u>evidence</u> that could reasonably support the $7.1 million damages award.

10          Merely pointing to a haystack of financial documents and claiming that somewhere

11  therein lies an unidentified damages needle is not sufficient to sustain a damages verdict.  To the

12  contrary, the law requires that there be a non-speculative and reasonable basis for any damages

13  award.  <u>See</u> <u>In re IBM Peripheral EDP Devices Antitrust Litig.</u>, 481 F. Supp. 965, 1013-1014

14  (N.D. Cal. 1979) (directing verdict for defendant because the available "damages evidence

15  would give no guidance [to the jury]. . . . Plaintiff could have done better.  Rather than showing a

16  general decline in profits and revenues, the damage proof could have been more closely

17  connected to the individual acts complained of."); <u>Informatica Corp. v. Business Objects Data</u>

18  <u>Integration, Inc.</u>, No. C 02-3378 EDL, 2007 WL 2344962, *3 (N.D. Cal. Aug. 16,

19  2007) (vacating damages award that conflicted with calculations in the record); <u>Institut Pasteur v.</u>

20  <u>Simon</u>, 383 F. Supp. 2d 809, 812 (E.D. Pa. 2005) (damages evidence must include "[a]t

21  minimum . . . a rough <u>calculation</u> that is not too speculative, vague, or contingent upon <u>some</u>

22  <u>unknown factor</u>") (emphases added) (quotations omitted).[2]

23

24  _____

[2] Plaintiffs cite a string of cases for the unremarkable proposition that the Court need not be able
to "reconstruct the precise mathematical formula that the jury adopted" in order to sustain a

25  damages award.  Opp'n at 6.  But, here, there is <u>no</u> plausible connection between the jury's
damages award and any of the record evidence (other than the amount of ad hoc payments made

26  to certain GLA Class members, which cannot legally support the damages award).  Plaintiffs'
own authorities confirm that a reasonable damages calculation methodology is necessary to

27  sustain a damages verdict.  <u>See</u>, <u>e.g.</u>, <u>NCRIC, Inc. v. Columbia Hosp. for Women Med. Center,</u>
<u>Inc.</u>, 957 A.2d 890, 903-04 & nn.39-40 (D.C. 2008) (affirming jury's damages award because it

28  conformed with a mathematical calculation provided by plaintiffs' witnesses).

Fourth, Plaintiffs' contention that the jury was not required to choose only from among the eight different damages amounts calculated by Mr. Rowley is beside the point. Opp'n at 9-10. Whether or not the jury's damages award was bound to Mr. Rowley's calculations, it cannot be sustained where, as here, it is "clearly not supported by the evidence, or based solely on speculation or guesswork." Opp'n at 7 (quoting Del Monte Dunes v. City of Monterrey, 95 F.3d 1422, 1435 (9th Cir. 1995)).[3]

Finally, Plaintiffs' red-herring argument that "Defendants have waived their right to challenge what they allege is an inconsistent jury verdict by failing to raise this objection before the jury was discharged" is flatly wrong. As noted above, Defendants are not seeking to vacate the breach of fiduciary duty damages award on the ground that it is inconsistent with the breach of contract damages verdict. See supra n.1. Rather, Defendants have moved to set aside the $7.1 million compensatory damages award because there is no evidence in the record to reasonably support it. Indeed, Defendants' challenge to this verdict was preserved through the original Rule 50 motion, during which the Court acknowledged Defendants' right "to renew[] the motion at the end" of trial. Trial Tr. 2472:8-2473:14.[4]

### 3. The $7.1 Million Damages Award Was Improperly Based on the Ad Hoc Licensing Payments

In the end, the only basis in the trial record for the jury's $7.1 million damages award is

---

[3] Plaintiffs also misstate the Court's comments from the charging conference. Opp'n at 6. The quoted statements by the Court dealt with whether there was sufficient evidence about how damages under the GLR pool theory would be attributed to individual class members – not what the total amount of damages would be. Compare Trial Tr. 2551:15-2560:25 with Opp'n at 6.

[4] Even if Defendants were challenging the verdict as inconsistent, there would be no waiver. The Ninth Circuit has, in a case Plaintiffs cited, expressly rejected this waiver theory because "it would permit the wrong party – the one favored by the jury's general verdict – to obtain a judgment. That is not a sensible reading of Rule 49(b)." L.A. Nut House v. Holiday Hardware Corp., 825 F.2d 1351, 1354-56 (9th Cir. 1987). Notwithstanding the decision in Home Indemnity Co. v. Lane Powell Moss and Miller, 43 F.3d 1322 (9th Cir. 1995), the analysis in Nut House remains controlling Ninth Circuit law. See, e.g., Flores v. Shephard, No. 04cv2337-IEG(NLS), 2008 WL 5046062, *3 n.1 (S.D. Cal. Nov. 21, 2008); Rogers v. City of Kennewick, No. CV-04-5028-EFS, 2007 WL 2055038, *2 (E.D. Wash. July 13, 2007); see also Kosmynka v. Polaris Indus., Inc., 462 F.3d 74, 84 (2d Cir. 2006). Moreover, Plaintiffs are likewise mistaken in suggesting that the only remedy would be a new trial. Opp'n at 2. Federal Rule of Civil Procedure 49(b)(3)(A) unambiguously provides that a district court may resolve an inconsistent verdict by "approv[ing], for entry . . ., an appropriate judgment according to the answers, notwithstanding the general verdict." See also Nuthouse, 825 F.2d at 1356.

