MANATT, PHELPS & PHILLIPS, LLP
RONALD S. KATZ (Bar No. CA 085713)
E-mail: rkatz@manatt.com
RYAN S. HILBERT (California Bar No. 210549)
E-mail: rhilbert@manatt.com
NOEL S. COHEN (California Bar No. 219645)
E-mail: ncohen@manatt.com
1001 Page Mill Road, Building 2
Palo Alto, CA 94304-1006
Telephone: (650) 812-1300
Facsimile: (650) 213-0260

McKOOL SMITH, P.C.
LEWIS T. LECLAIR (Bar No. CA 077136)
E-mail: lleclair@mckoolsmith.com
JILL ADLER NAYLOR (Bar No. CA 150783)
E-mail: jnaylor@mckoolsmith.com
300 Crescent Court, Suite 1500
Dallas, TX 75201
Telephone: (214) 978-4000
Facsimile: (214) 978-4044

*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| BERNARD PAUL PARRISH, HERBERT ANTHONY ADDERLEY, and WALTER ROBERTS, III on behalf of themselves and all others similarly situated,<br><br>Plaintiffs<br><br>vs.<br><br>NATIONAL FOOTBALL LEAGUE PLAYERS ASSOCIATION, a Virginia corporation, and NATIONAL FOOTBALL LEAGUE PLAYERS INCORPORATED d/b/a PLAYERS INC, a Virginia corporation,<br><br>Defendants. | CIVIL ACTION NO. C07 0943 WHA<br><br>**PLAINTIFFS' SUBMISSION OF THREE EXAMPLES OF NON-SPECULATIVE WAYS JURY COULD HAVE REASONABLY AWARDED $7.1 MILLION COMPENSATORY CLASS-WIDE DAMAGES BASED ON EVIDENCE IN TRIAL RECORD**<br><br>Date: January 8, 2009<br>Time: 2:00 p.m.<br>Judge: Honorable William H. Alsup<br><br>FILED PURSUANT TO COURT ORDER |

Pursuant to the Court's directive, the attached three illustrative calculations show different ways that the jury could have non-speculatively (that is, based on evidence in the record) arrived at $7.1 million in compensatory damages. This process is absolutely proper. Of course, it is in

- 1 -

PLAINTIFF'S SUBMISSION OF THREE
EXAMPLES OF NON-SPECULATIVE
DAMAGES CALCULATIONS

fact speculation on the part of counsel that the jury actually used any of these methods, or based its award on the amount of money paid via *ad hocs* as Defendants' counsel speculates. However, the type of speculation prohibited by the cases is "jury" speculation, defined as arriving at a damage award not based on evidence in the record. Each of the foregoing examples is unquestionably based on evidence in the record and utilizes the basic methodology described by Plaintiffs' expert. The idea that *In re First Alliance Mortgage* precludes this type of analysis is simply incorrect. In that case, the lawyers came up with a sample damage theory not "tethered to the law or the facts of the case" and therefore, unlike the examples here, could not be used to support the jury's conclusion.[1] The jury of course is entitled to accept or reject all, part of, or none of each witnesses' testimony. Therefore, in reaching $7.1 million, the jury had a great deal of flexibility so long as their calculation was rooted in the evidence.

There are many other examples that could be provided to this Court of how the jury could have reasonably reached its damages conclusion based on evidence in the record. We accept, of course, the Court's admonition that we are limited to only three illustrative examples, and thank the Court for providing us with this opportunity.

Dated: January 9, 2009

Respectfully submitted,

MANATT, PHELPS & PHILLIPS, LLP

By: /s/ Ronald S. Katz
  Ronald S. Katz (SBN 085713)
  Ryan S. Hilbert (SBN 210549)
  Noel S. Cohen (SBN 219645)
1001 Page Mill Road, Building 2
Palo Alto, CA 94304-1006
Telephone: (650) 812-1300
Facsimile: (650) 213-0260

*Attorneys for Plaintiffs*

41353025.1

---

[1] *In re First Alliance Mortgage* involved an exact damage number ($50,913,928) that left "no other plausible explanation" than an improper one for what the jury did. That exactness made *In re First Alliance Mortgage* according to the Ninth Circuit, "the rare case in which it is sufficiently certain that the jury award was not based on proper consideration of the evidence." In this case, the jury would have had to come up with the exact number of ad hoc payments ($7,116,196.29) to be "sufficiently certain" under *In re First Alliance Mortgage*. It did not. Instead of awarding that number, which was readily available to it, the jury awarded $7.1 million.

# EXAMPLE 1 -- DAMAGE CALCULATION BASED ON EA DEMONSTRATED USE OF ACTIVE AND RETIRED PLAYERS IN MADDEN GAME

This example represents a mathematical calculation, using the **method** explained at trial by Plaintiffs' damages witness Phillip Rowley,[1] that is based on the jury reasonably interpreting the RPGLA to mean that the amount of money that the class was entitled to share equally would be calculated using the number of class members actually "utilized" (as stated in the RPGLA itself) in the Madden game (a licensed use by EA). The jury would base this calculation on a finding that EA utilized 6 or more class members in the game, thereby entitling the entire class to share equally in that amount once calculated.

