# Dewey & LeBoeuf

Dewey & LeBoeuf LLP
1301 Avenue of the Americas
New York, NY 10019-6092

tel   +1 212 259 8050
fax   +1 212 259 7013
jkessler@dl.com

January 12, 2009

The Honorable William Alsup
United States District Court,
Northern District of California
450 Golden Gate Avenue
San Francisco, CA  94102

      Re:    *Parrish v. National Football League Players Association, et al.*
             **Case No. C07-0943 WHA**

Dear Judge Alsup,

      Defendants National Football League Players Association ("NFLPA") and National Football League Players Incorporated ("Players Inc") (collectively, "Defendants") hereby respond to Plaintiffs' Submission dated January 9, 2009 ("Submission").

      Plaintiffs' desperate attempt to contrive a purportedly reasonable basis in the trial record for the jury's $7.1 million breach of fiduciary duty damages award is utterly without merit.  Each of Plaintiffs' three examples rests upon misleading or incorrect calculations, numbers that are contrary to (or absent from) the trial record, grossly speculative assumptions, and three new damages methodologies that were never presented to the jury.  Indeed, class counsel's three Rube Goldberg constructs – their "best" attempts to support the $7.1 million breach of fiduciary duty damages verdict – merely underscore Plaintiffs' failure to submit any evidence of breach of fiduciary duty damages other than their theory of a contractual right by the GLA Class members to an equal share of the GLR pool.  That theory, however, was unequivocally rejected by the jury in its zero damages award on the breach of contract claim.  Perhaps the most disturbing, and revealing, aspect of Plaintiffs' Submission is that Plaintiffs' three examples rely upon un-disclosed erroneous "calculations" – *e.g.*, inconsistently rounding to whatever numbers that yield an end result of $7.1 million  – that expose the invalidity and unprincipled nature of each such example.  This response must therefore review Plaintiffs' misstatements in some detail.

      It is obvious that the jury either based its $7.1 million damages verdict on pure speculation or on the $7.116 million in ad hoc licensing revenues.  See Trial Exhibit 2056 (Decl. of David Greenspan, Ex. 2 (Nov. 26, 2008) (Rec. Doc. 581)).  Either result requires that the damages verdict be set aside.  See Defs.' Renewed Mot. for Judgment as a Matter of Law ("Defs.' Mot.") at 5-12 (Nov. 26, 2008); Defs.' Reply in Further Support of Their Renewed Mot. ("Defs.' Reply") at 3-11 (Dec. 26, 2008).  It is equally obvious that it would defy reason for the Court to conclude, as Plaintiffs urge, that the jury – without even the aid of a calculator – could have adopted any of the convoluted damages calculations now suggested, for the first time in this case, by Plaintiffs' counsel.  Indeed, many of the numbers in Plaintiffs' examples seem to be the

product of class counsel's imagination, dreamed up after trial. An award based upon such speculation and conjecture by the jury – even if possible – would be legally insufficient to sustain a damages verdict. See, e.g., In re First Alliance Mortgage Co., 471 F.3d 977, 1001 (9th Cir. 2006) (trial court may not affirm damages verdict which was based on either speculation or improper evidence); see also Defs.' Reply at 7 (citing, inter alia, In re IBM Peripheral EDP Devices Antitrust Litig., 481 F. Supp. 965, 1013-1014 (N.D. Cal. 1979) (directing verdict for defendant because the available "damages evidence would give no guidance [to the jury]. . . .") and Informatica Corp. v. Business Objects Data Integration, Inc., No. C 02-3378 EDL, 2007 WL 2344962, *3 (N.D. Cal. Aug. 16, 2007) (vacating damages award that conflicted with calculations in the record)).

Moreover, the three new damages calculations presented by Plaintiffs in their Submission are not, as Plaintiffs claim, based on the sole damages methodology presented to the jury by Philip Rowley, Plaintiffs' damages expert. It is thus unsurprising that, notwithstanding Plaintiffs' repeated claims that their three new calculations were supported by Mr. Rowley's trial testimony, Plaintiffs' Submission does not include a single citation to that testimony. Accordingly, it would have been pure "speculation or guesswork" for the jury to calculate damages on the basis of theories that were never presented to them during the trial.

Mr. Rowley's GLR pool damages methodology had four basic steps. "The first step was to determine the gross licensing revenues," which consisted of all licensing revenues received by Defendants on an annual basis (excluding the ad hoc licensing revenues). Trial Tr. 1844:10-1846:7. Mr. Rowley's first calculation thus took into account all of the licensing revenues that flowed into the GLR pool on an annual basis, as opposed to revenues attributable to any particular license or licensee. See id.; see also Expert Report of Philip Y. Rowley ("Rowley Expert Report") at 4-5 & Ex. 3A (May 23, 2008) (attached as Exhibit 1 hereto).

"The next step that occurs is there is a deduction by NFLPA/PI . . . for themselves. . . . On an annual basis it ranges between 63 and 69 percent." Trial Tr. at 1846:19-25 (emphasis added). This calculation results in "what's called the equal share pool," i.e., the approximately 31% to 37% of the GLR pool that was shared among eligible active players "on an annual basis." Id.

