United States District Court
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

BERNARD PAUL PARRISH, HERBERT ANTHONY ADDERLEY, WALTER ROBERTS III, on behalf of themselves and all others similarly situated,

    Plaintiffs,

  v.

NATIONAL FOOTBALL LEAGUE PLAYERS INCORPORATED, et al.,

    Defendants.
                                /

No. C 07-00943 WHA

**ORDER DENYING ALL POST-TRIAL MOTIONS**

      The jury returned a verdict for the plaintiff class of retired NFL players who had signed a "Retired Player Group License Agreement" during the class period, finding that defendants had breached a duty to market their likeness and names. The verdict was for $7.1 million in compensatory damages and $21 million in exemplary damages. Defendants have now moved for judgment in their favor. A hearing has been held. Briefing before and after the hearing have been considered.

      The Court is satisfied that the jury instructions were correct and fairly covered the issues submitted to the jury (or that any problem with them was not preserved). So much has already been said on the record as to the reasons for the instructions that more is unnecessary, although it is worth adding that on a majority of legal issues, the instructions favored the defense view of the law. The punitive damage instruction, for example, was exactly as requested by the defense.

The only other question is whether under the law as stated in the instructions, the trial evidence was sufficient to support the verdict. No doubt, defense counsel made a fine closing to the jury. Had the verdict been the other way, it would have been supported. But that is not the test. Given the deference we must accord jury verdicts, the test is whether the verdict as rendered was supportable. The answer is yes. Nor was the verdict so far against the weight of the evidence as to warrant a new trial.

The jury could reasonably have accepted the view of the evidence that defendants undertook a fiduciary duty to promote and to market all retired players who had signed RPGLAs — yet made no effort to do so — and that defendants' true commercial motive was to create an illusion of representation so that no one else would seek to sign up the RPGLA class and to market them. While defendants offered vague verbal testimony of passing attempts to market the RPGLA group as a whole, the jury could have easily rejected those snippets as self-serving "double talk." Not a single offer to market the entire group was ever in writing; nor was there ever any documentary corroboration of any such verbal group offer. To the contrary, the only writings showed the opposite of marketing — for example, that defendants told Electronic Arts to "scramble" the identities of retired players in the lucrative Madden vintage-team game. This game would have been a golden opportunity for defendants to have offered to license the entire group of RPGLA members but, significantly, no such offer was made — or so the jury could reasonably have found. Instead, defendants told EA to "scramble" the names and identities of retired players and the class received zero from this potential bonanza. What is more, the Hall of Fame evidence showed that defendants were willing to "sell out" the RPGLA class members in order to curry favor with EA (by keeping a competitor of EA out of the market) — or so the jury could have reasonably concluded. And, the "escrow account" referenced in the RPGLA (supposedly to be set up to hold revenues for class members) was never even established by defendants, from which it could reasonably have been inferred that the escrow account was never intended to be anything more than an illusion.

The multi-factor test for the existence of a fiduciary duty arguably favored defendants on some points but overall there was sufficient evidence that defendants took on a fiduciary duty to market the RPGLA class as a group. For example, defendants' own website (TX 5) held themselves out as "representing" both active and retired players with respect to their images and identities, saying that Players, Inc., was formed "to generate revenue for the players . . ." and that it had been "aggressive in its efforts to expand player marketing opportunities." Other such supportive evidence is cited in plaintiff's memorandum.

A monumental fact was never adequately explained by defendants — how could it have been that defendants lobbied thousands of retired players for fourteen years to sign up for defendants' RPGLA "program," yet never paid one cent to any retired player under the program? Put differently, if retired players' images and identities were really the undesirable "dog food" contended by the defense, then why did they try so hard to sign up the RPGLA class members for so long — only to never pay a penny? Given the golden opportunity presented by the Madden vintage-team game, the jury could reasonably have concluded that the true motive was to deter or to head off any competing effort by any third-party promoter (or by the retired players themselves) to license them as a group and to lull the retired players into misbelieving that defendants were out on the hustings trying to generate revenue for them. Instead, defendants gave complete priority in their *group* efforts to marketing *active* players. Defendants got to keep a large share of the *active* player group money (and very little of any retired player group money) so the incentives were skewed to favor marketing the *active* players to the exclusion of the *retired* players.

It is, of course, true that one can acquire a license to use a name and likeness without also undertaking to be a marketing agent. Put differently, a bare licensee may use or *not* use the rights as it wishes — even to the point of ignoring them. A marketing agent, by contrast, takes on an affirmative duty to promote the name and likeness. This distinction was carefully explained in the final charge to the jury. The jury plainly decided that defendants were more than bare licensees and, indeed, had undertaken to be marketing agents under its "program" for RPGLA class members. The evidence supported this conclusion. Again, defendants' website

3

(TX 5) specifically boasted that defendants "represented" thousands of *retired* football players with respect to their names and likenesses. In context, this meant that defendants were publicly acknowledging their role as marketing agents for retired players. We must also remember that defendants paid nothing for the RPGLAs, so retired players could have received compensation only if defendants made an effort to market the rights. The players could reasonably have expected that defendants would do so. This was thus unlike the situation where an investor pays cash up front for name and likeness rights and then has the right, as a bare licensee, to market or not to market as it wishes — or so the jury could reasonably have found.

Defendants' most vigorous attack is on the $7.1 million compensatory award. This was for breach of the fiduciary duty to market RPGLA class images and identities. The defense contends that the award was utterly speculative and merely a number snatched from the ether. The defense correctly points out that plaintiff's ambitious damage theory at trial was that the *retired* players were entitled to share equally and shoulder to shoulder with the *active* players in dividing up the huge GLR revenue pool. This theory was presented for both the contract claim and the fiduciary duty claim. Plainly, it was rejected by the jury on both counts. Instead, the jury awarded a far more modest amount, $7.1 million. That leads to the question of whether there was a viable basis in the record to sustain the $7.1 million verdict for the breach of fiduciary duty.

