```
 1                                      PAGES 1 - 58

 2                      UNITED STATES DISTRICT COURT

 3                    NORTHERN DISTRICT OF CALIFORNIA

 4              BEFORE THE HONORABLE WILLIAM H. ALSUP

 5   BERNARD PAUL PARRISH, HERBERT        )
     ANTHONY ADDERLEY, WALTER ROBERTS     )
 6   III,                                 )
                                          )
 7                    PLAINTIFFS,         )
                                          )
 8     VS.                                )   NO. C 07-0943 WHA
                                          )
 9   NATIONAL FOOTBALL LEAGUE PLAYERS     )
     ASSOCIATION AND NATIONAL FOOTBALL    )
10   LEAGUE PLAYERS INCORPORATED D/B/A    )
     PLAYERS INC,                         )
11                                        )   SAN FRANCISCO, CALIFORNIA
                      DEFENDANTS.         )   THURSDAY
12   _____)   JANUARY 8, 2009

13                    TRANSCRIPT OF PROCEEDINGS

14   APPEARANCES:

15   FOR PLAINTIFFS:           MANATT, PHELPS & PHILLIPS
                               1001 PAGE MILL ROAD, BUILDING 2
16                             PALO ALTO, CALIFORNIA 94304
                         BY:   RONALD S. KATZ, ESQ.
17                             RYAN S. HILBERT, ESQ.

18                             MANATT, PHELPS & PHILLIPS
                               7 TIMES SQUARE
19                             NEW YORK CITY, NEW YORK 10036
                         BY:   L. PETER PARCHER, ESQ.
20
                               MANATT, PHELPS & PHILLIPS
21                             11355 WEST OLYMPIC BOULEVARD
                               LOS ANGELES, CALIFORNIA  90064
22                       BY:   CHAD HUMMEL, ESQ.

23   (APPEARANCES CONTINUED ON NEXT PAGE)

24

25
```

*KATHERINE WYATT, OFFICIAL REPORTER, CSR, RMR (925) 212-5224*

1

2    **APPEARANCES CONTINUED:**

3

     **ALSO FOR PLAINTIFFS:**    MCKOOL SMITH
4                                300 CRESCENT COURT
                                 SUITE 1500
5                                DALLAS, TEXAS  75201
                         **BY:  LEWIS T. LECLAIR, ESQ.**
6

     **FOR DEFENDANTS:**         DEWEY & LEBOEUF
7                                1301 AVENUE OF THE AMERICAS
                                 NEW YORK CITY, NEW YORK  10019-6092
8                        **BY:  JEFFREY L. KESSLER, ESQ.**
                               **DAVID GREENSPAN, ESQ.**
9                              **DAVID G. FEHER, ESQ.**
                               **IAN L. PAPENDICK, ESQ.**
10

11

12   **REPORTED BY:**     *KATHERINE WYATT CSR #9866, RPR, RMR*
                          *OFFICIAL REPORTER - U.S. DISTRICT COURT*
13

14

15

16

17

18

19

20

21

22

23

24

25

# P R O C E E D I N G S

JANUARY 8, 2009                                    2:00 P.M.

**THE COURT:**  ALL RIGHT.  LET'S GO TO PARRISH VERSUS FOOTBALL.

ALL RIGHT.  WELCOME BACK.  LET'S HAVE OUR APPEARANCE.

**MR. PARCHER:**  MY NAME IS PETER PARCHER, YOUR HONOR, FOR THE PLAINTIFFS.

**THE COURT:**  MR. PARCHER, WELCOME BACK.

**MR. PARCHER:**  NICE TO SEE YOU.

**MR. KATZ:**  RON KATZ, YOUR HONOR.  GOOD AFTERNOON.

THE COURT REPORTER:  I'M SORRY?

**MR. KATZ:**  RON KATZ, K-A-T-Z.

**MR. LECLAIR:**  LEW LECLAIR ON BEHALF OF PLAINTIFFS.

**MR. HUMMEL:**  CHAD HUMMEL ON BEHALF OF PLAINTIFFS. GOOD AFTERNOON, YOUR HONOR.

**THE COURT:**  GOOD AFTERNOON.

**MR. KESSLER:**  JEFFREY KESSLER ON BEHALF OF DEFENDANTS.

**MR. FEHER:**  DAVID FEHER ON BEHALF OF DEFENDANTS.

**MR. GREENSPAN:**  DAVID GREENSPAN ON BEHALF OF DEFENDANTS, YOUR HONOR.

**MR. PAPENDICK:**  IAN PAPENDICK ON BEHALF OF DEFENDANTS, YOUR HONOR.

**THE COURT:**  I CAN ONLY GIVE EACH SIDE 15 MINUTES, SO I'M SORRY I CAN'T GIVE YOU MORE, BUT I GAVE YOU TONS OF TIME

ONCE BEFORE.  AND YOU HAVE FILED QUITE A NUMBER BRIEFS, WHICH I HAVE GONE THROUGH.  AND I ASK YOU TO TRY TO MAKE YOUR BEST POINTS IN 15 MINUTES PER SIDE.

ALL RIGHT, MR. KESSLER, IT'S YOUR MOTION.

**MR. KESSLER:**  THANK YOU, YOUR HONOR. I'LL JUST NEED ONE MINUTE TO ORGANIZE MY PAPERS, AND I'LL BE RIGHT THERE.

GOOD AFTERNOON, YOUR HONOR. THE MOST IMPORTANT POINT OF OUR MOTION IS THE VERY POINT THAT YOUR HONOR FORESHADOWED WHEN WE LAST ARGUED THE RULE 50 MOTIONS. AND THAT IS THE FOLLOWING:  PLAINTIFFS MADE A CHOICE HERE.

THE CHOICE THAT THEY MADE WAS NOT TO PUT IN ANY EVIDENCE AT ALL ON SEPARATE BREACH OF FIDUCIARY DUTY CLAIMS. THAT'S UNDISPUTED. THAT'S WHAT THEIR WITNESS, MR. ROWLEY, SAID.

THEY DON'T DISPUTE THAT IN THEIR BRIEFS. THEY ONLY PUT IN THEIR ONE PIECE OF TESTIMONY ON THE THEORY OF A CONTRACTUAL RIGHT TO SHARE EQUALLY IN THE GLR POOL.

BECAUSE THEY MADE THAT CHOICE AND DIDN'T, FOR EXAMPLE, CALL ON MR. HOLLYWOOD, AS YOUR HONOR SUGGESTED, WHO COULD TESTIFY HOW MUCH WOULD THE PLAYERS BE WORTH IF THEY WERE MARKETED IN THE DIFFERENT WAYS, OR HOW MUCH WOULD THE PLAYERS BE WORTH IF THERE WASN'T AN ALLEGED CONFLICT OF INTEREST, ANY OF THOSE BREACH OF FIDUCIARY DUTY CLAIMS.

BECAUSE THEY MADE THAT CHOICE, THERE WAS NO EVIDENTIARY RECORD FROM WHICH THE JURY COULD AWARD DAMAGES ON THIS BREACH OF FIDUCIARY DUTY CLAIM.  SO WHAT DID THE JURY DO?

WHAT THE JURY DID IS THEY PICKED THE NUMBER $7.1 MILLION.

NOW, WHAT DO WE KNOW ABOUT $7.1 MILLION?  WE KNOW TWO VERY IMPORTANT THINGS:  FIRST, IT IS VIRTUALLY IDENTICAL TO ONE PIECE OF EVIDENCE, WHICH WAS THE AMOUNT OF AD HOC LICENSING REVENUES THAT WERE PAID OUT TO THE CLASS MEMBERS.

AND ONE THING YOUR HONOR MADE VERY CLEAR IN YOUR INSTRUCTIONS IS THE JURY COULD NOT USE THAT AS A BASIS FOR DAMAGES, BECAUSE THE AD HOC LICENSING WAS NOT PART OF THE CASE, NOT PART OF THE DAMAGE CLAIMS, AND THAT THEY COULD NOT REALLOCATE THAT MONEY TO THE CLASS MEMBERS.

SO IF THE JURY SELECTED THAT EVIDENCE, IT CLEARLY WAS WRONG.  AND THE NINTH CIRCUIT IN A VERY SIMILAR CASE WHICH WE CITED, CALLED FIRST ALLIANCE MORTGAGE MADE IT VERY CLEAR IN EXACTLY THIS TYPE OF CASE THAT WHERE THE JURY WAS CLEARLY TAKING PROHIBITED INFORMATION TO FIND DAMAGES.  AND IN THAT CASE WHAT THE DISTRICT COURT DID IS ALLOW THE PLAINTIFFS TO SPECULATE, WELL, MAYBE THERE'S SOME OTHER POSSIBLE MATHEMATICAL WAY THEY COULD HAVE GOTTEN TO THAT NUMBER.

THE NINTH CIRCUIT REVERSED AND SAID NO, THERE WAS NO BASIS FOR THAT OTHER SPECULATION AS TO HOW THEY GOT TO THE NUMBER. SO THAT'S THE FIRST IMPORTANT POINT.

THE ALTERNATIVE IS THAT THE JURY JUST SPECULATED TO GET THE NUMBER. THEY DIDN'T TAKE THE AD HOC LICENSING, BUT THEY SIMPLY PULLED IT OUT OF THIN AIR.

WELL, PLAINTIFFS DON'T DISPUTE THAT, AGAIN, THE CASE

LAW IS VERY CLEAR:  YOU MUST HAVE A NONSPECULATIVE BASIS FOR A JURY VERDICT. IT IS NOT TRUE THAT YOU COULD SIMPLY SAY, AS THEY HAVE ARGUED, THAT THE RECORD COULD SUPPORT AN INFINITE NUMBER OF DAMAGE CALCULATIONS. ANYTHING FROM ZERO TO ANY POSSIBLE NUMBER, THAT'S THEIR ARGUMENT, IS THAT:

> "WELL, WE DON'T KNOW WHAT IT IS, SO IT COULD BE
> ANYTHING."

THAT IS NOT WHAT THE CASE LAW SAYS, AND WE'VE CITED CASE AFTER CASE THAT IF THERE'S NO NONSPECULATIVE BASIS TO GET TO THE DAMAGES ARRIVED AT -- AND THEY HAVE OFFERED NONE.  YOU KNOW, THE MOST AMAZING THING ABOUT THEIR OPPOSITION BRIEF, BUT I UNDERSTAND WHY IT'S ABSENT, IS THEY DON'T EVEN TRY TO GIVE YOUR HONOR A WAY IN WHICH YOU CAN GET TO 7.1 MILLION FROM THIS RECORD.

WHAT THEY SAY IS:

> "WELL, ALL THE LICENSE AGREEMENTS ARE IN THE
> RECORD, AND THE EXPERT SAID THAT THEY COULD DO
> WHATEVER THEY WANTED TO, SO SOMEHOW THEY CAME UP TO
> 7.1 MILLION."

WELL, THAT'S NOT GOOD ENOUGH UNDER THE LEGAL STANDARD. AND, AGAIN, HAD THEY HAD MR. HOLLYWOOD COME IN, AND MR. HOLLYWOOD HAD SAID:

> "I VALUE WHAT THESE RIGHTS WERE WORTH, AND THEY
> WERE WORTH BETWEEN X AND Y," AND THE JURY PICKED

ANYTHING BETWEEN X AND Y, WE WOULDN'T BE HERE ON THIS ISSUE.

1          BUT THAT'S A CHOICE THEY MADE. THEY CHOSE TO GO WITH

2     CLAIMS FOR WHICH THE BREACH OF FIDUCIARY DUTY CLAIMS WITHOUT

3     PUTTING IN ANY EVIDENTIARY BASIS.

4          NOW, WHAT DID HELP SAY IN RESPONSE?  FIRST --

5          **THE COURT:**  WELL, WAIT.  WAIT.  I'M SORRY TO

6     INTERRUPT, BUT I THINK I REMEMBER.  BUT I WANT YOU TO REMIND ME

7     WHAT WAS THE DAMAGE THEORY THAT WAS PRESENTED?

8          **MR. KESSLER:**  YES. THEIR DAMAGE THEORY WAS FOR BOTH

9     THE BREACH OF CONTRACT -- AND THEY SAID IT'S THE SAME THEORY

10    FOR FIDUCIARY DUTY -- WAS THAT THERE WAS A CONTRACTUAL RIGHT TO

11    AN EQUAL SHARE OF WHAT WAS CALLED "THE GLR POOL."

12          THAT WAS THAT MONEY THAT WAS GIVEN TO THE ACTIVE

13    PLAYERS. AND THEIR EXPERT SAID:

14               "HERE ARE SEVERAL ALTERNATIVE WAYS TO MEASURE

15               THAT. ONE WAY, IF YOU JUST ACCEPT THE PERCENTAGES

16               DIVIDED BETWEEN THE UNION AND PLAYERS INC. ANOTHER

17               WAY IF YOU DECIDE THAT THE PERCENTAGES WERE WRONG AND

18               SHOULD BE READJUSTED," YOU REMEMBER THEIR ALTERNATIVE

19    CALCULATIONS.

20          **THE COURT:**  EQUAL SHARE SHOULDER-TO-SHOULDER WITH THE

21    ACTIVE PLAYERS?

22          **MR. KESSLER:**  THAT'S CORRECT.

23          **THE COURT:**  I REMEMBER.

24          **MR. KESSLER:**  AND WHAT YOUR HONOR NOTED IN THE

25    ARGUMENT, YOU SAID TO THEM -- I REMEMBER YOU SAID THIS VERY

CLEARLY.  YOU SAID:

"WELL, I DON'T UNDERSTAND, PLAINTIFFS, WHAT
YOU'RE DOING, BECAUSE IF THEY HAVE A CONTRACTUAL
RIGHT TO THE EQUAL SHARE, AND YOU PREVAIL ON THAT,
YOU'LL WIN ON THE BREACH OF CONTRACT CLAIM, AND
YOU'LL GET THE DAMAGES THERE."

THAT'S WHAT YOU SAID TO THE PLAINTIFFS.

"AND, THEREFORE, THIS BREACH OF FIDUCIARY DUTY
CLAIM WOULD ADD NOTHING TO IT. AND IF YOU DON'T HAVE
A CONTRACTUAL RIGHT TO THE EQUAL SHARE OF THE GLR
POOL, THEN YOU'VE OFFERED NO EVIDENCE, NO MR.
HOLLYWOOD, NO OTHER TYPE OF EVIDENCE OF ANY OTHER
DAMAGE THEORY UNDER BREACH OF FIDUCIARY DUTY."

THOSE WERE YOUR WORDS.  SO WHAT YOU TOLD THEM -- I
THINK YOU HAD VERY GOOD ADVICE.  YOUR ADVICE WAS THEY SHOULD
THINK ABOUT SHOULD THEY DROP THE BREACH OF FIDUCIARY DUTY CLAIM
AND JUST TRY TO PAIR THE DAMAGES EVIDENCE THEY HAD WITH THEIR
BREACH OF CONTRACT CLAIM AND TRY TO CONVINCE THE JURY TO ACCEPT
IT, BECAUSE OTHERWISE, YOU SAID, THEY COULD END UP WINNING A
CLAIM AND THE CLAIM COULDN'T BE SUSTAINED BECAUSE OF THE
ABSENCE OF THE DAMAGES.

THAT'S THE PROBLEM THEY HAVE. THERE'S NO DAMAGES
EVIDENCE.

NOW, WHAT THEY SAY IN RESPONSE, THEY SAY:

"WELL, WAIT A MINUTE. MAYBE WHAT THE JURY DID IS

THAT THEY MEANT -- THE REASON THEY GAVE A ZERO FOR
BREACH OF CONTRACT DAMAGES AND 7.1 MILLION FOR THIS
IS BECAUSE YOUR HONOR SAID 'YOU CAN'T AWARD DOUBLE
DAMAGES.'"

NOW, WHY IS THAT BOTH WRONG AND IRRELEVANT?  WELL,
IT'S WRONG BECAUSE YOUR VERDICT SHEET IS VERY CLEAR. YOUR
VERDICT SHEET ON QUESTION TWO FOR BREACH OF CONTRACT SAYS:

"WHAT IS THE AMOUNT OF DAMAGES, IF ANY, FROM
BREACH OF CONTRACT?"

AND THEY ANSWERED:

"ZERO."

OKAY?  IT DIDN'T SAY ANYTHING ABOUT BREACH OF
FIDUCIARY DUTY.

ON QUESTION FIVE, WHICH SAYS:

"WHAT IS THE AMOUNT OF DAMAGES FOR BREACH OF
FIDUCIARY DUTY," IT SAYS, "DEDUCT ANYTHING YOU
ALREADY AWARDED FOR BREACH OF CONTRACT."

SO THE WAY YOUR HONOR SET UP THE SHEET IS THAT -- AND
THAT WAS THE WAY IT WAS DECIDED.  BUT THERE'S NO WAY THE JURY
WOULD EVER HAVE DONE WHAT PLAINTIFFS ARE SAYING, WHICH IS THAT
MAYBE THEY MEANT TO FIND THAT THERE WAS AN ENTITLEMENT TO THE
EQUAL SHARE, BUT THEY PUT IT ALL IN BREACH OF FIDUCIARY DUTY.

YOU COULDN'T DO THAT UNDER YOUR VERDICT SHEET.  BUT
MORE PROFOUNDING, 7.1 MILLION HAS DONE NOTHING TO DO WITH AN
EQUAL SHARE OF THE GLR POOL.

1      IN OTHER WORDS, THERE'S NO VARIATION.  THERE'S NO

2  THEORY, THERE'S NO CALCULATION.  THERE'S NO BASIS FOR WHICH

3  THEY COULD LINK 7.1 MILLION TO THE DAMAGE THEORY THEY

4  PRESENTED.

5      THE LOWEST DAMAGE NUMBER THEY HAD WAS $29 MILLION.

6  THAT WAS THE LOWEST ONE. AND THEY THEN HAD A SERIES OF

7  VARIATIONS THAT GOT YOU UP TO $82 MILLION. OKAY?

8      THERE IS NO BASIS THERE WHERE YOU COULD JUST PICK OUT

9  7.1.  AND, AGAIN, IT'S NOT THE LAW THAT THE JURY CAN BE

10  ARBITRARY. THEY CANNOT BE ARBITRARY.

11      NOW, I WOULD SUGGEST THE JURY WASN'T ARBITRARY. WHAT

12  THE JURY DID IS IGNORE THE COURT'S INSTRUCTIONS AND TOOK THE

13  7.1 MILLION FOR THE AD HOC LICENSING AND USED THAT AS THE

14  NUMBER, BECAUSE IT'S TOO MUCH OF A COINCIDENCE TO BE 7.1.  NOT

15  EVEN SEVEN, EXACTLY 7.1.

16      **THE COURT:**  WHAT WAS THE RECORD ON THE AD HOCS?

17      **MR. KESSLER:**  7.167. THAT WAS THE AD HOC NUMBER.

18      **THE COURT:**  7.167.  WELL 7.1 IS CLOSE, BUT IT'S

19  NOT --

20      **MR. KESSLER:**  AND IF YOU ACTUALLY GO THROUGH THE

21  TRANSCRIPT YOU'LL SEE PEOPLE REPEATEDLY REFERRING TO IT AS

22  "APPROXIMATELY 7.1."

23      IN OTHER WORDS, WHERE THE LAWYERS WOULD ARGUE ABOUT

24  IT, WHEN THEY WOULD BE QUESTIONING THEM, THEY WOULD SAY TO THE

25  WITNESS AND SAY:

1    "IS THAT APPROXIMATELY 7.1?"

2           AND THE WITNESS WOULD SAY:

3           "YES."

4           SO THE 7.1 CLEARLY COULD ONLY HAVE COME FROM THERE OR

5    NOWHERE. THAT'S THE PROBLEM.

6           THE OTHER POINT I WANT TO MAKE IN THIS, YOUR HONOR,

7    IS THAT -- BECAUSE THEY MAY RAISE THIS, AND THEY HAVE -- THEY

8    TRIED TO MAKE IT SEEM AS IF WE'RE ARGUING INCONSISTENT -- OH,

9    I'M SORRY.

10          OH, ACTUALLY, IT IS 7.116. SO IT IS 7.1.

11          THAT'S WHY I HAVE MY GOOD COLLEAGUE MR. FEHER HERE.

12          7,116,000.  SO VERY CLOSE TO SEVEN ONE.

13          THEY ALSO ARGUED:

14          "WELL, WE'RE ARGUING INCONSISTENT VERDICTS, AND,

15          THEREFORE, WE SHOULD HAVE RAISED IT BEFORE THE JURY

16          WAS DISCHARGED."

17          I WANT TO SAY TWO THINGS ABOUT THAT. FIRST OF ALL, WE

18   ARE NOT ARGUING INCONSISTENT VERDICTS. WHAT WE'RE ARGUING IS

19   EXACTLY WHAT I ARGUED IN THE RULE 50 MOTION, WHICH IS WHAT YOUR

20   HONOR COMMENTED ON, WHICH IS THAT THERE WAS NO EVIDENCE

21   PRESENTED FROM WHICH THE JURY COULD FIND BREACH OF FIDUCIARY

22   DUTY DAMAGES, BECAUSE THERE WAS NONE PRESENTED.

23          AND WHAT THE JURY DID, AWARD 7.1, SIMPLY CONFIRMS

24   THAT. THAT WOULD BE TRUE WHETHER OR NOT THE JURY AWARDED

25   CONTRACTUAL DAMAGES.  IN OTHER WORDS, WE'RE NOT ARGUING

1    INCONSISTENT VERDICT.

2         WE'RE ATTACKING THE BREACH OF FIDUCIARY DUTY DAMAGES,

3    BECAUSE THERE'S NO FOUNDATION FOR IT. WHAT THE "ZERO" SHOWS FOR

4    BREACH OF CONTRACT IS IT SIMPLY CONFIRMS THE FACT THAT THE JURY

5    DID NOT ACCEPT THE CONTRACTUAL RIGHT TO A GLR SHARE.  BECAUSE

6    IF THE JURY HAD FOUND THAT THERE WAS A CONTRACTUAL RIGHT TO AN

7    EQUAL SHARE OF GLR, THEN THEY WOULDN'T HAVE AWARDED ZERO

8    DAMAGES.  THEY WOULD HAVE AWARDED SOME AMOUNT OF DAMAGES.

9         BUT WE'RE NOT ARGUING INCONSISTENT VERDICTS. I WOULD

10   ALSO NOTICE THAT IN THE NINTH CIRCUIT THERE IS NO NEED TO RAISE

11   THIS WITH THE JURY, EVEN IF YOU WERE ARGUING INCONSISTENT

12   VERDICTS FOR THIS TYPE OF AN ARGUMENT.

13        THIS IS NOT THE TYPE OF CASE THEY CITE WHERE IT'S A

14   GENERAL VERDICT VERSUS SPECIFIC INTERROGATORIES. IT'S NOTHING

15   TO DO WITH THIS ISSUE AT ALL. BUT WE'RE NOT ARGUING

16   INCONSISTENT VERDICTS.  WE'RE ARGUING FAILURE OF PROOF, THE

17   TRADITIONAL RULE 50 ARGUMENT WITH RESPECT TO THE BREACH OF

18   FIDUCIARY DUTY CLAIM.

19        UNLESS YOUR HONOR HAS QUESTIONS ABOUT THAT, I'LL MAKE

20   JUST TWO MORE POINTS ON SOME OF THE OTHER ASPECTS OF THE

21   MOTION.

22        IN ADDITION TO THE FAILURE OF PROOF ON THE 7.1, THEY

23   ALSO FAIL, BECAUSE THEY HAVE OFFERED NO FORMULA TO SHOW

24   INDIVIDUALIZED INJURY.

25        NOW, YOUR HONOR WILL REMEMBER WE HAD THIS DISCUSSION

PREVIOUSLY, AND WE HAVE ALL THESE NINTH CIRCUIT CASES SAYING

EVEN IN A CLASS ACTION, THERE HAS TO BE A BASIS FOR FINDING AND

AWARDING INDIVIDUALIZED DAMAGES.

AND THE DEBATE WE HAD WAS THAT IT COULD BE BY

FORMULA.  AND YOUR HONOR SAID:

"WELL, IT COULD BE BY FORMULA."

AND THEY HAD IN THE GLR POOL DAMAGES THEORY A

FORMULA. THE FORMULA WAS THEIR THEORY WAS YOU HAD A CONTRACTUAL

RIGHT TO AN EQUAL SHARE.  SO THE FORMULA WAS EQUAL.

NOW, MOVE TO THE 7.1. THERE'S NO FORMULA TO SHOW

INDIVIDUALIZED INJURY FOR THE 7.1 MILLION DAMAGES. NO ONE HAS

GIVEN ANY BASIS, ANY EXPERT REPORT, ANY TESTIMONY, ANY

CONTRACTUAL ARGUMENT, ANYTHING TO SHOW THAT IT WOULD BE EQUAL

FOR THE BREACH OF FIDUCIARY DUTY CLAIM AND 7.1.

ALL THAT YOU HAVE IS THE LAWYERS IN THEIR BRIEFS

SAYING:

"WELL, IT SHOULD BE EQUAL."

BECAUSE WHY?  BECAUSE THE LAWYERS SAY IT SHOULD BE

EQUAL. BUT THAT'S NOT EVIDENCE. THAT'S NOT A BASIS FOR WHAT THE

NINTH CIRCUIT SAID.

IF THAT WERE TRUE, ALL THE NINTH CIRCUIT'S STATEMENTS

THAT THERE HAS TO BE SOME BASIS FOR DOING THIS WOULD BE

RENDERED MEANINGLESS.  THE LAWYERS COULD JUST COME IN AND SAY:

"DO IT EQUALLY."

THAT DOESN'T GET YOU THERE.  SO IT FAILS BOTH BECAUSE

1 OF A FAILURE OF PROOF AND BECAUSE THERE'S NO INDIVIDUALIZED

2 INJURY.

3        NOW, IF I'M RIGHT ON EITHER ONE OF THOSE POINTS -- I

4 ONLY HAVE TO BE RIGHT ON ONE OF THEM -- THEN THE COMPENSATORY

5 DAMAGE VERDICT HAS TO BE SET ASIDE.  AND IT FOLLOWS -- AND EVEN

6 IF THEY DON'T DISPUTE THIS -- THAT THERE CAN BE NO PUNITIVE

7 DAMAGES, BECAUSE THE LAWS UNEQUIVOCAL IN THE D.C. CIRCUIT,

8 REALLY IN THE COUNTRY, THAT IF YOU HAVE NO COMPENSATORY

9 DAMAGES, YOU CAN HAVE NO PUNITIVE DAMAGES.

10        THAT'S IMPOSSIBLE.  THEY DON'T DISPUTE THAT.  THEY

11 DIDN'T DISPUTE THAT IN THEIR BRIEF.  INSTEAD, THEY ARGUE THAT

12 THERE IS COMPENSATORY DAMAGES.

13        SO IF WE WIN ON COMPENSATORY DAMAGES, THE REST OF THE

14 VERDICT FALLS. ALTERNATIVELY, IF WE DID NOT WIN ON COMPENSATORY

15 DAMAGES, WHICH I FEEL, YOUR HONOR, THAT THAT IS THE RESULT THAT

16 MUST TAKE PLACE, BUT IF WE'RE WRONG, THE PUNITIVE DAMAGES

17 SHOULD STILL FALL INDEPENDENTLY.

18        AND THE REASON IS THE FOLLOWING:  YOUR HONOR CHARGED

19 QUITE CORRECTLY ON THE STANDARDS FOR PUNITIVE DAMAGES UNDER THE

20 DISTRICT OF COLUMBIA, WHICH ARE QUITE DIFFERENT FROM THE

21 STANDARDS IN OTHER PLACES. THEY HAVE THIS TWO-PART TEST.  AND

22 I'M READING FROM YOUR CHARGES.

23        WHAT THEY HAD TO HAVE FOR PUNITIVE DAMAGES WAS BY

24 CLEAR AND CONVINCING EVIDENCE TWO THINGS:  FIRST, THAT THE

25 DEFENDANTS ACTED WITH EVIL MOTIVE, ACTUAL MALICE, DELIBERATE

1   VIOLENCE OR OPPRESSION, OR WITH INTENT TO INJURE, OR IN WILLFUL

2   DISREGARD FOR THE RIGHTS OF THE RPGLA CLASS MEMBERS.

3            BUT THAT'S NOT ENOUGH. AND THEY HAVE TO HAVE

4   SOMETHING ELSE:  THAT THE DEFENDANT'S CONDUCT ITSELF WAS

5   OUTRAGEOUS, GROSSLY FRAUDULENT OR RECKLESS TOWARDS THE SAFETY

6   OF THE RPGLA CLASS MEMBERS.

7            NOW, THIS IS UNIQUE TO THE DISTRICT OF COLUMBIA.

8   IT'S NOT A CONSTITUTIONAL ARGUMENT.  WHAT THE DISTRICT OF

9   COLUMBIA CASES WE CITED SAY IS THEY ARE VERY LIMITED IN WHAT

10  KIND OF CONDUCT CAN BE THE BASIS OF PUNITIVE DAMAGES.

11           SO, FOR EXAMPLE, HOW ABOUT AN INTENTIONAL BREACH OF

12  CONTRACT?  COULD THAT BE A BASIS?  NO.

13           WE CITED DISTRICT OF COLUMBIA CASES THAT SAID ANY

14  TYPE OF BREACH OF CONTRACT, EVEN A WILLFUL INTENTION, THEY SAID

15  WANTON BREACH OF CONTRACT, THAT'S NOT ENOUGH FOR PUNITIVE

16  DAMAGES.

17           COULD IT BE FRAUD?  COULD IT BE A MISREPRESENTATION?

18  THE DISTRICT OF COLUMBIA SAYS:  NO.  MAYBE IT CAN IN

19  CALIFORNIA, NOT IN THE DISTRICT OF COLUMBIA.

20           THEY SAID ORDINARY FRAUD -- IT'S HARD TO SAY

21  "ORDINARY FRAUD," BUT ORDINARY FRAUD IS NOT ENOUGH. GROSS FRAUD

22  HAD TO BE PRESENT WITH RESPECT TO THIS.

23           SO THEY ARE VERY, VERY RIGID ON WHAT CAN BE THERE.

24  NOW, WHAT CONDUCT HAVE THEY PROVEN OR THEY ARGUE THEY HAVE

25  PROVEN TO SUPPORT THIS?

ONE, THEY GO:

    "WE KNEW WE WEREN'T GOING TO MARKET AND DIDN'T

    MARKET."

WELL, AT WORSE, THAT'S AN INTENTIONAL BREACH OF

CONTRACT. NOT ENOUGH.  NOT ENOUGH UNDER DISTRICT OF COLUMBIA

LAW.

SECOND, THEY SAY GENE UPSHAW MADE THE STATEMENTS

ABOUT:

    "EVEN IF YOU HAD THE GREATEST DOG FOOD IN THE

    WORLD, IF THE DOGS DON'T WANT IT, YOU CAN'T SELL IT."

ASSUMING THAT'S AN OFFENSIVE STATEMENT, THE CASE LAW

IS VERY CLEAR.  AGAIN, WE CITED THOSE TYPE OF STATEMENTS CAN'T

GIVE RISE TO PUNITIVE DAMAGES, BECAUSE, AMONG OTHER THINGS,

THEY ARE FREE SPEECH ELEMENTS AND THINGS.  THE LAW WON'T DO IT,

ESPECIALLY IN THE DISTRICT OF COLUMBIA.

WHAT ELSE DO THEY CITE?  SCRAMBLING. OKAY.  YOUR

HONOR, WHETHER TELLING -- WHAT IS THE SCRAMBLING?  THEY HAVE

THAT LETTER PRESTATUTE OF LIMITATIONS, BUT A LETTER SAYING:

    "YOU DIDN'T PAY FOR THESE RIGHTS.  YOU DIDN'T

    LICENSE THEM.  YOU HAVE TO SCRAMBLE THE NUMBERS AND

    IMAGES."

ASSUMING THAT'S TRUE, IS THAT THE TYPE OF EGREGIOUS

BEHAVIOR, OUTRAGEOUS BEHAVIOR, GROSSLY FRAUDULENT BEHAVIOR THE

DISTRICT OF COLUMBIA IS TALKING ABOUT?  TO TELL EA THAT IF THEY

ARE NOT GOING TO PAY FOR THE RIGHTS THAT THEY SHOULD HAVE TO

SCRAMBLE IT RATHER THAN USE THEM FOR FREE?

THAT'S WHAT WE'RE TALKING ABOUT.  THAT'S THE HEART OF IT.

AND THE LAST THING IS THE HALL OF FAME.  AND THIS IS THE TOTAL AMOUNT OF CONDUCT.  THE HALL OF FAME, YOU REMEMBER, WAS 17 CLASS MEMBERS, WHICH INVOLVED A CLAIM, AN E-MAIL CLAIM THAT THE RIGHTS WERE SOLD BELOW MARKET, EVEN THOUGH THE EVIDENCE, AS WE POINTED OUT, THERE WAS NO EVIDENCE IT WAS BELOW MARKET.  AND IT WAS THE HALL OF FAME THAT NEGOTIATED WITH THE PLAYERS, NOT THE CLASS MEMBERS.

SO HOW CAN -- EVEN IF YOU PUT ALL FOUR OF THOSE THINGS TOGETHER AND THERE'S NOTHING ELSE, HOW COULD THAT QUALIFY TO WHAT THE DISTRICT OF COLUMBIA SAYS IS THE TYPE OF BEHAVIOR THAT YOU AWARD PUNITIVE DAMAGES FOR?

I ALSO NOTE YOUR JUDGE INSTRUCTED THAT SCRAMBLING ITSELF WAS LAWFUL.  SO AT BEST WE'RE BEING COMPLICIT IN LAWFUL BEHAVIOR BY EA, AND THAT WOULD BE THE BASIS OF PUNITIVE DAMAGES.

AGAIN, YOUR HONOR, I JUST DON'T SEE HOW YOU GET THERE WITH RESPECT TO PUNITIVE DAMAGES.

FINALLY, YOUR HONOR, WE HAVE A THREE TIMES MULTIPLE OF PUNITIVE DAMAGES.  AND YOUR HONOR SHOULDN'T EVEN HAVE TO REACH THIS, BECAUSE I THINK WE WIN ON THE OTHER POINTS.  BUT I WOULD NOTE WE'RE NOT MAKING A CONSTITUTIONAL ARGUMENT AGAINST THREE TIMES.  WE'RE SAYING UNDER DISTRICT OF COLUMBIA LAW IF

1  THEY'D ALLOW PUNITIVE DAMAGES AT ALL, THEY WOULD NEVER ALLOW

2  THREE TIMES UNDER THIS.  AND WE'VE CITED NUMEROUS CASES WHERE

3  THEY HAVE TAKEN CONDUCT AND KNOCKED IT DOWN TO ONE TIMES, IN

4  OUR BRIEF.

5          YOUR HONOR, I'VE ALSO BRIEFED THE ISSUES OF WHY THERE

6  WAS NO BREACH OF -- THERE WAS NO -- INSUFFICIENT EVIDENCE TO

7  FIND THAT THERE WAS A FIDUCIARY DUTY AND INSUFFICIENT EVIDENCE

8  TO FIND A BREACH OF FIDUCIARY DUTY.  BUT I THINK GIVEN THE

9  COURT'S TIME CONSTRAINTS AND, FRANKLY, BECAUSE I BELIEVE THE

10 FIRST ARGUMENTS I JUST COVERED ELIMINATE THE ENTIRE DAMAGE

11 CLAIM, I WILL, I THINK, REST ON MY PAPERS FOR NOW ON THE OTHER

12 TWO POINTS, WHICH WE'VE ARGUED PREVIOUSLY.  AND I MIGHT ADDRESS

13 THEM IN REPLY DEPENDING IF PLAINTIFF CHOOSE TO ADDRESS THEM.

14         **THE COURT:**  ALL RIGHT.   YOU USED 20 MINUTES, BUT

15 I'LL GIVE YOU A FEW MORE MINUTES TO REPLY.

16         **MR. KESSLER:**  THANK YOU, YOUR HONOR.

17         **THE COURT:**  MR. PARCHER, ARE YOU GOING TO ARGUE THIS?

18         **MR. PARCHER:**  I AM.

19         **THE COURT:**  ALL RIGHT.  WELCOME BACK.  GO RIGHT

20 AHEAD.

21         **MR. PARCHER:**  THANK YOU, YOUR HONOR.  NICE TO SEE

22 YOU.  AT LEAST THE SUN WAS SHINING, BUT OTHER THAN THAT, NICE

23 TO BE IN YOUR CITY.

24         WELL, COUNSEL COVERED A LOT OF GROUND.  I GUESS I'LL

25 JUST --

1　　　　　**THE COURT:** WHY DON'T YOU ADDRESS THE DAMAGES ISSUE?

2　　　　　**MR. PARCHER:** I WILL. I WANTED TO SAVE THE BEST FOR

3　LAST, THOUGH. I'LL GIVE YOU MY EXAMPLES, YOUR HONOR.

4　　　　　**THE COURT:** ALL RIGHT.

5　　　　　**MR. PARCHER:** JUST AN INFINITE VARIETY OF THEM. I

6　DON'T WANT TO JUST COME UP WITH ONE OR TWO.

7　　　　　I JUST WANT TO START WITH SAYING THIS: THAT THE

8　GREATEST SINGLE DIFFERENCE BETWEEN THEIR SIDE AND OUR SIDE IS

9　THAT THEIR SIDE SEEMS TO THINK, ASSUMING YOU'RE A FIDUCIARY,

10　ASSUMING YOU HAVE FIDUCIARY OBLIGATIONS, THAT IT'S OKAY TO GO

11　BEHIND YOUR CLIENTS' BACK, STAB THEM IN THE BACK, AND DO WHAT'S

12　PERFECTLY LAWFUL, DO WHAT IS PERFECTLY LAWFUL, WHICH IF YOU

13　WEREN'T A FIDUCIARY, IF YOU'RE EA, WHICH IS SCRAMBLE. AND TURN

14　TO THE LICENSEE AND SAY:

15　　　　　　　　"I'M NOT GOING TO SAY THIS TO MY CLIENTS, DO

16　　　　　　　　YOU KNOW? BUT SCRAMBLE IT. SCRAMBLE IT."

17　　　　　THAT IS, I CALL IS "DESPICABLE." AND "DESPICABLE" IS

18　IN THE CASES. YOUR HONOR CHANGED IT TO "OUTRAGEOUS," WHICH IS

19　ALSO IN THE CASES.

20　　　　　**THE COURT:** I THOUGHT I USED EXACTLY THE FORM THAT

21　MR. KESSLER GAVE ME ON THE --

22　　　　　**MR. PARCHER:** YOU PROBABLY DID.

23　　　　　**THE COURT:** I USED WHAT YOU LAWYERS TOLD ME WAS THE

24　DISTRICT OF COLUMBIA.

25　　　　　**MR. PARCHER:** OH, I'M NOT BEING CRITICAL. I'M NOT

1  BEING CRITICAL.

2          **THE COURT:**  I DID THAT ON PURPOSE.  I HOPE THAT I --

3          **MR. PARCHER:**  I'M NOT BEING CRITICAL.

4          **THE COURT:**  NO ONE OUGHT TO BE CRITICIZING ME.

5          **MR. PARCHER:**  I'M NOT.

6          **THE COURT:**  YOU TOLD ME --

7          **MR. PARCHER:**  PLEASE LOOK AT MY EYES, YOUR HONOR.

8  I'M NOT. I'M NOT.  WHAT I'M TRYING TO SAY IS I USED THE WORD

9  "DESPICABLE."  "OUTRAGEOUS" IS FINE WITH ME. OKAY?

10          I THINK THAT IN THE UNITED STATES THAT'S OUTRAGEOUS.

11  BUT, MORE IMPORTANTLY, A JURY THOUGHT IT WAS OUTRAGEOUS.  SO

12  LET'S NOT GO REVISITING THAT.  LET'S NOT GO RETRYING OUR CASE

13  ALL OVER AGAIN NOW.  WE'RE DEALING WITH QUESTIONS OF LAW, SO

14  I'LL TAKE IT IN ORDER AS BEST I CAN.

15          THE FIRST THING WE HAVE IS A SPECIAL VERDICT FORM

16  THAT YOUR HONOR ISSUES THAT SAYS:

17              "IS THERE A CLASS-WIDE BREACH OF ANY TERM, ANY

18              TERM OF THE AGREEMENT?"

19          AND THE JURY ANSWERS:

20              "YES."

21          AND THEN, YOU GO TO THE SECOND PART OF THE FORM, AND

22  IT SAYS:

23              "WELL, WHAT'S THE AMOUNT OF DAMAGES?"

24          AND IF YOU LOOK AT JURY INSTRUCTION NUMBER 16,

25  SUBDIVISION ONE, WHICH IS ON PAGE 18 OF YOUR JURY INSTRUCTIONS,

YOUR HONOR, WHAT, IN EFFECT, YOU SAY -- AND I'M NOT LOOKING AT

THAT.  I'M LOOKING AT MY NOTES, NOT AT THE FORM ITSELF,

ALTHOUGH I CAN.

IT SAYS:

"WHAT WERE THE DAMAGES FOR MONIES THAT WERE

GENERATED BY DEFENDANTS' LICENSING OF RIGHTS TO WHICH

THE CLASS WAS ENTITLED?"

AND THE JURY CONCLUDES ZERO. NONE.

NOW, THE FACT OF THE MATTER IS IS THAT THE JURY'S

ALREADY CONCLUDED, PERHAPS IN THEIR ANSWER TO SPECIAL VERDICT

FORM NUMBER ONE, THAT MY CLIENT SHOULD HAVE BEEN INCLUDED IN,

FOR EXAMPLE, EA OR ALL THE OTHERS.  TAKE YOUR PICK.  IT DOESN'T

MATTER FOR PURPOSES OF THIS PURPOSE.

BUT THAT THE EA CONTRACT, LET'S SAY, WAS AN ACTIVE

PLAYER CONTRACT. IT WAS NOT, AS WE CONTENDED AND TRIED TO

PERSUADE THE JURY, THAT IT WAS AN ACTIVE AND RETIRED PLAYER

CONTRACT.

IT WOULD BE TOTALLY CONSISTENT AND APPROPRIATE AND,

IN FACT, MORE THAN REASONABLE FOR THE JURY TO CONCLUDE THAT YOU

BREACHED YOUR CONTRACT BY NOT GETTING US IN THERE, BUT NO

DAMAGES FLOWED BECAUSE ALL THE MONEY THAT WAS PAID, ALL THE

MONEY THAT WAS PAID FOR THAT CONTRACT WAS PAID TO ACTIVE

PLAYERS FOR AN ACTIVE PLAYER CONTRACT AND SAVE THE DAMAGES FOR

FIDUCIARY.

SECONDLY, YOU GOT A CLAUSE -- I THINK IT'S DOWN IN

THE FIFTH PARAGRAPH, IF I CAN PICTURE IT IN MY MIND.  AT LEAST

IT'S NOT UP HERE, BUT I CAN PICTURE IT IN MY MIND, WHICH TALKS

ABOUT AN ESCROW ACCOUNT, THE FAMOUS AND INFAMOUS ESCROW

ACCOUNT.  THE JURY COULD EASILY HAVE CONCLUDED:  YES, YOU

BREACHED YOUR CONTRACT.  YOU DIDN'T PUT AN ESCROW ACCOUNT --

YOU DIDN'T START AN ESCROW ACCOUNT.  HOWEVER, THERE'S NO

DAMAGES THAT FOLLOW FROM THAT.

        AND THIRD, LAST BUT NOT LEAST -- I'M SURE THERE ARE

OTHERS -- LAST BUT NOT LEAST IS WHAT I CALL "THE DOUBLE

ACCOUNTING," WHICH MR. KESSLER POO-POOS.

        HE SPECIFICALLY TOLD THE JURY, AND WHAT THEY DID IS

ENTIRELY CONSISTENT WITH WHAT YOU TOLD THEM.  AND WHAT YOU TOLD

THEM WAS CORRECT.

        YOU TOLD THEM NOT TO DOUBLE COUNT. PARAGRAPH -- I

THINK IT'S PARAGRAPH 53 OF THE JURY INSTRUCTION SAYS THAT:

            "IF YOU FIND THE SAME DAMAGES FOR CONTRACT AS

            YOU FIND FOR FIDUCIARY -- AS YOU FIND FOR FIDUCIARY

            BREACH, THEN YOU CAN ONLY CALCULATE THE DAMAGES

            ONCE."

        AND THAT'S PRECISELY WHAT THEY DID. WE WILL GET TO

HOW THEY GOT TO $7.1 MILLION BEFORE THIS IS OVER.  BUT ASSUMING

THAT THEY GOT TO $7.1 MILLION FOR CONTRACT DAMAGES, AND THE

SAME AMOUNT OF DAMAGES FOR FIDUCIARY DAMAGES, AND THEY ARE TOLD

THAT YOU CAN ONLY CALCULATE IT ONCE, IT WOULD BE ENTIRELY

REASONABLE FOR THEM TO SAY ZERO TO THE ANSWER TO YOUR QUESTION

TWO, AND 7.1 TO YOUR ANSWER TO FIDUCIARY.

AND THE SO-CALLED PARENTHETICAL TO YOUR SPECIAL

VERDICT CHARGE FIVE WHICH, IN EFFECT, SAYS:

"REMEMBER NOW, WE DON'T WANT YOU TO COUNT TWICE,

SO SUBTRACT ONE FROM THE OTHER."

WELL, THEY DIDN'T NEED TO SUBTRACT ANYTHING BECAUSE

THEY PUT "ZERO" UNDER CONTRACT DAMAGES.

SO I THINK THAT ONCE YOU ESTABLISH THE FACT THAT THEY

SAID THERE WAS A BREACH OF CONTRACT, WHICH IS WHAT YOUR HONOR

HAD SUGGESTED TO US NEEDED TO BE DONE FIRST TO GET TO THE

FIDUCIARY POINT -- THAT'S PRECISELY WHAT YOU SAID:

"YOU NEED TO GET A BREACH OF CONTRACT. ONCE THE

JURY SAID THAT THERE WAS A BREACH OF CONTRACT, YOU

CAN HAVE A FIDUCIARY DAMAGES, WHICH ARE EITHER THE

SAME AS THE CONTRACT DAMAGES, MORE THAN THE CONTRACT

DAMAGES OR LESS THAN THE CONTRACT DAMAGES."

IN THIS CASE THEY CAME UP WITH THE NUMBER OF $7.1

MILLION.

NOW, WERE THE DEFENDANTS FIDUCIARIES?  AND WHILE

THERE IS SOME DIFFERENCES, I DON'T THINK THEY ARE IMPORTANT TO

THIS PARTICULAR CASE. BUT WHILE THERE ARE SOME DIFFERENCES

WITHIN THE D.C. LAW AND CALIFORNIA LAW, AND ONLY BECAUSE I LOVE

MY CITY AND THE LAW IN THE SOUTHERN DISTRICT, WHAT YOUR HONOR

CHARGED THE JURY IS ABSOLUTELY THE LAW THAT APPLIES -- THAT

APPLIES TO THIS CASE.

1     SO WHAT DO YOU WANT TO KNOW?  YOU WANT TO KNOW -- AND

2   THIS IS STARTING WITH YOUR JURY INSTRUCTION NUMBER 37.  AND IT

3   GOES INTO THE EARLY -- INTO THE EARLY 40'S.  AND YOU WERE

4   METICULOUS ABOUT THIS.  WHAT YOU SAY TO THE JURY IS:

5             "LOOK AT THE WORDS OF THE CONTRACT, BUT THEN

6             DON'T STOP THERE. LOOK AT ALL THE CIRCUMSTANCES AND

7             LOOK AT THE RELATIONSHIP BETWEEN THE PARTIES."

8       WELL, THE CONTRACT -- MY OPINION.  I DON'T KNOW WHAT

9   THE JURY THOUGHT WERE THE WORDS IN THE CONTRACT.  THEY MAY VERY

10  WELL HAVE STOPPED RIGHT THERE. BUT THE CONTRACT -- BUT THE

11  CONTRACT WASN'T NEGOTIATED.  ITS MEANING WASN'T DISCUSSED

12  BETWEEN THE PARTIES.

13      WHAT YOU DO KNOW IS THAT THESE WERE THE

14  CIRCUMSTANCES:  ONE, EVERY PLAYER THAT SIGNED IT SOUGHT A TRUST

15  POSITION BETWEEN HIMSELF AND THE UNION AND THE DEFENDANTS,

16  EITHER BECAUSE THEY WERE MEMBERS OF THE UNION, OR THEY HAD BEEN

17  MEMBERS OF THE UNION, THEY WERE BEING SOLICITED BY THE UNION

18  WHO WAS TELLING THEM:

19            "WE'RE NOT STRANGERS TO YOU.  WE'RE NOT NEUTRAL

20            THIRD PARTIES.  WE'RE MEN" -- OR IN THE CASE OF

21            MS. ALLEN -- "MEN AND WOMEN.  BUT WE'RE MEN.  WE'RE

22            MEN WHOM YOU CAN TRUST."

23      IT'S ON THE WEB SITE. IT'S ON THE MAGAZINES THAT THEY

24  SEND OUT TO THE RETIRED PLAYERS.

25            "WE REPRESENT YOU.  WE'RE GOING TO REPRESENT

YOU IN YOUR MARKETING.  WE'RE GOING TO REPRESENT YOU

IN THIS ENDEAVOUR."

SO YOU HAVE UNDER THESE CIRCUMSTANCES A TRUST

RELATIONSHIP. THEN, YOU HAVE WHAT THE DEFENDANTS THEMSELVES

DID. THERE WAS SEVERAL PLAINTIFFS THAT TESTIFIED THEY THOUGHT

THAT THE DEFENDANTS WERE THEIR AGENT.

I DON'T KNOW WHICH ONES THEY ARE OFF THE TOP OF MY

HEAD. PROBABLY I SHOULD.

BUT ONE THING I REMEMBER, BECAUSE MR. LINZNER SAID --

AND I THOUGHT THAT WAS THE BALL GAME -- HE SAID THAT THE

DEFENDANTS SAID TO THEM -- I THINK IT WAS DOUG ALLEN, BUT I

DON'T KNOW.  DON'T HOLD ME TO THAT.  THE DEFENDANT SAID TO

THEM:

"WE'RE THEIR AGENT. WE'RE THEIR AGENT."

SO ONE OF THE CIRCUMSTANCES THAT YOU HAVE HERE, AND

ONE OF THE RELATIONSHIPS BETWEEN THE PARTIES THAT YOU HAVE HERE

IS THAT THE DEFENDANTS THEMSELVES ACKNOWLEDGED TO THEIR SINGLE

MOST IMPORTANT LICENSEE THAT THEY ARE THE AGENTS OF MY CLIENT.

AND CLEARLY THEY TELL MY CLIENT THAT THEY ARE IN A TRUST

RELATIONSHIP VIS-A-VIS ONE ANOTHER.

THEN, YOU WENT ON TO LIST ALL THE OTHER ISSUES:  THE

IMPORTANCE OF THE FINANCIAL RELATIONSHIP, THE IMPORTANCE OF THE

MARKETING, THE IMPORTANCE OF THE REASONABLE EXPECTATIONS.  AND

AS I SAID, THE AGENT ADMISSION, WHICH WAS CLEARLY AN ADMISSION

AGAINST INTEREST.

THAT IS YOUR REPORT. INCREDIBLY, I SUPPOSE THINKING
THEY WERE DOING THEMSELVES SOME GOOD, ONE OF THE DEFENDANTS --
I THINK IT WAS ALLEN. I'M NOT POSITIVE THERE -- SAID:

"WE WEREN'T GOING TO CHARGE THE RETIREDS
ANYTHING."

SO THE FINANCIAL RELATIONSHIP WAS:

"YOU GIVE ME, THE DEFENDANT -- YOU GIVE THE
DEFENDANT YOUR PRECIOUS NAME AND IDENTITY RIGHTS, THE
TIME TO -- THE OPPORTUNITY TO GET A CRITICAL MASS,
THE OPPORTUNITY TO GET CREDIBILITY IN THE MARKETPLACE
AS AN AGENT. YOU DO ALL THAT. YOU DO ALL THAT FOR
ME, AND IN RETURN," THEY SAY, "I'LL CHARGE YOU
NOTHING."

THAT CERTAINLY DOESN'T SMACK TO ME AS SOMEBODY WHO IS
IN AN ORDINARY TYPE OF RELATIONSHIP. THE REASONABLE
EXPECTATIONS OF THE PARTIES. I THINK THEY ARE ALMOST -- IT'S
NOT LAUGHABLE, BECAUSE IT'S A SERIOUS MATTER. BUT I THINK IT'S
REASONABLE FOR EVERY SINGLE ONE OF THESE MEN SIGNING WITH THEIR
UNION, WITH THE ORGANIZATION THAT THEY TRUSTED, TO HAVE THE
EXPECTATION THAT THEY WOULD BE -- THAT THEY WOULD BE TREATED IN
A SPECIAL KIND OF WAY, THAT THEY WOULD UNDERTAKE TO MARKET,
WHICH IS ONE OF THE CRITERIAS THAT YOU CITED. AS SOME OF THEM
SAID THEY WOULD NOT DO LIQUOR OR TOBACCO OR ANYTHING THAT THESE
MEN FOUND HEINOUS.

AND THEN, YOU TALKED ABOUT THE RIGHT TO TERMINATE --

1 THIS IS ALL COMING FROM THE DIFFERENT -- YOU KNOW, DIFFERENT

2 SECTIONS OF YOUR INSTRUCTIONS.

3           AND THE RIGHT TO TERMINATE HERE COULD EASILY BE FOUND

4 FROM THE JURY IMPLIED FROM A SILENT CONTRACT TO THE MERE FACT

5 THAT THE DEFENDANTS THEMSELVES ADMITTED THERE WAS AN AGENCY

6 RELATIONSHIP, TO SAY NOTHING OF THE FACT THAT WHEN THEY

7 MODIFIED THE CONTRACT THEY SAW FIT TO ADD THE WORDS:

8               "YOU CANNOT TERMINATE."

9           AND WHY WOULD THEY ADD THE WORDS "CANNOT TERMINATE"

10 IF DURING THE RELEVANT YEARS YOU COULD HAVE TERMINATED?

11           SO I THINK THE JURY WAS WELL WITHIN ITS BOUNDS IN

12 FINDING A FIDUCIARY.

13           THE IDEA YOU BROUGHT UP -- NOT YOU, BUT THE

14 DEFENDANTS.  HE DIDN'T SAY IT THIS TIME -- BROUGHT UP THE WORD

15 "CONTROL."  FIRST OF ALL, I THINK THERE WERE CONTROLS IN WHAT I

16 SAID, AND THE JURY COULD HAVE FOUND THAT.  BUT SECONDLY YOUR

17 HONOR MADE IT VERY CLEAR THAT WHILE CONTROL WAS AN IMPORTANT

18 FACTOR, IT WAS BY NO MEANS THE DISPOSITIVE FACTOR.

19           AND YOU WENT OUT OF YOUR WAY -- I THINK IT WAS IN

20 YOUR JURY INSTRUCTION NUMBER 42 -- TO TELL THE JURY

21 SPECIFICALLY:  HOW MUCH WEIGHT TO GIVE THE VARIOUS FACTORS IS

22 UP TO THE JURY.

23           SO I FEEL VERY CONFIDENT ABOUT THAT.

24           NOW, WAS THERE A FIDUCIARY BREACH?  I CAN'T -- YOU

25 KNOW, YOUR INSTRUCTIONS TALK ABOUT GOOD FAITH.  YOUR

INSTRUCTIONS TALK ABOUT LOYALTIES.  YOUR INSTRUCTIONS TALK

ABOUT DISCLOSURE OF THE FACTS.  THE PLAIN FACT IS, JUST TO

LIMIT IT, BECAUSE I'M MINDFUL.  I KNOW I'M GOING ON.  AND I

HAVEN'T GOTTEN TO THE MAIN POINT, WHICH IS MY EXAMPLE, YOU

KNOW.  BUT ASSUMING YOU ARE A FIDUCIARY, WHICH I THINK THE JURY

CONCLUDED AND I THINK THE EVIDENCE SUPPORTS, WHEN A FIDUCIARY

HAD BEEN SIGNING FOR YEARS, HAS BEEN LURING THEM IN FOR YEARS

TO:

          "SIGN THIS PIECE OF PAPER, BECAUSE IT'S GOOD FOR

          THE UNION.  IT'S GOOD FOR THE GAME.  IT'S GOOD FOR

          THE ORGANIZATION.  YOU CAN TRUST US."

          AND THEN, THEY SILENTLY AND SURREPTITIOUSLY DECIDE

THAT EA WANTS THESE MEN.  AND I BELIEVE THAT THE JURY DID NOT

BELIEVE THIS, PARTICULARLY, AND THEY HAD A RIGHT NOT TO, AND

THOUGHT INITIALLY BEFORE THAT LETTER WAS WRITTEN THEY WANTED

THEM, I THINK THAT'S AN OUTRAGEOUS ACT.

          I THINK THAT IT'S AN ACT THAT IS INTENDED TO INJURE.

I THINK THAT IT'S AN ACT THAT IS MALICIOUS.  IT DEPRIVED THESE

GUYS OF ANY OPPORTUNITY TO MAKE ANY MONEY AFTER THEY HAVE BEEN

LULLED IN AND LURED IN.  AND I THINK THE JURY WAS WELL WITHIN

ITS BOUNDS IN FINDING WHAT THEY FOUND.

          **THE COURT:**  IN THE E-MAILS ABOUT SCRAMBLING OR THE

LETTERS ABOUT SCRAMBLING --

          **MR. PARCHER:**  YEAH.

          **THE COURT:**  WASN'T THAT -- THAT WAS BEFORE THE

STATUTE OF LIMITATIONS.

**MR. PARCHER:** YES, BUT HE MADE IT CLEAR THAT THAT FOLLOWED THROUGH. HE FOLLOWED IT THROUGH FOR THE YEARS.

**THE COURT:** SO THEY CONTINUED TO HAVE THOSE MADDEN GAMES EVERY YEAR.

**MR. PARCHER:** I'M SORRY? I DIDN'T HEAR THAT.

**THE COURT:** THE MADDEN GAME.

**MR. PARCHER:** YES.

**THE COURT:** WERE THOSE GAMES BEING SOLD DURING THE --

**MR. PARCHER:** YES, OF COURSE. THEY WERE SOLD EVERY SINGLE YEAR. IN FACT, I BOUGHT MY GRANDSONS MADDEN FOR CHRISTMAS, AND I DID VERY POORLY, I'M SAD TO REPORT, BY MY EIGHT-YEAR-OLD CADIEGO (PHONETIC), I DON'T KNOW. I GUESS I DON'T GET THE GAME YET.

DO YOU KNOW? BUT SURE. IT'S THE BEST SELLER. THAT'S WHERE THEY MAKE ALL THEIR MONEY. ALL THEIR MONEY. EA IS -- PART OF WHAT I'M GOING TO TELL YOU IN A MINUTE -- EA IS HALF THEIR MONEY. AND THE MADDEN IS THE OVERWHELMING ENTITY OF EA.

**THE COURT:** ALL RIGHT.

**MR. PARCHER:** IT'S NOT IT WILL BE A PERIPHERAL --

**THE COURT:** I JUST WANTED TO MAKE SURE.

**MR. PARCHER:** ITS KEY COMPONENT. IT'S GOING TO GO FOREVER. IT'S GOING TO GO FOREVER.

**THE COURT:** OKAY. HOW ABOUT THE 7.1, BECAUSE WE'RE --

1    **MR. PARCHER:** OKAY. OKAY. I SKIPPED -- WE'RE GOING

2    TO TALK ABOUT PUNITIVES, AND THEN I'LL GET BACK TO 7.1.

3    **THE COURT:** ALL RIGHT.

4    **MR. PARCHER:** I DON'T KNOW. LOOK, MR KESSLER IS A

5    FINE LAWYER. WE HAVE OUR DIFFERENCES, BUT NOT ABOUT THAT. BUT

6    COME ON. THREE TIMES, THREE TIMES 7.1, WE ASKED AND YOU TOLD US

7    SO MANY TIMES:

8            "DON'T BE GREEDY," THAT EVEN I GOT IT. EVEN I

9    GOT IT. I GOT IT, DO YOU KNOW?

10           SO WHEN WE WENT FOR THE PUNITIVE DAMAGES, WE SAID:

11           "TEN PERCENT. TAKE TEN PERCENT OF $210 MILLION."

12           AND THEY SAID:

13           "OKAY. $21 MILLION."

14           I BELIEVE WE COULD HAVE SAID A LOT MORE AND GOT

15   OURSELVES IN HOT WATER WITH YOUR HONOR, WHICH IS NOT SMART,

16   EVEN IN THE SOUTHERN DISTRICT, NEVER MIND IN THE NORTHERN

17   DISTRICT OF CALIFORNIA.

18           SO WHEN WE DID THIS MODEST THING, AND HE SAYS:

19           "IT'S OUTRAGEOUS. THREE TIMES."

20           THERE'S A SUPREME COURT CASE. I THINK IT'S STATE

21   FARM. DON'T HOLD ME TO IT. BUT THERE'S A CASE IN WASHINGTON,

22   THE DAKA CASE, BECAUSE I READ ALL THESE CASES, WHERE THE JURY

23   CAME IN WITH 26 TIMES. AND THEY SAID NO.

24           BUT SOMEWHERE ALONG THE WAY THE SUPREME COURT SAID:

25           "SINGLE DIGIT IS OKAY. AND NOT AS A BRIGHT

LINE, BUT AS A GENERAL RULE."

AND SOMEWHERE ALONG THE WAY, I THINK IN THAT SAME CASE, THEY SAID:

"FOUR TIMES IS GETTING NEAR THE LINE."

WELL, WE'RE AT THREE TIMES.  I DON'T THINK IT'S THE ISSUE.

SO NOW WE GET DOWN TO:  WELL, HOW DO YOU GET TO $7.1 MILLION?

WELL, FIRST OF ALL, AS YOUR HONOR MIGHT IMAGINE, SINCE WE'RE A TEAM OF FOUR, YOU KNOW, BEFORE WE SAID THERE'S AN INFINITE VARIETY OF WAYS, AND LEFT IT AT THAT.  THERE'S SOME THAT CONTINUE TO THINK JUST LEAVE IT AT THAT.

I HAPPEN TO BE ONE WHERE AFTER MR. KESSLER RAISED THE CHALLENGE IN HIS REPLY, DO YOU KNOW, OF:

"THEY CAN'T DO IT.  THEY CAN'T DO IT."

I WILL GIVE HIM MINE WITHOUT GIVING IT TO YOU. GIVING IT TO BECAUSE YOU'RE DECIDING THIS CASE.

SO HERE.  TAKE THIS FOR AN EXAMPLE.  WE USE EA.  AND THE REASON WE USE -- OH, OH, I JUST WANTED TO SAY SOMETHING BEFORE THAT.

THE AD HOC PAYMENT SEVEN MILLION ONE-SIXTEEN ONE NINETY-SIX TWENTY-NINE. THAT'S THE PRECISE NUMBER.

NOW, WE'RE ENTITLED TO ROUGH MATH. BUT ONE THING I CAN SAY ABOUT THIS IS:  IF THE JURY HAS SEVEN MILLION ONE-SIXTEEN ONE NINETY-SIX TWENTY-NINE, THEY KNOW HOW TO SAY

1    SEVEN MILLION ONE-SIXTEEN ONE NINETY-SIX TWENTY-NINE. AND THEY

2    DIDN'T SAY THAT.

3            SO WHAT MR. KESSLER IS DOING IS PURE SPECULATION.

4    THE SUPREME COURT DOESN'T STOP HIM FROM SPECULATING.  BUT

5    THERE'S NO REASON THAT ANYBODY OUGHT TO HONOR IT.

6            SO TAKE EA, BECAUSE THEY ARE THE EASIEST EXAMPLE

7    BECAUSE THERE WAS A LOT OF TESTIMONY ABOUT EA. IF YOU LOOK

8    AT -- AND I WILL SUGGEST THAT YOU DO IT NOW -- BUT IF YOU LOOK

9    AT EXHIBIT 1217, YOU'LL FIND THAT THE EA LICENSING REVENUE FOR

10   THE PERIOD OF 2004 TO 2007 WAS $82,298,000. IF THAT'S NOT TO

11   THE PENNY, IT'S DARN NEAR -- NEAR IT.

12           BUT YOU'LL FIND FROM EXHIBIT --

13           **THE COURT:**  THAT WAS THE REVENUE THAT WENT --

14           **MR. PARCHER:**  2004.

15           **THE COURT:**  2004 TO 'O7, THAT WAS REVENUE THAT WAS

16   COLLECTED BY THE DEFENDANTS.

17           **MR. PARCHER:**  RIGHT.  I CAN HAND UP EXHIBITS.

18           **THE COURT:**  BUT THAT WASN'T FOR THE MADDEN GAME, WAS

19   IT?

20           **MR. PARCHER:**  NO, THAT'S --

21           **THE COURT:**  TOTAL.

22           **MR. PARCHER:**  -- TOTAL. ONCE WE'RE IN, WE'RE IN FOR

23   THE WHOLE --

24           **THE COURT:**  YES.  BUT HOW MUCH WAS THE MADDEN GAME?

25           **MR. PARCHER:**  I FRANKLY DON'T KNOW, BUT IT DOESN'T

MAKE -- IT FRANKLY DOESN'T MAKE ANY DIFFERENCE.  IT HAPPENED TO

BE ALL OF IT.

**THE COURT:**  IS THAT IN THE RECORD SOMEWHERE?

**MR. PARCHER:**  IT IS IN THE RECORD SOMEWHERE.  YOU'RE

JUST DEALING --

**THE COURT:**  ALL OF THAT WAS THE MADDEN GAME?

**MR. PARCHER:**  YOU'RE DEALING WITH A MAN WHO IS GOING

TO HAVE HIP SURGERY IN TWO WEEKS, SO I CAN'T GIVE YOU THAT

PRECISE ANSWER.

**THE COURT:**  WELL, I THOUGHT IT WAS ALL THAT VINTAGE

GAME, THE VINTAGE.

**MR. PARCHER:**  THAT'S THE SAME.

**THE COURT:**  IS THAT THE SAME THING?

**MR. PARCHER:**  THE MADDEN GAME IS 32.  YOU GOT TO PLAY

IT.  YOU GOT TO GO WITH YOUR FAMILY AND PLAY IT.  I'M TELLING

YOU, IT WILL CHANGE YOUR WHOLE ATTITUDE AND OUTLOOK ON LIFE.

IT WILL.

THE 32 ACTIVE PLAYERS, THE ACTIVE TEAMS, AND THERE'S

147 -- DON'T HOLD ME TO THE NUMBER -- OF RETIRED/VINTAGE.

ALL RIGHT. TO CONTINUE:  IF YOU TAKE THAT NUMBER,

$82,298,000 -- SORRY -- THE PLAYERS' SHARES OF THE LICENSING

REVENUE COMES FROM EXHIBIT 95, IS 37 PERCENT.

THE AMOUNT OF ASSUMED EQUAL SHARE ROYALTY FROM THE EA

TOTAL LICENSING REVENUE IS $28,970,260.

NOW, IN THAT CALCULATION IS AN ADJUSTMENT FOR THE

1    $8 MILLION REALLOCATION, BECAUSE EVEN THOUGH I SAID

2    "87 PERCENT," YOU RECALL THAT SOMETIME IN 2006 THERE WAS A

3    MODIFICATION BETWEEN PA&PI.  AND THEY WERE GOING TO TAKE AN

4    ADDITIONAL $8 MILLION.

5          AND THE ONLY EXHIBIT THAT SAYS THAT THE $8 MILLION

6    WERE TAKEN WAS THE 2000 -- WAS 2007 THEY TOOK THEIR EIGHT

7    MILLION.  TO FIND OUT WHETHER THEY TOOK IT FOR THE YEAR 2007,

8    YOU HAVE GOT GO TO 2008. IT WASN'T BEFORE THE JURY.

9          SO THE ACTIVE PLAYERS' LICENSE IN MADDEN, WE'RE

10   ASSUMING NOW THAT KESSLER INTERPRETATION, THAT THE RETIRED

11   PLAYERS' LICENSE WAS A USE LICENSE AND THAT THE JURY BOUGHT

12   THAT.

13         THE ACTIVE PLAYERS' LICENSE IN MADDEN, ACCORDING TO

14   THE ALLEN TRIAL TESTIMONY, THE ONLY NUMBER THAT ALLEN EVER GAVE

15   WAS APPROXIMATELY 1800 PEOPLE. ACTIVE PEOPLE.

16         THE RETIRED PLAYERS -- I DON'T KNOW IF I SAID THAT

17   RIGHT.  AM I BEING CLEAR?  THE ACTIVES, IF YOU TAKE THE ALLEN

18   TESTIMONY, IS APPROXIMATELY --

19         **THE COURT:**  YOU LOST ME AT 28.9 MILLION, BECAUSE YOU

20   GOT OFF ONTO THE $8 MILLION THING, AND THAT WAS --

21         **MR. PARCHER:**  OH, THE WAY I GOT TO $28 MILLION, SINCE

22   I'M NOT A ROCKET SCIENTIST, WAS I CALCULATED AN $8 MILLION

23   ADJUSTMENT INTO THAT FIGURE, BECAUSE THAT'S IN THE RECORD. THE

24   JURY -- THE JURY COULD HAVE --

25         **THE COURT:**  YOU ARE TAKING 37 PERCENT OF 82 MILLION.

1          **MR. PARCHER:**  THAT'S THE PLAYERS' SHARE OF LICENSING

2     REVENUE. THAT COMES TO A NUMBER WHICH I ADJUSTED FOR THE

3     $8 MILLION FACTOR.

4               **THE COURT:**  ALL RIGHT.  SO --

5               **MR. PARCHER:**  REMEMBER, THERE'S ALWAYS THE ARGUMENT

6     37 VERSUS 31 PERCENT, AND ALL OF THAT?

7               NO?  YOU HAD A FEW CASES SINCE THEN?

8               **THE COURT:**  YES.

9               **MR. PARCHER:**  YES.

10              **THE COURT:**  I DON'T REMEMBER THAT DETAIL NOW.

11              **MR. PARCHER:**  WELL, IT WAS --

12              **THE COURT:**  BUT JUST FINISH UP WITH THIS.  THIS

13    28-POINT -- LET'S SEE, THAT 28 MILLION, WHAT DOES THAT NUMBER

14    REPRESENT?

15              **MR. PARCHER:**  THAT REPRESENTS THE AMOUNT OF ASSUMED

16    EQUAL SHARE ROYALTY FROM ELECTRONIC ARTS' TOTAL LICENSING

17    REVENUE.

18              THEN, I SAID:

19                   "WELL, HOW MANY PLAYERS SHOULD WE USE, ACTIVE

20                   PLAYERS?"

21              AND I SAID:

22                   "LET'S GO TO THE ALLEN TESTIMONY," WHERE AT THE

23    TRANSCRIPT AT 492, LINES 8 THROUGH 13, HE APPROXIMATES 1800,

24    WHICH IS A NUMBER THAT GOT THROWN AROUND A LOT.

25              THEN, I SAID:

1    "WELL, HOW MANY OF THE RETIRED PLAYERS WERE USED

2    IN THE MADDEN GAME?"

3    I'M TRYING TO FIGURE OUT HOW THEY COULD HAVE GOT TO

4    $7.1 MILLION WITHOUT SPECULATING.  AND LET'S BE CLEAR ABOUT

5    SOMETHING. UNLESS IT'S VERY CLEAR THEY SPECULATED, IF THERE'S A

6    REASONABLE WAY THEY COULD HAVE DONE IT, WHETHER MR. KESSLER

7    LIKES IT OR HE DOESN'T LIKE IT, IT'S OVER. IT'S OVER.

8    AND I FOUND, NOT TO MY AMAZEMENT, BUT I WAS CURIOUS,

9    SO I DID IT. I FOUND THAT IF YOU TREAT IT AS A USE LICENSE

10   THERE'S 586 RETIRED PLAYERS THAT WERE IN THE MADDEN GAME.

11   THAT'S EXHIBIT 1240.

12   THAT COMES TO A TOTAL OF 2386 PLAYERS. THE RETIRED

13   PLAYERS' PERCENTAGE OF THAT TOTAL IS TWENTY-TWO FOUR

14   FIVE PERCENT.

15   THIS IS ALL MATHEMATICS THIS ISN'T ME, YOU KNOW,

16   COMING UP WITH A THEORY.  THE RETIRES PLAYERS' SHARE BASED ON

17   EA REVENUE AND MADDEN GAMES -- ARE YOU READY -- SEVEN MILLION

18   ZERO ONE EIGHTY-SEVEN SEVEN THIRTEEN.

19   AND UNDER SLIGHTLY ROUGH MATH, THE TI CHI GODS WILL

20   TELL YOU THAT THAT COMES TO $7.1 MILLION.

21   NOW, I HAVE OTHER EXAMPLES. I HAVE AN EXAMPLE FROM

22   TOPPS.  I HAVE ANOTHER EXAMPLE FROM EA.  I CAN GIVE IT TO YOU.

23   I WOULD LIKE TO HAND SOMETHING UP SO THAT YOU HAVE SOMETHING TO

24   SEE.

25   **THE COURT:**  IS THIS IN YOUR BRIEF?

1          **MR. PARCHER:**  NO, WHAT WAS IN THE BRIEF -- WELL, I

2    KNOW, BECAUSE I HEARD WHAT YOU SAID TO THE FIRST FELLOW. I

3    HEARD IT, AND I CRINGED, YOU KNOW?

4          **THE COURT:**  YOU'RE JUST GIVING ME STUFF THAT THE

5    OTHER SIDE HAS NEVER SEEN.

6          **MR. PARCHER:**  WELL, HE CAN TAKE THAT.  MR. KESSLER

7    WENT TO A LEADING LAW SCHOOL IN THIS COUNTRY.  HE CAN DO THE

8    MATH.  AND HE'S GOT A LOT OF PEOPLE BEHIND HIM WHO CAN BACK HIM

9    UP HERE.  BUT I ASSURE YOU THE NUMBERS ARE CORRECT.  THAT'S A.

10          B, I HAVE OTHER EXAMPLES.  I HAVE TOPPS EXAMPLE.  OH,

11   AS FAR AS IS IT IN THE BRIEF?  WE HAVE IN THE BRIEF --

12          **THE COURT:**  ARE YOUR EXAMPLES --

13          **MR. PARCHER:**  THE EXAMPLE'S NOT, BUT THE FACT THAT

14   THERE ARE A MYRIAD WAYS OF USING EA TO GET TO THE 7.1 IS

15   SPECIFICALLY IN THE BRIEF.

16          THAT'S ON PAGE 10 OF THE BRIEF, LINES 9 THROUGH LINES

17   15. IT'S NOT LIKE:  WHAT A SURPRISE.

18          AND THEN, HE COMES BACK, MR. KESSLER, AND SAYS:

19               "THERE IT IS."

20          THEY WON'T EVEN TELL YOU.  THEY WON'T EVEN -- THEY

21   WON'T EVEN COME TO COURT, LOOK YOU IN THE EYE AND GIVE YOU ANY

22   WAY TO DO IT, BECAUSE IT'S IMPOSSIBLE.

23          WELL, LET'S FACE IT.  HE DIDN'T TRY.  NOW, I CAN GIVE

24   YOU SOME OTHER EXAMPLES I WOULD LIKE TO PUT IN THE RECORD AS

25   A -- AS A SIDE PAPER, BECAUSE I'VE GOT TOPPS.  I'VE GOT ANOTHER

1  EA EXAMPLE THAT I COULD GIVE YOU.

2          **THE COURT:**  YOU DON'T HAVE TIME TO DO THAT TODAY.

3          **MR. PARCHER:**  TOPPS WILL TAKE A MINUTE.

4          **THE COURT:**  NO. NO. YOU'VE ALREADY USED UP ALL YOUR

5  TIME.

6          **MR. PARCHER:**  I HAVE?

7          **THE COURT:**  YES.

8          **MR. PARCHER:**  OKAY.  SO MAY I HAND UP -- I'M SORRY,

9  JUDGE.  I COME OUT -- MAYBE I'M JUST PUSHING TOO HARD HERE.

10 THAT'S PROBABLY WHAT I'M DOING.  I DON'T WANT TO -- I DON'T

11 WANT TO IRRITATE YOU.

12         **THE COURT:**  IF THIS WAS -- IT WON'T IRRITATE ME, BUT

13 YOU KNOW HOW MANY CASES I HAVE GOING ON?

14         **MR. PARCHER:**  YES.

15         **THE COURT:**  I'VE GOT A BIG TRIAL GOING RIGHT NOW, AND

16 IT INVOLVES DNA.

17         **MR. PARCHER:**  I HAVE TO SAY --

18         **THE COURT:**  WHY DON'T YOU SEND A FEW PEOPLE FROM YOUR

19 LAW FIRM OUT TO HELP ME UNDERSTAND DNA.

20         **MR. PARCHER:**  YES.  YES.  THERE IS A FELLOW IN NEW

21 YORK WHO DOES THAT, BARRY SCHECK (PHONETIC).

22         **THE COURT:**  YOU KNOW WHAT DNA IS?

23         **MR. PARCHER:**  YES.

24         **THE COURT:**  ALL RIGHT.  LET ME TELL YOU SOMETHING.

25 I'VE GOT OTHER CASES.  I'VE GOT A DEATH PENALTY CASE TO START.

1          **MR. PARCHER:** IT'S A BIG CASE.

2          **THE COURT:** THE FIRST ONE SINCE 1948 IN THIS

3    DISTRICT.

4          **MR. PARCHER:** THERE ARE PEOPLE IN NEW YORK WHO KNOW

5    YOU.

6          **THE COURT:** THE REASON WE DO THE BRIEFS IN AN ORDERLY

7    WAY IS SO THAT I'LL HAVE -- I CAN WORK IT IN.  AND HERE YOU

8    COME WITH AN ARGUMENT, AND ON THE FLY YOU WANT TO GIVE ME THIS

9    ACCOUNTING WORK?  IT'S NOT FAIR.

10         **MR. PARCHER:** WELL, JUDGE, I'M SORRY, AND I'LL TAKE

11   FULL RESPONSIBILITY FOR THAT. I'M TELLING YOU THAT, YOU KNOW,

12   NOT UNCOMMON BACK FROM SAN FRANCISCO TO NEW YORK.  YOU TALK

13   ABOUT IT.  I MEAN, LOOK, YOU COME HERE AT 5:30 IN THE MORNING.

14   YOU PREPARE FOR EVERY SINGLE CASE. YOU STAY UNTIL WHATEVER. AND

15   THE CASE LOAD PILES UP.  YOU NEVER CATCH UP WITH IT NO MATTER

16   WHAT YOU DO.

17         SO THERE'S NOTHING -- NOTHING BUT RESPECT COMING FROM

18   ME.  I COULDN'T DO IT.  I COULDN'T DO IT.

19         **THE COURT:** IT'S OKAY.  IT'S OKAY.  JUST PILE ONE

20   MORE THING ON.

21         **MR. PARCHER:** OKAY.  BUT I HAVE TO DO IT.  I CAN'T

22   HAVE YOU LEAVE HERE THINKING THAT THERE ARE NO -- THAT WE SAID

23   NO MYRIAD OF EXAMPLES, BUT WE'RE FULL OF BALONEY.  THAT'S NO --

24         **THE COURT:** HOW MANY OF THOSE EXAMPLES DO YOU HAVE?

25         **MR. PARCHER:** AH, I HAVE THREE THAT I CAN GIVE YOU

1  RIGHT NOW.  TWO OTHERS I CAN GIVE YOU RIGHT NOW.

2         **THE COURT:**  I HAVE A DIFFERENT PROPOSAL, BECAUSE THIS

3  IS NOT QUITE FAIR TO MR. KESSLER.

4         **MR. PARCHER:**  WE ALL WANT --

5         **THE COURT:**  TODAY IS THURSDAY. YOU BY NOON

6  TOMORROW --

7         **MR. PARCHER:**  OKAY.

8         **THE COURT:**  -- FILE A -- JUST A BRIEF.  IT DOESN'T

9  HAVE TO BE A DECLARATION BECAUSE --

10        **MR. PARCHER:**  JUST GIVE YOU EXAMPLES.

11        **THE COURT:**  -- BECAUSE IT'S JUST ARGUMENT, ANYWAY.

12        **MR. PARCHER:**  I'LL JUST GIVE YOU THE EXAMPLES.

13        **THE COURT:**  AND THEN, YOU FILE BY NOON TOMORROW YOUR

14 THREE EXAMPLES THAT LAY OUT THE METHOD BY WHICH YOU GOT TO 7.1

15 AND VARIOUS ALTERNATIVE WAYS.

16        AND THEN, HOW ABOUT YOU BY MONDAY AT NOON, MR.

17 KESSLER, YOU CAN RESPOND. AND THERE WON'T BE ANY REPLY BRIEFS

18 ON THIS.

19        **MR. PARCHER:**  NO.

20        **THE COURT:**  BECAUSE THIS IS SOMETHING YOU'RE NOT

21 ENTITLED TO DO, ANYWAY, MR. PARCHER.

22        **MR. PARCHER:**  WELL, FIRST, I'M GRATEFUL, AND SECONDLY

23 I'M CONTENT, BECAUSE THE LAW IS VERY CLEAR.  NOBODY IS SETTING

24 ASIDE A VERDICT, LEAST OF ALL YOUR HONOR, UNLESS IT'S APPARENT

25 THAT THERE WAS SPECULATION AND NO REASONABLE WAY TO GO IN THIS.

1    AND THE STATEMENT THAT MR. KESSLER MADE WASN'T TRUE

2   BEFORE WE GAVE A SPECIFIC EXAMPLE OR WE TOLD HIM THAT  WE HAD

3   PLENTY FROM EA, AND IT'S REALLY NOT TRUE NOW.

4    THIS EXAMPLE THAT I GAVE YOU, I PROBABLY SAID IT

5   POORLY, BUT IT LITERALLY MATCHES IT.

6    **THE COURT:**  WELL, HERE'S WHAT WE'RE GOING TO DO.

7   LIKE EACH PAGE, EXAMPLE NUMBER ONE, AND YOU SAY CHAPTER AND

8   VERSE "HERE'S THE EXHIBIT," WHERE YOU GOT THE NUMBER.

9    **MR. PARCHER:**  YES, SIR.

10    **THE COURT:**  PAGE WHERE YOU GOT THE NUMBER.

11    **MR. PARCHER:**  YES, SIR.

12    **THE COURT:**  AND THEN, YOU SAY "MULTIPLY IT BY

13   37 PERCENT," WHATEVER IT IS.

14    **MR. PARCHER:**  YES, SIR.

15    **THE COURT:**  JUST LIKE AN ACCOUNTANT WOULD DO IT.

16   JUST LIKE BOB CRATCHIT WOULD DO.

17    **MR. PARCHER:**  WHO IS THAT?

18    **THE COURT:**  DO YOU KNOW WHO BOB CRATCHIT IS?

19    **MR. PARCHER:**  NO.

20    **THE COURT:**  YOU NEVER HEARD OF BOB CRATCHIT?

21    **MR. PARCHER:**  DON'T BE ANNOYED.  I DON'T KNOW.  I'M

22   FROM NEW YORK.  I DON'T KNOW.  WHO IS BOB CRATCHIT?

23    **THE COURT:**  HE WAS THE ACCOUNTANT WHO WORKED FOR

24   SCROOGE.

25    **MR. PARCHER:**   OH.  SEE, I'M THINKING OF ENRON OR

1   SOME OF THE VILLANS THAT WE VOTED OUT OF OFFICE.

2           **THE COURT:**  HE MIGHT HAVE HAD, YOU KNOW --

3           **MR. PARCHER:**  OKAY.

4           **THE COURT:**  -- A HUNDRED YEARS LATER HAD TO WORK FOR

5   ENRON, BUT HE WAS WORKING --

6           **MR. PARCHER:**  OKAY.

7           **THE COURT:**  -- IN A COLD ACCOUNTING OFFICE --

8           **MR. PARCHER:**  OKAY.

9           **THE COURT:**  -- ON CHRISTMAS EVE.

10          **MR. PARCHER:**  RIGHT.

11          **THE COURT:**  SO THAT'S WHAT I MEAN. DO IT THE WAY BOB

12  CRATCHIT WOULD --

13          **MR. PARCHER:**  I WILL.

14          **THE COURT:**  -- AND THEN, MR. KESSLER CAN DO HIS

15  REPLY --

16          **MR. PARCHER:**  I WILL.

17          **THE COURT:**  -- ON MONDAY BY NOON.

18          **MR. PARCHER:**  ALL RIGHT.  THANKS FOR LISTENING TO ME,

19  YOUR HONOR.  YOU'RE VERY GRACIOUS.

20          **THE COURT:**  ALL RIGHT.  A FEW MINUTES, MR. KESSLER,

21  AND THAT'S IT.

22          **MR. KESSLER:**  YOUR HONOR, I OBVIOUSLY WILL BE HAPPY

23  TO RESPOND TO THAT.  BUT LET ME TELL YOU AGAIN THE MOST

24  IMPORTANT POINT:  WHAT MR. PARCHER HAS JUST ASKED YOU TO DO IS

25  WHAT THE NINTH CIRCUIT SAID YOU CAN'T DO IN <u>FIRST ALLIANCE</u>

1    MORTGAGE.  OKAY?

2              **THE COURT:**  ALL RIGHT.  TELL ME WHAT THEY SAID, AND

3    GIVE ME THE CITE, AGAIN.

4              **MR. KESSLER:**  ALL RIGHT.  FIRST ALLIANCE MORTGAGE IS

5    471 F.3D 977, 1001 TO -- '03.  IT'S A 2006 CASE IN THE NINTH

6    CIRCUIT, SO WE'RE TALKING RECENT AUTHORITY.

7              WHAT HAPPENED IN THAT CASE, IS THAT IT BECAME

8    APPARENT THAT THE JURY HAD BASED ITS DAMAGE NUMBER BY TAKING

9    APART WHAT WAS IMPERMISSIBLE, JUST LIKE THE 7.1.

10             AND SO WHEN THAT BECAME APPARENT, THE PLAINTIFFS WENT

11   TO THE JUDGE AND DID WHAT MR. PARCHER DID.

12             THEY CAME UP WITH SOME KIND OF RUBE GOLDBERG THING

13   AND SAID "WELL" -- AND THEY USED, BECAUSE IT WAS A REAL ESTATE

14   CASE, WHAT THEY DID IS THEY USED A COMBINATION OF EVIDENCE

15   ABOUT ORIGINATION FEES, INTEREST RATES, THE LENGTHS OF LOANS.

16             THEY SAID:

17                  "IF YOU JIGGLE ALL THIS UP AND YOU DO ALL THIS

18                  MATH, AND HERE IT IS.  LOOK.  IT COMES UP LOOKING

19                  LIKE THE JURY'S FIGURE."

20             AND THE COURT SAID:

21                  "OKAY. I DON'T WANT TO THROW OUT A JURY VERDICT.

22                  I'LL DO THAT."

23              AND THE NINTH CIRCUIT SAID -- NOT IN OUR CIRCUIT.

24   THE NINTH CIRCUIT SAID:

25                    "IT IS NOT THE COURT'S JOB TO COME UP WITH WILD

1          PERMUTATIONS OUT OF MISCELLANEOUS PIECES OF THE

2          RECORD THAT THE LAWYERS AFTER THE FACT, NEVER HAVING

3          PRESENTED THESE THEORIES TO THE JURY, NEVER SAID TO

4          THE JURY, FOR EXAMPLE, 'OH, WE'RE GOING TO GIVE

5          DAMAGES JUST TO THE INDIVIDUAL PLAYERS WHO WERE USED

6          IN THE MADDEN GAME,'" WHICH IS WHAT I JUST HEARD HIM

7     SAY, 586 PLAYERS, MANY OF WHOM, BY THE WAY, ARE NOT CLASS

8     MEMBERS.  BUT WE WILL RESPOND TO THAT.

9          HE'S MAKING UP A BRAND NEW THEORY OUT OF

10    MISCELLANEOUS PIECES OF THE EVIDENCE, AND HE'S SAYING:

11          "MAYBE THE JURY DID THAT."

12          THE NINTH CIRCUIT SAYS THAT'S SPECULATION. THAT'S

13    EXACTLY WHAT YOU CAN'T DO TO SUSTAIN A JURY VERDICT.  AND I'M

14    QUITE CONFIDENT WHEN YOUR HONOR LOOKS AT THAT THAT'S WHAT

15    YOU'LL CONCLUDE.

16          AND ALSO THE EXAMPLE HE GAVE CANNOT BE SUPPORTED BY

17    THE RECORD. IT'S CONTRARY TO THE RECORD, BUT I'LL RESPOND WHEN

18    HE DOES THAT.

19          SECOND -- VERY IMPORTANT -- WHAT IS THIS REALLY

20    ABOUT?  IT'S ABOUT WHAT YOUR HONOR SAID.  AND WHAT YOUR HONOR

21    SAID IS THE FOLLOWING ON THIS POINT. YOU LOOK -- AND I THINK IT

22    WAS MR. PARCHER, ACTUALLY, WITH RESPECT TO THAT.

23          AND YOU WERE TALKING ABOUT BREACH OF FIDUCIARY DUTY

24    FOR MARKETING OR BREACH OF FIDUCIARY DUTY FOR CONFLICT OF

25    INTEREST.  AND YOU SAID TO MR. PARCHER THE FOLLOWING --

1         **THE COURT:** READ SLOWLY.

2         **MR. KESSLER:** OKAY. I'M GOING TO DO THAT. OKAY. JUST

3 FIND THE ONE I WANT TO USE.

4         I APOLOGIZE, YOUR HONOR. I HAD IT, BUT THEN I WENT

5 TO THE FIRST ALLIANCE CASE. I HAD TO DO THAT AND THAT GOT ME A

6 LITTLE BIT OFF HERE.

7         SORRY, YOUR HONOR. I'LL GET IT IN ONE SECOND, I

8 PROMISE. OKAY.

9         OKAY. YOU SAID THE FOLLOWING. YOU SAID:

10         "LET'S PURSUE THAT, THOUGH. IF THAT'S -- IF THE

11         BREACH IS THAT THEY FAILED TO DISCLOSE A CONFLICT OF

12         INTEREST" -- YOU WERE USING THAT AS AN EXAMPLE --

13         "THEN THE DAMAGES WOULD FLOW FROM -- THAT WOULD BE IF

14         MR. ADDERLEY HAD KNOWN AND OTHER CLASS MEMBERS HAD

15         KNOWN THAT THERE WAS A CONFLICT OF INTEREST, THEN

16         CONCEIVABLY THEY COULD HAVE GONE OUT AND HIRED

17         MR. HOLLYWOOD TO BE THEIR GROUP LICENSING AGENT AND

18         MAY TRY TO MAKE THEIR OWN DEALS. AND, ONCE AGAIN, WE

19         COME BACK TO THE QUESTION OF: HAD MR. HOLLYWOOD GONE

20         OUT TO DO THAT, WHAT WOULD BE THE PLAUSIBLE RANGE OF

21         POTENTIAL ROYALTIES THAT SUCH A GROUP LICENSE WOULD

22         HAVE COMMANDED IN THE MARKET?"

23         AND THEN, YOUR HONOR SAID:

24         "THERE'S NO EVIDENCE ON THAT POINT."

25         AND THEN, YOUR HONOR WENT ON LATER, BECAUSE MR.

PARCHER WAS SAYING:

       "WE DON'T HAVE TO SHOW THAT."

    I THINK IT WAS MR. PARCHER. COULD HAVE BEEN MR. LECLAIR. I DON'T HAVE THAT WRITTEN HERE.

    AND THEN, YOUR HONOR SAID:

       "IT'S YOUR BURDEN OF PROOF. WHAT EVIDENCE DID YOU PUT IN ON WHAT THE INDEPENDENT AGENT WHO HAD NOTHING TO DO WITH THE LEAGUE, NOTHING TO DO WITH THE DEFENDANTS, WHAT THEY WOULD HAVE BEEN ABLE TO NEGOTIATE IN THE MARKETPLACE? I DIDN'T HEAR ANY EVIDENCE ON THAT."

    IT WAS MR. PARCHER. MR. PARCHER SAYS:

       "DEPENDS ON WHO THEY REPRESENTED AND WHO THEY COULD PUT IN.

       "THE COURT: THE EXACT GROUP THAT WE HAVE HERE, THE ENTIRE CLASS. THAT'S THE TEST."

    I NOTE THAT BECAUSE HE JUST PUT IN 587 PLAYERS, HE'S TALKING ABOUT DAMAGE FOR WHICH IS NOT THE ENTIRE CLASS, AND IT CAN'T BE THE TEST.

    AND THEN, MR. PARCHER SAYS:

       "WELL, WHAT IF IT WAS THE ENTIRE CLASS PLUS THE AD HOCS? WHAT IF IT WAS THE ENTIRE CLASS PLUS THE AD HOCS AND THE ACTIVES?"

    AND THEN THE COURT WAS GETTING A LITTLE INTO THIS, SAID:

1            "WE DIDN'T EVEN GET EVIDENCE ON THAT SCENARIO."

2       HE SAID:

3            "LOOK, I'M DENYING THE MOTION FOR NOW."

4       HE SAID:

5            "I THINK MY CONSCIOUSNESS HAS BEEN RAISED, BUT

6            YOU'VE RAISED IT AGAIN."

7            AND, YOUR HONOR, THERE'S PLENTY MORE OF THIS, AND WE

8  QUOTED THIS ALL IN THE BRIEF. WHAT YOUR HONOR WAS SAYING THERE

9  WAS NO CONNECTION BETWEEN THEIR ONE DAMAGES THEORY, THEIR ONE

10 DAMAGES THEORY, SAYS WHICH WAS AN EQUAL SHARE OF THE GLR POOL

11 AND ALL OF THIS OTHER STUFF ABOUT FIDUCIARY DUTY.

12           AND WHAT THE NINTH CIRCUIT SAYS IS YOU CAN'T GO BACK

13 NOW AFTER THE FACT WITH THEORIES NEVER PRESENTED TO THE JURY,

14 PIECES OF EVIDENCE THAT ARE GOING TO BE CONTRARY TO WHAT THE

15 JURY WAS TOLD, AND SAY:

16           "WELL, MAYBE THEY COULD HAVE DONE THIS."

17           THAT'S PURE SPECULATION. THE OTHER ONE I WANT TO GO

18 THROUGH, YOUR HONOR, THIS IS VERY IMPORTANT.  THERE'S ONE OTHER

19 HERE, BECAUSE I KNOW YOU'VE BEEN VERY GENEROUS WITH YOUR TIME,

20 WHICH IS WHAT MR. ROWLEY SAID ON THIS VERY POINT, WHEN IT WAS

21 ASKED, BECAUSE THIS IS WHAT THE JURY HEARD.

22           THE JURY DIDN'T HEAR MR. PARCHER GIVE THESE

23 PERMUTATIONS THAT HAVE NOTHING TO DO WITH ANYTHING. HE SAYS --

24 WHAT WE ASKED IS THE FOLLOWING -- THIS IS MR. ROWLEY IN MY

25 BRIEF.

1          **THE COURT:** REMIND ME WHO HE IS.

2          **MR. KESSLER:** HE WAS THEIR ONE DAMAGES PERSON. HE

3     WAS THE ONE WHO CALCULATED THE GLR POOL.

4          HE SAID: "OKAY."

5          MY QUESTION:

6              "NOW, THESE NUMBERS THAT HE PRESENTED" -- HE

7              PRESENTED ALL DIFFERENT PERMUTATIONS -- "CAN THEY

8              REPRESENT THE NUMBER THAT THE JURY MIGHT FIND

9              REASONABLE AS AN AWARD FOR PURPOSES OF BREACH OF

10             FIDUCIARY DUTY DAMAGES?"

11         **THE COURT:** IS THAT ME ASKING THE QUESTION?

12         **MR. KESSLER:** NO, I ASKED THE QUESTION.

13         **THE COURT:** ALL RIGHT.

14         **MR. KESSLER:** AND I SAID:

15             "IF SO, HOW?"

16         SO I ASKED HIM, I SAID:

17             "HERE, YOU JUST WENT THROUGH ALL YOUR NUMBERS."

18         I SAID:

19             "COULD THIS BE A BASIS FOR THE JURY?"

20         AND THIS WAS ALL THE NUMBERS HE PRESENTED.

21             "ANSWER: NO, I DID NOT. I DID NOT HAVE

22             DIFFERENT CALCULATIONS. THEY ARE THE SAME."

23         AND THEN, HE GOES ON TO EXPLAIN HE HAD ONE THEORY,

24     WHICH WAS THIS CONTRACTUAL RIGHT TO THE GLR POOL. AND THEN, TO

25     GO DIRECTLY ON THE FIDUCIARY DUTY POINT, I SAID -- THIS IS ME,

AGAIN:

   "LET ME ASK YOU, MR. ROWLEY, A QUESTION, THEN.

LET'S SAY THE JURY WERE TO FIND, OKAY, THAT JUST

SPECIFIC THAT THERE WAS A BREACH BECAUSE PLAYERS INC.

SHOULD HAVE DONE MORE TO MARKET RETIRED PLAYERS.

ASSUME THAT WITH ME, ALL RIGHT?

   "AND THAT WOULD BE LIKE SCRAMBLING, YOU KNOW.

FIND A WAY TO GET TO THEM TO USE IT.  DO MORE TO

MARKET THE PLAYERS. OKAY.

   "QUESTION:  BUT THEY DON'T FIND THAT THAT HAS

ANYTHING TO DO WITH AN ENTITLEMENT TO ANY SHARE OF

THE GLR POOL. ARE YOU WITH ME ON THOSE ASSUMPTIONS?

   "YES."

KEY QUESTION:

   "IN THAT CASE YOU'RE NOT OFFERING ANY MEASURE OF

DAMAGES, CORRECT?

   "ANSWER:  I THINK THAT'S CORRECT."

SO THAT'S ALL THAT WAS PRESENTED TO THEM IN THE WAY

OF DAMAGES. THEY GAVE THE JURY ONE CHOICE. THE CHOICE THEY

CHOSE TO GIVE TO THE JURY WAS OUR CLAIM IS THAT THERE'S A

CONTRACTUAL ENTITLEMENT TO AN EQUAL SHARE OF THE GLR POOL,

OKAY?

   AND THAT WAS ALL THE MARBLES.  AND THAT'S WHY YOUR

HONOR SAID ANOTHER TIME -- AND NOW I DON'T WANT TO GO BACK AND

FIND IT, BUT I'LL GIVE YOU, AND YOU CAN CHECK IN OUR BRIEF.

THIS IS WHAT YOU SAID. YOU SAID TO MR. PARCHER, YOU SAID:

"MR. PARCHER, I DON'T UNDERSTAND. YOUR ONLY DAMAGES IS A CONTRACTUAL ENTITLEMENT TO THE GLR POOL. IF YOU WIN ON THAT YOU'LL GET YOUR DAMAGES IN BREACH OF CONTRACT, RIGHT? YOU DON'T NEED BREACH OF FIDUCIARY DUTY."

THAT'S WHAT YOU SAID TO MR. PARCHER. AND YOU SAID:

"IF YOU DON'T WIN ON THAT, YOU'VE OFFERED NOTHING ELSE. IN OTHER WORDS, YOU'VE OFFERED NO OTHER DAMAGES FOR ANYTHING ELSE ON BREACH OF FIDUCIARY DUTY."

AND THEY HAD NO ANSWER THEN. THEY HAVE NO ANSWER IN THEIR BRIEF. AND WITH ALL DUE RESPECT TO MR. PARCHER, THEY HAVE NO ANSWER TODAY.

COMING IN AND SAYING THAT YOU CAN FIND A MATHEMATICAL WAY TO DO ANYTHING IS THE SAME AS THEIR INFINITE NUMBERS. IF YOU GIVE ME ANY NUMBER I CAN COME UP WITH A WAY THROUGH MATH TO GET TO THAT NUMBER. MAYBE MANY WAYS THROUGH MATH TO GET TO THAT NUMBER. THAT'S SPECULATION. THAT CAN'T BE THE BASIS FOR THIS JURY CLAIM.

I'D ALSO NOTE HE DOES NOT DISPUTE ANYTHING ABOUT OUR ARGUMENT ON THE INDIVIDUAL DAMAGES. HE DIDN'T EVEN SAY THAT. THERE'S NO WAY HE COULD COME UP IN HIS CALCULATIONS TO HOW THIS IS INDIVIDUAL.

IN FACT, HE SAID HE DID IT BY CALCULATING 548

1  PLAYERS.  THAT WOULDN'T BE THE WHOLE CLASS.  IT WOULDN'T EVEN

2  BE THE CLASS MEMBERS.  DID HE THINK THIS JURY THOUGHT THEY WERE

3  AWARDING DAMAGES TO 548 PLAYERS, OR WHATEVER NUMBER THEY

4  THOUGHT, AND NOT THE CLASS?  THEY CAN'T DO THAT.

5           **THE COURT:**  THE CLASS WAS -- WHAT WAS THE NUMBER?

6           **MR. KESSLER:**  2074.

7           **THE COURT:**  AND HOW MANY OF THOSE WERE HALL OF

8  FAMERS?

9           **MR. KESSLER:**  17.

10          **THE COURT:**  OKAY.

11          **MR. KESSLER:**  WELL, I DON'T KNOW IF THEY WERE ALL OF

12  FAMERS.  THEY WERE IN THE HALL OF FAME GAME, 17, IF THAT'S WHAT

13  YOU CALL THEM.

14          **THE COURT:**  17 OF THE CLASS MEMBERS WERE IN THE HALL

15  OF FAME.

16          **MR. KESSLER:**  WERE IN THE HALL OF FAME GAME.

17          **THE COURT:**  WELL, AREN'T THEY IN THE HALL OF FAME,

18  TOO?

19          **MR. KESSLER:**  WELL, IT'S POSSIBLE, BECAUSE OF THE

20  TIMING OF THAT GAME I DON'T KNOW IF THERE WAS A HALL OF FAME

21  MEMBER WHO WAS IN THE HALL OF FAME AFTER THE GAME WAS DONE OR

22  BEFORE THE GAME WAS DONE, SO I CAN'T ANSWER YOUR QUESTION OF

23  HALL OF FAME.  I CAN ANSWER THE GAME.

24          **THE COURT:**  WELL, THE HALL OF FAME --

25          **MR. KESSLER:**  WHAT'S IN THE RECORD IS THERE ARE 17

1   CLASS MEMBERS WHO WERE IN THE HALL OF FAME GAME.

2          **THE COURT:** ALL RIGHT.

3          **MR. KESSLER:** AND, BY THE WAY, JUST BECAUSE THEY ARE

4   WRONG, IT IS NOT TRUE THAT ALL THE EA MONEY WAS EVEN THE MADDEN

5   GAME BECAUSE THERE WAS FANTASY FOOTBALL AND OTHER THINGS THAT

6   WERE PART OF THAT LICENSE, BUT WE WILL RESPOND TO THAT.

7          THEY WERE NOT TRUE THAT MR. ALLEN EVER SAID THAT HE

8   TOLD MR. LINZNER --

9          **THE COURT:** I ONLY WANT YOU TO RESPOND TO THE

10   WRITE-UPS THAT GET TO 7.1.

11          **MR. KESSLER:** I WILL DO THAT.

12          **THE COURT:** WE'RE NOT GOING TO HAVE -- THIS IS GOING

13   TO BE VERY LIMITED.

14          AND, MR. PARCHER, THIS IS A VERY LIMITED LEAVE TO

15   FILE. JUST THESE THREE PROFORMAS THAT GET TO 7.1.

16          **MR. PARCHER:** YES, SIR.

17          **THE COURT:** AND THAT'S IT. YOU EACH HAVE ONE PAGE.

18   AND THAT'S ALL. I DON'T WANT NEW BRIEFS ON ANYTHING ELSE.

19          **MR. PARCHER:** OKAY.

20          **THE COURT:** ALL RIGHT.

21          **MR. KESSLER:** AND I WOULD ALSO ASK, YOUR HONOR, I

22   ASSUME HE WILL CITE WHERE IN THE TRIAL RECORD IT COMES FROM.

23          **THE COURT:** I SAID YOU HAVE TO CITE THE CHAPTER AND

24   VERSE.

25          **MR. KESSLER:** AND, FINALLY, YOUR HONOR, JUST TO GO

THROUGH A FEW MORE POINTS HE RAISED VERY QUICKLY, HE SAID

MR. LINZNER TESTIFIED THAT MR. ALLEN SAID THAT HE WAS THE AGENT

FOR THE PLAYERS.

MR. LINZNER NEVER TESTIFIED, AND I WANT YOU TO READ

THE RECORD AND CITE.  THAT'S NOT WHAT THE TESTIMONY IS.

AND, AGAIN, I'LL REST ON OUR BRIEF WITH RESPECT TO

THE FIDUCIARY BREACH POINT.  AND, AGAIN, I THINK THAT'S

COMPELLING.

AND FINALLY, ON THE EGREGIOUS POINT, HE SAID HE'LL

TAKE EGREGIOUS.  THAT IS, IN FACT, THE D.C. STANDARD.  IF YOUR

HONOR LOOKS AT THE D.C. --

**THE COURT:**  I USED THE LANGUAGE YOU GAVE ME, AND YOU

HANDED IT UP TO ME.

**MR. KESSLER:**  YOU DID EXACTLY WHAT I ASKED YOUR

HONOR.

**THE COURT:**  SO YOU CAN'T COMPLAIN ABOUT THAT

INSTRUCTION.

**MR. KESSLER:**  I HALE IT.  I HALE IT.  BUT WHAT MY

POINT IS, YOUR HONOR, IS THERE'S NOTHING WRONG WITH THAT

INSTRUCTION.  THAT WAS THE D.C. PATENT JURY INSTRUCTION ON

PUNITIVE DAMAGES.

WHAT'S WRONG IS THAT THE CONDUCT THEY JUST WENT

THROUGH, INCLUDING THE SCRAMBLING CONDUCT, SAYING THAT -- AND

REMEMBER WHAT IT WAS. MR. PARCHER SAID THEY DEPRIVED HIM OF

MONEY. THE TESTIMONY WAS UNEQUIVOCAL.  MR. LINZNER SAID HE

1    WOULDN'T PAY FOR ALL THOSE PLAYERS.

2              SO THE ONLY ISSUE WAS NOT WOULD THEY GET MONEY AS A

3    RESULT OF BEING USED IN THE EA GAMES IF THEY USED THEIR NAMES.

4              THE ISSUE WAS:  COULD THEY BE USED FOR FREE OR NOT?

5              AND THE UNION SAID:

6                   "YOU CAN'T USE THEM FOR FREE. SCRAMBLE."

7              THERE'S NO EVIDENCE EXCEPT LAWYERS' ARGUMENT THAT EA

8    WAS GOING TO PAY ANYTHING FOR THOSE RIGHTS.

9              MR. LINZNER IS THE ONLY ONE WHO TESTIFIED, SAID HE

10   WOULDN'T PAY ANYTHING FOR THOSE RIGHTS.

11             SO YOU'D HAVE TO FIND THAT UNDER DISTRICT OF COLUMBIA

12   LAW THAT IT IS OUTRAGEOUS CONDUCT WITH THE REQUIRED MENTAL

13   INTENT TO AWARD PUNITIVE DAMAGES BECAUSE THEY TOLD EA THAT:

14                  "IF YOU DON'T PAY FOR RIGHTS WHICH YOU HAVE THE

15                  LEGAL RIGHT TO USE, YOU SHOULDN'T USE THEM. YOU

16                  SHOULD SCRAMBLE THEM."

17             I WOULD SUBMIT, YOUR HONOR, THERE'S NO D.C. CASE

18   COULD DO THAT. IF ORDINARY FRAUD IS NOT ENOUGH UNDER D.C.,

19   WHICH IT'S NOT, HOW CAN THAT BE ENOUGH?

20             YOUR HONOR, THAT'S ALL I THINK I HAVE.

21        **MR. PARCHER:**  JUST ONE MINUTE, PLEASE?

22        **THE COURT:**  ALL RIGHT.  ONE MINUTE.  GO AHEAD.

23        **MR. PARCHER:**  HERE'S WHAT I WANT TO SAY. YOU KNOW, I

24   HEARD THE DEBATE BEFORE WITH THE FIRST FELLOW ABOUT THE WORD

25   "ONLY," WHAT DOES "ONLY" MEAN?

1      "SPECULATE," AS USED BY MR. KESSLER IS DIFFERENT THAN

2  "SPECULATE" AS USED BY THE CASES, INCLUDING BUT NOT LIMITED TO

3  THE <u>FIRST ALLIANCE</u> CASE.

4      "SPECULATE" IS THE JURY IS NOT ENTITLED TO COME UP

5  WITH SOME WILD NUMBER THAT'S NOT REASONABLY BASED ON EVIDENCE.

6      "SPECULATE," AS HE'S TALKING ABOUT, IS THE LAWYERS

7  WHO DON'T HAVE AN OBLIGATION TO DO THAT, BUT ARE TRYING TO

8  PERSUADE YOU, SPECULATING, AS HE IS ABOUT HIS AD HOCS, AS TO

9  WHAT THE JURY MAY OR MAY NOT HAVE DONE.

10     NOW, I'M SAYING THIS WITH THE ONE EXAMPLE THAT I GAVE

11 YOU. THE JURY IS ENTITLED UNDER THE EVIDENCE TO FIND THAT THE

12 GLA LICENSE WAS A USE LICENSE.

13     IF THEY FOUND THAT THE GLA LICENSE FOR RETIRED

14 PLAYERS WAS A USE LICENSE, WHICH HE ARGUED AT ONE POINT, YOU'D

15 HAVE THE NUMBER 587. IT'S AN EQUAL SHARING LICENSE. ALL THAT

16 $7.1 MILLION FROM THE RATIO I GAVE YOU HAS TO BE SHARED AMONGST

17 THE 2000 SOME ODD PLAYERS.

18     **THE COURT:** WHAT DO YOU MEAN BY "USE"? AS OPPOSED TO

19 WHAT?

20     **MR. PARCHER:** AS OPPOSED TO TAKING ALL -- GIVING THEM

21 DAMAGES -- GIVING DAMAGES FOR ALL 2067. 587 WERE IN THE GAME.

22 THE JURY COULD FIND THAT UNDER THE GLA AGREEMENT, EASILY,

23 COMFORTABLY, NO SPECULATION, THAT UNDER THAT --

24     **THE COURT:** DOES THAT THEN MEAN THAT THE -- HOW DO WE

25 DIVIDE THAT MONEY UP WITH THE CLASS, THEN?

1    **MR. PARCHER:** EQUALLY. EQUALLY, BECAUSE THAT'S THE

2    EVIDENCE IN THE CASE. THE EVIDENCE IN THE CASE IS THAT WHATEVER

3    MONEY WAS SUPPOSED TO BE PAID BY EA TO -- EXCUSE ME -- BY THE

4    UNION, REGARDLESS OF WHETHER IT WAS FOR 6 PLAYERS OR 66

5    PLAYERS, OR IN THIS CASE 587, BECAUSE THAT'S THE CORRECT

6    NUMBER, THAT MONEY NEEDS TO BE SHARED EQUALLY. SO THAT -- AND

7    WE'VE HAD DOZENS OF EXAMPLES OF THAT DURING THE COURSE OF THIS

8    TRIAL.

9         THE ONLY PERSON WHO EVER SAID THE CONTRACT REQUIRED

10   AT ONE POINT ALL -- USE OF ALL 2067 WAS ALLEN.

11        I ALMOST FELL OUT OF MY CHAIR, AND SO DID A LOT OF

12   OTHER PEOPLE, TOO.

13        **THE COURT:** NO. NO. YOU ARGUED IT, TOO.

14        **MR. KATZ:** NO, I ARGUED --

15        **THE COURT:** YOU SAID IT HAD TO BE A GROUP THING.

16        **MR. PARCHER:** IT IS A GROUP THING. AND I ARGUED FOR

17   THE ROWLEY POINT, TOO. I WAS FOR ROWLEY. WHY WOULDN'T I WANT

18   $29 MILLION?

19        **THE COURT:** YOUR ARGUMENT TO THE JURY WAS THAT THE

20   DEFENDANTS SHOULD HAVE GONE OUT AND NEGOTIATED A GROUP LICENSE

21   --

22        **MR. PARCHER:** RIGHT.

23        **THE COURT:** -- FOR ALL 2064.

24        **MR. PARCHER:** THAT'S CORRECT.

25        WELL, THEY DIDN'T THINK SO. WHAT THEY THOUGHT,

APPARENTLY, WAS THAT WHAT SHOULD HAVE HAPPENED IS THE DEFENDANT SHOULD HAVE MADE SURE THAT THE CORRECT EQUAL MONEY BETWEEN THE ACTIVES AND THE RETIREDS WAS PAID FOR THE 587.

AND THERE IS NO QUESTION THAT ONCE YOU GET TO THAT DOLLAR AMOUNT THAT HAS TO BE SHARED EQUALLY.

NOW, THAT'S NOT SPECULATION.

WHAT IS SPECULATING IS THAT'S WHAT THEY DID.

BUT THAT'S NOT WHAT THE CIRCUIT IS OPPOSED TO OR THE D.C. COURTS. WHAT THEY ARE OPPOSED TO IS HAVING THE JURY DO SOMETHING THAT HAS NO BASIS IN THE EVIDENCE.

THEY WERE ENTITLED TO HAVE THIS USE INTERPRETATION OF THE CONTRACT AND DO IT THE WAY I SAID IT.

I DON'T THINK THERE'S A SHADOW OF A DOUBT ABOUT IT. SO DON'T BE CONFUSED ABOUT THE "SPECULATION" WORD, PLEASE.

**THE COURT:**  ALL RIGHT.  IT'S GOT TO COME TO AN END NOW.

I THANK YOU FOR YOUR EXCELLENT ARGUMENTS, ONCE AGAIN.

AND IT'S ALWAYS GREAT TO SEE YOU.  AND --

**MR. KESSLER:**  THANK YOU.

**MR. KATZ:**  YOUR HONOR, THERE'S ANOTHER MOTION ON THE FEES.

WE WOULD LIKE TO SUBMIT THAT ON THE PAPERS.

**THE COURT:**  THAT WILL HAVE TO BE ON THE PAPERS.

I SAW THAT.

THANK YOU.

1        **MR. KATZ:**  THANK YOU.

2        **THE COURT:**  ALL RIGHT.

3        UNTIL NEXT TIME.

4        **MR. KESSLER:**  THANK YOU, YOUR HONOR.

5        (THEREUPON, THIS HEARING WAS CONCLUDED.)

6        CERTIFICATE OF REPORTER

7        I, KATHERINE WYATT, THE UNDERSIGNED, HEREBY CERTIFY

8  THAT THE FOREGOING PROCEEDINGS WERE REPORTED BY ME, A CERTIFIED

9  SHORTHAND REPORTER, AND WERE THEREAFTER TRANSCRIBED BY ME INTO

10  TYPEWRITING; THAT THE FOREGOING IS A FULL, COMPLETE AND TRUE

11  RECORD OF SAID PROCEEDINGS.

12        I FURTHER CERTIFY THAT I AM NOT OF COUNSEL OR

13  ATTORNEY FOR EITHER OR ANY OF THE PARTIES IN THE FOREGOING

14  PROCEEDINGS AND CAPTION NAMED, OR IN ANY WAY INTERESTED IN THE

15  OUTCOME OF THE CAUSE NAMED IN SAID CAPTION.

16        THE FEE CHARGED AND THE PAGE FORMAT FOR THE

17  TRANSCRIPT CONFORM TO THE REGULATIONS OF THE JUDICIAL

18  CONFERENCE.

19        IN WITNESS WHEREOF, I HAVE HEREUNTO SET MY HAND THIS

20  9TH DAY OF JANUARY, 2009.

21

22

23      _____

24

25