**Exhibit B**
**to the**
**Declaration of Ronald S. Katz**
**in Support of Class Counsels'**
**Response re Objections**



LEXSEE 108 F.R.D. 237

To Return to the New EXTRA Archive

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

COURT AWARDED ATTORNEY FEES

[NO NUMBER IN ORIGINAL]

REPORT OF THE THIRD CIRCUIT TASK FORCE

*1985 Extra LEXIS 2; 108 F.R.D. 237*

October 8, 1985, Decided

**[\*\*240]  [\*1]**

**TABLE OF CONTENTS**

I. *The Existing* Lindy *Time/Rate Regime*

      A. Overview: History of the Problem; *Lindy* as Supposed Answer
      B. Deficiencies of the *Lindy* Process
      C. The Need to Distinguish Between Fund-in-Court Cases and Statutory Fee Cases
      D. The Need for Re-evaluation Crystallizes

II. *The Task Force Committee and its Methodology*

III. *Fund-In-Court Cases*

IV. *Statutory Cases*

      A. Retention of *Lindy* in Statutory Fee Cases
      B. Recommendations

          1. Standardization of Hourly Rates
          2. Controlling Hours
          3. Multipliers - Augmentation and Discount
          4. The Special Problem of the Public Interest Bar

V. *The Prandini Problem*

VI. *Miscellaneous Procedural Aspects of Fee Awards*

      A. Promulgation of Local Rules
      B. Contemporaneous Recordkeeping

C. Judge, Master, Magistrate, Arbitration, or Fee Committee?
D. Scope of Review

VII. *Conclusion* [**241]

# I. The Existing *Lindy* Time/Rate Regime

## A. Overview: History of the Problem; Lindy as Supposed Answer

Traditionally, all parties involved in litigation in the United States have borne their own costs and attorneys' fees. This so-called "American no-fee rule" persevered despite the [*2] criticism that it fails to "make whole" the successful litigant and makes access to the judicial process difficult for less affluent claimants. However, by the late 1930's, American courts, particularly the federal courts, had developed certain exceptions to the no-fee rule based on their historic power to fashion equitable remedies.

Some of these exceptions had evolved as a product of the "inherent power in the courts to allow attorneys' fees in particular situations." n1 For example, one of the earliest and still most common exception is the common-fund doctrine, which allows a person who maintains a lawsuit that results in the creation, preservation, or increase of a fund in which others have a common interest, to be reimbursed from that fund for litigation expenses incurred. The doctrine is "part of the historic equity jurisdiction of the federal courts," n2 and contemplates "fair and just allowances for expenses and counsel fees" to be paid by those who have benefited from the efforts expended on their behalf. n3

   n1 *Alyeska Pipeline Service Co. v. Wilderness Society, 421 U.S. 240, 259, 95 S.Ct. 1612, 1622, 44 L.Ed.2d 141, 154 (1975). See generally* 10 C. Wright, A. Miller & M. Kane, *Federal Practice and Procedure* §§ 2675-2675.1 (1983).

[*3]

   n2 *Sprague v. Ticonic National Bank, 307 U.S. 161, 164, 59 S.Ct. 777, 779, 83 L.Ed. 1184, 1186 (1939).*

   n3 *Trustees of the Internal Improvement Fund v. Greenough, 105 U.S. 527, 536 (1881).*

The philosophy of the common-fund doctrine was extended by many federal courts to cover situations in which non-pecuniary benefits are recovered or rights established for persons not parties to the litigation. For several years, a number of federal courts also freely used the "private attorney general" concept in order to grant fee awards to individuals initiating litigation aimed at vindicating important public policies. The Supreme Court, however, limited the application of the private-attorney-general rationale in 1975 to situations in which Congress specifically had enacted statutory fee provisions. n4

   n4 *Alyeska Pipeline Service Co. v. Wilderness Society, 421 U.S. 240, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975)* (Brennan, J. & Marshall, J., dissenting) (Court narrowly construes federal courts' equitable powers to award attorneys fees in the absence of statutory authorization).

[*4]

In response, Congress enacted the Civil Rights Attorney's Fees Awards Act of 1976, n5 authorizing the district court to award a reasonable [**242] attorney's fee to the prevailing party in civil rights litigation. Moreover, during the past few decades there has been a tremendous growth in the number of statutory causes of action that include a provision for attorneys' fees, generally phrased in terms of an allowance to the prevailing party. n6 This legislation and other factors have led to a burgeoning practice of court-awarded fees in the federal courts in a variety of litigation contexts. For example, the phenomenon of the growth of statutory fee provisions, coupled with the expanding use of the class action in the years following the 1966 amendment to Federal Rule of Civil Procedure 23, n7 have resulted in federal courts being faced with fee petitions in a tremendous array of cases and in a high percentage of class actions.

n5 *42 U.S.C. § 1988* (1982). The Fees Act provides in relevant part:

> In any action or proceeding to enforce a provision of sections 1981, 1982, 1983, 1985, and 1986 of this title, title IX of Public Law 92-318 *[20 U.S.C. § 1681 et seq.]*, or title IV of the Civil Rights Act of 1964 *[42 U.S.C. § 2000d et seq.]*, the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs.

[*5]

n6 *See Ruckelshaus v. Sierra Club, 463 U.S. 680, 684, 103 S.Ct. 3274, 3276, 77 L.Ed.2d 938, 943 (1983)* ("[there are] more than 150 existing federal fee-shifting provisions * * *"). In addition to these federal fee-shifting provisions, at least four states have enacted fee-shifting laws.

n7 The equitable supervisory authority that Federal Rule 23 grants federal courts in class actions extends to attorney fee questions and itself provides a quasi-substantive predicate for fee allowances. *See* 7A C. Wright & A. Miller, *Federal Practice and Procedure* § 1803 (1972 & Supp. 1985). The Federal Rule recognizes the applicability of the common-fund doctrine to class action cases. *See generally*, A. Miller, *Attorneys' Fees in Class Actions* (Federal Judicial Center 1980).

Until a dozen years ago, the size of the fee award was left to the court's discretion, with the general standard being reasonableness under the circumstances of the particular case. Judges relied on a variety of factors in setting reasonable amounts for fee awards, [*6] but most heavily emphasized was the size of the fund or the amount of benefit produced for the class. Awards often reflected what the court believed was a "reasonable percentage" of the amount recovered, with the percentages varying considerably from case to case. However, the percentage-of-recovery system sometimes resulted in strikingly large fee awards in a number of cases. Press reaction to these awards, and criticism from within the profession that the fees were disproportionate to the actual efforts expended by the attorneys, generated pressure to shift away from the percentage-of-recovery approach.

The Third Circuit led this movement in 1973 in *Lindy Brothers Builders, Inc. of Philadelphia v. American Radiator & Standard Sanitary Corp.* ("*Lindy I*" and "*Lindy II*"), n8 in which Chief Judge Seitz set forth the guidelines for the computation of fee awards in the [**243] Third Circuit. In *Lindy*, the court vacated the district court's fee award, which had been based on a percentage of the settlement fund, and directed the district court to recalculate the fee pursuant to an entirely different formula. The technique is easily described. First, the court must determine the hours [*7] reasonably expended by counsel that created, protected, or preserved the fund. n9 Second, the number of compensable hours is multiplied by a reasonable hourly rate for the attorney's services. Hourly rates may vary according to the status of the attorney who performed the work (that is, the attorney's experience, reputation, practice, qualifications, and similar factors) or the nature of the services provided. n10 This multiplication of the number of compensable hours by the reasonable hourly rate was said to constitute the "lodestar" of the court's fee determination. n11

n8 *487 F.2d 161 (3d Cir. 1973)*("*Lindy I*"), appeal following remand, *540 F.2d 102 (3d Cir. 1976)*("*Lindy II*"). *Lindy* involved the review of an order allowing attorneys' fees out of a fund resulting from the settlement of class actions charging a conspiracy to fix prices in violation of Section 1 of the Sherman Act.

n9 *Lindy II, 540 F.2d at 111.*

n10 *Lindy I, 487 F.2d at 167.*

n11 *Id. at 168.*

[*8]

The "lodestar" then could be increased or decreased based upon the contingent nature or risk in the particular case involved and the quality of the attorney's work. An increase or decrease of the lodestar amount is referred to as a "multiplier." In determining whether to increase the lodestar to reflect the contingent nature of the case, the Third Circuit said "the district court should consider any information that may help to establish the probability of success." n12 However, "the court may find that the contingency was so slight or the amount found to constitute reasonable compensation

1985 Extra LEXIS 2, *; 108 F.R.D. 237, **

for the hours worked was so large a proportion of the total recovery that an increased allowance for the contingent nature of the fee would be minimal." n13 As to the quality multiplier, it was to be employed only for "an unusual degree of skill, superior or inferior, exhibited by counsel in the specific case before the court." n14 This methodology for calculating the basic fee award has become known as the "*Lindy*" fee-setting technique.

n12 *Id.*

n13 *Id.*

n14 *Silberman v. Bogle, 683 F.2d 62, 64 (3d Cir. 1982).*

**[*9]**

Since *Lindy I*, the Third Circuit has emphasized, both in fund-in-court cases n15 (like *Lindy* itself) and in a variety of statutory fee cases, n16 that **[**244]** individual determinations of reasonable billing rates are required for the lodestar computation. The Third Circuit's premise has been that the reasonable value of an attorney's time should be based upon the price that time normally commands in the marketplace in which it is offered.

n15 *Silberman v. Bogle, 683 F.2d 62 (3d Cir. 1982)* (shareholders' derivative action); *Shlensky v. Dorsey, 574 F.2d 131 (3d Cir. 1978).*

n16 *E.g., Merola v. Atlantic Richfield Co., 493 F.2d 292 (3d Cir. 1974)* (*Merola I*), appeal after remand, *515 F.2d 165 (3d Cir. 1975)*(*Merola II*); *NBO Industries Treadway Cos. v. Brunswick Corp., 523 F.2d 262 (3d Cir. 1975)*, vacated on other grounds sub nom. *Brunswick Corp. v. Pueblo Bowl-O-Mat, 429 U.S. 477, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977); Pitchford v. Pepi, Inc., 531 F.2d 92* (3d Cir.), cert. denied, *426 U.S. 935, 96 S.Ct. 2649, 49 L.Ed.2d 387 (1976); Prandini v. National Tea Co., 557 F.2d 1015 (3d Cir. 1977); Hughes v. Repko, 578 F.2d 483 (3d Cir. 1978); Baughman v. Wilson Freight Forwarding Co., 583 F.2d 1208 (3d Cir. 1978); Walker v. Robbins Hose Co. No. 1, Inc., 622 F.2d 692 (3d Cir. 1980); Inmates of Allegheny County Jail v. Pierce, 716 F.2d 177 (3d Cir. 1983); Danny Kresky Enterprises Corp. v. Magid, 716 F.2d 215 (3d Cir. 1983); Ursic v. Bethlehem Mines, 719 F.2d 670 (3d Cir. 1983); In re Fine Paper Antitrust Litigation, 751 F.2d 562 (3d Cir. 1984).*

For purposes of this report, the category "statutory fee case" includes those cases that commence as statutory fee cases but subsequently are converted into fund-in-court cases as a result of the settlement process. In these so-called "conversion" cases, settlement is structured to create a fund-in-court from which attorneys' fees can be paid, a practice approved by the court in *Lindy I*. Note that the true fund-in-court case is relatively rare; examples might include a commmon-law securities suit, a shareholders' derivative action, or a mass-tort disaster case, most likely predicated upon diversity jurisdiction.

**[*10]**

The *Lindy* lodestar approach rather quickly gained acceptance in other federal courts throughout the country because it was viewed as a more reasonable approach than the percentage-of-benefit technique for making fee awards in modern complex litigation. Most circuits that have defined their fee-setting standards have followed the lead of the Third Circuit. The Fifth Circuit, however, in its well known decision in *Johnson v. Georgia Highway Express, Inc.*, n17 adopted a twelve-factor scale n18 in lieu of *Lindy*. Soon thereafter, *Johnson* was adopted by the Ninth Circuit as well. n19

n17 *488 F.2d 714 (5th Cir. 1974).*

n18 The twelve elements are:

(1) the time and labor required;

(2) the novelty and difficulty of the questions involved;
(3) the skill requisite to perform the legal service properly;
(4) the preclusion of other employment by the attorney due to acceptance of the case;
(5) the customary fee;
(6) whether the fee is fixed or contingent;
(7) time limitations imposed by the client or the circumstances;
(8) the amount involved and the results obtained;
(9) the experience, reputation, and ability of the attorneys;
(10) the "undesirability" of the case;
(11) the nature and the length of the professional relationship with the client;
(12) awards in similar cases.

*488 F.2d at 717-19.* These factors are reflected in the American Bar Association Code of Professional Responsibility, Disciplinary Rule 2-106 (1980).

**[\*11]**

n19 *Kerr v. Screen Extras Guild, Inc., 526 F.2d 67 (9th Cir. 1975), cert. denied, 425 U.S. 951, 96 S.Ct. 1726, 48 L.Ed.2d 195 (1976).*

Yet, most commentators consider *Johnson* to be little different from *Lindy* because the first criterion of the *Johnson* test, and indeed the one most heavily weighted, is the time and labor required. Similarly, many of the *Johnson* factors are subsumed within the initial calculation of hours reasonably expended at a customary hourly rate. n20 Some commentators **[\*\*245]** have rejected *Johnson* outright because they believe the twelve factors, without more, cannot guarantee a rational setting of fees:

The fundamental problem with an approach that does no more than assure that the lower courts will consider a plethora of conflicting and at least partially redundant factors is that it provides no analytical framework for their application. It offers no guidance on the relative importance of each factor, whether they are to be applied differently in different contexts, or, **[\*12]** indeed, how they are to be applied at all. n21

n20 *See Copeland v. Marshall, 641 F.2d 880 (D.C. Cir. 1980)*(en banc):

Simply to articulate those twelve factors * * * does not itself conjure up a reasonable dollar figure in the mind of a district court judge. A formula is necessary to translate the relevant factors into terms of dollars and cents. This is particularly true because the twelve factors overlap considerably. For example, largely subsumed under the factor "time and labor required" is an assessment of the "difficulty of the questions." That is so because the more difficult the problem, the longer it will take adequately to solve it. Similarly, the customary hourly fee (*Johnson* factor # 5) is likely to be influenced by (# 3) the level of skill necessary to perform the services, (# 6) whether the fee is fixed or contingent, (# 7) time limitations, (# 8) the amount to be obtained, (# 9) the reputation of the attorneys, and (# 10) the undesirability of the case.

*Id. at 890.*

n21 Berger, *Court Awarded Attorneys' Fees: What is "Reasonable"?*, 126 U.Pa.L.Rev. 281, 286-87 (1977) (footnotes omitted); *accord*, Dawson, *Lawyers and Involuntary Clients in Public Interest Litigation*, 88 Harv.L.Rev. 849, 927 & n.327 (1975); Note, *Promoting the Vindication of Civil Rights Through the Attorney's Fees Awards Act*, 80 Colum.L.Rev. 346, 372-73 & nn. 164-69 (1980).

1985 Extra LEXIS 2, *; 108 F.R.D. 237, **

**[\*13]**

*Johnson* critics claim that without further guidance a district court is apt to make the conclusory statement "after evaluating this case under each of the twelve factors in *Johnson*, I find a reasonable fee to be X dollars." But these conclusory statements often are subject to reversal and remand. n22 Accordingly, those circuits that established their fee-setting procedures after *Lindy* and *Johnson*, and had an opportunity to study both systems, have chosen *Lindy* as the better rule. n23

> n22 *Copeland v. Marshall, 641 F.2d 880, 890 (D.C. Cir. 1980). See, e.g., Gay v. Board of Trustees, 608 F.2d 127, 128 (5th Cir. 1979); Davis v. Fletcher, 598 F.2d 469, 470-71 (5th Cir. 1979).*

> n23 *Copeland v. Marshall, 641 F.2d 880, 889-94 (D.C. Cir. 1980)* (court of appeals evaluates *Johnson* and *Lindy* and selects the latter; "Lindy \* \* eliminate[s] the redundancy and imprecision that many have identified in other fee-setting schemes"). The fee practices of the various federal courts as of 1980 is set out in A. Miller, *Attorneys' Fees in Class Actions* 60-201 (Federal Judicial Center, 1980).

**[\*14]**

In addition to appellate court acceptance, the *Lindy* lodestar approach recently received the Supreme Court's imprimatur -- at least in statutory fee cases -- in *Hensley v. Eckerhart*. n24 Justice Powell writes, in his opinion for the Court:

> The most useful starting point for determining the amount of a reasonable fee is the *number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate*. This calculation provides an objective basis on which to make an initial estimate of the value of a lawyer's services. The party seeking an award of fees should submit evidence supporting the hours worked and rates claimed. n25

In a separate concurring and dissenting opinion, Justice Brennan writes:

> As nearly as possible, market standards should prevail, for that is the best way of ensuring that competent counsel will be available to all persons with bona fide civil rights claims. This means that judges awarding fees must make certain that attorneys are paid the full value **[\*\*246]** that their efforts would receive on the open market in non-civil-rights cases, \* \* \* both by awarding them market-rate fees, \* \* \* and by awarding fees only for time *reasonably* **[\*15]** expended. n26

Even more recently, in *Blum v. Stenson*, n27 Justice Powell, for a unanimous Court, declared that the lodestar generally is "presumed to be the reasonable fee"; the base standard for fee determinations, even for cases litigated by not-for-profit law offices, was to be the prevailing market rate in the relevant community.

> n24 *461 U.S. 424, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983).*

> n25 *Id. at 433, 103 S.Ct. at 1939, 76 L.Ed.2d at 50* (emphasis added).

> n26 *Id. at 447, 103 S.Ct. at 1947, 76 L.Ed.2d at 59* (emphasis in original).

> n27 *U.S.   , 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984).*

Despite this growth in acceptance in the last ten years, *Lindy* has come under increased criticism, with some observers asserting that its technique causes more problems than it solves. **[\*16]** n28 This Task Force study of court-awarded attorneys' fees is an attempt to appraise the *Lindy* technique and to make suggestions for the future.

> n28 *See, e.g.*, Lauter, *When the Court Awards Fees*, 7 Nat. L.J. 43 (July 8, 1985) pp. S1-S16; Lerach, *Alternative Approaches for Awarding Attorneys' Fees in Federal Court Litigation: It's Time to Unload the Lodestar* (1984) (unpublished report on fees presented to the Ninth Circuit; advocates abolishing *Lindy* and returning to

percentage based fees) (William S. Lerach, Esq., Milberg Weiss Bershad Specthrie & Lerach, San Diego, California).

## B. Deficiencies of the *Lindy* Process

Whatever the merits of the *Lindy* objectives and the degree to which they are being achieved, there is a widespread belief that the deficiencies of the current system either offset or exceed its benefits. n29 In order to have some sense of the relative merits and demerits of the *Lindy* regime and to appraise any other procedures that might be proposed, it is necessary to **[*17]** understand the complaints that have been lodged against the present system. What follows is a list of accusations advanced against *Lindy*. Empiric evaluation of these accusations is difficult, if not impossible, and certainly well beyond the Task Force's charter and capabilities:

1. Lindy *increases the workload of an already overtaxed judicial system*. As a result of *Lindy*, the fee-setting process has become more costly in terms of the time and effort expended on it. The increased documentation demanded by the *Lindy* approach, the practice of conducting fee hearings (including the use of "experts"), and the desire to avoid misfeasance have so magnified the process that the system's human and physical resources are being deflected from other, perhaps more important, duties.

2. *The elements of the* Lindy *process are insufficiently objective and produce results that are far from homogenous*. Widespread variations in fees awarded lawyers, often in the same community, by different judges, and in different categories of cases, have led to a **[**247]** loss of predictability as to treatment, as well as a loss of confidence in the integrity of the fee-setting procedure.

3. **[*18]** *The* Lindy *process creates a sense of mathematical precision that is unwarranted in terms of the realities of the practice of law*. Perhaps the most obvious illustration of this phenomenon is that *Lindy* requires a calculation based on the petitioning attorney's customary billing rates. But many plaintiffs' lawyers who seek fees usually work on the basis of contingent fee arrangements and do not have a "customary" or "normal" billing rate. Accordingly, they argue, the notion that their "customary" or "normal" billing rates are being used is highly misleading. n30 For example, one plaintiffs' lawyer reportedly has been assigned, by different judges, a "customary" rate ranging from $ 60.00 to $ 250.00 an hour during a six-month period in the Eastern District of Pennsylvania. Similar imprecisions infect the other elements of the *Lindy* computation, it is argued.

4. Lindy *is subject to manipulation by judges who prefer to calibrate fees in terms of percentages of the settlement fund or the amounts recovered by the plaintiffs or of an overall dollar amount*. Those who tend to doubt the objectivity of the *Lindy* process occasionally complain that some judges are too **[*19]** result-oriented. These judges, it is charged, first determine what they wish to award, either in percentage or dollar amount terms, and then massage the major variables in the *Lindy* fee-setting procedure -- hours allowed, market rates, contingency, and quality -- until the desired result is achieved. n31

5. *Although designed to curb certain abuses*, Lindy *has led to others*. As was strongly suggested in a recent Third Circuit decision, *In re Fine Paper Antitrust Litigation, n32 Lindy* encourages **[**248]** lawyers to expend excessive hours, and, in the case of attorneys presenting fee petitions, engage in duplicative and unjustified work, inflate their "normal" billing rate, and include fictitious hours or hours already billed on other matters, perhaps in the hope of offsetting any hours the court may disallow. n33 These various forms of running the meter are accompanied in a number of cases by the presence of far too many law firms submitting fee petitions. The latter phenomenon seems to be the inevitable by-product of a fee-setting scheme based on hours worked regardless of the number of lawyers involved, rather than a limited percentage of a fixed monetary recovery. n34

6. **[*20]** Lindy *creates a disincentive for the early settlement of cases*. Because of *Lindy's* emphasis on hours worked, lawyers -- including defense counsel who typically bill their clients on an hourly basis -- have little or no incentive to settle cases at the earliest appropriate opportunity. To the contrary, there ap-

pears to be a conscious, or perhaps unconscious, desire to keep the litigation alive despite a reasonable prospect of settlement, to maximize the number of hours to be included in computing the lodestar.

7. Lindy *does not provide the district court with enough flexibility to reward or deter lawyers so that desirable objectives, such as early settlement, will be fostered*. Many believe that *Lindy's* preoccupation with the lodestar computation deprives the trial court of much needed discretion to take proper account of the variousness of litigation. On the other hand, greater discretion is likely to exacerbate the lack of uniformity described in item 2, above, and contribute to the concerns of the public interest bar discussed in item 8, below.

8. *The* Lindy *process works to the particular disadvantage of the public interest bar*. There is a strong feeling **[*21]** among public interest, particularly civil rights, lawyers that whatever *Lindy's* merits may be in other contexts, it has a decidedly negative impact on them and is undermining the efficacy of many of the fee statutes Congress has enacted. The claim is that lodestars in the so-called "money" cases, such as securities and antitrust actions, are set higher than they are in cases under statutes promoting non-monetary social objectives, such as the Civil Rights Attorneys Fees Awards **[**249]** Act of 1976. n35 It even has been suggested that this is true either because some judges are not disposed toward the policies reflected in these statutes and simply do not wish to encourage actions under them, or because in many cases the size of the fee requested seems disproportionate to the amount of economic recovery (or the value of the non-economic recovery) provided the claimants. n36 This is said to occur despite the fact that the benefits achieved in many Fees Act cases, although sometimes intangible and nonmonetary, are of great value to the individual or group directly affected as well as to society at large. Several members of the Task Force expressed the view that fee awards in recent years in **[*22]** the social action context have been so discouraging that few attorneys will accept a civil rights case. n37

9. *Despite the apparent simplicity of the* Lindy *formulation, considerable confusion and lack of predictability remain in its administration*. This point, of course, is implicit in a number of the preceeding paragraphs. But there are administrative difficulties beyond those already mentioned. For example, the *Lindy* requirement that community rates be applied only raises the question of rates in which community? Yet, in some complex cases affecting people on a nationwide scale, a national rate might be justified -- a position adopted by Judge Jack B. Weinstein in *In re "Agent Orange" Product Liability Litigation*. n38 If however, a local rate is chosen, there is ambiguity as to whether it is the forum's rate or each petitioning attorney's local rate. n39

    n29 *Id.*

    n30 This is made all the more difficult by the requirement recently prescribed by the Supreme Court in *Blum v. Stenson,     U.S.   , 104 S.Ct. 1541, 1547 n.11, 79 L.Ed.2d 891, 900 n.11 (1984)* that to assist the court's determination of a reasonable hourly rate, in the statutory fee context, a fee applicant should produce "satisfactory evidence" in addition to the attorney's own affidavits that the requested rate is in line with prevailing rates.
**[*23]**

    n31 This assertion appears to be supported by a study presented by United States District Judge Thomas A. Masterson at the 1977 Third Circuit Judicial Conference. Judge Masterson had tabulated the fees awarded by district courts within the Third Circuit under the *Lindy* lodestar regime from 1973 to the date of his presentation. In each case, the fee award was presented as a function of a percentage of the overall settlement amount. The statistics revealed that many of the judges systematically awarded fees in the range of twenty to twenty-five percent of the fund, regardless of type of case, benefits to the class, numbers of hours billed, size of fund, size of plaintiff class, or any other relevant factor. *See, e.g., Baughman v. Wilson Freight Forwarding Co., 79 F.R.D. 520 (W.D.Pa. 1977), reversed and remanded, 583 F.2d 1208 (3d Cir. 1978)*(fee award 26% of antitrust settlement); *Coleco Indus. Inc. v. Berman, 423 F.Supp. 275 (E.D.Pa. 1976)* (contract indemnity: 20-25%); *Entin v. Barg, 412 F.Supp. 508* (securities class action: 23.9%); *Dorfman v. First Boston Corp., 70 F.R.D. 366 (E.D.Pa. 1976)* (securities class action: 23.5%); *Lindy Bros. Builders, Inc. v. American Radiator & Standard Sanitary*

*Corp., 382 F.Supp. 999 (E.D.Pa. 1974)* (antitrust class action settlement: 27.8% from unrepresented claimants; 53.8% from represented claimants); *Bleznak v. C.G.S. Scientific Corp., 387 F.Supp 1184 (E.D.Pa. 1974)* (securities class action: 30%).

[*24]

n32 *751 F.2d 562 (3d Cir. 1984), affirming in part, reversing in part, 98 F.R.D. 48 (E.D.Pa. 1983)* (district court opinion emphasizes abuse by plaintiffs' lawyers).

n33 *Id.*

n34 Under the *Lindy* system every lawyer involved may petition for an award as long as the lawyer comports with the contemporaneous time-keeping requirements and can justify the hours spent to the court. Under the contingency system, however, the portion of the recovery pie to be devoted to attorneys' fees does not vary according to the number of attorneys involved in the case. Thus, under *Lindy*, in the large fund cases, there may be the unpleasant spectre of management committees or countless lawyers petitioning for a fee from a fund based on work, the value of which frequently seems marginal.

Another cause of this abuse may be the political maneuvering to obtain "votes" for a stipulated recommendation as to the appointment of lead counsel in multi-party cases. Candidates for lead counsel, it has been said, refer clients to other lawyers in order to get additional votes. In return for their votes, the new lawyers are compensated by the promise of additional *Lindy* hours.

[*25]

n35 *See* note 5, above.

n36 *See, e.g., Cunningham v. McKeesport, 753 F.2d 262 (3d Cir. 1985)* ($35,887.50 in attorneys' fees awarded on a recovery of $ 17,000.00).

n37 This may become all the more true in the wake of *Marek v. Chesny, U.S. , 105 S.Ct. 3012, L.Ed.2d (1985)* in which the Supreme Court held that a prevailing civil rights litigant entitled to fees under *42 U.S.C. § 1988* may be barred from recovering any fees for work performed after rejecting a settlement offer under Federal Rule 68 when less ultimately is recovered than the amount preferred in settlement.

n38 Slip opinion (E.D.N.Y. January 7, 1985), *modified*, slip opinion (E.D.N.Y. June 18, 1985) (memorandum and order on attorneys' fees and final judgment).

n39 The Third Circuit uses the rate applicable in the locale in which the attorney practices. *Cunningham v. City of McKeesport, 753 F.2d 262, 267 (3d Cir. 1985); In re Fine Paper Antitrust Litigation, 751 F.2d 562, 590-91 (3d Cir. 1984).* The Second Circuit, however, calculates the lodestar figure by using the hourly rate "normally charged for similar work by attorneys of like skill in the area," that is, the hourly rate of the district in which the reviewing court sits. *Polk v. New York State Dept. of Correctional Services, 722 F.2d 23, 25 (2d Cir. 1983); City of Detroit v. Grinnell Corp., 560 F.2d 1093, 1098 (2d Cir. 1977).* The Court of Appeals for the District of Columbia, the Seventh Circuit, and the Eighth Circuit similarly apply a forum rate to non-local counsel. *Donnell v. United States, 682 F.2d 240, 251-52 (D.C. Cir. 1982), cert. denied, 459 U.S. 1204, 103 S.Ct. 1190, 75 L.Ed.2d 436 (1983); Chrapliwy v. Uniroyal Inc., 670 F.2d 760, 768 (7th Cir. 1982), cert. denied, 461 U.S. 956, 103 S.Ct. 2428, 77 L.Ed.2d 1315 (1983); Avalon Cinema Corp. v. Thompson, 689 F.2d 137, 140-41 (8th Cir. 1982)*(en banc). Only when a need for "the special expertise of counsel from a distant district" is shown or when local counsel are unwilling to handle the case do these circuits find the appropriate hourly rate to be that of the attorney's own community. *Polk, 722 F.2d at 25; Avalon, 689 F.2d at 140-41. See also Maceira v. Pagan, 698 F.2d 38, 40 (1st Cir. 1983).* However, Judge Weinstein, in "*Agent Orange*," found reasons in the context of that litigation to reject the Second Circuit forum-rate test in favor of a "uniform, nationally prevailing rate." *In re "Agent Orange" Product Liability Litigation,* slip opinion at 89-98 (E.D.N.Y. January 7, 1985), *modified*, slip opinion (E.D.N.Y. June 18, 1985) (memorandum and order on attorneys' fees and final judgment) ("Obviously such a simple parochial rule is inappropriate in a multidistrict litigation requiring participation of attorneys from many districts.").

**[\*26]   [\*\*250]**
**C. The Need to Distinguish Between Fund-in-Court Cases and Statutory Fee Cases**

The Task Force believes that a distinction must be drawn between fund-in-court cases and statutory fee cases since the policies behind the two categories differ greatly. The *Lindy* lodestar method, however, first developed and applied in the context of a fund-in-court case, has been transferred to the statutory fee environment with little attention to the differences between these two types of cases. n40

> n40 *Lindy* was originally a statutory fee (antitrust class action) case that was converted into a fund-in-court case as a result of the settlement process. *See* notes 8 and 16, above.

The purpose of the "equitable-fund," "common-fund," or "fund-in-court" doctrine, enunciated by the Supreme Court over a century ago in *Trustees of the Internal Improvement Fund v. Greenough*, n41 is to avoid the unjust enrichment of those who benefit from the fund that is created, protected, or increased by the litigation and who otherwise would **[\*27]** bear none of the litigation costs. The rule also derives from the common-law concept that a trustee who is under a duty to act for others is entitled to be reimbursed from that fund for expenses incurred in administering the trust. n42

> n41 *105 U.S. 527 (1881).*

> n42 3 H. Newberg, *Class Actions* § 7245 (1977); Dawson, *Lawyers and Involuntary Clients: Attorney Fees from Funds*, 82 Harv.L.Rev. 1597 (1974).

A key element of the fund case is that the fees are not assessed against the unsuccessful litigant (fee shifting), but rather are taken from the fund or damage recovery (fee spreading), thereby avoiding the unjust enrichment of those who otherwise would be benefited by the fund without sharing in the expenses incurred by the successful litigant.

In sharp contrast to the fund-in-court cases are the substantial number of statutory causes of action, such as those created by the federal securities, antitrust, civil rights, copyright, and patent acts, that include **[\*28]** provisions for attorneys' fees -- typically characterized as being "reasonable" in amount -- to be awarded to the prevailing party. These are clearly of the "fee shifting" variety. Illustrative is the Civil Rights Attorney's Fees Awards Act of 1976, n43 which gives federal courts the discretion to award attorneys' fees to the prevailing party in suits brought to enforce certain provisions of the civil rights acts.

> n43 *See* note 5, above.

Rather than being based on the equitable notion that those who have benefited from litigation should share its costs, the legislative history of these fee acts makes it clear that the intent of Congress was to encourage private enforcement of the statutory substantive rights, whether they be economic or noneconomic, through the judicial process. Further recognition of the differences between fund and statutory fee **[\*\*251]** cases is found in footnote 16 of Justice Powell's opinion in *Blum v. Stenson*:

> Nor do we believe that the *number* of persons benefited is a consideration of significance **[\*29]** in calculating fees under § 1988. Unlike the calculation of attorney's fees under the "common fund doctrine," where a reasonable fee is based on a percentage of the fund bestowed on the class, a reasonable fee under § 1988 reflects the amount of attorney time reasonably expended on the litigation. Presumably, counsel will spend as much time and will be as diligent in litigating a case that benefits a small class of people, or, indeed, in protecting the civil rights of a single individual. n44

> n44    U.S. at    n.16, 104 S.Ct. at 1549 n.16, 79 L.Ed.2d at 903 n.16.

Another difference between fund-in-court and statutory fee cases is that in the former category there is a greater need for the judge to act as a fiduciary for the beneficiaries (who are paying the fee), particularly in the class action situation, because few, if any, of the action's beneficiaries actually are before the court at the time the fees are set. Judicial scrutiny is necessary inasmuch as the fee will be paid out of the fund established **[\*30]** by the litigation, in which the defendant no longer has any interest, and the plaintiff's attorney's financial interests conflict with those of the fund beneficiaries. n45 As a result, there is no adversary process that can be relied upon in the setting of a reasonable fee. In statutory fee cases, however, the losing party who will pay the fee is before the court, thus obviating any need for special judicial involvement. Arguably, all the judge need do is rule on the fee application based on the competing presentations of the adversaries.

n45 See the related discussion of the *Prandini* problem in Section V, below.

Despite these differences between fund cases and statutory fee cases, the *Lindy* formulation was applied to both without any real analysis of the propriety of doing so or the impact it would have. As Judge Gibbons stated in *In re Fine Paper Antitrust Litigation*: n46

> With little or no analysis of the substantial differences between the two situations, this court transferred to litigated disputes **[\*31]** over liability for statutory fees many of the standards for judicial scrutiny of fee awards first developed in the fund in court cases. * * * An examination of the case law in this circuit since *Lindy I* discloses that the principal beneficiaries of the heightened judicial scrutiny which that case required have not been class member beneficiaries of a settlement fund, but defendants resisting statutory liability for attorneys' fees. The public policy considerations in the two situations are not obviously identical.

n46 *751 F.2d 562, 583 n.19 (3d Cir. 1984)* (citations omitted).

Accordingly, in this report the Task Force treats separately the problems raised in the fund-in-court cases (Section III) and those raised in the statutory fee cases (Section IV).

**[\*\*252]  D. The Need for Re-evaluation Crystallizes**

A recent Third Circuit case, *Cunningham v. City of McKeesport*, n47 illustrates many of the post-*Lindy* problems discussed earlier. In *McKeesport*, the defendant City negligently **[\*32]** demolished a house valued at approximately $ 2,700. Plaintiff declined a settlement offer and instituted a civil rights action. Damages were entered by a jury in the amount of $ 35,000, which were reduced by the district judge to $ 17,000. Plaintiff sought $ 35,887.50 in statutory fees claiming that her counsel had devoted 358 hours to the case, including 247.75 hours in pretrial discovery, and that her attorney's services were worth between $ 100 and $ 125 per hour. The trial judge granted a fee of $ 5,785, disallowing all but 219 hours, valuing the attorney's service at $ 50 per hour, and applying a negative multiplier because of the relatively simple nature of the case. The Third Circuit vacated the district court's judgment and remanded for the entry of a fee of $ 35,887.50 on the basis that (1) the claimed rate of $ 100 per hour for a recent law school graduate and the number of hours of work had not been contradicted, and (2) the district court had not sufficiently articulated its justification for the downward adjustment. n48

n47 *753 F.2d 262 (3d Cir. 1985).*

n48 *Id. at 265-67.*

**[\*33]**

Four Third Circuit judges dissented from the order denying the City's petition for rehearing because they found it difficult to justify a $ 35,887.50 fee on a recovery of only $ 17,000:

Given the nature of the grievance here and the cost of the property demolished, this case raises serious questions regarding a fee request that appears to be more than ten times the cost of a small piece of real estate that was destroyed. Especially troubling is the fact that almost 250 hours were claimed to have been spent by plaintiff's counsel in pretrial discovery - that would be the equivalent of six full weeks of legal services devoted to discovery in a case involving a property acquired for $ 2700, and for which damages have been entered in the amount of $ 17,000. n49

n49 *Id. at 270.*

According to the dissenters, since the Third Circuit had given its imprimatur to a post-*Lindy* discretionary downward adjustment when limited benefit is achieved, n50 the panel in *McKeesport* did not accord **[*34]** proper respect to the district judge's exercise of that discretion. This view emphasizes the trial judge's awareness of local conditions, including the fee levels of some members of the local bar. Although the role of the court admittedly is less that of a fiduciary in statutory fee cases such as *McKeesport* than in fund cases, the dissenters expressed the view that the district judge still has an obligation to step in and correct a situation when the defense lawyers fail to file a timely or effective opposition to the fee petition.

n50 *See Ursic v. Bethlehem Mines, 719 F.2d 670, 677-78 (3d Cir. 1983),* and *Hughes v. Repko, 578 F.2d 483, 490-91 (3d Cir. 1978)* (Rosenn, J., concurring).

**[**253]** Judge Gibbons disagreed, quoting from *Prandini v. National Tea Co. & Amalgamated Food Employees Union, Local 590*: n51

* * * district courts, in awarding attorneys' fees, may not reduce an award by a particular percentage or amount (albeit for justifiable reasons) in **[*35]** an arbitrary or indiscriminate fashion. If the court believes that a fee reduction in the lodestar is indicated, *it must analyze the circumstances requiring the reduction and its relation to the fee, and it must make specific findings to support its action.* n52

n51 *585 F.2d 47, 52 (3d Cir. 1978).*

n52 *753 F.2d at 269* (emphasis added).

Judge Adams, dissenting from the denial of rehearing, stated:

Both the judiciary and the public increasingly are becoming concerned that a portion of the legal profession seems to be more interested in the subject of fees than in performing quality legal services. This perception, if left unchecked by careful judicial scrutiny, may threaten the viability of the counsel fee statute for legitimate social ends. The question of disproportionate attorney's fees is a matter sufficiently serious, I believe, to command the attention of the entire Court. * * * n53

n53 *Id. at 270.*

**[*36]**

*McKeesport* graphically illustrates certain *Lindy* problems noted earlier in this report. Solutions are needed because there are numerous statutory fee cases in which the monetary recovery is low (or nonexistent as is often the case in actions seeking declaratory or injunctive relief) but that involve important issues of social policy or civil rights. The public interest bar fears that too much subjectivity in the *Lindy* standard coupled with wide trial court discretion will under-

mine the congressional policies embedded in the fee statutes. But unless that discretion is respected, appellate review is encouraged, which proliferates the fee-setting process.

Can the process be made more objective and simple so that there is reasonable predictability and a reduction in the burden on the system without undue risk of unfairness and abuse? Can lawyers be encouraged to work efficiently and pursue settlement at the earliest opportunity and at the same time be compensated adequately to give them the incentives that lie at the heart of the fund-in-court doctrine and statutory fee provisions? Can a balance be struck between the legitimate deference to trial court discretion and the necessity **[\*37]** of appellate oversight? If not *Lindy*, then what? These were some of the questions that challenged the Task Force. Its response follows.

## II. The Task Force Committee and its Methodology

In response to the growing concern over the perceived deficiencies and abuses of the *Lindy* formulation, Chief Judge Ruggero J. Aldisert **[\*\*254]** requested that a Task Force of lawyers and judges be appointed to examine the standards and criteria utilized in determining court-awarded attorneys' fees and to report its recommendations at the 1985 Third Circuit Judicial Conference. The Task Force was charged with the responsibility of devising and articulating its view of an optimum court-awarded fee system unconstrained by existing law. n54

> n54 However, some Task Force members felt constrained in some unquantifiable measure by Supreme Court precedents, particularly *Blum v. Stenson,     U.S.    , 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984),* and *Hensley v. Eckerhart, 461 U.S. 424, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983).*

**[\*38]**

Because court-awarded fee problems confront every federal court in the country, the Task Force's membership was not limited to judges and attorneys within the Third Circuit. Indeed, one of the reasons for forming the group was to learn from experience outside the Third Circuit.

The Task Force was chaired by United States District Judge H. Lee Sarokin of Newark, New Jersey. Two other district judges served on the Task Force: Judge Dickinson R. Debevoise, District of New Jersey, and Judge Joseph L. McGlynn, Jr., Eastern District of Pennsylvania. Attorney members were Harold E. Kohn, Esq., of Kohn, Savett, Marion & Graf, Philadelphia, Pennsylvania; Arthur L. Liman, Esq., of Paul, Weiss, Rifkind, Wharton & Garrison, New York, New York; Michael P. Malakoff, Esq., of Berger Kapetan Malakoff & Meyers, P.C., Pittsburgh, Pennsylvania; Henry P. Sailer, Esq., of Covington & Burling, Washington, D.C.; Jonathan Stein, Esq., Executive Director, Community Legal Services, Inc., Philadelphia, Pennsylvania; Robert M. Talcott, Esq., of Talcott, Vandevelde & Woehrle, Los Angeles, California, and Thomas E. Willging, Esq., Senior Research Associate, Federal Judicial Center, Washington, D.C.

Professor Arthur **[\*39]** R. Miller of the Harvard Law School served as the Task Force's Reporter. The Assistant to the Reporter was Diana G. Culp, Esq., law clerk to the Honorable John J. Gibbons, United States Court of Appeals, Third Circuit. Mr. William K. Slate II, Circuit Executive, Third Circuit Court of Appeals, fully participated in the Task Force's activities.

The Task Force met formally on three occasions between April and July of 1985. Prior to each session, views were exchanged and, prior to the second and third meetings, drafts were commented upon in writing and revised accordingly. That process continued after the last meeting.

## III. Fund-in-Court Cases

As discussed above, the *Lindy* lodestar method has been applied in both the fund-in-court and statutory fee contexts without any real consideration of the differences between the two types of cases. n55 Upon reflection, the Task Force agreed that the fundamental differences between statutory fee and fund-in-court cases should be recognized in the fee-setting process. n56 Treating these two categories of cases in **[\*\*255]** variant ways to best achieve their policy objectives appears sound, especially in light of footnote 16 of Justice Powell's opinion **[\*40]** in *Blum v. Stenson*, quoted earlier. n57

> n55 *See* Section I(C), above; text at note 46, above.

> n56 *See* Section I(C), above.

n57 *See* text at note 44, above.

Of primary concern in dealing with fund-in-court cases is solving the problem raised when a class action lawyer secures a recovery for his clients and then proceeds to file a fee petition seeking compensation from those very same funds. n58 In these situations, the plaintiffs' attorney's role changes from one of a fiduciary for the clients to that of a claimant against the fund created for the clients' benefit. The perspective of the judge also changes because the court now must monitor the disbursement of the fund and act as a fiduciary for those who are supposed to benefit from it, since typically no one else is available to perform that function -- the defendant has no interest in how the fund is distributed and the plaintiff class members rarely become involved. Note that neither of these concerns arise in the statutory fee context, which **[*41]** continues to be an adversary proceeding until resolution, except when a statutory fee case is "converted" into a fund case by settlement.

n58 *See* the related discussion of the *Prandini* problem in Section V, below.

In response to these concerns, the Task force concluded that the traditional common-fund case and those statutory fee cases that are likely to result in a settlement fund from which adequate counsel fees can be paid, n59 should be treated differently than the more typical statutory fee case involving the declaration or enforcement of rights or relatively modest sums of money. The application of *Lindy* was thought necessary in the straight-forward statutory fee case, because it is reasonably objective, neutral, and does not require making monetary assessments of intangible rights that are not easily equated with dollars and cents. But these protections were not believed to be needed in the traditional fund case or in those statutory fee cases likely to produce a sizeable fund from which counsel fees **[*42]** could be paid.

n59 Note that under this definition even a *42 U.S.C. § 1983* civil rights action could be handled under the negotiated percentage fee scheme to be described below, if it is likely to produce a sufficient fund from which counsel fees could be paid. *See, e.g., Blum v. Stenson,    U.S.   , 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984).*

Accordingly, the Task Force recommends that in the traditional common-fund situation and in those statutory fee cases that are likely to result in a settlement fund from which adequate counsel fees can be paid, the district court, on motion or its own initiative and at the earliest practicable moment, n60 should attempt to establish a percentage fee arrangement agreeable to the Bench and to plaintiff's counsel. In statutory fee cases the negotiated fee would be applied in the event of **[**256]** settlement; in all fully litigated statutory fee cases the award would continue to be determined in an adversary **[*43]** manner under the basic *Lindy* approach, with the modifications suggested in the next section.

n60 It is assumed that the "earliest practicable moment" will be immediately after the pleadings are closed and before discovery is fully underway. However, the judicial members of the Task Force expressed differences as to when they would establish the percentage fee arrangement. Most likely, high management judges will want to settle the fee question at the outset of the case. Others may prefer not to become a participant so early in the proceedings and may wish to wait until the case is better formed. All lawyer members of the Task Force, however, desired early clarification of the fee issue.

The negotiated fee, and the procedure for arriving at it, should be left to the court's discretion. In most instances, it will involve a sliding scale dependent upon the ultimate recovery, the expectation being that, absent unusual circumstances, the percentage will decrease as the size of the fund increases. n61 In order to promote **[*44]** early settlement, the negotiated fee also could provide a percentage or fixed premium incentive based on how quickly or efficiently the matter was resolved. Other possibilities for custom-tailoring a fee arrangement abound. n62

n61 In a case in which a large settlement is anticipated, the negotiated contingency range may include relatively small percentages. For example, the *Agent Orange* plaintiffs' lawyers collected over ten million dollars in fees, yet that amounted to less than 6% of the settlement fund.

n62 For example, a judge might "custom tailor" a settlement so that attorneys' fees come out of the interest produced by the fund, not from the fund itself. *See In re "Agent Orange" Product Liability Litigation*, slip opin-

ion (E.D.N.Y. January 7, 1985) *modified*, slip opinion (E.D.N.Y. June 18, 1985) (memorandum order on fees) (interest on $ 180,000,000 fund came to $ 15,000,000 out of which was assigned $ 10,000,000 in fees, thus leaving the fund unimpaired).

In selecting a mechanism, the court should **[*45]** be guided by the circumstances of the particular case, ease of administration, fairness to the fund beneficiaries, and a desire to avoid the deficiencies of the *Lindy* process. The contextual and individualized nature of this process extends to various logistical elements, such as the timing of the negotiation and whether the judge hearing the case or another judge oversees the process. In statutory fee cases brought under the proposed negotiated fee procedure the court also must keep in mind that fees represent a substantive right created by Congress that should not be compromised.

Of critical importance is assuring that the compensation plan is negotiated in an open and appropriately arm's length manner. In most instances, particularly in complex cases, that task probably should not be undertaken by the district judge who will hear the case. When appropriate, it is recommended that the court appoint a non-judicial representative -- who typically will be an attorney -- for the then putative fund beneficiaries, who will negotiate the arrangement in the usual marketplace manner and submit the proposal for the court's approval.

The representative appointed to negotiate the fee arrangement **[*46]** for the beneficiaries should behave in exactly the same fashion as would any other attorney in a comparable situation. The attorneys who will benefit from the fee arrangement and the court appointed negotiator normally should discuss the amount of work contemplated, the nature of the work, the number of hours reasonably anticipated, the risks to be faced in the litigation, and the likelihood of winning and losing, all with an eye toward arriving at a reasonable basis for compensation. The percentage fee agreement should include all of the features normally contained in comparable arrangements that are negotiated directly between counsel and client. This is precisely the way contingency fee agreements are worked out daily in law offices throughout the country and there is no **[**257]** reason to expect that competent counsel could not enter into a detailed agreement taking account of all of the anticipated contingencies. In cases involving multiple plaintiffs' lawyers or conflicting claims of lawyers, the beneficiaries' judicially appointed representative might be asked to make a recommendation to the court based on both the economic considerations and the anticipated effectiveness of representation. **[*47]**

When a negotiator is appointed, the court should fix a limit on compensable time, an hourly fee limit, or a total fee limit on the representative in order to be certain that the negotiation procedure does not become unduly expensive. Of course, great care must be taken to avoid patronage and discrimination both in the selection of negotiating representatives and in the selection of litigation counsel when there is a competition for that position. The court must appoint people to these posts who will vigorously represent the interests of the beneficiaries; that goal will not be achieved unless appointments are based upon the abilities and experience of counsel.

In the event an agreement is reached, it should be submitted to the court for review. If an agreement is not reached, the difference between the parties should be presented to the court, and the court should determine the ultimate contingent fee arrangement and seek to elicit the assent of plaintiff's counsel to it. The district judge's review of the proposed fee arrangements should be completely independent and thorough. n63 The court can accept, reject, or revise the agreement, either providing exact terms or merely establishing **[*48]** ranges and retaining the ultimate authority to revise the agreement if later circumstances warrant. The judge's obligation is to assure that the negotiated compensation plan is reasonable and that the fee-setting procedure objectives set out above are furthered. To assure this, the court also should retain discretion to shift the fee-setting mechanism from the negotiated plan to part or all of the *Lindy* regime, should subsequent events indicate that the former is inappropriate.

> n63 The Task Force did not reach a consensus as to how the negotiating representative would be paid for services rendered but it generally was agreed that the representative's fee and expenses should be paid by those seeking to represent the fund claimants.

Some of the judicial members of the Task Force felt that no time limit should be imposed on the court's ability to shift from one fee regime to the other. For example, it was argued that a district judge officiating over a fund case that was being litigated under a negotiated fee system **[*49]** should be able to shift to the *Lindy* lodestar scheme, or vice versa, if it was thought to be in the best interests of justice. Other members felt that giving the judge complete freedom to determine at any time what type of fee regime to use afforded the judge too much discretion and destroyed the predictability of the negotiated fee approach. These members thought that after litigating a case for years under the assump-

tion of being compensated pursuant to a negotiated percentage fee, it would be improper for the district court suddenly to announce that the **[**258]** percentage fee no longer seemed appropriate and, on the eve of settlement or trial, that it was shifting to the *Lindy* system.

This negotiated fee procedure has a number of potentially desirable effects. By establishing the fee agreement early in the litigation, any and all inducement or inclination to increase the number of *Lindy* hours will be reduced, since the amount of work performed will not be permitted to alter the contingent fee. In addition, another alleged *Lindy* evil will be minimized because there will be a substantial inducement for plaintiff's counsel to settle the matter quickly, since the fee scale will **[*50]** have been established and counsel's compensation will not be enhanced by a delay. The negotiated percentage scheme also will eliminate the cumbersome, enervating, and often surrealistic process of preparing and evaluating fee petitions that now plagues the Bench and Bar under *Lindy*. Finally, the proposal offers attorneys a degree of predictability that many believe currently is lacking.

Note, however, that the advantage of the negotiated fee procedure will be entirely undermined if, at the end of the litigation, counsel have the right to renegotiate depending upon the result accomplished, the time devoted, the number of lawyers involved, or other factors relating to the case. In other words, renegotiation should not be permitted and the agreement should be strictly adhered to by the court, unless at the end of the case matters are presented that were not within the reasonable contemplation of the parties at the time the fee arrangement was negotiated.

The Task Force had the following recommendations as to the standard of review on appeal when the negotiated percentage fee track is followed: If the plaintiffs' lawyers agree to the negotiated fee and the agreement is approved by **[*51]** the district court, then there should be no review of the matter in the court of appeals. If, however, the lawyers disagree with the actual percentage fee fixed by the court -- for example, the plaintiffs' attorneys insist on a negotiated fee of 16% and the court imposes a percentage of 14% -- then the determination should be allowed to stand on appeal unless clearly erroneous. If, however, the issue on appeal is not a disagreement with the percentage figure but is rather a disagreement with the type of fee regime adopted by the district judge, then the judge's choice of whether to follow *Lindy* or a negotiated fee scheme in a particular case should be reviewed under an abuse of discretion standard.

A final note of caution. The negotiated percentage fee procedure is being recommended by the Task Force in part because its members believe it holds the promise of being more efficient for *all* participants in the fee-setting process than the *Lindy* technique has proven to be. This systemic value could prove illusory if the recommended procedure itself becomes protracted, hypertechnical, and a battlefield for the participants. Firm judicial control is necessary to avoid this possibility. **[*52]** In addition, when the court appoints a fee representative, certain principles should be established. These may include time limits for the completion of the **[**259]** process and compensation limits for the representative, either in terms of a total fee, hourly rates, or hours to be compensated.

## IV. Statutory Cases

### A. Retention of *Lindy* in Statutory Fee Cases

The Task Force concluded that the basic framework of the *Lindy* method should be retained in those statutory fee cases in which there is a risk that the economic rewards will not produce a fund from which a reasonable fee can be awarded. The following factors led the Task Force to this decision:

1) The years of experience under *Lindy* have provided some degree of objectivity and predictability to the fee-setting process. Despite extensive criticism, n64 both Bench and Bar have developed an ability to work within the *Lindy* framework, and have found it acceptable in most cases in this category since their scale makes it relatively easy to administer. Conversely, it was thought that any sharp deviation from this system was bound to have numerous and unnecessary destabilizing side effects.

2) *Blum v. Stenson* **[*53]** and *Hensley v. Eckerhart* may have placed the Supreme Court's imprimatur on the *Lindy* time/rate system -- at least in civil rights cases under Section 1988 of Title 42, and quite possibly in all statutory fee cases. n65 Although the Task Force's charge was to return to basic principles, ignore existing precedents, and build a better mousetrap if possible, the presence of these two very recent Supreme Court decisions had an obvious constraining influence on Task Force members.

3) Members of the Task Force felt that the potential for *Lindy* abuse was greater in fund-in-court cases than in statutory fee cases. Consequently, there appeared to be less of a need to tamper with the current system in the statutory fee environment.

4) Finally, in the context of public interest and civil rights litigation, a fee-setting scheme based on time and market rates seems most consistent with the public policies embedded in the legislative provisions. Moreover, even though, as noted earlier, *Lindy* may be flawed, it seems preferable to other, even less objective, compensation techniques because of the non-monetary character of many of these actions. n66 Accordingly, the concerns of **[*54]** the social action bar probably would be exacerbated by a radical departure from the time-rate calculation.

n64 *See* note 28, above.

n65 *See* Section I(A), above.

n66 A negotiated percentage fee procedure probably is unworkable in these cases, as well as being inconsistent with Congressional intent. The acceptability of a flat fee arrangement is a closer question.

Nonetheless, the Task Force believes many of the perceived deficiencies in the *Lindy* process are real; they must be ameliorated and its administration improved. The following recommendations were motivated **[**260]** by the goals of objectification and simplification of the fee-setting process in statutory fee cases.

## B. Recommendations

### 1. Standardization of Hourly Rates

One of the more time-consuming aspects of the *Lindy* process is the necessity of determining the "customary" or "normal" billing rate for each petitioning lawyer based on the nature of the work performed and then multiplying this rate by the number of hours expended. **[*55]** Not only does this exercise consume significant quantities of lawyer and judge time, but it has proven to be an extremely unpredictable endeavor. Variations in rates from case to case, from judge to judge, from court to court, and from lawyer to lawyer, have been commonplace. Moreover, the *Lindy* system seems to create an incentive in some lawyers to advance the highest possible billing rates, even though many of them, because of the nature of their practices, really do not charge anything that might be termed a "customary" or "normal" billing rate.

Despite the fact that variations in the value of lawyers' services based on differences in experience, reputation, skill, geography, and applicable substantive law do exist, the Task Force concluded that substantial efficiencies and objectification can be achieved by developing standardized district-wide hourly rates for fee-setting purposes. These rates would be applied to all petitions in statutory fee cases.

If simplicity of administration were the only objective, a single rate, applicable to all lawyers submitting fee petitions within the district, might be employed. But, the Task Force recognized that a single rate was unrealistic **[*56]** and probably unfair, given the tremendous variations in fee-setting situations. Moreover, it might be seen as inconsistent with the Supreme Court's recognition in *Blum* and *Hensley* that lawyers are not fungible for statutory fee-setting purposes. n67 Therefore, in principle it seems certain general categories of attorneys, perhaps partners and associates, or perhaps those with less than 10 years' experience in practice and those with more than 10 years' experience, to avoid too wide a disparity between the standardized hourly rate and the individual lawyer's actual marketplace value. An even more finely tuned set of categories may be appropriate. n68 Regardless of what categories are **[**261]** chosen, the Task Force recommends that the schedule be uniformly applied to all lawyers and in all cases.

n67 *Blum,*    U.S. at    n.11, 104 S.Ct. at 1547 n.11, 79 L.Ed.2d at 900 n.11.

n68 A highly developed standardized rate schedule might look something like that adopted by Community Legal Services, Inc., Philadelphia, Pennsylvania:

| Category | Range of Hourly Rates |
| --- | --- |
| Law Students | $ 30.00 - $ 50.00 |

| Category | Range of Hourly Rates |
| --- | --- |
| Attorneys with post law school experience under two years | $ 60.00 - $ 85.00 |
| Attorneys with 2-5 years experience | $ 80.00 - $ 120.00 |
| Attorneys with 6-10 years experience | $ 100.00 - $ 160.00 |
| Attorneys with more than 10 years experience | $ 125.00 - $ 180.00 |
| Supervising Attorneys, Project Heads, Managing Attorneys, Deputy Director, Executive Director | $ 130.00 - $ 200.00 |
| Paralegals I and II | $ 30.00 - $ 40.00 |
| Senior and Supervisory Paralegals | $ 40.00 - $ 60.00 |

[*57]

In establishing a standardized fee schedule the court will encounter the problem of selecting hourly rates for visiting lawyers from other parts of the country litigating in its forum. The Task Force reviewed the current practices of the various circuits n69 and concluded that the best rule is the "forum rate" rule. Hence an out-of-town lawyer would receive not the hourly rate prescribed by his district but rather the hourly rate prevailing in the forum in which the litigation is lodged. Deviation from this rule should be permitted only when the need for "the special expertise of counsel from a distant district" is shown or when local counsel are unwilling to handle the case. n70 Note that this rule is contrary to current Third Circuit practices. n71 The individual districts also might wish to provide a "safety valve" to permit district judges to use an emergency "national" rate when faced with a case involving a large number of specialized non-local attorneys such as *In re "Agent Orange" Product Liability Litigation.*

n69 *See* note 39, above.

n70 *Polk v. New York State Dept. of Correctional Services, 722 F.2d 23, 25 (2d Cir. 1983); Avalon Cinema Corp. v. Thompson, 689 F.2d 137, 140-41 (8th Cir. 1982)* (en banc).

[*58]

n71 *Cunningham v. City of McKeesport, 753 F.2d 262, 267 (3d Cir. 1985); In re Fine Paper Antitrust Litigation, 751 F.2d 562, 590-91 (3d Cir. 1984).*

The Task Force acknowledges that standardized rates applicable to all types of cases, even when broken into categories, will undercompensate certain attorneys and overcompensate others. Nonetheless, it concludes that the objectivity and efficiency that would be achieved by using uniform rates is preferable to the current system. n72 This seems especially true in light of the fact that the inconsistency and unpredictability of present practice undoubtedly pose the same risks of under and over-compensation.

n72 *See, e.g., 28 U.S.C. § 2412*(d)(2)(A)(ii)(1982)(Equal Access to Justice Act), which establishes a cap of $ 75 per hour unless the court determines that an increase is justified. *See Underwood v. Pierce, 761 F.2d 1342, 1347 (9th Cir. 1985).*

[*59]

The setting of standardized hourly rates should be accomplished on a district-by-district basis to reflect regional differences. The district court should appoint a Fee Advisory Committee composed of district judges and members of both plaintiffs' and defense bars. Rates should be set on an annual, biennial, or triennial basis. The Fee Advisory Committee's work product should be widely disseminated in proposed form and made the subject of public comment before any official action is taken.

Although the use of standardized rates will be most effective if uniformly applied, the Task Force felt that it probably is necessary to acknowledge the power of an individual district judge to deviate from them in exceptional cases. Deviations, however, should be limited to exceptional cases, given the need to achieve the efficiency and objectivity [**262] that underly the Task Force's proposal and the considerable flexibility added to the fee-setting process by the use of multipliers. n73

n73 *See* Section IV(B)(3), below.

Consideration [*60] should be given to incorporating the procedure for establishing standardized fees -- as well as the current rates -- into a district court local rule. It must be recognized, however, that such a rule might be challenged as being beyond the local rulemaking authority provided for in Federal Rule 83, n74 or the general rulemaking authority given the Supreme Court by Congress in Section 2072 of Title 28. n75 If the local rule approach is not used, some other mechanism must be employed that gives the fee schedule official status. At a minimum, therefore, the subject should be dealt with in a published court advisory or a general order issued under the court's imprimatur.

n74 *See* 12 C. Wright & A. Miller, *Federal Practice and Procedure* § 3153 (1973).

n75 Perhaps authority for standardized fee setting should be specifically provided for by amending Title 28 of the United States Code.

## 2. Controlling Hours

Perhaps the sharpest attack on the *Lindy* regime is the claim that its preoccupation with attorneys' [*61] time and market rates encourages the expenditure of excessive or unnecessary hours and, in some instances, attracts more lawyers to the plaintiffs' side of court-awarded fee cases than necessary. n76 Quite understandably, district judges find it difficult, indeed, in most instances, impossible, to police these matters by looking over the shoulders of lawyers to monitor the way they handle their cases. To impose that obligation on the Bench is unrealistic, unduly time-consuming, and typically will amount to little more than an exercise in hindsight.

n76 The criticism that *Lindy* attracts more lawyers to the plaintiff's side of cases than is necessary is much more applicable to fund-in-court cases than to statutory fee cases. The problem also is acute in "conversion cases," that is, those cases that start as a statutory fee case but "convert" into a fund case. A perfect example of too many plaintiffs' lawyers on a statutory fee case is *In re Fine Paper Antitrust Litigation, 751 F.2d 562 (3d Cir. 1984),* which commenced as a statutory fee case but was converted into a fund-in-court case as a result of settlement.

[*62]

The Task Force believes that a significant improvement in the current situation can be achieved if counsel and the court discuss various fee matters at the scheduling and pretrial conferences provided for by Federal Rules of Civil Procedure 16 and 26. Early, frank discussion of fee matters, such as the applicability of the court's standardized rates, projections as to the number of hours counsel anticipate devoting to the case, and the potential applicability or inapplicability of various adjustment factors, should have the salutary effects of identifying problems at the outset and improving the process' predictability should plaintiffs prevail.

The detail and character of these discussions undoubtedly will vary with the judge, the identity of counsel, and the nature of the case. n77 In [**263] some instances, the court might ask plaintiff's counsel to submit a proposed budget for the litigation, or require counsel to consider stipulating to a projected range of hours that will be consumed by a

case. Defense counsel also might be requested to present estimates. Of course, as is true of all matters dealt with at a pretrial conference, the preliminary treatment of fee questions should not be [*63] cast in concrete. Nonetheless, the court should manifest sufficient control by estimating the maximum hours to be included in the lodestar, so that the attorneys understand that excessive discovery or any other lawyer hyperactivity will not be tolerated or compensated.

n77 By encouraging early judicial involvement, the Task Force does not mean in any way to chill independent and uninhibited advocacy. Some members of the Task Force thought that early judicial involvement in fee matters could make it more difficult to litigate vigorously because the district court's early impressions of the merits of a case possibly could influence the amount negotiated for the fee. For example, a district judge might favor early settlements for reasons of relief of court dockets of administrative convenience, irrespective of the merits of the action. Objective guidelines established by the local district Fee Advisory Committee could provide whatever protections thought needed.

The Task Force believes full and frank discussion concerning [*64] fees at scheduling and pretrial conferences is completely consistent with the 1980 and 1983 amendments to Federal Rules 16 and 26, is in keeping with current thinking about the importance of judicial management, and is likely to avoid many of the fee-setting problems that can arise if the matter is left at large until the end of the case. In addition, it obliges counsel to make early and realistic appraisals of their cases, a process that might promote settlement.

Despite the foregoing, should a judge believe that too many *Lindy* hours have been billed, "the district court may attempt to identify specific hours that should be eliminated, or it may simply reduce the award to account for the limited success. The court necessarily has discretion in making this equitable judgment." n78

n78 *Hensley v. Eckerhart, 461 U.S. 424, 436-37, 103 S.Ct. 1933, 1941, 76 L.Ed.2d 40, 52 (1983).*


### 3. Multipliers -- Augmentation and Discount n79

n79 The terms "augmentation" and "discount" are being used interchangeably with "positive" and "negative."

[*65]

Since *Lindy*, Third Circuit fee determinations involving the contingency and quality factors have ranged between a negative multiplier, n80 to multipliers of four or more. n81 But this practice undoubtedly will be affected by *Blum v. Stenson*, n82 in which the Supreme Court limited upward adjustments to "those rare cases in which the success was 'exceptional.'" n83

n80 *In re Fine Paper Antitrust Litigation, 751 F.2d 562 (3d Cir. 1984).*

n81 *Delaware Valley Citizens Council for Clean Air v. Commonwealth of Pennsylvania, 762 F.2d 272 (3d Cir. 1985)* (multiplier of 4); *Municipal Authority of the Township of Bloomsberg v. Pennsylvania, 527 F.Supp. 982 (M.D.Pa. 1981)* (multiplier of 4.5); *Fried v. Utilities Leasing Corp.*, Fed. Securities Law Rep. (CCH) * 95,695 (E.D.Pa. 1976) (Trans. binder) (multiplier of 4).

n82 *U.S. at   , 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984).*

n83 *U.S. at   , 104 S.Ct. at 1549, 79 L.Ed.2d at 902. See also Hensley v. Eckerhart, 461 U.S. 424, 435, 103 S.Ct. 1933, 1940, 76 L.Ed.2d 40, 52 (1983)*("In some cases of exceptional success an enhanced award may be justified.").

[*66]  [**264]

*Blum* involved review of a fee award under Section 1983 of Title 42. The district court had increased the lodestar by 50 percent, citing as reasons the complexity of the litigation, the novelty of the issues, the high quality of representation, the "'great benefit' to the class, and the 'riskiness' of the lawsuit." n84 The Supreme Court held that this recital of factors was insufficient to justify an upward adjustment of the lodestar. It reasoned (1) that novelty and complexity of issues already are reflected in the lodestar, (2) that only in that "rare case" in which the fee applicant offers specific evidence to show the superior nature of the services rendered should quality of representation be a basis for increasing the lodestar, and (3) that no evidence in the record justified an increase based on the number of persons benefited. n85 As a contingency, the court noted that the fee applicants did not demonstrate any risks in their affidavits or brief to the district court and therefore an increase in the lodestar on that basis was unjustified. n86

[*67]

n84   U.S. at   , 104 S.Ct. at 1548, 79 L.Ed.2d at 901.

n85   U.S. at   , 104 S.Ct. at 1548-49, 79 L.Ed.2d at 901-02.

n86 *Id.*

*Blum* and *Hensley* have begun to generate a ripple effect and their scope of application may be broader than the contexts in which they arose. For example, although the *Blum* Court did not decide whether a contingency multiplier is permissible under Section 1988, n87 the Third Circuit recently decided that it was permissible in *Hall v. Borough of Roselle*. n88 *Hall*, however, does require the petitioning party to prove that enhancement is necessary. n89 *In Institutionalized Juveniles v. Secretary of Public Welfare*, n90 the Third Circuit affirmed a reduction of the lodestar because of the plaintiff's partial success and remanded on the finding of a positive contingency multiplier to ensure that petitioners had met the burden of proof required in *Blum*. And, finally, in *Delaware Valley Citizens Council for Clean Air v. Commonwealth of Pennsylvania*, n91 the Third Circuit affirmed the upward adjustment of various lodestars as having met the stringent requirements of *Blum*. A multiplier [*68] of four, however, is now perceived by some in the Circuit as exceeding what is permitted by *Blum*.

n87 *See*   U.S. at   & n.17, 104 S.Ct. at 1550 & n.17, 79 L.Ed.2d at 903 & n.17. In *Blum*, the Court did not "consider whether the risk of not being the prevailing party in a section 1983 case, and therefore not being entitled to an award of attorney's fees from one's adversary, may ever justify an upward fee adjustment." *Id.*

n88 *747 F.2d 838, 842-43 (3d Cir. 1984); accord, Delaware Valley Citizens Council for Clean Air v. Commonwealth of Pennsylvania, 762 F.2d 272 (3d Cir. 1985).*

n89 *747 F.2d at 843.*

n90 *758 F.2d 897 (3d Cir. 1985) (42 U.S.C. § 1988).*

n91 *762 F.2d 272 (3d Cir. 1985) (42 U.S.C. § 1988).*

n92 *Id. at 282* (Becker, J.).

[*69]

The Task Force believes the *Lindy* multiplier practice should be revised in several respects. First, the quality factor should be eliminated from consideration. This factor is superfluous since it reflects the type [**265] of performance expected of all attorneys and theoretically already has been taken into account by the district court in setting standardized rates. Moreover, assessing the quality factor involves too subjective an inquiry and is thought to be subject to potentially discriminatory application, thereby potentially undermining the legal community's faith in the fee-setting process. Finally, exceptionally fine lawyer performance in a case often will be rewarded under one or more of the other adjustment factors discussed below.

In contrast to its views on the quality factor, the Task Force feels that the contingency factor, which it defines simply as "the risk of winning or losing," *should be considered in all cases*. n93 Plaintiffs' attorneys always face the pros-

pect of receiving no compensation in statutory fee cases. Accordingly, even modest risks in cases in which liability is reasonably certain to be established should be recognized in the fee-setting process. n94 **[*70]**

> n93 Of course, an upward multiplier may not be applied when forbidden by Congress. *See Underwood v. Pierce, 761 F.2d 1342 (9th Cir. 1985)* (multiplier may not be applied to fees awarded under the Equal Access to Justice Act).

> n94 *See, e.g.*, Leubsdorf, *The Contingency Factor in Attorney Fee Awards*, 90 Yale L.J. 473 (1981).

Other factors that the Task Force thought should be considered in adjusting the basic fee are: (1) the result obtained in the action; (2) the petitioning attorney's contribution to a prompt or a delayed resolution of the action; and (3) the delay in receiving attorneys' fees. The second factor is designed to encourage early settlement by providing an incentive that neutralizes an attorney's possible predilection to increase the number of hours invested in a case for lodestar purposes. As to the third factor, which is designed to recognize the economic effects of a delay in receiving attorneys' fees, the court either may use a multiplier **[*71]** or may make an award to the attorney under the current scheduled hourly rate rather than the one in force when the work actually was done. An award of interest at an appropriate rate also could be employed to compensate for a delay in payment.

**4. The Special Problem of the Public Interest Bar**

As previously noted, there is a strong feeling among public interest and civil rights lawyers that the *Lindy* process has not always been applied to their advantage. n95 The proposals for standardized fees and the elimination of the quality factor represent attempts to eliminate the possible sources of any adverse discriminatory treatment. The proposals should reaffirm the need for a neutral fee-setting process that does not relate fees in statutory cases to subjective judgments about "benefit" and does not become mired in a concern about the dollars recovered and the dollars to be awarded in fees. It is hoped that the procedure outlined above will assure public interest and civil rights lawyers adequate compensation to enable them to pursue vindication of various public policies without regard to whether they produce economic or noneconomic benefits.

> n95 *See* Section I(B)(8), above.

**[*72]  [**266]**
**V. The *Prandini* Problem**

A special risk of abuse arises in the context of settlements when the defendant is paying the plaintiff's attorneys' fees. Naturally, a defendant usually will want to know the exact extent of its total liability before agreeing to settle. As a result, it may seek an agreement that provides for a specific attorneys' fee, a separate fund to be established for fees, or a ceiling on the allowable fee award. These types of agreements raise a serious problem because a plaintiff's attorney may be tempted to accept a smaller recovery for the client in return for an agreement that he or she be paid a handsome attorney's fee. Since the defendant is interested only in the total size of its liability, so long as the settlement is accepted, it often will be indifferent as to the division of the fund between the plaintiffs' recovery and the attorneys' fees.

When a large attorney's fee means a smaller recovery to plaintiff, a significant conflict of interest between client and attorney is created. Even if the plaintiff's attorney does not consciously or explicitly bargain for a higher fee at the expense of the beneficiaries, it is very likely that this situation **[*73]** has indirect or subliminal effects on the negotiations. And, in any event, there is an appearance of a conflict of interest.

The concern is not merely one of controlling major abuse; indeed, an excessively high fee would not be allowed by the court in any event. The apprehension is rather for those situations, short of actual abuse, in which the client's interests are somewhat encroached upon by the attorney's interests. This type of conflict is not only one that is difficult to perceive on the face of a settlement proposal, but even the parties may not be aware that it exists at the time of their discussions.

Concern about this problem is greatest in the class-action context, whether the case involves a fund-in-court or a statutory fee. n96 This is so because the monetary stakes generally are high and the fee-setting attorneys' clients (the plaintiff class) typically are not available to discuss the settlement negotiations and give consent to their counsel's en-

gaging in simultaneous negotiation of the merit settlement and the determination of attorneys' fees. The Third Circuit's answer to this problem came in *Prandini v. National Tea Co. & Amalgamated Food Employee Union, Local* [*74] *590*, n97 in which the court rejected a settlement agreement specifying the plaintiff's attorney's fees and concluded that counsel should not simultaneously negotiate settlements and attorneys' fees. According to the court, the fee question must not be discussed until after [**267] a settlement on the merits has been approved because of the potential for abuse. The *Prandini* decision was foreshadowed by *Jamison v. Butcher & Sherrerd*, n98 in which a district court, reject-ing a settlement as inadequate, also disapproved generally of settlements containing agreements on fees.

> n96 But note that the *Prandini* problem also can arise in a relatively straight-forward, non-class action, statutory fee case. *See, e.g.*, Kraus, *Ethical and Legal Concerns in Compelling the Waiver of Attorney's Fees by Civil Litigants in Exchange for Favorable Settlement of Cases Under the Civil Rights Attorney's Fees Awards Act of 1976, 29 Vill.L.Rev. 597 (1984). See also Evans v. Jeff D., 743 F.2d 648 (9th Cir. 1984), cert. granted*, *U.S.  , 105 S.Ct. 2319, 85 L.Ed.2d 838 (1985)*(reversal in *42 U.S.C. § 1983* action when settlement was condi-tioned upon plaintiffs' counsel's waiver of attorneys' fees).

[*75]

> n97 *557 F.2d 1015 (3d Cir. 1977).* The current status of *Prandini* is uncertain, however, because on May 13, 1985, the Supreme Court granted *certiorari* in *Jeff D. v. Evans, 743 F.2d 648 (9th Cir. 1984)*, a case in which the Ninth Circuit specifically follows *Prandini. Evans v. Jeff D.,    U.S.  , 105 S.Ct. 2319, 85 L.Ed.2d 838 (1985).*

> n98 *68 F.R.D. 479 (E.D.Pa. 1975).* In addition to the *Prandini* problem, two other conflicts of interest is-sues have arisen that are analytically discrete but will be dealt with in this section under the *Prandini* rubric. The first is the possible conflict that arises when the defendant tries to pressure the plaintiff or the plaintiff's attorney to waive a statutory right to fees. *See, e.g., Jeff D. v. Evans, 743 F.2d 648 (9th Cir. 1984), cert. granted,    U.S. , 105 S.Ct. 2319, 85 L.Ed.2d 838 (1985).* The second is the possibility that because of changed circumstances the fee negotiated between the client and the attorney results in an excessive fee for the attorney. *See, e.g., McKenzie Constr., Inc. v. Maynard, 758 F.2d 97 (3d Cir. 1985).*

[*76]

The *Prandini* approach theoretically eliminates the ethical conflict between the size of the settlement and the size of the fee award. But, in practice, *Prandini* has generated problems of its own:

> 1) *Enforcement Problems*: Enforcement of the *Prandini* rule is difficult because the trial judge does not know if the parties have discussed fee matters, although if the court pressed the matter it probably could ascertain whether improper talks have taken place by requesting the information in a signed statement that would be subject to the sanction provisions of Federal Rules 7 and 11 as amended in 1983. n99 It is suspected that fee discussions do take place and that agreements on fees are withheld from the court until after the settlement is approved. Although there is considerable sentiment to the effect that *Prandini* is absolutely "essential" and that it would be damaging to public interest litigation to abolish it, n100 there also is a belief that *Prandini* is not being honored and needs to have some teeth put into it in order to take it seriously.

> 2) Prandini *may well tend to discourage settlement*. Most members of the Task Force believe that *Prand-ini* [*77*] tends to discourage settlement in some cases and, on occasion, makes it impossible. n101 By preventing agreements on fees at the time settlement of the merits is discussed, *Prandini* makes it diffi-cult for the defendant to ascertain precisely what its liability will be, thereby eliminating the very cer-tainty that makes settlement attractive to the defendant. n102 The net effect of *Prandini* may be more tri-als, thus raising the question whether that cost is justifiable inasmuch as the conflict [**268] between settling the merits and discussing fees may be more hypothetical than real.

n99 *See* A. Miller & D. Culp, *The New Rules of Civil Procedure: Managing Cases; Limiting Discovery*, 6 Nat.L.J. 13 (Dec. 5, 1983); *Litigation Costs, Delay Prompted the New Rules of Civil Procedure*, 6 Nat.L.J. 12 (Nov. 28, 1983).

n100 *See* Kraus, note 96, above, at 648 ("The best remedy for this harmful settlement procedure [in Section 1988 actions] is that required by *Prandini*."). *See also Jeff D. v. Evans, 743 F.2d 648 (9th Cir. 1984), cert. granted, U.S. , 105 S.Ct. 2319, 85 L.Ed.2d 838 (1985)*, in which the Ninth Circuit follows *Prandini* to re-verse approval of a class action settlement in a civil rights action in which settlement was conditioned upon the waiver of attorneys' fees.

**[*78]**

n101 At least one member of the Task Force disagreed with the assertion that *Prandini* discourages settle-ment. The judges on the Task Force, however, were in agreement on this proposition.

n102 *See Vallo v. Great Atlantic & Pacific Tea Co., 16 FEP Cases 967 (W.D.Pa. 1977)*.

Most commentators agree that *Prandini* is a laudable attempt to deal with a legitimate concern. However, the prob-lems posed by its administration have led many Task Force members to conclude that its difficulties exceed its benefits. n103 This motivated the Task Force to conclude that the concern over conflicts of interest in the fee award arena might be minimized in other ways by adopting a number of procedures and safeguards that would not impair the litigants' abil-ity to settle.

n103 *Prandini* criticized: *El Club Del Barrio v. United Community Corps., 735 F.2d 98, 101 n.3 (3d Cir. 1985); See* A. Miller, *Attorneys' Fees in Class Actions* 224 (Federal Judicial Center 1980); Comment, *Settlement Offers Conditioned Upon Waiver of Attorney's Fees, 131 U.Pa.L.Rev. 793, 803-05 (1983)*; Note, *Attorney's Fees -- Conflicts Created by the Simultaneous Negotiation of Settlement of Damages and Statutorily Authorized At-torney's Fees in a Title VII Class Action, 51 Temple L.Q. 799 (1978)*.

**[*79]**

First, it must be acknowledged that the defendant must have enough information about its potential liability for fees at the time settlement is discussed to make a realistic appraisal of its overall liability. n104 This in part will occur if the suggestions made earlier in this report concerning the establishment of district-wide hourly rates in statutory fee cases and a negotiated compensation plan in fund-in-court cases have been followed in that district. n105 Similarly, the in-formation available to the defendant will be further enhanced if the proposals for discussing fee matters at the schedul-ing and pretrial conferences are followed. Frank conversations on those occasions as to the time expected to be invested in the case and the degree of contingency the litigation presents should enable the defendant to make a reasonably accu-rate estimate regarding fees.

n104 The Supreme Court recently acknowledged this position in *White v. New Hampshire Dept. of Em-ployment Security, 455 U.S. 445, 453-54 n.15, 102 S.Ct. 1162, 1167 n.15, 71 L.Ed.2d 325, 332 n.15 (1982)*("In considering whether to enter a negotiated settlement, a defendant may have good reason to demand to know his total liability from both damages and fees. Although such situations may raise difficult ethical issues for a plain-tiff's attorney, we are reluctant to hold that no resolution is ever available to ethical counsel.").

**[*80]**

n105 *See* Section III and Section IV(B)(1), above.

Second, the defendant should be permitted to secure additional information relating to the amount of its fee liabil-ity, especially under the auspices of the court. Plaintiffs should be allowed, perhaps even required, to provide defendants with data as to hours worked (and customary billing rates, if applicable n106) when meaningful settlement negotiations

are underway. This practice already exists in many districts and certainly is accomplished easily whenever plaintiff's counsel is obliged to report its hours to the court on a periodic basis.

   n106 Under the Task Force's proposed scheme, a standardized rate, not the attorney's "customary" or "normal" billing rate, would be utilized. *See* Section IV(B)(1), above.

   The Task Force believes that this information in statutory fee cases is discoverable under Federal Rule 26 inasmuch as the provisions for the awarding of fees is part **[*81]** of the statutory right making information pertaining thereto "relevant to the subject matter involved in the pending **[**269]** action." n107 Since most fund-in-court cases start as statutory fee cases, fee information should be discoverable at the time settlement negotiations are underway. In those relatively rare pure fund-in-court actions predicated on diversity jurisdiction, fee information should be made available prior to settlement as a matter of judicial discretion. It is doubtful that an appellate tribunal would find it to be an abuse of discretion for a district judge, sitting on a fund case, to order production of time sheets prior to settlement. Nor does disclosure seem barred by the work-product doctrine. Finally, disclosure of this type of information does not violate *Prandini* because it does not involve any negotiation as to the amount to be requested in the fee petition or the amount actually to be awarded. It simply provides defense counsel with a basis for making an approximation of the fee liability.

   n107 *See generally*, 8 C. Wright & A. Miller, *Federal Practice and Procedure* §§ 2007-15 (1970).

   **[*82]**
   Third, the defendant should be permitted to make an offer of settlement that is conditional on a subsequent satisfactory resolution of the question of fees. This type of offer, assuming the fee question is pursued in good faith, usefully separates the issues of settlement of the merits and resolution of the fees in a way that should minimize the defendant's reluctance to negotiate. Once again, the theory and objectives of *Prandini* are preserved and its inhibiting side effects minimized.

   Fourth, the defendant should be permitted to make a lump-sum offer of settlement that embraces the attorney's fee. This does not violate *Prandini* since at no point in the negotiation is there a discussion of how much of the settlement fund will be allocated to the attorneys' fee. However, this type of a lump-sum settlement does have the effect of creating a fund-in-court situation, even when the case may have been instituted in a statutory fee context, thereby imposing on the court the responsibility of assuring the equitable division of the fund between its beneficiaries and the attorneys. n108

   n108 The Task Force believes a lump-sum offer of settlement to be a permissible way of dealing with the *Prandini* problem as long as there exists an identifiable plaintiff. If, however, the client is not identifiable, then the lump-sum method does nothing to eradicate the *Prandini* problem. For example, a lump-sum offer would be improper when counsel represents an unidentified class. The lump-sum approach also becomes problematic when defendant agrees upon a lump-sum amount assuming that plaintiff has waived fees but plaintiff later asserts it never waived fees and successfully litigates the fee matter. *Jeff D. v. Evans, 743 F.2d 648 (9th Cir. 1984), cert. granted,    U.S.   , 105 S.Ct. 2319, 85 L.Ed.2d 838 (1985)*.

   **[*83]**
   Fifth, in an appropriate case the court may lift the *Prandini* limitation and allow the parties to negotiate simultaneously about the settlement of the merits and the fixation of attorneys' fees. The risk of liminal or even subliminal conflicts of interest arising seems to be extremely low when the parties approach the court and request a waiver of *Prandini* under the trial judge's supervision. The court should permit this to occur only when counsel's request appears to be made in good faith and there is reason to believe that granting it will materially advance the resolution of the litigation. Moreover, judicial oversight should be continuous during the settlement process and anything that might give **[**270]** rise to the suggestion that lifting the *Prandini* restriction will compromise the fee entitlement should be zealously avoided.

   Sixth, it is improper for the defendant to insist on a waiver of plaintiff's right to reasonable attorneys' fees. Unless this prohibition is clearly understood, public interest lawyers and others seeking non-monetary relief, such as an injunction or documents under the Freedom of Information Act, are likely to be subjected to the untoward pressure of **[*84]** a

settlement offer providing the relief requested on condition that the plaintiffs waive their attorneys' fees. This maneuver is in derogation of the Congressional policies embedded in the fee statutes and has a debilitating impact on the underlying statute's enforcement. Moreover, it motivates the plaintiff's attorney declining the settlement offer, even though it may give the client the relief he or she sought, since the attorney now may have no effective way to secure compensation other than full-scale litigation. n109

> n109 *See* Kraus, note 96, above.

Seventh, and in the same vein, the district judge should not use direct or indirect pressure on counsel to waive fees. n110 This principle applies even when plaintiff's attorney is employed by a not-for-profit institution or when the defendant is a public agency and the fees will have to be paid out of public funds. Of course, nothing prevents plaintiff's counsel from waiving fees voluntarily if he or she so desires.

> n110 Furthermore, in the class-action context, the court has a duty to review the reasonableness of all the terms of class-action settlement agreements, particularly those relating to attorneys' fees. *See* Fed.R.Civ.P. 23(e); 7A C. Wright & A. Miller, *Federal Practice and Procedure* §§ 1797, 1803 (1972). Moreover, this general duty in connection with class-action settlements is reinforced by the clear public policy of *42 U.S.C. § 1988* to award reasonable attorneys' fees in civil rights actions. *See Hensley v. Eckerhart, 461 U.S. 424, 429, 103 S.Ct. 1933, 1937, 76 L.Ed.2d 40, 48 (1983).*

**[\*85]**

The Task Force believes that these seven guidelines provide sufficient flexibility to assure that most, if not all, of the objectives of eliminating conflicts of interest underlying *Prandini* and other cases will be achieved without damaging the settlement dynamic. This approach was thought preferable to advocating the elimination of *Prandini*, or fully endorsing it and ignoring its probable unenforceability, or taking a mediate step and limiting it somewhat artificially, perhaps to class actions. n111

> n111 The Task Force's views on the *Prandini* problem were formulated prior to the recent Supreme Court decision in *Marek v. Chesny,    U.S.   , 105 S.Ct. 3012,    L.Ed.2d    (1985)* (Brennan, Marshall, and Blackman, JJ. dissenting). *Marek* holds that a prevailing civil rights litigant entitled to fees under *42 U.S.C. § 1988* may be barred from recovering any fees for work performed after rejecting a settlement offer when he ultimately recovers less than the proffered amount in settlement. It is premature to hazard a guess as to *Marek's* impact on the Task Force's views, the *Prandini* problem, or the entire field of court-awarded attorneys' fees.

**[\*86]**
## VI. Miscellaneous Procedural Aspects of Fee Awards

In pursuit of the objectives of achieving greater simplicity and predictability in the fee-setting process without diminishing efficiency or the system's ability to prevent abuse, the Task Force believes certain procedural steps are worthy of consideration. The following suggestions **[\*\*271]** carry the Task Force's imprimatur. They do not exhaust the range of procedural aspects that arise in the fee-setting process. n112

> n112 *See generally*, T.E. Willging & N.A. Weeks, *Attorney Fee Petitions: Suggestions for Administration and Management* (Federal Judicial Center 1985); T. Willging, *Judicial Regulation of Attorneys' Fees: Beginning the Process at Pretrial* (Federal Judicial Center 1984); A. Miller, *Attorneys' Fees in Class Actions* 202-94 (Federal Judicial Center 1980).

## A. Promulgation of Local Rules

As intimated in the discussion of standardizing the hourly rate, n113 the Task Force felt that many fee setting problems could be ameliorated by the promulgation [*87] of local rules or standing orders by the district courts. It is recommended that each district appoint a Fee Advisory Committee composed of lawyers and judges to confer and propose local rules or orders that would tend to standardize the practice of court-awarded attorneys' fees. These might govern the form of the attorneys' fee application, its timing, the scope and form of discovery, periodic submission of hours worked, procedures for resolving attorneys' fee disputes, and the criteria for reviewing fee applications, distinguishing between common-fund cases and statutory cases.

n113 *See* Section IV(B)(1), above.

The Task Force did not feel it appropriate to propose a model local rule or order because it thought each district is in the best position to devise its own standards in light of the circumstances and practices that exist in its locale. However, the Task Force does suggest that, for the sake of uniformity, each district's set of fee rules or orders should be scrutinized carefully by the appropriate committee [*88] of the applicable court of appeals.

**B. Contemporaneous Recordkeeping**

The Task Force believes that the time-keeping rule announced in *In re Meade Land & Development Co.*, n114 should be retained in both statutory and fund-in-court cases. As the court noted: "It is the attorney's obligation to keep and submit to the court time records supporting an application for compensation." n115 The Task Force believes that periodic reporting of time spent by attorneys in pending litigation should be required so that the court can assure itself that unnecessary and duplicative hours are not being expended; that the record keeping is sufficient to allow for an award; and that the necessary information can be provided to meet the *Prandini* problems discussed above.

n114 *527 F.2d 280 (3rd Cir. 1975).*

n115 *Id.* at 248.

At the pretrial conference, the judge should direct that contemporaneous timesheets be submitted to the court or magistrate, if one has been appointed -- at frequent, specified [*89] intervals. At the same time, it should be made clear what form the timesheets should take, what work and attorney categories should be used, and what hours will be compensated. This procedure enables periodic checking for insufficient reporting, unnecessary hours, duplication, and inconsistencies. If anything is amiss, the court should inform the attorneys of its views promptly in order to assure that the proper information is made available, to encourage any [**272] appropriate corrective action be taken, and to obviate any need for the imposition of serious sanctions. n116

n116 The time records probably should be kept *in camera* except when used as described in Section V, above. *See Manual for Complex Litigation, Second*, § 24.2.1 (Draft, Feb. 1985).

Some members of the Task Force believe that although timesheets should be filed in non-fund, statutory cases, filing, and the subsequent monitoring, was unnecessary in fund cases since the parties already had negotiated a fee agreement. These members felt that one of the [*90] purposes for recommending a return to the contingency arrangement in fund cases was to eliminate the burden of filing and monitoring. This idea was rejected because the system designed by the Task Force allows the district judge to shift from the negotiated fee regime to the *Lindy* regime should the court feel the interests of justice require that be done. n117 If a judge concludes that the *Lindy* system would be more appropriate and converts to it, but timesheets have not been kept and filed because it was a fund case, the judge would have no contemporaneous time records with which to compute the *Lindy* lodestar.

n117 *See* Section III, above.

**C. Judge, Master, Magistrate, Arbitration, or Fee Committee?**

1985 Extra LEXIS 2, *; 108 F.R.D. 237, **

The degree to which judges should delegate the fee-setting process was a matter of considerable debate within the Task Force. Some members believe that the district courts should explore the use of nonjudicial personnel to manage the paperwork, implement standard policies, and, when appropriate, make [*91] preliminary decisions regarding the award. In order to achieve some much needed simplification, it was suggested that courts delegate much of the routine work of administering attorney fee matters to magistrates, special masters, or other parajudicial personnel or court appointees. In particular, with guidance from the court, law clerks could apply specific policies to cumbersome petitions and thereby organize lengthy materials for expedited decision by the court. n118

n118 Note Judge Jack B. Weinstein's use of law clerks in *In re "Agent Orange" Product Liability Litigation*, slip opinion (E.D.N.Y. January 7, 1985), *modified*, slip opinion (E.D.N.Y. June 18, 1985)(memorandum and order on attorneys' fees and final judgment). Judge Weinstein requested permission from the Administrative Office of the United States Courts to hire three temporary assistant clerks to process fee petitions. These clerks, law school graduates awaiting admission to the Bar, worked full-time under the court's direction for more than three months on the fee and expense petitions. With the aid of a senior law clerk, also working full-time on the fee petition, the temporary clerks reviewed the petitions using guidelines established by the court. Another law clerk worked full-time on legal research connected with the petitions. Finally, a member of the Clerk's Office staff devoted a substantial amount of time during this three-month period to organizing fee petitions and related attorney submissions.

[*92]

Other Task Force members, however, believed that law clerks should not be involved in the process but that utilization of magistrates, special masters, or arbitration was desirable and appropriate when and if the circumstances called for their use. Obviously the divergent viewpoints within the Task Force simply reflects the fact that the referral of fee issue matters, as with many other referrals, properly varies from judge to judge. Most litigators prefer decisions by the district court because [**273] they believe judges are better at orchestrating settlements and because judicial determinations frequently avoid the appeals that are taken from any magistrate's decision on any matter of importance.

Although no consensus was reached among the Task Force members on this topic, it was assumed that fee issue references would vary from judge to judge. However, many members of the Task Force expressed the view that if the substantive rules for the determination of counsel fees could be simplified as suggested in this report, control over the procedure then could remain with the judge.

**D. Scope of Review**

The burden of litigating fee issues at the appellate level can best be alleviated if [*93] the court of appeals would establish clear guidelines for the district courts to apply and then allow the district judges considerable discretion in applying them. In theory, that already is the rule in the Third Circuit: in *Lindy*, the Court of Appeals indicated that if the standards set forth by the court were followed, a district judge's application of them would not be overturned except for abuse of discretion. n119

n119 *Lindy II, 540 F.2d at 115-16, 118, 130; Lindy I, 487 F.2d at 166.*

Since that time, the Third Circuit has reviewed *Lindy* lodestar computations under an abuse-of-discretion standard. n120 Yet it was the belief of the Task Force that, in many subsequent decisions, this standard simply has not been employed.

n120 *Institutionalized Juveniles v. Secretary of Public Welfare, 758 F.2d 897, 909 n.21 (3d Cir. 1985); Silberman v. Bogle, 683 F.2d 62, 64-65 (3d Cir. 1982); Merola v. Atlantic Richfield Co., 493 F.2d 292 (3d Cir. 1974) (Merola I).*

[*94]

The Task Force unanimously favors retention of the abuse-of-discretion standard and its application in practice. This means that reversible error occurs when a district court errs as a matter of law by utilizing improper standards or

procedures in determining fees. n121 However, findings of fact relating to the petition would be subject to the clearly erroneous standard of Federal Rule 52. n122 The Task Force was in agreement that the court of appeals should honor the discretion its standard accords to district judges and exercise restraint in reviewing fee awards.

n121 *Lindy I, 487 F.2d at 166.*

n122 *Merola I, 493 F.2d 292 (3d Cir. 1974); Merola II, 515 F.2d 165 (3d Cir. 1975).*

## VII. Conclusion

The Task Force recognizes that the recommendations contained in this document may be imperfect and that numerous questions about court-awarded fees remain. We expect and invite criticism so that the federal courts will have the **[*95]** opportunity to meet and eliminate the deficiences. The Task Force hopes that its recommendations will be accepted for what they are -- an effort to simplify and rationalize the activities of the federal courts in setting attorneys' fees in a broad range of factual circumstances and in a variety of legal contexts. These matters obviously are complex and the Task Force's time was limited. However, we are convinced that this report, even if its recommendations are not acted **[**274]** upon or otherwise accepted, serves an important function in enumerating the myriad problems posed by the *Lindy* doctrine as it is now employed and begins the process of seeking solutions for the deficiencies in current practice. At a minimum, we trust that the report will assist both the courts and Congress in identifying and meeting the problems posed by fee claims, as we have outlined them. If we have rendered some assistance by shedding some light on the problems, we will be content; if we also have advanced solutions to those problems that stand the test of application, our time and efforts certainly will have been well expended.



LEXSEE 108 F.R.D. 237

To Return to the New EXTRA Archive

************************************************************

COURT AWARDED ATTORNEY FEES

[NO NUMBER IN ORIGINAL]

REPORT OF THE THIRD CIRCUIT TASK FORCE

*1985 Extra LEXIS 2; 108 F.R.D. 237*

October 8, 1985, Decided

**[**240]   [*1]**

**TABLE OF CONTENTS**

I. *The Existing* Lindy *Time/Rate Regime*


    A. Overview: History of the Problem; *Lindy* as Supposed Answer
    B. Deficiencies of the *Lindy* Process
    C. The Need to Distinguish Between Fund-in-Court Cases and Statutory Fee Cases
    D. The Need for Re-evaluation Crystallizes


II. *The Task Force Committee and its Methodology*

III. *Fund-In-Court Cases*

IV. *Statutory Cases*


    A. Retention of *Lindy* in Statutory Fee Cases
    B. Recommendations


        1. Standardization of Hourly Rates
        2. Controlling Hours
        3. Multipliers - Augmentation and Discount
        4. The Special Problem of the Public Interest Bar


V. *The Prandini Problem*

VI. *Miscellaneous Procedural Aspects of Fee Awards*


    A. Promulgation of Local Rules
    B. Contemporaneous Recordkeeping

C. Judge, Master, Magistrate, Arbitration, or Fee Committee?
D. Scope of Review

VII. *Conclusion* [**241]

I. The Existing *Lindy* Time/Rate Regime

A. Overview: History of the Problem; Lindy as Supposed Answer

Traditionally, all parties involved in litigation in the United States have borne their own costs and attorneys' fees. This so-called "American no-fee rule" persevered despite the [*2] criticism that it fails to "make whole" the successful litigant and makes access to the judicial process difficult for less affluent claimants. However, by the late 1930's, American courts, particularly the federal courts, had developed certain exceptions to the no-fee rule based on their historic power to fashion equitable remedies.

Some of these exceptions had evolved as a product of the "inherent power in the courts to allow attorneys' fees in particular situations." n1 For example, one of the earliest and still most common exception is the common-fund doctrine, which allows a person who maintains a lawsuit that results in the creation, preservation, or increase of a fund in which others have a common interest, to be reimbursed from that fund for litigation expenses incurred. The doctrine is "part of the historic equity jurisdiction of the federal courts," n2 and contemplates "fair and just allowances for expenses and counsel fees" to be paid by those who have benefited from the efforts expended on their behalf. n3

n1 *Alyeska Pipeline Service Co. v. Wilderness Society, 421 U.S. 240, 259, 95 S.Ct. 1612, 1622, 44 L.Ed.2d 141, 154 (1975). See generally* 10 C. Wright, A. Miller & M. Kane, *Federal Practice and Procedure* §§ 2675-2675.1 (1983).

[*3]

n2 *Sprague v. Ticonic National Bank, 307 U.S. 161, 164, 59 S.Ct. 777, 779, 83 L.Ed. 1184, 1186 (1939).*

n3 *Trustees of the Internal Improvement Fund v. Greenough, 105 U.S. 527, 536 (1881).*

The philosophy of the common-fund doctrine was extended by many federal courts to cover situations in which non-pecuniary benefits are recovered or rights established for persons not parties to the litigation. For several years, a number of federal courts also freely used the "private attorney general" concept in order to grant fee awards to individuals initiating litigation aimed at vindicating important public policies. The Supreme Court, however, limited the application of the private-attorney-general rationale in 1975 to situations in which Congress specifically had enacted statutory fee provisions. n4

n4 *Alyeska Pipeline Service Co. v. Wilderness Society, 421 U.S. 240, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975)* (Brennan, J. & Marshall, J., dissenting) (Court narrowly construes federal courts' equitable powers to award attorneys fees in the absence of statutory authorization).

[*4]

In response, Congress enacted the Civil Rights Attorney's Fees Awards Act of 1976, n5 authorizing the district court to award a reasonable [**242] attorney's fee to the prevailing party in civil rights litigation. Moreover, during the past few decades there has been a tremendous growth in the number of statutory causes of action that include a provision for attorneys' fees, generally phrased in terms of an allowance to the prevailing party. n6 This legislation and other factors have led to a burgeoning practice of court-awarded fees in the federal courts in a variety of litigation contexts. For example, the phenomenon of the growth of statutory fee provisions, coupled with the expanding use of the class action in the years following the 1966 amendment to Federal Rule of Civil Procedure 23, n7 have resulted in federal courts being faced with fee petitions in a tremendous array of cases and in a high percentage of class actions.

n5 *42 U.S.C. § 1988* (1982). The Fees Act provides in relevant part:

> In any action or proceeding to enforce a provision of sections 1981, 1982, 1983, 1985, and 1986 of this title, title IX of Public Law 92-318 *[20 U.S.C. § 1681 et seq.]*, or title IV of the Civil Rights Act of 1964 *[42 U.S.C. § 2000d et seq.]*, the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs.

**[\*5]**

n6 *See Ruckelshaus v. Sierra Club, 463 U.S. 680, 684, 103 S.Ct. 3274, 3276, 77 L.Ed.2d 938, 943 (1983)* ("[there are] more than 150 existing federal fee-shifting provisions * * *"). In addition to these federal fee-shifting provisions, at least four states have enacted fee-shifting laws.

n7 The equitable supervisory authority that Federal Rule 23 grants federal courts in class actions extends to attorney fee questions and itself provides a quasi-substantive predicate for fee allowances. *See* 7A C. Wright & A. Miller, *Federal Practice and Procedure* § 1803 (1972 & Supp. 1985). The Federal Rule recognizes the applicability of the common-fund doctrine to class action cases. *See generally*, A. Miller, *Attorneys' Fees in Class Actions* (Federal Judicial Center 1980).

Until a dozen years ago, the size of the fee award was left to the court's discretion, with the general standard being reasonableness under the circumstances of the particular case. Judges relied on a variety of factors in setting reasonable amounts for fee awards, **[\*6]** but most heavily emphasized was the size of the fund or the amount of benefit produced for the class. Awards often reflected what the court believed was a "reasonable percentage" of the amount recovered, with the percentages varying considerably from case to case. However, the percentage-of-recovery system sometimes resulted in strikingly large fee awards in a number of cases. Press reaction to these awards, and criticism from within the profession that the fees were disproportionate to the actual efforts expended by the attorneys, generated pressure to shift away from the percentage-of-recovery approach.

The Third Circuit led this movement in 1973 in *Lindy Brothers Builders, Inc. of Philadelphia v. American Radiator & Standard Sanitary Corp. ("Lindy I"* and *"Lindy II")*, n8 in which Chief Judge Seitz set forth the guidelines for the computation of fee awards in the **[\*\*243]** Third Circuit. In *Lindy*, the court vacated the district court's fee award, which had been based on a percentage of the settlement fund, and directed the district court to recalculate the fee pursuant to an entirely different formula. The technique is easily described. First, the court must determine the hours **[\*7]** reasonably expended by counsel that created, protected, or preserved the fund. n9 Second, the number of compensable hours is multiplied by a reasonable hourly rate for the attorney's services. Hourly rates may vary according to the status of the attorney who performed the work (that is, the attorney's experience, reputation, practice, qualifications, and similar factors) or the nature of the services provided. n10 This multiplication of the number of compensable hours by the reasonable hourly rate was said to constitute the "lodestar" of the court's fee determination. n11

n8 *487 F.2d 161 (3d Cir. 1973)*("*Lindy I*"), appeal following remand, *540 F.2d 102 (3d Cir. 1976)*("*Lindy II*"). *Lindy* involved the review of an order allowing attorneys' fees out of a fund resulting from the settlement of class actions charging a conspiracy to fix prices in violation of Section 1 of the Sherman Act.

n9 *Lindy II, 540 F.2d at 111*.

n10 *Lindy I, 487 F.2d at 167*.

n11 *Id. at 168*.

**[\*8]**

The "lodestar" then could be increased or decreased based upon the contingent nature or risk in the particular case involved and the quality of the attorney's work. An increase or decrease of the lodestar amount is referred to as a "multiplier." In determining whether to increase the lodestar to reflect the contingent nature of the case, the Third Circuit said "the district court should consider any information that may help to establish the probability of success." n12 However, "the court may find that the contingency was so slight or the amount found to constitute reasonable compensation

for the hours worked was so large a proportion of the total recovery that an increased allowance for the contingent nature of the fee would be minimal." n13 As to the quality multiplier, it was to be employed only for "an unusual degree of skill, superior or inferior, exhibited by counsel in the specific case before the court." n14 This methodology for calculating the basic fee award has become known as the "*Lindy*" fee-setting technique.

> n12 *Id.*

> n13 *Id.*

> n14 *Silberman v. Bogle, 683 F.2d 62, 64 (3d Cir. 1982).*

**[*9]**

Since *Lindy I*, the Third Circuit has emphasized, both in fund-in-court cases n15 (like *Lindy* itself) and in a variety of statutory fee cases, n16 that  **[**244]**  individual determinations of reasonable billing rates are required for the lodestar computation. The Third Circuit's premise has been that the reasonable value of an attorney's time should be based upon the price that time normally commands in the marketplace in which it is offered.

> n15 *Silberman v. Bogle, 683 F.2d 62 (3d Cir. 1982)* (shareholders' derivative action); *Shlensky v. Dorsey, 574 F.2d 131 (3d Cir. 1978).*

> n16 *E.g., Merola v. Atlantic Richfield Co., 493 F.2d 292 (3d Cir. 1974)* (*Merola I*), *appeal after remand, 515 F.2d 165 (3d Cir. 1975)*(*Merola II*); *NBO Industries Treadway Cos. v. Brunswick Corp., 523 F.2d 262 (3d Cir. 1975), vacated on other grounds sub nom.  Brunswick Corp. v. Pueblo Bowl-O-Mat, 429 U.S. 477, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977); Pitchford v. Pepi, Inc., 531 F.2d 92* (3d Cir.), *cert. denied, 426 U.S. 935, 96 S.Ct. 2649, 49 L.Ed.2d 387 (1976); Prandini v. National Tea Co., 557 F.2d 1015 (3d Cir. 1977); Hughes v. Repko, 578 F.2d 483 (3d Cir. 1978); Baughman v. Wilson Freight Forwarding Co., 583 F.2d 1208 (3d Cir. 1978); Walker v. Robbins Hose Co. No. 1, Inc., 622 F.2d 692 (3d Cir. 1980); Inmates of Allegheny County Jail v. Pierce, 716 F.2d 177 (3d Cir. 1983); Danny Kresky Enterprises Corp. v. Magid, 716 F.2d 215 (3d Cir. 1983); Ursic v. Bethlehem Mines, 719 F.2d 670 (3d Cir. 1983); In re Fine Paper Antitrust Litigation, 751 F.2d 562 (3d Cir. 1984).*

>> For purposes of this report, the category "statutory fee case" includes those cases that commence as statutory fee cases but subsequently are converted into fund-in-court cases as a result of the settlement process. In these so-called "conversion" cases, settlement is structured to create a fund-in-court from which attorneys' fees can be paid, a practice approved by the court in *Lindy I*. Note that the true fund-in-court case is relatively rare; examples might include a commmon-law securities suit, a shareholders' derivative action, or a mass-tort disaster case, most likely predicated upon diversity jurisdiction.

**[*10]**

The *Lindy* lodestar approach rather quickly gained acceptance in other federal courts throughout the country because it was viewed as a more reasonable approach than the percentage-of-benefit technique for making fee awards in modern complex litigation. Most circuits that have defined their fee-setting standards have followed the lead of the Third Circuit. The Fifth Circuit, however, in its well known decision in *Johnson v. Georgia Highway Express, Inc.*, n17 adopted a twelve-factor scale n18 in lieu of *Lindy*. Soon thereafter, *Johnson* was adopted by the Ninth Circuit as well. n19

> n17 *488 F.2d 714 (5th Cir. 1974).*

> n18 The twelve elements are:

>> (1) the time and labor required;

(2) the novelty and difficulty of the questions involved;
(3) the skill requisite to perform the legal service properly;
(4) the preclusion of other employment by the attorney due to acceptance of the case;
(5) the customary fee;
(6) whether the fee is fixed or contingent;
(7) time limitations imposed by the client or the circumstances;
(8) the amount involved and the results obtained;
(9) the experience, reputation, and ability of the attorneys;
(10) the "undesirability" of the case;
(11) the nature and the length of the professional relationship with the client;
(12) awards in similar cases.

*488 F.2d at 717-19.* These factors are reflected in the American Bar Association Code of Professional Responsibility, Disciplinary Rule 2-106 (1980).

**[*11]**

n19 *Kerr v. Screen Extras Guild, Inc., 526 F.2d 67 (9th Cir. 1975), cert. denied, 425 U.S. 951, 96 S.Ct. 1726, 48 L.Ed.2d 195 (1976).*

Yet, most commentators consider *Johnson* to be little different from *Lindy* because the first criterion of the *Johnson* test, and indeed the one most heavily weighted, is the time and labor required. Similarly, many of the *Johnson* factors are subsumed within the initial calculation of hours reasonably expended at a customary hourly rate. n20 Some commentators **[**245]** have rejected *Johnson* outright because they believe the twelve factors, without more, cannot guarantee a rational setting of fees:

The fundamental problem with an approach that does no more than assure that the lower courts will consider a plethora of conflicting and at least partially redundant factors is that it provides no analytical framework for their application. It offers no guidance on the relative importance of each factor, whether they are to be applied differently in different contexts, or, **[*12]** indeed, how they are to be applied at all. n21

n20 *See Copeland v. Marshall, 641 F.2d 880 (D.C. Cir. 1980)*(en banc):

Simply to articulate those twelve factors * * * does not itself conjure up a reasonable dollar figure in the mind of a district court judge. A formula is necessary to translate the relevant factors into terms of dollars and cents. This is particularly true because the twelve factors overlap considerably. For example, largely subsumed under the factor "time and labor required" is an assessment of the "difficulty of the questions." That is so because the more difficult the problem, the longer it will take adequately to solve it. Similarly, the customary hourly fee (*Johnson* factor # 5) is likely to be influenced by (# 3) the level of skill necessary to perform the services, (# 6) whether the fee is fixed or contingent, (# 7) time limitations, (# 8) the amount to be obtained, (# 9) the reputation of the attorneys, and (# 10) the undesirability of the case.

*Id. at 890.*

n21 Berger, *Court Awarded Attorneys' Fees: What is "Reasonable"?, 126 U.Pa.L.Rev. 281, 286-87 (1977)* (footnotes omitted); *accord,* Dawson, *Lawyers and Involuntary Clients in Public Interest Litigation, 88 Harv.L.Rev. 849, 927 & n.327 (1975);* Note, *Promoting the Vindication of Civil Rights Through the Attorney's Fees Awards Act, 80 Colum.L.Rev. 346, 372-73 & nn. 164-69 (1980).*

[*13]

*Johnson* critics claim that without further guidance a district court is apt to make the conclusory statement "after evaluating this case under each of the twelve factors in *Johnson*, I find a reasonable fee to be X dollars." But these conclusory statements often are subject to reversal and remand. n22 Accordingly, those circuits that established their fee-setting procedures after *Lindy* and *Johnson*, and had an opportunity to study both systems, have chosen *Lindy* as the better rule. n23

> n22 *Copeland v. Marshall, 641 F.2d 880, 890 (D.C. Cir. 1980). See, e.g., Gay v. Board of Trustees, 608 F.2d 127, 128 (5th Cir. 1979); Davis v. Fletcher, 598 F.2d 469, 470-71 (5th Cir. 1979).*

> n23 *Copeland v. Marshall, 641 F.2d 880, 889-94 (D.C. Cir. 1980)* (court of appeals evaluates *Johnson* and *Lindy* and selects the latter; "Lindy * * eliminate[s] the redundancy and imprecision that many have identified in other fee-setting schemes"). The fee practices of the various federal courts as of 1980 is set out in A. Miller, *Attorneys' Fees in Class Actions* 60-201 (Federal Judicial Center, 1980).

[*14]

In addition to appellate court acceptance, the *Lindy* lodestar approach recently received the Supreme Court's imprimatur -- at least in statutory fee cases -- in *Hensley v. Eckerhart*. n24 Justice Powell writes, in his opinion for the Court:

> The most useful starting point for determining the amount of a reasonable fee is the *number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate*. This calculation provides an objective basis on which to make an initial estimate of the value of a lawyer's services. The party seeking an award of fees should submit evidence supporting the hours worked and rates claimed. n25

In a separate concurring and dissenting opinion, Justice Brennan writes:

> As nearly as possible, market standards should prevail, for that is the best way of ensuring that competent counsel will be available to all persons with bona fide civil rights claims. This means that judges awarding fees must make certain that attorneys are paid the full value **[**246]** that their efforts would receive on the open market in non-civil-rights cases, * * * both by awarding them market-rate fees, * * * and by awarding fees only for time *reasonably* **[*15]** expended. n26

Even more recently, in *Blum v. Stenson*, n27 Justice Powell, for a unanimous Court, declared that the lodestar generally is "presumed to be the reasonable fee"; the base standard for fee determinations, even for cases litigated by not-for-profit law offices, was to be the prevailing market rate in the relevant community.

> n24 *461 U.S. 424, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983).*

> n25 *Id. at 433, 103 S.Ct. at 1939, 76 L.Ed.2d at 50* (emphasis added).

> n26 *Id. at 447, 103 S.Ct. at 1947, 76 L.Ed.2d at 59* (emphasis in original).

> n27 *U.S.   , 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984).*

Despite this growth in acceptance in the last ten years, *Lindy* has come under increased criticism, with some observers asserting that its technique causes more problems than it solves. **[*16]** n28 This Task Force study of court-awarded attorneys' fees is an attempt to appraise the *Lindy* technique and to make suggestions for the future.

> n28 *See, e.g.*, Lauter, *When the Court Awards Fees*, 7 Nat. L.J. 43 (July 8, 1985) pp. S1-S16; Lerach, *Alternative Approaches for Awarding Attorneys' Fees in Federal Court Litigation: It's Time to Unload the Lodestar* (1984) (unpublished report on fees presented to the Ninth Circuit; advocates abolishing *Lindy* and returning to

percentage based fees) (William S. Lerach, Esq., Milberg Weiss Bershad Specthrie & Lerach, San Diego, California).

## B. Deficiencies of the *Lindy* Process

Whatever the merits of the *Lindy* objectives and the degree to which they are being achieved, there is a widespread belief that the deficiencies of the current system either offset or exceed its benefits. n29 In order to have some sense of the relative merits and demerits of the *Lindy* regime and to appraise any other procedures that might be proposed, it is necessary to [*17] understand the complaints that have been lodged against the present system. What follows is a list of accusations advanced against *Lindy*. Empiric evaluation of these accusations is difficult, if not impossible, and certainly well beyond the Task Force's charter and capabilities:

1. Lindy *increases the workload of an already overtaxed judicial system*. As a result of *Lindy*, the fee-setting process has become more costly in terms of the time and effort expended on it. The increased documentation demanded by the *Lindy* approach, the practice of conducting fee hearings (including the use of "experts"), and the desire to avoid misfeasance have so magnified the process that the system's human and physical resources are being deflected from other, perhaps more important, duties.

2. *The elements of the* Lindy *process are insufficiently objective and produce results that are far from homogenous*. Widespread variations in fees awarded lawyers, often in the same community, by different judges, and in different categories of cases, have led to a [**247] loss of predictability as to treatment, as well as a loss of confidence in the integrity of the fee-setting procedure.

3. [*18] *The* Lindy *process creates a sense of mathematical precision that is unwarranted in terms of the realities of the practice of law*. Perhaps the most obvious illustration of this phenomenon is that *Lindy* requires a calculation based on the petitioning attorney's customary billing rates. But many plaintiffs' lawyers who seek fees usually work on the basis of contingent fee arrangements and do not have a "customary" or "normal" billing rate. Accordingly, they argue, the notion that their "customary" or "normal" billing rates are being used is highly misleading. n30 For example, one plaintiffs' lawyer reportedly has been assigned, by different judges, a "customary" rate ranging from $ 60.00 to $ 250.00 an hour during a six-month period in the Eastern District of Pennsylvania. Similar imprecisions infect the other elements of the *Lindy* computation, it is argued.

4. Lindy *is subject to manipulation by judges who prefer to calibrate fees in terms of percentages of the settlement fund or the amounts recovered by the plaintiffs or of an overall dollar amount*. Those who tend to doubt the objectivity of the *Lindy* process occasionally complain that some judges are too [*19] result-oriented. These judges, it is charged, first determine what they wish to award, either in percentage or dollar amount terms, and then massage the major variables in the *Lindy* fee-setting process -- hours allowed, market rates, contingency, and quality -- until the desired result is achieved. n31

5. *Although designed to curb certain abuses*, Lindy *has led to others*. As was strongly suggested in a recent Third Circuit decision, *In re Fine Paper Antitrust Litigation, n32 Lindy* encourages [**248] lawyers to expend excessive hours, and, in the case of attorneys presenting fee petitions, engage in duplicative and unjustified work, inflate their "normal" billing rate, and include fictitious hours or hours already billed on other matters, perhaps in the hope of offsetting any hours the court may disallow. n33 These various forms of running the meter are accompanied in a number of cases by the presence of far too many law firms submitting fee petitions. The latter phenomenon seems to be the inevitable by-product of a fee-setting scheme based on hours worked regardless of the number of lawyers involved, rather than a limited percentage of a fixed monetary recovery. n34

6. [*20] Lindy *creates a disincentive for the early settlement of cases*. Because of *Lindy's* emphasis on hours worked, lawyers -- including defense counsel who typically bill their clients on an hourly basis -- have little or no incentive to settle cases at the earliest appropriate opportunity. To the contrary, there ap-

pears to be a conscious, or perhaps unconscious, desire to keep the litigation alive despite a reasonable prospect of settlement, to maximize the number of hours to be included in computing the lodestar.

7. Lindy *does not provide the district court with enough flexibility to reward or deter lawyers so that desirable objectives, such as early settlement, will be fostered*. Many believe that *Lindy's* preoccupation with the lodestar computation deprives the trial court of much needed discretion to take proper account of the variousness of litigation. On the other hand, greater discretion is likely to exacerbate the lack of uniformity described in item 2, above, and contribute to the concerns of the public interest bar discussed in item 8, below.

8. *The* Lindy *process works to the particular disadvantage of the public interest bar*. There is a strong feeling **[*21]** among public interest, particularly civil rights, lawyers that whatever *Lindy's* merits may be in other contexts, it has a decidedly negative impact on them and is undermining the efficacy of many of the fee statutes Congress has enacted. The claim is that lodestars in the so-called "money" cases, such as securities and antitrust actions, are set higher than they are in cases under statutes promoting non-monetary social objectives, such as the Civil Rights Attorneys Fees Awards **[**249]** Act of 1976. n35 It even has been suggested that this is true either because some judges are not disposed toward the policies reflected in these statutes and simply do not wish to encourage actions under them, or because in many cases the size of the fee requested seems disproportionate to the amount of economic recovery (or the value of the non-economic recovery) provided the claimants. n36 This is said to occur despite the fact that the benefits achieved in many Fees Act cases, although sometimes intangible and nonmonetary, are of great value to the individual or group directly affected as well as to society at large. Several members of the Task Force expressed the view that fee awards in recent years in **[*22]** the social action context have been so discouraging that few attorneys will accept a civil rights case. n37

9. *Despite the apparent simplicity of the* Lindy *formulation, considerable confusion and lack of predictability remain in its administration*. This point, of course, is implicit in a number of the preceeding paragraphs. But there are administrative difficulties beyond those already mentioned. For example, the *Lindy* requirement that community rates be applied only raises the question of rates in which community? Yet, in some complex cases affecting people on a nationwide scale, a national rate might be justified -- a position adopted by Judge Jack B. Weinstein in *In re "Agent Orange" Product Liability Litigation*. n38 If however, a local rate is chosen, there is ambiguity as to whether it is the forum's rate or each petitioning attorney's local rate. n39

n29 *Id.*

n30 This is made all the more difficult by the requirement recently prescribed by the Supreme Court in *Blum v. Stenson,    U.S.   , 104 S.Ct. 1541, 1547 n.11, 79 L.Ed.2d 891, 900 n.11 (1984)* that to assist the court's determination of a reasonable hourly rate, in the statutory fee context, a fee applicant should produce "satisfactory evidence" in addition to the attorney's own affidavits that the requested rate is in line with prevailing rates.

**[*23]**

n31 This assertion appears to be supported by a study presented by United States District Judge Thomas A. Masterson at the 1977 Third Circuit Judicial Conference. Judge Masterson had tabulated the fees awarded by district courts within the Third Circuit under the *Lindy* lodestar regime from 1973 to the date of his presentation. In each case, the fee award was presented as a function of a percentage of the overall settlement amount. The statistics revealed that many of the judges systematically awarded fees in the range of twenty to twenty-five percent of the fund, regardless of type of case, benefits to the class, numbers of hours billed, size of fund, size of plaintiff class, or any other relevant factor. *See, e.g., Baughman v. Wilson Freight Forwarding Co., 79 F.R.D. 520 (W.D.Pa. 1977), reversed and remanded, 583 F.2d 1208 (3d Cir. 1978)*(fee award 26% of antitrust settlement); *Coleco Indus. Inc. v. Berman, 423 F.Supp. 275 (E.D.Pa. 1976)* (contract indemnity: 20-25%); *Entin v. Barg, 412 F.Supp. 508* (securities class action: 23.9%); *Dorfman v. First Boston Corp., 70 F.R.D. 366 (E.D.Pa. 1976)* (securities class action: 23.5%); *Lindy Bros. Builders, Inc. v. American Radiator & Standard Sanitary*

*Corp., 382 F.Supp. 999 (E.D.Pa. 1974)* (antitrust class action settlement: 27.8% from unrepresented claimants; 53.8% from represented claimants); *Bleznak v. C.G.S. Scientific Corp., 387 F.Supp 1184 (E.D.Pa. 1974)* (securities class action: 30%).

**[\*24]**

n32 *751 F.2d 562 (3d Cir. 1984), affirming in part, reversing in part, 98 F.R.D. 48 (E.D.Pa. 1983)* (district court opinion emphasizes abuse by plaintiffs' lawyers).

n33 *Id.*

n34 Under the *Lindy* system every lawyer involved may petition for an award as long as the lawyer comports with the contemporaneous time-keeping requirements and can justify the hours spent to the court. Under the contingency system, however, the portion of the recovery pie to be devoted to attorneys' fees does not vary according to the number of attorneys involved in the case. Thus, under *Lindy*, in the large fund cases, there may be the unpleasant spectre of management committees or countless lawyers petitioning for a fee from a fund based on work, the value of which frequently seems marginal.

Another cause of this abuse may be the political maneuvering to obtain "votes" for a stipulated recommendation as to the appointment of lead counsel in multi-party cases. Candidates for lead counsel, it has been said, refer clients to other lawyers in order to get additional votes. In return for their votes, the new lawyers are compensated by the promise of additional *Lindy* hours.

**[\*25]**

n35 *See* note 5, above.

n36 *See, e.g., Cunningham v. McKeesport, 753 F.2d 262 (3d Cir. 1985)*($35,887.50 in attorneys' fees awarded on a recovery of $ 17,000.00).

n37 This may become all the more true in the wake of *Marek v. Chesny,    U.S.   , 105 S.Ct. 3012, L.Ed.2d   (1985)* in which the Supreme Court held that a prevailing civil rights litigant entitled to fees under *42 U.S.C. § 1988* may be barred from recovering any fees for work performed after rejecting a settlement offer under Federal Rule 68 when less ultimately is recovered than the amount proferred in settlement.

n38 Slip opinion (E.D.N.Y. January 7, 1985), *modified*, slip opinion (E.D.N.Y. June 18, 1985) (memorandum and order on attorneys' fees and final judgment).

n39 The Third Circuit uses the rate applicable in the locale in which the attorney practices. *Cunningham v. City of McKeesport, 753 F.2d 262, 267 (3d Cir. 1985); In re Fine Paper Antitrust Litigation, 751 F.2d 562, 590-91 (3d Cir. 1984).* The Second Circuit, however, calculates the lodestar figure by using the hourly rate "normally charged for similar work by attorneys of like skill in the area," that is, the hourly rate of the district in which the reviewing court sits. *Polk v. New York State Dept. of Correctional Services, 722 F.2d 23, 25 (2d Cir. 1983); City of Detroit v. Grinnell Corp., 560 F.2d 1093, 1098 (2d Cir. 1977).* The Court of Appeals for the District of Columbia, the Seventh Circuit, and the Eighth Circuit similarly apply a forum rate to non-local counsel. *Donnell v. United States, 682 F.2d 240, 251-52 (D.C. Cir. 1982), cert. denied, 459 U.S. 1204, 103 S.Ct. 1190, 75 L.Ed.2d 436 (1983); Chrapliwy v. Uniroyal Inc., 670 F.2d 760, 768 (7th Cir. 1982), cert. denied, 461 U.S. 956, 103 S.Ct. 2428, 77 L.Ed.2d 1315 (1983); Avalon Cinema Corp. v. Thompson, 689 F.2d 137, 140-41 (8th Cir. 1982)*(en banc). Only when a need for "the special expertise of counsel from a distant district" is shown or when local counsel are unwilling to handle the case do these circuits find the appropriate hourly rate to be that of the attorney's own community. *Polk, 722 F.2d at 25; Avalon, 689 F.2d at 140-41. See also Maceira v. Pagan, 698 F.2d 38, 40 (1st Cir. 1983).* However, Judge Weinstein, in "*Agent Orange*," found reasons in the context of that litigation to reject the Second Circuit forum-rate test in favor of a "uniform, nationally prevailing rate." *In re "Agent Orange" Product Liability Litigation,* slip opinion at 89-98 (E.D.N.Y. January 7, 1985), *modified*, slip opinion (E.D.N.Y. June 18, 1985) (memorandum and order on attorneys' fees and final judgment) ("Obviously such a simple parochial rule is inappropriate in a multidistrict litigation requiring participation of attorneys from many districts.").

[*26]  [**250]
C. The Need to Distinguish Between Fund-in-Court Cases and Statutory Fee Cases

The Task Force believes that a distinction must be drawn between fund-in-court cases and statutory fee cases since the policies behind the two categories differ greatly. The *Lindy* lodestar method, however, first developed and applied in the context of a fund-in-court case, has been transferred to the statutory fee environment with little attention to the differences between these two types of cases. n40

>    n40 *Lindy* was originally a statutory fee (antitrust class action) case that was converted into a fund-in-court case as a result of the settlement process. *See* notes 8 and 16, above.

The purpose of the "equitable-fund," "common-fund," or "fund-in-court" doctrine, enunciated by the Supreme Court over a century ago in *Trustees of the Internal Improvement Fund v. Greenough*, n41 is to avoid the unjust enrichment of those who benefit from the fund that is created, protected, or increased by the litigation and who otherwise would [*27]  bear none of the litigation costs. The rule also derives from the common-law concept that a trustee who is under a duty to act for others is entitled to be reimbursed from that fund for expenses incurred in administering the trust. n42

>    n41 *105 U.S. 527 (1881).*
>
>    n42 3 H. Newberg, *Class Actions* § 7245 (1977); Dawson, *Lawyers and Involuntary Clients: Attorney Fees from Funds*, 82 Harv.L.Rev. 1597 (1974).

A key element of the fund case is that the fees are not assessed against the unsuccessful litigant (fee shifting), but rather are taken from the fund or damage recovery (fee spreading), thereby avoiding the unjust enrichment of those who otherwise would be benefited by the fund without sharing in the expenses incurred by the successful litigant.

In sharp contrast to the fund-in-court cases are the substantial number of statutory causes of action, such as those created by the federal securities, antitrust, civil rights, copyright, and patent acts, that include [*28]  provisions for attorneys' fees -- typically characterized as being "reasonable" in amount -- to be awarded to the prevailing party. These are clearly of the "fee shifting" variety. Illustrative is the Civil Rights Attorney's Fees Awards Act of 1976, n43 which gives federal courts the discretion to award attorneys' fees to the prevailing party in suits brought to enforce certain provisions of the civil rights acts.

>    n43 *See* note 5, above.

Rather than being based on the equitable notion that those who have benefited from litigation should share its costs, the legislative history of these fee acts makes it clear that the intent of Congress was to encourage private enforcement of the statutory substantive rights, whether they be economic or noneconomic, through the judicial process. Further recognition of the differences between fund and statutory fee  [**251]  cases is found in footnote 16 of Justice Powell's opinion in *Blum v. Stenson*:

>    Nor do we believe that the *number* of persons benefited is a consideration of significance [*29]  in calculating fees under § 1988. Unlike the calculation of attorney's fees under the "common fund doctrine," where a reasonable fee is based on a percentage of the fund bestowed on the class, a reasonable fee under § 1988 reflects the amount of attorney time reasonably expended on the litigation. Presumably, counsel will spend as much time and will be as diligent in litigating a case that benefits a small class of people, or, indeed, in protecting the civil rights of a single individual. n44

>    n44    U.S. at    n.16, 104 S.Ct. at 1549 n.16, 79 L.Ed.2d at 903 n.16.

Another difference between fund-in-court and statutory fee cases is that in the former category there is a greater need for the judge to act as a fiduciary for the beneficiaries (who are paying the fee), particularly in the class action situation, because few, if any, of the action's beneficiaries actually are before the court at the time the fees are set. Judicial scrutiny is necessary inasmuch as the fee will be paid out of the fund established **[*30]** by the litigation, in which the defendant no longer has any interest, and the plaintiff's attorney's financial interests conflict with those of the fund beneficiaries. n45 As a result, there is no adversary process that can be relied upon in the setting of a reasonable fee. In statutory fee cases, however, the losing party who will pay the fee is before the court, thus obviating any need for special judicial involvement. Arguably, all the judge need do is rule on the fee application based on the competing presentations of the adversaries.

    n45 See the related discussion of the *Prandini* problem in Section V, below.

Despite these differences between fund cases and statutory fee cases, the *Lindy* formulation was applied to both without any real analysis of the propriety of doing so or the impact it would have. As Judge Gibbons stated in *In re Fine Paper Antitrust Litigation*: n46

        With little or no analysis of the substantial differences between the two situations, this court transferred to litigated disputes **[*31]** over liability for statutory fees many of the standards for judicial scrutiny of fee awards first developed in the fund in court cases. * * * An examination of the case law in this circuit since *Lindy I* discloses that the principal beneficiaries of the heightened judicial scrutiny which that case required have not been class member beneficiaries of a settlement fund, but defendants resisting statutory liability for attorneys' fees. The public policy considerations in the two situations are not obviously identical.

    n46 *751 F.2d 562, 583 n.19 (3d Cir. 1984)* (citations omitted).

Accordingly, in this report the Task Force treats separately the problems raised in the fund-in-court cases (Section III) and those raised in the statutory fee cases (Section IV).

**[**252] D. The Need for Re-evaluation Crystallizes**

A recent Third Circuit case, *Cunningham v. City of McKeesport*, n47 illustrates many of the post-*Lindy* problems discussed earlier. In *McKeesport*, the defendant City negligently **[*32]** demolished a house valued at approximately $ 2,700. Plaintiff declined a settlement offer and instituted a civil rights action. Damages were entered by a jury in the amount of $ 35,000, which were reduced by the district judge to $ 17,000. Plaintiff sought $ 35,887.50 in statutory fees claiming that her counsel had devoted 358 hours to the case, including 247.75 hours in pretrial discovery, and that her attorney's services were worth between $ 100 and $ 125 per hour. The trial judge granted a fee of $ 5,785, disallowing all but 219 hours, valuing the attorney's service at $ 50 per hour, and applying a negative multiplier because of the relatively simple nature of the case. The Third Circuit vacated the district court's judgment and remanded for the entry of a fee of $ 35,887.50 on the basis that (1) the claimed rate of $ 100 per hour for a recent law school graduate and the number of hours of work had not been contradicted, and (2) the district court had not sufficiently articulated its justification for the downward adjustment. n48

    n47 *753 F.2d 262 (3d Cir. 1985).*

    n48 *Id. at 265-67.*

**[*33]**

Four Third Circuit judges dissented from the order denying the City's petition for rehearing because they found it difficult to justify a $ 35,887.50 fee on a recovery of only $ 17,000:

Given the nature of the grievance here and the cost of the property demolished, this case raises serious questions regarding a fee request that appears to be more than ten times the cost of a small piece of real estate that was destroyed. Especially troubling is the fact that almost 250 hours were claimed to have been spent by plaintiff's counsel in pretrial discovery - that would be the equivalent of six full weeks of legal services devoted to discovery in a case involving a property acquired for $ 2700, and for which damages have been entered in the amount of $ 17,000. n49

n49 *Id. at 270.*

According to the dissenters, since the Third Circuit had given its imprimatur to a post-*Lindy* discretionary downward adjustment when limited benefit is achieved, n50 the panel in *McKeesport* did not accord **[*34]** proper respect to the district judge's exercise of that discretion. This view emphasizes the trial judge's awareness of local conditions, including the fee levels of some members of the local bar. Although the role of the court admittedly is less that of a fiduciary in statutory fee cases such as *McKeesport* than in fund cases, the dissenters expressed the view that the district judge still has an obligation to step in and correct a situation when the defense lawyers fail to file a timely or effective opposition to the fee petition.

n50 *See Ursic v. Bethlehem Mines, 719 F.2d 670, 677-78 (3d Cir. 1983),* and *Hughes v. Repko, 578 F.2d 483, 490-91 (3d Cir. 1978)* (Rosenn, J., concurring).

**[**253]** Judge Gibbons disagreed, quoting from *Prandini v. National Tea Co. & Amalgamated Food Employees Union, Local 590*: n51

* * * district courts, in awarding attorneys' fees, may not reduce an award by a particular percentage or amount (albeit for justifiable reasons) in **[*35]** an arbitrary or indiscriminate fashion. If the court believes that a fee reduction in the lodestar is indicated, *it must analyze the circumstances requiring the reduction and its relation to the fee, and it must make specific findings to support its action.* n52

n51 *585 F.2d 47, 52 (3d Cir. 1978).*

n52 *753 F.2d at 269* (emphasis added).

Judge Adams, dissenting from the denial of rehearing, stated:

Both the judiciary and the public increasingly are becoming concerned that a portion of the legal profession seems to be more interested in the subject of fees than in performing quality legal services. This perception, if left unchecked by careful judicial scrutiny, may threaten the viability of the counsel fee statute for legitimate social ends. The question of disproportionate attorney's fees is a matter sufficiently serious, I believe, to command the attention of the entire Court. * * * n53

n53 *Id. at 270.*

**[*36]**

*McKeesport* graphically illustrates certain *Lindy* problems noted earlier in this report. Solutions are needed because there are numerous statutory fee cases in which the monetary recovery is low (or nonexistent as is often the case in actions seeking declaratory or injunctive relief) but that involve important issues of social policy or civil rights. The public interest bar fears that too much subjectivity in the *Lindy* standard coupled with wide trial court discretion will under-

mine the congressional policies embedded in the fee statutes. But unless that discretion is respected, appellate review is encouraged, which proliferates the fee-setting process.

Can the process be made more objective and simple so that there is reasonable predictability and a reduction in the burden on the system without undue risk of unfairness and abuse? Can lawyers be encouraged to work efficiently and pursue settlement at the earliest opportunity and at the same time be compensated adequately to give them the incentives that lie at the heart of the fund-in-court doctrine and statutory fee provisions? Can a balance be struck between the legitimate deference to trial court discretion and the necessity [*37] of appellate oversight? If not *Lindy*, then what? These were some of the questions that challenged the Task Force. Its response follows.

## II. The Task Force Committee and its Methodology

In response to the growing concern over the perceived deficiencies and abuses of the *Lindy* formulation, Chief Judge Ruggero J. Aldisert [**254] requested that a Task Force of lawyers and judges be appointed to examine the standards and criteria utilized in determining court-awarded attorneys' fees and to report its recommendations at the 1985 Third Circuit Judicial Conference. The Task Force was charged with the responsibility of devising and articulating its view of an optimum court-awarded fee system unconstrained by existing law. n54

> n54 However, some Task Force members felt constrained in some unquantifiable measure by Supreme Court precedents, particularly *Blum v. Stenson,     U.S.    , 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984),* and *Hensley v. Eckerhart, 461 U.S. 424, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983).*

[*38]

Because court-awarded fee problems confront every federal court in the country, the Task Force's membership was not limited to judges and attorneys within the Third Circuit. Indeed, one of the reasons for forming the group was to learn from experience outside the Third Circuit.

The Task Force was chaired by United States District Judge H. Lee Sarokin of Newark, New Jersey. Two other district judges served on the Task Force: Judge Dickinson R. Debevoise, District of New Jersey, and Judge Joseph L. McGlynn, Jr., Eastern District of Pennsylvania. Attorney members were Harold E. Kohn, Esq., of Kohn, Savett, Marion & Graf, Philadelphia, Pennsylvania; Arthur L. Liman, Esq., of Paul, Weiss, Rifkind, Wharton & Garrison, New York, New York; Michael P. Malakoff, Esq., of Berger Kapetan Malakoff & Meyers, P.C., Pittsburgh, Pennsylvania; Henry P. Sailer, Esq., of Covington & Burling, Washington, D.C.; Jonathan Stein, Esq., Executive Director, Community Legal Services, Inc., Philadelphia, Pennsylvania; Robert M. Talcott, Esq., of Talcott, Vandevelde & Woehrle, Los Angeles, California, and Thomas E. Willging, Esq., Senior Research Associate, Federal Judicial Center, Washington, D.C.

Professor Arthur [*39] R. Miller of the Harvard Law School served as the Task Force's Reporter. The Assistant to the Reporter was Diana G. Culp, Esq., law clerk to the Honorable John J. Gibbons, United States Court of Appeals, Third Circuit. Mr. William K. Slate II, Circuit Executive, Third Circuit Court of Appeals, fully participated in the Task Force's activities.

The Task Force met formally on three occasions between April and July of 1985. Prior to each session, views were exchanged and, prior to the second and third meetings, drafts were commented upon in writing and revised accordingly. That process continued after the last meeting.

## III. Fund-in-Court Cases

As discussed above, the *Lindy* lodestar method has been applied in both the fund-in-court and statutory fee contexts without any real consideration of the differences between the two types of cases. n55 Upon reflection, the Task Force agreed that the fundamental differences between statutory fee and fund-in-court cases should be recognized in the fee-setting process. n56 Treating these two categories of cases in [**255] variant ways to best achieve their policy objectives appears sound, especially in light of footnote 16 of Justice Powell's opinion [*40] in *Blum v. Stenson*, quoted earlier. n57

> n55 *See* Section I(C), above; text at note 46, above.
>
> n56 *See* Section I(C), above.

n57 *See* text at note 44, above.

Of primary concern in dealing with fund-in-court cases is solving the problem raised when a class action lawyer secures a recovery for his clients and then proceeds to file a fee petition seeking compensation from those very same funds. n58 In these situations, the plaintiffs' attorney's role changes from one of a fiduciary for the clients to that of a claimant against the fund created for the clients' benefit. The perspective of the judge also changes because the court now must monitor the disbursement of the fund and act as a fiduciary for those who are supposed to benefit from it, since typically no one else is available to perform that function -- the defendant has no interest in how the fund is distributed and the plaintiff class members rarely become involved. Note that neither of these concerns arise in the statutory fee context, which **[*41]** continues to be an adversary proceeding until resolution, except when a statutory fee case is "converted" into a fund case by settlement.

n58 *See* the related discussion of the *Prandini* problem in Section V, below.

In response to these concerns, the Task force concluded that the traditional common-fund case and those statutory fee cases that are likely to result in a settlement fund from which adequate counsel fees can be paid, n59 should be treated differently than the more typical statutory fee case involving the declaration or enforcement of rights or relatively modest sums of money. The application of *Lindy* was thought necessary in the straight-forward statutory fee case, because it is reasonably objective, neutral, and does not require making monetary assessments of intangible rights that are not easily equated with dollars and cents. But these protections were not believed to be needed in the traditional fund case or in those statutory fee cases likely to produce a sizeable fund from which counsel fees **[*42]** could be paid.

n59 Note that under this definition even a *42 U.S.C. § 1983* civil rights action could be handled under the negotiated percentage fee scheme to be described below, if it is likely to produce a sufficient fund from which counsel fees could be paid. *See, e.g., Blum v. Stenson,    U.S.   , 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984).*

Accordingly, the Task Force recommends that in the traditional common-fund situation and in those statutory fee cases that are likely to result in a settlement fund from which adequate counsel fees can be paid, the district court, on motion or its own initiative and at the earliest practicable moment, n60 should attempt to establish a percentage fee arrangement agreeable to the Bench and to plaintiff's counsel. In statutory fee cases the negotiated fee would be applied in the event of **[**256]** settlement; in all fully litigated statutory fee cases the award would continue to be determined in an adversary **[*43]** manner under the basic *Lindy* approach, with the modifications suggested in the next section.

n60 It is assumed that the "earliest practicable moment" will be immediately after the pleadings are closed and before discovery is fully underway. However, the judicial members of the Task Force expressed differences as to when they would establish the percentage fee arrangement. Most likely, high management judges will want to settle the fee question at the outset of the case. Others may prefer not to become a participant so early in the proceedings and may wish to wait until the case is better formed. All lawyer members of the Task Force, however, desired early clarification of the fee issue.

The negotiated fee, and the procedure for arriving at it, should be left to the court's discretion. In most instances, it will involve a sliding scale dependent upon the ultimate recovery, the expectation being that, absent unusual circumstances, the percentage will decrease as the size of the fund increases. n61 In order to promote **[*44]** early settlement, the negotiated fee also could provide a percentage or fixed premium incentive based on how quickly or efficiently the matter was resolved. Other possibilities for custom-tailoring a fee arrangement abound. n62

n61 In a case in which a large settlement is anticipated, the negotiated contingency range may include relatively small percentages. For example, the *Agent Orange* plaintiffs' lawyers collected over ten million dollars in fees, yet that amounted to less than 6% of the settlement fund.

n62 For example, a judge might "custom tailor" a settlement so that attorneys' fees come out of the interest produced by the fund, not from the fund itself. *See In re "Agent Orange" Product Liability Litigation*, slip opin-

ion (E.D.N.Y. January 7, 1985) *modified*, slip opinion (E.D.N.Y. June 18, 1985) (memorandum order on fees) (interest on $ 180,000,000 fund came to $ 15,000,000 out of which was assigned $ 10,000,000 in fees, thus leaving the fund unimpaired).

In selecting a mechanism, the court should [*45] be guided by the circumstances of the particular case, ease of administration, fairness to the fund beneficiaries, and a desire to avoid the deficiencies of the *Lindy* process. The contextual and individualized nature of this process extends to various logistical elements, such as the timing of the negotiation and whether the judge hearing the case or another judge oversees the process. In statutory fee cases brought under the proposed negotiated fee procedure the court also must keep in mind that fees represent a substantive right created by Congress that should not be compromised.

Of critical importance is assuring that the compensation plan is negotiated in an open and appropriately arm's length manner. In most instances, particularly in complex cases, that task probably should not be undertaken by the district judge who will hear the case. When appropriate, it is recommended that the court appoint a non-judicial representative -- who typically will be an attorney -- for the then putative fund beneficiaries, who will negotiate the arrangement in the usual marketplace manner and submit the proposal for the court's approval.

The representative appointed to negotiate the fee arrangement [*46] for the beneficiaries should behave in exactly the same fashion as would any other attorney in a comparable situation. The attorneys who will benefit from the fee arrangement and the court appointed negotiator normally should discuss the amount of work contemplated, the nature of the work, the number of hours reasonably anticipated, the risks to be faced in the litigation, and the likelihood of winning and losing, all with an eye toward arriving at a reasonable basis for compensation. The percentage fee agreement should include all of the features normally contained in comparable arrangements that are negotiated directly between counsel and client. This is precisely the way contingency fee agreements are worked out daily in law offices throughout the country and there is no [**257] reason to expect that competent counsel could not enter into a detailed agreement taking account of all of the anticipated contingencies. In cases involving multiple plaintiffs' lawyers or conflicting claims of lawyers, the beneficiaries' judicially appointed representative might be asked to make a recommendation to the court based on both the economic considerations and the anticipated effectiveness of representation. [*47]

When a negotiator is appointed, the court should fix a limit on compensable time, an hourly fee limit, or a total fee limit on the representative in order to be certain that the negotiation procedure does not become unduly expensive. Of course, great care must be taken to avoid patronage and discrimination both in the selection of negotiating representatives and in the selection of litigation counsel when there is a competition for that position. The court must appoint people to these posts who will vigorously represent the interests of the beneficiaries; that goal will not be achieved unless appointments are based upon the abilities and experience of counsel.

In the event an agreement is reached, it should be submitted to the court for review. If an agreement is not reached, the difference between the parties should be presented to the court, and the court should determine the ultimate contingent fee arrangement and seek to elicit the assent of plaintiff's counsel to it. The district judge's review of the proposed fee arrangements should be completely independent and thorough. n63 The court can accept, reject, or revise the agreement, either providing exact terms or merely establishing [*48] ranges and retaining the ultimate authority to revise the agreement if later circumstances warrant. The judge's obligation is to assure that the negotiated compensation plan is reasonable and that the fee-setting procedure objectives set out above are furthered. To assure this, the court also should retain discretion to shift the fee-setting mechanism from the negotiated plan to part or all of the *Lindy* regime, should subsequent events indicate that the former is inappropriate.

> n63 The Task Force did not reach a consensus as to how the negotiating representative would be paid for services rendered but it generally was agreed that the representative's fee and expenses should be paid by those seeking to represent the fund claimants.

Some of the judicial members of the Task Force felt that no time limit should be imposed on the court's ability to shift from one fee regime to the other. For example, it was argued that a district judge officiating over a fund case that was being litigated under a negotiated fee system [*49] should be able to shift to the *Lindy* lodestar scheme, or vice versa, if it was thought to be in the best interests of justice. Other members felt that giving the judge complete freedom to determine at any time what type of fee regime to use afforded the judge too much discretion and destroyed the predictability of the negotiated fee approach. These members thought that after litigating a case for years under the assump-

tion of being compensated pursuant to a negotiated percentage fee, it would be improper for the district court suddenly to announce that the **[\*\*258]** percentage fee no longer seemed appropriate and, on the eve of settlement or trial, that it was shifting to the *Lindy* system.

This negotiated fee procedure has a number of potentially desirable effects. By establishing the fee agreement early in the litigation, any and all inducement or inclination to increase the number of *Lindy* hours will be reduced, since the amount of work performed will not be permitted to alter the contingent fee. In addition, another alleged *Lindy* evil will be minimized because there will be a substantial inducement for plaintiff's counsel to settle the matter quickly, since the fee scale will **[\*50]** have been established and counsel's compensation will not be enhanced by a delay. The negotiated percentage scheme also will eliminate the cumbersome, enervating, and often surrealistic process of preparing and evaluating fee petitions that now plagues the Bench and Bar under *Lindy*. Finally, the proposal offers attorneys a degree of predictability that many believe currently is lacking.

Note, however, that the advantage of the negotiated fee procedure will be entirely undermined if, at the end of the litigation, counsel have the right to renegotiate depending upon the result accomplished, the time devoted, the number of lawyers involved, or other factors relating to the case. In other words, renegotiation should not be permitted and the agreement should be strictly adhered to by the court, unless at the end of the case matters are presented that were not within the reasonable contemplation of the parties at the time the fee arrangement was negotiated.

The Task Force had the following recommendations as to the standard of review on appeal when the negotiated percentage fee track is followed: If the plaintiffs' lawyers agree to the negotiated fee and the agreement is approved by **[\*51]** the district court, then there should be no review of the matter in the court of appeals. If, however, the lawyers disagree with the actual percentage fee fixed by the court -- for example, the plaintiffs' attorneys insist on a negotiated fee of 16% and the court imposes a percentage of 14% -- then the determination should be allowed to stand on appeal unless clearly erroneous. If, however, the issue on appeal is not a disagreement with the percentage figure but is rather a disagreement with the type of fee regime adopted by the district judge, then the judge's choice of whether to follow *Lindy* or a negotiated fee scheme in a particular case should be reviewed under an abuse of discretion standard.

A final note of caution. The negotiated percentage fee procedure is being recommended by the Task Force in part because its members believe it holds the promise of being more efficient for *all* participants in the fee-setting process than the *Lindy* technique has proven to be. This systemic value could prove illusory if the recommended procedure itself becomes protracted, hypertechnical, and a battlefield for the participants. Firm judicial control is necessary to avoid this possibility. **[\*52]** In addition, when the court appoints a fee representative, certain principles should be established. These may include time limits for the completion of the **[\*\*259]** process and compensation limits for the representative, either in terms of a total fee, hourly rates, or hours to be compensated.

## IV. Statutory Cases

### A. Retention of *Lindy* in Statutory Fee Cases

The Task Force concluded that the basic framework of the *Lindy* method should be retained in those statutory fee cases in which there is a risk that the economic rewards will not produce a fund from which a reasonable fee can be awarded. The following factors led the Task Force to this decision:

1) The years of experience under *Lindy* have provided some degree of objectivity and predictability to the fee-setting process. Despite extensive criticism, n64 both Bench and Bar have developed an ability to work within the *Lindy* framework, and have found it acceptable in most cases in this category since their scale makes it relatively easy to administer. Conversely, it was thought that any sharp deviation from this system was bound to have numerous and unnecessary destabilizing side effects.

2) *Blum v. Stenson* **[\*53]** and *Hensley v. Eckerhart* may have placed the Supreme Court's imprimatur on the *Lindy* time/rate system -- at least in civil rights cases under Section 1988 of Title 42, and quite possibly in all statutory fee cases. n65 Although the Task Force's charge was to return to basic principles, ignore existing precedents, and build a better mousetrap if possible, the presence of these two very recent Supreme Court decisions had an obvious constraining influence on Task Force members.

3) Members of the Task Force felt that the potential for *Lindy* abuse was greater in fund-in-court cases than in statutory fee cases. Consequently, there appeared to be less of a need to tamper with the current system in the statutory fee environment.

4) Finally, in the context of public interest and civil rights litigation, a fee-setting scheme based on time and market rates seems most consistent with the public policies embedded in the legislative provisions. Moreover, even though, as noted earlier, *Lindy* may be flawed, it seems preferable to other, even less objective, compensation techniques because of the non-monetary character of many of these actions. n66 Accordingly, the concerns of **[*54]** the social action bar probably would be exacerbated by a radical departure from the time-rate calculation.

n64 *See* note 28, above.

n65 *See* Section I(A), above.

n66 A negotiated percentage fee procedure probably is unworkable in these cases, as well as being inconsistent with Congressional intent. The acceptability of a flat fee arrangement is a closer question.

Nonetheless, the Task Force believes many of the perceived deficiencies in the *Lindy* process are real; they must be ameliorated and its administration improved. The following recommendations were motivated **[**260]** by the goals of objectification and simplification of the fee-setting process in statutory fee cases.

## B. Recommendations

### 1. Standardization of Hourly Rates

One of the more time-consuming aspects of the *Lindy* process is the necessity of determining the "customary" or "normal" billing rate for each petitioning lawyer based on the nature of the work performed and then multiplying this rate by the number of hours expended. **[*55]** Not only does this exercise consume significant quantities of lawyer and judge time, but it has proven to be an extremely unpredictable endeavor. Variations in rates from case to case, from judge to judge, from court to court, and from lawyer to lawyer, have been commonplace. Moreover, the *Lindy* system seems to create an incentive in some lawyers to advance the highest possible billing rates, even though many of them, because of the nature of their practices, really do not charge anything that might be termed a "customary" or "normal" billing rate.

Despite the fact that variations in the value of lawyers' services based on differences in experience, reputation, skill, geography, and applicable substantive law do exist, the Task Force concluded that substantial efficiencies and objectification can be achieved by developing standardized district-wide hourly rates for fee-setting purposes. These rates would be applied to all petitions in statutory fee cases.

If simplicity of administration were the only objective, a single rate, applicable to all lawyers submitting fee petitions within the district, might be employed. But, the Task Force recognized that a single rate was unrealistic **[*56]** and probably unfair, given the tremendous variations in fee-setting situations. Moreover, it might be seen as inconsistent with the Supreme Court's recognition in *Blum* and *Hensley* that lawyers are not fungible for statutory fee-setting purposes. n67 Therefore, in principle it seems certain general categories of attorneys, perhaps partners and associates, or perhaps those with less than 10 years' experience in practice and those with more than 10 years' experience, to avoid too wide a disparity between the standardized hourly rate and the individual lawyer's actual marketplace value. An even more finely tuned set of categories may be appropriate. n68 Regardless of what categories are **[**261]** chosen, the Task Force recommends that the schedule be uniformly applied to all lawyers and in all cases.

n67 *Blum,*     U.S. at    n.11, 104 S.Ct. at 1547 n.11, 79 L.Ed.2d at 900 n.11.

n68 A highly developed standardized rate schedule might look something like that adopted by Community Legal Services, Inc., Philadelphia, Pennsylvania:

| Category | Range of Hourly Rates |
|---|---|
| Law Students | $ 30.00 - $ 50.00 |

1985 Extra LEXIS 2, *; 108 F.R.D. 237, **

| Category | Range of Hourly Rates |
| --- | --- |
| Attorneys with post law school experience under two years | $ 60.00 - $ 85.00 |
| Attorneys with 2-5 years experience | $ 80.00 - $ 120.00 |
| Attorneys with 6-10 years experience | $ 100.00 - $ 160.00 |
| Attorneys with more than 10 years experience | $ 125.00 - $ 180.00 |
| Supervising Attorneys, Project Heads, Managing Attorneys, Deputy Director, Executive Director | $ 130.00 - $ 200.00 |
| Paralegals I and II | $ 30.00 - $ 40.00 |
| Senior and Supervisory Paralegals | $ 40.00 - $ 60.00 |

[*57]

In establishing a standardized fee schedule the court will encounter the problem of selecting hourly rates for visiting lawyers from other parts of the country litigating in its forum. The Task Force reviewed the current practices of the various circuits n69 and concluded that the best rule is the "forum rate" rule. Hence an out-of-town lawyer would receive not the hourly rate prescribed by his district but rather the hourly rate prevailing in the forum in which the litigation is lodged. Deviation from this rule should be permitted only when the need for "the special expertise of counsel from a distant district" is shown or when local counsel are unwilling to handle the case. n70 Note that this rule is contrary to current Third Circuit practices. n71 The individual districts also might wish to provide a "safety valve" to permit district judges to use an emergency "national" rate when faced with a case involving a large number of specialized non-local attorneys such as *In re "Agent Orange" Product Liability Litigation.*

n69 *See* note 39, above.

n70 *Polk v. New York State Dept. of Correctional Services, 722 F.2d 23, 25 (2d Cir. 1983); Avalon Cinema Corp. v. Thompson, 689 F.2d 137, 140-41 (8th Cir. 1982)* (en banc).

[*58]

n71 *Cunningham v. City of McKeesport, 753 F.2d 262, 267 (3d Cir. 1985); In re Fine Paper Antitrust Litigation, 751 F.2d 562, 590-91 (3d Cir. 1984).*

The Task Force acknowledges that standardized rates applicable to all types of cases, even when broken into categories, will undercompensate certain attorneys and overcompensate others. Nonetheless, it concludes that the objectivity and efficiency that would be achieved by using uniform rates is preferable to the current system. n72 This seems especially true in light of the fact that the inconsistency and unpredictability of present practice undoubtedly pose the same risks of under and over-compensation.

n72 *See, e.g.,* 28 U.S.C. § 2412(d)(2)(A)(ii)(1982)(Equal Access to Justice Act), which establishes a cap of $ 75 per hour unless the court determines that an increase is justified. *See Underwood v. Pierce, 761 F.2d 1342, 1347 (9th Cir. 1985).*

[*59]

The setting of standardized hourly rates should be accomplished on a district-by-district basis to reflect regional differences. The district court should appoint a Fee Advisory Committee composed of district judges and members of both plaintiffs' and defense bars. Rates should be set on an annual, biennial, or triennial basis. The Fee Advisory Committee's work product should be widely disseminated in proposed form and made the subject of public comment before any official action is taken.

Although the use of standardized rates will be most effective if uniformly applied, the Task Force felt that it probably is necessary to acknowledge the power of an individual district judge to deviate from them in exceptional cases. Deviations, however, should be limited to exceptional cases, given the need to achieve the efficiency and objectivity **[**262]** that underly the Task Force's proposal and the considerable flexibility added to the fee-setting process by the use of multipliers. n73

n73 *See* Section IV(B)(3), below.

Consideration **[*60]** should be given to incorporating the procedure for establishing standardized fees -- as well as the current rates -- into a district court local rule. It must be recognized, however, that such a rule might be challenged as being beyond the local rulemaking authority provided for in Federal Rule 83, n74 or the general rulemaking authority given the Supreme Court by Congress in Section 2072 of Title 28. n75 If the local rule approach is not used, some other mechanism must be employed that gives the fee schedule official status. At a minimum, therefore, the subject should be dealt with in a published court advisory or a general order issued under the court's imprimatur.

n74 *See* 12 C. Wright & A. Miller, *Federal Practice and Procedure* § 3153 (1973).

n75 Perhaps authority for standardized fee setting should be specifically provided for by amending Title 28 of the United States Code.

## 2. Controlling Hours

Perhaps the sharpest attack on the *Lindy* regime is the claim that its preoccupation with attorneys' **[*61]** time and market rates encourages the expenditure of excessive or unnecessary hours and, in some instances, attracts more lawyers to the plaintiffs' side of court-awarded fee cases than necessary. n76 Quite understandably, district judges find it difficult, indeed, in most instances, impossible, to police these matters by looking over the shoulders of lawyers to monitor the way they handle their cases. To impose that obligation on the Bench is unrealistic, unduly time-consuming, and typically will amount to little more than an exercise in hindsight.

n76 The criticism that *Lindy* attracts more lawyers to the plaintiff's side of cases than is necessary is much more applicable to fund-in-court cases than to statutory fee cases. The problem also is acute in "conversion cases," that is, those cases that start as a statutory fee case but "convert" into a fund case. A perfect example of too many plaintiffs' lawyers on a statutory fee case is *In re Fine Paper Antitrust Litigation, 751 F.2d 562 (3d Cir. 1984),* which commenced as a statutory fee case but was converted into a fund-in-court case as a result of settlement.

**[*62]**

The Task Force believes that a significant improvement in the current situation can be achieved if counsel and the court discuss various fee matters at the scheduling and pretrial conferences provided for by Federal Rules of Civil Procedure 16 and 26. Early, frank discussion of fee matters, such as the applicability of the court's standardized rates, projections as to the number of hours counsel anticipate devoting to the case, and the potential applicability or inapplicability of various adjustment factors, should have the salutary effects of identifying problems at the outset and improving the process' predictability should plaintiffs prevail.

The detail and character of these discussions undoubtedly will vary with the judge, the identity of counsel, and the nature of the case. n77 In **[**263]** some instances, the court might ask plaintiff's counsel to submit a proposed budget for the litigation, or require counsel to consider stipulating to a projected range of hours that will be consumed by a

case. Defense counsel also might be requested to present estimates. Of course, as is true of all matters dealt with at a pretrial conference, the preliminary treatment of fee questions should not be [*63] cast in concrete. Nonetheless, the court should manifest sufficient control by estimating the maximum hours to be included in the lodestar, so that the attorneys understand that excessive discovery or any other lawyer hyperactivity will not be tolerated or compensated.

n77 By encouraging early judicial involvement, the Task Force does not mean in any way to chill independent and uninhibited advocacy. Some members of the Task Force thought that early judicial involvement in fee matters could make it more difficult to litigate vigorously because the district court's early impressions of the merits of a case possibly could influence the amount negotiated for the fee. For example, a district judge might favor early settlements for reasons of relief of court dockets of administrative convenience, irrespective of the merits of the action. Objective guidelines established by the local district Fee Advisory Committee could provide whatever protections thought needed.

The Task Force believes full and frank discussion concerning [*64] fees at scheduling and pretrial conferences is completely consistent with the 1980 and 1983 amendments to Federal Rules 16 and 26, is in keeping with current thinking about the importance of judicial management, and is likely to avoid many of the fee-setting problems that can arise if the matter is left at large until the end of the case. In addition, it obliges counsel to make early and realistic appraisals of their cases, a process that might promote settlement.

Despite the foregoing, should a judge believe that too many *Lindy* hours have been billed, "the district court may attempt to identify specific hours that should be eliminated, or it may simply reduce the award to account for the limited success. The court necessarily has discretion in making this equitable judgment." n78

n78 *Hensley v. Eckerhart, 461 U.S. 424, 436-37, 103 S.Ct. 1933, 1941, 76 L.Ed.2d 40, 52 (1983).*

### 3. Multipliers -- Augmentation and Discount n79

n79 The terms "augmentation" and "discount" are being used interchangeably with "positive" and "negative."

[*65]

Since *Lindy*, Third Circuit fee determinations involving the contingency and quality factors have ranged between a negative multiplier, n80 to multipliers of four or more. n81 But this practice undoubtedly will be affected by *Blum v. Stenson*, n82 in which the Supreme Court limited upward adjustments to "those rare cases in which the success was 'exceptional.'" n83

n80 *In re Fine Paper Antitrust Litigation, 751 F.2d 562 (3d Cir. 1984).*

n81 *Delaware Valley Citizens Council for Clean Air v. Commonwealth of Pennsylvania, 762 F.2d 272 (3d Cir. 1985)* (multiplier of 4); *Municipal Authority of the Township of Bloomsberg v. Pennsylvania, 527 F.Supp. 982 (M.D.Pa. 1981)* (multiplier of 4.5); *Fried v. Utilities Leasing Corp.*, Fed. Securities Law Rep. (CCH) * 95,695 (E.D.Pa. 1976) (Trans. binder) (multiplier of 4).

n82 *U.S. at   , 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984).*

n83 U.S. at   , 104 S.Ct. at 1549, 79 L.Ed.2d at 902. *See also Hensley v. Eckerhart, 461 U.S. 424, 435, 103 S.Ct. 1933, 1940, 76 L.Ed.2d 40, 52 (1983)*("In some cases of exceptional success an enhanced award may be justified.").

[*66]   [**264]

*Blum* involved review of a fee award under Section 1983 of Title 42. The district court had increased the lodestar by 50 percent, citing as reasons the complexity of the litigation, the novelty of the issues, the high quality of representation, the "'great benefit' to the class, and the 'riskiness' of the lawsuit." n84 The Supreme Court held that this recital of factors was insufficient to justify an upward adjustment of the lodestar. It reasoned (1) that novelty and complexity of issues already are reflected in the lodestar, (2) that only in that "rare case" in which the fee applicant offers specific evidence to show the superior nature of the services rendered and that exceptional success was achieved should quality of representation be a basis for increasing the lodestar, and (3) that no evidence in the record justified an increase based on the number of persons benefited. n85 As a contingency, the court noted that the fee applicants did not demonstrate any risks in their affidavits or brief to the district court and therefore an increase in the lodestar on that basis was unjustified. n86

**[*67]**

n84   U.S. at   , 104 S.Ct. at 1548, 79 L.Ed.2d at 901.

n85   U.S. at   , 104 S.Ct. at 1548-49, 79 L.Ed.2d at 901-02.

n86 *Id.*

*Blum* and *Hensley* have begun to generate a ripple effect and their scope of application may be broader than the contexts in which they arose. For example, although the *Blum* Court did not decide whether a contingency multiplier is permissible under Section 1988, n87 the Third Circuit recently decided that it was permissible in *Hall v. Borough of Roselle*. n88 *Hall*, however, does require the petitioning party to prove that enhancement is necessary. n89 *In Institutionalized Juveniles v. Secretary of Public Welfare*, n90 the Third Circuit affirmed a reduction of the lodestar because of the plaintiff's partial success and remanded on the finding of a positive contingency multiplier to ensure that petitioners had met the burden of proof required in *Blum*. And, finally, in *Delaware Valley Citizens Council for Clean Air v. Commonwealth of Pennsylvania*, n91 the Third Circuit affirmed the upward adjustment of various lodestars as having met the stringent requirements of *Blum*. A multiplier **[*68]** of four, however, is now perceived by some in the Circuit as exceeding what is permitted by *Blum*.

n87 *See*   U.S. at   & n.17, 104 S.Ct. at 1550 & n.17, 79 L.Ed.2d at 903 & n.17. In *Blum*, the Court did not "consider whether the risk of not being the prevailing party in a section 1983 case, and therefore not being entitled to an award of attorney's fees from one's adversary, may ever justify an upward fee adjustment." *Id.*

n88 *747 F.2d 838, 842-43 (3d Cir. 1984); accord, Delaware Valley Citizens Council for Clean Air v. Commonwealth of Pennsylvania, 762 F.2d 272 (3d Cir. 1985).*

n89 *747 F.2d at 843.*

n90 *758 F.2d 897 (3d Cir. 1985) (42 U.S.C. § 1988).*

n91 *762 F.2d 272 (3d Cir. 1985) (42 U.S.C. § 1988).*

n92 *Id. at 282* (Becker, J.).

**[*69]**

The Task Force believes the *Lindy* multiplier practice should be revised in several respects. First, the quality factor should be eliminated from consideration. This factor is superfluous since it reflects the type **[**265]** of performance expected of all attorneys and theoretically already has been taken into account by the district court in setting standardized rates. Moreover, assessing the quality factor involves too subjective an inquiry and is thought to be subject to potentially discriminatory application, thereby potentially undermining the legal community's faith in the fee-setting process. Finally, exceptionally fine lawyer performance in a case often will be rewarded under one or more of the other adjustment factors discussed below.

In contrast to its views on the quality factor, the Task Force feels that the contingency factor, which it defines simply as "the risk of winning or losing," *should be considered in all cases*. n93 Plaintiffs' attorneys always face the pros-

pect of receiving no compensation in statutory fee cases. Accordingly, even modest risks in cases in which liability is reasonably certain to be established should be recognized in the fee-setting process. n94 [*70]

n93 Of course, an upward multiplier may not be applied when forbidden by Congress. *See Underwood v. Pierce, 761 F.2d 1342 (9th Cir. 1985)* (multiplier may not be applied to fees awarded under the Equal Access to Justice Act).

n94 *See, e.g.*, Leubsdorf, *The Contingency Factor in Attorney Fee Awards*, 90 Yale L.J. 473 (1981).

Other factors that the Task Force thought should be considered in adjusting the basic fee are: (1) the result obtained in the action; (2) the petitioning attorney's contribution to a prompt or a delayed resolution of the action; and (3) the delay in receiving attorneys' fees. The second factor is designed to encourage early settlement by providing an incentive that neutralizes an attorney's possible predilection to increase the number of hours invested in a case for lodestar purposes. As to the third factor, which is designed to recognize the economic effects of a delay in receiving attorneys' fees, the court either may use a multiplier [*71] or may make an award to the attorney under the current scheduled hourly rate rather than the one in force when the work actually was done. An award of interest at an appropriate rate also could be employed to compensate for a delay in payment.

### 4. The Special Problem of the Public Interest Bar

As previously noted, there is a strong feeling among public interest and civil rights lawyers that the *Lindy* process has not always been applied to their advantage. n95 The proposals for standardized fees and the elimination of the quality factor represent attempts to eliminate the possible sources of any adverse discriminatory treatment. The proposals should reaffirm the need for a neutral fee-setting process that does not relate fees in statutory cases to subjective judgments about "benefit" and does not become mired in a concern about the dollars recovered and the dollars to be awarded in fees. It is hoped that the procedure outlined above will assure public interest and civil rights lawyers adequate compensation to enable them to pursue vindication of various public policies without regard to whether they produce economic or noneconomic benefits.

n95 *See* Section I(B)(8), above.

## [*72]  [**266]
### V. The *Prandini* Problem

A special risk of abuse arises in the context of settlements when the defendant is paying the plaintiff's attorneys' fees. Naturally, a defendant usually will want to know the exact extent of its total liability before agreeing to settle. As a result, it may seek an agreement that provides for a specific attorneys' fee, a separate fund to be established for fees, or a ceiling on the allowable fee award. These types of agreements raise a serious problem because a plaintiff's attorney may be tempted to accept a smaller recovery for the client in return for an agreement that he or she be paid a handsome attorney's fee. Since the defendant is interested only in the total size of its liability, so long as the settlement is accepted, it often will be indifferent as to the division of the fund between the plaintiffs' recovery and the attorneys' fees.

When a large attorney's fee means a smaller recovery to plaintiff, a significant conflict of interest between client and attorney is created. Even if the plaintiff's attorney does not consciously or explicitly bargain for a higher fee at the expense of the beneficiaries, it is very likely that this situation [*73] has indirect or subliminal effects on the negotiations. And, in any event, there is an appearance of a conflict of interest.

The concern is not merely one of controlling major abuse; indeed, an excessively high fee would not be allowed by the court in any event. The apprehension is rather for those situations, short of actual abuse, in which the client's interests are somewhat encroached upon by the attorney's interests. This type of conflict is not only one that is difficult to perceive on the face of a settlement proposal, but even the parties may not be aware that it exists at the time of their discussions.

Concern about this problem is greatest in the class-action context, whether the case involves a fund-in-court or a statutory fee. n96 This is so because the monetary stakes generally are high and the fee-setting attorneys' clients (the plaintiff class) typically are not available to discuss the settlement negotiations and give consent to their counsel's en-

gaging in simultaneous negotiation of the merit settlement and the determination of attorneys' fees. The Third Circuit's answer to this problem came in *Prandini v. National Tea Co. & Amalgamated Food Employee Union, Local* [*74] *590*, n97 in which the court rejected a settlement agreement specifying the plaintiff's attorney's fees and concluded that counsel should not simultaneously negotiate settlements and attorneys' fees. According to the court, the fee question must not be discussed until after [**267] a settlement on the merits has been approved because of the potential for abuse. The *Prandini* decision was foreshadowed by *Jamison v. Butcher & Sherrerd*, n98 in which a district court, reject-ing a settlement as inadequate, also disapproved generally of settlements containing agreements on fees.

n96 But note that the *Prandini* problem also can arise in a relatively straight-forward, non-class action, statutory fee case. *See, e.g.*, Kraus, *Ethical and Legal Concerns in Compelling the Waiver of Attorney's Fees by Civil Litigants in Exchange for Favorable Settlement of Cases Under the Civil Rights Attorney's Fees Awards Act of 1976, 29 Vill.L.Rev. 597 (1984). See also Evans v. Jeff D., 743 F.2d 648 (9th Cir. 1984), cert. granted*, U.S. , 105 S.Ct. 2319, 85 L.Ed.2d 838 (1985)(reversal in *42 U.S.C. § 1983* action when settlement was condi-tioned upon plaintiffs' counsel's waiver of attorneys' fees).

[*75]

n97 *557 F.2d 1015 (3d Cir. 1977).* The current status of *Prandini* is uncertain, however, because on May 13, 1985, the Supreme Court granted *certiorari* in *Jeff D. v. Evans, 743 F.2d 648 (9th Cir. 1984),* a case in which the Ninth Circuit specifically follows *Prandini. Evans v. Jeff D.,* U.S. , 105 S.Ct. 2319, 85 L.Ed.2d 838 (1985).

n98 *68 F.R.D. 479 (E.D.Pa. 1975).* In addition to the *Prandini* problem, two other conflicts of interest is-sues have arisen that are analytically discrete but will be dealt with in this section under the *Prandini* rubric. The first is the possible conflict that arises when the defendant tries to pressure the plaintiff or the plaintiff's attorney to waive a statutory right to fees. *See, e.g., Jeff D. v. Evans, 743 F.2d 648 (9th Cir. 1984), cert. granted,* U.S. , 105 S.Ct. 2319, 85 L.Ed.2d 838 (1985). The second is the possibility that because of changed circumstances the fee negotiated between the client and the attorney results in an excessive fee for the attorney. *See, e.g., McKenzie Constr., Inc. v. Maynard, 758 F.2d 97 (3d Cir. 1985).*

[*76]

The *Prandini* approach theoretically eliminates the ethical conflict between the size of the settlement and the size of the fee award. But, in practice, *Prandini* has generated problems of its own:

1) *Enforcement Problems*: Enforcement of the *Prandini* rule is difficult because the trial judge does not know if the parties have discussed fee matters, although if the court pressed the matter it probably could ascertain whether improper talks have taken place by requesting the information in a signed statement that would be subject to the sanction provisions of Federal Rules 7 and 11 as amended in 1983. n99 It is suspected that fee discussions do take place and that agreements on fees are withheld from the court until after the settlement is approved. Although there is considerable sentiment to the effect that *Prandini* is absolutely "essential" and that it would be damaging to public interest litigation to abolish it, n100 there also is a belief that *Prandini* is not being honored and needs to have some teeth put into it in order to take it seriously.

2) Prandini *may well tend to discourage settlement*. Most members of the Task Force believe that *Prand-ini* [*77]  tends to discourage settlement in some cases and, on occasion, makes it impossible. n101 By preventing agreements on fees at the time settlement of the merits is discussed, *Prandini* makes it diffi-cult for the defendant to ascertain precisely what its liability will be, thereby eliminating the very cer-tainty that makes settlement attractive to the defendant. n102 The net effect of *Prandini* may be more tri-als, thus raising the question whether that cost is justifiable inasmuch as the conflict [**268]  between settling the merits and discussing fees may be more hypothetical than real.

n99 *See* A. Miller & D. Culp, *The New Rules of Civil Procedure: Managing Cases; Limiting Discovery*, 6 Nat.L.J. 13 (Dec. 5, 1983); *Litigation Costs, Delay Prompted the New Rules of Civil Procedure*, 6 Nat.L.J. 12 (Nov. 28, 1983).

n100 *See* Kraus, note 96, above, at 648 ("The best remedy for this harmful settlement procedure [in Section 1988 actions] is that required by *Prandini*."). *See also Jeff D. v. Evans, 743 F.2d 648 (9th Cir. 1984), cert. granted,    U.S.   , 105 S.Ct. 2319, 85 L.Ed.2d 838 (1985)*, in which the Ninth Circuit follows *Prandini* to re-verse approval of a class action settlement in a civil rights action in which settlement was conditioned upon the waiver of attorneys' fees.

[*78]

n101 At least one member of the Task Force disagreed with the assertion that *Prandini* discourages settle-ment. The judges on the Task Force, however, were in agreement on this proposition.

n102 *See Vallo v. Great Atlantic & Pacific Tea Co., 16 FEP Cases 967 (W.D.Pa. 1977).*

Most commentators agree that *Prandini* is a laudable attempt to deal with a legitimate concern. However, the prob-lems posed by its administration have led many Task Force members to conclude that its difficulties exceed its benefits. n103 This motivated the Task Force to conclude that the concern over conflicts of interest in the fee award arena might be minimized in other ways by adopting a number of procedures and safeguards that would not impair the litigants' abil-ity to settle.

n103 *Prandini* criticized: *El Club Del Barrio v. United Community Corps., 735 F.2d 98, 101 n.3 (3d Cir. 1985); See* A. Miller, *Attorneys' Fees in Class Actions* 224 (Federal Judicial Center 1980); Comment, *Settlement Offers Conditioned Upon Waiver of Attorney's Fees, 131 U.Pa.L.Rev. 793, 803-05 (1983);* Note, *Attorney's Fees -- Conflicts Created by the Simultaneous Negotiation of Settlement of Damages and Statutorily Authorized At-torney's Fees in a Title VII Class Action, 51 Temple L.Q. 799 (1978).*

[*79]

First, it must be acknowledged that the defendant must have enough information about its potential liability for fees at the time settlement is discussed to make a realistic appraisal of its overall liability. n104 This in part will occur if the suggestions made earlier in this report concerning the establishment of district-wide hourly rates in statutory fee cases and a negotiated compensation plan in fund-in-court cases have been followed in that district. n105 Similarly, the in-formation available to the defendant will be further enhanced if the proposals for discussing fee matters at the schedul-ing and pretrial conferences are followed. Frank conversations on those occasions as to the time expected to be invested in the case and the degree of contingency the litigation presents should enable the defendant to make a reasonably accu-rate estimate regarding fees.

n104 The Supreme Court recently acknowledged this position in *White v. New Hampshire Dept. of Em-ployment Security, 455 U.S. 445, 453-54 n.15, 102 S.Ct. 1162, 1167 n.15, 71 L.Ed.2d 325, 332 n.15 (1982)*("In considering whether to enter a negotiated settlement, a defendant may have good reason to demand to know his total liability from both damages and fees. Although such situations may raise difficult ethical issues for a plain-tiff's attorney, we are reluctant to hold that no resolution is ever available to ethical counsel.").

[*80]

n105 *See* Section III and Section IV(B)(1), above.

Second, the defendant should be permitted to secure additional information relating to the amount of its fee liabil-ity, especially under the auspices of the court. Plaintiffs should be allowed, perhaps even required, to provide defendants with data as to hours worked (and customary billing rates, if applicable n106) when meaningful settlement negotiations

are underway. This practice already exists in many districts and certainly is accomplished easily whenever plaintiff's counsel is obliged to report its hours to the court on a periodic basis.

n106 Under the Task Force's proposed scheme, a standardized rate, not the attorney's "customary" or "normal" billing rate, would be utilized. *See* Section IV(B)(1), above.

The Task Force believes that this information in statutory fee cases is discoverable under Federal Rule 26 inasmuch as the provisions for the awarding of fees is part [*81] of the statutory right making information pertaining thereto "relevant to the subject matter involved in the pending [**269] action." n107 Since most fund-in-court cases start as statutory fee cases, fee information should be discoverable at the time settlement negotiations are underway. In those relatively rare pure fund-in-court actions predicated on diversity jurisdiction, fee information should be made available prior to settlement as a matter of judicial discretion. It is doubtful that an appellate tribunal would find it to be an abuse of discretion for a district judge, sitting on a fund case, to order production of time sheets prior to settlement. Nor does disclosure seem barred by the work-product doctrine. Finally, disclosure of this type of information does not violate *Prandini* because it does not involve any negotiation as to the amount to be requested in the fee petition or the amount actually to be awarded. It simply provides defense counsel with a basis for making an approximation of the fee liability.

n107 *See generally*, 8 C. Wright & A. Miller, *Federal Practice and Procedure* §§ 2007-15 (1970).

[*82]

Third, the defendant should be permitted to make an offer of settlement that is conditional on a subsequent satisfactory resolution of the question of fees. This type of offer, assuming the fee question is pursued in good faith, usefully separates the issues of settlement of the merits and resolution of the fees in a way that should minimize the defendant's reluctance to negotiate. Once again, the theory and objectives of *Prandini* are preserved and its inhibiting side effects minimized.

Fourth, the defendant should be permitted to make a lump-sum offer of settlement that embraces the attorney's fee. This does not violate *Prandini* since at no point in the negotiation is there a discussion of how much of the settlement fund will be allocated to the attorneys' fee. However, this type of lump-sum settlement does have the effect of creating a fund-in-court situation, even when the case may have been instituted in a statutory fee context, thereby imposing on the court the responsibility of assuring the equitable division of the fund between its beneficiaries and the attorneys. n108

n108 The Task Force believes a lump-sum offer of settlement to be a permissible way of dealing with the *Prandini* problem as long as there exists an identifiable plaintiff. If, however, the client is not identifiable, then the lump-sum method does nothing to eradicate the *Prandini* problem. For example, a lump-sum offer would be improper when counsel represents an unidentified class. The lump-sum approach also becomes problematic when defendant agrees upon a lump-sum amount assuming that plaintiff has waived fees but plaintiff later asserts it never waived fees and successfully litigates the fee matter. *Jeff D. v. Evans*, 743 F.2d 648 (9th Cir. 1984), *cert. granted*, __ U.S. __, 105 S.Ct. 2319, 85 L.Ed.2d 838 (1985).

[*83]

Fifth, in an appropriate case the court may lift the *Prandini* limitation and allow the parties to negotiate simultaneously about the settlement of the merits and the fixation of attorneys' fees. The risk of liminal or even subliminal conflicts of interest arising seems to be extremely low when the parties approach the court and request a waiver of *Prandini* under the trial judge's supervision. The court should permit this to occur only when counsel's request appears to be made in good faith and there is reason to believe that granting it will materially advance the resolution of the litigation. Moreover, judicial oversight should be continuous during the settlement process and anything that might give [**270] rise to the suggestion that lifting the *Prandini* restriction will compromise the fee entitlement should be zealously avoided.

Sixth, it is improper for the defendant to insist on a waiver of plaintiff's right to reasonable attorneys' fees. Unless this prohibition is clearly understood, public interest lawyers and others seeking non-monetary relief, such as an injunction or documents under the Freedom of Information Act, are likely to be subjected to the untoward pressure of [*84] a

settlement offer providing the relief requested on condition that the plaintiffs waive their attorneys' fees. This maneuver is in derogation of the Congressional policies embedded in the fee statutes and has a debilitating impact on the underlying statute's enforcement. Moreover, it motivates the plaintiff's attorney declining the settlement offer, even though it may give the client the relief he or she sought, since the attorney now may have no effective way to secure compensation other than full-scale litigation. n109

n109 *See* Kraus, note 96, above.

Seventh, and in the same vein, the district judge should not use direct or indirect pressure on counsel to waive fees. n110 This principle applies even when plaintiff's attorney is employed by a not-for-profit institution or when the defendant is a public agency and the fees will have to be paid out of public funds. Of course, nothing prevents plaintiff's counsel from waiving fees voluntarily if he or she so desires.

n110 Furthermore, in the class-action context, the court has a duty to review the reasonableness of all the terms of class-action settlement agreements, particularly those relating to attorneys' fees. *See* Fed.R.Civ.P. 23(e); 7A C. Wright & A. Miller, *Federal Practice and Procedure* §§ 1797, 1803 (1972). Moreover, this general duty in connection with class-action settlements is reinforced by the clear public policy of *42 U.S.C. § 1988* to award reasonable attorneys' fees in civil rights actions. *See Hensley v. Eckerhart, 461 U.S. 424, 429, 103 S.Ct. 1933, 1937, 76 L.Ed.2d 40, 48 (1983).*

**[\*85]**

The Task Force believes that these seven guidelines provide sufficient flexibility to assure that most, if not all, of the objectives of eliminating conflicts of interest underlying *Prandini* and other cases will be achieved without damaging the settlement dynamic. This approach was thought preferable to advocating the elimination of *Prandini*, or fully endorsing it and ignoring its probable unenforceability, or taking a mediate step and limiting it somewhat artificially, perhaps to class actions. n111

n111 The Task Force's views on the *Prandini* problem were formulated prior to the recent Supreme Court decision in *Marek v. Chesny,     U.S.    , 105 S.Ct. 3012,    L.Ed.2d    (1985)* (Brennan, Marshall, and Blackman, JJ. dissenting). *Marek* holds that a prevailing civil rights litigant entitled to fees under *42 U.S.C. § 1988* may be barred from recovering any fees for work performed after rejecting a settlement offer when he ultimately recovers less than the proffered amount in settlement. It is premature to hazard a guess as to *Marek's* impact on the Task Force's views, the *Prandini* problem, or the entire field of court-awarded attorneys' fees.

**[\*86]**
## VI. Miscellaneous Procedural Aspects of Fee Awards

In pursuit of the objectives of achieving greater simplicity and predictability in the fee-setting process without diminishing efficiency or the system's ability to prevent abuse, the Task Force believes certain procedural steps are worthy of consideration. The following suggestions  **[\*\*271]**  carry the Task Force's imprimatur. They do not exhaust the range of procedural aspects that arise in the fee-setting process. n112

n112 *See generally*, T.E. Willging & N.A. Weeks, *Attorney Fee Petitions: Suggestions for Administration and Management* (Federal Judicial Center 1985); T. Willging, *Judicial Regulation of Attorneys' Fees: Beginning the Process at Pretrial* (Federal Judicial Center 1984); A. Miller, *Attorneys' Fees in Class Actions* 202-94 (Federal Judicial Center 1980).

## A. Promulgation of Local Rules

As intimated in the discussion of standardizing the hourly rate, n113 the Task Force felt that many fee setting problems could be ameliorated by the promulgation [*87] of local rules or standing orders by the district courts. It is recommended that each district appoint a Fee Advisory Committee composed of lawyers and judges to confer and propose local rules or orders that would tend to standardize the practice of court-awarded attorneys' fees. These might govern the form of the attorneys' fee application, its timing, the scope and form of discovery, periodic submission of hours worked, procedures for resolving attorneys' fee disputes, and the criteria for reviewing fee applications, distinguishing between common-fund cases and statutory cases.

n113 *See* Section IV(B)(1), above.

The Task Force did not feel it appropriate to propose a model local rule or order because it thought each district is in the best position to devise its own standards in light of the circumstances and practices that exist in its locale. However, the Task Force does suggest that, for the sake of uniformity, each district's set of fee rules or orders should be scrutinized carefully by the appropriate committee [*88] of the applicable court of appeals.

**B. Contemporaneous Recordkeeping**

The Task Force believes that the time-keeping rule announced in *In re Meade Land & Development Co.*, n114 should be retained in both statutory and fund-in-court cases. As the court noted: "It is the attorney's obligation to keep and submit to the court time records supporting an application for compensation." n115 The Task Force believes that periodic reporting of time spent by attorneys in pending litigation should be required so that the court can assure itself that unnecessary and duplicative hours are not being expended; that the record keeping is sufficient to allow for an award; and that the necessary information can be provided to meet the *Prandini* problems discussed above.

n114 *527 F.2d 280 (3rd Cir. 1975).*

n115 *Id.* at 248.

At the pretrial conference, the judge should direct that contemporaneous timesheets be submitted to the court or magistrate, if one has been appointed -- at frequent, specified [*89] intervals. At the same time, it should be made clear what form the timesheets should take, what work and attorney categories should be used, and what hours will be compensated. This procedure enables periodic checking for insufficient reporting, unnecessary hours, duplication, and inconsistencies. If anything is amiss, the court should inform the attorneys of its views promptly in order to assure that the proper information is made available, to encourage any [**272] appropriate corrective action be taken, and to obviate any need for the imposition of serious sanctions. n116

n116 The time records probably should be kept *in camera* except when used as described in Section V, above. *See Manual for Complex Litigation, Second*, § 24.2.1 (Draft, Feb. 1985).

Some members of the Task Force believe that although timesheets should be filed in non-fund, statutory cases, filing, and the subsequent monitoring, was unnecessary in fund cases since the parties already had negotiated a fee agreement. These members felt that one of the [*90] purposes for recommending a return to the contingency arrangement in fund cases was to eliminate the burden of filing and monitoring. This idea was rejected because the system designed by the Task Force allows the district judge to shift from the negotiated fee regime to the *Lindy* regime should the court feel the interests of justice require that be done. n117 If a judge concludes that the *Lindy* system would be more appropriate and converts to it, but timesheets have not been kept and filed because it was a fund case, the judge would have no contemporaneous time records with which to compute the *Lindy* lodestar.

n117 *See* Section III, above.

**C. Judge, Master, Magistrate, Arbitration, or Fee Committee?**

The degree to which judges should delegate the fee-setting process was a matter of considerable debate within the Task Force. Some members believe that the district courts should explore the use of nonjudicial personnel to manage the paperwork, implement standard policies, and, when appropriate, make **[*91]** preliminary decisions regarding the award. In order to achieve some much needed simplification, it was suggested that courts delegate much of the routine work of administering attorney fee matters to magistrates, special masters, or other parajudicial personnel or court ap- pointees. In particular, with guidance from the court, law clerks could apply specific policies to cumbersome petitions and thereby organize lengthy materials for expedited decision by the court. n118

n118 Note Judge Jack B. Weinstein's use of law clerks in *In re "Agent Orange" Product Liability Litigation*, slip opinion (E.D.N.Y. January 7, 1985), *modified*, slip opinion (E.D.N.Y. June 18, 1985)(memorandum and or- der on attorneys' fees and final judgment). Judge Weinstein requested permission from the Administrative Office of the United States Courts to hire three temporary assistant clerks to process fee petitions. These clerks, law school graduates awaiting admission to the Bar, worked full-time under the court's direction for more than three months on the fee and expense petitions. With the aid of a senior law clerk, also working full-time on the fee pe- tition, the temporary clerks reviewed the petitions using guidelines established by the court. Another law clerk worked full-time on legal research connected with the petitions. Finally, a member of the Clerk's Office staff de- voted a substantial amount of time during this three-month period to organizing fee petitions and related attorney submissions.

**[*92]**

Other Task Force members, however, believed that law clerks should not be involved in the process but that utiliza- tion of magistrates, special masters, or arbitration was desirable and appropriate when and if the circumstances called for their use. Obviously the divergent viewpoints within the Task Force simply reflects the fact that the referral of fee issue matters, as with many other referrals, properly varies from judge to judge. Most litigators prefer decisions by the district court because **[**273]** they believe judges are better at orchestrating settlements and because judicial determi- nations frequently avoid the appeals that are taken from any magistrate's decision on any matter of importance.

Although no consensus was reached among the Task Force members on this topic, it was assumed that fee issue references would vary from judge to judge. However, many members of the Task Force expressed the view that if the substantive rules for the determination of counsel fees could be simplified as suggested in this report, control over the procedure then could remain with the judge.

## D. Scope of Review

The burden of litigating fee issues at the appellate level can best be alleviated if **[*93]** the court of appeals would establish clear guidelines for the district courts to apply and then allow the district judges considerable discretion in ap- plying them. In theory, that already is the rule in the Third Circuit: in *Lindy*, the Court of Appeals indicated that if the standards set forth by the court were followed, a district judge's application of them would not be overturned except for abuse of discretion. n119

n119 *Lindy II, 540 F.2d at 115-16, 118, 130; Lindy I, 487 F.2d at 166.*

Since that time, the Third Circuit has reviewed *Lindy* lodestar computations under an abuse-of-discretion standard. n120 Yet it was the belief of the Task Force that, in many subsequent decisions, this standard simply has not been em- ployed.

n120 *Institutionalized Juveniles v. Secretary of Public Welfare, 758 F.2d 897, 909 n.21 (3d Cir. 1985); Sil- berman v. Bogle, 683 F.2d 62, 64-65 (3d Cir. 1982); Merola v. Atlantic Richfield Co., 493 F.2d 292 (3d Cir. 1974) (Merola I).*

**[*94]**

The Task Force unanimously favors retention of the abuse-of-discretion standard and its application in practice. This means that reversible error occurs when a district court errs as a matter of law by utilizing improper standards or

procedures in determining fees. n121 However, findings of fact relating to the petition would be subject to the clearly erroneous standard of Federal Rule 52. n122 The Task Force was in agreement that the court of appeals should honor the discretion its standard accords to district judges and exercise restraint in reviewing fee awards.

n121 *Lindy I, 487 F.2d at 166.*

n122 *Merola I, 493 F.2d 292 (3d Cir. 1974); Merola II, 515 F.2d 165 (3d Cir. 1975).*

## VII. Conclusion

The Task Force recognizes that the recommendations contained in this document may be imperfect and that numerous questions about court-awarded fees remain. We expect and invite criticism so that the federal courts will have the [*95] opportunity to meet and eliminate the deficiences. The Task Force hopes that its recommendations will be accepted for what they are -- an effort to simplify and rationalize the activities of the federal courts in setting attorneys' fees in a broad range of factual circumstances and in a variety of legal contexts. These matters obviously are complex and the Task Force's time was limited. However, we are convinced that this report, even if its recommendations are not acted [**274] upon or otherwise accepted, serves an important function in enumerating the myriad problems posed by the *Lindy* doctrine as it is now employed and begins the process of seeking solutions for the deficiencies in current practice. At a minimum, we trust that the report will assist both the courts and Congress in identifying and meeting the problems posed by fee claims, as we have outlined them. If we have rendered some assistance by shedding some light on the problems, we will be content; if we also have advanced solutions to those problems that stand the test of application, our time and efforts certainly will have been well expended.