# Exhibit D
## to the
## Declaration of Ronald S. Katz
## in Support of Class Counsels'
## Response re Objections

MANATT, PHELPS & PHILLIPS, LLP
MARK S. LEE (State Bar No. 094103)
E-mail: mlee@manatt.com
CRAIG J. DE RECAT (State Bar No. 105567)
E-mail: cderecat@manatt.com
11355 West Olympic Boulevard
Los Angeles, CA 90064-1614
Telephone: (310) 312-4000
Facsimile: (310) 312-4224

MANATT, PHELPS & PHILLIPS, LLP
RONALD S. KATZ (State Bar No. 085713)
E-mail: rkatz@manatt.com
RYAN S. HILBERT (State Bar No. 210549)
E-mail: rhilbert@manatt.com
1001 Page Mill Road, Building 2
Palo Alto, CA 94304-1006
Telephone: (650) 812-1300
Facsimile: (650) 213-0260

MANATT, PHELPS & PHILLIPS, LLP
L. PETER PARCHER (NY SBN 8096)
E-mail: pparcher@manatt.com
7 Times Square
New York, NY 10036
Telephone: (212) 790-4500
Facsimile: (212) 704-1900

*Attorneys for Amici Curiae,*
JAMES "JIM" BROWN AND
HERBERT ANTHONY ADDERLEY

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| SAMUEL MICHAEL KELLER, on behalf of himself and all others similarly situated,<br><br>Plaintiff,<br><br>vs.<br><br>ELECTRONIC ARTS, INC.; NATIONAL COLLEGIATE ATHLETICS ASSOCIATION; COLLEGIATE LICENSING COMPANY,<br><br>Defendants. | No. CV-09-1967-CW<br><br>**AMICUS BRIEF IN OPPOSITION TO DEFENDANT ELECTRONIC ARTS, INC.'S MOTION TO DISMISS**<br><br>Date:     November 17, 2009<br>Div:       Courtroom 2, 4th Floor<br>Judge:   Hon. Claudia Wilken |

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
LOS ANGELES

AMICUS BRIEF IN OPPOSITION TO
DEFENDANT ELECTRONIC ARTS, INC'S
MOTION TO DISMISS

**TABLE OF CONTENTS**

Page

I.   INTRODUCTION ................................................................................................. 1

    A.   The Amici And Their Interests In This Suit............................................ 1

    B.   EA And Its Sports-Based Video Games ................................................ 2

    C.   EA's Licensing History And Its Motion To Dismiss............................. 4

II.  MANY COURTS HAVE HELD THAT A DEFENDANT'S USE OF AN INDIVIDUAL'S PUBLICITY RIGHTS IN WORKS THAT INCLUDE "SPEECH" CONSTITUTES INFRINGEMENT .................................................... 5

III. SPEECH DOES NOT AUTOMATICALLY IMMUNIZE INFRINGING OR OTHERWISE UNLAWFUL CONDUCT.......................................................... 7

    A.   Individuals And Companies Can Be Held Criminally And Civilly Liable For Actionable "Speech" Under Traditional First Amendment Analysis.............. 8

    B.   There Is No First Amendment Right To Take And Use Others' Property ............. 9

    C.   The Right of Publicity Is A Form Of Intellectual Property That Deserves Constitutional Protection.................................................................... 10

        1.   The Right of Publicity Protects Our Ability To Prevent Unauthorized Exploitation Of Our Identities And Performances............. 10

        2.   The Right Of Publicity Protects An Individual's Performance ................. 11

        3.   The Right of Publicity Is Constitutionally Protected Property ................. 11

    D.   EA's Alleged Misconduct Is Not Protected "Speech" Under The Standards That Should Apply To This Action.................................................... 13

        1.   The Supreme Court's "Intermediate Review" Standard Should Apply To EA's Alleged Misconduct................................................ 13

        2.   EA's Conduct is Actionable Under the Supreme Court's "Intermediate Review" Standard................................................... 15

        3.   The "Transformativeness" Test Should Not Apply ................................. 15

        4.   EA Would Be Liable Under the "Transformativeness" Test Even If It Did Apply ............................................................................. 18

        5.   The "Balancing" Test Should Not Apply, but EA Would Be Liable For Its Misconduct if It Did .................................................... 19

IV.  CONCLUSION.......................................................................................... 22

# TABLE OF AUTHORITIES

**Page**

## CASES

*Am. Econ. Rens. Co. v. Reed Bowens*,
852 F. Supp. 875 (N.D. Cal. 1994) .................................................................................. 12

*Apple Corps. Ltd. v. Leber*,
229 U.S.P.Q. 1015 (Cal.App.Dept.Super.Ct. 1986).......................................................... 7, 11

*C.B.C. v. Distribution & Marketing, Inc. v. Major League Baseball Advanced Media, L.P.*,
505 F.3d 818 (8th Cir. 2007).......................................................................................... 16, 19

*Cardtoons L.C. v. Major League Baseball Players Ass'n*,
95 F.3d 959 (10th Cir. 1996).......................................................................................... 21

*CBS Interactive, Inc. v. National Football League Players Association, Inc.*,
2009 WL 1151982 (D.Minn. April 28, 2009)...................................................................... 19

*Comedy III Productions v. Saderup*,
25 Cal. 4th 387 (2001) ................................................................................................ 16, 17, 21

*Dallas Cowboy Cheerleaders, Inc. v. Scoreboard Posters, Inc.*,
600 F.2d 1184 (5th Cir. 1979)........................................................................................ 7

*Dr. Seuss Enterprises, LP v. Penguin Books USA, Inc.*,
924 F. Supp. 1559 (S.D. Cal. 1996), aff'd, 109 F.3d 1394 (9th Cir. 1997) ........................... 20

*Eastwood v. The National Enquirer*,
123 F.3d. 1249 (9th Cir. 1997)...................................................................................... 16

*ESS Entertainment 2000, Inc. v. Rock Star Videos, Inc.*,
547 F.3d 1095 (9th Cir. 2008)........................................................................................ 20

*ETW Court v. Jireh Pub., Inc.*,
332 F.3d 915 (6th Cir. 2003).......................................................................................... 21

*Facenda v. NFL Films, Inc.*,
542 F.3d 1007 (3rd Cir. 2008) ...................................................................................... 6, 11

*Gionfriddo v. Major League Baseball*,
94 Cal. App. 4th 400 (2001).......................................................................................... 20

*Golden Gateway Center v. Golden Gateway Tenants Association*,
29 P.3rd 797 (Cal. 2001)............................................................................................... 10

*Grant v. Esquire, Inc.*,
367 F. Supp. 876 (S.D.N.Y. 1973).................................................................................. 9

*Gridiron.com v. National Football League Players Association*,
106 F.Supp.2d 1309 (S.D.Fla. 2000) ............................................................................. 6

*Groucho Marx Productions, Inc. v. Day and Night Co., Inc.*,
523 F. Supp. 485 (S.D.N.Y. 1981).................................................................................. 7, 11

*Haelan Laboratories, Inc. v. Topps Chewing Gum, Inc.*,
2002 F.2d 866 (2d Cir. 1953) *cert. denied*, 346 U.S. 816 (1953)..................................... 10

*Herbert Anthony Adderley vs. NFLPA*, Case
No. C 07-00943 (WHA) (N.D. Cal. 2009)....................................................................... 2

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
LOS ANGELES

**TABLE OF AUTHORITIES**
(continued)

Page

*Hill v. Colorado,*
530 U.S. 703 (2000) ............................................................................................ 9

*Hoffman v. Capital Cities/ABC, Inc.,*
255 F.3d. 1180 (9th Cir. 2001) .................................................................. 16, 20

*Hudgens v. National Labor Relations Board,*
424 U.S. 507 (1976) .......................................................................................... 9

*Hustler Magazine v. Falwell,*
485 U.S. 46 (1988) ........................................................................................... 17

*International Olympic Committee v. San Francisco Arts and Athletics,*
781 F.2d 733 (9th Cir. 1986), aff'd other grounds, *SFAA v. USOC* ...................... 20

*Jim Brown v. Electronic Arts, Inc., et al.,*
Case No. CV 09-1598 (FMC) (C.D. Cal. 2009) .................................................. 1

*John Doe v. TCI Cablevision,*
110 S.W. 3d 363 (Mo. S.Ct. 2003) .................................................................. 16

*Levi Strauss & Co. v. Shilon,*
121 F.3 1309 (9th Cir. 1997).............................................................................. 8

*Lloyd Corp. v. Tanner,*
407 U.S. 551 (1972)............................................................................................ 9

*Marsh v. Alabama,*
326 U.S. 501 (1946).......................................................................................... 10

*Mattel, Inc. v. MCA Records, Inc.,*
296 F.3d 894 (9th Cir. 2002)............................................................................ 20

*Matthews v. Rosencraft,*
15 F.3d 432 (5th Cir. 1994).............................................................................. 11

*McFarland v. Miller,*
14 F.3d 912 (3d Cir. 1994)................................................................................ 11

*Michaels v. Internet Entertainment Group,*
5 F. Supp.2d 823 (C.D. Cal. 1998) .................................................................. 11

*National Football League Properties v. Playoff Corp.,*
808 F. Supp. 1288 (N.D. Tex. 1992)................................................................... 7

*New York Times Co. v. Sullivan,*
376 U.S. 254 (1964)............................................................................................ 8

*Palmer v. Schonhorn Enterprises, Inc.,*
72 A.2d 458 (N.J. 1967)...................................................................................... 6

*Paris Hilton v. Hallmark Cards, ___ F.3d ___,*
2009 WL 2710225 (9th Cir. August 31, 2009) ................................. 6, 16, 19, 20

*Parks v. LaFace Records,*
329 F.3d 437 (6th Cir. 2003)............................................................................ 21

*Polygram Records, Inc. v. Legacy Entertainment Group, LLC,*
77 U.S.P.Q.2d 1680 (Penn.Ct.App. 2006) ......................................................... 6

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
LOS ANGELES

## TABLE OF AUTHORITIES
### (continued)

Page

*Presley's Estate v. Russen*,
513 F. Supp. 1339 (D.N.J. 1981) .................................................................. 7, 11

*Pruneyard Shopping Ctr. v. Robins*,
447 U.S. 74 (1980) ............................................................................................. 10

*Rogers v. Grimaldi*,
875 F.2d 994 (2nd Cir. 1989) .......................................................................... 20

*Rosemont Enterprises, Inc. v. Urban Systems, Inc.*,
340 N.Y.S.2d 144 (Sup.Ct. 1973), modified and aff'd., 42 A.D.2d 544) (1st
Dept. 1973) ............................................................................................................. 6

*San Francisco Arts and Athletics ("SFAA") v. U.S. Olympic Committee
("USOC")*,
483 U.S. 522 (1987) ................................................................................... passim

*Shelley v. Kraemer*,
334 U.S. 1 (1948) ............................................................................................... 12

*Shulman v. Group W Productions, Inc.*,
18 Cal.4th 200 (1998) ....................................................................................... 21

*Solano v. Playgirl, Inc.*,
292 F.3d. 1087 (9th Cir. 2002) ........................................................................ 16

*Titan Sports, Inc. v. Comics World Corp.*,
870 F.2d 85 (2d Cir. 1989) ................................................................................. 5

*U.S. v. Eichman*,
496 U.S. 310 (1990) ............................................................................................. 8

*Uhlaender v. Henricksen*,
306 F. Supp. 1277 (D. Minn. 1970) .................................................................. 6

*United States v. Dahlstrom*,
713 F.2d 1423 (9th Cir. 1983) ........................................................................... 8

*United States v. Raymond*,
228 F.3d 804 (7th Cir. 2000) ............................................................................. 8

*Waits v. Frito-Lay, Inc.*,
978 F.2d 1093 (9th Cir. 1992)......................................................................... 11

*Ward v. Rock Against Racism*,
491 U.S. 781 (1989) ....................................................................................... 9, 14

*Winter Bros. v. DC Comics*,
30 Cal. 4th 881 (2003) ........................................................................ 16, 17, 18

*Yuba River Power Co. v. Nevada Irrigation District*,
279 P. 128 (Cal. 1929) ..................................................................................... 11

*Zacchini v. Scripps-Howard, Inc.*,
433 U.S. 562 (1977) ................................................................................... passim

### STATUTES

17 U.S.C. § 107 .................................................................................................. 17

36 U.S.C. § 380 .................................................................................................. 14

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
LOS ANGELES

**TABLE OF AUTHORITIES**
(continued)

Page

Cal. Civil Code § 344.1(b) ........................................................................................... 12

Cal.Civ.Code § 654 ..................................................................................................... 11

California Constitution Art. I ....................................................................................... 12

U.S. Constitution Amendment 4 ................................................................................... 12

U.S. Constitution Amendment 5 ................................................................................... 12

U.S. Constitution Amendment 14 ................................................................................. 12

**OTHER AUTHORITIES**

Chris Littmann, *EA Designer Talks About Vick in Madden*, August 17, 2009
  (http://www.sportingnews.com/blog/firstcuts/entry/view/30194/ea_designer_ta
  lks_about_vick_in_madden) ....................................................................................... 3

Chris Morris, *Madden: Video Game Blitz or Holiday Scramble?*, August 14, 2009
  (http://www.cnbc.com/id/32414801) ........................................................................ 3

*EA Reports Fourth Quarter and Fiscal Year 2009 Results*, May 5, 2009
  (http://investor.ea.com/releasedetail.cfm?ReleaseID=381903) ................................ 3

http://maddennfl.easports.com/glob. action?blogID=sim%20style%20gameplay. ........................ 4

http://software.palm.com/US/html/display_palm_product.jsp?id= prod26053 ............................. 4

J. Thomas McCarthy, *The Right of Publicity and Privacy* §§ 6.1 and 9.18 (2d ed.
  2009) ...................................................................................................................... 10

J. Thomas McCarthy, *The Rights of Publicity and Privacy*, § 8:23 .............................. 21

Mark S. Lee, "*Agents of Chaos: Judicial Confusion in Defining the Right of
  Publicity -- Free Speech Interface*," Loyola of Los Angeles Entertainment Law
  Review, Vol. 23, no. 3, pp. 471, 488-501 (2003) ..................................................... 8

Mark S. Lee, *Entertainment and Intellectual Property Law* § 16:12-20
  (Thomson/West 2006) ............................................................................................... 8

Mark S. Lee, *Entertainment And Intellectual Property Law*, 3:6-49 ............................ 10

*Nimmer on Freedom of Speech*, § 2.02 (1984) .......................................................... 21

*Restatement of the Law of Unfair Competition* (Third) § 46 ...................................... 10

Richard A. Posner, *Economic Analysis of Law*, § 3.3 (4th Ed. 1992) ......................... 11

Thomas McCarthy, *The Rights of Publicity and Privacy 2009* § 8:38 (2d Ed.) ........... 17

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.   INTRODUCTION

Speech may be free, but the resources needed to create it cost money. A Constitutional speaker may not want to spend that money. Does the First Amendment authorize one private party to simply take another's property to effectuate "speech" for its own commercial exploitation and profit? If so, when?

These are the questions that Electronic Arts, Inc.'s ("EA's") motions to dismiss and strike require this Court to answer, but which its moving papers seek to avoid. EA cannot take and use football players' or other athletes' likenesses – even under the guise of "free speech" – any more than it could take other third parties' tangible property under that guise. No court has accepted EA's argument that "successful" right of publicity claims are limited to advertisements, and EA can only make the argument by ignoring decades of Supreme Court and other authority which holds otherwise. EA's First Amendment arguments should be rejected because:

(1)   EA's actions are not protected pursuant to the "intermediate review" standard that the U.S. Supreme Court has established should apply in this case;

(2)   This Court should not follow the "transformativeness" test which EA advocates because it is inconsistent with U.S. Supreme Court authority, and this Court is bound by the U.S. rather than California Supreme Court, with regard to First Amendment analysis; and

(3)   Even under the "transformativeness" test and any other applicable standards, EA's unauthorized misappropriation of individuals' publicity rights in its video games is not protected by the First Amendment.

### A.   The Amici And Their Interests In This Suit.

Jim Brown is a former collegiate and professional football player who has been inducted into both college and professional football's Halls of Fame. Selected by the Sporting News as the greatest football player of all time, he parlayed the fame he gained through his extraordinary accomplishments and unique talent as a professional athlete into a career in entertainment and public service. He also presently is the plaintiff in a suit entitled *Jim Brown v. Electronic Arts, Inc., et al.*, Case No. CV 09-1598 (FMC) (C.D. Cal. 2009), in which he contends, *inter alia*, that

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
LOS ANGELES

1

AMICUS BRIEF IN OPPOSITION TO
DEFENDANT ELECTRONIC ARTS, INC'S
MOTION TO DISMISS

1   EA infringed his rights of publicity by using his identity in a video game without permission.

2   Similarly, Herb Adderley is a former collegiate and professional football player who

3   played on six world championship football teams and has been inducted into the professional

4   football Hall of Fame. He also is the class representative in a suit filed by a group of retired NFL

5   football players against the NFLPA entitled *Herbert Anthony Adderley vs. NFLPA*, Case

6   No. C 07-00943 (WHA) (N.D. Cal. 2009). In that suit, Mr. Adderley and other class members

7   claimed, among other things, that the National Football League Players Association ("NFLPA")

8   and its licensing arm, Players Inc, breached their fiduciary duties by failing to license the players'

9   publicity rights for use in EA's video games. Though EA was not a party to that lawsuit, its

10  practice of "scrambling" the images of retired NFL players in Madden was a hotly contested issue

11  during trial. "Scrambling" was what the class called EA's practice of using certain criteria –

12  including the player's height, weight, position and years in the league – to make the game appear

13  more authentic, while removing the player's name to make the player less recognizable.

14  Following a $28.1 million jury verdict in favor of the retired players, the parties in that

15  action entered into a tentative settlement agreement which expressly preserves the class members'

16  right to sue EA for its taking of their publicity rights. [1]

17  Messrs. Brown and Adderley submit this brief as individuals whose athletic images have

18  monetary value that they worked for years to build up. Many retired athletes are in the same

19  position as Messrs. Brown and Adderley but are of modest means and lack the resources to

20  submit a brief themselves. The interests of Messrs. Brown and Adderley and all other present and

21  retired collegiate and professional athletes could be significantly harmed if the Court granted

22  EA's motion to dismiss.

23  **B.     EA And Its Sports-Based Video Games.**

24  EA is a multibillion dollar videogame company. It distributes a number of sports-centered

25  video games, including but not limited to games involving NCAA and professional football

26

27  [1] On August 6, 2009, Judge William Alsup ordered that: "Any claims by class members, individually or as a class, against Electronic Arts or any other licensee of defendants concerning

28  misuse of their images or identities, including scrambling, will not be released by the settlement."

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
LOS ANGELES

2

AMICUS BRIEF IN OPPOSITION TO
DEFENDANT ELECTRONIC ARTS, INC'S
MOTION TO DISMISS

1    players. EA's net revenue for 2009 was $4.212 billion, up 15 percent as compared with $3.665

2    billion for the prior year. EA's "Madden NFL" videogame is among its two or three most

3    popular products – if not its most popular product. According to a recent report on CNBC.com,

4    "Madden typically makes up between 5 and 6 percent of EA's annual revenues, typically

5    generating sales somewhere in the neighborhood of $250 million."[2] In fiscal year 2009, EA had

6    31 titles that sold more than 1 million copies. By comparison, EA sold more than 5 million

7    copies of "Madden NFL" that same year.[3]

8        EA has always prided itself on the authentic nature of its "Madden NFL" and other sports-

9    related video games. Each version of "Madden NFL" features virtual versions of the same

10    football teams that exist for the then-current NFL season. Each version of "Madden NFL"

11    depicts approximately 1,500 current NFL players. To give one a sense of the lengths to which

12    EA will go in order to ensure that its game is as authentic and realistic as possible, EA announced

13    that it would be adding controversial quarterback Michael Vick to the Philadelphia Eagles' roster

14    in Madden NFL 10 within days of his signing with that team for the coming season.[4]

15        In addition to the then-current teams, EA also included for years "vintage" teams. EA's

16    "vintage" teams include some of the best and most popular football teams in NFL history,

17    including the 1984 San Francisco 49'ers, the 1985 Chicago Bears, the 1968 New York Jets, and

18    the undefeated 1972 Miami Dolphins. They also include the championship-winning 1967 Green

19    Bay Packers team on which Mr. Adderley played, and the famed 1965 Cleveland Browns team on

20    which Jim Brown played. With this feature, gamers could pit these "vintage" teams against each

21    other or against teams from the modern era. Whereas recent editions of "Madden NFL" have

22    included virtual depictions of about 1,500 current NFL players, the "vintage" teams depicted over

23    10,000 retired NFL players. Despite the popularity of this feature, EA announced in September

24

25

26

27

28

[2]   Chris Morris, *Madden: Video Game Blitz or Holiday Scramble?*, August 14, 2009 (http://www.cnbc.com/id/32414801).

[3]   *EA Reports Fourth Quarter and Fiscal Year 2009 Results*, May 5, 2009 (http://investor.ea.com/releasedetail.cfm?ReleaseID=381903).

[4]   Chris Littmann, *EA Designer Talks About Vick in Madden*, August 17, 2009 (http://www.sportingnews.com/blog/firstcuts/entry/view/30194/ea_designer_talks_about_vick_in _madden).

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
LOS ANGELES

3

AMICUS BRIEF IN OPPOSITION TO
DEFENDANT ELECTRONIC ARTS, INC'S
MOTION TO DISMISS

1   2009 – ten months after "scrambling" became a heated issue in the retired players' November

2   2008 trial – that it would no longer feature vintage teams in any of its forthcoming Madden NFL

3   games.

4        EA's "Madden NFL" and other sports games use a number of performance, appearance,

5   movement, skill and other criteria to permit each of the virtual players in the game to look, move,

6   act and perform just as the real NFL players did or do.  This allows EA to state in advertising that

7   its games "use real NFL teams, players and their stats."[5]  Gameplay specifics vary from game to

8   game, but ultimately, the object of all of EA's games is the same -- to use virtually photorealistic

9   digital animation to recreate, as authentically and realistically as possible, each featured player's

10  identity and performance as a member of the team on which he plays.  As EA game developer Ian

11  Cummings stated with regard to EA's development of "Madden NFL 10," the current version of

12  the game, "we've tried to make clear our vision for Madden -- one of authenticity, realism and

13  simulation ('sim').  There is no doubt that we all want to turn this game into the most realistic

14  version of Madden in history."[6]  After describing in detail the changes made in the game to

15  achieve that goal, he concludes by noting that "the NCAA team took all of these

16  improvements . . . for NCAA Football 10."  *Id.*

17       **C.**    **EA's Licensing History And Its Motion To Dismiss.**

18       EA has licensed the right to use all current NFL players' publicity rights in its game for

19  years.  It also has licensed from time to time the right to use certain retired players predominantly

20  for discrete marketing activities associated with the game.  Indeed, EA is contractually prohibited

21  from contacting any retired NFL players about using their rights without the NFLPA's consent,

22  thereby acknowledging that such players' rights are valid and necessary.

23       EA has not consistently licensed retired players' rights, though it used them to maintain

24  the realism and historical accuracy of its featured historic teams.  To conceal its actions with

25  regard to use of unlicensed retired players, EA has intentionally and superficially "scrambled"

26  their identities to obscure its taking.  However, despite the minor cosmetic changes made to such

27  [5]  http://software.palm.com/US/html/display_palm_product.jsp?id= prod26053.

28  [6]  http://maddennfl.easports.com/glob. action?blogID=sim%20style%20gameplay.

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
LOS ANGELES

4

AMICUS BRIEF IN OPPOSITION TO
DEFENDANT ELECTRONIC ARTS, INC'S
MOTION TO DISMISS

1  "scrambled" players, they remain immediately identifiable and their performance characteristics

2  remain unchanged, so that the virtual "historic teams" in which they are featured will perform, as

3  closely as possible, to the way in which the real historic teams performed.

4      Despite its licensing history, EA's motions to dismiss and strike argue, *inter alia*, that its

5  uses of players' identities in its video games are immune from liability because they constitute

6  "speech" under the First Amendment, going so far as to argue that "successful" right of publicity

7  claims only involve use in "advertisements." (EA Motion to Dismiss 15-16; Motion to Strike

8  18-19.) Even though the present action relates only to EA's NCAA-oriented sports games (which

9  do not feature *Amici*), acceptance of EA's arguments would mean that EA could use for free the

10  identity of thousands of present and former collegiate and professional athletes, eliminating any

11  legal reason for EA to continue any licensing, and giving it a windfall worth hundreds of millions

12  of dollars.

13      EA's argument disregards both traditional First Amendment jurisprudence and decades of

14  case law which holds that exploitation of an individual's publicity rights in creative works can be

15  actionable under the First Amendment. EA's motion instead mashes up cases from different

16  jurisdictions which apply different legal standards to different factual situations to claim virtually

17  absolute "free speech" protection. EA's First Amendment arguments lack merit and should be

18  rejected as described below.

19  **II.  MANY COURTS HAVE HELD THAT A DEFENDANT'S USE OF AN**
**INDIVIDUAL'S PUBLICITY RIGHTS IN WORKS THAT INCLUDE "SPEECH"**
20  **CONSTITUTES INFRINGEMENT**

21      This Court should reject out-of-hand EA's argument that "successful" right of publicity

22  claims are limited to "advertising." No court has accepted that argument, while many courts,

23  including the U.S. Supreme Court, have rejected it for decades.

24      Historically, many courts rejected First amendment defenses and found uses of sports

25  figures' and others' identities in potentially "expressive" media infringing where the primary

26  purpose of the use was to commercially exploit, rather than communicate information about, the

27  celebrity. Many of these holdings applied to sports games and similar products. For example,

28  *Titan Sports, Inc. v. Comics World Corp.*, 870 F.2d 85 (2d Cir. 1989) held that a non-advertising

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
LOS ANGELES

5

AMICUS BRIEF IN OPPOSITION TO
DEFENDANT ELECTRONIC ARTS, INC'S
MOTION TO DISMISS

poster inside a magazine triggered right of publicity liability despite "newsworthy" information on the poster. *Rosemont Enterprises, Inc. v. Urban Systems, Inc.*, 340 N.Y.S.2d 144 (Sup.Ct. 1973), modified and aff'd., 42 A.D.2d 544) (1st Dept. 1973) rejected an argument that a board game which used Howard Hughes' name and likeness was a "medium of free speech," and granted plaintiff summary judgment on its right of publicity claim. *Uhlaender v. Henricksen*, 306 F. Supp. 1277 (D. Minn. 1970), rejected a First Amendment defense and held that a board game which used the names and statistics of hundreds of baseball players violated their rights of publicity. *Palmer v. Schonhorn Enterprises, Inc.*, 72 A.2d 458 (N.J. 1967), held that a board game that utilized the names and images of Arnold Palmer, Jack Nicklaus, and other golfers was not a protected form of free expression, and held defendant liable for violating plaintiffs' right of publicity.

The meritless nature of EA's argument in the face of these holdings was confirmed by the Supreme Court in *Zacchini v. Scripps-Howard, Inc.*, 433 U.S. 562 (1977), when the Supreme Court rejected a television station's claim that it had a First Amendment right to broadcast a "human cannonball's" performance during its news program, instead holding that the television station violated his right of publicity.

Following *Zacchini*, many lower courts have held infringing or potentially infringing the unauthorized taking and use of an individual's identity or performance even when the performance is embodied in a creative work on various legal grounds. *See, e.g., Paris Hilton v. Hallmark Cards*, ___ F.3d ___, 2009 WL 2710225 (9th Cir. August 31, 2009) (use of Paris Hilton's image on a gift card could infringe her publicity rights notwithstanding the card's expressive nature); *Facenda v. NFL Films, Inc.*, 542 F.3d 1007 (3rd Cir. 2008) (unauthorized use of narrator's voice in "Making of Madden NFL 06" video could violate his right of publicity; use neither protected speech nor preempted by copyright law); *Polygram Records, Inc. v. Legacy Entertainment Group, LLC*, 77 U.S.P.Q.2d 1680 (Penn.Ct.App. 2006) (heirs of Hank Williams owned publicity rights in musical performances he recorded during his lifetime); *Gridiron.com v. National Football League Players Association,* 106 F.Supp.2d 1309, 1315 (S.D.Fla. 2000) (website's use of players' images and playing statistics in violation of licensing agreement

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
LOS ANGELES

6

AMICUS BRIEF IN OPPOSITION TO
DEFENDANT ELECTRONIC ARTS, INC'S
MOTION TO DISMISS

1  violated the players' rights of publicity and not protected free speech); *National Football League*

2  *Properties v. Playoff Corp.*, 808 F. Supp. 1288, 1294 (N.D. Tex. 1992) ("purchasers, while

3  buying a <u>Sports Illustrated</u> primarily for newsworthy information, would be likely to buy

4  [defendant's football trading cards] for possible appreciation in value and for their ability to

5  trade . . . Defendant's First Amendment defense does not mitigate against a finding of likelihood

6  of success on the merits"); *Apple Corps. Ltd. v. Leber*, 229 U.S.P.Q. 1015

7  (Cal.App.Dept.Super.Ct. 1986) (producers of unauthorized "Beatlemania" theatrical production

8  violated the Beatles' rights of publicity and not protected speech); *Groucho Marx Productions,*

9  *Inc. v. Day and Night Co., Inc.*, 523 F. Supp. 485, 491 (S.D.N.Y. 1981) (defendant's unauthorized

10  imitation of a Marx Brothers' performance violated their rights of publicity and not protected

11  speech); *Presley's Estate v. Russen*, 513 F. Supp. 1339 (D.N.J. 1981) (theatrical production which

12  imitated a live "Elvis Presley" show violated the Presley Estate's right of publicity and is not

13  protected speech).

14       "Successful" right of publicity claims therefore are certainly <u>not</u> limited to

15  "advertisements." Instead, they may be brought against those who use publicity rights in

16  expressive works in appropriate circumstances. How these courts have reconciled free speech

17  and the right of publicity in such circumstances is described below. Examining traditional First

18  Amendment jurisprudence and right of publicity/free speech cases illustrates why EA's conduct

19  in misappropriating players' identifies and performances in its games is not privileged here.

20  **III.  SPEECH DOES NOT AUTOMATICALLY IMMUNIZE INFRINGING OR
21       OTHERWISE UNLAWFUL CONDUCT**

22       Every court to consider the issue has recognized that "the First Amendment is not a

23  license to trammel on legally recognized rights and intellectual property," since otherwise, one

24  could always utilize another's intellectual property on "free speech" grounds without liability for

25  copyright, trademark or right of publicity infringement. *Dallas Cowboy Cheerleaders, Inc. v.*

26  *Scoreboard Posters, Inc.*, 600 F.2d 1184, 1188 (5th Cir. 1979). Since there cannot be absolute

27  free speech immunity for taking other's intellectual property, lower courts have developed a

28  variety of different, and sometimes inconsistent, standards, guidelines and approaches to

Manatt, Phelps &
Phillips, LLP
Attorneys At Law
Los Angeles

7

AMICUS BRIEF IN OPPOSITION TO
DEFENDANT ELECTRONIC ARTS, INC'S
MOTION TO DISMISS

reconcile the expressive and property interests at issue. The complex nature of this case law has, on occasion, engendered judicial confusion on how best to reconcile the free speech/right of publicity interface.[7]

## A.    Individuals And Companies Can Be Held Criminally And Civilly Liable For Actionable "Speech" Under Traditional First Amendment Analysis.

Although speech is "free," the act of engaging in speech does not automatically immunize one from legal liability for misconduct under traditional First Amendment jurisprudence. Many crimes or torts embody speech but are not protected by the First Amendment.

For example, there is no Constitutional right to make fraudulent misrepresentations, even though such misrepresentations are usually made through "speech." *See, e.g.*, *New York Times Co. v. Sullivan,* 376 U.S. 254, 287-88 (1964); *Levi Strauss & Co. v. Shilon*, 121 F.3 1309, 1312-13 (9th Cir. 1997). There is no Constitutional right to solicit murder or offer a bribe to a public official, even though those crimes are "speech." *Levi Strauss, supra,* 121 F.3d at 1312-13. There is no Constitutional right to tell someone how to build a bomb or violate tax laws. *United States v. Raymond,* 228 F.3d 804-815 (7th Cir. 2000); *United States v. Dahlstrom*, 713 F.2d 1423, 1428 (9th Cir. 1983). While burning one's <u>own</u> flag can be "speech," burning someone <u>else's</u> flag or other property to "communicate" unhappiness with the property owner would not be protected by the First Amendment. See *U.S. v. Eichman*, 496 U.S. 310, 322 (1990) (Stevens, J., dissenting) ("The communicative value of a well-placed bomb in the Capital does not entitle it to the protection of the First Amendment.").

---

[7]    Surveying all relevant right of publicity/free speech jurisprudence is beyond the scope of this brief, but among the approaches developed by various courts are: (1) the "merchandise versus media" result; (2) the "fair use" test and its "transformativeness" variant; (3) defamation law's "malice" standard; (4) an *ad hoc* "balancing" approach; (5) "relatedness" test; (6) the "alternative means" test, pursuant to which a defendant may not use another's intellectual property if there are "alternative means" to communicate the message; and (7) the "predominant use" test, pursuant to which use of publicity rights in an expressive work will be held actionable if the predominant purpose of the use was to exploit rather than make an expressive comment about the person depicted. *See* Mark S. Lee, *Entertainment and Intellectual Property Law* § 16:12-20 (Thomson/West 2006); Mark S. Lee, "*Agents of Chaos: Judicial Confusion in Defining the Right of Publicity -- Free Speech Interface,*" *Loyola of Los Angeles Entertainment Law Review*, Vol. 23, no. 3, pp. 471, 488-501 (2003). (For purposes of full disclosure, please note that these citations were authored by one of Amici's counsel.)

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
LOS ANGELES

8

AMICUS BRIEF IN OPPOSITION TO
DEFENDANT ELECTRONIC ARTS, INC'S
MOTION TO DISMISS

Absent criminal or property concerns, traditional First Amendment jurisprudence generally evaluates the nature of the speech and the restriction on speech to determine whether the speech can properly be deemed illegal. *See, e.g., Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989). "Pure" speech generally receives the highest degree of First Amendment protection, but even it can be regulated without "strict scrutiny" review if the regulation is "content neutral." *Id.* at 798. "Content neutral" restrictions receive an intermediate level of review. *Id.* at 798-800. "So long as the means chosen are not substantially broader than necessary to achieve the government's interest . . . the regulation will not be invalid" under this standard. *Id.* at 800.

"Content neutral" restriction on speech is defined as follows: "A regulation that serves purposes unrelated to the content of expression is deemed neutral, even if it has an incidental effect on some speakers or messages but not others." *Id,* at 791; *see also, Hill v. Colorado*, 530 U.S. 703, 707-08, 725-26 (2000). "[S]o long as the...regulation promotes a substantial government interest that would be achieved less effectively absent the regulation," content-neutral restriction on speech is permissible, though the regulation may not "burden substantially more speech than is necessary to further the government's legitimate interests." *Ward v. Rock Against Racism, supra*, 491 U.S. at 799.

**B.      There Is No First Amendment Right To Take And Use Others' Property.**

It cannot be argued with a straight face that the First Amendment would permit someone to steal the money or computer equipment needed to create a videogame. *See Grant v. Esquire, Inc.*, 367 F. Supp. 876, 883 (S.D.N.Y. 1973) ("Nobody would seriously contend that artistic need would authorize a painter to walk into a supply store and help himself to whatever he might require"). Consistent with this principle, the U.S. Supreme Court has repeatedly ruled that the First Amendment does not permit the use of another's real property to engage in speech against the property's owner's wishes. *See Lloyd Corp. v. Tanner*, 407 U.S. 551, 567 (1972) (political leafleters had no federal speech rights in a privately owned shopping mall; "time, place and manner" restrictions on speech approved); *Hudgens v. National Labor Relations Board*, 424 U.S. 507, 520-21 (1976) (First Amendment did not require a privately-owned shopping center to permit picketing on its premises because the right to own private property encompassed the right

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
LOS ANGELES

9

AMICUS BRIEF IN OPPOSITION TO
DEFENDANT ELECTRONIC ARTS, INC'S
MOTION TO DISMISS

1  to prohibit unwanted "speech").

2       According to the Supreme Court, the only circumstance in which real property can be

3  used to promote speech occurs when the private property has been granted rights so extensive that

4  it, in effect, serves a governmental function and operates as a public forum. *See Marsh v.*

5  *Alabama*, 326 U.S. 501, 506-09 (1946).[8] The Supreme Court has utilized more nuanced

6  approaches to First Amendment disputes which involve intellectual property, but has been

7  respectful of publicity rights in the face of First Amendment defenses as described below.

8      **C.**   **The Right of Publicity Is A Form Of Intellectual Property That Deserves Constitutional Protection.**

9

10       **1.**   **The Right of Publicity Protects Our Ability To Prevent Unauthorized Exploitation Of Our Identities And Performances**

11     The "right of publicity" describes an individual's right to control commercial exploitation

12 of his or her identity and performances. It was first recognized in *Haelan Laboratories, Inc. v.*

13 *Topps Chewing Gum, Inc.*, 2002 F.2d 866 (2d Cir. 1953) *cert. denied*, 346 U.S. 816 (1953), when

14 a court held for the first time that baseball players had a right to stop the unauthorized commercial

15 appropriation of their likenesses and playing statistics on baseball cards. *Haelan* started a judicial

16 and legislative movement which recognizes an economic right in one's identity that has been

17 overwhelmingly accepted throughout the United States.[9]

18     "[T]he rationale for [protecting the right of publicity] is the straightforward one of

19 preventing unjust enrichment by the theft of goodwill. No social purpose is served by having a

20 defendant get free some aspect of the plaintiff that would have market value for which he

21

22   [8]   However, state statutes or constitutional provisions may afford additional access to property to effectuate speech under the state's police power, consistent with state's general ability to define

23 property. *See Pruneyard Shopping Ctr. v. Robins*, 447 U.S. 74, 81 (1980). The California Supreme Court has clarified that under California state law that private property may be used to

24 effectuate speech only where there is both state action and the property has become a public forum. *See Golden Gateway Center v. Golden Gateway Tenants Association*, 29 P.3rd 797, 810

25 (Cal. 2001).

26   [9]   A right of publicity for living persons has been recognized in over 40 states, a right of publicity for deceased people has been recognized in about 18 states, and the right of publicity

27 has been accepted by the American Law Institute's restatement. *See Restatement of the Law of Unfair Competition* (Third) § 46; J. Thomas McCarthy, *The Right of Publicity and Privacy* §§ 6.1

28 and 9.18 (2d ed. 2009); Mark S. Lee, *Entertainment And Intellectual Property Law, supra*, 3:6-49;. No U.S. court has ever rejected a right of publicity for living persons.

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
LOS ANGELES

10

AMICUS BRIEF IN OPPOSITION TO
DEFENDANT ELECTRONIC ARTS, INC'S
MOTION TO DISMISS

1  [defendant] would normally pay." *Zacchini v. Scripps-Howard Broad. Co., supra*, 433 U.S. at

2  576. The right of publicity recognizes that, in our culture of celebrity, an individual's identity can

3  attain significant commercial value through extraordinary accomplishments in the arts, sports,

4  politics, or other actions of public interest, and that such commercial value will be harmed by the

5  unauthorized and uncontrolled commercial exploitation of others. *See McFarland v. Miller*, 14

6  F.3d 912, 919 (3d Cir. 1994); *Matthews v. Rosencraft*, 15 F.3d 432, 438 N.2 (5th Cir. 1994);

7  Richard A. Posner, *Economic Analysis of Law*, § 3.3 (4th Ed. 1992).

8                  **2.      The Right Of Publicity Protects An Individual's Performance**

9         An individual's "identity" has at least two significant aspects for right of publicity

10  purposes. The most common involves the taking of some indicia of a person's identity, such as

11  his or her name, likeness, voice, etc. to enhance the attractiveness of a commercial product or

12  service. *Zacchini, supra*, 433 U.S. at 573.

13        The second, and more important, aspect of publicity rights involves an individual's

14  performance. The Supreme Court has emphasized that taking an individual's performance "may

15  be the strongest case for a 'right of publicity' -- involving, not the appropriation of an

16  entertainer's reputation to enhance the attractiveness of a commercial product, but the

17  appropriation of the very activity by which the entertainer acquired his reputation in the first

18  place." *Zacchini, supra*, 433 U.S. at 573. Many courts since *Zacchini* have found that the

19  unauthorized taking of an individual's performance as described above constitutes infringement.

20  *Facenda, supra*; *Apple Corps, supra; Groucho Marx Productions, supra; Presley's Estate, supra*.

21                  **3.      The Right of Publicity Is Constitutionally Protected Property**

22        "Property" has been defined as "everything which one person can own and transfer to

23  another." *Yuba River Power Co. v. Nevada Irrigation District*, 279 P. 128, 129 (Cal. 1929); *see*

24  *also* Cal.Civ.Code § 654. The right of publicity has been recognized as "property" by both statute

25  and case law for this reason. *See, e.g., Waits v. Frito-Lay, Inc.*, 978 F.2d 1093, 1100 (9th Cir.

26  1992) ("Waits' voice appropriation claim is one for invasion of a <u>personal</u> <u>property</u> <u>right</u>: his right

27  of publicity control or use of his identify as embodied in his voice") (emphasis added); *Michaels*

28  *v. Internet Entertainment Group*, 5 F. Supp.2d 823, 838 (C.D. Cal. 1998) ("[a] celebrity's

Manatt, Phelps &
Phillips, LLP
Attorneys At Law
Los Angeles

11

AMICUS BRIEF IN OPPOSITION TO
DEFENDANT ELECTRONIC ARTS, INC'S
MOTION TO DISMISS

1  property interest in his name and likeness is unique..."); (emphasis added) *Am. Econ. Rens. Co. v.*

2  *Reed Bowens*, 852 F. Supp. 875, 879-80 (N.D. Cal. 1994) (stating that dilution and right of

3  publicity claims involved property rights; Cal. Civil Code § 344.1(b) (West 2009) ("[t]he rights

4  recognized under this section of property rights, freely transferable, in whole or in part . . . .".]).

5  The fact that an individual's right of publicity (which, in this case, includes an athlete's physical

6  characteristics and performance) can be bought, sold, or licensed to companies such as EA

7  confirms that publicity rights are property rights.

8       The fact that the right of publicity is property is important, because it means that publicity

9  rights are entitled to Constitutional protection. The United States Constitution generally leaves it

10  to the states to define what property is, but several Constitutional provisions recognize and protect

11  private property rights once the state defines them.[10] For example, the Fourth Amendment

12  prohibits unreasonable searches and seizures of private property. U.S. Constitution Amendment

13  4. The Fifth and Fourteenth Amendments prohibit the taking of property without the due process

14  of law. *Id.* Amendments 5, 14. State constitutions routinely articulate specific property rights.

15  *See e.g.*, California Constitution Art. I (recognizing that all persons have the inalienable right to

16  acquire, possess and protect property).

17       This does not mean that the state can never regulate an individual's enjoyment of his or

18  her property.[11] However, all restrictions on private property are only exercisable *by the state*,

19  after appropriate administrative, legislative or judicial procedures. No statute or constitutional

20  provision permits a private party to take another's property, even when the party justifies the

21  taking to exercise a perceived right.[12] Generally one private party cannot take another's property,

22  [10]  In rare circumstances, substantive constitutional limitations, such as equal protection
guarantees and the concept of substantive due process, will restrict the ability of either state or

23  federal governments to limit rights and property. *See Shelley v. Kraemer*, 334 U.S. 1, 23 (1948)
(concluding that the government could not enforce rights in real property which violated the equal

24  protection clause of the Fourteenth Amendment).

25  [11]  Under the Fourth Amendment, the taking of property by the state is permitted, for example,
upon a showing of probable cause that the property may evidence a crime. Eminent domain

26  proceedings also permit the taking of private property so long as proper compensation is paid.
Further, use of private property can be restricted in certain circumstances by zoning or other laws

27  without qualifying as a "taking" under the Constitution.

28  [12]  To the contrary, elaborate mechanisms have been created to prevent such conduct by
punishing the perpetrators and compensating the victims. Theft, robbery, burglary,

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
LOS ANGELES
    12    AMICUS BRIEF IN OPPOSITION TO
DEFENDANT ELECTRONIC ARTS, INC'S
MOTION TO DISMISS

1  except through a meritorious litigation.

2  **D.   EA's Alleged Misconduct Is Not Protected "Speech" Under The Standards That Should Apply To This Action.**

3

4  **1.   The Supreme Court's "Intermediate Review" Standard Should Apply To EA's Alleged Misconduct.**

5  EA argues that its conduct meets the California Supreme Court's "transformativeness test"

6  and thus is protected under the First Amendment. But it is the U.S. Supreme Court, not the

7  Supreme Court of California, whose prior decisions must govern the outcome of this dispute.

8  Specifically, two U.S. Supreme Court decisions establish the standards that this Court should

9  apply in evaluating EA's First Amendment defense.

10  *Zacchini v. Scripps-Howard Broadcasting Co., supra,* held that a "human cannonball's"

11  interest in protecting the economic value of his performance was more important than the

12  television station's First Amendment rights, such that broadcasting the performance on the

13  evening news without permission violated his right of publicity. The Supreme Court stated:

14      The Constitution no more prevents a state from requiring
        respondent to compensate petitioner for broadcasting his act on
15      television than it would privilege respondent to film and broadcast a
        copyrighted dramatic work without liability to the copyright
16      owner . . .

17  433 U.S. at 573.

18  The Supreme Court emphasized that its holding applied to athletic and other similar

19  performances, stating:

20      [W]e are quite sure that the First and Fourteenth Amendments do
        not immunize the media when they broadcast a performer's entire
21      act without his consent. The Constitution no more prevents a state
        from requiring respondent to compensate petitioner for
22      broadcasting his act on television than it would privilege respondent
        to film and broadcast a copyrighted dramatic work without liability
23      to the copyright owner . . . or to film and broadcast a prize fight . . .
        or a baseball game . . . where the promoters or the participants had
24      other plans for publicizing the event.

25  433 U.S. at 575 (emphasis added and internal citations omitted).

26  _____

27  embezzlement, larceny, and extortion, which involve the unauthorized private taking of other's
    property, are crimes. There are civil equivalents—trespass, conversion, negligence, fraud and
    other torts which permit an individual whose property has been damaged, interfered with, or
28  misappropriated to obtain equitable and legal relief to stop the interference and recover damages.

13

AMICUS BRIEF IN OPPOSITION TO
DEFENDANT ELECTRONIC ARTS, INC'S
MOTION TO DISMISS

1          The Supreme Court expanded on the standards that this Court should apply to First

2    Amendment defenses in right of publicity and similar intellectual property actions in *San*

3    *Francisco Arts and Athletics ("SFAA") v. U.S. Olympic Committee ("USOC")*, 483 U.S. 522

4    (1987), a case which involved a right directly analogous to the right of publicity.  In *SFAA*, an

5    organization claimed a First Amendment right to use the statutory "Olympic" mark in the title

6    "Gay Olympic Games" because, SFAA alleged, it was "political speech."  The USOC's rights in

7    this statutory Olympic mark are directly analogous to a right of publicity because, contrary to

8    most trademark actions but consistent with the right of publicity, no likelihood of confusion need

9    be shown for the USOC to prevail on a statutory "Olympics" mark claim.  *See* 36 U.S.C. § 380 *et*

10   *seq.*

11         In rejecting SFAA's First Amendment defense, the Supreme Court viewed the intellectual

12   property statute as a "content neutral" restriction on speech, stating:

13                 [T]he restrictions on expressive speech properly are characterized
              as incidental to the primary congressional purpose of encouraging

14                 and rewarding the USOC's activities.  The appropriate inquiry is
              thus whether the incidental restrictions on First Amendment

15                 freedom are greater than necessary to further a substantial
              governmental interest . . . .

16

17   *SFAA*, *supra*, 483 U.S. at 536-37 and n. 16 (citations and footnotes omitted and emphasis added).

18   The Supreme Court characterized this as an "intermediate review" standard in *Ward v. Rock*

19   *Against Racism*, 491 U.S. 781, 798 (1989) (under "intermediate review" standard, regulation of

20   speech is permissible "so long as the regulation promotes a substantial government interest that

21   would be achieved less effectively absent the regulation").

22         In explaining why the First Amendment did not permit SFAA to use the "Olympic" mark

23   in the title of its event, the Supreme Court in SFAA stated:

24                 The SFAA's expressive use of the word [Olympic] cannot be
              divorced from the value USOC's efforts have given to it.  The mere

25                 fact that SFAA claims an expressive, as opposed to a purely
              commercial purpose does not give it a First Amendment right to

26                 appropriate to itself the harvest of those who have sown . . . The
              USOC's right to prohibit use of the word "Olympic" in the

27                 promotion of athletic events is at the core of its legitimate property
              interests.

28

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
LOS ANGELES

14

AMICUS BRIEF IN OPPOSITION TO
DEFENDANT ELECTRONIC ARTS, INC'S
MOTION TO DISMISS

1    *SFAA v. USOC, supra*, 483 U.S. at 541 (citations and footnotes omitted). This Supreme Court

2    authority is, of course, binding on all federal courts, and should govern this case.

### 2. EA's Conduct is Actionable Under the Supreme Court's "Intermediate Review" Standard.

5      The "regulation on speech" EA claims here is incidental to the substantial government

6    interest in protecting individuals' constitutionally protected property interests in the commercial

7    value of their identities. That government interest would be achieved far less effectively without

8    a right of publicity. EA's actions should not be protected by the First Amendment for this reason.

9      A ruling against EA would not preclude it from producing and distributing football or

10    other sports-related videogames. EA could create videogames with fictional figures and teams,

11    and could continue to use official NFL teams with appropriate permission from the trademark

12    owners. However, EA should not be able to do what it actually has done, that is, free-ride off of

13    the goodwill created by the extraordinary athletic accomplishments of thousands of real people.

14    EA should not be able to simply take their identities and performances to enhance the "reality" of

15    its videogame without permission. EA's claim to "speech" "does not give it a First Amendment

16    right to appropriate to itself the harvest of those who have sown . . .." *SFAA v. USOC, supra,* 43

17    U.S. at 541. This is especially so because EA has taken players' football "performances" to

18    virtually recreate the real teams on which they actually played. EA therefore seeks to profit from

19    "the very activity by which the entertainer [i.e., retired player] acquired his reputation in the first

20    place." *Zacchini, supra,* 433 U.S. at 573. Retired players' ability to protect their performances

21    "is at the core of" their "legitimate property interests," and is more important than any incidental

22    restriction on speech caused by this "content neutral" regulation. *SFAA v. USOC, supra,* 43 U.S.

23    at 541.

### 3. The "Transformativeness" Test Should Not Apply.

25      EA does not mention the Supreme Court Authority cited above, but instead focuses on one

26    of seven lower court standards, namely the California Supreme Court's "transformativeness test,"

27    to argue that its conduct should be protected under the First Amendment. Its arguments lack

28    merit for several reasons.

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
LOS ANGELES

15

AMICUS BRIEF IN OPPOSITION TO
DEFENDANT ELECTRONIC ARTS, INC'S
MOTION TO DISMISS

1    **First,** this Court need not and should not rely on a state court to articulate federal

2    Constitutional law when the Supreme Court has done so. Both *Comedy III Productions v.*

3    *Saderup,* 25 Cal. 4th 387 (2001), and *Winter Bros. v. DC Comics,* 30 Cal. 4th 881 (2003),

4    articulate that state court's views on the First Amendment to the U.S. Constitution.[13]

5    Notwithstanding EA's misleading claims, neither *Comedy III* nor *Winter* even mentions the

6    California Constitution, let alone purports to apply California Constitutional law. Although this

7    court should of course show deference to the California Supreme Court on state law issues, this

8    Court is bound by rulings of the U.S. Supreme Court and Ninth Circuit Court of Appeals on

9    matters of federal constitutional law. Federal courts have routinely ignored state court

10   pronouncements on federal constitutional issues for this reason. *Cf., e.g., John Doe v. TCI*

11   *Cablevision,* 110 S.W. 3d 363 (Mo. S.Ct. 2003) (describing the Missouri Supreme Court's

12   adoption of a "predominant use" test to evaluate Missouri right of publicity/free speech disputes)

13   and *C.B.C. v. Distribution & Marketing, Inc. v. Major League Baseball Advanced Media, L.P.,*

14   505 F.3d 818, 823 (8th Cir. 2007) (Eighth Circuit Court of Appeals ignores the Missouri Supreme

15   Court's "predominant use" test in evaluating a "free speech" defense to a Missouri right of

16   publicity claim, instead following a "balancing" test it had previously adopted).

17   **Second,** the most recent Ninth Circuit Court of Appeals decision to address this issue has

18   expressly "taken no position" on whether the "transformativeness" test or some other test should

19   be used to evaluate a First Amendment defense to a right of publicity claim. *Hilton v. Hallmark,*

20   *supra,* 2009 WL 2710225 at *14 n. 11. Earlier Ninth Circuit panels in different factual settings

21   have articulated very different standards to evaluate First Amendment defenses to right of

22   publicity claims that have nothing to do with the "transformativeness" test.[14]

---

[13]   Other state Supreme Courts have adopted very different standards. *See, e.g., John Doe v.*
*TCI Cablevision,* 110 S.W.3d 363 (Mo. S.Ct. 2003).

[14]   Three panels of the Ninth Circuit Court of Appeals have applied defamation's "malice"
standard to evaluate First Amendment defenses to right of publicity claims involving newspaper
or magazine features. *See Solano v. Playgirl, Inc.,* 292 F.3d 1087 (9th Cir. 2002); *Hoffman v.*
*Capital Cities/ABC, Inc.,* 255 F.3d 1180 (9th Cir. 2001); *Eastwood v. The National Enquirer,*
123 F.3d 1249 (9th Cir. 1997).

Those cases are factually distinguishable because they involved magazine uses and, in two
cases, defamation-based claims. Further, they do not mention and are inconsistent with Supreme
Court Authority. *Zacchini* discussed at length the difference between right of publicity claims

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
LOS ANGELES

16

AMICUS BRIEF IN OPPOSITION TO
DEFENDANT ELECTRONIC ARTS, INC'S
MOTION TO DISMISS

1   **Third,** with all due respect to the California Supreme Court, the "transformativeness" test

2   it articulated is both inconsistent with the U.S. Supreme Court's "intermediate review" standard

3   described above, and insufficiently sensitive to the property interests inherent in the right of

4   publicity, especially the performance right of publicity. The California Supreme Court took only

5   one of the copyright law's four "fair use" factors to articulate its "transformativeness" standard.

6   *Cf.* 17 U.S.C. § 107 and *Comedy III Productions, supra*, 25 Cal.4th at 404-05. However,

7   commentators have advised against attempting to adopt copyright law's four "fair use" factors in

8   right of publicity cases because they do not readily lend themselves to right of publicity claims.[15]

9   *See, e.g.*, Thomas McCarthy, *The Rights of Publicity and Privacy 2009* § 8:38 (2d Ed.). Further,

10  the "transformativeness" test does not weigh the four, fact-specific factors by which courts

11  evaluate "fair use" in a nuanced way. Instead, under the California Supreme Court standard, a

12  "transformative" use (whatever that is), automatically requires a ruling for defendant no matter

13  how much of an individual's identity is taken or how adverse the taking of that individual's

14  publicity rights is on the value of what was taken.

15       Finally, California's "transformativeness" test has already proven problematic in practice.

16  The California Supreme Court had to accept for review and reverse the first lower court decision

17  to apply its "transformativeness" test, implying at least discomfort with the consequences of its

18  formulation. *Winter v. DC Comics*, 30 Cal.4th 881 (2003).

19

20

---

21  and defamation claims, stating that "the differences between these two torts are important."
    *Zacchini, supra*, 433 U.S. at 571-73. The Supreme Court later flatly stated that the "actual malice
22  standard does not apply to the tort of appropriation of a right of publicity." *Hustler Magazine v.
    Falwell*, 485 U.S. 46, 52 (1988). EA has not argued that the "malice" standard should apply here.

23  [15] For example, one of copyright law's fair use factors, "the nature of the copyrighted work,"
24  would generally not be helpful in right of publicity analysis because the identity rights involved
    would usually be of the same "nature." Another factor, "the amount of substantiality of the
25  portion used in relation to the copyrighted work as a whole," also would not generally be
    meaningful, since by definition there must be a taking of an individual's "identity" before right of
26  publicity liability attaches. A third factor, "the effect of the use upon the potential market for or
    value of the copyrighted work" would always favor a finding of infringement, since the Supreme
27  Court in *Zacchini* establishes that uncompensated taking of an individual's publicity rights
    virtually always has an adverse impact on the market for commercial exploitation of the
28  celebrity's image.

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
LOS ANGELES

17

AMICUS BRIEF IN OPPOSITION TO
DEFENDANT ELECTRONIC ARTS, INC'S
MOTION TO DISMISS

**4.    EA Would Be Liable Under the "Transformativeness" Test Even If It Did Apply.**

EA's actions are not immune from liability even under the "transformativeness" test, because EA has not made a "transformative" use of individuals' identities or performances under California law.  To the contrary, the whole point of EA's use is to duplicate, as closely as possible, the actual identities and performances of the players depicted in its games.  Simply inserting a duplicative simulation into a work cannot make the use "transformative."  That is what was done in *Zacchini*, when a television station inserted an individual's performance into a news broadcast which included other elements, and the U.S. Supreme Court found such actions infringing.

EA's practice of "scrambling" athletes' images is nothing more than an intentional, self-defeating attempt to be transformative.  EA made a conscious attempt to "transform" the athletes who appear in its games by including certain information but removing other information, such as names.  However, this intentional exercise was self-defeating from the start because the more EA attempted to "transform" the athletes, the less its games could be considered realistic and authentic.  Unlike the half-worm, half-human comic book character in *Winter*, the athletes in EA's "Madden NFL" and other sports-related games could never be sufficiently altered under the "transformative test", or else the games would lose their hallmark of authenticity.

In order to escape this result, EA claims that "the focus is *not* on whether the plaintiff's likeness within the work has been transformed physically, but whether the work *as a whole* is transformative."  (EA Motion to Dismiss 10; Motion to Strike 14.)  So long as the athletes are only one element of what EA claims is a complex video game, EA cannot be held liable for using their rights. [16]  This cannot and should not be the law.

**First,** just as the athletes who are featured in "Madden NFL" and EA's other sports-related games are non-transformative, so too are the games themselves.  EA highlights the fact

---

[16] It is worth noting that the "Madden NFL" game used the rights of over 10,000 "scrambled" retired NFL player compared to the approximately 1,500 active NFL players for whom EA had a license.

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
LOS ANGELES

18

AMICUS BRIEF IN OPPOSITION TO
DEFENDANT ELECTRONIC ARTS, INC'S
MOTION TO DISMISS

1   that its games include original game elements and realistic sounds, "such as the crunch of football

2   pads, the swish of basketball nets, licensed fight songs for many of the college teams, and play-

3   by-play commentary describing the action." (EA Motion to Dismiss 10; Motion to Strike 15.)

4   EA cites these features as examples of how its games are transformative. To the contrary, each of

5   these features is designed to make the game more realistic, not more creative.

6          **Second**, it is indisputable that EA cannot use actual photographs of the athletes who are

7   featured in its games without their permission. Even EA knows this or else it would not have

8   sought to "scramble" the images of those athletes for whom it does not have a license in the first

9   place. But if EA's interpretation of the "transformative test" is correct, nothing will prevent EA

10  from using those athletes' actual images in future editions of its games, regardless of whether it

11  has a license.

12         The lack of "transformativeness" in EA's use of athletes' identities and performances in

13  its videogame is confirmed by the Ninth Circuit's recent *Paris Hilton* decision, which held that

14  use of Paris Hilton's image and a characteristic phrase from a television performance with which

15  she was associated was not "transformative" even though the message and meaning in the card

16  was different from what was intended in Paris Hilton's original performance, because "the

17  version of Hilton in Hallmark's card . . . does almost exactly what Hilton did" in her original

18  television performances. *Hilton v. Hallmark Cards, supra*, at 2009 WL 2710225 at *11-12. The

19  Ninth Circuit held that this meant that Hallmark's use was not transformative as a matter of law,

20  because Hilton "has at least some probability of prevailing on the merits before the trier of fact."

21  *Id.* Even under California Supreme Court's "transformativeness" test as interpreted by the Ninth

22  Circuit, therefore, this Court cannot rule that EA's use of players' identities and performances is

23  "transformative" as a matter of law.

24         **5.    The "Balancing" Test Should Not Apply, but EA Would Be Liable For
               Its Misconduct if It Did**

25

26         EA does not specifically invoke an *ad hoc* "balancing" test, but it relies heavily on several

27  decisions which applied that test to support its motion. *See C.B.C. Distribution and Marketing,*

28  *Inc. v. Major League Baseball Advanced Media, LP, supra*; *CBS Interactive, Inc. v. National*

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
LOS ANGELES

19

AMICUS BRIEF IN OPPOSITION TO
DEFENDANT ELECTRONIC ARTS, INC'S
MOTION TO DISMISS

1    *Football League Players Association, Inc.*, 2009 WL 1151982 (D.Minn. April 28, 2009); and

2    *Gionfriddo v. Major League Baseball*, 94 Cal. App. 4th 400 (2001), cited in EA's motion to

3    dismiss at 2, 12, 13, 14, and 18. This Court should not apply that test, or follow the above-cited

4    cases which do, for several reasons.

5    **First**, those decisions should be disregarded to the extent they are inconsistent with the

6    U.S. Supreme Court's *Zacchini* and *SFAA* decisions. Those cases give little indication of even

7    being aware of that Supreme Court authority, and they certainly made no effort to follow it.

8    **Second**, a "balancing" test has not been adopted by the Ninth Circuit Court of Appeals in

9    the right of publicity setting. The Ninth Circuit has most recently held that it takes "no position"

10   on the appropriate speech/publicity standard. *Paris Hilton, supra*, at 2009 WL 2710225 at *14,

11   n. 11.[17] Further, some lower courts in the Ninth Circuit have recognized that the "balancing" test

12   is inconsistent with that Supreme Court authority. *Dr. Seuss Enterprises, LP v. Penguin Books*

13   *USA, Inc.*, 924 F. Supp. 1559, 1571-72 (S.D. Cal. 1996), aff'd, 109 F.3d 1394 (9th Cir. 1997).

14   **Third**, though it has now been cited by a number of other circuits in the right of publicity

15   setting, the "balancing" approach is ultimately unsupported by authority. The first decision to

16   apply a "balancing" test was *Rogers v. Grimaldi*, 875 F.2d 994 (2nd Cir. 1989). However,

17   *Rogers* cites no authority to support the approach it develops; to the contrary, it acknowledged

18   Supreme Court authority which articulated an "alternative means" test in other factual settings but

19   declined to follow it, and it barely mentioned and did not follow the Supreme Court's *SFAA*

20   decision issued only two years before. *Rogers v. Grimaldi, supra*, 875 F.2d at 1000. Further, an

21   Eighth Circuit decision which adopted the "balancing" test in that circuit implicitly acknowledged

22   the lack of authority for its position, relying on dissents from previous cases to "support" the

---

[17] Some Ninth Circuit panels have accepted the "balancing" approach in the trademark setting.
*See, e.g., ESS Entertainment 2000, Inc. v. Rock Star Videos, Inc.*, 547 F.3d 1095 (9th Cir. 2008);
*Mattel, Inc. v. MCA Records, Inc.*, 296 F.3d 894 (9th Cir. 2002). However, three previous panel
decisions adopted three different standards to evaluate the trademark/free speech interface,
namely a "likelihood of confusion" standard, see *Dr. Seuss Enterprises, LP v. Penguin Books
USA, Inc.*, 109 F.3d 1394 (9th Cir. 1997); defamation's "malice" standard; see *Hoffman v.
Capital Cities/ABC, Inc.*, 255 F.3d 1180 (9th Cir. 2001), and the "alternative means" test.
*International Olympic Committee v. San Francisco Arts and Athletics*, 781 F.2d 733, 737 (9th
Cir. 1986), aff'd other grounds, *SFAA v. USOC, supra*. Thus, Ninth Circuit law on this issue in
the trademark area might best be described as unsettled.

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
LOS ANGELES

20                    AMICUS BRIEF IN OPPOSITION TO
                      DEFENDANT ELECTRONIC ARTS, INC'S
                      MOTION TO DISMISS

1     position it adopted. *Cardtoons L.C. v. Major League Baseball Players Ass'n*, 95 F.3d 959 (10th
2     Cir. 1996).

3          **Fourth**, although "balancing" implies fairness and describes in the broadest sense what a
4     court in this area must do, in practice "balancing" is unanchored by any meaningful evaluative
5     criteria, and often amounts to little more than a Rorschach test for a particular judge's
6     philosophical predilections. It has been criticized by commentators in the copyright and
7     trademark fields for these reasons. See *Nimmer on Freedom of Speech*, § 2.02 (1984); J. Thomas
8     McCarthy, *The Rights of Publicity and Privacy*, § 8:23. Judicial application of the approach
9     confirms the propriety of these criticisms; courts' "balancing" right of publicity or other
10    intellectual property rights have either applied criteria that are not amenable to case-by-case
11    determination or arrived at inconsistent and apparently irreconcilable results. *See, e.g., Parks v.*
12    *LaFace Records*, 329 F.3d 437 (6th Cir. 2003) (use of name "Rosa Parks" as title of song which
13    included lyric "everybody to the back of the bus" might infringe her rights of publicity and not be
14    protected speech under the "balancing" approach); *ETW Court v. Jireh Pub., Inc.*, 332 F.3d 915
15    (6th Cir. 2003) (use of image of Tiger Woods in painting held protected speech under the
16    "balancing" approach); *cf. Comedy III v. Saderup, supra* (defendant's creation and use of artistic
17    poster of "the Three Stooges" not protected speech under California's "transformativeness" test).

18          **Fifth**, *ad hoc* "balancing" can itself chill speech by creating legal uncertainty as to what
19    speech is or is not permitted. *Shulman v. Group W Productions, Inc.*, 18 Cal.4th 200, 225-26
20    (1998) ("balanc[ing] interest in an ad hoc fashion in each case is not desirable"). Standards which
21    give guidance avoid "chilling" speech by encouraging clarity as to the speech that is or is not
22    permitted. (*Id.*)

23          **Sixth**, EA is liable here even under a properly applied "balancing" test, as the *Zacchini*
24    and *SFAA* decisions demonstrate. EA has taken the "most important" and most valuable aspect of
25    thousands of football players' and other athletes' identities, namely their athletic performances,
26    and added them to its game for the specific purpose of enhancing the game's value to consumers.
27    The rights players developed through their participation in "athletic events is at the core of
28    [their] . . . legitimate property interests." *SFAA, supra*, 453 U.S. at 541. Nothing prevents EA

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
LOS ANGELES

21

AMICUS BRIEF IN OPPOSITION TO
DEFENDANT ELECTRONIC ARTS, INC'S
MOTION TO DISMISS

from creating a football game that does not infringe on those individuals' rights. Just as the defendant in *Zacchini* could not take a performer's act and use it in a television program without permission, EA should not be able to take athletes' performances and insert them in its games without compensating them for that use. EA's alleged "expressive use . . . cannot be divorced from the value . . . [these athletes'] efforts have given to it." *SFAA, supra*, 483 U.S. at 541. "The Constitution no more prevents a state from requiring [EA] to compensate [athletes] for [using their performances in games] than it would privilege [EA] . . . to film and broadcast a prize fight . . . or a baseball game" without permission. *Zacchini, supra*, 433 U.S. at 575. EA's alleged expressive purpose "does not give it a First Amendment right to appropriate to itself the harvest of those who have sown." *SFAA, supra*, 483 U.S. at 541.

## IV.  CONCLUSION

This Court should rule that EA cannot rely on the First Amendment to avoid liability for its exploitation of players' identities and performances for all the reasons described above. Any other result would unjustly enrich EA at the expense of athletes like Messrs. Brown and Adderley, who devoted years of hard work to reach the highest levels of achievement.

Dated: September 28, 2009            MANATT, PHELPS & PHILLIPS, LLP


By: /s/ Mark S. Lee
    Mark S. Lee
    *Attorneys for Amici,*
    JAMES "JIM" BROWN AND
    HERBERT ANTHONY ADDERLEY