IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| HERBERT ANTHONY ADDERLEY, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>NATIONAL FOOTBALL LEAGUE PLAYERS ASSOCIATION, a Virginia corporation, and NATIONAL FOOTBALL LEAGUE PLAYERS INCORPORATED d/b/a PLAYERS INC., a Virginia corporation,<br><br>Defendants.<br>　　　　　　　　　　　　　　　　　　　／ | No. C 07-00943 WHA<br><br>**ORDER RE ATTORNEY'S FEES, COSTS, AND COMPENSATION FOR CLASS REPRESENTATIVE ON CLASS ACTION SETTLEMENT** |

**INTRODUCTION**

In this certified class action of retired NFL players, the class prevailed at trial against their union and the case settled on appeal for $26,250,000. The settlement has been finally approved. Counsel now move for an award of attorney's fees and costs in excess of nine million dollars — more than 34 percent of the value of the settlement. This excessive amount is not warranted. Accordingly, the motion for attorney's fees and costs is approved in the lower amount of $4,930,000 for fees — twenty percent of the value of the settlement minus expenses — and $1,600,000 for costs. The awarded fees and costs together equal approximately 25 percent of the total value of the settlement. Plaintiff's motion for an extra payment for class representative Herbert Adderley is approved in part.

**STATEMENT**

Plaintiff Herbert Adderley is a retired National Football League player. He brought this action on behalf of all retired NFL players who signed standardized group licensing agreements, or GLAs, with the National Football Players Association, a Virginia corporation that acts as the labor union for players in the NFL but, for purposes of this action, was simply a marketing agent for the former players. Plaintiff alleged that the NFLPA breached the GLA with its retired members, and breached a fiduciary duty to pursue licensing opportunities on their behalf. The details of the case can be found in prior orders (*see, e.g.*, Dkt. Nos. 78 and 133).

Two law firms were appointed class counsel: Manatt Phelps and Phillips, LLP, and Mckool Smith PC. Manatt is a large litigation firm based in Los Angeles with offices nationwide including San Francisco. Mckool is a medium-sized firm based in Dallas with five other offices across the country.

A jury trial in October 2008 culminated in a $28.1 million verdict in favor of the class for breach of fiduciary duty. This was $7.1 million in compensatory damages and $21 million in punitive damages. The jury also found a breach of contract but awarded zero damages on that claim. Defendants appealed and the case settled before decision for $26,250,000. Back in the district court, the settlement was preliminarily approved in August 2009 and a final approval hearing was held on November 19, 2009 (Dkt. No. 635). Numerous objections were filed by former players, mostly complaining about class counsel. A separate order has approved the settlement. This order addresses most but not all of the fees and expenses sought by counsel. Class counsel now move for approval of an award of attorney's fees and costs.

**ANALYSIS**

Class counsel here requests an award of attorney's fees in the amount of $7,369,648.90, or thirty percent of the value of the settlement minus expenses. Counsel also requests reimbursement of expenses in the amount of $1,684,503.67, and a so-called "incentive payment" of $60,000 for Mr. Adderley. In total, plaintiff's motion requests $9,114,152.57 — approximately 35 percent of the settlement. This would leave $17,135,847.43 for class members.

2

**1. ATTORNEY'S FEES.**

Counsel are correct that when determining attorney's fees, courts apply the method required, if any, by the law governing the substantive claims at issue in the action. *Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1047 (9th Cir. 2002). The law of the District of Columbia was applied in this case. The substantive law of the District of Columbia is administered by the Superior Court of the District of Columbia and the District of Columbia Court of Appeals. Counsel asserts that the District of Columbia uses the percentage-of-the-fund method to determine attorney's fees in common fund cases. However, no decisions from the Superior Court of the District of Columbia or the District of Columbia Court of Appeals have been cited. Instead, counsel have cited to decisions of the United States Court of Appeals for the District of Columbia Circuit and to district court decisions from within that circuit. The decisions of those courts are *not* decisions of the Superior Court of the District of Columbia nor of the Court of Appeals of the District of Columbia. In reading the federal decisions cited, none of them purported to apply District of Columbia law. Nonetheless, this order will adopt the percentage-of-the-fund method as requested by counsel.

There appears to be no standard method under District of Columbia law for applying a percentage-of-the-fund analysis. For district courts applying the percentage-of-the-fund method — at least for cases arising under federal law — the Ninth Circuit has "established twenty-five percent of the recovery as a 'benchmark' for attorneys' fees calculations." *Powers v. Eichen*, 229 F.3d 1249, 1256 (9th Cir. 2000). Assuming this applies here, "[t]he benchmark percentage should be adjusted . . . when special circumstances indicate that the percentage recovery would be either too small or *too large* in light of the hours devoted to the case or *other relevant factors*." *Six Mexican Workers v. Ariz. Citrus Growers*, 904 F.2d 1301, 1311 (9th Cir. 1990) (emphasis added).

**A. THE LODESTAR.**

Before turning to the performance of counsel, the lodestar will be examined. The lodestar is said to be $7,784,868.13. This figure, however, is bloated by the presence of too many lawyers at trial, hearings and depositions, and by the use of too many timekeepers in general. This case

required the presence of no more than two attorneys at hearings and depositions — yet counsel routinely had three or more. It required no more than three attorneys each day at trial — yet counsel had *eight* attorneys present on a daily basis. Additionally, the two firms seek to recover fees accumulated by 37 total timekeepers (attorneys and paralegals) — fourteen from Manatt and 23 from Mckool.[1] This is a high number, and it indicates a likelihood of waste through duplication of effort and time spent getting up to speed on the case. In the Court's own experience, the litigation of this case required no more than four lawyers per firm plus appropriate paralegal support.

The top four attorneys from Manatt were Ryan Hilbert, Ronald Katz, Laura Franco, and Chad Hummel. The top four legal assistants were Donna Wishon, Keysha Hunt, Karen Sloane, and Daniel Crim. The total fees sought for the work of these eight individuals is $3,574,353. The top four attorneys from Mckool were Lewis LeClair, Jill Naylor, Brett Charhon, and Anthony Garza. The top four remaining timekeepers were Karen Sherrill, Betty Sanders, Suzie Bovine, and Omar Moreno. The total fees sought for the work of these eight individuals is $3,172,975.38. The total fees sought for the top sixteen timekeepers between the two firms is $6,747,328.38.

A downward adjustment of $247,162 is required to account for the excessive fees incurred by the presence of more than two attorneys at depositions and hearings, and the presence of more than three attorneys at trial on a daily basis.

When adjusted for only the most obvious waste as described above, counsel's lodestar is approximately $6,500,166.38. This figure is almost $1.4 million less than the figure asserted in counsel's motion — and less than the award sought by counsel.

In the Court's judgment, the 21 depositions and eight hearings in this case could have and should have been covered by $500,000 or less, including preparation time. The investigation and review of documents and interviews should have taken at most another $500,000 in time. The preparation of summary judgment, preparation for trial after the close of discovery, and the trial itself should have cost no more than $1.5 million. This totals $2.5 million. Admittedly this

---

[1] Upwards of seventy total timekeepers worked on this case between the two firms, but counsel do not seek reimbursement for all of them.

4

1  figure does not take into account time spent on the appeal. But even if this number is off by a
2  factor of two, it still is hard to justify the larger lodestar spent by counsel. Part of the lodestar
3  excess is undoubtedly due to having two law firms instead of a single firm on the case, by having
4  so many lawyers present in hearings, depositions, and at trial, and by having so many lawyers
5  cycling in and out of the case.

### B. COUNSEL'S PERFORMANCE.

Turning to their performance, counsel list a number of factors favorable to an award. *First*, counsel argue that despite defendants' "arduous efforts and numerous lawyers," they achieved a "momentous jury verdict of $28.1 million" and "successfully negotiated a resolution of this case on terms that are in the best interests of the class" (Br. 6). *Second*, counsel contend that no class members have made any "substantial objections" to the fees requested (*id.* at 6–7). Since the filing of plaintiff's motion, however, the Court has received 53 objections. Many of these objections are not from class members; most are simply a signed form letter originally written by a non-class member, and none objects specifically to the amount sought in attorney's fees — but it is worth noting the sheer number of objections as an indication that there is some displeasure with the settlement. *Third*, counsel assert that considering the amount of work performed, the "innumerable obstacles" overcome, and the caliber of opposing counsel, "the quality of their representation is reflected by the excellent results" (*id.* at 7–8). *Fourth*, counsel argue that the requested award is supported by the fact that counsel prevailed on most of the "novel and complex issues related to liability, damages and class certification" (*id.* at 8). *Fifth*, counsel contend that they "undertook grave risk of nonpayment of millions of dollars" (*ibid.*). *Sixth*, counsel detail the "substantial time and effort" expended in the course of investigating and filing the complaints, preparing motions and oppositions, producing and reviewing documents, taking depositions, preparing experts, trying the case, responding to defendants' post-trial motions and the subsequent appeal, and negotiating a settlement agreement (*id.* at 8–13). *Seventh*, counsel argue that an award of thirty percent is within the "normal range of recovery," and that such an award is typical of other similar common fund actions (*ibid.*). *Finally*, counsel assert that the requested award is further supported by the "noteworthy public

5

value" arising from the "message" this case sent to unions that they "*must* take care of [their] members, active or retired" (*id.* at 14).

The Court is reluctant to voice any criticisms of the performance of counsel and does so only because of their overreaching on the fee issue. While Peter Parcher's trial work on behalf of the class was admirable, he came in late and only for trial. He had to deal with the record made by his colleagues and that record was problematic in two important respects. These shortfalls likely reduced the size of the verdict awarded by the jury and consequently had a negative impact on the final value of the settlement, as follows:

### (1) Counsel's Failure to Lay the Proper Foundation for "Critical" Evidence.

A key fact issue all along was whether there was any demand to license group rights of retired players. Defendants said no, there wasn't, analogizing them to "dog food" at one point. Third-party discovery, however, revealed an email chain (marked at trial as Exhibit 1184) that should have led to powerful and admissible evidence in favor of the class. In the Court's judgment, class counsel should have pursued this lead with vigor. Instead, class counsel simply hoped the entire email chain — expressly labeled as "critical" even by class counsel — would somehow come into evidence. But it did not, being obvious hearsay. The details now follow.

Electronic Arts, Inc., was defendants' single most important licensee. Mainly, it wanted to use images and identities of *active* players. EA dealt with defendants as to active players with respect to its series of Madden NFL video games. As for retired players, class counsel demonstrated at trial that EA's Madden NFL games had a feature that allowed users to play with "vintage teams." EA, however, had "scrambled" the true names of the former players on these teams — many of whom were class members — by using made-up names (or no names at all). This much got into evidence.

What did *not* get into evidence was the most critical part of the controversial email chain. Again, the email chain was produced in third-party discovery by EA. Most of the email entries in the chain — and *all* of the entries that mattered — were written by an EA officer, Jeremy Strauser. Strauser's email made at least two statements supposedly summarizing what had been said to him by defendants.

6

The email chain began with Strauser at EA asking LaShun Lawson at Players, Inc., whether defendants would object to the display of retired players' statistical records in EA's Madden NFL football game (TX 1184 at EA000156):

> I know that Players INC doesn't want us to include any retired players "in the game" — but in this case given that it is factual, real [world] information that is readily available, our hope is that you would agree with us that this particular feature is made much stronger by including text display of the record data.

In the subsequent reply, there was no direct response on this issue from Lawson (her only response was to request that Strauser "call" her because "this is a little gray as it relates to rights"). Significantly, therefore, there was no admission from her that Strauser had accurately stated Player, Inc.'s position regarding the use of retired players (*id.* at EA000155). This part of the email chain was allowed in during counsel's examination of EA officer Joel Linzner regarding whether EA, as a company, understood the position of Players, Inc., to be that no retired players were to be used in EA games (Oct. 29 Tr. 1257–58). But on its own, outside of this context, this statement was inadmissible as hearsay (since its only relevance and importance would have been to prove the truth of the statement).

Later in the chain, in a message sent internally to other EA employees, Strauser characterized defendants' response to EA's request (TX 1184 at EA000153):

> They said "no" to this despite my attempts to convince them otherwise. They have taken a hard line on no retired players in the game in any form.

At the final pretrial conference, the Court requested supplemental briefing on the extent to which Strauser's internal email statement was admissible. Class counsel promised to provide a brief "because the admissibility of this document [was] *critical*" (Oct. 15 Tr. 86) (emphasis added).

Following the submission of these briefs, the Court explained that the proper foundation had not been laid for admission of the email into evidence. The Lawson parts of the email chain were, of course, "party admissions" and thus admissible but these snippets alone admitted nothing. The "critical" passages were all written by a non-party, Jeremy Strauser. These passages purported to put words, indeed, important words, in defendants' mouths — but for that

7

very reason they were classic hearsay. Since Lawson did not acknowledge or adopt or agree with any of these words, there was, to repeat, no party admission. As for the later passage stating "[t]hey have taken a hard line on no retired players in the game in any form," this statement did not even go to Lawson and was all the more classic hearsay.

Given that class counsel represented that this email chain was "critical" (*ibid.*), it was clear that class counsel should have called Strauser as a witness either live at trial or by deposition and developed the same lines of testimony, using the email to impeach as necessary. The Court so stated on the record (Oct. 21 Tr. 246). Another option conceivably available to counsel was to call a qualified EA employee to establish, if true, that it was a regular practice within the company to send emails to co-workers summarizing conversations with outside parties, among other requirements, thus laying the foundation for the email chain to be admitted under the business records exception of FRCP 803(6). Indeed, counsel called Joel Linzner, an officer of EA, and even questioned him about other parts of Exhibit 1184 — but counsel made no attempt to use Linzner to establish the existence of the business records exception.[2] Counsel should not have gambled on somehow getting Strauser's "critical" statements into evidence. There was no good reason for this failure. Since this evidence went directly to the only theory on which the jury awarded damages, this evidence would likely have enlarged the award.

**(2) Counsel's Failure to Present a Plausible Damages Theory on Plaintiff's Claim For Breach of Fiduciary Duty**.

In the same vein, but even more troubling, counsel wholly failed to present a damages assessment at trial keyed to a breach of fiduciary duty. The only damages theory presented related to the breach-of-contract claim. Here are the details.

Two claims were certified in this class action and presented to the jury at trial: (1) breach of contract; and (2) breach of fiduciary duty. As previously discussed, the jury found for plaintiff on both claims, but awarded damages *only* for defendants' breach of fiduciary duty. For both claims, class counsel presented *only one damages theory*. The theory was based *entirely* on the argument that the retired players were entitled to share equally with the *active* players in the

---

[2] Exhibit 1184 was redacted to omit the hearsay.

8

"gross licensing revenue pool." This was an extravagant theory, for it argued that the *retired* players should get as much as the *active* players in dividing up the "gross licensing revenue pool." If this gambit had succeeded it would have been terrific for the retired players, but the jury (sensibly) rejected this form of gross overreaching.

Problem was, counsel presented no alternative theory of damages based on the breach of fiduciary duty alone. Class counsel's damages expert, Mr. Rowley, acknowledged this to be the case (Nov. 3 Tr. 1937–38) (emphasis added):

> Q. You've given the jury *no basis* to calculate any damages if they find that retired players are not entitled to active player licensing money and all the money in the [gross licensing revenue] pool is active player licensing money, correct?
>
> A. If those two assumptions are true, then, yes.

Class counsel failed to present *any* alternative damages theory tailored to plaintiff's claim for breach of fiduciary duty to market the images and identities of class members. Again, counsel's damages expert, Mr. Rowley, admitted as much at trial (*id.* at 1915–16) (emphasis added):

> Q. . . . Have you done *any analysis* of specifically how much the retired players would have earned for their rights if they had been more aggressively marketed, just on [the breach of fiduciary] claim separately?
>
> A. No.

The Court itself observed and noted to counsel at trial that the lack of an alternative damages theory left the jury very little to work with for purposes of calculating a damages award solely on the claim for breach of fiduciary duty (Nov. 5 Tr. 2472–73).

Ordinarily, counsel should have and would have presented an assessment of how much a group license (for the retired players) would have fetched in the market had a sports agent gone to the market and tried faithfully to market the group rights. For reasons unknown, counsel presented no evidence, expert or otherwise, on this issue. During Rule 50 argument, the Court recognized this omission, referring by way of illustration to a fictitious agent, "Mr. Hollywood" (Nov. 5 Tr. 2469) (emphasis added):

> [T]hey could have gone out and hired Mr. Hollywood to be their group licensing agent [and tried] to make their own deals . . . [H]ad Mr. Hollywood gone out to do that, what would be the plausible range of potential royalties that such a group license

9

would have commanded in the market? *There's no evidence on this point*.

There was strong evidence supporting the breach of fiduciary duty claim. Indeed, the jury found that defendants' *had a fiduciary duty* to market the group rights of class members, and the evidence showed defendants did not so much as lift a finger to meet that duty. But counsel presented no coherent evidence or expert testimony to the jury regarding what the *actual value* of the retired players' group rights would have been had they been actively marketed. This was a highly controverted omission and left the jury at sea to construct its own number. On plaintiff's Rule 50 post-trial motion, the Court cobbled together sporadic elements in the record from which the verdict's damages figure might have been justified — but it was, admittedly, a very close call (Dkt. No. 605).

In the end, the jury's compensatory damages award of $7.1 million for breach of fiduciary duty was diminutive in comparison to the massive amounts that licensees of defendants paid for *active* player group rights, illustrating the jury's clear rejection of class counsel's "luxurious" damages theory. Although the jury's verdict was supported by the various items in evidence, the undersigned is convinced that the lack of a plausible, common-sense damages theory based on defendants' failure to market retired players' group rights had a negative effect on the class' final recovery. Attorneys in a case like this should have and would have normally presented such an assessment. The failure to do so here prejudiced the recovery.

\*       \*       \*

Thus, Attorney Parcher was forced to try a case with two problems of his own co-counsel's making. Counsel obtained a decent result and deserve praise for doggedly pursuing this case. The verdict should have and would have been more but for these problems. The undersigned has great respect for counsel. The only reason these criticisms are raised at all is because counsel are overreaching in their fee request and the undersigned feels obliged to explain why counsel do not deserve so much.

Counsel requests a fee award of thirty percent of the value of the settlement minus expenses. For the reasons described above, this figure is simply too high. In this Court's judgment, counsel here deserve a fee award of twenty percent of the value of the settlement

10

1  minus expenses. When combined with the expense reimbursement discussed below, counsel is
2  receiving approximately 25 percent of the value of the settlement. This figure adequately
3  compensates counsel for the work performed in this action, a reasonable fee in light of the
4  ultimate recovery obtained for the class, and is reasonable in light of the missed opportunity for
5  an even greater recovery.

### 2. EXPENSES.

Counsel have requested to be reimbursed for expenses in the amount of $1,684,503.67. But discrepancies between the reductions counsel claim to have made and the amounts ultimately sought cast doubt on the validity of some of counsel's claimed expenses. Additionally, the completely disorganized manner in which much of counsel's supporting documentation was presented severely hampered any efforts to verify the accuracy of counsel's submissions. Accordingly, this order awards most, but not all, of the expenses for which counsel seek reimbursement.

At the hearing, the Court voiced concerns about some of the discrepancies in counsel's expense submissions. As just one example, in their effort to avoid seeking reimbursement for overly luxurious travel, counsel claimed to have deleted *all* of Attorney Peter Parcher's airfare (Katz Decl. ¶ 52). But the Court found that reimbursement was still being sought for at least three of his flights, two of which were first-class trips costing upwards of $2,500 each (Katz Exh. D). In response to the Court's concerns, counsel stated that there was "a lot of paper" involved in their submissions, and acknowledged that they may have made mistakes in preparing their request for reimbursement. After appearing unsure as to whether Attorney Parcher's airfare and similar expenses had been completely written off or merely reduced, counsel invited the Court to itself "write off" any expenses it deemed inappropriate or unsupported.

The Court has a duty under FRCP 23 to protect the interests of the class. Considering both the lack of organization of counsel's submissions and the discrepancies present therein, a reduction is warranted to avoid inappropriately reimbursing counsel for unsupported expenses from the recovery available to the class. Accordingly, counsel are entitled to reimbursement for expenses in the lower amount of $1,600,000.

11

### 3. COMPENSATION FOR MR. ADDERLEY.

For many decades, class actions preceded fairly and with excellent results without ever giving "incentive payments" to class representatives. Incentive payments are a device introduced in recent years by lawyers. While in theory these payments compensate the representative for time and effort expended in support of the class, there is a huge risk that these payments are an incentive to entice a representative to support a marginal settlement:

> [E]xcessive payments to named class members can be an indication that the agreement was reached through fraud or collusion. Indeed, if class representatives expect routinely to receive special awards in addition to their share of the recovery, they may be tempted to accept suboptimal settlements at the expense of class members whose interests they are appointed to guard.

*Staton v. Boeing Co.*, 327 F.3d 938, 975 (9th Cir. 2003) (citations and quotations omitted). If the settlement alone is not good enough for the representative, it is likely not good enough for the class. As a matter of prudence, this Court is very reluctant to give a class representative more than class members. But considering the fact that this case did not settle until after a lengthy trial — and the unusual burden these circumstances placed on Mr. Adderley — the Court does believe he is entitled to additional payment in the amount of $10,000. This is not an "incentive" fee. Rather, it is compensation for the many hours Mr. Adderley spent representing the class.

### CONCLUSION

For all the above-stated reasons, plaintiff's motion for attorney's fees and expenses is approved in the amount of $4,930,000 for fees and $1,600,000 for expenses, to be divided by counsel in proportion to their submitted lodestar (as to fees) and expenses (as to costs). Compensation for Mr. Adderley is approved in the amount of $10,000.

**IT IS SO ORDERED.**

Dated: November 23, 2009.

                                      WILLIAM ALSUP
                                      UNITED STATES DISTRICT JUDGE