---

the amount of ad hoc licensing money Defendants generated for the GLA Class during the statute of limitations period: $7,116,196.29. Trial Ex. 2056 (Papendick Decl., Ex. 6). Plaintiffs, however, do not dispute that the jury was legally prohibited from issuing a damages award to redistribute the $7.1 million in ad hoc licensing payments, or from otherwise basing a damages award on the ad hoc money.[5] Yet, Plaintiffs cannot identify any evidence to support the $7.1 million damages amount. Plaintiffs' only explanation for the symmetry between the $7.1 million in ad hoc licensing payments and the $7.1 million damages award is coincidence, but the trial record does not support Plaintiffs' argument. Opp'n at 6.

A Ninth Circuit case cited by Plaintiffs holds that if the only plausible explanation for a jury's damages award is the consideration of improper evidence, then the award <u>must</u> be vacated. See <u>In re First Alliance Mortgage Co.</u>, 471 F.3d 977, 1001-03 (9th Cir. 2006). In <u>First Alliance Mortgage</u>, the parties' damages experts offered two competing fraud damages figures, including a figure offered by plaintiffs that was based on a "benefit of the bargain" calculation. The district court subsequently determined that plaintiffs could not recover damages on a "benefit of the bargain" basis, and instructed the jury accordingly. Nevertheless, the damages award returned by the jury was in an amount equal to "half of the sum of the figures provided by each party's damages expert," and clearly had been based on an improper "benefit of the bargain" theory. <u>Id.</u> at 1002. On appeal, the Ninth Circuit reversed the district court, which had sustained the damages verdict and had improperly "bent over backwards to find a potentially valid basis in the record for the jury verdict [when] that rationale is obviously not tethered to the law or the facts of the case . . . ." <u>Id.</u> at 1003.[6]

_____

[5] Plaintiffs stipulated that they could not recover any ad hoc licensing payments and the Court specifically instructed the jury that it could not base any damages award on such ad hoc licensing payments. See Trial Tr. 1694:8-10; 2796:16-2797:3 (Papendick Decl., Ex. 2); see also Joint Final Pre-Trial Order at 12 (Oct. 8, 2008) (Rec. Doc. 458); Final Charge to the Jury No. 17, at 6 (Nov. 7, 2008) (Rec. Doc. 549).

[6] The district court from <u>In re First Alliance Mortgage</u> had improperly theorized that evidence other than a "benefit of the bargain" analysis may have led the jury to halve plaintiffs' damages figure, such as permutations of evidence about origination fees, interest rates, and lengths of loans. See Order Denying Lehman's Mot. for J. as a Matter of Law, <u>Austin v. Chisick</u>, No. SACV 01-971 DOC (C.D. Cal. Apr. 12, 2004) at 5-6 (Papendick Decl., Ex. 7). The Court of Appeals made it clear that such speculation by the district court to support a damages award was improper. <u>In re First Alliance Mortgage</u>, 471 F.3d at 1003.

Plaintiffs are asking this Court to commit the same error as the district court in <u>First Alliance Mortgage</u>. The <u>only</u> plausible, non-speculative basis for the $7.1 million damages award in the trial record was the improper use of the ad hoc licensing payments. The Court must therefore vacate the jury's award for the additional reason that it "based the damages calculation in substantial part on an improper theory of damages." <u>In re First Alliance</u>, 471 F.3d at 1003 & 1001; <u>see also</u> <u>J.A. Jones Constr. Co. v. Steel Erectors, Inc.</u>, No. CV486-373, 1988 U.S. Dist. LEXIS 4277, *48 (S.D. Ga. May 10, 1988) (setting aside a jury verdict where "there [was] no other plausible explanation" for a verdict that matched the amount of a prohibited claim).

**C. There Is No Evidence Or Formula In The Record For Awarding The $7.1 Million Amount To Individual Class Members, And Plaintiffs Made No Showing Of Individual Damages**

Although Plaintiffs presented a methodology for calculating an award of equal shares of the GLR pool to class members – <u>i.e.</u>, dividing the GLR pool equally between active players and GLA Class members with RPGLAs in effect – there was no class-wide damages formula presented for any other type of damages award. For example, to the extent that the jury improperly utilized the $7.1 million in ad hoc licensing payments as a proxy for the missing "Mr. Hollywood" evidence, individual damages amounts would have to be based on how much money each class member would have received from such an independent agent's marketing efforts.[7] The absence of any formula in the trial record to determine individual damages for each class member is fatal under governing law. <u>See</u> Mot. at 11-12.

Indeed, Plaintiffs were required to prove damages for each individual class member under Ninth Circuit law.[8] Plaintiffs concede that they have not presented any such

---

[7] The Court's class certification decision expressly contemplated such a scenario where the class "may part company on the contingent issue of what [damages] formula should apply." Order Granting in Part and Denying In Part Pls.' Mot. for Class Certification at 7 (Apr. 29, 2008) (Rec. Doc. 275).

[8] <u>See</u> Mot. at 11-12 (discussing <u>Kline v. Coldwell, Banker & Co.</u>, 508 F.2d 226, 236 n.8 (9th Cir. 1974), <u>Abuan v. General Elec. Co.</u>, 3 F.3d 329, 334 (9th Cir. 1993) and <u>Hilao v. Estate of Marcos</u>, 103 F.3d 767, 788 (9th Cir. 1996)). Plaintiffs' attempts to distinguish these cases on the ground that they involved tort or antitrust claims is unavailing. The point that these cases are cited for is that the requirement of individualized proof of injury and damages is not excused in a class action. That governing legal doctrine unquestionably applies here.

Dewey & LeBoeuf LLP
One Embarcadero Center, Suite 400
San Francisco, CA 94111

individualized proof of damages, so they argue that such proof is not necessary.  Opp'n at 12.  None of Plaintiffs' cases, however, come from the Ninth Circuit.  Moreover, each of the cases that Plaintiffs rely upon involved situations in which the plaintiffs presented a damages methodology that could be applied to determine each <u>individual</u> class members' damages – the opposite of the situation here.  For example, in <u>Brown v. Pro Football</u> (<u>see</u> Opp'n at 12), the court held that a "simple, common formula-the subtraction of the former $1000 from the pro rata share of the latter salary serves as the measure of damages for <u>each</u> member of the plaintiff class."  146 F.R.D. 1, 5 (D.D.C. 1992) (emphasis added).[9]  Here, by contrast, Plaintiffs never submitted any formula for proving individual damages other than the "equal share" of the GLR pool contractual theory that was rejected by the jury.  Rather, class counsel just makes the unsupported assertion that "each individual GLA class member was damaged in the same way."  Opp'n at 11.  If it were sufficient for class counsel simply to declare that each class member "was damaged in the same way" without any evidentiary support, the Ninth Circuit's requirement of individualized proof of damages in class actions would be meaningless.  <u>See</u> <u>Hilao</u>, 103 F.3d at 788.

## II.   THE JURY'S PUNITIVE DAMAGES AWARD MUST ALSO BE VACATED

### A.   Plaintiffs Point To No Evidence Upon Which A Reasonable Jury Could Award Punitive Damages

As a threshold matter, Plaintiffs do not dispute that if the Court vacates the compensatory damages award, it must also vacate the punitive damages award.  <u>See</u> Mot. at 12-13.  But, even if the Court does not vacate the compensatory damages award, the punitive damages award still must be overturned because there was no evidence in the record to satisfy Plaintiffs' very high burden – under D.C. law – to prove with clear and convincing evidence both an evil intent <u>and</u>

---

[9] Likewise, contrary to Plaintiffs' assertion, <u>Windham v. American Brands, Inc.</u> did not "reject[] individualized damages."  Opp'n at 12.  Instead, the court held that where damages are "capable of mathematical or formula calculation, the existence of individualized claims for damages seems to offer no barrier to class certification."  565 F.2d 59, 68 (4th Cir. 1977) (quotation omitted).  The court in <u>Allapattah Services, Inc. v. Exxon Corp.</u>, also did not reject the requirement to prove individual damages, finding that "when data from each class member is required to assess individual recovery entitlement, it is appropriate for the class representatives to develop and prove common guidelines or formulae that will apply to determine the measure of recovery for each individual proof of claim."  157 F. Supp. 2d 1291, 1313 (S.D. Fla. 2001).

outrageous conduct.  See Sere v. Group Hospitalization, Inc., 443 A.2d 33, 37 (D.C. 1982); United Mine Workers of Am. v. Moore, 717 A.2d 332, 341 (D.C. 1998).  Indeed, a "review [of] the jury's conclusions . . . is particularly appropriate in the case of a punitive damages award, because of a likelihood of confusion on the part of the jury regarding the heightened standard . . . ." Wirtz v. Kansas Farm Bureau Servs., Inc., 311 F. Supp. 2d 1197, 1221 (D. Kan. 2004).[10]

### 1. Plaintiffs Point to No Evidence that Defendants Acted with the Requisite Mental State

Plaintiffs' first justification for the punitive damages award is that Defendants "never intended to honor" the terms of the GLAs.  Opp'n at 15-16.[11]  However, this assertion is not relevant since, under D.C. law, punitive damages are unavailable for any breach of contract, even if the breach is malicious.[12]

Nor can Plaintiffs point to any other record evidence (let alone clear and convincing evidence) supporting a verdict that Defendants acted with the evil intent required for a punitive damages verdict.  See United Mine Workers, 717 A.2d at 341.  Instead, Plaintiffs submit only lawyers' argument – not evidence – in support of their theories regarding Defendants' "evil" mental state.  For example, Plaintiffs argue that "Defendants knew that they did not intend to pay retired players under the GLA . . .," (Opp'n at 16), but cite nothing in the record to support this claim.  Plaintiffs also argue that "Defendants intentionally did absolutely nothing" with the GLAs, (Opp'n at 17), but cite no trial evidence of that supposed intent.

Plaintiffs also claim that the eligibility criteria for the active player GLR pool were

---

[10] Contrary to Plaintiffs' assertion, the Court's comments about instructing the jury on punitive damages were not a rubber stamp for any punitive damages award.  Opp'n at 14-15 (citing Trial Tr. 2486:1-2488:6 ("What I'm doing is reciting for the record a theory that the plaintiffs have in words, more or less, articulated . . .")).  Courts may instruct the jury on punitive damages but then later overturn the award if it is unsupportable.  United Mine Workers, 717 A.2d at 342 n.13.

[11] See also id. at 16 (Defendants breached the contract by failing to pay Plaintiffs anytime a licensee used six of more present of former NFL players), 14 ("You've got a contract that calls for an escrow and no escrow was ever set up.  You've got a contract they tried for 14 years to get people to sign up, and not one penny was ever distributed under this contract.").

[12] Cambridge Holdings Grp., Inc. v. Fed. Ins. Co., 357 F. Supp. 2d 89, 97 (D.D.C. 2004) ("[p]unitive damages are unavailable as a matter of law for pure contract actions . . ."); Bragdon v. Twenty-Five Twelve Assoc. Ltd. Partnership, 856 A.2d 1165, 1173 (D.C. 2004) (punitive damages are not available for breach of contract claims "even if it is proven that the breach was willful, wanton, or malicious.").

Dewey & LeBoeuf LLP
One Embarcadero Center, Suite 400
San Francisco, CA 94111

Dewey & LeBoeuf LLP
One Embarcadero Center, Suite 400
San Francisco, CA 94111

concocted to trick retired players. Opp'n at 16. Once again, however, Plaintiffs point to <u>nothing in the record</u> to support this claim that the Board of Player Representatives adopted the GLR pool eligibility criteria – back in 1994 – with the "evil intent" of deceiving GLA Class members some ten years later.

Finally, Plaintiffs argue that Defendants "discouraged third-party licensees from licensing retired players so licensing revenue would not have to be shared with [them]." Opp'n at 17. But Plaintiffs point to <u>no evidence</u> linking "scrambling" or any similar behavior by Defendants to any "evil" motive to deprive retired players of licensing revenue.[13] To the contrary, the only evidence Plaintiffs cite is a letter instructing EA that it should not use the number of any player (active or retired) for whose rights EA did not pay. <u>See</u> Trial Exh. 1320 (Papendick Decl., Ex. 8). This hardly constitutes the type of clear and convincing evidence of evil intent required to support a punitive damages award under D.C. law. <u>See</u> <u>United Mine Workers</u>, 717 A.2d at 341.

### 2. Defendants' Conduct Cannot Support Punitive Damages Under D.C. Law

Plaintiffs had the additional burden to prove with clear and convincing evidence that the conduct at issue constituted the type of extreme or outrageous behavior required to support a punitive damages award. Plaintiffs fail, however, to explain how <u>any</u> of Defendants' conduct could warrant punitive damages under D.C. law, or to identify a single case in which a punitive damages award was sustained under D.C. law with respect to any remotely similar set of facts. Indeed, Plaintiffs' Opposition simply ignores all of the D.C. authorities which make clear that none of the conduct at issue could satisfy the high burden for proving punitive damages.[14] <u>See</u> Mot. at 13-18.

Plaintiffs also have no response to the legal principle that the verbal statements made by

---

[13] Other than the assertion of class counsel that scrambling is "outrageous" conduct, Plaintiffs have no answer to the fact that EA's "scrambling" of retired players' identities was <u>lawful</u> (<u>see</u> Final Charge to the Jury no. 45, at 17) and that it cannot be tortious behavior – much less "extreme" tortious behavior – for Defendants to have allegedly "conspired" with EA to "permit it" to engage in such lawful activity. Mot. at 15.

[14] This, of course, is reason enough to vacate the award. <u>See</u> Wirtz, 311 F. Supp. 2d at 1221 ("Plaintiff fails to address any of the cases cited by the defendant or to demonstrate that the conduct found objectionable . . . was also present in plaintiff's case. A party may not rest its case on summary allegations and conclusory statements.").

---

Mr. Upshaw, no matter how insulting the jury might have found them to be, cannot justify a punitive damages award.[15]  Likewise, Plaintiffs have no response to the case law which establishes that Defendants' purported "failure to act," by not aggressively marketing GLA Class members, even if fraudulent, could not support a punitive damage award.[16]

As for Defendants' conduct with respect to EA's Hall of Fame ("HOF") game, Plaintiffs' Opposition simply ignores the undisputed facts that the HOF agreement was an "ad hoc" license for which Plaintiffs seek no damages, that the Hall of Fame retired player rights were procured by the HOF (not Defendants), and that, according to Plaintiffs' own expert, there is no evidence that the HOF agreement was "below market."  See Mot. at 16-17.[17]  Moreover, it is undisputed that the HOF agreement only involved 17 out of the more than 2,000 GLA Class members.  In cases where, as here, there is no evidence of conduct constituting "extreme" or "grossly fraudulent" behavior toward the plaintiffs, punitive damages may not be awarded as a matter of D.C. law.  See, e.g., Sere, 443 A.2d at 37.

**B.  Alternatively, The Punitive Damages Award Should Be Dramatically Reduced**

At a minimum, the punitive damages award should be substantially reduced.  Plaintiffs' response – that they are aware of "no Supreme Court or Ninth Circuit case disapproving of a single-digit ratio" – is inapposite.  To begin with, the amount of punitive damages must be evaluated under D.C. law.  And, under D.C. law, there is ample authority, which Plaintiffs ignore, for reducing punitive damages awards where they do not exceed a single digit ratio.  See Jackson v. Byrd, No. 01-ca-825, 2004 WL 3249693, *2-3 (D.C. Super. Ct. June 30, 2004)

---

[15] See Mot. at 16 (citing Pearce v. Hutton Group, 664 F. Supp. 1490, 1518 (D.D.C. 1987); Ficken v. AMR Corp., 578 F. Supp. 2d 134, 143-144 (D.D.C. 2008); Marshall v. Honeywell Tech. Solutions, Inc., 536 F. Supp. 2d 59, 69 (D.D.C. 2008)).

[16] Hendry v. Pelland, 73 F.3d 397, 400 (D.C. Cir. 1996) (punitive damages are not permitted in the absence of gross fraud; mere failure to act might be "imprudent," but "fall[s] far short of showing the blatant wrongdoing necessary" for punitive damages).

[17] Plaintiffs also suggest that the HOF deal was improper because it purportedly drove EA's competitor Take Two out of the market.  Opp'n at 14-15.  But, the only record evidence about Take Two entering the market proves the opposite.  See Trial Tr. 2179:23-2180:8 (" . . . [T]hat would seemingly prevent anybody from getting into this business.  Well, of course, it didn't.  Take Two went directly to 240 retired stars, got their licensing right[s], created a video game that was introduced in July of last year, where there's these 240 players.") (Papendick Decl., Ex. 2).

---

Dewey & LeBoeuf LLP
One Embarcadero Center, Suite 400
San Francisco, CA 94111

(overturning a punitive damages award of $500,000 (5:1 ratio) and awarding only $100,000 (less than a 1:1 ratio)).[18] This is especially true where, as here, the compensatory damages award is substantial.[19] As the courts have repeatedly held, punitive damages are very difficult to obtain under D.C. law. See, e.g., Sere, 443 A.2d at 37 ("punitive damages are not favored in the law," and are available "only in cases which present circumstances of extreme aggravation."), District of Columbia v. Jackson, 810 A.2d 388, 396 (D.C. 2002) (same).

Finally, Plaintiffs do not dispute that a court should consider the degree of reprehensibility of the defendant's conduct. State Farm Mutual Automobile Ins. Co. v. Campbell, 538 U.S. 408, 418 (2003). Here, as set forth above, the trial record is devoid of any evidence of the kind of outrageous behavior that would support a three-to-one ratio of punitive damages.[20] For this additional reason, the jury's punitive damages award must be vacated or, at the very least, substantially reduced.

## III. THERE IS INSUFFICIENT EVIDENCE TO SUSTAIN THE JURY'S FINDING OF LIABILITY ON THE BREACH OF FIDUCIARY DUTY CLAIM

### A. Plaintiffs Failed To Present Sufficient Evidence Of A Fiduciary Relationship

As set forth in Defendants' Motion (pp. 19-25), under the five agency factors charged to the jury, there was insufficient evidence to support a verdict that the RPGLAs gave rise to any fiduciary duty.

#### 1. Plaintiffs Lacked the Requisite Control Over Defendants

As the Court instructed the jury, "[a]n important factor to consider is control." Final

---

[18] There is also authority in the Ninth Circuit for reducing single-digit ratio awards. See e.g., Yates v. Gun Allen Financial, No. C05-1510 BZ, 2006 WL 1821194, at *2 (N.D. Cal. June 30, 2006) (reducing single-digit ratio award); Bains LLC v. Arco Prods. Co., 405 F.3d 764, 776 (9th Cir. 2005) ("When compensatory damages are substantial then a lesser ratio, perhaps only equal to compensatory damages, can reach the outermost limit of the due process guarantee.") (quotation omitted).

[19] Daka, Inc. v. McCrae, 839 A.2d 682, 698 (D.C. 2003) ("When compensatory damages are substantial then a lesser ratio, perhaps only equal to compensatory damages, can reach the outermost limit of the due process guarantee;" a $1 million award is substantial) (quotation omitted).

[20] See, e.g., Noyes v. Kelly Servs., Inc., No. 2:02-cv-2685-GEB-CMK, 2008 WL 2915113, *13-14 (E.D. Cal. July 25, 2008) ("In addition, while [defendant's] behavior was sufficiently reprehensible to warrant punitive damages, it was not highly egregious . . . Accordingly, a ratio of 1 to 1 is the constitutional limit in this case.")

---

Dewey & LeBoeuf LLP
One Embarcadero Center, Suite 400
San Francisco, CA 94111

Dewey & LeBoeuf LLP
One Embarcadero Center, Suite 400
San Francisco, CA 94111

Charge to the Jury No. 38, at 14. Because there is no evidence that GLA Class members had the requisite "day-to-day" control over Defendants' licensing operations, Plaintiffs' primary response on this point is to argue that the Court's instruction was incorrect.[21] The issue on this Motion, however, is not whether the Court's instructions were correct, but whether there was sufficient evidence to support a verdict under the legal standards charged to the jury. See Mot. at 19. Plaintiffs do not want to address the evidence regarding control because every single one of the GLA Class members who testified admitted that he did not have control over Defendants' licensing operations. See Trial Tr. 433:2-11, 980:20-22, 1181:6-11, 1568:1-14.

The only purported evidence of control that Plaintiffs cite to in their Opposition is the testimony of a few GLA Class members who supposedly understood that the RPGLAs granted them a right to decline licensing opportunities if they disagreed with the associated products. See Opp'n at 27. But, Plaintiffs' purported "understanding" about the RPGLA is not competent evidence in the face of the unambiguous RPGLA language which merely states that "[i]f the undersigned player's inclusion in a particular NFLPA program will conflict with an individual exclusive endorsement agreement, and the player provides the NFLPA with timely notice of that conflict, the NFLPA agrees to exclude the player from that particular program." Trial Ex. 110 (Papendick Decl., Ex. 9) (emphases added).[22] This narrow exclusion is not an unbounded "opt out" provision that could provide "control," and Plaintiffs' ipse dixit assertions to the contrary

---

[21] In particular, Plaintiffs resuscitate their argument that the agency relationship at issue is akin to a "broker/investor relationship, where a determination of agency is more likely if the investor does not control the day-to-day activities of the broker." Opp'n at 22-23. This argument is unavailing. Under D.C. law, the entire agency relationship is premised on "one person authoriz[ing] another to act on his behalf subject to his control, and the other consents to do so." Judah v. Reiner, 744 A.2d 1037, 1040 (D.C. 2000) (emphasis added). Thus, a broker/investor relationship is a unique type of relationship arising from the trust and confidence the investor reposes in the broker's special skills. See MidAmerica Fed. Sav. and Loan Ass'n v. Shearson/American Exp., Inc., 886 F.2d 1249, 1258 (10th Cir. 1989). None of Plaintiffs' cited authorities found that a principal's lack of control created a fiduciary relationship. In fact, one case did not find any fiduciary duty, see Merrill Lynch v. Cheng, 901 F.2d 1124, 1129 (D.C. Cir. 1990), and another case found the plaintiff to be the defendant's agent only because of "proof of Gulf Printing's control over Robles." Robles v. Consolidated Graphics, Inc., 965 S.W.2d 552, 558 (Tex. Ct. App. 1997) (emphasis added).

[22] It bears mentioning that Plaintiffs presented no evidence that any of these GLA Class members had exclusive contracts such that this RPGLA provision would even be applicable.

---

Defendants' Reply Brief in Further Support of Motion for JMOL    Civ. Action No. C07 0943 WHA

are unavailing.[23]

## 2. Plaintiffs Did Not Have a Right of Early Termination

The Court also instructed the jury to consider whether Plaintiffs had "the right to discharge [Defendants] and to terminate the relationship." Final Charge to the Jury No. 40, at 15. In their Opposition, Plaintiffs again rely upon the RPGLA provision about conflicts with exclusive endorsement agreements, arguing that it evidences a right to discharge. See Opp'n at 27-28. But, as set forth above, this narrow provision was, by its terms, limited to retired players who had conflicting exclusive endorsement agreements, and does not provide any right to terminate the RPGLA. Indeed, Plaintiffs have no response to the fact that each RPGLA was for a fixed term and contained no provision for early termination, thus making any such early termination not a discharge, but an unlawful repudiation and breach. See Mot. at 21-22.[24]

## 3. Defendants Did Not Undertake to Act as Plaintiffs' Marketing Agents

Plaintiffs also failed to present evidence to support another agency factor the Court instructed the jury upon – whether Defendants represented to the GLA Class members that they would "undertake to act as a marketing agent and to affirmatively promote the rights on behalf of the licensor [the GLA Class members]" (Final Charge to the Jury No. 36, at 14). See Mot. at 22-23. In fact, Plaintiffs presented no evidence of any such communications. See, e.g., Trial Tr. at 422:4-7 ("Q. Did you rely on any representations by anyone from the NFLPA or Players Inc

---

[23] As the Court knows, Defendants contend that, under D.C. law, there can be no agency relationship unless the RPGLA gave GLA Class members the right to "control . . . [Defendants'] day-to-day operations." Giles v. Shell Oil Corp., 487 A.2d 610, 611 (D.C. 1985). Defendants will not belabor this position here, except to respond to a new point raised in the Opposition (n. 15). There is nothing inconsistent about the NFLPA's positions in the recently-commenced StarCaps litigation. Defendants contend here that "day-to-day" control is the sine qua non of an agency relationship under D.C. law. See Defs.' Mem. and Objs. Re the Court's Draft Charge to the Jury and Special Verdict Form of Nov. 4, 2008 at 6 (Rec. Doc. 541) (Nov. 5, 2008). In the NFLPA v. NFL (StarCaps) litigation, by contrast, the fiduciary relationship alleged is a confidential relationship under New York law, based on the trust NFL players are required to repose in the doctors and NFL officials who administer the NFL's steroids policy. See generally Exhibit N to the Hilbert Declaration (NFLPA v. NFL Complaint).

[24] Plaintiffs' Opposition points to the fact that Defendants revised the RPGLA form in 2005 to state "that it could not be 'revoked or terminated by the undersigned player' prior to the expiration date," and they argue that the absence of this language from the Adderley RPGLA proves that it did provide such an early termination right. Opp'n at 28. But this argument is contrary to the express language of the Adderley RPGLA, which provides for a fixed termination date. See, e.g., Trial Exhibit 110 (Adderley RPGLA) (Papendick Decl., Ex. 9).

---

1  about what the agreement meant before you signed it?  A.  No, I didn't.") (McNeil testimony)

2  (Papendick Decl., Ex. 2).

3  Instead, Plaintiffs try to cobble together fragments of statements from Players Inc's

4  website and marketing materials and argue that they somehow constitute evidence of

5  Defendants' representations to the GLA Class members about acting as their marketing agent.

6  See Opp'n at 24-26.  Critically, however, Plaintiffs offer no evidence that any GLA Class

7  member ever read or heard those website comments or statements.  Instead, Plaintiffs rely upon

8  the testimony of EA's Joel Linzner – a third party – whose testimony cannot substitute for

9  evidence of the "reasonable expectations of the parties" to the RPGLA.  Final Charge to the Jury

10  No. 41, at 15 (emphasis added).  Moreover, the website references and other marketing evidence

11  that Plaintiffs cite contains no representations that would transform an ordinary licensing

12  agreement into a fiduciary relationship.  See Opp'n. at 23-24.

13  Indeed, the law is clear that even a marketing agreement does not, by itself, create any

14  fiduciary duties.  See, e.g., Arnold Prods., Inc. v. Favorite Films Corp., 298 F.2d 540, 543 (2d

15  Cir. 1962) (holding that agreement between motion picture owner and distributor, giving

16  distributor the exclusive right to exploit films and requiring it to pay a percentage of revenues to

17  the owner, was not a fiduciary relationship, but one of "simple contract").[25]

18  **4.  The Fiduciary Duty That Plaintiffs Seek to Impose was Beyond the Parties' Reasonable Expectations**

19  As the Court instructed, the jury also had to take into account "the reasonable

20  expectations of the parties … [Y]ou may not impose on defendants a fiduciary duty, if at all, that

21  would exceed the reasonable expectations of the parties in the circumstances of this case."  Final

22  Charge to the Jury No. 41, at 15.  The jury's zero contract damages verdict, however, necessarily

23  rejected any alleged duty of Defendants to include the GLA Class in the GLR pool.  See Point

24

25  _____

26  [25] See also Mellencamp v. Riva Music Ltd., 698 F. Supp. 1154, 1159 (S.D.N.Y. 1988) ("[T]he express and implied obligations assumed by a publisher in an exclusive licensing contract are not, as a matter of law, fiduciary duties."); Van Valkenburgh, Nooger & Neville, Inc. v. Hayden Publishing Co., 330 N.Y.S.2d 329, 332 (N.Y. 1972) (overruling finding of fiduciary relationship between an author and publisher who entered into a contract, even though the contract contained a "best efforts" clause concerning marketing).

27

28

---

I.A, supra. Thus, as the Court observed, such a duty could not have been within the parties' reasonable expectations:

> [THE COURT]: So if the reasonable expectations of the parties was in no way that the retired players were going to share with the active money, how can you then say that the contract and the circumstances imposed a fiduciary duty to do the opposite, i.e., to get them into the share and share alike with the active money?

Trial Tr. 2465:24-2466:9 (Papendick Decl., Ex. 2).

Plaintiffs contend that the same inapposite evidence referred to above (e.g., statements from Defendants' websites and the testimony of EA's Linzner) supported Plaintiffs' purported expectation that "the breach of fiduciary duty [] has to be that Defendants should have thrown in the retireds for free." Trial Tr. 2471:16-2472:22; Opp'n at 23-26. However, statements and testimony that GLA Class members were unaware of could not have shaped their expectations. Nor could any of the communications that were actually directed to GLA Class members (e.g., the GLA solicitation letters) have led them to reasonably believe that they would be included in the active player GLR pool. See, e.g., Opp'n at 24 (quoting Trial Ex. 23 (letter to retired players merely stating that if they signed the RPGLA, "[they] might get the opportunity to receive royalty payments or appearance fees," and further describing how active player licensing revenues were distributed to the active players) (emphasis added)).

### 5. The Financial Arrangement Between the Parties Could Not Support the Finding of a Fiduciary Duty

Finally, the Court instructed the jury to consider "the financial arrangements between the licensor and the licensee . . . ." Final Charge to the Jury No. 39, at 15. However, under D.C. law, the jury had to consider all of the applicable factors before finding an agency relationship. See, e.g., Judah, 744 A.2d at 1040 (listing conjunctively the factors to be considered). There was simply no evidence in the record to permit a reasonable jury to find that the agency factors instructed by the Court gave rise to a fiduciary relationship merely because Defendants did not pay Plaintiffs a flat licensing fee. Indeed, there is no support for such a finding of fiduciary duty under D.C. law. See Mot. at 25.[26]

---

[26] As Defendants have previously noted, a contrary rule would mean that any license agreement

**B. Plaintiffs Have Not Proven Any Breach Of Fiduciary Duty**

As discussed at length in Defendants' Motion, every breach of fiduciary duty claim asserted by Plaintiffs was circularly dependent upon their claimed entitlement to share equally with active players in the GLR pool.  See Mot. at 26-30.  Plaintiffs' Opposition does not dispute this.  Opp'n at 28-29.  The consequence is that once the jury awarded no damages based on the GLA Class not receiving equal shares of the GLR pool, all of Plaintiffs' fiduciary duty theories were negated.  See, e.g., Trial Tr. 2465:24-2466:9 ("[THE COURT]:  So if the reasonable expectations of the parties was in no way that the retired players were going to share with the active money, how can you then say that the contract and the circumstances imposed a fiduciary duty to do the opposite, i.e., to get them into the share and share alike with the active money?").  Plaintiffs' Opposition does not respond to this point, other than to repeat their unfounded assertion that the jury did not reject Plaintiffs' equal share of the GLR pool claim.  Opp'n at 29.  As discussed in Point I.A, supra, there can be no doubt that both of the jury's damages verdicts rejected Plaintiffs' GLR pool damages theory, since there was no damages award that even remotely correlated to such a theory.  Accordingly, there was no basis to support the jury's breach of fiduciary duty liability verdict.  See Mot. at 26-30.

**CONCLUSION**

For all of the foregoing reasons, as well as those set forth in the Motion, both the compensatory damages and punitive damages awards must be vacated, and the breach of fiduciary duty liability verdict must be overturned.

Date: December 26, 2008                          DEWEY & LEBOEUF LLP

                                                 BY:  ___/s/ Jeffrey Kessler_____
                                                      Jeffrey L. Kessler
                                                      *Attorneys for Defendants*

---

that calls for the payment of a royalty, rather than a fixed sum at the outset of the licensing relationship, would create a fiduciary relationship.  That is simply not the law.  See Wolf v. Super. Ct. of L.A. County, 107 Cal. App. 4th 25, 30-31 (Cal. Ct. App. 2003) ("[T]he contractual right to contingent compensation in the control of another has never, by itself, been sufficient to create a fiduciary relationship where one could not otherwise exist."); Sony Music Entm't Inc. v. Robison, 01 Civ. 6415 (LMM), 2002 U.S. Dist. LEXIS 3100, *9 (S.D.N.Y. Feb. 26, 2002); Mellencamp, 698 F. Supp. at 1159.

Dewey & LeBoeuf LLP
One Embarcadero Center, Suite 400
San Francisco, CA 94111