| Damage Factor | Amount | Source / Exhibit |
|---|---|---|
| Total EA Licensing Revenue 2004-2007 (includes moneys paid for Madden games) | $82,298,000 | Ex 1217 |
| Player Share of Licensing Revenue (based on "template" approved by Union) | 37% | Ex. 95 |
| Amount of Player Equal Share Royalty from EA Total Licensing Revenue | $28,970,260 | Calculation (adjusted for "$8 million re-allocation" (Ex. 91) by reducing 37% player share for 2006 season paid in 2007.) |
| Number of Active NFL Players Included in Madden game | 1800 | Ex 1246, 1257, 1263 |
| Number of RPGLA Class Members In Madden game | 586[2] | Ex 1240 (compilation exhibit in evidence showing by player those class members who were "scrambled") |
| | 2386 | Sum of Active and Retired Players |
| RPGLA Retired Players as % of Total Number of Players in Madden game | 24.5% | Calculation |
| Retired Player Share Based on EA Revenue and Madden Use | $7,097,713 | Calculation |
| Damage Amount for Retired Players | **$7.1 Million** | |

---

[1] The Rowley "method" (simply stated) was adding active and retired players together, calculating a percentage based on the ratio of retireds to actives, then applying that percentage to the royalties earned. In this example, the jury decides that sharing of revenue should have been based on the percentage of active players and retired class members actually included in the game.

[2] Because 586 is more than "six" retired class members, the monies attributed to the use of 586 is shared equally by the 2062 class members under the RPGLA.

# EXAMPLE 2 --DAMAGE CALCULATION BASED ON TOPPS AND UPPER DECK REVENUE AND DIFFERENT LICENSE AGREEMENT

This example assumes that the jury found that the class was entitled to revenues earned from Topps and Upper Deck licenses. It represents a mathematical calculation, using the **method** explained at trial by Plaintiffs' damages witness Phillip Rowley,[3] that is based on the jury reasonably concluding, from the language of the Topps and Upper Deck license agreements (Trial Exhs. 32 and 36, paragraph 1) (which specifically references Defendants' representation of retired players for purpose of the agreement in a clearer way than other licenses) that retired players were in fact included in those licenses. In this example, the jury accepts the reasonable proposition that all class members are included in the calculation. Dr. Rascher testified that an appropriate percentage of royalties retained by the Union would have ranged anywhere from 10 to 40% (Trial Tr. 1737:24-1738:2). This example assumes 15%, well within Dr. Rascher's range.

| Damage Factor | Amount | Source Exhibit |
|---|---|---|
| Total Topps and Upper Deck Licensing Revenue 2004-2007 | $20,826,000 | Ex 1217 |
| Player Share of Licensing Revenue | 85% | Adjustment based on Dr. Rascher's testimony |
| Player Share of Licensing Revenue | $17,702,000 | Calculation |
| Average Number of Retired Players (2004-2007) | 1512 | Ex 2057 |
| Average Number of Active Players less Practice Squad | 2100 | Ex 1298 (PI140567), Ex 1299 (PI141324) |
| Retired Players Share of Licensing Revenue (average ratio of retireds to actives) | 40% | Calculation based on Rascher testimony noted above (Trial Tr. 1737:24-1738:2) |
| Retired Player Share of Revenues Topps and Upper Deck | $ 7,080,840 | Calculation |
| Damage Amount for Retired Players | **$7.1 Million** | |

---

[3] The Rowley "method" (simply stated) was adding active and retired players together, calculating a percentage based on the ratio of retired payers to actives, then applying that percentage to the royalties earned.

# EXAMPLE 3 --DAMAGE CALCULATION BASED ON TWO YEARS OF EA ROYALTIES (2004-2005)

This sample calculation assumes that the jury allocated damages to the RPGLA Class based on the equal share royalty amount paid by EA for the years 2004 and 2005 from Ex. 1298 and 1299. The reasonable basis for using only the two earlier years is that the jury had ready access to the equal share royalty amount for those two years and the actual number of active players (see Exs. 1298 (PI140567) and 1299 (PI141324), which included the information for years 2004 and 2005). That same evidence in that form for 2006 and 2007 was not admitted into evidence. Although the jury could have obtained the information for 2006 and 2007 from other information in the record, they reasonably could have chosen the two earlier years based on Ex. 1298 and 1299. Based on the information available to the jury, they were able to make their own calculation based on the methodology suggested by Plaintiffs' witnesses. The Court even acknowledged this during the charge conference: "I'm going to deny this motion, because it looks to me like there's sufficient evidence from which the jury could figure out for each payment into the fund how many active players participated in it. And we know how many class members there were by year." (Trial Tr. 2556-59). Using the number of active players for those years, and finding, based on the royalties listed on Ex. 1217, that EA royalties averaged approximately 50% of total royalties based on that exhibit, and using the number of RPGLA class members by year from Ex. 2057, the jury could reasonably have found $7.1 million owed as follows.

|  | **2004** | **2005** | **Source Exhibit** |
|---|---|---|---|
| Equal Share Royalty | $15,401,000 | $17,701,000 | Ex 1298 (PI140567), Ex 1299 (PI141324) |
| EA Total Licensing Revenue paid as a Percentage of Total Licensing Revenue | 50% | 50% | Ex. 1217 |
| Amount of Assumed Equal Share Royalty from EA Percentage of Total Licensing Revenue | $7,700,000 | $8,850,000 | Calculation |
| Active Players less Practice Squad | 2142 | 2172 | Ex 1298 (PI140567), Ex 1299 (PI141324) |
| Retired Players | 1980 | 1,425 | Ex. 2057 |
|  | 4122 | 3597 | Sum |
| Retired Players % of Total | 48% | 39% | Calculation |
| Retired Player Share Based on EA Revenue Percentage | $3,696,000 | $3,451,500 | **$7,147,500** |
| Damage Amount for Retired Players |  |  | **$7.1 Million** |