Mr. Rowley's third step was to calculate "a new number of players to participate in the equal share pool," i.e., to calculate the number of eligible retired players to share in the GLR pool with eligible active players each year during the statute of limitations. Trial Tr. 1847:1-1849:1. This step had two components: "[f]irst, there is the number of active players in any given year. Then, you also have to find in any given year the number of retired players who had signed the relevant GLA" in that year. Id. (emphases added).[1] Mr. Rowley then took this new

---

[1] Under the "Rowley method," in order for a GLA Class member to be eligible for an equal share payout in a particular year, he must have had a RPGLA in effect on the last day of the prior year. See Rowley Expert Report at 3-4, n. 6. Thus, for example, a GLA Class member must have had a RPGLA in effect on December 31, 2004 in order to be eligible for an equal share payment in 2005. See id.

sum of eligible active and retired players to share in the GLR pool in a given year, and then calculated equal shares "based on all the players being included, retired and active players for the given year . . . ." Id. at 1849:6-1850:2.

Mr. Rowley's fourth and final step was to calculate the total amount of damages owed to the class. To arrive at his figure, "[i]n any given year, I then multiply that [equal share] amount by the number of retired players in that given year to come up with what [all] retired players are owed for the given year." Id. Mr. Rowley added up his equal share calculations for 2004, 2005, 2006 and 2007 and presented them to the jury as follows: $29 million ($32 million with interest) based upon the current GLR pool allocation (37% to players, 40% to the NFLPA, and 23% to Players Inc); $49 million ($54 million with interest) if Defendants retained a total of 40% of the GLR pool; $61 million ($68 million with interest) if Defendants retained a total of 25% of the GLR pool; and $73 million ($82 million with interest) if Defendants retained a total of 10% of the GLR pool.[2] Trial Tr. 1850:12-1851:25.

As Mr. Rowley testified at trial, this equal share of the GLR pool methodology was the only damages methodology submitted to the jury for both the breach of contract and breach of fiduciary duty claims:

> Q: Right. In other words, your whole premise for every one of your calculations is that the jury will find that the retired players by signing a Retired Player GLA were entitled to an equal share of the GLR pool? All your calculations are premised on that, right?
> A: Yes.
> \* \* \*
> Q. Now, Mr. Rowley, you – all of your calculations are based on the Plaintiffs receiving an equal share of this GLR pool, correct?
> A. Correct. Correct.

Trial Tr. 1915:19-1916:24; 1866:20-23 (emphasis added).

Thus, once the jury rejected the premise that GLA Class members were entitled to equal shares of the GLR pool (by, among other things, finding zero damages for breach of contract (see Defs.' Mot. at 4-11 and Defs.' Reply at 2-10)), there was no other damages evidence or theory in the record from which the jury could reasonably award fiduciary duty damages. As Mr. Rowley testified:

---

[2] In so calculating damages, the "Rowley method" rested upon an unlawful attempt to award Plaintiffs four annualized GLR pool payments during the three-year statute of limitations period. As the Court stated at trial, "So without getting into whether you go with when it's on a cash basis versus an accrual basis. It's just going to be three. You can't have four years." Trial Tr. 1957:11-13 (emphasis added). This fatal flaw is repeated in Plaintiffs' Examples Numbers 1 and 2 (which assume damages awards for 2004, 2005, 2006 and 2007), and constitutes an additional reason why these calculations cannot provide a reasonable evidentiary basis for the $7.1 million damages verdict. See Submission at 3, 4.

> Q. Okay. Now, these numbers, can they represent a number that the jury might find reasonable as an award for purposes of breach of fiduciary duty, damages, and if so, how?
>
> [Counsel's objections]
>
> A. <u>No</u>, <u>I did not – I did not have different calculations.</u> They are the same.
>
> \*   \*   \*
>
> Q. You've given the jury no basis to calculate any damages if they find that retired players are not entitled to active player licensing money and all the money in the GLR pool is active player licensing money, correct?
>
> A. If those two assumptions are true, then, yes.

Trial Tr. 1852:14-1855:11 (emphasis added); 1937:3-1938:15.

In sum, it would have been pure "speculation or guesswork" for the jury to have engaged in damage calculations and theories that were not presented to them by Mr. Rowley or any other witness in the case (such as the "Mr. Hollywood" damages evidence suggested by the Court). See Defs.' Mot. at 8-11; Defs.' Reply at 4-8. Yet, such "speculation or guesswork" is exactly what the jury's breach of fiduciary duty damages verdict would have been based upon if the jury had, in fact, adopted any one of the three new damages methodologies now offered for the first time in Plaintiffs' Submission. As detailed below, Plaintiffs' three examples have no basis in Mr. Rowley's damages methodology, and are based upon misleading or erroneous calculations and assumptions that are directly contrary to the record evidence.

## I.   **Plaintiffs' Example Number 1**

In Example Number 1, Plaintiffs assume that the jury awarded damages based upon the revenues paid by EA from 2004 to 2007, and based upon the number of GLA Class members purportedly scrambled in the 2007 Madden video game. See Submission at 3. Even assuming that the jury could properly calculate damages based solely upon the licensing revenues paid by EA during the statute of limitations (2004 to 2007),[3] the damages amount would be <u>more than double</u> the $7.1 million amount that Plaintiffs claim. See Submission at 3.

At trial, Plaintiffs' counsel elicited testimony from Mr. Rowley about how the jury could calculate damages based solely upon the 2004 to 2007 EA licensing revenues. Mr. Rowley explained that because the gross licensing revenues paid by EA from 2004 to 2007 comprise

---

[3] An essential premise of Plaintiffs' contractual and fiduciary duty theories was that retired players who signed the RPGLA were legally entitled to share in <u>all</u> of the licensing revenues that flowed into the GLR pool – not just the licensing revenues from a specific licensee such as EA. See, e.g., Joint Final Pre-Trial Order ("Final Pre-Trial Order") at 4 (Oct. 8, 2008) (Rec. Doc. 458) ("In breach of their contractual and fiduciary obligations, Defendants distributed the revenues that it generated in connection with its collective group licensing program in equal shares to every 'eligible NFLPA member,' whether famous or unknown").

approximately half of all GLR pool revenues during that time period, the jury would award half of any of Mr. Rowley's damages calculations if the jury wanted to limit any damages award to only EA licensing revenues.[4]  See Trial Tr. 1857:9-20.  Thus, under the "Rowley method," the minimum amount of damages based solely on the 2004 to 2007 EA licensing revenues would have been $14.5 million, or 50% of Mr. Rowley's smallest damages calculation ($29 million).

The only way that Plaintiffs were able to purportedly arrive at the $7,097,713 calculation in Example Number 1 was by ignoring and contradicting the Rowley methodology presented to the jury, and by making a host of wholly speculative factual assumptions that are contrary to the evidence in the trial record.  The following review of each step of Plaintiffs' "calculation" makes this clear.

"Total EA Licensing Revenue 2004-2007 (includes moneys paid for Madden games)"

As stated above, Example Number 1 is premised upon the jury awarding damages "using the number of class members actually 'utilized' (as stated in the RPGLA itself) in the Madden video game."  Submission at 3 (emphasis added).  But, as the Court correctly stated at the recent hearing, not all of the EA licensing revenues during the statute of limitations were attributable to licensing the Madden video game.  Thus, the $82,298,000 number used by Plaintiffs deliberately overstates the actual amount of revenues paid by EA to license the Madden video game because it makes no deduction for, for example, the fantasy football licensing revenues paid by EA during the statute of limitations period.  See, e.g., Trial Ex. 79 (EA license agreement for fantasy football products).

"Amount of Player Equal Share Royalty from EA Total Licensing Revenue"

The next input into Plaintiffs' results-oriented calculation is a figure of $28,970,260, which they claim represents the "Amount of Player Equal Share Royalty from EA Total Licensing Revenue."  Submission at 3.  But multiplying $82,298,000 (the revenues purportedly attributable to licensing the Madden video game) by 37% (the "Player Share of Licensing Revenue") actually equals $30,450,260.  Plaintiffs claim that they have "adjusted" this figure to account for the "$8 million re-allocation," but they neither disclose how they made this "adjustment," nor cite any evidence from the trial record to support such an adjustment with respect to only the EA licensing revenue.

---

[4] An examination of Trial Exhibit 1217 – Plaintiffs' "source exhibit" for the "Total EA Licensing Revenue 2004-2007" (Submission at 3) – shows that the EA licensing revenues did, in fact, comprise approximately half of all gross licensing revenues paid to Defendants during the statute of limitations. See Trial Ex. 1217 at 1, 4 (showing that from 2004 to 2007, EA paid $82,297,891.68, and that the total amount of gross licensing revenues paid during this period were $161,727,456.52) (Decl. of Ryan Hilbert, Ex. C (Dec. 18, 2008) (Rec. Doc. 597)).  To be exact, EA revenues comprised 50.9% ($82,297,891.68 divided by $161,727,456.52 = 50.88%) of all gross licensing revenues paid during the statute of limitations.

Working backwards, it is clear that Plaintiffs instead subtracted $4 million from $82,298,000, and then took 37% of that figure.[5] But Mr. Rowley never made any such calculation, and Plaintiffs cite no evidence in the trial record to support such a $4 million adjustment. To the contrary, Mr. Rowley testified that when using the 37% number as the "Player Share of Licensing Revenue" – which is the percentage that Plaintiffs assume in Example Number 1 – there should be no adjustment for the $8 million re-allocation: "Obviously, there would be no adjustment for the $8 million here if you assume that the 63 to 69 was appropriate because essentially you're getting to the 69 because the $8 million was taken out." Trial Tr. 1852:1-13.[6] There is simply no basis for the so-called "adjustment" made by Plaintiffs in Example Number 1. And, significantly, had Plaintiffs not made this "adjustment," their bottom line damages calculation in Example Number 1 would have been $7.46 million – not anything close to $ 7.1 million.

"Number of Active NFL Players Included in Madden Game"

Plaintiffs purport to calculate the GLA Class's share of the 2004 to 2007 EA licensing revenues by assuming there are 1,800 "Active NFL Players Included in Madden game." Submission at 3. There is no evidentiary basis whatsoever for this number. To begin with, it is completely irrelevant under the "Rowley method" how many active players were actually used in the Madden video game. Rather, the "Rowley method" only considers the "number of active players in any given year" who "participate in the equal share pool" – not the number of active players who are utilized in any particular licensed product. Trial Tr. 1847:1-1849:1. Indeed, as Plaintiffs themselves point out, licensing revenues are "paid regardless of which player images, if any, [Defendants'] licensees actually use." Final Pre-Trial Order at 4; see also Trial Tr. 1222:23-1224:7.

Further, even if the number of "Active NFL Players Included in Madden game" had any relevance under the "Rowley method" (it does not), the 1,800 number utilized by Plaintiffs is a figment of class counsel's imagination. Plaintiffs claim that Trial Exhibits 1246, 1257, and 1263 are the "source exhibits" for this figure (see Submission at 3), but an examination of these exhibits reveals no evidentiary basis for the 1,800 number. Trial Exhibits 1246, 1257, and 1263 are nothing more than physical copies of three editions of the Madden game (2004, 2006 and 2007), and, as best as Defendants can tell, they do not say anything about the number of active players in the game. Further, Plaintiffs do not even purport to cite to any evidence for the supposed number of active players who were included in the 2005 version of the Madden video game.

---

[5] $82,298,000 - $4,000,000 = $78,298,000 x 37% = $28,970,260.

[6] A review of Mr. Rowley's Expert Report shows that even under a scenario where Mr. Rowley thought that an adjustment for the $8 million re-allocation would be appropriate, he made a $2.256 million adjustment – not a $4 million adjustment. See Rowley Expert Report, Ex. 3D (Ex. 1 hereto). Plaintiffs' Submission offers absolutely no explanation as to the source of their new and undisclosed $4 million adjustment.

"Number of RPGLA Class Members in Madden Game"

Plaintiffs' purported calculation of the "Number of RPGLA Class Members in Madden game" (Submission at 3) is just as irrelevant, arbitrary, and misleading as their "calculation" of the number of active players in the Madden video game. Once again, under the "Rowley method," it is irrelevant how many GLA Class members were allegedly utilized (or scrambled) in the Madden video game. All that matters is how many GLA Class members had GLAs in effect in any given year. See supra n.1. Thus, if the jury based their breach of fiduciary duty damages award on any purported "Number of RPGLA Class Members in Madden game," it would be completely speculative and thus improper and the verdict would have to be set aside.

Moreover, the number that Plaintiffs utilize – 586 – wildly misrepresents the evidence. For starters, Trial Exhibit 1240 – Plaintiffs' "source exhibit" for the 586 figure – only purports to identify "Samples" of "Class Members Whom Plaintiffs Contend" were utilized in the various Madden video games. See Trial Ex. 1240 (emphasis added). Plaintiffs never introduced into evidence any complete list of the allegedly "scrambled" players. In fact, for the 2003, 2004, 2005, and 2006 versions of the Madden video game, Trial Exhibit 1240 identifies only fifteen allegedly scrambled players. The only version of the Madden video game for which Plaintiffs introduced any evidence of 586 GLA Class members being scrambled is the 2007 PC version (id.), but even then, Trial Exhibit 1240 does not identify this total, nor did any witness testify to the 586 number at trial. See id. In other words, Plaintiffs are assuming that the jury manually counted up each of the 586 GLA Class members supposedly utilized in the 2007 PC version of the Madden video game, and then arbitrarily applied that number to all other versions of the Madden video game.

Even more fundamentally, Trial Exhibit 1240 misleadingly refers to "Class Members Whom Plaintiffs Contend are in Certain Versions of EA's Madden Video Game" without regard to whether those GLA Class members actually had GLAs in effect during the years when their identities were allegedly scrambled. Under the "Rowley method," however, a GLA Class member is only eligible for an equal share damages payment for years in which he had a RPGLA in effect (indeed, after a retired player's RPGLA expires, he has no contractual or other legal right to any payment). But the vast majority of the allegedly scrambled GLA Class members identified in Trial Exhibit 1240 did not have RPGLAs in effect when their identities were supposedly scrambled. For example, only two of the 586 GLA Class members allegedly scrambled in the 2007 PC version of the Madden video game actually had RPGLAs in effect at that time.[7] In fact, many of the retired players whose identities were allegedly scrambled in the 2007 version of the Madden video game had RPGLAs that had expired several years beforehand (including, for example, Mr. Adderley).

Finally, even if it would have been reasonable for the jury to calculate and award damages based on 586 purported GLA Class members being utilized in the 2007 Madden video

---

[7] They were GLA Class members Michael Booker and Eric Davis. Compare Trial Ex. 1240 with Trial Ex. 2057 (compilation of GLA Class members).

game (it would not have been), Plaintiffs have presented no formula for how to calculate individual damages to the GLA class members from such an award. Although Plaintiffs presented a methodology for calculating an award of equal shares of the GLR pool to class members – i.e., dividing the GLR pool equally between active players and GLA Class members with RPGLAs in effect – there is no evidence in the record of any class-wide damages formula for any other type of damages award, such as an award based upon Example Number 1, in which the jury would have found that only 586 GLA Class members suffered any injury, only two of whom had RPGLAs in effect during the year in which they were shown to have been "scrambled" in one version of the Madden game. See Defs.' Mot. at 11-12; Defs.' Reply at 10-11.

## II.  Plaintiffs' Example Number 2

Example Number 2 also would not have been a reasonable basis for the $7.1 million damages verdict. In this example, Plaintiffs "assume[] that the jury found that the class was entitled to revenues earned from [only] Topps and Upper Deck licenses." Submission at 4. Even accepting all of Plaintiffs' grossly unreasonable and speculative assumptions in Example Number 2 (addressed below), Plaintiffs' arithmetic is at best wrong, and at worst, a deliberate attempt to mislead the Court. Either way, Example Number 2 does not provide any support for a $7.1 million damages award.

The most glaring of Plaintiffs' mathematical "mistakes" in Example Number 2 is their contention that the "Retired Players Share of Licensing Revenues" would be 40%. In fact, even if the jury had utilized the rest of Plaintiffs' (unreasonable) numbers, GLA Class members would receive a 41.86% – not a 40% – share of the Topps and Upper Deck licensing revenues.[8] In other words, Plaintiffs rounded 41.86% down to 40%, nearly two percentage points – without disclosing it – so that they could manufacture the $7.1 million result.

When the mathematically correct percentage of the GLA Class's share of the Topps and Upper Deck licensing revenues is applied, the resulting damages amount is more than 7.4 million – $7,410,057.20 – hundreds of thousands of dollars more than the jury's actual damages verdict, and hundreds of thousands of dollars more than Plaintiffs' $7.1 million purported calculation.[9] Plaintiffs have thus resorted to blatantly erroneous arithmetic in an effort to yield a damages amount that has no reasonable support in the evidence presented to the jury. This is just one of the reasons why Example Number 2 does not provide any proper basis for the breach of fiduciary duty damages award.

---

[8] To calculate the retired players' 41.86% share of the Topps and Upper Deck licensing revenues, the Court can divide Plaintiffs' "average number" of eligible retired players (1,512) by Plaintiffs' "average number" of all eligible players (1,512 eligible retired players + 2,100 eligible active players = 3,612). See Submission at 4. 1,512 divided by 3,612 equals 41.86%.

[9] This corrected damages calculation is arrived at by multiplying the total Topps and Upper Deck licensing revenues at issue – $17,702,000 (Submission at 4) – by the GLA Class's percentage share of those revenues (41.86%), i.e., $17,702,000 multiplied by 41.86% equals $7,410,057.20.

"Total Topps and Upper Deck Licensing Revenue 2004-2007"

As stated above, Example Number 2 assumes that the jury awarded damages based solely on the Topps and Upper Deck license agreements. See Submission at 4. Not only would such a determination by the jury contradict the Rowley methodology (which calculated damages based upon the GLA Class members sharing in all licensing revenues in the GLR pool (supra)), it would have been arbitrary and speculative for the jury to single out Topps and Upper Deck from the other 126 licensees whose revenues flowed into the GLR pool. See Trial Ex. 1217 (identifying revenues in the GLR pool from 128 different licensees).

Unlike EA, for which Plaintiffs presented specific evidence, Plaintiffs presented no specific evidence about Topps or Upper Deck during the trial to even arguably provide a non-speculative basis for the jury singling out the Topps and Upper Deck license agreements from the dozens of other license agreements that also contain references to "retired players."[10] See, e.g., Pls.' Mot. for Class Certification at 8 (Mar. 14, 2008) (Rec. Doc. 217) (identifying "numerous" license agreements that contain "virtually identical language" to the EA, Topps, and Upper Deck license agreements); Pls.' Opp'n to Defs.' Mot. for Summary Judgment at 10 (same) (July 1, 2008) (Rec. Doc. 310). There was thus no reasonable and non-speculative evidentiary basis for the jury to award damages based solely on the Upper Deck and Topps license agreements. Rather, any such award would have been based on pure speculation and guesswork.

"Average Number of Retired Players"

One of the inputs in Plaintiffs' Example Number 2 is the "average number of [eligible] retired players" who purportedly should have received equal share payments during the statute of limitations (1,512). Although it strains reason to believe that the jury would have taken it upon itself to calculate such an "average number of retired players," even if it had, it would constitute yet another arbitrary calculation unsupported by any evidence in the trial record. Mr. Rowley never utilized (or calculated) any "average" number of eligible GLA Class members. Rather, he testified to the jury that the damages amounts must be based upon the number of retired players who had RPGLAs in effect "in any given year." Trial Tr. 1847:1-1850:2 (emphasis added). Calculating an average would have unreasonably skewed any damages award, because the size of the GLR pool changed substantially from year to year (see Trial Ex. 1217), and GLA Class members would only be entitled to equal shares of the GLR pool based upon the specific years in which they had a RPGLA in effect.

"Average Number of Active Players"

Again, there would have been no reasonable evidentiary basis for the jury to calculate

---

[10] See, e.g., Trial Tr. 465:4-10; 2356:9-2358:11 (class counsel informing Court of Plaintiffs' choice not to offer the deposition testimony of Topps's 30(b)(6) representatives Messrs. Zucker and Friss).

any "average number of [eligible] active players" over the statute of limitations period and then use that number as an input for calculating damages to the GLA Class. Rather, as stated above, the only damages methodology presented to the jury utilized the number of eligible active players "in any given year" – not an "average number" of eligible active players over all applicable years. Trial Tr. 1847:1-1849:1 (emphasis added).

Further, even if it would have been reasonable for the jury to utilize an "average number" of eligible active players (it would not have been), the "average number" that Plaintiffs utilize – 2,100 – is just another results-oriented number pulled from thin air and not supported by any evidence in the trial record. Plaintiffs cite to Trial Exhibits 1298 and 1299 as the purported "source exhibits" for using 2,100 as the "average number of [eligible] active players" from 2004 to 2007, but Trial Exhibits 1298 and 1299 are the Players Inc Annual Reviews from 2005 and 2006 – and do not contain any information about the number of eligible active players who received equal share payments in 2006 and 2007. See Trial Ex. 1298 at PI140567 (listing active player equal share payouts through 2004); Trial Ex. 1299 at PI140682 (listing active player equal share payouts through 2005) (Hilbert Decl., Exs. T & U). There is thus no evidentiary support for the 2,100 "average number" that Plaintiffs essentially make up for the obvious purpose of manipulating their damages calculation in Example Number 2.

"Player Share of Licensing Revenue"

In Example Number 2, Plaintiffs assume that the jury determined that eligible active and retired players should have shared in 85% of the Upper Deck and Topps licensing revenues.[11] Once again, Plaintiffs conjure this results-oriented 85% figure from thin air. Plaintiffs claim that it would have been reasonable for the jury to determine that 85% of the Topps and Upper Deck revenues should have been paid to eligible active and retired players (with Defendants retaining 15%) because Dr. Rascher – Plaintiffs' economics expert – "testified that an appropriate percentage of royalties retained by the Union would have ranged anywhere from 10 to 40%." Submission at 4. But Mr. Rowley never performed any calculations based upon Defendants paying out 85% of any portion of the GLR pool, and thus the jury would have had no evidentiary basis to calculate damages accordingly.[12] The selection of 15% by Plaintiffs is simply an arbitrary number designed, after the fact, to yield the mathematical result that Plaintiffs are seeking. There was no testimony by Mr. Rowley or Dr. Rascher to suggest that this particular percentage would have been appropriate.

---

[11] In stark contradiction, in Example Number 1, Plaintiffs assume that the jury determined that eligible active and retired players should have shared in 37% – as opposed to 85% – of certain gross licensing revenues.

[12] As explained above, Mr. Rowley calculated different equal share of the GLR pool damages amounts based upon Defendants paying out 37%, 60%, 75% and 90% of the GLR pool. See Trial Tr. 1850:12-1851:25. He never calculated any damages based upon Defendants paying out 85% of the GLR pool. Moreover, he never calculated any damages based upon the Defendants paying out a specific percentage share of only those revenues generated by the Topps and Upper Deck agreements.

### III.  Plaintiffs' Example Number 3

Just like Plaintiffs' first two examples, Example Number 3 does not offer a reasonable evidentiary basis for the breach of fiduciary duty damages award. Example Number 3 rests upon the premise "that the jury allocated damages to the RPGLA Class based on the equal share royalty amount paid by EA for the years 2004 and 2005." Submission at 5. Even assuming, for the sake of argument, that it would have been reasonable for the jury to award damages solely based upon the EA license agreements, there would have been no reasonable basis for the jury to limit damages to the EA revenues paid in 2004 and 2005.

Plaintiffs' only purported justification for why it would have been "reasonable" for the jury to award damages solely based upon the EA revenues paid in 2004 and 2005 is that "the jury had ready access to the equal share royalty amount for those two years" and the "same evidence in that form for 2006 and 2007 was not admitted into evidence." Submission at 5. But Plaintiffs' own failure of proof for calculating 2006 and 2007 EA damages cannot constitute a reasonable basis for the jury to limit damages to the revenues paid by EA in 2004 and 2005. And, in any event, Mr. Rowley did not provide the jury with evidence of any damages methodology that would enable it to calculate damages for only certain years.[13]

But even accepting the entirely arbitrary and speculative premise of Example Number 3 (that damages could have reasonably been limited to EA licensing revenues paid in 2004 and 2005), and even pretending that Plaintiffs provided the jury with a damages methodology for calculating such damages, such a calculation still would not yield a $7.1 million damages award. Plaintiffs only arrive at this amount by again applying results-oriented numbers that flatly contradict the evidence in the trial record.

The most significant of Plaintiffs' multiple computation "errors" in Example Number 3 is their use of "50%" as the "EA Total Licensing Revenue paid as a Percentage of Total Licensing Revenue." Submission at 5. Put plainly, in Example Number 3, Plaintiffs assume that EA revenues constituted 50% of total GLR pool revenues in 2004 and 2005, and that the jury could therefore have awarded EA-specific damages in those years by re-distributing 50% of the GLR pool. Id. The evidentiary problem, however, is that while the EA licensing revenues accounted for approximately 50% of the GLR pool over the entire statute of limitations period, EA licensing revenues did not account for even close to 50% of the GLR pool in 2004 and 2005 – the only years at issue in Example Number 3.

---

[13] As explained above, the underlying methodology for each of Mr. Rowley's calculations assumed that Plaintiffs would receive equal shares of all licensing revenues in the GLR pool for all years during the statute of limitations. See Trial Tr. 1866:20-23; 1915:19-1916:24. Indeed, Mr. Rowley specifically testified that he calculated damages based upon what he was instructed was the applicable statute of limitations. See Trial Tr. 1837:18-1838:6 ("The second [assumption] was that the Court provided me what was the appropriate law. That then dictated the relevant period to go back and look at the royalties . . .").

According to Trial Exhibit 1217 – Plaintiffs' purported "source exhibit" for the 50% figure – in 2004 EA paid $11,805,072.59 out of the $30,030,276.74 in licensing revenues that flowed into the GLR pool that year. See Trial Ex. 1217 at 1, 4. Thus, in 2004, EA licensing revenues accounted for approximately 39% – not 50% – of the GLR pool (i.e., $11,805,072.59 divided by $30,030,276.74 equals 39.3%). In 2005, EA licensing revenues accounted for $13,759,152.71 out of the $34,783,434.50 in gross licensing revenues, or approximately 40% of the GLR pool. See id. It should come as no surprise that replacing Plaintiffs' 50% figure with the correct percentages –39% in 2004, and 40% in 2005 – yields a dramatically different damages amount than the $7.1 million that Plaintiffs claim to have calculated in Example Number 3:

|  | 2004 | 2005 |
|---|---|---|
| Equal Share Royalty | $15,401,000 | $17,701,000 |
| **Corrected EA Total Licensing Revenue paid as a Percentage of Total Licensing Revenue** | **39%** | **40%** |
| **Corrected Amount of Assumed Equal Share Royalty from EA Percentage of Total Licensing Revenue** | **$6,006,390** | **$7,080,400** |
| Active Players | 2,142 | 2,172 |
| Retired Players | 1,980 | 1,425 |
|  | 4,122 | 3,597 |
| Retired Players % of Total | 48% | 39% |
| **Corrected Retired Player Share Based on EA Revenue Percentage** | **$2,883,067** | **$2,761,356** |
| **CORRECTED TOTAL DAMAGES AMOUNT:** | **$5,644,423** | |

The above is sufficient to illustrate how Plaintiffs are unreasonably manipulating their calculations in Example Number 3, but there also are several other data inputs that have absolutely no basis in the trial record.[14] Moreover, Plaintiffs once again employ creative

---

[14] For example, Plaintiffs assert that there were 2,142 eligible active players (excluding practice squad players) who shared in the GLR pool in 2004. See Submission at 5 (citing Trial Exhibits 1298 and 1299 as the "source exhibits"). But Trial Exhibit 1298 actually shows that there were 2,292 active players (excluding practice squad players) who received such GLR pool payments in 2004. Plaintiffs apparently

rounding – this time, they round 39.6% <u>down</u> to 39% – in order to manufacture the $7.1 million result. Even if all of the other amounts were correct (they are not), without this rounding manipulation the result of the calculation would have been more than $7.2 million, an amount the jury did <u>not</u> reach in its verdict.[15]

\* \* \*

Finally, Defendants will briefly respond to Plaintiffs' attempt to distinguish the Ninth Circuit's decision in <u>First Alliance Mortgage</u>. <u>See</u> Submission at 2. Notwithstanding class counsel's protests to the contrary, it is evident that the <u>only</u> non-speculative basis for the jury's $7.1 million breach of fiduciary duty damages amount is an unlawful attempt to redistribute the $7,116,196.29 in ad hoc licensing revenues that were paid to GLA Class members.[16] <u>See</u> Trial Ex. 2056. In considering the question of whether the jury – which did not have a calculator – could have engaged in any of the three convoluted (and arbitrary and improper) damages calculations posited by class counsel, versus whether the jury simply rounded to the nearest hundred thousand dollars the $7,116,196.29 amount which appears on the face of Trial Exhibit 2056, it becomes clear that, like <u>First Alliance Mortgage</u>, this is "the rare case in which it is sufficiently certain that the jury award was not based on proper consideration of the evidence." 471 F.3d at 1001.

In <u>First Alliance Mortgage</u>, the parties' damages experts offered two competing fraud damages figures, including a figure offered by plaintiffs that was based on a "benefit of the bargain" calculation. The district court subsequently determined that plaintiffs could not properly recover damages on a "benefit of the bargain" basis, and instructed the jury accordingly (just as the Court here instructed the jury that the ad hoc license revenue could not properly be redistributed). <u>Id.</u>; Final Charge to the Jury No. 17, at 6 (Nov. 7, 2008) (Rec. Doc. 549). Nevertheless, the jury returned a damages verdict that the Ninth Circuit was "sufficiently certain" was based upon the improper "benefit of the bargain" damages theory. <u>First Alliance Mortgage</u>, 471 F.3d at 1002.

---

adjusted the 2,292 number in order to purportedly exclude the number of practice squad players, but Trial Exhibit 1298 plainly states that the 2,292 number <u>already</u> excludes practice squad players. <u>See</u> Trial Ex. 1298 at PI140567 (column identifying "Total # Paid" is for "<u>non</u>-practice squad players <u>only</u>") (emphases added). Plaintiffs repeat this error in calculating the number of eligible active players in 2005.

[15] The Court can calculate the 39.6% number by dividing Plaintiffs' number of eligible retired players in 2005 (1,425) by Plaintiffs' number of total eligible players in 2005 (1,425 retireds + 2,172 actives = 3,597), <u>i.e.</u>, 1,425 divided by 3,597 equals 39.61% (<u>not</u> 39%). When this mathematically correct "Retired Player Share Based on EA Revenue Percentage" for 2005 is applied, the resulting 2005 damages are $3,504,600 (instead of $3,451,500), bringing the total amount of damages in Example Number 3 to over $7.2 million (<u>not</u> $7.1 million).

[16] Plaintiffs do not dispute, and the Court is well aware, that any such attempt to redistribute the ad hoc licensing revenues would be unlawful. <u>See</u> Defs.' Mot. at 7-8.

Plaintiffs now argue that First Alliance Mortgage is distinguishable because that case involved a damages verdict that was "exactly" the same as the improper damages evidence. Submission n. 2. But that is not true. In First Alliance Mortgage, the Ninth Circuit surmised that the jury "averaged the figures provided by the two damages experts," i.e., the jury awarded the average of a proper and improper damages amount. Id. Thus, unlike this case, where it is "sufficiently certain" that the jury's damages award was exclusively based on improper damages evidence (the $7,116,196.29 in ad hoc licensing revenues), the damages verdict that the Ninth Circuit overturned in First Alliance Mortgage was at least partly based on a proper damages number. Id.

More fundamentally, however, the Ninth Circuit's decision in First Alliance Mortgage stands for the principle that a district court must utilize common sense in evaluating a damages award. There, just like here, the plaintiffs advanced convoluted theories about how the jury might have arrived at its damages verdict without consideration of improper evidence. See Order Denying Lehman's Mot. for J. as a Matter of Law, Austin v. Chisick, No. SACV 01-971 DOC (C.D. Cal. Apr. 12, 2004) at 5-6 ("First Alliance Order") (Decl. of Ian Papendick, Ex. 7 (Dec. 26, 2008) (Rec. Doc. 601)). The district court ultimately adopted plaintiffs' conjecture, theorizing that evidence other than any related to a "benefit of the bargain" analysis may have led the jury to halve plaintiffs' damages figure, such as permutations of evidence about origination fees, interest rates, and lengths of loans. See id. at 5-6.[17] The district court then concluded that "[t]he jurors in this case sat through a lengthy and complex trial and sifted through mountains of evidence . . . . [Defendant] ha[s] not convinced this Court . . . that other components of the trial could not have provided the basis for the jury's award." Id.

But the Ninth Circuit reversed the district court, holding that it had improperly "bent over backwards to find a potentially valid basis in the record for the jury verdict [when] that rationale is obviously not tethered to the law or the facts of the case . . . ." First Alliance Mortgage, 471 F.3d at 1003. This Court should not make the same legal error here, which is exactly what Plaintiffs are urging the Court to do.

For all of these reasons, and for those stated in Defendants' prior briefing and at the hearing on this matter, Defendants respectfully request that the Court grant their Renewed Rule 50 Motion. It was Plaintiffs' calculated decision not to submit evidence from a "Mr. Hollywood" damages expert or other source to reasonably support a breach of fiduciary duty damages verdict. Having failed to supply such evidence for the jury's consideration, they cannot seek to support the jury's improper damages verdict now from blatantly false and wholly speculative damages calculations that have no support in the trial record.

---

[17] Specifically, the district court hypothesized that "[i]f the jury made a factual finding that the loans would be held for a relatively short period of time, the difference between the cost of First Alliance loans and competing loans would be much greater than Lehman's expert suggested. The jury easily may have found that the average First Alliance borrower would only be able to recoup half of the higher origination fees through lower interest rates. The verdict is perfectly acceptable given this theory of the jury's reasoning." First Alliance Order at 5-6.

                                                                      Respectfully submitted,

                                                                       /s/ Jeffrey L. Kessler_____
                                                                       Jeffrey L. Kessler
                                                                       Counsel for Defendants

cc:      Ron S. Katz, Esq.