While it is true that plaintiff's counsel presented a luxurious damage theory, the instructions themselves supplied the correct measure. The jury was instructed (¶ 50) that "the measure of damages for breach of fiduciary duty is the amount of money necessary to place RPGLA class members in the same economic position they would have been in if defendants' fiduciary duty had not been breached." The jury was further instructed that plaintiff had to first prove economic injury as a result of any breach, and that plaintiff had to prove damages with reasonable certainty. The jury was told that "Plaintiff is not entitled to recover damages which are speculative, remote, imaginary, contingent, or merely possible. Your award must be based upon evidence and not from speculation, guesswork or conjecture"

(¶ 51). They were further told that if they found plaintiff's proof to be vague or speculative, then the jury could award nominal damages.

So the correct measure of damages was before the jury. Was there evidence from which the jury, following this measure, could assemble its own calculation? The defense is correct in that no expert testimony addressed the range of prices a group license for all 2074 class members might have commanded in the market during the times in question. In this regard, it is even true that the Court itself noted this omission before the case went to the jury and heard argument on its significance. Possibly, the better plaintiff's practice would have been to have called a sports agent to advise the jury on what the plausible range of prices that might have been fetched had defendants complied with their fiduciary duty.

In the end, the Court decided to let the issue go to the jury. The Court determined that despite this circumstance, there was sufficient other evidence from which the jury could construct a reasonable damage award, applying the correct measure stated in the instructions. For example, the jury was aware of the massive dollars paid for the *group* license for *active* players and the separate more modest dollars garnered by the various ad hoc license agreements for *retired* players. Plaintiff's memorandum references other benchmarks and evidence on the subject. The verdict is sufficiently low in relation to the vast sums negotiated for the active players and was sufficiently close to the ad hoc totals for retired players that by these benchmarks the verdict was reasonable.

While the $7.1 million number was never testified to by any expert, such testimony is not a prerequisite. Otherwise, virtually all verdicts would have to be tossed aside, for juries are supposed to exercise their own critical judgment and not simply rubber-stamp the theories of retained "experts." The evidence as a whole supported the conclusion that had defendants tried to market the RPGLA class members rather than letting EA scramble their identifies, a group royalty in the general vicinity of the verdict would have been obtainable. When viewed against the massive amounts paid for *active* player group rights, the $7.1 million was reserved. The verdict was within the bounds of reasonableness and the law does not require that the dollar amount be amenable to reverse engineering to trace the exact methodology used by the jury.

5

Under our jury system, jury verdicts must be accorded great deference and a jury is permitted "to do its own math." *City Solutions, Inc. v. Clear Channel Communications, Inc.*, 365 F.3d 835, 840–41 (9th Cir. 2004) (reversal of Rule 50 JMOL in analogous circumstances). In sum, in light of these cautionary instructions, the comparable moderation of the verdict, and the plausible benchmarks in the evidence, the verdict will be sustained as anchored in the evidence, even if not in the stratospheric range requested by counsel for the class.

The punitive damages award will not be set aside. The jury could reasonably have found an intentional and calculated breach of a fiduciary duty by defendants, for the reason stated. The amount was not disproportionate to the wrong done or to the compensatory award. Viewed in a light most favorable to the verdict, the evidence was clear and convincing.

With respect to the separate contract claim (on which no damages were awarded but a breach was found), defendants had no one to blame but themselves for the confounded wording of the RPGLA which, as was earlier said, was a "masterpiece of obfuscation." While defendants presented a plausible "understanding" of it, the jury could reasonably have rejected that interpretation, especially given that it was so lacking in any contemporaneous written support.

All other grounds asserted are denied as without merit or having been waived. As to any other specific point raised by the motion, this order is in agreement with the memorandum filed by plaintiff. All defense post-trial motions are **DENIED**.

\*     \*     \*

With respect to a plan of distribution of the recovery to the class members, all proceedings to collect the judgment and to devise a plan of allocation shall be **STAYED** pending resolution of all appeals, subject to the inquiry below. If the judgment is affirmed, then defendants must then promptly pay the judgment into registry of the court (with statutory interest from the date of judgment) and then a plan of allocation shall be devised. This is without prejudice to a motion for security for the judgment should the finances of defendants deteriorate but such circumstances seem unlikely at present. Plaintiff, however, shall be entitled

to quarterly inquiry into defendants' financial condition, failing cooperation on which the Court shall, on motion, consider a bond requirement.

So too as to any award of attorney's fees. It is unseemly to immediately lop a large percentage off the top for the lawyers until the plan of distribution is determined and the Court can see how prejudiced class members would be by any large fee award. The attorney's fee motion and the motion for a side bonus payment to the class representative are **DENIED WITHOUT PREJUDICE** to renewal in connection with the plan of distribution, which shall all take place after all appeals of the main judgment.

\*     \*     \*

By this order, the Court requests counsel to submit short memoranda on the issue of whether it is necessary to approve a plan of distribution or take any further action before the case can go on appeal. Please submit the memoranda within **FOURTEEN CALENDAR DAYS** of this order. The same memoranda should address also whether notice and opportunity to be heard should be given to the class as to the proposed plan of distribution and as to any attorney's fee motion and/or a side bonus payment to the class representative.

**IT IS SO ORDERED.**

Dated: January 13, 2009.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE